**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P

§
§   Case No. **19-34054-sgj11**

**The Dugaboy Investment Trust - Appellant**

§
vs.                                                           §                    **3:25-CV-01876-K**

**Highland Capital Management, L.P; et al** - Appellee

§
§

[4297] **Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025**

# Volume 5

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj |
| | § | |
| Reorganized Debtor. | § | |
| | § | *INDEX* |

## APPELLANT THE DUGABOY INVESTMENT TRUST'S AMENDED STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Pursuant to Rule 8009 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4311] on July 14, 2025; and having filed *Appellant The Dugaboy Investment Trust's Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* [Docket No. 4365] on August 11, 2025 in the above-captioned case; and having received correspondence from the Bankruptcy Clerk's Office [Docket No. 4367] asking Dugaboy to correct certain errors in its August 11, 2025 submission [Docket No. 4365]; hereby submits this *Amended Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.  **Did the Bankruptcy Court err in approving the settlement agreement and release entered into between the Highland Entities and the HMIT Entities pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure as being fair, equitable, and in the best interest of the estate?**

2.  **Did the Bankruptcy Court err by approving a settlement agreement utilizing an improper valuation methodology and without sufficient supporting evidence?**

3.  **Did the Bankruptcy Court err in approving the overly broad and vague release provisions contained within the settlement agreement?**

4.  **Did the Bankruptcy Court err in approving the settlement agreement without allowing adequate time for the Cayman Islands Joint Official Liquidators to complete their investigation?**

5.  **Did the Bankruptcy Court err in concluding Mark Patrick had the requisite corporate authority to enter into and bind the HMIT entities to the settlement agreement?**

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow, August 13, 2025.

*Vol. 1*

*000001*
1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4311] filed by Appellant;

*000010*
2. *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4297];

*000014*
3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| *000625* | 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| *000786* | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *000809* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an |

3

*vol. 2*

| | | | |
|---|---|---|---|
| *000807* | | | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *000832* | 5/20/2025 | 4218 | Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust(Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust(Attachments: # 1 Exhibit A-- Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |
| *000838* | 5/22/2025 | 4221 | Amended Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust(Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust(Attachments: # 1 Exhibit A-- Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery |

| | | | |
|---|---|---|---|
| *Vol. 2*<br>*000 844* | 6/9/2025 | 4228 | Motion for expedited hearing on Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion Filed by Partner Dugaboy Investment Trust (related document #4227 (Attachments: #1 Proposed Order Granting Motion for Expedited Hearing (Hesse, Gregory) Modified linkage on 6/10/2025 (mdo). |
| *000 849* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *000 857* | 6/10/2025 | 4232 | Response opposed to (related document(s): 4227 Motion to extend time to Time to Respond to Trusts' Motion filed by Partner Dugaboy Investment Trust, 4228 Motion for expedited hearing (related documents 4216 Motion to compromise controversy) on Emergency Motion for an Order Extending Duration of Time to Respond To Trusts' Motion filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| *000 863* | 6/10/2025 | 4234 | Reply to (related document(s): 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) to (I) Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion and (II) Motion for Expedited Hearing on Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *000 867* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *000 869* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 3*<br>*000 871*<br>*Thru   Vol 13* | 6/20/2025 | 4255<br><br>*(to be submitted to* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to |

*Vol. 3*
*Starts with*
*0008 71 —*

*Thru Vol EMD*
*Vol 1.3*

| | Clerk on flash drive) | | Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| *Vol. 14*  *003528* | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis |

*of*

6

| | | | |
|---|---|---|---|
| *Vol 14* 003531 | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart,#3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 15* 003851 | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| 003875 | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| 004002 | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| 004017 | 6/23/2025 | 4276 | Reply to (related document(s)): 4223 Objection filed by Creditor The Dugaboy Investment Trust) filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| 004019 | 6/24/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *Vol. 16* 004236 | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |

| | | | |
|---|---|---|---|
| *Vol. 16*<br><br>*0004247* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |
| *0004287* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *0004272* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *0004276* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust). Entered on 6/27/2025 (Okafor, M.) |
| *0004288* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 |

*Vol. 16*

| | | | |
|---|---|---|---|
| | | | Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *0004295* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *0004302* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *0004304* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *0004313* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *0004315* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *0004311* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of |

| | | | |
|---|---|---|---|
| *Vol. 16* | | | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *Vol. 17* *004684* | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| *004700* | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M. |
| *004812* | 8/4/2025 | 4353 | Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A (Harper, Geoffrey) |
| *004834* | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| | | | |

Dated: August 12, 2025             Respectfully submitted,

WINSTON & STRAWN LLP

By: /s/ Geoffrey S. Harper

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500

10

(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 12, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10.    <u>General Release By The Highland Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise)() and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11.    <u>Further Provisions Concerning The General Releases</u>.

(a)    **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b)    To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland

001371
HCMLPHMIT00000809

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)     Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein.  Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)     As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in <u>Sections 9 and 10</u>, should:

(i)     any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this

001372

HCMLPHMIT00000810

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)    any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.    <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)    Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)    Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)    For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.    <u>Representations and Warranties</u>.

(a)    Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)    The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the

4923-8662-5850.9 36027.003
001373
HCMLPHMIT00000811

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)    Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)    Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.    <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT ~~Releasors~~Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland ~~Releasors~~Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.    <u>Gatekeeper Standard</u>.

(a)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10~~53~~4 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities <u>and any Persons claiming through, under or on behalf of any of them,</u> and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party

001374
HCMLPHMIT00000812

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test.", " and that the dismissal of the Pending Litigation shall have res judicata effect.

16.    <u>Indemnification</u>.

(a)    Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)    Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

001375
HCMLPHMIT00000813

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

17.    Execution.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.    Bankruptcy Court Order.  The allowance of This Agreement and the allowed HMIT Class 10 Interest pursuant to Section 4 transactions contemplated hereby is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest entry of a Final Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby in a substantially similar amount form and on substantially similar terms as set forth in Section 4 herein to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.    Fees and Expenses.   Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to Section 18.  Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20.    Entire Agreement; No Other Representations.    **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PARTY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.    THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "REPRESENTATIONS"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY**

001376
HCMLPHMIT00000814

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21.  _Agreement and Release Knowing and Voluntary_.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.  _Cooperation_.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.  _Governing Law_.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.  _Jurisdiction/Venue_.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any ~~action or proceeding~~Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an ~~action or proceeding~~Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.  _No Admissions_.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this

001377

HCMLPHMIT00000815

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.    Other Provisions.

(a)    ~~This Agreement contains the entire agreement and understanding of the parties and supersedes any and all prior or contemporaneous agreements, arrangements, and understandings relating to the subject matter of this Agreement.~~ No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)    The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)    The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)    The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.    Notices.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643

001378
HCMLPHMIT00000816

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.    ~~Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement. For the avoidance of doubt, if any provision of this Agreement is overturned on appeal after the Bankruptcy Court Approval Date, any portion that is not overturned on appeal shall remain in full force and effect.~~

~~29.~~28.    Interpretive Provisions. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

[*Signature page follows*]

001379

HCMLPHMIT00000817

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By _____
    Name:    Mark Patrick
    Title:    Administrator
    Date:    May __, 2025

**BEACON MOUNTAIN LLC**

By _____
    Name:
    Title:
    Date:    May __, 2025

**RAND ADVISORS, LLC**

By _____
    Name:    Mark Patrick
    Title:    President
    Date:    May __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By _____
    Name:    Mark Patrick
    Title:    President
    Date:    May __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By _____
    Name:    Mark Patrick
    Title:    President

001380
HCMLPHMIT00000818

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:       May \_\_, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By   _____
     Name:       Mark Patrick
     Title:        President
     Date:        May \_\_, 2025

**ATLAS IDF GP, LLC**

By   _____
     Name:       Mark Patrick
     Title:        President
     Date:        May \_\_, 2025

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By   _____
     Name:       James. P. Seery, Jr.
     Title:        Chief Executive Officer
     Date:        May \_\_, 2025

**HIGHLAND CLAIMANT TRUST**

By   _____
     Name:       James P. Seery, Jr.
     Title:        Claimant Trustee
     Date:        May \_\_, 2025

**HIGHLAND LITIGATION SUB-TRUST**

By   _____
     Name:       Marc S. Kirschner
     Title:        Litigation Trustee

001381
HCMLPHMIT00000819

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:        May __, 2025

**HIGHLAND INDEMNITY TRUST**


By    _____
      Name:     James P. Seery, Jr.
      Title:     Indemnity Trust Administrator
      Date:     May __, 2025

001382

HCMLPHMIT00000820

**EXHIBIT 49**

001383

|  | |
|---|---|
| **From:** | "John A. Morris" <jmorris@pszjlaw.com> |
| **To:** | "Louis M. Phillips" <louis.phillips@kellyhart.com> |
| **Cc:** | "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com> |
| **Subject:** | Highland/HMIT: Settlement Agreement (HCMLP comments--5/15, 6:52 pm) |
| **Date:** | Thu, 15 May 2025 22:52:44 +0000 |
| **Importance:** | Normal |
| **Attachments:** | Highland_HMIT-Rand_Settlement_Agreement.012(Highland_Draft_05.15.25).docx; CUMULATIVE_REDLINE_-_HMIT_Settlement_Agreement.pdf; INCREMENTAL_REDLINE_-_HMIT_Settlement_Agreement.pdf |
| **Inline-Images:** | image001.jpg; image002.png |

---

Louis,

Attached is a revised agreement and black lines showing cumulative and incremental changes.

We're continuing to review this, and it remains subject to Claimant Oversight Board review and approval in all respects, but please let us know if you have any questions or comments.

Regards,

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

HCMLPHMIT00000829

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May [],16, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

HCMLPHMIT00000830

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, ~~actions~~Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

001386

HCMLPHMIT00000831

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, ~~including~~(vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, ~~(vi)~~in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (~~vii~~viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (~~viii~~ix) Marc S. Kirschner, individually and as Trustee of

001387
HCMLPHMIT00000832

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

the Litigation Sub-Trust, (ix x) the Committee and each of its members, (xi xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xii xii) any Person indemnified by any Highland Party (the Persons described in clauses (i)-(xi xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary,* none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

001388
HCMLPHMIT00000833

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement., but excluding Highland, the Claimant Trust, and their respective assets.

001389
HCMLPHMIT00000834

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in ~~Section~~Sections 1 – 2 and <u>Sections 9 - 16</u>.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"Operating Expenses" means ~~the expenses of operation and administration of the Highland Entities except for the Indemnity Trust~~, <u>except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities</u>, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

001390
HCMLPHMIT00000835

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X (N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threatened restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable ~~Statute~~statute of ~~Limitations~~limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats ~~made~~received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by ~~such Party~~the Indemnity Trust to the HMIT Entities, within ~~Five~~five (5) ~~business days~~Business Days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety

001391
HCMLPHMIT00000836

Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

WHEREAS, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

WHEREAS, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

WHEREAS, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

WHEREAS, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

WHEREAS, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

WHEREAS, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

WHEREAS, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

WHEREAS, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1. ~~Abatement~~Stay and Dismissal of Pending Litigation With Prejudice.

001392

HCMLPHMIT00000837

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(a)    Within three (3five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to abatestay the Pending Litigation.

(b)    Within three (3five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.    Maintenance of AbatementStay and Dismissal of Certain Defendants from the Amended Complaint.

(a)    The Litigation Trustee shall continue to maintain the abatementstay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within three (3five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3.    Cash Payment to HMIT.    In consideration for the dismissal of the Pending Litigation, within three (3Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

[wire instructions]

4.    HMIT Class 10 Interest.

(a)    Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, less the HMIT Note Balance.

(b)    Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)    Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest

4923-8662-5850.9 36027.003
001393
HCMLPHMIT00000838

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

(d)    For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.    Initial Interim Distributions on the Allowed Class 10 Interests.

(a)    Within ten (10five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of TwelveTen Million Dollars (US$1210,000,000.00) (the "**Initial Interim Cash Distribution Amount**").

(b)    HMIT shall deposit and hold Ten Million Dollars (US$10,000,000) of the Initial Interim Cash Distirbution Amount in an interest bearing escrow account (the "**HMIT Escrow Account**") pending the Final Court Approval Date.

(c)(b)    Within ten (10five (5) Business Days after the Bankruptcy Court Approval Date ("(the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be assigneddistributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the the Highland Entities, including the Indemnity Trust as of, from the Agreement Date to the Note Assignment Date.  Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6.    Subsequent Distribution(s) on the Allowed Class 10 Interests.

(a)    On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Eight Million Dollars (US$8,000,000.00).  . HMIT shall deposit and hold Six Million Dollars (US$6,000,000) of the First Subsequent Distribution in the HMIT Escrow Account pending the Final Court Approval Date.Six Million Five Hundred Thousand Dollars (US$6,500,000.00).

(b)    On DecemeberDecember 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the

001394
HCMLPHMIT00000839

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of ~~Eight~~Six Million ~~Five Hundred Thousand~~ Dollars (US$~~8,000~~6,500,000.00).

~~(c)     HMIT shall deposit and hold Six Million Dollars (US$6,000,000) of the Second Subsequent Distribution in the HMIT Escrow Account pending the Final Court Approval Date.~~

~~(d)~~(c)  Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.     Final Distribution on the Allowed Class 10 Interests.

(a)     On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; provided, however, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)     The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c)     Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.     Transfer Kirschner Claims; Dismissal of HMIT Note Claims.

(a)     ~~In consideration of the dismissal of the Pending Litigation and the releases provided herein, within ten (10~~Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in Section 2, the Litigation Sub-Trust shall execute ~~an~~a short-form assignment in ~~the form attached hereto as~~ **Exhibit [__]** in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims

001395

HCMLPHMIT00000840

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including Section 8(b) below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including without limitation the terms of Section 8(c) below.

(b)     THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against theany Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)     As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.  The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)     Each Party acknowledges and agrees that if (ai) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (b) the Final Court Approval Date does not occurii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.     <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other

001396
HCMLPHMIT00000841

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT~~ 5/15/2025

equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10.  <u>General Release By The Highland Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise)() and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11.  <u>Further Provisions Concerning The General Releases</u>.

(a)    FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.

(b)    To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland

001397

HCMLPHMIT00000842

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)    Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)    As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in Sections 9 and 10, should:

(i)    any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this

001398
HCMLPHMIT00000843

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii) any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12. <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a) Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b) Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c) For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13. <u>Representations and Warranties</u>.

(a) Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b) The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the

001399
HCMLPHMIT00000844

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)     Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)     Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.     <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT ~~Releasors~~Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland ~~Releasors~~Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.     <u>Gatekeeper Standard</u>.

(a)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10$^{53}$4 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party

001400
HCMLPHMIT00000845

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test." and that the dismissal of the Pending Litigation shall have res judicata effect.

16.     <u>Indemnification</u>.

(a)     Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be  severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)     Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

001401

HCMLPHMIT00000846

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

17.     <u>Execution</u>.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.     <u>Bankruptcy Court Order</u>.  The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in <u>Section 4</u> to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.     <u>Fees and Expenses</u>.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>.  Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20.     <u>Entire Agreement; No Other Representations</u>.  **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY ~~PARTY~~PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.  THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY**

001402

HCMLPHMIT00000847

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21.    <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.    <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.    <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.    <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any ~~action or proceeding~~Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an ~~action or proceeding~~Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.    <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the

001403
HCMLPHMIT00000848

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
~~DRAFT~~ 5/15/2025

terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.    <u>Other Provisions</u>.

(a)    ~~This Agreement contains the entire agreement and understanding of the parties and supersedes any and all prior or contemporaneous agreements, arrangements, and understandings relating to the subject matter of this Agreement.~~ No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)    The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)    The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)    The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.    <u>Notices</u>.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com

001404
HCMLPHMIT00000849

Amelia.Hurt@Kellyhart.com

28.    <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement. ~~For the avoidance of doubt, if any provision of this Agreement is overturned on appeal after the Bankruptcy Court Approval Date, any portion that is not overturned on appeal shall remain in full force and effect.~~

29.    <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

[*Signature page follows*]

001405
HCMLPHMIT00000850

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By _____
     Name:    Mark Patrick
     Title:     Administrator
     Date:    May __, 2025

**BEACON MOUNTAIN LLC**

By _____
     Name:
     Title:
     Date:    May __, 2025

**RAND ADVISORS, LLC**

By _____
     Name:    Mark Patrick
     Title:     President
     Date:    May __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By _____
     Name:    Mark Patrick
     Title:     President
     Date:    May __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By _____
     Name:    Mark Patrick
     Title:     President

001406

HCMLPHMIT00000851

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:        May __, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner


By    _____
    Name:        Mark Patrick
    Title:        President
    Date:        May __, 2025

**ATLAS IDF GP, LLC**


By    _____
    Name:        Mark Patrick
    Title:        President
    Date:        May __, 2025


**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By    _____
    Name:        James. P. Seery, Jr.
    Title:        Chief Executive Officer
    Date:        May __, 2025


**HIGHLAND CLAIMANT TRUST**


By    _____
    Name:        James P. Seery, Jr.
    Title:        Claimant Trustee
    Date:        May __, 2025


**HIGHLAND LITIGATION SUB-TRUST**


By    _____
    Name:        Marc S. Kirschner
    Title:        Litigation Trustee

001407
HCMLPHMIT00000852

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:          May __, 2025

**HIGHLAND INDEMNITY TRUST**

By      _____
        Name:      James P. Seery, Jr.
        Title:     Indemnity Trust Administrator
        Date:      May __, 2025

001408

HCMLPHMIT00000853

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**SETTLEMENT AGREEMENT & GENERAL RELEASE**

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 16, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand. The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

**DEFINITIONS**

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

001409
HCMLPHMIT00000854

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

001410

HCMLPHMIT00000855

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xii) any Person indemnified by any

001411

HCMLPHMIT00000856

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

001412

HCMLPHMIT00000857

Exhibit 49    Page 30 of 50

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

001413

HCMLPHMIT00000858

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in <u>Sections 1 – 2</u> and <u>Sections 9 - 16</u>.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"Operating Expenses" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X

001414
HCMLPHMIT00000859

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threated restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

001415

HCMLPHMIT00000860

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

WHEREAS, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## **AGREEMENT**

1.    <u>Stay and Dismissal of Pending Litigation With Prejudice</u>.

(a)    Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

001416
HCMLPHMIT00000861

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(b)    Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.    <u>Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)    The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3.    <u>Cash Payment to HMIT</u>.  Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

[wire instructions]

4.    <u>HMIT Class 10 Interest</u>.

(a)    Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)    Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)    Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

001417
HCMLPHMIT00000862

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(d)    For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.    Initial Interim Distributions on the Allowed Class 10 Interests.

(a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**").

(b)    Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date.  Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6.    Subsequent Distribution(s) on the Allowed Class 10 Interests.

(a)    On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00).

(b)    On December 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00).

(c)    Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential

001418
HCMLPHMIT00000863

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

       7.    <u>Final Distribution on the Allowed Class 10 Interests</u>.

       (a)    On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; <u>provided</u>, <u>however</u>, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

       (b)    The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

       (c)    Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

       8.    <u>Transfer Kirschner Claims; Dismissal of HMIT Note Claims</u>.

       (a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in <u>Section 2</u>, the Litigation Sub-Trust shall execute a short-form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including <u>Section 8(b)</u> below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of <u>Section 8(c)</u> below.

       (b)    THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR

001419
HCMLPHMIT00000864

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)    As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.  The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)    Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.    <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released

001420

HCMLPHMIT00000865

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10.   <u>General Release By The Highland Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11.   <u>Further Provisions Concerning The General Releases</u>.

(a)   **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b)   To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)   Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT**

001421

HCMLPHMIT00000866

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)    As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in Sections 9 and 10, should:

(i)    any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)    any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged

001422
HCMLPHMIT00000867

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.    <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)    Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)    Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)    For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.    <u>Representations and Warranties</u>.

(a)    Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)    The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)    Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)    Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this

001423
HCMLPHMIT00000868

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.    <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.    <u>Gatekeeper Standard</u>.

(a)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

001424
HCMLPHMIT00000869

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

16.    <u>Indemnification</u>.

(a)    Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)    Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17.    <u>Execution</u>.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.    <u>Bankruptcy Court Order</u>.  The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake

001425

HCMLPHMIT00000870

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in Section 4 to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.    Fees and Expenses.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to Section 18.  Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

20.    Entire Agreement; No Other Representations.  **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.  THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "REPRESENTATIONS"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE**

001426
HCMLPHMIT00000871

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

**HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21.    <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.    <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.    <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.    <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.    <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.    <u>Other Provisions</u>.

(a)    No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

001427
HCMLPHMIT00000872

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

(b)     The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)     The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)     The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.     <u>Notices</u>.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.     <u>Severability</u>.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

29.     <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to

001428
HCMLPHMIT00000873

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/15/2025

a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

*[Signature page follows]*

001429
HCMLPHMIT00000874

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By _____
     Name:     Mark Patrick
     Title:     Administrator
     Date:     May __, 2025

**BEACON MOUNTAIN LLC**

By _____
     Name:
     Title:
     Date:     May __, 2025

**RAND ADVISORS, LLC**

By _____
     Name:     Mark Patrick
     Title:     President
     Date:     May __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By _____
     Name:     Mark Patrick
     Title:     President
     Date:     May __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By _____
     Name:     Mark Patrick
     Title:     President

001430

HCMLPHMIT00000875

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:         May __, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner


By    _____
      Name:        Mark Patrick
      Title:       President
      Date:        May __, 2025

**ATLAS IDF GP, LLC**


By    _____
      Name:        Mark Patrick
      Title:       President
      Date:        May __, 2025


**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By    _____
      Name:        James. P. Seery, Jr.
      Title:       Chief Executive Officer
      Date:        May __, 2025


**HIGHLAND CLAIMANT TRUST**


By    _____
      Name:        James P. Seery, Jr.
      Title:       Claimant Trustee
      Date:        May __, 2025

**HIGHLAND LITIGATION SUB-TRUST**


By    _____
      Name:        Marc S. Kirschner
      Title:       Litigation Trustee


SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

001431

HCMLPHMIT00000876

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Date:        May __, 2025

**HIGHLAND INDEMNITY TRUST**


By    _____
      Name:        James P. Seery, Jr.
      Title:       Indemnity Trust Administrator
      Date:        May __, 2025

001432
HCMLPHMIT00000877

# EXHIBIT 50

001433

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** David Klos <DKlos@HighlandCapital.com>
**Subject:** Accepted: Confidential discussion - subject to Rule 408 and Confidentiality Agreement
**Date:** Thu, 17 Apr 2025 18:05:44 +0000
**Importance:** Normal
**Attachments:** unnamed

001434

HCMLPHMIT00000947

**EXHIBIT 51**

**From:** David Klos <DKlos@HighlandCapital.com>

**To:** Jim Seery <jpseeryjr@gmail.com>, Tim Cournoyer <TCournoyer@HighlandCapital.com>, Kristin Hendrix <KHendrix@HighlandCapital.com>, "John A. Morris" <jmorris@pszjlaw.com>, Jeff Pomerantz <jpomerantz@pszjlaw.com>, "Gregory V. Demo" <GDemo@pszjlaw.com>, Mark Patrick <mpatrick@dafholdco.com>, Shawn Raver <sraver@dafholdco.com>, "paul@gkmanagement.com.ky" <paul@gkmanagement.com.ky>, "Louis.Phillips@kellyhart.com" <Louis.Phillips@kellyhart.com>, "amelia.hurt@kellyhart.com" <amelia.hurt@kellyhart.com>

**Subject:** Confidential discussion - subject to Rule 408 and Confidentiality Agreement

**Date:** Mon, 7 Apr 2025 19:08:47 +0000

**Importance:** Normal

**Attachments:** unnamed

---

For in-person attendees:

**Location: 100 Crescent Court, Suite 1850, Dallas, TX 75201**

Physical directions for in-person attendees: Take the elevator bank in the "100 building" to Floor 17; then exit and find the small single elevator located around the corner, which will take you to Floor 18; then ring the doorbell at the Highland suite, which can be found around the corner from the elevator.

---

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: 215 023 216 231

Passcode: Qj7fS3Zb

---

**Dial in by phone**

+1 469-844-8017,,386721907# United States, Dallas

Find a local number

Phone conference ID: 386 721 907#

For organizers: Meeting options | Reset dial-in PIN

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

**EXHIBIT 52**

**Event:** Confidential discussion - subject to Rule 408 and Confidentiality Agreement

**Start Date:** 2025-04-08 15:30:00 +0000

**End Date:** 2025-04-08 17:30:00 +0000

**Organizer:** David Klos <DKlos@HighlandCapital.com>

**Location:** Microsoft Teams Meeting

**Class:** X-PERSONAL

**Date Created:** 2025-06-12 16:05:40 +0000

**Date Modified:** 2025-06-12 16:05:40 +0000

**Priority:** 5

**DTSTAMP:** 2025-04-07 19:08:45 +0000

**Attendee:** Jim Seery <jpseeryjr@gmail.com>; Tim Cournoyer <TCournoyer@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>; John A. Morris <jmorris@pszjlaw.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Gregory V. Demo <GDemo@pszjlaw.com>; Mark Patrick <mpatrick@dafholdco.com>; Shawn Raver <sraver@dafholdco.com>; paul@gkmanagement.com.ky <paul@gkmanagement.com.ky>; Louis.Phillips@kellyhart.com <Louis.Phillips@kellyhart.com>; amelia.hurt@kellyhart.com <amelia.hurt@kellyhart.com>

**Alarm:** Display the following message 15m before start

| Reminder

For in-person attendees:

**Location: 100 Crescent Court, Suite 1850, Dallas, TX 75201**

Physical directions for in-person attendees: Take the elevator bank in the "100 building" to Floor 17; then exit and find the small single elevator located around the corner, which will take you to Floor 18; then ring the doorbell at the Highland suite, which can be found around the corner from the elevator.

_____

# Microsoft Teams [Need help?](Need%20help?)

HCMLPHMIT00000950

**Join the meeting now**

Meeting ID: 215 023 216 231

Passcode: Qj7fS3Zb

---

**Dial in by phone**

+1 469-844-8017,,386721907# United States, Dallas

Find a local number

Phone conference ID: 386 721 907#

For organizers: Meeting options | Reset dial-in PIN

---

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

HCMLPHMIT00000951

**EXHIBIT 53**

001440

**From:** David Klos <DKlos@HighlandCapital.com>
**To:** Jim Shields <jshields@shieldslegal.com>
**Cc:** "John A. Morris" <jmorris@pszjlaw.com>, Jim Seery <jpseeryjr@gmail.com>, "Louis.Phillips@kellyhart.com" <Louis.Phillips@kellyhart.com>
**Subject:** Confidential - Subject to Rule 408 and Confidentiality Agreement
**Date:** Tue, 22 Apr 2025 16:20:33 +0000
**Importance:** Normal
**Attachments:** Privileged_and_confidential_-_DRAFT_4.8.25_discussion_materials.pdf; PRIVILEGED_AND_CONFIDENTIAL_DRAFT_SETTLEMENT_STRUCTURE_CLEAN_4.16.25.pdf; Privileged_and_Confidential_-_Indemnity_Trust_2025-4-16_Draft.pdf
**Inline-Images:** image001.jpg

---

Jim,

It was nice meeting you virtually this morning.  As a follow-up to our discussion, I understand the attached materials have already been provided to Louis, but I am re-sending this subset to you as well as I understand he's heading out of the country soon.

Attached are:

1. Discussion materials from April 8 meeting (the projected budget build-up can be found on p. 4)
2. Clean draft of settlement structure
3. Illustrative sources and uses of timing/amounts of potential future Indemnity Trust payouts

If you have other follow-ups or clarifications needed, feel free to reach out to John, Jim, or me.

