**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P

|  |  |  |
|---|---|---|
|  | § |  |
|  | § | Case No. **19-34054-sgj11** |
| **The Dugaboy Investment Trust - Appellant** |  |  |
|  | § |  |
| vs. | § | **3:25-CV-01876-K** |
|  |  |  |
| **Highland Capital Management, L.P; et al** - Appellee |  |  |
|  | § |  |
|  | § |  |

  [4297] **Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025**

## Volume 6

## APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | *INDEX* |

### APPELLANT THE DUGABOY INVESTMENT TRUST'S AMENDED STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Pursuant to Rule 8009 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4311] on July 14, 2025; and having filed *Appellant The Dugaboy Investment Trust's Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* [Docket No. 4365] on August 11, 2025 in the above-captioned case; and having received correspondence from the Bankruptcy Clerk's Office [Docket No. 4367] asking Dugaboy to correct certain errors in its August 11, 2025 submission [Docket No. 4365]; hereby submits this *Amended Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in approving the settlement agreement and release entered into between the Highland Entities and the HMIT Entities pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure as being fair, equitable, and in the best interest of the estate?**

2. **Did the Bankruptcy Court err by approving a settlement agreement utilizing an improper valuation methodology and without sufficient supporting evidence?**

3. **Did the Bankruptcy Court err in approving the overly broad and vague release provisions contained within the settlement agreement?**

4. **Did the Bankruptcy Court err in approving the settlement agreement without allowing adequate time for the Cayman Islands Joint Official Liquidators to complete their investigation?**

5. **Did the Bankruptcy Court err in concluding Mark Patrick had the requisite corporate authority to enter into and bind the HMIT entities to the settlement agreement?**

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow, August 13, 2025.

*Vol. 1*
*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4311] filed by Appellant;

*000010*

2. *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4297];

*000014*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an |

*000625*

*000786*

*000809*

*Vol. 2*

| | | | |
|---|---|---|---|
| | | | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *000807* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *000832* | 5/20/2025 | 4218 | Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust(Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust(Attachments: # 1 Exhibit A-- Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |
| *000838* | 5/22/2025 | 4221 | Amended Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust(Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust(Attachments: # 1 Exhibit A-- Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery |

| | | | |
|---|---|---|---|
| *Vol. 2*<br>*0008 44* | 6/9/2025 | 4228 | Motion for expedited hearing on Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion Filed by Partner Dugaboy Investment Trust (related document #4227 (Attachments: #1 Proposed Order Granting Motion for Expedited Hearing (Hesse, Gregory) Modified linkage on 6/10/2025 (mdo). |
| *0008 49* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *0008 57* | 6/10/2025 | 4232 | Response opposed to (related document(s): 4227 Motion to extend time to Time to Respond to Trusts' Motion filed by Partner Dugaboy Investment Trust, 4228 Motion for expedited hearing (related documents 4216 Motion to compromise controversy) on Emergency Motion for an Order Extending Duration of Time to Respond To Trusts' Motion filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| *0008 63* | 6/10/2025 | 4234 | Reply to (related document(s): 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) to (I) Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion and (II) Motion for Expedited Hearing on Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *0008 67* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *0008 69* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 3*<br>*0008 71*<br>*Thru Vol 13* | 6/20/2025 | 4255<br><br>*(to be submitted to* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to |

| | | | |
|---|---|---|---|
| *Vol. 3 Starts with 000871 — Thru Vol End of Vol 1.3* | *Clerk on flash drive)* | | Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| *Vol. 14 003528* | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis |

| | | | |
|---|---|---|---|
| *Vol 14* <br> *003531* | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart,#3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 15* <br> *003851* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *003875* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *004002* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *004017* | 6/23/2025 | 4276 | Reply to (related document(s)): 4223 Objection filed by Creditor The Dugaboy Investment Trust) filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| *004019* | 6/24/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *Vol. 16* <br> *004236* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |

| | | | |
|---|---|---|---|
| *Vol. 16*<br><br>*0004247* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |
| *0004287* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York; Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *0004272* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *0004276* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust). Entered on 6/27/2025 (Okafor, M.) |
| *0004288* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 |

*Vol. 16*

| | | | Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
|---|---|---|---|
| *0004295* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *0004302* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *0004304* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *0004313* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *0004315* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *0004311* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of |

| | | | |
|---|---|---|---|
| *Vol. 16* | | | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *Vol. 17*  *0004684* | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| *0004700* | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M. |
| *0004812* | 8/4/2025 | 4353 | Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A (Harper, Geoffrey) |
| *0004834* | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| | | | |

Dated: August 12, 2025          Respectfully submitted,

WINSTON & STRAWN LLP

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500

(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 12, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

11

Case 19-34054-sgj11 Doc 4557 Filed 06/30/25 Entered 06/30/25 12:32:29 Desc
Case 3:25-cv-01876-K    Document 6-7 Filed 09/03/25    Page 13 of 262    PageID 2758

13

```
 1                MR. MORRIS:  Can we take that 15-minute break?

 2                THE COURT:  Yes.  Yes.

 3                MR. MORRIS:  Yes.  Thank you.

 4                THE COURT:  All right.  Thank you.

 5                THE CLERK:  All rise.

 6       (A recess ensued from 9:18 a.m. until 9:47 a.m.)

 7                THE CLERK:  All rise.

 8                THE COURT:  All right.  Please be seated.

 9        All right.  Do we have anything that looks like a

10   compromise and settlement, or no?

11                MS. DEITSCH-PEREZ:  We do.  Can I take your computer?

12                MR. MORRIS:  Sure.

13                MS. DEITSCH-PEREZ:  Or somebody's computer?

14                MR. MORRIS:  It's Hayley's.  But you can read it if

15   you want.

16                MS. DEITSCH-PEREZ:  Okay.

17                MR. MORRIS:  Your Honor, just context, we greatly

18   appreciate the Court's indulgence of time.  It was used

19   constructively.  I believe that we have reached an agreement

20   to resolve today's matter.

21        And with that, I'm going to have Ms. Deitsch-Perez read

22   the written terms that we have right now.  Obviously, it'll be

23   subject to definitive documentation, which we would work on

24   promptly today.

25        But why don't you take it from here?
```

001621

HCMLPHMIT00003841

Case 19-34054-sgj11 Doc 4355-7 Filed 06/30/25 Entered 06/30/25 12:39:29 Desc
Case 3:25-cv-01876-K Document 67 Filed 06/09/25 Page 14 of 262 PageID 2759

14

```
 1              MS. DEITSCH-PEREZ:  Okay.

 2              THE COURT:  Okay.

 3              MS. DEITSCH-PEREZ:  And I'm not going to include your

 4    asterisks.  The --

 5              THE COURT:  And can I ask you to come to the podium

 6    and speak into the mic?  I just want it crystal clear on the

 7    record whatever is said.

 8              MS. DEITSCH-PEREZ:  Okay.  Come.  Yes.  Come.

 9       Okay.  The HCLOM claim would be converted to a Class 10

10    interest in the same amount.

11              THE COURT:  Okay.

12              MS. DEITSCH-PEREZ:  Okay.  HCLOM would release

13    protected parties.

14              MR. MORRIS:  It would be a general release.

15              THE COURT:  Uh-huh.

16              MS. DEITSCH-PEREZ:  But only by HCLOM.

17              MR. MORRIS:  Correct.  Only HCLOM Limited.

18              MS. DEITSCH-PEREZ:  HCLOM would not separately make

19    equity motions, like Hunter Mountain.  However, because of the

20    change in circumstances, I just want this to be clear.  Hunter

21    Mountain or Dugaboy may have -- may want to bring to the

22    Court's attention the change in the finances in the estate.

23              MR. MORRIS:  Your Honor, --

24              MS. DEITSCH-PEREZ:  But it would --

25              MR. MORRIS:  -- I really would prefer that we just
```

HCMLPHMIT00003842

Case 19-34054-sgj11 Doc 4557 Filed 12/09/25 Entered 12/09/25 12:23:29 Desc
Case 3:25-cv-01876-K    Document 7    Main Document Page 2003 of 31   Page 15 of 262    PageID 2760

15

1   read the terms of the agreement, and then she can put down the

2   commentary.  I'm going to do this the way we have -- the way

3   we have it written, and then she can provide whatever

4   commentary she'd like.

5        There's five elements to this settlement.

6            THE COURT:  Okay.

7            MR. MORRIS:  HCLOM claim will be converted to a Class

8   10 interest in the amount of the claim.

9        Number 2, there shall be a general release of all

10  Protected Parties, as that term is defined in the plan.

11       There will be no "equity" type motion by HCLOM Limited.

12  HCLOM Limited shall take no position in connection with this

13  case, including but not limited to in connection with this

14  scheduled claim, as a holder of a Class 10 interest.

15       Number 4, no estate fiduciary, Highland Capital

16  Management, LP, will owe any duty of any kind, whether it's

17  contractual, fiduciary, or otherwise, now or forever.

18       And Number 5, there shall be no reserve established.

19            THE COURT:  Let me -- let me --

20            MS. DEITSCH-PEREZ:  Let --

21            THE COURT:  -- make sure I heard that point.

22            MR. MORRIS:  Uh-huh.

23            THE COURT:  No estate fiduciary or Highland.  What --

24            MS. DEITSCH-PEREZ:  Other than this agreement.  I

25  mean, --

HCMLPHMIT00003843

1          MR. MORRIS:  Sure.

2          THE COURT:  Just, if you could just repeat what you

3    said.

4          MR. MORRIS:  There -- no estate fiduciary or Highland

5    Capital Management or the Trust shall owe any duty of any kind

6    to HCLOM Limited, including but not limited to contractual,

7    fiduciary, or any other duty.

8          MS. DEITSCH-PEREZ:  Except the duties owed as a

9    result of this agreement.  In other words, you're not saying

10   we'll make this agreement but, ha ha, you can't enforce it?

11   That's all.

12         MR. MORRIS:  The only thing that would be enforced is

13   they would have a Class 10 interest.

14         MS. DEITSCH-PEREZ:  Right.

15         MR. MORRIS:  Right?

16         MS. DEITSCH-PEREZ:  It would have its Class 10

17   rights.

18         MR. MORRIS:  Period, full stop.  So that's fine.

19      And then no reserve shall be established.

20      There actually has been a reserve.  That reserve can be

21   released.  There will be no further reserve with respect to

22   this 10 interest.

23      And, you know, we need to make sure, and I don't know that

24   counsel has the authority to do that today, but we need to

25   make sure that neither HMIT nor Dugaboy, the Class 10 and

HCMLPHMIT00003844

Case 19-34054-sgj11   Doc 4157   Filed 12/09/25   Entered 12/09/25 12:23:29   Desc
Case 3:25-cv-01876-K   Document 6   Filed 07/30/25   Page 17 of 262   PageID 2762

17

1   Class 11 interest holders, have any objection to this.  It's

2   got to be subject to their consent.

3          MS. DEITSCH-PEREZ:  Although I guess I still don't

4   quite understand, because right now HCLOM is ahead of them,

5   but I -- so now they're moving into --

6          MR. MORRIS:  Because if we had the trial today, I'm

7   fairly confident that the claim would be disallowed.

8          MS. DEITSCH-PEREZ:  And I'm equally confident that it

9   would not be --

10          MR. MORRIS:  Okay.  So --

11          MS. DEITSCH-PEREZ:  -- and that it would be ahead.

12          MR. MORRIS:  So we're having a settlement that could

13   impact them.  So --

14       Just to state this really simply, Your Honor, because I

15   want intent to be really clear on the record:  HCLOM Limited

16   is going to walk away with the economic interest of having an

17   allowed Class 10 interest in the amount of the claim and

18   nothing more, as if we actually tried the case today and the

19   scheduled claim was disallowed.  That's the point that we

20   continue to make, that if we had this case, the reason why we

21   really wanted to push forward to this case today and really

22   what we were talking about before we took the break is we

23   didn't want any continuing duty of any kind.

24       So this is why -- this is the compromise here.  Highland

25   gets what it wants, and that is, as a legal matter, the claim

001625

HCMLPHMIT00003845

Case 19-34054-sgj11 Doc 4357 Filed 06/30/25 Entered 06/30/25 12:23:59 Desc
Case 3:25-cv-01876-K    Document 67 Filed 06/09/25    Page 18 of 262    PageID 2763

18

1  has been effectively disallowed.  HCLOM gets what it wants,

2  because, as an economic matter, when and if Class 10 claim --

3  interest holders get paid, they'll get a distribution,

4  presumably prorated with HMIT if HMIT is ultimately found to

5  have, you know, an allowed claim.

6       That's really it.  We want the protection as if the claim

7  had been disallowed in full, no strings attached.  And they're

8  going to get, in exchange for that, they're going to get the

9  economic benefit of holding a Class 10 interest.

10            THE COURT:  Okay.  Let me ask the obvious question.

11  It seemed to the Court that standing was the issue.  When we

12  had this back and forth before the break, Highland wanted

13  disallowance.  Your client wanted subordination.  And we all

14  know that there have been many adversary proceedings and many

15  appeals where the standing of the plaintiff, the standing of

16  the appellant, was challenged.  And some court, maybe this

17  one, maybe an appellate court, said no standing of Mr.

18  Dondero.  Hunter Mountain.  You know.

19            MS. DEITSCH-PEREZ:  These are --

20            THE COURT:  Is this the rub here, or are we in

21  agreement from these five elements that HCLOM will not have

22  standing to bring actions or to pursue appeals that involve --

23            MS. DEITSCH-PEREZ:  We're --

24            THE COURT:  -- somehow Highland?

25            MS. DEITSCH-PEREZ:  We're basically -- and this is

001626

HCMLPHMIT00003846

Case 19-34054-sgj11 Doc 4557 Filed 12/06/25 Entered 12/06/25 12:22:59 Desc
Case 3:25-cv-01876-K    Document 6-7    Main Document Page 19 of 262    Page 19 of 262    PageID 2764

19

 1   why I was trying to give a little color earlier, which is to

 2   say circumstances have changed.

 3       So former equity, Classes 10 and 11, are in a position to

 4   say, Your Honor, look, see how much money there is in the

 5   estate.  Now can you agree that we have standing?  But we're

 6   not going to rely on the addition of HCLOM to say it's somehow

 7   different than if Hunter Mountain had done it or Dugaboy had

 8   done it.  Is that -- is that clear?

 9           MR. MORRIS:  Let me make sure that I understand.

10   This settlement has no impact on Dugaboy or HMIT.  It doesn't.

11   They've done whatever they wanted.  They'll continue to do

12   whatever they wanted, unfortunately.  But what the third

13   bullet point says is that HCLOM Limited shall take no position

14   in connection with this case.  Period, full stop.

15           MS. DEITSCH-PEREZ:  Other than --

16           MR. MORRIS:  Other than -- other than if, you know,

17   if we gave a distribution to HMIT but didn't give it to HCLOM

18   Limited, they can come in and complain about that.  That's

19   their economic right.

20           MS. DEITSCH-PEREZ:  Right.  We could complain about

21   --

22           MR. MORRIS:  Economic right.

23           MS. DEITSCH-PEREZ:  -- the economic -- about whether

24   we get or don't get what we've just agreed to.  I mean, we

25   have rights arising out of this agreement.

HCMLPHMIT00003847

Case 19-34054-sgj11 Doc 4059-67 Filed 12/09/25 Entered 12/09/25 12:39:59 Desc
Case 3:25-cv-01876-K Main Document Page 20 of 31 Page 20 of 262 PageID 2765

20

1    THE COURT:  Okay.  Would it be -- it might be

2    superfluous, but any problem with either one of you just

3    saying in this agreement, This compromise and settlement

4    agreement does not operate to give HCLOM standing in

5    connection with any adversary, any appeal?

6        MS. DEITSCH-PEREZ:  Not if it related to a violation

7    of the settlement.  So I think it's an unnecessary thing to

8    say.

9        THE COURT:  Except to enforce the settlement

10   agreement?  Could it have that proviso?

11      Because here's where I'm standing.  Standing.  No pun

12   intended, actually.  I mean, you mentioned that I have an

13   obligation or duty to manage my docket.  But I feel like I

14   also have a duty not to clog the court system, including the

15   appellate system, by entering an agreed order that might be

16   construed later, look, --

17       MS. DEITSCH-PEREZ:  Well, --

18       THE COURT:  -- she acknowledged we have a Class 10

19   interest and therefore we have standing.  Okay?

20       MS. DEITSCH-PEREZ:  Your Honor?

21       THE COURT:  Do you see what I'm saying?  I have some

22   duty here, too, to make sure I have not created a standing

23   argument where one --

24       MS. DEITSCH-PEREZ:  There --

25       THE COURT:  -- might not have existed.

HCMLPHMIT00003848

Case 19-34054-sgj11 Doc 4557 Filed 12/09/25 Entered 12/09/25 12:23:29 Desc
Case 3:25-cv-01876-K    Document 607    Filed 12/09/25    Page 21 of 262    PageID 2766

21

```
1              MS. DEITSCH-PEREZ:  There's nothing about this

2     agreement that creates any standing other than with respect to

3     the agreement itself.  And I would be loath to say something

4     that might be misconstrued about that.  It's simply

5     unnecessary.

6         And it's not, it's not clogging the courts for parties to

7     appeal those decisions with which they disagree.  And this

8     settlement is actually efficient, in the sense that surely

9     everybody here is aware that if we went forward on this case,

10    whoever lost would appeal.

11        So this is managing both this docket and lessening the

12    flow of --

13             THE COURT:  So, --

14             MS. DEITSCH-PEREZ:  -- cases into the future.

15             THE COURT:  -- to make me feel like I have done my

16    duty, you all would add a sentence that this order, this

17    agreed order, whatever you're calling the document, does not

18    operate to give standing to HCLOM for any purposes related to

19    the Highland estate except to allow it to enforce this order?

20             MS. DEITSCH-PEREZ:  I mean, I'll have to go back and

21    ask, but that sounds -- that sounds okay.  You know, as in

22    this case, you're right, the devil is always in the details,

23    but that sounds like what we've been saying.

24             THE COURT:  Okay.

25             MR. MORRIS:  I just --
```

001629

HCMLPHMIT00003849

Case 19-34054-sgj11 Doc 4255-67 Filed 12/09/25 Entered 12/09/25 12:39:59 Desc
Case 3:25-cv-01876-K     Document 67 Filed 06/09/25    Page 22 of 262    PageID 2767

22

```
 1              THE COURT:  You'll have to ask your client?  I think
 2    I saw him here earlier.  Has he left?
 3              MS. DEITSCH-PEREZ:  If he is, I'll go -- I'll go and
 4    call him in the hall.
 5              THE COURT:  Okay.  Okay.
 6              MR. MORRIS:  I just added a sixth clause that says,
 7    This order shall not operate -- does not and shall not operate
 8    -- does not and shall not operate to give standing to HCLOM
 9    Limited for any purpose against Highland -- against the
10    Highland estate except to enforce this order.
11              THE COURT:  Uh-huh.
12              MR. MORRIS:  And I just, I just need to respond to
13    that last comment.  Right?  We know they've appealed your
14    gatekeeper order.  We know that they've, you know, we're in
15    the Fifth Circuit now on recusal.  There's no indication
16    whatsoever that this case is nearing a conclusion.  We have no
17    more contested matters before you, at least as of this moment,
18    Your Honor.  There's no more adversary proceedings that I know
19    of at this moment.  I'm going to cross my fingers and hope
20    that the appellate court upholds the orders of this Court, the
21    orders that have -- from the district court that affirmed your
22    orders.
23         But, clearly, Mr. Dondero still has an appetite for
24    litigation.  He is still pursuing, you know, attacking the
25    gatekeeper.  He's still pursuing your recusal.  So I think --
```

001630

HCMLPHMIT00003850

Case 19-34054-sgj11 Doc 4355-7 Filed 06/30/25 Entered 06/30/25 12:23:29 Desc
Case 3:25-cv-01876-K Document 007 Exhibit Page 232 of 31 Page 23 of 262 PageID 2768

23

```
 1   I think the --

 2           THE COURT:  You know, I don't keep --

 3           MR. MORRIS:  Yeah.

 4           THE COURT:  -- as close tabs --

 5           MR. MORRIS:  Yeah.

 6           THE COURT:  -- as lawyers might think I --

 7           MR. MORRIS:  Right.

 8           THE COURT:  -- do on appeals.

 9           MR. MORRIS:  Uh-huh.

10           THE COURT:  But I do think I read where the recusal

11   order was -- was --

12           MS. DEITSCH-PEREZ:  It --

13           THE COURT:  It's a done deal.  They --

14           MS. DEITSCH-PEREZ:  No, Your Honor.

15           MR. MORRIS:  No.  No, they brought in Jonathan

16   Mitchell, the former Solicitor General of the State of Texas,

17   and John Ashcroft, the former Attorney General of the United

18   States.

19           THE COURT: He's still alive?  I don't mean to be

20   rude, but --

21           MR. MORRIS:  I thought it was his son.

22           MS. DEITSCH-PEREZ:  No, Your Honor.

23           MR. MORRIS:  It's a great question.  With all due

24   respect to Mr. Ashcroft, --

25           THE COURT:  Yes?
```

HCMLPHMIT00003851

Case 19-34054-sgj11 Doc 4255-57 Filed 12/06/25 Entered 12/06/25 12:32:59 Desc
Case 3:25-cv-01876-K    Document 7    Main Exhibit 67 Page 24 of 31 Page 24 of 262    PageID 2769

24

```
 1              MR. MORRIS:  -- I mean no disrespect whatsoever, --

 2              THE COURT:  Uh-huh.

 3              MR. MORRIS:  -- but when I heard that I thought it

 4    was his son, too.  But yes, --

 5              MS. DEITSCH-PEREZ:  No.

 6              MR. MORRIS:  -- they're on the brief, and they filed

 7    a motion for a petition for a rehearing en banc.

 8              MS. DEITSCH-PEREZ:  And --

 9              MR. MORRIS:  And our answer is due on December 26th.

10              MS. DEITSCH-PEREZ:  Yeah.  But --

11              MR. MORRIS:  So we'll see where that goes.  But the

12    point being that it validates Mr. Seery and Highland's

13    concerns that there be no ability to create another vehicle,

14    to create more litigation, and it validates the very concern

15    that Your Honor was addressing earlier on the same topic.

16         I think we're in agreement here, --

17              MS. DEITSCH-PEREZ:  Right.

18              MR. MORRIS:  -- but I want there to be context for

19    why we're so insistent that there be no duty of any kind and

20    no ability of HCLOM all of a sudden to start raising its hand

21    and commencing litigation.

22              MS. DEITSCH-PEREZ:  Okay.  And I do want to thank Mr.

23    Morris for bringing this up and making the recusal status --

24    correcting it.

25         And for all of the complaints and saying these appeals are
```

001632

HCMLPHMIT00003852

Case 19-34054-sgj11 Doc 4357 Filed 06/09/25 Entered 06/09/25 12:23:29 Desc
Case 3:25-cv-01876-K    Document 67    Filed 06/09/25    Page 25 of 262    PageID 2770

25

1  not well-founded, it is not often that the Fifth Circuit

2  actually asks a respondent to answer an *en banc* petition, much

3  less require them to do it the day after Christmas, which I am

4  sorry about.  They're an equal opportunity lawyer

5  inconveniencer.

6      So I would just ask that we -- that Highland tone down the

7  attacks on the appeals, because there have been ones that have

8  been upheld.

9          THE COURT:  Okay.  I, you know, --

10          MS. DEITSCH-PEREZ:  That's all.

11          THE COURT:  -- I didn't think Highland's lawyer's

12  tone was at all, you know, angry or elevated or whatever

13  you're thinking.

14          MS. DEITSCH-PEREZ:  I --

15          THE COURT:  Okay?  I have been approached by judge

16  colleagues in the circuit who have told me there have been

17  more appeals out of the Highland bankruptcy than any other

18  bankruptcy in Fifth Circuit history.  Okay?  So to say there

19  have been a whole lot of appeals is just factually correct.  I

20  don't know the number.

21          MR. MORRIS:  It's 15, Your Honor.  And there's more

22  in the pipeline.

23          THE COURT:  There -- what?

24          MR. MORRIS:  There have been 15 so far.  There's more

25  in the pipeline.

001633

HCMLPHMIT00003853

Case 19-34054-sgj11 Doc 4155-7 Filed 12/09/25 Entered 12/09/25 12:23:29 Desc
Case 3:25-cv-01876-K    Document 6-7    Main Document Page 2082 of 31    Page 26 of 262    PageID 2771

26

```
 1            THE COURT:  Wait, wait.  Okay.  You're talking at the
 2    Fifth Circuit?
 3            MR. MORRIS:  Correct.
 4            THE COURT:  But --
 5            MR. MORRIS:  Oh, there has been dozens in the
 6    district.
 7            THE COURT:  I think at one point a year or two ago
 8    you told --
 9            MR. MORRIS:  Yeah.
10            THE COURT:  -- me 50-plus.
11            MR. MORRIS:  Right, right.  I am just -- I am just
12    talking about the Fifth Circuit.  I've never heard of a
13    circuit court in the United States of America that's had 15
14    appeals from any case, let alone a bankruptcy case.
15            MS. DEITSCH-PEREZ:  Hmm.
16            THE COURT:  So, anyway, it is what it is.  But part
17    of the reason I'm engaging in this back and forth is, again,
18    we all have our duties.  You have duties to your clients.  I
19    have duties to the system, okay.  And if I sign anything that
20    all of a sudden is going to create standing where it might not
21    have existed had I allowed this to be litigated today, then I
22    think I've been derelict in my duties.  So it's essential, as
23    far as I'm concerned.
24       So do we need a five-minute break?  I'm telling you, if we
25    have to go forward today, which it's looking like we won't,
```

HCMLPHMIT00003854

Case 19-34054-sgj11 Doc 4255-57 Filed 06/30/25 Entered 06/30/25 12:29:59 Desc
Case 3:25-cv-01876-K Document 007 Page 2022 of 31 Page 27 of 262 PageID 2772

27

```
 1   but if we have to, it's going to be compressed, because we've
 2   got to finish --
 3            MR. MORRIS:  Right.
 4            THE COURT:  -- by 5:30.
 5            MR. MORRIS:  I think the only thing I would request
 6   is that Ms. Deitsch-Perez just confirm --
 7            MS. DEITSCH-PEREZ:  Ask about the sixth.
 8            MR. MORRIS:  -- that -- confirm that Number 6 is
 9   acceptable.
10            THE COURT:  Okay.  She suggested she might need to
11   run it by --
12            MR. MORRIS:  Yeah.
13            MS. DEITSCH-PEREZ:  Yeah.
14            THE COURT:  -- the client.
15            MS. DEITSCH-PEREZ:  Let's -- can we take five
16   minutes?
17            THE COURT:  Five minutes.
18            MR. MORRIS:  Thank you, Your Honor.
19            THE COURT:  Okay.  Thank you.
20            THE CLERK:  All rise.
21       (A recess ensued from 10:05 a.m. until 10:12 a.m.)
22            THE CLERK:  All rise.
23            THE COURT:  Okay.  Please be seated.
24       All right.  We're back on the record in Highland.  Have we
25   gotten to closure on all the issues or not?
```

001635

HCMLPHMIT00003855

Case 19-34054-sgj11 Doc 4255-7 Filed 06/30/25 Entered 06/30/25 12:39:59 Desc
Case 3:25-cv-01876-K   Document 6 Filed 08/29/25 Page 28 of 262   PageID 2773

28

```
 1              MS. DEITSCH-PEREZ:  We have, Your Honor.

 2              THE COURT:  Okay.

 3              MR. MORRIS:  And so what we'd like to do is Highland

 4   is going to take the laboring oar of doing an initial draft of

 5   a stipulated order.  We expect to get that to Stinson today.

 6   And we'd like to just put a loose deadline to report to the

 7   Court if we're unable to file this document, let's just say by

 8   the 24th, next -- I think it's Tuesday.

 9       And if we're unable to do it by then, we'll ask for

10   another date for coming back.  But I do just want to keep a

11   deadline there just so --

12              MS. DEITSCH-PEREZ:  I think it's a week.  Okay.

13              MR. MORRIS:  A week is -- it's six days instead of

14   five days because I didn't want to take Christmas.  That's

15   just me.

16              THE COURT:  Okay.  Sounds reasonable to me.

17              MR. MORRIS:  Yeah.

18              THE COURT:  Sounds more than reasonable that you can

19   work this out --

20              MR. MORRIS:  Yeah.

21              THE COURT:  -- with language within six days.

22              MR. MORRIS:  I do appreciate Ms. Deitsch-Perez's

23   listening and getting to yes on this.  It's a good result.

24              THE COURT:  Okay.

25              MR. MORRIS:  Thank you, Your Honor.
```

HCMLPHMIT00003856

```
 1          MS. DEITSCH-PEREZ:  Thank you, Your Honor.

 2          THE COURT:  Anything you want to add, or you're in

 3  agreement with everything you just heard, Ms. Deitsch-Perez?

 4          MS. DEITSCH-PEREZ:  Yes.

 5          THE COURT:  Okay.

 6          MR. MORRIS:  Deborah?

 7          MS. DEITSCH-PEREZ:  What?

 8          MR. MORRIS:  I assume part of this is withdrawing the

 9  bad faith motion?

10          MS. DEITSCH-PEREZ:  Oh, yes.

11          MR. MORRIS:  Yes.  I can confirm that that's Element

12  Number 7.  The bad faith motion will be deemed withdrawn.

13          THE COURT:  Okay.  All right.  Well, --

14          MS. DEITSCH-PEREZ:  Well, will be withdrawn.

15          MR. MORRIS:  Yeah.  Thank you.

16          THE COURT:  All right.  I would have been happy to

17  spend a whole day with you all, but we can now go on and take

18  care of other business, I guess.

19    So I thank you all for getting this resolved.  And I'm not

20  going to be a happy camper if I don't see an order.  I mean,

21  the battle of the forms, I really don't think we need to have

22  that here.  Okay?

23          MR. MORRIS:  Yep.

24          THE COURT:  So, --

25          MR. MORRIS:  Thank you, Your Honor.
```

001637
HCMLPHMIT00003857

```
 1              THE COURT:  All right.  Happy holidays to everyone.

 2              MR. MORRIS:  You, too.

 3              MS. DEITSCH-PEREZ:  You, too.

 4              THE CLERK:  All rise.

 5          (Proceedings concluded at 10:15 a.m.)

 6                           --oOo--

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20                         CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23      /s/ Kathy Rehling                    12/19/2024

24  _____        _____

25  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber
```

001638

HCMLPHMIT00003858

INDEX

PROCEEDINGS                                              3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                29

END OF PROCEEDINGS                                     30

INDEX                                                  31

001639

HCMLPHMIT00003859

# EXHIBIT 68



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed December 27, 2024**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

### STIPULATED AND AGREED ORDER RESOLVING (A) HCLOM, LTD.'S SCHEDULED CLAIMS 3.65 AND 3.66; AND (B) HIGHLAND CAPITAL MANAGEMENT, L.P.'S (1) OBJECTION AND (2) MOTION FOR A BAD FAITH FINDING AND AN AWARD OF ATTORNEYS' FEES AGAINST HCLOM, LTD. AND JAMES DONDERO IN CONNECTION THEREWITH [DOCKET NOS. 3657, 4176]

WHEREAS, on December 13, 2019, Highland Capital Management, L.P. ("Highland"), the reorganized debtor in the above-captioned Chapter 11 case (the "Bankruptcy Case"), filed its schedule of unsecured claims that identified "Highland CLO Holdco" as a creditor with claims arising under a note. Docket No. 247 (Schedule E/F, Part 3.64 and 3.65) (the "Initial HCLOM Claim");

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.



1934054241227000000000001

**001641**

HCMLPHMIT00003860

WHEREAS, on September 22, 2020, Highland filed a *Notice of Filing of Debtor's Amended Schedules* in which it, among other things, replaced Highland CLO Holdco as the creditor on the Initial HCLOM Claim with Highland CLO Management, Ltd. ("HCLOM Ltd.," and together with Highland, the "Parties"). [Docket No. 1082] (Schedule E/F, Part 3.65 and 3.66, the "HCLOM Claim");

WHEREAS, on February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (the "Plan"). The Plan became effective on August 11, 2021 (the "Effective Date") [Docket No. 2700];

WHEREAS, as required under the Plan, Highland created a reserve for the HCLOM Claim (the "Reserve");

WHEREAS, on February 2, 2023, Highland filed its objection to the HCLOM Claim [Docket No. 3657] (the "Objection");

WHEREAS, on April 3, 2023, HCLOM Ltd. filed its response to the Objection [Docket No. 3751] (the "Response");

WHEREAS, on November 21, 2024, Highland filed its *Motion for (A) a Bad Faith Finding and (B) an Award of Attorneys' Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* [Docket No. 4176] (the "Bad Faith Motion," and collectively with the HCLOM Claim and the Objection, the "HCLOM Litigation");

WHEREAS, an evidentiary hearing on the HCLOM Litigation was scheduled for December 18, 2024 (the "Hearing");

4933-5155-3032.2 36027.003

001642
HCMLPHMIT00003861

WHEREAS, the Parties desire to settle and resolve the HCLOM Litigation pursuant to the terms of this Stipulated and Agreed Order (the "<u>Agreement</u>");

WHEREAS, the Court finds and concludes that: (a) the Court has jurisdiction to consider the terms contained in this Stipulated and Agreed Order; (b) venue is proper under 28 U.S.C. §1409; (c) the Parties' Stipulated and Agreed Order is binding; and (d) the relief requested in the Stipulated and Agreed Order is appropriate;

**ACCORDINGLY:**

**IT IS HEREBY ORDERED that:**

1.      The HCLOM Claim is hereby converted to a Class 10 interest[2] in the amount of $10,140,633.26.

2.      Upon the Effective Date, and to the maximum extent permitted by law, except for claims arising out of an failure to abide this Order, HCLOM Ltd. hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates the Protected Parties,[3] individually and collectively, from, and waives and relinquishes, any and all Claims, which HCLOM Ltd. ever had, now has, or hereafter can, shall, or may have against any of the Protected Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management of the Highland Entities, or the Highland Entities' property and including any defense, affirmative defenses, and right to setoff

---

[2] "<u>Class 10</u>" shall have the meaning ascribed to that term in Article III.H. ¶ 10 of the Plan.

[3] "<u>Protected Parties</u>" shall have the meaning ascribed to that term in Article I.B ¶ 105 of the Plan.

001643

HCMLPHMIT00003862

arising out of, or otherwise related to, any of the foregoing (collectively, "HCLOM Ltd.'s Released

Claims").

**FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASE IS INTENDED TO BE GENERAL AND INCLUDES, WITHOUT LIMITATION, A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE EFFECTIVE DATE.**

3.      To the maximum extent permitted by law, HCLOM Ltd. waives the benefit of any

statute or other principle of law or equity that limits the applicability of a release with respect to

claims that the releasing party does not know or suspect to exist in his, her or its favor at the time

of executing the release.

4.      Without limiting the scope of the foregoing waiver, in connection with the

foregoing release, HCLOM Ltd. waives the benefits of Section 1542 of the California Civil Code

(to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as

follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

5.      HCLOM Ltd. hereby agrees that the provisions of Section 1542 of the Civil Code

of the State of California and all similar federal or state law, rights, rules or legal principles, legal

or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY**

**KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY HCLOM**

**LTD.** to the full extent that such rights and benefits pertaining to the matters released herein may

001644

HCMLPHMIT00003863

be waived, and HCLOM Ltd., on its own behalf and on behalf of the HCLOM Ltd. Releasors, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

6. Except for the limited purpose of enforcing this Order, HCLOM, Ltd. shall file no pleading, motion, adversary proceeding, or other paper in this Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), including but not limited to, in connection with the HCLOM Claim as a holder of a Class 10 interest.

7. The Protected Parties, individually and collectively, shall owe no duty to HCLOM, Ltd. (whether contractual, fiduciary, equitable, statutory or otherwise) except as arising out of this Order.

8. Highland is authorized to release the Reserve, and no reserve shall be established for HCLOM, Ltd.'s Class 10 interest.

9. This Stipulated and Agreed Order does not and shall not operate to give HCLOM Ltd. standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except in connection with the enforcement of this Order.

10. The Bad Faith Motion is deemed withdrawn with prejudice.

**THE PARTIES UNDERSTAND AND AGREE THAT THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF EITHER PARTY OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT. THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS, EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.**

### ### END OF ORDER ###

4933-5155-3032.2 36027.003

001645

HCMLPHMIT00003864

Case 19-34054-sgj11 Doc 4159-8 Filed 12/6/24 Entered 12/6/24 12:48:29 Desc
Main Document Page 06 of 7 Page 38 of 262 PageID 2783
Case 3:25-cv-01876-K Document 1-8 Filed 08/20/25 Page 38 of 262 PageID 2783

STIPULATED AND AGREED THIS 23RD DAY OF DECEMBER 2024

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569) 10100
Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
E-mail: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile:  (972) 755-7110

*Counsel for Plaintiff Highland Capital
Management, L.P.*

001646

HCMLPHMIT00003865

- and -

**STINSON LLP**
*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Highland CLO Management, Ltd. and
James Dondero*

- and -

**STINSON LLP**
*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Hunter Mountain Investment Trust and
Dugaboy Investment Trust (approved as to form
and substance)*

001647

HCMLPHMIT00003866

**EXHIBIT 69**

001648

## INTERCREDITOR AND PARTICIPATION AGREEMENT

This Intercreditor and Participation Agreement (the "Agreement") is entered into as of January 10, 2025 (the "Effective Date") by and between Highland CLO Management, Ltd. (together with its successors and assigns in such capacities, "HCLOM Ltd.") and Hunter Mountain Investment Trust (together with its successors and assigns in such capacities, "HMIT"). HCLOM Ltd. and HMIT are each referred to herein individually as a "Party" and jointly as the "Parties."

## RECITALS

WHEREAS, on September 22, 2020, Highland Capital Management, L.P. filed a Notice of Filing of Debtor's Amended Schedules in its pending Chapter 11 Case No. 19-34054-sgj11 (the "Bankruptcy Case") in which it, among other things, scheduled a creditor's claim by HCLOM Ltd. (the "HCLOM Claim"); and

WHEREAS, on December 27, 2024, the Bankruptcy Court entered a Stipulated and Agreed Order Resolving (A) HCLOM, Ltd.'s Scheduled Claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a Bad Faith Finding and an Award of Attorneys' Fees Against HCLOM, Ltd. and James Dondero in Connection Therewith [Docket Nos. 3657, 4176] in the Bankruptcy Case (the "Stipulation and Agreed Order"); and

WHEREAS, the Stipulation and Agreed Order converted the HCLOM Claim to a Class 10 interest/claim (as such is defined in Article III.H. ¶ 10 of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) in the Bankruptcy Case) (the "Plan") in the amount of $10,140,633.26; and

WHEREAS, the Parties have agreed to certain rights and priorities solely as between themselves regarding HCLOM Ltd.'s participation in the payment of Class 10 interests/claims;

THEREFORE, for and in consideration of the promises, covenants, conditions, stipulations, benefits, and obligations described and provided herein, the sufficiency and adequacy of which is expressly hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.    **HMIT Payment Obligation to HCLOM Ltd.** Upon HMIT's receipt of distributions on account of its Class 10 interest/claim (the "Distributions"), HMIT will pay to HCLOM Ltd. an amount equal to five percent (5%) of the funds received by HMIT within two (2) business days after receipt of indefeasible funds by HMIT (the "HMIT Payment Obligation"). HMIT shall be entitled to deduct from the Distributions the fees and expenses billed by Kelly Hart Hallman, LLP which directly relate to the Stipulation and Agreed Order or this Agreement (the "HMIT Expenses") until all HMIT Expenses are paid in full.

2.    **No Additional Duties to HCLOM Ltd.** HMIT shall retain and have the sole discretion to act with respect to its Class 10 interest/claim, and shall owe no additional duties to HCLOM Ltd. or any other person or entity, including without limitation, with respect to (i) the amount of Distributions or recovery by HMIT on account of its Class 10 interests/claims,

ACTIVE 706075387v4

001649

HCMLPHMIT00003868

(ii) the amount of Distributions that could be received by any holder of Class 10 interests/claims, (iii) the rights of any holder of Class 10 interests/claims, or (iv) any pleading or document that could or should be filed in any way related to the Bankruptcy Case, the Plan, or the HMIT Class 10 interests/claims.

3.   **No Liens or Encumbrances**. HMIT will not take any action that could reasonably be expected to encumber HMIT's Class 10 interests/claims, limit or affect HMIT's right or ability to fulfil and perform the HMIT Payment Obligation, or limit or affect HCLOM Ltd.'s right to receive the Distributions.

4.   **This Agreement Supersedes the Effects of the Stipulated and Agreed Order Among the Parties**. HCLOM acknowledges and agrees that, notwithstanding the Stipulated and Agreed Order, the terms of this Agreement amends and supersedes the effect of the Stipulation and Agreed Order as between the Parties and HCLOM's rights to payment under the Plan are limited solely to the HMIT Payment Obligation.

5.   **Non-Interference; No Cause of Action**. Notwithstanding Paragraph 3, HCLOM will not have any rights to object to or otherwise interfere with the rights of HMIT as a holder of Class 10 interest to reach a settlement with Highland Capital Management, LP ("Highland"). HCLOM acknowledges that it shall have no right to notice or approval of such a settlement nor will it have any cause of action against HMIT arising out of any such settlement.

6.   **Remittance Agreement**. The Parties acknowledge that contemporaneously herewith NREA SB II Holdings, LLC (together with its successors and assigns in such capacities, "NexPoint Small Bay."), Charitable DAF Holdings Corp. (together with its successors and assigns in such capacities, "Charitable DAF"), and Liberty CLO Holdco, Ltd. (together with its successors and assigns in such capacities, "Liberty CLO") have entered into that certain Remittance Agreement effective January 10, 2025 (the "Remittance Agreement"). HCLOM agrees that if NexPoint Small Bay fails to make the DAF Bridge Equity Payment (as defined in the Remittance Agreement) pursuant to the terms of the Remittance Agreement, HMIT will have no obligations to make the HMIT Payment Obligation, and HMIT shall not receive any distribution from HMIT or any other party related to any Class 10 interest/claim. Notwithstanding any failure of NexPoint Small Bay to adhere to the terms of the Remittance Agreement, HCLOM acknowledges that by executing this Agreement, it shall have no other recourse or rights to payment under the Plan other than the terms of this Agreement.

7.   **Choice of Law; Jurisdiction; Venue**. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflict of law provisions. Each Party to hereby consents and agrees that the courts located in Texas shall have sole and exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens*.

8.   **Amendments; Waivers**. No amendment, modification, or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the Party making such waiver or the obligations of the other Party in any other respect or at any other time.

001650

HCMLPHMIT00003869

9.      **Binding Effect**. Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors, assigns, executors, representatives, and administrators.

10.      **Entire Agreement**. The Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into this Agreement.

11.      **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Signature by facsimile or other similar electronic transmission shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Intercreditor and Participation Agreement as of the Effective Date set forth above and in the capacities set forth below.

001651

HCMLPHMIT00003870

HIGHLAND CLO MANAGEMENT, LTD.

By: _____

Name: __James Dondero_____

Title: ___President_____


HUNTER MOUNTAIN INVESTMENT TRUST

By: _____

Name: ___Mark Patrick_____

Title: ___Administrator_____

HCMLPHMIT00003871

**EXHIBIT 70**

001653

## TRUST AGREEMENT

This Trust Agreement is dated as of December 17, 2015 (this "Trust Agreement"), between Beacon Mountain, LLC, a Delaware limited liability company, as sponsor (in such capacity, the "Sponsor"), John Honis as administrator (in such capacity, the "Administrator"), and Wilmington Trust, National Association, a national banking association, as Delaware trustee (the Delaware Trustee").

1.    <u>Definitions</u>.  Certain capitalized terms used in this Trust Agreement shall have the respective meaning assigned to them in this Section 1. All references herein to "the Agreement" or "this Agreement" are to this Trust Agreement as it may be amended and supplemented from time to time, and all references herein to Articles, Sections and subsections are to Articles, Sections and subsections of this Trust Agreement unless otherwise specified.

"Account" means the trust account or other account established by the Administrator in the name of the Trust for the benefit of the Sponsor at any financial institution selected from time to time by the Administrator in his sole and absolute discretion.

"Delaware Act" means the Delaware Statutory Trust Act, Chapter 38 of Title 12 of the Delaware Code, 12 <u>Del. C.</u> § 3801 <u>et seq.</u>

"Honis Cause" means conduct by Honis, in any capacity, amounting to (i) Honis's conviction or plea of nolo contendere for any criminal offense; (ii) dishonesty, fraud, willful misconduct, unlawful discrimination, bad faith or theft on the part of Honis that is injurious to any of the Applicable Entities; (iii) Honis's using for his own benefit any confidential or proprietary information of any of the Applicable Entities, or willfully or negligently divulging any such information to third parties without the prior written consent of the Partnership, in each case, other than as provided herein; (iv) a breach or violation of the terms of this Agreement or other agreement to which Honis or any of his Affiliates and any of the Applicable Entities are party in any manner that adversely affects any of the Applicable Entities; or (v) a breach of fiduciary duties. Any determination of whether conduct constitutes Honis Cause pursuant to this Agreement shall be made in the reasonable discretion of the Partnership, shall be made in good faith and shall be binding upon all parties affected thereby.

"Honis Trigger Event" means, with respect to Honis or any of his Affiliates, (i) the Bankruptcy of Honis; (ii) the death of Honis; (iii) the Disability of Honis; (iv) any conduct by Honis amounting to Honis Cause; (v) the termination of Honis's employment with, or the failure of Honis to be actively engaged in the management of, Rand Advisors; (vi) a change in the ownership of Rand Advisors, such that Honis fails to retain, directly or indirectly, majority voting control of Rand Advisors; (vii) a sale of all or substantially all of the assets of Rand Advisors; or (viii) the termination of this Agreement pursuant to Section 16.  Honis agrees to give the Partnership ten (10) days' written notice of his Bankruptcy. "Limited Partnership" means Highland Capital Management, L.P., a Delaware limited partnership.

"Limited Partnership Agreement" means the Agreement of Limited Partnership of Highland Capital Management, L.P., as amended from time to time.

001654

HCMLPHMIT00004103

"Limited Partner Interests" means limited partner interests in the Limited Partnership.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, business trust, trust, organization, governmental entity or other entity of any kind.

"Trust" means the Delaware statutory trust established and governed by this Trust Agreement.

"Trust Property" means all Limited Partnership Interests and all amounts in the Account, unless and until any of such Limited Partnership Interests are disposed of in accordance with this Trust Agreement.

2.    Scope.  This Trust Agreement governs the Trust and the disposition of all Trust Property, including amounts in the Account or otherwise held by the Trust now existing or hereafter arising.  Each of the Sponsor, the Administrator and the Delaware Trustee hereby acknowledges that the Trust Property shall be held in trust for Beacon Mountain LLC under Delaware law solely for the use and purposes set forth herein.

3.    Name; Certificate of Trust.  The Trust shall be known as "HUNTER MOUNTAIN INVESTMENT TRUST", in which name the Administrator may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued on behalf of the Trust, to the extent herein provided.  The Delaware Trustee is authorized and directed to file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware in accordance with the applicable provisions of the Delaware Act.  It is the intention of the parties hereto that the Trust created hereby constitute a statutory trust under the Delaware Act and that this Trust Agreement constitute the governing instrument of the Trust.

4.    Account Establishment.  The Administrator shall establish and control the Account.  The Account shall include Trust Property and may include other assets in the sole discretion of the Administrator.

5.    Beneficial Owner; Liability of Beneficial Owner.  The beneficial owner of the trust shall be Beacon Mountain LLC.  Beacon Mountain LLC, as beneficial owner of the Trust, shall be entitled to the same limitation of liability extended to stockholders of private corporations for profit organized under the General Corporation Laws of the State of Delaware.

6.    Title to Trust Property.  Legal title to all Trust Property, including the Account, shall be vested at all times in the Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Trust Property or the Account, to be vested in a trustee or trustees, in which case title shall may be vested in a trustee, a co-trustee and/or a separate trustee, as the case may be, as selected by the Administrator.  Title to Trust Property shall not be vested in the name of the Delaware Trustee without the Delaware Trustee's prior written consent.

2

001655
HCMLPHMIT00004104

7. <u>Purpose and Powers of the Trust; Administrator's Powers</u>. The Trust shall have the power and authority (i) to accept funds and other assets, (ii) to contribute or otherwise transfer funds and other assets to the Account, (iii) to acquire Limited Partnership Interests from (a) the limited partners of the Limited Partnership and (b) the Limited Partnership, in each case, with funds in the Account or other sources of funds, including through the incurrence of debt, and to hold such Limited Partnership Interests in the Account or otherwise and (iv) to dispose of or otherwise allocate such Limited Partnership Interests pursuant to and accordance with the terms and conditions of the Limited Partnership Agreement. The Administrator shall pursuant to Section 3806(b)(7) of the Delaware Act have the power and authority, and shall be duly authorized, from time to time, in his sole discretion to manage the business and affairs of the Trust, and to take the actions described in (i) through (iv) on behalf of the Trust. The Administrator shall have all additional powers and authority necessary or desirable, in the sole discretion of the Sponsor, for prompt and effective administration of the Trust created hereunder, unless the particular power or authority is specifically denied by this Trust Agreement. The Administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute.

8. <u>Fiduciary Duties of Administrator</u>. (a) The Administrator is authorized to acquire and retain the Limited Partnership Interests in accordance with the terms of this Trust Agreement without regard to any law limiting the nature of investments of fiduciaries.

(b)    The Administrator agrees to perform his duties under this Trust Agreement in good faith and in the best interests of the Trust, but only upon the express terms of this Trust Agreement. To the fullest extent permitted by law, the Administrator shall have all implied duties (including fiduciary duties) or liabilities existing at law or in equity with respect to the Trust. For the avoidance of doubt, to the fullest extent permitted by law, no Person other than the Administrator (including any such Person that may control or be under common control with the Administrator) shall have any duties (including fiduciary duties) or liabilities at law or in equity to the Trust, any beneficial owner or any other Person.

(c)    To the extent that, at law or in equity, the Administrator has duties (including fiduciary duties) and liabilities relating thereto to the Trust or to any other Person, the Administrator shall not be liable to the Trust or to any other Person for his good faith reliance on the provisions of this Trust Agreement.

(d)    Unless otherwise expressly provided herein:

(i)    whenever a conflict of interest exists or arises between the Administrator or any of its affiliates, on the one hand, and the Trust or the beneficial owner, on the other hand; or

(ii)   whenever this Trust Agreement or any other agreement contemplated herein or therein provides that the Administrator shall act in a manner that is, or provides terms that are, fair and reasonable to the Trust or the beneficial owner,

the Administrator shall resolve such conflict of interest, take such action or provide such terms, considering in each case solely the interests of the Trust and the beneficial owner.

3

001656
HCMLPHMIT00004105

(e)    Notwithstanding any other provision of this Trust Agreement or otherwise applicable law, whenever in this Trust Agreement the Administrator is permitted or required to make a decision:

(i)    in his "discretion" or under a grant of similar authority, the Administrator shall be entitled to consider such interests and factors as it desires, including its own interest, and, to the fullest extent permitted by applicable law, shall have no duty or obligation to give any consideration to any interest of or factors affecting the Trust or any other Person; or

(ii)    in his "good faith" or under another express standard, the Administrator shall act under such express standard and shall not be subject to any other or different standard. The term "good faith" as used in this Trust Agreement shall mean subjective good faith as such term is understood and interpreted under Delaware law.

(f)    The Administrator and any of his affiliates may engage in or possess an interest in other profit-seeking or business ventures of any nature or description, independently or with others, whether or not such ventures are competitive with the Trust and the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to the Administrator. The Administrator insofar as he acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Trust shall not have any duty to communicate or offer such opportunity to the Trust, and the Administrator shall not be liable to the Trust or to the beneficial owners for breach of any fiduciary or other duty by reason of the fact that the Administrator pursues or acquires for, or directs such opportunity to another Person or does not communicate such opportunity or information to the Trust. Neither the Trust nor any beneficial owner shall have any rights or obligations by virtue of this Trust Agreement or the trust relationship created hereby in or to such independent ventures or the income or profits or losses derived therefrom, and the pursuit of such ventures, even if competitive with the activities of the Trust, shall not be deemed wrongful or improper. The Administrator may engage or be interested in any financial or other transaction with the Trust or any affiliate of the Trust, or may act as depositary for, trustee or agent for, or act on any committee or body of holders of, securities or other obligations of the Trust or its affiliates.

9.    <u>Recordkeeping and Accounting</u>.  The Administrator shall maintain appropriate records in which he shall record the Trust Property and the acquisition and disposition of Limited Partnership Interests.

10.    <u>Tax Treatment</u>.  The Sponsor and the Administrator acknowledge and agree that for United States Federal Income Tax purposes (i) the Trust shall be disregarded as an entity for federal income tax purposes.  The Administrator shall comply with the information reporting requirements applicable to the Trust under the Internal Revenue Code and prepare and furnish to Beacon Mountain LLC any appropriate Internal Revenue Service forms required to be provided to Beacon Mountain LLC as beneficial owner of the Trust.

4

001657
HCMLPHMIT00004106

11.   No Other Interests

(a)   The Sponsor acknowledges that it has no rights or claims to specific Trust Property, including funds in the Account, and otherwise has no interest in the Trust Property or the Account other than a beneficial interest in the Trust Property and the Account.

(b)   The Administrator acknowledges that he has no right, title, or interest in the Trust, the Trust Property, or the Account in his personal capacity and has no beneficial interest in the Trust.

12.   Compensation; Administrator Liability.   The Administrator shall not receive any compensation for his role as Administrator.   Nothing herein shall be construed to limit the Administrator's ability to receive compensation pursuant to other agreements for services he may provide other than his role as Administrator.   The Administrator shall be indemnified, defended and held harmless by the Trust for any liability incurred by him while acting hereunder, and shall not be liable to the Trust or the Sponsor, except for a breach of his fiduciary duties hereunder, his own bad faith, willful misconduct or gross negligence in the performance of his express duties under this Trust Agreement.

13.   Amendment.   The Administrator, solely with the consent of the beneficial owner, shall have the right at any time or times to amend or supplement the provisions of this Trust Agreement, in each case by a writing or writings signed by the Administrator; provided that no such amendment shall be permitted if it would subject any amount held hereunder to any right, charge, security interest, lien or claim by, of or for the benefit of any creditor or creditors of the Sponsor or its subsidiaries and affiliates in its corporate or personal capacity.   If any such amendment or supplement affects the rights, immunities or obligations of the Delaware Trustee, the Administrator shall be required to obtain the prior written consent of the Delaware Trustee.

14.   Duration.   The Trust shall be perpetual unless otherwise dissolved and terminated pursuant to paragraph 15 below.

15.   Termination.   The Administrator shall have the power solely upon the prior written consent of the beneficial owner to dissolve the Trust and to distribute all Trust Property held in the Account to, or for the benefit of, such persons (including the Sponsor) as the Administrator shall determine in his sole discretion and after satisfying the claims and obligations of the Trust in accordance with the Delaware Act.   Following any such dissolution, the Administrator shall proceed to wind up the affairs of the Trust in an orderly manner and within a reasonable period of time considering relevant circumstances and shall have the powers necessary to wind up the Trust's affairs, including but not limited to the power to fulfill or discharge the contracts of the Trust, collect its assets, sell, convey, exchange or otherwise dispose of all or any part of the remaining property of the Trust to one or more Persons at public or private sale (for consideration which may consist in whole or part of cash, securities or other property of any kind), discharge or pay its liabilities, defend or prosecute suits or administrative proceedings and do all other acts appropriate to the winding up and liquidation of the property and affairs of the Trust.   After paying or making reasonable provision for the payment of all claims and obligations of the Trust as required by the Delaware Act, and upon receipt of such releases, indemnities or like documentation as the Administrator may reasonably deem necessary

5

HCMLPHMIT00004107

for the protection of the Administrator, the Administrator shall distribute the remaining property of the Trust as contemplated by this Trust Agreement. Upon the completion of winding up, the Trust shall terminate and the Administrator shall provide written notice directing the Delaware Trustee to file an appropriate form of Certificate of Cancellation to be filed in the Office of the Secretary of State of the State of Delaware by the Delaware Trustee.

16.   Removal of Administrator.   Upon any Honis Trigger Event, the Administrator shall immediately be removed without any action by the Delaware Trustee or any other party.

17.   Successor Administrator.   The Administrator may resign as Administrator hereunder, without leave of court, at any time, and, in such event, the Administrator shall appoint a successor Administrator unless, prior to the effective date of his resignation, the Administrator dissolves the Trust in accordance with paragraph 15 above. Any appointment of a successor Administrator shall be in writing signed by the appointing Administrator, or by a duly authorized officer or officers of the appointing Administrator, if an entity. Whenever this Trust Agreement refers to the Administrator, such reference shall include any successor Administrator appointed under this paragraph. All powers hereby granted to the Administrator shall be exercisable by any successor Administrator, and each successor Administrator shall be deemed to have assumed the duties hereby undertaken by the Administrator.

Upon the termination of the Administrator in accordance with paragraph 16 above, Beacon Mountain, LLC shall appoint a successor Administrator within a reasonable period of time.

The Administrator shall not be required to furnish any bond or surety. No one dealing with the Administrator need inquire concerning the validity of anything the Administrator purports to do or see to the application of any money paid upon the Administrator's order.

18.   Delaware Trustee.

(a)   For purposes of satisfying Sections 3807 of the Delaware Act, during the existence of the Trust, there shall at all times be a "Delaware Trustee" hereunder who shall, in the case of a natural person, be a person who is a resident of the State of Delaware, or, in all other cases, is a trustee with its principal place of business in the State of Delaware. The Delaware Trustee shall not have any duties (including fiduciary duties) or liabilities except to the extent and for the limited purposes described in this paragraph. Accordingly, no reference in this Trust Agreement to the "Administrator" shall include, or be deemed to refer to, the Delaware Trustee. The sole power and duty of the Delaware Trustee shall be to accept service of process in accordance with Section 3804 of the Delaware Act and to execute and deliver for filing all documents required to be filed with the State of Delaware as required by the Delaware Act.

(b)   The Sponsor and the Administrator hereby appoint Wilmington Trust, National Association as the initial Delaware Trustee. The initial Delaware Trustee and any successor Delaware Trustee may resign and may be removed by the Sponsor then serving for any reason, with or without cause. If the Delaware Trustee resigns or is removed, or if there is no Delaware Trustee serving at any time for any other reason, the Administrator shall appoint a successor Delaware Trustee who qualifies under the terms of this paragraph 18. Upon each

6

001659
HCMLPHMIT00004108

appointment of a successor Delaware Trustee, the Administrator shall cause an amendment to the Certificate of Trust of the Trust that reflects such change to be filed with the Secretary of State of the State of Delaware in accordance with the Delaware Act.

(c) By its execution hereof, the Delaware Trustee accepts its appointment hereunder. Except as otherwise expressly required by clause (a) above, the Delaware Trustee shall not have any duty or liability with respect to the administration of the Trust, the investment of the Trust Property or the payment of any distributions of income or principal to the beneficial owners.

(d) The Delaware Trustee shall not be liable for the acts or omissions of the Administrator, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of or performing the duties and obligations of the Administrator, the Sponsor or the Trust under this Trust Agreement or any other document. The Delaware Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith or gross negligence in the performance of its express duties under this Trust Agreement. In particular, but not by way of limitation:

(i) the Delaware Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes gross negligence on its part;

(ii) no provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder, if the Delaware Trustee shall have reasonable grounds for believing that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iii) under no circumstances shall the Delaware Trustee be personally liable for any representation, warranty, covenant, agreement, or indebtedness of the Trust;

(iv) the Delaware Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Trust Agreement or for the due execution hereof by the Sponsor or the Administrator;

(v) the Delaware Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper reasonably believed by it to be genuine and reasonably believed by it to be signed by the proper party or parties. The Delaware Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, the Delaware Trustee may for all purposes hereof rely on a certificate, signed by the Administrator, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

7

HCMLPHMIT00004109

(vi)   in the exercise or administration of the Trust hereunder, the Delaware Trustee (a) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and the Delaware Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Delaware Trustee in good faith and with due care and (b) may consult with counsel, accountants and other skilled persons to be selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons; and

(vii)   except as expressly provided in this Section, in accepting and performing the Trust hereby created the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all Persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement or the Trust Agreement shall look only to the Trust's property for payment or satisfaction thereof.

(e)   The Delaware Trustee (or any successor Delaware Trustee) shall be entitled to receive compensation from the Sponsor or from the Trust for its services in accordance with such fee agreements and schedules as shall have been separately agreed to from time to time by the Delaware Trustee and the Sponsor. The Delaware Trustee may consult with counsel (who may be counsel for the Sponsor or for the Delaware Trustee). The reasonable legal fees incurred in connection with such consultation shall be reimbursed to the Delaware Trustee pursuant to this Section, provided that no such fees shall be payable to the extent that they are incurred as a result of the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(f)   The Delaware Trustee shall serve for the duration of the Trust and until the earlier of (i) the effective date of the Delaware Trustee's resignation, or (ii) the effective date of the removal of the Delaware Trustee. The Delaware Trustee may resign at any time by giving thirty (30) days written notice to the Administrator; provided, however, said resignation shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. The Delaware Trustee may be removed at any time by the Administrator by providing thirty (30) days written notice to the Delaware Trustee; provided, however, such removal shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. Upon the resignation or removal of the Delaware Trustee, the Administrator shall appoint a successor Delaware Trustee. If no successor Delaware Trustee shall have been appointed and shall have accepted such appointment within forty five (45) days after the giving of such notice of resignation or removal, the Delaware Trustee may, at the expense of the Sponsor, petition any court of competent jurisdiction for the appointment of a successor Delaware Trustee. Any successor Delaware Trustee appointed pursuant to this Section shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section, shall become fully vested with the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Delaware Trustee.

(g)   The Delaware Trustee or any officer, affiliate, director, employee, or agent of the Delaware Trustee (each an "Indemnified Person") shall be entitled to indemnification from the Sponsor, to the fullest extent permitted by law, from and against any and all losses, claims, actions, suits, taxes, damages, reasonable expenses, and liabilities (including liabilities under state or federal securities laws) of any kind and nature whatsoever (collectively, "Expenses"), to

8

001661

HCMLPHMIT00004110

the extent that such Expenses arise out of or are imposed upon or asserted against such Indemnified Persons with respect to the creation, operation or termination of the Trust, the execution, delivery or performance of this Trust Agreement or the transactions contemplated hereby; provided, however, that the Sponsor shall not be required to indemnify any Indemnified Person for any Expenses which are a result of the willful misconduct, bad faith or gross negligence of such Indemnified Person. The obligations of the Sponsor to indemnify the Indemnified Persons as provided herein shall survive the termination of this Trust Agreement and the resignation or removal of the Delaware Trustee.

(h)    The Delaware Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder.

19.    <u>Waiver of Jury Trial</u>. THE PARTIES HERETO HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO A TRIAL BY JURY IN ANY LITIGATION RELATING TO ANY CLAIM ARISING HEREUNDER OR RELATED HERETO.

20.    <u>Governing Law</u>. The validity and construction of this Trust Agreement and all amendments hereto shall be governed by the laws of the State of Delaware, and the rights of all parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof; provided, however, that the parties hereto intend that the provisions hereof shall control over any contrary or limiting statutory or common law of the State of Delaware (other than the Delaware Act) and that, to the maximum extent permitted by applicable law, there shall not be applicable to the Trust, the Sponsor, or the Delaware Trustee any provision of the laws (statutory or common) of the State of Delaware (other than the Delaware Act) pertaining to trusts which relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Sponsor or the Delaware Trustee set forth or referenced in this Trust Agreement. Sections 3540, 3542 and 3561 of Title 12 of the Delaware Code shall not apply to the Trust.

21.    <u>Exclusive Jurisdiction</u>. Each of the parties hereto, to the fullest extent permitted by law, (i) irrevocably agrees that any claims, suits, actions or proceedings arising out of or relating in any way to this Agreement (including any claims, suits or actions to interpret, apply or enforce (A) the provisions of this Agreement or (B) the duties, obligations or liabilities of the Sponsor, the Administrator and the Delaware Trustee, or (C) the rights or powers of, or

9

HCMLPHMIT00004111

restrictions on, the Trust, Sponsor, the Delaware Trustee or the Administrator, or (D) any provision of the Delaware Act, or (E) any other instrument, document, agreement or certificate contemplated by any provision of the Delaware Act relating to the Trust (regardless of whether such claims, suits, actions or proceedings (x) sound in contract, tort, fraud or otherwise, (y) are based on common law, statutory, equitable, legal or other grounds, or (z) are derivative or direct claims)), shall be exclusively brought in the Court of Chancery of the State of Delaware or, if such court does not have subject matter jurisdiction thereof, any other court in the State of Delaware with subject matter jurisdiction, (ii) irrevocably submits to the exclusive jurisdiction of such courts in connection with any such claim, suit, action or proceeding, (iii) irrevocably agrees not to, and waives any right to, assert in any such claim, suit, action or proceeding that (A) it is not personally subject to the jurisdiction of such courts or any other court to which proceedings in such courts may be appealed, (B) such claim, suit, action or proceeding is brought in an inconvenient forum, or (C) the venue of such claim, suit, action or proceeding is improper, (iv) expressly waives any requirement for the posting of a bond by a party bringing such claim, suit, action or proceeding, and (v) consents to process being served in any such claim, suit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address set forth in the books and records of the Trust, and agrees that such service shall constitute good and sufficient service of process and notice thereof; provided, nothing in clause (v) hereof shall affect or limit any right to serve process in any other manner permitted by law.

22.     Application to Successors.  This Trust Agreement shall extend to and be binding upon the successors, executors, administrators and assigns of each of the Sponsor, the Delaware Trustee and the Administrator.

23.     Transfer of Beneficial Ownership.   Beacon Mountain LLC shall be the sole beneficial owner of the Trust to the extent provided herein and the interests of Beacon Mountain LLC hereunder shall not be represented by a certificate.  To the fullest extent permitted by law, the beneficial interest of Beacon Mountain LLC in the Trust may not be offered, sold, transferred, pledged, hypothecated or otherwise disposed of.

[SIGNATURE PAGE FOLLOWS]

10

001663

HCMLPHMIT00004112

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By:_____
    Name:    John Honis
    Title:    President

JOHN HONIS, as Administrator

_____
                    1-11-16

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By:_____
    Name:
    Title:

11

001664

HCMLPHMIT00004113

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By:_____
    Name:    John Honis
    Title:    President

JOHN HONIS, as Administrator

_____

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By:_____
    Name:
    Title:    Jennifer A. Luce
             Vice President

11

001665
HCMLPHMIT00004114

**EXHIBIT 71**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION

                                    )   Case No. 19-34054-sgj-11
       In Re:                       )   Chapter 11
                                    )
       HIGHLAND CAPITAL             )   Dallas, Texas
       MANAGEMENT, L.P.,            )   Tuesday, June 8, 2021
                                    )   9:30 a.m. Docket
              Debtor.               )
                                    )   - SHOW CAUSE HEARING (2255)
                                    )   - MOTION TO MODIFY ORDER
                                    )     AUTHORIZING RETENTION OF
                                    )     JAMES SEERY (2248)
                                    )   - MOTION FOR ORDER FURTHER
                                    )     EXTENDING THE PERIOD WITHIN
                                    )     WHICH DEBTOR MAY REMOVE
                                    )     ACTIONS (2304)
       _____)
```

                          TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                     UNITED STATES BANKRUPTCY JUDGE.

       APPEARANCES:

       For the Debtor:          Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
                                10100 Santa Monica Blvd.,
                                 13th Floor
                                Los Angeles, CA  90067-4003
                                (310) 277-6910

       For the Debtor:          John A. Morris
                                Gregory V. Demo
                                PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
                                (212) 561-7700

       For the Debtor:          Zachery Z. Annable
                                HAYWARD & ASSOCIATES, PLLC
                                10501 N. Central Expressway,
                                 Suite 106
                                Dallas, TX  75231
                                (972) 755-7104

001667

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-71   Filed 09/09/25   Page 60 of 262   PageID 2805

2

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,      Mazin A. Sbaiti
     CLO Holdco, Show Cause       Jonathan E. Bridges
 3   Respondents, Movants,        SBAITI & COMPANY, PLLC
     and Sbaiti & Company:        Chase Tower
 4                                2200 Ross Avenue, Suite 4900W
                                  Dallas, TX  75201
 5                                (214) 432-2899

 6   For Mark Patrick:            Louis M. Phillips
                                  KELLY, HART & HALLMAN, LLP
 7                                301 Main Street, Suite 1600
                                  Baton Rouge, LA 70801
 8                                (225) 338-5308

 9   For Mark Patrick:            Michael D. Anderson
                                  KELLY, HART & HALLMAN, LLP
10                                201 Main Street, Suite 2500
                                  Fort Worth, TX  76102
11                                (817) 332-2500

12   For James Dondero:           Clay M. Taylor
                                  Will Howell
13                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
14                                420 Throckmorton Street,
                                    Suite 1000
15                                Fort Worth, TX  76102
                                  (817) 405-6900
16
     For the Official Committee   Matthew A. Clemente
17   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
18                                Chicago, IL  60603
                                  (312) 853-7539
19
     For the Official Committee   Paige Holden Montgomery
20   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
21                                Dallas, TX  75201
                                  (214) 981-3300
22
     Recorded by:                 Michael F. Edmond, Sr.
23                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
24                                Dallas, TX  75242
                                  (214) 753-2062
25
```

001668

HCMLPHMIT00002717

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 6-1    Filed 09/09/25    Page 61 of 262    PageID 2806

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.
25

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 6-71    Filed 09/09/29    Page 62 of 262    PageID 2807

4

|  | DALLAS, TEXAS - JUNE 8, 2021 - 9:30 A.M. |
|---|---|
| 1 | |
| 2 | THE COURT:  All right.  We have settings in Highland |
| 3 | this morning.  We have three settings.  We have the show cause |
| 4 | hearing with regard to a lawsuit filed in the District Court. |
| 5 | We have a couple of more, I would say, ministerial matters, |
| 6 | although I think we do have objections.  I know we have |
| 7 | objections.  We have a motion to extend the removal period in |
| 8 | this case as well as a motion to modify the order authorizing |
| 9 | Mr. Seery's retention. |
| 10 | So let's go ahead and start out by getting appearances |
| 11 | from the lawyers who are participating today.  I'll get those |
| 12 | now. |
| 13 | MR. MORRIS:  Good morning, Your Honor. |
| 14 | THE COURT:  Good morning. |
| 15 | MR. MORRIS:  John Morris from Pachulski, Stang, Ziehl |
| 16 | & Jones for the Debtor.  I'm joined with me this morning by my |
| 17 | colleagues, Jeffrey Pomerantz, Greg Demo, and Zachery Annable. |
| 18 | THE COURT:  Okay. |
| 19 | MR. MORRIS:  We do have a proposal on how to proceed |
| 20 | today, a substantial portion of which is in agreement with the |
| 21 | Respondents. |
| 22 | THE COURT:  Okay. |
| 23 | MR. MORRIS:  So, at the appropriate time, I'd be |
| 24 | happy to present that to the Court. |
| 25 | THE COURT:  All right.  Well, let's get all the |

HCMLPHMIT00002719

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 31-71   Filed 06/20/25   Page 63 of 262   PageID 2808

5

1    appearances and then I'll hear from you on that.

2              MR. SBAITI:  Your Honor, my name is -- would you like

3    me to approach, Your Honor?

4              THE COURT:  Yes, please.

5              MR. SBAITI:  It's my first time appearing in

6    Bankruptcy Court, Your Honor.  My name is Mazin Sbaiti.  I'm

7    here on behalf of the charitable DAF Fund, CLO Holdco, and the

8    Respondents to the show cause hearing.  We are also

9    representing them as the Movants on the motion to modify the

10   Court's order appointing Mr. Seery.

11             THE COURT:  All right.  Thank you.

12             MR. BRIDGES:  Jonathan Bridges, Your Honor, with Mr.

13   Sbaiti, also representing the Charitable DAF and CLO Holdco,

14   as well as our firm that is named in the show cause order.

15             THE COURT:  Okay.

16             MR. BRIDGES:  Thank you, Your Honor.

17             THE COURT:  Thank you.

18             MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

19   Phillips from Kelly Hart Hallman here on behalf of Mark

20   Patrick in the show cause matter.  I'm joined with my

21   colleague Michael Anderson from the Kelly Hart firm here in

22   Fort Worth.  And that's the matter that we're involved in, the

23   show cause auction.

24             THE COURT:  All right.  Thank you, Mr. Phillips.

25             MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

HCMLPHMIT00002720

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 6-71 Filed 07/09/25    Page 64 of 262    PageID 2809
Exhibit 71   Page 70 of 299

6

1    of Bonds Ellis Eppich Schafer Jones here on behalf of Jim

2    Dondero.  I have Mr. Will Howell here with me from my firm.

3             THE COURT:  All right.  Thank you.

4             MR. CLEMENTE:  Good morning, Your Honor.  Matthew

5    Clemente from Sidley Austin on behalf of the Committee.  I'm

6    here with my partner, Paige Montgomery.

7             THE COURT:  Okay.  Thank you.

8             MR. CLEMENTE:  Good morning.

9             THE COURT:  All right.  Just to remind people, we do

10   have participants on the WebEx, but in setting the hearing I

11   made clear that participants today needed to be here live in

12   the courtroom.  So the WebEx participants are going to be only

13   observers.

14      We have a camera on the screen here that is poised to

15   capture both the lawyer podium as well as the witness box, and

16   then another camera on the bench.

17      So, please be mindful.  We want the lawyers to speak from

18   the podium so that they are captured and heard by the WebEx.

19   And so hopefully we don't have any cords you will trip over.

20   We've worked hard to make it easy to maneuver around the

21   courtroom.

22      All right.  So, Mr. Morris, you had a proposal on how we

23   would approach this today?

24             MR. MORRIS:  I do, Your Honor.  And it's rather

25   brief, but I think it makes a lot of sense.

001672

HCMLPHMIT00002721

7

1    There are three motions on the calendar for today, --

2              THE COURT:  Uh-huh.

3              MR. MORRIS:  -- only one of which required the

4    personal appearance of certain parties.

5              THE COURT:  Uh-huh.

6              MR. MORRIS:  And for that reason, and because,

7    frankly, it was the first of the three motions filed, we

8    believe that that ought to go first.

9              THE COURT:  Okay.

10             MR. MORRIS:  And then it can be followed by the

11   motion for reconsideration of the July order, assuming time

12   permits, and then the motion to extend the removal deadline.

13       And with respect to the contempt motion, Your Honor, the

14   parties have agreed that each side shall have a maximum of

15   three hours to make opening statements, closing arguments,

16   direct and cross-examination of witnesses.

17       You know, I did point out to them that from time to time

18   Your Honor has used the Court's discretion to adjust the time

19   --

20             THE COURT:  Uh-huh.

21             MR. MORRIS:  -- if the Court is making inquiries, and

22   I guess we'll deal with that matter as it comes.  But as a

23   general matter, that is what we've agreed to.  And I would

24   propose that, unless anybody has any objections, that we just

25   proceed on that basis.

HCMLPHMIT00002722

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 6-71    Filed 09/09/25    Page 66 of 262    PageID 2811

8

1              THE COURT:  Okay.

2              MR. MORRIS:  And I could -- I could go right forward.

3              THE COURT:  So, three hours in the aggregate?

4              MR. MORRIS:  Uh-huh.

5              THE COURT:  It doesn't matter how people spend it --

6    with argument, examination, cross -- three hours in the

7    aggregate?

8              MR. MORRIS:  Correct.

9              THE COURT:  Okay.  So, Nate, you'll be the timer on

10   that.

11             MR. MORRIS:  Yeah.  We thought it was very important

12   to get this done today, with people coming in from out of

13   town.

14             THE COURT:  Okay.  Sounds fine.

15             MR. MORRIS:  So does the Court want to inquire if

16   anybody has any questions or comments?

17             THE COURT:  I do.  Well, I see Mr. Bridges getting

18   up.  You confirm that that's agreeable?

19             MR. BRIDGES:  Thank you, Your Honor.  Yes, that's

20   agreeable.  We have one slight difference in our proposal.  We

21   would suggest to Your Honor that the motion for modification,

22   if Your Honor decides our way, would moot the entire motion

23   for contempt.  And we'd suggest, if that possibility is

24   realistic, that we would go first with that motion, perhaps

25   obviate having to have the evidence presented and the lengthy

001674

HCMLPHMIT00002723

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 09/09/29   Page 67 of 262   PageID 2812

9

1   hearing.

2       The motion for modification, Your Honor, asks the Court to

3   reconsider -- to modify that order because of jurisdictional

4   and other shortcomings in it that make the order

5   unenforceable.  And because that's the order that is the

6   subject of the contempt motion, we'd ask Your Honor to

7   consider putting that motion first.

8           THE COURT:  Okay.  Or second?  Ahead of the contempt

9   matter?

10          MR. BRIDGES:  Ahead of the contempt matter, --

11          THE COURT:  Uh-huh.

12          MR. BRIDGES:  -- because it has a possibility --

13          THE COURT:  We have the removal matter, which I think

14  is the shortest.  All right.

15          MR. BRIDGES:  No objection to that, Your Honor.

16  That's correct.

17          THE COURT:  Okay.  So, Mr. Morris, that's fine by

18  you?

19          MR. MORRIS:  Your Honor, that doesn't make a lot of

20  sense to us.  We don't believe there's any basis for the Court

21  to reconsider, modify, or amend in any way the July order.

22  But even if we were wrong about that, that would not

23  retroactively validate conduct which was otherwise wrongful at

24  the time it was committed.

25      The contempt motion needs to go first.  The other motion

001675

HCMLPHMIT00002724

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K     Document 84-71   Filed 01/00/299   Page 68 of 262     PageID 2813
Exhibit 71     Page 100 of 299

10

1   will have no impact on whether or not there is a finding of

2   contempt of court.

3            THE COURT:  All right.  And update me on this.  There

4   was something filed yesterday, a notice of a proposed form of

5   order that the Debtor had proposed, that I think was not

6   agreed to, where there would be a change about any action that

7   goes forward, the cause of action would be in the sole

8   jurisdiction of the Court, and you all agreed to change that

9   part of the order, correct?

10            MR. MORRIS:  So, just as a division of labor for Your

11   Honor, I'm doing the contempt motion.

12            THE COURT:  Okay.  That's Mr. Pomerantz's?

13            MR. MORRIS:  Mr. Pomerantz is going to take care of

14   that.

15            MR. POMERANTZ:  Yes, Your Honor.  Good morning.  Good

16   to see you again.

17            THE COURT:  Good to see you.

18            MR. POMERANTZ:  Yes, Your Honor, that's correct.  If

19   Your Honor recalls, there's really three aspects of the

20   January 9th and the July 16th order.  First, requiring people

21   to come to Bankruptcy Court before commencing or pursuing an

22   action.  Second, for the Bankruptcy Court to have the sole and

23   exclusive authority to determine whether the claim is a

24   colorable claim of willful negligence or gross misconduct.

25   And then third, if Your Honor passed the claim through the

001676

HCMLPHMIT00002725

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 09/20/299    Page 69 of 262    PageID 2814

11

1    gate, whether you would have jurisdiction.

2        In Your Honor's January 9th and July 16th orders, you said

3    you would have exclusive jurisdiction.  In the motion for

4    reconsideration, and particularly the reply, Movants said, if

5    you just change that and say that if passes through the gate

6    that you'd have jurisdiction only to the extent you would

7    otherwise have it, that would resolve the motion, in the same

8    way that the plan of reorganization was amended.

9        We proposed that.  They rejected it.  We put it before

10   Your Honor.  So we believe that it moots out a good portion --

11   actually, we think it should moot out the entire motion.  They

12   obviously disagree.  But we definitely agree it moots out the

13   most significant portion of their motion, which is that Your

14   Honor would take jurisdiction to adjudicate a matter on an

15   exclusive basis when you might not otherwise have jurisdiction

16   on an exclusive basis.

17            THE COURT:  Okay.  Well, --

18            MR. BRIDGES:  Your Honor, may I respond to that?

19            THE COURT:  You may.  And --

20            MR. BRIDGES:  Thank you, Your Honor.

21            THE COURT:  -- why -- could you clarify why you think

22   it would moot out the entire show cause matter?  I wouldn't be

23   retroactively changing my order.  Is that what you're

24   proposing?

25            MR. BRIDGES:  Your Honor, with all respect, we

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 34-71    Filed 09/30/25    Page 70 of 262    PageID 2815
Exhibit 71    Page 70 of 299

12

```
 1   believe the order is defective and unenforceable and has to be

 2   modified in order to fix it.  And because of the defects,

 3   we're -- we're actually arguing, Your Honor, that it is

 4   unenforceable in a contempt proceeding.  That is exactly what

 5   our argument is.

 6          THE COURT:  Okay.  I think I'm getting way farther

 7   down this road than maybe I want to right now.  But I guess

 8   here's the elephant in the room, I feel like:  Republic Supply

 9   versus Shoaf.

10          MR. BRIDGES:  Uh-huh.

11          THE COURT:  The U.S. Supreme Court Espinosa case, for

12   that matter.  If I accept your argument that maybe there was a

13   flaw in those orders, that maybe they went too far, don't you

14   have a problem with those two cases?

15          MR. BRIDGES:  Your --

16          THE COURT:  The orders weren't appealed.

17          MR. BRIDGES:  I understand completely, Your Honor.

18          THE COURT:  Uh-huh.

19          MR. BRIDGES:  And I think the answer is no because of

20   the Applewood case from the Fifth Circuit.  The Applewood case

21   cited in our reply brief explains that in order for an order,

22   a final order of the Bankruptcy Court to have exculpatory

23   effect, in order for it to release claims, for example, that

24   the claims at issue must be enumerated in the order.  It's not

25   enough to have a blanket statement like the order, the July
```

HCMLPHMIT00002727

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 34-71   Filed 06/09/25   Page 71 of 262    PageID 2816

13

```
 1    order has, like the January order has, saying that Mr. Seery's
 2    claims -- claims cannot be brought against him for ordinary
 3    negligence at all.  The -- Your Honor, we're delving into my
 4    argument.
 5              THE COURT:  Okay.
 6              MR. BRIDGES:  And I was hoping to do this on a
 7    preliminary basis.
 8              THE COURT:  Right.
 9              MR. BRIDGES:  I don't mean to bog you down with that.
10    But Your Honor, no, mandatory authority from the Fifth Circuit
11    after Shoaf limits Shoaf's application and says that it does
12    not extinguish the claims that are not specifically enumerated
13    in the order.  And the reason for that is because it doesn't
14    give the kind of notice to the parties that they would need to
15    make an appearance and object to those orders at the time.  It
16    actually helps to stem the amount of litigation at the time
17    rather than to encourage it.
18              THE COURT:  All right.  Well, you'll get your
19    opportunity to make your full argument on this.  But I'm not
20    convinced, preliminarily, at least, to affect my decision on
21    the sequence, okay?  So even if it potentially wastes time
22    under your view of the law, I am going to do the removal
23    matter first -- the extension of time request, I should say --
24    and then the show cause and then the motion to modify.  And I
25    realize, those last two matters, everything is kind of
```

001679

HCMLPHMIT00002728

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-71   Filed 05/09/25   Page 72 of 262   PageID 2817

14

```
 1   interrelated.  All right?

 2          MR. BRIDGES:  Yes, Your Honor.

 3          THE COURT:  All right.  So, with that decided, is

 4   there a desire on the part of the lawyers to make opening

 5   statements, or shall we just go to the motions?  And, of

 6   course, people can use their three hours for oral argument,

 7   however much they want to use for oral argument.

 8          MR. MORRIS:  Your Honor, the -- to be clear, the six-

 9   hour time limit only applies to the contempt proceeding.

10          THE COURT:  Oh, yes.  Yes.  Uh-huh.

11          MR. MORRIS:  And I do want to make an opening

12   statement.

13          THE COURT:  Okay.

14          MR. MORRIS:  So, as the Movant, I'd like to go first.

15          THE COURT:  You want to make opening statements?

16          MR. BRIDGES:  Yes.  Yes, Your Honor.

17          THE COURT:  Okay.  Okay.

18          MR. BRIDGES:  I believe we've got a PowerPoint

19   prepared that I think can lay out our side of it.

20          THE COURT:  Okay.

21          MR. BRIDGES:  I don't think we're participating in

22   the motion to extend the removal time.

23          THE COURT:  Okay.

24          MR. BRIDGES:  That's going first.

25          THE COURT:  All right.
```

HCMLPHMIT00002729

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 34-71    Filed 06/06/25    Page 73 of 262    PageID 2818

15

1          MR. BRIDGES:  So we'll wait until that is --

2          THE COURT:  Well, so we don't get confused on the

3     timing, let's just do the motion to extend right now.  And I

4     think we only had one objection.  As Mr. Sbaiti just pointed

5     out, they're not objecting on that one.  We have a Dondero

6     objection.  So let's, without starting the timer, hear that

7     one.  Okay?

8          MR. DEMO:  Good morning, Your Honor.  Greg Demo;

9     Pachulski, Stang, Ziehl & Jones.

10          THE COURT:  Good morning.

11          MR. DEMO:  I'll be arguing the removal motion and

12     then turn it over.

13      It's fairly basic and straightforward, Your Honor.  We're

14     asking for a further extension of the statutory deadline to

15     remove cases until December 14th, 2021.  The deadline is

16     procedural only.  As Your Honor is well aware, there's a lot

17     of moving parts in this case.  You know, we don't know to this

18     date, really, the full universe of what could actually be out

19     there.  So we're just asking for a short extension of the

20     removal period to cover through December.

21      I know that there was an objection from Mr. Dondero.  I

22     know that he argues that 9006 does not allow us to extend that

23     deadline past the effective date of the plan, and he cites one

24     case for that purpose, which is *Health Support*.  I think it's

25     out of Florida.  That case dealt with the extension of the

HCMLPHMIT00002730

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 09/00/299    Page 74 of 262    PageID 2819

16

1    two-year extension of the statute of limitations and was very

2    clear that you can't use 9 --

3                THE COURT:  You mean the 546 deadline?

4                MR. BRIDGES:  Yes.  Yes.

5                THE COURT:  Okay.

6                MR. BRIDGES:  That you can't use 9006 to extend non-

7    bankruptcy deadlines.  That's not what we're doing here, Your

8    Honor.  We're using 9006 to extend the bankruptcy deadline to

9    remove the cases.

10               THE COURT:  Uh-huh.

11               MR. DEMO:  And we'd just ask Your Honor for the

12   extension through December.

13               THE COURT:  Okay.  I'll hear Mr. Dondero's counsel.

14               MR. HOWELL:  Good morning, Judge.  Will Howell for

15   Mr. Dondero.

16       So, the argument here is not that the Court can't do this.

17   I was just pointing that there is an outside limit to what

18   we're doing.  And so if you look at the cases that the Debtor

19   cites in support of this motion, the one that is most apt was

20   when Judge Nelms did a fourth extension of time.  But those

21   were all 90-day extensions.  Here, we're in a situation where

22   the Debtor is asking for a fourth 180-day extension of time,

23   and this is really where the, you know, objection came -- or,

24   the response in opposition came from.  They specifically asked

25   that it be without prejudice to further extensions.

HCMLPHMIT00002731

```
 1        And so, at some point, you know, does 9006 have an outside
 2   limit?  You know, do we need to see some sort of a light at
 3   the end of the tunnel here?
 4        So we would ask that the motion, at a minimum, be denied
 5   in part with respect to this open-ended request for extension
 6   beyond two years for a 90-day period.  The other cases that
 7   they cite, they have one extension here, one extension there,
 8   120 days here, but not 180 days after 180 days after 180 days,
 9   and then asking specifically for without prejudice to further
10   extensions beyond two years.  So that's -- that's where this
11   comes from.
12            THE COURT:  All right.  Do you think it matters that
13   this is a very complex case?
14            MR. BRIDGES:  I --
15            THE COURT:  There's litigation here, there, and
16   everywhere.
17            MR. HOWELL:  I also think, you know, *Mirant* was
18   complex.  I think *Pilgrim's Pride* was complex.  I think, you
19   know, it is not out of bounds for the Court to grant a fourth
20   extension.
21            THE COURT:  Uh-huh.
22            MR. BRIDGES:  But to -- you know, at some point --
23   you know, maybe the Court could grant a 90-day extension and
24   make them come back a little more frequently to kind of corral
25   this thing, rather than just saying "This grant of 180 days,
```

001683

HCMLPHMIT00002732

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 09/09/25    Page 76 of 262    PageID 2821

18

1  the fourth time, is going to be without prejudice to further

2  extensions."  It just gets kind of large.

3          THE COURT:  Okay.  Mr. Demo, your motion.  You get

4  the last word.

5          MR. DEMO:  Your Honor, I mean, it is without

6  prejudice for further extensions, but that doesn't mean that

7  Your Honor is granting the further extensions now.  It means

8  we'll have to come back.  We'll have to make our case for why

9  an extension is necessary.  And, you know, if Your Honor

10 doesn't want to give us another extension past December 2021,

11 Your Honor doesn't have to.  This is not an order saying that

12 it's a limitless grant.

13     You know, I'd also ask, you know, quite honestly, why Mr.

14 Dondero has such an issue with this.  He hasn't said that any

15 of these cases involve him.  He hasn't given any reasons why

16 this affects him.  He hasn't given any reason why this damages

17 him at all.  So I do, I guess, wonder as an initial matter

18 kind of why we're here, you know, why we're responding to Mr.

19 Dondero's request, when that request really has no impact on

20 him.

21     And then, Your Honor, to the extent that you are inclined

22 to limit this, I would say, you know, we would ask for a

23 reasonable extension of time.  We do think an extension of

24 time, because of the complexity of this case, through December

25 is warranted.  But if Your Honor for some reason does agree

HCMLPHMIT00002733

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 02/06/25    Page 77 of 262    PageID 2822

19

1    that a shorter extension is necessary under 9006 -- I don't

2    think it is -- we'd just ask that Your Honor grant us leave to

3    come back for further extensions of time.

4              THE COURT:  Okay.  All right.  I will -- I'll grant a

5    90-day extension, without prejudice for further extensions.

6              MR. DEMO:  Thank you, Your Honor.

7              THE COURT:  Maybe in 90 days we'll be farther down

8    the road and we won't need any more extensions, but you'll

9    have the ability to argue for more if you think it's really

10   necessary.  All right.  So that will bring us to around

11   September 14th, I guess.

12      All right.  Well, let's go ahead and hear opening

13   statements with regard to the show cause matter.  And again,

14   if you want to roll in arguments about the -- well, no, you

15   said the six hours only applies to show cause, so we'll not

16   hear opening statements with regard to the Seery retention

17   modification, just show cause.

18             MR. MORRIS:  All right.  Before I begin, Your Honor,

19   I have a small deck to guide --

20             THE COURT:  Okay.

21             MR. MORRIS:  -- to guide my opening statement.

22             THE COURT:  All right.

23             MR. MORRIS:  Can I approach the bench?

24             THE COURT:  You may.  And is your legal assistant

25   going to share her content --

HCMLPHMIT00002734

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 34-71    Filed 02/00/25    Page 78 of 262    PageID 2823

20

```
 1              MR. MORRIS:  Yes.

 2              THE COURT:  -- so people on the WebEx will see?

 3    Okay.

 4              MR. MORRIS:  That's the intention, Your Honor.

 5              THE COURT:  Okay.

 6              MR. MORRIS:  All right.  Are you ready for me to

 7    proceed?

 8              THE COURT:  I am.  And obviously, everyone has a

 9    copy?

10              MR. MORRIS:  Yes.

11              THE COURT:  Your opponents have a copy of this?

12              MR. MORRIS:  Yep.

13              THE COURT:  Okay.  Although we hope to see it on the

14    screen.

15              OPENING STATEMENT ON BEHALF OF THE DEBTOR

16              MR. MORRIS:  Good morning, Your Honor.  John Morris;

17    Pachulski, Stang, Ziehl & Jones; for the Debtor.

18        We're here today on the Debtor's motion to hold certain

19    entities and individuals in contempt of court for violating a

20    very clear and specific court order.  I hope to be relatively

21    brief in my opening here, Your Honor, and I'd like to begin

22    where I think we must, and that is, how do we -- how do we

23    prove this and what do we have to prove?

24        The elements of a claim for contempt of court are really

25    rather straightforward.  The Movant must establish by clear
```

HCMLPHMIT00002735

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-71   Filed 02/20/299   Page 79 of 262   PageID 2824

21

```
 1   and convincing evidence three things.

 2           THE COURT:  Let me stop you and stop the clock.

 3   We're not seeing the shared content.

 4           MR. MORRIS:  Uh-huh.

 5           THE COURT:  Did you want her to go ahead and share

 6   her content?

 7           MR. MORRIS:  I did.

 8           THE COURT:  Okay.

 9           MR. MORRIS:  I was hoping that she'd do that.

10           THE COURT:  All right.  It says it's receiving

11   content.

12           MR. MORRIS:  There we go.  It's on my screen, anyway.

13           THE COURT:  Oh, here it is.  I don't know why it's

14   not on my Polycom.  Can you all see it out there?

15       (Chorus of affirmative replies.)

16           THE COURT:  Okay.  Very good.

17           MR. MORRIS:  Okay.

18           THE COURT:  You may proceed.

19           MR. MORRIS:  Thank you, Your Honor.

20       So, there's three elements to the cause of action for

21   contempt, for civil contempt.  We have to prove by clear and

22   convincing evidence that a court order was in effect; that the

23   order required certain conduct by the Respondents; and that

24   the Respondent failed to comply with the Court's order.

25       We've cited in the footnote the applicable case law from
```

001687

HCMLPHMIT00002736

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 08/06/25    Page 80 of 262    PageID 2825

22

1  the Fifth Circuit, and I don't believe that there's any

2  dispute that is indeed the legal standard.

3       The intent of the Respondents as to liability is

4  completely irrelevant.  It doesn't matter if they thought they

5  were doing the right thing.  It doesn't matter if they

6  believed in their heart of hearts that the court order was

7  invalid.  These are the three elements, and we will be able to

8  establish these elements not by clear and convincing evidence,

9  but if we ever had to, beyond reasonable doubt.

10       If we can go to the next slide, please.

11       We begin with the Court's order, the Court's July 9 order.

12  And that order states very clearly what conduct was required.

13  And the conduct that was required was that no entity could

14  commence or pursue -- those are really the magic words --

15  commence or pursue a claim against Mr. Seery without the

16  Bankruptcy Court doing certain things.  And we've referred to

17  this as the gatekeeper.  And the only question I believe the

18  Court has to ask today is whether the Respondents commenced or

19  pursued a claim against Mr. Seery without seeking Bankruptcy

20  Court approval, as set forth in this order.

21       I'll dispute that there's anything ambiguous about this.

22  I'll dispute that it could not be clearer what conduct was

23  prohibited.  It could not be clearer.  The only question is

24  whether the conduct constitutes the pursuit of a claim.

25       Let's see what they did.  If we could go to the next

001688

HCMLPHMIT00002737

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-71   Exhibit 71   Filed 02/06/25   Page 240 of 299   Page 81 of 262   PageID 2826

23

1   slide.  There will be no dispute about what they did.  And

2   what they did is, a week after filing a lawsuit against the

3   Debtor and two others arising out of the HarbourVest

4   settlement, a settlement that this Court approved, after

5   notice and a hearing and participation by the Respondents,

6   after they had the opportunity to take discovery, after they

7   had the opportunity to examine Mr. Seery about the value of

8   HarbourVest's interest in HCLOF, after all of that, they

9   brought a lawsuit after Mr. Patrick took control of the DAF

10  and CLO Holdco.  And that lawsuit related to nothing but the

11  HarbourVest suit, and it named in Paragraph 2, right up above,

12  Mr. Seery as a potential party.  And a week later, Your Honor,

13  they filed what we call the Seery Motion, and it was a motion

14  for leave to amend their complaint to add Mr. Seery as a

15  defendant.

16      We believe that that clearly violates the Court's July 7

17  order.  And indeed, again, these are facts.  They're not --

18  they're not in dispute.  Just look at the first sentence of

19  their motion.  The purpose of the motion was to name James

20  Seery as a defendant.  That was the purpose of the motion.

21  And the way that they made the motion, Your Honor -- and these

22  are undisputed facts -- the way they made the motion, Your

23  Honor, shows contemptuous intent.  We don't have to prove

24  intent, but I think it might be relevant when you get to

25  remedies.  Okay?

001689

HCMLPHMIT00002738

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 06/25/29   Page 82 of 262   PageID 2827
Exhibit 71   Page 25 of 299

24

```
 1      And so how do I -- why do I say that?  Because they made
 2   this motion, Your Honor, and they didn't have to.  Everybody
 3   knows that under Rule 15 they could have amended the complaint
 4   if they wanted to.  If they wanted to, they didn't need the
 5   Court's permission.  What they wanted to do was try to get the
 6   District Court to do what they knew they couldn't.  And that's
 7   contemptuous.
 8      And they did it, Your Honor, without notice to the Debtor.
 9   Even after the Debtor had accepted service of the complaint,
10   even after we told them, if you go down this path, we're going
11   to file a motion for contempt, they did it anyway.  They
12   didn't serve the Debtor.  They didn't give the Debtor a
13   courtesy copy.  They didn't notify the Debtor.  The only thing
14   that happened was the next day, when the District Court
15   dismissed it without prejudice, they sent us a copy of that
16   notice.  And within three days, we were here.
17      A court order was in effect.  Mr. Patrick is going to
18   admit to that.  There's not going to be any dispute about
19   that.  The order required that the Respondents come to this
20   Court before they pursue a claim against Mr. Seery, and they
21   failed to comply with that order.  The facts, again -- if we
22   can go to the next slide.  We can look at some of the detail,
23   because the timeline is mindboggling.
24      Mr. Patrick became the Plaintiffs' authorized
25   representative on March 24th.  And folks, when I took their
```

HCMLPHMIT00002739

1    depositions, weren't specific about dates, and that's why some

2    of the entries here refer to sometime after, but there's no

3    question that the order of events is as presented here and as

4    the evidence will show today.

5        The evidence will show that sometime after Patrick became

6    the Plaintiffs' authorized representative, Mr. Dondero

7    informed Mr. Patrick that Highland had usurped an investment

8    opportunity from the Plaintiffs.  Mr. Patrick is going to

9    testify to that.  Mr. Patrick is also going to testify that,

10   without prompting, without making a request, D.C. Sauter, the

11   general counsel of NexPoint Advisors, recommended the Sbaiti

12   firm to Mr. Patrick.  Mr. Patrick considered nobody else.

13       Mr. Patrick retained the Sbaiti firm in April.  In other

14   words, within 12 days of the filing of the complaint.  They're

15   retained and they conduct an investigation.  You're going to

16   hear the assertion of the attorney-client and the common

17   interest privilege every time I ask Mr. Dondero what he and

18   Mr. Sbaiti talked about and whether they talked about naming

19   Jim Seery as a defendant.  But with Patrick's authorization,

20   the Sbaiti firm filed the complaint on April 12th, just days

21   after they were retained.

22       It's like a -- it's an enormous complaint.  I don't know

23   how they did that so quickly.  But in any event, the important

24   point is that they all worked together.  None of this happened

25   until Mr. Patrick became the authorized representative.

HCMLPHMIT00002740

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-01876-K Document 84-71 Filed 07/09/25 Page 84 of 262 PageID 2829
Exhibit 71 Page 270 of 299

26

```
 1        Mr. Patrick is going to tell you, Your Honor, he's going
 2   to tell you that he had no knowledge of any wrongdoing by Mr.
 3   Seery prior to the time he assumed the rein of the DAF and the
 4   CLO Holdco.  He had no knowledge, Your Honor, of any claims
 5   that the DAF and CLO Holdco had against the Debtor until he
 6   became the Plaintiffs' authorized representative and Mr.
 7   Dondero spoke to him.
 8        If we can flip to the next page.  Mr. Dondero has
 9   effective control of the DAF.  He has effective control of CLO
10   Holdco. You're going to be bombarded with corporate documents
11   today, because they're going to show you -- and they want you
12   to respect the corporate form, they really want you to follow
13   the rules and respect the corporate form, because only Mr.
14   Scott was responsible for the DAF and CLO Holdco until he
15   handed the reins on March 24th to Mr. Patrick.  Mr. Dondero
16   has nothing to do with this.  He's going to tell you.  He's
17   going to tell you he had nothing to do with the selection of
18   Mr. Patrick as Mr. Scott's replacement.
19        The facts are going to show otherwise, Your Honor.  The
20   DAF is a $200 million charitable organization that is funded
21   almost exclusively with assets derived from Highland or Mr.
22   Dondero or the Get Good Trust or the Dugaboy Trust.  The
23   evidence is going to show that at all times these entities had
24   shared services agreements and investment advisory agreements
25   with HCMLP.  The evidence will show that HCMLP at all times
```

HCMLPHMIT00002741

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 08/08/25    Page 85 of 262    PageID 2830

27

1    was controlled by Mr. Dondero.

2        And it made sense.  The guy put in an awful lot of money

3    for charitable usage.  Is he really just going to say, I don't

4    really care who runs it?  The evidence is going to show that

5    between October 2020 and January 2021, Grant Scott actually

6    exercised independence.  Grant Scott was Mr. Dondero's

7    childhood friend.  They went to UVA together.  They were

8    roommates.  Mr. Scott was the best man at Mr. Dondero's

9    wedding.  But we were now in bankruptcy court.  We're now in

10    the fishbowl.  And I will -- this may be a little argument,

11    but there's no disputing the facts that Mr. Scott acted

12    independently, and he paid the price for it.  Mr. Scott did it

13    three times.

14        He did it when he amended CLO Holdco's proof of claim to

15    take it down to zero.  He did it again after he withdrew the

16    objection to the HarbourVest settlement motion.  And he did it

17    again when he settled the lawsuit that the Debtors had brought

18    against CLO Holdco.  And that -- and on each of those three

19    occasions, the evidence will show that Mr. Scott did not

20    communicate with Mr. Dondero in advance, that Mr. Dondero

21    found out about these acts of independence after the fact, and

22    that each time he found out about it he had a little

23    conversation with Mr. Scott.

24        Mr. Dondero is going to tell you about it, and he's going

25    to tell you that he told Mr. Scott each act was inappropriate.

001693

HCMLPHMIT00002742

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 14-71   Filed 07/09/25   Page 86 of 262   PageID 2831
Exhibit 71   Page 290 of 299

28

1  You may have heard that word before.  Each act was not in the

2  best interests of the DAF.

3      The last of those conversations happened either on or just

4  after January 26th.  And by January 31st, Mr. Scott gave

5  notice of his resignation.  And you're going to see that

6  notice of resignation.  And he asks for releases.

7      Mr. Patrick becomes, almost two months later, the

8  successor to Mr. Scott.  Mr. Dondero is going to say he has no

9  idea how that happened.  He was just told after the fact that

10  Mr. Patrick and Mr. Scott had an agreement.  He's going to

11  tell you they had an agreement and he just heard about it

12  afterwards.  He didn't really -- for two months, I guess, he

13  sat there after Mr. Scott told him that he wanted out and did

14  nothing to try to find out who's going to take control of my

15  charitable foundation with $200 million.  He wasn't

16  interested.

17      But here's the thing, Your Honor.  If we go to the next

18  slide.  Let's see what Mr. Scott said at his deposition last

19  week.  Question, "Do you know who selected Mark?"  Answer, "I

20  do not."  Question, "Do you know how Mark was selected?"  Mark

21  is a reference to Mark Patrick.  "I do not."  "Did you ever

22  ask Mark how he was selected?"  "I did not."  "Did you ever

23  ask Mark who selected him?"  "I did not."  "Did you ever ask

24  anybody at any time how Mr. Patrick was selected to succeed

25  you?"  "No, I did not."  "Did you ever ask anybody at any time

001694

HCMLPHMIT00002743

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 14-71   Filed 09/09/25   Page 87 of 262   PageID 2832
Exhibit 71   Page 300 of 299

29

1   as to who made the decision to select Mr. Patrick to succeed

2   you?"  "No, I did not."

3       So I don't know what happened between Mr. Patrick and Mr.

4   Dondero when Mr. Patrick supposedly told Mr. Dondero that

5   there was an agreement with Mr. Scott, but that is news to Mr.

6   Scott.  He had no idea.

7       Your Honor, we are going to prove by clear and convincing

8   evidence that each of the Respondents violated a very clear

9   and specific court order.  And unless the Court has any other

10  questions, I'll stop for now.

11              THE COURT:  No questions.

12              MR. MORRIS:  Thank you, Your Honor.

13              THE COURT:  All right.  Who is making the argument

14  for the Respondents?

15              MR. SBAITI:  Your Honor, I am.  I'm just trying to

16  put the PowerPoint up on the WebEx.

17              THE COURT:  Okay.

18              MR. SBAITI:  Sorry about that.

19              MR. MORRIS:  Your Honor, I'll try not to make this a

20  practice, but can I inquire as to how much time I used?

21              THE COURT:  Oh.  Nate?

22              THE CLERK:  About thirteen minutes.

23              THE COURT:  Thirteen minutes?

24              MR. MORRIS:  Thank you very much.

25              THE COURT:  Okay.  All right.

HCMLPHMIT00002744

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-71   Filed 03/10/299   Page 88 of 262    PageID 2833
Exhibit 71   Page 90 of 299

30

1          MR. SBAITI:  Your Honor, our PowerPoint is a little

2     bit longer than that one.  May I approach with a copy?

3          THE COURT:  You may.  Uh-huh.

4       (Pause.)

5          MR. SBAITI:  Your Honor, it does feel good to be back

6     in the courtroom.

7          THE COURT:  Okay.

8          MR. SBAITI:  It's been a long time.

9          THE COURT:  Yes.  For us, too.

10          MR. SBAITI:  Jut wish it wasn't under a circumstance

11    where someone is trying to sanction me.

12        But we're going to be dividing up this oral argument a

13    little bit.  Also, to just kind of break up a little bit of

14    the monotony, because I think we have a lot to cover at the

15    opening stage of this.  And I'll try to be as expeditious as I

16    can be.

17      OPENING STATEMENT ON BEHALF OF THE SHOW CAUSE RESPONDENTS

18          MR. SBAITI:  Your Honor, the thing we -- the thing we

19    open with is the due process issue that we raised in our

20    brief.  And where this really arises from is the Court's show

21    cause order calls us violators before we've had a chance to

22    respond to the allegations and before we've obviously been

23    able to approach this hearing.  And the word violators means

24    something to us, Your Honor, because I've been a lawyer for a

25    long time, my partner has been a lawyer for a long time, our

001696

HCMLPHMIT00002745

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-71   Filed 03/20/29   Page 89 of 262   PageID 2834
Exhibit 71   Page 32 of 299

31

1   clients have never been sanctioned, we've never been

2   sanctioned, and for us to be labeled violators first by

3   counsel and then in a court order makes us wonder whether or

4   not this process is already prejudged or predetermined.

5           THE COURT:  I actually want to address that.  Turn

6   off the clock.

7       Just so you know, I looked this up a while back, because

8   we gave a bankruptcy judges panel at some CLE.  The average

9   bankruptcy judge in our district, back when I looked, signs

10  over 200 orders a week.

11          MR. SBAITI:  Sure.

12          THE COURT:  Many of those -- in fact, most of them --

13  are submitted by lawyers.  So, you know, a big chunk of my

14  week is signing orders.  And I obviously give more scrutiny to

15  those that are substantive in nature.  Okay?  If someone

16  submits to me a 50-page debtor-in-possession financing order,

17  I will look at that much more carefully than what I consider a

18  mere procedural order setting a hearing.

19      So I regret that that word was used, but I can assure you

20  I fairly quickly set that -- signed that, I should say --

21  regarding it as a merely procedural order setting a hearing.

22  Okay?  So it's as simple as that.  There was no hmm, I like

23  that word, violator.  I had a stack, if you will, an

24  electronic stack of probably 200 orders in front of me the day

25  I signed that.  Okay?

001697

HCMLPHMIT00002746

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 08/06/25   Page 90 of 262   PageID 2835
Exhibit 71   Page 90 of 299

32

1        So, if that makes anyone feel any better, I don't know,

2    but that's the reality.

3        Okay.  You can start the clock again.

4            MR. SBAITI:  And I appreciate Your Honor saying that.

5    It does make us feel better, both about where the -- the

6    genesis of the order and the impact and its reflection on what

7    Your Honor thinks in terms of going into this.

8        The other thing that obviously raised concerns, and I

9    assume this comes from the same place, was four days ahead of

10   that order counsel told us the Court was going to order

11   everyone to be in person, and they had advance notice of that,

12   and we weren't sure how they had advance notice of that.  I

13   guess they assumed --

14           THE COURT:  I can assure you right here on the record

15   I never had ex parte communications with any lawyer in this

16   case, on this matter or any other matter.  Okay?  Again, those

17   are pretty strong words to venture out there with, which your

18   pleading did venture out there with those words.

19       My courtroom deputy, Traci, I think answers her phone 24

20   hours a day.  So I'm quite sure she had communications with

21   the lawyers about this, just like she probably had

22   communications with you and your firm and every other firm in

23   this case.  Okay?

24           MR. SBAITI:  Like I said, Your Honor, we appreciated

25   what Your Honor -- appreciate what Your Honor said, but that

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 04/09/25    Page 91 of 262    PageID 2836

33

1  issue obviously stuck out -- stuck out to us, in combination.

2  So I'll move on from that issue.

3      This has to do with the lawsuit that was filed, and the

4  lawsuit, the genesis of the lawsuit, I think it's important to

5  say, because the argument has been raised in the briefing and

6  we wanted to address it upfront, why the lawsuit comes about.

7  And it comes about because of the Advisers Act and the

8  responsibilities that the Debtor has to the assets of the

9  funds that it manages.  And the Advisers Act imposes a duty

10  not only on Highland but obviously on its control people and

11  its supervised people.  And the lawsuit has to do with HCLOF,

12  which is what HarbourVest owned a piece of.  And Highland, as

13  the advisor to HCLOF and the advisor to the DAF, owed

14  fiduciary duties to CLO Holdco, which is the DAF's holding

15  entity of its assets in HCLOF, but Highland Capital was also

16  an advisor, a registered investment advisor to the DAF

17  directly at the time.  And so those federally-imposed

18  fiduciary duties lie at the crux of that lawsuit.

19      Moving on, Mr. Seery testified at the hearing that was in

20  this Court to be -- to get him appointed, and this was Exhibit

21  2 that was presented by the Debtor, and on Page 16 at the

22  bottom he says -- of the transcript, he says, I think, from a

23  high level, the best way to think about the Debtor is that

24  it's a registered investment advisor.  As a registered

25  investment advisor, which is really any advisor of third-party

001699

1   money over $25 million, it has to register with the SEC, and

2   it manages funds in many different ways.

3        In the middle of the next page he says, In addition, the

4   Debtor manages about $2 billion, $2 billion in total managed

5   assets, around $2 billion in CLO assets, and then other

6   securities, which are hedge funds -- other entities, rather,

7   which are hedge funds or PE style.  Private equity style.

8        On Page 23 towards the bottom he says, As I said, the

9   Investment Advisers Act puts a fiduciary duty on Highland

10  Capital to discharge its duty to the investors.  So while we

11  have duties to the estate, we also have duties, as I mentioned

12  in my last testimony, to each of the investors in the funds.

13  CLO Holdco would be an investor in one of those funds, HCLOF.

14       He goes on to say, Some of them are related parties, and

15  those are a little bit easier.  Some of them are owned by

16  Highland.  HCLOF was not owned by Highland.  But there are

17  third-party investors in these funds who have no relation

18  whatsoever to Highland, and we owe them a fiduciary duty both

19  to manage their assets prudently but also to seek to maximize

20  value.

21       Now, the lawsuit alleges that Seery testified that the

22  HarbourVest portion of Highland CLO Funding was worth $22-1/2

23  million.  Now, Mr. Morris wants the Court to hinge on the fact

24  that, well, no one asked him whether he was lying.  But that's

25  not really the standard, and it certainly isn't the standard

HCMLPHMIT00002749

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 06/20/25   Page 93 of 262   PageID 2838
Exhibit 71   Page 360 of 299

35

1   when someone's an investment advisor and owes fiduciary

2   duties, which include fiduciary duties to be transparent with

3   your investors.

4       It also includes fiduciary duties not to self-deal.

5       The lawsuit also alleges that, in reality, those assets

6   were worth double that -- double that amount at the time.  We

7   found out just, you know, in late March/early April that a

8   third -- from a third party who had access to the underlying

9   valuations at the time that those values were actually double

10  and that there was a misrepresentation, giving rise to the

11  lawsuit.  That change in circumstance is the key issue behind

12  the lawsuit.

13      We allege that Mr. Seery and the Debtor, as RIAs, had a

14  duty to not self-deal and be fully transparent with that

15  information, and we think both of those things were violated

16  under the Advisers Act.

17      We don't allege that the HarbourVest settlement should be

18  undone or unwound.  We can't unscramble that egg.  We do seek

19  damages, as I believe is our right, arising out of the

20  wrongdoing and the process of pushing forth the settlement.

21      I think one of the allegations in the actual motion for

22  the show cause order was that this was going to undo all of

23  the hard work that Court had done and basically unwind and try

24  to re-piece Humpty Dumpty back together again.  But that's

25  simply not the case.  Nowhere in our allegations or in the

001701

HCMLPHMIT00002750

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 07/09/25   Page 94 of 262   PageID 2839
Exhibit 71   Page 370 of 299

36

1    relief that we request are we trying to undo the HarbourVest

2    settlement as such.

3         Now, whether the lawsuit should be dismissed under the

4    affirmative defenses that they bring up -- res judicata,

5    waiver, release -- all of those are questionable under the

6    Advisers Act, given the change of circumstance, and therefore

7    are also questions on the merits.  They don't go to the

8    colorability of the underlying claims in and of themselves,

9    which I think is important.

10        So we asked for leave to amend from the Court.  And what

11   they want us to do, Your Honor, is they want to sanction us

12   for asking.  They're saying asking for leave to amend is the

13   same thing as pursuing a claim.  And I'll get to the specifics

14   on that in a little bit.  But that's the frame.  Can we be

15   sanctioned for asking a court, any court, even if it's the

16   wrong court, for permission to bring the lawsuit?  They don't

17   cite a single case that says that that, in and of itself, is

18   sanctionable conduct, us asking.

19        So I'd like to introduce some of the Respondents.

20        Your Honor, may I have one of these waters?

21            THE COURT:  Certainly.

22            MR. SBAITI:  Thank you.

23            THE COURT:  That's why they're there, by the way.

24            MR. SBAITI:  I didn't know if they belonged to

25   somebody else.

HCMLPHMIT00002751

```
 1              THE COURT:  We've scattered water bottles around for

 2    people.

 3              MR. SBAITI:  I appreciate it.  Thank you, Your Honor.

 4              THE COURT:  So if you see these little ones, that's

 5    for anyone.

 6              MR. SBAITI:  So, this is an org chart, and you'll see

 7    it as -- the exhibits that the Debtor's going to bring up.

 8    And when we talk about the DAF, Your Honor -- I don't know if

 9    that's visible to you.  We're on Slide 19, if you're looking

10    at it on paper.  There's a little number at the lower right-

11    hand corner.  The charitable DAF GP, LLP and then the

12    Charitable DAF Holdco, Ltd. together are the principles of the

13    Charitable DAF Fund, LP.  And so when we refer to the DAF or

14    the Charitable DAF, that's really the entity structure that

15    we're referring to.  And then the GP and Holdco Ltd. have a

16    managing member.  It used to be Grant Scott at the time this

17    was done.  Today, it's Mr. Mark Patrick, who's in the room,

18    sitting next to Mr. Bridges.

19         The DAF is a charitable fund.  It's funded over $32

20    million, as the evidence will show, including Dallas-Fort

21    Worth organizations, The Family Place, Dallas Children's

22    Advocacy, Center for Brain Health, the Crystal Ray Initiative,

23    Friends of the Dallas Police, Snowball Express, various

24    community and education initiatives, Dallas Arts, museums, the

25    Perot Museum, Dallas Zoo.  That evidence is undisputed, Your
```

001703

HCMLPHMIT00002752

1   Honor.  The DAF is a real fund.  It is a real charitable fund.

2   It does real good in the community.

3      Now, Respondents -- Holdco, which you will see at the

4   bottom of that chart, is essentially the investment arm.

5   There are assets that the DAF owns in various pots, and Holdco

6   is the actual business engine that generates the money from

7   those assets that then -- that then gets passed up to the

8   charitable -- the four charitable foundations at the top.

9      I'll go back to Slide 21.  And if you look at the top,

10  Your Honor, the Dallas Foundation, Greater Kansas City

11  Community, Santa Barbara Foundation, The Community Foundation

12  of North Texas:  Those are the charities that then themselves

13  bestow the funds onto the actual recipients.  So the money

14  flows up as dividends or distributions, and then gets

15  contributed.

16     CLO Holdco invests those assets, and it's an important

17  part of the business model, so that you're not sending out

18  principal.  It's the money that CLO makes, the profits, if you

19  will, that it is able to generate that gets donated and makes

20  its way into the community.

21     So there's an important feature to the structure in that

22  it has to be able to generate money.  It's not just money that

23  sits there and waits to be distributed.  There's active

24  investing going on.

25     Mr. Mark Patrick owns the control shares of the entities

HCMLPHMIT00002753

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 04/09/25    Page 97 of 262    PageID 2842
Exhibit 71    Page 98 of 299

39

1  comprising the DAF and CLO Holdco, as I showed you, and the

2  beneficiary charitable foundations hold what we call

3  beneficial interests, where they just get money.  They don't

4  have a vote.

5       Mr. Patrick cares about the public service the DAF engages

6  in.  He's been an advisor to the DAF, CLO Holdco, and its

7  predecessor, Mr. Scott, since its inception.  He receives no

8  compensation for the job he's doing today.  And you'll hear

9  how he became -- how he inured to the control position of the

10 DAF and CLO Holdco from him, but it doesn't involve Mr.

11 Dondero, and the absence of someone saying that it did, I

12 think, is going to be striking by the end of the presentation

13 of evidence.

14      Their only argument against you, Your Honor, is going to

15 be you just can't believe them.  But not believing witnesses

16 is not a substitute for the lack of affirmative evidence.

17      Mr. Patrick has said all along he authorized the filing of

18 the motion for leave to add Mr. Seery to the lawsuit in

19 District Court.  He doesn't believe the motion to amend

20 violated this Court's orders, for the reasons stated in our

21 responsive filings to the motions for contempt and show cause

22 order.  That's why he authorized it.

23      My firm, Sbaiti & Company, we're a small Dallas litigation

24 boutique retained by the DAF and CLO Holdco to file the

25 lawsuit.  We did an investigation.  I'm tickled to death that

001705

HCMLPHMIT00002754

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-71   Filed 04/00/299   Page 98 of 262   PageID 2843

40

1    Mr. Morris loved our complaint so much and gave us the

2    compliment that we got it done in a short amount of time, but

3    we did get it done in a short amount of time, because, in the

4    end, it's a rather simple issue, as I was able to lay it out

5    in about three or four bullet points in a previous slide.

6        The written aspect of that doesn't take that long, as Your

7    Honor knows, but the idea that there's a suspicion that we

8    didn't write it or someone else wrote it and ghost-wrote it

9    and gave it to us, which I think is the insinuation he was

10   making, is completely unfounded.  There's no evidence of that.

11       We carefully read Your Honor's orders.  We developed a

12   good-faith basis, as required by Rule 11, that the lawsuit and

13   the motion to add Mr. Seery were not filed in bad faith or for

14   an improper purpose.  We don't think they're frivolous.  We

15   don't think they're in violation of Your Honor's orders, given

16   the current state of the law.

17       Mr. Dondero is one of the settlors of the CRT, of the

18   Charitable Remainder Trust that ultimately provided assets to

19   CLO Holdco and the DAF.  He does care about the DAF's mission.

20   I think Mr. Morris hit the nail on the head.  Of course Mr.

21   Dondero cares about what happens to it.  He's one of the

22   settlors, and it was his funds that initially were put into

23   it, so he's allowed to care.  And I don't think him caring is

24   insidious, and him caring doesn't mean he has control and

25   doesn't mean he's the driving force behind some insidious

HCMLPHMIT00002755

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 04/20/25    Page 99 of 262    PageID 2844
Exhibit 71    Page 92 of 299

41

1    conspiracy that they're trying to insinuate exists.

2        He is an advisor to the DAF and CLO Holdco.  It is a lot

3    of money and it needs advice, and he's an advisor to Mr.

4    Patrick.  We don't run away from any of those facts, Your

5    Honor.

6        We also don't run away from the fact that he was the

7    source of some of the information that came in to that

8    complaint and that he relayed some of that information.  The

9    content, we do claim work product privilege and attorney-

10   client privilege, because he's an agent of our client, and as

11   lawyers doing an investigation, the content of our

12   communications is protected under the attorney-client and work

13   product privileges, as well as the joint interest privilege.

14   But the fact that we admit that those communications happened,

15   we're not running away from that fact.

16       So, what does he have to do with this?  It's interesting

17   that that opening argument you just heard spent about three

18   minutes on contempt and the other fourteen or fifteen minutes

19   or so on Mr. Dondero.  And only on Mr. Dondero.  There's a

20   negative halo effect, I believe, that they're trying to get

21   this Court to abide by.  They want to inflame Your Honor and

22   hopefully capture -- cultivate and then capitalize on whatever

23   antipathy you might have for Mr. Dondero, and then sweep us

24   all in under that umbrella and sanction everybody just because

25   he had some involvement.

HCMLPHMIT00002756

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 671   Filed 07/09/25   Page 100 of 262   PageID 2845

42

1     But whatever involvement he has, which we admit he had

2  some involvement in helping us marshal the facts, that's not a

3  basis for us to be sanctioned if there isn't an actual

4  sanctionable conduct that -- as we say there isn't.

5     We think there's an ulterior motive.  That's why Mr.

6  Morris just announced to Your Honor, Mr. Dondero controls it

7  all.  The ulterior motive, I believe, is, down the line, when

8  they want to argue some kind of alter ego theory, they want to

9  lay that foundation here.  I don't think this is the

10 appropriate time for that foundation, and I don't think any of

11 the information and the evidence they're trying to marshal in

12 front of you is really going to be relevant to the very

13 specific question that's before Your Honor:  Does our motion

14 asking the District Court to add Mr. Seery violate your order,

15 or violate it in a way that can be -- that we can be

16 sanctioned for?  We don't believe it violates it.

17    So, the three core standards that have to be met.  First

18 of all, civil contempt requires a valid, enforceable order.

19 It's not debatable and it's not -- I don't think that's a

20 shocking statement.  Then they have to have clear and

21 convincing evidence of a violation of a specific unambiguous

22 term therein.  Mr. Morris wants his version of the word pursue

23 to be unambiguous, and I think the word pursue is unambiguous.

24 But the way he wants you to construe it makes it completely

25 ambiguous, and we'll -- I'll get to that in a moment.

001708

HCMLPHMIT00002757

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 6-71    Filed 09/09/25    Page 101 of 262    PageID 2846

43

```
 1        Now, for sanctioning counsel, the Fifth Circuit has held

 2   you have to find bad faith.  We're adjudged under a slightly

 3   separate standard under the Fifth Circuit law.  So the

 4   contempt motion, though, to the extent it seeks to impose

 5   double and treble attorney's fees, those are in punitive

 6   fines.  They are not compensatory.  So criminal contempt

 7   standards are raised, and so they have to show a violation in

 8   bad faith.  In other words, our arguments that we're making

 9   have to be bad faith, not simply that we're wrong, and they

10   have to show beyond a reasonable doubt, usually in front of a

11   jury.  The U.S. Supreme Court explained the difference and the

12   different procedural protections that have to be involved if

13   they're really going to seek double and treble compensatory

14   damages.

15        Now, he's right.  Saying we intended -- saying that we

16   didn't mean to violate it isn't necessarily a defense.  But

17   what you're actually going to hear from him is the opposite

18   argument, that even though we didn't violate it, we wanted to.

19   That's what he says.  That's why he quoted you the opening

20   section of our motion asking for permission to sue Mr. Seery,

21   because that's a statement of purpose.  And he says you should

22   sanction them right there.  That's literally what he said.

23   It's right there, their purpose.  If intent is irrelevant to

24   them, it's irrelevant as to us.  The fact that we wanted to

25   sue Seery is fully admitted.  We don't deny the fact that we
```

001709

HCMLPHMIT00002758

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 71   Filed 06/20/25   Page 102 of 262   PageID 2847

44

1   believe Mr. Seery should be a defendant in this lawsuit.  But

2   the fact that we didn't sue him is why we didn't violate the

3   order.  And they can't say that the fact that we eventually

4   wanted to sue him means we did violate the order.  That door

5   swings both ways, Your Honor.

6       We don't think any element is met.  The order, while writ

7   large, prohibits suing Mr. Seery without permission, and we

8   did not sue James Seery, pure and simple.  The July 12 --

9   14th, 2020 order purports to reserve exclusively to this Court

10  that which, according to the statutes and the case law, we

11  believe the Court can't exclusively reserve to itself.  And

12  Your Honor, the order prohibits commencing and pursuing a

13  claim against Jim Seery without coming here first to decide

14  the colorability of such a claim.

15      They, I believe, admit that we didn't commence a claim

16  against Jim Seery.  I think they've admitted that now.  So now

17  we're talking about what does pursue mean?  We didn't pursue a

18  claim against Jim Seery.  Is asking for leave to bring suit

19  the same thing as pursuing a claim?  That's the question

20  that's really before Your Honor.  Lawyers never talk of

21  pursuing a claim that hasn't been filed.  We don't say, I'm

22  pursuing a claim and I'm going to file it next week or next

23  year.  Usually, that type of language is in an order, because

24  when the order happens, there may already be claims against

25  Mr. Seery.  And so the pursuit of claim is supposed to attack

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-71 Filed 09/09/25   Page 103 of 262   PageID 2848

45

1    those cases, to come here and show colorability, presumably,

2    before they continue on with those lawsuits.  It doesn't mean

3    asking for permission.

4        If it did mean asking for permission, then complying with

5    Your Honor's order would be a violation.  If the motion for

6    leave is a violation because it is pursuing a claim, if I had

7    filed that motion in this Court, it would still be pursuing a

8    claim without Your Honor's permission.  I'd have to get

9    permission just to ask for permission.  It puts us in this

10   endless loop of, well, if asking for permission is pursuing a

11   claim, and pursuing a claim is without permission violates the

12   Court's order, we'd always be in violation of the Court's

13   order just for asking, just for following Your Honor's edict.

14            THE COURT:  I'm just, I'm going to interject.  You

15   were supposed to, under the order, file a motion in this

16   Court.

17            MR. SBAITI:  I understand that, Your Honor, and I

18   think that we can get to the specifics on why we disagree with

19   how the motion went, Your Honor.  We hadn't sued Mr. Seery.

20   So as long as we dealt with the order, which is what our

21   position is, then we don't believe we violated the order.

22            THE COURT:  You think the order was ambiguous,

23   requiring a motion to be filed in the Bankruptcy Court?

24            MR. SBAITI:  Your Honor, what we believe is that the

25   order was ambiguous in terms of whether us asking for

HCMLPHMIT00002760

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document Exhibit 71 Filed 07/09/25    Page 104 of 262    PageID 2849

46

 1   permission in the District Court was in and of itself a

 2   violation of the order.  We don't think it was.  Actually, we

 3   don't think the order's ambiguous to that extent.  The second

 4   we file a suit against Mr. Seery and we don't have some

 5   resolution of the issue, then I think the question of

 6   sanctionability comes in.  But we never filed suit, Your

 7   Honor.

 8        The Court doesn't say I can't seek permission in the

 9   District Court or that we can't go to the District Court with

10   -- which has general jurisdiction over this case, and has

11   jurisdiction, we believe, over the actual case and controversy

12   that's being raised.  But the idea of pursuit being a

13   violation of the order, of the letter of that order, is

14   nonsensical under that, it leads to an absurd result, and it's

15   plainly vague and ambiguous, Your Honor.

16        Asking Judge Boyle or asking a District Court for

17   permission is not a violation of this Court's order, not the

18   way it was written and not -- and I don't even believe it was

19   a violation necessarily of the Court's -- of the language that

20   the Court has.  We -- it doesn't unambiguously prevent us from

21   asking the District Court for leave.

22        The Court's order yesterday, Your Honor, applied this very

23   rule.  The TRO -- you said the TRO did not specifically state,

24   Turn your cell phone over.  And you denied motion for

25   sanctions on that.  That's basically the argument we're making

001712

HCMLPHMIT00002761

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-71   Filed 06/30/2299   Page 105 of 262   PageID 2850

47

1    here, Your Honor.  We think that was the correct ruling, and

2    we think the same type of ruling applies here.

3        Your order yesterday also determined that the Court

4    ultimately believes that hiring lawyers to file motions should

5    not be viewed as having crossed the line into contemptuous

6    behavior.  That's essentially the argument they want you to

7    buy, that there's somehow a vindictiveness behind this and an

8    insidious plan to violate court orders, Your Honor.  We don't

9    have any evidence of that.

10            THE COURT:  Okay.  Take the words vindictiveness and

11   insidious out of the equation.  That's making things personal,

12   and I don't like that.  The key is the literal wording of the

13   order, is it not?

14            MR. SBAITI:  Your Honor, the key, I believe, is the

15   --

16            THE COURT:  No entity may commence or pursue a cause

17   of action of any kind against Mr. Seery relating in any way to

18   his role as the chief executive officer and chief

19   restructuring officer of the Debtor without the Bankruptcy

20   Court first determining, after notice, that such claim or

21   cause of action represents a colorable claim of willful

22   misconduct or gross negligence against Mr. Seery and

23   specifically authorizing such entity to bring such a claim.

24   So I'm trying to understand why you argue that filing a motion

25   asking the District Court for permission is not inconsistent

001713

HCMLPHMIT00002762

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 6-71    Filed 04/30/25    Page 106 of 262    PageID 2851

48

1  with this order.

2          MR. SBAITI:  Because it's not commencing a claim,

3  Your Honor.  It's not commencing a claim against him.

4          THE COURT:  Okay.  So is your argument that if Judge

5  Boyle authorizes amendment of the pleading to add Mr. Seery

6  and then you do it, at that point they may have grounds for a

7  motion for contempt, but not yet, because she has not actually

8  granted your motion?

9          MR. SBAITI:  Correct, Your Honor.  I mean, in a

10 nutshell.  In fact, that's one of -- I think that's probably

11 our next argument.  We think, in a sense, this argument is

12 incredibly premature.  There is three ways that this -- well,

13 I'd like to address this, so I've got -- I've got a diagram

14 that I think will actually help elucidate what our thought

15 process was.

16    There's three things she could have done.  She could have

17 referred -- referred it to Your Honor, which is what we

18 expected was likely to happen.

19          THE COURT:  But you didn't file a motion for referral

20 of the motion before her.

21          MR. SBAITI:  Well, no, I don't mean in respect of

22 enforcing the reference.  The referral we thought was most

23 likely going to happen because it's an associated case, and we

24 actually put those orders in front of her, so we expected that

25 those orders would end up -- that the question would

001714

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 671    Filed 05/09/22299    Page 107 of 262    PageID 2852

49

1    ultimately end up in front of Your Honor on that basis.

2        She could have denied our motion outright, in which case

3    we haven't filed a claim, we haven't violated it, or she could

4    have granted our motion and done one of two things.  She could

5    have granted it to the extent that she thought leave would be

6    proper but then referred it down, or she could have decided --

7    taken the decision as the court with general jurisdiction and

8    simply decided it all on her own.  She had all of those

9    options, Your Honor, and none of them results in a claim being

10    commenced or pursued without the leave of this Court, if leave

11    is absolutely necessary, Your Honor.  And that's the point

12    that we were trying to make.

13        Your Honor, the -- there's -- you know, there's no

14    evidence that, absent an order from a court with jurisdiction,

15    that we were going to file a claim against Mr. Seery, that we

16    were going to commence or pursue a claim against Mr. Seery.

17    We were cognizant of Your Honor's order.  We considered that.

18    And the reason we filed them the way we did is because,

19    according to the statutes and the case law, this is the type

20    of case that would be subject to a mandatory withdrawal of the

21    reference.

22        And so there's this paradox that arises, Your Honor.  And

23    the paradox that arises is that we show up and immediately go,

24    well, we need to be back in the District Court.  So we filed

25    our motion there, and I don't think that was contemptuous, it

HCMLPHMIT00002764

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 671 Filed 05/09/2299   Page 108 of 262   PageID 2853

50

1   wasn't intended to be contemptuous of the Court, but we showed

2   the orders to the Court, made the same arguments that we have

3   been making here, that we believe that there's problems with

4   the order, we believe the order oversteps its jurisdiction and

5   maybe is unenforceable, and it's up to that District Court, as

6   it has been in almost all of these other gatekeeper order

7   cases that get filed.  None of them result in sanctions, Your

8   Honor.  What they result in is a District Court deciding,

9   well, either they refer it or they decide I don't need to

10  refer it.  But I don't think that that is the same thing as

11  commencing or pursuing a claim in the end, Your Honor, because

12  all we did was ask for permission, and permission could have

13  been denied or granted or granted in part.

14      Your Honor, they haven't cited an injury.  You've heard

15  the testimony, Your Honor, that they -- the first time they

16  knew we had filed a motion -- which I don't understand why

17  that's the first time they knew we had filed a motion; we told

18  them we were going to file the motion -- was when I forwarded

19  an email saying that it's been denied without prejudice, Your

20  Honor.  Well, that means they didn't have to do any work to

21  respond to the motion.  They didn't have to do any work to do

22  any of the other things.

23      And one hundred percent of the damages that they're going

24  to say they incurred is the litigation of this contempt

25  hearing or this sanction motion, as opposed to some other

HCMLPHMIT00002765

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 61-71   Filed 05/20/25   Page 109 of 262   PageID 2854

51

```
 1    simpler remedy, like going in to Judge Boyle and saying, Your

 2    Honor, all that needs to go, which is what they eventually

 3    did.  But they would have had to incur those costs anyway

 4    because they're now moving to enforce the reference.  They

 5    filed a 12(b)(6).  That briefing would have existed regardless

 6    of whether or not we had filed our motion, regardless of

 7    whether the sanctions hearing had commenced.

 8         Your Honor, I'm going to let my partner, Mr. Bridges,

 9    address this part of it, if I could.  I think that gets into

10    more of the questions that you asked, and I think he can

11    answer them a lot better than I can.

12              THE COURT:  Okay.

13              MR. SBAITI:  Thank you.

14              THE COURT:  That's fine.

15              MR. BRIDGES:  Thank you, Your Honor.  And I do want

16    to address pointedly the questions that you're asking.  First,

17    though, I was hoping to back up to some preliminary remarks

18    that you made and say that I find the 200 orders a week just

19    mindboggling.  It amazes me, and puts the entire hearing in a

20    different perspective for me.  I'm grateful that you shared

21    that with us.

22         Your expression of regret about naming us violators was

23    very meaningful to me.  It causes me -- well, the strong words

24    in our brief were mine.  I wrote them.  And your expression of

25    regret causes me to regret some of those words.  I'm hopeful
```

HCMLPHMIT00002766

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 6-1   Filed 05/09/25   Page 110 of 262    PageID 2855

52

1    that you can understand, at least in part, our reaction out of

2    concern.

3         And Your Honor, it's awkward for me to talk about problems

4    with your order, and that's the task that's come to me, to

5    list and talk through four of them and why we think they put

6    us in a really awkward position in deciding what to do in this

7    case, in the filing of it, in where we filed it, and in how we

8    sought leave to go forward against Mr. Seery.  That was

9    awkward and difficult for us, and I'm hopeful that I can

10   explain that and that you'll understand, if I'm blunt about

11   problems with the order, that I mean it very respectfully.

12   Two hundred orders a week is still very difficult for me to

13   get my mind around.

14        The four issues in the order start with the gatekeeping.

15   Then, secondly, in the preliminary remarks, I made mention of

16   the *Applewood* case and the notice that the order releases some

17   claims.  Its effect of --

18             THE COURT:  And by the way, I mean, you might

19   elaborate on the facts and holding of *Applewood*, because I

20   came into this thinking *Republic Supply v. Shoaf*, and for that

21   matter, as I said, *Espinosa*, were much more germane.  And so,

22   you know, you'll have to elaborate on *Applewood*.  I remember

23   that case, but it's just not one people cite as frequently as

24   those two.

25             MR. BRIDGES:  Yes, Your Honor.  And our reply brief

001718

HCMLPHMIT00002767

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 31-6   Filed 09/09/25   Page 111 of 262   PageID 2856

53

```
 1   devotes a page to the case, and I'm hopeful that I can
 2   remember it well enough to give you what you're looking for
 3   about it, but I would point you to our reply brief on that
 4   topic as well.
 5        The Shoaf case that Applewood quotes from and
 6   distinguishes and expressly limits, the Shoaf case actually
 7   has been cautioned and limited and distinguished numerous
 8   times, if you Shepardize it, and the Applewood case is the
 9   leading case, and it also is from the Fifth Circuit, that
10   describes and cabins the effects of Shoaf.  And in Applewood,
11   what happened is a bankruptcy confirmation order became final
12   with releases in it, and the court held that exculpatory
13   orders in a final order from the Bankruptcy Court do not have
14   res judicata effect and do not release claims unless those
15   claims are enumerated in the exculpatory order.  And --
16             THE COURT:  Okay.  So it was about specificity more
17   than anything else, right?
18             MR. BRIDGES:  Yes, Your Honor. It was a --
19             THE COURT:  Okay.
20             MR. BRIDGES:  -- a blanket release, a blanket --
21             THE COURT:  Okay.
22             MR. BRIDGES:  -- exculpatory order that didn't
23   specify what claims were released by what parties, and
24   therefore the parties didn't have the requisite notice.
25        In my mind, Your Honor, it's comparable to the Texas
```

HCMLPHMIT00002768

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 61    Filed 05/02/25    Page 112 of 262    PageID 2857
Exhibit 71    Page 95 of 299

54

```
 1   Supreme Court's holdings on what's required in a settlement
 2   release in terms of a disclaimer of reliance, --
 3               THE COURT:  Okay.  But, again, --
 4               MR. BRIDGES:  -- that if you aren't --
 5               THE COURT:  -- it's about specificity --
 6               MR. BRIDGES:  Yes, Your Honor.
 7               THE COURT:  -- more than anything else?  And then
 8   we've got the U.S. Supreme Court Espinosa case subsequent.
 9               MR. BRIDGES:  Okay.  Your Honor, I'm not sure what
10   Espinosa you're referring to.  Can you tell me why that
11   applies?
12               THE COURT:  Well, it was a confirmation order.  It
13   was in a Chapter 13 context.  And there were provisions that
14   operated to discharge student loan debt, --
15               MR. BRIDGES:  Uh-huh.
16               THE COURT:  -- which, of course, cannot be discharged
17   without a 523 action, a separate adversary proceeding.
18   Nevertheless, the confirmation order operated to do what 523
19   suggests you cannot do, discharge student loan debt through a
20   plan confirmation order.
21        The U.S. Supreme Court says, well, that's unfortunate that
22   the confirmation order did something which it doesn't look
23   like you can do, but no one ever objected or appealed.  That's
24   my recollection of Espinosa.  So it seems to be the same
25   holding as Republic Supply v. Shoaf.  And what I -- why I
```

HCMLPHMIT00002769

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 671 Filed 06/09/25   Page 113 of 262   PageID 2858

55

1   asked you to elaborate on *Applewood* is because it does seem to

2   deal with the specificity of the order versus the

3   enforceability, no?

4           MR. BRIDGES:  Your Honor, if it's not obvious

5   already, I'm not prepared to argue *Espinosa*.  And your

6   explanation of it is very helpful to me.  I think you're right

7   that the specificity issue from *Applewood* is what we're

8   relying on.  And it sounds like --

9           THE COURT:  Okay.  So, that being the case, how was

10  this order not specific?  Okay?

11          MR. BRIDGES:  That's easy, Your Honor, because it

12  doesn't say which parties are releasing which claims.  And

13  what we're talking specifically about there -- as we go

14  through the order, I can show you the language -- but what

15  we're talking about specifically are the ordinary negligence

16  and breach of fiduciary duty claims that your order doesn't

17  provide for at all.  Rather, it says colorability of gross

18  negligence or willful wrongdoing, if I remember the words

19  precisely, that's what must be shown to pursue a case -- a

20  cause of action against Mr. Seery, thereby -- thereby

21  indicating that claims for mere negligence, not gross

22  negligence, or breach of fiduciary duty, which is an even

23  lesser standard, that those claims are prohibited entirely.

24      And by having that kind of general all-encompassing

25  release or exculpation for potential liability involving

HCMLPHMIT00002770

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document Exhibit 71   Filed 05/09/2299   Page 114 of 262    PageID 2859

56

|    |                                                                              |
|----|------------------------------------------------------------------------------|
| 1  | negligence, and most importantly, fiduciary duty breach under                |
| 2  | the Advisers Act, that that kind of exculpation under                        |
| 3  | *Applewood* is not enforceable and has no res judicata effect                |
| 4  | because it wasn't -- those claims weren't enumerated in the                  |
| 5  | order.                                                                       |
| 6  | That for it to have the intended exculpatory effect, if                      |
| 7  | that was what was intended, that the fiduciary duty claims and               |
| 8  | the parties who those claims may belong to would have to have                |
| 9  | been enumerated.                                                             |
| 10 | And indeed, that kind of specificity, what was required in                   |
| 11 | *Applewood*, isn't even possible for a claim that hasn't yet                 |
| 12 | occurred for future conduct.  It's not possible to enumerate                 |
| 13 | the details, any details, of a future claim, because the                     |
| 14 | underlying act -- if the underlying basis, facts for that                    |
| 15 | claim, haven't yet happened.  It's something to happen in the                |
| 16 | future.                                                                      |
| 17 | And here, that's what we're dealing with.  We're dealing                     |
| 18 | with conduct that took place well after the January and July                 |
| 19 | 2020 orders that had that exculpatory effect.  Is -- is that                 |
| 20 | clear?                                                                        |
| 21 | THE COURT:  Understood.                                                       |
| 22 | MR. BRIDGES:  Thank you, Your Honor.  So, the four                           |
| 23 | areas of the order, the four functions that the order does                   |
| 24 | that are problematic to us that led us to do what we have done               |
| 25 | are the gatekeeping function; the release; the fact that by                  |

001722

HCMLPHMIT00002771

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 6-71    Filed 08/02/299    Page 115 of 262    PageID 2860

57

1  stating sole jurisdiction, that it had a jurisdiction-

2  stripping effect; and then, finally, jurisdiction asserting,

3  where, respectfully, Your Honor, we think to some extent the

4  order goes beyond what this Court's jurisdiction is.  And so

5  that not only claiming exclusive jurisdiction, but claiming

6  jurisdiction over all actions against Mr. Seery, as described

7  in the order, is going too far.

8      And those are the four issues I want to talk about one at

9  a time, and here -- I went two screens instead of one.  There

10  we go.  And here's the order.  I have numbered the highlights

11  here out of sequence because this is the sequence that I wish

12  to talk about them and that I think their significance to our

13  decision applies.

14      Before we get into the words of this July 16, 2020 order,

15  I want to mention the January order as well.  Although the

16  motion for contempt recites both orders, we don't actually

17  think the January order applies to us, because our lawsuit

18  against Mr. Seery is not about his role as a director at

19  Strand in any way.  We didn't make an issue of that, other

20  than in a footnote in our brief, because we don't think that

21  distinction matters much since the orders essentially say the

22  same things.

23      I'm not sure that it matters whether we have potentially

24  violated one order or two.  If Your Honor finds we've violated

25  one, I think we're on the hook regardless.  If Your Honor

HCMLPHMIT00002772

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 71 Filed 09/09/22799   Page 116 of 262    PageID 2861

58

1  finds that we didn't violate the July order, I don't think you

2  will find that we violated the January order, either.  So my

3  focus is on the July order.

4      The gatekeeping function comes from the preliminary

5  language about commencing or pursuing a claim or cause of

6  action against Mr. Seery.  And it says what you want us to do

7  first before bringing such a claim.

8      The second issue of the release comes a little bit later.

9  It's the colorable claim of willful misconduct or gross

10  negligence language.  In other words, because only claims of

11  willful misconduct or gross negligence can pass the bar, can

12  pass muster under this order, that lesser claims -- ordinary

13  negligence and breach of fiduciary duty -- that those claims

14  are released by this order.  That's the second argument.

15      Third is your reference to sole jurisdiction and the

16  effect that that has of attempting to say that other courts,

17  courts of original jurisdiction, do not have jurisdiction

18  because it solely resides here.  That's the third thing I want

19  to address.

20      And then the fourth is the notion that we have to come to

21  this Court first for any action that fits the description of

22  an action against Mr. Seery, when some actions are, through

23  acts of Congress, removed from what this Court has the power

24  to address.  Under 157(d) of Title 28, Your Honor, there are

25  some kinds of actions which withdrawal of the reference is

001724

HCMLPHMIT00002773

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-71   Filed 09/02/25   Page 117 of 262   PageID 2862

59

 1   mandatory, and therefore this court lacks jurisdiction to

 2   address those.

 3        And so those are the four issues I want to tackle,

 4   starting with the first, the gatekeeping.  Your Honor, Section

 5   28 -- Section 959 of Title 28 appears to be precisely on

 6   point.  It calls -- it is called by some courts an exception

 7   to the Barton Doctrine, which we believe is the only basis,

 8   the Barton Doctrine, for this Court to claim that it has

 9   jurisdiction or sole jurisdiction and can require us to come

10   here first.  We think the Barton Doctrine is the only basis

11   for that.  We haven't seen anything in the briefing from

12   opposing counsel indicating there was another basis for it.

13   We think we're talking about the Barton Doctrine here as the

14   basis for that.

15        959 is exception to the Barton Doctrine, and we think it

16   explicitly authorizes what we have done.

17        Secondly, Your Honor, the order, the gatekeeping functions

18   of the order are too broad because of its incorporation of the

19   jurisdictional problems and the release problem that we'll

20   talk about later.  But for problem number one, the key issue

21   that we're talking about is 959 as an exception to the Barton

22   Doctrine.  And I went the wrong way.

23            THE COURT:  So, we could go down a lot of rabbit

24   trails today, and I'm going to try not to do that, but are you

25   saying the very common practice of having gatekeeping

HCMLPHMIT00002774

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document Exhibit 71    Filed 06/30/25    Page 118 of 262    PageID 2863

60

1    provisions in Chapter 11 cases is just defective law under 28

2    U.S.C. § 959(a)?

3              MR. BRIDGES:  Can I say yes and no?

4              THE COURT:  Okay.

5              MR. BRIDGES:  Yes, to some extent, for some claims.

6    No as to other claims to another extent.  We are not saying

7    gatekeeping orders are altogether wrong, --

8              THE COURT:  Okay.

9              MR. BRIDGES:  -- no.

10              THE COURT:  Okay.

11              MR. BRIDGES:  There are problems with gatekeeping

12    orders that do more than what the law, Section 959 in

13    particular, allows them to do.

14              THE COURT:  Okay.  Be more explicit.  I'm not -- I

15    think you're saying, no, except when certain situations exist,

16    but I don't know what the certain situations are.

17              MR. BRIDGES:  And Your Honor, you're exactly right.

18    It's complicated, and it takes a long explanation.  Let me

19    start --

20              THE COURT:  Okay.  I really want to know, --

21              MR. BRIDGES:  Yeah, me, too.

22              THE COURT:  -- since I do these all the time, and

23    most of my colleagues do.

24              MR. BRIDGES:  Thank you, Your Honor.  And 959 is on

25    the screen.  Managers of any property --

HCMLPHMIT00002775

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 11-6   Filed 09/29/299   Page 119 of 262   PageID 2864

61

1           THE COURT:  Uh-huh.

2           MR. BRIDGES:  -- is what we're talking about,

3    including debtors in possession.  Now, it starts off by saying

4    trustees, receivers.  I mean, this is exactly what the Barton

5    Doctrine is about, right?  We're talking about trustees and

6    receivers, but not just them.  We're also talking about

7    managers of any property, including debtors in possession, --

8           THE COURT:  Uh-huh.

9           MR. BRIDGES:  -- may be sued without leave of the

10   court appointing that.  That's contrary to the Barton Doctrine

11   so far.

12      With respect to what I've numbered five here -- these

13   numbers are mine -- the quote is directly verbatim out of the

14   U.S. Code, but the numbering one through five is mine.  With

15   respect to what acts or transactions in carrying on business

16   connected with such property.

17      And so, Your Honor, what we're talking about isn't Barton

18   Doctrine is inapplicable, or you can't have a gatekeeping

19   order for any claims, but it's about managers of property.

20   And one of the hornbook examples of this is the grocery store

21   that files for bankruptcy and then, when --

22           THE COURT:  Slip-and-fall.

23           MR. BRIDGES:  You've got it, Your Honor.

24           THE COURT:  Uh-huh.

25           MR. BRIDGES:  And because they're managing property,

001727

HCMLPHMIT00002776

1    --

2             THE COURT:  So your cause of action, if it went

3    forward, is the equivalent of a slip-and-fall --

4             MR. BRIDGES:  Yes, Your Honor.

5             THE COURT:  -- in a grocery store?

6             MR. BRIDGES:  Yes, Your Honor.

7             THE COURT:  Okay.  Let me skip ahead.  What about the

8    last sentence of 959(a)?

9             MR. BRIDGES:  959(b)?  Or 959(a)?

10            THE COURT:  No, of 959(a).

11            MR. BRIDGES:  What we're looking at here?

12            THE COURT:  That's the sentence that I have always

13   thought was one justification for a gatekeeper provision.  And

14   I know, you know, a lot of others feel the same.

15            MR. BRIDGES:  Are we talking about what I have listed

16   in number five here?

17            THE COURT:  No.  I'm talking about the last sentence

18   of 959(a).  Such actions, okay, shall be subject to the

19   general equity power of such court, you know, meaning the

20   Bankruptcy Court, so far as the same may be necessary to the

21   ends of justice, but this shall not deprive a litigant of his

22   right to a trial by jury.

23        Isn't that one of the provisions that lawyers sometimes

24   rely on in arguing a gatekeeper provision is appropriate?

25            MR. BRIDGES:  Certain --

HCMLPHMIT00002777

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 1-71   Filed 07/09/25   Page 121 of 262    PageID 2866
Exhibit 71   Page 30 of 299

63

```
 1              THE COURT:  You, Bankruptcy Judge, have the power,

 2    the general equity power, so far as the same may be necessary

 3    to the ends of justice?

 4              MR. BRIDGES:  Your Honor, you bet.  Absolutely, there

 5    is equitable power to do more.  There's no doubt that there

 6    are reliance -- there is reliance on that in many instances.

 7    So I'm not sure -- I'm not sure I'm responding to your point.

 8              THE COURT:  Well, again, I think this is the third or

 9    fourth argument down the line that really you start with in

10    the analytical framework here, but I guess I'm just saying I

11    always thought a gatekeeping provision was consistent,

12    entirely consistent with 28 U.S.C. § 959(a), the last

13    sentence.

14              MR. BRIDGES:  When you're dealing --

15              THE COURT:  You disagree with that?

16              MR. BRIDGES:  I do, Your Honor.

17              THE COURT:  Okay.

18              MR. BRIDGES:  And it's not that the Court lacks

19    equitable powers to do more.  It's that those equitable powers

20    are affected by when management of other parties, third

21    parties' property is at issue.

22         What we're talking about is similar to yesterday's

23    contempt order.  When you set the basis of describing what it

24    is that Highland's business is, that they're a registered

25    investment advisor in the business of buying, selling, and
```

HCMLPHMIT00002778

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 1-6   Filed 09/05/2299   Page 122 of 262   PageID 2867

64

1   managing assets -- assets, of course, are property, and that

2   property is not just Highland's, but it's third-party

3   property, as if a railroad loses luggage belonging to its

4   customers.  Rather than the railroad with a trustee appointed

5   having mismanaged railroad property, we're talking about

6   third-party property here, third-party property that belongs

7   to the CLOs, about a billion dollars of assets in these CLO

8   SPEs that Highland manages.

9       And again, the slide that Mr. Sbaiti showed you showing

10  Highland, yes, they manage their own assets, the assets of the

11  Debtor, but also of the third parties, including the

12  Charitable DAF and CLO Holdco, and that the Advisers Act

13  imposes fiduciary duties on them that are unwaivable when

14  they're doing that.

15      In *Anderson*, the Fifth Circuit called 959 an exception to

16  the rule requiring court's permission for leave to sue.  In

17  *Hoffman v. City of San Diego* much more recently, relying on

18  this statute again, the court rejected a *Barton* challenge and

19  called it a statutory exception.  And in *Barton* itself, from a

20  century ago, the U.S. Supreme Court even acknowledged there

21  that where a receiver misappropriated the property of another

22  -- not the debtor's property, the property of another -- that

23  the receiver could still be sued personally, without leave of

24  court.

25      Absent *Barton*, absent applicability of the Barton

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-71 Filed 09/09/22   Page 123 of 262   PageID 2868
Exhibit 671   Page 90 of 299

65

1  Doctrine, Your Honor, the gatekeeper order is problematic.

2      *Barton* applies where a court has appointed a trustee, and

3  I don't think, Your Honor, under the circumstances in this

4  case, that it is fair to say Mr. Seery was appointed, as

5  opposed to approved by this Court.  And it involves a

6  trustee's actions under the powers conferred on him.  The

7  Barton Doctrine is not about a broader exculpation of the

8  trustee.

9      Here, what the Debtor asked for in its motion for

10  approval, approval of hiring Mr. Seery, what it asked for

11  specifically in the motion was that the Court not interfere

12  with corporate decisions absent a showing of bad faith, self-

13  interest, or gross negligence, and asking the Court to uphold

14  the board's decision to appoint Mr. Seery as the CEO as long

15  as they are attributable to any rationale business purpose.

16      At the hearing, Your Honor, at the hearing, we've quoted

17  your comments saying that the evidence amply shows a sound

18  business justification and reasonable business judgment on the

19  part of the Debtor in proposing that Mr. Seery be CEO and CRO.

20  Your Honor, respectfully, those words don't sound like the

21  judge using its discretion to choose -- appoint a trustee.

22  They sound like the Court exercising deference to the business

23  judgment of a business.  And appropriately so.  We don't have

24  trouble with application of the business judgment rule.  Our

25  problem is with application of it and the Barton Doctrine.

001731

HCMLPHMIT00002780

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 671    Filed 07/07/2399    Page 124 of 262    PageID 2869

66

1    Those two do not go together.  A trustee has protection
2    because it's acting under color of the court that appointed
3    it.  A court that merely deferred to someone else's
4    appointment, that's not what the Barton Doctrine is about.
5    The Barton Doctrine is about the court's function that the
6    trustee takes on, not deference to the business judgment of
7    the debtor in possession or the other fiduciary appointed by
8    the court.
9        Problem one was the gatekeeping.  Problem two is about the
10   release and the *Applewood* case.  Your Honor, again, ordinary
11   negligence and ordinary fiduciary duty breaches do not rise to
12   the level of gross negligence and willful misconduct.  And
13   because of that, the language of this order appears to be
14   barring them entirely.  No entity may bring a lawsuit against
15   Mr. Seery in certain circumstances without the Bankruptcy
16   Court doing what?  Determining that the cause of action
17   represents a colorable claim of willful misconduct or gross
18   negligence against Mr. Seery.
19       A breach of fiduciary duty under the Advisers Act can be
20   unintentional, it can fall short of gross negligence by miles,
21   and to exculpate Mr. Seery from those kinds of claims entirely
22   is to make him no longer a fiduciary.  A fiduciary duty that
23   is unenforceable makes someone not a fiduciary.  That's
24   plainly not what Mr. Seery thinks his role is.  It's
25   inconsistent with the Advisers Act.  And Your Honor, the

HCMLPHMIT00002781

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-71   Filed 08/07/25   Page 125 of 262   PageID 2870

67

1   notion that he would not owe his clients fiduciary duties as

2   he manages their assets would require disclosures under the

3   SEC regulations.  It creates all kinds of problems to state

4   that a fiduciary under the Advisers Act does not have

5   enforceable fiduciary duties.  The order appears to be

6   releasing all of those.  But for *Applewood's* specificity

7   requirement, it would be doing that.

8       As an asset manager under the Advisers Act, Mr. Seery is

9   managing assets belonging to CLO Holdco and The Charitable

10  DAF.  That's precisely what the District Court action is

11  about, those fiduciary duties.  And Mr. Seery, in describing

12  these recently in testimony here -- forgive me for reading

13  through this, Your Honor, but it is pretty short -- Mr. Seery

14  testifies, I think, from a high level, the best way to think

15  about the Debtor is that it's a registered investment advisor.

16  As a registered investment advisor, which is really any

17  advisor of third-party money over $25 million, it has to

18  register with the SEC and it manages funds in many different

19  ways.  The Debtor manages approximately $200 million current

20  values -- it was more than that of the start of the case -- of

21  its own assets.

22      I'm pausing there, Your Honor.  $200 million of its own

23  assets, but we're about to talk about third-party assets.

24      It doesn't have to be a registered investment advisor for

25  those assets, but it does manage its own assets, which include

HCMLPHMIT00002782

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 71 Filed 09/09/25  Page 126 of 262   PageID 2871
Exhibit 71   Page 909 of 299

68

```
 1   directly-owned securities, loans, from mostly related entities

 2   but not all, and investments in certain funds, which it also

 3   manages.

 4        And then here it comes:  In addition, the manager -- the

 5   Debtor manages about roughly $2 billion, $2 billion in total

 6   managed assets, around $2 billion in CLO assets, and then

 7   other entities, which are hedge funds or PE style.

 8        We also had to get a very good understanding of each of

 9   the funds that we manage.  And as I said, the Investment

10   Advisers Act puts a fiduciary duty on Highland Capital to

11   discharge its duty to the investors.  So while we have duties

12   to the estate, we also have duties, as I mentioned in my last

13   testimony, to each of the investors in the funds.

14        Now, some of them are related parties, and those are a

15   little bit easier.  Some of them are owned by Highland.  But

16   there are third-party investors in these funds who have no

17   relation whatsoever to Highland, and we owe them a fiduciary

18   duty both to manage their assets prudently but also to seek to

19   manage -- maximize value.

20        Those duties do not require -- requires the opposite of

21   what I mean.  They don't merely require avoiding gross

22   negligence or willful wrongdoing.  When you're managing assets

23   of others, the fiduciary duties that you owe are far stricter

24   than that.  The highest duty known to law is a fiduciary duty.

25        The order is inconsistent with that testimony,
```

001734

HCMLPHMIT00002783

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 6-1    Filed 07/09/25    Page 127 of 262    PageID 2872

69

1    acknowledging the fiduciary duties owed to The Charitable DAF

2    and to CLO Holdco.  It appears to release the Debtor -- maybe

3    not the Debtor.  My slide may be wrong about that.  It appears

4    to release Seery from having to uphold these duties.

5         In addition to problems with the gatekeeping under the

6    Barton Doctrine, in addition to the release problem and

7    *Applewood* and the unwaivable fiduciary duties under the

8    Advisers Act, there's also a problem with telling other courts

9    that they lack jurisdiction.  Your Honor knows bankruptcy

10   court law -- bankruptcy -- and the Bankruptcy Code far better

11   than I do, I'm certain.  But a first principle, I believe, of

12   bankruptcy law is that this Court's jurisdiction is derivative

13   of the District Court's.  And the only doctrine I've heard of

14   that can allow this Court to exercise exclusive jurisdiction

15   of the District Court that it sits in is the Barton Doctrine,

16   which, again, is very problematic to apply in this case, for

17   the reasons we've discussed already.

18        By claiming to have -- by stating in the order that this

19   Court has sole jurisdiction, it appears to either be inclusive

20   of the District Court, which I understand Your Honor doesn't

21   think her order can be read that way, but if it's not read

22   that way, then it results in telling the District Court that

23   it doesn't have the original jurisdiction that Congress has

24   given it.  And that's problematic in the order as well.

25             THE COURT:  Let me ask you.  If you think the word

HCMLPHMIT00002784

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-71 Filed 07/09/25   Page 128 of 262   PageID 2873

70

1  "power" had been used, or "authority," versus "jurisdiction,"

2  that would have cured it?

3          MR. BRIDGES:  I think there would still have been

4  other problems.  Would it have cured this?  I don't think so,

5  Your Honor, because, again, I think the only basis for that

6  power is the Barton Doctrine.

7          THE COURT:  Okay.

8          MR. BRIDGES:  To listen to opposing counsel, you'd

9  think that our jurisdictional argument was entirely about the

10  jurisdiction stripping.  It's not.  Frankly, Your Honor,

11  that's maybe even a lesser point.  A key problem here to is

12  the assertion of jurisdiction, not over any of the claims, but

13  over all of the claims, because of 157(d), Your Honor, because

14  some claims, some causes of action, have been put outside the

15  reach of bankruptcy, the Bankruptcy Court, and those actions

16  may in some instances fit within your description of the cases

17  that are precluded here.

18      That's a problem jurisdictionally with this Court's

19  ability to say it retains jurisdiction or that it has, that it

20  asserts jurisdiction.  Over what?  Any kind of claim or cause

21  of action against Mr. Seery relating in any way to his role as

22  the chief executive officer and chief restructuring officer of

23  the Debtor.

24      Some claims that fit into that bucket also fit into the

25  description in 157(d) of cases that require both consideration

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-1   Exhibit 71   Filed 07/29/2299   Page 129 of 262   PageID 2874

71

 1   of bankruptcy law and federal laws affecting interstate

 2   commerce or regulating it.  Right?  Some cases must fall into

 3   -- under 157(d), despite having something to do with Mr.

 4   Seery's role as a chief executive officer.  And Your Honor,

 5   the Advisers Act fiduciary duty claims asserted by Respondents

 6   in the District Court are such claims.  They cannot be decided

 7   without considering the Advisers Act.

 8       There are also RICO claims that, of course, require

 9   consideration of the RICO statute.  But the Advisers Act

10   claims absolutely require consideration of both bankruptcy law

11   and this Court's order exonerating -- exculpating Mr. Seery

12   from some liability, in addition to the unwaivable fiduciary

13   duties imposed by the Advisers Act.

14       The assertion of jurisdiction here blanketed, in a blanket

15   manner, over all claims against Mr. Seery in any way related

16   to his CEO role is a 157(d) problem that the order has no --

17   has no solution for and we see no way around.  157(d) requires

18   withdrawal of the reference, makes it mandatory, when a case

19   requires considerations of federal law implicating interstate

20   commerce.

21       Your Honor, we think we had to do it the way we did,

22   filing in the District Court instead of filing here, in order

23   to preserve our jurisdictional arguments.  To come to this

24   Court with a motion and then what?  Immediately file a motion

25   to withdraw the reference on our own motion here?  To come

HCMLPHMIT00002786

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 671    Filed 07/09/25    Page 130 of 262    PageID 2875

72

1   here and ask for a decision on colorability, when first

2   colorability would exclude the claims that we're trying to

3   bring, at least some of them, the mere negligence, mere

4   fiduciary duty breaches, because they don't rise to the level

5   necessarily of gross negligence or willful wrongdoing.

6       Your Honor, coming here and asking this Court to rule on

7   that may well have waived our jurisdictional objections.

8   Coming here to this Court and doing that and immediately

9   filing a motion --

10          THE COURT:  I don't get it.

11          MR. BRIDGES:  The ordinary --

12          THE COURT:  Subject matter jurisdiction, if it's a

13  problem, it's not waivable.

14          MR. BRIDGES:  The ordinary issue -- the ordinary

15  waiver rule, Your Honor, is that when you come and ask for a

16  court to rule on something, that you waive your right to -- to

17  later -- you're estopped judicially from taking the contrary

18  position.

19          THE COURT:  Okay.  Well, again, I don't get it.  If

20  you filed your motion and I ruled in a way you didn't like,

21  you would appeal to the District Court.

22          MR. BRIDGES:  Yes, Your Honor.  An appeal to the

23  District Court, we would be entitled to do.  I understand, no

24  matter what happens here, we can appeal to the District Court.

25  That's different from whether or not, by coming here first,

HCMLPHMIT00002787

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 6-1    Filed 07/09/25    Page 131 of 262    PageID 2876
Exhibit 71    Page 974 of 299

73

1   have we waived or have we created an estoppel situation, in

2   terms of arguing jurisdiction.

3           THE COURT:  Okay.

4           MR. BRIDGES:  Because of the problems with the order,

5   we thought we were in a situation where coming here would

6   waive rights that we could avoid waiving by asking in the

7   District Court.

8       In other words, there was a jurisdictional paradox:  How

9   does a party ask a court to do something it believes the court

10  lacks the power to do?  That's the spot we found ourselves in.

11  What were we supposed to do?

12      Your Honor, it is definitely a complex case.  And coming

13  into this matter with over 2,000 filings on the docket before

14  I had ever heard of Highland was a very daunting thing, coming

15  into this case.  And whether or not there's something that we

16  missed is certainly possible, but these orders that are the

17  subject of the contempt motion, these orders are not things

18  that we overlooked.  These are things that we studied

19  carefully, that we did not ignore or have disdain for, but

20  that affected and changed our actions.

21      And in the Slide #3 from Mr. Morris's -- from Mr. Morris's

22  presentation, in his third slide, he quotes from the first

23  page of our motion for leave, the motion that he says exhibits

24  our contemptuous behavior.

25      The second paragraph is kind of tiny print there, Your

HCMLPHMIT00002788

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-71   Filed 07/09/25   Page 132 of 262   PageID 2877

74

1    Honor, and it's not highlighted, but I'd like to read it.

2    Seery is not named in the original complaint, but this is only

3    out of an abundance of caution due to the Bankruptcy Court in

4    HCM's pending Chapter 11 proceeding having issued an order

5    prohibiting the filing of any causes of action against Seery

6    in any way related to his role at HCM, subject to certain

7    prerequisites.  In that order, the Bankruptcy Court also

8    asserts sole jurisdiction over all such causes of action.

9        Your Honor, our intent was not to violate the order.  Our

10   intent was to be cautious about how we proceeded, to fully

11   disclose what we were doing, and to do it in a District Court

12   that absolutely could refer the matter here to this Court for

13   a decision, but to do it in a way that didn't waive our

14   jurisdictional arguments, that didn't waive our arguments

15   regarding the release of the very claims we were trying to

16   bring, by first having to prove that they were colorful claims

17   of willful misconduct or gross negligence, when we were trying

18   to assert claims that weren't willful negligence or gross --

19   gross negligence or willful misconduct.  That was what I was

20   trying to say.

21       Your Honor, this was not disregard of your order.  If

22   we're wrong on the law, we're wrong on the law, but it's not

23   that we disregarded your order or lacked respect for it.  We

24   disclosed it.

25       Mr. Morris has argued in the briefs that we attempted to

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 3-71    Filed 07/09/2299    Page 133 of 262    PageID 2878

75

1    do this on an ex parte basis.  Your Honor, we did not attempt

2    to do this on an ex parte basis.  And if there are errors,

3    they probably are mine.  I know one error is mine.  On the

4    civil cover sheet in the filing in the District Court, I noted

5    and passed on that we should check the box for related case

6    and list this case on there.  I did not follow up to make sure

7    that it happened, and administratively, it didn't happen.  We

8    did not check the box on the civil cover sheet.  Mr. Morris is

9    correct that we failed to do that.  He's incorrect that that

10   was sneaky or intentional.  It was my error, having noticed it

11   but not followed up.

12       Your Honor, similarly, the argument that we didn't serve

13   them with the motion I think is disingenuous.  What happened,

14   Your Honor, is that counsel for the Debtor had agreed to

15   accept service of the complaint itself against the Debtor

16   before the motion for leave, and after accepting service, I

17   was under the impression that they'd be monitoring the docket,

18   especially when I emailed them, informed them that we were

19   filing the motion for leave to amend, because I was required

20   to submit a certificate of conference on that motion.  I

21   informed them in a polite email.  The polite email is not

22   quoted in their brief.  It is included in the record, and it's

23   quoted in full in our brief.

24       The email exchange indicates to them, Thank you for

25   pointing out the Court's orders.  We've carefully studied them

HCMLPHMIT00002790

 1   and we don't think what we're doing is a violation of those

 2   orders.

 3       That we didn't serve them is because we thought they

 4   already knew that the motion was coming and would be

 5   monitoring the docket, and we didn't know which lawyers they

 6   were going to have make an appearance in that case, so we

 7   wouldn't have known who to serve.  But if not serving them --

 8   first, the Rules do not require that service.  But if not

 9   serving them out of politeness --

10           THE COURT:  Mr. Morris is standing up.  Did --

11           MR. MORRIS:  I move to strike all of this, Your

12   Honor.  If Counsel wants to take the stand and raise his hand,

13   he should testify under oath.  I'm just going to leave it at

14   that.  He's not on their witness list.

15           THE COURT:  All right.  I overrule.  You can

16   continue.

17           MR. BRIDGES:  Thank you, Your Honor.

18       If failure to serve them was an error, it was mine.  I

19   know of no rule that requires it.

20           THE COURT:  Can I ask you, you were talking about the

21   cover sheet mistake in not checking the box.  What about your

22   jurisdictional statement in the actual complaint not

23   mentioning 28 U.S.C. § 1334 as a possible basis for subject

24   matter jurisdiction?  Do you think that was a mistake as well,

25   or was that purposeful, not necessary?

HCMLPHMIT00002791

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 671   Filed 07/09/25   Page 135 of 262   PageID 2880

77

1          MR. BRIDGES:  Candidly, Your Honor, standing here

2     right now, I have no recollection whatsoever of it.

3          THE COURT:  You mention 28 U.S.C. § 1331, and then

4     1367 supplemental jurisdiction, but you don't mention 1334.

5          MR. BRIDGES:  I suspect it's true, but Mr. Sbaiti

6     would have written that.

7          THE COURT:  Okay.

8          MR. BRIDGES:  I have no recollection of --

9          THE COURT:  Okay.

10          MR. BRIDGES:  -- making any decision at all --

11          THE COURT:  All right.

12          MR. BRIDGES:  -- with regards to that.

13          THE COURT:  Okay.

14          MR. BRIDGES:  Your Honor, you've been very patient

15     with a very long opening argument, and I'm very grateful for

16     that.  Please know that we take this Court's order seriously.

17     We voluntarily appeared here before the Court ordered us to do

18     so by filing our motion asking for a modification of the order

19     we're accused now of having been in violation of.

20        And the last thing I'd like to say, Your Honor, Mr.

21     Morris's brief claims that the first he knew of the motion,

22     the motion seeking leave to add Mr. Seery to the District

23     Court claim, the first he knew of that was when Mr. Sbaiti

24     forwarded him the District Court's order dismissing that

25     motion, denying that motion without prejudice.

1        Your Honor, in a civil contempt proceeding, where the

2    issue is compensating, not punishing, if the aggrieved party

3    didn't even know about the action until it had been denied by

4    the District Court, we submit that there can be no harm from

5    that having taken place.

6        That's all I have for opening.  Thank you, Your Honor.

7            THE COURT:  All right.  Thank you.

8        Before we give you a time check, do we have other opening

9    statements?

10           MR. ANDERSON:  Yes.  Yes, Your Honor.  Michael

11   Anderson on behalf of Mr. Patrick.  If we need to take a

12   break, that's fine, too.

13           THE COURT:  Well, how long do you plan to use?

14           MR. ANDERSON:  No more than ten minutes, for sure.

15           THE COURT:  Let's go ahead and do that, and then

16   we'll take a break.

17           MR. POMERANTZ:  Your Honor, after, I would ask the

18   opportunity to respond to Mr. Bridges' argument.  Probably

19   another ten minutes.

20           THE COURT:  All right.  Let's go ahead and take a

21   ten-minute break.  And Mr. Taylor, you're going to have

22   something, because you --

23           MR. TAYLOR:  Five.

24           THE COURT:   Okay.  We'll take a ten-minute break.

25   And Nate, can you give them a time?

HCMLPHMIT00002793

```
 1              THE CLERK:  I'm showing it was about 59-1/2 minutes.

 2              THE COURT:  Fifty-nine and a half?  And is that

 3    subtracting some for my questioning?

 4              THE CLERK:  I stopped whenever you talked, maybe a

 5    little over --

 6              THE COURT:  Okay.  So he stopped it whenever I asked

 7    questions and you answered, so 59 minutes has been used by the

 8    Respondents.

 9         All right.  We'll take a ten-minute break.  We'll come

10    back at 11:35.

11              THE CLERK:  All rise.

12         (A recess ensued from 11:25 a.m. to 11:37 a.m.)

13              THE COURT:  All right.  We're going back on the

14    record in the Highland matter.  We have further opening

15    statements.  Counsel, you may proceed.

16       OPENING STATEMENT ON BEHALF OF MARK PATRICK, RESPONDENT

17              MR. ANDERSON:  Thank you.  May it please the Court,

18    Counsel.  Michael Anderson on behalf of Respondent, Mark

19    Patrick.

20         Your Honor, after listening to this and looking at the

21    filings in this case, this issue of whether there's contempt

22    -- and I would argue there's not -- is ripe for decision.  We

23    have no real undisputed facts for purposes of the contempt

24    issue.  We have your Court's July order, the subject of Mr.

25    Bridge's arguments.  We have the Plaintiffs in the underlying
```

HCMLPHMIT00002794

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 6-71   Filed 09/09/22299  Page 138 of 262    PageID 2883

80

1  lawsuit at issue.  They commenced the lawsuit in April of this

2  year.  There's absolutely nothing improper about that filing.

3  It's not subject to the contempt.  A week later, there is a

4  motion for leave to add Mr. Seery.  That's the issue.  There's

5  no dispute over that.  There's no dispute that Mr. Patrick

6  authorized the filing of the motion for leave.

7      And so then the question becomes we look at the Court's

8  July order, did a motion for leave, did that violate the terms

9  of the order?  The motion for leave is not commencing a

10  lawsuit.  It's also not pursuing a claim, because whether or

11  not the Court grants the motion, denies the motion, or

12  whatever the Court does, nothing happened, because the day

13  after the motion for leave was filed it was dismissed *sua*

14  *sponte* without prejudice because not all parties had been

15  served in the case.

16      It was permission asked one day.  The matter was mooted

17  the following day by the District Court.  And so that is

18  completely undisputed.

19      And so the question is, is asking permission, is that

20  commence?  I think everybody says there's no way that's

21  commencing a lawsuit because you have asked permission.  The

22  question, then, is it pursuing a claim?  And the argument,

23  well, no, that's not pursuing a claim; it's asking permission.

24      And I think it's also important to note that when the

25  motion for leave was filed, there were no secrets there.  I

HCMLPHMIT00002795

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-71   Filed 09/29/2299   Page 139 of 262   PageID 2884

81

1   mean, I'm coming in this after the fact, representing Mr.

2   Patrick.  You look at a motion for leave, and right there on

3   Page 1 it talks about Your Honor's order.  Page 2, it quotes

4   the order and it gives the reasons, there's arguments being

5   made as to why that order doesn't bar adding Mr. Seery as a

6   defendant in the lawsuit, many of the arguments that Mr.

7   Bridges made.

8       So that's where we are.  And so when I hear, hey, we've

9   got six hours, three hours and three hours, and we're going to

10  split this up, you know, maybe too simplistic from Fort Worth,

11  but I'm like, wait a second, this is all undisputed.  It's

12  totally undisputed.  The -- whether or not the prior order is

13  enforceable or not enforceable, those are all legal arguments.

14  You know, no witnesses are necessary for that.  And as I

15  understood, right before we broke, counsel stood up and he's

16  going to do what generally doesn't happen in opening

17  statements, which is respond to opening statements, which

18  shows that that's a legal issue.

19      And so it really does come down to undisputed facts.

20  There's no testimony.  No -- nothing is necessary.  And a lot

21  of what this comes down to is the old statement, you know, is

22  it better to ask forgiveness or permission?  And usually that

23  statement comes up when somebody has already done something:

24  Hey, I'm going to go do it anyway and I'll ask for forgiveness

25  later.  Well, what the Plaintiffs in the underlying case did

001747

HCMLPHMIT00002796

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-71 Filed 09/30/25   Page 140 of 262   PageID 2885

82

 1  was ask permission.  Motion for leave.  That is not

 2  contemptuous.  And there's literally no damages.  As was

 3  pointed out, by the time counsel found out, it had already

 4  been dismissed.

 5       The last thing I want to point out, Your Honor, is that

 6  the argument from opposing counsel was, well, under Rule 15 of

 7  the Federal Rules of Civil Procedure, since parties hadn't

 8  answered yet, the Plaintiffs in the underlying case could have

 9  just simply added Mr. Seery as a defendant and moved on that

10  way, but then that would be another ball of wax and then we

11  would be addressing issues as far as whether or not there is a

12  violation of the Court's order, notwithstanding Mr. Bridge's

13  arguments.  But then we would have those issues.  But that's

14  not what happened.  Everybody knows that's not what happened.

15  It was a motion for leave that was resolved the following day.

16       And so, Your Honor, for those reasons, and those

17  undisputed reasons, we would request that the Court at the end

18  of this hearing deny the request for sanctions and a contempt

19  finding against our client, Mr. Patrick.

20       Mr. Phillips is going to address one brief issue

21  bankruptcy-wise I believe that was raised earlier.

22            THE COURT:  Okay.  Mr. Phillips?

23            MR. PHILLIPS:  Your Honor, thank you very much.

24  Louis M. Phillips on behalf of Mark Patrick.

25       The only thing that I would point out, Your Honor, and I'm

HCMLPHMIT00002797

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 61   Filed 09/09/22   Page 141 of 262   PageID 2886
Exhibit 71   Page 940 of 299

83

1   going to do -- try to simplistically, because that's about the

2   level at which I operate, boil down the questions about the

3   order.

4       This order was an employment order.  The problem that Mr.

5   Bridges has elucidated to Your Honor is that the precise

6   effect, one of the precise effects of that order is to bar the

7   claims of third parties that arise into the future on the

8   basis of the employment of Mr. Seery, because the order

9   required that all claims asserting gross negligence or willful

10  misconduct need to be brought before you to determine that

11  they're colorable.

12      One question I have is, does it apply to the lawsuit that

13  was filed?  Doesn't apply unless the effect of the order was

14  to release those claims and preclude any party from bringing

15  those claims at all.  And while you can say correctly that

16  this Court issues gatekeeper orders all of the time, one thing

17  I cannot imagine that you would say is that in employment

18  orders you release claims of third parties existing and as may

19  arise in the future that could be brought against the party

20  employed to be a CRO of a debtor, who, by his own testimony,

21  says we do all kinds of stuff in the billions of dollars for

22  third parties that we owe fiduciary duties to.

23      There's no way, Your Honor, that you were considering your

24  July order to bar third-party claims arising from breach of

25  fiduciary duties by Mr. Seery to third parties who held third-

001749

HCMLPHMIT00002798

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 1-71   Filed 09/09/22399   Page 142 of 262   PageID 2887

84

1  party claims that did not involve some assertion that, in his

2  capacity as CRO, he was in some way acting within the scope of

3  his authority as CRO for the Debtor and yet committed

4  negligence against the Debtor.

5       Now, if the order was asserting that you know what a lot

6  of people in this courtroom know, that the standard of

7  liability for a CRO doing work for a debtor, just like the

8  standard of liability for the president of a corporation or an

9  officer of the corporation, is as long as you're within the

10  course and scope of your employment, your actions for the

11  corporation have -- can -- the corporation takes care of you

12  because there's no personal claim unless you're outside the

13  scope, and you're outside the scope if you commit gross

14  negligence or willful misconduct.

15      That, if you're restating the standard of care and

16  standard of liability for a CRO, we have no problem with that,

17  because Mr. Patrick did not authorize a cause of action

18  arising against Mr. Seery against the Debtors for damage to

19  the Debtors.  He authorized the filing of a complaint in the

20  District Court with jurisdiction for a third-party claim for

21  breach of a fiduciary duty to a third party that Mr. Seery

22  admits he owes, and then sought leave because they didn't

23  understand the order that Your Honor issued.  It couldn't have

24  been to release the breach of fiduciary duty claims that

25  wouldn't rise to gross negligence or willful misconduct, it

HCMLPHMIT00002799

1    couldn't be that, but it might be.  But if it did, under an

2    employment order?  That's very different from *Espinosa*, that's

3    very different from *Shoaf*, when you're at the end of a case in

4    a confirmation of a plan and you're talking about matters

5    arising in the past.

6         This order, if it has the effect it could be read to have,

7    precludes any third party from asserting a breach of fiduciary

8    duty against Seery for actions that violate the duty to that

9    third party, when Seery's biggest job, it looks to us like, is

10   running third-party money.  That could not have been what Your

11   Honor was thinking.

12        And so all I'm pointing out is I'm trying to distill down.

13   The lawsuit doesn't involve gross negligence or willful

14   misconduct allegations.  It involves breach of fiduciary duty,

15   breach of the Advisers Act, et cetera, et cetera.  Mr. Patrick

16   authorized that lawsuit.

17        Now, what we're here for today is to determine whether the

18   complaint, which was not against the Debtor -- which was not

19   against Seery, the motion for leave, which did not -- all they

20   did was ask for permission, not forgiveness.  And we can't

21   understand how the Debtor should be saying, all they had to do

22   was amend.  Well, if they amended, would we be in hotter water

23   than we are today for asking for permission to sue?  I think

24   we would have been, that should have been the prescribed

25   course, when we are more concerned and we are more risk-averse

HCMLPHMIT00002800

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document Exhibit 71 Filed 07/07/25    Page 144 of 262    PageID 2889

86

1    by asking for leave rather than just amending by right.

2    Absolutely, that makes no sense.  We can't be held to be more

3    contemptuous because we asked for permission, when we could

4    have just sued him, because they're saying asking for

5    permission was wrong.  Certainly, suing him would have been

6    wrong.  That would have been easier.

7            THE COURT:  But Mr. Phillips, the issue is you all

8    didn't come to the Bankruptcy Court and ask permission.

9            MR. PHILLIPS:  Look at your order, Your Honor.

10            THE COURT:  It's right in front of me.

11            MR. PHILLIPS:  Right.  That order either doesn't

12    apply to the claims that were brought or it released the

13    claims that were brought.  That's our point.  It couldn't have

14    released them.  Does it apply to them?  Thank you.

15            THE COURT:  Okay.  Mr. Taylor?

16            MR. TAYLOR:  Good morning.

17            THE COURT:  Good morning.

18            OPENING STATEMENT ON BEHALF OF JAMES DONDERO

19            MR. TAYLOR:  Your Honor, Clay Taylor on behalf of Jim

20    Dondero.  I'll be very brief because I know we've already

21    spent a lot of time on opening argument.  But I do think it is

22    appropriate to, one, first look at who brought the lawsuit,

23    CLO Holdco & DAF.  That was authorized -- it's undisputed it

24    was authorized by Mr. Patrick.  There is no dispute about

25    that.  There's no dispute who the Plaintiffs are.  But yet my

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 71   Filed 08/07/25   Page 145 of 262   PageID 2890

87

1   client is up here as an alleged violator.

2       I think it's very clear, as all the parties have said,

3   there's no dispute as to there's an order, there was a

4   complaint, and there was a motion for leave.

5       It seems to me that the rest of the evidentiary hearing

6   that you may be about to go through is going to be about pin

7   the blame on Mr. Dondero.  It is undisputed that he is not a

8   control person for the DAF or CLO Holdco.  The only type of

9   evidence you will hear is going to be insinuation that he

10  somehow controls Mr. Patrick and used to control Mr. Scott.

11  There will be no direct evidence that he authorized this or

12  that he's the control person and the proper corporate

13  authorized representative that signed off on the --

14      It seems to me, Your Honor, first of all, that's a

15  discrete issue that should be able to be decided separately

16  from this, and the first gating issue is, was there indeed a

17  violation of this Court's order?  It would seem to me that

18  there is no disputes about those facts and that we should

19  bifurcate that, and if you then find that there is a violation

20  and find that there is any even need to move into who the

21  alleged violators are, that then we could have that

22  evidentiary portion.  But there is no reason to do that now

23  before there's even been found to be a violation.

24          THE COURT:  All right.  Thank you.

25      All right.  Well, someone made the point rebuttals in

HCMLPHMIT00002802

1   opening statements are not very common, --

2           MR. POMERANTZ:  Your -- Your --

3           THE COURT:  -- but you can use your three hours

4   however you want.

5               OPENING STATEMENT ON BEHALF OF THE DEBTOR

6           MR. POMERANTZ:  Your Honor, I didn't intend to stand

7   up.

8           THE COURT:  Okay.

9           MR. POMERANTZ:  I also didn't intend to have the

10  motion to modify the sealing order presented to Your Honor,

11  which it was in the course of that opening argument.  And

12  despite your comments at the beginning of the hearing, the

13  Movants have taken Your Honor down a series of rabbit holes

14  that have really no relevance to the contempt motion.  And

15  notwithstanding, as I said, your ruling that basically the

16  contempt would go first and the modification would go second,

17  there they were, persistent in making all the arguments why

18  this Court should modify the order.

19      They're just really trying to obfuscate the simple issue

20  that Mr. Morris presented and raised at the beginning of the

21  hearing:  Did they violate the order by pursuing a claim?  We

22  think the answer is undoubtedly yes.

23      I'm not going to try to address each of the issues they

24  raised in connection with the modification motion in detail.

25  I have a lengthy presentation.  I'll do it at the appropriate

HCMLPHMIT00002803

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 71    Filed 09/02/299    Page 147 of 262    PageID 2892

89

1    time.  But there are a few issues I want to address.  I want

2    to address one of the last points Mr. Bridges raised first.

3    If they thought that the order was a problem, they could have

4    filed their motion to modify that order before Your Honor.

5    They could have had that heard first.  There was no statute of

6    limitations issue in connection with the HarbourVest matter.

7    They could have come to Your Honor to do that.  But no, they

8    didn't.  They went to the District Court first, and it was

9    only after we filed our contempt motion that they came back

10    and said, well, Your Honor, you should modify the order.

11    Their argument that if they did that there would have been

12    waiver and estoppel is just an after-the-fact justification

13    for what they did and what they tried to do, which was

14    unsuccessful.  They tried to have the District Court make the

15    decision.

16        And why?  Your Honor, they've filed motions to recuse

17    before Your Honor.  They -- they -- it's no secret the disdain

18    they have for Your Honor's rulings as it relates to them.

19    They wanted to be out of this courtroom and in another

20    courtroom.

21        And their belated argument, Mr. Bridges falling on the

22    sword, that they failed to check the box, inadvertent, it's on

23    me, it's very curious.  Because if they had done so and had

24    referred to the correct 1334 jurisdictional predicate, as Your

25    Honor had mentioned, the complaint would have been referred to

HCMLPHMIT00002804

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document Exhibit 71 Filed 09/09/25   Page 148 of 262   PageID 2893

90

1   this Court and the entire trajectory of the proceedings would

2   have been different.  They would have had the opportunity to

3   take their shot to go to District Court and argue that your

4   order didn't apply.

5        Your Honor, they say the January 9th order is not

6   relevant.  It is entirely relevant.  It covered the

7   independent directors and their agents.  Yes, Mr. Seery is an

8   independent director, but he was also an agent of the

9   independent directors and carried out the duties.  You heard

10  argument at the July 16th hearing that Mr. Seery had been

11  acting as the chief executive officer for several months.  And

12  why is it important?  Mr. Bridges said, well, if we violated

13  one order, we violated the other.  It's important because,

14  Your Honor, number one, Mr. Dondero supported that order.  We

15  would never have had an independent board in this case if Mr.

16  Dondero, the decision-making -- of the Debtor at that time,

17  supported that order and supported the exculpations that are

18  now claimed to have been invalid.

19       And also Your Honor heard testimony at the confirmation

20  hearing that the independent directors would never have taken

21  this job, would never have taken this job because of the

22  potential for litigation, litigation that we've now had to

23  endure for several months.  So to come back 16 months later

24  and say, well, you know, you couldn't really exculpate them,

25  it's really an employment order:  It was an employment order.

001756

HCMLPHMIT00002805

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 1671 Filed 09/29/2299    Page 149 of 262    PageID 2894

91

1    They know it.  We know it.  Your Honor knows it.  It was a

2    resolution of corporate governance issues that changed the

3    whole trajectory of the case, and luckily it -- luckily, Your

4    Honor approved it.

5        The question just is whether they violated the order,

6    period.  And I'll have a lot to say about res judicata, but I

7    won't go in too much in detail, but I will just briefly

8    address their arguments.  They're correct and the Court is

9    correct that there's a difference between *Applewood* and *Shoaf*.

10    And Your Honor got the exact difference.  In one case, a

11    release was not specific, *Applewood*.  In one case it was.

12    *Shoaf* hasn't been discredited by *Applewood*.  It was different

13    facts.  In fact, *Shoaf* relied on two Supreme Court cases, the

14    *Stoll* case and the *Chicot* case, both for the propositions that

15    a court that enters an order, a clear order, even if it didn't

16    have jurisdiction, that cannot be attacked in res judicata.

17    So here what we have is clear, unambiguous, you come to this

18    Court before commencing or pursuing a claim.  That's the

19    clarity.  The focus on the releases, that's not what we're

20    here for today, that's not what we're here for on a contempt

21    motion, on whether the release covered them or it didn't cover

22    them.  We're here on the clear issue of did they violate the

23    language, and we submit that they did.

24        And similarly, *Espinosa* applies.  Your Honor, just to

25    quote some language, "Appellees could have moved to remand the

001757

HCMLPHMIT00002806

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 6-71    Filed 09/30/2299    Page 150 of 262    PageID 2895

92

1    action to state court after it improperly -- after its

2    improper removal to the federal court or challenge the

3    district court's exercise in jurisdiction on direct appeal.

4    Because they did neither, they are now barred by principles of

5    res judicata."

6        Res judicata actually does apply, and I will speak about

7    it in much more detail in the modification motion.

8        With respect to *Barton*, Your Honor, we disagree with their

9    argument that Mr. Seery is not a court-appointed agent.  We've

10   briefed it extensively in our motion to modify.  *Barton*

11   applies to debtors in possession.  *Barton* applies to general

12   partners of the debtor.  *Barton* applies to chief restructuring

13   orders -- officers who are approved by the debtor.  And it

14   applies to general counsel who are appointed by the chief

15   restructuring order.  Officer.

16       So the argument that *Barton* is somehow inapplicable is

17   just wrong.  Your Honor knows that.  Your Honor has written

18   extensively on *Barton* in connection with your *Ondova* opinion.

19       Some of the argument about 959 is all wrong, as well.

20   Your Honor got it right that 959 applies to slip-and-fall

21   cases or torts, injuries to parties that are strangers to this

22   process.  There is a legion of cases that I will cite to Your

23   Honor in connection with argument.  959 does not apply here.

24   There's nothing more core to this case than the transactions

25   surrounding the resolution of the HarbourVest claims.

001758

HCMLPHMIT00002807

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6-1   Filed 09/09/22299   Page 151 of 262   PageID 2896

93

1       We also disagree, Your Honor, that the complaint is

2   subject to mandatory withdrawal of the reference.  We've --

3   one of our exhibits in the motion to modify is our motion to

4   enforce the reference.  We think Movants have it completely

5   wrong.  This is not the type of case that will be subject to

6   withdrawal -- mandatory withdrawal of the reference, and in

7   any event, for this contempt motion, it's irrelevant.

8       And they argue -- one of the other points Mr. Bridges

9   raises is that, because this Court would not have had

10  jurisdiction under 157 because of the mandatory withdrawal,

11  then Your Honor could not legally act as a gatekeeper.  But

12  they haven't addressed *Villegas v. Schmidt*.  We've raised it

13  throughout this case.  And again, in these series of

14  pleadings, they don't even address it.  And *Villegas v.*

15  *Schmidt* was a *Barton* case.  It was a *Barton* case where the --

16  where the argument was that *Barton* does not apply because it's

17  a *Stern* claim and the Bankruptcy Court would not have

18  jurisdiction.  And *Villegas* said no, it does apply.  And Your

19  Honor even cited that in your *Ondova* case.  And why does it

20  apply?  Because there's nothing inconsistent with a Bankruptcy

21  Court having exclusive decision to make a *Barton*

22  determination.

23      In fact, in that case *Villegas* said, you can't go to the

24  District Court for that decision, it is the Bankruptcy Court's

25  decision.

001759

HCMLPHMIT00002808

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 71 Filed 06/20/25   Page 152 of 262   PageID 2897

94

```
 1        So, again, it's a red herring, Your Honor.  Your Honor had

 2   the ability to act as an exclusive gatekeeper for these types

 3   of actions.

 4        With that, Your Honor, I'll leave the rest of my argument

 5   for the next motion.

 6            THE COURT:  All right.  Thanks.

 7        All right.  Nate, let's give everyone their time.

 8            THE CLERK:  That was just about eight and a half

 9   additional from the Debtor, and then altogether the other ones

10   were just shy of fourteen minutes.  Thirteen minutes and fifty

11   seconds for the other three combined.  Do you want me to --

12            THE COURT:  Yes, I meant for Debtor combined versus

13   --

14            THE CLERK:  Oh.  Oh.

15            THE COURT:  Respondents combined.

16            THE CLERK:  So that would be twenty one and a half

17   the Debtor.  Let me do the math on the other one.  Be an hour

18   twelve minutes and fifty seconds for --

19            THE COURT:  Okay.  All right.  Got that?  Debtors

20   used a total of twenty one and a half minutes; Responders have

21   used an hour twelve minutes and fifty seconds.

22        All right.  Mr. Morris, you may call your first witness.

23            MR. MORRIS:  Thank you very much, Your Honor.  The

24   Debtor calls Mark Patrick.

25            THE COURT:  All right.  Mr. Patrick?  Please approach
```

HCMLPHMIT00002809

Patrick - Direct                                95

1  our witness stand and I'll swear you in.  Please raise your

2  right hand.

3        (The witness is sworn.)

4            THE COURT:  All right.  Please take a seat.

5            MARK PATRICK, DEBTOR'S WITNESS, SWORN

6                    DIRECT EXAMINATION

7  BY MR. MORRIS:

8  Q    Good afternoon, Mr. Patrick.

9  A    Good afternoon.

10 Q    Can you hear me okay?

11 A    Yes, I can.

12 Q    Okay.  You have before you several sets of binders.

13 They're rather large.  But when I deposed you on Friday, we

14 did that virtually.  Now, I may direct you specifically to one

15 of the binders or one of the documents from time to time, so I

16 just wanted you to know that those were in front of you and

17 that I may be doing that.

18      Mr. Patrick, since March 1st, 2001 [sic], you've been

19 employed by Highland Consultants, right?

20 A    I believe the name is Highgate Consultants doing business

21 as Skyview Group.

22 Q    Okay.  And that's an entity that was created by certain

23 former Highland employees, correct?

24 A    That is my understanding, correct.

25 Q    And your understanding is that Mr. Dondero doesn't have an

001761

HCMLPHMIT00002810

1   ownership interest in that entity, correct?

2   A    That he does not.  That is correct.

3   Q    And your understanding is that he's not an employee of

4   that -- of Skyview, correct?

5   A    That is correct.

6   Q    Prior to joining Skyview on March 1st, you had worked at

7   Highland Capital Management, LP for about 13 years, correct?

8   A    Correct.

9   Q    Joining in, I believe, early 2008?

10  A    Correct.

11  Q    Okay.  I'm going to refer to Highland Capital Management,

12  LP from time to time as HCMLP.  Is that okay?

13  A    Yes.

14  Q    While at HCMLP, you served as a tax counselor, correct?

15  A    No, I would like to distinguish that.  I did have the

16  title tax counsel.  However, essentially all my activities

17  were in a non-lawyer capacity, being the client

18  representative.  I would engage other outside law firms to

19  provide legal advice.

20  Q    Okay.  So you are an attorney, correct?

21  A    Yes, I am.

22  Q    But essentially everything you did at Highland during your

23  13 years was in a non-lawyer capacity, correct?

24  A    Correct.

25  Q    In fact, you didn't even work in the legal department; is

HCMLPHMIT00002811

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 6171   Filed 09/02/2199   Page 155 of 262   PageID 2900

Patrick - Direct                                                    97

1   that right?

2   A    That is correct.  I worked for the tax department.

3   Q    Okay.  Let's talk about how you became the authorized

4   representative of the Plaintiffs.  You are, in fact,

5   authorized representative today of CLO Holdco, Ltd. and

6   Charitable DAF, LP, correct?

7   A    Charitable DAF Fund, LP.  Correct.

8   Q    And those are the two entities that filed the complaint in

9   the United States District Court against the Debtor and two

10  other entities, correct?

11  A    Correct.

12  Q    And may I refer to those two entities going forward as the

13  Plaintiffs?

14  A    Yes.

15  Q    You became the authorized representative of the Plaintiffs

16  on March 24th, 2021, the day you and Mr. Scott executed

17  certain transfer documents, correct?

18  A    Correct.

19  Q    And you had no authority to act on behalf of either of the

20  Plaintiffs before March 24th, correct?

21  A    Correct.

22  Q    The DAF controls about $200 million in assets, correct?

23  A    The Plaintiffs, you mean?  CLO Holdco and Charitable DAF

24  Fund, LP.

25  Q    Yes.

HCMLPHMIT00002812

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document Exhibit 71   Filed 09/09/2399   Page 156 of 262   PageID 2901

Patrick - Direct                          98

1   A    Around there.

2   Q    Okay.  Let me try and just ask that again, and thank you

3   for correcting me.  To the best of your knowledge, the

4   Plaintiffs control about $200 million in assets, correct?

5   A    Net assets, correct.

6   Q    Okay.  And that asset base is derived largely from HCMLP,

7   Mr. Dondero, or Mr. Dondero's trusts, correct?

8   A    Can you restate that question again, Mr. Morris?

9   Q    Sure.  The asset base that you just referred to is derived

10  largely from HCMLP, Mr. Dondero, or donor trusts?

11  A    The way I would characterize it -- you're using the word

12  derived.  I would characterize it with respect to certain

13  charitable donations --

14  Q    Uh-huh.

15  A    -- that were -- that were made at certain time periods,

16  where the donors gave up complete dominion and control over

17  the respective assets and at that time claimed a federal

18  income tax deduction for that.

19       I do -- I do believe that, as far as the donor group, as

20  you specified, Highland Capital Management, I recall, provided

21  a donation to a Charitable Remainder Trust that eventually had

22  expired and that eventually such assets went into the

23  supporting organizations.  And then I do believe Mr. Dondero

24  also contributed to the Charitable Remainder Trust No. 2,

25  which seeded substantial amounts of the original assets that

001764

HCMLPHMIT00002813

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 34-71    Filed 09/09/25    Page 157 of 262    PageID 2902
Exhibit 71    Page 100 of 299

Patrick - Direct                                99

1  were eventually composed of the $200 million.  And then from

2  time to time I do believe that Mr. Dondero's trusts made

3  charitable donations to their respective supporting

4  organizations.

5  Q    Okay.  Thank you.

6  A    Is that responsive?

7  Q    It is.  It's very responsive.  Thank you very much.  So,

8  to the best of your knowledge, the charitable donations that

9  were made that form the bases of the assets came from those

10  three -- primarily from those three sources, correct?

11  A    Well, you know, there's two different trusts.  There's the

12  Dugaboy Trust and the Get Good Trust.

13  Q    Okay.

14  A    Then you have Mr. Dondero and Highland Capital Management.

15  So I would say four sources.

16  Q    Okay.  All right.  Thank you.  Prior to assuming your role

17  as the authorized representative of the Plaintiff, you had

18  never had meaningful responsibility for making investment

19  decisions, correct?

20  A    I'm sorry.  You kind of talk a little bit fast.  Please

21  slow it down --

22  Q    That's okay.

23  A    -- and restate it.  Thank you.

24  Q    And I appreciate that.  And any time you don't understand

25  what I'm saying or I speak too fast, please do exactly what

001765

HCMLPHMIT00002814

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 09/09/25299 Page 158 of 262   PageID 2903

Patrick - Direct                    100

1    you're doing.  You're doing fine.

2        Prior to assuming your role as the authorized

3    representative of the Plaintiffs, you never had any meaningful

4    responsibility making investment decisions.  Is that correct?

5    A    To whom?

6    Q    For anybody.

7    A    Well, during my deposition, I believe I testified that I

8    make investment decisions with respect to my family.  Family

9    and friends come to me and they ask me for investment

10   decisions.  I was -- in my deposition, I indicated to you that

11   I was a board member of a nonprofit called the 500, Inc.  They

12   had received a donation of stock in Yahoo!, and the members

13   there looked to me for financial guidance.  As an undergrad at

14   the University of Miami, I was a -- I was a finance major, and

15   so I do have a variety of background with respect to

16   investments.

17   Q    Okay.  So you told me that from time to time friends and

18   family members come to you for investing advice.  Is that

19   right?

20   A    That is correct.

21   Q    And when you were a young lawyer you were on the board of

22   a nonprofit that received a donation of Yahoo! stock and the

23   board looked to you for guidance.  Is that correct?

24         THE COURT:  Just a moment.  I think there's an

25   objection.

HCMLPHMIT00002815

Patrick - Direct                                    101

1              MR. MORRIS:  Uh-huh.

2              THE COURT:  Go ahead.

3              MR. ANDERSON:  So far -- relevance, Your Honor.  This

4    is way out of the bounds of the contempt proceeding.  You

5    know, what he did as a young person with Yahoo! stock.  We're

6    here to -- he authorized the lawsuit.  They filed the lawsuit.

7    That's it.  Getting into all this peripheral stuff is

8    completely irrelevant.

9              THE COURT:  Your response?

10             MR. MORRIS:  My response, Your Honor, is very simple.

11   Mr. Patrick assumed responsibility, and you're going to be

12   told that he exercised full and complete authority over a $200

13   million fund that was created by Mr. Dondero, --

14             THE COURT:  Okay.

15             MR. MORRIS:  -- that funds -- that is funded

16   virtually by Mr. Dondero, and for which -- Mr. Patrick is a

17   lovely man, and I don't mean to disparage him at all -- but he

18   has no meaningful experience in investing at all.

19             THE COURT:  All right.  Counsel, I overrule.  I think

20   there's potential relevance.

21        And may I remind people that when you're back at counsel

22   table, please make sure you speak your objections into the

23   microphone.  Thank you.

24   BY MR. MORRIS:

25   Q    When you were a young lawyer, sir, you were on the board

001767

HCMLPHMIT00002816

1   of a nonprofit that received a donation of Yahoo! stock and

2   the board looked to you for guidance, correct?

3   A    Yes, correct.

4   Q    And -- but during your 13 years at Highland, you never had

5   formal responsibility for making investment decisions,

6   correct?

7   A    That is correct.

8   Q    Yeah.  In fact, other than investment opportunities that

9   you personally presented where you served as a co-decider, you

10  never had any responsibility or authority to make investment

11  decisions on behalf of HCMLP or any of its affiliated

12  entities, correct?

13  A    That is correct.

14  Q    And at least during your deposition, you couldn't identify

15  a single opportunity where you actually had the authority and

16  did authorize the execution of a transaction on behalf of

17  HCMLP or any of its affiliates, correct?

18  A    Correct.

19  Q    And yet today you are now solely responsible for making

20  all investment decisions with respect to a $200 million

21  charitable fund, correct?

22  A    Yes, but I get some help.  I've engaged an outside third

23  party called ValueScope, and they have been as -- effectively

24  working as a "gatekeeper" for me, and I look to them for

25  investment guidance and advice, and I informally look to Mr.

001768

HCMLPHMIT00002817

Patrick - Direct                                                    103

1   Dondero since the time period of when I took control on March

2   24th for any questions I may have with respect to the

3   portfolio.  So I don't feel like I'm all by myself in making

4   decisions.

5   Q    Okay.  I didn't mean to suggest that you were, sir, and I

6   apologize if you took it that way.  I was just asking the

7   question, you are the person now solely responsible for making

8   the investment decisions, correct?

9   A    Yes.

10   Q    Okay.  Let's talk about the circumstances that led to the

11   filing of the complaint for a bit.  On April 12, 2021, you

12   caused the Plaintiffs to commence an action against HCMLP and

13   two other entities, correct?

14   A    Correct.

15   Q    Okay.  One of the binders -- you've got a couple of

16   binders in front of you.  If you look at the bottom, one of

17   them says Volume 1 of 2, Exhibits 1 through 18.  And if you

18   could grab that one and turn to Exhibit 12.  Do you have that,

19   sir?

20   A    It says -- it says the original complaint.  Is that the

21   right one?

22   Q    That is the right one.  And just as I said when we were

23   doing this virtually last Friday, if I ask you a question

24   about a particular document, you should always feel free to

25   review as much of the document as you think you need to

001769

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 09/09/25    Page 162 of 262    PageID 2907

Patrick - Direct                    104

1   competently and fully answer the question.  Okay?

2   A    Okay.  Thank you.

3   Q    All right.  You instructed the Sbaiti firm to file that

4   complaint on behalf of the Plaintiffs, correct?

5   A    Correct.

6   Q    And to the best of your recollection, the Plaintiffs

7   returned -- retained the Sbaiti firm in April, correct?

8   A    Correct.

9   Q    So the Sbaiti firm was retained no more than twelve days

10  before the complaint was filed, correct?

11  A    Correct.

12  Q    You personally retained the Sbaiti firm, correct?

13  A    Correct.

14  Q    And the idea of filing this complaint originated with the

15  Sbaiti firm, correct?

16  A    Correct.

17  Q    Before filing -- withdrawn.  Before becoming the

18  Plaintiffs' authorized representative, you hadn't had any

19  communications with anyone about potential claims that might

20  be brought against the Debtor arising out of the HarbourVest

21  settlement, correct?

22  A    That is correct.

23  Q    Now, after you became the Plaintiffs' authorized

24  representative, Mr. Dondero communicated with the Sbaiti firm

25  about the complaint that's marked as Exhibit 12, correct?

001770

HCMLPHMIT00002819

1   A    Yes.  After he brought certain information to myself and

2   then that I engaged the Sbaiti firm to launch an

3   investigation, I also wanted Mr. Dondero to work with the

4   Sbaiti firm with respect to their investigation of the

5   underlying facts.

6   Q    Okay.  Mr. Dondero did not discuss the complaint with you,

7   but he did communicate with the Sbaiti firm about the

8   complaint, correct?

9   A    I believe -- yeah.  I heard you slip in at the end "the

10  complaint."  I know he communicated with the Sbaiti firm.  I

11  can't -- I can't say what he said or didn't say with respect

12  to the -- the actual complaint.

13  Q    Okay.  But Mr. Dondero got involved in the process

14  initially when he brought some information to your attention

15  concerning the HarbourVest transaction, correct?

16  A    Correct.

17  Q    And he came to you with the HarbourVest information after

18  you assumed your role as the authorized representative of the

19  Plaintiffs on March 24th, correct?

20  A    That is correct.

21  Q    At the time he came to you, you did not have any specific

22  knowledge about the HarbourVest transaction, correct?

23  A    I did not have specific knowledge with respect to the

24  allegations that were laid out and the facts with respect to

25  the original complaint.  I think I had just had a general

HCMLPHMIT00002820

1   awareness that there was a HarbourVest something or other, but

2   the specific aspects of it, I was unaware.

3   Q    Okay.  And you had no reason to believe that Mr. Seery had

4   done anything wrong with respect to the HarbourVest

5   transaction at the time you became the Plaintiffs' authorized

6   representative, correct?

7   A    That is correct.

8   Q    But you recall very specifically that some time after

9   March 24th Mr. Dondero told you that an investment opportunity

10  was essentially usurped or taken away, to the Plaintiffs' harm

11  and for the benefit of HCMLP, correct?

12  A    That is correct.

13  Q    And after Mr. Dondero brought this information to your

14  attention, you hired the Sbaiti firm to launch an

15  investigation into the facts, correct?

16  A    Correct.

17  Q    You had never worked with the Sbaiti firm before, correct?

18  A    That is correct.

19  Q    And you had hired many firms as a tax counselor at HCMLP,

20  but not the Sbaiti firm until now.  Correct?

21  A    That is correct.

22  Q    You got to the Sbaiti firm through a recommendation from

23  D.C. Sauter, correct?

24  A    Correct.

25  Q    Mr. Sauter is the in-house counsel, the in-house general

001772

1  counsel at NexPoint Advisors, correct?

2  A    Correct.

3  Q    You didn't ask Mr. Sauter for a recommendation for a

4  lawyer; he just volunteered that you should use the Sbaiti

5  firm.  Correct?

6  A    That is correct.

7  Q    And you never used -- considered using another firm, did

8  you?

9  A    When they were presented to me, they appeared to have all

10  the sufficient skills necessary to undertake this action, and

11  so I don't recall interviewing any other firms.

12  Q    Okay.  Now, after bringing the matter to your action, Mr.

13  Dondero communicated directly with the Sbaiti firm in relation

14  to the investigation that was being undertaken.  Correct?

15  A    That is correct.

16  Q    But you weren't privy to the communications between Mr.

17  Dondero and the Sbaiti firm, correct?

18  A    I did not participate in those conversations as the --

19  what I, again, considered Mr. Dondero as the investment

20  advisor to the portfolio, and he was very versant in the

21  assets.  I wanted him to participate in the investigation that

22  the Sbaiti firm was undertaking prior to the filing of this

23  complaint.

24  Q    Let's talk for a minute about the notion of Mr. Dondero

25  being the investment advisor.  Until recently, the entity

001773

HCMLPHMIT00002822

1    known as the DAF had an investment advisory committee with HC

2    -- an investment advisory agreement with HCMLP.  Correct?

3    A    It's my understanding that the investment advisory

4    agreement existed with the Plaintiffs, CLO Holdco, as well as

5    Charitable DAF Fund, LP, up and to the end of February,

6    throughout the HarbourVest transaction.

7    Q    Okay.  And since February, the Plaintiffs do not have an

8    investment advisory agreement with anybody, correct?

9    A    That is correct.

10   Q    Okay.  So Mr. Dondero, if he serves as an investment

11   advisor, it's on an informal basis.  Is that fair?

12   A    After I took control, he serves as an informal investment

13   advisor.

14   Q    Okay.  So there's no contract that you're aware of between

15   either of the Plaintiffs and Mr. Dondero pursuant to which he

16   is authorized to act as the investment advisor for the

17   Plaintiffs, correct?

18   A    That is correct.

19   Q    Okay.  When you communicated with Grant Scott --

20   withdrawn.  You know who Grant Scott is, right?

21   A    Yes, I do.

22   Q    He's the gentleman who preceded you as the authorized

23   representative of the Plaintiffs, correct?

24   A    Yes.

25   Q    Okay.  You communicated with Mr. Scott from time to time

001774

HCMLPHMIT00002823

1  during February and March 2021, correct?

2  A    February and March are the dates?  Yes.

3  Q    Yeah.  And from February 1st until March 21st -- well,

4  withdrawn.  Prior to March 24th, 2021, Mr. Scott was the

5  Plaintiffs' authorized representative, correct?

6  A    Correct.

7  Q    And you have no recollection of discussing with Mr. Scott

8  at any time prior to March 24th any aspect of the HarbourVest

9  settlement with Mr. Scott.  Correct?

10 A    Correct.

11 Q    And you have no recollection of discussing whether the

12 Plaintiffs had potential claims that might be brought against

13 the Debtor.  Correct?  Withdrawn.  Let me ask a better

14 question.

15      You have no recollection of discussing with Mr. Scott at

16 any time prior to March 24th whether the Plaintiffs had

17 potential claims against the Debtor.  Correct?

18 A    That is correct.

19 Q    You and Mr. Scott never discussed whether either of --

20 either of the Plaintiffs had potential claims against Mr.

21 Seery.  Correct?

22 A    Correct.

23 Q    Okay.  At the time that you became their authorized

24 representative, you had no knowledge that the Plaintiffs would

25 be filing a complaint against the Debtors relating to the

HCMLPHMIT00002824

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 01/09/25   Page 168 of 262   PageID 2913
Exhibit 71   Page 109 of 299

Patrick - Direct                110

1    HarbourVest settlement less than three weeks later, correct?

2    A    That is correct.

3    Q    Okay.  Now, if you look at Page 2 of the complaint, you'll

4    see at the top it refers to Mr. Seery as a potential party.

5    Do you see that?

6    A    Yes, I do.

7    Q    Okay.  You don't know why Mr. Seery was named --

8    withdrawn.  You don't know why Mr. Seery was not named as a

9    defendant in the complaint, correct?

10   A    No, I -- that's correct.  I do not know why he was not

11   named.  That's in the purview of the Sbaiti firm.

12   Q    Okay.  And the Sbaiti firm also made the decision to name

13   Mr. Seery on Page 2 there as a potential party when drafting

14   the complaint, correct?

15   A    That's what the document says.

16   Q    And you weren't involved in the decision to identify Mr.

17   Seery as a potential party, correct?

18   A    That is correct.  Again, I rely on the law firm to decide

19   what parties to bring a suit to -- against.

20   Q    Okay.  Okay.  Do you recall the other day we talked about

21   a document called the July order?

22   A    Yes.

23   Q    Okay.  That's in -- that's in Tab 16 in your binder, if

24   you can turn to that.  And take a moment to look at it, if

25   you'd like.  And my first question is simply whether this is

HCMLPHMIT00002825

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 01/02/05299 Page 169 of 262    PageID 2914

Patrick - Direct                                111

1   the July order, as you understand it.

2       (Pause.)

3   A    Yes, it is.  I was just looking for the gatekeeper

4   provision.  It looks like it's Paragraph 5.  So, --

5   Q    Okay.  Thank you for that.  About a week after the

6   complaint was filed, you authorized the Plaintiffs to file a

7   motion in the District Court for leave to amend the

8   Plaintiffs' complaint to add Mr. Seery as a defendant.

9   Correct?

10  A    I authorized the filing of a motion in Federal District

11  Court that would ask the Federal District Court whether or not

12  Jim Seery could be named in the original complaint with

13  respect to the gatekeeper provision cited in that motion and

14  with respect to the arguments that were made in that motion.

15  Q    Okay.  Just to be clear, if you turn to Exhibit 17, the

16  next tab, --

17  A    I'm here.

18  Q    -- do you see that document is called Plaintiffs' Motion

19  for Leave to File First Amended Complaint?

20  A    Yes.

21  Q    And that's the document that you authorized the Plaintiffs

22  to file on or about April 19th, correct?

23  A    Correct.

24  Q    Okay.  And can we refer to that document as the motion to

25  amend?

HCMLPHMIT00002826

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 03/03/25    Page 170 of 262    PageID 2915

Patrick - Direct                        112

1    A    Yes.

2    Q    Okay.  You were aware of the July order at Tab 16 before

3    you authorized the filing of the motion to amend.  Correct?

4    A    Yes, because it's cited in the motion itself.

5    Q    Okay.  And at the time that you authorized the filing of

6    the motion to amend, you understood that the July order was

7    still in effect.  Correct?

8    A    Yes, because it was referenced in the motion, so my

9    assumption would be it would still be in effect.

10   Q    Okay.  Before the motion to amend was filed, you're -- you

11   are aware that my firm and the Sbaiti firm communicated by

12   email about the propriety of filing the motion to amend?

13   A    Before it was filed?  Communications between your firm and

14   the Sbaiti firm?  I would have to have my recollection

15   refreshed.

16   Q    I'll just ask the question a different way.  Did you know

17   before you authorized the filing of the motion to amend that

18   my firm and the Sbaiti firm had engaged in an email exchange

19   about the propriety of filing the motion to amend in the

20   District Court?

21   A    It's my recollection -- and again, I could be wrong here

22   -- but I thought the email exchange occurred after the fact,

23   not before.  But again, I -- I just --

24   Q    Okay.  In any event, on April 19th, the motion to amend

25   was filed.  Correct?

HCMLPHMIT00002827

Patrick - Direct                          113

1   A    Correct.

2   Q    That's the document that is Exhibit 17.  And you

3   personally authorized the Sbaiti firm to file the motion to

4   amend on behalf of the Plaintiffs, correct?

5   A    Correct.

6   Q    And you authorized the filing of the motion to amend with

7   knowledge -- withdrawn.

8        Can you read the first sentence of the motion to amend out

9   loud, please?

10  A    Yeah.  (reading)  Plaintiffs submit this motion under Rule

11  15 of the Federal Rules of Civil Procedure for one purpose:

12  to name as defendant one James P. Seery, Jr., the CEO of

13  defendant Highland Capital Management, LP (HCM) and the chief

14  perpetrator of the wrongdoing that forms the basis of the

15  Plaintiffs' causes of action.

16  Q    And does that fairly state the purpose of the motion?

17             MR. SBAITI:  Objection, Your Honor.  Asks him to make

18  a legal conclusion about the purpose of the legal motion filed

19  in court that he didn't draft.

20             THE COURT:  Okay.  I overrule.  You can answer if you

21  have an answer.

22             THE WITNESS:  It's always been my general

23  understanding that the purpose of filing this motion was to go

24  to the Federal District Court and ask that Court of reference

25  to this Court whether or not Mr. Seery could be named with

001779

Patrick - Direct                                114

1    respect to the original complaint, citing again the gatekeeper

2    provisions and citing the various arguments that we've heard

3    much earlier.

4    BY MR. MORRIS:

5    Q    Okay.  You personally didn't learn anything between April

6    9th, when the complaint was filed, and April 19th, when the

7    motion to amend was filed, that caused you to authorize the

8    filing of the motion to amend, correct?

9    A    That is correct.

10   Q    In fact, you relied on the Sbaiti firm with respect to

11   decisions concerning the timing of the motion to amend.

12   Correct?

13   A    Correct.

14   Q    And you had no knowledge of whether anyone acting on

15   behalf of the Plaintiffs ever served the Debtor with a copy of

16   the motion to amend.  Correct?

17   A    Yes.  I have no knowledge.

18   Q    Okay.  And you have no knowledge that the Sbaiti firm ever

19   provided my firm with a copy of the motion to amend.  Correct?

20   A    I cannot recall one way or another.

21   Q    Okay.  You never instructed anyone on behalf -- acting on

22   behalf of the Plaintiffs to inform the Debtor that the motion

23   to amend had been filed, correct?

24   A    That is correct.

25   Q    And that's because you relied on the Sbaiti firm on

HCMLPHMIT00002829

1  procedural issues, correct?

2  A    That is correct.

3  Q    You didn't consider waiting until the Debtor --

4        (Interruption.)

5  Q    -- had appeared in the action before authorizing the

6  filing of the motion --

7  A    Yeah, --

8             THE COURT:  Yes.  Y'all are being a little bit loud.

9  Okay.

10            A VOICE:  Sorry.

11            MR. MORRIS:  No problem.

12            MR. PHILLIPS:  I've heard that before, Your Honor,

13  and I apologize.

14            THE COURT:  I bet you have.  Thank you.

15            MR. MORRIS:  Admonish Mr. Phillips, please.

16            THE COURT:  Okay.

17            MR. MORRIS:  He's always the wild card.

18            MR. PHILLIPS:  I admonish --

19            MR. MORRIS:  He's always the wild card.

20            MR. PHILLIPS:  I admonish myself.

21            THE COURT:  All right.  I think he got the message.

22  Continue.

23  BY MR. MORRIS:

24  Q    You didn't consider waiting until the Debtor had appeared

25  in the action before filing the motion to amend, correct?

HCMLPHMIT00002830

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-71   Filed 09/09/05   Page 174 of 262    PageID 2919

Patrick - Direct                116

```
 1   A    Again, I am the client and I rely upon the law firm that's

 2   engaged with respect to making legal decisions as to the

 3   timing and notice and appearance and what have you.  I'm a tax

 4   lawyer.

 5   Q    Okay.  You wanted the District Court to grant the relief

 6   that the Plaintiffs were seeking.  Correct?

 7   A    I wanted the District Court to consider, under the

 8   gatekeeper provisions of this Court, whether or not Mr. Seery

 9   could be named in the original complaint.  That's -- that,

10   from my perspective, is what was desired.

11   Q    All right.  You wanted the District Court to grant the

12   relief that the Plaintiffs were seeking, correct?

13          MR. SBAITI:  Objection, Your Honor.  Asked and

14   answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  Again, I would characterize this motion

17   as not necessarily asking for specific relief, but asking the

18   Federal District Court whether or not, under the gatekeeper

19   provision, that Mr. Seery could be named on there.  What

20   happens after that would be a second step.  So I kind of -- I

21   dispute that characterization.

22   BY MR. MORRIS:

23   Q    All right.  I'm going to cross my fingers and hope that

24   Ms. Canty is on the line, and I would ask her to put up Page

25   57 from Mr. Patrick's deposition transcript.
```

HCMLPHMIT00002831

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 09/09/25    Page 175 of 262    PageID 2920

Patrick - Direct                                117

1              THE COURT:  There it is.

2              MR. MORRIS:  There it is.  It's like magic.  Can we

3    go down to Lines 18 through 20?

4    BY MR. MORRIS:

5    Q    Mr. Patrick, during the deposition on Friday, did I ask

6    you this question and did you give me this answer?  Question,

7    "Did you want the Court to grant the relief you were seeking?"

8    Answer, "Yes."

9    A    I -- and it was qualified with respect to Lines 12 through

10   17.  In my view, when I answered yes, I was simply restating

11   what I stated in Line 12.  I wanted the District Court to

12   consider this motion as to whether or not Mr. Seery could be

13   named in the original complaint or the amended complaint

14   pursuant to the existing gatekeeper rules and the arguments

15   that were made in that motion.  That's -- that's what I

16   wanted.  And so then when I was asked, did you want the Court

17   to grant the relief that you were seeking, when I answered

18   yes, it was from that perspective.

19   Q    Okay.  Thank you very much.  If the District Court had

20   granted the relief that you were seeking, you would have

21   authorized the Sbaiti firm to file the amended complaint

22   naming Mr. Seery as a defendant if the Sbaiti firm recommended

23   that you do so.  Correct?

24   A    If the Sbaiti firm recommended that I do so.  That is

25   correct.

HCMLPHMIT00002832

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-71   Filed 09/09/25   Page 176 of 262   PageID 2921

Patrick - Direct                              118

1   Q    Okay.  Let's talk for a little bit about the line of

2   succession for the DAF and CLO Holdco.  Can we please go to

3   Exhibit 25, which is in the other binder?  It's in the other

4   binder, sir.

5        (Pause.)

6   Q    I guess you could look on the screen or you can look in

7   the binder, whatever's easier for you.

8   A    Yeah.  I prefer the screen.  I prefer the screen.

9   Q    Okay.

10  A    It's much easier.

11  Q    All right.  We've got it in both spots.  But do you have

12  Exhibit 25 in front of you, sir?

13  A    Yes, I do.

14  Q    All right.  Do you know what it is?

15  A    This is the organizational chart depicting a variety of

16  charitable entities as well as entities that are commonly

17  referred to the DAF.  However, when I look at this chart, I do

18  not look at and see just boxes, what I see is the humanitarian

19  effort that these boxes represent.

20           MR. MORRIS:  Your Honor, may I interrupt?

21           THE COURT:  You may.

22           MR. MORRIS:  Okay.

23  BY MR. MORRIS:

24  Q    I appreciate that, and when your lawyers get up to ask you

25  questions, I bet they'll want to know just what you were about

001784

HCMLPHMIT00002833

Patrick - Direct                          119

```
 1    to tell me.  But I just want to understand what this chart is.

 2    This chart is the DAF, CLO Holdco, structure chart.  Correct?

 3    A    Correct.

 4    Q    Okay.  And you were personally involved in creating this

 5    organizational structure, correct?

 6    A    I -- yes.

 7    Q    Okay.  And from time to time, the Charitable DAF Holdco

 8    Limited distributes cash to the foundations that are above it.

 9    Correct?

10    A    Correct.

11    Q    All right.  I want to talk a little bit more specifically

12    about how this happens.  The source of the cash distributed by

13    Charitable DAF Holdco Limited is CLO Holdco, Ltd., that

14    entity, the Cayman Islands entity near the bottom.  Correct?

15            MR. ANDERSON:  Your Honor, I have an objection.

16    Completely irrelevant.  I'm objecting on relevance grounds.

17    This has nothing to do with the contempt proceeding.  We've

18    already gone over that he authorized the filing of the

19    complaint, that he authorized the filing of the motion to

20    amend.  It's all in the record.  This is completely irrelevant

21    at this point.

22            THE COURT:  Okay.  Relevance objection.  Your

23    response?

24            MR. MORRIS:  I believe that it's relevant to the

25    Debtor's motion to hold Mr. Dondero in contempt for pursuing
```

001785

HCMLPHMIT00002834

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-71   Filed 09/29/05   Page 178 of 262    PageID 2923

Patrick - Direct                    120

1    claims against Mr. Seery, in violation of the July 7 order.  I

2    think an understanding of what the Plaintiffs are, how they're

3    funded, and Mr. Dondero's interest in pursuing claims on

4    behalf of those entities is relevant to the -- to the -- just

5    -- it's just against him.  It's not against their clients,

6    frankly.  It's just against Mr. Dondero.

7              THE COURT:  I overrule.

8              MR. MORRIS:  I'll try and -- I'll try and make this

9    quick, though.

10   BY MR. MORRIS:

11   Q    CLO Holdco had two primary sources of capital.  Is that

12   right?

13   A    Two primary sources of capital?

14   Q    Let me ask it differently.  There was a Charitable

15   Remainder Trust that was going to expire in 2011, correct?

16   A    That is correct.

17   Q    And that Charitable Remainder Trust had certain CLO equity

18   assets, correct?

19   A    Correct.

20   Q    And the donor to that Charitable Remainder Trust was

21   Highland Capital Management, LP.  Correct?

22   A    Not correct.  After my deposition, I refreshed my memory.

23   There were two Charitable Remainder Trusts that existed, which

24   I think in my mind caused a little bit of confusion.  The

25   Charitable Remainder Trust No. 2, which is the one that

001786

HCMLPHMIT00002835

```
 1   expired in 2011, was originally funded by Mr. Dondero.

 2   Q    Okay.  So, so the Charitable Remainder Trust that we were

 3   talking about on Friday wasn't seeded with capital from

 4   Highland Capital Management, it came from Mr. Dondero

 5   personally?

 6   A    That is correct.

 7   Q    Okay.  Thank you.  And the other primary source of capital

 8   was the Dallas Foundation, the entity that's in the upper

 9   left-hand corner of the chart.  Is that correct?

10   A    No.

11   Q    The -- you didn't tell me that the other day?

12   A    You said -- you're pointing to the Dallas Foundation.

13   That's a 501(c)(3) organization.

14   Q    I apologize.  Did you tell me the other day that the

15   Dallas Foundation was the second source of capital for HCLO

16   Hold Company?

17   A    No, I did not.  You --

18        (Pause.)

19   Q    Maybe I know the source of the confusion.  Is the Highland

20   Dallas Foundation something different?

21   A    Yes.  On this organizational chart, you'll see that it has

22   an indication, it's a supporting organization.

23   Q    Ah, okay.  So, so let me restate the question, then.  The

24   second primary source of capital for CLO Holdco, Ltd. is the

25   Highland Dallas Foundation.  Do I have that right?
```

001787

HCMLPHMIT00002836

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 09/23/05   Page 180 of 262   PageID 2925

Patrick - Direct                          122

1    A    Yes.

2    Q    Okay.  And the sources of that entity's capital were

3    grantor trusts and possibly Mr. Dondero personally.  Correct?

4    A    In addition -- per my refreshing my recollection from our

5    deposition, the other Charitable Remainder Trust, I believe

6    Charitable Remainder Trust No. 1, which expired later, also

7    sent a donation, if you will, or assets to -- and I cannot

8    recall specifically whether it was just the Highland Dallas

9    Foundation or the other supporting organizations that you see

10   on this chart.

11   Q    But the source of that -- the source of the assets that

12   became the second Charitable Remainder Trust was Highland

13   Capital Management, LP.  Is that right?

14   A    I think that is accurate from my recollection.  And again,

15   I'm talking about Charitable Remainder Trust No. 1.

16   Q    Okay.  So is it fair to say -- I'm just going to try and

17   summarize, if I can.  Is it fair to say that CLO Holdco, Ltd.

18   is the investment arm of the organizational structure on this

19   page?

20   A    Yes.

21   Q    And is it fair to say that nearly all of the assets that

22   are in there derived from either Mr. Dondero, one of his

23   trusts, or Highland Capital Management, LP?

24   A    Yes.  It's like the Bill Gates Foundation or the

25   Rockefeller Foundation.  These come from the folks that make

HCMLPHMIT00002837

1  their donations and put their name on it.

2  Q   Okay.

3           MR. MORRIS:  Now, now, Your Honor, I'm going to go

4  back just for a few minutes to how Mr. Scott got appointed,

5  because I think that lays kind of the groundwork for his

6  replacement.  It won't take long.

7           THE COURT:  Okay.  I have a question either --

8           MR. MORRIS:  Sure.

9           THE COURT:  -- for you or the witness.  I'm sorry,

10  but --

11          MR. MORRIS:  Sure.  Yeah.

12          THE COURT:  -- the organizational chart, it's not

13  meant to show everything that might be connected to this

14  substructure, right?  Because doesn't CLO Holdco, Ltd. own

15  49.02 percent of HCLOF, --

16          MR. MORRIS:  That --

17          THE COURT:  -- which gets us into the whole

18  HarbourVest transaction issue?

19          MR. MORRIS:  You're exactly right, Your Honor.

20          THE COURT:  Okay.

21          MR. MORRIS:  But that's just an investment that HCLO

22  Holdco made.

23          THE COURT:  Right.

24          MR. MORRIS:  Right?  And so I -- let me ask the

25  witness, actually.

HCMLPHMIT00002838

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 09/25/25   Page 182 of 262   PageID 2927

Patrick - Direct                                    124

```
 1              THE COURT:  Okay.  Thank you.  Thank you.

 2              MR. MORRIS:  Let me ask the witness.  Yeah.

 3              THE COURT:  I just want my brain --

 4              MR. MORRIS:  Right.

 5              THE COURT:  -- to be complete on this chart.

 6   BY MR. MORRIS:

 7   Q   Mr. Patrick, there are three entities under CLO Holdco,

 8   Ltd.  Do you see that?

 9   A   Yes.

10   Q   And does CLO Holdco, Ltd. own one hundred percent of the

11   interests in each of those three entities?

12   A   Yes.

13   Q   Do you know why those three entities are depicted on this

14   particular chart?  Is it because they're wholly-owned

15   subsidiaries?

16   A   Correct.

17   Q   Okay.  And CLO Holdco, Ltd. has interests in other

18   companies.  Isn't that right?

19   A   It has other investments.  That is correct.

20   Q   And the reason that they're not depicted on here is

21   because they're not wholly-owned subsidiaries, they're just

22   investments; is that fair?

23   A   That is fair.

24              MR. MORRIS:  Does that--?

25              THE COURT:  Yes.
```

001790

HCMLPHMIT00002839

```
1              MR. MORRIS:  Okay.
2              THE COURT:  Uh-huh.
3   BY MR. MORRIS:
4   Q    So, so let's go back to Mr. Grant for a moment.  Mr.
5   Scott, rather.  Mr. Dondero was actually the original general
6   partner.  If you look at this chart, while it's still up here,
7   you see on the left there's Charitable DAF GP, LLC?
8   A    Yes.
9   Q    And the Charitable DAF GP, LLC is the general partner of
10  the Charitable DAF Fund, LP.  Correct?
11  A    Correct.
12  Q    And on this chart, Grant Scott was the managing member of
13  Charitable DAF GP, LLC.  Right?
14  A    Correct.
15  Q    Okay.  But Mr. Dondero was the original general partner of
16  that entity, correct?
17  A    That is correct.  But I do want to point out, I just note
18  that the GP interest is indicating a one percent interest and
19  the 99 interest to Charitable DAF Holdco.  I believe that's
20  incorrect.  It's a hundred percent by Charitable DAF Holdco,
21  Ltd., and the Charitable DAF GP interest is a noneconomic
22  interest.  So that should actually reflect a zero percent to
23  the extent it may indicate some sort of profits or otherwise.
24  Q    Okay.  Thank you for the clarification.  Can you turn to
25  Exhibit 26, please, in your binder?  And is it your
```

001791

HCMLPHMIT00002840

1  understanding that that is the amended and restated LLC

2  agreement for the DAF GP, LLC?

3  A    Yes.

4  Q    Okay.  And this was amended and restated effective as of

5  January 1st, 2012, correct?

6  A    Yes.

7  Q    And if you go to the last page, you'll see there are

8  signatures for Mr. Scott and Mr. Dondero, correct?

9  A    Yes.

10  Q    And Mr. Dondero is identified as the forming -- former

11  managing member and Mr. Scott is identified as the new

12  managing member.   Correct?

13  A    Correct.  That's what the document says.

14  Q    And it's your understanding that Mr. Dondero had the

15  authority to select his successor.  Correct?

16  A    Correct.

17  Q    In fact, it's based on your understanding of documents and

18  your recollection that Mr. Dondero personally selected Mr.

19  Scott as the person he was going to transfer control to,

20  correct?

21  A    Upon advice of Highland Capital Management's tax

22  compliance officer, Mr. Tom Surgent.

23  Q    What advice did Mr. Surgent give?

24  A    He gave advice that, because Mr. Dondero -- and this is

25  what I came to an understanding after the fact of this

001792

HCMLPHMIT00002841

1   transaction, because I was not a part of it -- that by Mr.

2   Dondero holding that GP interest, that it would be -- the

3   Plaintiffs, if you will, would be an affiliate entity for

4   regulatory purposes, and so he advised that if he -- if Mr.

5   Dondero transferred his GP interest to Mr. Scott, it would no

6   longer be an affiliate, is my recollection.

7   Q   Okay.  You didn't appoint Mr. Scott, did you?

8   A   No.

9   Q   That was Mr. Dondero.  Is that right?

10  A   Yes.

11  Q   Okay.  Let's go to 2021.  Let's come back to the current

12  time.  Sometime in February, Mr. Scott called you to ask about

13  the mechanics of how he could resign.  Correct?

14  A   That is correct.

15  Q   But the decision to have you replace Mr. Scott was not

16  made until March 24th, the day you sent an email to Mr. Scott

17  with the transfer documents.  Correct?

18  A   That is correct.

19  Q   And it's your understanding that he could have transferred

20  the management shares and control of the DAF to anyone in the

21  world.  Correct?

22  A   Correct.

23  Q   That's what the docu... that he had the authority under

24  the documentation, as you understood it, to freely trade or

25  transfer the management shares.  Correct?

HCMLPHMIT00002842

1   A    Wait.  Now, let's be precise here.

2   Q    Okay.

3   A    Are you talking about the GP interests or the management

4   shares held by Charitable DAF Holdco, Ltd.?

5   Q    Let's start with the management shares.  Can you explain

6   to the Court what the management shares are?

7              MR. ANDERSON:  Your Honor?  Hang on one second.  Your

8   Honor, I want to object again on relevance.  We're going way

9   beyond the scope of the contempt issue, whether or not --

10             MR. MORRIS:  This is about control.

11             MR. ANDERSON:  -- the motion to amend somehow

12  violated the prior order of this Court.  Getting into the

13  management structure, transfer of shares, that's way outside

14  the bounds.  I object on relevance.

15             THE COURT:  Okay.  Relevance objection?

16             MR. MORRIS:  Your Honor, they have probably 30

17  documents, maybe 20 documents, on their exhibit list that

18  relate to management and control.  I'm asking questions about

19  management and control.  Okay?  This is important, again, to

20  (a) establish his authority, but (b) the circumstances under

21  which he came to be the purported control person.

22             THE COURT:  Okay.  Overruled.  Go ahead.

23             THE WITNESS:  It might be helpful to look at the

24  organizational chart, but if not -- but I'll describe it to

25  you again.  With respect to the entity called --

HCMLPHMIT00002843

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 09/09/25   Page 187 of 262   PageID 2932

Patrick - Direct                    129

1          MR. MORRIS:  Hold on one second.  Can we put up the

2    organizational chart again, Ms. Canty, if you can?  There you

3    go.

4          THE WITNESS:  Okay.  So with respect to the

5    Charitable DAF Holdco, Ltd., it is my understanding that Mr.

6    Scott, he organized that entity when he was the independent

7    director of the Charitable Remainder Trust, and he caused the

8    issuance of the management shares to be issued to himself.

9    And then those are, again, noneconomic shares, but they are

10   control shares over that entity.

11        And I think, to answer your question, is -- it -- he alone

12   decides who he can transfer those shares to.

13   BY MR. MORRIS:

14   Q    Do I have this right, that whoever holds the noneconomic

15   management shares has the sole authority to appoint the

16   representatives for each of the Charitable DAF entities and

17   CLO Holdco?  It's kind of a magic ticket, if you will?

18   A    It -- I think there's a -- the answer really is no from a

19   legal standpoint, because Charitable DAF Holdco is a limited

20   partner in Charitable DAF Fund, LP, so it does not have

21   authority -- authority under all -- the respective entities

22   underneath that.  It could cause a redemption, if you will, of

23   Charitable DAF Fund.  And so, really, the authority -- the

24   trickle-down authority that you're referencing is with respect

25   to his holding of the Charitable DAF GP, LLC interest.  It's a

001795

HCMLPHMIT00002844

Patrick - Direct                     130

```
 1   member-managed Delaware limited liability company.  And from

 2   that, he -- that authority kind of trickles down to where he

 3   can appoint directorships.

 4   Q    All right.  I think I want to just follow up on that a

 5   bit.  Which entity is the issuer of the manager shares, the

 6   management shares?

 7   A    Yeah, the -- per the organizational chart, it is accurate,

 8   it's the Charitable DAF Holdco, Ltd. which issued the

 9   management shares to Mr. Scott.

10   Q    Okay.  And that's why you have the arrow from Mr. Scott

11   into that entity?

12   A    Correct.

13   Q    And do those -- does the holder of the management shares

14   have the authority to control the Charitable DAF Holdco, Ltd.?

15   A    Yes.

16   Q    Okay.  And as the control person for the Charitable DAF

17   Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF

18   Holdco Limited owns a hundred percent of the limited

19   partnership interests of the Charitable DAF Fund, LP.

20   Correct?

21   A    Correct.

22   Q    And so does the holder of that hundred percent limited

23   partnership interest have the authority to decide who acts on

24   behalf of the Charitable DAF Fund, LP?

25   A    I would say no.  I mean, you know, just -- I would love to
```

001796

HCMLPHMIT00002845

Patrick - Direct                    131

1  read the partnership agreement again.  But I, conceptually,

2  what I know with partnerships, I would say the limited partner

3  would not.  It would be through the Charitable DAF GP, LLC

4  interest.

5  Q    The one on the left, the general partner?

6  A    The general partner.

7  Q    I see.  So when Mr. Scott transferred to you the one

8  hundred percent of the management shares as well as the title

9  of the managing member of the Charitable DAF GP, LLC, did

10 those two events give you the authority to control the

11 entities below it?

12 A    Yes.

13 Q    Thank you.  And so prior to the time that he transferred

14 those interests to you, is it your understanding that Mr.

15 Scott had the unilateral right to transfer those interests to

16 anybody in the world?

17 A    Yes.

18 Q    Okay.  And you have that right today, don't you?

19 A    Yes, I do.

20 Q    If you wanted, you could transfer it to me, right?

21 A    Yes, I could.

22 Q    Okay.  But of all the people in the world, Mr. Scott

23 decided to transfer the management shares and the managing

24 member title of the DAF GP to you, correct?

25 A    Restate that question again?

001797

HCMLPHMIT00002846

1   Q    Of all the people in the world, Mr. Scott decided to

2   transfer it to you, correct?

3   A    Yeah.  Mr. Scott transferred those interests to me.

4   Q    Okay.  And you accepted them, right?

5   A    Yes.

6   Q    You're not getting paid anything for taking on this

7   responsibility, correct?

8   A    I am not paid by any of the entities depicted on this

9   chart.

10   Q    And Mr. Scott used to get $5,000 a month, didn't he?

11   A    I believe that's what he testified to.

12   Q    Yeah.  But you don't get anything, right?

13   A    Correct.

14   Q    In fact, you get the exact same salary and compensation

15   from Skyview that you had before you became the authorized

16   representative of the DAF entities and CLO Holdco.  Correct?

17   A    Correct.

18        MR. MORRIS:  Okay.  Your Honor, if I may just take a

19   moment, I may be done.

20        THE COURT:  Okay.

21     (Pause.)

22        MR. MORRIS:  Your Honor, I have no further questions.

23        THE COURT:  All right.  Pass the witness.  Any

24   examination of the witness?

25                         CROSS-EXAMINATION

HCMLPHMIT00002847

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-71   Filed 01/30/25   Page 191 of 262    PageID 2936
Exhibit 71   Page 190 of 299

Patrick - Cross                          133

1  BY MR. ANDERSON:

2  Q   Mr. Patrick, I just had a few follow-up questions.  When

3  you authorized the filing of the lawsuit against Highland

4  Capital Management, LP, Highland HCF Advisor Limited, and

5  Highland CLO Funding, Limited, when that lawsuit was filed in

6  April of this year, was Mr. Seery included as a defendant?

7  A   No.

8  Q   Have the two Plaintiffs in that lawsuit, have they

9  commenced any lawsuit against Mr. Seery?

10 A   No.

11 Q   Have they pursued any lawsuit against Mr. Seery?

12 A   No.

13 Q   Have they pursued a claim or cause of action against Mr.

14 Seery?

15 A   No.

16 Q   At most, did the Plaintiffs file a motion for leave to add

17 Mr. Seery as a defendant?

18       MR. MORRIS:  Objection, Your Honor.  To the extent

19 that any of these questions are legal conclusions, I object.

20 He's using the word pursue.  If he's trying -- if he's then

21 going to argue that, But the witness testified that he didn't

22 pursue and that's somehow a finding of fact, I object.

23       THE COURT:  Okay.  I understand.

24       MR. MORRIS:  Yeah.

25       THE COURT:  But I overrule.  He can answer.

001799

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 06/09/25   Page 192 of 262   PageID 2937
Exhibit 71   Page 135 of 299

Patrick - Cross                                    134

```
1              MR. MORRIS:  That's fine.

2              THE WITNESS:  Can you restate the question again?

3    BY MR. ANDERSON:

4    Q    Sure.  On behalf of the Plaintiffs -- well, strike that.

5    Did the Plaintiffs pursue a claim or cause of action against

6    Mr. Seery?

7    A    No.

8    Q    At most, did the Plaintiffs file a motion for leave to

9    file an amended complaint regarding Mr. Seery?

10   A    Yes.  But, again, I viewed the motion as simply asking the

11   Federal District Court whether Mr. Seery could or could not be

12   named in a complaint, and then the next step might be how the

13   Federal District Court might rule with respect to that.

14   Q    And we have -- it's Tab 17 in the binders in front of you.

15   That is Plaintiffs' motion for leave.  If you could turn to

16   that, please.

17   A    Yes.  I've got it open.

18   Q    Is the Court's July order, the Bankruptcy Court's July

19   order, is it mentioned on the first page and then throughout

20   the motion for leave to amend?

21   A    Yes, it is.  I see it quoted verbatim on Page 2 under

22   Background.

23   Q    Was the Court's order hidden at all from the District

24   Court?

25   A    The document speaks for itself.  It's very transparent.
```

001800

HCMLPHMIT00002849

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 09/30/25    Page 193 of 262    PageID 2938

Patrick - Cross                    135

```
 1    Q    Was there any effort whatsoever to hide the prior order of

 2    the Bankruptcy Court?

 3    A    No.

 4            MR. ANDERSON:  Pass the witness.

 5            THE COURT:  Okay.  Other examination?

 6            MR. SBAITI:  Yes, Your Honor.  Just a couple of

 7    questions.

 8                         CROSS-EXAMINATION

 9    BY MR. SBAITI:

10    Q    Do you mind flipping to Exhibit 25, which I believe is the

11    org chart, the one that you were looking at before?

12    A    Okay.

13    Q    It'll still be in --

14    A    Okay.  Yeah.

15    Q    -- the defense binder.  No reason to swap out right now.

16    A    I've got the right binders.  Some of them are repeatable

17    exhibits, so --

18    Q    Yeah.

19    A    -- I have to grab the right binder.  Yes.

20    Q    As this org chart would sit today, is the only difference

21    that Grant Scott's name would instead be Mark Patrick?

22    A    Yes.

23    Q    Was there ever a period of time where Jim Dondero's name

24    would sit instead of Grant Scott's name prior?

25    A    Yes, originally, when this -- yes.
```

001801

HCMLPHMIT00002850

Patrick - Cross                    136

1   Q   So did Mr. Dondero both have the control shares of the GP,

2   LLC and DAF Holdco Limited?

3   A   No, I believe not.  I believe he only held the Charitable

4   DAF GP interest and that Mr. Scott at all times held the

5   Charitable DAF Holdco, LTD interest, until he decided to

6   transfer it to me.

7   Q   Can you just tell us how Mr. Scott came to hold the

8   control shares of the Charitable DAF Holdco, LTD?

9   A   When he was the independent trustee of the Charitable

10  Remainder Trust, he caused that -- the creation of that

11  entity, and that's how he became in receipt of those

12  management shares.

13  Q   And does the Charitable DAF GP, LLC have any control over

14  Charitable DAF Fund, LP's actions or activities?

15  A   Yes, it does.

16  Q   What kind of control is that?

17  A   I would describe complete control.  It's the managing

18  member of that entity and can -- and effectively owns, you

19  know, the hundred percent interest in the respective

20  subsidiaries, and so the control follows down.

21  Q   And when did Mr. Scott replace Mr. Dondero as the GP --

22  managing member of the GP?

23  A   Well, I think as the -- and Mr. Morris had shown me with

24  respect to that transfer occurring on March 2012.

25  Q   So nine years ago?

001802

HCMLPHMIT00002851

1   A    Yes.

2   Q    Does Mr. Dondero today exercise any control over the

3   activities of the DAF Charitable -- the Charitable DAF, GP or

4   the Charitable DAF Holdco, LTD?

5   A    No.

6   Q    Is he a board member of sorts for either of those

7   entities?

8   A    No.

9   Q    Is he a board members of CLO Holdco?

10  A    No.

11  Q    Does he have any decision-making authority at CLO Holdco?

12  A    None.

13  Q    The decision to authorize the lawsuit and the decision to

14  authorize the motion that you've been asked about, who made

15  that authorization?

16  A    I did.

17  Q    Did you have to ask for anyone's permission?

18  A    No.

19          MR. SBAITI:  No more questions, Your Honor.

20          THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21      All right.  Any redirect?

22                      REDIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q    Since becoming the authorized representative of the

25  Plaintiffs, have you ever made a decision on behalf of those

001803

```
 1   entities that Mr. Dondero disagreed with?

 2   A    I have made decisions that were adverse to Mr. Dondero's

 3   financial -- financial decision.  I mean, financial interests.

 4   Whether he disagreed with them or not, I don't -- he has not

 5   communicated them to me.  But they have been adverse, at least

 6   two very strong instances.

 7   Q    Have you ever -- have you ever talked to him about making

 8   a decision that would be adverse to his interests?  Did he

 9   tell -- did --

10   A    I didn't -- I don't -- I did not discuss with him prior to

11   making the decisions that I made that were adverse to his

12   economic interests.

13            MR. MORRIS:  Okay.  No further questions, Your Honor.

14            THE COURT:  Any further examination?  Recross on that

15   redirect?

16            MR. ANDERSON:  No further questions.

17            MR. SBAITI:  No further questions, Your Honor.

18            MR. ANDERSON:  Sorry.

19            THE COURT:  Nothing?

20            MR. ANDERSON:  I think we're good.

21            THE COURT:  Okay.  I have one question, Mr. Patrick.

22   My brain sometimes goes in weird directions.

23                    EXAMINATION BY THE COURT

24            THE COURT:  I'm just curious.  What are these Cayman

25   Island entities, charitable organizations formed in the Cayman
```

001804

HCMLPHMIT00002853

Patrick - Examination by the Court          139

1    Islands?

2              THE WITNESS:  Yeah.  I'll keep it as simple as I can,

3    even though I'm a tax lawyer, so I won't get into the tax

4    rules, but the Cayman structure is modeled after what you

5    typically see in the investment management industry, and so I

6    -- and I won't reference specific entities here with respect

7    to the Highland case, but I think you'll note some

8    similarities, if you think about it.  They're -- it's

9    described as an offshore master fund structure where you have

10   a -- and that would be the Charitable DAF Fund that's

11   organized offshore, usually in the Cayman or Bermuda Islands,

12   where the general partner, typically, in the industry, holds

13   the management --

14             THE COURT:  Yeah.  Let --

15             THE WITNESS:  Okay.

16             THE COURT:  -- me just stop you.  I've seen this

17   enough --

18             THE WITNESS:  Yeah, it's

19             THE COURT:  -- to know that it happens in the

20   investment world.  But in --

21             THE WITNESS:  Yeah.

22             THE COURT:  You know, usually, I see 501(c)(3), you

23   know, domestically-created entities for charitable purposes,

24   so I'm just curious.

25             THE WITNESS:  Yes.

001805

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 09/40/05299 Page 198 of 262    PageID 2943
Patrick - Examination by the Court          140

1          THE COURT:  Uh-huh.

2          THE WITNESS:  The offshore master fund structure

3    typically will have two different types of -- they call it

4    foreign feeder funds.  One foreign feeder fund is meant to

5    accommodate foreign investors; the other foreign feeder fund

6    is meant to accommodate U.S. tax-exempt investors.

7          Why, why is it structured that way?  In order to avoid

8    something called -- I was trying not to be wonkish -- UBTI.

9    That's, let's see, Un -- Unrelated Trader Business Income.  I

10   probably have that slightly wrong.  But it's essentially,

11   it's a means to avoid active business income, which includes

12   debt finance income, which is what these CLOs tend to be, that

13   would throw off income that would be taxable normally if the

14   exempts did not go through this foreign blocker, and it

15   converts that UBTI income -- it's called (inaudible) income --

16   into passive income that flows -- that flows up to the

17   charities.

18         And so it's very typical that you'll have a U.S. tax-

19   exempt investor, when they make an investment in a fund,

20   prefer to go through an offshore feeder fund, which is

21   actually Charitable DAF Holdco, LTD.  That's essentially what,

22   from a tax perspective, represents as a UBTI blocker entity.

23   And then you have the offshore investments being held offshore

24   because there's a variety of safe harbors where the receipt of

25   interest, the portfolio interest exception, is not taxable.

001806

HCMLPHMIT00002855

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 06/20/25   Page 199 of 262   PageID 2944
Patrick - Examination by the Court                141

```
 1   The creation of capital gains or losses under the -- they call
 2   it the trading, 864(b) trading safe harbor, is not taxable.
 3   So that's why you'll find these structures operating offshore
 4   to rely on those safe harbor provisions as well as -- as well
 5   as what I indicated with respect to the two type blocker
 6   entities.  It's very typical and industry practice to organize
 7   these way.  And so when this was set --
 8            THE COURT:  It's very typical in the charitable world
 9   to --
10            THE WITNESS:  In the investment management --
11            THE COURT:  -- form this way?
12            THE WITNESS:  In the investment management world,
13   when you have charitable entities that are taking some
14   exposure to assets that are levered, to set this structure up
15   in this way.  It was modeled after -- they just call them
16   offshore master fund structures.  They're known as Mickey
17   Mouse structures, where you'll have U.S. investors --
18            THE COURT:  Yes.  I -- yes, I --
19            THE WITNESS:  -- enter through a U.S. partnership,
20   and the foreign investors enter through a blocker.
21            THE COURT:  It was really just the charitable aspect
22   of this that I was --
23            THE WITNESS:  Yeah.  Yeah.
24            THE COURT:  -- getting at.
25            THE WITNESS:  Yeah.  No, but I'm just trying to
```

001807

HCMLPHMIT00002856

 1  emphasize if --

 2         THE COURT:  All right.  It's --

 3         THE WITNESS:  Yeah.

 4         THE COURT:  -- neither here nor there.  All right.

 5         MR. SBAITI:  Your Honor, may I ask a slightly

 6  clarifying leading question on that, because I think I

 7  understand what he was trying to say, just for the record?

 8         THE COURT:  Well, --

 9         MR. MORRIS:  I object.

10         THE COURT:  -- I tell you what.  Anyone who wants to

11  ask one follow-up question on the judge's question can do so.

12  Okay?  You can go first.

13         MR. SBAITI:  I'll approach, Your Honor.

14         THE COURT:  Okay.

15                     RECROSS-EXAMINATION

16  BY MR. SBAITI:

17  Q   Would it be a fair summary of what you were saying a

18  minute ago that the reason the bottom end of that structure is

19  offshore is so that it doesn't get taxed before the money

20  reaches the charities on the U.S. side?

21  A   Tax -- it converts the nature of the income that is being

22  thrown off by the investments so that it becomes a tax

23  friendly income to the tax-exempt entity.  Passive income.

24  That's --

25  Q   So, essentially, --

HCMLPHMIT00002857

Patrick - Recross                          143

```
 1              THE COURT:  Okay.  Okay.

 2              MR. SBAITI:  -- so it doesn't get taxed before it

 3    hits the --

 4              THE COURT:  I said one question.

 5              MR. SBAITI:  Sorry, Your Honor.

 6              THE COURT:  Okay.  He answered it.

 7              MR. PHILLIPS:  And I have one question, Your Honor

 8              THE COURT:  Okay.

 9              MR. PHILLIPS:  I don't know if I need to ask this

10    question, but I'd rather not ask you if I need to ask it.

11              THE COURT:  Go ahead.

12              MR. PHILLIPS:  But if I do, you know, I could --

13              THE COURT:  Go ahead.

14              MR. PHILLIPS:  Well, okay.

15                         RECROSS-EXAMINATION

16    BY MR. PHILLIPS:

17    Q    We've talked about the offshore structure.  Are the

18    foundations in the top two tiers of the organizational chart

19    offshore entities?

20    A    No.

21    Q    They're --

22    A    They're onshore entities.  They're tax-exempt entities.

23    Q    Thank you.

24    A    The investments are offshore.

25    Q    Thank you.
```

001809

HCMLPHMIT00002858

1          THE COURT:  Mr. Morris?  One question.

2                    FURTHER REDIRECT EXAMINATION

3    BY MR. MORRIS:

4    Q    Do you hold yourself out as an expert on the

5    organizational structures in the Caribbean for charitable

6    organizations?

7    A    I hold myself out as a tax professional versant on setting

8    up offshore master fund structures.  It's sort of a bread-and-

9    butter thing.  But there are plenty of people that can testify

10   that this is very typical.

11   Q    Uh-huh.  Okay.

12          THE COURT:  Okay.  Thank you.

13       All right.  You are excused, Mr. Patrick.  I suppose

14   you'll want to stay around.  I don't know if you'll

15   potentially be recalled today.

16       (The witness steps down.)

17          THE COURT:  All right.  We should take a lunch break.

18   I'm going to put this out for a democratic vote.  Forty-five

19   minutes?  Is that good with everyone?

20          MR. SBAITI:  Do we have to leave the building to eat,

21   Your Honor, or is there food in the building?

22          THE COURT:  I think --

23          MR. SBAITI:  I'm sorry to ask that question, but --

24          THE COURT:  Yes.  You know what, there used to be a

25   very bad cafeteria, but I think it closed.  Right, Mike?  So,

HCMLPHMIT00002859

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-71   Filed 09/09/25   Page 203 of 262    PageID 2948

145

```
 1    you know, --

 2            MR. SBAITI:  Sorry I asked that.

 3            A VOICE:  Hate to miss that one.

 4            THE COURT:  Is 45 minutes not enough since you have

 5    to go off campus?  I'll give you an hour.  It just means we

 6    stay later tonight.

 7            A VOICE:  Can we just say 2:00 o'clock?

 8            MR. SBAITI:  That's fine with us, Your Honor.

 9            THE COURT:  2:00 o'clock.  That's 50 minutes.  See

10    you then.

11            MR. SBAITI:  Thank you.

12            A VOICE:  Your Honor, can we just get a time check?

13            THE COURT:  Okay.

14            THE CLERK:  Yeah.  The Debtors are at an hour and

15    eleven minutes.  Respondents at an hour nineteen.

16            THE COURT:  And hour and eleven and an hour and

17    nineteen.

18            A VOICE:  Wait, that's not right.

19            A VOICE:  That can't be right.

20            A VOICE:  Two hours?  We started at --

21            THE COURT:  Okay.  So, again, their side, the

22    collective Respondents?

23            THE CLERK:  An hour and eleven, responding to your

24    questions, --

25            A VOICE:  Yeah, he's not recording --
```

001811

HCMLPHMIT00002860

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 04/09/25299   Page 204 of 262   PageID 2949

146

```
 1              THE CLERK:  So an hour and eleven and an hour and

 2    nineteen.

 3              THE COURT:  But they were already over an hour --

 4              A VOICE:  Yeah.  It's been over three hours.

 5              THE COURT:  -- with opening statements.

 6              THE CLERK:  An hour and twelve.  Yes.  They were very

 7    short with the questioning.  It was only like --

 8              THE COURT:  Okay.  We'll double-check that over the

 9    break with the court reporter.

10              A VOICE:  All right.  Thank you, Your Honor.

11              THE COURT:  We'll double-check and let you know.

12              THE COURT:  All rise.

13         (A luncheon recess ensued from 1:09 p.m. until 2:03 p.m.)

14              THE COURT:  All right.  Please be seated.  We're

15    going back on the record in Highland after our lunch break.

16    I'm going to confirm time.  We've had the Debtor an aggregate

17    of an hour and eleven minutes.  The Respondents, an aggregate

18    of an hour and twenty minutes.  Okay?  So we've gone two hours

19    and thirty-one minutes.

20         If it seems like we've been going longer, it's because we

21    did not do the clock on the opening matters regarding removal,

22    extension of time.  And then when I interjected with

23    questions, we stopped the clock.  All right?  So let's go.

24         You may call your next witness, Mr. Morris.

25              MR. MORRIS:  Thank you, Your Honor.  The Debtor calls
```

HCMLPHMIT00002861

```
 1    James Dondero.

 2              THE COURT:  All right.

 3              A VOICE:  He had to step down the hall.  We had a

 4    little trouble getting through security.  Let me --

 5              THE COURT:  All right.  Mr. Dondero, you've been

 6    called as the next witness.  So if you'll approach our witness

 7    stand, please.  All right.  Please raise your right hand.

 8         (The witness is sworn.)

 9              THE COURT:  All right.  Please be seated.

10              JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

11                         DIRECT EXAMINATION

12    BY MR. MORRIS:

13    Q    Good afternoon, Mr. Dondero.

14    A    Good afternoon.

15    Q    Can you hear me?

16    A    Yes.

17    Q    Okay.  So, you were here this morning, correct?

18    A    Yes.

19    Q    All right.  So, we're going to put up -- we'll put it up

20    on the screen, but if you'd prefer to look at a hard copy in

21    the binder that's marked Volume 1 of -- 2 of 2, I'd ask you to

22    turn to Exhibit 25.  Or you could just follow on the screen.

23    And this is a one-page document, so maybe that's easier.

24    A    Sure.

25    Q    Do you have it?  All right.
```

HCMLPHMIT00002862

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-71   Filed 09/09/25   Page 206 of 262    PageID 2951

Dondero - Direct                       148

1   A    Yes.

2   Q    This is the organizational chart for what's known as the

3   DAF, correct?

4   A    Yes.

5   Q    And Mark Patrick set up this structure, correct?

6   A    I believe he coordinated.  I believe it was set up by

7   third-party law firms.  I believe it was Hutton or a firm like

8   that.

9   Q    Mr. Patrick participated in the creation of this structure

10  because you gave him the task of setting up a charitable

11  entity for Highland at that time, correct?

12  A    Yes.

13  Q    And you approved of this organizational structure,

14  correct?

15  A    Yes.

16  Q    And Grant Scott was the Trustee of the DAF for a number of

17  years, correct?

18  A    I often use that word, trustee, but technically I think

19  it's managing member.

20  Q    That's right.  I appreciate that.  I was using your word

21  from the deposition.  But is it fair to say that, to the best

22  of your knowledge, Grant Scott was the sole authorized

23  representative of the entity known as the DAF from 2011 until

24  just recently?

25  A    Sole -- I would describe it more he was in a trustee

001814

HCMLPHMIT00002863

Dondero - Direct                                149

1   function.

2   Q    Uh-huh.

3   A    Advice was being provided by Highland on the investment

4   side.  He wasn't expected to be a financial or an investment

5   expert.  And then accounting, tax, portfolio, tracking, you

6   know, compliance with all the offshore formation documents,

7   that was all done by Highland as part of a shared services

8   agreement.

9   Q    Okay.  I appreciate that, but listen carefully to my

10  question.  All I asked you was whether he was the authorized

11  representative, the sole authorized representative for the

12  ten-year period from 2011 until recently.

13  A    Yes.

14  Q    Okay.

15  A    I believe so.

16  Q    Thank you.  You served as the managing member of the DAF

17  GP, LLC before Mr. Scott, correct?

18  A    Yes.

19  Q    Okay.  And if you turn to Exhibit 26 in your binder,

20  that's the amended and restated limited liability company

21  agreement for the DAF GP, LLC, correct?

22  A    Yes.

23  Q    And on the last page, that's your signature line, right?

24  A    Yes.

25  Q    And you stepped down as the managing member on March 12,

HCMLPHMIT00002864

```
 1   2012, and were replaced by Mr. Scott, correct?

 2   A    Yes.

 3   Q    And as you recall it, Mr. Scott came to be appointed the

 4   trustee of the DAF based on your recommendation, right?

 5   A    Based on my recommendation?  Yes, I would say that's fair.

 6   Q    And you made that recommendation to Mr. Patrick, right?

 7   A    I -- I don't remember who I made the recommendation to.

 8   But I would echo the testimony of Mark Patrick earlier that

 9   the purpose of stepping down was to make the DAF unaffiliated

10   or independent versus being in any way affiliated.

11            MR. MORRIS:  I move to strike.

12   BY MR. MORRIS:

13   Q    And I'd ask you to listen carefully to my question.

14            THE COURT:  Sustained.

15   BY MR. MORRIS:

16   Q    You made the recommendation to Mr. Patrick, correct?

17   A    I would give the same answer again.

18   Q    Okay.

19            MR. MORRIS:  Can we please put up Mr. Dondero's

20   deposition transcript from last Friday at Page 297?

21       I believe, Your Honor, that the court reporter thought

22   that this was a continuation of a prior deposition, and that's

23   why the pages begin in the, you know, high in the 200s and not

24   at Page 1.  Just to avoid any confusion.

25   BY MR. MORRIS:
```

HCMLPHMIT00002865

Dondero - Direct                    151

1   Q    Mr. Dondero, do you see the transcript in front of you?

2   A    Yes.

3   Q    Okay.  Were you asked this question and did you give this

4   answer?  "Who did you make the" -- question, "Who did you make

5   the recommendation to?"  Answer, "It would have been Mark

6   Patrick."

7   A    I don't recall right now as I sit here, and it seems like

8   I was speculating when I answered, but it -- it probably would

9   have been Mark Patrick.  I just don't have a specific

10  recollection.

11  Q    You made the recommendation to Mr. Patrick because he was

12  responsible for setting up the overall structure, correct?

13  A    I -- I can't testify to why I did something I don't

14  remember.  I think that would be --

15  Q    Can we --

16  A    -- speculative.

17  Q    Are you finished, sir?

18  A    Yeah.

19  Q    Okay.

20          MR. MORRIS:  Can we go to Page 299, please?

21  BY MR. MORRIS:

22  Q    Lines 6 through 10.  Did I ask this question and did you

23  give me this answer?  Question, "But why did you select Mr.

24  Patrick as the person to whom to make your recommendation?"

25  Answer, "Because he was responsible for setting up the overall

001817

HCMLPHMIT00002866

```
 1   structure."

 2        Were you asked that question and did you give that answer

 3   last Friday?

 4   A    Yes.

 5   Q    Thank you.  But it's your testimony that you don't really

 6   know what process led to Mr. Scott's appointment, correct?

 7   A    No, I -- I said I was refreshed by Mark Patrick's

 8   testimony earlier.

 9   Q    Yeah.  Were you refreshed that, in fact, you specifically

10   had the authority to and did appoint Grant Scott as the

11   managing member of the DAF GP, LLC?

12   A    I -- I don't know.

13   Q    Well, you're referring to Mr. Patrick's testimony and I'm

14   asking you a very specific question.  Did you agree -- is your

15   memory refreshed now that you're the person who put Grant

16   Scott in the position in the DAF?

17   A    I -- I don't know if I owned those secret shares that --

18   well, they're not secret, but shares that could appoint

19   anybody on the planet.  I guess if I was in that box at that

20   time before Grant, then I would have had that ability.  I'm

21   not denying at all that I recommended Grant.  I'm just saying

22   I don't -- I don't remember if I went specifically to him or

23   if it was Thomas Surgent that was orchestrating it at the

24   time.  I don't remember.

25   Q    Do you deny that you had the authority to and that you did
```

HCMLPHMIT00002867

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 01/04/25    Page 211 of 262    PageID 2956

Dondero - Direct                    153

1  appoint Grant Scott as your successor?

2          MR. TAYLOR:  Your Honor, objection to the extent it

3  calls for a legal conclusion.  I can't get close to a mic, so

4  --

5          THE COURT:  I overrule the objection.

6          THE WITNESS:  Can you repeat the question for me?

7  BY MR. MORRIS:

8  Q    Do you deny that you had the authority to and that you

9  did, in fact, appoint Grant Scott as your successor?

10 A    It'd be better to say I don't -- I don't -- no, I don't

11 remember or I didn't know the details at the time.  But,

12 again, I -- I assume I owned those shares.  And, again, I do

13 remember recommending Grant and -- but exactly how it

14 happened, I don't remember.

15 Q    Did you hear Mark Patrick say just an hour ago that you

16 appointed Grant Scott as your successor?

17         MR. SBAITI:  Objection, Your Honor.  Misstates

18 testimony.  The witness testified he transferred shares.

19 That's different than an appointment power.

20         THE COURT:  Response?  I can't remember the exact way

21 you worded it, to be honest.

22         MR. MORRIS:  Neither can I, but I'll even take it

23 that way.

24         THE COURT:  Okay.

25         MR. MORRIS:  I think he's wrong, but I'll even take

001819

HCMLPHMIT00002868

 1   it that way.

 2           THE COURT:  Okay.

 3   BY MR. MORRIS:

 4   Q   Mr. Dondero, did you listen to Mark Patrick say that you

 5   are the person who made the decision to transfer the shares to

 6   Mr. Scott in 2012?

 7   A   Yes, I heard him say that.

 8   Q   Okay.  So, do you -- do you dispute that testimony?

 9   A   I -- I don't have any better knowledge to dispute or

10   confirm.

11   Q   You and Mr. Scott have known each other since high school,

12   correct?

13   A   Yes.

14   Q   You spent a couple of years at UVA together, correct?

15   A   Yes.

16   Q   You were housemates together, correct?

17   A   Yes.

18   Q   He was the best man at your wedding, correct?

19   A   Yes.

20   Q   He's a patent lawyer, correct?

21   A   Yes.

22   Q   He had no expertise in finance when -- when he was

23   appointed as your successor to the DAF, correct?

24   A   Correct.

25   Q   To the best of your knowledge, at the time Mr. Scott

001820

HCMLPHMIT00002869

1  assumed his position, he had never made any decisions

2  concerning collateralized loan obligations, correct?

3  A    Correct, but he wasn't hired for that.  That wasn't his

4  position.

5  Q    Was he the person who was going to make the decisions with

6  respect to the DAF's investments?

7  A    My understanding on how it was structured was the DAF was

8  paying a significant investment advisory fee to Highland.

9  Highland was doing portfolio construction and the investment

10 selection of -- or the investment recommendations for the

11 portfolio.  There is an independent trustee protocol that I

12 believe was adhered to, but it was never my direct

13 involvement.  It was always the portfolio managers or the

14 traders.

15     You have to provide three similar or at least two other

16 alternatives, and then with a rationale for each of them, but

17 a rationale for why you think one in particular is better.

18 And the trustee looks at the three, evaluates them.  And the

19 way I understand it always worked, that it works at pretty

20 much every charitable trust or trust that I'm aware of, they

21 generally, if not always, pick alongside the -- or, pick the

22 recommendation of their highly-paid investment advisory firm.

23 Q    And are you the highly-paid investment advisory firm?

24 A    Highland was at the time, yes.

25 Q    And you controlled Highland, right?

001821

HCMLPHMIT00002870

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-671    Filed 05/09/25299 Page 214 of 262    PageID 2959

Dondero - Direct                                  156

1    A    Yes.

2    Q    Okay.  But at the end of the day, is it your understanding

3    that Mr. Scott had the exclusive responsibility for making

4    actual decisions on behalf of the charitable trust that you

5    had created?

6    A    Yeah, I mean, subject to the protocol I just described.

7    Q    Yeah, okay, so let's keep going.  Mr. Scott had no

8    experience or expertise running charitable organizations at

9    the time you decided to transfer the shares to him, correct?

10   A    Yes, I believe that's correct.

11   Q    Okay.  You didn't recommend Mr. Scott to serve as the

12   DAF's investment advisor, did you?

13   A    No.

14   Q    And until early 2021, as you testified, I believe,

15   already, HCMLP served as the DAF's investment advisor,

16   correct?

17   A    Yes.

18   Q    And until early 2021, all of the DAF's day-to-day

19   operations were conducted by HCMLP pursuant to a shared

20   services agreement, correct?

21   A    Yes.

22   Q    And from the time the DAF was formed until January 9,

23   2020, you controlled HCMLP, correct?

24   A    Yes.

25   Q    You can't think of one investment decision that HCMLP

001822

HCMLPHMIT00002871

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 09/08/25 299 Page 215 of 262   PageID 2960

Dondero - Direct                    157

1  recommended that Mr. Scott ever rejected in the ten-year

2  period, correct?

3          MR. SBAITI:  Objection, Your Honor.  Lacks

4  foundation.

5          THE COURT:  Response?

6          MR. MORRIS:  I'm not quite sure what to say, Your

7  Honor.  The witness has already testified that HCMLP was the

8  investment advisor, made recommendations to Mr. Scott, and

9  that Mr. Scott was the one who had to make the investment

10  decisions at the end of the day.

11          MR. SBAITI:  He's not here as a witness for HCMLP.

12  He's here in his personal capacity.  There's no foundation

13  he'd have personal knowledge of which specific investments

14  were proposed, which ones were rejected or accepted.  He said

15  it was done by the portfolio manager.

16          THE COURT:  Okay.  I overrule.  He can answer if he

17  has an answer.

18  BY MR. MORRIS:

19  Q   Sir, you can't think of one investment decision that HCMLP

20  ever recommended to Mr. Scott that he rejected, correct?

21  A   I can't think of one, but I would caveat with I wouldn't

22  have expected there to be any.

23  Q   So you expected him to just do exactly what HCMLP

24  recommended, correct?

25  A   No.  I would expect him to sort through the various

001823

HCMLPHMIT00002872

```
 1   investments when he was given three or four to choose from and
 2   be able to discern that, just as we had with our expertise,
 3   which was much greater than his, discern which one was the
 4   best and most suitable investment, the best risk-adjusted
 5   investment, that he would come to the same conclusion.
 6   Q    Okay.  You can't think of an investment that Mr. Scott
 7   ever made on behalf of the DAF that didn't originate with
 8   HCMLP, correct?
 9   A    Again, no, but I wouldn't expect there to be.
10   Q    Okay.  And that's because you expected all of the
11   investments to originate with the company that you were
12   controlling, correct?
13   A    We were the hired investment advisor with fiduciary
14   responsibility --
15   Q    Uh-huh.
16   A    -- and with a vested interest in making sure the DAF
17   performance was the best it could be.
18   Q    Okay.  Let --
19   A    He was, as you said, a patent attorney.  It would have
20   been unusual for him to second-guess.  I'm sure, in any
21   private investment or any investment that was one off or
22   didn't have comps, you know, he probably sought third-party
23   valuations.  But you would have to talk to him about that, or
24   the people at Highland that did that.
25             MR. MORRIS:  I move to strike.  It's a very simple
```

001824

HCMLPHMIT00002873

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-71   Filed 06/09/25299 Page 217 of 262    PageID 2962

Dondero - Direct                159

```
 1   question.

 2          THE COURT:  Sustained.

 3   BY MR. MORRIS:

 4   Q    Sir, you can't think of one investment that Mr. Scott made

 5   on behalf of the DAF that did not originate with HCMLP,

 6   correct?

 7   A    I'm going to give the same answer.

 8   Q    Okay.  Let's go to Page 371 of the transcript, please.

 9   Lines 7 through 11.

10          Oh, I apologize.  I think I might -- I think I meant 317.

11   I think I got that inverted.  Yeah.

12          Did I ask this question and did you give this answer:

13   "Can you think of any investment that Mr. Scott made on behalf

14   of the DAF that didn't original with HCMLP?"  Answer, "He

15   wasn't the investment advisor, but no, I don't -- I don't

16   recall."

17          Is that the answer you gave on Friday?

18   A    Yes.

19   Q    Thank you.  Let's --

20          MR. SBAITI:  Just for clarification, Your Honor, --

21          THE COURT:   Pardon?

22          MR. SBAITI:  -- the deposition was last Tuesday, not

23   on Friday.

24          MR. MORRIS:  I stand corrected, Your Honor.

25          THE COURT:  Okay.
```

HCMLPHMIT00002874

```
 1              MR. MORRIS:  I apologize.

 2              THE COURT:  Okay.

 3              MR. MORRIS:  I apologize if the Court thinks I misled

 4     it.

 5     BY MR. MORRIS:

 6     Q    Let's talk about Mr. Scott's decision during the

 7     bankruptcy case that preceded his resignation.  After HCMLP

 8     filed for bankruptcy, CLO Holdco, Ltd. filed a proof of claim,

 9     correct?

10              MR. ANDERSON:  Your Honor, I haven't objected yet,

11     but we literally haven't covered anything that deals with

12     commencing or pursuing a claim or cause of action.  I'm going

13     to object.  This is way outside, again, the bounds of the

14     contempt hearing.  It's -- otherwise, it's other discovery for

15     something else.  It literally has nothing to do with pursue a

16     claim or cause of action.

17              THE COURT:  We have another relevance objection.

18     Your response?

19              MR. MORRIS:  Your Honor, the evidence is going to

20     show that Mr. Dondero told Mr. Scott on three separate

21     occasions that his conduct, which were acts of independence,

22     were inappropriate and were not in the best interests of the

23     DAF.  Within days of the third strike, he resigned.  Okay?

24        I think it's relevant to Mr. Dondero's control of the DAF.

25     I think that the moment that Mr. -- this is the argument I'm
```

HCMLPHMIT00002875

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 06/20/25   Page 219 of 262   PageID 2964

Dondero - Direct                          161

1  going to make.  I'll make it right now.  You want me to make

2  it now, I'll make it now.  The moment that Mr. Scott exercised

3  independence, Mr. Dondero was all over him, and Mr. Scott

4  left.  That's what happened.  The evidence is going to be

5  crystal clear.

6      And I think that that control of the DAF is exactly what

7  led to this lawsuit.  And what led -- and I'm allowed to make

8  my argument.  So that's why it's relevant, Your Honor, because

9  I think it shows that Mr. Scott -- Mr. Scott, after exercising

10  independence, was forced out.

11        MR. ANDERSON:  That doesn't move the needle one bit

12  as to whether a lawsuit was commenced or a claim or cause of

13  action was pursued, which is the subject of the contempt

14  motion.  It doesn't move the needle one bit as to those two

15  issues, as to whether that has any bearing on was it commenced

16  or was it pursued.

17        MR. MORRIS:  Your Honor, I appreciate the very narrow

18  focus that counsel for a different party is trying to put on

19  this, but it is absolutely relevant to the question of whether

20  Mr. Dondero was involved in the pursuit of these claims.  All

21  right?  That's what the order says.  Pursue.

22        THE COURT:  All right.  Overruled.

23  BY MR. MORRIS:

24  Q   After HCMLP filed for bankruptcy, CLO Holdco filed a proof

25  of claim, correct?

001827

HCMLPHMIT00002876

Dondero - Direct                      162

1   A    I believe so.

2   Q    And in the fall of 2020, Mr. Scott amended the proof of

3   claim to effectively reduce it to zero, correct?

4   A    I -- I guess.

5   Q    And Mr. Scott made that decision without discussing it

6   with you in advance, correct?

7   A    Yes.

8   Q    But you did discuss it with him after you learned of that

9   decision, correct?

10  A    I don't -- I don't recall.  I'm willing to be refreshed,

11  but I don't remember.

12  Q    Well, you told him specifically that he had given up bona

13  fide claims against the Debtor, correct?

14  A    Let me state or clarify my testimony this way.  Um, --

15         MR. MORRIS:  Your Honor, it's really just a yes or no

16  question.  His counsel can ask him if he wants to clarify, but

17  it's really just a yes or no question.

18  BY MR. MORRIS:

19  Q    You told Mr. Scott that he gave up bona fide claims

20  against the Debtor, correct?

21         THE COURT:  Okay.

22         THE WITNESS:  I don't know if I told him then with

23  regard to those claims.

24  BY MR. MORRIS:

25  Q    Okay.  Can we go to Page 321 of the transcript?  At the

001828

HCMLPHMIT00002877

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 09/04/25    Page 221 of 262    PageID 2966

Dondero - Direct                                      163

1   bottom, Line 21?  22, I apologize.

2       Did I ask this question and did you give this answer?

3   "And what do you" -- Question, "And what do you recall about

4   your discussion with Mr. Scott afterwards?"  Answer, "That he

5   had given up bona fide claims against the Debtor and I didn't

6   understand why."

7       Did I ask that question and did you give that answer last

8   Tuesday?

9   A    Yes.

10  Q    Okay.  A short time later, in December, the Debtor filed

11  notice of their intention to enter into a settlement with

12  HarbourVest, correct?

13  A    Yes.

14  Q    And CLO Holdco, under Mr. Scott's direction, filed an

15  objection to that settlement, correct?

16  A    Yes.

17  Q    And that settlement, the substance of that settlement was

18  that the Debtor did not have the right to receive

19  HarbourVest's interests in HCLOF at the time, correct?

20  A    I don't remember the exact substance of it.

21  Q    Okay.  But you do remember that you learned that Mr. Scott

22  caused CLO Holdco to withdraw the objection, correct?

23  A    Yes, ultimately.

24  Q    Okay.  And again, Mr. Scott did not give you advance

25  notice that he was going to withdraw the HarbourVest

HCMLPHMIT00002878

1  objection, correct?

2  A    No, he -- he did it an hour before the hearing.  He didn't

3  give anybody notice.

4  Q    You learned that Mr. Scott caused CLO Holdco to withdraw

5  its objection to the HarbourVest settlement at the hearing,

6  correct?

7  A    Yes.

8  Q    And you were surprised by that, weren't you?

9  A    I believe everybody was.

10 Q    You were sur... you were surprised by that, weren't you,

11 sir?

12 A    Yes.

13 Q    And you were surprised by that because you believed Mr.

14 Scott's decision was inappropriate, right?

15 A    Partly inappropriate, and partly because 8:00 o'clock the

16 night before he confirmed that he was going forward with the

17 objection.  And I think the DAF's objection was scheduled to

18 be first, I think.

19 Q    After you learned that Mr. Scott instructed his attorneys

20 to withdraw the CLO Holdco objection to the HarbourVest

21 settlement, you again spoke with Mr. Scott, correct?

22 A    Yes.

23 Q    And that conversation took place the day of the hearing or

24 shortly thereafter, correct?

25 A    Yes.

001830

HCMLPHMIT00002879

Dondero - Direct                    165

1   Q    And during that conversation, you told Mr. Scott that it

2   was inappropriate to withdraw the objection, correct?

3   A    Yes.

4   Q    And in response, Mr. Scott told you that he followed the

5   advice of his lawyers, correct?

6   A    Yes.

7   Q    But that didn't -- that explanation didn't make sense to

8   you, right?

9   A    Yes.

10  Q    In fact, you believed that Mr. Scott failed to act in the

11  best interests of the DAF and CLO Holdco by withdrawing its

12  objection to the HarbourVest settlement, correct?

13  A    Yes.

14  Q    And while you didn't specifically use the words fiduciary

15  duty, you reminded Mr. Scott in your communications with him

16  that he needed to do what was in the best interests of the

17  DAF, correct?

18  A    Yes.

19  Q    You're the founder of the DAF, correct?

20  A    I put it -- I put it in motion.  Yeah.  I tasked Mark

21  Patrick and third-party law firms to do it, but if that boils

22  down to founder, I guess yes.

23  Q    Uh-huh.  And you're the primary donor to the DAF, correct?

24  A    Yes.

25  Q    You're the investment advisor to the DAF, or at least you

HCMLPHMIT00002880

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K      Document 84-71    Filed 09/03/299    Page 224 of 262      PageID 2969

Dondero - Direct                                    166

1    were at that time?

2    A    Yes.

3    Q    And because you served in these roles, you expected Mr.

4    Scott to discuss his decision to withdraw the HarbourVest

5    objection in advance, correct?

6    A    Yes, I -- I think it was even broader than that.  I mean,

7    he was having health and anxiety issues, and to the extent he

8    felt overwhelmed, I -- you know, yeah, you should do what's in

9    the best interests at all times, but -- but yes, I thought it

10   would be helpful if he conferred with me or Mark Patrick or

11   whoever he was comfortable with.

12   Q    Mr. Dondero, you specifically believed that Mr. Scott's

13   failure to tell you that he was going to withdraw the

14   HarbourVest objection in advance was inappropriate, right?

15   A    Yes.

16   Q    Even though he was the sole authorized representative, you

17   believed that, because you were the founder of the DAF, the

18   primary donor of the DAF, and the investment advisor to the

19   DAF, he should have discussed that before he actually made the

20   decision, correct?

21   A    No.  What I'm saying is at 8:00 o'clock at night, when he

22   confirms to numerous people he's ready to go first thing with

23   his objection, and then he or counsel or some combination of

24   them change their mind and don't tell anybody before the

25   hearing, that's odd and inappropriate behavior.

001832

HCMLPHMIT00002881

Dondero - Direct                    167

 1          MR. MORRIS:  Can we go to Page 330 of the transcript,

 2    please?

 3       And Your Honor, before I read the testimony, there is an

 4    objection there.  So I'd like you to rule --

 5          THE COURT:  Okay.

 6          MR. MORRIS:  -- before I do that.  It can be found at

 7    -- on Page 330 at Line 21.

 8       (Pause.)

 9          MR. MORRIS:  Here we go.  Page 30, beginning at Line

10    19.  330, rather.

11          THE COURT:  Okay.

12       (Pause.)

13          THE COURT:  Okay.  I overrule that objection.

14    BY MR. MORRIS:

15    Q    Mr. Dondero, were you asked this question and did you give

16    this answer last Tuesday?  Question, "Do you believe that he

17    had an obligation to inform you in advance?"  Answer, "I don't

18    know if I would use the word obligation, but, again, as the

19    founder or the primary donor and continued donor to the DAF,

20    and as the investment advisor fighting for above-average

21    returns on a daily basis for the fund, significant decisions

22    that affect the finances of the fund would be something I

23    would expect typically a trustee to discuss with the primary

24    donor."

25       Did you give that answer the other day, sir?

001833

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 09/09/25299 Page 226 of 262    PageID 2971

Dondero - Direct                        168

```
 1    A    Yes.

 2    Q    If Mr. Patrick decides tomorrow to withdraw the lawsuit

 3    that's in District Court, does he have an the obligation to

 4    tell you in advance?

 5    A    Again, I wouldn't use the word obligation.  But something

 6    that I think ultimately is going to be a $20 or $30 million,

 7    if not more, benefit to the DAF, to the detriment of Highland,

 8    if you were to give that up, I would expect him to have a

 9    rationale and I would expect him to get other people's

10    thoughts and opinions before he did that.

11    Q    Okay.  But does he have to get your opinion before he

12    acts?

13    A    No, he does not.

14    Q    Okay.  So he -- Mr. Patrick could do that tomorrow, he

15    could settle the case, and if he doesn't come to you to

16    discuss it in advance, you won't be critical of him, right?

17    A    He doesn't have the obligation, but there's -- there's a

18    reasonableness in alignment of interests.  I -- a growing

19    entrepreneur sets up a trust, a lot of times they'll put their

20    wife in charge of it, and she hires investment advisers and

21    whatever, but they've got the best interests at mind for the

22    charity or the children or whatever.

23         You know, people who go rogue and move in their own self-

24    interest or panic, that stuff can happen all the time.  It

25    doesn't make it appropriate, though.
```

001834

HCMLPHMIT00002883

1   Q    A couple of weeks after Mr. Scott withdraw the objection

2   to the HarbourVest settlement, he entered into a settlement

3   agreement with the Debtor pursuant to which he settled the

4   dispute between the Debtor and CLO Holdco, correct?

5   A    Yes.

6   Q    Okay.  You didn't get advance notice of that third

7   decision, correct?

8   A    No.

9   Q    Can we go to Page -- Exhibit 32 in your binder?  And this

10  is the settlement agreement between CLO Holdco and the Debtor,

11  correct?  Attached as the exhibit.  I apologize.

12  A    Yes.

13  Q    And do you understand that that's Mr. Scott's signature on

14  the last page?

15  A    Yep.

16  Q    And you learned about this settlement only after it had

17  been reached, correct?

18  A    Yep.

19  Q    And you believed Mr. Scott's decision not to pursue

20  certain claims against the Debtor or to remove HCMLP as the

21  manager of the CLOs was not in the best interests of the DAF,

22  correct?

23  A    Correct.

24  Q    And you let Mr. Scott know that, correct?

25  A    Yes.

HCMLPHMIT00002884

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-171   Filed 01/02/25299 Page 228 of 262   PageID 2973

Dondero - Direct                    170

1    Q    After learning about the settlement agreement on January

2    26th, you had one or two conversations with Mr. Scott on this

3    topic, correct?

4    A    Yes.

5    Q    And your message to Mr. Scott was that the compromise or

6    settlement wasn't in the DAF's best interest, correct?

7    A    It was horrible for the DAF.

8    Q    Uh-huh.  And you told him that, right?

9    A    Yes.

10   Q    Okay.  From your perspective, any time a trustee doesn't

11   do what you believe is in the trust's best interest, you leave

12   yourself open to getting sued, correct?

13   A    Who is "you" in that question?

14   Q    You.  Mr. Dondero.

15   A    Can you repeat the question, then, please?

16   Q    Sure.  From your perspective, any time you're a trustee

17   and you don't believe that the trustee is doing what's in the

18   best interests of the fund, the trustee leaves himself open to

19   getting sued, correct?

20   A    I don't know who the trustee leaves himself open to, but

21   as soon as you go down a path of self-interest or panic, you

22   -- you potentially create a bad situation.  But I don't know

23   who holds who liable.

24   Q    Did you believe that Mr. Scott was acting out of self-

25   interest or panic when he decided to settle the dispute with

HCMLPHMIT00002885

1 | the Debtor on behalf of CLO Holdco?

2 | A    Yes.

3 | Q    Did you tell him that?

4 | A    He told me that.

5 | Q    He told you that he was acting out of panic or

6 | desperation?  With self-int... withdrawn.  Withdrawn.  Did he

7 | tell you that he was acting out of self-interest?

8 | A    He was having health problems, anxiety problems, and he

9 | didn't want to deal with the conflict.  He didn't want to

10 | testify.  He didn't want to come to court.  He didn't want to

11 | do those things.  And I told him I didn't think the settlement

12 | was going to get him out of that stuff.  I think, you know, it

13 | got him out of some issues, but I think you guys are going to

14 | go after him for other stuff.  But he -- he panicked.

15 |         MR. MORRIS:  I move to strike the latter remark.

16 |         THE COURT:  Sustained.

17 | BY MR. MORRIS:

18 | Q    Shortly after you had the conversation with Mr. Scott, he

19 | sent you notice of his intent to resign from his positions at

20 | the DAF and CLO Holdco, correct?

21 | A    Yes.

22 | Q    Okay.  Let's take a look at that, please.  Exhibit 29.

23 | This is Mr. Scott's notice of resignation, correct?

24 | A    Yes.

25 | Q    He sent it only to you, correct?

HCMLPHMIT00002886

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 07/09/25   Page 230 of 262   PageID 2975

Dondero - Direct                              172

1   A    Yes.

2   Q    A couple of days before he sent this, he told you he was

3   considering resigning; isn't that right?

4   A    Yes.

5   Q    Okay.  And he told you he was considering resigning

6   because he was suffering from health and anxiety issues

7   regarding the confrontation and the challenges of

8   administering the DAF given the bankruptcy, correct?

9   A    Yes.

10  Q    He didn't tell you that he made the decision -- withdrawn.

11  Did you tell him in this same conversation -- withdrawn.  Is

12  this the same conversation where you conveyed the message that

13  the compromise or settlement wasn't in the best interests of

14  the DAF?

15  A    You mean the conversation -- or the resignation? Is that

16  -- can you rephrase the question, please?

17  Q    Yeah, I apologize.  It's my fault, sir.  You testified

18  that after the January 26th hearing you had a conversation

19  with Mr. Scott where you told him that the compromise or

20  settlement was not in the best interests of the DAF, correct?

21  A    Yes.

22  Q    Okay.  Did Mr. Scott share with you his concerns about

23  anxiety and health issues in that same conversation, or was it

24  in a subsequent conversation?

25  A    It was at or around that time.  I -- I don't remember

001838

HCMLPHMIT00002887

 1  which conversation.

 2  Q    Okay.

 3  A    But it was right at or around that time.

 4  Q    All right.  You never asked Mr. Scott to reconsider, did

 5  you?

 6  A    No.

 7  Q    You don't recall sending this notice of resignation to

 8  anyone, do you?

 9  A    No.

10  Q    You don't remember notifying anyone that you'd received

11  notice of Mr. Scott's intent to resign from the DAF, do you?

12  A    It was -- yeah, no, I -- I don't remember.  It was a busy

13  time around that time and this was a secondary issue.

14  Q    Okay.  So the fact that the person who has been running

15  the DAF for a decade gives you and only you notice of his

16  intent to resign was a secondary issue in your mind?

17  A    Yes, because when I talked to him at about that time, I

18  said, okay, well, it's going to take a while.  I don't even

19  know how the mechanism works.  But don't do anything adverse

20  to the DAF, don't do anything else until, you know, you've

21  figured out transition.

22  Q    Uh-huh.

23  A    And so once he had confirmed he wouldn't do anything

24  outside normal course until he transitioned, I didn't worry

25  about this.  I had bigger issues to worry about at the time.

001839

HCMLPHMIT00002888

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 07/09/25    Page 232 of 262    PageID 2977
Exhibit 71    Page 109 of 299

Dondero - Direct                                    174

1   Q    In the third paragraph of his email to you, he wrote that

2   his resignation will not be effective until he approves of the

3   indemnification provisions and obtains any and all necessary

4   releases.  Do you see that?

5   A    Yes.

6   Q    And that was the condition that on January 31st Mr. Scott

7   placed on the effectiveness of his resignation, correct?

8   A    Condition?  Yeah, I -- I think he's trying to state the

9   timing will happen after that.

10  Q    After he gets the release, right?

11  A    Yes.

12  Q    And he wanted the release because you'd told him three

13  different times that he wasn't acting in the best of the DAF,

14  correct?

15          MR. TAYLOR:  Objection, Your Honor.

16          MR. SBAITI:  Objection.  Calls for --

17          MR. TAYLOR:  Objection.  Calls for speculation.

18          THE WITNESS:  Yeah, I --

19          THE COURT:  Sustained.

20          THE WITNESS:  I can't take that jump.  Yeah.

21  BY MR. MORRIS:

22   Q    In response to this email from your lifelong friend, you

23  responded, if we could scroll up, about whether divest was a

24  synonym -- if we can look at the first one -- whether divest

25  is a synonym for resigned.  Do I have that right?

001840

HCMLPHMIT00002889

1   A   (no immediate response)

2   Q   If you will look at your response on Monday morning at

3   9:50.

4   A   Yes.

5   Q   Okay.  And then after Mr. Scott responds, you respond

6   further, if we can scroll up, and you specifically told him,

7   "You need to tell me ASAP that you have no intent to divest

8   assets."  Correct?

9   A   Yes.

10  Q   And you wrote that because you believed some of his

11  behavior was unpredictable, right?

12  A    I think I wrote that because the term divest in investment

13  terms means sale or liquidate, but I guess it had a different

14  legal term in the way he was looking at it.  I wasn't aware at

15  that time of the shares that could be bequeathed to anybody,

16  and I think the divest refers to that, but I wasn't aware that

17  that's how the structure worked at that time, and I was

18  worried that divest could be the investment term and I -- it

19  wouldn't have been appropriate for him to liquidate the

20  portfolio.

21  Q   So, and you wanted to make sure he wasn't liquidating or

22  intending to liquidate any of the CLOs, correct?

23  A   Correct.

24  Q   Okay.  So he's still the authorized, the sole authorized

25  representative, but you wanted to make sure that he didn't do

HCMLPHMIT00002890

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-71   Filed 07/09/25   Page 234 of 262    PageID 2979

Dondero - Direct                    176

| 1 | anything that you thought was inappropriate.  Fair? |
| 2 | A   It's because I had talked to him before this and he said |
| 3 | he wasn't going to do anything outside normal course, and then |
| 4 | the word divest scared me, but I didn't realize it was a legal |
| 5 | term in this parlance here. |
| 6 | Q   And so after he explained, you still wanted to make sure |
| 7 | that he wasn't divesting any assets, correct? |
| 8 | A   Yes. |
| 9 | Q   Okay.  Since February 1st, you've exchanged exactly one |
| 10 | text messages with Mr. Scott; is that right? |
| 11 | A   I think there've been several, several text messages.  But |
| 12 | one on his birthday. |
| 13 | Q   Yeah.  And you haven't spoken to him in months, correct? |
| 14 | A   In a couple months, yes. |
| 15 | Q   All right.  Let's talk about the replacement of Mr. Scott. |
| 16 | With -- with Mr. Scott's notice, someone needed to find a |
| 17 | replacement, correct? |
| 18 | A   Yes. |
| 19 | Q   And the replacement was going to be responsible for |
| 20 | managing a charitable organization with approximately $200 |
| 21 | million of assets, most of which was seeded directly or |
| 22 | indirectly through you, correct? |
| 23 | A   Yes. |
| 24 | Q   And the replacement was going to get his and her -- his or |
| 25 | her investment advice from you and NexPoint Advisors; do I |

001842

HCMLPHMIT00002891

Dondero - Direct                    177

1   have that right?

2   A    That was the plan.

3   Q    Okay.  Ultimately, Mr. Patrick replaced Mr. Scott,

4   correct?

5   A    Yes.

6   Q    But it's your testimony that you had no knowledge that Mr.

7   Patrick was going to replace Mr. Scott until after it happened

8   on March 24, 2021.  Correct?

9   A    That's correct.  I believe it happened suddenly.

10  Q    So, for nearly two months after you had received notice of

11  Mr. Scott's intent to resign, you were uninvolved in the

12  process of selecting his replacement, correct?

13  A    I was uninvolved.  I'd say the process was dormant for an

14  extended period of time until Mark Patrick came on board, and

15  then Mark Patrick ran the process of interviewing multiple

16  potential candidates.

17  Q    Mark Patrick didn't have any authority prior to March

18  24th, correct?

19  A    Is March 24th the date that he transitioned the shares to

20  himself from Grant Scott?

21  Q    Yep.

22  A    That's when he then became the trustee of the DAF, yes.

23  Q    Do you know -- do you know who was instructing Mr. Patrick

24  on who to interview or how to carry the process out?

25  A    He was doing that on his own with, I think,

001843

HCMLPHMIT00002892

1  recommendations from third-party tax firms.

2  Q   So Mr. Patrick was trying to find a successor to Mr.

3  Scott, even though he had no authority to do that, and you

4  were completely uninvolved in the whole process?  Do I have

5  that right?

6  A   I was uninvolved, yes.  He was trying to facilitate it for

7  the benefit of his friendship with Grant Scott and knowing

8  that it -- it -- with his resignation, it had to transition to

9  somebody.  And he enjoys working on the DAF, he enjoys the

10  charitable stuff in the community, and he was the most

11  appropriate person to work on helping Grant transition.

12          MR. MORRIS:  All right.  I move to strike, Your

13  Honor.  It's hearsay.

14          THE COURT:  Sustained.

15  BY MR. MORRIS:

16  Q   You're aware that Mr. Seery was appointed the Debtor's CEO

17  and CRO last summer, correct?

18  A   Yes.

19  Q   And you're aware that Mr. Seery's appointment was approved

20  by the Bankruptcy Court, correct?

21  A   Yes.

22  Q   And you were aware of that at the time it happened,

23  correct?

24  A   Yes.

25  Q   And even before that, in January of 2020, you consented to

001844

HCMLPHMIT00002893

1   a settlement where you gave up control of the Debtor.

2   Correct?

3   A    To the independent board for a consensual Chapter 11

4   restructuring that would leave Highland intact.

5   Q    And do you understand that the gatekeeper provision in the

6   July order is exactly like the one that you agreed to in

7   January except that it applies to Mr. Seery instead of the

8   independent directors?

9   A    I -- I learned a lot about that today, but I don't think

10  it's appropriate to move what applied to the board to the CEO

11  of a registered investment advisor.

12  Q    Okay.  I'm just asking you, sir.  Listen carefully to my

13  question.  Were you aware in January 2020 that you agreed to a

14  gatekeeper provision on behalf of the independent board?

15  A    Generally, but not specifically.

16  Q    Okay.

17  A    Not -- not like what we've been going over today.

18  Q    Okay.  And you knew that Mr. Seery had applied to be

19  appointed CEO subject to the Court's approval, correct?

20  A    Wasn't it backdated to March?  I -- I think the hearing

21  was in June, but it was backdated for -- for money and other

22  purposes, right?  I -- that's my recollection.  I don't

23  remember otherwise.

24  Q    You do remember that Mr. Seery got -- he got -- his

25  appointment got approved by the Court, right?

HCMLPHMIT00002894

1   A    Yes.  But, as far as the dates are concerned, I thought it

2   was either in March or retroactive to March.  Maybe it was

3   June or July.

4   Q    And you --

5   A    But I don't remember.

6   Q    Did you have your lawyers review the motion that was filed

7   on behalf of the Debtor?

8   A    I'm -- I assume they do their job.  I -- if they didn't, I

9   don't know.

10  Q    Okay.  That's what you hired them to do; is that fair?

11  A    Yes.

12  Q    Okay.  Can we go to Exhibit 12, please?  I think it's in

13  Binder 1.  You've seen this document before, correct?

14  A    Yes.

15  Q    In fact, you saw versions of this complaint before it was

16  filed, correct?

17  A    Yes, I saw one or two versions towards the end.  I don't

18  know if I saw the final version, but --

19  Q    Sir, you participated in discussions with Mr. Sbaiti

20  concerning the substance of this complaint before it was

21  filed, correct?

22  A    Some.  I would just use the word some.

23  Q    Okay.  Can you describe for me all of your conversations

24  with Mr. Sbaiti concerning the substance of this complaint?

25       MR. SBAITI:  Your Honor, I would object on the basis

001846

HCMLPHMIT00002895

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 08/20/25   Page 239 of 262   PageID 2984

Dondero - Direct                    181

1    of work product privilege and attorney-client communications.

2    He was an agent for my client, the DAF, at the time he was

3    having these discussions with us, and our discussions with him

4    were work product.  So to the extent he can reveal the

5    conversations without discussing the actual content, we would

6    raise privilege objection, Your Honor.

7              THE COURT:  Mr. Morris?

8              MR. MORRIS:  Your Honor, there is no privilege here.

9    That's exactly why I asked Mr. Patrick the questions earlier

10   today.  Mr. Dondero is not party to any agreement with the DAF

11   today.  It's an informal agreement, perhaps, but there is no

12   contractual relationship, there is no privity any longer

13   between Mr. Dondero or any entity that owns and controls in

14   the DAF, as far as I know.  If they have evidence of it, I'm

15   happy to listen, but that -- that's exactly why I asked those

16   questions of Mr. Patrick earlier today.

17             THE COURT:  All right.

18             MR. SBAITI:  Your --

19             THE COURT:  That was the testimony.  There's an

20   informal arrangement, at best.

21             MR. SBAITI:  Well, Your Honor, I would suggest that

22   that doesn't necessarily mean that he isn't an agent of the

23   DAF.  It doesn't have to be a formal agreement for him to be

24   an agent of the DAF.

25       Everyone's agreed he was an advisor.  Everyone's agreed he

HCMLPHMIT00002896

Dondero - Direct                    182

 1   was helping out.  That is an agency relationship.  It doesn't

 2   have to be written down.  It doesn't have to be a formal

 3   investment advisory relationship.  He's still an agent of the

 4   DAF.  He was requested to do something and agreed to do it

 5   under the expectation that all of us had that those would be

 6   privileged, Your Honor.  That is -- that is sufficient -- that

 7   is sufficient, I would argue, to get us where we need to be.

 8   The privilege should apply, Your Honor, and they don't have a

 9   basis for, I would say, invading the privilege, Your Honor.

10            THE COURT:  Well, do you have any authority?  Because

11   it just sounds wrong.  He's not an employee of your client.

12   He doesn't have any contractual arrangement with your client.

13            MR. SBAITI:  Your Honor, I would dispute the idea

14   that he has no contractual arrangement with my client.  The

15   question was asked, do you have a -- do you have a written

16   agreement, and then the question was, so you don't have a

17   contract, and the answer was no, I don't have a contract,

18   building upon that first -- that first question.  But the

19   testimony as he just recounted is that there is an agreement

20   that he would advise Mr. Patrick and he would advise the DAF.

21            THE COURT:  Okay.

22            MR. SBAITI:  That's -- that's a contract.

23            THE COURT:  Okay.  My question was, do you have any

24   legal authority?  That's what I meant when I said authority.

25   Any legal authority to support the privilege applying in this

001848

1 │ kind of --

2 │        MR. SBAITI:  In an informal arrangement, Your Honor?

3 │ I don't have one at my fingertips at the moment, Your Honor,

4 │ but I don't know that that should be a reason to invade the

5 │ privilege.

6 │    And I would just add, Your Honor, I would just add, we've

7 │ already -- because of the purpose of these questions, you've

8 │ heard Mr. Morris state several times that the purpose is to

9 │ show that Mr. -- that Mr. Dondero had some role in advising

10 │ and participating in the creation of this complaint.  That's

11 │ been conceded by myself.  I believe it was conceded by Mr.

12 │ Dondero.

13 │    The actual specific facts, the actual specific

14 │ conversations, Your Honor, shouldn't be relevant at this point

15 │ and they shouldn't be admissible, given -- given the

16 │ relevancy, given the perspective of the privilege.

17 │        THE COURT:  Okay.

18 │        MR. MORRIS:  If I might --

19 │        THE COURT:  I overrule your objection.  I don't think

20 │ a privilege has been shown here --

21 │        MR. SBAITI:  And Your Honor, --

22 │        THE COURT:  -- and I think it's relevant.

23 │        MR. SBAITI:  -- I would ask if we could *voir dire* the

24 │ witness on the basis of the privilege, if that's --

25 │        THE COURT:  All right.  You may do so.

001849

HCMLPHMIT00002898

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 09/05/25299    Page 242 of 262    PageID 2987

Dondero - Voir Dire                                  184

```
 1                    VOIR DIRE EXAMINATION

 2   BY MR. SBAITI:

 3   Q    Mr. Dondero, do you have a relationship with the DAF?

 4   A    Yes.

 5   Q    How would you describe that relationship?

 6   A    I view myself and my firm as the investment advisor.  I

 7   was actually surprised by the testimony today that there

 8   wasn't a contract in place, but there should be one.  There

 9   should be one soon, in my opinion.

10   Q    Have you -- did you hear Mr. Patrick testify earlier that

11   he comes to you for advice?

12   A    Yes.

13   Q    Is that --

14   A    As he should.  Yeah.

15   Q    Is that true?

16   A    Yes.

17   Q    When you render that advice, do you render that advice

18   with some expectation about him following or listening to that

19   advice?

20   A    Okay, I think there's only been one investment or one

21   change in the DAF portfolio since Mark Patrick's been

22   involved, only one, and it was a real estate investment that I

23   wasn't directly involved in.  And so the people who put that

24   investment forward worked with Mark without my involvement,

25   and then I think Mark got third-party appraisal firms and
```

001850

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 06/20/25   Page 243 of 262   PageID 2988
Exhibit 71   Page 189 of 299

Dondero - Voir Dire                              185

```
 1   third-party valuation firms involved to make sure he was
 2   comfortable, which was a good process.
 3   Q    When you supplied information to Mr. Patrick, do you do so
 4   under the belief that there is a contractual, informal or
 5   formal, relationship?
 6            MR. MORRIS:  Objection to the form of the question.
 7            THE COURT:  Overruled.
 8            MR. SBAITI:  What specific form?
 9            THE COURT:  Overruled.
10            MR. SBAITI:  Thank you.
11            THE WITNESS:  Yes.  I believe it -- it's a
12   relationship that can and should be papered as -- soon.
13   That's my -- I mean, unless I get some reason from counsel not
14   to, I think it's something that should be memorialized.
15   BY MR. SBAITI:
16   Q    And when you have that -- in that relationship, when you
17   communicate with Mr. Patrick about matters, investment or
18   otherwise, is there an expectation of privacy?
19   A    Yes.
20   Q    When Mr. Patrick -- did Mr. Patrick request that you
21   interface with my firm and myself, as he testified earlier?
22   A    Yes.
23   Q    And when he did so, did he ask you to do so in an
24   investigatory manner?
25            MR. MORRIS:  Objection to the form of the question.
```

001851

HCMLPHMIT00002900

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-71    Filed 07/07/25    Page 244 of 262    PageID 2989

Dondero - Voir Dire                    186

1              THE COURT:  Sustained.  Rephrase.

2    BY MR. SBAITI:

3    Q    Did he tell you why he wanted you to talk to us?

4    A    Yeah.  At that point, he had started an investigation into

5    the HarbourVest transaction.

6    Q    And -- and when he -- when you were providing information

7    to us, did he tell you whether he wanted you to help the

8    Sbaiti firm conduct the investigation?

9    A    The -- overall, the financial numbers and tables in there

10   were prepared by not myself, but I -- I did -- I did help on

11   -- on the -- some of the registered investment advisor issues

12   as I understood them.

13   Q    Okay.  And the communications that you had with us, was

14   that part of our investigation?

15              MR. MORRIS:  Objection to the form of the question.

16              THE COURT:  Overruled.

17              THE WITNESS:  Yes.

18   BY MR. SBAITI:

19   Q    And did you understand that we had been retained by Mr.

20   Patrick on behalf of the DAF and CLO Holdco?

21   A    Yes.

22   Q    And did you appreciate or have any understanding of

23   whether or not you were helping the law firm perform its legal

24   function on behalf of the DAF and CLO Holdco?

25   A    Perform its legal function?  I was just helping with

HCMLPHMIT00002901

1   regard to the registered investment advisor aspects of the

2   overall, you know, like that.

3   Q    Let me ask a more simple question.  Did you -- did you

4   appreciate that you were assisting a law firm in its

5   representation of the DAF?

6   A    Yes.

7   Q    And you were helping the law -- and were you helping the

8   law firm develop the facts for a complaint?

9   A    Yes.  I would almost say, more importantly, I wanted to

10  make sure that there weren't errors in terms of understanding

11  either how CLOs worked or how the Investment Advisers Act

12  worked.  So I was -- it was almost more of a proofing.

13          MR. SBAITI:  Your Honor, based upon that, I mean,

14  he's helping a law firm perform its function for the client.

15  That's an agency relationship that gets cloaked.  You can call

16  him a consulting expert.  You can call him, to a certain

17  extent, a fact witness, Your Honor.  If we want to take a

18  break, I'm sure we could find authority on that basis for a

19  work product privilege pretty easily.

20      But he's an agent of the DAF.  Even if it's an informal

21  agency relationship, that's still agency.  He's in some

22  respects, I guess, an agent of the law firm, to the extent

23  he's helping us perform our legal work.  And it seems like

24  invading that privilege at this juncture is (a) unnecessary,

25  because we've already conceded that there's been

HCMLPHMIT00002902

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 09/89/05299 Page 246 of 262   PageID 2991

Dondero - Voir Dire                        188

 1   conversations, which I think is the relationship they wanted

 2   to establish.  And it's not unusual for a law firm to use

 3   someone with specialized knowledge to understand some of the

 4   intricacies of the actual issues that they're -- that they're

 5   getting ready to litigate.

 6           THE COURT:  Okay.  I find no privilege.  All right.

 7   That's the ruling.

 8           MR. BRIDGES:  Your Honor, may I add one thing to the

 9   objection for the record?

10           THE COURT:  Okay, we have a rule, one lawyer per

11   witness.  Okay?  So, thank you.  A District Court rule, by the

12   way, not mine.

13           MR. SBAITI:  Your Honor, may we take a short recess,

14   given the Court's ruling?

15           THE COURT:  Well, I'd really like to finish this

16   witness.  How much longer do you have?

17           MR. MORRIS:  About eight more questions.

18           THE COURT:  All right.  We'll take a break after the

19   direct, okay?

20           MR. SBAITI:  Your Honor, I would ask that we -- if

21   he's going to ask him more questions about the content of the

22   communications, I ask respectfully for a recess so we can

23   figure out what to do about that.  Because, right now, there's

24   a ruling that he's going to have to reveal privileged

25   information, and we don't have a way to go around and figure

```
1    out how to resolve that issue if we needed to.

2            THE COURT:  Okay.  I've ruled it's not privilege.

3    Okay?

4            MR. SBAITI:  I understand that, Your Honor, but --

5            THE COURT:  Your client is CLO Holdco and the DAF.

6            MR. SBAITI:  Yes, Your Honor.

7            THE COURT:  Representative, Mark Patrick.  No

8    contract with Mr. Dondero.  The fact that he may be very

9    involved I don't think gives rise to a privilege.  That's my

10   ruling.

11           MR. SBAITI:  I understand, Your Honor.  I understand,

12   Your Honor, but I'm asking for a recess so that we can at

13   least undertake to provide Your Honor with some case law on a

14   reconsideration before we go there, because that bell can't be

15   unrung.

16           MR. MORRIS:  Your Honor, if I may?

17           MR. SBAITI:  And it's --

18           THE COURT:  Uh-huh.

19           MR. MORRIS:  I'm happy to give them ten minutes, Your

20   Honor, as long as they don't talk to the witness.

21           THE COURT:  Okay.

22           MR. MORRIS:  I want to give them the opportunity.  Go

23   right ahead.

24           THE COURT:  All right.  We'll take a ten-minute

25   break.
```

001855

Dondero - Voir Dire                      190

1              MR. SBAITI:  Thank you.

2              THE COURT:  It's 3:05.

3              THE CLERK:  All rise.

4         (A recess ensued from 3:03 p.m. until 3:17 p.m.)

5              THE CLERK:  All rise.

6              THE COURT:  Okay.  Please be seated.  Going back on

7    the record in Highland.  Mr. Sbaiti?

8              MR. SBAITI:  Yes, Your Honor.  May I approach?

9              THE COURT:  You may.

10             MR. SBAITI:  Your Honor, we have some authority to

11   support the position we'd taken.  We'd ask the Court to

12   reconsider your ruling on the privilege.

13        The first bit of authority is Section 70 of the

14   Restatement (Third) of Law Governing Lawyers.  Privileged

15   persons within the meaning of Section 68, which governs the

16   privilege, says that those persons include either agents of

17   either the lawyer or the client who facilitate communications

18   between the two in order for the lawyers to perform their

19   function.

20        Another case that we found is 232 F.R.D. 103 from the

21   Southern District of New York, 2005.  It's *Express Imperial*

22   *Bank of U.S. v. Asia Pulp Company*.  And in that case, Your

23   Honor, the consultant was a -- had a close working

24   relationship with the company and performed a similar role to

25   that of the employee and was assisting the law firm in

001856

HCMLPHMIT00002905

1    performing their functions, and the court there found that the

2    work product privilege -- actually, the attorney-client

3    privilege -- attached in what they called a Functional

4    Equivalents Doctrine, Your Honor.

5         And here we have pretty much the same set of facts that's

6    pretty much undisputed.  The fact that there -- and the fact

7    that there isn't a written agreement doesn't mean there isn't

8    a contractual arrangement for him to have rendered services

9    and advice.  And the fact that he's, you know, recruited by us

10   to help us perform our functions puts him in the realm, as I

11   said, of something of a consulting expert.

12        Either way, the work product privilege, Your Honor, should

13   apply, and we'd ask Your Honor not to invade that privilege at

14   this point, Your Honor.  And I'll ask you to reconsider your

15   prior ruling.

16        Furthermore, I believe Mr. Morris, you know, in making his

17   argument, is trying to create separation.  The fact that he

18   has no relationship, that the privilege can be invaded, seems

19   to defeat the whole premise of his whole line of questioning.

20        So, once again, Your Honor, I just -- it's a tit for a tat

21   there, and it seems to kind of eat itself.  Either he is

22   working with us, which we've admitted he is working with us,

23   us being the law firm, and helping us do our jobs, or he's

24   not.  And if he's not, then this should be done.

25             THE COURT:  Okay.

HCMLPHMIT00002906

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 08/08/25   Page 250 of 262   PageID 2995
Exhibit 71   Page 193 of 299

Dondero - Voir Dire                              192

 1              MR. MORRIS:  Your Honor, briefly?

 2              THE COURT:  Well, among other things, what do you

 3    want me to do?  Take a break and read your one sentence from

 4    the Restatements and your one case?  And could you not have

 5    anticipated this beforehand?

 6              MR. SBAITI:  Your Honor, --

 7              THE COURT:  This is not the way we work in the

 8    bankruptcy courts, okay?  We're business courts.  We have

 9    thousands of cases.  We expect briefing ahead of time.

10              MR. SBAITI:  Your Honor, this has been a rather

11    rushed process anyway.  And to be honest, --

12              THE COURT:  When was the motion filed?

13              MR. SBAITI:  Your Honor, --

14              THE COURT:  More than a month ago.

15              MR. SBAITI:  -- his deposition was a week ago.

16              THE COURT:  Well, okay.  So you could not have

17    anticipated this issue until his deposition one week ago?

18              MR. SBAITI:  Your Honor, this issue arose at the

19    deposition, obviously, because that's what he's quoting from.

20    However, at least to us, this is such a well-settled area, and

21    to be honest, --

22              THE COURT:  Such a well-settled area that you have

23    one sentence from the Restatement and one case from the

24    Southern District of New York?

25              MR. SBAITI:  No, Your Honor.  I think the work

HCMLPHMIT00002907

Dondero - Voir Dire                                            193

```
 1    product privilege lexicon -- we had ten minutes to try to find

 2    something more on point than the general case law that applies

 3    the work product privilege to people that work with lawyers,

 4    consultants who work with lawyers, employees who work with

 5    lawyers, even low-down employees who normally wouldn't enjoy

 6    the privileges that attach to the corporation, when they work

 7    with the company for -- when they work with the company

 8    lawyers, it typically attaches.

 9            THE COURT:  You know, obviously, I know a few things

10    about work product privilege, but he doesn't check any of the

11    boxes you just listed out.

12            MR. SBAITI:  I disagree, Your Honor.

13            THE COURT:  He's not an employee.  He's not a low-

14    level employee.

15            MR. SBAITI:  He's a consultant.

16            THE COURT:  With no agreement.

17            MR. SBAITI:  With a verbal agreement.  He's an

18    advisor.  And he was recruited by us, and at the request of

19    the DAF, of the head of the DAF, Mr. Patrick, to help us do

20    our job for the DAF.  I don't --

21            THE COURT:  Okay.  Mr. Morris, what do you want to

22    say?

23            MR. MORRIS:  Just briefly, Your Honor.  This issue

24    has been ripe since last Tuesday.  They directed him not to

25    answer a whole host of questions about his involvement at the
```

HCMLPHMIT00002908

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 05/05/25   Page 252 of 262   PageID 2997

Dondero - Voir Dire                    194

1   deposition last Tuesday, so they've actually had six days to

2   deal with this.  That's number one.

3       Number two, there's absolutely nothing inconsistent with

4   the Debtor's position that Mr. Dondero is participating in the

5   pursuit of claims and at the same time saying that his

6   communications with the Sbaiti firm are not privileged.

7   There's nothing inconsistent about that.

8       So the argument that he just made, that somehow because

9   we're trying to create separation, that that's inconsistent

10  with our overall arching theme that Mr. Dondero is precisely

11  engaged in the pursuit of claims against Mr. Seery, I think

12  that takes care of that argument.

13      Finally, your Honor, with respect to this consultancy

14  arrangement, not only isn't there anything in writing, but

15  either you or Mr. Sbaiti or I, I think, should ask Mr. Dondero

16  the terms of the agreement.  Is he getting paid?  Is he doing

17  it for free?  Who retained him?  Was it Mr. -- because the --

18  there's no such thing.  There's no such thing.

19      The fact of the matter is what happened is akin to I have

20  a slip-and-fall case and I go to a personal injury lawyer and

21  I bring my brother with me because I trust my brother with

22  everything.  It's not privileged.  Any time you bring in

23  somebody who is not the attorney or the client, the privilege

24  is broken.  It's really quite simple.  Unless there's a common

25  interest.  They can't assert that here.  There is no common

HCMLPHMIT00002909

 1 | interest.  So --
 2 |         THE COURT:  Okay.  Mr. Sbaiti, I'll give you up to
 3 | three more minutes to *voir dire* Mr. Dondero to try to
 4 | establish some sort of agency relationship or other evidence
 5 | that you think might be relevant.
 6 |                    VOIR DIRE, RESUMED
 7 | BY MR. SBAITI:
 8 | Q   Mr. Dondero, when you provided information to the law
 9 | firm, were you doing so under an agency relationship?  Do you
10 | know what an agency relationship is?
11 | A   Generally.  When you're working on the -- or why don't you
12 | tell me?
13 | Q   Tell me your understanding, so we can use --
14 | A   That you're working for the benefit or as a proxy for the
15 | other entity or the other firm or the other person.
16 | Q   Right.  So you're working for the DAF?
17 | A   Yes.
18 | Q   Do you do work for the DAF?
19 | A   Yes.  As I stated, I'm surprised there isn't -- when we
20 | reconstituted after leaving Highland, we put in shared
21 | services agreements in place and asset management agreements
22 | in place and tasked people with doing that for most of the
23 | entities.  There might be still a few contracts that are being
24 | negotiated, but I thought most of them were in place.
25 |     So I would imagine that there'll be an asset management

001861

 1  agreement with the DAF back to NexPoint sometime soon, so it

 2  -- it's --

 3  Q    Let me ask you this question.  When you were providing

 4  information to us and having conversations with us, were you

 5  doing that as an agent of the DAF, the way you described it,

 6  --

 7  A    Yes.

 8  Q    -- on their behalf?

 9  A    Yes.

10  Q    Were you also doing it to help us do our jobs for the DAF?

11  A    Yes.

12  Q    Did you respond to requests for information from myself?

13  A    Yes.

14  Q    Did you help coordinate other -- finding other witnesses

15  or sources of information at my request?

16  A    Yes.

17  Q    Did you do so based upon any understanding that I was

18  working on behalf of the DAF for that?

19  A    Yes.  I knew -- I knew you were working for the DAF.  No

20  one else, yeah.

21  Q    And so -- and so did you provide any expertise or any in-

22  depth understanding to myself in helping me prepare that

23  complaint?

24  A    I think so, but I give a lot of credit to your firm for

25  researching things that I -- I knew reasonably well but then

HCMLPHMIT00002911

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 06/08/25   Page 255 of 262   PageID 3000

Dondero - Voir Dire                    197

```
 1   you guys researched in even more depth.
 2          MR. MORRIS:  I'd move to strike the answer as
 3   nonresponsive.
 4          THE COURT:  Sustained.
 5   BY MR. SBAITI:
 6   Q   Let me ask the question again.  When you were providing us
 7   information and expertise, were you doing so knowing you were
 8   working -- helping us work for the DAF?
 9   A   Yes.
10   Q   Now, did you demand any compensation for that?
11   A   No.
12   Q   Do you require compensation necessarily to help the DAF?
13   A   No.
14   Q   Do you do other things for the DAF sometimes without
15   compensation?
16   A   Right.  We do the right thing, whether we get paid for it
17   or not.  Yes.
18   Q   Had you known that our communications were not necessarily
19   part of an agency relationship with the DAF, as you understood
20   it, that you were just some guy out on the street, would you
21   have had the same conversations with us?
22   A   (sighs)
23   Q   Let me ask a better question.  If I had come to you
24   working for someone that wasn't the DAF, you didn't already
25   have a relationship with, would you have given us the same
```

HCMLPHMIT00002912

1  help?

2  A   I wouldn't have been involved if it was somebody else.

3  Q   Is the reason you got involved because we were the lawyers

4  for the DAF?

5  A   Correct.

6         MR. MORRIS:  Objection.  It's just leading.  This is

7  all leading.

8         THE WITNESS:  Correct.

9         THE COURT:  Sustained.

10         MR. SBAITI:  Can --

11         THE WITNESS:  Yeah.  Sorry.

12  BY MR. SBAITI:

13  Q   Do you get -- do -- did you -- did you do work for the --

14  did you provide the help for the DAF laboring under the

15  understanding that there was an agreement?

16         MR. MORRIS:  Objection; leading.

17         THE COURT:  Sustained.

18  BY MR. SBAITI:

19  Q   Earlier you testified you believed there was an agreement?

20  A   I thought that was an agreement, and I thought there will

21  be one shortly if there isn't one, yes.

22  Q   Okay.

23  A   And so we -- I've been operating in a bona fide way in the

24  best interests of the DAF throughout -- assuming there was an

25  agreement, but even if there wasn't a formal one, I would

001864

HCMLPHMIT00002913

Dondero - Voir Dire                            199

```
 1   still be moving in the best interests of the DAF and helping

 2   your firm out or --

 3   Q    And you did that because you believed there was an

 4   agreement or soon would be?

 5   A    Yes.

 6            MR. SBAITI:  Your Honor, I mean, I believe we've

 7   established a dual role here, both as an agent of the DAF and

 8   as an agent of the law firm, Your Honor.

 9            THE COURT:  Okay.  Just a minute.  I'm looking at

10   Texas authority on common interest privilege to see if there's

11   anything that --

12       (Pause.)

13            THE COURT:  All right.  Again, it would have been

14   very nice to get briefing ahead of time.  I think this

15   absolutely could have been anticipated.

16     I do not find the evidence supports any sort of protection

17   of this testimony under work product privilege, common

18   interest privilege.  I just haven't been given authority or

19   evidence that supports that conclusion.  So the objections are

20   overruled.

21       Mr. Morris, go ahead.

22                    DIRECT EXAMINATION, RESUMED

23   BY MR. MORRIS:

24   Q    Can you describe for the Court the substance of your

25   communications with Mr. Sbaiti concerning the complaint?
```

001865

Dondero - Direct                    200

```
 1   A    As I've stated, directing him toward the Advisers Act and
 2   then largely in a proofing function regarding CLO nomenclature
 3   and some of the other fund nomenclature that sometimes gets
 4   chaotic in legal briefs.
 5   Q    Did you communicate in writing at any time with anybody at
 6   the Sbaiti firm regarding any of the matters that are the
 7   subject of the complaint?
 8   A    I can't remember anything in writing.  Almost everything
 9   was verbal, on the phone.
10   Q    You don't tend to write much, right?
11   A    Periodically.
12   Q    Did you communicate with Mr. Patrick?  Did you communicate
13   with anybody in the world in writing regarding the substance
14   of anything having to do with the complaint?
15             MR. SBAITI:  Objection, Your Honor.  Argumentative.
16             THE COURT:  Overruled.
17             THE WITNESS:  I --
18             MR. SBAITI:  Your Honor, may I just -- one
19   housekeeping.  Rather than raise the same objection, may we
20   have a standing objection, just so we're not disruptive, as to
21   the privilege, just for preservation purposes, on the content
22   of these communications?  Otherwise, I'll just make the same
23   objections and we can go through it.
24             THE COURT:  Well, disruptive as it may be, I think
25   you need to object to every --
```

001866

HCMLPHMIT00002915

Dondero - Direct                    201

1          MR. SBAITI:  Okay.

2          THE COURT:  -- question you think the privilege

3   applies to.

4          MR. SBAITI:  I will do so.  Thank you, Your Honor.

5   Uh-huh.

6   BY MR. MORRIS:

7   Q   Mr. Dondero, the question was whether you've ever

8   communicated with anybody in the world in writing concerning

9   anything having to do with the complaint?

10  A   Not that I remember.

11  Q   Okay.

12         MR. MORRIS:  I will point out, Your Honor, that last

13  week, when the privilege was asserted, I had requested the

14  production of a privilege log.  I was told -- I forget exactly

15  what I was told, but we never received one.  I'll just point

16  that out as well.

17         THE COURT:  Okay.

18  BY MR. MORRIS:

19  Q   You provided comments to the drafts of the complaint

20  before it was filed, correct?

21  A   Yes, a few.

22  Q   Can you describe for the Court all of the comments that

23  you provided to earlier drafts of the complaint?

24         MR. SBAITI:  Your Honor, we object on the basis of

25  privilege and work product and joint -- joint interest

HCMLPHMIT00002916

Dondero - Direct                    202

1   privilege.

2              THE COURT:  Overruled.

3              THE WITNESS:  It's along the lines of things I've

4   said in this court several times.  The obligations under the

5   Advisers Act cannot be negotiated away and they cannot be

6   waived by the people involved, full stop.  I remember giving

7   the -- Mazin the example of the only reason why we're in a

8   bankruptcy is from an arbitration award that, even though we

9   did what was in the best interests of the investors, we got

10  the investors out more than whole over an extended period of

11  time, they got an arbitration award that said when we

12  purchased some of the secondary interests we should have

13  offered them up to the other 800 members in the committee

14  besides the -- the 800 investors in the fund besides the eight

15  people on the committee who had approved it and that the

16  committee couldn't approve a settlement that went against the

17  Advisers Act and the Advisers Act stipulates specifically that

18  you have to offer it up to other investors before you take an

19  opportunity for yourself.  And someday, hell or high water, in

20  this court or some other, we will get justice on that.  And

21  that was the primary point that I reminded Mazin about.

22  BY MR. MORRIS:

23  Q   And that's exactly the conversation you had with Mark

24  Patrick that started this whole thing, correct?

25  A   No.

HCMLPHMIT00002917

Dondero - Direct                      203

1   Q    You told Mark Patrick that you believe the Debtor had

2   usurped a corporate opportunity that should have gone to the

3   DAF, didn't you?

4   A    That was not our conversation.

5   Q    So when Mr. Patrick testified to that earlier today, he

6   just got it wrong, right?

7   A    Well, maybe later on, but it wasn't that in the beginning.

8   The beginning, any conversation I had with Mark Patrick in the

9   beginning was smelling a rat in the way that the Debtor had

10  priced the portfolio for HarbourVest.

11  Q    Hmm.  So you're the one, again, who started that piece of

12  the discussion as well, correct?

13  A    Started the -- I -- I guess I smelled a rat, but I put the

14  person who could do all the numbers in touch with the Sbaiti

15  firm.

16  Q    And was the rat Mr. Seery?

17  A    Was the rat Mr. Seery?  Or the independent board.  Or a

18  combination thereof.  I believe the independent board knew

19  exactly what Seery was doing with --

20  Q    Do you have any idea --

21  A    -- HarbourVest.

22  Q    Do you have any idea why, why the Sbaiti firm didn't name

23  the whole independent board in the -- in the motion for leave

24  to amend?

25  A    I don't know.  Maybe they will at some point.

001869

HCMLPHMIT00002918

Dondero - Direct                                   204

1  Q    Yeah.

2  A    I don't know.

3  Q    But did you tell the Sbaiti firm that you thought the

4  whole independent board was acting in bad faith and was a rat?

5          MR. SBAITI:  Your Honor, I object on the basis of

6  privilege.

7          THE COURT:  Overruled.

8          MR. SBAITI:  All three.

9          THE WITNESS:  I knew Jim Seery was and I knew Jim

10  Seery had weekly meetings with the other independent board

11  members, so the HarbourVest settlement was significant enough

12  that it would have been approved, but I don't have direct

13  knowledge of their involvement.

14  BY MR. MORRIS:

15  Q    And so you -- but you believed Jim Seery was certainly a

16  rat, right?

17  A    Oh, I -- there was a defrauding of third-party investors

18  to the tune of not insignificant 30, 40, 50 million bucks, and

19  it was obfuscated, it was -- it was highly obfuscated in the

20  9019.

21  Q    Did you think Mr. Seery was a rat, sir?  Yes or no?

22  A    I believe he had monthly financials.  He knew that the

23  numbers presented in the 9019 were wrong.  And if that makes

24  him a rat, that makes him a rat.  Or maybe he's just being

25  aggressive for the benefit of his incentive or for the estate.

001870