**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P

§

§  Case No.  19-34054-sgj11

**The Dugaboy Investment Trust - Appellant**

§

vs.                                           §              **3:25-CV-01876-K**

**Highland Capital Management, L.P; et al** - Appellee

§

§

[4297] **Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025**

## Volume 7

## APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | *INDEX* |

## APPELLANT THE DUGABOY INVESTMENT TRUST'S AMENDED STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Pursuant to Rule 8009 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4311] on July 14, 2025; and having filed *Appellant The Dugaboy Investment Trust's Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* [Docket No. 4365] on August 11, 2025 in the above-captioned case; and having received correspondence from the Bankruptcy Clerk's Office [Docket No. 4367] asking Dugaboy to correct certain errors in its August 11, 2025 submission [Docket No. 4365]; hereby submits this *Amended Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in approving the settlement agreement and release entered into between the Highland Entities and the HMIT Entities pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure as being fair, equitable, and in the best interest of the estate?**

2. **Did the Bankruptcy Court err by approving a settlement agreement utilizing an improper valuation methodology and without sufficient supporting evidence?**

3. **Did the Bankruptcy Court err in approving the overly broad and vague release provisions contained within the settlement agreement?**

4. **Did the Bankruptcy Court err in approving the settlement agreement without allowing adequate time for the Cayman Islands Joint Official Liquidators to complete their investigation?**

5. **Did the Bankruptcy Court err in concluding Mark Patrick had the requisite corporate authority to enter into and bind the HMIT entities to the settlement agreement?**

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow, August 13, 2025.

*Vol. 1*
*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4311] filed by Appellant;

*000010*

2. *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4297];

*000014*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an |

*000625*
*000786*
*000804*

3

*Vol. 2*

| | | | |
|---|---|---|---|
| | | | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *000807* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *000832* | 5/20/2025 | 4218 | Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust(Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust(Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |
| *000838* | 5/22/2025 | 4221 | Amended Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust(Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust(Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery |

| Vol. 2 | 6/9/2025 | 4228 | Motion for expedited hearing on Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion Filed by Partner Dugaboy Investment Trust (related document #4227 (Attachments: #1 Proposed Order Granting Motion for Expedited Hearing (Hesse, Gregory) Modified linkage on 6/10/2025 (mdo). |
|---|---|---|---|
| 0008414 | | | |
| 0008449 | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| 0008857 | 6/10/2025 | 4232 | Response opposed to (related document(s): 4227 Motion to extend time to Time to Respond to Trusts' Motion filed by Partner Dugaboy Investment Trust, 4228 Motion for expedited hearing (related documents 4216 Motion to compromise controversy) on Emergency Motion for an Order Extending Duration of Time to Respond To Trusts' Motion filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| 0008863 | 6/10/2025 | 4234 | Reply to (related document(s): 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) to (I) Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion and (II) Motion for Expedited Hearing on Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| 0008867 | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| 0008869 | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| Vol. 3 0008871 Thru Vol. 13 | 6/20/2025 | 4255 (to be submitted to | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to |

| | | | |
|---|---|---|---|
| *Vol. 3*<br>*Starts with*<br>*0008 71* —<br><br>*Thru Vol End*<br>*of*<br>*Vol 1.3* | **Clerk on**<br>**flash drive)** | | Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| *Vol. 14*<br><br>*003528* | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis |

| | Date | No. | Description |
|---|---|---|---|
| Vol 14<br>003531 | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart,#3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| Vol. 15<br>003851 | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| 003875 | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| 004002 | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| 004017 | 6/23/2025 | 4276 | Reply to (related document(s)): 4223 Objection filed by Creditor The Dugaboy Investment Trust) filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| 004019 | 6/24/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| Vol. 16<br>004236 | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |

| | | | |
|---|---|---|---|
| *Vol. 16*<br><br>*0042 47* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |
| *0042 87* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *0042 72* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *0042 76* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust). Entered on 6/27/2025 (Okafor, M.) |
| *0042 88* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 |

| | | | |
|---|---|---|---|
| *Vol.16* | | | Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *004295* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *004302* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *004304* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *004313* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *004315* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *004311* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of |

| Vol. 16 | | | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| Vol. 17 004684 | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| 004700 | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M. |
| 004812 | 8/4/2025 | 4353 | Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A (Harper, Geoffrey) |
| 004834 | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| | | | |

Dated: August 12, 2025          Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500

(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 12, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*_____
Geoffrey S. Harper

Dondero - Direct                    205

1   But I -- I believe those things wholeheartedly.

2   Q    Did you tell the Sbaiti firm you thought Jim Seery was a

3   rat?

4          MR. SBAITI:  Objection, Your Honor.  Privilege.

5          THE COURT:  Overruled.

6          THE WITNESS:  I -- I don't remember using those

7   words.

8   BY MR. MORRIS:

9   Q    Did you tell the Sbaiti Firm that you thought Jim Seery

10  had engaged in wrongful conduct?

11         MR. SBAITI:  Your Honor, objection.  Privilege.

12         THE COURT:  Overruled.

13         THE WITNESS:  I believe he violated the Advisers Act,

14  and I was clear on that throughout.

15  BY MR. MORRIS:

16  Q    Listen carefully to my question.  Did you tell the Sbaiti

17  firm that you believed that Jim Seery engaged in wrongful

18  conduct?

19         MR. SBAITI:  Objection, Your Honor.  Calls for

20  privileged communications.

21         THE COURT:  Overruled.

22         THE WITNESS:  I think I gave the answer.  I'll give

23  the same answer.  I believe he violated the Advisers Act.

24  BY MR. MORRIS:

25  Q    What other wrongful conduct did you tell the Sbaiti firm

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-71   Filed 06/20/25   Page 14 of 262    PageID 3021
Exhibit 71   Page 207 of 299

Dondero - Direct                                    206

1   you thought Mr. Seery had engaged in?

2           MR. SBAITI:  Same objection, Your Honor.

3           THE COURT:  Overruled.

4           MR. SBAITI:  Calls for privileged communications.

5           THE COURT:  Overruled.

6           THE WITNESS:  I -- I just remember the obfuscating

7   and mispricing portfolio violations of the Advisers Act was

8   all I discussed with the Sbaiti firm regarding Seery's

9   behavior.

10  BY MR. MORRIS:

11  Q    Did you talk to them about coming to this Court under the

12  gatekeeper order to see if you could get permission to sue Mr.

13  Seery?

14  A    I --

15          MR. SBAITI:  Objection, Your Honor.  Calls for

16  privileged communication.

17          THE COURT:  Overruled.

18          THE WITNESS:  I wasn't involved in any of the --

19  BY MR. MORRIS:

20  Q    Did you --

21  A    -- tactical stuff on who to sell or -- who to sue or when

22  or whatever.

23  Q    Did you tell the Sbaiti firm that you thought they should

24  sue Mr. Seery?

25          MR. SBAITI:  Objection, Your Honor.  Calls for

HCMLPHMIT00002921

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 02/08/2299    Page 15 of 262    PageID 3022

Dondero - Direct                                   207

1    privileged communication.

2              THE COURT:  Overruled.

3              MR. SBAITI:  I'll also say, Your Honor, the question

4    is getting a little argumentative.

5              THE WITNESS:  I didn't get directly --

6              THE COURT:  Overruled.

7              THE WITNESS:  I didn't get directly involved in who

8    was -- who was specifically liable.

9    BY MR. MORRIS:

10   Q    How many times did you speak with the Sbaiti firm

11   concerning the complaint?

12   A    Half a dozen times, maybe.

13   Q    Did you ever meet with them in person?

14   A    I've only met with them in person a couple, three times.

15   And I don't think any of them -- no, it was, excuse me, it was

16   on deposition or other stuff.  It wasn't regarding this.

17   Q    Did you send them any information that was related to the

18   complaint?

19   A    I did not.

20   Q    Did you ask anybody to send the Sbaiti firm information

21   that related to the complaint?

22   A    I did not.  I -- I was aware that Hunter Covitz was

23   providing the historic detailed knowledge to the firm, but it

24   -- it wasn't -- I don't believe it was me who orchestrated

25   that.

001873
HCMLPHMIT00002922

Dondero - Direct                                           208

1   Q    Did you talk to anybody at Skyview about the allegations

2   that are contained in the complaint before it was filed?

3   A    I don't -- I don't remember.

4   Q    Have you ever talked to Isaac Leventon or Scott Ellington

5   about the allegations in the complaint?

6   A    No.  They weren't involved.

7   Q    How about -- how about D.C. Sauter?  You ever speak to him

8   about it?

9   A    I don't --

10            MR. TAYLOR:  Objection, Your Honor.

11            THE WITNESS:  I don't remember.

12            MR. TAYLOR:  At this point, D.C. Sauter is indeed an

13  employee of Skybridge and is a general counsel for some of the

14  entities which he worked for.  And to the extent he's trying

15  to ask for those communications, that would be invasion of the

16  privilege.

17            MR. MORRIS:  I'll withdraw it, Your Honor.  That's

18  fair.

19            THE COURT:  Okay

20            MR. MORRIS:  That's fair.

21            THE COURT:  Question withdrawn.

22            THE WITNESS:  I thought you only had eight more

23  questions.

24            MR. MORRIS:  Opened the door.

25  BY MR. MORRIS:

HCMLPHMIT00002923

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 02/09/29   Page 17 of 262   PageID 3024

Dondero - Direct                                      209

```
 1   Q    Can you describe the general fact -- withdrawn.  You

 2   provided facts and ideas to the Sbaiti firm in connection with

 3   your review of the draft complaint, correct?

 4   A    Ideas and proofreading.

 5   Q    Anything beyond what you haven't described already?

 6   A    Nope.

 7   Q    Okay.  Who is your primary contact at the Sbaiti firm, if

 8   you had one?

 9   A    Mazin.

10   Q    Okay.  Did you suggest to Mr. Sbaiti that Mr. Seery should

11   be named as a defendant in the lawsuit before it was filed?

12            MR. SBAITI:  Your Honor, calls for privileged

13   communication.  We object --

14            THE COURT:  Overruled.

15            MR. SBAITI:  -- to that answer.

16            MR. SBAITI:  Okay.

17            THE WITNESS:  Again, no.  I wasn't involved with the

18   tactics on who would be defendants and when or if other people

19   would be added.

20   BY MR. MORRIS:

21   Q    Did you -- are familiar with the motion to amend that was

22   filed by the Sbaiti firm?

23   A    I'm more familiar with it after today --

24   Q    Right.

25   A    -- than I was before.
```

001875

HCMLPHMIT00002924

Dondero - Direct                        210

1    Q    And were you aware that that motion was going to be filed

2    prior to the time that it actually was filed?

3    A    I -- I don't remember.  Probably.

4    Q    And who would have been the source of that information?

5    Would that have been Mr. Sbaiti?

6    A    Yes.

7    Q    Okay.  And did you express any support for the decision to

8    file the motion for leave to amend in the District Court?

9    A    I -- I wasn't involved.  It was very complicated legal

10   preservation conver... -- I wasn't involved.  I knew the

11   conversations were going on between different lawyers, but I

12   wasn't involved in the ultimate decision.  I didn't encourage,

13   applaud, or even know exactly what court it was going to be

14   filed in.

15            MR. MORRIS:  All right.  I have no further questions,

16   Your Honor.

17            THE COURT:  All right.  Pass the witness.

18            MR.

19   ANDERSON:  We have no questions, Your Honor.

20            THE COURT:  Okay.  Any questions from Respondents?

21            MR. SBAITI:  No questions.

22            THE COURT:  Okay.  Mr. Taylor?

23                      CROSS-EXAMINATION

24   BY MR. TAYLOR:

25   Q    Mr. Dondero, --

001876

HCMLPHMIT00002925

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-71    Filed 02/29/2299   Page 19 of 262    PageID 3026
Exhibit 4-71    Page 2129/2299

Dondero - Cross                          211

1  A    Yes, sir.

2  Q    -- you are not the authorized representative of CLO

3  Holdco, are you?

4  A    No.

5  Q    You're not the authorized representative for the DAF, are

6  you?

7  A    No.

8  Q    Do you know who that person is as we sit here today?

9  A    Yes.

10  Q    Who is that?

11  A    Mark Patrick.

12  Q    Thank you.

13         MR. TAYLOR:  No further questions.

14         THE COURT:  Any redirect on that cross?

15         MR. MORRIS:  I do not, Your Honor.  I would just like

16  to finish up the Debtor's case in chief by moving my exhibits

17  into evidence.

18         THE COURT:  Okay.  Mr. Dondero, you're excused.

19      (The witness steps down.)

20         THE COURT:  All right.  So you have no more

21  witnesses; you're just going to offer exhibits?

22         MR. MORRIS:  Yes, Your Honor.

23         THE COURT:  Okay.

24         MR. MORRIS:  So, at Docket #2410, --

25         THE COURT:  Uh-huh.

HCMLPHMIT00002926

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-71   Filed 01/30/2299   Page 20 of 262    PageID 3027

212

 1                MR. MORRIS:  -- the Court will find Exhibits 1

 2   through 53.

 3                THE COURT:  Uh-huh.

 4                MR. MORRIS:  In advance, Your Honor, I've conferred

 5   with the Respondents' counsel.  They had previously objected

 6   to Exhibits 15 and 16, which I believe were the Grant Scott

 7   deposition transcripts.  They objected to them on the grounds

 8   of lack of completeness because I had taken the time to make

 9   deposition designations, but I'm happy to put the entirety of

10   both transcripts into evidence, and I hope that that will

11   remove the objections to Exhibits 15 and 16.

12                THE COURT:  All right.  Before we confirm, let's just

13   make sure we have the right one.

14                MR. MORRIS:  Oh, I apologize.

15                THE COURT:  I have 16 as the July order.

16                MR. MORRIS:  I apologize.  You're absolutely right,

17   Your Honor.  What I was referring to was -- oh, goodness.  One

18   second.  (Pause.)  I was referring to Exhibits 23 and 24.

19   Those are Mr. Scott's deposition designations.  They had

20   lodged an informal objection with me on grounds of

21   completeness.  And in order to resolve that objection, we're

22   happy to put the entirety of both transcripts in.

23                THE COURT:  All right.  So if our Respondents could

24   confirm with the agreement to put in the entire depos at 23

25   and 24, you stipulate to 1 through 53?

HCMLPHMIT00002927

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 04-71   Page 21497/2399 Page 21 of 262   PageID 3028

213

         1            MR. PHILLIPS:  We also -- Your Honor, --

         2            MR. MORRIS:  Yeah, I was going to take them one at a

         3    time.  Just take those two.

         4            MR. PHILLIPS:  Yeah, can we just take those two?

         5    Confirmed?

         6            MR. MORRIS:  Okay.

         7            THE COURT:  Oh, okay.

         8            MR. PHILLIPS:  Because there are other -- there are

         9    other -- we exchanged objections to each other's witness and

        10    exhibit lists.  And so I think you can handle the rest of them

        11    kind of in a bunch, right?

        12            MR. MORRIS:  Yeah.  Yeah, there's two bunches,

        13    actually.

        14            MR. PHILLIPS:  Yeah.

        15            THE COURT:  Okay.  So you have just now stipulated to

        16    23 and 24 being admitted --

        17            MR. MORRIS:  Correct.

        18            THE COURT:  -- with the full depos?  Okay.

        19            MR. PHILLIPS:  Yes, ma'am.  Thank you.

        20            THE COURT:  All right.

        21        (Debtor's Exhibits 23 and 24 are received into evidence.)

        22            MR. MORRIS:  And then the next two that they objected

        23    to are Exhibits 15 and 16.  15 is the January order and 16 is

        24    the July order.  They objected on relevance grounds.  I think

        25    16 -- these are the two orders that the Debtors contend the

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 06/20/25   Page 22 of 262   PageID 3029

214

 1   Respondents have violated, so I don't understand the relevance

 2   objection, but that's what it was and that's my response.

 3        MR. PHILLIPS:  Resolved, Your Honor.

 4        THE COURT:  Okay.  15 and 16 are admitted.

 5      (Debtor's Exhibits 15 and 16 are received into evidence.)

 6        MR. MORRIS:  Okay.  And then the last objection

 7   relates to a group of exhibits.  They're Exhibits 1 through

 8   11.  Those exhibits I think either come in together or stay

 9   out together.  They are exhibits that relate to the

10   HarbourVest proceedings, including deposition notices,

11   including I think the transcript from the hearing, the Court's

12   order, the motion that was filed.

13      The Debtor believes that those documents are relevant

14   because they go right to the issue of the gatekeeper order and

15   had they filed, had the Respondents followed the gatekeeper

16   order, this is -- this is why they didn't do it.  You know

17   what I mean?  That's the argument, is that the Respondents,

18   one of the reasons the Respondents -- argument -- one of the

19   reasons the Respondents didn't come to this Court is because

20   they knew this Court had that kind of record before it.  And I

21   think that's very relevant.

22        THE COURT:  All right.  Response?

23        MR. PHILLIPS:  Your Honor, we think that these

24   exhibits are not relevant.  We have a very focused, we think,

25   -- we have the Court's order.  Those objections are withdrawn.

001880

HCMLPHMIT00002929

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 01/09/299    Page 23 of 262    PageID 3030

215

1   We have the complaint.  We have the motion to amend.  And the

2   issue is whether the motion to amend, which was dismissed one

3   day, or the next day after it was filed, constitutes criminal

4   -- constitutes contempt.

5       So we think the prior proceedings go to their underlying

6   argument, which is the lawsuit or the complaint is no good,

7   and that has nothing to do with -- there's been no foundation

8   laid and it's not relevant what happened in connection with

9   the HarbourVest settlement.  It is what it is, and there's no

10  dispute that it is what it is, but it's not relevant to

11  establish any type of -- they've even said intent is not even

12  relevant here.  So we -- that's -- we think all of that goes

13  out and simplifies the record, because it has nothing to do

14  with whether or not there was a contempt.

15          THE COURT:  Response?

16          MR. MORRIS:  We withdraw the exhibits, Your Honor.

17  I'm just going to make it simple for the Court.

18          THE COURT:  Okay.

19          MR. MORRIS:  I'm just going to make it simple for the

20  Court.

21          THE COURT:  1 through 11 are withdrawn.

22      (Debtor's Exhibits 1 through 11 are withdrawn.)

23          MR. MORRIS:  So, the balance, there was no objection.

24  So all of the Debtor's exhibits on Docket #2410 -- let me

25  restate that.  Exhibits 12 through 53 no longer have an

HCMLPHMIT00002930

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-71   Filed 07/09/25   Page 24 of 262    PageID 3031
Exhibit 71    Page 217 of 299

216

1  objection.  Is that correct?

2          MR. PHILLIPS:  Yes.

3          MR. MORRIS:  Okay.  And then --

4          MR. PHILLIPS:  Confirmed.

5          THE COURT:   Okay.

6     (Debtor's Exhibits 12 through 53 are received into

7  evidence.)

8          MR. MORRIS:  Okay.  Thank you.  And then we filed an

9  amended list, I believe, yesterday --

10         THE COURT:  Uh-huh.

11         MR. MORRIS:  -- to add Exhibits 40 -- 54 and 55.

12         THE COURT:  Uh-huh.

13         MR. MORRIS:  And those exhibits are simply my firm's

14  billing records.

15         THE COURT:  Okay.

16         MR. MORRIS:  You know, we added Mr. Demo to the

17  witness list in case there was a need to establish a

18  foundation.  That's the only thing he would testify to.  I

19  don't know if there's an objection to those two exhibits,

20  because we hadn't had an opportunity to confer.

21         THE COURT:  Any objection?

22         MR. PHILLIPS:  Your Honor, we're not going to require

23  authenticity and foundation for -- we have the right, we

24  think, to say that they're not a ground -- we're not going to

25  challenge that they are the bills, and the bills say what they

HCMLPHMIT00002931

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 14-71   Page 210 of 299   Page 25 of 262   PageID 3032

217

```
 1    say.  We don't need Mr. -- we don't need a witness to
 2    authenticate those exhibits.  But we reserve all substantive
 3    rights with respect to the effect of those exhibits.
 4            THE COURT:  All right.  54 and 55 are admitted.
 5        (Debtor's Exhibits 54 and 55 are received into evidence.)
 6            MR. MORRIS:  And with that, Your Honor, the Debtor
 7    rests.
 8            THE COURT:  Okay.  All right.  Respondents?
 9        (Counsel confer.)
10            MR. PHILLIPS:  If I could have a second?
11            THE COURT:  Okay.
12            A VOICE:  Sorry, Your Honor.
13        (Pause.)
14            MR. PHILLIPS:  Your Honor, we have filed in our
15    witness and exhibit list, and I have to say I don't have the
16    number, but we'll get the docket entry number, but we have 44
17    exhibits.  There's an objection to Exhibit #2, which is --
18    thank you -- it's Document 2411, Your Honor.  Thank you.
19            THE COURT:  Uh-huh.
20            MR. PHILLIPS:  There is a pending objection to
21    Exhibit #2 which we have not resolved.  There's no objection
22    to any other exhibit.  But in reviewing our exhibit list, I
23    found that we had some -- some mistakes and duplications.
24        So, with respect to 2411, we would withdraw Exhibit 13,
25    14, and 29, and we would offer Exhibit 1, and then 30 through
```

001883

HCMLPHMIT00002932

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-71    Filed 09/09/25    Exhibit 71    Page 219 of 299   Page 26 of 262    PageID 3033

218

```
1   44, with 13, 14, and 29 deleted.

2           THE COURT:  Okay.  So 1, 3 through 12, --

3           MR. PHILLIPS:  Yes.

4           THE COURT:  -- 15 through 28, and then 30 --

5           MR. PHILLIPS:  And then 30 through 44.

6           THE COURT: -- through 44?  Do you confirm, Mr.

7   Morris?

8           MR. MORRIS:  Yes, Your Honor.  The only objection we

9   have is to Exhibit #2.

10          THE COURT:  And that's -- he's not offering that?

11          MR. MORRIS:  Yeah.

12          MR. PHILLIPS:  Not at this time, Your Honor.

13          THE COURT:  Okay.

14          MR. PHILLIPS:  We would have to have testimony about

15  that.

16          THE COURT:  Okay.  All right.  So those are admitted.

17          MR. PHILLIPS:  Okay.

18      (Mark Patrick's Exhibits 1, 3 through 12, 15 through 28,

19  and 30 through 44 are received into evidence.)

20          THE COURT:  By the way, it looks like Exhibit 44 is

21  at a different docket number, Docket 2420.  Correct?  You have

22  --

23          MR. SBAITI:  Your Honor, I believe Exhibit 44 is the

24  hearing transcript from the July approval hearing.  At least

25  that's what it's supposed to be.
```

001884

HCMLPHMIT00002933

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 04-71   Page 2209/1299   Page 27 of 262    PageID 3034

219

```
 1              THE COURT:  Okay.

 2              MR. SBAITI:  It was Exhibit 2 on the Debtor's list,

 3    and then I think they took it off, so we had to add it.

 4              MR. PHILLIPS:  Oh, okay.  I was looking -- oh, that's

 5    right.  They -- that's correct, Your Honor.

 6              THE COURT:  Okay.

 7              MR. PHILLIPS:  Exhibit 44 was added --

 8              THE COURT:  Okay.

 9              MR. PHILLIPS:  -- because the Debtor's withdrew it,

10    and so it was added in the second -- in the supplemental and

11    amended list.  The -- the one that I was talking about was the

12    prior list.

13              THE COURT:  Okay.  So that's at Docket 2420?

14              MR. PHILLIPS:  Yes.

15              THE COURT:  You're not offering 45 or 46?

16              MR. PHILLIPS:  No, I think we'd offer 45 and 46 as

17    well.  I'm sorry.

18              THE COURT:  Okay.  Any objections, Mr. Morris?

19              MR. MORRIS:  No, Your Honor.

20              THE COURT:  Okay.  So 45 and 46 are admitted as well.

21    They're at Docket Entry 2420.

22        (Mark Patrick's Exhibits 45 and 46 are received into

23    evidence.)

24              THE COURT:  All right.  Your witnesses?

25              MR. PHILLIPS:  Your Honor, could we have five minutes
```

HCMLPHMIT00002934

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 02/19/2299  Page 28 of 262    PageID 3035
Exhibit 71    Page 220 of 299

220

 1 │ to just see what we're -- our plan is, and then we'll be back

 2 │ at 4:00?

 3 │         THE COURT:  Okay.  We'll be back at 4:00.

 4 │         MR. PHILLIPS:  Thank you.

 5 │         THE CLERK:  All rise.

 6 │     (A recess ensued from 3:55 p.m. until 4:04 p.m.)

 7 │         THE CLERK:  All rise.

 8 │         THE COURT:  Please be seated.  All right.  Back on

 9 │ the record in Highland.  Mr. Phillips?

10 │         MR. PHILLIPS:  Your Honor, with the introduction of

11 │ the Respondents -- CLO Holdco, DAF Fund, LP, and Mark Patrick,

12 │ those Respondents, and we consider Mark Patrick a Respondent

13 │ although not formally named as a Respondent because he is the

14 │ party who authorized the filing of the Seery motion -- we

15 │ rest.

16 │         THE COURT:  You rest?  Okay.  Well, Mr. Morris,

17 │ closing arguments?

18 │         MR. MORRIS:  How much time do I have?

19 │         THE COURT:  You've got a lot more time than you

20 │ probably thought you were going to.  You're under an hour.

21 │         MR. MORRIS:  42 minutes?

22 │         THE COURT:  How much?

23 │         THE CLERK:  42 minutes.

24 │         THE COURT:  42 minutes?  Feel free not to use it all.

25 │         MR. SBAITI:  Out of curiosity, how long do we have?

HCMLPHMIT00002935

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 02/29/2299   Page 29 of 262   PageID 3036

221

```
1              THE COURT:  You have a lot of time, which I hope you
2    won't use.
3              THE CLERK:  Hour and twenty-five minutes or so.
4              MR. SBAITI:  I was afraid it was going to be an hour
5    and twenty, so --
6              MR. PHILLIPS:  No, not either.
7              MR. MORRIS:  I don't suspect I'll use all the time.
8              THE COURT:  Okay.  Thank you.
9              MR. MORRIS:  May I proceed?
10             THE COURT:  You may.
11             CLOSING ARGUMENT ON BEHALF OF THE DEBTOR
12             MR. MORRIS:  Good afternoon, Your Honor.  John
13   Morris; Pachulski Stang Ziehl & Jones; for the Debtor.  I'd
14   like to just make some closing remarks after the evidence has
15   closed.
16       This is a very, very important motion, Your Honor.  I take
17   this stuff seriously.  It's only the second contempt motion
18   I've ever brought in my life.  I've never gone after another
19   law firm.  But these facts and circumstances require it,
20   because my client is under attack, and these orders were
21   entered to prevent that.
22       It is serious stuff.  There's no question in my mind,
23   there's no question the evidence showed, clear and
24   convincingly, beyond reasonable doubt, that they violated this
25   Court's order.
```

HCMLPHMIT00002936

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Page 2039 of 299   Page 30 of 262   PageID 3037

222

1      I started off with three very simple prongs.  So simple

2  you'd think I'd remember them.  Number one, was a court order

3  in effect?  There is no dispute.  The court order was in

4  effect.

5      Number two, did the order require certain conduct by the

6  Respondent?  We believe it did.  We heard an hour-long

7  argument styled as an opening statement, but it was really

8  argument and not an opening statement, about all the defects

9  in the order.  But the one thing that is crystal clear in the

10  order are the words commence or pursue.  You've been told many

11  times by the Respondent that nobody has commenced an action

12  against Mr. Seery.  That is true.  We all know what the word

13  commence means.  We all know what the word pursue means.

14      I heard argument this morning that pursue means after a

15  claim is filed you pursue a case.  That's the way lawyers talk

16  about it.  But that doesn't make any sense, Your Honor,

17  because once you've commenced the action you've violated the

18  order.  It's commence or pursue, it's in the disjunctive, and

19  you can't read out of the order the concept of pursuit by

20  making it an event that happens after the commencement,

21  because that's exactly what they're trying to do.  They're

22  trying to read out of the order the word pursuit.

23      And I ask you to use very simple common sense.  If filing

24  a motion for leave to amend a complaint to add Mr. Seery as a

25  defendant is not pursuit, what is?  What is?  There's nothing

001888

HCMLPHMIT00002937

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-71   Page 2249 of 2299   Page 31 of 262    PageID 3038

223

1   left.  You commence an action or you do something less than

2   commencing an action when you're going after the man.  That's

3   what pursuit means.  They're going after the man.  And they

4   asked the District Court to do what they knew they couldn't.

5        Mr. Phillips is exactly right.  I made the point about

6   Rule 15 because they knew they couldn't do it.  I'm not

7   suggesting that they should have.  I'm suggesting that the

8   reason that they didn't is because they knew they were -- they

9   were in a bad place.  Because if they really just wanted to

10   name Mr. Seery as a defendant, they wouldn't have done it.

11   They knew commence was crystal clear.

12        What they're trying to do is claim that somehow there's an

13   ambiguity around the word pursuit.  Does that make any sense

14   at all?  Filing a motion for leave to amend the complaint.

15   And Mr. Patrick, to his credit, candidly admitted that if the

16   motion was granted, they were suing, yeah, as long -- as long

17   as the Sbaiti firm, you know, recommended it.  That's what

18   would have happened.

19        Those orders that you signed, nothing, absolutely

20   meaningless from their point of view.  They believed they were

21   wrong.  They believed that they were overbroad.  They believed

22   they were too narrow.  They believed they were vague.  They

23   believed they were without authority.  They don't get to be

24   the gatekeeper.  They want to be the gate -- that's this

25   Court's decision.  That's why we went through all of the

HCMLPHMIT00002938

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-71   Page 225 of 299   Page 32 of 262   PageID 3039

224

1   processes that we did.  And they just flagrantly said, I don't

2   agree.  I don't agree because it's wrong this way and it's

3   wrong that way and it's wrong the other way, and therefore let

4   me go find a higher authority to validate my thinking.  That's

5   not the way this process is supposed to work.

6        The independent directors and Mr. Seery relied on the

7   gatekeeper in accepting their positions.  It was a quid pro

8   quo.  Mr. Dondero agreed to the exact same provision, the

9   exact same gatekeeper provision in the January order that he

10  now complains about today, that the DAF complains about today.

11  Where were these people?

12       As the Court knows, nobody appealed either order.  The

13  Debtor, the independent board, Mr. Seery expected that the

14  plain and unambiguous words would be honored and enforced.  I

15  think that's fair.  I think that's the way the process is

16  supposed to work.

17       Instead, we have games.  We have these linguistic

18  gymnastics.  We have statements that are too cute by half.

19  Mr. Dondero won't even admit that he appointed Mr. Scott back

20  in 2012.  I couldn't even get him to do that, really, even

21  though the documents say it, even though Mr. Patrick says it.

22       I'll take the Respondents one at a time in a moment, but I

23  just want to deal with some of the more interesting arguments

24  they make.  The order was vague because it didn't say you

25  can't seek leave from the District Court to amend your

HCMLPHMIT00002939

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 04-71    Page 0 of 299    Page 33 of 262    PageID 3040

225

 1    complaint to add Mr. Seery.  They said that that's what makes

 2    the order vague.

 3        Your Honor, if you had thought to put that language in,

 4    you know what they would have done?  They would have sued Mr.

 5    Seery in New York State Supreme Court, where he lives, and

 6    said, the order didn't say I couldn't do that.  Where does it

 7    end?

 8        There's a reason why the order was crafted broadly to say

 9    no commencement or pursuit without Bankruptcy Court  approval.

10    You have to bring a colorable claim.

11        We heard an argument this morning that they couldn't

12    possibly have brought that motion for reconsideration first.

13    You know, the one they filed about eight hours after we filed

14    the contempt motion.  They couldn't possibly have brought that

15    motion before the motion for leave to amend because somehow

16    they would have been estopped or they would have been found to

17    have waived some right.

18        How could it be that anybody reasonably believes that

19    complying with a court order results in a waiver of some

20    right?  It just -- these are games.  These are not good

21    arguments.  And they certainly don't carry the day on a

22    contempt motion.

23        We've heard repeatedly, the District Court denied the

24    motion without prejudice, how have you been harmed?  They

25    shouldn't be able to rely on the District Court's prudence to

HCMLPHMIT00002940

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-71   Filed 02/27/2025   Page 34 of 262   PageID 3041

226

1  protect themselves.  The question shouldn't be, have you been

2  harmed since the District Court didn't grant the motion?  No.

3  The question should be, were we harmed by the attempt to name

4  Mr. Seery a defendant, in violation of court orders, without

5  notice?  Without notice.

6      I'm told they assumed that I'd be checking the dockets.  I

7  wasn't checking the docket, Your Honor.  I hadn't filed an

8  appearance in the case.  And, in fact, if you look at the

9  exhibits, because I could pull it out, but we put in the

10  communications between the lawyers.  The last communication

11  was from Mr. Pomerantz, and the last communication from Mr.

12  Pomerantz said, Don't do it or we're going to file a motion

13  for contempt.  That's now in the evidence.

14      So, having sent that message, I wasn't going to check the

15  docket to see if they really were going to go ahead and do it.

16  I didn't think they would.  And if they did, I certainly

17  thought I'd get notice of it.  Nothing.

18      And, again, I don't really need to establish intent at all

19  in order to meet my burden of clear and convincing evidence of

20  a contempt of court, but I think it is relevant when the Court

21  hopefully finds liability and is considering damages, because

22  that's really the most important point I have to make right

23  now, is the Court needs to enforce its own orders, because if

24  the Court doesn't, or doesn't impose a penalty that's

25  meaningful, this is just going to continue.  And Your Honor,

HCMLPHMIT00002941

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 4-71    Filed 02/20/299    Page 35 of 262    PageID 3042

227

1    it's all in the record.  Your Honor knows this.  Mr. Daugherty

2    has gone through it.  Right?  Mr. Terry went through it.  UBS

3    went through it.  You've seen litigation now for a year and a

4    half.  It's happening in New York, right, the Sbaiti firm is

5    reopening the Acis case.  we've got this other lawsuit that's

6    filed by an entity with like a five-tenths of one percent

7    interest who's complaining about the SSP transaction that Mr.

8    -- that the Debtor engaged in.  There's no end here.

9        We need the Court to pump the brakes.  We need the Court

10   to exercise its authority.  We need the Court to protect the

11   estate fiduciary that it approved.

12       It is true, Mr. Seery is not a trustee.  But it is also

13   true that he is a third-party outsider who came into this case

14   with the expectation and the promise in an order that he

15   wouldn't be subjected to frivolous litigation, that this Court

16   would be the arbiter of whether claims could be pursued

17   against him.  That was the code of conduct.  That was the quid

18   pro quo.  That was the deal that Mr. Seery made.  It's the

19   deal that the board members made.

20       What gives these people the right to just say, your order

21   is wrong, and because I think your order is wrong I'm going to

22   go to the District Court, and if the District Court agrees,

23   too bad, and if the District Court doesn't agree, we'll be

24   back before Your Honor, and no harm, no foul?  No.  It can't

25   be.  It can't be that that's the way this process works.  It

HCMLPHMIT00002942

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 02/09/299   Page 36 of 262   PageID 3043

228

1  just can't.

2      So, Your Honor, let me take the Defendants one at a time,

3  the Respondents one at a time.  CLO Holdco and the DAF are

4  corporate entities.  They've done what they've done.  Mr.

5  Patrick, bless him, I think he's a lovely man.  I don't think

6  he quite bargained for what he's getting right now, but

7  nevertheless he is where he is and he's willing to stand up

8  and be counted, and for that, at least, I admire his courage.

9  He's willing to say, I authorized those.  But you know what?

10 It's a violation of the law, it's a violation of this Court's

11 order to file that motion, and so he has -- and he was very

12 candid today.  He knew of the order.  Right?  He knew it was

13 in effect.  He pointed out that it was in their papers.

14 Right?

15     They're trying to be cute, they're trying to thread this

16 needle, but it has no hole in it.  They keep -- they keep

17 doing this.  Well, maybe if we do it this way, maybe if we do

18 it -- no.  The order was crystal clear.

19     The Sbaiti firm.  They're probably fathers and husbands

20 and good people and I wish them no ill will, but this is

21 wrong.  This is wrong.  To come into a court you've never been

22 in before and in less than twelve days to jump the shark like

23 this in twelve -- in less than twelve days, because Mr.

24 Patrick said they weren't hired until April, and the complaint

25 was filed on the 12th.

001894

HCMLPHMIT00002943

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Page 230 of 299   Page 37 of 262   PageID 3044

229

1      We're told that they understood this was an overwhelming

2  case with two -- why don't you take your time?  What was the

3  rush?  Why not wait until the Defendant -- the Debtor appeared

4  in the action before rushing to do this?

5      It's bad conduct, Your Honor, and that's really a very

6  important point that I have to make, is that there's lots of

7  lawyers who are engaging in highly-questionable conduct here

8  that, from my perspective, goes well beyond the bounds of

9  zealous advocacy.

10      It's not aggressive lawyering.  I love aggressive

11  lawyering.  I really do.  Respectful, honest -- and I don't,

12  you know, I don't want to say that they're dishonest people.

13  I don't mean to do that.  But I think, I think they made a

14  gross error in judgment, and there's no question that they

15  violated this Court's order.

16      And then that leaves Mr. Dondero.  I don't even know what

17  to say about his testimony, Your Honor.  He pursued claims

18  against Mr. Seery.  He thinks he's a rat.  He's the one who

19  started the whole process.  He's the one who put the bug in

20  Mark Patrick's ear.  All of this is uncontested.  Right?

21  Uncontested.

22      I don't have to go back in time.  We can talk about what

23  happened to Grant Scott.  It's a very sad story.  Mr. Scott, I

24  think, did his honest best to do what he believed, on the

25  advice of counsel, was in the best interest of the DAF.  And

001895

HCMLPHMIT00002944

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 54-71   Filed 06/09/2299   Page 38 of 262   PageID 3045

230

```
1    Mr. Dondero, as you hear time and time again when he speaks

2    about Mr. Seery, it was inappropriate.  He's the arbiter of

3    what's in the best interest of entities that other people

4    control.  And they pay a price.  And they pay a price.  And so

5    Mr. Dondero felt it was his job, even though he tries to

6    distance himself from the DAF -- I have no responsibility, I

7    don't -- I'm not involved -- until, until somebody wants to

8    sue Seery and the Debtor.  Then he'll go all in on that, no

9    matter how specious the claim may be.

10        The Debtor's not going to fold its tent because a motion

11   for leave to amend was denied without prejudice.  That's not

12   the point.  The point is that people need to respect this

13   Court, people need to respect the Court's orders, and those

14   that aid and abet or otherwise support the violation of court

15   orders ought to be held to account, Your Honor.

16        I have nothing further.

17             THE COURT:  All right.  Thank you.  Respondents?

18             CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

19             MR. SBAITI:  Your Honor, the fact that we're here on

20   a motion for leave, and the motion for leave is what they're

21   saying is pursuing a claim under the Court's order, and then

22   you hear that the mere act of investigating a claim against

23   Mr. Seery is also pursuing a claim, this goes to the infinite

24   regression problem with this word pursue the way they want to

25   construe it, Your Honor.  Asking for permission is not
```

HCMLPHMIT00002945

Exhibit 71   Page 232 of 299

```
 1   pursuing a claim and can't be the definition of pursuing a
 2   claim because it's not doing anything other than asking for
 3   permission.
 4       We didn't file a suit.  We didn't commence a suit.  I
 5   think that's established.  We did not pursue a claim.  Mr.
 6   Morris ignores, I think, the very commonsensical aspect that
 7   we put out in the opening, which is that the reason pursue --
 8   and sometimes the language in these types of orders is,
 9   instead of pursue, it's maintain -- but the reason that word
10   is there is because sometimes the case has already been
11   started when the order is entered.  And so to pursue a claim,
12   i.e., one that's already been filed as of the date of the
13   order, that would be lost if the commencement of that claim
14   hadn't happened until after the -- until the -- if the
15   commencement happened before the order was filed.  That's the
16   --
17           THE COURT:  Okay.  So are you saying it's a
18   sequential thing?
19           MR. SBAITI:  I'm not sure I understood your question,
20   Your Honor.  I'm sorry.
21           THE COURT:  Well, I'm trying to understand what it is
22   you're saying about how pursue should be interpreted.
23           MR. SBAITI:  Sure.
24           THE COURT:  I think you're saying you have to -- you
25   can either have -- well, we've got a prohibition on commencing
```

001897

HCMLPHMIT00002946

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-71   Filed 06/30/25   Page 40 of 262   PageID 3047

232

1    an action.

2              MR. SBAITI:  Yes.

3              THE COURT:  And then the separate word pursue, I

4    think you're saying that must refer to you already have an

5    action that's been commenced and you're continuing on with it.

6    Is that what you're saying?

7              MR. SBAITI:  Yes, Your Honor.

8              THE COURT:  Then why not use the word continue?

9              MR. SBAITI:  Well, Your Honor, the choice of --

10             THE COURT:  Kind of like 362(a) of the Bankruptcy

11   Code, you know, is worded.

12             MR. SBAITI:  Well, Your Honor, the choice of the

13   wording of pursue at that point, Your Honor, I believe ends up

14   being ambiguous, because by filing the motion here that would

15   be pursuing a claim under that definition.  So before I got

16   permission to pursue a claim, I've got to pursue a claim.

17   That's the problem that they have with the words that they're

18   trying to get you to adopt, or the meaning of the words

19   they're trying to get you to adopt.

20        If I came to this Court and said, Judge, I need

21   permission, I need leave to file suit against Mr. Seery, and

22   then the question is, well, you're not allowed to seek leave

23   because that's pursuing the claim, it's infinitely regressive.

24   And in fact, his closing argument just proved how it's

25   infinitely regressive.

HCMLPHMIT00002947

```
 1              THE COURT:  Okay.  Let me -- I'm not following this
 2   infinitely regressive or whatever the term was.
 3              MR. SBAITI:  Yes.
 4              THE COURT:  Just answer this very direct question.
 5   Why did you not file a motion for leave in the Bankruptcy
 6   Court?  That would have clearly, clearly complied with the
 7   July order.
 8              MR. SBAITI:  Your Honor, I believe we explained this
 9   in the opening.  I took a stab at it.  Mr. Bridges took a stab
10   at it.  We did not believe coming here and asking for leave
11   and asking for -- for Your Honor to do what we don't believe
12   Your Honor can do, would effectuate an estoppel or a waiver,
13   which we didn't think was in the best interest of our client
14   to have.  Your Honor, this happens -- I don't believe this is
15   the --
16              THE COURT:  Okay.  Connect the dots.  Make that clear
17   as clear can be for me.  You file a motion for leave --
18              MR. SBAITI:  Yes.
19              THE COURT:  -- to file this District Court action
20   against the Debtor and Seery, and if I say yes, everything is
21   fine and dandy from your perspective.  If I say no, tell me
22   again what your estoppel argument is.
23              MR. SBAITI:  Your Honor, the key question is whether
24   us putting the Court's ability to decide colorability and the
25   Court's gatekeeper functions, for us to invoke those functions
```

001899

HCMLPHMIT00002948

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 04-71   Page 235 of 299   Page 42 of 262   PageID 3049

234

1    concerned us because there's case law that says that that

2    effectuates an estoppel.  And so we don't get our chance in

3    front of an Article III judge to make that in the first

4    instance.

5         THE COURT:  Okay.  Tell me what cases you're talking

6    about and the exact context of those cases.

7         MR. SBAITI:  Your Honor, I would have to defer to my

8    partner on this one, Your Honor.

9         THE COURT:  Okay.

10        MR. SBAITI:  So, --

11        THE COURT:  Because I'm just letting you know --

12        MR. SBAITI:  Yes.

13        THE COURT:  -- I am at a complete loss.  I'm at a

14   complete loss understanding what you're saying.  I am.

15        MR. SBAITI:  Well, Your Honor, the --

16        THE COURT:  I don't understand.  If you have followed

17   the order to the letter and I tell you no, --

18        MR. SBAITI:  Then --

19        THE COURT:  -- what, you're saying you were worried

20   you'd be estopped from appealing my order to the District

21   Court and saying abuse of discretion or invalid order in the

22   first place?  You'd be estopped from taking an appeal?

23        MR. SBAITI:  No, Your Honor.  We wouldn't be estopped

24   from taking an appeal.

25        THE COURT:  Then why didn't you follow the letter of

HCMLPHMIT00002949

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 06/20/25   Page 43 of 262    PageID 3050

235

1   the order?

2          MR. SBAITI:  For one thing, Your Honor, asking the

3   District Court made sense to us, given the order and given our

4   understanding of the law.  Certainly, we had other options, as

5   Your Honor is pointing out.  We could have come here.  Our

6   read of the law, our understanding of what we were doing, made

7   it -- put us in, like I said, put us in the sort of

8   jurisdictional and paradoxical position.

9          THE COURT:  This is your chance to tell me exactly

10  which law you think applies here.  What case?  What statute?

11         MR. SBAITI:  Your Honor, like I said, I don't have

12  those at the moment.

13         THE COURT:  Why not?  Your whole argument rides on

14  this, apparently.

15         MR. SBAITI:  Well, Your Honor, I don't know that our

16  whole argument rides on that.

17         THE COURT:  Okay.

18         MR. SBAITI:  I mean, our argument rides on we don't

19  think we violated the letter of the order.  I think that's

20  really what I'm -- what we're here to say, is that we didn't

21  commence a lawsuit and we didn't pursue a claim by filing for

22  leave in the District Court, just like filing for leave in

23  this Court would not be pursuing a claim.  It would be filing

24  for leave.

25         THE COURT:  I agree.  Filing a motion for leave in

HCMLPHMIT00002950

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 04-71   Filed 02/07/2299   Page 44 of 262   PageID 3051

236

1    this Court would be exactly what the order contemplated.

2            MR. SBAITI:  I understand, Your Honor.

3            THE COURT:  What you did is not exactly what the

4    order contemplated.

5            MR. SBAITI:  Your Honor, but we're -- we're moving

6    back and forth between two concepts.  One, your question is

7    why didn't we file for leave?

8            THE COURT:  Uh-huh.

9            MR. SBAITI:  And the answer to that, I've tried to

10   explain.  And if we -- if you'd like us to bring up the case

11   law or to give you a better articulation of our concern, I'm

12   happy to defer to my partner.

13       What I'm really here to say, Your Honor, is a very simple

14   point, though.  Just because we didn't file for leave here and

15   we filed for leave in the District Court doesn't mean we

16   violated your order, and that's the point I'm trying to make,

17   Your Honor.  And I think that's the simplest point I can make.

18   Asking the Article III judge for leave to amend, for leave to

19   amend to add Mr. Seery, doesn't violate, facially, at least as

20   we read it, Your Honor's order.  It's not commencing a suit

21   and it's not -- it's not pursuing a claim against him.  It's

22   all preliminary to pursuing a claim against him, because a

23   claim hasn't even been filed.

24       The judge could have -- the judge could have -- the

25   District Court could have denied it, the District Court could

HCMLPHMIT00002951

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 02/08/2299   Page 45 of 262   PageID 3052

237

 1   have referred it down here, the District Court could have

 2   decided part of it and then asked Your Honor to rule on some

 3   portion of it.  There are innumerable ways that could have

 4   gone.  That fork -- those forks in the road is precisely why

 5   we say this is not pursuing the claim.  Otherwise, where does

 6   it stop?

 7      Does pursuing a claim happen just when we file the motion

 8   for leave?  Why didn't it happen when we started the

 9   investigation?  If pursuing a claim means having the intent

10   and taking steps towards eventually filing a lawsuit, that's

11   the point that I'm making that it is infinitely regressive,

12   and that's exactly what Mr. Morris argued to you.

13      He said Mr. Dondero, by merely speaking to me, is pursuing

14   a claim and that violates your order.  Speaking to me.  Even

15   if we had never filed it.  Speaking is pursuing a claim.

16            THE COURT:  I don't agree with that, for what it's

17   worth.

18            MR. SBAITI:  Okay.  But that was his argument.  I'm

19   just responding to it.

20            THE COURT:  Okay.

21            MR. SBAITI:  And if that's not pursuing a claim,

22   filing a motion for leave likewise wouldn't be pursuing a

23   claim.  I understand it's an official act in a court, but we

24   did it in a Court that is an adjutant to this Court.  This

25   Court is an adjutant to that Court.  It's the Court with

HCMLPHMIT00002952

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Page 239 of 299   Page 46 of 262   PageID 3053

238

  1   original jurisdiction over the matter.  So we didn't go to New

  2   York.  We didn't go to the state court in New York where I

  3   learned Mr. Seery lives.  We came to the Northern District of

  4   Texas, understanding that this Court and this Court's orders

  5   had to be -- had to be addressed.  And that's the very first

  6   thing we did.  We asked the Court to address it.

  7       That judge could either decide to send it down here, which

  8   is normally what I think -- what we understood would happen.

  9   So it's not like we were avoiding it.  But we wanted to invoke

 10   the jurisdiction which we, as the Plaintiff, we believe we had

 11   the right to invoke.  We're allowed to choose our forum.  So

 12   that's the forum we chose for the primary case, which there's

 13   not a problem, no one's raised an issue with us filing the

 14   underlying lawsuit.

 15       Adding Mr. Seery to that lawsuit and filing a motion for

 16   leave in the same court where we actually had the lawsuit,

 17   knowing that it might get -- that might get decided or

 18   referred in some way, doesn't strike me as being anything

 19   improper, because he didn't get sued and we don't know what

 20   Judge Boyle would have said had the motion gone forward.  And

 21   for them to speculate and to say that, well, this is exactly

 22   the type of thing you have to protect against, I completely

 23   disagree.

 24       The case law that they cited for you on these -- on most

 25   of these orders really do discuss the fact that you have

HCMLPHMIT00002953

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-71   Filed 04/09/299   Page 47 of 262   PageID 3054

239

1   somebody who is actually protecting the underlying property of

2   the Debtor.  This claim comes from a complete third party that

3   Mr. Seery himself has admitted under oath he owes a fiduciary

4   duty to.  Two third parties.  One is an investor of a fund

5   that he manages, and one to a fund that the Debtor, with Mr.

6   Seery as the head of it, was an advisor for up until recently.

7       Those fiduciary duties exist.  We felt like there was a

8   valid claim to be brought against Mr. Seery.  And the only

9   reason -- and he says this like it's a negative; I view it as

10   a positive -- the reason he wasn't named is because of Your

11   Honor's orders.  And so we asked a Court, the Court with

12   general jurisdiction, to address it for us or to tell us what

13   to do.  And I don't see how that is a violation of this

14   Court's order, nor is it contemptuous of this Court's order.

15       If every time one of these issues came up it was a

16   contempt of the court that appointed a trustee, we'd see a lot

17   more contempt orders.

18       Interestingly, the cases that were thrown out to you in

19   the opening argument by the other side, for example, *Villages*

20   [sic] *v. Schmidt*, was a trustee case, but not one that

21   involved a sanction.  And the trustee case specifically in

22   that case held that the Barton Doctrine didn't have an

23   exception for *Stern* cases, whereas the cases we cited to you,

24   *Anderson*, for example, in the Fifth Circuit, which is 520 F.2d

25   1027, expressly held that Section 959 is an exception to the

001905

HCMLPHMIT00002954

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 04-71    Page 240 of 299    Page 48 of 262    PageID 3055

240

1  Barton Doctrine.

2       And my partner, Mr. Bridges, can walk through the issues

3  that we had on the enforceability of the order, but all -- to

4  me, all of that is sort of a secondary issue because, *prima*

5  *facie*, we didn't violate this order.  I understand it may

6  irritate the Debtor and may raise questions about why the

7  motion wasn't filed here versus the District Court.  But it

8  was a motion for leave.  In order to sanction us, Your Honor

9  would have to find that asking for permission is sanctionable

10  conduct in the gatekeeper order.  Even if we ask the wrong

11  court.  Simply asking the wrong court is sanctionable, not

12  knowing what that court would have done, not knowing what that

13  court's mindset was, not even having the benefit of the

14  argument.  And that's, I guess, where this bottom -- the

15  bottom line is for me.

16       The evidence that they put on for you, Your Honor.

17  Everything you heard was evidence in the negative.  You know,

18  they talk about the transition from Mr. Dondero to Mr. Scott

19  and Mr. Scott to Mr. Patrick, but if you actually look at the

20  evidence he wants you to see and he wants you to rule on, it's

21  the evidence that wasn't there.  It's the evidence that Mr.

22  Dondero had no control.  In fact, I believe that was the basis

23  he argued for why there should be no privilege.  And all he

24  said is that he was promoting it.

25       But the fact of the matter is, like I said, all of that is

HCMLPHMIT00002955

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-71   Filed 04/29/25   Page 49 of 262    PageID 3056
Exhibit 71   Page 242 of 299

241

```
 1   secondary to the core issue that we didn't violate the order.

 2   We didn't take steps to violate the order.  We took steps to

 3   try to not violate the order.  And they want you to punish us

 4   to send a message.  Even used words like the Court needs to

 5   enforce its own orders.  And he did that as a transition away

 6   from the idea that there were no damages, Your Honor, and I

 7   think that has implications.

 8       And then he said you have to enforce a meaningful penalty.

 9   Well, Your Honor, I don't think that is the purpose of these

10   sanctions.  These sanctions are supposed to be remedial,

11   according to the case law, according to the case law that they

12   cite.  So a meaningful --

13             THE COURT:  Coercive or remedial.

14             MR. SBAITI:  Sorry?

15             THE COURT:  Coercive or remedial.  Civil contempt.

16             MR. SBAITI:  Sure, Your Honor.  But usually coercive

17   sanctions require someone to do something or they are

18   sanctioned until they do it.

19             THE COURT:  Coerced compliance.  Coerced compliance

20   --

21             MR. SBAITI:  Yes.

22             THE COURT:  -- with an existing order.

23             MR. SBAITI:  Yes.

24             THE COURT:  Uh-huh.

25             MR. SBAITI:  The last thing, he says you have to
```

001907

HCMLPHMIT00002956

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 04/30/299    Page 50 of 262    PageID 3057

242

```
 1   protect the estate of the fiduciary and his expectation -- I
 2   believe he's talking about Mr. Seery -- his expectation that
 3   the Court would be the gatekeeper.  And Your Honor, that
 4   argument rings a little bit hollow here, given that what
 5   they're really saying is that we should have come here first
 6   and asked for permission.  But that insinuates that, by coming
 7   here, the case is dead on arrival, which I don't think is the
 8   right argument.
 9        I think the issue for us has been, who do we have to ask
10   and who can we ask to deal with the Court's gatekeeper order?
11   I believe we chose a court, a proper court, a court with
12   jurisdiction, to hear the issue and decide the issue.  Your
13   Court's -- Your Honor's indication of the jurisdiction of this
14   Court we believed invoked the District Court's jurisdiction at
15   the same time.
16        And so the last thing is he said -- the last thing, and
17   getting back to the core issue, is Mr. Morris wants you to
18   believe that we intended to violate the order, and now, as an
19   afterthought, we're using linguistic gymnastics to get around
20   all of that.  But it's not linguistic gymnastics.  Linguistic
21   gymnastics is saying that pursue means doing anything in
22   pursuit of a claim.  That's a little -- I believe that's
23   almost a direct quote.  They're chasing the man.  Well, that's
24   the infinite regression that I talked about, Your Honor, that
25   it's going to be impossible in any principled way to reconcile
```

HCMLPHMIT00002957

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 04-71   Page 024490f299   Page 51 of 262    PageID 3058

243

1    Mr. Morris's or the Debtor's definition of pursue with any

2    logical, reasonable limitation that is readable into the

3    order, Your Honor.

4        And I'm going to defer to my partner, Mr. Bridges -- oh,

5    go ahead.

6            THE COURT:  I'm going to stop you.  I mean, we have

7    the linguistic argument.  But how do you respond to this?

8            MR. SBAITI:  Sure.

9            THE COURT:  What if I tell you, in my gut, this

10   appears to be an end run?  An end run.  I mean, I'm stating

11   something that should be obvious, right?  An end run around

12   this Court.  This Court spent hours, probably, reading a

13   motion to compromise issues with HarbourVest, issues between

14   the Debtor and HarbourVest.  I had objections.  An objection

15   from CLO Holdco that was very document-oriented, as I recall.

16   Right of first refusal.  HarbourVest can't transfer its 49.98

17   percent interest in HCLOF, right?  Talk about alphabet soup.

18   We definitely have it.

19           MR. SBAITI:  Yes.

20           THE COURT:  Without giving CLO Holdco the first right

21   to buy those assets.  Read pleadings.  Law clerk and I stay up

22   late.  And then, you know, we get to the hearing and there's

23   the withdrawal -- we heard a little bit about that today --

24   withdrawal of the objection.  We kind of confirmed that two or

25   three different ways on the record.  And then I remember going

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 04-71   Filed 02/45/02299   Page 52 of 262   PageID 3059

244

1    to Mr. Draper, who represents the Dugaboy and Get Good Trusts.

2    You know, are you challenging the legal propriety of doing

3    this?  And he backed off any objection.

4        So the Court ended up having a hearing where we went

5    through what I would call the standard 9019 prove-up, where we

6    looked at was it in the best interest, was it fair and

7    equitable given all the risks, rewards, dah, dah, dah, dah.

8    You know, HarbourVest had initially, you know, started at a

9    $300 million proof of claim, eye-popping, but this all put to

10   bed a very complicated claim.

11           MR. SBAITI:  Yeah.

12           THE COURT:  Tell me something that would make me feel

13   better about what is, in my core, in my gut, that this is just

14   a big, giant end run around the Bankruptcy Court approval of

15   the HarbourVest settlement, which is not on appeal, right?

16   There are a gazillion appeals in this case, but I don't think

17   the HarbourVest --

18           A VOICE:  It is on -- it is on appeal, Your Honor.

19           THE COURT:  Is it?  Oh, it is on appeal?  Okay.  So I

20   may be told --

21           MR. SBAITI:  I didn't know.

22           THE COURT:  I may be told, gosh, you got it wrong,

23   Judge.  You know, that happens sometimes.

24       So, this feels like an end run.  You know, the appeal is

25   either going to prevail or not.  If it's successful, then, you

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-71   Page 246 of 299   Page 53 of 262    PageID 3060
Exhibit 71   Page 240 of 299

245

1  know, do you really need this lawsuit?  You know, I don't --

2  okay.  Your chance.

3          MR. SBAITI:  Thank you, Your Honor.

4          THE COURT:  Uh-huh.

5          MS. SBAITI:  Your Honor, this wouldn't be the first

6  case where finality or where there was a settlement -- I'm not

7  familiar as well with bankruptcy, but certainly in litigation

8  -- where the settlement then reveals -- well, after a

9  settlement is done, after everyone thinks it's done, some new

10 facts come to light that change people's views about what

11 happened before the settlement or before the resolution.  And

12 that's what happened here, Your Honor.  This is what we've

13 pled.  And this is what we understand.

14     There were the instances of Mr. Seery's testimony where he

15 testified to the value of the HarbourVest assets.  I believe,

16 as I recall, he testified in I believe it's the approval

17 hearing that Your Honor is talking about that the settlement

18 gave HarbourVest a certain amount of claims of I think it's,

19 Series 8 and then Series 9 claims, and that those were

20 discounted to a certain dollar value that he quantified as

21 about $30, $31 million.  And the way he ratified and justified

22 the actual settlement value, the actual money or value he was

23 conferring on HarbourVest, given the critique of HarbourVest

24 claims that he was settling, is he explained it this way.  He

25 said $22-1/2 million of this whole pot that I'm giving them

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 04-71   Filed 02/07/299   Page 54 of 262   PageID 3061

246

1  pays for the HarbourVest -- HarbourVest's interests in HCLOF

2  -- it's alphabet soup again -- and Highland CLO Funding,

3  Limited.  And so it's the other $9 million that's really

4  settling their claims.  And given the amount of expense it's

5  going to take, so on and so forth, $9 million seems like a

6  reasonable amount to settle them with, especially since we're

7  just giving them claims.

8      So that $22-1/2 million everyone apparently took to the

9  bank as being the value, including CLO Holdco at the time,

10  because they didn't have the underlying valuations.  Highland

11  was supposed to give the updated valuations.

12      So, fast-forward a couple of months -- and this is what

13  we've played in our lawsuit, Your Honor; this is why I don't

14  think it's an end run -- we pled in our lawsuit just a couple

15  months later Highland -- I believe some of the people that

16  worked at Highland started leaving, according to some

17  mechanisms that I saw where Highland didn't want to keep all

18  the staff and so the staff was migrated to other places.  And

19  one of those gentlemen, I believe Mr. Dondero referred to him

20  as a gentleman named Hunter Covitz, and Hunter Covitz, who's

21  also an investor in HCLOF, he owns a small piece of HCLOF, he

22  had the data, he had some of the information that showed that,

23  actually, in January, when Mr. Seery said that the HarbourVest

24  settlement was worth 22 -- excuse me, the HarbourVest

25  interests in HCLOF were worth $22-1/2 million, that they're

HCMLPHMIT00002961

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-71   Filed 08/01/25   Page 55 of 262    PageID 3062

247

1   actually worth upwards of $45 million.

2       And so that information, Your Honor, we believe gives us a

3   different -- a different take on what happened and what was

4   supposed to happen.  This is strictly about the lack of

5   transparency.

6           THE COURT:  Okay.  Assuming --

7           MR. SBAITI:  Yeah.

8           THE COURT:  -- I buy into your argument that this is

9   newly-discovered evidence --

10          MR. SBAITI:  Yes.

11          THE COURT:  -- CLO Holdco would not have had reason

12  to know -- I guess that's what you're saying, right?

13          MR. SBAITI:  I'm saying they -- they didn't know.

14          THE COURT:  That they didn't know.

15          MR. SBAITI:  Uh-huh.

16          THE COURT:  And didn't have reason to know.  I'm

17  trying to figure out who's damaged here.

18          MR. SBAITI:  Well, CLO Holdco, my client, is damaged,

19  Your Honor.

20          THE COURT:  How?

21          MR. SBAITI:  Because one of the aspects of the -- of

22  Highland, one of the issues under, excuse me, of Highland's

23  advisory, is that it has a fiduciary duty.  And that fiduciary

24  duty, at least here, entails two, if not, three prongs.  The

25  first prong is they have to be transparent.  You can't say --

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 04-71   Page 24990/299   Page 56 of 262   PageID 3063

248

```
 1              THE COURT:  How is -- you know, I know a lot about
 2   fiduciary duties, believe it or not.  How is CLO Holdco harmed
 3   and the DAF harmed?
 4              MR. SBAITI:  Because, Your Honor, they lost out on an
 5   investment opportunity to buy the piece of -- the HarbourVest
 6   piece.  They would have been able to go out and raise the
 7   money.  They had the opportunity --
 8              THE COURT:  Okay.
 9              MR. SBAITI:  They would have had the opportunity to
10   make a different argument.
11              THE COURT:  What you're saying, you're saying, if
12   they had known what they didn't have reason to know, that it
13   was worth, let's say, $45 million, that they would have gone
14   out and raised money and said, oh, we do want to exercise this
15   right of first refusal that we decided we didn't have and gave
16   in on, we're going to press the issue and then outbid the $22
17   million, because we know it's worth more?  Is that where
18   you're going? I'm trying to figure out where the heck you're
19   going, to be honest.
20              MR. SBAITI:  That's -- Your Honor, I'd push back on a
21   little of the phrasing, only because the way these duties --
22   the way we understand the SEC's duties work when you're an
23   investment advisor is you have a transparency obligation and
24   an obligation --
25              THE COURT:  Yes.  Yes.
```

001914

HCMLPHMIT00002963

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Page 25092299   Page 57 of 262   PageID 3064

249

```
 1              MR. SBAITI:  -- not to divert these.  So, yes, CLO
 2    Holdco would have at least had the opportunity and been
 3    offered the opportunity, which it could have taken advantage
 4    of, to, if the assets were really on the block for $22-1/2
 5    million, they should have been able to buy their percentage
 6    pro rata share of that $22-1/2 million deal.  I mean, in a
 7    nutshell, that's -- that's where we believe we've been harmed.
 8    And we believe that the obfuscation of those values and, to a
 9    certain extent, the misrepresentation of those values in the
10    settlement is not cleansable by the argument, well, you should
11    have asked.
12         Well, you should have asked is fine in normal litigation,
13    but when the person you should have asked actually owes you a
14    positive duty to inform, we believe that the should-have-asked
15    piece doesn't really apply and there's -- and that's, that's
16    the basis of our case.
17         So it's not an end run around the settlement, Your Honor.
18    I think I opened with we're not trying to undo the settlement.
19    We're not saying HarbourVest has to take its interest back.
20    We're not saying the settlement has to go on.  We're not even
21    saying any of the things that happened in Bankruptcy Court
22    need to change.  But Section 959 is pretty clear that this is
23    management of third-party property --
24              THE COURT:  I guess -- okay.  Again, rabbit trail,
25    maybe.  But CLO Holdco still owns its same 49.02 percent
```

001915

HCMLPHMIT00002964

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-71   Filed 05/09/299   Page 58 of 262   PageID 3065

250

1   interest that it did before this transaction.  So if there's

2   value galore in HCLOF, it still has its 49.02 percent

3   interest.  What am I missing?

4           MR. SBAITI:  Oh, I think Your Honor's assuming that

5   HCLOF bought the piece back from HarbourVest.  It didn't.

6           THE COURT:  No, I'm not.

7           MR. SBAITI:  Oh.

8           THE COURT:  I'm not assuming that.

9           MR. SBAITI:  Well, --

10          THE COURT:  I know that now the Debtor has, what,

11  fifty point, you know, five percent of HCLOF, whereas it only

12  had, you know, a fraction.

13          MR. SBAITI:  Point six-ish.  Yeah.

14          THE COURT:  Point six-ish, and HarbourVest had 49.98.

15          MR. SBAITI:  Right.

16          THE COURT:  So, again, please educate me.  I'm really

17  trying to figure out how this lawsuit isn't just some crazy

18  end run around a settlement I approved.  And moreover, what's

19  the damages?

20          MR. SBAITI:  Well, Your Honor, --

21          THE COURT:  What's the damages?  CLO Holdco still has

22  its 49.02 percent interest in HCLOF.

23          MR. SBAITI:  Your Honor, again, --

24          THE COURT:  What am I missing?  I must be missing

25  something.

001916
HCMLPHMIT00002965

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 05/29/25   Page 59 of 262   PageID 3066

251

1              MR. SBAITI:  I think so, Your Honor.

2              THE COURT:  What?

3              MR. SBAITI:  The damages is the lost opportunity, the

4    lost opportunity to own more of HCLOF.

5              THE COURT:  Oh, it could have owned the whole darn

6    thing?

7              MR. SBAITI:  I could have owned 90 -- whatever 49

8    plus 49.98, 98.98 percent.

9              THE COURT:  But --

10             MS. SBAITI:  Or some pro rata portion.

11             THE COURT:  But Mr. Seery had some information that

12   you think he was holding back from CLO Holdco that CLO Holdco

13   had no reason to know?

14             MR. SBAITI:  Yes, Your Honor.  The -- the -- what he

15   testified to that the value of those assets, excuse me, the

16   value of the HarbourVest interests in HCLOF or its share of

17   the underlying assets being $22-1/2 million was either, one,

18   intentionally obfuscated, or, two, and I don't think this

19   excuses it at all, he simply used ancient data and simply

20   never updated himself, not for the Court and not for any

21   representations to the investors, who he himself testified

22   under oath in this Court that he has a fiduciary duty to under

23   the Investment Advisers Act.

24             THE COURT:  This could get very --

25             MR. SBAITI:  So that's injury to my client, Your

HCMLPHMIT00002966

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 05/30/2299   Page 60 of 262   PageID 3067

252

 1 | Honor.
 2 |           THE COURT:  This could get really dangerous.  Maybe
 3 | --
 4 |           MR. SBAITI:  I'm sorry.
 5 |           THE COURT:  This could get really dangerous.  Maybe I
 6 | should cut off where I'm going on this.
 7 |           MR. SBAITI:  Okay.
 8 |           THE COURT:  Of course, someone dangled it out there
 9 | in a pleading.  You know where I'm going, right?
10 |           MR. SBAITI:  I'm not sure I do, Your Honor.
11 |           THE COURT:  Hmm.  I do read the newspaper, but
12 | someone put it in a pleading.  HCLOF owns MGM stock, right?
13 | Is that what this is all about?  Is that what this is all
14 | about?  Or shall we not do this on the record?
15 |           MR. SBAITI:  Well, Your Honor, this has nothing -- I
16 | don't -- I don't think this has anything to do with the MGM
17 | stock one way or the other.
18 |           THE COURT:  You don't?  OH?
19 |           MR. SBAITI:  Your Honor, my charge as a counsel for
20 | the DAF is pretty straightforward.  We looked at the claims.
21 | We looked at the newly-discovered information.  We talked to
22 | the people who had it, Your Honor.  That was our
23 | investigation.  We put together a complaint.  We believed that
24 | we had a good basis to file suit, despite Your Honor's -- the
25 | settlement approval.  We expressly, because we understand how

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 05/30/25   Page 61 of 262   PageID 3068

253

1    finality is so critical in a bankruptcy context, we expressly

2    didn't ask for rescission.  We expressly didn't ask for

3    anything that would undo the settlement.

4        Asking for damages because of how the settlement happened,

5    through no fault of the Court's, of course, but asking for

6    damages is not, at least not as I see it, an end run around

7    the Court's settlement, and it's a legitimate claim.  And I

8    don't think this is far from the first time that new evidence

9    has come up that's allowed someone to question how something

10   was done that actually -- that actually damaged them.

11           THE COURT:  Usually, they come in for a motion to

12   reopen evidence to the court who issued the order approving

13   the settlement.

14           MR. SBAITI:  Well, Your Honor, I mean, that's --

15           THE COURT:  Newly-discovered evidence.

16           MR. SBAITI:  That would be the case in a final

17   judgment, Your Honor.  But, you know, our understanding of the

18   way the settlement worked was that that was not necessarily

19   going to be -- not the direction anybody wanted to go, but

20   seeking damages on a straight claim for damages, which we're

21   allowed to seek, which I think is our prerogative to seek, we

22   went that direction.

23           THE COURT:  Okay.  Okay.

24           MR. SBAITI:  But this --

25           THE COURT:  My last question.

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-71   Filed 05/30/25   Page 62 of 262    PageID 3069
Exhibit 71   Page 255 of 299

254

```
 1              MR. SBAITI:  Yes, Your Honor.

 2              THE COURT:  Again, I have to know.  You have filed

 3    some sort of pleading to reopen litigation against Acis in New

 4    York?  I'm only asking this because it's part of what's going

 5    on here.  What is going on here?

 6              MR. SBAITI:  Your Honor, that's a -- that's a

 7    separate lawsuit, and it's not to reopen litigation against

 8    Acis.  It deals with post-plan confirmation mismanagement by

 9    Acis.

10              THE COURT:  Oh, okay.  Okay.

11              MR. SBAITI:  Yeah.

12              THE COURT:  All right.

13              MR. SBAITI:  But I believe there's a motion in front

14    of Your Honor, just to -- that gave notice that the suit was

15    filed, but I believe Mr. -- well, a bankruptcy lawyer filed

16    it.  I don't know.

17              THE COURT:  A motion or a notice?  I don't know.

18              MR. SBAITI:  I don't know, Your Honor.  That's above

19    my paygrade.

20              THE COURT:  I have not seen it.  Okay?

21              MR. SBAITI:  Okay.

22              THE COURT:  Maybe it's there, but no one has called

23    it to my attention.

24              MR. SBAITI:  With the Court's permission, I'm going

25    to yield time to Mr. Bridges.
```

001920

HCMLPHMIT00002969

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 05/09/299    Page 63 of 262    PageID 3070

255

```
1            THE COURT:  Okay.  Mr. Bridges?

2            CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

3            MR. BRIDGES:  Thank you, Your Honor.  I'm grateful

4    that you asked most of those questions to Mr. Sbaiti.  I would

5    not have been able to answer them.  The one I can answer is

6    the one about judicial estoppel.  Apparently, I did a pretty

7    lousy job earlier.  I think I'm prepared to do a better job

8    now.

9        The case law I'd like to refer you to is the Texas Supreme

10   Court's 2009 decision in Ferguson v. Building Materials, 295

11   S.W.3d 642.  And this was my concern and my issue, perhaps

12   because I used to teach it and so it was at the front of my

13   mind.  But contrary to what you would think and what you said

14   earlier, it's not your ruling against us that would create a

15   judicial estoppel problem.  It's if you ruled in our favor.

16   And I know that seems weird.  Let me explain.

17       The two things that have to take place for there to be

18   judicial estoppel are, first, successfully maintaining a

19   position in one proceeding, and then taking an inconsistent

20   position in another.  And Your Honor, what we talked about

21   earlier is the notion that your July order forecloses the key

22   claim that Mr. Sbaiti was just describing, that Mr. Seery

23   should have known.  Not that he was grossly negligent or did

24   intentional wrong, but that he breached fiduciary duties

25   because he should have known and should have disclosed.
```

HCMLPHMIT00002970

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-71   Filed 06/26/25   Page 64 of 262    PageID 3071
Exhibit 71   Page 257 of 299

256

1    And if your order forecloses that and we come and convince

2    you that we nonetheless have colorable claims, colorable

3    claims of gross negligence or willful wrongdoing, that we

4    ultimately are unable to prove, our lawsuit could fail, even

5    though we had proved -- in the lawsuit we had proved he should

6    have known and that he breached fiduciary duties, but we would

7    be estopped, having succeeded from coming here and asking in

8    compliance with the order and its colorability rule, that we

9    would be estopped from then saying that this Court lacked the

10   authority to have issued that order in the first place, to

11   have released the claim on the mere breach of fiduciary duty

12   or ordinary negligence.  That's the inconsistency that I was

13   concerned about.

14   By coming here rather than trying to make our objection

15   and our position known without submitting to the foreclosure

16   of that claim that is, in many ways, the most important, the

17   headliner from our District Court complaint, is the concern,

18   Your Honor.  And frankly, if Your Honor's order does foreclose

19   that, then we're in serious trouble.  That's the claim that

20   we're trying to preserve.

21   But Your Honor, I don't think it was in anyone's

22   contemplation in July of 2000 that what that order would do is

23   terminate -- 2020; sorry, Your Honor -- in July of 2020, that

24   that order would terminate future claims that might arise

25   based on future conduct that had not yet happened in Mr.

HCMLPHMIT00002971

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-71   Filed 08/07/25   Page 65 of 262    PageID 3072

257

1   Seery's role.  Not in his role as a manager of the Debtor's

2   property, but in his role as a registered investment advisor

3   on behalf of his clients and their property.  And that is the

4   concern that the judicial estoppel argument is about.

5           THE COURT:  I still don't understand.  I'm very well

6   aware of judicial estoppel, the old expression, you can't play

7   fast and loose with the court.  Take one position in one

8   court, you're successful, and then take another position in

9   another court.  That's the concept.

10          MR. BRIDGES:  Coming here --

11          THE COURT:  How is this judicial estoppel if you had

12  done what I think the order required and asked this Court for

13  leave?  What -- and I said fine, you have leave.  Where's the

14  judicial estoppel problem?

15          MR. BRIDGES:  If you say fine, you have leave, but

16  that leave is only, as the order states, because we have

17  colorable claims of gross negligence, colorable claims of

18  intentional wrongdoing, what happens to our mere negligence

19  and mere breach of fiduciary duty claims?  Are they

20  foreclosed?  The order on its face --

21          THE COURT:  Well, I would interpret the order to be

22  yes, and then you could appeal me, and the Court would either

23  say it's too late to appeal that because you didn't appeal it

24  in July 2020, or fine, I'll hear your appeal.  Where's the

25  estoppel?

HCMLPHMIT00002972

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-71   Filed 05/09/299   Page 66 of 262    PageID 3073

258

1             MR. BRIDGES:  Your Honor, our claims that this Court

2    lacks the authority either to have made that order in the

3    first place or the jurisdiction to rule on colorability now

4    because of Section -- the mandatory abstention provision,

5    whose section number I've now lost.  That if we come to you

6    and ask you to rule on those things, have we not thereby

7    waived on appeal our claim that you couldn't rule in the first

8    place on those things?

9         That is what our motion for leave in the District Court

10   argues, is that there's -- there are jurisdictional

11   shortcomings with your ability to decide what we're asking

12   that Court to decide.  And Your Honor, by coming here first

13   and then appealing, that's what we fear we would have lost.

14   And instead of coming here and appealing, what we -- what we

15   would have done, in the alternative, I guess, would be to come

16   here and ask you not to rule but move to withdraw the

17   reference of our own motion.

18        That two-step, filing here and filing a motion to withdraw

19   the reference on the thing we filed here, we didn't think was

20   required, nor could we find any case law or rule saying that

21   that was appropriate.

22             THE COURT:  Okay.

23             MR. BRIDGES:  These are not games, Your Honor.  We

24   were not trying to play games.  We aren't bankruptcy court

25   lawyers.  We're not regularly in front of the Bankruptcy

HCMLPHMIT00002973

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-71   Filed 06/09/299   Page 67 of 262   PageID 3074

259

1   Court.  So the notion why didn't we come here first isn't

2   exactly at the top of our mind.  The question for trial

3   lawyers typically is, where can we file this, what are the

4   permissible venues, not why don't we come to Bankruptcy Court?

5   Especially when your order appears to say that causes of

6   action that don't rise to the level of gross negligence or

7   intentional wrongdoing are already foreclosed.

8        Your Honor, the January order, I think I have to just

9   briefly address again, even though I don't understand why it

10  makes a difference.  Apparently, counsel thinks it makes a

11  difference because Mr. Dondero apparently supported it in some

12  way.  Our position is, for whatever difference it makes, the

13  January versus the July, we don't believe there's anything in

14  the District Court complaint putting at issue Mr. Seery's role

15  as a director, so we don't understand how that order is

16  implicated.

17       Again, I'm not sure that matters at all.  I'm not raising

18  it as a defense.  I'm just telling Your Honor this is all

19  about the July order, from our perspective.  Certainly, the

20  July order puts his role as a CEO -- certainly, the District

21  Court case puts his role as a CEO at issue, and that's what

22  the July order is about.

23       Your Honor, the *Applewood* case requires specifics in order

24  to terminate our rights to sue and to bring certain causes of

25  action, and without that kind of specificity, Your Honor, we

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 1-71    Filed 06/20/25    Page 68 of 262    PageID 3075

260

1    believe that that order fails to preclude, fails to have

2    preclusive effect as to these later-arising claims.  And we

3    would submit not only that it was not contemplated, but that

4    it was not intended to have that effect, and that even Mr.

5    Seery's testimony suggests that that's not how he understood

6    that order to be effective.

7        Counsel argued that the Barton Doctrine does apply here

8    and rattled off the names of cases that don't -- to my

9    knowledge, no case, no case that I can find deals with this

10   type of deferential order where someone is asked -- where a

11   court is asked to defer to the business judgment of an entity

12   in approving an appointment, and nonetheless deciding that the

13   Barton Doctrine applies.  That's not what *Villegas* holds.

14   That's not what *Espinosa* holds.  I don't think *Barton* is

15   applicable in a situation like that.  Certainly, it's outside

16   of the context of what *Barton* anticipated itself over a

17   century ago when it was decided.

18       Your Honor, if we're wrong, please know we're wrong in

19   earnest.  These are not games.  These are not sneakiness.  No

20   such motivation is at issue here.  I was hopeful that that

21   would be plain from the text of the motion for leave itself.

22   If it's not, I'd offer this in addition.  The docket at the

23   District Court shows that immediately upon filing the motion

24   for leave, a proposed order was filed with it asking to have

25   the proposed complaint deemed filed, which as soon as I saw I

001926

HCMLPHMIT00002975

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 06/20/25    Page 69 of 262    PageID 3076
Exhibit 71    Page 262 of 299

261

```
 1   asked us to immediately retract it and to substitute a new
 2   proposed order that does not ask for the amended complaint to
 3   be deemed filed.  That is not what we wanted.
 4       And the fear was what if our motion is granted because the
 5   District Court says you have the right, you don't even need
 6   leave, but as to the Bankruptcy Court, you're on your own,
 7   this is at your own risk, I'm not going to rule on any of the
 8   jurisdictional questions that you attempt to raise?  We did
 9   not want our complaint deemed filed for that reason.  What we
10   did want was for a court where we did not risk judicial
11   estoppel to decide whether or not our key claim under the
12   Advisers Act had been foreclosed by your July order, and that
13   was the key and motivating factor.
14       On top of that, Your Honor, instead of arguing the meaning
15   of the word pursue, let me just say this.  We understood
16   pursue in that context to refer to claims or causes of action,
17   not potential, unfiled, unasserted, contemplated claims or
18   causes of action.  That until a claim or cause of action is
19   actually asserted in some way, that it can't be pursued, and
20   that the reference here was to two kinds of action, those that
21   had not yet been commenced -- and your order foreclosed the
22   commencing of them without permission -- and those that had
23   been commenced.  And your order couldn't foreclose the
24   commencing of them because they hadn't been commenced yet, but
25   your order did foreclose pursuing them.
```

HCMLPHMIT00002976

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 04-71    Page 263 of 299    Page 70 of 262    PageID 3077

262

 1        And that was my reading of what that order said.  And it

 2    fits with this notion that a claim or cause of action isn't

 3    something you're considering or even researching.  It didn't

 4    dawn on us that researching or talking to a client about a

 5    potential claim could violate the order because in some

 6    respect that conversation could be in pursuit of the claim.

 7        By the same notion, we didn't think asking a court with

 8    original jurisdiction according to Congress, asking a court to

 9    decide whether or not we were foreclosed from bringing our

10    claims in a motion for leave was violating your order.

11        We don't have much else, Your Honor.  In terms of the need

12    to enforce compliance with your orders, if we understand them,

13    we sure as heck are going to follow them.  And if we've

14    misconstrued the term pursue, I'm certainly very sorry about

15    that.

16        I appreciate counsel saying he thinks we're probably good

17    people.  I did not think what we did was any kind of gross

18    error in judgment.  I thought that what we were doing was

19    preserving our clients' rights, going to a court of competent

20    jurisdiction, and asking the question, can we do what we think

21    we ought to be able to do, but is -- frankly, Your Honor,

22    we're a bit confused about because of the order that seems on

23    its face to foreclose the very lawsuit that we think we should

24    be bringing on behalf on this charitable organization that

25    foreclosed it months before the conduct at issue that gave

001928

HCMLPHMIT00002977

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-01876-K Document 4-71 Page 264 of 299 Page 71 of 262 PageID 3078

263

```
 1   rise to the complaint.  And with that conundrum, knowing what
 2   to do was not obvious or easy for the lawyers or for the
 3   client who was dependent on his lawyers to give him good,
 4   sound advice.
 5       I'm very grateful for you giving us the time and for your
 6   very pointed questions.  Thank you, Your Honor.
 7               THE COURT:  Thank you.  All right.  Who's next?
 8                CLOSING ARGUMENT ON BEHALF OF MARK PATRICK
 9               MR. ANDERSON:  May it please the Court, Michael
10   Anderson on behalf of Mr. Patrick, Mark Patrick.
11       You know, this is a contempt proceeding.  It's very
12   serious.  And, you know, my stomach aches for the people here.
13               THE COURT:  Mine does, too, by the way.
14               MR. ANDERSON:  It truly aches.
15               THE COURT:  Uh-huh.
16               MR. ANDERSON:  And I mean what I said when I did
17   opening, when I said we don't need a hearing, an evidentiary
18   hearing.  And I still don't believe we did, because it comes
19   down to what does the word pursue mean, because there's
20   already been an acknowledgement --
21               THE COURT:  Do you all want to withdraw all your
22   exhibits?  I've got a lot of exhibits that I now need to go
23   through.  If I admit them into evidence, I'm going to read
24   them.
25               MR. ANDERSON:  No, I understand.
```

HCMLPHMIT00002978

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 06/20/25    Page 72 of 262    PageID 3079
Exhibit 71    Page 265 of 299

264

```
 1                THE COURT:  Uh-huh.

 2                MR. ANDERSON:  But it does come down to the word

 3    pursue.  Counsel has already said commence doesn't do it, and

 4    so then it's pursue.

 5          And I could ask Your Honor, what did you mean when you

 6    said pursue in the July order, but I'm not going to say that.

 7    And I asked my client on the stand, you know, did you pursue a

 8    claim or cause of action?  And then it was very telling.  What

 9    happened with counsel?  He stood up and objected to me even

10    asking if it was pursued.  And it dawned on me, if he's going

11    to object, does pursue have some sort of legal -- that was his

12    objection.  It was he objected on legal grounds.  Does that

13    have some sort of legal meaning?

14          This is contempt.  You can't be held in contempt unless it

15    is bright-line clear that you have deviated from a standard of

16    conduct and there's no ambiguity.  Well, clearly, there is

17    ambiguity, because over on this side of the room we say filing

18    a motion for leave can't be pursue.  We can look at the order

19    and we know it doesn't mean pursue because I just heard Your

20    Honor say you should have filed a motion for leave in this

21    Court before doing anything.  All right?  So if that -- if

22    that is what without the Bankruptcy Court first determining,

23    if that's what the motion for leave is, well, then if we go up

24    to the first sentence, No entity may commence or pursue a

25    claim or cause of action, then it has this, without the
```

HCMLPHMIT00002979

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 06/09/25    Page 73 of 262    PageID 3080

265

1   Bankruptcy Court first determining, that means -- if pursue

2   means a motion for leave, if that's what that means, then that

3   order says you can't commence or file a motion for leave

4   before you file a motion for leave.  Because that's what it

5   means.  If pursue means motion for leave and you've said you

6   should have come here and filed a motion for leave because it

7   says, Debtor, without the Bankruptcy Court first determining

8   that notice that such claim or cause of action represents a

9   colorable claim, and specifically authorizing.  The vehicle to

10  do that would be a motion for leave, right?  And you can't

11  pursue anything until a motion for leave has been filed.

12      Now, where was the motion for leave?  And I understand,

13  Your Honor, you know, no expert at reading the room,

14  obviously, you're frustrated that the motion for leave was

15  filed in the District Court and not in this Court.  But it

16  doesn't change the fact, and neither did any of the evidence,

17  change anything, is what does pursue mean?

18      And if someone says, well, it's obviously clear it means

19  $x$, well, is it really obviously clear it means filing a motion

20  for leave?  Because nobody on my side, when you read it, when

21  you say pursue, can read it that way.  And if we're going to

22  have contempt sanctions being posed, and there has to be clear

23  and convincing evidence or beyond reasonable doubt, depending

24  upon, you know, I don't think you have to get to that part,

25  but clear --

HCMLPHMIT00002980

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 4-71    Filed 06/20/25    Page 74 of 262    PageID 3081
Exhibit 71    Page 267 of 299

266

1          THE COURT:  This is not criminal contempt.

2          MR. ANDERSON:  Clear and convincing is the civil

3    standard for contempt.

4          THE COURT:  Right.

5          MR. ANDERSON:  And if pursue is open to that much

6    interpretation, it's not the kind of thing that can be held in

7    contempt on.  And I understand the frustration.  I hear the

8    frustration.  I hear counsel talk about that was not their

9    intent when they filed it.  You know, I heard Mr. Patrick get

10   up there.  I heard counsel say, hey, Mr. Patrick's doing his

11   job, he's a good guy, seems like a good guy.  Well, Mr.

12   Patrick's up there.  Look, they filed the underlying lawsuit.

13   Nobody -- there's no motion for that in this Court about the

14   underlying lawsuit.  It's only about the motion for leave.

15   That's all we're here about.

16       And so you go to that, and we've heard all these arguments

17   about it, and we've been here almost as long as the motion for

18   leave was actually on file before it was sua sponte dismissed

19   without prejudice.

20       And so I go back to that and I say that, if pursue means

21   filing a motion for leave, then that order would require an

22   order for anyone to violate -- it would be violated upon the

23   filing of a motion for leave, because you can't pursue

24   something until the Bankruptcy Court has already first

25   determined, after notice, that such claim or cause of action

001932

HCMLPHMIT00002981

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-71   Filed 06/30/25   Page 75 of 262   PageID 3082

267

```
 1    represents a colorable claim and specifically authorizing the
 2    entity to bring such a claim.  Because that -- we already know
 3    that's a motion for leave in and of itself.  Therefore,
 4    pursue, just simply filing a motion for leave will put you in
 5    that.
 6        But that gets into all these -- we don't need to be having
 7    this discussion about, you know, is a motion for leave pursue?
 8    Is pursue a motion for leave?  I've heard both arguments here.
 9    It doesn't justify contempt.  And I know -- and so certainly
10    with respect to my side, I, you know -- given that, I would
11    request that the Court deny the request for contempt.
12        And again, I want to say, too, look, we hear you.
13    Absolutely hear you.  Understand the frustration.  Totally
14    hear you on that.
15        I'm going to turn over the balance of my time to Mr.
16    Phillips, --
17            THE COURT:  Okay.
18            MR. ANDERSON:  -- unless you have any questions, Your
19    Honor.  I appreciate it.
20            THE COURT:  Okay.  I do not.
21            CLOSING ARGUMENT ON BEHALF OF MARK PATRICK
22            MR. PHILLIPS:  Your Honor, Louis M. Phillips, and
23    I'll be brief.  I'm going to try to bring it down to -- I was
24    not involved.  We are -- we are here because of the
25    indemnification provisions of CLO Holdco representing Mr.
```

001933

HCMLPHMIT00002982

Case 19-34054-sgj11 Doc 4255-71 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-01876-K Document 4-71 Filed 06/09/2299 Page 76 of 262 PageID 3083

268

```
1   Patrick individually.  My firm was not involved in the
2   litigation.  We were hired to represent CLO Holdco and some of
3   the defendants in the UCC litigation, and our role has
4   expanded to do some other stuff, particularly represent Mr.
5   Patrick because of the indemnification provisions of the
6   Holdco entity documents.  He's entitled to indemnification and
7   we're providing a defense for him.  That's why we're here.
8       So I come way after the order.  We have not been involved
9   in anything.  But I think I'm just going to try to distill
10  everything about the order and about the concern and about the
11  litigation, because the Court is asking about is this an end
12  run on the settlement?  The Court is also saying, all you had
13  to do was come here first.
14      But let's look.  We're here about one thing, the motion
15  for leave.  And as Mr. Anderson pointed out, the commence or
16  pursue a claim, according to the order, commence or pursue can
17  only occur after the Court has authorized the litigation.
18  Okay.  So that's what the order says.  You can't commence or
19  pursue.
20      Counsel for the Debtors says, well, it can't be after
21  commencement because you've already commenced the action.  So
22  pursue has to mean something before the commencement of the
23  action.  It would mean something before the commencement of
24  the action under this order.
25      But it doesn't mean something before the Court approves
```

001934

HCMLPHMIT00002983

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 04-71    Page 270 of 299    Page 77 of 262    PageID 3084

269

```
 1    the commencement of the action, because commence or pursue

 2    under this order does not occur before the Court has acted.

 3    That's the language of the order.  It only occurs after the

 4    Court has authorized it.  That's the context in which commence

 5    or pursue exists, after this Court has authorized.

 6        Okay.  So it can't be pursuit before the Court has

 7    authorized without commencement because it only is triggered

 8    by the Court's authorization of the action, which means,

 9    before you commence it, actions in time take time, before you

10    commence the action, you have to pursue the action to commence

11    it.  But you can't do that until you've approved it.  All

12    right?

13        That's the temporal concern and why we say the motion for

14    leave can't be pursuit of an action under this order.  It

15    might be pursuit under another definition or another order.

16    In other words, maybe an order could be issued saying, you

17    can't file a motion for leave in any other court but this one.

18    I don't know whether it'd be a good order, but the order could

19    say that.  But when you say all you had to do was file a

20    motion for leave in this Court and everything would be okay,

21    no.  The motion for leave is not, under this order, pursuit.

22    Pursuit only occurs under this order after you've done

23    something, after Your Honor has done something.

24        So if a motion for leave is violative at the District

25    Court, the motion for leave would be violative here, because
```

HCMLPHMIT00002984

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 07/09/25   Page 78 of 262   PageID 3085
Exhibit 64-71   Page 270 of 299

270

1  it occurs before Your Honor has taken action.

2       Now, clearly, you want people to ask, but just as clearly,

3  and this was the point of my remarks earlier at the tail-end

4  of opening, just as clearly, I have a question, because

5  frankly, I understand what these guys are saying.  These guys

6  haven't really said it.  They're a little shame-faced at what

7  these guys are asking.  Because what these guys are asking is

8  whether or not an employee Seery, as the CRO -- and we heard,

9  oh, he bargained for it, he wouldn't have done it without

10 getting the order and the protections because -- did he

11 bargain for not having to comply with the Investor Advisory

12 Act?  Did he bargain for not having a fiduciary duty to third

13 parties?  Because the one thing that Mr. Bridges has been

14 trying to tell you is that, under this order, if it's

15 interpreted one way, you would never authorize a violation of

16 the Investment Advisory Act because it wouldn't necessarily be

17 gross negligence or willful misconduct.

18      In other words, in employing Seery, did the Debtor go out

19 in this disclosure statement and say, we are advisor to $1.2

20 billion of third-party money, and guess what, our CRO has no

21 fiduciary duty to you?  We have forestalled any claim under

22 the Investment Advisory Act in our employment order.  Did that

23 happen?

24      Because if that happened, I don't know if the Court was

25 really thinking that way, because that -- that can't happen in

HCMLPHMIT00002985

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-71   Filed 07/29/25   Page 79 of 262   PageID 3086

271

1   a confirmation order before, under the Fifth Circuit

2   authority, after disclosure statement, plan, et cetera, et

3   cetera, because that's a third party release of claims that

4   may -- that haven't occurred yet.  You would be releasing

5   because you would be saying you have no right.  You have no

6   right.  This is not temporal.  This is saying you have no

7   right, if it's saying that, to bring an Investment Advisory --

8   Investment Advisory Act or a Breach of Fiduciary Duty Act

9   that's not gross negligence or willful misconduct forever upon

10   an employment order.

11       Now, if that's not what it means, then we have another

12   conundrum.  The other conundrum -- and I'm new to this, maybe

13   this has been thought out by everybody, but I don't think so.

14   The other conundrum is this order doesn't apply to actions

15   that don't involve willful -- gross negligence or willful

16   misconduct.  It only applies to those types of actions.  So,

17   frankly, I don't know what the order does.

18       I think the problem -- I probably shouldn't be the

19   purviewer of who ought to know because my standard's probably

20   really low, given my capacity here.  But I'm a guy off the

21   street.  Seery gets hired to run the Debtor.  Seery testifies

22   and he admits, we've got Investment Advisory  Act all over the

23   place.  We're making lots of fees out of administering all

24   this third-party money.  Do they know?  Do they know he's

25   immune?  Do the third parties know?

001937

HCMLPHMIT00002986

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 04-71   Page 273 of 299   Page 80 of 262   PageID 3087

272

1          Now, a standard about managing the Debtor?  Absolutely.

2     That's just pure D Chapter 11, pure D corporate, pure D

3     standard liability if you're operating an entity.  You're not

4     liable for gross negligence or willful misconduct.  You're

5     not.  And so any claim for damage to the Debtor or to the

6     estate by actions taken in the CRO capacity, absolutely.

7     Absolutely.  You don't want a bunch of yoyos suing, you did

8     something against the Debtor and the Debtor is now worth $147

9     less than it was because you did something, you were negligent

10    and you forgot to put the dog out.  No.  It's got to be gross

11    negligence or willful misconduct if you are talking about

12    running the Debtor and running the estate.

13         But that's not what we have here.  And you can ask all the

14    questions you want about whether the lawsuit's any good, but

15    that's not what's up before the Court.  What's up before the

16    Court is whether filing a motion for leave is contempt.  And

17    under this order, you're saying, all you had to do is come

18    here.  Well, in one reading of it, you'd have never got relief

19    because you can't bring the kind of action.  I foreclosed it

20    by employing Seery.  He no longer has a fiduciary duty and is

21    no longer bound by the Investment Advisory Act.  Case closed.

22    Get out of here.  Unless you can formulate something around so

23    that you can establish gross negligence or willful misconduct,

24    I've done away with all those causes of action.

25         I don't think that's what happened.  And if that's not

001938

HCMLPHMIT00002987

1    what happened, this doesn't apply because it shouldn't apply

2    to third-party actions.  It should apply to actions for damage

3    to the estate by creditors of the estate for whom Seery is

4    acting as CRO of the Debtor, who is the -- in possession of

5    the estate.  That makes perfect sense.  Perfect sense.  And

6    nobody would say that you shouldn't have sole authority to

7    determine whether a CRO who's acting for the estate and

8    damages the estate -- because that'd be a claim against the

9    estate.  That would be an administrative claim against the

10   estate.  That is just hornbook law.

11       That's the way I see this order.  And I admit I didn't

12   write it.  I admit I didn't submit it.  I admit I didn't

13   litigate it.  I admit I'm coming in late.  But sometimes maybe

14   a fresh pair of elderly, trifocal-assisted eyes doesn't hurt.

15   Because I will tell you, Judge, on one read this Court says

16   don't bother coming here because you don't have the kind of

17   claim that can be brought, even if you're a third party.  And

18   the only way that happens is if Seery's released from any

19   obligation under the Investment Advisory Act, and I think

20   everybody would like to know that.  And he can't be sued for

21   breach of fiduciary duty to third parties that he admits he

22   owes.  I think people would like to know that.

23       And if it doesn't, then this is not -- this order is not

24   about that.  But the fact -- I've been at this 40 years, and I

25   usually don't want to talk about myself.  There's really not a

HCMLPHMIT00002988

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 4-71    Filed 07/09/25    Page 82 of 262    PageID 3089
Exhibit 71    Page 275 of 299

274

1   lot to talk about.  But I hear Mr. Morris how he's never done

2   this, he's never done that.  I hear this, I'm a good -- you

3   know, whatever.  I'm confused.  I've been doing this 41 years.

4   Bankruptcy, 39.7.  I must be crazy, but that's what I've been

5   doing.  And I'm confused because I don't even know if they

6   needed to come here.  I don't even know if, had they come

7   here, if they could have even presented an action for gross --

8   for negligence or breach of fiduciary duty, could have --

9   gross negligence or willful misconduct?  I don't know whether

10  this order just applies to Seery's duties as CRO vis-a-vis

11  creditors of the estate and property of the estate and damage

12  to the estate.  Because that's not what we're dealing with

13  here.

14      The point is, Judge, this is contempt.  And I understand

15  Your Honor knows all about contempt.  Your Honor knows about

16  *Matter of Hipp*.  Your Honor knows about civil contempt

17  authorization for bankruptcy courts.  Your Honor knows that

18  you can't operate without the right to impose civil contempt

19  sanctions.  And Your Honor knows, and I agree with Your Honor,

20  that civil contempt is both remedial and coercive.

21      But how do you coerce around my questions?  Maybe I am all

22  wet, but if I am, I don't think I am, and I don't understand

23  that I am, and that's why I'm concerned about going off into

24  this contempt wilderness and millions in fees, when the motion

25  for leave was dismissed and when the lawsuit doesn't ask for

HCMLPHMIT00002989

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 07/09/299    Page 83 of 262    PageID 3090

275

1  or includes most of its claims.  I don't even -- I have not

2  studied the lawsuit.  I wasn't involved in it.  But if it's a

3  breach of fiduciary duty and Advisory Act and it says what

4  you've been told it says, that he should have pulled up

5  different stuff, that the valuation metrics were different,

6  that he shouldn't have used it, I don't know that they're

7  saying fraud.  I don't know that they're saying he knew he was

8  doing -- I think they're saying he breached the Investment

9  Advisory Act.  And that's not gross negligence or willful

10  misconduct.  Then does this order apply or this order -- does

11  this order foreclose that?

12      The fact is, I think we could have decided this on the

13  pleadings and on the order.  We didn't.  The fact that Mr.

14  Dondero did A, B, C.  And I will tell you this.  Mr. Patrick

15  has stood up.  He's going to get a harpoon, he's going to get

16  a harpoon, subject to his right to appeal.  But he has told

17  this Court.  We represent him.  We're not trying to get him

18  out of having authorized the order.  It's very important for

19  this Court to understand.  Mr. Patrick is one of these

20  entities.  Mr. Dondero can holler and scream all he wants to.

21  Mr. -- and look, did he terminate Grant Scott?  If I'm Grant

22  Scott, and this is my best friend and I was in his wedding and

23  I was his roommate and I was his best friend and I'm doing

24  this stuff for $5,000 and I do something and $5,000 a month

25  and I do something and I get hollered at and I've got a full a

HCMLPHMIT00002990

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 02/09/25   Page 84 of 262   PageID 3091
Exhibit 71   Page 27 of 299

276

 1   law practice, I'm an IP lawyer, why don't I just tell him to

 2   go jump in a lake, which is the other way you could look at

 3   Grant Scott leaving.  I want you to jump in a lake.  I'm out

 4   of here.  I don't need this.

 5       Thank you.

 6               THE COURT:  All right.  Thank you.

 7               MR. DEMO:  Your Honor, how much time do they have

 8   left, --

 9               THE COURT:  Um, --

10               MR. DEMO:  -- to be honest?

11               THE COURT:  Nate, are you -- 26 minutes?  All right.

12               MR. TAYLOR:  I'll go way under, Your Honor.

13               THE COURT:  Okay.

14                CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

15               MR. TAYLOR:  Your Honor, Clay Taylor.  I'm here on

16   behalf of Mr. Dondero.  He was named as an individual alleged

17   violator within the order.

18               THE COURT:  Okay.  I'm getting lawyers mixed up.  Mr.

19   Anderson, who did you represent?

20               MR. ANDERSON:  Mr. Patrick.  Mr. Phillips and I

21   represent --

22               THE COURT:  You're Mr. Patrick?

23               MR. PHILLIPS:  We're Mr. Patrick.

24               THE COURT:  You're both --

25               MR. PHILLIPS:  Mr. Patrick.

HCMLPHMIT00002991

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 02/09/22   Page 85 of 262   PageID 3092

277

```
 1              THE COURT:  Okay.  I'm sorry.  I'm getting my Fort
 2    Worth law firms mixed up.  Okay.
 3              MR. TAYLOR:  That's quite all right.  Clay Taylor
 4    from Bonds Ellis here on behalf of Mr. Dondero.  And we're
 5    here because he was named in the alleged violator motion
 6    within the order as an alleged violator.  We don't think that
 7    he is, for the reasons that we're about to explain, but we
 8    were ordered to appear --
 9              A VOICE:  No.
10              MR. TAYLOR:  -- and so therefore we are appearing and
11    telling you why we're not an alleged violator.
12         First of all, for all the reasons that Mr. Sbaiti and Mr.
13    Bridges and Mr. Phillips and Mr. Anderson said, the court
14    order was in effect.  We agree with that.  It required certain
15    conduct to be done.  Yes, it did.  It said you couldn't
16    commence something.  It said you couldn't pursue it.  I think
17    we have gone through what the pursuit and commence.  Nobody is
18    arguing that anything was commenced.  It comes down to
19    pursuit.
20         But let's talk about what the evidence shows about Mr.
21    Dondero.  It shows that Mr. Dondero believes that there have
22    been breaches of fiduciary duty.  He thinks that there has
23    been negligence committed.  He believes that actions should be
24    taken.  We don't run away from that.  He, frankly, told you
25    that.
```

001943

HCMLPHMIT00002992

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 4-71    Page 279 of 299    Page 86 of 262    PageID 3093

278

1      But here, he didn't take any action to pursue it.  The DAF

2    did.  CLO Holdco did.  It's undisputed that he's not an

3    officer, director, or control person for either of those

4    entities.  The act we're here on is a motion for leave to file

5    an amended complaint to include Mr. Seery.  That's -- Mr.

6    Dondero didn't take any of those acts.  He believes it should

7    have been done, but he's not the authorizing person.

8      He might have -- let's just pretend that he thought he was

9    authorizing something.  It doesn't matter that he thought he

10   could authorize something or that he was trying to push for

11   it.  The fact remains he can't authorize it.  You know, he can

12   say, I declare war on Afghanistan.  Well, he can't.  Congress

13   can't.  He can write a letter to his Congressman.  He already

14   wrote a letter to his Congressman.  He talked.  He talked with

15   the head of the acting CLO -- CLO Holdco and he said, I think

16   there's something wrong here.  I think you should be looking

17   into it.  You know what, he goes, you might be right.  Go talk

18   with Mazin about it.  Give him some data.  Conduct an

19   investigation.  They did.  And then they went to the

20   authorizing person and they filed a motion for leave to

21   include Mr. Seery.  Mr. Dondero did nothing wrong in that.

22     Now, there is some personal animosity.  I think that Your

23   Honor has probably seen there seems to be some personal

24   animosity between Mr. Seery and Mr. Dondero, and that's

25   unfortunate.  But just because there's some personal animosity

001944

HCMLPHMIT00002993

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 4-71    Filed 08/08/25    Page 87 of 262    PageID 3094
Exhibit 71    Page 280 of 299

279

1    doesn't mean that maybe something wasn't done wrong.  Maybe

2    that Mr. Dondero -- he's certainly allowed to at least tell

3    people, well, I think there was something done wrong.  And if

4    there is an action to be had, then those appropriate entities

5    can take it.  But he didn't do those things.

6        And so even if he says, just like Michael Scott, "I

7    declare bankruptcy," it doesn't matter.  You have to take the

8    certain actions.

9            THE COURT:  I got it.  I don't know if everyone did.

10            MR. TAYLOR:  Yes, well, yeah, you have to be a *The*

11   *Office* fan.

12       But so that's where we stand.  And for all the reasons the

13   prior people have discussed, I don't think that there was any

14   violation of this Court's order.  But even if there was, Mr.

15   Dondero in this situation was not the one.  We're going to

16   have to deal with the other order that came out yesterday in

17   due course, but for this discrete issue that is before this

18   Court today, Mr. Dondero didn't violate anything.

19       Thank you.

20            THE COURT:  All right.  Mr. Morris, you get the last

21   word.

22         REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23            MR. MORRIS:  Thank you, Your Honor.  These are going

24   to be discrete points because it's truly rebuttal.  I'm going

25   to try to respond to certain points.

001945

HCMLPHMIT00002994

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-71   Filed 08/09/299   Page 88 of 262   PageID 3095

280

1          Mr. Bridges and Mr. Phillips made extensive arguments

2     about why they believe the order is wrong, why it's

3     overreaching.  They tried to get into your head to think about

4     what you intended or what you thought.  The fact of the matter

5     is, the answer to all of those questions -- first of all, none

6     of it's relevant to this motion because we've got the order --

7     but the answer is very simple.  Forget about coming here to

8     seek leave to amend to add Mr. Seery.  We can avoid Mr.

9     Sbaiti's concerns about judicial estoppel or something.  Why

10    didn't they just file the motion for reconsideration?  They

11    filed that after they filed the motion for leave to amend,

12    after we filed the motion for contempt.  Only then did they

13    file the motion for reconsideration.

14         Now, we think it's ill-thought-out.  We think it's

15    problematic.  Probably not today, is my guess, we'll argue to

16    you as to why we think that motion ought to be denied.  But if

17    they truly believed that the order was infirm in any way,

18    wouldn't the proper thing to have been to come here and tell

19    you that?  Wouldn't the proper thing to be to come to the

20    court that issued the order that you have a problem with and

21    ask the court to review it again?  And if Your Honor overruled

22    the motion, to appeal it.

23         Why are we even doing this?  Why did they do it?  It's not

24    we.  Why did they do it?  Right?  And that solves almost

25    everything they've said.  That's point one.

HCMLPHMIT00002995

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-71   Filed 06/20/25   Page 89 of 262   PageID 3096
Exhibit 71   Page 282 of 299

281

1      Point two, the January order.  The January order is very

2   important.  It's important not just because it applies to

3   directors, but it's important because Mr. Dondero agreed to

4   it, and it also applies -- I want to get it -- Paragraph 10.

5   It's Exhibit 15.  It applies to the independent directors and

6   the independents directors' agents.  If a CEO is not an agent

7   of an independent director, I'm not sure what is.  The

8   independent directors are the body that appointed the CEO.

9   The CEO, Mr. Seery, is acting on behalf of the board.  This is

10  the order that Mr. Dondero agreed to.  It's the order -- take

11  out the word independent director; put in Mr. Seery -- it's

12  the order everybody's complaining about.  But even the January

13  order certainly applied to Mr. Seery.  That's point two.

14      Point three.  I've heard a lot of concerns about the

15  slippery slope and what does pursuit mean and does talking to

16  a lawyer mean pursuit and doing an investigation being

17  pursuit.  I don't know, Your Honor, and I don't care, because

18  that's not what we're here to talk about.  We're here to talk

19  about a specific act -- not a hypothetical, not a slippery

20  slope.  We're talking about the filing of a motion for leave

21  to amend a complaint to add Mr. Seery as a defendant.  That's

22  all we're talking about.  So, you know, the rest of it, it's

23  just noise.  And the only question is whether, and I think

24  it's pretty clear, that means pursuit.

25      Another version on the theme of was there any alternative

001947

HCMLPHMIT00002996

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 08/30/299   Page 90 of 262   PageID 3097

282

1  to filing the motion in the District Court, I think there was.

2  The Sbaiti firm did file that suit against Acis in New York.

3  And if Your Honor checks the docket in the Acis bankruptcy, I

4  think you'll find that there's a motion from Mr. Rukavina, for

5  a comfort order, basically, saying that -- asking the court to

6  declare that the filing of the complaint in New York against

7  Acis didn't violate the plan injunction.  I think I have that

8  right.

9      But I point that out, Your Honor -- it's not evidence in

10  the record, but the Court can certainly take judicial notice

11  of what's on its docket -- I point that out because there's

12  another example of a lawyer who is very active in this case

13  who actually -- now, he already commenced the suit, so he did

14  -- they did both simultaneously, so I don't want to suggest

15  that that's the perfect thing to have done, but at least he's

16  here asking for -- he's bringing it to your attention, he's

17  telling you it's happened, he's asking for a comfort order,

18  and someday Your Honor may rule on it.  I don't know.

19      Number six, what's with the pursuit of Mr. Seery?  What is

20  with the pursuit of Mr. Seery?  Is there any doubt in

21  anybody's mind that the Debtor is going to have to indemnify

22  Mr. Seery and will bring in another law firm?  And while I

23  don't think it will ever happen in a hundred billion years, if

24  there is a judgment against Mr. Seery, isn't that going to be

25  the Debtor's responsibility?  Why are they even bothering to

001948

HCMLPHMIT00002997

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 04-71   Page 284902399  Page 91 of 262    PageID 3098

283

1    do this?  I think it's a fair question for the Court to ask.

2        I think Mr. Taylor came up and talked about animosity.

3    How do you explain going after Jim Seery?  How do you do it?

4    He's going to be indemnified.  It's in -- it's in like three

5    different orders.  It's in the confirmation order.  It's in

6    the CEO order.  It's -- it's probably as a matter of law.

7    It's in the Strand partnership agreement.  It's -- he's been

8    indemnified like 12 different times.  What is the purpose,

9    other than to make Mr. Seery's life miserable?  There is none.

10   You'll never hear a rational explanation for why they're doing

11   this.

12            THE COURT:  Just so you know, I've not looked at any

13   of the pleadings in the District Court --

14            MR. MORRIS:  And I'm not asking you to.

15            THE COURT:  -- other than what has been presented to

16   me today.

17            MR. MORRIS:  Yeah.  That's fine, Your Honor.

18            THE COURT:  But I'm very flipped out about the causes

19   of action against the Debtor, --

20            MR. MORRIS:  Yeah.

21            THE COURT:   -- who hasn't reached an effective date.

22            MR. MORRIS:  Well, --

23            THE COURT:  And I'm most interested to know what the

24   defenses, motions --

25            MR. MORRIS:  We'll get to that.

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 1-71    Page 285 of 299    Page 92 of 262    PageID 3099

284

```
1              THE COURT:  -- are going to be raised in that regard.
2              MR. MORRIS:  We will get to that in due course.
3       I do want to point out, just to be clear, because we keep
4    hearing that they learned about, you know, all of these
5    horrible things after the fact.  In the complaint, which I
6    think is Exhibit 12, --
7              THE COURT:  I'm there.
8              MR. MORRIS:  -- at Paragraph 127, the Plaintiffs
9    allege, "Mr. Seery was informed in late December 2020 at an
10   in-person meeting in Dallas, to which Mr. Seery had to fly,
11   that HCO" -- excuse me "HCLF and HCM had to suspend trading in
12   MGM Studios' securities because Seery had learned from James
13   Dondero, who was on the board, of a potential purchase of the
14   company.  The news of the MGM purchase should have caused
15   Seery to revalue."
16      I cannot begin to tell you the problems with that
17   paragraph.  We're not going to discuss them today.  I made a
18   promise to these folks that we wouldn't get into the merits of
19   the complaint.  But Your Honor was onto something before, and
20   those issues, you know, may see the light of day one day.  And
21   if they do, folks are going to have to deal with it.  But I
22   will point out that at the time the communication was made,
23   the other TRO was in effect.  We didn't bring that one to the
24   Court's attention.  But the important point there, Your Honor,
25   is December 2020.  It is December 2020.  That is the
```

HCMLPHMIT00002999

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 06/20/25   Page 93 of 262   PageID 3100

285

1   allegation that's being made against Mr. Seery.  And the fact

2   of the matter is, because I've done the research myself, the

3   Court will find that on December 23rd, the day the HarbourVest

4   settlement motion was filed, it was fully public knowledge

5   that Amazon and Apple, I think, had shut down negotiations

6   with MGM at that time.  Right?  So the big secret information,

7   it was in the public domain on December 23rd.

8       There will also never be any evidence ever that Mr. Seery

9   got on a plane and flew to Dallas in December 2020, but that's

10  a minor point.

11      I'd like to just conclude, Your Honor, by saying I've

12  heard pleas that they understand.  They understand, Your

13  Honor, now they understand.  It would be good if they promised

14  the Court that they won't seek to assert claims against Mr.

15  Seery anywhere but in this Court and comply with the order as

16  it's written.  That, that, that would be taking a little bit

17  of responsibility.

18      I have nothing further, Your Honor.

19          THE COURT:  Okay.  Thank you.

20      All right.  Let me give you some clue of when I'm going to

21  be able to rule.  I've been glancing at my email in hopes that

22  something set tomorrow would go away, but that's not

23  happening.  I've got a hearing that I've been told will take

24  all day tomorrow on a case involving a half-built hotel,

25  luxury hotel in Palm Springs, California.  So I have to spend

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 06/09/25    Page 94 of 262    PageID 3101

286

1    the next I don't know how long getting ready for that hearing

2    tomorrow, and then I have what looks like a full day of

3    hearings Thursday, including you people coming back on

4    something.

5             MR. POMERANTZ:  Your Honor, I was going to address

6    that.  We have Dugaboy's motion to enforce compliance on the

7    2015(3) reports.

8             THE COURT:  That's what it was.

9             MR. POMERANTZ:  Since we haven't gotten to the motion

10   to modify the Seery order, my suggestion would be we use that

11   time -- of course, Dugaboy, I'm not sure if they're on the

12   phone.  They're not here.  I'm not sure that's time sensitive.

13   But if Your Honor wanted to have a hearing on that motion,

14   which was contemplated to take place today, the Debtor would

15   be okay having that motion heard on Thursday, perhaps by

16   WebEx, unless Your Honor wants us to stay here, which we would

17   if you do, and then reschedule the 2015(3) motion.

18         But again, that wasn't my motion.  It's Dugaboy's.  I'm

19   not sure Mr. Draper is on.  But we obviously have some

20   calendar issues.

21            MR. MORRIS:  And Your Honor, just to complete it, I

22   think also on Thursday the Court is supposed to hear HCRE and

23   Highland Capital Management Services motions for leave to

24   amend their complaint in the promissory note litigation

25   against each of them.  I think that's also on the calendar for

001952

HCMLPHMIT00003001

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Filed 08/01/25   Page 95 of 262   PageID 3102

287

```
 1   Thursday.  I don't expect that -- I hope that doesn't take
 2   very long, but that's also, I believe, on the calendar.
 3              THE COURT:  Okay.  Mr. Draper, are you out there?
 4              MR. PHILLIPS:  I didn't see him on the list, Your
 5   Honor.  I was just looking.  But --
 6              THE COURT:  Okay.  All right.  Well, --
 7              MR. PHILLIPS:  What is the question?  I can send him
 8   a text real quick.
 9              THE COURT:  Well, just have -- if you all could
10   follow up with Traci Ellison, my courtroom deputy, tomorrow, I
11   am perfectly happy to continue the motion to modify the Seery
12   order to Thursday morning at 9:30 if Draper is willing to
13   continue the 2015 motion.
14              MR. POMERANTZ:  I know, if I was him, my first
15   question would be is what times does the Court have available?
16   We could work that through Ms. Ellison.
17              THE COURT:  Yes.  And I'm just letting you know --
18   talk to her.  Okay.  Number one, I'll do these by video, okay?
19   WebEx.  But I know I don't have any time Wednesday, and
20   Thursday's a busy day.
21      We have court Friday morning at 9:30 in--?
22              THE CLERK:  Cici's Pizza.
23              THE COURT:  Cici's Pizza?  That's not going to take
24   very long, right?
25              THE CLERK:  I don't think so.
```

001953

HCMLPHMIT00003002

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-71   Page 289 of 299   Page 96 of 262   PageID 3103

288

```
1              THE COURT:  I can potentially do something, you know,
2    10:00 o'clock Friday morning.  Other than that, then you've
3    got to wait a while, because I have a seven-day trial, live
4    human beings in the courtroom starting next Monday.  And so my
5    point is mainly to tell you, as much as I would like to rule
6    very, very fast, it's going to be, it looks like, a couple of
7    weeks or so before I can give you a ruling on this.
8              MR. BRIDGES:  Your Honor?
9              THE COURT:  Yes?
10             MR. BRIDGES:  May I?  It's our motion.  I would
11   propose, if counsel would agree, that we just submit it on the
12   papers.
13             THE COURT:  Everybody good with that?  I'm certainly
14   good with that.
15             MR. POMERANTZ:  Your Honor, I'd like there to be
16   argument.  I have a lengthy argument.  I think I'd like to
17   address a number of the things that -- Mr. Bridges made his
18   argument today.  Okay?
19             THE COURT:  Okay.
20             MR. POMERANTZ:  His deck, it was entitled, Motion to
21   Modify.
22             THE COURT:  Okay.
23             MR. POMERANTZ:  So that's very nice of him, but I
24   would like to make my argument.
25             THE COURT:  Okay.  Let's try to nail this down right
```

HCMLPHMIT00003003

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 64-71    Filed 02/20/25    Page 97 of 262    PageID 3104

Exhibit 71    Page 290 of 299

289

```
 1    now.  Friday at 10:00 o'clock, can we do the oral argument
 2    WebEx?
 3              MR. POMERANTZ:  On that one, yes, Your Honor.
 4              THE COURT:  On that one?  Everybody good?  Okay.  So
 5    we'll come back Friday, 10:00 o'clock, WebEx, for that motion.
 6        You know, I'm going to say a couple of things where --
 7    I've leaned toward thinking this is a pretty simple motion
 8    before me, the motion for contempt, but when people offer into
 9    evidence documents, I read your documents.  Okay?  That's my
10    duty.  And so I have however many exhibits I admitted today
11    that I am going to look at and see how they sway me one way or
12    another on this issue.  But I will tell you that my gut is
13    there has been contempt of court.  Okay?  I don't see anything
14    ambiguous at all about Paragraph 5 of my July 16th, 2020
15    order.  Somebody may think I overreached, but if that was the
16    case, someone should have argued at the time I was
17    overreaching.  Someone should have appealed the order.  And I
18    think it's a *Shoaf/Espinosa* problem at this point for anyone
19    to argue about the enforceability of that order.
20        I think there's nothing ambiguous in the wording.  Pursue
21    is not ambiguous.  There's nothing confusing about the
22    requirement that any entity who wanted to sue or pursue a
23    claim, you know, commence claim, pursue a claim against Mr.
24    Seery, had to come to the Bankruptcy Court.  Standard-fare
25    gatekeeping order.
```

001955

HCMLPHMIT00003004

Case 19-34054-sgj11    Doc 4255-71    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 4-71    Filed 09/09/299    Page 98 of 262    PageID 3105

290

```
 1      So what I'm going to be looking at is, do these documents
 2   I admitted into evidence change my view on that, and then the
 3   harder question is who of the alleged contemnors am I going to
 4   think it's clear and convincing committed contempt and -- who
 5   are the contemnors, and then, of course, what are the damages?
 6   Coercive or compensatory damages?
 7      So, again, you know how I feel, to the extent that's
 8   helpful in your planning purposes.  I'm pretty convinced
 9   contempt of court has occurred.  It's just a matter of who's a
10   contemnor and what are the damages.
11      I'll say a couple of remaining things.  I continue to be
12   frustrated, I think was the word people used, about
13   unproductive ways we all spend our time.  I am going to spend
14   I don't know how many more hours drafting another ruling on a
15   contempt motion, and attorneys' fees are through the roof.
16   And, you know, I dangled out there a question I couldn't
17   resist about MGM.
18      And I will tell you, I mean, someone mentioned about their
19   stomach aching.  Personal story, I could hardly sleep the
20   night it became public about the Amazon purchase, because,
21   silly me, maybe, I'm thinking game-changer.  This is such
22   potentially a windfall, an economic windfall.  Maybe this
23   could be the impetus to make everyone get in a room and say
24   look, we've got this wonderful windfall of money.  I don't
25   know how much is owned directly or indirectly by the Debtor of
```

001956

HCMLPHMIT00003005

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-71   Filed 09/29/2299   Page 99 of 262   PageID 3106

291

```
1    MGM stock.  I don't know how much the Debtor  manages.  I

2    don't know how much, you know, some other entity.  I know it's

3    probably spread out in many different entities.  But I know, I

4    know because I listen, that one or more of the Highland-

5    managed CLOs has some of this, and I think I read -- remember

6    that HCLOF, which now Highland owns more than 50 percent of,

7    has some of this stock.  Right?

8              MR. DONDERO:  Do you want to know what happened?

9              THE COURT:  Oh.

10             A VOICE:  No.

11             THE COURT:  Well, okay.  So, you know, I can

12   understand I'm getting into maybe uncomfortable territory in a

13   public proceeding, so I'll stop.

14       But, you know, do we need to set up a status conference?

15   Do you all need to like talk about this?  Am I just being

16   naïve?  Couldn't this be a game-changer, where maybe it would

17   give new incentive to --

18             MR. POMERANTZ:  Your Honor, I would -- he's been

19   pretty quiet through the whole hearing, Mr. Clemente.  He has

20   the Committee, that a couple of people you've heard have sold

21   claims.  They're now held by other parties.

22       You know, the door is always open.  I don't think this is

23   going to be game-changer, unfortunately.  We would like

24   nothing more, as Debtor's counsel.  We don't enjoy coming to

25   Your Honor for contempt hearings.
```

001957

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 02/03/25   Page 100 of 262   PageID 3107

292

1      Mr. Clemente said that it was productive.  We would sure

2   participate.  But right now, we have creditors who are very

3   angry that millions and millions of dollars have been spent on

4   really a waste of time and a waste of the Court's time and a

5   waste of everyone's time and eating into the creditors' money.

6   So I would ask Mr. Clemente to address that.

7          MR. CLEMENTE:  I'm here.

8          THE COURT:  Yes, he's way in the back, hoping to be

9   ignored.

10          MR. CLEMENTE:  It's too cold, Your Honor, where I was

11   sitting.  For the record, Your Honor, --

12          THE COURT:  I noticed some entity called Muck

13   Holdings bought HarbourVest, according to the docket.

14          MR. CLEMENTE:  That's correct.  Muck Holdings bought

15   HarbourVest, and I believe also the Acis claim, and then

16   there's a different entity that bought the Redeemer claim.

17          THE COURT:  Uh-huh.

18          MR. CLEMENTE:  So, as we mentioned in our -- one of

19   our pleadings, I think it was the retention pleading for

20   Teneo, the Committee consists of two members currently, Meta-e

21   and UBS.

22          THE COURT:  Uh-huh.

23          MR. CLEMENTE:  Obviously, Your Honor just approved

24   the UBS settlement recently.  The U.S. Trustee is aware of the

25   make-up of the Committee, and is currently comfortable with

001958

HCMLPHMIT00003007

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-71   Filed 09/04/25   Page 101 of 262   PageID 3108

293

```
 1    the Committee maintaining a two-person membership at this
 2    point.
 3        In terms of whether the MGM transaction is a game-changer,
 4    we've not yet seen, to Your Honor's point, how all of that
 5    rolls up through the various interests that the Debtor may or
 6    -- you know, may have --
 7            THE COURT:  Okay.
 8            MR. CLEMENTE:  -- that would be implicated by the MGM
 9    transaction.  If ultimately the MGM transaction has to
10    actually occur, right?  I mean, so, you know, just based on
11    what I read in the public documents, we're not sure when that
12    transaction may actually happen.  But obviously it's a good
13    thing for the Debtor's estate because it's going to recognize
14    value for the estate.
15        In terms of whether it ultimately changes how Mr. Dondero,
16    you know, wishes to proceed, that's entirely up to him, Your
17    Honor.  But we don't see it as something at this point that
18    would suggest that there's an overall back to let's talk about
19    a pot plan because of where the MGM transaction might
20    ultimately come out.
21        So I don't know if that's helpful to Your Honor, but those
22    are -- that's my perspective.
23            THE COURT:  Well, and I'm not trying to, you know,
24    push a pot plan on anyone.
25            MR. CLEMENTE:  No, I understand.
```

HCMLPHMIT00003008

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K     Document 84-71   Filed 06/20/25   Page 102 of 262     PageID 3109

294

```
 1              THE COURT:  I'm just saying it looked like an
 2   economic windfall.  I just -- I don't know how much is
 3   Highland versus other entities in the so-called byzantine
 4   complex, but, gosh, I just hoped that there might be something
 5   there to change the dynamic of, you know, lawsuit, lawsuit,
 6   lawsuit, lawsuit, motion for contempt, motion for contempt.
 7              MR. CLEMENTE:  Agreed, Your Honor.
 8              THE COURT:  Uh-huh.
 9              MR. CLEMENTE:  And like I said, it was a very
10   positive development obviously for the creditors for the
11   Debtor.  But whether it's the game-changer that Your Honor
12   would envision, I'm not sure that I can suggest at this point
13   that it is.
14       I think that, you know, obviously, we don't like to see
15   these lawsuits continue to be filed.  That's the whole point
16   of the gatekeeper order, Your Honor.
17              THE COURT:  Uh-huh.
18              MR. CLEMENTE:  I didn't say anything during the
19   hearing, but obviously the January 9th order, as Your Honor
20   has said many times, was in the context of a trustee being
21   appointed.
22              THE COURT:  Right.  Right.
23              MR. CLEMENTE:  Right?  So, and the July 16th order,
24   very similar vein, it's an outshoot of that.  In fact, it was
25   contemplated in the January 9th settlement that a CEO could be
```

001960

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-71   Filed 02/00/25 299 Page 103 of 262    PageID 3110
Exhibit 71   Page 299 of 299

295

1   appointed.

2        So I think, again, it's just -- it's important, the

3   context in which that January 9th order came into play, for

4   this very reason, so we could avoid this type of litigation,

5   Your Honor.

6              THE COURT:  Uh-huh.

7              MR. CLEMENTE:  And so again, I didn't -- I obviously

8   didn't rise to mention that during the hearing, but Your Honor

9   is already aware of that.  I didn't need to remind Your Honor

10  of that.

11             THE COURT:  Uh-huh.  Okay.

12             MR. CLEMENTE:  Anything else for me, Your Honor?

13             THE COURT:  No.  Thank you.

14             MR. CLEMENTE:  Okay, then, Your Honor.

15             THE COURT:  Sorry I picked on you.  But, all right.

16  Well, again, I hope the message has landed in the way I hope

17  will matter, and that is I'm going to look at your documents

18  but I feel very strongly that, unless there's something in

19  there that, whoa, is somehow eye-opening, I'm going to find

20  contempt of court.  It's just a matter of who and what the

21  damages are.  There's just not a thing in the world ambiguous

22  about Paragraph 5 of the July 9th, 2020 order.  So I'll get to

23  it as soon as we humanly can get to it.

24        Mr. Morris, anything else?

25             MR. MORRIS:  Nothing.  No, thank you.

001961

HCMLPHMIT00003010

Case 19-34054-sgj11   Doc 4255-71   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K     Document 84-71   Filed 09/09/25   Page 104 of 262     PageID 3111

296

```
1            THE COURT:  I guess I'll see you Thursday on the

2    WebEx.  Thank you.

3            THE CLERK:  All rise.

4        (Proceedings concluded at 6:00 p.m.)

5                         --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    /s/ Kathy Rehling                      06/09/2021

24   _____    _____
     Kathy Rehling, CETD-444                    Date
25   Certified Electronic Court Transcriber
```

297

INDEX

PROCEEDINGS                                                              4

OPENING STATEMENTS (Show Cause)
- Mr. Morris                                                             21
- Mr. Sbaiti                                                             31
- Mr. Bridges                                                            52
- Mr. Anderson                                                           80
- Mr. Phillips                                                           83
- By Mr. Taylor                                                          87
- By Mr. Pomerantz                                                       88

WITNESSES

Debtor's Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                                       95
- Cross-Examination by Mr. Anderson                                     132
- Cross-Examination by Mr. Sbaiti                                       135
- Redirect Examination by Mr. Morris                                    137
- Examination by the Court                                              138
- Recross-Examination by Mr. Sbaiti                                     142
- Recross-Examination by Mr. Phillips                                   143
- Further Redirect Examination by Mr. Morris                            144

James D. Dondero
- Direct Examination by Mr. Morris                                      147
- *Voir Dire* Examination by Mr. Sbaiti                                 184
- Direct Examination (Resumed) by Mr. Morris                            199
- Cross-Examination by Mr. Taylor                                       210

EXHIBITS

Debtor's Exhibits 1 through 11                      Withdrawn 215
Debtor's Exhibits 12 through 53                      Received 216
Debtor's Exhibits 15 and 16                          Received 214
Debtor's Exhibits 23 and 24                          Received 213
Debtor's Exhibits 54 and 55                          Received 217

Mark Patrick's Exhibits 1, 3 through 12,             Received 218
15 through 28, and 30 through 44

Mark Patrick's Exhibits 45 and 46                    Received 219

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

001963

HCMLPHMIT00003012

298

1                                  INDEX
                                  Page 2
2

3       CLOSING ARGUMENTS

4       - Mr. Morris                                         221
        - Mr. Sbaiti                                         230
5       - Mr. Bridges                                        255
        - Mr. Anderson                                       263
6       - Mr. Phillips                                       267
        - Mr. Taylor                                         276
7       - Mr. Morris                                         279

8       RULINGS

9       Motion for Entry of an Order Further Extending the Period   19
        Within Which It May Remove Actions Pursuant to 28 U.S.C.
10      § 1452 and Rule 9027 of the Federal Rules of Bankruptcy
        Procedure filed by Debtor (2304)
11

12      Show Cause Hearing (2255) - *Taken Under Advisement*        285

13      Motion to Modify Order Authorizing Retention of James      285
        Seery filed by Plaintiffs CLO Holdco, Ltd., The
14      Charitable DAF Fund, L.P. (2248) - *Taken Under Advisement*

15      END OF PROCEEDINGS                                         296

16      INDEX                                                  297-298

17

18

19

20

21

22

23

24

25

001964

HCMLPHMIT00003013

**EXHIBIT 72**

001965

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | June 8, 2023 |
|  | ) | 9:30 a.m. Docket |
| Reorganized Debtor. | ) |  |
|  | ) | HMIT'S MOTION FOR LEAVE TO |
|  | ) | FILE VERIFIED ADVERSARY |
|  | ) | PROCEEDING (3699) |
|  | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Reorganized Debtor: | John A. Morris |
| | Gregory V. Demo |
| | Hayley R. Winograd |
| | PACHULSKI STANG ZIEHL & JONES, LLP |
| | 780 Third Avenue, 34th Floor |
| | New York, NY  10017-2024 |
| | (212) 561-7700 |
| | |
| For the Reorganized Debtor: | Jeffrey Nathan Pomerantz |
| | PACHULSKI STANG ZIEHL & JONES, LLP |
| | 10100 Santa Monica Blvd., 13th Floor |
| | Los Angeles, CA  90067 |
| | (310) 277-6910 |
| | |
| For Hunter Mountain Investment Trust: | Sawnie A. McEntire |
| | Timothy J. Miller |
| | PARSONS MCENTIRE MCCLEARY, PLLC |
| | 1700 Pacific Avenue, Suite 4400 |
| | Dallas, TX  75201 |
| | (214) 237-4303 |
| | |
| For Hunter Mountain Investment Trust: | Roger L. McCleary |
| | PARSONS MCENTIRE MCCLEARY, PLLC |
| | One Riverway, Suite 1800 |
| | Houston, TX  77056 |
| | (713) 960-7305 |

001966

HCMLPHMIT00003014

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-1   Filed 09/30/25   Page 109 of 262   PageID 3116
Exhibit 72   Page 89 of 390

2

```
 1   APPEARANCES, cont'd.:

 2   For Hunter Mountain          Deborah Deitsch-Perez
     Investment Trust:            STINSON
 3                                2200 Ross Avenue, Suite 2900
                                  Dallas, TX  75201
 4                                (214) 560-2218

 5   For Muck Holdings, et al.:   Brent Ryan McIlwain
                                  HOLLAND & KNIGHT, LLP
 6                                300 Crescent Court, Suite 1100
                                  Dallas, TX  75201
 7                                (214) 964-9481

 8   For James P. Seery, Jr.:     Mark Stancil
                                  Joshua Seth Levy
 9                                WILLKIE FARR & GALLAGHER, LLP
                                  1875 K Street, NW
10                                Washington, DC  20006
                                  (202) 303-1133
11
     Recorded by:                 Michael F. Edmond, Sr.
12                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
13                                Dallas, TX  75242
                                  (214) 753-2062
14
     Transcribed by:              Kathy Rehling
15                                311 Paradise Cove
                                  Shady Shores, TX  76208
16                                (972) 786-3063

17

18

19

20

21

22

23

24
           Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

001967

HCMLPHMIT00003015

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-7 72 Filed 04/09/25390   Page 110 of 262   PageID 3117

3

```
 1              DALLAS, TEXAS - JUNE 8, 2023 - 9:42 A.M.
 2         THE CLERK:  All rise.  United States Bankruptcy Court
 3    for the Northern District of Texas, Dallas Division, is now in
 4    session, The Honorable Stacey Jernigan presiding.
 5         THE COURT:  Good morning.  Please be seated.  All
 6    right.  We are here this morning for a setting in Highland.
 7    This is on a motion of Hunter Mountain for leave to file an
 8    adversary proceeding.  I will start out by getting appearances
 9    from lawyers in the courtroom.
10         MR. MCENTIRE:  Yes, Your Honor.  Sawnie McEntire
11    along with my partner Roger McCleary and Tim Miller on behalf
12    of Hunter Mountain Investment Trust, Ltd.
13         THE COURT:  Thank you.
14         MR. MORRIS:  Good morning, Your Honor.  John Morris,
15    Pachulski Stang Ziehl & Jones, for the Reorganized Highland,
16    for the Highland Claimant Trust.  I'm joined by Mr. Pomerantz,
17    Mr. Demo, and Ms. Winograd.
18         THE COURT:  Good morning.
19         MR. STANCIL:  Good morning, Your Honor.  Mark Stancil
20    from Willkie Farr & Gallagher for Mr. Seery.  I'm joined by my
21    colleague Josh Levy.
22         THE COURT:  Good morning.
23         MR. MCILWAIN:  Good morning, Your Honor.  Brent
24    McIlwain from Holland & Knight here for Muck Holding, LLC,
25    Jessup Holdings, LLC, Farallon Capital Management, LLC, and
```

001968

HCMLPHMIT00003016

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-1 72 Filed 06/09/25 390   Page 111 of 262   PageID 3118

4

 1   Stonehill Capital Management, LLC.

 2           THE COURT:  Thank you.  All right.  Is that all of

 3   our lawyer appearances?  I know we have observers on the

 4   WebEx, but I assume you are just observers.  We scheduled this

 5   to be a live hearing for participants.

 6      All right.  Well, we had some ground rules for how this

 7   would go forward today.  We, of course, have had two -- I call

 8   them hearings on what kind of hearing we're going to have.

 9   We've had two status conferences.  And so our ground rules

10   were set.  Three hours of total presentation time for each the

11   Movant and the aggregate Respondents.  We also had an order

12   regarding what discovery would or would not be allowed.

13      And to my surprise, there were a flurry of pleadings.

14   We're a few minutes late getting out here because we were

15   trying to digest what was filed late yesterday and into the

16   night.

17      So I understand we have a controversy about a couple of

18   expert witnesses who were listed on Monday on the Movants'

19   exhibit and witness list.  And I've seen a motion to exclude

20   the expert witnesses' testimony.  And I think we need to

21   address that right off the bat.  I don't want to take too much

22   time on this, because, again, we're going to finish today, and

23   I won't let this housekeeping matter eat into our three hours,

24   but I want to get going.  So I'll hear from Movant, Mr.

25   McEntire.

001969

HCMLPHMIT00003017

```
 1              MR. STANCIL:  Your Honor, may --

 2              THE COURT:  Go ahead.

 3              MR. STANCIL:  We moved to exclude, so I would propose

 4    that my colleague, Mr. Levy, address this motion very briefly

 5    if --

 6              THE COURT:  Well, I guess --

 7              MR. STANCIL:  Or I will do as --

 8              THE COURT:  -- that actually makes sense.

 9              MR. STANCIL:  Okay.

10              THE COURT:  I was thinking Mr. McEntire teed up the

11    issue, but I suppose you did with the motion to exclude.  So,

12    Counsel?

13              MR. LEVY:  Thank you, Your Honor.  Josh Levy on

14    behalf of Mr. Seery.

15         So, we think our papers largely speak for themselves, but

16    two additional points we'd like to raise.  In the response

17    filed by Hunter Mountain this morning, and this is Docket

18    Entry 3828, in Paragraph 11, they argue that this is a bench

19    hearing on colorability, not a trial where junk science is a

20    concern.  But junk science is precisely what they're trying to

21    introduce here.  They have raised two expert witnesses, one

22    who purports to be an expert in compensation but has no

23    experience whatsoever in evaluating compensation, and they

24    provide no methodology for their conclusion.

25         For example, they claim to have identified red flags.
```

001970

HCMLPHMIT00003018

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-7  Exhibit 72  Filed 09/09/25   Page 113 of 262   PageID 3120

6

1    They never explain what those red flags are, why they are red

2    flags, or how they determined they were red flags.  This is

3    junk science, precisely what the Federal Rules are designed to

4    exclude.

5         But that shouldn't detract from the broader procedural

6    point that this is the first time we're hearing about expert

7    witnesses, at 10:00 p.m. three days before the hearing.  This

8    is a trial by ambush.  This motion was filed in March, we've

9    been litigating this motion for over two months now, and this

10   is the first time we're hearing about any expert witnesses.

11        As Your Honor noted, we've had multiple conferences.

12   We've had rules setting the ground rules for this hearing.

13   We've had orders setting the scope of discovery.  But now

14   Hunter Mountain is trying to pull a bait-and-switch.  After

15   never mentioning any experts, after obtaining orders limiting

16   the scope of discovery, they then wait until right before the

17   hearing to disclose their experts, ensuring that these experts

18   are insulated from any kind of discovery and can ambush us at

19   the hearing.

20        I'm happy to answer any other questions, but we believe

21   they should be excluded and the accompanying exhibits should

22   also be excluded.

23             THE COURT:  All right.  Thank you.  And the

24   accompanying exhibits, I don't review exhibits before a trial

25   or a hearing because I don't know what's going to be objected

001971

HCMLPHMIT00003019

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 34-1    Exhibit 72    Filed 09/30/25    Page 114 of 262    PageID 3121

7

1   to and admitted.  So do you want to point out, were there

2   expert reports in the proposed exhibits?

3           MR. LEVY:  These were charts and analyses prepared by

4   their experts, not actual expert reports.

5           THE COURT:  Okay.

6           MR. LEVY:  In their witness and exhibit list, Hunter

7   Mountain included several paragraphs that I guess serves as

8   what would be their expert reports.  And then it would be

9   Exhibits 39 through 52, which consist of CVs, materials

10  reviewed, and then what they term "data charts" prepared by

11  their experts.

12          THE COURT:  39 through 52?  Oh, I'm looking at the

13  wrong exhibit notebook.  Oh.

14      (Pause.)

15          THE COURT:  Okay.  Here we go.  All right.  No

16  questions at this time.

17      Mr. McEntire?

18          MR. MCENTIRE:  Yes, Your Honor.  May I proceed?

19          THE COURT:  You may.

20          MR. MCENTIRE:  Again, my presentation and response is

21  subject to our objection concerning that any evidence is being

22  admitted for any purpose, other than what we believe is the

23  proper standard of review.  So my response and our offer of

24  these experts is subject to that objection.

25      With that said, Mr. Levy's argument he just presented to

001972

HCMLPHMIT00003020

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 34-17 72Filed 09/09/390    Page 115 of 262    PageID 3122

8

 1 | the Court presupposes that my client has a duty under 9014 to

 2 | provide a report, which we do not; to provide detailed

 3 | disclosures, which we do not, because 9014 is specifically

 4 | exempted from the scope of Rule 26.  What we did, we didn't

 5 | have to do.  What we did, and I made the decision to provide

 6 | them some disclosure and identification of who they were,

 7 | their backgrounds, and --

 8 |           THE COURT:  Well, let me stop you.

 9 |           MR. MCENTIRE:  Certainly.

10 |           THE COURT:  "What we did, we didn't have to do."  The

11 | Local Rules, first of all, do require an exhibit and witness

12 | list.  And --

13 |           MR. MCENTIRE:  We've provided that.

14 |           THE COURT:  I know.  I know.  But you -- I thought I

15 | heard you --

16 |           MR. MCENTIRE:  No, no.

17 |           THE COURT:  -- saying you didn't have to do that.

18 | You do have to do that.

19 |           MR. MCENTIRE:  No, no, no.

20 |           THE COURT:  But I guess what you're saying is --

21 |           MR. MCENTIRE:  What we provided was more than what

22 | the Local Rules require.

23 |           THE COURT:  How so?

24 |           MR. MCENTIRE:  We provided CVs.  We provided their

25 | backgrounds.  We disclosed in the actual witness description

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 7-72   Filed 09/09/25   Page 116 of 262    PageID 3123

9

1   who they were and the key components of their opinions.  And

2   we refer to their data charts.  That is not something that the

3   Local Rule requires.

4           THE COURT:  Okay.  Well, let me back up.  We have our

5   Local Rules, but then we had our two status conferences --

6           MR. MCENTIRE:  Yes.

7           THE COURT:  -- on what the format of the hearing --

8           MR. MCENTIRE:  Yes.

9           THE COURT:  -- would be.

10           MR. MCENTIRE:  Yes.

11           THE COURT:  And, of course, there was extensive

12   discussion, evidence or no evidence?  What did the legal

13   standard, colorability, require?

14           MR. MCENTIRE:  Yes.

15           THE COURT:  And I came out in the end and said, if

16   people want to put on witnesses, they're entitled to put on

17   witnesses.  I think there may be a mixture of a fact question

18   and law question on colorability.  So, and then I set a three-

19   hour time limit and I said, if someone wants to depose Mr.

20   Seery and Mr. Dondero, they can, but no more discovery other

21   than that.  Okay?

22           MR. MCENTIRE:  I understand.

23           THE COURT:  Why then did you not say, well, wait,

24   Judge, if it's going to be evidence, we're just letting you

25   know, in full disclosure, we might call a couple of experts,

HCMLPHMIT00003022

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 31-7 72 Filed 07/09/25390    Page 117 of 262    PageID 3124

10

1    and this may impact your decision on what kind of discovery

2    can happen.  And this may impact your decision on whether

3    three hours each side is enough.

4         MR. MCENTIRE:  Well, Your Honor, in fairness, I don't

5    think we had made a final decision to actually designate any

6    experts.  And at the time, the focus was on other witnesses.

7    But there was no exclusion, there was no limitation at all on

8    my right to bring an expert.  And the Rules are very clear.

9    And the Court's --

10         THE COURT:  But I specifically limited discovery, and

11    it was on your motion.  It was on your motion we set the

12    hearing on --

13         MR. MCENTIRE:  Actually, --

14         THE COURT:  You know, did you need a continuance,

15    because if we were going to have evidence, maybe you needed a

16    continuance.  And then there was a discovery issue raised.

17         MR. MCENTIRE:  To be clear, Your Honor, I'm looking

18    at your orders.

19         THE COURT:  Got them in front of me.

20         MR. MCENTIRE:  Your order of May 26, 2023.  You said,

21    You can put on your witnesses and the Court is going to rule.

22    You made no limitations as to who the witnesses would be.

23    Your order did not limit the scope of witnesses to simply Mr.

24    Seery or Mr. Dondero.  In fact, any suggestion that you did

25    limit the witnesses is contrary --

HCMLPHMIT00003023

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 172    Filed 07/29/25    Page 118 of 262    PageID 3125

11

```
1              THE COURT:  Now, which order are you looking at?

2              MR. MCENTIRE:  I'm looking at the May 26, 2023 order,

3    Page 51, Lines 3 through 14.

4              THE COURT:  Okay.

5              MR. MCENTIRE:  You also stated --

6              THE COURT:  I have -- have I entered three orders on

7    this?  I've got a May 10th order.  I've got a May 22nd order.

8              MR. MCENTIRE:  And I would also point out, Your

9    Honor, --

10             THE COURT:  Could you answer my question?  I want to

11   look at what you're looking at.

12             MR. MCENTIRE:  Certainly.

13             THE COURT:  Here we -- this is the one.  Okay.  Aha.

14   Okay.  May 26.

15             MR. MCENTIRE:  Page 51, Lines 3 through 14.

16             THE COURT:  I've entered three orders on what kind of

17   hearing we're going to have.  Okay.  So you're looking where?

18             MR. MCENTIRE:  Page 51, Lines 3 through 14.  "You can

19   put on your witnesses."

20             THE COURT:  Page 51?

21             MR. MCENTIRE:  Yes, ma'am.

22             THE COURT:  Oh.  You're looking at a transcript, not

23   the order.

24             MR. MCENTIRE:  That's right.  I apologize.

25             THE COURT:  Okay.
```

HCMLPHMIT00003024

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 31-72   Filed 07/09/25   Page 119 of 262   PageID 3126

12

1           MR. MCENTIRE:  Yeah, I'm looking at the transcript

2     from the hearing.

3           THE COURT:  Okay.  Well, I'm looking at my order.

4           MR. MCENTIRE:  And the order, the order also

5     specifies no limitation at all in connection with the -- the

6     --

7           THE COURT:  But my order was based on what was

8     discussed that day.

9           MR. MCENTIRE:  And what was --

10          THE COURT:  If you had said, hmm, Judge, if you're

11    going to allow evidence, we may call a couple of experts, then

12    there would have been a whole discussion about that and did I

13    need to limit the discovery, as I did.  And there would have

14    been a whole discussion of, well, three hours, three hours

15    each side, is that going to be enough if we have experts?

16          MR. MCENTIRE:  The discovery ruling that you made was

17    on my motion, and at the time I was not seeking to take any

18    expert depositions.  And you denied my request to take ample

19    discovery.  You limited my right to take only one deposition,

20    without documents.

21        The issue of taking expert discovery was not even on the

22    table.  However, you made it very --

23          THE COURT:  Well, that's my point precisely.  The

24    whole purpose of the hearing was, what kind of hearing are we

25    going to have on June 8th?

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 11-72   Filed 07/09/25   Page 120 of 262   PageID 3127

13

1          MR. MCENTIRE:  I understand.  And our position --

2          THE COURT:  We had already had one status conference

3    on argument only versus evidence.  And I allowed you all to

4    file some briefing, which you did.  And then I issued an order

5    after the briefing, saying, I think I should allow evidence on

6    the colorability question.  I'm not forcing anyone to put on

7    evidence, but if you want to put on evidence, you can.

8      And then you filed your motions and we had the next status

9    conference on what kind of hearing we're going to have.  And

10   there was more argument:  We don't think the evidence is

11   appropriate, but if evidence is appropriate, we want you to

12   continue the hearing to allow all kinds of discovery.  I don't

13   know what.  And it was right before Memorial Day, and I hated

14   the fact that a bunch of subpoenas were going to go out and

15   ruin people's holidays.  But there was no discussion then of,

16   okay, but just so you know, since you have made the ruling

17   that evidence can come in, we're going to have a couple of

18   experts.

19         MR. MCENTIRE:  As I've already mentioned, Your Honor,

20   we had not made a decision to call experts at that time.  We

21   made a decision to call the experts shortly before we filed

22   our designations.

23     The point here is this.  The Rules do not require me to

24   provide any more disclosure than I have.  I have gone over and

25   above the Local Rules.

HCMLPHMIT00003026

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 17-2 Filed 07/09/25   Page 121 of 262   PageID 3128
Exhibit 72   Page 15 of 390

14

```
 1        If the Court believes that it would have allowed more time
 2   for this hearing, I would advise the Court that opposing
 3   counsel vehemently opposed any type of postponement or
 4   continuance.  The discovery that I was requesting was
 5   discovery from fact witnesses.  Experts were not at issue at
 6   that time.  Experts are --
 7             THE COURT:  Because --
 8             MR. MCENTIRE:  -- at issue now.
 9             THE COURT:  -- nobody knew that experts might be
10   called.
11             MR. MCENTIRE:  I have a right to call experts, Your
12   --
13             THE COURT:  It changes the whole complexion.
14             MR. MCENTIRE:  But I have a right to call experts,
15   under the Rules.  I have a right, a fundamental due process --
16   let me -- may I finish, Your Honor?  A fundamental due process
17   right to call experts.  Their attempt to charge some type of
18   Daubert challenge is nothing but a shotgun blast on the wall,
19   having no meaning at all.  At a minimum, I have a right to put
20   the witnesses on the stand and we'll have a Daubert hearing.
21        If they want more time, they need to ask for it.  They
22   didn't ask for it.  Their solution is to strike my experts,
23   which is improper.  It would be improper for this Court to
24   strike my experts when they have been properly tendered under
25   the Local Rules.  They have not cited an alternative remedy.
```

001979

HCMLPHMIT00003027

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K     Document 72   Filed 07/09/25   Page 122 of 262     PageID 3129
Exhibit 72  Page 16 of 390

15

```
 1   If they want the alternative remedy, they need to ask the

 2   Court.

 3             THE COURT:  My next question is:  How do you propose

 4   to get this all done in only three hours?

 5             MR. MCENTIRE:  We intend to move quickly.

 6             THE COURT:  But, see, now they, I'm guessing,

 7   prepared their case assuming there weren't going to be

 8   experts.  And they, if they're good lawyers, which I know you

 9   all are, they have their script of the kind of things they

10   were going to ask the witnesses.

11             MR. MCENTIRE:  Well, did they have a --

12             THE COURT:  And now they've got to carve out time for

13   two last-minute experts?

14             MR. MCENTIRE:  They had an option.  And one of the

15   options was they could have called me up on Tuesday and asked

16   for their depositions and I probably would have agreed.

17             THE COURT:  I already said no depositions except

18   Seery and Dondero.

19             MR. MCENTIRE:  Then they could have come and filed a

20   different kind of motion with the Court.

21        Their only remedy that they're seeking is a draconian one.

22   There are other options that are more consistent with the

23   implementation of due process here, Your Honor, not striking

24   my experts, which were properly identified under the Local

25   Rules.
```

HCMLPHMIT00003028

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 172   Filed 07/09/25   Page 123 of 262   PageID 3130

16

```
 1        If the Court is going to strike my experts, note our

 2   objection.  We are tendering our experts.  We will put -- like

 3   to put a proffer on for the Fifth Circuit or for the appellate

 4   process.  But if the Court is going to strike our experts,

 5   then it needs to do so.  We object because we have done

 6   everything correctly.

 7            THE COURT:  Okay.  Here's another problem.  I have

 8   not had time to process their motion to exclude.  Beyond the

 9   procedural issues, they are saying junk science, that there's

10   inadequate expertise on the part of I guess at least one of

11   them regarding executive compensation.  I haven't had -- they

12   filed their motion to exclude at 4:00-something yesterday.

13   Okay?

14            MR. MCENTIRE:  I understand.

15            THE COURT:  Now, yeah, I could have stayed up all

16   night.  I stayed up pretty late anyway, by the way.  But --

17            MR. MCENTIRE:  Well, first of all, --

18            THE COURT:  -- I haven't even had the time to process

19   and intelligently rule on their motion --

20            MR. MCENTIRE:  I appreciate that, and I'll respect --

21            THE COURT:  -- as far as the --

22            MR. MCENTIRE:  I'll respect the Court's statement.

23            THE COURT:  -- junk science argument.

24            MR. MCENTIRE:  I'll respect the Court's statement.

25   Their process and the procedure they've adopted is improper,
```

HCMLPHMIT00003029

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 72 Filed 06/09/25   Page 124 of 262   PageID 3131
Exhibit 72   Page 891 of 390

17

1   because if you're going to have a *Daubert* hearing, that's a

2   live hearing.  Or they're going to have to have evidence to

3   support their challenge.  This is simply a conclusory shotgun

4   blast on the wall, Your Honor.

5       If you even want to consider a *Daubert* challenge, the

6   proper procedure is to put the witnesses on the stand and have

7   an opportunity to have a proffer of evidence and a cross-

8   examination.  That's the proper procedure.  Throwing something

9   and innuendo and rhetoric and conclusions is not a proper

10  *Daubert* motion at all.  The Court could deny their *Daubert*

11  motion just on those grounds.

12          THE COURT:  I'm not going to rule on a motion that

13  I've barely had a chance to read, not to mention your response

14  that was filed at 8:00-something this morning.

15          MR. MORRIS:  It was.

16          MR. MCENTIRE:  It was.  Well, then the option is you

17  need to continue the proceeding to allow the experts to take

18  the stand.

19          THE COURT:  Well, I know you have thought on that,

20  but here is something I'm contemplating doing.  We'll go

21  forward with the hearing in the manner my order said we would

22  go forward with it.  My, I guess, Order #3 of my three orders.

23  And at the end of the evidence, you can argue in closing, each

24  of you, why we should keep the evidence open to come back

25  another day on only the experts.  But time matters.  If you've

HCMLPHMIT00003030

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 31-72   Filed 07/09/25   Page 125 of 262   PageID 3132

18

1  all already used your three hours on each side, then are we

2  going to come back for five minutes on each of them?  I mean,

3  I don't know.

4      And then, of course, I would have to, if I ruled in that

5  way, I believe I would have to give them a chance to depose

6  these people.

7              MR. MCENTIRE:  I think that would be reasonable.

8              THE COURT:  Okay.  But you think you can get all of

9  your evidence in, other than your experts, and your opening

10  statement, if any, your closing argument, if any, in three

11  hours?

12             MR. MCENTIRE:  I'll do my best.

13             THE COURT:  Well, if you -- it's not a matter of --

14  I'm just saying this may all be an academic argument, because

15  I'm not increasing this to more than three hours each.  We've

16  fully vetted that.

17             MR. MCENTIRE:  Well, what the Court is then doing by

18  virtue of your ruling is that you're making me actually

19  present my evidence in a shortened form today, two hours, two

20  and a half hours, not knowing how -- whether or not you are

21  actually going to allow experts.

22      So, without the certainty, I will have to abbreviate my

23  entire presentation, giving them the advantage of putting more

24  evidence on than I, in an effort to anticipate a positive

25  ruling, which you're not prepared to provide yet.  And so I'm

001983

HCMLPHMIT00003031

1    actually being penalized.

2          THE COURT:  Counsel, we had two status conferences on

3    what kind of hearing we were going to have.

4          MR. MCENTIRE:  I understand.

5          THE COURT:  Now, the fact that you had not decided

6    your strategy for this hearing, that's not my fault.  Again,

7    we had two hearings on what kind of hearing we were going to

8    have today.  We could have fully vetted this.  I could have

9    heard about the experts, I could have decided if we were going

10   to continue the hearing past June 8th, could have decided if

11   we were going to allow more depositions.

12         MR. MCENTIRE:  Your Honor, --

13         THE COURT:  I could have fully studied the merits of

14   the motion to exclude and decided if this is junk science or

15   not.

16         MR. MCENTIRE:  I would request a ruling at this time,

17   Your Honor, on the experts.  If you are not inclined to

18   provide a ruling to me on the experts at this time, I would

19   effectively be penalized on my time limits.  I will have to

20   set aside enough time to put the experts on, not knowing, not

21   knowing whether you're going to give me the opportunity to do

22   so until the end of the day.  And that would be -- that would

23   be punishment.

24         THE COURT:  Isn't this going to be just preparing

25   your case you would have -- I mean, going forward with your

001984

HCMLPHMIT00003032

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 1-72    Filed 09/20/25    Page 127 of 262    PageID 3134

20

1  case the way you would have?

2          MR. MCENTIRE:  No, I don't -- really don't think so.

3  I think there's --

4          THE COURT:  I mean, --

5          MR. MCENTIRE:  There's a difference.

6          THE COURT:  -- you did not prepare your witnesses and

7  your possible cross-examination with the expectation of I'll

8  get my two experts in?

9          MR. MCENTIRE:  My -- of course.  But the point is,

10  then I'm going to have to set aside a half an hour or maybe

11  even longer from my other witness preparations, not knowing

12  whether you'll even give me that time.

13          THE COURT:  Isn't the other side going to have to do

14  the very same thing?

15          MR. MCENTIRE:  No.

16          THE COURT:  Why not?  They don't know how I'm going

17  to rule.  I don't know how I'm going to rule.  I have not

18  studied the motion to exclude the way I should.

19          MR. MCENTIRE:  Okay.  Well, Your Honor, we request a

20  ruling now.  But if the Court is not inclined to do so, please

21  note our objection.

22          THE COURT:  All right.  I'll give the Movants the

23  last word.  And I say "Movants" plural.  I'm trying to

24  remember where I saw a joinder and when I did not.  Did I see

25  a joinder?  I can't remember.

HCMLPHMIT00003033

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 1-72 Filed 09/29/25   Page 128 of 262    PageID 3135
Exhibit 72   Page 229 of 390

21

```
 1              MR. MORRIS:  Can we just have a moment, Your Honor?

 2              THE COURT:  Okay.  Okay.

 3              MR. MCILWAIN:  Your Honor, my clients did file a

 4   joinder, but --

 5              THE COURT:  Okay.

 6              MR. MCILWAIN:  -- I'm going to let them handle this.

 7              THE COURT:  Okay.

 8         (Pause.)

 9              THE COURT:  Counsel?

10              MR. LEVY:  Thank you, Your Honor.  Two brief points

11   we'd like to make.  The first is on the Rules.  So, Hunter

12   Mountain is focused on Rule 26(a) regarding reports.  However,

13   Rule 26(b) applies to contested matters under Rule 9014.  And

14   as we explain in Paragraph -- we explain in our brief, that --

15   or, in Paragraph 19 of our brief, that under Rule 26(b) we're

16   entitled to depose the experts.

17         And so we agree with Your Honor's suggestion that if

18   there's going to be any sort of experts, then we need the

19   opportunity to depose them.  This is Rule 26(b)(4)(A), which

20   expressly does apply to contested matters under Bankruptcy

21   Rule 9014(b).

22         The second point is we agree with the approach Your Honor

23   has proposed.  We think, for today, both sides can put on

24   their full cases without expert witnesses.  Both sides can

25   have the full three hours, which should address Hunter
```

HCMLPHMIT00003034

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 31-72   Filed 09/09/25   Page 129 of 262   PageID 3136
Exhibit 72   Page 239 of 390

22

1 Mountain's concern.  And if Your Honor decides at the

2 conclusion of the hearing that expert testimony would be

3 helpful, then we could take the opportunity to depose their

4 experts and then come back for an additional half-hour for

5 each side to address any expert testimony that Your Honor

6 believes would be helpful.

7         THE COURT:  Okay.  Is your proposal that you each

8 today would be limited to two and a half/two and a half?  Or

9 three/three, and then another hour, 30 minutes/30 minutes, if

10 I --

11         MR. LEVY:  Three/three.

12         THE COURT:  -- decide to allow any experts?

13         MR. LEVY:  Yeah.  Three.  Three and three for each

14 side, the hearing contemplated by Your Honor's orders, today.

15 And if Your Honor decides that expert testimony would be

16 helpful, we could come back for an hour, for half an hour on

17 each side, regarding experts.

18         THE COURT:  All right.  Mr. McEntire, what about

19 that?

20     Oh, I'm sorry, did you --

21         MR. STANCIL:  Oh, I'm sorry.  Just one additional

22 point, Your Honor.  We would ask that Your Honor's ruling on

23 the ultimate admissibility of this be limited to what they've

24 actually put in front of us.  The day for the hearing is

25 today, so I think I'd like -- I'd suspect Your Honor would

HCMLPHMIT00003035

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 7-72    Filed 09/09/25    Page 130 of 262    PageID 3137
Exhibit 72    Page 24 of 390

23

```
 1   like to avoid another raft of submissions.  So we would just
 2   ask that they live or die with what they've said in the way of
 3   methodology, disclosures, and the like.
 4           THE COURT:  Okay.  Mr. McEntire, this seems like the
 5   best of all worlds, maybe.
 6           MR. MCENTIRE:  Well, it may be the best of the worlds
 7   in which we're operating.
 8     My first position is that the experts are admissible,
 9   period.  And the Rules do not require anything more than what
10   we've already done.  In fact, we've done more than we were
11   supposed to.
12           THE COURT:  What is your argument about 26(b)(4),
13   which --
14           MR. MCCLEARY:  If they want to take a deposition,
15   they could have called me up and asked for it.
16           MR. STANCIL:  Your Honor, I was --
17           THE COURT:  Wait a second.  They were under a court
18   order.  Okay?
19           MR. MCENTIRE:  They could have -- they could have
20   sought --
21           THE COURT:  They were under my order.  Okay?  They
22   would have been violating my order if they had done it.
23           MR. STANCIL:  I was also, Your Honor, I was in a --
24           THE COURT:  Not to mention that it was --
25           MR. STANCIL:  I was in an airplane from 9:00 a.m.
```

001988

HCMLPHMIT00003036

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 72  Filed 06/20/25  Page 131 of 262    PageID 3138

24

1   Tuesday until 9:00 p.m. Tuesday.

2           THE COURT:  I'm surprised a lot of you got here, with

3   the Martian atmosphere that I saw pictures of.

4       Yes.  That's not realistic, to think that you disclose an

5   expert on Monday for a Thursday hearing and they can call you

6   up and --

7           MR. MCENTIRE:  The other --

8           THE COURT:  -- quickly put together a deposition.

9   So, --

10          MR. MCENTIRE:  Sure.  The other option, --

11          THE COURT:  Uh-huh.

12          MR. MCENTIRE:  -- of course, Your Honor, as I

13  mentioned before, and I'm not going to repeat myself, is they

14  -- there's other forms of relief they could seek.  But under

15  the circumstances, and in light of your apparent leaning on

16  the issue, then this is the best under the circumstances that

17  they've suggested.  We'd like an hour each.

18      I would also point out that -- well, anyway, that's it,

19  Your Honor.  Thank you.

20          THE COURT:  All right.  So we are going to go forward

21  as planned, three hours/three hours.  No experts today.  In

22  making your closings -- well, this is kind of awkward.  I'm

23  trying to think if we really have closing arguments, when you

24  don't know if it's -- it doesn't seem to make sense.  Like, I

25  guess we could have closing arguments if you want, subject to

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 17-2    Filed 06/09/25    Page 132 of 262    PageID 3139

25

1    supplementing your closing arguments if we come back a second

2    day with the experts.  Okay?

3        And I'm not making a ruling today on the motion to

4    exclude.  I'm going to hear what I hear.  And maybe what we'll

5    do is I'll give you a placeholder hearing if we're going to

6    come back on the experts.  Then I'll go back and read the

7    motion, the response, and make my ruling on are we coming back

8    for another day of experts.  Okay?  Got it?

9        And with regard to the comment about not adding to, I

10   think that's a fair point.  You can't add new exhibits that

11   the expert might talk about or that you might want me to

12   consider between now and whenever the tentative day two is.

13            MR. MCENTIRE:  Understand.  We agree with that.

14            THE COURT:  Okay.

15            MR. MCCLEARY:  Your Honor, there is one -- one

16   exhibit that has a small typo transcription of a number on it.

17   So we would like to substitute for that.  It's a minor detail.

18   But I'll provide opposing counsel with that.  But it's very

19   minor.

20            THE COURT:  You have it today, I presume?

21            MR. MCCLEARY:  Yes, we have it.

22            THE COURT:  Okay.  So as long as you hand it to them

23   today.

24            MR. STANCIL:  No objection, Your Honor.  We do -- I

25   think someone is back at the office working on a short reply

HCMLPHMIT00003038

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document Exhibit 72 Filed 207912390    Page 133 of 262    PageID 3140

26

```
 1   on our motion, which I assume we could file in support of -- I

 2   mean, we filed our motion.  They filed an opposition.  I

 3   assume we would be entitled under the Rules to file a short

 4   reply on the actual exclusion issue.

 5          THE COURT:  That is fair, but let's talk about

 6   timing.  You said someone is back at the office working on it.

 7   Could you get it on file by Monday?

 8          MR. STANCIL:  Yes, ma'am.

 9          THE COURT:  Okay.  Then that'll be allowed if it's

10   filed by the end of the day Monday.

11          MR. MCCLEARY:  Your Honor, I'm providing a copy of

12   Exhibit 43 to opposing counsel, which is the substitute

13   exhibit.

14      And obviously, we'd like to have an opportunity to respond

15   to what their filing is on Monday.

16          THE COURT:  No.  I mean, motion, response, reply.

17   That's all our Rules permit.  Okay?  Motion, response, reply.

18   Okay.

19          MR. MCCLEARY:  Yes, Your Honor.

20          THE COURT:  All right.  Well, with that, do the

21   parties want to make opening statements?  If so, Mr. McEntire,

22   you go first.

23          MR. MCENTIRE:  Yes, Your Honor.  We have a PowerPoint

24   I would like to utilize, if I could.

25          THE COURT:  You may.
```

001991

HCMLPHMIT00003039

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document Exhibit 72 Filed 06/20/25   Page 134 of 262   PageID 3141

27

```
 1            MR. MORRIS:  Your Honor, before we get to that, the
 2   Plaintiff has objected to virtually every single exhibit that
 3   we have.  Should we deal with the evidence first, because I
 4   don't want to refer to documents or evidence in my opening
 5   that they're objecting to.  They've literally objected to
 6   every single exhibit except one, although I think they're
 7   withdrawing certain of those objections.
 8       I don't -- I don't know if the Court has had an
 9   opportunity to see the objection that was filed to the
10   exhibits.
11            THE COURT:  That was what was filed like at 11:00
12   last night or so?
13            MR. MORRIS:  That's right.
14            THE COURT:  Okay.
15            MR. MORRIS:  And so at 2:00, 3:00, 4:00, 5:00 o'clock
16   this morning, I actually typed out a response that I'd like to
17   hand up to the Court.  But we've got to resolve the
18   evidentiary issues before we get to this.
19            THE COURT:  Okay.  Well, --
20            MR. MORRIS:  And I don't know what their position is
21   going to be --
22            THE COURT:  -- as a housekeeping matter, let's do
23   that first.  And let's start with the Movants' exhibits.  Do
24   we have any stipulations on admissibility of Movants'
25   exhibits?
```

HCMLPHMIT00003040

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 1-72   Filed 02/09/23790   Page 135 of 262    PageID 3142

28

1          MR. MORRIS:  So, if I understand correctly, Your

2   Honor, you'd like to know if we object to any of their

3   exhibits first?

4          THE COURT:  Yes.  And --

5          MR. MORRIS:  Okay.

6          THE COURT:  -- we'll hold --

7          MR. MORRIS:  Because we have very limited objections.

8          THE COURT:  Yes.  We're going to keep on hold for now

9   your exhibits to the expert-related, --

10         MR. MORRIS:  Yes.

11         THE COURT:  -- your objections to the expert-related

12  ones.

13         MR. MORRIS:  Right.  I think -- I think --

14         THE COURT:  So let's not talk about, for this moment,

15  --

16         MR. MORRIS:  39 --

17         THE COURT:  -- 39 through 52.

18         MR. MORRIS:  Okay.

19         THE COURT:  But as for 1 through 38 or 53 through 80,

20  do the Respondents have objections?

21         MR. LEVY:  Yes, Your Honor.  We have very limited

22  objections.

23         THE COURT:  Okay.

24         MR. LEVY:  So, the three to which we object in their

25  entirety are Exhibits 24, 25, and 76, all of which we object

001993

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 1-72 Filed 09/09/25   Page 136 of 262   PageID 3143

29

1   to on relevance grounds.

2       Exhibits 24 and 25 are email correspondence between

3   counsel in an unrelated state court matter where Mr. Seery is

4   responding to a third-party subpoena regarding the

5   preservation of his text messages on his iPhone.  This has

6   absolutely nothing to do with whether or not the Movants have

7   stated a colorable claim for breach of fiduciary duties.

8       What this appears to be is related to an entirely separate

9   motion raised by Dugaboy regarding the preservation of Mr.

10   Seery's iPhone.  So we object to Exhibits 24 and 25 because

11   they have simply nothing to do with the issues in this

12   hearing.

13       We also object to Exhibit 76, which is a filing from two

14   years ago in a different bankruptcy matter, from *Acis*,

15   regarding an injunction in place in that -- in that plan about

16   issues that -- that occurred before the bankruptcy was in

17   place.  So this is just an entirely different case from issues

18   that arose many, many years ago that, again, has nothing to do

19   with this case.

20           THE COURT:  This was whether the *Acis* plan injunction

21   barred some lawsuit?

22           MR. LEVY:  Exactly.

23           THE COURT:  Okay.  Okay.  Is that all?

24           MR. LEVY:  We also have limited objections to certain

25   exhibits that we think are admissible for the -- for the fact

HCMLPHMIT00003042

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document Exhibit 72 Filed 06/20/25 390   Page 137 of 262   PageID 3144

30

1   they're said, but not the truth of the matter asserted.

2       For example, Exhibits 1 and 2 are complaints filed in

3   those actions.  We have no objection to those coming in, but

4   not for the truth of the matter asserted.  These are advocacy

5   pieces and pleadings.  They're not actually substantive

6   evidence.

7       And we would have similar -- similar objections to

8   Exhibits 4, 6, 11, --

9            THE COURT:  Wait.  4 is James Dondero Handwritten

10  Notes, May 2021.

11           MR. LEVY:  Yes.

12           THE COURT:  Okay.

13           MR. LEVY:  So, we have no objection to that coming

14  into evidence.

15           THE COURT:  Uh-huh.

16           MR. LEVY:  But there are -- those are hearsay.

17  They're not admissible standing by themselves for the truth of

18  the matter asserted.

19           THE COURT:  Okay.

20           MR. LEVY:  And Exhibit 6 are news articles.

21  Similarly, they're hearsay, but we have no objection to them

22  coming in.  They're admissible for the fact that they're

23  published, but not the truth of the matter asserted.

24           THE COURT:  Okay.

25           MR. LEVY:  Exhibit 11, which is a motion filed by the

001995

HCMLPHMIT00003043

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 7-2   Exhibit 72   Filed 03/29/23   Page 138 of 262   PageID 3145

31

1  Debtor.  Similarly, it's for -- we have no objection to

2  anything on the docket coming in, but anything that's an

3  advocacy piece, like a motion as opposed to an order, we think

4  is not admissible for the truth of the matter asserted.

5      And that would be a similar objection, then, for Exhibit

6  58, which is a complaint.

7      Exhibits 59, 60, and 61 are -- are letters by counsel for

8  Mr. Dondero to the U.S. Trustee's Office.  We similarly have

9  no objection to that coming in, but not for the truth of the

10  matter asserted.

11      And Exhibits 62 and 63, Exhibit 62 is an attorney

12  declaration attaching, similarly, documents that are -- that

13  are advocacy pieces.

14      And Exhibit 63 appears to be an asset chart prepared by

15  counsel.  So it would be a similar objection.

16      And Exhibit 66 also is a declaration attaching documents.

17      No objections to those coming in, but not for the truth of

18  the matter asserted.

19      Exhibits 72, 73, and 74 are all -- well, 72 are press

20  articles.  73 and 74 are briefs.  We don't object to that

21  coming in, but we object to it being admitted for the truth of

22  the matter asserted.

23      And similarly, Exhibit 80 is a pleading in an SDNY

24  bankruptcy.  We have no objection to that coming in, but not

25  for the truth of the matter asserted.

HCMLPHMIT00003044

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 31-72   Filed 09/09/25   Page 139 of 262   PageID 3146

Exhibit 72 Page 30 of 390

32

```
 1        And finally, Exhibits 81, 82, 83 don't specify particular
 2   documents.  They appear to largely be reservations of rights.
 3   And so we would likewise reserve our right to object once we
 4   see any specific documents --
 5             THE COURT:  Okay.
 6        MR. LEVY:  -- admitted under these exhibits.
 7             THE COURT:  Okay.  Mr. --
 8        MR. LEVY:  And I understand my colleague has an
 9   objection to Exhibit 5.
10        MR. MORRIS:  Exhibit 5, which is the subject, I
11   believe, of an unopposed sealing motion.  That document has to
12   do with purported restrictions on certain securities.  Since
13   it's subject to a sealing motion, I don't want to say too much
14   more than that, other than that -- we don't think it should be
15   admitted, because you can just see from the information on the
16   document that it was created after the termination of a shared
17   services agreement.
18        However, I'm hopeful that we can resolve the issue by
19   simply stipulating that in December 2020 MGM was on a
20   restricted list.  What that means, what the consequences of
21   it, the rest of it can be the subject of discussion.  But if
22   they're trying to get that document in for that particular
23   fact, we would stipulate to it in order to resolve that
24   dispute.
25             THE COURT:  All right.  Well, that's lots to respond
```

001997

HCMLPHMIT00003045

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 72 Filed 07/09/25    Page 140 of 262    PageID 3147

33

```
 1   to, Mr. McCleary.  Why don't we start with the outright
 2   objections:  24, 25.  It's apparently text messages related to
 3   Mr. Seery's iPhone.  I know we've got another motion pending
 4   out there that's not set today regarding Mr. Seery's iPhone.
 5           MR. MCCLEARY:  Yes, Your Honor.  Well, as the Court
 6   is aware, we've attempted to get discovery from Mr. Seery in
 7   relation to the allegations in this lawsuit.  And by the way,
 8   all of our exhibits that we're tendering are subject to our
 9   objections that this should not be an evidentiary hearing.  I
10   just want to make that clear.
11           THE COURT:  Understood.
12           MR. MCCLEARY:  Okay.  Thank you.  So, we're not
13   waiving that.
14      The Exhibits 24 and 25 are relevant to the fact that he's
15   -- he's not preserving information that is relevant to the
16   claims in this lawsuit.  And that also is something that is a
17   factor in the colorability of our claims in this case.
18           THE COURT:  How?
19           MR. MCCLEARY:  Well, there is an effort, we believe,
20   underway to not have information available for us to discover.
21   And it reflects that they have been involved in providing --
22   we think supports -- providing material nonpublic information
23   to other people that would be in his phone.  And we want him
24   to preserve it.  And we think the fact that he is not is
25   evidence that supports the colorability of our claims.
```

HCMLPHMIT00003046

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 1-72    Filed 09/05/2390    Page 141 of 262    PageID 3148

34

```
 1              THE COURT:  So, --

 2              MR. MCENTIRE:  Your Honor, this --

 3              THE COURT:  No.  No.  I'm processing that.  You're

 4  wanting the Court to receive into evidence a text that may say

 5  something like, I delete messages periodically on my phone, to

 6  support your claim that you have a colorable claim that some

 7  sort of improper insider disclosure of information and insider

 8  trading is going on?  He said he had an automatic delete

 9  feature on his phone; therefore, he -- that must be evidence

10  of a colorable claim for insider trading.  That's the

11  argument?

12              MR. MCENTIRE:  May I add to it, supplement, Your

13  Honor?  Mr. Seery, in his deposition, indicated that he did

14  receive a text message that he had recently reviewed from

15  Stonehill in February of 2021.  To the extent, however, that

16  is inconsistent with the fact that he has an automatic delete

17  button, suggesting to me that certain text messages have been

18  selectively saved and some other messages have been not

19  selectively saved.

20              THE COURT:  We don't have that motion set today.

21              MR. MCENTIRE:  This is not -- that has nothing to do

22  with the motion.  It has to do with the fact that what is

23  being presented to the Court in response, the Respondents'

24  argument, is a selected window, a selected picture, that is --

25  distorts the reality of what we think has been destroyed
```

HCMLPHMIT00003047

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 72 Filed 06/20/25   Page 142 of 262    PageID 3149
Exhibit 72   Page 306 of 390

35

```
 1   evidence.

 2       Mr. Seery can't save one message that may be helpful to

 3   them and not save others that may not be.  And it is

 4   inconsistent with the notion that this automatic delete button

 5   was already in effect, so why does he have one favorable

 6   message?  That's why it's relevant.

 7              THE COURT:  Maybe he stopped using the automatic

 8   delete after --

 9              MR. MCENTIRE:  No, he didn't at this time, Your

10   Honor.

11              THE COURT:  Well, --

12              MR. MCENTIRE:  That's the relevance.

13              THE COURT:  So, --

14              MR. MCCLEARY:  And he should never have used it, Your

15   Honor, given his role and responsibilities.

16              THE COURT:  We don't have that motion set today.

17   What is the content of these emails?  February 16th, March

18   10th, 2023?  What is the content, for me to really zero in --

19              MR. LEVY:  I have --

20              THE COURT:  -- on relevance or not.

21              MR. LEVY:  -- copies of the emails, if that would be

22   helpful --

23              THE COURT:  Okay.

24              MR. LEVY:  -- to Your Honor.

25              THE COURT:  Well, you know, now I'm seeing them, so I
```

HCMLPHMIT00003048

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 72   Filed 07/02/25   Page 143 of 262   PageID 3150

36

1    don't know what the big deal is if --

2            MR. LEVY:  As Your Honor can see, these are emails

3    between counsel regarding preservation, which has nothing to

4    do with whether there are colorable claims for fiduciary

5    duties.

6        I'll add that -- and to show that this has nothing to do

7    with this case and it is an attempt to generate a fishing

8    expedition for documents in an entirely unrelated motion, we

9    had a meet-and-confer where we represented to the counsel

10   bringing that motion that we have been able to recover the

11   text messages from the iCloud.

12       And so this is really just a sideshow.  It has nothing to

13   do with the issues of the colorability of claims for breach of

14   fiduciary duties.  It should not be introduced into evidence

15   in this hearing.

16           THE COURT:  All right.  I'm going to sustain the

17   objection, but this is without prejudice to you re-urging

18   admission of these messages at the hearing on the motion

19   regarding Mr. Seery's phone.  Okay?  Now, --

20           MR. MCCLEARY:  That's as to 24 and 25, Your Honor?

21           THE COURT:  Correct.  And let's go now to the other

22   one, the Exhibit 76, the *Acis*-related document, the relevance

23   of that.  Statement of Interested Party in Response to Motion

24   of NexPoint to Confirm Discharge or Plan Injunction Does Not

25   Bar Suit, or Alternatively, for Relief from All Applicable

002001

HCMLPHMIT00003049

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document Exhibit 72 Filed Page 889 2390   Page 144 of 262    PageID 3151

37

```
 1   Injunctions.

 2       What is the relevance for today's matter?

 3           MR. MCCLEARY:  Your Honor, this is background of

 4   pleadings and just background information generally to support

 5   the allegations made in the case and the background.

 6           THE COURT:  What do you mean, background?

 7           MR. MCCLEARY:  Kind of the history relative to the

 8   claims trading and relative to the claims of the use of

 9   insider information.

10           THE COURT:  Okay.  Be more specific, because I

11   certainly have a background education on Acis litigation.

12       (Pause.)

13           MR. MCCLEARY:  Yeah.  Your Honor, this is a data

14   point that is referred to in one of our experts' data charts,

15   I believe, so --

16           THE COURT:  All right.  So let's just carry that to

17   --

18           MR. MCCLEARY:  Yes.

19           THE COURT:  I'm just going to mark it as carried

20   along with 39 through 62, related to the experts.

21       (HMIT's Exhibits 39 through 62 and Exhibit 76 carried.)

22           THE COURT:  Okay.  What about all of these objections

23   that we don't object per se but we want it clear that the

24   documents are not being offered for the truth of the matter

25   asserted because there's hearsay?
```

002002

1              MR. MCENTIRE:  Your Honor, I'll let Mr. McCleary

2    address all of those.

3         I want to point out one exception, and that is Exhibit #4,

4    which are handwritten notes from Mr. Jim Dondero.  Those are

5    not -- they are being offered for the truth of the matter

6    asserted because it's an admission of a party opponent in

7    these proceedings, and that's Farallon.  They reflect

8    significant statements and admissions by Farallon, which are

9    not hearsay.  It's an exception to the hearsay rule.  And

10   they're being offered for more -- they are being offered for

11   the truth of the matter asserted, because -- and it's

12   admissible in that format.

13             THE COURT:  But are you referring to hearsay within

14   hearsay?  Because there would be, I guess -- I guess the

15   handwritten notes of Mr. Dondero are his hearsay, and then

16   you're saying there's --

17             MR. MCENTIRE:  So, this is reflecting statements made

18   to Mr. Dondero that are admissions of a party opponent.

19             MR. LEVY:  None of that has been established.  These

20   are not notes from anybody at Farallon or Stonehill which

21   could potentially be a party admission.  These are notes by

22   Mr. Dondero about what was purportedly said by somebody else,

23   and there's no evidence that these were kept in the regular

24   course of business.

25        This is hearsay and hearsay within hearsay.  And this

HCMLPHMIT00003051

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 1-72    Filed 09/09/25    Page 146 of 262    PageID 3153

39

```
 1   could be established in testimony, but it can't be admitted --
 2   the document can't be admitted to speak on behalf of a third
 3   person who's not here.
 4        MR. MCENTIRE:  Well, first of all, I agree, we'd need
 5   to lay a foundation.  But that's not the purpose of this
 6   discussion right now.  I am simply advising the Court that
 7   once I lay a foundation, it comes in for all purposes.  It
 8   comes in as an admission of a party opponent.
 9        MR. LEVY:  It is not an admission of a party
10   opponent.  It is not notes or statements by any actual
11   defendant.  These are notes by Mr. Dondero being introduced
12   for his own benefit.  It is not a party admission.
13        THE COURT:  Okay.  I'm going to carry that one.  If
14   one of the witnesses that's on the witness stand -- well,
15   presumably Mr. Dondero will be called -- we can get context at
16   that time and decide if it's appropriate to let it in and let
17   you cross-examine him on them if that's going to come in.  All
18   right?  So we'll carry this one.
19      Anything else, though, unique, or can we consider as a
20   batch all these other objections to -- most of them being
21   pleadings, not all of them but a lot of them -- that the
22   Respondents just want it clear that they're not being offered
23   for the truth of the matter asserted?  Your response?
24        MR. MCCLEARY:  They're, again, largely data points
25   relied on by experts in the course of coming up with their
```

HCMLPHMIT00003052

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 172   Filed 04/09/25   Page 147 of 262   PageID 3154
Exhibit 72   Page 40 of 390

40

1   opinions and just setting the background and history of the

2   claims trading.

3          THE COURT:  Well, then which ones are data points?

4   Because I just need to carry those, right?  If they're not

5   being offered for any other reason.

6          MR. MCCLEARY:  Well, I would have to -- we would have

7   to refer to the charts of the experts, Your Honor, to

8   determine that on all of them.

9          MR. MCENTIRE:  In order to facilitate this, may I

10  make a suggestion, Your Honor?  We'll agree that if we're

11  going to offer anything that he's identified other than for

12  the purposes indicated, we will advise the Court.  Otherwise,

13  we'll accept the limitations imposed.  And as we go through,

14  if we offer an exhibit that is more than the truth -- if we

15  are offering it for the truth of the matter asserted, we will

16  advise the Court, and then we could take it up then.  I'm just

17  trying to get the ball rolling.

18         THE COURT:  Okay.  Well, that's still going to be a

19  time-consuming thing, maybe.  But, okay.  Just, when we start

20  the clock here -- very shortly, I hope -- I want people clear

21  that when you make objections, that counts against your three

22  hours.  Okay?  All right?

23         MR. LEVY:  Okay.  Understood, Your Honor.

24         MR. MCCLEARY:  Your Honor, we have certainly made

25  objection to some of their exhibits.

002005

HCMLPHMIT00003053

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Documents Exhibit 72   Filed 04/29/25   Page 148 of 262   PageID 3155

41

```
 1              THE COURT:  All right.  Well, shall we turn to those

 2   now?

 3              MR. MCCLEARY:  Yes, Your Honor.

 4              MR. MORRIS:  Your Honor, they objected to every

 5   single exhibit except one, so let's be clear.

 6              THE COURT:  Okay.

 7              MR. MORRIS:  If they're withdrawing them, that's

 8   fine.

 9              MR. MCCLEARY:  Well, --

10              MR. MORRIS:  But let's be clear.

11              MR. MCCLEARY:  -- we are not withdrawing our general

12   objection to all the evidence, of course.  Just --

13              THE COURT:  Okay.  Let me just say for the record

14   right now, I understand and you are preserving for all

15   purposes your ability to argue on appeal that it was error for

16   the Court to consider any evidence.  Okay?  You have not

17   waived that argument by --

18              MR. MCCLEARY:  Thank you.

19              THE COURT:  -- now --

20              MR. MCCLEARY:  Thank you.  We can have --

21              THE COURT:  -- agreeing to the admission of anybody's

22   exhibit or offering your own exhibits.

23              MR. MCCLEARY:  And we could have a running objection

24   on that basis, on relevance to all the witnesses and the

25   evidence that they offer on that basis.  I would request that.
```

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document Exhibit 72 Filed 06/20/25   Page 149 of 262    PageID 3156

42

```
 1              THE COURT:  Well, okay, let me be clear.  Relevance.

 2   Your argument is that no evidence is relevant because the

 3   Court doesn't need to consider any evidence --

 4              MR. MCCLEARY:  Yes, Your Honor.

 5              THE COURT:  -- on the colorability issue.  You've got

 6   a running objection.  It's not destroyed for appeal purposes.

 7   Okay?

 8              MR. MCCLEARY:  Thank you, Your Honor.  Then, subject

 9   to that, in terms --

10              MR. MORRIS:  I'm sorry to interrupt, but --

11              MR. MCCLEARY:  Sure.

12              MR. MORRIS:  -- would it be helpful if I gave the

13   Court my list so she can see --

14              MR. MCCLEARY:  Sure.

15              MR. MORRIS:  -- what the --

16              MR. MCCLEARY:  Sure.

17              MR. MORRIS:  Okay.  May I approach, Your Honor?

18              THE COURT:  You may.  I'm not sure, if everything has

19   been objected to, I'm not sure how --

20              MR. MORRIS:  Because I've tried -- I've tried to

21   organize it in a way that would be helpful.

22              THE COURT:  Okay.

23         (Pause.)

24              MR. MCCLEARY:  Okay.  Your --

25              THE COURT:  I'm ready.
```

002007

HCMLPHMIT00003055

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document Exhibit 72 Filed 06/24/02 2390   Page 150 of 262   PageID 3157

43

1          MR. MCCLEARY: -- Honor, yes.

2          THE COURT: Uh-huh.

3          MR. MCCLEARY: So, we are withdrawing our objections,

4    other than the general objections to relevance based on the

5    evidentiary nature of the proceeding, to Exhibits 1 and 2.

6        With respect to 3, this is a verified petition to take

7    deposition for suit and seek documents filed on July 22, 2021.

8    We object on the grounds of relevance and hearsay to that.  Is

9    that --

10         THE COURT: Well, --

11         MR. MORRIS: I don't -- I don't understand this one.

12         THE COURT: This --

13         MR. MCCLEARY: Is that, I'm sorry, is that your #11?

14         MR. MORRIS: Yeah.

15         MR. MCCLEARY: All right.  We withdraw our objection

16   to #3, subject to our general objection.

17       On Exhibit 4, we object to relevance and hearsay on a

18   verified amended petition to take deposition before suit and

19   seek documents.

20         THE COURT: Okay.  This is my time to hear your

21   argument.  And we're going to be here --

22         MR. MORRIS: Can I -- can I do this here?  It's going

23   to be much quicker.

24         THE COURT: What do you mean?  Do what here?

25         MR. MORRIS: So, if you just follow the chart that I

HCMLPHMIT00003056

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 77   Filed 06/05/25   Page 151 of 262    PageID 3158
Exhibit 72   Page 45 of 390

44

```
1    gave the Court, --

2              THE COURT:  Uh-huh.

3              MR. MORRIS:  -- Section A is a list of exhibits that

4    they've objected to.  Those exhibits are in the right-hand

5    column.

6        At the same time, they are offering the exact same

7    exhibits into evidence on their exhibit list.  I don't

8    understand how they can offer their exhibits and object to

9    ours.

10             MR. MCCLEARY:  Counsel.  I'm sorry.  We've already

11   told them that, subject to our general objection, we'll

12   withdraw the objections to those exhibits.

13             MR. MORRIS:  Right.  So can we agree that all

14   objections to Section A are withdrawn?

15             MR. MCCLEARY:  Subject to the general objection, yes.

16             MR. MORRIS:  Thank you.

17             THE COURT:  Okay.  So, --

18             MR. MORRIS:  That's going to be much quicker.

19             THE COURT:  -- 11, 34, 2, 46, 42, 38, 41, 39, 40,

20   and various attachments to Highland Exhibits 5 are withdrawn.

21   So, admitted by stipulation.

22       (Debtors' Exhibits 2, 11, 34, 38, 39, 40, 41, 42, 46 are

23   received into evidence.  Certain attachments to Debtors'

24   Exhibit 5 are received into evidence.)

25             MR. MORRIS:  And to make this easy, Your Honor, at
```

002009

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 31-72   Filed 04/09/25   Page 152 of 262   PageID 3159
Exhibit 72   Page 46 of 390

45

1   some point I hope later today, but perhaps tomorrow, we'll

2   slap a caption on this, we'll file it on the docket, so that,

3   you know, an appellate court, if necessary, can follow along.

4   But I think that we've just stipulated that all of the

5   exhibits identified in Section A of this document are -- the

6   objections have been withdrawn.

7           THE COURT:  Okay.

8           MR. MCCLEARY:  Subject to the general objections.

9           MR. MORRIS:  Right.  That gets us -- I'm going to

10  jump to Section C, because I think the same is true.  Section

11  C identifies all exhibits that each party has taken from the

12  docket.  And you can see from Footnote 4, the Court can take

13  judicial notice under Federal Rule of Evidence 201, we've just

14  had the discussion about whether or not any of them would be

15  limited for purposes of the truth of the matter asserted, but

16  all of the exhibits identified in Section C I think the Court

17  can take judicial notice of because they're on a docket.

18          THE COURT:  Response?

19          MR. MORRIS:  And so I would respectfully request that

20  they withdraw their objections to anything in Section C.

21          THE COURT:  Response, Mr. McCleary?

22          MR. MCCLEARY:  I understand the Court can take

23  judicial notice of those, Your Honor, but they do contain

24  irrelevant and hearsay information also.

25          MR. MORRIS:  The hearsay, I think that we just had

HCMLPHMIT00003058

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 7-72    Filed 07/07/25    Page 153 of 262    PageID 3160

46

```
 1    the discussion.  I mean, if there's something that he wants to

 2    really point out at this point that I can respond to.  But we

 3    would agree that advocacy pieces shouldn't be offered for the

 4    truth of the matter asserted.  Court orders, on the other

 5    hand, are law of the case.

 6         THE COURT:  So, I mean, it's the very same situation

 7    we just addressed with your own exhibits.  You have a lot of

 8    court filings.  And they didn't have a problem with it, as

 9    long as everyone knew advocacy was not being accepted for the

10    truth of the matter asserted.

11         MR. MCCLEARY:  Well, --

12         THE COURT:  Isn't this the same thing?

13         MR. MCCLEARY:  -- they're not offering it for the

14    truth of the matter asserted.  That's one thing.  And

15    certainly the Court can take judicial notice.  We do object to

16    the extent they're offering Exhibits 6 through 10 for the

17    truth of the matter asserted.

18         MR. MORRIS:  Well, let me check those.

19         THE COURT:  Well, --

20         MR. MCCLEARY:  I'm sorry.  6, 7, uh -- (pause).

21         THE COURT:  Those are orders of --

22         MR. MORRIS:  Yeah.

23         THE COURT:  -- courts.

24         MR. MORRIS:  Yeah.  They're orders of the Court.

25         MR. MCCLEARY:  The orders are not relevant, Your
```

HCMLPHMIT00003059

 1 | Honor.

 2 |            THE COURT:  Explain.

 3 |            MR. MCCLEARY:  Well, they have not demonstrated that

 4 | the orders that they seek to introduce are relevant.  They

 5 | have orders regarding, for example, the contempt proceedings

 6 | that are irrelevant to these proceedings.  And prejudicial

 7 | under 403.

 8 |            THE COURT:  All right.  Shall I take a five- or ten-

 9 | minute break?  Let me -- I think I've been very generous by

10 | not starting the clock yet on the three hours/three hours.

11 |            MR. MCCLEARY:  Appreciate that.

12 |            THE COURT:  But here's how we do things in bankruptcy

13 | court.  And I don't mean to talk down to anyone.  I don't

14 | know, you may appear in bankruptcy court every day of your

15 | life.  But we expect counsel to get together ahead of time and

16 | stipulate to the admissibility of as many exhibits as you can.

17 | If there's a preservation of rights here and there, fine.  But

18 | we --

19 |            MR. MCCLEARY:  Maybe if we take --

20 |            THE COURT:  You know, --

21 |            MR. MCCLEARY:  We can try to --

22 |            THE COURT:  -- helping everyone to understand, --

23 |            MR. MCCLEARY:  Sure.

24 |            THE COURT:  -- we have thousands of cases in our

25 | court.

HCMLPHMIT00003060

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 31-72   Filed 09/09/25   Page 155 of 262   PageID 3162
Exhibit 72   Page 9499 of 2390

48

```
1              MR. MCCLEARY:  Sure.

2              THE COURT:  And this is just something we have to do

3   to give all parties their day in court when they need time.

4   And so --

5              MR. MCCLEARY:  If you'd like us to take ten minutes

6   and try to narrow this, we certainly --

7              THE COURT:  Okay.  With everybody understanding you

8   should have taken the ten minutes before we got here.  But,

9   again, when I say three hours, --

10             MR. MORRIS:  Yeah.

11             THE COURT:  -- that's what I meant.  Okay?

12             MR. MCCLEARY:  Yes, Your Honor.

13             THE COURT:  So we'll take a ten-minute break.

14             THE CLERK:  All rise.

15        (A recess ensued from 10:42 a.m. until 10:54 a.m.)

16             THE CLERK:  All rise.

17             THE COURT:  All right.  Please be seated.  Have we

18   reached agreements on some of these exhibits?

19             MR. MCCLEARY:  Your Honor, we have agreed on the ones

20   that we can agree on, and we announced that to the Court with

21   respect to the Paragraph A items that the Court's already

22   ruled on.

23        I would like to point out to the Court that we just got

24   their objections handed to us right before the hearing.  We

25   filed ours last night.  So we didn't --
```

HCMLPHMIT00003061

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K     Document 1-72   Filed 05/09/25   Page 156 of 262     PageID 3163
Exhibit 72   Page 50 of 390

49

 1          THE COURT:  At 11:00-something, right?

 2          MR. MCCLEARY:  Yes, Your Honor, but we did --

 3          THE COURT:  Okay.  Well, okay.  So I guess your point

 4  is you want to make sure I'm annoyed with everyone, not just

 5  selective of you.

 6          MR. MCCLEARY:  Well, --

 7          THE COURT:  I mean, exhibit lists were filed Monday.

 8  So I don't know why on Tuesday people were not on the phone

 9  saying, you know, or Wednesday morning at the latest.

10          MR. MCCLEARY:  Sure.  And we haven't had much of an

11  opportunity, in fairness, to consider their objections and

12  respond because we just received them right at the time of the

13  hearing, just before the hearing started.

14     Your Honor, we would urge our objections to Exhibit #4.

15  We've objected to this petition to take deposition before suit

16  and seek documents on the basis of relevance and hearsay.

17  They have a number of pleadings in other matters that have

18  nothing to do with, frankly, the colorability standard in this

19  case.  And this is an example.

20          THE COURT:  Okay.  This is the time for me to hear

21  specific objections and what the basis is, and not just --

22          MR. MORRIS:  Can we go back --

23          THE COURT:  -- a category.

24          MR. MCCLEARY:  Yeah.

25          MR. MORRIS:  Can we go back to my way?  Because it's

HCMLPHMIT00003062

50

```
 1   just going to be much faster.  It really will be.  Right?  We
 2   -- Category 1, A and C, we dealt with.  Category B, --
 3           THE COURT:  Well, we dealt with A.
 4           MR. MORRIS:  Right.  And --
 5           THE COURT:  All of those are withdrawn, and they are
 6   admitted by stipulation.
 7           MR. MORRIS:  Right.
 8           MR. MCCLEARY:  Subject to --
 9           THE COURT:  Category C, --
10           MR. MCCLEARY:  -- the general objections.
11           THE COURT:  -- I'm not sure we're to closure on.
12           MR. MORRIS:  Um, --
13           THE COURT:  Are we to closure on C?  Are you
14   stipulating?
15           MR. MCCLEARY:  No.  We are not stipulating on C.
16           MR. MORRIS:  Let's do them one at a time.
17           MR. MCCLEARY:  I have not had an opportunity to -- to
18   --
19           MR. MORRIS:  Let's do them one at a time.
20           MR. MCCLEARY:  Have not had an opportunity to look at
21   each and every one of these, Your Honor.  Because we did just
22   get these.
23           THE COURT:  Okay.
24           MR. MCCLEARY:  But generally --
25           THE COURT:  If we have not wrapped this up in 15
```

HCMLPHMIT00003063

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 172   Filed 05/29/2390   Page 158 of 262   PageID 3165

51

1  minutes, we're just going to start, and you can object the

2  old-fashioned way.  But I'm telling all lawyers here,

3  objections count against your time.  Okay?

4         MR. MORRIS:  And I'd move for the admission of all of

5  our exhibits right now, then.

6         THE COURT:  Okay.

7         MR. MORRIS:  So let him -- let -- put him on the

8  clock and let's go.

9         THE COURT:  Okay.  So, 15 minutes.  Let start going

10  through everything except Category A.

11         MR. MORRIS:  Number 4?

12         MR. MCCLEARY:  Number 4, Your Honor, we object on the

13  basis of relevance and hearsay.

14         MR. MORRIS:  Okay.  My response to that, Your Honor,

15  and this will be my response -- this is in Section B of my

16  outline --

17         THE COURT:  Uh-huh.

18         MR. MORRIS:  Okay?  They object to Exhibits 3, 4, 5,

19  and 9.  These are Mr. Dondero's prior sworn statements.  You

20  just heard his lawyer stand here and tell the Court that

21  somehow his handwritten notes should be admissible as an

22  admission.  You know what he did?  He testified four different

23  times under oath.  That's Exhibits 3, 4, 5, and 9.  Sworn

24  statements.

25     They come into evidence not as hearsay but under Federal

002016

HCMLPHMIT00003064

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 3-72 Filed 09/09/25    Page 159 of 262    PageID 3166

52

1    Rule of Evidence 801(d)(1).  It's beyond -- the notion that

2    they can prove a colorable claim and that it's not relevant

3    that he's got diametrically different -- he's got four

4    different statements, now five with his notes, he's got five

5    different statements.  Doesn't that go to the colorability of

6    these claims?

7        We believe it does.  That's the basis for the introduction

8    of these documents into evidence.

9            THE COURT:  Okay.  Mr. McCleary, your response?

10            MR. MCCLEARY:  Well, it's a verified amended

11    petition, Your Honor, in another matter, to -- before suit to

12    seek documents.  Has nothing to do with the merits of this

13    case and our motion for leave.  So we object on the grounds of

14    relevance and hearsay.

15            THE COURT:  Well, since they're prior sworn

16    statements of Mr. Dondero, --

17            MR. MCCLEARY:  Well, then they might -- if they want

18    to use it later to impeach, they can try to do that, but they

19    have to lay the foundation.

20            THE COURT:  What about 801(d)(1)?

21            MR. MCCLEARY:  Again, relevance, Your Honor.

22            THE COURT:  Okay.  I overrule.  Those are --

23            MR. MCCLEARY:  And Mr. --

24            MR. MORRIS:  Okay.

25            THE COURT:  Those are going to be admitted.

002017

HCMLPHMIT00003065

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 17-2   Filed 07/09/25   Page 160 of 262    PageID 3167
Exhibit 72   Page 54 of 390

53

```
 1              MR. MCCLEARY:  By the way, on hearsay, Mr. Dondero is

 2    not Hunter Mountain.  So when he argues that these are

 3    admissions, they're not admissions by Hunter Mountain.

 4              MR. MORRIS:  Your Honor, the only piece of evidence,

 5    literally the only piece of evidence they have are the words

 6    out of Mr. Dondero's mouth.  There is no evidence, there will

 7    be no evidence of a quid, a pro, or a quo.  There will be no

 8    evidence other than what Mr. Dondero testifies to --

 9              MR. MCCLEARY:  Well, --

10              MR. MORRIS:  -- about what he was told.  There will

11    be no evidence that there was a meaningful relationship

12    between Mr. Seery and Ms. -- and Farallon and Stonehill.

13    There will be no evidence, none, that Farallon and Stonehill

14    rubber-stamped Mr. Seery's compensation package.  Nothing.

15    The only thing we have are going to be the words out of Mr.

16    Dondero's mouth and these notes that just showed up.  And

17    these statements --

18              MR. MCCLEARY:  Your Honor?

19              THE COURT:  Okay.  Counsel, I mean, it just feels

20    like --

21              MR. MORRIS:  It's --

22              THE COURT:  -- if notes get in, then sworn statements

23    of Mr. Dondero should get in.  Right?

24              MR. MCCLEARY:  Your Honor, he's making arguments,

25    closing arguments, opening arguments, trying to run out the
```

002018
HCMLPHMIT00003066

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 17-2  Filed 07/09/25  Page 161 of 262    PageID 3168
Exhibit 72    Page 59 of 390

54

```
 1   clock.  We objected to relevance, and we stand on our

 2   objection.

 3            THE COURT:  Okay.

 4            MR. MCCLEARY:  And on hearsay.

 5            THE COURT:  I'll admit 3, 4, 5, and 9.

 6        (Debtors' Exhibits 3, 4, 5, and 9 are received into

 7   evidence.)

 8            MR. MORRIS:  Section E.

 9            MR. MCCLEARY:  I'm sorry.  So our objections are

10   overruled?

11            THE COURT:  They are overruled.

12            MR. MCCLEARY:  On 3, 4, 5?

13            THE COURT:  And 9.

14            MR. MORRIS:  Section E of my outline.

15            MR. MCCLEARY:  What about 6?

16            THE COURT:  That's not --

17            MR. MORRIS:  Well, --

18            THE COURT:  Well, I don't --

19            MR. MORRIS:  -- it would -- it would --

20            THE COURT:  Let's go back to C.  I'm not clear if

21   we're to closure on Section C.

22            MR. MORRIS:  I'll let Counsel go through --

23            THE COURT:  And 6 is within Section C.

24            MR. MORRIS:  I'll let Counsel go through each one,

25   one at a time.
```

HCMLPHMIT00003067

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 72 Filed 06/20/25    Page 162 of 262    PageID 3169
Exhibit 72    Page 569 of 390

55

1          MR. MCCLEARY:  No.  That's all right.  If you want to

2    go through, you have them lumped in.  Yeah, I think it'd

3    probably be quickest if, frankly, we just go down the list,

4    Your Honor.  Frankly.

5          THE COURT:  Well, you've got ten minutes left.

6          MR. MCCLEARY:  Okay.  We object to #6, memorandum and

7    opinion order granting Dondero's motion to remand, on the

8    basis of relevance and hearsay.

9          THE COURT:  Overruled.  I can take judicial notice

10    under 201 of that.  So 6 is admitted.

11      (Debtors' Exhibit 6 is received into evidence.)

12          MR. MCCLEARY:   We object to Exhibits 7 and 8 on the

13    grounds of relevance.  7 on relevance and hearsay, and 8 on

14    relevance.

15          MR. MORRIS:  I'll take 7 first, Your Honor.

16          THE COURT:  Okay.

17          MR. MORRIS:  It's an order dismissing Mr. Dondero's

18    202 petition.  That 202 petition sought discovery on the basis

19    of the exact same so-called insider trading claims that Hunter

20    Mountain is asserting today.

21      I think it's not only relevant, it's almost dispositive

22    that a Texas state court heard the exact same -- or, actually,

23    not the exact same, because Mr. Dondero changed his story so

24    many times -- but heard a version, I think Versions 1, 2, and

25    3, of this insider trading and would not even give them

002020

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document Exhibit 72   Filed 05/09/25 2390   Page 163 of 262    PageID 3170

56

1    discovery.

2        So when the Court considers whether or not there's a

3    colorable claim here, I think it ought to think about what a

4    Texas state court decided on not whether or not they have

5    colorable claims, whether or not they're even entitled to

6    discovery.  I think it's very relevant.  Move for its

7    admission right now.

8        MR. MCCLEARY:  Your Honor, it's ironic, because at

9    that hearing counsel for the Respondents was arguing that it

10   ought to be this Court that considers what discovery is

11   appropriate.

12       THE COURT:  Okay.  Well, obviously, you can argue

13   about that, but, again, I think I can take judicial notice of

14   this.  Right?

15       MR. MCCLEARY:  Well, we argue that it's not relevant,

16   Your Honor, and it is the --

17       THE COURT:  Okay.

18       MR. MCCLEARY:  7 is not relevant and is hearsay.

19       THE COURT:  Okay.

20       MR. MORRIS:  Number 8, --

21       THE COURT:  Objection is overruled.

22       MR. MCCLEARY:  Overruled?

23       THE COURT:  And so 7 is admitted.

24       (Debtors' Exhibit 7 is received into evidence.)

25       MR. MCCLEARY:  8 is our verified petition.  And we

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 11-72   Filed 08/01/25   Page 164 of 262   PageID 3171

57

1  object on the grounds of relevance.

2           MR. MORRIS:  You know, Your Honor, if I really had

3  the time and the patience to do this, I think I'd find this

4  document attached to Mr. McEntire's affidavit that's on their

5  exhibit list.

6       But to speed this up just a little bit, how could their

7  202 petition that sought discovery on the basis of the very

8  same insider trading allegation not be relevant?  It's a

9  judicial order.  You can take notice of it.  And it's

10  incredibly relevant that a second Texas state court heard the

11  same allegations that they're presenting to you as colorable

12  and said no, you're not getting discovery.

13           MR. MCCLEARY:  We don't know why they made that

14  order, Your Honor.  They could have simply accepted the

15  opposition's arguments that this Court had jurisdiction and

16  should consider what discovery ought to be done.

17           THE COURT:  Overruled.

18           MR. MCCLEARY:  It's not relevant to our --

19           THE COURT:  I admit 8.

20           MR. MORRIS:  Next?

21           MR. MCCLEARY:  Overruled?

22           THE COURT:  Yes.

23       (Debtors' Exhibit 8 is received into evidence.)

24           MR. MCCLEARY:  The declaration of James Dondero.  I

25  think we withdrew the Dondero --

002022

HCMLPHMIT00003070

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 72 Filed 05/09/25   Page 165 of 262    PageID 3172

58

```
 1              THE COURT:  Right.

 2              MR. MCCLEARY:  -- declarations.  If it --

 3              THE COURT:  It's --

 4              MR. MCCLEARY:  Numbered -- I'm sorry, #9.

 5              THE COURT:  9.  I've already checked it as admitted.

 6              MR. MCCLEARY:  If you want to -- if you want to offer

 7   #9, they can offer it.

 8              THE COURT:  It's admitted.  I've already --

 9              MR. MCCLEARY:  Okay.

10              THE COURT:  -- said.

11              MR. MCCLEARY:  Number 10.  It's an order denying our

12   second Rule 202 petition.  And we object to it on relevance,

13   Your Honor.

14              THE COURT:  Same objection.  It's overruled.  It's

15   admitted.

16        (Debtors' Exhibit 10 is received into evidence.)

17              MR. MCCLEARY:  Number 12, 13, and -- 12 and 13 are

18   correspondence regarding resignation letters.  We object on

19   grounds of relevance.

20              THE COURT:  Wait.  Did we skip 11 for a reason?

21              MR. MCCLEARY:  Pardon me?

22              THE COURT:  Did we skip 11 for a reason?

23              MR. MCCLEARY:  We only have it --

24              THE COURT:  Oh, wait.  It's already admitted by

25   stipulation.
```

002023

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 77   Filed 09/02/25   Page 166 of 262   PageID 3173
Exhibit 72   Page 90 of 390

59

```
 1              MR. MCCLEARY:  Yeah, and we have --

 2              MR. MORRIS:  That's the one --

 3              MR. MCCLEARY:  We have our general objection.

 4              MR. MORRIS:  That's the one exhibit that they didn't

 5    object to.

 6              THE COURT:  Okay.

 7              MR. MCCLEARY:  We only had our general objection with

 8    respect to that.

 9              THE COURT:  Okay.  Thank you.  Thank you.

10              MR. MCCLEARY:  On 12 --

11              THE COURT:  Uh-huh.

12              MR. MCCLEARY:  -- and 13, those are correspondence

13    regarding resignations.  We object on the grounds of

14    relevance.

15              MR. MORRIS:  So, the relevance of that, Your Honor,

16    is to show that when Mr. Dondero sent this email to Mr. Seery

17    in December 2020, he had absolutely no relationship to

18    Highland, had absolutely no duty to Highland, had absolutely

19    no reason to send this email to Highland.  He wasn't in

20    control of Highland.  He wasn't --

21         If they'll stipulate to this, that's fine.  He wasn't in

22    control.  He had no authority to do anything.  He couldn't

23    effectuate trades.  He wasn't there.  And that's what these

24    documents are intended to prove.

25              THE COURT:  Okay.  Why are we -- this is --
```

HCMLPHMIT00003072

60

```
 1              MR. MCCLEARY:  Because there are --

 2              THE COURT:  Some of this stuff, I mean, --

 3              MR. MCCLEARY:  There are other agreements.

 4              THE COURT:  -- is no big deal.  Right?

 5              MR. MCCLEARY:  Sub-advisory agreements, other

 6   agreements that he had under which he had a responsibility to

 7   make the communications regarding material nonpublic

 8   information that he made.  So this is simply irrelevant, Your

 9   Honor.

10              THE COURT:  I overrule.  I mean, again, I don't --

11              MR. MCCLEARY:  Okay.

12       (Debtors' Exhibits 12 and 13 are received into evidence.)

13              MR. MCCLEARY:   Number 14, --

14              THE COURT:  You're both giving me just a lot of

15   background that I already have, but of course a Court of

16   Appeals --

17              MR. MORRIS:  That's why we --

18              THE COURT:  -- isn't going to have it.

19              MR. MORRIS:  Yep.

20              MR. MCCLEARY:  Well, #14, Exhibit 14, we object on

21   the grounds of relevance and hearsay.

22              THE COURT:  Okay.  Wait a minute.  We skipped 13

23   because -- why?  Oh, wait, that was, I'm sorry, 12 and 13 --

24              MR. MORRIS:  Yes.

25              THE COURT:  -- where I've overruled the objection and
```

002025

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 1-72 Filed 02/29/2390    Page 168 of 262    PageID 3175

61

1    admitted.

2        Okay.  Go ahead.

3        MR. MCCLEARY:  14, we object on the grounds of

4    relevance and hearsay, Your Honor.

5        MR. MORRIS:  I'm just going to make this real quick,

6    Your Honor.  Here's the thing.  This Court knows it.  It's

7    actually facts that cannot be disputed because they're subject

8    of court orders.

9        As the Court will recall, beginning in late November 2020

10    continuing through late December 2020, Mr. Dondero was engaged

11    in a continuous pattern of interference with Highland's

12    business and trading.  It was the subject of the TRO, which is

13    why the TRO is relevant.

14        Your Honor will recall that at the end of November Mr.

15    Dondero attempted to stop Mr. Seery from trading in Avaya

16    stock.  On December 3rd is when he sent this threatening

17    email, text message, to Mr. Dondero [sic].  It caused us to

18    get the TRO.

19        Your Honor will recall on December 16, 2020, that's when

20    we had the hearing on Mr. Dondero's motion to try to stop Mr.

21    Seery from trading in the CLOs that the Court dismissed as

22    frivolous and granted the directed verdict of Highland.

23        So, that's December 16.  He sends this email about MGM on

24    December 17th.  And what happens on December 18th?  More

25    interference with Highland's business.  It's a matter of --

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 72    Filed 06/30/25    Page 169 of 262    PageID 3176

62

1    beyond dispute.  It's law of the case at this point because

2    that's the subject of the contempt order.  And the Court found

3    that, after -- after hours, on December 18th, Hunter Covitz

4    told Mr. Dondero that Mr. Seery was again trying to trade in

5    Avaya stock, and within a day or two Mr. Dondero was again

6    interfering it, and that's what led to the second -- to the

7    first contempt order.

8        So all of these documents are relevant to show motive and

9    what was happening.  This email was not sent for any

10   legitimate purpose.  The evidence is just overwhelming.  And

11   it's not -- it's not like, oh, that's an argument we're

12   making.  Between the TRO and the contempt order, it's law of

13   the case.  He was interfering with Highland's business nonstop

14   for thirty days, including the day before he sent this email

15   and the day after he sent the email.

16           THE COURT:  Okay.

17           MR. MCCLEARY:  Your Honor, this is a lawsuit or an

18   effort to file a lawsuit on behalf of Hunter Mountain

19   Investment Trust, not James Dondero.  And as much as Counsel

20   wants to make this about Jim Dondero and attack him, this is a

21   different case.  So this exhibit has nothing to do with the

22   claims in this lawsuit.  It's not relevant.  And hearsay.

23           MR. MORRIS:  The only evidence is Mr. Dondero.  It's

24   -- could not be more relevant.

25           THE COURT:  Okay.  I overrule.  I'm admitting this.

HCMLPHMIT00003075

```
 1  And so we're --

 2           MR. MCCLEARY:  Uh, --

 3           THE COURT:  It's 14.  It's -- how far?

 4           MR. MCCLEARY:  14.  Exhibit 15 is where we are, Your

 5  Honor.

 6           THE COURT:  Okay.

 7      (Debtors' Exhibit 14 is received into evidence.)

 8           THE COURT:  15.

 9           MR. MORRIS:  Oh, that's -- that's the contempt order.

10  And so these contain the judicial findings that are now beyond

11  dispute that Mr. Dondero was engaged in interfering with

12  Highland's business after the TRO was entered on December

13  10th.

14           THE COURT:  Okay.  Again, my own orders, --

15           MR. MCCLEARY:  Your Honor, it's not --

16           THE COURT:  -- I can take judicial notice of --

17           MR. MCCLEARY:  It's --

18           THE COURT:  -- under the Federal Rules of Evidence.

19           MR. MCCLEARY:  It's --

20           THE COURT:  201.

21           MR. MCCLEARY:  We simply object as not relevant.  We

22  object based on Federal Rule of Evidence 403.  Any possible

23  relevance is outweighed by the prejudice.  And we object on

24  the grounds of hearsay, Your Honor.

25           THE COURT:  Prejudice?  Prejudice?  They're orders I
```

HCMLPHMIT00003076

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 1-72    Filed 06/30/25    Page 171 of 262    PageID 3178
Exhibit 72    Page 939 of 390

64

```
 1    issued.  I'm going to be prejudiced by my own orders?

 2              MR. MCCLEARY:  Uh, well, --

 3              THE COURT:  I don't --

 4              MR. MCCLEARY:  -- Hunter Mountain will be.

 5              THE COURT:  Okay.  I'll overrule.

 6         (Debtors' Exhibit 15 is received into evidence.)

 7              THE COURT:  I'll tell you what.  We're out of our --

 8    well, we've get probably 30 seconds left.  Anything that we

 9    can maybe knock out to not have eat into your three hours?

10    Both of you?

11              MR. MCCLEARY:  Your Honor, we filed written

12    objections to all of these exhibits.  We urge those

13    objections.  16.

14              THE COURT:  I know, but this is your chance to argue

15    why your objections have merit.  I can -- we can just --

16              MR. MCCLEARY:  Because, well, obviously, we're

17    talking about pleadings and filings in other matters.  The

18    evidence that they're trying to use to impugn Jim Dondero,

19    which has nothing to do with the merits of HMIT's claims and

20    allegations of insider trades.

21              THE COURT:  Okay.  A lot of this is articles.

22    Articles, articles, articles about MGM.

23              MR. MCCLEARY:  On the articles, Your Honor, subject

24    to our general objection, we'll withdraw the objections to the

25    articles if they'll agree to the articles that we've offered.
```

002029

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 1-72    Filed 09/09/25    Page 172 of 262    PageID 3179

65

```
1              MR. MORRIS:  Your Honor, we didn't lodge an objection
2    to their articles.
3              MR. MCCLEARY:  Okay.
4              MR. MORRIS:  And just so, if anybody is keeping track
5    at home, this is Item B on the list that I created earlier
6    this morning.
7              THE COURT:  Okay.  So, 25 through 30 are articles.
8    Those are admitted by stipulation.  Nothing is about the truth
9    of the matter asserted.  They're just articles that were out
10   there for --
11             MR. MORRIS:  Right.  I would just --
12             MR. MCCLEARY:  Yes.
13             THE COURT:  -- the world.
14             MR. MORRIS:  Just so we're clear, it's Exhibits 25, 6
15   -- 25, 26, 27, 28, 29, and 30.
16             THE COURT:  Right.
17        (Debtors' Exhibits 25 through 30 are received into
18   evidence.)
19             MR. MORRIS:  And so, yes, those are all articles.
20   They have their articles.  Exhibit 72.
21             THE COURT:  Oh, and 34 is another one.  So that's
22   admitted as well.
23             MR. MORRIS:  Yes.
24             MR. MCCLEARY:  Yes, Your Honor.
25        (Debtors' Exhibit 34 is received into evidence.)
```

002030

HCMLPHMIT00003078

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 1-72    Filed 07/09/25    Page 173 of 262    PageID 3180

66

```
 1                THE COURT:  Okay.  Well, we're out of time, so as for
 2      the others, they can offer them the old-fashioned way if they
 3      want to, you can object the old-fashioned way, and it eats
 4      into both of your three hours.
 5                MR. MCCLEARY:  Yes, Your Honor.
 6                THE COURT:  Okay.  Let's hear opening statements.
 7           And by the way, before we wrap up today, I'm going to say
 8      out loud everything I've admitted so we're all crystal clear
 9      on what's in the record.  This has been a bit chaotic.
10                MR. MCCLEARY:  Okay.  Understood.
11                THE COURT:  So, Caroline is going to be the keeper of
12      our time over here.  And if the judge ever interrupts you,
13      she's going to stop the timer.  Okay?
14                MR. MCENTIRE:  Thank you.
15                THE COURT:  I hope I won't any more, but you may
16      proceed.
17                MR. MCENTIRE:  No, I appreciate it.  Thank you.  Can
18      you see it, Your Honor?
19                THE COURT:  I can, yes.  Thanks.
20                MR. MCENTIRE:  Can opposing counsel see it?
21                MR. MORRIS:  Yes, sir.
22                MR. MCENTIRE:  All right.
23                THE COURT:  And I'm just going to ask everyone who
24      has a PowerPoint today, can I get a hard copy --
25                MR. MCENTIRE:  Certainly.
```

HCMLPHMIT00003079

| | |
|---|---|
| 1 | THE COURT: -- before we close? |
| 2 | MR. MCENTIRE: Certainly. |
| 3 | THE COURT: Okay. Thank you. |
| 4 | OPENING STATEMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT |
| 5 | TRUST |
| 6 | MR. MCENTIRE: May it please the Court, Your Honor, |
| 7 | at this time I'll be providing the opening statement on behalf |
| 8 | of Hunter Mountain Investment Trust. It is a Delaware trust. |
| 9 | Mark Patrick, who's in the courtroom, is the Administrator. |
| 10 | He will be one of the witnesses that you'll hear today. |
| 11 | Hunter Mountain Investment Trust is the former 99.5 |
| 12 | percent equity holder, currently classified as a Class 10 |
| 13 | contingent beneficiary under the Claimant Trust Agreement. It |
| 14 | is active in supporting various entities that in turn support |
| 15 | charities throughout North Texas. |
| 16 | Your Honor, this is not an ordinary claims-trading case. |
| 17 | I know the Court made those references in one of the hearings, |
| 18 | and I wanted to more clearly respond. This has different |
| 19 | indicia. An ordinary claims-trading case is normally outside |
| 20 | the purview of the bankruptcy court. What makes this |
| 21 | different is that we're involving, we believe and allege, |
| 22 | breaches of fiduciary duty of the Debtor-in-Possession's CEO |
| 23 | and the Trustee. |
| 24 | It involves also aiding and abetting by the entities that |
| 25 | actually acquired the claims. And that falls into the |

002032

HCMLPHMIT00003080

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 7-72 Filed 09/09/25    Page 175 of 262    PageID 3182

68

1    category of willful misconduct.

2        It also involves injury to the Reorganized Debtor and to

3    the Claimant Trust.  Ordinarily, a claims trade would not

4    involve injury to the estate or the reorganized debtor.  Here,

5    we have alleged that it has.  And the injury takes the form of

6    unearned excessive fees that Mr. Seery has garnered as a

7    result of his relationship and arrangements, as we have

8    alleged, with the Claims Purchasers.

9        During the course of my presentation today, I'll be

10    referring to the Claims Purchasers as the collective of

11    Farallon, Stonehill, Muck, and Jessup.

12        I would like to briefly discuss some of the issues that

13    have already been presented to the Court, just to make sure

14    that this record is clear.

15        Can you please continue?

16        We don't believe the *Barton* Doctrine is applicable.  I

17    believe that precedent is very clear that the *Barton* Doctrine

18    deals with proceedings in other courts, and the various

19    standards and requirements of *Barton* do not apply if in fact

20    we're coming to the Court and filing the proceeding in the

21    court where the Trustee was actually appointed.

22        And so I think that the law is clear.  And this is Judge

23    Houser here in the Northern District of Texas in the case *In*

24    *re Provider Meds*.  And she makes very clear that the standard

25    for granting leave to sue here is actually less stringent than

HCMLPHMIT00003081

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 31-7   Filed 07/09/25   Page 176 of 262   PageID 3183

69

```
 1    a 12(b)(6) plausibility standard.  So if there is any issue as

 2    to what standard this Court should be applying to the -- to

 3    this process, we believe it's a 12(b)(6) standard, confined to

 4    the four corners of the document.

 5         If the Court wishes to consult the documents that are

 6    referred to in the four corners of the petition or complaint,

 7    it may do so.

 8         But the standard here is even more flexible than a

 9    standard plausibility.  Our evidence, though, achieves the

10    standard of plausibility as well.

11         The In re Deepwater Horizon case is another important

12    case.  That's a Fifth Circuit case.  A plaintiff's claim is

13    colorable if it can allege standing and the elements necessary

14    to state a claim on which relief could be granted.  Defining a

15    colorable claim as one with some possible validity.  I don't

16    have to prove my case today.  I didn't have to prove my case

17    in the prior hearings.  I have to prove sufficient

18    allegations, not evidence, but sufficient allegations to show

19    that it has some possible basis of validity.

20         Possible basis of validity.  We're not here talking about

21    likelihoods.  We're not here talking about prima facie

22    evidence.  We're not here talking about probabilities.  We're

23    talking about something less than plausibility.  But, again,

24    we achieve plausibility.

25         A colorable claim is defined as one which is plausible or
```

HCMLPHMIT00003082

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 72   Filed 07/09/25   Page 177 of 262    PageID 3184

70

1   not without merit.  These are various cases from around the

2   country.  The colorable claim requirement is met if a

3   committee has asserted claims for relief that, on appropriate

4   proof, would allow recovery.  On appropriate proof.  We're not

5   required to put on that proof today, Your Honor.

6       Courts have determined that a court need not conduct an

7   evidentiary hearing, but must ensure that the claims do not

8   lack any merit whatsoever.  We submit that our claims have

9   substantial merit and deserve the opportunity to initiate our

10  proceedings, have an opportunity to conduct discovery.  And if

11  they want to file a 12(b)(6) motion before this judge, before

12  you, they can do so.  If they want to file a motion for

13  summary judgment, they can do so.  But at this juncture, they

14  cannot, and at this juncture this Court should not consider

15  evidence in making its determination.

16      Standing under Delaware law.  The Funds have collectively

17  really hit the standing issue hard.  I think it's easily

18  resolved.  First of all, it's clear that a beneficial owner

19  has standing to bring a derivative action.  Under Delaware

20  law, a beneficial owner has a right to bring a derivative

21  action on behalf of the -- against the trustee.

22      So the issue is, am I a beneficial owner?  As a contingent

23  beneficiary in Class 10, and that's the Court's inquiry here,

24  do I qualify as a beneficial owner?  And I think that Delaware

25  law is clear that, by not limiting it to only vested

HCMLPHMIT00003083

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 72    Filed 07/29/2390    Page 178 of 262    PageID 3185

71

1    interests, by not limiting it only to immediate beneficiaries,

2    they are not -- they are not extending the scope of the

3    statute to contingent beneficiaries.  And this is consistent

4    with the laws around the country, because even Texas

5    recognizes that an unvested contingent beneficiary has a

6    property right to protect.

7        Even Mr. Seery admitted in his deposition that a unvested

8    contingent interest is in the nature of a property right.  If

9    you have a property right, that property right can be abused.

10   If you have a property right, that property right, whether

11   it's inchoate or not, it can be abused, it can be

12   misappropriated, and you could become aggrieved.  And that is

13   the constitutional standard for standing:  Is Hunter Mountain

14   Investment Trust aggrieved?  And the answer is yes.

15       Contingent beneficiaries from around the country, in

16   addition to Mr. Seery's admission that we have a property

17   interest, contingent beneficiary has standing.  This is the

18   *Smith v. Clearwater* case on Slide 11.  Very clearly, they say

19   that even if it's subject to a future event.  Their argument

20   is that Mr. Seery has not certified Hunter Mountain as in the

21   money.  We believe we are in the money.  That's a different

22   issue.  We believe he should certify, in the discharge of his

23   duties.  That's a different issue.

24       But even assuming his case -- his argument for a moment,

25   their argument is that since he's not done that act, which we

HCMLPHMIT00003084

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 1-72   Filed 07/09/25   Page 179 of 262   PageID 3186

72

1   also challenge and criticize that he's not done that act, that

2   we can't qualify to bring this case.  Well, that's not what

3   the law is, that even an unvested interest, a contingent

4   interest, has a right.

5       Slide 12.  This is the State of Illinois.  Despite the

6   fact that interest is contingent and may not vest in

7   possession, you still have a right to protect what you have.

8   And you have standing to bring a cause of action.

9       The Claimant Trust Agreement, by the way, suggests that we

10  have no vested interest, and they'll likely argue that point.

11  But the point there is the law says that's irrelevant.  If

12  it's an inchoate interest, if it's potentially vested in the

13  future, that's what imbues you with standing.

14      And in any event, the Claimant Trust Agreement is subject

15  to Delaware trust law, and they can't get around that.  They

16  can say whatever they want to say in the agreement to try to

17  block us from participation, but it's still subject to

18  Delaware trust law, and Delaware trust law does not draw a

19  distinction between vested or unvested.

20      The State of Missouri:  There is no dispute in this case

21  that the future -- that future beneficiaries have standing to

22  bring an accounting action, whether they're vested or

23  contingent.  The *Bucksbaum* case.  Article III standing exists,

24  constitutional standing, including discretionary

25  beneficiaries, have long been permitted to bring suits to

002037

HCMLPHMIT00003085

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document Exhibit 72   Filed 07/09/23 90   Page 180 of 262    PageID 3187

73

```
 1    redress trustees' breaches of trust.  This applies not only to

 2    our standing as an individual plaintiff, which we've brought,

 3    but also in our standing -- in our capacity seeking to bring a

 4    derivative action to benefit the Claimant Trust of the

 5    Reorganized Debtor.  Both are permitted under this law under

 6    these cases.

 7        An interest -- in the Mayfield case, an interest is any

 8    interest, whether legal or equitable or both, vested,

 9    contingent, defeasible, or indefeasible.  So the unilateral

10    self-serving wording of the Claimant Trust does not abrogate

11    our right to bring the claim.

12        I'd like to talk briefly about fiduciary duties.  We know

13    that Mr. Seery has fiduciary duties to the estate when he was

14    the CEO prior to the effective date.  We allege that he

15    breached those fiduciary duties, and that gives us standing to

16    bring the claim that we have brought for breaching fiduciary

17    duties, causing damages that are accruing post-effective date.

18        In the Xtreme Power case, again, the directors can either

19    appear on both sides of the transaction or expect to derive

20    any personal financial benefit.  We are alleging that Mr.

21    Seery engaged in self-dealing.  We allege that he engaged in

22    self-dealing by arriving at an understanding where he could

23    put business allies -- whether you call them friends, business

24    allies, close acquaintances -- on the committee, the Oversight

25    Board that would ultimately oversee his compensation, which,
```

HCMLPHMIT00003086

1    in the context of this case, makes no sense and it is

2    excessive.

3        Muck is a specially -- special-purpose entity of Farallon.

4    Farallon acquired the claims, created Muck to do the job.

5    Muck is now on the Oversight Board.

6        Jessup.  Jessup is a special-purpose entity, a shell

7    created by Stonehill.  Stonehill bought the claims, funneled

8    the money through Jessup.  Jessup is now on the Oversight

9    Board.  Jessup and Muck -- and by the way, the principals in

10   Farallon are actually the representatives from Muck on the

11   Oversight Board.  So there's no suggestion that there's really

12   a distinct corporate relationship here.

13       Michael Linn, who is a principal at Farallon.  You'll hear

14   his name today, throughout today.  He actually is a

15   representative of the Oversight Board, dealing with Mr. Seery

16   and negotiating Mr. -- I put negotiation in quotes --

17   negotiating Mr. Seery's compensation.

18       I'd like to talk very briefly about background.  We took

19   Mr. Seery's deposition.  I was unaware of this.  I now know

20   it.  Perhaps the Court was already aware of it.  This is Mr.

21   Seery's first job as a CEO of any debtor.  This is the first

22   time Mr. Seery has ever been a chief restructuring officer.

23   This is the first time Mr. Seery has ever been the CEO of a

24   reorganized debtor.  This is the first time that he's served

25   as a trustee post-effective date.  However, his compensation

HCMLPHMIT00003087

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 7-2    Filed 07/09/25    Page 182 of 262    PageID 3189

75

1   is excessive and not market-driven, and there's a reason for

2   that.  We believe and we allege that it's a *quid pro quo*

3   because of prior relationships with Farallon and Stonehill.

4       Farallon and Stonehill are hedge funds, Your Honor.  They

5   created their special-purpose entities on the eve of this

6   transaction simply to take the title to the claims, but the

7   money is going upstream.

8       Seery has a relationship with Farallon.  Do we know the

9   full extent of that relationship?  No.  We have been deprived

10   of discovery.  We attempted to get the discovery in the state

11   court 202 process.  We were denied for reasons not articulated

12   in the court's order.

13       We attempted to get the discovery here that the Court

14   refused under the last hearing about these relationships.

15       So what we do have begins to put the pieces of the puzzle

16   together.  And sufficient is more than plausible.  It is more

17   than colorable.

18       We know that Mr. Seery went on a meet-and-greet trip to

19   Farallon's offices in 2017.  Didn't have to.  He was trying to

20   cultivate a business relationship.  Farallon was important to

21   him.

22       We know that in 2019 he was no longer with Guggenheim

23   Securities.  He goes out to Farallon's offices for another

24   meet-and-greet and he specifically meets with the two

25   principals who are reflected in Mr. Dondero's notes, Raj Patel

HCMLPHMIT00003088

1    and Michael Linn.

2        We know that in June 2020 Farallon emailed Seery.  This is

3    after Mr. Seery becomes the CEO.  He says, "Congratulations.

4    We're monitoring what you're doing."

5        Seery's relationship with Stonehill.  These are all --

6    this is all before what we believe to be the events that are

7    at issue in this case.  We believe that -- represented

8    Stonehill in the *Blockbuster* bankruptcy proceeding.  There was

9    an objection to a document.  Mr. Seery was involved in the

10   *Blockbuster* proceedings.  Stonehill was one of his many

11   clients on the committee that he represented.

12       We know that Stonehill is actively involved in one of Mr.

13   Seery's charities in New York.  We know that he sent text

14   messages to Mr. Seery in February of 2021, wanting to know how

15   to get involved in this bankruptcy.

16       Farallon and Stonehill were strangers to this bankruptcy.

17   They weren't creditors.  They were encouraged and they came

18   into this process.

19       Farallon and Stonehill have not denied any of our

20   allegations.  They are not putting any evidence on today.  We

21   allege that these relationships was based and founded upon a

22   *quid pro quo*.  I'll scratch your back; you scratch mine.  You

23   give me some information; I want to evaluate these claims.

24   And, by the way, we're going to be on the Oversight Board, or

25   you're going to put us on the Oversight Board, or by default

002041
HCMLPHMIT00003089

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 3-17    Filed 08/08/25    Page 184 of 262    PageID 3191

Exhibit 72    Page 978 of 390

77

1    we'll be on the Oversight Board, and we'll work out your

2    compensation agreement.

3        Mr. Seery also has an established relationship with

4    Stonehill.

5        I like to have a timeline of certain events.  This is not

6    all of the relevant events, but this can give you a quick

7    picture.  We know that Mr. Dondero sent an email to Mr. Seery

8    in December of 2020 relating to MGM.  It is undisputed that

9    Mr. -- that Farallon emailed Seery, Mr. Seery, in January of

10    2021 if there was a path to get information regarding the

11    claims for sales.  Mr. Seery says he never responded to it,

12    but we know that this entity, Farallon, got deeply involved in

13    buying these claims shortly after this email.

14        We have the Claimant Trust Agreement suddenly being

15    amended to not have a base fee, but now we're going to

16    incorporate a success participation fee.  As part of a plan,

17    we're not criticizing that, but suddenly the vehicle for post-

18    effective date bonuses is being created.

19        The Debtors' analysis comes out in association with the

20    plan confirmation.  It projects a 71.32 percent recovery for

21    Class 8 and Class 9, and those are the principal classes we're

22    talking about.  95 percent -- 98 percent of all of the claims

23    here are in Class 8 and Class 9, until you get to us, Class

24    10.

25        71.32 percent of Class 8 means that Farallon and Stonehill

HCMLPHMIT00003090

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 3-72   Filed 07/09/25   Page 185 of 262   PageID 3192
Exhibit 72   Page 79 of 130

78

1   will get less than about a six percent internal rate return on

2   their $163 million investment, which they have never denied.

3   That is not a hedge fund investment goal.  Investment -- hedge

4   funds like these companies, they go for 38, 40, 50 percent of

5   returns.  Who would ever invest $163 million on a distressed

6   asset that's not collateralized with only an expectation of an

7   internal rate of turn of six percent?  But that's going to be

8   the evidence before the Court.  That does not make any

9   financial, rational wisdom at all.

10       The plan is confirmed.  It's undisputed that Stonehill

11   contacts Seery after the plan is confirmed to want to know how

12   to get involved.  They have phone calls after this text

13   message.  Muck is created on March 9.  We know from Mr.

14   Seery's deposition that Farallon told Seery that six days

15   later they bought the claims.  All the claims, by the way,

16   when I say bought the claims, it's everything except UBS.  To

17   our knowledge.  They may have negotiated the paperwork back

18   then, but the claims transfers did not occur until the summer.

19   All the other claims involved, the claims transfers were filed

20   with this Court in mid-April and at the end of April.

21       Tim Cournoyer removes MGM from the restricted list.  Tim

22   Cournoyer is an employee of Highland.  Well, it tells us that

23   MGM was on the restricted list and there should be no

24   discussion about MGM, but there was.  There was discussions

25   about MGM, and Mr. Dondero is going to testify to that.

002043

HCMLPHMIT00003091

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 72 Filed 09/09/25    Page 186 of 262    PageID 3193

79

1    And we also know that the HarbourVest settlement was

2    consummated during this period of time.  If it had been on the

3    restricted list, as it was, that transaction should never have

4    occurred.  But it did occur.  This Court ordered it.  It

5    approved it.  And I'm not challenging -- we're not challenging

6    that settlement.  It is done.  That is done.  What we are

7    challenging is the fact that Mr. Seery is actively involved in

8    using inside material nonpublic information.

9        Jessup Holdings is created shortly thereafter, on April

10    8th.  We have claims settling on April 30th.  The Acis claim

11    is transferred to Muck -- that's Farallon -- on April 16.  The

12    Redeemer and Crusader are all transferred on April 30th.

13        Stonehill and Farallon never deny that they did no due --

14    that they failed to do due diligence.  We allege that there

15    was no due diligence.  And that relies in significant part

16    upon Mr. Dondero.  But now, because we have Mr. Seery's

17    deposition, it also relies upon Mr. Seery's admissions in

18    deposition, because he says he never opened up a data room, he

19    doesn't know what due diligence they did.  Farallon says the

20    only due diligence they did is they talked to Jim Seery.  And

21    how do you invest $163 million, or $10 million or $50 million,

22    whatever the part is, with an internal rate of return six

23    percent, only on the advice of Mr. Seery, who's never been a

24    trustee or a CEO before, unless there's something going on?

25        Your Honor, public announcement of MGM on May 26th.  On

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 17-2   Filed 09/09/25   Page 187 of 262   PageID 3194
Exhibit 72   Page 90 of 390

80

1   May 28th, two days later, Mr. Dondero calls Farallon.  It took

2   Mr. Dondero or his group a few days, a week or so, to even

3   understand who -- that Farallon was involved, because the

4   registrations for Muck and Jessup did not disclose their

5   principals, did not even disclose addresses.  They were shell

6   -- they were companies that came in in the last minute to buy

7   these claims incognito, frankly.

8       They found out that Farallon was involved.  They had a

9   call initially with Raj Patel, who is the principal of

10  Farallon.  He has three conversations total:  One with Mr.

11  Patel and two with Michael Linn.  Michael Linn was the one

12  responsible for these claim purchases.  Patel admitted that

13  Farallon relied exclusively on Seery and did no due diligence.

14  Linn rejected the premium to sell.  The evidence you'll hear

15  today, that Mr. Linn rejected a premium up to 40 percent to

16  sell the claims.  He actually said he would not sell at all

17  because he was told by Mr. Seery that the claims were too

18  valuable.

19      That is evidence of insider trading.  Specifically, they

20  said they were very optimistic about MGM and they were

21  unwilling to sell because Seery said too valuable.

22      We have -- these are the purchases.  This is where the

23  Class 9 claims fall.  And keep in mind -- Tim, go back -- that

24  $95 million of this upside potential is being told, at least

25  to the publicly available information, that you're never going

002045

HCMLPHMIT00003093

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 1-72   Filed 08/29/2390   Page 188 of 262   PageID 3195

81

1   to get there.  Yet 95 -- $95 million is allocated to this

2   category.  So Class 8 is $275 million.  Class 9 is 29 -- $95

3   million.

4        Next.

5        So we have the evidence that you'll hear today.  Farallon

6   admitted the timing.  No due diligence, never denied by the

7   Claim Purchasers.  Based upon material nonpublic information.

8   That's our allegation.  Purchased over $160 million.  This is

9   never denied by the Claims Purchasers.  They purchased claims

10  when the return on investment was highly doubtful.  Maximum

11  expected annual rate of return, assuming publicly-available

12  information, was approximately six percent, and that is

13  totally atypical of what a hedge fund would seek.

14       Insider information.  We're not talking about just MGM.

15  The Respondents want to narrow the Court's inquiry.  This is

16  much larger than MGM.  MGM is a part of it, it's a big part of

17  it, but it's not the only part of it.  It's other assets.

18  Portfolio companies.  Other invested assets.  There's a lot of

19  money out there, and it was never disclosed during the

20  ordinary course of the bankruptcy, for reasons that the Court

21  already knows, in terms of asset values.  How does someone

22  come in and purchase distressed assets, claims, without any

23  understanding of what assets are backing those claims, when

24  there's no publicly-available information there to do it and

25  there's no evidence, no indication, no statement that actually

HCMLPHMIT00003094

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 31-72   Filed 09/02/25   Page 189 of 262   PageID 3196
Exhibit 72   Page 39 of 390

82

1 due diligence was done?

2      That right there, without anything else, makes our claims

3 plausible.  You don't have to prove insider trading by direct

4 evidence.  Nobody's going to admit that they did something

5 wrong.  You prove it circumstantially, and we've cited cases

6 and we'll give you cases to that effect.

7      Next.

8      We have material nonpublic information.  It is very clear

9 that Mr. Dondero on December 17th sent this email, not just to

10 Mr. Seery but to several other individuals, including lawyers.

11 It states that he'd just gotten off a board call.  A pre-board

12 call.  The update, he provides the update.  Active

13 diligencing.  It's probably a first-quarter event.  We can

14 scour all of the other media documents that are in evidence,

15 both from us and them, and you're not going to find any

16 indication anywhere that a board member has said, guys, gals,

17 it's going to be a probable first-quarter event.  That's

18 material nonpublic information.

19           THE COURT:  By the way, you all objected to this

20 exhibit.

21           MR. MCENTIRE:  No, this is my exhibit.

22           THE COURT:  We spent --

23           MR. MCENTIRE:  I did not.  They objected to this.

24           MR. MORRIS:  Your Honor, we didn't object to it, and

25 that is the one exhibit that they did not object to.

002047

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 31-72    Filed 09/29/25    Page 190 of 262    PageID 3197
Exhibit 72    Page 190 of 390

83

```
 1                  THE COURT:  Oh, it is?

 2                  MR. MORRIS:  Nobody objected to this exhibit.

 3                  MR. MCENTIRE:  I'm not going to object to this

 4      exhibit, Your Honor.

 5                  THE COURT:  Okay.  It's a different version.

 6                  MR. MCENTIRE:  Fair enough.

 7                  THE COURT:  Okay.  It was a different email around

 8      that same time frame.

 9                  MR. MCENTIRE:  So just --

10                  THE COURT:  Apologies.  We stopped the clock.

11                  MR. MCENTIRE:  This -- my next exhibit is simply a

12      demonstrative, but I just want the Court to understand that

13      MGM is no small matter here and Mr. Seery did testify in

14      deposition that it probably made up $450 million.  He was

15      pretty close.

16                  MR. MORRIS:  Your Honor, I object to this

17      demonstrative.  There is no evidence in the record.  It's not

18      cited to anything.  We're not just going to start putting up

19      stuff on the screen that we like.

20                  MR. MCENTIRE:  Excuse me.  I'm not offering this

21      document into evidence.

22                  MR. MORRIS:  I don't care.  The Court shouldn't be

23      seeing a demonstrative exhibit that contains matters that are

24      never going to be in the record.

25                  THE COURT:  Okay.
```

002048

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 44-72    Filed 09/09/25    Page 191 of 262    PageID 3198
Exhibit 72    Page 90 of 390

84

```
 1              MR. MCENTIRE:  I disagree.  I can put the data in the

 2    record.

 3         May I proceed?

 4              MR. MORRIS:  But you didn't.

 5              THE COURT:  Okay.  I'm not considering the truth of

 6    this until and unless I get evidence of this.

 7              MR. MCENTIRE:  Fair enough.  But the point is this,

 8    Mr. Seery has conceded in deposition that between the

 9    institutional funds and the CLOs, there's a lot of MGM

10    securities and stock.  We're talking a lot of money.  We're

11    not talking about just Highland Capital's investment.

12         You can skip the next slide.  Skip.

13         So, rumors versus material nonpublic information.  They

14    can talk all day long, and if they want to use their time

15    doing this, they can.  There's a difference between rumor and

16    actual material nonpublic information.  Rumor from

17    undocumented sources, lack of clarity, lack of timing.  There

18    is no -- there's no debate that a lot of people knew that

19    maybe MGM might be for sale.  Maybe they wouldn't.  Sometimes

20    it falls apart, you know.  But the point is a board member is

21    telling someone that there's a probable event in the first

22    quarter of 2021.  That is definite, specific, and it comes

23    from the highest authority.  That is -- if that's not material

24    and public information, I don't know what could be.

25         Classic indications of insider trading.  You have to have
```

HCMLPHMIT00003097

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 1-72   Filed 09/09/25   Page 192 of 262   PageID 3199

85

 1   a tipper with access to MNPI.  Here, we know that Mr. Seery,

 2   if he's the tipper, we allege he's the tipper -- and these are

 3   words of art out of case law, by the way -- he has access to

 4   information about MGM.  He has access about asset values,

 5   projected values.  He has a relationship.  We believe he has a

 6   very strong relationship.  It's more than just social

 7   acquaintances.  He's giving congratulatory emails.  He's

 8   getting solicitations.  He's solicited.  Benefits received.

 9   We know what the benefits are.  They get the opportunity to

10   invest money with huge upside.

11       There was a point mentioned some time ago that, well, only

12   -- only the sellers really have the grievance.  Well, Your

13   Honor, we have a right to start our lawsuit and do some

14   discovery, because, frankly, a lot of sellers have big-boy

15   agreements.  They say, you don't sue me if I have MNPI.  I

16   don't sue you if you have MNPI.  We have mutual releases.

17   Let's go by our way.  Everybody's happy.  We're not going to

18   come back and see each other ever again.

19       That's one of the things we're being deprived of here.

20   But otherwise, what we have here is a colorable plan.  We've

21   asked for the communications with the sellers.  We can't get

22   it.  We have here an email.

23       Next.

24       We have here an email.  This actually -- you'll hear Mr.

25   Dondero say this actually reflects three communications.  Raj

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 31-72   Filed 07/09/25   Page 193 of 262   PageID 3200

86

1   Patel, Farallon, bought it because of Seery.  Mr. Dondero

2   contacted Mr. Patel and says, Raj Patel bought it because of

3   Seery.  50 to 70 percent's not compelling.  Class 8.  50

4   percent, 70 percent.  Give you a 30 percent to 40 percent

5   premium.  Not compelling.  I ain't going to sell.  Ask what

6   would be compelling.  Nothing.  No offer.  Bought in February/

7   March.  We now know the time frame.  We know that Stonehill is

8   communicating with them and we know that Farallon has been

9   just communicating with Mr. Seery.  Bought assets with claims.

10  It's not just the MGM.  It's not just the portfolio companies

11  and other assets.  It's also the claims.

12      Well, what are the claims?  It's the claims against Mr.

13  Dondero.  Well, how would they know about all this if there's

14  no due diligence and there's no evidence of any due diligence

15  before you?  130 percent of costs, not compelling, no counter.

16  Mr. Dondero's angry.  Discovery is coming.

17      Atypical behaviors are also circumstantial evidence of

18  insider trading.  We have strange behaviors here, Judge.  We

19  have a vast majority of the claim value is acquired by only

20  two entities post-confirmation.  Most significant claims are

21  only owned by two entities who were strangers to the whole

22  process.

23      The removal of -- and Mr. Morris offered to stipulate.

24  The sudden removal of MGM from the compliance list in April of

25  2021 -- by the way, the removal doesn't cleanse the MNPI.  If

HCMLPHMIT00003099

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 7-2 Filed 08/08/25    Page 194 of 262    PageID 3201
Exhibit 72    Page 889 of 390

87

1    you have material nonpublic information because you received

2    it from Mr. Dondero, the fact that Mr. Dondero's no longer

3    employed by Highland Capital or no longer directly or formally

4    affiliated doesn't cleanse the MNPI.

5        We have no due diligence, regardless of the significant

6    nine-digit numbers, and we have no rational explanation of why

7    this kind of money would be invested when they're projecting

8    an actual loss, if -- a modest return at best for Class 8 and

9    a loss for Class 9.

10        Insider trading can be proved by circumstantial evidence,

11    Your Honor.  No fraudster, no person who's done wrong is going

12    to admit to it, so you look for the classic -- you look for

13    the classic elements.  And that's what we had here.  And we

14    have alleged all of this in our pleadings.  Not in extraneous

15    evidence.  Within the four corners of our pleadings.  And

16    that's why we have a plausible claim.

17        You know, I believe it's Rule 8, Rule 9 of the Federal --

18    you have to require specificity in a fraud claim.  Well, this

19    is not a fraud claim.  This is a different claim.  But we have

20    provided specificity that passes the smell test of

21    colorability.  We have provided specificity that would satisfy

22    even more stringent requirements under 12(b)(6).

23        The plan analysis.  This is a, I think, a document

24    admitted by everyone.  Mr. Seery has testified that this

25    projection of 71.32 percent for Class 8 came out in February

002052

HCMLPHMIT00003100

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 17-72    Filed 09/09/25    Page 195 of 262    PageID 3202

88

1  of 2021 and never changed, all the way up to the effective

2  date.

3      So this is what the public believed.  This is what the

4  public knew.  And if this was all that Farallon and if is all

5  that Stonehill had access to, that means that they were going

6  to lose their entire investment on Class 9.  They bought UBS

7  at a loss to begin with.  And on the other three investments,

8  they were going to get a very, very modest, minor return, six

9  percent over three years, or even less.  That is not what

10  hedge funds do.

11      Seery's excessive post-effective date compensation.  We

12  have obtained no discovery from Farallon or Stonehill in this

13  regard, but we know that he had no prior experience.  We know

14  that the award that was given him was not market-based, even

15  though the self-serving documents that have been produced and

16  that are attached to their exhibit list suggests a robust

17  negotiation.  Well, they were robust without any kind of

18  reality check in the real world about whether it was market-

19  supported.  None.  Mr. Seery has admitted to that.

20      It was not lowered.  He's making $1.8 million a year right

21  now, with most -- a lot of the assets already sold, the

22  reorganization done.  All they're doing now is monetizing

23  assets.  He's getting $1.8 million.  He's got 11 people

24  working for him.  And then he has a bonus, a bonus that is --

25  increases significantly with his ability to recover for Muck,

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 172 Filed 09/09/25   Page 196 of 262   PageID 3203

89

1   Jessup, Farallon, and Stonehill.

2       And in the absence of -- if we were really dealing with

3   uncertainty and risk, then that may be another issue, but here

4   we're dealing with entities that already know that they're

5   going to get a payday and they already have.  They've already

6   made about a $170 million return -- 170 percent return, excuse

7   me -- over and above the original investment, when they were

8   projected to actually lose money.

9       Just so you know, we have over $534 million of cash that

10  has been basically monetized, and out of that, $203 million in

11  total expenses -- $277 million to Class 8 and -- and -- 1

12  through 7, and Class 8 distributors.  Excuse me, creditors.

13  Even if you take -- if you take out the alleged obligations of

14  Mr. Dondero on the promissory note cases, that still leaves

15  over $100 million available, which puts us in the money.  Puts

16  us in the money.  And the fact that you have $203 million of

17  expenses in a case of this nature is part of our claim, is

18  that we have delay actions.  We have a situation where Mr.

19  Seery is continuing to receive $1.8 million a year on a slow

20  pace to monetize, paying other professionals, when this could

21  have been over a long time ago.  That's part of our

22  allegations.  It's not part of any valuation motion.  It's

23  actually in our allegations.

24      I'm going to reserve the rest.  I think that's my opening

25  statement, Your Honor.  I'm going to reserve the rest for my

HCMLPHMIT00003102

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 172 Filed 06/19/25    Page 197 of 262    PageID 3204
Exhibit 72    Page 90 of 390

90

```
 1   closing.  And let me see.  Yes, that's right.  And thank you

 2   for your time.

 3            THE COURT:  All right.  Caroline, how much time was

 4   that?

 5            THE CLERK:  Thirty-four minutes and 27 seconds.

 6            THE COURT:  Thirty-four minutes and 37 seconds.

 7   Okay.

 8            THE CLERK:  Twenty-seven.

 9            THE COURT:  Oh, 27.  Okay.

10            MR. MCENTIRE:  Thirty-four minutes?

11            MR. MCCLEARY:  Thirty-four minutes.

12            MR. MORRIS:  Your Honor, I do have hard copies of my

13   short slide presentation.

14            THE COURT:  All right.  You may approach.

15       And Mr. McEntire, are you going to give me your PowerPoint

16   later, hard copies later?

17            MR. MCENTIRE:  Yes, Your Honor.  I found one typo and

18   I'd like to fix one typo and then we'll give it to you.

19            THE COURT:  Okay.

20             OPENING STATEMENT ON BEHALF OF THE DEBTORS

21            MR. MORRIS:  Good morning, Your Honor.  John Morris,

22   Pachulski Stang Ziehl & Jones, for Highland Capital Management

23   and the Claimant Trust.

24       I want to be fairly brief because I really want to focus

25   on the evidence.  I look forward to Your Honor hearing from
```

HCMLPHMIT00003103

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 14-72   Filed 09/29/25   Page 198 of 262   PageID 3205

91

1    Mr. Seery so that he could clear up a lot of the misleading

2    statements that were just made.

3         The Court is here today on a gatekeeper function, and

4    we're delighted that the gatekeeper exists.  We're delighted

5    that the Court will have an opportunity, after considering

6    evidence, to determine whether or not these claims are

7    actually colorable.

8         There's -- there were a lot of conclusory statements I

9    just heard.  There were a lot of assumptions that were made.

10   There were a lot of misleading statements that were made.  At

11   the end of the day, what the Court is going to be asked to do

12   is to decide whether, in light of the evidence, do these

13   claims stand up on their own?  And they do not.

14        And let me begin by saying that I made a mistake a couple

15   of weeks ago.  If we can go to Slide 1.  I told Your Honor

16   that you were the sixth body to consider these insider trading

17   claims.  Based on Hunter Mountain's exhibit list, there is

18   actually one more, and I'll get to that in a moment.  So

19   you're actually -- this is the seventh attempt to peddle these

20   claims to one body or another.

21        The first was Mr. Dondero's 202 petition.

22        Everything I have here, Your Honor, is footnoted to

23   evidence.  Okay?

24        So, Footnote 1, you can look in the paragraphs of Mr.

25   Dondero's petition, his amended petition, his declaration,

002056

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 17-2   Filed 09/02/25   Page 199 of 262   PageID 3206
Exhibit 72   Page 90 of 390

92

1   where he makes the same allegations.  Again, I misspeak.  Not

2   the same allegations.  Different versions of the allegations

3   that are being presented today concerning insider trading.

4       He did it three times.  The Texas state court said no

5   discovery.  In October of 2021, Douglas Draper wrote an

6   extensive letter to the U.S. Trustee, setting forth the same

7   allegations.  You can find them at our Exhibit 5.  It's

8   attachment Exhibit A, Pages 6 through 11.  Compare them to the

9   allegations that are being made by Hunter Mountain today.  The

10  U.S. Trustee's Office took no action.

11      Mr. Rukavina followed up with the same thing to the same

12  body in November of 2021.  You can see where his allegations

13  of insider trading are made and *quid pro quo* and all the rest

14  of it.  Again, they took no action.

15      The one that I don't have on this chart because I didn't

16  -- I made the chart last week and then was unavailable.  Mr.

17  Rukavina sent a second letter.  And you can find that at

18  Plaintiffs' Exhibit 61.  And in Plaintiffs' Exhibit 61, you'll

19  see that Mr. Rukavina sent yet another letter to the U.S.

20  Trustee's Office on May 11, 2022.

21      And these are all really important, right?  The U.S.

22  Trustee's Office has oversight responsibility for matters

23  including claims trading.  That's their job.  They took three

24  different swings at this.  And these are pages of allegations.

25  6 to 11.  9 to 13.  We think it's very important that the

HCMLPHMIT00003105

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 3-72   Filed 09/09/25   Page 200 of 262   PageID 3207
Exhibit 72   Page 94 of 390

93

1   Court look at what was told to the U.S. Trustee's Office.  And

2   you're going to hear Mr. Seery testify that Highland has never

3   heard from the U.S. Trustee's Office concerning any of these

4   allegations or any of the other allegations that are set forth

5   in Mr. Rukavina and Mr. Draper's letter.  Never.  Declined to

6   even initiate an investigation.

7        Hunter Mountain filed its own 202 petition.  It boggles my

8   mind that they try to create distance with Mr. Dondero,

9   because the whole petition, like this whole complaint, is

10  based on Mr. Dondero.  He submitted a declaration alleging the

11  same insider trading case, and a second Texas state court said

12  I'm not even giving you discovery.  We know that's the result.

13       But the best is the Texas State Securities Board.  I think

14  we're going to hear testimony that Mr. Dondero or somebody

15  under his control is the one who filed the complaint with the

16  Texas State Securities Board.  Who would be the better body to

17  assess whether or not there's insider trading than a

18  securities board?  I can't imagine there's a better body.

19  They did an investigation.  Mr. Dondero could have told them

20  anything he wanted.  I'm sure he did.  And they wrote in their

21  motion in Paragraph 37 one of the reasons they have colorable

22  claims is the investigation is ongoing.

23       Much to their dismay, I'm sure, two days before our

24  opposition was due, the Texas State Securities Board said,

25  we've looked at the complaint, we've done our investigation,

HCMLPHMIT00003106

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 172   Filed 06/09/25   Page 201 of 262   PageID 3208

94

1 | and we're not taking any action.  You can find that, Your

2 | Honor, Footnoted 5 at Exhibit 33.

3 | You are now the seventh body who's being asked -- and

4 | you're being asked to do substantially more than any of the

5 | other prior bodies were.  The Texas state courts were being

6 | asked, just let them have discovery.  They said no.  The U.S.

7 | Trustee's Office, charged with the responsibility of looking

8 | at claims trading, said, I'm not going to investigate.  I know

9 | what you've told me.  No.  The Texas State Securities Board.

10 | Insider trading, insider trading.  I'm not doing an

11 | investigation.  I'm not doing anything.  And now they want to

12 | come here and engage in, you know, in expensive, long

13 | litigation over the same claims nobody else would touch.

14 | Can we go to the next slide?

15 | Mr. Dondero's email.  Good golly.  "Amazon and Apple are

16 | in the data room."  There's a hundred articles out there that

17 | they're putting into evidence that say that.  "Both continue

18 | to express material interest."  There's a hundred articles out

19 | there that say that.  "Probably a first-quarter event.  Will

20 | update as facts change."

21 | There will not be any evidence that he ever updated

22 | anybody, because that wasn't the purpose of this, as Your

23 | Honor will recall.  He had an axe to grind.

24 | And I direct your -- I don't direct the Court to do

25 | anything -- I ask the Court to take a look at our opposition

HCMLPHMIT00003107

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 72   Filed 09/09/25   Page 202 of 262   PageID 3209

95

1    to the motion, in Paragraphs 23 to 25, where we cite to

2    extensive evidence, all of which is now part of the record,

3    showing just what was happening, from the moment he got fired

4    on October 10th until the end of the year, with the

5    interference, with the interference, with the threats, with

6    the TRO.  It was nonstop.

7        Was this email sent in good faith by somebody who owed no

8    duty to anybody?  Or was it really just another attempt -- and

9    this is why the gatekeeper is so important, because I think

10   that's exactly what this Court is supposed to do:  Is this a

11   good-faith claim?  Is this a claim that's made in good faith?

12   It can't be.  And you know why?  You know what's -- you know

13   what's -- I'll just say it now.  I won't even save it for

14   cross.

15       Remember the HarbourVest settlement that they're making so

16   much, you know, about?  Mr. Dondero is the tipper.  According

17   to him, he gave Mr. Seery inside information.  According to

18   him, Mr. Seery abused it by engaging in the HarbourVest

19   transaction.  But Mr. Dondero filed an extensive objection to

20   the HarbourVest settlement and never said a word about this,

21   because that wasn't on his mind at the time.  The email was

22   sent in order to interfere.  And when that failed, he's trying

23   to play gotcha now.  It's ridiculous.

24       He owed no duty to Highland.  It would have been a breach

25   of his own duty to MGM to share that information at that

HCMLPHMIT00003108

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 72 Filed 07/02/25   Page 203 of 262   PageID 3210
Exhibit 72   Page 90 of 390

96

1   period of time.

2       The shared services agreement.  They don't help him.  Mr.

3   Dondero has nothing to do with that.  Highland is providing

4   services.  He's not providing services to Highland.  Highland

5   was providing.  We had already given notice of termination.

6   We had already had our plan and disclosure -- we had already

7   had our disclosure statement approved.  We were weeks away

8   from confirmation.  Please.

9       And the *Wall Street Journal* article on December 21st at

10  Exhibit 27, that's not your garden-variety *Wall Street Journal*

11  article, because it specifically says that investment bankers

12  were engaged to start a formal process.  The investment

13  bankers are identified by name.  Something has changed.

14  Anybody could see that.

15      Yes, there were rumors for a long time.  Nobody had ever

16  said there was a formal process.  Nobody had ever said

17  investment bankers had ever been hired.  Nobody had ever

18  identified those investment bankers.  Right?  I mean, just the

19  world changed.

20      If you can go to the next slide.

21      You know, before I get to the next slide in too much

22  detail, *quid pro quo*.  We look at it as *quid*.  Did he -- is

23  there any evidence that he actually gave anybody material

24  nonpublic inside information?  The answer is going to be no.

25  The *quo* is the relationship.  And I'm not going to spend too

HCMLPHMIT00003109

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 772   Filed 09/09/2390   Page 204 of 262    PageID 3211

97

1   much time on that now.  But wait until you hear Mr. Seery

2   testify as to the actual facts about his relationship.

3   Because some of what we just heard is mind-boggling, that

4   little -- that little page from the *Blockbuster* case, like, 14

5   years ago, where Farallon was one of a group of people who Jim

6   Seery never met.  Like, the stretch, what they're trying to do

7   is beyond the pale.  But I'm delighted to have Mr. Seery sit

8   in the box and answer all the questions they want to ask him

9   about his relationship with Farallon and Stonehill.

10       But getting to the point, the *quid pro quo*.  The *quo* is

11   they fixed his compensation?  Are you kidding me?  They

12   rubber-stamped his compensation?  Highland and Mr. Seery and

13   the board are alleged to have negotiated?  There's nothing

14   alleged.  There are facts.  There is evidence.  It is beyond

15   dispute.  If you look, just for example, right, they take

16   issue with his salary?  The salary was fixed by this Court in

17   2020.  Without objection.  He's getting the exact same salary

18   that he ever got.

19       You'll hear that it's a full-time job.  Your Honor knows

20   better than anybody in this courtroom, other than me, perhaps,

21   the litigation burden that's been placed on this man.  He has

22   no other income.  He doesn't do anything else.  This is a

23   full-time job.  It's the exact same job that he had when Your

24   Honor approved his compensation package three years ago,

25   without a raise.  They didn't give him a nickel more.  Not one

HCMLPHMIT00003110

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 3-72   Filed 09/09/25   Page 205 of 262   PageID 3212

98

1   nickel.  It's outrageous.

2       The balance of his compensation, of which he has not yet

3   received a nickel, is exactly what this Court would want

4   somebody in Mr. Seery's position to do.  It aligns his

5   interests with his constituency.  Not with Stonehill.  Not

6   with Farallon.  With all creditors.  The greater the recovery,

7   the greater the bonus.  Outrageous, right?  Remarkable, isn't

8   it?  Only in their world.

9       If Your Honor can go back to Mr. Rukavina's letter,

10  because this is where it all -- that's where it all starts

11  from.  Like, excessive compensation.  Mr. Rukavina, I don't

12  know how he did this, why he did it, what it was based on.  He

13  actually told the U.S. Trustee's Office that they thought Mr.

14  Seery made $50 million.  It's in the letter.  $50 million,

15  they told the U.S. Trustee's Office he made.  It's footnoted,

16  so you can go find it.  It's right there, at Page 14.  Quote,

17  Seery's success fee could approximate $50 million.

18      $8.8 million is what he's making.  They think that's

19  excessive?  What do they think he should make?  Three?  Five?

20  We're not going to hear that.  But that's what this case is

21  about.  You just heard counsel in his opening statement.  He

22  literally said the only thing at issue is his compensation.

23  And that has to be the case, because if there was -- if there

24  was no claims trading, UBS and HarbourVest and Acis, right,

25  the Redeemer Committee, they would all still be holding these

HCMLPHMIT00003111

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/09/25   Page 206 of 262   PageID 3213

99

1   claims today.

2       When Stonehill and Farallon acquired the claims, they were

3   all allowed.  There was no debate about what the claims were.

4   If they held the claims today, they would be worth the exact

5   same amount of money, only a different person would be

6   benefitting from it.

7       So the case actually is only about Mr. Seery's

8   compensation.  And they've moved the goalposts, as often

9   happens in this courtroom, from rubber-stamping -- I'll give

10  you what you want.  When I hear rubber-stamp, I hear, you make

11  a demand and I'll give it to you.  And now they realize, when

12  they see the negotiation -- because it's in evidence, it's

13  just the documents, you can see the board minutes -- what do

14  we, doctor the board minutes and they should get discovery

15  because we doctored the board minutes?  The board minutes show

16  a four-month negotiation with an Independent Board member

17  fully involved.  It's mind-boggling.  It's actually -- well,

18  I'll just leave it at that.

19      Next slide.  Last slide.  Let me finish up.  Three of the

20  four sellers were former Committee members.  Mr. Dondero

21  agreed that Committee members would have access to special

22  nonpublic inside information as part of the protocols, as part

23  of the corporate governance settlement.  He agreed to that.

24  These are the people who got abused?  These are the people who

25  didn't know what was happening?  Committee members and

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K     Document 84-72   Filed 09/02/25390 Page 207 of 262     PageID 3214

100

1  HarbourVest, probably one of the biggest and most

2  sophisticated funds in the world, didn't know what was

3  happening?  They got abused?  Stonehill and Farallon took

4  advantage of them?

5       If you read their pleadings closely, they actually allege,

6  and I don't -- I don't know if there'll ever be any evidence

7  of this -- but they actually allege that -- I forget which --

8  oh, somebody is an investor in Stonehill and Farallon, and so

9  the theory is one of the sellers is an investor in Farallon.

10  So not only did they abuse, they abused one of their own

11  investors.  Like, this is not a colorable claim.  This is

12  ridiculous.

13       None of the claims sellers are here.  Sophisticated people

14  who -- who -- right?  Mr. Dondero could pick up the phone and

15  say, hey, guys, you got ripped off.  You sold your claims when

16  you shouldn't have.  They had an unfair advantage.

17       Nobody's here.  Where is anybody complaining?  They're not

18  going to because they cut a deal that they thought was good

19  for them at the time.  In hindsight, maybe they have regrets.

20  Right?  We all have regrets sometimes in hindsight.  But that

21  doesn't create a claim.

22       We've heard so much about what hedge funds would get and

23  how much and is this rational?  The fact of the matter is, at

24  the time Mr. Dondero had his phone call on May 28th, UBS had

25  not been purchased, although MGM had already been announced.

002065

HCMLPHMIT00003113

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-72   Filed 09/09/25   Page 208 of 262   PageID 3215

101

1   So when they talk about MGM, maybe it's the fact -- and this

2   is in evidence -- maybe it's the fact that, two days before,

3   the MGM-Amazon deal actually was publicly announced.   It

4   actually was.   So maybe when they say, hey, yeah, we like MGM,

5   because, you know, that just -- that just got announced.

6   Maybe that happened.

7        But at the end of the day, the claims that they bought, if

8   you just look at the claims that were purchased at the time he

9   had the conversation, all Mr. Seery had to do was meet

10  projections and they were going to get $33 million in two

11  years.   A 30 percent return in two years.   I don't know.   That

12  doesn't -- that doesn't sound crazy to me.   Doesn't sound

13  crazy to me.   It certainly doesn't create a colorable claim,

14  just because they think that Farallon or Stonehill -- there's

15  not going to be any evidence of Farallon or Stonehill's risk

16  profile.   There's not going to be any evidence of Farallon or

17  Stonehill's, you know, expected returns.   There's not going to

18  be any evidence at all about what due diligence they did or

19  didn't do, other than what comes out of Mr. Dondero's mouth,

20  as usual.

21       Mr. Dondero -- and let's look at what's going to come out

22  of Mr. Dondero's mouth.   He has multiple sworn statements.

23  I'm going to take his notes and they're going to become mine.

24  I'll put him on notice right now.   Because those notes bear no

25  relationship to the evolution of his sworn statements over

002066

HCMLPHMIT00003114

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 09/03/25390    Page 209 of 262    PageID 3216

102

1   time.

2       The first time he mentions MGM in a sworn statement is two

3   years after the fact in Version #5.  That's a colorable claim?

4   You want -- you want to oversee a litigation, or maybe it gets

5   removed to the district court, maybe I get lucky to be in

6   front of a jury, and I'll have Mr. Dondero explain how it took

7   him five tries before he could write down the letters MGM.

8   Not a colorable claim.  No evidence against Stonehill

9   whatsoever.  Zero.  Zero.  Never spoke to them.  There's no

10  colorable claim here, Your Honor.

11      I'm going to turn the podium over to Mr. Stancil to talk

12  about the law.

13          THE COURT:  Okay.

14      OPENING STATEMENT ON BEHALF OF JAMES P. SEERY, JR.

15          MR. STANCIL:  Thank you, Your Honor.  Mark Stancil,

16  counsel for Mr. Seery.  But I'm going to just very briefly

17  address a few legal points.  And I actually mean briefly.

18          THE COURT:  Okay.

19          MR. STANCIL:  I'll come back to a good bit of this in

20  closing as time permits.

21      I heard Mr. McEntire say *Barton* doesn't apply.  I would

22  encourage him to start with what the gatekeeping order

23  actually says.  Here it is.  This is in -- it's in the plan.

24  Your Honor has confirmed it.  The question we have in terms of

25  what standard applies is, what does this order mean?  Well, we

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-172   Filed 09/04/25   Page 210 of 262    PageID 3217

103

1  think that's going to be clear.  It's not what they think the

2  word "colorable" would mean in other contexts.  It's not what

3  they think they should have to satisfy now that they have a

4  theory.  It's, what does this mean?

5      And we'll get into some of the additional evidence from

6  Your Honor's order at the time, later in closing.

7      Next slide, please.

8      But let me just start to say I'm awfully surprised to hear

9  him say that he doesn't believe *Barton* applies, because the

10  order says that it does.  This is Paragraph 80 of the

11  confirmation order.  It says that the Court has statutory

12  authority to approve the gatekeeper provision under these

13  sections of the Bankruptcy Code.  The gatekeeper provision is

14  also within the spirit of the Supreme Court's *Barton* Doctrine.

15  The gatekeeper provision is also consistent with the notion of

16  a pre-filing injunction to deter vexatious litigants that has

17  been approved by the Fifth Circuit in such cases as *Baum v.*

18  *Blue Moon Ventures*.

19      So I think it is impossible, and respectfully, Your Honor,

20  it's law of the case.  This is what the order is based on.

21  The day for objecting to what's in the confirmation order is

22  long gone.

23      So let me come back, then -- first slide, please -- and

24  I'll just very briefly give you a little legal framework for

25  what we're going to be arguing to you later in closing.

HCMLPHMIT00003116

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-01876-K Document 84-72 Filed 09/09/25 Page 211 of 262 PageID 3218

104

1      So, *Barton* does require a *prima facie* showing. That is

2 *Vistacare* and plenty of other cases. That is more than a

3 12(b)(6) standard, Your Honor. Numerous courts agree. And in

4 fact, as you'll hear us discuss later, Judge Houser's opinion

5 is not to the contrary, because she said explicitly, I'm not

6 applying *Barton*. So anything that they're relying on for what

7 *Barton* requires from that opinion is *dicta*. But we can show

8 you case after case after case, and we will, to show that

9 *Barton* requires evidentiary hearings.

10      Here's a point, this third bullet here is something I have

11 not heard a single word in all of the briefing and ink that

12 has been spilled and in as long as we've been here this

13 morning, is what is a gatekeeping order doing if all it does

14 is reproduce a 12(b)(6) standard? That's what they say. In

15 fact, they're actually saying it's even lower. Now I think I

16 heard them say it's even lower than a 12(b)(6) standard.

17      That makes no sense whatsoever. We've just shown you that

18 this gatekeeping order was imposed consistent with *Barton* and

19 vexatious litigant principles. Later I will walk Your Honor

20 through factual findings that you made detailing the vexatious

21 litigation, detailing the abuses. The notion that the gate is

22 the same gate that every other litigant who hasn't

23 demonstrated that record of bad faith is absurd, and it serves

24 no purpose.

25      And as Mr. Morris described, Hunter Mountain woefully,

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/09/25   Page 212 of 262   PageID 3219

105

1    woefully violates any *prima facie* showing.  And we'll get into

2    a little bit more exactly how that works.

3         We are going to ask this Court, in addition to ruling that

4    *Barton* applies and that they've failed it, we're going to ask

5    this Court, respectfully, to please consider ruling on

6    multiple independent grounds as well.  We know there's a

7    penchant for appeals and appeals upon appeals.  So we will

8    argue to Your Honor, although we will largely spare you

9    another rehash of our briefs, but we will explain to Your

10   Honor why they do lack standing to bring this claim as a

11   matter of Delaware law.  And there was a lot of fuzzing up

12   about constitutional standing and Delaware law.  Not

13   necessary.

14        If -- we will be happy to rely on our pleadings here, but

15   on Page 27 of the Claimant Trust Agreement, that's what

16   defines their rights under Delaware law, and they were talking

17   about how beneficial owners under Delaware law have standing.

18   Well, are they beneficial owners?  They are not.  Equity

19   holders -- this is in Paragraph C, Page 27 of the Claimant

20   Trust Agreement -- Equity holders will only be deemed

21   beneficiaries under this agreement upon the filing of a

22   payment certification with the bankruptcy court, at which time

23   the contingent trust interests will vest and be deemed equity

24   trust interests.

25        They are not beneficial owners of squat.  That has not

HCMLPHMIT00003118

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/09/25   Page 213 of 262   PageID 3220

106

1   happened.

2       And last, Your Honor, we will -- and I will organize this

3   for Your Honor in closing as well -- we would ask you to rule

4   on a straight-up 12(b)(6) standard as an alternative, because

5   we know what's coming on appeal and we think their complaint

6   collapses under its own weight.  You heard Mr. Morris

7   detailing their own math shows significant returns.  You'll

8   also hear us describe how they have nothing but mere

9   conclusions and naked assertions upon information and belief

10  but unsupported.

11      *Iqbal* and *Twombly* would still apply under their 12(b)(6)

12  standard, especially, and perhaps even more with a heightened

13  standard under Rule 9(b), because they're essentially alleging

14  some version of fraud, it sounds like.

15      They're never going to get there, Your Honor.  All we

16  would ask is for a full record to take inevitably,

17  unfortunately, to the Court of Appeals.

18      And I think Mr. -- I'm not sure which of my colleagues

19  will be speaking briefly for Holland & Knight, but I'll just

20  turn it over to them.

21          THE COURT:  All right.  Mr. McIlwain?

22      OPENING STATEMENT ON BEHALF OF THE CLAIM PURCHASERS

23          MR. MCILWAIN:  Thank you, Your Honor.  I'll be even

24  briefer.  Brent McIlwain here for the Claim Purchasers.

25      Your Honor, Mr. McEntire stated to this Court that my

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-72   Filed 09/09/25390   Page 214 of 262   PageID 3221

107

1   clients have never denied any of this.  In fact, in his reply,

2   he says, The Claim Purchasers do not deny that they invested

3   over $163 million.  We do not deny that we did not due

4   diligence, we do not deny that we refused to sell our claims

5   at any price, and we do not deny that we invested the claims

6   at what is, at best, a low ROI.

7       We had no duty to answer to HMIT or Mr. McEntire.  We had

8   no duty when we bought these claims to -- we had no duties to

9   any creditor.  We had -- it was a bilateral agreement with a

10  third party.  And frankly, Your Honor, it's not Mr. Dondero's

11  or HMIT's business what due diligence we did and what

12  information that we obtained.

13      But I will tell you right now, Your Honor, we were very

14  careful in our pleadings to not bring issues of fact, because

15  this -- HMIT has been chasing my clients, obviously, based on

16  the notes that were presented in the initial PowerPoint, it

17  was a -- it's retribution.  It's retribution for not agreeing

18  to sell the claims to Mr. Dondero when he offered to purchase

19  at a 40 percent premium.

20      And Your Honor, when I look at that note, it's

21  interesting, because I hadn't seen the note, obviously, until

22  it showed up on the exhibit list.  When you look at that note,

23  I think it's -- I think it's very interesting.  To the extent

24  it was contemporaneous, I don't know.  But what it shows, it

25  shows that if you're a hammer, everything's a nail.  And Mr.

HCMLPHMIT00003120

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/09/25   Page 215 of 262   PageID 3222

108

1   Dondero is a vexatious litigator.  And what did he write down?

2   Discovery to follow.

3       But my question is this.  Who was trying to trade on

4   inside information?  Mr. Dondero was offering a 40 percent

5   premium, allegedly, on the cost.  What information did he

6   have?  Certainly, he had inside information.

7       My client owed no duty to Mr. Dondero.  My client owed no

8   duty to anybody in this estate at the time of these claims

9   purchase.

10      And Your Honor, we talk a lot about -- or, it's been

11  talked a lot of insider trading.  These are claims trades.  I

12  think the Court honed in on this from the very get-go.  The

13  Court does not have a role in claims trades.  There's a 3001

14  notice that's filed post-claims trade, but there's no

15  requirement that there's Court approval.

16      And these aren't securities.  It's not as if we're trading

17  claims and it could benefit or hurt you based on some equity

18  position that you're going to obtain.  We obtained claims that

19  had been settled, they were litigated heavily, and the most

20  that we can obtain is the amount of the claim.  And that is,

21  as Mr. Morris stated, all that changed was the name of the

22  claimant.  That's all.  Because the claims didn't increase in

23  value based on the trade.

24      Your Honor, our pleadings, I think, speak for themselves

25  in terms of you really -- you really don't have to consider

002073

HCMLPHMIT00003121

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 01/09/25    Page 216 of 262    PageID 3223

109

 1   evidence, from our perspective, to determine that this

 2   proposed complaint has no merit and is not plausible and

 3   presents no colorable claims.

 4       The gatekeeper provision, and we're going to talk a lot

 5   about that today, obviously, right, requires that Mr. Dondero

 6   establish a *prima facie* case that the claims have some

 7   plausibility.  If you can simply write down allegations, file

 8   a motion for leave and attach those allegations and say, Your

 9   Honor, you have to take all these as true, the gatekeeper has

10   no meaning.  There's no point in having a gatekeeper

11   provision.

12       And in summary, Your Honor, what -- and I think Mr. Morris

13   honed in on this specifically -- this really comes down to

14   compensation.  Right?  Because this -- the allegation is that

15   my clients purchased claims, presumably at a discount, right,

16   based on some inside information, which we obviously deny, but

17   we don't have to put that at issue today.  For what purpose?

18   For what purpose?  So we got inside information from Mr. Seery

19   so that we could then scratch his back on compensation on the

20   back-end?

21       Your Honor, there is no reason that my clients need to be

22   involved in this litigation.  If HMIT thinks that this -- that

23   they have a claim against Mr. Seery for excessive

24   compensation, they can -- they could have brought such a

25   gatekeeper motion, or a motion for leave under the gatekeeper

HCMLPHMIT00003122

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 01/09/25390 Page 217 of 262    PageID 3224

110

1   provision, without including my clients.  Why did they include

2   my clients?  They included my clients because my clients did

3   not sell to Mr. Dondero when he called, unsolicited, to try to

4   get information.  It's retribution.  And that's what a

5   vexatious litigator does, and that's why the gatekeeper

6   provision is in place.

7        I'll reserve the rest for closing, Your Honor.

8            THE COURT:  All right.  Caroline, what was the

9   collective time of the Respondents?

10           THE CLERK:  Twenty-eight minutes and 37 seconds.

11           THE COURT:  Twenty-eight minutes, 37 seconds.

12       All right.  Well, let's talk about should we take a lunch

13   break now?  I'm thinking we should, because any witness is

14   going to be, I'm sure, more than an hour.  So can you all get

15   by with 30 minutes, or do you need 45 minutes?  I'll go with

16   the majority vote on this.

17       (Counsel confer.)

18           MR. MCENTIRE:  1:00 o'clock.  45 minutes.

19           MR. MORRIS:  40 minutes, whatever.  1:00 o'clock?

20           THE COURT:  We'll come back at 1:00 o'clock.

21           MR. MORRIS:  Thank you, Your Honor.

22           THE COURT:  Okay.  Thank you.

23           THE CLERK:  All rise.

24       (A luncheon recess ensued from 12:19 p.m. until 1:05 p.m.)

25           THE CLERK:  All rise.

HCMLPHMIT00003123

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/02/25   Page 218 of 262   PageID 3225

111

1          THE COURT:  All right.  Please be seated.  We're

2     going back on the record in the Highland matter, the Hunter

3     Mountain motion for leave to file lawsuit.

4        I'll just let you know that at 1:30 we're going to take

5     probably what will be a five-minute break, maybe ten minutes

6     at the most, because I have a 1:30 motion to lift stay docket.

7     Just looking at the pleadings, I really think maybe one is

8     going to be resolved and it won't be more than five or ten

9     minutes.  So whoever is on witness stand can either just stay

10    there, because I think we won't be finished, or you can take a

11    bathroom break or whatever.  All right?  So, it's video, the

12    1:30 docket.

13       All right.  So, Mr. McEntire, are you ready to call your

14    first witness?

15          MR. MCENTIRE:  I am, Your Honor.

16          THE COURT:  Okay.

17          MR. MCENTIRE:  May I proceed?

18          THE COURT:  You may.

19          MR. MCENTIRE:  At this time, Hunter Mountain calls

20    Mr. James Dondero.

21          THE COURT:  All right.  Mr. Dondero, welcome.  If you

22    could find your way to the witness box, I will swear you in

23    once you're there.  It looks like you've got lots of notebooks

24    there.  Please raise your right hand.

25       (The witness is sworn.)

HCMLPHMIT00003124

Dondero - Direct                    112

```
 1          THE COURT:  All right.  Thank you.  You may be

 2    seated.

 3          MR. MCENTIRE:  I'm not familiar with your procedure.

 4    Should I approach the -- here to --

 5          THE COURT:  If you would, unless you're having --

 6          MR. MCENTIRE:  That's fine.

 7          THE COURT:  -- any kind of --

 8          MR. MCENTIRE:  That's fine.  I'm not.

 9          THE COURT:  -- knee issues or, you know, sometimes

10    people want to stay seated for that reason.

11          MR. MCENTIRE:  Your Honor, again, my tender of Mr.

12    Dondero as a witness is subject to our running objection on

13    the evidentiary format.

14          THE COURT:  Understood.

15       JAMES DAVID DONDERO, HUNTER MOUNTAIN INVESTMENT TRUST'S

16                          WITNESS, SWORN

17                        DIRECT EXAMINATION

18    BY MR. MCENTIRE:

19    Q   Mr. Dondero, would you state your full name for the

20    record, please?

21    A   James David Dondero.

22    Q   With whom are you currently -- what company are you

23    currently affiliated with?

24    A   Founder and president of NexPoint.

25    Q   All right.  And I think the Court is well aware, but would
```

HCMLPHMIT00003125

```
1   you just briefly describe your prior affiliation with -- was
2   it Highland Capital?
3   A    Yes.
4   Q    What was that affiliation?
5   A    President and founder for 30 years, and then to facilitate
6   an expeditious resolution of the estate I handed the reins to
7   three Independent Board members and I became a portfolio
8   manager until October of -- I was an unpaid portfolio manager
9   until October of '20.
10  Q    Thank you, sir.  Do you have any current official position
11  with Hunter Mountain Investment Trust?
12  A    No.
13  Q    Can you describe for us, sir, any actual or control you
14  attempt to exercise on the business affairs of Hunter Mountain
15  Investment Trust?
16  A    None.
17  Q    Are you -- do you have any official legal relationship
18  with Hunter Mountain Investment Trust where you can attempt to
19  exercise either direct or indirect control over Hunter
20  Mountain Investment Trust?
21  A    I do not.
22  Q    Did you participate -- personally participate in the
23  decision of whether or not to file the proceedings that are
24  currently pending before Judge Jernigan?
25  A    I did not.
```

HCMLPHMIT00003126

Dondero - Direct                            114

1   Q    As the former CEO of Highland Capital, are you familiar

2   with the types of assets that Highland Capital owned?  On the

3   petition date?

4   A    Yes.

5   Q    And have you been monitoring these proceedings and the

6   disclosures in these proceedings since the petition date?

7   A    Yes.

8   Q    Okay.  Can you describe generally for me the types of

9   assets on the petition date that Highland Capital owned?  The

10  types of assets?  Describe the types of assets -- companies,

11  stocks, securities, whatever, whatever you -- however you

12  would describe it.

13  A    There were some securities, but it was primarily

14  investments in private equity companies and interests in

15  funds.

16  Q    Okay.  I've heard the term portfolio company.  What is a

17  portfolio company?

18  A    A portfolio company would be a private equity company that

19  we controlled a majority of the equity and appointed and held

20  accountable the management teams.

21  Q    Would there be separate management, separate boards, for

22  those portfolio companies?

23  A    Yes.

24  Q    All right.  How many portfolio companies were there on the

25  petition date, if you're aware?  If you recall?

002079

Dondero - Direct                     115

1    A    Half a dozen, of different sizes.

2    Q    Can you identify the names, if you recall?

3    A    Yes.

4    Q    What are those names?

5    A    Trussway, Cornerstone, some small -- Carey International,

6    CFA, SSP Holdings.  Yeah, to a lesser extent, OmniCare.

7    Q    All right.

8    A    Or, um, --

9    Q    In addition to the portfolio --

10   A    Sorry.

11   Q    -- of companies in which Highland Capital would own

12   interests, did Highland also have interests in various funds?

13   A    Yes.  I said OmniCare.  I meant OmniMax, I think was the

14   name.

15   Q    What type of funds?

16   A    I'm sorry.  The funds were usually funds that we were

17   invested in or seeded or managed.  So they're things like

18   Multistrat, Restoration, a Korea fund, PetroCap.

19   Q    Are these managed funds by Highland Capital?  Or were

20   they?

21   A    Yes.  Pretty much, with the exception of PetroCap.  We

22   were a minority -- a minority -- a large -- a large minority

23   investor with a sub-advisor.

24   Q    Did Highland Capital Management on the petition date own

25   an interest, a direct security interest in MGM?

002080

HCMLPHMIT00003128

Dondero - Direct                    116

1   A    Yes.  And I -- yes.

2   Q    Did the various portfolio companies that you've

3   identified, did one or more of those portfolio companies also

4   own MGM stock?

5   A    Yes.

6   Q    Did the various funds that you've identified, did one or

7   more of those funds also own MGM stock?

8   A    Yes.  Between -- yes.  Between the CLOs, the funds,

9   Highland directly, it was about $500 million that eventually

10  got taken out for about a billion dollars.

11  Q    Okay.  $500 million is what you said?

12  A    Approximately.  Depending on what mark, what time frame.

13  But ultimately they got taken out for about a billion dollars.

14  Q    Okay.  And as a consequence of these investments,

15  significant investment -- first of all, how would you describe

16  that magnitude of investments?  Is that a significant

17  investment from the perspective of MGM?

18  A    Yes.

19  Q    As a consequence, what role, if any, did you play in terms

20  of MGM's governance?  Were you -- did you become a member of

21  the board of directors?

22  A    Yes.  I was a board member for approximately ten years,

23  and myself and the president of Anchorage, between our two

24  entities, we had a majority of the equity in MGM.

25  Q    Okay.  If there was a third party, not familiar with the

HCMLPHMIT00003129

1  management of Highland Capital, who had been monitoring these

2  bankruptcy proceedings as you have, was there any way that a

3  third-party stranger to this bankruptcy proceeding could, from

4  your perspective, actually appreciate or identify the -- all

5  the details of the investments that Highland Capital had?

6          MR. MORRIS:  Objection to the form of the question.

7  It calls for speculation.  He's not here as an expert today.

8  He shouldn't be allowed to testify what a third party would or

9  wouldn't have thought or known.

10          MR. MCENTIRE:  Well, I'll --

11          THE COURT:  I'll overrule.

12  BY MR. MCENTIRE:

13  Q    Mr. Dondero?

14  A    The disclosures in the Highland bankruptcy were scant.  I

15  think there was six or eight line items listed, the

16  descriptions of which were limited.  But it didn't include --

17  it didn't include a broad listing of all the funds, and it

18  didn't include subsidiaries or any net value or any offsetting

19  liabilities or risks of any of the underlying companies or

20  investments, either.

21          MR. MCENTIRE:  Would you put up Exhibit 3, please?

22  BY MR. MCENTIRE:

23  Q    Mr. Dondero, we're going to -- do you have a screen in

24  front of you as well?

25  A    Yes.

Dondero - Direct                    118

1  Q    We're going to put up Exhibit 3, and I'm going to ask you

2  some questions about it.  First of all, would you identify

3  Exhibit 3?

4  A    It didn't come up on my screen yet.

5  Q    Still not up there?

6  A    Yes.  Now it is.

7  Q    Can you identify Exhibit 3, please?

8       (Discussion.)

9  Q    There we go.  Mr. Dondero, would you identify Exhibit 3,

10  please?

11  A    This was an email I sent to Compliance and relevant people

12  to put -- to put MGM on the restricted list.

13  Q    It indicates it was on December 17, 2020.  Did you

14  personally author this email?

15  A    Yes.

16  Q    You sent it to multiple individuals, including Mr.

17  Surgent.  Was Mr. Surgent an attorney at Highland Capital at

18  the time?

19  A    He was head of compliance for both organizations.

20  Q    Scott Ellington?  Is he an attorney?  Was he an attorney

21  at the time?

22  A    He's the general counsel of Highland.

23  Q    You also sent it to someone at NexPoint Advisors, Jason

24  Post.  Who is Mr. Post?

25  A    Mr. Post was head of compliance at NexPoint Advisors and a

002083

HCMLPHMIT00003131

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/29/25390 Page 226 of 262   PageID 3233

Dondero - Direct                                        119

```
 1   subordinate of Thomas Surgent's.

 2   Q    Jim Seery.  Mr. Seery, of course.  You also addressed it

 3   to Mr. Seery?

 4   A    Yes.

 5   Q    It says, Trading Restrictions Re: MGM Material Nonpublic

 6   Information.  What did you mean by the term "material

 7   nonpublic information"?

 8   A    Material nonpublic information is when you have material

 9   nonpublic information that the public does not have, and it

10   essentially makes you an insider and restricts you from

11   trading.

12   Q    All right.  It says, Just got off a pre-board call.

13        First of all, you generated this in the ordinary course of

14   your business, did you not?

15   A    Um, --

16   Q    This email.

17   A    Yes.

18   Q    Okay.

19   A    Yes.

20   Q    And --

21   A    Any restricted list.  Restricted list items happen all the

22   time in the normal course of business.

23   Q    And you've maintained a copy of this email as well, have

24   you not?

25   A    I'm sure we have one.  I don't have it personally.
```

002084

HCMLPHMIT00003132

1  Q    Fair enough.  But you're -- you have -- you have access

2  and custody over emails, correct?

3  A    Not any of my Highland emails.

4  Q    But those were left.  Right?

5  A    Yes.  Yes.

6          MR. MORRIS:  Your Honor, I mean, he's leading the

7  witness at this point, so I'm just --

8          MR. MCENTIRE:  That's fine.

9          MR. MORRIS:  I'm just --

10          THE COURT:  Okay.  Sustained.

11          MR. MORRIS:  -- going to be sensitive to it.

12          THE COURT:  Sustained.

13  BY MR. MCENTIRE:

14  Q    Mr. -- this is a true and accurate copy of the email that

15  you sent, is it not?

16  A    It appears to be.

17          MR. MCENTIRE:  At this time, I would offer Exhibit 3

18  into evidence, Your Honor.

19          THE COURT:  Okay.  I'm looking through what we

20  admitted earlier.  Did we not --

21          MR. MCENTIRE:  This already may be in evidence.

22          THE COURT:  Yes.  I'm --

23          MR. MCENTIRE:  I don't --

24          THE COURT:  Was there any objection?

25          MR. MORRIS:  There wasn't.  I mean, --

002085

HCMLPHMIT00003133

Dondero - Direct                    121

```
 1            THE COURT:  I think there was an objection that I
 2    overruled.
 3            MR. MORRIS:  No.  There wasn't.  I mean,
 4    unfortunately, we've gotten the short end of the stick here,
 5    because all of their documents are in evidence, and I got
 6    caught short because I'm going to have to do it the old-
 7    fashioned way.  But yes, this is in evidence.
 8            MR. MCENTIRE:  Okay.  Fair enough.
 9            MR. MORRIS:  Because -- actually got through all of
10    their documents.
11            MR. MCENTIRE:  Fair enough.
12            THE COURT:  Okay.  All right.
13    BY MR. MCENTIRE:
14    Q   So, Mr. --
15            THE COURT:  So it's in evidence.
16    BY MR. MCENTIRE:
17    Q   -- Dondero, going back to Exhibit 3, it says, Just got off
18    a pre-board call.
19        Is that the MGM board, a pre-board call?
20    A   Yes.
21    Q   What is a pre-board call?
22    A   It's a pre-board call that usually sets the agenda.  And,
23    again, myself and the Anchorage guys, we would move in
24    locksteps, in a coordinated fashion, generally, in terms of
25    agenda and company policy.
```

002086

HCMLPHMIT00003134

```
 1   Q   It says, Update is as follows.  Amazon and Apple actively

 2   diligencing in the data room.

 3       What was your understanding of -- of -- what was your

 4   intent in conveying that information to the recipients?

 5   A   The intent was really in the last sentence, or second-to-

 6   last sentence, that the transaction was likely to close.

 7   Amazon had come back.  We had turned Amazon away earlier in

 8   the year at $120 a share, and they said they wouldn't be

 9   willing to pay more.  And --

10           THE COURT:  Is there an objection?

11           MR. MORRIS:  There is an objection.  None of this was

12   shared with Mr. Seery, all of this background that we're --

13   that we're doing.  He -- I would request that we stick with

14   the -- only the information that was given to Mr. Seery, like

15   -- like he's talking about his intent.  Like, who cares at

16   this point?

17           MR. MCENTIRE:  Well, --

18           MR. MORRIS:  This is what Mr. Seery got.

19           THE COURT:  Okay.  What is your response to that?

20           MR. MCENTIRE:  I have a response to -- well, they've

21   -- they've questioned his intent in sending this in his

22   opening statement.

23           MR. MORRIS:  Ah.

24           MR. MCENTIRE:  And I'm trying to make it clear what

25   his intent was.
```

002087

HCMLPHMIT00003135

 1          MR. MORRIS:  So, you know what, Your Honor?  *Quid pro*

 2  *quo*.  Now we're going to do a real *quid pro quo*.  He can ask

 3  him about his intent, and then he can't object to all of the

 4  other documents and exhibits that I say prove that this was

 5  here only to interfere with Mr. Seery's trading activity.

 6  I'll do that *quid pro quo*.

 7          MR. MCENTIRE:  May I proceed, Your Honor?

 8          THE COURT:  You may.  Objection is overruled.

 9  BY MR. MCENTIRE:

10  Q    Mr. Dondero, what was your intent in communicating --

11  A    Okay.

12  Q    -- that probably a first-quarter event?  What was your

13  understanding?

14  A    After 30 years of compliance education:  Taint one, taint

15  all.  We were all sitting together.  I -- the trading desk was

16  right outside my desk.  All the employees of Highland that

17  would eventually move to NexPoint, all the ones that would

18  eventually move to Skyview, all the ones that eventually moved

19  to Jim Seery, were all within 30 feet of my desk.

20  Q    What do you mean by "Taint one, taint all"?

21  A    That's a compliance concept that, as a professional, you

22  have a responsibility, when you are in possession of material

23  nonpublic information, to put something on the restricted list

24  so that it's not traded.  Okay?  And you can't -- one person

25  can't sit in their cube and say they know something and not

002088

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 44-72    Filed 05/29/25    Page 231 of 262    PageID 3238
                                                Exhibit 72    Page 125 of 390

Dondero - Direct                                                    124

 1  tell anybody else, such that the rest of the organization

 2  trades.  That's not the way compliance works.

 3  Q    It says also no -- also, any sales are subject to a

 4  shareholder agreement.

 5       What was the meaning of that or the intent of that?

 6  A    There was a stringent shareholder agreement, particularly

 7  among the board members, that no shares could be bought or

 8  sold without approval of the company.

 9  Q    The company here being MGM?

10  A    MGM, yes.

11  Q    What is a restricted list?

12  A    A restricted list is when you believe as an investment

13  professional that you have material nonpublic information, you

14  notify Compliance, and then Compliance notifies the entire

15  organization and prevents any trading in that security.

16  Q    You mentioned the doctrine taint one, taint all.  If an

17  individual or -- if an individual within a company setting is

18  found to have traded on material nonpublic information, what

19  is the potential consequence or sanction?

20           MR. MORRIS:  Objection, Your Honor.  This is like a

21  legal conclusion.  He's not a law enforcement officer.  He's

22  not a securities officer.  What are we doing?

23           MR. MCENTIRE:  I can rephrase.

24           THE COURT:  Okay.  He's going to rephrase.

25  BY MR. MCENTIRE:

HCMLPHMIT00003137

Dondero - Direct                           125

1   Q    Based upon your years -- based upon your years of

2   experience as a board member of MGM, based upon your years of

3   experience as a CEO of Highland Capital and an executive that

4   trades in securities and has sold securities, what is your

5   understanding, from a non-legal perspective, of what the risks

6   are associated with trading on material nonpublic information?

7   A    You could be -- you would be fired from the organization

8   if you did.  You could be banned from the securities industry.

9   The industry can shut down the -- or, the SEC can shut down

10  the advisor or they can fine the advisor.

11  Q    Do you know what a compliance log is?

12  A    Yes.

13  Q    Should MGM have been placed on a compliance log at

14  NexPoint?

15  A    Throughout the organization -- throughout the

16  organization, it should -- it should and it was on all -- at

17  all organizations, yes.

18  Q    Should it have been placed on a -- on a compliance log to

19  Highland Capital, from your perspective?

20  A    Yes.

21  Q    Can you give us any explanation of why, to your knowledge,

22  why MGM would be taken off the restricted list in April of

23  2021 at Highland Capital?

24  A    When an investment professional puts something on the

25  restricted list, in order for it to come off the restricted

002090

HCMLPHMIT00003138

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/29/25   Page 233 of 262   PageID 3240

Dondero - Direct                                    126

1   list, the material nonpublic information has to be public.  So

2   there has to be a cleansing that occurs by the company.

3   Q    To the extent that you were no longer affiliated with

4   Highland Capital in the early portion, the first quarter of

5   2021, does that somehow cleanse the material nonpublic

6   information that you identified?

7   A    It does not.

8   Q    Why not?

9   A    Because the -- it -- the company hasn't -- the company

10  didn't come out and make public the information that we knew

11  from a private perspective that the transaction was about to

12  go through.

13  Q    You sat here during opening statements when Mr. Morris

14  referred to the various news coverage and media coverage

15  concerning MGM and the fact that people had expressed interest

16  in buying in the past?

17  A    Yes.  And at the board level, we had entertained numerous

18  ones.  There were rumors that had no basis in fact, and there

19  were negotiations we had with people that were never in the

20  news.  But none of them got to this degree of certainty where

21  it was going to close within a couple months.

22  Q    From your perspective as an investment professional, with

23  the years of experience that you described for the Court, what

24  is the difference between receiving an email from a board

25  member such as yourself and rumors or suggestions of possible

002091

HCMLPHMIT00003139

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 09/29/05390 Page 234 of 262    PageID 3241

Dondero - Direct                    127

1  sale in the media?

2  A    I knew with certainty from the board level that Amazon had

3  hit our price, agreed to hit our price, and it was going to

4  close in the next couple months.

5  Q    That's not rumor or innuendo; that's hard information from

6  a member of the MGM board?

7  A    Correct.

8              MR. MCENTIRE:  All right.  You can take that down,

9  please, Tim.

10  BY MR. MCENTIRE:

11  Q    I want to talk a little bit about due diligence.  When you

12  were the chief executive officer of Highland Capital, --

13  A    Yes.

14  Q    -- can you tell us whether Highland Capital ever involved

15  itself in the acquisition of distressed assets?

16  A    Yes.  We did a fair amount of investing in distressed

17  assets.

18  Q    What is a distressed asset?

19  A    It's something that trades at a discount, where the

20  certainty and the timing of realizations or contractual

21  obligations is uncertain.

22  Q    Is a -- well, let me back up.  Has Highland -- did

23  Highland Capital ever invest in unsecured claims in connection

24  with bankruptcy proceedings?

25  A    Yes.

HCMLPHMIT00003140

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/29/25390   Page 235 of 262   PageID 3242

Dondero - Direct                          128

1  Q    And in terms of the -- on the spectrum of risk, where does

2  an unsecured creditor claim in a bankruptcy proceeding kind of

3  rank in terms of the uncertainties or risk, from your

4  perspective?

5  A    It's high risk.  It's a -- yeah, it would be highly-

6  distressed, generally.

7  Q    Explain to us -- I know the Court is very familiar with

8  claims trading.  Explain to us from your perspective as an

9  investment -- a seasoned investment expert or executive what

10 those risks are.  What types of risk are associated with such

11 an investment?

12 A    You have to evaluate the assets tied to the claim

13 specifically.  Or if it's an unsecured in general, the assets

14 in general in the estate.

15     You have to handicap the realization that a distressed

16 seller might not get full value for something.  You have to

17 handicap the likelihood around that.  And then you have to

18 handicap the timing, and then you have to handicap the

19 expenses and the other obligations of the estate, and then

20 handicap risk items that aren't known or that are difficult if

21 not impossible to underwrite, like unknown litigation or last-

22 minute litigation or claims or something.

23 Q    And all these handicapping, this handicapping process, how

24 does that impact the price or the investment that you're

25 willing to make?  Generally?

HCMLPHMIT00003141

Dondero - Direct                    129

1  A    Generally, you put a much higher discount rate.  You know,

2  like if you would do debt at 10 percent and a normal public

3  equity at a 15 percent return, you would do distressed or

4  private equity investing at a 20, 25 percent return

5  expectation to offset the risk and the unknowns.

6  Q    In order to handicap an investment in an unsecured

7  creditor's claim appropriately to reach an informed decision,

8  what type of data would you need to have access to?

9        MR. MORRIS:  Objection to the form of the question.

10  He's not here as an expert.  He's here as a fact witness.  He

11  should -- he should limit himself to that instead of talking

12  about what investors should be doing.

13        MR. MCENTIRE:  Well, Your Honor, with all due

14  respect, he's here as the former CEO of Highland Capital.  He

15  has experience, firsthand knowledge experience, and he also

16  has expertise because of his education, his career, and

17  training.

18     And again, there's no limitation here under the Rules

19  about what type of information I can elicit from him in this

20  proceeding.  This is, whether you call it expert testimony, I

21  call it personal knowledge, but it has some expert aspects to

22  it, but I think that's fair and appropriate.

23        THE COURT:  Well, I think you can ask what kind of

24  data would you rely on, would Highland Capital or entities

25  he's been in charge of rely on, --

HCMLPHMIT00003142

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 06/30/25   Page 237 of 262    PageID 3244

Dondero - Direct                 130

1          MR. MCENTIRE:  I understand.

2          THE COURT:  -- but not what would people rely on.  So

3   I sustain the objection partially.

4          MR. MCENTIRE:  All right.

5   BY MR. MCENTIRE:

6   Q   Mr. Dondero, I'll rephrase the question.  When you were

7   the chief executive officer of Highland Capital before Mr.

8   Seery took the reins, and you, your company, Highland Capital,

9   was investing in an unsecured creditor's claims, what due

10  diligence, what type of information would you expect your team

11  to explore and investigate?

12  A   Sure.  Distressed investment in a trade claim would be

13  among our thickest folders, it would be among our most

14  diligenced items, because you have those three buckets, the

15  value of the assets, again, and the ability and timing of

16  monetization of those as a not strong -- as a weak seller, and

17  then you would have the litigation or claims against those,

18  and then you would have to also have a third section of

19  analysis for the litigation risk of the estate overall.

20  Q   What type of legal analysis or legal due diligence would

21  you have required as the CEO of Highland Capital?

22  A   At Highland, we would have had third-party law firms, in

23  addition to our own legal staff, in addition to our own

24  business professionals, reviewing all the analysis and the

25  assumptions.

002095

HCMLPHMIT00003143

Dondero - Direct                    131

1   Q    With regard to a financial analysis, what types of

2   financial due diligence would you have required?

3   A     It would have been a detailed -- a detailed analysis of

4   all the cash flows on the particular underlying investments,

5   and an evaluation and valuation of what those companies or

6   investments were worth.

7   Q    Why is it important to look at the underlying value of the

8   asset?

9   A    Because that -- those are what will be monetized in order

10  to give you a return on the claims or securities that you buy

11  in a distressed situation.

12            MR. MCENTIRE:  Tim, would you please put up Exhibit

13  4?

14            MR. MORRIS:  Your Honor, I don't mean to be

15  monitoring your time, but we're at the 1:30 --

16            THE COURT:  I was just checking the clock here.

17  Let's do take a break.  So, --

18            MR. MCENTIRE:  All right.

19            MR. MORRIS:  Your Honor, can we have an instruction

20  to the witness not to --

21            THE COURT:  Yes.

22            MR. MORRIS:  -- look at his phone and not to confer

23  with anybody?  Because we had that incident once before.

24            THE COURT:  Okay.  Well, I don't --

25            THE WITNESS:  I don't have my phone.

002096

HCMLPHMIT00003144

Dondero - Direct                     132

```
 1              THE COURT:  Okay.

 2              THE WITNESS:  My phone's at the front desk.

 3              THE COURT:  So, no discussions with your lawyers or

 4    -- I guess he doesn't have his phone -- during this break.

 5              MR. MORRIS:  Thank you, Your Honor.

 6              THE COURT:  All right.  So, I really think this will

 7    take five minutes, so don't go far.

 8         (Off the record, 1:33 p.m. to 1:47 p.m.)

 9              THE COURT:  Okay.  We will go back on the record,

10    then, in the Highland matter.

11              MR. MCENTIRE:  I'm just going to grab him right now.

12              THE COURT:  Okay.  We are, for the record, waiting on

13    Mr. Dondero to take his place again on the witness stand.

14         (Pause.)

15              THE COURT:  All right, Mr. Dondero.  We're ready for

16    you to resume your testimony.

17         All right.  Mr. McEntire, you may proceed.

18              MR. MCENTIRE:  Thank you, Your Honor.

19                     DIRECT EXAMINATION, RESUMED

20    BY MR. MCENTIRE:

21    Q   Mr. Dondero, when we left off, I was just putting up what

22    I requested as Exhibit 4.

23              MR. MCENTIRE:  And Tim, if you can put that back up,

24    please.

25    BY MR. MCENTIRE:
```

HCMLPHMIT00003145

1    Q    Mr. Dondero, can you identify Exhibit #4, please?

2    A    Yes.  These are notes I took contemporaneous with three

3    conversations with guys at Farallon.

4    Q    I didn't quite hear you.  Did you say contemporaneous?

5    A    Yes.

6    Q    So, you say with three conversations.  Who were the

7    conversations with?

8    A    One was with Raj Patel that was fairly short, and he

9    deflected me to Mike Linn, who was the portfolio manager in

10   charge and had done the transactions.

11   Q    Which transactions?

12   A    The buying of the claim, the Highland claims.

13   Q    All right.  And what was your purpose in making these

14   notes?

15   A    We'd been trying nonstop to settle the case for two-plus

16   years.  We'd been counseled that it was a Kabuki dance that

17   would just, you know, all settle at the end, and it never

18   quite happened that way.  And when we heard the claims traded,

19   we realized there were new parties to potentially negotiate to

20   resolve the case.

21        The ownership was initially hidden, but we were able to

22   find out pretty quickly that Farallon was Muck.  So I reached

23   out the Farallon guys.

24   Q    All right.  And were you ever able at that time to

25   determine who was affiliated with Jessup, the other special-

HCMLPHMIT00003146

1  purpose entity?

2  A   We -- initially, we thought Farallon was all of the

3  entities.  We didn't find out about Stonehill -- it was more

4  difficult and they had taken more efforts to hide the

5  ownership in Stonehill.  We didn't find out for two more

6  months.

7  Q   So your first conversation was with Mr. Patel?

8  A   Yes.

9  Q   And did you call him?

10 A   Yes.

11 Q   Your first entry, there's a 28 on the left-hand side.

12 What does that 28 refer to, if you recall?

13 A   That was the date, I believe.

14 Q   Do you believe it was May 28th?

15 A   Yes.

16 Q   What makes you believe that?

17 A   That's what it says.

18 Q   Okay.  Raj Patel --

19        THE COURT:  Is there a way you can show the words

20 that are cut off?

21        MR. MCENTIRE:  On this particular one, I can't, Your

22 Honor.  We tried, but we can't.  No.

23        THE COURT:  If I look in the notebook, can I see it?

24        MR. MCENTIRE:  I don't think so.  I think this is --

25 what you see is exactly what's in the notebook.  It's the same

HCMLPHMIT00003147

1   document.  This is how -- how we -- this is how we have it.

2   BY MR. MCENTIRE:

3   Q   Mr. Patel.  Who is Mr. Patel?

4   A   He's Mike Linn's boss.  He's head of -- I believe head of

5   credit at Farallon.

6   Q   Okay.  And Farallon is based where, if you know?

7   A   San Francisco.

8   Q   And what kind of company is Farallon, if you know?

9   A   They -- they look a lot like Highland.  Well, they do real

10  estate.  They do hedge funds.  They do -- they don't do as

11  many 40 Act or retail funds, but they're -- they're an

12  investor.

13  Q   Mr. Patel.  What did he tell you during this phone call?

14  A   That he bought it because Seery told him to buy it and

15  they had made money with Seery before.

16  Q   All right.  And how long did the call last?

17  A   Not long.

18  Q   Okay.  You said he referred you to Mr. -- who was the

19  person?

20  A   To Mike Linn.

21  Q   Who is Mike Linn?

22  A   Mike Linn is a portfolio manager that works for Mr. Patel.

23  Q   And did you call Mr. Linn?

24  A   Yes.

25  Q   All right.  The notes here, do these reflect several

002100

Dondero - Direct                          136

1   conversations?

2   A    The first one reflects a conversation with Raj Patel, and

3   then the rest of it reflects two conversations with Mike Linn.

4   Q    All right.  Where does the first conversation with Mike

5   Linn start and where does it end?

6   A    It ends -- it begins at the 50, 70 cents.  We knew that

7   they had -- that the claims had traded around 50 cents.  And I

8   said we'd be willing to pay 70 cents.  We'd like to prevent

9   the $5 million-a-month burn.  We'd like to buy your claims.

10  Q    Why 70 cents?  What was -- what was that all about?

11  A    I was trying to give them a compelling premium that was

12  still less than I had offered the UCC three months earlier.

13  Q    And so you have:  Not compelling, Class 8.  What does that

14  mean?

15  A    He said that was -- he just said 70 cents wasn't

16  compelling.

17  Q    There's a reference to:  Asked what would be compelling.

18  Was that a question you asked him?

19  A    Yes.

20  Q    And what was his response?

21  A    He said he had no offer.  And he -- we had heard he paid

22  50 cents and I offered him 70 cents and then -- but he was

23  clear to me that he wouldn't tell me what he paid.  And so the

24  next time I called him I -- I -- instead of just making it

25  cents on the dollar, I said I'd pay 130 percent of whatever he

002101

HCMLPHMIT00003149

 1  did pay.  You don't have to tell me what you paid, but I'll

 2  pay you 30 percent more than you paid, you know, a couple

 3  months ago.  And -- or we thought they notified the Court when

 4  they just bought it, but they had actually negotiated buying

 5  it back in February.  January or February.  So --

 6  Q    Who told you that they bought it in February or March time

 7  frame?

 8  A    He did.

 9  Q    Okay.  Was this during the first or the second phone --

10       MR. MORRIS:  I apologize for interrupting.  Who's the

11  "he"?

12       MR. MCENTIRE:  Mike Linn.

13       THE WITNESS:  Mike Linn.

14       MR. MORRIS:  Thank you so much.

15       MR. MCENTIRE:  I'll make sure the record --

16  BY MR. MCENTIRE:

17  Q    Mike Linn --

18  A    Yes.

19  Q    -- told you that Farallon had bought their interest in the

20  claims back in the February or March time frame?

21  A    Yes.

22  Q    All right.  Bought assets with claims.  What does that

23  refer to?

24  A    He said it wasn't compelling because he said Seery told

25  him it would be worth a lot more.  He -- he confirmed what Raj

002102

HCMLPHMIT00003150

Dondero - Direct                      138

```
 1   said, that -- I said, do you realize the estate is spending $5
 2   million a month on legal fees?  That, you know, you should
 3   want to sell this thing.  And he said Seery told him it was
 4   worth a lot more and there were claims and litigation beyond
 5   the asset value.
 6   Q   You offered him 40 to 50 percent premium.  What is that?
 7   A   That's what the 70 cents on the 50 cents represents.  And
 8   then I changed the dialogue to I'll pay you 130 percent of
 9   whatever your cost was.  And he said, not compelling.  And
10   then I, both -- both calls, I pressed him, what price would he
11   offer at?  And he said he had no offer, he wasn't willing to
12   sell.
13   Q   The 130 percent of cost, not compelling, was that in the
14   second or the third call with Mr. Linn?
15   A   It was at my third and final call with Farallon.  My
16   second call with Mike Linn was the 130 percent of cost.
17   Q   And he said not compelling?  You put it in quotation
18   marks?
19   A   Yep.
20   Q   And then you said, no counter.  What does that mean?
21   A   He wouldn't -- he wouldn't give an offer, he wouldn't give
22   a price at which he would sell.
23   Q   What did Mike Linn tell you, in effect, with regard to his
24   due diligence that Farallon had undertaken?
25   A   When I -- when I told him about the risks and the
```

002103

HCMLPHMIT00003151

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 01/09/25   Page 246 of 262   PageID 3253

Dondero - Direct                          139

 1  litigation and the burn, he said he wasn't following the case,

 2  he wasn't aware of it, he was depending on Jim Seery.

 3  Q    What, if anything, did Michael Linn tell you about MGM?

 4  A    That was more the initial Raj Patel call, where he said we

 5  bought it because he was very optimistic regarding MGM.

 6  Q    Okay.  Did you have any understanding when he first got

 7  his optimism about MGM?

 8  A    No.  He just said that's why they had bought it initially,

 9  they were very optimistic about MGM.

10  Q    That's why they had bought it initially?

11  A    Yes.

12  Q    And they had bought it initially in the February-March

13  time frame?

14  A    Yes.

15  Q    And that -- would you -- does that predate the public

16  disclosure of the MGM sale to Amazon?

17  A    Yes.

18  Q    Substantially by a couple of months?

19  A    Yes.

20  Q    I'd like to turn your attention now to a different topic.

21       MR. MCENTIRE:  And Tim, if you could pull up Exhibit

22  8, please.

23       I believe this document is already in evidence, Your

24  Honor.

25       THE COURT:  8 is?

```
1            MR. MCENTIRE:  Oh, by the way, I offer Exhibit 4 into
2    evidence.
3    BY MR. MCENTIRE:
4    Q   Let me ask you a couple quick questions.
5            THE COURT:  Is there an objection?
6            MR. MORRIS:  Nope.
7            THE COURT:  Okay.  4 is admitted.
8        (Hunter Mountain Investment Trust's Exhibit 4 is received
9    into evidence.)
10   BY MR. MCENTIRE:
11   Q   Exhibit 8.
12           MR. MORRIS:  I apologize, Your Honor.  Just one
13   caveat.  It's not for the truth of the matter asserted; it's
14   for what his impressions were at the time.
15           MR. MCENTIRE:  Well, --
16           MR. MORRIS:  This is what he wrote down.  I don't --
17           MR. MCENTIRE:  I'm offering it for the truth of the
18   matter asserted.
19           MR. MORRIS:  Okay.  And I object to that extent.
20   This --
21           MR. MCENTIRE:  Let me --
22           MR. MORRIS:  Can I voir dire?  Can I voir dire?  May
23   I do --
24           MR. MCENTIRE:  May I finish my statement that I was
25   --
```

HCMLPHMIT00003153

Dondero - Direct                    141

1              THE COURT:  Let him finish, and then --

2              MR. MCENTIRE:  Thank you.

3              THE COURT:  -- you can.

4              MR. MCENTIRE:  I am offering it for the truth of the

5    matter asserted because these are documents that were prepared

6    contemporaneously, it's an exception to the hearsay rule and

7    reflects admissions of a -- of an adverse party.  Admissions

8    that are adverse to their interests.  Declarations of interest

9    adverse to their interest and admissions of an adverse party

10   contemporaneously recorded.  And so that's why I'm offering

11   it.

12             MR. MORRIS:  For all purposes?

13             THE COURT:  Okay.  Let me have you point me to the

14   exact hearsay exception.  I understand this hearsay exception

15   you're arguing for the hearsay within the hearsay, the party

16   opponent exception.  But it's technically hearsay of Mr.

17   Dondero, even though he's here on the stand.

18             MR. MCENTIRE:  Well, I could lay a foundation, then.

19   BY MR. MCENTIRE:

20   Q   Mr. Dondero, --

21             THE COURT:  Well, no.  I'm asking for what your --

22             MR. MCENTIRE:  It's --

23             THE COURT:  -- rule reference is.

24             MR. MCENTIRE:  I don't have the Rules with me right

25   this second.  It's 803(1) --

002106

HCMLPHMIT00003154

Dondero - Direct                  142

1         (Discussion.)

2              MR. MCENTIRE:  All right.  Well, it's -- it's

3    admissible under several categories.  It's not hearsay because

4    it's an admission of a party opponent.  It's also an admission

5    under 803(1), present sense impression.  It's also admissible

6    --

7              THE COURT:  So you say it's Mr. Dondero's statement

8    describing or explaining an event --

9              MR. MCENTIRE:  Yes.

10             THE COURT:  -- or admission made while or immediately

11   after the declarant perceived it?

12             MR. MCENTIRE:  Yes.  It's also a record of a

13   regularly-conducted activity, which is 803(6).  And I think

14   it's also not technically hearsay because it's also an

15   admission of a party.  So, this --

16             THE COURT:  Well, that's the hearsay within the

17   hearsay.

18             MR. MORRIS:  Yeah.

19             THE COURT:  But I'm -- I'm --

20             MR. MORRIS:  That can't possibly be right.  I can't

21   go back to my hotel right now and write down that he told me

22   that he did a bad thing and come in here tomorrow and say he

23   admitted he did a bad thing because it's in my notes.

24             MR. MCENTIRE:  Well, --

25             MR. MORRIS:  That's can't possibly be the law.

HCMLPHMIT00003155

```
 1              MR. MCENTIRE:  Well, --

 2              MR. MORRIS:  That's not the law.

 3              MR. MCENTIRE:  There are two hearsay issues here.

 4   One is whether this is a business record or otherwise

 5   qualifies as an exception to the hearsay rule, and then

 6   there's an internal hearsay issue of whether or not what Mr.

 7   Patel and Mr. --

 8              THE COURT:  You haven't established the business

 9   record exception.  Okay?

10              MR. MCENTIRE:  I'm prepared to lay the foundation

11   right this second.  At this moment.

12              THE COURT:  You may proceed.

13   BY MR. MCENTIRE:

14   Q   Mr. Dondero, is this a document that was generated by you

15   in the ordinary course of your business?

16   A   Yes.

17   Q   Did you have personal knowledge when you recorded this

18   document?

19   A   Yes.

20   Q   You personally recorded this document, correct?

21   A   Yes.

22   Q   And you have had custody of this document.  Correct?

23   A   Yes.

24   Q   And this is --

25              MR. MCENTIRE:  That's a -- that's a business record,
```

002108

HCMLPHMIT00003156

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/05/25   Page 251 of 262   PageID 3258

Dondero - Voir Dire                    144

 1   Your Honor.

 2           MR. MORRIS:  May I, Your Honor?

 3           THE COURT:  You may.

 4           MR. MORRIS:  Okay.

 5                        VOIR DIRE EXAMINATION

 6   BY MR. MORRIS:

 7   Q    Where's the document now?  How come it's -- how come it's

 8   cut off?

 9   A    I don't know.

10   Q    Do you have the document today?  How come we're looking at

11   a document that's cut off?

12   A    I'm sure we have it somewhere.  I don't have it.

13           MR. MORRIS:  So, number one, Your Honor, we don't

14   have the actual document.  We have a partial document.

15       Number two, let's talk about it for a second.

16   BY MR. MORRIS:

17   Q    You say that you do this in the ordinary course of

18   business.  What's the purpose of taking these notes?

19   A    When I'm starting negotiation with somebody new on

20   something complicated and I don't know what their concerns or

21   rationale is going to be, I take little notes like this.

22   Q    And is it -- is it the purpose of it to capture the

23   important things that are going on in the conversation?

24   A    So I know next time how to address it differently, you

25   know.

002109

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 04/09/25390 Page 252 of 262    PageID 3259

Dondero - Voir Dire                    145

1   Q    That's not my question.  My question is, is the purpose of

2   taking notes so that you have a written record of the

3   important points that you discussed?

4   A    Yes, so I know how to address it the next time.

5   Q    Okay.  And among the important points that you never put

6   down on these notes was the letters MGM.  Is that correct?

7   A    Correct.

8   Q    Okay.  And you never put down here that Michael Linn told

9   you he wasn't following the case, correct?

10  A    No, I did not.

11  Q    Okay.

12  A    But it was --

13  Q    And --

14  A    Yeah.  But I --

15  Q    That --

16          MR. MORRIS:  Your Honor, if this is --

17          MR. MCENTIRE:  (faintly)  This is *voir dire* of the

18  witness for a business record exception.

19          MR. MORRIS:  No, because --

20          THE COURT:  Overruled.

21          MR. MORRIS:  Thank you.

22  BY MR. MORRIS:

23  Q    Mr. Patel wouldn't tell you how much he paid and that's

24  why you didn't write it down, right?

25  A    Mr. Patel told me he bought it because of Seery.  My

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 04/07/25390 Page 253 of 262   PageID 3260

Dondero - Voir Dire                                    146

 1   conversation was very short with him.  That was one of the few

 2   things he said.  Linn said he wouldn't sell it because he

 3   didn't find it compelling.

 4   Q   Okay.

 5   A   And Linn was the one who wouldn't tell me --

 6   Q   Okay.

 7   A   -- the price.

 8   Q   But -- but even though you took these notes to write down

 9   things that you thought were important, you didn't write down

10   MGM.  Correct?

11   A   Yes.

12   Q   And you didn't write down that anybody was very optimistic

13   about MGM.  Correct?

14   A   No, I did not.

15   Q   And you didn't write down that Mr. Linn told you he wasn't

16   following the case.  Correct?

17   A   Well, he said the same thing Patel said about he bought it

18   because of Seery.  He did confirm that.  I didn't see any

19   reason to write that again.

20   Q   You didn't -- you never wrote it down.  Not once.  Not --

21   there's nothing about again, right.  You never wrote down that

22   --

23   A   No, I did write --

24   Q   -- anybody ever told you they weren't following the case.

25   Correct?

HCMLPHMIT00003159

```
 1   A    Correct.

 2   Q    Okay.

 3   A    But I wrote down that he bought it because of Seery.

 4   Q    Okay.

 5            MR. MORRIS:  Your Honor, no objection.  It can go in.

 6            MR. MCENTIRE:  Okay.

 7            THE COURT:  Wait.  Did you just say no objections?

 8            MR. MORRIS:  Except -- except for the hearsay on

 9   hearsay.  It can't possibly be an admission.  It's his -- it's

10   his notes.  This is what he wrote.  It can come in for that

11   purpose.  It's -- it's a -- that's what he's testified to, and

12   I can't object to that.  But it can't possibly come in as an

13   admission against Farallon.

14            MR. MCENTIRE:  Well, I disagree.

15            MR. MORRIS:  That's the point.

16            MR. MCENTIRE:  Well, first of all, I disagree.  This

17   is otherwise admissible, and it can come.  I think that's

18   really, Your Honor, that's really the weight it's going to be

19   given.  It comes in.  He's not making an objection to its

20   admissibility.  And if he wants to argue the weight of the

21   document, that's a different issue.

22            MR. STANCIL:  Your Honor, if I may.

23            THE COURT:  You may.

24            MR. STANCIL:  The second layer of hearsay goes to

25   whether this is a statement by Farallon.  It is a statement by
```

002112

HCMLPHMIT00003160

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 01/09/25   Page 255 of 262   PageID 3262
Exhibit 72   Page 149 of 390

Dondero - Direct                                        148

1   Mr. Dondero of what he heard, what he says he heard Farallon

2   say.  801(d) refers to, when they're talking about an opposing

3   party statement, made by the party, not made by a listener who

4   says he heard the party.  This is classic hearsay within

5   hearsay.  It's not admissible for that purpose.

6          THE COURT:  Okay.  I sustain the objection, and --

7   but I'm still struggling to understand what the Respondents

8   have agreed to.  Because --

9          MR. MORRIS:  That -- that this is what he claims to

10  have written down.  I mean, right?  So, so --

11         THE COURT:  Okay.

12         MR. MORRIS:  -- a present sense impression.

13         THE COURT:  So, it is admitted as Mr. Dondero's

14  present sense impression, but it's not admitted as to the

15  truth of anything that Claims Purchasers may have said.

16         MR. MORRIS:  And -- and the --

17         THE COURT:  That's what you're saying?

18         MR. MORRIS:  Yes.  And the most important thing is

19  that he's testified that the purpose of the notes was to

20  capture the things that were important that he was told.  And

21  we've established what he wasn't told.

22         MR. MCENTIRE:  Okay.  I believe the document is in

23  evidence, Your Honor.

24         THE COURT:  Exhibit 4 is in evidence.  But, again,

25  there's no admission in here as to what Claims Purchasers

002113

Dondero - Direct                    149

```
 1  testified as to.

 2          MR. MCENTIRE:  Well, they haven't testified yet

 3  because --

 4          THE COURT:  This is what he --

 5          THE DEFENDANT:  I understand.  I understand.

 6          THE COURT:  -- he says he remembers.

 7          MR. MCENTIRE:  Okay.  So, --

 8          THE COURT:  It's sort of an --

 9          MR. STANCIL:  Your Honor, just so we're clear for our

10  record, this is not admitted for the truth of what Farallon is

11  purported to have said.

12          MR. MCENTIRE:  Correct.

13          THE COURT:  Correct.

14          MR. MCENTIRE:  This --

15          MR. STANCIL:  Thank you.

16          MR. MCENTIRE:  This is offered for the truth of what

17  Mr. -- Mr. Dondero recalls them saying.

18          THE COURT:  Okay.

19          MR. MCENTIRE:  In part.

20          THE COURT:  I think -- I think we're on the same page

21  now.  I think.  I think.

22      (Hunter Mountain Investment Trust's Exhibit 4 is received

23  into evidence.)

24          MR. MCENTIRE:  All right.  May I proceed, Your Honor?

25          THE COURT:  You may.
```

HCMLPHMIT00003162

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 05/12/25390 Page 257 of 262   PageID 3264

Dondero - Direct                    150

```
 1              MR. MCENTIRE:  Can you please put up Exhibit 8,

 2    please?  And I believe this document has been put into

 3    evidence --

 4              THE COURT:  It is.

 5              MR. MCENTIRE:  Thank you.

 6    BY MR. MCENTIRE:

 7    Q    Mr. Dondero, this document is a -- part of a -- the

 8    Court's docket.  It was filed on February 1, 2021, if you

 9    could go to the top upper banner.  It's Debtors' Notice of

10    Filing of Plan Supplement of the Fifth Amended Plan of

11    Reorganization of Highland Capital Management, as Modified.

12         Do you see that?

13    A    Yes.

14    Q    I'll direct your attention, --

15              MR. MCENTIRE:  If you could go to Page 4, please, for

16    me, Tim.

17    BY MR. MCENTIRE:

18    Q    Page 4 has a schedule, a plan analysis and a liquidation

19    analysis.  Do you see that?

20    A    Yes.

21    Q    All right.  For Class 8, what does it identify that is

22    being projected for distributions to the general unsecured

23    claims for Class 8?

24    A    71.3 percent.

25    Q    What percentage is being identified that will be
```

002115

```
 1   distributed to Class 9?

 2   A    9, no distribution.

 3   Q    No distribution?  All right.  Mr. Dondero, in Paragraph --

 4   I'm going to give you a piece of paper.

 5        MR. MCENTIRE:  Can you just give me a piece of paper

 6   real quick?

 7   BY MR. MCENTIRE:

 8   Q    I'm handing you a piece of paper and I'm --

 9   A    Okay.  Thank you.

10   Q    Mr. Dondero, in our complaint in this case, the proposed

11   complaint in this case, we allege that Class 8 had a total of

12   $270 million, the claims that were purchased by Farallon and

13   Stonehill had a face value in Class 8 of $270 million.  Would

14   you write that number down?

15        And assuming that this was public information that was

16   available in February of 2021 at 71.32 percent, --

17        MR. MORRIS:  Objection, Your Honor.  That's an

18   assumption not in evidence.  He hasn't laid a foundation for

19   what was available in February in 2021.

20   BY MR. MCENTIRE:

21   Q    Mr. Dondero, according to --

22        THE COURT:  Wait.  Are you going to respond, or are

23   you just going to --

24        MR. MCENTIRE:  I'll rephrase the question.

25        THE COURT:  -- rephrase?  Okay.
```

002116

1  BY MR. MCENTIRE:

2  Q    According to the document that is identified as Exhibit #8

3  that says that 71.32 percent is the anticipated projected

4  payout on Class 8 claims, what is 71.32 percent of the face

5  value of the claims that were purchased?

6  A    About $192 million.

7  Q    $192 million?  And assuming for a moment that, as alleged

8  by Hunter Mountain in this case, that $163 million was

9  actually used to purchase the Class 8 claims, what is the

10  difference?

11  A    About $30 million.

12  Q    A little less than that, isn't it?  Or is the number --

13  A    Yeah.  $28 million or whatever.

14  Q    $28 million?  And based upon your years of experience in

15  running Highland Capital, being involved in the purchase of

16  unsecured claims, being involved in investigating and

17  acquiring distressed assets, that return over a two-year

18  period, is that the kind of return that a hedge fund would

19  typically -- you would expect to receive?

20        MR. MORRIS:  I just want to make sure that -- because

21  the question changed a little bit in the middle.  If he wants

22  to ask him if he would have made the investment, that's fine.

23  But he should not be permitted to testify as to what any other

24  investor, including the ones who purchased these claims, would

25  have done.  Every -- there's different risk profiles.  He can

002117

Dondero - Direct                        153

```
 1   testify to whatever he wants about himself.
 2            THE COURT:  Sustained.
 3   BY MR. MCENTIRE:
 4   Q   Go ahead.  Based upon your experience at Highland Capital,
 5   would Highland Capital have ever acquired those claims based
 6   upon that kind of return over two years?  For a distressed
 7   asset such as this?
 8   A   No.
 9   Q   Why not?
10   A   It's below a debt level return that you could get on high-
11   rated assets with certainty.  It's --
12   Q   What do you mean by it's below -- below a debt return that
13   you could get on collateralized assets?  What do you mean by
14   that?
15   A   I think in this case the debt that the Debtor put in place
16   paid 12, 13 percent and was triple secured or whatever.  So no
17   one would buy the residual claims for an 8 percent compounded,
18   whatever that $28 million works out to.
19            MR. MORRIS:  I move to strike, Your Honor.  He
20   shouldn't be talking about or testifying to what other people
21   might do.
22            THE WITNESS:  Well, we --
23            THE COURT:  This is --
24            THE WITNESS:  We would never have done that.
25            THE COURT:  This is --
```

002118

Dondero - Direct                    154

1           MR. MCENTIRE:  He would not have.

2           THE COURT:  -- Highland, not nobody.  Okay.

3   BY MR. MCENTIRE:

4   Q   Mr. Dondero, and what is it about the fact that these

5   claims are not collateralized that impacts the decision-

6   makers, from your perspective?

7   A   You have all the risk that the $205 million of expenses

8   this estate has currently paid grows to $300 or $400 million.

9   You know, you have the risk that other litigation regarding

10  Seery violating the Advisers Act --

11          MR. MORRIS:  I move to strike, Your Honor.

12          THE WITNESS:  -- results in --

13          THE COURT:  Sustained.

14          THE WITNESS:  -- expenses.

15  BY MR. MCENTIRE:

16  Q   Just respond to my question, sir.  What does the fact

17  about not being collateralized, how does that impact the

18  decision-maker's --

19  A   Well, I was trying to answer it.  You just have all kinds

20  of residual risk of bad acts that have happened at the estate

21  or expenses increasing or whatever.

22          MR. MORRIS:  I move to strike the phrase "bad acts,"

23  Your Honor.

24          THE COURT:  Overruled.

25  BY MR. MCENTIRE:

002119

Dondero - Direct                    155

```
 1  Q    What did you mean by that?  What did you mean by "bad
 2  acts"?
 3  A    We've highlighted it in a lot of complaints.  There's been
 4  several violations of the Advisers Act.
 5          MR. MORRIS:  Move to strike, Your Honor.  It's a
 6  legal conclusion.
 7          THE COURT:  Sustained.
 8  BY MR. MCENTIRE:
 9  Q    Mr. Dondero, are you familiar with an entity known as NHF?
10  A    Yes.
11  Q    What is NHF?
12  A    A NexPoint hedge fund.  It was a closed-in fund that we
13  manage still to this day at NexPoint.  The name has changed to
14  NXDT.
15  Q    Was NHF publicly traded?
16  A    It -- yeah, it's a publicly-traded equity.  It's a closed-
17  in fund, technically, but it's a publicly-traded security.
18  Q    What -- what is your affiliation with NHF?
19  A    I'm the portfolio manager.
20  Q    And, again, what are your responsibilities as the
21  portfolio manager?
22  A    To optimize the portfolio and hopefully exceed investor
23  expectations.
24  Q    Have you become aware that Stonehill was purchasing MGM
25  stock in the first quarter of 2021?  And NHF?
```

002120

HCMLPHMIT00003168