**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P

§

§  Case No. **19-34054-sgj11**

**The Dugaboy Investment Trust - Appellant**

§

vs.                                      §                    **3:25-CV-01876-K**

**Highland Capital Management, L.P; et al** - Appellee

§

§

  [4297] **Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025**

# Volume 8

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | *INDEX* |

### APPELLANT THE DUGABOY INVESTMENT TRUST'S AMENDED STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Pursuant to Rule 8009 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4311] on July 14, 2025; and having filed *Appellant The Dugaboy Investment Trust's Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* [Docket No. 4365] on August 11, 2025 in the above-captioned case; and having received correspondence from the Bankruptcy Clerk's Office [Docket No. 4367] asking Dugaboy to correct certain errors in its August 11, 2025 submission [Docket No. 4365]; hereby submits this *Amended Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in approving the settlement agreement and release entered into between the Highland Entities and the HMIT Entities pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure as being fair, equitable, and in the best interest of the estate?**

2. **Did the Bankruptcy Court err by approving a settlement agreement utilizing an improper valuation methodology and without sufficient supporting evidence?**

3. **Did the Bankruptcy Court err in approving the overly broad and vague release provisions contained within the settlement agreement?**

4. **Did the Bankruptcy Court err in approving the settlement agreement without allowing adequate time for the Cayman Islands Joint Official Liquidators to complete their investigation?**

5. **Did the Bankruptcy Court err in concluding Mark Patrick had the requisite corporate authority to enter into and bind the HMIT entities to the settlement agreement?**

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow, August 13, 2025.

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4311] filed by Appellant;

*000010*

2. *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4297];

*000014*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

*000625*

*000786*

*000 809*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an |

| | | | |
|---|---|---|---|
| *vol. 2* | | | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *000807* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *000832* | 5/20/2025 | 4218 | Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust(Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust(Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |
| *000838* | 5/22/2025 | 4221 | Amended Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust(Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust(Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery |

*Vol. 2*

*0008 44*

| | 6/9/2025 | 4228 | Motion for expedited hearing on Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion Filed by Partner Dugaboy Investment Trust (related document #4227 (Attachments: #1 Proposed Order Granting Motion for Expedited Hearing (Hesse, Gregory) Modified linkage on 6/10/2025 (mdo). |
|---|---|---|---|
| *0008 49* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *0008 57* | 6/10/2025 | 4232 | Response opposed to (related document(s): 4227 Motion to extend time to Time to Respond to Trusts' Motion filed by Partner Dugaboy Investment Trust, 4228 Motion for expedited hearing (related documents 4216 Motion to compromise controversy) on Emergency Motion for an Order Extending Duration of Time to Respond To Trusts' Motion filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| *0008 63* | 6/10/2025 | 4234 | Reply to (related document(s): 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) to (I) Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion and (II) Motion for Expedited Hearing on Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *000 86 7* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *0008 69* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 3* *0008 71* *Thru  Vol 13* | 6/20/2025 | 4255 *(to be submitted to* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to |

*Vol. 3*
*Starts with*
*0008 71 —*

*Thru Vol End*
*Vol 1.3*

*Vol.14*
*003528*

| | | | |
|---|---|---|---|
| | *Clerk on flash drive*) | | Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis |

| | | | |
|---|---|---|---|
| *Vol 14* *003531* | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart,#3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 15* *003851* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *003875* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *004002* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *004017* | 6/23/2025 | 4276 | Reply to (related document(s)): 4223 Objection filed by Creditor The Dugaboy Investment Trust) filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| *004019* | 6/24/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *Vol. 16* *004236* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |

| | | | |
|---|---|---|---|
| Vol. 16 0042417 | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |
| 0042187 | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| 0042172 | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| 0042176 | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust). Entered on 6/27/2025 (Okafor, M.) |
| 0042188 | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 |

*Vol. 16*

*0004295*

*0004302*

*0004304*

*0004313*

*0004315*

*0004411*

| | | | |
|---|---|---|---|
| | | | Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of |

| | | | |
|---|---|---|---|
| *Vol. 16* | | | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *Vol. 17* *004684* | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| *004700* | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M. |
| *004812* | 8/4/2025 | 4353 | Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A (Harper, Geoffrey) |
| *004834* | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| | | | |

Dated: August 12, 2025            Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500

10

(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 12, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper_____*
Geoffrey S. Harper

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72    Filed 05/09/25    Page 13 of 262    PageID 3282
Exhibit 72    Page 0379 of 390

Dondero - Direct                    156

1   A    Yes.  We believe -- we're able to demonstrate from

2   Bloomberg records, on the Bloomberg terminal, they show up as

3   holders and purchasers in the -- in the first few months of

4   2021.

5   Q    What magnitude?

6   A    I think it was one of their top equity positions.  It was

7   about six million bucks.

8              MR. MCENTIRE:  Can you put up the chart?  This is for

9   demonstrative purposes only.

10        I'm not offering this chart into evidence, Your Honor.

11   It's simply a demonstration.  Or a demonstrative.

12              MR. MORRIS:  Your Honor, there's no such thing.

13              MR. MCENTIRE:  There is.

14              MR. MORRIS:  A demonstrative has to be based on

15   evidence.  A demonstrative is supposed to summarize evidence.

16   You don't put up a demonstrative until --

17              THE COURT:  All right.  What's your response to that?

18              MR. MCENTIRE:  That I'm about to walk through some

19   points where he can establish as a point of evidence, and then

20   we can talk about it.  Demonstratives, demonstratives are used

21   all the time, Your Honor.

22              MR. MORRIS:  It's to --

23              THE COURT:  Well, they summarize evidence.

24              MR. MORRIS:  It's to summarize evidence.

25              THE COURT:  Yes.  So, --

HCMLPHMIT00003169

Dondero - Direct                         157

```
 1              MR. MCENTIRE:  Well, this is --
 2              THE COURT:  -- you can elicit the evidence, and then
 3    if this chart seems to summarize whatever he testifies as to,
 4    then --
 5              MR. MCENTIRE:  All right.
 6              THE COURT:  -- then I think maybe you can put it up.
 7              MR. MCENTIRE:  Mr. -- you can take it down, Tim.
 8    BY MR. MCENTIRE:
 9    Q    Mr. Dondero, do you have an understanding of how much
10    total distributions have been paid to date in the Highland
11    bankruptcy?
12    A    I believe the Class 8 -- the 1 through 7 was only about
13    $10 million.  I believe Class 8 got $260 or $270 million so
14    far.
15    Q    All right.  And do you have an understanding of what the
16    total amount of expenses are?
17    A    Total expenses paid to date was $203 million.  $205
18    million.
19    Q    So the -- the -- there's a rough approximation between the
20    professional expenses and the actual all proofs of claim; is
21    that correct?
22    A    There is, yeah, a ratio, and -- yes.
23    Q    The total cash flow, if you add those two together, what
24    are they?  What are they approximately?
25    A    $470 million.
```

002122

HCMLPHMIT00003170

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 24-72    Filed 05/90/2590 2390  Page 15 of 262    PageID 3284

Dondero - Direct                                        158

1   Q   $470 million?  And do you understand that the -- that the

2   Reorganized Debtor and the Claimant Trust would have more than

3   sufficient assets to reach Class 10 where Hunter Mountain is

4   currently located, even setting aside the claims against you?

5   A    Correct.  There's $57 million of cash on the balance

6   sheet, net of a couple million today, I guess.  And then

7   there's $100 million of other assets.

8           MR. MCENTIRE:  Reserve the rest of my questions.

9   Reserve the rest of my questions, Your Honor.

10          THE COURT:  Okay.  Pass the witness.

11          MR. MCENTIRE:  Could I have my time estimate?

12          THE COURT:  Yes.  Caroline?

13          THE CLERK:  (faintly)  As of right now, we are at 81

14  minutes, so --

15          MR. MCENTIRE:  Thank you.

16          THE COURT:  That was 81 minutes total?

17          THE CLERK:  Yes.

18          THE COURT:  Okay.

19          MR. MORRIS:  May I proceed, Your Honor?

20          THE COURT:  You may.

21                   CROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q    Good afternoon, Mr. Dondero.

24  A    Good to see you.

25  Q    My pleasure.  Do you know an attorney named Ronak

002123

HCMLPHMIT00003171

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-72    Filed 06/09/25    Page 16 of 262    PageID 3285

Dondero - Cross                              159

1    (phonetic) Patel?

2    A    Is that Rakhee that they call --

3    Q    Could be.  Do you know an attorney named Rakhee Patel?

4    A    There was a Rakhee Patel, I believe, early in the *Acis*

5    case.

6    Q    Let me try --

7    A    I'm not -- I've never met her.

8    Q    Let me try this differently.

9    A    Okay.

10   Q    Did you ever meet with the Texas State Securities Board?

11   A    No.

12   Q    Did anybody acting on your behalf ever file a complaint

13   with the Texas State Securities Board?

14   A    No.

15   Q    Do you know if anybody's filed a complaint with the Texas

16   State Securities Board?  About Highland?

17   A    I believe you covered it earlier.  Mark Patrick.

18   Q    Mark Patrick what?

19   A    I guess he did, or Hunter Mountain did, or the DAF did.  I

20   don't -- I don't know.

21   Q    Did you ever speak with Mark Patrick about a TSSB

22   investigation of Highland?

23   A    No.

24   Q    Okay.  Why do you think Mark Patrick knows about the TSSB

25   investigation of Highland?

002124

HCMLPHMIT00003172

Dondero - Cross                    160

1              MR. MCENTIRE:  Objection to form.  Calls for

2    speculation.  He's just established that he's never --

3              THE WITNESS:  I don't know.

4              MR. MCENTIRE:  -- talked to Mark Patrick.

5              MR. MORRIS:  Okay.

6              THE COURT:  Okay.  Sustained.

7              MR. MORRIS:  Okay.

8    BY MR. MORRIS:

9    Q    Have you ever seen the draft Hunter Mountain complaint in

10   this case?

11   A    No.

12   Q    Okay.  I think you testified a moment ago that Amazon had

13   hit MGM's price by December 17th.  Do I have that right?

14   A    Yes.

15   Q    Okay.  Then how come you didn't say that in your email to

16   Mr. Seery?

17   A    Your best practices and typical practices, when you put it

18   on the restricted list, is to just give as little information

19   as possible so that the inside information isn't promulgated

20   specifically throughout the organization and leaked --

21   Q    So, --

22   A    -- throughout the organization.

23   Q    So, even though your intent was to convey information to

24   Mr. Seery, you didn't actually tell him the truth, right?  You

25   didn't tell him that Amazon had actually hit the stock price.

002125

HCMLPHMIT00003173

Dondero - Cross                161

1    Right?

2    A    I wouldn't characterize it that way.

3    Q    Okay.  In fact, all you told him was that they were

4    interested.  Isn't that right?

5    A    I wasn't telling him anything.  I was telling Compliance,

6    as an investment professional, that it needed to be on the

7    restricted list because we were in possession of material

8    nonpublic information regarding a merger that was going to go

9    through shortly.  Or in the next few months.

10   Q    Is it your testimony that, as of December 17th, Amazon had

11   made an offer that was acceptable to MGM?

12   A    Yeah, we were going into -- that's what the board meeting

13   was.  We were going into exclusive negotiations to culminate

14   the merger with them.

15   Q    Okay.  I think you have a binder there of our exhibits.

16   If you can go to #11.

17   A    Which one?

18           MR. MORRIS:  May I approach?

19           THE WITNESS:  Sure.

20       (Pause.)

21   BY MR. MORRIS:

22   Q    That's your email, sir, right?

23   A    Yes.

24   Q    Okay.  It doesn't say anything about Amazon hitting the

25   price, right?

HCMLPHMIT00003174

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Filed 06/20/25   Page 19 of 262   PageID 3288

Dondero - Cross                          162

1   A    It doesn't need to.

2   Q    In fact, it still mentions Apple, doesn't it?  Why did you

3   feel the need to mention Apple if Amazon had already hit the

4   price?

5   A    The only way you generally get something done at

6   attractive levels in business is if two people are interested.

7   Q    But why weren't you -- why were you creating a story for

8   the Compliance Department when the whole idea was to be

9   transparent so they would understand what was happening?  Why

10  would you create a story that differed from the facts?

11  A    It didn't differ from the facts, and it's not a story.

12  It's a, we have material nonpublic information.  Please put

13  this on the restricted list.  And --

14  Q    But that -- but you said Amazon and Apple are actively

15  diligencing and they're in the data room.  Do you see that?

16  A    That's true.

17  Q    So, even though -- you know what, I'll move on.  But this

18  -- this doesn't say what you testified to earlier, that Apple

19  hit the -- that Amazon hit the price.  Right?  Can we just

20  agree on that?

21  A    Well, agree that it doesn't have to and it's not supposed

22  to.

23          MR. MORRIS:  I move to strike.  I just want --

24          THE COURT:  Sustained.

25  BY MR. MORRIS:

002127

HCMLPHMIT00003175

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-72   Filed 06/20/25   Page 20 of 262    PageID 3289

Dondero - Cross                     163

1    Q    -- you to -- I want you to just work with me here.  You

2    did not tell the Compliance Department that Apple -- that

3    Amazon had hit the strike price.  Right?  Isn't that correct?

4    That's not what this email says?

5    A    The -- you can pull up a hundred of these type emails.

6    They're not specific.

7              MR. MORRIS:  I'm going to move to strike and I'm just

8    going to ask you, --

9              THE COURT:  Sustained.

10   BY MR. MORRIS:

11   Q    -- because you testified to one thing, and I just want to

12   make clear that you told the Compliance Department something

13   different.  Can we just agree on that?

14             MR. MCENTIRE:  Well, Your Honor, may I respond to his

15   motions to strike?  I think he's becoming argumentative.

16             THE COURT:  Could you speak into the mic, --

17             MR. MCENTIRE:  I can.

18             THE COURT:  -- please.

19             THE COURT:  He's becoming argumentative.  And I think

20   it's very clear that, if he asks a question, the witness has a

21   right to respond.  I think his answers are totally responsive.

22   And I don't think anything should be struck.

23             THE COURT:  Okay.  Your question was you didn't put

24   in there anything about it hit the strike price --

25             MR. MORRIS:  He didn't --

HCMLPHMIT00003176

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 08/09/25   Page 21 of 262   PageID 3290

Dondero - Cross                              164

```
 1              THE COURT:  -- or whatever?

 2              MR. MORRIS:  He didn't -- he didn't tell the

 3   Compliance Department what he just testified to.  In fact, he

 4   told the Compliance Department something very different.

 5   That's all I'm asking.

 6              THE COURT:  And I think that's just a yes or no.

 7              MR. MORRIS:  Okay.

 8   BY MR. MORRIS:

 9   Q    Yes or no?  You told the Compliance Department something

10   different than what was actually happening?

11   A    That's not true.

12   Q    Oh.

13   A    Exactly what was here, what was happening.  I didn't give

14   more detail, which is more hearsay.

15   Q    Okay.  If somebody was filing -- following the Highland

16   bankruptcy, they would have known that MGM was very important,

17   right?

18   A    You'd have to show me where.  I don't -- I don't see it in

19   any of the bankruptcy --

20   Q    You don't think that that's true?

21   A    I didn't see it in any of the public filings.

22   Q    Do you remember we were here two years ago on this very

23   day, June 8, 2021, for the second contempt hearing?  You sat

24   in that very witness box during the second contempt hearing?

25   Remember that?  That was two years ago.
```

002129

HCMLPHMIT00003177

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-72   Filed 0369002390   Page 22 of 262    PageID 3291
Exhibit 72    Page 03690239

Dondero - Cross                                              165

1    A    I remember sitting in the box.  What are you asking?

2    Q    And do you remember that that was just a few days after

3    MGM had announced its deal with Amazon?

4    A    I -- I don't remember -- I -- was that the day the judge

5    was hopeful that would lead to a resolution of the case?

6    Q    Exactly.  So, --

7    A    Okay.

8    Q    -- Judge Jernigan certainly knew that MGM was important.

9    Right?

10   A    Yes.

11   Q    And she's a bankruptcy judge, right?

12   A    Yes.

13   Q    And she was overseeing the bankruptcy case, right?

14   Correct?

15   A    Yes.

16   Q    And the very first thing when she walked in the door two

17   years ago on this day was, oh my goodness, MGM, they have a

18   deal, maybe we can finally get to a settlement.  Right?

19   A    And I wish she had pushed on that.

20   Q    Do you --

21   A    And I remember you guys dismissing it.

22   Q    Do you think she had material nonpublic inside

23   information?

24   A    No, I don't think so.

25   Q    She probably learned it in the bankruptcy case, right?

HCMLPHMIT00003178

Dondero - Cross                                    166

1   A    Yeah.

2   Q    Okay.  Do you believe Mr. Seery sold any MGM securities

3   between the day you sent your email and the day the Amazon

4   deal was announced on May 26th?

5   A    I don't know.

6   Q    Do you -- so you have no knowledge?  Let's do this a

7   different way.  You have no basis to say that Mr. Seery sold

8   any MGM securities between the moment you sent this email on

9   December 17th and the day the Amazon deal was announced on May

10  26th.  Correct?

11  A    I'm sorry.  Just to clarify, you're saying sold, not

12  bought, right?  You're not asking me if --

13  Q    I'll do either way.

14  A    Okay.

15  Q    Fair point.

16  A    Sure.

17  Q    Very fair point.

18  A    Okay.

19  Q    Do you believe that Mr. Seery engaged in any transactions

20  of MGM securities between those two relevant data points?

21  A    Yes.

22  Q    Okay.  What do you think he did?

23  A    The HarbourVest transaction.

24  Q    Okay.  So, you learned about the HarbourVest transaction

25  when?

HCMLPHMIT00003179

Dondero - Cross                              167

1   A    When it was filed.

2   Q    And that was on December 23rd.  Do you remember that?

3   A    Yes.

4   Q    It was just less than a week after you sent your email,

5   right?

6   A    Yes.

7   Q    And do you remember that you filed an objection to the

8   HarbourVest settlement?

9   A    Yes.

10  Q    And you're the one who gave Mr. Seery this material

11  nonpublic inside information, right?

12  A    Yes.

13  Q    Did you object to the HarbourVest settlement on the basis

14  that Mr. Seery was engaging in insider trading?

15  A    Not then, I don't think.  I believe --

16  Q    You didn't, right?  Even though it was happening at the

17  exact same moment, the very -- within a week of you giving him

18  this information.  He's announcing that he's doing this

19  settlement and you don't say a word.  Isn't that right?

20  A    Because I delegated the responsibility to Compliance by

21  notifying them of material nonpublic information, and

22  Compliance should hold the organization accountable.

23  Compliance is separate and discrete from management.

24  Compliance reports to the SEC.

25  Q    You filed a 15-page objection to the settlement, didn't

HCMLPHMIT00003180

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-72   Filed 08/06/25    Page 25 of 262    PageID 3294

Dondero - Cross                                          168

1   you?

2   A   I don't -- I don't know.

3   Q   Did you tell Judge Jernigan that Mr. Seery was doing bad?

4   A   Not then.  I think a month later, two months later.

5   Q   Even though you knew what was happening, you didn't say

6   anything, right?

7   A   I -- I'm not responsible for all the filings.  I --

8   Q   Even though it's under your name?

9   A   Correct.

10  Q   How about -- how about CLO Holdco?  Did CLO Holdco file an

11  objection to the HarbourVest settlement?

12  A   I -- I don't know which entities did, but it -- whatever

13  entities that were in control that could did, eventually, when

14  they found out, you know, and -- but did -- did they, within a

15  week or contemporaneously?  No.  It was right around the

16  holidays.  A lot of people weren't paying attention.  You guys

17  were trying to rush the HarbourVest thing through.

18  Q   Sir, CLO Holdco filed an objection, claiming that it was

19  entitled to purchase the HarbourVest interests in HCLOF

20  because it had a right of first refusal, right?  Isn't that

21  right?

22  A   Okay.  I -- what ultimately governs the --

23  Q   Isn't that right?

24  A   I don't -- okay.

25  Q   It's really just yes or no.

HCMLPHMIT00003181

Dondero - Cross                           169

1   A    I don't know.

2   Q    If you don't remember, that's fine.

3   A    I don't remember, yeah.

4              MR. MCENTIRE:  Your Honor, would he please give the

5   witness an opportunity to answer?  He's interrupted three

6   times in less than five seconds.  Give the witness an

7   opportunity to respond.

8              MR. MORRIS:  This is real easy stuff.

9              THE COURT:  Okay.

10             MR. MORRIS:  I'm trying to cross him here.

11             MR. MCENTIRE:  Your Honor, with all due respect, he's

12  making it very difficult because he's being very aggressive --

13             MR. MORRIS:  Nah.

14             MR. MCENTIRE:  -- and he's interrupting the witness.

15             MR. MORRIS:  I would never.

16             THE COURT:  Okay.  I don't feel the need to do that

17  right now, but I will -- I will consider your request.

18             THE WITNESS:  Can I give a complete answer to his

19  last question, or one that I'd like to be my answer on the

20  record?

21             THE COURT:  Go ahead.

22             THE WITNESS:  The governing responsibility as a

23  registered investment advisor is you're not allowed to buy

24  back from investors fund interests or investments unless you

25  offer it to everybody else, in writing, in that fund first.

002134

HCMLPHMIT00003182

Dondero - Cross                          170

1    That's the Investment Advisers Act as I understand it, and

2    that is what was improper in the HarbourVest transaction.  I

3    mean, besides the fact that the pricing was wrong, they misled

4    HarbourVest.  And I know HarbourVest hasn't complained, but

5    just because your investors don't complain doesn't mean you

6    can rip them off.

7             MR. MORRIS:  I'd really move to strike the entirety

8    of the answer, Your Honor.

9             THE COURT:  Granted.

10   BY MR. MORRIS:

11   Q    Mr. Dondero, HC --

12   A    I'm not going to -- I'm not answering any more questions

13   unless I can answer that question with that answer, --

14   Q    Mr. Dondero, do you --

15   A    -- because I believe it's responsive.

16   Q    Do you remember that CLO Holdco withdrew their objection?

17   A    I --

18   Q    To the HarbourVest settlement?

19   A    I don't remember.

20   Q    Do you remember that's really when Grant Scott left the

21   scene?

22   A    I don't --

23   Q    He thought it was inappropriate for them to withdraw,

24   right?

25   A    I don't remember all the details.  I know they made some

HCMLPHMIT00003183

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72   Filed 07/29/25   Page 28 of 262   PageID 3297
Exhibit 72   Page 007290390

Dondero - Cross                                171

1  mistakes, and there's a tolling agreement against Kane's

2  (phonetic) firm for making mistakes, and, you know, whatever.

3  But I -- I don't remember all the details.

4  Q   And a couple of months later, you conspired with Mr.

5  Patrick to try to sue Mr. Seery in order to try to get that

6  very same interest in HCLOF, right?

7       MR. MCENTIRE:  Your Honor, I have to object.  There's

8  no foundation and it's also highly argumentative and I move to

9  object.  That's a -- that's a question asked in bad faith.

10      THE WITNESS:  I deny any conspiring.

11      MR. MORRIS:  Okay.

12      THE COURT:  Sustained.

13 BY MR. MORRIS:

14 Q   In April, Mr. Patrick filed a lawsuit on behalf of CLO

15 Holdco a couple of weeks after getting appointed as the head

16 of CLO Holdco and the DAF about the HarbourVest settlement.

17 Isn't that right?

18 A   I believe so.

19 Q   Okay.  And you worked with him on that, right?

20 A   I -- I did not work with him on that.  I was very just

21 tangentially aware.

22 Q   Okay.

23      MR. MORRIS:  I'm just going to refer the Court -- I'm

24 going to move for the admission into evidence of the second

25 contempt order.

HCMLPHMIT00003184

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Page 073902390   Page 29 of 262   PageID 3298

Dondero - Cross                          172

1           THE COURT:  Exhibit what?

2           MR. MORRIS:  Just one moment, Your Honor.

3      (Pause.)

4           MR. MORRIS:  You know what, I don't know that I have

5  it on the list.  I'm just going to ask the Court to take

6  judicial notice.  We had a hearing two years ago to this day,

7  and the Court found in the order that it entered at the

8  conclusion of that hearing that Mr. Patrick had abdicated his

9  responsibility to Mr. Seery.  It's one of the reasons why Mr.

10  Seery wasn't held in contempt of Court.  And I'd like -- I'd

11  like Counsel to address it now.

12          MR. MCENTIRE:  Yeah, I'll -- you said Seery, didn't

13  you?

14          MR. MORRIS:  Oh, sorry.  I said Seery.  I meant

15  Dondero.

16          MR. MCENTIRE:  (faintly)  Also, I believe it's

17  entirely irrelevant.  Judicial -- taking judicial --

18          THE COURT:  Would you speak in the microphone,

19  please?

20          MR. MCENTIRE:  I'm sorry.  Taking judicial notice of

21  something that is utterly irrelevant is not necessary, not

22  appropriate.  What this Court did two years ago roughly to the

23  day -- and I assume he's correct -- has no bearing on anything

24  before the Court today.  Nothing.  This has zero connection,

25  nexus, under any analysis, any fair scrutiny, dealing with the

HCMLPHMIT00003185

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Filed 07/09/25   Page 30 of 262   PageID 3299

Dondero - Cross                          173

1   colorability of the claim that Hunter Mountain, who was not

2   involved in those proceedings, is trying to advance here.  And

3   it would be -- it would be improper for this Court to even

4   take it under judicial notice.

5            THE COURT:  Okay.  Response?

6            MR. MORRIS:  Can I respond?

7            THE COURT:  Uh-huh.

8            MR. MORRIS:  Okay.  So, Your Honor, I'm going to move

9   for the introduction into evidence of Exhibit 45.  It is the

10  Charitable DAF complaint that was filed in the federal

11  district court on April 12, 2021, under the direction of Mark

12  Patrick, who today stands here as the representative of Hunter

13  Mountain.

14     This was the complaint, if Your Honor will recall, that

15  they tried to amend and we had a hearing here about the

16  circumstances, because that amendment was going to name Mr.

17  Seery personally, in violation of the gatekeeper order.

18  Right?

19            THE COURT:  Uh-huh.

20            MR. MORRIS:  And so it is all tied together.  If you

21  go to Paragraph 77 of this exhibit, it says, HCLOF holds

22  equity in MGM Studio.  This is the exact same transaction,

23  right?  So, so Mr. Dondero says, I gave Mr. Seery inside

24  information, he violated all of these things in the

25  HarbourVest transaction, even though he didn't say a word

002138

HCMLPHMIT00003186

 1  then, and here, while it's still on the restricted list,

 2  before the Amazon deal is announced, they're actually in court

 3  saying that they should be entitled to acquire that same asset

 4  that Mr. Seery supposedly acquired improperly.  He wants it

 5  for himself.

 6      I mean, are you kidding me?  It's not relevant?

 7          THE COURT:  I overrule the relevance objection.  It's

 8  admitted.

 9          MR. MORRIS:  Thank you.  And 45 is admitted, Your

10  Honor?

11          THE COURT:  45 is admitted.

12          MR. MORRIS:  Okay.

13      (Debtors' Exhibit 45 is received into evidence.)

14          MR. MCENTIRE:  Just, Your Honor, I was identifying my

15  objection in connection with his original request that you

16  take something under --

17          THE COURT:  Would you speak in the microphone?

18  Again, we --

19          MR. MCENTIRE:  Yes.  My original objection was

20  addressing his request of you, Your Honor, to take something

21  under judicial notice.  I want to make sure my objection is

22  also lodged with regard to Exhibit 45, which I understand

23  you've overruled.

24          THE COURT:  Correct.

25          MR. MCENTIRE:  Okay.

HCMLPHMIT00003187

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Filed 07/09/25   Page 32 of 262   PageID 3301

Dondero - Cross                    175

1          THE COURT:  It is so noted.

2          MR. MORRIS:  Okay.

3          THE COURT:  You've objected and I've admitted it.

4          MR. MORRIS:  And I think I've said this already, but

5     the reason that we're requesting the Court take judicial

6     notice of its order on the second contempt proceeding is

7     because it shows that Mr. Dondero and Mr. Patrick worked

8     together, in violation of the gatekeeper, to try to suit Mr.

9     Seery to obtain the interest in HCLOF that he is sitting here

10    today saying somehow that Mr. Seery wrongfully acquired, even

11    though he didn't say a word at the time.

12         THE COURT:  Okay.  So now we're talking about not

13    Exhibit 45 --

14         MR. MORRIS:  Yes.

15         THE COURT:  -- but the order that was entered --

16         MR. MORRIS:  Correct.

17         THE COURT:  -- regarding the filing of Exhibit 45?

18         MR. MORRIS:  Exactly.

19         THE COURT:  Someone is going to need to give me a

20    docket entry number before we're done here.

21         MR. MORRIS:  Okay.

22         THE COURT:  I can and will take judicial notice of

23    that, but I need to have it --

24         MR. MCENTIRE:  So I assume, for the record, my

25    objection is overruled?

002140

HCMLPHMIT00003188

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Filed 07/09/25   Page 33 of 262   PageID 3302
Exhibit 72   Page 177 of 390

Dondero - Cross                                    176

1          THE COURT:  Your objection is overruled.

2          MR. MCENTIRE:  Thank you.

3          MR. MORRIS:  All right.

4   BY MR. MORRIS:

5   Q    You mentioned something about, I think, was it NXDT or

6   NHF?

7   A    Yes.

8   Q    And just let me see if I can do it this way.  Right?  So

9   there used to be a fund known as the NexPoint Strategic

10  Opportunities Fund, right?

11  A    Yes.

12  Q    Okay.  And in 2020 that was a closed-in fund.  Correct?

13  A    Yes.

14  Q    And it traded under the ticker symbol NHF, correct?

15  A    Yes.

16  Q    And then late in 2021 the name of the fund was changed to

17  NexPoint Diversified Real Estate Trust, correct?

18  A    Yes.

19  Q    And the ticker symbol changed from NHF to NXDT, correct?

20  A    Yes.

21  Q    And then it became a REIT the following year, right?

22  A    Yes.

23  Q    And I'm just going to refer to these letters as the Fund;

24  is that fair?

25  A    That's fine.

002141

HCMLPHMIT00003189

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72   Filed 07/09/25   Page 34 of 262    PageID 3303
Exhibit 72   Page 9 of 890   PageID 3303

Dondero - Cross                          177

1    Q    For purposes of these questions.  And you were the Fund's

2    portfolio manager, the president, the principal executive

3    officer, correct?

4    A    Yes.

5    Q    And another entity that you controlled, NexPoint Advisors,

6    provided advisory services to the Fund, correct?

7    A    Yes.

8    Q    And you controlled NexPoint Advisors at all times,

9    correct?

10   A    Yes.

11   Q    Okay.  And the Fund was publicly traded, right?

12   A    Yes.

13   Q    And the Fund owned shares of MGM at the end of 19 -- at

14   the end of 2020, correct?

15   A    Yes.

16   Q    In fact, as of December 2020, MGM was one of the Fund's

17   ten largest holdings, with -- valued at over $25 million.

18   Isn't that right?

19   A    Yes.

20   Q    And by the end of 2021, MGM was the Fund's fifth largest

21   holding, with assets -- with a value of over $40 million.

22   Correct?

23   A    Yes.

24   Q    And the Fund also held MGM common stock indirectly; isn't

25   that right?

HCMLPHMIT00003190

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Page 1799/2390   Page 35 of 262   PageID 3304

Exhibit 72   Page 0079002390

Dondero - Cross                                    178

1   A    Yes.

2   Q    In fact, when the Amazon deal closed at the -- in March of

3   2022, the Fund issued a press release disclosing that it stood

4   to receive over $125 million on the MGM shares that it held

5   directly and indirectly.  Correct?

6   A    We issued several press releases.  I don't remember --

7   Q    Okay.  Do you remember that, that as a result of the MGM

8   sale, the Fund was expected to receive approximately $126

9   million?

10  A    Yes.

11  Q    Okay.

12  A    Roughly.

13  Q    All right.  In October 2020, just a few weeks before you

14  sent your email, the Fund announced the commencement of a

15  tender offer to acquire outstanding shares at a certain price.

16  Correct?

17  A    Yeah, I believe so.

18  Q    And you authorized that, right?

19  A    Yes.

20  Q    And when a fund acquires shares and then retires them, the

21  shareholders who did not tender consequently own a larger

22  percentage of the fund than they did before the tender,

23  correct?

24  A    Yes.

25  Q    Okay.  And the tender was completed in January, in the

 1  first week of January 2001 [sic], correct?

 2  A    I don't remember when it was complete.

 3  Q    It started at the end of October 2020, and it ended

 4  sometime in January '21.  Is that fair?

 5  A    Okay.  I don't remember.  Okay.

 6  Q    Do you want me to refresh your recollection?

 7  A    I'm just saying I don't remember.

 8  Q    Yeah, okay.

 9  A    I'm not dis...

10  Q    Okay.

11  A    -- denying it.  I just don't remember the exact dates.

12      (Discussion.)

13          MR. MORRIS:  Your Honor, can I mark for

14  identification purposes Plaintiffs' Exhibit -- I'm just going

15  to call it 100, to see if it refreshes the witness's

16  recollection?

17          THE COURT:  You may mark it.

18          MR. MORRIS:  Okay.

19          THE COURT:  We'll see where it goes from there.

20      (Debtors' Exhibit 100 is marked for identification.)

21  BY MR. MORRIS:

22  Q    So, I've put --

23          MR. MCENTIRE:  Hold it.  Your Honor, I think we're

24  now marking exhibits that we haven't put on an exhibit list.

25          MR. MORRIS:  I'm trying to refresh his recollection.

002144

HCMLPHMIT00003192

1          MR. MCENTIRE:  Okay.

2          MR. MORRIS:  Yeah.

3          MR. MCENTIRE:  Well, --

4          THE COURT:  Yes.

5          MR. MORRIS:  Okay?  I haven't offered it in -- I

6    haven't offered it --

7          THE COURT:  I've not admitted -- I don't know what it

8    is.  I haven't admitted it yet.  I'm waiting.

9          MR. MORRIS:  I haven't offered it into evidence.  He

10   said he doesn't remember, --

11         THE COURT:  Okay.

12         MR. MORRIS:  -- I've got an SEC document here, and

13   I'm going to try and refresh his recollection.

14         THE COURT:  Okay.

15   BY MR. MORRIS:

16   Q    You're familiar with these forms, right?

17   A    Generally.

18   Q    In fact, in fact, you sign them in your capacity as the

19   fund portfolio manager, right?  Your signature is put on it,

20   anyway?

21   A    Generally.

22   Q    Yeah.  And do you see that this is the Form N-CSR that was

23   filed with the SEC at the end of 2001 [sic] on behalf of

24   NexPoint Diversified Real Estate Trust?

25   A    Yes.

002145

HCMLPHMIT00003193

Dondero - Cross                         181

1    Q    Okay.  So if you just turn to Page 16.  And the numbers

2    are kind of at the bottom in the middle of the page.  You'll

3    see the notes to the consolidated financial statements.

4    A    Yes.

5    Q    Okay.  And Note 1 discusses the organization.  Do you see

6    that?

7    A    Yes.

8    Q    And at the bottom of the left-hand column, it says, On

9    January 8, 2021, the company announced the final result of its

10   exchange offer pursuant to which the company purchased the

11   company's outstanding -- the company's common shares in

12   exchange for certain consideration.

13        Do you see that?

14   A    Yes.

15   Q    That's a reference to the tender offer that you authorized

16   at the end of October, correct?

17   A    Yes.

18   Q    And then at the bottom it says, The company share --

19   company -- excuse me.  I strike that.  It says, quote, The

20   common shares at a price of $12 per common share, for an

21   aggregate purchase price of approximately $125 -- $105

22   million.  Upon retirement of the repurchased shares, the net

23   asset value was $152 million, or $17.41 million.

24        Do you see that?

25   A    Yes.

HCMLPHMIT00003194

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72   Filed 08/30/25   Page 39 of 262    PageID 3308
Exhibit 72   Page 00390390

Dondero - Cross                              182

1   Q    Does that refresh your recollection that the tender offer

2   was completed at the beginning of January?

3   A    Yes.

4   Q    And that's with all of the MGM stock that the Fund still

5   owned at that time, right?

6   A    Yeah.  We -- we didn't -- we didn't violate --

7   Q    You didn't --

8   A    We didn't -- we didn't violate like Seery did.  We didn't

9   sell any shares or buy shares.

10  Q    Okay.

11          MR. MORRIS:  I'm going to move to strike that, Your

12  Honor.

13          THE COURT:  So granted.

14          MR. MCENTIRE:  Well, Your Honor, I've actually got a

15  response to his motion to strike.  This entire inquiry is

16  irrelevant.

17          MR. MORRIS:  Not --

18          MR. MCENTIRE:  This has no relevance at all in

19  connection with the allegations that we're making in this

20  case.

21          THE COURT:  Your response?

22          MR. MORRIS:  My response, Your Honor, if you ask me

23  -- let me just get a few more questions.  He personally owned

24  shares in the Fund.  The Fund owned shares in MGM.  And

25  notwithstanding the restricted material, this is the insider,

HCMLPHMIT00003195

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Filed 08/04/25   Page 40 of 262   PageID 3309

Dondero - Cross                          183

1    and he is benefiting from himself through the Fund's

2    repurchase of these shares in the tender offer, and he went

3    and he had substantial holdings.  I'll get to that in a

4    minute.

5        So he is actually doing something worse than what Mr.

6    Seery -- what he accuses Mr. Seery of, because he's buying

7    shares for his own personal benefit.  Right?  He's the

8    insider.  Right?  And the Fund owns the shares directly.

9    There's never going to be an allegation that HCLOF ever owned

10   any MGM stock.  Never.

11            THE COURT:  Okay.  I'm going to allow this.

12   Obviously, on redirect, you can further question on this --

13            MR. MCENTIRE:  Well, --

14            THE COURT:  -- to --

15            MR. MCENTIRE:  Well, first of all, his suggestions

16   and his accusations are purely argumentative.

17            THE COURT:  Would you please speak in the microphone?

18   We --

19            MR. MCENTIRE:  Well, he's standing in the way, Your

20   Honor.

21            THE COURT:  Well, --

22            MR. MCENTIRE:  It's irrelevant.

23            THE COURT:  There are two.  There's room for both of

24   you.

25        Continue.  Go ahead.

HCMLPHMIT00003196

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72   Filed 08/09/25   Page 41 of 262    PageID 3310

Dondero - Cross                    184

```
 1            MR. MCENTIRE:  It's entirely irrelevant, and it's
 2   argumentative.
 3            THE COURT:  Okay.  Overruled.  You can continue.
 4   BY MR. MORRIS:
 5   Q    You did own an awful lot of the Fund's shares, didn't you?
 6   A    I owned some.
 7   Q    You owned some?  You owned millions, right?
 8   A    Yes.
 9   Q    Okay.  And as a result of the tender, you owned a greater
10   interest of the Fund, right?
11   A    Yes.
12   Q    And therefore you owned a greater number -- a greater
13   portion of the MGM stock, the $125 million of MGM stock that
14   was owned directly and indirectly by the Fund, correct?
15   A    You do know insiders weren't permitted to participate in
16   the tender, which would have kept my percentage the same.
17   Q    Sir, you benefitted -- you didn't stop the tender, right?
18   You didn't say, now I know what's going to happen, I should
19   stop it?  You benefitted from the tender.  Can we just agree
20   on that?
21   A    I did everything I was supposed to do, notifying
22   Compliance.  If they thought it was material, they would have
23   -- it was in their hands once I notified Compliance of the
24   material --
25   Q    Okay.
```

HCMLPHMIT00003197

Dondero - Cross                                 185

1   A   -- nonpublic information.

2   Q   I appreciate that.  I just want --

3   A   It wasn't my responsibility to do Compliance's job to call

4   you or call --

5   Q   Okay.

6   A   -- the SEC or call anybody else.

7   Q   But you will agree that, even though you had material

8   nonpublic inside information, you didn't take any steps to

9   stop the tender, correct?

10  A   The tender was for a relatively small amount of the stock.

11  But I did -- I would -- it would not be my responsibility to

12  change or adjust the tender --

13  Q   Okay.

14  A   -- or what was happening.

15  Q   Okay.  And then the last question is, you benefitted from

16  the tender because the Fund repurchased shares, which

17  increased your percentage ownership of the Fund, and therefore

18  your percentage ownership of the MGM shares that were held

19  directly and indirectly.  Is that fair?

20  A   Marginally, I guess.  Yes.

21  Q   Okay.  From the -- from the millions of shares, you would

22  describe it as marginal?  Okay.

23      Let me move on.  You've testified now that you spoke with

24  representatives of Farallon in the late spring, I guess

25  beginning on May 28th.  Right?

HCMLPHMIT00003198

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72    Filed 09/09/25390   Page 43 of 262    PageID 3312

Dondero - Cross                      186

1   A    Yes.

2   Q    And that was two days after the MGM deal was publicly

3   announced, correct?

4   A    Yes.

5   Q    Okay.  And had you ever communicated with Mr. Patel before

6   that phone call?

7   A    I don't believe so.

8   Q    And then you spoke with Mr. Linn shortly after?

9   A    Yes.

10  Q    Had you ever spoken with Mr. Linn before that phone call

11  with Mr. Linn?

12  A    I don't believe so.

13  Q    So these phone calls were the very first time that you

14  ever spoke to either one of these gentlemen.  Is that right?

15  A    That I can remember.

16  Q    Okay.

17  A    If I ran into them at --

18  Q    Uh-huh.

19  A    -- a conference a decade ago, I don't know, but --

20  Q    And they told you that they bought the shares in the

21  February-March time frame, right?

22  A    Yes.

23  Q    And you have no reason to dispute that, correct?

24  A    Correct.

25  Q    Okay.  And you didn't know how much they had paid for the

HCMLPHMIT00003199

Dondero - Cross                          187

1   claims as a result of these conversations, correct?

2   A    They did not admit a price.

3   Q    Okay.  And it's your testimony that there wasn't

4   sufficient information in the public for them to buy -- this

5   is your view -- that there wasn't sufficient information in

6   the public to justify their purchases.  Is that your view?

7   A    Correct.

8   Q    And even though you didn't think there was sufficient

9   information in the public, you were prepared to pay 30 percent

10  more than they did, right?

11  A    Yes.

12  Q    And is that because you were 30 percent more irrational

13  than them or because you had material nonpublic inside

14  information?

15          MR. MCENTIRE:  Objection.  Argumentative, Your Honor.

16          THE COURT:  Overruled.

17          THE WITNESS:  Even at a 30 percent premium, it was

18  less than I offered the UCC several months earlier, number

19  one.

20      Number two, I was still under the illusion there was a

21  desire to resolve the place, not burn it down.  You know,

22  there was -- all the original members were happy to sell at

23  $150 million.  It was a $500 or $600 million estate.  There

24  should be $400 or $500 million of residual value.  It

25  shouldn't all be going out the door to lawyers and others.

HCMLPHMIT00003200

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Filed 08/90/2390   Page 45 of 262   PageID 3314

Dondero - Cross                                188

 1  BY MR. MORRIS:

 2  Q    You were willing to pay 30 percent more for an unknown

 3  purchase price, 30 percent more of an unknown purchase price,

 4  at a moment that you didn't believe there was sufficient

 5  information to buy the claims, correct?

 6  A    You have a couple misstatements in there.  The Grosvenor

 7  piece was public.  The Grosvenor piece traded at $67 million.

 8  So we knew that piece trade at around 50 cents.  We knew from

 9  people in the marketplace the other pieces were trading right

10  around that level.

11      So I wasn't just offering 30 percent on any willy-nilly

12  number, 130 percent of any willy-nilly number.  I knew they

13  had paid around 50, 60 cents.  And so I was offering 30

14  percent more than that.  Thirty percent more than $150

15  million, call it $200 million.  I had offered $230 or $240

16  million to resolve the whole estate before the plan went

17  effective, and I got no response from the original UCC

18  members.

19  Q    So why didn't you just try to settle the case with them?

20  Why did you try to buy the claim?  Why, if you had these new

21  people, and your good intentions were to finally get to a

22  settlement of the case, why didn't you say, hey, guys, how do

23  we resolve the case?  Why did you want to buy the claims at a

24  30 percent premium over what they paid with no knowledge and

25  no diligence, according to you?  Can you explain that to Judge

HCMLPHMIT00003201

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 4-72    Filed 09/09/25    Page 46 of 262    PageID 3315

Dondero - Cross                                    189

1    Jernigan?

2    A    Because Seery told them to hold on, don't worry, they were

3    going to make $270 million.

4    Q    That doesn't answer my question.  Why didn't you try --

5    you had new owners.  Why didn't you try to settle with them?

6    A    When someone owns an asset, buying their asset is settling

7    with them.  What claim does Farallon have against us?  At that

8    point, they had no claims against us.

9    Q    It doesn't settle the case, does it?

10   A    But if we owned all the claims, it would settle the case.

11   Just like if Seery had objected to the claims trading that

12   they were supposed to give written notice to the Court, he had

13   enough cash on the balance sheet to buy and retire all the

14   claims.

15   Q    All right.  Let's go back, I apologize, to that Exhibit

16   11.  No, it's not Exhibit 11.  I think it's their Exhibit 4,

17   your notes.

18            MR. MORRIS:  Your Honor, may I have -- just have one

19   moment?

20            THE COURT:  You may.

21            MR. MORRIS:  Can you tell me how long I've been

22   going?  That's really my question.

23            THE CLERK:  So, on cross, --

24            MR. MORRIS:  Yeah.

25            THE CLERK:  -- you've been going for 32 minutes.

002154

HCMLPHMIT00003202

```
 1              MR. MORRIS:  Okay.  Trying to speed this up.
 2    BY MR. MORRIS:
 3    Q    All right.  So, do we have your handwritten notes, which
 4    are Exhibit 4, in this binder?  Oh.
 5              THE COURT:  Do you want to put it up again on the
 6    screen?
 7              MR. MORRIS:  Ms. Canty, if you're listening and you
 8    can do that, that would be great.  If not, --
 9        (Discussion.)
10              MS. CANTY:  One second, John.
11              MR. MORRIS:  All right.  He -- he's got it.
12              THE COURT:  Okay.
13    BY MR. MORRIS:
14    Q    Okay.  So, I just -- I just want to make -- you know,
15    follow up on a few questions I asked you earlier on *voir dire*.
16    So, these are your notes, right, and you said you write down
17    the important stuff.  Correct?
18    A    I write down, yeah, the stuff I thought I would need for
19    the next call.
20    Q    Okay.  And, you know, again, just so we have it all in one
21    spot, it doesn't say anything about MGM.  Correct?
22    A    It does not.
23    Q    It doesn't say anything about a *quid pro quo*, correct?
24    A    *Quid pro*?  Uh, no, it does not.
25    Q    It doesn't say anything at all about Mr. Seery's
```

HCMLPHMIT00003203

Dondero - Cross                          191

1  compensation, correct?

2  A    It does not.

3  Q    It doesn't say anything about the sharing of material

4  nonpublic inside information, correct?

5  A    When I told them discovery was coming, that was my

6  response to I knew they had traded on material nonpublic

7  information.

8  Q    Okay.  That -- you told them that?

9  A    Yes.

10 Q    Is that what you're saying now?

11 A    Yes.

12 Q    Oh, so that's what you told them?  They didn't tell you

13 that; that's what you told them?

14 A    Yes.

15 Q    And that's why you wanted discovery, right?

16 A    I thought it would be a lot easier to get discovery on a

17 situation like this than it has been for the last two years,

18 yes.

19 Q    Okay.  Um, --

20 A    In fact, I told them that it would be coming in the next

21 few weeks.  And this has been a couple years.

22 Q    And that's exactly what you did, right?

23 A    Well, we've been trying for two years to get --

24 Q    Right.

25 A    -- discovery in this.

002156

HCMLPHMIT00003204

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-72   Filed 09/09/25   Page 49 of 262    PageID 3318
Exhibit 72   Page 193 of 390

Dondero - Cross                                    192

1  Q   Okay.  So you filed your Texas 202, right?

2  A   I don't know who filed what.

3  Q   That was the one by Mr. Sbaiti that was filed under your

4  name?  Do you remember that?

5  A   Generally.

6  Q   Okay.  Let's take a quick look at that document.  It's #3

7  in our binder.

8  A   Binder #3?

9      (Discussion.)

10          MR. MORRIS:  Okay.  I think #3 is in evidence, Your

11  Honor.

12          THE WITNESS:  Number 3 is in evidence.

13          THE COURT:  Yes.

14          MR. MORRIS:  Okay.

15          THE COURT:  It is.

16  BY MR. MORRIS:

17  Q   And if you can turn to the last page, Mr. Dondero.  Page

18  8.

19  A   Yes.

20  Q   Okay.  And that's your signature, right?

21  A   Yes.

22  Q   And you verified that this document was true and correct

23  within the best of your personal knowledge, correct?

24  A   Yes.

25  Q   Did you read it before you signed it?

HCMLPHMIT00003205

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-72   Filed 05/07/25   Page 50 of 262    PageID 3319

Dondero - Cross                                      193

1   A    Probably.

2   Q    You don't recall doing that?

3   A    Not at this moment.

4   Q    And you may not have.  Is that fair?

5   A    No, I probably did.  Do you have a question?

6   Q    I'm just wondering if you signed it or not.

7   A    I did sign it.

8   Q    Okay.  Good.  So, can you go to Paragraph 21?  Well, let's

9   start at Paragraph 20.  It says that Mr. Seery, quote, has an

10  age-old connection to Farallon, and upon information and

11  belief, advised Farallon to purchase the claims.

12       Do you see that?

13  A    Yes.

14  Q    And then the next paragraph you refer to the telephone

15  call that you had with Michael Linn, right?

16  A    Yes.

17  Q    It doesn't refer to any phone call with Mr. Patel,

18  correct?

19  A    It does not.

20  Q    And the only reason that you swore under oath you were

21  told that Farallon purchased the claims was because of

22  Farallon's, quote, prior dealings with Mr. Seery.  Correct?

23  In Paragraph 21, it says, Relying entirely on Mr. Seery's

24  advice solely because of their prior dealings?

25  A    Yes.

HCMLPHMIT00003206

Dondero - Cross                              194

1    Q    Okay.  You didn't -- you didn't swear under oath at that

2    time that you were told that they bought the claims because of

3    MGM.  Right?

4    A    If you're asking if this is -- it seems like it's not

5    complete, if that's what you're asking me.

6    Q    I'm not asking you that.  I'm asking you what -- I'm

7    asking you to confirm that you swore under oath to the Texas

8    state court, just weeks after you had these conversations,

9    about what you were told concerning Farallon's purchase of the

10   claims.

11       I'm focused on Paragraph 21.  The only reason that you

12   gave, that you told the Texas state court under oath, was that

13   Farallon told you they bought their claims because of their

14   prior dealings with Seery.  Right?

15   A    Yeah.  And that's true.  And that's consistent with what

16   I've said.

17   Q    Okay.  You didn't say anything about MGM, correct?

18   A    Correct.

19   Q    You didn't say anything about a *quid pro quo*, correct?

20   A    Correct.

21   Q    You didn't say anything about Mr. Seery's compensation.

22   Correct?

23   A    I did not.

24   Q    You didn't say anything about the sharing of material

25   nonpublic inside information, correct?

002159

HCMLPHMIT00003207

1   A    Different document, different purposes.

2   Q    Well, but that's now two documents.  You have your notes

3   and you had this document, neither one of which say any of

4   those things.  Fair?

5   A    Different documents, different purposes.  I don't know if

6   that's --

7   Q    Is it fair that neither one of those documents say any of

8   those things?

9   A    It's fair that they don't all match.

10  Q    Okay.  Okay.  Well, that's a fair statement.  Let's go to

11  the next one.  Do you remember the next year you filed an

12  amended petition?

13  A    What tab?

14  Q    That's -- I appreciate that.  It's Tab 4.  Do you see at

15  the last page you've again signed a verification?

16  A    Yep.

17  Q    And do you see this one's filed with the Texas state court

18  on May 2, 2022?

19  A    Yes.

20  Q    And you swore under oath that this statement was complete,

21  true, and accurate to the best of your knowledge, correct?

22  A    Yes.

23  Q    Okay.  Can you go to Page 5, please?

24  A    Yes.

25  Q    Directing your attention to Paragraph 23, do you see where

HCMLPHMIT00003208

```
 1   you say now that Farallon was relying, quote, on Mr. Seery's

 2   say-so because they had made so much money in the past when

 3   Mr. Seery told them to purchase claims.

 4        Do you see that?

 5   A    Yes.

 6   Q    Again, you don't say anything about MGM, correct?

 7   A    Correct.

 8   Q    Again, you don't say anything about material nonpublic

 9   inside information, correct?

10   A    Well, on 24 it does.  Right?  Mr. Seery had inside

11   information on the price and value of claims.  So, you've got

12   to look at all of the bullet points.

13   Q    But that's not the paragraph where you're talking --

14   that's -- it says, in other words.  That's not the paragraph

15   where you're describing your conversation with Farallon.

16   That's your interpretation of it, correct, just as you just

17   said?

18   A    (no immediate response)

19   Q    You told -- I'm sorry.  I should let you finish the

20   answer.  That's your interpretation of it, correct?

21   A    Well, I'm reading all the bullets in aggregate, and it's

22   -- it's a picture of material information shared by Seery, not

23   just MGM or one particular investment, but on all the other

24   assets that aren't detailed in any of the public filings,

25   also.
```

HCMLPHMIT00003209

```
1   Q    The only -- the only point I want to make, I think we can

2   agree on this --

3   A    Okay.

4   Q    -- is that you believed that Mr. Seery gave them material

5   nonpublic inside information.  Farallon never told you that.

6   Isn't that true?  That's why you wanted discovery?

7   A    They said they relied on him and did no diligence of their

8   own.  They were very express -- explicit about that.

9   Q    Okay.  Can you answer my question now?

10  A    Which -- I thought -- that does, --

11  Q    You concluded --

12  A    -- yes.

13  Q    -- that Mr. Seery gave them material nonpublic inside

14  information.  They never told you that.  Fair?

15  A    They said they relied on -- solely on Seery, didn't buy it

16  for any other reason, and they did no due diligence of their

17  own.

18  Q    Okay.  Let's go to the next one.  Now, the no-due-

19  diligence part, that's not in any version we've seen, right?

20  That's something that you just --

21  A    No, no, --

22  Q    -- that you're just testifying to now?  That's not in your

23  notes, it's not in Version 1, and it's not in this version,

24  correct?

25  A    Well, let's go back to the Linn one, because when I was
```

HCMLPHMIT00003210

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 14-72   Page 109 of 390   Page 55 of 262   PageID 3324

Dondero - Cross                                          198

1   going back and forth and he wouldn't give a price, he kept

2   saying, Seery told us it's worth a lot more.  And I kept

3   saying, you've got to look at the burn, you've got to look at

4   the professionals.  And --

5   Q    Okay.

6   A    -- that's --

7   Q    Shortly after this, you filed yet another declaration,

8   right?

9   A    Yes.

10   Q    Uh-huh.  Can you turn to #5?  And this is another version

11   of your recollection of what you were told, correct?  In

12   Paragraph 2?

13   A    These are all -- I don't know why you're saying they're

14   different.  They're all the same.  They're just slightly

15   different verbiage.  What's the major difference between any

16   of them?

17   Q    I'll ask, I'll ask you the question.  The question is, you

18   had never written in any of the prior versions that they

19   didn't do any due diligence; isn't that right?  You never --

20   you never talked about their due diligence in any prior

21   version, correct?

22   A    It's all -- it's all the same version.  I don't -- some

23   versions --

24   Q    Can you answer my question?

25   A    I don't know.  I don't know --

002163

HCMLPHMIT00003211

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 02/09/25   Page 56 of 262   PageID 3325

Dondero - Cross                                    199

1   Q   Which --

2   A   -- which ones included which -- I don't --

3   Q   We've just looked at them.  Do you want to look at them

4   again?

5   A   I just looked at one page in the other one and it was five

6   pages.  I just looked at the one page and I found two or three

7   things --

8   Q   Your notes --

9   A   -- it didn't include, but --

10          MR. MORRIS:  You know what.  I don't want to argue.

11   They say what they say, Your Honor, and I would ask the Court

12   to look carefully at our objection to the motion because we

13   lay all of this out.

14       Your Honor can -- here's the point, because I do want to

15   finish up right now.  There are five different versions of

16   this conversation.  They're laid out in the brief.  And the

17   question that you have to ask yourself, Your Honor, is, if you

18   allow this case to go forward, how do they make a colorable

19   claim when the story keeps changing?

20       And I'll just leave it at that, because, you know, the

21   last version says MGM for the first time.  Like, it comes out

22   of nowhere.  This -- his notes don't say it, he hasn't

23   testified that that's what he was told, but somehow that's in

24   his sworn statement.

25       So I'm just going to rest on the papers, because this is

HCMLPHMIT00003212

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 34-72   Filed 02/09/23   Page 57 of 262    PageID 3326

Dondero - Cross                                    200

1    -- I don't want to be argumentative.

2              THE COURT:  Okay.

3              MR. MCENTIRE:  Well, I'll object to the argument of

4    counsel.  He's just doing another opening statement here, and

5    it's inappropriate and not proper.

6              THE COURT:  Okay.  I agree.  This is Q and A.

7              MR. MORRIS:  Okay.

8              THE COURT:  So, --

9    BY MR. MORRIS:

10   Q   Do you know -- do you have any knowledge or information as

11   to how Mr. Seery's compensation was established?

12   A   Uh, --

13   Q   Withdrawn.  I'm talking now not in his capacity as an

14   independent director or the CEO of the Debtor.  I'm only

15   talking about in his capacity as the CEO of the Reorganized

16   Debtor and the Claimant Trustee.  Do you have any personal

17   knowledge as to how his compensation was established?

18   A   The knowledge I have is that the Claimant Trust gives full

19   latitude to change it at almost any time they want.  Add more

20   to it, add more than that we've seen, double it in the future

21   if reserves are reversed.  It can do anything it wants.  And I

22   guess we've seen some redacted partial statements of his

23   compensation, but that's all I know.

24   Q   Okay.  You have no knowledge about how Mr. Seery's

25   compensation package was determined, correct?

002165

HCMLPHMIT00003213

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-72    Filed 02/29/12390   Page 58 of 262    PageID 3327
Exhibit 72   Page 202 of 390

Dondero - Redirect                        201

1   A    I was not involved.

2   Q    Okay.  You've never -- I'll just leave it at that.

3              MR. MORRIS:  I have nothing further, Your Honor.

4              THE COURT:  Okay.  Pass the witness.  I'm sorry, I

5   guess I should ask, do any of the other responding parties

6   have examination?

7              MR. STANCIL:  No, Your Honor.

8              THE COURT:  No?  Okay.  Redirect?

9              MR. MCENTIRE:  Just very briefly, Your Honor.

10             THE COURT:  Okay.

11             MR. MCENTIRE:  Thank you, Your Honor.

12                       REDIRECT EXAMINATION

13  BY MR. MCENTIRE:

14  Q    Mr. Dondero, you remember the questions about Judge

15  Jernigan walking into the courtroom on June 8 two years ago

16  saying, MGM is sold, maybe we can settle this case?  Do you

17  recall those questions?

18  A    Yes.

19  Q    And do you remember Mr. Morris's dramatic suggestion that,

20  well, how did Judge Jernigan know, or to that effect?

21  A    Yes.

22  Q    Well, that had already been announced, had it not,

23  publicly?

24  A    Yes.

25  Q    Several weeks before?

HCMLPHMIT00003214

Dondero - Redirect                          202

```
 1   A    Yes.

 2   Q    I'd like to direct your attention -- do you still have

 3   Exhibit 4 that he handed you?  Do you have Exhibit 4 there?

 4   A    Uh, --

 5   Q    His exhibit?

 6   A    Is that the notes?

 7   Q    No, it's -- Exhibit 4 is the verified amended petition to

 8   take deposition before suit -- take -- in the state court.  To

 9   -- deposition.

10   A    You've got to give me more of a clue.  I'm sorry.  There's

11   like six binders.

12          MR. MCENTIRE:  Mr. Morris, can you show us where the

13   exhibit --

14          MR. MORRIS:  Sure.  Which one is it?

15          MR. MCENTIRE:  It's Exhibit 4.  I'm going to talk to

16   him about Exhibit 4 (inaudible) that you've have used with

17   this witness.

18   BY MR. MCENTIRE:

19   Q    I assume -- Mr. Dondero, were you assuming from the tone

20   and the substantive content of his questions that Mr. Morris

21   is suggesting that your notes are not reliable?

22   A    He was trying to make it seem like the versions were

23   different.  They were all 90 percent the same.  Different --

24   it seemed like different emphasis for different purposes.  And

25   then you have to remember we learned more about Farallon and
```

002167

HCMLPHMIT00003215

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Filed 02/04/25   Page 60 of 262   PageID 3329

Dondero - Redirect                                    203

 1   Stonehill over time.  Like, in the beginning, when I had --

 2   when I -- we didn't even know Stonehill was involved when I --

 3   Q    Sure.

 4   A    -- first talked to -- when --

 5   Q    Well, he made the big suggestion about you never talked

 6   about due diligence before.  Turn to Exhibit 4, Paragraph 23,

 7   which he did not address with you.  Can you turn to Paragraph

 8   23 of Exhibit 4?  Mr. Morris omitted to refer you to this

 9   particular paragraph.

10   A    23?  Go ahead.

11   Q    Would you read it into the record?

12   A    (reading)  On a telephone call between Petitioner and

13   Michael Linn, a representative of Farallon, Michael Linn

14   informed the Petitioner Farallon had purchased the claim

15   sight-unseen and with no due diligence, a hundred percent

16   relying on Mr. Seery's say-so, because they had made so much

17   in the past with Mr. -- when Mr. Seery had (overspoken).

18   Q    Now, since you've an opportunity to see other paragraphs

19   and other -- that he was otherwise not selecting, you did

20   refer to the -- to what Mr. Linn had told you about in May of

21   2021?

22   A    Yes.  I've been very consistent.  Listen, I believe

23   Farallon tapes all their conversations.  So, eventually, as

24   this goes further, I purposefully --

25   Q    Well, let's --

HCMLPHMIT00003216

1              MR. MORRIS:  I move to strike, Your Honor.

2              THE WITNESS:  Okay.

3              THE COURT:  Sustained.

4    BY MR. MCENTIRE:

5    Q   He also did not direct your attention or the Court's

6    attention to Paragraph 27 of Exhibit 4, selecting --

7    presumably strategically selecting not to refer to that

8    paragraph.  Do you see Paragraph 27?

9    A   Yes.

10   Q   Could you read that into the record, please?

11   A   (reading)  However, Mr. Seery is privy to material

12   nonpublic information, inside information of many of the

13   securities that Highland deals in, as well as the funds that

14   Mr. Seery manages through Highland.  One of these assets was a

15   publicly-traded security that Highland was an insider of, and

16   therefore should not have traded, whether directly or

17   indirectly, given its possession of insider information.

18   Q   Isn't that paragraph just basically addressing MGM?

19   A   Yeah, that's the only major position we had that that

20   would apply to.

21   Q   So the suggestion that you're just making this MGM stuff

22   up is not true.  It's consistent with what you've (inaudible)

23   in other courts as well, correct?

24   A   Yes.  I believe it's disingenuous to say that there's

25   different versions of my story.

HCMLPHMIT00003217

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-72   Filed 02/09/25   Page 62 of 262    PageID 3331
Exhibit 72   Page 206 of 390

Dondero - Redirect                    205

1   Q   Well, let's continue with Mr. Morris's strategy.  Go to

2   Exhibit 3, please.  Mr. Morris suggested that there's no

3   reference at all in any of these prior pleadings about Mr.

4   Seery's excess conversation.  Do you recall that series of

5   questions?

6   A   Yes.  Or his statements, yes.

7   Q   Yes.  And he did not direct your --

8        MR. MORRIS:  I move to strike.  I asked him if he had

9   any knowledge of the man's compensation package.  That's what

10  I asked him.

11       MR. MCENTIRE:  No, sir.  Your Honor, that's not what

12  he asked him.  That was one of the questions he asked.  The

13  other question was, there's nothing in here about

14  compensation.  That's what I'd like to address now.

15       MR. MORRIS:  Oh, go right ahead.

16       THE COURT:  Okay.

17  BY MR. MCENTIRE:

18  Q   Directing your attention --

19       THE COURT:  You can ask.  I'd have to go back and

20  check the record whether you had that second question you

21  mentioned.  I remember questions about does he have knowledge

22  of Seery's compensation.  I just can't remember if he asked,

23  --

24       MR. MCENTIRE:  Fair enough.

25       THE COURT:  -- were there references to it in the --

HCMLPHMIT00003218

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72    Page 0207/02390   Page 63 of 262    PageID 3332
Exhibit 72    Page 207 of 390

Dondero - Redirect                           206

```
 1              MR. MCENTIRE:  Well, --

 2              THE COURT:  -- prior pleadings.

 3              MR. MCENTIRE:  -- for the record, we'll make it clear

 4    that there is a reference.

 5    BY MR. MCENTIRE:

 6    Q    If I could direct your attention to Paragraph 23, Exhibit

 7    -- as to --

 8              MR. MORRIS:  What exhibit is it?

 9              MR. MCENTIRE:  It's Exhibit 3.

10              MR. MORRIS:  Hold on one second.

11              MS. MUSGRAVE:  Your exhibit.

12              THE COURT:  Highland's Exhibit 3.

13              MR. MORRIS:  Give me a moment.

14              THE COURT:  Page what?

15              MR. MCENTIRE:  It's Paragraph 22 on Page 5.

16              THE WITNESS:  I'm sorry.  My Exhibit 3?

17    BY MR. MCENTIRE:

18    Q    Could you read for me, please, Mr. --

19              MR. MORRIS:  Hold on one second.  It's my Exhibit 3

20    or your exhibit?

21              MR. MCENTIRE:  It's your exhibit.  This is Hunter

22    Mountain's binder.

23              MR. MORRIS:  Ah, I apologize.

24              MR. MCENTIRE:  You were just using it.

25              MR. MORRIS:  Okay.  All right.  Go ahead.  What
```

HCMLPHMIT00003219

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 02/03/25   Page 64 of 262   PageID 3333
Exhibit 72   Page 208 of 390

Dondero - Redirect                                          207

1  paragraph were you?

2  BY MR. MCENTIRE:

3  Q    I'd direct your attention, Mr. Dondero, to Paragraph 22.

4        MR. MORRIS:  Yeah.

5  BY MR. MCENTIRE:

6  Q    Would you read -- would you read Paragraph 22 into the

7  record, please?

8  A    (reading)  Mr. Seery had much to gain by brokering a sale

9  of the claim suggested to Muck, mainly his knowledge that

10  Farallon as a friendly investor would allow him to remain as

11  Highland's CEO with virtually unfettered discretion to

12  administer Highland.  In addition, Mr. Seery's written

13  compensation package incentivized him to continue the

14  bankruptcy for as long as possible.

15  Q    There was also a series of questions to you about a

16  transaction involving NexPoint -- NexPoint Diversified Real

17  Estate Trust.  Do you recall those questions?

18  A    Yeah.  Let's talk about that.

19  Q    All right.  Tell me what the transaction was.

20  A    I'm sorry.  The tender that he was asking about or --

21  Q    Yes, the tender.

22  A    There was -- investors wanted some shares retired, and we

23  didn't have enough cash on the balance sheets.  So we tendered

24  in the form of giving them Preferred, which was like equity

25  but a better dividend or a more secured dividend, and 20

002172

HCMLPHMIT00003220

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72   Filed 02/09/2390   Page 65 of 262   PageID 3334
Exhibit 72   Page 209 of 390

Dondero - Redirect                  208

1  percent cash.  And then insiders weren't allowed to

2  participate.  But the whole tender was only for eight or ten

3  percent of the nominal amount outstanding.  And again, you've

4  got a package of securities, so you didn't get any -- you

5  didn't cash.  And although it reduced the share count, it also

6  increased the Preferred or the claims against the company.  So

7  it was marginally accretive, I guess.

8  Q    All right.

9  A    But, again, as far as inside information is concerned,

10  Compliance is a separate party organization that reports up to

11  the SEC.  Has a dotted line to me.  Reports to the SEC.  They

12  make sure everything we do is compliant.

13  Q    Mr. Dondero, --

14  A    Yeah.  Can --

15  Q    -- you didn't participate in the transaction, did you?

16  A    No.  Insiders weren't allowed to participate in the

17  transaction.

18          MR. MCENTIRE:  Reserve the rest of my questions, Your

19  Honor.

20          THE COURT:  Any recross?

21                    RECROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q    The reference to the compensation that we just looked at,

24  that was your own personal view, not something that anybody

25  from Farallon ever told you, correct?  You can go back and

002173

HCMLPHMIT00003221

Dondero - Recross                          209

1   look.

2   A    Yeah, that --

3   Q    I mean, it's not a trick question.

4   A    Yeah, that was my pleading.

5   Q    Okay.  And that was your own speculation, if you will?  It

6   had nothing to do with anything Farallon ever told you,

7   correct?

8   A    I never discussed Seery's compensation with Farallon.

9   Q    Okay.  Thank you, sir, very much.  Just one last question.

10  The price of the tender --

11  A    Yes.

12  Q    -- was based in part on the value of the MGM stock,

13  correct?

14  A    The tender was based on market price --

15  Q    And --

16  A    -- of where the closed-in fund was trading.  It was

17  trading at a discount.  And the discount to NAV, the NAV

18  included MGM accurately marked at whatever time.

19  Q    I appreciate that.

20         MR. MORRIS:  No further questions, Your Honor.

21         THE COURT:  All right.  Mr. Dondero, that concludes

22  your testimony.

23         THE WITNESS:  Thank you.

24         THE COURT:  You are excused from the witness box.

25      (The witness steps down.)

HCMLPHMIT00003222

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 02/09/2390   Page 67 of 262   PageID 3336

210

```
 1              THE COURT:  We probably should take a break, right?

 2              MR. MORRIS:  Okay.

 3              THE COURT:  Caroline, do you want to give them the

 4   aggregate time used?

 5              THE CLERK:  Yes.  The Defendants used 91 minutes

 6   right now.  And the Respondents together, 86 minutes.

 7              THE COURT:  Okay.  I thought it was going to be

 8   higher than that.

 9         (Laughter.)

10              MR. MCENTIRE:  That's what it feels like.

11              MR. MORRIS:  You were wishing.

12              THE COURT:  I was wishing.  Okay.  A ten-minute

13   break.

14              THE CLERK:  All rise.

15         (A recess ensued from 3:17 p.m. until 3:28 p.m.)

16              THE CLERK:  All rise.

17              THE COURT:  All right.  Please be seated.  We're back

18   on the record in the Highland matter.  Mr. McEntire, you may

19   call your next witness.

20              MR. MCENTIRE:  Your Honor, Hunter Mountain would call

21   Mr. Seery adversely.

22              MR. STANCIL:  Your Honor, we're waiting for Mr.

23   Morris for just 60 more seconds.  I think he's on his way back

24   to the courtroom.

25              THE COURT:  Okay.  I just noticed.
```

HCMLPHMIT00003223

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 14-72    Filed 06/20/25    Page 68 of 262    PageID 3337

Exhibit 72    Page 212 of 390

Seery - Direct                            211

```
 1        Did I hear you say you're going to call him virtually?

 2             MR. MCENTIRE:  Adversely.

 3             THE COURT:  Oh, adversely?  Okay.  I'm so used to

 4    hearing the word "virtually" the past few years.

 5        Oh, and there he is.  Okay.

 6             MR. SEERY:  I'm sorry, Your Honor.

 7             THE COURT:  Mr. Seery, welcome.

 8             MR. SEERY:  Good afternoon, Your Honor.

 9             THE COURT:  Please raise your right hand.

10        (The witness is sworn.)

11             THE WITNESS:  I do.

12             THE COURT:  All right.  You may be seated.

13        JAMES P. SEERY, JR., HUNTER MOUNTAIN INVESTMENT TRUST'S

14                       ADVERSE WITNESS, SWORN

15                       DIRECT EXAMINATION

16    BY MR. MCENTIRE:

17    Q    Mr. Seery, would you please state your full name for the

18    record?

19    A    James P. Seery, Jr.

20    Q    And you and I met for the first time I believe it was last

21    Friday in your deposition; is that correct?

22    A    You were by video.

23    Q    I mean, --

24    A    We didn't actually meet.

25    Q    Correct.  You are currently the CEO of the Reorganized
```

002176

HCMLPHMIT00003224

 1  Debtor?

 2  A    That's correct.

 3  Q    Prior to your appointment as the CEO of the Reorganized

 4  Debtor, you've never served as a CEO of a reorganized debtor

 5  in the past, have you?

 6  A    I have not.

 7  Q    You previously served as the chief executive officer of

 8  Highland Capital as a Debtor-In-Possession.  Is that correct?

 9  A    That's correct.

10  Q    And that was the first time you'd ever served in a

11  position such as that; is that correct?

12  A    As the CEO of a debtor, yes.

13  Q    Right.  You also now currently serve as a Trustee for the

14  Highland Claimant Trust, which was put into effect after the

15  effective date of the plan, correct?

16  A    Yes, I'm the Claimant Trustee.

17  Q    All right.  That's the first time --

18            THE COURT:  Mr. McEntire, we usually require standing

19  at the podium.  I mean, do you need --

20            MR. MCENTIRE:  That's fine.  I'm totally fine.

21            THE COURT:  Okay.  That's --

22            MR. MCENTIRE:  I forgot.

23            THE COURT:  Okay.  Thank you.

24  BY MR. MCENTIRE:

25  Q    That was -- and your capacity as the Trustee for the

002177

HCMLPHMIT00003225

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 01/49/25   Page 70 of 262   PageID 3339

Exhibit 72   Page 214 of 390

Seery - Direct                                    213

```
 1   Claimant Trust, that's a first experience as well, correct?

 2   A    As the Claimant Trustee, yes.

 3   Q    All right.  And in these various capacities as a CEO of

 4   the Reorganized Debtor, do you consider yourself to be subject

 5   to the Investment Advisers Act?

 6   A    No, I don't I'm subject to the Investment Advisers Act.  I

 7   think Highland in certain capacities could be.

 8   Q    All right.  But do you have any duties that -- that you

 9   are required to fulfill under the Investment Advisers Act

10   accordingly?

11   A    Do I?

12   Q    Yes.

13   A    I believe Highland does.  I don't know that I have any

14   personal duties.

15   Q    All right, sir.  Let me now talk a little bit about your

16   duties that you did have at Highland.  You agree that when you

17   were at Highland you had fiduciary duties that you owed to the

18   estate?

19   A    Yes.

20   Q    What were those duties?

21   A    To generally treat the estate on an honest and fair

22   matter.

23   Q    Avoid conflicts of interest?

24   A    Yes.

25   Q    Not self-deal?
```

HCMLPHMIT00003226

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Filed 02/05/25   Page 71 of 262   PageID 3340

Seery - Direct                                    214

1   A    Yes.

2   Q    Do you agree with me that you would have a duty not to

3   trade on material inside -- material nonpublic information?

4   A    Generally, I would have a duty to not trade on material

5   nonpublic information, yes.

6   Q    Can you think of an exception?

7   A    There may be.  I just don't think of any one off the top

8   of my head.

9   Q    So, today, you would agree, for purposes of these

10  proceedings, that you would have an obligation as the CEO of

11  the Debtor-In-Possession not to participate in a transaction

12  involving material nonpublic information?  Agreed?

13  A    It would depend.  So, for example, if I was trading with

14  someone else who had material nonpublic information, that

15  might be a permissible transaction.

16  Q    The HarbourVest transaction, you were involved in

17  negotiating the HarbourVest settlement?

18  A    Yes, I was.

19  Q    Did that involve any component related to MGM stock?

20  A    No, it did not.

21  Q    There was no involvement at all concerning the transfer of

22  MGM stock to any entity as a result of that transaction?

23  A    None whatsoever.

24  Q    Okay.  And does HCLOF not have a participation at this

25  time in MGM stock?

HCMLPHMIT00003227

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 64-72    Filed 02/06/25    Page 72 of 262    PageID 3341
Exhibit 72    Page 216 of 390

Seery - Direct                          215

1   A    We call it H-C-L-O-F.

2   Q    Yes.

3   A    It does not own MGM stock, and as I far as I know, never

4   owned MGM stock.

5   Q    Okay.  You agree you received an email from Mr. Dondero in

6   December of 2020.  We've had it here before.  You've seen it

7   in the courtroom, correct?

8   A    Yes.

9   Q    Okay.  Did you ever send -- forward that email to anyone

10  else?

11  A    I'm sorry.  Could you repeat that?

12  Q    Did you forward that email on to anyone else?

13  A    I believe I did, yes.

14  Q    To whom?

15  A    I certainly discussed it with counsel.  I believe I

16  forwarded it to counsel, both the Pachulski firm and the

17  WilmerHale firm.  Thomas Surgent had gotten it.  He was on the

18  email.  And I also forwarded it, I believe -- certainly,

19  discussed it -- with the other independent directors.

20  Q    Okay.  I'm not going to talk about your conversations with

21  other lawyers in-house, okay, or your outside counsel.  Did

22  you take any steps yourself personally to make sure that MGM

23  stock was placed on a restricted list at Highland Capital

24  after you received that email?

25  A    No.  MGM was already on the restricted list at Highland

002180

HCMLPHMIT00003228

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Page 21790 of 390   Page 73 of 262   PageID 3342

Seery - Direct                                    216

 1  Capital.

 2  Q   Okay.  And is that because of Mr. Dondero's position on

 3  the board of MGM?

 4  A   It -- I believe that's the reason.  It was on before I got

 5  to Highland.

 6  Q   Okay.  And you agree, do you not, sir, that the email that

 7  you received from Mr. Dondero also contained material

 8  nonpublic information?

 9  A   I don't think so, no.

10        MR. MCENTIRE:  Would you put up Exhibit -- our

11  Exhibit 4, please?

12        MR. MORRIS:  4?

13        MR. MCENTIRE:  4.

14  BY MR. MCENTIRE:

15  Q   Did H-C-L-O-F -- I'll refer to it as HCLOF, you refer to

16  it as H-C-L-O-F -- did that -- did HCLOF own any funds that

17  owned MGM stock?

18  A   HCLOF had interest in certain Highland-managed CLOs that

19  did own some.

20  Q   As a result of the Highland settlement -- excuse me, the

21  HarbourVest settlement, was there any impact on who owned some

22  of those CLO funds?

23  A   No.

24  Q   Okay.  How was the CLOs, the funds, handled, if at all, in

25  the -- in the HarbourVest settlement?

HCMLPHMIT00003229

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 02/09/25   Page 74 of 262   PageID 3343
Exhibit 72   Page 218 of 390

Seery - Direct                              217

 1   A    They didn't have any impact whatsoever on the HarbourVest

 2   settlement.

 3   Q    Looking at Exhibit 4 for a moment, please, did the

 4   interests, did the interests in -- HarbourVest's interests in

 5   any of those CLOs transfer?

 6   A    No, they did not.

 7   Q    Okay.  And did HCLOF acquire any interest in any of those

 8   CLO's as a consequence of the HarbourVest settlement?

 9   A    No, it did not.

10   Q    Looking at Exhibit 4.  Excuse me, Exhibit 3 is what I

11   meant to say.  Exhibit 3.

12            THE COURT:  Hunter Mountain Exhibit 3?

13            MR. MCENTIRE:  Yes, ma'am.

14            THE COURT:  Okay.

15            MR. MCENTIRE:  Yes, Your Honor.  Excuse me.

16   BY MR. MCENTIRE:

17   Q    This is the email that we were just referring to that you

18   received, correct?

19   A    Yes.

20   Q    And you don't think -- you knew that Mr. Dondero was on

21   the board of directors of MGM?

22   A    Yes.

23   Q    And he -- as a member of the board of directors, when you

24   received this, you see where he indicated that it was probably

25   a first-quarter event?  Do you see that?

HCMLPHMIT00003230

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 1-72   Filed 02/09/25   Page 75 of 262    PageID 3344
Exhibit 72   Page 209 of 390

Seery - Direct                                218

1    A    I see what it says, yes.

2    Q    Okay.  And you did not think that that was material

3    nonpublic information?

4    A    No, I did not.

5    Q    When he indicated that Amazon and Apple were actively

6    diligencing -- are diligencing in the data room, both continue

7    to express material interest, coming from a member of the

8    board of directors of MGM, you did not think that was material

9    nonpublic information?

10   A    I did not, no.

11   Q    You know the difference between a newspaper article or a

12   media article that discusses rumors of a possible sale and the

13   difference between that and a member of the board of directors

14   saying that a sale is going to occur?  You understand the

15   difference between the two?

16   A    Between the two things you just outlined?

17   Q    Yes.

18   A    Yes.  One you said a sale is going to occur, and the other

19   you said a media report.  But it would depend on what's in the

20   media report.  Some media reports are pure speculation.

21   Others have a lot of detail, and they clearly came from an

22   inside source, and that's why the market moves on them.

23   Q    Okay.  So what you're suggesting to me, that there was

24   some indication in the media press before you received this

25   email suggesting that there was actually going to be a sale in

002183

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Filed 02/20/25   Page 76 of 262   PageID 3345

Exhibit 72   Page 220 of 390

Seery - Direct                          219

1    the first quarter of 2021?

2    A    I don't know if it had a first-quarter event in it, but

3    certainly it was clear from the media reports and the actual

4    quotes from Kevin Ulrich of Anchorage, who was the chairman at

5    MGM, that a transaction had to take place very quickly.  And

6    in fact, the transaction did not take place in the first

7    quarter.

8    Q    Okay.  So you -- when you received this particular email,

9    you did not think that it was requiring any additional

10   protection at -- in any way?  Is that what you're suggesting

11   to this Court?

12   A    That the email required additional protection?

13   Q    That you didn't take additional steps to make sure that it

14   was maintained on the restricted list.

15   A    It was already on the restricted list, so there was no

16   change.

17   Q    Was it --

18   A    I --

19        MR. MORRIS:  Hold on.  Let him finish.

20   BY MR. MCENTIRE:

21   A    I was suspicious when I got the email, but I didn't think

22   I had to do anything else than the steps I told you I just

23   took.

24   Q    Yeah, I'm not asking whether you were suspicious or not.

25   My question's a little bit different.  You understand that MGM

002184

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 02/09/23   Page 77 of 262   PageID 3346

Seery - Direct                                            220

1   was taken off your restricted list in April of 2021?

2   A    I understand that that's what you've recently shown me.  I

3   wasn't aware of that fact or I didn't have a recollection of

4   that fact, but certainly April of 2021 would be beyond the

5   first quarter.  Mr. Dondero was not an employee, an affiliate,

6   subject to a contractual relationship.  He had no duty to

7   Highland and Highland had no duty to him.  And in fact, it was

8   quite antagonistic by that time.  So it would be appropriate

9   to take MGM off the restricted list at the end of that time.

10  Q    Well, hopefully you won't take this as argumentative, but

11  I object as nonresponsive.  That really wasn't my question.

12  Okay?  My question --

13           THE COURT:  Sustained.

14  BY MR. MCENTIRE:

15  Q    -- is a little bit different.  As far as you were

16  concerned, MGM was on the restricted list and stayed on the

17  restricted list all the way until the public announcement in

18  May of 2021?

19  A    That's not true.

20  Q    When did you first become aware it was taken off the

21  restricted list?

22  A    I didn't -- I wasn't aware that it had come off the

23  restricted list.  I would have assumed it would have been off

24  the restricted list once Mr. Dondero had been severed from

25  Highland.

002185

HCMLPHMIT00003233

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72   Filed 02/29/2390   Page 78 of 262    PageID 3347
Exhibit 72   Page 22290390

Seery - Direct                                221

1    Q    I see.  Now, Mr. Dondero has relayed a conversation that

2    he had with Mr. Patel and Mr. Linn, suggesting that they were

3    particularly optimistic about MGM based upon what you told

4    them.

5    A    I --

6    Q    Let me finish.  If that occurred, are you suggesting that

7    that is a lie?

8    A    Two things.  One is I don't think he actually testified to

9    that.  I think he said he had a conversation with Mr. Patel.

10   Then he had a different conversation with Mr. Linn, and a

11   subsequent conversation with Mr. Linn.  So the way he laid it

12   out were multiple conversations.

13   Q    Agreed.

14   A    I don't -- I don't know which one you're talking about.

15   Q    Mr. Dondero testified that Mr. Patel was particularly

16   optimistic about the investment because of what he had learned

17   from Mr. -- from you about MGM.

18           MR. MORRIS:  I dispute that characterization.  Why

19   can't he just ask the question?

20           MR. MCENTIRE:  That is my question.  If that --

21           THE COURT:  What is the question?  I'm not sure I

22   hear the question.

23           MR. MCENTIRE:  I'm getting lost because I'm getting

24   interrupted.  I'll try to rephrase it again.

25           MR. MORRIS:  It's my first objection.

002186

HCMLPHMIT00003234

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72   Filed 02/03/25   Page 79 of 262    PageID 3348
Exhibit 72    Page 22390 2390

Seery - Direct                                    222

1          MR. MCENTIRE:  And I --

2          THE COURT:  Go ahead.

3          MR. MCENTIRE:  I'm just going to rephrase, Your

4    Honor.

5          THE COURT:  Just rephrase your question.

6          MR. MCENTIRE:  Thank you.

7    BY MR. MCENTIRE:

8    Q    Mr. Dondero has testified that Farallon advised him in May

9    of 2021 that they were optimistic about MGM based upon what

10   you told them.  Assuming that to be the case, do you deny that

11   happened?

12   A    I do deny that happened.  Because I can't -- I don't know

13   what Farallon told him, but I never told Farallon anything.

14   And a conversation on May 28th, after the May 26th

15   announcement that MGM was going through, might make people

16   optimistic that it could go through, but there was a very

17   difficult FTC process that MGM would have to go through.

18   Q    And I'm referring to that.  If Farallon stated that they

19   were optimistic about MGM based upon what you had told them,

20   --

21   A    That would not be true.

22   Q    -- that would be false?

23   A    That would not be true.

24   Q    And is Mr. Dondero says that's what Farallon told them,

25   that would also be false?

HCMLPHMIT00003235

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-72   Filed 02/24/2390   Page 80 of 262   PageID 3349

Seery - Direct                                      223

1   A    That's correct.

2   Q    So we have your statement, we have what may be Farallon's

3   statement, and we have what Mr. Dondero believes may have been

4   Farallon's statement, and you're saying the latter two are

5   just not true?

6   A    I didn't have a conversation with Farallon about MGM that

7   -- that I recall --

8   Q    Well, you're on the witness stand.

9   A    -- virtually at any time.

10  Q    You're on the witness stand.

11  A    Oh, I'm aware of where I am sitting.

12  Q    Yeah.  Good.  We've got that cleared up.  Now, are you

13  suggesting that -- that you may not specifically recall this

14  conversation?

15  A    No, I am not saying that at all.  After May 26th, when the

16  MGM announcement was made and it was public, I may have had

17  conversations with a number of people about MGM.

18  Q    Well, let's make sure the record is clear.  Did you call

19  Farallon on May 26th and say, hey, did you know that MGM just

20  sold?

21  A    No, I don't recall any such conversation, and I wouldn't

22  have had to, since it was in the paper.

23  Q    I'm not talking about what's in the paper.  I'm talking

24  about conversations between you and Farallon.

25  A    Yeah.  I don't recall having a conversation with Farallon

002188

HCMLPHMIT00003236

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K     Document 4-72     Filed 02/05/25390   Page 81 of 262     PageID 3350
Exhibit 72    Page 225 of 390

Seery - Direct                                    224

1    on May 26th.

2    Q    How about May 27th?

3    A    Not that I recall, no.

4    Q    How about May 28th?

5    A    Not that I recall off the top of my head.

6    Q    And we understand that that's the day that Mr. Dondero

7    actually had his conversation that he's reported, at least,

8    with Farallon.  Do you recall that?

9    A    That's what he claims, yes.

10   Q    You were with a company called River -- you're a lawyer,

11   correct?

12   A    I am.  I'm in retired status.

13   Q    Okay.  I wish I was.

14   A    It's simply retiring your license and not having to take

15   the CLE.

16   Q    Understood.  Now, you were with a company called River

17   Birch?

18   A    Yes.

19   Q    And from River Birch, you went to Guggenheim Securities?

20   A    That's correct.

21   Q    At Guggenheim Securities, did you go to Farallon and meet

22   with Mr. Patel in their offices in San Francisco?

23   A    I believe we did, yes.

24   Q    You call it a meet-and-greet?

25   A    I do, yes.

002189

HCMLPHMIT00003237

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-72   Filed 02/09/23   Page 82 of 262    PageID 3351

Seery - Direct                                        225

1   Q    That was in 2017?

2   A    2017, 2018.  I'm not exactly sure when it was.

3   Q    And one of the purposes of meet-and-greet is to solicit

4   business or to see if a business opportunity -- see if it

5   exists?

6   A    That's not correct, no.

7   Q    What is a meet-and-greet for, then?

8   A    It's to meet the people at the fund and to greet the

9   people at the fund.  Introduce them to other people in your

10  firm.

11  Q    Just because it's going to be fun, or does it have a

12  business angle to it?

13  A    Oh, it hopefully will be fun, yes, but it's done in order

14  to build a relationship over time.  You're not in there

15  soliciting business.  If you do that, you won't do very well.

16  Q    Okay.  Fair enough.  So you're there trying to develop a

17  relationship with Farallon?

18  A    Guggenheim was, yes.

19  Q    And you were part of it?

20  A    That's correct.

21  Q    And what was your job at Guggenheim?

22  A    I was co-head of credit.

23  Q    Is that a fairly significant position at Guggenheim?

24  A    Not really, no.

25  Q    It's not significant at all?

002190

HCMLPHMIT00003238

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 02/27/25   Page 83 of 262   PageID 3352

Seery - Direct                                    226

1   A    No.

2   Q    All right.

3   A    Which is why --

4   Q    Well, you left --

5   A    Which is why they don't have that business.

6   Q    Okay.  So is that why you left Guggenheim?

7   A    It -- I did, yeah.  It wasn't a good fit for either

8   Guggenheim or for me, because it really wasn't something --

9   Q    When did you --

10  A    -- that they were set up to do.

11  Q    -- leave Guggenheim?

12  A    In 2019.

13  Q    And then you went back to Farallon to meet with them

14  again, did you not?

15  A    I met with Farallon while I was in San Francisco with my

16  wife.

17  Q    Okay.  Did you call ahead to arrange the meeting, or was

18  it just a --

19  A    I --

20  Q    -- a blind call?

21  A    I did call ahead, yes.

22  Q    A cold call, I guess, is the word -- the phrase that they

23  use.  Okay.  So -- and was that a meet-and-greet?

24  A    That was again, yes.

25  Q    Again, what were you trying to do?  Develop a relationship

002191

HCMLPHMIT00003239

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Filed 02/20/25   Page 84 of 262   PageID 3353

Seery - Direct                                    227

1  with Farallon?

2  A   I was trying to catch up with them after having met them

3  previously.  And that was just Raj Patel.  And this one I also

4  met Michael Linn.

5  Q   Okay.  What kind of business were you in when you met with

6  them the second time?

7  A   I wasn't doing anything.

8  Q   What were you hoping to do?

9  A   I was hoping to get back into the investing side of the

10  business, from running a credit-type lending business at

11  Guggenheim, which is what they tried to do and it didn't work

12  out.  And I wanted to get back to what I was doing more at

13  River Birch, but I was looking at other opportunities,

14  whatever came along.

15  Q   Well, what were the different options that you were

16  looking at?

17  A   I was looking at potentially getting back into investing,

18  joining potentially a restructuring firm, any options like

19  that.  I was not looking to become a lawyer again.

20  Q   And why would meeting and greeting with Farallon fit in

21  within that scenario, the strategic scenarios that you've just

22  discussed?

23  A   They're a giant hedge fund.

24  Q   A giant hedge fund?

25  A   Yes.

HCMLPHMIT00003240

Seery - Direct                          228

1   Q    And so it would be good to have a relationship with a

2   giant hedge fund, wouldn't it?

3   A    And to know what their thinking of the markets, where the

4   opportunity set might be, who they are dealing with and

5   interacting with.  Those are -- those are valuable things to

6   know over time.

7   Q    And --

8   A    And you need to maintain those relationships in order to

9   be --

10  Q    Sure.

11  A    -- part of any business.

12  Q    Sure.  These meet-and-greets can actually evolve and

13  provide relationship benefits, correct?

14  A    I don't -- I'm not sure what you mean by relationship

15  benefits.

16  Q    Sloppy words for -- on my part.  They can evolve into

17  something that is a meaningful relationship?

18  A    They could over time, yes.

19  Q    And we know that after you became the CEO of Highland

20  Capital that you received a call from, was it Farallon, to

21  congratulate you on your appointment?

22  A    It was an email.

23  Q    And that was in the summer of 2020, shortly after your

24  meet-and-greet out in San Francisco?

25  A    Your calendar's a bit off, but it was in June of 2020, so

002193

HCMLPHMIT00003241

1  that would have been more than shortly after, but yes.

2  Q   Okay.  And who contacted you to congratulate you on your

3  appointment?

4  A   This was my appointment as an independent director.  I had

5  not yet been appointed as CEO or CRO.  This was in June of

6  2020, and it was Michael Linn.

7  Q   Michael Linn?  Was it a telephone call?

8  A   I think 30 seconds ago I said it was an email.

9  Q   Fair enough.  Do you still have that email?

10 A   I do, yes.

11 Q   Okay.  He contacted you again, "he" being Michael Linn, he

12 contacted you again in January of 2021, did he not?

13 A   That's correct, yes.

14 Q   He wanted to see if he could get involved somehow in the

15 Highland bankruptcy?

16 A   Well, he congratulated -- he didn't congratulate -- he

17 wished me a happy new year, and he basically said it looks

18 like you're -- again, he's following the case -- it looks like

19 you're doing good work.  Is there any way for us to get

20 involved?  We're interested in claims or buying assets.

21 Q   Okay.  And Stonehill.  Now, you know the founder of

22 Stonehill, do you not?

23 A   No, I don't know him.  I've met him several times.

24 Q   Doesn't he come by and stop in and talk with you when

25 you're in Stonehill's offices?  And that's happened recently?

HCMLPHMIT00003242

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72    Filed 03/09/25    Page 87 of 262    PageID 3356
Exhibit 72    Page 230 of 390

Seery - Direct                                    230

1   A   Your use of the plural is incorrect, and you know that

2   from the deposition.  I was in Stonehill's office one time,

3   and I was in a meeting with Mr. Stern.  We ended up having a

4   board meeting from Stonehill's office with the other

5   participants on video, and Mr. Motulsky came in and said

6   hello.

7   Q   All right.  And who's Mr. Motulsky?

8   A   He's the founder of Stonehill.

9   Q   I see.  And did you know Mr. Motulsky before that?

10  A   I'd interacted with Mr. Motulsky over the years at --

11  mostly at industry-type functions.

12  Q   Okay.  Now, Stonehill is also a hedge fund?

13  A   Yes.

14  Q   Are they different than Farallon in that regard, or

15  similar?

16  A   I don't know as much about what their business is.  They

17  certainly do a direct lending component, so I know that they

18  -- they will do some direct lending, which I don't think is

19  something Farallon really does.  Farallon is much bigger, as I

20  understand it, but I don't really know the size of Stonehill.

21  Q   Okay.

22  A   I know they're not a $50 billion fund like Farallon.

23  Q   And do you know Mr. Stern at Farallon?

24  A   I now know him, yes, because he was -- he's really the

25  representative on the -- no, he's not the representative on

002195

HCMLPHMIT00003243

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 61-72   Filed 03/29/25   Page 88 of 262   PageID 3357

Exhibit 72   Page 230 of 390

Seery - Direct                                231

1   the board, but he is the one who manages the Stonehill and

2   Jessup positions for Stonehill.

3   Q    Well, we know that after you were CEO of Highland, you

4   also got a text message, correct, a text message from someone

5   at Stonehill, correct?

6   A    Mr. Stern sent me a text message reintroducing himself --

7   I don't know if it was re- or just introducing -- and sent me

8   his email and asked me to contact him about the case.  This

9   was at the end of February/beginning of March 2021, after the

10  confirmation order.

11  Q    Okay.  After the -- after the confirmation order?

12  A    Yes.

13  Q    I believe the confirmation order -- I may be wrong -- I

14  thought it was like the 21st, 22nd, somewhere in there.  Does

15  that sound right to you?

16  A    Yes.

17  Q    Okay.  So, shortly after confirmation, then, Farallon

18  calls you to congratulate you and wants to see how they can

19  get involved?

20  A    No.  There was no congratulations there.  Shortly after

21  the confirmation order, which I believe was at least a week to

22  ten days after confirmation, I got the communication from Mr.

23  Stern to try to connect about the case.

24  Q    All right.

25  A    He's at Stonehill, not Farallon.

002196

HCMLPHMIT00003244

Seery - Direct                                  232

1    Q    Correct.  Now, --

2    A    You said Farallon.

3    Q    I misspoke, then.  Thank you for correcting me.  Let's

4    talk about -- you live in New York?

5    A    I do.

6    Q    You're involved with a charity called Team Rubicon?

7    A    Yes.

8    Q    And Team Rubicon is a -- is that a veterans-type charity?

9    A    Yeah.  It's a veteran-led organization, and what it does

10   is connects veterans to disasters.  And mostly in the U.S.,

11   but also all over.  So if there's a flood, if there's a

12   hurricane, if there's an earthquake, veterans who have been

13   trained in -- by the military in ready response and really

14   being able to handle themselves when things are bad are

15   deployed to help the communities that are hit.  So I think

16   that Team Rubicon likes to think, you know, on your worst day

17   they're your best friend.

18   Q    So you're -- are you on the board?

19   A    No, I'm not.

20   Q    You're on the Host Committee?

21   A    I was on the Host Committee last year, and I'll be on the

22   Host Committee this year.

23   Q    Okay.  And you have charity events?

24   A    We have a charity event, yes.

25   Q    Okay.  And the purpose of the charity event is to raise a

002197

HCMLPHMIT00003245

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 1-72   Filed 02/04/25   Page 90 of 262    PageID 3359
Exhibit 72   Page 0349 of 390

Seery - Direct                                  233

1    bunch of money?

2    A    That's correct.

3    Q    Okay.  Have you been successful in the past?

4    A    I do my best.  Team Rubicon is a big organization.  It's

5    done very well raising money.  It doesn't have an endowment.

6    The founder's theory was that if people give us money, we're

7    supposed to spend it on helping other people.  And so each

8    year it has to raise more money.

9    Q    And Stonehill has been -- has contributed to your charity?

10   A    I believe Stonehill, one or two years, and I should know

11   this, and I didn't look it up after our deposition, gave

12   $10,000.

13   Q    Okay.  Maybe once, maybe twice?

14   A    Maybe twice.

15   Q    Okay.

16   A    I hope more.

17   Q    Okay.  And they also attend your -- your actual charity

18   events, do they not?

19   A    No.

20   Q    All right.  They just give money?

21   A    That's right.  And the Mike Stern who's on the board of

22   Team Rubicon is not the Mike Stern who is at Stonehill.  It's

23   an older gentleman who's in Texas who just happens to give a

24   lot of money to --

25   Q    All right.

002198

HCMLPHMIT00003246

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 1-72   Filed 02/26/25   Page 91 of 262   PageID 3360

Seery - Direct                                               234

1    A    -- Team Rubicon.

2    Q    You also represented Blockbuster.  Take that back.  Were

3    you the lawyer or the attorney representing the Creditors

4    Committee, the UCC, in the *Blockbuster* bankruptcy?

5    A    No, I was not.

6    Q    Tell me what your capacity was.

7    A    I represented a group of bondholders, secured bondholders.

8    So I represented the group.

9    Q    And was Stonehill a member of that group?

10   A    Not that I recall, but your pleadings seem to indicate

11   that they were.  So if they were, they were a small

12   participant.  The largest participant was Carl Icahn, who

13   owned about 30 percent of it.  Then the others who were big

14   were DK, Davidson Kempner, Monarch, Owl Creek.  Those were the

15   big players.

16   Q    Well, --

17   A    When Carl Icahn is in your group, you remember that.

18   Q    Yeah, well, Carl Icahn is not here.  We're talking about

19   Stonehill right now.

20   A    And I said I don't remember them actually being a part of

21   it.  If they were, --

22   Q    Okay.  Well, let me -- let me give you what I'm going to

23   mark as Exhibit 80.  That's your name at the top, right?

24        (Hunter Mountain Investment Trust's Exhibit 80 is marked

25   for identification.)

002199

HCMLPHMIT00003247

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 02/06/25   Page 92 of 262   PageID 3361

Seery - Direct                              235

1  A    That's correct, yes.

2  Q    You were at the time with Sidley & Austin?

3  A    That's correct, yes.

4  Q    This is *In re Blockbuster*.

5        MR. MCENTIRE:  Scroll down, please.

6  BY MR. MCENTIRE:

7  Q    And steering group of senior -- involves -- well, let's

8  count them.  Let's see.  One, two, three, four, five.  Five

9  entities comprising the backstop lenders.  Is that correct?

10 A    I think that's the steering group.  So, in order to

11 represent the group, you need to try to assemble a large-

12 enough group that it's material to the company.  And then the

13 company, if you're -- particularly if you're over 50 percent,

14 will pay the fees of the group.  And you don't represent any

15 individual member of the group.  I've never represented Carl

16 Icahn.  I represent the group.  And if folks want to stay in

17 the group, they can stay.  If they want to trade out of the

18 group, they do.  And the company will generally continue to

19 pay the fees, and you represent the group so long as you have

20 a controlling interest in the -- whatever the issue is.

21 Q    Well, that's interesting, because now what you're telling

22 me is that this group right here, this is kind of like the

23 executive committee of the group.

24 A    No, it's called the steering group, and it doesn't

25 necessarily --

HCMLPHMIT00003248

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 02/07/25   Page 93 of 262   PageID 3362

Exhibit 72   Page 2079 of 390

Seery - Direct                                     236

1   Q    That's fine.

2   A    Well, it's not an executive committee.  It doesn't

3   necessarily include just the largest.  Some large holders

4   won't be on it.  The largest holders here by a long shot were

5   Icahn, who --

6   Q    I'm not talking about --

7   A    -- unloaded, as I say, over 30 percent.  Monarch, Owl

8   Creek, and I just don't recall Stonehill being a part of it.

9   Q    I'm not really interested in Carl Icahn.  I just want to

10  establish this is a steering group in which you were the lead

11  counsel and Blockbuster was on it.  Is that correct?

12  A    Yes.

13  Q    Excuse me.  Not Blockbuster.

14  A    I'm sorry.

15  Q    Stonehill.

16  A    No, it's the Blockbuster case in 2010, and Stonehill was

17  apparently on it, but I just don't have a recollection of

18  their involvement.

19  Q    All right.  So when Mr. -- who sent you the text message

20  in February of 2021 from Stonehill?

21  A    Michael Stern.

22  Q    And had you actually met him before?

23  A    I think I had, but we didn't know each --

24  Q    All right.

25  A    You know, we certainly didn't know each other, we'd never

002201

HCMLPHMIT00003249

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-72    Filed 02/28/25    Page 94 of 262    PageID 3363
Exhibit 72    Page 238 of 390

Seery - Direct                                       237

1  worked on anything together, but I --

2  Q    Do you have all your text messages from that period of

3  time, that first quarter of 2021?

4  A    I believe I do, yes.

5  Q    They're saved?

6  A    Yes.

7  Q    Okay.  When did the automatic delete button on your cell

8  phone start?

9          MR. STANCIL:  Your Honor, objection.  We've covered

10  this this morning.  I believe this is a motion coming down the

11  pike, and I thought we had -- thought we had had tabled this

12  preservation issue.

13          MR. MCENTIRE:  This has a direct bearing on his

14  communications with Farallon and Stonehill in this period of

15  time, Your Honor.  We have one text message that he's

16  identified, and I have a right to examine whether there are

17  others.  Or if not, why not.

18          MR. STANCIL:  Your Honor, he's --

19          MR. MCENTIRE:  That's a legitimate -- I'm not

20  finished.  That's a legitimate area of inquiry in this

21  examination.

22          MR. STANCIL:  He's testified he has them all.  Your

23  Honor did not order document discovery.  I think that's it for

24  purposes of today's hearing, Your Honor.

25          THE COURT:  Okay.  I sustain the objection.

HCMLPHMIT00003250

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 64-72   Filed 02/09/25   Page 95 of 262   PageID 3364

Seery - Direct                                        238

1   BY MR. MCENTIRE:

2   Q    After this text message that you received from Stonehill

3   in February 2021, did you have any follow-up?

4   A    Well, his text message, I don't recall what it said other

5   than I was -- I do recall that he gave me his email address,

6   because I didn't have it.  And we just didn't know each other

7   well enough.  But we definitely had follow -up.  He wanted to

8   talk to me, and at some point we talked.

9   Q    And when did you talk?

10  A    I'm sorry?

11  Q    When did you talk?

12  A    When?  I -- it was at the, initially, end of February,

13  beginning of March.  So it would have been somewhere in that

14  -- in that time period.

15  Q    End of February, beginning of March?  And we also know

16  that you next talked to Farallon, according to your testimony,

17  and they advised you they had already purchased all their

18  claims as of March 15, correct?

19  A    On March 15th, they sent me an email that said they had

20  purchased an interest in claims, and --

21  Q    So -- go ahead.

22  A    I'm not finished.  And then at some point after that, we

23  arranged a quick discussion, because that was a curious --

24  Q    I want to assure you I will always let you finish.

25  A    Thank you very much.

002203

HCMLPHMIT00003251

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 64-72    Filed 04/09/25    Page 96 of 262    PageID 3365

Exhibit 72    Page 240 of 390

Seery - Direct                                    239

1    Q    Unlike others.  So, with that said, Mr. Seery, can you

2    identify -- let me back up.  Was there a data room set up at

3    Highland Capital for claims investors to come in and look at

4    data?

5    A    No, there was not.

6    Q    Are you aware, sitting here today, that Farallon did any

7    due diligence in connection with its investment in the claims

8    it purchased that are at issue in this proceeding?

9    A    I have indication that they did some, yes.  I don't know

10   how much they did.

11   Q    What is the indication?

12   A    In the email in June of 2020, Mr. Linn said that he and

13   his associate were following the case, thought it was --

14   that's the one that congratulated me on being an independent

15   director, and that they were paying attention to the case.

16   And it -- I don't recall the exact other items in there, but

17   it was clear that they were following the Highland matter.

18   And then in the email in January 2021, he also indicated that

19   they'd been following the case further, and said, Looks like

20   you have things well in hand, or something to that effect.  So

21   --

22   Q    Do you have that email, too?  Have you saved that email?

23   A    They're all saved, yeah.

24   Q    Okay.  So let's talk about that.  But you had no data room

25   that would allow them to come in and actually investigate the

HCMLPHMIT00003252

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 02/09/25   Page 97 of 262   PageID 3366

Seery - Direct                                    240

1  underlying assets.  Is that correct?

2  A    Not in respect of anybody trying to buy claims.  We did

3  have a data room with respect to financing.

4  Q    Please listen to my question.  I'll get to it.  Data room

5  for claims investors.  There was no data room set up on or

6  before March 15 to allow Farallon to come in and investigate

7  its investment in this claim?

8  A    That's correct.

9  Q    There was no data room set up prior to March 15 to allow

10  Stonehill to come in and investigate its investment in the

11  claims it purchased.  Is that correct?

12  A    That's correct.

13  Q    Can you identify any due diligence, sitting here today --

14  let me back up.  You heard Mr. Dondero's testimony about

15  portfolio companies, correct?

16  A    Yes.

17  Q    Portfolio companies are companies in which Highland

18  Capital has an interest that actually have separate and

19  distinct management.  Is that correct?

20  A    Generally.  And it -- I disagree with some of his

21  testimony, but generally that's correct, yes.

22  Q    Well, okay.  Let's just take on the part that you agree

23  with.  With regard to those portfolio companies, was there

24  anything that was disclosed in the Highland publicly-available

25  financials that would allowed a detailed analysis of

HCMLPHMIT00003253

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 4-72   Filed 024/29/25   Page 98 of 262   PageID 3367

Seery - Direct                                    241

1  Highland's investments in each of those portfolio companies?

2  A   I don't know.  Certainly, in the four or five sets of

3  projections that were filed, there were financial projections.

4  I'm not sure exactly what was included in each one or in the

5  disclosure statement.

6  Q   Fair enough.  Well, I'll represent to you I don't think

7  there's detailed information on each individual portfolio

8  company.

9           MR. MORRIS:  Your Honor, he's not here to testify.  I

10  move to strike.

11           MR. MCENTIRE:  Okay.

12           THE COURT:  Sustained.

13  BY MR. MCENTIRE:

14  Q   In that regard, Mr. Seery, can you identify what Farallon

15  did to investigate the underlying asset value of any of these

16  portfolio companies?

17  A   I don't have any knowledge as to what Farallon did before

18  it bought claims.

19  Q   Can you identify what due diligence Stonehill did to

20  investigate the underlying asset value in any of these

21  portfolio companies?

22  A   I don't -- I mean, in connection with claims purchasing, I

23  have no idea what Stonehill did.

24  Q   Now, I understand that you solicited -- perhaps I don't

25  recall correctly.  Did you solicit both Farallon and Stonehill

HCMLPHMIT00003254

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 4-72   Filed 04/09/25   Page 99 of 262    PageID 3368
Exhibit 72   Page 243 of 390

Seery - Direct                                        242

1  to participate in a bid to provide exit financing?

2  A    I don't think that's fair.  I solicited Farallon because I

3  knew they already owned claims.  Stonehill reached out to me,

4  and that was one of the things they were interested in doing,

5  if there was financing needs.

6  Q    Okay.

7  A    And at the time they reached out, which was right after

8  confirmation -- right after confirmation and the confirmation

9  order, we didn't know what our needs would be.  We didn't

10 really, at the early stage, think we needed exit financing.

11 When we looked at some of the difficulty we were going to have

12 -- for example, collecting notes and realizing on assets -- we

13 realized that we were going to need some exit financing in

14 order to have enough money to support the enterprise to

15 monetize the assets.

16 Q    And I think you used the -- I think the phrase you used,

17 you are the straw man or a straw man bid?  Is that what you

18 called it the other day?

19 A    We did.  You set up a very typical competitive process to

20 do exit financing.

21 Q    And what was the --

22 A    And what -- well, I --

23 Q    -- suggest --

24 A    I was going to get to your straw man.  And one of the

25 things you do is you assess what the market's going to look

002207

HCMLPHMIT00003255

Seery - Direct                                            243

```
 1   like, what you think the market looks like, what you think a
 2   financing would be good for the enterprise, the flexibility
 3   you need, how you'd structure it.  And then you put that out
 4   to prospective lenders and say, Here's our straw man.  This is
 5   what we'd like you to consider in terms of financing.  And
 6   then they do their work and come back.  And they can either
 7   say, that looks great, or we have a totally different idea of
 8   what the financing might be, or some other combination of
 9   those things.
10   Q   Mr. Seery, thank you for that answer, but I need to ask
11   you to do me a favor.  I'm on the clock, and so I'd just like
12   to get my questions out, if you'd try to respond.  Okay?
13   A   Uh-huh.
14   Q   Because your answers, as long as they may be, are
15   impacting me a little bit.
16       So let me ask this question.  In the straw man proposal
17   that you put out for bid, what was the suggested interest
18   rate?
19   A   You know, you asked me that the other day, and I think I
20   was slightly off.  So it -- and I -- but I did tell you that
21   it depended.  There was -- I don't recall what the rate was,
22   but it starts -- if everybody wants to put out money -- and I
23   apologize for the length of the answer -- they look and they
24   say, well, what if I get paid back in six months?  Nobody
25   wants to do that.  So, duration makes a difference.  So
```

HCMLPHMIT00003256

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 02/45/25390   Page 101 of 262   PageID 3370

Seery - Direct                                            244

1   there's an interest rate.  There's upfront fees.  There's

2   often exit fees.  And sometimes there's other amounts.  So,

3   our -- my recollection is that our straw man was somewhere in

4   the low teens on the high end, and then closer to high single-

5   digits on the low end.  Something in that range.

6   Q    And Farallon indicated to you they were not interested,

7   correct?

8   A    No, not exactly.  What Farallon said was they didn't --

9   they signed an NDA because we invited them in.  We invited in

10  six folks.   Five signed NDAs.  Two of the -- I invited in

11  Farallon.  I invited in Stonehill.  Well, Stonehill called me.

12  I invited in Contrarian because they had bought claims.  And

13  then two lenders that I knew.  And Farallon did the work and

14  came back and said, this isn't really what we do.  And the

15  other guys, you're telling me, which I was, that other people

16  are more competitive.  And so it's not really what we do, we

17  don't think the returns are good enough, but if you need us,

18  because now they're already invested in the claims, call us.

19  Q    Okay.

20        MR. MCENTIRE:  And again, I'll object as

21  nonresponsive.  Your Honor, that was a very long answer

22  talking about a lot of other entities.  My only question was

23  what the interest rate was.

24        MR. MORRIS:  Your Honor, we oppose the motion to

25  strike.  I think it's --

002209

HCMLPHMIT00003257

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 06/09/25   Page 102 of 262    PageID 3371
Exhibit 72   Page 245 of 390

Seery - Direct                           245

 1              MR. MCENTIRE:  No, I didn't strike it.  I said -- my

 2   objection was nonresponsive.  I will now follow it up with a

 3   motion to strike his answer.

 4              THE COURT:  Overruled.  Okay.

 5   BY MR. MCENTIRE:

 6   Q    Mr. Seery, you just told us that the interest rate was in

 7   the high single digits to in the 12 and 13 percent range.

 8   A    No, I was giving you the all-in return for the lender.

 9   That's a very different --

10   Q    All-in return?

11   A    -- thing for the -- than an interest rate.

12   Q    That's even better.

13   A    And it depended on the time.

14   Q    Fair enough.

15   Q    So if -- the shorter the duration, the higher the

16   effective return, because he's not getting the return for as

17   long a period of time.  If I have $100 million and I get 10

18   percent, I get just $10 million.  But if I have that out for

19   $3 million, I've earned $30 million.  So maybe that gets

20   squeezed in the longer it's out.

21   Q    And Farallon said that the interest rate or the return

22   rate was not what they were looking for?

23   A    They indicated two things.  I believe I've said this

24   several times.  One is they said, this isn't really what we

25   do, a $50-ish million dollar loan to do an exit.  But we're in

002210

HCMLPHMIT00003258

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 04/09/25390 Page 103 of 262   PageID 3372

Seery - Direct                                    246

 1   the case.  If you need us, call us.  Included in that was, it

 2   doesn't look attractive enough to us because you're telling me

 3   other guys are more competitive.

 4   Q    Okay.  And do you know what kind of rate of return they

 5   were going to get on the investment of the -- on the claims at

 6   a 71 percent projected return rate?

 7   A    If we only hit the plan, Farallon's two purchases, based

 8   on the numbers you get -- you gave, over a two-year period,

 9   would be 38.9 percent.

10   Q    Okay, but we're going to talk about that in a second.

11   Okay.  How much -- how much did Farallon actually invest?

12   A    I'd have to look back at your numbers.  They're in your

13   pleading.  I don't know what they actually paid.  I just have

14   it from your pleading.

15   Q    Okay.  And do you have paperwork that -- can you

16   (inaudible) calculation here?

17   A    I have a calculator that, when I looked at your numbers, I

18   ran that, and I --

19   Q    I see.  All right.

20   A    I'm able to remember certain things.

21   Q    So, so if it's projected that the internal rate of return

22   is only six percent, do you disagree with that?

23   A    A hundred percent disagree.  There's -- that's virtually

24   impossible.

25   Q    Okay.

002211

HCMLPHMIT00003259

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 04/09/25   Page 104 of 262   PageID 3373
Exhibit 72   Page 248 of 390

Seery - Direct                                    247

1   A    And that's, by the way, for hitting the plan.

2   Q    I'm sorry?

3   A    That's for hitting the 70 -- the 71-and-change percent.

4   Q    I want to ask you a question about that.  The 71-percent-

5   and-change --

6   A    Uh-huh.

7   Q    -- that came out of the plan for Class 8, --

8   A    Yes.

9   Q    -- that was for Class 8, correct?

10  A    Correct.

11  Q    There was zero expected return to Class 9, correct?

12  A    That's correct.  They would only get upside, and I think

13  it says in the projections, based upon our view at the time,

14  litigation that could ensue, and that was part of the plan.

15  Q    And as I understand it, that 71-and-some-change --

16  A    Uh-huh.

17  Q    -- projected return rate never changed from the date of

18  confirmation all the way up to the effective date.  Am I

19  correct?

20  A    The -- we didn't change the projections that we'd filed

21  with the plan because the plan was confirmed.  We didn't need

22  to change the projections that were filed with the plan.

23  Q    The NDAs, as you understand it, can you tell me

24  specifically when the NDAs were signed?

25  A    I know it's the first week of April to the second week of

002212

HCMLPHMIT00003260

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 03/05/25   Page 105 of 262   PageID 3374
Exhibit 72   Page 249 of 390

Seery - Direct                           248

1   April.  Blue Torch may have signed -- who actually ended up

2   doing the financing -- they may have signed it a week or so

3   before.  They'd been around offering financing a number of

4   times in the past.

5   Q    Fair enough.  But we know that you understood as of March

6   15th that Farallon had already made their investments?  I

7   mean, claims?

8   A    That's what they told me in that email, yes.

9   Q    Okay.  When did Stonehill sign the NDA?

10  A    In and around the same time.

11  Q    But you don't know when Stonehill actually purchased their

12  claims?

13  A    I don't know exactly when.  I know generally that by the

14  end of April, early May, they were -- they were the holder of

15  the Redeemer claim.  And --

16      (Interruption.)

17  A    -- I can't remember whether it was from them or whether it

18  was from --

19  Q    Did you ever communicate with Stonehill during the time

20  that they were doing their due diligence on the exit

21  financing?

22  A    Yes.

23  Q    Okay.  Did they come to your offices?

24  A    I don't know if we were back yet.  I think we were back,

25  but I don't recall them coming to our offices.  I think it was

HCMLPHMIT00003261

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 05/09/25    Page 106 of 262    PageID 3375
Exhibit 72    Page 259 of 390

Seery - Direct                                                   249

1  all virtual.  It's early '21, so there would have been

2  vaccines.  It would have been very -- very -- I don't recall

3  them coming to the offices at that time.

4  Q    But just to be clear, you don't know, you can't give the

5  Court a date when Stonehill actually completed their

6  investments in either Redeemer or HarbourVest?

7  A    No, I don't.  I don't know.  Did -- just --

8  Q    That was my question.

9  A    When you say Redeemer or HarbourVest, they never bought

10  HarbourVest.

11  Q    It was just Redeemer?

12  A    Correct.

13  Q    All right.  You understand that Muck is an entity, a

14  special-purpose entity created by Farallon?

15  A    That's my understanding, yes.

16  Q    And you understand Jessup is a special-purpose entity

17  created by Stonehill?

18  A    That's my understanding, yes.

19  Q    Muck and Jessup are both on the Oversight Committee?

20  A    They are.  They -- those entities are the --

21  Q    Is it the Oversight Committee or the Oversight Board?

22  A    Same thing.

23  Q    Fair enough.

24  A    I'll consider them the same.

25  Q    And there's a third member, too, correct?

002214

HCMLPHMIT00003262

Seery - Direct                    250

1   A    That's correct.

2   Q    Okay.

3   A    Independent member.

4   Q    Okay.  So you have a three-person board; is that right?

5   A    That's correct.

6   Q    And one of their jobs is to make decisions concerning your

7   compensation?

8   A    The structure of the Claimant Trust Agreement provides

9   that I'm to negotiate with the -- either the Committee or the

10  Oversight Board.  And the compensation in the Claimant Trust

11  Agreement is a base salary of $150,000, which is -- a month,

12  which is the same as the one in the case, plus severance, plus

13  a success fee.  And it's very specific that that will be

14  negotiated by the -- either the Committee or then the

15  Oversight Board.

16  Q    And Michael Linn, who Mr. Dondero has referred to, he's

17  actually on the Oversight Board, is he not?

18  A    He's the Muck representative on the Oversight Board.

19  Q    All right.

20  A    Yes.

21  Q    If I understand it correctly, you are currently receiving,

22  as the Trustee, $150,000 a month.  Is that correct?

23  A    That's incorrect.

24  Q    What are you receiving?

25  A    I receive $150,000 a month as the Trustee and the CEO of

002215

HCMLPHMIT00003263

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/26/25   Page 108 of 262   PageID 3377

Seery - Direct                                        251

1   Highland Capital.

2   Q    Well, --

3   A    So I have --

4   Q    -- fair enough.

5   A    I have both roles.  The Trustee, for example, doesn't

6   manage the team, they actually work for Highland Capital, and

7   I'm the CEO of Highland Capital.

8   Q    There was some suggestion that the $150,000 was something

9   that the Court had passed upon prior to the effective date or

10  part of the plan.  This is a separate negotiated item that you

11  -- that you allegedly negotiated that was awarded to you post-

12  effective date, correct?

13  A    That's false.

14  Q    Okay.  So the $150,000 had a discount that was supposed to

15  drop down to $75,000 after a period of time.  That never

16  happened, did it?

17  A    The -- you seem to be mixing concepts.  But the $150,000 a

18  month was set by the plan and the -- and the Claimant Trust

19  Agreement as the "base salary."  That wasn't going to move.

20  When we -- it never was supposed to move.

21       When I began negotiating with the Oversight Board for the

22  success fee, they pushed back and said, we would like that to

23  step down.  So in our -- I did not say, oh, that's a great

24  idea.  We ended up negotiating, and they included a provision

25  that we would renegotiate depending on the level of work.

HCMLPHMIT00003264

1  That's one of the provisions.

2  Q   Okay.  But renegotiate down to $75,000 after a period of

3  time, but that never happened?

4  A   Initially, I believe it was supposed to step down to

5  $75,000 automatic, subject to renegotiation that it go back

6  up, not a structure that I particularly liked.  And since

7  then, we've negotiated on that point.

8  Q   So you currently are making $150,000 a month?

9  A   That's correct.

10 Q   How often do you come to Dallas?

11 A   Usually I'm here at least once a month.  Usually it's

12 between two and four days.

13 Q   Okay.  And you have a staff here in Dallas at Highland

14 Capital, correct?

15 A   Yes.

16 Q   How many people?

17 A   Eleven.

18 Q   Eleven people?

19 A   Uh-huh.

20 Q   Working full-time?

21 A   Yes.

22 Q   And you're still making $1.8 million a year?

23 A   Yes.

24 Q   You also have a bonus structure, correct?

25 A   That's correct.

HCMLPHMIT00003265

1   Q    And that's performance-based?

2   A    That's correct.

3          MR. MCENTIRE:  Can you pull up the agreement please?

4   Okay.

5      (Pause.)

6   BY MR. MCENTIRE:

7   Q    All right.  Do you see --

8          MR. MCENTIRE:  We're having technical difficulty

9   here.

10  BY MR. MCENTIRE:

11  Q    All right.  Can you identify this document?

12         MR. MCENTIRE:  What exhibit number is this?

13         MR. MILLER:  28.

14  BY MR. MCENTIRE:

15  Q    Exhibit 28.

16         MR. MCENTIRE:  I believe this is already in evidence.

17         THE COURT:  Hunter Mountain Exhibit 28?

18         MR. MCENTIRE:  Yes, Your Honor.

19         THE COURT:  Okay.

20  BY MR. MCENTIRE:

21  Q    This is the memorandum of agreement.  Do you see that?

22  A    Yes.

23  Q    On the third line, it says -- and your name is identified

24  here.  You're the Claimant Trustee, correct?

25  A    Claimant Trustee/CEO.

002218

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/20/25390 Page 111 of 262   PageID 3380

Seery - Direct                                254

1   Q    Engaged in robust, arm's length, and good-faith

2   negotiations regarding the incentive compensation program.

3       As part of this robust, arm's length, and good-faith

4   negotiation, did you personally conduct any independent search

5   in the marketplace?

6   A    I did -- what do you mean by search in the marketplace?

7   Q    Well, did you try to do a market study?  I asked that

8   question in your deposition.

9   A    I didn't know if you were asking a different question.

10  Q    Same question.

11  A    You mean market study on compensation?

12  Q    Yes.

13  A    No, I did not.

14  Q    Are you aware of whether or not any member of the

15  Oversight Board or Oversight Committee did a market study?

16  A    On compensation?

17  Q    On compensation.

18  A    I'm not aware that they did one, no.

19  Q    So this robust, arm's length, and good-faith negotiation,

20  as far as you know, is divorced from any market study database

21  or -- or methods.  Is that correct?

22  A    I don't believe that's correct, no.

23  Q    I see.  So did -- was any third-party consultant hired?

24  A    Not by me or Highland or the Trust, no.

25  Q    All right.

002219

HCMLPHMIT00003267

1          MR. MCENTIRE:  Can you scroll down a little bit,

2   please?

3   BY MR. MCENTIRE:

4   Q    You signed this agreement, correct?

5   A    Yes.

6   Q    And we have Michael Linn signing on behalf of Muck, who

7   also is with Farallon, correct?

8   A    That's correct.

9          MR. MCENTIRE:  Scroll down.

10  BY MR. MCENTIRE:

11  Q    And by the way, this is a heavily-redacted document.  The

12  redactions deal with what?

13  A    The redactions deal with the portion that would go to the

14  team as opposed to going to me.

15  Q    Are we talking about the 11-member team?

16  A    Correct.

17         MR. MCENTIRE:  Can you scroll down?  Stop.  Go back.

18  BY MR. MCENTIRE:

19  Q    So we have the assumed allowed claim amounts under Section

20  D.  Do you see that?

21  A    Yes.

22  Q    Class 9, $98 million and some change.  Class 8, $295

23  million and some change.  Then we go into the incentive

24  payment tiers.  Do you see that?

25  A    Yes.

HCMLPHMIT00003268

1   Q    What's the purpose of the tiers?

2   A    The purpose of the tiers was to set additional

3   compensation so that, the more recovery, the higher the

4   compensation.  So, below Tier 1, there was really effectively

5   no bonus, is my recollection.  And then in each tier there

6   would be a percentage.

7        So the first tier is $10 million.  There would be a

8   percentage of that $10 million that could be allocated for

9   bonus.  Then in the next tier it would be $56 million.  A

10  portion of that would be allocated for bonus.  And it's

11  weighted more heavily to the higher-recovery tiers, meaning it

12  incentivizes both me and the team to try to reach deeper into

13  Class 8 and Class 9 and get higher recoveries.

14  Q    Okay.  So the idea is, the more difficult it is to get the

15  recoveries, the higher percentage you should get, because if

16  you're successful then you should be rewarded accordingly?  Is

17  that kind of how it works?

18  A    I'm not sure if difficult is the term, but it's a

19  combination of both expertise, difficulty, and time.

20           MR. MCENTIRE:  All right.  Can you scroll down,

21  please?  Next page.

22  BY MR. MCENTIRE:

23  Q    And here are your actual tier participations.  They go --

24  you said basically nothing Tier 1, up through 6 percent.  So

25  Tier 1 is the 71 percent, right?

002221

HCMLPHMIT00003269

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/09/25   Page 114 of 262   PageID 3383

Seery - Direct                                    257

1   A    It's .72 percent, and it's of the -- that's the first

2   piece.  You have to get to Tier 1.  So if we had not -- I

3   believe it's structured is if we don't get to Tier 1, for

4   example, we don't hit the plan, right around the plan number

5   of 71-and-change cents, then there wouldn't -- there wouldn't

6   be upside.

7        So it was very much structured in a way that you had to

8   perform.  And then the better the performance, the bigger the

9   percentages of the tier.

10  Q    So, in theory, Mr. Seery, by the time you get down to Tier

11  4 and Tier 5, it's a little bit less certain that you're ever

12  going to get there.  Is that right?

13  A    Well, out of the gate, going deeper was uncertain.  It's a

14  question of being able to execute well on the assets and being

15  able to control the costs and being able to make

16  distributions.  It wasn't based on what we just got for the

17  assets.  It's actually based on actual distributions --

18  Q    I understand that.

19  A     -- to Class 8 and 9 claimants.

20  Q    I understand that.  And the idea is, is that it take a lot

21  more effort -- the theory was it might take a lot more effort

22  to get all the way to the bottom of Tier 5 to pay all the

23  Class 9 claims, right?

24  A    And maybe a little luck.

25  Q    Yeah.  And Class 10 is not even factored into this, is it?

002222

HCMLPHMIT00003270

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 08/05/25   Page 115 of 262   PageID 3384

Seery - Direct                            258

1    A    No, it is not.

2    Q    And so you didn't consider Class 10.  You stopped at Tier

3    5?

4    A    That's correct.

5    Q    So your entitlement to a 6 percent return, or a 6 percent

6    bonus on the recoveries, you say it's there to incentivize

7    you.  You didn't expect that to actually happen, did you, when

8    you signed this?  Is that your testimony?

9         MR. STANCIL:  I object to the form of the question.

10   It mischaracterizes the agreement.

11   BY MR. MCENTIRE:

12   Q    You didn't expect it to happen, did you, sir?

13        THE WITNESS:  Well, the six --

14        THE COURT:  Wait.  I'm sorry.  Could you rephrase the

15   question?

16        MR. MCENTIRE:  Sure.

17   BY MR. MCENTIRE:

18   Q    Are you telling the judge that you really didn't expect

19   that to happen and that's why you were entitled to a higher

20   percentage?

21   A    No.  We didn't expect to reach Class 9 and go deep into

22   Class 9, but we certainly held out the possibility that we

23   could.  And it's not six percent.  It's six percent of the

24   increment.  These are cumulative.  So you get .72 of Tier 1.

25   You get 1.17 of Tier 2.  And you can add those, and you earn

002223

HCMLPHMIT00003271

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/20/25390   Page 116 of 262   PageID 3385

Seery - Direct                                        259

1  them when you've actually made the distribution, but you don't

2  get paid until you get all your distribution or we're

3  relatively done or there's a renegotiation.  Because the

4  Committee wanted to make sure that I didn't say, hey, I hit

5  Tier 3, time to go, I got a better job.

6  Q   So, Mr. Seery, if Farallon told Mr. Dondero that they

7  wouldn't sell basically at any price because you said it was

8  too valuable, and they rejected a 40 or 50 percent premium, if

9  they said that, is that -- is that a lie?

10  A   That I -- rephrase that, please.  I don't -- didn't quite

11  understand your question.

12  Q   Yeah.  You've heard the testimony that Farallon, Michael

13  Linn, told Mr. Dondero that they were not going to sell their

14  claim at any amount because you had told them it was too

15  valuable.  Is that a lie?

16  A   I think that's -- yeah, I don't think that's true.

17  Q   Okay.  And obviously, if they're not going to be willing

18  to sell at any amount, they must be pretty certain they're

19  going to hit Tier 5.  Would that just be a lie?

20  A   That -- that conversation was before this negotiation.

21  That -- there's no -- they could not have had any expectation,

22  either when they had that conversation in May or when we had

23  this discussion that I was going to hit Tier 5 and I hadn't

24  hit Tier 5.  And the idea that they wouldn't sell at any price

25  is complete utter nonsense, because they're capped on what

002224

HCMLPHMIT00003272

 1  they can get.

 2  Q   So if -- sure.  Okay.  So, but if Farallon told --

 3  A   But that's what you said.

 4  Q   If Farallon told Mr. Dondero that they wouldn't even sell

 5  at 130 percent of the purchase price because you told them it

 6  would be too valuable, is that a lie?

 7  A   I never told them it would be too valuable.  I don't -- I

 8  don't know any of the other parts that you're saying, the 130

 9  percent of an unknown number, some guess number that Mr.

10  Dondero had.  I never told them it would be too valuable.

11  That would be their own assessment of where we were at the end

12  of May 2021.

13  Q   If they said that you told them not to sell, that it was

14  too valuable, is that a lie?

15  A   That's untrue, yes.

16  Q   If they told him -- if they told him that he told you --

17  that you told them it was too valuable because of MGM, is that

18  a lie?

19  A   Yes.

20  Q   How many shares of stock did Highland Capital own?

21          MR. MCENTIRE:  Well, one second.  What is my time?

22  How much time do I have?

23          THE CLERK:  Right now you're at --

24          MR. MCENTIRE:  So I'm almost two and a half hours in?

25          THE CLERK:  Just about.  A little under.

HCMLPHMIT00003273

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/20/25   Page 118 of 262   PageID 3387

Seery - Direct                                    261

1   BY MR. MCENTIRE:

2   Q    I'm going to have to speed up here, Mr. Seery.

3        THE COURT:  A little under two and a half, you said.

4   BY MR. MCENTIRE:

5   Q    Mr. Seery, I want to make sure.  Highland Capital owns

6   interests in the CLOs.  What is the CLOs' stake in the MGM

7   stock, or what was it?

8   A    Highland Capital does not own any interest in any of the

9   CLOs it manages.  It has a fee stream, and it can have certain

10  deferred fees that it can get, but it didn't own any interest

11  in any of the CLOs that it managed.

12  Q    Fair enough.  How about the portfolio companies?

13  A    Did Highland Capital own interests in the portfolio

14  companies?

15  Q    Yes.

16  A    Some of the ones Mr. Dondero listed, but they weren't

17  portfolio companies.  So he said OmniMax, but we didn't have

18  any management of OmniMax.  We just had debt that converted to

19  equity, but we didn't control the -- the thing.  That was

20  during the case, the company.

21  Q    Did Multistrat have an interest in MGM?

22  A    Multistrat owned MGM, yes.

23  Q    Okay.  And did your company, Highland Capital -- your

24  company -- Highland Capital have an interest in Multistrat?

25  A    Highland Capital owns 57 percent of Multistrat, yes.

HCMLPHMIT00003274

1   Q    And did Highland Capital have an interest in any other

2   portfolio companies that have an interest in -- had a stake in

3   MGM?

4   A    RCP.  Restoration Capital Partners.

5   Q    And do you recall what the value of that was?

6   A    It shifted over time.  I don't -- I don't know what time

7   you're talking about.

8   Q    And isn't it true that 90 percent of all the securities

9   that Highland Capital owned at the time that the sale went

10  public was roughly 90 percent of all of Highland Capital's

11  securities?

12          MR. STANCIL:  Objection, Your Honor.  I don't know

13  what that question is asking.

14          THE COURT:  I don't understand it, either.

15      Could you rephrase?

16          MR. MCENTIRE:  I'll try to.

17  BY MR. MCENTIRE:

18  Q    At the time that the announcement was made about Amazon

19  buying MGM in May of 2021, what percentage of all the

20  securities did MGM comprise of the securities that were owned

21  by Highland Capital?

22  A    Of the securities that were directly owned by Highland

23  Capital, it may have been -- I'm thinking of public or semi-

24  public securities, the 150,000 or 170,000 that we had that

25  were subject to the Frontier lien.  Might have been almost all

002227

Seery - Direct                                    263

```
 1   of the securities that we owned.  It wasn't -- it was a good

 2   position, but it wasn't a huge driver for the directly-owned

 3   shares.  There was more value in the Multistrat and the RCP.

 4   Q   What percent of shares of all --

 5              MR. STANCIL:  Your Honor, I'm sorry, I'm having

 6   trouble hearing the end of Mr. Seery's answers.  So I know

 7   it's not his --

 8              THE WITNESS:  I'm sorry.

 9              THE COURT:  Okay.  If you could make sure you speak

10   into the mic.

11              THE WITNESS:  Yeah.  I'm sorry.

12              MR. STANCIL:  I'm having trouble with Mr. McEntire

13   talking over the end of Mr. Seery's answers.

14              THE COURT:  Ah.

15              MR. STANCIL:  I'm having trouble following.

16              THE COURT:  Okay.

17              MR. STANCIL:  I apologize.

18              THE COURT:  Okay.  Could you --

19              MR. MCENTIRE:  I didn't know I was doing that.

20              THE COURT:  Well, --

21              MR. MCENTIRE:  I'll try to do better.

22   BY MR. MCENTIRE:

23   Q   Mr. Seery, of all the stock that Highland Capital owned in

24   May of 2021, what percentage of that was (inaudible) stock?

25   A   Hopefully this is clear.  Highland Capital did not own a
```

002228

HCMLPHMIT00003276

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/05/25   Page 121 of 262   PageID 3390

Seery - Direct                    264

1  lot of stock.  Highland Capital did have a direct ownership

2  interest in MGM, so that might have been the vast majority of

3  the stock that Highland Capital owned.  It did own interest in

4  other entities, like its investment in RCP or its investment

5  in Multistrat.  But of the stock that it owned directly, that

6  was probably it, and that's the one that was liened up to

7  Frontier.

8  Q   Mr. Seery, did Highland Capital own approximately 170,000

9  shares of MGM stock in May of 2021?

10 A   Yes.  You -- I'm sorry.  You asked me what percentage, and

11 I think I said roughly that amount of stock liened up to

12 Frontier, and that that might have been almost all of the

13 stock we owned.

14 Q   Does Highland Capital own a direct interest in HCLOF?

15 A   In HC --

16 Q   HCLOF?

17 A   HCLOF?  Yes.  Highland Capital owns a small direct

18 interest, and a large indirect interest which we got through

19 the settlement with HarbourVest.

20 Q   And the entity in which you acquired the indirect

21 interest, what's the name of that entity?

22 A   I don't recall.  It's a -- it's a single-shell special-

23 purpose entity that we own all of it and it has no other

24 assets.

25 Q   And just to make sure that the record is clear, you deny

HCMLPHMIT00003277

1   under oath that HCLOF has any interest -- or had any interest

2   in MGM stock?

3   A    HCLOF has never owned MGM stock and still doesn't own MGM

4   stock.  It's never owned it.

5   Q    Um, --

6   A    At least -- at least, as long as I've been in this case.

7          MR. MCENTIRE:  One second, Your Honor, please.

8      (Pause.)

9          MR. MCENTIRE:  I'm going to have to pass the witness

10  because of time sensitivities, Your Honor, so I'll pass the

11  witness at this time.

12         THE COURT:  Okay.  Cross?

13                  CROSS-EXAMINATION

14  BY MR. MORRIS:

15  Q    Mr. Seery?

16  A    Yes, sir.

17  Q    You just covered a lot of what we would have covered, so I

18  want to be really, really quick here.  Okay?  We're not

19  covering old ground.  Let's just start with the HarbourVest

20  settlement.  Do you recall that Mr. Dondero sent the email to

21  you on December 17th?

22  A    Yes.

23  Q    Okay.  When did you reach the agreement with HarbourVest

24  on the settlement?

25  A    December 10th.

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/20/25   Page 123 of 262   PageID 3392
Exhibit 72   Page 209 of 390

Seery - Cross                    266

1  Q   Okay.

2          MR. MCENTIRE:  Your Honor, I'd like to move into

3  evidence Exhibit 31.  Actually, let me lay a foundation first.

4      Can you give the witness --

5          MR. MCENTIRE:  Is this a new exhibit?

6          MR. MORRIS:  No.  It's Exhibit 31.

7          MR. MCENTIRE:  Can I see it, Tim, please?

8          MR. MORRIS:  It's in your box.

9          MR. MCENTIRE:  Give me a minute.

10          MR. MORRIS:  Uh-huh.

11          THE COURT:  Okay.  We're about to focus on Highland

12  Exhibit what?

13          MR. MORRIS:  31.

14          THE COURT:  Okay.

15          MR. MORRIS:  Do you have it, Your Honor?

16          THE COURT:  I do.

17  BY MR. MORRIS:

18  Q   Do you have it, Mr. Seery?

19  A   I do, yes.

20          MR. MORRIS:  Do you have it, sir?

21          MR. MCENTIRE:  I do.  Thank you.

22          MR. MORRIS:  Okay.

23  BY MR. MORRIS:

24  Q   Can you just tell the Court what this is?

25  A   This is an email chain.  It starts from me to the other

002231

HCMLPHMIT00003279

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/09/25   Page 124 of 262   PageID 3393

Seery - Cross                                    267

1  independent directors, copying counsel, to outline the terms

2  of the HarbourVest settlement that I had just made the offer

3  to HarbourVest to settle on these terms on December 8th.  And

4  this was the product of a number of negotiations that had

5  taken place over the prior weeks, and this was the final offer

6  that I was making to them to settle.

7  Q   Directing your attention to the bottom of the first page,

8  the first email dated December 8, 2020 at 6:46 p.m., can you

9  just read the first sentence out loud.

10  A   I lost -- you lost me.

11  Q   That begins, "As discussed yesterday."

12  A   Oh.  "As discussed yesterday, after consultation with John

13  Morris" -- that would be you -- "regarding litigation risks,

14  this evening I made an offer" -- it says "and," but it should

15  have said "an" -- "offer to HarbourVest to settle their

16  claims.  The following are the proposed terms."

17  Q   Okay.  Just stop right there.  And you were -- this is the

18  report that you gave to the independent directors?

19  A   The other independent directors.

20  Q   Right.

21  A   I was also one.

22  Q   Right.  And did Mr. Dubel respond?

23  A   He did, yes.

24  Q   And can you just describe briefly what your understanding

25  was of his response?

HCMLPHMIT00003280

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 09/09/25    Page 125 of 262    PageID 3394

Seery - Cross                                          268

 1   A     Dubel responds a couple hours after I sent the original

 2   email:  "Jim, this basically looks like a $10 million -- net

 3   $10 million payment to HV." That's HarbourVest.  "Is that

 4   correct?  Does the 72-cent recovery include the $22-1/2

 5   million that we get from the transfer of HCLOF interests?

 6   Remind me again, post-effective date, who is managing HCLOF?"

 7        So I think my understanding was Mr. Dubel was querying me

 8   on some of the terms that I had set forth here, including that

 9   the value of the claim in our estimation was going to be about

10   $9.9 million, meaning they would have a $45 million senior

11   claim, a $35 million junior claim, and we thought, based on

12   the values we had then, it was going to pay out about $9.9

13   million.

14   Q     Okay.  And was this offer accepted?

15   A     Yes, it was.

16   Q     When was it accepted?

17   A     I think I just said.  On -- on December 10th.

18   Q     Okay.  And did the terms that you described for the other

19   independent directors on December 8th, did they change in any

20   way at all from that reflected in this email until the time we

21   got to the 9019 hearing?

22   A     Not at all, no.

23   Q     Okay.  I see that you mention in here that you -- it says,

24   quote, "The interests have a marked value of $22-1/2 million,

25   according to Hunter Covitz."  Do you see that?

HCMLPHMIT00003281

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 07/09/25    Page 126 of 262    PageID 3395

Seery - Cross                                            269

1   A    That's correct, yes.

2   Q    Who's Hunter Covitz?

3   A    Hunter Covitz was a Highland employee.  He ran the

4   structured products business.  So he was responsible for

5   making sure that the CLO we managed, which was AC7, was

6   compliant and was -- with the indentures.  He also was

7   responsible for monitoring the -- what we call the 1.0 CLOs,

8   even though they weren't really CLOs, they were more like

9   closed-in funds.  And he also kept track of the Acis -- CLOs

10  that HCLOF had an interest in that were managed by Acis.

11  Q    Okay.  And do you recall how he conveyed to you the NAV?

12  A    Well, I talked to him numerous times, so this wasn't our

13  -- I didn't just call him up at the end and say, what's the

14  NAV?  I had had discussions with him while I was negotiating

15  with HarbourVest.  And at some point, he or someone -- he told

16  me the amount, and at some point he gave me a NAV statement

17  that actually showed the NAV of HCLOF, which at 11/30 was

18  roughly $45 million.

19  Q    Okay.  Can you turn to Exhibit 31-A, the next document in

20  the binder?

21  A    Mine's completely blacked out.

22          THE COURT:  I'm sorry, what number?

23          MR. MORRIS:  31-A.

24          THE COURT:  Oh.

25          MR. MORRIS:  And the first two pages are redacted

HCMLPHMIT00003282

1   just because they're not relevant and they're business

2   information.

3   BY MR. MORRIS:

4   Q    But can you turn to the last page, sir?

5   A    Yes.

6   Q    Can you tell the judge what this is?

7   A    So this is a net asset value statement from HCLOF.  That's

8   Highland CLO Funding, Limited.  That's the Guernsey entity

9   that -- that held these interests.  And this is a net asset

10  amount, and it shows what the net -- what the net asset value

11  is as of this time on a carryforward basis of $45.191 million.

12  Q    Okay.  And where did you get this document?

13  A    I believe I got it from Covitz.  It's generated by an

14  entity called Elysium, which is the fund administrator for

15  HCLOF, and I believe they're out of Guernsey.

16  Q    And did you rely on this document in setting the proposal

17  to HarbourVest?

18  A    Well, both the conversations with Covitz and the document.

19  And frankly, HarbourVest got the same documents because they

20  were -- they held a membership interest in HCLOF.  So he --

21  Michael Pugatch knew what the NAV was.

22  Q    And would Mr. Dondero or entities controlled by him who

23  also have interests in HCLOF, is it your understanding that

24  they would have also had this document available?

25  A    All members would --

HCMLPHMIT00003283

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 07/09/25   Page 128 of 262   PageID 3397

Seery - Cross                                    271

 1             MR. MCENTIRE:  Excuse me.  Excuse me.  I object to

 2    that question, the question being "and the entities controlled

 3    by Mr. Dondero."  There's no foundation for this witness to

 4    answer a question like that.

 5    BY MR. MORRIS:

 6    Q    Who else owned --

 7             THE COURT:  Sustained.

 8    BY MR. MORRIS:

 9    Q    -- an interest in HCLOF?

10             THE COURT:  Go ahead.

11             THE WITNESS:  It would have been DAF.

12    BY MR. MORRIS:

13    Q    The DAF?

14    A    Yeah.

15    Q    Okay.  Let's just ask this question.  Is it your

16    understanding that these NAV valuation reports were made to

17    all holders of interests in HCLOF?

18    A    Yes.  And that would include the DAF.  And I did leave off

19    that there were three former Highland employees long gone, or

20    at least not around at this point, who also owned very small

21    interests, and they would have gotten those statements as

22    well.

23    Q    And does HCLOF also produce audited financial statements?

24    A    It does, yes.

25    Q    Can you go to Exhibit 60, please?

HCMLPHMIT00003284

1   A    Six zero?

2   Q    Yes, sir.  A couple of questions here.  Is this a document

3   that Highland would have received in the ordinary course of

4   business?

5   A    Yes, it is.

6   Q    Okay.  And what is the NAV depicted on this page as of the

7   end of the year 2020?

8   A    Well, you have to look through it, because this document

9   is actually dated 4/21/21, --

10  Q    Okay.

11  A    -- which you can see on Page 10 where it's signed.  And

12  that shows a net asset value of $50.4 million as of 12/31/21.

13  12/20.  I'm sorry.  And -- but it wasn't prepared until -- the

14  audits aren't done and we don't get this document until after

15  the directors sign off in April.

16  Q    Okay.

17        MR. MORRIS:  And Your Honor, I move for the admission

18  into evidence of these three HarbourVest-related documents,

19  30, 31-A, and 60.

20        MR. MCENTIRE:  No objection.

21        THE COURT:  They're admitted.

22        MR. MORRIS:  Okay.

23     (Debtors' Exhibits 30, 31-A, and 60 are received into

24  evidence.)

25  BY MR. MORRIS:

HCMLPHMIT00003285

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 07/09/25   Page 130 of 262   PageID 3399

Seery - Cross                                        273

1   Q   Okay.  Let me move on.  We've seen Mr. Dondero's email

2   today.  You've seen that before, correct?

3   A   Yes.

4   Q   Okay.  What was your reaction when you got it?

5   A   I was highly suspicious.

6   Q   Why is that?

7   A   Well, not to replow too much old ground, but this came

8   after he threatened me.  He threatened me in writing.  I'd

9   never been threatened in my career.  I've never heard of

10  anyone else in this business who's been threatened in their

11  career.  So anything I would get from him, I was going to be

12  highly suspicious.

13      It also followed the imposition of a TRO for interfering

14  with the business.  He knew what was in the TRO and he knew

15  what it applied to, and it restricted him from communicating

16  with me or any of the other independent directors without

17  Pachulski being on it.

18      Furthermore, Pachulski had advised Mr. Dondero's counsel

19  that not only could they not communicate with us, if they

20  wanted to communicate they had to prescreen the topics.

21      And how do we know that?  Because Dondero filed a motion

22  to modify the TRO.  And that was all before this email.

23      In addition, that followed the termination of the shared

24  service arrangements, the approval of the disclosure

25  statement, and the demand to collect on the demand notes that

**002238**

HCMLPHMIT00003286

```
 1   Mr. Dondero and his entities were liable for.

 2        So at that point, he'd been interfering with the business,

 3   he had threatened me, he was subject to a TRO, and I got this

 4   email and I was highly suspicious.

 5   Q    Did you ever share this email with anybody at Farallon?

 6   A    No.

 7   Q    Did you ever share this email with anybody at Stonehill?

 8   A    No.  And just to be clear, not just the email, the

 9   contents.  Never discussed it with them.

10   Q    That was going to be my next question.  Did you ever share

11   any information about MGM with anybody?

12            MR. MCENTIRE:  Objection.  Leading.

13            MR. MORRIS:  I'm asking the question.

14            MR. MCENTIRE:  No, you're leading.

15            MR. MORRIS:  This is the whole --

16            MR. MCENTIRE:  You're leading the witness.

17            THE COURT:  Overruled.  Finish the question.

18   BY MR. MORRIS:

19   Q    Did you ever share any information concerning with MGM

20   with anybody at Stonehill before you learned that they had

21   purchased claims?

22            MR. MCENTIRE:  Objection.  Leading.

23            THE COURT:  Overruled.

24            THE WITNESS:  No.  No, I did not.

25   BY MR. MORRIS:
```

HCMLPHMIT00003287

1  Q   Did you ever share any information with anybody at

2  Farallon concerning MGM before you learned that they purchased

3  their claims?

4          MR. MCENTIRE:  Objection.  Leading.

5          THE WITNESS:  No, I did not.

6          THE COURT:  Overruled.

7          THE WITNESS:  I'm sorry.

8      (Pause.)

9          THE WITNESS:  You know, you just asked me something

10  about Stonehill.

11          THE COURT:  No.

12          THE WITNESS:  I'm sorry.

13  BY MR. MORRIS:

14  Q   Yeah.  No question.

15  A   I wanted to clarify one.

16  Q   What did you want to clarify, sir?

17  A   Certainly didn't share anything about this email, any of

18  the contents of it.  I don't know if I ever -- I don't know

19  exactly when Stonehill bought their claims, and they were

20  subject to the NDA to do the financing process.  So I know

21  when Farallon told me they had bought their claims and I know

22  we never had any discussions at all before they acquired their

23  claims, and I don't know when Stonehill got those -- their

24  claims, so I don't know when -- what was in the data room or

25  what -- what might have been discussed about MGM while they

002240

HCMLPHMIT00003288

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 07/09/25   Page 133 of 262   PageID 3402
Exhibit 72   Page 209 of 390

Seery - Cross                    276

1  were under an NDA.

2  Q   Okay.

3  A   But certainly nothing -- I never shared the contents of

4  this email, the substance of this email, the email at all.

5  That's what I wanted to clarify.

6  Q   What data room are you talking about, sir?

7  A   This was the data room related to the exit financing where

8  we sought exit financing and ultimately got exit financing

9  from Blue Torch Capital.

10 Q   And who put together the data room?

11 A   DSI, which was our financial consultants, and our finance

12 team.

13 Q   And why did you -- did you delegate responsibility for

14 creating the data room to DSI and the members of your team you

15 just identified?

16 A   Yeah, of course.

17 Q   How come?

18 A   I don't really know how to put together a data room.

19 Q   Did you -- did you direct them to put anything in the data

20 room?

21 A   Not specifically.  We had a deck that we -- that certainly

22 I worked on and commented on, which would have been a general

23 overview of the -- of the post-reorganized Highland and the --

24 and the -- and the Claimant Trust.  So I certainly commented

25 on that.  But the specific information in the data room, I

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 07/09/25390 Page 134 of 262   PageID 3403

Seery - Cross                                              277

 1   don't -- I never looked at it.  I don't know what it is.

 2   Q   How many -- how many entities who were participating in

 3   the exit facility process wound up making bids or offers?

 4   A   There were five that signed NDAs.  Three provided

 5   substantive proposals.  One was verbal.  That was Bardin Hill,

 6   who'd been contacting me throughout the case, and they do this

 7   kind of financing, and they submitted a competitive bid.

 8   Stonehill in writing, and then amended, a more aggressive one,

 9   in writing.  And Blue Torch probably three, and the most

10   aggressive.

11   Q   And did you give the -- did you give the opportunity to

12   your age-old friends at Stonehill?

13   A   They're not my age-old friends.  And no, they lost.  They

14   were second, they were close, it was a good real proposal, but

15   they didn't win.

16   Q   So, --

17   A   Blue Torch won.

18   Q   So is it fair to say that you -- did you pick the best

19   proposal that you thought provided the best value for the

20   company that you were managing?

21           MR. MCENTIRE:  Your Honor, again, for the last ten

22   minutes, we've had nothing but leading questions.  And it just

23   is --

24           MR. MORRIS:  Fine.  Happy to --

25           THE COURT:  Sustained.  Rephrase.

002242

HCMLPHMIT00003290

Seery - Cross                                278

1   BY MR. MORRIS:

2   Q    Why did you pick Stone -- why did you pick Blue -- Blue-?

3   A    Blue Torch.

4   Q     Blue Torch, over the other bids?

5   A    It was the best bid.  So, structurally, it was the least

6   expensive, although they were extremely close.  I had a lot of

7   confidence in Blue Torch because this type of financing is

8   what they do.  And while you can never have a hundred percent

9   confidence that if somebody goes through the -- this is an

10  LOI, right, so this is a letter of intent.  When they go

11  further, they may -- they may not complete it.  But I had a

12  high degree of confidence that they would get there, because,

13  again, that's what they do.  And they were the -- they were

14  just the better bid.

15  Q    Okay.  Do you recall that in Mr. Dondero's notes he wrote

16  down that he was told that Farallon had purchased their claims

17  in February or March?

18  A    I saw that on what he claimed, yes.

19  Q    And is that consistent with what you were told by Farallon

20  in March?

21  A    They told me they acquired the claims -- they had acquired

22  the claims on March 15th, by email.  I don't know if they

23  acquired them in February or March.  Or even January.  I know

24  they said they had them on March 15.

25  Q    Did you ever speak with Farallon about anything having to

002243

HCMLPHMIT00003291

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 09/09/25   Page 136 of 262    PageID 3405
Exhibit 72   Page 289 of 390

Seery - Cross                                       279

 1  do with the purchase of their claims?

 2          MR. MCENTIRE:  Objection.  Leading.

 3          THE COURT:  Overruled.

 4          THE WITNESS:  Not -- not before they sent me that

 5  email.

 6          MR. MORRIS:  I apologize.  Withdrawn.

 7  BY MR. MORRIS:

 8  Q   Before -- before learning of their purchase, had you had

 9  any discussions with them about potential claim purchases?

10          MR. MCENTIRE:  Objection.

11          THE WITNESS:  No.

12          MR. MCENTIRE:   Leading.

13          THE WITNESS:  I'm sorry.

14          THE COURT:  Overruled.

15          THE WITNESS:  No, I didn't.

16  BY MR. MORRIS:

17  Q   Okay.  Before you learned that Stonehill had purchased

18  claims in the Highland bankruptcy, had you ever had any

19  conversation with them about the potential purchase of claims?

20          MR. MCENTIRE:  Objection.  Leading.

21          THE WITNESS:  No, I don't -- I don't --

22          THE COURT:  Overruled.

23          THE WITNESS:  I'm sorry.  I don't -- I don't believe

24  so, no.

25  BY MR. MORRIS:

HCMLPHMIT00003292

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/30/25   Page 137 of 262   PageID 3406

Seery - Cross                                    280

1   Q    Do you have any knowledge at all as to how the sellers

2   went about selling their claims?

3   A    I have some knowledge now, post-effective date, that I

4   believe I have some understanding, but not a great one.

5   Q    Did you ever communicate with any of the sellers about the

6   potential sale of their claims prior to the time their claims

7   were sold?

8            MR. MCENTIRE:  Objection.  Leading.

9            THE COURT:  Overruled.

10            THE WITNESS:  I did have a conversation with Eric

11   Felton who was the Redeemer representative on the Creditors'

12   Committee.  And it came out of one of the emails I got.  I

13   think it indicated that --

14            MR. MCENTIRE:  Objection, hearsay, Your Honor.  I

15   mean, hearsay, Your Honor.

16            THE COURT:  Okay.

17            MR. MCENTIRE:  It's hearsay.

18            THE COURT:  Okay.  He's about to say something that's

19   hearsay is the objection.  Any response?

20            MR. MORRIS:  I'm not offering it for the truth of the

21   matter asserted.  I'm offering it for Mr. Seery's state of

22   mind and the extent of his communications.  How about that?

23            MR. MCENTIRE:  I don't see how you could offer it for

24   anything other than for the truth of the matter asserted.

25   It's coming from a third party, so I object to hearsay.

002245

Seery - Cross                              281

```
 1            MR. MORRIS:  Okay.  You know what?  We --
 2   BY MR. MORRIS:
 3   Q    Other than the one conversation --
 4            THE COURT:  Are you withdrawing the question or do I
 5   need --
 6            MR. MORRIS:  Yeah.  This is just --
 7            THE COURT:  Okay.  You're withdrawing the question.
 8            MR. MORRIS:  I'll withdraw the question.
 9            THE COURT:  Okay.
10   BY MR. MORRIS:
11   Q    Other than the one conversation with Mr. Felton, did you
12   ever have a conversation with any seller prior to the time you
13   learned that Farallon or Stonehill --
14            MR. MCENTIRE:  Objection.  Leading.
15   BY MR. MORRIS:
16   Q    -- purchased the claims?
17            THE COURT:  Overruled.
18            THE WITNESS:  No.
19   BY MR. MORRIS:
20   Q    Did you play any role in facilitating or recommending to
21   Farallon or Muck that it purchase claims?
22            MR. MCENTIRE:  Objection.  Leading.
23            THE COURT:  Overruled.
24            THE WITNESS:  No.  None whatsoever.
25   BY MR. MORRIS:
```

002246

1   Q    Did you play any role in facilitating or recommending that

2   Stonehill or Jessup purchase claims?

3   A    No.

4           MR. MCENTIRE:  Objection.  Leading.

5           THE COURT:  Overruled.

6           THE WITNESS:  I'm sorry.

7   BY MR. MORRIS:

8   Q    All right.  Let's just finish up with compensation.  Can

9   you go to Exhibit 41, please?  Can you just identify that

10  document for the Court?

11  A    This is the -- it's a memorandum agreement that sits on

12  top of an outline.  It is the December 2 incentive

13  compensation agreed terms for Highland Capital --

14  Q    Okay.

15  A     -- and the Trust.

16  Q    And when was this signed?

17  A    It would have been -- the date is December 6th.

18  Q    And --

19  A    2021.  I'm sorry.

20  Q    Okay.  And when did you and the Committee members begin

21  discussing your compensation package?

22  A    Shortly after the effective date, which was August 11,

23  2021.

24  Q    And were there any negotiations during that intervening

25  three- or four-month period?

HCMLPHMIT00003295

Seery - Cross                              283

1   A    Considerable negotiations during that period, yes.

2   Q    Can you go to the last page of Exhibit 41?  Can you

3   describe that for the Court?  I know it's hard to read, but --

4   A    I --

5   Q    -- the numbers don't matter so much as the infor... you

6   know, just, can you just describe --

7   A    Yeah.

8   Q     -- what's being conveyed?

9   A    So it's very hard to read, but it says -- because it's

10  small -- Seery Proposal 1, Oversight Counter 1, Seery Proposal

11  2, Oversight Counter 2, and then it continues down.  My

12  recollection is that we had four or five rounds of back-and-

13  forth that were meaningful.  But it -- but it even took a

14  detour in the middle, because it started with my proposal,

15  which was pretty robust, and their response to me that they

16  didn't like the structure or the amount, and so then we

17  started talking about that.  And then they -- after we were

18  kind of hitting numbers and structure at the same time, they

19  came back to me and said, stop, we've got to agree on the

20  structure before we agree on the amounts.

21          MR. MCENTIRE:  Your Honor, I'm going to object as

22  it's hearsay and move to strike.  This is -- he's not talking

23  about the document.  He's talking about something outside of

24  the four corners of the document.  I object to hearsay.

25          MR. MORRIS:  Hearsay?  There's no statement.

002248

HCMLPHMIT00003296

1          THE COURT:  There was --

2          MR. MORRIS:  It's a description of what happened.

3          MR. MCENTIRE:  But he's actually referring to

4   statements in his substantive comments.

5          THE COURT:  Overruled.  Okay.

6          MR. MORRIS:  I move for the admission into evidence

7   of Exhibit 41.

8          THE COURT:  Any objection?

9          MR. MCENTIRE:  That's the memorandum agreement, Mr.

10  Morris?  Is that it?

11          MR. MORRIS:  Yes, sir.

12          MR. MCENTIRE:  No objection.

13          THE COURT:  Admitted.

14      (Debtors' Exhibit 41 is received into evidence.)

15  BY MR. MORRIS:

16  Q   Can we go backwards to Exhibit 39, please?  Can you

17  describe for the Court what that is?

18  A   This is a redacted copy of minutes of the board meeting on

19  August 21 -- 26, 2021.

20  Q   And there's a lot of stuff redacted there.  Do you have an

21  understanding as to why there is redactions?

22  A   It would have nothing to do with these issues that we're

23  discussing or the alleged *quid pro quo*.

24  Q   Okay.  Can you just read out loud the last portion that's

25  unredacted on the second page, beginning with "Mr. Seery

002249

1  reviewed"?

2  A    It actually says, "Mr. Seery also presented the board with

3  an overview of his incentive compensation program proposal,

4  which would include not only Mr. Seery but the current HCMLP

5  team.  The terms and structure of the proposal had been

6  previewed with the board in prior operating models presented

7  by Mr. Seery.  Mr. Seery reviewed the proposal and stated his

8  view that the proposal was market-based and was designed to

9  align incentive between himself and the HCMLP team on the one

10  hand and the Claimant Trust beneficiaries on the other.  The

11  board asked questions regarding the proposal and determined

12  that it would consider the proposal and revert to Mr. Seery

13  with a counterproposal."

14  Q    All right.  When you were -- when you were shown one of

15  these documents before, you were asked to identify Mr. Linn,

16  but you weren't asked about the others.  Do you see Richard

17  Katz there?

18  A    Yes.

19  Q    Who's that?

20  A    He's the independent member.

21  Q    Did he play any role in the negotiation of your

22  compensation package?

23  A    Yes.  He was actively involved.

24  Q    Okay.  And how about Mr. Provost?  Who's he?

25  A    He is the Jessup person.  Jessup is the board member.

HCMLPHMIT00003298

1   He's their representative on the board.

2   Q    Okay.

3           MR. MORRIS:   And I move for admission into evidence

4   of Exhibit 39.

5           MR. MCENTIRE:   No objection, Your Honor.

6           THE COURT:   Admitted.

7       (Debtors' Exhibit 39 is received into evidence.)

8   BY MR. MORRIS:

9   Q    Let's go to Exhibit 40, please.   Can you just describe for

10  the Court what that is?

11  A    This is a subsequent board meeting minutes, August 30,

12  2021.

13  Q    And can you just read into the record -- why are there

14  redactions?

15  A    Again, they would -- if there are redactions, it would

16  have nothing to do with the issues that are being brought up

17  in this motion.

18  Q    And can you just read into the record the paragraph

19  beginning, "Mr. Katz"?

20  A    "Mr. Katz began the meeting by walking the Oversight Board

21  and Mr. Seery through the Oversight Board's counterproposal to

22  the HCMLP incentive compensation proposal, including the

23  review of the spreadsheet and summary of the counterproposal.

24  Discussion was joined by Mr. Linn and Mr. Stern.   Mr. Seery

25  asked numerous questions and received detailed responses from

002251

1   the Oversight Board.  Mr. Seery and the Oversight Board agreed

2   to continue the discussion and negotiations regarding the

3   proposed incentive compensation plan for the Claimant Trustee

4   and the -- and the HCMLP."

5   Q    So they didn't accept your original proposal that you made

6   in the earlier document?

7   A    They did not.

8   Q    Okay.  And did negotiations continue?

9   A    They did, yes.

10        MR. MORRIS:  Before we go on, I move for admission

11   into evidence Exhibit 40.

12        THE COURT:  Any --

13        MR. MCENTIRE:  No objection.

14        THE COURT:  It's admitted.

15   (Debtors' Exhibit 40 is received into evidence.)

16   BY MR. MORRIS:

17   Q    Can you go to Exhibit 59, please?  Can you describe for

18   the Court what this is?

19   A    This is an email string between me and the Oversight Board

20   regarding the compensation proposal.

21   Q    Okay.  And directing your attention to the bottom, I

22   guess, of the second page, there is an email from Mr. Katz

23   dated October 26.  Do you see that?

24   A    At the bottom of the second -- oh, yes, yes.

25   Q    Okay.  Can you just read the sentence at the bottom of the

HCMLPHMIT00003300

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 09/289/05390 Page 145 of 262    PageID 3414

Seery - Cross                    288

1   page beginning "We propose"?

2          MR. MCENTIRE:  Well, Your Honor, I would, first of

3   all, object to him just reading from the document until it's

4   been put into evidence.

5          THE COURT:  I'm sorry, say again?

6          MR. MCENTIRE:  I would object to Exhibit --

7          THE COURT:  We can't pick things up on the record

8   when you don't speak in a mic.

9          MR. MCENTIRE:  I object to him simply reading from

10  the document before the document is offered into evidence.

11         MR. MORRIS:  Okay.

12         MR. MCENTIRE:  Accepted into evidence.

13         MR. MORRIS:  Sure.  I'd move it into evidence.

14         MR. MCENTIRE:  I object as hearsay.

15         MR. MORRIS:  This is a present sense recollection --

16  recorded.  It's a clear business record.  It's a negotiation

17  that's happening over time.  Mr. Seery is here to answer any

18  questions about authenticity.

19         MR. MCENTIRE:  Well, first of all, it's an email

20  string involving communications with third parties.  That's

21  hearsay in and of itself.  And it's not been established that

22  this is a business record.  And Mr. Morris's statements to

23  that effect, frankly, don't carry his burden.  There's

24  internal hearsay contained throughout the document, Your

25  Honor, even if it is a business record.

002253

HCMLPHMIT00003301

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/09/25   Page 146 of 262   PageID 3415
Exhibit 72   Page 290 of 390

Seery - Cross                                289

1        MR. MORRIS:  Your Honor, just to be clear, let me

2   respond.

3             THE COURT:  Uh-huh.

4             MR. MORRIS:  Exceptions to hearsay rule.  803(1)

5   present sense impression; (2) -- (3) existing mental

6   impression, state of mind about motive, (5) recorded

7   recollection, (6) records of regularly-conducted activity, or

8   Federal Rule of Evidence 807, residual exception for

9   trustworthy and probative evidence.  I'll take any of them.

10            MR. MCENTIRE:  None of them apply.

11            MR. MORRIS:  Okay.

12            THE COURT:  Okay.  Overruled.

13            MR. MORRIS:  Thank you.

14            THE COURT:  I admit it.  59's admitted.

15       (Debtors' Exhibit 59 is received into evidence.)

16   BY MR. MORRIS:

17   Q   Can you just read that last sentence at the bottom of that

18   page?

19   A   This is from Rich Katz to me.

20   Q   Uh-huh.

21   A   (reading)  We propose doing this in two stages.  First,

22   we'd like to come to agreement on structural, underscored,

23   elements of the ICP.

24       ICP means incentive compensation program or plan.

25       Only after we'd done that, when the board had greater

002254

HCMLPHMIT00003302

Seery - Cross                               290

1    understanding of what plan they were pricing, would we haggle

2    out the specific numbers, underscore, tier attachment points,

3    and percentage participation in each tier.

4    Q    Okay.  And going to the right-hand part of that, do you

5    see where it says, Salary J.S. Only?

6    A    Yes.

7    Q    Can you just, you know, generally describe for the Court

8    what the debate is or the negotiation that's happening on that

9    particular point?

10   A    Well, this was brought up earlier.  The salary was

11   $150,000 a month.  That was the same salary that I'd had

12   during the case that was approved by the Court.  It had been

13   approved by the Committee, approved by the other independent

14   members.  That was continuing.  It was also contained as an

15   actual base salary in the plan and the Claimant Trust

16   Agreement, and they were never amended.

17       The Committee came back to me and said, we'd like that to

18   step down.  And they'd like it to step down on a definitive

19   specific schedule, because they had a view that that would

20   incentivize me to work faster to make distributions before the

21   stepdown and that I wouldn't linger in the role.  And the

22   yellow --

23   Q    Can you just read the yellow out loud?

24   A    That's --

25   Q    Read the whole thing.

002255

HCMLPHMIT00003303

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 02/22/25390 Page 148 of 262   PageID 3417

Seery - Cross                    291

1  A    That's my response.

2  Q    Read the whole thing.

3  A    (reading)  Based on the required expertise, volume, and

4  personal risk of the work today, I do not think that any

5  formulaic reduction in base comp is appropriate.  With the

6  complexity and amount of issues that I have to manage on a

7  daily basis, I currently do not have capacity to take on

8  significant outside work.  Of course, things can change.  If

9  they do, I am open to discussing reduction in the base.  I

10  have no interest in sitting around doing nothing, having no

11  risk, and collecting the full base compensation.  We can

12  include prefatory language and an agreement to revisit our

13  terms, but I do not see an avenue to set parameters to lock in

14  an agreement for the future at this time.

15      And then there's another paragraph on severance.

16  Q    You can stop there.

17            MR. MORRIS:  I have no further questions.

18            THE COURT:  All right.  Pass the witness.

19            MR. MCENTIRE:  Do you have any questions?

20            A VOICE:  No.

21            MR. MCENTIRE:  Okay.  How much time do I have,

22  please?

23            THE CLERK:  So, the limit is at two hours and 32

24  minutes.

25            MR. MCENTIRE:  All right.

002256

HCMLPHMIT00003304

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 09/09/25    Page 149 of 262    PageID 3418

Seery - Redirect                          292

1                        REDIRECT EXAMINATION

2    BY MR. MCENTIRE:

3    Q    Just a couple questions very quickly, Mr. Seery.  Highland

4    Capital Management paid HarbourVest cash as part of the

5    settlement, correct?

6    A    That's incorrect.

7    Q    There was no cash component at all?

8    A    There was not.

9    Q    And in connection with the HarbourVest settlement,

10   HarbourVest transferred an interest in HCLOF to Highland

11   Capital or an entity affiliated with Highland Capital; is that

12   not correct?

13   A    That's correct.

14   Q    And that -- that entity -- and HCLOF, and HCLOF had an

15   interest in various CLOs, correct?

16          MR. MORRIS:  Your Honor, I object.  This is beyond

17   the scope of my cross, or redirect, however you prefer.

18          MR. MCENTIRE:  Well, you spent a lot of time on

19   HarbourVest.  I'm just trying to clear it up.

20          MR. MORRIS:  I didn't say the word CLO.  I did not

21   say the word CLO.

22          THE COURT:  Overruled.  He can go there.

23      If you'd please move the mic towards your voice.

24   BY MR. MCENTIRE:

25   Q    And HCLOF had an interest in various CLOs, correct?

002257

HCMLPHMIT00003305

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 02/04/25390 Page 150 of 262   PageID 3419

Seery - Redirect                          293

1   A    I believe it had an interest in five CLOs.  Oh, that's not

2   true.  It had an interest in five of the 1.0 CLOs.  It also

3   owned one hundred -- basically, somewhere between 87 and a

4   hundred percent of Acis 3, 4, 5, 6, and 7, which is about a

5   billion dollars of CLOs to 10 (inaudible) leveraged vehicles,

6   and they owned basically all the equity, so that was the

7   driver of the value.

8   Q    And various entities that were -- I mean, some of these

9   various CLOs had an interest in MGM stock, correct?

10  A    The 1. -- the Highland 1.0s did.  The value drivers I just

11  described -- Acis 3, 4, 5, 6, and 7 -- had no interest in MGM.

12  Q    But one of them did have an interest in MGM?

13  A    That's not correct.

14  Q    What did you just say?

15  A    3, 4, 5, 6, and 7 did not have any interest in MGM.

16  Q    Were there any CLOs that had an interest in MGM?

17  A    Some of the 1.0 CLOs did, --

18  Q    I see.

19  A    -- yes.

20           MR. MCENTIRE:  Pass the witness.

21           MR. MORRIS:  No further questions.

22           THE COURT:  Mr. Seery, I want to ask you one thing.

23           THE WITNESS:  Yes, Your Honor.

24                    EXAMINATION BY THE COURT

25           THE COURT:  We dance around it a lot.  The Highland

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-01876-K Document 34-72 Filed 06/20/25 Page 151 of 262 PageID 3420

Seery - Examination by the Court 294

1  ownership of MGM stock. If think -- if you could confirm I've

2  heard this correct -- you said Highland itself owned 170,000

3  shares that were subject to a Frontier Bank lien?

4        THE WITNESS: Yes, Your Honor. I believe that's the

5  right amount. So, Highland directly owned about 170,000

6  shares. Those were liened up to Frontier. They were -- they

7  were never transferred. Highland never sold any MGM stock.

8        THE COURT: Okay. So Frontier still holds it or

9  what?

10        THE WITNESS: No. In fact, post-effective -- I

11  believe it was post-effective date, and with cash generated,

12  we -- we paid off the Frontier loan, --

13        THE COURT: Uh-huh.

14        THE WITNESS: -- released that lien, and then we held

15  those shares in MGM until the merger was consummated.

16        THE COURT: Okay.

17        THE WITNESS: So we tendered our shares into the --

18  into the merger and got the merger consideration, which was

19  cash.

20        THE COURT: Okay. And so there was that. But other

21  than that, you said Highland owned 50 percent of Multistrat,

22  which owned some MGM stock?

23        THE WITNESS: Multistrat had a -- I don't recall the

24  amount, but a material amount of MGM stock. That also -- so,

25  Highland owned 57 percent of Multistrat. Is also the manager

002259

HCMLPHMIT00003307

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 09/09/25   Page 152 of 262   PageID 3421
Seery - Examination by the Court                    295

1   of Multistrat.

2            THE COURT:  Uh-huh.

3            THE WITNESS:  Multistrat did not sell any MGM stock.

4   It also tendered them into the merger as well.

5            THE COURT:  Okay.  And then you said Highland owned

6   some percentage of Restoration --

7            THE WITNESS:  Restorations Capital Partners.

8            THE COURT:   -- Capital Partners, which owned some

9   MGM stock?

10           THE WITNESS:  Similarly, Highland is the manager of

11  what we call RCP.  RCP owned a material amount of MGM stock.

12  RCP did not sell any MGM stock.  However, in 2019, you'll

13  recall that Mr. Dondero sold $125 million of stock

14  postpetition out of RCP.  It was MGM stock.  He sold it back

15  to MGM.  We had a -- we had a hearing on it, because

16  subsequently the Independent Board learned about it, the

17  Committee learned about it, they had not -- it had not been

18  disclosed, but there was a -- what we thought was a binding

19  agreement with MGM, and MGM indicated that they were going to

20  hold us to it, and so we had a hearing about approving that

21  transaction.  The Committee was not happy.

22           THE COURT:  Okay.  I'm fuzzy on when that was.  You

23  said?

24           THE WITNESS:  That would have been in early 2020,

25  probably April-ish timeframe.

HCMLPHMIT00003308

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 09/09/25    Page 153 of 262    PageID 3422
Exhibit 72    Page 297 of 390

Seery - Examination by the Court          296

1          THE COURT:  Okay.

2          MR. MORRIS:  Your Honor?

3          THE WITNESS:  The transaction was in November, I

4    believe.

5          MR. MORRIS:  If it's helpful, Your Honor, you can

6    find it at Docket 487.

7          THE COURT:  Okay.

8          MR. MORRIS:  I think that's the objection from the

9    Committee where the issue was -- comes up at least at one

10   time.

11         THE COURT:  Okay.  And then I think this is the last

12   category I heard, that HCM and its specially-created sub owned

13   just over 50 percent of HCLOF, and it in turn owns interest in

14   a lot of CLOs, and a few of those, what you call the 1.0 CLOs,

15   did own some MGM stock?

16         THE WITNESS:  That's correct.  So if you look on the

17   audited financials that we had introduced into evidence,

18   you'll see actually every asset that HCLOF owns.  There's no

19   MGM in there.  It does own interest.  There were minority

20   interests in five or six of the 1.0 CLOs.  Grayson,

21   Greenbrier, Gleneagles, Brentwood, Liberty, and one other.

22   And it had interest in those, but it never owned any MGM stock

23   and it never traded any MGM stock.  It didn't own any.

24         THE COURT:  All right.  Did I cover the universe of

25   what MGM stock was owned by Highland or something Highland had

002261

HCMLPHMIT00003309

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 08/08/25   Page 154 of 262    PageID 3423

Seery - Examination by the Court                297

1   an interest in?

2           THE WITNESS:  Yeah.  So, the ones that HCLOF had an

3   interest in that I just listed, those -- Jasper was the other

4   one.  I apologize.  The -- they owned -- they owned MGM stock

5   among their other -- they had a lot of other assets.   The

6   other CLOs, the 1.0 CLOs that Highland had, every one of them

7   owned MGM stock.  None of them sold or bought any stock.

8   Those all tendered into the merger as well.  Highland did not

9   own any interest in any of those entities.

10          THE COURT:  Uh-huh.

11          THE WITNESS:  It just managed them.

12          THE COURT:  Okay.  And this is my last question.

13  Someone brought up or it came up today that exactly two years

14  ago today -- I didn't remember we were on an anniversary of

15  that -- but was when we had a hearing, and I think it was a

16  contempt hearing, but I had, I guess, read in the media, like

17  many other human beings, an article about the MGM-Amazon

18  transaction, and I had said I had hope in my heart and brain

19  that this could be an impetus or a triggering event for maybe

20  a settlement.  And that was kind of quickly pooh-poohed, if

21  you will.

22      Remind me why I was quickly persuaded, oh well, I guess

23  that's not going to happen.  I just can't remember what I

24  heard that day.

25          THE WITNESS:  Well, it was widely known that

002262

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 09/09/25    Page 155 of 262    PageID 3424

Seery - Examination by the Court                    298

1  Highland, meaning not the 171,000 --

2          THE COURT:  Uh-huh.

3          THE WITNESS:  -- but the entities that Highland or

4  related entities, including DAF, the other Dondero entities,

5  controlled a lot of Highland stock, as even Mr. Dondero said

6  between Anchorage --

7          THE COURT:  You mean MGM?

8          THE WITNESS:  MGM, I'm sorry.  Between -- there were

9  only five major holders.  There was the two we just mentioned

10  and Davidson Kempner and Monarch and Owl Creek, and just a few

11  other big holders.

12      And so Your Honor would have learned it from the case, but

13  you also would have learned it from the paper, that any time a

14  holder is mentioned, it's first Anchorage, because they owned

15  the biggest piece, and Kevin Ulrich, who was the chairman of

16  Anchorage, was also the chairman of MGM.  And then Highland

17  was always mentioned.

18      The reason that it didn't have some great amount of

19  capital that went on to Highland, although there was money

20  from RCP and there was money from MGM, is Highland doesn't own

21  the stock that's -- or interests in the 1.0 CLOs that owned

22  all of it.  We just manage it.

23          THE COURT:  Uh-huh.

24          THE WITNESS:  And that goes to various other

25  entities, including, in large part, to Dondero entities.  So

002263

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 09/09/25   Page 156 of 262    PageID 3425

Seery - Examination by the Court                299

 1  there wasn't a big windfall to Highland from that.

 2      The possibility of some upside from HCLOF, because it

 3  owned small interests in those five, there was some value in

 4  that, but a lot of it got tied up in the litigation that other

 5  entities, Dondero entities, are bringing against U.S. Bank and

 6  Acis, which has tied up everything in that -- those

 7  distributions.

 8          THE COURT:  Okay.  All right.  Thank you.  You are

 9  excused from the stand.

10          THE WITNESS:  Thank you, Your Honor.

11          MR. STANCIL:  I owe you a docket number, Your Honor.

12  You said don't let us leave before we give you a docket number

13  for that second contempt order.  We promised to come back.  It

14  was #2660.

15          THE COURT:  Okay.  Got it.

16          MR. STANCIL:  Which -- did we move that into

17  evidence?

18          MR. MORRIS:  No.  We asked the Court to take judicial

19  notice.

20          THE COURT:  I will take judicial notice of 2660, --

21          MR. STANCIL:  Thank you, Your Honor.

22          THE COURT:   -- I already said.  Thank you.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  You're excused.

25      (The witness steps down.)

HCMLPHMIT00003312

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K     Document 84-72   Filed 09/09/25   Page 157 of 262     PageID 3426

300

```
 1            THE COURT:  All right.  Are you going to have any
 2   other evidence, Mr. McEntire?
 3            MR. MCENTIRE:  Your Honor, as I respond to your
 4   question, I think we have 30 -- approximately 30 minutes left.
 5            THE CLERK:  Twenty-six, yes.
 6            MR. MCENTIRE:  Twenty-six.  We do have another
 7   witness.  We also have a closing final argument.  And we also
 8   have an opportunity -- we want to reserve an opportunity for
 9   our experts that is still under advisement.
10        So my first action would be to ask for an extension of
11   time, or we would like to add to our time limit.  Instead of
12   just three hours, we'd like to increase the time so we can
13   accomplish all these things.
14        I mean, if the Court is unwilling to give us additional
15   time, then I will be forced not to call another witness.  I
16   will move to a very short final argument.  I need to preserve
17   some time for my experts, should you allow them to testify.
18            THE COURT:  Well, --
19            MR. MORRIS:  May I respond?
20            THE COURT:   -- you don't have to preserve time.  I'm
21   either going to allow you to put on your experts, and we said
22   30 minutes/30 minutes, --
23            MR. MORRIS:  That was what I was going to say, Your
24   Honor.
25            THE COURT:  Okay.
```

HCMLPHMIT00003313

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 09/09/25    Page 158 of 262    PageID 3427
Exhibit 72    Page 302 of 390

301

 1              MR. MORRIS:  There's no prejudice here.  Nobody's

 2    being harmed.  There's no appellate issue.  I thought we were

 3    really clear.  Everybody gets their three hours today.  We

 4    will file our reply brief on Monday.  The Court will determine

 5    both whether it needs to hear expert testimony and whether or

 6    not our motion should be sustained.  If the Court denies the

 7    motion, we'll take a couple of depositions and each side will

 8    get whatever period of time the Court orders.

 9         But, you know, the attempts to create an appellate record

10    are just -- you know, that's not -- there's no issue here.  He

11    can -- he's got 26 minutes.  He can put on his witness, he can

12    make his closing in the 26 minutes that they've always had.

13              THE COURT:  All right.  Well, we have --

14              MR. MCENTIRE:  May I caucus?  May I caucus very

15    quickly, Your Honor?

16              THE COURT:  Okay.  Uh-huh.  And while you're

17    caucusing, we have our game plan on the experts.  We know how

18    that's going to happen.  And I'm not extending the three

19    hours.

20              MR. MORRIS:  (sotto voce)  We have 62 minutes?

21         (Pause.)

22              MR. MCENTIRE:  Your Honor, accordingly, I'll just --

23    we'll move into a final argument at this time.

24              THE COURT:  Okay.  So you rest?

25              MR. MCENTIRE:  I rest.

**002266**

HCMLPHMIT00003314

```
 1              THE COURT:  All right.

 2              MR. MORRIS:  We call Mark Patrick.

 3              THE COURT:  All right.  Mr. Patrick, you've been

 4   called to the witness stand.

 5              MR. MORRIS:  I just need to find my examination

 6   notes.  Just give me one moment, please.

 7              THE COURT:  All right.  Please raise your right hand.

 8   Could you remain standing, please.

 9        (The witness is sworn.)

10              THE COURT:  All right.  You may be seated.

11              MARK PATRICK, DEBTORS' WITNESS, SWORN

12                      DIRECT EXAMINATION

13   BY MR. MORRIS:

14   Q    Hi, Mr. Patrick.

15   A    Hello.

16   Q    Did you ever meet with anybody at the Texas State

17   Securities Board?

18   A    No.

19   Q    Do you know if -- do you know anybody who ever met with

20   anybody at the Texas State Securities Board concerning

21   Highland?

22   A    Yes.

23   Q    And who met with the Texas State Securities Board

24   concerning Highland?

25   A    Ronnie (phonetic) Patel.
```

002267

HCMLPHMIT00003315

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K     Document 84-72   Filed 09/04/25   Page 160 of 262     PageID 3429

Patrick - Direct                                    303

1    Q    And is that a lawyer?

2    A    Yes.

3    Q    Do you know who retained Mr. -- that lawyer?

4    A    Yes.

5    Q    Who retained that lawyer?

6    A    The DAF, the Charitable DAF Fund.  Or one of its entities.

7    Q    Okay.  And is it your understanding that the DAF Fund or

8    one of its charitable entities filed a complaint with the

9    Texas State Securities Board?

10   A    Yes.

11   Q    Okay.  Thank you very much.  Does Hunter Mountain owe any

12   money to Mr. Dondero?

13   A    No.

14   Q    Is there a promissory note that's outstanding that Mr.

15   Dondero has pursuant to which Hunter Mountain owes him $60-

16   plus million?

17   A    No.

18   Q    Who created Hunter Mountain?

19   A    Well, I don't recall specifically.  I just recall the

20   facts that, when Hunter Mountain was created, Thomas Surgent,

21   the chief compliance officer of Highland Capital Management,

22   who was representing the Dugaboy Investment Trust as well as

23   Highland Capital legally with respect to that transaction,

24   requested to Rand that the Hunter Mountain Investment Trust be

25   created for purposes of Highland filing its ADV with the SEC.

002268

HCMLPHMIT00003316

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 09/05/25   Page 161 of 262    PageID 3430
Exhibit 72   Page 305 of 390

Patrick - Direct                                304

1   It was my understanding that when the ADV would be filed, sort

2   of the ownership change would -- chain would stop at Hunter

3   Mountain.

4   Q    Okay.  Dugaboy is Mr. Dondero's family trust, correct?

5   A    No.  But I'll help you along.  Just please use the full

6   name of the trust.

7   Q    If I refer to the Trust, will you know that that's -- is

8   that for the Hunter Mountain Investment Trust, or do you want

9   me to use trust --

10  A    There's no entity called Dugaboy.  Just Dugaboy.  There's

11  not.

12  Q    Okay.

13  A    It's a shorthand.  I'm --

14  Q    Okay.  I'll refer to Dugaboy then, okay?

15  A    What are we referring to?

16  Q    The trust known as Dugaboy.

17  A    Okay.  Fair enough.  Go ahead.

18  Q    Okay.  Did Dugaboy contribute a portion of its ownership

19  interest in Highland to the Highland -- to the Hunter Mountain

20  Investment Trust?

21  A    Contribute?  No.

22  Q    Did it transfer?

23  A    Yes.

24  Q    And did it receive in exchange a promissory note from

25  Hunter Mountain?

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 09/09/25390 Page 162 of 262    PageID 3431

Patrick - Direct                   305

```
1   A    Yes, it did.

2   Q    Okay.  And Mr. Dondero is the lifetime beneficiary of

3   Dugaboy, correct?

4   A    Yes and no.  It's a placeholder -- a placeholder provision

5   that's never been used.

6            MR. MCCLEARY:  Your Honor, pardon me.  Pardon me.

7   Objection, relevance, Your Honor.

8            THE COURT:  Relevance?

9            MR. MORRIS:  This is -- we've been told so many times

10  that Mr. Dondero has no interest in this case, he has nothing

11  to do with Hunter Mountain.  He's the lifetime beneficiary of

12  Dugaboy.  And if I --

13           THE WITNESS:  That provision has never been invoked.

14  He's received no money through that provision.

15           THE COURT:  Okay.  Just wait.  We're resolving --

16           MR. MORRIS:  Right.

17           THE COURT:   -- an objection at the moment.

18  BY MR. MORRIS:

19  Q    Can we turn to Exhibit 51?

20           THE COURT:  I'm still working on the objection.

21           MR. MORRIS:  I'm going to try and lay a foundation.

22  Okay?

23           THE COURT:  Okay.  So he's withdrawing the question.

24           MR. MCCLEARY:  He's withdrawing the question?  Okay.

25           THE COURT:  Okay.
```

002270

HCMLPHMIT00003318

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 09/09/25   Page 163 of 262    PageID 3432

Patrick - Direct                                    306

1  BY MR. MORRIS:

2  Q   You have a binder in front of you, sir.  Can you go to

3  Exhibit 51?

4           THE COURT:  And this is Highland's Exhibit 51?

5           MR. MORRIS:  Yeah.

6           THE COURT:  Okay.

7  BY MR. MORRIS:

8  Q   And is that a promissory note that was made --

9  A   Yes, it is.

10 Q   -- that was made by Hunter Mountain in favor of Dugaboy

11 back in 2015?

12          MR. MCCLEARY:  Objection, relevance, Your Honor.

13          MR. MORRIS:  I'm trying to connect Mr. Dondero to

14 Hunter Mountain.

15          THE COURT:  Okay.  Overruled.

16          THE WITNESS:  Yeah.  It's a secured promissory note

17 with the amount of approximately $62.6 million signed by

18 Beacon Mountain, LLC, --

19          MR. MORRIS:  Uh-huh.

20          THE WITNESS:  -- as administrator for Hunter Mountain

21 Investment Trust.

22 BY MR. MORRIS:

23 Q   Okay.  And as the -- what's your role with Hunter Mountain

24 today?

25 A   And it's in favor, just to answer your question, it's in

002271

HCMLPHMIT00003319

1   favor of the Dugaboy Investment Trust.  That's where I was

2   just being a little stickler --

3   Q    I appreciate that.

4   A     -- previously.  Sorry.

5   Q    I do.

6   A    Okay.  What is your question?

7   Q    What's your role with Hunter Mountain today?

8   A    I am the administrator.

9   Q    When did you become the administrator?

10  A    On or about August of 2022.

11  Q    Okay.  How did you become the administrator?

12  A    Through the acquisition of Rand Advisors.

13  Q    And does Hunter Mountain have any employees?

14  A    No.

15  Q    Does it have any operations?

16  A    No.

17  Q    Does it generate any revenue?

18  A    Not -- not currently.

19  Q    Okay.  Did it generate any revenue in 2022?

20  A    No.

21  Q    Does it own any assets?

22  A    Yes.

23  Q    What does it own?

24  A    It has -- it's my understanding it has a contingent

25  beneficiary interest in the Claimants Trust.

002272

HCMLPHMIT00003320

1   Q    And that's the only asset it has, right?

2   A    Correct.

3   Q    So that if it -- if that interest has no value, then

4   Hunter Mountain has no ability to pay the Dugaboy note.  Fair?

5   A    (sotto voce) If that interest has no value?

6        That is correct.

7   Q    Okay.

8            MR. MORRIS:  I move Exhibit 51 into evidence.

9            MR. MCCLEARY:  Your Honor, relevance.  Objection.

10           THE COURT:  Your response?

11           MR. MORRIS:  Mr. Dondero desperately needs Hunter

12  Mountain to win in this lawsuit because otherwise his family

13  trust will get nothing on this $63 million note.

14           THE COURT:  Okay.  Overrule the objection.  It's

15  admitted.

16       (Debtors' Exhibit 51 is received into evidence.)

17  BY MR. MORRIS:

18  Q    Neither you or any representative of Hunter Mountain has

19  ever spoken with any representative of Farallon, correct?

20  A    Correct.

21  Q    Neither you nor any representative of Hunter Mountain has

22  ever spoken with anybody at Stonehill, correct?

23  A    Correct.

24  Q    You have -- neither you nor Hunter Mountain have any

25  personal knowledge about a *quid pro quo*, correct?

HCMLPHMIT00003321

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 09/09/25   Page 166 of 262    PageID 3435

Patrick - Direct                                                309

1   A    (sotto voce)  Nor Hunter Mountain have any personal

2   knowledge about a *quid pro quo*.

3        Correct.

4   Q    Neither you nor anybody at Hunter Mountain have any

5   personal knowledge about how Mr. Seery's compensation package

6   was determined, correct?

7   A    Correct.

8   Q    Neither you nor anybody at Hunter Mountain had any

9   knowledge about the terms of Mr. Seery's compensation package

10  until the Highland parties voluntarily disclosed that in

11  opposition to the Hunter Mountain motion, correct?

12  A    No.  I --

13           MR. STANCIL:  Objection, relevance, Your Honor.

14           THE COURT:  Overruled.

15           THE WITNESS:  No.  I seem to -- I seem to have an

16  awareness that the performance fee was amended at a certain

17  time post-confirmation, or, you know, around the confirmation

18  time period.  And so that's with respect to the compensation.

19  I -- just myself.

20  BY MR. MORRIS:

21  Q    Can you tell Judge Jernigan everything you know or

22  everything you knew before receiving Highland's opposition to

23  this motion about Mr. Seery's compensation as the CEO of the

24  Reorganized Debtor at the Claimant Trustee?

25           MR. MCCLEARY:  Objection, Your Honor.  That's

HCMLPHMIT00003322

Case 19-34054-sjg11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-872   Filed 03/10/25   Page 167 of 262   PageID 3436

Patrick - Direct                            310

 1  overboard and an unclear question.

 2          THE COURT:  Overruled.  He's gone through some

 3  specific things now.  I guess he's just trying to encompass

 4  anything we haven't covered.

 5          THE WITNESS:  Yeah.  I had a -- I personally had a

 6  general understanding that Mr. Seery's compensation changed

 7  after the claims trading to put in a performance-based-type

 8  measure.  But I do recall that it was always very -- it was

 9  unclear exactly the terms.

10  BY MR. MORRIS:

11  Q   Okay.  Did you learn anything else?

12  A   Such as?

13  Q   Just, did you ever learn anything else about Mr. Seery's

14  compensation package that you haven't testified to yet?

15          MR. STANCIL:  Your Honor, objection.  Vague.

16          THE COURT:  Overruled.

17          THE WITNESS:  No.

18  BY MR. MORRIS:

19  Q   Okay.  Neither you nor Hunter Mountain has any personal

20  knowledge whatsoever about any due diligence that Stonehill

21  did in connection with the purchase of claims, correct?

22          MR. MCCLEARY:  Your Honor, he's getting into

23  allegations in the complaint which involve attorney work

24  product, so we object on the basis of invading the attorney

25  work product.

002275

HCMLPHMIT00003323

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 07/02/25   Page 168 of 262   PageID 3437
Exhibit 72   Page 312 of 390

Patrick - Direct                311

1               THE COURT:  Overruled.

2               THE WITNESS:  Can you restate the question again?

3    BY MR. MORRIS:

4    Q    Yes, sir.  Neither you nor Hunter Mountain have any

5    personal knowledge as to what due diligence Stonehill did

6    before purchasing its claims in this case, correct?

7               MR. MCCLEARY:  Objection.  Attorney work product.

8    Invasion of that.  Could I --

9               THE COURT:  I just ruled.

10              MR. MCCLEARY:  I understand.

11              THE COURT:  I just --

12              MR. MCCLEARY:  Could I have a running objection to

13   this line of questioning on that basis, Your Honor, invasion

14   of attorney work product?

15              THE COURT:  Why don't you explain why it's attorney

16   work product.  I'm missing --

17              MR. MCCLEARY:  Because they might -- he would have

18   knowledge from the efforts and investigation through attorneys

19   in the case.  I assume he's not asking -- you can't separate

20   that, potentially.  So he's getting into attorney work

21   product.

22              MR. MORRIS:  I'm asking for facts.

23              THE COURT:  He's asking for facts.  I overrule.

24   BY MR. MORRIS:

25   Q    Can you answer the question, sir?

HCMLPHMIT00003324

1  A    Yeah.  I'm not aware -- I'm not personally aware of how

2  much work Farallon did, or Stonehill.

3  Q    You have no knowledge whatsoever about the diligence

4  Stonehill did before purchasing its claims, correct?

5  A    Well, I would generalize now is that they did nothing.

6  Q    And that's on the basis of Mr. Dondero's testimony,

7  correct?

8  A    I would just call it on a basis of our general inquiry,

9  which would be including, in part, Mr. Dondero's testimony.

10  Q    What else are you relying upon for your conclusion that

11  you just described other than Mr. Dondero's?  What other

12  facts?

13  A    Yeah, we -- yeah, we have not uncovered any facts that

14  indicated that they did conduct any due diligence of any sort.

15  Q    Okay.  And are you -- do you have any personal knowledge

16  as to what Farallon did in connection with its due diligence

17  prior to buying its claim?

18  A    Yeah.  We have not been able to find any facts that would

19  suggest that Farallon conducted any due diligence of any kind.

20  Q    Okay.

21         MR. MORRIS:  One second, Your Honor.

22      (Pause.)

23  BY MR. MORRIS:

24  Q    Who's paying Hunter Mountain's legal fees?

25  A    Hunter Mountain is paying -- is legally obligated and

HCMLPHMIT00003325

1   paying its own legal fees.

2   Q   If it generates no income and its only assets is the

3   interest in Highland, where is it getting the funds to pay

4   legal fees?

5          MR. MCCLEARY:  Objection, Your Honor.  This is

6   irrelevant and invades the attorney-client privilege.

7          MR. STANCIL:  Your Honor, I'm happy to read a Fifth

8   Circuit case that says the identity of a third-party payer of

9   attorneys' fees is not privileged.  I would refer them to *In*

10  *re Grand Jury Subpoena*, 913 F.2d 1118, a 1990 Fifth Circuit

11  case.  I can read from Judge Jones' opinion, but you tell me

12  how much you want to hear on this.

13         THE COURT:  Okay.  I overrule your objection.  He can

14  answer.

15         THE WITNESS:  There is a settlement agreement by

16  Hunter Mountain Investment Trust as well as the Dugaboy

17  Investment Trust that provides for the payment of attorney

18  fees.

19         MR. MORRIS:  No further questions, Your Honor.

20         THE COURT:  Okay.  Cross?

21         MR. MCCLEARY:  Yes, Your Honor, briefly.

22                    CROSS-EXAMINATION

23  BY MR. MCCLEARY:

24  Q   Mr. Patrick, how would you describe Mr. Dondero's

25  relationship with Hunter Mountain Investment Trust today?

002278

HCMLPHMIT00003326

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 03/05/25    Page 171 of 262    PageID 3440

Patrick - Cross                    314

1    A    None.

2    Q    You were asked some -- let me ask you about litigation,

3    and litigation involving the sub-trust.  Has Hunter Mountain

4    been involved in litigation with Mr. Kirschner?

5    A    Yes.

6    Q    Okay.  And what is your understanding of Mr. Kirschner's

7    role?

8              MR. MORRIS:  Your Honor, while I would love for them

9    to continue --

10             MR. MCCLEARY:  He's the --

11             MR. MORRIS:   -- to use their time, I object that

12   it's beyond the scope of my examination.  They passed on the

13   witness.  They rested their case.  He should be limited to the

14   scope of my inquiry.

15             THE COURT:  Okay.  How does this tie to direct?

16             MR. MCCLEARY:  Your Honor, it -- just very generally.

17   This is --

18             THE COURT:  Okay.  I need to know how it ties to the

19   direct.

20             MR. MCCLEARY:  This doesn't tie directly to the

21   direct, Your Honor.

22             THE COURT:  Then it's beyond the scope, you

23   acknowledge?

24             MR. MCCLEARY:  Yes, Your Honor.

25             THE COURT:  Okay.  Sustained, then.

002279

HCMLPHMIT00003327

```
 1              MR. MCCLEARY:  Okay.

 2   BY MR. MCCLEARY:

 3   Q    Mr. Patrick, has Hunter Mountain Investment filed any

 4   litigation as a plaintiff other than its efforts to be a

 5   plaintiff in this lawsuit and its action as a petitioner in

 6   the Rule 201 matter earlier this year in Dallas state court?

 7   A    The 202.

 8   Q    202, yes.

 9   A    No, it has not.

10   Q    All right.  And then it's -- has it been a party, then, to

11   any other litigation other than the efforts to file this

12   action, the Rule 202 action, and has it been a defendant in

13   any lawsuits?

14   A    To my understanding, no.

15   Q    Is it involved as a defendant in the Kirschner litigation?

16   A    Yes.

17   Q    Mr. Kirschner is suing Hunter Mountain; is that correct?

18   A    That is correct.

19   Q    Okay.  So, is Hunter Mountain a vexatious litigant?

20              MR. MORRIS:  Objection, Your Honor.  This is now

21   really beyond the scope.  We're not doing -- this is -- we're

22   not doing it.  I'm not letting -- because there's a vexatious

23   litigant motion pending now in the district court right now

24   before Judge Starr.  This has nothing to do with anything I

25   asked.
```

002280

HCMLPHMIT00003328

Patrick - Cross                          316

```
1              THE COURT:  Okay.

2              MR. MCCLEARY:  They're trying to draw --

3              THE COURT:  You've already asked him is it a party in

4    any other litigation besides the 202 and this attempted one,

5    so where are we going with this?

6              MR. MCCLEARY:  Well, they're just trying to draw Mr.

7    Dondero into this and -- this vexatious litigant argument, and

8    we're just developing the fact that obviously Hunter Mountain

9    has only filed -- attempting to file this action and a Rule

10   202 proceeding.  So they're not involved in a lot of

11   litigation and they're not a vexatious litigant.

12             THE COURT:  Okay.  I think I'll sustain that and we

13   can just move on.

14             MR. MCCLEARY:  Okay.  Then I'll pass the witness.

15   Thank you, Your Honor.

16             THE COURT:  Okay.  Any redirect?

17             MR. MORRIS:  No, thank you, Your Honor.

18             THE COURT:  All right.  You are excused, Mr. Patrick.

19        (The witness steps down.)

20             THE COURT:  Anything else?

21             MR. MORRIS:  Just a time check for both sides and

22   let's get to closings.

23             THE COURT:  Okay.  Caroline?

24             THE CLERK:  Movant has 23 minutes left and the

25   Respondents have 47.
```

002281

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 07/09/25   Page 174 of 262   PageID 3443

317

```
 1                THE COURT:  23 and 47.  Any other evidence from the

 2    Respondents?

 3                MR. MORRIS:  That is a fair question.

 4          (Discussion.)

 5                MR. MCCLEARY:  Your Honor, I just want to confirm

 6    that all the exhibits that they did not object to have been

 7    admitted into evidence.

 8                THE COURT:  All right.  Well, let me --

 9                MR. MCCLEARY:  We do offer them.

10                MR. MORRIS:  Oh.

11                THE COURT:  Hang on.

12                MR. MORRIS:  Did I get Exhibit 45, Your Honor?

13                THE COURT:  Just a moment.  I'm doing two things at

14    once here.  45 is in.

15                MR. MORRIS:  Okay.

16                THE COURT:  All right.  On HMIT's exhibits, okay,

17    first, as we all know, 29 through 52 are carried until -- if

18    we have another hearing with the experts.

19          (HMIT's Exhibits 29 through 52 carried.)

20                THE COURT:  I'm showing we have -- and speak up if

21    anyone questions this -- I show that we have Hunter Mountain

22    Exhibits 3 and 4, and then 7 through 10, 12 through 23, and 26

23    through 38, and 53 through 57, 64, 65, and then 67 through

24    seventy --

25          (HMIT's Exhibits 3, 4, 7-10, 12-23, 26-38, 53-57, 64, 65,
```

002282

HCMLPHMIT00003330

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 03/09/25390  Page 175 of 262    PageID 3444

318

1    67-70 are received into evidence.)

2            MR. MCCLEARY:  Your Honor, I apologize.  From 36 --

3    26 to 32 are in?

4            THE COURT:  I believe that was part of the

5    stipulation, Mr. Morris, right?

6            MR. MCCLEARY:  Yes.

7            MR. MORRIS:  I think that's right.

8            THE COURT:  Okay.

9            MR. MORRIS:  We really didn't object to very many.

10           THE COURT:  Yes.

11           MR. MCCLEARY:  That would be 25, too.  That would

12   include 25?

13           MR. STANCIL:  No.  Objection.  25 is not --

14           THE COURT:  It's not admitted.

15           MR. STANCIL:  It's not in evidence.

16           THE COURT:  25 and 24 were not admitted.

17           MR. MORRIS:  Correct.  Those are my emails.

18           THE COURT:  Okay.  So --

19           MR. MCCLEARY:  25 is an article.

20           THE COURT:  Your 25 was John Morris Email Re: Text

21   Messages dated March 10, 2023.

22           MR. MCCLEARY:  Okay.

23           THE COURT:  Okay.  I can't remember where I left off.

24   I think I left off -- I'll just repeat after the expert

25   exhibits that are carried.  I've admitted 53 through 57.  I

HCMLPHMIT00003331

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-01876-K Document 84-72 Filed 03/20/25 Page 176 of 262 PageID 3445

319

1  have admitted 64, 65, 67 through 71.

2       (HMIT's Exhibit 71 is received into evidence.)

3       Now, I'm not sure if I ended up admitting 72. That was

4  the articles. I can't remember if you stipulated on that

5  finally.

6            MR. MORRIS: I said they --

7            MR. MCCLEARY: They had no objection.

8            MR. MORRIS: -- they come in --

9            THE COURT: Not for the truth of the matter asserted.

10           MR. MORRIS: -- self -- exactly.

11           THE COURT: Okay.

12           MR. MORRIS: Self-authenticating.

13           THE COURT: So 72 is in.

14           MR. MCCLEARY: Okay.

15      (HMIT's Exhibit 72 is received into evidence.)

16           THE COURT: Then we had some pleadings. I think 73,

17  74, 75 are in, but again, not for the truth of the matter

18  asserted in any advocacy on 73 and 74. And then 77, 78, 79

19  are in. And that's it.

20      (HMIT's Exhibits 73, 74, 75, 77, 78, and 79 are received

21  into evidence.)

22           MS. DEITSCH-PEREZ: Your Honor, I didn't make an

23  appearance, but I was taking notes (inaudible).

24           MR. MCCLEARY: Your Honor, I believe 80 should be in.

25           MR. MORRIS: No objection to 80. It's on our -- it's

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 03/20/25   Page 177 of 262   PageID 3446

320

```
 1    part of our Exhibit 5.

 2            THE COURT:  Okay.  80 is in.  Admitted.

 3        (HMIT's exhibit 80 is received into evidence.)

 4            MR. MORRIS:  Yeah.  That's really Section A of that

 5    thing that I gave you this morning.

 6            THE COURT:   If Ms. Deitsch-Perez wants to consult

 7    with the Hunter Mountain lawyers, she can.  I don't know --

 8            MR. MORRIS:  Can I go through quickly mine, Your

 9    Honor?  Because we actually never had the opportunity to put

10    our exhibits in.

11            THE COURT:  Okay.  Let's make sure we're to --

12            MR. MORRIS:  Okay.  I'm sorry.  I'm sorry.

13            THE COURT:   -- closure on the Hunter Mountain

14    exhibits.

15            MR. MORRIS:  I'm sorry.

16            THE COURT:  Anything I said that you disagree with?

17    I don't think --

18        (Pause.)

19            THE COURT:  Okay.  Let's hurry up.  What is the

20    controversy?

21            A VOICE:  Roger?  The Court's addressing you.

22            MR. MCCLEARY:  Oh.  Excuse me, Your Honor.  So, just

23    a little unclear of whether you have Exhibits 21 through 25

24    admitted.

25            THE COURT:  I have 21, 22, and 23.  Not 24.  Not 25.
```

002285

HCMLPHMIT00003333

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/20/25390   Page 178 of 262   PageID 3447

321

```
1    Okay.  Anything else?
2              MR. MCCLEARY:  Okay.  Then we do offer 24 and 25.
3              THE COURT:  You offered them.  I did not admit them.
4              MR. MCCLEARY:  Okay.  76.  I believe -- was that --
5    you're carrying?
6              MS. DEITSCH-PEREZ:  Carried.
7              MR. MCCLEARY:  You're carrying that?
8              THE COURT:  Okay.  I carried that and --
9              MR. MCCLEARY:  It's part of the expert issue.
10             THE COURT:  Okay.  Yes, part of the expert.  So it's
11   carried.
12       (HMIT's Exhibit 76 is carried.)
13       (Pause.)
14             MR. MCCLEARY:  I understand you've admitted 53
15   through 83, although some of them have now not been approved.
16             THE COURT:  All right.  Well, we need to clarify.  58
17   through 63, you think you offered them and I admitted them,
18   but not for the truth?  I remember that being discussed for 58
19   through 63.  Are you actually offering them?
20             MR. MCCLEARY:  Yes.  58 through 63.
21             THE COURT:  All right.  And Mr. Morris, you
22   ultimately agreed that yes, but not for the truth of the
23   matter asserted?
24             MR. MORRIS:  That's right, Your Honor.
25             THE COURT:  Okay.  So they are admitted.  Okay.
```

HCMLPHMIT00003334

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 03/29/25   Page 179 of 262   PageID 3448

322

1       (HMIT's Exhibits 58 through 63 are received into

2   evidence.)

3           THE COURT:  And then there was an objection to the

4   Mark Patrick declaration for the same thing, not for the truth

5   of the matter asserted.

6           MR. MORRIS:  Exactly.

7           THE COURT:  But you agree as long as it's --

8           MR. MORRIS:  Correct.

9           THE COURT:  Okay.  So what that means is, to recap,

10  53 through 75 are admitted, although some of those are only --

11  they're not for the truth of the matter asserted.  And then 77

12  through 80 are admitted.  Okay?

13          MR. MCCLEARY:  And 76?  We offered 76.

14          THE COURT:  That's -- we carried it.  We carried it.

15  It relates to the expert.

16          MR. MCCLEARY:  Carried it.

17                        (Pause.)

18          MR. MCCLEARY:  Thank you, Your Honor.

19          THE COURT:  Okay.  Now let's straighten out

20  Highland's exhibits.  So, I'm showing 1 through 16 have been

21  admitted, and then 25 through 31-A?

22          MR. MORRIS:  25 through 31-A?

23          THE COURT:  I'm sorry.  Yes.  25 through 31-A.

24          MR. MORRIS:  Okay.

25          THE COURT:  And then 34.  And then 39, 40, 41, and

002287

HCMLPHMIT00003335

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 03/24/25    Page 180 of 262    PageID 3449

323

1  then 45.  51, 59, and 60.

2          MR. MORRIS:  Okay.  So I'm going to do my best not to

3  burden the Court.  I'm trying to focus.  We move for the

4  admission into evidence of Exhibit 32, which is Mr. Dondero's

5  objection to the HarbourVest settlement.  And the reason that

6  we're offering it is because he made no mention of any concern

7  at all that the settlement implicated material nonpublic

8  inside information.

9          THE COURT:  All right.  Any objection?

10          MR. MCCLEARY:  32?

11          THE COURT:  Uh-huh.

12          MR. MCCLEARY:  Yes, Your Honor.  Relevance and

13  hearsay.

14          THE COURT:  Overruled.  And I can take judicial

15  notice of it in any event.

16      (Debtors' Exhibit 32 is received into evidence.)

17          MR. MORRIS:  We move for the admission into evidence

18  of Exhibit 33, which is the recent letter from the Texas State

19  Securities Board declining to take any action after conducting

20  an investigation of the Dugaboy complaint.

21          THE COURT:  Okay.  Any objection?

22          MR. MCCLEARY:  We object on the grounds of relevance,

23  403, hearsay, and authenticity, Your Honor.

24      And I also, I think it's important that the decision by a

25  regulatory body has no bearing on this cause of action or the

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 03/25/390   Page 181 of 262    PageID 3450

324

1    colorability of this claim, and the Texas State Securities

2    Board will tell you that.  This is completely and utterly

3    irrelevant to your inquiry, Your Honor.

4            THE COURT:  Okay.  I overrule the relevance

5    objection.  Certainly, it goes to colorability.  It's some

6    evidence.  It's some evidence.  A regulatory body did not

7    choose to go forward --

8            MR. MCCLEARY:  But that could be for --

9            THE COURT:   -- on the complaint.

10           MR. MCCLEARY:  That could be for reasons entirely

11   unrelated.

12           THE COURT:  True, true.  It's some evidence.

13           MR. MORRIS:  That's speculation.

14           MR. MCCLEARY:  Not for this.

15           THE COURT:  But what is the authenticity objection?

16           MR. MCCLEARY:  Well, there's no demonstration.  I

17   don't believe they sponsored that with anyone.

18           THE COURT:  Pardon?  Say again?

19           MR. MCCLEARY:  They didn't sponsor that with anyone.

20           MR. MORRIS:  Your Honor, I actually -- if they really

21   put me to it, because I was reading the Rules of Evidence in

22   the wee hours of the morning, I am certain that there's an

23   exception for government documents and government statements

24   and government decisions.

25           MR. STANCIL:  Your Honor, as to its authenticity, I

HCMLPHMIT00003337

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/20/25390   Page 182 of 262   PageID 3451

325

1   could produce a witness from Highland who said they got it, if

2   that's really what we're doing.  That it's the letter, they

3   got it from the TSSB, if we're really doing authenticity.

4           MR. MCENTIRE:  Well, first of all, it's hearsay and

5   there is no authenticity issue and it's irrelevant.  I

6   understand --

7           MR. STANCIL:  What is the authenticity issue, Mr.

8   McEntire?

9           THE COURT:  I'm trying to understand the authenticity

10  issue.  You think this is a --

11          MR. STANCIL:  Do you think it's a real letter or a

12  fake letter?

13          MR. MCENTIRE:  Well, first of all, I'm going to

14  address the Court and not you, okay?

15      Your Honor, --

16          THE COURT:  Well, address by speaking in a --

17          MR. MCENTIRE:  Yeah.  Thank you.

18          THE COURT:  Okay.  I'm just saving the court reporter

19  from grief, okay?

20          MR. MCENTIRE:  It is hearsay, and it is hearsay that

21  is calculated to be misrepresented or mischaracterized because

22  it's utter speculation as to the basis for their decision.

23  And if it's -- utter speculation is the basis of your

24  decision, it has no reason to come in.  There's no --

25          THE COURT:  What you're telling me, it goes to the

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 03/07/25390   Page 183 of 262   PageID 3452

326

1   weight of the evidence.  Okay?

2          MR. MCENTIRE:  Your Honor, --

3          THE COURT:  Okay.  You're not telling me it's

4   inadmissible hearsay.

5          MR. MCENTIRE:  Well, it is inadmissible hearsay.

6          MR. MORRIS:  Can I just, for one second?

7          THE COURT:  Please.

8          MR. MORRIS:  Paragraph 34 of their motion, Your

9   Honor.  Quote, "The Court also should be aware that the Texas

10  State Securities Board opened an investigation into the

11  subject matter of the insider tradings at issue, and this

12  investigation has not been closed.  The continuing nature of

13  this investigation underscores HMIT's position that the claims

14  described in the attached adversary proceeding are plausible

15  and certainly far more than merely colorable."

16     They used the investigation to try to convince you that

17  their claims are colorable, and now we have a letter saying

18  there's nothing.

19         THE COURT:  Okay.  You want to explain that to me?

20         MR. MCENTIRE:  Well, we put no evidence in, in this

21  proceeding --

22         THE COURT:  You put what?

23         MR. MCENTIRE:  We have put no evidence in, in this

24  proceeding, --

25         THE COURT:  You filed a pleading under Rule 11

HCMLPHMIT00003339

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 03/28/5390   Page 184 of 262   PageID 3453

327

1    suggesting this was highly relevant, right?

2         MR. MCENTIRE:  We filed a motion.  Yes, we did.

3         THE COURT:  Under Rule 11.

4         MR. MCENTIRE:  Yes.  Of course we did.

5         THE COURT:  Okay.

6         MR. MCENTIRE:  Of course we did.

7         THE COURT:  Suggesting this Texas State Securities

8    Board complaint and investigation was highly relevant.

9         MR. MCENTIRE:  The fact that it had opened an

10   investigation and was conducting an investigation is

11   irrelevant.  Its decision to stop the investigation without

12   further elaboration or clarification, this is why it calls for

13   utter speculation.

14        MR. MORRIS:  Your --

15        THE COURT:  Okay.  Do you have the hearsay exception

16   that applies?  I'm looking at my evidence rules right now for

17   the government record or public record.  Is it 803(8) that we

18   need to have addressed here?

19        MR. STANCIL:  803(8), Your Honor.

20        A VOICE:  Yeah, public records.

21        THE COURT:  Okay.

22        MR. STANCIL:  Public record.  Sets out --

23        THE COURT:  Public records, 803(8), hearsay

24   exception.  Moreover, you pled allegations suggesting this

25   investigation was really relevant.  So I overrule your

HCMLPHMIT00003340

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 09/29/25    Page 185 of 262    PageID 3454
Exhibit 72    Page 329 of 390

328

1   objection, and so that means 33 is admitted.

2        (Debtors' Exhibit 33 is received into evidence.)

3            MR. MORRIS:  Thank you, Your Honor.  I continue.

4   Exhibit 36 --

5            MR. MCENTIRE:  Which one was that?

6            MR. MORRIS:  That was 33.

7        So now we're up to 36, Your Honor.  I'm going to skip some

8   of these.

9            THE COURT:  Okay.

10           MR. MORRIS:  But this is just the Court's order

11  approving Mr. Seery's original --

12           THE COURT:  I'm waiting for any objection for the

13  record.  Do we have an objection, Mr. McCleary?

14           MR. MCCLEARY:  36, relevance, Your Honor.

15           MR. MORRIS:  The relevance is that this Court

16  approved without objection Mr. Seery's compensation package in

17  an amount that included a base salary of $150,000, which the

18  Claimant Purchasers and the independent director saw fit to

19  continue.

20           THE COURT:  Objection overruled.  It's admitted.

21       (Debtors' Exhibit 36 is received into evidence.)

22           MR. MORRIS:  I think 38 may be on their list.  Yeah,

23  38 is in as their 26, right?  So that should be admitted.

24           THE COURT:  Admitted.

25       (Debtors' Exhibit 38 is received into evidence.)

HCMLPHMIT00003341

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 09/09/25   Page 186 of 262    PageID 3455

329

1              MR. MCCLEARY:  If it's on our list, we agree.

2              THE COURT:  Okay.  It's admitted.

3              MR. MORRIS:  That's it, Your Honor.

4              THE COURT:  Okay.  Do you all need a five-minute

5     break before we do closing arguments?

6              MR. MORRIS:  I'd be grateful.

7              THE COURT:  Okay.

8              MR. MCCLEARY:  Yes, Your Honor.  Thank you.

9              THE COURT:  Will do.

10             THE CLERK:  All rise

11        (A recess ensued from 5:49 p.m. to 5:57 p.m.)

12             THE CLERK:  All rise.

13             THE COURT:  All right.  Please be seated.

14        We're back on the record in the Highland matter.  Closing

15    arguments.  Just for everyone's benefit, time -- you said 47

16    minutes and 23 minutes back several minutes ago, and then we

17    had all the housekeeping stuff.  So I'm not sure if that's

18    where we are right now or if --

19             MR. MCENTIRE:  I'm waiting for my monitor guy to be

20    here.

21             THE COURT:  Okay.  Okay.

22        So Caroline, is it still 47 and 23?

23             THE CLERK:  Yes.

24             THE COURT:  That's when we started the housekeeping

25    stuff.

002294

HCMLPHMIT00003342

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/30/25   Page 187 of 262   PageID 3456

330

1              MR. MCENTIRE:  So 27 minutes?

2              THE COURT:  Twenty-three.

3              THE CLERK:  Twenty-three.

4              MR. MCENTIRE:  Twenty-three?  Can I get a five-minute

5    warning, please?  Would you pull up the PowerPoint?  And let's

6    go to Slide 39.

7          May I proceed, Your Honor?

8              THE COURT:  You may.

9    CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT TRUST

10             MR. MCENTIRE:  So, before I go to the PowerPoint, I'd

11   like to kind of give a high-altitude overview of the situation

12   as I see it from the evidence perspective.  We don't believe

13   this should have been an evidentiary hearing.  Evidence has

14   been allowed.

15         We had a situation where, if you believe Mr. Dondero's

16   testimony as contrasted with Mr. Seery's testimony, you have a

17   credibility issue.  So the Court is now conducting an inquiry

18   presumably on the basis in part on the credibility of

19   witnesses.  And if you engage -- and if you want to indulge

20   that type of inquiry, the credibility of witnesses, without

21   allowing the Plaintiff in this case or the Movant in this case

22   to conduct some level of meaningful discovery, I would suggest

23   we have been deprived of due process, because without

24   documents to test Mr. Seery's statements, we are being

25   deprived of something that's basically very fundamental in our

002295

HCMLPHMIT00003343

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 03/22/590   Page 188 of 262   PageID 3457

331

1   judicial process.

2        And therefore, it underscores our argument and our

3   rationale why this shouldn't be an evidentiary hearing,

4   because I don't believe the Court can consider credibility

5   issues.

6        We have, on the one hand, unequivocal notes from Mr.

7   Dondero prepared contemporaneously that would suggest that

8   someone admitted to him and stated to him that they did in

9   fact obtain material nonpublic information.  Mr. Seery says

10  that didn't happen.  I specifically said, is that a lie?  Yes,

11  it's not true.  Well, that's a real problem, because that's

12  not the criteria that this Court should use for determining

13  whether we have a colorable claim.  A colorable claim is

14  whether there is some possibility.  It's something less, even

15  less stringent than a 12(b)(6) standard, plausibility.  We

16  have that.

17       If you look at our pleadings, we have set forth all of the

18  facts we need, all the elements we need to establish a trade

19  on material inside information, nonpublic information.  We

20  have evidence -- we have allegations that there was no due

21  diligence.  And Farallon's lawyer stood up here -- well, I'm

22  not going to really address that today.  But if there was any

23  day to address it, it was today.  We have no evidence to

24  suggest they did do due diligence.  Even Mr. Seery said, I

25  don't know what due diligence they did.  We have evidence to

HCMLPHMIT00003344

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/09/25   Page 189 of 262   PageID 3458

332

 1   suggest that the only due diligence they did was to talk to

 2   Mr. Seery, who has told -- who told them that this is very

 3   valuable, don't -- this is a really good -- a good investment

 4   here, it's a lot better than the 71 percent that's on our

 5   disclosures.

 6        And Judge, that evidence supports the colorability of the

 7   claim.  And if you go down the pathway of saying, well, I'm

 8   not sure about Mr. Dondero because he had been held in

 9   contempt two years ago, that's a real problem.  That's a

10   problem for this Court.  And I'm going to suggest that's why

11   this should have been a four-corners deliberation.  Even

12   Farallon and Stonehill suggest this should be a four-corners

13   deliberation.

14        We have evidence now of no due diligence.  We have

15   evidence before you that suggests that they did learn about

16   MGM before the announcement date.  We have evidence that Mr.

17   Seery did trade on -- did -- was aware and received

18   information of material nonpublic information.  And for him, a

19   CEO of his reputed stature, to sit here and say that was not

20   material and that was nonpublic defies common sense.  It

21   defies reasonableness.  That goes to credibility.

22        Mr. Dondero's notes speak volumes.  The trades themselves

23   speak volumes.  Mr. Dondero established that the interest --

24   return of interest here is to be less than one -- it's in the

25   one digits, and hedge funds trade in the 30, 40, 50 percent

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 08/04/25   Page 190 of 262   PageID 3459

333

1   range.  Well, if that's the case, we have Farallon walking

2   away from a return on the exit financing of 13 percent, and

3   that wasn't good enough for him.  How could six percent be

4   good enough for him?  There's something missing here.  There's

5   something not right.

6       And we're entitled to get our lawsuit on file and do some

7   discovery.  And if they want to do a 12(b)(6), they do a

8   12(b)(6).  If they want to do a Rule 56 after discovery, they

9   could do a Rule 56, all in this Court.  But to address this

10  threshold issue now based upon this, what happened here today,

11  is a fundamental denial of due process.

12      I'd like to go to my pleadings.

13      Can you go to Slide 39, please?

14      First of all, let there be no doubt -- 39.  Slide 39.  38.

15  38, please.

16      We can plead on information and belief.  We have a right

17  to plead on information and belief.  And the Fifth Circuit --

18  that is an acknowledged procedural practice in the Fifth

19  Circuit.  And if some of our allegations are based upon

20  information and belief, so be it.  The test here is not at

21  this stage.  The test here is whether I have sufficient

22  factual allegations, whether on information and belief or

23  otherwise, to satisfy at most a plausibility standard.  That's

24  it.

25      And if they want to challenge us at a later date, they

HCMLPHMIT00003346

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/30/25   Page 191 of 262   PageID 3460

334

1   can.  Rule 56.  12(b)(6).  Or standing.  But we have standing.

2   We have standing.  We have standing under Delaware law.  We're

3   a contingent beneficial interest that has standing under

4   Delaware law and all other law.  All -- even Texas agrees that

5   a contingent interest has standing, an inchoate interest as

6   Mr. Seery described.  A property interest.  You have property

7   interest, you have standing.

8            THE COURT:  Let me ask you.

9        And Caroline, turn the clock off when the Court

10   interrupts.

11        Just so you know, I mean, my analysis here is standing

12   first.  Does your client have standing?  Because we all know

13   that's a subject matter jurisdiction inquiry and I have to

14   explore that first.  And then I've said many times the legal

15   standard question for colorability.  That's kind of the second

16   place I go --

17            MR. MCENTIRE:  Sure.

18            THE COURT:  -- if I find there's standing.  But can

19   you tell me, have there been appellate decisions that are

20   relevant today on standing?  Contrary to what people may

21   expect, I don't follow every appellate decision from every

22   appeal in the Highland case.  Okay?  I wait until I get a

23   mandate --

24            MR. MCENTIRE:  Sure.

25            THE COURT:  -- to where I have to act on something.

**002299**

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 08/08/25    Page 192 of 262    PageID 3461

335

1              MR. MCENTIRE:  Sure.

2              THE COURT:  So I feel like I've learned at some point

3    that some either district judge or Fifth Circuit said some

4    party didn't have standing.  And I don't know if it was Hunter

5    Mountain or some other trust.

6              MR. MCENTIRE:  Not --

7              THE COURT:  And is there anything they said that, if

8    it wasn't Hunter Mountain, could be relevant here?

9              MR. MCENTIRE:  I hope somebody kicks me if I'm wrong,

10   what I'm about to say.  I'm not aware of any such issue --

11             THE COURT:  Okay.

12             MR. MCENTIRE:  -- dealing with Hunter Mountain

13   Investment Trust.  I am not.

14             THE COURT:  But any other party that might somehow

15   bear on this case?

16             MR. MORRIS:  I apologize, Your Honor, I was

17   distracted.  For which issue?

18             THE COURT:  Standing.  Because I was saying my first

19   thing I've got to tackle in ruling on this is standing of

20   Hunter Mountain.  And I seem to remember learning that either

21   the district court on an appeal or the Fifth Circuit on some

22   appeal from Highland --

23             MR. MORRIS:  Correct.

24             THE COURT:  -- said some party didn't have standing.

25             MR. MORRIS:  Correct.

002300

HCMLPHMIT00003348

```
1              THE COURT:  And I don't know if it was --

2              MR. MORRIS:  Dugaboy on the 2015.3, for sure, was a

3    Fifth Circuit standing decision.

4              THE COURT:  Okay.

5              MR. MORRIS:  I think there was a district court order

6    that preceded that.

7              THE COURT:  Okay.

8              MR. MORRIS:  That was the subject of the appeal.

9              THE COURT:  The Dugaboy --

10             MR. MORRIS:  2015.3.

11             THE COURT:   -- motion to require those --

12             MR. MORRIS:  Yeah.

13             THE COURT:  -- 2015.3 statements.  Okay.

14             MR. MCENTIRE:  So what we have here -- we can go back

15   on the clock if you'd like.

16             THE COURT:  Yes, please.

17             MR. MCENTIRE:  How much time do I have?

18             THE CLERK:  You have just under 16 minutes.

19             MR. MCENTIRE:  Sixteen?  Okay.  Give me a two-minute

20   warning.  Sorry.

21        Your Honor, what we have here --

22             THE COURT:  I don't think the U.S. Supreme Court

23   justices will give you a two-minute warning, but maybe I'm

24   wrong.

25             MR. MCENTIRE:  Would you give me a two-minute
```

002301

HCMLPHMIT00003349

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 09/08/25    Page 194 of 262    PageID 3463

337

1    warning, please?

2            THE COURT:  And I'm sure not a Supreme Court justice.

3            MR. MCENTIRE:  What we have here is we have a 99.5

4    percent equity interest that has now been relegated to a

5    category of contingent interest, which we don't believe we

6    should be, and that's part of our declaratory judgment relief

7    we're asking for, which we have standing to do that at a

8    minimum because we want to be treated like a Class 9.

9        If they want to treat us like a Class 10, I have an

10    argument for that, and it's more than colorable.  It's

11    persuasive.  It's -- it is a winning argument.  And that is we

12    do have standing in our individual capacity, and we have given

13    you a whole bunch of cases in our PowerPoint, or we will give

14    you a whole bunch of cases in our PowerPoint and in our

15    briefing to support that.

16        We also have given you Delaware case law that says we have

17    standing under Delaware trust law to bring a derivative action

18    against the Trustee.  We have done everything appropriate

19    here.

20        We have the -- a demand upon Seery obviously would be

21    futile to prosecute the claim.  A demand upon the Oversight

22    Board would be futile to make a demand on Muck and Jessup,

23    because they're Defendants and they're SPEs of Farallon and

24    Stonehill.  And a demand upon Mr. Kirschner would be futile.

25    They suggest that there's an assignment of some sort, but that

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 06/09/25    Page 195 of 262    PageID 3464

338

1    would be a modification -- of the claims over to the

2    Litigation Trust, but that would be a modification of the

3    plan.

4        There's been no assignment of this claim, or these claims,

5    to the Litigation Trust Trustee.  But even if there had been,

6    we pled that in the alternative as well.  And it would be

7    futile to make a demand on Mr. Kirschner because he's suing

8    Hunter Mountain.

9        So we are an appropriate party.  The only, then, issue

10   becomes whether or not we have standing under Delaware law to

11   bring a derivative action.  And we have briefed that and we --

12   and that's included in our PowerPoint.  The answer is yes.

13       I'd like to go briefly to Page -- next slide.

14       In our factual section, we set forth why this investment

15   would defy any kind of rational economic sense in the absence

16   of material nonpublic information as a factual allegation

17   supported by data, supported by dates, supported by time.

18       Based upon that, we also have allegations that are framed

19   around the admissions that Mr. Michael Linn provided.  We have

20   allegations that he turned down a 30 or 40 percent premium in

21   our petition.  We have allegations that they admitted that

22   they did no due diligence.  We have allegations that they

23   admitted that they got material -- basically information about

24   MGM.

25       And again, it's not all about MGM.  It's about the values

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/09/25   Page 196 of 262   PageID 3465

339

1  of all the portfolio companies.  They want to make it about

2  MGM.  If they do, we win.  But it's much broader than that.

3      And we have standing to bring this claim because if we're

4  right Mr. Seery will have to return excess compensation and

5  the Claims Purchasers will have to disgorge.  And that's going

6  to help not just Hunter Mountain.  That's going to help other

7  creditors who haven't been paid yet.

8      So this is not exclusively -- Hunter Mountain would

9  substantially benefit.  I'm not suggesting otherwise.  But it

10 also benefits innocent stakeholders other than Hunter

11 Mountain.  And that's why we are an appropriate party.  We

12 don't have a conflict of interest to bring this.  Everybody on

13 their side of the table does.  There's no one else who could

14 bring this.

15     Your Honor, it's very clear when the trades took place.

16 We give dates and times.  It's very clear that -- next slide,

17 40.  It's very clear that their investment was over $160

18 million.  If it isn't, I don't see any denials.  All we got

19 today was a lame statement from the lawyer saying we're not

20 here today to deny this.

21         MR. MORRIS:  I'm offended.

22         THE COURT:  He's offended by being called lame.

23         MR. MCENTIRE:  Not you lame personally.

24         MR. MORRIS:  Oh, thanks for the clarification.

25         THE COURT:  Okay.

HCMLPHMIT00003352

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 04/09/25    Page 197 of 262    PageID 3466

340

 1              MR. MCENTIRE:  A lame statement by you.  In fact, it

 2    wasn't even you, so --

 3         In any event, Your Honor, --

 4              MR. MORRIS:  I've been called worse.

 5              MR. MCENTIRE:  -- the point being is that there was

 6    no -- there's not -- never been an attempt to deny the factual

 7    allegations in our pleadings dealing with Farallon and

 8    Stonehill.  None at all.

 9         And so -- not that that's ultimately relevant, because

10    that's an evidentiary issue outside of the four corners of our

11    pleading, but it does -- it just stands out and screams.  It

12    screams.  And it screams volumes.

13         So right, now based upon our pleadings -- we even plead in

14    Paragraph 42, Paragraph 42, exactly what they invested.  This

15    is what you have before you.  No one has disputed it.  It's in

16    the four corners of our pleading.  We've got dates, times,

17    amounts.  We have admissions to Mr. -- well, we have

18    admissions from Michael Linn, Paragraph 47.  We have -- we do

19    plead upon information and belief the *quid pro quo* on

20    compensation.  And frankly, the evidence here today is that

21    the compensation is excessive.  And the experts will further

22    confirm that it is excessive.  $1.8 million with a bonus

23    program in place to pay him another $8, $9, $10 million, when

24    in fact the risks don't exist and there's no uncertainty and

25    therefore the percentages make no sense.  That's --

HCMLPHMIT00003353

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 04/22/25390   Page 198 of 262   PageID 3467

341

1          THE COURT:  What do you mean, the risks don't exist

2     and there is no uncertainty?

3          MR. MCENTIRE:  If Mr. Seery is telling Farallon and

4     Stonehill don't sell, this could be really valuable, it's

5     inconsistent with the notion that the schedule and the

6     performance -- performance schedule in the compensation

7     agreement is rationally justified.  Because if it's really

8     certain or it's likely you're going to make a lot of money,

9     there's no reason to give him six percent to incentivize him

10    because it's already a done deal.

11         And the whole point here is that I scratch your back, you

12    scratch mine.  They make a lot of money on their deal and he

13    gets a lot of money on the backside post-effective date.

14    Post-effective date.

15         Next slide, 49.

16         It would have been impossible, based upon the publicly-

17    available information in Paragraph 49, impossible for

18    Stonehill and Farallon, in the absence of inside information,

19    to forecast any significant profit when they made their

20    investments.  It's not possible.  Because given the amount of

21    the Claim 8 and Claim 9 claims -- they actually invested in

22    Claim 9 with a zero return.  It's projected to be a negative

23    result.  On Claim 8, even if you allocate their entire

24    purchase price to Claim 8, they're going to get something less

25    than a 10 percent return paid out over a couple years.  Nobody

HCMLPHMIT00003354

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-72   Filed 09/03/25   Page 199 of 262   PageID 3468

342

1   invests that kind of money in an unsecured creditor asset that

2   hasn't been collateralized.  There's something wrong here.

3       And we have a right to have our day in court to show that.

4   We have our right to take a true deposition of Mr. Seery with

5   documents.  We have a right to take Farallon and Stonehill's

6   deposition with documents.  And we have tried to get

7   information and we have been turned down at every turn.  We

8   have a right to have our day in court, Your Honor.

9       We have allegations of excessive compensation.  I know Mr.

10  Morris suggested the other day that we didn't have any such

11  allegations.  They're here.  The whole idea here is that Mr.

12  Seery would really profit on the backside.  And, you know, he

13  actually testified, I believe -- I won't do that because

14  that's outside the four corners of our pleading.  But the --

15  there is a *quid pro quo*.  We allege there's a *quid pro quo*

16  upon information and belief.  And we also allege willfully and

17  knowingly, we allege conduct that falls clearly within the

18  exceptions.

19      None of this -- none of these claims were released.  Mr.

20  Seery's not an exculpated party in the context of how we --

21  proposing to sue him here.  None of the protected parties, to

22  the extent that Muck and Jessup claim to be protected parties,

23  they're not protected here, because all of the claims we're

24  making are on the basis of willful misconduct and bad faith,

25  which are the standards that they used and incorporated in the

HCMLPHMIT00003355

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 34-172   Filed 08/09/25   Page 200 of 262   PageID 3469

343

1  plan and in the gatekeeper provisions.

2      How much time do I have?

3          THE CLERK:  Right now you have --

4          MR. MCENTIRE:  Thirty seconds?

5          THE CLERK:  -- seven minutes left.

6          MR. MCENTIRE:  Okay.  Next slide, please.

7      Mr. Seery has admitted that he has a duty to avoid self-

8  dealing.  We allege that he did self-deal.  There is clearly a

9  relationship.  We have a right to explore the depths of that

10  relationship.  Well, already we know there is a relationship.

11  We have investments in charities, contributions to charities,

12  meet-and-greets, congratulatory emails.  It's not as if

13  Farallon and Stonehill are strangers, or Mr. Seery's a

14  stranger to them.  It's not like that at all.  They contacted

15  him to get involved.

16      And by placing -- by acquiring these claims -- and by the

17  way, this is the most significant trading activity in your

18  bankruptcy, in this bankruptcy proceeding.  Post-confirmation.

19  Post-confirmation.  By acquiring these claims, they were

20  guaranteed to be put onto the Oversight Board.  By acquiring

21  these claims, they were guaranteed to be put in a position --

22  into a position where they would adjust, monitor, compensate

23  Mr. Seery.  That's the terms of the Claimant Trust.  Those are

24  the terms.

25      And it's interesting, because one of the amendments that's

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/05/25   Page 201 of 262   PageID 3470

344

1    in evidence to the plan, I think it's either the third or the

2    fourth amendment, that came out of nowhere right before

3    confirmation, they changed the structure of the Claimant Trust

4    to go off a standard base pay and added in a bonus structure

5    at the last minute.  That's evidence.

6        Mr. Seery has acknowledged, we have alleged he had duties

7    to avoid self-dealing, to always look out for the best

8    interests of the estate, to avoid conflicts of interest.

9    Well, here, to the extent that there is a *quid pro quo*, he is

10   self-dealing and he has injured the Reorganized Debtor and

11   he's injured the Claimant Trust, because that's just less

12   money.

13       And we also allege, Your Honor, it's also an allegation

14   that --

15           THE COURT:  And let me ask, the sole injury here is

16   compensation was more than it would have been if not for the

17   sale of the claims to Farallon and Stonehill --

18           MR. MCENTIRE:  That's one of the injuries.

19           THE COURT:  -- and therefore less money at the end of

20   the day for creditors and ultimately Hunter Mountain?

21           MR. MCENTIRE:  Yes.  And we also allege that, as part

22   of this arrangement, conspiracy, as we allege conspiracy, we

23   have seen over $200 million flow out of the coffers of this

24   estate in the form of --

25           THE COURT:  What do you mean, as a result of the

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 03/09/25390 Page 202 of 262   PageID 3471

345

1   alleged conspiracy?  What do you mean?

2         MR. MCENTIRE:  A delay, a postponement, making long-

3   term payouts, keeping the litigation alive.  They actually

4   suggested to Mr. Linn, don't settle these claims, don't sell

5   out, because this is asset-backed, and we also have claims.

6   And so --

7         THE COURT:  Wait, what?  Say again?

8         MR. MCENTIRE:  One of the things that Mr. Linn told

9   Mr. Dondero, according to Mr. Dondero's notes, is we have --

10  this is very valuable, we're buying assets and we're buying

11  into claims, the litigation claims that are being asserted in

12  this bankruptcy proceeding.

13        THE COURT:  Yes.  Got it.

14        MR. MCENTIRE:  Yeah.  And so the whole idea here is,

15  is that people are funneling money in and taking money out of

16  the coffers of this estate to fuel future litigation in order

17  to have a bigger payday at the end for Class 8 and Class 9.

18  That's exactly what those notes suggest.

19        THE COURT:  I don't understand the correlation.  What

20  correlation are you making?  Because of the claims being

21  purchased, what?

22        MR. MCENTIRE:  The claims being purchased allow Muck

23  and Jessup to be in a position to award compensation.  We've

24  talked about that.

25        THE COURT:  I got that.

HCMLPHMIT00003358

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/09/25   Page 203 of 262   PageID 3472

346

 1            MR. MCENTIRE:  That's one type of injury.  The other

 2   injury is, and we have alleged it, is the fact that these

 3   claims become very valuable not only because they're asset-

 4   backed but because also the litigation claims that Mr.

 5   Kirschner is prosecuting.

 6            THE COURT:  But how does the purchase of the claims

 7   impact that?  They were allowed claims at certain amounts

 8   before, and after the purchase they're still allowed claims.

 9            MR. MCENTIRE:  Mr. Seery is telling them that,

10   basically, this is our plan, this is what we're doing, this is

11   --

12            THE COURT:  That was the plan of reorganization that

13   was confirmed by the Court.  I don't get how something

14   changed.  I'm trying to get to what are the injuries that your

15   client has suffered.  And I get the compensation argument

16   you're making, but I don't get the rest of it.

17            MR. MCENTIRE:  If Mr. Dondero had been in a position,

18   or one of his entities had been in a position, or even Hunter

19   Mountain, and I'm not sure why Hunter Mountain -- be in a

20   position to have acquired the claims, then we would -- this

21   bankruptcy wouldn't even be in existence anymore.  It'd be

22   over.  All creditors would be paid.  It would be done.  Be

23   over.  And that is an allegation we have made --

24            THE COURT:  How do I know that?

25            MR. MCENTIRE:  Because all the creditors would have

HCMLPHMIT00003359

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 09/08/25   Page 204 of 262   PageID 3473

347

1  been paid off.

2          THE COURT:  How do I know, if he would have purchased

3  the claims, that's what would have happened?

4          MR. MCENTIRE:  Well, that's what he testified to

5  today here.  I don't want to get off on a rabbit trail.

6          THE COURT:  I'm trying to understand the injury, --

7          MR. MCENTIRE:  Sure.  I understand.

8          THE COURT:  -- because that's part of my analysis

9  here.

10          MR. MCENTIRE:  The focus, the focus is on the

11  compensation.  And once they aid and abet, once they aid and

12  abet a breach of fiduciary duties, they are subject to

13  disgorgement, and disgorgement of all of their ill-gotten

14  gains.  And the ill-gotten gains are now well over --

15  approaching over $100,000 million.

16          THE COURT:  How do you get to that number?

17          MR. MCENTIRE:  Easily.  We know how much they

18  purchased, which has never been denied.  We know how much has

19  been distributed to Class 8.  And we know what percentage of

20  Class 8 they own.  They own about 95 percent of all Class 8

21  claims.  So if $270,000 million has been distributed to Class

22  8, they got 90 percent of that, 95 percent of it has already

23  gone to them, Farallon and Stonehill.

24          THE COURT:  But it would have gone to the sellers of

25  the claims as well.  I'm trying to make the connection.

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 06/09/25    Page 205 of 262    PageID 3474

348

1          MR. MCENTIRE:  That's not the injury.  The injury is

2     what -- that is a consequence of their conduct.  The injury is

3     the compensation.  All right?  That's a distinct injury.  They

4     are subject to disgorgement as a consequence because they have

5     done wrong, and the law should not tolerate -- should not

6     tolerate and allow wrongdoers to get away.  And that's where

7     the unjust enrichment and disgorge --

8          THE COURT:  And what are your best cases for that,

9     that they would have to disgorge --

10          MR. MCENTIRE:  We have cited --

11          THE COURT:   -- the Purchasers would have to disgorge

12     --

13          MR. MCENTIRE:  We have cited cases in our brief.

14          THE COURT:  I'm asking you now to --

15          MR. MCENTIRE:  I don't have them in front of me right

16     this second.  But an aider and abettor --

17          THE COURT:  The *CVC* case, is that your best case?

18          MR. MCENTIRE:  I don't have the cases in front of me.

19     I can say this, that the case law is robust, and I can supply

20     you --

21          THE COURT:  It is not robust.  That's why I'm asking

22     you to zero in.  I read your *CVC* case from the Third Circuit,

23     and I'm wondering, is that your strongest case?

24          MR. MCENTIRE:  No.  I think we -- I think we have a

25     lot of strong cases.  I'm not sure that it is the strongest.

HCMLPHMIT00003361

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 09/09/25    Page 206 of 262    PageID 3475

349

1          THE COURT:  Tell me which ones, so I --

2          MR. MCENTIRE:  Ma'am, I just said I don't have it in

3   front of me.  If you'll look --

4          THE COURT:  Okay.  Well, this is closing argument

5   where you present law in support of your position.

6          MR. MCENTIRE:  Well, actually, I'm arguing facts

7   right now.  But Your Honor, what I want to tell you is if

8   you'd like me to submit a letter brief on that, I will.

9          THE COURT:  No.

10          MR. MCENTIRE:  Okay.  Then I won't.  It's in my

11   brief.  All of our authorities are in the brief.

12       In conclusion, --

13          THE COURT:  Okay.  So that was the *CVC* case from the

14   Third Circuit which dealt with an insider who purchased

15   claims, statutory insider, a board member, a 28-percent equity

16   owner, who purchased claims during the case to be in a

17   position to file a competing plan and didn't disclose to the

18   board or file a 3001(e) notice.  Okay.  There was -- claims

19   shouldn't be allowed at more than what the purchaser paid for

20   it.

21          MR. MCENTIRE:  Okay.

22          THE COURT:  Okay.  I'm asking you, is that your best

23   case?  Because you also cited *Adelphia*, which seemed kind of

24   factually off the mark.  And so I really --

25          MR. MCENTIRE:  I -- I'm sorry, --

HCMLPHMIT00003362

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 05/19/25   Page 207 of 262   PageID 3476

350

```
1              THE COURT:  I need to know, because I've made clear
2    from the beginning, --
3              MR. MCENTIRE:  Yes.
4              THE COURT:   -- I'm struggling with how is there a
5    cause of action related to claims trading.
6              MR. MCENTIRE:  (chuckles)
7              THE COURT:  I don't know why you're giggling.  This
8    is --
9              MR. MCENTIRE:  No, I'm not.  But --
10             THE COURT:   -- serious stuff.  Okay?
11             MR. MCENTIRE:  Agreed.  Agreed.
12             THE COURT:  A bankruptcy estate is being charged ka-
13   ching, ka-ching -- not bankruptcy estate -- the post-
14   confirmation trust.  Ka-ching, ka-ching, ka-ching.  So this is
15   serious stuff.
16             MR. MCENTIRE:  Agreed.
17             THE COURT:  I need to, you know, colorable claim.
18             MR. MCENTIRE:  Agreed.
19             THE COURT:   Colorable claim.
20             MR. MCENTIRE:  Agreed.
21             THE COURT:  Even if plausibility is the standard,
22   which I've expressed my doubt about that, how do you have a
23   plausible claim?  What is your best case?
24             MR. MCENTIRE:  Okay.  This --
25             THE COURT:  Just to recap what I'm focused on,
```

HCMLPHMIT00003363

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 03/02/25390 Page 208 of 262   PageID 3477

351

1   purchaser and seller, okay?  I can see where breach of

2   contract, maybe some sort of torts between those two.  Okay.

3   I can see where the U.S. Trustee, the SEC, I don't know, the

4   Texas State Securities Board, they might get concerned about

5   allegations of insider trading and there might be a regulatory

6   action.  But the estate?  Again, the post-confirmation trust

7   --

8           MR. MCENTIRE:  Okay.

9           THE COURT:  -- and a contingent beneficiary.  I'm

10  trying to understand what is the best legal authority that

11  might support a colorable claim.  And we talked about the *CVC*

12  case and *Adelphia*.  I'm trying to figure out what are other

13  cases you think I should really hone in on to understand this.

14          MR. MCENTIRE:  All right.  At the very beginning this

15  morning, during my opening statement, I had said this is not

16  your typical claims-handling case, because I recall from our

17  last conference you asked that question a couple of times.

18  This is not your typical claims-handling case.  And it's not a

19  typical claims-handling case because we have a fiduciary that

20  we claim breached his duties that were owed to the estate.

21  And he self-dealt.  And he -- this has nothing to do with the

22  plan.  This has something to do with what Mr. Seery did

23  outside the corners of the plan.  Perhaps he used the plan

24  expediently.  He self-dealt.

25      That's why this is not just between a seller and a buyer

HCMLPHMIT00003364

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 05/09/25   Page 209 of 262   PageID 3478

352

1   of a claim.  That's number one.

2       We have been denied an opportunity to discover the

3   communications between the sellers and the buyers, and my

4   guess is we have big boy agreements that prevent the sellers

5   from ever coming back at anybody for fraud.  My expectation,

6   that's the case.  We should have a right to go explore that.

7   So that's why they're not here.

8           THE COURT:  Why?  I mean, what would that tell you?

9   What would that tell you?

10          MR. MCENTIRE:  That --

11          THE COURT:  If there's a big boy agreement, if

12  there's not, what --

13          MR. MCENTIRE:  It would tell us --

14          THE COURT:   -- consequence would that have for this

15  --

16          MR. MCENTIRE:  It would tell us --

17          THE COURT:   -- proposed lawsuit?

18          MR. MCENTIRE:  It would answer Mr. Morris's question

19  that he's raised several times, this is the seller's issue,

20  this is not -- this is not the Hunter Mountain's issue.  It is

21  Hunter Mountain's issue.  Hunter Mountain as an equity

22  interest-holder should be in a position to be certified as a

23  Class 9 beneficiary now pursuant to our declaratory judgment

24  action.  That's number one.

25      Number two.  As a contingent beneficiary, it is entitled

HCMLPHMIT00003365

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 06/20/25    Page 210 of 262    PageID 3479

353

1    to protect its interests and bring suits if it sees that

2    something has happened that is incorrect and is a tort

3    involving the Reorganized Debtor and the Claimant Trust.  That

4    is the nature and the essence of our claim.

5        And as a consequence, the aiders and abettors should not

6    be allowed to walk away unharmed.  They should be required to

7    disgorge their ill-gotten profits.  And that calculation is

8    easily done, as I've just demonstrated.

9        Your Honor, that's all I have.  Thank you very much.

10            THE COURT:  Thank you.

11            MR. MCENTIRE:  And we talked -- we'd need an

12   opportunity to argue on the issue of experts, because --

13   whether you're just going to take it under advisement, I'm not

14   sure how you're going to handle that.

15            THE COURT:  I'm going to read the pleadings and then

16   I'm going to let you all know are we coming back for another

17   day.

18            MR. MCENTIRE:  Thank you.

19            THE COURT:  All right.  Who is making the closing

20   argument -- do we have three closing arguments?

21            MR. STANCIL:  Yes.

22            MR. MCILWAIN:  We're going to do it in reverse order.

23            MR. MORRIS:  Reverse order in.

24            THE COURT:  Okay.  Reverse order of --

25            MR. STANCIL:  Keep it interesting.

HCMLPHMIT00003366

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 05/05/390 Page 211 of 262    PageID 3480

354

1                    MR. MORRIS:  I think I was last on the opening.

2                    THE COURT:   -- importance?

3          (Laughter.)

4                    THE COURT:  No.  Just kidding.  Just kidding.

5                    MR. MORRIS:  We're assuming you remember what the

6     original order was.

7                    MR. STANCIL:  Yeah, right, right.

8                    MR. MORRIS:  It was so many hours ago.

9                    THE COURT:  Okay.  Oh, so many hours ago.

10                   MR. MCILWAIN:  I think I was referred to earlier as

11    the lame lawyer.

12                   THE COURT:  Oh, you were.  I think --

13                   MR. MCILWAIN:  So I'll start.  I think --

14                   THE COURT:  I think you --

15                   MR. MCILWAIN:  Or maybe it was the lame argument,

16    whatever.  Whatever.

17                   THE COURT:  I think you were the lame one.

18          CLOSING ARGUMENT ON BEHALF OF THE CLAIM PURCHASERS

19                   MR. MCILWAIN:  Your Honor, Brent McIlwain here for

20    the Claim Purchasers.

21          Let me start, I guess, by saying I understand now why

22    Hunter Mountain did not want to put on evidence, because the

23    evidence that they put on, frankly, made their case much

24    worse.

25          As we argued or we stated in the opening statement, our

HCMLPHMIT00003367

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/09/25   Page 212 of 262   PageID 3481

355

1   position is that you can look within the four corners of this

2   document and determine that there is no plausible or colorable

3   claim.  What the evidence showed is that Mr. Dondero allegedly

4   had a call with one -- with Farallon, not with Stonehill, with

5   Farallon, Farallon wouldn't tell him what they paid, Farallon

6   did not accept an offer of 130 or 140 percent of whatever they

7   paid for the claim, and he thinks they did no due diligence,

8   right?  He had nothing in his notes about MGM.  So he can say

9   that he thought that they were positive because of MGM, but

10  it's certainly not -- I don't think the Court should take that

11  evidence with any credibility.

12      But interestingly, what Mr. Dondero says is, well, how do

13  you know how much they paid for these claims?  He goes, well,

14  there was a market for the claims, right?  They were all

15  trading at 50 or 60 cents.  But yet no one would ever buy

16  these claims without any due diligence because the projections

17  in the plan indicate that they wouldn't -- they wouldn't get a

18  return.

19      Well, if there's a market for the claims and he's willing

20  to pay 30 or 40 percent more than whatever someone purchased,

21  certainly there is a market for the claims.  And he is the

22  only one, frankly, that had inside information.  That's why he

23  was willing to maybe pay more.

24      Or, alternatively, the case that you were describing

25  before, Mr. Dondero maybe wanted to buy the claims so he could

HCMLPHMIT00003368

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 06/20/25    Page 213 of 262    PageID 3482

356

1    control the case, right, so he could dismiss any litigation

2    that was pending against himself so he could avoid the ire of

3    the estate that is aimed at him.

4         It also -- the Court's inquiry as to what the injury is I

5    think is precisely on point.  The only injury offered at this

6    point really is that somehow my client's agreed-to higher

7    compensation that is reasonable or appropriate in return for

8    some inside information on claims that were allegedly trading

9    at 50 or 60 cents in any instance.  And what the evidence

10   showed is that, one, Mr. Dondero never had any information

11   about that, about the compensation that Seery is receiving

12   when this complaint was filed, when this motion for leave was

13   filed.

14        And so if you judge the complaint within the four corners,

15   there is no -- there is no *quid pro quo*, right?  Because he

16   says, well, there's obviously something up here because they

17   wouldn't have bought these claims without due diligence, and

18   they must have agreed to higher compensation, and that's why

19   it all happened.  And if we throw all this out here, then

20   we'll get to do the discovery that we wanted to do.

21        Importantly, if you look at his notes, right, the first

22   thing that's written down is discovery to follow, because

23   that's how he operates.  That's how a serial litigator

24   operates.  Discovery to follow so that I can pay you back for

25   not selling your claim to me.  Right?  So I can't control the

HCMLPHMIT00003369

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 05/30/25   Page 214 of 262   PageID 3483

357

1   world, so I can't control this case, you're going to pay.  And

2   we're all paying.  Every one of us here.  Right?  There's 15

3   lawyers in the courtroom and probably 10 on the phone, right?

4   We're all paying.

5       And so when Mr. McEntire says I'm not getting my day in

6   court, we've had an entire day in court.  We've had three

7   hearings to decide what this hearing is going to be.  And he's

8   gotten more than his day in court for, frankly, what is word

9   salad.  This complaint doesn't pass any test, whether it's

10  12(b)(6) or under the *Barton* Doctrine.  It's simply

11  allegations that are thrown out there, and they're saying, so

12  that we can do more discovery to determine if we actually have

13  allegations.  Because they want to continue to harass people,

14  they want to continue to be a thorn in everyone's side, so

15  that perhaps they can avoid further litigation against Mr.

16  Dondero or they can convince somebody to settle with Mr.

17  Dondero.

18      It doesn't make any sense, Your Honor, and this is exactly

19  why there is a gatekeeper provision, right.  That's why the

20  Court imposed this.

21      And you ask yourself, why would someone sell these claims?

22  Obviously, the sellers of the claims have not shown up.

23  Whether they're big boy, it doesn't matter, because the Court

24  and this estate had nothing to do with those sales.  But they

25  haven't shown back up.  I can -- I can venture a guess why, if

002322

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/59/05390 Page 215 of 262   PageID 3484

358

1   I was involved with Mr. Dondero, I would sell my claim, right?

2   Because I wouldn't have to be here.  And that's exactly why

3   the Court should not authorize this complaint to be filed and

4   the gatekeeper provision of the order should prevent it.  And

5   frankly, this should be shut down and we should not have to

6   have continued litigation over experts, or anything else, for

7   that matter.  And frankly, we should just be able to go on and

8   let Mr. Seery do his job.

9        Because I think the evidence was pretty clear that his

10  compensation is reasonable and it was in line, frankly, with

11  what he was making before.  And candidly -- and maybe it's

12  because Mr. McEntire is not involved in bankruptcy cases, but

13  this is similar compensation that I see in numerous cases, and

14  it's tiered to incentivize Mr. Seery to do his job, and he's

15  doing his job.

16       So, with that, Your Honor, I'll cede the rest of the time

17  to the other parties.

18            THE COURT:  Okay.  Thank you.

19       CLOSING ARGUMENT ON BEHALF OF JAMES P. SEERY, JR.

20            MR. STANCIL:  Thank you, Your Honor.  I'm going to

21  focus -- and I'm going to put my little clock up so Mr. Morris

22  doesn't, you know, give me the hook here.

23            THE COURT:  Okay.

24            MR. STANCIL:  But first --

25            THE COURT:  Next time we're all here, maybe I'll have

HCMLPHMIT00003371

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/09/25   Page 216 of 262   PageID 3485

359

```
 1   one of those red, what do you call them, the buzzer.

 2           MR. STANCIL:  Oh, the big light?

 3           THE COURT:  The red light.

 4           MR. STANCIL:  We used to joke that the judge I

 5   clerked for wished he had a trapdoor and he could just pull

 6   the lever when it was done.

 7           THE COURT:  Okay.

 8       (Laughter.)

 9           MR. STANCIL:  Maybe I shouldn't have put that in your

10   head.

11           THE COURT:  Who was that?  Are we going to say who

12   that was?

13           MR. STANCIL:  So Your Honor, I'm going to try to set

14   the legal framework.  I'm going to ask you -- and I think we

15   have our -- we have the deck.  It's the little -- if we could

16   put that up and start on Slide 2.

17       I'd like to address what standard applies, and then I'd

18   like to spend a few minutes asking Your Honor again not only

19   to rule on multiple alternative grounds, but also I'd like to

20   walk through what if you did this on a pure 12(b)(6), because

21   it's going to collapse.

22       So, well, we'll just jump in.  I said at the beginning

23   that we know that the question here is not what does the word

24   colorable mean in isolation.  We wouldn't do that in any

25   context.  We would always look and see what the operative
```

002324

HCMLPHMIT00003372

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 14-72    Filed 06/20/25390  Page 217 of 262    PageID 3486

360

1   language here is in the Court's confirmation order.  So the

2   question is, what did the Court mean, it must represent a

3   colorable claim?

4        So we mentioned before Paragraph 80 of the confirmation

5   order.  That cites *Barton*.  It cites the vexatious litigant

6   cases.  I've not heard one word from Mr. McEntire answering

7   how it can be that we're here on a sub-12(b)(6) standard he

8   now says when the Court articulated this legal authority and

9   this legal basis in the confirmation order.  If he believed

10  that, the time to make that argument was on the confirmation

11  appeal, and that's over.

12       But let me then say, how did we get, how did the Court get

13  to Paragraph 80?  Well, that came after a series of factual

14  findings in the confirmation order -- in fact, actually, Josh,

15  do you have the hard copy of this?

16           MR. LEVY:  Yeah.

17           MR. STANCIL:  If I could hand that to the Court.

18       May I approach, Your Honor?

19           THE COURT:  You may.  Thanks.

20           MR. STANCIL:  And I don't propose to go through every

21  slide, Your Honor.

22           THE COURT:  Okay.

23           MR. STANCIL:  But if you could turn to Slide #5.

24  This is Paragraph 77 of the Court's confirmation order.

25  Factual support for gatekeeper provision.

HCMLPHMIT00003373

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-872   Filed 03/09/25   Page 218 of 262   PageID 3487

361

1          MR. MCENTIRE:  Excuse me.  May I have a copy?  I

2   can't see it.

3          THE COURT:  Oh.

4          MR. LEVY:  Oh, yeah, sure, sure.

5          MR. STANCIL:  And can we get a copy of yours as well,

6   --

7          MR. MCENTIRE:  Sure.

8          MR. STANCIL:  -- while we're at it?  Thanks.

9      The facts supporting the need for the gatekeeper provision

10  are as follows.  I will not read them all, but if you scroll

11  about eight lines down, it says, During the last several

12  months, Mr. Dondero and the Dondero-related entities have

13  harassed the Debtor, which has resulted in further

14  substantial, costly, and time-consuming litigation for the

15  Debtor.  And then there are six separate enumerated examples

16  of that.

17     Paragraph 78 on the next slide.  Findings regarding

18  Dondero postpetition litigation.  The Bankruptcy Court finds

19  that the Dondero postpetition litigation was a result of Mr.

20  Dondero failing to obtain creditor support for his plan

21  proposal and consistent with his comments, as set forth in Mr.

22  Seery's credible testimony, that if Mr. Dondero's plan

23  proposal was not accepted he would, quote, burn down the

24  place.

25     Next slide.  This is Paragraph 79.  Necessity of the

002326

HCMLPHMIT00003374

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/03/25   Page 219 of 262   PageID 3488

362

 1  gatekeeper provision.  If you would just skim to the bottom of

 2  that first column, it says, Approval of the gatekeeper

 3  provision will prevent baseless litigation designed merely to

 4  harass the post-confirmation entities charged with monetizing

 5  the Debtors' assets for the benefit of its economic

 6  constituents, will avoid abuse of the court system and preempt

 7  the use of judicial time that properly could be used to

 8  consider the meritorious claims of other litigants.

 9      And then came Paragraph 80, which we've just discussed.

10  With respect, Your Honor, the question is, what is the meaning

11  of Paragraph 80?  And in context, following those paragraphs

12  regarding vexatious litigation and abuse of litigation, it is

13  simply implausible to suggest that colorability is a sub-

14  12(b)(6) standard.

15      And that is Mr. McEntire's contention today, that the

16  gatekeeping order is actually lower than the threshold that

17  every other litigant faces.  Everyone else has to file a

18  claim, pass a 12(b)(6), and on they go to get to discovery.

19  Mr. McEntire believes that the gatekeeping order imposes less

20  than that on him, and then he's treated just like everybody

21  else.  It makes no sense whatsoever.

22      So I'll skip Slides 8 and 9, Your Honor, but that's where

23  the Fifth Circuit described the gatekeeping orders, affirmed

24  them in relevant part, citing *Barton*.  There is no mystery

25  here.

002327

HCMLPHMIT00003375

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 06/30/25   Page 220 of 262    PageID 3489

363

1       If you could flip, Your Honor, to Slide 10 very briefly.

2  We've talked about this case a little bit in one of our status

3  hearings, *In re Vistacare Group*.  This is the leading case

4  that describes what it is that one does under a *Barton*

5  analysis, and it says that the trustee must make a -- pardon

6  me -- a party seeking leave to sue a trustee must make a *prima*

7  *facie* case against the trustee, showing that its claim is not

8  without foundation.  A *prima facie* case is more than a

9  12(b)(6).

10      And I would direct Your Honor to the language in the third

11 bullet.  It involves a greater degree of flexibility than a

12 Rule 12(b)(6) motion to dismiss because the bankruptcy court,

13 which, given its familiarity with the underlying facts and the

14 parties, is uniquely situated to determine whether a claim

15 against the trustee has merit.  Boy howdy, are we -- I'm

16 sorry.  My kids are going to tease me for that.

17      But this -- no case has ever proved the wisdom of that

18 statement, Your Honor.  We are here, and the Court is all too

19 familiar with the facts and the parties of this case.  And

20 we're not here on an adversary proceeding.  We're here on a

21 contested matter.  And Your Honor has the authority on any

22 contested matter to take evidence, and a broad, broad

23 discretion as to what evidence is appropriate to meet that

24 standard.

25      So we have laid out briefly in Slide 11 what -- why we

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/20/25   Page 221 of 262   PageID 3490

364

1   believe that -- or how we believe that the *prima facie* showing
2   would work.  And in short -- and maybe this will help us going
3   forward -- we believe that if they make -- if a party seeking
4   relief under the gatekeeping order says things, we have the
5   right to rebut them, like in a burden-shifting or a burden of
6   production -- pardon me -- analysis.  So you can say that the
7   sun rises in the west, but we can bring in evidence to say it
8   doesn't, it rises in the east.  And that's the plausibility
9   threshold.

10   And here, and if Your Honor would flip to the next slide,
11   I'm not sure it's entirely fair to say, even after they have
12   purported to withdraw their evidence, that they've really done
13   so.  And we disagreed with Mr. McEntire, and advised him of
14   such leading up to this hearing, that we do not agree that his
15   redactions fully excise all of the evidentiary assertions from
16   his motion.

17   And I'll just pick one example here on Slide 12.  On the
18   left is Paragraph 32 of the motion for leave prior to the
19   purported withdrawal.  On the right is Paragraph 32 after the
20   withdrawal.  Your Honor will see all they've withdrawn are the
21   citations.  It's verbatim.  It's the same allegations.  And
22   they have argued various facts and put them in evidence.  So
23   even if it were true, and it's not, but even if it were true
24   that all you get here is a 12(b)(6) ruling in the ordinary
25   case if you put no evidence in dispute, they forfeited that

HCMLPHMIT00003377

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/20/25390 Page 222 of 262   PageID 3491

365

1    right by putting these facts and evidence in dispute in their

2    motion.

3        The fact that they have withdrawn evidentiary support for

4    their evidentiary assertions does not relieve them of the

5    reality that they have made all sorts of factual arguments in

6    their motion for leave, and as a contested matter we have the

7    right to address it.

8        I'm proposing, Your Honor, unless you have questions on

9    the cases on 13, 14, those are the cases where we have

10   described the hearings that have been held under *Vistacare* and

11   *Foster*, and I know more about the down-in-the-weeds of *Foster*

12   than I ever cared to, but I don't want to repeat what's in our

13   briefs.

14       If Your Honor is willing to flip to Page 15, this is an

15   argument I've alluded to briefly, but boy, we don't hear -- we

16   have not heard a single thing as to what function the

17   gatekeeper serves, particularly in context of Your Honor's

18   factual findings in the confirmation order, if all it means is

19   12(b)(6) or lower.  It just, it's an unanswerable point that

20   they just persist in ignoring.

21       But I'd like to address very briefly that third bullet,

22   because at various times and in their brief they have cited,

23   Hunter Mountain has cited, down here we call it *Louisiana*

24   *World*, I think in the Second Circuit we call it *STN*, but this

25   UCC derivative standing.  There are, in fact, two elements one

002330

HCMLPHMIT00003378

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 08/09/25390   Page 223 of 262   PageID 3492

366

1    has to pass for that, and that's a different context.  The

2    first is colorability as it's used in that context, and that

3    is often a 12(b)(6) standard in that context.  But still to

4    have standing, to bring that claim on behalf of the estate,

5    you have to show a cost-benefit analysis.  As we've heard

6    today, we've probably spent more in legal fees today, or over

7    the last three months, than the purportedly excessive

8    compensation to Mr. Seery.  And so I would respectfully

9    submit, if we were here on a *Louisiana World* or *STN* hearing,

10   this would be an open-and-shut case just as well.

11        So if I could, Your Honor, if you are willing to jump

12   ahead to Slide 17, I'd like to ask you -- and I do want to

13   address the standing jurisdictional question a little bit.

14            THE COURT:  Okay.

15            MR. STANCIL:  Not to get into the weeds of standing,

16   because I think we have briefed that out the wazoo in our

17   papers, and I read this morning -- I think it was this morning

18   -- from the Claimant Trust Agreement, which says they're not a

19   beneficial interest.

20        But my understanding is that Article III standing, whether

21   there is a theoretical injury in any way, that is -- that goes

22   to Your Honor's subject matter jurisdiction under Article III,

23   but that is not true of statutory standing under Delaware law

24   or prudential standing.  Those are -- those go to basically

25   whether they state a claim.

002331

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 06/09/25    Page 224 of 262    PageID 3493

367

1    So, Your Honor, I believe, can -- and I've confessed to my

2    colleague that the only way I remember this is I screwed it up

3    really, really badly when I was clerking years ago -- but I

4    believe Your Honor can, and in this case should, rule on the

5    standing ground in the alternative.  Not on the Article III.

6    Article III is binary.  They either have it or they don't.

7    But on the statutory standing, you can say -- I think you can

8    hold that they do not have standing under Delaware law to

9    pursue the claim, but even if they do have standing, and then

10   reach the remainder.

11   And we know we're headed for appeal.  We've heard --

12   pretty much two-thirds of the time this morning has been

13   laying the groundwork for an appeal.  And we would only like

14   -- we would like to make sure that we give the Fifth Circuit a

15   fulsome record.

16   So I would like to ask Your Honor to flip to Page 19.  And

17   this is really the end of, I think, what we need to do.  So,

18   Your Honor, what if we were here just on 12(b)(6)?  So we've

19   got a *quid*, we've got a *pro*, we've got a *quo*.  They fail at

20   each turn.  Let me spend most of my time on the *quid*.  I'll

21   let the documents of which the Court can take judicial notice

22   speak for themselves.  I will let the bare-bones nature of the

23   assertion -- and it's okay to put in a complaint something on

24   information and belief, but you still have to pass *Iqbal* and

25   *Twombly*.  I can't say upon information and belief that I was

HCMLPHMIT00003380

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/09/25   Page 225 of 262   PageID 3494

368

1   denied a starting position on the Knicks, right?  I would like

2   to believe that's the case, but it still has to be a plausible

3   allegation.

4       Let's look at this chart.  And this chart is taken right

5   out of our brief.  These are their numbers.  This is at the

6   bottom.  And I want to -- I would like to take head-on this

7   proposition that this is not a rational investment on their

8   numbers.

9       So let's take the Stonehill purchase of Redeemer.  They

10  paid $78 million to earn a projected profit, according to the

11  November 30 disclosure statement, of $19.71 million.  By my

12  arithmetic, that is a return of 25.27 percent.  Even by Mr.

13  Dondero's lights, that's a pretty good return.

14      I'm going to come back to why that's not the end of the

15  return, but let's look at the Farallon purchase of Acis.

16  Spent $8 million.  Projected profit, $8.4 million.  I'll take

17  105 percent return any day.

18      Let's look at the Farallon purchase of HarbourVest.

19  Purchase price, $27 million.  Projected profit, $5.09 million.

20  That is -- oh, I can't read my own writing anymore -- I think

21  that is 18.85 percent.  I would again gladly take that every

22  day of the week, whether it's a distressed asset or otherwise.

23      But let me make one really important point that Mr.

24  Dondero obfuscated, Mr. McEntire does not acknowledge, and it

25  is just a fact.  These are projected profits if all Mr. Seery

HCMLPHMIT00003381

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/09/25   Page 226 of 262   PageID 3495

369

1   does is hit the plan.  November 30, 2021.  If he does no

2   better than what he thought these assets were worth then, this

3   is the expected return.  So for those trades that we've talked

4   about, that's a slam dunk even on that.

5        But let's look about -- we'll talk about upside.  Because,

6   as Your Honor knows from doing bankruptcy cases, upside, it's

7   all about upside for people who are purchasing claims.  So it

8   isn't just that their returns were capped at these already-

9   ample percentages.  If Class 8, for example, of Redeemer paid

10  out in full, they would be making not -- oh, gosh, I'm not

11  sure I should do this on the fly -- but they'd be recovering

12  $137 million on the Class 8 claim, not the $97.71 million.  So

13  there's another $40 million of upside.

14       Even if it's a low-probability event, that's a -- hedge

15  funds do that all day every day.

16       Same here with Acis.  Paid $8 million, expected $16.4

17  million, but they could get up to $23 million.

18       Now, we've heard so much about how Class 9 was worthless,

19  worthless, worthless.  No, it's not.  There's always the

20  potential for upside.  Paid $27 million.  Could recover $45

21  million just on Class 8.  Could recover another $35 million on

22  Class 9.  They could recover $80 million on a $27 million

23  purchase.  Now, the probability of that is complicated, but

24  it's not zero.  We know that it's not zero.  All we've heard

25  from them today is that Mr. Seery is -- could pay off 8 and 9

002334

HCMLPHMIT00003382

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 07/02/25    Page 227 of 262    PageID 3496

370

1    in full.  So I don't think that is even remotely plausible.

2        Let's talk briefly about UBS.  They like to talk about UBS

3    for the projected profit of $3.61 million in loss.  But that

4    was -- that's in August, and that claim trades.

5        So a couple of things that happened between the November

6    30 disclosure statement setting that projected value and the

7    purchase of the UBS claim in August.  Number one is we are

8    nine, ten months past the worst of COVID.  And Your Honor

9    could take judicial notice of massive market movements just if

10   you do nothing.

11       We don't need to get to that, because we talked all

12   morning about MGM.  May 26th, it's announced publicly.  May

13   26, 2021.

14       So the notion that a purchaser of a UBS claim in the

15   summer of 2021, after this MGM transaction is announced, would

16   think, you know what, I think these claims are only worth what

17   they were worth back in November, is not plausible.

18       And so this is why the comparisons to the debt, the exit

19   financing, well, 12 percent.  That's a 12 percent capped

20   return.  We're talking here about returns of 25 percent, 105

21   percent, 18.85 percent, just based on projections at the --

22   sort of in the darkest days post-COVID.

23       So it's not plausible.  If a court were looking at this

24   just under the 12(b)(6) standard, we would be -- we'd be

25   dismissing this claim as well.  And we really -- respectfully,

HCMLPHMIT00003383

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 03/20/390 Page 228 of 262    PageID 3497

371

 1   Your Honor, we need that ruling.  We think we need that ruling

 2   so that whatever the -- whatever they may say the standard is

 3   in the Fifth Circuit, we only have to go one time.  And we

 4   really believe that we're entitled to that.

 5        I'll let Your Honor -- I will just stand on the deck and

 6   our briefs on the *pro* and the *quo*.  But meet-and-greets, these

 7   are just conclusory allegations in the complaint.  He says

 8   they worked -- that he worked for them 10 or 15 years ago,

 9   which some of that's not even true, but even if it were all

10   true, if I were beholden to every client I've met at a

11   schmooze fest or everybody I worked for in a group 20 years

12   ago or 15 years ago, you know, I would be incapable of

13   operating without a conflict of interest.  And it's just not

14   plausible.  This is something that needs to go.

15        Unless the Court has questions, I will cede the remainder

16   of our time to Mr. Morris.

17             THE COURT:  No questions.  Thank you.

18      CLOSING ARGUMENT ON BEHALF OF THE REORGANIZED DEBTOR

19             MR. MORRIS:  Thank you so much, Your Honor, for your

20   patience.  It's been a very long day.  I am very grateful that

21   we're going to finish today.

22        As I said at the beginning, I believe this exercise, as

23   difficult as it may have been, is so important and so vital,

24   preserving this estate and what's left of it.

25        The gatekeeper exists for very important reasons.  Your

HCMLPHMIT00003384

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 07/09/25   Page 229 of 262   PageID 3498

372

1   Honor made those findings in her order that has been upheld on

2   appeal.  And we're here to make sure that frivolous litigation

3   is not commenced against my clients, or, frankly, against

4   Stonehill and Farallon, given their capacity as Claimant

5   Oversight Board members.

6       Hunter Mountain confuses argument with facts.  There's no

7   facts here to support anything, and that's what the gatekeeper

8   is about.  The gatekeeper is making sure that there's a good-

9   faith basis to pursue claims.  And as Mr. Stancil points out,

10  it is certainly acceptable to state things upon information

11  and belief.  But the point of the gatekeeper is if somebody

12  says -- not somebody says -- somebody offers proof that those

13  beliefs are wrong, you no longer have a plausible claim.  And

14  that's why we thought it was so important to go through this

15  exercise today.  Because the facts show that their beliefs are

16  simply wrong, and the entire complaint is based on their

17  beliefs.

18      There is zero evidence concerning the compensation other

19  than their belief that the compensation is excessive.  The

20  case is over.  Like, you could stop there.  I'm going to go

21  through a bunch of things that -- you could stop there.

22      I want to actually begin backwards, though, in time, with

23  the HarbourVest settlement.  Right?  After two years of

24  litigation and re-litigation and re-litigation of the

25  HarbourVest settlement, the claims of insider trading, finally

002337

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 07/09/25   Page 230 of 262   PageID 3499

373

1   the Court has before it admissible indisputable evidence that

2   Mr. Seery negotiated the terms of the HarbourVest settlement

3   before he ever got this notorious email from Mr. Dondero.

4   That should be a finding of fact in Your Honor's order and it

5   should never be -- nobody should ever make that allegation

6   again.  It's over.  You have the documents.  You have the

7   email from Mr. Seery to the board, here are the terms, and

8   those are the terms Your Honor approved.

9        And there's more.  Because this is so important for us,

10  because we're tired of being accused of wrongdoing.  We're

11  tired of being falsely accused of wrongdoing.

12       $22-1/2 million.  That's the valuation Mr. Seery put on

13  it.  You can see that he's doing it to his Independent Board

14  colleagues, copying his lawyers.  He's telling them where he

15  got it, from Hunter Covitz.  The evidence is now in the

16  record.  It came from a regularly-published NAV report from

17  November 30th.  It was seven days old.  It can never be

18  disputed again that $22.5 million was a fair value, not based

19  on some subjective view of Mr. Seery but based on the person

20  who gave him the report that everybody relies upon that Mr.

21  Dondero got.

22       And it was ratified yet again in the audited financial

23  statements that came out, and it shows for the period ending

24  -- this is Exhibit 60, I believe -- for the period ending

25  December 31, 2020, $50 million.  Okay, so it went up a few

002338

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 03/09/25   Page 231 of 262   PageID 3500

374

1    million dollars in December.

2        This is their case?  This is the case?  Your Honor I know

3    is still working on the motion to dismiss.  That's Mark

4    Patrick, right?  That's the complaint that he brought.  That's

5    what this is about.  I don't mean to confuse the issue, but

6    it's time to put this stuff to rest, because it's wrong.  Mr.

7    Dondero has lost and he's got to get over it at some point.

8        But here's the best piece of evidence about this whole

9    shenanigans about MGM being inside information.  Mr. Dondero

10   filed a 15-page objection to the HarbourVest settlement and

11   didn't say a word about it.  How is that possible?  Six days

12   before the settlement, he sends this email.  Two weeks later,

13   in January, he files a 15-page objection and doesn't mention

14   anything about insider trading, MGM, or any wrongdoing by Mr.

15   Seery.  In fact, he argues the exact opposite, that Mr. Seery

16   cut a bad deal.  How is that possible?  This is a plausible

17   claim?

18       It gets better, or worse, depending on your point of view.

19   CLO Holdco filed an objection and they said they're entitled

20   to buy the asset.  This is Mr. Dondero's, you know, operating

21   arm of the DAF.  They lost -- they actually had an honorable

22   person who concluded, I don't really have that right.  But

23   these are the claims that Mr. Patrick is asserting, and he

24   asserted them on April -- in April, before the MGM deal was

25   announced.  Right?  And Your Honor found, and that's why it

002339

HCMLPHMIT00003387

Case 19-34054-sgj11 Doc 4255-72 Filed 06/20/25 Entered 06/20/25 21:39:29 Desc
Case 3:25-cv-01876-K Document 84-87 Filed 03/09/25 390 Page 232 of 262 PageID 3501

375

1   was so important for the Court to take judicial notice of the

2   second contempt order, because Mr. Dondero was intimately

3   involved in bringing those claims and in bringing those claims

4   against -- or trying to bring those claims against Mr. Seery,

5   in violating of the gatekeeper. This is all tied together.

6       I have to tell you, I don't know why we're not doing Rule

7   11. Forget about colorable claims. This is a fraud on the

8   Court. It really is. And I don't know when it's going to

9   stop. I'd love to move on with my life, to be honest with

10  you.

11      The tender offer. He's out there doing a tender offer

12  benefitting as the fund that he manages acquires more shares

13  and his interest goes up and the value goes up with all these

14  MGM holdings. Really? And he's going to accuse Mr. Seery of

15  wrongdoing?

16      There was one point of Mr. Dondero's testimony that made

17  my heart skip a beat. It's when he referred to the need to

18  get discovery. And why did it skip a beat? Because he

19  actually had a moment of candor where he admitted that the

20  notion that Mr. Seery gave them material nonpublic inside

21  information was his thought. It's not anything that Farallon

22  ever told him. And then it spins and it spins and it spins,

23  and finally when he gets to the fifth version of his sworn

24  statement MGM suddenly appears. It's not right. Colorable

25  claims? Fraudulent claims.

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 07/09/25390 Page 233 of 262   PageID 3502

376

1       What's the undisputed evidence right now?  I'll take Mr.

2   Dondero at his word that Mr. Patel told him that Farallon

3   bought the claims in February or March.  How did they

4   reconcile that with the undisputed testimony that Mr. Seery

5   thereafter invited Farallon to participate in the exit

6   financing?  And they signed an NDA in early April.  Why would

7   you sign an NDA if you already got inside information?  Who

8   would do that?  What would be the purpose of that?

9       How do you reconcile the fact that, according to Mr.

10   Dondero, the claims were already in Farallon's pocket when

11   they signed an NDA to get information for an exit facility.

12   Is that plausible?

13       We've heard Mr. McEntire say a bunch of times it's much

14   broader than MGM.  Not only not a scintilla of evidence, but

15   no substantive allegation.  Again, confusing argument with

16   facts.  Because he had -- yes, Mr. Seery had access to inside

17   information relative to Highland.  He's the CEO.  But where is

18   the evidence that he shared anything with anybody?  There is

19   nothing.

20       Mr. Dondero admitted in his motion -- in a moment of

21   candor, he said that's what he concluded based on the fact

22   that Mr. Patel supposedly told him, I bought because Seery

23   told me to.  He made the inference.  No evidence.  Nothing.

24       They're bringing this case for the benefit of innocent

25   parties?  These people have told you time and again that

HCMLPHMIT00003389

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 07/09/25   Page 234 of 262   PageID 3503

377

1  assets exceed liabilities.  What innocent parties?  Where are

2  they and how come they're not -- let's get to that point, too.

3  Because they're saying, oh, Mr. Seery is, like, just not

4  declaring the end of this.  Seriously?  How much do they think

5  Mr. Seery should reserve for indemnification claims as we do

6  trials like this with a mountain of lawyers billing $800,

7  $1,500 an hour?  Seriously?  Mr. Seery is somehow acting in

8  bad faith by not declaring the end of this case?  How much is

9  he supposed to reserve?  They keep skipping over that.  We'll

10  talk about that in the mediation motion.  We'll talk about

11  that in the Hunter Mountain motion in July.  Who's prosecuting

12  that?  Mr. Dondero's lawyer.  I know there's a really big

13  separation between Hunter Mountain and Mr. Dondero, but

14  Stinson is prosecuting that claim on behalf of Hunter Mountain

15  when they're seeking information.

16      And they complain about the legal fees?  We've put our

17  pens down.  Kirschner put his pens down.  We put down the

18  claim objection.  What we're doing is defense at this point.

19      We're awaiting the ruling on the notes litigation, and we

20  will very much prosecute the vexatious litigant motion if

21  Judge Starr grants the pending motion to exceed the page limit

22  that's been out there for months.  I'm not sure what's

23  happening there.  We'll do that for sure.  But otherwise,

24  we're just playing defense.

25      We're here today because they've made a motion, a motion

HCMLPHMIT00003390

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 09/09/25   Page 235 of 262   PageID 3504

378

1   that lacks any good-faith basis whatsoever.  And that's why

2   today was so important, so the Court could hear the witnesses.

3   They could -- the Court -- I mean, think about it.  Texas

4   State Securities Board.  The audacity of saying that somehow a

5   letter from the Texas State Securities Board saying they're

6   taking no action after conducting an investigation of

7   Dugaboy's claim of insider trading is irrelevant?  Like, what?

8        I've told you before, all we do is play Whack-A-Mole.

9   Whack-A-Mole.  They make an argument, we prove it's frivolous,

10  so they just make a new argument.  Their pleading says their

11  claims are colorable because there's an open investigation.

12  Now there's no investigation and they say that's irrelevant.

13  How can they say that with a straight face?  I couldn't.

14       I want to talk about Mr. Seery.  I want to finish with my

15  Mr. Seery.  I may not use all my time.  We can go home early.

16       (Laughter.)

17            THE COURT:  It's past early.

18            MR. MORRIS:  But this guy has worked doggedly, Your

19  Honor, and I will defend him until the end of time.  He's a

20  man who has so far exceeded expectations.  And they're saying

21  he's not -- he's overpaid?  The guy is overpaid?  When he's

22  into Class 9?  When he's being pursued with these frivolous

23  claims?  Every day he's being attacked.  How much do they

24  think he should be paid?  I would have loved to -- I hope --

25  no, I don't hope.  I don't think there's any reason to hear

HCMLPHMIT00003391

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 03/09/25 390   Page 236 of 262   PageID 3505

379

1    expert testimony.  I think Your Honor should exercise -- the

2    Court should exercise its discretion and say there's no need,

3    the Court doesn't need to hear expert testimony.

4        But if we do, I'll be delighted to hear their expert's

5    view on what Mr. Seery -- if it's not $8.8 million for all

6    these years, what should it be, after he takes an estate from

7    71 percent on the 8s to, according to them, assets exceed

8    liabilities, 9s are paid in full?

9        You know what?  If they put their pens down, maybe there

10   would be a conversation.  But as long as we keep doing this

11   ridiculous, baseless, frivolous litigation, Mr. Seery is going

12   to conserve resources, because he's got to pay people like me

13   to defend him and to defend the estate.  This is a preview of

14   what we'll talk about at the mediation motion.  He's doing a

15   great job.  He's devoting his life to it.  He has no other

16   income.  He's got no other job.  It's wrong.

17       The claims are not only not colorable, they are frivolous.

18   I ask the Court to stop this in its tracks right now.

19       Thank you very much.

20           THE COURT:  Thank you.

21       All right.  Is there any time for the Movant to have the

22   last word, which we usually give the Movant the last word.

23           THE CLERK:  The Movant, I think, has a little under

24   -- maybe about a minute left.

25           THE COURT:  Anything you want to say in a minute?

002344

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 06/20/25   Page 237 of 262    PageID 3506

380

1           MR. MCENTIRE:  Yes, just I'll take 30 seconds.  How

2    is that?

3           THE COURT:  Okay.

4      REBUTTAL CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN

5           MR. MCENTIRE:  I just want to direct your attention

6    to our reply brief, specific paragraphs that address your

7    question about authorities.  We do cite several cases on Page

8    41, 40 and 41, dealing with the issue of unjust enrichment.

9    That's it.

10       Thank you, Your Honor, very much.

11          THE COURT:  Okay.  Thank you.  Unjust enrichment?

12          MR. MCENTIRE:  Disgorgement.

13          THE COURT:  Okay.  But I was really, you know, claims

14   trading in the bankruptcy context, just your best --

15          MR. MCENTIRE:  Well, I think the cases that you

16   identified were our best cases.  The --

17          THE COURT:  Okay.

18          MR. MCENTIRE:  -- *Adelphia* and the other cases.

19          THE COURT:  All right.  Well, --

20          MR. MCENTIRE:  There are other cases, Your Honor, in

21   different contexts.  There's also the *Washington Mutual* case

22   dealing with equitable disallowance.  There's also the *Mobile*

23   *Steel* case, a Fifth Circuit --

24          THE COURT:  *Mobile Steel*?  Oh, my goodness.  Okay.

25          MR. MCENTIRE:  Okay.  All right.

HCMLPHMIT00003393

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K    Document 84-72   Filed 06/20/25390   Page 238 of 262    PageID 3507

381

```
 1              THE COURT:  1968?  Or no.  That doesn't mean it isn't

 2     still quoted often, but --

 3              MR. MCENTIRE:  Those would also be relevant.

 4              THE COURT:  Equitable subordination --

 5              MR. MCENTIRE:  Yes, ma'am.

 6              THE COURT:   -- when there's bad acts.

 7              MR. MCENTIRE:  And Footnote #10 in the Mobile Steel

 8     case.  That is relevant, too.  Just, --

 9              THE COURT:  Okay.

10              MR. MCENTIRE:  Thank you.

11              THE COURT:  All right.  So I gave a deadline of

12     Monday, right, --

13              MR. STANCIL:  Yes.

14              THE COURT:   -- to reply to the response to the

15     motion in limine?

16              MR. STANCIL:  Yes, Your Honor.  Do you want time

17     before you leave for the day?  I mean, it's not going to be

18     that long, so 4:00 o'clock Monday?  Does that work for you?

19              THE COURT:  I don't care.  I probably won't start

20     looking at it until the next day.

21              MR. STANCIL:  But I will -- I'll just reserve and so

22     I don't have my associates --

23              THE COURT:  Yes.  I think these days midnight, 11:59

24     p.m., is what lawyers tend to want.

25              MR. STANCIL:  Oh, not this lawyer.
```

HCMLPHMIT00003394

1          THE COURT:  Oh, well, okay.  Okay.  So I'll just have

2     to look at this, and probably by Friday of next week I will

3     reach out through Traci and let you know what my decision is

4     on whether we're going to have another day of just 30 minutes,

5     30 minutes of experts.

6          MR. MCENTIRE:  Your Honor, another housekeeping

7     matter.  You'd wanted a copy of our PowerPoint, --

8          THE COURT:  Yes.

9          MR. MCENTIRE:  -- which I'm pleased to give you.  We

10    found a typo that we can correct electronically on the version

11    I showed.

12          THE COURT:  Uh-huh.

13          MR. MCENTIRE:  I likely will send that to you and I

14    can copy opposing counsel.  Is that --

15          THE COURT:  Okay.  Send it to Traci Ellison, my

16    courtroom deputy.

17          MR. MCENTIRE:  All right.

18          THE COURT:  And she'll --

19          MR. MCENTIRE:  We'll do that first thing in the

20    morning.

21          THE COURT:  Okay.

22          MR. MCENTIRE:  So you'll have a copy --

23          MR. STANCIL:  Can we get the hard copy that -- from

24    today, though?

25          MR. MCENTIRE:  No, that had a typo on it.  I really

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 08/04/25   Page 240 of 262   PageID 3509

383

1   don't want to share it.  We fixed it.

2         THE COURT:  What?  I'm sorry, what?

3         MR. MORRIS:  That's fine.

4         MR. STANCIL:  Never mind.

5         THE COURT:  Do I not need to know?

6         MR. STANCIL:  Let's all go home.

7         THE COURT:  Okay.  And then my last question is --

8   and there was a mention of the CLO Holdco lawsuit, where

9   there's a pending motion to dismiss.  There's an opinion I'm

10  writing well underway.  I just keep getting sidetracked by

11  other things.  Imagine that.  So I know that people are

12  wanting to get an answer to that.  So, trust me, it's going to

13  get done here pretty soon.

14     You mentioned Brantley Starr.  I mean, it is not my role

15  to pick up the phone and call him and say hey, --

16        MR. MCENTIRE:  No, I wasn't suggesting that.

17        THE COURT:   -- District Judge, get busy on that.

18        MR. MCENTIRE:  Yeah.

19        THE COURT:  But I'll at least tell you, I know the

20  man seems to have more jury trials than any judge I've seen in

21  this building, so I suspect he's working late hours trying to

22  get things done.

23        MR. MCENTIRE:  Yeah.

24        THE COURT:  What do we have upcoming?  We have what

25  you called the mediation motion.  When is that set?

HCMLPHMIT00003396

Case 19-34054-sgj11    Doc 4255-72    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc
Case 3:25-cv-01876-K    Document 84-72    Filed 06/05/25    Page 241 of 262    PageID 3510

384

 1              MR. MORRIS:  June 26.

 2              THE COURT:  June 26th.  Be here before we know it.

 3              MR. MORRIS:  Yeah.  And just to keep the Court

 4    informed, the Movant's reply was due today.  We gave them a

 5    week extension.  They asked earlier today.  I saw in my email

 6    we gave them.  So I think you should expect the reply on the

 7    15th.  The hearing is the 26th, and that's not in person.

 8              THE COURT:  Okay.  Well, I'm very interested to dive

 9    into those pleadings.  I knew the motion was coming because

10    one of the lawyers said at a prior hearing it would be coming.

11    So I haven't read any of those pleadings, but, well, I'm just

12    very interested to hear how this plays out.  I mean, I've said

13    it before.

14              MR. MORRIS:  Uh-huh.

15              THE COURT:  We had global mediation in summer of

16    2020.  We had two very fine mediators.  We had a heck of a lot

17    settled, to my amazement.  But we're now way down the road and

18    whole lot of money has been eaten up fighting lots of stuff.

19    I mean, it would have to be pens down.  There's an enormous

20    amount out there that would have to be part of it, and I just

21    don't know if everyone is fully appreciating that.  I hope

22    they are.  Anyone listening.  We're really, really far down

23    the road now, and there's just how many appeals?  Someone at

24    one time told me there were 26.  I bet it's more than that by

25    now.

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 06/09/25   Page 242 of 262   PageID 3511

385

```
 1              MR. MORRIS:  I think that's right.  I think we argued

 2   on Monday, what is it, the sixth of nine appeals in the Fifth

 3   Circuit.  And we've got, you know, a cert petition that we're

 4   waiting to hear from on the Supreme Court.  And yeah, there's

 5   still a couple dozen matters in the district court.

 6              THE COURT:  Okay.

 7              MR. MORRIS:  Not one of them, not one of them we're

 8   prosecuting, with the exception of waiting on the Court to

 9   rule on the Report and Recommendation on the notes litigation

10   and vexatious litigant.  We are not the plaintiff, movant, in

11   anything.

12              THE COURT:  We've got adversaries.  The Reports and

13   Recommendations.  That's just made everything go a lot slower.

14   But all right.  So we have that.  And anything else coming up?

15              MR. MORRIS:  I think on July 11th maybe there is a

16   hearing scheduled on Hunter Mountain.  If you recall, Hunter

17   Mountain had that valuation motion last year that you denied

18   on the grounds that they didn't have a legal right to

19   valuation information.  They made a motion earlier this year

20   for leave to file an adversary proceeding to assert an

21   equitable claim and some other declaratory relief, is my

22   recollection.

23       While we filed an opposition, we didn't oppose the relief

24   requested, so that motion got resolved.  They have filed an

25   adversary proceeding.  And I think, if I remember correctly,
```

HCMLPHMIT00003398

1   our response to the complaint, maybe that's what due.  Oh, the

2   11th is a status conference.  It could be a status conference,

3   maybe to set a scheduling order.

4           THE COURT:  Okay.

5           MR. MORRIS:  But that's it.  I think that's the only

6   thing on the calendar.

7           THE COURT:  That's a lot.

8           MR. MCENTIRE:  Thank you.

9           THE COURT:  Anything else?  Okay.

10          MR. STANCIL:  Thank you, Your Honor.

11          MR. MORRIS:  Thank you, Your Honor.

12          THE CLERK:  All rise.

13      (Proceedings concluded at 7:18 p.m.)

14                          --oOo--

15

16

17

18

19                      CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21  above-entitled matter.

22    **/s/ Kathy Rehling**                        **06/12/2023**

23  _____    _____

24  Kathy Rehling, CETD-444                    Date
    Certified Electronic Court Transcriber

25

HCMLPHMIT00003399

387

                              INDEX

PROCEEDINGS                                              3

OPENING STATEMENTS

- By Mr. McEntire                                       67
- By Mr. Morris                                         90
- By Mr. Stancil                                       102
- By Mr. McIlwain                                      106

WITNESSES

Hunter Mountain Investment Trust's Witnesses

James David Dondero
- Direct Examination by Mr. McEntire                   112
  *Voir Dire* Examination by Mr. Morris                144
- Cross-Examination by Mr. Morris                      158
- Redirect Examination by Mr. McEntire                 201
- Recross-Examination by Mr. Morris                    208

James P. Seery
- Direct Examination by Mr. McEntire                   211
- Cross-Examination by Mr. Morris                      265
- Redirect Examination by Mr. McEntire                 292
- Examination by the Court                             293

Debtors' Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                     302
- Cross-Examination by Mr. McCleary                    313

EXHIBITS

HMIT's Exhibits

Certain Exhibits                         Received 33-40

HMIT's Exhibit 3                            Received 317
HMIT's Exhibit 4                            Received 317
HMIT's Exhibit 4                        Received 140/149
HMIT's Exhibits 7-10                        Received 317
HMIT's Exhibits 12-23                       Received 317
HMIT's Exhibits 26-38                       Received 317
HMIT's Exhibits 29-52                        Carried 317

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

002352

HCMLPHMIT00003400

Case 19-34054-sgj11   Doc 4255-72   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 84-72   Filed 08/09/25   Page 245 of 262   PageID 3514

388

```
 1                              INDEX
                              Page 2
 2

 3    HMIT'S Exhibits, cont'd.

 4    HMIT's Exhibits 39-62                         Carried 37
      HMIT's Exhibits 53-57                        Received 317
 5    HMIT's Exhibits 58-63                        Received 321
      HMIT's Exhibit 64                            Received 317
 6    HMIT's Exhibit 65                            Received 317
      HMIT's Exhibits 67-70                        Received 317
 7    HMIT's Exhibit 71                            Received 318
      HMIT's Exhibit 72                            Received 319
 8    HMIT's Exhibit 73                            Received 319
      HMIT's Exhibit 74                            Received 319
 9    HMIT's Exhibit 75                            Received 319
      HMIT's Exhibit 76                         Carried 37/321
10    HMIT's Exhibit 77                            Received 319
      HMIT's Exhibit 78                            Received 319
11    HMIT's Exhibit 79                            Received 319
      HMIT's Exhibit 80                Marked 234 Received 320
12

13    Debtors' Exhibits

14    Debtors' Exhibit 2                           Received  44
      Debtors' Exhibit 3                           Received  54
15    Debtors' Exhibit 4                           Received  54
      Debtors' Exhibit 5                           Received  54
16    Debtors' Exhibit 6                           Received  55
      Debtors' Exhibit 7                           Received  56
17    Debtors' Exhibit 8                           Received  57
      Debtors' Exhibit 9                           Received  54
18    Debtors' Exhibit 10                          Received  58
      Debtors' Exhibit 11                          Received  44
19    Debtors' Exhibit 12                          Received  60
      Debtors' Exhibit 13                          Received  60
20    Debtors' Exhibit 14                          Received  63
      Debtors' Exhibit 15                          Received  64
21    Debtors' Exhibits 25-30                      Received  65
      Debtors' Exhibit 30                          Received 272
22    Debtors' Exhibit 31-A                        Received 272
      Debtors' Exhibit 32                          Received 323
23    Debtors' Exhibit 33                          Received 327
      Debtors' Exhibit 34                       Received 44/65
24    Debtors' Exhibit 36                          Received 328

25
```

389

1                                    INDEX
                                    Page 3
2

3    Debtors' Exhibits, cont'd.

4    Debtors' Exhibit 38                          Received   44/328
     Debtors' Exhibit 39                          Received   44/286
5    Debtors' Exhibit 40                          Received   44/287
     Debtors' Exhibit 41                          Received   44/284
6    Debtors' Exhibit 42                              Received   44
     Debtors' Exhibit 45                              Received  174
7    Debtors' Exhibit 46                              Received   44
     Debtors' Exhibit 51                              Received  308
8    Debtors' Exhibit 59                              Received  289
     Debtors' Exhibit 60                              Received  272
9    Debtors' Exhibit 100                               Marked  179

10   Judicial Notice to be Taken                              175

11   CLOSING ARGUMENTS

12
     - By Mr. McEntire                                        329
13   - By Mr. McIlwain                                        354
     - By Mr. Stancil                                         358
14   - By Mr. Morris                                          371
     - By Mr. McEntire                                        379
15
     RULINGS
16
     HMIT's Motion for Leave to File Verified Adversary       382
17   Proceeding (3699) - *Taken Under Advisement*

18   END OF PROCEEDINGS                                       386

19   INDEX                                               387-389
20

21

22

23

24

25

002354
HCMLPHMIT00003402

**EXHIBIT 73**

002355

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## ATLAS IDF GP, LLC

This Limited Liability Company Agreement (this "**Agreement**") of Atlas IDF GP, LLC (the "**Company**") is entered into as of October 29, 2015 by and between the Company and John Honis (the "**Managing Member**", and collectively with any individuals and/or entities who subsequently become members of the Company in the future in accordance with the terms hereof, "**Members**"), pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del.C. § 18-101, et seq.), as amended from time to time (the "**Act**").

**Section 1**      **Name**.  The name of the limited liability company governed hereby is Atlas IDF GP, LLC.

**Section 2**      **Certificates**.   The Managing Member, as an authorized person within the meaning of the Act, has executed, delivered and filed the certificate of formation of the Company (the "**Certificate of Formation**") with the Secretary of State of the State of Delaware on October 29, 2015. Upon the execution of this Agreement, the Managing Member shall thereafter be designated as an authorized person within the meaning of the Act.  Hereafter, the Managing Member shall have the power to execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

**Section 3**      **Purpose**.  The Company was formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in all lawful activities for which limited liability companies may be formed under the Act, including, without limitation of the foregoing, serving as the general partner of Atlas IDF, LP, a Delaware limited partnership.

**Section 4**      **Powers**.  The Company shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose and business described herein and for the protection and benefit of the Company, and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Managing Member pursuant to this Agreement.

**Section 5**      **Principal Business Office**.  The principal place of business and office of the Company shall be located at, and the Company's business shall be conducted from 87 Railroad Place, Suite 403, Saratoga Springs, NY 12866, or elsewhere as the Managing Member may from time to time determine.

**Section 6**      **Registered Office**.  The address of the registered office of the Company in the State of Delaware is:  c/o Stellar Corporate Services LLC, 3500 South DuPont Highway, County of Kent, Dover, Delaware 19901.

**Section 7**      **Registered Agent**.   The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is:  c/o Stellar Corporate Services LLC, 3500 South DuPont Highway, County of Kent, Dover, Delaware 19901.

**Section 8**      **Members**. The names, the nature of the interests held, the mailing addresses, the initial capital contributions and the Percentage Interests (as defined below) of the Members are as set

HCMLPHMIT00003511

forth in **Schedule A** attached hereto.

**Section 9** **Term**. The term of the Company commenced on the date of filing of the Certificate of Formation in accordance with the Act and shall continue until dissolution of the Company in accordance with **Section 23** of this Agreement.

**Section 10** **Limited Liability**. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and none of the Members, any Officer (as hereinafter defined), employee or agent of the Company (including a person having more than one such capacity) shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of acting in such capacity.

**Section 11** **Initial Capital Contributions**. Each Member is deemed admitted as a Member of the Company upon his, her or its execution and delivery of this Agreement. The initial capital contributions of the Members are set forth on **Schedule A** attached hereto.

**Section 12** **Additional Capital Contributions**. The Members are not required to make any capital contributions to the Company beyond their initial capital contributions, unless otherwise determined by the Managing Member.

**Section 13** **Capital Accounts**. Separate capital accounts shall be maintained for each Member on the books of the Company, which accounts shall set forth the capital of such Member in the Company. Each capital account shall be adjusted to reflect such Member's share of allocations and distributions as provided in **Sections 14 and 15** of this Agreement, and any additional capital contributions to the Company or withdrawals of capital from the Company. Such capital accounts shall further be adjusted to conform to the Treasury Regs. under Section 704(b) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), as interpreted in good faith by the Managing Member.

**Section 14** **Allocations of Profit and Loss**. All items of income, gain, loss, deduction and credit shall be allocated among the Members in accordance with their percentage interests as set forth on **Schedule A** attached hereto ("**Percentage Interests**").

**Section 15** **Distributions**. Distributions shall be made to the Members at such times and in such amounts as may be determined in the sole discretion of the Managing Member. Distributions shall be allocated among the Members in accordance with their Percentage Interests. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Members on account of their interest in the Company if such distribution would violate Section 18-607 of the Act or other applicable law.

**Section 16** **Management**.

(a) The business and affairs of the Company shall be managed by the Managing Member. Subject to the express limitations contained in any provision of this Agreement, the Managing Member shall have complete and absolute control of the affairs and business of the Company, and the Managing Member shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Company, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.

(b) Subject to the rights and powers of the Managing Member and the limitations thereon contained herein, the Managing Member may delegate to any person any or all of his powers,

002357

HCMLPHMIT00003512

rights and obligations under this Agreement, and the Managing Member may appoint, contract or otherwise deal with any person to perform any acts or services for the Company as the Managing Member may reasonably determine.

(c) No Member (other than the Managing Member) shall participate in the management or control of the business of, or shall have any rights or powers with respect to, the Company except those expressly granted to it by, or pursuant to the terms of, this Agreement, or those conferred on it by law.

(d) The Managing Member shall hold office until the earliest to occur of his death, disability or other inability to act in such capacity, at which time a successor Managing Member may be appointed by Members owning at least a majority of the Percentage Interests.

**Section 17** **Officers**. The Managing Member may, from time to time as he deems advisable, appoint officers of the Company (the "**Officers**") and assign in writing titles (including, without limitation, President, Vice President, Secretary and Treasurer) to any such person. Unless the Managing Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this **Section 17** may be revoked at any time by the Managing Member.

**Section 18** **Other Business**. The Members (including, for the avoidance of doubt, the Managing Member) may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others. Neither the Company nor any other Member shall have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

**Section 19** **Exculpation and Indemnification**. The Managing Member shall not be liable to the Company or to the other Members for any action taken or omitted to be taken in connection with the business or affairs of the Company, so long as he acted in good faith and is not found to be guilty of gross negligence or willful misconduct with respect thereto, as determined by a final non-appealable decision of a court of competent jurisdiction. To the fullest extent permitted by law, the Company agrees to indemnify and hold harmless: (i) the Managing Member, and (ii) in the discretion of the Managing Member, the Company's managers, shareholders, partners, officers, employees, agents and affiliates and/or the other Members (each, an "**Indemnified Party**") from and against any and all claims, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding related to any action taken or omitted to be taken by any of them in connection with the business and affairs of the Company (including the settlement of any such claim or legal proceeding); *provided, however*, that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final non-appealable decision of a court of competent jurisdiction. Any indemnity under this **Section 19** shall be provided out of and to the extent of Company assets only, and no Member (including the Managing Member) shall have personal liability on account thereof.

**Section 20** **Admission of Additional Members**. Additional Members may be admitted to the Company only with the written consent of the Managing Member. The capital contribution required of, and the Percentage Interests assigned to, such newly-admitted Member shall be determined by the Managing Member.

**Section 21** **Effect of Bankruptcy, Dissolution, Death or Incompetence of a Member**. The bankruptcy, dissolution, death or disability of a Member, or an adjudication that such Member is

3

002358

HCMLPHMIT00003513

incompetent (a Member experiencing any such event, a "**Disabled Member**"), shall not cause the termination or dissolution of the Company, and the business of the Company shall continue. If a Member is dissolved or becomes bankrupt, the trustee or receiver of such Disabled Member's estate or, if a Member dies, such Disabled Member's executor, administrator or trustee, or, if such Member is adjudicated incompetent, such Disabled Member's committee, guardian or conservator, or the personal representative of such Disabled Member, as applicable, shall have the rights of such Disabled Member for the purposes of settling or managing such Disabled Member's estate or property and such power as the Disabled Member possessed to dispose of all or any part of such Member's interest in the Company, and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a substitute Member.

Section 22    **Assignments**.  A Member may not transfer, assign, pledge or hypothecate, in whole or in part, his, her or its limited liability company interest without the prior written consent of the Managing Member.

Section 23    **Dissolution**.

(a)    The Company shall dissolve, and its affairs shall be wound-up upon the first to occur of the following: (i) the written consent of the Managing Member; (ii) the death, disability, bankruptcy or withdrawal of the Managing Member, in the event no successor managing member is appointed pursuant to **Section 16(d)**; and (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind-up its affairs (including the sale of the assets of the Company in an orderly manner).

Section 24    **Tax Matters Partner**.  John Honis shall be the tax matters partner within the meaning of Section 6231(a)(7) of the Code.  All expenses incurred by the tax matters partner in connection with his duties as tax matters partner shall be expenses of the Company.

Section 25    **Elections**.  The Managing Member shall determine the accounting methods and conventions under the tax laws of any and all applicable jurisdictions as to the treatment of income, gain, loss, deduction and credit of the Company or any other method or procedure related to the preparation of such tax returns.  The Managing Member may cause the Company to make or refrain from making any and all elections permitted by such tax laws, and the Managing Member shall not be liable for any consequences to any previously admitted or subsequently admitted Members resulting from making or failing to make any such elections.

Section 26    **Separability of Provisions**.  Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 27    **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

Section 28    **Entire Agreement**.  This Agreement constitutes the entire agreement of the Members with respect to the subject matter hereof and shall supersede all prior and contemporaneous agreements, understandings and discussions with respect thereto.

002359

HCMLPHMIT00003514

**Section 29**      <u>**Governing Law, Personal Jurisdiction and Venue**</u>.  The parties acknowledge and agree that any claim, controversy, dispute or action relating in any way to this Agreement or the subject matter of this Agreement shall be governed solely by the laws of the State of Delaware, without regard to any conflict of laws doctrines.  The parties irrevocably consent to and submit to being served with legal process issued from the state and federal courts located in the State of New York and irrevocably consent to the exclusive personal jurisdiction of the federal and state courts situated in the State of New York.  The parties irrevocably waive any objections to the personal jurisdiction of these courts.  The federal and state courts of the State of New York in New York County shall have sole and exclusive jurisdiction over any and all claims, controversies, disputes and actions which in any way relate to this Agreement or the subject matter of this Agreement.  Any such claim, controversy, dispute or action must first be brought in the federal court of the State of New York in New York County, unless the federal courts do not have subject matter jurisdiction as a matter of law, in which case it must first be brought in the Commercial Division of the New York State Supreme Court in New York County (and can only proceed in New York County outside the Commercial Division if the Commercial Division rejects it).  The parties also irrevocably waive any objections that these courts constitute an oppressive, unfair, or inconvenient forum and agree not to seek to change venue on these grounds or any other grounds.

**Section 30**      <u>**Amendments**</u>.  This Agreement may be modified, altered, supplemented or amended in the sole discretion of the Managing Member.

*[remainder of page intentionally left blank]*

5

002360

HCMLPHMIT00003515

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the date first written above.

THE COMPANY:

ATLAS IDF GP, LLC

By: _____
Name:  John Honis
Title: Managing Member

MANAGING MEMBER:

_____
Name:  John Honis

6

002361

HCMLPHMIT00003516

## Schedule A

### Members of Atlas IDF GP, LLC

### As of October 29, 2015

| NAME | NATURE OF INTEREST | MAILING ADDRESS | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|---|---|
| John Honis | Managing Member | 87 Railroad Place, Suite 403<br><br>Saratoga Springs, NY 12866 | $100 | 100% |

7

002362

HCMLPHMIT00003517

**EXHIBIT 74**

002363

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopier: (817) 878-9280

COUNSEL FOR CLO HOLDCO, LTD., CHARITABLE DAF FUND, LP AND
HIGHLAND DALLAS FOUNDATION, INC.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Chapter 11 |
| | § | |
| Debtor | § | Relates to Dkt. No. 2460 |

---

RESPONSE AND DISCLOSURES RELATED TO THE COURT'S ORDER REQUIRING DISCLOSURES


1934054210709000000000015

002364

HCMLPHMIT00003523

CLO HoldCo, Ltd. ("CLO HoldCo"), Charitable DAF Fund, LP ("DAF Fund"), Highland Dallas Foundation, Inc., ("Highland Dallas Foundation," collectively, the "Charitable Respondents"), [1] file this *Response* ("Response") and submit these *Disclosures* ("Disclosures") to comply with the Court's *sua sponte Order Requiring Disclosures* (Dkt. No. 2460) (the "Disclosures Order").

---

[1]     CLO Holdco and Highland Dallas Foundation have filed a *Motion to Withdraw the Reference* in Adversary Case No. 20-03195 (the "Adversary Proceeding"), at Dkt. No. 24 (in the Adversary Proceeding), and neither the fact nor content of this Response is intended to be nor shall be deemed a waiver of their right to a trial by jury on all claims asserted in the Adversary Proceeding nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court. DAF Fund is also a defendant in the Adversary Proceeding but has not been served. Neither the fact nor content of this Response by DAF Fund is intended to be nor shall be deemed: a waiver of service requirements in the Adversary Proceeding; acceptance of service of citation or summons in the Adversary Proceeding; waiver of its right to a trial by jury on all claims in the Adversary Proceeding (if ever served), nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court (again, if ever served). The Charitable Respondents submit this Response in the Bankruptcy Case solely because the Court has ordered them to do so, and because they have appeared before this Court previously.

002365

HCMLPHMIT00003524

TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................I

TABLE OF AUTHORITIES ......................................................................................... II

PRELIMINARY STATEMENT ..................................................................................... 1

PROCEDURAL HISTORY............................................................................................ 4

RESPONSE...................................................................................................................... 7

    I.        The Charitable Respondents are independently owned and controlled charitable organizations. ........................................................................................... 7

        a)    CLO HoldCo.......................................................................................... 9

        b)    DAF Fund ............................................................................................. 9

        c)    DAF Holdco ........................................................................................ 10

        d)    DAF GP .............................................................................................. 11

        e)    The Supporting Organizations.......................................................... 11

        f)    Mr. Patrick's role............................................................................... 15

    II.        The Charitable Respondents have donated tens of millions of dollars to charitable causes .......................................................................................................16

    III.        CLO HoldCo and DAF Fund may be creditors of the Debtor...............................18

    IV.        The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing................................20

        a)    The Court does not have the power to require non-parties to provide it with disclosures............................................................................................... 20

        b)    The Court's *sua sponte* investigation into hypothetical standing is improper. .......... 22

        c)    The Disclosures Order is not just improper, it is prejudicial..................................... 26

    CONCLUSION.............................................................................................................28

002366

HCMLPHMIT00003525

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Baum v. Blue Moon Ventures, LLC*,
    513 F.3d 181 (5th Cir. 2008) ................................................26

*Berry v. CIGNA/RSI-CIGNA*,
    975 F.2d 1188 (5th Cir. 1992) ..............................................21

*Brackeen v. Haaland*,
    994 F.3d 249 (5th Cir. 2021) ................................................24

*Castro v. United States*,
    540 U.S. 375, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003) .........................23

*In re Delta Underground Storage Co., Inc.*,
    165 B.R. 596 (Bankr. S.D. Miss. 1994) ......................................25

*Franklin v. Laughlin*,
    No. SA-10-CV-1027 XR, 2011 WL 598489 (W.D. Tex. Jan. 13, 2011) ..............26

*In re Friede Goldman Halter Inc.*,
    600 B.R. 526 (Bankr. S.D. Miss. 2019) ......................................25

*Greenlaw v. United States*,
    554 U.S. 237 (2008) ........................................................23

*NASCO, Inc. v. Calcasieu Television & Radio, Inc.*,
    894 F.2d 696 (5th Cir.1990) ................................................22

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
    2 F.3d 1397 (5th Cir. 1993) ............................................21, 22

*Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*,
    No. 219CV184FTM99MRM, 2019 WL 3219667 (M.D. Fla. July 17, 2019) ...........24

*In re Saldana*,
    531 B.R. 141 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R.
    678 (N.D. Tex. 2015) .......................................................22

*Sanchez-Llamas v. Oregon*,
    548 U.S. 331 (2006) ........................................................23

*Simon v. Taylor*,
    794 F. App'x 703 (10th Cir. 2019) .........................................23

002367

HCMLPHMIT00003526

*Thompson v. Gonzales*,
    No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436 (E.D. Cal. Sept. 27, 2016) ........................22

*Uberoi v. Labarga*,
    769 F. App'x 692 (11th Cir. 2019) ........................................................................24

*United States v. Sineneng-Smith*,
    140 S. Ct. 1575 (2020) ........................................................................................23

*Matter of Ward*,
    978 F.3d 298 (5th Cir. 2020) ...............................................................................21

*Wood v. Milyard*,
    566 U.S. 463 (2012) ............................................................................................23

**Statutes**

11 U.S.C. § 101(10) ..................................................................................................20

11 U.S.C. § 105 .................................................................................................5, 20, 21, 24

**Other Authorities**

Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L. REV. 245 (2002) ...............................23

Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832 (2000)........................................................................................................................24

Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR. L.J. 461, 563 (2002)..............................................................................................24

002368

HCMLPHMIT00003527

<h1 style="text-align:center">PRELIMINARY STATEMENT</h1>

1.      CLO HoldCo, DAF Fund, and Highland Dallas Foundation have each previously filed pleadings in this Court and are, at least arguably, parties to the Bankruptcy Case.  As set forth herein, several targets of the Court's Disclosures Order have never made an appearance before this Court including Charitable DAF Holdco, Ltd.[2] ("DAF Holdco"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara Foundation"), and Highland Kansas City Foundation, Inc. ("Highland Kansas City Foundation," collectively with DAF Holdco and Highland Santa Barbara Foundation, the "Non-Party Targets").[3]  The Court does not have the power to order a non-party to produce documents nor undertake *sua sponte* investigations, particularly into non-parties.  The fact that these entities are non-parties and at the same time targets, is telling.  Further the Non-Party Targets have not been served with the Disclosures Order.

2.      Neither the Charitable Respondents nor undersigned counsel are authorized to make appearances for the Non-Party Targets, and the Non-Party Targets are not by this Response submitting themselves to this Court's jurisdiction.  The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Non-Party Targets.  Nonetheless, much of the Disclosures provided by the Charitable Respondents on their own behalf will be informative regarding the Non-Party Targets.  Further, the Non-Party Targets have provided limited authorization for the

---

[2]      Undersigned counsel has been retained to represent DAF Holdco; however, DAF Holdco has never made an appearance in this bankruptcy case and has not been served in the Adversary Proceeding.  Nor has DAF Holdco been served with this Disclosures Order.  DAF Holdco has not authorized undersigned counsel to accept service nor to make an appearance for it in this Bankruptcy Case.

[3]      The Highland Dallas Foundation, the Highland Santa Barbara Foundation, and the Highland Kansas City Foundation are sometimes also referred to as "Supporting Organizations."

1

002369

HCMLPHMIT00003528

Charitable Respondents, through Mr. Mark Patrick ("Patrick"), to provide the information to the Court that is submitted by the Charitable Respondents in this Response.

3.      Further, the Disclosures Order does not mention the third-party foundation level entities included in the Structure Chart (*infra*) ("Foundations"); however, these Foundations have provided the Charitable Respondents with documents and important information regarding their charitable giving structures and the supporting organizations include the Highland Dallas Foundation and the supporting organizations that are Non-Party Targets. The fact and content of this Response is not intended to be nor shall be deemed to be an appearance by these Foundations in this Bankruptcy Case, nor submission by them to this Court's jurisdiction. The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Foundations.

4.      Patrick has provided a declaration regarding the information provided by and/or about the Foundations and the Supporting Organizations, and as provided herein within the Disclosures. As well, he has reviewed the Response and Disclosures. *See* **Exhibit 1** [Mark Patrick Declaration]

5.      As set forth herein, contrary to the Court's unsupported and highly prejudicial *sua sponte* assertions that the Charitable Respondents and Non-Party Targets "appear to be under the *de facto* control of Mr. Dondero," the Charitable Respondents and Non-Party Targets (along with the Foundations) make up a legal and viable charitable giving structure, established through a non-byzantine set of entities that has committed over $42 million in grants, and funded $32.5 million, to nonprofits across a wide-range of issues including education, support of military, veterans, and first-responders, and victims of family violence and child abuse. With respect to Mr. Dondero, of course he is involved, personally in the capacity as the Donor personality. In addition, as disclosed

2

HCMLPHMIT00003529