**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P

§

§  Case No. 19-34054-sgj11

**The Dugaboy Investment Trust - Appellant**

§

vs. §     **3:25-CV-01876-K**

**Highland Capital Management, L.P; et al** - Appellee

§

§

  [4297] **Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025**

# Volume 14

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | Case No. 19-34054-sgj |
| | § | |
| **Reorganized Debtor.** | § | *INDEX* |
| | § | |

## APPELLANT THE DUGABOY INVESTMENT TRUST'S AMENDED STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

1

Pursuant to Rule 8009 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4311] on July 14, 2025; and having filed *Appellant The Dugaboy Investment Trust's Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* [Docket No. 4365] on August 11, 2025 in the above-captioned case; and having received correspondence from the Bankruptcy Clerk's Office [Docket No. 4367] asking Dugaboy to correct certain errors in its August 11, 2025 submission [Docket No. 4365]; hereby submits this *Amended Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in approving the settlement agreement and release entered into between the Highland Entities and the HMIT Entities pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure as being fair, equitable, and in the best interest of the estate?**

2. **Did the Bankruptcy Court err by approving a settlement agreement utilizing an improper valuation methodology and without sufficient supporting evidence?**

3. **Did the Bankruptcy Court err in approving the overly broad and vague release provisions contained within the settlement agreement?**

4. **Did the Bankruptcy Court err in approving the settlement agreement without allowing adequate time for the Cayman Islands Joint Official Liquidators to complete their investigation?**

5. **Did the Bankruptcy Court err in concluding Mark Patrick had the requisite corporate authority to enter into and bind the HMIT entities to the settlement agreement?**

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow, August 13, 2025.

2

*Vol. 1*
*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4311] filed by Appellant;

*000010*

2. *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4297];

*000014*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

*000625*

*000786*

*000 804*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an |

*Vol. 2*

*000807*

*000832*

*000838*

| | | | |
|---|---|---|---|
| | | | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| | 5/20/2025 | 4218 | Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust(Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust(Attachments: # 1 Exhibit A-- Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |
| | 5/22/2025 | 4221 | Amended Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust(Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust(Attachments: # 1 Exhibit A-- Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery |

| | | | |
|---|---|---|---|
| *Vol. 2*<br><br>*0008 44* | 6/9/2025 | 4228 | Motion for expedited hearing on Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion Filed by Partner Dugaboy Investment Trust (related document #4227 (Attachments: #1 Proposed Order Granting Motion for Expedited Hearing (Hesse, Gregory) Modified linkage on 6/10/2025 (mdo). |
| *0008 49* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *0008 57* | 6/10/2025 | 4232 | Response opposed to (related document(s): 4227 Motion to extend time to Time to Respond to Trusts' Motion filed by Partner Dugaboy Investment Trust, 4228 Motion for expedited hearing (related documents 4216 Motion to compromise controversy) on Emergency Motion for an Order Extending Duration of Time to Respond To Trusts' Motion filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| *0008 63* | 6/10/2025 | 4234 | Reply to (related document(s): 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) to (I) Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion and (II) Motion for Expedited Hearing on Emergency Motion for an Order Extending Duration of Time to Respond to Trusts' Motion filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *0008 67* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *0008 69* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 3*<br><br>*0008 71*<br>*Thru Vol 13* | 6/20/2025 | 4255<br><br>*(to be submitted to* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to |

| | | | |
|---|---|---|---|
| *Vol. 3*<br>*Starts with*<br>*000871 —*<br><br>*Thru Vol EnD*<br>*Vol 1.3* | *Clerk on flash drive)* | *of* | Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| *Vol. 14*<br><br>*003528* | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis |

| | | | |
|---|---|---|---|
| Vol 14 003531 | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart,#3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| Vol. 15 003851 | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| 003875 | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| 004002 | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| 004017 | 6/23/2025 | 4276 | Reply to (related document(s)): 4223 Objection filed by Creditor The Dugaboy Investment Trust) filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery) |
| 004019 | 6/24/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| Vol. 16 004236 | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |

| | | | |
|---|---|---|---|
| *Vol. 16*<br><br>*0041247* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |
| *0041287* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *0041272* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *0041276* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust). Entered on 6/27/2025 (Okafor, M.) |
| *0041288* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 |

*Vol. 16*

| | | | |
|---|---|---|---|
| | | | Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *0004295* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *0004302* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *0004304* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *0004313* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *0004315* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *0004111* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of |

| | | | |
|---|---|---|---|
| *Vol. 16* | | | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *Vol. 17* *004684* | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| *004700* | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M. |
| *004812* | 8/4/2025 | 4353 | Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A (Harper, Geoffrey) |
| *004834* | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| | | | |

Dated: August 12, 2025         Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500

(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

***Counsel for Appellant The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 12, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**COUNSEL FOR THE HMIT ENTITIES**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Case No. 19-34054-sgj11** |
| **MANAGEMENT, L.P.** | § | |
| | § | |
| **Reorganized Debtor.** | § | |

### HMIT ENTITIES WITNESS AND EXHIBIT LIST WITH RESPECT TO HEARING TO BE HELD ON JUNE 25, 2025

Hunter Mountain Investment Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "HMIT Entities") submit this *Witness and Exhibit List* with respect to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Dkt.

1

003528

No. 4216] (the "HMIT Settlement Motion") which the Court has set for hearing at 9:30 a.m.
(Central Time) on June 25, 2025 (the "Hearing").

**A. Witnesses:**

1)  Any witness identified by or called by any other party; and

2)  Any witness necessary for rebuttal.

**B. Exhibits:**

The HMIT Entities adopt the *Exhibit List* filed by Highland Capital Management, L.P., the
reorganized debtor (the "Debtor" or "Highland," as applicable) in the above-captioned chapter 11
case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant Trust"), and the
Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the
Claimant Trust, the "Movants") at Dkt. No. 4255, as may be amended or supplemented.

Respectfully Submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

***Counsel for the HMIT Entities***

2

003529

**CERTIFICATE OF SERVICE**

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties receiving notice in this chapter 11 case through this Court's CM/ECF System on this June 20, 2025.

/s/ Louis M. Phillips_____
Louis M. Phillips (#10505)

003530

Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
Okin Adams Bartlett Curry LLP
1113 Vine Street, Suite 240
Houston, Texas 77002
Tel: (713) 228-4100
Fax: (346) 247-7158
mokin@okinadams.com
dcurry@okinadams.com

**ATTORNEYS FOR THE DALLAS FOUNDATION AND
CROWN GLOBAL LIFE INSURANCE, LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD.
WITNESS AND EXHIBIT LIST FOR JUNE 25, 2025 HEARING**

The Dallas Foundation and Crown Global Life Insurance, Ltd. file this Witness and
Exhibit List for the December 25, 2025 hearing in the above-captioned case.

### WITNESSES

The Dallas Foundation and Crown Global Life Insurance, Ltd. designate the following
individuals who may be called as witnesses at the June 25, 2025 Hearing (exclusive of those that
may be used for impeachment purposes):

1. Torrey Littleton, Chief Financial Officer, The Dallas Foundation;

2. All witnesses designated by any other party.

003531

## EXHIBITS

The Dallas Foundation and Crown Global Life Insurance, Ltd. designate the following exhibits that may be used at the June 25, 2025 Hearing (exclusive of those that may be used for impeachment purposes):

| Ex. # | DESCRIPTION | MARKED | OFFERED | OBJECT | ADMIT | Disp. After Trial |
|---|---|---|---|---|---|---|
| 1. | Charitable DAF/CLO HoldCo Organization Chart | | | | | |
| 2. | Rand Structure Chart | | | | | |
| 3. | Haynes & Boone July 9, 2021 Memo on DAFs and Sponsoring Orgs [ECF #2547-4] | | | | | |
| 4. | Charitable Respondents' Response and Disclosures Related to the Court's Order Requiring Disclosures with Exhibits 1 – 43 [ECF #2547] | | | | | |
| 5. | Any exhibits designated by other parties | | | | | |

The Dallas Foundation and Crown Global Life Insurance, Ltd. reserve the right to use additional demonstrative exhibits as they deem appropriate in connection with the June 25, 2025 Hearing.  The Dallas Foundation and Crown Global Life Insurance, Ltd reserve the right to use any exhibits presented by any other party and reserve the right to amend and/or supplement this exhibit list.

Respectfully submitted on this 22nd day of June 2025.

**THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD WITNESS AND EXHIBIT LIST FOR JUNE 25, 2025 HEARING—Page 2**

**OKIN ADAMS BARTLETT CURRY LLP**

By: /s/ *David L. Curry, Jr.*
     Matthew S. Okin
     Texas Bar No. 00784695
     David L. Curry, Jr.
     Texas Bar No. 24065107
     1113 Vine Street, Suite 240
     Houston, Texas 77002
     Tel: (713) 228-4100
     Fax: (346) 247-7158
     Email: mokin@okinadams.com
     Email: dcurry@okinadams.com

**ATTORNEYS FOR THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD.**

**EXHIBIT 1**

**EXHIBIT 1**

# Charitable DAF/CLO HoldCo
## Structure Chart



# EXHIBIT 2

**EXHIBIT 2**

**Rand Structure Chart –**
*(effective as of 4/27/2023)*



003537

# EXHIBIT 3

003538

# MEMORANDUM

**Date: July 9, 2021**

**To:  Mark Patrick**

**Company:  Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd.**

**From:  Haynes and Boone, LLP, by Kenneth Bezozo**

**Subject:  Donor Advised Funds ("*DAFs*"), Sponsoring Organizations and Supporting Organizations -- The Reasons for Making Investments in Offshore Jurisdictions**

---

1. ***What are Donor Advised Funds, Sponsoring Organizations and Supporting Organizations?***

A donor advised fund, or DAF, is a separately managed charitable investment account established by a donor within a public charity (a section 501(c)(3) organization), which is generally referred to as a sponsor.  Sponsors may include a community foundation, university, religious organization, or financial institution.  The donor (or the donor's designee) typically maintains certain advisory privileges over the DAF funds or account – specifically with respect to charities that should receive donations, although the DAF account is fully and completely owned and controlled by the sponsor.

In some cases, a sponsor can create as a subsidiary a "supporting organization" which also is a Section 501(c)(3) public charity.  A supporting organization is a separate entity controlled by the sponsor through its ability to elect a majority of the supporting organization's governing board.  Because of this control, a supporting organization is treated financially as part of a consolidated unit with the sponsor.

Here, for example, The Dallas Foundation formed, and owns and controls, a supporting organization named Highland Dallas Foundation, Inc. ("*Highland Dallas Foundation*") to assist The Dallas Foundation in carrying out its charitable mission in helping support a wide variety of community affairs.  Donations were made to the Highland Dallas Foundation as both the sponsor and the supporting organization.  The Highland Dallas Foundation from time to time makes distributions of funds to The Dallas Foundation which in turn makes further distributions to local public charities.  *Exhibit 1* attached shows these above-described entities, as well as other entities referenced herein that are pertinent to this donor advised fund.

2. ***How Does a Donor Establish a DAF Account?***

To establish a DAF fund or account, a donor must make an irrevocable contribution of assets, such as cash, stock or securities or other business or financial assets, to a sponsoring public charity. The donor's contribution is recorded and recognized as a donation to the sponsoring

**003539**

public charity of the DAF. A donor can make additional contributions to the sponsoring organization whenever they choose.

Because a contribution to a sponsoring organization is, for tax purposes, the equivalent of a contribution to a public charity and because the donor gets an immediate tax benefit for the contribution, the contribution, when made, is permanent and irrevocable. This is true even though the donor contribution to the sponsoring organization is in an account that grows tax-free and the donor has advisory rights as to where to invest the assets and donations made from these assets.

Here, the Highland Dallas Foundation is the sponsor of the DAF account which it fully owns and controls. Although the donor has advisory rights regarding investments and donations to charities (by way of a board seat he fills in the supporting organization), the Highland Dallas Foundation has full authority and control over all such decision-making.

3. *What Type of Investments Can be Made by a Sponsor/Supporting Organization?*

A sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are able to invest in a wide variety of assets including, but not limited to, marketable securities, financial assets, businesses, real estate, private equity and hedge funds. But because the sponsor and supporting organization are both public charities that are tax-exempt organizations, their investments must take into account all laws that could possibly effect their tax-exempt status.

a. *Can a Sponsor and its Supporting Organization Invest in a Hedge Fund, Private Equity Fund or Similar Investment Vehicle?*

The short answer is yes, but as stated above, a sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are both public charities that are tax-exempt organizations. As a strong general rule, a tax-exempt organization will avoid any investments that will subject it to federal or state taxes. A tax-exempt organization is generally exempt from all federal and state taxes except to the extent it receives income classified as unrelated business taxable income (UBTI), which would be taxed at a 21% rate. The term "unrelated business taxable income" generally means the income derived from an unrelated trade or business regularly conducted by the tax-exempt organization. UBTI also can arise from the receipt of income from debt-financed investments, which is why hedge and private equity funds generally utilize a special investment structure to ensure tax-exempt investors do not have UBTI.

To prevent UBTI from flowing through to a tax-exempt organization, a corporation can be utilized to "block" this income at the corporate level, which is accomplished by having a corporation interposed between the tax-exempt organization and the hedge fund, such as The Charitable DAF Holdco, Ltd. (a corporate blocker) from the Charitable DAF Fund, L.P. Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation. The blocker corporation thereafter distributes the income to the tax-exempt

003540

Case 19-34054-sgj11 Doc 2547-5 Filed 07/09/21 Entered 07/09/21 20:23:00 Page 4 of 6
Case 3:25-cv-01376-X   Document 14-6   Filed 08/05/25   Page 26 of 335   PageID 4774
EXHIBIT 5

investor through the payment of dividends which are not UBTI and therefore not taxable to a tax-exempt organization.

Although using a domestic corporate blocker can avoid the problem of having UBTI passed through to a tax-exempt sponsor or its supporting organization, a U.S.-based blocker corporation will be required to pay corporate and state-level income tax on the income they receive from an investment fund.

> b. *Are There Particular Jurisdictions in Which Hedge and Private Equity Funds form Investment Partnerships and Blocker Corporations for their tax-exempt investors?*

It is common for hedge and private equity funds that have tax-exempt investors such as The Dallas Foundation and Highland Dallas Foundation to utilize an offshore structure to form its investment partnership.  In addition, these funds may form offshore blocker corporations as well as for other reasons including the ability to make non-U.S. investments or U.S. investments that do not give rise to U.S. tax for foreign investors (i.e., U.S. investments that do not cause the investor to be "engaged in a U.S. trade or business.")  Jurisdictions such as Bermuda and the Cayman Islands are typically used because those countries do not have an income tax regime.

By utilizing an offshore structure with corporate blockers, hedge and private equity funds can ensure their tax-exempt investors will not receive any UBTI from investments held by The Dallas Foundation or Highland Dallas Foundation. In addition, to the extent the sole source of UBTI is through debt financing (which is often the case in a hedge fund), then using an offshore corporate blocker can eliminate this type of UBTI (because the debt financing will not flow through the corporate blocker to taint the income received by the tax-exempt investor).  This allows the sponsor (i.e., Highland Dallas Foundation), as well as any other charities that receive distributions from Highland Dallas Foundation or The Dallas Foundation, to receive the largest possible distributions.

Utilizing an offshore structure for hedge and private equity funds in the manner described above for tax-exempt investors is a best practice used by many U.S. law firms representing U.S. hedge and private equity funds.  In fact, if a U.S. firm didn't use offshore blockers in the manner described above, it could be considered a poor practice.

In summary, using an offshore blocker corporation, such as Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd., for many hedge funds minimizes taxes and increases the net after-tax cash flow to the tax-exempt investors because investments grow tax-free, giving a sponsor, such as Highland Dallas Foundation, the potential to create even more capital for philanthropic giving.

4. *Who Has Control and Authority over the Assets Held by the Sponsor?*

Because a DAF is an account within a sponsor organization, the sponsoring organization has full, complete and final control over the funds in the DAF, which is the case here with the sponsor, the Highland Dallas Foundation.  Although the supporting organization permits the donor or the donor's designee to recommend how funds should be invested and how funds should be

003541

Case 19-34054-sgj11 Doc 2547-3 Filed 07/08/20 Entered 07/08/20 20:22:30 Page 5 of 6
Case 3:25-cv-01876-K Document 34-1 Filed 05/25 Page 27 of 35 PageID 4775
**EXHIBIT 3**

distributed to other public charities, Highland Dallas Foundation must approve any investments and all distributions to charities.

In this case, the donor of the charitable DAF, or his designee, is able to appoint a representative to the board of the Highland Dallas Foundation, which allows the donor to recommend investments or distributions to charitable organizations, i.e., organizations that are tax-exempt under Internal Revenue Code section 501(c)(3) and classified as public charities under Internal Revenue Code section 509(a). But the donor (or the donor's designee) only has advisory privileges over making investments and the distribution of funds.

5. ***What Are the Benefits to a Donor of a Contribution to a DAF account?***

A DAF account allows a donor who makes an irrevocable charitable contribution to the DAF account to receive an immediate tax deduction, and with the ability to recommend distributions be made by the sponsor to specific charities either presently or in the future. Also, if the donor contributes certain appreciated assets to the DAF account, such as stock or securities, the donor avoids the recognition of any gain in these appreciated assets. This is a significant additional benefit to donors made available in the Internal Revenue Code.

The DAF assets that are not immediately distributed to charities are then invested and depending on the type of investments and the jurisdiction in what the investments are made, the assets may grow tax-free.

003542

Case 19-34054-sgj11 Doc 2547-3 Filed 07/09/21 Entered 07/09/21 20:23:00 Page 6 of 6
Case 3:25-cv-01376-L Document 14-1 Filed 05/25 Page 28 of Page 6 PageID 4776
Exhibit 3

**Exhibit 1**

**Charitable DAF/CLO Holdco
Structure Chart**



# EXHIBIT 4

003544

Case 19-34054-sgj11 Doc 2547 Filed 07/09/21 Entered 07/09/21 23:00:44 Desc
Case 3:21-cv-04876 Charitable Respondents Filed 09/09/25 Page 30 of 335 PageID 4778

Docket #2547 Date Filed: 07/09/2021

**EXHIBIT 4**

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopier: (817) 878-9280

**COUNSEL FOR CLO HOLDCO, LTD., CHARITABLE DAF FUND, LP AND HIGHLAND DALLAS FOUNDATION, INC.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.,** | § | **Chapter 11** |
| | § | |
| | § | |
| Debtor | § | **Relates to Dkt. No. 2460** |

---

**RESPONSE AND DISCLOSURES RELATED TO THE COURT'S ORDER REQUIRING DISCLOSURES**

1934054210709000000000000015
003545

**EXHIBIT 4**

CLO HoldCo, Ltd. ("CLO HoldCo"), Charitable DAF Fund, LP ("DAF Fund"), Highland

Dallas Foundation, Inc., ("Highland Dallas Foundation," collectively, the "Charitable

Respondents"), [1] file this *Response* ("Response") and submit these *Disclosures* ("Disclosures") to

comply with the Court's *sua sponte Order Requiring Disclosures* (Dkt. No. 2460) (the

"Disclosures Order").

---

[1] CLO Holdco and Highland Dallas Foundation have filed a *Motion to Withdraw the Reference* in Adversary Case No. 20-03195 (the "Adversary Proceeding"), at Dkt. No. 24 (in the Adversary Proceeding), and neither the fact nor content of this Response is intended to be nor shall be deemed a waiver of their right to a trial by jury on all claims asserted in the Adversary Proceeding nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court. DAF Fund is also a defendant in the Adversary Proceeding but has not been served. Neither the fact nor content of this Response by DAF Fund is intended to be nor shall be deemed: a waiver of service requirements in the Adversary Proceeding; acceptance of service of citation or summons in the Adversary Proceeding; waiver of its right to a trial by jury on all claims in the Adversary Proceeding (if ever served), nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court (again, if ever served). The Charitable Respondents submit this Response in the Bankruptcy Case solely because the Court has ordered them to do so, and because they have appeared before this Court previously.

**TABLE OF CONTENTS**

TABLE OF CONTENTS..........................................................................................I

TABLE OF AUTHORITIES ..............................................................................II

PRELIMINARY STATEMENT ..........................................................................1

PROCEDURAL HISTORY..................................................................................4

RESPONSE..........................................................................................................7

    I.        The Charitable Respondents are independently owned and controlled charitable organizations. ..........................................................................7

       a)    CLO HoldCo...........................................................................9

       b)    DAF Fund ..............................................................................9

       c)    DAF Holdco ..........................................................................10

       d)    DAF GP .................................................................................11

       e)    The Supporting Organizations ............................................11

       f)    Mr. Patrick's role.................................................................15

    II.       The Charitable Respondents have donated tens of millions of dollars to charitable causes ...............................................................16

    III.      CLO HoldCo and DAF Fund may be creditors of the Debtor.............................18

    IV.      The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing...............................................20

       a)    The Court does not have the power to require non-parties to provide it with disclosures. ......................................................20

       b)    The Court's *sua sponte* investigation into hypothetical standing is improper. ..........22

       c)    The Disclosures Order is not just improper, it is prejudicial......................................26

CONCLUSION....................................................................................................28

003547

**EXHIBIT 4**

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Baum v. Blue Moon Ventures, LLC*,
 513 F.3d 181 (5th Cir. 2008) ........................................................................26

*Berry v. CIGNA/RSI-CIGNA*,
 975 F.2d 1188 (5th Cir. 1992) ......................................................................21

*Brackeen v. Haaland*,
 994 F.3d 249 (5th Cir. 2021) ........................................................................24

*Castro v. United States*,
 540 U.S. 375, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003).................................23

*In re Delta Underground Storage Co., Inc.*,
 165 B.R. 596 (Bankr. S.D. Miss. 1994).......................................................25

*Franklin v. Laughlin*,
 No. SA-10-CV-1027 XR, 2011 WL 598489 (W.D. Tex. Jan. 13, 2011) ..............26

*In re Friede Goldman Halter Inc.*,
 600 B.R. 526 (Bankr. S.D. Miss. 2019)........................................................25

*Greenlaw v. United States*,
 554 U.S. 237 (2008)......................................................................................23

*NASCO, Inc. v. Calcasieu Television & Radio, Inc.*,
 894 F.2d 696 (5th Cir.1990) .........................................................................22

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
 2 F.3d 1397 (5th Cir. 1993) ......................................................................21, 22

*Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*,
 No. 219CV184FTM99MRM, 2019 WL 3219667 (M.D. Fla. July 17, 2019) ........24

*In re Saldana*,
 531 B.R. 141 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R.
 678 (N.D. Tex. 2015)....................................................................................22

*Sanchez-Llamas v. Oregon*,
 548 U.S. 331 (2006)......................................................................................23

*Simon v. Taylor*,
 794 F. App'x 703 (10th Cir. 2019) ...............................................................23

ii

003548

**EXHIBIT 4**

*Thompson v. Gonzales,*
    No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436 (E.D. Cal. Sept. 27, 2016) .........................22

*Uberoi v. Labarga,*
    769 F. App'x 692 (11th Cir. 2019) ...........................................................................................24

*United States v. Sineneng-Smith,*
    140 S. Ct. 1575 (2020)..............................................................................................................23

*Matter of Ward,*
    978 F.3d 298 (5th Cir. 2020) ....................................................................................................21

*Wood v. Milyard,*
    566 U.S. 463 (2012)..................................................................................................................23

**Statutes**

11 U.S.C. § 101(10) ...........................................................................................................................20

11 U.S.C. § 105...................................................................................................................5, 20, 21, 24

**Other Authorities**

Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte*
    *Decisions by Appellate Courts*, 69 TENN. L. REV. 245 (2002) ................................................23

Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General*
    *Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832
    (2000)........................................................................................................................................24

Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The*
    *Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR.
    L.J. 461, 563 (2002)..................................................................................................................24

003549

PRELIMINARY STATEMENT

1.      CLO HoldCo, DAF Fund, and Highland Dallas Foundation have each previously filed pleadings in this Court and are, at least arguably, parties to the Bankruptcy Case.  As set forth herein, several targets of the Court's Disclosures Order have never made an appearance before this Court including Charitable DAF Holdco, Ltd.[2] ("DAF Holdco"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara Foundation"), and Highland Kansas City Foundation, Inc. ("Highland Kansas City Foundation," collectively with DAF Holdco and Highland Santa Barbara Foundation, the "Non-Party Targets").[3]  The Court does not have the power to order a non-party to produce documents nor undertake *sua sponte* investigations, particularly into non-parties.  The fact that these entities are non-parties and at the same time targets, is telling.  Further the Non-Party Targets have not been served with the Disclosures Order.

2.      Neither the Charitable Respondents nor undersigned counsel are authorized to make appearances for the Non-Party Targets, and the Non-Party Targets are not by this Response submitting themselves to this Court's jurisdiction.  The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Non-Party Targets.  Nonetheless, much of the Disclosures provided by the Charitable Respondents on their own behalf will be informative regarding the Non-Party Targets.  Further, the Non-Party Targets have provided limited authorization for the

---

[2]      Undersigned counsel has been retained to represent DAF Holdco; however, DAF Holdco has never made an appearance in this bankruptcy case and has not been served in the Adversary Proceeding.  Nor has DAF Holdco been served with this Disclosures Order.  DAF Holdco has not authorized undersigned counsel to accept service nor to make an appearance for it in this Bankruptcy Case.

[3]      The Highland Dallas Foundation, the Highland Santa Barbara Foundation, and the Highland Kansas City Foundation are sometimes also referred to as "Supporting Organizations."

1

003550

Case 19-34054-sgj11 Doc 4257-4 Filed 07/09/25 Entered 07/09/25 23:04:46 Desc 7 of 34
Case 3:25-kbit-01876-M Charitable Respondents Response and Disclosures 36 of 307 Page 2 of 307 PageID 4784
**EXHIBIT 4**

Charitable Respondents, through Mr. Mark Patrick ("Patrick"), to provide the information to the Court that is submitted by the Charitable Respondents in this Response.

3.      Further, the Disclosures Order does not mention the third-party foundation level entities included in the Structure Chart (*infra*) ("Foundations"); however, these Foundations have provided the Charitable Respondents with documents and important information regarding their charitable giving structures and the supporting organizations include the Highland Dallas Foundation and the supporting organizations that are Non-Party Targets.  The fact and content of this Response is not intended to be nor shall be deemed to be an appearance by these Foundations in this Bankruptcy Case, nor submission by them to this Court's jurisdiction.  The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Foundations.

4.      Patrick has provided a declaration regarding the information provided by and/or about the Foundations and the Supporting Organizations, and as provided herein within the Disclosures.  As well, he has reviewed the Response and Disclosures.  *See* **Exhibit 1** [Mark Patrick Declaration]

5.      As set forth herein, contrary to the Court's unsupported and highly prejudicial *sua sponte* assertions that the Charitable Respondents and Non-Party Targets "appear to be under the *de facto* control of Mr. Dondero," the Charitable Respondents and Non-Party Targets (along with the Foundations) make up a legal and viable charitable giving structure, established through a non-byzantine set of entities that has committed over $42 million in grants, and funded $32.5 million, to nonprofits across a wide-range of issues including education, support of military, veterans, and first-responders, and victims of family violence and child abuse.  With respect to Mr. Dondero, of course he is involved, personally in the capacity as the Donor personality.  In addition, as disclosed

Case 19-34054-sgj11 Doc 4257 Filed 07/09/25 Entered 07/09/25 23:04 Page 8 of 34
Case 3:25-cv-01476-N Exhibit Charitable Respondents Response and Disclosures Page 37 of 307 PageID 4785
**EXHIBIT 4**

within the Disclosures, he holds positions within the Supporting Organizations, which are subject to the authority of the Foundations they support. As well, and as established by Mr. Patrick's uncontroverted testimony before this Court, Mr. Dondero currently acts as an unpaid investment advisor to CLO HoldCo and DAF Fund. However, as will be shown Mr. Dondero is not in "de facto" or legal control of the Charitable Respondents nor the Non-Party Targets (nor the Foundations).

6.     The Charitable Respondents take the time to refute the Court's assertions in the Disclosures Order because not only are they factually inaccurate—which will be shown herein and through the submitted Disclosures—but worse, these *sua sponte* findings bear directly upon the causes of action asserted by Official Committee of Unsecured Creditors (the "Committee") against CLO HoldCo, DAF Holdco, DAF Fund, and Highland Dallas Foundation (the "Charitable Defendants") in Adversary Proceeding No. 20-03195 (the "Adversary Proceeding"). While there are several motions to withdraw the reference pending in the Adversary Proceeding, this Court should, at an absolute minimum, refrain from espousing, *sua sponte*, any "findings" or "conclusions" that in fact are indistinguishable from allegations made in conclusory fashion (much like the Court's expositions) by a plaintiff party in litigation currently pending in this Court. Such an "approach" to exercise of the judicial function (under the notion of maintaining the Court's docket) is, frankly, not recognizable as a constitutional approach to exercise of judicial power. This Court, it appears has become litigant, investigator and decider, far outside the scope of case or controversy. Through its assertions the Court appears to have decided integral issues in the Adversary Proceeding *sua sponte* without considering any evidence nor offering the Charitable Defendants any opportunity to present their case, and all this notwithstanding pending motions to

003552

withdraw reference (that the Court has previously stayed over the objection of the Charitable Defendant movers).

**PROCEDURAL HISTORY**

7.      As the Court is aware, there was a show cause hearing on June 8, 2021 (the "Show Cause Hearing") related to the lawsuit filed by CLO HoldCo and DAF Fund against the Debtor captioned *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P. et al.*, case no. 21-cv-00842, pending in the United States District Court for the Northern District of Texas (the "District Court Suit"). In the District Court Suit, the plaintiffs filed a motion to amend their complaint (the "Seery Motion"), and thereafter, the Court issued what it titled: *Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Dkt. No. 2255] (the "Show Cause Order") to determine if the "Violators" should be held in contempt of court for filing the Seery Motion. The Court ordered the "Violators," as defined by the Court, including CLO HoldCo and DAF Fund, those persons who authorized the filing of the Seery Motion and the District Court Suit (and the law firm representing the plaintiffs), along with Mr. Dondero, to appear at the Show Cause Hearing.

8.      Patrick identified himself as the person who authorized the filing of the Seery Motion and the District Court Suit and identified that he was vested with such authority by virtue of his position as the director CLO HoldCo and control person of DAF Fund. *See* Response, Dkt. No. 2309. The Debtor undertook extensive discovery related to the Show Cause Hearing with the express purpose of attempting to prove that despite Mr. Patrick authorizing the filings and being the control person of the plaintiffs, Mr. Dondero should nonetheless be held in contempt.

003553

Case 19-34054-sgj11 Doc 2447-5 Filed 07/09/21 Entered 07/09/21 23:00 Page 10 of 34
Case 3:21-cv-01478 Charitable Respondents Response and Disclosures Page 11 of 307 D 4787
**EXHIBIT 4**

9.      Therefore, at the Show Cause Hearing, the respondents, including Patrick, introduced evidence reflecting the structure of the Charitable Respondents,[4] the ownership of the Charitable Respondents,[5] and the controlling entities/persons of the Charitable Respondents.[6] At the Show Cause Hearing, Patrick further provided extensive testimony regarding the creation, structure, organization, purpose, and control of the Charitable Respondents. *See* **Exhibit 2** [Transcript, June 8, 2021 Hearing, Excerpts].

10.      On June 17, 2021, the Court issued its Disclosures Order *sua sponte* pursuant to Section 105 of the Bankruptcy Code and its "inherent ability to efficiently monitor its docket and evaluate standing of parties who ask for relief in the [Bankruptcy Case]." Disclosures Order, p. 1.

11.      Importantly, the Disclosures Order does not relate to and was not issued in connection with any contested matter or adversary proceeding before the Bankruptcy Court. Instead, the Court states that the Disclosures Order is "in furtherance of [its] desire to be more clear about the standing of various of these entities, and to assess whether their interests may be sufficiently aligned, in some circumstances, so as to require joint pleadings." Disclosures Order, p. 12. As such, the Court appears to be attempting to ascertain some sort of generalized standing where there is no proceeding before it and contemplating the issuance of pre-filing injunctions against the Charitable Respondents and Non-Party Targets.

12.      Based on the forgoing, the Disclosures Order requires numerous parties (whether before the Court or not), including the Charitable Respondents and Non-Party Targets, to file a notice in the Bankruptcy Case disclosing: (a) who owns the entity (showing percentages); (b)

---

[4] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 1)

[5] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 9, 10, 11, 12, 15, 16, 17, 18, 19, 20)

[6] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 3, 4, ,5, 6, 7, 8, 29)

003554

Case 19-34054-sgj11 Doc 2642-5 Filed 07/06/25 Entered 07/06/25 23:01:11 Page 11 of 84
Case 3:23-cv-01804 Charitable Respondents Response and Disclosures Page 512 of 557 PageID 4788
**EXHIBIT 4**

whether Mr. Dondero or his family trusts have either a direct or indirect ownership interest in the entity and, if so, what percentage of ultimate ownership; (c) who are the officers, directors, managers and/or trustees of the Non-Debtor Dondero-Related Entity (this itself looks to be a determination by this Court of "relationship" with damaging consequences); and (d) whether the entity is a creditor of the Debtor (explaining in reasonable detail the amount and substance of its claims).

13.     The Disclosures Order does not even pretend to be concerned with such mundane matters as proper service, or the right of parties not before the Court, even if creditors, to remain outside the Court.  Certainly the Court does not exhibit a glimpse of concern about possible limitations upon the judicial power to compel parties to appear before it.  Because of its assertions concerning Mr. Dondero's "de facto control" of third party entities (again, outside of any pending case or controversy and in fact contrary to evidence put before the Court), the Court has (i) dispensed with case or controversy boundaries, and (ii) sent its Disclosures Order into the universe as an all-powerful compulsion imposed upon entities that have never made appearance before the Court - all without service.  All because this Court has concluded that these third parties are controlled by Mr. Dondero, and because this Court has power over Mr. Dondero, it need not think twice about its power over any entity it has determined (without ground) to be controlled by Mr. Dondero because such party may have some relation to Mr. Dondero.

