**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P

|  | | |
|---|---|---|
|  | § | |
|  | § | Case No. **19-34054-sgj11** |
| **Patrick Daugherty - Appellant** | | |
|  | § | **3:25-CV-01901-S** |
|  | | CONSOLIDATED UNDER: |
| vs. | § | **3:25-CV-01876-K** |
| **Highland Capital Management, L.P; et al** - Appellee | | |
|  | § | |
|  | § | |

[4297] **Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025**

# Volume 2

# APPELLANT RECORD

Jason S. Brookner (Texas Bar No. 240033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
Drake M. Rayshell (Texas Bar No. 24118507)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email:      jbrookner@grayreed.com
            dyork@grayreed.com
            jsmeltzer@grayreed.com
            drayshell@grayreed.com

*Counsel to Patrick Daugherty*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | § § § | |

*INDEX*

**APPELLANT'S AMENDED DESIGNATION OF ITEMS
TO BE INCLUDED IN THE RECORD ON APPEAL
AND STATEMENT OF THE ISSUES PRESENTED**

Pursuant to Fed. R. Bankr. P. 8009(a) and Docket No. 4366, Appellant Patrick Daugherty

("Daugherty") hereby submits his amended designation of items to be included in the record on

appeal and statement of issues to be presented in connection with his appeal from the *Order*

*Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the*

*Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address
for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

No. 4297] (the "HMIT Settlement Order").[2] *See Notice of Appeal* [Docket No. 4310, as amended at Docket No. 4327].

## Statement of Issues on Appeal

1. Whether the Bankruptcy Court erred in its approval of the HMIT Settlement Order [Docket No. 4297], which permits payment to Class 10 creditors before all Class 8 and Class 9 claims have been paid in full when the plain language of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. 1808], the Court's Confirmation Order [Dkt. 1943] and the Claimant Trust Agreement [Dkt. 3817-4] require full payment plus applicable interest to all Class 8 and Class 9 creditors before any Class 10 or Class 11 claims can vest.

2. Whether the Bankruptcy Court abused its discretion by approving the HMIT Settlement Order [Docket No. 4297] when the settlement is not fair, reasonable, or in the best interests of the estate as the Debtor, through its principals, is forgoing the recovery of millions in material value to the estate in exchange for, inter alia, self-serving releases of its principals.

## Designation of Record

Daugherty respectfully designates the following items to be included in the appellate record pursuant to Bankruptcy Rule 8009(a):

000001    1. Amended Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Dkt. 4327].

000011    2. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Dkt. 4310].

000022    3. The Judgment Order or Decree appealed from: *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4297].

000026    4. Docket Sheet for Bankruptcy Case No. 19-34054-sgj1 kept by the Bankruptcy Clerk.

5. Documents listed below for Bankruptcy Case No. 19-34054-sgj11:

---

[2]  Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the HMIT Settlement Order.

4905-5299-6446

*vol. 2*

*000637*

*000727*

*000745*

*000773*

| Date | Docket | Description |
|------|--------|-------------|
| 11/18/2020 | 1426 | *Transcript regarding Hearing Held 11/17/2020 (90 pages)* RE: Motion for Temporary Allowance of Claim (#1281). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/16/2021. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 1422 Hearing held on 11/17/2020. (RE: related document(s) 1281 Motion for leave - Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 filed by Creditor Patrick Daugherty) (Appearances: T. Uebler, J. Christensen, and J. Kathman for P. Daugherty; J. Morris and J. Pomeranz for Debtor; M. Clemente for UCC. Evidentiary hearing. Claim estimated for voting purposes at $9,134,019 for reasons stated on the record. Counsel to upload order.)). Transcript to be made available to the public on 02/16/2021. (Rehling, Kathy) |
| 05/19/2025 | 4216 | *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (Attachments: # 1 Exhibit A--Proposed Order) |
| 05/19/2025 | 4217 | *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 05/20/2025 | 4218 | *Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust* (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |

4905-5299-6446

Case 3:25-cv-01876-K   Document 35-2   Filed 08/12/25   Page 4 of 174   PageID 6777
Case 19-34054-sgj11   Doc 4360   Filed 08/12/25   Entered 06/25/25 17:12:18   Page 3 of 6
Main Document        Page 4 of 9

VOL 2

000779

008785

| Date | Docket | Description |
|------|--------|-------------|
| 05/22/2025 | 4221 | *Amended Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust* (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |
| 06/09/2025 | 4229 | *Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust)* (filed by Creditor Patrick Daugherty. (Attachments: # 1 Proposed Order) (York, Andrew) |

| Date | Docket | Description |
|---|---|---|
| 06/20/2025 | 4255 | *Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53 # 54 Exhibit 54 # 55 Exhibit 55 # 56 Exhibit 56 # 57 Exhibit 57 # 58 Exhibit 58 # 59 Exhibit 59 # 60 Exhibit 60 # 61 Exhibit 61 # 62 Exhibit 62 # 63 Exhibit 63 # 64 Exhibit 64 # 65 Exhibit 65 # 66 Exhibit 66 # 67 Exhibit 67 # 68 Exhibit 68 # 69 Exhibit 69 # 70 Exhibit 70 # 71 Exhibit 71 # 72 Exhibit 72 # 73 Exhibit 73 # 74 Exhibit 74 # 75 Exhibit 75 # 76 Exhibit 76 # 77 Exhibit 77 # 78 Exhibit 78 # 79 Exhibit 79 # 80 Exhibit 80 # 81 Exhibit 81 # 82 Exhibit 82 # 83 Exhibit 83 # 84 Exhibit 84 # 85 Exhibit 85 # 86 Exhibit 86 # 87 Exhibit 87 # 88 Exhibit 88 # 89 Exhibit 89 # 90 Exhibit 90 # 91 Exhibit 91 # 92 Exhibit 92 # 93 Exhibit 93 # 94 Exhibit 94 # 95 Exhibit 95 # 96 Exhibit 96 # 97 Exhibit 97 # 98 Exhibit 98 # 99 Exhibit 99 # 100 Exhibit 100 # 101 Exhibit 101 # 102 Exhibit 102 # 103 Exhibit 103 # 104 Exhibit 104 # 105 Exhibit 105 # 106 Exhibit 106 # 107 Exhibit 107 # 108 Exhibit 108 # 109 Exhibit 109 # 110 Exhibit 110 # 111 Exhibit 111 # 112 Exhibit 112 # 113 Exhibit 113 # 114 Exhibit 114 # 115 Exhibit 115 # 116 Exhibit 116 # 117 Exhibit 117 # 118 Exhibit 118 # 119 Exhibit 119 # 120 Exhibit 120 # 121 Exhibit 121 # 122 Exhibit 122 # 123 Exhibit 123) (Annable, Zachery) |
| 06/20/2025 | 4256 | *Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |

5

| Date | Docket | Description |
|---|---|---|
| *Vol. 14* 06/23/2025 *0003461* | 4266 | *Witness and Exhibit List of Patrick Daugherty filed by Creditor Patrick Daugherty* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 List of 20 Largest Creditors 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 List of 20 Largest Creditors 34 # 35 Exhibit 35 # 36 List of 20 Largest Creditors 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42) (York, Andrew) |
| *Vol. 15* 06/23/2025 *0004643* | 4275 | *Omnibus Reply to (related document(s): 4229 Objection filed by Creditor Patrick Daugherty, 4230 Objection filed by Partner Dugaboy Investment Trust, 4231 Objection filed by Interested Party The Dallas Foundation, Interested Party Crown Global Life Insurance, Ltd) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery)* |
| 06/23/2025 *0004654* | 4276 | *Joinder by to Reply in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith filed by Creditor Hunter Mountain Investment Trust* (RE: related document(s) 4275 Reply). (Phillips, Louis) |
| 06/24/2025 *0004656* | 4277 | *Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4255 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 124 # 2 Exhibit 125) (Annable, Zachery) |
| *Vol. 16* 06/24/2025 *0004873* | 4280 | *Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 126) (Annable, Zachery) |
| 06/25/2025 *0004898* | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). |

4905-5299-6446

*vol. 16*

*004899*

*vol. 17*
*005165*

*005166*

*005181*

*005183*

| Date | Docket | Description |
|---|---|---|
| 06/30/2025 | 4296 | *Transcript regarding Hearing Held 06/25/2025 before Judge Stacy G.C. Jernigan (266 pages) RE: Motion for an Order Further Extending Duration of Trusts (4213); Motion for Entry of an Order Approving Settlement with HMIT Entities (4216).* THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 09/29/2025. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 4294 Hearing held on 6/25/2025. (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Appearances: J. Morris and Pachulski team for Reorganized Debtor; R. Loigman for Post-Confirmation Trusts; D. Deitsch-Perez for Dugaboy; L. Young for UST. Evidentiary hearing. Motion granted. Counsel to upload order.), 4295 Hearing held on 6/25/2025. (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Appearances: J. Morris and Pachulski team for Reorganized Debtor; R. Loigman for Post-Confirmation Trusts; L. Phillips for HMIT Entities; M. Lang for Dugaboy; D. Curry for Dallas Foundation; L. Young for UST. Evidentiary hearing. Motion granted. Counsel to upload order.)). Transcript to be made available to the public on 09/29/2025. (Rehling, Kathy) |
| 07/16/2025 | 4317 | *Clerk's correspondence requesting to amend notice of appeal from creditor.* (RE: related document(s) 4297 Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document 4216) Entered on 6/30/2025. (Okafor, M.)) Responses due by 7/18/2025. (Whitaker, Sheniqua) |
| 07/22/2025 | 4336 | *Certificate of mailing regarding appeal* (RE: related document(s) 4327 Amended notice of appeal filed by Creditor Patrick Daugherty Related document(s) 4310 Notice of appeal filed by Creditor Patrick Daugherty. MODIFIED linkage on 7/17/2025 (suw).) (Attachments: # 1 Service List) (Whitaker, Sheniqua) |
| 07/22/2025 | 4337 | *Notice regarding the record for a bankruptcy appeal to the U.S. District Court.* (RE: related document(s) 4327 Amended Notice of appeal . Fee Amount $298 filed by Creditor Patrick Daugherty (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Attachments: # 1 Exhibit A)) (Whitaker, Sheniqua) |
| 07/22/2025 | 4343 | *Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01901-S.* (RE: related document(s) 4327 Amended notice of appeal filed by Creditor Patrick Daugherty Related document(s) 4310 Notice of appeal filed by Creditor Patrick Daugherty. (RE: related document(s)4297 Order on motion to compromise controversy).) (Almaraz, Jeanette) |

7

**Reservation of Rights**

Daugherty expressly reserves the right to amend or supplement this Designation and/or to object, or otherwise supplement or move to strike or modify, some or all of any designations filed by any other party to this appeal. This filing is made expressly subject to, and without waiver, of any and all rights, remedies, challenges and objections.

Respectfully submitted this 14th day of August 2025.

**GRAY REED**

By:  */s/ Andrew K. York*
      Jason S. Brookner
      Texas Bar No. 240033684
      Andrew K. York
      Texas Bar No. 24051554
      Joshua D. Smeltzer
      Texas Bar No. 24113859
      Drake M. Rayshell
      Texas Bar No. 24118507

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 954-4135
Facsimile:    (214) 953-1332
Email:       jbrookner@grayreed.com
              dyork@grayreed.com
              jsmeltzer@grayreed.com
              drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing instrument was served on all Parties or counsel of record herein on this 14th day of August 2025, via the CM/ECF system and/or email.

*/s/ Andrew K. York*
ANDREW K. YORK

9

4905-5299-6446

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

                               )    Case No. 19-34054-sgj-11
In Re:                         )    Chapter 11
                               )
HIGHLAND CAPITAL               )    Dallas, Texas
MANAGEMENT, L.P.,              )    Tuesday, November 17, 2020
                               )    1:30 p.m. Docket
          Debtor.              )
                               )    PATRICK DAUGHERTY'S MOTION
                               )    FOR TEMPORARY ALLOWANCE OF
                               )    CLAIM FOR VOTING PURPOSES
                               )    [1281]
_____ )

                      TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                   UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:            John A. Morris
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           780 Third Avenue, 34th Floor
                           New York, NY  10017-2024
                           (212) 561-7700

For the Debtor:            Jeffrey N. Pomerantz
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd.,
                            13th Floor
                           Los Angeles, CA  90067-4003
                           (310) 277-6910

For Patrick Daugherty:     Jason Patrick Kathman
                           PRONSKE & KATHMAN, P.C.
                           2701 Dallas Parkway, Suite 590
                           Plano, TX  75093
                           (214) 658-6500

For Patrick Daugherty:     Thomas A. Uebler
                           Joseph L. Christensen
                           MCCOLLOM D'EMILIO SMITH UEBLER,
                            LLC
                           Little Falls Centre Two
                           2751 Centerville Road, Suite 401
                           Wilmington, Delaware 19808
                           (302) 468-5960
```

2

```
 1
 2    For the Official Committee   Matthew A. Clemente
      of Unsecured Creditors:      SIDLEY AUSTIN, LLP
 3                                 One South Dearborn
                                   Chicago, IL  60603
 4                                 (312) 853-7539

 5    Recorded by:                 Michael F. Edmond, Sr.
                                   UNITED STATES BANKRUPTCY COURT
 6                                 1100 Commerce Street, 12th Floor
                                   Dallas, TX  75242
 7                                 (214) 753-2062

 8    Transcribed by:              Kathy Rehling
                                   311 Paradise Cove
 9                                 Shady Shores, TX  76208
                                   (972) 786-3063
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

000638

1          DALLAS, TEXAS - NOVEMBER 17, 2020 - 1:38 P.M.

2          THE CLERK:  All rise.  The United States Bankruptcy

3     Court for the Northern District of Texas, Dallas Division, is

4     now in session, the Honorable Stacey Jernigan presiding.

5          THE COURT:  Good afternoon.  Please be seated.  We

6     have a setting we'll start now in Highland, Case No. 19-34054.

7     We have a motion of Patrick Daugherty to have his claim

8     allowed for voting purposes under Bankruptcy Rule 3018.  For

9     Mr. Daugherty, who do we have appearing?  Do we have Mr.

10    Kathman and crew?

11         MR. KATHMAN:  Good afternoon, Your Honor.  Jason

12    Kathman on behalf of Mr. Daugherty.  I'm also joined today by

13    my co-counsel in Delaware, Tom Uebler and Joe Christensen with

14    the firm McCollum D'Emilio Smith & Uebler, LLC.  They've been

15    admitted *pro hac vice* in this case and they're going to be

16    handling the case this morning for our side, Your Honor.  We

17    also have on the phone and in the WebEx today Mr. Daugherty as

18    well.

19         THE COURT:  All right.  Very good.  I see Mr. Morris

20    up there.  Are you going to be taking the lead for the Debtor

21    this afternoon?

22         THE CLERK:  He's on mute.

23         THE COURT:  You're on mute, sir.

24         MR. MORRIS:  Thank you very much.  Yes, I -- yes, I

25    will, Your Honor.  It's John Morris from Pachulski Stang Ziehl

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 09/22/25   Page 14 of 90   Page 14 of 174   PageID 6786

4

1    & Jones for the Debtor.

2        With the agreement of all of the parties, before we begin

3    my partner Mr. Pomerantz would like to just briefly update the

4    Court on certain plan issues, and then we'd like to proceed to

5    the matter on the schedule.

6        THE COURT:  All right.  That is fine.  So, we'll --

7    first off, I'm just going to note we have a lot of other

8    participants showing on the video screen.  I'm not going to

9    take other appearances.  I assume they're just interested

10   observers today.  The only pleadings on the contested matter

11   were filed by Daugherty and the Debtor.  But certainly if

12   someone at some point has something to say regarding the case

13   generally, I'm happy to hear anything people want to report.

14        So, with that, Mr. Pomerantz, what would you like to say?

15        MR. POMERANTZ:  So, thank you, Your Honor.  As Mr.

16   Morris mentioned, I thought I would give Your Honor a brief

17   update.  We haven't been here in a couple of weeks, which has

18   seemed like a lifetime, but I wanted to apprise the Court last

19   Friday night the Debtor filed an amended plan and disclosure

20   statement, pursuant to the Court's prior scheduling order.  We

21   also filed the infamous plan supplement, which was discussed

22   in a lot of detail at the last hearing, which contained

23   drafts, advance drafts of the principal plan implementation

24   documents likely to be of interest to the creditors, including

25   the Claimant Trust Agreement, the Liquidating Trust Agreement,

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-1   Filed 09/02/25   Page 15 of 174   PageID 6787
Main Document   Page 15 of 90

5

1   other corporate organizational documents, and a list of

2   retained causes of action under the plan.

3       And I'm pleased to report that over the last couple of

4   weeks the Debtor and the Committee have made substantial

5   progress in addressing the disputed issues that were forefront

6   at the hearing on October 27th.

7       Such progress included a resolution of the structure and

8   consideration relating to the releases to be provided under

9   the plan; the identity of the independent board members and

10  the Liquidating Trustee, or Litigation Trustee, excuse me;

11  substantial agreement on the form of the Claimant Trust

12  Agreement and the Litigation Trust agreement; and the

13  inclusion of a protocol to address how disputed claims will be

14  resolved.

15      While there are a few issues left to be resolved and

16  ironed out between the Debtor and the Committee, (audio gap)

17  can be resolved by Monday.  We believe that as it relates to

18  the Committee's issues next week, the hearing will largely be

19  consensual, and we extend the opportunity to other parties who

20  objected, including UBS, who has already reached out to us

21  with a couple of comments they have, as well as we suggest

22  that Mr. Daugherty and HarbourVest also reach out to us in

23  advance of that hearing so that we can work through as many

24  issues.

25      So, we took Your Honor's comments last week to heart, and

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-1    Filed 09/02/25    Page 16 of 174    PageID 6788
Main Document    Page 25 of 90

6

```
 1   I think the parties have worked cooperatively to streamline to

 2   what I think will be a narrow set of issues, if any, that will

 3   be up for hearing on Monday, Your Honor.

 4         THE COURT:  Okay.  That's very good to hear.  I'll

 5   just check:  Is Committee counsel on the line and do you wish

 6   to respond to that?

 7         MR. CLEMENTE:  Your Honor, it's Matt Clemente at

 8   Sidley.  Can you hear me?

 9         THE COURT:  I can.

10         MR. CLEMENTE:  Oh, hi, yeah, good afternoon, Your

11   Honor.  As Mr. Pomerantz I think has accurately captured of

12   the current state of play, so we took the time that Your Honor

13   wisely gave us and I think we worked very, very hard and I

14   think we have come to conclusion on, you know, a variety of

15   the issues that we had.  Mr. Pomerantz is correct, there's a

16   hearing full of things that we still need to discuss, Your

17   Honor.  But I would expect that either we come to a resolution

18   on those or those are things that, you know, ultimately can be

19   dealt with in connection with plan confirmation itself.  But I

20   agree with Mr. Pomerantz's comments.

21         THE COURT:  Okay.  Very good.  Well, I hope all of

22   you will keep working at it.  You've got almost a week until

23   we're here next Monday.  So, UBS and the others, I really hope

24   you will accept the invitation of Mr. Pomerantz you heard just

25   now to talk to him and see if you can get your issues worked
```

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/02/25   Page 17 of 174   PageID 6789
Main Document   Page 75 of 90

7

1   out.

2       All right.  Well, we did note that you had filed the

3   documents Friday night, and I think I know what my weekend

4   activity is going to be besides, you know, watching my

5   Longhorns:  Reading the Highland disclosure statement and plan

6   supplement.  So, anyway, I look forward to doing that, and I

7   will hope for a somewhat smooth hearing Monday, if not an

8   entirely smooth hearing.

9       All right.  Thank you for that report, Mr. Pomerantz.

10          MR. POMERANTZ:  You're very welcome, Your Honor.

11          THE COURT:  Okay.  Thank you.  All right.  Well,

12   let's turn to the matter at hand, the motion.  You all have

13   blessed me with lots of papers to read and exhibits for today.

14   We have a two-hour time estimate, so I hope you will do your

15   best to stick with that.

16       As far as your presentations today, let me tell you that I

17   really don't need you to spend much time, if any, arguing the

18   law, Bankruptcy Rule 3018(a), the case law construing it.  I'm

19   pretty familiar.  It says such things as the Rule contemplates

20   a summary estimation proceeding, not a full trial on the

21   merits.  The Court has a lot of discretion.  So please don't

22   argue the 20 or 30 cases that are out there that interpret

23   Rule 3018.  I'd really like to focus on the numbers more than

24   anything else.

25       And so as far as opening statements, I'm going to turn to

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/02/25   Page 18 of 174   PageID 6790
Main Document   Page 25 of 90

8

1    -- I don't know if it will be Mr. Uebler or Mr. Christensen --

2    and ask you right off the bat:  Why is the Debtors' suggested

3    compromise of $9,134,019 not a fair resolution, when we all

4    know that you can argue entitlement to every penny in that $40

5    million plus proof of claim ultimately in the adversary

6    proceeding, in the trial on the proof of claim, but for now,

7    it looks like the Debtor has put out a pretty reasonable olive

8    branch?  So let me just put you on the spot and ask you to

9    start there in your opening statement.

10         MR. UEBLER:  Thank you, Your Honor.  This is Tom

11   Uebler on behalf of Patrick Daugherty.

12         While it is a generous offer, it leaves disputed $31 --

13   approximately $31 million with respect to Mr. Daugherty's

14   claims.  The Debtor has agreed to the amount of Mr.

15   Daugherty's 2012 Texas court judgment, plus interest, and the

16   Debtor has also agreed to the unjust enrichment and promissory

17   estoppel damages from the Delaware case in the amount of

18   approximately $5 million.  But what the Debtor refuses to

19   agree to or acknowledge any potential liability for are the

20   three other subparts of Mr. Daugherty's claim.

21         The first of those subparts is what we're calling the

22   Reimbursement Claims, and that includes Mr. Daugherty's claims

23   for contractual indemnification under Highland's partnership

24   agreement.  And it includes fees on fees -- at least that's

25   how we refer to it in Delaware -- which are fees expended by

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/02/25   Page 19 of 174   PageID 6791
Main Document   Page 25 of 90

9

1    Mr. Daugherty in seeking to establish his indemnification

2    rights in Delaware.  And finally, fee shifting, for what we

3    have laid out as a decade pattern of litigation misconduct by

4    Highland against Mr. Daugherty.

5         The Debtor also disputes Mr. Daugherty's claim for the

6    remaining 80.9 percent of the value of HERA, Highland Employee

7    Retention Assets.  That claim is valued at approximately $21.2

8    million.

9         And finally, --

10             THE COURT:  Let me stop you.  Let me stop you there,

11   because that's obviously a big, big, big chunk of the

12   disparity.  Remind me.  Either you lost on that in Delaware,

13   or I'm trying to remember, you abandoned it, you somehow had

14   an adverse ruling in Delaware.  Remind me real quick what that

15   was.

16             MR. UEBLER:  We did.  We had an adverse ruling.  We

17   brought claims in Delaware as part of Mr. Daugherty's original

18   pleading in 2017.  And those were claims for breach of

19   fiduciary duty, aiding and abetting breach of fiduciary duty.

20   Ultimately, Mr. Daugherty was seeking to put back into HERA

21   the millions of dollars that Highland had taken from HERA in

22   2013 and then to dissolve HERA.  And it's Mr. Daugherty's

23   position that he is the 100 percent owner of HERA at this

24   point in time.

25        The Delaware Court of Chancery dismissed that portion of

000645

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 09/12/25   Page 20 of 174   Page 20 of 93   PageID 6792

10

1    Mr. Daugherty's pleading on *laches* grounds, finding that --

2            THE COURT:  Yes.

3            MR. UEBLER:  -- Mr. Daugherty should have filed that

4    claim sooner.  We argued that he was excused from the

5    limitations period because there was an open question in the

6    Texas courts about whether Mr. Daugherty remained a unit

7    holder of HERA up through 2016.  And that's an argument we

8    plan to pursue on appeal.

9        To fully respond to your question, I want to note I read a

10   footnote in the Debtors' opposition that said something like

11   we've had a year to seek leave to file an appeal of that

12   dismissal in Delaware.  But we don't yet have a final

13   appealable judgment in Delaware to appeal.  That dismissal

14   remains an interlocutory order.  As Your Honor probably knows,

15   we were in day three of trial on the claims that did survive

16   the Debtors' motion to dismiss when this proceeding was filed.

