**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P

§

§  Case No.  19-34054-sgj11

**Patrick Daugherty - Appellant**

§        **3:25-CV-01901-S**

         CONSOLIDATED UNDER:

vs.                                    §        **3:25-CV-01876-K**

**Highland Capital Management, L.P; et al** - Appellee

§

§

  **[4297] Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025**

**Volume 11**

**APPELLANT RECORD**

Jason S. Brookner (Texas Bar No. 240033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
Drake M. Rayshell (Texas Bar No. 24118507)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email:      jbrookner@grayreed.com
            dyork@grayreed.com
            jsmeltzer@grayreed.com
            drayshell@grayreed.com

*Counsel to Patrick Daugherty*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 (SGJ) |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

*INDEX*

**APPELLANT'S AMENDED DESIGNATION OF ITEMS
TO BE INCLUDED IN THE RECORD ON APPEAL
AND STATEMENT OF THE ISSUES PRESENTED**

Pursuant to Fed. R. Bankr. P. 8009(a) and Docket No. 4366, Appellant Patrick Daugherty

("Daugherty") hereby submits his amended designation of items to be included in the record on

appeal and statement of issues to be presented in connection with his appeal from the *Order*

*Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the*

*Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

No. 4297] (the "HMIT Settlement Order").[2] *See Notice of Appeal* [Docket No. 4310, as amended at Docket No. 4327].

## Statement of Issues on Appeal

1. Whether the Bankruptcy Court erred in its approval of the HMIT Settlement Order [Docket No. 4297], which permits payment to Class 10 creditors before all Class 8 and Class 9 claims have been paid in full when the plain language of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. 1808], the Court's Confirmation Order [Dkt. 1943] and the Claimant Trust Agreement [Dkt. 3817-4] require full payment plus applicable interest to all Class 8 and Class 9 creditors before any Class 10 or Class 11 claims can vest.

2. Whether the Bankruptcy Court abused its discretion by approving the HMIT Settlement Order [Docket No. 4297] when the settlement is not fair, reasonable, or in the best interests of the estate as the Debtor, through its principals, is forgoing the recovery of millions in material value to the estate in exchange for, inter alia, self-serving releases of its principals.

## Designation of Record

Daugherty respectfully designates the following items to be included in the appellate record pursuant to Bankruptcy Rule 8009(a):

*000001*   1. Amended Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Dkt. 4327].

*000011*   2. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Dkt. 4310].

*000022*   3. The Judgment Order or Decree appealed from: *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4297].

*000026*   4. Docket Sheet for Bankruptcy Case No. 19-34054-sgj1 kept by the Bankruptcy Clerk.

5. Documents listed below for Bankruptcy Case No. 19-34054-sgj11:

---

[2]  Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the HMIT Settlement Order.

*Vol. 2*

*0000637*

*0000727*

*0000745*

*0000773*

| Date | Docket | Description |
|---|---|---|
| 11/18/2020 | 1426 | *Transcript regarding Hearing Held 11/17/2020 (90 pages)* RE: Motion for Temporary Allowance of Claim (#1281). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/16/2021. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 1422 Hearing held on 11/17/2020. (RE: related document(s) 1281 Motion for leave - Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 filed by Creditor Patrick Daugherty) (Appearances: T. Uebler, J. Christensen, and J. Kathman for P. Daugherty; J. Morris and J. Pomeranz for Debtor; M. Clemente for UCC. Evidentiary hearing. Claim estimated for voting purposes at $9,134,019 for reasons stated on the record. Counsel to upload order.)). Transcript to be made available to the public on 02/16/2021. (Rehling, Kathy) |
| 05/19/2025 | 4216 | *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (Attachments: # 1 Exhibit A-- Proposed Order) |
| 05/19/2025 | 4217 | *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 05/20/2025 | 4218 | *Notice of hearing filed by Debtor Highland Capital Management. L.P., Other Professional Highland Claimant Trust* (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |

Vol. 2

| Date | Docket | Description |
|---|---|---|
| 05/22/2025 000779 | 4221 | *Amended Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust* (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |
| 06/09/2025 000785 | 4229 | *Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust)* (filed by Creditor Patrick Daugherty. (Attachments: # 1 Proposed Order) (York, Andrew) |

4905-5299-6446

| Date | Docket | Description |
|---|---|---|
| 06/20/2025 | 4255 | *Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53 # 54 Exhibit 54 # 55 Exhibit 55 # 56 Exhibit 56 # 57 Exhibit 57 # 58 Exhibit 58 # 59 Exhibit 59 # 60 Exhibit 60 # 61 Exhibit 61 # 62 Exhibit 62 # 63 Exhibit 63 # 64 Exhibit 64 # 65 Exhibit 65 # 66 Exhibit 66 # 67 Exhibit 67 # 68 Exhibit 68 # 69 Exhibit 69 # 70 Exhibit 70 # 71 Exhibit 71 # 72 Exhibit 72 # 73 Exhibit 73 # 74 Exhibit 74 # 75 Exhibit 75 # 76 Exhibit 76 # 77 Exhibit 77 # 78 Exhibit 78 # 79 Exhibit 79 # 80 Exhibit 80 # 81 Exhibit 81 # 82 Exhibit 82 # 83 Exhibit 83 # 84 Exhibit 84 # 85 Exhibit 85 # 86 Exhibit 86 # 87 Exhibit 87 # 88 Exhibit 88 # 89 Exhibit 89 # 90 Exhibit 90 # 91 Exhibit 91 # 92 Exhibit 92 # 93 Exhibit 93 # 94 Exhibit 94 # 95 Exhibit 95 # 96 Exhibit 96 # 97 Exhibit 97 # 98 Exhibit 98 # 99 Exhibit 99 # 100 Exhibit 100 # 101 Exhibit 101 # 102 Exhibit 102 # 103 Exhibit 103 # 104 Exhibit 104 # 105 Exhibit 105 # 106 Exhibit 106 # 107 Exhibit 107 # 108 Exhibit 108 # 109 Exhibit 109 # 110 Exhibit 110 # 111 Exhibit 111 # 112 Exhibit 112 # 113 Exhibit 113 # 114 Exhibit 114 # 115 Exhibit 115 # 116 Exhibit 116 # 117 Exhibit 117 # 118 Exhibit 118 # 119 Exhibit 119 # 120 Exhibit 120 # 121 Exhibit 121 # 122 Exhibit 122 # 123 Exhibit 123) (Annable, Zachery) |
| 06/20/2025 | 4256 | *Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |

*Handwritten annotations in left margin:* Vol. 3 Starts w/ 000801 Thru End of Vol. 13 ; Vol 14 003458

*Vol. 14*

*0003461*

*Vol. 15*

*0004643*

*0004654*

*0004656*

*Vol. 16*

*0004873*

*0004898*

| Date | Docket | Description |
|------|--------|-------------|
| 06/23/2025 | 4266 | *Witness and Exhibit List of Patrick Daugherty filed by Creditor Patrick Daugherty* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 List of 20 Largest Creditors 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 List of 20 Largest Creditors 34 # 35 Exhibit 35 # 36 List of 20 Largest Creditors 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42) (York, Andrew) |
| 06/23/2025 | 4275 | *Omnibus Reply to (related document(s): 4229 Objection filed by Creditor Patrick Daugherty, 4230 Objection filed by Partner Dugaboy Investment Trust, 4231 Objection filed by Interested Party The Dallas Foundation, Interested Party Crown Global Life Insurance, Ltd) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust.* (Annable, Zachery) |
| 06/23/2025 | 4276 | *Joinder by to Reply in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith filed by Creditor Hunter Mountain Investment Trust* (RE: related document(s) 4275 Reply). (Phillips, Louis) |
| 06/24/2025 | 4277 | *Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4255 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 124 # 2 Exhibit 125) (Annable, Zachery) |
| 06/24/2025 | 4280 | *Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 126) (Annable, Zachery) |
| 06/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). |

| Date | Docket | Description |
|---|---|---|
| 06/30/2025 | 4296 | *Transcript regarding Hearing Held 06/25/2025 before Judge Stacy G.C. Jernigan (266 pages) RE: Motion for an Order Further Extending Duration of Trusts (4213); Motion for Entry of an Order Approving Settlement with HMIT Entities (4216).* THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 09/29/2025. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 4294 Hearing held on 6/25/2025. (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Appearances: J. Morris and Pachulski team for Reorganized Debtor; R. Loigman for Post-Confirmation Trusts; D. Deitsch-Perez for Dugaboy; L. Young for UST. Evidentiary hearing. Motion granted. Counsel to upload order.), 4295 Hearing held on 6/25/2025. (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Appearances: J. Morris and Pachulski team for Reorganized Debtor; R. Loigman for Post-Confirmation Trusts; L. Phillips for HMIT Entities; M. Lang for Dugaboy; D. Curry for Dallas Foundation; L. Young for UST. Evidentiary hearing. Motion granted. Counsel to upload order.)). Transcript to be made available to the public on 09/29/2025. (Rehling, Kathy) |
| 07/16/2025 | 4317 | *Clerk's correspondence requesting to amend notice of appeal from creditor.* (RE: related document(s) 4297 Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document 4216) Entered on 6/30/2025. (Okafor, M.)) Responses due by 7/18/2025. (Whitaker, Sheniqua) |
| 07/22/2025 | 4336 | *Certificate of mailing regarding appeal* (RE: related document(s) 4327 Amended notice of appeal filed by Creditor Patrick Daugherty Related document(s) 4310 Notice of appeal filed by Creditor Patrick Daugherty. MODIFIED linkage on 7/17/2025 (suw).) (Attachments: # 1 Service List) (Whitaker, Sheniqua) |
| 07/22/2025 | 4337 | *Notice regarding the record for a bankruptcy appeal to the U.S. District Court.* (RE: related document(s) 4327 Amended Notice of appeal . Fee Amount $298 filed by Creditor Patrick Daugherty (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Attachments: # 1 Exhibit A)) (Whitaker, Sheniqua) |
| 07/22/2025 | 4343 | *Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01901-S.* (RE: related document(s) 4327 Amended notice of appeal filed by Creditor Patrick Daugherty Related document(s) 4310 Notice of appeal filed by Creditor Patrick Daugherty. (RE: related document(s)4297 Order on motion to compromise controversy).) (Almaraz, Jeanette) |

4905-5299-6446

## Reservation of Rights

Daugherty expressly reserves the right to amend or supplement this Designation and/or to object, or otherwise supplement or move to strike or modify, some or all of any designations filed by any other party to this appeal.  This filing is made expressly subject to, and without waiver, of any and all rights, remedies, challenges and objections.

4905-5299-6446

Respectfully submitted this 14th day of August 2025.

**GRAY REED**

By:  */s/ Andrew K. York*
    Jason S. Brookner
    Texas Bar No. 240033684
    Andrew K. York
    Texas Bar No. 24051554
    Joshua D. Smeltzer
    Texas Bar No. 24113859
    Drake M. Rayshell
    Texas Bar No. 24118507

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:  jbrookner@grayreed.com
    dyork@grayreed.com
    jsmeltzer@grayreed.com
    drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing instrument was served on all Parties or counsel of record herein on this 14th day of August 2025, via the CM/ECF system and/or email.

*/s/ Andrew K. York*
ANDREW K. YORK

9

4905-5299-6446

securities it receives in the transaction or by purchasing securities in the open market. The Partnership must generally pledge cash with the lender equal to the market price of the borrowed securities. This deposit may be increased or decreased in accordance with changes in the market price of the borrowed securities. During the period in which the securities are borrowed, the lender typically retains its right to receive interest and dividends accruing to the securities. In exchange, in addition to lending the securities, the lender generally pays the Partnership a fee for the use of the Partnership's cash. This fee is based on prevailing interest rates, the availability of the particular security for borrowing and other market factors.

Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed. In addition, the supply of securities that can be borrowed fluctuates from time to time. The Partnership may be subject to substantial losses if a security lender demands return of the lent securities and an alternative lending source cannot be found.

<u>Small Companies</u>.  The Investment Manager may invest a portion of the Partnership's assets in small and/or unseasoned companies with small market capitalizations. While smaller companies generally have potential for rapid growth, they often involve higher risks because they may lack the management experience, financial resources, product diversification and competitive strength of larger companies. In addition, in many instances, the frequency and volume of their trading may be substantially less than is typical of larger companies. As a result, the securities of smaller companies may be subject to wider price fluctuations. When making large sales, the Partnership may have to sell portfolio holdings at discounts from quoted prices or may have to make a series of small sales over an extended period of time due to the lower trading volume of smaller company securities.

<u>Leverage</u>.  When deemed appropriate by the Investment Manager and subject to applicable regulations, the Partnership will incur leverage in its investment program, whether directly through the use of borrowed funds, or indirectly through investment in certain types of financial instruments with inherent leverage, such as puts, calls and warrants, which may be purchased for a fraction of the price of the underlying securities while giving the purchaser the full benefit of movement in the market price of those underlying securities. While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. To the extent that the Partnership purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Partnership. If the interest expense on this leverage were to exceed the net return on the investments made with borrowed funds, the Partnership's use of leverage would result in a lower rate of return than if the Partnership were not leveraged.

If the amount of leverage which the Partnership may have outstanding at any one time is large in relation to its capital, fluctuations in the market value of the Partnership's portfolio will have disproportionately large effects in relation to the Partnership's capital and the possibilities for profit and the risk of loss will therefore be increased. Any investment gains made with the additional leverage will generally cause the Net Asset Value of the Partnership to rise more rapidly than would otherwise be the case. Conversely, if the investment performance of the leveraged capital fails to cover its cost to the Partnership, the Net Asset Value of the Partnership will generally decline faster than would otherwise be the case.

Certain of the Partnership's trading and investment activities in securities and other financial instruments may be subject to Federal Reserve Board margin requirements, which are computed each day. When the market value of a particular open position changes to a point where the margin on deposit does not satisfy maintenance margin requirements, a "margin call" on the customer is made. If the customer does not deposit additional funds with the broker to meet the margin call within a reasonable time, the customer's position may be closed out. In the event of a precipitous drop in the value of the assets managed by the Partnership, the Partnership might not be able to liquidate

002800


HCMLPHMIT00004065

assets quickly enough to pay off the margin debt and might suffer mandatory liquidation of positions in a declining market at relatively low prices, incurring substantial losses. With respect to the Partnership's trading activities, the Partnership, and not the Limited Partners personally, will be subject to margin calls.

Overall, the use of leverage, while providing the opportunity for a higher return on investments, also increases the volatility of such investments and the risk of loss.

<u>**Options and Other Derivative Instruments**</u>. The Investment Manager may invest, from time to time, a portion of the Partnership's assets in options and derivative instruments, including buying and writing puts and calls on some of the securities held by the Partnership. The prices of many derivative instruments, including many options and swaps, are highly volatile. The value of options and swap agreements depend primarily upon the price of the securities, indexes, currencies or other instruments underlying them. Price movements of options contracts and payments pursuant to swap agreements are also influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. The Partnership is also subject to the risk of the failure of any of the exchanges on which its positions trade or of their clearinghouses or of counterparties. The cost of options is related, in part, to the degree of volatility of the underlying securities, currencies or other assets. Accordingly, options on highly volatile securities, currencies or other assets may be more expensive than options on other investments.

Put options and call options typically have similar structural characteristics and operational mechanics regardless of the underlying instrument or asset on which they are purchased or sold. A put option gives the purchaser of the option, upon payment of a premium, the right to sell, and the writer the obligation to buy, the underlying security, index, currency or other instrument or asset at the exercise price. A call option, upon payment of a premium, gives the purchaser of the option the right to buy, and the seller the obligation to sell, the underlying instrument or asset at the exercise price.

If a put or call option purchased by the Partnership were permitted to expire without being sold or exercised, the Partnership would lose the entire premium it paid for the option. The risk involved in writing a put option is that there could be a decrease in the market value of the underlying instrument or asset caused by rising interest rates or other factors. If this occurred, the option could be exercised and the underlying instrument or asset would then be sold to the Partnership at a higher price than its current market value. The risk involved in writing a call option is that there could be an increase in the market value of the underlying instrument or asset caused by declining interest rates or other factors. If this occurred, the option could be exercised and the underlying instrument or asset would then be sold by the Partnership at a lower price than its current market value.

Purchasing and writing put and call options and, in particular, writing "uncovered" options are highly specialized activities and entail greater than ordinary investment risks. In particular, the writer of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying instrument or asset above the exercise price of the option. This risk is enhanced if the instrument or asset being sold short is highly volatile and there is a significant outstanding short interest. These conditions exist in the stocks of many companies. The instrument or asset necessary to satisfy the exercise of the call option may be unavailable for purchase except at much higher prices. Purchasing instruments or assets to satisfy the exercise of the call option can itself cause the price of the instruments or assets to rise further, sometimes by a significant amount, thereby exacerbating the loss. Accordingly, the sale of an uncovered call option could result in a loss by the Partnership of all or a substantial portion of its assets.

Swaps and certain options and other custom instruments are subject to the risk of non-performance by the counterparty, including risks relating to the financial soundness and creditworthiness of the counterparty.

<u>**Hedging Transactions**</u>. Investments in financial instruments such as options and interest

002801

HCMLPHMIT00004066

rate swaps, caps and floors, and other derivatives are commonly utilized by investment funds to hedge against fluctuations in the relative values of its portfolio positions as a result of changes in currency exchange rates, interest rates and/or the equity markets or sectors thereof. Any hedging against a decline in the value of portfolio positions does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline, but establishes other positions designed to gain from those same developments, thus moderating the decline in the portfolio positions' value. Such hedging transactions also limit the opportunity for gain if the value of the portfolio positions should increase. Moreover, it may not be possible for the Partnership to hedge against a fluctuation at a price sufficient to protect the Partnership's assets from the decline in value of the portfolio positions anticipated as a result of such fluctuations. For example, the cost of options is related, in part, to the degree of volatility of the underlying instruments or assets. Accordingly, options on highly volatile instruments or assets may be more expensive than options on other instruments or assets and of limited utility in hedging against fluctuations in their prices.

The Investment Manager is not obligated to establish hedges for portfolio positions and may not do so. To the extent that hedges are implemented, their success is dependent on the Investment Manager's ability to correctly predict movements in the direction of currency and interest rates and the equity markets or sectors thereof.

<u>Market or Interest Rate Risk</u>. The Partnership may, from time to time, invest in fixed income securities and instruments. The price of most fixed income securities move in the opposite direction of the change in interest rates. For example, as interest rates rise, the prices of fixed income securities fall. If the Partnership holds a fixed income security to maturity, the change in its price before maturity may have little impact on the Partnership's performance. However, if the Partnership has to sell the fixed income security before the maturity date, an increase in interest rates could result in a loss to the Partnership.

<u>Callable Securities</u>. Many bonds, including agency, corporate and municipal bonds, and mortgage-backed securities, sometimes contain a provision that allows the issuer to "call" (i.e., redeem) all or part of the issue before the bond's maturity date. The issuer usually retains this right to refinance the bond in the future if market interest rates decline below the coupon rate on the outstanding debt security. From the investor's perspective, there are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Partnership is exposed to reinvestment rate risk – the Partnership will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

<u>Maturity Risk</u>. In certain situations, the Partnership may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these circumstances, the Partnership will make an adjustment to account for the interest rate risk differential in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

<u>Inflation Risk</u>. Inflation risk results from the variation in the value of cash flows from a fixed income security or instrument due to inflation, as measured in terms of purchasing power. For example, if the Partnership purchases a 5-year bond with a coupon rate of 5%, but the rate of inflation is 6%, then the purchasing power of the cash flow has declined. For all but inflation-linked bonds, adjustable bonds or floating rate bonds, the Partnership is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

<u>Downgrades in Fixed Income Debt Securities</u>. Unless required by applicable law, the

002802

HCMLPHMIT00004067

Partnership is not required to sell or dispose of any debt security that either loses its rating or has its rating reduced after the Partnership purchases such security.

**Investments in Non-U.S. Investments**.  From time to time, the Investment Manager may invest and trade a portion of the Partnership's assets in non-U.S. securities and other assets (through ADRs and otherwise), which will give rise to risks relating to political, social and economic developments abroad, as well as risks resulting from the differences between the regulations to which U.S. and non-U.S. issuers and markets are subject.  Such risks may include:

•   Political or social instability, the seizure by foreign governments of company assets, acts of war or terrorism, withholding taxes on dividends and interest, high or confiscatory tax levels, and limitations on the use or transfer of portfolio assets.

•   Enforcing legal rights in some foreign countries is difficult, costly and slow, and there are sometimes special problems enforcing claims against foreign governments.

•   Non-U.S. securities and other assets often trade in currencies other than the U.S. dollar, and the Partnership may directly hold foreign currencies and purchase and sell foreign currencies through forward exchange contracts.  Changes in currency exchange rates will affect the Partnership's Net Asset Value, the value of dividends and interest earned, and gains and losses realized on the sale of investments.  An increase in the strength of the U.S. dollar relative to these other currencies may cause the value of the Partnership's investments to decline.  Some foreign currencies are particularly volatile.  Foreign governments may intervene in the currency markets, causing a decline in value or liquidity of the Partnership's foreign currency holdings.  If the Partnership enters into forward foreign currency exchange contracts for hedging purposes, it may lose the benefits of advantageous changes in exchange rates.  On the other hand, if the Partnership enters forward contracts for the purpose of increasing return, it may sustain losses.

•   Non-U.S. securities and other markets may be less liquid, more volatile and less closely supervised by the government than in the United States.  Foreign countries often lack uniform accounting, auditing and financial reporting standards, and there may be less public information about the operations of issuers in such markets.

**Risks Associated with ADRs**.  The Partnership may purchase ADRs, which are certificates evidencing ownership of shares of a non-U.S. issuer, acting as alternatives to directly purchasing the underlying non-U.S. securities in their national markets and currencies.  Such investments are subject to many of the risks associated with investing directly in non-U.S. securities.  These risks include the political and economic risks of the underlying issuer's country, as well as, in the case of depositary receipts traded on non-U.S. markets, foreign exchange risk.  ADRs may be sponsored or unsponsored.  Unsponsored ADRs are established without the participation of the issuer.  In addition, unsponsored ADRs may involve higher expenses, may not carry pass-through voting or other shareholder rights, and may be less liquid.  The performance of ADRs may be different from the performance of the ordinary shares of the non-U.S. issuers to which they relate.

**Emerging Markets**.  The Partnership may invest a portion of its assets in investments related to emerging market countries.  The securities markets of emerging market countries as a whole have been volatile and the loans and securities of issuers in emerging markets tend to be subject to abrupt or erratic price movements.  Investing a portion of the Partnership's assets in issuers in emerging markets will make the Partnership susceptible to a greater degree than otherwise would be the case to factors affecting markets in general and issuers in emerging markets included in the Partnership's portfolio in particular, and may increase the volatility of the value of the Partnership's portfolio investments.  The economies of these markets may differ significantly from the economies of certain developed countries in such respects as gross domestic product or gross national product, rate of inflation, currency depreciation, capital reinvestment, resource self-sufficiency, structural unemployment and balance of payments position.  In particular, these economies frequently experience high levels of inflation.  In addition, such countries may have:    (1) restrictive national policies that limit the Partnership's investment opportunities; (2) limited information about their issuers; (3) a

general lack of uniform accounting, auditing and financial reporting standards, auditing practices and requirements compared to the standards of developed countries; (4) less governmental supervision and regulation of business and industry practices, securities exchanges, brokers and listed companies; (5) economic developments that may be slowed or reversed by unanticipated political or social events in such countries; and (6) a lack of capital market structure or market-oriented economy.

Systemic and market factors may affect the acquisition, payment for or ownership of investments including:  (a) the prevalence of crime and corruption; (b) the inaccuracy or unreliability of business and financial information; (c) the instability or volatility of:  (i) banking and financial systems, or the absence or inadequacy of an infrastructure to support such systems, (ii) custody and settlement infrastructure of the market in which such investments are traded and held, and (iii) the acts, omissions and operation of any securities depository; (d) the risk of the bankruptcy or insolvency of banking agents, counterparties to cash and securities transactions, registrars or transfer agents; and (e) the existence of market conditions that prevent the orderly execution or settlement of transactions or that affect the value of assets.  Different clearance and settlement procedures may prevent the Partnership from making intended security purchases causing the Partnership to miss attractive investment opportunities, possibly resulting in either losses to or contract claims against the Partnership.  The investment markets of many of the countries in which the Partnership may invest may also be smaller, less liquid, and subject to greater price volatility than developed markets.  The Partnership's assets may be denominated in a variety of currencies subject to changes in currency exchange rates and in exchange control regulations.

**Volatility of Currency Prices**.  In general, price movements of currencies are difficult to predict accurately because they are influenced by, among other things, changing supply and demand relationships; governmental, trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates.  Governments from time to time intervene in certain markets in order to influence prices directly.

**Currency Control**.  It is sometimes the case that governments alter the exchange rate policy of a currency without advance notice, and it may not always be possible to foresee a change in policy.

**Exchange Rate Fluctuations**.  Investments that are denominated in a foreign currency are subject to the risk that the value of a particular currency will change in relation to one or more other currencies.  The Partnership intends to value its holdings and to make distributions in U.S. dollars.  Thus, changes in currency exchange rates adverse to the U.S. dollar may affect adversely the value of such holdings.  Among the factors that may affect currency values are trade balances, the appropriateness of interest rates, the shape of the yield curve, the degree of central bank independence and credibility, differences in relative values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments.

**Risks of Trading Futures**.  The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the CEA that provides an exemption from registration as a commodity pool operator.  Trading futures is a highly risky strategy.  Whenever the Partnership purchases a particular future, there is a possibility that the Partnership may sustain a total loss of its purchase price.  The equity values of leveraged positions using futures are, in general, much more volatile than the prices of securities, such as stocks and bonds.  As a result, the risk of loss in trading futures is substantially greater than in trading those securities.  The prices of futures react strongly to the prices of the underlying commodities.  The prices of these underlying products, in turn, rise and fall based on changes in interest rates, international balances of trade, changes in governments, wars, weather events and a host of other factors that are entirely beyond the Investment Manager's control and very difficult (and perhaps impossible) to predict.

**Forward Trading**.  Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis.  Forward

002804

HCMLPHMIT00004069

and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable. The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration. There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell. Disruptions can occur in any market traded by the Partnership due to unusual trading volume, political intervention or other factors. The imposition of controls by governmental authorities might also limit such forward trading to less than that which the Investment Manager would otherwise recommend, to the possible detriment of the Partnership. Market illiquidity or disruption could result in major losses to the Partnership.

<u>Over-the-Counter-Trading</u>. Financial instruments that may be purchased or sold by the Partnership may include instruments not traded on an exchange. The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Partnership can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange. Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

To the extent that the Partnership engages in these transactions, the Partnership must rely on the creditworthiness of its counterparty. In certain instances, counterparty or credit risk is affected by the lack of a central clearinghouse for foreign exchange trades. To reduce their credit risk exposure, the Partnership may trade in the forward foreign currency market through money center banks and leading brokerage firms.

<u>Position Limits</u>. Position limits imposed by various regulators or regulations may also limit the Partnership's ability to affect desired trades. Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument. All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded. Thus, even if the Partnership does not intend to exceed applicable position limits, it is possible that different accounts managed by the Investment Manager or its affiliates may be aggregated. If at any time positions managed by the Investment Manager were to exceed applicable position limits, the Investment Manager would be required to liquidate positions, which might include positions of the Partnership, to the extent necessary to come within those limits. Further, to avoid exceeding the position limits, the Partnership might have to forego or modify certain of its contemplated trades.

<u>Risk of Default or Bankruptcy of Third Parties</u>. The Partnership may engage in transactions in securities and other financial instruments and assets that involve counterparties. Under certain conditions, the Partnership could suffer losses if a counterparty to a transaction were to default or if the market for certain securities or other financial instruments or assets were to become illiquid. In addition, the Partnership could suffer losses if there were a default or bankruptcy by certain other third parties, including brokerage firms and banks with which the Partnership does business, or to which securities or other financial instruments or assets have been entrusted for custodial purposes.

<u>Potential Custody and Brokerage Risk</u>. The Partnership may rely on its relationship(s) with brokers and/or custodians. There are risks involved in dealing with the custodians or brokers who may settle Partnership trades. The Partnership may maintain custody accounts with a broker. Although the Investment Manager intends to monitor the Partnership's broker(s) and/or custodian(s), if any, there is no guarantee that such broker(s) and/or custodian(s) that the Partnership may use from time to time, will not become bankrupt or insolvent. While both the U.S. Bankruptcy Code, as amended, and

002805

HCMLPHMIT00004070

the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a bankruptcy, insolvency, failure, or liquidation of a broker-dealer, there is no certainty that, in the event of a failure of a broker-dealer that has custody of Partnership assets, the Partnership would not incur losses due to its assets being unavailable for a period of time, the ultimate receipt of less than full recovery of its assets, or both.

The Partnership and/or its broker or custodian, if any, may appoint sub-custodians in certain non-U.S. jurisdictions to hold the assets of the Partnership. The appointing broker and/or custodian may not be responsible for cash or assets which are held by sub-custodians in certain non-U.S. jurisdictions, nor for any losses suffered by the Partnership as a result of the bankruptcy or insolvency of any such sub-custodian. The Partnership may therefore have a potential exposure on the default of any sub-custodian and, as a result, many of the protections that would normally be provided to a fund by a custodian may not be available to the Partnership. Under certain circumstances, including certain transactions where the Partnership's assets are pledged as collateral for leverage from a non-broker-dealer custodian or a non-broker-dealer affiliate of the broke and/or custodian, or where the Partnership's assets are held at a non-U.S. custodian, the securities and other assets deposited with the custodian or broker may not be clearly identified as being assets of the Partnership and hence the Partnership could be exposed to a credit risk with regard to such parties. Custody services in certain non-U.S. jurisdictions remain undeveloped and, accordingly, there is a transaction and custody risk of dealing in certain non-U.S. jurisdictions. Given the undeveloped state of regulations on custodial activities and bankruptcy, insolvency, or mismanagement in certain non-U.S. jurisdictions, the ability of the Partnership to recover assets held by a sub-custodian in the event of the sub-custodian's bankruptcy or insolvency could be in doubt, as the Partnership may be subject to significantly less favorable laws than many of the protections that would be available under U.S. laws. In addition, there may be practical or time problems associated with enforcing the Partnership's rights to its assets in the case of a bankruptcy or insolvency of any such party.

<u>Temporary Defensive Investments</u>. If warranted under certain economic or market conditions or for other reasons, the Investment Manager may temporarily invest up to 100% of the Partnership's assets outside the scope of its principal investment focus in U.S. government securities, such as Treasury bills, notes and bonds, cash, money-market funds, certificates of deposit, time deposits, bankers' acceptances and other short-term debt instruments bearing a reasonable rate of interest. In such circumstances, the Partnership may not achieve its investment objectives.

<u>Other Instruments</u>. The Partnership may take advantage of opportunities with respect to certain other instruments that are not presently contemplated for use or that are currently not available, but that may be developed, to the extent such opportunities are both consistent with the investment objective of the Partnership and legally permissible. Special risks may apply to instruments that are invested in by the Partnership in the future that cannot be determined at this time or until such instruments are developed or invested in by the Partnership.

<u>Specific Risks Associated with Investing in Illiquid Investments</u>

You should note that certain of the following risk factors specifically applicable with respect to Illiquid Investments have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

<u>Special Situations</u>. The Partnership will invest in companies involved in (or the target of) acquisition attempts or tender offers or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions. In any investment opportunity involving any such type of special situation, there exists the risk that the contemplated transaction either will be unsuccessful, take considerable time or result in a distribution of cash or a new security the value of which will be less than the purchase price to the Partnership of the security or other financial instrument in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Partnership may be required to sell its investment at a loss. In connection with such transaction (or otherwise), the Partnership may purchase securities on a when-issued

002806

HCMLPHMIT00004071

basis, which means that delivery and payment take place sometime after the date of the commitment to purchase and are often conditioned upon the occurrence of a subsequent event, such as approval and consummation of a merger, reorganization or debt restructuring. The purchase price and/or interest create receivable with respect to a when-issue security are fixed when the Partnership enters into the commitment. Such securities are subject to changes in market value prior to their delivery. Because there is substantial uncertainty concerning the outcome of transactions involving companies in which the Partnership may invest, there is a potential risk of loss by the Partnership of its entire investment in such companies.

**Alternative Investments.** In the alternative asset class, the Investment Manager may invest assets of the Partnership in other pooled investment vehicles managed by the Investment Manager. The pooled investment vehicles managed by the Investment Manager may follow a variety of investment strategies including investments in commodities, managed futures, inflation-adjusted bonds, global real estate, "hedge fund strategies", which may be broadly characterized as "hedge funds", and mezzanine debt or Illiquid Investments.

**Withdrawal Considerations.** The Partnership is permitted to invest in Illiquid Investments. There is no market for the Interests, and no market is expected to develop. Therefore, in certain circumstances, the Partnership may not be able to withdraw invested assets with respect to Illiquid Investments at a time that would be most advantageous to the Partnership or at a time that would allow the Partnership to comply with its withdrawal obligations to its Limited Partners. In this regard, the General Partner has the right to suspend in whole or in part certain withdrawal rights of the Limited Partners to the extent that the Partnership is unable to obtain liquidity from its investments in one or more of the Illiquid Investments. The illiquidity of Illiquid Investments could have a material adverse effect on the Partnership, as well as the ability of the Limited Partners to liquidate their investments in the Partnership during permitted withdrawal periods. Consequently, Limited Partners may be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the terms of this Memorandum, and, even in such event, payment of withdrawal proceeds may be delayed for a significant period of time. Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason. **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in Side Pocket Accounts; and (ii) any investment made by Series 1 into the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

**High Growth Industry Related Risks.** The Partnership may have significant investments in the securities of high growth companies (e.g., technology, communications and healthcare). It is noted that these securities may be very volatile. In addition, these companies may face undeveloped or limited markets, have limited products, have no proven profit-making history, may operate at a loss or with substantial variations in operating results from period to period, have limited access to capital and/or be in the developmental stages of their businesses, have limited ability to protect their rights to certain patents, copyrights, trademarks and other trade secrets, or be otherwise adversely affected by the extremely competitive markets in which many of their competitors operate.

**Risk of Illiquid Investments.** Illiquid Investments involve a high degree of financial risk. There can be no assurance that Illiquid Investments will be profitable or that substantial losses will not occur. The companies in which the Illiquid Investments will invest are often dependent on the skills of a small number of executives and are vulnerable to changes in technology, fluctuations in demand for their products, changing interest rates and other factors. There can also be no assurance that the Illiquid Investments will be repaid, be able to sell or otherwise liquidate their investments at the optimal time or price. Therefore, there can be no assurance that the rate of return objectives of the Illiquid Investments will be realized or that there will be any return of capital to the Limited Partners.

**Illiquid and Long-Term Investments.** It is anticipated that there will be a significant period of time before certain Illiquid Investments will have completed their investments. Such investments may take several years from the date of initial investment to reach a state of maturity when realization of the investment can be achieved. Although

002807

HCMLPHMIT00004072

investments by Illiquid Investments occasionally may generate some current income, private investment transaction structures typically will not provide for liquidity of the Illiquid Investment's investment prior to that time. The return of capital and the realization of gains, if any, from such investment will generally occur only upon the partial or complete disposition or refinancing of the investment. In light of the foregoing, it is likely that no significant return from the disposition of Illiquid Investment's underlying investments will occur for a substantial period of time from the commencement of the Illiquid Investment's operations. It is unlikely that there will be a public market for the securities held by the Illiquid Investment and/or its portfolio companies at the time of their acquisition. The Illiquid Investment generally will not be able to sell its securities publicly unless the issuer has consummated a public offering of its securities and such offered securities are registered under applicable securities laws, unless an exemption from such registration requirements is available. In addition, in some cases, the Partnership may be prohibited by contract from selling certain securities for a period of time and, as a result, may not be permitted to sell an underlying investment at a time it might otherwise desire to do so. Further, disposition of such investments may require a lengthy time period or may result in distributions in kind to investors.

**Investments in Less Established Companies.** The Partnership may invest a portion of its assets in the securities of less established companies, or early stage companies. Investments in such early stage companies may involve greater risks than those generally associated with investments in more established companies. For instance, less established companies tend to have smaller capitalizations and fewer resources and, therefore, are often more vulnerable to financial failure. Such companies also may have shorter operating histories on which to judge future performance and in many cases, if operating, will have negative cash flow. In the case of start-up enterprises, such companies may not have significant or any operating revenues. In addition, less mature companies could be more susceptible to irregular accounting or other fraudulent practices. Furthermore, to the extent there is any public market for the securities held by the Illiquid Investment, securities of less established companies may be subject to more abrupt and erratic market price movements than those of larger, more established companies.

Some of the investments expected to be made by an Illiquid Investment would be considered highly speculative and may result in the loss of the Special Situation Investment's entire investment therein. There can be no assurance that any such losses will be offset by gains (if any) realized on the Illiquid Investment's other investments.

**Investments in Restructurings or Underperforming Companies.** The Partnership may make investments in companies that are experiencing or are expected to experience financial difficulties, which such companies may never overcome. Such investments could, in certain circumstances, subject the Partnership to additional potential liabilities, which may exceed the value of the Partnership's original investment therein. Such investments of the Partnership could also be subject to federal bankruptcy law and state fraudulent transfer laws, which may vary from state to state, if the securities relating to such investments were issued with the intent of hindering, delaying or defrauding creditors or, in certain circumstances, if the issuer receives less than reasonably equivalent value or fair consideration in return for issuing such securities. If such investments constitute debt and such debt is used for a buyout of shareholders, this risk is greater than if the debt proceeds are used for day-to-day operations or organic growth. If a court were to find that the issuance of the securities was a fraudulent transfer or conveyance, the court could void the payment obligations under the securities, further subordinate the securities to other existing and future indebtedness of the issuer or require the Partnership to repay any amounts received by it with respect to the securities. In the event of a finding that a fraudulent transfer or conveyance occurred, the Partnership may not receive any repayment on the securities.

Under the Bankruptcy Code, a lender that has inappropriately exercised control of the management and policies of a company may have its claims against the company subordinated or disallowed, or may be found liable for damages suffered by parties as a result of such actions. In addition, under certain circumstances, payments to the Partnership and distributions by the Partnership ion Investment to its limited partners may be reclaimed if any such payment or distribution is later determined to have been a

002808
HCMLPHMIT00004073

fraudulent conveyance or a preferential payment. Such debt may also be disallowed or subordinated to the claims of other creditors if the Partnership is found to have engaged in other inequitable conduct resulting in harm to other parties. The Partnership's underlying investment may be treated as equity if it is deemed to be a contribution to capital, or if the Partnership attempts to control the outcome of the business affairs of a company prior to its filing under the Bankruptcy Code. While the Partnership will attempt to avoid taking the types of action that would lead to such liability, there can be no assurance that such claims will not be asserted or that the Partnership will be able successfully to defend against them.

## REGULATORY AND TAX RISKS

**General Regulatory Risks**. Statutes, regulations and policies are continually under review by the U.S. Congress and state legislatures and federal and state regulatory agencies. The introduction of new legislation or amendments to existing legislation and regulations (including changes in how they are interpreted or implemented) by governments, the decisions of courts and tribunals and the rulings and decisions of regulatory authorities, can adversely impact the Partnership's returns. The regulatory environment for private investment funds is evolving, and changes in the regulation of these funds may adversely affect the value of investments held by the Partnership, the cost of compliance with applicable regulations, and the ability of the Partnership to obtain the leverage it might otherwise obtain or to pursue its trading strategies.

**Regulatory Risks Related to the Highland Transaction**. In connection with the Highland Transaction (if consummated), there can be no assurance that such transaction (if consummated) will not result in adverse regulatory consequences (including, without limitation, being characterized as a "change of control" under applicable laws), even though the Highland Transaction only contemplates the acquisition of non-voting limited partnership interests in Highland.

**Strategy Restrictions**. Certain institutions may be restricted from directly utilizing investment strategies of the type in which the Partnership may engage. Such institutions, including entities subject to ERISA, should consult their own advisors, counsel and accountants to determine what restrictions may apply and whether an investment in the Partnership is appropriate.

**Trading Limitations**. For all securities, instruments and/or assets listed on an exchange, including options listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances. Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Partnership to loss. Also, such a suspension could render it impossible for the Investment Manager to liquidate positions and thereby expose the Partnership to potential losses relating thereto.

**Limited Regulatory Oversight**. The Partnership's investments are not supervised or monitored by any regulatory authority. The Partnership is not registered as an "investment company" under the Investment Company Act. Although the Investment Manager is registered as an investment adviser with the SEC, neither the General Partner nor the Investment Manager is registered as a commodity pool operator, pursuant to an exemption provided under Rule 4.13(a)(3) of the CEA. Consequently, Limited Partners will not benefit from some of the protections afforded by these statutes, including oversight by the Commodity Futures Trading Commission.

**Prevention of Money Laundering and Terrorism**. The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "**USA PATRIOT Act**"), signed into law and effective as of October 26, 2001, requires that financial institutions, a term that includes banks, broker-dealers and investment companies, establish and maintain compliance programs to guard against money laundering activities. The USA PATRIOT Act requires the Secretary of the U.S. Treasury ("**Treasury**") to prescribe regulations in connection with anti- money laundering policies of financial institutions. The U.S. Federal Reserve Board, the Treasury and the SEC are currently studying what types of investment vehicles should be required to adopt anti-money laundering procedures, and it is unclear at this time whether such

002809

HCMLPHMIT00004074

procedures will apply to pooled investment vehicles such as the Partnership. Future rules and regulations regarding money laundering or proceeds of crime could regulate the Partnership. In addition, in April 2000, the Treasury Department published proposed regulations that would require certain investment advisors to establish an anti-money laundering program. It is possible that there could be promulgated legislation or regulations that would require the Partnership or its affiliates, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Interests. Such legislation and/or regulations could require the Partnership to implement additional restrictions on the transfer of the Interests. The Partnership reserves the right to request such information as is necessary to verify the identity of investors in the Interests, and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by Financial Crimes Enforcement Network and/or the SEC or such information as may be required in order for the Partnership to discharge its obligations under the laws of the Cayman Islands (including pursuant to the Proceeds of Criminal Conduct Law (2005 Revision)). In the event of delay or failure by the applicant to produce any information required for verification purposes, an application for or transfer of the Interests and the subscription monies relating thereto may be refused.

**Recent Developments in the Financial Services Industry.** Recent developments in the U.S. financial markets have heightened the risks associated with the investment activities and operations of hedge funds, including without limitation, those resulting from a substantial reduction in the availability of credit and the increased cost of short-term credit, a decrease in market liquidity and an increased risk of insolvency of brokers, custodians and other counterparties. In addition, in July of 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. Even with the passage of Dodd-Frank, the implications of its passage for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory, or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Partnership or the Partnership's business, operations and performance.

**Enhanced Regulation of Swaps.** The Wall Street Transparency and Accountability Act of 2010 (the "**WSTAA**") will, subject to exceptions for certain hedgers, (1) require swaps accepted for clearing by a derivatives clearing organization (a "**DCO**") or for trading through a designated contract market or swaps-execution facility to be so cleared and traded, (2) require margin for almost all swap transactions, (3) subject traders with a "substantial position" in swaps to registration and regulation requirements as a "major swap participant" or "swap dealer", and (4) impose position limits on swaps either individually or in the aggregate with respect to positions in commodity-futures contracts. Due to the new requirements imposed by the WSTAA, the Partnership may experience increased transaction costs to pay for the clearing, execution and segregation obligations. In addition, margin requirements may increase once margin is set by DCOs with input from the CFTC, which may limit the Partnership's ability to engage in leverage and limit the Partnership's return. The application of position limits to swap contracts may also limit the Partnership's ability to concentrate in any particular contract or exposure to an underlying commodity and may negatively impact the Partnership's ability to take advantage of current market trends or conditions. Any tightening in the market for swaps may significantly impact the Partnership and its returns. In addition, if the Partnership were deemed to be a swap dealer or a major swap participant under WSTAA, the Partnership may be required to register with the CFTC and would be subject to a number of regulatory requirements that would significantly impact the Partnership's legal obligations and its returns.

**Tax Risk.** The tax aspects of an investment in the Partnership are complicated and each investor should have them reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and

002810

HCMLPHMIT00004075

private investment vehicles.  The Partnership is not intended and should not be expected to provide any tax shelter, but is organized as a limited partnership to avoid corporate taxation and to permit any distributions it might make to be made without being taxed as dividends.  No assurance can be given that legislative, administrative or judicial changes will not occur which will alter, either prospectively or retroactively, the tax considerations or risk factors discussed in this Memorandum.

The tax consequences to a Limited Partner of an investment in the Partnership are uncertain.  All or substantially all of the assets of the Partnership are expected to be invested in Illiquid Investments.  Such investments are often structured as "pass through" entities for tax purposes and therefore may generate significant taxable income to the Limited Partners without any corresponding liquidity from such investments.  As a result, an investment in the Partnership may be unsuitable for those investors that do not receive a corresponding deduction for such allocated income.

Neither the General Partner nor the Investment Manager makes any representations or warranties regarding any tax matters.  Prospective investors are strongly urged to consult their own tax advisors regarding the U.S. federal, state and local and non-U.S. tax consequences to them arising from an investment in the Partnership, and should rely on the advice of their own tax advisors with respect to the possible impact on its investment in the Partnership of any future legislation or administrative or judicial action.  You should review the section entitled "TAXATION" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests.

**Tax-Exempt Entities**.  Certain prospective Limited Partners may be subject to federal and state laws, rules and regulations that may regulate their participation in the Partnership, or their engaging, directly or indirectly through an investment in the Partnership, in investment strategies of the types that the Partnership utilizes from time to time.  Tax-exempt entities should consider the applicability to them of the provisions relating to UBTI (as defined below).  Investments in the Partnership by entities subject to ERISA and other tax-exempt entities require special consideration.  See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors".

**Accounting Rules**.  The Partnership's assets and liabilities are valued in accordance with the Partnership Agreement.  However, for purposes of preparing the Partnership's annual audited financial statements, which are prepared in accordance with GAAP, certain of the Partnership's assets and liabilities may be valued in a manner that, while consistent with GAAP, may be different from the manner in which such assets are valued in accordance with the valuation policies set forth in the Partnership Agreement.

The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the IFRS.  In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

## CONFLICTS OF INTEREST

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Limited Partners.

**No Obligation of Full-Time Service**.  None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates has any obligation to devote its full time to the business of the Partnership.  Each is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership, and each may engage in other business activities, including competing ventures and/or unrelated employment, which may result in various conflicts of interest between such persons and the Partnership.

**Services to Affiliated Funds**.  In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including

002811

HCMLPHMIT00004076

those that may employ an investment program and strategy similar to that of the Partnership. Specifically, as of the date hereof: (i) the Investment Manager acts as the investment manager to the IDF Fund that is structured as an insurance-dedicated fund and is expected to invest a portion of its assets in the Partnership; (ii) Atlas IDF GP, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the IDF Fund; (iii) the Principal is the managing member and controlling person of Atlas IDF GP, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

The investments made by Affiliated Funds that may be managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates in the future may compete with investments for the Partnership's account, and the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates may decide to invest the funds of these Affiliated Funds rather than the assets of the Partnership in a particular security or strategy. In addition, the Investment Manager and/or such other persons will determine the allocation of funds by and among the Partnership and the Affiliated Funds to investment strategies and techniques on whatever basis they decide is appropriate or desirable in their sole and absolute discretion. The records of these Affiliated Funds will not be made available to Limited Partners. Nonetheless, in the event that certain securities, instruments and other assets are suitable for acquisition by the Partnership and by other accounts managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates, and the Investment Manager or such other persons are not able to acquire the desired aggregate amount of such securities, instruments and other assets on terms and conditions which they deem advisable, the Investment Manager and such persons will endeavor in good faith to allocate the limited amount of such investment opportunities among the various accounts for which they consider to be suitable.

**<u>Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests</u>**. The Principal was previously a Partner and Co-Head of Private Equity at Highland, an investment manager with significant assets under management located in Dallas, Texas. Although Mr. Honis has retired from that position, he still currently serves on: (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland, and receives compensation in connection with each of the foregoing. Additionally, as part of his retirement, Mr. Honis has received or is in the process of receiving payments in the total amount of approximately $3 million from certain affiliates of Highland.

In addition, pursuant to the Shared Services Agreement, Highland serves as the Shared Services Provider, which provides the Investment Manager and the Partnership with certain administrative, information technology, accounting, tax, back-office and other services. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

Further, the Investment Manager and Highland have had preliminary discussions concerning the potential Highland Transaction. Although, as of the date hereof, the Partnership and Highland have not actively negotiated documentation for the legal and economic terms of the Highland Transaction (and there can be no assurances that such transaction will be consummated), it is nonetheless the intention of such parties that the transaction should come about.

In light of the foregoing, the Principal, and indirectly the Investment Manager, are in a position of conflict with respect to the ultimate decision by the Partnership regarding whether it pursues the Highland Transaction, and under what terms (if any) it agrees to participate in any such transaction.

Also see "—Potential Directorship Positions; Other Roles" herein.

002812

HCMLPHMIT00004077

**Highland Transaction; Limited Control**.  If the Highland Transaction is consummated, it is currently contemplated that the Partnership would acquire only limited partnership interests in Highland.  As with investments in non-controlling interests in other partnerships, the Highland Transaction may involve special risks associated with the possibility that the controlling principals of Highland may:  (i) have economic or business interests or goals that are inconsistent with those of the Partnership, (ii) take actions contrary to the instructions or requests of the Partnership or contrary to the Partnership's policies or objectives, (iii) be unable or unwilling to fulfill its obligations under the organizational/governing documents, and/or (iv) experience financial difficulties.  The occurrence of such problems could have a material adverse effect on the business and prospects of the Partnership's investment in the Highland Transaction and may affect management decisions and exit strategies in a manner adverse to the Partnership's interests.

**Conflicts Related to Shared Services Provider**.  The Investment Manager has certain affiliated entities that may provide services with respect to the IDF Fund, as well as the Partnership and certain investments held by the Partnership.  The Shared Services Provider may provide services for the benefit of the Partnership under the Shared Services Agreement and/or may incur reimbursable expenses on behalf of the Partnership and/or the Investment Manager.  In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.  The Principal is a former Partner and former Co-Head of Private Equity of the Shared Services Provider.

**Potential Directorship Positions; Other Roles**.  The Investment Manager Affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Partnership or other entities that operate in the same or a related line of business as the Partnership, for other clients managed by the Investment Manager or any of the Investment Manager Affiliates, or for any portfolio company of the Partnership, and the Partnership shall have no right to any such fees.  In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Partnership.  Also see "—Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests" herein.

The Investment Manager and/or the Investment Manager Affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by the Partnership.  Such transactions are on an arm's-length basis and may be subject to arm's-length fees.  There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by the Investment Manager and/or the Investment Manager Affiliates and the Partnership shall not have any right to any such fees.

**Potential Cross-Trades**.  The Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Partnership and another client advised by it or any of its affiliates.  The Investment Manager may engage in a client cross-transaction involving the Partnership any time that the Investment Manager believes such transaction to be fair to the Partnership and such other client.  By purchasing an Interest in the Partnership, a Limited Partner is deemed to have consented to such client cross-transactions between the Partnership and another client of the Investment Manager or one of its affiliates.

**Diverse Limited Partners**.  The Limited Partners may include taxable and tax-exempt entities and persons or entities resident of or organized in various jurisdictions.  As a result, conflicts of interest may arise in connection with decisions made by the General Partner that may be more beneficial for one type of Limited Partner than for another.  In making such decisions, the General Partner intends to consider the investment objectives of the Partnership as a whole, not the investment objectives of any Limited Partner individually.

002813

HCMLPHMIT00004078

**Soft Dollars**.  The General Partner and the Investment Manager may be offered soft dollars in the form of research and brokerage and other products or services, which may be utilized by the General Partner, the Investment Manager and their respective affiliates in connection with the services they offer to clients other than the Partnership.  The use of soft dollars presents the Investment Manager with potential conflicts of interest and may provide the Investment Manager with incentives to: (i) use certain brokers who may provide certain soft dollar benefits that other brokers may not, without regard to its obligations to the Partnership (including, without limitation, its best execution obligations); or (ii) trade more actively in order to generate more soft dollars and thereby reduce its expenses.

**Referral of Investors**.  The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense.  The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer.  Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership.  Such broker-dealers may have a conflict of interest in advising prospective investors to purchase Interests, as the broker-dealers are often only compensated upon the investment of the prospective investors.

**Lack of Separate Representation; Potential Conflicts of Counsel**.  Neither the Partnership Agreement nor any of the agreements, contracts and arrangements between the Partnership, on the one hand, and the General Partner or the Investment Manager, on the other hand, were or will be the result of arm's-length negotiations.  The attorneys, accountants and others who have performed services for the Partnership in connection with this offering, and who will perform services for the Partnership in the future, have been and will be selected by the General Partner.  No independent counsel has been retained to represent the interests of prospective investors or Limited Partners.  You are therefore urged to consult your own counsel as to the terms and provisions of the Partnership Agreement and all subscription and other related documents.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different times over a period lasting over a decade.  It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the IDF Fund, the possible consummation of the Highland Transaction, and certain related matters.  The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

**Valuation of Assets**.  The Administrator will calculate the net asset value of the Partnership (based upon information provided by the Investment Manager).  Such calculations could be incorrect, delayed or subject to significant adjustments, any of which events could adversely affect the valuation of the Partnership's investments.  The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments.  Partnership If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument pursuant to the valuation methodologies described herein does not fairly represent its market value, the Investment Manager will value such security, option or other financial instrument as it reasonably determines.  Likewise, any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value.  The Investment Manager has a conflict of interest in that it will receive a higher Management Fee if the Partnership's assets are given a favorable valuation.  See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Determination of Net Asset Value".

002814

HCMLPHMIT00004079

The foregoing list of risk factors and conflicts of interest does not purport to be a complete enumeration or explanation of the risks and conflicts of interest involved in an investment in the Partnership.  Offerees should read this entire Memorandum and the Partnership Agreement and consult with their own advisors before deciding to purchase Interests.

002815
HCMLPHMIT00004080

## ERISA CONSIDERATIONS

An investment of benefit plan assets in the Partnership may raise issues under ERISA and the U.S. Internal Revenue Code of 1986, as amended ("**Code**"). ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan (as defined below) and prohibit certain transactions involving the assets of a Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of a Plan or the management or disposition of the assets of a Plan, or who renders investment advice for a fee or other compensation to a Plan, is generally considered to be a fiduciary of the Plan.

In considering an investment in the Partnership of a portion of the assets of any employee benefit plan (including a "**Keogh**" plan) subject to the fiduciary and prohibited transaction provisions of ERISA or the Code or similar provisions under applicable state law (collectively, a "**Plan**"), a Plan fiduciary should determine, in light of the risks and limited liquidity inherent in an investment in the Partnership, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA or similar law relating to a fiduciary's duties to the Plan. Furthermore, absent an exemption, the fiduciaries of a Plan should not purchase Interests with the assets of any Plan if the Investment Manager or any affiliate thereof is a fiduciary or other "party in interest" or "disqualified person" (collectively, a "**party in interest**") with respect to such Plan.

### PLAN ASSETS

Regulations promulgated under ERISA by the U.S. Department of Labor ("**Plan Asset Regulations**") generally provide that when a Plan subject to Title I of ERISA or Section 4975 of the Code acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company", in each case as defined in the Plan Asset Regulations. The Interests will not constitute "publicly offered" securities or securities issued by an investment company registered under the Investment Company Act, and it is not expected that the Partnership will qualify as an "operating company" under the Plan Asset Regulations. For purposes of the Plan Asset Regulations, equity participation in an entity by benefit plan investors will not be "significant" so long as they own, in the aggregate less than 25%, directly or indirectly, of the value of each class of such entity's equity. For purposes of such calculation, equity interests held by persons (other than a benefit plan investor) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof, are disregarded. For purposes of this 25% test ("**Benefit Plan Investor Test**"), "benefit plan investors" include: employee benefit plans subject to the provisions of Part 4 of Title I of ERISA and plans subject to Section 4975 of the Code, including "Keogh" plans and individual retirement accounts ("**IRAs**"). The following are not included in the definition of benefit plan investor: employee benefit plans maintained outside the U.S. by foreign companies that cover non-U.S. persons, governmental plans, and certain church plans. Thus, absent satisfaction of another exception under the Plan Asset Regulations, if 25% or more of the value of any class of Interests in the Partnership were owned by benefit plan investors, an undivided interest in each of the underlying assets of the Partnership would be deemed to be "plan assets" of any Plan subject to Title I of ERISA or Section 4975 of the Code that invested in the Partnership.

Consequently, the General Partner intends to use reasonable efforts either (i) to prohibit plans subject to Title I of ERISA or Section 4975 of the Code from investing in the Partnership or (ii) to provide that investment by "benefit plan investors" in the Partnership will not be "significant" for purposes of the Plan Asset Regulations by limiting equity participation by benefit plan investors in the Partnership to less than 25% of the value of each class of Interests in the Partnership as described above. However, each Plan fiduciary should be aware that even if the Partnership were to avoid plan asset status

002816

HCMLPHMIT00004081

under the Benefit Plan Investor Test at the time a Plan acquires Interests in the Partnership, the exemption could become unavailable at a later date as a result, for example, of subsequent transfers or withdrawals of Interests in the Partnership, and that Interests held by benefit plan investors may be subject to mandatory withdrawal in such event in order for the Partnership to continue to avoid plan asset status under the Benefit Plan Investor Test.

Furthermore, there can be no assurance that notwithstanding the reasonable efforts of the Partnership, the Partnership will satisfy the Benefit Plan Investor Test, that the structure of particular investments of the Partnership will otherwise satisfy the Plan Asset Regulations or that the underlying assets of the Partnership will not otherwise be deemed to include ERISA plan assets.

## PLAN ASSET CONSEQUENCES

If the assets of the Partnership were deemed to be "plan assets" under ERISA, (i) the prudence and other fiduciary responsibility standards of ERISA would extend to investments made by the Partnership and (ii) certain transactions in which the Partnership might seek to engage could constitute "prohibited transactions" under ERISA and the Code.  If a prohibited transaction occurs for which no exemption is available, the Investment Manager and any other fiduciary that has engaged in the prohibited transaction could be required (x) to restore to the Plan any profit realized on the transaction and (y) to reimburse the Plan for any losses suffered by the Plan as a result of the investment.  In addition, each party in interest involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%.  Plan fiduciaries that decide to invest in the Partnership could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Partnership or as co-fiduciaries for actions taken by or on behalf of the Partnership or the Investment Manager.  With respect to an IRA that invests in the Partnership, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, could cause the IRA to lose its tax-exempt status.

Under the Partnership Agreement, the General Partner has the power to take certain actions to avoid having the assets of the Partnership characterized as plan assets, including, without limitation, the right to refuse a subscription, exclude a Limited Partner from an investment or to compulsorily redeem a Limited Partner's Interests in the Partnership.  While the General Partner does not expect that it will need to exercise such power, it cannot give any assurance that such power will not be exercised.

**Each Plan fiduciary should consult its own legal advisor concerning the considerations discussed above before making an investment in the Partnership.**

002817

HCMLPHMIT00004082

<div align="right">TAXATION</div>

**Prospective investors are advised that: (i) any U.S. federal tax advice contained herein, including any opinion of counsel referred to herein, is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding U.S. federal tax penalties that may be imposed on the taxpayer; (ii) any such advice is written to support the promotion or marketing of the transactions described herein (or in any such opinion of counsel); and (iii) each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

### INTRODUCTION

The following is a summary of certain aspects of the taxation of the Partnership and its Partners, which should be considered by a potential purchaser of an Interest in the Partnership. A complete discussion of all tax aspects of an investment in the Partnership is beyond the scope of this Memorandum. The following summary is only intended to identify and discuss certain salient issues.

This summary of certain tax considerations applicable to the Partnership is considered to be a correct interpretation of existing laws and regulations in force on the date of this Memorandum. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum or that any such future guidance or interpretation will not be applied retroactively.

**The following summary is not intended as a substitute for careful tax planning. The tax matters relating to the Partnership are complex and are subject to varying interpretations. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Partners will vary with the particular circumstances of each Partner. Accordingly, each prospective investor must consult with and rely solely on his or her professional tax advisors with respect to the tax results of his or her investment in the Partnership. In no event will the General Partner, its affiliates, counsel or other professional advisors be liable to any Limited Partner for any federal, state, local or other tax consequences of an investment in the Partnership, whether or not such consequences are as described below.**

### CLASSIFICATION OF THE PARTNERSHIP

Under the provisions of the Code and the Treasury Regulations promulgated thereunder ("**Regulations**"), as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement, the Partnership should be classified for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

The Partnership has been formed under the Delaware Act as a series limited partnership and may offering its Interests in multiple separate Series. Under the provisions of the Code and the Regulations, as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement and the Delaware Act, each Series of Interests in the Partnership should be classified for U.S. federal income tax purposes as equity interests in a separate partnership and not as equity interests in an association taxable as a corporation.

The Partnership has not sought and will not seek a ruling from the Internal Revenue Service ("**IRS**") with respect to its status as a partnership. If a Series of Interests in the Partnership should be classified as an association taxable as a corporation (e.g., as a result of a change in law or a material change in facts), the taxable income of the Partnership allocable to such Series would be subject to corporate income taxation; and distributions from the Partnership to the Limited Partners owning Interests in such Series would be treated as dividend income when received by such Limited Partners to the extent of the current or accumulated earnings and profits of the Partnership allocable to

002818

HCMLPHMIT00004083

such Series.

Certain partnerships may be taxable as corporations for U.S. federal income tax purposes under the publicly traded partnership rules set forth in the Code and the Regulations, and a Series of the Partnership may not qualify for one of the safe harbors under the Regulations if such Series has more than 100 Partners. The Partnership expects that, under the facts and circumstances test set forth in the Regulations, the Interests will not be readily tradable on a secondary market (or the substantial equivalent thereof) and therefore, the Series partnerships will not be treated as publicly traded partnerships under the Regulations. It is assumed in the following discussion of tax considerations that each Series of the Partnership will be treated as a partnership for U.S. federal income tax purposes.

Unless otherwise indicated, references in the discussion below to the tax consequences of the "Partnership's" investments, activities, income and expenses refer to the investments, activities, income and expenses attributable to each Series that is treated as a separate tax partnership. Prospective investors should note that each Series will issue its annual Schedule K-1 tax reporting form to its Partners. Therefore, investors that own Interests in more than one Series will receive separate Schedule K-1 reporting forms for each Series in which the investor is treated as owning an equity interest.

## TAXATION OF PARTNERSHIP OPERATIONS

As a partnership, the Partnership is not itself subject to U.S. federal income tax but will file an annual partnership information return with the IRS. Each Limited Partner, in computing his own federal income tax liability for a taxable year, is required to take into account such Partner's distributive share of the Partnership's net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income or loss and any separately stated income items, deductions and credits for the taxable year of the Partnership that ends in or within such Partner's taxable year. The Partnership may utilize a variety of investment and trading strategies, which produce both short-term and long-term capital gain (or loss), as well as ordinary income (or loss). The Partnership will send annually to each Limited Partner a Schedule K-1 form reporting such Partner's distributive share of the Partnership items of income, gain, loss, deduction and credit. The Partnership intends to use the calendar year as its taxable year unless a different fiscal year is required under the Code.

Each Limited Partner will be subject to tax, and liable for such tax, on such Partner's distributive share of the Partnership's taxable income regardless of whether the Limited Partner has received or will receive any distribution of cash from the Partnership. Thus, in any particular year, a Limited Partner's distributive share of taxable income from the Partnership (and, generally, the taxes imposed on that income) could exceed the amount of cash, if any, such Limited Partner received or is entitled to withdraw from the Partnership.

Under Section 704 of the Code, a Limited Partner's distributive share of any Partnership item of income, gain, loss, deduction or credit is governed by the Partnership Agreement unless the allocation provided by the Partnership Agreement does not have "substantial economic effect". The Regulations promulgated under Section 704(b) of the Code provide certain "safe harbors" with respect to allocations, which, under the Regulations, will be deemed to have substantial economic effect. The validity of an allocation which does not satisfy any of the "safe harbors" of these Regulations is determined by taking into account all facts and circumstances relating to the economic arrangements among the Partners. While no assurance can be given, the allocations provided by the Partnership Agreement should have substantial economic effect and should be sustained under the facts and circumstances test. However, if it were determined by the IRS or otherwise that the allocations provided in the Partnership Agreement with respect to a particular item do not have substantial economic effect, each Limited Partner's distributive share of that item would be determined for tax purposes in accordance with that Limited Partner's interest in the Partnership, taking into account all facts and circumstances.

Cash distributions and withdrawals, to the extent they do not exceed a Limited Partner's tax basis in such Partner's interest in the Partnership, should not result in taxable gain to

002819

HCMLPHMIT00004084

that Limited Partner, but reduce the tax basis in the Interest by the amount distributed or withdrawn.  Cash distributed to a Limited Partner in excess of the tax basis of his or its Interest is generally taxable either as capital gain or ordinary income, depending on the circumstances.  A distribution of property other than cash generally will not result in taxable income or loss to the Limited Partner to whom it is distributed until such time that the property is sold.

In the event a Limited Partner withdraws all of the capital in such Partner's capital account, the General Partner will have the discretion to specially allocate an amount of the Partnership's taxable gains or losses to the withdrawing Partner to the extent that the Partner's capital account exceeds, or is less than, its federal income tax basis in its Partnership Interest.  However, there can be no assurances that the IRS will accept such a special allocation.  If the special allocation were to be successfully challenged by the IRS, the Partnership's taxable gains or losses allocable to the remaining Partners would be increased.

For financial statement presentation and capital account maintenance purposes, all securities held by the Partnership will be marked-to-market at the end of each relevant accounting period and the net gain or loss from marking to market will be reported as income or loss.  This treatment differs from the general tax rule applicable to many securities transactions that a transaction does not result in gain or loss until it is closed by an actual sale or other disposition.  The divergence between such accounting and tax treatments frequently may result in substantial variation between financial statement income (or loss) and taxable income (or loss) reported by the Partnership.

The Partnership may be required to determine (on an annual basis) whether it will take the position for U.S. federal income tax purposes that it is (i) carrying on a trade or business as a trader in securities, or (ii) an investor in securities.  This determination will be made each year based primarily on the frequency, extent and regularity of the Partnership's trading activity during the particular year.  The Partnership expects to be treated as engaged in a trade or business by reason of its anticipated investment in the Highland Transaction.  The Partnership may also engage in other trade or business activities, either directly or through investments in portfolio partnerships.  Prospective investors that are U.S. tax-exempt entities should consider the impact of UBTI on an investment in the Partnership.  See "—Tax-Exempt Investors" below.  The Partnership's status as a trader or investor may vary from year to year.

If the Partnership is a trader, each Limited Partner who is an individual may deduct his share of the Partnership's expenses (other than interest expense) under Code section 162 as a business expense.  Alternatively, if the Partnership is characterized as an investor, an individual Limited Partner's share of the Partnership's expenses (other than interest expense) would pass through to the Partner as separately stated investment expenses deductible under Code section 212 as "miscellaneous itemized deductions".  An individual taxpayer's itemized deductions of this type are subject to deduction limitations and phase-out rules that are discussed below in "Limitations on Losses and Deductions—Itemized Deduction Limitations".  The limitations on deductions for "investment interest" are discussed below in "Limitations on Losses and Deductions—Investment Interest Limitations".

A Limited Partner may, with the consent of the General Partner, contribute securities to the capital of the Partnership.  However, a Limited Partner's contribution of appreciated securities may be a taxable exchange under Section 721(b) of the Code.

The Partnership will also engage in investing and trading securities for its own account.  Accordingly, a portion of the Partnership's direct and indirect expenses are expected to be deductible as trade or business expenses under Section 162 of the Code.  Certain other expenses may be classified as Section 212 investment expenses, which, for certain types of Limited Partners, including trusts, would be classified as miscellaneous itemized deductions.  Prospective investors that are classified as trusts for U.S. federal income tax purposes should consult their tax advisors concerning the limitations in the Code on deductions for miscellaneous itemized deductions.

002820

HCMLPHMIT00004085

## LIMITATIONS ON LOSSES AND DEDUCTIONS

**In General.** A Limited Partner is not permitted to deduct Partnership losses that exceed the Partner's adjusted basis in its Interest at the end of the year in which such loss is incurred. A Limited Partner's basis for its Interest is generally equal the amount of such Partner's cash contributions made to the Partnership, increased by (i) the Partner's allocable share of Partnership taxable income, (ii) the Partner's allocable share of Partnership tax-exempt income, and (iii) the Partner's allocable share of nonrecourse liabilities of the Partnership (if any); and decreased by (w) the Limited Partner's allocable share of Partnership taxable losses and non-deductible expenses, (x) any distributions of cash received by the Limited Partner from the Partnership, (y) the basis of any property distributed by the Partnership to such Partner and (z) any decrease in the Partner's share of Partnership nonrecourse liabilities (if any). There are several other Code provisions that may limit the ability of a Limited Partner to claim deductions attributable to an investment in the Partnership. The most significant of these limitations are discussed below.

**At Risk Limitations.** Section 465 of the Code limits certain taxpayers' losses from certain activities to the amount they are "at risk" in the activities. Taxpayers subject to the "at risk" rules are non-corporate taxpayers, including trusts, and certain closely-held corporations. The activities subject to the "at risk" limitations include all activities in which the Partnership expects to engage. A Partner subject to the "at risk" rules will not be permitted to deduct in any year losses arising from its interest in the Partnership to the extent that the losses exceed the amount it is considered to have "at risk" in the Partnership at the close of that year.

A taxpayer is considered to be "at risk" in any activity to the extent of his cash contribution to the activity, his basis in other property contributed to the activity and his personal liability for repayments of amounts borrowed for use in the activity. With respect to amounts borrowed for use in the activity, the taxpayer is not considered to be "at risk" even if he is personally liable for repayment if the borrowing was from a person who has an "interest" in the activity other than an interest as a creditor. Even if a taxpayer is personally liable for repayment of amounts borrowed for use in the activity, and even if the amount borrowed is borrowed from a person whose only interest in the activity is an interest as a creditor, a taxpayer will not be considered "at risk" in the activity to the extent his investment in the activity is protected against loss through guarantees, stop loss agreements, or other similar arrangements.

Each Limited Partner will be at risk initially for the amount of his capital contribution. A Partner's amount "at risk" will be increased by his distributive share of income from the Partnership and will be decreased by his distributive share of losses from the Partnership and distributions to him. If a Partner's amount "at risk" decreases to zero, he can take no further losses until he has an "at risk" amount to cover the losses. A Partner is subject to a recapture of losses previously allowed to the extent that his amount "at risk" is reduced below zero (limited to loss amounts previously allowed to the Partner over any amounts previously recaptured).

**Investment Interest Limitations.** To the extent that the Partnership incurs interest expense or short sale expenses, a non-corporate Limited Partner, including a trust, will likely be subject to the "investment interest expense" limitations of Section 163(d) of the Code. Investment interest expense includes (i) interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment and (ii) any amounts deductible in connection with a short sale. The deduction for investment interest expense is limited to the taxpayer's net investment income for the taxable year; i.e., the excess of investment income over investment expenses. Excess investment interest expense that is disallowed is not lost permanently but may be carried forward to succeeding years subject to the Section 163(d) limitation. Net capital gain (i.e., net long-term capital gain over net short-term capital loss) on property held for investment and qualified dividends are only included in investment income to the extent that the taxpayer elects to subject some or all of such gain or dividend income to taxation at ordinary income tax rates. The Section 163(d) limitations will apply at the Partner level with regard to the Partner's distributive share of the Partnership's interest expense.

002821
HCMLPHMIT00004086

To the extent that the Partnership is treated as engaged in a trade or business by reason of being deemed a trader, a non-corporate Limited Partner's share of the Partnership's interest expense from such trading activity would retain its character as investment interest subject to the Section 163(d) investment income limitation, but the allowable investment interest deduction would be deducted "above the line" in determining adjusted gross income and therefore fully deductible, rather than being treated as an itemized deduction.

Section 265(a)(2) of the Code disallows any deduction for interest paid by a taxpayer on indebtedness incurred or continued for the purpose of purchasing or carrying tax-exempt obligations. The IRS has announced that such purpose will be deemed to exist with respect to indebtedness incurred to finance a "portfolio investment", and that a limited partnership interest will be regarded as a "portfolio investment". Therefore, if the Partnership holds tax-exempt obligations, the IRS might take the position that all or part of the interest expense incurred by a Limited Partner in connection with the purchase of such Partner's Interest should be viewed as incurred to enable such Limited Partner to continue carrying tax-exempt obligations, and that such Limited Partner should not be allowed to deduct all or a portion of such interest.

<u>Itemized Deduction Limitations</u>. Under Section 67 of the Code, for non-corporate taxpayers, including trusts, certain miscellaneous itemized deductions are allowable only to the extent they exceed a "floor" amount equal to 2% of the taxpayer's adjusted gross income ("**2% Floor**"). To the extent that the Partnership's operations do not constitute a trade or business within the meaning of Section 162 and other provisions of the Code, a non-corporate Limited Partner's distributive share of the Partnership's investment expenses, other than investment interest expense, would be deductible only as miscellaneous itemized deductions, subject to the 2% Floor. In addition, Section 68 of the Code further restricts the ability of high income individuals with adjusted gross incomes in excess of specified threshold amounts to deduct certain itemized deductions. Under this limitation (the "3% Phase-Out Rule"), miscellaneous itemized deductions in excess of the 2% Floor described above, along with certain other itemized deductions (not including investment interest expense), are reduced by 3% of the amount by which the taxpayer's adjusted gross income exceeds the applicable threshold, which, for 2015, is $309,900 for joint return filers and $258,250 for single taxpayers. However, the amount of otherwise deductible itemized deductions is not reduced by more than 80% under the 3% Phase-Out Rule. Moreover, a non-corporate taxpayer's investment expenses that are miscellaneous itemized deductions are also not deductible in calculating the taxpayer's alternative minimum tax liability.

Capital losses generally may be deducted only to the extent of capital gains, except for non-corporate taxpayers who are allowed to deduct $3,000 of excess capital losses per year against ordinary income. Corporate taxpayers may carry back unused capital losses for three years and may carry forward such losses for five years; non-corporate taxpayers may not carry back unused capital losses but may carry forward unused capital losses indefinitely.

### ADDITIONAL TAX ISSUES

Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent that the property used to close the short sale constitutes a capital asset in the Partnership's hands.

The "wash sale" rules of Section 1091 of the Code disallow any deduction for losses arising from the sale or other disposition of "stock or securities", where, within a period beginning 30 days before such sale or disposition and ending 30 days afterwards, the taxpayer acquires "substantially identical" stocks or securities by purchase or by an exchange on which the entire amount of gain or loss is recognized. This disallowance rule also applies where, within such 61-day period, the taxpayer enters into a contract or option to acquire substantially identical stock or securities. Thus, if the Partnership were to engage in such a "wash sale" transaction, the Partners would not be able to recognize their distributive share of any loss realized in connection with such sale in the current year.

002822

HCMLPHMIT00004087

**Currency Fluctuations - "Section 988" Gains and Losses.**  To the extent that the Partnership's investments are made in securities denominated in a foreign currency, gain or loss realized by the Partnership frequently will be affected by the fluctuation in the value of such foreign currencies relative to the value of the U.S. dollar.  Generally, gains or losses with respect to the Partnership's investments in common stock of foreign issuers will be taxed as capital gains or losses at the time of the Partnership's sale of such stock. However, under Section 988 of the Code, gains or losses of the Partnership on the acquisition or disposition of foreign currency (i.e., the purchase of foreign currency and subsequent use of such currency to acquire stock) will be treated as ordinary income or loss.  Moreover, under Section 988, gains and losses from disposition of debt securities denominated in a foreign currency  that are attributable to the fluctuations in such currency between the date of acquisition of the debt security and the date of its disposition will be treated as ordinary income or loss.  Since the Code provides limitations on the ability of taxpayers to deduct capital losses against ordinary income, a Partner's share of capital losses realized by the Partnership on sale of foreign securities would not be available to offset the Partner's share of ordinary income realized by the Partnership on its currency hedging transactions.

The Partnership may acquire foreign currency forward contracts, enter into foreign currency futures contracts and acquire put and call options on foreign currencies. Generally, foreign currency regulated futures contracts and option contracts that qualify as "Section 1256 contracts" will not be subject to ordinary income and loss treatment under Section 988.  However, if the Partnership acquires currency futures contracts or options contracts that are not Section 1256 contracts, or any currency forward contracts, any gain or loss realized by the Partnership with respect to such instruments will be ordinary income or loss, unless (i) the contract is a capital asset in the hands of the Partnership and is not part of a straddle transaction and (ii) the Partnership makes an election (by the close of the day the transaction is entered into) to treat the gain or loss attributable to such contract as capital gain or loss.

The taxation of debt obligations under the Code is complex; the following discussion is intended to provide only a general description of these rules.  Generally, interest income and income items similar to stated interest, such as original issue discount (in general, the annual portion of the discount on original issuance of debt obligations issued for less than their stated principal amount) and market discount (the amount by which debt obligations are acquired in the secondary market for less than their principal) are treated as items of ordinary income.  Generally, debt obligations that are disposed of in a taxable transaction for an amount greater than their adjusted cost basis give rise to capital gain, which will be long-term if the debt obligation is held for longer than one year, and short-term, if held for a period of one year or less.  Generally, debt obligations that are disposed of in a taxable transaction for an amount less than their adjusted cost basis give rise to capital loss, which will be long-term if the debt obligation is held for longer than one year, and short-term if held for a period of one year or less.  In the event that any such debt obligations are not held as capital assets, such dispositions will generally give rise to ordinary gain or loss, as the case may be.

Section 1259 of the Code requires that the Partnership recognize gain on the constructive sale of any appreciated financial position in stock, a partnership interest, or certain debt instruments.  A constructive sale of an appreciated financial position occurs if, among other things, the Partnership enters into (1) a short sale of the same or substantially identical property (a transaction commonly known as a "short sale against the box"), (2) an offsetting notional principal contract with respect to the same or substantially identical property, or (3) a futures or forward contract to deliver the same or substantially identical property.  Exceptions to the foregoing apply to certain transactions closed within 30 days after the close of the taxable year if the underlying appreciated financial position remains "unhedged" for at least 60 days thereafter, and to transactions involving certain contracts to sell stock, debt instruments, or partnership interests if the contract settles within one year.

The IRS may treat certain positions in securities held (directly or indirectly) by a Partner and its indirect interest in similar securities held by the Partnership as "straddles" for federal income tax purposes.  The application of the "straddle" rules in such a case could

002823

HCMLPHMIT00004088

affect a Partner's holding period for the securities involved and may defer the recognition of losses with respect to such securities.  In addition, if either of the Partner's positions in such a transaction is an "appreciated financial position", application of the "straddle" rules may trigger a constructive sale of that position under the rules described above.

Section 1258 of the Code recharacterizes capital gain from a "conversion transaction" as ordinary income, with certain limitations.  Conversion transactions are defined as transactions in which substantially all the expected return is attributable to the time value of money and either: (a) the transaction consists of the acquisition of property by the taxpayer and a substantially contemporaneous agreement to sell the same or substantially identical property in the future; (b) the transaction qualifies as a "straddle" (within the meaning of Section 1092(c) of the Code); (c) the transaction is one that was marketed or sold to the taxpayer on the basis that it would have the economic characteristics of a loan but the interest-like return would be taxed as capital gain; or (d) the transaction is described as a conversion transaction in the Regulations.  The amount of gain so recharacterized will not exceed the amount of interest that would have accrued on the taxpayers' net investment for the relevant period at a yield equal to 120% of the "applicable rate".

## INVESTMENTS IN NON-U.S. CORPORATIONS

The Partnership may invest in certain foreign corporations that will be classified as "passive foreign investment companies" ("**PFICs**") for U.S. tax purposes.  Under the PFIC rules, unless the Partnership makes one of the elections described below, any gain realized by the Partnership on the sale or disposition of stock in a PFIC that is allocable to Partners that are U.S. Persons (as defined in the Code) will be treated as ordinary income and will be subject to U.S. federal income tax as if (i) the gain had been realized ratably over the Partnership's holding period and (ii) the amount deemed realized had been subject to tax in each year of that holding period at the highest applicable federal income tax rate; in addition, an interest charge at the rate generally applicable to underpayments of federal income tax will be imposed on the amount.  Further, any "excess distributions" from a PFIC (as defined in the Regulations) are treated as ordinary income (regardless of their original character) and subject to this deferred tax and interest charge.

Provided the PFIC complies with certain reporting requirements, the Partnership may elect to have the PFIC treated as a "qualified electing fund", in which case the Partnership would include annually in its gross income its *pro rata* share of the PFIC's net ordinary income and net realized capital gains, whether or not such amounts are actually distributed to the Partnership.  Generally, any net operating losses or net capital losses of the PFIC will not pass through to the Partnership and will not offset any ordinary income or capital gains of the PFIC reportable to the Partnership in subsequent years.  Alternatively, the Partnership could elect to "mark-to-market" stock in certain PFICs if such stock is considered "marketable stock" under the Code, and thereby avoid being subject to the deferred tax and interest charge discussed above.  However, there can be no assurance that the Partnership will be able to make either of these elections with respect to any PFICs in which it invests.  Further, Limited Partners may be subject to IRS reporting requirements with respect to the Partnership's investments in PFICs.

The Partnership may also invest in certain foreign corporations that will be considered "controlled foreign corporations" ("**CFCs**") for U.S. tax purposes.  A CFC is a non-U.S. corporation in which certain U.S. shareholders own, directly or indirectly, more than 50% of either the total voting power of all classes of stock entitled to vote or the total value of all classes of stock.  Under the CFC rules, certain U.S. shareholders are subject to U.S. federal income tax on certain types of income (generally passive income) realized by the CFC regardless of whether any amounts are distributed from the CFC to such U.S. shareholder.  Further, such U.S. shareholders may be subject to IRS reporting requirements with respect to investments in CFCs.

In addition, if the Partnership invests in stock of foreign corporations that become PFICs or CFCs after the Partnership has made such investment, this may also result in adverse tax consequences for the Limited Partners that are U.S. Persons and may subject them to IRS reporting requirements with respect to such investments.

002824

HCMLPHMIT00004089

### 3.8 % MEDICARE SURTAX ON NET INVESTMENT INCOME

High income U.S. individuals are subject to an annual 3.8% Medicare contribution tax on their "net investment income" (the "**NII Tax**").  The NII Tax is an "add on" federal surtax which must be paid in addition to the regular federal income tax on such income.  The NII Tax applies to single taxpayers with "modified" adjusted gross income ("**MAGI**") in excess of $200,000 and married persons filing jointly with MAGI in excess of $250,000.  THE NII Tax also applies, in modified form, to the undistributed net investment income of certain trusts and estates.

For purposes of the NII Tax, "investment income" is defined to include (1) interest, dividends, annuities, royalties and rents (subject to certain exceptions); (2) income from a trade or business that consists of trading financial instruments or commodities (i.e., income from trader funds); (3) income from a trade or business that is a passive activity for the individual (i.e., income from an equity interest in a partnership engaged in a trade or business in which the partner does not actively participate); and (4) net gain attributable to disposition of capital assets and certain other property.

It is anticipated that a U.S. individual Limited Partner's distributive share of taxable income from the Partnership will be classified as investment income of the type subject to the NII Tax.  To the extent the Partnership generates income from activities that constitute a trade or business (e.g., originating loans), such trade or business income would still be classified as investment income under the NII Tax because the Limited Partner will not be considered an active participant in the Partnership's business.

Net investment income for purposes of calculating the NII Tax is (i) investment income (as defined above) reduced by (ii) any deductions allowed under the regular rules applicable for federal income tax purposes that are properly allocable to such gross income or net gain.  If the Partnership is not engaged in a trade or business, an individual Limited Partner's distributive share of investment-related expenses (other than investment interest) would pass through to such Partners as Code Section 212 expenses which are deductible for regular income tax purposes and the NII Tax only as itemized deductions and are subject to the Section 67 (2% Floor) and Section 68 (3% Phase-Out Rule) limitations previously discussed.

### TAX-EXEMPT INVESTORS

If the Partnership derives income which would be considered "unrelated business taxable income" (as defined in Section 512 of the Code) ("**UBTI**"), if derived directly by a Limited Partner that is a qualified retirement plan or other organization exempt from tax under Sections 401 or 501(a) of the Code or an individual retirement account ("**IRA**") exempt under Section 408(e) of the Code (each, a "**Tax-Exempt Entity**"), such Limited Partner's allocable share of such Partnership income would be subject to tax.  A Tax-Exempt Entity which is subject to tax on its allocable share of the Partnership's UBTI, including an IRA, may also be subject to the alternative minimum tax with respect to items of tax preference which enter into the computation of UBTI.

UBTI is generally the excess of gross income from any unrelated trade or business conducted by a Tax-Exempt Entity (or by a partnership of which the Tax-Exempt Entity is a member) over the deductions attributable to such trade or business.  UBTI generally does not include certain passive income, including dividends, interest, annuities, royalties and gain or loss from the disposition of property held for investment, unless such income items are debt-financed income (as discussed below).

While UBTI itself is taxable, the receipt of UBTI by a Tax-Exempt Entity generally has no effect upon that entity's tax-exempt status or upon the exemption from tax of its other income.  However, for certain types of Tax-Exempt Entities, the receipt of any UBTI may have extremely adverse consequences.  In particular, for charitable remainder trusts (as defined under Section 664 of the Code), the receipt of any taxable income from UBTI during a taxable year will result in the imposition of an excise tax equal to the amount of such UBTI.

002825

HCMLPHMIT00004090

A Tax-Exempt Entity also includes in its UBTI its "unrelated debt-financed income" (and its allocable share of the "unrelated debt-financed income" of any partnership in which it invests) pursuant to Section 514 of the Code.  In general, unrelated debt-financed income consists of: (i) income derived by a Tax-Exempt Entity (directly or through a partnership) from income producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year; and (ii) gains derived by a Tax-Exempt Entity (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness". Acquisition indebtedness is generally defined as debt incurred to purchase or carry an investment.  Such income and gains derived by a Tax-Exempt Entity from the ownership and sale of debt-financed property are taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

<u>Income From the Partnership's Private Equity Investments</u>.  The Investment Manager expects to invest a substantial portion of the Partnership's Series 1 assets in the Highland Transaction.  The Partnership expects to incur acquisition indebtedness with respect to the Highland Transaction (if it occurs) and may use borrowed funds to acquire other property.  Accordingly, Limited Partners that are Tax-Exempt Entities should anticipate that a substantial portion, and possibly all, of their distributive share of the Partnership's net income realized from ownership of equity interests in Highland and other portfolio companies that are business partnerships, including gain realized upon sales of such equity investments, will be subject to federal income tax as UBTI.

<u>Income From the Partnership's Other Activities</u>. The Investment Manager expects that the Partnership will incur indebtedness in connection with its operations from time to time.  The law is not entirely clear regarding the appropriate method to be used to determine what portion of a tax-exempt Limited Partner's share of the Partnership's income is attributable to debt financing and therefore constitutes "debt-financed income".  Accordingly while the Partnership will compute each tax-exempt Limited Partner's share of "debt-financed income" from the Partnership in a manner which the Partnership considers to be reasonable, there can be no assurance that the IRS will accept the method of computation used by the Partnership.

Tax-exempt Limited Partners will also realize UBTI if the Partnership acquires equity interests of publicly traded partnerships or private partnerships that are engaged in trade or business activities or the Partnership directly carries on other trade or business activities (other than as a securities trader).

## OTHER TAXES

Partners may be subject to other taxes, such as the alternative minimum tax, state and local income taxes, and estate, inheritance or intangible property taxes that may be imposed by various jurisdictions.  Each prospective investor should consider the potential consequences of such taxes due to an investment in the Partnership.    It is the responsibility of each prospective investor to become satisfied as to the legal and tax consequences of an investment in the Partnership under state law, including the laws of the state(s) of its, his or her domicile and residence, by obtaining advice from such investor's own tax advisors, and to file all appropriate tax returns that may be required.

Income received by the Partnership from sources within non-U.S. countries may be subject to withholding and other taxes imposed by such countries.  Each Partner may be entitled either to deduct (as an itemized deduction) such Partner's proportionate share of the non-U.S. taxes of the Partnership in computing such Partner's taxable income or to use the amount as a foreign tax credit against his or its U.S. federal income tax liability, subject to limitations.  Generally, a credit for non-U.S. taxes is subject to the limitation that it may not exceed the taxpayer's U.S. tax attributable to his or its non-U.S. source taxable income.  With respect to Partners that are U.S. Persons: (i) certain currency fluctuation gains, including fluctuation gains from non-U.S.-Dollar-denominated debt securities, receivables and payables, will be treated as ordinary income derived from U.S. sources; and (ii) Partnership gains from the sale of securities also will be treated as derived from U.S. sources.  The limitation on the foreign tax credit is applied separately to non-U.S.

002826

HCMLPHMIT00004091

source passive income (as defined for purposes of the foreign tax credit), including the non-U.S. source passive income realized by the Partnership. The foreign tax credit limitation rules do not apply to certain electing individual taxpayers who have limited creditable non-U.S. taxes and no non-U.S. source income other than passive investment-type income. The foreign tax credit generally is eliminated with respect to non-U.S. taxes withheld on income and gain if the Partnership fails to satisfy minimum holding period requirements with respect to the property giving rise to the income and gain.

## TAX ELECTIONS; RETURNS; TAX AUDITS

If the General Partner determines that the Partnership is treated as a securities trader for federal income tax purposes, the General Partner may cause the Partnership to elect to "mark-to-market" its securities at the end of each taxable year, in which case such securities would be treated for federal income tax purposes as though sold for fair market value on the last business day of such taxable year. Such an election under Code Section 475(f) would apply to the taxable year for which made and all subsequent taxable years unless revoked with the consent of the IRS. If the Partnership were to make such an election, all or a portion of the Partnership's gains and losses would be considered ordinary income or loss, rather than capital gain or loss. Since for federal income tax purposes capital losses generally may be deducted only against capital gains, a Limited Partner may be unable to deduct capital losses realized from other investments and transactions in a taxable year against his share of the Partnership's income.

The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death); provided that a partnership election has been made pursuant to Section 754 of the Code. Under the Partnership Agreement, the General Partner, in its sole discretion, may cause the Partnership to make such an election. Any such election, once made, cannot be revoked without the IRS's consent. The General Partner also has the authority and sole discretion to make or refrain from making other tax elections that are available to the Partnership.

Additionally, even if a partnership has not made a Section 754 election, Section 743 of the Code provides for a mandatory basis adjustment to partnership property on certain transfers of partnership interests (including transfers by reason of death), if the partnership has a "substantial built-in loss" immediately after such transfer. A partnership is treated as having a "substantial built-in loss" if the partnership's adjusted basis in partnership property exceeds the property's fair market value by more than $250,000. Section 734 of the Code also provides for mandatory basis adjustments in the case of certain property distributions to partners. Such Code provisions could cause the Partnership to decrease the basis of its remaining assets in such circumstances.

The General Partner will decide how to report partnership items on the Partnership's tax returns and all Limited Partners are required to treat such tax items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. Since the Partnership may engage in transactions whose treatment for tax purposes is not clear, there is a risk that a claim of tax liability could be asserted against the Partnership or its Partners. In the event that the income tax returns of the Partnership are audited by the IRS, the tax treatment of Partnership income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Partners. As the "Tax Matters Partner", the General Partner has considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners. In addition, the Tax Matters Partner has the authority to bind certain Partners to settlement agreements and the right on behalf of all Partners to extend the statute of limitations relating to the Partners' tax liabilities with respect to Partnership items. The General Partner may, in its sole discretion, consult with, and rely upon, the Partnership's auditors and their determinations or advice as to tax and/or accounting matters.

It is possible that the Partnership and or certain transactions executed by the Partnership would be subject to tax shelter disclosure registration and listing requirements under applicable U.S. tax laws and regulations.

002827

HCMLPHMIT00004092

**PFIC Reporting**. The Code provides that each U.S. Person (as defined herein) that is a direct or indirect shareholder of a PFIC (generally, an investment corporation organized under the laws of a foreign jurisdiction) is required to file an annual information return containing such information as the IRS may require.  Limited Partners would be indirect shareholders of stock in any PFICs owned by the Partnership, and would satisfy such filing requirement (if applicable to such Partner) by completing a copy of IRS Form 8621 for the reportable PFIC investment and submitting such forms to the IRS with the Partner's federal income tax return.

**FATCA Withholding and Compliance**. The provisions of the Code known as the Foreign Account Tax Compliance Act ("**FATCA**") provide that a 30% withholding tax will be imposed on payments of U.S.-source dividends and interest (and certain other items of U.S.-source income) to certain foreign financial entities, and beginning on January 1, 2017 with regard to other withholdable payments (including gross proceeds from the sale of property that give rise to U.S.-source, interest or dividends), unless the foreign financial entity has registered with the IRS and agreed to provide specified U.S. tax information concerning "specified U.S. persons" that own interests in the foreign entity. The Partnership is a withholding agent with respect to such withholding taxes that may be imposed on any of its Partners.  U.S. and non-U.S. Partners will be required to furnish appropriate documentation certifying as to their U.S. or non-U.S. tax status, together with such other additional tax information as the Partnership may from time to time request.  Limited Partners that are "non-financial foreign entities" (as defined in Code Section 1472) are required to certify whether they have any "substantial United States owners" and, if so, to disclose the identity and tax identification numbers of such persons to the Partnership. Failure to provide such information may subject a Limited Partner to withholding taxes or mandatory withdrawal of its entire interest in the Partnership.  Limited Partners are encouraged to consult with their own tax advisors regarding the possible impact of the FATCA legislation on their investment in the Partnership.

## OTHER MATTERS

The Partnership may incur certain expenses in connection with its organization and the marketing of the Interests.  Amounts paid or incurred to organize the Partnership are being amortized, for tax purposes, over a period of 180 months from the date the Partnership commenced operations.  Amounts paid or incurred to market interests in a partnership (marketing and syndication expenses) are not deductible or amortizable.

002828

HCMLPHMIT00004093

## SPECIAL CONSIDERATIONS FOR PARTNERS WHO ARE NOT U.S. PERSONS

A "**U.S. Person**" is (a) a citizen or resident of the United States, (b) a corporation, partnership, or other entity organized under the laws of the United States, any state, or the District of Columbia, other than a partnership that is not treated as a U.S. Person under the Regulations, (c) an estate whose income is subject to United States income tax, regardless of its source, or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust. In addition, to the extent provided in the Regulations, "U.S. Person" includes certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, that have elected to be treated as U.S. Persons. Partners that are not U.S. Persons are referred to below as "non-U.S. Partners".

**Taxation of Effectively Connected Income**. The Partnership expects to be treated for U.S. tax purposes as being engaged in the conduct of a U.S. trade or business. As a result, non-U.S. Limited Partners that acquire interests in the Partnership will generally be treated as being engaged in the conduct of a U.S. trade or business. Thus, each non-U.S. Limited Partner will be subject to U.S. federal income taxation, at graduated rates, on its distributive share of the Partnership's income, gain or loss (whether ordinary or capital) that is effectively connected with the conduct of the Partnership's U.S. trade or business ("**ECI**"). Such Limited Partners will be required to file annual U.S. federal income tax returns with respect to such ECI, and the Partnership will be required to withhold and remit to the U.S. Treasury a portion of the non-U.S. Limited Partner's distributive share of such ECI. The Limited Partner would be entitled to claim a credit on his U.S. federal income tax return for the amount withheld by the Partnership with respect to such ECI. Non-U.S. Limited Partners may also be required to file applicable state and local tax returns in jurisdictions in which the Partnership is engaged in business or in which its real property interests are located.

**U.S. Branch Profits Tax**. In the case of a Limited Partner that is a non-U.S. corporation, in addition to the regular corporate income tax that must be paid on its ECI, the Code provides for an additional 30% "branch profits" tax. The branch profits tax is 30% (or lower rate permitted by tax treaty) of the foreign corporation's "dividend equivalent amount". This is the amount of the foreign corporation's effectively connected after-tax earnings that are not reinvested in a U.S. trade or business by the end of the tax year or disinvested in a later tax year. Certain income tax treaties may reduce or eliminate the branch profits tax; however, under certain circumstances, the branch profits tax may override income tax treaty benefits.

**FIRPTA**. The Foreign Investment in Real Property Tax Act of 1980, as amended ("**FIRPTA**"), imposes a tax on gain realized on disposition by a foreign person of a "U.S. real property interest" ("**USRPI**") by treating such gain as ECI, generally giving rise to the tax consequences described above. A USRPI includes a direct investment in U.S. real estate and buildings and also investments in stock and certain types of debt interests of a U.S. corporation that is classified as a "U.S. real property holding corporation" (as defined in the Code). A USRPI held by a partnership is deemed to be held proportionately by its partners.

**Taxation of Non-ECI**. The Partnership also expects to realize certain types of periodic income from U.S. sources (e.g., dividends and certain types of interest) which are not classified as ECI. Each non-U.S. Limited Partner will be subject to a flat 30% withholding tax on its allocable share of the gross amount of such income. Such withholding tax is sometimes reduced or eliminated by an applicable income tax treaty, provided that the proper certification is provided by the non-U.S. Limited Partner when necessary. The applicable IRS form or forms (W-8 series) should be submitted to the Partnership by each non-U.S. Limited Partner at the time such Limited Partner acquires an Interest in the Partnership, and should be resubmitted every three years thereafter (or earlier, if the information on such form changes before such date).

**Disposition of Partnership Interests**. A non-U.S. Limited Partner that disposes of its Interest in the Partnership, by sale or otherwise, may be subject to U.S. federal income

002829

HCMLPHMIT00004094

taxation on such disposition.  A transferee of an Interest in the Partnership may be required to deduct and withhold a tax equal to 10% of the gross amount realized on such disposition.  Any amount so withheld can be applied as a credit against the U.S. federal income tax liability of the non-U.S. Limited Partner and can be recovered as a refund in the event of overpayment.

**U.S. Estate and Gift Taxation of Interests**.  Non-U.S. Limited Partners that are individuals should also be aware that Interests in the Partnership will be treated as U.S. situs property by reason of the Partnership's ownership of U.S. real property interests, and thus subject to U.S. estate taxation upon the death on a non-U.S. individual owner, or U.S. gift taxation upon a donative transfer of such Interest.

## STATE TAXATION

In addition to the federal income tax consequences described above, prospective investors should consider potential state tax consequences of an investment in the Partnership.  No attempt is made herein to provide a discussion of such state tax consequences.  State laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit.  A Partner's distributive share of the taxable income or loss of the Partnership generally will be required to be included in determining the Partner's reportable income for state tax purposes in the jurisdiction in which he or she is a resident.  Each prospective investor must consult such investor's own tax advisors regarding such state tax consequences.

## FUTURE TAX LEGISLATION

Future amendments to the Code, other legislation, new or amended Regulations, administrative rulings or guidance by the IRS, or judicial decisions may adversely affect the federal income tax aspects of an investment in the Partnership, with or without advance notice, and retroactively or prospectively.

002830
HCMLPHMIT00004095

**EXHIBIT 82**

002831

MEMBER AND MANAGER CONSENT
OF
ATLAS IDF GP, LLC

October 13, 2022

THE UNDERSIGNED sole member (the "**Member**") and sole manager (the "**Manager**") of ATLAS IDF GP, LLC, a Delaware limited liability company (the "**General Partner**"), the general partner of ATLAS IDF, LP, a Delaware limited partnership (the "**Partnership**"), acting pursuant to the Delaware Limited Liability Company Act and the Amended and Restated Company Agreement of the General Partner, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the "Purchase Agreement"), by and among JOHN HONIS (as "Seller"), the Sole Member (as "Buyer"), and CLO HOLDCO, LTD. a Cayman limited company (as "Guarantor"), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the General Partner;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person's successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an "**Officer**"):

| **Name** | **Office** |
|----------|------------|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers. As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the General Partner but not named above is hereby removed from the office of the General Partner;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the General Partner and the Partnership, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the General Partner and/or the Partnership prior to the date

002832

HCMLPHMIT00004124

hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the General Partner and/or the Partnership; and

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the General Partner.

*[Signature Page to Follow]*

2

**002833**

HCMLPHMIT00004125

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

MEMBER

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: _____

       Mark Patrick, Sole Director

SOLE MANAGER

_____

Mark Patrick

*Signature Page*

002834

# EXHIBIT 83

002835

AMENDED AND RESTATED COMPANY AGREEMENT

*of*

ATLAS IDF GP, LLC

A Delaware Limited Liability Company

002836

HCMLPHMIT00004127

## AMENDED AND RESTATED COMPANY AGREEMENT

*of*

## ATLAS IDF GP, LLC

### A Delaware Limited Liability Company


This AMENDED AND RESTATED COMPANY AGREEMENT (collectively, the "Agreement," which shall include all amendments and exhibits hereto) dated effective as of the 1st day of August, 2022 (the "Effective Date"), are entered into by and among those Persons executing the signature page hereto as the Members of ATLAS IDF GP, LLC, a Delaware limited liability company (the "Company"). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

### ARTICLE I

### INTRODUCTION

1.01   <u>Formation of Limited Liability Company</u>   The Company was formed by the filing of the Certificate of Formation (the "Certificate") with the Secretary of State of Delaware on the October 29, 2015. The Company's business shall be conducted under the name "ATLAS IDF GP, LLC" until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replaces, in its entirety, all prior governing agreements for the Company, including any and all amendments thereto.

This Agreement is subject to, and governed by, the Delaware laws governing limited liability companies (the "DELAWARE LAWS") and the Certificate. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DELAWARE LAWS or the provisions of the Certificate, such provisions of the DELAWARE LAWS or the Certificate, as the case may be, will be controlling.

1.02   <u>Registered Office and Agent</u>   The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.03   <u>Other Offices</u>   The Company may also have offices at such other places, both within and without the State of Delaware, as the Board of Managers may from time to time determine or the business of the Company may require.

1.04   <u>Defined Terms</u>   The terms used in this Agreement with their initial letter capitalized shall, unless the context requires otherwise, have the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

(a)   "DELAWARE LAWS" shall mean the Delaware laws governing limited liability companies, as the same may be amended from time to time.

(b)   "Affiliate" shall mean, as to any Person, any Person controlled by, controlling, or under common control with such Person, and, in the case of a Person who is an individual, a member of the family of such individual consisting of a spouse, sibling, in-law, lineal descendant, or ancestor (including by adoption). For purposes of this definition, "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, alone or in concert with others, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and no Person shall be deemed in control of another solely by virtue of being a director, officer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

2

002837

HCMLPHMIT00004128

(c)     "Bankruptcy" shall mean, and a Member shall be deemed a "Bankrupt Member," upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief Laws; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member's affairs; (iv) the filing of a petition in any involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(d)     "Book Depreciation" for any asset shall mean for any Fiscal Year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board of Managers.

(e)     "Book Value" shall mean for any asset the asset's adjusted tax basis, except as follows:

(i)     the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board of Managers;

(ii)     the Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of one of the following times: (1) on the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest in the Company if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (3) on the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations;

(iii)     the Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv)     the Book Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations and Section 8.02(d) hereof; provided, however, that Book Values shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the Board of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv); and

(v)     if the Book Value of an asset has been determined or adjusted pursuant to Section 1.04(e)(i),1.04(e)(ii), or 1.04(e)(iv) hereof, such Book Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(f)     "Capital Contribution" shall mean the total value of cash and Book Value (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, attached hereto and incorporated herein for all purposes, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

3

prior Member for the interest of such then Member, reduced by any distribution to such Member in return of its capital as contemplated herein.

(g)    "Class A Interest" shall refer to the Interest of a Class A Member in the Profits, Losses, Distributable Cash, and assets upon liquidation of the Company as described in this Agreement.

(h)    "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit A, as amended from time to time.

(i)    Intentionally Blank.

(j)    Intentionally Blank.

(k)    "Code" shall mean the Internal Revenue Code of 1986, as amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l)    "Company" shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m)    "Debtor Relief Laws" shall mean any federal or state bankruptcy, insolvency, or similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n)    Intentionally Blank.

(o)    "Distributable Cash" of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time; (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time; and (iii) provision for a working cash reserve in accordance with Section 8.07 below.

(p)    "Fiscal Year" shall mean the calendar year.

(q)    "Former Member" shall mean a member that causes a Dissolution Event.

(r)    "Interest" in the Company shall mean the entire ownership interest of a Member in the Company at any particular time, including such Member's Capital Account, allocable share of Profits, Losses, and Distributable Cash, and the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s)    Intentionally Blank

(t)    "Manager" shall mean an individual elected to the Board of Managers of the Company pursuant to Sections 3.02 and 3.04 below.

(u)    "Member(s)" shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof.  The names, business or residence addresses, Capital Contributions, Percentage Interest, and class of Interest of the Members shall be set forth on Exhibit B, attached hereto and incorporated herein by reference.  Reference to a "Member" shall be to any one of the Members.

(v)    "Percentage Interest" of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit B, as such percentage may be adjusted from time to time pursuant to the terms hereof.

(w)    "Person" shall mean any individual, corporation, partnership, limited liability company or partnership, association, organization, trust, estate, or other entity.

4

002839

HCMLPHMIT00004130

(x)     "Pro Rata Part" shall mean the percentage expression of a fraction the numerator of which is a Member's respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y)     "Profits" and "Losses" shall mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y) shall be added to such taxable income or loss;

(ii)     any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y), shall be subtracted from such taxable income or loss;

(iii)     if the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(iv)     gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(v)     in lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation; and

(vi)     notwithstanding any other provision of this Section 1.04(y), any items that are specially allocated pursuant to Section 8.02 or Section 8.03 shall not be taken into account in computing Profits and Losses.

(z)     "Regulatory Allocations" shall mean the special allocations of items of income, gain, loss, and deduction, if any, set forth in Section 8.02 hereof.

(aa)     "Transfer" or "Transferred" shall mean the sale, assignment, conveyance, gift, bequest, devise, transfer under the rules of intestate succession, pledge, mortgage, or other encumbrance. In addition, the term "Transfer" or "Transferred" shall mean an "ownership change" of a Member as defined in Section 382(g) of the Code in effect as of the Effective Date, except that the term "Member" shall be substituted for "shareholder" wherever it appears.

(bb)     "Treasury Regulations" shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc)     "Unanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTICLE II

### MEMBERS AND MEMBERSHIP INTERESTS

2.01     Members. The Members of the Company shall be those Persons listed on Exhibit B. Except as otherwise may be provided in Exhibit A or Exhibit B, and except as provided in Section 7.05 below, a Person may be admitted as a Member to the Company only upon the affirmative vote of the Managers, plus one or more Members whose Percentage Interests total more than fifty percent (50%); provided, however, that no Person will be recognized as a Member of the

002840
HCMLPHMIT00004131

Company until he/she shall have executed this Agreement, or a counterpart hereto, and agrees to be bound by all of the terms and conditions hereof.

2.02    <u>Annual Meetings</u>    An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, and if a legal holiday, then on the next business day following, at the time specified in the notice of the meeting.    At such meeting, the Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.03    <u>Special Meetings</u>    A special meeting of the Members may be called at any time by the President, the Board of Managers, or one or more Members whose Percentage Interests total at least 10%.    Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04    <u>Place of Meetings</u>    The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the Board of Managers.    Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.03.    If no place for a meeting is designated, it shall be held at the registered office of the Company.

2.05    <u>Notice</u>.    Written or printed notice stating the place, day, and hour of each meeting of Members and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days or more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the President, the Secretary, or the person calling the meeting, to each Member of record entitled to vote at such meeting.

2.06    <u>Voting List</u>    At least 10 days before each meeting of Members, the Secretary shall prepare a complete list of Members entitled to vote at such meeting, arranged in alphabetical order, including the address of each Member and the number of voting Interests held by each Member.    For a period of 10 days prior to such meeting, such list shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member during usual business hours.    Such list shall be produced at such meeting, and at all times during such meeting shall be subject to inspection by any Member.    The membership interest transfer books shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer books.

2.07    <u>Voting of Interests</u>.    Interests held by the Company in treasury, Interests owned by a Person the majority of the voting interests of which are owned or controlled by the Company, and Interests held by the Company in a fiduciary capacity shall not be Interests entitled to vote or to be counted in determining the total number of outstanding Interests of the Company.    Interests held by an administrator, executor, guardian, or conservator may be voted by him or her, either in person or by proxy, without transfer of such Interests into his or her name so long as such Interests form a part of the estate and are in the possession of the estate being served by him or her.    Interests standing in the name of a trustee may be voted by him or her, either in person or by proxy, only after the Interests have been transferred into his or her name as trustee.    Interests standing in the name of a receiver may be voted by such receiver, and Interests held by or under the control of a receiver may be voted by such receiver without transfer of such Interests into his or her name if authority to do so is contained in the court order by which such receiver was appointed.    Interests standing in the name of another domestic or foreign corporation of any type or kind may be voted by such officer, agent, or proxy as the bylaws of such corporation may provide or, in the absence of such provision, as the board of directors of such corporation may by resolution determine.    A Member whose Interests are pledged shall be entitled to vote such Interests until they have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote such Interests.

2.08    <u>Quorum</u>.    The presence in person or by proxy of one or more Members whose Percentage Interests total more than fifty percent (50%) shall constitute a quorum at any meeting of Members, except as otherwise provided by law, the Certificate, or this Agreement.    At any reconvening of an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that could have been transacted at the original meeting if a quorum had been present or represented.

2.09    <u>Vote; Withdrawal of Quorum</u>.    If a quorum is present in person or represented by proxy at any meeting, except as otherwise may be provided in <u>Exhibit A</u> or <u>Exhibit B</u>, the vote of one or more Members whose Percentage Interests total more than fifty percent (50%) of <u>all</u> Members, whether or not they are present in person or represented by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of law, the

6

002841

HCMLPHMIT00004132

Certificate, or this Agreement a different vote is required, in which event such express provision shall govern and control the decision of such question. The Members present at a duly convened meeting may continue to transact business until adjournment, notwithstanding any withdrawal of Members that may leave less than a quorum remaining.

2.10   <u>Method of Voting; Proxies</u>. Except as otherwise may be provided in <u>Exhibit A</u> or <u>Exhibit B</u>, each Member shall be entitled to that number of votes on each matter submitted to the Members for their vote equal to such Member's Percentage Interest multiplied by 100. At any meeting of Members, every Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting. No proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy. If no date is stated on a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted. Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law.

2.11   <u>Closing of Transfer Books; Record Date</u> . For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any reconvening thereof, or entitled to receive payment of any distribution, or in order to make a determination of Members for any other proper purpose, the Board of Managers may provide that the membership interest transfer books of the Company shall be closed for a stated period but not to exceed in any event 50 days. If the membership interest transfer books are closed for the purpose of determining Members entitled to notice of, or to vote at, a meeting of Members, such books shall be closed for at least 10 days immediately preceding such meeting. In lieu of closing the membership interest transfer books, the Board of Managers may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than 50 days and not less than 10 days prior to the date on which the particular action requiring such determination of Members is to be taken. If the membership interest transfer books are not closed and if no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or entitled to receive payment of a distribution, the date on which the notice of the meeting is to be mailed or the date on which the resolution of the Board of Managers declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.

2.12   <u>Presiding Officials at Meetings</u> The President shall preside at, and the Secretary shall prepare minutes of, each meeting of Members, and in the absence of either such officer, his other duties shall be performed by some person appointed at the meeting.

## ARTICLE III

### MANAGERS

3.01   <u>Management</u>. The business and affairs of the Company shall be managed EXCLUSIVELY by the Board of Managers. Subject to the restrictions imposed by law, the Certificate, or this Agreement, the Board of Managers may exercise all the powers of the Company.

3.02   <u>Number; Election; Term; Qualification</u>. The first Board of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents. Thereafter, except as otherwise may be restricted by this Agreement, the number of Managers that shall constitute the entire Board of Managers shall be determined by resolution of the Board of Managers at any meeting thereof or by the Members at any meeting thereof, but shall never be less than one (1). At each annual meeting of Members, Managers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and qualified. No Manager need be a Member, a resident of the State of Delaware, or a citizen of the United States.

3.03   <u>Removal</u> Except as otherwise may be provided by the Members, at any meeting of Members called expressly for that purpose, any Manager or the entire Board of Managers may be removed, with or without cause, by a vote of one or more Members whose Percentage Interests total more than fifty percent (50%).

3.04   <u>Change in Number; Vacancies</u>. No decrease in the number of Managers constituting the entire Board of Managers shall have the effect of shortening the term of any incumbent Manager. In the case of any increase in the number of Managers, or in the case of the death, retirement, resignation, or removal of a Manager, the vacancies to be filled by such increase or death, retirement, resignation, or removal may be filled by (a) the Board of Managers for a term of office

002842

HCMLPHMIT00004133

continuing only until the next election of one or more Managers by the Members; or (b) the Members at any annual or special meeting of the Members. A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

3.05   <u>Place of Meetings</u> . The Board of Managers may hold its meetings in such place or places, including by telephonic or other electronic method of communication, within or without the State of Delaware as the Board of Managers may from time to time determine.

3.06   <u>First Meeting</u> . Each newly elected Board of Managers may hold its first meeting, if a quorum is present, for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of Members, and no notice of such meeting shall be necessary.

3.07   <u>Regular Meetings</u> . Regular meetings of the Board of Managers may be held without notice at such times and places, including by telephonic or other electronic method of communication, as may be designated from time to time by resolution of the Board of Managers and communicated to all Managers. Regular meetings of the Board of Managers may be held when and if needed, and no more than one regular meeting of the Board of Managers shall be required in any calendar year.

3.08   <u>Special Meetings</u> . A special meeting of the Board of Managers shall be held whenever called by any Manager at such time and place, including by telephonic or other electronic method of communication, as such Manager shall designate in the notice of such special meeting. The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting. Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Managers need be specified in the notice or waiver of notice of any special meeting.

3.09   <u>Quorum; Vote</u> . At all meetings of the Board of Managers, a majority of the Managers fixed in the manner provided in this Agreement shall constitute a quorum for the transaction of business. If a quorum is not present at a meeting, a majority of the Managers present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. The vote of a majority of the Managers present at a meeting at which a quorum is in attendance shall be the act of the Board of Managers, unless the vote of a different number is required by law, the Certificate, or this Agreement.

3.10   <u>Procedure; Minutes</u> . At meetings of the Board of Managers, business shall be transacted in such order as the Board of Managers may determine from time to time. The Board of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute book of the Company.

3.11   <u>Presumption of Assent</u> . A Manager of the Company who is present at any meeting of the Board of Managers at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof, or shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

3.12   <u>Compensation</u> . Except as otherwise may be restricted in this Agreement, Managers, in their capacity as Managers, may receive, by resolution of the Board of Managers, a stated salary or a fixed sum and expenses of attendance, if any, for attending meetings of the Board of Managers. No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

## ARTICLE IV

## COMMITTEES

4.01   <u>Designation</u> . The Board of Managers may, by a resolution adopted by a majority of the entire Board of Managers, designate executive and other committees.

8

002843

HCMLPHMIT00004134

4.02   <u>Number; Qualification; Term</u> .  Each committee shall consist of one or more Managers appointed by resolution adopted by a majority of the entire Board of Managers.  The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the entire Board of Managers.  Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignation, unless sooner removed as a committee member or as a Manager.

4.03   <u>Authority</u> .  The executive committee, to the extent provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in the management of the business and affairs of the Company.  Each other committee, to the extent expressly provided for in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in such other matters and affairs concerning the Company.  However, no committee shall have the authority of the Board of Managers in reference to any of the following:

(a)   amending the Certificate;

(b)   approving a plan of merger or consolidation;

(c)   recommending to the Members the sale, lease, or exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business;

(d)   recommending to the Members a voluntary dissolution of the Company or a liquidation thereof;

(e)   filling vacancies in, or removing members of, the Board of Managers or of any committee thereof;

(f)   filling any vacancy to be filled by reason of an increase in the number of Managers;

(g)   electing or removing officers or committee members;

(h)   fixing the compensation of any committee member; or

(i)   altering or repealing any resolution of the Board of Managers that, by its term, provides that it shall not be amendable or repealable.

4.04   <u>Committee Changes</u> .  The Board of Managers shall have the power at any time to fill vacancies in, to change the Membership of, and to discharge any committee.  However, a committee member may be removed by the Board of Managers only if, in the judgment of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.05   <u>Regular Meetings</u> .  Regular meetings of any committee may be held without notice at such times and places, including by telephonic or other electronic methods of communication, as may be designated from time to time by resolution of the committee and communicated to all committee members.

4.06   <u>Special Meetings</u> .  A special meeting of any committee may be held whenever called by any committee member at such time and place, including by telephonic or other electronic methods of communication, as such committee member shall designate in the notice of such special meeting.  The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting.  Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.07   <u>Quorum; Majority Vote</u> .  At all meetings of any committee, a majority of the number of committee members designated by the Board of Managers shall constitute a quorum for the transaction of business.  If a quorum is not present at a meeting of any committee, a majority of the committee members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  The vote of a majority of the committee members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the vote of a different number is required by law, the Certificate, or this Agreement.

9

HCMLPHMIT00004135

4.08 <u>Minutes</u>. Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board of Managers. The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute books of the Company.

4.09 <u>Compensation</u>. Except as otherwise may be restricted in this Agreement, committee members may, by resolution of the Board of Managers, be allowed a stated salary or a fixed sum and expenses of attendance, if any, for attending any committee meetings.

4.10 <u>Responsibility</u>. The designation of any committee and the delegation of authority to it shall not operate to relieve the Board of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

## ARTICLE V

## GENERAL PROVISIONS RELATING TO MEETINGS

5.01 <u>Notice</u> Whenever by law, the Certificate, or this Agreement notice is required to be given to any Member, Manager, or committee member and no provision is made as to how such notice shall be given, it shall be construed to mean that notice may be given either (a) in person; (b) in writing, by mail; (c) by telegram, telex, cable, telecopy or facsimile transmission, or similar means; or (d) by any other method permitted by law. Any notice required or permitted to be given hereunder (other than personal notice) shall be addressed to such Member, Manager, or committee member at his address as it appears on the books on the Company or, in the case of a Member, on the membership interest transfer records of the Company or at such other place as such Member, Manager, or committee member is known to be at the time notice is mailed or transmitted. Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the United States mail, postage prepaid. Any notice required or permitted to be given by telegram, telex, cable, telecopy or facsimile transmission, or similar means shall be deemed to be delivered and given at the time transmitted.

5.02 <u>Waiver of Notice</u>. Whenever by law, the Certificate, or this Agreement any notice is required to be given to any Member, Manager, or committee member of the Company, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time notice should have been given, shall be equivalent to the giving of such notice. Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meeting, except where a Manager or Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.03 <u>Telephone and Similar Meetings</u> Members, Managers, or committee members may participate in and hold a meeting by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.04 <u>Action Without Meeting</u>. Any action that may be taken, or is required by law, the Certificate, or this Agreement to be taken at a meeting of the Members, the Board of Managers, or a committee thereof may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Members owning the required Percentage Interests of all Members (as set forth herein for the respective action or decision), a majority of the Managers or committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such Members, Managers, or committee members, as the case may be, and may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person. The consent may be in one or more counterparts so long as each Member, Manager, or committee member signs one of the counterparts. The signed consent shall be placed in the minute books of the Company.

## ARTICLE VI

## OFFICERS AND OTHER AGENTS

002845


HCMLPHMIT00004136

6.01    Number; Titles; Election; Term    The Company shall have a president, one or more vice presidents (and, in the case of each vice president, with such descriptive title, if any, as the Board of Managers shall determine), a secretary, a treasurer, and such officers and agents as the Board of Managers may deem desirable.  The Board of Managers shall elect a president, vice president, treasurer, and secretary at its first meeting at which a quorum shall be present after the annual meeting of Members or whenever a vacancy exists.  The Board of Managers then, or from time to time, may also elect or appoint one or more other officers or agents as it shall deem advisable.  Except as otherwise may be provided by separate agreement, each officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and qualified.  Unless otherwise provided in the resolution of the Board of Managers electing or appointing an officer or agent, his term of office shall extend to and expire at the meeting of the Board of Managers following the next annual meeting of Members or, if earlier, at his death, resignation, or removal.  Any two or more offices may be held by the same person.  No officer or agent need be a Member, a Manager, a resident of the State of Delaware, or a citizen of the United States.

6.02    Removal .  Any officer or agent elected or appointed by the Board of Managers may be removed by a majority of the Board of Managers only if, in the judgment of a majority of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.

6.03    Vacancies .  Any vacancy occurring in any office of the Company may be filled by the Board of Managers.

6.04    Authority .  Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the Board of Managers not inconsistent with this Agreement.

6.05    Compensation .  Except as otherwise may be provided by separate agreement, the compensation, if any, of officers  or any salaried employee shall be fixed, increased, or decreased from time to time by the Board of Managers, provided, however, that the Board of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

6.06    Chairman of the Board .  The Chairman of the Board, if any, shall be an officer of the Company and, subject to the direction of the Board of Managers, shall perform such executive, supervisory, and management functions and duties as may be assigned to him from time to time by the Board of Managers.

6.07    President, CEO and COO .  The Board of Managers may designate and appoint a President, CEO and/or COO, with rights, duties and responsibilities established by the Board of Managers.

6.08    Vice Presidents .  Each Vice President shall have such powers and duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President and (in the order as designated by the Board of Managers, or in the absence of such designation, as determined by the length of time each has held the office of Vice President continuously) shall exercise the powers of the President during that officer's absence or inability to act.

6.09    Treasurer .  The Treasurer shall have custody of the Company's funds and securities, shall keep full and accurate accounts of receipts and disbursements, and shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the Board of Managers.  The Treasurer shall audit all payrolls and vouchers of the Company; shall receive, audit, and consolidate all operating and financial statements of the Company and its various departments; shall supervise the accounting and auditing practices of the Company; and shall have charge of matters relating to taxation.  Additionally, the Treasurer shall have the power to endorse for deposit, collection, or otherwise all checks, drafts, notes, bills of exchange, and other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company.  The Treasurer shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.10    Assistant Treasurers .  Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Treasurers (in the order as designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

002846

HCMLPHMIT00004137

6.11    <u>Secretary</u> .  The Secretary shall maintain minutes of all meetings of the Board of Managers, of any committee, and of the Members, or consents in lieu of such minutes, in the Company's minute books, and shall cause notice of such meetings to be given when requested by any person authorized to call such meetings.  The Secretary may sign with the President, in the name of the Company, all contracts of the Company and affix the seal of the Company thereto.  The Secretary shall have charge of the certificate books, membership interest transfer books, and other documents as the Board of Managers may direct, all of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours.  The Secretary shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.12    <u>Assistant Secretaries</u> .  Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Secretaries (in the order designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

## ARTICLE VII

### CAPITALIZATION AND CAPITAL ACCOUNTS

7.01    <u>Capital Contributions</u> .  The Capital Contributions of the Members, as set forth in the books and records of the Company, shall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the Board of Managers.  No Member shall be entitled to make any additional Capital Contributions except as provided in Section 7.02 and 7.03 below.

7.02    <u>Additional Capital Contributions</u> .  If the Board of Managers determine that additional capital is required for the purposes of the Company, as set forth herein, the Board of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made.  Thereupon, all Members shall have the right (but not the obligation) to make additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage Interests in the Company at the time notice is given.  The Board of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

7.03    <u>Failure to Make Additional Capital Contributions</u> .  If any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a "Non-Contributing Member"), then the other Members shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member (such Members being referred to as "Contributing Members") of the additional capital needed pro rata according to such Contributing Members' Percentage Interests at such time or such other share as otherwise agreed upon by the Contributing Members.

7.04    <u>Effect of Failure to Make Additional Capital Contributions</u> .  In the event of a Non-Contributing Member, the Percentage Interests of all of the Members shall be recomputed on the following basis:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member plus the additional Capital Contribution, if any, made by such Member pursuant to Sections 7.02 and 7.03 above, and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections 7.02 and 7.03 above.

7.05    <u>Recapitalization by Admission of Additional Members</u> .  If additional capital is required for the purposes of the Company as set forth herein and the Board of Managers is unable to finance such capital needs by borrowing the required amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section 7.02 and 7.03 above, the Board of Managers shall have the right to admit additional Members to the Company, upon receiving the other approvals required herein.  Following the admission of one or more new Members, the Percentage Interest of each Member, including the newly admitted Member(s), shall be computed as follows:  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the Members, including the newly admitted Members.

002847



HCMLPHMIT00004138

7.06    <u>Maintenance of Capital Accounts</u> .  The Company shall maintain for each Member a separate Capital Account in accordance with this Section 7.06, which shall control the allocation of Profits and Losses and the division of assets upon liquidation of the Company as provided in Section 12.01.  Each Capital Account shall be maintained in accordance with the following provisions:

(a)    a Member's Capital Account shall initially be zero and shall be increased by the cash amount or Book Value of any property contributed by such Member to the Company pursuant to this Agreement, such Member's allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b)    such Capital Account shall be decreased by the cash amount or Book Value of any property distributed to such Member pursuant to this Agreement, such Member's allocable share of Losses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company; and

(c)    if all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest, provided, however, that if the Transfer causes a termination of the Company under Code Section 708(b)(1)(B), the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the Interest) in liquidation of the Company and recontributed by such Members and transferees in reconstitution of the Company.  Such deemed liquidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board of Managers may authorize such modifications, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Sections 8.06 and 12.01 hereof.

7.07    <u>Negative Capital Accounts</u> .  If any Member has a deficit balance in its Capital Account, such Member shall have no obligation to restore such negative balance or to make any Capital Contribution to the Company by reason thereof, and such negative balance shall not be considered an asset of the Company or of any Member.

7.08    <u>Interest</u> .  No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

7.09    <u>No Withdrawal</u> .  No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the Company, except as provided in Sections 11.02 and 12.01 of this Agreement.

7.10    <u>Loans From Members</u> .  Loans by a Member to the Company shall not be considered Capital Contributions.

## ARTICLE VIII

### ALLOCATIONS AND DISTRIBUTIONS

8.01    <u>Allocation of Profits and Losses</u>.

(a)    <u>Allocation of Profits</u>.  Except as provided on any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, and after giving effect to all distributions of cash or property (other than cash or

13



HCMLPHMIT00004139

property to be distributed pursuant to Section 12.01), Profits for any Fiscal Year shall be allocated to the Members in the following manner:

        (i)      first, to each Member with a negative balance in its Capital Account, pro rata in accordance with such negative Capital Account balances, until such negative Capital Account balances have been eliminated;

        (ii)     next, to all of the Members in accordance with their respective Percentage Interests.

    (b)    <u>Allocation of Losses</u>.  Except as provided in any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, Losses for any Fiscal Year shall be allocated to the Members in the following manner:

        (i)      to all of the Members in accordance with their respective Percentage Interests.

    8.02    <u>Special Allocations of Profits and Losses</u> .

    (a)    <u>Minimum Gain Chargeback–Company Nonrecourse Liabilities</u>.  If there is a net decrease in Company minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.704-2(f) and (j)(2)(i) and (ii), subject to the exemptions set forth in Treasury Regulations Section 1.704-2(f)(2), (3), (4) and (5).  This Section 8.02(a) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(f) relating to Company nonrecourse liabilities, as defined in Treasury Regulations Section 1.704-2(b)(3) and shall be so interpreted.

    (b)    <u>Minimum Gain Chargeback–Member Nonrecourse Debt</u>.  If there is a net decrease in Member minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) as quickly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.704-2(i)(5) in the amounts and manner described in Treasury Regulations Sections 1.704-2(i)(4), (j)(2)(ii), and (j)(2)(iii).  This Section 8.02(b) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(i)(4) relating to Member nonrecourse debt, as defined in Treasury Regulations Section 1.704-2(b)(4) and shall be so interpreted.

    (c)    <u>Qualified Income Offset</u>.  If, after applying Section 8.02(a) and Section 8.02(b), any Member has an adjusted Capital Account deficit, items of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the adjusted Capital Account deficit of such Member as quickly as possible.  This Section 8.02(c) is intended to comply with the "qualified income offset" requirement set for the in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be so interpreted.

    (d)    <u>Optional Basis Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken in to account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

    (f)    <u>Partner Nonrecourse Deductions</u>.  Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.704-2(b)(4) and (i)(1) to the Member who bears the economic risk of loss with respect to such deductions.

    8.03    <u>Curative Allocations</u> .  The Regulatory Allocations are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.03.  Therefore, notwithstanding any other provisions of this Article VIII, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 8.01(a) and Section 8.01(b) hereof.

002849

HCMLPHMIT00004140

8.04    <u>Tax Allocations: Code Section 704(c)</u> .

(a)    In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value.

(b)    If the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(c)    Any elections or other decisions relating to such allocation shall be made by the Board of Managers. Allocations pursuant to this Section 8.04 are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Member's Capital Account, or share of Profits, Losses, and other items or distribution pursuant to any provision of this Agreement.

8.05    <u>Other Allocation Rules</u> .

(a)    For purposes of determining the Profits, Losses, or any other item allocable to any period, Profits, Losses, and any such other item shall be determined on a daily, monthly, or other   basis, as determined by the Board of Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b)    For federal income tax purposes, every item of income, gain, loss, and deduction shall be allocated among the Members in accordance with the allocations under Sections 8.01, 8.02, 8.03, and 8.04.

(c)    The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their shares of Company income and loss for income tax purposes.

(d)    It is intended that the allocations in Sections 8.01, 8.02, 8.03, and 8.04 hereof effect an allocation for federal income tax purposes consistent with Section 704 of the Code and comply with any limitations or restrictions therein.

8.06    <u>Distributions of Distributable Cash</u> .  Except as otherwise may be provided in this Agreement, the Board of Managers shall cause the Company to make distributions of Distributable Cash at such intervals and in such amounts as the Board of Managers in its sole discretion shall determine by majority vote.   Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

8.07    <u>Working Cash Reserve</u> .  The Board of Managers may from time to time establish a working cash reserve for capital expenditures, unforeseen contingencies, projected operating deficits, and other corporate purposes and may increase or decrease the amount in such reserve in its business judgment.

<div align="center">

**ARTICLE IX**

**CERTIFICATES**

</div>

9.01    <u>Certificated and Uncertificated Interests</u> .  The membership interests of the Company may be either certificated interests or uncertificated interests.  As used herein, the term "certificated interests" means Interests represented by instruments in bearer or registered form, and the term "uncertificated interests" means Interests not represented by such instruments and the transfers of which are registered upon books maintained for that purpose by or on behalf of the Company.

9.02    <u>Certificates for Certificated Interests</u> .  The certificates for certificated interests shall be in such form as shall be approved by the Board of Managers in conformity with law.  The certificates shall be consecutively numbered, shall be entered as they are issued in the books of the Company or in the records of the Company's designated transfer agent, if any, and shall state the Member's name, the class of Interests, the Percentage Interest that such Interest represents, and such

<div align="center">15</div>


002850

HCMLPHMIT00004141

other matters as may be required by law.  The certificates shall be signed by the President or any Vice President and also by the Secretary, an Assistant Secretary, or any other officer, and may be sealed with the seal of the Company or a facsimile thereof.  If any certificate is countersigned by a transfer agent or registered by a registrar, either of which is other than the Company itself or an employee of the Company, the signatures of the foregoing officers may be a facsimile.

9.03    Lost, Stolen, or Destroyed Certificates .  The Company shall issue a new certificate in place of any certificate for Interests previously issued if the registered owner of the certificate satisfies the following requirements:

(a)    the registered owner makes proof in affidavit form that a previously issued certificate for Interests has been lost, destroyed, or stolen;

(b)    the registered owner requests the issuance of a new certificate before the Company has notice that the certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(c)    the registered owner gives a bond in such form, and with such surety or sureties, with fixed or open penalty, as the Board of Managers may direct, in its discretion, to indemnify the Company (and its transfer agent and registrar, if any) against any claim that may be made on account of the alleged loss, destruction, or theft of the certificate; and

(d)    the registered owner satisfies any other reasonable requirements imposed by the Board of Managers.

When a certificate has been lost, destroyed, or stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of it, if the Company registers a transfer of the Interests represented by the certificate before receiving such notification, the Member of record is precluded from making any claim against the Company for the transfer or for a new certificate.

9.04    Transfer of Interests .  Interests of the Company shall be transferable only on the books of the Company by the Members thereof in person or by their duly authorized attorneys or legal representatives, but only as authorized in this COMPANY AGREEMENT.  With respect to certificated interests, upon surrender to the Company or the transfer agent of the Company of a certificate representing Interests duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books.  With respect to uncertificated interests, upon delivery to the Company of proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall record the transaction upon its books.

9.05    Registered Members .  The Company shall be entitled to treat the Member of record as the Member in fact of any Interests and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other Person, whether or not it shall have actual or other notice thereof, except as otherwise provided by law.

9.06    Legends .  If the Company is authorized to issue Interests of more than one class, each certificate representing Interests issued by the Company (a) shall conspicuously set forth on the face or back of the certificate a full statement of all of the designations, preferences, limitations, and relative rights of the Interests of each class authorized to be issued; or (b) shall conspicuously state on the face or back of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement; and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written request to the Company at its principal place of business or registered office.

If the Company issues any Interests that are not registered under the Securities Act of 1933, the transfer of any such interests shall be restricted in accordance with an appropriate legend.

In the event any restriction on the transfer, or registration of the transfer, of Interests shall be imposed or agreed to by the Company, each certificate representing Interests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate; (b) shall set forth such statement on the back of the certificate and conspicuously refer to the same on the face of the certificate; or (c) shall conspicuously state on the face or back of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written request to the Company at its principal place of business or registered

16

002851

HCMLPHMIT00004142

office a copy of the specified document; or (ii) if such document is one required or permitted by law to be and has been filed, that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTICLE X

## ACCOUNTING AND RECORDS

10.01    <u>Records and Accounting</u> .  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal income tax purposes.  The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business.

10.02    <u>Access to Accounting Records</u> .  All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business, and each Member owning a Percentage Interest of at least ten percent (10%), and his duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.03    <u>Annual and Tax Information</u> .  The Company shall deliver to each Member within 90 days after the end of each Fiscal Year all information necessary for the preparation of such Member's federal income tax return.  The Company shall prepare, within 120 days after the end of each Fiscal Year, a financial report of the Company for such Fiscal Year, containing a statement of the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

10.04    <u>Accounting Decisions</u> .  All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board of Managers.  The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.05    <u>Federal Income Tax Elections</u> .  The Company may make all elections for federal income tax purposes, including, but not limited to, the following:

(a)    to the extent permitted by applicable law and regulations, the election to use an accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b)    in case of a transfer of all or part of the Interest of any Member, the election pursuant to Section 734, 743, and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE XI

## CHANGES IN MEMBERS

The provisions of this Article XI are subject to, and may be superceded by, one or more separate agreements entered into by and among one or more Members.  The provisions of this Article XI shall continue to control with respect to matters not covered by, or Members not parties to, such agreement(s).

11.01    <u>Intentionally Blank</u> .

11.02    <u>Transfer and Assignment of Members' Interest</u> .  Except as approved by the Manager, plus a Member or Members owning a Percentage Interest greater than fifty percent (50%), no Member shall be entitled to Transfer any part of its Interest in the Company.  The Company and, if applicable, the remaining Members shall be entitled to match the terms of the proposed Transfer, with consideration being only set forth in traditional monetary terms.  If the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire Interest, or portion thereof, the Member proposing to make the Transfer may move forward with the proposed Transfer.  Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.05(b) hereof.


002852

HCMLPHMIT00004143

11.03    Further Restrictions on Transfer .  No Member shall Transfer any part of his Interest in the Company:  (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged, when added to the total of all other Interests to be sold or exchanged in the preceding 12 consecutive months prior thereto, would result in the termination of the Company under Code Section 708.

11.04    Substitute Members .  A transferee shall have the right to become a substitute Member if (a) the requirements of Section 11.02 and 11.03 hereof are met; (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.05    Effect of Transfer .

(a)    Any permitted Transfer of all or any portion of a Member's Interest in the Company will take effect on the first day of the month following receipt by the Members of written notice of Transfer.  Any transferee of an Interest in the Company shall take subject to the restrictions on Transfer imposed by this Agreement.

(b)    Upon any Transfer of a Member's Interest in the Company in violation of this Agreement, and if such Member's Interest is not purchased pursuant to Section 11.01, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee shall be entitled to receive only the allocable share of Profits, Losses, Distributive Cash, and other items to which the transferor of such Interest in the Company would otherwise be entitled.

11.06    No Dissolution or Withdrawal: Advanced Consent .  Upon the occurrence of a Dissolution Event with regard to a respective Member, all remaining Members shall be deemed to automatically consent to the continuation of the business of the Company.  By executing this Agreement, however, all Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member's capital.  If any Member shall breach the agreement represented by this Section 11.06, the agreement of such breaching Member shall not be specifically performable, but shall be actionable for damages, and shall be deemed an offer of the Interest of such breaching Member for sale pursuant hereto.  The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member's Interest, or as otherwise set forth herein (whichever is greater), which shall be deducted from any payments to such Member upon dissolution or purchase of such Member's Interest hereunder.  The value of the breaching Member's Interest shall be determined pursuant to Section 11.01, to which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.06.

## ARTICLE XII

### TERMINATION

12.01    Termination of the Company .

(a)    The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following events:

(i)    a determination by the Managers, plus the Unanimous Consent of the Members that the Company should be dissolved;

(ii)    a sale of all or substantially all of the assets of the Company;

(iii)    the expiration of the Company's term as stated in its Certificate; or

(iv)    at such earlier time as provided by applicable law.

002853

HCMLPHMIT00004144

(b)      In settling accounts of the Company after dissolution, the liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following order, all as required by the DELAWARE LAWS:

(i)      those to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their Capital Contributions;

(ii)      to the Members, pro rata, in accordance with the positive balances, if any, in their Capital Accounts; and

(iii)      to the Members in proportion to their relative Percentage Interests.

## ARTICLE XIII

### INDEMNIFICATION

13.01      Indemnification of Members, Managers, and Other Persons .

(a)      To the greatest extent not inconsistent with the laws and public policies of Delaware, the Company shall indemnify any Member, Manager, or officer of the Company made a party to any proceeding because such individual is or was a Member, Manager, or officer of the Company (an "Indemnitee"), as a matter of right, against all liability incurred by such individual in connection with any proceeding; provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 13.01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 13.01.  The Company shall advance, pay for, or reimburse the reasonable expenses incurred by an Indemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the Indemnitee furnishes the Company a written affirmation of the Indemnitee's good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 13.01; (ii) the Indemnitee furnishes the Company a written undertaking, executed personally or on such Indemnitee's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct; and (iii) a determination is made in accordance with subsection (d) that based upon facts then known to those making the determination, indemnification would not be precluded under this Section 13.01.  The undertaking described in subsection (a)(ii) above must be a general obligation of the Indemnitee, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment.  The Company shall indemnify an Indemnitee who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section 13.01.  Upon demand by an Indemnitee for indemnification or advancement of expenses, as the case may be, the Company shall expeditiously determine whether the Indemnitee is entitled thereto in accordance with this Section 13.01.  The indemnification and advancement of expenses provided for under this Section 13.01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 13.01.

(b)      The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member, Manager, or officer of the Company.

(c)      Indemnification is permissible under this Section 13.01 only if (i) the Indemnitee conducted himself in good faith; (ii) he or she reasonably believed that his conduct was in, or at least not opposed to, the Company's best interest; (iii) in the case of any criminal proceeding, he or she had no reasonable cause to believe his conduct was unlawful; and (iv) such Indemnitee is not adjudged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty.  The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Indemnitee did not meet the standard of conduct described in this subsection (c).

(d)      A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures:

002854

HCMLPHMIT00004145

        (i)        by the Board of Managers or by a majority vote consisting of Members not at the time parties to the proceeding; or

        (ii)        by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e)        An Indemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

        (i)        in a proceeding in which the Indemnitee is wholly successful, on the merits or otherwise, the Indemnitee is entitled to indemnification under this Section 13.01, in which case the court shall order the Company to pay the Indemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification; or

        (ii)        the Indemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Indemnitee met the standard of conduct set forth in subsection (c) of this Section 13.01.

(f)        Indemnification shall also be provided for an Indemnitee's conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g)        Nothing contained in this Section 13.01 shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member, Manager, or officer of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not. Nothing contained in this Section 13.01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual. It is the intent of this Section 13.01 to provide indemnification to Indemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 13.01. Indemnification shall be provided in accordance with this Section 13.01 irrespective of the nature of the legal or equitable theory upon which a claim is made, including, without limitation, negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h)        For purposes of this Section 13.01:

        (i)        The term "expenses" includes all direct and indirect costs (including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement, or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 13.01, applicable law, or otherwise.

        (ii)        The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

        (iii)        The term "party" includes an individual who was, is, or is threatened to be made a named defendant or respondent in a proceeding.

        (iv)        The term "proceeding" means any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.

        (v)        The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this Section 13.01, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

002855

HCMLPHMIT00004146

## ARTICLE XIV

### MISCELLANEOUS

14.01    <u>Complete Agreement</u> .  This Agreement, the Certificate, and all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein.  This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of them, and no representation, statement, or condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02    <u>Governing Law</u> .  This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware.

14.03    <u>Binding Effect</u> .  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective distributes, successors, and assigns.

14.04    <u>Terms</u> .  Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.  Any reference to the DELAWARE LAWS, the Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.05    <u>Headings</u> .  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.06    <u>Severability</u> .  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

14.07    <u>Multiple Counterparts</u> .  This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.  However, in making proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.08    <u>Additional Documents and Acts</u> .  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.09    <u>No Third-Party Beneficiary</u> .  This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10    <u>References to this Agreement</u> .  Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

14.11    <u>Notices</u> .  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member at the address specified in <u>Exhibit B</u> hereto.  Any Member or the Company may, at any time by giving five days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

002856

HCMLPHMIT00004147


14.12    <u>Amendments</u> .  Except as otherwise may be provided in this Agreement, all amendments to this Agreement must be approved by the Managers, plus one or more Members whose aggregate Percentage Interests total more than fifty percent (50%).

14.13    <u>Title to Company Property</u> .  Legal title to all property of the Company will be held and conveyed in the name of the Company.

14.14    <u>Reliance on Authority of Person Signing Agreement</u> .  In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual; or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.15    <u>S-Corp Election</u> .  In the event the Company elects to be treated as a S-Corporation for federal tax purposes, the provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as required in order to pertain to a S-corporation.

14.16    <u>Company Indemnification</u> .  In the event any Member is personally liable for any debt or obligations associated with a Company asset, then the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is required to pay or perform, as measured by the Percentage Interest of the Members, except as otherwise agreed by the Members.

*14.17    <u>**Management by Members**</u>.  The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member **may** reflect management by members, and not management by managers.  As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such a manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.*

002857

HCMLPHMIT00004148

IN WITNESS WHEREOF, the Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: _____

　　　Mark Patrick, Director and President

23

002858

HCMLPHMIT00004149

**EXHIBIT A**

THE CLASS A MEMBERS AND INTERESTS

      The sole Class A Member shall be RAND ADVISORS HOLDING CORP., a Delaware corporation, and it shall own the Percentage Interest set forth on <u>Exhibit "B"</u> hereto.  In addition to such other rights as a Member described in this Agreement, the holders of record of the Class A Interests shall have no additional rights.

002859

HCMLPHMIT00004150

**EXHIBIT B**

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADVISORS HOLDING CORP. 2101 Cedar Springs Road Suite 1200, Dallas, TX 75201 Attn: Mark Patrick | 8/1/2022 | 100% | 100% |

25

002860

HCMLPHMIT00004151

**EXHIBIT 84**

AMENDED AND RESTATED COMPANY AGREEMENT

*of*

RAND ADLISORSF, , C

A Delaware , imited , iability Company

002862

HCMLPHMIT00004152

## AMENDED AND RESTATED COMPANY AGREEMENT

### *of*

### RAND ADLISORSF, , C

### A Delaware , imited , iability Company

This AMENDED AND RESTATED COMPANY AGREEMENT (collectivelyF the "AgreementF" which shall include all amendments and exhibits hereto) dated effective as of the 1ˢᵗ day of AugustF 2022 (the "Effective Date")F are entered into by and among those Persons executing the signature page hereto as the Members of RAND ADLISORSF, , CFa Delaware limited liability company (the "Company"). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

### ARTIC, E I

### INTRODUCTION

1.01   9ormation of , imited , iability Company   The Company was formed by the filing of the Certificate of 9ormation (the "Certificate") with the Secretary of State of Delaware on the August 25F201' . The Companyˌs business shall be conducted under the name "RAND ADLISORSF, , C" until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replacesF in its entiretyF all prior governing agreements for the CompanyF including but not limited to that certain Amended and Restated , imited , iability Company Agreement dated March 1F201WF and any and all amendments thereto.

This Agreement is sub3ect toF and governed byF the Delaware laws governing limited liability companies (the "DE, AB ARE , AB S") and the Certificate. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DE, AB ARE , AB S or the provisions of the CertificateF such provisions of the DE, AB ARE , AB S or the CertificateF as the case may beF will be controlling.

1.02   Registered Office and Agent   The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.0'   Other Offices   The Company may also have offices at such other placesF both within and without the State of DelawareF as the q oard of Managers may from time to time determine or the business of the Company may re: uire.

1.04   Defined Terms   The terms used in this Agreement with their initial letter capitalized shallF unless the context re: uires otherwiseF have the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuterF and vice versaF as the context re: uires. B hen used in this AgreementF the following terms shall have the meanings set forth below"

(a)   -DE, AB ARE , AB S- shall mean the Delaware laws governing limited liability companiesF as the same may be amended from time to time.

(b)   "Affiliate" shall meanF as to any PersonF any Person controlled byF controllingF or under common control with such PersonF andF in the case of a Person who is an individualF a member of the family of such individual consisting of a spouseF siblingF inlawF lineal descendantF or ancestor (including by adoption). 9or purposes of this definitionF "control" (including the terms "controlling"F "controlled by" and "under common control with") of a Person means the possessionF directly or indirectlyF alone or in concert with othersF of the power to direct or cause the direction of the management and policies of such PersonF whether through the ownership of securitiesF by contract or otherwiseF and no Person shall be deemed in control of another solely by virtue of being a directorF Officer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

2

002863

HCMLPHMIT00004153

(c)      "Bankruptcy" shall mean, and a Member shall be deemed a "Bankrupt Member," upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief Laws, (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any involuntary bankruptcy which petition remains undismissed for a period of 100 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Laws now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(d)      "Depreciation" for any asset shall mean for any Fiscal Year or other period an amount that bears the same ratio to the Gross Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other period is zero, then Gross Value; Depreciation for that asset shall be determined with reference to such beginning Gross Value using any reasonable method selected by the Board of Managers.

(e)      "Gross Value" shall mean for any asset the asset's adjusted tax basis, except as follows:

(i)      the initial Gross Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board of Managers;

(ii)      the Gross Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of one of the following times: (1) on the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest in the Company if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (3) on the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations;

(iii)      the Gross Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv)      the Gross Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations and Section 5.02(d) hereof; provided, however, that Gross Values shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the Board of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv); and

(v)      if the Gross Value of an asset has been determined or adjusted pursuant to Section 1.04(e)(i), 1.04(e)(ii), or 1.04(e)(iv) hereof, such Gross Value shall thereafter be adjusted by the Gross Value Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(f)      "Capital Contribution" shall mean the total value of cash and Gross Value (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each Member, as shown on <u>Exhibit A</u> attached hereto and incorporated herein for all purposes, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

HCMLPHMIT00004154

prior Member for the interest of such then MemberFreduced by any distribution to such Member in return of its capital as contemplated herein.

(g)     "Class A Interest" shall refer to the Interest of a Class A Member in the ProfitsF, ossesFDistributable CashF and assets upon li: uidation of the Company as described in this Agreement.

(h)     "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit AF as amended from time to time.

(i)     Intentionally q lan; .

(3)     Intentionally q lan; .

(; )     -Code- shall mean the Internal Revenue Code of 16UWas amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l)     -Company- shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m)     "Debtor Relief , aws" shall mean any federal or state ban; ruptcyFinsolvencyFor similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n)     Intentionally q lan; .

(o)     -Distributable Cash- of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time' (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time' and (iii) provision for a wor; ing cash reserve in accordance with Section U05 below.

(p)     "9iscal Year" shall mean the calendar year.

(: )     "9ormer Member" shall mean a member that causes a Dissolution Event.

(r)     -Interest- in the Company shall mean the entire ownership interest of a Member in the Company at any particular timeFincluding such Member's Capital AccountFallocable share of ProfitsF, ossesFand Distributable CashFand the right of such Member to any and all benefits to which a Member may be entitled as provided in this AgreementFtogether with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s)     Intentionally q lan;

(t)     -Manager- shall mean an individual elected to the q oard of Managers of the Company pursuant to Sections ' .02 and ' .04 below.

(u)     -Member(s)- shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof.  The namesFbusiness or residence addressesFCapital ContributionsFPercentage InterestFand class of Interest of the Members shall be set forth on Exhibit q Fattached hereto and incorporated herein by reference.  Reference to a -Member- shall be to any one of the Members.

(v)     -Percentage Interest- of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column -Percentage Interest- in Exhibit q Fas such percentage may be ad3usted from time to time pursuant to the terms hereof.

(w)     "Person" shall mean any individualF corporationF partnershipF limited liability company or partnershipF associationForganizationFtrustFestateFor other entity.

4

(x)      -Pro Rata Part- shall mean the percentage expression of a fraction the numerator of which is a Member$s respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y)      "Profits" and ", osses" shall meanFfor each 9iscal Year or other periodFan amount e: ual to the Company$s taxable income or loss for such year or periodFdetermined in accordance with Code Section 50' (a) (for this purposeFall items of incomeFgainFlossFor deduction re: uired to be stated separately pursuant to Code Section 50' (a)(1) shall be included in taxable income or loss)Fwith the following ad3ustments"

(i)      income of the Company that is exempt from federal income tax and not otherwise ta; en into account in computing Profits and , osses pursuant to this Section 1.04(y) shall be added to such taxable income or loss'

(ii)      any expenditures of the Company described in Code Section 50V(a)(2)(q )For treated as Code Section 50V(a)(2)(q ) expenditures pursuant to Section 1.504kl(b)(2)(iv)(i) of the Treasury RegulationsF and not otherwise ta; en into account in computing Profits and , osses pursuant to this Section 1.04(y)Fshall be subtracted from such taxable income or loss'

(iii)      if the q oo;  L alue of any Company asset is ad3usted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii)Fthe amount of such ad3ustment shall be ta; en into account as gain or loss from the disposition of such asset for purposes of computing Profits and , osses'

(iv)      gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the q oo;  L alue of the property disposed offFnotwithstanding that the ad3usted tax basis of such property differs from its q oo;  L alue'

(v)      in lieu of the deduction for depreciationF cost recoveryF or amortization ta; en into account in computing such taxable income or lossFthere shall be ta; en into account q oo;  Depreciation' and

(vi)      notwithstanding any other provision of this Section 1.04(y)Fany items that are specially allocated pursuant to Section U02 or Section U0'  shall not be ta; en into account in computing Profits and , osses.

(z)      "Regulatory Allocations" shall mean the special allocations of items of incomeFgainFlossFand deductionFif anyFset forth in Section U02 hereof.

(aa)      -Transfer- or -Transferred- shall mean  the saleF assignmentF conveyanceF giftF be: uestF deviseF transfer under the rules of intestate successionF pledgeF mortgageF or other encumbrance.  In additionF the term -Transfer- or -Transferred- shall mean an -ownership change- of a Member as defined in Section ' U2(g) of the Code in effect as of the Effective DateFexcept that the term -Member- shall be substituted for -shareholder- wherever it appears.

(bb)      -Treasury Regulations- shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc)      "7 nanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTIC, E II

## MEMBERS AND MEMBERSHIP INTERESTS

2.01      Members.  The Members of the Company shall be those Persons listed on Exhibit q . Except as otherwise may be provided in Exhibit A or Exhibit q Fand except as provided in Section 5.0V belowFa Person may be admitted as a Member to the Company only upon the affirmative vote of the ManagersFplus one or more Members whose Percentage Interests total more than fifty percent (V0%)' providedFhoweverF that no Person will be recognized as a Member of the

V

002866


HCMLPHMIT00004156

Company until he/she shall have executed this AgreementFor a counterpart heretoFand agrees to be bound by all of the terms and conditions hereof.

2.02   <u>Annual Meetings</u>   An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the q oard of Managers and stated in the notice of the meetingFand if a legal holidayFthen on the next business day followingFat the time specified in the notice of the meeting.  At such meetingFthe Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.0'   <u>Special Meetings</u>   A special meeting of the Members may be called at any time by the PresidentFthe q oard of ManagersFor one or more Members whose Percentage Interests total at least 10%.  Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04   <u>Place of Meetings</u>   The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the q oard of Managers.  Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.0' .  If no place for a meeting is designatedFit shall be held at the registered office of the Company.

2.0V   <u>Notice.</u>   B ritten or printed notice stating the placeFdayFand hour of each meeting of Members andFin case of a special meetingFthe purpose or purposes for which the meeting is calledFshall be delivered not less than 10 days or more than V0 days before the date of the meetingFeither personally or by mailFby or at the direction of the PresidentFthe SecretaryF or the person calling the meetingFto each Member of record entitled to vote at such meeting.

2.0W   <u>Loting , ist</u>   At least 10 days before each meeting of MembersFthe Secretary shall prepare a complete list of Members entitled to vote at such meetingFarranged in alphabetical orderFincluding the address of each Member and the number of voting Interests held by each Member.  9or a period of 10 days prior to such meetingFsuch list shall be ; ept on file at the registered office of the Company and shall be sub3ect to inspection by any Member during usual business hours.  Such list shall be produced at such meetingFand at all times during such meeting shall be sub3ect to inspection by any Member.  The membership interest transfer boo; s shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer boo; s.

2.05   <u>Loting of Interests</u>.  Interests held by the Company in treasuryFInterests owned by a Person the ma3ority of the voting interests of which are owned or controlled by the CompanyFand Interests held by the Company in a fiduciary capacity shall not be Interests entitled to vote or to be counted in determining the total number of outstanding Interests of the Company.  Interests held by an administratorFexecutorFguardianFor conservator may be voted by him or herFeither in person or by proxyFwithout transfer of such Interests into his or her name so long as such Interests form a part of the estate and are in the possession of the estate being served by him or her.  Interests standing in the name of a trustee may be voted by him or herFeither in person or by proxyFonly after the Interests have been transferred into his or her name as trustee.  Interests standing in the name of a receiver may be voted by such receiverFand Interests held by or under the control of a receiver may be voted by such receiver without transfer of such Interests into his or her name if authority to do so is contained in the court order by which such receiver was appointed.  Interests standing in the name of another domestic or foreign corporation of any type or ; ind may be voted by such officerFagentFor proxy as the bylaws of such corporation may provide orFin the absence of such provisionFas the board of directors of such corporation may by resolution determine.  A Member whose Interests are pledged shall be entitled to vote such Interests until they have been transferred into the name of the pledgeeFand thereafter the pledgee shall be entitled to vote such Interests.

2.0U   <u>Quorum.</u>   The presence in person or by proxy of one or more Members whose Percentage Interests total more than fifty percent (V0%) shall constitute a : uorum at any meeting of MembersFexcept as otherwise provided by lawFthe CertificateF or this Agreement.  At any reconvening of an ad3ourned meeting at which a : uorum shall be present or representedFany business may be transacted that could have been transacted at the original meeting if a : uorum had been present or represented.

2.06   <u>Lote' B ithdrawal of Quorum</u>.  If a : uorum is present in person or represented by proxy at any meetingF except as otherwise may be provided in <u>Exhibit A</u> or <u>Exhibit q</u>Fthe vote of one or more Members whose Percentage Interests total more than fifty percent (V0%) of <u>all</u> MembersFwhether or not they are present in person or represented by proxyFshall decide any : uestion brought before such meetingFunless the : uestion is one on whichFby express provision of lawFthe

W

002867



CertificateFor this Agreement a different vote is re: uiredFin which event such express provision shall govern and control the decision of such : uestion.  The Members present at a duly convened meeting may continue to transact business until ad3ournmentFnotwithstanding any withdrawal of Members that may leave less than a : uorum remaining.

2.10    Method of Loting' Proxies.  Except as otherwise may be provided in Exhibit A or Exhibit qFeach Member shall be entitled to that number of votes on each matter submitted to the Members for their vote e: ual to such Member $s$ Percentage Interest multiplied by 100.   At any meeting of MembersFevery Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorneykinkfact.  Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting.  No proxy shall be valid after 11 months from the date of its executionFunless otherwise provided in the proxy.  If no date is stated on a proxyFsuch proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted.  Each proxy shall be revocable unless expressly provided herein to be irrevocable or unless otherwise made irrevocable by law.

2.11    Closing of Transfer q oo; s' Record Date .  9or the purpose of determining Members entitled to notice ofFor to vote atFany meeting of Members or any reconvening thereofFor entitled to receive payment of any distributionFor in order to ma; e a determination of Members for any other proper purposeFthe q oard of Managers may provide that the membership interest transfer boo; s of the Company shall be closed for a stated period but not to exceed in any event V0 days.  If the membership interest transfer boo; s are closed for the purpose of determining Members entitled to notice ofFor to vote atFa meeting of MembersFsuch boo; s shall be closed for at least 10 days immediately preceding such meeting.  In lieu of closing the membership interest transfer boo; sFthe q oard of Managers may fix in advance a date as the record date for any such determination of MembersFsuch date in any case to be not more than V0 days and not less than 10 days prior to the date on which the particular action re: uiring such determination of Members is to be ta; en.  If the membership interest transfer boo; s are not closed and if no record date is fixed for the determination of Members entitled to notice ofFor to vote atFa meeting of Members or entitled to receive payment of a distributionFthe date on which the notice of the meeting is to be mailed or the date on which the resolution of the q oard of Managers declaring such distribution is adoptedFas the case may beFshall be the record date for such determination of Members.

2.12    Presiding Officials at Meetings   The President shall preside atFand the Secretary shall prepare minutes ofF each meeting of MembersFand in the absence of either such officerFhis other duties shall be performed by some person appointed at the meeting.

<h2 style="text-align:center"><u>ARTIC, E III</u></h2>

<h2 style="text-align:center">MANAGERS</h2>

' .01    Management.  The business and affairs of the Company shall be managed EXC, 7 SIL E, Y by the q oard of Managers.   Sub3ect to the restrictions imposed by lawF the CertificateF or this AgreementF the q oard of Managers may exercise all the powers of the Company.

' .02    Number' Election' Term' Qualification.   The first q oard of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents.   ThereafterFexcept as otherwise may be restricted by this AgreementFthe number of Managers that shall constitute the entire q oard of Managers shall be determined by resolution of the q oard of Managers at any meeting thereof or by the Members at any meeting thereofFbut shall never be less than one (1).  At each annual meeting of MembersFManagers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and : ualified.  No Manager need be a MemberFa resident of the State of DelawareFor a citizen of the 7 nited States.

' .0'    Removal   Except as otherwise may be provided by the MembersF at any meeting of Members called expressly for that purposeFany Manager or the entire q oard of Managers may be removedFwith or without causeFby a vote of one or more Members whose Percentage Interests total more than fifty percent (V0%).

' .04    Change in Number' Lacancies.   No decrease in the number of Managers constituting the entire q oard of Managers shall have the effect of shortening the term of any incumbent Manager.  In the case of any increase in the number of ManagersFor in the case of the deathFretirementFresignationFor removal of a ManagerFthe vacancies to be filled by such increase or deathF retirementF resignationF or removal may be filled by (a) the q oard of Managers for a term of office

<p style="text-align:center">5</p>



continuing only until the next election of one or more Managers by the Members' or (b) the Members at any annual or special meeting of the Members. A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

'.0V   Place of Meetings . The q oard of Managers may hold its meetings in such place or placesFincluding by telephonic or other electronic method of communicationFwithin or without the State of Delaware as the q oard of Managers may from time to time determine.

'.0W   9irst Meeting . Each newly elected q oard of Managers may hold its first meetingFif a : uorum is presentF for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of MembersFand no notice of such meeting shall be necessary.

'.05   Regular Meetings . Regular meetings of the q oard of Managers may be held without notice at such times and placesFincluding by telephonic or other electronic method of communicationFas may be designated from time to time by resolution of the q oard of Managers and communicated to all Managers. Regular meetings of the q oard of Managers may be held when and if neededFand no more than one regular meeting of the q oard of Managers shall be re: uired in any calendar year.

'.0U   Special Meetings . A special meeting of the q oard of Managers shall be held whenever called by any Manager at such time and placeFincluding by telephonic or other electronic method of communicationFas such Manager shall designate in the notice of such special meeting. The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting. Neither the business to be transacted atF nor the purpose ofFany special meeting of the q oard of Managers need be specified in the notice or waiver of notice of any special meeting.

'.06   Quorum' Lote . At all meetings of the q oard of ManagersFa ma3ority of the Managers fixed in the manner provided in this Agreement shall constitute a : uorum for the transaction of business. If a : uorum is not present at a meetingF a ma3ority of the Managers present may ad3ourn the meeting from time to timeFwithout notice other than an announcement at the meetingFuntil a : uorum is present. The vote of a ma3ority of the Managers present at a meeting at which a : uorum is in attendance shall be the act of the q oard of ManagersFunless the vote of a different number is re: uired by lawFthe CertificateF or this Agreement.

'.10   Procedure' Minutes . At meetings of the q oard of ManagersFbusiness shall be transacted in such order as the q oard of Managers may determine from time to time. The q oard of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute boo; of the Company.

'.11   Presumption of Assent . A Manager of the Company who is present at any meeting of the q oard of Managers at which action on any matter is ta; en shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the ad3ournment thereofFor shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the ad3ournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

'.12   Compensation . Except as otherwise may be restricted in this AgreementFManagersFin their capacity as ManagersFmay receiveFby resolution of the q oard of ManagersFa stated salary or a fixed sum and expenses of attendanceFif anyFfor attending meetings of the q oard of Managers. No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

## ARTIC, E IL

## COMMITTEES

4.01   Designation . The q oard of Managers mayFby a resolution adopted by a ma3ority of the entire q oard of ManagersFdesignate executive and other committees.

U

002869

HCMLPHMIT00004159

4.02    <u>Number' Qualification' Term</u> .  Each committee shall consist of one or more Managers appointed by resolution adopted by a ma3rity of the entire q oard of Managers.  The number of committee members may be increased or decreased from time to time by resolution adopted by a ma3rity of the entire q oard of Managers.  Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignationF unless sooner removed as a committee member or as a Manager.

4.0'    <u>Authority</u> .  The executive committeeF to the extent provided in the resolution establishing such committeeF shall have and may exercise all of the authority of the q oard of Managers in the management of the business and affairs of the Company.  Each other committeeF to the extent expressly provided for in the resolution establishing such committeeF shall have and may exercise all of the authority of the q oard of Managers in such other matters and affairs concerning the Company.  HoweverF no committee shall have the authority of the q oard of Managers in reference to any of the following"

(a)    amending the Certificate'

(b)    approving a plan of merger or consolidation'

(c)    recommending to the Members the saleF leaseF or exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business'

(d)    recommending to the Members a voluntary dissolution of the Company or a li: uidation thereof'

(e)    filling vacancies inF or removing members ofF the q oard of Managers or of any committee thereof'

(f)    filling any vacancy to be filled by reason of an increase in the number of Managers'

(g)    electing or removing officers or committee members'

(h)    fixing the compensation of any committee member' or

(i)    altering or repealing any resolution of the q oard of Managers thatF by its termF provides that it shall not be amendable or repealable.

4.04    <u>Committee Changes</u> .  The q oard of Managers shall have the power at any time to fill vacancies inF to change the Membership ofF and to discharge any committee.  HoweverF a committee member may be removed by the q oard of Managers only ifF in the 3udgment of the q oard of ManagersF the best interests of the Company will be served therebyF but such removal shall be without pre3udice to the contract rightsF if anyF of the person so removed.

4.0V    <u>Regular Meetings</u> .  Regular meetings of any committee may be held without notice at such times and placesF including by telephonic or other electronic methods of communicationF as may be designated from time to time by resolution of the committee and communicated to all committee members.

4.0W    <u>Special Meetings</u> .  A special meeting of any committee may be held whenever called by any committee member at such time and placeF including by telephonic or other electronic methods of communicationF as such committee member shall designate in the notice of such special meeting.  The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting.  Neither the business to be transacted atF nor the purpose ofF any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.05    <u>Quorum' Ma3rity Lote</u> .  At all meetings of any committeeF a ma3rity of the number of committee members designated by the q oard of Managers shall constitute a : uorum for the transaction of business.  If a : uorum is not present at a meeting of any committeeF a ma3rity of the committee members present may ad3ourn the meeting from time to timeF without notice other than an announcement at the meetingF until a : uorum is present.  The vote of a ma3rity of the committee members present at any meeting at which a : uorum is in attendance shall be the act of a committeeF unless the vote of a different number is re: uired by lawF the CertificateF or this Agreement.

6

002870

HCMLPHMIT00004160

4.0U   <u>Minutes</u> .  Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the q oard of Managers.  The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute boo; s of the Company.

4.06   <u>Compensation</u> .  Except as otherwise may be restricted in this AgreementFcommittee members mayFby resolution of the q oard of ManagersFbe allowed a stated salary or a fixed sum and expenses of attendanceFif anyFfor attending any committee meetings.

4.10   <u>Responsibility</u> .  The designation of any committee and the delegation of authority to it shall not operate to relieve the q oard of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

## ARTIC, E L

## GENERA,  PROLISIONS RE, ATING TO MEETINGS

V.01   <u>Notice</u>  B henever by lawFthe CertificateFor this Agreement notice is re: uired to be given to any MemberF ManagerFor committee member and no provision is made as to how such notice shall be givenFit shall be construed to mean that notice may be given either (a) in person' (b) in writingFby mail' (c) by telegramFtelexFcableFtelecopy or facsimile transmissionFor similar means' or (d) by any other method permitted by law.  Any notice re: uired or permitted to be given hereunder (other than personal notice) shall be addressed to such MemberFManagerFor committee member at his address as it appears on the boo; s on the Company orFin the case of a MemberFon the membership interest transfer records of the Company or at such other place as such MemberFManagerFor committee member is ; nown to be at the time notice is mailed or transmitted.  Any notice re: uired or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the 7 nited States mailFpostage prepaid.  Any notice re: uired or permitted to be given by telegramFtelexFcableFtelecopy or facsimile transmissionFor similar means shall be deemed to be delivered and given at the time transmitted.

V.02   <u>B aiver of Notice</u> .  B henever by lawFthe CertificateFor this Agreement any notice is re: uired to be given to any MemberFManagerFor committee member of the CompanyFa waiver thereof in writing signed by the person or persons entitled to such noticeFwhether before or after the time notice should have been givenFshall be e: uivalent to the giving of such notice.  Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meetingFexcept where a Manager or Member attends a meeting for the express purpose of ob3ecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

V.0'   <u>Telephone and Similar Meetings</u>  MembersFManagersFor committee members may participate in and hold a meeting by means of a conference telephone or similar communications e: uipment by means of which all persons participating in the meeting can hear each other.  Participation in such a meeting shall constitute presence in person at such meetingFexcept where a person participates in the meeting for the express purpose of ob3ecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

V.04   <u>Action B ithout Meeting</u> .  Any action that may be ta; enFor is re: uired by lawFthe CertificateFor this Agreement to be ta; en at a meeting of the MembersFthe q oard of ManagersFor a committee thereof may be ta; en without a meeting if a consent in writingFsetting forth the action so ta; enFshall be signed by the Members owning the re: uired Percentage Interests of all Members (as set forth herein for the respective action or decision)Fa ma3ority of the  Managers or committee membersFas the case may beFentitled to vote with respect to the sub3ect matter thereofFand such consent shall have the same force and effect as a vote of such MembersFManagersFor committee membersFas the case may beFand may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person.  The consent may be in one or more counterparts so long as each MemberFManagerFor committee member signs one of the counterparts.  The signed consent shall be placed in the minute boo; s of the Company.

## ARTIC, E LI

## OVVICERS AND OTHER AGENTS

10

002871

HCMLPHMIT00004161

W01   <u>Number' Titles' Election' Term</u>   The Company shall have a presidentFone or more vice presidents (andFin the case of each vice presidentFwith such descriptive titleFif anyFas the q oard of Managers shall determine)Fa secretaryFa treasurerFand such officers and agents as the q oard of Managers may deem desirable.  The q oard of Managers shall elect a presidentFvice presidentFtreasurerFand secretary at its first meeting at which a : uorum shall be present after the annual meeting of Members or whenever a vacancy exists.  The q oard of Managers thenFor from time to timeFmay also elect or appoint one or more other officers or agents as it shall deem advisable.  Except as otherwise may be provided by separate agreementFeach officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and : ualified.  7 nless otherwise provided in the resolution of the q oard of Managers electing or appointing an officer or agentFhis term of office shall extend to and expire at the meeting of the q oard of Managers following the next annual meeting of Members orFif earlierFat his deathFresignationFor removal.  Any two or more offices may be held by the same person.  No officer or agent need be a MemberFa ManagerFa resident of the State of DelawareFor a citizen of the 7 nited States.

W02   <u>Removal</u> .  Any officer or agent elected or appointed by the q oard of Managers may be removed by a ma3ority of the q oard of Managers only ifFin the 3udgment of a ma3ority of the q oard of ManagersFthe best interests of the Company will be served therebyFbut such removal shall be without pre3udice to the contract rightsFif anyFof the person so removed.  Election or appointment of an officer or agent shall not of itself create contract rights.

W0'   <u>Lacancies</u> .  Any vacancy occurring in any office of the Company may be filled by the q oard of Managers.

W04   <u>Authority</u> .  Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the q oard of Managers not inconsistent with this Agreement.

W0V   <u>Compensation</u> .  Except as otherwise may be provided by separate agreementFthe compensationFif anyFof officers  or any salaried employee shall be fixedF increasedF or decreased from time to time by the q oard of ManagersF providedFhoweverFthat the q oard of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

W0W   <u>Chairman of the q oard</u> .  The Chairman of the q oardFif anyFshall be an officer of the Company andF sub3ect to the direction of the q oard of ManagersFshall perform such executiveFsupervisoryFand management functions and duties as may be assigned to him from time to time by the q oard of Managers.

W05   <u>PresidentFCEO and COO</u> .  The q oard of Managers may designate and appoint a PresidentFCEO and/or COOFwith rightsFduties and responsibilities established by the q oard of Managers.

W0U   <u>Lice Presidents</u> .  Each Lice President shall have such powers and duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President and (in the order as designated by the q oard of ManagersFor in the absence of such designationFas determined by the length of time each has held the office of Lice President continuously) shall exercise the powers of the President during that officerjs absence or inability to act.

W06   <u>Treasurer</u> .  The Treasurer shall have custody of the Companyjs funds and securitiesFshall ; eep full and accurate accounts of receipts and disbursementsFand shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the q oard of Managers.  The Treasurer shall audit all payrolls and vouchers of the Company' shall receiveF auditF and consolidate all operating and financial statements of the Company and its various departments' shall supervise the accounting and auditing practices of the Company' and shall have charge of matters relating to taxation.  AdditionallyFthe Treasurer shall have the power to endorse for depositF collectionF or otherwise all chec; sFdraftsFnotesFbills of exchangeFand other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company.  The Treasurer shall perform such other duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President.

Wl0   <u>Assistant Treasurers</u> .  Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President.  The Assistant Treasurers (in the order as designated by the q oard of Managers orFin the absence of such designationFas determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

11

002872

HCMLPHMIT00004162

Wl1   <u>Secretary</u> .  The Secretary shall maintain minutes of all meetings of the Board of Managers, of any committee, and of the Members, or consents in lieu of such minutes, in the Company's minute book, and shall cause notice of such meetings to be given when requested by any person authorized to call such meetings.  The Secretary may sign with the President, in the name of the Company, all contracts of the Company and affix the seal of the Company thereto.  The Secretary shall have charge of the certificate book, membership interest transfer book, and other documents as the Board of Managers may direct, all of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours.  The Secretary shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

Wl2   <u>Assistant Secretaries</u> .  Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.  The Assistant Secretaries (in the order designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

<div align="center">

## ARTICLE LII

### CAPITALIZATION AND CAPITAL ACCOUNTS

</div>

5.01   <u>Capital Contributions</u> .  The Capital Contributions of the Members, as set forth in the books and records of the Company, shall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the Board of Managers.  No Member shall be entitled to make any additional Capital Contributions except as provided in Section 5.02 and 5.0' below.

5.02   <u>Additional Capital Contributions</u> .  If the Board of Managers determine that additional capital is required for the purposes of the Company, as set forth herein, the Board of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made.  Thereupon, all Members shall have the right (but not the obligation) to make additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage Interests in the Company at the time notice is given.  The Board of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

5.0'   <u>Failure to Make Additional Capital Contributions</u> .  If any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a "Non-Contributing Member"), then the other Members shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member (such Members being referred to as "Contributing Members") of the additional capital needed pro rata according to such Contributing Members' Percentage Interests at such time or such other share as otherwise agreed upon by the Contributing Members.

5.04   <u>Effect of Failure to Make Additional Capital Contributions</u> .  In the event of a Non-Contributing Member, the Percentage Interests of all of the Members shall be recomputed on the following basis"  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member plus the additional Capital Contribution, if any, made by such Member pursuant to Sections 5.02 and 5.0' above, and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections 5.02 and 5.0' above.

5.0V   <u>Recapitalization by Admission of Additional Members</u> .  If additional capital is required for the purposes of the Company as set forth herein and the Board of Managers is unable to finance such capital needs by borrowing the required amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section 5.02 and 5.0' above the Board of Managers shall have the right to admit additional Members to the Company, upon receiving the other approvals required herein.  Following the admission of one or more new Members, the Percentage Interest of each Member, including the newly admitted Member(s), shall be computed as follows"  Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the Members, including the newly admitted Members.

<div align="center">12</div>

HCMLPHMIT00004163

5.0W    Maintenance of Capital Accounts .  The Company shall maintain for each Member a separate Capital Account in accordance with this Section 5.0W which shall control the allocation of Profits and , osses and the division of assets upon li: uidation of the Company as provided in Section 12.01.  Each Capital Account shall be maintained in accordance with the following provisions"

(a)    a Member s Capital Account shall initially be zero and shall be increased by the cash amount or q oo; L alue of any property contributed by such Member to the Company pursuant to this Agreement F such Member s allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section U02 and Section U0' hereof F and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member'

(b)    such Capital Account shall be decreased by the cash amount or q oo; L alue of any property distributed to such Member pursuant to this Agreement F such Member s allocable share of , osses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section U02 and Section U0' hereof F and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company' and

(c)    if all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement F the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest F provided F however F that if the Transfer causes a termination of the Company under Code Section 50U(b)(1)(q ) F the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the Interest) in li: uidation of the Company and recontributed by such Members and transferees in reconstitution of the Company.  Such deemed li: uidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.504k l(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the q oard of Managers determines that it is prudent to modify the manner in which the Capital Accounts F or any increases or decreases to the Capital Accounts F are computed in order to comply with such Treasury Regulations F the q oard of Managers may authorize such modifications F provided that it is not li; ely to have a material effect on the amounts distributable to any Member pursuant to Sections U0W and 12.01 hereof.

5.05    Negative Capital Accounts .  If any Member has a deficit balance in its Capital Account F such Member shall have no obligation to restore such negative balance or to ma; e any Capital Contribution to the Company by reason thereof F and such negative balance shall not be considered an asset of the Company or of any Member.

5.0U    Interest .  No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

5.06    No B ithdrawal .  No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the Company F except as provided in Sections 11.02 and 12.01 of this Agreement.

5.10    , oans 9 rom Members .  , oans by a Member to the Company shall not be considered Capital Contributions.


## ARTIC, E LIII

## A, , OCATIONS AND DISTRIBUTIONS

U01    Allocation of Profits and , osses.

(a)    Allocation of Profits.  Except as provided on any Exhibit hereto F after giving effect to the allocations set forth in Section U02 and Section U0' F and after giving effect to all distributions of cash or property (other than cash or

1'

HCMLPHMIT00004164

property to be distributed pursuant to Section 12.01)FProfits for any 9iscal Year shall be allocated to the Members in the following manner"

(i)     firstFto each Member with a negative balance in its Capital AccountFpro rata in accordance with such negative Capital Account balancesFuntil such negative Capital Account balances have been eliminated'

(ii)     nextFto all of the Members in accordance with their respective Percentage Interests.

(b)     Allocation of , osses.  Except as provided in any Exhibit heretoFAfter giving effect to the allocations set forth in Section U02 and Section U0' F, osses for any 9iscal Year shall be allocated to the Members in the following manner"

(i)     to all of the Members in accordance with their respective Percentage Interests.

U02     Special Allocations of Profits and , osses .

(a)     Minimum Gain Chargebac; –Company Nonrecourse , iabilities.  If there is a net decrease in Company minimum gain during any 9iscal YearFcertain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.504k2(f) and (3)(2)(i) and (ii)F sub3ect to the exemptions set forth in Treasury Regulations Section 1.504k2(f)(2)F(' )F(4) and (V).  This Section U02(a) is intended to comply with the minimum gain chargebac; re: uirement set forth in Treasury Regulations Section 1.504k2(f) relating to Company nonrecourse liabilitiesFas defined in Treasury Regulations Section 1.504k2(b)(' ) and shall be so interpreted.

(b)     Minimum Gain Chargebac; –Member Nonrecourse Debt.  If there is a net decrease in Member minimum gain during any 9iscal YearFcertain items of income and gain shall be allocated (on a gross basis) as : uic; ly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.504k 2(i)(V) in the amounts and manner described in Treasury Regulations Sections 1.504k2(i)(4)F3(2)(ii)Fand (3)(2)(iii).  This Section U02(b) is intended to comply with the minimum gain chargebac; re: uirement set forth in Treasury Regulations Section 1.504k2(i)(4) relating to Member nonrecourse debtFas defined in Treasury Regulations Section 1.504k2(b)(4) and shall be so interpreted.

(c)     Qualified Income Offset.  IfF after applying Section U02(a) and Section U02(b)F any Member has an ad3usted Capital Account deficitFitems of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the ad3usted Capital Account deficit of such Member as : uic; ly as possible.  This Section U02(c) is intended to comply with the ": ualified income offset" re: uirement set for the in Treasury Regulations Section 1.504kl (b)(2)(ii)(d) and shall be so interpreted.

(d)     Optional q asis Ad3ustments.  To the extent an ad3ustment to the ad3usted tax basis of any Company asset pursuant to Code Sections 5' 4(b) or 54' (b) is re: uiredFpursuant to Treasury Regulations Section 1.504kl (b)(2)(iv)(m)Fto be ta; en in to account in determining Capital AccountsFthe amount of such ad3ustment to the Capital Accounts shall be treated as an item of gain (if the ad3ustment increases the basis of the asset) or loss (if the ad3ustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are re: uired to be ad3usted pursuant to such Section of the Treasury Regulations.

(f)     Partner Nonrecourse Deductions.  Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.504k2(b)(4) and (i)(1) to the Member who bears the economic ris; of loss with respect to such deductions.

U0'     Curative Allocations .  The Regulatory Allocations are intended to comply with certain re: uirements of the Treasury Regulations.  It is the intent of the Members thatFto the extent possibleFall Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company incomeF gainF lossF or deduction pursuant to this Section U0' .  ThereforeFnotwithstanding any other provisions of this Article L IIIFthe q oard of Managers shall ma; e such offsetting special allocations of Company incomeFgainFlossFor deduction in whatever manner it determines appropriate so thatFafter such offsetting allocations are madeFeach Member⅛ Capital Account balance isFto the extent possibleFe: ual to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section U01(a) and Section U01(b) hereof.

002875
HCMLPHMIT00004165

U04    Tax Allocations"Code Section 504(c) .

(a)    In accordance with Code Section 504(c) and the Treasury Regulations thereunderFincomeFgainFlossFand deduction with respect to any property contributed to the capital of the Company shallF solely for federal income tax purposesFbe allocated among the Members so as to ta; e account of any variation between the ad3usted basis of such property to the Company for federal income tax purposes and its initial q oo;  L alue.

(b)    If the q oo;  L alue of any Company asset is ad3usted pursuant to Section 1.04(e)(ii) hereofF subse: uent allocations of incomeFgainFlossFand deduction with respect to such asset shall ta; e account of any variation between the ad3usted basis of such asset for federal income tax purposes and its q oo;  L alue in the same manner as under Code Section 504(c) and the Treasury Regulations thereunder.

(c)    Any elections or other decisions relating to such allocation shall be made by the q oard of Managers. Allocations pursuant to this Section U04 are solely for purposes of federalFstateFand local taxes and shall not affect or in any way be ta; en into account in computing any Member% Capital AccountFor share of ProfitsF ossesFand other items or distribution pursuant to any provision of this Agreement.

U0V    Other Allocation Rules .

(a)    9or purposes of determining the ProfitsF ossesFor any other item allocable to any periodFProfitsF ossesF and any such other item shall be determined on a dailyFmonthlyFor other   basisFas determined by the q oard of Managers using any permissible method under Code Section 50Wand the Treasury Regulations thereunder.

(b)    9or federal income tax purposesFevery item of incomeFgainFlossFand deduction shall be allocated among the Members in accordance with the allocations under Sections U01FU02FU0' Fand U04.

(c)    The Members are aware of the income tax conse: uences of the allocations made by this Article LIII and hereby agree to be bound by the provisions of this Article LIII in reporting their shares of Company income and loss for income tax purposes.

(d)    It is intended that the allocations in Sections U01FU02FU0' Fand U04 hereof effect an allocation for federal income tax purposes consistent with Section 504 of the Code and comply with any limitations or restrictions therein.

U0W    Distributions of Distributable Cash .   Except as otherwise may be provided in this AgreementFthe q oard of Managers shall cause the Company to ma; e distributions of Distributable Cash at such intervals and in such amounts as the q oard of Managers in its sole discretion shall determine by ma3ority vote.   Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

U05    B or; ing Cash Reserve .   The q oard of Managers may from time to time establish a wor; ing cash reserve for capital expendituresF unforeseen contingenciesF pro3ected operating deficitsF and other corporate purposes and may increase or decrease the amount in such reserve in its business 3udgment.

## ARTIC, E IX

## CERTIVICATES

6.01    Certificated and 7 ncertificated Interests.   The membership interests of the Company may be either certificated interests or uncertificated interests.   As used hereinFthe term -certificated interests- means Interests represented by instruments in bearer or registered formFand the term -uncertificated interests- means Interests not represented by such instruments and the transfers of which are registered upon boo; s maintained for that purpose by or on behalf of the Company.

6.02    Certificates for Certificated Interests .   The certificates for certificated interests shall be in such form as shall be approved by the q oard of Managers in conformity with law.   The certificates shall be consecutively numberedFshall be entered as they are issued in the boo; s of the Company or in the records of the Companyĵs designated transfer agentFif anyFand shall state the Memberĵs nameFthe class of InterestsFthe Percentage Interest that such Interest representsFand such

1V

002876


HCMLPHMIT00004166

other matters as may be re: uired by law.  The certificates shall be signed by the President or any Lice President and also by the SecretaryFan Assistant SecretaryFor any other officerFand may be sealed with the seal of the Company or a facsimile thereof.  If any certificate is countersigned by a transfer agent or registered by a registrarFeither of which is other than the Company itself or an employee of the CompanyFthe signatures of the foregoing officers may be a facsimile.

6.0'    . ostF StolenF or  Destroyed Certificates .  The Company shall issue a new certificate in place of any certificate for Interests previously issued if the registered owner of the certificate satisfies the following re: uirements"

(a)    the registered owner ma; es proof in affidavit form that a previously issued certificate for Interests has been lostFdestroyedFor stolen'

(b)    the registered owner re: uests the issuance of a new certificate before the Company has notice that the certificate has been ac: uired by a purchaser for value in good faith and without notice of an adverse claim'

(c)    the registered owner gives a bond in such formF and with such surety or suretiesF with fixed or open penaltyF as the q oard of Managers may directF in its discretionF to indemnify the Company (and its transfer agent and registrarFif any) against any claim that may be made on account of the alleged lossFdestructionFor theft of the certificate' and

(d)    the registered owner satisfies any other reasonable re: uirements imposed by the q oard of Managers.

B hen a certificate has been lostFdestroyedFor stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of itFif the Company registers a transfer of the Interests represented by the certificate before receiving such notificationFthe Member of record is precluded from ma; ing any claim against the Company for the transfer or for a new certificate.

6.04    Transfer of Interests .  Interests of the Company shall be transferable only on the boo; s of the Company by the Members thereof in person or by their duly authorized attorneys or legal representativesFbut only as authorized in this COMPANY AGREEMENT.  B ith respect to certificated interestsFupon surrender to the Company or the transfer agent of the Company of a certificate representing Interests duly endorsed or accompanied by proper evidence of successionF assignmentFor authority to transferFthe Company or its agent shall issue a new certificate to the person entitled theretoF cancel the old certificateFand record the transaction upon its boo; s.  B ith respect to uncertificated interestsFupon delivery to the Company of proper evidence of successionFassignmentFor authority to transferFthe Company or its agent shall record the transaction upon its boo; s.

6.0V    Registered Members .  The Company shall be entitled to treat the Member of record as the Member in fact of any Interests andFaccordinglyFshall not be bound to recognize any e: uitable or other claim to or interest in such Interests on the part of any other PersonFwhether or not it shall have actual or other notice thereofFexcept as otherwise provided by law.

6.0W    . egends .  If the Company is authorized to issue Interests of more than one classF each certificate representing Interests issued by the Company (a) shall conspicuously set forth on the face or bac; of the certificate a full statement of all of the designationsFpreferencesFlimitationsFand relative rights of the Interests of each class authorized to be issued' or (b) shall conspicuously state on the face or bac; of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement' and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written re: uest to the Company at its principal place of business or registered office.

If the Company issues any Interests that are not registered under the Securities Act of 16' ' Fthe transfer of any such interests shall be restricted in accordance with an appropriate legend.

In the event any restriction on the transferFor registration of the transferFof Interests shall be imposed or agreed to by the CompanyF each certificate representing Interests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate' (b) shall set forth such statement on the bac; of the certificate and conspicuously refer to the same on the face of the certificate' or (c) shall conspicuously state on the face or bac; of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written re: uest to the Company at its principal place of business or registered

002877
HCMLPHMIT00004167

office a copy of the specified document' or (ii) if such document is one re: uired or permitted by law to be and has been filedF that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTIC, E X

## ACCOUNTING AND RECORDS

10.01  <u>Records and Accounting</u> .  The boo; s and records of the Company shall be ; eptFand the financial position and the results of its operations recordedFin accordance with the accounting methods elected to be followed by the Company for federal income tax purposes.  The boo; s and records of the Company shall reflect all Company transactions and shall be appropriate and ade: uate for the Companyjs business.

10.02  <u>Access to Accounting Records</u> .  All boo; s and records of the Company shall be maintained at any office of the Company or at the Companyjs principal place of businessFand each Member owning a Percentage Interest of at least ten percent (10%)Fand his duly authorized representativeFshall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.0'  <u>Annual and Tax Information</u> .  The Company shall deliver to each Member within 60 days after the end of each 9iscal Year all information necessary for the preparation of such Memberjs federal income tax return.  The Company shall prepareFwithin 120 days after the end of each 9iscal YearFa financial report of the Company for such 9iscal YearF containing a statement of the year then endedF a statement of sources and applications of fundsF and a statement of reconciliation of the Capital Accounts of the Members.

10.04  <u>Accounting Decisions</u> .  All decisions as to accounting mattersFexcept as otherwise specifically set forth hereinFshall be made by the q oard of Managers.  The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.0V  <u>9ederal Income Tax Elections</u> .  The Company may ma; e all elections for federal income tax purposesF includingFbut not limited toFthe following"

(a)  to the extent permitted by applicable law and regulationsFthe election to use an accelerated depreciation method on any depreciable unit of the assets of the Company' and

(b)  in case of a transfer of all or part of the Interest of any MemberFthe election pursuant to Section 5' 4F54' F and 5V4 of the CodeFas amended (or corresponding provisions of future law) to ad3ust the basis of the assets of the Company.

## ARTIC, E XI

## CHANGES IN MEMBERS

The provisions of this Article XI are sub3ect toFand may be superceded byFone or more separate agreements entered into by and among one or more Members.  The provisions of this Article XI shall continue to control with respect to matters not covered byFor Members not parties toFsuch agreement(s).

11.01  <u>Intentionally q lan;</u> .

11.02  <u>Transfer and Assignment of Membersj Interest</u> .  Except as approved by the ManagerFplus a Member or Members owning a Percentage Interest greater than fifty percent (V0%)Fno Member shall be entitled to Transfer any part of its Interest in the Company.  The Company andFif applicableFthe remaining Members shall be entitled to match the terms of the proposed TransferFwith consideration being only set forth in traditional monetary terms.  If the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire InterestFor portion thereofF the Member proposing to ma; e the Transfer may move forward with the proposed Transfer.  Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.0V(b) hereof.

15

002878


HCMLPHMIT00004168

11.0'    9urther Restrictions on Transfer .  No Member shall Transfer any part of his Interest in the Company" (i) without registration under applicable federal and state securities lawsFor unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not re: uired' or (ii) if the Interest to be sold or exchangedFwhen added to the total of all other Interests to be sold or exchanged in the preceding 12 consecutive months prior theretoFwould result in the termination of the Company under Code Section 50U

11.04    Substitute Members .  A transferee shall have the right to become a substitute Member if (a) the re: uirements of Section 11.02 and 11.0' hereof are met' (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement' and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.0V    Effect of Transfer .

(a)    Any permitted Transfer of all or any portion of a Member̦s Interest in the Company will ta; e effect on the first day of the month following receipt by the Members of written notice of Transfer.  Any transferee of an Interest in the Company shall ta; e su3ject to the restrictions on Transfer imposed by this Agreement.

(b)    7 pon any Transfer of a Member̦s Interest in the Company in violation of this AgreementFand if such Member̦s Interest is not purchased pursuant to Section 11.01Fthe transferee shall have no right to participate in the management of the business and affairs of the Company or to become a MemberFbut such transferee shall be entitled to receive only the allocable share of ProfitsF, ossesFDistributive CashFand other items to which the transferor of such Interest in the Company would otherwise be entitled.

11.0W    No Dissolution or B ithdrawal" Advanced Consent .  7 pon the occurrence of a Dissolution Event with regard to a respective MemberFall remaining Members shall be deemed to automatically consent to the continuation of the business of the Company.  q y executing this AgreementFhoweverFall Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member̦s capital.  If any Member shall breach the agreement represented by this Section 11.0Wfthe agreement of such breaching Member shall not be specifically performableFbut shall be actionable for damagesFand shall be deemed an offer of the Interest of such breaching Member for sale pursuant hereto.  The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member̦s InterestFor as otherwise set forth herein (whichever is greater)Fwhich shall be deducted from any payments to such Member upon dissolution or purchase of such Member̦s Interest hereunder.  The value of the breaching Member̦s Interest shall be determined pursuant to Section 11.01Fto which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.0W

### ARTIC, E XII

### TERMINATION

12.01    Termination of the Company .

(a)    The Company shall be dissolvedFits assets shall be disposed ofFand its affairs wound up on the first to occur of the following events"

(i)    a determination by the ManagersFplus the 7 nanimous Consent of the Members that the Company should be dissolved'

(ii)    a sale of all or substantially all of the assets of the Company'

(iii)    the expiration of the Company̦s term as stated in its Certificate' or

(iv)    at such earlier time as provided by applicable law.

1U

002879


HCMLPHMIT00004169

(b)      In settling accounts of the Company after dissolutionFthe liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following orderFall as re: uired by the DE, AB ARE , AB S"

(i)      those to creditorsFin the order of priority as provided by lawFexcept those to Members of the Company on account of their Capital Contributions'

(ii)      to the MembersFpro rataFin accordance with the positive balancesFif anyFin their Capital Accounts' and

(iii)      to the Members in proportion to their relative Percentage Interests.

## ARTIC, E XIII

## INDEMNIVICATION

1' .01      Indemnification of MembersFManagersFand Other Persons .

(a)      To the greatest extent not inconsistent with the laws and public policies of DelawareFthe Company shall indemnify any MemberFManagerFor officer of the Company made a party to any proceeding because such individual is or was a MemberFManagerFor officer of the Company (an "Indemnitee")Fas a matter of rightFagainst all liability incurred by such individual in connection with any proceeding' provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 1' .01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 1' .01.  The Company shall advanceFpay forFor reimburse the reasonable expenses incurred by an Indemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the Indemnitee furnishes the Company a written affirmation of the Indemnitee͗s good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 1' .01' (ii) the Indemnitee furnishes the Company a written underta; ingFexecuted personally or on such Indemnitee͗s behalfFto repay the advance if it is ultimately determined that such individual did not meet such standard of conduct' and (iii) a determination is made in accordance with subsection (d) that based upon facts then ; nown to those ma; ing the determinationFindemnification would not be precluded under this Section 1' .01.  The underta; ing described in subsection (a)(ii) above must be a general obligation of the IndemniteeFsub⅔ect to such reasonable limitations as the Company may permitFbut need not be secured and may be accepted without reference to financial ability to ma; e repayment. The Company shall indemnify an Indemnitee who is wholly successfulFon the merits or otherwiseFin the defense of any such proceedingFas a matter of rightFagainst reasonable expenses incurred by the individual in connection with the proceeding without the re: uirement of a determination as set forth in subsection (c) of this Section 1' .01.  7 pon demand by an Indemnitee for indemnification or advancement of expensesFas the case may beFthe Company shall expeditiously determine whether the Indemnitee is entitled thereto in accordance with this Section 1' .01.  The indemnification and advancement of expenses provided for under this Section 1' .01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 1' .01.

(b)      The Company shall have the powerFbut not the obligationFto indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a MemberFManagerFor officer of the Company.

(c)      Indemnification is permissible under this Section 1' .01 only if (i) the Indemnitee conducted himself in good faith' (ii) he or she reasonably believed that his conduct was inFor at least not opposed toFthe Company͗s best interest' (iii) in the case of any criminal proceedingFhe or she had no reasonable cause to believe his conduct was unlawful' and (iv) such Indemnitee is not ad⅔udged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty.  The termination of a proceeding by ⅔udgmentForderFsettlementFconvictionFor upon a plea of nolo contendere or its e: uivalent is notFof itselfFdeterminative that the Indemnitee did not meet the standard of conduct described in this subsection (c).

(d)      A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures"

16

002880


HCMLPHMIT00004170

(i)     by the qoard of Managers or by a ma3ority vote consisting of Members not at the time parties to the proceeding' or

(ii)     by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e)     An Indemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the courtFif anyFconducting the proceeding or to another court of competent 3urisdiction.  On receipt of an applicationFthe courtFafter giving notice the court considers necessaryFmay order indemnification if it determines"

(i)     in a proceeding in which the Indemnitee is wholly successfulFon the merits or otherwiseFthe Indemnitee is entitled to indemnification under this Section 1'.01Fin which case the court shall order the Company to pay the Indemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification' or

(ii)     the Indemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstancesFwhether or not the Indemnitee met the standard of conduct set forth in subsection (c) of this Section 1'.01.

(f)     Indemnification shall also be provided for an Indemnitee's conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g)     Nothing contained in this Section 1'.01 shall limit or preclude the exercise or be deemed exclusive of any right under the lawFby contract or otherwiseFrelating to indemnification of or advancement of expenses to any individual who is or was a MemberFManagerFor officer of the Company or is or was serving at the Company's re:uest as a directorF officerFpartnerFmanagerFtrusteeFemployeeFor agent of another foreign or domestic companyFpartnershipFassociationF limited liability companyFcorporationF3oint ventureFtrustFemployee benefit planFor other enterpriseFwhether for profit or not.  Nothing contained in this Section 1'.01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual.  It is the intent of this Section 1'.01 to provide indemnification to Indemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 1'.01.  Indemnification shall be provided in accordance with this Section 1'.01 irrespective of the nature of the legal or e:uitable theory upon which a claim is madeFincludingFwithout limitationFnegligenceFbreach of dutyFmismanagementFwasteFbreach of contractFbreach of warrantyFstrict liabilityFviolation of federal or state securities lawFviolation of the Employee Retirement Income Security Act of 1654Fas amendedFor violation of any other state or federal law.

(h)     9or purposes of this Section 1'.01"

(i)     The term -expenses- includes all direct and indirect costs (includingFwithout limitationFcounsel feesFretainersFcourt costsFtranscriptsFfees of expertsFwitness feesFtravel expensesFduplicating costsFprinting and binding costsFtelephone chargesFpostageFdelivery service feesFand all other disbursements or outkofkpoc;et expenses) actually incurred in connection with the investigationFdefenseFsettlementFor appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 1'.01Fapplicable lawFor otherwise.

(ii)     The term -liability- means the obligation to pay a 3udgmentFsettlementFpenaltyFfineFexcise tax (including an excise tax assessed with respect to an employee benefit plan)For reasonable expenses incurred with respect to a proceeding.

(iii)     The term -party- includes an individual who wasFisFor is threatened to be made a named defendant or respondent in a proceeding.

(iv)     The term -proceeding- means any threatenedFpendingFor completed actionFsuit or proceedingF whether civilFcriminalFadministrativeFor investigative and whether formal or informal.

(v)     The Company may purchase and maintain insurance for its benefitFthe benefit of any individual who is entitled to indemnification under this Section 1'.01For bothFagainst any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the CompanyFwhether or not the Company would have the power to indemnify such individual against such liability.

002881

HCMLPHMIT00004171

## ARTIC‚ E XIL

## MISCE‚ ‚ ANEOUS

14.01    <u>Complete Agreement</u> .  This AgreementFthe CertificateFand all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein.  This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of themFand no representationFstatementFor condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02    <u>Governing ‚ aw</u> .  This Agreement and the rights of the parties hereunder will be governed byFinterpretedF and enforced in accordance with the laws of the State of Delaware.

14.0'    <u>q inding Effect</u> .  Sub3ect to the provisions of this Agreement relating to transferabilityFthis Agreement will be binding upon and inure to the benefit of the MembersFand their respective distributesFsuccessorsFand assigns.

14.04    <u>Terms</u> .  Common nouns and pronouns will be deemed to refer to the masculineFfeminineFneuterFsingular and pluralFas the identity of the Person may in the context re: uire.  Any reference to the DE, AB ARE ‚ AB SFthe Code or other statutes or laws will include all amendmentsFmodificationsFor replacements of the specific sections and provisions concerned.

14.0V    <u>Headings</u> .  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.0W    <u>Severability</u> .  If any provision of this Agreement is held to be illegalFinvalidFor unenforceable under the present or future laws effective during the term of this AgreementFsuch provision will be fully severable' this Agreement will be construed and enforced as if such illegalFinvalidFor unenforceable provision had never comprised a part of this Agreement' and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegalFinvalidFor unenforceable provision or by its severance from this Agreement.  9urthermoreFin lieu of such illegalF invalidFor unenforceable provisionFthere will be added automatically as a part of this Agreement a provision as similar in terms to such illegalFinvalidFor unenforceable provision as may be possible and be legalFvalidFand enforceable.

14.05    <u>Multiple Counterparts</u> .  This Agreement may be executed in several counterpartsFeach of which will be deemed an original but all of which will constitute one and the same instrument.  HoweverFin ma; ing proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.0U    <u>Additional Documents and Acts</u> .  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuateFcarry outFand perform all of the termsFprovisionsFand conditions of this Agreement and the transactions contemplated hereby.

14.06    <u>No ThirdkParty q eneficiary</u> .  This Agreement is made solely and specifically among and for the benefit of the parties heretoFand their respective successors and assigns sub3ect to the express provisions hereof relating to successors and assignsFand no other person will have any rightsFinterestFor claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10    <u>References to this Agreement</u> .  Numbered or lettered articlesFsectionsFand subsections herein contained refer to articlesFsectionsFand subsections of this Agreement unless otherwise expressly stated.

14.11    <u>Notices</u> .  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member at the address specified in <u>Exhibit q</u> hereto.  Any Member or the Company mayFat any time by giving five daysj prior written notice to the other Members and the CompanyFdesignate any other address in substitution of the foregoing address to which such notice will be given.

21

HCMLPHMIT00004172

14.12    <u>Amendments</u> . Except as otherwise may be provided in this AgreementFall amendments to this Agreement must be approved by the ManagersFplus one or more Members whose aggregate Percentage Interests total more than fifty percent (V0%).

14.1'    <u>Title to Company Property</u> . , egal title to all property of the Company will be held and conveyed in the name of the Company.

14.14    <u>Reliance on Authority of Person Signing Agreement</u> . In the event that a Member is not a natural personF neither the Company nor any Member will (a) be re: uired to determine the authority of the individual signing this Agreement to ma; e any commitment or underta; ing on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual' or (b) be re: uired to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.1V    <u>SkCorp Election</u>. In the event the Company elects to be treated as a SkCorporation for federal tax purposesFthe provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as re: uired in order to pertain to a Skcorporation.

14.1W    <u>Company Indemnification</u>. In the event any Member is personally liable for any debt or obligations associated with a Company assetFthen the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is re: uired to pay or performFas measured by the Percentage Interest of the MembersFexcept as otherwise agreed by the Members.

*14.17* *__Management by Members__. The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member __may__ reflect management by members, and not management by managers. As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such a manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.*

002883

HCMLPHMIT00004173

IN B ITNESS B HEREO9Fthe Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADL ISORS HO, DING CORP.F
a Delaware corporation

qy" _____
     Mar;  Patric; FDirector and President

002884

HCMLPHMIT00004174

## EXHIBIT A

THE C, ASS A MEMq ERS AND INTERESTS

The sole Class A Member shall be RAND ADL ISORS HO, DING CORP.Fa Delaware corporationFand it shall own the Percentage Interest set forth on Exhibit "q" hereto.  In addition to such other rights as a Member described in this AgreementFthe holders of record of the Class A Interests shall have no additional rights.

002885

HCMLPHMIT00004175

## EXHIBIT B

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADLISORS HO, DING CORP. 2101 Cedar Springs Road Suite 1200FDallasFTX 5V201 Attn" Mar; Patric; | U1/2022 | 100% | 100% |

2ν

002886

HCMLPHMIT00004176

**EXHIBIT 85**

002887

AMENDED AND RESTATED COMPANY AGREEMENT

*of*

RAND PE LI ND MANAGEMENTF, , C

A Delaware , imited , iability Company

002888

HCMLPHMIT00004177

## AMENDED AND RESTATED COMPANY AGREEMENT

### *of*

### RAND PE LI ND MANAGEMENTF, , C

### A Delaware , imited , iability Company

This AMENDED AND RESTATED COMPANY AGREEMENT (collectivelyF the "AgreementF" which shall include all amendments and exhibits hereto) dated effective as of the 1st day of AugustF2022 (the "Effective Date")Fare entered into by and among those Persons executing the signature page hereto as the Members of RAND PE LI ND MANAGEMENTF, , CFa Delaware limited liability company (the "Company"). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

### ARTIC, E U

### UNTRODI CTUON

1.01    Lormation of , imited , iability Company   The Company was formed by the filing of the Certificate of Lormation (the "Certificate") with the Secretary of State of Delaware on the September 19F2015. The Company's business shall be conducted under the name "RAND PE LI ND MANAGEMENTF, , C" until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replacesF in its entiretyFall prior governing agreements for the CompanyFincluding any and all amendments thereto.

This Agreement is subject toF and governed byF the Delaware laws governing limited liability companies (the "DE, AWARE , AWS") and the Certificate. 3n the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DE, AWARE , AWS or the provisions of the CertificateF such provisions of the DE, AWARE , AWS or the CertificateFas the case may beFwill be controlling.

1.02    Registered Office and Agent   The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.0B    Other Offices   The Company may also have offices at such other placesFboth within and without the State of DelawareFas the q oard of Managers may from time to time determine or the business of the Company may re: uire.

1.04    Defined Terms   The terms used in this Agreement with their initial letter capitalized shallF unless the context re: uires otherwiseFhave the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuterF and vice versaF as the context re: uires. When used in this AgreementFthe following terms shall have the meanings set forth below"

(a)    -DE, AWARE , AWS- shall mean the Delaware laws governing limited liability companiesFas the same may be amended from time to time.

(b)    "Affiliate" shall meanFas to any PersonFany Person controlled byFcontrollingFor under common control with such PersonFandFin the case of a Person who is an individualFa member of the family of such individual consisting of a spouseF siblingFinlawF lineal descendantFor ancestor (including by adoption). Lor purposes of this definitionF "control" (including the terms "controlling"F"controlled by" and "under common control with") of a Person means the possessionF directly or indirectlyFalone or in concert with othersFof the power to direct or cause the direction of the management and policies of such PersonFwhether through the ownership of securitiesFby contract or otherwiseFand no Person shall be deemed in control of another solely by virtue of being a directorFofficer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

2

HCMLPHMIT00004178

(c)      "Bankruptcy" shall mean, and a Member shall be deemed a "Bankrupt Member," upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief Laws; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member's affairs; (iv) the filing of a petition in any involuntary bankruptcy case, which petition remains undismissed for a period of 190 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States Bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Laws now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(d)      "Depreciation" for any asset shall mean for any Fiscal Year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Value; Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board of Managers.

(e)      "Book Value" shall mean for any asset the asset's adjusted tax basis, except as follows:

(i)      the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board of Managers;

(ii)     the Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of one of the following times: (1) on the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an interest in the Company if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (3) on the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations;

(iii)    the Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv)     the Book Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations and Section 9.02(d) hereof; provided, however, that Book Values shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the Board of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv); and

(v)      if the Book Value of an asset has been determined or adjusted pursuant to Section 1.04(e)(i), 1.04(e)(ii), or 1.04(e)(iv) hereof, such Book Value shall thereafter be adjusted by the Book Value; Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(f)      "Capital Contribution" shall mean the total value of cash and Book Value (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each Member, as shown on <u>Exhibit A</u> attached hereto and incorporated herein for all purposes, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

B

002890

HCMLPHMIT00004179

prior Member for the interest of such then MemberFreduced by any distribution to such Member in return of its capital as contemplated herein.

(g)    "Class A 3nterest" shall refer to the 3nterest of a Class A Member in the ProfitsF, ossesFDistributable CashF and assets upon li: uidation of the Company as described in this Agreement.

(h)    "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit AF as amended from time to time.

(i)    3ntentionally q lan; .

(j)    3ntentionally q lan; .

(; )    -Code- shall mean the 3nternal Revenue Code of 1796Fas amended.  All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l)    -Company- shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m)    "Debtor Relief , aws" shall mean any federal or state ban;ruptcyFinsolvencyFor similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n)    3ntentionally q lan; .

(o)    -Distributable Cash- of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time' (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time' and (iii) provision for a wor; ing cash reserve in accordance with Section 9.0Vbelow.

(p)    "Liscal Year" shall mean the calendar year.

(: )    "Lormer Member" shall mean a member that causes a Dissolution Event.

(r)    -3nterest- in the Company shall mean the entire ownership interest of a Member in the Company at any particular timeFincluding such Member's Capital AccountFallocable share of ProfitsF, ossesFand Distributable CashFand the right of such Member to any and all benefits to which a Member may be entitled as provided in this AgreementFtogether with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s)    3ntentionally q lan;

(t)    -Manager- shall mean an individual elected to the q oard of Managers of the Company pursuant to Sections B.02 and B.04 below.

(u)    -Member(s)- shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof.  The namesFbusiness or residence addressesFCapital ContributionsFPercentage 3nterestFand class of 3nterest of the Members shall be set forth on Exhibit q Fattached hereto and incorporated herein by reference.  Reference to a -Member- shall be to any one of the Members.

(v)    -Percentage 3nterest- of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column -Percentage 3nterest- in Exhibit q Fas such percentage may be adjusted from time to time pursuant to the terms hereof.

(w)    "Person" shall mean any individualF corporationF partnershipF limited liability company or partnershipF associationForganizationFtrustFestateFor other entity.

4

002891

HCMLPHMIT00004180

(x)      -Pro Rata Part- shall mean the percentage expression of a fraction the numerator of which is a Member's respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y)      "Profits" and ", osses" shall mean Ffor each Fiscal Year or other period Fan amount e: ual to the Company's taxable income or loss for such year or period Fdetermined in accordance with Code Section V0B(a) (for this purpose Fall items of income Fgain Floss For deduction re: uired to be stated separately pursuant to Code Section V0B(a)(1) shall be included in taxable income or loss) Fwith the following adjustments"

(i)      income of the Company that is exempt from federal income tax and not otherwise ta; en into account in computing Profits and , osses pursuant to this Section 1.04(y) shall be added to such taxable income or loss'

(ii)      any expenditures of the Company described in Code Section V05(a)(2)(q) For treated as Code Section V05(a)(2)(q) expenditures pursuant to Section 1.V04kl(b)(2)(iv)(i) of the Treasury Regulations Fand not otherwise ta; en into account in computing Profits and , osses pursuant to this Section 1.04(y) Fshall be subtracted from such taxable income or loss'

(iii)      if the q oo; Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii) Fthe amount of such adjustment shall be ta; en into account as gain or loss from the disposition of such asset for purposes of computing Profits and , osses'

(iv)      gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the q oo; Value of the property disposed of Fnotwithstanding that the adjusted tax basis of such property differs from its q oo; Value'

(v)      in lieu of the deduction for depreciation Fcost recovery For amortization ta; en into account in computing such taxable income or loss Fthere shall be ta; en into account q oo; Depreciation' and

(vi)      notwithstanding any other provision of this Section 1.04(y) Fany items that are specially allocated pursuant to Section 9.02 or Section 9.0B shall not be ta; en into account in computing Profits and , osses.

(z)      "Regulatory Allocations" shall mean the special allocations of items of income Fgain Floss Fand deduction Fif any Fset forth in Section 9.02 hereof.

(aa)      -Transfer- or -Transferred- shall mean the sale F assignment F conveyance F gift F be: uest F devise F transfer under the rules of intestate succession F pledge F mortgage F or other encumbrance. In addition F the term -Transfer- or -Transferred- shall mean an -ownership change- of a Member as defined in Section B92(g) of the Code in effect as of the Effective Date Fexcept that the term -Member- shall be substituted for -shareholder- wherever it appears.

(bb)      -Treasury Regulations- shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc)      "I nanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTIC, E II

## MEMBERS AND MEMBERSHIP INTERESTS

2.01      <u>Members</u>. The Members of the Company shall be those Persons listed on <u>Exhibit q</u>. Except as otherwise may be provided in <u>Exhibit A</u> or <u>Exhibit q</u> Fand except as provided in Section V.05 below Fa Person may be admitted as a Member to the Company only upon the affirmative vote of the Managers Fplus one or more Members whose Percentage Interests total more than fifty percent (50%)' provided Fhowever Fthat no Person will be recognized as a Member of the

002892

HCMLPHMIT00004181

Company until he/she shall have executed this Agreement, a counterpart hereto, and agrees to be bound by all of the terms and conditions hereof.

2.02  <u>Annual Meetings</u>  An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, and if a legal holiday, then on the next business day following, at the time specified in the notice of the meeting.  At such meeting, the Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.03  <u>Special Meetings</u>  A special meeting of the Members may be called at any time by the President, the Board of Managers, or one or more Members whose Percentage Interests total at least 10%.  Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04  <u>Place of Meetings</u>  The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the Board of Managers.  Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.03.  If no place for a meeting is designated, it shall be held at the registered office of the Company.

2.05  <u>Notice</u>.  Written or printed notice stating the place, day, and hour of each meeting of Members and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days or more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the President, the Secretary, or the person calling the meeting, to each Member of record entitled to vote at such meeting.

2.06  <u>Voting List</u>  At least 10 days before each meeting of Members, the Secretary shall prepare a complete list of Members entitled to vote at such meeting, arranged in alphabetical order, including the address of each Member and the number of voting Interests held by each Member.  For a period of 10 days prior to such meeting, such list shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member during usual business hours.  Such list shall be produced at such meeting, and at all times during such meeting shall be subject to inspection by any Member. The membership interest transfer books shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer books.

2.07  <u>Voting of Interests</u>.  Interests held by the Company in treasury, Interests owned by a Person the majority of the voting interests of which are owned or controlled by the Company, and Interests held by the Company in a fiduciary capacity shall not be Interests entitled to vote or to be counted in determining the total number of outstanding Interests of the Company.  Interests held by an administrator, executor, guardian, or conservator may be voted by him or her, either in person or by proxy, without transfer of such Interests into his or her name so long as such Interests form a part of the estate and are in the possession of the estate being served by him or her.  Interests standing in the name of a trustee may be voted by him or her, either in person or by proxy, only after the Interests have been transferred into his or her name as trustee.  Interests standing in the name of a receiver may be voted by such receiver, and Interests held by or under the control of a receiver may be voted by such receiver without transfer of such Interests into his or her name if authority to do so is contained in the court order by which such receiver was appointed.  Interests standing in the name of another domestic or foreign corporation of any type or kind may be voted by such officer, agent, or proxy as the bylaws of such corporation may provide or, in the absence of such provision, as the board of directors of such corporation may by resolution determine.  A Member whose Interests are pledged shall be entitled to vote such Interests until they have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote such Interests.

2.09  <u>Quorum</u>.  The presence in person or by proxy of one or more Members whose Percentage Interests total more than fifty percent (50%) shall constitute a quorum at any meeting of Members, except as otherwise provided by law, the Certificate, or this Agreement.  At any reconvening of an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that could have been transacted at the original meeting if a quorum had been present or represented.

2.07  <u>Vote; Withdrawal of Quorum</u>.  If a quorum is present in person or represented by proxy at any meeting, except as otherwise may be provided in Exhibit A or Exhibit B, the vote of one or more Members whose Percentage Interests total more than fifty percent (50%) of <u>all</u> Members, whether or not they are present in person or represented by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of law, the

6

002893

HCMLPHMIT00004182

CertificateFor this Agreement a different vote is re: uiredFin which event such express provision shall govern and control the decision of such : uestion.  The Members present at a duly convened meeting may continue to transact business until adjournmentFnotwithstanding any withdrawal of Members that may leave less than a : uorum remaining.

2.10    Method of Uoting' Proxies.  Except as otherwise may be provided in Exhibit A or Exhibit qFeach Member shall be entitled to that number of votes on each matter submitted to the Members for their vote e: ual to such Member�s Percentage 3nterest multiplied by 100.   At any meeting of MembersFevery Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorneyk inkfact.  Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting.  No proxy shall be valid after 11 months from the date of its executionFunless otherwise provided in the proxy.  3f no date is stated on a proxyFsuch proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted.  Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law.

2.11    Closing of Transfer q oo; s' Record Date .  Lor the purpose of determining Members entitled to notice ofFor to vote atFany meeting of Members or any reconvening thereofFor entitled to receive payment of any distributionFor in order to ma; e a determination of Members for any other proper purposeFthe q oard of Managers may provide that the membership interest transfer boo; s of the Company shall be closed for a stated period but not to exceed in any event 50 days.  3f the membership interest transfer boo; s are closed for the purpose of determining Members entitled to notice ofFor to vote atFa meeting of MembersFsuch boo; s shall be closed for at least 10 days immediately preceding such meeting.  3n lieu of closing the membership interest transfer boo; sFthe q oard of Managers may fix in advance a date as the record date for any such determination of MembersFsuch date in any case to be not more than 50 days and not less than 10 days prior to the date on which the particular action re: uiring such determination of Members is to be ta; en.  3f the membership interest transfer boo; s are not closed and if no record date is fixed for the determination of Members entitled to notice ofFor to vote atFa meeting of Members or entitled to receive payment of a distributionFthe date on which the notice of the meeting is to be mailed or the date on which the resolution of the q oard of Managers declaring such distribution is adoptedFas the case may beFshall be the record date for such determination of Members.

2.12    Presiding Officials at Meetings   The President shall preside atFand the Secretary shall prepare minutes ofF each meeting of MembersFand in the absence of either such officerFhis other duties shall be performed by some person appointed at the meeting.

## ARTlC‚ E llU

## MANAGERS

B01    Management.  The business and affairs of the Company shall be managed EXC‚ I S3UE‚ Y by the q oard of Managers.  Subject to the restrictions imposed by lawF the CertificateF or this AgreementF the q oard of Managers may exercise all the powers of the Company.

B02    Number' Election' Term' Qualification.   The first q oard of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents.  ThereafterFexcept as otherwise may be restricted by this AgreementFthe number of Managers that shall constitute the entire q oard of Managers shall be determined by resolution of the q oard of Managers at any meeting thereof or by the Members at any meeting thereofFbut shall never be less than one (1).  At each annual meeting of MembersFManagers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and : ualified.  No Manager need be a MemberFa resident of the State of DelawareFor a citizen of the I nited States.

B0B    Removal  Except as otherwise may be provided by the MembersF at any meeting of Members called expressly for that purposeFany Manager or the entire q oard of Managers may be removedFwith or without causeFby a vote of one or more Members whose Percentage 3nterests total more than fifty percent (50%).

B04    Change in Number' Uacancies.  No decrease in the number of Managers constituting the entire q oard of Managers shall have the effect of shortening the term of any incumbent Manager.  3n the case of any increase in the number of ManagersFor in the case of the deathFretirementFresignationFor removal of a ManagerFthe vacancies to be filled by such increase or deathF retirementF resignationFor removal may be filled by (a) the q oard of Managers for a term of office

V

HCMLPHMIT00004183

continuing only until the next election of one or more Managers by the Members' or (b) the Members at any annual or special meeting of the Members.  A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

B05   <u>Place of Meetings</u> .  The q oard of Managers may hold its meetings in such place or placesFincluding by telephonic or other electronic method of communicationFwithin or without the State of Delaware as the q oard of Managers may from time to time determine.

B06   <u>Lirst Meeting</u> .  Each newly elected q oard of Managers may hold its first meetingFif a : uorum is presentF for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of MembersFand no notice of such meeting shall be necessary.

B0V   <u>Regular Meetings</u> .  Regular meetings of the q oard of Managers may be held without notice at such times and placesFincluding by telephonic or other electronic method of communicationFas may be designated from time to time by resolution of the q oard of Managers and communicated to all Managers.  Regular meetings of the q oard of Managers may be held when and if neededFand no more than one regular meeting of the q oard of Managers shall be re: uired in any calendar year.

B09   <u>Special Meetings</u> .  A special meeting of the q oard of Managers shall be held whenever called by any Manager at such time and placeFincluding by telephonic or other electronic method of communicationFas such Manager shall designate in the notice of such special meeting.  The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting.  Neither the business to be transacted atF nor the purpose ofFany special meeting of the q oard of Managers need be specified in the notice or waiver of notice of any special meeting.

B07   <u>Quorum' Uote</u> .  At all meetings of the q oard of ManagersFa majority of the Managers fixed in the manner provided in this Agreement shall constitute a : uorum for the transaction of business.  3f a : uorum is not present at a meetingF a majority of the Managers present may adjourn the meeting from time to timeFwithout notice other than an announcement at the meetingFuntil a : uorum is present.  The vote of a majority of the Managers present at a meeting at which a : uorum is in attendance shall be the act of the q oard of ManagersFunless the vote of a different number is re: uired by lawFthe CertificateF or this Agreement.

B10   <u>Procedure' Minutes</u> .  At meetings of the q oard of ManagersFbusiness shall be transacted in such order as the q oard of Managers may determine from time to time.  The q oard of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting.  The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute boo: of the Company.

B11   <u>Presumption of Assent</u> .  A Manager of the Company who is present at any meeting of the q oard of Managers at which action on any matter is ta; en shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereofFor shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the adjournment of the meeting.  Such right to dissent shall not apply to a Manager who voted in favor of such action.

B12   <u>Compensation</u> .  Except as otherwise may be restricted in this AgreementFManagersFin their capacity as ManagersFmay receiveFby resolution of the q oard of ManagersFa stated salary or a fixed sum and expenses of attendanceFif anyFfor attending meetings of the q oard of Managers.  No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

<div align="center">

**ARTIC‚ E IV**

**COMMITTEES**

</div>

4.01   <u>Designation</u> .  The q oard of Managers mayFby a resolution adopted by a majority of the entire q oard of ManagersFdesignate executive and other committees.

<div align="center">9</div>

HCMLPHMIT00004184

4.02   <u>Number' Qualification' Term</u> .  Each committee shall consist of one or more Managers appointed by resolution adopted by a majority of the entire q oard of Managers.  The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the entire q oard of Managers.  Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignationFunless sooner removed as a committee member or as a Manager.

4.0B   <u>Authority</u> .  The executive committeeFto the extent provided in the resolution establishing such committeeF shall have and may exercise all of the authority of the q oard of Managers in the management of the business and affairs of the Company.  Each other committeeFto the extent expressly provided for in the resolution establishing such committeeFshall have and may exercise all of the authority of the q oard of Managers in such other matters and affairs concerning the Company.  HoweverFno committee shall have the authority of the q oard of Managers in reference to any of the following"

(a)    amending the Certificate'

(b)    approving a plan of merger or consolidation'

(c)    recommending to the Members the saleFleaseFor exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business'

(d)    recommending to the Members a voluntary dissolution of the Company or a li: uidation thereof'

(e)    filling vacancies inFor removing members ofFthe q oard of Managers or of any committee thereof'

(f)    filling any vacancy to be filled by reason of an increase in the number of Managers'

(g)    electing or removing officers or committee members'

(h)    fixing the compensation of any committee member' or

(i)    altering or repealing any resolution of the q oard of Managers thatFby its termFprovides that it shall not be amendable or repealable.

4.04   <u>Committee Changes</u> .  The q oard of Managers shall have the power at any time to fill vacancies inFto change the Membership ofFand to discharge any committee.  HoweverFa committee member may be removed by the q oard of Managers only ifFin the judgment of the q oard of ManagersFthe best interests of the Company will be served therebyFbut such removal shall be without prejudice to the contract rightsFif anyFof the person so removed.

4.05   <u>Regular Meetings</u> .  Regular meetings of any committee may be held without notice at such times and placesFincluding by telephonic or other electronic methods of communicationFas may be designated from time to time by resolution of the committee and communicated to all committee members.

4.06   <u>Special Meetings</u> .  A special meeting of any committee may be held whenever called by any committee member at such time and placeFincluding by telephonic or other electronic methods of communicationFas such committee member shall designate in the notice of such special meeting.  The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting.  Neither the business to be transacted atFnor the purpose ofFany special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.0V   <u>Quorum' Majority Uote</u> .  At all meetings of any committeeF a majority of the number of committee members designated by the q oard of Managers shall constitute a : uorum for the transaction of business.  3f a : uorum is not present at a meeting of any committeeFa majority of the committee members present may adjourn the meeting from time to timeFwithout notice other than an announcement at the meetingFuntil a : uorum is present.  The vote of a majority of the committee members present at any meeting at which a : uorum is in attendance shall be the act of a committeeFunless the vote of a different number is re: uired by lawFthe CertificateFor this Agreement.

7

002896
HCMLPHMIT00004185

4.09    <u>Minutes</u> .  Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the q oard of Managers.  The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute boo; s of the Company.

4.07    <u>Compensation</u> .  Except as otherwise may be restricted in this AgreementF committee members mayF by resolution of the q oard of ManagersF be allowed a stated salary or a fixed sum and expenses of attendanceF if anyF for attending any committee meetings.

4.10    <u>Responsibility</u> .  The designation of any committee and the delegation of authority to it shall not operate to relieve the q oard of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

## ARTIC, E V

## GENERA,  PROVISIONS RE, ATING TO MEETINGS

5.01    <u>Notice</u>  Whenever by lawF the CertificateF or this Agreement notice is re: uired to be given to any MemberF ManagerF or committee member and no provision is made as to how such notice shall be givenF it shall be construed to mean that notice may be given either (a) in person' (b) in writingF by mail' (c) by telegramF telexF cableF telecopy or facsimile transmissionF or similar means' or (d) by any other method permitted by law.  Any notice re: uired or permitted to be given hereunder (other than personal notice) shall be addressed to such MemberF ManagerF or committee member at his address as it appears on the boo; s on the Company orF in the case of a MemberF on the membership interest transfer records of the Company or at such other place as such MemberF ManagerF or committee member is ; nown to be at the time notice is mailed or transmitted.  Any notice re: uired or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the I nited States mailF postage prepaid.  Any notice re: uired or permitted to be given by telegramF telexF cableF telecopy or facsimile transmissionF or similar means shall be deemed to be delivered and given at the time transmitted.

5.02    <u>Waiver of Notice</u> .  Whenever by lawF the CertificateF or this Agreement any notice is re: uired to be given to any MemberF ManagerF or committee member of the CompanyF a waiver thereof in writing signed by the person or persons entitled to such noticeF whether before or after the time notice should have been givenF shall be e: uivalent to the giving of such notice.  Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meetingF except where a Manager or Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.0B    <u>Telephone and Similar Meetings</u>  MembersF ManagersF or committee members may participate in and hold a meeting by means of a conference telephone or similar communications e: uipment by means of which all persons participating in the meeting can hear each other.  Participation in such a meeting shall constitute presence in person at such meetingF except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.04    <u>Action Without Meeting</u> .  Any action that may be ta; enF or is re: uired by lawF the CertificateF or this Agreement to be ta; en at a meeting of the MembersF the q oard of ManagersF or a committee thereof may be ta; en without a meeting if a consent in writingF setting forth the action so ta; enF shall be signed by the Members owning the re: uired Percentage Interests of all Members (as set forth herein for the respective action or decision)F a majority of the  Managers or committee membersF as the case may beF entitled to vote with respect to the subject matter thereofF and such consent shall have the same force and effect as a vote of such MembersF ManagersF or committee membersF as the case may beF and may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person.  The consent may be in one or more counterparts so long as each MemberF ManagerF or committee member signs one of the counterparts.  The signed consent shall be placed in the minute boo; s of the Company.

## ARTIC, E VU

## OLLICERS AND OTHER AGENTS

10

HCMLPHMIT00004186

6.01   <u>Number' Titles' Election' Term</u>   The Company shall have a presidentFone or more vice presidents (andFin the case of each vice presidentFwith such descriptive titleFif anyFas the q oard of Managers shall determine)Fa secretaryFa treasurerFand such officers and agents as the q oard of Managers may deem desirable. The q oard of Managers shall elect a presidentF vice presidentF treasurerF and secretary at its first meeting at which a : uorum shall be present after the annual meeting of Members or whenever a vacancy exists. The q oard of Managers thenFor from time to timeFmay also elect or appoint one or more other officers or agents as it shall deem advisable. Except as otherwise may be provided by separate agreementFeach officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and : ualified. I nless otherwise provided in the resolution of the q oard of Managers electing or appointing an officer or agentFhis term of office shall extend to and expire at the meeting of the q oard of Managers following the next annual meeting of Members orFif earlierFat his deathFresignationFor removal. Any two or more offices may be held by the same person. No officer or agent need be a MemberFa ManagerFa resident of the State of DelawareFor a citizen of the I nited States.

6.02   <u>Removal</u> .  Any officer or agent elected or appointed by the q oard of Managers may be removed by a majority of the q oard of Managers only ifFin the judgment of a majority of the q oard of ManagersFthe best interests of the Company will be served therebyFbut such removal shall be without prejudice to the contract rightsFif anyFof the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights.

6.0B   <u>Uacancies</u> .  Any vacancy occurring in any office of the Company may be filled by the q oard of Managers.

6.04   <u>Authority</u> .  Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the q oard of Managers not inconsistent with this Agreement.

6.05   <u>Compensation</u> .  Except as otherwise may be provided by separate agreementFthe compensationFif anyFof officers or any salaried employee shall be fixedF increasedF or decreased from time to time by the q oard of ManagersF providedFhoweverFthat the q oard of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

6.06   <u>Chairman of the q oard</u> .  The Chairman of the q oardFif anyFshall be an officer of the Company andF subject to the direction of the q oard of ManagersFshall perform such executiveFsupervisoryFand management functions and duties as may be assigned to him from time to time by the q oard of Managers.

6.0V   <u>PresidentFCEO and COO</u> .  The q oard of Managers may designate and appoint a PresidentFCEO and/or COOFwith rightsFduties and responsibilities established by the q oard of Managers.

6.09   <u>Uice Presidents</u> .  Each Uice President shall have such powers and duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President and (in the order as designated by the q oard of ManagersFor in the absence of such designationFas determined by the length of time each has held the office of Uice President continuously) shall exercise the powers of the President during that officer's absence or inability to act.

6.07   <u>Treasurer</u> .  The Treasurer shall have custody of the Company's funds and securitiesFshall ; eep full and accurate accounts of receipts and disbursementsFand shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the q oard of Managers. The Treasurer shall audit all payrolls and vouchers of the Company' shall receiveF auditF and consolidate all operating and financial statements of the Company and its various departments' shall supervise the accounting and auditing practices of the Company' and shall have charge of matters relating to taxation. AdditionallyFthe Treasurer shall have the power to endorse for depositFcollectionFor otherwise all chec; sFdraftsFnotesFbills of exchangeFand other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company. The Treasurer shall perform such other duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President.

6.10   <u>Assistant Treasurers</u> .  Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President. The Assistant Treasurers (in the order as designated by the q oard of Managers orFin the absence of such designationFas determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

002898
HCMLPHMIT00004187


6.11   Secretary .  The Secretary shall maintain minutes of all meetings of the q oard of ManagersF of any committeeFand of the MembersFor consents in lieu of such minutesFin the Company's minute boo; sFand shall cause notice of such meetings to be given when re: uested by any person authorized to call such meetings.  The Secretary may sign with the PresidentFin the name of the CompanyFall contracts of the Company and affix the seal of the Company thereto.  The Secretary shall have charge of the certificate boo; sFmembership interest transfer boo; sFand other documents as the q oard of Managers may directFall of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours.  The Secretary shall perform such other duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President.

6.12   Assistant Secretaries .  Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the q oard of Managers or as may be delegated from time to time by the President.  The Assistant Secretaries (in the order designated by the q oard of Managers orFin the absence of such designationFas determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

## ARTIC, E VI U

### CAPI,TA, I.ZATI,ON AND CAPI,TA, I,  ACCOI NTS

V.01   Capital Contributions .  The Capital Contributions of the MembersFas set forth in the boo; s and records of the CompanyFshall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the q oard of Managers.  No Member shall be entitled to ma; e any additional Capital Contributions except as provided in Section V.02 and V.0B below.

V.02   Additional Capital Contributions .  3f the q oard of Managers determine that additional capital is re: uired for the purposes of the CompanyFas set forth hereinFthe q oard of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made.  ThereuponFall Members shall have the right (but not the obligation) to ma; e additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage 3nterests in the Company at the time notice is given.  The q oard of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

V.0B   Lailure to Ma; e Additional Capital Contributions .  3f any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a "NonkContributing Member")Fthen the other Members shall be entitled (but not obligated) to contribute the share of such NonkContributing Member (such Members being referred to as "Contributing Members") of the additional capital needed pro rata according to such Contributing Members' Percentage 3nterests at such time or such other share as otherwise agreed upon by the Contributing Members.

V.04   Effect of Lailure to Ma; e Additional Capital Contributions .  3n the event of a NonkContributing MemberF the Percentage 3nterests of all of the Members shall be recomputed on the following basis"  Each Member's Percentage 3nterest immediately following the computation shall e: ual the percentage expression of a fractionFthe numerator of which is the total Capital Contributions of such Member plus the additional Capital ContributionF if anyFmade by such Member pursuant to Sections V.02 and V.0B aboveF and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections V.02 and V.0B above.

V.05   Recapitalization by Admission of Additional Members .  3f additional capital is re: uired for the purposes of the Company as set forth herein and the q oard of Managers is unable to finance such capital needs by borrowing the re: uired amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section V.02 and V.0B aboveFthe q oard of Managers shall have the right to admit additional Members to the CompanyFupon receiving the other approvals re: uired herein.  Lollowing the admission of one or more new MembersFthe Percentage 3nterest of each MemberF including the newly admitted Member(s)F shall be computed as follows"  Each Member's Percentage 3nterest immediately following the computation shall e: ual the percentage expression of a fractionFthe numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the MembersFincluding the newly admitted Members.

12


002899
HCMLPHMIT00004188

V.06     <u>Maintenance of Capital Accounts</u> .  The Company shall maintain for each Member a separate Capital Account in accordance with this Section V.06 which shall control the allocation of Profits and , osses and the division of assets upon li: uidation of the Company as provided in Section 12.01.  Each Capital Account shall be maintained in accordance with the following provisions"

(a)      a Member's Capital Account shall initially be zero and shall be increased by the cash amount or q oo; Ualue of any property contributed by such Member to the Company pursuant to this Agreement such Member's allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section 9.02 and Section 9.0B hereof and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member'

(b)      such Capital Account shall be decreased by the cash amount or q oo; Ualue of any property distributed to such Member pursuant to this Agreement such Member's allocable share of , osses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section 9.02 and Section 9.0B hereof and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company' and

(c)      if all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest provided however that if the Transfer causes a termination of the Company under Code Section V09(b)(1)(q ) the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the Interest) in li: uidation of the Company and recontributed by such Members and transferees in reconstitution of the Company.  Such deemed li: uidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.V04kl(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  If the q oard of Managers determines that it is prudent to modify the manner in which the Capital Accounts or any increases or decreases to the Capital Accounts are computed in order to comply with such Treasury Regulations the q oard of Managers may authorize such modifications provided that it is not li; ely to have a material effect on the amounts distributable to any Member pursuant to Sections 9.06 and 12.01 hereof.

V.0V     <u>Negative Capital Accounts</u> .  If any Member has a deficit balance in its Capital Account such Member shall have no obligation to restore such negative balance or to ma; e any Capital Contribution to the Company by reason thereof and such negative balance shall not be considered an asset of the Company or of any Member.

V.09     <u>Interest</u> .  No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

V.07     <u>No Withdrawal</u> .  No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the Company except as provided in Sections 11.02 and 12.01 of this Agreement.

V.10     <u>, oans Lrom Members</u> .  , oans by a Member to the Company shall not be considered Capital Contributions.


## ARTIC, E VIIU

## A, , OCATIONS AND DISTRIBU TIONS

9.01     <u>Allocation of Profits and , osses</u>.

(a)     <u>Allocation of Profits</u>.  Except as provided on any Exhibit hereto after giving effect to the allocations set forth in Section 9.02 and Section 9.0B and after giving effect to all distributions of cash or property (other than cash or

1B

002900
HCMLPHMIT00004189


property to be distributed pursuant to Section 12.01)FProfits for any Liscal Year shall be allocated to the Members in the following manner"

        (i)    firstFto each Member with a negative balance in its Capital AccountFpro rata in accordance with such negative Capital Account balancesFuntil such negative Capital Account balances have been eliminated'

        (ii)    nextFto all of the Members in accordance with their respective Percentage Interests.

    (b)    <u>Allocation of , osses</u>.  Except as provided in any Exhibit heretoFAfter giving effect to the allocations set forth in Section 9.02 and Section 9.0BF, osses for any Liscal Year shall be allocated to the Members in the following manner"

        (i)    to all of the Members in accordance with their respective Percentage Interests.

    9.02    <u>Special Allocations of Profits and , osses</u> .

    (a)    <u>Minimum Gain Chargebac; –Company Nonrecourse , iabilities</u>.  If there is a net decrease in Company minimum gain during any Liscal YearFcertain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.V04k2(f) and (j)(2)(i) and (ii)F subject to the exemptions set forth in Treasury Regulations Section 1.V04k2(f)(2)F(B)F(4) and (5).  This Section 9.02(a) is intended to comply with the minimum gain chargebac; re: uirement set forth in Treasury Regulations Section 1.V04k2(f) relating to Company nonrecourse liabilitiesFas defined in Treasury Regulations Section 1.V04k2(b)(B) and shall be so interpreted.

    (b)    <u>Minimum Gain Chargebac; –Member Nonrecourse Debt</u>.  If there is a net decrease in Member minimum gain during any Liscal YearFcertain items of income and gain shall be allocated (on a gross basis) as : uic; ly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.V04k 2(i)(5) in the amounts and manner described in Treasury Regulations Sections 1.V04k2(i)(4)F(j)(2)(ii)Fand (j)(2)(iii).  This Section 9.02(b) is intended to comply with the minimum gain chargebac; re: uirement set forth in Treasury Regulations Section 1.V04k2(i)(4) relating to Member nonrecourse debtFas defined in Treasury Regulations Section 1.V04k2(b)(4) and shall be so interpreted.

    (c)    <u>Qualified Income Offset</u>.  IF after applying Section 9.02(a) and Section 9.02(b)F any Member has an adjusted Capital Account deficitFitems of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the adjusted Capital Account deficit of such Member as : uic; ly as possible.  This Section 9.02(c) is intended to comply with the ": ualified income offset" re: uirement set for the in Treasury Regulations Section 1.V04kl(b)(2)(ii)(d) and shall be so interpreted.

    (d)    <u>Optional q asis Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections VB4(b) or V4B(b) is re: uiredFpursuant to Treasury Regulations Section 1.V04kl(b)(2)(iv)(m)Fto be ta; en in to account in determining Capital AccountsFthe amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are re: uired to be adjusted pursuant to such Section of the Treasury Regulations.

    (f)    <u>Partner Nonrecourse Deductions</u>.  Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.V04k2(b)(4) and (i)(1) to the Member who bears the economic ris; of loss with respect to such deductions.

    9.0B    <u>Curative Allocations</u> .  The Regulatory Allocations are intended to comply with certain re: uirements of the Treasury Regulations.  It is the intent of the Members thatFto the extent possibleFall Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company incomeF gainF lossF or deduction pursuant to this Section 9.0B.  ThereforeFnotwithstanding any other provisions of this Article U333Fthe q oard of Managers shall ma; e such offsetting special allocations of Company incomeF gainFlossFor deduction in whatever manner it determines appropriate so thatFafter such offsetting allocations are madeFeach Member's Capital Account balance isFto the extent possibleFe: ual to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 9.01(a) and Section 9.01(b) hereof.

002901

HCMLPHMIT00004190

9.04    <u>Tax Allocations" Code Section V04(c)</u> .

(a)    In accordance with Code Section V04(c) and the Treasury Regulations thereunderFincomeFgainFlossFand deduction with respect to any property contributed to the capital of the Company shallF solely for federal income tax purposesFbe allocated among the Members so as to ta; e account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial q oo;  Ualue.

(b)    If the q oo;  Ualue of any Company asset is adjusted pursuant to Section 1.04(e)(ii) hereofF subse: uent allocations of incomeFgainFlossFand deduction with respect to such asset shall ta; e account of any variation between the adjusted basis of such asset for federal income tax purposes and its q oo;  Ualue in the same manner as under Code Section V04(c) and the Treasury Regulations thereunder.

(c)    Any elections or other decisions relating to such allocation shall be made by the q oard of Managers. Allocations pursuant to this Section 9.04 are solely for purposes of federalFstateFand local taxes and shall not affect or in any way be ta; en into account in computing any Member%s Capital AccountF or share of ProfitsF, ossesF and other items or distribution pursuant to any provision of this Agreement.

9.05    <u>Other Allocation Rules</u> .

(a)    Lor purposes of determining the ProfitsF, ossesF or any other item allocable to any periodFProfitsF, ossesF and any such other item shall be determined on a dailyFmonthlyF or other   basisFas determined by the q oard of Managers using any permissible method under Code Section V06 and the Treasury Regulations thereunder.

(b)    Lor federal income tax purposesFevery item of incomeFgainFlossFand deduction shall be allocated among the Members in accordance with the allocations under Sections 9.01F9.02F9.0BFand 9.04.

(c)    The Members are aware of the income tax conse: uences of the allocations made by this Article U333 and hereby agree to be bound by the provisions of this Article U333 in reporting their shares of Company income and loss for income tax purposes.

(d)    It is intended that the allocations in Sections 9.01F9.02F9.0BF and 9.04 hereof effect an allocation for federal income tax purposes consistent with Section V04 of the Code and comply with any limitations or restrictions therein.

9.06    <u>Distributions of Distributable Cash</u> .  Except as otherwise may be provided in this AgreementFthe q oard of Managers shall cause the Company to ma; e distributions of Distributable Cash at such intervals and in such amounts as the q oard of Managers in its sole discretion shall determine by majority vote.    Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

9.0V    <u>Wor; ing Cash Reserve</u> .  The q oard of Managers may from time to time establish a wor; ing cash reserve for capital expendituresF unforeseen contingenciesF projected operating deficitsF and other corporate purposes and may increase or decrease the amount in such reserve in its business judgment.

<div align="center">

**ARTIC, E IX**

**CERTILICATES**

</div>

7.01    <u>Certificated and I ncertificated Interests</u> .  The membership interests of the Company may be either certificated interests or uncertificated interests.  As used hereinFthe term -certificated interests- means Interests represented by instruments in bearer or registered formFand the term -uncertificated interests- means Interests not represented by such instruments and the transfers of which are registered upon boo; s maintained for that purpose by or on behalf of the Company.

7.02    <u>Certificates for Certificated Interests</u> .  The certificates for certificated interests shall be in such form as shall be approved by the q oard of Managers in conformity with law.  The certificates shall be consecutively numberedFshall be entered as they are issued in the boo; s of the Company or in the records of the Company's designated transfer agentF if anyFand shall state the Member's nameFthe class of InterestsFthe Percentage Interest that such Interest representsFand such

<div align="center">15</div>

002902


HCMLPHMIT00004191

other matters as may be re: uired by law.  The certificates shall be signed by the President or any Uice President and also by the SecretaryFan Assistant SecretaryFor any other officerFand may be sealed with the seal of the Company or a facsimile thereof.  3f any certificate is countersigned by a transfer agent or registered by a registrarFeither of which is other than the Company itself or an employee of the CompanyFthe signatures of the foregoing officers may be a facsimile.

7.0B   . ostF StolenF or  Destroyed Certificates .  The Company shall issue a new certificate in place of any certificate for 3nterests previously issued if the registered owner of the certificate satisfies the following re: uirements"

(a)      the registered owner ma; es proof in affidavit form that a previously issued certificate for 3nterests has been lostFdestroyedFor stolen'

(b)       the registered owner re: uests the issuance of a new certificate before the Company has notice that the certificate has been ac: uired by a purchaser for value in good faith and without notice of an adverse claim'

(c)      the registered owner gives a bond in such formF and with such surety or suretiesF with fixed or open penaltyF as the q oard of Managers may directF in its discretionF to indemnify the Company (and its transfer agent and registrarFif any) against any claim that may be made on account of the alleged lossFdestructionFor theft of the certificate' and

(d)      the registered owner satisfies any other reasonable re: uirements imposed by the q oard of Managers.

When a certificate has been lostFdestroyedFor stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of itFif the Company registers a transfer of the 3nterests represented by the certificate before receiving such notificationFthe Member of record is precluded from ma; ing any claim against the Company for the transfer or for a new certificate.

7.04   Transfer of 3nterests .  3nterests of the Company shall be transferable only on the boo; s of the Company by the Members thereof in person or by their duly authorized attorneys or legal representativesFbut only as authorized in this COMPANY AGREEMENT.  With respect to certificated interestsFupon surrender to the Company or the transfer agent of the Company of a certificate representing 3nterests duly endorsed or accompanied by proper evidence of successionF assignmentF or authority to transferF the Company or its agent shall issue a new certificate to the person entitled theretoF cancel the old certificateFand record the transaction upon its boo; s.  With respect to uncertificated interestsFupon delivery to the Company of proper evidence of successionFassignmentFor authority to transferFthe Company or its agent shall record the transaction upon its boo; s.

7.05   Registered Members .  The Company shall be entitled to treat the Member of record as the Member in fact of any 3nterests andFaccordinglyFshall not be bound to recognize any e: uitable or other claim to or interest in such 3nterests on the part of any other PersonFwhether or not it shall have actual or other notice thereofFexcept as otherwise provided by law.

7.06   . egends .  3f the Company is authorized to issue 3nterests of more than one classF each certificate representing 3nterests issued by the Company (a) shall conspicuously set forth on the face or bac; of the certificate a full statement of all of the designationsFpreferencesFlimitationsFand relative rights of the 3nterests of each class authorized to be issued' or (b) shall conspicuously state on the face or bac; of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement' and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written re: uest to the Company at its principal place of business or registered office.

3f the Company issues any 3nterests that are not registered under the Securities Act of 17BBFthe transfer of any such interests shall be restricted in accordance with an appropriate legend.

3n the event any restriction on the transferFor registration of the transferFof 3nterests shall be imposed or agreed to by the CompanyFeach certificate representing 3nterests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate' (b) shall set forth such statement on the bac; of the certificate and conspicuously refer to the same on the face of the certificate' or (c) shall conspicuously state on the face or bac; of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written re: uest to the Company at its principal place of business or registered

16

002903

HCMLPHMIT00004192

office a copy of the specified document' or (ii) if such document is one re: uired or permitted by law to be and has been filedF that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTIC‚ E X

### ACCOI NTING AND RECORDS

10.01    <u>Records and Accounting</u> .  The boo; s and records of the Company shall be ; eptFand the financial position and the results of its operations recordedFin accordance with the accounting methods elected to be followed by the Company for federal income tax purposes.  The boo; s and records of the Company shall reflect all Company transactions and shall be appropriate and ade: uate for the Company's business.

10.02    <u>Access to Accounting Records</u> .  All boo; s and records of the Company shall be maintained at any office of the Company or at the Company's principal place of businessFand each Member owning a Percentage Interest of at least ten percent (10%)Fand his duly authorized representativeFshall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.0B    <u>Annual and Tax Information</u> .  The Company shall deliver to each Member within 70 days after the end of each Liscal Year all information necessary for the preparation of such Member's federal income tax return.  The Company shall prepareFwithin 120 days after the end of each Liscal YearFa financial report of the Company for such Liscal YearF containing a statement of the year then endedF a statement of sources and applications of fundsF and a statement of reconciliation of the Capital Accounts of the Members.

10.04    <u>Accounting Decisions</u> .  All decisions as to accounting mattersFexcept as otherwise specifically set forth hereinFshall be made by the q oard of Managers.  The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.05    <u>Lederal Income Tax Elections</u> .  The Company may ma; e all elections for federal income tax purposesF includingFbut not limited toFthe following"

(a)    to the extent permitted by applicable law and regulationsFthe election to use an accelerated depreciation method on any depreciable unit of the assets of the Company' and

(b)    in case of a transfer of all or part of the Interest of any MemberFthe election pursuant to Section VB4FV4BF and V54 of the CodeFas amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTIC‚ E XU

### CHANGES IN MEMBERS

The provisions of this Article X3 are subject toFand may be superceded byFone or more separate agreements entered into by and among one or more Members.  The provisions of this Article X3 shall continue to control with respect to matters not covered byFor Members not parties toFsuch agreement(s).

11.01    <u>Intentionally q lan;</u> .

11.02    <u>Transfer and Assignment of Members' Interest</u> .  Except as approved by the ManagerFplus a Member or Members owning a Percentage Interest greater than fifty percent (50%)Fno Member shall be entitled to Transfer any part of its Interest in the Company.  The Company andFif applicableFthe remaining Members shall be entitled to match the terms of the proposed TransferFwith consideration being only set forth in traditional monetary terms.  If the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire InterestFor portion thereofF the Member proposing to ma; e the Transfer may move forward with the proposed Transfer.  Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.05(b) hereof.


002904

HCMLPHMIT00004193

11.0B  Further Restrictions on Transfer .  No Member shall Transfer any part of his interest in the Company" (i) without registration under applicable federal and state securities lawsfor unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required' or (ii) if the interest to be sold or exchangedfwhen added to the total of all other interests to be sold or exchanged in the preceding 12 consecutive months prior theretofwould result in the termination of the Company under Code Section 709.

11.04  Substitute Members .  A transferee shall have the right to become a substitute Member if (a) the requirements of Section 11.02 and 11.0Bhereof are met' (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement' and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.05  Effect of Transfer .

(a)  Any permitted Transfer of all or any portion of a Member's interest in the Company will take effect on the first day of the month following receipt by the Members of written notice of Transfer.  Any transferee of an interest in the Company shall take subject to the restrictions on Transfer imposed by this Agreement.

(b)  Upon any Transfer of a Member's interest in the Company in violation of this Agreementfand if such Member's interest is not purchased pursuant to Section 11.01fthe transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Memberfbut such transferee shall be entitled to receive only the allocable share of ProfitsF ossesFDistributive CashFand other items to which the transferor of such interest in the Company would otherwise be entitled.

11.06  No Dissolution or Withdrawal" Advanced Consent .  Upon the occurrence of a Dissolution Event with regard to a respective MemberFall remaining Members shall be deemed to automatically consent to the continuation of the business of the Company.  qy executing this AgreementFhoweverFall Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member's capital.  If any Member shall breach the agreement represented by this Section 11.06Fthe agreement of such breaching Member shall not be specifically performableFbut shall be actionable for damagesFand shall be deemed an offer of the interest of such breaching Member for sale pursuant hereto.  The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member's interestFor as otherwise set forth herein (whichever is greater)Fwhich shall be deducted from any payments to such Member upon dissolution or purchase of such Member's interest hereunder.  The value of the breaching Member's interest shall be determined pursuant to Section 11.01fto which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.06.

**ARTICLE XII**

**TERMINATION**

12.01  Termination of the Company .

(a)  The Company shall be dissolvedFits assets shall be disposed ofFand its affairs wound up on the first to occur of the following events"

(i)  a determination by the ManagersFplus the Unanimous Consent of the Members that the Company should be dissolved'

(ii)  a sale of all or substantially all of the assets of the Company'

(iii)  the expiration of the Company's term as stated in its Certificate' or

(iv)  at such earlier time as provided by applicable law.


002905  HCMLPHMIT00004194

(b)    3n settling accounts of the Company after dissolutionFthe liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following orderFall as re: uired by the DE, AWARE , AWS"

(i)    those to creditorsFin the order of priority as provided by lawFexcept those to Members of the Company on account of their Capital Contributions'

(ii)    to the MembersFpro rataFin accordance with the positive balancesFif anyFin their Capital Accounts' and

(iii)    to the Members in proportion to their relative Percentage 3nterests.

**ARTIC, E XLIU**

**INDEMNIUICATION**

1B.01    3ndemnification of MembersFManagersFand Other Persons .

(a)    To the greatest extent not inconsistent with the laws and public policies of DelawareFthe Company shall indemnify any MemberFManagerFor officer of the Company made a party to any proceeding because such individual is or was a MemberFManagerFor officer of the Company (an "3ndemnitee")Fas a matter of rightFagainst all liability incurred by such individual in connection with any proceeding' provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 1B.01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 1B.01.  The Company shall advanceFpay forFor reimburse the reasonable expenses incurred by an 3ndemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the 3ndemnitee furnishes the Company a written affirmation of the 3ndemnitee's good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 1B.01' (ii) the 3ndemnitee furnishes the Company a written underta; ingFexecuted personally or on such 3ndemnitee's behalfFto repay the advance if it is ultimately determined that such individual did not meet such standard of conduct' and (iii) a determination is made in accordance with subsection (d) that based upon facts then ; nown to those ma; ing the determinationFindemnification would not be precluded under this Section 1B.01.  The underta; ing described in subsection (a)(ii) above must be a general obligation of the 3ndemniteeFsubject to such reasonable limitations as the Company may permitFbut need not be secured and may be accepted without reference to financial ability to ma; e repayment.  The Company shall indemnify an 3ndemnitee who is wholly successfulFon the merits or otherwiseFin the defense of any such proceedingFas a matter of rightFagainst reasonable expenses incurred by the individual in connection with the proceeding without the re: uirement of a determination as set forth in subsection (c) of this Section 1B.01.  I pon demand by an 3ndemnitee for indemnification or advancement of expensesFas the case may beFthe Company shall expeditiously determine whether the 3ndemnitee is entitled thereto in accordance with this Section 1B.01.  The indemnification and advancement of expenses provided for under this Section 1B.01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 1B.01.

(b)    The Company shall have the powerFbut not the obligationFto indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a MemberFManagerFor officer of the Company.

(c)    3ndemnification is permissible under this Section 1B.01 only if (i) the 3ndemnitee conducted himself in good faith' (ii) he or she reasonably believed that his conduct was inFor at least not opposed toFthe Company's best interest' (iii) in the case of any criminal proceedingFhe or she had no reasonable cause to believe his conduct was unlawful' and (iv) such 3ndemnitee is not adjudged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty.  The termination of a proceeding by judgmentForderFsettlementFconvictionFor upon a plea of nolo contendere or its e: uivalent is notFof itselfFdeterminative that the 3ndemnitee did not meet the standard of conduct described in this subsection (c).

(d)    A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures"

17

002906


HCMLPHMIT00004195

(i)      by the qoard of Managers or by a majority vote consisting of Members not at the time parties to the proceeding' or

(ii)      by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e)      An 3ndemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the courtFif anyFconducting the proceeding or to another court of competent jurisdiction.  On receipt of an applicationFthe courtFafter giving notice the court considers necessaryFmay order indemnification if it determines"

(i)      in a proceeding in which the 3ndemnitee is wholly successfulFon the merits or otherwiseFthe 3ndemnitee is entitled to indemnification under this Section 1B.01Fin which case the court shall order the Company to pay the 3ndemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification' or

(ii)      the 3ndemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstancesFwhether or not the 3ndemnitee met the standard of conduct set forth in subsection (c) of this Section 1B.01.

(f)      3ndemnification shall also be provided for an 3ndemnitee's conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g)      Nothing contained in this Section 1B.01 shall limit or preclude the exercise or be deemed exclusive of any right under the lawFby contract or otherwiseFrelating to indemnification of or advancement of expenses to any individual who is or was a MemberFManagerFor officer of the Company or is or was serving at the Company's re: uest as a directorF officerFpartnerFmanagerFtrusteeFemployeeFor agent of another foreign or domestic companyFpartnershipFassociationF limited liability companyFcorporationFjoint ventureFtrustFemployee benefit planFor other enterpriseFwhether for profit or not.  Nothing contained in this Section 1B.01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual.  3t is the intent of this Section 1B.01 to provide indemnification to 3ndemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 1B.01.  3ndemnification shall be provided in accordance with this Section 1B.01 irrespective of the nature of the legal or e: uitable theory upon which a claim is madeFincludingFwithout limitationFnegligenceFbreach of dutyFmismanagementFwasteFbreach of contractFbreach of warrantyFstrict liabilityFviolation of federal or state securities lawFviolation of the Employee Retirement 3ncome Security Act of 17V4Fas amendedFor violation of any other state or federal law.

(h)      Lor purposes of this Section 1B.01"

(i)      The term -expenses- includes all direct and indirect costs (includingFwithout limitationFcounsel feesFretainersFcourt costsFtranscriptsFfees of expertsFwitness feesFtravel expensesFduplicating costsFprinting and binding costsFtelephone chargesFpostageFdelivery service feesFand all other disbursements or outofkpoc; et expenses) actually incurred in connection with the investigationFdefenseFsettlementFor appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 1B.01Fapplicable lawFor otherwise.

(ii)      The term -liability- means the obligation to pay a judgmentFsettlementFpenaltyFfineFexcise tax (including an excise tax assessed with respect to an employee benefit plan)For reasonable expenses incurred with respect to a proceeding.

(iii)      The term -party- includes an individual who wasFisFor is threatened to be made a named defendant or respondent in a proceeding.

(iv)      The term -proceeding- means any threatenedFpendingFor completed actionFsuit or proceedingF whether civilFcriminalFadministrativeFor investigative and whether formal or informal.

(v)      The Company may purchase and maintain insurance for its benefitFthe benefit of any individual who is entitled to indemnification under this Section 1B.01For bothFagainst any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the CompanyFwhether or not the Company would have the power to indemnify such individual against such liability.

002907

HCMLPHMIT00004196

**ARTIC E XIV**

**MISCE , ANEOI S**

14.01  <u>Complete Agreement</u> .  This AgreementFthe CertificateFand all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein.  This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of themFand no representationFstatementFor condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02  <u>Governing , aw</u> .  This Agreement and the rights of the parties hereunder will be governed byFinterpretedF and enforced in accordance with the laws of the State of Delaware.

14.0B  <u>q inding Effect</u> .  Subject to the provisions of this Agreement relating to transferabilityFthis Agreement will be binding upon and inure to the benefit of the MembersFand their respective distributesFsuccessorsFand assigns.

14.04  <u>Terms</u> .  Common nouns and pronouns will be deemed to refer to the masculineFfeminineFneuterFsingular and pluralFas the identity of the Person may in the context re: uire.  Any reference to the DE ,AWARE , AWSFthe Code or other statutes or laws will include all amendmentsFmodificationsFor replacements of the specific sections and provisions concerned.

14.05  <u>Headings</u> .  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.06  <u>Severability</u> .  3f any provision of this Agreement is held to be illegalFinvalidFor unenforceable under the present or future laws effective during the term of this AgreementFsuch provision will be fully severable' this Agreement will be construed and enforced as if such illegalFinvalidFor unenforceable provision had never comprised a part of this Agreement' and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegalFinvalidFor unenforceable provision or by its severance from this Agreement.  LurthermoreFin lieu of such illegalF invalidFor unenforceable provisionFthere will be added automatically as a part of this Agreement a provision as similar in terms to such illegalFinvalidFor unenforceable provision as may be possible and be legalFvalidFand enforceable.

14.0V  <u>Multiple Counterparts</u> .  This Agreement may be executed in several counterpartsFeach of which will be deemed an original but all of which will constitute one and the same instrument.  HoweverFin ma; ing proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.09  <u>Additional Documents and Acts</u> .  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuateFcarry outFand perform all of the termsFprovisionsFand conditions of this Agreement and the transactions contemplated hereby.

14.07  <u>No ThirdkParty q eneficiary</u> .  This Agreement is made solely and specifically among and for the benefit of the parties heretoFand their respective successors and assigns subject to the express provisions hereof relating to successors and assignsFand no other person will have any rightsFinterestsFor claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10  <u>References to this Agreement</u> .  Numbered or lettered articlesFsectionsFand subsections herein contained refer to articlesFsectionsFand subsections of this Agreement unless otherwise expressly stated.

14.11  <u>Notices</u> .  Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice.  Such notices will be given to a Member at the address specified in <u>Exhibit q</u> hereto.  Any Member or the Company mayFat any time by giving five days' prior written notice to the other Members and the CompanyFdesignate any other address in substitution of the foregoing address to which such notice will be given.

002908

HCMLPHMIT00004197


14.12    <u>Amendments</u> .  Except as otherwise may be provided in this AgreementFall amendments to this Agreement must be approved by the ManagersFplus one or more Members whose aggregate Percentage 3nterests total more than fifty percent (50%).

14.1B    <u>Title to Company Property</u> .  , egal title to all property of the Company will be held and conveyed in the name of the Company.

14.14    <u>Reliance on Authority of Person Signing Agreement</u> .  3n the event that a Member is not a natural personF neither the Company nor any Member will (a) be re: uired to determine the authority of the individual signing this Agreement to ma; e any commitment or underta; ing on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual' or (b) be re: uired to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.15    <u>SkCorp Election</u> .   3n the event the Company elects to be treated as a SkCorporation for federal tax purposesFthe provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as re: uired in order to pertain to a Skcorporation.

14.16    <u>Company 3ndemnification</u> .   3n the event any Member is personally liable for any debt or obligations associated with a Company assetFthen the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is re: uired to pay or performFas measured by the Percentage 3nterest of the MembersFexcept as otherwise agreed by the Members.

*14.17    <u>**Management by Members**</u>.  **The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such a manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.*

002909

HCMLPHMIT00004198

3N W3TNESS WHEREOLFthe Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADU3SORS HO, D3NG CORP.F
a Delaware corporation

q y"  _Mark Patriel_____

Mar;  Patric; ⊢Director and President

2E

**002910**

## EXHIBIT A

### THE C<sub></sub>ASS A MEMqERS AND 3NTERESTS

The sole Class A Member shall be RAND ADU3SORS HO, D3NG CORP.Fa Delaware corporationFand it shall own the Percentage 3nterest set forth on <u>Exhibit "q"</u> hereto.  3n addition to such other rights as a Member described in this AgreementFthe holders of record of the Class A 3nterests shall have no additional rights.

24

002911

HCMLPHMIT00004200

**EXHIBIT B**

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADVISORS HO, DING CORP. 2101 Cedar Springs Road Suite 1200F Dallas FTX 75201 Attn" Mar; Patric; | 9/1/2022 | 100% | 100% |

25

002912

HCMLPHMIT00004201

**EXHIBIT 86**

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as August 1, 2022, is entered into by and among JOHN HONIS ("**Seller**"), RAND ADVISORS HOLDING CORP., a Delaware corporation ("**Buyer**"), and CLO HOLDCO, LTD. a Cayman limited company (the "**Guarantor**").

## RECITALS

WHEREAS, Seller owns one hundred (100%) percent of the issued and outstanding membership interests, (the "**Interests**") of each of Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**") and Rand Advisors, LLC, a Delaware limited liability company ("**Advisor**", and together with Atlas GP and Rand GP, each a "**Company**" and collectively, the "**Companies**");

WHEREAS, the Companies collectively manage certain private investment funds, including two (2) insurance-dedicated funds ("**IDFs**") and one (1) one private equity fund that one of the IDFs invests in (collectively, the "**Client Funds**");

WHEREAS, in addition to the foregoing with respect to the Client Funds, Advisor acts as the investment sub-advisor to Rand Advisors Series I Insurance Fund of SALI Multi-Series Fund, L.P., a Delaware series limited partnership (such, product, the "**SALI Fund**");

WHEREAS, Rand GP as the general partner of Rand PE Fund I, LP, ("**Rand LP**") manages: a) Rand LP; b) Rand LP's wholly owned subsidiary Beacon Mountain, LLC ("**Beacon**"); and c) Beacon's sponsorship and administration of the Hunter Mountain Investment Trust ("**HMIT**", and together with Rand LP and Beacon, the "**Managed Companies**"); and

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Interests, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01   Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Interests, free and clear of any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance. In connection with such sale of the Interests, Seller acknowledges that he retains no rights to any commissions or other compensation or consideration from (a) any Company, (b) any of the Client Funds, (c) the SALI Fund, (d) any of the Managed Funds, and/or (e) any person or entity affiliated with any of the foregoing, that has not been paid as of the Closing.

HCMLPHMIT00004202

**Section 1.02   Purchase Price.** The purchase price payable by Buyer for the Interests shall be equal to One Million One Hundred Twenty Thousand ($1,120,000.00) Dollars (the "**Purchase Price**").  The Purchase Price shall be due and payable in sixteen (16) equal quarterly installments of Seventy Thousand ($70,000.00) Dollars (each, an "**Installment Payment**") with the first Installment Payment payable on the Closing Date and subsequent Installment Payments made quarterly thereafter on March 31, June 30, September 30 and December 31 of each calendar year until the Purchase Price has been paid in full; *provided, however,* that if any Installment Payment is due and owing on a day that is not a Business Bay, such Installment Payment shall be paid on the next Business Day.  For purposes of this Agreement, the term "Business Day" means any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York. Each Installment Payment shall be paid to Seller pursuant to the wiring instructions provided in writing at least two (2) days prior to Closing; *provided* that Seller may provide alternative wiring instructions in writing at least two (2) days prior to any Installment Payment.

<div align="center">

**ARTICLE II
CLOSING**

</div>

**Section 2.01   Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place electronically as of the Effective Date, with the parties executing and exchanging all material closing documents by counterpart, as applicable, on the date that all deliverables pursuant to <u>Sections 2.02</u> and <u>2.03</u> have been delivered, or at such other time, date or place as Seller and Buyer may mutually agree upon in writing.  The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**Section 2.02   Seller Closing Deliverables.** At the Closing, Seller shall deliver to Buyer the following:

      **(a)**      The resignation letter, resigning in all capacities from each of the Companies.

      **(b)**      The independent contractor agreement, by and between Seller and Buyer, dated as of the date hereof (the "**Independent Contractor Agreement**"), countersigned by Seller.

      **(c)**      The books and records of the Companies.

**Section 2.03   Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Seller:

      **(a)**      The Purchase Price.

      **(b)**      The Independent Contractor Agreement, countersigned by Buyer.

002915
HCMLPHMIT00004203

    **(c)**       Evidence of compliance with <u>Section 5.01(b)</u>.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01   Organization and Authority of Seller.** Seller is a natural person and resident of the State of New York. Seller has all necessary authority to enter into this Agreement, to carry out his obligations hereunder and to consummate the transactions contemplated hereby. This Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 3.02   Organization, Authority, Qualification and Ownership of the Companies.** Each Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it is currently conducted. Each Company is duly licensed or qualified to do business and is in good standing in each jurisdiction where the operation of its business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a material adverse effect. Seller is the sole owner and member of each Company.

**Section 3.03   Employment Matters.** Seller is the only employee of each of the Companies.

**Section 3.04   Title to Interests.** Seller has exclusive and valid title to all of the Interests, with the absolute right to sell, assign and transfer the same to Buyer free and clear of all liens, pledges, security interests and encumbrances. Seller has not assigned, transferred or sold any rights, options or other benefits associated with the Interests. Further, Seller represents and warrants that the assets of the Companies are free and clear of any and all liens, pledges, security interests and other encumbrances.

**Section 3.05   No Restrictions Against Sale.** Seller has full right, power and authority to sell the Interests to Buyer as provided in this Agreement without obtaining the consent or approval of any creditor, third party or governmental body.

**Section 3.06   Intentionally Blank**

3

002916

HCMLPHMIT00004204

**Section 3.07   No Other Representations and Warranties.** Except for the representations and warranties contained in this **ARTICLE III**, none of Seller, the Companies or any other person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or any Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Companies furnished or made available to Buyer as to the future revenue, profitability or success of each Company, or any representation or warranty arising from statute or otherwise in law.

# ARTICLE IV
# REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article IV are true and correct as of the date hereof.

**Section 4.01   Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder, and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.02   No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation or by-laws of Buyer; (b) violate or conflict with any provision of any law or governmental order applicable to Buyer; (c) require the consent, notice or other action by any person under, violate or conflict with, or result in the acceleration of any agreement to which Buyer is a party; or (d) require any consent, permit, governmental order, filing or notice from, with or to any governmental authority; except, in the cases of clauses (b) and (c), where the violation, conflict, acceleration or failure to obtain consent or give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby and, in the case of clause (d), where such consent, permit, governmental order, filing or notice which, in the aggregate, would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

**Section 4.03   Legal Proceedings.** There are no actions pending or, to Buyer's knowledge, threatened against or by Buyer or any of its affiliates that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

4

HCMLPHMIT00004205

**Section 4.04   Buyer Acknowledgement of SALI Agreement and CG Agreement**. Buyer acknowledges the obligations of (i) the Advisor pursuant to the Subadvisor Agreement dated September 25, 2013 between the Advisor and SALI Fund Management, LLC (the **"SALI Agreement"**) and (ii) Atlas IDF, LP and the Advisor pursuant to the Participation Agreement dated as of November 30, 2015 among Crown Global Life Insurance Ltd., Atlas IDF, LP and the Advisor (the **"CG Agreement"**).   The purchase and sale of the Interests pursuant to this Agreement will not cause a violation of either Exhibit C to the SALI Agreement or Schedule D to the CG Agreement ("**Schedule D**").

**Section 4.05   Independent Investigation.** Buyer has conducted its own independent investigation, review and analysis of Seller, the Companies, the Managed Companies, the Client Funds and the SALI Fund, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Seller, the Companies, the Managed Companies, the Client Funds and the SALI Fund for such purpose.   Buyer represents and warrants that it is aware that the Companies are involved in multiple litigations, the ultimate liability under such litigations may not be quantified and accepts any risk related thereto.   Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in ARTICLE III of this Agreement; and (b) none of Seller, any Company or any other person has made any representation or warranty as to Seller, any Company, any Managed Company, any Client Funds, the SALI Fund or this Agreement, except as expressly set forth in ARTICLE III of this Agreement.

# ARTICLE V
# COVENANTS

**Section 5.01   Director, Manager and Officer Indemnification Liability.**

(a)      Buyer agrees that all rights to indemnification, advancement of expenses and exculpation by each Company now existing in favor of each person who is now, or has been at any time prior to the date hereof, an officer, manager, member or director of such Company, in each case as in effect on the date of this Agreement, or pursuant to any other agreements in effect on the date hereof, shall survive the Closing Date and shall *continue in full force and effect in accordance with their respective terms.*

(b)      Each Company shall, and Buyer shall cause each Company to (i) maintain in effect for a period of six (6) years after the Closing Date the current policies of Investment Adviser and Fund Professional and Directors and Officers Liability Insurance (or similar policy) maintained by each Company immediately prior to the Closing Date (provided that each Company may substitute policies, of at least the same coverage and amounts and containing terms and conditions that are not less advantageous to the directors, members, managers and officers of such Company when compared to the insurance maintained by such Company as of the date hereof), or (ii) obtain as of the Closing Date "tail" insurance policies with a claims period of six (6) years from the

002918
HCMLPHMIT00004206

Closing Date with at least the same coverage and amounts, and containing terms and conditions that are not less advantageous to the mangers and officers of such Company, in each case with respect to claims arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).  The parties acknowledge and agree that the coverages required by this Section 5.01(b) shall not be required to cover the Excluded Claims referenced in Section 5.04 hereinafter.

(c)    The obligations of Buyer and each Company under this Section 5.01 shall not be terminated or modified in such a manner as to adversely affect Seller.

(d)    In the event that Buyer, any Company or any of their respective successors or assigns (i) consolidates with or merges into any other person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any person, then, and in either such case, proper provision shall be made so that the successors and assigns of Buyer or such Company, as the case may be, shall assume all of the obligations set forth in this Section 5.01.

**Section 5.02    Further Assurances.**  Following the Closing:

(a)    each of the parties hereto shall, and shall cause their respective affiliates to, execute and deliver such additional documents and instruments and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

(b)    The parties agree that certain matters in which any of the Affected Parties will be involved may necessitate Seller's cooperation in the future. Accordingly, for any reason, to the extent requested by any of the Affected Parties or their representatives and/or agents, Seller shall reasonably cooperate with the Affected Parties in connection with any matters in which any of the Affected Parties asserts that Seller's assistance is necessary, including, but not limited to, the Kirschner Litigation, the HCMLP Bankruptcy, and any other disputes; provided that, any of the Affected Parties shall make reasonable efforts to minimize disruption of Seller's other activities. The respective Affected Parties shall reimburse Seller for reasonable expenses incurred in connection with such reasonable cooperation and, to the extent that Seller is required to spend substantial time on such matters, the respective Affected Parties shall compensate Seller at an hourly rate of $350.00 per hour.  Such reasonable cooperation shall include, but is not limited to, providing interviews, truthful testimony, documents, assistance, information, and executing and returning documents related to any litigation or disputes in which any of the Affected Parties is involved, including, but not limited to, the Kirschner Litigation and/or the HCMLP Bankruptcy and any disputes related thereto. "Affected Parties" shall collectively mean Buyer, Companies, Client Funds, SALI Fund and Managed Companies.

6

002919

HCMLPHMIT00004207

(c)    Additionally, Seller agrees that he will not voluntarily provide reasonable assistance to or cooperate with any party that has any adverse interests to any of the Affected Parties without prior written consent from the respective Affected Parties, and Seller will notify the Affected Parties if any third-party seeks such reasonable assistance or cooperation from Seller.   Any failure to comply with this clause by Seller shall constitute a material breach of this Agreement.   Seller shall not, except as required by law, disclose to any third party this Agreement, its terms and particularly this cooperation clause.   If, at any time, Seller is ordered or subpoenaed by any court, regulator, agency, or legislative body to disclose, or is served with a subpoena or discovery request seeking or requiring disclosure of, this Agreement or any of its terms, Seller shall so notify the Affected Parties at least two (2) business days in advance of the time for compliance with the order, subpoena or discovery request.

Section 5.03    Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Seller shall cooperate with respect thereto as necessary).

Section 5.04    Release.  Effective as of the Closing, (i) Buyer shall, (ii) Buyer shall cause the Companies, (iii) Buyer shall cause the Companies to cause the Client Funds, and (iv) Buyer shall cause the Companies to cause the Managed Companies (together, the "**Buyer Releasors**") generally, irrevocably, unconditionally and completely to release and forever discharge Seller and his partners, affiliates, employees, consultants, counsel and agents, and the counsel, consultants and agents of the Companies, the Managed Companies, and the Client Funds (each, a "**Seller Releasee**" and collectively, the "**Seller Releasees**") from, and irrevocably, unconditionally and completely to waive and relinquish each and all past, present and future disputes, claims, controversies, demands, rights, obligations, liabilities, actions and causes of action of every kind and nature, including any unknown, unsuspected or undisclosed claim (collectively "**Claims**"), that the Buyer Releasors may have had in the past, may now have or may have in the future against any of the Seller Releasees and has arisen or arises directly or indirectly out of, or relates directly or indirectly to, this Agreement and the transactions contemplated hereby, or the operation of the Companies, the Managed Companies, the SALI Fund or the Client Funds, other than any claim that Buyer may have against any of the Seller Releasees that arises under this Agreement.  Buyer Releasors, acknowledges that the laws of many states provide substantially the following: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."   The Buyer Releasors acknowledge that such provisions are designed to protect a party from waiving claims which it does now exist or may exist. Nonetheless, the Buyer Releasors, agree that, effective as of the Closing, the Companies, the Client Funds and the Managed Companies shall be deemed to waive any such provision. Buyer shall not permit any Company, Client Fund or Managed Company to institute, solicit or encourage, or participate, assist or cooperate in, any legal proceeding based upon, arising out of, or relating to any of the disputes, claims, controversies, demands, rights,

7

002920
HCMLPHMIT00004208

obligations, liabilities, actions and causes of action waived under this Section 5.04.
Notwithstanding the foregoing, the parties acknowledge and agrees that the Claims released by
this Section 5.04 shall not include any and all Claims that are found by a court of competent
jurisdiction to be a result of a Seller Releasees fraud, gross negligence or willful misconduct
(each an "**Excluded Claim**" and/or collectively, the "**Excluded Claims**").

### Section 5.05    Guaranty.

(a)    The Guarantor hereby irrevocably and unconditionally guarantees to Seller
full and punctual performance of and compliance with all of Buyer's obligations pursuant
to this Agreement. The guaranty set forth in this Section 5.05(a) is an absolute, present,
primary and continuing guaranty of performance, payment and compliance.    The
Guarantor acknowledges and agrees that upon any default by Buyer, Seller shall not be
obligated to first attempt enforcement against Buyer.  The Guarantor hereby waives any
and all defenses to enforcement of the guaranty set forth in this Section 5.05(a), now
existing or hereafter arising, which may be available to guarantors, sureties and other
secondary parties at law or in equity.  The Guarantor further agrees to pay all reasonable
costs and expenses, including reasonable attorney fees and related costs, incurred by any
Seller Releasee in enforcing the guaranty set forth in this Section 5.05(a).

(b)    The Guarantor represents and warrants to Seller that (i) the execution and
delivery of this Agreement, and the Guarantor's performance under this Agreement,
including the Guarantor's performance under this Section 5.05, does not violate any law,
decree or contractual restriction binding on the Guarantor, (ii) this Agreement has been
duly executed and delivered by the Guarantor and constitutes the valid and legally
binding obligation of the Guarantor, enforceable against the Guarantor in accordance
with its terms and conditions, subject to applicable bankruptcy, insolvency,
reorganization, moratorium and other similar laws affecting creditor's rights generally
and general principles of equity and (iii) the Guarantor has the financial capacity
necessary to perform its obligations under the guaranty set forth in Section 5.05(a).

**Section 5.06    Ownership of Work Product of the Companies**.  Seller hereby agrees
that all work product, designs, graphics, processes, trade secrets, proprietary information and
confidential investor information of the Companies, that is not (i) generally available to the
public other than by virtue of a disclosure by Seller after the Closing Date and in violation of this
Agreement or (ii) independently developed by Seller from sources not known by Seller to be
bound by an obligation of confidentiality to the Companies (collectively, "**Confidential
Information**") and shall remain the property of the applicable Company without any further act
on Seller's or any Company's part, and that Seller shall not have any past, current or future
copyright, trademark right, intellectual property right, property interest and/or any other right,
title or interest in such Confidential Information.  Seller acknowledges and agrees that all right,
title and interest in such Confidential Information, including, without limitation, all conceivable
intellectual property rights, including, without limitation, all copyrights, trademarks, service
marks, patents, and discoveries shall remain the property of the applicable Company on and after
the Closing Date.  Notwithstanding anything in this Section 5.06 or otherwise in this Agreement

002921
HCMLPHMIT00004209

to the contrary, Seller may retain the phone that he used in the management and ownership of the Companies as his own personal property, and all "personal" information/data on such phone shall not constitute Confidential Information.

**Section 5.07    Client Information**.  Seller hereby covenants and agrees at all times following the execution hereof to hold in strictest confidence, and not to use (for himself or for any other person), or to disclose to any person, firm or entity, any such Confidential Information. The provisions of this Section 5.07 shall survive the execution hereof.

**Section 5.08    Buyer Obligations Pursuant to CG Agreement**.  Buyer covenants and agrees to ensure that after the Closing, either (x) Buyer and each person that would be an "Adviser Party" within the meaning of Schedule D immediately after the Closing is not affiliated with any "Policy Party" within the meaning of Schedule D or (y) each such person that would be such an Adviser Party immediately after the closing and that is affiliated with any such Policy Party has established or will establish procedures pursuant to a legally binding written agreement to prevent any communication prohibited by Schedule D.

**Section 5.09    Managed Companies Counsel**.  Buyer expressly acknowledges that counsel who have appeared for or represented the Managed Companies prior to the execution of this Agreement shall withdraw as counsel from any existing litigation and shall be replaced by counsel of Buyer's choice or designation.  The Managed Companies existing counsel shall cooperate with Buyer's designated replacement counsel in all respects, including filing any necessary pleadings or motions with the applicable court and turning over all documents, correspondence or other work product heretofore generated in connection with any such existing litigation to Buyer's designated replacement counsel; *provided* that Buyer acknowledges existing counsel may retain one copy of each such document, correspondence or work product for record keeping purposes.

# ARTICLE VI
## INDEMNIFICATION AND OTHER REMEDIES

**Section 6.01    Indemnification by Buyer.** Buyer shall defend and indemnify each Seller Releasee against, and hold each Seller Releasee harmless from, all Claims (other than Excluded Claims), including those related to Seller's ownership of the Interests or any actions or inaction by any Company, any Managed Company, any Client Fund or the SALI Fund.

**Section 6.02    Indemnification by Seller.** Seller shall have no obligations of indemnification with respect to any Claims (other than Excluded Claims), including those related to this Agreement or the transactions contemplated hereby.

**Section 6.03    Intentionally Blank**

**Section 6.04    Exclusive Remedies.** The parties acknowledge and agree that their sole and exclusive remedy with respect to any and all Claims for any breach of any representation,

9

002922

HCMLPHMIT00004210

warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions set forth in this ARTICLE VI. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their affiliates arising under or based upon any law, except pursuant to the indemnification and other provisions set forth in this ARTICLE VI. Nothing in this Section 6.04 shall limit any person's right to seek and obtain any equitable relief to which such person shall be entitled or to seek any remedy on account of any fraud by any party hereto. The provisions of this Articles VI shall survive the execution hereof.

## ARTICLE VII
## MISCELLANEOUS

**Section 7.01    Expenses.** All costs and expenses incurred in connection with the preparation and negotiation of this Agreement and the transactions contemplated hereby shall be paid by Buyer at Closing.

**Section 7.02    Notices.** All notices, claims, demands and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the second day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid, if sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

**If to Seller:**

John Honis
42 Regatta View Drive
Saratoga Springs, NY 12866
Email:  jwhonis@icloud.com

with a copy (which shall not constitute notice) to:

Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Attn:  Steven Huttler
Email: SHuttler@sadis.com

**If to Buyer:**

Rand Advisors Holding Corp.
6716 Glenhurst Dr.
Dallas, TX 75254

002923
HCMLPHMIT00004211

Email: mpatricktax1040@gmail.com
Attention: Mark Patrick

with a copy (which shall not
constitute notice) to:

Leggett Clemons Crandall, PLLC
5700 Granite Parkway, Ste. 950
Plano, TX 75024
Email: sclemons@lcclawfirm.com
Attention: Steve H. Clemons

**Section 7.03   Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 7.04   Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement.

**Section 7.05   Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

**Section 7.06   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign its rights or obligations hereunder without the prior written consent of the other parties. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 7.07   Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof. No single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 7.08   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

**(a)**     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware any other jurisdiction).

11

002924
HCMLPHMIT00004212

**(b)** ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**(c)** EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.08(c).

**Section 7.09   Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 7.10   AS-IS, WHERE-IS.** Except as expressly set forth in this Agreement to the contrary, Buyer is expressly purchasing the Interests "AS-IS, WHERE-IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions, and defects, and Seller has no obligation to determine or correct any such facts, circumstances, conditions, or defects or to compensate Buyer for same. Except as expressly set forth in this Agreement, Seller has specifically bargained for the assumption by Buyer of all responsibility to investigate Seller, the Companies, the Client Funds, the SALI Fund, the Managed Companies and the Interests, and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof. Except for the representations set forth in ARTICLE III, Buyer is and will be relying strictly and solely on its own inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel, and officers. Except as set forth

12

002925
HCMLPHMIT00004213

in ARTICLE III and otherwise in this Agreement, Buyer assumes the full risk of any loss or damage occasioned by any fact, circumstance, condition, or defect pertaining to Seller, any Company, any Client Fund, the SALI Fund, any Managed Company or the Interests. The provisions of this <u>Section 7.10</u> shall survive the Closing and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

Section 7.11  **Specific Performance**. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 7.12  **Privileges; Conflicts**.  It is acknowledged by each of the parties hereto that the Seller has retained Sadis & Goldberg LLP ("**Sadis**") to act as their counsel in connection with the transactions contemplated hereby and that Sadis has not acted as counsel for Buyer, any Company, any Client Fund, SALI Fund, any Managed Company or any of their respective affiliates in connection with the transactions contemplated hereby and that no other party has the status of a client of Sadis for conflict of interest or any other purposes as a result thereof. Buyer hereby agrees that, in the event that a dispute arises between Buyer or any of its affiliates (including, after the Closing, the Companies) and the Seller or any of his affiliates, Sadis may represent the Seller or any such affiliate in such dispute even though the interests of the Seller or such affiliate may be directly adverse to Buyer or any of its affiliates (including, after the Closing, the Companies), and even though Sadis may have represented such Company in a matter substantially related to such dispute, or may be handling ongoing matters for the Companies, and Buyer and the Companies hereby waive, on behalf of themselves and each of their affiliates, any claim they have or may have that Sadis has a conflict of interest in connection with, or is otherwise prohibited from engaging in, such representation.  Buyer further agrees that, as to all communications among Sadis, Seller, any Company, or their respective affiliates that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege, the expectation of client confidence and all other rights to any evidentiary privilege belong to Seller and may be controlled by Seller and shall not pass to or be claimed by Buyer, any Company or their affiliates.  Buyer agrees to take, and to cause its affiliates to take, all reasonable steps necessary to implement the intent of this <u>Section 7.12</u>.  Buyer and Seller further agree that Sadis and its partners and employees are third-party beneficiaries of this <u>Section 7.12</u>.

[SIGNATURE PAGE FOLLOWS]

002926
HCMLPHMIT00004214

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

**SELLER**:

_____
JOHN HONIS

**BUYER**:

RAND ADVISORS HOLDING CORP

By_____
Name: Mark Patrick
Title: Director

**GUARANTOR**:

CLO HOLDCO, LTD.,
a Cayman limited company

By_____
Name: **Mark Patrick**
Title: **Director**

14

002927

HCMLPHMIT00004215

**EXHIBIT 87**

002928

MEMBER AND MANAGER CONSENT
OF
RAND ADVISORS, LLC

October 13, 2022

THE UNDERSIGNED sole member (the "**Member**") and sole manager (the "**Manager**") of RAND ADVISORS, LLC, a Delaware limited liability company (the "**C mpan** "), acting pursuant to the Delaware Limited Liability Company Act, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the "Purchase Agreement"), by and among JOHN HONIS (as "Seller"), the Sole Member (as "Buyer"), and CLO HOLDCO, LTD. a Cayman limited company (as "Guarantor"), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the Company;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person's successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an "**Officer**"):

| Name | Office |
|------|--------|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the Company but not named above is hereby removed from the office of the Company;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the Company; and

002929

HCMLPHMIT00004216

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the Company.

*[Signature Page to Follow]*

002930
HCMLPHMIT00004217

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

SOLE MEMBER

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: _____
        Mark Patrick, Sole Director

SOLE MANAGER

_____
Mark Patrick

*Signature Page*

HCMLPHMIT00004218

**EXHIBIT 88**

002932

MEMBER AND MANAGER CONSENT
OF
RAND PE FUND MANAGEMENT, LLC

October 13, 2022

THE UNDERSIGNED sole member (the "**Member**") and sole manager (the "**Manager**") of RAND PE FUND MANAGEMENT, LLC, a Delaware limited liability company (the "**General Partner**"), the general partner of RAND PE FUND I, L.P., a Delaware limited partnership (the "**Partnership**"), acting pursuant to the Delaware Limited Liability Company Act and the Amended and Restated Company Agreement of the General Partner, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the "Purchase Agreement"), by and among JOHN HONIS (as "Seller"), the Sole Member (as "Buyer"), and CLO HOLDCO, LTD. a Cayman limited company (as "Guarantor"), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the General Partner;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person's successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an "**Officer**"):

| **Name** | **Office** |
|---|---|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers.  As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the General Partner but not named above is hereby removed from the office of the General Partner;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the General Partner and the Partnership, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the General Partner and/or the Partnership prior to the date

002933

hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the General Partner and/or the Partnership; and

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the General Partner.

*[Signature Page to Follow]*

2

**002934**

HCMLPHMIT00004220

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

MEMBER

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By:_____

Mark Patrick, Sole Director

SOLE MANAGER

_____

Mark Patrick

002935

HCMLPHMIT00004221

**EXHIBIT 89**

**FORM ADV**

UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS

| | |
|---|---|
| **Primary Business Name: RAND ADVISORS, LLC** | **CRD Number: 172839** |
| **Annual Amendment - All Sections** | **Rev. 10/2021** |
| **3/17/2025 8:51:05 AM** | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A.  Your full legal name (if you are a sole proprietor, your last, first, and middle names):
    **RAND ADVISORS, LLC**

B.  (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
    **RAND ADVISORS, LLC**

    *List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

    (2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

    *If you check this box, complete a Schedule R for each relying adviser.*

C.  If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
    ☐ your legal name or ☐ your primary business name:

D.  (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-80265**
    (2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:
    (3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:

    | CIK Number |
    |---|
    | 1660386 |
    | 1660401 |

E.  (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **172839**

    *If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

    (2) If you have additional *CRD* Numbers, your additional *CRD* numbers:
    No Information Filed

F.  *Principal Office and Place of Business*
    (1) Address (do not use a P.O. Box):

    | | | | |
    |---|---|---|---|
    | Number and Street 1: | | Number and Street 2: | |
    | 2101 CEDAR SPRINGS ROAD | | SUITE 1200 | |
    | City: | State: | Country: | ZIP+4/Postal Code: |
    | DALLAS | Texas | United States | 75201 |

    If this address is a private residence, check this box: ☐

    *List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.*

    (2) Days of week that you normally conduct business at your *principal office and place of business*:
    ◉ Monday - Friday ○ Other:

    Normal business hours at this location:
    9AM-5PM
    (3) Telephone number at this location:
    214-908-8130
    (4) Facsimile number at this location, if any:

HCMLPHMIT00003465

Case 19-84054-sgj11   Doc 4255-89 Filed 06/20/25   Entered 06/20/25 21:38:29   Desc
Exhibit 89   Page 3 of 30

G.   Mailing address, if different from your *principal office and place of business* address:

Number and Street 1:                              Number and Street 2:
City:                     State:                  Country:          ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H.   If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1:                              Number and Street 2:
City:                     State:                  Country:          ZIP+4/Postal Code:

|  |  | Yes | No |
|---|---|---|---|

I.   Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)?   ⦿   ○

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J.   Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name:                                             Other titles, if any:
Telephone number:                                 Facsimile number, if any:
Number and Street 1:                              Number and Street 2:
City:                     State:                  Country:          ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):

Name:
IRS Employer Identification Number:

K.   Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name:                                             Titles:
Telephone number:                                 Facsimile number, if any:
Number and Street 1:                              Number and Street 2:
City:                     State:                  Country:          ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

|  |  | Yes | No |
|---|---|---|---|

L.   Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*?   ⦿   ○

*If "yes," complete Section 1.L. of Schedule D.*

|  |  | Yes | No |
|---|---|---|---|

M.   Are you registered with a *foreign financial regulatory authority*?   ○   ⦿

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

|  |  | Yes | No |
|---|---|---|---|

N.   Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934?   ○   ○

|  |  | Yes | No |
|---|---|---|---|

O.   Did you have $1 billion or more in assets on the last day of your most recent fiscal year?   ○   ○
If yes, what is the approximate amount of your assets:

HCMLPHMIT00003466

○ $1 billion to less than $10 billion
○ $10 billion to less than $50 billion
○ $50 billion or more

For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.

P.   Provide your *Legal Entity Identifier* if you have one:

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

---

## SECTION 1.B. Other Business Names

No Information Filed

---

## SECTION 1.F. Other Offices

No Information Filed

---

## SECTION 1.I. Website Addresses

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform:   HTTP://WWW.RANDADVISORS.COM/

---

## SECTION 1.L. Location of Books and Records

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
HIGHGATE CONSULTING GROUP INC

| | |
|---|---|
| Number and Street 1: | Number and Street 2: |
| 2101 CEDAR SPRINGS RD | SUITE 1200 |

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| DALLAS | Texas | United States | 75201 |

If this address is a private residence, check this box:  ☐

| Telephone Number: | Facsimile number, if any: |
|---|---|
| 214-550-4459 | |

This is (check one):
○ one of your branch offices or affiliates.
● a third-party unaffiliated recordkeeper.
○ other.

Briefly describe the books and records kept at this location.
ALL BOOKS AND RECORDS OF THE ADVISER

---

## SECTION 1.M. Registration with Foreign Financial Regulatory Authorities

**Item 2 SEC Registration/Reporting**

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

A.   To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). *Part 1A Instruction 2* provides information to help you determine whether you may affirmatively respond to each of these items.

You (the adviser):

☑ (1)   are a **large advisory firm** that either:

(a) has regulatory assets under management of $100 million (in U.S. dollars) or more; or

(b) has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

☐ (2)   are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

(a) not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

(b) not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

Click *HERE* for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.

(3)   Reserved

☐ (4)   have your *principal office and place of business* **outside the United States**;

☐ (5)   are **an investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

☐ (6)   are **an investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

☐ (7)   are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

☐ (8)   are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

If you check this box, complete *Section 2.A.(8) of Schedule D.*

☐ (9)   are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days;**

If you check this box, complete *Section 2.A.(9) of Schedule D.*

☐ (10)   are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

If you check this box, complete *Section 2.A.(10) of Schedule D.*

☐ (11)   are an **Internet adviser** relying on rule 203A-2(e);

If you check this box, complete *Section 2.A.(11) of Schedule D.*

☐ (12)   have **received an SEC order** exempting you from the prohibition against registration with the SEC;

If you check this box, complete *Section 2.A.(12) of Schedule D.*

☐ (13)   are **no longer eligible** to remain registered with the SEC.

**State Securities Authority Notice Filings** and State Reporting by *Exempt Reporting Advisers*

C.   Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☑ TX |

HCMLPHMIT00003468

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ CA | ☐ KY | | ☐ NM | | ☐ UT | |
| ☐ CO | | | ☐ NC | | ☐ VT | |
| ☐ DE | ☐ MD | | ☐ ND | | ☐ VA | |
| ☐ DC | ☐ MA | | ☐ OH | | ☐ WA | |
| ☐ FL | ☐ MI | | ☐ OK | | ☐ WV | |
| ☐ GA | ☐ MN | | ☐ OR | | ☐ WI | |
| ☐ GU | ☐ MS | | ☐ PA | | ☐ WY | |
| ☐ HI | ☐ MO | | ☐ PR | | | |
| ☐ ID | ☐ MT | | ☐ RI | | | |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

---

**SECTION 2.A.(8) Related Adviser**

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser
-

---

**SECTION 2.A.(9) Investment Adviser Expecting to be Eligible for Commission Registration within 120 Days**

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

---

**SECTION 2.A.(10) Multi-State Adviser**

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

---

**SECTION 2.A.(11) Internet Adviser**

If you are relying on rule 203A-2(e), the Internet adviser exemption from the prohibition on registration, you are required to make a representation about your eligibility for SEC registration. By checking the appropriate box, you will be deemed to have made the required representation.

If you are applying for registration as an investment adviser with the SEC or changing your existing Item 2 response regarding your eligibility for SEC registration, you must make this representation:

☐ I will provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

If you are filing an annual updating amendment to your existing registration and are continuing to rely on the Internet adviser exemption for SEC registration, you must make this representation:

☐ I have provided and will continue to provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

HCMLPHMIT00003469

If you are applying for SEC registration or submitting a report as an exempt reporting adviser, complete the following Section 1.O.

Application Number:

803-

Date of *order*:

---

## Item 3 Form of Organization

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A. How are you organized?

- ○ Corporation
- ○ Sole Proprietorship
- ○ Limited Liability Partnership (LLP)
- ○ Partnership
- ◉ Limited Liability Company (LLC)
- ○ Limited Partnership (LP)
- ○ Other (specify):

  *If you are changing your response to this Item, see* Part 1A Instruction 4.

B. In what month does your fiscal year end each year?
   DECEMBER

C. Under the laws of what state or country are you organized?

   State      Country
   Delaware   United States

   *If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

   *If you are changing your response to this Item, see* Part 1A Instruction 4.

---

## Item 4 Successions

|  |  | Yes | No |
|---|---|---|---|
| A. | Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (e.g., form of organization or state of incorporation)? | ○ | ◉ |

   *If "yes", complete Item 4.B. and* Section 4 of Schedule D.

B. Date of Succession: (MM/DD/YYYY)

   *If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See* Part 1A Instruction 4.

---

## SECTION 4 Successions

No Information Filed

---

## Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

### Employees

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

HCMLPHMIT00003470

A.   Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.

1

B.   (1)   Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?

1

(2)   Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?

0

(3)   Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?

0

(4)   Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives* for an investment adviser other than you?

0

(5)   Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

0

(6)   Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

0

*In your response to Item 5.B.(6), do not count any of your employees and count a firm only once – do not count each of the firm's employees that solicit on your behalf.*

## Clients

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C.   (1)   To approximately how many *clients* for whom you do not have regulatory assets under management did you provide investment advisory services during your most recently completed fiscal year?

0

(2)   Approximately what percentage of your *clients* are non-*United States persons*?

0%

D.   *For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*

*The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, do not answer (1)(d) or (3)(d) below.*

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respond to Item 5.D.(1).

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets under management reported in Item 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the *client* to avoid double counting *clients* and assets. If you advise a registered investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as applicable.

| Type of *Client* | (1) Number of *Client(s)* | (2) Fewer than 5 *Clients* | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | 0 | ☐ | $ 0 |
| (b) *High net worth individuals* | 0 | ☐ | $ 0 |
| (c) Banking or thrift institutions | 0 | ☐ | $ 0 |
| (d) Investment companies | 0 | | $ 0 |
| (e) Business development companies | 0 | | $ 0 |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 3 | | $ 153,660,847 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | 0 | ☐ | $ 0 |
| (h) Charitable organizations | 0 | ☐ | $ 0 |
| (i) State or municipal *government entities* (including government pension plans) | 0 | ☐ | $ 0 |
| (j) Other investment advisers | 0 | ☐ | $ 0 |

| (k) Insurance companies | 0 | ☐ | $ 0 |
| (l) Sovereign wealth funds and foreign official institutions | 0 | ☐ | $ 0 |
| (m) Non-United States public benefit-type fees not covered above | 0 | ☐ | $ 0 |
| (n) Other: | 0 | ☐ | $ 0 |

---

**Compensation Arrangements**

E.   You are compensated for your investment advisory services by (check all that apply):

- ☑ (1)   A percentage of assets under your management
- ☐ (2)   Hourly charges
- ☐ (3)   Subscription fees (for a newsletter or periodical)
- ☐ (4)   Fixed fees (other than subscription fees)
- ☐ (5)   Commissions
- ☐ (6)   *Performance-based fees*
- ☐ (7)   Other (specify):

---

**Item 5 Information About Your Advisory Business - Regulatory Assets Under Management**

**Regulatory Assets Under Management**

                                                                                 **Yes   No**

F.   (1)   Do you provide continuous and regular supervisory or management services to securities portfolios?   ◉   ○

    (2)   If yes, what is the amount of your regulatory assets under management and total number of accounts?

|  | U.S. Dollar Amount |  | Total Number of Accounts |
|---|---|---|---|
| Discretionary: | (a)  $ 153,660,847 | (d) | 80 |
| Non-Discretionary: | (b)  $ 0 | (e) | 0 |
| Total: | (c)  $ 153,660,847 | (f) | 80 |

*Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.*

    (3)   What is the approximate amount of your total regulatory assets under management (reported in Item 5.F.(2)(c) above) attributable to *clients* who are non-*United States persons*?

    $ 0

---

**Item 5 Information About Your Advisory Business - Advisory Activities**

**Advisory Activities**

G.   What type(s) of advisory services do you provide? Check all that apply.

- ☐ (1)   Financial planning services
- ☐ (2)   Portfolio management for individuals and/or small businesses
- ☐ (3)   Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
- ☑ (4)   Portfolio management for pooled investment vehicles (other than investment companies)
- ☐ (5)   Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
- ☐ (6)   Pension consulting services
- ☐ (7)   Selection of other advisers (including *private fund* managers)
- ☐ (8)   Publication of periodicals or newsletters
- ☐ (9)   Security ratings or pricing services
- ☐ (10)  Market timing services
- ☐ (11)  Educational seminars/workshops
- ☐ (12)  Other(specify):

*Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in Section 5.G.(3) of Schedule D.*

H.   If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- ○   0
- ○   1 - 10
- ○   11 - 25
- ○   26 - 50
- ○   51 - 100
- ○   101 - 250
- ○   251 - 500
- ○   More than 500

    If more than 500, how many?
    (round to the nearest 500)

*In your response to this Item 5.H., do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

|  |  | Yes | No |
|---|---|---|---|
| I. | (1) Do you participate in a *wrap fee program*? | ○ | ⊙ |
|  | (2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as: |  |  |
|  | (a) *sponsor* to a *wrap fee program*<br>$ |  |  |
|  | (b) portfolio manager for a *wrap fee program*?<br>$ |  |  |
|  | (c) *sponsor* to and portfolio manager for the same *wrap fee program*?<br>$ |  |  |

If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).

If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in *Section 5.I.(2) of Schedule D*.

If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).

|  |  | Yes | No |
|---|---|---|---|
| J. | (1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments? | ○ | ⊙ |
|  | (2) Do you report *client* assets in Item 4.E. of Part 2A that are computed using a different method than the method used to compute your regulatory assets under management? | ○ | ⊙ |

| K. | Separately Managed Account *Clients* | Yes | No |
|---|---|---|---|
|  | (1) Do you have regulatory assets under management attributable to *clients* other than those listed in Item 5.D.(3)(d)-(f) (separately managed account *clients*)? | ○ | ⊙ |

If yes, complete *Section 5.K.(1) of Schedule D*.

|  |  | Yes | No |
|---|---|---|---|
|  | (2) Do you engage in borrowing transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ⊙ |

If yes, complete *Section 5.K.(2) of Schedule D*.

|  |  | Yes | No |
|---|---|---|---|
|  | (3) Do you engage in derivative transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ⊙ |

If yes, complete *Section 5.K.(2) of Schedule D*.

|  |  | Yes | No |
|---|---|---|---|
|  | (4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian hold ten percent or more of this remaining amount of regulatory assets under management? | ○ | ⊙ |

If yes, complete *Section 5.K.(3) of Schedule D* for each custodian.

| L. | Marketing Activities | Yes | No |
|---|---|---|---|
|  | (1) Do any of your *advertisements* include: |  |  |
|  | (a) Performance results? | ○ | ⊙ |
|  | (b) A reference to specific investment advice provided by you (as that phrase is used in rule 206(4)-1(a)(5))? | ○ | ⊙ |
|  | (c) *Testimonials* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ⊙ |
|  | (d) *Endorsements* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ⊙ |
|  | (e) *Third-party ratings*? | ○ | ⊙ |
|  | (2) If you answer "yes" to L(1)(c), (d), or (e) above, do you pay or otherwise provide cash or non-cash compensation, directly or indirectly, in connection with the use of *testimonials*, *endorsements*, or *third-party ratings*? | ○ | ○ |
|  | (3) Do any of your *advertisements* include *hypothetical performance* ? | ○ | ⊙ |

HCMLPHMIT00003473

**SECTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies**

No Information Filed

**SECTION 5.I.(2) *Wrap Fee Programs***

No Information Filed

**SECTION 5.K.(1) Separately Managed Accounts**

After subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate percentage of this remaining amount attributable to each of the following categories of clients. If the remaining amount is at least $10 billion in regulatory assets under management, complete Question (a). If the remaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment* . Mid-year is the date six months before the end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

Investments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be reported in those categories. Do not report those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of deposit, bankers' acceptances and similar bank instruments.

Some assets could be classified into more than one category or require discretion about which category applies. You may use your own internal methodologies and the conventions of your service providers in determining how to categorize assets, so long as the methodologies or conventions are consistently applied and consistent with information you report internally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with any instructions or other guidance relating to this Section.

(a)

| Asset Type | | Mid-year | End of year |
|---|---|---|---|
| (i) | Exchange-Traded Equity Securities | % | % |
| (ii) | Non Exchange-Traded Equity Securities | % | % |
| (iii) | U.S. Government/Agency Bonds | % | % |
| (iv) | U.S. State and Local Bonds | % | % |
| (v) | *Sovereign Bonds* | % | % |
| (vi) | Investment Grade Corporate Bonds | % | % |
| (vii) | Non-Investment Grade Corporate Bonds | % | % |
| (viii) | Derivatives | % | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % | % |
| (xi) | Cash and Cash Equivalents | % | % |
| (xii) | Other | % | % |

Generally describe any assets included in "Other"

(b)

| Asset Type | | End of year |
|---|---|---|
| (i) | Exchange-Traded Equity Securities | % |
| (ii) | Non Exchange-Traded Equity Securities | % |
| (iii) | U.S. Government/Agency Bonds | % |
| (iv) | U.S. State and Local Bonds | % |
| (v) | *Sovereign Bonds* | % |
| (vi) | Investment Grade Corporate Bonds | % |
| (vii) | Non-Investment Grade Corporate Bonds | % |
| (viii) | Derivatives | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development | % |

Generally describe any assets included in "Other"

---

## SECTION 5.K.(2) Separately Managed Accounts - Use of *Borrowings* and Derivatives

☑ **No information is required to be reported in this Section 5.K.(2) per the instructions of this Section 5.K.(2)**

If your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Question (a). If your regulatory assets under management attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b).

(a)  In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the accounts included in column 1 with respect to each category of derivatives specified in 3(a) through (f).

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(ii) End of Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(b)  In the table below, provide the following information regarding the separately managed accounts you advise as of the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

HCMLPHMIT00003475

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the *gross notional exposure* of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *long* positions and (b) the absolute value of any *short* positions by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* |
|---|---|---|
| **Less than 10%** | $ | $ |
| **10-149%** | $ | $ |
| **150% or more** | $ | $ |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

---

**SECTION 5.K.(3) Custodians for Separately Managed Accounts**

No Information Filed

---

**Item 6 Other Business Activities**

In this Item, we request information about your firm's other business activities.

A.    You are actively engaged in business as a (check all that apply):
- [ ] (1)   broker-dealer (registered or unregistered)
- [ ] (2)   registered representative of a broker-dealer
- [ ] (3)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- [ ] (4)   futures commission merchant
- [ ] (5)   real estate broker, dealer, or agent
- [ ] (6)   insurance broker or agent
- [ ] (7)   bank (including a separately identifiable department or division of a bank)
- [ ] (8)   trust company
- [ ] (9)   registered municipal advisor
- [ ] (10) registered security-based swap dealer
- [ ] (11) major security-based swap participant
- [ ] (12) accountant or accounting firm
- [ ] (13) lawyer or law firm
- [ ] (14) other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

|   | | | Yes | No |
|---|---|---|---|---|
| B. | (1) | Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ● |
|   | (2) | If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

|   | | | Yes | No |
|---|---|---|---|---|
|   | (3) | Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ● |

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

---

**SECTION 6.A. Names of Your Other Businesses**

No Information Filed

---

**SECTION 6.B.(2) Description of Primary Business**

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

HCMLPHMIT00003476

## SECTION 6.B.(3) Description of Other Products and Services

Describe other products or services you sell to your client. You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

---

## Item 7 Financial Industry Affiliations

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A.   This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

☐ (1)   broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
☐ (2)   other investment adviser (including financial planners)
☐ (3)   registered municipal advisor
☐ (4)   registered security-based swap dealer
☐ (5)   major security-based swap participant
☐ (6)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐ (7)   futures commission merchant
☐ (8)   banking or thrift institution
☐ (9)   trust company
☐ (10)   accountant or accounting firm
☐ (11)   lawyer or law firm
☐ (12)   insurance company or agency
☐ (13)   pension consultant
☐ (14)   real estate broker or dealer
☐ (15)   sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
☐ (16)   sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

---

## SECTION 7.A. Financial Industry Affiliations

No Information Filed

---

## Item 7 *Private Fund* Reporting

Yes   No

B.   Are you an adviser to any *private fund*?   ⊙   ○

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

002949

HCMLPHMIT00003477


Funds per Page: 15 □  Total Funds: 2

---

A. PRIVATE FUND

**Information About the _Private Fund_**

1. (a) Name of the _private fund_:

   ATLAS IDF, LP

   (b) _Private fund_ identification number:
   (include the "805-" prefix also)

   805-9274628204

2. Under the laws of what state or country is the _private fund_ organized:

   State:                                    Country:
   Delaware                                  United States

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or _persons_ serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| ATLAS IDF GP, LLC |

   (b) If filing an _umbrella registration_, identify the _filing adviser_ and/or _relying adviser(s)_ that sponsor(s) or manage(s) this _private fund_.

| No Information Filed |
|---|

4. The _private fund_ (check all that apply; you must check at least one):
   - ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
   - ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each _foreign financial regulatory authority_ with which the _private fund_ is registered.

| No Information Filed |
|---|

                                                                                            **Yes  No**
6. (a) Is this a "master fund" in a master-feeder arrangement?                               ○    ◉

   (b) If yes, what is the name and _private fund_ identification number (if any) of the feeder funds investing in this _private fund_?

| No Information Filed |
|---|

                                                                                            **Yes  No**
   (c) Is this a "feeder fund" in a master-feeder arrangement?                               ○    ◉

   (d) If yes, what is the name and _private fund_ identification number (if any) of the master fund in which this _private fund_ invests?

   Name of _private fund_:

   _Private fund_ identification number:
   (include the "805-" prefix also)

   NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
|---|

   NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

HCMLPHMIT00003478

8.  (a)  Is this *private fund* a "fund of funds"?   Yes ◯  No ◯

NOTE: In responding to this question, disregard any *private fund* investments in other *pooled investment vehicles*, regardless of whether they are also *private funds* or registered investment companies.

(b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*?   Yes ◯  No ◯

9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?   Yes ◯  No ●

10.  What type of fund is the *private fund*?

◯ hedge fund   ◯ liquidity fund   ● private equity fund   ◯ real estate fund   ◯ securitized asset fund   ◯ venture capital fund   ◯ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11.  Current gross asset value of the *private fund*:

$ 29,902,788

**Ownership**

12.  Minimum investment commitment required of an investor in the *private fund*:

$ 500,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13.  Approximate number of the *private fund's* beneficial owners:

2

14.  What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15.  (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

(b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*?   Yes ◯  No ◯

16.  What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

100%

**Your Advisory Services**

17.  (a)  Are you a subadviser to this *private fund*?   Yes ◯  No ●

(b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

18.  (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?   Yes ◯  No ●

(b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

19.  Are your *clients* solicited to invest in the *private fund*?   Yes ◯  No ◯

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20.  Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

Yes  No

22. If "yes," provide the Regulation D Form D file number (if any):

No Information Filed

B. SERVICE PROVIDERS

<u>Auditors</u>

Yes No

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?

   (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

| Additional Auditor Information : 1 Record(s) Filed. |
|---|

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

   COHEN & CO.

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| AKRON | Ohio | United States |

Yes No

(d) Is the auditing firm an *independent public accountant*?

(e) Is the auditing firm registered with the Public Company Accounting Oversight Board?

   If yes, Public Company Accounting Oversight Board-Assigned Number:
   925

(f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?

Yes No

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

   ⦿ Yes   ○ No   ○ Report Not Yet Received

   *If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

<u>Prime Broker</u>

Yes No

24. (a) Does the *private fund* use one or more prime brokers?

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

<u>Custodian</u>

Yes No

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

| Additional Custodian Information : 1 Record(s) Filed. |
|---|

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
US BANK

(c) Primary business name of custodian:
US BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

City:             State:           Country:
DALLAS            Texas            United States

(e) Is the custodian a *related person* of your firm?          Yes: ○   No: ●

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-
CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

## Administrator

26. (a) Does the *private fund* use an administrator other than your firm?          Yes: ●   No: ○

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:
HIGHGATE CONSULTING GROUP INC

(c) Location of administrator (city, state and country):

City:             State:           Country:
DALLAS            Texas            United States

(d) Is the administrator a *related person* of your firm?          Yes: ○   No: ●

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?
● Yes (provided to all investors)   ○ Some (provided to some but not all investors)   ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?          Yes: ○   No: ○

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or other similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund*

Case 19-34054-sgj11   Doc 4255-89   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
Case 3:25-cv-01876-K   Document 35-11   Filed 05/13/25   Page 165 of 260   PageID 9190
Exhibit 89   Page 157 of 39

No Information Filed

---

## A. PRIVATE FUND

**Information About the *Private Fund***

1.  (a)  Name of the *private fund*:

    RAND PE FUND I, L.P.

    (b)  *Private fund* identification number:
         (include the "805-" prefix also)

    805-7357834832

2.  Under the laws of what state or country is the *private fund* organized:

    State:                                       Country:
    Delaware                                     United States

3.  (a)  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

    | Name of General Partner, Manager, Trustee, or Director |
    | --- |
    | RAND PE FUND MANAGEMENT, LLC |

    (b)  If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

    | No Information Filed |
    | --- |

4.  The *private fund* (check all that apply; you must check at least one):
    - ☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
    - ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

    | No Information Filed |
    | --- |

6.                                                                                                    **Yes   No**
    (a)  Is this a "master fund" in a master-feeder arrangement?                                        ○     ●

    (b)  If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

    | No Information Filed |
    | --- |

                                                                                                      **Yes   No**
    (c)  Is this a "feeder fund" in a master-feeder arrangement?                                        ○     ●

    (d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

    Name of *private fund*:

    *Private fund* identification number:
    (include the "805-" prefix also)

    NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

    | No Information Filed |
    | --- |

    NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their

HCMLPHMIT00003482

assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares, interests, or units and invested them in multiple master funds.

8.  (a)  Is this *private fund* a "fund of funds"?                    Yes ○   No ○

    NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

    (b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*?                    ○   ○

                                                                       Yes   No
9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment    ○   ●
    Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?

10. What type of fund is the *private fund*?

    ○ hedge fund  ○ liquidity fund  ● private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

    NOTE: For definitions of these fund types, please see *Instruction 6 of the Instructions to Part 1A.*

11. Current gross asset value of the *private fund*:

    $ 0

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

    $ 500,000

    NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

    3

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

    0%

15. (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

    0%

                                                                       Yes   No
    (b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment    ●   ○
         Company Act of 1940, are sales of the fund limited to *qualified clients*?

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

    100%

**Your Advisory Services**

                                                                       Yes   No
17. (a)  Are you a subadviser to this *private fund*?                    ○   ●

    (b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

    | No Information Filed |
    |---|

                                                                       Yes   No
18. (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?    ○   ●

    (b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

    | No Information Filed |
    |---|

                                                                       Yes   No
19. Are your *clients* solicited to invest in the *private fund*?        ○   ●

    NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20. Approximately what percentage of your *clients* has invested in the *private fund*:

    0%

002955

HCMLPHMIT00003483

Private Offering

21. Has the private fund ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?    Yes ○  No ○

22. If yes, provide the private fund's Form D file number (if any):

| No Information Filed |
| --- |

### B. SERVICE PROVIDERS

Auditors

                                                                            Yes  No

23. (a) (1) Are the private fund's financial statements subject to an annual audit?    ⦿ ○

      (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?    ⦿ ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the private fund uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

> **Additional Auditor Information : 1 Record(s) Filed.**
>
> If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the private fund uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.
>
> (b) Name of the auditing firm:
>     COHEN & CO
>
> (c) The location of the auditing firm's office responsible for the private fund's audit (city, state and country):
>
> | City: | State: | Country: |
> | --- | --- | --- |
> | AKRON | Ohio | United States |
>
>                                                                         Yes  No
>
> (d) Is the auditing firm an independent public accountant?    ⦿ ○
>
> (e) Is the auditing firm registered with the Public Company Accounting Oversight Board?    ⦿ ○
>
>     If yes, Public Company Accounting Oversight Board-Assigned Number:
>     925
>
> (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?    ⦿ ○

                                                     Yes  No

    (g) Are the private fund's audited financial statements for the most recently completed fiscal year distributed to the private fund's investors?    ⦿ ○

    (h) Do all of the reports prepared by the auditing firm for the private fund since your last annual updating amendment contain unqualified opinions?

    ⦿ Yes  ○ No  ○ Report Not Yet Received

    *If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

Prime Broker

                                                                         Yes  No

24. (a) Does the private fund use one or more prime brokers?    ○ ⦿

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the private fund uses. If the private fund uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
| --- |

Custodian

                                                                         Yes  No

25. (a) Does the private fund use any custodians (including the prime brokers listed above) to hold some or all of its assets?    ⦿ ○

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the private fund uses. If the private fund uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)   Legal name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(c)   Primary business name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(d)   The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

(e)   Is the custodian a *related person* of your firm?                                    Yes ○   No ◉

(f)   If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 69862
CRD Number (if any):
285852

(g)   If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

## Administrator

26.   (a)   Does the *private fund* use an administrator other than your firm?            Yes ◉   No ○

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b)   Name of administrator:

HIGHGATE CONSULTING GROUP INC

(c)   Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

(d)   Is the administrator a *related person* of your firm?                                 Yes ○   No ◉

(e)   Does the administrator prepare and send investor account statements to the *private fund's* investors?
◉ Yes (provided to all investors)   ○ Some (provided to some but not all investors)   ○ No (provided to no investors)

(f)   If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27.   During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

28.  (a)  Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? Exhibit 88 Page 210 of 301

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| No Information Filed |
| --- |

Funds per Page:  15  Total Funds: 2

---

**SECTION 7.B.(2) *Private Fund* Reporting**

1.  Name of the *private fund*:

    RAND ADVISORS SERIES I INSURANCE FUND SERIES INTERESTS OF THE SALI MULTISERIES

2.  *Private fund* identification number:
    (include the "805-" prefix also)
    805-9425927696

3.  Name and SEC File number of adviser that provides information about this *private fund* in Section 7.B.(1) of Schedule D of its Form ADV filing
    Name:
    SALI FUND SERVICES
    SEC File Number:
    801 - 61702

4.  Are your *clients* solicited to invest in this *private fund*?    Yes ○  No ●

    In answering this question, disregard feeder funds' investment in a master fund. For purposes of this question, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

---

**Item 8 Participation or Interest in *Client* Transactions**

In this Item, we request information about your participation and interest in your *clients*' transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that you expect to engage in during the next year.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

**Proprietary Interest in *Client* Transactions**

A.  Do you or any *related person*:    Yes  No

    (1)  buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)?    ○  ●

    (2)  buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*?    ●  ○

    (3)  recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A.(1) or (2))?    ●  ○

**Sales Interest in *Client* Transactions**

B.  Do you or any *related person*:    Yes  No

    (1)  as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)?    ○  ●

    (2)  recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for which you or any *related person* serves as underwriter or general or managing partner?    ●  ○

    (3)  recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)?    ○  ●

**Investment or Brokerage Discretion**

C.  Do you or any *related person* have *discretionary authority* to determine the:    Yes  No

    (1)  securities to be bought or sold for a *client's* account?    ●  ○

(2)  amount of securities to be bought or sold for a *client's* account?

(3)  broker or dealer to be used for a purchase or sale of securities for a *client's* account?

(4)  commission rates to be paid to a broker or dealer for a *client's* securities transactions?

D.  If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*?

E.  Do you or any *related person* recommend brokers or dealers to *clients*?

F.  If you answer "yes" to E. above, are any of the brokers or dealers *related persons*?

G.  (1)  Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party ("soft dollar benefits") in connection with *client* securities transactions?

(2)  If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under section 28(e) of the Securities Exchange Act of 1934?

H.  (1)  Do you or any *related person*, directly or indirectly, compensate any *person* that is not an *employee* for *client* referrals?

(2)  Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* for the firm (cash or non-cash compensation in addition to the *employee's* regular salary)?

I.  Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any *related person*) for *client* referrals?

*In your response to Item 8.I., do not include the regular salary you pay to an employee.*

*In responding to Items 8.H. and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H.) or received from (in answering Item 8.I.) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

---

## Item 9 Custody

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

|  |  |  | Yes | No |
|---|---|---|---|---|
| A. | (1) | Do you have *custody* of any advisory *clients'*: |  |  |
|  |  | (a)  cash or bank accounts? | ● | ○ |
|  |  | (b)  securities? | ● | ○ |

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

(2)  If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody*:

U.S. Dollar Amount                    Total Number of *Clients*
(a) $ 153,649,022                     (b) 3

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clients' accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

|  |  |  | Yes | No |
|---|---|---|---|---|
| B. | (1) | In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients'*: |  |  |
|  |  | (a)  cash or bank accounts? | ○ | ● |
|  |  | (b)  securities? | ○ | ● |

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2)  If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which your *related persons* have *custody*:

U.S. Dollar Amount                    Total Number of *Clients*
(a) $                                 (b)

C.  If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

(1)  A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage.  ☐

(2)  An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial statements  ☑

are distributed to the investors in the pools.

(3) An *independent public accountant* conducts an annual surprise examination of *client* funds and securities. ☐

(4) An *independent public accountant* prepares an internal control report with respect to *custodial* services when you or your *related persons* are qualified custodians for *client* funds and securities. ☐

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in Section 9.C. of Schedule D if you already provided this information with respect to the private funds you advise in Section 7.B.(1) of Schedule D).*

|  |  | Yes | No |
|---|---|:-:|:-:|
| D. | Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*? |  |  |
| | (1)  you act as a qualified custodian | ○ | ⦿ |
| | (2)  your *related person(s)* act as qualified custodian(s) | ○ | ⦿ |

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in Section 7.A. of Schedule D, regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E. If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YYYY) the examination commenced:

F. If you or your *related persons* have *custody* of *client* funds or securities, how many *persons*, including, but not limited to, you and your *related persons*, act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?
2

---

**SECTION 9.C. *Independent Public Accountant***

No Information Filed

---

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

|  |  | Yes | No |
|---|---|:-:|:-:|
| A. | Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? | ○ | ⦿ |

*If yes, complete Section 10.A. of Schedule D.*

B. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

---

**SECTION 10.A. *Control Persons***

No Information Filed

---

**SECTION 10.B. *Control Person* Public Reporting Companies**

No Information Filed

---

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling you* or *controlled by* you.

If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the entire Item 11 and must, you may, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

|  | Yes | No |
|---|---|---|
| Do any of the events below involve you or any of your *supervised persons*? | ○ | ◉ |

**For "yes" answers to the following questions, complete a Criminal Action DRP:**

A. In the past ten years, have you or any *advisory affiliate*:

|  | Yes | No |
|---|---|---|
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ◉ |
| (2) been *charged* with any *felony*? | ○ | ◉ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

B. In the past ten years, have you or any *advisory affiliate*:

|  | Yes | No |
|---|---|---|
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ◉ |
| (2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)? | ○ | ◉ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

**For "yes" answers to the following questions, complete a Regulatory Action DRP:**

C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever:

|  | Yes | No |
|---|---|---|
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ○ | ◉ |
| (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ○ | ◉ |
| (5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ○ | ◉ |

D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*:

|  | Yes | No |
|---|---|---|
| (1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ◉ |
| (2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ◉ |
| (3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? | ○ | ◉ |
| (5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? | ○ | ◉ |

E. Has any *self-regulatory organization* or commodities exchange ever:

|  | Yes | No |
|---|---|---|
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)? | ○ | ◉ |
| (3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities? | ○ | ◉ |

|  | Yes | No |
|---|---|---|
| F. Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended? | ○ | ◉ |
| G. Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.? | ○ | ◉ |

**For "yes" answers to the following questions, complete a Civil Judicial Action DRP:**

|  | Yes | No |
|---|---|---|
| H. (1) Has any domestic or foreign court: | | |

HCMLPHMIT00003489

(a) in the past ten years, *enjoined* from any *advisory affiliate* in connection with any *investment-related* activity?

(b) ever *found* that you or any *advisory affiliate* were ~~involved in a violation of *investment-related* statutes or regulations?~~

(c) ever *dismissed*, after a hearing, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*?

(2) Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)?

---

## Item 12 Small Businesses

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to *control* the other *person*.

| | | Yes | No |
|---|---|---|---|
| A. | Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |

*If "yes," you do not need to answer Items 12.B. and 12.C.*

| | | | Yes | No |
|---|---|---|---|---|
| B. | Do you: | | | |
| | (1) | *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| | (2) | *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| C. | Are you: | | | |
| | (1) | *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| | (2) | *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

---

## Schedule A
### Direct Owners and Executive Officers

1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.
2. Direct Owners and Executive Officers. List below the names of:
   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;
   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);
   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.
   (c) if you are organized as a partnership, <u>all</u> general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;
   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and
   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.
3. Do you have any indirect owners to be reported on Schedule B?  ● Yes  ○ No
4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.
5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6. Ownership codes are:   NA - less than 5%     B - 10% but less than 25%   D - 50% but less than 75%
                           A - 5% but less than 10%   C - 25% but less than 50%   E - 75% or more
7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does

not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

Case 19-34054-sgj11   Doc 4255-89   Filed 06/20/25   Entered 06/20/25 21:39:29   Desc
(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.
Exhibit 89   Page 28 of 30
(c) Complete each column.

Case 3:25-cv-01876-K   Document 35-11   Filed 09/12/25   Page 174 of 260   PageID 9199

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| CHARITABLE DAF HOLDINGS CORP. | DE | OWNER | 08/2022 | E | Y | N | |
| Patrick, Mark | I | CCO | 08/2022 | NA | Y | N | 7626259 |

---

### Schedule B

**Indirect Owners**

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, <u>all</u> general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:    C - 25% but less than 50%      E - 75% or more
                           D - 50% but less than 75%      F - Other (general partner, trustee, or elected manager)

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| LIBERTY CLO HOLDCO, LTD. | FE | CHARITABLE DAF HOLDINGS CORP. | OWNER OF CHARITABLE DAF HOLDINGS CORP. | 04/2023 | E | Y | N | |
| CHARITABLE DAF HOLDCO LTD. | FE | LIBERTY CLO HOLDCO, LTD. | OWNER OF CHARITABLE DAF FUND, L.P. | 11/2011 | E | Y | N | |
| CDH GP, LTD | DE | LIBERTY CLO HOLDCO, LTD. | GNEREAL PARTNER OF CHARITABLE DAF FUND, L.P | 03/2024 | F | Y | N | |
| Patrick, Mark | I | CDH GP, LTD | SOLE OWNER AND SOLE DIRECTOR OF CDH GP, LTD. | 03/2024 | E | Y | N | 7626259 |

---

### Schedule D - Miscellaneous

You may use the space below to explain a response to an Item or to provide any other information.

---

### Schedule R

No Information Filed

---

### DRP Pages

HCMLPHMIT00003491

**CRIMINAL DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

**Part 2**

**Exemption from brochure delivery requirements for SEC-registered advisers**

SEC rules exempt SEC-registered advisers from delivering a firm brochure to some kinds of clients.  If these exemptions excuse you from delivering a brochure to *all* of your advisory clients, you do not have to prepare a brochure.

Are you exempt from delivering a brochure to all of your clients under these rules?                               Yes   No
                                                                                                                      ○     ⦿

*If no, complete the ADV Part 2 filing below.*

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 400181 | ADV PART 2A | Private funds or pools |
| 409351 | ADV PART 2 | Private funds or pools |

---

**Part 3**

| CRS | Type(s) | Affiliate Info | Retire |
|---|---|---|---|

There are no CRS filings to display.

---

**Execution Pages**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:                                      Date: MM/DD/YYYY
SHAWN RAVER                                     03/17/2025
Printed Name:                                   Title:
SHAWN RAVER                                     OPERATIONS


002964
HCMLPHMIT00003492

**NON-RESIDENT INExecuTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

### 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

### 2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

### 3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

### Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:                                          Date: MM/DD/YYYY

Printed Name:                                       Title:

Adviser *CRD* Number:
172839

002965

HCMLPHMIT00003493

**EXHIBIT 90**

This page constitutes the signature page for the Subscription Agreement, the Prospective Investor Questionnaire and the Partnership Agreement, and execution of this signature page constitutes execution of each.

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement, the Prospective Investor Questionnaire and the Partnership Agreement this _21_ day of _December_, 20_15_.

$ _7,000,000_
Capital Contribution

Series _1_

**For Individuals:**

_____
Name of Prospective Investor (print or type)

_____
(Signature)

_____
Name of Joint Prospective Investor (print or type)
(if applicable)

_____
(Joint Signature, if applicable)

**For Entities:**

_Atlas IDF LP_
Name of Prospective Investor (print or type)

By: _____
(Signature)

Name: _Don Honis_

Title: _Managing Member of GP_

_____
(Name and Initials of IRA custodian, if applicable)

$ _7,000,000_
Capital Contribution Accepted
Series _2_

Accepted and Agreed, as of _Dec 21_, 20_15_:

**RAND PE FUND I, L.P.**
By:  Rand PE Fund Management, LLC, as its general partner
(acting severally in the name of and for the account of each individual Series)

By: _____
Name: John Honis
Title: Managing Member

002967

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

Print or type
See Specific Instructions on page 2.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

2 Business name/disregarded entity name, if different from above
Atlas IDF, LP

3 Check appropriate box for federal tax classification; check only **one** of the following seven boxes:
☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☒ Partnership ☐ Trust/estate
☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶
**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.
☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):
Exempt payee code (if any)
Exemption from FATCA reporting code (if any)
*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.)
87 Railroad Place - Suite 403

Requester's name and address (optional)

6 City, state, and ZIP code
Saratoga Springs, NY 12866

7 List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

**Social security number**
☐☐☐ - ☐☐ - ☐☐☐☐

**or**

**Employer identification number**
47 - 5455343

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here** | **Signature of U.S. person ▶** [signature] | **Date ▶** 12/21/15

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments**. Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),
2. Certify that you are not subject to backup withholding, or
3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and
4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

**PART I – SUBSCRIBER INFORMATION PAGE**

Subscriber Name: _____

-or-

Entity Name: _At/as IDF, LP_

Joint Subscriber Name (if necessary): _____

Subscriber Social Security/Tax ID No.:
_42-3455343_

Joint Subscriber Social Security/Tax ID No. (if necessary):
_____

Subscriber Date of Birth/Date of Incorporation or Formation:
_Oct 2015_

Joint Subscriber Date of Birth/Date of Incorporation or Formation (if necessary): _____

State, or if not in the U.S., Country in which the Subscription Agreement was signed: _New York_

Residence (for individuals) or Principal Place of Business (for entities) (May not be a P.O. Box):

Address: _87 Railroad Place_
_Suite 403_

City: _Saratoga_    State: _NY_    Zip: _12866_
Country: _US_

Telephone: _714-335-7969_
Facsimile: _____
Email: _JHonie@RandAdvisors.com_

**Mailing Address (if other than above)**

Address: _____
_____

City: _____  State: _____  Zip: _____
Country: _____

Telephone: _____
Facsimile: _____
Email: _____

**Subscriber Type:**

☐ Individual   ☐ Joint Tenants with Right of Survivorship   ☐ Trust   ☒ Partnership   ☐ Corporation   ☐ LLC

☐ IRA (Self-directed)   ☐ IRA (Custodian)   ☐ Tenants in Common   ☐ Other: _____

If through a custodian, please provide details:

_____

☐ Community Property (Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington or Wisconsin).
**_PLEASE NOTE:  if you are married and live in a community property state, both you and your spouse must sign the Signature Page to the Subscription Agreement._**

**Series of Interests:**
Please indicate which Series of Interests you are subscribing for:

☒ Series 1 Interests
*Prior to selecting a Series of Interests, Subscribers are advised to review the detailed descriptions of the rights and obligations applicable to such Series of Interests, which are set forth in the Memorandum (and/or a supplement to any such document), the Partnership Agreement and/or this Agreement.*

**Form PF Investor Type:**

002969

Under the reporting requirements on Form PF (Reporting Form for Investment Advisers to Private Funds and Certain Commodity Pool Operators and Commodity Trading Advisors), a reporting entity must organize its investors by certain specified investor groups set forth in Form PF.  Accordingly, please check below the investor type that best describes the Subscriber.  (*If the Subscriber is acting as trustee, agent, representative or nominee for a beneficial owner, please check the item that best describes the beneficial owner.*)

*Please check one*:

- ☐ Individual that is a United States person[4] (or a trust of such a person)
- ☐ Individual that is not a United States person (or a trust of such a person)
- ☐ Broker-dealer
- ☐ Insurance company
- ☐ Investment company registered with the SEC
- ☒ Private fund[5]
- ☐ Non-profit
- ☐ Pension plan (other than a governmental pension plan)
- ☐ Banking or thrift institution (proprietary)
- ☐ State or municipal government entity (other than a governmental pension plan)
- ☐ State or municipal government pension plan
- ☐ Sovereign wealth fund or foreign official institution
- ☐ Investor that is not a United States person and about which the foregoing beneficial ownership information is not known and cannot reasonably be obtained because the beneficial interest is held through a chain involving one or more third-party intermediaries
- ☐ Other (*please specify*): _____

**Payment Information:**

Please insert your payment information.  Please note **you must wire the payment from an account in your name**.

Bank Name: *BBVA Compas*          Swift Code*: _____

Bank ABA#: *062001186*          For Further Credit to: _____

City/State/Country: *Dallas, TX*          Account Name: _____

Account Name: *Atlas IDF, LP*          Account #: _____

Account #: *6733738776*

\*          Required for U.S. dollar wire transfer to non-U.S. banks.  Please contact your bank for more information.

**Was the Subscriber referred to the Partnership by a placement agent?**

☐ Yes          ☒ No

If yes, please provide the name of placement agent: _____

**COMMUNICATIONS TO SUBSCRIBER:**

**Please send all communications to (please check one):**

☒          Residence or Principal Place of Business

_____

[4] For purposes of Form PF, the term "United States person" has the meaning provided in Rule 203(m)-1 under the Advisers Act, which includes any natural person that is resident in the United States.
[5] For purposes of Form PF, the term "private fund" means any issuer that would be an investment company as defined in Section 3 of the Investment Company Act, but for Section 3(c)(1) or 3(c)(7) thereof.

002970

☒   Mailing Address

**Duplicate communications should be sent to an authorized representative as follows (complete if desired; otherwise, leave blank):**

Name:            _____

Address:         _____

                 _____

                 _____

Facsimile:       _____

Email:           _____

**Preferred Methods of Communication**: Choose *one* for the Subscriber and *one* for the authorized representative whose address appears immediately above, if any; *Note*: each of the Partnership, the Administrator, the Investment Manager, and the General Partner is permitted to send notices and other information relating to the Subscriber's investment in the Partnership in any manner it chooses but will send notices and other information by the method selected below if possible and may charge a related fee to the Subscriber in connection therewith.

|                            | Mail | Facsimile | Email/Web-based Delivery |
|----------------------------|------|-----------|--------------------------|
| Subscriber                 | ☐    | ☐         | ☒                        |
| Authorized Representative  | ☐    | ☐         | ☐                        |

**Electronic Delivery of Reports and Other Communications:**

If you elected "Email/Web-based Delivery" above, at their discretion, the Partnership, the Administrator, the Investment Manager and/or the General Partner may provide to you (or your authorized representative) statements, reports and other communications relating to the Partnership and/or your investment in the Partnership in electronic form, such as email.

Do you consent to the sending of such statements, reports and other communications regarding the Partnership and your investment in the Partnership (including Net Asset Value information, subscription and withdrawal activity, and annual and other updates of the Partnership's consumer privacy policies and procedures) exclusively in electronic form without separate mailing of paper copies?

                ☒ Yes            ☐ No

By consenting you also acknowledge that emails from the Partnership, the Administrator, the Investment Manager and/or the General Partner may be accessed by recipients other than you and may be interfered with, may contain computer viruses or other defects and may not be successfully replicated on other systems. The Partnership, the Administrator, the Investment Manager and the General Partner each give no warranties in relation to these matters. If you have any doubts about the authenticity of an email purportedly sent by the Partnership, the Administrator, the Investment Manager and/or the General Partner, please contact the purported sender immediately.

**Schedule K-1s:**

The annual Schedule K-1 statement will be sent to the Subscriber in physical form unless the Subscriber consents below to receive it electronically. Does the Subscriber grant permission for the annual Schedule K-1 to be sent electronically?

☒ Yes            ☐ No

Please note that this choice will apply until the Subscriber informs the Administrator that it is electing to alter such permission, which the Subscriber is able to do at any time by contacting the Administrator and in such contact specifying the effective date of the new election. The Administrator will confirm the receipt of the Subscriber's

002971

change in election and will specify the date on which such change will take effect. If the Subscriber has chosen to receive the Schedule K-1 electronically, a paper copy can be obtained by contacting the Administrator, and such a request will NOT alter the election noted above. The Schedule K-1s will only be sent for those periods for which the Subscriber was an investor in the Partnership. Subscribers should note that the electronic versions of the Schedule K-1 will be sent as Microsoft Word documents or .pdf files and that the Schedule K-1 may be required to be printed by the Subscriber for the purpose of attaching it to the Subscriber's federal, state and/or local income tax returns, if required by applicable law.

**Compliance with the PATRIOT Act:**

To comply with applicable anti-money laundering/OFAC rules and regulations, you and/or the institution remitting payment are required to provide the following payment information:

1.    Name of the bank from which your payment to the Partnership is being wired (the "**Wiring Bank**")?

_BBVA CoмPᴀss_

2.    Is the Wiring Bank located in the United States or another "**FATF Member**"[6]?

☒ Yes        ☐ No

If **yes**, please answer question 3 below.

If **no**, please provide the information described in Footnote 7 below and contact the Administrator.[7]

3.    Are you a customer of the Wiring Bank?

_Yes_

[6] As of November 1, 2015, members of the Financial Action Task Force on Money Laundering (each, an "**FATF Member**") include: Argentina; Australia; Austria; Belgium; Brazil; Canada; China; Denmark; the European Commission; Finland; France; Germany; Greece; the Gulf Co-operation Council; Hong Kong, China; Iceland; India; Ireland; Italy; Japan; the Kingdom of the Netherlands (including the Netherlands, Aruba, Curaçao and Saint Maarten); Luxembourg; Mexico; New Zealand; Norway; Portugal; the Republic of Korea; the Russian Federation; Singapore; South Africa; Spain; Sweden; Switzerland; Turkey; the United Kingdom; and the United States. This list may be expanded, from time to time, to include future FATF Members and FATF-compliant countries, as appropriate.

[7] Subscribers who responded "no" to question 2 or 3 of "Compliance with the PATRIOT Act" above must provide the following additional information and materials to the Administrator, and contact the Administrator to obtain further anti-money laundering schedules:

For Individual Investors: (i) a government-issued form of picture identification (e.g., passport or driver's license); and (ii) proof of the individual's current address (e.g., current utility bill), if not included in the form of picture identification.

For Funds-of-Funds or Entities that Invest on Behalf of Third Parties Not Located in the United States or Other FATF Members: (i) a certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (e.g., certificate of good standing); (ii) an incumbency certificate attesting to the title of the individual executing the Subscription Agreement on behalf of the prospective Subscriber; (iii) a completed form certifying that the entity has adequate anti-money laundering policies and procedures in place that are consistent with the PATRIOT Act, OFAC and other relevant federal, state or foreign anti-money laundering laws and regulations; and (iv) a letter of reference from a local office of a reputable bank or brokerage firm which is incorporated, or has its principal place of business located, in the United States or other FATF Member certifying that the prospective Subscriber (i.e., the fund-of-funds or the entity investing on behalf of third parties) has maintained an account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective Subscriber's integrity.

For All Other Entity Subscribers: (i) a certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (e.g., certificate of good standing); (ii) an incumbency certificate attesting to the title of the individual executing the Subscription Agreement on behalf of the prospective Subscriber; (iii) a letter of reference from a local office of a reputable bank or brokerage firm which is incorporated, or has its principal place of business located, in the United States or other FATF Member certifying that the prospective Subscriber has maintained an account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective Subscriber's integrity; (iv) if the prospective Subscriber is a privately-held entity, a completed form listing the name of each person who directly, or indirectly through intermediaries, is the beneficial owner of 25% or more of any voting or non-voting class of equity interests of the prospective Subscriber; and (v) if the prospective Subscriber is a trust, a list of current beneficiaries of the trust that have, directly or indirectly, 25% or more of any interest in the trust, the settlors or grantors of the trust, and the trustees.

☒ Yes        ☐ No

If **yes**, the information described in Footnote 7 below is not required.

If **no**, please provide the information described in Footnote 7 below and contact the Administrator.

**PART III – TO BE COMPLETED BY IRAs (OTHER THAN SELF-DIRECTED IRAs), KEOGHS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, TRUSTS AND OTHER ENTITIES**

**A.**   *General Information*

6.   Is the Subscriber subscribing for an Interest as agent, nominee, trustee or otherwise on behalf of, for the account of or jointly with any other person or entity?

☐ Yes   ☒ No

7.   Will any other person or persons have a beneficial interest in the Interest acquired (other than as a shareholder, partner, member, trust beneficiary or other beneficial owner of equity interests in the Subscriber)?

☐ Yes   ☒ No

8.   Does the Subscriber control, or is the Subscriber controlled by or under common control with, any other existing or prospective investor in the Partnership?

☐ Yes   ☒ No

*PLEASE NOTE: If any of the above questions were answered "Yes", please provide identifying information or contact the Administrator.*

9.   Legal form of the Subscriber: _____ *LP* _____

10.  U.S. state or foreign jurisdiction in which the Subscriber was incorporated or formed: _____ *Delaware* _____

11.  Date of incorporation or formation of the Subscriber: *Oct 2015*

12.  Is the Subscriber in any way affiliated with the General Partner or the Partnership?

☒ Yes   ☐ No

If yes, please describe the relationship below.

*Fund managed by the same General Partner as the Partnership*

13.  Is the Subscriber in any way affiliated with a senior foreign government, political or military official, or an immediate family member or close associate of such person (a *"politically exposed person"*)?

☐ Yes   ☒ No

If yes,   (a)  which government? _____

(b)  what position in the government? _____

(c)  if an immediate family member or close associate of a politically exposed person, what relationship to the politically exposed person? _____

14.  Authorized individual who is executing the Subscription Agreement on behalf of the investing entity is:

Name: _____ *John Howin* _____   *Partner-*

Current position or title: _____ *Managing member of the General Partnership* _____

Telephone number: _____ *214-335-7969* _____

002974

Facsimile number: _____
Email: _JHONID@RANDADVISORS.COM_

**B.      Subscriber Qualification**

1.       **Accredited Investor.** Interests will be sold only to investors who are "*accredited investors*" (as defined in Rule 501 of Regulation D promulgated under the Securities Act). Please indicate the basis of "*accredited investor*" status of the Subscriber by checking the applicable statement or statements.

     ☒ The Subscriber has total assets in excess of $5,000,000, was not formed for the purpose of investing in the Partnership and is one of the following:
- a corporation
- a partnership
- a limited liability company
- a business trust
- a tax-exempt organization described in Section 501(c)(3) of the Code.

     ☐ The Subscriber is a personal (non-business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 which was not formed for the purpose of investing in the Partnership and whose decision to invest in the Partnership has been directed by a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of the investment.

     ☐ The Subscriber is licensed, or subject to supervision, by U.S. federal or state examining authorities as a "*bank*", "*savings and loan association*", "*insurance company*", or "*small business investment company*" (as such terms are used and defined in 17 CFR §230.501(a)) or is an account for which a bank or savings and loan association is subscribing in a fiduciary capacity.

     ☐ The Subscriber is registered with the SEC as a broker or dealer or an investment company, or has elected to be treated or qualifies as a "*business development company*" (within the meaning of Section 2(a)(48) of the Investment Company Act or Section 202(a)(22) of the Advisers Act).

     ☐ The Subscriber is an employee benefit plan within the meaning of ERISA (including an IRA), which satisfies at least one of the following conditions:

        ___ it has total assets in excess of $5,000,000; or

        ___ the investment decision is being made by a plan fiduciary which is a bank, savings and loan association, insurance company or registered investment adviser; or

        ___ it is a self-directed plan (i.e., a tax-qualified defined contribution plan in which a participant may exercise control over the investment of assets credited to the participant's account) and the decision to invest is made by those participants investing, and each such participant qualifies as an accredited investor.

     ☐ The Subscriber is an employee benefit plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, which has total assets in excess of $5,000,000.

     ☐ The Subscriber is an entity in which all of the equity owners are at least one of the following:  (a) natural persons who are "accredited investors", (b) grantor trusts where the individual grantors are "accredited investors" or (c) non-natural persons described above.

If the Subscriber does <u>not</u> qualify in any accredited investor category above (and is not a natural person or grantor trust), please indicate this in the space provided below.

     ☐ The Subscriber does not qualify in any of the above accredited investor categories.

002975

2.    **Qualified Client.** Interests will be sold only to investors who are "*qualified clients*" (as defined in Rule 205-3 promulgated under the Advisers Act).  Please indicate the basis of "*qualified client*" status of the Subscriber by checking the applicable statement or statements.

    (a)    Is the Subscriber an entity with net assets at the time of entering into the Subscription Agreement exceeding $2,000,000?

            ☐ Yes        ☐ No

    (b)    Is the Subscriber an entity that has at least $1,000,000 under the management of the Investment Manager immediately after entering into the Subscription Agreement?

            ☐ Yes        ☐ No

    (c)    Is the Subscriber a "*qualified purchaser*" as defined in Section 2(a)(51)(A) of the Investment Company Act at the time of entering into the Subscription Agreement?

            ☒ Yes        ☐ No

If the Subscriber does <u>not</u> qualify in any qualified client category above (and is not a natural person or grantor trust), please indicate this in the space provided below.

    ☐    The Subscriber does not qualify in any of the above qualified client categories.

3.    **Qualified Purchaser.** The Partnership intends to claim exemption from registration under the Investment Company Act in reliance on Section 3(c)(7) thereof, and accordingly Interests will be sold only to investors who are "*qualified purchasers*" (as defined in Section 2(a)(51) of the Investment Company Act).  Please indicate the basis of "*qualified purchaser*" status of the Subscriber by checking the applicable statement or statements. In connection therewith, **the Subscriber must read Annexes B and C to these Subscription Documents** for the definition of "*investments*" and for information regarding the valuation of "*investments,*" respectively.

    ☐ (a)    A company, partnership or trust that owns not less than $5,000,000 in "*investments*" and that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations or trusts established by or for the benefit of such persons.

    ☐ (b)    A trust that is not covered by (a) above as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in clause (a), (c), (d) or (e) hereof (or under Part II, Section (B)(3) above).

    ☐ (c)    An entity, acting for its own account or the accounts of other qualified purchasers, which, in the aggregate, owns and invests on a discretionary basis not less than $25,000,000 in "*investments.*"

    ☐ (d)    A qualified institutional buyer as defined in paragraph (a) of Rule 144A under the Securities Act, acting for its own account, the account of another qualified institutional buyer, or the account of a qualified purchaser; *provided* that:  (i) a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25,000,000 in securities of issuers that are not affiliated persons of the dealer and (ii) a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

002976

[X] (e)  An entity, each beneficial owner of which is a qualified purchaser.  **_PLEASE NOTE_**:  _This certification does not apply to beneficiaries of an irrevocable trust._

If the Subscriber does <u>not</u> qualify in a qualified purchaser category above (and is not a natural person or grantor trust), please indicate this in the space provided below.

☐      The Subscriber does not qualify in any of the above qualified purchaser categories.

4.      **Supplemental Data**

(a)     Was the Subscriber organized or reorganized for the specific purpose of acquiring Interests in the Partnership?

☐  Yes      [X]  No

_PLEASE NOTE: If the answer to question 4(a) is "Yes", each person who is an equity owner of the Subscriber must complete a copy of the Prospective Investor Questionnaire as if such person were directly purchasing an Interest._

(b)     With respect to its acquisition of the Interests, is the Subscriber a participant-directed defined contribution plan (such as a 401(k) plan), or a partnership or other investment vehicle (1) in which its partners or participants have or will have any discretion as to their level of investment in the Subscriber or in investments made by the Subscriber (including the Subscriber's investment in an Interest), or (2) that is otherwise an entity managed to facilitate the individual decisions of its beneficial owners to invest in the Partnership?

☐  Yes      [X]  No

(c)     Will the Subscriber, at any time, invest more than 40% of the Subscriber's assets in the Partnership?

[X]  Yes      ☐  No

5.      **ERISA and Tax-Exempt Information**

(a)     Is the Subscriber a pension, profit-sharing, annuity or employee benefit plan (a "**Plan**") described in ERISA, whether or not subject to ERISA, or a "_plan_" (as defined in Section 4975(e)(i) of the Code), or is the Subscriber an entity whose underlying assets include Plan assets by reason of a Plan's investment in the Subscriber?

☐  Yes      [X]  No

If the answer to question 5(a) is "No", please skip to question 4(b) below.

If the answer to question 5(a) is "Yes", is the Subscriber subject to ERISA?

☐  Yes      ☐  No

If the answer to question 5(a) is "Yes", is the Subscriber a "_governmental plan_" (as defined in Section 3(32) of ERISA) or a "_church plan_" (as defined in Section 3(33) of ERISA)?

☐  Yes      ☐  No

(b)     Is the Subscriber a partnership, a limited liability company, an S Corporation, trust or other pass-through entity?

[X]  Yes      ☐  No

If the answer to question 5(b) is "*Yes*", please supply the approximate percentage of ERISA plan assets to be invested in the Partnership by the Subscriber as compared to the total assets of such Subscriber?

_____ 0 _ %                    *John Homer*
Please identify a contact for confirmation

If the answer to question 5(b) is "*Yes*", please provide the approximate percentage of ERISA plan assets to be invested in the Partnership as compared with the total assets of the ERISA plan sponsor _____ 0 _ %

If the answer to question 5(b) is "*Yes*", please provide the percentage of assets of such entity that constitute "plan assets" as defined in DOL Reg. Sec. 2510.3-101.

_____ 0 _ %

(c)     If the Subscriber is subscribing as a trustee or custodian for an IRA, is the Subscriber a qualified IRA custodian or trustee?

☐ Yes          ☒ No          ☐ N/A

(d)     If applicable, if the Subscriber is an IRA, the IRA beneficiary must complete the Subscription Agreement.  The IRA custodian must approve the Subscription Agreement and retain legal title of the Interest for the benefit of the IRA beneficiary.  By initialing on the line below, the Subscriber represents that the IRA custodian has approved the Subscription Agreement and will retain legal title of the Interest for the benefit of the IRA beneficiary.

_____                    _____
Initial                                   Name of IRA Custodian (Note: cannot be an individual)

**6.     Bank Holding Company Act Information**

Does the Subscriber wish to be treated as if it were subject to the Bank Holding Company Act of 1956, as amended from time to time ("**BHCA**")?

☐ Yes          ☒ No

By checking "*Yes*", the Subscriber acknowledges and agrees that the Partnership shall not be deemed to be providing any legal advice to Limited Partners that are subject to the BHCA and that all such Limited Partners should consult their own counsel regarding an investment in the Partnership.

**7.     Tax Information**

(a)     Is the Subscriber a "*United States person*" as defined in Section 7701(a)(30) of the Code and the regulations promulgated thereunder?[10]

☒ Yes          ☐ No

If the answer to question 7(a) is "*Yes*", has the Subscriber included a fully executed Form W-9 with this Prospective Investor Questionnaire?

---

[10] As per Section 7701(a)(30) of the Code and the regulations promulgated thereunder, "United States person" means (i) a citizen or resident of the United States, (ii) a U.S. partnership, (iii) a U.S. corporation, (iv) any estate (other than a non-United States estate, within the meaning of Section 7701(a)(31) of the Code), (v) any trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or (vi) any trust which has elected to be taxed as a trust described in (v).

002978

☒ Yes          ☐ No

If the answer to question 7(a) is "No", has the Subscriber included a fully executed Form W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP, as applicable, with this Prospective Investor Questionnaire?

☐ Yes          ☐ No

(b)    Please provide the Subscriber's U.S. state or foreign country of residence for tax purposes:

_____*Delaware*_____

(c)    The Subscriber reports income for federal income tax purposes on the following basis:

☒ calendar year taxable year;
☐ other taxable year (please specify):_____; or
☐ N/A

(d)    Is the Subscriber exempt from U.S. federal income tax (e.g., a qualified employee benefit plan or trust, retirement account, charitable remainder trust, or a charitable foundation or other tax-exempt organization described in Section 501(c)(3) of the Code)?

☐ Yes          ☐ No          ☐N/A

(e)    Is the Subscriber treated as a "disregarded entity" for U.S. federal income tax purposes?

☐ Yes          ☐ No

If the answer to question 7(e) is "No", pleas skip to question 7(f) below.

If the answer to question 7(e) is "*Yes*", is the owner of the Subscriber a "*United States person*"?

☐ Yes          ☐ No

If the answer to the previous question is "*Yes*", please provide a fully executed Form W-9.

If the answer to the previous question is "No", please provide a fully executed Form W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP, as applicable.

(f)    Is the Subscriber a "*simple trust*" or a "*grantor trust*" for U.S. federal income tax purposes?

☐ Yes          ☐ No

If the answer to question 7(f) is "Yes", please provide a fully executed Form W-9 or Form W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP, as applicable, with respect to the persons who are subject to U.S. federal income tax on the trust's income.

(g)    Is the Subscriber a "*grantor trust*", "*S Corporation*" or an entity treated as a partnership for U.S. federal income tax purposes?

☐ Yes          ☐ No

[*remainder of page intentionally left blank*]

002979

**PART IV—NEW ISSUES CERTIFICATION TO BE COMPLETED BY ALL SUBSCRIBERS**

The Subscriber must complete this Certification in order for the Partnership to be able to determine the extent to which the Subscriber may participate in "new issue" securities in accordance with Rule 5130 (the "**New Issues Rule**") of the Securities Offering and Trading Standards and Practices of FINRA. If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity or a nominee for another person, the person completing this Certification with respect to the Subscriber *must* be a person authorized to represent the beneficial owner(s) of the Subscriber, or a bank, foreign bank, broker-dealer, investment adviser or other conduit acting on behalf of the beneficial owner(s) of the Subscriber.

INSTRUCTIONS: Each Subscriber must complete this Certification by checking the box next to all applicable categories under Section A below to determine whether the Subscriber is a restricted person under the New Issues Rule (a "**Restricted Person**") or indicating that none of the Restricted Person categories apply to it and the Subscriber is eligible to participate in new issues. A Subscriber that is an entity and that is also a Restricted Person under Section A may still be able to participate fully in new issue investments if it indicates in Section B that it is also an exempted entity (an "**Exempted Entity**"). Accordingly, each such Subscriber should check the box next to any applicable categories under Section B to determine whether or not the Subscriber is an Exempted Entity.

If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity (including a hedge fund, fund-of-funds, investment partnership or any other collective investment vehicle, or a broker-dealer organized as an investment fund) (any of the foregoing, an "**Entity Investor**"), such Entity Investor must complete the certification of beneficial ownership in Section C. Based on such information and the size of the investment by such Entity Investor in the Partnership, such Entity Investor may be deemed to be a Restricted Person with respect to the entirety of its investment in the Partnership or any portion thereof (such determination of Restricted Person status by the Partnership shall be final and conclusive).

 *The Subscriber does not wish to participate in new issues and will be deemed a Restricted Person.* If this box is checked, no further responses to Section A, B or C are necessary.

**A.    Determination of Restricted Person Status.** Please check all appropriate boxes.

The Subscriber is:

☐    (i) a broker-dealer;

☐    (ii) an officer, director, general partner, associated person[11] or employee of a broker-dealer (other than a limited business broker-dealer)[12];

☐    (iii) an agent of a broker-dealer (other than a limited business broker-dealer) that is engaged in the investment banking or securities business;

☐    (iv) an immediate family member[13] of a person described in (ii) or (iii) above. Under certain circumstances, a Subscriber who checks this box may be able to participate in new issue investments. The Partnership may request additional information in order to determine the eligibility of a Subscriber under this Restricted Person category;

---

[11] A person "associated with" a broker-dealer includes any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a broker-dealer, or any partner, director, officer or sole proprietor of a broker-dealer.

[12] A "limited business broker-dealer" is any broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities and direct participation program securities.

[13] The term "immediate family" includes the Subscriber's: (i) parents, (ii) mother-in-law or father-in-law, (iii) husband or wife, (iv) brother or sister, (v) brother-in-law or sister-in-law, (vi) son-in-law or daughter-in-law, (vii) children, and (viii) any other person who is supported, directly or indirectly, to a material extent by an officer, director, general partner, employee, agent of a broker-dealer or person associated with a broker-dealer.

☐        (v) a finder or any person acting in a fiduciary capacity to a managing underwriter, including, but not limited to, attorneys, accountants and financial consultants.  Notwithstanding the foregoing, a Subscriber who is a finder or fiduciary but who is not acting in such capacity with respect to the security being offered, may be able to participate in new issue investments, and, accordingly, the Partnership may request additional information from a Subscriber who checks this box in order to determine the Subscriber's eligibility under this Restricted Person category;

☐        (vi) a person who has authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment advisor or collective investment account[14] (including a private investment vehicle such as a hedge fund);

☐        (vii) an immediate family member of a person described in (v) or (vi) above who materially supports[15], or receives material support from, the Subscriber;

☐        (viii) a person listed or required to be listed in Schedule A, B or C of a Form BD (other than with respect to a limited business broker-dealer), except persons whose listing on Schedule A, B or C is related to a person identified by an ownership code of less than 10% on Schedule A;

☐        (ix) a person that (A) directly or indirectly owns 10% or more of a public reporting company listed, or required to be listed, in Schedule A of a Form BD, or (B) directly or indirectly owns 25% or more of a public reporting company listed, or required to be listed in Schedule B of a Form BD, in each case (A) or (B), other than a reporting company that is listed on a national securities exchange, or other than with respect to a limited business broker-dealer;

☐        (x) an immediate family member of a person described in (viii) or (ix) above.  Under certain circumstances, a Subscriber who checks this box may be able to participate in new issue investments.  The Partnership may request additional information in order to determine the eligibility of a Subscriber under this Restricted Person category; or

☐        (xi) any entity (including a corporation, partnership, limited liability company, trust or other entity) in which any person or persons listed in (i)-(x) above has a beneficial interest[16].

☐    None of the above categories apply and the Subscriber is eligible to participate in new issue securities.

---

[14] A "collective investment account" is any hedge fund, investment corporation, or any other collective investment vehicle that is engaged primarily in the purchase and/or sale of securities.  Investment clubs (groups of individuals who pool their money to invest in stock or other securities and who are collectively responsible for making investment decisions) and family investment vehicles (legal entities that are beneficially owned solely by immediate family members (as defined above)) are not considered collective investment accounts.

[15] The term "material support" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to materially support each other.

[16] The term "beneficial interest" means any economic interest such as the right to share in gains or losses.  The initial receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is not considered a beneficial interest in the account; however, if such payments are accumulated and subsequently invested into the account (as a deferred fee arrangement or otherwise), they would constitute a beneficial interest in that account.

**B.**    **Determination of Exempted Entity Status.**  A Subscriber that is an entity and that is also a Restricted Person under Section A may still be able to participate fully in new issue investments, whether directly or through an account in which such Subscriber has a beneficial interest, if it indicates below that it is also an Exempted Entity.  Please check all appropriate boxes.

The Subscriber is:

☐    (i) a publicly-traded entity (other than a broker-dealer or an affiliate of a broker-dealer, where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member or underwriter) that is listed on a national securities exchange, or is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

☐    (ii) an investment company registered under the Investment Company Act;

☐    (iii) an investment company organized under the laws of a foreign jurisdiction and:

(a)    the investment company is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; and

(b)    no person owning more than 5% of the shares of the investment company is a Restricted Person;

☐    (iv) (A) an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code and that is not sponsored solely by a broker-dealer, (B) a state or municipal government benefits plan that is subject to state and/or municipal regulation or (C) a church plan under Section 414(e) of the Code;

☐    (v) a tax-exempt charitable organization under Section 501(c)(3) of the Code;

☐    (vi) a common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Exchange Act, and the fund

(a)    has investments from 1,000 or more accounts, and

(b)    does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons;

☐    (vii) an insurance company general, separate or investment account, and

(a)    the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders, and

(b)    the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons; or

☐    (viii) an entity (including a private investment vehicle, such as a hedge fund or fund of hedge funds) (a) in which the beneficial interests of Restricted Persons do not exceed in the aggregate 10% of such entity, or (b) that limits participation in New Issue profits by Restricted Persons to not more than 10% of the profits from New Issues.

002982

**C.**   **Determination of Beneficial Ownership.**

If the box for (viii) in Section B above is checked, please specify the current percentage of the net profits from New Issues allocable to beneficial owners of such entity who are Restricted Persons:

_____%

*[remainder of page intentionally left blank]*

002983

**PART V—SPINNING PROHIBITION CERTIFICATION TO BE COMPLETED BY ALL SUBSCRIBERS**

The Subscriber must complete this Certification in order for the Partnership to be able to determine the extent to which the Subscriber may participate in "new issue" securities in accordance with FINRA Rule 5131(b) (the "**Spinning Prohibition Rule**"), which prohibits a FINRA member who provides investment banking services from allocating new issues to accounts in which officers and directors of certain current, former or prospective investment banking clients have an interest. To enable the Partnership to purchase new issues, the Partnership must determine whether the Subscriber is an executive officer or director or person materially supported by an executive officer or director of a public company or a "covered non-public company" under the Spinning Prohibition Rule. Please note that the Spinning Prohibition Rule (FINRA Rule 5131(b)) is in addition to, not a replacement of, the New Issues Rule (FINRA Rule 5130) covered in Part IV of this Questionnaire.

If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity or a nominee for another person, the person completing this Certification with respect to the Subscriber *must* be a person authorized to represent the beneficial owner(s) of the Subscriber, or a bank, foreign bank, broker-dealer, investment adviser or other conduit acting on behalf of the beneficial owner(s) of the Subscriber.

INSTRUCTIONS: Each Subscriber must complete this Certification by checking the box next to all applicable categories under Section A below to determine whether the Subscriber is a restricted investor under the Spinning Prohibition Rule (a "**Restricted Investor**"), or indicating that none of the Restricted Investor categories apply to it and that the Subscriber is eligible to participate in new issues. A Subscriber that is an entity which is deemed a Restricted Investor under Section A may still be able to participate in new issues if it indicates in Section B below that it is an unrestricted investor under the Spinning Prohibition Rule (an "**Unrestricted Investor**").

 *The Subscriber does not wish to participate in new issues and will be deemed a Restricted Investor.* If this box is checked, no further responses to Section A or B are necessary.

**A.    Determination of Restricted Investor Status.**  Please check all appropriate boxes.

The Subscriber is:

☐    (i) an executive officer or director of a public company[17] or a covered non-public company[18].

If this box is checked, please provide the name and ticker symbol (where applicable) of each such company (include additional sheets if necessary):

_____

_____

_____

☐    (ii) a person who receives material support[19] from an executive officer or director of a public company or a covered non-public company.

If this box is checked, please provide the name and ticker symbol (where applicable) of each such company (include additional sheets if necessary):

_____

---

[17] A "public company" is any company that is registered under Section 12 of the Exchange Act, or files periodic reports pursuant to Section 15(d) of the Exchange Act.

[18] A "covered non-public company" is any non-public company satisfying the following criteria: (i) income of at least $1 million in the last fiscal year or in two of the last three fiscal years and shareholders' equity of at least $15 million; (ii) shareholders' equity of at least $30 million and a two-year operating history; or (iii) total assets and total revenue of at least $75 million in the latest fiscal year or in two of the last three fiscal years.

[19] The term "material support" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Persons living in the same household are deemed to be providing each other with material support.

002984

_____

_____

☐  (iii) an entity (including a corporation, partnership, limited liability company, trust or other entity) in which a person or persons listed in (i) and (ii) above has a beneficial interest[20] (each such person, a "**Restricted Participant**").

If this box is checked, please indicate the company or companies (and ticker symbol(s) where applicable) on whose behalf such executive officers or directors serve and the percentage share of profits or losses attributable to new issues to be received by all Restricted Participants related to each company (include additional sheets if necessary):

Name and ticker symbol of each such company:                    Share of profits:

_____                           _____

_____                           _____

_____                           _____

☐  (iv) None of the above categories apply and the Subscriber is not a Restricted Investor and is eligible to participate in new issues. The Subscriber does not need to complete Section B below.

B.    **Determination of Unrestricted Investor Status.**  A Subscriber that is an entity which is deemed a Restricted Investor under Section A may still be able to participate in new issues if it indicates below that it is also an Unrestricted Investor.  Please check all appropriate boxes.

The Subscriber is:

☐  (i) an entity (including a corporation, partnership, limited liability company, trust or other entity) in which a Restricted Participant(s) has/have a beneficial interest, but the Subscriber hereby represents and warrants that such Restricted Participant(s) affiliated with the same public company or covered non-public company in aggregate (as to each such public company or covered non-public company) is/are allocated no more than 25% of any profits or losses attributable to new issues received by the Subscriber.

If this box is checked, please indicate the company or companies (and ticker symbol(s) where applicable) on whose behalf such executive officers or directors serve and the percentage share of profits or losses attributable to new issues to be received by all Restricted Participants related to each company (include additional sheets if necessary):

Name and ticker symbol of each such company:                    Share of profits:

_____                           _____

_____                           _____

_____                           _____

☐  (ii) a publicly-traded entity (other than a broker-dealer or an affiliate of a broker-dealer, where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member or underwriter) that is listed on a national securities exchange, or is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

_____

[20] The term "beneficial interest" means any economic interest such as the right to share in gains or losses.  The initial receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is <u>not</u> considered a beneficial interest in the account; however, if such payments are accumulated and subsequently invested into the account (as a deferred fee arrangement or otherwise), they would constitute a beneficial interest in that account.

002985

☐    (iii) an investment company registered under the Investment Company Act;

☐    (iv) an investment company organized under the laws of a foreign jurisdiction and:

      (a)    the investment company is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; <u>and</u>

      (b)    no person owning more than 5% of the shares of the investment company is a Restricted Person;

☐    (v) (A) an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code and that is not sponsored solely by a broker-dealer, (B) a state or municipal government benefits plan that is subject to state and/or municipal regulation or (C) a church plan under Section 414(e) of the Code;

☐    (vi) a tax-exempt charitable organization under Section 501(c)(3) of the Code;

☐    (vii) a common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Exchange Act, and the fund

      (a)    has investments from 1,000 or more accounts, <u>and</u>

      (b)    does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons; or

☐    (viii) an insurance company general, separate or investment account, and

      (a)    the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders, <u>and</u>

      (b)    the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons.

*[remainder of page intentionally left blank]*

002986

**EXHIBIT 91**

ADDITIONAL CONTRIBUTION FORM

Rand PE Fund I, L.P.
c/o Administrator
[address to be provided upon request]

Dear Sir or Madam:

The undersigned hereby wishes to make an additional capital contribution ("**Additional Capital Contribution**") to Rand PE Fund I, L.P., a Delaware limited partnership (the "**Partnership**").  Subject to the discretion of the Partnership's general partner, Rand PE Fund Management, LLC, a Delaware limited liability company (the "**General Partner**"), to accept a lower amount, the minimum Additional Capital Contribution is $500,000.  The amount of the undersigned's Additional Capital Contribution to Series ___1___ is: $ _9,253,000_.

The undersigned acknowledges and agrees that:  (i) the undersigned is making the Additional Capital Contribution on the terms and conditions contained in the Subscription Agreement, dated _12/21/15_, previously executed by the undersigned and accepted by the General Partner (the "**Subscription Agreement**"); (ii) the representations of the undersigned contained in the Subscription Agreement are true and correct in all material respects as of the date set forth below; (iii) the undersigned has complied in all material respects through the date set forth below with all covenants contained in the Subscription Agreement; and (iv) the information provided by the undersigned in the Prospective Investor Questionnaire submitted with the Subscription Agreement is true and correct as of the date set forth below.  **THE UNDERSIGNED AGREES TO NOTIFY THE PARTNERSHIP PROMPTLY SHOULD THERE BE ANY CHANGE IN ANY OF THE FOREGOING INFORMATION.**

Dated: _Dec 23, 2015_

**For Individuals:**                                    **For Entities:**

_____                    _Atlas IDF, LP_____
Name of Investor (print or type)                  Name of Investor (print or type)

_____                    By: _____
(Signature)                                           (Signature)

_____                    Name: _John Honis_____
Name of Joint Investor (print or type) (if          Title: _Managing Member_
applicable)                                           _of the General Partner_

_____                    (Name and Initials of IRA custodian, if applicable)
(Joint Signature, if applicable)

**FOR INTERNAL USE ONLY:**

$ _9,253,000.00_
Additional Capital Contribution Accepted

Accepted and Agreed, as of _Dec 23_, 20_15_:

**RAND PE FUND I, L.P.**
By:  Rand PE Fund Management, LLC, as its general partner
(acting severally in the name of and for the account of each individual Series)

By: _____
Name: John Honis
Title: Managing Member

002988

**EXHIBIT 92**

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM D**

**Notice of Exempt Offering of Securities**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

## 1. Issuer's Identity

**CIK (Filer ID Number)**

0001660386

**Name of Issuer**
Atlas IDF, LP

**Jurisdiction of Incorporation/Organization**
DELAWARE

**Year of Incorporation/Organization**
[X] Over Five Years Ago
[ ] Within Last Five Years (Specify Year)
[ ] Yet to Be Formed

**Previous Names**  [X] None

**Entity Type**
[ ] Corporation
[X] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

---

## 2. Principal Place of Business and Contact Information

**Name of Issuer**
Atlas IDF, LP

| Street Address 1 | Street Address 2 |
|---|---|
| C/O ATLAS IDF GP, LLC | 2101 CEDAR SPRINGS ROAD, SUITE 1200 |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| DALLAS | TEXAS | 75201 | (214) 288-9555 |

---

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Atlas IDF GP, LLC | N/A | |

| Street Address 1 | Street Address 2 |
|---|---|
| 2101 Cedar Springs Road | Suite 1200 |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Dallas | TEXAS | 75201 |

**Relationship:** [ ] Executive Officer  [ ] Director  [X] Promoter

**Clarification of Response (if Necessary):**

The Issuer's General Partner

| Last Name | First Name | Middle Name |
|---|---|---|

002990

HCMLPHMIT00003518

Patrick | Mark
Street Address 1 | Street Address 2
c/o Atlas IDF GP, LLC | 2101 Cedar Springs Road, Suite 1200
City | State/Province/Country | ZIP/PostalCode
Dallas | TEXAS | 75201

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Controlling Person

---

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services

  [ ] Commercial Banking

  [ ] Insurance

  [ ] Investing

  [ ] Investment Banking

  [X] Pooled Investment Fund

    [X] Hedge Fund

    [ ] Private Equity Fund

    [ ] Venture Capital Fund

    [ ] Other Investment Fund

    Is the issuer registered as an investment company under the Investment Company Act of 1940?

    [ ] Yes      [X] No

  [ ] Other Banking & Financial Services

[ ] Business Services

Energy

  [ ] Coal Mining

  [ ] Electric Utilities

  [ ] Energy Conservation

  [ ] Environmental Services

  [ ] Oil & Gas

  [ ] Other Energy

Health Care

  [ ] Biotechnology

  [ ] Health Insurance

  [ ] Hospitals & Physicians

  [ ] Pharmaceuticals

  [ ] Other Health Care

[ ] Manufacturing

Real Estate

  [ ] Commercial

  [ ] Construction

  [ ] REITS & Finance

  [ ] Residential

  [ ] Other Real Estate

[ ] Retailing

[ ] Restaurants

Technology

  [ ] Computers

  [ ] Telecommunications

  [ ] Other Technology

Travel

  [ ] Airlines & Airports

  [ ] Lodging & Conventions

  [ ] Tourism & Travel Services

  [ ] Other Travel

[ ] Other

---

## 5. Issuer Size

Revenue Range      OR      Aggregate Net Asset Value Range

[ ] No Revenues          [ ] No Aggregate Net Asset Value

[ ] $1 - $1,000,000       [ ] $1 - $5,000,000

002991

HCMLPHMIT00003519

☐ $1,000,001 - $5,000,000
☐ $5,000,001 - $25,000,000
☐ $25,000,001 - $100,000,000
☐ Over $100,000,000
☐ Decline to Disclose
☐ Not Applicable

☐ $5,000,001 - $25,000,000
☐ $25,000,001 - $50,000,000
☐ $50,000,001 - $100,000,000
☐ Over $100,000,000
☒ Decline to Disclose
☐ Not Applicable

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☒ Investment Company Act Section 3(c)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))
☐ Rule 504 (b)(1)(i)
☐ Rule 504 (b)(1)(ii)
☐ Rule 504 (b)(1)(iii)
☒ Rule 506(b)
☐ Rule 506(c)
☐ Securities Act Section 4(a)(5)

☐ Section 3(c)(1)
☐ Section 3(c)(2)
☐ Section 3(c)(3)
☐ Section 3(c)(4)
☐ Section 3(c)(5)
☐ Section 3(c)(6)
☒ Section 3(c)(7)

☐ Section 3(c)(9)
☐ Section 3(c)(10)
☐ Section 3(c)(11)
☐ Section 3(c)(12)
☐ Section 3(c)(13)
☐ Section 3(c)(14)

## 7. Type of Filing

☐ New Notice    Date of First Sale 2015-12-15    ☐ First Sale Yet to Occur
☒ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?    ☒ Yes ☐ No

## 9. Type(s) of Securities Offered (select all that apply)

☐ Equity
☐ Debt
☐ Option, Warrant or Other Right to Acquire Another Security
☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security

☒ Pooled Investment Fund Interests
☐ Tenant-in-Common Securities
☐ Mineral Property Securities
☐ Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?    ☐ Yes ☒ No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

002992
HCMLPHMIT00003520

## 12. Sales Compensation

Recipient                                    Recipient CRD Number  [X] None

(Associated) Broker or Dealer  [X] None      (Associated) Broker or Dealer CRD      [X] None
                                             Number

Street Address 1                             Street Address 2

City                                         State/Province/Country                ZIP/Postal
                                                                                   Code

State(s) of Solicitation (select all that    [ ] All      [ ] Foreign/non-US
apply)                                        States
Check "All States" or check individual
States

## 13. Offering and Sales Amounts

Total Offering Amount              USD  or  [X] Indefinite

Total Amount Sold      $37,975,518  USD

Total Remaining to be Sold         USD  or  [X] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

[ ]  Select if securities in the offering have been or may be sold to persons who do not qualify as accredited
     investors, and enter the number of such non-accredited investors who already have invested in the
     offering.

     Regardless of whether securities in the offering have been or may be sold to persons who do not      | 3 |
     qualify as accredited investors, enter the total number of investors who already have invested in the
     offering:

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is
not known, provide an estimate and check the box next to the amount.

Sales Commissions  $0  USD  [X] Estimate

Finders' Fees  $0  USD  [X] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the
persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is
unknown, provide an estimate and check the box next to the amount.

$0  USD  [X] Estimate

Clarification of Response (if Necessary):

Atlas IDF GP, LLC and/or its affiliates receive customary management fees, as described in the Issuer's Confidential Private Placement
Memorandum.

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and
clicking SUBMIT below to file this notice.**

002993

HCMLPHMIT00003521

Terms of Submission

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| Atlas IDF, LP | /s/ Mark Patrick | Mark Patrick | Controlling Person | 2025-02-24 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

002994
HCMLPHMIT00003522

# EXHIBIT 93

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
**FORM D**

**Notice of Exempt Offering of Securities**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

### 1. Issuer's Identity

| | | |
|---|---|---|
| CIK (Filer ID Number) | Previous Names [X] None | Entity Type |
| 0001660401 | | [ ] Corporation |
| Name of Issuer | | [X] Limited Partnership |
| Rand PE Fund I, L.P. | | [ ] Limited Liability Company |
| Jurisdiction of Incorporation/Organization | | [ ] General Partnership |
| DELAWARE | | [ ] Business Trust |
| Year of Incorporation/Organization | | [ ] Other (Specify) |

[X] Over Five Years Ago
[ ] Within Last Five Years (Specify Year)
[ ] Yet to Be Formed

---

### 2. Principal Place of Business and Contact Information

Name of Issuer
Rand PE Fund I, L.P.

| Street Address 1 | Street Address 2 |
|---|---|
| C/O RAND PE FUND MANAGEMENT, LLC | 2101 CEDAR SPRINGS ROAD, SUITE 1200 |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| DALLAS | TEXAS | 75201 | (214) 288-9555 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Rand PE Fund Management, LLC | N/A | |

| Street Address 1 | Street Address 2 |
|---|---|
| 2101 Cedar Springs Road | Suite 1200 |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Dallas | TEXAS | 75201 |

Relationship: [ ] Executive Officer  [ ] Director  [X] Promoter

Clarification of Response (if Necessary):

The Issuer's General Partner

| Last Name | First Name | Middle Name |
|---|---|---|

002996
HCMLPHMIT00004096

Patrick                                    Mark

| Street Address 1 | Street Address 2 |
|---|---|
| c/o Rand PE Fund Management, LLC | 2101 Cedar Springs Road, Suite 1200 |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Dallas | TEXAS | 75201 |

Relationship: [X] Executive Officer  [ ] Director  [ ] Promoter

Clarification of Response (if Necessary):

Controlling Person

---

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services
- [ ] Commercial Banking
- [ ] Insurance
- [ ] Investing
- [ ] Investment Banking
- [X] Pooled Investment Fund
  - [X] Hedge Fund
  - [ ] Private Equity Fund
  - [ ] Venture Capital Fund
  - [ ] Other Investment Fund

  Is the issuer registered as an investment company under the Investment Company Act of 1940?
  [ ] Yes          [X] No

- [ ] Other Banking & Financial Services

[ ] Business Services

Energy
- [ ] Coal Mining
- [ ] Electric Utilities
- [ ] Energy Conservation
- [ ] Environmental Services
- [ ] Oil & Gas
- [ ] Other Energy

Health Care
- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care

[ ] Manufacturing

Real Estate
- [ ] Commercial
- [ ] Construction
- [ ] REITS & Finance
- [ ] Residential
- [ ] Other Real Estate

- [ ] Retailing
- [ ] Restaurants

Technology
- [ ] Computers
- [ ] Telecommunications
- [ ] Other Technology

Travel
- [ ] Airlines & Airports
- [ ] Lodging & Conventions
- [ ] Tourism & Travel Services
- [ ] Other Travel

[ ] Other

---

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |

002997

HCMLPHMIT00004097

☐ $1,000,001 - $5,000,000        ☐ $5,000,001 - $25,000,000

☐ $5,000,001 - $25,000,000        ☐ $25,000,001 - $50,000,000

☐ $25,000,001 - $100,000,000        ☐ $50,000,001 - $100,000,000

☐ Over $100,000,000        ☐ Over $100,000,000

☐ Decline to Disclose        ☒ Decline to Disclose

☐ Not Applicable        ☐ Not Applicable

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☒ Investment Company Act Section 3(c)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))        ☐ Section 3(c)(1)        ☐ Section 3(c)(9)

☐ Rule 504 (b)(1)(i)        ☐ Section 3(c)(2)        ☐ Section 3(c)(10)

☐ Rule 504 (b)(1)(ii)        ☐ Section 3(c)(3)        ☐ Section 3(c)(11)

☐ Rule 504 (b)(1)(iii)        ☐ Section 3(c)(4)        ☐ Section 3(c)(12)

☒ Rule 506(b)        ☐ Section 3(c)(5)        ☐ Section 3(c)(13)

☐ Rule 506(c)        ☐ Section 3(c)(6)        ☐ Section 3(c)(14)

☐ Securities Act Section 4(a)(5)        ☒ Section 3(c)(7)

---

## 7. Type of Filing

☐ New Notice   Date of First Sale 2015-12-17   ☐ First Sale Yet to Occur

☒ Amendment

---

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?   ☒ Yes ☐ No

---

## 9. Type(s) of Securities Offered (select all that apply)

☐ Equity        ☒ Pooled Investment Fund Interests

☐ Debt        ☐ Tenant-in-Common Securities

☐ Option, Warrant or Other Right to Acquire Another Security        ☐ Mineral Property Securities

☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security        ☐ Other (describe)

---

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?   ☐ Yes ☒ No

Clarification of Response (if Necessary):

---

## 11. Minimum Investment

Minimum investment accepted from any outside investor $500,000 USD

---

002998

HCMLPHMIT00004098

## 12. Sales Compensation

Recipient                                    Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None       (Associated) Broker or Dealer CRD [X] None
                                             Number

Street Address 1                             Street Address 2

City                                         State/Province/Country                    ZIP/Postal
                                                                                       Code

State(s) of Solicitation (select all that    [ ] All     [ ] Foreign/non-US
apply)                                        States
Check "All States" or check individual
States

---

## 13. Offering and Sales Amounts

Total Offering Amount                USD  or [X] Indefinite

Total Amount Sold          $16,417,187 USD

Total Remaining to be Sold           USD  or [X] Indefinite

Clarification of Response (if Necessary):

---

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited
    investors, and enter the number of such non-accredited investors who already have invested in the
    offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not         [ 3 ]
qualify as accredited investors, enter the total number of investors who already have invested in the
offering:

---

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is
not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [X] Estimate

Finders' Fees $0 USD [X] Estimate

Clarification of Response (if Necessary):

---

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the
persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is
unknown, provide an estimate and check the box next to the amount.

$0 USD [X] Estimate

Clarification of Response (if Necessary):

Rand PE Fund Management, LLC and/or its affiliates receive customary management fees, as described in the Issuer's Confidential Private
Placement Memorandum.

---

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and
clicking SUBMIT below to file this notice.**

002999

HCMLPHMIT00004099

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of:  (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Rand PE Fund I, L.P. | /s/ Mark Patrick | Mark Patrick | Controlling Person | 2025-02-24 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

003000
HCMLPHMIT00004100

**EXHIBIT 94**

003001

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF
### BEACON MOUNTAIN LLC

This Amended and Restated Limited Liability Company Agreement (this "Agreement"), dated as of the 24th day of September, 2015, has been entered into by Rand PE Fund I, L.P. – Series 1 (the "Member"). The Member's LLC Interest (as hereinafter defined) is as set forth on Schedule A hereto.

**WHEREAS**, the initial Limited Liability Company Agreement, also dated as of the 24th day of September, 2015 ("Initial Agreement"), contained a scrivener's error with respect to the name of the single member of the Company (as defined below).

**NOW, THEREFORE,** in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Initial Agreement is hereby amended and restated in its entirety to read as follows:

1.  Name, Business, Address and Registered Agent.

    (a)     The Member hereby acknowledges that a limited liability company under the name of "Beacon Mountain LLC" (the "Company") was formed under the Delaware Limited Liability Company Act (the "Act") for the purpose of engaging in any business of any kind necessary to, in connection with, related to or incidental to such purposes as the Member shall from time to time deem desirable.

    (b)     The principal office of the Company shall be at such place as the Member may from time to time designate.

    (c)     The initial registered office of the Company for purposes of the Act shall be at 1675 South State Street, Suite B, in the City of Dover, County of Kent, Delaware 19901. The initial registered agent of the Company for purposes of the Act shall be Capitol Services, Inc., whose business office is identical to the Company's registered office.

2.  Member.  The sole responsibility for managing the business and affairs of the Company, except as otherwise provided herein or in the Act, shall be vested in the Member. Except as expressly provided herein, voting power shall be vested solely in the Member, and all matters requiring a vote pursuant to this Agreement or the Act shall be determined by the vote of the Member and the Member may act by written consent.

3.  Officers.

    (a)     Election of Officers: Term.  Officers, including assistant and subordinate officers, may from time to time be appointed by the Member. All officers shall hold office until their successors are appointed by the Member. Any two or more offices may be combined in the same person as the Member may determine. No officer may act in more than one capacity where the action of two or more officers is required.

003002

HCMLPHMIT00004115

(b)   <u>Removal of Officers: Vacancies</u>.  Any officer of the Company may be removed summarily with or without cause, at any time, by the Member.  Vacancies may be filled by the Member.

(c)   <u>Duties</u>.  The officers of the Company shall have only such powers and duties as are from time to time conferred by the Member in writing or as are set forth in writing and executed by either of the President or the Secretary.  The Member shall determine the compensation of all officers of the Company.

4.   <u>Term</u>.  The term of the Company shall be perpetual, except that the Company shall be dissolved upon the first to occur of any of the following events:

(a)   The election of the Member to dissolve and terminate the Company;

(b)   At any time there are no remaining members, except as may be avoided pursuant to §18-801(a)(4) of the Act;

(c)   The entry of a decree of judicial dissolution under §18-802 of the Act; or

(d)   Automatic cancellation of the Company's certificate of formation pursuant to §18-1108 of the Act.

5.   <u>Capital</u>.  The Member may contribute such capital, in cash or other property, as it so chooses in its sole discretion.  No capital contributions shall be required unless the Member consents thereto in writing, in its sole and absolute discretion.

6.   <u>Bank Accounts</u>.  The President and the Secretary and any other officer, including any assistant or subordinate officer, as may be authorized to do so in writing by either of the President or the Secretary, are authorized to open commercial banking accounts for and in the name of the Company throughout the United States, at any time and from time to time, and to deposit to the credit of the Company in such banking accounts any monies, checks, drafts, orders or other commercial paper payable to the Company, and from time to time to withdraw all or any part of the funds on deposit in the name of the Company by check drawn in the name of the Company and signed by such officer.

7.   <u>Voting of Shares</u>.  Unless otherwise provided by written resolution of the Member, either of the President or the Secretary may from time to time appoint an attorney or attorneys or agent or agents of the Company, in the name and on behalf of the Company, to cast the vote which the Company may be entitled to cast as a stockholder or otherwise in any corporation, partnership, limited liability company, joint venture or any other entity, any of whose securities may be held by the Company, at meetings of the holders of the shares or other securities of such entity or to consent in writing to any action by any such entity.  Such officer shall instruct the person or persons so appointed as to the manner of casting such votes or giving such consent and may execute or cause to be executed on behalf of the Company such written proxies, consents, waivers or other instruments as may be necessary or proper in the premises.  In lieu of such appointment, either of the President or the Secretary may himself attend any meetings of the holders of the shares or other securities of any such entity and there vote or

003003
HCMLPHMIT00004116

exercise any or all power of the Company as the holder of such shares or other securities of such entity or consent in writing to any action by any such entity.

8.    <u>Distributions</u>.  Any cash or other property of the Company not required for the operation of the Company shall be distributable to the Member at such times and in such amounts as determined by the Member.

9.    <u>Certificates; "Opt-In" to Article 8; Transferability of Interests</u>.

(a)    The Company may issue one or more certificates evidencing the limited liability company interests in the Company ("<u>LLC Interest</u>") in the form attached hereto as <u>Exhibit A</u>.  Certificates shall be executed on behalf of the Company by one of its executive officers.  The Member hereby agrees that the LLC Interest held by such Member shall be treated as a "security" for purposes of and shall be governed by Article 8 of the Delaware Uniform Commercial Code--Investment Securities, as amended from time to time.

(b)    The Member may transfer, sell, assign, mortgage, grant a lien on, give or otherwise dispose of, whether voluntarily or by operation of law, at judicial sale or otherwise, all or any part of its LLC Interest in the Company; <u>provided</u>, <u>however</u>, that there shall not at any time be more than one member until this Agreement is amended to provide generally (in addition to <u>Section 12</u> hereof) for having more than one member.  If, in connection with any such transfer, less than 100% of the LLC Interest of the transferor member is transferred, then this Agreement shall be amended to include appropriate provisions, including those relating to partnership accounting and tax issues, necessary to address the fact that the Company has more than one member.

10.    <u>Liquidation</u>.  Any net proceeds from the sale, exchange or other disposition (including a disposition pursuant to foreclosure or deed in lieu of foreclosure) of the assets of the Company following the dissolution of the Company shall be distributed to the Member.

11.    <u>Other Activities</u>.  The Member may engage in or possess any interest in another venture or business of any nature or description, independently or with others.

12.    <u>Tax Classification</u>.  The Member intends that the Company be disregarded for U.S. federal income tax purposes as long as there is only one member, and that if there is ever more than one member or more than one owner of the Company as determined for U.S. federal income tax purposes, that the Company be classified as a partnership for U.S. federal income tax purposes and this Agreement shall be interpreted accordingly.

13.    <u>Limited Liability</u>.  The Member shall not have any personal obligation for any debts, obligations or liabilities of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Member, except as provided under the Act.

14.    <u>Exculpation; Indemnification</u>.

(a)    Except as otherwise provided by any written employment, consulting or similar agreement, if applicable, or unless otherwise expressly required by law, no officer or member of the Company (including any former executive officer or member) (each such person

003004
HCMLPHMIT00004117

referred to herein as a "Covered Person") shall have any liability to the Company or to any member for any loss suffered by the Company or any member which arises out of any act or omission or alleged act or omission of the Covered Person in the Covered Person's capacity as a Covered Person to the extent the Covered Person acted in good faith and to the extent such course of conduct did not constitute willful misconduct or gross negligence of the Covered Person. Each Covered Person shall be indemnified by the Company against any losses, judgments, liabilities, claims, damages, costs, expenses (including reasonable legal fees and other expenses actually incurred in investigating or defending against any such losses, judgments, liabilities or claims and expenses actually incurred enforcing this Agreement) and amounts paid in settlement of any claim (approved in advance and in good faith by the Member) sustained by any of them by reason of any act or omission or alleged act or omission in connection with the activities of the Company (including any subsidiaries thereof) unless there is a final judicial determination by a court of competent jurisdiction to which all rights of appeal have been exhausted or expired that the same were the result of bad faith, willful misconduct or gross negligence of the Covered Person. The Covered Person may rely in good faith upon the advice of legal counsel.

(b)     To the extent available on commercially reasonable terms, the Company may purchase, at the Company's expense, insurance (including without limitation, liability insurance policies and errors and omissions policies) to cover any liabilities covered by this Section 14 in such amount and with such deductibles as the Company may determine; provided, however, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person. Any such insurance may extend beyond the termination of the Company for a commercially reasonable period. The Company shall be subrogated to the Covered Person's rights under such indemnification or insurance. If any Covered Person recovers any amounts in respect of any such liabilities from insurance coverage or any third party source, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to it by the Company in respect of such liabilities. The Company shall not incur the cost of that portion of any insurance, other than public liability insurance, which insures any party against any liability the indemnification of which is herein prohibited.

(c)     The Company may, as determined in good faith by the Member, pay the legal fees and other expenses reasonably incurred by any Covered Person hereunder in connection with any proceeding in advance of the final disposition of such proceeding, so long as the Company receives a written undertaking, in form and content approved by the Company's counsel, by such Covered Person to repay the full amount advanced if there is a final judicial determination by a court of competent jurisdiction, as to which all rights of appeal have been exhausted or expired, that such Covered Person did not satisfy the standards which entitle it to indemnification pursuant to the terms of this Section 14.

(d)     The right of indemnification hereby provided shall not be exclusive of, and shall not affect, any other rights to which any Covered Person may be entitled. Nothing contained in this Section 14 shall limit any lawful rights to indemnification existing independently of this Section 14.

003005

HCMLPHMIT00004118

(e)     The indemnification rights provided by this <u>Section 14</u> shall not be construed to increase the liability of the Member.

(f)     The indemnification rights provided by this <u>Section 14</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

(g)     The provisions of this <u>Section 14</u> shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this <u>Section 14</u> and regardless of any subsequent amendment to this Agreement; <u>provided</u>, <u>however</u>, that no such amendment shall reduce or restrict the extent to which the indemnification provisions of this <u>Section 14</u> apply to actions taken or omissions made or alleged actions taken or omissions made prior to the date of such amendment.

(h)     If deemed appropriate or necessary by the Member, the Company may establish reserves, escrow accounts or similar accounts to fund its obligations under this <u>Section 14</u>.

(i)     The provisions of this <u>Section 14</u> shall survive the termination or dissolution of the Company.

15.     <u>No Third Party Beneficiary</u>.  No creditor or other third party having dealings with the Company shall have the right to enforce the right or obligation of the Member to make capital contributions or loans or to pursue any other right or remedy hereunder or at law or in equity, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the Member, the Covered Persons (to the extent granted herein) and the Company and their respective successors and permitted assigns.


[Signature Page Follows]

003006
HCMLPHMIT00004119

IN WITNESS WHEREOF, the undersigned member has executed this Amended and Restated Limited Liability Company Agreement as of the date first set forth above.

RAND PE FUND I, L.P. – Series 1

By: RAND PE FUND MANAGEMENT, LLC
Its:   General Partner

By: _____
Its:   *MANAGING MEMBER*

Page 6

*Signature Page to Beacon Mountain LLC*
*Company Agreement*

003007

HCMLPHMIT00004120

**SCHEDULE A**

**MEMBER**

| Member | LLC Interest |
|---|---|
| Rand PE Fund I, L.P. – Series 1 | 100% |

003008
HCMLPHMIT00004121

## EXHIBIT A

## <u>CERTIFICATE NO.__</u>

### CERTIFICATE OF LLC INTEREST

### of

### BEACON MOUNTAIN LLC

### A Delaware Limited Liability Company

This Certificate of LLC Interest (this "<u>Certificate</u>") is issued and shall be held subject to the provisions of the Certificate of Formation of Beacon Mountain, LLC, a limited liability company organized under the laws of the State of Delaware (the "<u>Company</u>"), filed on September ___, 2015 with the Secretary of State of the State of Delaware, and the Limited Liability Company Agreement of the Company, dated as of September ___, 2015, as each may be amended from time to time.

This Certificate of LLC Interest certifies that _____, a Member of the Company, is the registered holder of ___% of the "<u>LLC Interest</u>" (as such term is defined in the above-referenced Limited Liability Company Agreement) of the Company, which LLC Interest shall be transferable only on the books of the Company by the holder hereof in person or by a duly authorized attorney upon surrender of this Certificate with a proper endorsement.

### *SEE RESTRICTIONS ON REVERSE SIDE.*

IN WITNESS WHEREOF, the Company has caused this Certificate to be signed by its duly authorized officer as of the _____ day of _____, 2___.

BEACON MOUNTAIN LLC

By: _____
Name: _____
Title: _____

003009

HCMLPHMIT00004122

## [REVERSE SIDE OF CERTIFICATE]

## BEACON MOUNTAIN LLC

For value received, the undersigned hereby sells, assigns, and transfers to

_____ and its successors and assigns, ____% of the LLC Interest of

Beacon Mountain LLC standing in the name of _____, on the books of said

limited liability company represented by certificate No. _____ and does hereby irrevocably

constitute and appoint _____, and its successors and assigns, attorney

to transfer said interests on the books of the limited liability company with full power of

substitution.

Dated: _____

_____

By: _____
Name: _____
Title: _____


THE LLC INTEREST REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE SECURITIES ACT OR OTHER SIMILAR STATUTE IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. WITHOUT SUCH REGISTRATION, THE SALE, PLEDGE OR OTHER TRANSFER OF THIS LLC INTEREST IS RESTRICTED, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT REGISTRATION IS NOT REQUIRED FOR THE TRANSFER, OR SUCH OTHER EVIDENCE SATISFACTORY TO THE COMPANY THAT THE TRANSFER IS NOT IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAW.  THE SALE, PLEDGE OR OTHER TRANSFER OF THIS LLC INTEREST IS ALSO SUBJECT TO THE RESTRICTIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, WHICH MAY BE AMENDED FROM TIME TO TIME.

003010

HCMLPHMIT00004123

**EXHIBIT 95**

003011





2

003013

d r      d      r           d           d
d d   d      d      d                    r                d    r      r
                                        r

                                                      r      d

M r      r
M      r

**SCHEDULE A**

**MEMBER**

| Member | LLC Interest |
|--------|--------------|
| d      |              |

**EXHIBIT A**

**CERTIFICATE NO.** _____

**CERTIFICATE OF LLC INTEREST**

**of**

**BEACON MOUNTAIN LLC**

**A Delaware Limited Liability Company**



***SEE RESTRICTIONS ON REVERSE SIDE.***

**[REVERSE SIDE OF CERTIFICATE]**

# BEACON MOUNTAIN LLC

003020

**EXHIBIT 96**

**BYLAWS**

**OF**

**THE OKADA FAMILY FOUNDATION, INC.**

003022

## TABLE OF CONTENTS

<div align="right">Page</div>

ARTICLE I.   OFFICES..................................................................................................1

    Section 1.1  Registered Office .............................................................................1
    Section 1.2  Other Offices ...................................................................................1

ARTICLE II.  MEMBERSHIP........................................................................................1

    Section 2.1   Classes and Number .......................................................................1
    Section 2.2   Voting .............................................................................................1
    Section 2.3   Transfer of Membership ................................................................1
    Section 2.4   Resignation of Member ..................................................................2
    Section 2.5   Place of Meetings ...........................................................................2
    Section 2.6   Annual Meetings ............................................................................2
    Section 2.7   Special Meetings ...........................................................................2
    Section 2.8   Notice of Meetings of Members .....................................................2
    Section 2.9   Quorum ...........................................................................................3
    Section 2.10  Voting .............................................................................................3
    Section 2.11  Proxies............................................................................................3
    Section 2.12  Action by Written Consent .............................................................3
    Section 2.13  Control of Investments...................................................................3

ARTICLE III. DIRECTORS ...........................................................................................4

    Section 3.1   General Powers ..............................................................................4
    Section 3.2   Number of Directors ......................................................................4
    Section 3.3   Vacancies.......................................................................................4
    Section 3.4   Place of Meetings ..........................................................................5
    Section 3.5   Committees of Directors ................................................................5
    Section 3.6   Compensation of Directors ............................................................5
    Section 3.7   Annual Meeting .............................................................................5
    Section 3.8   Additional Regular Meetings .........................................................5
    Section 3.9   Special Meetings ...........................................................................5
    Section 3.10  Method and Timing of Notice........................................................5
    Section 3.11  Purpose not Required in Notice .....................................................6
    Section 3.12  Waiver of Notice ............................................................................6
    Section 3.13  Action by Written Consent .............................................................6
    Section 3.14  Validation of Action by Consent ...................................................6
    Section 3.15  Quorum and Manner of Acting .......................................................6
    Section 3.16  Resignation and Removal of Directors ...........................................7

ARTICLE IV. OFFICERS ..............................................................................................7

    Section 4.1   Officers ..........................................................................................7
    Section 4.2   Election, Term of Office and Eligibility........................................7
    Section 4.3   Subordinate Officers .....................................................................7

6646907.1/SP/12409/0104/030915

003023

Section 4.4  Removal .................................................................................................7

Section 4.5  The President and Co-President.........................................................7

Section 4.6  The Secretary .......................................................................................8

Section 4.7  The Assistant Secretaries ...................................................................8

Section 4.8  Chairman and Co-Chairs ...................................................................8

Section 4.9  The Chief Financial Officer ...............................................................8

Section 4.10  The Assistant Chief Financial Officers .........................................9

Section 4.11  Delegation of Duties .........................................................................9

ARTICLE V.  BOOKS AND RECORDS ...........................................................................9

Section 5.1  Location .................................................................................................9

Section 5.2  Inspection .............................................................................................9

ARTICLE VI. MISCELLANEOUS PROVISIONS ...........................................................9

Section 6.1  Fiscal Year ............................................................................................9

Section 6.2  Depositories ..........................................................................................9

Section 6.3  Checks, Drafts and Notes .................................................................10

Section 6.4  Contracts and Other Instruments ..................................................10

Section 6.5  Conflicts of Interest...........................................................................10

Section 6.6  Waivers of Notice ..............................................................................10

Section 6.7  Ownership Interests in Other Entities ..........................................10

Section 6.8  Indemnification ..................................................................................11

Section 6.9  Amendment of Bylaws .....................................................................12

6646907.1/SP/12409/0104/030915

003024

# BYLAWS

## OF

## THE OKADA FAMILY FOUNDATION, INC.

## ARTICLE I.

### OFFICES

Section 1.1    Registered Office.  The registered office of THE OKADA FAMILY FOUNDATION, INC. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices.  The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II.

### MEMBERSHIP

Section 2.1    Classes and Number.  The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be Mark Okada or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting.  Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members, In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership.  Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Okada, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the

6646907.1/SP/12409/0104/030915

003025

death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4    Resignation of Member.  A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings.  All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings.  Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2015, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7    Special Meetings.  Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall he called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8    Notice of Meetings of Members.  When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the

telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    Quorum.  Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. lf, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting, if the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    Voting.  When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    Proxies.  At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting,

Section 2.13    Control of Investments.  Notwithstanding any other provision contained in these Bylaws to the contrary, the Institutional Member shall have the sole and exclusive power and authority to direct the management and investment of the assets of the Corporation. Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of

6646907.1/SP/12409/0104/030915

003027

the Corporation which have no power or authority with respect to the matters delegated hereby to the Institutional Member with respect to investments. Such power and authority of the Institutional Member shall include, but not be limited to: [a] the power to purchase, sell and retain assets of the Corporation; [b] the power to exercise voting, subscription, conversion, redemption, withdrawal, cancellation, option and similar rights with respect to such assets; [c] the power to participate in and consent to any voting trust, reorganization, merger, dissolution or other action affecting any such property; [d] the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) and [e] the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments.  The Corporation shall furnish the Institutional Member with such information as is necessary or desirable for it to fulfill its responsibilities. The Corporation shall furnish the Institutional Member with such clerical and other assistance as the Institutional Member may need to carry out its powers and authority. The Institutional Member shall advise the Board of Directors periodically of the investments of the assets of the Corporation and changes thereto.  The Institutional Member shall have the sole power to retain investment advisors and custodians to assist it in carrying out its powers and authority under this Section 2.13 and it may delegate to any such investment advisors and custodians any and all such powers and authority subject to limitations on such delegation provided under the law, if any. The Corporation shall be responsible for all costs and expenses incurred by the Institutional Member in carrying out its powers and authority under this Section 2.13.

## ARTICLE III.

## DIRECTORS

Section 3.1   General Powers.   The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2   Number of Directors.   The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3   Vacancies.   If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual

003028

Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings.  The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors.  The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors.  Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting.  The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings.  The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings.  Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days' notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice.  Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered

6646907.1/SP/12409/0104/030915

003029

personally, or (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation. If mailed, such notice shall he deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.

Section 3.11   <u>Purpose not Required in Notice</u>.  Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12   <u>Waiver of Notice</u>.  Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall he deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13   <u>Action by Written Consent</u>.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14   <u>Validation of Action by Consent</u>.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15   <u>Quorum and Manner of Acting</u>.  A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall he the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such

6646907.1/SP/12409/0104/030915

003030

participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16    <u>Resignation and Removal of Directors</u>.  Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV.

## OFFICERS

Section 4.1    <u>Officers</u>.  The officers of the Corporation shall include a President  and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2    <u>Election, Term of Office and Eligibility</u>.  The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3    <u>Subordinate Officers</u>.  The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4    <u>Removal</u>.  The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5    <u>The President and The Co-Presidents</u>.  The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect, and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the

003031

Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors. A second person may be appointed by the Board of Directors having the same duties and powers as provided for under this Section 4.5, and in the case of such an appointment, each person serving pursuant to this Section 4.5 shall be referred to as Co-President. When Co-Presidents are serving either Co-President may act alone without the concurrence of the other Co-President. Should the Co-Presidents disagree as to the taking or not taking of an action provided for by this Section 4.5, then the Members shall decide whether to take or not take such action.

Section 4.6   The Secretary.   The Secretary shall:

(a)   keep the minutes of the meetings of the members and of the Board of Directors;

(b)   see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)   be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)   in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7   The Assistant Secretaries.   If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4,3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8   Chairman and Co-Chairs.   The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time. A second person may be appointed by the Board of Directors having the same duties and powers as provided for under this Section 4.8, and in the case of such an appointment, each person serving pursuant to this Section 4.8 shall be referred to as a Co-Chair. When Co-Chairs are serving either Co-Chair may act alone without the concurrence of the other Co-Chair.

Section 4.9   The Chief Financial Officer.   The Chief Financial Officer, if any, shall:

(a)   receive and he responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the

6646907.1/SP/12409/0104/030915

003032

Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

      (b)     render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

      (c)     in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10    <u>The Assistant Chief Financial Officers</u>.  If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11    <u>Delegation of Duties</u>.    In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V.

## BOOKS AND RECORDS

Section 5.1    <u>Location</u>.  The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2    <u>Inspection</u>.  The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI.

## MISCELLANEOUS PROVISIONS

Section 6.1    <u>Fiscal Year</u>.  The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2    <u>Depositories</u>.  The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

6646907.1/SP/12409/0104/030915

003033

Section 6.3    <u>Checks, Drafts and Notes</u>.  All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4    <u>Contracts and Other Instruments</u>.  The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances,

Section 6.5    <u>Conflicts of Interest</u>.  No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6    <u>Waivers of Notice</u>.  Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members. Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7    <u>Ownership Interests in Other Entities</u>.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or

003034

by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8     Indemnification.

(a)     Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all, costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking. by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)     If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea

6646907.1/SP/12409/0104/030915

003035

of nolo contendere or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct,

(c)    The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)    The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)    To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f)    Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)    The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9    Amendment of Bylaws.  Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

\* \* \* \* \*

The undersigned, being the duly elected and qualifying Secretary of the Corporation, hereby certifies that the foregoing initial Bylaws of the Corporation were duly adopted by the Board of Directors of the Corporation by unanimous written consent on   March 9  , 2015.

Digitally signed by Gary Garcia
DN: cn=Gary Garcia, o=The Dallas
Foundation, ou,
email=gwgarcia@dallasfoundation.org,
c=US
Date: 2015.03.09 16:09:08 -05'00'

Gary W. Garcia, Secretary

-12-

6646907.1/SP/12409/0104/030915

003036

6646907.1/SP/12409/0104/030915

003037

**EXHIBIT 97**

003038

**BYLAWS**

**OF**

**EMPOWER DALLAS FOUNDATION, INC.**

## TABLE OF CONTENTS

Page

ARTICLE I.    OFFICES...................................................................................................1

    Section 1.1  Registered Office ....................................................................1
    Section 1.2  Other Offices ..........................................................................1

ARTICLE II.   MEMBERSHIP.........................................................................................1

    Section 2.1  Classes and Number ...............................................................1
    Section 2.2  Voting .....................................................................................1
    Section 2.3  Transfer of Membership ........................................................1
    Section 2.4  Resignation of Member ..........................................................2
    Section 2.5  Place of Meetings ...................................................................2
    Section 2.6  Annual Meetings .....................................................................2
    Section 2.7  Special Meetings .....................................................................2
    Section 2.8  Notice of Meetings of Members .............................................2
    Section 2.9  Quorum ...................................................................................3
    Section 2.10 Voting .....................................................................................3
    Section 2.11 Proxies ....................................................................................3
    Section 2.12 Action by Written Consent .....................................................3
    Section 2.13 Control of Investments ...........................................................3

ARTICLE III. DIRECTORS ............................................................................................4

    Section 3.1  General Powers .......................................................................4
    Section 3.2  Number of Directors ...............................................................4
    Section 3.3  Vacancies ................................................................................4
    Section 3.4  Place of Meetings ...................................................................5
    Section 3.5  Committees of Directors .........................................................5
    Section 3.6  Compensation of Directors .....................................................5
    Section 3.7  Annual Meeting ......................................................................5
    Section 3.8  Additional Regular Meetings ..................................................5
    Section 3.9  Special Meetings .....................................................................5
    Section 3.10 Method and Timing of Notice ................................................5
    Section 3.11 Purpose not Required in Notice ..............................................6
    Section 3.12 Waiver of Notice ....................................................................6
    Section 3.13 Action by Written Consent .....................................................6
    Section 3.14 Validation of Action by Consent ...........................................6
    Section 3.15 Quorum and Manner of Acting ..............................................6
    Section 3.16 Resignation and Removal of Directors ..................................7

ARTICLE IV. OFFICERS ...............................................................................................7

    Section 4.1  Officers ...................................................................................7
    Section 4.2  Election, Term of Office and Eligibility .................................7
    Section 4.3  Subordinate Officers ..............................................................7

003040

Section 4.4  Removal ..................................................................................................7
Section 4.5  The President ..........................................................................................7
Section 4.6  The Secretary ..........................................................................................8
Section 4.7  The Assistant Secretaries ......................................................................8
Section 4.8  Chairman .................................................................................................8
Section 4.9  The Chief Financial Officer ..................................................................8
Section 4.10  The Assistant Chief Financial Officers ..............................................9
Section 4.11  Delegation of Duties ............................................................................9

ARTICLE V.  BOOKS AND RECORDS ......................................................................9
Section 5.1  Location ...................................................................................................9
Section 5.2  Inspection ...............................................................................................9

ARTICLE VI. MISCELLANEOUS PROVISIONS .......................................................9
Section 6.1  Fiscal Year .............................................................................................9
Section 6.2  Depositories ...........................................................................................9
Section 6.3  Checks, Drafts and Notes ....................................................................9
Section 6.4  Contracts and Other Instruments ........................................................9
Section 6.5  Conflicts of Interest ..............................................................................10
Section 6.6  Waivers of Notice ................................................................................10
Section 6.7  Ownership Interests in Other Entities ...............................................10
Section 6.8  Indemnification .....................................................................................10
Section 6.9  Amendment of Bylaws .........................................................................12

010036 000016 14282559.2

003041

# BYLAWS

## OF

## EMPOWER DALLAS FOUNDATION, INC.

### ARTICLE I.

### OFFICES

Section 1.1    Registered Office.    The registered office of EMPOWER DALLAS FOUNDATION, INC. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2    Other Offices.    The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

### ARTICLE II.

### MEMBERSHIP

Section 2.1    Classes and Number.    The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be Grant Scott or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2    Voting.    Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members, In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3    Transfer of Membership.    Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Scott, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the

-1-

death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4    Resignation of Member.  A member may resign at any time upon written notice to the Secretary.

Section 2.5    Place of Meetings.  All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6    Annual Meetings.  Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2015, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7    Special Meetings.  Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall he called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8    Notice of Meetings of Members.  When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the

-2-

010036 000016 14282559.2

003043

telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9    Quorum.  Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. lf, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting, if the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10    Voting.  When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11    Proxies.  At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12    Action by Written Consent.  Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting,

Section 2.13    Control of Investments.  Notwithstanding any other provision contained in these Bylaws to the contrary, the Institutional Member shall have the sole and exclusive power and authority to direct the management and investment of the assets of the Corporation. Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of

010036 000016 14282559.2

003044

the Corporation which have no power or authority with respect to the matters delegated hereby to the Institutional Member with respect to investments. Such power and authority of the Institutional Member shall include, but not be limited to: [a] the power to purchase, sell and retain assets of the Corporation; [b] the power to exercise voting, subscription, conversion, redemption, withdrawal, cancellation, option and similar rights with respect to such assets; [c] the power to participate in and consent to any voting trust, reorganization, merger, dissolution or other action affecting any such property; [d] the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) and [e] the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments.  The Corporation shall furnish the Institutional Member with such information as is necessary or desirable for it to fulfill its responsibilities. The Corporation shall furnish the Institutional Member with such clerical and other assistance as the Institutional Member may need to carry out its powers and authority. The Institutional Member shall advise the Board of Directors periodically of the investments of the assets of the Corporation and changes thereto.  The Institutional Member shall have the sole power to retain investment advisors and custodians to assist it in carrying out its powers and authority under this Section 2.13 and it may delegate to any such investment advisors and custodians any and all such powers and authority subject to limitations on such delegation provided under the law, if any. The Corporation shall be responsible for all costs and expenses incurred by the Institutional Member in carrying out its powers and authority under this Section 2.13.

## ARTICLE III.

## DIRECTORS

Section 3.1    General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2    Number of Directors.  The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3    Vacancies.  If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual

010036 000016 14282559.2

003045

Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4    Place of Meetings.  The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5    Committees of Directors.  The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6    Compensation of Directors.  Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7    Annual Meeting.  The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8    Additional Regular Meetings.  The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9    Special Meetings.  Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days' notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10    Method and Timing of Notice.  Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered

003046

personally, or (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation. If mailed, such notice shall he deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.

     Section 3.11    <u>Purpose not Required in Notice</u>.  Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

     Section 3.12    <u>Waiver of Notice</u>.  Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall he deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

     Section 3.13    <u>Action by Written Consent</u>.  Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

     Section 3.14    <u>Validation of Action by Consent</u>.  All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

     Section 3.15    <u>Quorum and Manner of Acting</u>.  A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall he the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such

010036 000016 14282559.2

003047

participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16   <u>Resignation and Removal of Directors</u>.  Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## **ARTICLE IV.**

## **OFFICERS**

Section 4.1   <u>Officers</u>.  The officers of the Corporation shall include a President  and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2   <u>Election, Term of Office and Eligibility</u>.  The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3   <u>Subordinate Officers</u>.  The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4   <u>Removal</u>.  The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5   <u>The President</u>.  The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the

-7-

003048

President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6     The Secretary.  The Secretary shall:

(a)     keep the minutes of the meetings of the members and of the Board of Directors;

(b)     see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c)     be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d)     in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7     The Assistant Secretaries.  If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4,3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8     Chairman.  The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9     The Chief Financial Officer.  The Chief Financial Officer, if any, shall:

(a)     receive and he responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)     render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c)     in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

-8-

003049