**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P

|  |  |  |
|---|---|---|
|  | § |  |
|  | § | Case No. 19-34054-sgj11 |
| **Patrick Daugherty - Appellant** |  |  |
|  | § | **3:25-CV-01901-S** |
|  |  | CONSOLIDATED UNDER: |
| vs. | § | **3:25-CV-01876-K** |
|  |  |  |
| **Highland Capital Management, L.P; et al** - Appellee |  |  |
|  | § |  |
|  | § |  |

 **[4297] Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025**

# Volume 12

# APPELLANT RECORD

Jason S. Brookner (Texas Bar No. 240033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
Drake M. Rayshell (Texas Bar No. 24118507)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email:     jbrookner@grayreed.com
           dyork@grayreed.com
           jsmeltzer@grayreed.com
           drayshell@grayreed.com

*Counsel to Patrick Daugherty*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | § § § | |

*INDEX*

**APPELLANT'S AMENDED DESIGNATION OF ITEMS
TO BE INCLUDED IN THE RECORD ON APPEAL
AND STATEMENT OF THE ISSUES PRESENTED**

Pursuant to Fed. R. Bankr. P. 8009(a) and Docket No. 4366, Appellant Patrick Daugherty

("Daugherty") hereby submits his amended designation of items to be included in the record on

appeal and statement of issues to be presented in connection with his appeal from the *Order*

*Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the*

*Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

No. 4297] (the "HMIT Settlement Order").[2] *See Notice of Appeal* [Docket No. 4310, as amended at Docket No. 4327].

## Statement of Issues on Appeal

1. Whether the Bankruptcy Court erred in its approval of the HMIT Settlement Order [Docket No. 4297], which permits payment to Class 10 creditors before all Class 8 and Class 9 claims have been paid in full when the plain language of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. 1808], the Court's Confirmation Order [Dkt. 1943] and the Claimant Trust Agreement [Dkt. 3817-4] require full payment plus applicable interest to all Class 8 and Class 9 creditors before any Class 10 or Class 11 claims can vest.

2. Whether the Bankruptcy Court abused its discretion by approving the HMIT Settlement Order [Docket No. 4297] when the settlement is not fair, reasonable, or in the best interests of the estate as the Debtor, through its principals, is forgoing the recovery of millions in material value to the estate in exchange for, inter alia, self-serving releases of its principals.

## Designation of Record

Daugherty respectfully designates the following items to be included in the appellate record pursuant to Bankruptcy Rule 8009(a):

*000001*   1. Amended Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Dkt. 4327].

*000011*   2. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Dkt. 4310].

*000022*   3. The Judgment Order or Decree appealed from: *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4297].

*000026*   4. Docket Sheet for Bankruptcy Case No. 19-34054-sgj1 kept by the Bankruptcy Clerk.

5. Documents listed below for Bankruptcy Case No. 19-34054-sgj11:

---

[2]  Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the HMIT Settlement Order.

*Vol. 2*

| | Date | Docket | Description |
|---|---|---|---|
| *000637* | 11/18/2020 | 1426 | *Transcript regarding Hearing Held 11/17/2020 (90 pages)* RE: Motion for Temporary Allowance of Claim (#1281). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/16/2021. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 1422 Hearing held on 11/17/2020. (RE: related document(s) 1281 Motion for leave - Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 filed by Creditor Patrick Daugherty) (Appearances: T. Uebler, J. Christensen, and J. Kathman for P. Daugherty; J. Morris and J. Pomeranz for Debtor; M. Clemente for UCC. Evidentiary hearing. Claim estimated for voting purposes at $9,134,019 for reasons stated on the record. Counsel to upload order.)). Transcript to be made available to the public on 02/16/2021. (Rehling, Kathy) |
| *000727* | 05/19/2025 | 4216 | *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (Attachments: # 1 Exhibit A-- Proposed Order) |
| *000745* | 05/19/2025 | 4217 | *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| *000773* | 05/20/2025 | 4218 | *Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust* (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |

4905-5299-6446

*Vol. 2*

| Date | Docket | Description |
|------|--------|-------------|
| 05/22/2025 | 4221 | *Amended Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust* (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |
| 06/09/2025 | 4229 | *Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust)* (filed by Creditor Patrick Daugherty. (Attachments: # 1 Proposed Order) (York, Andrew) |

*000779*

*000785*

4905-5299-6446

| | Date | Docket | Description |
|---|---|---|---|
| *Vol. 3 Starts w/ 000801* *Thru End of Vol. 13* | 06/20/2025 | 4255 | *Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53 # 54 Exhibit 54 # 55 Exhibit 55 # 56 Exhibit 56 # 57 Exhibit 57 # 58 Exhibit 58 # 59 Exhibit 59 # 60 Exhibit 60 # 61 Exhibit 61 # 62 Exhibit 62 # 63 Exhibit 63 # 64 Exhibit 64 # 65 Exhibit 65 # 66 Exhibit 66 # 67 Exhibit 67 # 68 Exhibit 68 # 69 Exhibit 69 # 70 Exhibit 70 # 71 Exhibit 71 # 72 Exhibit 72 # 73 Exhibit 73 # 74 Exhibit 74 # 75 Exhibit 75 # 76 Exhibit 76 # 77 Exhibit 77 # 78 Exhibit 78 # 79 Exhibit 79 # 80 Exhibit 80 # 81 Exhibit 81 # 82 Exhibit 82 # 83 Exhibit 83 # 84 Exhibit 84 # 85 Exhibit 85 # 86 Exhibit 86 # 87 Exhibit 87 # 88 Exhibit 88 # 89 Exhibit 89 # 90 Exhibit 90 # 91 Exhibit 91 # 92 Exhibit 92 # 93 Exhibit 93 # 94 Exhibit 94 # 95 Exhibit 95 # 96 Exhibit 96 # 97 Exhibit 97 # 98 Exhibit 98 # 99 Exhibit 99 # 100 Exhibit 100 # 101 Exhibit 101 # 102 Exhibit 102 # 103 Exhibit 103 # 104 Exhibit 104 # 105 Exhibit 105 # 106 Exhibit 106 # 107 Exhibit 107 # 108 Exhibit 108 # 109 Exhibit 109 # 110 Exhibit 110 # 111 Exhibit 111 # 112 Exhibit 112 # 113 Exhibit 113 # 114 Exhibit 114 # 115 Exhibit 115 # 116 Exhibit 116 # 117 Exhibit 117 # 118 Exhibit 118 # 119 Exhibit 119 # 120 Exhibit 120 # 121 Exhibit 121 # 122 Exhibit 122 # 123 Exhibit 123) (Annable, Zachery) |
| *Vol 14 003458* | 06/20/2025 | 4256 | *Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |

*Vol. 14*

*0003461*

*Vol. 15*

*0004643*

*0004654*

*0004656*

*Vol. 16*

*0004873*

*0004898*

| Date | Docket | Description |
|---|---|---|
| 06/23/2025 | 4266 | *Witness and Exhibit List of Patrick Daugherty filed by Creditor Patrick Daugherty* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 List of 20 Largest Creditors 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 List of 20 Largest Creditors 34 # 35 Exhibit 35 # 36 List of 20 Largest Creditors 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42) (York, Andrew) |
| 06/23/2025 | 4275 | *Omnibus Reply to (related document(s): 4229 Objection filed by Creditor Patrick Daugherty, 4230 Objection filed by Partner Dugaboy Investment Trust, 4231 Objection filed by Interested Party The Dallas Foundation, Interested Party Crown Global Life Insurance, Ltd) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust.* (Annable, Zachery) |
| 06/23/2025 | 4276 | *Joinder by to Reply in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith filed by Creditor Hunter Mountain Investment Trust* (RE: related document(s) 4275 Reply). (Phillips, Louis) |
| 06/24/2025 | 4277 | *Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4255 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 124 # 2 Exhibit 125) (Annable, Zachery) |
| 06/24/2025 | 4280 | *Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 126) (Annable, Zachery) |
| 06/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). |

| Date | Docket | Description |
|---|---|---|
| 06/30/2025 | 4296 | *Transcript regarding Hearing Held 06/25/2025 before Judge Stacy G.C. Jernigan (266 pages) RE: Motion for an Order Further Extending Duration of Trusts (4213); Motion for Entry of an Order Approving Settlement with HMIT Entities (4216).* THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 09/29/2025. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 4294 Hearing held on 6/25/2025. (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Appearances: J. Morris and Pachulski team for Reorganized Debtor; R. Loigman for Post-Confirmation Trusts; D. Deitsch-Perez for Dugaboy; L. Young for UST. Evidentiary hearing. Motion granted. Counsel to upload order.), 4295 Hearing held on 6/25/2025. (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Appearances: J. Morris and Pachulski team for Reorganized Debtor; R. Loigman for Post-Confirmation Trusts; L. Phillips for HMIT Entities; M. Lang for Dugaboy; D. Curry for Dallas Foundation; L. Young for UST. Evidentiary hearing. Motion granted. Counsel to upload order.)). Transcript to be made available to the public on 09/29/2025. (Rehling, Kathy) |
| 07/16/2025 | 4317 | *Clerk's correspondence requesting to amend notice of appeal from creditor.* (RE: related document(s) 4297 Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document 4216) Entered on 6/30/2025. (Okafor, M.)) Responses due by 7/18/2025. (Whitaker, Sheniqua) |
| 07/22/2025 | 4336 | *Certificate of mailing regarding appeal* (RE: related document(s) 4327 Amended notice of appeal filed by Creditor Patrick Daugherty Related document(s) 4310 Notice of appeal filed by Creditor Patrick Daugherty. MODIFIED linkage on 7/17/2025 (suw).) (Attachments: # 1 Service List) (Whitaker, Sheniqua) |
| 07/22/2025 | 4337 | *Notice regarding the record for a bankruptcy appeal to the U.S. District Court.* (RE: related document(s) 4327 Amended Notice of appeal . Fee Amount $298 filed by Creditor Patrick Daugherty (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Attachments: # 1 Exhibit A)) (Whitaker, Sheniqua) |
| 07/22/2025 | 4343 | *Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01901-S.* (RE: related document(s) 4327 Amended notice of appeal filed by Creditor Patrick Daugherty Related document(s) 4310 Notice of appeal filed by Creditor Patrick Daugherty. (RE: related document(s)4297 Order on motion to compromise controversy).) (Almaraz, Jeanette) |

4905-5299-6446

**Reservation of Rights**

Daugherty expressly reserves the right to amend or supplement this Designation and/or to object, or otherwise supplement or move to strike or modify, some or all of any designations filed by any other party to this appeal.  This filing is made expressly subject to, and without waiver, of any and all rights, remedies, challenges and objections.

4905-5299-6446

Respectfully submitted this 14th day of August 2025.

**GRAY REED**

By:  */s/ Andrew K. York*
    Jason S. Brookner
    Texas Bar No. 240033684
    Andrew K. York
    Texas Bar No. 24051554
    Joshua D. Smeltzer
    Texas Bar No. 24113859
    Drake M. Rayshell
    Texas Bar No. 24118507

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:  jbrookner@grayreed.com
       dyork@grayreed.com
       jsmeltzer@grayreed.com
       drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing instrument was served on all Parties or counsel of record herein on this 14th day of August 2025, via the CM/ECF system and/or email.

*/s/ Andrew K. York*
Andrew K. York

9

Section 4.10   The Assistant Chief Financial Officers.   If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11   Delegation of Duties.   In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V.

## BOOKS AND RECORDS

Section 5.1   Location.   The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2   Inspection.   The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI.

## MISCELLANEOUS PROVISIONS

Section 6.1   Fiscal Year.   The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2   Depositories.   The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3   Checks, Drafts and Notes.   All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4   Contracts and Other Instruments.   The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances,

010036 000016 14282559.2

003050

Section 6.5    Conflicts of Interest.  No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6    Waivers of Notice.  Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members. Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7    Ownership Interests in Other Entities.  Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8    Indemnification.

(a)    Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held

-10-

003051

harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all, costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking. by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b)    If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct,

(c)    The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d)    The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense,

liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e)    To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f)    Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g)    The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9    Amendment of Bylaws.  Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

*  *  *  *  *

The undersigned, being the duly elected and qualifying Secretary of the Corporation, hereby certifies that the foregoing initial Bylaws of the Corporation were duly adopted by the Board of Directors of the Corporation by unanimous written consent on ⎯March 9⎯, 2015.

Digitally signed by Gary Garcia
DN: cn=Gary Garcia, o=The Dallas Foundation, ou, email=gwgarcia@dallasfoundation.org, c=US
Date: 2015.03.09 15:47:15 -05'00'

Gary W. Garcia, Secretary

**EXHIBIT 98**



**Deferred Variable Annuity Policy**

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Goertzen,

12/16/15 Janita Burkey,

**THIS IS A LEGAL CONTRACT.**

**PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

*continued on next page*

**Crown Global Life Insurance Ltd.**

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com



**Deferred Variable Annuity Policy**

Crown Global Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.

NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.



## Policy Data Page

### General Policy Data

All amounts expressed in "$" or "dollars" are in United States dollars

| | |
|---|---|
| Proposed Policyholder: | Proposed Annuitant: |
| Empower Dallas Foundation, Inc | Grant Scott |

| | |
|---|---|
| Proposed Annuitant's Date of Birth: | Gender: |
| 29 May, 1962 | Male |

Policy Effective Date: 10 Dec, 2015    Issue Date: 10 Dec, 2015

Annuity Starting Date: Deferred

until Annuitant's 85th birthday

at the latest

| Beneficiary: | Beneficiary Interest | Revocable/Irrevocable? |
|---|---|---|
| Empower Dallas Foundation, Inc | 100% | Irrevocable |

Separate Account number : 30218
### Premium Amounts

| | |
|---|---|
| Initial Premium: | $ 15,903,108.54 |
| Premium Limit: | n/a |
| Premium Deposit: | n/a |

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.



## Policy Data Page

**Initial Allocation of Payments to Investment Options**

| Investment Options | Initial Allocation |
|---|---|
| 1. IDF: Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank:  n/a

Investment Manager:  n/a

003058



## Policy Data Page

### Policy Fees and Charges

| Charge | Due Date | Amount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value:<br><br>0.45% p.a  $10mm of  Premium<br><br>0.35% p.a. $11-20mm of Premium<br><br>0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm<br><br>(adjusted for additional premium payments and withdrawals, as applicable)<br><br>*See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |



## Table of Contents

General Policy Data ............................................................................................... 3
Initial Allocation of Payments to Investment Options ............................... 4
Policy Fees and Charges ..................................................................................... 5

**Article I    General Provisions.................................................................15**
Section 1.1    Consideration .................................................................. 15
Section 1.2    Entire Policy..................................................................... 15
Section 1.3    Survival of Representations, Warrants, Covenants...................... 15
Section 1.4    Amendment or Modification ....................................... 15
Section 1.5    Misstatement of Age...................................................... 15
Section 1.6    Non-Participating Policy .............................................. 16
Section 1.7    Ownership of Assets....................................................... 16
Section 1.8    Rule of Construction ...................................................... 16
Section 1.9    Governing Law ................................................................ 16
Section 1.10   Effective Date of Coverage.......................................... 16

**Article II   Premium Provisions..............................................................17**
Section 2.1    Premiums .......................................................................... 17
Section 2.2    Insurer's Right to Refuse Premiums .......................... 17
Section 2.3    Nonpayment of Premium .............................................. 18

**Article III  Termination Provisions ........................................................19**
Section 3.1    Insurer's Cancellation Rights ...................................... 19
Section 3.2    Reinstatement ................................................................. 20

**Article IV  Premium Investment; Policy Account Values ...................21**
Section 4.1    The Separate Account .................................................... 21
Section 4.2    Premiums .......................................................................... 21
Section 4.3    Allocations to Investment Options ............................ 21
Section 4.4    Compliance with Investor Control Rules.................... 22
Section 4.5    Changes in Allocations to Investment Options ........... 23
Section 4.6    Responsibility for Selecting Investment Options ............ 23
Section 4.7    Appointment of Investment Manager and Custodian Bank ........... 24
Section 4.8    Timing of Allocations .................................................... 24
Section 4.9    Investment of Separate Account Assets..................... 24
Section 4.10   Request for Extension of Investment Rights  With Respect
               to Adequate Diversification................................... 26
Section 4.11   Changes in Investment Options .................................. 26



Section 4.12   Policy Account Value ............................................................. 27

**Article V   Transfers Among Investment Options** ...............................................**28**
Section 5.1   General ................................................................................... 28
Section 5.2   Conditions on Transfer ........................................................... 28
Section 5.3   Liability ................................................................................... 29
Section 5.4   Limits on Right of Transfer ..................................................... 29

**Article VI   Annuity Provisions** ..................................................................**30**
Section 6.1   Annuity Payments ................................................................... 30
Section 6.2   Annuity Percentage ................................................................ 30
Section 6.3   No Guaranteed Payments ...................................................... 30
Section 6.4   Annuity Starting Date ............................................................. 31
Section 6.5   Change of Annuity Starting Date ............................................ 31
Section 6.6   Annuity Income Options ......................................................... 31
Section 6.7   Maturity Payment ................................................................... 32

**Article VII  Loan Provisions** .......................................................................**33**
Section 7.1   Policy Loans .......................................................................... 33

**Article VIII Surrender Provisions** ...............................................................**34**
Section 8.1   General ................................................................................... 34
Section 8.2   Full Surrender ........................................................................ 34
Section 8.3   Partial Surrender .................................................................... 34

**Article IX  Policy Fees and Charges** ..........................................................**36**
Section 9.1   Policy Administration Fee ....................................................... 36
Section 9.2   DAC Charges ......................................................................... 36
Section 9.3   Management & Expense Fee .................................................. 36
Section 9.4   Policy Set-Up Deposit ............................................................ 36
Section 9.5   Acceptance Fee ..................................................................... 36
Section 9.6   Surrender Charge ................................................................... 37
Section 9.7   Taxes ..................................................................................... 37
Section 9.8   Agreed Upon Procedures Fee ................................................ 37
Section 9.9   Deductions for Fees and Charges .......................................... 37
Section 9.10  Custodian Bank and Investment Manager Fees ..................... 37

**Article X   Death Benefit Provisions** ...........................................................**39**
Section 10.1  Death Benefit ......................................................................... 39
Section 10.2  Due Proof of Death ................................................................ 40



**Article XI  Owner, Beneficiary, Assignment** ...................................................**41**
    Section 11.1    Proposed Policyholder .................................................. 41
    Section 11.2    Change of Proposed Policyholder ................................. 41
    Section 11.3    Proposed Annuitant ..................................................... 41
    Section 11.4    Change of Proposed Annuitant .................................... 41
    Section 11.5    Beneficiary .................................................................. 42
    Section 11.6    Change of Beneficiary ................................................. 42
    Section 11.7    Assignment .................................................................. 42

**Article XII Other General Provisions** .................................................................**44**
    Section 12.1    Periodic Reports .......................................................... 44
    Section 12.2    Currency and Place of Payment ................................... 44
    Section 12.3    Notices, Requests and Elections .................................. 44
    Section 12.4    Policy Settlement ......................................................... 45
    Section 12.5    Deferment .................................................................... 45
    Section 12.6    Incontestability ............................................................ 45
    Section 12.7    Policyholder Information .............................................. 46
    Section 12.8    Tax Matters .................................................................. 46
    Section 12.9    Limitation on Liability of Insurer ................................ 47

**CROWN GLOBAL**
INSURANCE

## Definitions

**Acceptance Fee** – The fee deducted by the Insurer as stated in the Policy Data Page and described in Section 9.5.

**Accredited Investor** – An "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.

**Age** –  A Proposed Annuitant or Proposed Joint Annuitant's age on their last birthday.

**Agreed Upon Procedures ("AUP") Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.8.

**Annuity Application Form** – The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Payments** – The benefits payable to the Beneficiary under Section 6.1 of this Policy (each an "Annuity Payment").

**Annuity Starting Date** – The date on which Annuity Payments under Section 6.4 of this Policy commence.

**Beneficiary** – The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** – Any day on which banks in the U.S. and Bermuda are open for business.

**Claim Date** – The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 10.2 at the Insurer's Home Office.

**Code** – The U.S. Internal Revenue Code of 1986, as amended.

**Confidential Private Placement Memorandum** – The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,

003063

**CROWN GLOBAL**
INSURANCE

exhibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** – The period of time described in Section 12.6 which extends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** – The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section 9.2.

**Death Benefit** – The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** – Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management & Expense Fee, the Acceptance Fee, Taxes, and the Agreed Upon Procedures Fee.

**FINMA** – The Swiss Financial Market Supervisory Authority.

**Full Surrender** – A Surrender pursuant to Section 8.2.

**Grace Period** – A period of thirty days following the date on which the Insurer makes available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than $250,000, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than $250,000 following payment of such Fees and Charges.

**Home Office** – The Insurer's office in Hamilton, Bermuda. The Insurer's mailing address is Crown Global Life Insurance Ltd., Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda,  email: info@crownglobalinsurance.com,  facsimile: +1-345-945-6121.

**IDF** – An insurance dedicated fund.

**In Force** – A condition that the Policy has not terminated.

**Initial Premium** – The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** – An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company

003064

CROWN GLOBAL
INSURANCE

(i) which is intended to operate as an insurance dedicated fund (an "IDF") and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is acquiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** – Crown Global Life Insurance Ltd. The Insurer has elected under Code section 953(d) to be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

**Investment Adviser Act** – The U.S. Investment Adviser Act of 1940, as amended.

**Investment Company Act** – The U.S. Investment Company Act of 1940, as amended.

**Investment Option** – A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** – The U.S. Internal Revenue Service.

**Issue Date** – The issue date of the Policy as stated on the Policy Data Page.

**Joint Life Annuity** – An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Liquid Asset Subaccount** – A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial bank accounts.

**Liquidity Date** – The last Business Day of each calendar quarter.

**Managed Subaccount** – An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer.  For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Management & Expense Fee** – The Management & Expense Fee as stated on the Policy Data Page and described in Section 9.3.



**Minimum Liquid Asset Allocation** – An amount not in excess of the expected annual Fees and Charges related to the Policy that the Insurer may place in the Liquid Asset Subaccount.

**Net Premium** – A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section 9.5.

**Next Available Liquidity Date** – For any specified day, the Liquidity Date on or next following the 100th calendar day following the specified day.

**Partial Surrender** – A Surrender pursuant to Section 8.3.

**Policy** – This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** – The net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Administration Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.1.

**Policy Anniversary** – The anniversary of the Policy Effective Date.

**Policy Data Page** – The pages of this Policy titled "Policy Data Page."  The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effective Date** – The "Policy Effective Date" of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** – A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section 9.4.

**Policy Year** – Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the next Policy Anniversary.

**Premiums** – The Initial Premium and any subsequent Premiums paid to the Insurer under this Policy.



**Private Act** – The private act entitled "The Scottish Annuity & Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2001," as amended and consolidated from time to time.

**Proposed Annuitant** – The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed Joint Annuitants** – Each Proposed Annuitant (each being a "Proposed Joint Annuitant") when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** – Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**Qualified Purchaser** – A Qualified Purchaser within the meaning of Section 2(a)(51) of the Investment Company Act.

**SEC** – The U.S. Securities and Exchange Commission.

**Securities Act** – The U.S. Securities Act of 1933, as amended.

**Separate Account** – A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tasks means the Insurer in respect of the Separate Account.

**Single Life Annuity** – An annuity measured by the life of a single Proposed Annuitant.

**003067**



**Subaccount** – A subaccount established by the Insurer as a bookkeeping entry within the Separate Account.

**Surrender** – A surrender under Article VIII including a Full Surrender under Section 8.2 and a Partial Surrender under Section 8.3.

**Taxes** – The taxes defined in Section 9.7 of this Policy.

**Unscheduled Premium** – Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** – The U.S. Treasury regulations promulgated under the Code, as amended.

003068

**CROWN GLOBAL**
INSURANCE

# Article I        General Provisions

### Section 1.1        Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

### Section 1.2        Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, acknowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

### Section 1.3        Survival of Representations, Warrants, Covenants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the execution of this Policy.

### Section 1.4        Amendment or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder's consent, provided that, the Insurer may take any action it deems necessary in order to preserve the U.S. tax treatment of the Policy without the Proposed Policyholder's consent, so long as the Insurer provides 90 days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

### Section 1.5        Misstatement of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will require due proof of the Age or survival of any person on

**003069**



whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

### Section 1.6    Non-Participating Policy

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

### Section 1.7    Ownership of Assets

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

### Section 1.8    Rule of Construction

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

### Section 1.9    Governing Law

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1978 as may be amended from time to time.

### Section 1.10    Effective Date of Coverage

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.



## Article II        Premium Provisions

**Section 2.1        Premiums**

The minimum Initial Premium payable under the Policy is $2 million. Such minimum may be met by aggregating Policies having initial Premiums of $1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the maximum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder's financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon request, a receipt will be provided at the Insurer's Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to make said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-kind asset contributions as Premium payments. The Insurer may reject in-kind asset contributions in its sole and absolute discretion.

**Section 2.2        Insurer's Right to Refuse Premiums**

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. tax consequences the Policy is intended to provide or the tax consequences under the laws of any other applicable jurisdiction.



The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a Qualified Purchaser or an Accredited Investor. The Insurer may require any Proposed Policyholder to provide confirmation of the Proposed Policyholder's status as a Qualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not exceed the sum of expected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section 2.3        Nonpayment of Premium**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is $500,000 or more.

**CROWN GLOBAL**
INSURANCE

## Article III  Termination Provisions

### Section 3.1  Insurer's Cancellation Rights

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1.  The Policy Account Value is less than $250,000 at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2.  The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

3.  The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

4.  Subject to the provisions of section 12.6 of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

5.  If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide 90 day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination.  The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.



**Section 3.2**      **Reinstatement**

If the Policy terminates as the result of the expiration of a Grace Period, it may not be reinstated unless reinstatement is required by Bermuda law.

003074



## Article IV    Premium Investment; Policy Account Values

### Section 4.1    The Separate Account

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

### Section 4.2    Premiums

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the extent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager).

### Section 4.3    Allocations to Investment Options

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Liquidity Date a Proposed Policyholder's Net Premiums will be allocated among the



Investment Options according to the allocation percentages selected. Allocation percentages must be zero or a whole number not less than ten nor greater than 100. The sum of the allocation percentages must equal 100. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to require allocation of an amount equal to the expected aggregate quarterly Fees and Charges related to the Policy to the Liquid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Liquid Asset Subaccount equal to the expected quarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories:  IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates make no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager's investment performance and makes no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

### Section 4.4    Compliance with Investor Control Rules

The Proposed Policyholder agrees that, except for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section 4.3, and changes to such allocations as contemplated in Section 4.5, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.



### Section 4.5     Changes in Allocations to Investment Options

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in "Initial Allocation of Payment to Investment Options" on the Policy Data Page will continue to apply to any additional Premium payments.

### Section 4.6     Responsibility for Selecting Investment Options

The Insurer does not and will not make any recommendation as to the Proposed Policyholder's selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the



performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

**Section 4.7    Appointment of Investment Manager and Custodian Bank**

The Insurer shall have the right, exercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian bank with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer's investment management or similar agreement with such investment manager).   A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian banks who meet the Insurer's general requirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

**Section 4.8    Timing of Allocations**

The Insurer will allocate the Proposed Policyholder's Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written request of the Proposed Policyholder, within two business days  following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Liquid Asset Subaccount and subsequently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to liquidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

**Section 4.9    Investment of Separate Account Assets**

The Insurer will require each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following:

1.    Investment of assets held in each Subaccount will be sufficiently diversified to comply with the requirements of U.S. Treasury Regulation section 1.817-5(b). Assets of any investment fund relying upon a "look-through" basis for purposes



of meeting such diversification requirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such requirements.

2.    The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or make any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

3.    No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

4.    The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, market-linked deposits and flexible deposits) managed, advised and/or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager's sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than 55% of the assets on an initial purchase basis (excluding market value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

5.    In accordance with Section 4.4, except for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder's advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.

003079



### Section 4.10 Request for Extension of Investment Rights With Respect to Adequate Diversification

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section 4.4 and partial or complete release of the investment manager's obligations in Section 4.9 to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

### Section 4.11 Changes in Investment Options

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of 60 days following receipt of the Insurer's notice of any



such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

**Section 4.12    Policy Account Value**

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.



## Article V        Transfers Among Investment Options

### Section 5.1        General

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

### Section 5.2        Conditions on Transfer

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions:

1.      Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.

2.      Transfers will be effected within 60 days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.

3.      Any transfer request must clearly specify: (a) the amount which is to be transferred; and (b) the Subaccounts which are to be affected.

4.      Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).

5.      The minimum amount that may be transferred in a single transfer will be the lesser of $250,000 or the entire interest in a Subaccount.

6.      No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.

7.      In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.



## Section 5.3          Liability

Neither the Insurer nor any of the Insurer's affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder's transfer request including lower returns which may result.

## Section 5.4          Limits on Right of Transfer

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to make the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested.  For the avoidance of doubt, a transfer described in this Section 5.4 is a situation where a change from one Investment Option to another Investment Option occurs.



## Article VI        Annuity Provisions

### Section 6.1        Annuity Payments

The Insurer will make periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will equal the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar quarter immediately preceding each Annuity Payment) and will vary depending upon the investment experience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

### Section 6.2        Annuity Percentage

The Annuity Percentages are listed in the Appendix I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

### Section 6.3        No Guaranteed Payments

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment experience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account backing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account backing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.



### Section 6.4    Annuity Starting Date

The Annuity Starting Date must be on the first day of a calendar quarter and may not be later than the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty- fifth (85th) birthday shall be the Annuity Starting Date.

### Section 6.5    Change of Annuity Starting Date

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Next Available Liquidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant's 85th birthday. Distributions must commence after the Annuity Starting Date in accordance with requirements under the Code.

### Section 6.6    Annuity Income Options

Two (2) basic benefit options are offered under the Policy: (i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder; however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (30) calendar days' written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer's



actuary each year (and recomputed on the annual anniversary date each year thereafter) by multiplying the applicable Annuity Percentage in the Annuity Percentage Table attached as Appendix I to this Policy by the then current Policy Account Value as of the Annuity Starting Date and predetermined on the annual anniversary date each year thereafter. If the Policy Account Value is zero, then all payments will cease. All Annuity Payments shall be made to an account outside the U.S. The Insurer may consider the adoption of additional benefit options at the request of a Proposed Policyholder.

**Section 6.7** **Maturity Payment**

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint Annuitants), the Insurer will pay to the Beneficiaries, or their successors as Beneficiaries, as the case may be, the balance of the Policy Account Value.

**CROWN GLOBAL**
INSURANCE

## Article VII     Loan Provisions

**Section 7.1     Policy Loans**

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder's request to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer's sole and absolute discretion.



## Article VIII    Surrender Provisions

### Section 8.1    General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may request one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 100% of the Policy Account Value. Should the Policy Account Value be equal to or less than $250,000, the Policy will lapse. The rights of a Proposed Policyholder to make a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written request with the Insurer at the Insurer's Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Next Available Liquidity Date occurring after the Insurer receives the request to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Next Available Liquidity Date after receipt of the Surrender request, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Liquidity Date or another date (subject to such liquidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section 8.2    Full Surrender

If the Proposed Policyholder requests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender request in accordance with Section 12.3.

### Section 8.3    Partial Surrender

The Proposed Policyholder may request a Partial Surrender of the Policy for up to and including 90% of the Policy Account Value of the Policy. No more than one Partial Surrender may be requested by the Proposed Policyholder during each quarter of a Policy Year. As provided in Section 3.1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than



$250,000 may be deemed by the Insurer to be a request for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than $250,000, then the Insurer shall have the right, exercisable in its sole and absolute discretion, to treat a Partial Surrender request as a Full Surrender request.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any request for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.



# Article IX    Policy Fees and Charges

### Section 9.1    Policy Administration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative expenses.

### Section 9.2    DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred acquisition costs for U.S. federal income tax purposes under section 848 of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income tax rate.  The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section 9.3    Management & Expense Fee

The Insurer will deduct the Management & Expense Fee from the Separate Account. The Management & Expense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section 9.4    Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer.  Upon issuing the Policy, an amount equal to the Policy Set-Up Deposit will be used to offset the Acceptance Fee.  If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section 9.5    Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.



### Section 9.6     Surrender Charge

Surrender charges will not apply to this Policy.

### Section 9.7     Taxes

The Insurer will deduct only those Taxes (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account.  These taxes (the "Taxes") exclusively include withholding taxes, excise taxes, sales taxes, stamp taxes, value added taxes, state taxes imposed on the Insurer or its affiliates, and taxes imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred tax amount and any interest charge or other taxes imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding tax laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Taxes when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Taxes have resulted from the investment experience of any Subaccount or receipt by the Insurer of Premiums.

### Section 9.8     Agreed Upon Procedures Fee

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

### Section 9.9     Deductions for Fees and Charges

The Fees and Charges are paid to the Insurer under the Policy initially by making deductions from Premiums and then by making deductions from the Separate Account. To the extent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Liquid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

### Section 9.10     Custodian Bank and Investment Manager Fees

Each custodian bank and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the



custodian bank and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon request.



## Article X     Death Benefit Provisions

**Section 10.1    Death Benefit**

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant's death (or survivor of the Proposed Joint Annuitants' death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder's estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder's last known domicile on the date of the Proposed Policyholder's death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recognized as the "primary Proposed Annuitant" and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the "annuity starting date" (defined under Code Section 72(c)(4) as the first day of the first period for which an amount is received as an annuity under the contract; such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder's entire interest in the Policy shall be distributed to the Beneficiaries within five (5) years from the date of the Proposed Policyholder's death, unless the Beneficiaries

003093



elect to receive such interest in distributions made over their life or lives (or over a period not extending beyond their respective life expectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder's death. Any such election must be made in writing and received by the Insurer at the Insurer's Home Office within 180 calendar days from the date of the Proposed Policyholder's death.

If the Proposed Policyholder dies on or after the "annuity starting date" (as defined under Code Section 72(c)(4)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder's death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section 72(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

**Section 10.2     Due Proof of Death**

Due proof of death is one of the following received at the Insurer's Home Office in a form satisfactory to the Insurer in its absolute discretion:

1.     A certified copy of a death certificate;

2.     A certified copy of a decree of a court of competent jurisdiction as to the finding of death; or

3.     Any other proof of death satisfactory to the Insurer.



## Article XI        Owner, Beneficiary, Assignment

**Section 11.1        Proposed Policyholder**

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in bankruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be exercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder's rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

**Section 11.2        Change of Proposed Policyholder**

The Proposed Policyholder may change the ownership of the Policy by submitting a request to the Insurer's Home Office and obtaining written approval of the Insurer. Any approved change will take effect on the date specified in the approval.

**Section 11.3        Proposed Annuitant**

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subsequently changed.

**Section 11.4        Change of Proposed Annuitant**

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.



### Section 11.5    Beneficiary

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

### Section 11.6    Change of Beneficiary

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

### Section 11.7    Assignment

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1035 exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.7 have been met.

003096



The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or exchange, including a "1035" exchange of the Policy with another carrier and will cooperate to exchange underlying IDFs or sub-accounts with such carrier.  Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1035 exchange or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder's rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in liquidated damages to the Proposed Policyholder equal to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and Expense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) exists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder.  For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the liquidated damages amount provided for herein.   The Proposed Policyholder (x) acknowledges that the Insurer's ordinary and customary process for 1035 exchanges includes obtaining satisfactory assurance from the transferor of compliance with relevant tax and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any tax obligations relating to the Policy  and (y) agrees that following the Insurer's 1035 exchange process will not be considered to be a failure to cooperate by the Insurer.

003097



## Article XII    Other General Provisions

### Section 12.1    Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section 12.2    Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section 12.3    Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions



received by facsimile communication are genuine. Any notice or report required to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person's authorized representative.