Thank you,

-Dave

**DAVID KLOS**



100 Crescent Court  |  Suite 1850  |  Dallas, Texas 75201
C: 214.674.2926  |  O: 972.419.4478  |  F: 972.628.4147
dklos@highlandcapital.com  |  www.highlandcapital.com

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

HCMLPHMIT00000987

**PRIVILEGED AND CONFIDENTIAL ATTORNEY CLIENT COMMUNICATON**

**PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH EXISTING LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION**

**PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA**

**April 15, 2025**

DRAFT Potential Settlement Structure with DAF and HMIT

**HMIT**

- **Settlement of remanded motion to sue** – HCMLP, the Claimant Trust, and HMIT settle existing motion to sue and all other claims with prejudice for a cash payment of [$500k]
- **Allowance of claim** - HCMLP to allow HMIT Class 10 interest in the amount of ~$337mm (calculated as ~$395mm Petition Date capital account, less ~$58mm P&I outstanding on HMIT note as of Petition Date), subject to:
  - The HMIT allowed Class 10 interest is not transferable
  - HMIT releases all claims and accepts the "Litigation Protections" – see separate document containing the releases and other required provisions – which eliminate claims and limit the Class 10 allowed interest
  - LT releases HMIT from all other claims in the LT litigation and otherwise
  - LT transfers to holders of allowed Class 10 interests all remaining LT litigation (after HMIT and DAF/CLO Holdco releases) "as-is, where-is" along with all documents produced in the LT case to date
    - Such causes of action are limited to the currently stayed litigation and other causes of action that may exist related to former employees Ellington and Leventon
    - If for any reason the transfer of the LT litigation is nullified, the settlement will not be affected
  - Complete cessation and withdrawal of any other litigation among the parties
  - Class 10 remains senior to Class 11 as required by the Plan
- **Court Approval –** Settlement and allowance of Class 10 Claim subject to approval of the Bankruptcy Court

**DAF**

- **Settlement of DAF Claims** – HCMLP, the Claimant Trust, and DAF/CLO Holdco settle all claims underlying the current Fifth Circuit appeal and all other claims with

HCMLPHMIT00000988

**REVISED DRAFT**

prejudice for a cash payment of $[2mm] within [10] business days of execution of the settlement; the Fifth Circuit appeal will be dismissed with prejudice within [10] business days of execution of the settlement

- o HCMLP will purchase DAF's right to distribution from HCLOF related to Acis 6, as is - where is, without representation except for unencumbered ownership, for $[3mm] cash, to be paid within [10] business days of execution of the settlement; DAF releases HCLOF from any claims related to Acis 6 distributions
- o DAF/CLO Holdco release all claims and accept the "Litigation Protections" – see separate document containing the releases and other required provisions
- o LT releases DAF/CLO Holdco from all other claims in the LT litigation and otherwise
- o Complete cessation and withdrawal of any other litigation among the parties
- o Settlement will be filed with the Bankruptcy Court and "so ordered"

**Distributions**

- **Initial Interim Cash Distributions** – Within [91] days of the receipt of a final/non-appealable order not subject to certiorari:
  - o The Indemnity Trust will distribute $[10]mm cash directly to Class 9 Claimant Trust Beneficiaries in accordance with the waterfall and the Indemnity Trust Agreement
  - o [Subject to Class 9 Approval], the Indemnity Trust will distribute $[10]mm cash directly to holders of allowed Class 10 interests
    - ▪ On approval of the settlement by the Bankruptcy Court, the Indemnity Trust will set up a separate $[10]mm reserve for the Initial Interim Cash Distribution which reserve will be held in UST on the same terms as other Indemnity Trust holdings pending distribution to Class 10 interest holders or reversal/remand of the settlement
    - ▪ Any payments on the Dugaboy Note from the date of Bankruptcy Court approval of the settlement to the date of the Initial Interim Cash Distributions will be held by the Indemnity Trust in a separate account and also be paid to holders of allowed Class 10 interests
      - The actual dollar amount of any such P+I payments paid will reduce the Class 10 interests outstanding

HCMLPHMIT00000989

REVISED DRAFT

- **Subsequent Distribution(s)** - Following the Initial Interim Cash Distributions, most, if not all remaining assets will be held by the Indemnity Trust, except for potentially the Disputed Claims Reserve (if the pending claim is not fully resolved) and cash at the Claimant Trust and HCMLP (indirectly owned by the Indemnity Trust) to be used in the wind-down of those entities with  any excess amounts contributed/distributed to the Indemnity Trust
  - On April 1, 2028, if no threats, demands, or litigations have been brought against the Indemnity Trust or its beneficiaries:
    - The Indemnity Trust will distribute ~$[11]mm cash directly to Class 9 Claimant Trust Beneficiaries in accordance with the waterfall and the Indemnity Trust Agreement, satisfying the remainder of the Class 9 interests outstanding
    - The Indemnity Trust will distribute $[5]mm cash directly to holders of allowed Class 10 interests
    - Note Cash or In-Kind Distribution – At the election of HMIT, the Indemnity Trust will either (a) sell the currently $[17.6]mm face value (P+I) promissory note receivable from Dugaboy Investment Trust to HCMLP that has been irrevocably participated (and may be assigned if it defaults) to the Indemnity Trust (the "Dugaboy Note") and distribute the net proceeds (plus all P+I payments on the Dugaboy Note from the Interim Cash Distribution Date to April 1, 2028) to holders of allowed Class 10 interests or (b) assign the Dugaboy Note directly to holders of allowed Class 10 interests
      - For purposes of tracking progress toward the ~$337mm Class 10 interest:
        - if the Dugaboy Note is sold, the distribution will be valued at the amount of cash distributed;
        - if the Dugaboy Note is distributed in kind, the distribution will be valued at fair market value as determined by the Indemnity Trust Administrator
      - Assumes the Dugaboy Note continues to perform; if there is a default prior to April 1, 2028, the Indemnity Trust will accelerate the Dugaboy Note and pursue full collection plus cost of collection
        - If distribution of the Dugaboy Note is to be effected on April 1, 2028 and collection litigation has been commenced, at its election, holders of allowed Class 10 interests can receive, the collected balance or the

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

HCMLPHMIT00000990

**REVISED DRAFT**

> litigation or elect to have the Indemnity Trust continue the litigation and subsequently pay the proceeds to holders of allowed Class 10 interests

- o As it pertains to the Disputed Claims Reserve, Highland will object to the Daugherty tax POC (final remaining pending claim). Following a final non-appealable order resolving the claim, any remaining funds will be distributed to Class 9 or, if Class 9 has been paid in full, to holders of allowed Class 10 interests

- **"Final Distribution"** - After April 1, 2029, if no threats, demands, or litigations have been brought against beneficiaries of the Indemnity Trust and all statutes of limitation (SOLs) and any potentially applicable tolling thereof have expired, at the Indemnity Trust Administrator's sole discretion, any excess remaining funds in the Indemnity Trust shall be paid out in accordance with the Plan and the Indemnity Trust Agreement (i.e. to holders of allowed Class 10 interests, up to allowed amounts) in conjunction with the dissolution, wind down and cancellation of the Indemnity Trust
  - o The Indemnity Trust Administrator will consult with [Mark Patrick] regarding potentially applicable SOLs and tolling

- **Other**
  - o **Extension of Claimant Trust –** A one-year extension for the Claimant Trust will be sought in the bankruptcy court. During the 1-year extension period, the Claimant Trust will be placed into dissolution and begin its winding up.
    - ▪ The Indemnity Trust will covenant not to transfer any funds to the Claimant Trust following the date of final non-appealable approval of the HMIT settlement
  - o **HCMLP wind down –** the remaining unliquidated assets of the estate, including HCMLP, itself, will be retained within the Indemnity Trust and will be liquidated.
    - ▪ HCMLP personnel will complete the liquidation, dissolution, cancellation, tax compliance, and any other winding up activities for the remaining entities under its purview, including HCMLP.
    - ▪ Any excess amounts remaining at cancellation of HCMLP will be distributed to the Indemnity Trust.

001445

HCMLPHMIT00000991

- The Indemnity Trust will covenant not to transfer any funds to HCMLP following the date of final non-appealable approval of the HMIT settlement
    - HCMLP will have a funding agreement with the Claimant Trust to assure that the Claimant Trust has sufficient funds to complete its wind-down
    - Any excess funds in the Claimant Trust at its cancellation will be contributed to the Indemnity Trust; excess funds at HMLP will be distributed to the Indemnity Trust
  - **HCMLP and its general partner –** While HCMLP will be placed into dissolution, the entity will continue to survive during its winding up period, during which time it may continue to defend inbound litigation, prosecute outbound litigation, maintain its books and records, and monetize its remaining assets.  HCMLP's general partner will be dissolved, wound-down and cancelled along with HCMLP
  - **Claimant Trust Oversight Board –** Subject to the Plan and Claimant Trust agreement, it is anticipated that the members of the Oversight Board will continue in their existing roles until the final/non-appealable order approving the HMIT settlement is received
  - **Information rights to HMIT –** After Bankruptcy Court approval of the HMIT settlement, per the Claimant Trust Agreement, except that:
    - HCMLP will review forecasted expenses with [Mark Patrick] at his request, but not more often than quarterly, and will work in good faith to reduce expenses where possible
  - **Approval rights –** None, other than as specified elsewhere
  - **Duties to HMIT –** None before or after vesting/Bankruptcy Court approval of the HMIT settlement
  - **Compensation –** CEO and employee compensation remains governed by existing agreements with the oversight of the Claimant Trust Oversight Board; following the vesting of HMIT's interests, no changes will be permitted to those agreements without HMIT written consent; CEO maintains ability to maintain or reduce headcount in his absolute discretion

HCMLPHMIT00000992

PRIVILEGED AND CONFIDENTIAL ATTORNEY CLIENT COMMUNICATON

PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH EXISTING LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION

PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

# ILLUSTRATIVE HIGHLAND INDEMNITY TRUST PAYOUT SCHEDULE

EXPERIENCED. DISCIPLINED. **BOLD.**



001447
HCMLPHMIT00000993



### HIGHLAND INDEMNITY TRUST

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

| Total Illustrative Sources and Uses (4/1/26 - 4/1/29) | | | |
|---|---|---|---|
| **Sources** | | **Uses** | |
| Beginning Cash | $ 67,850,000 | Cash to repay 9s in Full | $ 21,029,073 |
| Interest Received on Cash (4% annual) | $ 6,970,471 | Cash distributions to 10s [2] | $ 60,439,653 |
| Dugaboy Note P&I Received | $ 3,991,523 | | |
| Disputed Claim Reserve [1] | $ 2,656,732 | | |
| Total Cash Sources | $ 81,468,726 | Total Cash Uses | $ 81,468,726 |
| | | | |
| Dugaboy Note (P& Accrued I)  4/1/28 [3] | $ 15,137,110 | Dugaboy Note to 10s [3] | $ 15,137,110 |
| Total Sources | $ 96,605,837 | Total Uses | $ 96,605,837 |
| | | | |
| | | Total to 9s | $ 21,029,073 |
| | | Total to 10s (incl Dugaboy Note) [3][4] | $ 75,576,763 |

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

Notes

[1] HCMLP will object to this claim. If claim is disallowed, following a final non-appealable order, any remaining funds will be distributed to Class 9, or if Class 9 has been paid in full, Class 10.

[2] Assumes no indemnification costs are expended throughout the period.

[3] Assumes Dugaboy Note FMV at face with no discounting.

[4] Excludes any net value ultimately obtained from the Kirschner Litigation

PRIVILEGED AND CONFIDENTIAL

1

001448

HCMLPHMIT00000994



## HIGHLAND INDEMNITY TRUST

PRIVILEGED AND CONFIDENTIAL  ATTORNEY WORK PRODUCT  PREPARED AT THE DIRECTION OF COUNSEL IN
CONNECTION WITH SETTLEMENT NEGOTIATION AND IN ANTICIPATION OF FUTURE LITIGATION PROTECTED BY FRE 408 AND
SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

### Interim Cash Distribution Sources and Uses (4/1/26)

| Sources | | Uses | |
|---|---|---|---|
| Beginning Cash | $ 67,850,000 | Distribution to 9s - IT | $ 10,000,000 |
| Interest Received on Cash | $ 1,360,718 | Distribution to 9s - DCR | $ 2,656,732 |
| Dugaboy Note P&I Received | $ 1,354,892 | Distribution to 10s - IT | $ 10,000,000 |
| Disputed Claim Reserve | $ 2,656,732 | Distribution to 10s - Dugaboy Note P&I | $ 1,354,892 |
| | | Remaining Indemnity Trust Cash | $ 49,210,718 |
| Total Cash Sources | $ 73,222,342 | Total Cash Uses | $ 73,222,342 |

### Subsequent Distribution(s) Sources and Uses (4/1/28) [1]

| Sources | | Uses | |
|---|---|---|---|
| Beginning Cash | $ 49,210,718 | Distribution to 9s - IT | $ 8,372,341 |
| Interest Received on Cash | $ 4,015,595 | Distribution to 10s - IT | $ 5,000,000 |
| Dugaboy Note P&I Received | $ 2,636,631 | Distribution to 10s - Dugaboy Note P&I | $ 2,636,631 |
| | | Remaining Indemnity Trust Cash | $ 39,853,972 |
| Total Cash Sources | $ 55,862,943 | Total Cash Uses | $ 55,862,943 |
| | | | |
| Dugaboy Note (P&I Accrued ) 4/1/28 | $ 15,137,110 | Dugaboy Note to 10s | $ 15,137,110 |
| Total Sources | $ 71,000,054 | Total Uses | $ 71,000,054 |

### Final Distribution (4/1/29) [1][2]

| Sources | | Uses | |
|---|---|---|---|
| Beginning Cash | $ 39,853,972 | Distribution to 10s | $ 41,448,130 |
| Interest Received on Cash | $ 1,594,159 | | |
| Total Cash Sources | $ 41,448,130 | Total Cash Uses | $ 41,448,130 |

[1] Assumes no threats, demands or litigations.

[2] Assumes all SOL (and any applicable tolling) expired.

PRIVILEGED AND CONFIDENTIAL

2

001449
HCMLPHMIT00000995

DRAFT – SUBJECT TO CONFIDENTIALITY AGREEMENT



# HIGHLAND INDEMNITY TRUST

PRIVILEGED AND CONFIDENTIAL. ATTORNEY-CLIENT PRIVILEGED. PREPARED AT THE DIRECTION OF COUNSEL IN CONNECTION WITH LITIGATION AND IN ANTICIPATION OF FUTURE LITIGATION PROTECTED BY FRE 408 AND SIMILAR STATE LAW PROTECTIONS.  PROVIDED PURSUANT TO NDA

**Illustrative Indemnity Trust Payout - Draft**
**4/15/2025**

| Period Ending | Start Date 9/30/2025 | Assumed Final Order Year 1 4/1/2026 | Year 2 4/1/2027 | Subsequent Distribution(s) [1] Year 3 4/1/2028 | Final Distribution [1] [2] Year 4 4/1/2029 | Total |
|---|---|---|---|---|---|---|
| Indemnity Trust Cash Balance [3] | $ 67,850,000 | $ 49,210,718 | $ 51,179,147 | $ 39,853,972 | $ - | |
| Dugaboy Note Balance (P & and Accrued I) [4] | $ 17,806,565 | $ 16,729,382 | $ 15,932,744 | $ - | $ - | |
| TOTAL INDEMNITY TRUST | $ 85,656,565 | $ 65,940,100 | $ 67,111,891 | $ 39,853,972 | $ - | |
| | | | | | | |
| Disputed Claim Reserve | $ 2,656,732 | $ - | $ - | $ - | $ - | |
| | | | | | | |
| Class 9 Payment of Disputed Claim Reserve [5] | | $ (2,656,732) | $ - | $ - | $ - | $ (2,656,732) |
| Class 9 Payments Indemnity Trust | | $ (10,000,000) | $ - | $ (8,372,341) | $ - | $ (18,372,341) |
| Class 9 Total Payments | | $ (12,656,732) | $ - | $ (8,372,341) | $ - | $ (21,029,073) |
| Class 9 Balance [6] | $ 21,009,022 | $ 8,352,290 | 8,358,972 | $ - | $ - | |
| | | | | | | |
| Class 10 Payments Indemnity Trust | | $ (10,000,000) | $ - | $ (5,000,000) | $ (41,448,130) | $ (56,448,130) |
| Class 10 Payments Dugaboy Note [7] | | $ (1,354,892) | $ - | $ (17,773,741) | $ - | $ (19,128,633) |
| Class 10 Total Payments | | $ (11,354,892) | $ - | $ (22,773,741) | $ (41,448,130) | $ (75,576,763) |
| Class 10 Balance | $ 336,940,231 | $ 325,585,339 | $ 325,585,339 | $ 302,811,598 | $ 261,363,467 | |

Notes
[1] Assumes no threats, demands or litigations.
[2] Assumes all SOL (and any applicatable tolling) expired.
[3] Assumes no threats, demands or litigations. Assumes 4% Interest earned each period.
[4] 3.26% Interest and $790k Amort due 12/31 each year
[5] HCMLP will object to this claim. If claim is disallowed, following a final non-appealable order, any remaining funds will be distributed to Class 9, or if Class 9 has been paid in full, Class 10.
[6] Interest on balance accrues at 0.08%. Start Date face value of claims outstanding is $20,584,958.56.
[7] Assumes Dugaboy Note FMV at face with no discounting. Payment Year 3 includes P&I received after Initial Interim Cash Distribution.

001450
HCMLPHMIT00000996

Case 19-34054-sgj11    Doc 4255-53    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 53    Page 12 of 15

Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties

**Current Snapshot - remaining assets [1]**
*in USD millions, except percentages*

| Asset description | Ref | Claimant Trust [2] | Indemnity Trust [3] | Combined |
|---|---|---|---|---|
| Cash/treasuries | [4] | $    20.3 | $    67.9 | $    88.1 |
| Disputed Claims Reserve | [5] | 2.7 | - | 2.7 |
| Dugaboy Note receivable | [6] | - | 17.6 | 17.6 |
| HCM Korea (note and equity) | [7] | 3.0 | - | 3.0 |
| HCLOF shares | [8] | 2.5 | - | 2.5 |
| HCRE bad faith sanction | [9] | 0.9 | - | 0.9 |
| Kirschner Litigation (main adversary) | [10] | *See footnote* | - | - |
| HMIT note | [11] | *See footnote* | - | - |
| **Total assets** | | $    29.4 | $    85.5 | $    114.8 |

[1] As of April 3, 2025.  This disclosure is NOT a balance sheet prepared in accordance with US GAAP.  In some instances, values are estimated and actual amounts retained may ultimately differ materially.  No liabilities are included herein, including existing liabilities, contingent liabilities, indemnification obligations, or considerations for future expenses, including costs of liquidation that have not yet been, but will be incurred.

[2] Claimant Trust, including consolidation of the various "Plan" entities other than the Indemnity Trust (HCMLP GP, LLC, Highland Capital Management, LP, Litigation Sub-Trust), each on a standalone basis, with intercompany balances eliminated.

[3] Stand-alone assets retained by the Indemnity Trust.  Other than less than <$1M retained in cash, remainder of cash is invested in US treasuries with maturities less than 1 year.  Excludes <$1M of cash/treasuries on account of the Okada settlement.  Pursuant to the Okada settlement, these funds are segregated and are to be repaid to Okada as first-out funds to the extent that any excess exists in the Indemnity Trust.  Accordingly, in a settlement scenario, these funds would not be available to Class 10 interest holders.

[4] Cash and treasuries includes full face amount of treasuries maturing within 6 months and has also been adjusted up to assume the near-term receipt of approximately $5 million from Highland CLO Funding, Ltd.

[5] Segregated funds invested in US treasuries with near-term maturities.  Funds are reserved for the Daugherty tax proof of claim, which remains pending.  If Highland successfully objects to the proof of claim, funds would be released from the Disputed Claims Reserve.  If the claim is ultimately allowed in full or in part, funds would be paid to Daugherty on account of the allowed claim and any excess remaining would be released from the Disputed Claims Reserve.

[6] Note receivable from The Dugaboy Investment Trust ("Dugaboy").  ~$17.4M principal and ~$0.2M interest currently outstanding, accruing at approximately $1,553/day.  Fair value is less than face value as the note is long-dated, accruing interest at 3.26% and makes annual principal and interest payments through 2046, with the last of such payments due December 31, 2046.  Dugaboy is current on its payments, including with the most recent payment completed for year-end 2024.  Principal payments due are $790,215 yearly, plus accrued interest, which declines each year as principal declines.  The next interest payment due December 31, 2025 is $566,677.  No assurance that Dugaboy will continue making the annual principal and interest payments when due, although the holder of the note could accelerate and pursue collection in that event.

[7] 100% equity interest in Highland Capital Management Korea Limited ("HCM Korea"), plus $2.5 million note from HCM Korea.  Ultimate value dependent on the monetization of the Caris Life Sciences investment through an expected 2025 IPO, which is expected to be in the range of $2 million to $5 million, but could also exceed or fall short of this range.

[8] Shares of Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey company.  Value has been adjusted down to assume a near-term cash dividend of approximately $5 million.  Remaining value is primarily tied up in the "Acis 6" asset, for which a NexPoint entity has recently initiated an appeal in the 2nd Circuit Court of Appeals.  Ultimate value dependent on the Acis 6 litigation and costs of winding down HCLOF and expected to be in the range of $2 million to $4 million, but could also exceed or fall short of this range.

[9] Bad faith sanction against HCRE of $825,940.55, currently on appeal in the District Court.  Fully briefed since November 2024.  Award was posted in the court registry and is accruing post-judgment interest at a rate of $118.80/day.  Approximately $870k is outstanding, including post-judgment interest currently.  No assurance that the appeal will resolve favorably and as a result, there is no assurance that any amounts will ultimately be collected.

[10] Litigation brought by Marc Kirschner as Litigation Trustee to the Litigation Sub-Trust.  Adversary proceeding is currently stayed.  The value of the claims, their collectibility, and the costs of their continued pursuit is ultimately unknown.  For purposes of aggregating the current value of assets for this illustrative presentation, no value has been ascribed.

[11] Within the litigation brought by Marc Kirschner as Litigation Trustee to the Litigation Sub-Trust were claims against HMIT relating to the "HMIT note" receivable, which had originally been a portion of the consideration HMIT paid for acquiring limited partnership interests in Highland in 2015.  These claims are also stayed as part of the overall stay in the case.  The value of the note, its collectibility, and the costs of their continued pursuit is ultimately unknown.  For purposes of aggregating the current value of assets for this illustrative presentation, no value has been ascribed.

HCMLPHMIT00000997

Case 19-34054-sgj11    Doc 4255-53    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 53    Page 13 of 15

**Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties**

**Uses: how much could be left after satisfying Class 9 claims?**
*in USD millions*

| | | | |
|---|---|---:|---|
| **Total combined assets** | $ | **114.8** | *see "current snapshot"* |
| <u>Less:</u> | | | |
| Oustanding Class 9, including interest | | (21.0) | |
| Existing Incentive Compensation triggered through full payment of Class 9 | | (2.5) | |
| Long-dated assets - Dugaboy Note receivable | | (17.6) | [1] |
| Wind down expenses and accrued liabilities | | (20.0) | [2] |
| Pending Class 8 claims (Daugherty tax) | | *See footnote* | [3] |
| Indemnification obligations | | *See footnote* | [4] |
| **Net expected cash prior to any indemnification considerations and necessary reserves** | $ | **53.7** | [5] |
| **Plus: Non-cash assets - Dugaboy Note receivable** | $ | **17.6** | |

[1] Note receivable from The Dugaboy Investment Trust ("Dugaboy"). ~$17.4M principal and ~$0.2M interest currently outstanding, accruing at approximately $1,553/day.  Fair value is less than face value as the note is long-dated, accruing interest at 3.26% and makes annual principal and interest payments through 2046, with the last of such payments due December 31, 2046.  Dugaboy is current on its payments, including with the most recent payment completed for year-end 2024.  Principal payments due are $790,215 yearly, plus accrued interest, which declines each year as principal declines.  The next interest payment due December 31, 2025 is $566,677.  No assurance that Dugaboy will continue making the annual principal and interest payments when due, although the holder of the note could accelerate and pursue collection in that event.

[2] Amount is ultimately TBD and will ultimately depend on litigation, timing of monetization of remaining assets, and operational needs.  For example, if additional litigation is brought forth, outside counsel will incur additional time and expense and certain employees may need to be retained for a longer period of time.  If actual expenses exceed $20 million, less cash would be potentially available after Class 9; if actual expenses fall short of $20 million, more cash would be potentially available after Class 9.

[3] For illustrative purposes of this presentation, $0 is assumed.  However, if the claim is ultimately allowed in full or in part, funds would be paid to Daugherty on account of the allowed claim, which would reduce cash potentially available after Class 9.  No assurances can be provided that the claim will be completely disallowed.

[4] For illustrative purposes of this presentation, $0 is assumed.  Thus, all funds utilized for purposes of satisfying indemnification obligations will reduce the funds available dollar for dollar.  Under current conditions, it is believed that at least $100 million may be needed for indemnification obligations and as a result, there is not sufficient liquidity at this time to even make any further payments to Class 9 interest holders.  Assuming a final/non-appealable order, providing for among other things, a complete cessation of litigation and comprehensive releases from the HMIT/DAF parties, the need for indemnification reserves could be greatly reduced.

[5] Assumes HCM Korea, HCLOF, and HCRE bad faith sanctions are monetized for the amounts described on the "current snapshot" ($6.4 million in aggregate).  Monetization in excess of these amounts would result in more cash remaining; monetization below those amounts would result in less cash remaining.

HCMLP HMIT00000998

*Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties*
**Information request made April 7, 2025**

**(i) Accrued liabilities**

| | Entity | | Amount | |
|---|---|---|---|---|
| End of case/severance bonuses - remaining employees | HCMLP | $ | 1,230,000 | |
| Accounts payable book balance (as of March 31, 2025) | HCMLP | | 576,207 | |
| Estimate of other incurred, but not invoiced for work performed | HCMLP | | 500,000 | general estimate |
| **Sub-total (i)** | | **$** | **2,306,207** | A |

| **Other liabilities not included in section totals above** | Entity | | Amount | |
|---|---|---|---|---|
| Distribution payable | HCT | $ | 2,656,732 | previously authorized distributions related to pending Daugherty claim (has offsetting cash reserve; see current snapshot); to be released following resolution of the pending claim |
| Okada settlement payable | Indemnity Trust | $ | 870,000 | first-out dollars in treasuries (amount is face of such treasuries) - for purposes of settlement discussions, the cash reserved related to the Okada settlement and the potential first-out dollars are excluded as irrelevant |

**(ii) Anticipated success or severance (or completion) payments or bonuses**

| | Entity | | Amount | |
|---|---|---|---|---|
| Incentive Compensation Plan | HCMLP/HCT | $ | 2,480,088 | assuming full payment of the Class 9's; calc'd as 14.7516% on remaining distributions to Class 9 with a time discount applied to the gross dollars distributed |
| Retention Date payments - employees | HCMLP | | 925,000 | Retention Date is 9/30/2025 |
| Nate Burns (employee) incentive comp | HCMLP | | -- | Note receives a portion of the performance fees earned related to HCM Korea; assuming zero for presentation purposes as amounts would be a percentage of incremental value received from HCM Korea |
| **Sub-total (ii)** | | **$** | **3,405,088** | B |

**(iii) Continuing admin budget for the Claimant Trust, Indemnification sub trust and/or litigation sub trust**

| | | | |
|---|---|---|---|
| See subsequent page; Sub-total (iii) | $ | 16,768,874 | C - additional detail contained on separate page |

| **Sum of A, B, and C** | **$** | **22,480,169** |
|---|---|---|

**(iv) Identity and amount and basis for any holdback(s)**

| Identity: | | Amount | Basis for amount |
|---|---|---|---|
| Sum of A, B, and C from above | $ | 22,480,169 | from above; See notes and assumptions related to items A, B, and C |
| Incremental operational reserve | | 5,000,000 | Excess cash to retain to cover potential cost overages - largest risk is incremental litigation and resulting time and expense of PSZJ plus longer retention of employees/CEO to assist with litigation, if applicable |
| Indemnification reserves | | 35,000,000 | Assumes comprehensive releases and settlement amongst the HMIT/DAF Parties; at least $100 million if no settlement |
| Sum of items above | $ | 62,480,169 | to below |

| Calc of estimated cash available for a prelim distribution to Class 10, assuming settlement | $ millions | |
|---|---|---|
| Current cash/treasuries (see previous page) | 88.1 | Cash and treasuries (including all Plan entities) |
| Assets expected to monetize in next 12 months | 6.4 | HCM Korea, remainder of HCLOF, bad faith sanction (but excluding near-term Dugaboy Note P&I amortization due December 2025) |
| **Sub-total** | **94.5** | |
| | | |
| less: outstanding Class 9, including interest | (21.0) | current outstanding Class 9 with interest |
| less: holdbacks (from above) | (62.5) | from above |
| | | |
| Remaining cash available for initial distribution to Class 10 | $ 11.1 | [1] |
| **Round to nearest million** | **$ 11.0** | |

[1] Possibility of incremental amount of up to $2.7 million in the event of a successful opposition to the pending Daugherty tax POC, along with incremental interim cash received from Dugaboy Note P&I amortization. Amount also does not include non-cash assets (litigation, oustanding Dugaboy Note, etc).

001453

HCMLP HMIT00000999

Case 19-34054-sgj11    Doc 4255-53    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Exhibit 53    Page 15 of 15

*Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties*
**Projected Budget Build-Up**

Remaining expected budget assuming a comprehensive settlement with HMIT/DAF Parties (excluding accrued liabilities and contingencies separately discussed)

| Description | Total for budget | Notes and assumptions |
|---|---|---|
| Pachulski Stang and other litigation or BK-related | $    5,000,000 | Primary issues: expected new litigation to defend (actual causes of action unknown) from Dondero parties, incorporation of HMIT/DAF settlement and approval/appeals of same, appeals of "valuation complaint" and "HCRE bad faith", extension of the Trust for 1 yr. and dissolution issues. Ultimate amount required could vary materially higher or lower. |
| HCMLP employees salary and benefits (other than CEO) | 4,084,354 | Assumes declining headcount from 6 to 3, ending August 2026 (monthly trending from approx. $300k/month currently to approx. $200k/month at end) |
| Claimant Trustee/CEO salary | 2,700,000 | Assumes 18 months at $150k/month |
| Litigation Trustee | 360,000 | Assumes 18 months at $20k/month |
| Independent Member | 225,000 | Assumes 18 months at $12.5k/month |
| Litigation trust (other than Trustee) | 250,000 | Assuming minimal time and expense other than in conjunction with transfer of main case |
| Incentive Compensation on distributions to Cl. 10 | TBD | Provide for alignment in regards to quantum and timing of distributions and management of costs |
| *Overhead related* | | |
| Facilities/offsite storage and related | 1,079,121 | Office space through end of 2026 and offsite document retention through 2028 |
| External tax | 1,000,000 | Declining each year with final year for tax year 2027 |
| IT costs | 701,760 | Cloud storage, network infrastructure through 2027, email storage through 2030 |
| Accounting systems and information | 331,045 | General retention and maintenance through 2028 (primarily Oracle maintenance) |
| Other professionals | 200,000 | Misc reserve for other professionals |
| Other misc overhead | 200,000 | Misc reserve for other overhead, T&E, entity wind-up costs, etc |
| Indemnification expenses | 200,000 | Assuming misc. expenses from misc. matters |
| US Trustee | 437,594 | Assuming 0.8% of budget + accruals + distributions (assuming $30M total) |
| **Grand total** | **$    16,768,874** | *to previous page* |

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

HCMLPHMIT00001000

**EXHIBIT 54**

001455

**From:** "jpseeryjr@gmail.com" <jpseeryjr@gmail.com>
**To:** <mpatrick@dafholdco.com>, Shawn Raver <sraver@dafholdco.com>, "Louis M. Phillips" <Louis.Phillips@kellyhart.com>, <amelia.hurt@kellyhart.com>, <jshields@shieldslegal.com>
**Cc:** "John A. Morris" <jmorris@pszjlaw.com>, David Klos <DKlos@HighlandCapital.com>, Tim Cournoyer <TCournoyer@HighlandCapital.com>, Jeff Pomerantz <jpomerantz@pszjlaw.com>, "Gregory V. Demo" <GDemo@pszjlaw.com>
**Subject:** PRIVILEGED AND CONFIDENTIAL
**Date:** Mon, 28 Apr 2025 19:34:04 -0400
**Importance:** Normal
**Attachments:** 4923-8662-5850.v9_Highland-HMIT-Rand_Settlement_Agreement.doc

---

HMIT Team:

Subject to our NDA, and further to our prior discussions, attached please find a draft settlement agreement.