14.     As mentioned above, the Charitable Respondents are responding.  But the entities outside the scope of the Court's authority are not appearing in Response.  As set forth below, the Charitable Respondents believe this Response and the Disclosures provided herein are sufficient and compliant.  The Charitable Respondents reserve all rights.

003555

**EXHIBIT 4**

RESPONSE

15.     The Charitable Respondents file their Response to the Disclosures Order to comply with it, but with full reservations concerning the propriety of such a *sua sponte* investigation into standing where there is no proceeding before the Court and the prospective issuance of pre-filing injunctions against parties who have never participated in the Bankruptcy Case (i.e. the Non-Party Targets), or have only do so on a limited basis or were compelled to by order of the Court (i.e. the Charitable Respondents).

16.     The Charitable Respondents have already provided the Debtor and the Court with much of the information ordered by the Court, and do so again and more robustly herein, to show to the Court that the Charitable Respondents are not "under the *de facto* control of Mr. Dondero" and its directors do not act "at Mr. Dondero's direction." *See* Disclosures Order, pp. 5, 11.

17.     The Charitable Respondents, however, take this opportunity to correct any misunderstanding regarding their structure and control, while noting and reserving all rights regarding the impropriety of such prejudicial *sua sponte* assertions.

    **I.**    **The Charitable Respondents are independently owned and controlled charitable organizations.**

18.     The best starting point to understand the structure of the Charitable Respondents is the Structure Chart attached hereto as **Exhibit 3** ["Structure Chart"].  For ease of reference, the Structure Chart is reproduced as follows:

7

003556

**EXHIBIT 4**



19.     Second, the Charitable Respondents provide the Court with a legal memorandum of Kenneth K. Bezozo, a partner with Haynes and Boone, LLP, determined by the Charitable Respondents to be a legal expert in the field of taxation and organizational structures. *See* **Exhibit 4** [Kenneth K. Bezozo Memorandum]. As the Bezozo Memorandum explains, the Structure Chart and the entity structure of which the Charitable Respondents are a part (along with the Supporting Organizations and the Foundations) is a structure including offshore entities that is a typical industry standard investment structure to facilitate tax-exempt ownership and charitable giving. Given that the structure employed is in fact, within the tax-exempt, charitable entity structures neither unusual nor exotic, the Charitable Respondents submit that contrary to the jargon appropriated by the Court from the Committee and the Debtor and its counsel, this structure is not at all "Byzantine."

003557

**EXHIBIT 4**

**The Entities**

    **a)  CLO HoldCo**

20.      As the Structure Chart reflects, CLO HoldCo is a company limited by shares incorporated in the Cayman Islands. *See* **Exhibit 5** [Certificate of Incorporation - CLO HoldCo, Ltd.]. CLO HoldCo was incorporated in 2010. *See* **Exhibit 6** [Memorandum of Association of CLO HoldCo, Ltd.]. CLO HoldCo is managed and controlled by directors who are appointed by resolution of shareholders of CLO HoldCo. *See* Memorandum of Association of CLO HoldCo, Ltd., p. 11-12 ("Directors"). The Directors are currently Mr. Patrick and Mr. Paul Murphy. *See* **Exhibit 36** [CLO HoldCo - Register of Directors].

21.      CLO HoldCo is owned by the holder of its sole share. The sole shareholder of CLO HoldCo was previously DAF Holdco who contributed the share on November 7, 2011 to DAF Fund. *See* **Exhibit 7** [Ordinary Share Registry - CLO HoldCo]. Therefore, CLO HoldCo is wholly owned by DAF Fund.[7]

    **b)  DAF Fund**

22.      DAF Fund is a limited partnership organized under the laws of the Cayman Islands. *See* **Exhibit 8** [Certificate of Registration of Exempted Limited Partnership - DAF Fund]. Pursuant to the *Amended and Restated Exempted Limited Partnership Agreement dated November 7, 2011* (the "DAF Fund LP Agreement"), DAF Holdco is the limited partner of the DAF Fund and the Charitable DAF GP, LLC ("DAF GP") is the general partner. *See* **Exhibit 9** [DAF Fund

---

[7]      While not appearing on the Structure Chart, nor made subject of the Disclosures Order, there are subsidiaries of CLO HoldCo as well, and these are named, with corresponding ownership and director exhibits identified as follows: (i) Liberty CLO Holdco, Ltd. (*see* **Exhibits 38 and 39** [Register of Directors and Share Register]); (ii) MGM Studios HoldCo, Ltd. (*see* **Exhibits 40 and 41** [Register of Directors and Share Register]); (iii) HCT HoldCo 2, Ltd. (*see* **Exhibits 42 and 43** [Register of Directors and Share Register]). Note, Dondero holds no directorship or ownership.

003558

Case 1:23-04054-sgj11 Doc 264-7 Filed 07/06/25 Entered 07/06/25 23:03:14 Page 15 of 64
Case 3:21-cv-04872-Charitable Respondents Response and Disclosures 44 Page 16 of 307 ID 4792
**EXHIBIT 4**

LP Agreement]. Pursuant to the terms of the DAF Fund LP Agreement, DAF Holdco contributed its equity interest in CLO HoldCo to DAF Fund pursuant to a Contribution and Transfer Agreement dated November 7, 2011. Ordinary Share Class Transfers - CLO HoldCo; DAF Fund LP Agreement, ¶3.1.

23. The express purpose of DAF Fund is and always was to invest and trade in securities of all type and other investment vehicles for the purpose of befitting, direct and indirectly, the indirect equity owners of DAF Holdco, which were required to be Section 501(c)(3) of the IRS Code entities or organizations or have sole beneficiaries which are entities or organizations exempt from taxation under Section 501(c)(3) of the IRS Code. *See* DAF Fund LP Agreement, ¶1.3.

24. Because DAF Fund is a limited partnership, the DAF GP has the exclusive and complete discretion in the management and control of the DAF Fund. DAF Fund LP Agreement, ¶1.6, **Exhibit 10** [DAF Fund General Partner Register].

**c) DAF Holdco**

25. DAF Holdco is a company limited by shares incorporated under the laws of the Cayman Islands. See **Exhibit 11** [Amended and Restated Memorandum of Association of DAF Holdco]. DAF Holdco's equity ownership consists of holders of Management and Participating Shares. *Id.* The Management Shares confer no right to participate in profits but rather to manage DAF Holdco, whereas Participating Shares confer the right to participate in profits or assets but not management rights. *Id.*

26. The Management Shares of DAF Holdco were allotted to Grant Scott ("Scott") in 2011 but as will be discussed herein, were transferred to Patrick in 2021. *See* **Exhibit 12** [Register of Management Shares DAF Holdco]. The Directors are currently Mr. Patrick and Mr. Paul Murphy. *See* **Exhibit 37** [DAF Holdco - Register of Directors]. The Participating Shares of DAF

003559

Case 19-34054-sgj11 Doc 2644-5 Filed 07/09/25 Entered 07/09/25 23:09 Page 16 of 34
Case 3:23-cv-01875 Charitable Respondents Response and Disclosures Page 45 Page 17 of 307 PID 4793
**EXHIBIT 4**

Holdco are held by the "Supporting Organizations," which are Highland Kanas City Foundation [32.78%], Highland Dallas Foundation [32.78%], Highland Santa Barbara Foundation [32.78%], and Highland Community Foundation of North Texas [1.63%].[8]  *See* **Exhibit 13** [Register of Participating Shares DAF Holdco].

       27.    As set forth in the DAF Fund LP Agreement, DAF Fund's investments are for the benefit of the equity owners of  DAF Holdco which were required to be non-profit organizations. The Supporting Organizations are those non-profit organizations.

    **d)  DAF GP**

       28.    DAF GP is a limited liability company organized under the laws of Delaware.  *See* **Exhibit 14** [Certificate of Formation of DAF GP].  Again, DAF GP is the general partner of DAF Fund who manages and controls DAF Fund.  Prior to March 2021, 100% of the limited liability company interests in the DAF GP (the "DAF GP Membership Interests") were held by Mr. Scott. Mr. Scott transferred all of the DAF GP Membership Interests to Mr. Patrick.  **Exhibit 15** [Assignment and Assumption of Membership Interests Agreement Dated March 24, 2021].

       29.    As shown by the Exhibits hereto, Dondero holds no ownership, officer, or director status in any of:  CLO HoldCo; DAF Fund; DAF HoldCo; or DAF GP.

    **e)  The Supporting Organizations**

       30.    As mentioned, the Supporting Organizations are Highland Dallas Foundation, Highland Kansas City Foundation, Highland Santa Barbara Foundation, and Highland Community Foundation of North Texas.  These Supporting Organizations were established by the Foundations.

---

[8]    The Court has not included Highland Community Foundation of North Texas in its Disclosures Order.

**EXHIBIT 4**

- **Highland Dallas Foundation**

31.      Highland Dallas Foundation is a corporation incorporated in 2011 under the laws of Delaware. **Exhibit 16** [HDF Certificate of Incorporation]. The Highland Dallas Foundation was and is organized and operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the IRS Code. **Exhibit 17** [IRS Determination - HDF].

32.      The Highland Dallas Foundation supports and benefits the Dallas Foundation. *See* HDF Certificate of Incorporation, **Exhibit 18** [Narrative Description of Activities]. The Dallas Foundation is a third-party and is the oldest community foundation in Texas.

33.      As set forth in the attached letter from the President and Chief Executive Officer of the Dallas Foundation, the Dallas Foundation is a Texas nonprofit corporation, and is the successor in interest to Dallas Community Trust, a charitable trust which was formed in 1929. **Exhibit 19** [reserved for supplementation]. The Dallas Foundation has hundreds of donors with whom it works regularly to make charitable grants supporting numerous worthy causes and regularly utilizes donor-advised funds and supporting organizations to carry out its charitable mission. *Id.*

34.      The Highland Dallas Foundation is a membership corporation, and its members have the ultimate authority to elect its Board of Directors. *Id*. **Exhibit 20** [HDF Bylaws]. The Highland Dallas Foundation has two (2) classes of members, an "Institutional Member" (the TDF), and an "Individual Member" (Mr. Dondero). *Id.*

35.      The Institutional Member has two (2) votes and the Individual Member has only one (1) vote on any matter submitted to the members. *Id*. Further, the Institutional Member elects two (2) of Highland Dallas Foundation's three (3) directors, and the Individual Member elects one (1) director. *Id*. The Board of Directors of Highland Dallas Foundation consists of Mr. Dondero, Julie Diaz (Chief Philanthropic Partnerships Officer of TDF) and Matthew Randazzo (President

003561

Case 19-34054-sgj11 Doc 2544-5 Filed 07/09/26 Entered 07/09/26 23:04 Page 18 of 34
Case 3:23-cv-01478 Charitable Respondents Response and Disclosures 47 Page 19 of 307 ID 4795
**EXHIBIT 4**

& Chief Executive Officer of Dallas Foundation). Mr. Dondero serves as President, Mr. Randazzo serves as Vice President and Ms. Diaz serves as Secretary and Treasurer.

36. So while Mr. Dondero is a member with some level of influence within the Highland Dallas Foundation, he has 1/3 of the voting power, where TDF employees have 2/3 of voting power.

37. The Highland Dallas Foundation is an independent supporting organization of the Dallas Foundation. While Mr. Dondero is on the Board of Directors and is President of the Highland Dallas Foundation, it cannot be said to be "under the control" (de facto or otherwise) of Mr. Dondero, because of the control of the Board of Directors held by the Dallas Foundation.

- **Highland Santa Barbara Foundation**

38. The Highland Santa Barbara Foundation was formed in November 2011 as a Delaware nonprofit nonstock corporate to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Santa Barbara Foundation. See **Exhibit 21** [HSBF Certificate of Incorporation]; **Exhibit 22** [IRS Determination - HSBF].

39. The Santa Barbara Foundation is a third-party community foundation incorporated in 1928 as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. **Exhibit 23** [SBF Letter Overview]. The Santa Barbara Foundation funds a wide range of initiatives, projects, and organizations and has supported nearly every Santa Barbara County nonprofit organization and essential community sproject during its 93-year history. *Id*.

40. Similarly to the Dallas Foundation, the Santa Barbara Foundation works with entities organized under Section 509(a)(3) of IRS Code as supporting organizations to Santa Barbara Foundation for the specific and primary purpose of benefiting, performing functions of,

003562

Case 19-34054-sgj11 Doc 4475 Filed 07/09/25 Entered 07/09/25 23:09 Page 19 of 34
Case 3:25-cv-01187 Charitable Respondents Response and Disclosures 48 Page 20 of 307 ID 4796
**EXHIBIT 4**

and engaging in activities consistent with Santa Barbara Foundation's charitable purposes. *Id.*
Highland Santa Barbara Foundation is one such supporting organization. *Id.*

41.     Again as is common amongst supporting organizations, Highland Santa Barbara
Foundation has two classes of members, institutional and individual, and one member in each
class. *Id.*, *see also* Bylaws HSBF.  Santa Barbara Foundation is the institutional member and Mr.
Dondero is the individual member.  Highland Santa Barbara Foundation has three directors, two
elected by SBF and one elected by Mr. Dondero. The president, secretary, and any other officers
of HSBF are elected by the three directors.  *Id.*  The directors are Mr. Dondero, Jacqueline M.
Carrera (President & CEO of SBF), and Arnold Brier (Santa Barbara County community
volunteer).  Currently, Mr. Dondero serves as President, Jacqueline M. Carrera as Vice President,
and the Secretary position is vacant pending board of directors election.

42.     Again, while Mr. Dondero positions in the Highland Santa Barbara Foundation, it
is certainly not under his "de facto" control, nor do the other directors and officers act under Mr.
Dondero's direction.  The Highland Santa Barbara Foundation is an independent supporting
organization of the Santa Barbara Foundation, and is controlled by the Santa Barbara Foundation.
Imputing a lack of independence based on what is a typical structure for supporting organization
management sets a unwarrantable precedent for charitable organizations.

- **Highland Kansas City Foundation**

43.     Highland Kansas City Foundation was and is organized and operated exclusively
for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the
IRS Code, and to support and benefit the Greater Kansas City Community Foundation
("GKCCF").  *See* **Exhibit 24** [GKCCF Certificate of Formation].

003563

Case 3:19-cv-34054-sgj11 Doc 2644-25 Filed 07/09/26 Entered 07/09/26 12:38:93 Page 20 of 34
Case 3:25-cv-01874 Charitable Respondents Responses and Disclosures Page 51 of 367 PageID 4797
**EXHIBIT 4**

44.     The Greater Kansas City Community Foundation was created in 1978 and manages over $4 billion in assets, and again uses donor-advised funds and supporting organizations.  *See* **Exhibit 25** [GKCCF Letter].  As explained by the President & CEO of Greater Kansas City Community Foundation, Highland Kansas City Foundation is one of 18 supporting organizations that Greater Kansas City Community Foundation works with.  *Id.*

45.     Highland Kansas City Foundation has two classes of members, institutional and individual, and one member in each class.  *See* **Exhibit 26** [Bylaws HKCF].  Greater Kansas City Community Foundation is the institutional member and Mr. Dondero is the individual member.

46.     The Directors of Highland Kansas City Foundation are: Brenda Chumley (Senior Vice President of Greater Kansas City Community Foundation), Mr. Dondero, and Deborah Wilkerson (the President & CEO of Greater Kansas City Community Foundation).  The Highland Kansas City Foundation has not named officers. All three directors approve grants by unanimous consent.

**f)  Mr. Patrick's role**

47.     Prior to March 24, 2021, Mr. Scott was the holder of Management Shares in the DAF Holdco.  On March 24, 2021, Mr. Scott executed the *Share Transfer Form*, in which he transferred the management shares in DAF Holdco to Mr. Patrick.  **Exhibit 27** [Share Transfer Form].  Further on March 24, 2021, Mr. Scott and Mr. Patrick entered into that certain *Assignment and Assumption of Membership Interest* whereby Mr. Scott assigned and Mr. Patrick assumed one hundred percent of the limited liability company interest in the DAF GP.  *See* Assignment and Assumption Agreement.

48.     As the holder of the management shares in DAF Holdco, Mr. Patrick executed a resolution removing Mr.  Scott as Director and appointing Mr. Patrick as Director.  **Exhibit 28** [March 25 Resolution - DAF Holdco].

15

Case 19-34054-sgj11 Doc 2447-4 Filed 07/06/21 Entered 07/06/21 20:53:03 Page 2 of 34
Case 3:21-cv-01878 Charitable Respondents Response and Disclosures Page 52 of 205 ID 4798
**EXHIBIT 4**

49.     On April 2, 2021, Mr. Patrick, as holder of one hundred percent of the interest in DAF GP, executed the shareholder resolution removing Mr. Scott as Director of CLO HoldCo and appointing Mr. Patrick as director.  **Exhibit 29** [April 2 Resolution - CLO HoldCo].

50.     While on paper the switch from Mr. Scott to Mr. Patrick was completed, it became obvious that this switch would be practically more complicated.  Therefore, there was a transitional period wherein Mr. Scott had to continue to authorize certain actions with Mr. Patrick assisting him.  As of the date of filing, Mr. Scott no longer has authority/ control over the Charitable Respondents.

51.     After Mr. Patrick's appointment, he determined that given the breadth of issues facing the Charitable Respondents, including but not limited to the Adversary Proceeding, it would be in the best interest of DAF Holdco, CLO HoldCo and others for another director to be appointed. As such, on April 22, 2021, Paul Murphy was appointed a director of DAF Holdco and CLO HoldCo.  **Exhibit 30** [Written Resolution - Murphy].

## II.     The Charitable Respondents have donated tens of millions of dollars to charitable causes

52.     The Court included the Charitable Respondents and Non-Party Targets as part of what it terms — borrowing from the Committee's verbiage in the Adversary Proceeding — Mr. Dondero's "byzantine" empire and made *sua sponte* assertions regarding their lack of independence and Mr. Dondero's "de facto" control.  Again, as will be set forth herein, these findings are procedurally improper and highly prejudicial to the Charitable Defendants.  But most importantly, they are wrong.

53.     The Charitable Respondents are part of a charitable structure that donates tens of millions of dollars to charitable causes focusing on education; support for military, veterans, and

Case 3:23-cv-04495-ggjj Doc 25447 25i7ed 07/09/2016/2i/r25rec EnTe09d206120025293:00age 22 Deof 34
Case 3:23-cv-04487 Charitable Respondents Respons and 2D Disclosures 51 Page 23 of 307 ID 4799
**EXHIBIT 4**

first responders; health and medical research; economic and community development initiatives; and youth and family.  *See* **Exhibit 31** [Charitable Giving Overview, Grant Summary: 2012-2020].

54.     Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations, and have funded $32 million of the total commitments (with the remaining commitments being comprised of future scheduled installments).  *Id*.

55.     The Supporting Organizations' charitable giving has made a tangible impact on some of the most vulnerable including grants to the Dallas Children's Advocacy Center which serves over 8,000 abused children a year and The Family Place which serves more than 11,000 victims of family violence.  *Id*.  The CEO of The Family Place has submitted a letter in support which is attached hereto as **Exhibit 32** [The Family Place Letter].  The Family Place empowers victims of family violence by providing safe housing and counseling, and identifies its partnership with the Highland Dallas Foundation as "instrumental" in providing community exposure and awareness of domestic violence as well as providing essential services to family violence victims.  *Id*.  As stated by the CEO, The Family Violence Place would not be able to successfully serve its domestic violence clients without this support.

56.     Cristo Rey Dallas also submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 33** [Cristo Rey Letter].  Cristo Rey Dallas provides college preparatory high school curriculum accessible to those of limited financial resources.  Highland Dallas Foundation provided impactful donations which allow Crito Rey Dallas to provide services to its 465 students, including funding work study programs and remote work places during COVID-19 pandemic.  *Id*.

57.     Dallas Children's Advocacy Center submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 34** [DCAC Letter].  Dallas Children's

Case 19-34054-sgj11 Doc 4725 Filed 07/09/25 Entered 07/09/25 23:09 Page 23 of 34
Case 3:23-cv-01087 Charitable Respondents' Initial and Disclosures Page 24 of 307 D 4800
**EXHIBIT 4**

Advocacy Center's mission is to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues. *Id.* Highland Dallas Foundation has robustly supported this mission since 2016, including providing funding that has been critical to the sustainability of its programs. *Id.*

58.     The Supporting Organizations' grants to the Center for BrainHealth helped provide and training other programming to members of the military, veterans, and local law enforcements to improve their congestive health. *See* Charitable Giving Overview.

59.     The Friends of the Dallas Police grants show appreciation to men and women who risk their lives every day to make Dallas a safer city and the Supporting Organizations have funded awards programs and educational sponsorships for children of police officers. *Id.*

60.     The Charitable Respondents invite the Court, and others who have characterized the Supporting Organizations as mere "puppets" of Mr. Dondero, to review the Charitable Giving Overview provided herewith as well as the letters in support from The Family Place, Cristo Rey Dallas, Dallas Children's Advocacy Center,  the Santa Barbara Foundation, and the Highland Kansas City Foundation.  The Charitable Respondents have and will continue to make meaningful impacts on the communities they serve through the tens of millions of dollars of philanthropic giving they facilitate.

### III.     CLO HoldCo and DAF Fund may be creditors of the Debtor

61.     In the Disclosures Order, the Court requires all entities to state whether the entity is a creditor of the Debtor and explain in reasonable detail the amount and substance of its claims. Disclosures Order, p. 13.

62.     All claims bar dates have long since passed [*see* General Claims Bar Date Order [Dkt. No. 498].

003567

Case 19-34054-sgj11 Doc 4257 Filed 07/09/25 Entered 07/09/25 23:04 Page 24 of 64
Case 3:23-cv-01087 Charitable Respondents Response And Disclosures Page 25 of 307 ID 4801
**EXHIBIT 4**

63.     The Court states that CLO HoldCo filed two proofs of claim.  Disclosures Order,
p. 11.  This is not correct.  CLO HoldCo filed a proof of claim on April 8, 2020 [Proof of Claim
No. 133] and on October 21, 2021, CLO HoldCo amended that same proof of claim [Proof of
Claim No. 198] (the "Amended Proof of Claim").  In the Amended Proof of Claim, CLO HoldCo
explained that as a result of certain proceedings that effectuated a termination of the Debtor's
participation interests in the funds referred to in the CLO HoldCo proof of claim, such termination
served to cancel the CLO HoldCo interests, as well, as the CLO HoldCo interests were in effect
derivative of the Debtor's interests.  Accordingly, the Amended Proof of Claim reflected that the
CLO HoldCo claim was reduced to $0.00, and therefore resolved.

64.     The Court stated in the Disclosures Order that it was unaware of whether DAF
Holdco, DAF Fund, Highland Dallas Foundation, Highland Santa Barbara Foundation, or
Highland Kansas City Foundation filed proofs of claims (notwithstanding this "uncertainty" the
Court deemed it appropriate nevertheless to try to compel appearance).  Disclosures Order, p. 11.
A review of the Court's Claims Register and that of the Debtor's claims and noticing agent reflects
that none of these entities filed proofs of claim against the Debtor.

65.     Therefore, none of the Charitable Respondents are pre-petition creditors of the
Debtor, as the claims bar date has long since passed and no claims were filed which have not been
fully resolved.

66.     It is unclear from the Disclosures Order whether the Court is referring to the term
"creditor" as defined in section 101(10) of the Bankruptcy Code or using creditor as a lay term.  If
it is the former, the Charitable Respondents are not creditors of the Debtor.  *See* 11 U.S.C. §
101(10) (defining a "creditor" an entity that has a claim against the debtor that arose at the time of
or before the order for relief concerning the debtor).

003568

Case 19-34054-sgj11 Doc 4725 Filed 07/09/25 Entered 07/09/25 23:00:44 Page 25 of 34
Case 3:23-cv-01810-C Charitable Respondents' Response and Disclosures Page 26 of 307 ID 4802
**EXHIBIT 4**

67.     As the Court is aware from the Show Cause Hearing, CLO HoldCo and DAF Fund filed the District Court Suit against the Debtor. The causes of action asserted by CLO HoldCo and DAF Fund arose after the order for relief. **Exhibit 35** [Complaint]. The substance of these claims is set forth in the Complaint.

### IV.     The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing.

68.     The Charitable Defendants have fully complied with the Court's Disclosures Order and provided the Court with complete information regarding: (a) who owns each entity, (b) whether Mr. Donerdo or his family trusts have direct or indirect ownership, (c) who the officers, directors, and managers are, and (d) whether the entity is a creditor of the Debtor. The Charitable Defendants have done so because they were expressly ordered by the Court do; however, the Disclosures Order is procedurally improper and highly prejudicial.

#### a)     The Court does not have the power to require non-parties to provide it with disclosures.

69.     The Charitable Defendants are those named entities who have made appearances before this Court. The Court does not have the power to order production or disclosures from non-parties including the Non-Party Targets.

70.     In the Disclosures Order, the Court states that the order is issued "*sua sponte* pursuant to Section 105 of the Bankruptcy Code and the court's inherent ability to efficiently monitor its docket and evaluate the standing of parties who ask for relief in the above-referenced case." Disclosures Order, p. 1. But yet, the Disclosures Order goes on to target entities who have never asked for the relief in the Bankruptcy Case.

71.     Of course, it is undisputed that the Court has the inherent power to manage its own docket "to ensure the orderly and expeditious disposition of cases." *Berry v. CIGNA/RSI-CIGNA*, 975 F.2d 1188, 1191 (5th Cir. 1992) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31

Case 19-34054-sgj11 Doc 4254-4 Filed 07/09/25 Entered 07/09/25 23:04 26 of 34
Case 3:23-cv-01874-S Document 44-1 Filed 09/09/23 Page 27 of 307 PageID 4803
**EXHIBIT 4**

(1962)).  But this inherent authority is limited, as is the Court's authority pursuant to section 105 of the Bankruptcy Code.  *Matter of Ward*, 978 F.3d 298, 303 (5th Cir. 2020) (noting that "the powers afforded to bankruptcy courts pursuant to § 105, however, are not unlimited").

72.  In *Energy Gathering*, the Fifth Circuit considered whether the district court could *sua sponte* order a party's attorney, a non-party to the case, to produce documents.  *See Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1412 (5th Cir. 1993).  In that case, the district court found that the attorney had purposefully withheld documents from the court, and "ordered [him] to produce every document in his possession relating to [his client] or business he had done with [his client]." *Id*. at 1404. The district court did not explain the source of its perceived authority to do so. *See id.* at 1405.

73.  On appeal by the attorney, the plaintiffs asserted that the district court had the inherent authority to order him to produce documents. *Id*. at 1406.  The Fifth Circuit disagreed with the plaintiffs. *See id.* at 1408-09. Specifically addressing whether the district court had the inherent authority to issue its order, the Fifth Circuit acknowledged that the district court had certain limited power "to conduct discovery not recognized by rule or statute," observing that federal courts "possess[ ] all of the common law equity tools of a Chancery Court (subject, of course, to congressional limitation) to process litigation to a just and equitable conclusion." *Id*. at 1409.  The Fifth Circuit suggested that the district court had the inherent authority to order the attorney to produce documents—if at all—under its power to issue a "bill of discovery," a common law "chancery tool" that the Supreme Court has described as "the forerunner of all modern discovery procedures." *Id*. at 1409.  But recognizing that bills of discovery "could not be used to obtain documents (or other discovery) from someone who was not a party," the Fifth Circuit

003570

Case 3:23-cv-03054-gjj Doc 26472 Filed 07/09/2025 Entered 07/09/2025 23:00 Page 2 of 34
Case 3:23-cv-04187 Charitable Respondents Response and Disclosures Page 28 of 307 D 4804
EXHIBIT 4

therefore concluded that district courts do not have the inherent authority to order non-parties to produce discovery.  *Id.*

74.    Important here, the Fifth Circuit noted the impropriety of the *sua sponte* investigation by the district court.  *Id.* at 1411 (noting "factors [that] contribute to the order's unreasonableness" as being the *sua sponte* nature of the order and that the "court engaged in a fishing expedition").  Expressly relying upon the *Energy Gathering* opinion, the court in *Thompson v. Gonzales* determined that the court lacked inherent authority to order disclosures from non-parties.  *Thompson v. Gonzales*, No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436, at *8 (E.D. Cal. Sept. 27, 2016).

**b) The Court's *sua sponte* investigation into hypothetical standing is improper.**

75.    As the Fifth Circuit noted in *Energy Gatherings* and this Court and others numerous have many times since, inherent authority "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir.1990); *In re Saldana,* 531 B.R. 141, 166 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R. 678 (N.D. Tex. 2015).

76.     Here, the Court has launched a *sua sponte* investigation into parties under the stated purpose of evaluating their hypothetical standing.

77.    The American adversarial system differs from its European (and other) inquisitorial counterparts in that its central features are "party presentation of evidence and arguments" for resolution before a "neutral and passive decision maker[]." Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L. REV. 245, 272 & n.143 (2002); *see also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020); *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *Wood v. Milyard*, 566 U.S. 463, 472 (2012).

003571

Case 19-34054-sgj11 Doc 4472 Filed 07/06/25 Entered 07/06/25 23:00 Page 28 of 34
Case 3:23-cv-01087 Charitable Respondents' Response and Disclosures Pages 57 Page 29 of 307 D 4805
**EXHIBIT 4**

78.     The judge "does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties."    *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356 (2006) (quotation omitted). Thus,"[i]t is normally incumbent on each party to prove its claims," and a *sua sponte* investigation upsets the normal burden of persuasion between the parties."  Domitille Baizeau and Tessa Hayes, *The Arbitral Tribunal's Duty and Power to Address Corruption Sua Sponte*, in Andrea Menaker (ed), International Arbitration and the Rule of Law: Contribution and Conformity, ICCA Congress Series, Volume 19, pp. 225 -265.

79.     Thus, federal courts have been instructed to restrain from conducting such an inquest which is antithetical to the American adversarial system.  *Simon v. Taylor*, 794 F. App'x 703, 718 (10th Cir. 2019) (noting that scientific evidence involving environmental contamination from the district court's own *sua sponte* investigation cannot be considered); *Wood*, 566 U.S. at 472 ("federal court does not have carte blanche to depart from the principle of party presentation basic to our adversary system"); *Castro v. United States*, 540 U.S. 375, 381–383, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003).

80.     The Court asserts that it launched its investigation because standing is an issue of subject matter jurisdiction and that it must gain "clarity" with regard to standing. Disclosures Order, p. 2.  But what the Court proposes to do is render an impermissible advisory opinion on the hypothetical standing of the various entities, including some of have never filed a pleading in the Bankruptcy Case.  How can this Court have blanket power to compel investigation of entities that have never made appearances before the Court, or that have only been made parties because they have been sued, on the purported ground it needs to investigate standing?  As shown here, it cannot.

003572

Case 19-34054-sgj11 Doc 4725 Filed 07/09/26 Entered 07/09/26 12:33:09 Page 29 of 64
Case 3:21-cv-01878 Charitable Respondents' Responses and Disclosures Page 30 of 307 D 4806
**EXHIBIT 4**

81.     A bankruptcy case itself is not a justiciable controversy; rather, it is the individual proceedings (contested matters or adversary proceedings) which create a justiciable case or controversy.[9]  Here, there is no proceeding, and instead, the Court expressly stated that it will determine standing *sua sponte* pursuant to section 105 of the Bankruptcy Code.  While this general rule of justiciablity standing alone would prohibit such a determination, evaluating a party's hypothetical standing absent a justiciable controversy is acutely problematic. *See Uberoi v. Labarga*, 769 F. App'x 692, 697 (11th Cir. 2019) ("The Court should not speculate concerning the existence of standing."); *Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*, No. 219CV184FTM99MRM, 2019 WL 3219667, at *2 (M.D. Fla. July 17, 2019) (noting that advisory opinions on standing are improper).

82.     This is because "standing is not dispensed in gross," rather, standing must be established for each claim a party seeks to press and for each form of relief that is sought.  *Brackeen v. Haaland*, 994 F.3d 249, 291 (5th Cir. 2021) (quoting *Town of Chester v. Laroe Estates, Inc.*, –— U.S. ——, 137 S. Ct. 1645, 1650, 198 L.Ed.2d 64 (2017) and *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008)).

83.     This is rule is no less applicable in a bankruptcy case.  The Bankruptcy Code does not define "party in interest," offering instead a non-exclusive list of who "may raise and may appear and be heard on any issue" in cases under chapter 11.  *In re Friede Goldman Halter Inc.*,

---

[9]     Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832 (2000); Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR. L.J. 461, 563 (2002) (explaining that: "the appropriate constitutional explanation for the entirety of federal bankruptcy jurisdiction materializes only when one recognizes that the fundamental jurisdictional unit in bankruptcy is an individual bankruptcy 'proceeding' raising a justiciable controversy between adverse parties.").

003573

Case 19-34054-sgj11 Doc 2447-5 Filed 07/09/21 Entered 07/09/21 15:23:03 Page 30 of 34
Case 3:21-cv-01479 Charitable Respondents Response and Disclosures Page 59 of 335 D 4807
**EXHIBIT 4**

600 B.R. 526, 530–31 (Bankr. S.D. Miss. 2019).  "The lack of definition was intentional." *In re*

*Delta Underground Storage Co., Inc*., 165 B.R. 596, 598 (Bankr. S.D. Miss. 1994).