17   So we have not had an opportunity to appeal the dismissal of

18   what we're calling the HERA 80 Percent Claim, but Mr.

19   Daugherty intends to exercise those appellate rights in

20   wherever the appropriate venue may be as this proceeds.

21           THE COURT:  All right.  Well, you know, courts always

22   want to be pragmatic, as you know, in situations like this,

23   3018 estimation proceedings.  And my pragmatic view of things

24   is, while, again, we may have a multi-day trial one day where

25   you convince me on this $21 million plus claim, that

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 03/22/25    Page 21 of 174    PageID 6793
Main Document    Page 25 of 90

11

1    notwithstanding the Delaware court's dismissal of it for

2    *laches*, at the end of the day you ought to get this, it seems

3    like a pragmatic place to draw the line here today for

4    purposes of an estimation hearing.  I'm not sure how you could

5    convince me in two hours that this absolutely is likely enough

6    to prevail that you ought to get to vote the claim.

7         Another area, as long as I'm talking about pragmatic ways

8    to resolve this issue today, is the post-petition interest.  I

9    have a feeling that's only a couple of hundred thousand

10    dollars or so.  But nevertheless, it's argued here somewhat

11    extensively that Daugherty ought to get to keep accruing post-

12    judgment interest on the HERA judgment post-petition because,

13    you know, it's not really a judgment against the Debtor, it's

14    a judgment against HERA, and the general 502(b)(2) you can't

15    accrue post-petition interest, unmatured interest, if you're

16    an unsecured creditor, ought not to apply.  I'm just telling

17    you right now, that would be a nonstarter here for me today.

18    Again, I have a feeling that's only a couple of hundred

19    thousand dollars, right?  Maybe it's more than that. It can't

20    be.  Right?

21              MR. UEBLER:  That's --

22              THE COURT:  Okay.

23              MR. UEBLER:  That's correct, Your Honor.

24              THE COURT:  So, --

25              MR. UEBLER:  So I won't, I won't address that any

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 09/22/25   Page 22 of 93   Page 22 of 174   PageID 6794

12

 1   further.

 2            THE COURT:  Okay.  So we can take that one off the

 3   table.

 4       And then the other kind of pragmatic way I view things

 5   today is the attorney fee shifting.  Now, you might be able to

 6   piece this together for me and show me that, contractually,

 7   under the indemnification provision, that there is some

 8   component of attorneys' fees that ought to be allowable, but,

 9   you know, to just generally kind of give a common law bad

10   faith argument here, that I should depart from the *American*

11   Rule -- you know, if there's no contractual entitlement, if

12   there's no statutory entitlement -- that's a heavy lift.

13   Again, you might prevail one day, but for purposes of a

14   summary voting estimation claim context, I just don't see how

15   you get there.

16       So, does that help narrow the issues today?  I had trouble

17   thinking how I'm ever going to get to the $21 million claim in

18   a summary 3018 context, the breakaway from the *American* Rule

19   on attorneys fee shifting, and then the post-petition

20   interest.

21       So if you carve those away, I don't know how close we are

22   to the $9,134,000 that the Debtor has proposed, but I guess

23   we're still a few million away.

24            MR. UEBLER:  We're getting closer, but let me respond

25   to the pragmatic way of dealing with the HERA 80 Percent

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 04/02/25    Page 23 of 174    PageID 6795
Main Document    Page 23 of 90

13

1    Claim, which is $21 million.  We don't view that as at all a

2    nothing amount for purposes of today.  I might not convince

3    you that Mr. Daugherty should be entitled to the entire $21

4    million, and I'm not -- I'm not going to try, because I do

5    recognize that the claim was dismissed and that creates at

6    least a procedural burden for us.

7          So, one result may be to award Mr. Daugherty a portion of

8    that claim.  But let me move on --

9                THE COURT:  Okay.

10                MR. UEBLER:  -- to address the fee issue.  These are

11    -- there are 30 different sources of Mr. Daugherty's rights to

12    fee reimbursement, only one of which is the common law

13    exception to the *American* Rule.  And my thought was to just

14    briefly outline what it is that we're asking for, break down

15    Mr. Daugherty's claim, and then ask Mr. Daugherty to testify

16    very briefly about how he calculated that amount and what out-

17    of-pocket payments he's actually made throughout the course of

18    this litigation, to give the Court an opportunity to see which

19    of the different buckets the fees may fall into and how you

20    may be able to resolve some or all of those amounts.

21                THE COURT:  All right.

22                MR. UEBLER:  So, the claim for indemnification and

23    fee shifting, as I said, it has -- it has three components.

24    The first, which we focused on in our reply, is the bad-faith

25    fee shifting.

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 03/12/25   Page 24 of 174   PageID 6796
Main Document   Page 24 of 90

14

1          Now, in Mr. Morris's presentation that I expect him to

2     show today, he'll refer to this as a new argument that wasn't

3     in our Delaware complaint and was not in the proof of claim

4     submitted by Mr. Daugherty.  That's just not the case.  This

5     was an issue that was presented to the Delaware court in

6     August 2019, before trial.  We laid out why Mr. Daugherty

7     should be entitled to fee shifting.  And that's an issue that

8     would have been addressed post-trial but for this bankruptcy.

9     And that's based on the series of events that we laid out in

10    detail -- probably too much detail for these purposes -- in

11    our papers about shifting positions in litigation; attempts to

12    put Mr. Daugherty in jail, which thankfully the Texas

13    appellate court put a stop to; preventing Mr. Daugherty from

14    collecting compensation that's rightfully his.  All of that

15    has cost Mr. Daugherty millions of dollars over the last ten

16    years, and he hasn't recovered a dime.

17         So, the three legal doctrines are the bad-faith exception

18    to the *American* Rule.

19         The second is contractual indemnification under Highland

20    Capital's partnership agreement.  This is a claim that was

21    fully briefed on cross-motions for summary judgment in

22    Delaware, and it was argued to the Delaware Vice Chancellor

23    and submitted for a decision.  The source of Mr. Daugherty's

24    indemnification claim is Section 4.1(h) of Highland's

25    partnership agreement, and that's Exhibit 39 in the papers we

000650

1    submitted.  I'll just read briefly what that provision is.

2        It states that a partnership -- that is, Highland Capital

3    -- shall indemnify and hold harmless the general partner --

4    which is a company called Strand -- and any director, officer,

5    employee, agent, or representative of the general partner --

6    again, Strand -- against all liabilities, losses, and damages

7    incurred by any of them by reason of any act performed or

8    omitted to be performed in the name of or on behalf of the

9    partnership -- which is Highland -- or in connection with the

10   partnership's business -- which is Highland's business --

11   including, without limitation, attorney's fees and any amounts

12   expanded in the settlement of any claims or liabilities,

13   losses, or damages, to the fullest extent permitted by

14   Delaware law.

15       Now, it was undisputed through summary judgment in the

16   Delaware case and going I would say close to three years of

17   litigation that Mr. Daugherty was a covered party under that

18   provision.  In other words, he was an officer, agent,

19   representative of Strand who could be entitled to

20   indemnification.

21       Highland admitted in every version of its answer in the

22   Delaware case that Mr. Daugherty was, in fact, an officer or

23   an agent of Strand through his resignation from Highland in

24   2011.  But in this Court now, we have Highland claiming that

25   Mr. Daugherty ceased being an officer of Strand in 2009.

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 08/22/25    Page 26 of 174    PageID 6798
Main Document    Page 26 of 90

16

1          And, in fact, just a few hours ago I received a few

2     documents from Mr. Morris showing that Mr. Daugherty was not

3     listed as an officer of Strand after 2009.  I'm still

4     processing in my own mind why I'm just receiving these

5     documents now, after three years of litigation, why Highland

6     made previous judicial admissions to the contrary, and why we

7     made it through summary judgment without this issue being

8     raised.

9          But ultimately, it doesn't matter, because Mr. Daugherty

10    will prove, consistent with Highland's prior admissions in the

11    Delaware court, that he is a covered person under this

12    indemnification clause, because, at a minimum, he was an agent

13    and representative of Strand through 2011.

14         And he'll also prove that all of the Texas litigation and

15    what has happened since the Texas litigation began in 2012

16    really stems from what Mr. Daugherty did or did not do related

17    to Highland's business.  So the nexus requirement under the

18    indemnification agreement is satisfied.

19         Again, this is an issue that was fully submitted to the

20    Delaware court, but no decision was issued.

21         The third component of our reimbursement claim is fees on

22    fees and the idea that, to the extent Mr. Daugherty is

23    successful in establishing his contractual indemnification

24    rights, he is also entitled to reimbursement for the cost of

25    proving his entitlement to indemnification.

000652

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/12/25   Page 27 of 174   PageID 6799
Main Document   Page 27 of 90

17

1        Now, if you put all of these three buckets together,

2    you're left with $7.8 million.  That's not an insignificant

3    amount, and it's -- it's more than the $9 million that

4    Highland has offered.  And if any line is going to be drawn

5    today, we submit that that line should be drawn to include

6    this $7.8 million for -- based on the law that we've provided

7    in our papers and based on the facts that we have demonstrated

8    and the exhibits and Mr. Daugherty's declarations and the

9    brief testimony you'll hear today about the litigation that

10   Mr. Daugherty defended and what he's had to deal with for the

11   last ten years.

12       I'm going to stop there.  Do you have any questions at

13   this time about the fee reimbursement portion of the claim,

14   which is $7.8 million?

15           THE COURT:  No questions on that.

16           MR. UEBLER:  Okay.  The one aspect of Mr. Daugherty's

17   claim that we did not have an opportunity to talk about yet is

18   what we're calling the 2008 Tax Refund Claim.  And that's --

19   that's an amount of $2.6 million in Mr. Daugherty's proof of

20   claim, and that amount should be allowed in full for voting

21   purposes.

22       Now, I'm going to let Mr. Daugherty explain the factual

23   background of this claim, but the short version is that Mr.

24   Daugherty received compensation in 2008 from Highland Capital,

25   and he received that compensation as an employee and in the

000653

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 02/25/25   Page 28 of 174   PageID 6800

18

1   form of a tax refund.  The IRS is still in the process of

2   auditing Highland's tax treatment for 2008, so there's a

3   possibility that in the future the IRS will claw back Mr.

4   Daugherty's 2008 compensation that was approximately $1.4

5   million.  And with that would come interest and penalties that

6   we estimate could total $2.6 million.

7       So, yes, it's correct that as of today there is no

8   definite liability to the IRS.  This is a contingent liability

9   and we don't know what the total amount may be.

10      Now, if Highland hadn't come out and said in its adversary

11  complaint that it's basically refusing to acknowledge any

12  potential liability for this issue, we might not have a

13  current claim to put before Your Honor today.  But the fact

14  that Highland has already come out and said it has no

15  intention of either covering future tax liability or giving

16  Mr. Daugherty substitute employee compensation for 2008 in the

17  event that the IRS were to take that away, we think presents a

18  live claim that Mr. Daugherty has sought to preserve through

19  this proceeding.

20      He's not seeking a cash payment, ultimately.  All he's

21  looking for is some agreement by Highland to assume this

22  liability or to put the money in escrow in the event of a

23  clawback.  But for voting purposes, we're asking that the full

24  potential of $2.6 million for this claim be permitted.

25      And, you know, you asked earlier about why $9 million

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 07/22/25   Page 25 of 90   Page 29 of 174   PageID 6801

19

1   isn't enough.  It's a matter of degree.  Mr. Daugherty is a

2   creditor and he is entitled to a say in the plan, and that's

3   what we're trying to establish today.  And we think it's

4   important that Mr. Daugherty have a voice, and that voice

5   carry some weight, to enable Mr. Daugherty to have a seat at

6   the table, have a voice in the plan.

7        I think the more that this Court would be willing to

8   permit at this summary stage of the proceedings, where there's

9   a presumption in favor of claims, even if they're disputed --

10  I think that will be my only reference to 3018 law today -- we

11  submit the Court should err on the side of more rather than

12  less.

13       Mr. Morris and I had discussed doing mutual openings

14  followed by Mr. Daugherty's testimony.  I think now would be a

15  good time to turn this over to Mr. Morris before we call Mr.

16  Daugherty, if that works for you.

17            THE COURT:  All right.  That works for me.  Mr.

18  Morris?

19            MR. MORRIS:  Good afternoon, Your Honor.  John

20  Morris; Pachulski Stand Ziehl & Jones, for the Debtor.

21       I really do appreciate Your Honor's preliminary

22  projections of where we are.  I had prepared a rather

23  extensive presentation for the Court that I'm actually going

24  to dispense with because I'd like to focus on the narrow

25  issues that Your Honor has identified.

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 10/22/25   Page 226 of 90   Page 30 of 174   PageID 6802

20

1   I want to begin by apologizing to the Court for having to

2   engage in this process.  We have tried very hard, I think as

3   Your Honor has perceived, to fully resolve this particular

4   motion.  At the outset of the process, the Debtor readily

5   acknowledged the validity of Mr. Daugherty's judgment in the

6   amount of $2.6 million, plus interest, through $3.7 million.

7   That's not an amount in dispute today.  That won't be in

8   dispute as a matter of his claim.  We have admitted it, we

9   acknowledge it, and it will be allowed in that amount.

10   We went one step further in the hope that it would resolve

11   this motion by agreeing to allow the maximum amount that Mr.

12   Daugherty's expert was prepared to testify to on the petition

13   date for these promissory estoppel and other related claims.

14   The expert at that time testified to a range of somewhere of

15   four to about $4-1/2, $5-1/2 million, and that's how we

16   arrived at the $9.1 million.

17   Let me make it clear, Your Honor, that if the parties are

18   unable to resolve this, the Debtor will contest that.  But for

19   this purpose, we felt by giving it one hundred percent

20   validity, notwithstanding the fact that we will contest it on

21   the merits if needed, that that was a fair resolution, that

22   that was a very simple way to get this done.  Unfortunately,

23   we were not successful.

24   We're here today not because we like to litigate but

25   because we're doing our best for these estates and its

000656

1    stakeholders, including all unsecured creditors.  Mr.

2    Daugherty is entitled to a seat at the table.  We have given

3    him a seat at the table.  He now sits with the third largest

4    general unsecured claim that is going to be allowed, and that

5    follows from the settlements with the Crusader and Redeemer

6    Funds and with Acis.  At $3.7 million, he's already got the

7    third largest allowed claim.  And we're prepared to give him a

8    vote of over $9 million for this purpose.  But what we don't

9    do and we don't think our fiduciary duty will allow us to do

10   is give him credit for claims that, in our view, clearly have

11   no merit.

12       So let me just go through them very quickly.  The first is

13   a claim for over $20 million arising from the assertion that

14   somehow he is now entitled to one hundred percent of the HERA

15   assets.  Mr. Daugherty -- I don't know Mr. Daugherty.  I have

16   no animosity against Mr. Daugherty.  One of the things that I

17   and my colleagues and the board have dealt with throughout

18   this case is that there's so much baggage here, Your Honor.

19   And it's -- this has been our burden, this has been our

20   challenge, is to cut through this and try to get to the

21   merits.  What's really fair and what's really reasonable?  And

22   it's what we try to do in our settlement negotiations and it's

23   the only reason we're here today, because we thought we made a

24   generous offer.

25       And Mr. Daugherty is well within his rights to say, Not

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 03/22/25   Page 32 of 174   PageID 6804

22

 1   good enough.  But we think, we think we've offered enough.

 2   When we think of his claim to a hundred percent of the HERA

 3   assets, he will testify, I assume, that when he left he had

 4   19.1 percent.  He never thought he had more than 19.1 percent.

 5   Nobody ever promised him any more than 19.1 percent.  His

 6   expert in Delaware was prepared to testify on damages based on

 7   19.1 percent.  He actually pursued these claims, Your Honor,

 8   not just in Delaware, he actually started in Texas.  He knew

 9   about this in 2013, right when it happened.  It was part of

10   his Texas action, and it was rejected.  And you heard -- and

11   we heard Mr. Uebler allude to it, right?  So then he goes to

12   -- he goes to Delaware and he tries to bring them again, maybe

13   three years later, in 2017.  These are undisputed facts, Your

14   Honor.  And they get dismissed.

15       Now, the interesting thing is, if you look at our Exhibit

16   T, it's the Delaware -- I think it's V, actually.  It's the

17   Delaware court's order dismissing the claims.  It didn't give

18   a reason.  But if you go back to Highland's brief, you'll see

19   there's a multitude of reasons.

20       And when they use the phrase *laches*, Your Honor, it

21   doesn't mean that Mr. Daugherty was found to have sat on his

22   hands.  The Delaware Chancery Court is a court of equity, and

23   so they use equitable principles.  What really happened is

24   that the Delaware court found that the claim was barred by the

25   statute of limitations because the cause of action arose in

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 09/22/25   Page 23 of 90   Page 33 of 174   PageID 6805

23

1    2013, Mr. Daugherty knew that, and he didn't bring his action

2    until 2017, more than, you know, more than the three-year

3    statute of limitations.

4        But you'll see in the Debtors' brief, which we've cited,

5    that Highland actually asserted a multitude of reasons why

6    this claim should be barred.  And we don't know exactly why

7    the Chancery Court did it, but he's going to have to deal not

8    just with *laches* -- which is the word, the phrase that's used

9    for statute of limitations -- he's going to have to deal with

10   promissory estoppel.  He's going to have to -- not promissory

11   estoppel; just estoppel generally.  Res judicata.  It's all in

12   there.  There is no chance he's going to succeed on this claim

13   on appeal.  And it's $21 million, and he shouldn't be given

14   the right to vote any portion of it.  That's number one.

15       Number two, with respect to the tax claim, what's really

16   interesting here, Your Honor, is that there is no claim that

17   Highland has breached any duty today.  There's no claim that

18   he's breached a contract -- that Highland has breached a

19   contract.  There's no claim that Highland has committed any

20   tort.

21       What happened was, back in 2008, Mr. Daugherty, according

22   to him, was promised $1.475 million as compensation.  There

23   was an agreement.  That compensation was delivered to him not

24   in cash but in the form of an allocation of losses from the

25   Highland partnership.  Mr. Daugherty was a limited partner.

000659

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 03/12/25    Page 34 of 174    PageID 6806
Main Document    Page 24 of 90

24

1   He got over $4 million in losses.  Those losses were recorded

2   on a K-1 that's going to be admitted into evidence.  And Mr.

3   Daugherty took those losses and shielded his income and his

4   gains in other places in his life, I don't know.  But the

5   benefit of that was $1.475 million.

6        Mr. Daugherty never says that Highland breached its

7   agreement.  He never says that Highland failed to perform.  He

8   never says that Highland did anything wrong.  All that's

9   happened here, Your Honor, is that the IRS is conducting an

10  audit of Highland's 2008 taxes, including these losses.  Okay?

11  So, as we sit here today, Highland owes zero.  There is no

12  basis to give him any claim for voting purposes.  There's

13  just, there's no reason.  It may be -- later that he should be

14  getting.  And what I would find to be very reasonable is that

15  we are here on the merits and he asked the Court to establish

16  a reserve.  I think it's almost what Mr. Uebler asked for,

17  that you establish some type of reserve for a contingent

18  claim.  You know, that would make sense.  But that's not why

19  we're here today.  We're here to say whether or not he's

20  allowed to vote this claim, a claim where Highland today

21  admittedly owes nothing.

22       So, you know, I think that that dispenses with the tax

23  issue.

24       The last one is this claim for attorneys' fees.  I will

25  tell you, Your Honor, I didn't have a good weekend myself this

000660

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2   Filed 09/22/25   Page 35 of 174    PageID 6807
Main Document   Page 25 of 90

25

1   past weekend because I had to flip through 2,600 pages of Mr.

2   Daugherty's appendix.  I don't have the experience here on

3   (garbled), but I waded all through that stuff.  And Mr. Uebler

4   and I have a very cordial relationship, which I'm grateful

5   for, and we were talking on Friday, and he said, Why do you

6   guys say that he resigned from Strand in 2009?  And I said, I

7   don't know where I picked it up, but that's what I put in

8   here.  And he said, But that's not right.  And I asked him, I

9   said, If you have a letter of resignation, you have something,

10  give it to me.  And he didn't give me anything.

11      But last night -- and this is why it came up at the last

12  minute.  This is why it came up at the last minute.  Last

13  night, they filed a declaration from someone named Mr. Covlin

14  or Colvin, who I hadn't heard of but who apparently was the

15  Highland general counsel back when Mr. Daugherty was at

16  Highland.  And you'll see in Paragraph 5 of his declaration he

17  says, I don't have a memory of Mr. Daugherty resigning from

18  the Strand board before he left in 2011.  And I said to

19  myself, I don't -- I don't understand why people can't --

20  there's got to be a letter of resignation, there's got to be

21  something to prove the fact.

22      And so I called Highland this morning and I said, When did

23  he resign?  Do we have anything?  I said, I want anything you

24  can find.  And we're going to put into evidence, Your Honor,

25  two different exhibits, one of which, ironically, is a

000661

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 03/22/25    Page 36 of 174    PageID 6808

26

1    Secretary's Certificate that was signed by Mr. Colvin.  And it

2    was signed in early 2009, where he certifies to the Strand

3    board resolutions, which set forth the officers of the

4    company, and Mr. Daugherty is not on it.

5        The second document, Your Honor, is even more significant.

6    It is a periodic statement of the officers of Strand that are

7    listed by individual with their title and each person signs

8    it.  And what the evidence is going to show is that Mr.

9    Daugherty signed his statement as either Secretary or

10   Assistant Secretary every single time from 2006 until about

11   March of 2009.  And then in the mid-2009 document, consistent

12   with Mr. Colvin's certificate, Secretary's Certificate, he's

13   no longer there, but Mr. Colvin was still signing all of his

14   papers without Mr. Daugherty.

15       So I don't really know the record of Delaware.  I'm doing

16   the best I can, Your Honor.  But I don't think that there's

17   going to be any dispute at the end of all of this that Mr.

18   Daugherty ceased to be a director or an officer of Strand

19   sometime between March and May 2009.

20       Why is that significant?  Because that is what he hangs

21   his hat on in order to establish his claim for

22   indemnification.  We don't think there is any claim because he

23   was no longer an officer of Strand after early 2009.

24       Even if he was, Your Honor, everything that he's seeking

25   indemnification for now arose after he left in 2011.  He's

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 08/22/25   Page 225 of 90   Page 37 of 174   PageID 6809

27

1  trying to use the indemnification provision in order to

2  recover his attorneys' fees, attorneys' fees that were

3  recovered [sic] after 2011, that were incurred solely for his

4  own personal benefit.

5      It's not as if he brought a claim derivatively on behalf

6  of Highland.  Instead, he pursued litigation where he would

7  recover damages, where he was the plaintiff.  In fact,

8  Highland was a defendant, is a defendant in a lot of this

9  litigation.  I don't understand how anyone can fairly read an

10  indemnification agreement that requires the indemnitee to act

11  on behalf of the indemnitor, and that somehow suing an

12  indemnitor is consistent with the concept of indemnification.

13  It just, it doesn't make sense.  He wasn't there.  The fees

14  accrued after the fact.  There's just, there's no basis for

15  it.

16      And fees on fees, that other concept that they're building

17  upon, is fees on top of fees to pursue indemnity.  So if the

18  indemnity doesn't work, fees on fees don't work either, Your

19  Honor.

20      And I'll just very briefly, the fee shifting thing, I

21  heard Your Honor's point.  But, again, I bear no ill will

22  toward Mr. Daugherty, but a fair reading of the record says

23  that nobody comes to this, none of those parties come here

24  with unclean hands.  Mr. Daugherty was found to have breached

25  his fiduciary duty.  The only judgments that have been

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2 Filed 09/22/25    Page 38 of 174    PageID 6810

28

1    rendered by any court so far have him paying Highland 2.8 and

2    Highland paying him 2.6.  He complains that so many of

3    Highland's causes of actions were dismissed.  We could do a

4    scorecard if you think it's necessary showing that Daugherty's

5    claims and causes of action were dismissed.

6        I heard Mr. Uebler talk about, you know, the appellate

7    court reversing the criminal issue.  But you know what, Your

8    Honor?  The trial court actually agreed with Highland there.

9        So, again, fee shifting is an extreme remedy, the absolute

10   extreme remedy in the United States.  And, again, not to cast

11   aspersions against Mr. Daugherty, but nobody comes here with

12   unclean hands.  There's no basis to do it in this particular

13   case.