**Section 12.4    Policy Settlement**

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

**Section 12.5    Deferment**

The Insurer will execute allowable requests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within 60 days of a request. Such requests may require conversion of certain Investment Option assets to cash or in-kind distributions, where possible. This may take longer than 60 days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will take reasonable steps to comply with such requests at the earliest time possible.  The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

**Section 12.6    Incontestability**

Except as expressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer's obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Next Available Liquidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within 90 days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer's obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.



### Section 12.7    Policyholder Information

The Insurer may disclose Policyholder information to third parties such as banks or independent asset managers. Specifically with respect to banking relationships in Switzerland and in accordance with FINMA Newsletter 18 (2010) "handling of Life insurance with separately managed accounts/portfolios" dated December 20, 2010, the Insurer may disclose Policyholder or source of funding information to banking partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be required to confirm in accordance with FINMA Newsletter 18 (2010) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric risks, of the Insurer's domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing Form TD F 90-22.1 (Report of Foreign Bank and Financial Accounts), commonly referred to as an "FBAR", with the Department of the Treasury on or before June 30 of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could request information with respect to such filings and the Proposed Policyholder acknowledges that the Insurer may provide such FBAR-related information to the IRS if requested to do so.

### Section 12.8    Tax Matters

The Proposed Policyholder acknowledges that he or she is responsible for complying with all tax reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to tax. The Proposed Policyholder must consult its own tax advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.



**Section 12.9**     **Limitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR ANY LOSS OR OTHER DAMAGES WITH RESPECT TO THE POLICY IS LIMITED TO THE POLICY ACCOUNT VALUE.**

003101

**CROWN GLOBAL**
INSURANCE

## Appendix I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |

**EXHIBIT 99**



## *TERMSHEET*

| | | |
|---|---|---|
| Policy Number | : | # 30218 Separate Account |
| Policyholder | : | Empower Dallas Foundation, Inc |
| Annuitant | : | Grant Scott |
| Beneficiary | : | Empower Dallas Foundation, Inc |
| Premiums planned | : | Approx. US$ 20'000'000 |
| Premium Date | : | TBA |
| Policy Date | : | TBA |
| Policy Type | : | Deferred Variable Annuity (DVA) |
| Issuing Company | : | Crown Global Life Insurance Ltd., Bermuda (953d) |
| Custodian Bank | : | n/a |
| Account/Portfolio Number | : | n/a |
| Investment Manager | : | n/a |
| Asset Allocation/Investment Profile | : | IDF: Atlas IDF, LP/ Rand Advisors LLC |
| Investment of Funds Model: | : | n/a |
| Acceptance Fee | : | Zero |
| Mgmt. & Expense Fee | : | 0.45% p.a  $10mm of  Premium<br>0.35% p.a. $11-20mm of Premium<br>0.25% p.a. $21mm+ of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm. |
| Policy Administration Fee | : | US$ 2,900 p.a. |
| DAC Tax | : | 0.25% of all premium payments |
| Federal Excise Tax – 1% of Premium | : | n/a |
| Surrender Charge | : | US$ 5'000 |
| Policy Audit (optional) | : | US$ 1'975 p.a. |

Place, Date                            GRAND CAYMAN , DEC 9TH 2015 .

Signature

*Christopher Pegalla*

Policyholder

003104

**EXHIBIT 100**



**Deferred Variable Annuity Policy**

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Greertzen

12/16/15 Janita Burke

**THIS IS A LEGAL CONTRACT.**
**PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

*continued on next page*

Crown Global
Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

30219



**Deferred Variable
Annuity Policy**

**Crown Global
Life Insurance Ltd.**

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.

NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.

003107



## Policy Data Page

### General Policy Data

**All amounts expressed in "$" or "dollars" are in United States dollars**

Proposed Policyholder:

The Okada Family Foundation, Inc

Proposed Annuitant:

Mark Okada

Proposed Annuitant's Date of Birth:

11 May, 1962

Gender:

 Male

Policy Effective Date: 11 Dec, 2015    Issue Date: 11 Dec, 2015

Annuity Starting Date: Deferred

until Annuitant's 85th birthday

| Beneficiary: | Beneficiary Interest | Revocable/Irrevocable? |
|---|---|---|
| The Okada Family Foundation, Inc | 100% | Irrevocable |

Separate Account number : 30219

### Premium Amounts

Initial Premium:            $ 5,301,065.12

Premium Limit:            n/a

Premium Deposit:            n/a

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.

003108



## Policy Data Page

**Initial Allocation of Payments to Investment Options**

| Investment Options | Initial Allocation |
|---|---|
| 1. IDF:  Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank:        n/a

Investment Manager:   n/a



## Policy Data Page

**Policy Fees and Charges**

| Charge | Due Date | Amount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value:<br><br>0.45% p.a  $10mm of  Premium<br><br>0.35% p.a. $11-20mm of Premium<br><br>0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm<br><br>(adjusted for additional premium payments and withdrawals, as applicable)<br><br>*See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |



## Table of Contents

General Policy Data ........................................................................................... 3
Initial Allocation of Payments to Investment Options ................................ 4
Policy Fees and Charges .................................................................................. 5

**Article I    General Provisions ............................................................. 15**
Section 1.1    Consideration ......................................................... 15
Section 1.2    Entire Policy ........................................................... 15
Section 1.3    Survival of Representations, Warrants, Covenants ...................... 15
Section 1.4    Amendment or Modification ................................. 15
Section 1.5    Misstatement of Age ............................................ 15
Section 1.6    Non-Participating Policy ...................................... 16
Section 1.7    Ownership of Assets ............................................ 16
Section 1.8    Rule of Construction ............................................ 16
Section 1.9    Governing Law ...................................................... 16
Section 1.10   Effective Date of Coverage .................................. 16

**Article II   Premium Provisions .......................................................... 17**
Section 2.1    Premiums ............................................................... 17
Section 2.2    Insurer's Right to Refuse Premiums ................... 17
Section 2.3    Nonpayment of Premium ..................................... 18

**Article III  Termination Provisions .................................................... 19**
Section 3.1    Insurer's Cancellation Rights ............................. 19
Section 3.2    Reinstatement ...................................................... 20

**Article IV  Premium Investment; Policy Account Values ................ 21**
Section 4.1    The Separate Account ......................................... 21
Section 4.2    Premiums ............................................................... 21
Section 4.3    Allocations to Investment Options ..................... 21
Section 4.4    Compliance with Investor Control Rules ............ 22
Section 4.5    Changes in Allocations to Investment Options ... 23
Section 4.6    Responsibility for Selecting Investment Options ... 23
Section 4.7    Appointment of Investment Manager and Custodian Bank ........... 24
Section 4.8    Timing of Allocations ........................................... 24
Section 4.9    Investment of Separate Account Assets ............. 24
Section 4.10   Request for Extension of Investment Rights  With Respect
               to Adequate Diversification .................................. 26
Section 4.11   Changes in Investment Options ......................... 26



Section 4.12    Policy Account Value .................................................................. 27

**Article V    Transfers Among Investment Options ....................................... 28**
Section 5.1    General ............................................................................... 28
Section 5.2    Conditions on Transfer ......................................................... 28
Section 5.3    Liability ............................................................................... 29
Section 5.4    Limits on Right of Transfer ................................................... 29

**Article VI   Annuity Provisions ............................................................... 30**
Section 6.1    Annuity Payments ................................................................ 30
Section 6.2    Annuity Percentage ............................................................. 30
Section 6.3    No Guaranteed Payments ..................................................... 30
Section 6.4    Annuity Starting Date ........................................................... 31
Section 6.5    Change of Annuity Starting Date ........................................... 31
Section 6.6    Annuity Income Options ....................................................... 31
Section 6.7    Maturity Payment ................................................................ 32

**Article VII  Loan Provisions .................................................................. 33**
Section 7.1    Policy Loans ....................................................................... 33

**Article VIII Surrender Provisions ............................................................ 34**
Section 8.1    General ............................................................................... 34
Section 8.2    Full Surrender ..................................................................... 34
Section 8.3    Partial Surrender ................................................................. 34

**Article IX   Policy Fees and Charges ....................................................... 36**
Section 9.1    Policy Administration Fee ..................................................... 36
Section 9.2    DAC Charges ...................................................................... 36
Section 9.3    Management & Expense Fee ................................................. 36
Section 9.4    Policy Set-Up Deposit .......................................................... 36
Section 9.5    Acceptance Fee .................................................................. 36
Section 9.6    Surrender Charge ................................................................ 37
Section 9.7    Taxes ................................................................................. 37
Section 9.8    Agreed Upon Procedures Fee ............................................... 37
Section 9.9    Deductions for Fees and Charges .......................................... 37
Section 9.10   Custodian Bank and Investment Manager Fees ......................... 37

**Article X    Death Benefit Provisions ...................................................... 39**
Section 10.1   Death Benefit ..................................................................... 39
Section 10.2   Due Proof of Death .............................................................. 40

003112



**Article XI  Owner, Beneficiary, Assignment** .......................................................**41**
    Section 11.1  Proposed Policyholder ............................................................ 41
    Section 11.2  Change of Proposed Policyholder ......................................... 41
    Section 11.3  Proposed Annuitant ............................................................... 41
    Section 11.4  Change of Proposed Annuitant ............................................. 41
    Section 11.5  Beneficiary ............................................................................. 42
    Section 11.6  Change of Beneficiary ........................................................... 42
    Section 11.7  Assignment ............................................................................ 42

**Article XII Other General Provisions** ................................................................**44**
    Section 12.1  Periodic Reports .................................................................... 44
    Section 12.2  Currency and Place of Payment ........................................... 44
    Section 12.3  Notices, Requests and Elections .......................................... 44
    Section 12.4  Policy Settlement .................................................................. 45
    Section 12.5  Deferment ............................................................................. 45
    Section 12.6  Incontestability ...................................................................... 45
    Section 12.7  Policyholder Information ........................................................ 46
    Section 12.8  Tax Matters ........................................................................... 46
    Section 12.9  Limitation on Liability of Insurer ........................................... 47



## Definitions

**Acceptance Fee** – The fee deducted by the Insurer as stated in the Policy Data Page and described in Section 9.5.

**Accredited Investor** – An "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.

**Age** –  A Proposed Annuitant or Proposed Joint Annuitant's age on their last birthday.

**Agreed Upon Procedures ("AUP") Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.8.

**Annuity Application Form** – The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Payments** – The benefits payable to the Beneficiary under Section 6.1 of this Policy (each an "Annuity Payment").

**Annuity Starting Date** – The date on which Annuity Payments under Section 6.4 of this Policy commence.

**Beneficiary** – The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** – Any day on which banks in the U.S. and Bermuda are open for business.

**Claim Date** – The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 10.2 at the Insurer's Home Office.

**Code** – The U.S. Internal Revenue Code of 1986, as amended.

**Confidential Private Placement Memorandum** – The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,



exhibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** – The period of time described in Section 12.6 which extends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** – The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section 9.2.

**Death Benefit** – The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** – Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management & Expense Fee, the Acceptance Fee, Taxes, and the Agreed Upon Procedures Fee.

**FINMA** – The Swiss Financial Market Supervisory Authority.

**Full Surrender** – A Surrender pursuant to Section 8.2.

**Grace Period** – A period of thirty days following the date on which the Insurer makes available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than $250,000, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than $250,000 following payment of such Fees and Charges.

**Home Office** – The Insurer's office in Hamilton, Bermuda. The Insurer's mailing address is Crown Global Life Insurance Ltd., Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda,  email: info@crownglobalinsurance.com,  facsimile: +1-345-945-6121.

**IDF** – An insurance dedicated fund.

**In Force** – A condition that the Policy has not terminated.

**Initial Premium** – The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** – An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company



(i) which is intended to operate as an insurance dedicated fund (an "IDF") and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is acquiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** – Crown Global Life Insurance Ltd. The Insurer has elected under Code section 953(d) to be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

**Investment Adviser Act** – The U.S. Investment Adviser Act of 1940, as amended.

**Investment Company Act** – The U.S. Investment Company Act of 1940, as amended.

**Investment Option** – A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** – The U.S. Internal Revenue Service.

**Issue Date** – The issue date of the Policy as stated on the Policy Data Page.

**Joint Life Annuity** – An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Liquid Asset Subaccount** – A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial bank accounts.

**Liquidity Date** – The last Business Day of each calendar quarter.

**Managed Subaccount** – An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer.  For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Management & Expense Fee** – The Management & Expense Fee as stated on the Policy Data Page and described in Section 9.3.



**Minimum Liquid Asset Allocation** – An amount not in excess of the expected annual Fees and Charges related to the Policy that the Insurer may place in the Liquid Asset Subaccount.

**Net Premium** – A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section 9.5.

**Next Available Liquidity Date** – For any specified day, the Liquidity Date on or next following the 100th calendar day following the specified day.

**Partial Surrender** – A Surrender pursuant to Section 8.3.

**Policy** – This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** – The net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Administration Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.1.

**Policy Anniversary** – The anniversary of the Policy Effective Date.

**Policy Data Page** – The pages of this Policy titled "Policy Data Page." The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effective Date** – The "Policy Effective Date" of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** – A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section 9.4.

**Policy Year** – Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the next Policy Anniversary.

**Premiums** – The Initial Premium and any subsequent Premiums paid to the Insurer under this Policy.



**Private Act** – The private act entitled "The Scottish Annuity & Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2001," as amended and consolidated from time to time.

**Proposed Annuitant** – The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed Joint Annuitants** – Each Proposed Annuitant (each being a "Proposed Joint Annuitant") when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** – Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**Qualified Purchaser** – A Qualified Purchaser within the meaning of Section 2(a)(51) of the Investment Company Act.

**SEC** – The U.S. Securities and Exchange Commission.

**Securities Act** – The U.S. Securities Act of 1933, as amended.

**Separate Account** – A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tasks means the Insurer in respect of the Separate Account.

**Single Life Annuity** – An annuity measured by the life of a single Proposed Annuitant.



**Subaccount** – A subaccount established by the Insurer as a bookkeeping entry within the Separate Account.

**Surrender** – A surrender under Article VIII including a Full Surrender under Section 8.2 and a Partial Surrender under Section 8.3.

**Taxes** – The taxes defined in Section 9.7 of this Policy.

**Unscheduled Premium** – Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** – The U.S. Treasury regulations promulgated under the Code, as amended.



## Article I      General Provisions

### Section 1.1      Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

### Section 1.2      Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, acknowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

### Section 1.3      Survival of Representations, Warrants, Covenants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the execution of this Policy.

### Section 1.4      Amendment or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder's consent, provided that, the Insurer may take any action it deems necessary in order to preserve the U.S. tax treatment of the Policy without the Proposed Policyholder's consent, so long as the Insurer provides 90 days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

### Section 1.5      Misstatement of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will require due proof of the Age or survival of any person on



whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

### Section 1.6 Non-Participating Policy

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

### Section 1.7 Ownership of Assets

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

### Section 1.8 Rule of Construction

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

### Section 1.9 Governing Law

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1978 as may be amended from time to time.

### Section 1.10 Effective Date of Coverage

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.



## Article II        Premium Provisions

**Section 2.1        Premiums**

The minimum Initial Premium payable under the Policy is $2 million. Such minimum may be met by aggregating Policies having initial Premiums of $1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the maximum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder's financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon request, a receipt will be provided at the Insurer's Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to make said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-kind asset contributions as Premium payments. The Insurer may reject in-kind asset contributions in its sole and absolute discretion.

**Section 2.2        Insurer's Right to Refuse Premiums**

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. tax consequences the Policy is intended to provide or the tax consequences under the laws of any other applicable jurisdiction.



The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a Qualified Purchaser or an Accredited Investor. The Insurer may require any Proposed Policyholder to provide confirmation of the Proposed Policyholder's status as a Qualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not exceed the sum of expected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section 2.3      Nonpayment of Premium**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is $500,000 or more.



## Article III    Termination Provisions

### Section 3.1    Insurer's Cancellation Rights

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1. The Policy Account Value is less than $250,000 at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2. The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

3. The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

4. Subject to the provisions of section 12.6 of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

5. If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide 90 day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination.  The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.



## Section 3.2        Reinstatement

If the Policy terminates as the result of the expiration of a Grace Period, it may not be reinstated unless reinstatement is required by Bermuda law.



## Article IV    Premium Investment; Policy Account Values

**Section 4.1    The Separate Account**

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

**Section 4.2    Premiums**

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the extent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager).

**Section 4.3    Allocations to Investment Options**

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Liquidity Date a Proposed Policyholder's Net Premiums will be allocated among the



Investment Options according to the allocation percentages selected. Allocation percentages must be zero or a whole number not less than ten nor greater than 100. The sum of the allocation percentages must equal 100. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to require allocation of an amount equal to the expected aggregate quarterly Fees and Charges related to the Policy to the Liquid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Liquid Asset Subaccount equal to the expected quarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories:  IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates make no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager's investment performance and makes no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

**Section 4.4     Compliance with Investor Control Rules**

The Proposed Policyholder agrees that, except for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section 4.3, and changes to such allocations as contemplated in Section 4.5, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.



### Section 4.5     Changes in Allocations to Investment Options

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in "Initial Allocation of Payment to Investment Options" on the Policy Data Page will continue to apply to any additional Premium payments.

### Section 4.6     Responsibility for Selecting Investment Options

The Insurer does not and will not make any recommendation as to the Proposed Policyholder's selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the



performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

### Section 4.7    Appointment of Investment Manager and Custodian Bank

The Insurer shall have the right, exercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian bank with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer's investment management or similar agreement with such investment manager).  A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian banks who meet the Insurer's general requirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

### Section 4.8    Timing of Allocations

The Insurer will allocate the Proposed Policyholder's Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written request of the Proposed Policyholder, within two business days  following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Liquid Asset Subaccount and subsequently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to liquidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

### Section 4.9    Investment of Separate Account Assets

The Insurer will require each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following:

1.    Investment of assets held in each Subaccount will be sufficiently diversified to comply with the requirements of U.S. Treasury Regulation section 1.817-5(b). Assets of any investment fund relying upon a "look-through" basis for purposes



of meeting such diversification requirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such requirements.

2.    The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or make any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

3.    No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

4.    The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, market-linked deposits and flexible deposits) managed, advised and/or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager's sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than 55% of the assets on an initial purchase basis (excluding market value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

5.    In accordance with Section 4.4, except for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder's advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.



**Section 4.10**   **Request for Extension of Investment Rights
With Respect to Adequate Diversification**

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section 4.4 and partial or complete release of the investment manager's obligations in Section 4.9 to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

**Section 4.11**   **Changes in Investment Options**

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of 60 days following receipt of the Insurer's notice of any



such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

**Section 4.12    Policy Account Value**

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.



# Article V    Transfers Among Investment Options

**Section 5.1    General**

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

**Section 5.2    Conditions on Transfer**

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions:

1.    Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.

2.    Transfers will be effected within 60 days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.

3.    Any transfer request must clearly specify: (a) the amount which is to be transferred; and (b) the Subaccounts which are to be affected.

4.    Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).

5.    The minimum amount that may be transferred in a single transfer will be the lesser of $250,000 or the entire interest in a Subaccount.

6.    No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.

7.    In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.



### Section 5.3        Liability

Neither the Insurer nor any of the Insurer's affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder's transfer request including lower returns which may result.

### Section 5.4        Limits on Right of Transfer

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to make the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested.  For the avoidance of doubt, a transfer described in this Section 5.4 is a situation where a change from one Investment Option to another Investment Option occurs.



# Article VI    Annuity Provisions

### Section 6.1    Annuity Payments

The Insurer will make periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will equal the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar quarter immediately preceding each Annuity Payment) and will vary depending upon the investment experience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

### Section 6.2    Annuity Percentage

The Annuity Percentages are listed in the Appendix I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

### Section 6.3    No Guaranteed Payments

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment experience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account backing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account backing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.



## Section 6.4    Annuity Starting Date

The Annuity Starting Date must be on the first day of a calendar quarter and may not be later than the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday shall be the Annuity Starting Date.

## Section 6.5    Change of Annuity Starting Date

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Next Available Liquidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant's 85th birthday. Distributions must commence after the Annuity Starting Date in accordance with requirements under the Code.

## Section 6.6    Annuity Income Options

Two (2) basic benefit options are offered under the Policy: (i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder; however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (30) calendar days' written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer's



actuary each year (and recomputed on the annual anniversary date each year thereafter) by multiplying the applicable Annuity Percentage in the Annuity Percentage Table attached as Appendix I to this Policy by the then current Policy Account Value as of the Annuity Starting Date and predetermined on the annual anniversary date each year thereafter. If the Policy Account Value is zero, then all payments will cease. All Annuity Payments shall be made to an account outside the U.S. The Insurer may consider the adoption of additional benefit options at the request of a Proposed Policyholder.

**Section 6.7     Maturity Payment**

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint Annuitants), the Insurer will pay to the Beneficiaries, or their successors as Beneficiaries, as the case may be, the balance of the Policy Account Value.



## Article VII    Loan Provisions

**Section 7.1    Policy Loans**

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder's request to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer's sole and absolute discretion.



## Article VIII    Surrender Provisions

### Section 8.1    General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may request one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 100% of the Policy Account Value. Should the Policy Account Value be equal to or less than $250,000, the Policy will lapse. The rights of a Proposed Policyholder to make a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written request with the Insurer at the Insurer's Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Next Available Liquidity Date occurring after the Insurer receives the request to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Next Available Liquidity Date after receipt of the Surrender request, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Liquidity Date or another date (subject to such liquidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section 8.2    Full Surrender

If the Proposed Policyholder requests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender request in accordance with Section 12.3.

### Section 8.3    Partial Surrender

The Proposed Policyholder may request a Partial Surrender of the Policy for up to and including 90% of the Policy Account Value of the Policy. No more than one Partial Surrender may be requested by the Proposed Policyholder during each quarter of a Policy Year. As provided in Section 3.1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than



$250,000 may be deemed by the Insurer to be a request for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than $250,000, then the Insurer shall have the right, exercisable in its sole and absolute discretion, to treat a Partial Surrender request as a Full Surrender request.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any request for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.



## Article IX    Policy Fees and Charges

### Section 9.1    Policy Administration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative expenses.

### Section 9.2    DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred acquisition costs for U.S. federal income tax purposes under section 848 of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income tax rate.  The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section 9.3    Management & Expense Fee

The Insurer will deduct the Management & Expense Fee from the Separate Account. The Management & Expense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section 9.4    Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer.  Upon issuing the Policy, an amount equal to the Policy Set-Up Deposit will be used to offset the Acceptance Fee.  If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section 9.5    Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.



### Section 9.6    Surrender Charge

Surrender charges will not apply to this Policy.

### Section 9.7    Taxes

The Insurer will deduct only those Taxes (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account.  These taxes (the "Taxes") exclusively include withholding taxes, excise taxes, sales taxes, stamp taxes, value added taxes, state taxes imposed on the Insurer or its affiliates, and taxes imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred tax amount and any interest charge or other taxes imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding tax laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Taxes when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Taxes have resulted from the investment experience of any Subaccount or receipt by the Insurer of Premiums.

### Section 9.8    Agreed Upon Procedures Fee

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

### Section 9.9    Deductions for Fees and Charges

The Fees and Charges are paid to the Insurer under the Policy initially by making deductions from Premiums and then by making deductions from the Separate Account. To the extent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Liquid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

### Section 9.10    Custodian Bank and Investment Manager Fees

Each custodian bank and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the



custodian bank and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon request.

003143



## Article X    Death Benefit Provisions

**Section 10.1    Death Benefit**

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant's death (or survivor of the Proposed Joint Annuitants' death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder's estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder's last known domicile on the date of the Proposed Policyholder's death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recognized as the "primary Proposed Annuitant" and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the "annuity starting date" (defined under Code Section 72(c)(4) as the first day of the first period for which an amount is received as an annuity under the contract; such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder's entire interest in the Policy shall be distributed to the Beneficiaries within five (5) years from the date of the Proposed Policyholder's death, unless the Beneficiaries



elect to receive such interest in distributions made over their life or lives (or over a period not extending beyond their respective life expectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder's death. Any such election must be made in writing and received by the Insurer at the Insurer's Home Office within 180 calendar days from the date of the Proposed Policyholder's death.

If the Proposed Policyholder dies on or after the "annuity starting date" (as defined under Code Section 72(c)(4)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder's death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section 72(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

**Section 10.2    Due Proof of Death**

Due proof of death is one of the following received at the Insurer's Home Office in a form satisfactory to the Insurer in its absolute discretion:

1.    A certified copy of a death certificate;

2.    A certified copy of a decree of a court of competent jurisdiction as to the finding of death; or

3.    Any other proof of death satisfactory to the Insurer.



## Article XI    Owner, Beneficiary, Assignment

### Section 11.1    Proposed Policyholder

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in bankruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be exercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder's rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

### Section 11.2    Change of Proposed Policyholder

The Proposed Policyholder may change the ownership of the Policy by submitting a request to the Insurer's Home Office and obtaining written approval of the Insurer. Any approved change will take effect on the date specified in the approval.

### Section 11.3    Proposed Annuitant

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subsequently changed.

### Section 11.4    Change of Proposed Annuitant

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.



### Section 11.5    Beneficiary

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

### Section 11.6    Change of Beneficiary

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

### Section 11.7    Assignment

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1035 exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.7 have been met.



The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or exchange, including a "1035" exchange of the Policy with another carrier and will cooperate to exchange underlying IDFs or sub-accounts with such carrier.  Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1035 exchange or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder's rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in liquidated damages to the Proposed Policyholder equal to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and Expense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) exists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder.  For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the liquidated damages amount provided for herein.   The Proposed Policyholder (x) acknowledges that the Insurer's ordinary and customary process for 1035 exchanges includes obtaining satisfactory assurance from the transferor of compliance with relevant tax and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any tax obligations relating to the Policy  and (y) agrees that following the Insurer's 1035 exchange process will not be considered to be a failure to cooperate by the Insurer.



## Article XII    Other General Provisions

### Section 12.1    Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section 12.2    Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section 12.3    Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions



received by facsimile communication are genuine. Any notice or report required to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person's authorized representative.

**Section 12.4    Policy Settlement**

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

**Section 12.5    Deferment**

The Insurer will execute allowable requests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within 60 days of a request. Such requests may require conversion of certain Investment Option assets to cash or in-kind distributions, where possible. This may take longer than 60 days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will take reasonable steps to comply with such requests at the earliest time possible.  The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

**Section 12.6    Incontestability**

Except as expressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer's obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Next Available Liquidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within 90 days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer's obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.



### Section 12.7    Policyholder Information

The Insurer may disclose Policyholder information to third parties such as banks or independent asset managers. Specifically with respect to banking relationships in Switzerland and in accordance with FINMA Newsletter 18 (2010) "handling of Life insurance with separately managed accounts/portfolios" dated December 20, 2010, the Insurer may disclose Policyholder or source of funding information to banking partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be required to confirm in accordance with FINMA Newsletter 18 (2010) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric risks, of the Insurer's domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing Form TD F 90-22.1 (Report of Foreign Bank and Financial Accounts), commonly referred to as an "FBAR", with the Department of the Treasury on or before June 30 of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could request information with respect to such filings and the Proposed Policyholder acknowledges that the Insurer may provide such FBAR-related information to the IRS if requested to do so.

### Section 12.8    Tax Matters

The Proposed Policyholder acknowledges that he or she is responsible for complying with all tax reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to tax. The Proposed Policyholder must consult its own tax advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.



**Section 12.9**     **Limitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR ANY LOSS OR OTHER DAMAGES WITH RESPECT TO THE POLICY IS LIMITED TO THE POLICY ACCOUNT VALUE.**

003152

**CROWN GLOBAL**
INSURANCE

## Appendix I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |

# EXHIBIT 101

003154



## *TERMSHEET*

| | | |
|---|---|---|
| Policy Number | : | # 30219 Separate Account |
| Policyholder | : | The Okada Family Foundation, Inc |
| Annuitant | : | Mark Okada |
| Beneficiary | : | The Okada Family Foundation, Inc |
| Premiums planned | : | Approx. US$ 20'000'000 |
| Premium Date | : | TBA |
| Policy Date | : | TBA |
| Policy Type | : | Deferred Variable Annuity (DVA) |
| Issuing Company | : | Crown Global Life Insurance Ltd., Bermuda (953d) |
| Custodian Bank | : | n/a |
| Account/Portfolio Number | : | n/a |
| Investment Manager | : | n/a |
| Asset Allocation/Investment Profile | : | IDF: Atlas IDF, LP/ Rand Advisors LLC |
| Investment of Funds Model: | : | n/a |
| Acceptance Fee | : | Zero |
| Mgmt. & Expense Fee | : | 0.45% p.a  $10mm of  Premium<br>0.35% p.a. $11-20mm of Premium<br>0.25% p.a. $21mm+ of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm. |
| Policy Administration Fee | : | US$ 2,900 p.a. |
| DAC Tax | : | 0.25% of all premium payments |
| Federal Excise Tax – 1% of Premium | : | n/a |
| Surrender Charge | : | US$ 5'000 |
| Policy Audit (optional) | : | US$ 1'975 p.a. |

Place, Date                          GRAND CAYMAN, DEC 9TH 2015.

Signature

_Christopher Pezalla_
Policyholder

003155

**EXHIBIT 102**

# PARTICIPATION AGREEMENT

among

**CROWN GLOBAL LIFE INSURANCE LTD.**

and

**CROWN GLOBAL LIFE INSURANCE LTD.** acting on behalf of each its Separate
Accounts set out in Schedule A hereto as may be amended from time to time

and

**ATLAS IDF, LP**

and

**RAND ADVISORS, LLC**

**Dated as of**

**November 30, 2015**

{00290535.DOC; 3}

003157

## TABLE OF CONTENTS

Page

ARTICLE I. Certain Definitions ................................................................1

ARTICLE II. Sale and Withdrawal of Interests ........................................3

ARTICLE III. Net Asset Value ................................................................5

ARTICLE IV. Representations, Warranties and Covenants ........................6

ARTICLE V. Investment Restrictions; Information and Reports; Other Obligations ................................................................122

ARTICLE VI. Expenses. ........................................................................13

ARTICLE VII. Indemnification ..............................................................13

ARTICLE VIII. Termination ..................................................................15

ARTICLE IX. Notices, Requests or Consents ........................................16

ARTICLE X. Privacy Obligations..........................................................16

ARTICLE XI. Miscellaneous ................................................................17

003158

**THIS PARTICIPATION AGREEMENT** (this "**Agreement**") is made and entered into by and among **CROWN GLOBAL LIFE INSURANCE LTD.** ("**CGLI**"), a Bermuda exempted company registered as a long term Class C insurer, the Company on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A hereto ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**"), as the same may be amended from time to time, **ATLAS IDF, LP**, a Delaware limited partnership (the "**Fund**"), and **RAND ADVISORS, LLC**, a Delaware limited liability company (the "**Adviser**") (collectively, the "**Parties**" and each, a "**Party**"), and shall be effective as of the date set forth on the counterpart signature page hereto.

WITNESSETH:

**WHEREAS**, the Fund was organized as a private investment vehicle and is offering its limited partnership interests ("**Interests**") to Eligible Insurance Funds and to separate accounts, or subaccounts thereof, that fund Variable Contracts offered by Eligible Insurance Companies, as such terms are defined below;

**WHEREAS**, the offering and sale of Interests will be exempt from registration or qualification under the U.S. Securities Act of 1933, as amended (the "**1933 Act**");

**WHEREAS**, the Company has established a Separate Account, and may in the future establish additional Separate Accounts (and subaccounts thereof) to hold one or more Interests; and

**WHEREAS**, the Company desires to purchase, and the Fund desires to issue, Interests in accordance with this Agreement.

**NOW, THEREFORE**, the Parties agree as follows:

ARTICLE I. CERTAIN DEFINITIONS

1.1    "**Business Day**" means each day the NYSE is open for regular trading, unless defined differently on Schedule A-2 hereto.

1.2    "**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

1.3    "**Company Contracts**" means those Variable Contracts issued by the Company and listed on Schedule A hereto, as the same may be amended from time to time.

1.4    "**Compliant Seed Investment**" means an investment in the Fund by the Adviser made in compliance with the Tax Requirements.

1.5    "**Confidential Information**" as used in this provision means any term of this Agreement, any transaction in connection with this Agreement, and any other non-public information concerning the Parties and their respective businesses and affiliates that may be acquired by reason of this Agreement or any transaction in connection therewith, but shall not include any information that is in or has entered the public domain other than due to a breach of Section 10 hereof.

1.6    "**Contract PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, utilized in connection with the offering of the Company Contracts.

003159

**1.7**  "**Customer Information**" means any "non-public personal information" (as defined in Regulation S-P of the U.S. Securities and Exchange Commission (the "**SEC**")) about a Policy Owner or prospective Policy Owner.  Customer Information includes, but is not limited to, a Policy Owner's (or prospective Policy Owner's) name, social security number and health and financial information.

**1.8**  "**Eligible Insurance Company**" means a life insurance company that is taxed as a U.S. life insurance company under Subchapter L of the Code and is eligible to purchase and hold Interests under the Tax Requirements.

**1.9**  "**Eligible Insurance Fund**" means a regulated investment company, real estate investment trust, limited liability company, limited partnership or trust that is eligible to purchase and hold Interests under the Tax Requirements and is in compliance with Revenue Ruling 2005-7.

**1.10**  "**Fund PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, provided by the Fund or the Adviser to the Company in connection with the offering of Interests.

**1.11**  "**Fund Agreements**" means the Operating Agreement and the subscription documents of the Fund.

**1.12**  "**Fund Reports**" shall have the meaning set forth in Section 5.2(b) hereof.

**1.13**  "**Interest Owner**" means (a) any Eligible Insurance Fund that and (b) any separate account (or a subaccount thereof) of an Eligible Insurance Company on behalf of which the Eligible Insurance Company has invested in one or more Interests.

**1.14**  "**Operating Agreement**" means the Fund's amended and restated limited partnership agreement dated as of the date set forth on Schedule A-2 hereto.

**1.15**  "**Policy Owner**" means the owner of a Company Contract.

**1.16**  "**Policy Representative**" means any agent or representative of a Policy Owner, the grantor or beneficiary of any Policy Owner that is a trust, or any agent or representative of such grantor or beneficiary.

**1.17**  "**Privacy Law**" means any applicable privacy law.

**1.18**  "**Sales Literature**" means (i) the Fund PPM and reports provided to the Company by the Fund or the Adviser, (ii) any written or other communication distributed or made available to existing or potential investors or their agents or employees, including brochures, circulars, research reports, market letters, form letters, seminar texts, or reprints of or excerpts from any other advertisement, sales literature, or published article, with respect to the Fund, and (iii) any other material regarding the Fund constituting sales literature or advertising, including all offering materials.

**1.19**  "**Separate Accounts**" means those separate accounts (or subaccounts thereof) established by the Company for the purpose of holding one or more Interests and listed on

003160

Schedule A hereto, as the same may be amended from time to time.  Each Separate Account shall be a separate and distinct owner of Interest(s).

**1.20**   "**Tax Requirements**" means the requirements of Section 817(h) of the Code, Regulations 1.817-5 thereunder and any amendments or successor provisions thereto.

**1.21**   "**Valuation Date**" means the last Business Day of each calendar month.

**1.22**   "**Variable Contract**" means a variable life insurance policy, variable annuity policy or other variable insurance policy that is characterized as a "variable contract" under Section 817(d) of the Code.

## ARTICLE II. SALE AND WITHDRAWAL OF INTERESTS

**2.1**   **Offering and Sale of Interests**.

(a)   Subject to Section 8.2 and subject to and on the terms of the Fund PPM, the Fund may offer Interests for purchase in any amount by the Company on behalf of the Separate Accounts, subject to the minimum initial investment amount set forth on Schedule A-2 hereto.  The Fund may accept additional capital contributions in any amount, subject to the minimum additional investment amount set forth on Schedule A-2 hereto.  Capital contributions will be accepted as of the first Business Day of each calendar month or quarter (as specified on Schedule A-2 hereto) (each, a "**Subscription Date**").  The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than the date and time set forth on Schedule A-2 hereto.  The Company shall complete and send to the Fund the Subscription Form set forth in Appendix A.  The Company shall not be required to enter into any agreement other than this Agreement and the Fund Agreements in order to purchase Interests.