The draft is consistent with the term sheet and the illustrative payment deck we reviewed with you.

However, we changed the timing of certain of the "gives" and "gets" so that the payments, reserves, releases, and litigation assignments, as well as a best-efforts undertaking are exchanged at or around execution. This is consistent with the DAF agreement, and these exchanges do not require Bankruptcy Court approval. We believe that an immediate exchange of as much of the material value of the settlement as possible is in the best interests of both sides.

The Class 10 claim allowance and the application of the HMIT Note to fix the amount requires court approval and is set up that way with future Indemnity Trust payments keyed to the Bankruptcy Court order becoming final. To assure that the order is timely procured and the expectations of the parties protected, we have included the aforementioned best efforts undertaking to reconstruct the essential terms of the deal and deliver it to the parties if for any reason the claim allowance is not approved or is overturned . We do believe there is much risk to either denial or reversal.

We are at your disposal. It may make sense for us to walk some or all of you through draft, and we can do that tomorrow. (We understand that Louis is away and do not presume to intrude on a well-earned holiday.) Nonetheless, if an overview is appealing, please let me know.

Thank you for your consideration. Please call me with any questions or issues. We look forward to working with you to resolve our disputes and reach a mutually satisfactory resolution.

Best. Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

HCMLPHMIT00001001

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of April [__], 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the  "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

001457
HCMLPHMIT00001002

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

001458
HCMLPHMIT00001003

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, including Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, (vi) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (vii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (viii) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (ix) the Committee and each of its members, (x) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or

001459
HCMLPHMIT00001004

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xi) any Person indemnified by any Highland Party (the Persons described in clauses (i)-(xi), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO, Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

001460

HCMLPHMIT00001005

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions of the Plan, the Plan Documents, the Claimant Trust Agreement, this Agreement, and applicable law.

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement.

001461
HCMLPHMIT00001006

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"**Kirschner Claims**" means all Claims and causes of action other than the HMIT Note Claims that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in Section 1 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-

001462
HCMLPHMIT00001007

Case 3:25-cv-01876-K    Document 84-5    Filed 09/09/25    Page 105 of 262    PageID 2588
Exhibit 54    Page 99 of 236

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

01531-X (N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any threats, demands, complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threatened restraining orders or injunctions, or similar actions of any kind in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement).

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities, including those asserted in the Pending Litigation;

001463
HCMLPHMIT00001008

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1.  <u>Dismissal of Pending Litigation With Prejudice</u>.  Within three (3) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.  <u>Dismissal of Certain Defendants from the Amended Complaint</u>.

    (a)    Within three (3) Business Days after the Effective Date, the Litigation Trustee shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE Fund from Counts I, II, and III of the Amended Complaint.  For the avoidance of doubt, Counts I, II, and III constitute all Kirschner Claims that are not HMIT Note Claims, and such dismissal shall not affect or impair any HMIT Note Claims or any liability or obligation of HMIT with respect to the HMIT Note, if any.

    (b)    Within three (3) Business Days after the Final Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Count XXIV of the Amended Complaint, which constitutes all HMIT Note Claims against HMIT and Rand PE.

3.  <u>Cash Payment to HMIT</u>.  In consideration for the dismissal of the Pending Litigation, within three (3) Business Days following the Agreement Date, Highland shall pay HMIT a one-time, lump sum of [Five Hundred Thousand Dollars (US$500,000.00)] (the "**Payment**") by wire transfer:

001464
HCMLPHMIT00001009

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

[wire instructions]

4.    <u>HMIT Class 10 Interest</u>.

(a)    Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)    Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)    Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto.

(d)    For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.    <u>Initial Interim Cash Distributions on the Allowed Class 10 Interests</u>.

(a)    Within ten (10) Business Days of the Final Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: (i) cash in the aggregate amount of [Ten Million Dollars (US$10,000,000.00)] (the "**Initial Interim Cash Distribution Amount**"); and (ii) cash in the aggregate amount of all principal and interest payments paid on the Dugaboy Note and actually received by Highland or the Indemnity Trust from and after the Bankruptcy Court Approval Date (the "**Initial Interim Dugaboy Distribution Amount**").

(b)    Upon the Bankruptcy Court Approval Date, the Indemnity Trust shall establish a balance sheet reserve in respect of the Initial Interim Cash Distribution Amount and the Initial Interim Dugaboy Distribution Amount (if and when received), which reserve will be held solely in cash or Permitted Investments and otherwise on the same terms as other Indemnity

001465
HCMLPHMIT00001010

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Trust Assets pursuant to the Indemnity Trust Agreement pending distribution in accordance with
<u>Section 5(a)</u>.

     6.    <u>Subsequent Distribution(s) on the Allowed Class 10 Interests.</u>

     (a)    On the later of the Final Court Approval Date and April 1, 2028, the
Indemnity Trust shall distribute (such distribution, collectively, the "**Subsequent Distribution**",
and the date on which such Subsequent Distribution is made, the "**Subsequent Distribution
Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: (i) cash in the
aggregate amount of [Five Million Dollars (US$5,000,000.00)]; and (ii)(x)(1) if HMIT elects in
writing that it desires for the Indemnity Trust to sell the Dugaboy Note, the net proceeds, if any,
actually received by the Indemnity Trust from such sale, or (2) if HMIT instead elects that it
desires to receive the Dugaboy Note in kind, the Dugaboy Note in kind, plus (y) cash in the
aggregate amount of all principal and interest payments actually received on the Dugaboy Note
by the Indemnity Trust from and after the Initial Interim Distribution Date (the amount pursuant
to subclause (y), the "**Subsequent Dugaboy P+I Amount**"). If the Dugaboy Note is distributed
in kind, HMIT will engage an independent valuation service provider to value the Dugaboy Note
for purposes of determining the magnitude of reduction to the outstanding allowed Class 10
Interests on account of such in-kind distribution. The HMIT Entities acknowledge and agree that
none of the Highland Entities are representing or warranting that the Dugaboy Note can or will
be sold or the price, if any, received for the Dugaboy Note and further acknowledge and agree
that any such purchase price may be de minimis.

     (b)    Upon the Initial Interim Distribution Date, the Indemnity Trust shall
establish a balance sheet reserve in respect of the cash portion of the Subsequent Dugaboy P+I
Amount, which will be held solely in cash or Permitted Investments and otherwise on the same
terms as other Indemnity Trust Assets pursuant to the Indemnity Trust Agreement pending
distribution in accordance with <u>Section 6(a)</u>.

     (c)    Notwithstanding anything herein to the contrary, the obligations of the
Indemnity Trust to make the Subsequent Distribution, including any Cash, the Dugaboy Note, or
the Subsequent Dugaboy P+I Amount, is subject in all respects to (i) there being no Threats and
(ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust
Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably
necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity
Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the
Indemnity Trust Agreement).

     7.    <u>Final Distribution on the Allowed Class 10 Interests.</u>

     (a)    On the later of the Final Court Approval Date and April 1, 2029, the
Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with
Article VIII of the Indemnity Trust Agreement; <u>provided</u>, <u>however</u>, that the obligation of the
Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the
Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in
accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as

001466
HCMLPHMIT00001011

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)     The Indemnity Trust agrees to not use Indemnity Trust Assets to fund the operating expenses of Highland.

(c)     Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.     Transfer Kirschner Claims; Dismissal of HMIT Note Claims.

(a)     In consideration of the dismissal of the Pending Litigation and the releases provided herein, within ten (10) Business Days of the Agreement Date, but after the dismissal provided for in Section 2, and solely to the extent permitted by the Plan, the Litigation Sub-Trust Agreement and applicable law, the Litigation Sub-Trust shall execute an assignment in the form attached hereto as **Exhibit [_]** in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (which, for the avoidance of doubt, shall not include any HMIT Note Claims) (the "**Kirschner Transfer**").[1] Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

(b)     THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is

---

[1] NTD: HMIT Claim to be dismissed without prejudice.

001467
HCMLPHMIT00001012

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against the Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)    As promptly as reasonably practicable following the Effective Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint. The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)    Each Party acknowledges and agrees that if (a) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (b) the Final Court Approval Date does not occur, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.    <u>General Release By The HMIT Entities</u>. On the Agreement Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

001468
HCMLPHMIT00001013

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

10.     General Release By The Highland Entities.

(a)     On the Agreement Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise)(collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims, excepting any HMIT Note Claims, which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Initial Highland Released Claims**").  For the avoidance of doubt and notwithstanding anything herein to the contrary, the HMIT Note Claims shall not be released until Final Court Approval Date, at which time the HMIT Note will be applied to calculate the allowed HMIT Class 10 Interest set forth in Section 4 and the balance of the HMIT Note and any HMIT Note Claims shall be released pursuant to Section 10(b).

(b)     Upon the Final Court Approval Date, and to the maximum extent permitted by law, each of the Highland Releasors hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, the HMIT Note Claims (the "**Subsequent Highland Released Claims**" and together with the Initial Highland Released Claims, the "**Highland Entity Released Claims**" and together with the HMIT Entity Released Claims, the "**Released Claims**").

11.     Further Provisions Concerning The General Releases.

(a)     **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b)     To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or

001469
HCMLPHMIT00001014

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)     Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)     As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in Sections 9 and 10, should:

(i)     any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this

001470
HCMLPHMIT00001015

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)     any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.     <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)     Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)     Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)     For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.     <u>Representations and Warranties</u>.

(a)     Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)     The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to

001471
HCMLPHMIT00001016

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)     Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)     Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.    No Continuing Rights, Duties or Obligations.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date.  For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Releasors, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Releasors, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.    Gatekeeper Standard.

(a)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and for a claim or cause of action to be "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

001472

HCMLPHMIT00001017

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

(b)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test."

16.     <u>Indemnification</u>.

(a)     Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)     Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT

001473

HCMLPHMIT00001018

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17.   <u>Execution</u>.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.   <u>Bankruptcy Court Order</u>.  The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in Section 4 to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.   <u>Fees and Expenses</u>.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>.  Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

001474
HCMLPHMIT00001019

20.    <u>Entire Agreement; No Other Representations</u>. **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PARTY OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT. THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21.    <u>Agreement and Release Knowing and Voluntary</u>. The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement. The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.    <u>Cooperation</u>. The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard. For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.    <u>Governing Law</u>. This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.    <u>Jurisdiction/Venue</u>. The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any action or proceeding arising out of or related

001475
HCMLPHMIT00001020

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an action or proceeding arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.    <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.    <u>Other Provisions</u>.

(a)    This Agreement contains the entire agreement and understanding of the parties and supersedes any and all prior or contemporaneous agreements, arrangements, and understandings relating to the subject matter of this Agreement.  No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)    The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)    The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)    The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.    <u>Notices</u>.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910

001476

HCMLPHMIT00001021

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.    <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

29.    <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

[*Signature page follows*]

001477
HCMLPHMIT00001022

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By    _____
      Name:      Mark Patrick
      Title:      Administrator
      Date:      April __, 2025

**RAND ADVISORS, LLC**

By    _____
      Name:      Mark Patrick
      Title:      President
      Date:      April __, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By    _____
      Name:      Mark Patrick
      Title:      President
      Date:      April __, 2025

**RAND PE FUND MANAGEMENT, LLC**

By    _____
      Name:      Mark Patrick
      Title:      President
      Date:      April __, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By    _____

001478
HCMLPHMIT00001023

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

Name:      Mark Patrick
Title:     President
Date:      April __, 2025

**ATLAS IDF GP, LLC**


By    _____
      Name:      Mark Patrick
      Title:     President
      Date:      April __, 2025


**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By    _____
      Name:      James. P. Seery, Jr.
      Title:     Chief Executive Officer
      Date:      April __, 2025


**HIGHLAND CLAIMANT TRUST**


By    _____
      Name:      James P. Seery, Jr.
      Title:     Claimant Trustee
      Date:      April __, 2025

**HIGHLAND LITIGATION SUB-TRUST**


By    _____
      Name:      Marc S. Kirschner
      Title:     Litigation Trustee
      Date:      April __, 2025

001479

HCMLPHMIT00001024

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/28/25

**HIGHLAND INDEMNITY TRUST**


By   _____

|        |                                   |
|--------|-----------------------------------|
| Name:  | James P. Seery, Jr.               |
| Title: | Indemnity Trust Administrator     |
| Date:  | April __, 2025                    |

001480
HCMLPHMIT00001025

**EXHIBIT 55**

**From:** David Klos <DKlos@HighlandCapital.com>

**To:** Jim Seery <jpseeryjr@gmail.com>, Kristin Hendrix <KHendrix@HighlandCapital.com>, "mpatrick@dafholdco.com" <mpatrick@dafholdco.com>, Shawn Raver <sraver@dafholdco.com>, "paul@gkmanagement.com.ky" <paul@gkmanagement.com.ky>

**Subject:** Confidential discussion - Subject to Rule 408 and Confidentiality Agreement

**Date:** Thu, 3 Apr 2025 13:16:34 +0000

**Importance:** Normal

**Attachments:** unnamed

---

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: 226 527 188 989

Passcode: tT6tZ9dz

---

## Dial in by phone

+1 469-844-8017,,153081385# United States, Dallas

Find a local number

Phone conference ID: 153 081 385#

For organizers: Meeting options | Reset dial-in PIN

---

**EXHIBIT 56**

**From:** David Klos <DKlos@HighlandCapital.com>
**To:** Mark Patrick <MPatrick@CharitableDAF.com>
**Cc:** Kristin Hendrix <KHendrix@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>
**Subject:** Time tomorrow for a Teams
**Date:** Wed, 2 Apr 2025 20:29:42 +0000
**Importance:** Normal

---

Mark,

It's been a long time - I hope this email finds you doing well.

I understand that you have some time tomorrow for a Teams call for an initial discussion around financial information.  Could I propose an hour starting at 11:30 CT?

We plan to have Kristin and Jim on (cc'd), in addition to me.  I don't know that I have a good email for Shawn, so in addition to confirming the time works for you, could you also provide his email or just confirm that you will be able to forward him the invite?  Once I hear from you, I'll circulate a Teams. Thanks and looking forward to speaking with you soon.

-Dave
214-674-2926

001484

HCMLPHMIT00001042

**EXHIBIT 57**

001485

**From:** Jim Seery <jpseeryjr@gmail.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, Tim Cournoyer
    <TCournoyer@HighlandCapital.com>, David Klos <DKlos@HighlandCapital.com>,
    Matthew Gray <MGray@HighlandCapital.com>
**Subject:** FW: PRIVILEGED AND CONFIDENTIAL
**Date:** Wed, 11 Jun 2025 17:29:13 +0000
**Importance:** Normal
**Attachments:** Highland_HMIT-Rand_Settlement_Agreement.012(Highland_Draft_05.15.25).docx;
    Written_Consent_-_Class_9_Holders_.docx

---

Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** jpseeryjr@gmail.com <jpseeryjr@gmail.com>
**Date:** Friday, May 16, 2025 at 9:45 AM
**To:** Nader Attalla <nader.attalla@ubs.com>, Katie.George@lw.com <Katie.George@lw.com>, Gregory V. Demo
<GDemo@pszjlaw.com>
**Cc:** David Klos <DKlos@highlandcapital.com>, Tim Cournoyer <TCournoyer@highlandcapital.com>
**Subject:** Re: PRIVILEGED AND CONFIDENTIAL

Nader and Katie:

Attached is final version of the Class 9 consent with Exhibit B showing the proposed payments to
Class 9 and Class 10.  I have also attached the latest version of the Settlement Agreement which will
be an exhibit to the consent.  Aside from the timing of the Class 10 payments, there are no provisions
in the agreement that affect UBS.

As discussed, assuming final agreement on the settlement and filing of the approval motion this
evening, we anticipate Bankruptcy Court approval in mid-July.  After court approval, the first $10mm
would be paid to Class 9 and Class 10 simultaneously.

Class 9 will also receive the proceeds from the Daugherty Class 8 reserve when that claim is
disallowed.  We filed our objection/complaint last week and expect resolution around September 30.

The balance of Class 9 will be paid off with the First Subsequent Distribution to Class 10 on December
1, 2027.

Please call me if you have any questions.

We appreciate your assistance trying to get the consent approved as soon as possible.

Thank you.

Best.  Jim

HCMLPHMIT00001220

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**Fr**

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 12, 9095 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the  "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined).  For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 3013 and in accordance with <u>Section 18</u>.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 909 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made.  The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 9160-0726sgj (Bankr. N.D. Tex. May 13, 9099).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 136-40546sgj (Bankr. N.D. Tex.) and its related proceedings.

001488
HCMLPHMIT00001222

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 1016l5‑9 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 3013 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 9091, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 134‑ ], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May ‑ 1, 9017, in the original face amount of $94,928,291.23, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non‑Exempt Trust, collectively as Payee.

9

HCMLPHMIT00001223

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 20 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 9091.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 9091, (xii) any Person indemnified by any

-

HCMLPHMIT00001224

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO, Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T6Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 90176-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary,* none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

4

001491

HCMLPHMIT00001225

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

"**HMIT Note**" means that certain Secured Promissory Note dated December 91, 9015, in the original face amount of $2-,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 9091, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 98], 9095, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 3, 9090, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. - - 3].

001492

HCMLPHMIT00001226

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in <u>Sections 1 – 9</u> and <u>Sections 3 612</u>.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 12, 9091, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 9091.

"Operating Expenses" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 134- on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. - :9- 6cv6090716E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. - 233 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, - :946cv6015- 16X

001493
HCMLPHMIT00001227

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

(N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. - :946cv017826L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for presuit discovery, suits, litigations, arbitrations, actual or threated restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

## RECITALS

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 91, 9015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 35/100 Dollars ($57,230,240.35) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 9091, in accordance with the Plan;

001494
HCMLPHMIT00001228

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 5-/100 Dollars ($- 34,2- 0,871.5- ) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

WHEREAS, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 3 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## **AGREEMENT**

1.  Stay and Dismissal of Pending Litigation With Prejudice.

(a)  Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

8

001495
HCMLPHMIT00001229

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

(b)    Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

9.    <u>Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)    The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 9160-0726sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub6Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

-.    <u>Cash Payment to HMIT</u>.  Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one6time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

[wire instructions]

4.    <u>HMIT Class 10 Interest</u>.

(a)    Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty6Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$--2,340,9-0.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)    Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)    Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

001496
HCMLPHMIT00001230

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

(d)      For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.      <u>Initial Interim Distributions on the Allowed Class 10 Interests</u>.

(a)      Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**").

(b)      Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in6kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date.  Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in6 kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

2.      <u>Subsequent Distribution(s) on the Allowed Class 10 Interests</u>.

(a)      On December 1, 9097, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$2,500,000.00).

(b)      On December 1, 9098, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$2,500,000.00).

(c)      Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential

HCMLPHMIT00001231

Exhibit 57 Page 139 of 257
CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.    <u>Final Distribution on the Allowed Class 10 Interests</u>.

(a)    On the later of the Final Court Approval Date and April 1, 9093, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; <u>provided</u>, <u>however</u>, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (9) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)    The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c)    Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.    <u>Transfer Kirschner Claims; Dismissal of HMIT Note Claims</u>.

(a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in <u>Section 9</u>, the Litigation Sub-Trust shall execute a short-form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including <u>Section 8(b)</u> below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of <u>Section 8(c)</u> below.

(b)    THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR

001498
HCMLPHMIT00001232

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)     As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.  The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)     Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

3.     <u>General Release By The HMIT Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released

001499

HCMLPHMIT00001233

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10.    <u>General Release By The Highland Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11.    <u>Further Provisions Concerning The General Releases</u>.

(a)    **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b)    To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)    Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1549 of the California Civil Code (to the extent, if any, that Section 1549 might apply to the foregoing release), which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT**

001500
HCMLPHMIT00001234

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

**TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1549 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d) As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in <u>Sections 3 and 10</u>, should:

(i) any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii) any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged

001501
HCMLPHMIT00001235

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

19.  <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)  Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)  Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)  For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

1-.  <u>Representations and Warranties</u>.

(a)  Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)  The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors.  The HMIT Entities further agree, on their own behalf and on behalf of the other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)  Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)  Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this

001502
HCMLPHMIT00001236

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms. Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.   <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.   <u>Gatekeeper Standard</u>.

(a)   The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 9-610[5-]4 (5th Cir. Mar. 18, 9095), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 909- Bankr. LEXIS 9104 at *1946-2 (Bankr. N.D. Tex. Aug. 94, 909-).

(b)   The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)   The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

001503

HCMLPHMIT00001237

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

12.    <u>Indemnification</u>.

(a)    Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 1-</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims. Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 19</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 19</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action. Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)    Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 1-</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims. Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 19</u> shall be liable to the HMIT Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 19</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action. Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17.    <u>Execution</u>. This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel. All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.    <u>Bankruptcy Court Order</u>. The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order. To that end, the Highland Entities shall file the 3013 Motion no later than five (5) Business Days after the Agreement Date. Each Party shall, and shall cause each of their respective Affiliates to, undertake

001504
HCMLPHMIT00001238

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 3013 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 3013 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no affect on, adjustment to or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in Section 4 to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

13.  Fees and Expenses.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to Section 18.  Notwithstanding the foregoing, if any Party hereto brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that Action shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

90.  Entire Agreement; No Other Representations.  **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.  THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "REPRESENTATIONS"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE**

001505
HCMLPHMIT00001239

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

**HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

91.    <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

99.    <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

9-.    <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

94.    <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

95.    <u>No Admissions</u>.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

92.    <u>Other Provisions</u>.

(a)    No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

001506

HCMLPHMIT00001240

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

(b)     The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)     The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)     The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

97.     <u>Notices</u>.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 300276400-
- 10.977.2310
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
- 01 Main Street, Suite 1200
995.- 81.324-
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

98.     <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

93.     <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to

001507
HCMLPHMIT00001241

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 5/12/9095

a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

[*Signature page follows*]

001508
HCMLPHMIT00001242

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By _____
Name:    Mark Patrick
Title:    Administrator
Date:    May __, 9095

**BEACON MOUNTAIN LLC**

By _____
Name:
Title:
Date:    May __, 9095

**RAND ADVISORS, LLC**

By _____
Name:    Mark Patrick
Title:    President
Date:    May __, 9095

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By _____
Name:    Mark Patrick
Title:    President
Date:    May __, 9095

**RAND PE FUND MANAGEMENT, LLC**

By _____
Name:    Mark Patrick
Title:    President

001509
HCMLPHMIT00001243

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/98/95

Date:        May __, 9095

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner


By    _____
      Name:        Mark Patrick
      Title:       President
      Date:        May __, 9095

**ATLAS IDF GP, LLC**


By    _____
      Name:        Mark Patrick
      Title:       President
      Date:        May __, 9095


**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By    _____
      Name:        James. P. Seery, Jr.
      Title:       Chief Executive Officer
      Date:        May __, 9095


**HIGHLAND CLAIMANT TRUST**


By    _____
      Name:        James P. Seery, Jr.
      Title:       Claimant Trustee
      Date:        May __, 9095


**HIGHLAND LITIGATION SUB-TRUST**


By    _____
      Name:        Marc S. Kirschner
      Title:       Litigation Trustee


SIGNATURE PAGE TO SETTLEMENT AGREEMENT & GENERAL RELEASE

001510

HCMLPHMIT00001244

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FED. R. EVID. 408
DRAFT 4/98/95

Date:        May __, 9095

**HIGHLAND INDEMNITY TRUST**


By    _____
      Name:      James P. Seery, Jr.
      Title:     Indemnity Trust Administrator
      Date:      May __, 9095

001511

HCMLPHMIT00001245

**EXHIBIT 58**

CONFIDENTIAL

Highland Claimant Trust
100 Crescent Court, Suite 1850
Dallas, TX 75201

May 20, 2025

Patrick Daugherty
3621 Cornell Ave, Ste 830
Dallas, TX 75205

Dear Patrick Daugherty:

Highland Claimant Trust is making a distribution (the "**Eighth Distribution**") of cash proceeds to holders of Claimant Trust Interests in accordance with Article VI of the Claimant Trust Agreement.

Your share of the Eighth Distribution is $797,269.56, of which $781,707.29 represents the remaining portion of your previously allowed Class 9 claim and $15,562.27 represents all accrued interest with respect to such claim. No further distributions will be made on account of your allowed Class 9 claim after the Eighth Distribution, provided however that you still have an unresolved and pending claim that is separate from your allowed Class 9 claim, which has neither been allowed nor disallowed as of the date of this notice. The Eighth Distribution will be paid out to you on or about May 20, 2025.

The foregoing is not intended to provide, and should not be relied on for, tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors regarding treatment of the Eighth Distribution. This notice contains confidential information and is intended only for the addressee named herein. If you are not named addressee, you should not disseminate, distribute, or copy this notice. If you have received this notice by mistake, please notify David Klos immediately by e-mail (dklos@highlandcapital.com) and delete it along with any copies in your possession. If you are not the intended recipient, you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.


Sincerely,

James P. Seery, Jr.
Claimant Trustee, Highland Claimant Trust

001513

**EXHIBIT 59**

001514

**WRITTEN CONSENT**
**OF THE**
**HOLDERS OF CLASS 9 SUBORINDATED CLAIM TRUST INTERESTS**
**IN THE**
**HIGHLAND CLAIMANT TRUST**

May 16, 2025

The undersigned, constituting all of the holders of the Class 9 Subordinated Claim Trust Interests (as defined in the Claimant Trust Agreement (as hereinafter defined)) in the Highland Claimant Trust, a Delaware statutory trust (the "**Claimant Trust**"), except for Mr. Patrick Hagaman Daugherty (such holders, the "**Consenting Holders**"), having waived any requirement for or notice of a meeting, hereby adopt and approve the following written consent:

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. (the "**Debtor**" or "**HCMLP**") filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Bankruptcy Court**") and captioned In re Highland Capital Management, L.P., Case No. 19-34054-sgj11 (the "**Chapter 11 Case**");

WHEREAS, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (as may be amended, supplemented, or otherwise modified from time to time, the "**Plan**"), which was confirmed by the Bankruptcy Court on February 22, 2021, pursuant to the *Findings of Fact and Order Confirming Plan of Reorganization for the Debtor* [ Docket No. 1943] (the "**Confirmation Order**");

WHEREAS, pursuant to the terms of the Plan, each of the Consenting Holders hold Allowed Class 9 Subordinated Claims entitled to the treatment provided in the Plan or such other less favorable treatment as such Holder and the Claimant Trustee may agree in writing;

WHEREAS, on August 11, 2021, the Effective Date as defined in the Plan occurred, the Debtor emerged from bankruptcy and the Claimant Trust was established pursuant to the Plan and that certain Claimant Trust Agreement, effective as of August 11, 2021 (as may be amended, supplemented, or otherwise modified from time to time, the "**Claimant Trust Agreement**"), by and among the Debtor, as settlor, James P. Seery, Jr. as trustee, and Wilmington Trust, National Association, as Delaware trustee;

WHEREAS, capitalized terms used but not otherwise defined herein or obvious from the context in which they are used have the meanings ascribed to such terms in the Plan and the Claimant Trust Agreement, as applicable.

1

HCMLPHMIT00002677

**Payment in Satisfaction of Mr. Daugherty's Subordinated Claim Trust Interest**

WHEREAS, Mr. Patrick Hagaman Daugherty is the holder of a Class 9 Subordinated Claim Trust Interest in the Claimant Trust in the original amount of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000) with the current aggregate outstanding amount of Seven Hundred Eighty-One Thousand Seven Hundred Seven and 29/100 DOLLARS ($781,707.29), exclusive of interest (the "**Daugherty Class 9 Interest**");

WHEREAS, interest of Fifteen Thousand Five Hundred Fifty-Three and 71/100 Dollars ($15,553.71) has accrued in respect of the Daugherty Class 9 Interest as of May 15, 2025 and interest continues to accrue at approximately $1.71 per calendar day.

WHEREAS, the Claimant Trust desires to make a non-ratable distribution in respect of the Daugherty Class 9 Interest in order to pay such Daugherty Class 9 Interest in full, along with applicable interest (the "**Final Daugherty Distribution**"); and

WHEREAS, none of the Consenting Holders will receive a distribution at the time the Final Daugherty Distribution is made, but such Consenting Holders will retain all other rights related to their respective Subordinated Claim Trust Interests as set forth in the Plan and the Claimant Trust Agreement.

NOW, THEREFORE, BE IT RESOLVED AND CONSENTED TO that notwithstanding anything in the Plan or the Claimant Trust Agreement to the contrary, the Consenting Holders hereby approve, consent to and waive the Final Daugherty Distribution.

**Payments to Holders of Allowed Class 10 Interests**

WHEREAS, reference is made to the Settlement Agreement & General Release materially in the form attached hereto as <u>Exhibit A</u> (the "**HMIT Settlement Agreement**") to be entered into by and among HCMLP, the Claimant Trust, the Highland Litigation Sub-Trust, a Delaware statutory trust, and the Highland Indemnity Trust, a Delaware statutory trust (the "**Indemnity Trust**"), Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Rand Advisors, LLC, a Delaware limited liability company, Rand PE Fund I, LP, a Delaware series limited partnership, Rand PE Fund Management, LLC, a Delaware limited liability company, Atlas IDF, LP, a Delaware limited partnership, and Atlas IDF GP, LLC, a Delaware limited liability company;

WHEREAS, as of the Petition Date, HMIT held the only Class B and Class C Limited Partnership Interests in HCMLP;

WHEREAS, on December 21, 2015, HMIT entered into the HMIT Note (as defined in the HMIT Settlement Agreement) with HCMLP, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

WHEREAS, HMIT's Class B and Class C Limited Partnership Interests in HCMLP were extinguished on August 11, 2021, in accordance with the Plan;

001516

HCMLPHMIT00002678

WHEREAS, pursuant to the Limited Partnership Agreement, HMIT's capital account balance at HCMLP on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

WHEREAS, pursuant to the terms and subject to the conditions set forth in the HMIT Settlement Agreement, including, without limitation, the entry of the Bankruptcy Court Order (as defined in the HMIT Settlement Agreement), the HMIT Class 10 Interest (as defined in the HMIT Settlement Agreement) will be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance; and

WHEREAS, pursuant to the HMIT Settlement Agreement and subject to the conditions set forth therein, the Indemnity Trust will make certain distributions to the Holders of allowed Class 10 Claims or Equity Interests prior to the Claimant Trust having repaid in full with applicable interest the holders of Class 9 Subordinated Claim Trust Interests (all of whom are Consenting Holders), including, the Initial Interim Cash Distribution Amount, the assignment of the Dugaboy Note in-kind to HMIT and a corresponding pro rata cash distribution to the other Holder of an allowed Class 10 Claim or Equity Interest, the First Subsequent Distribution, and the Second Subsequent Distribution (each as defined in the HMIT Settlement Agreement, and any such payment pursuant to the HMIT Settlement Agreement, a "**Class 10 Distribution**").