84.    Congress' failure to define a party in interest specifically was discussed by both

Senator DeConcini and Representative Edwards during the proceedings preceding the enactment

of the Code.  Senator DeConcini stated:

> Rules of bankruptcy procedure or court decisions will determine who is a party in
> interest **for the particular purposes of the provision in question.**' 124 Cong.Rec.
> § 12407 (daily ed. Oct. 6, 1978).... Party in interest is an expandable concept
> **depending on the particular factual context in which it is applied**.

*Id. (*citing *In re North American Oil & Gas, Inc.*, 130 B.R. 473, 479 (Bankr.W.D.Tex.1990))

(emphasis added).  Congress has thus expressly directed that standing in a bankruptcy case must

be determined in the particular proceeding before the bankruptcy court.

85.    But here, there is no "particular purpose" or "particular factual context" in which

this Court can properly evaluate party in interest standing.  Instead, it appears that the Court

proposes to render an advisory opinion on the named entities' standing to file pleadings without

any requisite justiciable controversy before it.  But none of this makes sense, with respect to entities

not before the Court or only before the Court in capacity as defendants.  In fact the Disclosures

Order appears to be more of an investigation to find evidence that the Court could point to as

supporting its assertions about Dondero's *de facto* control.

86.    Additionally, the Court further states that beyond determining the hypothetical

standing of such parties, it also must "ascertain whether their interests are sufficiently aligned such

that the parties might be required to file joint pleadings hence forth, rather than each file pleadings

that are similar in content."  Disclosures Order, p. 1.  What the Court is describing are pre-filing

injunctions, which "are an extreme remedy" that courts should not issue "with undue haste because

such sanctions can tread on a litigant's due process right of access to the courts."  *Franklin v.*

Case 19-34054-sgj11 Doc 2647-4 Filed 07/09/21 Entered 07/09/21 05:23:01 Page 31 of 34
Case 3:21-cv-01878 Charitable Respondents Response And Disclosure Pages 60 Page 32 of 307D 4808
EXHIBIT 4

*Laughlin,* No. SA-10-CV-1027 XR, 2011 WL 598489, at *7 (W.D. Tex. Jan. 13, 2011), *report*

*and recommendation adopted*, No. SA-10-CV-1027-XR, 2011 WL 672328 (W.D. Tex. Feb. 15,

2011).

      87.    Specifically, the Fifth Circuit has explained that:

> "In determining whether it should impose a pre-filing injunction or should modify
> an existing injunction to deter vexatious filings, a court must weigh all the relevant
> circumstances.  Four factors must be specifically considered: (1) the party's history
> of litigation, in particular whether he has filed vexatious, harassing, or duplicative
> lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or
> simply intended to harass; (3) the extent of the burden on the courts and other
> parties resulting from the party's filings; and (4) the adequacy of alternative
> sanctions.

*Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008).

      88.    What is more, this purported reason makes no sense, as multiple entities the Court

seeks to compel have never made an appearance and the Court has no basis to even suspect that

they might make an appearance.  With respect to parties who have filed pleadings, for example the

Charitable Defendants, the Court already knows that Highland Dallas Foundation and CLO

HoldCo have filed joint pleadings within the Adversary Proceeding (a single motion to dismiss for

failure to state claims and a single motion to withdraw reference). The Non-Party Targets are

nowhere to be found within the Bankruptcy Case or any proceedings before the Court; yet the

Court must conduct an investigation into these entities to see whether to compel the filing of joint

pleadings?  Cannot be.

      **c)  The Disclosures Order is not just improper, it is prejudicial.**

      89.    As this Court is aware, the Charitable Defendants are defendants in the Adversary

Proceeding instituted by the Committee (DAF Fund and DAF Holdco are also defendants, though

yet unserved—despite the Adversary Proceeding being pending for over 6 months).  Central to the

Committee's claims against the Charitable Defendants are the conclusions posing as allegation(s)

003575

Case 19-34054-sgj11 Doc 2472-4 Filed 07/09/21 Entered 07/09/21 23:04 Page 32 of 34
Case 3:21-cv-01878 Charitable Respondents Response and Disclosures Page 61 Page 33 of 307 ID 4809
**EXHIBIT 4**

that the Charitable Defendants are part of civil conspiracy to fraudulently transaction assets out of the estate orchestrated by Mr. Dondero whom the Committee characterized as: standing on top of byzantine empire, moving assets and funds from one entity to another to meet various needs. *See* Adversary Proceeding, Dkt. No. 6, ¶2. (Sounds familiar).

90.     In the Disclosures Order, the Court, seemingly already deciding this highly disputed issue in the Adversary Proceeding (which is not even a dispute—CLO HoldCo and Highland Dallas Foundation have filed a (joint) motion to dismiss under Rule 7012 for failure to state a claim), as it borrows the Committee's "byzantine" characterization and states that the targets of its Disclosures Order "appear to be under the *de facto* control of Mr. Dondero" and that the DAF Fund's decisions are "presumably at Mr. Dondero's direction." (the word "byzantine" is a much overworked word within this Bankruptcy Case, and its proceedings, pleadings, and orders of this Court). Disclosures Order, pp. 5, 11. This constitutes direct, specific, and express pre-judgment by this Court, and, of course, has tainted the Adversary Proceeding.

91.     First and foremost, as shown herein, these assertions/findings are wrong. The Charitable Respondents and Non-Party Targets comprise an independent charitable giving structure that has facilitated the donation of tens of millions of dollars to important philanthropic causes. They are not under the *de facto* control of Mr. Dondero nor does Mr. Dondero direct their decisions—though like any donor would expect, Mr. Dondero has some say in the causes which the Supporting Organizations donate to.

92.     But the fact that the Court has made these assertions/findings *sua sponte* outside of the Adversary Proceeding (or any case or controversy), when it has no authority to adjudicate the Adversary Proceeding (that is the subject of a motion to withdraw reference), is highly prejudicial to the Charitable Defendants. This Court, in its assumed posture as investigative body as well as

Case 19-34054-sgj11 Doc 4725 Filed 07/09/25 Entered 07/09/25 23:03:44 Page 33 of 64
Case 3:23-cv-01878 Charitable Respondents Response and Disclosures 62 Page 34 of 307 ID 4810
EXHIBIT 4

prosecutor and decider, has given cover to the utterly conclusory assertions of the Committee, and has, practically, joined the Committee as a plaintiff.

93.     At an absolute minimum, the Court should refrain from deciding or even commenting upon contested issues of law and fact *sua sponte* outside of the Adversary Proceeding, and should retract its supposed findings (issued under the transparently incorrect suggestion of its power to manage its own docket [by pre-screening parties for standing????? - again, the case law cited above shows this is not proper]).  The Charitable Respondents urge the Court, particularly after reviewing the information and documents provided in this Response and Disclosures, to reconsider such findings, and respectfully request that this Court retract its Disclosure Order or at least the problematic content therein.

## CONCLUSION

By this Response and the Disclosures, the Charitable Respondents have fully complied with this Court's Disclosures Order, but have done so with the express reservations concerning the impropriety of the Disclosures Order and the non-appearance or submission by the Non-Party Targets.  But most important to the Charitable Respondents is that the Court closely review this Response and Disclosures and reconsider its assumptions/assertions/findings/conclusion that the Charitable Respondents are under the *de facto* control of or act at the direction of Mr. Dondero.  The Charitable Respondents are real, independent charitable giving vehicles that have affected, very positively, the lives of countless people through the tens of millions of dollars donated to important philanthropic causes.

[*signature block on following page*]

003577

**EXHIBIT 4**

Respectfully submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this July 9, 2021.

*/s/ Louis M. Phillips*
Louis M. Phillips

003578

Case 1:23-cv-00645-sjj-11 Doc 254-25 Filed 07/09/20/25 Entered 07/09/20/25 07/06/23 00:44 Lot 4
Case 3:23-cv-01878 Charitable Respondents Response and Disclosures Pages Page 36 of 307 4812
EXHIBIT 4

# EXHIBIT 1

003579

**EXHIBIT 4**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Chapter 11 |
| | § | |
| Debtor | § | Relates to Dkt. No. 2460 |

### Declaration of Mark Patrick

I, Mark Patrick, hereby declare as follows:

1.      My name is Mark Patrick, and I am over the age of 21.  I have personal knowledge of the facts set forth herein, and make this declaration pursuant to 28 U.S.C. § 1746.

2.      I am a Director of Charitable DAF Holdco, Ltd. and the managing member of the sole general partner of Charitable DAF Fund, L.P. (Charitable DAF Holdco, Ltd. and Charitable DAF Fund, L.P., and their direct and indirect subsidiaries will be referred to herein as the "DAF"). A more robust discussion of these entities and their interrelation is set forth in the Response and Disclosures (defined herein).

3.      I appreciate the opportunity to describe the important charitable work the DAF is doing through its charitable beneficiaries.

4.      Since its inception in 2012, the DAF has had a significant impact in the communities where the supporting organizations that are the DAF's beneficiaries deploy their capital. In fact, such supporting organizations have funded more than $32 million in charitable contributions to numerous non-profit organizations. The DAF's charitable commitments are in excess of $42 million. The non-profit organizations that have received support from the DAF include The Family Place, which provides emergency shelter to those in need, and the Dallas Children's Advocacy Center, which serves the needs of abused and neglected children. A more

1

003580

Case 19-34054-sgj11 Doc 2547-4 Filed 07/09/20 Entered 07/09/20 22:39:00 Page 3 of 4
Case 3:23-cv-01087 Charitable Respondents' Response and Disclosures Page 38 of 307 D 4814
**EXHIBIT 4**

detailed summary of the DAF's charitable impact is an exhibit filed with the Response and Disclosures referenced herein.

      5.     I ultimately agreed to take on the roles I currently hold with the DAF because I believe in the causes the DAF is supporting. In college, I was a guardian ad litem for abused and neglected children. I have seen firsthand how the DAF is helping people every day who are struggling with abuse or difficult life situations. I have visited the Cristo Rey Dallas school campus, where low income and disadvantaged children are receiving a high-quality education that they otherwise would likely not receive.

      6.     The actions taken by me on behalf of the DAF in connection with the bankruptcy case of Highland Capital Management, L.P., and the lawsuit I authorized to be filed on behalf of CLO Holdco, Ltd. and DAF Fund against Highland Capital Management, L.P., were done so the DAF can continue to support these worthy causes. I am only trying to protect the DAF's investments, which are the source of the millions in charitable contributions the DAF has made over the past decade.

      7.     My actions aren't taken under the direction of James Dondero, or to somehow protect a direct or indirect economic benefit Mr. Dondero receives from the DAF. As the Response and Disclosures set forth in greater detail, Mr. Dondero has no direct or indirect economic ownership in the DAF.

      8.     My concern in vigorously pursuing claims for the DAF, or defending claims against the DAF, is to protect the DAF's investments from being taken by creditors who have no credible basis to obtain such investments.

      9.     I have been provided with and reviewed this Court's Order Requiring Disclosures (the "Disclosures Order").

003581

**EXHIBIT 4**

10.     In my capacity with the DAF, I assisted counsel in preparing the Response and Disclosures related to the Disclosures Order on behalf of CLO Holdco, Ltd., Charitable DAF Fund, L.P., and Highland Dallas Foundation, Inc. (the "Response and Disclosures," and capitalized terms used herein which are not otherwise defined are as defined in the Response and Disclosures).

11.     With respect to the documents and Exhibits provided by the Foundations about the Supporting Organizations and Non-Party Targets I or those acting under my direction dealt with the Foundations to obtain such information. Multiple Exhibits have already been provided as evidence to the Bankruptcy Court at the Show Cause Hearing. I have reviewed the exhibits to the Response and Disclosures and affirm that the Exhibits provided about the Charitable Respondents are true and correct copies of what each document is identified as in the Response and Disclosures. With respect to the documents and Exhibits provided by the Foundations, I affirm, upon information and belief that these Exhibits are true and correct copies of what each document is identified as in the Response and Disclosures. As I am not a person with authority over the Supporting Organizations I cannot identify such documents and Exhibits of my own personal knowledge, but am satisfied that I can upon information and belief.

12.     I have reviewed the Response and Disclosures and certify that the factual recitations therein are accurate.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.**

Executed on July 9, 2021

**Mark Patrick**

3

003582

Case 1:19-cv-04494-sgj11 Doc 25-4 Filed 07/09/20 Entered 07/09/20 16:23:00 Page 1 of 12
Case 3:23-cv-01878 Charitable Respondents Response and Disclosure Pages 68 Page 40 of 307 D 4816
EXHIBIT 4

# EXHIBIT 2

003583

**EXHIBIT 4**

```
                  IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION
```

| | |
|---|---|
| | ) **Case No. 19-34054-sgj-11** |
| In Re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) Tuesday, June 8, 2021 |
| | ) 9:30 a.m. Docket |
| Debtor. | ) |
| | ) - SHOW CAUSE HEARING (2255) |
| | ) - MOTION TO MODIFY ORDER |
| | )   AUTHORIZING RETENTION OF |
| | )   JAMES SEERY (2248) |
| | ) - MOTION FOR ORDER FURTHER |
| | )   EXTENDING THE PERIOD WITHIN |
| | )   WHICH DEBTOR MAY REMOVE |
| _____ | )   ACTIONS (2304) |

```
                     TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:          Jeffrey Nathan Pomerantz
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         10100 Santa Monica Blvd.,
                           13th Floor
                         Los Angeles, CA  90067-4003
                         (310) 277-6910

For the Debtor:          John A. Morris
                         Gregory V. Demo
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         780 Third Avenue, 34th Floor
                         New York, NY  10017-2024
                         (212) 561-7700

For the Debtor:          Zachery Z. Annable
                         HAYWARD & ASSOCIATES, PLLC
                         10501 N. Central Expressway,
                           Suite 106
                         Dallas, TX  75231
                         (972) 755-7104
```

003584

Case 19-34054-sgj11 Doc 2544-25 Filed 07/09/21 Entered 07/09/21 16:23:00 Page 3 of 12
Case 3:21-cv-01479 Exhibit 4 Charitable Respondents' Response and Disclosures 70 Page 42 of 307 D 4818

**EXHIBIT 4**

2

```
 1    APPEARANCES, cont'd.:

 2    For the Charitable DAF,      Mazin A. Sbaiti
      CLO Holdco, Show Cause       Jonathan E. Bridges
 3    Respondents, Movants,        SBAITI & COMPANY, PLLC
      and Sbaiti & Company:        Chase Tower
 4                                 2200 Ross Avenue, Suite 4900W
                                   Dallas, TX  75201
 5                                 (214) 432-2899

 6    For Mark Patrick:            Louis M. Phillips
                                   KELLY, HART & HALLMAN, LLP
 7                                 301 Main Street, Suite 1600
                                   Baton Rouge, LA 70801
 8                                 (225) 338-5308

 9    For Mark Patrick:            Michael D. Anderson
                                   KELLY, HART & HALLMAN, LLP
10                                 201 Main Street, Suite 2500
                                   Fort Worth, TX  76102
11                                 (817) 332-2500

12    For James Dondero:           Clay M. Taylor
                                   Will Howell
13                                 BONDS ELLIS EPPICH SCHAFER
                                     JONES, LLP
14                                 420 Throckmorton Street,
                                     Suite 1000
15                                 Fort Worth, TX  76102
                                   (817) 405-6900
16
      For the Official Committee   Matthew A. Clemente
17    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
18                                 Chicago, IL  60603
                                   (312) 853-7539
19
      For the Official Committee   Paige Holden Montgomery
20    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                   2021 McKinney Avenue, Suite 2000
21                                 Dallas, TX  75201
                                   (214) 981-3300
22
      Recorded by:                 Michael F. Edmond, Sr.
23                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
24                                 Dallas, TX  75242
                                   (214) 753-2062
25
```

Case 9:19-cv-00054-gjl1 Doc 254-25 Filed 07/09/20 Entered 07/09/20 26:23:00 Page 2 of 12
Case 3:23-cv-01878 Charitable Respondents Responses and Disclosures Page 43 of 307 ID 4819
**EXHIBIT 4**

3

```
 1   Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
 2                                Shady Shores, TX  76208
                                  (972) 786-3063
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
                  Proceedings recorded by electronic sound recording;
24                    transcript produced by transcription service.

25
```

Case 19-34054-sgj11 Doc 2544-25 Filed 07/09/26 Entered 07/09/26 23:00 Page 2 of 12
Case 3:23-cv-01878-K Charitable DonorsDocument 14-15 Respondents Filed 09/07/23 Disclosures 72 Page 44 of 307 PageID 4820
**EXHIBIT 4**
Patrick - Cross                                      135

```
 1   Q    Was there any effort whatsoever to hide the prior order of
 2   the Bankruptcy Court?
 3   A    No.
 4           MR. ANDERSON:  Pass the witness.
 5           THE COURT:  Okay.  Other examination?
 6           MR. SBAITI:  Yes, Your Honor.  Just a couple of
 7   questions.
 8                        CROSS-EXAMINATION
 9   BY MR. SBAITI:
10   Q    Do you mind flipping to Exhibit 25, which I believe is the
11   org chart, the one that you were looking at before?
12   A    Okay.
13   Q    It'll still be in --
14   A    Okay.  Yeah.
15   Q    -- the defense binder.  No reason to swap out right now.
16   A    I've got the right binders.  Some of them are repeatable
17   exhibits, so --
18   Q    Yeah.
19   A    -- I have to grab the right binder.  Yes.
20   Q    As this org chart would sit today, is the only difference
21   that Grant Scott's name would instead be Mark Patrick?
22   A    Yes.
23   Q    Was there ever a period of time where Jim Dondero's name
24   would sit instead of Grant Scott's name prior?
25   A    Yes, originally, when this -- yes.
```

003587

1    Q   So did Mr. Dondero both have the control shares of the GP,

2    LLC and DAF Holdco Limited?

3    A   No, I believe not.  I believe he only held the Charitable

4    DAF GP interest and that Mr. Scott at all times held the

5    Charitable DAF Holdco, LTD interest, until he decided to

6    transfer it to me.

7    Q   Can you just tell us how Mr. Scott came to hold the

8    control shares of the Charitable DAF Holdco, LTD?

9    A   When he was the independent trustee of the Charitable

10   Remainder Trust, he caused that -- the creation of that

11   entity, and that's how he became in receipt of those

12   management shares.

13   Q   And does the Charitable DAF GP, LLC have any control over

14   Charitable DAF Fund, LP's actions or activities?

15   A   Yes, it does.

16   Q   What kind of control is that?

17   A   I would describe complete control.  It's the managing

18   member of that entity and can -- and effectively owns, you

19   know, the hundred percent interest in the respective

20   subsidiaries, and so the control follows down.

21   Q   And when did Mr. Scott replace Mr. Dondero as the GP --

22   managing member of the GP?

23   A   Well, I think as the -- and Mr. Morris had shown me with

24   respect to that transfer occurring on March 2012.

25   Q   So nine years ago?

003588

Case 19-34054-sgj11 Doc 2544-25 Filed 07/09/21 Entered 07/09/21 16:29:00 Page 1 of 12
Case 3:23-cv-01478 Charitable Respondents Response to Disclosures 74 Page 46 of 307 D 4822
EXHIBIT 4
Patrick - Cross                    137

```
 1    A    Yes.

 2    Q    Does Mr. Dondero today exercise any control over the

 3    activities of the DAF Charitable -- the Charitable DAF, GP or

 4    the Charitable DAF Holdco, LTD?

 5    A    No.

 6    Q    Is he a board member of sorts for either of those

 7    entities?

 8    A    No.

 9    Q    Is he a board members of CLO Holdco?

10    A    No.

11    Q    Does he have any decision-making authority at CLO Holdco?

12    A    None.

13    Q    The decision to authorize the lawsuit and the decision to

14    authorize the motion that you've been asked about, who made

15    that authorization?

16    A    I did.

17    Q    Did you have to ask for anyone's permission?

18    A    No.

19              MR. SBAITI:  No more questions, Your Honor.

20              THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21        All right.  Any redirect?

22                        REDIRECT EXAMINATION

23    BY MR. MORRIS:

24    Q    Since becoming the authorized representative of the

25    Plaintiffs, have you ever made a decision on behalf of those
```

Case 19-34054-sgj11 Doc 2544-25 Filed 07/09/21 Entered 07/09/21 23:00 Page 3 of 12
Case 3:21-cv-01878 Charitable Respondents Responsive Disclosures Page 75 Page 47 of 307 ID 4823

EXHIBIT 4
Patrick - Cross                                          138

1  entities that Mr. Dondero disagreed with?

2  A   I have made decisions that were adverse to Mr. Dondero's

3  financial -- financial decision.  I mean, financial interests.

4  Whether he disagreed with them or not, I don't -- he has not

5  communicated them to me.  But they have been adverse, at least

6  two very strong instances.

7  Q   Have you ever -- have you ever talked to him about making

8  a decision that would be adverse to his interests?  Did he

9  tell -- did --

10  A   I didn't -- I don't -- I did not discuss with him prior to

11  making the decisions that I made that were adverse to his

12  economic interests.

13          MR. MORRIS:  Okay.  No further questions, Your Honor.

14          THE COURT:  Any further examination?  Recross on that

15  redirect?

16          MR. ANDERSON:  No further questions.

17          MR. SBAITI:  No further questions, Your Honor.

18          MR. ANDERSON:  Sorry.

19          THE COURT:  Nothing?

20          MR. ANDERSON:  I think we're good.

21          THE COURT:  Okay.  I have one question, Mr. Patrick.

22  My brain sometimes goes in weird directions.

23                  EXAMINATION BY THE COURT

24          THE COURT:  I'm just curious.  What are these Cayman

25  Island entities, charitable organizations formed in the Cayman

Case 1:19-40054-bgil Doc 25442-5 Filed 07/09/25 Entered 07/09/25 22:00 Page 9 of 12
Case 3:23-cv-01174 Charitable Respondents Response and Disclosures 76 Page 548 of 357 D 4824

**EXHIBIT 4**
Patrick - Examination by the Court                    140

1    THE COURT:  Uh-huh.

2    THE WITNESS:  The offshore master fund structure

3  typically will have two different types of -- they call it

4  foreign feeder funds.  One foreign feeder fund is meant to

5  accommodate foreign investors; the other foreign feeder fund

6  is meant to accommodate U.S. tax-exempt investors.

7    Why, why is it structured that way?  In order to avoid

8  something called -- I was trying not to be wonkish -- UBTI.

9  That's, let's see, Un -- Unrelated Trader Business Income.  I

10  probably have that slightly wrong.  But it's essentially,

11  it's a means to avoid active business income, which includes

12  debt finance income, which is what these CLOs tend to be, that

13  would throw off income that would be taxable normally if the

14  exempts did not go through this foreign blocker, and it

15  converts that UBTI income -- it's called (inaudible) income --

16  into passive income that flows -- that flows up to the

17  charities.

18    And so it's very typical that you'll have a U.S. tax-

19  exempt investor, when they make an investment in a fund,

20  prefer to go through an offshore feeder fund, which is

21  actually Charitable DAF Holdco, LTD.  That's essentially what,

22  from a tax perspective, represents as a UBTI blocker entity.

23  And then you have the offshore investments being held offshore

24  because there's a variety of safe harbors where the receipt of

25  interest, the portfolio interest exception, is not taxable.

003591

Case 1:23-cv-10084-sgj11 Doc 2547-27 Filed 07/09/20/25 Entered 07/09/20/25 23:00:44 Page 13 of
Case 3:23-cv-01187-S Exhibit 4 Charitable Response and Response and Disclosure Pages 77 Page 49 of 307 D 4825
**EXHIBIT 4**
Patrick - Examination by the Court                    141

1   The creation of capital gains or losses under the -- they call

2   it the trading, 864(b) trading safe harbor, is not taxable.

3   So that's why you'll find these structures operating offshore

4   to rely on those safe harbor provisions as well as -- as well

5   as what I indicated with respect to the two type blocker

6   entities.  It's very typical and industry practice to organize

7   these way.  And so when this was set --

8           THE COURT:  It's very typical in the charitable world

9   to --

10          THE WITNESS:  In the investment management --

11          THE COURT:  -- form this way?

12          THE WITNESS:  In the investment management world,

13  when you have charitable entities that are taking some

14  exposure to assets that are levered, to set this structure up

15  in this way.  It was modeled after -- they just call them

16  offshore master fund structures.  They're known as Mickey

17  Mouse structures, where you'll have U.S. investors --

18          THE COURT:  Yes.  I -- yes, I --

19          THE WITNESS:  -- enter through a U.S. partnership,

20  and the foreign investors enter through a blocker.

21          THE COURT:  It was really just the charitable aspect

22  of this that I was --

23          THE WITNESS:  Yeah.  Yeah.

24          THE COURT:  -- getting at.

25          THE WITNESS:  Yeah.  No, but I'm just trying to

003592

Case 1:09-cv-10459-sj11 DoD 2547-27 Filed 07/09/20/25 Entered 07/09/20/25 23:00: Page 1 of
Case 3:Exhibit 01-87 Charitable Documents 44-14 Responses and Disclosures 78 Page 50 of 307 ID 4826
EXHIBIT 4
Patrick - Recross                                    142

 1  emphasize if --

 2           THE COURT:  All right.  It's --

 3           THE WITNESS:  Yeah.

 4           THE COURT:  -- neither here nor there.  All right.

 5           MR. SBAITI:  Your Honor, may I ask a slightly

 6  clarifying leading question on that, because I think I

 7  understand what he was trying to say, just for the record?

 8           THE COURT:  Well, --

 9           MR. MORRIS:  I object.

10           THE COURT:  -- I tell you what.  Anyone who wants to

11  ask one follow-up question on the judge's question can do so.

12  Okay?  You can go first.

13           MR. SBAITI:  I'll approach, Your Honor.

14           THE COURT:  Okay.

15                     RECROSS-EXAMINATION

16  BY MR. SBAITI:

17  Q    Would it be a fair summary of what you were saying a

18  minute ago that the reason the bottom end of that structure is

19  offshore is so that it doesn't get taxed before the money

20  reaches the charities on the U.S. side?

21  A    Tax -- it converts the nature of the income that is being

22  thrown off by the investments so that it becomes a tax

23  friendly income to the tax-exempt entity.  Passive income.

24  That's --

25  Q    So, essentially, --

Case 1:09-cr-00524-sgj11 Doc 254-27 Filed 07/09/20 Entered 07/09/20 20:20:40 Page 12 of
Case 3:15-cv-01718-B Charitable Respondents Response and Disclosures 79 Page 51 of 307 ID 4827
**EXHIBIT 4**
Patrick - Recross                                   143

1          THE COURT:  Okay.  Okay.

2          MR. SBAITI:  -- so it doesn't get taxed before it

3    hits the --

4          THE COURT:  I said one question.

5          MR. SBAITI:  Sorry, Your Honor.

6          THE COURT:  Okay.  He answered it.

7          MR. PHILLIPS:  And I have one question, Your Honor

8          THE COURT:  Okay.

9          MR. PHILLIPS:  I don't know if I need to ask this

10   question, but I'd rather not ask you if I need to ask it.

11         THE COURT:  Go ahead.

12         MR. PHILLIPS:  But if I do, you know, I could --

13         THE COURT:  Go ahead.

14         MR. PHILLIPS:  Well, okay.

15                    RECROSS-EXAMINATION

16   BY MR. PHILLIPS:

17   Q    We've talked about the offshore structure.  Are the

18   foundations in the top two tiers of the organizational chart

19   offshore entities?

20   A    No.

21   Q    They're --

22   A    They're onshore entities.  They're tax-exempt entities.

23   Q    Thank you.

24   A    The investments are offshore.

25   Q    Thank you.

# **EXHIBIT 3**

**EXHIBIT 4**

Charitable DAF/CLO HoldCo
Structure Chart



Case 1:23-cv-04054-sgj1 Doc 254-7 Filed 07/08/20/25 Entered 07/08/20/2 07/26 23:00:24 Page 1 of 6
Case 3:23-cv-01874 Charitable Respondents Response 0/09/25 Disclosure 82 Page 54 of 305 ID 4830
EXHIBIT 4

# EXHIBIT 4

# MEMORANDUM

EXHIBIT 4

**Date: July 9, 2021**

**To:  Mark Patrick**

**Company:  Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd.**

**From:  Haynes and Boone, LLP, by Kenneth Bezozo**

**Subject:  Donor Advised Funds (*"DAFs"*), Sponsoring Organizations and Supporting Organizations -- The Reasons for Making Investments in Offshore Jurisdictions**

---

1. ***What are Donor Advised Funds, Sponsoring Organizations and Supporting Organizations?***

A donor advised fund, or DAF, is a separately managed charitable investment account established by a donor within a public charity (a section 501(c)(3) organization), which is generally referred to as a sponsor.  Sponsors may include a community foundation, university, religious organization, or financial institution.  The donor (or the donor's designee) typically maintains certain advisory privileges over the DAF funds or account – specifically with respect to charities that should receive donations, although the DAF account is fully and completely owned and controlled by the sponsor.

In some cases, a sponsor can create as a subsidiary a "supporting organization" which also is a Section 501(c)(3) public charity.  A supporting organization is a separate entity controlled by the sponsor through its ability to elect a majority of the supporting organization's governing board.  Because of this control, a supporting organization is treated financially as part of a consolidated unit with the sponsor.

Here, for example, The Dallas Foundation formed, and owns and controls, a supporting organization named Highland Dallas Foundation, Inc. ("***Highland Dallas Foundation***") to assist The Dallas Foundation in carrying out its charitable mission in helping support a wide variety of community affairs.  Donations were made to the Highland Dallas Foundation as both the sponsor and the supporting organization.  The Highland Dallas Foundation from time to time makes distributions of funds to The Dallas Foundation which in turn makes further distributions to local public charities.  ***Exhibit 1*** attached shows these above-described entities, as well as other entities referenced herein that are pertinent to this donor advised fund.

2. ***How Does a Donor Establish a DAF Account?***

To establish a DAF fund or account, a donor must make an irrevocable contribution of assets, such as cash, stock or securities or other business or financial assets, to a sponsoring public charity. The donor's contribution is recorded and recognized as a donation to the sponsoring

public charity of the DAF. A donor can make additional contributions to the sponsoring organization whenever they choose.

Because a contribution to a sponsoring organization is, for tax purposes, the equivalent of a contribution to a public charity and because the donor gets an immediate tax benefit for the contribution, the contribution, when made, is permanent and irrevocable. This is true even though the donor contribution to the sponsoring organization is in an account that grows tax-free and the donor has advisory rights as to where to invest the assets and donations made from these assets.

Here, the Highland Dallas Foundation is the sponsor of the DAF account which it fully owns and controls. Although the donor has advisory rights regarding investments and donations to charities (by way of a board seat he fills in the supporting organization), the Highland Dallas Foundation has full authority and control over all such decision-making.

3. *What Type of Investments Can be Made by a Sponsor/Supporting Organization?*

A sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are able to invest in a wide variety of assets including, but not limited to, marketable securities, financial assets, businesses, real estate, private equity and hedge funds. But because the sponsor and supporting organization are both public charities that are tax-exempt organizations, their investments must take into account all laws that could possibly effect their tax-exempt status.

a. *Can a Sponsor and its Supporting Organization Invest in a Hedge Fund, Private Equity Fund or Similar Investment Vehicle?*

The short answer is yes, but as stated above, a sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are both public charities that are tax-exempt organizations. As a strong general rule, a tax-exempt organization will avoid any investments that will subject it to federal or state taxes. A tax-exempt organization is generally exempt from all federal and state taxes except to the extent it receives income classified as unrelated business taxable income (UBTI), which would be taxed at a 21% rate. The term "unrelated business taxable income" generally means the income derived from an unrelated trade or business regularly conducted by the tax-exempt organization. UBTI also can arise from the receipt of income from debt-financed investments, which is why hedge and private equity funds generally utilize a special investment structure to ensure tax-exempt investors do not have UBTI.

To prevent UBTI from flowing through to a tax-exempt organization, a corporation can be utilized to "block" this income at the corporate level, which is accomplished by having a corporation interposed between the tax-exempt organization and the hedge fund, such as The Charitable DAF Holdco, Ltd. (a corporate blocker) from the Charitable DAF Fund, L.P. Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation. The blocker corporation thereafter distributes the income to the tax-exempt

003599

investor through the payment of dividends which are not UBTI and therefore not taxable to a tax-exempt organization.

Although using a domestic corporate blocker can avoid the problem of having UBTI passed through to a tax-exempt sponsor or its supporting organization, a U.S.-based blocker corporation will be required to pay corporate and state-level income tax on the income they receive from an investment fund.

> b. *Are There Particular Jurisdictions in Which Hedge and Private Equity Funds form Investment Partnerships and Blocker Corporations for their tax-exempt investors?*

It is common for hedge and private equity funds that have tax-exempt investors such as The Dallas Foundation and Highland Dallas Foundation to utilize an offshore structure to form its investment partnership. In addition, these funds may form offshore blocker corporations as well as for other reasons including the ability to make non-U.S. investments or U.S. investments that do not give rise to U.S. tax for foreign investors (i.e., U.S. investments that do not cause the investor to be "engaged in a U.S. trade or business.") Jurisdictions such as Bermuda and the Cayman Islands are typically used because those countries do not have an income tax regime.

By utilizing an offshore structure with corporate blockers, hedge and private equity funds can ensure their tax-exempt investors will not receive any UBTI from investments held by The Dallas Foundation or Highland Dallas Foundation. In addition, to the extent the sole source of UBTI is through debt financing (which is often the case in a hedge fund), then using an offshore corporate blocker can eliminate this type of UBTI (because the debt financing will not flow through the corporate blocker to taint the income received by the tax-exempt investor). This allows the sponsor (i.e., Highland Dallas Foundation), as well as any other charities that receive distributions from Highland Dallas Foundation or The Dallas Foundation, to receive the largest possible distributions.