14       So we think $9.1 million was very fair, Your Honor.  We

15   think the undisputed facts are going to show that the balance

16   of these claims are without merit at the merit hearing, but

17   certainly for this purpose, Your Honor.  He doesn't -- he

18   doesn't come close to the -- even the low bar that's needed

19   for voting purposes.

20       Thank you, Your Honor.

21           THE COURT:  All right.  Thank you.  Mr. Uebler, you

22   can call your witness.

23           MR. UEBLER:  Thank you, Your Honor.  Mr. Daugherty,

24   are you available?

25           MR. DAUGHERTY:  Yes.  I am here.

000664

1          THE COURT:  All right.  Mr. Daugherty, I'm going to

2   swear you in.

3   PATRICK DAUGHERTY, CREDITOR PATRICK DAUGHERTY'S WITNESS, SWORN

4          THE COURT:  Thank you.  You may proceed.

5       (Note:  Witness muffled throughout testimony.)

6                     DIRECT EXAMINATION

7   BY MR. UEBLER:

8   Q   Good afternoon, Mr. Daugherty.

9   A   Good afternoon.

10  Q   I'd like to begin by asking you a few questions about what

11  we call the fee reimbursement portion of your claim.  Would

12  you explain to the Court what out-of-pocket payments are

13  included as components of that claim?

14  A   As far as category or number?

15  Q   What's -- however you'd like to address it.  Maybe

16  categories and then number.

17  A   Sure.  There's (inaudible) I'm pursuing for the costs

18  incurred pursuant to executing my release under Strand.  And

19  just to be clear, Strand reimburses not just for officers and

20  executives, but also for representatives in any case, which is

21  consistent with what Highland said in Delaware on multiple

22  occasions.

23      Then there are fees on fees, which is, under Delaware law

24  as I understand it, I'm entitled to the fees that I had to

25  incur in order to gain -- in order to get Highland to make

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 03/25   Page 235 of 90   Page 40 of 174   PageID 6812

Daugherty - Direct                          30

1   good on its promise in that original partnership agreement

2   with Strand and Highland.

3       And then, let's see, indemnification, fees on fees.  And

4   then there's my claim for the fee-shifting.  And I certainly

5   understand the concept of the *American* Rule and the judge's

6   point, and (inaudible), but what you have to remember here is

7   there was a crime fraud finding in Delaware which caused

8   Highland to lose its attorney-client privilege where we

9   discovered that its in-house counsel -- Scott Ellington, Isaac

10  Leventon, Thomas Surgent -- working with outside counsel,

11  basically provided prima facie evidence of a fraud.  So this

12  moves far beyond just, you know, two parties going at it.

13  This has been, again, that Highland sued based on, frankly,

14  lying to that very same judge in Dallas County Court that Mr.

15  Morris referred to.  And not only the judge, the jury, where

16  we have (inaudible) law from the various outside firms

17  summarizing what these people -- you know, again, I generally

18  refer to them as the cabal.  But this just goes far beyond two

19  parties having a good-faith battle with one another.  This

20  turns into, frankly, fraud.  And I've had -- and by the way,

21  Judge (inaudible) in Delaware Chancery Court, once he made

22  this ruling, said that he sees evidence of fraud going all the

23  way back to December of 2013, when Highland allegedly set up

24  an escrow account on my behalf, and it never happened.  And

25  not only did it not happen, but again, they told Judge Hoffman

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/22/25   Page 41 of 174   PageID 6813
Main Document   Page 25 of 90

Daugherty - Direct                        31

1   down in Texas and they told the jury that it did happen.  And

2   (inaudible) and everyone else on multiple occasions that

3   (inaudible), only to find out in December of 2016, after all

4   appeals -- the appeal process was exhausted, that most of that

5   money was never put into escrow.  Again, they never

6   (inaudible) Dondero (inaudible).  And (inaudible), his

7   counsel.  But that what any of those assets were there would

8   have been shifting -- and when I say they, I mean Scott

9   Ellington and Isaac Leventon -- while they (inaudible) my

10  house in Dallas, while they were claiming that I had

11  (inaudible) and were seeking turnover in Dallas, while they

12  were terrorizing my family and sending the cops on the house,

13  they had all those assets shifted to themselves, kept quiet

14  about it, and then proceeded to order me to make a $3.1

15  million (inaudible) for their attorneys' fees.

16      I don't think a fraud can get more absolute than that.

17  And so that is, you know, that's my quick summary on the

18  nature of those fees.  And, again, I know this (inaudible),

19  but this is just a little bit different than your, you know,

20  run-of-the-mill situation.

21  Q   Mr. Daugherty, you mentioned indemnification in your

22  answer.  Did Highland or its affiliates assert claims against

23  you in Texas state court based on your conduct as a Highland

24  employee?

25  A   They did.  I mean, I was accused of having (inaudible), of

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2    Main Document    Filed 03/25/25    Page 42 of 92   Page 42 of 174    PageID 6814

Daugherty - Direct                          32

1    committing securities fraud violations, of not executing my

2    duties to investors, when in fact I was doing just the

3    opposite and (inaudible) protecting them from being defrauded.

4    And some of those investors are on the Creditors' Committee

5    today, as the Crusader and Redeemer Committee, is Eric Felton,

6    (inaudible) Montgomery.  Those were the people I was trying to

7    protect from -- and by the way, at the end of the day, I felt

8    like I protected Highland, too, to keep them from doing

9    something stupid that could end us in this -- all of us in the

10   situation where we are today.

11       So I was executing my duties as a portfolio manager.  I

12   was -- and by the way, that carried all the way through to

13   January or February of 2012, after I left, because what Mr.

14   Morris didn't tell you is in Mr. Colvin's affidavit I was

15   enlisted by Highland to come to an exit interview after I had

16   resigned, where they wanted to hear two categories of topics.

17   One, the performance of the individual (inaudible) in the

18   Crusader Fund, because Highland had lied to them (inaudible).

19   They wanted to hear from me what I thought its true value was.

20   One of those investments was Cornerstone, which we're all

21   familiar with.

22       And then the other category of topics that they wanted to

23   discuss with me was (inaudible) leaving Highland.  And that

24   included the timing, (inaudible) efforts.  Money was being

25   thrown at me, or offered to me, I should say, directly from

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2   Main Document   Filed 04/22/25   Page 43 of 174    Page 43 of 90   PageID 6815

Daugherty - Direct                        33

1  Dondero, from Cornerstone, to pay me a (inaudible) in order to

2  seek releases for Highland.

3       So, you add all these things up together, and I was

4  performing my duties as their portfolio manager and as a

5  fiduciary that basically superseded any duty that I had to

6  Highland itself when it came to those clients, which was my

7  fund, Crusader, that I managed and that ultimately the

8  beneficiaries, the investors, led by, as I said, one of their

9  UCC members, Eric Felton, (inaudible) at the time, who now

10 leads the Crusader entity.

11 Q  Mr. Daugherty, with that background about the different

12 bases for your theory (inaudible) claim, could you quantify it

13 for us, how you reached $7.8 million?

14 A   Well, the total fund, for the total 7.8, the answer is

15 yes, I could break it down into individual components if it

16 would be helpful to the judge because I believe the -- I

17 believe the indemnification part of that, which the judge

18 seemed to have issues with, was around 1.5, if I remember

19 correctly.  The rest of it was fees on fees, and defending

20 myself against false accusations from the Debtor, and

21 executing (inaudible) to defend those investors from --

22 (inaudible) that they were getting ripped off by Highland, by

23 Dondero.

24 Q  Are there any other components to your -- the amount

25 that's represented in your fee claim?

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Main Document    Filed 03/24/25    Page 234 of 90    Page 44 of 174    PageID 6816

Daugherty - Direct                          34

1    A    It's fees on fees.  I think we touched on that.  So that's

2    related to the (inaudible).

3    Q    You're -- you're saying that the claim included a

4    reference to IRA penalties and --

5    A    Oh, yeah.  So, you know, when you have to proceed like

6    this, and I know I've been presented as this rich greedy

7    person, but there's a reason why Highland was wanting to get

8    garnishment and wanting to seize my assets with the constable,

9    because I got (inaudible) fighting this.  And Judge Jernigan,

10   I was in your case on another matter and you asked why there's

11   not counsel, it's because I didn't have the money.  And so one

12   of the things I had to do was cash in my IRA, my wife's IRA.

13   Q    What's --

14   A    I had to take a mortgage on my house.  I had -- with

15   interest on that.  And with penalties on the IRA.  I did not

16   (inaudible) -- I did not -- I hate this.  I hate talking about

17   this.  Is that enough?

18   Q    I want to talk briefly about this tax refund claim for

19   2008 and the basis for it.  What -- what is this tax refund

20   that you received in 2008?

21   A    (inaudible).  In 2008, and I put it in a page in my

22   declaration, Highland was in trouble (inaudible) of the

23   crisis, you know, the various -- and we had talked about our

24   credit facility with our banks, led by Bank of America

25   (inaudible), but they were unsecured.  So what that's -- the

000670

Case 19-34054-sgj11  Doc 1426  Filed 11/18/20  Entered 11/18/20 18:56:37  Desc
Case 3:25-cv-01876-K  Document 35-2  Main Document  Filed 03/25/25  Page 45 of 174  Page 45 of 90  PageID 6817

Daugherty - Direct                    35

1    way it's drafted, and they wanted to get secured.  In the

2    process, I was having negotiations, which (inaudible) into

3    2009.  They were concerned that money was being siphoned out

4    of Highland while we were in breach of our credit facility.

5    Initially -- initially, they thought all the partners were

6    taking money out, and after getting their -- after getting

7    their forensic accountants in there from FTI, they discovered

8    that the only people taking money out was Dondero and Okada,

9    under a guise of quote/unquote repaying a loan to themselves.

10        So, in the heat of all that, there were two things that

11   came from that.  One, they shut down all the money going out

12   of Highland and they closed (inaudible).  We had to reduce our

13   headcount by 20 percent.  We also had to reduce our costs, you

14   know, our outgoing costs, as you would expect when you're in

15   this type of situation.

16        Well, the problem was there wasn't enough money to pay the

17   cash element of bonuses that were coming due in February of

18   2009 for the work that we (inaudible), you know, operate for

19   the year 2008.  The way it worked at Highland, and still does

20   apparently, the employees work the full year, and then in

21   February of the following year they get a compensation

22   benefits letter that says, Here's what your bonus is.  Here's

23   what your tax bonus is going to be.  It's going to be paid out

24   in installments, call it February or August, February and

25   August of the subsequent years.  And then there would be some

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 03/23/25   Page 46 of 174   PageID 6818
Main Document   Page 235 of 90

Daugherty - Direct                    36

1    type of deferred compensation and then some type of listing of

2    the value of the (inaudible).  So we got lunch generally every

3    day, we had healthcare costs paid for, we had life insurance.

4    And so we (inaudible) out all these things (inaudible).

5        And I think what you're asking in your question is, Where

6    did the tax refund come in this?  Well, historically, we would

7    -- we would have got a cash bonus in that particular, you

8    know, document that I mentioned.  But (inaudible) pay cash

9    bonuses beyond a *de minimis* amount.  Dondero and, I believe,

10   Mark Patrick in the tax groups and Rick Swadley, and there's

11   another one, Jennifer Blumer, I think, and Michael Collins,

12   they called all of us into the conference room and they said,

13   We're going to pay your cash bonuses, but we're going to have

14   to do it by making this election with the IRS.

15       And, frankly, none of us really understood what it was.

16   It was very convoluted.  But when we got our February 2009

17   award letter, and I think that's an exhibit in here somewhere,

18   it says very clearly -- in my case, anyway -- (inaudible) tax

19   refund, $1.475 million.  And then it says, You're going to get

20   this -- and I'm paraphrasing -- but, You're going to get this

21   amount, but to the extent that you don't get this amount, we

22   will provide you, you know, Highland will provide you

23   substitute compensation.

24       So it was very important that -- to take the place of what

25   had (inaudible) cash bonus, but it was compensation through

Daugherty - Direct                         37

1   and through.  And when you hear Mr. -- Mr. Morris, I'm sorry,

2   go on about me getting $4 million in the loss, well, I did get

3   (inaudible) that had a $4 million loss.  As the IRS

4   interpreted it, they only netted, I guess, accepted it, the --

5   they had the number equivalent at roughly 1.1.

6       But the point in all this is that was the method that

7   Dondero and the tax team had concocted to generate the funds

8   for Highland, its separate obligation, this is a compensation

9   of benefits letter that I got.

10      And we understood the situation that Highland was in and

11  we were willing to live with that.  Where I think things went

12  bad -- and by the way, this has been dragged out forever, Your

13  Honor.  I've talked to Mr. Stewart about it.  I informed the

14  IRS, tried to settle it.  And I know (inaudible) probably

15  never (inaudible), I'm more than willing to work with the

16  Debtor to get it settled.  But what I want, and I don't know

17  how this works in bankruptcy, Your Honor, I -- I've got a

18  claim, so I filed the claim, because if you don't file the

19  claim, you lose it.  Right?  And then what happens is I'm

20  (inaudible) the Debtor.  The Debtor (inaudible) as an

21  adversary, said, We're going to equitably subordinate this

22  because this is equity in nature.  And at one time, the method

23  of payment that was concocted by the Debtor (inaudible) was,

24  the compensation agreement is separate and apart from that,

25  and that stands.  And neither I nor any of the other guys that

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 03/12/25    Page 48 of 174    PageID 6820
Main Document    Page 35 of 90

Daugherty - Direct                    38

 1   got this are looking for a windfall.  And I don't know how you

 2   vote it.  I mean, if the Debtor had said, We're just going to

 3   assume this like a lease contract, I wouldn't be in here

 4   asking you to put a number on it.  But what I got was an

 5   adversary saying, We're not going to pay this.  We're going to

 6   go equitably subordinate this, even if you're trying to, you

 7   know, get it reimbursed through the partnership.  So that

 8   forced me to bring it to you, Your Honor, and try to put a

 9   number on it.

10   Q    Mr. Daugherty, during your time with Highland Capital, did

11   you receive cash distributions from Highland in your capacity

12   as a limited partner of Highland?

13   A    That's a very important point.  These K-1's that -- there

14   were two kinds of partners at Highland.  There were the real

15   partners, Jim Dondero and Mark Okada, who referred to

16   themselves as founding partners, and then there were the

17   subclass of partners, really, we kind of -- we called

18   ourselves profit centers partners because we had a place in

19   the partnership but we weren't allowed to get any

20   distributions.

21       So whenever you see a K-1, we didn't get any of that

22   money.  All right?  That money stayed in the partnership or

23   went to Mark and Jim.  What we had was what's called a

24   (inaudible) and a buy-sell agreement that were attached to the

25   partnership which -- that basically we didn't get any

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Main Document    Filed 08/22/25    Page 49 of 174    Page 25 of 90    PageID 6821

Daugherty - Direct                          39

1  (inaudible) distributions or income from this, but what we got

2  was at the end of that time we could go and terminate it and

3  say, Pay me out now, and at that point it would be valued.

4  And so in my case, when I left, the value that they offered me

5  was $199,000.  For all, for all those years of service.  And

6  so to answer your question, no, I didn't get any money from

7  it.

8  Q    Thank you.  I want to ask you just a few questions about

9  the HERA 80 or 81 Percent Claim that they were referring to.

10  At a high level, what is HERA?

11  A    Well, this goes back to the same situation I was talking

12  about before as it related to this 2008 tax refund.  As I

13  mentioned, we were losing employees.  People were leaving.  I

14  mean, we started the year in 2008 with 22 partners and we were

15  down to I think 11 or 12 at the start of 2009.  The banks were

16  just, the banks were furious and they were talking about

17  liquidating us and getting a trustee put in place because they

18  were furious to find out that Dondero and Okada had taken out

19  money.  It was around $20 or $30 million.

20      Once we got through that hurdle, I said, Listen -- because

21  I became, by the way, Your Honor, I became Highland's kind of

22  advisor, restructuring person.  I did that for Highland as

23  (inaudible) usually us on the same side of the table as the

24  banks on, you know, I was head of distressed and private

25  equity at Highland, so I -- distressed debt and go and

1  negotiate at the Debtors' beck and call.

2      In this position, I moved over to the other side of the

3  table and I was negotiating on behalf of Highland with a lot

4  of my colleagues who were in the distressed community, which I

5  generally refer to as knuckle raps.  But they knew me, and I

6  knew them, and we sort of -- and we had trust between each

7  other, especially given what had just happened.  And they

8  agreed to set aside HERA, which is an acronym for Highland

9  Employee Retention Assets, and it was a fund where they set

10  aside, I don't know, around $20 to $25 million of assets that

11  would then be used to incent employees to stay.  And it had a

12  three-year cliff vesting.  And what happened is they didn't

13  have any money left.  Well, the employees that remained got

14  reallocated their shares.  So, contrary again to what Mr.

15  Morris said, there was an agreement that the ownership

16  interest would go up as we stayed through and helped right-

17  size the ship.

18  Q   Mr. Daugherty, why is it that you contend now that you're

19  the one hundred percent owner of HERA?

20  A   Well, this goes back to bad faith.  And I sympathize with

21  the judge, I did give you a ton of information, but this has

22  just been nine years of terrorizing, you know, that I've had

23  to contend with.  And if you look back to December of 2012,

24  January of 2013, a gentleman named (inaudible) had sent

25  Dondero an email saying, Here's how you can pay everybody

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2   Main Document   Filed 12/19/25   Page 25 of 90   Page 51 of 174    PageID 6823

Daugherty - Direct                            41

1    except for one.  And (inaudible) board member on HERA.  And on

2    HERA's board, there's affiliates of this guy.  Ellington and

3    John (inaudible).  It's basically Jim's buddies, Jim Dondero's

4    buddies, not (inaudible).  So he sent me this email saying,

5    Here's how you can pay everybody but one.  So we get into

6    January 2013, and Highland purports to make an offer to buy

7    out everybody at HERA except me.  Well, guess what.  In the

8    middle of January, all of the board resigns, without having

9    anyone change the shareholder unit to the LLC and without

10   taking board action that would allow Highland Capital to be an

11   assignee of these units.

12       There is a reason for this.  We go back to why HERA was

13   created.  The banks were furious about Mark and Jim taking

14   money and the banks wanted to take a secured interest in all

15   things Highland.  So what we agreed is we would put it in a

16   (inaudible), in an entity referred to as HERA, and Mark and

17   Jim and Highland would not be able to participate in it.  So

18   they are not recipients of the preferred units, and the only

19   way it can ever become (inaudible) preferred units is for

20   there to be action taken, specific action take to amend the

21   documents, or by the board, if they remain.  And in my Texas

22   trial, this issue did come up, and Thomas Surgent said that no

23   such action was taken.  Thomas Surgent is Highland's chief

24   compliance officer.  (inaudible).  I'm getting a little --

25   Q   I'm just going to ask two questions briefly before we turn

000677

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 25-2    Main Document    Filed 03/12/25    Page 52 of 174    Page 25 of 90    PageID 6824

Daugherty - Direct                          42

1   this over to Mr. Morris.  How did you calculate the value of

2   $21 million for this HERA 80 Percent Claim?

3   A    I took what -- Highland took my own expert report and made

4   it attorneys' eyes only in Delaware.  So my lawyers could

5   never sit down with me and explain it to me.  So all I could

6   go off of was what I saw at the trial.  And it was only the

7   last two or three days where Mr. Morris, he did file the

8   entire expert opinion of my expert where I could see all the

9   components.

10      So, at the time, I took what my expert was saying was the

11  value of my expert assets, I think as of December 2016.  And

12  since I knew that that was based on 19.1 percent, I divided

13  that number by 19.1 percent, came up with a total, and then

14  re-multiplied by 80 -- 80.1 percent, to find out what that

15  delta was.

16  Q    Given that these claims were dismissed on procedural

17  grounds in Delaware, and having heard Judge Jernigan's

18  comments earlier about this claim and its value for voting

19  purpose, what do you as the Claimant believe a fair allocation

20  of this claim is for voting purposes?

21          MR. MORRIS:  Objection to the form of the question.

22          THE WITNESS:  Listen.  I've --

23          THE COURT:  Overruled.

24          THE WITNESS:  -- been around Judge Jernigan --

25          THE COURT:  Overruled.  You can answer.

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2   Main Document   Filed 03/12/25   Page 42-43 of 99   Page 53 of 174    PageID 6825

Daugherty - Direct                    43

1          THE WITNESS:  I've been around Judge Jernigan long

2     enough to know that she means what she says and she says what

3     she means.  And I understand her reservations on this, too.

4     But I will say there are some mitigating factors here that

5     Highland, in Texas and all the way through the Texas Court of

6     Appeals, they were saying (inaudible), this is a double

7     counting, this is a double counting.  That (inaudible) up for

8     reconsideration in a court -- Texas Court of Appeals

9     (inaudible), and the Court refused to see it that way.  Then

10    when we went to Delaware, they(inaudible), they said, Oh, no,

11    we have cures.  There's *laches*, statute of limitation is

12    operating against them.

13         And so my reaction to that was, How am I supposed to be in

14    an action based on my share ownership when you're saying I

15    don't even own my share ownership and it's not determined

16    until December 2016?

17         It is true that Judge (inaudible) said you should have

18    basically filed a placeholder.  As I've learned a little bit

19    about Delaware law, I don't think that is consistent with

20    Delaware law, but it is what it is.  And if Judge Jernigan

21    (inaudible) position.  So if she's right to say that I could

22    bring these claims over (inaudible) you know, contains, you

23    know, a different item.  And so you're asking me whether

24    (inaudible) advice to the judge?  I would say that I'm more --

25    I'm more than agreeable to whatever she decides.  I just want

Daugherty - Cross                    44

 1  to know -- her to know why I'm here and what this is about,

 2  that this is not frivolous, but if it doesn't end with plan

 3  voting as she sees it, then I can live with that.

 4  Q    Thank you, Mr. Daugherty.

 5         THE COURT:  All right.  Thank you.  Pass the witness.

 6  Mr. Morris?

 7         MR. MORRIS:  Thank you, Your Honor.

 8                    CROSS-EXAMINATION

 9  BY MR. MORRIS:

10  Q    Good afternoon, Mr. Daugherty.

11  A    Hello.

12  Q    My name is John Morris with Pachulski Stang and I'm here

13  on behalf of the Debtor.  We've never spoken before, have we?

14  A    Yeah, we have.

15  Q    Yeah?  I don't --

16  A    Yes.

17  Q    I don't recall.  But it's --

18  A    You were in in-person court in Judge Jernigan's court in

19  January and February and I think we spoke.

20  Q    Okay.  Well, forgive me for not recalling that particular

21  detail.  I just wanted -- just a few questions, sir.  On the

22  tax issue, according to your testimony you were promised

23  $1.475 million approximately in connection with your 2008

24  compensation; do I have that right?

25  A    That's correct.

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 06/20/25   Page 45 of 90   Page 55 of 174   PageID 6827

Daugherty - Cross                    45

1   Q   And I understand your testimony that it was Highland's

2   idea, but you agreed to the method of compensation in the form

3   of an allocation of Highland's partnership losses, right?

4   A   I would not say that.  There was no -- it was dictation,

5   not an offer and acceptance.

6   Q   Well, you did accept -- you did accept the benefit of the

7   allocation of the Highland losses on your 2008 tax returns,

8   right?

9   A   I -- I don't know if accept is the right answer.  I sent

10  my K-1 in with my tax return, and as I clearly admit, there's

11  approximately $4 million of losses that are allocated to me

12  via the K-1 that they could use in the computation of my

13  taxes.

14  Q   Okay.  So it's fair to say, then, that the manner in

15  which, or I think the word that was used in your papers, the

16  method by which you were compensated was through the

17  allocation of a portion of Highland's losses; is that right?

18  A   That is wrong.  I was compensated that said you're going

19  to get 1.475.  If you don't get 1.475, we will provide

20  substitute compensation.  What you're confusing is the manner

21  in which Highland decided to try and fund the obligation, and

22  I just don't think it's right to conflate the two.

23  Q   Well, Highland did fund the obligation through the

24  allocation of losses to you; isn't that right?