(b)   The Fund may suspend or discontinue its offering of Interests solely in conformity with the Fund PPM upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto.

(c)   The issuance and transfer of Interests shall be by book entry only, and certificates therefor shall not be issued to the Company or the Separate Accounts.

**2.2**   **Payment for Interests**.  The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than the date and time set forth on Schedule A-2 hereto.  Federal funds received after that time and date shall be held in a subscription account of the Fund's custodian until the next Subscription Date or returned to the Company upon its request.

**2.3**   **Withdrawal of Interests**.

(a)   **General Withdrawal Terms.**  Any withdrawal request shall specify the number and value of the Interest(s) to be withdrawn, shall not be less than the amount set forth on Schedule A-2 hereto and shall be subject to any other requirements set forth on Schedule A-2 hereto.  Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by a Separate Account at less than the amount set forth on Schedule A-2 hereto as of the date of withdrawal shall be deemed a complete withdrawal.  (See Appendix

003161

B for Withdrawal Form.) The terms of this Section 2.3(a) shall apply unless otherwise provided in Sections 2.3(b) through 2.3(f) or on Schedule A-2 hereto.

(b)     **Standard Withdrawals.**  Subject to Section 2.3(f), the Company will be permitted to redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Standard Withdrawal Request**") as of the last day of any calendar month or quarter as set forth on Schedule A-2 hereto (each, a "**Standard Withdrawal Date**") following the lock-up period set forth on Schedule A-2 hereto.  The Adviser may waive the notice period in its discretion.   The withdrawal proceeds in connection with a Standard Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(c)     **Death Benefit Withdrawals.**   Subject to Section 2.3(f), with respect to withdrawals required for the payment of a death benefit, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Death Benefit Withdrawal Request**") as of the last day of any calendar month (each, a "**Death Benefit Withdrawal Date**").   The Adviser may waive the notice period in its discretion.  The withdrawal proceeds in connection with a Death Benefit Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(d)     **Special Withdrawals.**   Subject to Section 2.3(f), with respect to withdrawals required for the payment of any insurance charges and/or expenses of the Company Contracts or as otherwise agreed upon by the Adviser, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Special Withdrawal Request**") as of the last day of any calendar month (each, a "**Special Withdrawal Date**").   The Adviser may waive the notice period in its discretion.   The withdrawal proceeds in connection with a Special Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

(e)     **Withdrawal Events.**  Subject to Section 2.3(f), the Company may redeem for cash Interests if any of the following events ("**Withdrawal Events**") occur: (i) the Fund fails to comply with the Tax Requirements, and such noncompliance cannot be cured in a reasonable period of time pursuant to the regulations and proceedings of the U.S. Department of the Treasury (the "**Treasury**") and the U.S. Internal Revenue Service; or (ii) there is a violation of the requirements set forth on Schedule D hereto.  The Adviser shall notify the Company as soon as any Withdrawal Event occurs.  Upon the occurrence of a Withdrawal Event, the Company may redeem its Interests as of the last day of any calendar month (each, an "**Event Withdrawal Date**") upon not less than 30 days' prior written notice to the Adviser (each such notice an "**Event Withdrawal Request**").  Upon an Event Withdrawal Request, the Fund shall pay 100% of the withdrawal proceeds within 30 days following the Event Withdrawal Date.  Event Withdrawal Requests shall not be subject to any lock-up withdrawal requests.

(f)     **Limitations on Withdrawal Rights Granted Hereunder.** Notwithstanding the foregoing provisions of this Section 2.3, and any other terms of this Agreement, if the

Adviser determines that compliance with any of the withdrawal and payment rights granted pursuant to this Section 2.3 or any other provisions of this Agreement shall (i) cause it or the Fund to fail to adhere to the Tax Requirements, or (ii) require it to liquidate any asset which is then illiquid and/or part of a Side Pocket Account (as defined in the Operating Agreement), then it may defer such compliance until such failure or requirement shall no longer exist; *provided* that for so long as (x) such condition continues and (y) the Company shall not be receiving payment of any insurance charges and/or expenses of the Company Contracts as a result of such delayed compliance, the Adviser agrees that it shall defer its fees pursuant to Operating Agreement, and such amounts otherwise payable to the Adviser shall instead be paid by the Fund to the Company for such insurance charges and/or expenses.

**2.4    Payment of Withdrawal Proceeds.**

**(a)    Payment of Withdrawal Proceeds Generally.**   Subject always to any liquidity limitations set out in the Fund PPM, the Fund shall transfer to the Company, or to any person designated by the Company in writing, any withdrawal proceeds via wire transfer in the form of federal funds.

**(b)    Payment of Withdrawal Proceeds In-Kind.**   The Fund may, but only if permitted by applicable law and in conformity with the Operating Agreement and the Fund PPM, transfer in-kind interests in an underlying investment of the Fund to (i) the Company and/or the Separate Accounts in full or partial satisfaction of any withdrawal request, or (ii) a Policy Owner in full or partial satisfaction of a full or partial surrender of a Company Contract, or to a beneficiary under a Company Contract in full or partial satisfaction of a death benefit payment under such Company Contract; provided, however, that such transfer to a Policy Owner is conducted as a transaction exempt from registration under the 1933 Act. For the avoidance of doubt, notwithstanding the foregoing, the provisions of this Section 2.4(b) shall be subject to the limitations on liquidity and withdrawals, and terms therein on payments with withdrawal proceeds (including, in particular, the payment of withdrawal proceeds in-kind) set forth in in the Fund Agreements.

**2.5    Company Contracts.**   The Fund and the Adviser acknowledge and agree that, subject to each Company Contract, CGLI shall have the exclusive right, in its sole discretion, to suspend the offer or sale of any of the Company Contracts or to reject any application for the purchase of any Company Contract.

### ARTICLE III. NET ASSET VALUE

**3.1    NAV Generally.**   The Fund shall determine its net asset value (the "**NAV**") on each Valuation Date in the manner prescribed in the Operating Agreement and the Fund PPM. The Adviser shall make the NAV available to the Company in an electronic data file in a format specified by the Company, and shall do so as soon as reasonably practicable after each Valuation Date, and in any event no later than the date and time set forth on Schedule A-2 hereto.

**3.2    Adjustments.**   The NAV information provided pursuant to Section 3.1 hereof may be based on estimated values and/or values determined by the Adviser acting in good faith and using reasonable judgment ("**Reasonable Valuations**"), and prospective adjustments shall be made, if necessary, to correct the NAV within a reasonable period of time after the Fund or

003163

the Adviser is in receipt of the Fund's audited financials.  No retroactive adjustments shall be made.

## ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS

**4.1    Representations, Warranties and Covenants of the Company.**  The Company represents and warrants to, and for the benefit of, and covenants and agrees with the Fund and the Adviser that:

(a)    CGLI is an Eligible Insurance Company that is duly organized, validly existing and in good standing under the laws of Bermuda.

(b)    The Separate Account(s) are legally and validly established segregated asset accounts (or subaccounts thereof) under the laws of Bermuda (including, without limitation the Bermuda Insurance Act 1978, as amended ("**Bermuda Insurance Act**") and related rules and regulations and any Bermuda private act to which CGLI or the Separate Accounts are subject), applicable state insurance and tax laws and regulations, and were established by CGIL to set aside and invest premiums attributable to Company Contracts.

(c)    CGLI has the power and is duly qualified and has all necessary licences, consents, permits and authorities necessary (including those referred to in paragraph 4.1(a) above) to offer and sell the Company Contracts and for the Company to purchase the Interests, all of which are valid and subsisting.

(d)    The Company shall be an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the 1933 Act (an "**Accredited Investor**"), a "qualified client" within the meaning of Rule 205-3 promulgated under the U.S. Investment Advisers Act of 1940, as amended, and a "qualified purchaser" within the meaning of Section 2(a)(51) of the U.S. Investment Company Act of 1940, as amended (a "**Qualified Purchaser**"; such statute, the "**1940 Act**").

(e)    The Company Contracts shall be offered and sold, and the Contract PPM and the Fund PPM shall be disseminated to prospective or existing Policy Owners, in compliance in all material respects with all applicable Bermuda, U.S. and other foreign securities, commodities, tax and insurance laws and regulations.

(f)    CGLI shall sell Company Contracts only to persons that CGLI or its agents reasonably believe to be Accredited Investors and Qualified Purchasers.

(g)    The Company Contracts shall be treated as Variable Contracts under the Code, provided that the Fund and the Adviser comply with all of the terms of the Operating Agreement and this Agreement, and CGLI shall promptly notify the Fund and the Adviser in writing upon forming a reasonable belief that the Company Contracts will or may no longer qualify for such treatment.

(h)    The Separate Accounts shall not be subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

(i)    The Contract PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Fund or the Adviser for

003164

inclusion in the Contract PPM. For the avoidance of doubt, the Company is not representing whether the Contract PPM meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

(j)    The Company shall not disseminate any information, or make any representation or statement, to any person concerning the offer or sale of Interests or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, Fund Reports, or any Sales Literature approved by the Adviser for such purposes. This Section 4.1(j) shall not in any way restrict the right of the Company to disseminate materials (such as illustrations) describing the Company, its operations and its products, as well as those materials describing the insurance industry and insurance products generally.

(k)    The Company shall establish and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited the Company's Know Your Client (KYC) and due diligence requirements under the Bermuda Proceeds of Crime (Anti-Money Laundering and Anti-Terrorist Financing) Regulations 2008, as amended the regulations of the Treasury and the Executive Orders related to the Treasury's Office of Foreign Assets Control ("**OFAC**"; and, together, the "**AML Procedures**"). The Fund and the Adviser acknowledge that in connection with, and as a complement to its own AML Procedures, where permitted by applicable law, the Company shall be entitled to rely on AML Procedures implemented by third parties with respect to Policy Owners; provided that such acknowledgement shall not limit any rights of the Fund or the advisor relating to AML under the Fund Agreements.

The Company's AML Procedures shall include those reasonably designed to ensure the accuracy of the following representations of the Company:

(i)    the identity of each purchaser of a Company Contract has been established by evidence that the Company reasonably believes is genuine;

(ii)    the Company reasonably believes that no premium funds tendered for the purchase of a Company Contract are derived directly or indirectly from activities that may contravene relevant U.S. federal or state, or international, laws or regulations related to money laundering; and

(iii)    unless the Fund, in its sole discretion, lawfully waives such a requirement, CGIL shall not issue a Variable Contract to any person or entity that the Company reasonably believes, at the time of the possible purchase of the Company Contract, to be:

1. a country, territory, organization, person or entity named in OFAC's List of Specially Designated Nationals and Blocked Persons, as such list may be amended from time to time;

2. a person or entity that resides or has a place of business in a country or territory named on an OFAC list, or that is designated as a

003165

"Non-Cooperative Jurisdiction" by the Financial Action Task Force on Money Laundering, or whose premium funds tendered for the acquisition of a Company Contract are transferred from or through any such country or territory;

3. a "foreign shell bank" as such term is defined in 31 U.S.C. § 5318(j) and Treasury regulations thereunder;

4. a person or entity that resides in, or is organized under, the laws of a jurisdiction designated by the Secretary of the Treasury as a "jurisdiction of primary money laundering concern" pursuant to 31 U.S.C. § 5318A; or

5. a "senior foreign political figure," or a "family member" or "close associate" of a senior foreign political figure as such terms are defined in the *Guidance on Enhanced Scrutiny for Transactions that May Involve the Proceeds of Foreign Official Corruption* issued by the Treasury, unless CGIL has diligently scrutinized the proposed purchase of the Company Contract by or for the benefit of such person and has determined to permit such purchase.

**(l)**    The Company shall promptly notify the Fund and the Adviser of any change in the information set forth in this Section 4.1.

**(m)**    The Company is not aware of any conflict between this Agreement and any law or regulation to which it may be subject (including under any Bermuda private act).

**4.2    Of the Fund.**    The Fund represents and warrants to, and for the benefit of, and covenants and agrees with the Company that:

**(a)**    The Fund has been established under the laws of the jurisdiction of its formation and is in good standing thereunder, and qualifies for the exclusion from the definition of "investment company" provided by Section 3(c)(7) of the 1940 Act.

**(b)**    The Interests shall be offered and sold in compliance in all material respects with all applicable federal and state laws and regulations.

**(c)**    None of the Fund; any predecessor of the Fund; any affiliated issuer of the Fund; any director, executive officer, other officer who is participating in the offering of interests in the Fund, general partner or managing member of the Fund; any beneficial owner of 20% or more of the Fund's outstanding voting equity securities (calculated on the basis of voting power); any promoter connected with the Fund in any capacity; the Adviser; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of interests in the Fund (a "**Solicitor**"); any general partner or managing member of the Adviser or a Solicitor; or any director, executive officer or other officer who is participating in the offering of interests in the Fund of the Adviser or a Solicitor or general partner or managing member of the Adviser or a Solicitor is subject to any event listed in Rule 506(d)(1).

**(d)**    The Fund shall offer and sell Interests only to Eligible Insurance Funds and Eligible Insurance Companies that have certified that they (i) are Accredited Investors and

003166

Qualified Purchasers and (ii) will purchase and hold Interests, directly or indirectly, solely for the benefit of policy owners that they reasonably believe are Accredited Investors and Qualified Purchasers; provided, however, that the Fund may offer and sell Interests to employee benefit plans and other funds subject to ERISA and/or Section 4975 of the Code that meet the requirements of clause (i). Further, the Fund shall, with the exception of any Compliant Seed Investment, issue Interests only to Eligible Insurance Funds and Eligible Insurance Companies with which it has entered into an agreement containing provisions substantially similar to those provisions of this Agreement listed on Schedule A-2 hereto.

(e)    The Fund shall invest, hold and dispose of its assets in compliance with the Tax Requirements.  The Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to comply with the Tax Requirements, and shall cure any non-conformance within the period for cure afforded by Regulations 1.817-5.  The Fund and the Adviser acknowledge that the Fund's compliance with the Tax Requirements is material to their performance under this Agreement.

(f)    The Fund shall be operated so as to maintain its treatment for U.S. federal income tax purposes as a partnership, or if there is only one Interest Owner, a disregarded entity, under the Code, and the Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to qualify for such tax treatment.

(g)    The Fund, the Adviser and their respective officers, directors, employees, principals, affiliates and other representatives shall comply with the requirements set forth on Schedule D hereto so as to prevent any Policy Owner from having "incidents of control" under the Investor Control Doctrine (as defined on Schedule D hereto).

(h)    The Fund's assets shall be invested in compliance with the investment restrictions set forth on Schedule B hereto, as the same may be modified from time to time pursuant to Section 5.1.

(i)    The Adviser is and will exercise commercially reasonable best efforts to remain registered with the SEC as an investment adviser; provided that the Adviser shall be deemed to be so registered if it qualifies as a "relying" Adviser.  If the Adviser applies to withdraw its registration, the Adviser shall notify the Company at least thirty (30) days prior to the intended effective date of its withdrawal.

(j)    The Adviser is exempt from registration as a commodity pool operator ("**CPO**") pursuant to CFTC Rule 4.13(a)(3) and shall notify the Company as soon as reasonably practicable upon forming a reasonable belief that such exempt status will change.

(k)    The Adviser shall have the sole discretionary authority over the Fund's investments and shall manage the Fund in accordance with the Operating Agreement and the Fund PPM; provided that, for the avoidance of doubt, the Fund may invest in Portfolio Funds (as defined in the Fund PPM) and the like, in the manner contemplated in the Fund PPM.

(l)    The Fund PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Company for inclusion in the Fund PPM.  For the avoidance of doubt, the Fund is not representing whether the Fund PPM

003167

meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

(m)    No material change shall be made to the Operating Agreement or the Fund PPM (e.g., a change to the Fund's investment objective or strategies) without at least thirty (30) days' prior notice to the Company.  Any updates thereto shall be promptly delivered to the Company.

(n)    Subject to Section 4.1(k), the Fund shall be responsible for anti-money laundering compliance related to its activities, and shall maintain and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited to, the USA PATRIOT Act of 2001, the regulations of the Treasury and the Executive Orders related to OFAC; provided that for the avoidance of doubt the Fund may delegate such compliance in a manner that is substantially consistent with standard practices of private investment funds in the U.S.

(o)    The Company shall be provided the most recent audited financial statements of the Fund as soon as reasonably practicable after they become available.

(p)    Neither the Fund nor the Adviser shall disseminate any information, or make any representation or statement, to any person concerning the Company or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, any Sales Literature approved by the Company pursuant to Section 5.3, or available in the public domain.

(q)    Unless the Company otherwise consents, the Fund and the Adviser shall use its commercially reasonable best efforts to ensure that all communications related specifically to the Company Contracts, shall only be between the Company and a Policy Owner or Policy Representative.

(r)    The Fund shall maintain and implement commercially reasonable procedures to safeguard the confidentiality and integrity of their records with respect to the Fund and the Company.

(s)    The Fund shall promptly notify the Company upon any change to a service provider to the Company.

(t)    The Fund is not aware of any conflict between this Agreement and any law or other obligation to which it or the Advisor may not be subject.

(u)    The Fund shall promptly notify the Company of any change in the information set forth in this Section 4.2.

(v)    The Fund shall not invest in a "passive foreign investment company" (a "**PFIC**") as defined in Section 1297(a) of the Code unless, prior to making such investment, the Fund has certified to the Company that (i) such PFIC will comply with the requirements of Section 1295(a)(2) of the Code and the Treasury regulations thereunder (e.g., that the PFIC provide its "qualifying electing fund" ("**QEF**") shareholders with a PFIC Annual

Information Statement) or (ii) the Fund will provide information reasonably equivalent to the information contained in a PFIC Annual Information Statement. If the Fund or the Company determines that a PFIC is not in compliance with its QEF reporting requirements, the Fund shall take any steps necessary to cause the PFIC to comply therewith.

**4.3     Of the Adviser.** The Adviser represents, warrants and covenants to the Company that the Adviser shall use reasonable efforts to provide the Company with any information concerning the Adviser that the Company requires in making any filings with any government authority having regulatory authority over the Company.

**4.4     Mutual Representations, Warranties and Covenants.** Each of the Company and the Fund hereto represents and warrants to, and for the benefit of, and covenants and agrees with the other Parties that:

(a)     it shall use reasonable efforts to cooperate with each other Party and any governmental authority in respect of any such authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated hereby;

(b)     the Adviser and the Company are not in an affiliate or agency relationship;

(c)     upon reasonable notice, the execution and delivery of this Agreement and the consummation of the transactions contemplated herein (i) have been duly authorized by all necessary corporate or other formal action by such Party and, when executed and delivered, this Agreement shall be a valid and binding obligation upon such Party enforceable in accordance with its terms; and (ii) the transactions contemplated thereto do not and will not violate, conflict with or constitute a default under any requirement of any law or any regulation of Bermuda, the U.S. or otherwise (including, without limitation, any Bermuda private act);

(d)     except as otherwise set forth herein, the provisions of this Agreement shall be deemed to control in the case of any conflict between the provisions of this Agreement and the provisions of the Fund PPM, Operating Agreement, or any other agreement entered into between the Company and the Fund or the Adviser;

(e)     the Operating Agreement and the Fund PPM, as currently in effect, shall have been delivered to the Company prior to the signing of this Agreement; and

(f)     the representations, warranties and covenants contained in this Agreement and the Fund Agreements (collectively, the "**Party Documents**") are the only representations, warranties and covenants that have been made by any Party to any other Party, and in entering into this Agreement, each Party has relied solely on the information contained in the Party Documents or that it obtained by its own independent investigation.

**4.5     Duration.** The representations, warranties and covenants contained in this Article IV shall be deemed continuing at all times until the termination of this Agreement.

## ARTICLE V. INVESTMENT RESTRICTIONS; INFORMATION AND REPORTS; OTHER OBLIGATIONS

**5.1    Revision of Investment Restrictions.**    The investment restrictions of the Company are as set forth on Schedule B hereto.  The Company shall be permitted to request a change in such investment restrictions only if such change is necessitated by a change in the laws, regulations or interpretations thereof to which the Company is subject.  The Company shall make a request for a change in its investment restrictions in writing to the Fund and the Adviser.  If the Adviser determines in its absolute discretion that causing the Fund to comply with the revised investment restrictions proposed by the Company is in the best interests of the Interest Owners, the Parties shall amend Schedule B hereto accordingly.  If the Adviser determines otherwise, it shall notify the Company within thirty (30) days of such determination.

**5.2    Provision of Reports and Information.**    The Company shall provide to the Adviser, upon request, a specimen copy of the Contract PPM and each Company Contract.  The Fund shall on a timely basis provide to the Company the following without charge:

**(a)**    a current copy of the Fund PPM (and any amendment or supplement thereto) in any form the Company may reasonably request;

**(b)**    electronic copies of those reports and other communications that the Fund provides to its Interest Owners, including its periodic performance reports (collectively, the "**Fund Reports**");

**(c)**    any reports and information that the Company requires as a U.S. taxpayer; and

**(d)**    any other documents that the Company may reasonably request of the Fund, including, but not limited to, its governing instruments, tax reports, marketing materials, and any government filings and updates and amendments thereto, including, but not limited to, the Adviser's Form ADV; provided that neither the Fund nor the Adviser need supply any agreements or documents of the Fund or the Adviser that are confidential.

**5.3    Review of Sales Literature.**    Neither the Fund, the Adviser nor any person acting on their behalf shall use any Sales Literature in which the Company is named without the consent of the Company which shall not be unreasonably withheld or delayed.

**5.4    Distribution of Certain Information by the Company.**    The Company shall be permitted, without further review or consent of the Fund or the Adviser, to deliver to Policy Owners, prospective Policy Owners, and their agents and representatives, the Fund PPM (and any amendments or supplements thereto), Fund Reports and any Sales Literature approved for such purposes by the Adviser.

**5.5    Provision of Information Prior to Signing of Agreement.**    Prior to signing this Agreement, the Adviser has provided the Company with its most recent Form ADV, and any amendments thereto, as filed with the SEC.

Prior to signing this Agreement, the Fund or the Adviser has provided the Company with (a) the name and address of the Fund's independent auditor(s) and (b) upon the Company's

003170

request, a consent and authorization for the Company to contact the auditor(s) for information reasonably required about the auditor(s) and its/their relationship with the Fund and the Adviser. At any time the Fund retains a different independent auditor, the Fund or the Adviser shall provide the Company with the same consent and authorization upon request.  For avoidance of doubt, the Company shall not be entitled to obtain access to the Fund's books and records pursuant to this Section 5.5.

Prior to signing this Agreement, CGIL has provided the Fund with its Class C certificate of registration issued to it by the Bermuda Monetary Authority and any directions and/or approvals relating to it issued by the Bermuda Monetary Authority pursuant to the Bermuda Insurance Act.

**5.6     Certification of Investment Diversification.**  As soon as reasonably practicable after the end of each calendar quarter, but in no event later than the number of days after the end of such calendar quarter set forth on Schedule A-2 hereto, the Adviser shall deliver to the Company a written certification in the form of Schedule C hereto.

## ARTICLE VI. EXPENSES

**6.1     Expenses Borne by the Company.**  The Company shall bear all of the costs incurred in connection with the (i) filing and qualification of the Company Contracts under any applicable state insurance or securities laws; (ii) preparation of the Contract PPM and any other necessary disclosure documents or regulatory filings with respect to the Company Contracts or the Separate Accounts; (iii) preparation and dissemination to Policy Owners of Fund Reports and of all statements, notices or other documents required by applicable federal and state laws and regulations; (iv) dissemination of the Fund PPM to Policy Owners and prospective Policy Owners; and (v) performance of its obligations under this Agreement.

**6.2     Expenses Borne by the Fund.**  The Fund shall bear all of the costs incurred in connection with the offering and sale of Interests to Interest Owners and the performance of its obligations under this Agreement, in addition to the other expenses it bears pursuant to the Operating Agreement and the Fund PPM.

## ARTICLE VII. INDEMNIFICATION

**7.1     Indemnification of Fund Parties.**  The Company shall indemnify and hold harmless the Fund and the Adviser (collectively, the "**Fund Parties**" and each, a "**Fund Party**"), against any and all claims, losses, damages or expenses, including without limitation any judgment, settlement, reasonable attorney's and accountant's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding (collectively, "**Claims**" and each, a "**Claim**"); provided, however, that a Fund Party shall be entitled to indemnification in respect of a Claim only if:

**(a)**     the Claim does not arise out of its or another Fund Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill any of its representations, warranties or covenants contained herein, and

**(b)**     the Claim arises out of, or is based upon, one of the following:

003171

> (i)    the Company's fraud, willful default or gross negligence in performing its obligations under this Agreement; or

> (ii)    the Company's breach of, or material failure to fulfill, any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

**7.2    Indemnification of Company Parties.**  The Fund shall indemnify and hold harmless the Company and the Separate Accounts (collectively, the "**Company Parties**" and each, a "**Company Party**"), against any and all Claims; provided, however, that a Company Party shall be entitled to indemnification in respect of a Claim only if:

> **(a)**    the Claim does not arise out of its or another Company Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill to satisfy any of its representations, warranties or covenants contained herein, and

> **(b)**    the Claim arises out of, or is based upon, one of the following:

>> (i)    the fraud, willful default or gross negligence of a Fund Party in performing its obligations under this Agreement; or

>> (ii)    the breach of, or material failure to fulfill, by any Fund Party any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

**7.3    Other Indemnification Provisions.**    No indemnification, hold harmless, limitation of liability or similar provision in the Fund's Certificate of Formation, the Operating Agreement or any agreement to which the Fund or the Adviser is a party shall preclude or serve as a defense to the indemnification by the Fund of a Company Party pursuant to Section 7.2.

**7.4    Notice of Claim of Indemnification.**  A Fund Party or Company Party seeking indemnification under this Article VII (an "**Indemnified Party**") shall give the Party obliged to provide indemnification under this Article VII (an "**Indemnifying Party**") written notice within a reasonable time after the Indemnified Party receives notice of a Claim; provided, however, that a failure to provide, or delay in providing, such notice shall not relieve the Indemnifying Party of any obligation it may have under this Article VII to indemnify the Indemnified Party, unless such failure or delay is the sole or primary cause of the Indemnifying Party's inability to effectively defend against the Claim and materially disadvantages the Indemnifying Party.

**7.5    Assumption of or Participation in Defense Against Claims.**  In any situation where an Indemnified Person is directly involved in defending against a Claim, an Indemnifying Party shall be entitled to, at its own expense, (i) participate in the defense of the Claim or (ii) assume the defense against the Claim with counsel reasonably satisfactory to the Indemnified Party.  If the Indemnifying Party elects to assume the defense of a Claim, the Indemnifying Party shall, after notice to the Indemnified Party of such election, have no obligation to bear any subsequent fees and expenses independently incurred by the Indemnified Party in connection with the defense of the Claim (excluding reasonable costs of investigation), except that the Indemnifying Party shall be liable for reasonable fees and expenses associated with additional counsel retained by the Indemnified Party where the Indemnifying Party and the Indemnified

003172

Person are both parties to the Claim and their representation by the same counsel would be inappropriate due to an actual or potential conflict of interests. Any assumption or participation in the defense of a Claim pursuant to this Section 7.5 shall not be construed as, or be deemed to create a presumption or inference of, an admission of liability or responsibility by the Indemnifying Party, and shall not estop or otherwise limit the Indemnifying Party from contesting liability in respect of the Claim.

**7.6    Settlements.**    An Indemnifying Party shall not be obliged to indemnify an Indemnified Party for the settlement of any Claim that is effected without the former's prior written consent. An Indemnifying Party may settle any Claim on behalf of an Indemnified Party without the Indemnified Party's consent; provided, however, that the settlement involves solely the payment of damages, such damages are fully paid and results in a total release of the Indemnified Party from the Claim. To the extent that its consent to a settlement is required, an Indemnified Party shall not unreasonably withhold its consent to any settlement not involving injunctive relief.

**7.7    Successors.**    A successor to any Party shall be entitled to all of the benefits, and shall be subject to the burdens, of this Article VII.

**7.8    Survival.**    This Article VII shall survive the termination of this Agreement including, without limitation, a termination by reason of the breach or alleged breach of any representation, warranty or covenant of this Agreement.

## ARTICLE VIII. TERMINATION

**8.1    Termination Generally.**    Except as otherwise set forth in this Article VIII, no term of this Agreement shall terminate until the Separate Accounts no longer hold any Interests.

**8.2    Effectiveness of Termination of Offering Obligation.**    A termination of the Offering Obligation pursuant to Section 8.2(a) shall take effect immediately. A termination pursuant to Section 8.2(b), (c), (d), (e) or (f) shall be effective immediately after the Fund provides notice to the Company of such termination.

**8.3    Mandatory Withdrawal.**    The Fund shall have the right to require the Company, upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto, to redeem any Interest(s) attributable to any Company Contract that ceases to qualify as a Variable Contract or that the Fund reasonably believes will fail to so qualify. The timing of such mandatory withdrawal shall be specified in the Fund's notice to the Company and shall be determined with reference to Section 817(h) of the Code.

**8.4    Termination by Company.**    Notwithstanding anything in this Agreement to the contrary, either the Fund or the Company may terminate this Agreement immediately and without penalty to such party:

(a)    from the date hereof until November 30, 2017, upon at least 30 days' prior written notice to the Fund and the Adviser, or

(b)    if the Fund or the Adviser has materially breached a representation, warranty or covenant under this Agreement and has failed to cure such breach after being given a reasonable opportunity to cure; provided, however, that the Company need not provide the

003173

Fund or the Adviser a reasonable opportunity to cure if the material breach may, in the Company's reasonable judgment, materially and adversely affect the Company or any of its Separate Accounts or Company Contracts, or any regulatory authority, including, but not limited to, the SEC and any state regulatory authority, has instituted a formal proceeding against the Fund or the Adviser, and the anticipated outcome of such proceeding would, in the Company's reasonable judgment, materially impair the Fund's or the Adviser's ability to perform its obligations under this Agreement or under the Operating Agreement.

## ARTICLE IX. NOTICES, REQUESTS OR CONSENTS

**9.1**    Any notice, consent, request or other communication required or permitted by this Agreement (a "**Communication**") to the Fund or the Adviser shall be sent to its address set forth on Schedule A-2 hereto or such other address as the Fund or the Adviser shall designate in writing to the other Parties.  Any Communication to the Company required or permitted by this Agreement shall be sent to the address set forth below.  Every Communication shall be in writing; shall be sent by registered or certified U.S. mail with return receipt requested, by overnight delivery with a nationally recognized courier, or by electronically transmitted facsimile or other electronic transmission, including electronic mail, with confirmed electronic receipt; and shall be effective upon the earlier of actual receipt and the 10th Business Day after sending.

| **If to the Company:** | Crown Global Life Insurance Ltd. |
| --- | --- |
| | Canon's Court |
| | 22 Victoria Street |
| | Hamilton HM 12 |
| | Bermuda |

| With a copy to: | Crown Global Life Insurance (Cayman) Ltd |
| --- | --- |
| | Landmark Square, 2nd Floor |
| | 64 Earth Close, SMB, P.O. Box 10467 |
| | Grand Cayman  KY1-1004 |
| | Cayman Islands |

**9.2**    Each Party may rely conclusively upon, and shall not incur any liability for any action taken in reliance upon, any Communication that it reasonably believes, in good faith, to be genuine and properly authorized by another Party.

## ARTICLE X. PRIVACY OBLIGATIONS

**10.1**    The Company is, and each of the Fund and the Adviser may be, a financial institution subject to Privacy Law.  To the extent that a Party is subject to Privacy Law, it shall not use or disclose any Customer Information received from another Party unless such use or disclosure is:

**(a)**    required by law, regulation or rule, or permitted by Privacy Law;

**(b)**    necessary to carry out the purposes for which the Party was given the Customer Information; or

003174

**(c)**      authorized by the express written consent of the Policy Owner or prospective Policy Owner to which the Customer Information relates, where such consent specifies the purposes for which such Customer Information may be used or disclosed.

**10.2**    Each Party shall establish and maintain safeguards against any unauthorized access to, or destruction, loss or alteration of, any Customer Information in its possession or control, which safeguards must be at least as rigorous as those the Party uses to secure its own information of a similar nature.

**10.3**    Notwithstanding anything in this Agreement to the contrary, including Section 11.7, each Party is expressly authorized hereby to disclose to any person, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated herein and all materials related thereto that are or were provided to such Party.

**10.4**    Each Party agrees to keep confidential any Confidential Information that such Party may acquire as a result of this Agreement or any transaction in connection therewith and to ensure that no such Confidential Information is disclosed to or utilized by any of such Party's affiliates or any of its or their respective officers, directors, employees, agents or other representatives (each, a "**Relevant Person**") except for the purpose of permitting a Party to perform its obligations and/or enforce such Party's rights under this Agreement, the Fund Agreements or any transaction in connection therewith or pursuant to this Section 10 and Section 11.4 hereof.

## ARTICLE XI. MISCELLANEOUS

**11.1    Governing Law.**   It is the intention of the Parties that the internal laws of Bermuda, as the same may be amended from time to time, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Parties.

**11.2    Entire Agreement.**  This Agreement, together with any amendments hereto and any other agreements referred to herein (including, without limitation, the Fund Agreements), shall constitute the entire agreement among the Parties with respect to the subject matter hereof, and shall supersede any prior agreement or understanding, oral or written, among the Parties with respect to the subject matter hereof.

**11.3    Waiver.**  A Party's failure to insist, or delay in insisting, upon another Party's performance of any term of this Agreement shall not be construed as a waiver of the performance of such term.

**11.4    Access to Books and Records.**  Each Party shall, upon request, provide each other Party and any governmental authority with reasonable access to its books and records to the extent that such request relates to a governmental authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated herein.   To the extent permitted by applicable law, the access provided pursuant to this Section 11.4 shall not extend to any attorney work product or information protected by the attorney-client privilege.

**11.5    Assignment.**  No Party shall assign any right or obligation under this Agreement to a third party without the prior written consent of all of the Parties, which consent shall not be unreasonably withheld.   Notwithstanding the previous sentence, the Company may assign,

003175

without the consent of the Fund or the Adviser, any right or obligation under this Agreement to another insurance company that controls, is controlled by or under common control with the Company; provided, however, that the Company provides the Fund and the Adviser with notice as soon as reasonably practicable after such assignment.

**11.6   Third-Party Beneficiary.**   This Agreement is not intended to and shall not convey any rights to persons not party to this Agreement.

**11.7   Confidentiality.**   No Party shall disclose the terms of this Agreement to any persons not party to this Agreement, except that a Party may disclose the terms of this Agreement to comply with a legal or regulatory requirement or request, or to its representatives where such disclosure is necessary to the Party's performance of its obligations under this Agreement; provided that the Company agrees and acknowledges the disclosures concerning the subject matter hereof set forth in the Fund PPM, and disclosures of a similar nature.

**11.8   Amendment.**   No amendment or modification to this Agreement shall be binding upon any Party unless reduced to a writing signed by all of the Parties.

**11.9   Rights and Remedies.**   The rights, remedies and obligations contained in this Agreement are in addition to any and all rights, remedies and obligations, at law or in equity, to which the Parties are entitled under state and federal laws.

**11.10   Severability.**   In the event that any provision of this Agreement shall be declared invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the other provisions of this Agreement, it being hereby agreed that such provisions are severable and that this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

**11.11   Headings.**   The headings in this Agreement are inserted for convenience of reference only and shall not be considered part of this Agreement or affect this Agreement's interpretation.

**11.12   Counterparts.**   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument.

**SIGNATURE PAGE FOLLOWS**

003176

IN WITNESS WHEREOF, each of the Parties hereto has caused this Participation Agreement to be executed in its name and on its behalf by its duly authorized representative hereto as of November 30, 2015.

**CROWN GLOBAL LIFE INSURANCE LTD.,**

By: _____

Name: TERRIA GODWIN

Title: Director

By: _____

Name: Avi Hasen

Title: Director


**CROWN GLOBAL LIFE INSURANCE LTD.,** on behalf of each of its Separate Accounts, as set out in Schedule A hereto as may be amended from time to time.