NOW, THEREFORE, BE IT RESOLVED AND CONSENTED TO that notwithstanding anything in the Plan or the Claimant Trust Agreement to the contrary, the Consenting Holders hereby approve, consent to all Class 10 Distributions, in each case, in accordance with the terms and conditions set forth in the HMIT Settlement Agreement; <u>provided</u>, that, and such consent by the Consenting Holders being expressly conditioned upon, at the time each Class 10 Distribution is made, if any, the Claimant Trust or the Indemnity Trust, as applicable, shall make the corresponding distribution set forth on <u>Exhibit B</u> on a pro rata basis to the holders of Class 9 Subordinated Claim Trust Interests.

*[Signature Page Follows.]*

001517

HCMLPHMIT00002679

IN WITNESS WHEREOF, the undersigned Consenting Holders have executed this Written Consent to be effective as of the date first written above.

MUCK HOLDINGS, LLC

By: _____
Name: Michael Linn
Title:  Michael Linn


JESSUP HOLDINGS, LLC

By: _____
Name: Paul Malek
Title:  Authorized Signatory


UBS SECURITIES LLC

By: _____
Name: Michael Parniawski
Title: Authorized Signatory

By: _____
Name: Nader Attalla
Title: Authorized Signatory

UBS AG LONDON BRANCH

By: _____
Name: Michael Parniawski
Title: Authorized Signatory

By: _____
Name: Nader Attalla
Title: Authorized Signatory

ACCEPTED AND AGREED:


_____
James P. Seery, Jr., solely in his capacity as
Claimant Trustee of the Highland Claimant
Trust

WRITTEN CONSENT OF THE HOLDERS OF CLASS 9 SUBORDINATED CLAIM TRUST INTERESTS

001518

HCMLPHMIT00002680

**EXHIBIT A**

**Form of HMIT Settlement Agreement**

[*Attached.*]

001519
HCMLPHMIT00002681

# EXHIBIT B

## Class 9/10 Distribution Schedule

| General description | Event | Amount to Class 9 | Amount to Class 10 |
|---|---|---|---|
| Retirement of Daugherty Class 9 | After receipt of written consent | $797,261, plus daily interest if applicable [1] | - |
| Disputed Claims Reserve distribution | Resolution of pending "Daugherty tax claim" | Up to $2,656,732.31 [2] | - |
| Initial Interim Distribution (cash) | Within 5 Business Days after Bankruptcy Court Approval | $10,000,000.00 | $10,000,000.00 |
| Initial Interim Distribution (in-kind) | Within 5 Business Days after Bankruptcy Court Approval | n/a | Assignment of Dugaboy Note [3] |
| First Subsequent Distribution | December 1, 2027, subject to Section 6(c) of settlement agreement | Remaining outstanding w/interest | $6,500,000.00 |
| Second Subsequent Distribution | December 1, 2028, subject to Section 6(c) of settlement agreement | n/a | $6,500,000.00 |
| Final Distribution | April 1, 2029, subject to Section 7(c) of settlement agreement | n/a | Remaining assets |

[1] Payable to Daugherty only in respect of his allowed Class 9 claim, pursuant to the written consent.

[2] Disputed Claims Reserve of up to $2,656,732.31 (representing the reserved Class 8 Daugherty tax claim, including interest) will be released upon resolution of the claim.  Payment of the reserve to allowed claimholders will follow the terms of the Plan.  For example, if the claim is completely disallowed, the entire reserve will be promptly paid to holders of Class 9 interests up to the holders' remaining unpaid face amount plus interest.  Similarly, if the claim is partially allowed, any excess of the reserve over the partially allowed amount will be promptly paid to holders of Class 9 interests up to the holders' remaining unpaid face amount plus interest.

[3] Dugaboy Note to be assigned to HMIT.  Cash of up to $550k to be distributed pro rata to other Class 10 holder.

001520

**EXHIBIT 60**

*EXECUTION VERSION*

## TOLLING AGREEMENT EXTENDING CLAIM OBJECTION DEADLINE

This Tolling Agreement (the "<u>Agreement</u>") is made as of July 27, 2022 (the "<u>Effective Date</u>"), by and between Patrick Hagaman Daugherty ("<u>Mr. Daugherty</u>"), on the one hand, and Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>," as applicable) and the Highland Claimant Trust (the "<u>Claimant Trust</u>," and together with Highland, the "<u>Highland Parties</u>"), on the other.  Each of Mr. Daugherty, Highland, and the Claimant Trust are individually referred to herein as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

## RECITALS

WHEREAS, Mr. Daugherty is a former employee and limited partner of Highland and served in other positions with affiliates and former affiliates of Highland from time to time;

WHEREAS, on October 16, 2019, Highland filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Case</u>"), which is pending in the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division (the "<u>Bankruptcy Court</u>");

WHEREAS, on April 1, 2020, Mr. Daugherty filed a general, unsecured, non-priority claim against Highland in the amount of at "least $37,483,876.59," and such claim was denoted by Highland's claims agent as Proof of Claim No. 67 ("<u>Claim No. 67</u>");

WHEREAS, on April 6, 2020, Mr. Daugherty filed a general, unsecured, non-priority claim against Highland in the amount of at "least $37,482,876.62" that superseded Claim No. 67 and that was denoted by Highland's claims agent as Proof of Claim No. 77 ("<u>Claim No. 77</u>");

WHEREAS, on August 31, 2020, Highland commenced an adversary proceeding, Adv. Proc. No. 20-03107-sgj (Bankr. N.D. Tex.) (the "<u>Adversary Proceeding</u>"), against Mr. Daugherty by filing a complaint [Adv. Dkt. No. 1][1] (the "<u>Complaint</u>") in which Highland (a) objected to Claim No. 77 on various grounds, and (b) asserted a cause of action for the subordination of part of Mr. Daugherty's claim pursuant to 11 U.S.C. § 510(b);

WHEREAS, on September 29, 2020, Mr. Daugherty filed his answer to the Complaint [Adv. Dkt. No. 8] in the Adversary Proceeding;

WHEREAS, on October 23, 2020, Mr. Daugherty filed a motion seeking leave to amend Claim No. 77 [Bankr. Dkt. No. 1280][2] (the "<u>POC Amendment Motion</u>") and attached an amended proof of claim to the POC Amendment Motion increasing Mr. Daugherty's general, unsecured, non-priority claim against Highland to the amount of at "least $40,410,819.42" and sought to supersede Claim No. 67 and Claim No. 77;

---

[1] Adv. Dkt. No. refers to the docket maintained in the Adversary Proceeding.

[2] Bankr. Dkt. No. refers to the docket maintained in the Bankruptcy Case.

WHEREAS, on December 10, 2020, the Bankruptcy Court entered an order [Bankr. Dkt. No. 1533] granting the POC Amendment Motion, and Mr. Daugherty was permitted to file an amendment to his proof of claim;

WHEREAS, on December 23, 2020, Mr. Daugherty filed an amended proof of claim, designated by Highland's claims agent as Proof of Claim No. 205 ("Claim No. 205," and together with Claim No. 67 Claim No. 77, the "Daugherty Claim");

WHEREAS, Claim No. 205 superseded Claim No. 77 and increased the Daugherty Claim to $40,710,819.42;

WHEREAS, on February 22, 2021, the Bankruptcy Court entered its *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Dkt. No. 1943] (the "Confirmation Order") confirming the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Dkt. No. 1808] (as amended, supplemented, or modified, the "Plan");

WHEREAS, on August 11, 2021, the Effective Date (as defined in the Plan) occurred [Bankr. Dkt. No. 2700];

WHEREAS, on or about November 22, 2021, Highland and Mr. Daugherty executed that certain Settlement Agreement (the "Settlement Agreement") attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* [Bankr. Dkt. No. 3089] filed in support of the *Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* [Bankr. Dkt. No. 3088] (the "Settlement Motion");

WHEREAS, following an evidentiary hearing on the Settlement Motion held on March 1, 2022, the Bankruptcy Court entered its order [Bankr. Dkt. No. 3298] (the "Settlement Order") approving the Settlement Motion and the Parties' entry into the Settlement Agreement;

WHEREAS, pursuant to the Settlement Order, the Daugherty Claim, excluding the Reserved Claim,[3] was satisfied in its entirety;

WHEREAS, the Highland Parties dispute the validity and amount of the Reserved Claim and, pursuant to Section 9 of the Settlement Agreement, Mr. Daugherty and Highland reserved all rights with respect to the Reserved Claim; *provided, however*, that any litigation between Highland and Mr. Daugherty concerning the Reserved Claim was stayed until the IRS makes a final determination with respect to the dispute between the Debtor and the IRS (the "IRS Dispute") or the Highland Parties and Mr. Daugherty otherwise agree;

---

[3] "Reserved Claim" means the contingent and unliquidated claim as referenced in Proof of Claim No. 205 that related to an alleged claim for compensation and an audit/dispute between the Debtor and the Internal Revenue Service (the "IRS") in an amount estimated to be $2,650,353.00 as of October 23, 2020.

001523

WHEREAS, pursuant to the Confirmation Order, the deadline to object to claims was 180 days after the Effective Date, *i.e.*, February 7, 2022, unless extended by the Bankruptcy Court (the "Claim Objection Deadline");

WHEREAS, the Claim Objection Deadline was extended by order of the Bankruptcy Court [Bankr. Dkt. No. 3198] to August 8, 2022;

WHEREAS, the Highland Parties were vested with the exclusive authority to compromise, settle, withdrew, or resolve all claims against the Debtor, including the Reserved Claim, without further order of the Bankruptcy Court pursuant to Article VII.B of the Plan;

WHEREAS, on July 6, 2022, the Highland Parties filed the *Reorganized Debtor and Claimant Trustee Joint Motion for Entry of an Order Further Extending the Claim Objection Deadline Pursuant to Confirmed Chapter 11 Plan by which Reorganized Debtor May Object to Certain Claims* [Bankr. Dkt. No. 3387] (the "Second Extension Motion");

WHEREAS, Mr. Daugherty and the Highland Parties continue to consider potential resolutions of the Reserved Claim in the absence of a resolution of the IRS Dispute;

WHEREAS, it is unknown when the IRS Dispute may be resolved; and

WHEREAS, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, and without any Party admitting liability, fault, or wrongdoing, or releasing or waiving any rights or defenses with respect to the Reserved Claim, the Parties desire to enter into this Agreement to extend the Claim Objection Deadline, solely with respect to the Reserved Claim, to January 11, 2023, at 5:00 p.m. (Central Time) (the "Objection Deadline").

NOW, THEREFORE, effective as of the Effective Date, each of the Parties agrees as follows:

1.    <u>Covenant to Reserve</u>.  In consideration of Mr. Daugherty's agreement to extend the Claim Objection Deadline (as set forth in paragraph 2 of this Agreement), the Highland Parties agree not to commence any lawsuit, action or proceeding to further object to the Reserved Claim at any time until the Objection Deadline (notwithstanding Mr. Daugherty's position that the Highland Parties would have no right to do so in any event under the Settlement Agreement until such time that the IRS resolves the IRS Dispute) and further agree to reserve $2,650,353.00 on account of the Reserved Claim in the "Disputed Claim Reserve" as such term is defined in the Plan until the Parties resolve the Reserved Claim pursuant to a signed agreement, or, alternatively, an order of the Bankruptcy Court.

2.    <u>Extension of Claim Objection Deadline</u>.  In consideration of the Highland Parties' "Covenant to Reserve" (as set forth in paragraph 1 of this Agreement), Mr. Daugherty agrees that the Claim Objection Deadline applicable to the Reserved Claim is hereby tolled as of, and extended from, the Effective Date to the Objection Deadline.

3.    <u>Acknowledgement and Waiver</u>.  Mr. Daugherty acknowledges and agrees that:

001524

a.      Regardless of whether the Second Extension Motion is approved by the Bankruptcy Court, Mr. Daugherty waives any right or ability to argue (x) that the terms of this Agreement and the extension of the Claim Objection Deadline required an order of the Bankruptcy Court; or (y) the application of the expiration of the Claims Objection Deadline to the Reserved Claim; and

b.      Mr. Daugherty is estopped from arguing that this Agreement is ineffective to extend the time within which the Highland Parties must object to the Reserved Claim.

4.      <u>Acknowledgement and Waiver</u>.  The Highland Parties acknowledge and agree that regardless of whether the Second Extension Motion is approved by the Bankruptcy Court, the Highland Parties waive any right or ability to argue that the terms of this Agreement and the extension of the Claim Objection Deadline required an order of the Bankruptcy Court.

5.      <u>Representations and Warranties</u>.

a.      Mr. Daugherty represents and warrants that he has not sold, transferred, hypothecated, pledged, or assigned the Reserved Claim to any other person or entity, and that no person or entity other than Mr. Daugherty has been, is, or will be authorized to bring, pursue, or enforce the Reserved Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) Mr. Daugherty.

b.      Each Party represents and warrants to the other Party that such Party is fully authorized to enter into and perform the terms of this Agreement and that, as of the Effective Date, this Agreement will be fully binding upon each Party in accordance with its terms.

6.      <u>Miscellaneous</u>.

a.      <u>Binding Effect; Successors-in-Interest</u>.  Each of the Parties agrees that this Agreement will be binding upon the Parties, and, as applicable, upon their predecessors, successors, subsidiaries, divisions, alter egos, affiliated and related entities, and their past or present officers, directors, partners, employees, attorneys, assigns, agents, representatives, and any or all of them.

b.      <u>No Admission of Liability</u>.  The Parties acknowledge that there is a bona fide dispute with respect to the validity and amount of the Reserved Claim.  Nothing in this Agreement will imply an admission of liability, fault or wrongdoing by the Highland Parties, Mr. Daugherty, or any other person and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Highland Parties, Mr. Daugherty, or any other person.

c.      <u>Notice</u>.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**Mr. Daugherty**

Patrick Hagaman Daugherty
3621 Cornell Avenue, Suite 830
Dallas, TX 75205
Email: pdaugherty@glacierlakecap.com

with a copy (which shall not constitute notice) to:

McCollom D'Emilio Smith Uebler LLC
Attn: Thomas Uebler, Esquire
2751 Centerville Road, Suite 401
Wilmington, DE 19808
E-mail: tuebler@mdsulaw.com

**Highland Parties**

Highland Capital Management, L.P.
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: David Klos
E-mail: dklos@HighlandCapital.com

Highland Claimant Trust
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: David Klos
E-mail: dklos@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Gregory Demo, Esq.
780 Third Avenue, 34th Floor
New York, NY 10017
E-mail: gdemo@pszjlaw.com

d.     Advice of Counsel.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, in the negotiation of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without reservation; and (d) had the opportunity to have the terms and conditions of this Agreement explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

**001526**

   e. <u>Counterparts</u>.  This Agreement may be signed in counterparts and such signatures may be delivered by facsimile or other electronic means.

   f. <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written and oral agreements and discussions.  This Agreement may only be amended by an agreement in writing signed by the Parties.

   g. <u>No Waiver and Reservation of Rights</u>.  Except as otherwise provided herein, nothing in this Agreement shall be, or deemed to be, a waiver of any rights, remedies or privileges of any of the Parties, and each Party hereby reserves all of such rights, privileges and remedies under applicable law.

   h. <u>No Waiver if Breach</u>.  The Parties agree that no breach of any provision hereof can be waived except in writing.  The waiver of a breach of any provision hereof shall not be deemed a waiver of any other breach of any provision hereof.

   i. <u>Governing Law</u>.  This Agreement will be exclusively governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of law principles, and all claims relating to or arising out of this Agreement, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Delaware, excluding Delaware's conflicts of law principles.

   j. <u>Jurisdiction</u>.  The Bankruptcy Court will retain exclusive jurisdiction over disputes relating to this Agreement.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

DOCS_NY:46061.8 36027/003

6

001527

**IT IS HEREBY AGREED.**

PATRICK HAGAMAN DAUGHERTY

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: _____
Its: _____

HIGHLAND CLAIMANT TRUST

By: _____
Name: _____
Its: _____

001528

**IT IS HEREBY AGREED.**

**PATRICK HAGAMAN DAUGHERTY**

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name: _____
Its: _____

**HIGHLAND CLAIMANT TRUST**

By: _____
Name: _____
Its: _____

001529

**EXHIBIT 61**

001530

## AMENDMENT NO. 1 TO TOLLING AGREEMENT
## EXTENDING CLAIM OBJECTION DEADLINE

This Amendment No. 1 (the "Amendment"), dated as of December 21, 2022, to that certain Tolling Agreement Extending Claim Objection Deadline, dated as of July 27, 2022 (the "Agreement"), is made by and between Patrick Hagaman Daugherty, on the one hand, and Highland Capital Management, L.P. and the Highland Claimant Trust, on the other. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

## RECITALS

WHEREAS, the Parties entered into the Agreement to extend the Claim Objection Deadline to object to the Reserved Claim to January 11, 2023, at 5:00 p.m. (Central Time) (*i.e.*, the Objection Deadline).

WHEREAS, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, the Parties desire to enter into this Amendment to further extend the Objection Deadline to object to the Reserved Claim.

NOW, THEREFORE, effective as of the date set forth above, each of the Parties agrees as follows:

1. <u>Extension of Objection Deadline</u>. The term Objection Deadline as used in the Agreement is hereby amended and modified to mean 5:00 p.m. (Central Time) on the earlier of (a) December 31, 2023, (b) the first business day after the date that James P. Seery, Jr., is no longer the sole trustee of the Claimant Trust, or (c) the first business day after the date that the Claimant Trust is no longer (i) Highland's sole limited partner or (ii) the sole owner of, and with the right to direct, Highland's general partner.

2. <u>Representations and Warranties</u>. Each Party represents and warrants that the representations and warranties set forth in Section 5 of the Agreement are true and accurate as of the date hereof.

3. <u>Effectiveness of Agreement; No Other Changes</u>. Except as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms. If there is a conflict between this Amendment and the Agreement, the terms of this Amendment will prevail.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

001531

**IT IS HEREBY AGREED.**

PATRICK HAGAMAN DAUGHERTY

_____

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:        _____
Name:      James P. Seery, Jr.
Its:        CEO

HIGHLAND CLAIMANT TRUST

By:        _____
Name:      James P. Seery, Jr.
Its:        Claimant Trustee

001532

**EXHIBIT 62**

## AMENDMENT NO. 2 TO TOLLING AGREEMENT
## EXTENDING CLAIM OBJECTION DEADLINE

This Amendment No. 2 (the "Amendment"), dated as of November 6, 2023, to that certain Tolling Agreement Extending Claim Objection Deadline, dated as of July 27, 2022 (the "Tolling Agreement"), is made by and between Patrick Hagaman Daugherty, on the one hand, and Highland Capital Management, L.P. and the Highland Claimant Trust, on the other. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

## RECITALS

WHEREAS, the Parties entered into the Tolling Agreement to extend the Claim Objection Deadline to object to the Reserved Claim to January 11, 2023, at 5:00 p.m. (Central Time) (*i.e.*, the Objection Deadline).

WHEREAS, the Parties entered into that certain *Amendment No. 1 to Tolling Agreement Extending Claim Objection Deadline* on December 21, 2022, further extending the deadline to object to the Reserved Claim to December 31, 2023 (or earlier if certain conditions were satisfied) (the "First Amendment," and together with the Tolling Agreement, the "Agreement").

WHEREAS, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, the Parties desire to enter into this Amendment to further extend the Objection Deadline to object to the Reserved Claim.

NOW, THEREFORE, effective as of the date set forth above, each of the Parties agrees as follows:

1.    Extension of Objection Deadline.    The term Objection Deadline as used in the Agreement is hereby amended and modified to mean 5:00 p.m. (Central Time) on the earlier of (a) December 31, 2024, (b) the first business day after the date that James P. Seery, Jr., is no longer the sole trustee of the Claimant Trust, or (c) the first business day after the date that the Claimant Trust is no longer (i) Highland's sole limited partner or (ii) the sole owner of, and with the right to direct, Highland's general partner.

2.    Representations and Warranties.    Each Party represents and warrants that the representations and warranties set forth in Section 5 of the Agreement are true and accurate as of the date hereof.

3.    Effectiveness of Agreement; No Other Changes.    Except as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms. If there is a conflict between this Amendment and the Agreement, the terms of this Amendment will prevail.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

001534

**IT IS HEREBY AGREED.**

PATRICK HAGAMAN DAUGHERTY

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:     _____
Name:   _____
Its:    _____

**HIGHLAND CLAIMANT TRUST**

By:     _____
Name:   _____
Its:    _____

001535

**IT IS HEREBY AGREED.**

**PATRICK HAGAMAN DAUGHERTY**

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:    _____
Name:    James P. Seery, Jr.
Its:    CEO


**HIGHLAND CLAIMANT TRUST**

By:    _____
Name:    James P. Seery, Jr.
Its:    Claimant Trustee


DOCS_NY:48918.2 36027/003                2

**001536**

**EXHIBIT 63**

001537

## AMENDMENT NO. 3 TO TOLLING AGREEMENT
## EXTENDING CLAIM OBJECTION DEADLINE

This Amendment No. 3 (the "Amendment"), dated as of November 20, 2024, to that certain *Tolling Agreement Extending Claim Objection Deadline*, dated as of July 27, 2022 (the "Tolling Agreement"), is made by and between Patrick Hagaman Daugherty, on the one hand, and Highland Capital Management, L.P. and the Highland Claimant Trust, on the other. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

## RECITALS

WHEREAS, the Parties entered into the Tolling Agreement to extend the Claim Objection Deadline to object to the Reserved Claim to January 11, 2023, at 5:00 p.m. (Central Time) (*i.e.*, the Objection Deadline).

WHEREAS, the Parties entered into that certain *Amendment No. 1 to Tolling Agreement Extending Claim Objection Deadline* on December 21, 2022, further extending the deadline to object to the Reserved Claim to December 31, 2023 (or earlier if certain conditions were satisfied) (the "First Amendment").

WHEREAS, the Parties entered into that certain *Amendment No. 2 to Tolling Agreement Extending Claim Objection Deadline* on November 6, 2023, further extending the deadline to object to the Reserved Claim to December 31, 2024 (or earlier if certain conditions were satisfied) (the "Second Amendment," and together with the Tolling Agreement and the First Amendment, the "Agreement").

WHEREAS, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, the Parties desire to enter into this Amendment to further extend the Objection Deadline to object to the Reserved Claim.

NOW, THEREFORE, effective as of the date set forth above, each of the Parties agrees as follows:

1.    Extension of Objection Deadline.  The term Objection Deadline as used in the Agreement is hereby amended and modified to mean 5:00 p.m. (Central Time) on the earlier of (a) June 30, 2025, (b) the first business day after the date that James P. Seery, Jr., is no longer the sole trustee of the Claimant Trust, or (c) the first business day after the date that the Claimant Trust is no longer (i) Highland's sole limited partner or (ii) the sole owner of, and with the right to direct, Highland's general partner.

2.    Representations and Warranties.  Each Party represents and warrants that the representations and warranties set forth in Section 5 of the Agreement are true and accurate as of the date hereof.

3.    Effectiveness of Agreement; No Other Changes.  Except as set forth in this Amendment, the Agreement is unaffected and shall continue in full force and effect in accordance with its terms.  If there is a conflict between this Amendment and the Agreement, the terms of this Amendment will prevail.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

001538

**IT IS HEREBY AGREED.**

**PATRICK HAGAMAN DAUGHERTY**

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
Name:  James P. Seery, Jr.
Its:  Chief Executive Officer

**HIGHLAND CLAIMANT TRUST**

By: _____
Name:  James P. Seery, Jr.
Its:  Claimant Trustee

001539

# EXHIBIT 64

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>
**Cc:** "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Subject:** RE: John, would you have a couple of minutes to visit with me this morning or sometime today? Thanks.
**Date:** Mon, 6 Jan 2025 17:10:00 +0000
**Importance:** Normal
**Inline-Images:** image004.png; image003.png

---

Happy New Year, John.  Answer, No.  We have a draft ready, but have reviewed the rules and think the deadline is 14 days, and therefore Friday (9023(b) A motion for a new trial or to alter or amend a judgment must be filed within 14 days after the judgment is entered).  We plan to circulate before filing.  Happy to visit.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Monday, January 6, 2025 10:47 AM
**To:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Subject:** RE: John, would you have a couple of minutes to visit with me this morning or sometime today? Thanks.

HCMLPHMIT00000008

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Good morning and Happy New Year.

Do you anticipate filing anything today?

**From:** Louis M. Phillips <Louis.Phillips@kellyhart.com>
**Sent:** Monday, December 30, 2024 10:15 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Subject:** John, would you have a couple of minutes to visit with me this morning or sometime today? Thanks.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT:  225-338-5308

louis.phillips@kellyhart.com
www.kellyhart.com

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

HCMLPHMIT00000009

**EXHIBIT 65**

**From:** "Louis M. Phillips" <Louis.Phillips@kellyhart.com>
**To:** "John A. Morris" <jmorris@pszjlaw.com>, "Amelia L. Hurt" <Amelia.Hurt@kellyhart.com>
**Cc:** "Dan.Elms@gtlaw.com" <Dan.Elms@gtlaw.com>, "Hayley R. Winograd"
     <hwinograd@pszjlaw.com>
**Subject:** RE: DRAFT Motion to Reconsider HCLOM Stipulated Order
**Date:** Sat, 11 Jan 2025 03:48:31 +0000
**Importance:** Normal
**Inline-Images:** image005.jpg; image006.png; image002.png

---

John,

We think the ground for the change of lawyers for HCLOM is self-evident.

This is to advise that we will not be filing the motion Amelia sent around earlier (which she sent as a courtesy as I told you we would circulate). Hope to visit soon.

**Louis M. Phillips**
*Partner*



KELLY HART & PITRE
301 MAIN STREET SUITE 1600
BATON ROUGE, LOUISIANA 70801
TELEPHONE: 225-381-9643
FAX: 225-336-9763
DIRECT: 225-338-5308

*louis.phillips@kellyhart.com*
*www.kellyhart.com*

*Licensed to Practice in the State of Louisiana*

Confidentiality Notice: The information contained in this email message is protected under the Electronic Communications Privacy Act, 18 U.S.C. 2510, et seq., and may also be protected by attorney-client and/or the attorney/work product privileges. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by email. If the person actually receiving this email or any other reader of the email is not the named recipient, any use, dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone at (225) 381-9643 and return the original message to us at louis.phillips@kellyhart.com.

IRS Circular 230 Disclosure: Any tax advice contained in this email including any attachments, was not intended to be used, and cannot be used by you or anyone else, for the purpose of avoiding penalties imposed by the Internal Revenue Code or other law or for the purpose of marketing or recommending to any other party any transaction or other matter.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Friday, January 10, 2025 3:43 PM

HCMLPHMIT00000010

**To:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Cc:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; Dan.Elms@gtlaw.com; Hayley R. Winograd <hwinograd@pszjlaw.com>
**Subject:** RE: DRAFT Motion to Reconsider HCLOM Stipulated Order

**EXTERNAL SENDER ALERT - This message originated outside the Kelly Hart domain. Please exercise caution when opening attachments, following links or responding to this message.**

Thank you, Amelia.

I honestly don't know what to make of all of this—including Mr. Elms suddenly representing HCLOM rather than Ms. Deitsch Perez—but please confirm that neither HMIT nor HCLOM is making any request of Highland at this time.

Assuming that to be the case, Highland will wait to see what gets filed, if anything, and otherwise reserves all of its rights at law and in equity.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Amelia L. Hurt <Amelia.Hurt@kellyhart.com>
**Sent:** Friday, January 10, 2025 4:19 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Louis M. Phillips <Louis.Phillips@kellyhart.com>; Dan.Elms@gtlaw.com
**Subject:** DRAFT Motion to Reconsider HCLOM Stipulated Order

Good afternoon,

Per Louis, we said that we would circulate the attached draft before filing. We think our deadline is today but we are actively working with Mr. Elms who has been recently retained by HCLOM to resolve without necessity of litigating. But in case we do not reach a resolution this evening and as we said we would circulate a draft prior to filing, we wanted to get this draft to you.

thanks,

Amelia

**Amelia L. Hurt**

HCMLPHMIT00000011

*Associate*



400 POYDRAS STREET SUITE 1812
NEW ORLEANS, LOUISIANA 70130
T. 504.522.1812
M. 630.292.6652
*amelia.hurt@kellyhart.com*
*www.kellyhart.com*

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it
constitute confidential information which is intended only for the named recipient and which may be legally
privileged. If you have received this communication in error, do not read it. Please reply to the sender at Kelly
Hart & Hallman LLP that you have received the message in error. Then delete it. Any disclosure, copying,
distribution or the taking of any action concerning the contents of ths communication or any attachment(s) by
anyone other than the named recipient is strictly prohibited.