Utilizing an offshore structure for hedge and private equity funds in the manner described above for tax-exempt investors is a best practice used by many U.S. law firms representing U.S. hedge and private equity funds. In fact, if a U.S. firm didn't use offshore blockers in the manner described above, it could be considered a poor practice.

In summary, using an offshore blocker corporation, such as Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd., for many hedge funds minimizes taxes and increases the net after-tax cash flow to the tax-exempt investors because investments grow tax-free, giving a sponsor, such as Highland Dallas Foundation, the potential to create even more capital for philanthropic giving.

4. *Who Has Control and Authority over the Assets Held by the Sponsor?*

Because a DAF is an account within a sponsor organization, the sponsoring organization has full, complete and final control over the funds in the DAF, which is the case here with the sponsor, the Highland Dallas Foundation. Although the supporting organization permits the donor or the donor's designee to recommend how funds should be invested and how funds should be

003600

Case 3:19-cv-34054-sgj11 Doc 254-4 Filed 07/09/20/25 Entered 07/09/20 17:06:23 00:44 Desc 6
Case 3:23-bv-04187 Charitable Respondents Response and Disclosure Page 86 Page 58 of 3057D 4834
EXHIBIT 4

distributed to other public charities, Highland Dallas Foundation must approve any investments and all distributions to charities.

In this case, the donor of the charitable DAF, or his designee, is able to appoint a representative to the board of the Highland Dallas Foundation, which allows the donor to recommend investments or distributions to charitable organizations, i.e., organizations that are tax-exempt under Internal Revenue Code section 501(c)(3) and classified as public charities under Internal Revenue Code section 509(a). But the donor (or the donor's designee) only has advisory privileges over making investments and the distribution of funds.

5. ***What Are the Benefits to a Donor of a Contribution to a DAF account?***

A DAF account allows a donor who makes an irrevocable charitable contribution to the DAF account to receive an immediate tax deduction, and with the ability to recommend distributions be made by the sponsor to specific charities either presently or in the future. Also, if the donor contributes certain appreciated assets to the DAF account, such as stock or securities, the donor avoids the recognition of any gain in these appreciated assets. This is a significant additional benefit to donors made available in the Internal Revenue Code.

The DAF assets that are not immediately distributed to charities are then invested and depending on the type of investments and the jurisdiction in what the investments are made, the assets may grow tax-free.

003601

Case 19-34054-sgj11 Doc 2547-4 Filed 07/09/21 Entered 07/09/21 20:23:00 Page 6 of 6
Case 3:23-cv-01478 Charitable Respondents' Response and Disclosures Page 59 of 307
EXHIBIT 4

**Exhibit 1**

**Charitable DAF/CLO Holdco
Structure Chart**



Case 1:13-cv-04854-sgj11 Doc 2547-5 Filed 09/01/20 Entered 09/01/20 06:23:00 Page 1 of 2
Case 3:25-cv-01875 Charitable Respondents' Response to Initial Disclosures Page 88 Page 50 of 307 ID 4836
EXHIBIT 4

# EXHIBIT 5

WK–249232

# *Certificate Of Incorporation*

*I, **V. DAPHENE WHITELOCKE** Assistant Registrar of Companies of the Cayman Islands
DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said
Law in respect of registration were complied with by*

**CLO HoldCo, Ltd.**

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect
from the 13th day of December Two Thousand Ten*

*Given under my hand and Seal at George Town in the
Island of Grand Cayman this 13th day of December
Two Thousand Ten*



**Assistant Registrar of Companies,
Cayman Islands.**

003604

EXHIBIT 4

# EXHIBIT 6

Case 19-34054-sgj11 Doc 2547-25 Filed 07/09/21 Entered 07/09/21 23:00 Page 2 of 29
Case 3:21-cv-01878 Charitable Respondents Responses and Disclosures 91 Page 63 of 307 ID 4839
EXHIBIT 4

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CLO HOLDCO, LTD.



Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
T 345 949 0100  F 345 949 7886  www.walkersglobal.com
REF: VC/CM/99957

**EXHIBIT 4**

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

OF

# CLO HOLDCO, LTD.



REGISTERED AND FILED
AS NO 249232 THIS 13th DAY
OF December, 2010

Asst. Registrar of Companies
Cayman Islands

1. The name of the company is CLO HoldCo, Ltd. (the "**Company**").

2. The registered office of the Company will be situated at the offices of **Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands** or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is **US$50,000.00** divided into **50,000** shares of a nominal or par value of **US$1.00 each** provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

1

PATRICK 003608

003607

**EXHIBIT 4**

The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| **NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER** | **NUMBER OF SHARES TAKEN BY SUBSCRIBER** |
|---|---|
| Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands | ONE SHARE |

(Sgd) Virginia Czarnocki

Virginia Czarnocki
as Authorised Signatory of Walkers Nominees Limited

Dated:     13 December 2010

(Sgd) Carol MacDonald
Signature of Witness

Name:         Carol MacDonald

Address:      87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation:   Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.

V. Daphene Whitelocke
Assistant Registrar

Date. 13th December, 2010

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

3760538_1

003608

# EXHIBIT 4

## TABLE OF CONTENTS

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 3 |
| SHARES | 3 |
| MODIFICATION OF RIGHTS | 4 |
| CERTIFICATES | 4 |
| FRACTIONAL SHARES | 4 |
| LIEN | 5 |
| CALLS ON SHARES | 5 |
| FORFEITURE OF SHARES | 6 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 7 |
| REDEMPTION AND PURCHASE OF SHARES | 8 |
| GENERAL MEETINGS | 8 |
| NOTICE OF GENERAL MEETINGS | 9 |
| PROCEEDINGS AT GENERAL MEETINGS | 9 |
| VOTES OF SHAREHOLDERS | 10 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 11 |
| DIRECTORS | 11 |
| ALTERNATE DIRECTOR OR PROXY | 12 |
| POWERS AND DUTIES OF DIRECTORS | 12 |
| BORROWING POWERS OF DIRECTORS | 13 |
| THE SEAL | 14 |
| DISQUALIFICATION OF DIRECTORS | 14 |

i

PATRICK 080065

003609

**EXHIBIT 4**

PROCEEDINGS OF DIRECTORS .......................................................................................... 14

DIVIDENDS ....................................................................................................................... 16

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ...................................... 17

CAPITALISATION OF RESERVES ......................................................................................... 17

SHARE PREMIUM ACCOUNT ............................................................................................. 18

NOTICES ........................................................................................................................... 18

INDEMNITY ....................................................................................................................... 19

NON-RECOGNITION OF TRUSTS ....................................................................................... 20

WINDING UP .................................................................................................................... 20

AMENDMENT OF ARTICLES OF ASSOCIATION .................................................................. 21

CLOSING OF REGISTER OR FIXING RECORD DATE ............................................................ 21

REGISTRATION BY WAY OF CONTINUATION ..................................................................... 21

DISCLOSURE ..................................................................................................................... 21

PATRICK 000066

003610

**EXHIBIT 4**



COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

# CLO HOLDCO, LTD.

REGISTERED AND FILED
AS NO: 249232 THIS 15 DAY
OF December, 2010

Asst. Registrar of Companies
Cayman Islands

### TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to CLO HoldCo, Ltd. (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

### INTERPRETATION

1.  In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

    "**Articles**" means these articles of association of the Company, as amended or substituted from time to time;

    "**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company;

    "**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof;

    "**Law**" means the Companies Law (as amended) of the Cayman Islands;

    "**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time;

    "**Office**" means the registered office of the Company as required by the Law;

    "**Ordinary Resolution**" means a resolution:

    (a)    passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and

1

003611
PATRICK_A_000097

**EXHIBIT 4**

where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)    approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed;

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up;

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires;

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law;

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof;

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company;

"**Share**" means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share;

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber;

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law;

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means; and

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)    passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)    approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

2.    In these Articles, save where the context requires otherwise:

(a)    words importing the singular number shall include the plural number and vice versa;

PATRICK 003612

# EXHIBIT 4

(b)     words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)     the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)     reference to a dollar or dollars (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)     reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f)     reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g)     reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3.     Subject to the last two preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

4.     The business of the Company may be commenced at any time after incorporation.

5.     The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6.     The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7.     The Directors shall keep, or cause to be kept, the Register at such place as the Directors may from time to time determine and, in the absence of any such determination, the Register shall be kept at the Office.

## SHARES

8.     Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)     issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b)     grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

3

PATRICK 000069

003613

# EXHIBIT 4

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9. The Directors may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors.

10. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13. The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company.

## CERTIFICATES

14. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

15. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or

4

PATRICK's 000070

003614

# EXHIBIT 4

par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## LIEN

16. The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share. The Company also has a first and paramount lien on every Share registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable). The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article. The Company's lien on a Share extends to any amount payable in respect of it.

17. The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

18. For giving effect to any such sale the Directors may authorise some Person to transfer the Shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

19. The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

## CALLS ON SHARES

20. The Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares.

21. The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

22. If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

23. The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share,

5

PATRICK 000074

003615

## EXHIBIT 4

becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

24.    The Directors may make arrangements on the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

25.    The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors.

### FORFEITURE OF SHARES

26.    If a Shareholder fails to pay any call or instalment of a call in respect of partly paid Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

27.    The notice shall name a further day (not earlier than the expiration of fourteen days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the Shares in respect of which the call was made will be liable to be forfeited.

28.    If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

29.    A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

30.    A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

31.    A statutory declaration in writing that the declarant is a Director, and that a Share has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

32.    The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

33.    The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the

6

003616

**EXHIBIT 4**

amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## TRANSFER OF SHARES

34. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

35. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor.

36. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

37. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

## TRANSMISSION OF SHARES

38. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased survivor, shall be the only Person recognised by the Company as having any title to the Share.

39. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

40. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

41. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

42. The Company may by Ordinary Resolution:

7

PATRICK 003672

003617

Case 1:23-cv-04453-sgj11 Doc 254-57 Filed 07/09/25 Entered 07/09/25 23:00:14 Desc of
Case 3:25-ex-04876 Charita Doc Respondents Response to Disclosure Pages 103 Page 35 of 302 ID 4851
EXHIBIT 4

(a)     consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b)     convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c)     subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d)     cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

43.     The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION AND PURCHASE OF SHARES

44.     Subject to the Law, the Company may:

(a)     issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may, before the issue of such Shares, determine;

(b)     purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder; and

(c)     make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law, including out of its capital, profits or the proceeds of a fresh issue of Shares.

45.     Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

46.     The redemption or purchase of any Share shall not be deemed to give rise to the redemption or purchase of any other Share.

47.     The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## GENERAL MEETINGS

48.     The Directors may, whenever they think fit, convene a general meeting of the Company.

49.     General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later

PATRICK 000074
003618

Case 1:23-cv-34534-sgj11 Doc 254-57 Filed 07/09/20/25 Entered 07/09/20/25 23:00:44 Page 15 of
Case 3:25-exhibit-4-76 Charitable Respondents Response and Disclosures 104 Page 36 of 302 ID 4852
**EXHIBIT 4**

than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

50.    If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

51.    At least seven days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

52.    The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

53.    All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, the appointment and removal of Directors and the fixing of the remuneration of the Company's auditors.  No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

54.    No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business.  Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

55.    If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved.  In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

56.    If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

9

PATRICK-000075

**EXHIBIT 4**

57. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

58. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

59. The chairman may with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting) adjourn a meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

60. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason, upon notice in writing to Shareholders. A postponement may be for a stated period of any length or indefinitely as the Directors may determine.

61. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

62. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

63. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

64. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF SHAREHOLDERS**

65. Subject to any rights and restrictions for the time being attached to any Share, on a show of hands every Shareholder present in person and every Person representing a Shareholder by proxy shall, at a general meeting of the Company, each have one vote and on a poll every Shareholder and every Person representing a Shareholder by proxy shall have one vote for each Share of which he or the Person represented by proxy is the holder.

66. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

10

**EXHIBIT 4**

67.     A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

68.     No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

69.     On a poll votes may be given either personally or by proxy.

70.     The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

71.     An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

72.     The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

73.     The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

74.     A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

### CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

75.     Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

### DIRECTORS

76.     The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

77.     The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

78.     Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

PATRICK 000027

003621

Case 1:23-cv-04534-sgj11 Doc 254-57 Filed 07/09/25 Entered 07/09/25 23:00:44 Page 18 of
Case 3:25-cv-01876 Charitable Respondents Response and Disclosures 107 Page 39 of 302 ID 4855
**EXHIBIT 4**

79. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

80. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

81. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

82. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

### ALTERNATE DIRECTOR OR PROXY

83. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be an officer of the Company. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

84. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

### POWERS AND DUTIES OF DIRECTORS

85. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

86. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their

12

PATRICK 000078

Case 1:23-cv-00534-sjll-DoD-2547-57 Filed 07/09/2/25 Entered 07/09/2/25 22:00:45 Desc of
Case 3:25-cv-00476 Charitable Respondents Response and Disclosure Page 108 Page 880 of 302 ID 4856
**EXHIBIT 4**

number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

87. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

88. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

89. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

90. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article .

91. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

92. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

93. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

### BORROWING POWERS OF DIRECTORS

94. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

13

PATRICK 000079

003623

**EXHIBIT 4**

## THE SEAL

95.     The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

96.     The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

97.     Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

98.     The office of Director shall be vacated, if the Director:

       (a)     becomes bankrupt or makes any arrangement or composition with his creditors;

       (b)     dies or is found to be or becomes of unsound mind;

       (c)     resigns his office by notice in writing to the Company;

       (d)     is removed from office by Ordinary Resolution;

       (e)     is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

       (f)     is removed from office pursuant to any other provision of these Articles.

## PROCEEDINGS OF DIRECTORS

99.     The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit . Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

100.    A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication

PATRICK 000080

003624

**EXHIBIT 4**

equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

101. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

102. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

103. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

104. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

105. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

    (a) all appointments of officers made by the Directors;

    (b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

    (c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

106. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

PATRICK 060094
003625

Case 1:23-cv-11053-PBS Document 54-57 Filed 07/09/25 Entered 07/09/25 23:30:42 Page 22 of
Case 3:25-cv-01876-Charitable Respondents Response and Disclosure 111 Page 383 of 307 ID 4859
Exhibit 4 Charitable Respondents Response and Disclosure 111 Page 383 of 307 ID 4859

# EXHIBIT 4

107.   A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

108.   The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

109.   The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

110.   Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

111.   A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

112.   All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

## DIVIDENDS

113.   Subject to any rights and restrictions for the time being attached to any Shares, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

114.   Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

115.   The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

16

PATRICK_060082

003626

## EXHIBIT 4

116.   Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

117.   The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

118.   Subject to any rights and restrictions for the time being attached to any Shares, all dividends shall be declared and paid according to the amounts paid up on the Shares, but if and for so long as nothing is paid up on any of the Shares dividends may be declared and paid according to the par value of the Shares.

119.   If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

120.   No dividend shall bear interest against the Company.

### ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

121.   The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

122.   The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

123.   The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

124.   The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

125.   The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

### CAPITALISATION OF RESERVES

126.   Subject to the Law, the Directors may, with the authority of an Ordinary Resolution:

(a)     resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

17

PATRICK 000888

003627

## EXHIBIT 4

(b)    appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

    (i)    paying up the amounts (if any) for the time being unpaid on Shares held by them respectively, or

    (ii)    paying up in full unissued Shares or debentures of a nominal amount equal to that sum,

and allot the Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Shares to be allotted to Shareholders credited as fully paid;

(c)    make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d)    authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

    (i)    the allotment to the Shareholders respectively, credited as fully paid, of Shares or debentures to which they may be entitled on the capitalisation, or

    (ii)    the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Shares,

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e)    generally do all acts and things required to give effect to the resolution.

### SHARE PREMIUM ACCOUNT

127.    The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share .

128.    There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

### NOTICES

129.    Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the

PATRICK 003628

003628

**EXHIBIT 4**

purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

130. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

131. Any notice or other document, if served by:

   (a)   post, shall be deemed to have been served five days after the time when the letter containing the same is posted;

   (b)   facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

   (c)   recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

   (d)   electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

   In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

132. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

133. Notice of every general meeting of the Company shall be given to:

   (a)   all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

   (b)   every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

   No other Person shall be entitled to receive notices of general meetings.

**INDEMNITY**

134. Every Director (including for the purposes of this Article any alternate Director appointed pursuant to the provisions of these Articles), Secretary, assistant Secretary, or other officer for the time being and from time to time of the Company (but not including the Company's auditors) and the personal representatives of the same (each an "**Indemnified Person**") shall be indemnified and

19

PATRICK 003629

**EXHIBIT 4**

secured harmless against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Indemnified Person, other than by reason of such Indemnified Person's own dishonesty, wilful default or fraud, in or about the conduct of the Company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Indemnified Person in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

135. No Indemnified Person shall be liable:

   (a)    for the acts, receipts, neglects, defaults or omissions of any other Director or officer or agent of the Company; or

   (b)    for any loss on account of defect of title to any property of the Company; or

   (c)    on account of the insufficiency of any security in or upon which any money of the Company shall be invested; or

   (d)    for any loss incurred through any bank, broker or other similar Person; or

   (e)    for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgement or oversight on such Indemnified Person's part; or

   (f)    for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Indemnified Person's office or in relation thereto;

unless the same shall happen through such Indemnified Person's own dishonesty, wilful default or fraud.

**NON-RECOGNITION OF TRUSTS**

136. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

137. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

138. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in

20

PATRICK 000066

## EXHIBIT 4

trustees upon such trusts for the benefit of the Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

### AMENDMENT OF ARTICLES OF ASSOCIATION

139. Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

### CLOSING OF REGISTER OR FIXING RECORD DATE

140. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

141. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

142. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

### REGISTRATION BY WAY OF CONTINUATION

143. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

### DISCLOSURE

144. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial

21

PATRICK 060097

003631

Case 1:23-cv-11195-SHS-OTW Document 547-57 Filed 07/06/25 Page 28 of
Case 3:25-cv-04737 Charitable Respondents Response and Disclosures Page 89 of 307 ID 4865

**EXHIBIT 4**

authority, or to any stock exchange on which the Shares may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

PATRICK 060069

003632

**EXHIBIT 4**

---

**NAME, ADDRESS AND DESCRIPTION
OF SUBSCRIBER**

---

Walkers Nominees Limited, 87 Mary
Street, George Town, Grand Cayman
KY1-9001, Cayman Islands

(Sgd) Virginia Czarnocki
_____

Virginia Czarnocki
as Authorised Signatory for and on behalf of Walkers
Nominees Limited

Dated:     13 December 2010

(Sgd) Carol MacDonald
_____
Signature of Witness

Name:          Carol MacDonald

Address        87 Mary Street, George
               Town, Grand Cayman KY1-
               9001, Cayman Islands

Occupation:    Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY

SIG.
        V. Daphene Whitelocke
        Assistant Registrar

Date. *13th December, 2010*



23

PATRICK 003633

Case 1:19-cv-03054-sgj11 Doc 254257-4 Filed 09/20/25 Entered 07/09/21 07:26:23 Page 1 of 4
Case 3:25-hib-04876 Charita Doc Respondents Response 99/00/25 Disclosure 119 Page 91 of 307 ID 4867
EXHIBIT 4

# EXHIBIT 7

003634



Exhibit 4 - Charitable Respondents Response and Disclosures    Page 92 of 307

## EXHIBIT 4

Registration No.: **249232**

Date of Incorporation: **13 December 2010**

Client No.: **KY057017**

REGISTER OF MEMBERS
FOR:
**CLO HOLDCO, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 1.00** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member<br>Name & Address | Date Entered<br>as a Member | Transaction<br>Type | Number of<br>Shares | Notes | Cert # | %<br>Paid | Total Share<br>Holding | Date Ceased<br>to be a<br>Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services<br>Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005<br>Cayman Islands | 13 Dec 2010 | Allotment | 1.00 | 13 Dec 2010 : Subscriber's share<br>issued by operation of law on<br>registration | No<br>Cert | | | |
| | | Transfer | (1.00) | 17 Dec 2010 : Transfer of 1.0<br>Ordinary share(s) from WNL<br>Limited to Highland Capital<br>Management Partners, Charitable<br>Trust #2 pursuant to resolutions<br>dated 17 Dec 2010 | | | | |
| | | | | | | **Nil** | **Nil** | 17 Dec 2010 |
| **Highland Capital<br>Management Partners,<br>Charitable Trust #2**<br>13455 Noel Road<br>Suite 800<br>Dallas TX  75240<br>USA | 17 Dec 2010 | Transfer | 1.00 | 17 Dec 2010 : Transfer of 1.0<br>Ordinary share(s) from WNL<br>Limited to Highland Capital<br>Management Partners, Charitable<br>Trust #2 pursuant to resolutions<br>dated 17 Dec 2010 | No<br>Cert | | | |
| | | Transfer | (1.00) | 7 Nov 2011 : Transfer of 1.0<br>Ordinary share(s) from Highland<br>Capital Management Partners,<br>Charitable Trust #2 to<br>CHARITABLE  DAF HOLDCO, LTD | | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 3]

003635

**EXHIBIT 4**

intertrust
GROUP

Registration No.: **249232**

Date of Incorporation: **13 December 2010**

Client No.: **KY057017**

REGISTER OF MEMBERS
FOR:
**CLO HOLDCO, LTD.**

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| | | | | pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | | | | |
| | | | | | | **Nil** | **Nil** | 7 Nov 2011 |
| **CHARITABLE DAF FUND, LP** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 7 Nov 2011 | Transfer | 1.00 | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from CHARITABLE DAF HOLDCO, LTD to CHARITABLE DAF FUND, LP pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | No Cert | | | |
| | | | | | | **100** | **1.00** | |
| **CHARITABLE DAF HOLDCO, LTD** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 7 Nov 2011 | Transfer | 1.00 | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CHARITABLE DAF HOLDCO, LTD pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | No Cert | | | |
| | | Transfer | (1.00) | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from CHARITABLE DAF HOLDCO, LTD to CHARITABLE DAF FUND, LP pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | | | | |
| | | | | | | **Nil** | **Nil** | 7 Nov 2011 |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[2 / 3]

003636



**EXHIBIT 4**

Registration No.: **249232**

Date of Incorporation: **13 December 2010**

Client No.: **KY057017**

REGISTER OF MEMBERS
FOR:
**CLO HOLDCO, LTD.**

Notes:

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

003637

# EXHIBIT 8

**EXHIBIT 4**



WK–53083

*Certificate of Registration of Exempted Limited Partnership*

*I, JOY A. RANKINE Assistant Registrar of Exempted Limited Partnership in the Cayman Islands DO HEREBY CERTIFY, pursuant to the Exempted Limited Partnership Law, 1991 that all the requisitions of the said Law in respect of registration were complied with by*

**Charitable DAF Fund, LP**

*an Exempted Limited Partnership registered in the Cayman Islands on the 28th day of October Two Thousand Eleven*

*Given under my hand and Seal at George Town in the Island of Grand Cayman this 28th day of October Two Thousand Eleven*

**Assistant Registrar of Exempted Limited Partnership
Cayman Islands.**

003639

**EXHIBIT 4**

# EXHIBIT 9

**EXHIBIT 4**

**DATED NOVEMBER 7, 2011**

**AMENDED AND RESTATED**

**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF**

**CHARITABLE DAF FUND, LP**

---

**WARNING**

**THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY**

PATRICK 000041

003641

**EXHIBIT 4**

# TABLE OF CONTENTS

**PAGE**

| | | |
|---|---|---|
| ARTICLE I | GENERAL PROVISIONS; COMPENSATION AND EXPENSES | 2 |
| 1.1 | Continuation | 2 |
| 1.2 | Name | 2 |
| 1.3 | Purpose and Powers | 2 |
| 1.4 | Registered Office | 2 |
| 1.5 | Partners | 2 |
| 1.6 | Powers. | 2 |
| 1.7 | Term | 3 |
| 1.8 | Admission of New Partners | 3 |
| 1.9 | Taxable Year | 3 |
| 1.10 | Liability of Partners | 3 |
| 1.11 | Limitation on Assignability of Partners' Interests. | 3 |
| 1.12 | Definitions | 4 |
| 1.13 | Service Providers | 4 |
| 1.14 | Partnership Expenses | 4 |
| 1.15 | Withdrawal of Initial Limited Partner | 5 |
| ARTICLE II | POWERS | 5 |
| 2.1 | Partnership Powers | 5 |
| 2.2 | Rights, Powers, Limitations on Liability and Indemnification of General Partner. | 6 |
| ARTICLE III | CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES | 9 |
| 3.1 | Capital Contributions. | 9 |
| 3.2 | Capital Account; Allocation of Profits and Losses. | 9 |
| ARTICLE IV | LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT | 9 |
| 4.1 | Legal Interest | 9 |
| 4.2 | Distributions. | 10 |
| 4.3 | Withdrawal | 10 |
| ARTICLE V | DURATION OF PARTNERSHIP | 10 |
| 5.1 | Termination | 10 |
| 5.2 | Winding Up | 11 |
| ARTICLE VI | MISCELLANEOUS | 11 |
| 6.1 | Tax Matters Partner | 11 |
| 6.2 | Right to Hire. | 11 |
| 6.3 | Applicable Law, etc | 12 |
| 6.4 | Power of Attorney | 12 |
| 6.5 | Tax Elections Under the Internal Revenue Code | 12 |
| 6.6 | Amendments to Partnership Agreement | 12 |

i

003642

**EXHIBIT 4**

| | | |
|---|---|---|
| 6.7 | Investment Representation | 13 |
| 6.8 | Notices | 13 |
| 6.9 | General Partner Determinations | 14 |
| 6.10 | Dispute Resolution | 14 |
| 6.11 | Successors and Assigns | 16 |
| 6.12 | Severability | 16 |
| 6.13 | No Third Party Rights | 16 |
| 6.14 | No Right to Partition | 16 |

003643
PATRICK 000043

**EXHIBIT 4**

# AMENDED AND RESTATED
## EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
## CHARITABLE DAF FUND, LP

**THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "**Agreement**") is made on November 7, 2011

**BETWEEN**

(1)    Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as general partner (the "**General Partner**"); and

(2)    Charitable DAF HoldCo, Ltd, a Cayman Islands exempted Company having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3)    Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement; and

(4)    Walkers Nominees Limited having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9005, Cayman Islands as the initial limited partner (the "**Initial Limited Partner**") solely for the purposes of withdrawing as such.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "**Law**"), and since its formation has been governed by the Initial Limited Partnership Agreement of the Partnership, dated October 25, 2011 (the "**Initial Agreement**"); and

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein; and

**WHEREAS**, the parties hereto wish to amend and restate the Initial Agreement in its entirety and enter into this Agreement.

PATRICK-000044

Case 1:19-cv-09046-gbl11 Doc 25-4 25 Filed 07/09/20 Entered 07/09/20 16:22:00 Page Desc of 22
Case 3:Exhibit 4 Charitable Respondents' Response and Disclosures Page 130 Page 302 of 307 D 4878
**EXHIBIT 4**

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

**ARTICLE I**
**GENERAL PROVISIONS; COMPENSATION AND EXPENSES**

1.1 <u>Continuation</u>.  The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Law.

1.2 <u>Name</u>.  The business of the Partnership shall be carried on under the name of Charitable DAF Fund, LP.

1.3 <u>Purpose and Powers</u>.  The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments.  At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4 <u>Registered Office</u>.  The registered office of the Partnership is c/o Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

1.5 <u>Partners</u>.  The name and addresses of the Partners are as follows:

| Name | Address |
|---|---|
| Charitable DAF GP, LLC | c/o Walkers Corporate Services Limited |
| | Walker House |
| | 87 Mary Street |
| | George Town |
| | Grand Cayman KY1-9005, Cayman Islands |
| | |
| Charitable DAF HoldCo Ltd (Limited Partner) | c/o Walkers Corporate Services Limited |
| | Walker House |
| | 87 Mary Street |
| | George Town |
| | Grand Cayman KY1-9005, Cayman Islands |

1.6 <u>Powers</u>.

(a)     Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and

2

PATRICK 000045
003645

Case 9:14-cv-80595-aaa Doc 254-25 Filed 07/09/20 Entered 07/09/20 20:00 Page 2 of 22
Case 3:23-cv-01878 Charitable Respondents' Response and Disclosures Page 131 Page 303 of 367 ID 4879
**EXHIBIT 4**

obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b)     Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7     <u>Term</u>. The Partnership was established on October 25, 2011 and shall continue until terminated in accordance with this Agreement or any amendment or modification thereof.

1.8     <u>Admission of New Partners</u>. The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9     <u>Taxable Year</u>. The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10     <u>Liability of Partners</u>.

(a)     The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b)     Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1.

1.11     <u>Limitation on Assignability of Partners' Interests</u>.

(a)     A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

3

PATRICK's 000046

(b)    The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part.

1.12   <u>Definitions</u>. For the purpose of this Agreement, unless the context otherwise requires:

(a)    <u>General Partner</u>. The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b)    <u>Indirect Charitable Owners</u>. The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(c)    <u>Limited Partner</u>. The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(d)    <u>Partner</u>. The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13   <u>Service Providers</u>. The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14   <u>Partnership Expenses</u>. The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

4

Case 1:9-40054-sgj11 Doc 254-4 Filed 07/09/20 Entered 07/09/20 22:00 Page 9 of 22
Case 3:23-cv-01878-Charitable Respondents Response and Disclosures 133 Page 5 of 7D 4881
**EXHIBIT 4**

1.15    Withdrawal of Initial Limited Partner.  The Initial Limited Partner hereby withdraws as a limited partner immediately following the admission of the Limited Partners and thereafter shall have no further rights, liabilities or obligations under or in respect of this Agreement in its capacity as Initial Limited Partner.

## ARTICLE II
## POWERS

2.1    Partnership Powers.  The Partnership shall have the following powers:

(a)    To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

5

Case 1:23-cv-04775-MHC Document 47-1 Filed 07/09/25 Entered 07/09/25 23:00:44 Page 18 of
Case 3:23-cv-01873-Charitable Respondent's Response and Disclosure Pages 134 Page 306 of 307 D 4882
**EXHIBIT 4**

(b)     To possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c)     To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d)     To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e)     To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f)     To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g)     To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2    <u>Rights, Powers, Limitations on Liability and Indemnification of General Partner</u>.

(a)     Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be subject to the provisions of this Section.

(b)     To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the

6

PATRICK-000049

**EXHIBIT 4**

business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c) Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d) To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e) Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f) The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may

7

PATRICK 003650

**EXHIBIT 4**

otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g)   The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)   **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred.  In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.  No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i)   <u>**WAIVER OF CONSUMER RIGHTS**</u>**:  The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA. Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j)   No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person.  Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k)   This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

8

PATRICK_000051

**EXHIBIT 4**

## ARTICLE III
## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1     <u>Capital Contributions</u>.

    (a)      Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2     <u>Capital Account; Allocation of Profits and Losses</u>.

    (a)      There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

    (b)      Since the General Partner's capital account and contributions shall be the minimum required by Law, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

    (c)      For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

    (d)      To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

    (e)      Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

## ARTICLE IV
## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL
## WITHDRAWALS FROM CAPITAL ACCOUNT

4.1     <u>Legal Interest</u>. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

PATRICK_008052

**003652**

Case 1:93-cv-00453-SGJ1 Doc 0547-57 Filed 07/09/20/25 Entered 07/09/20/25 23:90:44 Page 1 of
Case 3:23-cv-01875 Charitable Respondent 14 Response and Disclosures 138 Page 35 of 307 1D 4886
EXHIBIT 4

4.2 <u>Distributions</u>.

    (a)    Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3).

    (b)    The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

            For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership.

4.3 <u>Withdrawal</u>. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may terminate all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

## ARTICLE V
## DURATION OF PARTNERSHIP

5.1 <u>Termination</u>. The Partnership shall be required to be wound up and dissolved upon:

    (a)    the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

PATRICK 003653

Case 1:23-cv-10904-sgj-11-DoD 264-57 Filed 07/09/20/25 Entered 07/09/20/25 2:30:14 Page 15 of
Case 3:23-cv-10187 Charitable Respondents Response and Disclosures 139 Page 351 of 307D 4887
EXHIBIT 4

(b)     the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c)     the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint.

5.2    <u>Winding Up</u>.  Upon the Partnership being required to be wound up and dissolved, the General Partner shall proceed with the liquidation and distribution of the assets of the Partnership, and upon completion of the winding up of the Partnership, shall have the authority to and shall execute and file a dissolution notice and such other documents required to effect the dissolution and termination of the Partnership in accordance with the Law.  Before the distribution of all the assets of the Partnership, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement.  The winding up of the Partnership and payment of creditors shall be effected in accordance with the Law.

## ARTICLE VI
## MISCELLANEOUS

6.1    <u>Tax Matters Partner</u>.  The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership.  In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith.  All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2    <u>Right to Hire</u>.

(a)     Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership.

(b)     Each of the Partners consents that the General Partner, the Investment Manager or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others,

PATRICK-A 003654
003654

Case 1:93-cv-04545-sgj11 Doc 254-57 Filed 07/09/21 Entered 07/09/21 23:10:41 Page 16 of
Case 3:23-cv-01843 Charitable Respondents Response and Disclosures Page 312 of 307
Exhibit 4 Charitable Respondents Responses and Disclosures Page 140 of 307 D 4888
EXHIBIT 4

including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c)   The General Partner, the Investment Manager and any affiliate or employee of such General Partner or Investment Manager, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3   <u>Applicable Law, etc.</u>   This Limited Partnership Agreement:  (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and (iii) may be executed in more than one counterpart with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written; provided, however, that in the aggregate, they shall have been signed by all of the Partners.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural as the identity of the person may require.  The term "gross negligence" and its cognates shall be interpreted in accordance with the laws of the State of Delaware.