25  A   It is not.  As I said, I got the $4 million pass-through

000681

1   that the IRS determined was approximately $1.1 million, as I

2   recall.

3        Again, I'm not here to try to capture that missing 3.75.

4   All I want is Highland to basically stay in the shoes if -- or

5   stand by the promise that they made, that they made, sorry,

6   that they made to me, which is if the IRS changes their mind

7   or if Highland (inaudible) and wanted to start to use this

8   (inaudible) argument, that I get sufficient compensation to

9   make me whole.

10       I mean, at this point, if that -- if we aren't successful,

11  right, on this tax refund issue, then I'm going to get -- not

12  just me.  There's about seven or eight other employees who

13  have all also filed claims in this case.  We're going to get

14  hammered with penalties and interest that far exceed that

15  amount, and that's not fair.

16  Q   Okay.  As of today, Highland doesn't owe you -- that audit

17  is not complete; is that right?

18  A   Well, it's -- the audit took place for two years, and

19  you're probably familiar more than me, I got a letter from

20  Byron Collins in December of 2019, after the Debtor filed for

21  bankruptcy, saying, We've exhausted effectively our

22  negotiations with the IRS.  We've now turned this over to some

23  appeals unit in the IRS, and they determined that you don't

24  get -- I'm paraphrasing -- that you don't get to keep this

25  amount.

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 03/12/25   Page 57 of 174   Page 57 of 90   PageID 6829

Daugherty - Cross                                    47

1    Now, that basically put me on notice, right, that this is

2    coming to somewhat of a conclusion.  (inaudible), I listed it

3    as a claim, I listed it as unliquidated, because I really

4    don't know how to treat it.  I guess, I mean, hopefully, the

5    judge makes a decision, and the same kind of category, I don't

6    know how you classify this thing.  But when you guys filed an

7    adversary against me and said, You know what, by the way,

8    (inaudible) to me about any of my clients.  So when you

9    present to the Court that you engage me and (inaudible) with

10   this guy, you guys didn't talk to me once from the time you

11   filed until October about my claims.  You did it just

12   recently, after you filed an adversary.  I would have been

13   happy to work with you on this.

14        MR. MORRIS:  Your Honor?  Your Honor, I apologize for

15   interrupting.  Can I have the question read back?  Because I

16   really move to strike.  I'll be here all day if we get these

17   answers that really have nothing to do with my question.

18        THE COURT:  Okay.

19        MR. MORRIS:  It's not proper.

20        THE COURT:  Well, I'm going to sustain and strike the

21   narrative answer.  I'm going to ask you to just repeat your

22   question at this point.

23        MR. MORRIS:  Okay.

24   BY MR. MORRIS:

25   Q    The audit is not completed; isn't that correct?

000683

```
 1   A   I don't know.  I've been told by you that it's not.

 2   Q   Okay.  And nobody has told you and you have no information

 3   to contradict my assertion that the audit is incomplete today?

 4   A   That's correct.

 5   Q   And as you sit here today, you don't know how much, if

 6   anything, you might owe on account of the tax issue.  Is that

 7   right?

 8   A   That is right.

 9   Q   Okay.  You first learned about the audit in 2010; isn't

10   that correct?

11   A   I don't know when I first learned about the audit.

12   Q   You learned about the audit before you left Highland;

13   isn't that correct?

14   A   I know that when we filed this, you know, when we filed

15   the returns, we had to file a cover letter that basically

16   notified the IRS, hey, and I'm paraphrasing, we made these

17   elections, you may not agree with these elections, but we're

18   drawing your attention to it right now to put you on notice

19   that we're making these elections.  So that's what I know.

20   Q   When is your first recollection of when you learned about

21   the audit?

22   A   I don't recall.

23   Q   Okay.  Let's talk about the HERA assets for a moment.

24   When you left in 2011, you owned approximately 19.1 percent of

25   the HERA preferred units; is that right?
```

000684

Daugherty - Cross                        49

1    A    That is right.

2    Q    Okay.  And you learned in 2013 of the events that you

3    described earlier with respect to the amendment of the HERA

4    partnership agreement -- limited liability -- limited

5    liability company agreement, the assignment agreement, the

6    expense allocation?  All of that occurred in 2013, and you

7    knew it at that time, right?

8    A    Well, if I could clarify that.  I believe I was informed

9    that the amendment -- you had a lot of questions in there, so

10   I'll try and break it down.  The amendment -- you're talking

11   about 1241, right?  I believe I was informed, informed of that

12   either late February or early March 2014.

13       On the other stuff, we had -- we had sought discovery,

14   and, you know, people have experiences that you don't always

15   get discovery on an expedited basis all the time.  We started

16   to take discovery in dribs and drabs in -- early in July, and

17   then a lot more in October and then a lot more in December of

18   2013.  So the (inaudible) that you asked me a question about,

19   we got a lot of it in that time period, and then some of it

20   rolled into 2014.

21   Q    Okay.  So, you knew about Highland's purchase of the other

22   holders of the HERA preferred units in 2013, right?

23   A    Yeah, I knew about the purported purchase probably in

24   February 2013.

25   Q    And the purchases were by people who hold -- who held

Daugherty - Cross                    50

```
 1   vested interests in their preferred units in HERA; isn't that

 2   right?

 3   A    You said it was by them.  I think it was from them.  But I

 4   think (inaudible).

 5   Q    If I did, I misspoke, but thank you for the correction.

 6   But you'll agree, right, that -- that you knew in 2013 that

 7   Highland purchased from the vested holders of the preferred

 8   units their interests in -- in the HERA --

 9   A    You know, I knew that ultimately that happened.  I don't

10   remember if I knew definitively it happened until probably

11   October of 2013.

12   Q    Okay.  And you don't bring these claims relating to all of

13   this -- all of these things that happened in 2013 until the

14   summer of 2017 in Delaware; is that right?

15   A    That -- that's generally about right.

16   Q    Okay.  And that's more than three years after you learned

17   of them.  Is that fair?

18   A    I brought my claims after the Texas Court of Appeals said

19   that I had that shares that your clients said I didn't.

20   Q    Okay.

21           MR. MORRIS:  I'd move to strike.

22   BY MR. MORRIS:

23   Q    And I ask you to just listen carefully to --

24           THE COURT:  Sustained.

25   BY MR. MORRIS:
```

000686

Daugherty - Cross                          51

1    Q   -- my question.  Okay.  Listen carefully to my question.

2    You brought the claims relating to the HERA events of 2013 for

3    the very first time in Delaware in July 2017, right?

4    A   Yes.

5    Q   And it's more than three years after you learned of them;

6    is that fair?

7    A   I'm sorry.  More than three years--?

8    Q   More than three years after you learned of those events.

9    You just said that you learned about them in 2013.

10   A   I think that's right, yeah.

11   Q   Okay.  And you brought four different claims?  I think

12   claim -- Counts 2, 3, 4, and 5 in the original Delaware action

13   were all based on the events of early 2013; is that right?

14   A   I don't know.  I don't -- I don't -- frankly, I don't

15   recall my claims (inaudible) that you described.

16   Q   Okay.

17        MR. MORRIS:  Can we please call up Exhibit A to Mr.

18   Daugherty's proof of claim, which I believe has been marked as

19   Exhibit 40?

20        THE COURT:  Okay.  Are you going to share the screen

21   or do you want the Court to pull it up?

22        MR. MORRIS:  Yes.

23        THE COURT:  Okay.

24        MR. MORRIS:  I think we'll be able to share the

25   screen.  Thank you.  And if we could just scroll to the end.

000687

Daugherty - Cross                                    52

 1  And I apologize, I don't have the page number, but it should

 2  be --

 3          THE WITNESS:  Could you go back up to the top, just

 4  so I know what I'm dealing with here?

 5  BY MR. MORRIS:

 6  Q    Yeah.  It's Paragraph 82.

 7  A    No, I'm looking at the date this was filed.  Can you do it

 8  to the top?  All right.  So this is --

 9  Q    This is your amended pleading.

10  A    Oh, this -- okay.  You mentioned 2017, so I got a little

11  bit thrown off.  Okay.

12  Q    So this is the -- this is the document that was attached

13  to your proof of claim.  That's why I'm using it.  Okay?

14  A    Okay.  We've amended our proof of claim.  You're talking

15  about the first one?

16  Q    This is the -- this is the one that was attached to your

17  proof of claim, right?

18  A    Well, as I said, we've amended the proof of claim.  So are

19  we talking about the one that's amended or the first one?

20  Q    All right.  Just take a look,

21          MR. MORRIS:  If you can scroll down to Paragraph --

22  keep -- no, keep going.  Keep going.  La Asia, can we scroll

23  down, please?  Okay.  So go to Paragraph 84 and 85.  Okay.

24  BY MR. MORRIS:

25  Q    Can you read Paragraph 85 into the record, please?

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Main Document    Filed 03/12/25    Page 63 of 174    Page 63 of 90    PageID 6835

Daugherty - Cross                          53

1    A    (inaudible) unit holder of Highland Employee Retention

2    Assets.  The purported purchases of units by Highland Capital

3    on January 30th, 2013 using the funds of Highland Employee

4    Retention Assets were -- were invalid transfers.

5    Q    Okay.  And that's exactly what you're asking the Court

6    here to find; isn't that right?  That you're the sole

7    remaining holder and that the purported purchases by Highland

8    in 2013 were invalid transfers, right?

9    A    Correct.

10   Q    Okay.

11   A    Well, we're not asking her to find that, but we're asking

12   her to find for voting purposes.

13   Q    Okay.

14         MR. MORRIS:  Can you go to Paragraph 89, please?

15   BY MR. MORRIS:

16   Q    In 89, the relief that you requested is the return to HERA

17   of the funds transferred it and distributed to you as the sole

18   remaining shareholder, right?

19   A    That's correct.

20   Q    And that's specifically one of the claims that the Court

21   dismissed; isn't that right?

22   A    I thought it dismissed the claims for me making ownership

23   of the, you know, the (inaudible) because of the *laches* issue

24   that you described.

25   Q    Sir, sir, this claim was dismissed by the Chancery Court,

000689

Daugherty - Cross                              54

1    right?

2    A    It was dismissed by Judge (inaudible) who's the Chancery

3    Court on *laches* grounds.

4    Q    Okay.  How do you know it was on *laches* grounds?

5    A    Because he said so.

6    Q    Okay.  Can we just look quickly at Cause of Action No. 3?

7    This was a claim arising out of the exact same conduct against

8    HERA Management and Mr. Dondero; isn't that right?

9    A    I'm not sure I understand your question.

10   Q    Count III was against HERA Management and Mr. Dondero

11   arising out of the same facts, only this claim was for breach

12   of fiduciary duty, right?

13   A    I guess it was breach of fiduciary duty.  I don't see -- I

14   guess Mr. Dondero down there in No. 2, but I can't read the

15   whole paragraph.

16          MR. MORRIS:  Can you scroll down a little bit,

17   please?

18   BY MR. MORRIS:

19   Q    Okay.  Right there, Paragraph 93?

20   A    Correct.

21   Q    The adoption of the third amended and restated agreement

22   you allege to be self-dealing and constituting a breach of

23   fiduciary duty, right?

24   A    Correct.

25   Q    And in Paragraph 94, if we can scroll down, you allege

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Main Document    Filed 04/22/25    Page 255 of 99    Page 65 of 174    PageID 6837

Daugherty - Cross                        55

1  that the execution of the allocation, the expense allocation

2  whereby your interest was reduced to zero was also self-

3  dealing and a breach of duty, right?

4  A    Can you go back there?  I can't read it.

5  Q    But you recall making that claim generally?

6  A    (inaudible)  You know, give -- ask me the question again

7  about generally what I recall.

8  Q    Do you recall generally making an allegation in the

9  Delaware Chancery Court that there is a breach of fiduciary

10  duty by executing the expense allocation agreement, right?

11  A    Yeah.  On behalf of Highland ERA Management.

12  Q    Okay.

13        MR. MORRIS:  Can we go to Paragraph 95, please?

14  BY MR. MORRIS:

15  Q    You also challenge the assignment agreement, is that

16  right, as an act of self-dealing and breach of fiduciary duty?

17  A    Yeah.  I obviously can't read the redacted parts.

18  Q    But this claim was also dismissed, right?

19  A    As I said, these claims were reduced on a *laches* basis,

20  but obviously I plan to appeal.  I just (inaudible).

21  Q    Right.  And *laches* you understood meant that it was time-

22  barred, right?  It was brought beyond the statute of

23  limitations?

24  A    Yeah, as I understood it, yes.

25  Q    Okay.

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2   Filed 08/22/25   Page 66 of 174    PageID 6838
Main Document   Page 55 of 90

Daugherty - Cross                          56

1          MR. MORRIS:  Can we go to the next cause of action?

2    This will be the last one, Your Honor.

3    BY MR. MORRIS:

4    Q    This is against the Debtor, Highland Capital.  Aiding and

5    abetting breach of fiduciary duty.  If you look at Paragraphs

6    101 and 102 and 103, it's charging Highland with liability for

7    the same conduct, for the execution of the third amended and

8    restated agreement, the receipt of the HERA assets, right, as

9    --

10   A    Correct.

11   Q    -- part of -- and this too was dismissed on statute of

12   limitations grounds, right?

13   A    I believe so.

14   Q    Okay.  Thank you.

15   A    You know, I know that Highland is liable for the transfer

16   of promissory stock and the unjust enrichment.  I don't know

17   if (inaudible).

18   Q    Okay.  Well, we'll leave that alone.  Okay?  I think that

19   -- that's what we've actually offered to allow your claim for,

20   for all of those claims.  Let's --

21          THE COURT:  Mr. Morris, I want to make sure --

22          MR. MORRIS:  Yes, Your Honor.

23          THE COURT:  -- the record is clear about what Mr.

24   Daugherty was testifying about the last five minutes.

25          MR. MORRIS:  Sure.

000692

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2   Main Document   Filed 12/25/   Page 275 of 90   Page 67 of 174    PageID 6839

Daugherty - Cross                          57

1          THE COURT:  This is, of course, an attachment to

2     Daugherty's original proof of claim, but it is in the record

3     at Docket Entry #1388, which was collectively all of

4     Daugherty's exhibits for today, and it was at --

5          MR. MORRIS:  Right.

6          THE COURT:  -- Subpart 40, or Exhibit 40 therein,

7     Subpart A of that.

8       All right.  Did you want to offer that or does anyone want

9     to offer that into evidence so that the record will make

10    sense?

11         MR. MORRIS:  Sure.  I'll take it upon myself for this

12    specific exhibit, Your Honor.

13         THE COURT:  Okay.

14         MR. MORRIS:  I offer -- I offer PHD Exhibit 40 unto

15    evidence.

16         THE COURT:  Okay.  And I assume there's no objection

17    since that was Daugherty's exhibit.  It's admitted.

18         MR. UEBLER:  No objection.

19         THE COURT:  Okay.

20       (Patrick Daugherty's Exhibit 40 is received into

21    evidence.)

22    BY MR. MORRIS:

23    Q   Mr. Daugherty, let's just talk for a moment as to the

24    timing of your departure from Strand.  You were an officer of

25    Strand at one point; isn't that right?

Daugherty - Cross                              58

1    A    Yes.

2    Q    Do you have any letter of resignation or any other

3    documentation that shows the date on which you were no longer

4    an officer of Strand?

5    A    I don't recall.

6    Q    Okay.

7         MR. MORRIS:  Can we please call up Exhibit X2?  Your

8    Honor, this is one of the two exhibits that I shared with

9    counsel earlier today that are the corporate records that show

10   the officers of Strand at various points in time.

11        THE COURT:  All right.  Are they on the docket?

12        MR. MORRIS:  This goes to -- this goes to -- they're

13   not.  This goes to the indemnification claim.

14        THE COURT:  Okay.

15        MR. MORRIS:  All right.  So if we can get X2 up,

16   please.

17      (Pause.)

18        MS. CANTY:  I'm sorry, John.  One second.  The

19   computer's acting a little crazy.

20        MR. MORRIS:  Okay.

21      (Pause.)

22      You know, Your Honor, instead of taking the Court's time

23   with this, I don't need to cross-examine Mr. Daugherty with

24   this.  What I'd like to do is, because I've shared the

25   documents with Mr. Daugherty's counsel -- oh, here it is.

Daugherty - Cross                        59

 1    Okay.

 2              THE COURT:  Okay.

 3              MR. MORRIS:  So let's just --

 4              THE WITNESS:  I see it.

 5              MR. MORRIS:  Thank you.  Let's just get through this

 6    quickly.

 7    BY MR. MORRIS:

 8    Q    Do you recall that, when you were an officer of Strand,

 9    that from time to time you signed a document that identified

10    all of the officers of that entity?

11    A    No.

12    Q    Okay.

13              MR. MORRIS:  Can you scroll down a little bit here?

14    BY MR. MORRIS:

15    Q    Do you see that this is --

16              MR. MORRIS:  I'm sorry, just a -- not quite so much.

17    I want to see the first paragraph.

18    BY MR. MORRIS:

19    Q    It says that "I am the president of Strand Advisors" and

20    that Mr. Dondero was certifying that the people below were

21    duly appointed and qualified to serve as officers of Strand.

22    I'm paraphrasing a bit there.  Do you see that?

23    A    I can read it.

24    Q    Okay.  And do you see the third line down is you?

25    A    Correct.

Daugherty - Cross                              60

1    Q    And that's your signature?

2    A    It appears to be.

3    Q    And did you serve in the capacity as Secretary of Strand?

4    A    I mean, I served in various capacities.  So I was agent, I

5    was representative, I was an officer.  I never was limited to

6    just being Secretary.

7    Q    Okay.  But that's what you signed this document as, right?

8    A    That's what my signature is next to.

9    Q    Okay.

10        MR. MORRIS:  And if you scroll down a little bit,

11   let's just see the date.

12   BY MR. MORRIS:

13   Q    And so that's August of 2006.

14        MR. MORRIS:  Can we go to the next page, please?

15   BY MR. MORRIS:

16   Q    You signed the next iteration of this as Secretary.  Do

17   you see that?

18   A    I do.

19        MR. MORRIS:  Can we scroll down a few lines to see

20   the date?

21   BY MR. MORRIS:

22   Q    That's February 27, 2007, okay?  And all of these folks

23   were officers at the time, do you recall?

24   A    No.

25   Q    No, you don't recall that?

Daugherty - Cross                                    61

1   A    Huh-uh.  I don't remember Nicky being an officer or Jim

2   (inaudible) or Ron Williams.

3   Q    Okay.  It was 13 years ago.

4        MR. MORRIS:  Let's scroll to the next page, please.

5   BY MR. MORRIS:

6   Q    Do you see --

7        MR. MORRIS:  Scroll down a little further.

8   BY MR. MORRIS:

9   Q    You're now -- you've now been designated Assistant

10  Secretary.  Do you see that?

11  A    Yes.

12  Q    And that's your signature?

13  A    It is.

14  Q    And two lines above that, do you see there's Michael

15  Colvin?

16  A    Colvin, yes.

17  Q    Yeah.  And did you understand that he was Secretary of

18  Strand at one point?

19  A    I didn't focus on it one way or the other.

20  Q    He submitted -- Mr. Colvin submitted a declaration last

21  night on your behalf; isn't that right?

22  A    He did.

23  Q    And he said he couldn't recall when you stepped down from

24  your position as an officer of Strand, right?

25  A    Words to that effect, yes.

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 06/25/25   Page 72 of 174   Page 72 of 90   PageID 6844

Daugherty - Cross                          62

1        MR. MORRIS:  Can we just show the date of this

2   document?  So, this is January 2008.  Let's go to the next

3   page.  Here, again, if we can scroll down a little further, --

4   BY MR. MORRIS:

5   Q    -- you have Mr. Colvin signing and you also signing as

6   Assistant Secretary.  Do you see that?

7   A    I do.

8   Q    And that's your signature?

9   A    Yes.

10        MR. MORRIS:  Okay.  Can we just see the date of this

11   document?  This is May 2008.  Let's go to the next page.

12   BY MR. MORRIS:

13   Q    Okay.  Again, Mr. Colvin as Secretary and you as

14   Assistant Secretary; is that right?

15   A    Yes.

16   Q    And that's your signature?

17   A    Yes.

18   Q    And it's March 1st, 2009, right?

19   A    That's what it says, yes.

20        MR. MORRIS:  Okay.  Let's go to the next page.  Stop.

21   BY MR. MORRIS:

22   Q    You see Mr. Colvin is still there, but you're not, right?

23   A    Correct.

24   Q    And this is dated May 29, 2009, right?

25   A    Correct.

Daugherty - Cross                        63

1    Q    So Mr. Colvin, the person who submitted a declaration on

2    your behalf, signed a document where you're no longer listed

3    as an officer of Strand as of May 29, 2009, fair?

4    A    That is correct.

5    Q    Okay.

6         MR. MORRIS:  Let's just keep going.

7    BY MR. MORRIS:

8    Q    This one is dated January 2010.  Again, Mr. Colvin was on

9    and you're not, right?

10   A    Correct.

11        MR. MORRIS:  Next page.

12   BY MR. MORRIS:

13   Q    Mr. Colvin was here as Secretary and you're not listed as

14   an officer of Strand as of July 1st, 2010, right?

15   A    That's correct.

16   Q    Okay.  Does -- does -- do these documents refresh your

17   recollection that you stepped down as an officer of Strand

18   sometime between March and May of 2009?

19   A    No.

20   Q    Okay.

21        MR. MORRIS:  Can we call up the other exhibit,

22   please?

23   BY MR. MORRIS:

24   Q    This is a document entitled Secretary's Certificate.  Do

25   you see that?

000699

Daugherty - Cross                          64

1    A    I do.

2    Q    And do you see Mr. Colvin signed it as Secretary?

3    A    I do.

4    Q    And do you see that it was delivered on behalf of Strand

5    Advisors?

6    A    No.

7    Q    Up at the top line.

8    A    Oh, yes.

9    Q    Okay.  And Mr. Colvin signed this as of August 4, 2009,

10   right?

11   A    Well, it's --

12   Q    Above his signature?

13   A    Well, Highland had the practice of -- it sort of had the

14   practice where they would put an effective date prior to the

15   actual time that the document was created.

16   Q    So Mr. Colvin, the person and the attorney who submitted a

17   declaration on your behalf, signed this document as of August

18   4, 2009, right?

19   A    Well, well, it says, The undersigned has executed, so

20   yeah, I'm just going to have to say yes.  I'm just not sure --

21   I don't know, I guess, is my obvious question of when he

22   actually signed it.

23   Q    Okay.  Well, he was comfortable signing it as of August 4,

24   2009, is that fair, based on his signature?

25   A    I mean, you're showing me a document with his signature on

000700

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 03/26/25   Page 75 of 90   Page 75 of 174   PageID 6847

Daugherty - Cross                          65

 1   it.  That's all I see in front of me.  I don't know what he

 2   was comfortable with.

 3   Q   Okay.  And in Paragraph 1, it says that, The resolutions

 4   attached as Exhibit A have been duly authorized by the

 5   company, by the company's sole director.  Do you see that?

 6   A   I do.

 7          MR. MORRIS:  Let's look at Exhibit A, please, if we

 8   can scroll down.

 9   BY MR. MORRIS:

10   Q   And this is the consent of the sole director as of May 29,

11   2009.  Do you see that?

12   A   Yeah.  (inaudible) as Treasurer?

13   Q   No, we'll scroll down, sir.  No problem.

14          MR. MORRIS:  Let's keep scrolling down.  Okay.  All

15   right.

16   BY MR. MORRIS:

17   Q   And there's your list of officers, and you don't appear

18   there, right?

19   A   I don't appear there, no.

20   Q   And so would you agree that Mr. Colvin, the attorney who

21   signed the declaration on your behalf last night, signed a

22   Secretary's Certificate pursuant to which he attested to the

23   accuracy of the resolution, that as of May 29, 2009 the

24   officers were as listed here and it didn't include -- did not

25   include you?

000701

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Main Document    Filed 08/22/25    Page 265 of 90    Page 76 of 174    PageID 6848

Daugherty - Cross                        66

 1  A    Okay.  I just want to clarify a couple things.  One, he

 2  signed it on Friday.  You know, just so you know, it didn't

 3  get created last night.  And will you ask me the rest of that

 4  question?

 5  Q    Sure.  I apologize.  I just didn't see it until last

 6  night, and that's why I'm referring to last night, because I

 7  didn't see it until it was filed.