By: _____

Name: TERRIA GODWIN

Title: Director

By: _____

Name: Avi Hasen

Title: Director

003177

**ATLAS IDF, LP**

By: Atlas IDF GP, LLC, it general partner

By: _____

Name: _____

Title: _____

**RAND ADVISORS, LLC**

By: _____

Name: _____

Title: _____

003178

## SCHEDULE A
### As of November 30, 2015

### SEPARATE ACCOUNTS AND ASSOCIATED POLICIES

| No. | Name of Separate Account and each Subaccount, if any, thereof: | Form Nos. of Policies Funded by Separate Account: |
|-----|----------------------------------------------------------------|---------------------------------------------------|
|     |                                                                |                                                   |

003179

**SCHEDULE A-2**
**As of November 30, 2015**

**SUPPLEMENT TO PARTICIPATION AGREEMENT**

FUND: Atlas IDF, LP
ADVISER: Rand Advisors, LLC

To the extent that the information below is also provided in the Fund PPM or the Operating Agreement, the parties agree that the information below is the same as the information contained in the Fund PPM or Operating Agreement and is provided for ease of reference.

| | |
|---|---|
| **Section 1.2**<br>"Business Day" | No change to standard definition. |
| **Section 1.13**<br>"Operating Agreement" | Dated as of November 30, 2015. |
| **Section 2.1(a)**<br>Minimum Initial and Additional Investment Amounts / Notice of Intent to Purchase / "Subscription Date" | Minimum initial investment amount: $500,000 or as otherwise consented to in writing by Adviser<br><br>Minimum additional investment amount: $500,000, or as determined by the Adviser in its sole discretion.<br><br>The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than 12:00 am Eastern time on the 3rd Business Day prior to the relevant Subscription Day.<br><br>The Subscription Date shall be the first Business Day of each calendar month. |
| **Section 2.1(b)**<br>Suspension or Discontinuation of Offering | The Fund may suspend or discontinue its offering of Interests at the discretion of the Adviser upon at least **30** Business Days' prior written notice to the Company. |
| **Section 2.2**<br>Payment for Interests | The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than 5:00pm Eastern time on the 3rd Business Day prior to the relevant Subscription Day. |
| **Section 2.3(a)**<br>General Withdrawal Terms | Minimum withdrawal amount: $100,000<br><br>Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by a Separate Account at less than $500,000 as of the date of withdrawal shall be deemed a complete withdrawal.<br><br>Payment of Withdrawal Proceeds: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement. |
| **Section 2.3(b)**<br>Standard Withdrawals | Notice Period: 91 days<br><br>Standard Withdrawal Date: Last day of each calendar quarter. |

003180

Lock-up Period: 12 months.

Payment of Withdrawal Proceeds: 90% of the withdrawal proceeds shall be paid within 90 days following the Standard Withdrawal Date.  The balance of the amount payable upon such withdrawal will be paid, without interest, within 90 days after completion of the audited financial statements for the fiscal year in which the withdrawal occurs.

Payment of Withdrawal Proceeds: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement.

| | |
|---|---|
| **Section 2.3(c)**<br>Death Benefit<br>Withdrawals | Notice Period: 91 days prior to Death Benefit Withdrawal Date on prior written notice to the Adviser.<br><br>Death Benefit Withdrawal Date: Last day of any calendar quarter.<br><br>Payment of Withdrawal Proceeds: 100% of the withdrawal proceeds shall be paid as soon as reasonably practicable, but in no case more than 330 days following the Death Benefit Withdrawal Date.  For the avoidance of doubt, such withdrawals may be satisfied by payments in kind. |
| **Section 2.3(d)**<br>Special Withdrawals | Notice Period: 91 days prior to a Special Withdrawal Date prior written notice to the Adviser.<br><br>Special Withdrawal Date: Last day of each calendar quarter.<br><br>Payment of Withdrawal Proceeds: 100% of the withdrawal proceeds shall be paid within 90 days following the Special Withdrawal Date. |
| **Section 3.1**<br>NAV Generally | The Adviser shall make the NAV available to the Company no later than 12am Eastern time on the 20th Business Day following each Valuation Date. |
| **Section 4.3(a)**<br>Errors and Omissions<br>Insurance Policy | The Fund shall obtain commercially reasonable coverage in favor of the Adviser, within a reasonable period following the execution of this Agreement. |
| **Section 5.6**<br>Certification of<br>Investment<br>Diversification | The Adviser shall deliver the certification required by Section 5.6 no later than 20 Business Days after the end of the calendar quarter following the quarter to which such certification relates. |
| **Section 8.4**<br>Mandatory Withdrawal | The Fund must provide the Company with at least 5 days' prior written notice of a Mandatory Withdrawal. |
| **Section 9.1**<br>Notices, Consents,<br>Requests or Other<br>Communications | **If to the Fund:**<br>Atlas IDF, LP<br>c/o Atlas IDF GP, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866     **If to the Adviser:**<br>Rand Advisors, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866 |

003181

## SCHEDULE B
### As of November 30, 2015

### INVESTMENT RESTRICTIONS

The Company will not participate in the allocation of gains or losses derived from "New Issues" as defined in the Rules of the U.S. Financial Industry Regulatory Authority ("**FINRA**"), except that the Fund, in its sole discretion, may allocate de minimis levels of such gains or losses in a manner consistent with applicable FINRA Rules.

003182

## SCHEDULE C

## FORM OF COMPLIANCE CERTIFICATION

This compliance certificate ("**Compliance Certificate**") is given by Rand Advisors, LLC, as the adviser (the "**Adviser**") of Atlas IDF, LP (the "**Fund**"), pursuant to Section 5.6 of that Participation Agreement, dated as of November 30, 2015, among the Fund, the Adviser, Crown Global Life Insurance Ltd. ("**CGLI**"), a Bermuda exempted company registered as a long term Class C insurer, the Company (on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A of the Participation Agreement (as defined below), as such Schedule A may be amended from time to time) ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**")), as the same may be amended, restated, supplemented or otherwise modified from time to time (the "**Participation Agreement**"). Capitalized terms used, but not defined, in this Compliance Certificate shall have the meanings set forth in the Participation Agreement.

By executing this Compliance Certificate, the Adviser certifies that, as of the calendar quarter ended [March 31/June 30/September 30/December 31], 201[-]:

1.  The Fund's assets have been invested in compliance with the diversification requirements of Regulations 1.817-5(b) under the Code.

a.  No more than 55% of the value of the total assets of the Fund is represented by any one investment;

b.  No more than 70% of the value of the total assets of the Fund is represented by any two investments;

c.  No more than 80% of the value of the total assets of the Fund is represented by any three investments; and

d.  No more than 90% of the value of the total assets of the Fund is represented by any four investments.

| Diversification Test | Name of Issuer | % of Total Assets | Cum % | Test |
|---|---|---|---|---|
| Largest Issuer | [Issuer one] | x.xx% | x.xx% | < 55% TA |
| Second Largest Issuer | [Issuer two] | x.xx% | x.xx% | < 70% TA |
| Third Largest Issuer | [Issuer three] | x.xx% | x.xx% | < 80% TA |
| Fourth Largest Issuer | [Issuer four] | x.xx% | x.xx% | < 90% TA |

2.  If the Fund relied on the "look through" provision of Regulation 1.817-5(f), the investments of any underlying investment vehicle must be sufficiently diverse to permit the Fund to comply with the diversification requirements of Regulation 1.817-5(b).

3.  The Adviser has in all respects complied with the requirements set forth on Schedule D to the Participation Agreement.

4.  The Adviser has reviewed the foregoing statements and certifies that they are true and correct.

IN WITNESS WHEREOF, the Adviser has caused this Compliance Certificate to be executed by one of its authorized officers this ____ day of _____, 201__.

**Rand Advisors, LLC**

Authorized Signature: _____

Name: _____

003183

## SCHEDULE D

## INVESTOR CONTROL REQUIREMENTS

The Adviser and each of its officers, employees, agents, affiliates or sub-advisers that is in any capacity responsible for, or involved in the determination of, the Fund's investments or investment objective, strategies or policies (each, an "**Adviser Party**"), shall not take any action that would cause any Policy Owner or Policy Representative (together with such Policy Owner, a "**Policy Party**") to be deemed to have such incidents of control as would cause the Fund's income and gains to be currently taxable to the Policy Owner pursuant to the "Investor Control Doctrine" as set forth in Revenue Rulings 77-85, 80-274, 81-225, 82-54, 2003-91, 2003-92, or 2007-7, or described in other materials published by the U.S. Department of the Treasury or the U.S. Internal Revenue Service. In seeking to ensure that no Policy Party is deemed to have incidents of control, each Adviser Party shall at all times act in compliance with the requirements of this Schedule D, as set forth below:

1.  All decisions involving the investment of the Fund's assets shall be made by the relevant Adviser Party in its sole and absolute discretion, without any direct or indirect input from any Policy Party.

2.  No Adviser Party shall enter into, directly or indirectly, any agreement, plan or other arrangement, whether written or otherwise, with a Policy Party regarding (i) the Fund's investments or investment objective, strategies or policies; (ii) the availability of the Fund as an investment option under the Policy Owner's policy; or (iii) the assets to be held by the Fund.

3.  To the extent that the Adviser provides information (i) to a prospective Policy Owner or representative thereof as part of a direct or indirect sale of a Variable Contract, or (ii) to the Company for the Company to communicate with a Policy Party, any Adviser Party may describe: (a) the past performance of the Fund or related performance information with respect to the Fund; (b) its general view of market and industry trends (e.g., its belief that interest rates will rise in the short-term or that technology stocks are over-valued); (c) the background, education and past employment of its staff, including the performance of other funds under its management; and (d) other due diligence information that the Adviser generally provides to prospective investors with respect to the Adviser's other funds and accounts so long as such information does not relate to the quality or rate of return of any investment or group of investments of the Fund.

4.  Without limiting the foregoing, no Adviser Party shall knowingly discuss, communicate or solicit in any manner, whether directly or indirectly, the views of any Policy Party on the current or future investments, objectives, strategies or policies of the Fund, either in general or specific terms.

5.  No Adviser Party shall at any time be affiliated with a Policy Party; provided, however, that an Adviser Party may maintain such an affiliation if it establishes, pursuant to a legally binding written agreement, procedures to prevent any communication prohibited by this Schedule D.

6.  The Company understands that the Adviser provides investment management services to a variety of clients outside the context of Variable Contracts. The Company further understands that the Adviser may provide such services to clients that are Policy Parties. The Adviser recognizes that these relationships could present an opportunity for a Policy Party to communicate with any Adviser Party concerning the Fund in a manner prohibited by this Schedule D. The Adviser shall take appropriate steps to comply with this Schedule D in the context of any such relationships.

003184

## APPENDIX A

**Instructions:**

A completed and signed copy of the Subscription Form must be delivered by electronic mail to:

jhonis@randadvisors.com

**Payment Instructions for Subscription:**

All contributions should be made by wire transfer to the following account:

> [bank name/address]
> ABA:
> ABA:
> For the account of:
>
> Account No.:
> For further credit to the account of:    [            ]
> Account No.:              [      ]
> Ref:                   [subscriber's name]

After you have given your bank these wire instructions, please notify the Fund of the exact amount and date of your wire using the contact information above.  Doing so will help us identify your payment and credit it to the appropriate account.

003185

**APPENDIX A (Continued)**
**SUBSCRIPTION FORM**
**FOR ATLAS IDF, LP**

**Subscriber's Name:**

_____Crown Global Life Insurance Ltd._____ on Behalf of Separate Account _____, _____
Division [Fund #].

**Tax I.D. Number:** _____

**Type of entity (check one):**
☐ *Corporation*
☐ *Other (_____)*

**Subscription Amount in US $** _____        **Policy/Series Identifier (if any):** _____
☐ *Initial Subscription (minimum US $[_____])**
☐ *Additional Subscription (minimum US $[_____])**

**Date of Investment:**    ___/___/____

| **Subscriber's Domicile Address:** | **Subscriber's Mailing Address:** |
|---|---|
| Canon's Court | Landmark Square, 2nd Floor |
| 22 Victoria Street | 64 Earth Close |
| Hamilton HM 12 | P.O. Box 10467 |
| Bermuda | Grand Cayman KY1-1004 |
| | Cayman Islands |

| | | | | |
|---|---|---|---|---|
| *Contact Name:* | [_____] | *Contact Name:* | [_____] |
| *Tel:* | [_____] | *Tel:* | [_____] |
| *Fax:* | [_____] | *Fax:* | [_____] |
| *E-Mail:* | [_____] | *E-Mail* | [_____] |

\* Each subscription shall be treated as a separate Interest/Capital Account.

---

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank*                _____
*ABA #*               _____
*For the Account of*  _____
*Account #:*          _____
*Reference:*          _____

003186

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

By: _____     By: _____

Name:                                   Name:

Title:                                  Title:

_____

Date of Execution

003187

**APPENDIX B**
**WITHDRAWAL FORM**
**FOR ATLAS IDF, LP**

Date:_____

To:

        [Tel.:  ]
        [Fax:  ]
        Attn:  [contact name]

The undersigned hereby requests to redeem the amounts specified below on the next available date following the Fund's receipt of this Withdrawal Request.

**Subscriber's Name:**

_____Crown Global Life Insurance Ltd._____ on Behalf of Separate Account _____, _____ Division [Fund #].

**Policy/Series Identifier (if any):** _____

**Withdrawal Amount:**
☐ *Full Withdrawal*
☐ *Partial Withdrawal\* – Amount in US$* _____
                             *(minimum US $100,000)*

**Type of Withdrawal:**
☐ *Standard Withdrawal*      ☐ *Special Withdrawal*
☐ *Death Benefit Withdrawal*   ☐ *Event Withdrawal*

**Date of Withdrawal** ____/____/____

| **Subscriber's Domicile Address:** | **Subscriber's Mailing Address:** |
|---|---|
| Canon's Court | Landmark Square, 2nd Floor |
| 22 Victoria Street | 64 Earth Close |
| Hamilton HM 12 | P.O. Box 10467 |
| Bermuda | Grand Cayman KY1-1004 |
| | Cayman Islands |

| | | | |
|---|---|---|---|
| *Contact Name:* | [_____] | *Contact Name:* | [_____] |
| *Tel:* | [_____] | *Tel:* | [_____] |
| *Fax:* | [_____] | *Fax:* | [_____] |
| *E-Mail:* | [_____] | *E-Mail* | [_____] |

*Crown Global Life Insurance Ltd.*

\* Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by an Account at less than **$500,000** as of the date of withdrawal shall be deemed a complete withdrawal.

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank* _____
*ABA #* _____
*For the Account of* _____
*Account #:* _____
*Reference:* _____

003188

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

By: _____      By: _____

Name:                                 Name:

Title:                                Title:

_____
Date of Execution

# EXHIBIT 103

## CERTIFICATE OF HIGHLAND CAPITAL MANAGEMENT, LP

Reference is hereby made to that certain U.S. federal income tax opinion, dated January 29, 2016 (the "**Tax Opinion**"), attached hereto as Exhibit A, which Highland Capital Management, L.P. ("**HCM**") has requested from Sadis & Goldberg LLP ("**S&G**") to provide to HCM regarding certain U.S. federal income tax issues described in Part IV of such Tax Opinion.  Each term herein with an initial capital not required by standard capitalization rules is a defined term, and each such term not parenthetically defined herein shall have the meaning ascribed to it in the Tax Opinion.

HCM acknowledges and understands that S&G is relying upon the validity of each of the statements set forth below as the factual basis for the conclusions expressed in the Tax Opinion and that any inaccuracy in the matters set forth herein could adversely affect the conclusions in such Tax Opinion.

Pursuant to the foregoing, HCM hereby represents, warrants, covenants and certifies, after reasonable investigation and review and consultation as appropriate, as follows:

1.  The Statement of Facts set forth in Part II of the Tax Opinion is accurate and complete in all material respects.  The Assumptions Made set forth in Part III of the Tax Opinion are believed by HCM to be reasonable, and to the extent that factual matters appear in Part III, they are accurate.

2.  We have reviewed the Tax Opinion attached as Exhibit A hereto and, to the best of our knowledge, information and belief, there are no additional facts, conditions or circumstances which should have been disclosed to S&G for purposes of preparing this Tax Opinion.

3.  S&G has been provided with true, correct and complete copies of the Relevant Documents as well as any other documents provided to S&G in connection with its services in connection with the Tax Opinion (collectively, "**Opinion Documents**").  Except to the extent made clear in the Opinion Documents themselves, each of the Opinion Documents has not been further amended, altered, modified, or restated and, to the extent that such document is an agreement, is in full force and effect on the date hereof and has been at all times since the date of such amendments. No resolution, proceeding or other action has been taken for the further amendment, alteration, modification or restatement of such Opinion Documents.

[Signature Page follows.]

Highland Capital Management, L.P.
Certificate of Representations


IN WITNESS WHEREOF, HCM has executed this Certificate under seal by its duly authorized representative as of January 29, 2016.


**HIGHLAND CAPITAL
MANAGEMENT, L.P.**

By: Strand Advisors, Inc.

Its:  General Partner

By: _____

Name and Title:

James Dondero, President

003192

**EXHIBIT 104**

**SadisGoldberg**LLP

January 29, 2016

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, Texas  75201

Dear Sirs:

You have requested our ("our", "we" or "Sadis & Goldberg LLP" as the context may require) opinion concerning certain U.S. federal income tax issues relating to investments made by two tax-exempt supporting organizations identified herein in variable annuity contracts issued by Crown Global Life Insurance Ltd. under the facts discussed below.

Part I of this letter describes our factual investigation. Part II of this letter sets forth a statement of the relevant facts which you have reviewed and confirmed to us to be accurate and complete in all material respects.  Part III of this letter then lists certain assumptions that you have authorized us to make in rendering our opinion, and which you have confirmed are correct and reasonable, and Part IV of this letter states the opinion that is being requested.  In Part V of this letter, we describe the relevant U.S. federal income tax provisions, rulings of the Internal Revenue Service and relevant tax cases relating to the opinion requested.  Part VI of this letter sets forth our opinion, together with your permitted use of and reliance on this opinion letter.

I.    **FACTUAL INVESTIGATION**

      **For purposes of rendering the opinions expressed below, we have been furnished and have reviewed the following documentation (the "Relevant Documents"):**

      1.    The Okada Family Foundation, Inc. certificate of incorporation filed on February 10, 2015.

      2.    The Okada Family Foundation, Inc. bylaws dated March 9, 2015.

      3.    The Okada Family Foundation, Inc. draft IRS Form 1023 - Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.

      4.    The Supporting Organization Operating Agreement entered into between The Okada Family Foundation, Inc. and The Dallas Foundation.

      5.    Empower Dallas Foundation, Inc. certificate of incorporation filed on February 10, 2015.

      6.    Empower Dallas Foundation, Inc. bylaws dated March 9, 2015.

      7.    Empower Dallas Foundation, Inc. draft IRS Form 1023 - Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.

      8.    The Supporting Organization Operating Agreement entered into between Empower Dallas Foundation, Inc. and The Dallas Foundation.

1

003194

9.    Mark Okada 12/08/2015 donation of $5,345,021.50 to The Okada Family Foundation Inc. Nexbank Statement Transaction entries from 11/10/2015 to 12/10/2015

10.    Mark Okada 12/22/2015 donation of $2,138,333.33 to The Okada Family Foundation Inc. Nexbank Statement Transaction entries from 11/28/2015 to 12/28/2015

**11.**    Jim Dondero 12/08/2015 donation of $16,034.978.50 to Empower Dallas Foundation, Inc. Nexbank Statement Transaction entries from 11/10/2015 to 12/10/2015

**12.**    Jim Dondero 12/22/2015 donation of $6,415,000 to Empower Dallas Foundation, Inc. Nexbank Statement Transaction entries from 11/28/2015 to 12/28/2015

13.    The Okada Family Foundation, Inc. Unanimous Written Consent of Directors in Lieu of Special Meeting, December 9th, 2015.

14.    Empower Dallas Foundation, Inc. Unanimous Written Consent of Directors in Lieu of Special Meeting, December 9th, 2015.

15.    The Okada Family Foundation, Inc.:  Crown Global Due Diligence Declaration Signed 12/09/2015

16.     The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30219, effective December 11, 2015

17.    The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30219, Term Sheet 12/09/2015

18.    The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Application Form, 12/09/2015

19.    The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy FATCA Waiver, 12/09/2015

20.    The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy Structure Chart 12/09/2015

21.    The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Growth Series Supplement

22.    The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Hedge Series Supplement

23.    The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Limited Power of Attorney, 12/09/2015

24.    The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Atlas IDF, LP, Private Placement Memorandum

25.    The Okada Family Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Rand PE Fund I, LP, Private Placement Memorandum

003195

26.   The Okada Family Foundation, Inc.:  Nexbank Wire Transfer Department: $5,301,065.12 wire premium to Crown Global on 12/10/2015

27.   The Okada Family Foundation, Inc.:  Nexbank Transaction detail entries from 11/28/2015 to 12/28/2015 for additional wire premium to Crown Global of $2,117,423.00 on 12/22/2015.

28.   The Empower Dallas Foundation, Inc.:  Crown Global Due Diligence Declaration Signed 12/09/2015

29.   The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30218, effective December 11, 2015

30.   The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy #30218, Term Sheet 12/09/2015

31.   The Empower Dallas Foundation, Inc.:   Crown Global Deferred Variable Annuity Application Form, 12/09/2015

32.   The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy FATCA Waiver, 12/09/2015

33.   The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy Structure Chart 12/09/2015

34.   The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Growth Series Supplement

35.   The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: JPM Hedge Series Supplement

36.   The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Limited Power of Attorney, 12/09/2015

37.   The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Atlas IDF, LP, Private Placement Memorandum

38.   The Empower Dallas Foundation, Inc.:  Crown Global Deferred Variable Annuity Policy: Rand PE Fund I, LP, Private Placement Memorandum

39.   The Empower Dallas Foundation, Inc.:   Nexbank Wire Transfer Department: $15,903,108.54 wire premium to Crown Global on 12/10/2015

40.   Empower Dallas Foundation, Inc.:  Nexbank Transaction Account detail from 11/28/2015 to 12/28/2015 indicating wire of $6,352,270 for additional premium to Crown Global on 12/22/2015

41.   Back Office Shared Services Agreement by and among Highland Capital Management, L.P. and Rand Advisors, LLC dated October 10, 2013.

003196

42. Amendment to Back Office Shared Services Agreement between Highland Capital Management, L.P. and Rand Advisors, LLC dated October 14, 2014.

43. Contribution Agreement between Highland Capital Management, L.P. and Hunter Mountain Investment Trust, dated December 21, 2015

44. Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 21st, 2015

45. Partnership Interest Purchase Agreement among The Dugaboy Investment Trust, The Mark and Pamela Okada Family Trust-Exempt Trust #1, The Mark and Pamela Okada Family Trust-Exempt Trust #2, Mark K. Okada, and Hunter Mountain Investment Trust, dated December 24, 2015

46. Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 24th, 2015.

We are not aware of any documents other than the Relevant Documents that would alter our conclusions. We have assumed the genuineness of all signatures, the legal capacity of natural persons, the authenticity of all documents submitted to us as originals and the conformity with original documents of all documents submitted to us as copies, the fact that each party to an agreement has the power and capacity to execute, deliver and perform all obligations under such documents, the due authorization of all requisite action with respect to such documents (including the execution and delivery thereof) by each party thereto, and the validity and binding effect of such documents upon each party. We have also assumed that all factual assertions in the Relevant Documents are accurate and complete in all material respects. We have no reason to believe that any of the foregoing assumptions are unreasonable.

## II. STATEMENT OF FACTS

A. The Dallas Foundation ("TDF") is a Texas non-profit corporation exempt from federal income taxation under Section 501(c)(3) of the U.S. Internal Revenue Code, as amended ("Code"), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code.

B. The principal objective of TDF is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily, but not exclusively in or for the benefit of Dallas County, Texas. TDF is not controlled by James Dondero, Mark Okada or Highland Capital Management, L.P.

C. Empower Dallas Foundation, Inc. ("Supporting Organization #1") is a Delaware non-profit non-stock charitable corporation which has been established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of TDF.

D. The Okada Family Foundation, Inc. ("Supporting Organization #2") is a Delaware non-profit non-stock charitable corporation which has been established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of TDF.

E. Supporting Organization #1 and Supporting Organization #2 each expect to obtain a determination letter from the U.S. Internal Revenue Service ("IRS") that each such Supporting Organization,

4

003197

respectively, is a tax-exempt organization described in Section 501(c)(3) of the Code and a "Type I" supporting organization described in Section 509(a)(3) of the Code. For the avoidance of doubt, such tax-exempt status is expected to be effective retroactively to the date of each Supporting Organization's formation, respectively.

F.  As a result of qualifying as Type I supporting organizations under Section 509(a)(3) of the Code, Supporting Organization #1 and Supporting Organization #2 will each be exempted from private foundation status under Section 509(a) of the Code.

G.  Mary M. Jalonick is the President and Chief Executive Officer of TDF, and is the Incorporator of both Supporting Organization #1 and Supporting Organization #2.[1]

H.  Supporting Organization #1 has been formed at the request of James Dondero. On December 8, 2015, Mr. Dondero contributed $16,034,978.50 to Supporting Organization #1. On December 22, 2015, Mr. Dondero contributed $6,415,000 to Supporting Organization #1. At the present time, Mr. Dondero is the only contributor to Supporting Organization #1. Although Mr. Dondero made a recommendation to the Board as to how the Board should invest such contributions (as described below), the Board of Supporting Organization #1 is not contractually obligated to follow the investment recommendations of Mr. Dondero at the time such contributions are made or at any later date.

I.  Supporting Organization #2 has been formed at the request of Mark Okada. On December 8, 2015, Mr. Okada contributed $5,345,021.50 to Supporting Organization #2. On December 22, 2015 Mr. Okada contributed $2,138,333.33 to Supporting Organization #2. Although Mr. Okada made a recommendation to the Board as to how such contributions should be invested (as described below), the Board of Supporting Organization #2 is not contractually obligated to follow the investment recommendations of Mr. Okada at the time such contributions are made or at any later date.

J.  Under the relevant governing documents, TDF has total control over both Supporting Organization #1 and Supporting Organization #2, as the institutional member ("Institutional Member") of each Supporting Organization. The Institutional Member appoints the majority of each Supporting Organization's Board of Directors. The Board of Directors of each Supporting Organization appoints the officers of the Supporting Organization. The officers of each Supporting Organization can be removed with or without cause by the Board of Directors of such Supporting Organization.

K.  Supporting Organization #1 currently has a three-person Board of Directors. Mary M. Jalonick and Gary W. Garcia are the institutional directors ("Institutional Directors") of the Board of Supporting Organization #1. Gary W. Garcia currently serves as Senior Director of Development of TDF. The third member of the Board is W. Grant Scott II. Mr. Scott is an attorney engaged in private practice at Myers Bigel Sibley Sajovec, P.A. in Raleigh, North Carolina and knows Mr. Dondero from college.

L.  Supporting Organization #2 also currently has a three-person Board of Directors. Mary M. Jalonick and Gary W. Garcia are the Institutional Directors. Mark Okada is the third member of the Board.

M.  Mr. Dondero has recommended to the Board of Supporting Organization #1 that it invest its assets

---

[1] See Dallas Foundation's web page for background: www.dallasfoundation.org.

003198

in a private placement deferred variable annuity policy ( referred to herein as a "Variable Contract" or "Deferred Variable Annuity Policy") to be issued by Crown Global Life Insurance Ltd., a Bermuda-based insurance company ("Crown Global") that is a life insurance company within the meaning of the Code. Mr. Okada has made the same investment recommendation to the Board of Supporting Organization #2. However, the Boards of each Supporting Organization are not bound by those recommendations, and retain the authority to reallocate premiums or assets to different IDFs or managed accounts available under the Crown Global Variable Contracts.

N.  Crown Global maintains a segregated asset account ("Separate Account") pursuant to Bermuda law to hold assets that fund obligations arising under each Variable Contract issued by it. Under the terms of the Contracts and Bermuda law, assets allocated or credited to each Separate Account are the property of the insurance company and the policyholder has no direct proprietary interest in such assets. Rather, the Supporting Organizations have only a contractual claim against Crown Global to collect cash from Crown Global in the form of annuity payments or other withdrawals available under the Variable Contract. The performance of the investments held in the applicable Separate Account provide the measure for the economic return to the investor in the Variable Contract. The Crown Global Variable Contracts purchased by the Supporting Organizations provided that the investor was permitted to choose among certain "insurance dedicated funds" ("IDF" as further defined below) and managed accounts selected by Crown Global as available investments that could be held in the Separate Account identified in the Contract. One such IDF that was designated by Crown Global as an available investment option that the investors in the Variable Contract were permitted to select is Atlas IDF, LP ("Atlas IDF"), a newly formed Delaware "series" limited partnership managed by Rand Advisors, LLC ("Rand Advisors"). The Variable Contract also lists two other IDFs as investment options which the policyholder is able to select, JP Morgan Access Growth Strategies Insurance Fund, and JP Morgan Hedge Growth Strategies Insurance Fund. None of the IDFs or other managed funds available under the Variable Contracts will be funds that are offered to the general public under the IRS rulings discussed herein.

O.  The Variable Contract does not immediately payout distributions in accordance with a distribution schedule. The policyholders, Supporting Organization #1 and Supporting Organization #2 have the ability to make partial(s) or a full surrender of the Variable Contract at quarterly intervals, subject to applicable surrender charges. Further, as policyholders, Supporting Organization #1 and Supporting Organization #2 can decide at quarterly intervals (but no more than twice per calendar year) to reallocate funds from one investment option provided under the Variable Contract to another investment option offered by Crown Global under the Variable Contract.

P.  Crown Global, in its sole and exclusive discretion, can determine the investment offering within its offered insurance products and is under no legal requirement to make any particular offering of an investment strategy currently or in the future or to maintain an investment strategy offering. Crown Global, in its sole and absolute discretion, can terminate or remove an investment offering at any time in the future. All decisions as to the choice of IDFs or managed accounts that are made available for selection by the investor in the Variable Contract are made by Crown Global in its sole and absolute discretion. Mr. Dondero recommended to the Board of Supporting Organization #1 that it select Atlas IDF as the measuring investment under its Variable Contract. Mr. Okada made the same investment recommendations to the Board of Supporting Organization #2 as those made by Mr. Dondero to Supporting Organization #1.

Q.  On December 9, 2015, the Directors of Supporting Organization #1 and Supporting Organization #2 each unanimously approved resolutions authorizing the acquisition by the Supporting Organization

003199

of the Deferred Variable Annuity Policy from Crown Global, and authorized the officers of the Supporting Organization to take any and all further actions to carry out such acquisition.

R.  On December 10, 2015, Supporting Organization #1 wired an initial premium to Crown Global of $15,903,108.54 with respect to the Variable Contract.  On December 22, 2015, Supporting Organization #1 wired additional premium of $6,352,270 to Crown Global with respect to the Variable Contract.

S.  Effective December 11th, 2015, Crown Global issued Deferred Variable Annuity Policy #30218 to Supporting Organization #1.  Supporting Organization #1 is named the policyholder and irrevocably the sole beneficiary of the Variable Contract.

T.  On December 10, 2015, Supporting Organization #2 wired an initial premium to Crown Global of $5,301,065.12 with respect to the Variable Contract.  On December 22, 2015, Supporting Organization #2 wired additional premium of $2,117,423.00 to Crown Global with respect to the Variable Contract.

U.  Effective December 11th, 2015, Crown Global issued Deferred Variable Annuity Policy #30219 to Supporting Organization #2.  Supporting Organization #2 is named the policyholder and irrevocably the sole beneficiary of the Variable Contract.

V.  Crown Global is a subsidiary of Crown Global Insurance Group and is not affiliated with or controlled by Mr. Dondero or Mr. Okada, or Highland Capital Management, L.P. ("Highland"), which is the business conducted by Messrs. Dondero and Okada.  Highland is an investment manager business, with significant assets under management, located in Dallas, Texas.  Crown Global has made an election under the Code to be treated as a domestic life insurance company.

W.  In addition to acting as the investment manager of Atlas IDF, Rand Advisors will also act as the investment manager of Rand PE Fund I, L.P., a Delaware "series" limited partnership private investment fund ("PE Portfolio Fund"), to which Atlas IDF will initially allocate 55% of its investment portfolio and which: (x) is expected to initially invest in the Highland Transaction (as defined below), and (y) will potentially make investments in other private equity transactions.  The Supporting Organizations have not been offered the opportunity to invest directly in the PE Portfolio Fund, and Crown Global has not designated the PE Fund as an available investment option for inclusion in a Separate Account with respect to the Variable Contracts purchased by the Supporting Organizations.

X.  Atlas IDF has been organized by Rand Advisors as an "insurance-dedicated fund" (i.e., an investment fund that only admits institutional investors that are insurance companies and certain other eligible investors described in Treasury Regulation section 1.817(h)-5(f)(3)).  The confidential private placement memorandum of Atlas IDF provides that Series 1 of Atlas IDF will invest: (x) approximately 45% of its portfolio in traded assets (including, without limitation, distressed debt instruments), to be selected and managed by Rand Advisors, and (y) approximately (but not more than) 55% of its portfolio in private equity investments, to be selected and managed by Rand Advisors.  The percentage of Atlas IDF's assets invested in specific private equity investments is not fixed, and is subject to change by Rand Advisors.  However, Atlas IDF is required to satisfy the portfolio diversification requirements set forth in Section 1.817-5(b)(1) of the Treasury Regulations.

003200

Y.  At the outset, Crown Global will be the only insurance company owning a limited partnership interest in Atlas IDF. However, the governing documents of Atlas IDF permit other insurance companies to invest directly in Atlas IDF on behalf of their separate accounts established in connection with variable annuities and insurance contracts. Thus, Interests in Atlas IDF are not being offered for sale to the "general public" (within the meaning of IRS Rulings and Regulations discussed below), and thus such other investors could invest in Atlas IDF only indirectly by purchasing a Variable Contract from Crown Global (if Crown Global were to make the Atlas IDF available as an eligible investment). The PE Portfolio Fund in which Atlas IDF will invest is not an IDF. PE Portfolio Fund will have other direct investors that are not affiliates of Crown Global. Rand Advisors anticipates that it will market PE Portfolio Fund, or subsequent series thereof, to other investors in the future.

Z.  Rand Advisors is owned and controlled by John Honis. In addition, Mr. Honis owns and controls the general partner entities of Atlas IDF and PE Portfolio Fund. Mr. Honis has over 25 years of investment management and business experience, and is not controlled by Highland, nor by Mr. Dondero, nor Mr. Okada.

AA. Mr. Honis was previously a Partner and Head of Private Equity at Highland. Although Mr. Honis has retired from that position, he still currently serves on: (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies for investment funds operated by Highland, and receives compensation in connection with each of the foregoing. Mr. Honis does not currently own any limited partnership interests in Highland and does not have any direct share in the profits or revenues of such company. However, as part of his retirement, Mr. Honis is in the process of receiving payments in the total amount of $3 million from certain affiliates of Highland.

BB. The governing documents of Atlas IDF require such fund to comply with the portfolio diversification requirements in Section 817(h) of the Code. Similarly, the Variable Contracts each require the Separate Accounts established in connection with such Contracts to satisfy such portfolio diversification requirements. Each of the Variable Contracts specifically provides that the policyholder is not permitted to have direct contact with the investment manager of any IDF or managed subaccount held in the Separate Account and may not participate in the management of the Separate Account or any IDF or managed subaccount.