**EXHIBIT 66**

001547

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Reorganized Debtor. | ) |  |
|  | ) |  |

_____

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR (A) A BAD FAITH FINDING
AND (B) AN AWARD OF ATTORNEYS' FEES AGAINST HIGHLAND CLO
MANAGEMENT, LTD. AND JAMES DONDERO IN CONNECTION WITH HCLOM
CLAIMS 3.65 AND 3.66**

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

001548

HCMLPHMIT00000441

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ....................................................................1

II.   RELEVANT BACKGROUND ...................................................................5

      A.    The Bankruptcy Case: The HCLOM Claim, the Objection, and the
            Response .......................................................................................5

      B.    Dondero Terminates Terry and the Parties Execute the Participation
            Agreement ......................................................................................6

      C.    The Note is Assigned to HCLOM Ltd. Under False Pretenses in Exchange
            for HCLOM Ltd. Agreeing to Become the Successor Manager of the CLOs
            ..................................................................................................10

      D.    The Note and Payment of Acis Participation Interests are Part of One
            Integrated Transaction .....................................................................14

      E.    Undisputed Evidence Proves that HCLOM Ltd. and Acis Breached the
            Transfer Agreement and Acis Breached the Participation Agreement .................16

      F.    The Undisputed Evidence Shows that HCLOM LLC Was To Be the Acis
            Successor Manager .........................................................................17

      G.    The Parties' Post-Transfer Agreement Conduct Shows that the HCLOM
            Parties Knew Neither Acis Nor HCLOM Ltd. Would Perform under the
            Transfer Agreement or Participation Agreement After Terry Received His
            Arbitration Award ..........................................................................19

      H.    Waterhouse was Unprepared to Testify as HCLOM Ltd.'s Rule 30(b)(6)
            Witness and Otherwise Lacked Personal Knowledge Such that he Cannot
            Testify in Good Faith ......................................................................21

      I.    Dondero Cannot Testify in Good Faith .................................................22

III.  ARGUMENT .......................................................................................24

      A.    The HCLOM Parties' Prosecution of the HCLOM Claim Constitutes Bad
            Faith and Willful Abuse of the Judicial Process ......................................24

            1.    HCLOM Ltd.'s Prosecution of the HCLOM Claim Despite
                  Admitting that it Breached its Obligations Under the Transfer
                  Agreement Constitutes Bad Faith ............................................24

                  a.    The Note is Unenforceable Because HCLOM Ltd. Provided
                        No Consideration ......................................................25

                  b.    The Note is Unenforceable Because HCLOM Ltd.
                        Materially Breached its Obligations under The Transfer
                        Agreement .............................................................27

                  c.    Acis Breached its Obligation to Pay the Acis Participation
                        Interest to Highland ...................................................29

001549

HCMLPHMIT00000442

2.      HCLOM Ltd.'s Designation of Waterhouse as its Rule 30(b)(6)
        Witness Constitutes Bad Faith and a Willful Abuse of the Judicial
        Process ..................................................................................................30

3.      Dondero's Involvement in the Prosecution of the HCLOM Claim
        Constitutes Bad Faith and a Willful Abuse of the Judicial Process...........30

B.      Highland is Entitled to Attorneys' Fees from the HCLOM Parties for Costs
        Incurred in Connection with the Bad Faith Prosecution of the HCLOM
        Claim.......................................................................................................31

CONCLUSION....................................................................................................................32

001550

HCMLPHMIT00000443

<u>**TABLE OF AUTHORITIES**</u>

<u>Page</u>

<u>**CASES**</u>

*ASARCO, L.L.C. v. Jordan Hyden Womble Culbreth & Holzer, P.C. (In re ASARCO, L.L.C.),*
   751 F.3d 291 (5th Cir. 2014) ........................................................................... 32

*Baker Botts L.L.P. v. ASARCO LLC,*
   576 U.S. 121 (2015) ........................................................................................ 32

*Barclays Bank Plc v. Kenton Capital*
   [1994-95 CILR 489] ........................................................................................ 25

*Blue v. Ashley*
   [2017] EWHC 1928 (Comm) Leggatt J .......................................................... 25

*Dondero v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt. L.P.),*
   105 F.4th 830 (5th Cir. 2024) ......................................................................... 32

*Folkvang Ltd v. Valorte Capital*
   (unreported, 29 February 2024, FSD 199 of 2023, Parker J) ........................ 25

*Golfco Limited v. Borden*
   [2002 CILR 1], Kellock Ag. J ......................................................................... 27

*H.E.B. Enterprises Ltd and Bodden Jr v. Richards*
   [2023] UKPC 7 ................................................................................................ 26

*Heyman v. Darwins Ltd.*
   [1942] AC 356 ................................................................................................. 26

*Hongkong Fir Shipping Co Ltd v. Kawasaki Kisen Kaisha Ltd*
   [1962] 2 W.L.R. 474 ........................................................................................ 27

*In re Brown,*
   444 B.R. 691 (E.D. Tex. 2009) ...................................................................... 31

*In re Cleveland Imaging & Surgical Hosp., L.L.C.,*
   26 F.4th 285 (5th Cir. 2022) ..................................................................... 24, 31

*In re Monteagudo,*
   536 F. App'x 456 (5th Cir. 2013) ................................................................... 32

*In re Paige,*
   365 BR 632 (Bankr. N.D. Tex. 2007) ....................................................... 31, 32

*In re Yorkshire, LLC,*
   540 F.3d 328 (5th Cir. 2008) .......................................................................... 31

001551

HCMLPHMIT00000444

*Johnson v. Agnew*
    [1980] A.C. 367 ............................................................................................ 27

*Lopez v. Portfolio Recovery Assocs. (In re Lopez)*,
    576 B.R. 84 (S.D. Tex. 2017) ...................................................................... 32

*McDonald v. Dennys Lascelles Ltd*
    (1933), 48 C.L.R. 457 ................................................................................. 27

*Richards v. H.E.B Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84] ...................... 26

*Schermerhorn v. Kubbernus (In re Skyport Glob. Commc'n, Inc.)*,
    642 F. App'x 301 (5th Cir. 2016) .............................................................. 32

*Tempo Group Ltd and others v. Fortuna Development Corporation*
    (unreported, 31 March 2015, FSD 125 of 2012, Henderson J ...................... 28

001552

HCMLPHMIT00000445

Highland Capital Management, L.P. ("Highland"), the reorganized debtor in the above-captioned bankruptcy case (the "Bankruptcy Case"), by and through its undersigned counsel, hereby files this *Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* (the "Motion") against Highland CLO Management, Ltd. ("HCLOM Ltd.") and James Dondero ("Dondero" and together with HCLOM Ltd., the "HCLOM Parties"). In support of its Motion, Highland states as follows:

## I.    PRELIMINARY STATEMENT[1]

1. The undisputed facts adduced during discovery show that the HCLOM Ltd. Claim is baseless and HCLOM Ltd. lacks a good faith basis to continue prosecuting its claim.

2. HCLOM Ltd. holds the Note at issue.[2] *There is no dispute that (a) HCLOM Ltd. never gave anything of value to Highland (or Acis) for the Note, (b) HCLOM Ltd. never performed any of its obligations under the Transfer Agreement or even attempted the necessary steps to enable it to do so, (c) HCLOM Ltd. never paid Highland any Acis Participation Interests, and (d) Acis failed to pay any Acis Participation Interests after the Transfer Agreement was executed*. Despite Highland not receiving the promised Acis Participation Interests and HCLOM Ltd. providing no consideration and breaching the Transfer Agreement, HCLOM Ltd. offers three reasons why it thinks it can nevertheless enforce the Note against Highland; each reason is meritless.

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

[2] Incredibly, at the time of his deposition, Dondero claimed he did not know who held the Note or who was responsible for prosecuting this litigation on HCLOM Ltd.'s behalf. (Ex. 62 at 8:7-14; 14:10-14; 19:22-20:15; 110:2-19). At the hearing, Highland respectfully requests that Stinson be directed to disclose the identity of the individual(s) instructing it in this matter on HCLOM Ltd.'s behalf and who is paying its fees.

001553
HCMLPHMIT00000446

3.     *First*, HCLOM Ltd. contends that the Note is a stand-alone document, enforceable without reference to the Participation Agreement or Transfer Agreement and without regard to whether HCLOM Ltd. provided any consideration or performed its obligations under those agreements.  Response ¶¶ 16-24. This contention lacks any legal basis and is contradicted by the plain and unambiguous terms of (a) the Participation Agreement, pursuant to which Acis agreed to "participate" a portion of its Servicing Fees to Highland in exchange for a downpayment and deferred payments under the Note; (b) the Note which accompanied the Participation Agreement and conditioned its own effectiveness on the effectiveness of the Participation Agreement; and (c) the Transfer Agreement (concocted just days after Terry obtained an $8 million arbitration award against Acis), pursuant to which HCLOM Ltd. was to "step into the shoes of Acis" by becoming Acis' Successor Manager in exchange for the Note.  There can be no credible dispute that these agreements were inextricably intertwined as part of one integrated transaction pursuant to which mutually dependent payments were to be made.  Dondero and Waterhouse confirmed this point during their depositions.  As Dondero testified, "it was essentially a trade of promises, and one side wouldn't have signed if they didn't get the promises of the other side."[3]  HCLOM Ltd.'s contention that the Note is somehow enforceable as a separate, unrelated binding agreement, without regard to the others, is thus unsupported and belied by the documentary and testimonial evidence.[4]

---

[3] Ex. 62 at 50:7-21; *see also id*. at 50:23-51:12.

[4] Notwithstanding HCLOM Ltd.'s new tale, Dondero confirmed these facts under oath in direct examination by his own lawyer in the Acis case in 2018: "Q…it's Mr. Terry's position … that [the Note] does not condition payment by Highland of the promissory note to receipt of service fees from Acis. So what is your response to that contention? A. [Dondero] It was always a – it was always a paired transaction, and the tying of the two together and a recommendation for unwinding or whatever you want to call it, selling the note came to me from counsel and advisors.  I mean does that not answer?"  [Ex. 76 at 151:4-12].

001554

HCMLPHMIT00000447

4.      **Second**, HCLOM Ltd. blames the Acis bankruptcy, this Court's June 2018 injunction, and the subsequent Acis plan injunction for its failure to become Acis' Successor Manager. Response ¶¶ 25-32. This contention is likewise false. It is indisputable that a different entity with a strikingly similar name—Highland CLO Management, LLC ("HCLOM LLC")—*was* created by Highland weeks before HCLOM Ltd. and *was* specifically organized, authorized, and equipped to serve as Acis' Successor Manager. But, HCLOM Ltd. and HCLOM LLC were completely separate entities, and HCLOM Ltd. never did, never could, and never would serve in the Acis replacement manager role—a fact Dondero admitted in the Acknowledgement and Waiver Agreement he signed eleven days *before* the Acis bankruptcy petition was even filed.[5]

5.      **Finally**, HCLOM Ltd. contends that the Note is enforceable because Highland included it on its Schedules and Seery supposedly testified during the Acis 9019 hearing that the Note was enforceable. Response ¶¶ 33-49. These contentions are equally meritless. By its terms, the Schedules are subject to an extensive reservation of rights "including, but not limited to, the right to dispute or assert offsets or defenses to any claim reflected on the SoFA and Schedules as to amount, liability, or classification of the claim, or to otherwise subsequently designate any claim as 'disputed,' 'contingent' or 'unliquidated.'"[6]   As HCLOM Ltd. acknowledges, while the

---

[5] Ex. 7. As shown below, the indisputable evidence proves that HCLOM LLC was created and specifically constructed and enabled to serve as Acis' Successor Manager for the resetting and refinancing of the Acis CLOs. *See infra* ¶¶ 43-51. Incredibly, despite being designated as HCLOM Ltd.'s Rule 30(b)(6) witness, Waterhouse did not recall that there was an entity named "Highland CLO Management, LLC" and another entity named "Highland CLO Management, Ltd." (Ex. 3 at 6:2-11; 25:21-26:5). Whether negligently or deceitfully, HCLOM Ltd.'s Response completely and nonsensically confuses HCLOM Ltd. and HCLOM LLC. That confusion or deceit is also reflected in Dondero's recent verified interrogatories in the Acis case where, completely contradicting the terms of the Transfer Agreement and HCLOM Ltd.'s position here, he stated: "Highland CLO Management LLC ("Highland Management") was established to assume management of the Acis CLOs post-reset, including taking on Acis obligation to pay 50% of the Acis CLO fees to Highland Capital as well as becoming payee on Highland Capital's the [sic] Promissory Note. In accordance with the above, Acis, on November 7, [sic] 2017 agreed to transfer the Promissory Note to Highland Management [LLC] and also agreed to transfer to Highland Management [LLC], when it became manager of the Acis CLO's [sic] post-reset, to pay 50% of the CLO management fees to Highland Capital." Ex. 65 (response to Interrogatory No. 4).

[6] *Notice of Filing of Debtor's Amended Schedules*, Docket No. 1082, Ex. 1 at 2.

001555

HCMLPHMIT00000448

HCLOM Claim may be prima facie valid, Highland's Objection and the evidence adduced herein

(and at trial) shifts the burden of proof back to HCLOM Ltd. to establish the validity and amount

of its claim.[7] And Seery will testify that his testimony during the Acis 9019 hearing was based on

the erroneous notion that Highland owned HCLOM Ltd. at the time, a notion HCLOM Ltd.'s own

corporate representative ironically still believes is true.[8]

6. In addition to pursuing a baseless claim, HCLOM Ltd.'s witnesses—Dondero and

Waterhouse, both individually and as HCLOM Ltd.'s Rule 30(b)(6) witness—were so uninformed

and unprepared to testify that sanctions are warranted. *See infra* ¶¶ 52-59. Dondero deserves

special focus because while he attempted to distance himself from virtually everything, (a) his

family trust, The Dugaboy Investment Trust ("Dugaboy"), was the majority ultimate beneficial

owner of Acis and therefore the primary beneficiary of the tax-driven strategy that lead to the

Participation Agreement, (b) through Dugaboy, he indirectly owns a majority interest in HCLOM

Ltd. and therefore has the largest stake in the outcome of this litigation, and (c) while he claimed

to be unaware of it, Dondero was, and apparently remains, the President of HCLOM Ltd.

7. Discovery is complete. HCLOM Ltd. knows that there is no genuine dispute that

the HCLOM Claim is invalid and will be disallowed; the continued pursuit of the HCLOM Claim

is now just another vexatious abuse of the judicial process. HCLOM Ltd. should immediately

consent to the entry of an order disallowing the HCLOM Claim—and all the factual and legal

theories upon which it is based—with prejudice. If it fails to do so, Highland requests that the

---

[7] Ex. 20 ¶¶ 13-15.

[8] Ex. 3 at 36:7-22.

001556

HCMLPHMIT00000449

Court enter a finding of bad faith and an award of attorneys' fees[9] jointly and severally against

HCLOM Ltd. and Dondero.[10]

## II.    RELEVANT BACKGROUND

### A.    The Bankruptcy Case: The HCLOM Claim, the Objection, and the Response

8.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of

Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

9.    On December 4, 2019, the Delaware Court entered an order transferring venue of

the Debtor's Bankruptcy Case to this Court [Docket No. 186].[3]

10.    On December 13, 2019, Highland filed its schedule of unsecured claims that

identified "Highland CLO Holdco" as a creditor with claims under a note.  Docket No. 247

(Schedule E/F, Part 3.64 and 3.65) (the "Initial HCLOM Claim").

11.    On September 22, 2020, Highland filed a *Notice of Filing of Debtor's Amended

Schedules* in which it, among other things, replaced Highland CLO Holdco as the creditor with the

Initial HCLOM Claim with HCLOM Ltd., an entity Highland's independent directors then

believed was owned directly or indirectly by Highland.  Docket No. 1082 (Schedule E/F, Part 3.65

and 3.66) (the "HCLOM Claim").

---

[9] Highland reserves the right to offer proof of the legal fees it has incurred during the evidentiary hearing currently scheduled for December 18, 2024.

[10] As the Court will recall, Highland moved for similar relief against HCRE but only after the evidentiary hearing was completed and the Court rendered a decision on the merits.  *See* Docket No. 3851. To be more efficient; because the evidence supporting Highland's Objection and this Motion will be the same; and to give HCLOM Ltd. fair notice of the relief requested, Highland files this Motion in advance of the hearing.  While HCLOM Ltd. technically has 21 days to oppose the Motion, Highland has no objection to HCLOM Ltd. filing its response on December 16, 2024, to take into account the Thanksgiving holiday.  Highland reserves the right to offer and rely on such further evidence that is adduced at trial in support of this Motion.

001557

HCMLPHMIT00000450

12.     On February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "<u>Confirmation Order</u>"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (the "<u>Plan</u>").  The Plan became effective on August 11, 2021 (the "<u>Effective Date</u>") [Docket No. 2700].

13.     Following the Effective Date and in furtherance of the Plan, Highland began reviewing the available information to determine the validity, amount, and priority of all unresolved claims.  The evidence will show that, as part of the process, Highland discovered, among other things, that (a) it only held a 1% economic interest in HCLOM Ltd.,[11] (b) HCLOM Ltd. provided no consideration for the Note, (c) HCLOM Ltd. never performed its obligations under the Transfer Agreement and could never have done so, and (d) Acis failed to perform its obligations under the Participation Agreement and the Transfer Agreement, all of which vitiated any obligations Highland may have had under the Participation Agreement, the Note, or the Transfer Agreement.  Based on these facts, among others, Highland filed its objection to the HCLOM Claim on February 2, 2023 (the "<u>Objection</u>").  Ex. 1.

14.     On April 3, 2023, HCLOM Ltd. filed its response to the Objection (the "<u>Response</u>").  Ex. 20.

**B.    <u>Dondero Terminates Terry and the Parties Execute the Participation Agreement</u>**

15.     This dispute arises from a series of intercompany agreements and machinations orchestrated in the "Highland Complex" while James Dondero ("<u>Dondero</u>") was firmly in control of all sides of the enterprise.

---

[11] It also held 99% of the voting, non-economic interests in HCLOM Ltd.

001558

HCMLPHMIT00000451

16.     Prior to the Petition Date, Acis Capital Management, L.P. ("Acis"), then an affiliate of Highland, provided portfolio management services to the issuers of certain collateralized loan obligations ("CLOs") in exchange for management fees ("Servicer Fees") to be paid under portfolio management agreements (the "PMA's").[12]  The PMA's prohibit the portfolio manager from assigning any of its rights or obligations under the PMA's without permission and the satisfaction of certain conditions.[13]  At all relevant times, Dondero controlled Acis and Highland.

17.     Since Acis had no employees of its own, Highland provided back- and middle-office services as well as investment advisory services to Acis pursuant to certain Shared Services and Sub-Advisory Agreements (the "SSA" and "SAA", respectively, and together, the "HCMLP Services Agreements," as amended).   The services provided under the HCMLP Services Agreements enabled Acis to perform under the PMA's.   Joshua Terry ("Terry"), a Highland employee, was also an officer and portfolio manager of Acis until 2016.

18.     On June 9, 2016, Dondero, acting through Highland, terminated Terry and as a result, Dondero and Frank Waterhouse ("Waterhouse") remained as the sole officers of Acis' general partner. *See* Ex. 9.

19.     On July 29, 2016, Highland and Acis amended the HCMLP Services Agreements pursuant to which, among other things, Acis agreed to pay Highland a fee at the following rates for each of the Acis CLOs: (a) 20 basis points for sub-advisory services; and (a) 15 basis points for shared services, for a total of 35 basis points, with the rates applied retroactively to January 1, 2016.  *See* Ex.10 at HCLOM00535306 (20 bps for sub-advisory services), HCLOM00535321 (15

---

[12] Fees under the PMA's are calculated by multiplying the fee earning assets in a given CLO by the fee rate, expressed in basis points.  The CLO issuers were obligated to pay Acis the following under the Acis managed CLOs:  Acis CLO 2013-1, Ltd. 50 bps; Acis CLO 2014-3, Ltd. 40 bps; Acis CLO 2014-4, Ltd. 40 bps, Acis CLO 2014-5, Ltd. 40 bps; and Acis CLO 2015-6, Ltd. 40 bps.  *See* Ex. 13 (Schedule A under "Total Servicer Fee").

[13] *See* Ex. 32 §14; Ex. 34 §14; Ex. 36 §14; Ex. 38 § 14.

001559

HCMLPHMIT00000452

bps for shared services).[14] These fee amendments roughly doubled the aggregate annual fees Highland was to receive from Acis and the retroactive nature of the agreements immediately saddled Acis with approximately $3 million in additional payables to Highland.

20.     In or around September 2016, Dondero caused Highland to sue Terry in Texas state court. Terry moved to compel arbitration, and his motion was granted. *See* Ex. 25. As discussed below, the arbitration was conducted in September 2017.

21.     On October 7, 2016, Dondero caused Acis and Highland to enter into an *Agreement for Purchase and Sale of CLO Participation Interests* (the "Participation Agreement"). Ex. 13. The Participation Agreement was not an arms' length economic transaction but was adopted for the tax-driven purpose of converting ordinary income into capital gains for the benefit of Acis' ultimate beneficial owners—Dugaboy and Mark Okada—of up to 20%.[15] As Dondero previously testified: "So immediately upon Josh's [Terry] leaving back in June [2016], the partnership became just Mark and I, 75/25. What this transaction was and was meant to be and never anything more was a tax-planning strategy to reduce taxes. Because Acis was a full taxpaying entity and Highland wasn't. You know, the creation of the note of Highland paying Acis a note, that note—**Highland never got any monies for it. Highland never got any value for it, other than a promise for Acis to pay its management fees over time.**" Ex. 76 at 133:23-134:7 (emphasis added).

22.     In order to try to achieve the desired tax savings under the Participation Agreement, Acis agreed to participate to Highland a portion of the Servicer Fees (the participated portion, the "Acis Participation Interests") for a finite period of time in exchange for Highland's payment to

---

[14] Dondero signed the amendments to the HCMLP Services Agreements on behalf of Acis and Highland.

[15] Dondero admitted that Acis and Highland were "pass through" entities and that the purpose of the Participation Agreement was to defer or recharacterize taxes for the benefit of the ultimate beneficial owners. (Ex. 62 at 35:10-36:16, 37:4-19; *see also* Ex. 3 at 79:19-80:24, 83:1-6,85:22-86:16 (Waterhouse testified that the Participation Agreement was a "tax-driven strategy" that also provided certain cash management benefits to Highland)).

001560
HCMLPHMIT00000453

Acis of $666,655 in cash (the "Cash Purchase Price") and the payment of deferred annual installments under a note in favor of Acis, in the original principal amount of $12,666,446.00 (the "Note"). *See id.* §§ 1, 1.1; *see also* Ex. 14.[16] While the Note references "advances" by Acis, no money was ever loaned to Highland. The Note simply reflected amounts that would be paid back to Acis by Highland—a "wash" according to Dondero—after Highland received payment of the Acis Participation Interests.[17]

23.     Despite Terry's contentious departure in 2016 and the public litigation Highland launched against him later that year, it was "business as usual" for Acis. (*See* Ex. 3 at 68:7-69:24). For example, Acis continued serving as the portfolio manager for the CLOs, managing billions of dollars of bank loans and paying the Acis Participation Interests to Highland in exchange for the installment payments under the Note, all as required under the Participation Agreement. In March 2017, Dondero caused Highland and Acis to further amend the HCMLP Services Agreements. *See* Ex. 11 (Fourth Amended and Restated Shared Services Agreement, dated March 17, 2017); Ex. 12 (Third Amended and Restated Sub-Advisory Agreement, Dated March 17, 2017). The next month, Acis even completed a new, risk-retention compliant CLO ("Acis 7"), using an indirect

---

[16] The Note called for annual payments to be made on May 31, 2017, 2018, and 2019. Ex. 14. The evidence will show that Acis and Highland performed their respective obligations under the Participation Agreement and the Note until the Transfer Agreement was executed in November 2017. After that, even though Dondero controlled Acis until the appointment of a trustee, Acis stopped remitting the Acis Participation Interests to Highland as required under the Participation Agreement, Highland stopped making payments to Acis under the Note and HCLOM Ltd. did absolutely nothing.

[17] In response to his attorney's questioning in the Acis case, Dondero testified as follows: "Q. "This is not like I – for example, I refinanced my house recently, give a note to the bank, but I get cash money at closing from the bank. Are you saying that did not happen here? A. [Dondero] Correct. In October. Highland got nothing other than a promise for Acis to pay. And all the payment schedule – the amortization on the note was timed exactly to match the expected management fees as Acis got them in." Ex. 76 at 134:13-20. Dondero continued: "**It's essentially a wash. They're – yes, it doesn't matter which pocket it goes into.**" *Id.* at 152:23-24 (emphasis added). On cross, Dondero insisted: "A. I'm saying it was paired together, it was a tax transaction, it was supposed to have very little net value, there was supposed to be offsetting flows, and the recommendation on the sale was all guided by counsel, internal and external…." *Id.* at 36:10-14.

001561

HCMLPHMIT00000454

subsidiary, Acis CLO Management, LLC ("ACLOM LLC"), as the portfolio manager. Ex. 15 (Portfolio Management Agreement between Acis CLO 2017-7, Ltd. and ACLOM LLC).[18]

24. Things went south in 2017 as summer turned to fall. Dondero and his team spent 10 days opposing Terry's arbitration in September. Clearly sensing that the arbitration was not going well for him, Dondero instructed his attorneys to eliminate arbitration clauses in existing and future contracts. Even more tellingly, on October 19, 2017, Highland formed HCLOM LLC as a Delaware LLC to replace ACLOM LLC for future CLO issuances and resets of existing managed CLOs. Ex. 87. The next day, on October 20, 2017, Terry was awarded an $8 million arbitration award against Acis (the "Arbitration Award"). Ex. 26.[19]

## C. The Note is Assigned to HCLOM Ltd. Under False Pretenses in Exchange for HCLOM Ltd. Agreeing to Become the Successor Manager of the CLOs

25. Despite having formed HCLOM LLC a week earlier and inserting that entity as successor manager into draft agreements and memoranda, on October 27, 2017, Highland also formed HCLOM Ltd. as a Cayman entity with Summit Management Limited ("Summit") appointed by Highland as HCLOM Ltd.'s initial and sole director. *See* Ex. 5. The creation of this entity in the Cayman Islands was no accident: its sole purpose was to secretly hold the Note and—according to Isaac Leventon, Highland's then-Assistant General Counsel in charge of litigation—cause Terry to spend "multiple years to collect" on his Arbitration Award. Ex. 69; Ex. 83.[20]

---

[18] Dondero stubbornly clings to the notion that all of the asset transfers away from Acis were required because the Acis brand was "toxic." As the Court will recall, during the Acis case, the Highland team under Dondero's leadership attempted to tag HarbourVest with the "toxicity" concept, but that effort failed. During his deposition, he tried to tag Goldman Sachs with the concept despite having no personal knowledge to support it. In fact, the documentary and testimonial evidence is to the contrary.

[19] Even though the Panel found that—under Dondero's watch—Highland concocted pretextual arguments for denying Terry his benefits and interfering with his economic rights, and that Acis breached its contractual and fiduciary duties (Ex. 26 at 21-22), Dondero inexplicably insists that he has never read the Arbitration Award and is unfamiliar with the findings. Ex. 62 at 67:11-22, 70:3-20).

[20] During his deposition, Dondero repeatedly disavowed responsibility for anything related to Terry's termination or arbitration or any of the events that followed; instead, he tried to point the finger at Thomas Surgent and Tim Cournoyer (two current employees of Highland). While the issue is legally irrelevant (it does not matter who caused

001562

HCMLPHMIT00000455

26.    On November 3, 2017, roughly two weeks after the Arbitration Award was rendered, a meeting was held with Dondero in his office to discuss the "Terry Arbitration" and the "Acis Restructuring." *See* Ex. 69 (11/3/17 email among Leventon, Ellington, and Welton detailing "[d]raft bullets for internal management discussion"); Ex. 83 (final version of the bullet points); Ex. 81 (acceptance of meeting invite).

27.    Sometime during or immediately after the November 3, 2017 meeting, Dondero executed the *Assignment and Transfer Agreement* (the "Transfer Agreement" or "Assignment") on behalf of Highland[21] and Acis; Summit (acting at the direction of Dondero-controlled Highland) executed the Transfer Agreement on HCLOM Ltd.'s behalf. *See* Ex. 16.

28.    Pursuant to the Transfer Agreement, which falsely stated that Highland notified Acis that Highland was unwilling to continue providing services to Acis under the HCMLP Services Agreements and, therefore, Acis was unable to fulfill its portfolio management duties to the applicable CLO's,[22] (a) HCLOM Ltd. agreed to become the CLOs' Successor Manager (as defined in the Transfer Agreement); (b) Acis and HCLOM Ltd. agreed to remit the Acis Participation Interests to Highland; and (c) the Note was assigned to HCLOM Ltd. Significantly, the Transfer Agreement Assignment provides: "HCLOM, a qualified Successor Manager, irrevocably commits to be appointed as Successor Manager *in consideration of Acis assigning to it the Note*." Ex. 16 at 1 (emphasis added).

---

HCLOM Ltd. not to provide consideration for the Note or perform under the Transfer Agreement), it weighs on credibility or the lack thereof. The evidence will establish that Scott Ellington—with Dondero's knowledge—dictated that Leventon and an outside attorney, Jamie Welton, were to be solely responsible for working on the Terry case (Ex. 68), and that's exactly what happened (*see, e.g.*, Ex. 69).

[21] Section 5.1 of the Participation Agreement requires Highland's written consent to an assignment by Acis of any of its rights or obligations thereunder.

[22] Written notice of termination was required under the HCMLP Services Agreements, but no such notice was ever given and, in fact, Highland continued to perform the services under the HCMLP Services Agreements until the summer of 2018 when a new service provided took over following the appointment of the Acis trustee.

001563

HCMLPHMIT00000456

29.     According to Waterhouse, the Transfer Agreement was intended to authorize HCLOM Ltd. to take the necessary steps to become Acis' Successor Manager so that it would receive the Servicing Fees and remit them to Highland in exchange for the expected cash streams due under the Note.  Ex. 3 at 135:24-136:24.

30.     The Transfer Agreement also required (a) Acis (again, then under Dondero's control) to "promptly provide the Controlling Class (as defined in the CLO Indentures) with notice requesting the appointment of HCLOM [Ltd.] as Portfolio Manager pursuant to the requirements of the CLO Documents," and (b) each of Acis and HCLOM Ltd. to "promptly pursue Successor Manager appointment of HCLOM [Ltd.] in respect of each CLO." *Id*. §§ 1, 2.  None of this occurred.