6.4   <u>Power of Attorney.</u>   Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement.  This power of attorney is intended to secure an interest in property and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5   <u>Tax Elections Under the Internal Revenue Code.</u>   The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6   <u>Amendments to Partnership Agreement.</u>   The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect

PATRICK 003655
003655

Case 1:11-cv-00457-ll DoD 54-57 Filed 07/09/20/25 Entered 07/09/20/25 23:00:44 Page 15 of
Case 3:23-cv-01873 Charitable Respondents Response and Disclosures 142 Page 13 of 307 D 4889
**EXHIBIT 4**

amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the Investment Manager or the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; *provided, that* in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; *provided further, that* the General Partner shall give notice to the Limited Partners of any such amendment.

6.7 <u>Investment Representation</u>. Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8 <u>Notices</u>. All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the addresses set forth beneath his signature to this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of each such notice sent simultaneously to the General Partner and the Investment Manager at Nextbank Tower, 13455 Noel Road, 8th Floor, Dallas, Texas 75240; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI. Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or (iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

PATRICKS_000056
**003656**

Case 1:23-cv-11195-SHS-OTW   Document 457   Filed 07/09/25   Entered 07/09/25 23:00:14   Page 18 of
Case 3:23-cv-04738   Charitable Respondents Responses and Disclosures 142   Page 14 of 307
**EXHIBIT 4**

6.9    <u>General Partner Determinations</u>.  Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10    <u>Dispute Resolution</u>.  The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person.  If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

    (a)    <u>Mediation</u>.

        (1)    Any Dispute shall be submitted to mediation by written notice to the other party or parties.  In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations.  The mediator will be selected by agreement of the parties.  If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

        (2)    The mediation will be conducted as specified by the mediator and agreed upon by the parties.  The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

        (3)    The mediation will be treated as a settlement discussion and therefore will be confidential.  The mediator may not testify for either party in any later proceeding relating to the dispute.  No recording or transcript shall be made of the mediation proceedings.

        (4)    Each party will bear its own costs in the mediation.  The fees and expenses of the mediator will be shared equally by the parties.

    (b)    <u>Arbitration</u>.  If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration.  A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed.  Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein.  The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**").  In the event of a conflict, the provisions of this document will control.

        (1)    The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the

14

PATRICK 003657

Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2)     The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3)     The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(4)     No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The

15

PATRICKS_000058
003658

Case 1:23-cv-04537-sj1 Doc 54-7 Filed 07/09/25 Entered 07/09/25 23:00:44 Desc
Case 3:23-cv-01873 Charitable Respondents' Responses and Disclosures 144 Page 16 of 307 ID 4892
EXHIBIT 4

total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5)   All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6)   The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11   <u>Successors and Assigns</u>. Subject to the limitations set forth in <u>Section 1.11</u>, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12   <u>Severability</u>. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13   <u>No Third Party Rights</u>. Except for rights expressly granted hereunder to the Covered Persons, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto.

6.14   <u>No Right to Partition</u>. Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

16

PATRICK 000059
003659

**EXHIBIT 4**

### SIGNATURE PAGE FOR AMENDED AND RESTATED
### EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
### CHARITABLE DAF FUND, LP

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: _____

    James D. Dondero
    Managing Member

Witnessed By: _____

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:


By: _____

    Name:  Grant Scott
    Title:   Director


Witnessed By: _____

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:


By: _____

    Name:
    Title:


Witnessed by: _____

PATRICK_060060

Case 19-34054-sgj11 Doc 2547-4 Filed 07/09/25 Entered 07/09/25 23:90:44 Page 22 of
Case 3:25-civ-01873 Charitable Respondents Response and Disclosures Page 318 of 307 ID 4894
**EXHIBIT 4**

SIGNATURE PAGE FOR AMENDED AND RESTATED
EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
CHARITABLE DAF FUND, LP

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated
Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the
day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: _____
    James D. Dondero
    Managing Member

Witnessed By: _____

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: _____
    Name: Grant Scott
    Title: Director

Witnessed By: _Candi L. Riggs_
           Candi L, Riggs

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: _____
    Name: ROD PALMER
    Title:

Witnessed by: _Graine O'Bay_

003661

**EXHIBIT 4**

# EXHIBIT 10

intertrust GROUP

**EXHIBIT 4**

Registration No.: **53083**

Date of Incorporation: **28 October 2011**

Client No.: **KY059900**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF FUND, LP**

Share Class:    **General Partner**

Nominal Value:    **USD 0.00**

Voting Rights:    Yes

Conditional:    NO

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **CHARITABLE DAF GP, LLC** The Corporation Trust Company Corporation Trust Center 1209 Orange St New Castle 19801 Wilmington DE USA | 25 Oct 2011 | New Partner | 1.00 | 25 Oct 2011 : Initial Exempted Limited Partnership Agreement dated 25 Oct 2011 | No Cert | | | |
| | | | | | | **Nil** | **1.00** | |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

INTERTRUST GROUP

003663

Case 1:23-cv-04534 sealed 11 DoD 25-47-51 Filed 07/06/21/25 Entered 07/06/21/25 06:29:44 Page 1 of
Case 3:23-cv-04876 Charitable Respondent 14 Response and Disclosures 149 Page 31 of 307 D 4897
EXHIBIT 4

# EXHIBIT 11

**EXHIBIT 4**

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

## CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)



**||| WALKERS**

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
T +1 345 949 0100   F +1 345 949 7886   www.walkersglobal.com

**REF: SSJ/VT/H0851-120776**



AMER_Docs   11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

Case 1:23-cv-09534-sgj11 Doc 2542-51 Filed 07/06/25 Entered 07/06/25 05:29:44 Page 3 of
Case 3:23-cv-04837 Charitable Respondents' Responses and Disclosures Page 323 of 807 PageID 4899
Exhibit 4 Title Page 151 Page 323 of 807 PageID 4899

**EXHIBIT 4**

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

## (ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

1.  The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2.  The registered office of the Company will be situated at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3.  The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4.  The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5.  The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6.  The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7.  The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8.  The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK 000084

003666

Case 1:23-cv-11195-SHS-OTW   Document 451-41   Filed 07/06/25   Entered 07/06/25 06:29:44   Page 4 of
Case 3:23-cv-04801-TLT   Charitable Respondents' Response and Disclosures   Page 324 of 307
EXHIBIT 4

### TABLE OF CONTENTS

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 4 |
| SHARES | 4 |
| MANAGEMENT SHARES | 5 |
| PARTICIPATING SHARES | 6 |
| MODIFICATION OF RIGHTS | 6 |
| CERTIFICATES | 7 |
| FRACTIONAL SHARES | 7 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK 000092

003667

**EXHIBIT 4**

THE SEAL ................................................................................................ 15

DISQUALIFICATION OF DIRECTORS ..................................................... 15

PROCEEDINGS OF DIRECTORS ............................................................ 16

DIVIDENDS .............................................................................................. 18

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ........ 18

CAPITALISATION OF RESERVES .......................................................... 19

SHARE PREMIUM ACCOUNT .................................................................. 20

NOTICES .................................................................................................. 20

NON-RECOGNITION OF TRUSTS .......................................................... 21

WINDING UP ............................................................................................ 21

AMENDMENT OF ARTICLES OF ASSOCIATION ................................... 22

CLOSING OF REGISTER OR FIXING RECORD DATE ........................... 22

REGISTRATION BY WAY OF CONTINUATION ...................................... 22

MERGERS AND CONSOLIDATION ......................................................... 22

DISCLOSURE .......................................................................................... 23

INDEMNITY .............................................................................................. 23

DISPUTE RESOLUTION .......................................................................... 24



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

003668

**EXHIBIT 4**

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

### (ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

### INTERPRETATION

1.    In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Law and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

003669

**EXHIBIT 4**

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

(a)   passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)   approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Law and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "**Participating Shares**" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require.  For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Restricted Person**" means any Person holding Participating Shares:

(a)   in breach of the law or requirements of any country or governmental authority;

(b)   that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the US Internal Revenue Code of 1986, as amended (the "**Code**") or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c)   in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.



AMER_Docs   11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

**003670**

## EXHIBIT 4

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)  passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)  approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a)  words importing the singular number shall include the plural number and vice versa;

(b)  words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)  the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)  reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)  reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

AMER_Docs   11255406.3 H0851.120776

003671

**EXHIBIT 4**

    (f)      reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

    (g)      reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

2.      Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

<b>PRELIMINARY</b>

3.      The business of the Company may be commenced at any time after incorporation.

4.      The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5.      The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6.      The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

<b>SHARES</b>

7.      Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

    (a)      issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

    (b)      grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8.      The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions,

AMER_Docs 11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK 000087

003672

**EXHIBIT 4**

preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9.  The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

### MANAGEMENT SHARES

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.

12. Any Management Shares held by Grant Scott will be automatically redeemed by the Company upon his death or upon the Company receiving written notice from two board certified physicians confirming that he is of unsound mind or otherwise incapacitated ("**Automatic Redemption**").

13. If at the time of an Automatic Redemption, Grant Scott is the sole Director of the Company, such office will be automatically vacated by Grant Scott.

14. Upon an Automatic Redemption, the Company shall issue 100 Management Shares to a successor management shareholder ("**Successor Management Shareholder**") designated by James Dondero ("**Designator**"), or, if he is unable or declines to act, by an individual or individuals designated by James Dondero ("**Successor Designator**"), in either case within 15 days of the Automatic Redemption. If the Designator is:

    (a)  deceased and has not named a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made in accordance with the provisions of the Designator's will, or if his will contains no such provisions, by the qualified personal representative of his estate (the "**Designator's Personal Representative**"); or

    (b)  otherwise incapacitated and has not previously designated a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made by the Designator's attorney-in-fact appointed for such purpose, under a valid, effective power of attorney instrument (the "**Designator's Attorney**").

15. Any designation of a Successor Management Shareholder must be notified to the Company in writing and signed by either the Designator, the Successor Designator, the Designator's Personal Representative, or the Designator's Attorney, as appropriate, and accompanied by a consent to become a Shareholder signed by the Successor Management Shareholder ("**Issue Notice**"). The issue of the 100 Management Shares to the Successor Management Shareholder shall take effect upon receipt by the Company of the Issue Notice and the Register will be updated accordingly.



5

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK 000098

**003673**

Case 3:19-cv-04405-gjjl1 Doc 25442517 Filed 07/09/20/25 Entered 07/09/20/17 503290:44 Page 41 of
Case 3:Exhibit 04873 Charitable Respondents Response and Disclosures 159 Page 3531 of 307 D 4907

# EXHIBIT 4

16. The Designator may name a Successor Designator (including an individual, or a series of individuals) at any time pursuant to a written notice delivered to the Company during his lifetime or by a provision in his will. Each Successor Designator upon succeeding and replacing the Designator or a prior Successor Designator, may in the same manner as set out above, designate an individual, or a series of individuals, to succeed him as Successor Designator. In the event of a conflict between such instruments, the one bearing the latest date shall control. A Successor Designator will assume such office upon consenting to so act.

17. The Successor Management Shareholder may not be a "disqualified person" (as that term is defined in Section 4946 of the United States Internal Revenue Code of 1986, as amended), other than a foundation manager, with respect to Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., or Highland Kansas City Foundation, Inc.

18. In connection with the appointment of the Successor Management Shareholder, the Company and its registered office service provider will be entitled to rely on the advice of counsel confirming that the designation of the Successor Management Shareholder has been made in accordance with the procedures set out in these Articles.

## PARTICIPATING SHARES

19. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

20. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

21. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.



AMER_Docs 11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK 009099

003674

# EXHIBIT 4

## CERTIFICATES

22.    No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

23.    The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## TRANSFER OF SHARES

24.    The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

25.    The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

26.    The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

27.    All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

28.    If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

## TRANSMISSION OF SHARES

29.    The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share.  In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

30.    Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person

7



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK 003180

003675

EXHIBIT 4

could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

31.    A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

### ALTERATION OF SHARE CAPITAL

32.    The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

33.    The Company may by Ordinary Resolution:

(a)    consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b)    convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c)    subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d)    cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

34.    The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

### REDEMPTION, PURCHASE AND SURRENDER OF SHARES

35.    Subject to the Law, the Company may:

(a)    issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

(b)    purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c)    make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

(d)    accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.



AMER_Docs   11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

003676

36. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

37. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

38. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## TREASURY SHARES

39. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

40. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

41. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

    (a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

    (b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

42. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

## GENERAL MEETINGS

43. The Directors may, whenever they think fit, convene a general meeting of the Company.

44. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

45. General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the

AMER_Docs   11255406.3 H0851.120776



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2013 09:13 EST*

**003677**

Case 3:13-cv-04054-gjj11 Doc 264-17 Filed 07/09/20/25 Entered 07/09/22 12:50:32 90:44 Page 45 of
Case 3:25-cv-04873 Charitable Responden14 Response and Disclosure 163 Page 335 of 307D 4911
**EXHIBIT 4**

objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

46. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

47. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

48. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

49. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

50. No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

51. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

52. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

10



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000103
003678

**EXHIBIT 4**

53. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

54. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

55. The chairman may adjourn a meeting from time to time and from place to place either:

    (a)    with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

    (b)    without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

        (i)    secure the orderly conduct or proceedings of the meeting; or

        (ii)    give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

56. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

57. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

58. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

59. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF SHAREHOLDERS**

60. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of

AMER_Docs 11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK 003184

003679

**EXHIBIT 4**

Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

61. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

62. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

63. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

64. On a poll votes may be given either personally or by proxy.

65. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

66. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

67. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

68. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

69. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS**

70. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

**DIRECTORS**

71. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK 000166
003680

**EXHIBIT 4**

72. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

73. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

74. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

75. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

76. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

77. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR

78. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

79. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

80. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

AMER_Docs  11255406.3 H0851.120776



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK 003126

**003681**

Case 3:19-cv-04355-gjl Doc 26-4 2517 Filed 07/09/20/25 Entered 07/09/22 01 15 03 290:44 age 09 of
Case 3:Exhibit 4 87 Charitable Respondents Responses and Disclosures 167 Page 359 of 307 ID 4915
**EXHIBIT 4**

81. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

82. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

83. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

84. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

85. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

86. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

87. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.



14

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000107
003682

**EXHIBIT 4**

88.     Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

### BORROWING POWERS OF DIRECTORS

89.     The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

### THE SEAL

90.     The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

91.     The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal.   The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

92.     Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

### DISQUALIFICATION OF DIRECTORS

93.     The office of Director shall be vacated, if the Director:

        (a)     becomes bankrupt or makes any arrangement or composition with his creditors;

        (b)     dies or is found to be or becomes of unsound mind;

        (c)     resigns his office by notice in writing to the Company;

        (d)     is removed from office by Ordinary Resolution;

        (e)     is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK 000168
003683

Case 9-34054-sgj11 Doc 264-17 Filed 07/09/20 Entered 07/09/20 17:03:09 Page 21 of
Case 3:23-cv-01878 Charitable Respondents Response and Disclosures Page 341 of 507 D 4917
**EXHIBIT 4**

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

## PROCEEDINGS OF DIRECTORS

94. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

95. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

96. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

97. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

98. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

99. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.



AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK 000109
003684

# EXHIBIT 4

100.    The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

    (a)    all appointments of officers made by the Directors;

    (b)    the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

    (c)    all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

101.    When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

102.    A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

103.    The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

104.    The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

105.    Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

106.    A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

107.    All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK 003685

**EXHIBIT 4**

### DIVIDENDS

108. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

109. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

110. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

111. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

112. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

113. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

114. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

115. No dividend shall bear interest against the Company.

### ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

116. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

117. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

118. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK 003684

003686

**EXHIBIT 4**

being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

119.    The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

120.    The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

121.    Subject to the Law and these Articles, the Directors may:

(a)    resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b)    appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

    (i)    paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

    (ii)    paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c)    make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d)    authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

    (i)    the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

    (ii)    the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares,

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK 000142

**003687**

Case 1:19-cv-04355-gjjl1 Doc 26447 257 Filed 07/09/2025 Entered 07/09/25 16:30:44 Page 25 of
Case 3:Exhibit 04.87Charitable Respondents Respons and Disclosures 173 Page 345 of 307D 4921

# EXHIBIT 4

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e)    generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

122.    The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

123.    There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

124.    Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

125.    Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

126.    Any notice or other document, if served by:

(a)    post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b)    facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c)    recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d)    electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.



AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

PATRICK 003688

**EXHIBIT 4**

127.  Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

128.  Notice of every general meeting of the Company shall be given to:

  (a)  all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

  (b)  every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

  No other Person shall be entitled to receive notices of general meetings.

### NON-RECOGNITION OF TRUSTS

129.  Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

### WINDING UP

130.  If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

131.  Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

  (a)  first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

  (b)  second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

132.  If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such

AMER_Docs  11255406.3 H0851.120776



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

003689

# EXHIBIT 4

assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

133. Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

134. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

135. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

136. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

137. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

138. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.



AMER_Docs   11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

003690

# EXHIBIT 4

### DISCLOSURE

139. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

### INDEMNITY

140. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or Gross Negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

141. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

142. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

143. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

AMER_Docs  11255406.3 H0851.120776



*Uploaded: 27-Jun-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

**003691**

**EXHIBIT 4**

144.   The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

### DISPUTE RESOLUTION

145.   The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

    (a)   Mediation:

        (i)   any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

        (ii)   the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

        (iii)   the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

        (iv)   each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

    (b)   Arbitration:

    if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in these Articles and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

        (i)   the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any



AMER_Docs   11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000117
003692

**EXHIBIT 4**

issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however,* that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii)     the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii)    the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv)     no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted;

(v)      all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a

AMER_Docs   11255406.3 H0851.120776



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

PATRICK_000118
003693

Case 3:13-cv-04755-gjgjl Doc 264-257 Filed 07/09/20/25 Entered 07/09/20/25 23:90:44 Page 81 of
Case 3:13-cv-04755 Charitable Respondents' Responses and Disclosures 179 Page 351 of 307 D 4927
**EXHIBIT 4**

reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi)    the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

003694

Case 19-34054-sgj11 Doc 2542-27 Filed 07/09/25 Entered 07/09/25 03:20:44 Page 1 of 3
Case 3:21-cv-01878 Charitable DO Respondents Responses and Disclosures 180 Page 352 of 307 D 4928
EXHIBIT 4

# EXHIBIT 12

**EXHIBIT 4**

intertrust
GROUP

PATRICK_000017

Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | |
|---|---|
| Share Class: | **Management** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | NO |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| Grant Scott<br>Highland Capital<br>Managment, L.P.<br>13455 Noel Road, Suite 800<br>Dallas<br>Texas 75240<br>USA | 7 Nov 2011 | Allotment | 100.00 | 7 Nov 2011 : Allotment of 100.0 Management share(s) for USD0.01 / share to Mr. Grant Scott pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Transfer | (100.00) | 25 Mar 2021 : Transfer of 100.0 Management share(s) from Mr. Grant Scott to Mark E. Patrick pursuant to resolutions dated 25 Mar 2021 | | | | |
| | | | | | | Nil | Nil | 25 Mar 2021 |
| WNL Limited<br>Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005<br>Cayman Islands | 7 Nov 2011 | Allotment | 1.00 | 7 Nov 2011 : Allotment of 1.0 Management share(s) for USD0.01 / share to WNL Limited pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Repurchase | (1.00) | 7 Nov 2011 : Repurchase of 1.0 Management share(s) from WNL Limited pursuant to resolutions | No Cert | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 2]

003696

**EXHIBIT 4**



Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | dated 07 Nov 2011. | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | **Nil** | **Nil** | 7 Nov 2011 |
| **Mark E. Patrick** | 25 Mar 2021 | Transfer | 100.00 | 25 Mar 2021 : Transfer of 100.0 Management share(s) from Mr. Grant Scott to Mark E. Patrick pursuant to resolutions dated 25 Mar 2021 | No Cert | | | |
| | | | | | | **100** | **100.00** | |

Notes:

Date printed: 19 May, 2021

[ 2 / 2 ]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

PATRICK_000018

003697

Case 1:19-cv-03954-sgj11 Doc 254-25 Filed 07/09/20/25 Entered 07/09/20/25 08:29:04 Page 1 of 4
Case 3:19-cv-04873 Charitable Respondents Response and Disclosures Page 355 of 307 ID 4931
EXHIBIT 4

# EXHIBIT 13

**EXHIBIT 4**

 intertrust
GROUP

Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | |
|---|---|
| Share Class: | **Participating** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | NO |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **The Highland Capital Management Partners Charitable Trust #2** Highland Capital Management, L.P. 13455 Noel Rd, Suite 800 Dallas TX 75240 USA | 7 Nov 2011 | Allotment | 300.00 | 7 Nov 2011 : Allotment of 300.0 Participating share(s) for USD0.01 / share to The Highland Capital Management Partners Charitable Trust #2 pursuant to minutes/resolutions dated 07 Nov 2011 | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Kansas City Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | New Certificate | 200.00 | 30 Nov 2011 : New certificate No. 0 issued for remaining balance of 200.0 Participating share(s) | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Dallas Foundation, Inc | | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 3]

PATRICK_000019

003699

Case 19-34054-sgj11 Doc 2547-4 Filed 07/09/21 Entered 07/09/21 20:44:28 Page 2 of 4
Exhibit 4 - Charitable Respondents Response and Disclosures    Page 157 of 307
**EXHIBIT 4**



PATRICK_000020

Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | New Certificate | 100.00 | pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | | | 30 Nov 2011 : New certificate No. 0 issued for remaining balance of 100.0 Participating share(s) | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Santa Barbara Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | | |
| | | | | | | **Nil** | **Nil** | 30 Nov 2011 |
| **Highland Kansas City Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Kansas City Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | No Cert | | | |
| | | | | | | **100** | **100.00** | |
| **Highland Dallas Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Dallas Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | No Cert | | | |
| | | | | | | **100** | **100.00** | |
| **Highland Santa Barbara Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management | No Cert | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[2 / 3]

003700

**EXHIBIT 4**

 intertrust
GROUP

Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | Partners Charitable Trust #2 to Highland Santa Barbara Foundation, Inc pursuant to resolutions dated 30 Nov 2011 | | | |
| | | | | | | 100 | 100.00 |
| **Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT** 306 W. 7th St., Suite 1045 Fort Worth TX 76102 USA | 13 Aug 2015 | Allotment | 5.00 | 13 Aug 2015 : Allotment of 5.0 Participating share(s) for USD0.01 / share to Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT pursuant to minutes/resolutions dated 12 Aug 2015 | No Cert | | |
| | | | | | | 100 | 5.00 |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[3 / 3]

PATRICK_000021

003701

# EXHIBIT 14

Case 1:19-cv-03054-... Doc 254-12 Filed 07/09/20/... Entered 07/09/20 25:03:00 Page 2 of 3
Case 3:25-cv-01873-X Document 34-14 Filed 09/09/25 Page 188 of 335 PageID 4936
Exhibit 4 - Charitable Respondents Response and Disclosures - Page 160 of 307

**EXHIBIT 4**

# Delaware

PAGE 1

## *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "CHARITABLE DAF GP,
LLC", FILED IN THIS OFFICE ON THE TWENTY-FIFTH DAY OF OCTOBER,
A.D. 2011, AT 11:23 O'CLOCK A.M.

5056341 8100

111131792

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9113377

DATE: 10-25-11

003703

Case 1:94-cv-03545-xxx Doc 2547 Filed 07/09/20 Entered 07/09/20 20:30:90 Page 2 of 3
Case 3:25-cv-01878-X   Document 34-14   Filed 09/09/25   Page 189 of 335   PageID 4937
Exhibit 4 - Charitable Respondents Response and Disclosures   Page 161 of 307

**EXHIBIT 4**

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:26 AM 10/25/2011*
*FILED 11:23 AM 10/25/2011*
*SRV 111131792 – 5056341 FILE*

**CERTIFICATE OF FORMATION**

**OF**

**CHARITABLE DAF GP, LLC**

The undersigned hereby executes this Certificate of Formation of Charitable DAF GP, LLC (the "**Company**"), for the purpose of forming a limited liability company pursuant to the Delaware Limited Liability Company Act.

1. The name of the Company is **Charitable DAF GP, LLC.**

2. The address of the registered office of the Company in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, County of New Castle, State of Delaware 19901. Its registered agent at such address is The Corporation Trust Company.

IN WITNESS WHEREOF, the undersigned, an authorized person of the Company, has caused this Certificate of Formation to be duly executed as of the 24th day of October, 2011.

By: _____
James S. Seevers, Jr.
Authorized Person

78673.000002 EMF_US 37662262v2

# EXHIBIT 15

# EXHIBIT 4

ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST AGREEMENT (this "Agreement") is made and entered into as of the 2 4 day of March, 2021, by and between Grant J. Scott (the "Assignor") and Mark E. Patrick.

WHEREAS, Assignor is the legal and beneficial owner of one hundred percent (100%) of the limited liability company interest (the "Membership Interest") in Charitable DAF GP, LLC, a Delaware limited liability company (the "Company"), and Assignor desires to assign the Membership Interest to Assignee, upon the terms and conditions set forth herein; and

WHEREAS, Assignee desires to accept an assignment of the Membership Interest (such right, title and interest in and to the Membership Interest, together with, if any: (i) Assignor's capital account, (ii) the Assignor's rights in and to specific Company property, (iii) Assignor's rights to participate in the management of the Company, (iv) Assignor's rights to distributions, reimbursements or other payments (including any distributions of cash flow which have not been distributed), (v) rights to profits, losses and other allocations, and (vi) all other rights and benefits of Assignor in the Company with respect to the Membership Interest assigned hereby to Assignee being herein sometimes collectively referred to as the "Assigned Interest").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

1.      Assignment and Assumption of Assigned Interest. Assignor does hereby unconditionally and irrevocably assign, transfer, set over and deliver unto the Assignee, its successors and assigns, the Assigned Interest, including, but not limited to the profits, losses, capital and cash flow, if any, allocable to the Assigned Interest, free and clear of any and all liens, security interests, encumbrances, claims, rights of another, rights of first refusal, covenants, conditions, reservations and any and all other restrictions. Assignee does hereby accept the Assigned Interest and agrees to be bound by and assume all obligations under the limited liability company agreement of the Company.

2.      Substitute Member. Assignor hereby acknowledges that Assignee is hereby admitted as a substitute member of the Company with respect to the Membership Interest from and after the date hereof as a result of this Agreement.

3.      Effective Date. This Agreement is effective as of the date first above mentioned.

4.      Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one Agreement. This Agreement and any signed agreement or instrument entered into in connection with this Agreement or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, PDF or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

PATRICK_000006

003706

**EXHIBIT 4**

ASSIGNOR:

Name: Grant J. Scott

ASSIGNEE:

Name: **Mark E. Patrick**

[Signature Page for Assignment of Membership Interest Agreement]

078673.0000002 EMF_US 84142968v2

# EXHIBIT 16

## Attachment 2

***Part II, Line 1***          Certificate of Incorporation

**EXHIBIT 4**

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND DALLAS FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:34 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

5069985  8100

111224468

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177054

DATE: 11-23-11

003710

**EXHIBIT 4**

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:34 PM 11/22/2011
SRV 111224468 - 5069985 FILE

# CERTIFICATE OF INCORPORATION

## OF

## HIGHLAND DALLAS FOUNDATION, INC.

FIRST: The name of the corporation is Highland Dallas Foundation. Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws: provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation. the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code. (ii) a corporation contributions

**EXHIBIT 4**

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to The Dallas Foundation. If The Dallas Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this ___ day of November, 2011.

_____
James Dondero

- 2 -

003712

Case 19-34054-sgj11 Doc 2547 Filed 07/09/21 Entered 07/09/21 08:20:42 Page 1 of 3
Case 3:21-cv-01878-D Charitable DC Respondents Response and Disclosures 198 Page 370 of 397 ID 4946
EXHIBIT 4

# EXHIBIT 17

P. O. BOX 2508
CINCINNATI, OH 45201

**EXHIBIT 4**

Date:
**JAN 19 2013**

HIGHLAND DALLAS FOUNDATION INC
C/O HUNTON & WILLIAMS LLP
MARGARET S ALFORD
1445 ROSS AVE STE 3700
DALLAS, TX 75202

Employer Identification Number:
▮1755
DLN:
▮8022
Contact Person:
SHEILA M ROBINSON        ID# ▮1220
Contact Telephone Number:
(877) 829-5500
Accounting Period Ending:
December 31
Public Charity Status:
509(a)(3)
Form 990 Required:
Yes
Effective Date of Exemption:
November 22, 2011
Contribution Deductibility:
Yes
Addendum Applies:
No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax
exempt status we have determined that you are exempt from Federal income tax
under section 501(c)(3) of the Internal Revenue Code.  Contributions to you are
deductible under section 170 of the Code.  You are also qualified to receive
tax deductible bequests, devises, transfers or gifts under section 2055, 2106
or 2522 of the Code.  Because this letter could help resolve any questions
regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified
as either public charities or private foundations.  We determined that you are
a public charity under the Code section(s) listed in the heading of this
letter.

Specifically, we have determined that you are a Type I supporting organization
under section 509(a)(3).  A Type I supporting organization is operated,
supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public
Charities, for some helpful information about your responsibilities as an
exempt organization.

Letter  947 (DO/CG)

003714

**EXHIBIT 4**

HIGHLAND DALLAS FOUNDATION INC

Sincerely,

*Holly O. Paz*

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure:   Publication 4221-PC

Letter   947 (DO/CG)

**EXHIBIT 4**

# EXHIBIT 18

Case 19-34054-sgj11 Doc 2544-7 Filed 07/09/21 Entered 07/09/21 08:30:44 Page 2 of 2
Case 3:21-cv-01878 Charitable Respondents Response and Disclosures 202 Page 574 of 707 D 4950
Form 1023                    Highland Dallas Foundation, Inc.                    TIN: 45-3961755

## **Attachment 4**

***Part IV***        Narrative Description of Activities

The Applicant is organized and will be operated exclusively as a supporting organization within the meaning of section 509(a)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), to support and benefit The Dallas Foundation ("TDF"), a Texas nonprofit corporation. TDF is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code and a public charity described in section 509(a)(1) of the Code.

The Applicant received its funding as one of three charitable remainder beneficiaries of a charitable remainder trust created by James Dondero, which terminated on November 30, 2011. As the attached Schedule D reflects, the Applicant qualifies as a Type I supporting organization within the meaning of section 509(a)(3)(B)(i) because a majority of its board is elected by TDF.

The Applicant's supported organization, TDF, is the oldest community foundation in Texas and serves donors and nonprofit agencies throughout North Texas. As a community foundation, TDF offers a range of ways for local philanthropists to assist the community, including donor advised funds, designated and agency endowment funds, field of interest funds, scholarship funds, and unrestricted funds. TDF focuses on challenges facing North Texas and searches for nonprofit agencies that address these issues most efficiently and effectively, and it assists in connecting donors to causes they care about. In 2010, TDF paid out $31,408,988 in grants to charitable organizations in North Texas. The Applicant will support and benefit TDF by making grants directly to TDF in support of its charitable purposes. In addition, upon the direction and on behalf of TDF, the Applicant may make grants to such other public charities that TDF wishes to benefit in furtherance of TDF's exempt purposes. The total annual grants from the Applicant to or on behalf of TDF are expected to average approximately $1,000,000 per year.

# EXHIBIT 19

Reserved for Possible Supplementation

**EXHIBIT 4**

# EXHIBIT 20

Form 1023                    Highland Dallas Foundation, Inc.                    TIN: 45-3961755

## Attachment 3

**_Part II, Line 5_**          Bylaws

EXHIBIT 4

**BYLAWS**
**OF**

**HIGHLAND DALLAS FOUNDATION, INC.**

**EXHIBIT 4**

## TABLE OF CONTENTS

Page

ARTICLE I OFFICES ..................................................................................................1

    Section 1.1    Registered Office ............................................................1
    Section 1.2    Other Offices..................................................................1

ARTICLE II MEMBERSHIP .......................................................................................1

    Section 2.1    Classes and Number.......................................................1
    Section 2.2    Voting.............................................................................1
    Section 2.3    Transfer of Membership ................................................1
    Section 2.4    Resignation of Member..................................................2
    Section 2.5    Place of Meetings..........................................................2
    Section 2.6    Annual Meetings............................................................2
    Section 2.7    Special Meetings ...........................................................2
    Section 2.8    Notice of Meetings of Members ....................................2
    Section 2.9    Quorum..........................................................................3
    Section 2.10   Voting.............................................................................3
    Section 2.11   Proxies...........................................................................3
    Section 2.12   Action by Written Consent ............................................3

ARTICLE III DIRECTORS ..........................................................................................4

    Section 3.1    General Powers .............................................................4
    Section 3.2    Number of Directors......................................................4
    Section 3.3    Vacancies......................................................................4
    Section 3.4    Place of Meetings..........................................................4
    Section 3.5    Committees of Directors ................................................4
    Section 3.6    Compensation of Directors ...........................................4
    Section 3.7    Annual Meeting .............................................................4
    Section 3.8    Additional Regular Meetings ........................................5
    Section 3.9    Special Meetings ...........................................................5
    Section 3.10   Method and Timing of Notice........................................5
    Section 3.11   Purpose not Required in Notice .....................................5
    Section 3.12   Waiver of Notice ...........................................................5
    Section 3.13   Action by Written Consent............................................6
    Section 3.14   Validation of Action by Consent ..................................6
    Section 3.15   Quorum and Manner of Acting ......................................6
    Section 3.16   Resignation and Removal of Directors..........................6

ARTICLE IV OFFICERS..............................................................................................6

    Section 4.1    Officers..........................................................................6
    Section 4.2    Election, Term of Office and Eligibility .......................7

003722

**EXHIBIT 4**

| | | |
|---|---|---|
| Section 4.3 | Subordinate Officers | 7 |
| Section 4.4 | Removal | 7 |
| Section 4.5 | The President | 7 |
| Section 4.6 | The Secretary | 7 |
| Section 4.7 | The Assistant Secretaries | 7 |
| Section 4.8 | Chairman | 8 |
| Section 4.9 | The Chief Financial Officer | 8 |
| Section 4.10 | The Assistant Chief Financial Officers | 8 |
| Section 4.11 | Delegation of Duties | 8 |

**ARTICLE V BOOKS AND RECORDS** ........................................................ 8

| | | |
|---|---|---|
| Section 5.1 | Location | 8 |
| Section 5.2 | Inspection | 9 |

**ARTICLE VI MISCELLANEOUS PROVISIONS** ........................................... 9

| | | |
|---|---|---|
| Section 6.1 | Fiscal Year | 9 |
| Section 6.2 | Depositories | 9 |
| Section 6.3 | Checks, Drafts and Notes | 9 |
| Section 6.4 | Contracts and Other Instruments | 9 |
| Section 6.5 | Conflicts of Interest | 9 |
| Section 6.6 | Waivers of Notice | 10 |
| Section 6.7 | Ownership Interests in Other Entities | 10 |
| Section 6.8 | Indemnification | 10 |
| Section 6.9 | Amendment of Bylaws | 11 |

003723

## EXHIBIT 4

BYLAWS

OF

HIGHLAND DALLAS FOUNDATION, INC.