 8  A    I think we included it in the exhibit list on Friday.

 9  Q    Okay.  I know it was on the list.  In fact, that's where

10  --

11  A    I pulled it off the Internet from the court site, so they

12  had it.

13  Q    You're not on this list of officers?

14  A    I'm not on this list, no.

15  Q    Okay.  And just a few more questions, sir.

16          THE COURT:  I'm going to make sure the record is

17  clear once again.  Are you going to offer into evidence these

18  pages you've described as Exhibit X2, so we --

19          MR. MORRIS:  X2 and X1.

20          THE COURT:  X2 and X1?

21          MR. MORRIS:  Yes.

22          THE COURT:  All right.

23          MR. MORRIS:  And we will file -- we will file an

24  amended list for the docket, Your Honor.  But again, this just

25  came up a couple of hours before the hearing, because

000702

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 12/27/25    Page 77 of 174    PageID 6849
Main Document    Page 75 of 90

Daugherty - Cross                    67

 1  personally I didn't see the Colvin declaration until I woke up

 2  this morning.  I asked the question and I got these documents.

 3  So these documents are being tendered in response to that very

 4  specific declaration.

 5          THE COURT:  All right.  It was filed at 6:11 p.m.

 6  last night, in case -- Central Time.

 7          MR. MORRIS:  Right.

 8          THE COURT:  Any objection to X1 and X2?

 9          MR. UEBLER:  And Your Honor, this is Tom Uebler.  For

10  purposes of this summary proceeding, I'm inclined not to

11  object to the document.  We've both put a lot of paper before

12  the Court.  But we would reserve our right to explore these

13  documents further in discovery on the merits and try to find

14  out why we didn't see them for the last three years in

15  Delaware.

16          THE COURT:  All right.  So X1 and X2 will be admitted

17  for today's hearing.  And Mr. Morris, you're going to file

18  them later on the docket.

19          MR. MORRIS:  Yes, Your Honor.

20     (Debtors' Exhibits X1 and X2 received into evidence.)

21          MR. MORRIS:  Yes, Your Honor.  Just a few more

22  questions.  I know we're almost out of time here.

23  BY MR. MORRIS:

24  Q   Mr. Daugherty, just quickly, in the Texas action you were

25  found liable for breaching your fiduciary duty to Highland;

000703

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 03/22/25    Page 78 of 174    PageID 6850
Main Document    Page 78 of 90

Daugherty - Cross                                68

1  isn't that correct?

2  A    Correct.

3  Q    And you were ordered to pay Highland's legal fees of

4  approximately $2.8 million; is that right?

5  A    Correct.

6  Q    The litigation that you -- excuse me.  Withdrawn.  The

7  claims that you have been pursuing against all of the

8  Highland-related people and entities, you would be the

9  beneficiary of any judgment that you obtained, right?

10  A    I don't know what you mean by that.

11  Q    You are the sole plaintiff in all of these cases?

12  A    On the actions that I brought?

13  Q    Yes.

14  A    I believe so, yeah.

15  Q    Okay.  And so any judgment that's rendered will be

16  rendered in your own personal capacity; isn't that right?

17  A    Yes.

18  Q    You didn't bring --

19  A    Well, I'm the plaintiff, I guess is what I'm saying.

20  Q    Yeah.  That's fair.

21  A    So, I mean, yeah, the payments will go to me.

22  Q    Okay.  You mentioned something about a criminal case being

23  overturned on appeal.

24  A    I didn't.  My lawyer did.

25  Q    Okay.  Can you just describe for the Court what the

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 08/22/25   Page 25 of 90   Page 79 of 174   PageID 6851

Daugherty - Cross                          69

1   original charge was?

2   A    I don't believe that it's relevant, but there was an

3   injunction put in place that said that -- that prohibited me

4   from retaining Highland's account information.  And over the

5   course of, I don't know, from about 2014 to 2018, Highland

6   brought eight different, you know, variations of show cause

7   violations on that injunction against me.  Eight times I had

8   to defend.  And one of those eight was based on Josh Terry had

9   just been terminated from Highland and I saw him, I think, I

10  saw him in London May of 2016.  He got terminated in June.  I

11  sent him -- I walked up to his house and handwrote him a

12  letter extending my condolences and --

13            MR. MORRIS:  Your Honor, I'm going to --

14            THE WITNESS:  You asked me a question and I'm trying

15  to answer it.

16  BY MR. MORRIS:

17  Q    I apologize.  I apologize.  Let me ask a different

18  question because -- because that wasn't responsive to what I

19  was asking.  Were you found in contempt of court?

20  A    No.

21  Q    Okay.  What crime were you charged with?

22  A    I was charged with contempt of court violating the

23  injunction.  And a three-member panel at the Texas Court of

24  Appeals found unanimously in my favor that there was no

25  evidence that I violated the injunction.

000705

Case 19-34054-sgj11  Doc 1426  Filed 11/18/20  Entered 11/18/20 18:56:37  Desc
Case 3:25-cv-01876-K  Document 35-2  Filed 09/22/25  Page 80 of 174  PageID 6852
Main Document  Page 75 of 99

Daugherty - Redirect                    70

1   Q   But the trial court did in fact not only find that there

2   was evidence, but the trial court is the one who imposed the

3   judgment against you; is that fair?

4   A   That is correct.  And he was ordered to vacate that

5   ruling.

6   Q   Okay.

7           MR. MORRIS:  Your Honor, I have no further questions.

8           THE COURT:  All right.  Redirect?

9           MR. UEBLER:  Thank you, Your Honor.

10                        REDIRECT EXAMINATION

11  BY MR. UEBLER:

12  Q   Mr. Daugherty, the fee award that Mr. Morris referred to

13  in Highland's favor, did you pay that?

14  A   I did.  I wired approximately $3.1 million to Highland, I

15  want to say, December 13th or 14th, 2016.

16  Q   2016?

17  A   Yeah.

18  Q   What amount have you received form Highland or any of its

19  affiliates as a result of the judgment you obtained?

20  A   Zero.

21  Q   With respect to Strand Advisors, when did you last serve

22  as an agent of Strand?

23  A   January-February 2012, when Highland enlisted me to meet

24  with the Crusader investors, and I guess one called a Stratus

25  (phonetic) investor, to the Stratus -- as I mentioned, there

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 25-2 Filed 04/22/25    Page 81 of 174    PageID 6853
Main Document    Page 75 of 90

Daugherty - Redirect                    71

1  was two categories.  One, my view on value of various Top 40

2  portfolio investments, and two, to discuss my reasons for

3  leaving Highland.

4  Q    When did you last serve as a representative of Strand?

5  A    In that January-February 2012 time frame.

6  Q    Were you authorized to sign documents on behalf of Strand

7  Advisors?

8  A    Yes.

9  Q    When did that authority cease?

10 A    When my employment at Highland terminated in October 2011.

11        MR. UEBLER:  Your Honor, I have no further questions.

12        THE COURT:  Any recross?

13        MR. MORRIS:  Mr. Daugherty?  Yes, Your Honor.

14        THE COURT:  Go ahead.

15                    RECROSS-EXAMINATION

16 BY MR. MORRIS:

17 Q   Mr. Daugherty, did you submit any documentation in support

18 of your contention that you served not as an officer but as an

19 agent or a representative of Strand until the time of your

20 departure in 2011?

21 A    Yes.

22 Q   All right.

23        MR. MORRIS:  No further questions, Your Honor.

24        THE COURT:  All right.  Thank you.

25     Mr. Daugherty, we appreciate your testimony.  You're

Daugherty - Redirect                    72

1    excused.

2             THE WITNESS:  Thank you, Judge.

3             THE COURT:  All right.  Mr. Uebler, do you have any

4    other evidence today?

5             MR. UEBLER:  I don't have any other evidence, Your

6    Honor, just some very brief closing remarks, if that's

7    permitted.  And I see we have four minutes left, so I'll defer

8    to the Court.

9             THE COURT:  Well, I won't cut you off cold in four

10   minutes.

11        Mr. Morris, did the Debtor have any evidence today?

12            MR. MORRIS:  Yes, Your Honor.  Does Mr. Daugherty

13   rest?

14            THE COURT:  Yes, they rested.  What I understood,

15   they rest.

16            MR. UEBLER:  I -- that's correct.  I mean, subject to

17   my comment earlier about submitting the exhibits and the

18   papers as part of our case.

19            THE COURT:  Well, let's make sure we get all of Mr.

20   Daugherty's evidence in before I shift over to Mr. Morris.  So

21   what else did you want to offer?

22            MR. UEBLER:  Only the -- the papers we've provided,

23   including Mr. Daugherty's declaration and the exhibits

24   attached to our motion and our reply.

25            THE COURT:  All right.  So those were filed as

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 06/27/25   Page 72 of 90   Page 83 of 174   PageID 6855

73

```
1    separate exhibits at Docket Entry No. 1388.  I think it's all

2    there, correct?

3              MR. UEBLER:  Correct.

4              THE COURT:  All right.  So it looks like it's

5    Exhibits 1 through 42 that appear there.

6         Any objection, Mr. Morris?

7              MR. MORRIS:  Yes, Your Honor.  I object to the

8    admission into evidence of Exhibits 7 through 10, No. 14, and

9    No. 17 through 38, on grounds that they are irrelevant in

10   light of the fact that the Debtor has conceded for purposes of

11   voting the $9.1 million in claims, and on the separate ground

12   under Rule of Evidence 403 that any probative value of this

13   material is greatly outweighed by the waste of time and the

14   irrelevance of the subject matter.

15        I will point out just some examples, Your Honor.  And this

16   is why the Debtor really doesn't put this stuff in the record,

17   because it is so irrelevant to these claims.  But he's got

18   things in there, the Court of Appeals decision on his criminal

19   case.  He's got a Crusader presentation.  Actually, I -- we

20   also object to that one, which is Exhibit 5.  We've got, you

21   know, appellate decisions, the escrow correspondence.  We've

22   got a Court of Appeals mandate.  We've got correspondence

23   relating to the escrow at Exhibit 30.  We've got a transcript

24   on an argument on a motion to compel.  We've got motions for

25   the argument.
```

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2   Filed 03/24/25   Page 84 of 174   PageID 6856
Main Document   Page 74 of 90

74

1      If you look at these documents, Your Honor, they really

2   have nothing to do with the claims that are being made here.

3   Certainly, in light of the Defendant -- in light of the

4   Debtor's concessions that we've made, we don't think that the

5   record should include any of the documents that I've

6   identified.

7           THE COURT:  All right.  Mr. Uebler, it's 2,619 pages

8   in all.  And what do you say to that objection?

9           MR. UEBLER:  I agree they are prejudicial documents,

10  Your Honor, but that doesn't make them inadmissible.  They're

11  prejudicial documents because they establish Mr. Daugherty's

12  right to fee shifting under the bad-faith exception to the

13  *American* Rule.

14      This is not, as Mr. Morris said earlier, a case where both

15  sides' hands are dirty.  This is a case where the Delaware

16  court found the crime fraud exception applied.  Based on my

17  research, that was the second time that has happened in

18  Delaware.  That's a big deal.

19      And the transcripts that we put in, the motions for re-

20  argument, the history we have presented in those 2,000 pages

21  supports Mr. Daugherty's claim.  It's directly relevant to an

22  issue that I think Mr. Morris referred to as frivolous

23  earlier, but I don't want to put words in his mouth.  It's

24  directly relevant, and that relevance by far outweighs any

25  prejudice to Highland, or at least prejudice that wasn't of

000710

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2 Filed 06/12/25   Page 85 of 174    PageID 6857
Main Document    Page 75 of 90

75

1  its own making.

2       So it should all be submitted at a minimum for the purpose

3  of considering Mr. Daugherty's request for fees.

4              THE COURT:  Okay.  I overrule the objection.  I'll

5  admit Exhibits 1 through 42.

6       (Patrick Daugherty's Exhibits 1 through 42 are received

7  into evidence.)

8              THE COURT:  All right.  So you rest at this point?

9              MR. UEBLER:  Yes.  Thank you, Your Honor.

10             THE COURT:  All right.  Mr. Morris?

11             MR. MORRIS:  Yeah, just one clarification there, Your

12 Honor.  Is Mr. Daugherty attempting to offer into evidence Mr.

13 Colvin's declaration?

14             THE COURT:  I did not hear him offer that.

15             MR. UEBLER:  I believe that's No. 42, Your Honor, so

16 the answer is yes.  And Mr. Morris had ample opportunity to

17 question Mr. Daugherty about the substance of the declaration.

18             MR. MORRIS:  Your Honor, it's --

19             THE COURT:  Oh, okay.  I had misunderstood.

20             MR. MORRIS:  Okay.

21             THE COURT:  It is Exhibit 42, even though it was just

22 filed separately on the docket last night.  So did you have an

23 objection, Mr. Morris?

24             MR. MORRIS:  I do.  It's hearsay, Your Honor.  It's

25 being offered for the truth of the matter asserted by a

76

1    witness who is not available to be cross-examined.

2                 THE COURT:  Okay.  I sustain --

3                 MR. UEBLER:  Your Honor, --

4                 THE COURT:  I sustain that objection.  42 will not be

5    admitted.  All right.

6         (Admission of exhibits revised to exclude Patrick

7    Daugherty's Exhibit 42.)

8                 THE COURT:  Mr. Morris, you have evidence?

9                 MR. MORRIS:  Yeah.  So the Debtor offers into

10   evidence Exhibits A through -- Exhibits A through V.  And I

11   guess Exhibits X1 and X2 have already been admitted.

12                THE COURT:  All right.  Let's be clear there.  Those

13   appear --

14                MR. KATHMAN:  Your Honor?  Your Honor, this is Jason

15   Kathman.  And I just wanted to -- on Exhibit 42, we talked

16   with Mr. Morris, and maybe I had a misunderstanding, but my

17   understanding is that we were going to present witnesses via

18   declarations in that manner.  And there had been some

19   discussion about -- and giving him the opportunity to cross-

20   examine Mr. Daugherty.  So if I misunderstood the agreement,

21   that's on me, but there was -- we had I believe it was in two

22   phone calls, and I think he's had more (inaudible), about how

23   testimony and witnesses would be presented for this hearing.

24   And if Mr. Colvin is outside of that, again, maybe I'm

25   misunderstanding, but I at least wanted to raise that issue.

1          MR. MORRIS:  Your Honor, respectfully, I have great

2    respect for Mr. Kathman, but he is misunderstanding.  I would

3    never, ever permit a declaration to come into evidence in a

4    matter like this without the ability to cross-examine.  I can

5    describe for the Court what the offer was, but it was not

6    that.

7          THE COURT:  Okay.  Well, I regret there was a

8    misunderstanding, but just pulling this up, while it's only a

9    one-and-a-half page declaration, it has 57 pages of

10   attachments, or approximately 57 pages of just all kinds of

11   things that I can presume the Debtor might want to cross-

12   examine Mr. Colvin on.  So I again sustain the objection.  42

13   will not come in.

14      All right.  Mr. Morris, your evidence.  Where do Exhibits

15   A through V appear on the docket?  I need to refresh my

16   memory.

17         MR. MORRIS:  Your Honor, just to let you know what

18   happened last night, because we were working with Mr.

19   Daugherty's counsels on redaction, and I think Mr. Anabel,

20   with your Court's permission, allowed us to email the

21   documents to you, and we had emailed them to Mr. Daugherty

22   because we weren't sure at the late moment as to where we were

23   going to be with the redactions.  We can certainly file

24   everything now.  But Your Honor has those documents.

25         THE COURT:  Okay.  I do have those.  I knew that

Case 19-34054-sgj11 Doc 1426 Filed 11/18/20 Entered 11/18/20 18:56:37 Desc
Case 3:25-cv-01876-K Document 35-2 Filed 03/27/25 Page 88 of 174 PageID 6860
Main Document Page 75 of 90

78

1    there were several emails that they were attached to.  I just

2    didn't know if they were separately on the docket.  So, again,

3    let me pull those up.  It's A through V?

4              MR. MORRIS:  Yes.

5              THE COURT:  Any objections by Daugherty's counsel?

6              MR. UEBLER:  Your Honor, as I said, for this summary

7    proceeding, we're not going to object to A through V.  But

8    with the exclusion of Daugherty 42, the Colvin declaration, it

9    seems that X1 and X2 have no relevance anymore and should be

10   excluded.  Mr. Morris stated earlier that those two documents

11   were submitted expressly in response to the Colvin

12   declaration.  With that out, Exhibits X1 and X2 should be out

13   as well.

14             THE COURT:  Okay.  Your response, Mr. Morris?

15             MR. MORRIS:  Yeah, very briefly.  Number one, I used

16   them to cross-examine his witness.  I offered them into

17   evidence.  There was no objection.  They've already been

18   admitted into court.  So I think this issue is moot.

19        But number two, when Mr. Daugherty said that he didn't --

20   I don't remember exactly what his testimony was, but suffice

21   it to say that he wouldn't agree that he had resigned sometime

22   between March 3rd and -- between March and May of 2009, I

23   certainly could have used them as impeachment documents under

24   any circumstance.

25             THE COURT:  All right.  I overrule the objection.  X1

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 03/22/25   Page 12 of 99   Page 89 of 174   PageID 6861

79

1    and X2 are in.

2         (Debtors' Exhibits X1 and X2 are again received into

3    evidence.

4              THE COURT:  Again, I think not only were they

5    admitted without objection earlier, but they do, I guess you

6    would say, contradict some of the testimony of Mr. Daugherty.

7    His position, as I hear it, is he was still an agent, or he

8    was an agent at least of Strand beyond the May 2009 time

9    period.  And these are documents that arguably impeach that

10   testimony.

11        All right.  So A through V and X1 and X2 are admitted.

12        (Debtors' Exhibits A through V and X1 and X2 received into

13   evidence.)

14             THE COURT:  If I could just ask, Mr. Morris, that you

15   all later submit on the docket these exhibits, all of them, so

16   we don't have to go back and print out the email attachments

17   and do it the old-fashioned way.

18             MR. MORRIS:  Sure.

19             THE COURT:  All right.  Any other evidence?

20             MR. MORRIS:  No, Your Honor.  The Debtor rests.

21             THE COURT:  All right.  I'll hear brief closing

22   arguments.  Mr. Uebler, you first.  (Pause.)  Mr. Uebler,

23   you're on mute, sir.  Mr. Uebler?

24        CLOSING ARGUMENT ON BEHALF OF CREDITOR PATRICK DAUGHERTY

25             MR. UEBLER:  Thank you.  Let me try that again.  I

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 08/22/25   Page 90 of 174   Page 90 of 90   PageID 6862

80

 1  want to start by responding to one of Mr. Morris's questions

 2  of Mr. Daugherty, which was, Did you submit any papers in this

 3  case that would establish that you were either an officer or

 4  an agent of Strand through resignation in 2011?  That's

 5  Exhibit 2.  It is, in fact, Highland's answer in the Delaware

 6  case at Paragraph 66, where Defendants admit that Daugherty

 7  served as an officer and agent of Strand from 2004 until he

 8  resigned from Highland in 2011.  So I think that should answer

 9  Mr. Morris's question.

10      Let me just conclude by some comments that James Seery

11  recently made in a deposition.  He said, Equally, on the other

12  side, you could say that the man's life was ripped out from

13  him, that his position was taken away, that he got an

14  arbitration award that arguably the Debtor and the Debtors'

15  management at the time stripped away all the assets and pretty

16  patently denuded it to try to leave him with no recovery.

17  Then when he sought a recovery, they sought to sue him in

18  every jurisdiction in the world and basically ruin the guy's

19  life and put him in a position where, while to some it might

20  seem a windfall, to him it might seem just.

21      Mr. Seery was talking about Josh Terry, not Mr. Daugherty.

22  But Highland's blueprint for ruining a guy's life originated

23  from its treatment of Mr. Daugherty.

24      We've given you reasons today to permit the full amount of

25  the three remaining disputed issues for voting purposes for

1    Mr. Daugherty's claim.  Allowing that full amount will protect

2    Mr. Daugherty as a creditor, give him his appropriate say in

3    any plan that's presented, and would hopefully bring these

4    parties at least one step closer to resolution.

5        Thank you for your time today.

6            THE COURT:  Thank you, Mr. Uebler.  Mr. Morris?

7                CLOSING ARGUMENT ON BEHALF OF THE DEBTORS

8            MR. MORRIS:  Yeah.  Very briefly, I'll just borrow

9    Mr. Uebler's phraseology and say that it would not be just to

10    give to Mr. Daugherty anything on account of a $21 million

11    claim that has already been dismissed and that his testimony

12    just established will be time-barred.  We don't believe that

13    it would be just to give him anything on account of a tax

14    claim that is completely contingent, unliquidated, and where

15    the Debtor admittedly owes absolutely nothing to Mr. Daugherty

16    today.

17        I can't imagine what it's been like to go through this

18    litigation, just like I couldn't imagine from Mr. Terry's

19    perspective, from Mr. Dondero's perspective.  These people

20    have been at this for a decade.  That's not what -- that's,

21    you know, it's not anything I can get my arms around.  What

22    I'm here to do is to protect the Debtors' estate and its

23    stakeholders, including its general unsecured creditors.

24        Mr. Daugherty is going to have a very meaningful claim if

25    the Court allows his claim for voting purposes at $9 million.

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/12/25   Page 92 of 174   PageID 6864
Main Document   Page 825 of 90

82

1   It's going to be the third biggest claim, at least at this

2   point, of anybody.  So that's just.  It's just that he has a

3   seat at the table.  We're offering him a seat at the table.

4   But he shouldn't get anything on account of the claims that

5   really have little to no merit.

6        Thank you, Your Honor.

7             THE COURT:  All right.  Thank you.

8        Well, I thank you for your thoroughness, your professional

9   courtesy that was very visible here today.

10        As I started out with today, Bankruptcy Rule 3018(a) is

11   what guides us.  That rule is a provision that states, quote,

12   Notwithstanding an objection to a claim, the Court may

13   temporarily allow a claim for voting purposes in such amount

14   the Court deems proper, after notice and a hearing.

15        There are many cases that have attempted to kind of impose

16   a legal framework for analysis on that rule because, as you've

17   just heard, the rule doesn't give much detail.  The cases all

18   sort of sing the same tune, that the rule contemplates only a

19   summary estimation proceeding, not a full trial on the merits.

20   The Court has great discretion to employ whatever method is

21   best-suited to the circumstances of the case in determining

22   what amount should be allowed for voting purposes.  The Court

23   should consider things like whether there's a last-minute

24   objection to strategically prevent a creditor from voting who

25   might vote no and the objection might be frivolous, that sort

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 03/22/25    Page 93 of 174    PageID 6865
Main Document    Page 23 of 90

83

 1   of thing.  And all decisions are reviewed for abuse of

 2   discretion, should there be any appeal.

 3       So that is the rule and the case law interpreting the

 4   rule.  Based on that, I will note that we start out here with

 5   an amended proof of claim filed by Mr. Daugherty in the amount

 6   of $40,710,819.42.  And I studied hard before coming out here

 7   today the addendum to that proof of claim filed by Mr.

 8   Daugherty.  It had a description of the claim that was done in

 9   the form of a chart.  I'm holding it up here -- I don't know

10   if it picks up on camera -- what I'm looking at.  But it

11   appears at Docket Entry 1280-2.  It was part of the appendix

12   to the motion to estimate claim.

13       So the amount is broken down into components.  If you're

14   looking at that chart -- again, which was most helpful -- I

15   note that in the claim of Daugherty for HERA units, there are

16   different line items that total approximately $26 million and

17   some change.  So that's the issue we've talked about a lot

18   today.  Is it correct, is it reasonable to assume that

19   Daugherty might be entitled to a hundred percent of the value

20   or a hundred percent of the HERA units?  So, I found that,

21   based on the evidence and the argument, to be a problematic

22   assumption.  Again, one day we will have a trial on the

23   adversary, a trial on the proof of claim.  I will hear every

24   bit of relevant evidence that the parties choose to put in on

25   that issue.  But for our purposes today, under Rule 3018, I

000719

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K     Document 35-2   Filed 03/12/25   Page 94 of 174     PageID 6866
Main Document   Page 85 of 90

84

1   just found considerable doubt that that would be an

2   appropriate damage calculation here.