CC. It was anticipated solely among Rand Advisors, Strand Advisors (the General Partner of Highland Capital Management), James Dondero, and Mark Okada that the first series of PE Portfolio Fund would acquire all or substantially all of the non-voting limited partnership interests in Highland from Highland, including newly-issued limited partnership interests, or from trusts or other affiliates of Mr. Dondero or Mr. Okada (collectively, the "Highland Transaction"). Although with respect to any trusts, the Trustees would have to evaluate and approve any transaction independently and during the time of the relevant acquisition. During this time, the PE Portfolio Fund and Highland did not negotiate documentation for the legal terms of the Highland Transaction. Further, there was no assurances that such transaction would be consummated as it was understood that it would have to be negotiated, the respective parties had not made any offer (and would not until after the PE Portfolio Fund had assets), and that all parties would be separately represented by legal counsel. It was nonetheless the intention of such parties that the

003201

transaction should come about.

DD. At the time that the Supporting Organizations acquired their ownership interests in their Variable Contracts and had selected the Rand IDF as to investment to be held in the Separate Account, PE Portfolio Fund had not entered into a binding contract to acquire the previously described limited partnership interests in Highland, and the Institutional Members of the Boards of the Supporting Organizations did not have any knowledge of the terms of the investment subsequently made by the Rand PE Fund in Highland.

EE. On December 21, 2015, as part of the Highland Transaction, Hunter Mountain Investment Trust (a special purpose vehicle of PE Portfolio Fund) acquired through a contribution of cash and note, newly issued limited partnership interests in Highland Capital Management, L.P.

FF. On December 24, 2015, as part of the Highland Transaction, Hunter Mountain Investment Trust acquired through purchase from trusts affiliated with Mr. Dondero and Mr. Okada, and Mr. Okada individually, newly reclassified limited partnership interests in Highland Capital Management, L.P.

GG. Hunter Mountain Investment Trust's acquisition of substantially all the interests in Highland Capital Management, L.P. was at a substantial discount to book value. The substantial discount offered reflects the overall donative intent of Mr. Dondero and Mr. Okada to engage in the transaction.

HH. The Variable Contract/Separate Account structure may provide a federal income tax advantage to the Supporting Organizations if the income realized by such Supporting Organizations as a result of ownership of their Variable Contracts would not be treated as taxable unrelated business taxable income ("UBTI") under the Code. In contrast, if either Supporting Organization were to acquire a direct ownership interest in an investment partnership such as Atlas IDF, such Supporting Organization would almost certainly realize taxable UBTI if Atlas IDF owned, directly, or through other partnerships, equity interests in business partnerships (such as Highland) or debt-financed assets.

II. The Variable Contract/Separate Account structure may also provide state and local tax advantages to the Supporting Organizations since the structure enables the Supporting Organizations to avoid being treated as engaged in business in the states and localities in which the underlying portfolio companies that are partnerships are engaged in business.

JJ. Crown Global has represented that (1) it qualifies as a life insurance company under the Code; (2) it has made an effective election to be treated as a domestic corporation for U.S. federal income tax purposes; and (3) the terms of the Variable Contracts to be purchased by the Supporting Organizations would meet the requirements of Section 72 of the Code to be treated as annuity contracts under such Code Section if such Contracts were held by a "natural person" (within the meaning of Code Section 72(u)).

KK. Mr. Dondero and Mr. Okada (the "Donors") are entering into the transactions described herein based on a donative intent to provide funds to be used by TDF, a public charity.

LL. Prior to making any investments in the Variable Contracts to be issued by Crown Global, the Dallas Foundation had their independent financial consultant evaluate John Honis, as an investment

003202

manager acting through Rand Advisors, and the proposed investment strategy offered by him through an insurance dedicated fund that combined a private equity and liquid investment strategy for the Supporting Organizations.

MM.  The Dallas Foundation's independent financial consultant recommended to The Dallas Foundation that such investment strategies used by John Honis would be a prudent investment by each of the Supporting Organizations through a deferred variable contract policy issued by an insurance company.

NN.  Prior to making any investments in the Variable Contracts to be issued by Crown Global, the Board of each Supporting Organization received (1) the confidential private placement memorandum prepared by Crown Global with respect to the Variable Contracts, and (2) the confidential private placement memorandum detailing the terms of the Atlas IDF.

OO.  The decision made by each Board to invest in its Variable Contract and to designate the Atlas IDF as the designated investment to be made by the Separate Account of Crown Global were made on the basis of the anticipated investment returns on the underlying investments that will be made and managed by Rand Advisors.


## III. ASSUMPTIONS MADE

You have authorized us to make the following assumptions for the purpose of rendering our opinion stated herein:

A.  Mr. Honis will manage the investments of Rand IDF and the PE Portfolio Fund in order to provide attractive returns to the current and future investors in such funds.  Mr. Honis' performance will affect his ability to attract additional investors to such funds (including separate series funds) as well as any other funds subsequently managed by Rand Advisors.

B.  Atlas IDF will, at all times, comply with the applicable diversification requirements under Section 817(h) of the Code.  In order to achieve such compliance, Atlas IDF will restrict the ownership of equity interests in Atlas IDF to those investors described in Treasury Regulation 1.817-5(f).

C.  The Boards of the Supporting Organizations will control any decisions made to be made as the owner of the Variable Contract, including any decisions to withdraw funds from the Variable Contract, to move funds from Atlas IDF to other investments that Crown Global may offer under the Variable Contract, or to invest additional funds of the Supporting Organization in Atlas IDF through the Variable Contract.

D.  Highland is a successful investment management firm and it would be able to raise additional capital from other sources if it chose to do so.

E.  The intentions of the parties are that, for federal income tax purposes,: (1) Crown Global will at all times be treated as the owner of the limited partnership interests in Atlas IDF that provide an

003203

economic return for the Variable Contracts owned by the Supporting Organizations; (2) each Supporting Organization will be treated as the owner of its Variable Contract; (3) Mr. Dondero and Mr. Okada will each be treated as having made charitable contributions in cash to their Supporting Organizations in the amounts described in the facts above; (4) any sales of partnership interests in Highland by Mr. Dondero or Mr. Okada, any trust established by M. Dondero or Mr. Okada or any related party to such Donors, to the PE Portfolio Fund will be treated as sales occurring between the applicable seller and the PE Portfolio Fund.

F.  Neither Supporting Organization will incur "acquisition indebtedness" within the meaning of Section 514 of the Code with respect to its Variable Contract at any time.

## IV.  REQUESTED OPINIONS

You have asked us to render an opinion on the following issues:

1.  Whether the Internal Revenue Service could successfully contend that, under the facts and assumptions described above, the owners of the Variable Contracts, i.e., the two Supporting Organizations, are to be treated as owners for federal income tax purposes of the underlying investments held in the Crown Global Separate Accounts established in connection with such Variable Contracts.

2.  Whether the income realized by the Supporting Organizations from their investment in the Variable Contracts will be exempt from the tax imposed under Section 511 of the Code on the "unrelated business taxable income" of tax-exempt entities described in Section 511(a).

## V.  LEGAL ANALYSIS

**Tax Benefits for Tax-Exempt Organizations Investing in Variable Annuity Contracts**

U.S. tax-exempt entities described in Section 501 of the Code, such as the Supporting Organizations, are subject to federal income tax on their unrelated business taxable income (UBTI).  UBTI is defined in Section 512 as income from a "trade or business" that is regularly carried on by the tax-exempt organization, or a partnership in which it a partner, and which is not substantially related to the exempt organization's exempt purpose or function.  UBTI also includes income from "debt-financed property" as defined in Section 514. Debt-financed property is property held to produce income with respect to which "acquisition indebtedness" exists at any time in the taxable year (or, if the property is sold or disposed during the year, with respect to which there was any acquisition indebtedness at any time during the 12-month period ending on the date of such disposition).

Section 512(b)(1) specifically exempts "annuities" from UBTI, along with other notable categories of investment income, including interest, dividends, capital gains and rent from real property.   However, the specific statutory exemptions from UBTI do not apply to the extent such income items are unrelated debt-financed income under Code Section 514.  Where debt-financed property is involved, UBTI includes the income from the property multiplied by its "debt-basis percentage" (a percentage equal to "average acquisition indebtedness" divided by "average adjusted basis").

003204

The term "annuities" is not defined in Section 512 or the Treasury regulations ("Regulations") thereunder. There is also no comprehensive definition of annuity or "annuity contract' in Section 72 (governing tax treatment of distributions from life insurance and annuity contracts) or elsewhere in the Code. The Regulations under Section 72 provide that an annuity contract that is subject to the rules of Section 72 includes a contract that is recognizable as an annuity under the "customary" practices of life insurance companies. See Treas. Reg. Section 1.72-2(a)(1). Under Section 72, if the entire value of an annuity contract is applied to a stream of periodic payments, each of these payments will be partly included in income and (because of nondeductible premium payments) partly excludible as a return of capital, pursuant to an "exclusion ratio". Under Section 72(e)(2)(A), any non-annuity amount received under an annuity contract (including withdrawals and partial surrenders) on or after the "annuity starting date" are treated as "gross income". Any non-annuity amounts received **before** the annuity starting date may be treated as gross income or a return of the policyholder's investment in the contract under rules set forth in Section 72(e)(3).

**Tax Status of Separate Accounts**. Life insurance companies have segregated asset accounts that are created and regulated under the laws of various states or foreign jurisdictions. These accounts are typically formed for the purpose of segregating assets attributable to variable life insurance contracts, variable annuities and group contracts from the general assets of the life insurance company. In Revenue Ruling 78-204, the IRS ruled that a segregated asset account established by a life insurance company is not an organization that can be taxed separately from the insurance company. The Ruling states that if a segregated asset account holds assets pursuant to contracts described in former Code section 801(g)(1) (which includes variable annuity contracts or contracts with reserves based on a segregated asset account), it is taxed as part of the insurance company.

**Code Section 817: Statutory Diversification Requirements**. To discourage consumer use of various insurance type products as investment vehicles, Congress in 1984 granted the Treasury authority to prescribe diversification standards for the investment of variable contract assets held in segregated asset accounts. The legislative history states the Congress's goal in so doing was "to deny annuity or life insurance treatment for investments that are publicly available to investors and investments which are made, in effect, at the direction of the investor." *H.R. Conf. Rep. No. 98-561, at p. 1055 (1984)*.

Under the Treasury Regulations, a separate account will be considered adequately diversified if no more than 55% of the total value of the account is represented by any one investment; no more than 70% of the total value of the account is represented by any two investments; no more than 80% of the total value is represented by any three investments; and no more than 90% of the total value is represented by any four investments. Treas. Regs. Sec. 1.817-5(b)(1).

For purposes of testing diversification, Section 817(h)(4) and Section 1.817-5(f) of the Regulations provide a look through for assets held in certain investment entities, including partnerships, trusts and investment companies, provided that the beneficial interest in the investment entity are held by one or more segregated asset accounts of one or more insurance companies, and public access to such investment entity is available exclusively (except as otherwise permitted by Regs. Sec. 1.817-5(f)(3)) through the purchase of a variable contract. As previously discussed, the Separate Accounts established in connection with the Variable Contracts are expected to satisfy the diversification

003205

requirements of Code Section 817.  In order to satisfy the diversification requirements, Atlas IDF will satisfy the requirements of the Section 817 regulations to qualify for "look through" treatment.

## A. <u>INVESTOR CONTROL ISSUES</u>.

In the 1970's the IRS grew concerned that taxpayers were avoiding federal income tax by "wrapping" their investments in "investment annuity contracts" which created the possibility of major tax shelter abuse.  Such transactions were structured as follows:  Each investment annuity contract paid an annuity based on the investment return and market value of the contract's segregated asset account.  A third party custodian, typically a bank, held and invested the segregated account's assets according to the annuity owner's directions.  In response to such transactions, the IRS issued four revenue rulings between 1977 and 1982 describing the circumstances in which owners of variable annuity contracts or variable life insurance contracts would be treated and taxed as owners of the underlying assets because of their control of the investments.  The revenue rulings applied to variable annuity contracts and variable life insurance contracts the federal income tax principle that a person other than the person holding legal title to the property is treated as the owner for tax purposes if that other person possesses the "benefit and burdens" or "incidents of ownership" of such property.  See generally *Commissioner v. Sunnen*, 33 U.S. (1948); *Helvering v. Clifford*, 309 U.S. 331 (1940); *Corliss v. Bowers*, 281 U.S. 376 (1930).

**Revenue Ruling 77-85**.  This Ruling concludes that the annuity owner is, for federal income tax purposes, the owner of the separate account assets under the following conditions:

1. the annuity owner controls the investment of the separate account assets;

2. the annuity has the power to vote any securities in the account; and

3. the annuity owner can withdraw any or all of the assets at any time.

**Revenue Ruling 80-274**.  The second Ruling similarly concludes that the investor in the annuity contract was treated as the owner of a bank certificate of deposit (CD) underlying a variable annuity contract when the contract owner transferred the CD to the life insurance company in exchange for the variable annuity contract and the insurance company is expected to hold the CD for the investor's benefit.

**Revenue Ruling 81-225**.  This Ruling applies the investor control principle to five different situations, and thus is considered the most important ruling on the principle.  In four of the fact patterns considered, the annuity owner- not the insurance company- is considered the owner of the mutual fund investments underlying the annuity contract because the mutual fund investments were available for direct purchase by the general public.  In the fifth fact pattern, the insurance company, rather than the annuity owner, is considered the owner of the mutual fund investments because such shares were not available for direct purchase by the general public; they were only available through the purchase of a variable contract.  The Ruling states that in factual situations one through four, the insurance company is "little more than a conduit between the policyholders and their mutual fund shares."

**Revenue Ruling 82-54**.  In this fourth "investor control" Ruling, the annuity owners direct the insurance company to invest in shares of any or all of three mutual funds that are **not** available to the public.  One mutual fund invests primarily in common stocks, another in bonds, and the third in money market

13

003206

instruments.  The investors chose the original allocation of the investments among the three funds and have the unlimited right reallocate before the annuity contract's maturity date.  The IRS held that the annuity owners' ability to choose the contract's investments did not constitute sufficient control to cause them to be treated as owners of the mutual fund shares.  In its analysis, the IRS reiterated its position in Revenue Ruling 81-225 that public availability of investments will cause annuity owners to be treated as owners of the underlying mutual fund shares.

**Christoffersen v. United States**.  In 1984, the United States Court of Appeals for the Eighth Circuit upheld the IRS's investor control theory of Revenue Ruling 81-225 in *Christoffersen v. United States*. The taxpayers in *Christoffersen* had purchased a variable annuity contract that reflected the investment return and market value of the insurance company's separate account assets.  The taxpayers had the power to direct the investment of premiums in any one or all of six publicly available mutual funds, to reallocate their investment among such funds at any time, to make withdrawals, to surrender the contract, and to apply the contract's accumulated value to provide annuity payments.

**Post-Christoffersen Legislation**.  After the Eighth Circuit Court's decision in the *Christoffersen* case, the Congress enacted Code section 817, which aims to discourage use of variable annuities and life insurance primarily as investment vehicles.  Before the issuance of further revenue rulings in 2003 (discussed below), some commentators had suggested that the enactment of the diversification requirements under Code section 817(h) (and other measures) effectively rendered *Christoffersen* (and Revenue Ruling 81-225) obsolete.  This view was supported by language in the General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 ("DEFRA Blue Book") indicating that the Congress introduced the diversification requirements in Section 817(h) to address any and all concerns with respect to investor control of assets underlying insurance company variable contracts.  The Joint Committee on Taxation wrote the following:

> In authorizing Treasury to prescribe diversification standards, the Congress intended that the standards be designed to deny annuity or life insurance treatment for investments that are publicly available to investors and investments which are made, in effect, at the direction of the investor.

When the Treasury issued its proposed regulations under Code section 817(h), it sidestepped the investor control issue.  In its preamble to such regulations, the Treasury expressly noted that the regulations "do not provide guidance concerning the circumstances in which investor control of the investments of a segregated asset account may cause the investor, rather than the insurance company, to be treated as the owner of the asset in the account."  The preamble further stated that guidance on investor control issues would be provided in separate regulations or rulings.

**Revenue Rulings 2003-91 and 2003-92**.  The subsequent major guidance issued by the IRS on the investor control issues with respect to variable contracts was in the form of two revenue rulings issued in 2003.  Revenue Ruling 2003-91 involved a life insurance company that offered variable life insurance and variable annuity contracts.  The assets that funded the contracts were held in a separate account that was divided into various sub-accounts.  Each sub-account offered a different strategy.  Under the facts of this ruling, an individual purchased a life insurance contract and at the time of purchase, the

holder specified the allocation of premiums paid among the sub-accounts. The investments could be reallocated, at the direction of the holder, among the twelve sub-accounts, each representing a different investment strategy, at any time. Investment in the sub-accounts was available solely through the purchase of the insurance contract.

All decisions concerning the choice of the investment adviser, and any changes with respect to the sub-accounts offered, were made by the insurance company in its sole and absolute discretion. No arrangement, plan, contract, or agreement exists between the contract holder and the insurance company or between the contract holder and the investment advisor regarding the specific investments or investment objective of the sub-accounts. The contract holder could not communicate directly or indirectly with the insurance company concerning the selection or substitution of the investment advisor or other managers of the account or sub-accounts. The contract holder had no legal, equitable, direct, or indirect interest in any of the assets held by a sub-account; rather the contract holder had only a contractual claim against the insurance company to collect cash from the insurance company in the form of death benefits, or cash surrender values under the contract. Revenue Ruling 2003-91 concluded that the holder of a variable contract under such facts was not the owner of the assets that funded the variable contract for federal income tax purposes because the holder did not have direct or indirect control over the separate account.

Revenue Ruling 2003-92 clarified and amplified Revenue Ruling 81-22, by stating that a variable contract holder was the owner of interests in an unregistered partnership (e.g., a hedge fund or private equity fund) where the interests in such partnership were not available exclusively through the purchase of a life insurance policy or annuity contract. In effect this Ruling confirmed the position taken by the IRS in private letter rulings that the term "general public" included individuals purchasing partnership interests in private placement transactions. More recently, the IRS has confirmed that the fact that a similar fund is available to the public will not cause the fund held by the insurance company's separate account to be treated as being publicly available. See, e.g., Private Letter Ruling 20147007 (April 25, 2014).

**Webber v. Commissioner.** On June 30, 2015, the Tax Court issued a 92-page opinion in the case of *Webber v. Commissioner* affirming the enforceability of the IRS' investor control doctrine. Mr. Webber was a venture capital investor and private equity fund manager who established a grantor trust to purchase private placement variable life insurance policies insuring the lives of two elderly relatives. The policies were purchased from a Cayman life insurance company and the taxpayer and his family members were listed as the beneficiaries. The premiums paid for each policy, after deduction of a mortality risk premium and other applicable charges, were placed in a separate account underlying the policy. The Tax Court summarized the investor control doctrine[2] as follows:

> The "investor control" doctrine posits that, if a policyholder has sufficient "incidents of ownership" over the assets in a separate account underlying a variable life insurance or annuity policy, the policyholder rather than the insurance company will be considered the owner of those assets for Federal income tax purposes. The critical "incident of ownership" that emerges from these rulings is the power to decide what specific

---

[2] *Webber v. Com'r,* 144 T.C. No. 17 (2015), at pp. 55-56.

003208

investments will be held in the account. . . . Other "incidents of ownership" emerging from these rulings include the powers to vote securities in the separate account; to exercise other rights or options relative to these investments; to extract money from the account by withdrawal or otherwise; and to derive, in other ways, what the Supreme Court has termed "effective benefit" from the underlying assets.

The assets in these separate accounts purchased investments in startup companies which, as the Tax Court noted, the taxpayer was intimately familiar with, and also in which he invested personally and through the funds he managed. After examining the facts, including thousands of emails sent by Webber to parties acting as his agent with "recommendations" that were routinely followed by the "investment managers" of the accounts, the Tax Court determined that the taxpayer effectively dictated both the companies in which the separate accounts would invest and all actions taken with respect to these investments.

The IRS cited the "investor control" doctrine and other principles, and concluded that the taxpayer had retained sufficient control and incidents of ownership over the assets in the separate accounts to be treated as their owner for federal income tax purposes. The IRS thus treated the taxpayer as having received the dividends, interest, capital gains, and other income realized by the separate accounts. The IRS also assessed accuracy related penalties on the taxpayer under Code section 6662.

The Tax Court held that the IRS' pronouncements enunciating the investor control doctrine are entitled to deference and weight and that Webber "retained control and incidents of ownership over the assets" and was therefore "taxable on the income earned on those assets during the taxable years at issue." In holding that the taxpayer was the owner of investments held under the variable annuity contract , as contract owner, the taxpayer had (a) unfettered ability to select investments for the separate accounts under the contract, and neither the issuer nor the investment manager of the separate account exercised any independent investment discretion, (b) dictated all actions the separate account took with respect to ongoing investments,[3] (c) had numerous ways to extract cash from the contract without a surrender of the contract[4] and without loans against the contract, and he frequently exercised such power (e.g., by selling assets to the separate accounts, by borrowing money from the separate accounts, and by having the separate account make investments that generated liquidity for the taxpayer), and (d) derived other economic benefits, including causing the separate accounts to make investments that were used for personal pleasure by the taxpayer (including a winery, a Big Sur resort, and a Canadian hunting lodge), that discharged the contract owner's personal commitments, and that bolstered investments held by the taxpayer outside the contract.

Consequently, the Tax Court upheld the IRS' deficiency determinations for the most part but concluded that the taxpayer as not liable for the penalty assessments (even though the taxpayer was widely believed by tax advisors to have flagrantly disregarded the most minimal of standards to avoid investor control). The facts described herein concerning the investments made by the Supporting Organizations

---

[3] Giving the contract owner SEC-mandated voting rights with respect to underlying investments is not sufficient to establish investor control. Rev. Rul. 81-225, 1981-2 C.B. 12.
[4] The contract owner's right to surrender the contract is not sufficient to establish investor control. Rev. Rul. 81-225, 1981-2 C.B. 12.

003209

in the Variable Contracts issued by Crown Global in no way resemble the facts considered by the court in the *Webber* case.

**Application of the Investor Control Precedents to the Variable Contracts.**

Both Supporting Organizations certificates of incorporation state in the "Second" clause:

"The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. . . . [T]he corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code."

The "Second" paragraph quoted from each certificate of incorporation is clear that the respective Supporting Organization is formed to operate exclusively "to support and benefit" The Dallas Foundation. Further the "Eighth" paragraph of the certificate of incorporation for each Supporting Organization indicates that upon its dissolution, all of its assets are to be distributed to The Dallas Foundation.

Each Supporting Organization will be classified as a "Tier 1" supporting organization for federal income tax purposes. A "Tier 1" Supporting Organization, from time to time, will provide its supported organization, The Dallas Foundation, distributions of cash. The IRS web page describes the relationship as:

"**Type I.** A Type I supporting organization must be operated, supervised or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. The relationship between the supported organization(s) and the supporting organization is sometimes described as *similar to a parent-subsidiary relationship*. (emphasis added.)"[5]

Section 2.13 "Control of Investments" within the bylaws of each Supporting Organization provide that The Dallas Foundation, as Institutional Member, "shall have the sole and exclusive power and authority to direct the management and investment of the assets" of each Supporting Organization. This power affirmatively rests exclusively in the hands of The Dallas Foundation's Institutional Members and no other officer or director of the respective Supporting Organization. This mandate is reflected in the bylaws' Section 2.13 as:

"Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of the

---

[5] See, https://www.irs.gov/Charities-&-Non-Profits/Charitable-Organizations/Supporting-Organizations-Requirements-and-Types

Corporation **which have no power or authority** with respect to the matters delegated hereby to the Institutional Member with respect to investments" (emphasis added).

Therefore, the Supporting Organizations' Individual Directors and officers, including Grant Scott or Mark Okada, have no power or authority with respect to matters assigned to The Dallas Foundation with respect the decision to purchase the Variable Contracts.

This power within Section 2.13(d) vested with the Institutional Member includes control of decisions with respect to:

 "the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) ..."

Section 2.13(e) of the bylaws extends the power to the Institutional Members to include:

"the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments."

The Dallas Foundation holds the Institutional Member seats on the board of the Supporting Organizations per Section 2.1 of the respective bylaws.  The Dallas Foundation has appointed as Directors Gary W. Garcia and Mary M. Jalonick per the respective "Statement of Incorporator."

Thus, the corporate provisions for each Supporting Organization's certificate of incorporation and bylaws is absolutely clear that The Dallas Foundation controls all of the respective Supporting Organization's activities, including investments, purchases of the Variable Contracts, grants, and operating costs and expenses, and is entitled solely and exclusively to the economic benefit of such Supporting Organization's investments, including from the Variable Contracts.

Supporting Organization #1 received a donation of cash of $16,034,978.50 on December 8, 2015 from Mr. Dondero.  Supporting Organization #2 received a donation of cash of $5,345,021.50 from Mr. Okada on December 8, 2015.  After the cash donation was made, the Board of Directors of each Supporting Organization authorized the purchase of a Variable Contract offered by Crown Global through a Resolution of Unanimous Consent on December 9, 2015.   Effective December 11, 2015, Crown Global issued Variable Contracts #30218 and #30219 to Supporting Organization #1 and Supporting Organization #2, respectively.  The Variable Contracts offered investment opportunities in three Insurance Dedicated Funds, including Atlas IDF.  The Dallas Foundation, acting as the Institutional Board member of each Supporting Organization, directed the premiums to be allocated 100% to Atlas IDF.

Each Variable Contract, in the respective "Policy Data Page" to the Deferred Variable Annuity Policy, indicates under "Beneficiary" the sole beneficiary as the respective purchasing Supporting Organization #1 and Supporting Organization #2, and such designation is "irrevocable".

003211

Therefore, it is without question that the investment decision to purchase the Variable Contract and allocate the premium to Atlas IDF was made by The Dallas Foundation.  Through this decision by The Dallas Foundation, the investment performance of Atlas IDF will accrete to each respective Supporting Organization, and therefore, ultimately, to The Dallas Foundation.   Ultimately, The Dallas Foundation will solely and exclusively derive any and all of the economic benefits from the Variable Contracts issued by Crown Global.   Concomitantly, neither the Donors nor the Donors' agents, affiliates, related parties etc. derive any of the economic benefits from the Variable Contract's performance through the investment decisions made by Rand Advisors within Atlas IDF.

Each Variable Contract policy provides in Sections 4.5 and 5.1 the allowance that the Supporting Organization can reallocate funds, at quarterly intervals (but no more than twice per calendar year), among the available investment options provided in the Contract.  Therefore, The Dallas Foundation, should it no longer want exposure to Atlas IDF, has the right to reallocate funds to another investment offering.

Crown Global, through Sections 4.7 and 4.11 of each Variable Contract policy, has the sole and absolute discretion to terminate Atlas IDF as an investment offering available to each Supporting Organization. Each Supporting Organization has the right to fully or partially surrender the Variable Contract back to Crown Global, in accordance with Sections 8.2 and 8.3 of the policies.  No more than one partial surrender may be requested by the policyholder during each quarter of a policy year.

As discussed above, Atlas IDF will qualify for look through treatment for purposes of satisfying the diversification requirements of Section 817 of the Code.  In order to qualify for such look through treatment, it is essential to conclude that the equity interests in the Rand IDF have not been offered to the "general public".  Since the offering documents for the Rand IDF provide for such restricted access to the fund, we have assumed that the Rand IDF has satisfied, and will continue to satisfy this requirement.

The PPM for Atlas IDF provides that approximately 45 percent of its assets will be invested in a portfolio of high yield debt instruments and other securities selected by, and managed by the investment manager of the IDF, Rand Advisors.  Under the governing documents of the Variable Contracts and the Atlas IDF, the Supporting Organizations are not provided with any opportunities to participate in any purchase or sale or other investment decisions made with respect to the IDF's debt portfolio, and we have been instructed to assume that the Supporting Organizations and their agents will not attempt to do so.

The PPM for Atlas IDF further provides that approximately (but no more than) 55 percent of the IDF's portfolio will be invested in private equity investments through an investment made by the IDF in the Rand PE Fund 1.  Although it was anticipated that the Rand PE Fund would seek to make an investment in limited partnership interests in Highland, the terms of such investment were negotiated by Rand Advisors, as investment manager of the PE Fund, the Supporting Organizations were not provided with any opportunity to participate in such negotiations, and in fact purchased their Variable Contracts before any such investment in Highland was made by the PE Fund.  There was no guarantee that the Highland investment would in fact be made and there was no provision for unwinding the investment by

003212

Crown Global in Atlas IDF or the investments made by each Supporting Organization in its Variable Contract if such were the case.

Further, the governing documents of the Rand PE Fund provide that all investment decisions with respect to such Fund are to be made by Rand Advisors, and we have been instructed to assume that the Supporting Organizations and their agents will not attempt to participate in such decisions. The owners of the Variable Contracts will not have the ability to exercise any voting rights with respect to securities held by the Atlas IDF or Rand PE Fund, and such owners of the Variable Contracts will not have the ability to require any distributions by the insurance company pursuant to withdrawal rights in such contracts to be made in kind rather than in cash. Due to the nature of the illiquid private equity investments in the Separate Accounts, the Variable Contracts contain certain limitations on the ability of the owners of such contracts to withdraw funds.

On December 21, 2015, Rand Advisor's special purpose vehicle, Hunter Mountain Investment Trust, controlled by the Rand PE Fund, executed a Contribution Agreement with Highland Capital Management. L.P., in exchange for newly-issued limited partnership interests in Highland Capital Management, L.P. (the "Contribution Transaction"). On December 24, 2015, Rand Advisor's special purpose vehicle, Hunter Mountain Investment Trust, controlled by the Rand PE Fund, executed a Purchase and Sale Agreement to acquire interests in Highland Capital Management, L.P. from The Dugaboy Investment Trust, The Mark and Pamela Okada Family Trust-Exempt Trust #1, The Mark and Pamela Okada Family Trust-Exempt Trust #2, and Mark K. Okada (the "Purchase Transaction" and together with the Contribution Transaction, the "Highland Transaction").

The Highland Transaction was negotiated between Rand Advisors and the respective Highland counterparties and their legal representatives. Prior to consummation of the Highland Transaction, neither The Dallas Foundation nor the Supporting Organizations directed, compelled, or caused Rand Advisors to make the investment in the Highland Transaction.

The investor control doctrine was created to prevent the policyholder or beneficiary of an insurance product that qualifies under Section 72 of the Code from directly or indirectly making investment decisions with respect to the investment assets within the insurance product. The concern was that policyholders and beneficiaries should not be able to direct the investments and receive the economic benefit of those directions within an insurance product. That is the fundamental principle laid out in in the recent Tax Court case of *Webber v. Commissioner*.

Therefore, applying that *Webber* principle of the investor control doctrine to the Highland Transaction, it is not a legally significant fact that the Donors to each of the Supporting Organization are also participants in the Highland Transaction because the beneficiary of the economics from the investment performance of the Variable Contracts are not the Donors but rather are the Supporting Organizations and ultimately The Dallas Foundation.

As further support for our view, Rand Advisors made the independent investment decision to participate and negotiate the Highland Transaction. Moreover, it is clear that Rand Advisors was not taking directions nor compelled by The Dallas Foundation or the Supporting Organizations to enter into the Highland Transaction. Accordingly, there is no way the Highland Transaction can in any way be

003213

characterized as "control" by The Dallas Foundation or the Supporting Organizations over the investment activities of Atlas IDF and its respective investment accounts.

The facts and circumstances of the purchase of the Variable Contracts by the Supporting Organizations support the conclusion that Crown Global is the owner of Atlas IDF and its investments, and that the Supporting Organizations will not be treated as the owner of the investments.  The facts present none of the factors that the Tax Court found determinative in *Webber*.  In particular:

- Neither The Dallas Foundation nor the Supporting Organizations have any ability to select investments in Atlas IDF held by the Variable Contracts;
- Neither The Dallas Foundation nor the Supporting Organizations have any ability to vote securities owned by Atlas IDF or the ability to exercise other options with respect to such investments;
- Other than the right to partially or fully surrender the Variable Contracts, the Supporting Organizations cannot withdraw funds indirectly out of the Variable Contracts.  In particular, neither The Dallas Foundation nor the Supporting Organizations can cause Atlas IDF to purchase assets from The Dallas Foundation or the Supporting Organizations.  Nor can The Dallas Foundation or the Supporting Organizations borrow funds from Atlas IDF or otherwise engage in any transaction with Atlas IDF.

In addition, the facts and circumstances closely track the facts and circumstances of Revenue Ruling 2003-91's safe harbor provisions.  In addition to the facts recited above:

- There is no arrangement, plan, contract, or agreement between The Dallas Foundation or the Supporting Organizations and Crown Global or Rand Advisers as to the investments to be held in Atlas IDF.
- The Dallas Foundation and the Supporting Organizations have no right to, and will not, communicate with any investment officer of Crown Global or its affiliates or with any Investment Manager regarding the selection, quality, or rate of return of any specific investment or group of investments held in Atlas IDF.
- The Dallas Foundation and the Supporting Organizations have no legal, equitable, direct, or indirect interest in any of the assets held by Atlas IDF.  Rather the Supporting Organizations only have a contractual claim against Crown Global to collect cash from the Variable Contracts.
- All decisions concerning the choice of Insurance Dedicated Fund offerings, or any of Crown Global's investment officers involved in the investment activities of any Insurance Dedicated Fund, are made by Crown Global in its sole and absolute discretion.[6]

---

[6] See also, P.L.R. 9752061 (Dec. 24,1997) ("Policyholder influence over the way the investments are managed will be limited to selecting an investment manager from a pool of investment managers whose credentials have been evaluated and approved by Taxpayer. These investment managers may be recommended to Taxpayer by one or more Policyholders. Taxpayer will be under no obligation to approve any such recommendations. Moreover, once Policyholder makes an initial selection, the investment manager can only be changed by Taxpayer and not by Policyholder"; Taxpayer (the issuing insurance company) was held to be the owner of the assets held under the contract).

003214

- Neither The Dallas Foundation nor the Supporting Organizations have any right to, and will not, communicate with Crown Global concerning the selection or substitution of any investment manager or insurance dedicated fund involved in the investment activities of Atlas IDF.

In sum, based upon these facts, we believe that the Supporting Organizations will not be treated as the owners of the investments and other assets held in the Separate Accounts, since the Supporting Organizations will not have the types of control which the IRS has viewed as essential in order to apply the investor control doctrine to make another person other that the holder of the assets (i.e., the insurance company) the owner for tax purposes.

B.  **UNRELATED BUSINESS TAXABLE INCOME ISSUES FOR INVESTORS IN DEFERRED VARIABLE ANNUITY CONTRACTS**.

As discussed above, we have reached the conclusion that under the facts and assumptions set forth herein, for federal income tax purposes, the insurance company should be treated as the owner of the assets in the Separate Account (i.e., the equity interests in the Rand IDF), and each of the Supporting Organizations should be treated as owners of their respective Variable Contract. We have also been instructed to assume that neither Supporting Organization has, or will ever, incur "acquisition indebtedness" with respect to its Variable Contract.

**Possible Application of Section 72(u) of the Code**.  In 1986, Congress was concerned that employers were utilizing deferred annuity contracts to fund nonqualified deferred compensation arrangements on a tax-favored basis, and that this was acting as a disincentive to employers to fund benefits through qualified retirement plans.  Section 72(u) was added to the Code to curtail such activity.  The legislative history to section 72(u) states:

> The committee believes that the present-law rules relating to deferred annuity contracts present an opportunity for employers to fund, on a tax-favored basis, significant amounts of deferred compensation for employees.  This favorable tax treatment may create a disincentive for employers to provide benefits to employees under qualified pension plans, which are subject to significantly greater restrictions.[7]

Section 72(u) states, in relevant part, that "any annuity contract" owned by "a person who is not a natural person" (e.g., a corporation) shall not be treated as an annuity contract for purposes of the income tax provisions of the Code (Sections 1-1563, known as Subtitle A), other than Subchapter L (i.e., Sections 801-848 relating to insurance companies).  The effect of this rule was to eliminate the deferral of income tax for the corporate investor in the contract on the "inside buildup" income of the annuity contract.  If a non-natural person does hold an annuity contract and no exception applies, then Section 72(u)(1)(B) provides that the "income of the contract" for any taxable year is "ordinary income" that the owner is treated as receiving or accruing during that taxable year.