31.     Section 3 of the Transfer Agreement provides:

**3.     Assignment and Transfer of the Promissory Note; Stabilization Payments.**

a. Effective immediately upon execution of this Agreement by the Parties, all right, title and interest of Acis under the Note, including the right to any and all Stabilization Payments not yet paid to Acis, are hereby irrevocably assigned and transferred by Acis to HCLOM [Ltd.], it being understood that from the date of such assignment, HCLOM [Ltd.] shall become the "Payee" thereunder.

b. For so long as Acis shall receive Servicer Fees following the date hereof, Acis shall remit to H[ighland] the HCM Stabilization Fees [*i.e.*, the Acis Participation Interests] pursuant to the Note Purchase Agreement [*i.e.*, the Participation Agreement].

c. For so long as HCLOM [Ltd.] receives any Servicer Fees following any Appointment, then HCLOM [Ltd.] shall remit to H[ighland] any portion of such fees that would otherwise have constituted HCM Stabilization Fees pursuant to the Note Purchase Agreement if Acis was the recipient of such fees.

d. HCLOM [Ltd.] shall sign a joinder to Note Purchase Agreement upon HCM's written notice thereof.

Transfer Agreement, § 3 (emphasis added).

001564
HCMLPHMIT00000457

32.     Thus, the Transfer Agreement provided that HCLOM Ltd. would receive Acis's rights under the Note, subject to HCLOM Ltd. becoming the Successor Manager, and Acis and HCLOM Ltd. continuing to remit Acis Participation Interests to Highland.  According to Dondero, from Acis' and Highland's perspective, the purpose of the Transfer Agreement was to replace Acis as Portfolio Manager. Ex. 3 at 83:23-84:11.[23]

33.     Although Dondero signed the Transfer Agreement, he now says he has no knowledge of any facts underlying its execution.  For instance, Dondero says he does not recall (a) the document or reading it before he signed it, (Ex. 62 at 79:4-18; 83:12-19); (b) receiving any advice before signing, (*id.* at 100:4-10); or (c) taking any steps to make sure the Transfer Agreement accurately reflected the facts, (*id.* at 108:16-25).  Dondero also says he does not know who John Cullinane is and never communicated with him, or anyone authorized to act on HCLOM Ltd.'s behalf, before executing the Transfer Agreement, (*id.* at 79:19-81:19; 82:24-83:3).

34.     During his deposition, Dondero (a) could not recall if he expected Highland to receive *any* benefit under the Transfer Agreement, (*id.* at 84:22-25); (b) was unable to identify *anything* of value HCLOM. Ltd. provided to Highland pursuant to the Transfer Agreement, (*id.* at 88:15-89:2); and (c) did not know if HCLOM Ltd. *ever* gave anything of value to Highland for any purpose, (*id.* at 89:20-91:5).  In fact, Dondero (x) was initially unaware that Highland was a party to the Transfer Agreement; (y) could not identify a benefit Highland was to receive even after reviewing the Agreement; and (z) has "no idea" why he signed the Agreement on behalf of Acis and Highland.  *Id.* 85:8-86:15.

---

[23] The Transfer Agreement created a new consolidated defined term—"Note Purchase Agreement"—that provided further evidence that the Note and the Participation Agreement (what was being referred to in the Transfer Agreement as the "Purchase Agreement") are one integrated and mutually dependent agreement.

001565
HCMLPHMIT00000458

**D.**     **The Note and Payment of Acis Participation Interests are Part of One Integrated Transaction**

35.     Contrary to HCLOM Ltd.'s unsupported contentions, the evidence will show that the Note and payment of Acis Participation Interests under the Participation Agreement and Transfer Agreement are inextricably intertwined as one integrated transaction. The Participation Agreement attached a copy of the Note as an exhibit and made repeated references to the Note. *See, e.g.*, Ex. 13 § 1.1 ("In consideration of the sale of the Acis Participation Interests to the Purchase, the Purchaser shall" pay the Cash Purchase Price and deliver the Note); § 1.3 (the Purchase Price "reflects the arm's length value of the Acis Participation Interests as of the date of this Agreement…").  Unlike the many promissory notes that were issued and separately litigated in the Highland bankruptcy, the Note was not tendered in exchange for a cash advance; rather it was tendered solely for the promise of future Acis Participation Interests.[24]

36.     The Note also refers to, and depends on, the Participation Agreement.  By its terms, the Note was to become effective only upon the effectiveness of the Participation Agreement, which was executed contemporaneously by Highland and Acis.[25]  A condition precedent to the effectiveness of the Note provides:

> ***This Note shall not become effective and Payee shall have no obligation to make the advance hereunder until*** Payee has received each of the following in form and substance acceptable to Payee:
>
> ....

---

[24] Dondero under oath at deposition in the Acis case: "A. What did Highland get when the note was put in place? It's a $12 million note.  Did Highland get $12 million? Did Highland get $13 million? Did Highland get an asset? No. Highland got a promise from Asis to pay it management fees that Acis was gonna get over the next three or four years, and the amortization [of the Note] was tied to the fees as they came in, and Highland got them. So when Highland got fees, it paid down – it paid the money to Acis to pay off the note."  Ex. 78 at 12:8-19.

[25] Dondero on direct in the Acis case: "Q. And I think this is obvious, by why are Exhibits 14 [the Participation Agreement] and 15 [the Note] dated October 7, 2016? A, (Dondero) Because they're paired together."  Ex. 76 at 141:6-8.

001566

HCMLPHMIT00000459

(b) the Agreement for Purchase and Sale of CLO Participation Interests dated of even date herewith (the "Purchase Agreement"), by and between Maker and Acis Capital Management, LP, a Delaware limited partnership ("Highland") [*sic*], and copies of all agreements, documents and instruments executed or delivered in connection therewith and evidence that ***all conditions to the effectiveness of the Purchase Agreement have been or will be fulfilled contemporaneously with the initial advance under this Note***;

Ex. 14 (Note) at 1 (emphases added).

37.     The Transfer Agreement was ostensibly intended to assign Acis' rights and obligations under the Participation Agreement to HCLOM Ltd.  Pursuant to the Transfer Agreement, HCLOM Ltd. would step into Acis' shoes as Successor Manager.  And, as noted above, the Transfer Agreement combines the Note and the Participation Agreement into one agreement—the "Note Purchase Agreement"—and treats them as the fully integrated transaction they were intended to be.

38.     In addition to the plain and unambiguous terms of the Note, Participation Agreement, and Transfer Agreement, Waterhouse—the former Treasurer of Acis and CFO of Highland—admitted that (a) "Highland is giving the Cash Purchase Price and the Note to Acis *in exchange* for Acis' promise to share the Acis' Participation Interest as defined in th[e] agreement," (Ex. 3 at 104:16-105:24 (emphasis added)), and (b) the Note and Participation Agreement "were part and parcel of the same overall transaction," (*id.* at 111:9-112:1).  Regarding the Transfer Agreement, Waterhouse acknowledged "that the reason Highland agreed to transfer the note to HCLOM [Ltd.] is because HCLOM [Ltd.] was agreeing to become the new portfolio manager for the Acis CLOs and would share the servicing fees after that happened."  (Ex. 3 at 150:13-23).

39.     Dondero also (once again) confirmed that these agreements all constituted one integrated transaction.  According to Dondero, under the Participation Agreement, Acis was to participate a portion of its expected Servicing Fees for cash and a Note for the purpose of reducing the taxes owed by the beneficial owners.  (Ex. 62 at 35:13-41:25; 43:20-25; *see also* Ex. 3 at 79:19-

001567
HCMLPHMIT00000460

80:24, 83:1-6, 85:22-86:16).  As Dondero stated: "one side wouldn't have signed if they didn't get

the promises of the other side" (Ex. 62 at 50:7-12; *see also* 50:23-51:12); *see also* (Ex. 28) (opinion

letter from Hunton & Williams that conditions favored tax treatment on the continued exchange

of Acis Participation Interests for payments under the Note).

### E.   Undisputed Evidence Proves that HCLOM Ltd. and Acis Breached the Transfer Agreement and Acis Breached the Participation Agreement

40.     The overwhelming, undisputed evidence proves that HCLOM Ltd. breached the

Transfer Agreement.  HCLOM Ltd. never began, let alone fulfilled, its purported commitment to

serve as the Successor Manager—the only "thing of value" that HCLOM Ltd. contends it "gave"

to Highland in exchange for agreeing to the transfer of the Note.  Ex. 21 (Response to Interrogatory

1) (when asked to identify each thing of value HCLOM Ltd. gave to Highland in exchange for the

Note, HCLOM Ltd. stated that it "irrevocably committed in the Assignment to be appointed as

successor manager and then took steps to effectuate the transfer as promised.").  Contrary to its

contention, HCLOM Ltd. never took any steps, nor did it ever have the operational capacity, to be

appointed Successor Manager because it:

- had no employees, (Ex. Ex. 3 at 22:1-2);

- was never a registered investment advisor and earned no fees, (Ex. 3 at 26:17-19; Ex. 62 at 91:23-25);

- had no shared services or sub-advisory agreement and therefore could never fulfill its duties as portfolio manager, (Ex. 3 at 22:3-9; Ex. 62 at 93:6-19);

- was not "qualified" pursuant to PMAs and Indentures, (*see* Ex. 62 at 104:24-105:2);

- had no risk retention financing, nor ever tried to obtain any;

- never engaged an investment bank to arrange any reset or refinancing, reissue, refinancing, or new underwriting of any CLO or other vehicle or business;

- was never capitalized and had no bank account or bank relationship, (Ex. 3

001568

HCMLPHMIT00000461

at 26:6-10);

- never maintained financial statements or books and records, (Ex. 3 at 11-16); and

- never sought the consents required to become the Successor Manager.

41.    In fact, ***HCLOM Ltd. admits that it failed to perform any of its obligations under the Transfer Agreement*** because it never (a) became Successor Manager, (b) managed the Acis CLOs, or (c) remitted any Acis Participation Interests to Highland. *See* Ex. 21 (Responses to Interrogatories 4-6 and RFAs 2, 4, and 6); Ex. 3 at 20:25-21:20, 31:14-24, 156:15-157:6; Ex. 62 at 106:14-16; 107:1-10.[26]

42.    Notably, Acis—while under Dondero's control—also breached the Transfer Agreement.  Between November 3, 2017 (when the Transfer Agreement was executed) and April 13, 2018, the time Dondero lost control of Acis with the granting of the order for relief and the appointment of the Acis trustee, Acis continued to receive Servicing Fees in its capacity as the CLO portfolio manager but failed to remit the Acis Participation Interests to Highland as required under both the Participation Agreement and the Transfer Agreement. *See* Ex. 3 at 120:10-18.

**F.    The Undisputed Evidence Shows that HCLOM LLC Was To Be the Acis Successor Manager**

43.    While HCLOM Ltd. was furtively established as a Cayman Islands entity that did nothing except enter into the Transfer Agreement and purportedly take title to the Note, HCLOM LLC (formed prior to HCLOM Ltd.) was busy actually taking the substantial steps required to become Acis' Successor Manager.  As a result, the Note was effectively hidden in the Cayman Islands entity while Highland, under Dondero's control, worked to transfer the business of running the CLOs away from Acis to a separate, same-named, Delaware entity with no obligation to pay

---

[26] Dondero could not recall ever signing a document (other than the Transfer Agreement) that contemplated that HCLOM Ltd. would serve as Acis' Successor Manager. (*See* Ex. 62 at 125:8-12).

001569

HCMLPHMIT00000462

the Acis Participation Interests to Highland.  If Highland could transfer the management of the

CLO's to HCLOM LLC and abscond with the Note, Acis would no longer receive any Servicing

Fees, Acis would get no payments under the Note, and Terry would be unable to collect on his

Arbitration Award.

44.    In the weeks after Terry obtained his Arbitration Award:

- On November 15, 2017, HCLOM LLC entered into an agreement with Mizuho pursuant to which HCLOM LLC would serve as the manager of the Acis CLOs and Mizuho would serve as the placement agent for the resets and refinancings of certain of the applicable CLOs, (Ex. 64);[27]

- On December 19, 2017, HCLOM LLC entered into Shared Services and Sub-Advisory Agreements with Highland so that it was prepared to fulfill its expected duties as the manager of the applicable CLOs, (Ex. 85, Ex. 86);

- On January 19, 2018, HCLOM LLC signed a Custodial Agreement in order to be able to hold the securities required of it under the U.S. "risk retention" rules then in effect, (Ex. 27); and

- Later in January, HCLOM LLC entered into certain agreements (executed by Dondero) to obtain "risk retention" financing that would enable it to reset Acis-3, (Exs. 72, 73).

45.    The Acis involuntary petition and the section 303(f) order did undercut the

willingness of bankers to participate in resetting the CLO's away from Acis' control and,

ultimately, the order for relief and the injunction prevented HCLOM LLC from continuing its plan

to replace Acis as Successor Manager but—contrary to the Response (Ex. 20 ¶¶ 27-28)—neither

the involuntary, the 303(f) order, nor the order for relief and the ultimate plan injunction had *any*

impact on HCLOM Ltd.'s failure to perform it obligations under the Transfer Agreement because

---

[27] *See also* Ex. 62 at 119:18-120:4; 122:5-11; 123:19-124:7 (despite signing the Mizuho Agreement, Dondero (a) did not know where HCLOM LLC obtained authority to enter in that Agreement, (b) acknowledged that HCLOM Ltd. is not mentioned in the document; and (c) does not know why HCLOM LLC entered into the Agreement rather than HCLOM Ltd.).

001570
HCMLPHMIT00000463

HCLOM Ltd. was never going to, nor did it take affirmative steps to, serve in that Successor Manager role.

### G.     The Parties' Post-Transfer Agreement Conduct Shows that the HCLOM Parties Knew Neither Acis Nor HCLOM Ltd. Would Perform under the Transfer Agreement or Participation Agreement After Terry Received His Arbitration Award

46.     The parties' conduct further demonstrates that, following the issuance of the Arbitration Award, neither HCLOM Ltd. nor Acis would ever satisfy their obligations to Highland under the Participation Agreement or the Transfer Agreement.

47.     For example, on January 19, 2018—before the Acis bankruptcy was commenced—Dondero signed an Acknowledgement and Waiver Agreement in which he (a) acknowledged that HCLOM LLC would succeed Acis rather than HCLOM Ltd., and (b) recognized that HCLOM Ltd.'s failure to serve as Acis' successor constituted a material breach of its obligations under the Transfer Agreement.[28]  While purporting to waive HCLOM Ltd.'s breach, Dondero was unaware of anything Highland received in exchange for such waiver (*i.e.*, Highland's waiver of HCLOM Ltd.'s material breach was unsupported by any consideration).[29]

48.     The undisputed evidence will also show that both before and immediately upon the filing of the Acis involuntary petition, while Dondero continued to firmly control both Highland and Acis, Highland eliminated all payments to and from Acis under the Participation Agreement from its internal weekly cash flow forecasts. (*Compare* Ex. 44 at 6 (showing "Stability Transaction" payments during the projection period) *with* Ex. 45 at 3, 6 (showing the removal of the "stability" payments) and Exs. 46-61 (no reference to any stability payments in any forecast

---

[28] Although Dondero signed the Acknowledgement and Waiver Agreement, he does not remember reading it before signing it or discussing it with anyone (Ex. 62 at 129:10-130:7; 134:15-23).

[29] At deposition, Dondero testified that (a) he did not know what Highland received from HCLOM Ltd. in exchange for the waiver; (b) he never asked; and (c) no one ever explained what benefit Highland received for waiving the breaches of the Transfer Agreement (Ex. 62 at 135:18-136:6).

001571

HCMLPHMIT00000464

through May 31, 2018 the date the next amortization payment was due under the Note). The evidence will also show that Acis removed both the Note (asset) and the Participation Agreement (liability) from its financial statements and both Acis and Highland stopped making any payments related to the transaction.[30]

49.  Further, under Dondero's leadership, Highland filed unsecured, priority, and administrative claims in the Acis bankruptcy case for fees due under the HCMLP Services Agreements, (Exs. 17, 67), yet Highland *never* filed a claim for the Acis Participation Interests due under the Participation Agreement.

50.  Finally, while HCLOM Ltd. now claims it can seek payment under the Note notwithstanding the lack of consideration or performance, it abandoned whatever claims it may have had well before Highland filed its Objection. In fact, rather than trying to declare a default under the Note or suing to collect, HCLOM Ltd. signed "forbearance" agreements pursuant to which it agreed not to collect under the Note in exchange for Highland's promise not to demand the Acis Participation Interests. Exs. 18, 19. But this made no sense because Dondero had already acknowledged that HCLOM Ltd. would never succeed Acis and therefore would never receive any Servicing Fees. If HCLOM Ltd.'s current position had any merit (and it doesn't), HCLOM Ltd. should have been trying to enforce its purported rights under the Note. Waterhouse testified that the benefit HCLOM Ltd. received from entering into the forbearance was "preserv[ing] that relationship [with Highland]."[31]  The Court can assess the credibility of that testimony.

---

[30] *See, e.g.*, Ex. 76 at 147:6-150:12. Dondero specifically testified that the Transfer Agreement effectively cancelled the Participation Agreement and the Note: "The unwinding of the note plus the unwinding of the liabilities [the participation] which netted each other . . . were never really of any net value anyway." *Id.* at 147:6-9.

[31] Because "everyone knew" HCLOM Ltd. would never receive any Servicing Fees, Waterhouse could not identify any benefit it received from the forbearance agreements other than supposedly "preserving the relationship," even though the same people were making the decisions on behalf of both parties and HCLOM Ltd. was an empty box on a piece of paper. (Ex. 3 at 165:21-168:22, 171:25-172:3, 182:19-184:21).

001572
HCMLPHMIT00000465

51.     Waterhouse admitted that he was unaware "of any discussion or attempt by anybody in the world after January 19, 2018 to install HCLOM Ltd. as the portfolio manager of the CLOs." (Ex. 3 at 172:4-173:11).  Thus, whether by neglect or design, HCLOM Ltd.'s contention that the Acis bankruptcy and this Court's injunction prevented HCLOM Ltd. from becoming Acis' Successor Manager so that it could perform under the Transfer Agreement is simply untrue.

## H.     Waterhouse was Unprepared to Testify as HCLOM Ltd.'s Rule 30(b)(6) Witness and Otherwise Lacked Personal Knowledge Such that he Cannot Testify in Good Faith

52.     Waterhouse testified as HCLOM Ltd.'s Rule 30(b)(6) witness but was so uninformed and unprepared that he cannot testify at trial in good faith.  In fact, even his verification of HCLOM Ltd.'s interrogatory responses was false.[32]

53.     Attached as **Exhibit A** is a demonstrative exhibit that summarizes Waterhouse's deposition testimony (the transcript of which is offered as Ex. 3).  As shown therein, Waterhouse testified that the only thing he did to prepare to testify as HCLOM Ltd.'s Rule 30(b)(6) witness was meet with the Stinson lawyers for a few hours and review the primary transaction documents at issue.  He (a) did not review a single email or speak with anyone other than counsel, and (b) testified about whole topics with no personal knowledge or preparation.  (Ex. 3 at 6:18-8:9, 7:15-16, 9:15-17, 9:21-11:5, 41:9-42:7, 124:24-126:3).[33]

54.     Reflecting his lack of preparation, Waterhouse testified, among other things, that:

•       he did not know that there is an entity called "Highland CLO Management,

---

[32] During his deposition, Waterhouse was forced to admit that (a) his verification falsely stated that it was based on discussions with people with personal knowledge concerning the events at issue and (b) it would be accurate to say that he only spoke with counsel, people he admitted lacked personal knowledge.  (*Compare* Ex. 10 (last page) *with* Ex. 3 at 176:4-178:13).  Waterhouse also sheepishly admitted he did nothing to verify the accuracy of the interrogatory responses except to take "what counsel provided as correct."  As it turns out, certain of the discovery responses were unresponsive or lacked any basis that Waterhouse knew of.  (Ex. 3 at 178:21-180:1, 180:14-181:12, 182:3-18).

[33] Waterhouse admitted that he never spoke with Dondero, Cullinane, Sevilla, Ellington or Leventon and read nothing but the primary documents at issue.  (Ex. 3 at 9:21-11:5)

001573

HCMLPHMIT00000466

Ltd." and a different entity called "Highland CLO Management, LLC," (*id.* at 6:2-11; 25:21-26:5);

- he did not know if he ever served as an officer of HCLOM Ltd. and did not know if he was an officer of HCLOM Ltd. at the time of the deposition, (*id.* at 14:13-17);[34]

- despite being Acis' Treasurer at the time, and despite causing the Acis bankruptcy and its destructive and continuing aftermath, Waterhouse claimed to have no recollection of Acis transferring its assets to other Highland entities in the fourth quarter of 2017, (*id.* at 131:1-15); and

- he did not know if HCLOM LLC or HCLOM Ltd. was doing the resets and could not competently testify about the meaning, intent or terms of the Acknowledgement and Waiver Agreement, (*id.* at 157:7-163:2).

55.     A fair reading of Waterhouse's deposition transcript shows he lacks a good faith basis to testify in this matter.

## I.     **Dondero Cannot Testify in Good Faith**

56.     Dondero is one of two witnesses HCLOM Ltd. intends to call at the evidentiary hearing in this matter. Ex. 21 (response to Interrogatory No. 10). Given that (a) he controlled Highland, Acis, and HCLOM LLC at all relevant times, (b) has served as HCLOM Ltd.'s President beginning on February 7, 2018, (Ex. 6), and (c) executed many of the relevant agreements on those entities' behalf, that is not surprising. But other than providing certain broad perspectives (all of which undermine HCLOM Ltd.'s contentions), Dondero lacks such basic knowledge, and his testimony will be so disingenuous, that he cannot testify in good faith.

57.     Attached as **Exhibit B** is a demonstrative exhibit that summarizes Dondero's deposition testimony (the transcript of which is offered as Ex. 62). As shown therein, Dondero testified, among other things, that:

- he did not know who holds the Note that is the subject of this litigation, (Ex.

---

[34] Of course, Waterhouse (a) has served as HCLOM Ltd.'s Treasurer since February 7, 2018 (Ex. 6), and (b) signed an agreement waiving HCLOM Ltd.'s purported right to collect on the Note at issue for a period of time (Ex. 19).

001574
HCMLPHMIT00000467

62 at 8:7-14; 14:10-14);

- he did not know anything about HCLOM Ltd. or HCLOM LLC other than that they were supposed to be involved in the Acis resets and refinancings, (*id*. at 9:24-10:22, 11:19-12:2);

- he did not know whether HCLOM Ltd. and HCLOM LLC are related in any way, (*id*. at 12:13-13:5);

- he could not identify the ultimate beneficial owners of HCLOM Ltd. or who controls it (and never asked) and did not know if he was authorized to act on its behalf, (*id*. at 14:15-16:13), (again, Dondero has been HCLOM Ltd.'s President for nearly seven years (Ex. 6));

- he never saw HCLOM's Response and does not know who is instructing Stinson in this litigation on HCLOM Ltd.'s behalf, (*id*. at 16:14-23, 18:8-19:13, 19:22-20:15, 110:20-111:3);

- he did not recall if he was an officer of Acis or if he controlled that entity, (*id*. at 24:21-25:6);[35]

- he claimed to have never read the Arbitration Award and was unfamiliar with the Panel's findings that the entities he controlled took actions under false pretenses and breached various agreements and fiduciary duties, (*id*. at 67:11-22, 70:3-20);

- he never communicated with Summit or Cullinane, the counterparty to the Transfer Agreement and related documents, (*id*. at 79:19-81:19, 82:24-83:3);

- he did not recall that Highland was a party to the Transfer Agreement, has "no idea" why he signed it, and could not identify any benefit Highland was expected to obtain even after reviewing the document, (*id*. at 84:22-86:14, 88:15-89:2, 89:20-91:5);

- he claimed to have no personal knowledge about the Notification, who gave it, or why Highland was unwilling to support Acis, (*id*. at 94:24-95:18, 98:12-16, 100:11-14);[36]

---

[35] As Waterhouse acknowledged, Dondero controlled Acis at all times from at least June 10, 2016 (the day after Terry's ouster) until the trustee was appointed in the Acis bankruptcy case. (Ex. 3 at 47;16-21; Ex. 9 (Acis consent showing Dondero's appointment as President)).

[36] "Notification" is defined in the Transfer Agreement and refers to the alleged fact that Highland was unwilling to continue providing services to Acis—the whole premise for the Transfer Agreement. Ex. 13 (third "Whereas" clause). Given that Dondero controlled both entities at the time, he either abdicated responsibility or gave false testimony. In fact, Waterhouse testified that Dondero made the decision to give the Notification. (Ex. 3 at 138:3-13). As noted above, there is no evidence that a written Notification was ever given as required by the HCMLP Services Agreements.

001575

HCMLPHMIT00000468

- he took no steps to make sure the assertions set forth in the Transfer Agreement were true and accurate, (*id*. at 108:6-25); and

- he could not identify anything of value Highland received in exchange for its purported waiver of HCLOM Ltd.'s breaches of the Transfer Agreement, (id. at 135:18-136:6).

58.    As will be shown at trial, Dondero's deposition testimony in this case directly contradicts his sworn testimony in the Acis bankruptcy case (including in the ongoing adversary proceeding) as well as his sworn responses to interrogatories.

59.    This is not just a matter of "credibility." Dondero's testimony is so uninformed and disingenuous that he cannot testify in good faith.

### III.    <u>ARGUMENT</u>

### A.    <u>The HCLOM Parties' Prosecution of the HCLOM Claim Constitutes Bad Faith and Willful Abuse of the Judicial Process</u>

60.    Based on clear and convincing evidence, the HCLOM Parties' prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial process. *See In re Cleveland Imaging & Surgical Hosp., L.L.C.*, 26 F.4th 285, 297 (5th Cir. 2022) (noting that a bankruptcy court may sanction litigants if it finds, "by clear and convincing evidence, that they acted in bad faith or willfully abused the judicial process.").

### 1.    <u>HCLOM Ltd.'s Prosecution of the HCLOM Claim Despite Admitting that it Breached its Obligations Under the Transfer Agreement Constitutes Bad Faith</u>

61.    There is no dispute that HCLOM Ltd. failed to perform its obligations under the Transfer Agreement. *See supra* ¶¶ 40-42. Even Dondero and Waterhouse acknowledge that the Note is part of a fully integrated transaction with the Participation Agreement and Transfer Agreement. In fact, the Note represents those deferred payments that Highland was to make in exchange for the deferred Acis Participation Interest payments Acis was able to make under the Participation Agreement. The Note is unenforceable because HCLOM Ltd. (a) provided no

001576

HCMLPHMIT00000469

consideration, (b) both Acis and HCLOM Ltd. materially breached their obligations under the Transfer Agreement, and (c) Acis breached its obligation to pay the Acis Participation Interests to Highland. HCLOM Ltd. knows this because Dondero caused the breaches for each entity which caused a complete failure of consideration to Highland for any purported obligations. Nevertheless, HCLOM Ltd. continues to prosecute the HCLOM Claim without any legal or factual basis.

### a. The Note is Unenforceable Because HCLOM Ltd. Provided No Consideration

62.    The Note is unenforceable because HCLOM Ltd. failed to provide any consideration in exchange for its assignment. Under Cayman Islands law,[37] "[a] compromise like any agreement, must be supported by consideration…" *Folkvang Ltd v Valorte Capital* (unreported, 29 February 2024, FSD 199 of 2023, Parker J. at ¶ 99);[38] *see also Blue v Ashley* [2017] EWHC 1928 (Comm) Leggatt J at ¶ 49 ("The basic requirements of a contract are that: (i) the parties have reached an agreement, which (ii) is intended to be legally binding, (iii) is supported by consideration, and (iv) is sufficiently certain and complete to be enforceable…").[39] Thus, an agreement is unenforceable for lack of consideration where one party's promised performance fails. *See Barclays Bank Plc v. Kenton Capital* [1994-95 CILR 489]: the Grand Court of the Cayman Islands, per Smellie J at page 499 ("... It may also be the case that the depositors would be entitled to recover, as against Kenton in claims at common law, for moneys had and

---

[37] The Transfer Agreement is governed by the laws of the Cayman Islands. *See* Ex. 65, § 6(d).

[38] *See Declaration of Hayley R. Winograd in Support of the Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with Scheduled Claims 3.65 and 3.66* (the "Winograd Dec.") (being filed concurrently herewith), **Exhibit 1**.

[39] *See* Winograd Dec., **Exhibit 1**. *"Winograd Dec."* refers to the *Declaration of Hayley R. Winograd in Support of the Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with Scheduled Claims 3.65 and 3.66,* being filed concurrently herewith.

001577

HCMLPHMIT00000470

received on the basis that the consideration on which the agreement is based has failed.");[40] *H.E.B. Enterprises Ltd and Bodden Jr v Richards* [2023] UKPC 7, ¶ 58 ("money had and received to the claimant's use can be recovered where the basis (there referred to as consideration) has wholly failed.");[41] *Richards v H.E.B Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84] ¶¶ 102-4 (finding a total failure of consideration to have occurred in the context of two agreements (namely a sale/purchase agreement and a loan agreement) which, contrary to the defendant's argument, the Court found to constitute one agreement, and holding, "…[a]ccordingly, it is correctly submitted that under the terms of the agreements, there has still been a total failure of consideration on the sale of the parcels.")[42]

63.     Here, in order to transfer any of the rights or obligations under the Participation Agreement, Highland's prior written consent was required.  *See* Ex. 13, § 5.1.  HCLOM Ltd. obtained Highland's agreement to enter into the Transfer Agreement through the commitments of HCLOM Ltd. set out in the agreement.  HCLOM Ltd. admits that it failed to satisfy any of its obligations under the Transfer Agreement, the very document pursuant to which HCLOM Ltd. was assigned the Note.  The ostensible purpose of the Transfer Agreement, *i.e.*, for HCLOM Ltd. to succeed Acis as Successor Manager, was never realized (indeed, *no* steps were ever taken to enable HCLOM Ltd. to become Acis' Successor Manager).  *See supra* ¶¶ 40-51.  HCLOM Ltd. thus failed to perform its promised obligation under the Transfer Agreement, and as a result, the consideration on which the Transfer Agreement is based has failed. *See Richards v H.E.B Enterprises Ltd and Bodden Jr* [2018 (2) CILR 84] per Williams J at ¶ 72, applying *Heyman v Darwins Ltd*. [1942] AC 356, per Lord Porter at page 399 ("Strictly speaking, to say that, upon

---

[40] *See* Winograd Dec., **Exhibit 2**.

[41] *See* Winograd Dec., **Exhibit 3**.

[42] *See* Winograd Dec., **Exhibit 4**.