## ARTICLE I

## OFFICES

Section 1.1    Registered Office.  The registered office of Highland Dallas Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices.  The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## MEMBERSHIP

Section 2.1    Classes and Number.  The Corporation shall have two classes of members and one member in each such class:  the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting.  Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members.  In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership.  Institutional Membership in the Corporation is not transferable or assignable.  The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member.  Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member.  Each successor Individual Member shall succeed to the rights of the initial Individual Member.  Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

-1-

# EXHIBIT 4

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4    Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings. All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7    Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting.  The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8    Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting).  Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid.  If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address.  If delivered by facsimile, such notice shall be deemed to be delivered when the

003725

Case 1:23-cv-00853-DAE Document 54-20 Filed 07/06/23 Entered 07/06/23 06:29:44 Page 3 of
Case 3:23-cv-01876-DB Exhibit 4 Charitable Respondents Responses and Disclosures 21 Page 383 of 367 D 4959
EXHIBIT 4

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

003726

**EXHIBIT 4**

## ARTICLE III

## DIRECTORS

Section 3.1   General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2   Number of Directors.  The number of Directors that shall constitute the Board of Directors shall be three (3).  Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member.  Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3   Vacancies.  If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy.  If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director.  Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4   Place of Meetings.  The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5   Committees of Directors.  The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6   Compensation of Directors.  Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7   Annual Meeting.  The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors.  If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

003727

Case 3:23-cv-00404-jdp Document 247 Filed 07/09/25 Entered 07/09/25 20:44:40 Page 46 of
Case 3:23-cv-00404-jdp Charitable Respondents Response and Disclosures 213 Page 335 of 307 D 4961
**EXHIBIT 4**

Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8 <u>Additional Regular Meetings</u>. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9 <u>Special Meetings</u>. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10 <u>Method and Timing of Notice</u>. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11 <u>Purpose not Required in Notice</u>. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12 <u>Waiver of Notice</u>. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

003728

Case 3:13-cv-04545-gjl Doc 264-27 Filed 07/09/20 Entered 07/09/20 13:30:44 Page 41 of
Case 3:23-cv-04878-M Charitable Respondents Response and Disclosures 214 Page 386 of 307
**EXHIBIT 4**

Section 3.13    Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors.  A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13.  Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14    Validation of Action by Consent.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held.  At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice.  If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15    Quorum and Manner of Acting.  A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors.  Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors.  Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting.  In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present.  Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16    Resignation and Removal of Directors.  Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation.  A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable.  The Institutional Member may remove an Institutional Director at any time, with or without cause.  The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV

## OFFICERS

Section 4.1    Officers.  The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer.  A person may hold multiple offices.

003729

**EXHIBIT 4**

Section 4.2  Election, Term of Office and Eligibility.  The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof.  Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal.  None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3  Subordinate Officers.  The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine.  The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4  Removal.  The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause.  Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5  The President.  The President shall be the chief executive officer of the Corporation.  He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation.  In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6  The Secretary.  The Secretary shall:

(a)  keep the minutes of the meetings of the members and of the Board of Directors;

(b)  see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)  be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)  in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7  The Assistant Secretaries.  If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

003730

Case 3:19-cv-34054-sgj11 Doc 2647-250 Filed 07/09/25 Entered 07/09/25 20:44:48 of
Case 3:23-04874 Charitable Respondents Response and Disclosures 216 Page 388 of 357 D 4964
EXHIBIT 4

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 <u>Chairman</u>. The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9 <u>The Chief Financial Officer</u>. The Chief Financial Officer, if any, shall:

    (a) receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

    (b) render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

    (c) in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10 <u>The Assistant Chief Financial Officers</u>. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11 <u>Delegation of Duties</u>. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

<u>**ARTICLE V**</u>

<u>**BOOKS AND RECORDS**</u>

Section 5.1 <u>Location</u>. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

-8-

003731

Case 3:19-cv-04405-sgjl1 Doc 26-4 Filed 07/09/20 25 Entered 07/09/20 17:50:32 09:44 Page 44 of
Case 3:Exhibit 4 Charitable Respondents Responses and Disclosures 21 Page 38 of 30 71 D 4965
**EXHIBIT 4**

Section 5.2    Inspection.  The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1    Fiscal Year.  The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    Depositories.  The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3    Checks, Drafts and Notes.  All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    Contracts and Other Instruments.  The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5    Conflicts of Interest.  No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment.  All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

003732

**EXHIBIT 4**

Section 6.6    Waivers of Notice.  Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7    Ownership Interests in Other Entities.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8    Indemnification.

(a)    Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators.  The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise.  The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)    If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

-10-

Case 3:23-cv-04155-jjj Document 264-47 Filed 07/09/25 Entered 07/09/25 00:44 Page 46 of
Case 3:23-cv-04155 Charitable Respondents Response and Disclosures 219 Page 391 of 307 D 4967
**EXHIBIT 4**

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c)     The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)     The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)     To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f)     Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)     The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9     Amendment of Bylaws. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the

003734

**EXHIBIT 4**

Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

003735

**EXHIBIT 4**

# **EXHIBIT 21**

**EXHIBIT 4**

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND SANTA BARBARA FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:36 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

5069989 8100

111224480

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177064

DATE: 11-23-11

You may verify this certificate online
at corp.delaware.gov/authver.shtml

003737

**EXHIBIT 4**

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:36 PM 11/22/2011
SRV 111224480 - 5069989 FILE

# CERTIFICATE OF INCORPORATION

## OF

## HIGHLAND SANTA BARBARA FOUNDATION, INC.

FIRST: The name of the corporation is Highland Santa Barbara Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated, exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit Santa Barbara Foundation, a California nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code of 1986 as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by Santa Barbara Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

003738

Case 19-34054-sgj11 Doc 2544-17 Filed 07/09/21 Entered 07/09/21 08:29:44 Page 4 of 4
Case 3:21-cv-01878 Charitable DERP Document 1-4 Filed 09/08/21 Page 396 of 397 PageID 4972
**EXHIBIT 4**

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to Santa Barbara Foundation. If Santa Barbara Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 2\_\_ day of November, 2011.

James Dondero

003739

# EXHIBIT 22

Case 3:19-cv-04405-WHA Document 547-4 Filed 07/09/25 Entered 07/09/25 03:20:43 Page 2 of 3
Case 3:Exhibit 4 - IRS Charitable Determination - Response and Disclosures - Page 3798 of 3071 D 4974
**EXHIBIT 4**

IRS   DEPARTMENT OF THE TREASURY
      INTERNAL REVENUE SERVICE
      CINCINNATI OH   45999-0023

Date of this notice:  12-02-2011

Employer Identification Number:
██████2008

Form:  SS-4

Number of this notice:  CP 575 E

HIGHLAND SANTA BARBARA FOUNDATION
INC
13455 NOEL RD STE 800
DALLAS, TX  75240

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.


          WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

     Thank you for applying for an Employer Identification Number (EIN).  We assigned you
EIN ██████2008.  This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

     When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above.  Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN.  If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

     Assigning an EIN does not grant tax-exempt status to non-profit organizations.
Publication 557, *Tax Exempt Status for Your Organization*, has details on the
application process, as well as information on returns you may need to file.  To apply
for formal recognition of tax-exempt status, most organizations will need to complete
either Form 1023, *Application for Recognition of Exemption Under Section 501(c)(3) of
the Internal Revenue Code*, or Form 1024, *Application for Recognition of Exemption
Under Section 501(a)*.  Submit the completed form, all applicable attachments, and the
required user fee to:

Internal Revenue Service
PO Box 12192
Covington, KY  41012-0192

     The Pension Protection Act of 2006 contains numerous changes to the tax law
provisions affecting tax-exempt organizations, including an annual electronic
notification requirement (Form 990-N) for organizations not required to file an annual
information return (Form 990 or Form 990-EZ).  Additionally, if you are required to
file an annual information return, you may be required to file it electronically.
Please refer to the Charities & Non-Profits page at www.irs.gov for the most current
information on your filing requirements and on provisions of the Pension Protection
Act of 2006 that may affect you.

     To obtain tax forms and publications, including those referenced in this notice,
visit our Web site at www.irs.gov.  If you do not have access to the Internet, call
1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

003741

Case 3:23-cv-04496-sgjl Doc 25-4 257 Filed 07/09/20/25 Entered 07/09/20/25 08:20:47 Page 2 of 3
Case 3:Exhibit 04 87 Charitable Respondents Response and Disclosures 22 Page 399 of 307 D 4975
(IRS USE ONLY)    575E    EXHIBIT 041  HIGH  O  9999999999  SS-4

**IMPORTANT REMINDERS:**

  * Keep a copy of this notice in your permanent records. **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.**

  * Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

  * Refer to this EIN on your tax-related correspondence and documents.

  * Provide future officers of your organization with a copy of this notice.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice. If you write, please tear off the stub at the bottom of this notice and send it along with your letter. If you do not need to write us, do not complete and return the stub. Thank you for your cooperation.

                     Keep this part for your records.       CP 575 E (Rev. 7-2007)

-----------------------------------------------------------------------------------

    Return this part with any correspondence
    so we may identify your account.  Please                      CP 575 E
    correct any errors in your name or address.
                                                            9999999999

    Your Telephone Number  Best Time to Call   DATE OF THIS NOTICE:  12-02-2011
    (     )    -                               EMPLOYER IDENTIFICATION NUMBER: ████2008
    _____ _____   FORM:  SS-4            NOBOD

    INTERNAL REVENUE SERVICE                   HIGHLAND SANTA BARBARA FOUNDATION
    CINCINNATI  OH   45999-0023                INC
     Illdluldlullludulludullud                 13455 NOEL RD STE 800
                                               DALLAS, TX  75240

003742

Case 1:19-cv-00475-gjl Doc 254-25 Filed 07/06/20/25 Entered 07/06/20/25 08:29:04 Page 1 of 3
Case 3:Exhibit 4875 Charitable Respondents Responses and Disclosures Page 228 Page 330 of 337 ID 4976

**EXHIBIT 4**

# EXHIBIT 23

**EXHIBIT 4**

### SANTA BARBARA
# FOUNDATION

**BOARD OF TRUSTEES**

Pamela Gann
**Chair**

Stephen Hicks
**Vice Chair**

Susan T. Richards
**Treasurer**

Nicolasa Sandoval, Ph.D.
**Secretary**

Diane Adam

Phil Alvarado

Randall Day

Donna France

Angel Iscovich, M.D.

Danna McGrew

Robert C. Nakasone

Ernesto Paredes

Cathy Pepe

James Rogers

Matt Rowe

Ginger Salazar

Tracy Stouffer

Michael D. Young, Ph.D.

**President & CEO**
Jacqueline M. Carrera

**South County Headquarters**
1111 Chapala Street, Suite 200
Santa Barbara, CA 93101-3100
Phone: (805) 963-1873
Fax: (805) 966-2345

**North County Headquarters**
2625 S. Miller Street, Suite 101
Santa Maria, CA 93455-1777
Phone: (805) 346-6123
Fax: (805) 346-6125

SBFoundation.org

@sbfoundation

@sbfoundation

/santa-barbara-foundation

@santabarbarafoundation

July 9, 2021

Honorable Stacy G. C. Jernigan
United States Bankruptcy Judge
Northern District of Texas

Re:  Highland Dallas Foundation, Inc.

Dear Judge Jernigan:

The Santa Barbara Foundation ("SBF") is a community foundation incorporated in 1928 under the laws of the state of California as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. The mission of SBF is to mobilize collective wisdom and philanthropic capital to build empathetic, inclusive, and resilient communities. Working in partnership with individuals, families, community organizations, nonprofits, businesses, and government, SBF funds a wide range of initiatives, projects, and organizations. SBF has supported nearly every Santa Barbara County nonprofit organization and essential community project during its 93-year history and continues to serve as one of the largest private funding sources for area nonprofits, agencies, and college-bound students.

In 2020, SBF awarded $31 million in grants, received $36 million in contributions, and had $514 million in assets. Nonprofit support included annual grant programs (behavioral health, health care, food, shelter & safety, and child care), laying the groundwork for workforce development strategies, and creating the Collaboration for Social Impact to help nonprofits with capacity building and leadership development. Additionally, SBF co-organized and co-led the countywide COVID-19 Joint Response Effort, broadened its grantmaking to include small businesses through the Santa Barbara Better Together Fund, co-led the 2020 census efforts with the County of Santa Barbara, sponsored and produced educational events to promote diversity, equity, inclusion and access, and continued its annual funding of the Scholarship Foundation of Santa Barbara. Grants are made through SBF from various types of funds, including donor advised, donor designated, and field of interest. Discretionary grants, totaling over $7 million in 2020, are also supported by SBF's unrestricted contributions and investment income.

<u>Supporting Organizations</u>

SBF works with entities organized under Section 509(a)(3) of the Internal Revenue Code as supporting organizations to SBF for the specific and primary purpose of benefiting, performing functions of, and engaging in activities consistent with SBF's charitable purposes. SBF appoints a majority of the members of the governing boards of the supporting organizations. Each governing board may create its own investment policy and grant guidelines. Each organization is a separate legal entity required to file

003744

Case 19-34054-sgj11 Doc 2547-4 Filed 07/06/21 Entered 07/06/21 08:20:44 Page 3 of 3
Case 3:21-cv-01878 Charitable Respondents Response and Disclosures 230 Page 332 of 337ID 4978
EXHIBIT 4

Honorable Stacy G. C. Jernigan                    July 7, 2021                    Page 2

its own IRS Form 990, "Return of Organization Exempt from Income Tax". SBF and its supporting organizations are considered under SBF's control and thus consolidated in SBF's audited financial statements.

## Overview of Highland Santa Barbara Foundation, Inc.

Highland Santa Barbara Foundation, Inc. (HSBF) was formed in November 2011 as a Delaware nonprofit nonstock corporation to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of SBF. HSBF is a Type I supporting organization under Section 509(a)(3) of the Internal Revenue Code. SBF is a supported organization under Section 509(a)(1) of the Internal Revenue Code.

The Bylaws of HSBF describe the governance of HSBF by its members, directors, and officers. HSBF has two classes of members, institutional and individual, and one member in each class. SBF is the institutional member. James Dondero is the individual member. HSBF has three directors, two elected by SBF and one elected by James Dondero. The president, secretary, and any other officers of HSBF are elected by the three directors.

SBF and HSBF have an operating agreement whereby SBF provides grant administration and other services to HSBF and HSBF pays support fees to SBF. The fees are calculated using a tiered schedule based on the fair market value of 100 participation shares of Charitable DAF HoldCo, Ltd., which is the primary asset of HSBF. The fair market value is determined by an independent valuation firm at least annually.

## Relationship and Mission Advancement

SBF meets annually with HSBF to discuss SBF activities, alignment of SBF priorities and focus areas with HSBF philanthropic objectives, and proposed HSBF funding for the upcoming year. Since its inception, HSBF has funded over $5 million of the grants awarded by SBF, including nearly $3 million in Santa Barbara County. See HSBF, Inc. History, attached.

HSBF has augmented SBF's discretionary grants in the areas of: early childhood, youth, and workforce development and education; scholarships; veterans and military education and job training; Community Caregiving Initiative; and Food Action Plan. HSBF has also funded grants to specific organizations, including: $400,000 to Children's Museum of Santa Barbara d.b.a. MOXI - The Wolf Museum of Exploration and Innovation; $90,000 to Reasoning Mind, Inc. for identified local schools to participate in a math literacy program; and $30,000 to Boy Scouts of America - Los Padres Council for rebuilding of Camp Rancho Alegre following the Whittier Fire.

Thank you.

Sincerely,

Jacqueline M. Carrera
President & Chief Executive Officer

003745

Case 1:94-cv-04054-sfgj-1 Doc 25442-7 Filed 07/09/20/25 Entered 07/09/20/25 08:29:02 Page 1 of 4
Case 3:21-cv-01837 Charitable Respondents Response and Disclosures Pages 231 Page 303 of 307 ID 4979
**EXHIBIT 4**

# EXHIBIT 24

Case 1:19-cv-04355-11 Doc 25-4 257 Filed 07/06/20/25 Entered 07/06/20/25 09:200:42 Page 2 of 4
Case 3:25-cv-01878-X   Document 34-14   Filed 09/09/25   Page 232 of 335   PageID 4980
Exhibit 4 - Charitable Respondents Response and Disclosures - Page 204 of 307

**EXHIBIT 4**

# Delaware

**PAGE  1**

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND KANSAS CITY FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-THIRD DAY OF NOVEMBER, A.D. 2011, AT 4:23 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

5070449   8100

111227849

Jeffrey W. Bullock, Secretary of State

**AUTHENTICATION: 9179752**

**DATE: 11-28-11**

003747

Case 9:14-cv-00563-... Doc 25-4 ... Filed 07/09/21 Entered 07/09/21 08:20 ... Page 2 of 4
Case 3:25-cv-01878-X    Document 34-14    Filed 09/09/25    Page 233 of 335    PageID 4981
Exhibit 4 - Charitable Respondents Response and Disclosures

**EXHIBIT 4**

Secretary of State
Division of Corporations
Delivered 05:03 PM 11/23/2011
FILED 04:23 PM 11/23/2011
SRV 111227849 - 5070449 FILE
State of Delaware

# CERTIFICATE OF INCORPORATION

## OF

## HIGHLAND KANSAS CITY FOUNDATION, INC.

FIRST: The name of the corporation is Highland Kansas City Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit the Greater Kansas City Community Foundation, a Missouri nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by the Greater Kansas City Community Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation

003748

exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to the Greater Kansas City Community Foundation. If the Greater Kansas City Community Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22 day of November, 2011.

James Dondero

- 2 -

**003749**

Case 19-40945-elm11 Doc 254-25 Filed 07/09/20 Entered 07/09/20 23:00:44 Page 1 of 2
Case 3:23-cv-01875 Charitable Respondents' Responses and Disclosures 235 Page 307 of 307 ID 4983
EXHIBIT 4

# EXHIBIT 25

**EXHIBIT 4**



GREATER KANSAS CITY
COMMUNITY FOUNDATION™

July 7, 2021

To Whom It May Concern:

Thank you for this opportunity to share our experience working with the Highland Kansas City Foundation, Inc.

I represent the Greater Kansas City Community Foundation, which exists to serve philanthropic donors by providing vehicles for their charitable giving. The Community Foundation was founded in 1978, and now has an asset base of more than $4 billion, housing thousands of donor-advised funds, scholarship funds, supporting organizations and other charitable funds and accounts established by individuals, families and businesses. In 2020, the Community Foundation's donors used their charitable dollars to grant over $550 million to their favorite causes across the country.

The Community Foundation currently works with 18 supporting organizations, one of which is the Highland Kansas City Foundation, established in 2011. Supporting organizations operate under their own legal entities but require the Community Foundation's active oversight and involvement. The Community Foundation's Board of Directors controls the Board of the Highland Kansas City Foundation. The Community Foundation oversees all of the Highland Kansas City Foundation's grants, ensuring every dollar is distributed for charitable purposes.

Since 2011, the Highland Kansas City Foundation has granted more than $9 million to support education and college preparation, historical preservation, medical research, veterans, the arts, the environment and more.

The Community Foundation's mission is to increase philanthropy and connect donors to the causes they care about, and we are honored to further the Highland Kansas City Foundation's generosity through significant annual distributions to important causes in our country.

Sincerely,

Deborah L. Wilkerson
President & CEO

Case 1:23-cv-04853 sgg 11 DoD 2542-56-4 Filed 07/06/20/25 Entered 07/06/20/25 06:20:44 Page 1 of
Case 3:23-dv-04873 Charitable Respondent 4 Response and Disclosures 237 Page 309 of 307 ID 4985
EXHIBIT 4

# EXHIBIT 26

Case 19-34054-sgj11 Doc 2542-5 Filed 07/06/21 Entered 07/06/21 06:29:44 Page 2 of
Case 3:21-cv-01878-M Charitable DRE Respondents' Responses and Disclosures Page 10 of 307 ID 4986
**EXHIBIT 4**

**BYLAWS**

**OF**

**HIGHLAND KANSAS CITY FOUNDATION, INC.**

**EXHIBIT 4**

## TABLE OF CONTENTS

Page

ARTICLE I      OFFICES ................................................................................. 1

     Section 1.1      Registered Office ........................................................ 1
     Section 1.2      Other Offices .............................................................. 1

ARTICLE II      MEMBERSHIP ..................................................................... 1

     Section 2.1      Classes ....................................................................... 1
     Section 2.2      Voting ....................................................................... 1
     Section 2.3      Transfer of Membership ............................................. 1
     Section 2.4      Resignation of Member .............................................. 2
     Section 2.5      Place of Meetings ...................................................... 2
     Section 2.6      Annual Meetings ....................................................... 2
     Section 2.7      Special Meetings ....................................................... 2
     Section 2.8      Members' List ........................................................... 2
     Section 2.9      Notice of Meetings of Members ................................. 2
     Section 2.10      Quorum ..................................................................... 3
     Section 2.11      Voting ....................................................................... 3
     Section 2.12      Proxies ...................................................................... 3
     Section 2.13      Action by Written Consent ......................................... 3

ARTICLE III      DIRECTORS ........................................................................ 4

     Section 3.1      General Powers .......................................................... 4
     Section 3.2      Number of Directors .................................................. 4
     Section 3.3      Vacancies ................................................................. 4
     Section 3.4      Place of Meetings ...................................................... 4
     Section 3.5      Committees of Directors ............................................. 4
     Section 3.6      Compensation of Directors ......................................... 4
     Section 3.7      Annual Meeting ......................................................... 5
     Section 3.8      Additional Regular Meetings ...................................... 5
     Section 3.9      Special Meetings ....................................................... 5
     Section 3.10      Method and Timing of Notice .................................... 5
     Section 3.11      Purpose not Required in Notice .................................. 6
     Section 3.12      Waiver of Notice ....................................................... 6
     Section 3.13      Action by Written Consent ......................................... 6
     Section 3.14      Validation of Action by Consent ................................ 6
     Section 3.15      Quorum and Manner of Acting ................................... 6
     Section 3.16      Resignation and Removal of Directors ........................ 7
     Section 3.17      Chairman Presiding .................................................... 7

ARTICLE IV      OFFICERS ........................................................................... 7

     Section 4.1      Officers ..................................................................... 7

003754

**EXHIBIT 4**

| | | |
|---|---|---|
| Section 4.2 | Election, Term of Office and Eligibility | 7 |
| Section 4.3 | Subordinate Officers | 7 |
| Section 4.4 | Removal | 7 |
| Section 4.5 | The President | 8 |
| Section 4.6 | The Secretary | 8 |
| Section 4.7 | The Assistant Secretaries | 8 |
| Section 4.8 | The Chief Financial Officer | 8 |
| Section 4.9 | The Assistant Chief Financial Officers | 9 |
| Section 4.10 | Delegation of Duties | 9 |

ARTICLE V      BOOKS AND RECORDS ......9

| | | |
|---|---|---|
| Section 5.1 | Location | 9 |
| Section 5.2 | Inspection | 9 |

ARTICLE VI     MISCELLANEOUS PROVISIONS ......9

| | | |
|---|---|---|
| Section 6.1 | Fiscal Year | 9 |
| Section 6.2 | Depositories | 9 |
| Section 6.3 | Checks, Drafts and Notes | 9 |
| Section 6.4 | Contracts and Other Instruments | 10 |
| Section 6.5 | Waivers of Notice | 10 |
| Section 6.6 | Ownership Interests in Other Entities | 10 |
| Section 6.7 | Indemnification. | 10 |
| Section 6.8 | Amendment of Bylaws. | 12 |

003755

**EXHIBIT 4**

BYLAWS

OF

HIGHLAND KANSAS CITY FOUNDATION, INC.

## **ARTICLE I**

## **OFFICES**

Section 1.1 <u>Registered Office</u>. The registered office of Highland Kansas City Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2 <u>Other Offices</u>. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## **ARTICLE II**

## **MEMBERSHIP**

Section 2.1 <u>Classes</u>. The Corporation shall have two classes of members, the Institutional Member, which shall be the Greater Kansas City Community Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2 <u>Voting</u>. Except as otherwise provided in these Bylaws, each member shall be entitled to one vote upon each matter submitted to a vote of the members. In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3 <u>Transfer of Membership</u>. Institutional Membership in the Corporation is not transferable or assignable. Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document designate an individual, or series of individuals, to serve as a successor Individual Member, and such designation may be a current appointment or an appointment to take effect upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Each successor Individual Member may in the same manner designate an individual, or

003756

series of individuals, to serve as successor Individual Member, and such designation may be a current appointment or an appointment to take effect upon the occurrence of a future contingency such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such appointments, the one bearing the earliest date shall control. Each Individual Member may at any time revoke his or her appointment notice or other document in whole or in part by written notice delivered to the Institutional Member. If at any time there is no Individual Member and no individual has been designated in accordance with the foregoing provisions of this Section to act as such, then the Individual Member shall be the individual designated by a majority of the eldest generation of then living descendants of James Dondero that has at least one descendant then living.

Section 2.4    Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings. All meetings of the members shall be by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings. An annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.9 below.

Section 2.7    Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.9 below.

Section 2.8    Members' List. At least ten days before every meeting of members, a complete list of the members entitled to vote at said meeting, arranged in alphabetical order, shall be prepared by the Secretary. Such list shall be open to the examination of any member, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten days prior to the meeting at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any member who is present.

Section 2.9    Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting. Notice shall be given (a) by written notice delivered personally,

003757

Case 1:23-cv-04534-sjj-11 DoD 25-25 Filed 07/06/25 Entered 07/06/25 06:29:44 Page 5 of
Case 3:Exhibit 04 87 Charitable Respondents Responses and Disclosures 243 Page 315 of 307 D 4991
**EXHIBIT 4**

(b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.10    Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business except as otherwise provided by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall again be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.11    Voting. When a quorum is present at any meeting, the vote of a majority of the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.12    Proxies. At any meeting of the members, a member is entitled to be counted as present and to vote by written proxy executed by that member or his or her duly authorized attorney-in-fact. No proxy shall be valid after three (3) months from the date of its execution.

Section 2.13    Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by that number of members necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.13. Prompt notice of the taking of an action by the members without a

003758

Case 1:23-cv-04155-JGK Document 42-5 Filed 07/06/21 Entered 07/06/21 06:29:44 Page 8 of
Case 3:23-cv-01871-Exhibit 4 Charitable Respondents Response and Disclosures 244 Page 16 of 307 PageID 4992
EXHIBIT 4

meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

## ARTICLE III

## DIRECTORS

Section 3.1    General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors.  The number of Directors that shall constitute the Board of Directors shall be three (3).  Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member.  Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies.  If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy.  If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director.  Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings.  The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors.  The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors.  Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and

003759

Case 1:23-cv-04853- sgj11 Doc 25-42-75 Filed 07/06/20/25 Entered 07/06/20/25 06:29:44 Page 3 of
Case 3:23-cv-01878 Charitable Respondents Responses and Disclosures 245 Page 317 of 307 ID 4993
EXHIBIT 4

expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7   <u>Annual Meeting</u>. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8   <u>Additional Regular Meetings</u>. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9   <u>Special Meetings</u>. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10   <u>Method and Timing of Notice</u>. When notice is required to be given for a meeting of the Board of Directors, such notice shall specify the date, time, and location of the meeting and shall be given to each Director at least ten (10) days prior to the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

003760

Case 1:23-cv-04455-sgj11 Doc 26-4 Filed 07/06/25 Entered 07/06/25 20:44 Page 40 of
Case 3:Exhibit 4 Charitable Respondents Responses and Disclosures 246 Page 318 of 307 D 4994
**EXHIBIT 4**

Section 3.11   Purpose not Required in Notice.  Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12   Waiver of Notice.  Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice.  A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13   Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by that number of Directors necessary to authorize or take such action at a meeting at which all Directors entitled to vote thereon were present and voted.  A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13.  Prompt notice of the taking of an action by the Board of Directors without a meeting by less than unanimous written consent shall be given to each Director who did not consent in writing to the action.  Each such consent must state the date of each Director's signature.  Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14   Validation of Action by Consent.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held.  At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice.  If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15   Quorum and Manner of Acting.  Except as otherwise provided in these Bylaws, a quorum for the transaction of business at any meeting of the Board of Directors shall consist of all three of the then serving Directors.  Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors.  A Director shall be considered present at any meeting of the Board of Directors if the Director participates in person or by proxy or if during the meeting he or she can communicate with all other persons

003761

**EXHIBIT 4**

participating in the meeting by using conference telephone or another suitable
electronic communications system. In the absence of a quorum, a majority of the
Directors present may adjourn the meeting from time to time until a quorum shall be
present. Notice of any adjourned meeting need not be given, except that notice shall
be given to all Directors if the adjournment is for more than thirty days.

Section 3.16 <u>Resignation and Removal of Directors</u>. Each Director may
resign at any time by written notice delivered to the member that appointed such
Director and to the President and Secretary of the Corporation. The Institutional
Member may remove an Institutional Director at any time, with or without cause.
The Individual Member may remove an Individual Director at any time, with or
without cause.

Section 3.17 <u>Chairman Presiding</u>. If a Chairman is appointed by the Board
of Directors, the Chairman shall preside at all meetings of the Board of Directors and
in general shall perform all duties incident to a nonexecutive chairman of a board of
directors.

**ARTICLE IV**

**OFFICERS**

Section 4.1 <u>Officers</u>. The officers of the Corporation shall be a President, a
Secretary and a Chief Financial Officer. One person may hold any number of said
offices.

Section 4.2 <u>Election, Term of Office and Eligibility</u>. The officers of the
Corporation shall be elected annually by the Board of Directors at its annual meeting
or at a special meeting held in lieu thereof. Each officer, except such officers as may
be appointed in accordance with the provisions of Section 4.3, shall hold office until
such officer's successor shall have been duly elected and qualified or until such
officer's death, resignation or removal. None of the officers need be members of the
Board of Directors.

Section 4.3 <u>Subordinate Officers</u>. The Board of Directors may appoint
such Assistant Secretaries, Assistant Chief Financial Officers, Controller and other
officers, and such agents as the Board may determine, to hold office for such period
and with such authority and to perform such duties as the Board of Directors may
from time to time determine. The Board of Directors may, by specific resolution,
empower the President or another officer of the Corporation to appoint any such
subordinate officers or agents.

Section 4.4 <u>Removal</u>. The President, the Secretary and/or the Chief
Financial Officer may be removed at any time by the Board of Directors with or
without cause. Any subordinate officer appointed pursuant to Section 4.3 may be
removed at any time, with or without cause, by the Board of Directors or by the
person holding the officer position by which the subordinate officer was appointed.

003762

Case 3:19-cv-04405-gjj1 Doc 26-4 Filed 07/09/20/25 Entered 07/09/20 17:06:32 20:44 Page 42 of
Case 3:Exhibit 4 8 Charitable Respondents Resp and and Disclosures 248 Page 20 of 307 ID 4996
**EXHIBIT 4**

Section 4.5    The President.  The President shall be the chief executive officer of the Corporation.  He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation.  In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6    The Secretary.  The Secretary shall:

(a)    Keep the minutes of the meetings of the members and of the Board of Directors;

(b)    See that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)    Be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized;

(d)    In general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7    The Assistant Secretaries.  If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8    The Chief Financial Officer.  The Chief Financial Officer shall:

(a)    Receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things:  keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)    Render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation;

003763

**EXHIBIT 4**

       (c)     In general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

       Section 4.9   <u>The Assistant Chief Financial Officers</u>.  If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

       Section 4.10  <u>Delegation of Duties</u>.  In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

**ARTICLE V**

**BOOKS AND RECORDS**

       Section 5.1   <u>Location</u>.  The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

       Section 5.2   <u>Inspection</u>.  The books, accounts, and records of the Corporation shall be open to inspection by any member of the Board of Directors at all times; and open to inspection by the members at such times, and subject to such regulations as the Board of Directors may prescribe, except as otherwise provided by statute.

**ARTICLE VI**

**MISCELLANEOUS PROVISIONS**

       Section 6.1   <u>Fiscal Year</u>.  The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

       Section 6.2   <u>Depositories</u>.  The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

       Section 6.3   <u>Checks, Drafts and Notes</u>.  All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or

003764

Case 3:19-cv-04405-sgj11 Doc 26447256 Filed 07/09/20/25 Entered 07/09/20 12:50:63:29 0:44 ag 44 of
Case 3:Exhibit 4 87 Charitable Respondents Response and Disclosures 250 Page 322 of 307 D 4998
**EXHIBIT 4**

agents as shall from time to time be designated by resolution of the Board of
Directors or by an officer appointed by the Board of Directors.