3       So, again, using my discretion, I found that, at a

4   minimum, you should reduce that $26 million-plus component of

5   the Daugherty proof of claim by the roughly 81 percent,

6   because it was 19.1 percent, I think, that Daugherty would

7   have been entitled to of the HERA units.  So that's a roughly

8   $5 million amount, or a $19 million reduction that -- excuse

9   me.  I did my math wrong.  That's a $21 million reduction that

10  I think would be reasonable for estimation purposes under

11  3018.

12      Further looking at the chart that breaks down Daugherty's

13  claim -- we discussed this today in testimony -- there is an

14  attorney fee component that aggregates to $7,854,752.31, and

15  that's the indemnification, it's the interest on

16  indemnification award, it's the fee shifting fees on fee

17  award.  And once again, looking at this through the lens of

18  3018(a), I do not think it's appropriate to assume I'm going

19  to get there, if you will, on this attorneys' fee award.

20  There have been *bona fide* issues, if you will, raised on

21  whether the indemnification provision that was cited would

22  entitle Mr. Daugherty to these fees.  Section 4.1(h) of the

23  partnership agreement would be that indemnification provision.

24      Moreover, the deviation from the *American* Rule, if that

25  indemnification provision does not apply, is a big hurdle to

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Main Document   Filed 03/28/25   Page 95 of 174   Page 95 of 99   PageID 6867

85

1  achieve.  It's very deeply rooted in our law that if you don't

2  have a contract provision and you don't have a statute that

3  entitles you to attorneys' fees, it's quite a high hurdle to

4  get there, whether it be Rule 11, the vexatious litigation

5  statute, or some common law argument of bad faith.

6       So, again, looking through the lens I'm looking through

7  today, I just cannot get there under 3018.

8       So, doing my math, I'll go backwards.  I've just said that

9  I can't there on $7,854,750.31 of Mr. Daugherty's $40-plus

10  million claim.  I've said I can't get there on $21 million of

11  his $40.7 million proof of claim because of the HERA, the 81

12  percent interest in the HERA units.  So what else in that

13  chart gives me pause?  The tax refund, the 2008 tax refund

14  component.  We have $1,475,816 plus estimated interest on that

15  of $1.174537 [million].  It's very clear that at this point

16  this is, at best, contingent.  And again, down the road we may

17  get to a point where it's not contingent, the IRS has finished

18  doing what it's going to do, and we may get to a point where

19  we think a result is appropriate.  I don't know.  There may

20  be, even if we get there, a subordination argument.  The point

21  is, there are *bona fide* arguments today that do not allow me

22  to get to the point I feel like I need to get at an estimation

23  hearing to allow this claim, these components of the claim.

24       So when you subtract $7.854 million and $1.475 million and

25  $1.174 million and $21 million, that's about $32 million that

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K   Document 35-2   Filed 09/22/25   Page 96 of 174   PageID 6868

86

1    I would -- I was thinking about, before I even heard the

2    evidence, deducting out of the claim that I would estimate for

3    voting purposes.

4        That, I will tell you, is why I came out here at the very

5    beginning today and said, Jeez, the Debtors' suggested voting

6    claim of $9,134,019, which the Debtor came at a different way

7    as far as the math, that sounded darn reasonable to me.

8        So I am going to allow a voting claim for Mr. Daugherty at

9    $9,134,019.

10        Now, let me say a couple of more words why I fall back on

11    that number.  A, it's pretty close to the direction I was

12    leaning, but B, I want Mr. Daugherty, if he's still on the

13    line, to understand.  I hope it doesn't seem like I'm giving

14    Highland every benefit of the doubt here today and reducing

15    your claim by every argument they made and just going at it

16    that way.  I do feel like I am obviously giving you some

17    benefits of the doubt here.  Primarily, the benefits of the

18    doubt I'm giving you are, number one, the HERA judgment was

19    obviously a HERA judgment.  I mean, it was a judgment awarded

20    to Mr. Daugherty against HERA, not Highland per se, right?  I

21    didn't misunderstand that.  So I am assuming you have got darn

22    good arguments, Mr. Daugherty, to hold Highland liable for

23    that HERA award, plus the pre-judgment and post-judgment

24    interest, up to the bankruptcy petition date of October 16th,

25    2019.

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Main Document    Filed 07/22/25    Page 275 of 90    Page 97 of 174    PageID 6869

87

1          So I'm giving you the benefit of the doubt there, and on

2     -- well, I do want to make one more point on the attorneys'

3     fees.  Again, that was a huge component of your proof of

4     claim.  And I certainly well understand the bad faith

5     arguments and your many ways you think you will have of

6     getting attorneys' fees at the end of the day.  But I'm

7     sitting here today looking at the fact that the Texas state

8     court actually awarded Highland attorneys' fees against you.

9     Now, I understand, or I think I understand, that was somewhat

10    of a discrete issue with regard to the breach of fiduciary

11    duty arguments in sharing information or taking files or

12    information.  And you might argue, well, that was very

13    discrete, and obviously you paid it.  But all this to say

14    there are lots of a *bona fide* disputes here, I think.  And

15    again, the rule doesn't use that term, *bona fide* disputes,

16    but, again, I have lots of discretion here, and I think, at

17    the end of the day, a roughly $9 million voting claim is very

18    reasonable.

19         I know the point I ended up making.  I've also given you

20    the benefit of the doubt, Mr. Daugherty, on the roughly $5

21    million claim I'm giving you for the 19 percent of the HERA

22    assets.  And I understand there were things about the Texas

23    state court judgment that left that a little ambiguous,

24    whether you could get that or whether that would be double-

25    counting.  But again, I just, I want you to know that I

Case 19-34054-sgj11   Doc 1426   Filed 11/18/20   Entered 11/18/20 18:56:37   Desc
Case 3:25-cv-01876-K    Document 35-2   Filed 03/12/25   Page 98 of 174    PageID 6870
Main Document    Page 88 of 90

88

1  haven't weighed every benefit of the doubt in favor of

2  Highland here.  I've weighed a couple of these doubts in your

3  favor.

4      All right.  So, $9,134,019 is the voting claim of Mr.

5  Daugherty.  Again, this is without prejudice or waiver of any

6  arguments at a later trial on the claim for distribution

7  purposes.

8      Are there any questions?

9          MR. DAUGHERTY:  Just, you asked if I was on.  I just

10 wanted to let you know I got back on.  I took my (inaudible).

11 But I heard every word and I appreciate your comments.

12         THE COURT:  All right.  Thank you, Mr. Daugherty.

13     Mr. Morris, would you be the scrivener on this order?  And

14 of course, run it by Mr. Uebler and Kathman.

15         MR. MORRIS:  Of course, Your Honor.

16         MR. KATHMAN:  Your Honor?  Your Honor, this is Jason

17 Kathman.  We have just one housekeeping issue.  We had filed,

18 when we filed our motion to -- this 3018 motion at Docket No.

19 1280, actually, we filed a motion for leave to amend our proof

20 of claim, which is the -- actually, the chart that I think

21 Your Honor was looking at was the chart that we attached to

22 our amended proof of claim.  We filed that with negative

23 notice, and that negative notice actually ran yesterday.  So

24 we'll upload a certificate of no objection.  But just, while

25 we're here on the record, I wanted to ask for the Court to

89

1   approve that motion for leave to file an amended proof of

2   claim.

3           THE COURT:  Okay.  So I neglected to note that

4   detail.  I was of the impression it wasn't contested, and in

5   fact, the objection deadline has run.  So I will accept your

6   order on that.  Okay?

7           MR. KATHMAN:  Thank you, Your Honor.

8           THE COURT:  All right.  Thank you all.  We stand

9   adjourned.

10          MR. MORRIS:  Thank you, Your Honor.

11          THE CLERK:  All rise.

12      (Proceedings concluded at 3:59 p.m.)

13                          --oOo--

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript to
    the best of my ability from the electronic sound recording of
22  the proceedings in the above-entitled matter.

23   **/s/ Kathy Rehling**                         **11/18/2020**

24  _____     _____

25  Kathy Rehling, CETD-444                        Date
    Certified Electronic Court Transcriber

Case 19-34054-sgj11    Doc 1426    Filed 11/18/20    Entered 11/18/20 18:56:37    Desc
Case 3:25-cv-01876-K    Document 35-2    Filed 03/12/25    Page 100 of 174    PageID 6872
Main Document    Page 95 of 96

90

INDEX

PROCEEDINGS                                                        3

WITNESSES

Creditor Patrick Daugherty's Witnesses

Patrick Daugherty
- Direct Examination by Mr. Uebler                               29
- Cross-Examination by Mr. Morris                                44
- Redirect Examination by Mr. Uebler                            70
- Recross-Examination by Mr. Morris                             71

EXHIBITS

Patrick Daugherty's Exhibit 40                      Received 57
Patrick Daugherty's Exhibits 1 through 42           Received 75
Patrick Daugherty's Exhibit 42                      Denied   76

Debtors' Exhibits X1 and X2                         Received 67
Debtors' Exhibits X1 and X2                         Received 78
Debtors' Exhibits A through V, X1, and X2           Received 79

CLOSING ARGUMENTS

By Mr. Uebler                                                   79
By Mr. Morris                                                   81

RULINGS

Daugherty's Motion for Temporary Allowance of Claim for         82
Voting Purposes (1281)

END OF PROCEEDINGS                                              89

INDEX                                                           90

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

QUINN EMANUEL URQUHART &
SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Highland Capital Management,*
*L.P. and the Highland Claimant Trust*

*Co-Counsel for Marc S. Kirschner, as*
*Litigation Trustee of The Highland*
*Litigation Sub-Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § | |

**MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019**
**AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND**
**AUTHORIZING ACTIONS CONSISTENT THEREWITH**

Highland Capital Management, L.P., the reorganized debtor (the "<u>Debtor</u>" or "<u>Highland</u>,"

as applicable) in the above-captioned chapter 11 case (the "<u>Bankruptcy Case</u>"), the Highland

Claimant Trust (the "<u>Claimant Trust</u>"), and the Highland Litigation Sub-Trust (the "<u>Litigation</u>

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and
service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Sub-Trust" and together with Highland and the Claimant Trust, the "<u>Movants</u>") file this Motion (the "<u>Motion</u>") for entry of an order pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), substantially in the form attached hereto as **Exhibit A**, approving a settlement agreement (the "<u>Settlement Agreement</u>")[2] between Highland, the Claimant Trust, the Litigation Sub-Trust, and the Highland Indemnity Trust (the "<u>Indemnity Trust</u>", and together with Highland, the Claimant Trust, and the Litigation Sub-Trust, the "<u>Highland Entities</u>"), on the one hand, and Hunter Mountain Investment Trust ("<u>HMIT</u>"), Beacon Mountain LLC ("<u>Beacon Mountain</u>"), Rand Advisors, LLC ("<u>Rand Advisors</u>"), Rand PE Fund I, LP ("<u>Rand PE Fund</u>"), Rand PE Fund Management, LLC ("<u>Rand GP</u>"), Atlas IDF, LP ("<u>Atlas IDF</u>"), and Atlas IDF GP, LLC ("<u>Atlas GP</u>" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "<u>HMIT Entities</u>"), on the other hand. A copy of the Settlement Agreement is attached as **Exhibit 1** to the *Declaration of Gregory V. Demo in Support of the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (the "<u>Demo Declaration</u>"), filed concurrently herewith. In support of this Motion, the Movants respectfully state as follows:

<u>**INTRODUCTION**</u>

1.      Following extensive, arm's-length, good faith negotiations, the Highland Entities and the HMIT Entities, acting through their duly authorized representatives, executed the Settlement Agreement that will result in, among other things: (a) the dismissal with prejudice of all pending litigation between and among them; (b) the disposition of Estate Claims asserted against certain of the HMIT Entities by the Litigation Trustee of the Litigation Sub-Trust and the

---

[2] Capitalized terms used herein, but not defined, have the meanings ascribed to them in the Settlement Agreement or elsewhere in this Motion, as applicable.

assignment of the balance of the remaining Estate Claims (as defined in the Plan) to the HMIT Entities; (c) the allowance of the HMIT Class 10 Interest in the Claimant Trust in a fixed amount; (d) distributions to HMIT on account of its Class 10 interest, including the assignment of the Dugaboy Note, a long-term note with no ready market, at times and in amounts, and subject to the conditions, set forth in the Settlement Agreement; and (e) the exchange of mutual general and broad releases and other protections consistent with the parties' intent to end all current, and avoid all future litigation, between and among them (except for any alleged breach of the Settlement Agreement).

2.    The parties' entry into the Settlement Agreement is one of the most significant developments in the long-running Highland Bankruptcy Case. As this Court is aware, until now, HMIT has used its position as a holder of an unallowed, unvested, contingent interest in Class 10 of the Claimant Trust to commence litigation demanding books and records, seeking judicial declarations as to its claimed status as a beneficiary of the Claimant Trust, and asserting various other claims against the Highland Entities and their Court-appointed fiduciaries. The HMIT Entities have been made subject to a motion filed by Highland in the District Court seeking an adjudication that they or some of them are vexatious litigants. While that motion was denied by the District Court, Highland could bring the same type of motion before this Court. Also certain of the HMIT Entities have been named as defendants by the Liquidation Sub-Trust in the Amended Kirschner Complaint.

3.    No more. The parties' willingness to resolve all disputes and settle all claims among them will finally end that portion of the protracted and value-destructive litigation that has impeded the Highland Entities' ability to distribute their assets to their constituents and fully implement the Plan. The Settlement Agreement will also remove substantial hurdles to the

eventual windup of the Highland Entities.[3] Indeed, among the many benefits that will accrue to the Highland Entities from the Settlement Agreement are: (a) the cessation of costly, time-consuming, and disruptive litigation; (b) the disposition of two significant Estate assets—the Estate Claims and another illiquid asset, the Dugaboy Note—via distribution, assignment, and sale in furtherance of the ultimate winding up of the Claimant Trust's affairs; (c) the resolution of all disputes in connection with the HMIT Class 10 interest in the Claimant Trust, which was not previously allowed; and (d) the protection against future value-destructive litigation.

4. The proposed Settlement Agreement is clearly in the best interests of the Highland Entities and their stakeholders and results from a sound exercise of their business judgment. The Motion should be granted.

## RELEVANT BACKGROUND

### I. HMIT's Partnership Interest in Highland

5. In December 2015, HMIT acquired 100% of Highland's Class B and Class C limited partnership interests (the "Class B/C Interests") from James Dondero, Mark Okada, and certain entities affiliated with them. Mr. Dondero—through the Dugaboy Investment Trust ("Dugaboy") and Strand Advisors, Inc. ("Strand")—and Mr. Okada, directly and indirectly, retained Highland's Class A limited partnership interests (the "Class A Interests").

6. The Class B/C Interests represented 99.50% of the Debtor's prepetition total equity. The Class A Interests, in aggregate, represented the remaining 0.50%.

7. Concurrently with its acquisition of the Class B/C Interests, HMIT executed that certain *Secured Promissory Note* dated December 21, 2015, in the original face amount of

---

[3] Assuming the Settlement Agreement is approved, the only unresolved Claims or Equity Interests will be Patrick Daugherty's claim (Adv. Proc. No. 25-03055-sgj, Docket No. 1 (Bankr. N.D. Tex. May 2, 2025) (the "Daugherty Claim")), and the disputed, out-of-the-money, *de minimis* Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand.

$63,000,000 in favor of Highland (the "HMIT Note"), which, as of the Petition Date, had an outstanding principal balance of $57,690,640.95 (the "HMIT Note Balance").

8.     On December 24, 2015, the Debtor and its limited partners, including HMIT, entered into that certain *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as subsequently amended, the "LPA"). Pursuant to the LPA, each limited partner had a capital account at the Debtor on account of its limited partnership interests.

9.     As of the Petition Date, HMIT's capital account balance on account of its Class B/C Interests was $394,630,871.53 (the "HMIT Capital Account Balance"), and the capital account for all Class A Interests in aggregate was $1,983,069.70.[4]

## II.     The Bankruptcy Case

10.     The Debtor commenced the Bankruptcy Case in the District of Delaware on October 16, 2019, by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Bankruptcy Case was subsequently transferred to this Court.

11.     On February 22, 2021, the Bankruptcy Court entered the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* [Docket No. 1943], which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1943-1] (the "Plan"). The Plan went effective on August 11, 2021 [Docket No. 2700] (the "Effective Date").

12.     On the Effective Date, in accordance with the Plan: (a) the Claimant Trust and Litigation Sub-Trust were created; (b) the Class B/C Interests and the Class A Interests were extinguished; (c) holders of allowed Class 10 interests, consisting of Class B/C Interests, would receive contingent and unvested Class 10 Interests if and when their claims or interests were

---

[4] As of the Petition Date, Dugaboy's capital account was $740,081.61; Strand's capital account was $994,707.76; and Mr. Okada's and his affiliates entities' capital accounts, in aggregate, was $248,280.33.

allowed in amounts determined under the Plan; (d) holders of allowed Class 11 interests, consisting of the Class A Interests, would receive contingent and unvested Class 11 Interests if and when their claims or interests were allowed in amounts under the Plan; (e) James P. Seery, Jr., was appointed the Claimant Trustee of the Claimant Trust; and (f) Marc Kirschner was appointed the Litigation Trustee of the Litigation Sub-Trust.

13.      Presently, neither the HMIT Class 10 Interest nor any of the Class 11 Interests have been Allowed (as such term is defined in the Plan).

### III.      **The Kirschner Litigation**

14.      On October 15, 2021, the Litigation Trustee filed his *Complaint and Objection to Claims* (Adv. Proc. No. 21-03076-sgj, Docket No. 1 (Bankr. N.D. Tex. Oct. 15, 2021)) (the "Kirschner Complaint") which asserted, among other things, various claims against (a) Rand PE Fund and (b) HMIT, including a cause of action to collect amounts owed to Highland by HMIT pursuant to the HMIT Note.

15.      On May 19, 2022, the Litigation Trustee amended the Kirschner Complaint (Adv. Proc. No. 21-03076-sgj, Docket No. 158 (Bankr. N.D. Tex. May 19, 2022)) (the "Amended Kirschner Complaint"). The Amended Kirschner Complaint asserted substantially similar claims against HMIT and Rand PE Fund, including claims to collect the amounts owed under the HMIT Note.

16.      On April 4, 2023, upon the motion of the Litigation Trustee, this Court stayed prosecution of the Amended Kirschner Complaint, among other proceedings. Adv. Proc. No. 21-03076-sgj, Docket No. 338 (Bankr. N.D. Tex. April 4, 2023). As of the issuance of the stay, none of the HMIT Entities named a defendant had filed answers and therefore had not been required to file any counterclaims.

000732

## IV.    The Pending HMIT Litigation

17.    On March 28, 2023, HMIT filed *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket Nos. 3699, 3760, 3815, 3816] (as amended and supplemented, the "First Motion for Leave") in which HMIT asserted, *inter alia*, claims for breach of fiduciary duty, conspiracy, and unjust enrichment against Highland, the Claimant Trust, and Mr. Seery, among others. On August 25, 2023, this Court denied the First Motion for Leave. *In re Highland Cap. Mgmt., L.P.*, 2023 Bankr. LEXIS 2104 (Bankr. S.D. Tex Aug. 25, 2023). HMIT appealed to the District Court for the Northern District of Texas (the "District Court"), and, on March 21, 2025, the District Court remanded to this Court for further proceedings. *Hunter Mountain Inv. Tr. v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E, Docket No. 44 (N.D. Tex. Mar. 21, 2025).

18.    On May 10, 2023, Dugaboy Investment Trust ("Dugaboy") and HMIT filed that certain *Complaint to (i) Compel Disclosures About the Assets of Highland Claimant Trust and (ii) Determine (a) Relative Value of Those Assets, and (b) Nature of Plaintiffs' Interests in the Claimant Trust*, Adv. Proc. No. 23-03038-sgj, Docket No. 1 (the "Valuation Complaint"), seeking an order (a) compelling the Claimant Trust to provide information about its assets, (b) valuing those assets, and (c) deeming Dugaboy and HMIT "Claimant Trust Beneficiaries." On May 24, 2024, this Court dismissed the Valuation Complaint with prejudice [Docket No. 27]. Dugaboy and HMIT appealed to the District Court (Case No. 3:24-cv-01531-X (N.D. Tex.)), and the appeal is fully briefed and *sub judice*.

19.    On January 1, 2024, HMIT filed its *Motion for Leave to File a Delaware Complaint* [Docket. No. 4000] (the "Second Motion for Leave," and together with the First Motion for Leave and the Valuation Complaint, the "Pending HMIT Litigation"). On January 16, 2024, Highland and the Claimant Trust moved to stay the Second Motion for Leave pending

appellate review of the dismissal of the Valuation Complaint [Docket No. 4013] (the "Stay Motion"). On June 22, 2024, this Court granted the Stay Motion [Docket No. 4104]. HMIT subsequently appealed to the District Court (Case No. 3:24-cv-01786-L (N.D. Tex.)), and the appeal is fully briefed and *sub judice*.

**V.    Summary of the Salient Terms of the Settlement Agreement**

20.    To resolve the disputes between the Highland Entities and the HMIT Entities, including the Pending HMIT Litigation, the parties and their counsel engaged in extensive arm's-length, good faith negotiations over the last several months. These negotiations resulted in the Settlement Agreement, which provides for, *inter alia*, the sale and transfer of certain Estate Claims and other Estate assets to the HMIT Entities, the dismissal of the Pending HMIT Litigation, and the exchange of broad mutual releases.

21.    Subject to the terms of the Settlement Agreement, the principal terms of the Settlement Agreement are set forth below:[5]

- Within five (5) business days after the Court issues an order approving the allowance of HMIT Class 10 Interest (the "Bankruptcy Court Approval Date"), the HMIT Entities will dismiss the Pending HMIT Litigation with prejudice;[6]

- Within five (5) business days after the Bankruptcy Court Approval Date, the Litigation Trustee will dismiss HMIT and Rand PE Fund from Counts I, II, III, and XXIV (which relates to the HMIT Note) of the Amended Kirschner Complaint with prejudice;

- Within five (5) business days after the Bankruptcy Court Approval Date, Highland will pay $500,000 to HMIT;

- Subject to the Court's approval and the terms and conditions set forth in the Settlement Agreement, the HMIT's Class 10 Interests will be allowed in the amount of

---

[5] In the event of any inconsistency between this Motion and the Settlement Agreement, the terms of the Settlement Agreement shall control.

[6] The Valuation Complaint will only be dismissed as to HMIT; Dugaboy's claims in the Valuation Complaint will not be impaired.

$336,940,230.58, which represents the HMIT Capital Account Balance, less the HMIT Note Balance;[7]

- Within five (5) business days after the Bankruptcy Court Approval Date, (a) the Indemnity Trust will distribute $10 million Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests and (b)(i) the Highland Entities will cause the portion of that certain *Promissory Note*, dated May 31, 2017, in the original face amount of $24,268,621.69, from Dugaboy, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee (the "Dugaboy Note") held by the Highland Entities to be distributed in-kind to HMIT and (ii) the Indemnity Trust will distribute to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the date of the Settlement Agreement to the date of such assignment of the Dugaboy Note;[8]

- Subject to certain conditions precedent, the Indemnity Trust will make subsequent distributions Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests with a final distribution date estimated to be on or about April 1, 2029;

- Within five (5) business days after the Bankruptcy Court Approval Date, the Litigation Trustee will, solely to the extent permitted by the Plan, the Litigation Sub-Trust Agreement, and applicable law, transfer, sell and assign to the HMIT Entities all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee in the Amended Kirschner Complaint (the "Transferred Claims"); and

- On the Bankruptcy Court Approval Date, the HMIT Releasors will provide broad, general releases to the Highland Released Parties and the Highland Releasors will provide broad, general releases to the HMIT Released Parties.

If the Settlement Agreement is approved, the only unresolved Claims or Equity Interests will be the Daugherty Claim and the Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand—that have no value but, if they did, their aggregate maximum value, if allowed, would not exceed approximately $1.7 million.

---

[7] Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in the Settlement Agreement.

[8] Pursuant to the Settlement Agreement, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than 50% of the current balance owed under the Dugaboy Note. Contemporaneously with the assignment of the Dugaboy Note, the Indemnity Trust will make a *pro rata* cash distribution to any other Holder of an Allowed Class 10 Claim or Equity Interest based on such valuation.