---

[7] S. Rep. No. 99-313, at 567 (1986).

003215

**Exemptions under Section 72(u)**. We would also note that the drafters of Section 72(u) also inserted some specific exemptions in Section 72(u)(3). For example, Section 72(u)(3)(B) provides that Section 72(u) does not apply to any annuity contract held under a qualified plan described in Section 401(a) of the Code or an "individual retirement plan" (i.e., individual retirement accounts and individual retirement annuities described in Section 7701(a)(37)). Section 72(u) also contains an exemption for "immediate annuities" held by any non-natural person. The inclusion of these exemptions indicates that Section 72(u) is designed to eliminate the tax deferral benefit that taxable corporations could derive from investments in deferred annuity contracts. We are not aware of any policy reason why a deferred annuity contract held by a qualified plan or an IRA should be exempted from Section 72(u) but one held by a tax-exempt corporation should be covered, and we have found nothing in the brief legislative history of this Code provision that addresses this issue. Consequently, the failure of the drafters to include an exemption from Section 72(u) for other tax-exempt entities that are not qualified plans or IRAs appears to be an oversight or drafting error.

**Definition of "Income on the Contract"**. Section 72(u) provides its own special definition of "income on the contract" in Section 72(u)(2). Such income is defined as the *excess of* (1) the sum of the "net surrender value' of the contract at the close of the taxable year plus all distributions under the contract received during the taxable year or any prior taxable year, *over* (2) the sum of premiums paid on the contract (net of dividends) plus all amounts includible in income for prior taxable years under Section 72(u). It is significant that the income to be recognized by the owner of the annuity contract is the net change in value of the contract rather than the actual net income realized by the separate account of the insurance company that has issued the annuity contract backed by the separate account. In effect, Section 72(u) does **not** provide for income taxation of the holder of the contract as if the contract owner owned the underlying assets in the insurance company's separate account.

The Supporting Organizations are corporations, and thus non-natural persons within the meaning of Section 72(u). Section 512(b), which contains a specific exclusion from UBTI for "annuities" is in Subtitle A of the Code. Thus, the Section 72(u) could be interpreted to provide that the UBTI exclusion for "annuities" would not apply to a tax-exempt corporation that owned a variable annuity contract. We have found no evidence in the legislative history that would indicate that Section 72(u) was intended to change the character of the income recognized by tax-exempt corporations that owned variable annuity contracts. Even if the specific exclusion from UBTI for "annuities" were held inapplicable to the income derived by the Supporting Organizations from the Variable Contracts, there are alternative provisions of the tax law that could be cited to support an exclusion of the income from such Contracts from UBTI.

**Treasury Regulations Defining Investment Income Excluded from UBTI**. Section 512(b) of the Code states that certain income items, including "annuities", interest, dividends, royalties, real property rents and gains realized on sale, exchange or disposition of property (other than inventory or property held primarily for sale to customers in the ordinary course of a trade or business) are specifically excluded from UBTI. Congress subsequently amended Section 512(b)(1) to add "payments with respect to securities loans" and "amounts received or accrued as consideration for entering into agreements to make loans" to the list of items excluded from UBTI. In the 1990's there were many new types of financial instruments, including equity swaps and total return swaps, that were made available and tax counsel sought advice from the Treasury for further clarification of the UBTI rules for investments made

003216

by tax-exempt entities in such financial instruments.   In 1992, the Treasury amended Section 1.512(b)-1 of the Regulations to provide that the specific exclusion from UBTI in Section 512(b)(1) also applies to "income from notional principal contracts" (as defined in the Regulations) and "other substantially similar income from ordinary and routine investments to the extent determined by the Commissioner…."

Thus, it can be argued that the income required to be recognized by a Supporting Organization under Section 72(u) as a result of its investment in the Variable Contract could still qualify for exclusion under this Treasury Regulation as "substantially similar income from ordinary and routine investments".  We have found no revenue ruling or case which has addressed this issue.  We would note, however, that Section 72(u) by its terms is only applicable to "annuity contracts".  Thus, if the Supporting Organizations had instead purchased variable life insurance policies, Section 72(u), by its terms, would not be applicable.  If Congress intended to eliminate the UBTI exemptions applicable to tax-exempt corporations that invested in variable contracts, it is unclear why the Section 72(u) provision by its terms is only applicable to "annuities" and not variable life insurance policies.

**Unrelated Trade or Business.**

The tax on UBTI was passed into law to rectify situations where an exempt organization could engage in any trade or business, secure in the knowledge that the profits generated from such trade or businesses would not be subject to tax, assuming the funds from such trade or business were received by the exempt organization.  As stated in the House Committee Report:

> The problem at which the tax on unrelated business income is directed here is primarily that of unfair competition.   The tax-free status of these section 101 organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes.   Also, a number of examples have arisen where these organizations have, in effect, used their tax exemption to buy an ordinary business.[8]

Under Section 511 of the Code, gross income of a tax-exempt organization will be treated as UBTI if:

1. It is income from a "trade or business";

2. The trade or business is "regularly carried on" by the organization or a partnership in which it is a member; and

3. The conduct of the "trade or business" is not substantially related to the purposes of the organization.

In order for the IRS to assert that some or all of the income from Variable Contracts constitutes UBTI, the IRS will need to establish that some or all of the income from the Variable Contracts is "trade or business" income.  Thus, unless the Variable Contracts were deemed to be partnership interests, or the

---

[8] H. Rep't No. 2319, 81st Cong., 2d Sess. 33-37 (1950).

003217

activity of acquiring such Variable Contracts were deemed to be a business activity, the income items recognized by the Supporting Organizations would not be treated as UBTI.

In general, a trade or business for UBTI purposes is based on Section 162 principles, and is viewed as an activity that produces income from the sale of a product or performance of services.  In a 1969 Revenue Ruling, the IRS held that a tax-exempt entity's investment in insurance and annuity contracts was not a business activity.  See Revenue Ruling 69-74.  The IRS will not be able to establish an unrelated trade or business with respect to either Supporting Organization.  The Variable Contracts are contractual entitlements only, and any economics paid or accrued are paid or accrued with respect to such contract.

As discussed in detail in this letter, we do not believe that the Supporting Organizations could be treated as the tax owners of the underlying partnership investments of the Separate Accounts under the IRS's "investor control" doctrine discussed in detail above.  The facts and assumptions described above do not support treating the Supporting Organizations as partners in the Atlas IDF, the Rand PE Fund or the underlying Highland limited partnership.

**Code Section 514(g) Amendment**.  Section 72(u) was added to the Code in 1986.  Two years **earlier**, Congress had amended Code Section 514 (by adding a new subsection (g)) to specifically grant regulatory authority to the Treasury to issue regulations "necessary or appropriate" to prevent the avoidance of the debt-financed income rules through the use of "segregated asset accounts"**.**  The legislative history of the 1984 legislation specifically states that such regulations, if issued, shall only apply prospectively.  We have found no reference to the 1984 amendment to Section 514 in the legislative history of Section 72(u).  As of the date of this letter, the Treasury has not issued any proposed regulations to implement Section 514(g). Further, there have been no regulations issued or proposed under Section 72(u).

**Private Letter Rulings under Section 72(u).**  There are two IRS private letter rulings, published in 2002 and 1997, that appear to have addressed the tax treatment of tax-exempt corporations that have made investments in variable annuities backed by separate accounts that held UBTI generating assets**.**  PLR 20020647 (dated Nov. 13, 2001); PLR 9708022 (dated Nov. 26, 1996). These PLRs focus on the application of Section 72(u) and the use of group annuity contracts (GACs) purchased by a foundation or endowment (i.e., a non-natural person).  The underlying investment of the GAC was a real estate partnership (presumably funded with debt financing).  The PLRs state that while the GAC was subject to Section 72(u) in the hands of the tax-exempt organizations, the annuity continued to be treated as a valid variable contract under Section 817(d) of the Code.  As a result of Section 72(u) being applicable, the life insurer would issue a Form 1099 to the endowment or foundation for any current income required to be recognized by reason of Section 72(u).

The tax issue is the character of the income to such tax-exempt entities.  The two letter rulings, state, in essence, that in the view that the contract's status as an annuity contract under Subchapter L of the Code (relating to insurance company taxation), "the tax treatment of the contract holder under Section 72(u)(1)(A) does not preclude the contract from satisfying the requirements of Section 817(d)(2)(A) for purposes of determining the taxpayer's income."  As such, the rulings conclude that the contracts do provide for the "payment of annuities."  This would support the conclusion that the "income on the

003218

contract" received by the Supporting Organizations constitutes "annuity" income and therefore does not constitute UBTI. It is our understanding the counsel for insurance companies generally are of the view that such PLRs support the position that the character of the contract holder's income is "annuity" income or other investment income exempt from UBTI despite the fact that the GAC is subject to Section 72(u).

In addition, another private letter ruling, published in 1990, supports the contention that the income reportable by each Supporting Organization does not constitute UBTI. In PLR 9009047, a trust was requesting a ruling that it qualified as a charitable remainder unitrust. The trustee of the trust intended to invest all the trust's assets in a deferred annuity contract. The ruling acknowledges that the annuity contract to be acquired by the trust will be subject to Code section 72(u) because the trust is not a natural person and the trust is not holding the annuity as an agent for a natural person. The ruling concludes that the trust will qualify as a charitable remainder unitrust and therefore the trust "will be exempt from taxes imposed by subtitle A of the Code unless it has any unrelated business taxable income as defined in section 512 of the Code and the regulations applicable thereto." Immediately thereafter, the ruling states that the trust will include in its ordinary income for any tax year the "income on the [annuity] contract" in accordance with Code section 72(u). This again supports the conclusion that amounts reportable by a tax-exempt organization with respect to an annuity contract will not constitute UBTI.[9]

Private letter rulings of this type are issued to a particular taxpayer in response to a request from the taxpayer for an interpretation of the tax law to a particular set of facts. PLRs may not be cited as precedent and generally may not be relied upon by as taxpayer other than the taxpayer which applied for and received the PLR. However, PLRs are typically viewed by tax counsel as indicative of the interpretations of the tax law that IRS personnel would likely apply to other taxpayers with the same issue.

**Mark to Market Taxation of an Annuity Contract under Section 72(u) Supports Exclusion from UBTI.** Even if the "income on the contract" that will be reported to each Supporting Organization is not considered an amount from an annuity because of Code section 72(u), alternative arguments exist that support the contention that the "income on the contract" does not constitute UBTI.

As discussed above, the "income on the contract" that will be reportable to each Supporting Organization will represent the increase in value of the assets underlying the Variable Contracts. The manner in which the contract owner's annual income inclusion is calculated under Section 72(u) resembles a mark-to-market approach to determining the investor's gain from ownership of the contract during the applicable taxable year. Essentially, the "income on the contract" represents the amount that would be realized if all the assets underlying the Separate Accounts were sold for their fair market value at the close of each taxable year. As noted above, Section 512(b)(5) contains a broad exemption from UBTI for gains realized on sales, exchanges or "other dispositions" of property (other

---

[9] This conclusion is also supported by commentators. *See* Zaritsky, Lane & Danforth, <u>Federal Income Taxation of Estates and Trusts</u>, §14.03[6][a][iv] ("Because the income option CRUT is tax exempt, no tax is due on the current accumulations").

003219

than inventory or dealer assets). Furthermore, gain realized by tax-exempt investors under the mark-to-market rules of Code Section 1256 are entitled to the UBTI exclusion provided by Section 512(b)(5).

The UBTI exclusion does not apply to gains or losses from the sale, exchange, or other disposition of property that is (i) stock in trade or other property of a kind which would properly be included in the inventory of the organization if on hand at the close of the taxable year, or (ii) property held primarily for sale to customers in the ordinary course of the trade or business. The investments underlying the Variable Contracts should not constitute inventory or property held primarily for sale to customers in the ordinary course of a trade or business. Accordingly, even if the "income on the contract" does not constitute annuity income, it is analogous to gains from the sale, exchange or other disposition of property that is not inventory or held for sale to customers, which is excluded from UBTI.

**Notional Principal Contract or Other Ordinary or Routine Investment Income.** Additionally, each Supporting Organization is an owner of an investment contract issued by Crown Global. Even if such contract is excluded from being treated as an annuity contract under the literal reading of Section 72(u), such contract more closely resembles a "notional principal contract" or "other ordinary or routine investment" referred to in the exclusions from UBTI of Section 1.512(b)-1(a) of the Regulations.

**Failure to Qualify for the Section 512(b)(1) Exclusion Does Not Result in UBTI.** Section 512(b) provides a special exclusion for certain types of investment income, but the failure to qualify for the specific exclusions in such Section does not automatically result in UBTI classification for the income items. Section 72(u) provides that the income to be recognized by the non-natural owner of the annuity account is treated as "ordinary income". Ordinary income is not of necessity characterized as UBTI; interest income, royalties and real property rents, for example, are also items of ordinary income that qualify for exemption from UBTI.

**There is No Federal Income Tax Authority to Support an IRS Position that the Income from the Variable Contracts is UBTI.**

Unable to find an unrelated trade or business upon which to base a conclusion that the Supporting Organizations receive UBTI (as discussed above), the IRS would need to develop a legal theory that the character of trade or business income that flows to Crown Global maintains its character as the income (i.e., UBTI) received by the Supporting Organizations. The IRS would encounter at least three problems with any such legal theory.

First, corporate entities similar to Crown Global are regularly used to "block" a tax-exempt organization from receiving UBTI. Under this planning technique, the corporate blocker reports any income that would have been UBTI if received directly by the tax-exempt on its own corporate tax return. Any amounts distributed by such corporation to its shareholder are generally dividend income, which is excluded from UBTI.[10] In this instance, any trade or business income will be reported by Crown Global on its own federal income tax return. Therefore, any amounts received by the Supporting Organizations should be classified as a dividend or other distribution that would not constitute UBTI.

---

[10] Code § 512(b)(1).

003220

Second, the Variable Contracts are similar to a derivative contract, as both are contractual obligations between two unrelated parties who both rely on other party's credit quality and risk, which may be significantly different than the risk profile of the reference assets underlying the contract. Further, one party to the contract typically "hedges" its obligations, similar to Crown Global hedging its obligations by purchasing interests in Atlas IDF, L.P.[11] Derivative financial instruments are regularly used to convert or block certain types of income to the desired derivative income by changing the legal relationship and risks from holding the investments directly versus obtaining a counterparty's promise to return similar economics.

Similar examples are found in the context of FIRPTA assets[12] and a foreign investor investing in U.S. assets indirectly through derivative contracts. With respect to FIRPTA, foreign investors can avoid the application of FIRPTA withholding by acquiring a synthetic long position in U.S. real estate through a derivative product. The IRS has concluded that this type of position is not a U.S. real property interest that would be subject to FIRPTA withholding.[13] Another example is a foreign investor gaining exposure to U.S. investment assets by entering into a derivative contract with a foreign counterparty bank. The foreign bank will acquire the investment assets. From the foreign investor's standpoint, the derivative contract converts U.S. source income on the U.S. investment assets into foreign source income, thereby avoiding exposure to U.S. income tax or withholding tax.[14]

The above examples demonstrate that federal tax laws respect the difference between holding a certain investment asset directly and another where one has economic exposure to the investment asset indirectly through a contractual promise by a counterparty. These examples are closely analogous, if not nearly identical, to the issuance of a variable annuity contract by a life insurance company that provides the investor a return measured by a Separate Account owned by the insurance company. The only difference is that the contractual relationship is also regulated under an insurance regime.

Third, an IRS legal theory that some portion of the Variable Contract's income is UBTI would expose a significant flaw. Such a legal theory would require that the same amount of income be taxed twice, without reduction for the amount paid by the first party. Specifically, the income from the Variable Contract is reported on Crown Global's U.S. federal income tax return. To then require the Supporting Organizations to also report such income as UBTI would be axiomatic to tax law principles of not taxing different taxpayers on the same income received. Even double tax regimes, such as the corporate income and dividend tax, do not tax the same amount of income to two different taxpayers twice. Rather, first the corporate earnings are taxed at a corporate rate; then the corporation only has the after-tax dollars to distribute to shareholders in the form of a dividend.

---

[11] Generally, it does not make a difference from a tax perspective if one of the parties to the derivative is fully hedged or is not, or actually owns the referenced assets. The income from the derivative contract is not treated for tax purposes as income on the underlying referenced investment assets. *See* Rubinger, Jeffrey, *IRS Rules Total Return Swap Tied to Real Estate Index Is Not Subject to FIRPTA*, Journal of Taxation (Sept. 2008).
[12] FIRPTA refers to the provisions of the Code added by the Foreign Investment in Real Property Tax Act of 1980 (FIRPTA), which impose federal income tax on foreign persons disposing of United States real property interests.
[13] Rev. Rul. 2008-31, 2008-26 I.R.B.1180.
[14] Treas. Reg. § 1.863-7(b)(1).

003221

**A Possible Legal Theory Available to Support a UBTI Position by the IRS Would Be to Disregard the Variable Contracts Issued by Crown Global as Shams**

The discussion above indicates that the IRS would not have a strong legal basis to support the position that the Variable Contract income is UBTI.  Therefore, the only plausible legal theory the IRS could assert to cause the underlying UBTI earned within a Variable Contract flow directly to a Supporting Organization would be to make a sham transaction (*i.e.*, economic substance) argument.  Under such an argument, the IRS would treat each Supporting Organization as direct investors in Atlas IDF and ignore, for tax purposes, Crown Global and its contractual relationship with each Supporting Organization.  As discussed below, the IRS will encounter substantial factual hurdles to overcome before it could successfully apply such a legal theory to the Variable Contracts in order to treat any underlying UBTI received by Crown Global as taxable to the Supporting Organizations.

The focus of the sham transaction doctrine is to determine whether a transaction has economic effects other than the creation of tax benefits.[15]  Courts have stated that a multi-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, containing tax-independent considerations, and not structured solely by tax-avoidance features should be respected.[16]  Furthermore, "the existence of a tax benefit resulting from a transaction does not automatically make it a sham as long as the transaction is imbued with tax-independent considerations."[17]  If an investment is one for which Congress has specifically bestowed a tax incentive, the investment, if imbued with economic substance, will not be considered a sham merely because the taxpayer could not expect profits apart from tax benefits.[18]

The transactions between each Supporting Organization and Crown Global, as represented, appear to have ample economic substance and are far from empty transactions entered into solely to generate tax benefits.  In fact, the following facts support the assertion that the transactions between the Supporting Organizations and Crown Global have economic substance and are not "shams":

- Crown Global is a Bermuda-based insurance company subject to the insurance laws of Bermuda;
- Crown Global was not formed solely for the purpose of entering into the transactions; rather it has been existence for many years prior to issuing the Variable Contracts;
- Crown Global has customers beyond the Supporting Organizations;
- Crown Global continues to market a variety of insurance-based products;
- Crown Global has employees who are undertaking the respective roles befitting an insurance company, according to its website;
- The Variable Contracts were negotiated between Crown Global and each Supporting Organization with specified pricing and contractual terms being agreed upon;

---

[15] *Kirchman v. Com'r,* 862 F.2d 1486, 1492 (11th Cir. 1989).
[16] *Frank Lyon Co. v. United States,* 435 U.S. 561, 583-84 (1978).
[17] *Holladay v. Com'r,* 649 F.2d 1176, 1179 (5th Cir. 1981).
[18] Bittker & Lokken, Federal Taxation of Income, Estates, and Gifts, § 4.3.4A.  *But see In re CM Holdings, Inc.,* 301 F.3d 96, 105 (3rd Cir. 2002) ("Choosing a tax-favored investment vehicle is fine, but engaging in an empty transaction that shuffles payments for the sole purpose of generating a deduction is not.")

003222

- Crown Global received a premium for each Variable Contract which was deposited in accounts owned and controlled by Crown Global;
- Crown Global's fee charged within the Variable Contracts is based upon the value of the respective Variable Contracts and not upon any anticipated tax benefits;
- Crown Global's fee appears commensurate with fees charged by other insurers;
- Presumably, Crown Global will continue to operate as an insurance company after any termination of the Variable Contracts;
- Each Supporting Organization's creation and existence is not transitory;
- Crown Global negotiated and entered into a Participation Agreement with the investment manager for Atlas IDF; and
- Crown Global received the Atlas IDF Private Placement Memorandum and completed the applicable subscription documents when Crown Global received a premium that was allocated to Atlas IDF.

Based upon such facts, a court would likely determine that Crown Global (a) is a real third-party insurance company, independently owned, and not affiliated with the Supporting Organizations (or their respective principals and agents) in any form, (b) has many customers, (c) operates in a regulatory environment and that it offers a variety of insurance products, and (d) it was not formed for the specific purpose of entering into the transactions. The Variable Contracts were intended to comply with the insurance regulatory laws governing Crown Global. Any conflicts between Crown Global and each Supporting Organization would have to be resolved under the terms of the respective Variable Contracts. Each Supporting Organization has no legal rights normally associated with a subscriber to the Atlas IDF. Nor have the Supporting Organizations completed subscription documents with Atlas IDF. Rather, Crown Global invested the premium received from each Supporting Organization in Atlas IDF, and has all the rights and entitlements normally associated with an investor in entities similar to Atlas IDF.

The foregoing demonstrates that a court would likely reject the application of the sham transaction or economic substance doctrine to the Variable Contracts issued by Crown Global to each Supporting Organization, and therefore reject any assertion that any UBTI realized with respect to the assets held in the Separate Account referenced in the Variable Contract should flow to the Supporting Organization. Rather, the IRS would have to address analogous legal positions directly adverse to such an assertion.

**Overall Conclusion with Respect to UBTI.**

After reviewing the respective legal authorities, arguments, and positions that the IRS could attempt to assert, we believe there are at least three supportive arguments, when considered together and presented to a court, to support our opinion. These supportive arguments are as follow: (1) the Variable Contracts income would not generate UBTI to the Supporting Organizations because such income is annuity income; 2) if the "income on the contract" was not considered annuity income, but rather (a) income reported on a "mark to market" method (which represents the changes in value of the Variable Contracts on year over year basis), (b) income from a notional principal contract, or (c) income from ordinary and routine investments, such "income on the contract" would still not be UBTI; and 3) IRS

003223

would have little, if any, legal support for its position supporting UBTI inclusion by the Supporting Organizations but rather have adverse legal authorities in other financial contexts.

Therefore, we feel that if challenged by the IRS, each of Supporting Organization #1 and Supporting Organization #2 would have a more likely than not (a greater than 50% chance of success) in a court of law, to uphold the position that any income from the Variable Contracts reported by each Supporting Organization would not be UBTI income.

Although we have reached this level of opinion, it is not to suggest that the likelihood of success is not much greater than may be indicated by our opinion level, but rather, reflects only upon the lack of direct legal precedents which we can refer for giving our opinion.  If the IRS were to litigate this position, we would anticipate that the taxpayer would likely win, and that legal authority would exist, such that if at that time we would have been able to reach a higher opinion level.  We reiterate that our opinion is a very strong "more likely than not" level of opinion.

**VI. OPINION RENDERED**

Based upon the accuracy of the statement of facts contained herein and the assumptions set forth above, and the legal analysis set forth above it is our opinion that:

1. If the Internal Revenue Service were to assert, in reliance on the "investor control doctrine", as currently interpreted, that  Supporting Organization #1 and Supporting Organization #2 should be treated as the owners, for federal income tax purposes, of the investments held in the Separate Accounts of Crown Global associated with the Variable Contracts owned by Supporting Organization #1 and Supporting Organization #2, a court should conclude that such investor control doctrine should not apply to  Supporting Organization #1 and Supporting Organization #2 (a confidence level that there is a greater than 50% likelihood that the position will be upheld by a court if challenged by the Internal Revenue Service), but rather, for federal income tax purposes, a court should conclude Crown Global is the owner of the investments held in such Separate Accounts, including without limitation, to those investments held in Atlas IDF (a confidence level that there is a greater than 50% likelihood that the position will be upheld by a court if challenged by the Internal Revenue Service).

2. It is more likely than not (*i.e.*, a greater than 50% likelihood) that the position that the income realized by the Supporting Organization #1 and Supporting Organization #2 from their ownership of the Variable Contracts will not be classified as unrelated business table income within the meaning of Section 511 of the Code, will be upheld by a court if challenged by the Internal Revenue Service.

************

The legal opinion expressed above is subject to the assumptions, exceptions, restrictions, and qualifications stated herein as well as the following qualifications and limitations:

**1.  This letter and the legal opinion contained herein are limited to the matters expressly set forth herein, and no legal opinion shall be implied or may be inferred beyond the matters expressly so stated.   As such,**

31

003224

   (a)  **The opinion is limited to the specific federal tax issues addressed herein;**

   (b)  **Additional issues may exist that could affect the federal income tax treatment of matters that are the subject of this opinion and this opinion does not provide a conclusion with respect to any additional issues; and**

   (c)  **With respect to any significant federal tax issues outside the limited scope of this opinion, this opinion was not written, and cannot be used by the taxpayer, for the purpose of avoiding penalties that may be imposed by the taxpayer.**

2.  The legal opinion set forth herein represents our best professional judgment and is not a guarantee or warranty of any of the matters discussed herein.

3.  This letter and the legal opinion expressed herein are rendered as of the date hereof, and are based upon relevant provisions of the Code and the Treasury regulations thereunder, and upon relevant judicial precedents and other authorities, as they exist as of the date of this legal opinion. These authorities are subject to change at any time, and if they do change, it may be necessary to re-examine this legal opinion.  In that regard, we expressly disclaim any undertaking to advise you of any changes in applicable law, facts or any other matters that may come to our attention after the date hereof which may alter, in whole or in part, the legal opinion expressed herein.  In addition, the legal opinion expressed in this letter is based solely on the accuracy of the facts and assumptions expressly stated herein, and the conclusions, statements and views expressed herein cannot be relied on, and may change, if any of the facts or assumptions described herein are, or later become, inaccurate or incomplete in any respect.

4.  This letter communicates legal advice, and has been prepared in anticipation of potential litigation concerning the tax consequences described herein.  It is intended that this letter be protected from discovery under the attorney-client privilege and work product doctrine to the extent provided by law. Disclosure of this letter and the information communicated in it should be carefully controlled so that disclosure is not made in a manner that will invalidate the protected status of the information.

5.  We confirm that there is no limitation on the disclosure by you or any other parties to the transaction discussed of the tax treatment or tax structure as described in this letter.  The implications of any such disclosure on attorney-client privilege or other applicable legal protections should be carefully considered prior to any such disclosure.

This letter may be relied upon by the addressee only and may not be relied upon by, nor may copies be delivered to, any other person without our prior written consent.

                    Very truly yours,

                    *Sadis & Goldberg LLP*

003225

# EXHIBIT 105

003226

## PROMISSORY NOTE

**$24,268,621.69**                                                          **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in its entirety that certain promissory note dated May 31, 2017, in the original face amount of **$24,198,069.28** (the "**Amended Note**"), which was in substitution for and superseded in its entirety that certain promissory note dated December 28, 2016, in the original face amount of **$23,817,639.58** (the "**Original Note**"), from The Dugaboy Investment Trust, as Maker, and The Get Good Non-Exempt Trust as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.
WHEREAS, The Get Good Non-Exempt Trust sold, transferred and assigned 97.6835% of its interest in the Original Note to Highland Capital Management, L.P. pursuant to that Purchase and Sale Agreement dated December 28, 2016 between Highland Capital Management, L.P. and The Get Good Non-Exempt Trust.

FOR VALUE RECEIVED, THE DUGABOY INVESTMENT TRUST ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. and THE GET GOOD NON-EXEMPT TRUST (collectively, the "**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWENTY FOUR MILLION, TWO HUNDRED SIXTY-EIGHT THOUSAND, SIX HUNDRED TWENTY ONE AND 69/100 DOLLARS ($24,268,621.69), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      **Interest Rate**.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of three and twenty-six hundredths percent (3.26%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.      **Payment of Principal and Interest**. Principal and interest under this Note shall be payable as follows:

2.1     **Annual Payment Dates**. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. 97.6835% of each Annual Installment shall be paid to Highland Capital Management, L.P. and the remaining 2.3165% shall be paid to The Get Good Non-Exempt Trust. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2     **Final Payment Date**.  The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

**003227**

HCMLPHMIT00001327

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    <u>Prior Notes</u>.    The original of each of the Original Note and the Amended Note superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

THE DUGABOY INVESTMENT TRUST

By: _____
Name: Nancy Dondero
Title:  Trustee

2

003228

HCMLPHMIT00001328

# EXHIBIT 106

003229

# THE DUGABOY INVESTMENT TRUST

## OFFERING[1] OF $18.17 MILLION PROMISSORY NOTE OWED TO HCMLP

### FEBRUARY 2024



[1] Any offering of the Dugaboy Note will be subject to Oversight Board approval

003230

HCMLPHMIT00002323

Case 19-34054-sgj11    Doc 4255-106    Filed 06/20/25    Entered 06/20/25 21:39:29
Desc Exhibit 106    Page 3 of 6

 **DUGABOY INVESTMENT TRUST**

## SUMMARY TERMS OF DUGABOY PROMISSORY NOTE

| | |
|---|---|
| **Maker:** | The Dugaboy Investment Trust |
| **Facility:** | Promissory Note dated 5/31/2017 in the principal amount of $24,268,621.69 payable to Highland Capital Management, LP (97.6835% = $23,706,439.07) and The Get Good Non-Exempt Trust (2.3165% = $562,182.62) |
| **Current Principal:** | Principal Payable to Highland Capital Management is currently $18,174,936.62 (76.67% of original principal amount following amortization payments which occurred between 2017 - 2023) |
| **Security:** | None |
| **Guarantor:** | None |
| **Maturity:** | 12/31/2046[1] |
| **Interest Rate:** | 3.26%, compounding annually on May 31 and payable annually on December 31 |
| **Amortization** | 1 / 30 of original principal amount payable annually on December 31 (4.35% of current principal amount) |
| **Call Protection:** | None; Maker may prepay in whole or in part the unpaid principal or accrued interest of the Note |
| **Event of Default:** | Failure to pay this Note or any installment as it becomes due; immediate acceleration upon default |
| **Cost of Collection:** | Expressly included in note terms |
| **Covenants:** | None |

[1] Based on amortization schedule. The promissory note states the final payment date is 12/31/47 due to a scrivener's error

CONFIDENTIAL                                                                                1

003231
HCMLPHMIT00002324

 **DUGABOY INVESTMENT TRUST**

## POTENTIAL TRANSACTION EXECUTIVE SUMMARY [1]

- The Dugaboy Investment Trust ("Dugaboy") is a Delaware Trust established in 2010 for the benefit of Jim Dondero ("Dondero")
- Dugaboy is believed to be one of Dondero's most significant personal assets, holding among other items:
  - 100% LP interest in NexPoint Advisors, Dondero's flagship real estate investment platform
  - Significant portfolio of publicly traded Dondero-managed entities as well as privately held real estate investments and other private investments
  - A potential claim to a contingent unvested derivative interest in the HCMLP estate through Dugaboy's purported claim on Hunter Mountain Investment Trust
- Dugaboy was the Maker of a Promissory Note (the "Original Note") dated 12/28/16 in the face amount of $23,817,639.58 owed to The Get Good Non-Exempt Trust [2] as Payee
  - The Get Good Non-Exempt Trust assigned 97.6835% of its interest in the original note to HCMLP on 12/28/16, retaining 2.3165%
  - The Original Note was replaced by an Amended Note in the face amount of $24,198,069.28 dated 5/31/17 and further replaced by a Promissory Note (the "Note") in the face amount of $24,268,621.69, also dated 5/31/17
  - The current face amount owed to HCMLP under the Note is $18,174,936.62 [3]
  - Despite raising defenses with other notes owed by Dondero-affiliated entities, Dugaboy's trustee affirmed under oath that no similar oral agreements existed beyond those specific notes [4]
  - Dugaboy's counsel in fact asserted that "there is no dispute that . . . Dugaboy has been making (and continues to make) payments on the Dugaboy Note and that there is little risk of Dugaboy defaulting on the Dugaboy Note" [5]
- Terms of the Note:
  - Unsecured note due 12/31/46 [6]
  - Interest: 3.26% payable annually on December 31
  - Amortization: 1 / 30 of original principal amount owed annually on December 31 ($790k owed annually to HCMLP, or 4.35% of the current principal amount)

[1] Any offering of the Dugaboy Note will be subject to Oversight Board approval
[2] Dondero trust which is currently not believed to hold significant assets
[3] Principal amount owed following the December 2023 amortization payment
[4] *Appendix in Support of Highland Capital Management, LP's Motion for Partial Summary Judgement in Notes Actions* (Adv Case No. 19-34054, Docket #0127)
[5] Dugaboy's *Brief in Support of the Motion to Dismiss, or in the alternative, Motion for More Definite Statement* entered on 4/30/21 (Adv Case No. 20-03195, Docket #30)
[6] The note states that the final maturity date is 12/31/47, however it also states the note principal is due in thirty equal annual installments beginning 12/31/17, which would make the final installment due 12/31/46

CONFIDENTIAL

2

003232


 **DUGABOY INVESTMENT TRUST**

### DUGABOY NOTE CASHFLOWS

| | Beginning Principal | Amort Payment | Interest Payment | Total Payment | Ending Principal |
|---|---|---|---|---|---|
| 12/31/2023 | | | | | $ 18,174,936.62 |
| 12/31/2024 | $ 18,174,936.62 | $ 790,214.64 | $ 594,126.23 | $ 1,384,340.87 | $ 17,384,721.98 |
| 12/31/2025 | $ 17,384,721.98 | $ 790,214.64 | $ 566,741.94 | $ 1,356,956.58 | $ 16,594,507.34 |
| 12/31/2026 | $ 16,594,507.34 | $ 790,214.64 | $ 540,980.94 | $ 1,331,195.58 | $ 15,804,292.70 |
| 12/31/2027 | $ 15,804,292.70 | $ 790,214.64 | $ 515,219.94 | $ 1,305,434.58 | $ 15,014,078.06 |
| 12/31/2028 | $ 15,014,078.06 | $ 790,214.64 | $ 490,799.93 | $ 1,281,014.57 | $ 14,223,863.42 |
| 12/31/2029 | $ 14,223,863.42 | $ 790,214.64 | $ 463,697.95 | $ 1,253,912.59 | $ 13,433,648.78 |
| 12/31/2030 | $ 13,433,648.78 | $ 790,214.64 | $ 437,936.95 | $ 1,228,151.59 | $ 12,643,434.14 |
| 12/31/2031 | $ 12,643,434.14 | $ 790,214.64 | $ 412,175.95 | $ 1,202,390.59 | $ 11,853,219.50 |
| 12/31/2032 | $ 11,853,219.50 | $ 790,214.64 | $ 387,473.63 | $ 1,177,688.27 | $ 11,063,004.86 |
| 12/31/2033 | $ 11,063,004.86 | $ 790,214.64 | $ 360,653.96 | $ 1,150,868.60 | $ 10,272,790.22 |
| 12/31/2034 | $ 10,272,790.22 | $ 790,214.64 | $ 334,892.96 | $ 1,125,107.60 | $ 9,482,575.58 |
| 12/31/2035 | $ 9,482,575.58 | $ 790,214.64 | $ 309,131.96 | $ 1,099,346.60 | $ 8,692,360.94 |
| 12/31/2036 | $ 8,692,360.94 | $ 790,214.64 | $ 284,147.33 | $ 1,074,361.97 | $ 7,902,146.30 |
| 12/31/2037 | $ 7,902,146.30 | $ 790,214.64 | $ 257,609.97 | $ 1,047,824.61 | $ 7,111,931.66 |
| 12/31/2038 | $ 7,111,931.66 | $ 790,214.64 | $ 231,848.97 | $ 1,022,063.61 | $ 6,321,717.02 |
| 12/31/2039 | $ 6,321,717.02 | $ 790,214.64 | $ 206,087.97 | $ 996,302.61 | $ 5,531,502.38 |
| 12/31/2040 | $ 5,531,502.38 | $ 790,214.64 | $ 180,821.02 | $ 971,035.66 | $ 4,741,287.74 |
| 12/31/2041 | $ 4,741,287.74 | $ 790,214.64 | $ 154,565.98 | $ 944,780.62 | $ 3,951,073.10 |
| 12/31/2042 | $ 3,951,073.10 | $ 790,214.64 | $ 128,804.98 | $ 919,019.62 | $ 3,160,858.46 |
| 12/31/2043 | $ 3,160,858.46 | $ 790,214.64 | $ 103,043.99 | $ 893,258.63 | $ 2,370,643.82 |
| 12/31/2044 | $ 2,370,643.82 | $ 790,214.64 | $ 77,494.72 | $ 867,709.36 | $ 1,580,429.18 |
| 12/31/2045 | $ 1,580,429.18 | $ 790,214.64 | $ 51,521.99 | $ 841,736.63 | $ 790,214.54 |
| 12/31/2046 | $ 790,214.54 | $ 790,214.54 | $ 25,760.99 | $ 815,975.53 | $ - |
| | | $ 18,174,936.62 | $ 7,115,540.26 | $ 25,290,476.88 | |

CONFIDENTIAL

3

003233
 HCMLPHMIT00002326

 **DUGABOY INVESTMENT TRUST**

## ESTIMATED DUGABOY BALANCE SHEET

The Dugaboy Investment Trust
*Est Current Non-GAAP Balance Sheet, Net of Secured Debt* [1]
*$ in 000*

| Assets | | Liabilities | |
|---|---|---|---|
| Private Investments | $ 111,067,696 | Note Owed to Jim Dondero [2] | $ 110,530,584 |
| Net Securities + Real Estate | $ 69,253,250 | Note Owed to HCMLP | $ 18,174,937 |
| Notes Receivable | $ 22,757,955 | Other Off Balance Sheet Debt | $ 11,401,584 |
| Cash | $ 17,710,240 | Note Owed to CDO Fund --> UBS | $ 2,603,822 |
| Other Assets | $ 46,586 | Accounts Payable, Other | $ 1,833,939 |
| | | Note Owed to HCM Services | $ 373,406 |
| | | Total Liabilities | $ 144,918,272 |
| | | Equity | $ 75,917,455 |
| Total Assets | $ 220,835,727 | Total Liabilities + Equity | $ 220,835,727 |
| | | LTV: | 65.6% |
| | | LTV excluding Dondero Note: | 15.6% |

[1] Adjust 9/30/20 Accrual Based Balance Sheet to Est Current FMV, Assets Shown Net of Corresponding Secured Debt
[2] Note potentially subject to creditor dispute

NOTE: Historical financial statement summaries are presented as prepared by Jim Dondero's accountant on an Accrual Basis. These financial statements are not audited, do not include a cashflow statement and do not include supporting notes. Adjustments to the most recently available financial statements (9/30/20) are made by HCMLP to as many items as can be supported to create a "Pro Forma" balance sheet which is intended to reflect a good faith estimate of current fair market value. HCMLP makes no representation as to the completeness or accuracy of these financial statements, and are included in this presentation for illustrative purposes.