4880-1728-2300.13 36027.003                                    26

001578

HCMLPHMIT00000471

acceptance of the renunciation of a contract, the contract is rescinded is incorrect. In such a case the injured party may accept the renunciation as a breach going to the root of the whole of the consideration. By that acceptance he is discharged from further performance and may bring an action for damages, but the contract itself is not rescinded.")[43]   HCLOM Ltd.'s failure of its promised performance under the Transfer Agreement renders the Note unenforceable by HCLOM Ltd.  Based on the evidence adduced in discovery, including HCLOM Ltd.'s extensive admissions, HCLOM Ltd.'s continued prosecution of its HCLOM Claim, with knowledge that it provided no consideration for the Note, constitutes bad faith and a willful abuse of the judicial process.

### b.    The Note is Unenforceable Because HCLOM Ltd. Materially Breached its Obligations under The Transfer Agreement

64.    It is also undisputed that HCLOM Ltd. materially breached its obligations under the Transfer Agreement.  For this additional reason, the Note is unenforceable.  Under Cayman law, a non-breaching party is relieved of performing its obligations where the counterparty materially breaches its obligations. *See Beach Club Enterprises Limited v Horizon Management Limited* [1980-83 CILR 223], Carberry J.A. at page 235 (an innocent party's termination following a breach of a condition excuses future performance) applying *McDonald v Dennys Lascelles Ltd.* (1933), 48 C.L.R. 457 as approved in *Johnson v Agnew* [1980] A.C. 367;[44] *Hongkong Fir Shipping Co Ltd v Kawasaki Kisen Kaisha Ltd* [1962] 2 W.L.R. 474, Lord Diplock, at pages 493-494 (noting that a breach of a condition in a contract provides the innocent party with an immediate, unequivocal right to terminate future performance of the contract);[45] *Golfco Limited v Borden* [2002 CILR 1], Kellock Ag. J at ¶ 25 (finding that the purchaser of an apartment block's

---

[43] *See* Winograd Dec., **Exhibit 5**.

[44] *See* Winograd Dec., **Exhibit 6**.

[45] *See* Winograd Dec., **Exhibit 7**.

001579

HCMLPHMIT00000472

failure: (a) to pay certain instalments to the seller pursuant to the contract for the sale of land; and (b) to remedy their breach within 28 days of receiving a written notice to do so (in accordance with clause 11(1) of the contract of sale) from the seller "*would have had to be regarded as a fundamental breach*");[46] *In the Matter of Re Indies Suites Ltd* [2004-05 CILR 498], Smellie C.J. at ¶ 22, (accepting that termination excuses future performance, together with a right of the innocent party to claim damages by way of compensation for the loss sustained in consequence of the non-performance of the contract in the future, applying the English case of *Photo Production Ltd. v Securicor Transport Ltd.* [1980] A.C. 827).[47]

65.     A breach is "material" when it goes to the "root" of the contract or forms an essential condition of performance. *See Tempo Group Ltd and others v. Fortuna Development Corporation* (unreported, 31 March 2015, FSD 125 of 2012, Henderson J at ¶ 296) ("[a]n act of repudiation must go to the root of the contract ... The repudiatory breach must deprive the innocent parties of substantially the whole benefit which they would have obtained from due performance of the contract…");[48] *Chitty on Contracts*, 35th Ed. Chapter 28-014 (a "condition" of a contract is that of "an essential stipulation of the contract which one party guarantees is true or promises will be fulfilled.").[49]

66.     Here, it is undisputed that HCLOM Ltd. materially breached the Transfer Agreement by failing to (a) "provide the Controlling Class (as defined in each of the CLO Indentures) with notice requesting the appointment of HCLOM as Portfolio Manager," as required by Section 1 of the Transfer Agreement; (b) "promptly pursue Successor Manager appointment,"

---

[46] *See* Winograd Dec., **Exhibit 8**.

[47] *See* Winograd Dec., **Exhibits 9 and 10**.

[48] *See* Winograd Dec., **Exhibit 11**.

[49] *See* Winograd Dec., **Exhibit 12**.

001580
HCMLPHMIT00000473

as required by Section 2 of the Assignment; (c) "achiev[e] all conditions precedent required by the CLO Documents," as required by Section 2 of the Transfer Agreement; and (d) execute a joinder to the to the Participation Agreement [referred to as the "Purchase Agreement" in the Transfer Agreement], as required by Section 3.d of the Transfer Agreement.

67.    If there was any doubt—and there isn't—Dondero agreed on behalf of Highland that HCLOM Ltd. and Acis breached the Transfer Agreement in the Waiver and Acknowledgment Agreement (although he purportedly waived those breaches for no consideration). Ex. 7.

68.    Based on the documentary evidence adduced during discovery, including the Waiver Agreement, HCLOM Ltd. is prosecuting its HCLOM Claim based on the Participation Agreement, the Note and the Transfer Agreement despite knowing that it materially breached its obligations the Transfer Agreement. HCLOM Ltd.'s material breaches of the Transfer Agreement excused Highland's obligations under the related Note. HCLOM Ltd.'s continued prosecution of this claim, despite knowing it materially breached the Transfer Agreement, constitutes bad faith and willful abuse of the judicial process.

        c.    **Acis Breached its Obligation to Pay the Acis Participation Interest to Highland**

69.    As soon as Terry received the Arbitration Award and the Transfer Agreement was executed, Acis and HCLOM Ltd. breached their obligations under the Participation Agreement and the Transfer Agreement. In addition to the breaches of the Transfer Agreement by HCLOM Ltd. described above, Dondero-controlled Acis ceased paying any Acis Participation Interests to Highland. That failure of consideration continued after the Acis order for relief was entered. The complete failure of Acis and HCLOM Ltd to provide Highland with the consideration it was to receive under Participation Agreement and the Transfer Agreement—the Acis Participation Interests—vitiates any obligation Highland may have had under the Participation Agreement or its

001581
HCMLPHMIT00000474

Note.  As recognized in the Participation Agreement, Highland bore the risk of payment of the Note *other than* in the event that Highland it did not receive the Acis Participation Interests "as a result of the Seller [Acis] breaching its covenants [including to promptly remit the Acis Participation Interests] under this Agreement or as result of the fraud or willful misconduct or the Seller." Ex. 13 §3.6.  Acis' and HCLOM Ltd.'s breach of their obligations under the Participation Agreement and the Transfer Agreement relieved Highland of any duty to make any further payments under the Note.[50]

### 2.  HCLOM Ltd.'s Designation of Waterhouse as its Rule 30(b)(6) Witness Constitutes Bad Faith and a Willful Abuse of the Judicial Process

70.    HCLOM Ltd.'s designation of Waterhouse as its Rule 30(b)(6) further demonstrates that HCLOM Ltd. is prosecuting the HCLOM Claim in bad faith.  As discussed above, Waterhouse was wholly unprepared to testify on behalf of HCLOM Ltd.  He lacked knowledge of critical facts underlying the HCLOM Claim, including, for instance, (a) whether he was an officer of HCLOM Ltd. at the time of his deposition; (b) the purpose of the agreements at issue in the HCLOM Claim; and (c) that HLCOM LLC and HCLOM Ltd. were different entities. *See supra* ¶¶ 52-55.  It is untenable for a 30(b)(6) witness to lack such fundamental information about the entity it represents.

### 3.  Dondero's Involvement in the Prosecution of the HCLOM Claim Constitutes Bad Faith and a Willful Abuse of the Judicial Process

71.    Dondero's involvement in the prosecution of the HCLOM Claims is likewise in bad faith.  As set forth above, Dondero cannot testify in good faith on behalf of HCLOM Ltd.  He, like HCLOM Ltd.'s 30(b)(6) witness, lacks critical knowledge underlying the facts of this case, including those as fundamental as, among other things, who holds the Note that is the subject of

---

[50] The Participation Agreement and the Note are governed by Texas law.

001582

HCMLPHMIT00000475

this litigation and why he signed the very agreements that are the subject of this litigation.  *See*

*supra* ¶¶ 56-59.  Dondero's testimony is not credible, is directly contradicted by his sworn

testimony and interrogatory responses given in the Acis case, and is otherwise uncorroborated; he

simply cannot testify in good faith on behalf of HCLOM Ltd.  Dondero's continued involvement

in the prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial

process.

### B. Highland is Entitled to Attorneys' Fees from the HCLOM Parties for Costs Incurred in Connection with the Bad Faith Prosecution of the HCLOM Claim

72.     The HCLOM Parties should be sanctioned for their bad faith prosecution of the

HCLOM Claim by reimbursing Highland for attorneys' fees and expenses incurred in connection

with litigating the HCLOM Claim.

73.     Bankruptcy courts possess inherent authority under section 105 of the Bankruptcy

Code to issue sanctions after making a finding of bad faith. *See In re Yorkshire, LLC*, 540 F.3d

328, 332 (5th Cir. 2008) (affirming bankruptcy court's imposition of sanctions for bad faith filing

"following an extensive hearing in which the bankruptcy court heard testimony from the parties

and witnesses and made certain credibility determines," and made specific findings that Appellants

acted in bad faith."); *In re Brown*, 444 B.R. 691, 695 (E.D. Tex. 2009) (issuing sanctions against

party and their counsel, and relying on section 105(a) of the Bankruptcy Code as a basis for

awarding attorney's fees against parties for acting "with reckless disregard of their duty to this

Court"); *In re Paige*, 365 BR 632, 640 (Bankr. N.D. Tex. 2007) (awarding attorneys' fees against

debtor for their "bad faith" conduct during bankruptcy case, noting "[t]he sanction here is derived

from the Court's inherent power to sanction" under section 105(a)); *Cleveland Imaging*, 26 F.4th

at 297 (noting that a bankruptcy court may sanction litigants "if it finds, by clear and convincing

evidence, that they acted in bad faith or willfully abused the judicial process") ; *Schermerhorn v.*

001583

HCMLPHMIT00000476

*Kubbernus (In re Skyport Glob. Commc'n, Inc.)*, 642 F. App'x 301, 304 (5th Cir. 2016) (same);

*(Lopez v. Portfolio Recovery Assocs. (In re Lopez)*, 576 B.R. 84, 93 (S.D. Tex. 2017) (same).

74. A bankruptcy court has "broad discretion" to determine reasonable attorneys' fees. *See In re Monteagudo*, 536 F. App'x 456, 459 (5th Cir. 2013) (sanctions orders granted under bankruptcy court's inherent powers are reviewed for "abuse of discretion"); *ASARCO, L.L.C. v. Jordan Hyden Womble Culbreth & Holzer, P.C. (In re ASARCO, L.L.C.)*, 751 F.3d 291, 294 (5th Cir. 2014), *aff'd sub nom.*, *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015) ("A bankruptcy court has 'broad discretion' to determine reasonable attorneys' fees, as the bankruptcy court is familiar "with the actual services performed" and is well positioned to determine "what is just and reasonable") (internal quotations omitted); *In re Paige*, 365 B.R. 632, 637-640 (Bankr. N.D. Tex. 2007) (awarding attorneys' fees against debtor for their "bad faith" conduct during bankruptcy case, noting "[t]he sanction here is derived from the Court's inherent power to sanction" under section 105(a)); *Lopez v. Portfolio Recovery Assocs., LLC (In re Lopez)*, 576 B.R. 84, 93 (S.D. Tex. 2017) (same); *Dondero v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt. L.P.)*, 105 F.4th 830, 841 (5th Cir. 2024) ("Undergirding our analysis of the sanctions award here is a recognition of the goal of such awards everywhere: "to do rough justice.' ... Complete accuracy is neither required nor expected. The bankruptcy court's judgments in these matters are entitled to our 'substantial deference.'") (internal quotations omitted).

75. Here, the Bankruptcy Court should award sanctions against HCLOM Ltd. and Dondero in the form of attorneys' fees and expenses incurred by Highland in connection with the bad faith prosecution of the HCLOM Claim, in an amount to be determined at trial.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Highland respectfully requests that the Court enter an order, in the form attached hereto as **Exhibit C**, (a) finding that HCLOM Ltd. and Dondero

001584

HCMLPHMIT00000477

prosecuted the HCLOM Claim in bad faith, (b) entering sanctions jointly and severally against
HCLOM Ltd. and Dondero in the form of reimbursement to Highland of Highland's costs and
expenses incurred in objecting to HCLOM Ltd.'s HCLOM Claim in an amount to be determined
at trial; and (c) granting such other and further relief that the Court deems just and proper under
the circumstances.

Dated:  November 21, 2024

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
E-mail:jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile:  (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

4880-1728-2300.13 36027.003

33

001585

HCMLPHMIT00000478

## CERTIFICATE OF CONFERENCE

     The undersigned hereby certifies that, on November 19 and 20, 2024, counsel for Highland Capital Management, L.P., John A. Morris, corresponded with counsel for Highland CLO Management, Ltd., Deborah Deitsch-Perez and Michael Aigen, regarding the relief requested in the foregoing Motion.  As of the filing of the Motion, it is assumed that Highland CLO Management, Ltd. is **OPPOSED** to the relief requested in the Motion.

                             */s/ Zachery Z. Annable*
                             Zachery Z. Annable

001586
HCMLPHMIT00000479

# EXHIBIT A

001587

HCMLPHMIT00000480

## WATERHOUSE DEPOSITION DIGEST[1]

- **FW does not know that there is an entity called "Highland CLO Management, Ltd." and a different entity called "Highland CLO Management, LLC" (6:2-11; 25:21-26:5)**

### WATERHOUSE DID NOT PROPERLY PREPARE TO TESTIFY

- To prepare, FW met with counsel and reviewed the Note, the Purchase and Sale Agreement, the Transfer Agreement, the Rule 30(b)(6) notice and the pleadings; he also reviewed portions of Dondero's deposition transcript from the Acis case. (6:18-8:9); FW met with counsel a few weeks before for 2-3 hours (41:9-42:7)

- But FW didn't review any emails (7:15-16); was unaware that there is ongoing, current litigation between Acis and Dondero (9:15-17); spoke with nobody other than counsel to prepare, including Dondero, Cullinane, Sevilla, Ellington or Leventon; and read nothing but the primary documents. (9:21-11:5)

- Even though "resets" were a Rule 30(b)(6) topic, FW looked at no documents to prepare, talked to no one other than counsel, and has no personal knowledge on the topic. (124:24-126:3)

- **FW DNR if he ever served as an officer of HCLOM Limited, and did not know if he was an officer of HCLOM Limited at the time of the deposition. (14:13-17)**

- FW DNR seeing HCLOM Limited resolutions; DNK how Summit Management became Limited's director at formation. (15:4-16:20)

- FW DNK who formed HCLOM Limited and DNK of any communications with Summit or Cullinane on the topic. (16:21-17:7)

- FW discussed with Dondero and legal team the need to form HCLOM because Acis could not continue to serve as CLO manager following Terry's arbitration award. (17:11-18:13)

- Needed to create successor manager. (18:14-23)

- **FW claims Acis couldn't continue because Highland wouldn't support it and investors did not want to be associated with it. (18:24-19:13)**

---

[1] "FW" refers to Frank Waterhouse. "DNR" means "does not recall" or "does not remember." "DNK" means "does not know." Citations are to the transcript of Waterhouse's deposition marked as Ex. 3.

001588

HCMLPHMIT00000481

- **FW can't identify any specific person who told him investors did not want to be associated with Acis, nor could he identify any particular investors (19:10-20:17)**

- **FW DNR why Highland was unwilling to service Acis. (20:18-20)**

- **HCLOM Limited never served as Successor CLO Services for Acis and DNK if it ever generated a dollar of revenue. (20:25-21:10)**

- Other than formation expenses, FW DNK if HCLOM Limited ever incurred any expenses. (21:11-23)

- **FW DNK if he was HCLOM Limited's Treasurer. (21:24-25)**

- **FW DNR whether HCLOM Limited had any employees or a shared services agreement. (22:1-9)**

- **FW DNR seeing 2/7/18 HCLOM Limited resolutions; they show he is the Treasurer (22:11-23:7). This was a Rule 30(b)(6) topic, yet FW has no knowledge concerning HCLOM Limited's officers. (23:8-24:8)**

- **FW does not know if HCLOM Limited or HCLOM LLC was the entity that tried to take steps to become the Successor Manager. (24:14-25:20)**

- **FW DNR that HCLOM Limited had a bank account; prepared financial statements; maintained books and records; was a registered financial advisor. (26:6-19)**

- **FW never saw a document concerning resets where HCLOM Limited was identified as the proposed portfolio manager rather than LLC. (27:4-7)**

- The Acknowledgement and Waiver Agreement was signed about 10 weeks after the Transfer Agreement by Dondero and Cullinane. (27:14-29:4)

- FW not aware of anything inaccurate or incorrect. (29:5-8)

- **FW has no independent knowledge of the Acknowledgement and Waiver Agreement; it says what it says. (29:9-31:4)**

- **FW admits that the Notices and Appointments required under the Transfer Agreement never occurred. (31:14-24)**

- **Dugaboy and Okada own HCLOM Limited. (34:7-10)**

- **FW has no facts to support speculation that Limited and LLC are affiliates. (33:15-36:1)**

001589

HCMLPHMIT00000482

- **HCMLP had an ownership interest in Limited until 2022. (36:7-22)**

- FW DNK if LLC ever had an ownership interest in Limited. (37:15-19)

- FW's understanding is that Highland owned LLC until 2022. (37:20-38:25)

- **FW was "likely" Treasurer of Acis. (43:14-17)**

- **FW admits that on June 10, 2016, the day after Terry was terminated, he and Dondero were Acis' sole remaining officers. (44:2-45:14)**

- **FW has never discussed Acis with Nancy Dondero even though she is the Dugaboy trustee, which owned Acis, and FW was one of only two officers of Acis. (45:24-46:14)**

- **FW agrees that JD controlled Acis at all times from at least 6/10/16 until Phalen is appointed. (47:16-21)**

- If FW needed approval to do something as Treasurer of Acis, he'd turn to Dondero. (48:12-16)

- **Acis had no employees but did have shared services and sub-advisory agreements with Highland enabled Acis to fulfill its duties as portfolio manager. (48:22-50:1)**

- **Dondero signed amended SSA and Sub-Advisory Agreements the month after Terry is terminated. (50:6-51:10)**

- Despite being Highland's CFO and Acis' Treasurer, FW testified that he wasn't involved in amending the service agreements. (51:11-52:9)

- Dondero would have to approve the 20-BPS formula for Acis and Highland. (59:2-7)

- **FW does not know if Highland ever gave written notice of termination of the SSA pursuant to Section 14(b). (60:2-16)**

- Acis was to pay Highland an aggregate of 35 basis points for shared and sub-advisory services. (64:21-65:4)

- **FW DNR Highland providing written notice of termination of the sub-advisory agreement in accordance with Section 7.02. (65:4-66:7)**

- Shared Services and Sub-Advisory Agreements were amended again in March 2017; Dondero signed the amended agreements so, again, Acis is still paying 35 basis points for services. (66:8-68:6)

001590

HCMLPHMIT00000483

- **So as of March 2017, Acis was still the vehicle through which the Acis CLOs were expected to be managed. (68:7-69:6)**

- **FW does not recall anyone expressing concerns over Acis until 2018. (69:7-24)**

- **FW DNR either party ever giving written notice of termination of the service agreements. (69:25-70:16)**

- FW DNR shared services agreement being amended. (72:4-22)

- FW DNR Highland assigning or delegating any rights or obligations. (72:23-75:2)

- **FW DNR sub-advisory agreement being the subject of a written notice of termination. (75:16-76:21)**

- FW DNR Sub-Advisory Agreement ever being amended. (76:22-77:10)

- FW DNR Sub-Advisory Agreement ever being assigned. (77:11-21)


## CLO PARTICIPATION AGREEMENT

- "Highland purchased an … interest in Acis' management fees." (78:10-22)

- **Whole concept was a "tax-driven strategy" that also gave Highland a cash management benefit because it would receive the Servicing Fees before it paid out on the Note. (79:19-80:24; 83:1-6)**

- FW discussed tax planning and cash management aspects with tax group and Dondero. (82:4-25)

- **Because Acis is a pass-through entity, Acis' ultimate beneficial owners were the beneficiaries of the expected tax benefits on the Acis side; same was true on the Highland side. (85:22-86:16)**

- **Unpredictability and instability of Servicing Fees never caused Acis to default or breach obligations. (98:14-22)**

- **FW cannot identify any adverse consequence to Acis from the alleged unpredictability and instability of Servicing Fees. (99:23-25)**

- Terry, Okada, and Dondero were the only people who could make decisions on Acis' behalf because they were the owners; after Terry was terminated, Dondero and Okada remained in control until Phalen was appointed Trustee. (101:13-102:6)

- **FW DNR the issuers ever breaching their obligation to pay servicing fees to Acis or Acis ever declaring a default. (102:7-14)**

4888-1820-6968.1 36027.003

4

HCMLPHMIT00000484

- **Schedule A of the Transfer Agreement identifies the CLOs subject to the Agreement. Based on the figures in Schedule A, and the fees due under the Shared and Sub-Advisory Service Agreements, FW agrees that "Acis was obligated to pay to Highland more than it expected to receive in servicing fees." (102:15-104:15)**

- **As Treasurer of Acis and the CFO of Highland, FW admits that "Highland is giving the Cash Purchase Price and the Note to Acis in exchange for Acis' promise to share the Acis Participation Interest as defined in th[e] agreement" (104:16-105:24)**

- FW DNR how the Cash Purchase Price and initial principal balance of the Note were determined; whether they equaled the value of the Participation interests; or whether they were the subject of negotiation. (106:1-16)

## NOTE

- **The Note was executed at the same time as the Participation Agreement, both of which "were part and parcel of the same overall transaction." (111:9-112:1)**

- **The same people made decisions on behalf of Acis and Highland in connection with the Participation Agreement and Note. (112:10-21)**

- Highland did not have a dedicated team looking out for its interests; while H&W was involved, they were engaged solely by Acis. (112:22-113:10)

- HCLOM Limited never paid servicing fees because it never became the collateral manager of the CLOs. (118:7-15)

- FW still insists that HCLOM Ltd. didn't become collateral manager of CLOs because of the Acis bankruptcy. (118:7-18)

- **Highland made the first payment under the Note, but not the second payment due of 5/31/18; HCLOM did not declare a default but entered into the forbearance agreement instead. (118:20-119:12)**

- **Dondero and FW were the sole officers of Acis from at least November 1, 2017 until Phelan was appointed in the Spring or Summer of 2018. (120:3-9)**

- **Acis continued to receive quarterly servicing fees from the CLOs after November 1, 2017. (120:10-15)**

- **FW DNR if Acis remitted servicing fees to Highland after 11/1/17. (120:16-18)**

- **In April 2017, under Dondero's direction, Acis launched a brand-new CLO (Acis-7). (121:11-21)**

001592    HCMLPHMIT00000485

- **FW admits that Dondero would not have launched a brand-new CLO if he didn't believe Acis could not perform. (121:18-25)**

- FW DNR recall (a) anyone expressing any concern about Acis' ability to perform or (b) how Acis funded the risk retention amount (or whether Highland loaned the money). (122:1-23)

- Acis looking to reset Acis-3 in late 2017. (123:13-124:2)

## ASSIGNMENT AND TRANSFER AGREEMENT

- **Despite being the CFO of Acis, FW has no recollection of Acis transferring its assets to other Highland entities in the fourth quarter of 2017. (131:1-15)**

- **FW had no recollection that Highland caused a Delaware entity called "Highland CLO Management, LLC" to be created in October 2007. (131:16-132:7)**

- **FW DNK who authorized the creation of LLC or what its purpose was. (132:4-13)**

- **FW DNK why the Transfer Agreement was entered on 11/3/17 except that (a) Terry got his award and (b) Highland said it wouldn't support Acis; those are the only two reasons why this Agreement was entered. (132:22-134:25)**

- **Dondero made the decision to enter the Transfer Agreement on behalf of Highland and Acis, and Cullinane made the decision on behalf of HCLOM Limited. (135:1-10)**

- **The only purpose of the Transfer Agreement was to transfer the participation interest (i.e., the servicing fees) and the Note. (135:24-136:13)**

- **FW admitted that HCLOM Ltd. had to become the manager of the Acis CLOs "to receive the servicing fees to then in turn remit the participation interest to Highland. That was it." (136:14-24)**

- FW DNK if Transfer Agreement was negotiated or what role, if any, Cullinane played in drafting or negotiating the Agreement and despite being the Rule 30(b)(6) witness, FW made no effort to ascertain Cullinane's thoughts concerning the Agreement. (136:25-138:2)

- **Dondero made the decision on behalf of Highland to stop supporting Acis, as set forth in the third recital. (138:3-13)**

- The team managing the Acis CLOs was the same the day after Terry left as it was on 11/3/17, lead by Dondero (139:23-140:24)

001593

HCMLPHMIT00000486

- **In fact, despite Terry's departure and the public litigation that Highland initiated, Dondero still had enough confidence in the Acis brand that he entered into new service agreements and launched a new CLO with the Acis name. (140:25-142:13)**

- **The award was the sole reason FW could identify for entering into the Assignment and Transfer Agreement. (142:14-21)**

- FW DNK who gave the Notice on behalf of Highland or who received it on behalf of Acis, although Dondero did control both entities at the time. (142:22-143:6)

- FW has no knowledge that Acis ever defaulted under either the SSA or Sub-Advisory Agreement. (143:7-144:8)

- **Dondero made the decision on Highland's behalf not to support Acis, and then made the decision on behalf of Acis that it couldn't continue. (144:9-145:10)**

- **FW cannot identify any "damage to the Acis brand" other than the damage allegedly caused by the Acis arbitration award. (145:11-22)**

- **Acis "simply accepted Highland's notification and said, okay, we're done" without seeking alternatives or declaring a default on Highland's part. (146:13-10)**

- **And despite allegedly giving notice, Highland continued to perform under the service agreements until Phalen was appointed. (147:11-21)**

- **HCLOM was "going to step into Acis' shoes" and would "have the obligation under the CLO participation interest agreement to remit… that 20 bases point over to Highland." (149:18-150:12)**

- **FW agrees that it's fair to say "that the reason Highland agreed to transfer the note to HCLOM is because HCLOM was agreeing to become the new portfolio manager for the Acis CLOs and would share the servicing fees after that happened." (150:13-23)**

- **"The planning contemplated the sale of the CLO participation interest and a note to the CLO manger." (152:1-13)**

- FW has no knowledge concerning the proofs of claim Highland filed in the Acis bankruptcy case. (153:20-155:25)

- **FW admits that the obligations under sections 1 and 2 of the Transfer Agreement were never fulfilled. (156:15-157:6)**

001594

HCMLPHMIT00000487

- **FW has no idea if HCLOM LLC or HCLOM Limited was doing the resets and cannot competently testify about the meaning, intent or terms of the Acknowledgement and Waiver document. (157:7-163:2)**

## FORBEARANCE AGREEMENT

- FW signed – but doesn't know if its electronic signature or a wet signature (163:3-21)

- **FW DNR (a) the circumstances surrounding his execution of the document or (b) why highland did not make the payment due on 5/31/18. (163:22-164:4)**

- **FW DNR HCLOM Limited (a) making a demand under the Note, (b) declaring a default, or (c) exercising any remedies. (164:11-20)**

- FW DNR (a) reviewing before signing, (b) discussing the document with anyone before signing, (c) who asked him to sign it, or (d) where the idea originated. (164:21-165:20)

- **FW admits that "everyone knew" HCLOM Ltd. wasn't receiving fees under the portfolio management agreement and was relieved of the obligation to make payments, so HCLOM received no benefit under the Forbearance Agreement. (165:21-167:11)**

- **The only thing Waterhouse could identify that HCLOM Ltd. received from entering into the Forbearance Agreement was somehow helping Highland preserve its relationships with the investors in the CLOs. (167:12-168:22)**

## AMENDED FORBEARANCE AGREEMENT

- Signed by FW on behalf of both Highland and HCLOM Limited after the Acis plan is confirmed and there is no prospect for Acis reset. (170:5-24)

- **FW admits that by this time, there is no chance HCLOM Limited will ever become the portfolio manager of Acis. (170:25-171:13)**

- **FW DNR HCLOM Limited ever being identified as a portfolio manager in 2019. (171:14-24)**

- **Only alleged benefit to HCLOM Limited from Forbearance Agreement is "reserv[ation] of the relationship. (171:25-172:3)**

- **FW is not aware "of any discussion or attempt by anybody in the world after January 19, 2018 to install HCLOM, Ltd. as the portfolio manager of the CLOs." (172:4-173:11)**

001595

HCMLPHMIT00000488

**RESPONSE**

- FW read it before and is unaware of any mistakes.  (174:13-175:1)

- **FW is not aware of any amendments needed to fully and accurately set forth HCLOM's factual and legal bases for responding to the Objection or of any intended amendments.  (175:2-9)**

**HCLOM'S DISCOVERY RESPONSES**

- Served before FW reviewed and verified.  (176:4-177:1)

- **The verification falsely states that FW spoke with people with "personal knowledge" about the responses.  (177:2-178:13)**

- **FW does not believe the Responses need to be amended or modified to make them more accurate.  (178:14-20)**

- **FW did not verify the accuracy of the Response to Interrogatory No. 2, he just "took what counsel provided as correct."  (178:21-180:1)**

- **FW then admits the response to Interrogatory No. 2 is unresponsive; he doesn't know if the Transfer Agreement was subject to negotiations; and he did nothing to find out.  (180:14-181:2)**

- **FW DNK basis for the denial of the Firs Request to Admit.  (182:3-18)**

- **The "consideration" HCLOM gave was the "preservation of the relationship" even though the same people making the same decisions on behalf of both entities.  (182:19-184:21)**

- Dondero, Ellington & Waterhouse.  (184:22-185-22)

001596

HCMLPHMIT00000489

# EXHIBIT B

HCMLPHMIT00000490

## **DONDERO DEPOSITION DIGEST**[1]

- **JD does not know who holds the Note that is the subject of the litigation. (8:7-14; 14:10-14)**

- JD didn't do anything to prepare other than meet with counsel, an hour the Friday before and 15 minutes today; didn't review documents; didn't speak with anyone other than counsel (including FW). (8:15-9:23).