Section 6.4    <u>Contracts and Other Instruments</u>.  The Board of Directors may
authorize any officer, agent or agents to enter into any contract or execute and deliver
any instrument in the name and on behalf of the Corporation and such authority may
be general or confined to specific instances.

Section 6.5    <u>Waivers of Notice</u>.  Whenever any notice is required to be
given under the provisions of the statutes or of the Certificate of Incorporation or of
these Bylaws, a waiver thereof in writing signed by the person or persons entitled to
said notice, whether before or after the time stated therein, shall be deemed equivalent
to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of
such meeting, except when the person attends a meeting for the express purpose of
objecting, at the beginning of the meeting, to the transaction of any business because
the meeting is not lawfully called or convened.  Neither the business to be transacted
at, nor the purpose of, any regular or special meeting of the members, Directors or
members of a committee of directors need be specified in any written waiver of
notice.

Section 6.6    <u>Ownership Interests in Other Entities</u>.  Any ownership interests
(e.g., shares of stock in any other corporation which may from time to time be held by
this Corporation) may be represented and voted at any meeting of owners of such
entity by the President, or by any other person or persons thereunto authorized by the
Board of Directors, or by any proxy designated by written instrument of appointment
executed in the name of this Corporation by its President.

Section 6.7    <u>Indemnification</u>.

(a)    Each person who was or is a party or is threatened to be made a
party to or is involved in any action, suit or proceeding, whether civil, criminal,
administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the
person is or was a Director or officer of the Corporation or is or was a Director or officer
of the Corporation who is or was serving at the request of the Corporation as a director,
officer, employee or agent of another corporation or of a partnership, joint venture, trust
or other enterprise, including service with respect to employee benefit plans, shall be
indemnified and held harmless by the Corporation to the fullest extent authorized by the
laws of Delaware as the same now or may hereafter exist (but, in the case of any change,
only to the extent that such change authorizes the Corporation to provide broader
indemnification rights than said law permitted the Corporation to provide prior to such
change) against all costs, charges, expenses, liabilities and losses (including attorneys'
fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in
settlement) reasonably incurred or suffered by such person in connection therewith and
such indemnification shall continue as to a person who has ceased to be a Director or
officer and shall inure to the benefit of the person's heirs, executors and administrators.
The right to indemnification conferred in this Section shall be a contract right and shall
include the right to be paid by the Corporation the expenses incurred in defending any

003765

Case 3:19-cv-34754-gg-jl Doc 264-4 236 Filed 07/09/20 25 Entered 07/09/20 12:50:33 90:44 Page 45 of
Case 3:23-vit-04187 Charitable Respondents Responses and Disclosures 25 Page 223 of 307 ID 4999
**EXHIBIT 4**

such proceeding in advance of its final disposition upon receipt by the corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)    If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c)    The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)    The Corporation may maintain insurance, at its expense, to protect itself and any Director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)    To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

003766

(f)     Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)     The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.8    Amendment of Bylaws.

(a)     The members, by the affirmative unanimous vote of the members entitled to vote, may, at any annual or special meeting if notice of such alteration or amendment of the Bylaws is contained in the notice of such meeting, adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors.

(b)     The Board of Directors, by unanimous vote, may adopt, amend, or repeal these Bylaws at any meeting, except as provided in Section 6.8(a), above. Any alterations or amendments to these Bylaws made by the Board of Directors may be altered or repealed by the members.

99900.13475 EMF_US 37828905v4

003767

Case 3:23-cv-04455-sjj-11 Doc 25447256 Filed 07/09/21 25 Entered 07/09/21 25 03:90:44 Page 45 of
Case 3:23-bit 04-87 Charitable Respondent 14 Response and Disclosure 253 Page 325 of 307 ID 5001
**EXHIBIT 4**



HUNTON & WILLIAMS LLP
FOUNTAIN PLACE
1445 ROSS AVENUE
SUITE 3700
DALLAS, TEXAS 75202-2799

TEL  214 • 979 • 3000
FAX  214 • 880 • 0011


ANDREW W. LAWRENCE
DIRECT DIAL: 214 • 979 • 3052
EMAIL: alawrence@hunton.com

FILE NO: 78673.000002

November 9, 2011


Deborah L. Wilkerson                                              *Via E-Mail*
General Counsel
Greater Kansas City Community Foundation
9001 W. 110th Street, Suite 220
Overland Park, KS  66210

      Re:    Highland Capital Management Partners Charitable Trust #2

Dear Debbie:

      In accordance with your request during our telephone conversation last week, the paragraphs below describe briefly the proposed distribution of assets from Highland Capital Management Partners Charitable Trust #2 (the "Trust") to a to-be-formed supporting organization (i.e., Highland Kansas City Foundation, Inc.) with respect to which the Greater Kansas City Community Foundation ("GKCCF") is the supported organization.

      1.    The Trust. As you know, James Dondero, as the Settlor, and Grant Scott, as the Trustee, established the Trust by a trust agreement dated December 1, 2006 (the "Trust Agreement"). Under the terms of the Trust Agreement, Mr. Dondero, as Settlor, is entitled to name remainder beneficiaries and substitute new remainder beneficiaries from time to time until the remainder interest is ultimately distributed.

      2.    Assets of the Trust/Cayman Islands Company. The remainder interest will be comprised solely of one hundred percent (100%) of the non-voting shares (the "Shares") of Charitable DAF HoldCo, Ltd., a Cayman Islands corporation ("HoldCo"). Highland Kansas City Foundation, Inc. will receive one-third (1/3) of the Shares. HoldCo will own one hundred percent (100%) of the limited partner interests in Charitable DAF Fund, LP, a Cayman Island limited partnership, which, in turn, will own one hundred percent (100%) of the shares of CLO Holdco, Ltd., a Cayman Islands exempted company, which, in turn, owns minority equity interests in Cayman Islands investment companies that own portfolios of debt instruments issued by various public companies.

ATLANTA  AUSTIN  BANGKOK  BEIJING  BRUSSELS  CHARLOTTE  DALLAS  HOUSTON  LONDON  LOS ANGELES
McLEAN  MIAMI  NEW YORK  NORFOLK  RALEIGH  RICHMOND  SAN FRANCISCO  TOKYO  WASHINGTON
www.hunton.com

Case 19-34054-sgj11 Doc 2647-2 Filed 07/09/21 Entered 07/09/21 15:30:44 Page 48 of
Case 3:21-cv-01878 Charitable Respondents' Response and Disclosures Page 326 of 1057 ID 5002
**EXHIBIT 4**



November 9, 2011
Page 2

     3.    <u>The Supporting Organizations</u>. Mr. Dondero intends to name as the remainder beneficiaries of the Trust three supporting organizations (each an "SO", collectively, the "SOs"), each of which will support one of three separate community foundations. Each SO will receive an equal number of HoldCo Shares. Highland Capital Management, L.P. currently receives management fees from the companies that own the corporate debt portfolios and will continue to receive those fees under existing agreements with those companies after the Holdco Shares are transferred to the SOs.

     4.    <u>Use of Multiple Supporting Organizations</u>. Rather than the remainder interest being distributed in its entirety to just one or two SOs, the remainder interest is being distributed in equal shares to the three SOs out of an abundance of caution in light of the excess benefit transaction rules under Section 4958(c)(3) of the Code, such that no SO will own more than fifty percent (50%) of the stock of HoldCo.

     Please let me know if you have additional questions regarding this matter.

                        Very truly yours,

                        Andrew W. Lawrence

AWL/bt

cc:    Alexander G. McGeoch, Esq.
       Douglas M. Mancino, Esq.

# EXHIBIT 27

**EXHIBIT 4**

**CHARITABLE DAF HOLDCO, LTD**

(the "Company")

**SHARE TRANSFER FORM**

Dated 24 March 2021

I, **Grant James Scott** (the "**Transferor**"), for good and valuable consideration received by me from **Mark E. Patrick** (the "**Transferee**"), do hereby:

1.     transfer to the Transferee 100 Management Shares (the "**Shares**") for the par value of $0.01 each standing in my name in the register of members of the Company to hold unto the Transferee, his executors, administrators and assigns, subject to the several conditions on which I held the same at the time of execution of this Share Transfer Form; and

2.     consent that my name remains on the register of the Company until such time as the Company enters the Transferee's name in the register of the Company.

**SIGNED** by **TRANSFEROR**:                     )
                                                                          )
                                                                          Name:  Grant J. Scott

And the Transferee does hereby agree to take the Shares subject to the same conditions.

**SIGNED** by **TRANSFEREE**:                     )
                                                                          )
                                                                          Name:  Mark E. Patrick

1

PATRICK-000005

003771

# EXHIBIT 28

**EXHIBIT 4**

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR**
**OF THE COMPANY DATED** March 25 **2021**

---

**1.  SHARE TRANSFER**

1.1  **IT IS NOTED** that the Director has received a duly executed share transfer form relating to the transfer by Grant James Scott of 100 Management Shares to Mark E. Patrick.

1.2  **IT IS RESOLVED** that:

(a)  the following share transfer (the "**Transfer**") be and is hereby ratified, confirmed and approved:

| TRANSFEROR | TRANSFEREE | NO OF SHARES | DATE OF TRANSFER |
|---|---|---|---|
| Grant James Scott | Mark E. Patrick | 100 Management Shares | 24 March 2021 |

(b)  the Company's registered office provider be instructed to update the Register of Members of the Company to reflect the Transfer.

**2.  GENERAL AUTHORISATION**

2.1  **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as the Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3.  RATIFICATION OF PRIOR ACTIONS**

3.1  **IT IS RESOLVED** that any and all actions of the Company, or of the Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

1

**EXHIBIT 4**

These written resolutions are signed by the sole Director of the Company.

**Mark E. Patrick**

PATRICK 003004

003774

# EXHIBIT 29

Case 19-34054-sgj11 Doc 2544-27 Filed 07/09/20 Entered 07/09/20 03:09:42 Page 2 of 2
Case 3:25-cv-01874-X Document 34-14 Filed 09/09/25 Page 262 of 335 PageID 5009
Exhibit 4 - Charitable Respondents' Responses and Disclosures - Page 83 of 307

**EXHIBIT 4**

CLO HOLDCO, LTD.
(THE "COMPANY")

WRITTEN SHAREHOLDER RESOLUTIONS OF THE SOLE
SHAREHOLDER OF THE COMPANY
MADE ON _April 2_ 2021

The undersigned, being the sole holder of Shares of the Company having the right to receive notice of, attend and vote at general meetings hereby resolves the following shareholder resolutions.

**1. REMOVAL OF DIRECTOR AND APPOINTMENT OF NEW DIRECTOR**

1.1 **IT IS RESOLVED** by ordinary resolutions that:

(a) Grant James Scott be and is hereby removed as a Director of the Company with effect from the date of these resolutions;

(b) Mark E. Patrick be and is hereby appointed as a Director of the Company with effect from the date of these resolutions until such time as such Director resigns or is removed or otherwise disqualified in accordance with the Articles of Association of the Company;

(c) the Register of Directors of the Company be amended to note the removal of the Director and the appointment of the new Director, all as set out in these resolutions; and

(d) the Company's registered office be and is hereby instructed to notify the Registrar of Companies in the Cayman Islands of the removal of Mark E. Patrick as a Director of the Company and the appointment of Grant James Scott as a Director of the Company.

BY _Mark Patrick_
Mark E. Patrick for and on behalf of

Charitable DAF GP, LLC, the general partner of Charitable DAF Fund, L.P.

1

003776

Case 1:19-cv-09439-PKC Document 254-37 Filed 07/09/20 Entered 07/09/20 23:00:44 Page 1 of 4
Case 3:23-cv-01870-Karitable Respondents Respons and Disclosure 262 Page 234 of 307 D 5010
EXHIBIT 4

# EXHIBIT 30

**EXHIBIT 4**

THE COMPANIES LISTED IN THE ATTACHED SCHEDULE
(EACH A "COMPANY" AND TOGETHER THE "COMPANIES")

WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR
OF EACH COMPANY DATED _April 22,_ 2021

**1.    APPOINTMENT OF DIRECTOR**

1.1   **IT IS NOTED** that the Directors wish to appoint Paul Murphy as a Director of each Company with effect from the date of these resolutions and that such proposed Director has indicated a willingness to hold such office and has executed a letter of consent and/or a services agreement in relation thereto (such appointment, the "**Director's Appointment**").

1.2   **IT IS RESOLVED** that:

(a)   the Director's Appointment be and is hereby approved with effect from the date of these resolutions until such time as the Director resigns or is removed from office in accordance with the Articles of Association of each Company; and

(b)   the registered office service provider be and is hereby instructed to update the Register of Directors of each Company and to make the necessary filings with the Registrar of Companies to reflect the Director's Appointment.

**2.    GENERAL AUTHORISATION**

2.1   **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director or any officer or (if applicable) any attorney or duly authorised signatory of each Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of each Company, to do such further acts and things as the Director or any officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of each Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3.    RATIFICATION OF PRIOR ACTIONS**

3.1   **IT IS RESOLVED** that any and all actions of each Company, or of the Director or any officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

*[Remainder of page left blank intentionally]*

21250473.2 G0639.159068

**003778**

**EXHIBIT 4**

These written resolutions are signed by the sole Director of the Company.

**Mark E. Patrick**

3

Error! Unknown document property name.

**EXHIBIT 4**

**Schedule**
(*List of Companies*)


Charitable DAF HoldCo, Ltd.

CLO HoldCo, Ltd.

Liberty CLO Holdco, Ltd.

Liberty Sub, Ltd.

HCT Holdco 2, Ltd.

MGM Studios Holdco, Ltd.

21250473.2 G0639.159068

003780

# EXHIBIT 31

Case 1:23-cv-11195-sjj11-DoD 05472-51-4 FileIl 07/06/20/25 Entered 07/06/20/25 06:29:44 Page 2 of
Exhibit 4 - Charitable Respondents Response and Disclosures    Page 239 of 307
**EXHIBIT 4**

# Charitable Giving Overview

GRANT SUMMARY : 2012-2020

003782

**EXHIBIT 4**

# Highlights

The following provides an overview of philanthropic activities across the group of charitable entities that operate as supporting organizations to community foundation: the Highland Dallas Foundation, Inc., the Highland Santa Barbara Foundation, Inc., and the Highland Kansas City Foundation, Inc. (together the "Supporting Organizations" or "we").

Each of the entities within the Supporting Organizations has its own independent board, which provides oversight for the organization's grantmaking activity.

Data represents activity between January 1, 2012, and December 31, 2020 unless otherwise noted.

**$42M+** — Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations operating across a range of issue areas.

**$32M+** — We have funded over $32 million of our total commitments; remaining commitments are comprised of future scheduled installments of multiyear grants.

**$3.7M** — Average annual grant payments total $3.7 million.

**275+** — The Supporting Organizations have made donations to more than 275 individual organizations.

**2029** — Through our multiyear grants we have over $10 million in funds committed through 2029.

003783

GRANTS OVERVIEW                                                    **EXHIBIT 4**

# Total committed: $42.7 million[1]

The Supporting Organizations have committed **$42,688,403** in grants to nonprofits across a range of issue areas, with a focus on:

- civic and cultural institutions in the Dallas-Ft. Worth area;
- education;
- support for military, veterans, and first responders;
- health and medical research;
- economic and community development initiatives; and
- youth and family.

GRANT COMMITMENTS BY ISSUE AREA[2]



- Civic & Cultural Institutions
- Education & Research
- Military, Veterans & First Responders
- Health
- Economic & Community Development
- Youth & Family
- Other

1. As of 12/31/2020.  Figures rounded to the nearest hundred thousand.  2. Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments). Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP. Grants categorized by purpose and/or use of funds.  "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

003784

G R A N T S  O V E R V I E W                                                    **EXHIBIT 4**

# Total funded: $32.5 million[1]



The Supporting Organizations have funded **$32,548,403** in grants, representing payments made directly to nonprofit organizations that are improving lives and addressing pressing issues in our local community—and beyond.

GRANTS FUNDED BY ISSUE AREA[2]

- Civic & Cultural Institutions
- Education & Research
- Military, Veterans & First Responders
- Health
- Economic & Community Development
- Youth & Family
- Other

44%
22%
11%
8%
5%
5%
5%

1. As of 12/31/2020.  Figures rounded to the nearest hundred thousand.  2. Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments). Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP. Grants categorized by purpose and/or use of funds.  "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

003785

GRANTS OVERVIEW    **EXHIBIT 4**

# Average annual funding: $3.7 million[1]



TOTAL GRANT PAYMENTS ($M)[2]

1. As of 12/31/2020.   Figures rounded to the nearest hundred thousand.   2. Represents amount paid in grants and/or grant installments during each calendar year. Not inclusive of grants committed but not funded.

003786

Case 19-34054-sgj11 Doc 4247-1 Filed 07/06/21 Entered 07/06/21 03:29:44 Page 2 of
Exhibit 4 - Charitable Respondents Response and Disclosures    Page 244 of 307
EXHIBIT 4

G R A N T S   O V E R V I E W

# Highlights of grants' impact

Supporting **4,000** military and law enforcement members

Grants to the Center for BrainHealth helped provide training and other programming to members of the military, veterans, and local law enforcement that aims to improve the cognitive health—all at no cost.

Enabling **1.2M** visitors to make memorable experiences with wildlife

Grants funding the construction of the new hippo exhibit and providing support for the organization's membership program helped the Dallas Zoo draw a record-breaking 1.2 million visitors in 2017.

Providing a path to safety for **11,000** victims of family violence

Grants to The Family Place helped the organization serve more than 11,000 clients in 2019, including providing more than 62,000 days of Emergency Shelter.

Supporting and defending **8,000** abused children

Grants to the Dallas Children's Advocacy Center helped the organization serve over 8,000 children who have been abused each year,

Providing educational opportunities for **600** low-income students in southeast Dallas

Grants to expand the Cristo Rey Dallas campus in Pleasant Grove enable the school to accommodate up to 600 students. 95% of CRD students are the first in their families to attend college, and with a 100% college acceptance rate, the expansion will help create an estimated 570 first-generation college students every four years.

003787

**EXHIBIT 4**

G R A N T   H I G H L I G H T

# Dallas Zoo

### About the Dallas Zoo

The Dallas Zoological Society (the "Zoo"), the largest zoological park in Texas, has become a staple in the Dallas community over its 130-year history. Home to over 430 different species, the Dallas Zoo engages and educates visitors, while seeking to create a better world for animals.

### Promoting Visitor Engagement: Grant to Support Zoo Membership

The Supporting Organizations have supported the Zoo's membership program since 2014 through a series of multiyear grants that help the Dallas Zoo continue to reach new audiences. In the first full year of the grant, the Zoo welcomed a record 600,000 guests, and that number has steadily increased since. With our support, the Zoo continues to find new ways to deliver unforgettable experiences. As a result, it regularly ranks in the top-10 zoos in the U.S. by USA Today.

### Increasing Community Access: Grant to Support Discounted Admission

The Supporting Organizations pursue grant opportunities that increase community access to local civic and cultural institutions. With this goal, we expanded our support of the Zoo in 2017 to include the annual sponsorship of the "Penguin Days" program. The grant enables the Zoo to reduce the price of general admission to $7 on select days from December-February, making the Zoo more accessible to the North Texas Community and allowing families who might not otherwise visit the Zoo to do so in an affordable way.

### Opening a New Exhibit: Grant to Support Construction of an Educational/Event Space at the Hippo Exhibit

The Zoo announced in early 2016 that it was planning to break ground on a new exhibit that would bring hippos to the Zoo for the first time in 16 years. The project also marked the first major exhibit opening at the Zoo since 2010. The Supporting Organizations contributed to this project through a grant that helped establish a 4,485-square-foot indoor/outdoor multipurpose event space, which engages visitors in interactive activities that further the Zoo's animal education mission. Currently, the space is a walkthrough exhibit highlighting conservation efforts of hippo habitats around the world. This exhibit helped increase attendance to a record-breaking 1.2 million visitors in 2017.

Issue Area: **Civic & Cultural Institutions**

003788

Case 1:25-cv-01634-sggj-11-DoD 05 42-57-4 Filed 07/08/20/25 Entered 07/08/20/25 03:20:44 Page 3 of
Exhibit 4 - Charitable Respondents Response and Disclosures    Page 246 of 307
EXHIBIT 4

GRANT HIGHLIGHT

# George W. Bush Presidential Center

### About the George W. Bush Presidential Center

The George W. Bush Presidential Center (the "Bush Center") is comprised of the George W. Bush Presidential Library and Museum, which houses the official records of the presidency of George W. Bush, and the George W. Bush Institute, an action-oriented, nonpartisan policy organization. Through these dual operations, the Bush Center works to both preserve history and shape the future. The Bush Center is uniquely equipped to promote leadership development, advance policy initiatives, and inspire action on a local, national, and global scale. Its work covers three major Impact Centers: Domestic Excellence; Global Leadership; and Engagement. Through these Impact Centers, the Bush Center is dedicated to solving some of today's most pressing challenges.

### Driving a Local Institution's Ambitious Global Agenda: Grant Supporting the Construction of the Bush Center in Dallas

In 2008, the Bush Center officially selected Dallas as its permanent home, announcing plans to construct its building on the campus of SMU. The Supporting Organizations helped make the vision of the Bush Center's Dallas home a reality, making a grant to help complete construction and design for the building. On May 1, 2013, the Bush Center opened its doors to the public. In its first five years after opening, the Bush Center welcomed over $1.6 million visitors.

### Securing a Legacy and Driving Engagement: Grant Supporting the Center's Long-term Operations and Engagement Agenda

In 2018, the Bush Center launched an important fundraising initiative to ensure its mission endures for generations to come. With its "A Charge to Keep" capital campaign, the Bush Center aimed to raise funds that would sustain its operations beyond the lifetimes of President and Mrs. Bush.

The Supporting Organizations made a grant to help ensure the Bush Center can continue its important work well into the future. The grant specifically focused on the public speaker series, Engage at the Bush Center. The series brings newsmakers, thought leaders, and authors to the Bush Center for thought-provoking panel discussions and keynote conversations that allow guests to connect with the Bush Center in a meaningful way and dive deeper into many of today's most pressing policy areas and issues.

Issue Area: **Civic & Cultural Institutions**

003789

**EXHIBIT 4**

GRANT HIGHLIGHT

# Perot Museum

### About the Perot Museum

The Perot Museum of Nature and Science (the "Perot") promotes science and education in the North Texas community through hands-on exhibits, educator resources, unique films, and other special programming that engages audiences of all ages.

**Helping Establish a World Class Museum in Downtown Dallas: Grant to Support Construction of the New Perot Museum:**

With support from Dallas' philanthropic community, the Perot Museum opened a new building in December 2012. With its bold architectural design, it quickly became a fixture in its new location in Dallas' Victory Park. The project also sparked a renewed commitment to inspire minds and improve community achievement, giving rise to new initiatives that promote science learning.

The Supporting Organizations contributed to the project by issuing a challenge grant, which matched donations, inciting additional giving and helping complete the project's capital campaign. Since then, we have contributed additional funding to support ongoing educational programming, special exhibitions, and community engagement initiatives.

**Increasing Community Access: Grant to Support the Perot's Traveling Exhibition Programs**

In 2014, the Supporting Organizations began issuing a series of grants to support the traveling exhibitions program. The initial exhibition, the "The World's Largest Dinosaurs" exhibition, educated audiences on the gigantic sauropods that once roamed the earth, drawing nearly 200,000 visitors to the museum. Since then, our grants have made possible the many captivating exhibitions that have been hosted by the Perot, covering a range of subject areas. With two special exhibitions held each year, the grants enable the museum to deliver new experiences that give visitors a reason to keep coming back and serve as a complement to the museum's 11 permanent exhibit halls. The program draws exhibitions from around the globe to the Perot, providing the North Texas community with access to world-class educational experiences. All the special exhibition grants include funding that allows the Perot to make all traveling exhibitions bilingual (with programming in both English and Spanish). These exhibits have helped increase community access to the North Texas Hispanic population.

Issue Area: **Civic & Cultural Institutions**

003790

GRANT HIGHLIGHT

**EXHIBIT 4**

# Cristo Rey Dallas

### About Cristo Rey Dallas

Cristo Rey Dallas College Prep ("CRD") is a private, independent Catholic high school located in the Pleasant Grove area of Southeast Dallas. The Cristo Rey Network's formula for success is a proven, revolutionary model of college preparatory high school curriculum accessible to those of limited financial resources. It integrates rigorous college preparatory academics with professional work experience through the Corporate Work Study Program—a key component of the fiscal sustainability of the Cristo Rey model. Through the Work Study Program, students work in a professional setting five days per month to earn the majority of their tuition. The 144 job partners include some of Dallas's most prominent companies.



*The Cristo Rey model is proven, with 100% of graduates gaining acceptance to a two- or four-year college and 90% matriculating. For students in Pleasant Grove—where only 4% of the population graduated from college—CRD offers access and opportunity that can change their trajectory.*

### Building Space for Innovation: Grant to Support CRD Campus Expansion and Renovations

The 30th school in the nationwide Cristo Rey network, CRD opened in August 2015, operating out of an old elementary school and aging gymnasium. They quickly outgrew the space and had to begin turning away prospective students. In 2019, CRD launched a $15 million capital campaign to expand the campus, adding new academic and athletic buildings and conducting much needed renovations on the existing buildings.

The Supporting Organizations issued the campaign's lead grant, helping build a new 37,000 sq. ft. Innovation Center, which boasts spaces for fine arts and counseling. The campaign also created a new cafeteria and gymnasium, as well as a new soccer field – something the school never had before. The new buildings opened in time for the 2020 school year.

The Supporting Organizations also helped provide space for CRD students off campus in a centrally located office building near Downtown Dallas. The space gave students a place to study and complete work study programs that were moved to Work From Home due to the pandemic.

Issue Area: **Education & Research**

003791

Case 1:3-4765-tgg-11 Document 647251 Filed 07/09/20/25 Entered 07/09/20/25 03:30:44 Page 49 of
Exhibit 4 - Charitable Respondents Response and Disclosures    Page 249 of 307
**EXHIBIT 4**

G R A N T   H I G H L I G H T

# Education Is Freedom

### About Education Is Freedom

Education Is Freedom ("EIF") is committed to transforming students' lives through education. With a focus on college planning, the organization provides underserved students in the North Texas community with a range of resources to ensure every student has the opportunity to pursue a college education.

EIF's higher education advisors work onsite at public high schools across the region, helping students and their families navigate the college process. In 20XX, EIF helped high school seniors complete 21,000 college applications and receive over $132 million in scholarships.

In addition to their college planning initiatives, EIF operates a number of supplementary programs to enhance access to postsecondary education and promote workforce readiness.

### Developing a Skilled and Educated Workforce: Grant Supporting the Mayor's Intern Fellows Program

In 2008, EIF worked with the Mayor's Office to create the Mayor's Intern Fellows Program ("MIFP"), an initiative to provide workforce readiness. The program provides Dallas high school students with internship opportunities at local companies, nonprofits, and government entities. Through the eight-week, paid internship, students gain real-world experience and insight into the professional opportunities available to them. Not only does the program prepare students for future careers, but it also connects local businesses with the future workforce, promoting collaboration to strengthen the pipeline of talent.

The Supporting Organizations have issued grants to EIF to support the MIFP. The grants have helped EIF put on the program's annual Job Fair. Held in the spring, the Job Fair provides an opportunity for students to interview with prospective employers in the hopes of securing an internship for the summer. Education Is Freedom conducts extensive training with the students throughout the program, offering workshops and coaching on everything from interview preparation to professional etiquette.

In 2018, over 2,400 students from 52 high schools applied for the program. Of those applicants, 1,050 were selected to attend the Job Fair. At the 2018 Job Fair, over 200 employers from across the Dallas-Fort Worth region interviewed internship candidates, ultimately offering positions to 395 students for the summer. In addition to the Job Fair, our grants have funded internships at various nonprofit partners, covering the cost for organizations that might not otherwise be able to hire paid interns.

Issue Area: **Education & Research**

003792

**EXHIBIT 4**

G R A N T   H I G H L I G H T

# SMU Tower Center

### About the SMU Tower Scholars Program

The Southern Methodist University ("SMU") Tower Scholars Program provides top undergraduate students with an opportunity to integrate public policy and international affairs into their studies through a dedicated curriculum of academic coursework and real-world experiences. Students in the program receive a minor in public policy and international affairs, offered through SMU's John Goodwin Tower Center for Political Studies (the "Tower Center").

> " *The Tower Scholar Program's resources and curriculum allow me to not only learn public policy principles through lectures, but also gain tactile experience with practicums and classes taught by policy practitioners. Without this program, I would have been unable to experience and explore my interest in public policy.*"
>
> *– Tower Scholar, Class of 2020*

### Investing in the Next Generation of Policymakers: Grant to Endow the Tower Scholars Undergraduate Program at SMU

In 2014, the Supporting Organizations worked with the Tower Center to create a dedicated undergraduate program that carries out the center's mission of bridging the gap between the scholarship and practice of politics and striving to inspire ethical public service. The grant established an endowment that provides long-term funding for the Tower Scholars Program.

A hallmark of the program is its interdisciplinary focus. Over 75% of the Tower Scholars either earned or are pursuing more than one major—and that is in addition to the minor they earn in the program. Outside the classroom, each student is involved in multiple on-campus organizations, many in leadership positions.

The Supporting Organizations' grant makes possible the unique academic experiences—from meeting with global leaders, to working on real policy issues for major corporations—offered to the Tower Scholars. The program accepts 10 students each year, and recently welcomed its eighth cohort.

Issue Area: **Education & Research**

003793

G R A N T   H I G H L I G H T                                        **EXHIBIT 4**

# Center for BrainHealth

## About the Center for BrainHealth

The Center for BrainHealth ("CBH"), part of The University of Texas at Dallas, is a research institute committed to enhancing, protecting and restoring brain health across the lifespan. CBH is composed of independent labs that are responsible for more than 60 fully funded research projects that investigate brain health, injury, and disease. Many of the center's programs use functional and structural neuroimaging techniques to better understand the neurobiology supporting cognition and emotion in health and disease. Areas of research include addiction, aging, Alzheimer's disease, autism, multiple sclerosis, social cognition, and traumatic brain injuries.

Applying Innovative Research to Improve the Lives of Post-9/11 Veterans and First Responders: Grant Supporting the Warriors Program Through the Brain Performance Institute

In 2015, CBH broke ground on new building dedicated to translating leading-edge science to scalable solutions for the public at large. Through construction of the Brain Performance Institute, CBH sought to extend the reach and applications of its research, providing solutions to the public to maximize brain performance in health, injury, and disease.

The Supporting Organizations made a grant to help fund the construction of the Brain Performance Institute and expand CBH's Warrior Initiative, which that focused on translating research into cognitive therapies for former military personnel. The Warrior Initiative was established to provide high performance brain training to current and former military service men and women and their families.

The goal of the Warrior Initiative program is to arm veteran and active-duty service members with the necessary tools to achieve successful, enriching, and fulfilling lives by proactively optimizing brain performance, building resilience in cognitive brain function, and reversing losses in cognitive capacity. The program was expanded in 2016 to support first responders, specifically focusing on local law enforcement.

The grant help create a space in the Brain Performance Institute building specifically for veterans, first responders, and their families, where these groups are able to come together in a safe, relaxing environment and get to know other members of service before and after training sessions.

Issue Area: **Military, Veterans & First Responders**

003794

GRANT HIGHLIGHT

**EXHIBIT 4**

# Friends of the Dallas Police

### About Friends of the Dallas Police

The Friends of Dallas Police was founded in 1982 to recognize the commitment that the employees of the Dallas Police Department make to better the city and its residents' quality of life. The organization's mission is to raise and provide funds to be used to host a major awards banquet each year honoring Dallas Police Department personnel for outstanding performance in the line of duty. Over the years, approximately 4,400 awards have been presented to officers and civilian staff, and more than $43,000 in educational scholarships have been awarded to their children.

### Helping Show Appreciation and Recognition to Local Law Enforcement: Grant Supporting the Annual Awards Program

The Supporting Organizations have provided grants to help the Friends of the Dallas Police show appreciation to the men and women of the Dallas Police Department who risk their lives every day to make Dallas a safer city. Our grants have helped fund the annual awards event hosted by the Friends of the Dallas Police, which honors and recognizes outstanding employees throughout the Dallas Police Department.

Through our grants, the Supporting Organizations have facilitated the production of the annual awards program, enabled sworn and non-sworn employees and their spouses to attend the event, and provided educational sponsorships for children of police officers.

The Supporting Organizations have also drawn on its philanthropic network to provide gifts to award recipients and their families, including tickets to visit organizations like the Dallas Zoo, George W. Bush Presidential Center, and Perot Museum.

Issue Area: **Military, Veterans & First Responders**

003795

**GRANT HIGHLIGHT**

**EXHIBIT 4**

# Snowball Express

## About Snowball Express

Snowball Express (now part of the Gary Sinise Foundation) serves the children of fallen military heroes. By providing events and other experiences in a stress-free environment, the organization is creating a community to learn, grow, and make lasting memories with new friends.

The organization hosts an annual five-day experience for 1,750+ children of the fallen and their surviving parent or guardian. As a therapeutic retreat with a blend of fun and inspiring programs, these families can lean on their peers for support. The organization also hosts community-driven events for these families all year long. From baseball games, to arts and educational opportunities, to camping trips, the events strengthen the local networks of Gold Star families, helping children and surviving spouses to build bonds with the only people who can truly understand their loss: each other.