000735

## RELIEF REQUESTED

22.     Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 363(b), the
Movants request entry of an order substantially in the form attached hereto as **Exhibit A**, granting
the Motion, approving the Settlement Agreement, and authorizing the Highland Entities and their
agents to take all actions necessary or desirable to implement the Settlement Agreement without
the need for further notice or approval by the Court.

## BASIS FOR RELIEF REQUESTED

23.     Bankruptcy Rule 9019 provides that "[o]n motion … and after notice and a
hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a).
Settlements are favored in the bankruptcy context to "minimize litigation and expedite the
administration of a bankruptcy estate." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir.
1996). The approval of a settlement is within the "sound discretion" of the Court. *In re Jackson
Brewing Co.*, 624 F.2d 599, 603 (5th Cir. 1980).

24.     Pursuant to Bankruptcy Rule 9019(a), the Court may approve a settlement if it is
fair, reasonable, and in the best interests of the estate. *See, e.g., Official Comm. of Unsecured
Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015). A settlement should
be approved unless it falls below the lowest point in the range of reasonableness, based on a
comparison between the terms of the settlement and the costs and benefits of further litigation. *See,
e.g., Jackson Brewing Co.*, 624 F.2d at 602 (court must compare the "terms of the compromise
with the likely rewards of litigation"); *Cook v. Waldron*, 2006 U.S. Dist. LEXIS 31411, at *10
(S.D. Tex. April 18, 2006) (court should "canvass the issues" to decide if settlement falls "below
the lowest point in the range of reasonableness").

25.     In evaluating a proposed settlement, courts consider (i) the "probability of success
in the litigation, with due consideration for the uncertainty in fact and law," (ii) the "complexity

and likely duration of the litigation and any attendant expense, inconvenience and delay," and (iii) "[a]ll other factors bearing on the wisdom of the compromise." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (quoting *Jackson Brewing Co.*, 624 F.2d at 602). Assessing the first factor—success on the merits—does not require a "mini-trial" on the merits. *Cajun Elec. Power Coop.*, 119 F.3d at 356. The "other factors" include "the best interests of the creditors, 'with proper deference to their reasonable views,'" as well as "'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.'" *Id.* (quoting *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917-18 (5th Cir. 1995)).

26.    A trustee also "is permitted to settle lawsuits pursuant to section 363(b)" of the Bankruptcy Code. *Id.* at 354. Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. 363(b)(1). A settlement involving a transaction outside the ordinary course of business "'must be supported by an articulated business justification, good business judgment, or sound business reasons.'" *Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*, 922 F.3d 323, 327 (5th Cir. 2019) (quoting *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010)).

27.    As discussed in detail below, the factors to be considered pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 363(b) weigh in favor of approving the Settlement Agreement in this case.

28.    First, although the Highland Entities believe they have strong and meritorious defenses to all of the Pending HMIT Litigation, history has shown that defending the Pending HMIT Litigation, including the appeals that could result therefrom, will be costly, time-consuming and value-destructive to the estate and creditor recoveries. Further, there is no guarantee that the

Highland Entities would continue to be successful in defending the Pending HMIT Litigation—or that the HMIT Entities will not file additional litigation against the Highland Entities and their indemnified parties.

29.     The second factor—complexity, duration, and costs of litigation—also weighs heavily in favor of approval of the Settlement Agreement. As this Court is aware, the cost of defending against the litigation in this case, including the Pending HMIT Litigation, has been significant. The litigation and its attendant costs have also significantly delayed and reduced distributions to the Debtor's constituents. The Pending HMIT Litigation began in 2023 and, although HMIT has lost in this Court, the Pending HMIT Litigation is subject to at least two pending appeals and has no signs of resolving absent this settlement. If the Settlement Agreement is not approved, the Highland Entities will be faced with significant appellate litigation and potentially additional litigation in this Court and other courts to resolve the Pending HMIT Litigation as well as any other litigation that may be brought by the HMIT Entities if the Settlement Agreement—and the Litigation Protections, including the releases—are not approved.

30.     Third, approval of the Settlement Agreement is justified by the paramount interest of Highland's creditors and constituents. The Settlement Agreement resolves the Pending HMIT Litigation, resolves all disputes in connection with the HMIT Class 10 claim; sells, transfers, and assigns the Estate Claims asserted in the Amended Kirschner Complaint—which has been pending since 2021 at significant cost to the estate—to the HMIT Entities; and provides for broad mutual releases and a cessation of the litigation and acrimony that has delayed consummation of the Plan. In exchange the Highland Entities are paying $500,000 and the Indemnity Trust is agreeing to scheduled distributions from the Indemnity Trust to the Holders of Allowed Class 10 Claims and Equity Interests. The Settlement Agreement is clearly a rational exercise of the Highland Entities' business judgment.

31.     Finally, the Settlement Agreement was unquestionably negotiated in good faith and at arm's length. The Highland Entities' and HMIT Entities' relationship to date has been defined by hostility. Notwithstanding that history, the Highland Entities and HMIT Entities, with their advisors, negotiated the Settlement Agreement over the last several months, which, although not perfect for any party, finally resolves the years of active litigation and acrimony between the Highland Entities and HMIT Entities.

32.     While this Motion is the motion of the Highland Entities, undersigned counsel for the HMIT Entities appears below to evidence the approval by the HMIT Entities of the form and content of this Motion.

## NO PRIOR REQUEST

33.     No previous request for the relief sought herein has been made to this Court or any other court.

## PRAYER

**WHEREFORE**, the Movants respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the Motion and the relief requested herein, and granting them such other and further relief as the Court deems just and proper.

[remainder of page intentionally blank]

000739

May 19, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email:      jpomerantz@pszjlaw.com
              jmorris@pszjlaw.com
              gdemo@pszjlaw.com
              hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P., and
the Highland Claimant Trust*

Appearing to Evidence Approval of Form and Content:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

*Counsel for the HMIT Entities*

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

*/s/ Robert S. Loigman*
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

-and-

**SIDLEY AUSTIN LLP**

*/s/ Paige Holden Montgomery*
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300


*Co-Counsel for Marc S. Kirschner, as Litigation
Trustee of the Highland Litigation Sub-Trust*

**Exhibit A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

**ORDER APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND
AUTHORIZING ACTIONS CONSISTENT THEREWITH**

This matter having come before the Court on the *Motion for Entry of an Order Pursuant
to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and
Authorizing Actions Consistent Therewith* [Docket No. []] (the "Motion")[2] filed by the Movants;
and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 as well
as the retention of jurisdiction provisions of the Plan; and the Court having found that this is a

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and
service address for the Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

000742

core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered the Motion, the materials submitted in support of the Motion, all responses to the Motion, and the arguments presented by counsel at the hearing on the Motion; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest, and is supported by sound business reasons and justifications; and the Court having determined that the legal and factual bases set forth in the Motion establish sufficient cause for the relief granted herein; and adequate notice of the Motion having been given; and after due deliberation and good cause appearing therefor,

**THE COURT FINDS THAT:**

1.      The Settlement Agreement was negotiated and entered into by the HMIT Entities without collusion or fraud, in good faith, and was the product of arm's-length negotiations.

2.      The HMIT Entities are not "insiders" or "affiliates" of Highland as those terms are defined in Bankruptcy Code sections 101(3) and 101(2).

3.      The HMIT Entities entered into the Settlement Agreement and are acquiring the Transferred Claims and Dugaboy Note in good faith and have proceeded with all aspects of the Settlement Agreement in good faith.

4.      The Highland Entities have demonstrated a sufficient basis and compelling circumstances to enter into the Settlement Agreement, and entry into the Settlement Agreement is an appropriate exercise of the Highland Entities' business judgment and in the best interests of Highland, its estate, and its creditors.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

5.      The Motion is **GRANTED**.

000743

6.      The Settlement Agreement attached as **Exhibit 1** to the Demo Declaration is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363(b) of the Bankruptcy Code.

7.      The HMIT Entities, as good faith purchasers of Estate assets in the Settlement, are entitled to the protections contained in section 363(m) of the Bankruptcy Code.

8.      The Highland Entities and their agents are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement without further notice or further Court approval.

9.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

### **END OF ORDER** ###

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

QUINN EMANUEL URQUHART &
SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Highland Capital Management,
L.P. and the Highland Claimant Trust*

*Co-Counsel for Marc S. Kirschner, as
Litigation Trustee of The Highland
Litigation Sub-Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## DECLARATION OF GREGORY V. DEMO IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

I, Gregory V. Demo, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as

follows:

---

[1] The last four digits of the Debtor's taxpayer identification number are 8357. The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

1.      I am an attorney at the law firm Pachulski Stang Ziehl & Jones LLP, counsel to Highland Capital Management, L.P., and I submit this Declaration in support of the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith*, being filed concurrently with this Declaration.  I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.      Attached as **<u>Exhibit 1</u>** is a true and correct copy of the *Settlement Agreement and General Release*, dated as of May 19, 2025, by and among, Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, on the one hand, and Hunter Mountain Investment Trust, Beacon Mountain LLC, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Atlas IDF, LP, Atlas IDF GP, LLC, on the other hand.

*[Signature Page Follows]*

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: May 19, 2025.                                    /s/ Gregory V. Demo
                                                        Gregory V. Demo

# EXHIBIT 1

EXECUTION VERSION

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 19, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand. The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant

3

Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xii) any Person indemnified by any Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO, Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming

4

through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity

000753

trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in Sections 1 – 2 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"**Operating Expenses**" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

000754

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X (N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threatened restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

## **RECITALS**

7

**000755**

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

**WHEREAS**, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

000756

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1. <u>Stay and Dismissal of Pending Litigation With Prejudice</u>.

(a)     Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

(b)     Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2. <u>Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)     The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3. <u>Cash Payment to HMIT</u>.  Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

> Hunter Mountain Investment Trust
> C/o CLO Holdco, LLC
> Hancock Whitney
> Account # - 071173413
> Routing # - 113000968
> (469) 604-0955

4. <u>HMIT Class 10 Interest</u>.

(a)     Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)     Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable,

9

000757

statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement.  Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c)    Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

(d)    For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5.    Initial Interim Distributions on the Allowed Class 10 Interests.

(a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**"), by means of wire transfer with the Pro Rata portion in respect of the HMIT Class 10 Interest sent to the wire instructions contained in Section 3 ("**Wire Transfer**").

(b)    Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date.  Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6.    Subsequent Distribution(s) on the Allowed Class 10 Interests.

(a)    On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the

Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00), by Wire Transfer.

(b)    On December 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00) by Wire Transfer.

(c)    Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.    Final Distribution on the Allowed Class 10 Interests.

(a)    On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; provided, however, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)    The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c)    Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.    Transfer Kirschner Claims; Dismissal of HMIT Note Claims.

(a)    Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in Section 2, the Litigation Sub-Trust shall execute a short-

000759

form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including Section 8(b) below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of Section 8(c) below.

(b) THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT. The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement. Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c) As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint. The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d) Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9. General Release By The HMIT Entities. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants,

000760

administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10.    <u>General Release By The Highland Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11.    <u>Further Provisions Concerning The General Releases</u>.

(a)    **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

000761

(b)      To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)      Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein.  Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)      As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in <u>Sections 9 and 10</u>, should:

000762

(i)     any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)     any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.     <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)     Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)     Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)     For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.     <u>Representations and Warranties</u>.

(a)     Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)     The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the

15

000763

other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)     Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)     Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.     <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.     <u>Gatekeeper Standard</u>.

(a)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

000764

(b)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)    The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

16.    <u>Indemnification</u>.

(a)    Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)    Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT

000765

Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action. Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17. <u>Execution</u>. This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel. All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18. <u>Bankruptcy Court Order</u>. The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order. To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date. Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby. If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no effect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in <u>Section 4</u> to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19. <u>Fees and Expenses</u>. Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>. Notwithstanding the foregoing, if any Party hereto, any Highland Released Party, or any HMIT Released Party brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Person in that Action shall be entitled to have and recover from the non-prevailing Person all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Person may suffer or incur in the pursuit or defense of such action or proceeding.

000766

20.    <u>Entire Agreement; No Other Representations</u>.  **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT.  THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT.  THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21.    <u>Agreement and Release Knowing and Voluntary</u>.  The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement.  The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22.    <u>Cooperation</u>.  The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard.  For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23.    <u>Governing Law</u>.  This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24.    <u>Jurisdiction/Venue</u>.  The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or

000767

subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25.    No Admissions.  All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26.    Other Provisions.

(a)    No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b)    The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c)    The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d)    The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27.    Notices.  All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

000768

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.   <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

29.   <u>Interpretive Provisions</u>. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

*[Signature page follows]*

000769

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By     /s/ Mark Patrick
      Name:     Mark Patrick
      Title:      Administrator
      Date:      May 19, 2025

**BEACON MOUNTAIN LLC**

By     /s/ Mark Patrick
      Name:     Mark Patrick
      Title:      President
      Date:      May 19, 2025

**RAND ADVISORS, LLC**

By     /s/ Mark Patrick
      Name:     Mark Patrick
      Title:      President
      Date:      May 19, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By     /s/ Mark Patrick
      Name:     Mark Patrick
      Title:      President
      Date:      May 19, 2025

**RAND PE FUND MANAGEMENT, LLC**

By     /s/ Mark Patrick
      Name:     Mark Patrick
      Title:      President
      Date:      May 19, 2025

000770

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner


By     /s/ Mark Patrick
        Name:     Mark Patrick
        Title:      President
        Date:      May 19, 2025

**ATLAS IDF GP, LLC**


By     /s/ Mark Patrick
        Name:     Mark Patrick
        Title:      President
        Date:      May 19, 2025


**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By     /s/ James P. Seery, Jr.
        Name:     James. P. Seery, Jr.
        Title:      Chief Executive Officer
        Date:      May 19, 2025


**HIGHLAND CLAIMANT TRUST**


By     /s/ James P. Seery, Jr.
        Name:     James P. Seery, Jr.
        Title:      Claimant Trustee
        Date:      May 19, 2025

**HIGHLAND LITIGATION SUB-TRUST**


By     /s/ Marc S. Kirschner
        Name:     Marc S. Kirschner
        Title:      Litigation Trustee
        Date:      May 19, 2025

**000771**

**HIGHLAND INDEMNITY TRUST**

By     __/s/ James P. Seery, Jr._____
       Name:        James P. Seery, Jr.
       Title:       Indemnity Trust Administrator
       Date:        May 19, 2025

000772

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

*Counsel for Highland Capital Management,*
*L.P. and the Highland Claimant Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
|  | § |  |
| Reorganized Debtor. | § |  |

**NOTICE OF HEARING ON**
**(I) MOTION FOR AN ORDER FURTHER EXTENDING DURATION OF TRUSTS AND**
**(II) MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE**
**9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES**
**AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**PLEASE TAKE NOTICE** that the following matters are scheduled for hearing on **Wednesday, June 25, 2025, at 9:30 a.m. (Central Time)** (the "Hearing") in the above-captioned bankruptcy case (the "Bankruptcy Case"):

1.  *Motion for an Order Further Extending Duration of Trusts* [Docket No. 4213] (the "Trusts Motion"); and

2.  *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "9019 Motion," and together with the Trusts Motion, the "Motions").

The Hearing on the Motions will be a **HYBRID** hearing. Any party offering evidence and any witness testifying at the Hearing must appear **IN-PERSON** before The Honorable Stacey G. C. Jernigan, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Texas (Dallas Division), Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, Texas 75242-1496. Parties interested in attending the Hearing—but not offering evidence at the Hearing—may appear via WebEx videoconference through the following participation/attendance link:

https://us-courts.webex.com/meet/jerniga.

A copy of the WebEx Hearing Instructions for the Hearing is attached hereto as **Exhibit A**; alternatively, the WebEx Hearing Instructions for the Hearing may be obtained from Judge Jernigan's hearing/calendar site at: https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judge-jernigans-hearing-dates.

[*Remainder of Page Intentionally Blank*]

Dated:  May 20, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P. and
the Highland Claimant Trust*

# **EXHIBIT A**

000776

# JUDGE STACEY G. JERNIGAN

**WebEx Meeting Link:**
https://us-courts.webex.com/meet/jerniga

**WebEx Teleconference Information:**
**Dial-in 650-479-3207 Access Code 2304 154 2638**

## NOTICE OF HEARING CONTENT AND FILING REQUIREMENTS

For remote and hybrid hearings in Judge Jernigan's court, the notice of hearing must (1) advise case participants that appearances by WebEx are permitted, (2) include notice of the WebEx Meeting Link https://us-courts.webex.com/meet/jerniga, and (3) refer participants to Judge Jernigan's webpage at https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judge-jernigans-hearing-dates for WebEx Hearing Instructions and Helpful Hints and Etiquette. When filing the notice of hearing in ECF, the filer should select https://us-courts.webex.com/meet/jerniga as the hearing location for all remote and hybrid hearings. Select the hearing location *Dallas Judge Jernigan Ctrm* only if participants are **required** to attend in person.

## WEBEX HEARINGS – CONNECTION INSTRUCTIONS

Please connect at least 10 minutes prior to the hearing time using one of the two options below. It is recommended that attorneys discuss the logistics of the WebEx appearance with their clients/witnesses at least 48 hours prior to the hearing.

**Option 1: Using the WebEx app on your smartphone, tablet, laptop, or desktop.**
- It is strongly preferred that participants who wish to speak during a hearing use the WebEx application rather than using the "call-in" option described in Option 2.
- Attorneys offering legal argument or conducting examination and all witnesses are required to utilize the video function. The Court may consider special requests for other appearance options on a case-by-case basis.
- Please connect using only one device. Using two or more devices may cause audio feedback issues.
- If using a smartphone or tablet for video, it should be set in a stationary position. Holding a phone or tablet in your hand while speaking does not yield a good video for the Court or other participants.

**NOTE: If you are experiencing audio issues when using the WebEx application,** you may use the "Call Me" selection under "Audio Connection" to move just the audio portion of the WebEx conference to your telephone.

**Option 2: Call-in via phone (audio only).**
The meeting number/access code and dial-in number can be found on the attached WebEx Connection Information. Please use *6 or the mute function on your smartphone to mute your line.

000777

## HELPFUL HINTS AND ETIQUETTE

• Please use the mute function when you are not speaking. Please be aware that sometimes the Court mutes everyone when there is background noise. When you want to speak, make sure you are not muted. Call-in users should dial *6 to unmute your line.

• Remember to state your name for the record each time before speaking and speak slowly and clearly so the Court can get a good record. Also, use your proper name on your device or for your WebEx login when participating over video, so that the Court can more easily determine who is speaking.

• Use headphones whenever possible, especially if using a desktop PC with external speakers. We have found that newer iPhones provide the best visual and audio feed – better than most desktop computers. If you are on a personal computer, headphones or earbuds are required for those who need to speak during the hearing.

• During examination, attorneys and witnesses should use a separate camera and microphone when possible. To avoid feedback, parties using separate devices must not be in the same room. The Court may consider special requests on a case-by-case basis.

• WebEx participants may use the "share" button to easily share their screen or document with the Court or other WebEx participants. Press "stop sharing" to remove the presentation from the meeting.

• When making an appearance from a vehicle, please park in a safe location with windows rolled up (to minimize background distraction and noise) and use a headset that is ear-to-phone (not the vehicle's hands-free speaker-phone option).

• Suggestions for participating in a WebEx hearing from home: If you are having connectivity problems, turn off devices that may be using bandwidth on your home network. Devices or applications such as Facetime, Roku, streaming media players, video games, or large downloads can negatively impact the audio and video quality of the WebEx meeting.

• Participants are reminded that they should wear attire suitable for court.

• Participants who wish to test their WebEx connection or the share screen functionality in advance of the hearing may arrange a "practice run" by contacting the courtroom deputy at sgj_settings@txnb.uscourts.gov.


## EXHIBITS AND DEMONSTRATIVE AIDS

Exhibits should be filed ahead of time by the date that they would normally be exchanged pursuant to our local rules using the "notice" or "list (witness/exhibit/generic)" event in ECF, with a true and correct copy of each designated exhibit filed as a separate, individual attachment, so that the Court and all participants have ready access to all designated exhibits. For voluminous exhibits, please provide the Court with two exhibit notebooks in advance of the hearing. For any witness who is to be called to testify remotely, the party calling the witness is responsible for supplying the witness or counsel, as appropriate, with paper copies of all designated exhibits prior to the hearing.
Demonstrative aids and PowerPoints should also be filed prior to the hearing, if possible. If not, WebEx has the ability to allow you to share your screen, or a particular document, with everyone in the hearing. If these documents are admitted as exhibits, they would then have to be filed after the hearing.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

*Counsel for Highland Capital Management,*
*L.P. and the Highland Claimant Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § | |

**AMENDED NOTICE OF HEARING ON**
**(I) MOTION FOR AN ORDER FURTHER EXTENDING DURATION OF TRUSTS AND**
**(II) MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE**
**9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES**
**AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**PLEASE TAKE NOTICE** that the following matters are scheduled for hearing on **Wednesday, June 25, 2025, at 9:30 a.m. (Central Time)** (the "Hearing") in the above-captioned bankruptcy case (the "Bankruptcy Case"):

1.  *Motion for an Order Further Extending Duration of Trusts* [Docket No. 4213] (the "Trusts Motion"); and

2.  *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "9019 Motion," and together with the Trusts Motion, the "Motions").

The Hearing on the Motions will be a **HYBRID** hearing.  Any party offering evidence and any witness testifying at the Hearing must appear **IN-PERSON** before The Honorable Stacey G. C. Jernigan, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Texas (Dallas Division), Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom No. 1, Dallas, Texas 75242-1496.  Parties interested in attending the Hearing—but not offering evidence at the Hearing—may appear via WebEx videoconference through the following participation/attendance link:

https://us-courts.webex.com/meet/jerniga.

A copy of the WebEx Hearing Instructions for the Hearing is attached hereto as **Exhibit A**; alternatively, the WebEx Hearing Instructions for the Hearing may be obtained from Judge Jernigan's hearing/calendar site at: https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judge-jernigans-hearing-dates.

Any response to the relief requested in the Motions shall be filed with the Clerk of the Court on or before **Monday, June 9, 2025**.

Any reply in support of the Motions shall be filed with the Clerk of the Court on or before **Monday, June 23, 2025**.

Dated:  May 22, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
_____
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P. and
the Highland Claimant Trust*

# **EXHIBIT A**

000782

# JUDGE STACEY G. JERNIGAN

**WebEx Meeting Link:**
https://us-courts.webex.com/meet/jerniga

**WebEx Teleconference Information:**
**Dial-in 650-479-3207 Access Code 2304 154 2638**

## NOTICE OF HEARING CONTENT AND FILING REQUIREMENTS

For remote and hybrid hearings in Judge Jernigan's court, the notice of hearing must (1) advise case participants that appearances by WebEx are permitted, (2) include notice of the WebEx Meeting Link https://us-courts.webex.com/meet/jerniga, and (3) refer participants to Judge Jernigan's webpage at https://www.txnb.uscourts.gov/judges-info/hearing-dates/chief-judge-jernigans-hearing-dates for WebEx Hearing Instructions and Helpful Hints and Etiquette. When filing the notice of hearing in ECF, the filer should select https://us-courts.webex.com/meet/jerniga as the hearing location for all remote and hybrid hearings. Select the hearing location *Dallas Judge Jernigan Ctrm* only if participants are **required** to attend in person.

## WEBEX HEARINGS – CONNECTION INSTRUCTIONS

Please connect at least 10 minutes prior to the hearing time using one of the two options below. It is recommended that attorneys discuss the logistics of the WebEx appearance with their clients/witnesses at least 48 hours prior to the hearing.

**Option 1: Using the WebEx app on your smartphone, tablet, laptop, or desktop.**
- It is strongly preferred that participants who wish to speak during a hearing use the WebEx application rather than using the "call-in" option described in Option 2.
- Attorneys offering legal argument or conducting examination and all witnesses are required to utilize the video function. The Court may consider special requests for other appearance options on a case-by-case basis.
- Please connect using only one device. Using two or more devices may cause audio feedback issues.
- If using a smartphone or tablet for video, it should be set in a stationary position. Holding a phone or tablet in your hand while speaking does not yield a good video for the Court or other participants.

**NOTE: If you are experiencing audio issues when using the WebEx application,** you may use the "Call Me" selection under "Audio Connection" to move just the audio portion of the WebEx conference to your telephone.