CONFIDENTIAL

4

003234
HCMLPHMIT00002327

# EXHIBIT 107

003235



**PARTICIPATION AGREEMENT FOR PAR/NEAR PAR TRADES**
_____

### TRANSACTION SPECIFIC TERMS

THIS PARTICIPATION AGREEMENT FOR PAR/NEAR PAR TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Participation in the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Participations for Par/Near Par Trades, published as of July 21, 2023 (the "Standard Terms"). The Standard Terms and (if applicable) the Collateral Annex are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms, the Collateral Annex (if applicable) and the Transaction Specific Terms together constitute a single integrated Participation Agreement for Par/Near Par Trades governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | | |
|---|---|---|
| Trade Date: | **Agreement Date** | |
| Agreement Date: | **July 18, 2024** | |
| Seller: | **Highland Capital Management, L.P.** | |
| Buyer: | **HIGHLAND INDEMNITY TRUST** | |
| Credit Agreement: | **That certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as the Payee (the "Note")** | |
| Borrower: | **The Dugaboy Investment Trust** | |
| Purchase Amount(s): | **$18,174,936.62** | |
| Tranche(s): | | |
| CUSIP Number(s), if available: | | |
| Delivery of Credit Documents: | Yes ☒ | No ☐ |
| Netting Arrangements: | Yes ☐ | No ☒ |
| Set-Off Applicable: | Yes ☐ | No ☒ |
| Collateral Annex Applicable: | Yes ☐ | No ☒ |
| Elevation: | Yes ☒ | No ☐ |

A.    **DEFINITIONS**

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means none.

LSTA EFFECTIVE JULY 21, 2023                    Copyright © LSTA 2023. All rights reserved.

HCMLPHMIT00002594

"Buyer Purchase Price" select one:

- ☒ not applicable.
- ☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
- ☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Collateral Annex" means the Collateral Annex to the Participation Agreement for Par/Near Par Trades published by the LSTA as of July 21, 2023.

"Commitments" select one:

- ☒ none.
- ☐ means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (i.e., that is not subject to future drawing)].

"Elevation Transfer Fee" means none.

"Loans" means the outstanding principal amount of the Note as of the Trade Date payable to Seller pursuant to the Note (which amount, for the avoidance of doubt, equals 97.6835% of the total outstanding principal amount of the Note).

"Netting Letter" select one:

- ☒ not applicable.
- ☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:

- ☒ not applicable.
- ☐ means [specify original buyer in the netting arrangement].

"Participation Required Consents" means none.

"Participation Transfer Fee" means the transfer fee (if any) set forth in Section E.1 payable to Seller in connection with the assignment by Buyer of all or any portion of the Participation, subject to Section 10.1 of the Standard Terms and Conditions.

"Penultimate Buyer" select one:

- ☒ not applicable.
- ☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
- ☐ means [_____].

"Seller Purchase Price" select one:

- ☒ not applicable.
- ☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Unfunded Commitments" means none.

## B.    SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

003237

SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS; COMMITMENT REDUCTIONS)

**C.1**   Section 8.3 (Wire Instructions).

Buyer's Wire Instructions:

Bank:  M&T Bank
ABA No.: 031100092
Acct.: Highland Indemnity Trust
Acct. No.: 150474-000
Attn.: Neumann Marlett III
Ref.: True Sale Participation 100% Dugaboy Note

Seller's Wire Instructions:

Bank:  East West Bank
ABA No.: 322070381
Acct.: Highland Capital Management, LP
Acct. No.: 5500014686
Attn.: Corporate Accounting
Ref.: True Sale Participation 100% Dugaboy Note

**C.2**   Section 8.8 (Set-Off).

If "Yes" is specified opposite "Set-Off" in the Transaction Summary, clause (i) of the proviso to the second sentence of Section 8.8 shall apply.

**D.**   **SECTION 9 (NOTICES; RECORDS)**

Buyer's Address for Notices and Delivery:

Highland Indemnity Trust
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Electronic Mail Address: jpseeryjr@gmail.com; jseery@highlandcapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Attention: Highland Capital Lead Partner

Seller's Address for Notices and Delivery:

Highland Capital Management, L.P.
100 Crescent Court, Suite 1850
Dallas, Texas 75201
Attention: Chief Financial Officer
Electronic Mail Address: Notices@highlandcapital.com

**E.**   **SECTION 10 (FURTHER TRANSFERS)**

**E.1**   Select one:

☒   There is no Participation Transfer Fee.

☐   There is a Participation Transfer Fee, in the amount of $/£/€_____.

**E.2**   If an Affiliate of Buyer that is a buyer under a participation agreement with Seller entered into as of the same day as this Agreement makes a Pre-Elevation Transfer (whether or not such transfer is so defined under such participation agreement) of loans and commitments (if any) under the Credit Documents subject

**003238**

HCMLPHMIT00002596

to such participation agreement on the same day, and Buyer or substantially similar documents and to the same Entity as Buyer:

☐     Buyer and such Affiliate(s) of Buyer shall pay only one Participation Transfer Fee.

☐     Buyer and each such Affiliate of Buyer shall pay a separate Participation Transfer Fee in respect of each such Pre-Elevation Transfer.

☒     Not applicable (there is no Participation Transfer Fee).

**E.3**     Section 10.1 Right of Buyer to sell subparticipations:

☒     Buyer may sell subparticipations in respect of the Transferred Rights without Seller's prior consent. Section 10.1(b) of the Standard Terms and Conditions will apply.

☐     Buyer may not sell subparticipations in respect of the Transferred Rights without Seller's prior consent. Section 10.1(b) of the Standard Terms and Conditions will not apply.

**F.**     **SECTION 11 (VOTING)**

**F.1**     "Voting" select one:

☒     Buyer shall have voting rights with respect to the Transferred Rights, subject to Section 11.1(a) of the Standard Terms and Conditions.

☐     Buyer shall have no voting rights in respect of the Transferred Rights, subject to Section 11.1(b) of the Standard Terms and Conditions, except with respect to the following matters: _____.

**F.2**     For purposes of determining the Majority Holders or Majority Claims Holders pursuant to Section 11.1(a) of the Standard Terms and Conditions:

☐     the interests or claims held by Seller for its own account shall be counted;

☐     the interests or claims held by Seller for its own account shall not be counted;

☒     Not applicable;

<u>AND</u>

☐     the interests or claims held by Affiliates of Seller shall be counted;

☐     the interests or claims held by Affiliates of Seller shall not be counted;

☒     Not applicable.

**G.**     **SECTION 15 (ELEVATION)**

**G.1**     Select one:

☒     There is no Elevation Transfer Fee.

☐     The Elevation Transfer Fee shall be paid as follows:

    ☐     The Elevation Transfer Fee shall be paid by Seller to the Agent and Buyer shall reimburse Seller in an amount equal to
      ☐   one-half thereof.
      ☐   [other relevant fraction or percentage] _____ thereof.
    ☐     The Elevation Transfer Fee shall be paid by Buyer to the Agent and Seller shall reimburse Buyer in an amount equal to
      ☐   one-half thereof.
      ☐   [other relevant fraction or percentage] _____ thereof.

**G.2**     If "No" is specified opposite "Elevation" in the Transaction Summary, then select one:

**003239**

HCMLPHMIT00002597

☐  Subject to Section 15, Seller may at any time request an Elevation and Buyer may request an Elevation only in the following circumstances: _____ _____.

**H.** **SECTION 31 (ADDITIONAL PROVISIONS)**

The following additional provisions, including any modifications to existing provisions, apply:

"**Claimant Trust**" has the meaning set forth in the Indemnity Trust Agreement

"**Direction Letter**" means that certain Direction Letter, dated as of the Agreement Date, by and among Seller, HCMLP GP LLC, Highland Claimant Trust, and Buyer.

"**Indemnity Trust Agreement**" means that certain First Amended and Restated Indemnity Trust Agreement, dated as of July 1, 2024, by and among the Highland Claimant Trust, as grantor (the "**Grantor**"), James P. Seery, Jr., as indemnity trust administrator, Wilmington Trust, National Association, a national banking association, as indemnity trustee, for the benefit of Beneficiaries, and as the Delaware trustee, as the same may be amended, modified or supplemented from time to time.

"**Lender**" means a Payee under the Note.

"**Purchase Price**" means none (for the avoidance of doubt, the Participation shall constitute a contribution by the Grantor to Buyer pursuant to the Direction Letter and in accordance with the Indemnity Trust Agreement).

"**Settlement Date**" means the Agreement Date.

For the avoidance of doubt, Buyer is entitled to all interest accrued and unpaid on the Note through the Agreement Date.

Until the earlier of (x) the termination of this Agreement and (y) thirty (30) day's prior written notice by either Party to the Party, Seller shall provide the following services for the benefit of Buyer with respect to the Note:

   (i)    Maintain the schedule of Annual Installments (as defined in the Note);

   (ii)   Monitor the Borrower's compliance with the terms of the Note;

   (iii)  Confirm wire instructions and amounts for payments under the Note with the Borrower's personnel;

   (iv)   Communicate with the Borrower as needed, including with respect to noticing any events of default;

   (v)    Provide bookkeeping and fair value information to Buyer and perform other related miscellaneous requests with respect to the Note and the Participation, in each case, as reasonably requested by Buyer.

   As consideration for providing such services, Buyer shall pay to Seller an annual fee equal to 10 bps of Buyer's share of the then outstanding principal amount of the Note.  Such fee shall be payable only to the extent the Borrower makes its required Annual Installment payment to Seller under the Note, and notwithstanding anything in this Agreement to the contrary, Seller shall be permitted to set-off the amount of such fee against Buyer's right to receive payments with respect to the Transferred Rights and the Participation.

**003240**

HCMLPHMIT00002598

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

**By: HCMLP GP LLC, its General Partner**

By:_____

    Name: James P. Seery, Jr.
    Title: President

**BUYER**

**HIGHLAND INDEMNITY TRUST**

By:_____

    Name: James P. Seery, Jr.
    Title: Indemnity Trust Administrator

003241

HCMLPHMIT00002599

**ANNEX TO PARTICIPATION AGREEMENT FOR PAR/NEAR PAR TRADES**

This Participation is a "true-participation" intending to transfer all of Seller's right, title and beneficial interest in and to the Loans to Buyer.

The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is $0.

003242
HCMLPHMIT00002600

# EXHIBIT 108

Case 19-34054-sgj11    Doc 4255-108    Filed 06/20/25    Entered 06/20/25 21:39:29
Desc Exhibit 108    Page 2 of 3

| $18.5mm Dugaboy Note Attempted Sale -- Process Update | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | |
| | | | | | | | |
| Potential Buyer Firm | Person Contacted | Title | Date Contacted | Information/Materials Provided | Initial Responses | Follow-Up | Notes |
| Riva Ridge Capital Management | Stephn Golden | Founding Partner- PM | 2/27/2024 | Over telephone  discussed information in HCMLP prepared materials and the opportunity | Asked questions regarding the counter-party; rejected receipt of the materials; no interest at all; "life's too short" | None | Acutally laughed; stated that while the note was performing, that was for now; in his view the note was an invitation to litigate |
| Cyrus Capital Partners | Svetoslav Nikov | Partner/Analyst | 2/27/2024 | Over telephone, discussed information in HCMLP materials and the opportunity | Very quick no; no interest in the materials; believes owning the note is asymetric risk to the downside -- if it pays back, a modest return for the risk; if it defaults, your investors will want to know why you would voluntarily become a creditor to Dondero. Compared the opportunity to the chance to lend money to Phil Falcone. Once again said "lifes too short to be a creditor of Dondero" | None | |
| Carronade Capital Management | Dan Gropper | Managing Partner/CIO | 2/23/2024 | Initial email mentioning note; lunch meeting with Gropper and head of research Andy Taylor on 2/29/24; reviewed materials at lunch meeting | Gropper and Taylor quickly expressed no interest in the note; upside vs. downside skewed (far too much downside); even if the upside was better balanced, the liklihood of litigation over such a small note made the investment unattactive (even if you got costs of collection); asset transfers out of maker also a concern | None.  Did not want to keep the materials | Small note with likely costly litigation that would be never ending makes the opportunity completely unattactive |
| UBS | Nader Attalla | Structured Credit Trading; responsible for day-to-day management of UBS actions against Dondero | 2/23/2024 | Initial email mentioning note; follow up call and emailing of "teaser" | Two calls in March and early April; He has been too busy to focus on it; troubled by the fact that it does not cross-default with other Dugaboy obligations | Has Teaser; follow-up discussion required | UBS is suing Dondero and Dugaboy on other obligations/torts; could be useful to them at the right price |

003244

| $18.5mm Dugaboy Note Attempted Sale -- Process Update | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| **Potential Buyer Firm** | **Person Contacted** | **Title** | **Date Contacted** | **Information/Materials Provided** | **Initial Responses** | **Follow-Up** | **Notes** |
| NexPoint | Matt McGraner and DC Sauter | CIO / General Counsel | 5/16/2024 | Email with description of note. Indicated nonbinding offer price of $12mm, subject to approval of oversight board. | DC Sauter responded via email on 5/22/24 that they were not currently interested in the terms outlined. If the terms change, they would be interested in taking another look. | Dave Klos sent email on 5/23/24 thanking DC Sauter for response. "As you are not interested in the note, we will move forward with another transaction." | |
| Bardin Hill Investment Partners | Pratik Desai | Partner/Portfolio Manager | 6/7/2024 | Initial email with "teaser" and requesting follow-up call | 30 min call on June 10, 2024; reviewed teaser with Desai; questions regarding backgorund of note; why it had not been accelerated; payment history; terms; Dugaboy assets and liabilities; payback period at various discounts; ultimately would require a material discount to 50% soft offer; Desai asks about lending against the note and other Claimant Trust assets with material hair-cuts. Bardin Hill would not be interested in being a direct counterpart to Dondero especially if that was their only recourse. | Desai and Claimant Trust to consider ways to lend against the note and other assets in the event the Claimant Trust desires $10 million to $20 million of liquidity | Thoughtful approach; no interest in Dondero as a counterparty but would like to provided liquidity to the Trust and use a variety of assets to secure the BH advances. |

003245

**EXHIBIT 109**

003246

PRIVILEGED AND CONFIDENTIAL

# THE DUGABOY INVESTMENT TRUST

## $18.17 MILLION PROMISSORY NOTE OWED TO HCMLP

### FEBRUARY 2024





003247

HCMLPHMIT00002602

 **DUGABOY INVESTMENT TRUST**

## EXECUTIVE SUMMARY

- The Dugaboy Investment Trust ("Dugaboy") is a Delaware Trust established in 2010 for the benefit of Jim Dondero ("Dondero")
- ███████████████████████████████████████████:
  - 100% LP interest in NexPoint Advisors, Dondero's flagship real estate investment platform
  - Significant portfolio of publicly traded Dondero-managed entities as well as privately held real estate investments and other private investments
  - ████████████████████████████████████████████████████████████████████████████
- Dugaboy was the Maker of a Promissory Note (the "Original Note") dated 12/28/16 in the face amount of $23,817,639.58 owed to The Get Good Non-Exempt Trust [1] as Payee
  - The Get Good Non-Exempt Trust assigned 97.6835% of its interest in the original note to HCMLP on 12/28/16, retaining 2.3165%
  - The Original Note was replaced by an Amended Note in the face amount of $24,198,069.28 dated 5/31/17 and further replaced by a Promissory Note (the "Note") in the face amount of $24,268,621.69, also dated 5/31/17
  - The current face amount owed to HCMLP under the Note is $18,174,936.62 [2]
  - Despite raising defenses with other notes owed by Dondero-affiliated entities, Dugaboy's trustee affirmed under oath that no similar oral agreements existed beyond those specific notes [3]
  - Dugaboy's counsel in fact asserted that "there is no dispute that . . . Dugaboy has been making (and continues to make) payments on the Dugaboy Note and that there is little risk of Dugaboy defaulting on the Dugaboy Note" [4]
- Terms of the Note:
  - Unsecured note due 12/31/46 [5]
  - Interest: 3.26% payable annually on December 31
  - Amortization: 1 / 30 of original principal amount owed annually on December 31 ($790k owed annually to HCMLP, or 4.35% of the current principal amount)
- HCMLP is offering this Note at 50% of par, or $9,087,468.31 / IRR of 13.6%
  - Proposed sale process will include a $3mm overbid should another bidder come in at a higher price than initial bidder

---

[1] Dondero trust which is currently not believed to hold significant assets
[2] Principal amount owed following the December 2023 amortization payment
[3] *Appendix in Support of Highland Capital Management, LP's Motion for Partial Summary Judgement in Notes Actions* (Adv Case No. 19-34054, Docket #0127)
[4] Dugaboy's *Brief in Support of the Motion to Dismiss, or in the alternative, Motion for More Definite Statement* entered on 4/30/21 (Adv Case No. 20-03195, Docket #30)
[5] The note states that the final maturity date is 12/31/47, however it also states the note principal is due in thirty equal annual installments beginning 12/31/17, which would make the final installment due 12/31/46

003248
HCMLPHMIT00002603



## DUGABOY INVESTMENT TRUST

| SUMMARY PROPOSED SALE TIMELINE AND PROCESS |
| --- |

| Sale Period | • First Round marketing February – March, Executed Stalking Horse Agreement Signed by April 30 with $1mm deposit<br>• Second Round Marketing May, Auction week of June 10-14<br>• Closing week of June 24-28 |
| --- | --- |
| Materials / Documentation | • Initial outreach with one slide teaser (executive summary slide)<br>• Potential buyers sign NDA and receive full deck along with [the note; historical Dugaboy financials]<br>• Negotiate / sign Stalking Horse Agreement<br>• Negotiate / sign final PSA with winner of auction |
| ████████████ | • ████████████████████████████ |
| Sale Terms | • $1mm deposit due upon execution of Stalking Horse Agreement<br>• Stalking Horse bidder receives $2mm breakup fee from Seller<br>• Winning bid must be $3mm over Stalking Horse Bid<br>• Example: Stalking Horse Bid of $6mm, buyer puts up $1mm deposit, another party bids $9mm at auction, Seller nets $7mm (receives $9mm from buyer, refunds $1mm deposit to Stalking Horse bidder and pays Stalking Horse bidder $2m breakup fee)<br>• All sales are for cash only due at closing; all accrued interest travels to buyer<br>• 100% of purchase price due next business day<br>• Deposit due in advance of auction<br>• Second place bidder must agree that his bid must remain open and can be accepted 36 hours after the auction |

003249
HCMLPHMIT00002604



**DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE CASHFLOWS

**Dugaboy promissory note owed to HCMLP**

| | | |
|---|---|---|
| Beginning principal owed to HCMLP | $ 18,174,936.62 | |
| Interest rate | 3.26% | |
| Maturity | 12/31/2046 | |
| Years to Maturity | 22.52 | |
| Amort / Yr | 4.35% | |
| WAL (years) | 10.48 | |
| | | |
| Purchase Price (% of Par) | 50.00% | [Illustrative] |
| Purchase Price ($) | $ 9,087,468.31 | [trades flat] |
| Closing Date | 6/30/2024 | [Illustrative] |
| IRR: | 13.62% | |
| Return % | 178.30% | |
| P/L | $ 16,203,008.57 | |
| Years to breakeven | 6.5 | |

| | Amort schedule Beg principal | Amort Payment | Interest Payment | Total Payment | Eding Principal |
|---|---|---|---|---|---|
| 12/31/2023 | | | | | $ 18,174,936.62 |
| 12/31/2024 | $ 18,174,936.62 | $ 790,214.64 | $ 594,126.23 | $ 1,384,340.87 | $ 17,384,721.98 |
| 12/31/2025 | $ 17,384,721.98 | $ 790,214.64 | $ 566,741.94 | $ 1,356,956.58 | $ 16,594,507.34 |
| 12/31/2026 | $ 16,594,507.34 | $ 790,214.64 | $ 540,980.94 | $ 1,331,195.58 | $ 15,804,292.70 |
| 12/31/2027 | $ 15,804,292.70 | $ 790,214.64 | $ 515,219.94 | $ 1,305,434.58 | $ 15,014,078.06 |
| 12/31/2028 | $ 15,014,078.06 | $ 790,214.64 | $ 490,799.93 | $ 1,281,014.57 | $ 14,223,863.42 |
| 12/31/2029 | $ 14,223,863.42 | $ 790,214.64 | $ 463,697.95 | $ 1,253,912.59 | $ 13,433,648.78 |
| 12/31/2030 | $ 13,433,648.78 | $ 790,214.64 | $ 437,936.95 | $ 1,228,151.59 | $ 12,643,434.14 |
| 12/31/2031 | $ 12,643,434.14 | $ 790,214.64 | $ 412,175.95 | $ 1,202,390.59 | $ 11,853,219.50 |
| 12/31/2032 | $ 11,853,219.50 | $ 790,214.64 | $ 387,473.63 | $ 1,177,688.27 | $ 11,063,004.86 |
| 12/31/2033 | $ 11,063,004.86 | $ 790,214.64 | $ 360,653.96 | $ 1,150,868.60 | $ 10,272,790.22 |
| 12/31/2034 | $ 10,272,790.22 | $ 790,214.64 | $ 334,892.96 | $ 1,125,107.60 | $ 9,482,575.58 |
| 12/31/2035 | $ 9,482,575.58 | $ 790,214.64 | $ 309,131.96 | $ 1,099,346.60 | $ 8,692,360.94 |
| 12/31/2036 | $ 8,692,360.94 | $ 790,214.64 | $ 284,147.33 | $ 1,074,361.97 | $ 7,902,146.30 |
| 12/31/2037 | $ 7,902,146.30 | $ 790,214.64 | $ 257,609.97 | $ 1,047,824.61 | $ 7,111,931.66 |
| 12/31/2038 | $ 7,111,931.66 | $ 790,214.64 | $ 231,848.97 | $ 1,022,063.61 | $ 6,321,717.02 |
| 12/31/2039 | $ 6,321,717.02 | $ 790,214.64 | $ 206,087.97 | $ 996,302.61 | $ 5,531,502.38 |
| 12/31/2040 | $ 5,531,502.38 | $ 790,214.64 | $ 180,821.02 | $ 971,035.66 | $ 4,741,287.74 |
| 12/31/2041 | $ 4,741,287.74 | $ 790,214.64 | $ 154,565.98 | $ 944,780.62 | $ 3,951,073.10 |
| 12/31/2042 | $ 3,951,073.10 | $ 790,214.64 | $ 128,804.98 | $ 919,019.62 | $ 3,160,858.46 |
| 12/31/2043 | $ 3,160,858.46 | $ 790,214.64 | $ 103,043.99 | $ 893,258.63 | $ 2,370,643.82 |
| 12/31/2044 | $ 2,370,643.82 | $ 790,214.64 | $ 77,494.72 | $ 867,709.36 | $ 1,580,429.18 |
| 12/31/2045 | $ 1,580,429.18 | $ 790,214.64 | $ 51,521.99 | $ 841,736.63 | $ 790,214.54 |
| 12/31/2046 | $ 790,214.54 | $ 790,214.54 | $ 25,760.99 | $ 815,975.53 | $ - |
| | | $ 7,115,540.26 | $ 25,290,476.88 | | |
| | | | Purchase Price: | $ (9,087,468.31) | [Illustrative] |
| | | | P/L: | $ 16,203,008.57 | [Illustrative] |

003250
HCMLPHMIT00002605



**DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE PURCHASE PRICE SENSITIVITY

| | | | | | |
|---|---|---|---|---|---|
| Note Purchase Price ($) | $ 6,361,227.82 | $ 7,269,974.65 | $ 8,178,721.48 | $ 9,087,468.31 | $ 9,996,215.14 |
| Note Purchase Price (% of Par) | 35.00% | 40.00% | 45.00% | 50.00% | 55.00% |
| IRR | 21.80% | 18.38% | 15.74% | 13.62% | 11.87% |
| Return | 297.57% | 247.88% | 209.22% | 178.30% | 153.00% |
| Total Cashflows Received | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 |
| P/L | $ 18,929,249.06 | $ 18,020,502.23 | $ 17,111,755.40 | $ 16,203,008.57 | $ 15,294,261.74 |
| Years to Breakeven | 4.5 | 5.5 | 6.5 | 6.5 | 7.5 |

N   F r   rd   r

Assumes 6/30/2024 closing date

DRAFT   PRIVILEGED AND CONFIDENTIAL

4

003251
HCMLPHMIT00002606

 **DUGABOY INVESTMENT TRUST**



DRAFT - PRIVILEGED AND CONFIDENTIAL

5

003252

HCMLPHMIT00002607

## EXHIBIT 110

003253

# THE DUGABOY INVESTMENT TRUST
## $18.17 MILLION PROMISSORY NOTE OWED TO HCMLP
## FEBRUARY 2024



003254
HCMLPHMIT00002608

 **DUGABOY INVESTMENT TRUST**

## EXECUTIVE SUMMARY

- The Dugaboy Investment Trust ("Dugaboy") is a Delaware Trust established in 2010 for the benefit of Jim Dondero ("Dondero")
- ███████████████████████████████████████████████
  - 100% LP interest in NexPoint Advisors, Dondero's flagship real estate investment platform
  - Significant portfolio of publicly traded Dondero-managed entities as well as privately held real estate investments and other private investments
  - ███████████████████████████████████████████████████████████████
- Dugaboy was the Maker of a Promissory Note (the "Original Note") dated 12/28/16 in the face amount of $23,817,639.58 owed to The Get Good Non-Exempt Trust [1] as Payee
  - The Get Good Non-Exempt Trust assigned 97.6835% of its interest in the original note to HCMLP on 12/28/16, retaining 2.3165%
  - The Original Note was replaced by an Amended Note in the face amount of $24,198,069.28 dated 5/31/17 and further replaced by a Promissory Note (the "Note") in the face amount of $24,268,621.69, also dated 5/31/17
  - The current face amount owed to HCMLP under the Note is $18,174,936.62 [2]
  - Despite raising defenses with other notes owed by Dondero-affiliated entities, Dugaboy's trustee affirmed under oath that no similar oral agreements existed beyond those specific notes [3]
  - Dugaboy's counsel in fact asserted that "there is no dispute that . . . Dugaboy has been making (and continues to make) payments on the Dugaboy Note and that there is little risk of Dugaboy defaulting on the Dugaboy Note" [4]
- Terms of the Note:
  - Unsecured note due 12/31/46 [5]
  - Interest: 3.26% payable annually on December 31
  - Amortization: 1 / 30 of original principal amount owed annually on December 31 ($790k owed annually to HCMLP, or 4.35% of the current principal amount)
- HCMLP is offering this Note at 50% of par, or $9,087,468.31 / IRR of 13.6%
  - Proposed sale process will include a $3mm overbid should another bidder come in at a higher price than initial bidder

---

[1] Dondero trust which is currently not believed to hold significant assets
[2] Principal amount owed following the December 2023 amortization payment
[3] *Appendix in Support of Highland Capital Management, LP's Motion for Partial Summary Judgement in Notes Actions* (Adv Case No. 19-34054, Docket #0127)
[4] Dugaboy's *Brief in Support of the Motion to Dismiss, or in the alternative, Motion for More Definite Statement* entered on 4/30/21 (Adv Case No. 20-03195, Docket #30)
[5] The note states that the final maturity date is 12/31/47, however it also states the note principal is due in thirty equal annual installments beginning 12/31/17, which would make the final installment due 12/31/46

003255
HCMLPHMIT00002609



## DUGABOY INVESTMENT TRUST

### SUMMARY PROPOSED SALE TIMELINE AND PROCESS

| Sale Period | • First Round marketing February – March, Executed Stalking Horse Agreement Signed by April 30 with $1mm deposit<br>• Second Round Marketing May, Auction week of June 10-14<br>• Closing week of June 24-28 |
|---|---|
| Materials / Documentation | • Initial outreach with one slide teaser (executive summary slide)<br>• Potential buyers sign NDA and receive full deck along with [the note; historical Dugaboy financials]<br>• Negotiate / sign Stalking Horse Agreement<br>• Negotiate / sign final PSA with winner of auction |
| ███████████ | • ███████████████████████ ████████████ |
| Sale Terms | • $1mm deposit due upon execution of Stalking Horse Agreement<br>• Stalking Horse bidder receives $2mm breakup fee from Seller<br>• Winning bid must be $3mm over Stalking Horse Bid<br>• Example: Stalking Horse Bid of $6mm, buyer puts up $1mm deposit, another party bids $9mm at auction, Seller nets $7mm (receives $9mm from buyer, refunds $1mm deposit to Stalking Horse bidder and pays Stalking Horse bidder $2m breakup fee)<br>• All sales are for cash only due at closing; all accrued interest travels to buyer<br>• 100% of purchase price due next business day<br>• Deposit due in advance of auction<br>• Second place bidder must agree that his bid must remain open and can be accepted 36 hours after the auction |

003256
HCMLPHMIT00002610

 **DUGABOY INVESTMENT TRUST**

| | SUMMARY TERMS OF DUGABOY PROMISSORY NOTE |
|---|---|
| Maker | The Dugaboy Investment Trust |
| acility | Promissory Note dated 5/31/2017 in the principal amount of $24,268,621.69 payable to Highland Capital Management, LP (97.6835% $23,706,439.07) and The Get Good Non-Exempt Trust (2.3165%   $562,182.62) |
| Current Principal | Principal Payable to Highland Capital Management is currently $18,174,936.62 (76.67% of original principal amount following amortization payments which occurred between 2017 - 2023) |
| Security | None |
| uarantor | None |
| Maturity | 12/31/2046 |
| nterest  ate | 3.26%, compounding annually on May 31 and payable annually on December 31 |
| Amorti ation | 1 / 30 of original principal amount payable annually on December 31 (4.35% of current principal amount) |
| Call Protection | None. Maker may prepay in whole or in part the unpaid principal or accrued interest of the Note |
| vent o  De ault | Failure to pay this Note or any installment as it becomes due; immediate acceleration upon default. Cost of collection expressly included in note terms. |
| Covenants | None |

¹ Based on amortization schedule. The promissory note states the final payment date is 12/31/47 due to a scrivener's error

003257
HCMLPHMIT00002611

 **DUGABOY INVESTMENT TRUST**

| SUMMARY OF DONDERO AFFILIATED NOTES DUE TO HCMLP |
| --- |

Highland is in the process of collecting on notes owed by Dondero-affiliated entities, which are in default [1]

Dondero-affiliates raised a number of defenses, including the existence of an alleged oral agreement with Nancy Dondero as Trustee of Dugaboy and holder of a majority of HCMLP units that the notes would be forgiven contingent on Dondero's monetization of certain assets [2]

On 1/17/23, the Bankruptcy Court filed a supplemental report and recommendation finding the Dondero-affiliates liable for the notes under Highland's motion for summary judgement

On 7/6/23, the United States District Court, Northern District of Texas, Dallas Division adopted and approved the Bankruptcy Court's Report and Recommendation on HCMLP's motion for summary judgement on the notes and subsequently entered amended final judgements against the Dondero entities

Defendants have paid the judgement amounts into the court registry, pending appeal to the United States Court of Appeals for the Fifth Circuit

| Party | Judgement Amount | Individual Bond Amount |
| --- | --- | --- |
| NexPoint Advisors, LP | $25,849,816.94 | $28,693,296.80 |
| NexPoint Real Estate Partners, LLC | $13,251,661.00 | $14,709,343.70 |
| James Dondero | $10,152,391.87 | $11,269,154.90 |
| NexPoint Asset Management, LP | $8,441,524.65 | $9,370,092.36 |
| Highland Capital Management Services, Inc. | $7,578,620.41 | $8,412,268.66 |
| NexPoint Asset Management, LP | $3,628,692.37 | $4,027,848.53 |
| Total | | |

[1] Nexpoint Asset Management, LP was a defendant in two adversary actions and final judgements were handed down in both, which is why there are two discrete judgements against this entity

[2] ███████████████████████████████████████████████████████████████

DRAFT    PRIVILEGED AND CONFIDENTIAL

003258
HCMLPHMIT00002612



**DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE CASHFLOWS

**Dugaboy promissory note owed to HCMLP**

| | | |
|---|---|---|
| Beginning principal owed to HCMLP | $ 18,174,936.62 | |
| Interest rate | 3.26% | |
| Maturity | 12/31/2046 | |
| Years to Maturity | 22.52 | |
| Amort / Yr | 4.35% | |
| WAL (years) | 10.48 | |
| | | |
| Purchase Price (% of Par) | 50.00% | [Illustrative] |
| Purchase Price ($) | $ 9,087,468.31 | [trades flat] |
| Closing Date | 6/30/2024 | [Illustrative] |
| IRR: | 13.62% | |
| Return % | 178.30% | |
| P/L | $ 16,203,008.57 | |
| Years to breakeven | 6.5 | |