- **JD doesn't know anything about HCLOM Limited other than it was one of the entities that was going to be involved in refinancing or resetting of the CLOS. (9:24-10:22)**

- **JD doesn't know when Limited was formed; formed by "the lawyers." (10:23-11:18)**

- **JD is aware that LLC exists and speculates that it was an onshore entity involved in resets and refinancings. (11:19-12:2)**

- **JD doesn't know if LLC/Limited have common ownership or had any contractual relationship. (12:13-13:5)**

- JD never asked why there were entities with similar names because he "wasn't specifically involved in any of the details on a transaction of this size," and DNR anyone ever explaining why. (13:10-14:1)

- **JD can't identify the ultimate beneficial owners of HCLOM Limited as of today or at the time of formation. (14:15-15:17)**

- **JD DNK who controls HCLOM Limited: "This is a small transaction. I wasn't involved in the details," and he never asked anyone. JD doesn't even know if he's authorized to act on behalf of HCLOM Limited. (15:18-16:13)**

- **JD never saw HCLOM's Response; DNR seeing before filed. (16:14-23; 18:8-19:13)**

- **JD doesn't know who, within his organization, is responsible for handling this litigation on behalf of HCLOM Limited; he never designated anyone; no one ever told him who that person was; and he never spoke with anyone internally concerning this litigation. (19:22-20:15)**

---

[1] "JD" refers to James Dondero. "DNR" means "does not recall" or "does not remember." "DNK" means "does not know." Citations are to the transcript of Dondero's deposition in this matter, marked as Ex. 62.

001598

HCMLPHMIT00000491

- Acis: formed in 2011 by Dondero, Terry & Okada to be a RIA and manage and invest in CLOs.  (22:4-16)

- Acis obtained role as CLO Manager through management agreements with issuers and would receive fees for services.  (22:17-23:13)

- **JD DNR if he was an officer of Acis or controlled that entity.  (24:21-25:6)**

- **JD doesn't remember if he fired Josh Terry for cause.  (25:7-22)**

- Terry's interests in Acis were allocated between entities owned or controlled by Dondero and Okada, but JD believes the decisions were made by an unnamed in-house lawyer; JD did not delegate to a particular person the responsibility for addressing issues arising from Terry's departure.  (26:3-27:13)

- JD DNR delegating or designating anyone to act on behalf of Acis after Terry departs.  (29:5-10)

- JD controlled HCMLP at all times until Independent Board appointed in 1/20, and authorized HCMLP to file for bankruptcy.  (31:6-17)

- JD acknowledges that Terry left in June 2016, HCMLP sued him based on JD's authority, and Terry moved to compel arbitration on 9/12/16.  (31:18-32:23)

- **JD DNR Acis and Highland entering into the Participation Agreement. (31:18-33:3)**

## PARTICIPATION AGREEMENT

- JD signed but did not read before doing so.  (35:2-9)

- **Purchase of expected fees for a note in order to recharacterize short-term income as capital gains.  Tax advantage.  (35:13-36:6)**

- **Acis is a pass-thru entity; not a tax-paying entity; tax liability goes to owners. (36:7-16)**

- **Highland was also pass through entity so neither Acis nor Highland were the tax-paying entities.  (37:4-19)**

- When JD signed, he understood that Acis "was agreeing to pay to Highland a portion of the servicing fees that it was going to receive from serving as the portfolio manager of the CLOs."  (38:18-23)

001599

HCMLPHMIT00000492

- **Schedule A:  "In exchange for the Acis participation interests, as set forth on Schedule A, Highland agreed to give some cash and a note."  (38:24-41:14; 41:10-25; 43:20-25)**

- **JD doesn't know the "nuts and bolts" that it takes "to be bona fide for tax purposes" so can't say if you needed cash going both ways.  (42:1-13)**

## PROMISSORY NOTE

- JD signed.  (42:24-43:9)

- **JD doesn't know how principal amount of the Note was calculated; he "wouldn't have been involved with that."  (44:1-6)**

- **JD does not know if there is a relationship between cash flow to/from Highland.  (46:4-12)**

- Benefit to Highland was tax deferral and/or recharacterization of income.  (46:14-25)

- **JD can't quantify the tax benefit to Highland; he didn't ask anyone what it would be; he doesn't know expected rate of return; he didn't ask; DNR if anyone ever told him IRR.  (47:1-17)**

- **Idea originated with tax group, but can't name a person.  (49:15-22)**

- **The Note was an integral part of the Participation Agreement:**

    - **Exchange of promises:  "one side wouldn't have signed if they didn't get the promises of the other side."  (50:7-21)**

    - **Wouldn't have agreed without the promises.  (50:23-51:12)**

    - JD DNK if HCMLP made any payments under the amortization schedule; he wasn't involved.  (52:5-18)

## SHARED SERVICES AND SUB-ADVISORY AGREEMENTS

- JD signed but DNK why he did so.  (55:13-56:8)

- **Goldman says brand toxic; JD has no personal knowledge; can't even remember who told him. (57:11-59:14; 61:18-62:21; 64:3-13)**

001600

HCMLPHMIT00000493

## ARBITRATION AWARD

- **JD has never read it.  (67:11-22)**

- **Not familiar with findings, only that it was against Acis.  (70:3-20)**

- **Recalls that just after Award rendered, he signed the Transfer Agreement. (78:23-79:3)**


## TRANSFER AGREEMENT

- **JD signed.  (79:4-18)**

- **JD DNR Summit or Cullinane.  (79:19-81:2)**

- **JD DNR ever meeting or communicating with Cullinane.  (81:3-19)**

- **JD does not know if agreement was negotiated; "not involved."  (82:16-18)**

- **JD never spoke with anyone authorized to act on HCLOM Limited's behalf before it was executed.  (82:24-83:3)**

- **JD doesn't recall the document; didn't recall if he read it.  (83:12-19)**

- **From Acis and Highland's perspective, JD's understanding is that the purpose of the agreement was to replace Acis as portfolio manager.  (83:23-84:11)**

- JD had no opinion when signing whether Highland would continue to receive serving fees in exchange for payments under the Note.  (84:12-20)

- **JD does not recall if he expected Highland to receive any benefit under this Agreement.  (84:22-25)**

- **JD was unaware that Highland was a party to the Agreement; could not identify a benefit Highland was to receive even after reviewing the document. (85:8-86:4)**

- **JD has "no idea" why he signed the document on behalf of Acis and Highland.  (86:5-14)**

- **Based on his reading of Sections 3(b) and (c), the Agreement is "just trying to make sure the promises and the obligations of Acis transfer to the new entity."  (87:4-24)**

001601

HCMLPHMIT00000494

- Asked to identify anything of value that HCLOM Limited provided to Highland pursuant to this Agreement, JD referred to "shared servicer fees" but didn't know if HCLOM Limited had a shared services agreement. **(88:15-89:2)**

- JD has no idea if HCLOM Limited ever gave anything of value to Highland for any purpose. **(89:20-91:5)**

- HCLOM Limited wasn't a registered investment advisor and had no fees. **(91:23-25)**

- JD DNK if HCLOM Limited ever entered into SSA or sub-advisory agreement with anyone. **(93:6-19)**

- JD has no personal knowledge about the Notification (as defined in Transfer Agreement.). **(94:24-95:6)**

- JD DNK who gave the Notification on Highland's behalf or who received it on Acis' behalf. **(95:7-12)**

- JD DNK why Highland was unwilling to support Acis. **(95:13-18)**

- JD has no opinion as to whether agreement was "neutral" to Acis. **(97:16-24)**

- JD DNK who made the decision on Highland's behalf not to service Acis – but it wasn't him. **(98:12-16)**

- The Terry relationship and litigation was handled by Surgent. **(99:4-18)**

- JD DNR any advice he received before signing the Agreement. **(100:4-10)**

- JD DNK who was authorized to give the Notification. **(100:11-14)**

- JD DNK if HCLOM Limited was a qualified Successor Manager. **(104:24-105:2)**

- DNK if HCLOM Limited ever appointed Successor Manager. **(106:14-16)**

- DNK if HCLOM Limited or HCLOM LLC took steps to become Successor Manager. **(107:1-10)**

- JD wouldn't have signed the Agreement if he thought there were errors in it (and there were: among other things, HCLOM Limited was not "qualified"). **(108:6-14)**

- Yet, took no steps to make sure the Agreement reflected the facts; just "trusted internal counsel," without asking any questions at all. **(108:16-25)**

001602

HCMLPHMIT00000495

- JD's understanding is that the Transfer Agreement "was intended to simply let HCLOM Limited step into the shoes of Acis." (109:22-110:1)

- JD DNK who is managing the litigation on behalf of HCLOM Limited and never asked. (110:2-19)

- JD DNK who owns HCLOM Limited or who its officers are or who is authorized to act on its behalf. (110:20-111:3)

- JD not involved in reset/refinance process. (112:13-22)

- One piece of the resets was that Acis would be replaced as portfolio manager and lose the right to receive the serving fees; the fees would go to the Successor Manager. (113:10-25)

- JD did not authorize or instruct anyone to pursue the resetting of the CLOs. (114:1-115:11).

- JD DNK who was authorized to have Acis reset the CLOs in 11/17. (116:12-15)


## MIZUHO AGREEMENT

- JD signed but DNR ever reading before. (119:18-120:4)

- JD DNK where HCLOM LLC got the authority to engage Mizuho or why HCLOM Limited was designated as the "Company" for this purpose. (122:5-11)

- JD admits that HCLOM Limited is not referred to in the Agreement and he has no knowledge that HCLOM Limited was going to play a role in the transactions subject to the document. (123:19-124:7)

- JD DNK why LLC is the signatory and not Limited and never asked. (124:9-14)

- JD DNR ever signing a document (other than the Transfer Agreement) that contemplated that Limited would serve as Acis' successor portfolio manager. (125:8-12)


## CUSTODIAL AGREEMENT

- JD signed but DNR doing so. (126:15-127:3)

001603

HCMLPHMIT00000496

- Every deal needs a custodial bank; it's a different role than placement agent. (127:25-128:14)

## ACKNOWLEDGEMENT AND WAIVER

- **JD signed it but doesn't remember seeing it; reading it before he signed it; or discussing it with anyone. (129:10-130:7; 134:15-23)**

- **JD has no reason to believe paragraph 3 is incorrect in any way. (131:6-13)**

- **JD DNK if Acis ever promptly gave notice to the controlling class of each CLO. (133:9-14)**

- **JD DNK if Acis and HCLOM ever promptly pursued an appointment for each CLO. (133:16-25)**

- **JD did not have a specific awareness that he was waiving breaches of the Transfer Agreement on Highland's behalf. (135:4-11)**

- **JD DNK what Highland received in exchange for the waiver; he never asked; and no one ever explained what benefit Highland would receive by waiving the breaches of the Transfer Agreement. (135:18-136:6)**

001604

HCMLPHMIT00000497

# **EXHIBIT C**

4872-7286-7837.1 36027.003

001605
HCMLPHMIT00000498

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Reorganized Debtor. | ) |
| | ) |

ORDER GRANTING HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR
(A) A BAD FAITH FINDING AND (B) AN AWARD OF ATTORNEYS' FEES AGAINST
HIGHLAND CLO MANAGEMENT, LTD. AND JAMES DONDERO IN CONNECTION
WITH HCLOM CLAIMS 3.65 AND 3.66

Before the Court is the *Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys'*

*Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM*

*Claims 3.65 and 3.66* [Docket No. __] (the "Motion"),[2] filed by Highland Capital Management,

L.P. ("Highland"), in which Highland requests that this Court enter an order (a) finding that

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not defined herein shall take on the meaning ascribed to them in the Motion.

4872-7286-7837.1 36027.003

001606

HCMLPHMIT00000499

HCLOM Ltd. and Dondero prosecuted the HCLOM Claim in bad faith, and (b) entering sanctions against HCLOM Ltd. and Dondero, jointly and severally, in the form of reimbursement to Highland of Highland's costs and expenses incurred in objecting to the HCLOM Claim. Having considered (a) the Motion, (b) the evidence in support thereof, and (c) all arguments and evidence heard at the hearing on the Motion on December 18, 2024 (the "Hearing"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. § 1409; and this Court having found that Highland's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1. The Motion is **GRANTED**.

2. The clear and convincing evidence supports a finding that HCLOM Ltd.'s and Dondero's prosecution of the HCLOM Claim constitutes bad faith and a willful abuse of the judicial process.

3. HCLOM Ltd. and Dondero are hereby ordered, jointly and severally, to reimburse Highland for Highland's costs and expenses incurred in objecting to the HCLOM Claim in the aggregate amount of $[___].

4. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

###End of Order###

001607

HCMLPHMIT00000500

# EXHIBIT 67

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION
```

|  |  |
|---|---|
| In Re: | **Case No. 19-34054-sgj-11** |
|  | Chapter 11 |
| HIGHLAND CAPITAL | Dallas, Texas |
| MANAGEMENT, L.P., | December 18, 2024 |
|  | 9:00 a.m. Docket |
| Reorganized Debtor. |  |
|  | - OBJECTION TO SCHEDULED |
|  |   CLAIMS [3657] |
|  | - MOTION FOR A BAD FAITH |
|  |   FINDING [4176] |

```
                         TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                     UNITED STATES BANKRUPTCY JUDGE.
```

APPEARANCES:

| For the Reorganized Debtor: | John A. Morris |
|---|---|
|  | Hayley R. Winograd |
|  | PACHULSKI STANG ZIEHL & JONES, LLP |
|  | 780 Third Avenue, 34th Floor |
|  | New York, NY 10017-2024 |
|  | (212) 561-7760 |
| For the Reorganized Debtor: | Zachery Z. Annable |
|  | HAYWARD, PLLC |
|  | 10501 N. Central Expressway, |
|  |   Suite 106 |
|  | Dallas, TX 75231 |
|  | (972) 755-7108 |
| For the Reorganized Debtor: | Jeffrey N. Pomerantz |
|  | PACHULSKI STANG ZIEHL & JONES, LLP |
|  | 10100 Santa Monica Blvd., |
|  |   13th Floor |
|  | Los Angeles, CA 90067 |
|  | (310) 277-6910 |
| For Highland CLO Management, Ltd. and James Dondero: | Deborah Rose Deitsch-Perez |
|  | Michael P. Aigen |
|  | STINSON, LLP |
|  | 2200 Ross Avenue, Suite 2900 |
|  | Dallas, TX 75201 |
|  | (214) 560-2201 |



Case 19-34054-sgj11 Doc 4359-7 Filed 12/09/25 Entered 12/09/25 12:29:59 Desc
Case 3:25-cv-01876-K Document 34 Filed 06/24/25 Page 252 of 262 PageID 2735

Main Document Page 232 of 31

2

```
 1   Recorded by:              Michael F. Edmond, Sr.
                               UNITED STATES BANKRUPTCY COURT
 2                             1100 Commerce Street, 12th Floor
                               Dallas, TX  75242
 3                             (214) 753-2062

 4   Transcribed by:           Kathy Rehling
                               311 Paradise Cove
 5                             Shady Shores, TX  76208
                               (972) 786-3063
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.
```

001610

HCMLPHMIT00003830

Case 19-34054-sgj11 Doc 4255-7 Filed 12/09/25 Entered 12/09/25 12:23:59 Desc
Case 3:25-cv-01876-K Document 53 Main Document Page 253 of 262 Page 253 of 262 PageID 2736

3

```
 1            DALLAS, TEXAS - DECEMBER 18, 2024 - 9:05 A.M.
 2            THE CLERK:  All rise.  The United States Bankruptcy
 3   Court for the Northern District of Texas, Dallas Division, is
 4   now in session, the Honorable Stacey Jernigan presiding.
 5            THE COURT:  Good morning, everyone.  Please be
 6   seated.
 7       All right.  We have a hearing all day today scheduled for
 8   Highland, an objection to the scheduled claim of what I'm
 9   going to call HCLOM.  You all tell me today if you want to
10   call it something different.  For the record, this is Case No.
11   19-34054.  So let's start out by getting appearances from our
12   lawyers.
13            MR. MORRIS:  Good morning, Your Honor.  It's been a
14   while.  Nice to see you.  John Morris from Pachulski Stang
15   Ziehl & Jones for Highland Capital Management, LP.  I'm joined
16   here today by my colleagues, Jeffrey Pomerantz, Hayley
17   Winograd, and Zachery Annable.
18            THE COURT:  Okay.  Good morning to all.
19            MS. DEITSCH-PEREZ:  Good morning, Your Honor.  I'm
20   Deborah Deitsch-Perez from Stinson representing HCLOM, which I
21   will sometimes refer to as Limited to distinguish it from
22   HCLOM, LLC.  So I'll call one Limited and the other LLC,
23   hopefully.
24            THE COURT:  Okay.
25            MS. DEITSCH-PEREZ:  I'm here with my colleague Mike
```

001611

HCMLPHMIT00003831

Case 19-34054-sgj11 Doc 4255-7 Filed 06/09/25 Entered 06/09/25 12:23:29 Desc
Case 3:25-cv-01876-K Document 5 Exhibit 6 Page 232 of 31 Page 254 of 262 PageID 2737

4

1    Aigen, and Patricia Tomasky, who's a paralegal, and Fred

2    Jones, who are assisting.

3              THE COURT:  Okay.

4              MS. DEITSCH-PEREZ:  Thank you.

5              THE COURT:  Good morning to all.

6         All right.  I presume those are the only appearances, and

7    anyone else on the WebEx is an observer.

8         Do we have a housekeeping matters or shall we go to

9    opening statements?

10             MS. DEITSCH-PEREZ:  I have one housekeeping matter

11   I'd like to raise.  And this is really because Your Honor has

12   on many occasions chided us and said, why are you here, have

13   you done anything to try not to be here?

14        And this is not in the nature of settlement, but certain

15   things happened last week.  Last week, it became clear that

16   $73-odd million is going to come out of the Registry of the

17   Court into the estate, and another several million dollars is

18   going to come out because of the administrative claims,

19   because the Fifth Circuit just ruled, so it's another roughly

20   $80 million in the estate.  And there's already $80 million or

21   so in the estate, and there's $80-ish million left in claims.

22        And so what we had proposed is that, rather than spending

23   time and money fighting about all of this, we would agree to

24   put HCLOM's claim behind Class 8, which I believe has

25   otherwise been fully paid, and Class 9, because otherwise what

HCMLPHMIT00003832

Case 19-34054-sgj11 Doc 4255-7 Filed 06/02/25 Entered 06/02/25 22:29:29 Desc
Case 3:25-cv-01876-K    Document 58    Filed 06/09/25    Page 255 of 262    PageID 2738

5

1    the estate is doing here is bringing in money that's going to

2    be the residual left over for former equity, and we're willing

3    to put HCLOM back there anyway.  And then we wouldn't be

4    spending your time and our time and money to fight this, and

5    particularly with a sanctions motion to try and get fees from

6    Mr. Dondero.

7        I mean, honestly, Your Honor, what is the point, when

8    there's enough money there to pay everyone and basically

9    you're moving it from one pocket to the other, because at the

10   end of the day there's going to be money left over for former

11   equity?

12       And so I would ask that you use your ability to control

13   your docket and send us all home.

14           THE COURT:  Okay.  And by the way, I neglected to

15   ask, does Mr. Dondero have separate counsel today --

16           MS. DEITSCH-PEREZ:  No, I'm here --

17           THE COURT:  -- or you are also his counsel?

18           MS. DEITSCH-PEREZ:  Yes, I'm here for Mr. Dondero

19   also.

20           THE COURT:  All right.  So what I have heard is there

21   is an agreement by your client to essentially have a

22   subordinated claim behind all --

23           MS. DEITSCH-PEREZ:  Yes.

24           THE COURT:  -- Class 8, all Class 9?

25           MS. DEITSCH-PEREZ:  Yep.

HCMLPHMIT00003833

Case 19-34054-sgj11 Doc 4155-7 Filed 12/09/25 Entered 12/09/25 12:22:59 Desc
Case 3:25-cv-01876-K Document 45 Exhibit 6 Page 257 of 311 Page 256 of 262 PageID 2739

6

```
 1              THE COURT:  It would come above equity.

 2              MS. DEITSCH-PEREZ:  Uh-huh.

 3              THE COURT:  Strand, I guess, or --

 4              MS. DEITSCH-PEREZ:  Yeah, the 10 and 11, --

 5              THE COURT:  I think I still remember this --

 6              MS. DEITSCH-PEREZ:  Yeah.

 7              THE COURT:  -- organizational structure.  And that,

 8    of course, eliminates the sanction component of this.

 9         What do you have to say, Mr. Morris?

10              MR. MORRIS:  Sure.  I'm just going to come to the

11    podium.  I'm more comfortable there.

12              THE COURT:  Uh-huh.

13              MR. MORRIS:  I'm surprised and disappointed that

14    we're hearing this now.  This is something that could have

15    been raised the day after we filed our objection.  Instead of

16    raising this issue then, they filed a response, and we have

17    spent more than $600,000 litigating this matter.  She's opened

18    the door now.  Before there was a deposition taken, Your

19    Honor, we offered to pay them a half a million dollars for the

20    withdrawal of this claim.  That was not accepted.

21         Here we are now.  When I received this missive on

22    Saturday, saying, gee, it's not -- not complete what's being

23    said here.  She also directed us to pay the Class 8 and Class

24    9 in full, which we're not going to do unless and until the

25    Trustee determines that's in the estate's best interest.  We
```

001614

HCMLPHMIT00003834

1    responded by saying, if that's what you want to do, then just

2    withdraw your claim with prejudice and we will withdraw our

3    bad faith motion.

4        So, instead of accepting that, they pushed on.  Right?

5    Because it doesn't matter.  If they're going to subordinate

6    that claim to 8 and 9, the claim becomes irrelevant, because

7    if there's ever a distribution to the Class 10, that's the

8    same person.  It's Jim Dondero.  Right?  We don't have to play

9    games here.

10       So I said, withdraw your claim with prejudice, we'll

11    withdraw our bad faith motion with prejudice, and we will have

12    no trial.  Not acceptable.

13       So here we are.  We've now spent the time.  They could

14    have made this proposal two years ago.  They didn't.  They

15    didn't accept the very generous offer that we made before a

16    deposition was taken in this case.  They've got no case here.

17    There's no legal basis for this claim.  There is no factual

18    basis for this claim.  We were prepared to actually write a

19    meaningful check and avoid the whole thing.  Not acceptable.

20    We're forced to go through it.

21       This is like HCRE all over again, where, like, I don't

22    know why we're here.  I really don't know why we're here.

23    It's the same person.  Right?

24       But they pushed me here, and I think we ought to, as long

25    as everybody's here, we ought to just get on with it and be

001615

HCMLPHMIT00003835

Case 19-34054-sgj11 Doc 4557 Filed 12/09/25 Entered 12/09/25 12:23:59 Desc
Case 3:25-cv-01876-K    Document 1-7 Filed 09/09/25 Page 258 of 262    PageID 2741

Main Document    Page 00832 of 31

8

1  done today.

2         THE COURT:  Well, I'm trying to figure out if it's

3  just a mechanical thing at this point.  I mean, I'm hearing

4  that your proposal is the claim be subordinated.

5         MS. DEITSCH-PEREZ:  Uh-huh.

6         THE COURT:  And --

7         MS. DEITSCH-PEREZ:  And the reason we don't agree

8  with Mr. Morris, and I'll correct a few of the things he said,

9  is there are some differences between HCLOM and former equity,

10 and we don't know what kind of tax or other implications there

11 would be from changing it from HCLOM's claim to dumping it

12 into some other category.

13    But as a practical and economic matter for the estate,

14 we're willing to have it at the back.  So it's no difference

15 to the estate.

16    And the reason we didn't make this proposal initially and

17 we made it last week is because of the very material change

18 that the estate suddenly has $80 million more.  And it should

19 be clear to everybody that there's enough money to pay

20 everyone.

21    It is also not true that I said to Mr. Morris that he had

22 to pay everybody this minute to make this claim, because then

23 I would be saying, oh, pay me next week.  That's not what I

24 said.  What I said was we would agree that if it turns out, as

25 we firmly believe and we're putting our money where our mouth

001616

HCMLPHMIT00003836

Case 19-34054-sgj11 Doc 4259-7 Filed 06/20/25 Entered 06/20/25 12:23:59 Desc
Case 3:25-cv-01876-K Document 67 Filed 08/05/25 Page 259 of 262 PageID 2742

9

```
 1   is, that there's enough money to pay everyone, then pay HCLOM
 2   then.  They've already reserved the money for it.
 3       And for them to say this is a ridiculous claim is itself
 4   ridiculous.  This is not a proof of claim.  This is a claim
 5   that Highland scheduled, not just when Mr. Dondero was at the
 6   helm but when Mr. Seery was at the helm.  And then he
 7   reaffirmed it for years afterwards.  It's only when they
 8   realized that allowing the claim would benefit Mr. Dondero,
 9   among others, that they did an about-face and said, oh, no,
10   now we object to the claim.
11           THE COURT:  Okay.  Now we're getting into argument.
12           MS. DEITSCH-PEREZ:  Okay.
13           THE COURT:  And I promise you, I've read every single
14   --
15           MS. DEITSCH-PEREZ:  Okay.
16           THE COURT:  -- sentence of every single pleading.
17           MR. MORRIS:  Yeah.
18           THE COURT:  So I know what the counter-arguments are.
19           MS. DEITSCH-PEREZ:  And --
20           THE COURT:  I'm going to suggest this.  Can we take a
21   15-minute break?  And we are pressed for time today, because I
22   think I told you all, or maybe, I mean, not me, but Traci
23   probably told you all that I have a presentation at 6:00
24   o'clock tonight.  It's five minutes away, but --
25           MR. MORRIS:  I think --
```

HCMLPHMIT00003837

Case 19-34054-sgj11 Doc 4155-7 Filed 12/09/25 Entered 12/09/25 12:23:59 Desc
Case 3:25-cv-01876-K    Document Exhibit 007 Page 009 of 33 Page 260 of 262    PageID 2743

10

```
 1              THE COURT:  What I'm really afraid of is you
 2    mentioned HCRE.  I remember when we were in the devil-is-in-
 3    the-details kind of situation there, where we didn't really
 4    have a meeting of the minds on what might happen with a
 5    withdrawal of that claim.
 6        So might I suggest a 15-minute break, and you can write it
 7    down and sign it in blood.  I hate to say it.  But if it's
 8    something that you both can get to the same point on.
 9              MR. MORRIS:  I'm happy to do it, but I just want to
10    make this really clear on the record.  The reason that we were
11    prepared to agree to withdrawal of our bad faith motion in
12    exchange for disallowance of the scheduled claim is because we
13    would have no theoretical let alone legal duty to HCLOM.  And
14    that's where we need to get to.  That's why we're going
15    forward today.  That's why their settlement proposal was
16    unacceptable.
17        We probably -- I'd have to confer with my client, but we
18    probably would still be willing to withdraw the bad faith
19    motion with the disallowance of the scheduled claims.  But the
20    subordination of it, to leave it hanging out there to create
21    new arguments that we owe some kind of duty is unacceptable.
22              MS. DEITSCH-PEREZ:  And that --
23              THE COURT:  All right.  Wouldn't you know at this
24    point in time if there's a tax consequence or some sort of
25    negative consequence from withdrawal?  Withdrawal seems weird
```

001618

HCMLPHMIT00003838

Case 19-34054-sgj11 Doc 4355-67 Filed 06/90/25 Entered 06/90/25 12:23:29 Desc
Case 3:25-cv-01876-K    Document 60 on Page 09 of 32    Page 261 of 262    PageID 2744

11

 1  because it's a scheduled claim.

 2            MR. MORRIS:  That's why I say disallowance.

 3            MS. DEITSCH-PEREZ:  It's --

 4            THE COURT:  Disallowance versus subordination?

 5            MS. DEITSCH-PEREZ:  We don't know.  And there's

 6  really no --

 7            THE COURT:  Why wouldn't you, after all of this time?

 8            MS. DEITSCH-PEREZ:  Because this only came up last

 9  week, and I don't know how many other things one would have to

10  look at to know that, Your Honor.

11      But the bottom line is we don't.  And there's also no

12  reason, because it is economically no different for the Debtor

13  to put us behind 9 than to disallow it, because there's going

14  to be --

15            THE COURT:  Oh, okay.  Well, --

16            MS. DEITSCH-PEREZ:  -- money left over.

17            THE COURT:  -- I still want the 15-minute break, --

18            MR. MORRIS:  Okay.

19            THE COURT:  -- because it seems like there's a

20  mechanic, such as I think the HCRE issue was --

21            MR. MORRIS:  They were saving claims for another day.

22            MS. DEITSCH-PEREZ:  And --

23            MR. MORRIS:  That's what we want to avoid doing here

24  today.

25            THE COURT:  Yes.  That this claim would never be used

Case 19-34054-sgj11 Doc 4357 Filed 06/09/25 Entered 06/09/25 22:29:29 Desc
Case 3:25-cv-01876-K Main Document Page 262 of 331 Page 262 of 262 PageID 2745

12

```
 1   --
 2            MR. MORRIS:  We want to make sure that we have
 3   finality, --
 4            THE COURT:  -- in litigation.
 5            MR. MORRIS:  -- that we're never going to see this
 6   again.
 7            THE COURT:  It would never be used in any future
 8   litigation.
 9            MS. DEITSCH-PEREZ:  Right.  That I could -- as I
10   stand here now, I don't know of any claims that HCLOM has
11   other than this.  And the time to make them is long past.  I
12   mean, the bar date has passed.  The schedules are the
13   schedules.
14            THE COURT:  But that would be against Highland, not
15   against who knows who else.  I mean, I don't know.
16            MS. DEITSCH-PEREZ:  But why does the Debtor -- I
17   mean, why does that matter to the Debtor?
18            THE COURT:  Well, --
19            MS. DEITSCH-PEREZ:  I mean, I also don't know of any
20   claims HCLOM has against anybody else, but why is --
21            THE COURT:  Mr. Seery has been the subject of a lot
22   of claim litigation.  Or trying to assert a claim.
23            MR. MORRIS:  Your Honor?
24            THE COURT:  Fifteen-minute break.
25            MS. DEITSCH-PEREZ:  I'll give you an example.
```

HCMLPHMIT00003840