## Supporting Families of Fallen Service Members: Grant to Support Programming for Gold Star Children

In 2014, Myles Eckert, the nine-year-old son of U.S. Army Sergeant was killed in Iraq on active duty, gave a $20 bill that he found to a veteran in a pay-it-forward act of kindness towards our military. Myles's story was shared widely online, and the gift quickly received national attention.

In honor of Myles Eckert's gift, the Supporting Organizations issued a challenge grant to Snowball Express to support the organization's programming for children that have lost one or both parents during active service.

The grant inspired significant giving from individuals and organizations around the world, enabling Snowball Express to expand its services for Gold Star children and their families.

Snowball Express used the proceeds from the challenge grant to provide services to over 8,000 Gold Star children in 2014—almost 6,000 more than the year before and a new record for the organization.

Issue Area: **Military, Veterans & First Responders**

003796

Case 1:24-cv-04055-LGS Document 547-17 Filed 07/09/25 Entered 07/09/25 13:33:90:44 Page 1 of
Exhibit 4 - Charitable Respondents Response and Disclosures    Page 254 of 307
**EXHIBIT 4**

GRANT HIGHLIGHT

# Dallas Children's Advocacy Center

## About Dallas Children's Advocacy Center

Dallas Children's Advocacy Center ("DCAC") is the only agency of its kind in Dallas County, working in agreement with public and private agencies to investigate, prosecute, and provide healing services for child abuse cases in Dallas County. DCAC reduces the re-victimization of the child, removes barriers to investigation and treatment, and enhances criminal prosecution with its distinctive multidisciplinary approach to these complex and severe cases.

**Fostering Crucial Collaboration: Grant to Support DCAC's Operations and Strengthen Collaboration Among Agencies Involved in Child Abuse Cases**

The Supporting Organizations have been a longtime partner of the Dallas Children's Advocacy Center ("DCAC"), issuing annual grants that provide funding for a range of operating costs. The grants help DCAC serve over 8,000 children (and their non-offending family members) each year who were sexually abused, severely physically abused, or who had witnessed a violent crime. DCAC's average client is a 9-year-old girl, sexually abused by someone she knows and trusts.

The grants also support DCAC in its efforts to foster crucial collaboration across government agencies and other organizations involved in child abuse cases. The DCAC building houses the Child Abuse Unit of the Dallas Police Department, six units of CPS, and a Dallas County Assistant District Attorney. Having all of these professionals under one roof drives collaboration and communication in the very sensitive cases that DCAC coordinates.

Not only have the Supporting Organizations been a long-time financial supporter of DCAC, we have also provided support in other ways, leveraging connections with our network of nonprofit partners. Most recently, we worked with the Dallas Zoo to provide animal encounter demonstrations during DCAC's summer camps, which serve as a way to deliver ongoing support to—and help build a community for—children who have experienced trauma.

Issue Area: **Youth & Family**

003797

GRANT HIGHLIGHT

**EXHIBIT 4**

# The Family Place

## About The Family Place

The Family Place was founded in 1978 and has grown to become the largest family violence prevention agency in North Texas, providing shelter and assistance to victims across the region along with counseling and education. Since its founding, the organization has served over 839,000 clients through counseling, shelter, and hotline responses.

In 2019, The Family Place served nearly 12,000 clients, providing over 62,000 days of emergency shelter, over 36,000 days of transitional housing, and over 18,000 hours of counseling to nonresidential clients, and over 8,000 hours of counseling to batterers. All services are in Spanish and in English.

## Providing Support for Victims of Family Violence Across North Texas

The Family Place empowers victims of family violence by providing safe housing, counseling, and skills that create independence while building community engagement and advocating for social change to stop family violence.

While The Family Place supports clients in several different ways, its Residential Services, which provide safe shelter for families affected by violence, are one of crucial components of its work. These services include the Emergency Shelter Services, which provide immediate shelter for families escaping abuse, and the Supportive Living Program, which provides long-term housing for families as they rebuild their lives. Not only does the organization provide necessities like food, clothing, and transportation, but it also offers childcare, legal services, counseling, and case management.

As The Family Place expanded, its Residential Services were constrained by the capacity of its emergency shelters, and at many times the organization had to house clients in hotels and other temporary housing in order to meet demand.

In 2016, the Supporting Organizations issued a challenge grant to help The Family Place build a new shelter facility to expand its Residential Services. The new facility provides space and support services for over 2,000 victims per year. It also includes onsite Medical and Dental Clinics and even an Animal Kennel so families can bring their beloved pets with them to safety. The shelter has been operating at full capacity since October 2017. With the new facility, The Family Place now has three emergency shelters, providing 177 shelter beds each night, and three counseling centers.

Issue Area: **Youth & Family**

003798

**EXHIBIT 4**

# EXHIBIT 32

**EXHIBIT 4**

BOARD OF DIRECTORS

PRESIDENT
Harold Ginsburg

TREASURER
Wes McCown

SECRETARY
Thomas McCollum

V.P. COMMUNITY ENGAGEMENT
Clarisa Lindenmeyer

V.P. DEVELOPMENT
Lindsay Jacaman

V.P. FACILITIES
Jim Buddrus

V.P. HUMAN CAPITAL
David Oliver

V.P. LONG RANGE PLANNING
Radhika Zaveri

V.P. NOMINATIONS
Belinda Griffin

V.P. PUBLIC AFFAIRS
Delia Jasso

GENERAL COUNSEL
Kristin Bauer
Eric White

Sandra Aguirre
Lisa Armstrong
Mandy Austin
Steven Bauer
Melinda Bell
Laurie Berger
Nancy Bierman
Julie Bosché
Eric Chandler
Kerry Cole
Nicole Collins
Barbara Durham
Monika Flood
Theresa Flores
Beth Garvey
Lauran Goldberg
Carlos Gonzalez-Jaime
Michelle Goolsby
Rhonda Green
Tasha Grinnell
Johnese Howard
Stacee Johnson-Williams
Linda Knox
Holly Krug
Emily Maduro
Margo McClinton Stoglin
Mary McNulty
Sam Megally
Aaliyah Miranda
Mike Montgomery
Tiffany Moon
Elizabeth Saab
Nathaniel St. Clair
Kristen Sanger
Ryan Scripps
Carol Seay
Lisa Singleton
Ghousuddin Syed
Jill Tananbaum
Samantha Wortley
Ana Yoder

Chief Executive Officer
Paige Flink

*the family place*
*Where family violence stops*

July 7, 2021

To Whom It May Concern:

I am pleased to write this letter outlining the relationship between The Family Place and the Highland Dallas Foundation. The Family Place empowers victims of family violence by providing safe housing, counseling and skills that create independence while building community engagement and advocating for social change to stop family violence. Our agency provides emergency shelter, individual and group counseling, case management, transitional housing as well as other essential services to help those seeking refuge from family violence. The Family Place provides free, comprehensive services in both Spanish and English that prevent violence and fully support women, children, and men on their path from fear to safety.

In 2020, The Family Place successfully navigated through COVID-19 and the barriers it presented, serving 11,933 unduplicated clients across our programs. Our emergency shelters served 678 women, 886 children and 58 men for a total of 62,118 shelter nights. 98% of our shelter clients did not return to their abuser after exiting one of our shelters. In our counseling programs, we served 2,258 clients, an 11.5% increase over 2019. 98% of our counseling clients reported feeling safer after attending counseling at The Family Place. At our on-site medical and dental clinics, we treated 778 clients and referred 571 clients to more intensive medical and dental services.

The Highland Dallas Foundation has been a long-standing partner with The Family Place in providing services to domestic violence clients. In 2016, The Family Place launched a 5-year, $16.5 million dollar capital campaign to build a new facility specifically designed to provide all necessary services for victims seeking shelter and counseling. The Family Place successfully reached our capital campaign goal due in large part to the commitment of a $1 million matching grant by the Highland Dallas Foundation. In December 2016, the Highland Dallas Foundation donated $13,950 for Christmas gifts for our clients. In 2017, when the Highland Hippo Hut was opened at the Dallas Zoo, the Highland Dallas Foundation generously invited our shelter clients to a special Mother's Day luncheon.

The collaboration between the Highland Dallas Foundation and The Family Place has been instrumental in providing community exposure and awareness of domestic violence in our community as well as providing essential services to family violence victims. With our new facility, completed in 2017, The Family Place has been able to expand programs and execute on the long-range plans developed for these programs. For victims of family violence, The Family Place is the Dallas area's leading organization delivering proven programs that address emotional and physical abuse and incest. Without the ongoing support of the Highland Dallas Foundation, The Family Place would not be able to successfully serve our domestic violence clients who are in desperate need of support.

Sincerely,

Paige Flink
CEO, The Family Place

P.O Box 7999
Dallas, Texas 75209
214 559 2170
fax 214 443 7797
www.familyplace.org



003800

Case 1:19-cv-00945-RGA Doc. #: 542-37 Filed: 07/09/25 Entered: 07/09/25 08:29:44 Page 1 of 2
Case 3:19-cv-01873 Charitable Respondents' Response and Disclosures Page 286 Page 258 of 307 PageID 5034
EXHIBIT 4

# EXHIBIT 33

003801

### Cristo Rey Dallas Update

Cristo Rey Dallas (CRD) is incredibly grateful for the gifts from Highland Dallas Foundation, Inc. CRD is excited to have the Highland Capital Academic Center and the NexBank Gymnasium in the Innovation Center on our campus. These naming rights were given as the result of a donation that Highland Dallas Foundation, Inc.made to our Innovation Center Capital Campaign. These facilities truly impact our students and allow us to provide our services to our population of 465 students.

CRD also receives support from Highland Dallas Foundation, Inc. through the Corporate Work Study Program (CWSP). Cornerstone Healthcare and NexBank both currently have one job team (a team of 4 students) that work in their offices. In the upcoming year, NexBank will host two teams of students. One team is funded through the gift from Highland Dallas Foundation, Inc. and the other is supported by NexBank. The work study program allows students to earn about 60% percent of their tuition to CRD, and the involvement in the work study program makes such a difference in the lives of the 8 students that work in those businesses.

Finally, CRD is incredibly thankful for the remote workspace at Cityplace Tower. CWSP has been greatly affected by COVID-19. This year, many partners were unable to host students in their offices. The space at Cityplace Tower allows 30 students to work remotely for their job partners each day which means that about 120 students benefit from the offices each week. Without this space, CRD would not have the capacity to allow these students to work remotely.

The support of Highland Dallas Foundation, Inc. has meant so much to us at CRD. We are so appreciative, and we look forward to continuing our partnership for many years.

003802

Case 1:19-cv-04055-sgj11 Doc 2547-4 Filed 07/09/20 Entered 07/09/20 23:09:44 Page 1 of 3
Case 3:21-cv-01878 Charitable Respondents' Response and Disclosures Page 360 of 307 ID 5036
EXHIBIT 4

# EXHIBIT 34

**EXHIBIT 4**



**Dallas Children's Advocacy Center (DCAC)**
**Partnership with Highland Dallas Foundation, Inc.**

**Organization Mission and History**
The mission of DCAC is *to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues*. Since opening its doors in 1991, DCAC has served more than 60,000 of the most severely abused children and their non-offending family members in Dallas County. In FY2021, DCAC will serve 8,400 children and their non-offending family members.

DCAC was created to coordinate the investigation of child abuse cases that rise to the criminal level in a seamless, collaborative process. We facilitate a coordinated approach to child abuse cases that results in more successful investigation and prosecution outcomes and provides a less traumatic response to child victims and families. DCAC partners with 39 organizations to form a Multidisciplinary Team (MDT) that includes medical, legal, and law enforcement and is designed to ensure child clients receive the appropriate services for healing and safety.

In 2015 DCAC's Partner Relations Team began reading all reports of abuse and neglect made to DFPS in Dallas County as part of a state-wide effort to ensure every child who needs services from a children's advocacy center (CAC) gets them. In FY2019 we read 28,131 reports of child abuse for Dallas County. At the beginning of March 2020 before COVID-19 safety measures were implemented, we had experienced a 15% increase in the number of cases read. While case reports went down during quarantine, we have projected and experienced a dramatic increase in cases; at the end of February 2021, we had experienced a 35% increase in cases read year-over-year.

In addition to supportive services provided by the MDT, DCAC also provides the following Core Programs at no cost to our clients. Please note, for the second half of FY2020, DCAC provided therapy and family advocacy services via a HIPPA-approved telehealth platform, Doxy.me. Forensic interviews were always conducted on-site during quarantine. Below you will find details and outcomes for FY 2020.

*Forensic Interview Program*
Trained DCAC forensic interviewers conduct interviews of children, both as a first step in the child's healing process and as a vital component of the investigation and prosecution of alleged perpetrators. The result is a legally defensible investigative interview of each alleged child victim. During FY2020, DCAC conducted 1,921 forensic interviews.

*Family Advocacy Program*
The Family Advocacy Team is committed to helping each family navigate the complex process of investigation, prosecution and healing after a child makes an outcry of abuse. The team helps the family learn about their rights and resources available to them during crisis as well as provides tangible, critical needs items like clothing, toiletries, and financial assistance on an as-needed basis. During FY 2020, the Family Advocacy Program supported 7,431 children and their non-offending family members.

*Evidence-Based Therapy Program*

003804

**EXHIBIT 4**



Dallas Children's
Advocacy Center™
PROVIDING JUSTICE • RESTORING HOPE

The Evidence-Based Therapy Program provides clients and their non-offending caregivers with cutting-edge, no-cost therapeutic services. Treatment is informed by an initial assessment to enhance engagement between families and therapists toward the recovery of children. When clients are assessed at the end of treatment, over 70% report a reduction in trauma symptoms. During FY 2020, the DCAC Therapy Program provided services to 2,498 clients.

*Education Program*

DCAC has pioneered a comprehensive, multi-part training curriculum that provides holistic responses to Texas child abuse reporting laws. In the past year, 100,405 people were educated in our curriculum by means of in-person instruction or online learning. In addition to our cutting-edge curriculum, we also host a Lecture Series at the Center. Lecture Series topics are designed to provide continuing education for medical, legal, clinical, law enforcement and other children's advocacy professionals. Since the start of the pandemic, we moved all lecture series' online; we continue to provide this education virtually and as such have discovered we can reach even more professional.

**Partnership with Highland Dallas Foundation, Inc.**

Since 2016, Highland Dallas Foundation, Inc. has supported DCAC through yearly, general operating investments towards our mission. We have received over $85,000 over the past five years through sponsorship of our Art for Advocacy event as well as from a golf tournament where DCAC was the dedicated beneficiary. This funding has been critical to the sustainability of our programs and each dollar allows us to serve our clients with transformative services at no cost to them. Alongside the financial commitment, Highland Dallas Foundation, Inc. has gone above and beyond in introducing us to additional community advocates who individually support our efforts as well. The ripple effect of our partnership with Highland Dallas Foundation, Inc. is invaluable and for that we are so grateful.

**EXHIBIT 4**

# EXHIBIT 35

Case 19-34054-sgj11 Doc 2542-55 Filed 07/08/21 Entered 07/08/21 06:29:44 Page 2 of
Case 3:23-cv-02071 Charitable Respondents' Response to SEC MJ0472 Disclosures Page 293 Page 294 of 307 ID 5040
EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
|  | § | |
| *Plaintiffs,* | § | |
|  | § | |
| v. | § | **Cause No.** _____ |
|  | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
|  | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT

---

### I.

### INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

003807

Case 19-34054-sgj11 Doc 2547-55 Filed 07/08/21 Entered 07/08/21 16:29:44 Page 3 of
Case 3:21-cv-00879-G Document 1 Filed 04/14/21 Page 293 of 335 PageID 5041
**EXHIBIT 4**

At all relevant times, HCM was headed by CEO and potential party James P. Seery
("<u>Seery</u>"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98%
of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests
in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon
a sales price that was vastly below the Net Asset Value ("<u>NAV</u>") of those interests. Upon
information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed
to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which
includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to
which HCM and Seery had access to superior non-public information. Upon information and
belief, HCM's internal compliance policies required by the Advisers Act would not generally have
allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of
compliance rules preventing it, or the compliance protocols themselves were disabled or amended
to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have
created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for
their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a
pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative,
HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious
interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the
current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest
2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and
Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

---

Case 19-34054-sgj11 Doc 4257-4 Filed 07/08/25 Entered 07/08/25 06:29:44 Page 3 of
Case 3:23-cv-02071 Chantable Respondents Response to RICO Disclosures 294 Page 356 of 367ID 5042
EXHIBIT 4

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

Case 19-34054-sgj11 Doc 4257-5 Filed 07/08/25 Entered 07/08/25 16:29:44 Page 5 of 23
Case 3:23-cv-02071-E Chartable Respondents' Responses to Disclosures 295 Page 357 of 307
EXHIBIT 4

### III.

### <u>JURISDICTION AND VENUE</u>

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

### IV.

### <u>RELEVANT BACKGROUND</u>

### *HCLOF IS FORMED*

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

---

Case 19-34054-sgj11 Doc 4255-4 Filed 07/08/25 Entered 07/08/25 06:29:44 Page 2 of
Case 3:23-cv-02071 Exhibit 01 Claimable Respondents Responsive Disclosures 296 Page 296 of 305 ID 5044
**EXHIBIT 4**

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

**The Harbourvest Settlement with**
**Highland Capital Management in Bankruptcy**

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

Case 19-34054-sgj11 Doc 2547-35 Filed 07/06/21 Entered 07/06/21 16:29:44 Page 2 of
Case 3:23-cv-01336-K Document 1-4 Filed 04/04/23 Page 297 Page 236 of 307 D 5045
**EXHIBIT 4**

17.     The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18.     Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19.     Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20.     Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21.     In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22.     The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23.     Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

---

Case 3:21-cv-01171-B Document 1-4 Filed 07/06/21 Entered 07/06/21 16:29:44 Page 8 of
Case 3:23-cv-01834-sgj11 Doc 254-5 Filed 07/06/25 Entered 07/06/25 26:29:44 Page 8 of
Case 3:23-cv-01834 Charitable Respondents' Response to Plaintiffs' Disclosures Page 790 of 3920 ID 5046
**EXHIBIT 4**

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million). Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

---

**003813**

Case 19-34054-sgj11 Doc 2542-5 Filed 07/06/21 Entered 07/06/21 16:29:44 Page 9 of
Case 3:23-cv-01338-K Document 4-5 Filed 06/09/23 Page 299 of 335 PageID 5047
**EXHIBIT 4**

32.     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.     It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.     The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

Case 3:23-cv-34054-sgj11 Doc 2644-257 Filed 07/09/25 Entered 07/09/25 20:44:48 of
Case 3:23-bit-01367-l Kit Label Responde Responde Res Bon 09/00/25 sclose 300 Page 372 of 307 ID 5048
EXHIBIT 4

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.    Typically, the value of the securities reflected by a market price quote.

41.    However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.    There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.    Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.    Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.    It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.    For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

Case 19-34054-sgj11 Doc 2644-5 Filed 07/06/20 Entered 07/06/20 20:44:44 Page 42 of
Case 3:25-cv-01180-N Document 14 Filed 04/07/25 Page 302 of 335 PageID 5050
EXHIBIT 4

53. Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54. HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### *Breaches of Fiduciary Duty*

55. Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56. HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57. The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

003817

Case 3:23-cv-34554-sgj11 Doc 2644-4255 Filed 07/09/26/20/25 Entered 07/09/26 20:27:50 23:30:44 Page 48 of
Case 3:23-cv-01218-Chartable Respondents' Respondents' Disclosures 303 Page 325 of 304 D 5051
EXHIBIT 4

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

Case 3:23-cv-34054-sgj11 Doc 264-2557 Filed 07/09/20/25 Entered 07/09/2012 750:32:90:44 Page 44 of
Case 3:25-cv-01018-TMR-DDE Respondents Response 06/09/2025 Disclosure 30 Page 325 of 308D 5052
EXHIBIT 4

65.      This is manifested in a duty of loyalty and a duty of utmost care. It also means that
the RIA has to follow the terms of the company agreements and the regulations that apply to the
investment vehicle.

66.      The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and
confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-
registered or not) to establish, maintain, and enforce written policies and procedures reasonably
designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. §
275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not
have to second guess or dig behind representations made by them.

67.      The simple thesis of this claim is that Defendants HCFA and HCM breached their
fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the
underlying assets—i.e., trading with Harbourvest on superior, non-public information that was
neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest
Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its
designee) without offering it to or making it available to Plaintiff or the DAF.

68.      HCM, as part of its contractual advisory function with Plaintiffs, had expressly
recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on
its investment was an additional breach of fiduciary duty.

69.      This violated a multitude of regulations under 27 C.F.R. part 275, in addition to
Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while
possessing non-public information is liable for insider trading, and they do not necessarily have to
have *used* the specific inside information.

70.      It also violated HCM's own internal policies and procedures.

---

Case 3:23-cv-34654-sgj11 Doc 2644-255 Filed 07/09/20/25 Entered 07/09/22/25 03:29:44 Page 45 of
Case 3:21-cv-01028-Th-BD Document 16 Filed 09/01/25 Disclosure Page 305 Page 337 of 304 D 5053
**EXHIBIT 4**

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

Case 19-34054-sgj11 Doc 2557 Filed 07/09/20 Entered 07/09/20 13:09:44 Page 16 of
Case 3:23-cv-01018-E Document 14 Reply in Support of Disclosure Page 500 of 528 PageID 5054
**EXHIBIT 4**

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.     Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.     Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.     Seery's knowledge is imputed to HCM.

80.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

003821

EXHIBIT 4

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

EXHIBIT 4

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.     Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.     What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.     Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.     For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.     HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.     Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

**EXHIBIT 4**

## SECOND CAUSE OF ACTION
### *Breach of HCLOF Company Agreement*
### (By Holdco against HCLOF, HCM and HCFA)

92.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.     On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.     The Company Agreement governs the rights and duties of the members of HCLOF.

95.     Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.     Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.     The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.     Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.     Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

Case 3:21-cv-03054-X Document 255 Filed 07/09/25 Entered 07/09/25 20:44:20 Page 28 of
Case 3:23-cv-01818-S Exhibit to Charitable DAF's Response to Seery Discharge Stip Page 310 of 335 PageID 5058
**EXHIBIT 4**

100.     Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

101.     No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

102.     Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

103.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

104.     Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

105.     Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

106.     Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

107.     It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

Case 3:23-cv-34545-ggj-11 Doc 26447257 Filed 07/09/20/25 Entered 07/09/20/25 23:00:44 Desc of
Case 3:Exhibit 4 8-Charitable Response to 14 Response Disclosure Page 311 Page 383 of 3027D 5059
EXHIBIT 4

**108.**     It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.**     It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.**     Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.**     Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.**     Plaintiff is thus entitled to damages.

**FOURTH CAUSE OF ACTION**
***Racketeering Influenced Corrupt Organizations Act***
**(CLO Holdco and DAF against HCM)**

**113.**     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.**     Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.**     HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

---

Case 3:21-cv-03454-gjjl Doc 2647255 Filed 07/09/20/25 Entered 07/09/22 01:75:03290:44 age 22 of
Case 3:21-cv-1018-X Document Responders Reglas 09.20.25 isclosure Page 311 Page 234 of 301 ID 5060
EXHIBIT 4

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including

Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations

owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116.    The association-in-fact was bound by informal and formal connections for years

prior to the elicit purpose, and then changed when HCM joined it in order to achieve the

association's illicit purpose. For example, HCM is the parent and control person over HCFA,

which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are

registered investment advisors and provide advisory and management services to HCLOF.

117.    Defendants injured Plaintiffs through their continuous course of conduct of the

HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery

and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a

case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118.    HCM operated in such a way as to violate insider trading rules and regulations when

it traded with Harbourvest while it had material, non-public information that it had not supplied to

Harbourvest or to Plaintiffs.

119.    In or about November 2020, HCM and Harbourvest entered into discussions about

settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through

the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests

in HCLOF.

120.    On or about each of September 30, 2020, through December 31, 2020, Seery,

through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive

at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

Case 19-34054-sgj11 Doc 2644-5 Filed 07/09/21 Entered 07/09/21 20:44:28 of
Case 3:21-cv-01171-B Document 1 Filed 05/21/21 Page 313 Page 313 of 335 D 5061
EXHIBIT 4

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

Case 19-34054-sgj11 Doc 2647 Filed 07/09/20/25 Entered 07/09/22/25 00:44 Page 24 of
Case 3:21-cv-01878-C Document 16 Filed 09/09/21 Page 314 Page 336 of 3093D 5062
EXHIBIT 4

126.     In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest

Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount,

which would violate the letter and spirit of the Adviser's Act.

127.     Seery was informed in late December 2020 at an in-person meeting in Dallas to

which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities

because Seery had learned from James Dondero, who was on the Board of MGM, of a potential

purchase of the company.  The news of the MGM purchase should have caused Seery to revalue

the HCLOF investment in MGM.

128.     In or around October 2020, Seery (who controls the Board of CSS Medical) was

pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain

securities by 25%. In several communications through the U.S. interstate wires and/or mails, and

with Plaintiffs, and the several communications with Harbourvest during the negotiations of the

settlement, Seery failed to disclose these changes which were responsible in part for the ever-

growing value of the HCLOF CLO portfolio.

129.     Seery was at all relevant times operating as an agent of HCM.

130.     This series of related violations of the wire fraud, mail fraud, and securities fraud

laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of

racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000

payday under the confirmation agreement.

131.     The federal RICO statute makes it actionable for one's conduct of an enterprise to

include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions

require full transparency and accountability to an advisers' investors and clients and does not

require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

Case 3:21-cv-03054-X Document 255 Filed 07/09/25 Entered 07/09/25 12:50:44 Page 25 of
Case 3:21-cv-01878-S Document 14 Filed 09/02/21 Page 315 of 335 PageID 5063
EXHIBIT 4

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.    Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.    Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

**FIFTH CAUSE OF ACTION**
*Tortious Interference*
**(CLO Holdco against HCM)**

134.    Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.    At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.    At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.    Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.    HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

Case 3:23-cv-00455-gjl Doc 264-2 Filed 07/09/20/25 Entered 07/09/20 17:50 20 00:44 Page 26 of
Case 3:Exhibit 18-Charitable Respondents Response in Disclosure Page 316 Page 338 of ECF D 5064
**EXHIBIT 4**

139.　　HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.　　But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.　　Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## <u>JURY DEMAND</u>

142.　　Plaintiff demands trial by jury on all claims so triable.

## VII.

## <u>PRAYER FOR RELIEF</u>

143.　　Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

　　　　a.　Actual damages;

　　　　b.　Disgorgement;

　　　　c.　Treble damages;

　　　　d.　Exemplary and punitive damages;

　　　　e.　Attorneys' fees and costs as allowed by common law, statute or contract;

　　　　f.　A constructive trust to avoid dissipation of assets;

　　　　g.　All such other relief to which Plaintiff is justly entitled.

Case 4:19-cv-04054-sgc Doc #25-4 Filed 07/06/20/25 Entered 07/06/20/25 23:00:44 Page 25 of
Case 3:25-cv-01018-X-BT Non-Charitable Respondents' Response to Motion to Disclose Page 317 Page 338 of 306 D 5065
**EXHIBIT 4**

Dated:  April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/  Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
E:  mas@sbaitilaw.com
      jeb@sbaitilaw.com

**Counsel for Plaintiffs**

003832

Case 19-34054-sgj11 Doc 3547 Filed 07/09/25 Entered 07/09/25 03:29:44 Page 1 of 2
Case 3:23-cv-01878 Charitable DAF Respondents Responses and Disclosures 318 Page 290 of 307 D 5066
EXHIBIT 4

# EXHIBIT 36

Case 19-34054-sgj11 Doc 2547-4 Filed 07/09/21 Entered 07/09/21 20:44:42 Page 2 of 2
Exhibit 4 - Charitable Respondents Response and Disclosures    Page 291 of 307

**EXHIBIT 4**

 **intertrust**
GROUP

Registration No.: **249232**

Client No.: **KY057017**

REGISTER OF DIRECTORS
FOR:
**CLO HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 17 Dec 2010 | 17 Dec 2010 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 17 Dec 2010 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | 31 Mar 2021 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 31 Mar 2021 | 02 Apr 2021 |
| **Mark E. Patrick**<br>. | Director | 02 Apr 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

003834

Case 19-34054-sgj11 Doc 2547-37 Filed 07/09/20 Entered 07/09/20 23:00:44 Page 1 of 2
Case 3:Exhibit 4 Charitable Respondents' Responses and Disclosures Page 2 of 307 D 5068
**EXHIBIT 4**

# EXHIBIT 37

**EXHIBIT 4**



Registration No.: **263805**
Client No.: **KY059904**

REGISTER OF DIRECTORS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 04 Nov 2011 | 04 Nov 2011 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 04 Nov 2011 | 25 Mar 2021 |
| **Patrick Mark**<br>Highland Capital Management, L.P.; 13455 Noel Rd, Suite 800; Dallas; TX 75240; USA. | Director | 25 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Graves, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

003836

# EXHIBIT 38

## EXHIBIT 4



Registration No.: **269389**
Date of Incorporation: **6 June 2012**
Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

| Share Class: | **Ordinary** |
|---|---|
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005<br>Cayman Islands | 6 Jun 2012 | Allotment | 1.00 | 6 Jun 2012 : Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | | | | |
| | | | | | | **Nil** | **Nil** | 26 Jun 2012 |
| **CLO HOLDCO, LTD.**<br>Intertrust Corporate Services (Cayman) Limited<br>One Nexus Way<br>Camana Bay<br>Grand Cayman KY1-9005<br>Cayman Islands | 26 Jun 2012 | Transfer | 1.00 | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | No Cert | | | |
| | | | | | | **100** | **1.00** | |

Notes:

Date printed: 19 May, 2021                                        INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 2]

003838

Case 19-34054-sgj11  Doc 2547-4  Filed 07/06/20   Entered 07/06/20 13:00:44   Page 2 of 3
Exhibit 4 - Charitable Respondents Response and Disclosures     Page 296 of 307
**EXHIBIT 4**



Registration No.: **269389**

Date of Incorporation: **6 June 2012**

Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

Date printed: 19 May, 2021

[2 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

## 003839

# EXHIBIT 39

Case 19-34054-sgj11 Doc 2547-4 Filed 07/06/21 Entered 07/06/21 08:00:44 Page 2 of 2
Exhibit 4 - Charitable Respondents Response and Disclosures    Page 298 of 307
EXHIBIT 4



Registration No.: **269389**

Client No.: **KY061847**

REGISTER OF DIRECTORS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 26 Jun 2012 | 26 Jun 2012 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 26 Jun 2012 | 24 Mar 2021 |
| **Mark E. Patrick**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Graves, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

003841

Case 19-40504-sgj11 Doc 2547-4 Filed 07/09/20 Entered 07/09/20 03:29:44 Page 1 of 2
Case 3:23-cv-01873 Charitable Respondents' Responses and Disclosures Page 329 of 307 ID 5075
EXHIBIT 4

# EXHIBIT 40

**EXHIBIT 4**

 **intertrust** GROUP

Registration No.: **293607**

Client No.: **KY073541**

REGISTER OF DIRECTORS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>190 Elgin Avenue; George Town; Grand Cayman KY1-9001; Cayman Islands. | Director | 12 Nov 2014 | 12 Nov 2014 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 12 Nov 2014 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

003843

# EXHIBIT 41

**EXHIBIT 4**

 intertrust
GROUP

Registration No.: **293607**

Date of Incorporation: **12 November 2014**

Client No.: **KY073541**

REGISTER OF MEMBERS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 0.01** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited** 190 Elgin Avenue George Town Grand Cayman KY1-9001 Cayman Islands | 12 Nov 2014 | Allotment | 1.00 | 12 Nov 2014: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | | | | |
| | | | | | | **Nil** | **Nil** | 12 Nov 2014 |
| **CLO HOLDCO, LTD.** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 12 Nov 2014 | Transfer | 1.00 | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | No Cert | | | |
| | | | | | | **100** | **1.00** | |

Notes:

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

003845

Case 1:19-cv-09439-PKC Doc 254-27 Filed 07/09/20 Entered 07/09/20 08:29:44 Page 1 of 2
Case 3:Exhibit 4 Charitable Respondents Response and Disclosures 331 Page 303 of 307 ID 5079
**EXHIBIT 4**

# EXHIBIT 42

**EXHIBIT 4**

 intertrust
GROUP

Registration No.: **249848**

Client No.: **KY058111**

REGISTER OF DIRECTORS
FOR:
**HCT HOLDCO 2, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 30 Dec 2010 | 30 Dec 2010 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 30 Dec 2010 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

003847

Case 1:19-cv-03954-sgj11 Doc 25-4 Filed 07/09/20 Entered 07/09/20 20:44 Desc
Case 3:Exhibit 4 Charitable Respondents Response and Disclosure Page 333 of 307 D 5081
**EXHIBIT 4**

# EXHIBIT 43

# EXHIBIT 4


**intertrust** GROUP

Registration No.: **249848**

Date of Incorporation: **29 December 2010**

Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

| | |
|---|---|
| Share Class: | **Ordinary** |
| Nominal Value: | **USD 1.00** |
| Voting Rights: | Yes |
| Conditional: | No |

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 29 Dec 2010 | Allotment | 1.00 | 29 Dec 2010: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | | | | |
| | | | | | | **Nil** | **Nil** | 30 Dec 2010 |
| **Highland Capital Management Partners, Charitable Trust #2** 13455 Noel Road Suite 800 Dallas TX  75240 USA | 30 Dec 2010 | Transfer | 1.00 | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | No Cert | | | |
| | | Transfer | (1.00) | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution | | | | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 2]

003849

**EXHIBIT 4**



Registration No.: **249848**

Date of Incorporation: **29 December 2010**

Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| | | | | Agreement | | | | |
| | | | | | | Nil | Nil | 24 Oct 2011 |
| **CLO HOLDCO, LTD.** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 24 Oct 2011 | Transfer | 1.00 | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution Agreement | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[2 / 2]

003850