**Option 2: Call-in via phone (audio only).**
The meeting number/access code and dial-in number can be found on the attached WebEx Connection Information. Please use *6 or the mute function on your smartphone to mute your line.

000783

## HELPFUL HINTS AND ETIQUETTE

• Please use the mute function when you are not speaking. Please be aware that sometimes the Court mutes everyone when there is background noise. When you want to speak, make sure you are not muted. Call-in users should dial *6 to unmute your line.

• Remember to state your name for the record each time before speaking and speak slowly and clearly so the Court can get a good record. Also, use your proper name on your device or for your WebEx login when participating over video, so that the Court can more easily determine who is speaking.

• Use headphones whenever possible, especially if using a desktop PC with external speakers. We have found that newer iPhones provide the best visual and audio feed – better than most desktop computers. If you are on a personal computer, headphones or earbuds are required for those who need to speak during the hearing.

• During examination, attorneys and witnesses should use a separate camera and microphone when possible. To avoid feedback, parties using separate devices must not be in the same room. The Court may consider special requests on a case-by-case basis.

• WebEx participants may use the "share" button to easily share their screen or document with the Court or other WebEx participants. Press "stop sharing" to remove the presentation from the meeting.

• When making an appearance from a vehicle, please park in a safe location with windows rolled up (to minimize background distraction and noise) and use a headset that is ear-to-phone (not the vehicle's hands-free speaker-phone option).

• Suggestions for participating in a WebEx hearing from home: If you are having connectivity problems, turn off devices that may be using bandwidth on your home network. Devices or applications such as Facetime, Roku, streaming media players, video games, or large downloads can negatively impact the audio and video quality of the WebEx meeting.

• Participants are reminded that they should wear attire suitable for court.

• Participants who wish to test their WebEx connection or the share screen functionality in advance of the hearing may arrange a "practice run" by contacting the courtroom deputy at sgj_settings@txnb.uscourts.gov.

## EXHIBITS AND DEMONSTRATIVE AIDS

Exhibits should be filed ahead of time by the date that they would normally be exchanged pursuant to our local rules using the "notice" or "list (witness/exhibit/generic)" event in ECF, with a true and correct copy of each designated exhibit filed as a separate, individual attachment, so that the Court and all participants have ready access to all designated exhibits. For voluminous exhibits, please provide the Court with two exhibit notebooks in advance of the hearing. For any witness who is to be called to testify remotely, the party calling the witness is responsible for supplying the witness or counsel, as appropriate, with paper copies of all designated exhibits prior to the hearing.
Demonstrative aids and PowerPoints should also be filed prior to the hearing, if possible. If not, WebEx has the ability to allow you to share your screen, or a particular document, with everyone in the hearing. If these documents are admitted as exhibits, they would then have to be filed after the hearing.

000784

Jason S. Brookner (Texas Bar No. 24033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
Drake M. Rayshell (Texas Bar No. 24118507)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone: (214) 954-4135
Facsimile:  (214) 953-1332
Email:      jbrookner@grayreed.com
            dyork@grayreed.com
            jsmeltzer@grayreed.com
            drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 (SGJ) |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

## PATRICK DAUGHERTY'S OBJECTION
## TO MOTION FOR ENTRY OF AN ORDER
## PURSUANT TO BANKRUPTCY RULE 9019 AND
## 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT
## <u>ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH</u>

Patrick Daugherty ("<u>Daugherty</u>") files this Objection to the *Motion for Entry of an Order*

*Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT*

*Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "<u>Motion</u>") filed by

Highland Capital Management, L.P.'s ("<u>Debtor</u>" or "<u>Highland</u>"), the Highland Claimant Trust

(the "<u>Claimant</u> <u>Trust</u>"), and the Highland Litigation Sub-Trust (the "<u>Litigation Sub-Trust</u>")

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for
Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

(collectively, Highland, the Claimant Trust and the Litigation Sub-Trust are referred to as "<u>Movants</u>").  In support of this Objection, Daugherty respectfully states as follows:

<strong>I.      SUMMARY</strong>

1.      The proposed settlement between Movants and the HMIT Entities[2] is not in the best interests of Highland's estate and violates the Plan, this Court's Confirmation Order, the Claimant Trust Agreement, and the absolute priority rule because the proposed settlement contravenes the class priority required by the same.  As Movants state in their Motion, Daugherty remains the "only unresolved Claim[]" against the estate, which is classified as a Class 8 claim.  Motion at 4, n. 3, ¶ 21; *see also* Adv. Proc. 25-03055-sgj, Docket No. 1 at ¶ 37.  The HMIT Entities' claims are contingent Class 10 claims under the Plan and are subordinated to Daugherty's unresolved claim.  Adv. Proc. 25-03055-sgj, Docket No. 1 at ¶ 37, n. 8.  Thus, the HMIT Entities' claim cannot be resolved, and there cannot be any distributions from the estate to the HMIT Entities until Daugherty's remaining Class 8 claim is resolved.

2.      In addition to violating the terms of the Plan and Claimant Trust Agreement, the proposed settlement violates promises made by James Seery to Daugherty that Daugherty's remaining claim would be resolved before Highland reached any resolution that would effectively lead to the liquidation of the estate, as this proposed settlement with the HMIT Entities seeks to do.  Worse, the proposed settlement, on its face, inverts the priority of Class 8 and 10 creditors in an attempt to provide a payoff to the HMIT Entities and their insiders who have consistently sought to subvert the Bankruptcy.

3.      What is more, at face value, the proposed settlement appears to be Movants' submission to the HMIT Entities' litigation tactics.  In exchange for Movants' consideration under

---

[2] Capitalized terms not otherwise defined herein are defined in the Motion.

the Settlement Agreement, Movants are seeking individual releases and protections from the HMIT Entities, that courts have otherwise withheld or limited, as opposed to prioritizing the interests of the estate.  Tellingly, the proposed settlement comes on the heels of the United States Court of Appeals for the Fifth Circuit's March 18, 2025, judgment that Highland recently characterized as having "shredded" the gatekeeper provision in the approved Governance Settlement.  *See* Emergency App. For Stay of Mandate and Judgment, at 2 in Case No. 24A1154 (filed May 27, 2025 in the Supreme Court of the United States).[3]

4.      For all of these reasons, as more fully set forth below, the Court should reject the proposed settlement.

## II.      BACKGROUND

5.      Daugherty filed Proof of Claim No. 67 on April 1, 2020.  He later filed Proof of Claim No. 77, which superseded and replaced Claim No. 67 in its entirety.  Then on December 23, 2020, Daugherty filed Proof of Claim No. 205, which superseded and replaced Claim No. 77 in its entirety.

6.      On January 22, 2021, Highland filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1808] (the "Plan").  A month later, the Court entered the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (II) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order").    The Plan then became effective on August 11, 2021. *See* Docket No. 2700.

---

[3] In addition to the claims made in the various adversary proceedings tied to Highland's bankruptcy, the proposed settlement would insulate current Highland employees from potential liability in other litigation in the absence of the gatekeeper provision.  *See, e.g.*, *Highland Employee Retention Assets LLC v. James Dondero et al.*, Civ. A. No. 3:24-cv-00498-K (N.D. Tex.) at Docket No. 1 (Complaint)(implicating current Highland employees, such as Thomas Surgent and David Klos, even though they are not named parties).

4938-1049-1722

000787

7.      On March 8, 2022, following Court approval, Daugherty and Highland entered a Settlement Agreement to resolve, in part, his Claim No. 205.  Docket No. 3088, 3089 (the "Settlement Agreement").

8.      Under that Settlement Agreement, Daugherty retained a Reserved Claim[4] relating to Highland's 2008 tax return.  *Id*.  The Reserved Claim concerns a compensation and benefits contract between Highland and Daugherty relating to Daugherty's cash bonus, that was presented to Daugherty pursuant to a tax refund scheme developed by Highland during the financial crisis in 2008 and 2009.  That tax refund scheme was later challenged by the Internal Revenue Service ("IRS").  The gravamen of Daugherty's Reserved Claim relates to whether Highland's refund "deviated materially from [Highland's] estimate" such that "other compensation [to Daugherty should have been] fairly adjusted" as promised.  Adv. Proc. 25-03055-sgj, Docket No. 1-1.

9.      Critically, under the terms of the Settlement Agreement, "[a]ny litigation by and between the [Debtor] and Daugherty concerning the validity and amount of the Reserved Claim *shall be stayed* until the IRS makes a final determination with respect to the IRS Audit Dispute." *Id.* (emphasis added).  Highland concedes that the resolution of the IRS audit is still pending.  Adv. Proceeding 25-03055-sgj, Docket No. 1 at ¶ 3 ("Highland's 2008 tax return *is currently subject to an IRS audit*.") (emphasis added); ¶ 4 ("It is unclear when, how, or if the 2008 Audit will be finally resolved."). Movants also acknowledged Daugherty's Reserved Claim is "contingent on the final outcome of the 2008 Audit."  *Id.* at ¶ 35.  Thus, the validity and amount of Daugherty's Reserved Claim remains pending until the IRS Audit Dispute[5] is resolved.

10.     Daugherty's Reserved Claim is a general unsecured claim and thus is classified as a Class 8 Claim under the Plan.  *See* Docket No. 1943, Ex. A at 22-23.  Following the Court's

---

[4]"Reserved Claim" has the meaning ascribed to it in Docket No. 3089, the parties' Settlement Agreement.
[5] "IRS Audit Dispute" has the meaning ascribed to it in Docket No. 3089, the parties' Settlement Agreement.

4938-1049-1722

000788

approval of the Settlement Agreement, Seery promised Daugherty on at least one occasion that Highland would not take any steps to liquidate the estate before Daugherty's Reserved Claim was resolved.

11.     The proposed settlement between Movants and the HMIT Entities would, among other things, make an allowance for the HMIT Entities' Class 10 Interest in the Claimant Trust in a fixed amount, and make distributions to the HMIT Entities on account of its Class 10 Interest. Docket No. 4216 at 3.

12.     The Plan provides that the "allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise." Plan at Art. III.J.

13.     This Court's Confirmation Order approving the Plan echoes that same sentiment, providing that:

> [T]he Contingent Interests [in Class 10 and Class 11] will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement. ***Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest.***

See Docket No. 1943 at 44 (emphasis added).

14.     Further, the Highland Capital Claimant Trust Agreement (the "Claimant Trust Agreement") does not allow Class 10 or Class 11 claims to vest, "unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan, and all Disputed Claims have been resolved"

4938-1049-1722

000789

(the "GUC Payment Certification").  Docket No. 3817-4 at 577.  As of the date of this Objection, the Claimant Trustee has not filed the GUC Payment Certification.  Nor could it because Daugherty's remaining claim is unresolved.[6]

15.    As Movants concede, and the Court is well aware, this Bankruptcy proceeding has endured a tortured history of disputed claims, off-shoot litigation, challenges to this Court's authority, a multitude of appeals, and a myriad of material accusations levied by Movants against the very HMIT Entities, and their insiders, that Movants now seek to absolve and reward through this proposed settlement.  *See e.g.,* Motion at ¶¶ 14-19 (collecting actions).  Perhaps a poster child for the prolific scope of the HMIT Entites' litigation strategy, the Court previously issued an excoriating 105-page opinion lambasting the HMIT Entities' attempt to subvert the Bankruptcy through seeking leave to file an adversary proceeding (one of many) without standing to do so. Docket No. 3903.

16.    At various points in the Bankruptcy, the Litigation Trustee, Mark Kirschner, on behalf of the Litigation Sub-Trust, has taken the position that insiders of the HMIT Entities were individually responsible and beholden to the estate to return enormous sums of money that were fraudulently siphoned from the Debtors' coffers through a series of illegitimate schemes.  *See* Adv. Proceeding 21-03076-sgj, Docket No. 158 (asserting multiple claims sounding in Fraud against the HMIT Entities and their insiders).  Now, rather than seek to recover the "hundreds of millions of dollars in damages that [Highland] suffered at the hands of its founder, James Dondero, acting in concert with other entities [(including the HMIT Entities)] that he owned and controlled [] and with the aid of other [Highland] officers and attorneys who disregarded their fiduciary duties to

---

[6] Recently, Highland announced that it had paid all Class 9 claims in full, which would also violate the Plan, the Claimant Trust Agreement, and the absolute priority rule vis-à-vis Daugherty's Reserved Claim.  *See* Docket 3817-4 at 576-77 (providing that Class 9 Claims "shall only be entitled to distributions" after "all Disputed General Unsecured Claims have been resolved").

4938-1049-1722

[Highland] in favor of Dondero and their own self-interest," Movants seek to lay down and forgo the potential recovery of hundreds of millions of dollars for the estate and its creditors. *Id.* at ¶ 1.

17.     Against that backdrop, and in direct contravention of the explicit prohibitions in the Plan, Confirmation Order, and Claimant Trust Agreement, the Movants have elected to enter into a settlement that would result in the transfer payments of over $300 million of value on account of the HMIT Entities' *contingent* Class 10 equity interests.   In other words, with this proposed settlement, Movants aim to sidestep their fiduciary obligations and reward the HMIT Entities for their vexatious litigation tactics.  It appears HMIT Entities' strategy to overwhelm the Movants, and Dondero's oft-quoted goal to "burn the place down," has worn the Movants into submission such that Movants would prefer to take an offramp in lieu of continuing the pursuit of recovering hundreds of millions of dollars rightfully belonging to creditors of the estate.

## III.     ARGUMENT AND AUTHORITIES

### A.     The Proposed Settlement Inverts the Priority Structure Under the Confirmation Order and the Bankruptcy Code.

18.     It is settled law that a confirmation order is "a judgment that binds all interested parties to the plan's terms." *Matter of German Pellets Louisiana, L.L.C.*, 91 F.4th 802, 805 (5th Cir. 2024).  Here, the Confirmation Order established a binding priority structure that requires the payment in full of Class 8 claims before distributing funds to contingent Class 10 equity interest holders. *See* Docket No. 1943 at 44.  Indeed, holders of any equity interests that are junior to the Claims in Class 8 and Class 9 "will not receive or retain under the Plan . . . any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest." *Id*.  This Court interpreted and applied this very language in a now dismissed adversary proceeding.  In a May 24, 2024, memorandum opinion, the Court found that HMIT's former limited partnership interest in Highland was classified in Class 10 and that:

4938-1049-1722

[u]nder the terms of the Plan, [HMIT's] interest[] [was] cancelled in exchange for [a] *unvested* contingent interest[] in the Claimant Trust . . . that will vest if, and only if, the Claimant Trustee certifies that the Class 8 general unsecured claims and Class 9 subordinated claims have been paid in full, all disputed claims in Classes 8 and 9 have been resolved, *and* certain other obligations—primarily, the Claimant Trust's significant indemnity obligations—have been satisfied.

*Hunter Mountain Inv. Tr. v. Highland Capital Mgmt., L.P.*, (*In re Highland Capital Mgmt., L.P.*), No. 19-34054-SGJ-11, 2024 WL 2703149, at *3 (Bankr. N.D. Tex. May 24, 2024) (emphasis in original); *See In re Highland Capital Mgmt., L.P.*, No. 19-34054-SGJ-11, 2023 WL 5523949, at *35 n. 215 (Bankr. N.D. Tex. Aug. 25, 2023).

19.    Further, the Claimant Trust Agreement approved by this Court requires the Creditor Trustee to file a GUC Payment Certification confirming that all general unsecured claims under Class 8 and Class 9 had been paid "indefeasibly in full" prior to making any payments to Class 10 or Class 11 equity interest holders.  Docket No. 3817-4 at 577.  The Certification requires the Creditor Trustee to certify that all Disputed Claims have been resolved.

20.    Notwithstanding the plain language of the Plan, Confirmation Order, and the Claimant Trust Agreement, Bankruptcy Code § 1129(b)(2) requires the payments of creditors under a plan of reorganization to be "fair and equitable."  11 U.S.C. § 1129(b)(2).  A fundamental part of the fair and equitable standard is that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property."  *Id* § 1129(b)(2)(C)(ii).  This standard is commonly referred to as the absolute priority rule.

21.    Here, the Movants' proposed settlement agreement with HMIT would violate not only this Court's Confirmation Order, but also the absolute priority rule.  *See Hunter Mountain Inv. Tr.*, 2024 WL 2703149, at *3; *see also* 11 U.S.C. 1129(b)(2).  The Debtor's own Motion admits as much.  Motion at 4 n. 3, ¶ 21 (Daugherty remains the "only unresolved Claim[]" against

the estate.); *see also* Adv. Proc. 25-03055-sgj, Docket No. 1 at ¶ 37.  The indisputable fact looming

over the Movants' proposed settlement agreement with the HMIT Entities is that Daugherty's

Class 8 claim has not been "paid in full plus applicable interest."  *See* Docket No. 1943 at 44.

Therefore, any settlement payments made to the HMIT Entities—a holder of Class 10 contingent

equity interests—prior to the full satisfaction of Daugherty's Class 8 claim would be improper and

subvert the Bankruptcy Code, this Court's Confirmation Order, and the Claimant Trust Agreement.

For this reason alone, the Court should deny the Movants' Motion.

> **B.    The Proposed Settlement Operates to Reward the HMIT Entities' Bad-Faith Litigation Tactics Employed to Diminish and Obstruct the Bankruptcy Estate and Does Not Satisfy the Three-Factor Test Courts in the Fifth Circuit Employ to Analyze and, Ultimately, Approve Proposed Settlements.**

22.    Under Bankruptcy Rule 9019, a bankruptcy court may approve a compromise or

settlement after appropriate notice and a hearing so long as the proposed settlement is fair,

reasonable, and in the estate's best interest.  *See Official Comm. of Unsecured Creditors v. Moeller*

*(In re Age Refin. Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, a decision to accept or reject

a compromise or settlement is within the sound discretion of the Court.  *United States v. AWECO,*

*Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984) (citing *Rivercity v. Herpel (In re*

*Jackson Brewing Co.)*, 624 F.2d 599, 602–03  (5th Cir. 1980)); *In re ASARCO LLC*, No. 05-21207,

2009 WL 8176641, at *10 (Bankr. S.D. Tex. June 5, 2009).

23.    Generally, the role of the bankruptcy court is not to decide the issues in dispute

when evaluating a settlement.  *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993).  Instead, the

court should determine whether the settlement as a whole is fair and equitable.  *Protective Comm.*

*for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

24.    To determine whether a settlement is fair and equitable, this Court should consider

and evaluate the following factors: "(1) [t]he probability of success in the litigation, with due

consideration for the uncertainty in fact and law, (2) [t]he complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) [a]ll other factors bearing on the wisdom of the compromise." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *In re Jackson Brewing Co.*, 624 F.2d at 602); *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1997); *In re Wright*, 545 B.R. 541, 561 (Bankr. S.D. Tex. 2016); *see also TMT Trailer Ferry, Inc.*, 390 U.S. at 424–25 (providing that in determining whether a settlement is fair and equitable, a court should consider "the probabilities of ultimate success should the claim be litigated…[,] the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.").

25.     Factors "bearing on the wisdom of the compromise" include:  (a) "the paramount interest of creditors with proper deference to their reasonable views"; and (2) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *In re Foster Mortg. Corp.*, 68 F.3d at 917–18; *Cajun Electric*, 119 F.3d at 356; *In re Wright*, 545 B.R. at 561.

26.     Movants run afoul of the foregoing factors by skirting their obligation to prosecute their legitimate and well-founded claims against the HMIT Entities for their part in fraudulently dissipating hundreds of millions of dollars from Highland's coffers.  *See e.g.*, Adv. Proceeding 21-03076-sgj, Docket No. 158; *see also* Motion at ¶¶ 14-19 (collecting actions).  Appallingly, Movants seek to instead promise hundreds of millions of dollars to the HMIT Entities in exchange for mutual releases.  These mutual releases are the result of the HMIT Entities bringing a barrage

4938-1049-1722

of actions against Movants that this Court and others have repeatedly rebuffed, including on appeal. *Id.* Moreover, this laydown occurs in spite of Movants' steadfast assertion in this Court that "they have strong and meritorious defenses to all." *Id.* at ¶ 28. The HMIT Entities' barrage of actions that at one point even prompted Highland to "seek an adjudication that they or some of [the HMIT Entities] are vexations litigants." *Id.* at ¶ 2.

27.     Casting all of it to the wayside, Movants now seek to throw in the towel because "history has shown that defending the Pending HMIT Litigation, including the appeals that *could* result therefrom, will be costly, time-consuming and value-destructive to the estate and creditor recoveries" and there is no guarantee that "the HMIT Entities will not file additional litigation against the Highland Entities *and their indemnified parties*." *Id.* at ¶ 28 (emphasis added). Apparently, Movants have decided that succumbing to the HMIT Entities' litigation tactics better suits their individual pursuits and economic wellbeing, regardless of its impact on the estate. *Id.* Stated plainly, this proposed settlement is a matter of self-serving convenience, not one of fairness and equity.

28.     The ultimate effect of this proposed settlement is to reward bad-faith and vexatious litigants, who defrauded the estate, in response to their overwhelming litigation tactics. There can be no wisdom identified in such a proposed compromise, because there is no compromise— there is simply submission and surrender. As such, this proposed settlement is not fair, reasonable, or in the best interest of the estate and should be categorically denied.

## IV.     CONCLUSION

29.     For the foregoing reasons, the Court should reject the proposed settlement between Movants and the HMIT Entities.

4938-1049-1722

000795

Respectfully submitted this 9th day of June, 2025.

**GRAY REED**

By: _/s/ Andrew K. York_____
    Jason S. Brookner
    Texas Bar No. 24033684
    Andrew K. York
    Texas Bar No. 24051554
    Joshua D. Smeltzer
    Texas Bar No. 24113859
    Drake M. Rayshell
    Texas Bar No. 24118507
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:   (469) 320-6050
Facsimile:   (469) 320-6886
Email:     jbrookner@grayreed.com
       dyork@grayreed.com
       jsmeltzer@grayreed.com
       draysehll@grayreed.com

*Counsel to Patrick Daugherty*

000796

## CERTIFICATE OF SERVICE

     I hereby certify that a true and accurate copy of the foregoing instrument was served on all Parties or counsel of record herein on this 9th day of June 2025, via the CM/ECF system and/or email.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz
CA Bar No. 143717
jpomerantz@pszjlaw.com
John A. Morris
NY Bar No. 2405397
jmorris@pszjlaw.com
Gregory V. Demo
NY Bar No. 5371992
gdemo@pszjlaw.com
Hayley R. Winograd
NY Bar No. 5612569
hwinograd@pszjlaw.com
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

**HAYWARD PLLC**
Melissa S. Hayward
TX Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
TX Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

     By: */s/ Andrew K. York*
        Andrew K. York

4938-1049-1722

000797

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 (SGJ) |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

**ORDER SUSTAINING PATRICK DAUGHERTY'S OBJECTION**
**TO, AND DENYING, HIGHLAND CAPITAL MANAGEMENT, L.P.'S**
**MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY**
**RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE**
**HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

Upon *Patrick Daugherty's Objection to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (the "Objection") filed by Patrick Daugherty; and this Court having jurisdiction over the Objection pursuant to 28 U.S.C. § 1334, paragraph 66 of the Confirmation Order, and the matters listed in Article XI of the Plan, s*ee* Docket No. 1943 ¶ 66; *see also, e.g.*, Plan Article XI; and the Objection being a core proceeding pursuant to

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

000798

28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Objection in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that notice of the Objection and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Objection and conducted a hearing thereon; and the Court having determined that the legal and factual bases set forth in the Objection and on the record of the hearing on the Objection establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:[2]

1.       Daugherty's Objection to the Motion is **SUSTAINED**.

2.       The Motion is **DENIED** in its entirety.

3.       The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

4.       This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# # # END OF ORDER # # #

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion or the Plan, as applicable.

000799

Submitted by:
Jason S. Brookner
Texas Bar No. 24033684
Andrew K. York
Texas Bar No. 24051554
Joshua D. Smeltzer
Texas Bar No. 24113859
Drake M. Rayshell
Texas Bar No. 24118507
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 954-4135
Facsimile:   (214) 953-1332
Email:        jbrookner@grayreed.com
             dyork@grayreed.com
             jsmeltzer@grayreed.com
             draysehll@grayreed.com

*Counsel to Patrick Daugherty*

000800