**Amort schedule**

| | Beg principal | Amort Payment | Interest Payment | Total Payment | Eding Principal |
|---|---|---|---|---|---|
| 12/31/2023 | | | | | $ 18,174,936.62 |
| 12/31/2024 | $ 18,174,936.62 | $ 790,214.64 | $ 594,126.23 | $ 1,384,340.87 | $ 17,384,721.98 |
| 12/31/2025 | $ 17,384,721.98 | $ 790,214.64 | $ 566,741.94 | $ 1,356,956.58 | $ 16,594,507.34 |
| 12/31/2026 | $ 16,594,507.34 | $ 790,214.64 | $ 540,980.94 | $ 1,331,195.58 | $ 15,804,292.70 |
| 12/31/2027 | $ 15,804,292.70 | $ 790,214.64 | $ 515,219.94 | $ 1,305,434.58 | $ 15,014,078.06 |
| 12/31/2028 | $ 15,014,078.06 | $ 790,214.64 | $ 490,799.93 | $ 1,281,014.57 | $ 14,223,863.42 |
| 12/31/2029 | $ 14,223,863.42 | $ 790,214.64 | $ 463,697.95 | $ 1,253,912.59 | $ 13,433,648.78 |
| 12/31/2030 | $ 13,433,648.78 | $ 790,214.64 | $ 437,936.95 | $ 1,228,151.59 | $ 12,643,434.14 |
| 12/31/2031 | $ 12,643,434.14 | $ 790,214.64 | $ 412,175.95 | $ 1,202,390.59 | $ 11,853,219.50 |
| 12/31/2032 | $ 11,853,219.50 | $ 790,214.64 | $ 387,473.63 | $ 1,177,688.27 | $ 11,063,004.86 |
| 12/31/2033 | $ 11,063,004.86 | $ 790,214.64 | $ 360,653.96 | $ 1,150,868.60 | $ 10,272,790.22 |
| 12/31/2034 | $ 10,272,790.22 | $ 790,214.64 | $ 334,892.96 | $ 1,125,107.60 | $ 9,482,575.58 |
| 12/31/2035 | $ 9,482,575.58 | $ 790,214.64 | $ 309,131.96 | $ 1,099,346.60 | $ 8,692,360.94 |
| 12/31/2036 | $ 8,692,360.94 | $ 790,214.64 | $ 284,147.33 | $ 1,074,361.97 | $ 7,902,146.30 |
| 12/31/2037 | $ 7,902,146.30 | $ 790,214.64 | $ 257,609.97 | $ 1,047,824.61 | $ 7,111,931.66 |
| 12/31/2038 | $ 7,111,931.66 | $ 790,214.64 | $ 231,848.97 | $ 1,022,063.61 | $ 6,321,717.02 |
| 12/31/2039 | $ 6,321,717.02 | $ 790,214.64 | $ 206,087.97 | $ 996,302.61 | $ 5,531,502.38 |
| 12/31/2040 | $ 5,531,502.38 | $ 790,214.64 | $ 180,821.02 | $ 971,035.66 | $ 4,741,287.74 |
| 12/31/2041 | $ 4,741,287.74 | $ 790,214.64 | $ 154,565.98 | $ 944,780.62 | $ 3,951,073.10 |
| 12/31/2042 | $ 3,951,073.10 | $ 790,214.64 | $ 128,804.98 | $ 919,019.62 | $ 3,160,858.46 |
| 12/31/2043 | $ 3,160,858.46 | $ 790,214.64 | $ 103,043.99 | $ 893,258.63 | $ 2,370,643.82 |
| 12/31/2044 | $ 2,370,643.82 | $ 790,214.64 | $ 77,494.72 | $ 867,709.36 | $ 1,580,429.18 |
| 12/31/2045 | $ 1,580,429.18 | $ 790,214.64 | $ 51,521.99 | $ 841,736.63 | $ 790,214.54 |
| 12/31/2046 | $ 790,214.54 | $ 790,214.54 | $ 25,760.99 | $ 815,975.53 | $ - |
| | | $ 7,115,540.26 | $ 25,290,476.88 | | |
| | | | Purchase Price: | $ (9,087,468.31) | [Illustrative] |
| | | | P/L: | $ 16,203,008.57 | [Illustrative] |

D R A F T   P R I V I L E G E D   A N D   C O N F I D E N T I A L

003259


HCMLPHMIT00002613

 **DUGABOY INVESTMENT TRUST**

## DUGABOY NOTE PURCHASE PRICE SENSITIVITY

| Note Purchase Price ($) | $ 6,361,227.82 | $ 7,269,974.65 | $ 8,178,721.48 | $ 9,087,468.31 | $ 9,996,215.14 |
|---|---|---|---|---|---|
| Note Purchase Price (% of Par) | 35.00% | 40.00% | 45.00% | 50.00% | 55.00% |
| IRR | 21.80% | 18.38% | 15.74% | 13.62% | 11.87% |
| Return | 297.57% | 247.88% | 209.22% | 178.30% | 153.00% |
| Total Cashflows Received | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 | $ 25,290,476.88 |
| P/L | $ 18,929,249.06 | $ 18,020,502.23 | $ 17,111,755.40 | $ 16,203,008.57 | $ 15,294,261.74 |
| Years to Breakeven | 4.5 | 5.5 | 6.5 | 6.5 | 7.5 |

N   F r   rd   r

Assumes 6/30/2024 closing date

D R A F T    P R I V I L E G E D   A N D   C O N F I D E N T I A L

003260
HCMLPHMIT00002614



DRAFT - PRIVILEGED AND CONFIDENTIAL

003261

HCMLPHMIT00002615



003262

HCMLPHMIT00002616

 **DUGABOY INVESTMENT TRUST**

DRAFT - PRIVILEGED AND CONFIDENTIAL

9

003263

HCMLPHMIT00002617



**DUGABOY INVESTMENT TRUST**

003264
HCMLPHMIT00002618



**DUGABOY INVESTMENT TRUST**

THE DUGABOY INVESTMENT TRUST ORG CHART



DRAFT   PRIVILEGED AND CONFIDENTIAL

003265
HCMLPHMIT00002619

 **DUGABOY INVESTMENT TRUST**

**APPENDIX**

DRAFT   PRIVILEGED AND CONFIDENTIAL

003266

HCMLPHMIT00002620

 **DUGABOY INVESTMENT TRUST**

Current Share Count / Current Price





DRAFT - PRIVILEGED AND CONFIDENTIAL

003267

HCMLPHMIT00002621



**DUGABOY INVESTMENT TRUST**

## DUGABOY SECURITIES PORTFOLIO  NXRT

### Business   verview

NexPoint Residential Trust, Inc ("N  RT") is an externally advised, publicly traded real estate investment trust (REIT)focused on the acquisition, asset management, and disposition of multifamily assets, located primarily in the Sun Belt region of the United States.

The company pursues investments in class B multifamily real estate properties, typically with a value-add component, where it can invest significant amounts of capital to provde "life-style" amenities to "workforce" housing.

N  RT was formed via a spin-off from the predecessor to N  DT, which at the time was a closed end fund (NHF)

N  RT is NexPoint's flagship investment product

### Capital Structure

NexPoint Residential Trust, Inc

| | $mm | x LTM EBITDA |
|---|---|---|
| Mortgages payable | $  1,575 | |
| Credit Facility | $      41 | |
| Total Debt | $  1,616 | 11.7x |
| | | |
| Cash | $      10 | |
| Net Debt | $  1,606 | 11.6x |
| | | |
| Equity Value | $    769 | |
| Enterprise Value | $  2,375 | 17.2x |

### Considerations

Dugaboy owns 7.6% of outstanding N  RT shares

N  RT benefited from 2015-21 from era of low interest rates

Growth story has been challenged recently as company forced to sell assets to reduce leverage

Currently 36% of debt matures by 2026 and carries a weighted average floating rate of 6.3%

$21.6mm of run-rate annual fees are being waived by NexPoint Advisors, whose LP interest is 100% owned by Dugaboy, therefore if N  RT fundamentals can improve it represents significant upside to Dugaboy through both share appreciation and revenue

### T C  art




003268
HCMLPHMIT00002622

Case 19-34054-sgj11    Doc 4255-110    Filed 06/20/25    Entered 06/20/25 21:39:29    Desc Exhibit 110    Page 17 of 24

 **DUGABOY INVESTMENT TRUST**

## DUGABOY REAL ESTATE PORTFOLIO



DRAFT - PRIVILEGED AND CONFIDENTIAL

15

003269

HCMLPHMIT00002623

 **DUGABOY INVESTMENT TRUST**

DRAFT - PRIVILEGED AND CONFIDENTIAL

16

003270

HCMLPHMIT00002624

 **DUGABOY INVESTMENT TRUST**





003271
HCMLPHMIT00002625

 **DUGABOY INVESTMENT TRUST**

003272
HCMLPHMIT00002626

 **DUGABOY INVESTMENT TRUST**





003273

HCMLPHMIT00002627

 **DUGABOY INVESTMENT TRUST**






003274
HCMLPHMIT00002628

 **DUGABOY INVESTMENT TRUST**



DRAFT - PRIVILEGED AND CONFIDENTIAL

003275

HCMLPHMIT00002629

 **DUGABOY INVESTMENT TRUST**

DRAFT - PRIVILEGED AND CONFIDENTIAL

003276

HCMLPHMIT00002630

# EXHIBIT 111

003277

# HIGHLAND CLAIMANT TRUST

## PRIVILEGED & CONFIDENTIAL
## RECOMMENDED DUGABOY NOTE CONTRIBUTION
## 6.27.24

CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

**HIGHLAND CAPITAL**
**M A N A G E M E N T**

003278
HCMLPHMIT00002631

Case 19-34054-sgj11     Doc 4255-111     Filed 06/20/25     Entered 06/20/25 21:39:29
Desc Exhibit 111     Page 3 of 7



## SUMMARY OF BACKGROUND AND RECOMMENDATION

- As has been discussed at several prior meetings, Dugaboy is the Maker and HCMLP is a Payee under a promissory note with a long-dated maturity and annual P&I payments

- The note has a current principal balance of approximately $18.2 million and has accrued interest of approximately $0.3 million as of June 30, 2024 and has no restrictions with respect to assignment.
  - The next payment is due December 31, 2024, with $0.8 million of principal and $0.6 million of interest due
  - Subsequent payments are due on December 31 of each year - $0.8 million of principal, plus accrued interest
  - See next slide for amortization schedule

- During 1H 2024, Highland has engaged with numerous parties in an attempt to determine the market for the note and ultimately to assign the note if a willing buyer was prepared to offer reasonable value in exchange

- These efforts (as described in greater detail herein) ultimately proved unsuccessful as neither Dondero parties nor third parties ultimately made any (let alone an attractive) bid for the note

- While the asset lacks a liquid market and carries with it all the stigma and risks associated with its Maker, the note is nevertheless currently performing and has some value
  - However, the time horizon to monetization is long and mismatched with the timing of other remaining assets of HCMLP and the Claimant Trust

- Separately, regarding reserves for indemnification obligations, the Indemnity Trust remains well short of it's 9-figure target



003279
HCMLPHMIT00002632

Case 19-34054-sgj11    Doc 4255-111    Filed 06/20/25    Entered 06/20/25 21:39:29
Desc Exhibit 111    Page 4 of 7



## AMORTIZATION SCHEDULE – PAYMENTS DUE TO HCMLP UNDER NOTE

| | Beg prin | Principal | Interest | End prin |
|---|---|---|---|---|
| Beginning principal owed to HCMLP | 18,174,937 | | | |
| Interest rate (fixed) | 3.26% | | | |
| WAL (years) | 10.48 | | | |
| | **Amortization schedule** | | | |
| | Beg prin | Principal | Interest | End prin |
| 12/31/2023 | | | | 18,174,937 |
| 12/31/2024 | 18,174,937 | (790,215) | (594,126) | 17,384,722 |
| 12/31/2025 | 17,384,722 | (790,215) | (566,742) | 16,594,507 |
| 12/31/2026 | 16,594,507 | (790,215) | (540,981) | 15,804,293 |
| 12/31/2027 | 15,804,293 | (790,215) | (515,220) | 15,014,078 |
| 12/31/2028 | 15,014,078 | (790,215) | (490,800) | 14,223,863 |
| 12/31/2029 | 14,223,863 | (790,215) | (463,698) | 13,433,649 |
| 12/31/2030 | 13,433,649 | (790,215) | (437,937) | 12,643,434 |
| 12/31/2031 | 12,643,434 | (790,215) | (412,176) | 11,853,220 |
| 12/31/2032 | 11,853,220 | (790,215) | (387,474) | 11,063,005 |
| 12/31/2033 | 11,063,005 | (790,215) | (360,654) | 10,272,790 |
| 12/31/2034 | 10,272,790 | (790,215) | (334,893) | 9,482,576 |
| 12/31/2035 | 9,482,576 | (790,215) | (309,132) | 8,692,361 |
| 12/31/2036 | 8,692,361 | (790,215) | (284,147) | 7,902,146 |
| 12/31/2037 | 7,902,146 | (790,215) | (257,610) | 7,111,932 |
| 12/31/2038 | 7,111,932 | (790,215) | (231,849) | 6,321,717 |
| 12/31/2039 | 6,321,717 | (790,215) | (206,088) | 5,531,502 |
| 12/31/2040 | 5,531,502 | (790,215) | (180,821) | 4,741,288 |
| 12/31/2041 | 4,741,288 | (790,215) | (154,566) | 3,951,073 |
| 12/31/2042 | 3,951,073 | (790,215) | (128,805) | 3,160,858 |
| 12/31/2043 | 3,160,858 | (790,215) | (103,044) | 2,370,644 |
| 12/31/2044 | 2,370,644 | (790,215) | (77,495) | 1,580,429 |
| 12/31/2045 | 1,580,429 | (790,215) | (51,522) | 790,215 |
| 12/31/2046 | 790,215 | (790,215) | (25,761) | (0) |
| | | (18,174,937) | (7,115,540) | |
| Total Principal & Interest if paid current through maturity | | | | 25,290,477 |

CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.                                         3

003280
HCMLPHMIT00002633

 **SUMMARY OF OUTREACH EFFORTS**

| Potential buyer | Person contacted | Title | Initial date contacted | Information/materials provided | Responses |
|---|---|---|---|---|---|
| Riva Ridge Capital Management | Stephen Golden | Founding Partner/PM | 2/27/24 | Over telephone, discussed information in HCMLP-prepared materials and the opportunity | Asked questions regarding the counter-party; rejected receipt of the materials; no interest at all; "life's too short"; actually laughed; stated that while the note was performing, that was for now; in his view the note was an invitation to litigate |
| Cyrus Capital Partners | Svetoslav Nikov | Partner/Analyst | 2/27/24 | Over telephone, discussed information in HCMLP materials and the opportunity | Very quick no; no interest in the materials; believes owning the note is asymmetric risk to the downside – if it pays back, a modest return for the risk; if it defaults, your investors will want to know why you would voluntarily become a creditor of Dondero. Compared the opportunity to the chance to lend money to Phil Falcone. Once again said "life's too short to be a creditor of Dondero" |
| Carronade Capital Management | Dan Gropper | Managing Partner/CIO | 2/23/24 | Initial email mentioning note; lunch meeting with Gropper and head of research Andy Taylor on 2/29/24; reviewed materials at lunch meeting | Gropper and Taylor quickly expressed no interest in the note; upside vs. downside skewed (far too much downside); even if the upside was better balanced, the likelihood of litigation over such a small note made the investment unattractive (even if you got costs of collection); asset transfers out of Maker also a concern; Gropper and Taylor did not want to keep the materials |
| UBS | Nader Attalla | Structured Credit Trading; responsible for day-to-day management of UBS actions against Dondero | 2/23/24 | Initial email mentioning note; follow-up call and emailing of "teaser" | Two calls in March and early April; he has been too busy to focus on it; troubled by the fact that it does not cross-default with other Dugaboy obligations; while UBS is suing Dondero and Dugaboy on other obligations torts, making this note potentially useful at the right price, UBS ultimately did not have a bid |
| Bardin Hill Investment Partners | Pratik Desai | Partner/PM | 6/7/24 | Initial email with "teaser" and requesting follow-up call | 30 minute call on June 10, 2024; reviewed teaser with Desai; questions regarding background of note; why it had not been accelerated; payment history; terms; Dugaboy's assets and liabilities; payback period at various discounts; ultimately would require a material discount to 50% soft offer; asked about lending against the note and/or other Claimant Trust assets with material haircuts. Bardin Hill would not be interested in being a direct counterpart to Dondero especially if that was their only recourse; Bardin Hill would consider ways to lend against the note or other assets if the Claimant Trust was in need of $10-$20 million of liquidity |
| NexPoint/affiliates | Matt McGraner & DC Sauter | CIO General Counsel | 5/16/24 | Email with description of note; Indicated nonbinding offer price of $12M, subject to approval of Oversight Board | DC Sauter responded via email of 5/22/24 that they were not currently interested in the terms outlined. If the terms change, they would be interested in taking another look. They did not have a bid of their own. |

CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

003281
HCMLPHMIT00002634



## VALUATION AND DISCLOSURE DISCUSSION

▪ ████████████████████████████████████████████████████████████
████████████████

▪ ████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████

▪ ████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████

▪ ████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████

▪ Based on these and other factors considered, we believe the actual fair value of the note for a non-Dondero-related buyer is approximately *$3.9* million or *21.5%* of the current par value outstanding

▪ ████████████████████████████████████████████████████████████
████████████████████████████████████████

003282

HCMLPHMIT00002635



CONFIDENTIAL. INTERNAL USE ONLY. NOT FOR PUBLIC DISTRIBUTION.

003283
HCMLPHMIT00002636

**EXHIBIT 112**

003284

**From:** "David Klos" <DKlos@HighlandCapital.com>
**To:** "DC Sauter" <DSauter@Nexpoint.com>
**Cc:** "Matt McGraner" <mmcgraner@nexpoint.com>
**Subject:** RE: Dugaboy note and misc
**Date:** Thu, 23 May 2024 20:50:39 -0000
**Importance:** Normal
**Inline-Images:** image001.jpg

---

DC,
Thanks for the response.  As you are not interested in the note, we will move forward with another transaction.  With respect to other settlements, we would be happy to engage whenever you are ready.  Thanks and have a nice long weekend.
-Dave


**From:** DC Sauter <DSauter@Nexpoint.com>
**Sent:** Wednesday, May 22, 2024 5:16 PM
**To:** David Klos <DKlos@HighlandCapital.com>; Matt McGraner <mmcgraner@nexpoint.com>
**Subject:** RE: Dugaboy note and misc

Dave, thanks for following up, and sorry for not responding.  We're not currently interested in the terms you outline below, but I think it's a positive thing if we can continue to resolve some of these outlying issues on mutually agreeable terms.  If the terms of your proposed transaction change, we'd certainly be interested in taking another look.


Regards,


D.C. SAUTER

# NEXPOINT

O: 214.550.8278 | C: 469.877.6440
dsauter@nexpoint.com | https://www.nexpoint.com

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at NexPoint Advisors. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at NexPoint Advisors.

**From:** David Klos <DKlos@HighlandCapital.com>
**Sent:** Wednesday, May 22, 2024 6:11 PM
**To:** Matt McGraner <MMcGraner@Nexpoint.com>
**Cc:** DC Sauter <DSauter@Nexpoint.com>
**Subject:** RE: Dugaboy note and misc

Matt/DC,
I have not heard anything back from you on the Dugaboy note and other assets mentioned in my email last week.  Please let me know if there is any interest in the assets for NexPoint or any of its affiliates.  If not, we will go forward with other transactions.  I understand you are likely busy but would appreciate if you would confirm that you are passing by tomorrow morning.   Thanks.
-Dave

HCMLPHMIT00002637

**From:** David Klos
**Sent:** Thursday, May 16, 2024 4:26 PM
**To:** Matt McGraner <MMcGraner@Nexpoint.com>
**Cc:** DC Sauter <DSauter@Nexpoint.com>
**Subject:** Dugaboy note and misc

Matt/DC,

I wanted to reach out to you on a few points to see if there was any interest amongst the NexPoint affiliated entities. While much of this doesn't fit neatly into your team's world like SE Multi and NHT, the fact that we were able to get those assets traded gives me some hope that traction may be possible in other places. Hoping you may have some feedback on the following:

Dugaboy Note
I'd be happy to provide more details on the note itself, or you could verify these points with Dugaboy's accountant, but the basics are as follows and it's quite a simple asset:

- Principal outstanding to Highland - $18,174,936.62
- Interest rate – 3.26% fixed
- WAL (yrs) – 10.5
- Payments – P+I Due December 31 each year (next payment due 12/31/24)
  - Minimum principal amort to Highland - $790,214.64 each year
  - Next interest payment to Highland is $594,126.23
  - Combined payment of $1,384,340.87 due 12/31/24
- Final payment date– December 31, 2046

This note wasn't part of the "notes litigation" and has not been accelerated because Dugaboy has stayed current on its payments.

Before we complete a transfer of the Dugaboy note, we wanted to at least check NexPoint's/Dondero's interest in buying it back. The following is a summary of the price and terms by which Highland would consider offering to sell the note. These terms are indicative and nonbinding and nothing in this email constitutes a firm commitment. Any firm offer to sell must be in a writing signed by Highland's CEO after approval of the Claimant Trust Oversight Board.

Purchaser – NexPoint Advisors, LP or its affiliates
Proposed purchase price (the "Purchase Price") - $12,000,000.00 in cash
a. Purchase Price as % of principal outstanding – Approximately 66%
b. Discount to current principal outstanding - $6,174,936.62
c. Implied purchaser IRR – Approximately 9%

Trades flat – Purchase Price represents the total amount of consideration to be paid
Closing – on or before May 31, 2024
"As-is, where-is" with no reps or warranties, except ownership and authority to sell

Our willingness to consider any discount is simply to facilitate an immediate sale of the note and does not impact our view of value.

Please revert to us by close of business on Wednesday, May 22, 2024 with any feedback you may have. If you desire to move forward, we will promptly seek Oversight Board approval and prepare documentation with a firm offer. If we don't hear from you, we'll be taking that to mean there is no interest.

Ginn
It's a small stub position, but Highland/Highland-managed funds have ownership interests in Ginn (A & B loans and LLC units). We believe NexPoint also has ownership through its affiliated entities, and understand Matt DiOrio is currently serving as a Director of G-LA Resorts Holdings, LLC. We'd be willing to sell these interests to NexPoint or one of its affiliates for nominal consideration to facilitate the further wind down of entities, which will cost more to maintain than the prospective value that may eventually come out of Ginn, which we understand could take up to several more years. We thought this might be appealing to you since it wouldn't create incremental monitoring burden to your team. If interested, just let me know and I'd be happy to help coordinate documentation.

003286

HCMLPHMIT00002638

Global resolution

Since the unsuccessful mediation last October, it's been quiet on this front, but the framework that Highland would consider is essentially unchanged.  The level of indemnification reserves needed for indemnified parties and the cash on hand that needs to be maintained for future expenses could be reduced with agreement to broad, unequivocal releases and a permanent cessation of litigation.  Dondero's counsel has Highland's position with respect to the scope of these items, which have not changed since the mediation and remain the gating issue to begin a substantive conversation.   I raise this point only to highlight that the door is open if he'd like to engage at all – whether now or in the future.  I don't want to be wasting peoples' time, but it shouldn't be unsaid either.

Thank you,
Dave

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

# EXHIBIT 113

003288

# Highland Capital Management, L.P.

**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2018**

003289

HCMLPHMIT00002548

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Index**
**December 31, 2018**

**Page**

**Report of Independent Auditors** .......................................................................................................... 1

**Consolidated Financial Statements**

Consolidated Balance Sheet ............................................................................................................. 2

Consolidated Statement of Income ................................................................................................... 3

Consolidated Statement of Changes in Partners' Capital .................................................................. 4

Consolidated Statement of Cash Flows ............................................................................................. 5

Notes to Consolidated Financial Statements ................................................................................. 6-39

Supplemental Information………………………………………………………………………………...40-44

003290

HCMLPHMIT00002549



## Report of Independent Auditors

To the General Partner of Highland Capital Management, L.P.

We have audited the accompanying consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership"), which comprise the consolidated balance sheet as of December 31, 2018, and the related consolidated statements of income, of changes in partners' capital and of cash flows for the year then ended.

### Management's Responsibility for the Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Partnership's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Highland Capital Management, L.P. and its subsidiaries as of December 31. 2018, and the results of their operations, changes in their partners' capital and their cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

### Other Matter

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The Supplemental Consolidating Balance Sheet, the Supplemental Consolidating Statement of Income, the Supplemental Unconsolidated Balance Sheet and the Supplemental Unconsolidated Statement of Income are presented for purposes of additional analysis and are not a required part of the consolidated financial statements. The information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves and other additional procedures, in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

June 3, 2019

---

*PricewaterhouseCoopers LLP, 2121 N Pearl Street, Suite 2000, Dallas, Texas 75201*
*T: (214) 999 1400, F: (214) 754 7991, www.pwc.com/us*

HCMLPHMIT00002550

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Balance Sheet**
**December 31, 2018**

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 5,034 |
| Investments at fair value (cost $922,027) | | 845,186 |
| Management and incentive fees receivable | | 2,393 |
| Due from broker for securities sold, not yet settled | | 598 |
| Other assets | | 9,255 |
| Notes and other amounts due from affiliates | | 173,398 |
| Intangible assets | | 3,022 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,197 | | 4,581 |
| **Total assets** | $ | 1,043,467 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,983 |
| Securities sold, not yet purchased (proceeds $26,135) | | 32,357 |
| Withdrawals payable | | 57,009 |
| Due to brokers | | 116,560 |
| Due to brokers for securities purchased, not yet settled | | 1,640 |
| Accrued and other liabilities | | 40,246 |
| Notes payable | | 55,752 |
| Investment liabilities | | 46,092 |
| **Total liabilities** | | 354,639 |
| Non-controlling interest | | 316,867 |
| **Partners' capital** | | 371,961 |
| **Total liabilities and partners' capital** | $ | 1,043,467 |

The accompanying notes are an integral part of these consolidated financial statements.

003292
HCMLPHMIT00002551

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Income**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---:|---:|
| **Revenue:** | | |
| Management fees | $ | 36,600 |
| Interest and investment income | | 15,831 |
| Incentive fees | | 70 |
| Shared services fees | | 9,187 |
| Other income | | 2,622 |
| Total revenue | | 64,310 |
| | | |
| **Expenses:** | | |
| Compensation and benefits | | 34,475 |
| Professional fees | | 17,679 |
| Interest expense | | 5,670 |
| Marketing and advertising expense | | 2,413 |
| Depreciation and amortization | | 1,317 |
| Investment and research consulting | | 1,082 |
| Bad debt expense | | 7,862 |
| Other operating expenses | | 10,027 |
| Total expenses | | 80,525 |
| | | |
| **Other Income/(Expense):** | | |
| Other income | | 9,826 |
| Impairment on intangible assets | | (2,830) |
| Total other income | | 6,996 |
| | | |
| Loss before investment and derivative activities | | (9,219) |
| | | |
| **Realized and unrealized loss on investments and derivatives:** | | |
| Net realized loss on investments and derivatives | | (31,517) |
| Net change in unrealized loss on investments and derivatives | | (93,755) |
| Net realized and unrealized loss on investments and derivatives | | (125,272) |
| | | |
| Net loss | | (134,491) |
| | | |
| Net loss attributable to non-controlling interest | | (61,313) |
| | | |
| Net loss attributable to Highland Capital Management, L.P. | $ | (73,178) |

The accompanying notes are an integral part of these consolidated financial statements.

003293

HCMLPHMIT00002552

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2018**

*(in thousands)*

|  | General Partner | | Limited Partners | | Total | |
|---|---|---|---|---|---|---|
| Partners' capital, December 31, 2017 | $ | 163 | $ | 450,014 | $ | 450,177 |
| Net loss attributable to Highland Capital Management, L.P. | $ | (183) | $ | (72,995) | $ | (73,178) |
| Partner distributions | $ | (13) | $ | (5,025) | $ | (5,038) |
| Partners' capital, December 31, 2018 | $ | (33) | $ | 371,994 | $ | 371,961 |

The accompanying notes are an integral part of these consolidated financial statements.

003294

HCMLPHMIT00002553

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net loss | $ | (134,491) |
| Adjustment to reconcile net loss to net cash | | |
| provided from operating activities: | | |
| Net realized loss on investments and derivative transactions | | 31,517 |
| Net change in unrealized loss on investments and derivative transactions | | 93,755 |
| Amortization and depreciation | | 1,317 |
| Changes in assets and liabilities: | | |
| Management and incentive fee receivable | | 9,468 |
| Due from brokers | | 1,689 |
| Due from affiliate | | (10,989) |
| Other assets | | 4,272 |
| Intangible assets | | 3,308 |
| Accounts payable | | 546 |
| Accrued and other liabilities | | 1,214 |
| Due to brokers for securities purchased, not yet settled | | 1,886 |
| Due to brokers | | 11,665 |
| Net cash provided from operating activities | | 15,157 |
| **Cash flows from investing activities:** | | |
| Purchases of fixed assets and leasehold improvements, net | | (67) |
| Purchases of investments | | (195,263) |
| Proceeds from dispositions of investments | | 258,858 |
| Proceeds from securities sold, not yet purchased | | 46,550 |
| Issuance of notes receivable to affiliates | | (2,400) |
| Proceeds from repayments of notes receivable from affiliates | | 3,395 |
| Purchases of investments to cover securities sold, not yet purchased | | (127,954) |
| Net cash used in investing activities | | (16,881) |
| **Cash flows from financing activities:** | | |
| Payments on notes payable & investment liabilities | | (2,743) |
| Proceeds from long-term debt | | 38,501 |
| Capital contributions from minority interest investors of consolidated entities | | 14,615 |
| Capital withdrawals by minority interest investors of consolidated entities | | (141,986) |
| Partner distributions | | (5,060) |
| Net cash used in financing activities | | (96,673) |
| Net decrease in cash and cash equivalents | | (98,397) |
| **Cash and cash equivalents** | | |
| Beginning of year | | 103,479 |
| De-consolidating funds adjustment | | (48) |
| End of year | $ | 5,034 |
| **Supplemental disclosure of cash flow information:** | | |
| Interest paid during the year | $ | (5,629) |
| Taxes paid during the year | | (510,961) |
| Investments acquired for non-cash consideration | | 26,018 |
| Investments disposed for non-cash consideration | | 116 |

The accompanying notes are an integral part of these consolidated financial statements.

003295

HCMLPHMIT00002554

# Highland Capital Management, L.P.
## Notes to Consolidated Financial Statements
### December 31, 2018

1. **Description of Business**

   Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware. The Partnership is a registered investment adviser under the Investment Advisers Act of 1940 that manages collateralized loan obligations ("CLOs"), hedge funds, private equity funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds. The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business. The Partnership's general partner is Strand Advisors, Inc. (the "General Partner"). The Partnership is owned by an unaffiliated (other than through its direct ownership) trust as well as affiliated trusts and personal holdings of the senior management of the Partnership.

   As of December 31, 2018, the Partnership provided investment advisory services for eighteen CLOs, five separate accounts, one master limited partnership, and nine hedge funds or private equity structures, with total fee-earning assets under management of approximately $3.1 billion. The Partnership also provides investment services on behalf of affiliate advisors.

2. **Summary of Significant Accounting Policies**

   The following is a summary of the significant accounting policies followed by the Partnership in preparation of its consolidated financial statements.

   **Basis of Accounting**
   The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles in the United States of America ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification and are stated in the United States Dollar.

   **Use of Estimates**
   The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements. Actual results could differ from those estimates and those differences could be material.

   **Principles of Consolidation**
   The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries ("Consolidated Entities"), which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

   The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties. If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs' expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

003296

HCMLPHMIT00002555

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership assesses consolidation requirements pursuant to ASU 2015-02: Consolidation, which was adopted using the modified retrospective method and resulted in an effective date of adoption of January 1, 2016.

The Partnership and its affiliate's involvement with unconsolidated VIEs is generally limited to that of an advisory services provider, and their investment, if any, represents an insignificant interest in the relevant investment entities' assets under management. The Partnership's affiliate's exposure to risk in these entities is generally limited to any capital contribution it has made or is required to make and any earned but uncollected asset based and performance fees. The Partnership has not issued any investment performance guarantees to these VIEs or their investors, except that the Partnership has agreed to subject the full value of its equity interest in Highland Prometheus Fund to dollar-for-dollar reduction to the extent the third party investor in such fund does not achieve an annual target return.

As of December 31, 2018, the net assets of the unconsolidated VIEs and the Partnership's maximum risk of loss were as follows:

*(in thousands)*

| | Unconsolidated VIE Net Assets | | Carrying Value and Maximum Risk of Loss | |
|---|---|---|---|---|
| Sponsored investment funds | $ | 206,329 | $ | 12,178 |

## Consolidation of Variable Interest Entities

The Partnership consolidates the following VIEs (along with majority owned funds: Highland Diversified Credit Fund, L.P., and Highland Select Equity Fund, L.P., collectively the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Multi Strategy Credit Fund, L.P. ("Multi Strategy Master"), formerly Highland Credit Opportunities CDO, L.P., a Delaware limited partnership that commenced operations on December 15, 2005 and changed its name on August 26, 2014;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strategy Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore"), a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore"), a Delaware limited partnership that commenced operations on September 2, 2008; and

003297

HCMLPHMIT00002556

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

---

**Consolidation of Majority Owned Entities**

The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master SubFund, LLC, a Delaware limited liability company that commenced operations on July 19, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master Subfund II, LLC, LLC, a Delaware limited liability company that commenced operations on February 22, 2007;

- 100% interest in Highland Brasil, LLC, a Delaware limited liability company that commenced operations on January 28, 2014;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd. ("HCM Singapore"), a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 100% interest in Highland Capital Management Korea, Ltd. ("HCM Korea"), a company organized in the Republic of Korea that commenced operations on August 2, 2012;

- 100% interest in Highland Capital Management Latin America, L.P., ("HCM Latin America"), a Cayman company that was formed on April 13, 2017;

- 100% interest in HE Capital, LLC, a Delaware limited liability company that was formed on March 22, 2007;

- 100% interest in De Kooning, Ltd, a Cayman company that was formed on December 1, 2012;

- 100% interest in Hirst, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Hockney, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Oldenburg, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Eames, Ltd, a Cayman company that was formed on December 12, 2012;

- 99.9% interest in Penant Management, L.P., a Delaware limited partnership that was formed on December 12, 2012;

- 100% interest in Pollack, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Warhol, Ltd., a Cayman company that was formed on December 1, 2012;

8

003298


HCMLPHMIT00002557

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

- 100% interest in HCREF-I Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XI Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XII Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in Highland ERA Management, LLC, a Delaware limited liability company that was formed on February 1, 2013;

- 100% interest in The Dondero Insurance Rabbi Trust., a trust that was formed on May 27, 2004;

- 100% interest in The Okada Insurance Rabbi Trust, a trust that was formed on May 27, 2004;

- 100% interest in Highland Employee Retention Assets ("HERA"), LLC, a Delaware limited liability company that was formed on October 26, 2009;

- 100% interest in Highland Diversified Credit Fund, L.P. ("Highland Offshore Partners"), a Delaware limited partnership which began operations on February 29, 2000 and was organized for the sole purpose of investing substantially all of its assets in Highland Offshore Partners, L.P.;

- 99.6% interest in Highland Select Equity Master Fund, LP, and Highland Select Equity Fund, LP Delaware limited partnerships which began operations on January 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value;

- 100% interest in Highland Fund Holdings, LLC, a Delaware limited liability company that was formed on May 24, 2016;

- 100% interest in Maple Avenue Holdings, LLC, a Texas limited liability company formed on August 17, 2016;

- 100% interest in Highland HCF Advisor, Ltd., a Cayman company that was formed on October 27, 2017;

- 100% interest in Asury Holdings, LLC, a Delaware limited liability company formed on February 14, 2017 and;

- 100% interest in Highland CLO Management, Ltd., a Cayman company that was formed on October 27, 2017.

All inter-partnership and intercompany accounts and transactions involving the above listed Consolidated Entities have been eliminated in all of the aforementioned consolidating schedules. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide - Investment Companies.  The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

003299
HCMLPHMIT00002558