**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P

|  |  |  |
|---|---|---|
| | § | |
| | § | Case No. **19-34054-sgj11** |
| **Patrick Daugherty - Appellant** | | |
| | § | **3:25-CV-01901-S** |
| | | CONSOLIDATED UNDER: |
| vs. | § | **3:25-CV-01876-K** |
| **Highland Capital Management, L.P; et al** - Appellee | | |
| | § | |
| | § | |

   **[4297] Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025**

# Volume 14

# APPELLANT RECORD

Jason S. Brookner (Texas Bar No. 240033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
Drake M. Rayshell (Texas Bar No. 24118507)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas  75201
Telephone: (214) 954-4135
Facsimile:  (214) 953-1332
Email:     jbrookner@grayreed.com
           dyork@grayreed.com
           jsmeltzer@grayreed.com
           drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | § § § | |

*INDEX*

### APPELLANT'S AMENDED DESIGNATION OF ITEMS
### TO BE INCLUDED IN THE RECORD ON APPEAL
### AND STATEMENT OF THE ISSUES PRESENTED

Pursuant to Fed. R. Bankr. P. 8009(a) and Docket No. 4366, Appellant Patrick Daugherty

("Daugherty") hereby submits his amended designation of items to be included in the record on

appeal and statement of issues to be presented in connection with his appeal from the *Order*

*Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the*

*Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address
for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

No. 4297] (the "HMIT Settlement Order").[2] *See Notice of Appeal* [Docket No. 4310, as amended at Docket No. 4327].

## Statement of Issues on Appeal

1. Whether the Bankruptcy Court erred in its approval of the HMIT Settlement Order [Docket No. 4297], which permits payment to Class 10 creditors before all Class 8 and Class 9 claims have been paid in full when the plain language of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. 1808], the Court's Confirmation Order [Dkt. 1943] and the Claimant Trust Agreement [Dkt. 3817-4] require full payment plus applicable interest to all Class 8 and Class 9 creditors before any Class 10 or Class 11 claims can vest.

2. Whether the Bankruptcy Court abused its discretion by approving the HMIT Settlement Order [Docket No. 4297] when the settlement is not fair, reasonable, or in the best interests of the estate as the Debtor, through its principals, is forgoing the recovery of millions in material value to the estate in exchange for, inter alia, self-serving releases of its principals.

## Designation of Record

Daugherty respectfully designates the following items to be included in the appellate record pursuant to Bankruptcy Rule 8009(a):

*000001*

1. Amended Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Dkt. 4327].

*000011*

2. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Dkt. 4310].

*000022*

3. The Judgment Order or Decree appealed from: *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4297].

*000026*

4. Docket Sheet for Bankruptcy Case No. 19-34054-sgj1 kept by the Bankruptcy Clerk.

5. Documents listed below for Bankruptcy Case No. 19-34054-sgj11:

---

[2]  Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the HMIT Settlement Order.

4905-5299-6446

*Vol. 2*

*000637*

*000727*

*000745*

*000773*

| Date | Docket | Description |
|------|--------|-------------|
| 11/18/2020 | 1426 | *Transcript regarding Hearing Held 11/17/2020 (90 pages)* RE: Motion for Temporary Allowance of Claim (#1281). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/16/2021. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 1422 Hearing held on 11/17/2020. (RE: related document(s) 1281 Motion for leave - Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 filed by Creditor Patrick Daugherty) (Appearances: T. Uebler, J. Christensen, and J. Kathman for P. Daugherty; J. Morris and J. Pomeranz for Debtor; M. Clemente for UCC. Evidentiary hearing. Claim estimated for voting purposes at $9,134,019 for reasons stated on the record. Counsel to upload order.)). Transcript to be made available to the public on 02/16/2021. (Rehling, Kathy) |
| 05/19/2025 | 4216 | *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (Attachments: # 1 Exhibit A-- Proposed Order) |
| 05/19/2025 | 4217 | *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 05/20/2025 | 4218 | *Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust* (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |

Vol. 2

| Date | Docket | Description |
|------|--------|-------------|
| 05/22/2025 | 4221 | *Amended Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust* (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |
| 06/09/2025 | 4229 | *Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (filed by Creditor Patrick Daugherty. (Attachments: # 1 Proposed Order) (York, Andrew)* |

000779

008785

4905-5299-6446

Case 3:25-cv-01056-K-sjj11 Document 365-14 Filed 09/12/25 Entered 09/12/25 11:12:19 Desc
Case 19-34054-sgj11 Doc 3658-1 Filed 08/14/25 Entered 08/14/25 11:12:19 Page 6 of 1195 PageID 9719
Main Document    Page 5 of 9

| Date | Docket | Description |
|---|---|---|
| 06/20/2025 | 4255 | *Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53 # 54 Exhibit 54 # 55 Exhibit 55 # 56 Exhibit 56 # 57 Exhibit 57 # 58 Exhibit 58 # 59 Exhibit 59 # 60 Exhibit 60 # 61 Exhibit 61 # 62 Exhibit 62 # 63 Exhibit 63 # 64 Exhibit 64 # 65 Exhibit 65 # 66 Exhibit 66 # 67 Exhibit 67 # 68 Exhibit 68 # 69 Exhibit 69 # 70 Exhibit 70 # 71 Exhibit 71 # 72 Exhibit 72 # 73 Exhibit 73 # 74 Exhibit 74 # 75 Exhibit 75 # 76 Exhibit 76 # 77 Exhibit 77 # 78 Exhibit 78 # 79 Exhibit 79 # 80 Exhibit 80 # 81 Exhibit 81 # 82 Exhibit 82 # 83 Exhibit 83 # 84 Exhibit 84 # 85 Exhibit 85 # 86 Exhibit 86 # 87 Exhibit 87 # 88 Exhibit 88 # 89 Exhibit 89 # 90 Exhibit 90 # 91 Exhibit 91 # 92 Exhibit 92 # 93 Exhibit 93 # 94 Exhibit 94 # 95 Exhibit 95 # 96 Exhibit 96 # 97 Exhibit 97 # 98 Exhibit 98 # 99 Exhibit 99 # 100 Exhibit 100 # 101 Exhibit 101 # 102 Exhibit 102 # 103 Exhibit 103 # 104 Exhibit 104 # 105 Exhibit 105 # 106 Exhibit 106 # 107 Exhibit 107 # 108 Exhibit 108 # 109 Exhibit 109 # 110 Exhibit 110 # 111 Exhibit 111 # 112 Exhibit 112 # 113 Exhibit 113 # 114 Exhibit 114 # 115 Exhibit 115 # 116 Exhibit 116 # 117 Exhibit 117 # 118 Exhibit 118 # 119 Exhibit 119 # 120 Exhibit 120 # 121 Exhibit 121 # 122 Exhibit 122 # 123 Exhibit 123) (Annable, Zachery) |
| 06/20/2025 | 4256 | *Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |

5

| Date | Docket | Description |
|------|--------|-------------|
| *Vol. 14* 0003461 06/23/2025 | 4266 | *Witness and Exhibit List of Patrick Daugherty filed by Creditor Patrick Daugherty* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 List of 20 Largest Creditors 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 List of 20 Largest Creditors 34 # 35 Exhibit 35 # 36 List of 20 Largest Creditors 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42) (York, Andrew) |
| *Vol. 15* 0004643 06/23/2025 | 4275 | *Omnibus Reply to (related document(s): 4229 Objection filed by Creditor Patrick Daugherty, 4230 Objection filed by Partner Dugaboy Investment Trust, 4231 Objection filed by Interested Party The Dallas Foundation, Interested Party Crown Global Life Insurance, Ltd) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust.* (Annable, Zachery) |
| 0004654 06/23/2025 | 4276 | *Joinder by to Reply in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith filed by Creditor Hunter Mountain Investment Trust* (RE: related document(s) 4275 Reply). (Phillips, Louis) |
| 0004656 06/24/2025 | 4277 | *Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4255 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 124 # 2 Exhibit 125) (Annable, Zachery) |
| *Vol. 16* 0004873 06/24/2025 | 4280 | *Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust* (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 126) (Annable, Zachery) |
| 0004898 06/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). |

4905-5299-6446

*vol. 16*

*004899*

*vol. 17*

*005165*

*005166*

*005181*

*005183*

| Date | Docket | Description |
|------|--------|-------------|
| 06/30/2025 | 4296 | *Transcript regarding Hearing Held 06/25/2025 before Judge Stacy G.C. Jernigan (266 pages) RE: Motion for an Order Further Extending Duration of Trusts (4213); Motion for Entry of an Order Approving Settlement with HMIT Entities (4216).* THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 09/29/2025. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 4294 Hearing held on 6/25/2025. (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Appearances: J. Morris and Pachulski team for Reorganized Debtor; R. Loigman for Post-Confirmation Trusts; D. Deitsch-Perez for Dugaboy; L. Young for UST. Evidentiary hearing. Motion granted. Counsel to upload order.), 4295 Hearing held on 6/25/2025. (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Appearances: J. Morris and Pachulski team for Reorganized Debtor; R. Loigman for Post-Confirmation Trusts; L. Phillips for HMIT Entities; M. Lang for Dugaboy; D. Curry for Dallas Foundation; L. Young for UST. Evidentiary hearing. Motion granted. Counsel to upload order.)). Transcript to be made available to the public on 09/29/2025. (Rehling, Kathy) |
| 07/16/2025 | 4317 | *Clerk's correspondence requesting to amend notice of appeal from creditor.* (RE: related document(s) 4297 Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document 4216) Entered on 6/30/2025. (Okafor, M.)) Responses due by 7/18/2025. (Whitaker, Sheniqua) |
| 07/22/2025 | 4336 | *Certificate of mailing regarding appeal* (RE: related document(s) 4327 Amended notice of appeal filed by Creditor Patrick Daugherty Related document(s) 4310 Notice of appeal filed by Creditor Patrick Daugherty. MODIFIED linkage on 7/17/2025 (suw).) (Attachments: # 1 Service List) (Whitaker, Sheniqua) |
| 07/22/2025 | 4337 | *Notice regarding the record for a bankruptcy appeal to the U.S. District Court.* (RE: related document(s) 4327 Amended Notice of appeal . Fee Amount $298 filed by Creditor Patrick Daugherty (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Attachments: # 1 Exhibit A)) (Whitaker, Sheniqua) |
| 07/22/2025 | 4343 | *Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01901-S.* (RE: related document(s) 4327 Amended notice of appeal filed by Creditor Patrick Daugherty Related document(s) 4310 Notice of appeal filed by Creditor Patrick Daugherty. (RE: related document(s)4297 Order on motion to compromise controversy).) (Almaraz, Jeanette) |

**Reservation of Rights**

  Daugherty expressly reserves the right to amend or supplement this Designation and/or to object, or otherwise supplement or move to strike or modify, some or all of any designations filed by any other party to this appeal.  This filing is made expressly subject to, and without waiver, of any and all rights, remedies, challenges and objections.

4905-5299-6446

Respectfully submitted this 14th day of August 2025.

**GRAY REED**

By: */s/ Andrew K. York*

Jason S. Brookner
Texas Bar No. 240033684
Andrew K. York
Texas Bar No. 24051554
Joshua D. Smeltzer
Texas Bar No. 24113859
Drake M. Rayshell
Texas Bar No. 24118507

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:    (214) 954-4135
Facsimile:    (214) 953-1332
Email:        jbrookner@grayreed.com
              dyork@grayreed.com
              jsmeltzer@grayreed.com
              drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing instrument was served on all Parties or counsel of record herein on this 14th day of August 2025, via the CM/ECF system and/or email.

*/s/ Andrew K. York*
ANDREW K. YORK

4905-5299-6446

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**COUNSEL FOR THE HMIT ENTITIES**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL** | § | **Case No. 19-34054-sgj11** |
| **MANAGEMENT, L.P.** | § | |
| | § | |
| **Reorganized Debtor.** | § | |

## HMIT ENTITIES WITNESS AND EXHIBIT LIST WITH RESPECT TO HEARING TO BE HELD ON JUNE 25, 2025

Hunter Mountain Investment Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "HMIT Entities") submit this *Witness and Exhibit List* with respect to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Dkt.

1

003458

No. 4216] (the "HMIT Settlement Motion") which the Court has set for hearing at 9:30 a.m.
(Central Time) on June 25, 2025 (the "Hearing").

### A. Witnesses:

1) Any witness identified by or called by any other party; and

2) Any witness necessary for rebuttal.

### B. Exhibits:

The HMIT Entities adopt the *Exhibit List* filed by Highland Capital Management, L.P., the
reorganized debtor (the "Debtor" or "Highland," as applicable) in the above-captioned chapter 11
case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant Trust"), and the
Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the
Claimant Trust, the "Movants") at Dkt. No. 4255, as may be amended or supplemented.

Respectfully Submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

***Counsel for the HMIT Entities***

2

003459

**CERTIFICATE OF SERVICE**

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties receiving notice in this chapter 11 case through this Court's CM/ECF System on this June 20, 2025.

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)

003460

Jason S. Brookner (Texas Bar No. 24033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
Drake M. Rayshell (Texas Bar No. 24118507)
GRAY REED
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email:      jbrookner@grayreed.com
            dyork@grayreed.com
            jsmeltzer@grayreed.com
            drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 (SGJ) |
| | § | |
| Reorganized Debtor. | § | |
| | § | |

## PATRICK DAUGHERTY'S WITNESS AND EXHIBIT LIST
## <u>FOR HEARING SCHEDULED FOR JUNE 25, 2025 AT 9:30 A.M.</u>

Patrick Daugherty, ("<u>Daugherty</u>") hereby files this Witness and Exhibit List for the

hearing scheduled for June 25, 2025, at 9:30 a.m. (Central Time) in connection with Highland

Capital Management, L.P.'s *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11*

*USC s 363 Approving Settlement with the HMIT Entities* [Docket No. 4216] and Patrick Daugherty's

*Objection* to same [Docket No. 4229].

---

[1]   Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

4931-5856-6735

003461

## WITNESSES

Daugherty may call one or more of the following witnesses at the hearing:

1.  Patrick Daugherty;

2.  James Seery[2];

3.  Mark Patrick[3];

4.  David Klos (by deposition excerpts)[4];

5.  Any witnesses called by any other party; and

6.  Any witnesses necessary for impeachment, depending upon the witnesses and evidence presented by other parties.

Daugherty reserves the right to cross-examine any witness called by any other party.

## EXHIBITS

Daugherty designates the following exhibits:

| EXHIBIT NUMBER | DESCRIPTION | MARKED | OFFERED | OBJECT | ADMITTED |
|---|---|---|---|---|---|
| PD-1 | Settlement Agreement between Highland Capital Management, L.P. and Patrick Daugherty. | | | | |

---

[2]   Highland's counsel has previously represented in writing, and in their witness list, that Highland will be calling Mr. Seery to testify in support of the Motion.

[3]   The HMIT Entities' counsel has represented in writing that Mr. Patrick will be in attendance at the hearing.

[4]   The final transcript of Mr. Klos' deposition has not been released by the court reporter who transcribed the deposition as of the date/time of this filing.  Daugherty will supplement the excerpts once the transcript is available.

4931-5856-6735

003462

| EXHIBIT NUMBER | DESCRIPTION | MARKED | OFFERED | OBJECT | ADMITTED |
|---|---|---|---|---|---|
| PD-2 | Complaint for (1) Disallowance of Claim No. 205 In Its Entirety, (2) Estimation of Claim No. 205 For Allowance Purposes, Or (3) Subordination of Any Allowed Portion of Claim No. 205 of Patrick Hagaman Daugherty in Adversary Proceeding No. 25-03055-sgj, *Highland Capital Management, L.P. v. Patrick Hagaman Daugherty* | | | | |
| PD-3 | Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) | | | | |
| PD-4 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (II) Granting Related Relief | | | | |
| PD-5 | Claimant Trust Agreement | | | | |
| PD-6 | Motion to Dismiss in Adversary Proceeding No. 25-03055-sgj, *Highland Capital Management, L.P. v. Patrick Hagaman Daugherty* | | | | |
| PD-7 | May 20, 2025 email from Gregory Demo to Drew York and John Morris, Subject: Highland – Eighth Distribution Notice | | | | |
| PD-8 | Nov. 20, 2024 IRS Letter to P. Daugherty re Notification concerning Highland Capital Management | | | | |
| PD-9 | Amended Complaint and Objection to Claims in *Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust v. James Dondero et al.*, Adversary No. 21-03076-sgj | | | | |

4931-5856-6735

003463

| EXHIBIT NUMBER | DESCRIPTION | M A R K E D | O F F E R E D | O B J E C T | A D M I T T E D |
|---|---|---|---|---|---|
| PD-10 | Complaint in *Highland Employee Retention Assets LLC v. James Dondero et al.*, Case No. Civ. A. No. 3:24-cv-00498-k | | | | |
| PD-11 | Email from P. Daugherty to M Kirschner dated August 20, 2021; Subject: Highland History – Part 1 | | | | |
| PD-12 | Email from P. Daugherty to M. Kirscher dated August 20, 2021; Subject: Highland History – Part 2 Okada and Highland Capital Management Services, Inc? | | | | |
| PD-13 | Email from P. Daugherty to M. Kirschner dated August 20, 2021; Subject: Highland History – Prt 3 Supplement with Safety-kleen S-1 and 2nd Governance Re Bermuda Entity | | | | |
| PD-14 | Email from P. Daugherty to M. Kirschner dated August 20, 2021; Subject: Highland History – Part 4 NexPoint Credit Strategies Fund filing that shows ownership including Governance Re, PCMG, Highland Capital Management Services, etc. | | | | |
| PD-15 | Email from P. Daugherty to M. Kirschner dated August 20, 2021; Subject: Brad Ross – Anonymous threats from HCM sources (see bottom) | | | | |
| PD-16 | Email from P. Daugherty to M. Kirschner dated August 23, 2021; Subject: How does Highland's Charitable DAF Work? – Part 1 | | | | |
| PD-17 | Email from P. Daugherty to M. Kirschner dated August 23, 2021; Subject: How does the Charitable DAF work? Part 2 | | | | |
| PD-18 | Email from P. Daugherty to M. Kirschner dated August 23, 2021; Subject: How does Highland's Charitable DAF work? Part 3 | | | | |
| PD-19 | Email from P. Daugherty to M. Kirschner dated August 23, 2021; Subject: How does Highland's Charitable DAF work? Part 4 | | | | |

4931-5856-6735

003464

| EXHIBIT NUMBER | DESCRIPTION | M A R K E D | O F F E R E D | O B J E C T | A D M I T T E D |
|---|---|---|---|---|---|
| PD-20 | Email from P. Daugherty to P. Montgomery et al. dated January 5, 2022; Subject: CPCM, LLC – another avatar for Scott Ellington | | | | |
| PD-21 | Email from P. Daugherty to M. Clemente dated February 18, 2021; Subject: Fw: Sentinel transactions with Highland Capital re transfer of shares in NexPoint | | | | |
| PD-22 | Email from P. Daugherty to M. Clemente dated February 21, 2021; Subject: Fw: SAS Platform – Sentinel – Patton – Nimitz – Dondero – Ellington connection [quite the web] – Part 1 | | | | |
| PD-23 | Email from P. Daugherty to P. Montgomery et al. dated October 1, 2021; Subject: Fw: Part 2 – Ellington creates SPVs in the Caymans to receive Barclays units; while John Cullinane buys Dondero's divorce claim against his wife | | | | |
| PD-24 | Email from P. Daugherty to M. Clemente dated July 2, 2021; Subject: Fw: Appendix to Part 3 (due to file size limitations) – Summit-NexPoint et al | | | | |
| PD-25 | Email from P. Daugherty to M. Clemente dated July 11, 2021; Subject: Fw: Part 4 – DiOrio-Ellington-Family and Friends: An empire of their own | | | | |
| PD-26 | Email from P. Daugherty to P. Montgomery et al. dated December 17, 2021; Subject: Fw: Sentinel transactions with Highland Capital re transfer of shares in NexPoint | | | | |
| PD-27 | Email from P. Daugherty to M. Clemente dated July 1, 2021; Subject: Fw: Part 3 – Dondero-Summit-Cullinane-Egglishaw-Ellington-DiOrio-Walkers-Maples et al | | | | |
| PD-28 | Email from P. Montgomery to P. Daugherty et al. dated December 17, 2021; Subject: RE: CPCM – Highgate Consulting – Skyview - Ellington | | | | |

4931-5856-6735

003465

| EXHIBIT NUMBER | DESCRIPTION | MARKED | OFFERED | OBJECT | ADMITTED |
|---|---|---|---|---|---|
| PD-29 | Email from P. Montgomery to P. Daugherty dated October 1, 2021; Subject: RE: Highland background reading – additions for Crusader Redeemer Committee | | | | |
| PD-30 | Email from P. Montgomery to P. Daugherty dated September 29, 2021; Subject: RE: Dondero-Highland-NexBank: alter ego evidence and year-end tax scheming | | | | |
| PD-31 | Email from P. Daugherty to P. Montgomery and M. Clemente dated July 30, 2021; Subject: Re: Rule 2004 Brief – Where is Okada and Highland Capital Management Services, Inc? | | | | |
| PD-32 | Email from P. Daugherty to P. Montgomery et al. dated October 1, 2021; Subject: Fw: Part 3 – Dondero-Summit-Cullinane-Egglishaw-Ellington-DiOrio-Walkers-Maples et al | | | | |
| PD-33 | Email from P. Montgomery to P. Daugherty dated September 21, 2021; Subject: RE: Highland Capital Management LP Asset Holdings – as of May 2009 | | | | |
| PD-34 | Email from P. Montgomery to P. Daugherty dated September 21, 2021; Subject: FW: Novation of the Highland Credit Strategies Fund management contract | | | | |
| PD-35 | Email from P. Montgomery to P. Daugherty dated September 10, 2021; Subject: RE: Are you available to chat? | | | | |
| PD-36 | Email from P. Montgomery to P. Daugherty dated August 31, 2021; Subject: RE: Highland Regroup call | | | | |
| PD-37 | Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding | | | | |

4931-5856-6735

003466

| EXHIBIT NUMBER | DESCRIPTION | MARKED | OFFERED | OBJECT | ADMITTED |
|---|---|---|---|---|---|
| PD-38 | Memorandum Opinion and Order Pursuant to Plan "Gatekeeper Provision" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding | | | | |
| PD-39 | Plaintiff's First Amended Original Complaint in *Highland Employee Retention Assets LLC v. James Dondero et al.*, Case No. Civ. A. No. 3:24-cv-00498-k | | | | |
| PD-40 | Plaintiff Highland Employee Retention Assets LLC's Omnibus Response to the Highland Defendants, Outside Attorneys Defendants and Trustee Defendants' Motions to Dismiss and Memorandum in Support in *Highland Employee Retention Assets LLC v. James Dondero et al.*, Case No. Civ. A. No. 3:24-cv-00498-k | | | | |
| PD-41 | Exhibit 6 to Debtor's Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on June 8, 2021 | | | | |
| PD-42 | Defendant's Original Answer, Counterclaim and Third-Party Petition in *Highland Capital Management, L.P. v. Patrick Daugherty*, Cause No. DC-12-04005 (68th District Court, Dallas County, Texas) | | | | |
| PD- | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | | | |
| PD- | Any exhibits identified by or offered by any other party at the hearing | | | | |
| PD- | Any exhibits offered for impeachment and/or rebuttal purposes | | | | |

4931-5856-6735

003467

Daugherty reserves the right to supplement or amend this Witness and Exhibit List any time prior to the hearing. This Witness and Exhibit List is not intended to limit Daugherty at the hearing or to imply that Daugherty may not seek introduction of evidence that is not on this list. Daugherty reserves the right to use any of the exhibits designated by any other party in this case.

Respectfully submitted this 23rd day of June, 2025.

GRAY REED

By: _/s/ Andrew K. York_
    Jason S. Brookner
    Texas Bar No. 24033684
    Andrew K. York
    Texas Bar No. 24051554
    Joshua D. Smeltzer
    Texas Bar No. 24113859
    Drake M. Rayshell
    Texas Bar No. 24118507

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:  jbrookner@grayreed.com
    dyork@grayreed.com
    jsmeltzer@grayreed.com
    draysehll@grayreed.com

*Counsel to Patrick Daugherty*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing instrument was served on all Parties or counsel of record herein on this 23rd day of June 2025, via the CM/ECF system and/or email.

_/s/ Andrew K. York_
ANDREW K. YORK

4931-5856-6735

003468

# Exhibit 1

**Final Execution Copy**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement") is made and entered into by and between (i) Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), and (ii) Patrick Hagaman Daugherty ("Daugherty" and together with HCMLP, the "Parties," and individually as a "Party"). This Settlement provides for the treatment of certain claims asserted by Daugherty against the Debtor, and for the Parties to take certain other specified actions in settlement thereof.

### RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, the Debtor's chapter 11 case (the "Bankruptcy") is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, on February 2 and 3, 2021, the Court conducted a confirmation hearing with respect to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1808] (the "Plan");

WHEREAS, on February 8, 2021, the Court rendered an opinion from the bench in which it confirmed the Plan [Docket No. 1924];

WHEREAS, on February 22, 2021, the Court issued an order confirming the Plan [Docket No. 1943];

WHEREAS, on August 11, 2021, the Effective Date (as defined in the Plan) occurred [Docket No. 2700];

WHEREAS, Daugherty is a former employee and limited partner of the Debtor and has

DOCS_NY:42669.9 36027/002

**003470**

served in other positions with affiliates and former affiliates of the Debtor;

WHEREAS, at the time of his resignation, Daugherty owned 19.1% of the preferred units of Highland Employee Retention Assets LLC ("HERA"), an employee deferred compensation vehicle managed by the Debtor and Highland ERA Management, LLC ("ERA") and contends that he owned or had the right to own all of the preferred units of HERA;

WHEREAS, prior to his resignation from HCMLP, Daugherty was awarded units of HERA, which vehicle owned interests in Restoration Capital Partners, LP ("RCP"), an HCMLP managed private equity fund, and other investments;

WHEREAS, in April 2012, the Debtor commenced an action against Daugherty in Texas state court (the "Texas Action"), and Daugherty subsequently asserted counterclaims for breach of contract and defamation, and third-party claims against HERA and others;

WHEREAS, after a three-week trial, the jury returned a verdict partially in favor of the Debtor, but Daugherty prevailed on his claims against the Debtor and James Dondero ("Dondero") for defamation with malice and a third-party claim against HERA and was awarded damages of $2.6 million against HERA, plus prejudgment and post-judgment interest at 5% (the "HERA Judgment");[1]

WHEREAS, in July 2017, after being unable to collect on the HERA Judgment, Daugherty commenced an action against the Debtor, Dondero, HERA, and ERA Management in the Delaware Chancery Court (the "Delaware Court"), in a case captioned *Daugherty v. Highland Capital Management, L.P., et al.*, C.A. No. 2017-0488-MTZ, for fraudulent transfer, promissory estoppel, unjust enrichment, indemnification, and fees on fees (the "Highland Delaware Case");

---

[1] The Debtor prevailed on its claims against Mr. Daugherty for breach of contract and breach of fiduciary duty for non-monetary damages and obtained an award of $2.8 million in attorney's fees. The HERA Judgment was affirmed on appeal on December 1, 2016.

003471

WHEREAS, the Delaware Court in the Highland Delaware Case (i) found that the Dondero-related defendants improperly withheld dozens of documents in discovery on privilege grounds, and (ii) ruled that there was "a reasonable basis to believe that a fraud has been perpetrated" such that the Delaware Court applied the "crime-fraud exception" to the attorney-client privilege assertion, and such rulings have not been overturned;

WHEREAS, Daugherty asserts that such withholding of documents and the failure to search defendants' and their employees personal electronic devices for stored documents and texts as well as other emails and domain names such as sasmgt.com and gmail.com which were in their possession and control and to provide required discovery injured him by undermining his attempts to build an evidentiary record to support his claims against the Debtor and the other defendants in the Highland Delaware Case;

WHEREAS, on October 14, 2019, the Highland Delaware Case proceeded to trial and two days later, on October 16, 2019, before the completion of the trial and before the Delaware Court ruled on Daugherty's and the Debtor's cross-motions for summary judgment regarding indemnification and fees on fees, the Debtor filed for bankruptcy;

WHEREAS, on December 1, 2019, Daugherty filed a separate lawsuit in the Delaware Court, captioned *Daugherty v. Dondero, et al.*, C.A. No. 2019-0956-MTZ, against Dondero, HERA, ERA, Hunton Andrews Kurth LLP ("Andrews Kurth"), Marc Katz ("Katz"), Michael Hurst ("Hurst"), the Debtor's Chief Compliance Officer, the Debtor's then in-house counsel (Isaac Leventon ("Leventon")), and the Debtor's then general counsel (Scott Ellington ("Ellington")), for conspiracy to commit fraud, among other claims (the "HERA Delaware Case" and together with the Highland Delaware Case, the "Delaware Cases");

WHEREAS, on April 1, 2020, Daugherty filed a general, unsecured, non-priority claim

3

003472

against the Debtor in the amount of at "least $37,483,876.59," and such claim was denoted by the Debtor's claims agent as Proof of Claim No. 67 ("Proof of Claim No. 67");

WHEREAS, on April 6, 2020, Daugherty filed a general, unsecured, non-priority claim against the Debtor in the amount of at "least $37,482,876.62" that superseded Proof of Claim No. 67 and that was denoted by the Debtor's claims agent as Proof of Claim No. 77 ("Proof of Claim No. 77");

WHEREAS, on August 31, 2020, the Debtor commenced an adversary proceeding against Daugherty by filing a complaint (the "Complaint") in which the Debtor: (1) objected to Proof of Claim No. 77 on various grounds (the "Claim Objection"), and (2) asserted a cause of action for the subordination of part of Daugherty's claim pursuant to section 510(b) of the Bankruptcy Code. Adv. Proc. No. 20-03107 (the "Adv. Proc.") [Adv. Docket No. 1] (the "Adversary Proceeding");

WHEREAS, on September 29, 2020, Daugherty filed his answer to the Complaint [Adv. Docket No. 8] (the "Answer");

WHEREAS, on September 24, 2020, Daugherty filed his *Motion to Confirm Status of Automatic Stay, or Alternatively to Modify Automatic Stay* [Docket No. 1099] (the "Stay Motion") pursuant to which he sought to sever the Debtor from the Highland Delaware Case and then consolidate the remaining claims in the Highland Delaware Case into the HERA Delaware Case and proceed with one case against the non-Debtor parties;[2]

WHEREAS, on October 23, 2020, Daugherty filed a motion seeking leave to amend his Proof of Claim No. 77 [Docket No. 1280] (the "POC Amendment Motion"). The amended proof

---

[2] On October 8, 2020, the Debtor commenced a second adversary proceeding against Daugherty (the "Second Adversary Proceeding"), seeking to enjoin him from prosecuting the Delaware Cases. Adv. Proc. 20-03128 ("2d Adv. Proc.") [2d Adv. Proc. Docket No. 1].   On January 29, 2021, the parties filed a Settlement that resolved the Second Adversary Proceeding, and the Second Adversary Proceeding was subsequently dismissed with prejudice. [2d Adv. Proc. Docket No. 12].

003473

of claim attached to the POC Amendment Motion increased Daugherty's general, unsecured, non-priority claim against the Debtor to the amount of at "least $40,410,819.42" and sought to supersede Proof of Claim No. 67 and Proof of Claim No. 77;

WHEREAS, on October 23, 2020, Daugherty filed his *Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 Motion*, seeking for his Claim to be temporarily allowed for voting purposes in this amount of $40,410,819.42 [Docket No. 1281] (the "3018 Motion");

WHEREAS, on November 3, 2020, the Court granted the Stay Motion [Docket No. 1327];

WHEREAS, the Debtor opposed the 3018 Motion, and after conducting an evidentiary hearing for the limited purpose of determining the 3018 Motion, the Court entered an order temporarily allowing Daugherty's Claim only for voting purposes in the amount of $9,134,019 [Docket No. 1474];

WHEREAS, on December 10, 2020, the Court entered an order [Docket No. 1533] granting the POC Amendment Motion, and Daugherty was permitted to file an amendment to his proof of claim. On December 23, 2020, Daugherty filed an amended proof of claim, designated by the Debtor's claim agent as Proof of Claim No. 205 ("Proof of Claim No. 205" or the "Daugherty Claim"). Proof of Claim No. 205 superseded Proof of Claim No. 77 and increased the amount of the Daugherty's Claim to $40,710,819.42;

WHEREAS, on November 30, 2020, Daugherty filed his Motion to Lift the Automatic Stay (the "Lift Stay Motion") [Docket No. 1491] seeking to lift the automatic stay to allow him to finish his trial in the Delaware Court and liquidate his claims. The Debtor opposed the Lift Stay Motion, and after a hearing was held on December 17, 2020, the Court denied the relief requested in the Lift Stay Motion [Docket No. 1612];

003474

WHEREAS, except with respect to the Reserved Claim (as defined below), the Parties have agreed to settle and resolve all claims and disputes between them and their respective current affiliates, managed entities, and employees, including the Daugherty Claim, on the terms set forth in this Settlement:

<u>AGREEMENT</u>

**NOW, THEREFORE**, after good-faith, arms-length negotiations, and in consideration of the foregoing, it is hereby stipulated and agreed that:

1.  <u>Allowed Claims</u>:  In full satisfaction of the entirety of the Daugherty Claim against the Debtor and HCMLP Released Parties (defined below), excluding the Reserved Claim, Daugherty shall receive (a) an allowed general unsecured Class 8 claim in the amount of $8,250,000; (b) an allowed subordinated general unsecured Class 9 claim in the amount of $3,750,000; and (c) a one-time lump sum cash payment in the amount of $750,000 to be paid within 5 business days of Bankruptcy Court approval of this Settlement Agreement.

2.  <u>Recovery</u>:  The Debtor makes no representation or warranty as to the recovery on Class 8 or Class 9 claims under the Plan.

3.  <u>Observation Access</u>:  As soon as practicable following entry of an order of the Bankruptcy Court approving this Settlement, HCMLP shall use reasonable efforts to petition the Claimant Trust Oversight Board[3] to permit Daugherty to have access as an observer to meetings of the Claimant Trust Oversight Board, subject to policies, procedures, and agreements applicable to other observers of the Claimant Trust Oversight Board, including policies, procedures, and agreements related to confidentiality and common interest.  Whether Daugherty will be granted observer access and any continuing observer access is and will remain at the sole discretion of the

---

[3] The Claimant Trust Oversight Board refers to the Oversight Board as defined in the August 11, 2021 Highland Claimant Trust Agreement establishing the Claimant Trust, as defined therein.

003475

Claimant Trust Oversight Board.

     4.    <u>RCP Track Record</u>:  HCMLP shall use reasonable efforts to provide Daugherty with data constituting the investment performance track record of RCP during Daugherty's tenure at HCMLP.  Daugherty shall not be entitled to any compensation with respect to the performance of RCP.  HCMLP makes no representations or warranties regarding such data and takes no responsibility with respect to the use of such data for any purposes.

     5.    <u>Daugherty Releases</u>:  Except as specifically provided in this paragraph 5, and to the maximum extent permitted by applicable law, the Debtor, on behalf of itself and each of the HCMLP Entities and HCMLP Parties (as those terms are defined in paragraph 6 below), hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue Daugherty, his successors, affiliates, and assigns, (and in each such category to include their respective advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, and designees) (collectively, the "<u>Daugherty Additional Release Parties</u>" and together with Daugherty, the "<u>Daugherty Released Parties</u>"), in each case acting in such capacity, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, or the Delaware Cases, all existing as of the date hereof (collectively, the "<u>HCMLP Released Claims</u>"); <u>provided</u>, <u>however</u>, that such release shall not

apply with respect to any and all defenses that HCMLP or the HCMLP Entities may have to the Reserved Claim or the Reserve Motion (as those terms are defined herein) or Daugherty's obligations under this Settlement. For the avoidance of doubt, the HCMLP Released Claims include all claims or causes of action and facts, known or unknown, that exist as of the date hereof but do not include or apply to claims or causes of action based on facts occurring after the date hereof.

6.   HCMLP Releases: Except as specifically provided in this paragraph 6, and to the maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty Released Parties, hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (a)(i) HCMLP; (ii) Strand Advisors Inc.; (iii) the Claimant Trust; (iv) the Claimant Trust Oversight Board; (v) the Highland Litigation Sub-Trust; (vi) the Highland Indemnity Trust; (vii) any entity of which greater than fifty percent of the voting ownership is held directly or indirectly by HCMLP as of the date hereof and any entity otherwise directly or indirectly controlled by HCMLP as of the date hereof,; and (viii) any entity managed by either HCMLP or a direct or indirect subsidiary of HCMLP, including Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Master, L.P. (and all of their respective general partners, feeder funds, managers, and affiliates) (the foregoing (a)(i) through (a)(viii) the "HCMLP Entities"), and (b) with respect to each such HCMLP Entity, such HCMLP Entity's respective current (meaning employed in their respective roles as of the date hereof) advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders (but not the shareholders of Strand Advisors Inc.), agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "HCMLP Parties," and together with the

8

003477

HCMLP Entities, the "HCMLP Released Parties"),[4] in each case acting in such capacity, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, the Daugherty Claim, or the Highland Delaware Case (collectively, the "Daugherty Released Claims"); provided, however, that such release shall not apply with respect to the Reserved Claim or the Reserve Motion (as those terms are defined in paragraph 9 below) or HCMLP's obligations under this Settlement. This release expressly applies to all current employees of HCMLP as the Reorganized Debtor (as defined in the Plan), in their capacities as such. For the avoidance of doubt, the Daugherty Released Claims includes all claims or causes of action and facts, known or unknown, that exist as of the date hereof but do not include or apply to claims or causes of action based on facts occurring after the date hereof.

7.    Reservation of Daugherty Rights: Notwithstanding anything contained herein to the contrary, the term HCMLP Released Parties shall not include (a) NexPoint Advisors, L.P. (or any of its subsidiaries and employees, advisors, or agents), (b) the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and any of their respective employees, advisors, or agents), (c) NexBank, SSB (or any of its subsidiaries, employees, advisors, or agents), (d) James Dondero or any trust in which Dondero or any of his family members are a trustee or beneficiary (or any trustee acting for such trust), including but not limited to Hunter

---

[4] The Daugherty Additional Released Parties and the HCMLP Released Parties are collectively referred to as the "Additional Released Parties."

003478

Mountain Investment Trust, The Get Good Trust, Dugaboy Investment Trust, SLHC Investment

Trust, (e) HERA (subject to paragraph 8 below), (f) ERA (subject to paragraph 8 below), (g) Grant

Scott, (h) Mark Okada and any trust in which Mark Okada or any of his family members are a

beneficiary (or any trustee acting for such trust in their respective capacities), (i) Ellington, (j)

Leventon, (k) Katz, (l) Hurst, (m) Andrews Kurth, or (m) any other former employee (as of the

date hereof) of the HCMLP Released Parties.

      8.    <u>HERA and ERA</u>:  The Parties acknowledge and agree that as of the date hereof,

HERA and ERA have no material assets other than potential claims that may exist against persons

or entities not released at or prior to the date hereof, and no claims against the HCMLP Released

Parties. The allowed claims provided in paragraph 1 hereof are expressly agreed to in order to

satisfy any liability the Debtor may have in connection with the HERA Judgment.  To facilitate

recovery of such potential claims – which expressly excludes any and all claims by or in the name

of HERA and ERA against any of the HCMLP Released Parties --  HCMLP will transfer its

interests in HERA and ERA to Daugherty.  Such transfer will include the HERA and ERA books

and records (spreadsheet) maintained on HCMLP's system.  Such transfer will be without

representation or warranty of any type; including, for the avoidance of doubt, without any

representation or warranty as to the merits of the potential claims or the efficacy of the transfer of

the potential claims.  Such transfer will be without any liability or material cost to HCMLP or its

affiliates or the other HCMLP Released Parties, including any liability in respect of any assets that

HERA or ERA ever actually or allegedly owned, possessed, or controlled and that were actually

or allegedly transferred, conveyed, sold, written off or otherwise disposed of (in any such case, a

"<u>Disposition</u>").  In connection with the transfer, HERA and ERA have expressly released the

HCMLP Released Parties from any and all claims, including any claims actions or remedies related

003479

to any Disposition, either of them may have against any HCMLP Released Party now or in the future (the "HERA and ERA Release"). Daugherty on behalf of himself and each of the Daugherty Released Parties acknowledges, accepts, and agrees not to challenge the HERA and ERA Release or support any challenge thereto. A copy of the HERA and ERA Release is annexed hereto as **Exhibit A**. Daugherty acknowledges and agrees that even though HERA and ERA are not HCMLP Released Parties under this Agreement, Daugherty and all Daugherty Released Parties shall (a) not seek to hold any HCMLP Released Party liable for any action or inaction taken by or on behalf of HERA or ERA, including through any derivative, veil-piercing or similar cause of action or remedy; and (b) not seek to recover damages or obtain any form of relief against any HCMLP Released Party on account of any action or inaction taken by or on behalf of HERA or ERA, including through any veil piercing or similar cause of action or remedy. If, for any reason, HERA or ERA, or any person or entity acting on their behalf, recovers anything from any HCMLP Released Party, Daugherty shall promptly turnover to HCMLP or its successors and assigns any amounts actually recovered by Daugherty or any Daugherty Released Party, from HERA or ERA arising from, related to, or derived from any claim that HERA or ERA or any person or entity acting on their behalf has or may have against any HCMLP Released Party. HCMLP will provide reasonable assistance to Daugherty to assist with the preparation of any required HERA K-1s for 2021, but any requirement to provide such K-1s will be the obligation, if any, of HERA.

9.     IRS Compensation Claim: In section 4(ii) of the Addendum to Proof of Claim No. 205, Daugherty contends that he has a contingent, unliquidated claim against the Debtor arising out of a 2008/2009 compensation letter (the "Reserved Claim"), which claim is also related to an audit/dispute between the Debtor and the Internal Revenue Service (the "IRS") (the dispute between the Debtor and IRS being referred to herein as the "IRS Audit Dispute"). The Debtor

003480

disputes the validity and amount of the Reserved Claim. Daugherty shall retain the Reserved Claim solely against the Debtor and not against any other HCMLP Released Party, and the Debtor reserves the right to assert any and all defenses thereto. Any litigation by and between the Debtor and Daugherty concerning the validity and amount of the Reserved Claim shall be stayed until the IRS makes a final determination with respect to the IRS Audit Dispute; provided, however, that Daugherty may file a motion with the Bankruptcy Court to have the Reserved Claim estimated for purposes of establishing a reserve as a "Disputed Claim" under the Debtor's Plan (the "Reserve Motion"), and the Debtor (and any successor) reserves the right to assert any and all defenses thereto. Notwithstanding the foregoing, Daugherty may address any personal claim or personal liability to the IRS as a result of the IRS Audit Dispute, including settlement of any such claims; provided, however, Daugherty agrees to forego settling or addressing any claims with the IRS without the written consent of the Debtor until March 31, 2022.

10.   Current HCMLP Employees: The HCMLP Parties set forth on **Appendix A** hereto are currently employed by the Debtor are HCMLP Released Parties. By executing a copy of this Settlement and delivering it to Daugherty, each of the persons on Appendix A agrees not to sue, attempt to sue, or threaten or work with or assist any entity or person to sue, attempt to sue, or threaten any Daugherty Released Party on or in connection with any claim or cause of action arising prior to the date of this Settlement.

11.   Dismissal and Motions in Other Actions. Within ten business days after approval of this Settlement by the Bankruptcy Court, the Parties shall take all steps necessary (a) to dismiss with prejudice (i) the Highland Delaware Case, as against the Debtor and any HCMLP Released Party, and (ii) the HERA Delaware Case, as against every HCMLP Released Party, (b) to file an agreed motion and proposed order to partially vacate the final judgment entered against Daugherty

003481

in the Texas Action, (c) withdraw HCMLP's objection to the Daugherty motion to recuse in the Texas Action, and (d) to dismiss the Adversary Proceeding with prejudice. The parties shall file the foregoing motions and withdrawals substantially in the form of the documents annexed hereto as **Exhibit B**.

12.     Additional Third Party Claims Discovery: The Debtor (a) shall accept service of any subpoenas via email served by Daugherty in connection with the Delaware Cases on behalf of itself, the HCMLP Entities, the HCMLP Parties (but only in their capacity as employees of HCMLP); and (b) acknowledge and consent to the jurisdiction of the Delaware Chancery Court for purposes of enforcing any such subpoenas, subject in all respects to the rights that the HCMLP Entities and HCMLP Parties to defend the requested production, if any.

13.     Settlement of Third Party Claims: Daugherty shall not settle any claims or causes of action against any current or former director, officer, employee, agent or representative of HCMLP or Strand Advisors Inc. (collectively, the "Potentially Indemnified Parties") to the extent such claims have been brought or could have been brought against any Potentially Indemnified Parties, if any such settlement designates, defines or describes the settled claims as arising out of or relating to simple negligence or as having otherwise been within the scope of employment of the Potentially Indemnified Party.

14.     Claims Register:  As soon as practicable after the Settlement Effective Date, HCMLP shall instruct the claims agent in the Debtor's chapter 11 case to adjust the claims register in accordance with this Settlement.

15.     Daugherty Representations:  Daugherty represents and warrants to each of the HCMLP Released Parties that (a) he has full authority to release the Daugherty Released Claims and has not sold, transferred, or assigned any Daugherty Released Claim to any other person or

003482

entity and that (b) no person or entity other than Daugherty has been, is, or will be authorized to bring, pursue, or enforce any Daugherty Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) Daugherty.

16. <u>HCMLP Representations</u>: Each of HCMLP and each HCMLP Released Party who has signed this Settlement represents and warrants to Daugherty that (a) he, she or it has not sold, transferred, pledged, assigned or hypothecated any HCMLP Released Claim to any other person or entity and (b) he, she, or it has full authority to release any HCMLP Released Claims that such HCMLP Released Party personally has against Daugherty.

17. <u>Additional HCMLP Representations</u>: HCMLP represents and warrants that it is releasing the HCMLP Released Claims on behalf of the HCMLP Entities to the maximum extent permitted by any contractual or other legal rights HCMLP possesses. To the extent any of the HCMLP Entities dispute HCMLP's right to release the HCMLP Released Claims on behalf of any of the HCMLP Entities, HCMLP shall use commercially reasonable efforts to support Daugherty's position, if any, that such claims were released herein. For the avoidance of doubt, HCMLP will have no obligations to assist Daugherty under this paragraph if HCMLP has been advised by external counsel that such assistance could subject HCMLP to liability to any third party or if such assistance would require HCMLP to expend material amounts of time or money. HCMLP shall not argue in any forum that the non-signatory status of any of the HCMLP Entities to this Settlement shall in any way affect the enforceability of this Settlement vis-à-vis any of the HCMLP Entities. The Parties agree that all of the HCMLP Entities are intended third-party beneficiaries of this Release.

18. <u>HCMLP Covenant</u>: HCMLP and the HCMLP Entities covenant and agree that they will not pursue or seek to enforce any injunctions entered in the Texas Action against

003483

Daugherty.

19.     <u>Entire Agreement; Modification</u>:  This Settlement contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties.  This Settlement may not be modified other than by a signed writing executed by the Parties.

20.     <u>Bankruptcy Court Approval</u>:  Notwithstanding anything to the contrary contained herein, the effectiveness of HCMLP and the Claimant Trust's execution of this Settlement shall be subject to entry of an order of the Bankruptcy Court approving this Settlement.  HCMLP shall take all steps necessary to file with the Bankruptcy Court a motion for an order approving this Settlement pursuant to Federal Rule of Bankruptcy Procedure 9019 and section 363 of the Bankruptcy Code (the "<u>Motion</u>").   The parties agree to cooperate in the preparation and prosecution of the Motion which shall be filed no later than 5 business day after execution of this Settlement, unless such time is extended by mutual agreement.

21.     <u>Counterparts</u>:   This Settlement may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which will be deemed an original but all of which together constitute one and the same instrument and shall be effective against a Party or Additional Released Party upon approval of the Settlement by the Bankruptcy Court.

22.     <u>Governing Law; Jurisdiction</u>:  This Settlement will be exclusively governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of law principles, and all claims relating to or arising out of this Settlement, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Delaware, excluding Delaware's conflicts of law principles. The Bankruptcy Court will retain exclusive jurisdiction over all disputes relating to this Settlement.

003484

23.    <u>Headings</u>:  Paragraph headings included herein are for convenience and shall have no impact whatsoever on the meaning or interpretation of any part of this Settlement.

[Remainder of page intentionally left blank]

003485

In witness whereof, the parties hereto, intending to be legally bound, have executed this Settlement as of the day and year set forth below:

Dated: 11-21-21

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name: James P. Seery, Jr.
Title:   Chief Executive Officer

HIGHLAND CLAIMANT TRUST

By: _____
Name: James P. Seery, Jr.
Title:  Claimant Trustee

PATRICK HAGAMAN DAUGHERTY

Dated: 11/22/21

By: _____
Name:  Patrick Hagaman Daugherty

003486

# EXHIBIT A

HERA RELEASE AGREEMENT

This HERA Release Agreement ("HERA Release Agreement") is entered into as of November 21, 2021 by and among Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), Patrick Hagaman Daugherty ("Daugherty"), Highland Employee Retention Assets, LLC ("HERA") and Highland ERA Management, LLC ("ERA" and together with HCMLP, and HERA, the "Parties," and individually as a "Party").

WHEREAS, reference is hereby made to the Settlement Agreement (the "Settlement") of even date herewith and attached hereto made and entered into by and between the Debtor, the Highland Claimant Trust, and Daugherty.

WHEREAS, the Settlement settles all of Daugherty's claims against the HCMLP Released Parties, including all claims against the HCMLP Released Parties relating to transfers of assets from HERA.

WHEREAS, the Settlement includes, among other things, the transfer by HCMLP to Daugherty of HCMLP's interests in HERA and ERA.

WHEREAS, under the Settlement such transfer is being made without any liability to any of the HCMLP Released Parties of any type and is conditional on the full release of, and covenant not to sue, each of the HCMLP Released Parties, by and from HERA, ERA, Daugherty and the Daugherty Released Parties.

WHEREAS, neither HERA nor ERA filed proofs of claim in the Bankruptcy and have no claims against HCMLP.

WHEREAS, out of an abundance of caution to confirm that HERA, ERA, Daugherty, and the Daugherty Released Parties have no claims against the HCMLP Released Parties, this HERA Release Agreement is being entered into contemporaneously with the Settlement and constitutes an

003488

essential part thereof.

WHEREAS, capitalized terms used herein but not otherwise defined herein have the respective meanings set forth in the Settlement.

NOW, THEREFORE, in consideration of the entry into of the Settlement, the transfer of the equity interests in HERA and ERA to Daugherty in accordance with the Settlement, and for other good and valuable consideration, including the provisions set forth herein, the parties hereto further agree as follows:

1.      Upon entry of an order of the Bankruptcy Court approving this Settlement and to the maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty Additional Release Parties, together with each of HERA and ERA (Daugherty, the Daugherty Additional Release Parties, HERA and ERA shall be collectively referred to herein as the "HERA Releasing Parties"), each hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, any of the HCMLP Released Parties for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, the Daugherty Claim, Highland Delaware Case, or the HERA Delaware Case (collectively, "Claims"), in each case that in any way arise from or otherwise in any way relate to HERA or ERA, including, without limitation, any actual or potential claims, whether known or unknown, in any way related to or

003489

arising out of the formation, management, operation or assets of HERA, ERA or any of their respective predecessors or successors, including the transfer of any assets to or from HERA or ERA, it being understood that all remaining assets of HERA have been transferred to HCMLP prior to the date hereof, and in addition to the releases set forth above, each of the HERA Releasing Parties irrevocably waives and releases and covenants not to sue with respect to any Claims against any of the HCMLP Released Parties in any way related to any such transfers or assets, whether *in personam* with respect to the HCMLP Released Parties or *in rem* with respect to any of their assets (collectively, the "HERA Released Claims") or any other Disposition.

2.     This Release constitutes a part of, and is supplemental to, the provisions of the Settlement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

003490

In witness whereof, the parties hereto, intending to be legally bound, have executed this

HERA Release Agreement as of the date set forth above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:
Name:   James P. Seery, Jr.
Title:   Chief Executive Officer

PATRICK HAGAMAN DAUGHERTY

By:
Name:   Patrick Hagaman Daugherty

HIGHLAND EMPLOYEE RETENTION ASSETS, LLC

By: Highland ERA Management, LLC, its manager

By: Highland Capital Management, LP

By:
Name:   James P. Seery, Jr.
Title:   Chief Executive Officer

HIGHLAND ERA MANAGEMENT, LLC

By:
Name:   James P. Seery, Jr.
Title:   Authorized Signatory

003491

**EXHIBIT B**

003492

CAUSE NO. 12-04005

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | IN THE DISTRICT COURT OF |
| **Plaintiffs,** | § § § | |
| v. | § § | |
| PATRICK DAUGHERTY, | § § | |
| **Defendant and Counter-Plaintiff,** | § § § | **DALLAS COUNTY, TEXAS** |
| v. | § § | |
| SIERRA VERDE, LLC, HIGHLAND EMPLOYEE RETENTION ASSETS LLC, JAMES DONDERO, PATRICK BOYCE, AND WILLIAM L. BRITAIN, | § § § § § | |
| **Third-Party Defendants.** | § § § | **68th JUDICIAL DISTRICT** |

## <u>AGREED MOTION TO PARTIALLY VACATE THE FINAL JUDGMENT DATED JULY 14, 2014</u>

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Highland Capital Management, LP ("<u>Highland</u>") and Defendant Patrick Daugherty ("<u>Daugherty</u>" and together with Highland, the "<u>Parties</u>") file this *Agreed Motion to Partially Vacate the Final Judgment dated July 14, 2014* (the "<u>Motion</u>"), and respectfully show the following:

1.      On July 14, 2014, this Court entered a *Final Judgment* (the "<u>Judgment</u>") that, among other things, granted Highland's motion for injunctive relief against Daugherty.

2.      The Judgment was amended on March 23, and June 23, 2017.

3.      On October 16, 2019, filed a petition under chapter 11 in the United States Bankruptcy Court for the District of Delaware ("<u>Highland's Bankruptcy Case</u>").  On October 24,

003493

2019, as a result of the commencement of Highland's Bankruptcy Case, the Supreme Court of Texas issued an order abating a related case that Daugherty had brought in that court, Case No. 19-0758.    Highland's Bankruptcy Case was subsequently transferred to the United States Bankruptcy Court for the Northern District of Texas.

4.    Daugherty asserted certain claims against Highland in Highland's Bankruptcy Case. The Parties have fully and finally resolved their disputes pursuant to a settlement agreement (the "Settlement Agreement") reached in the Highland Bankruptcy Case pursuant to which, among other things, (a) all of Daugherty's known and unknown claims against each of the Highland Released Parties (as those terms are defined in the Settlement Agreement) are resolved, and (b) this Motion seeking the *vacatur* of certain provisions of the Judgment specifically set forth below is being filed.

5.    Highland and Daugherty hereby agree and stipulate that the Court has plenary power to issue an order granting this Motion because the Court retained authority to enforce the permanent injunction rendered in the Judgment, and that changed circumstances have now arisen such that the Court should dissolve the permanent injunction.    Highland and Daugherty further agree and stipulate that this Motion shall be treated as an agreement of the Parties pursuant to Texas Rule of Civil Procedure 11, and is fully enforceable. *See Coale v. Scott*, 331 S.W.3d 829, 831-32 (Tex. App.—Amarillo 2011, no pet.) ("Irrespective of whether a trial court lost its plenary jurisdiction over its judgment, the trial court's authority to approve a Rule 11 agreement does not depend on whether it has such jurisdiction.").

6.    Highland and Daugherty agree that the following portions of the Judgment shall be vacated pursuant to their settlement in the Highland Bankruptcy:

003494

a.   The second full paragraph on Page 2 of the Judgment, which begins "The Court, after considering the jury's findings regarding Daugherty's breaches of contract and breaches of fiduciary duty . . .";

b.   The permanent injunction rendered against Daugherty in the third full paragraph on Page 2 of the Judgment, which begins "It is therefore further ORDERED that Daugherty be and hereby is commanded to cease and desist from . . .";

c.   The fourth and fifth full paragraphs on Page 2 of the Judgment awarding Highland a monetary judgment against Daugherty for reasonable and necessary attorney's fees, as well as post-judgment interest on that award[1]; and

d.   The jury's answers to Questions 1, 2, 5, 6, 9 and 12 in the Verdict, which was attached as Exhibit 1 to the Judgment.

7.      Highland and Daugherty further agree that, as a result of the vacation of the permanent injunction in the Judgment, Highland hereby withdraws any pending motions to show cause or motions for contempt against Daugherty that allege Daugherty violated or is violating the permanent injunction.  Highland also agrees not to seek to enforce the permanent injunction in any manner in the future.

---

[1] Daugherty previously satisfied the monetary judgment awarded to Highland, and Highland filed a release of the monetary judgment.  Although Highland and Daugherty have agreed to vacate the monetary judgment awarded to Highland, Daugherty waives and relinquishes any right or claim to recover any amount previously paid in satisfaction of the Judgment and Highland shall not be required to reimburse Daugherty for his prior satisfaction of the monetary judgment.  To the extent Daugherty is entitled to indemnification for any liabilities, losses, and damages allegedly incurred by him for actions taken in connection with Highland's business, including the liabilities Daugherty allegedly incurred in connection with this action and the Judgment, such indemnification claims have been fully and finally satisfied and resolved under the Settlement Agreement.

8.      Concurrent with the filing of this Motion, Daugherty will file a motion to dismiss his as-yet unfiled petition for review pending before the Supreme Court of Texas under Case No. 19-0758.

9.      Highland and Daugherty further agree that any portions of the Judgment that are not specifically vacated pursuant to this Motion shall remain in full force and effect.

WHEREFORE, Highland and Daugherty pray that the Court grant this Motion in its entirety, and for all further relief, at law or in equity, the Court deems necessary.

Respectfully submitted,

GRAY REED & McGRAW LLP

By:   */s/ Sonya D. Reddy*
       ANDREW K. YORK
       State Bar No. 24051554
       E-mail: dyork@grayreed.com
       SONYA D. REDDY
       State Bar No. 24079188
       E-mail: sreddy@grayreed.com

1601 Elm Street, Suite 4600
Dallas, Texas 75201
(214) 954-4135
(214) 953-1332 (Fax)

**ATTORNEYS FOR PATRICK DAUGHERTY**

**CERTIFICATE OF SERVICE**

    I hereby certify that a true and correct copy of the foregoing document has been transmitted by electronic transmission to all counsel of record on February ___, 2021, as follows:

| | |
|---|---|
| Marc D. Katz | Michael K. Hurst |
| Crystal J. Woods | A. Shonn Brown |
| DLA PIPER LLP (US) | Jonathan Childers |
| 1717 Main St., Suite 3700 | LYNN PINKER COX HURST, LLP |
| Dallas, Texas 75201 | 2100 Ross Ave., Suite 2700 |
| 214-743-4545 (Fax) | Dallas, Texas 75201 |
| marc.katz@dlapiper.com | (214) 981-3839 (Fax) |
| crystal.woods@dlapiper.com | mhurst@lynnllp.com |
| | sbrown@ lynnllp.com |
| Attorneys for Highland Capital | jchilders@ lynnllp.com |
| Management, L.P. | |
| | Attorneys for Third-Party Defendants HERA, |
| | Patrick Boyce, and William Britain |

*/s/ Sonya D. Reddy*
SONYA D. REDDY

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 5 OF 5**
4851-6473-6986.4

003497

**APPENDIX A** (signatures to follow)

1. James P. Seery, Jr.
2. Cameron Baynard
3. Nathan Burns
4. Timothy Cournoyer
5. Naomi Chisum
6. Stetson Clark
7. Sean Fox
8. Matthew Gray
9. Kristin Hendrix
10. David Klos
11. Vishal Patel
12. Thomas Surgent
13. Michael Throckmorton

003498

Exhibit

003499

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| v. | § | _____ |
| | § | |
| PATRICK HAGAMAN DAUGHERTY, | § | |
| | § | |
| Defendant. | § | |

## COMPLAINT FOR (1) DISALLOWANCE OF CLAIM NO. 205 IN ITS ENTIRETY, (2) ESTIMATION OF CLAIM NO. 205 FOR ALLOWANCE PURPOSES, OR (3) SUBORDINATION OF ANY ALLOWED PORTION OF CLAIM NO. 205 OF PATRICK HAGAMAN DAUGHERTY

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**003500**

Highland Capital Management, L.P., the reorganized debtor ("Highland" or the "Debtor" as applicable) in the above-captioned chapter 11 case ("Bankruptcy Case") and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), files the *Complaint for (1) Disallowance of Claim No. 205 in Its Entirety, (2) Estimation of Claim No. 205 for Allowance Purposes, or (3) Subordination of Any Allowed Portion of Claim No. 205 of Patrick Hagaman Daugherty* (the "Complaint"), alleging upon knowledge of its own actions and upon information and belief as to all other matters as follows:

## PRELIMINARY STATEMENT[2]

1.      Patrick Daugherty is a former employee of, and former limited partner in, the Debtor. Mr. Daugherty filed a claim (denoted as Claim No. 205) in which he asserted a myriad of claims against the Debtor. All of Mr. Daugherty's claims were settled except his unliquidated, contingent claim that the Debtor has a continuing and indefinite obligation to make him whole if a tax refund he apparently received for tax year 2008 on account of his Partnership Interests is ever successfully challenged by the IRS.

2.      As discussed below, in 2009, Mr. Daugherty was allocated his applicable losses from Highland for tax year 2008 on account of his Partnership Interests. The allocation of losses in 2009 fully satisfied the 2008 Refund line item in the 2009 Statement; Mr. Daugherty received exactly what he was entitled to receive from Highland. Accordingly, Mr. Daugherty's Claim against the Debtor for additional compensation for 2008 has no basis and the Claim should be disallowed.

3.      To avoid this result, Mr. Daugherty alleges the Debtor is required to make him whole if any portion of the tax refund he received for 2008 on account of his Partnership Interest

---

[2] All capitalized terms used but not defined in this Preliminary Statement have the meanings given to them below.

003501

is clawed back by the IRS—Highland's 2008 tax return is currently subject to an IRS audit. But the 2009 Statement contains no future, ongoing obligations. Under the 2009 Statement, if Mr. Daugherty received the material equivalent of the "2008 Refund" (which he apparently did), Highland's obligations have been satisfied in full. The 2009 Statement contains no ongoing obligation for Highland to defend Mr. Daugherty or indemnify him. And it would violate basic tenets of contract law to read vague and indefinite precatory language in the 2009 Statement as creating a specific continuing and binding payment obligation that can be enforced forever. This is particularly true where the agreement that governed Mr. Daugherty's employment by the Debtor expressly provided that after his separation from the Debtor, the Debtor would have no further liability or obligation to Mr. Daugherty in connection with his employment.

4.      However, even if Mr. Daugherty's Claim is not disallowed in its entirely, it remains contingent on the outcome of the 2008 Audit. It is unclear when, how, or if the 2008 Audit will be finally resolved. Moreover, if the Claim is not disallowed, it will need to be estimated—after taking into account the likely outcome of the 2008 Audit, including adjustments that result therefrom—pursuant to 11 U.S.C. § 502(c). The Claim (in whatever amount) based on his partnership tax allocations must also be subordinated to the interests in Class 10 pursuant to 11 U.S.C. § 510(b).

## JURISDICTION AND VENUE

5.      This Adversary Proceeding arises in and relates to Highland's Bankruptcy Case.

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

7.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Bankruptcy Rule 7008, Highland consents to the entry of a final order by the Court if

003502

it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the U.S. Constitution.

8.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

9.     Highland is a limited partnership formed under the laws of Delaware with a business address at 100 Crescent Court, Suite 1850, Dallas, Texas 75201.

10.     Upon information and belief, Defendant Patrick Daugherty is an individual residing at 3621 Cornell Avenue, Suite 830, Dallas, Texas 75205.

## STATEMENT OF FACTS

**I.     The Bankruptcy Case and Mr. Daugherty's Claims**

11.     On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the Bankruptcy Case.

12.     On April 1, 2020, Mr. Daugherty filed Proof of Claim No. 67 ("Claim 67"). On April 6, 2020, Mr. Daugherty filed Proof of Claim No. 77 ("Claim 77"), which superseded and replaced Claim 67 in its entirety. On December 23, 2020, Mr. Daugherty filed Proof of Claim No. 205 (the "Claim" or "Claim 205"), which superseded and replaced Claim 77 in its entirety.

13.     On February 22, 2021, this Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943],[3] which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808] (as amended, the "Plan"). The Plan became effective August 11, 2021 [Bankr. Docket No. 2700].

---

[3] Bankr. Docket No. __" refers to the docket maintained in Case No. 19-34054-sgj11.

003503

14.     On December 8, 2021, the Debtor filed *Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* [Bankr. Docket No. 3088] (the "Settlement Motion").

15.     This Court approved the Settlement Motion on March 8, 2022 [Bankr. Docket No. 3298] (the "Settlement Order"), disallowing Claim 67 and Claim 77 with prejudice and resolving all of Claim 205 other than Mr. Daugherty's claim for the 2008 Refund.

## II.     Mr. Daugherty Was Employed by the Debtor and Became a Limited Partner

16.     Mr. Daugherty was hired by the Debtor in 1998. Later, he became eligible to participate in the Debtor's long-term incentive plan (the "LTIP"). Pursuant to the LTIP, at various times, Mr. Daugherty received limited partnership interests in the Debtor (the "Partnership Interests") and became one of the Debtor's limited partners. At all relevant times with respect to Claim 205 as it relates to the 2008 Tax Refund, Mr. Daugherty's employment was governed by an *Amended and Restated Employment Agreement*, dated as of December 31, 2004 (the "Employment Agreement"). For the 2008 tax year, Mr. Daugherty was allocated 0.740262% of the taxable losses of the Debtor on account of his Partnership Interests.

17.     Because the Debtor was a limited partnership, it was a pass-through entity for tax purposes and paid no federal income tax. The Debtor's limited partners, including Mr. Daugherty, were therefore required to pay individual federal income taxes (among other taxes) based on, among other things, their allocable share of the Debtor's income, if any, or could use their allocable share of any losses to offset other current income or, in certain circumstances, carry back losses, and receive a tax refund from the Internal Revenue Service (the "IRS"). Thus, because of his Partnership Interests, Mr. Daugherty was entitled to receive a pass through of his allocable share of any taxable gains or losses generated by the Debtor. Taxable gains increase tax liability; taxable losses decrease tax liability.

003504

### III.    The 2009 Statement and IRS Audit

18.    On February 27, 2009, the Debtor provided Mr. Daugherty with a *Comprehensive Compensation and Benefits Statement* recapping all earnings, awards, and benefits Mr. Daugherty received in connection with his employment by and Partnership Interests in the Debtor during calendar year 2008 (the "2009 Statement"). A true and accurate copy of the 2009 Statement is attached hereto as **Exhibit A**. Such statements were provided to all employees each year at the conclusion of the annual performance review and bonus cycle.

19.    The 2009 Statement included what Highland estimated to be the tax refund Mr. Daugherty could expect for tax year 2008 in the amount of $1,475,816 (the "2008 Refund"). That amount purported to be an estimate of the pre-tax equivalent refund that Mr. Daugherty should have expected to receive from the IRS on account of the losses attributable to his Partnership Interests for the 2008 tax year.

20.    The 2008 Refund was "an estimated amount" based on the notion that losses in 2008 would equal or exceed total partnership gains that had been allocated to Mr. Daugherty in tax years 2005, 2006, and 2007 and assuming a 27% effective tax rate for each year for all of the employee limited partners. The amount was then "grossed up" by 35% so that Mr. Daugherty could compare it to the value of the other benefits for being a Debtor partner and employee[4]. Finally, the estimated partner tax refund amount was calculated without reference to Mr. Daugherty's other personal tax attributes for the 2008 tax year or prior years, and partners were advised that each person's own actual refund may vary based on their own effective tax rate.

21.    While the 2009 Statement vaguely noted that "[i]f actual refund deviates materially from estimate, other compensation will be fairly adjusted," partners like Mr.

---

[4] The calculation of the 2008 Refund was therefore 2005-2007 allocated income of $3,552,890 x 27% or $959,280. Then the $959,280 was divided by 35% for a "pre-tax" calculated amount of $1,475,816.

003505

Daugherty were told that the tax refund amounts were "not guaranteed," and that if refund amounts were different, Highland would merely "consider what action to take on a case-by case basis, considering several factors."

22.     As reflected on his K-1 for tax year 2008 (the "2008 K-1"), Mr. Daugherty was allocated ordinary business losses by Highland in excess of $4 million, along with other losses that well-exceeded the allocated income from 2005-2007.[5] As shown in the 2008 K-1, Mr. Daugherty received what he was promised in the 2009 Statement, if not more.

23.     After the obligations to Mr. Daugherty under the 2009 Statement had been satisfied, the IRS began an audit of Highland's 2008 tax return (the "2008 Audit").[6] On information and belief, the 2008 Audit is not yet fully resolved.

24.     On October 31, 2011, Mr. Daugherty terminated his employment with Highland. Pursuant to the express conditions of his Employment Agreement, Mr. Daugherty acknowledged and agreed that the Debtor would "have no further liability or obligation to [Mr. Daugherty] under [the Employment Agreement] or in connection with his/her employment of termination."

**IV.     The Alleged Basis for the Claim**

25.     In the Claim, Mr. Daugherty demands the Debtor pay him $2,650,353, which consists of the full amount of the 2008 Refund ($1,475,816) plus interest of $1,174,537.[7] Mr.

---

[5] In the simplest terms, to determine whether an individual owes additional taxes or is entitled to a refund, income or losses are multiplied by the applicable tax rate. As an example, in a vacuum, $4 million of taxable losses allocated to an individual in the 27% bracket would result in $1.1 million of benefit in terms of reduction to their taxes owed ($4 million x 27% = $1.1 million). Likewise, $1 million of adjusted gross income resulting from W-2 wage income for an individual would result in $270,000 of tax liability for an individual whose effective tax rate is 27%, all else equal.

[6] Strand Advisors, Inc. ("Strand"), is the Debtor's "tax matters partner" for purposes of defending the 2008 Audit. Control of Strand reverted to James Dondero—the Debtor's ousted founder—in 2021, and the Debtor has no role in the 2008 Audit or visibility into its current status or how it is being conducted. On information and belief, the 2008 Audit has not been resolved and is heading to court with a resolution not expected until approximately 2029.

[7] Mr. Daugherty has provided no statutory or other justification for his claim for interest nor has he provided a proposed interest rate.

003506

Daugherty's theory seems to be that if, upon the conclusion of the 2008 Audit, he is required to reverse the tax loss he received as a limited partner, the Debtor must reimburse him for the entirety of the 2008 Refund with interest. In other words, Mr. Daugherty reads a continuing obligation into the 2009 Statement to indemnify him for personal income taxes he may owe, if any, as a result of the 2008 Audit.

26.     However, and as set forth above, there is no such obligation in the 2009 Statement. Mr. Daugherty has no claim.

27.     But even if Mr. Daugherty did have a claim (he does not), it would be unliquidated and contingent and subordinated as it arises solely from his Partnership Interests.

### FIRST CLAIM FOR RELIEF

### (Disallowance under Bankruptcy Code 11 U.S.C. § 502(a))

28.     Highland repeats and re-alleges as if set forth herein the foregoing factual allegations.

29.     Under 11 U.S.C. § 502(a) a "claim ..., proof of which is filed under section 501 [of the Bankruptcy Code], is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a).

30.     The ultimate burden of proof for a claim always lies with the claimant. *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15 (2000)).

31.     Mr. Daugherty received and has benefited for the past 16 years from the 2008 Refund, *i.e.*, the 2008 losses allocated to Mr. Daugherty as a Highland partner. The benefit he received from the IRS (either as a tax refund or liability reduced through offsetting of income) did not materially deviate from, and may have exceeded, the basis for the estimated 2008 Refund set forth in the 2009 Statement.

003507

32.     Accordingly, the Debtor satisfied its obligations (to the extent it even had any) under the 2009 Statement in full, and no additional, future obligations exist under the 2009 Statement. Because the Debtor has satisfied its obligations, Claim 205 should be disallowed in its entirety.

33.     Moreover, even if the tax benefits he received related to tax year 2008 materially deviated from the 2009 Statement, Mr. Daugherty would not be able to recover from the Debtor based on the vague statement in the 2009 Statement that lacks the definiteness required to form a contractual obligation.

## **SECOND CLAIM FOR RELIEF**

## **(Estimation under Bankruptcy Code 11 U.S.C. § 502(c))**

34.     Highland repeats and re-alleges as if set forth herein the foregoing factual allegations.

35.     As set forth above, Mr. Daugherty has no Claim; however, to the extent the Court believes he has one, it is unliquidated and contingent on the final outcome of the 2008 Audit, including the magnitude of any adjustments. If the 2008 Audit is successfully defended, Mr. Daugherty will have no claim.

36.     Under 11 U.S.C. § 502(c) "[t]here shall be estimated for purposes of allowance … (1) any contingent or unliquidated claim, the fixing or liquidation of which … would unduly delay the administration of the case …."

37.     The Plan was confirmed in February of 2021 and has been effective since August of 2021. Mr. Daugherty's Claim is the last unresolved claim[8] against the estate.

38.     It is currently unknown when, if, or how the 2008 Audit will be resolved.

---

[8] The Equity Interests in subordinated Class 10 and further subordinated Class 11 have not been allowed under the terms of the Plan.

003508

39.     Accordingly, the Debtor requests that this Court estimate the Claim—after taking into account the likelihood and degree to which the 2008 Audit will be successful or unsuccessful—under 11 U.S.C. § 502(c) for purposes of allowance and distribution.

### **THIRD CLAIM FOR RELIEF**

### **(Subordination under Bankruptcy Code 11 U.S.C. § 510(b))**

40.     Highland repeats and re-alleges as if set forth herein the foregoing factual allegations.

41.     Under the Bankruptcy Code,

> a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security ….

11 U.S.C. § 510(b). Section 510(b) requires the subordination of claims arising from the purchase of the equity itself and all claims arising thereafter as incidents of ownership. *In re SeaQuest Diving, LP*, 579 F.3d 411, 421 (5th Cir. 2009).

42.     Section 510(b) applies to the ownership of limited partnership interests. *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 154 (5th Cir. 2015).

43.     Mr. Daugherty owned the Partnership Interests, and his Claim is contingent on the IRS clawing back the 2008 Refund he received on account of those Partnership Interests through the 2008 Audit.

44.     But for the Partnership Interests, Mr. Daugherty would not have been entitled to the 2008 Refund nor would Mr. Daugherty have any potential liability to the IRS from the 2008 Audit. A nexus or causal relationship exists between Claim 205 and the "purchase" of the Partnership Interests.

003509

45.     Accordingly, judgment should issue declaring that the Claim—to the extent it is not disallowed in full—is subordinated pursuant to 11 U.S.C. § 510(b) and shall, subject to such other defenses or objections as may exist with respect to the Claim, have the same rank and priority as Class 11 under the Plan.

## **PRAYER**

WHEREFORE, Highland prays for judgment as follows:

1.     For the disallowance of the Claim in its entirety;

2.     For estimation for the Claim for purposes of allowance and distribution;

3.     For subordination of the Claim;

4.     For damages and costs of suit, including attorneys' fees, incurred in connection herewith; and

5.     For such other and further relief as the Court deems just and proper.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

003510

Dated: May 2, 2025.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**003511**

# EXHIBIT A

003512

## PAT DAUGHERTY

Date of Hire: 4/3/1998
Comprehensive Compensation and Benefits Statement
February 27, 2009

### EARNINGS AND AWARDS

| | |
|---|---|
| 2008 Base Salary, as of 12/31/08 | $ ███0 |
| **2009 Base Salary, effective March 1, 2009 : $ ███0** | |
| 2008 Tax Refund | $ 1,475,816 |

Refund is an estimated amount. If actual refund deviates materially from estimate, other compensation will be fairly adjusted. Refund is expected to be received in approximately 4 months.

Loan Forgiven in 2009 as part of bonus:

2008 Other Awards
- 401K Match
- Defined Benefit

2008 Deferred Compensation
- Retention Award

Highland's Hedge Funds and Private Equity funds, for a variety of reasons, largely preclude redemptions and Highland Capital Management, L.P. may or may not be in a position to provide a cash equivalent upon triggering of any employee specific monetization. Therefore for this deferred compensation award and any previous awards of Option IT and STIP, Employee agrees to accept payment in kind settlement of any monetization if necessary. _____ (*Please Initial*)

| | |
|---|---|
| ***2008 Total Earnings and Awards*** | $ ██████ |

### HIGHLAND PAID BENEFITS

Medical
Dental
Basic and Dependent Life Insurance/AD&D
Short Term Disability and Long Term Disability
Executive LTD
Daily Catered Lunches
Blackberry
Parking

***2008 Estimated Total Value of Highland Paid Benefits***

### TOTAL COMPENSATION PACKAGE                $ ██████

| | |
|---|---|
| ***Waiver and Release Payments in 2008*** | $ ███0 |

**ACCEPTED AND AGREED:**

_____        _____
**Patrick Daugherty**                                        **Date**

003513

# Exhibit

003514

Docket #1808  Date Filed: 01/22/2021

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210122000000000013

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
    GOVERNING LAW AND DEFINED TERMS ............................................ 1

    A.    Rules of Interpretation, Computation of Time and Governing Law ................... 1

    B.    Defined Terms ........................................................................................ 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

    A.    Administrative Expense Claims ................................................................ 16

    B.    Professional Fee Claims .......................................................................... 17

    C.    Priority Tax Claims ................................................................................ 18

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
    AND EQUITY INTERESTS ....................................................................... 18

    A.    Summary ............................................................................................... 18

    B.    Summary of Classification and Treatment of Classified Claims and
    Equity Interests ...................................................................................... 19

    C.    Elimination of Vacant Classes ................................................................. 19

    D.    Impaired/Voting Classes ......................................................................... 19

    E.    Unimpaired/Non-Voting Classes .............................................................. 19

    F.    Impaired/Non-Voting Classes .................................................................. 19

    G.    Cramdown ............................................................................................. 19

    H.    Classification and Treatment of Claims and Equity Interests ........................... 20

    I.    Special Provision Governing Unimpaired Claims ............................................ 24

    J.    Subordinated Claims ............................................................................... 25

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ......................... 25

    A.    Summary ............................................................................................... 25

    B.    The Claimant Trust .................................................................................. 26

    1.    *Creation and Governance of the Claimant Trust and Litigation Sub-
    Trust.* ................................................................................................... 26

    2.    *Claimant Trust Oversight Committee* ....................................................... 27

003516

| | | |
|---|---|---|
| 3. | *Purpose of the Claimant Trust.* | 27 |
| 4. | *Purpose of the Litigation Sub-Trust.* | 28 |
| 5. | *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* | 28 |
| 6. | *Compensation and Duties of Trustees.* | 29 |
| 7. | *Cooperation of Debtor and Reorganized Debtor.* | 30 |
| 8. | *United States Federal Income Tax Treatment of the Claimant Trust.* | 30 |
| 9. | *Tax Reporting.* | 30 |
| 10. | *Claimant Trust Assets.* | 31 |
| 11. | *Claimant Trust Expenses.* | 31 |
| 12. | *Trust Distributions to Claimant Trust Beneficiaries.* | 31 |
| 13. | *Cash Investments.* | 31 |
| 14. | *Dissolution of the Claimant Trust and Litigation Sub-Trust.* | 32 |
| C. | The Reorganized Debtor | 32 |
| 1. | *Corporate Existence* | 32 |
| 2. | *Cancellation of Equity Interests and Release* | 33 |
| 3. | *Issuance of New Partnership Interests* | 33 |
| 4. | *Management of the Reorganized Debtor* | 33 |
| 5. | *Vesting of Assets in the Reorganized Debtor* | 34 |
| 6. | *Purpose of the Reorganized Debtor* | 34 |
| 7. | *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets* | 34 |
| D. | Company Action | 34 |
| E. | Release of Liens, Claims and Equity Interests | 35 |
| F. | Cancellation of Notes, Certificates and Instruments | 36 |
| G. | Cancellation of Existing Instruments Governing Security Interests | 36 |

003517

**Page**

H.    Control Provisions ......................................................................................... 36

I.    Treatment of Vacant Classes .......................................................................... 36

J.    Plan Documents .............................................................................................. 36

K.    Highland Capital Management, L.P. Retirement Plan and Trust ..................... 37

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ......................................................................................................... 37

A.    Assumption, Assignment, or Rejection of Executory Contracts and
        Unexpired Leases ........................................................................................... 37

B.    Claims Based on Rejection of Executory Contracts or Unexpired
        Leases ............................................................................................................. 38

C.    Cure of Defaults for Assumed or Assigned Executory Contracts and
        Unexpired Leases ........................................................................................... 39

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........................................... 39

A.    Dates of Distributions .................................................................................... 39

B.    Distribution Agent .......................................................................................... 40

C.    Cash Distributions .......................................................................................... 41

D.    Disputed Claims Reserve ............................................................................... 41

E.    Distributions from the Disputed Claims Reserve ........................................... 41

F.    Rounding of Payments .................................................................................... 41

G.    *De Minimis* Distribution ................................................................................. 41

H.    Distributions on Account of Allowed Claims ................................................. 42

I.    General Distribution Procedures ..................................................................... 42

J.    Address for Delivery of Distributions ............................................................ 42

K.    Undeliverable Distributions and Unclaimed Property .................................... 42

L.    Withholding Taxes .......................................................................................... 43

M.    Setoffs ............................................................................................................ 43

003518

**Page**

N.   Surrender of Cancelled Instruments or Securities ................................................. 43

O.   Lost, Stolen, Mutilated or Destroyed Securities ................................................. 43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
            UNLIQUIDATED AND DISPUTED CLAIMS ........................................... 44

A.   Filing of Proofs of Claim ..................................................................................... 44

B.   Disputed Claims .................................................................................................... 44

C.   Procedures Regarding Disputed Claims or Disputed Equity Interests ............... 44

D.   Allowance of Claims and Equity Interests ........................................................... 44

1.   *Allowance of Claims* ........................................................................................... 45

2.   *Estimation* ........................................................................................................... 45

3.   *Disallowance of Claims* ..................................................................................... 45

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ............................................................ 46

A.   Conditions Precedent to the Effective Date ......................................................... 46

B.   Waiver of Conditions ............................................................................................ 47

C.   Effect of Non-Occurrence of Conditions to Effectiveness**Error! Bookmark not defined.**

D.   Dissolution of the Committee ............................................................................... 47

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................ 48

A.   General ................................................................................................................... 48

B.   Discharge of Claims .............................................................................................. 48

C.   Exculpation ........................................................................................................... 48

D.   Releases by the Debtor .......................................................................................... 49

E.   Preservation of Rights of Action .......................................................................... 50

1.   *Maintenance of Causes of Action* ..................................................................... 50

2.   *Preservation of All Causes of Action Not Expressly Settled or Released* ........... 50

F.   Injunction .............................................................................................................. 51

003519

**Page**

    G.     Term of Injunctions or Stays...................................................................52

    H.     Continuance of January 9 Order ...........................................................52

ARTICLE X. BINDING NATURE OF PLAN ...............................................................52

ARTICLE XI. RETENTION OF JURISDICTION ..........................................................53

ARTICLE XII. MISCELLANEOUS PROVISIONS ........................................................55

    A.     Payment of Statutory Fees and Filing of Reports ................................55

    B.     Modification of Plan .............................................................................55

    C.     Revocation of Plan ...............................................................................55

    D.     Obligations Not Changed .....................................................................56

    E.     Entire Agreement .................................................................................56

    F.     Closing of Chapter 11 Case ..................................................................56

    G.     Successors and Assigns.........................................................................56

    H.     Reservation of Rights ...........................................................................56

    I.     Further Assurances ...............................................................................57

    J.     Severability ...........................................................................................57

    K.     Service of Documents ...........................................................................57

    L.     Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code...........................................................................58

    M.     Governing Law .....................................................................................59

    N.     Tax Reporting and Compliance ...........................................................59

    O.     Exhibits and Schedules ........................................................................59

    P.     Controlling Document ..........................................................................59

003520

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns;

003521

(h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**B.    Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.    "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.    "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.    "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.    "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.    "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the

003522

Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7. "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8. "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9. "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

003523

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

003524

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold

5

Claimant Trust Interests unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

003526

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein.  Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved.  As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be:  (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or

7

Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

003528

62. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

003529

69. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

10

003530

81. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement. As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91. "*Petition Date*" means October 16, 2019.

92. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

003531

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

003532

101.    "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102.    "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103.    "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any

003533

damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110.    "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111.    "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113.    "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114.    "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115.    "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized

003534

Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116.   "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117.   "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118.   "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119.   "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120.   "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121.   "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122.   "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123.   "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124.   "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125.   "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126.   "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.   "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

15

003535

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or order entered by the Bankruptcy Court.

130.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.    "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A.**    **Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized

003536

Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.  Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee

003537

Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.    Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

## A.    Summary

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

003538

B.    **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

C.    **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

D.    **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

E.    **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

F.    **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

G.    **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the

19

003539

Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.**      **Classification and Treatment of Claims and Equity Interests**

    *1.*      *Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

    *2.*      *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

003540

3.  *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4.  *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.  *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.    *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

003542

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9.   *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

  *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.   *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

003543

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.  *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

I.  **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

003544

J.      **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Under section 510 of the Bankruptcy Code, upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.      **Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be

003545

cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.**     **The Claimant Trust**[2]

     *1.*          *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

003546

Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.      *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.      *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and

27

monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.        *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.        *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)        the payment of the Claimant Trust Expenses;

(ii)        the payment of other reasonable expenses of the Claimant Trust;

(iii)        the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)        the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)        the orderly monetization of the Claimant Trust Assets;

(vi)        litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)        the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)        the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)        the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

003548

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)     the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.          *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust

003549

Agreement, as appropriate.  The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.        *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.        *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests.  Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.        *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

003550

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.        *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.        *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.        *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.        *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are

003551

investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

   *14.*      _Dissolution of the Claimant Trust and Litigation Sub-Trust._

   The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

   Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

**C.**   **The Reorganized Debtor**

   *1.*      _Corporate Existence_

   The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

003552

2.        *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

3.        *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date.  Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order.  Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

4.        *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC.  The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

003553

5.  *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.  *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.  *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.    Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in

34

003554

the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

## E.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of

003555

doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

**F.  Cancellation of Notes, Certificates and Instruments**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

**G.  Cancellation of Existing Instruments Governing Security Interests**

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

**H.  Control Provisions**

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

**I.  Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

**J.  Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

003556

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

**K.      Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a

003557

contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

## B.   Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed

003558

and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

## C.   Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

## A.   Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity

39

003559

Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan. Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

**B.     Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the

40

Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C.    **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D.    **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E.    **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

## F.    **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

## G.    *De Minimis* **Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall

41

003561

revert to the Claimant Trust.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**H.    Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order.  Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**I.    General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise.  All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

**J.    Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

**K.    Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes.  Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

003562

## L.     Withholding Taxes

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

## M.     Setoffs

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

## N.     Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

## O.     Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any

003563

damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### A.   Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

### B.   Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

### C.   Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

### D.   Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

003564

1.    *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2.    *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3.    *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH**

003565

LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.

## ARTICLE VIII.
## EFFECTIVENESS OF THIS PLAN

### A.     Conditions Precedent to the Effective Date

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding

003566

upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.  Waiver of Conditions

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee) and any applicable parties in Section VII.A of this Plan, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C.  Dissolution of the Committee

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's

47

003567

Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

**A.**    **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

**B.**    **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**C.**    **Exculpation**

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross

003568

negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.     Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

003569

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

**E.      Preservation of Rights of Action**

*1.      Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

*2.      Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final

003570

Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

## F.    <u>Injunction</u>

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or**

003571

arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

**G.**  **Duration of Injunctions and Stays**

ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.

**H.**  **Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

## ARTICLE X.
## BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state,

003572

Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XI.
## <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or

003573

expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such

003574

orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.    Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement

55

003575

executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

**D.      Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**E.      Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**F.      Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

**G.      Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**H.      Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this

003576

Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

**I.      Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order. On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**J.      Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.      Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

003577

**If to the Claimant Trust:**

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

## L.   Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego

003578

the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

## M.      Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

## N.      Tax Reporting and Compliance

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

## O.      Exhibits and Schedules

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

## P.      Controlling Document

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

003579

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

**003580**

# Exhibit

003581



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed February 22, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |

### ORDER (I) CONFIRMING THE FIFTH AMENDED
### PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
### MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

The Bankruptcy Court[2] having:

a.  entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.



*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "Disclosure Statement") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.    set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "Objection Deadline"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "Plan");

c.    set January 5, 2021, at 5:00 p.m. prevailing Central Time, as the deadline for voting on the Plan (the "Voting Deadline") in accordance with the Disclosure Statement Order;

d.    initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.    reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "Confirmation Hearing Notice"), the form of which is attached as Exhibit 1-B to the Disclosure Statement Order;

f.    reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "Plan Supplements");

g.    reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "<u>List of Assumed Contracts</u>");

h.      reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "<u>Confirmation Brief</u>"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "<u>Voting Certifications</u>").

i.      reviewed: (i) *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

003584

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j.  reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.  conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l.  heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.  considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

003585

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.       **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.       **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case.  Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021.  The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board.  The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders.  The Claimant Trustee is responsible

for this process, among other duties specified in the Plan's Claimant Trust Agreement. There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3.      **Confirmation Requirements Satisfied.** The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7. Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code. The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4.      **Not Your Garden Variety Debtor**. The Debtor's case is not a garden variety chapter 11 case. The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940. It was founded in 1993 by James Dondero and Mark Okada. Mark Okada resigned from his role with Highland prior to the

003587

bankruptcy case being filed on October 16, 2019 (the "Petition Date"). Mr. Dondero controlled

the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020,

pursuant to an agreement reached with the Committee, as described below. Although Mr. Dondero

remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his

employment with the Debtor terminated on October 9, 2020. Mr. Dondero continues to work for

and/or control numerous non-debtor entities in the complex Highland enterprise.

5. **The Debtor**. The Debtor is headquartered in Dallas, Texas. As of the

Petition Date, the Debtor employed approximately 76 employees. The Debtor is privately-owned:

(a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment

Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark

Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general

partner.

6. **The Highland Enterprise.** Pursuant to various contractual arrangements,

the Debtor provides money management and advisory services for billions of dollars of assets,

including collateralized loan obligation vehicles ("CLOs"), and other investments. Some of these

assets are managed by the Debtor pursuant to shared services agreements with certain affiliated

entities, including other affiliated registered investment advisors. In fact, there are approximately

2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these

affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not

subsidiaries (direct or indirect) of the Debtor. Many of the Debtor's affiliated companies are

DOCS_SF:104487.21 36027/002

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

7.     **Debtor's Operational History.**  The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.  For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business.  The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits."  The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

8.     **Not Your Garden Variety Creditor's Committee**.  The Debtor and this chapter 11 case are not garden variety for so many reasons.  One of the most obvious standouts in this case is the creditor constituency.  The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11.  For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  The Debtor also did not have problems with its trade vendors or landlords.

003589

The Debtor also did not suffer any type of catastrophic business calamity. In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic. Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator." The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a. **The Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee")**. This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda). This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b. **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("Acis")**. Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date. This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016. Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis. Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case. Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

003590

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c. **UBS Securities LLC and UBS AG London Branch ("UBS").** UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d. **Meta-E Discovery ("Meta-E").** Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

9. **Other Key Creditor Constituents.** In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

DOCS_SF:104487.21 36027/002

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor. The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose). Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations. HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10. **Other Claims Asserted.** Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11. **Not Your Garden Variety Post-Petition Corporate Governance Structure.** Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure. Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best. First, the Committee moved for a change of venue from

003592

Delaware to Dallas.  Second, the Committee (and later, the United States Trustee) expressed its

then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr.

Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and

perhaps worse).

       12.     **Post-Petition Corporate Governance Settlement with Committee.**  After

spending many weeks under the threat of the potential appointment of a trustee, the Debtor and

Committee engaged in substantial and lengthy negotiations resulting in a corporate governance

settlement approved by the Bankruptcy Court on January 9, 2020.[5]  As a result of this settlement,

among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as

an officer or director of the Debtor and its general partner, Strand.  As noted above, Mr. Dondero

agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any

Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor.

The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the

commencement of any litigation against the three independent board members appointed to

oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the

exculpation of those board members by limiting claims subject to the "gatekeeper" provision to

those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "<u>January 9 Order</u>" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "<u>Settlement Motion</u>").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "<u>Stipulation</u>").

DOCS_SF:104487.21 36027/002

**003593**

13.    **Appointment of Independent Directors.**    As part of the Bankruptcy Court-approved settlement, three eminently qualified independent directors were chosen to lead Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are each technically independent directors of Strand (Mr. Dondero had previously been the sole director of Strand and, thus, the sole person in ultimate control of the Debtor).  The three independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr. Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative.  Suffice it to say that this settlement and the appointment of the independent directors changed the entire trajectory of the case and saved the Debtor from the appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent directors.  They were the right solution at the right time.  Because of the unique character of the Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent directors was a far better outcome for creditors than the appointment of a conventional chapter 11 trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in particular, knew and had vast experience at prominent firms with high-yield and distressed investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis, the former affiliate of Highland that the Bankruptcy Court presided over and which company was

003594

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience. While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland complex shortly after he was appointed (which the Bankruptcy Court had to address). The Acis trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14. **Conditions Required by Independent Directors.** Given the experiences in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer, as it would be in an ordinary chapter 11 case. The independent board members were stepping into a morass of problems. Naturally, they were worried about getting sued no matter how defensible their efforts—given the litigation culture that enveloped Highland historically. Based on the record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything always ended in litigation at Highland. The Bankruptcy Court heard credible testimony that none of the independent directors would have taken on the role of independent director without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent directors without the Bankruptcy Court's prior authority. This gatekeeper provision was also

003595

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on July 16, 2020.[7] The gatekeeper provisions in both the January 9 Order and July 16 Order are precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine" (first articulated in an old Supreme Court case captioned *Barton v. Barbour*, 104 U.S. 126 (1881)). The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16 Order, and no one appealed either of those orders. As noted above, Mr. Dondero signed the Stipulation that led to the settlement that was approved by the January 9 Order. The Bankruptcy Court finds that, like the Committee, the independent board members have been resilient and unwavering in their efforts to get the enormous problems in this case solved. They seem to have at all times negotiated hard and in good faith, which culminated in the proposal of the Plan currently before the Bankruptcy Court. As noted previously, they completely changed the trajectory of this case.

15. **Not Your Garden Variety Mediators.** And still another reason why this was not your garden variety case was the mediation effort. In the summer of 2020, roughly nine months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis, UBS, the Redeemer Committee, and Mr. Dondero. The Bankruptcy Court selected co-mediators because mediation among these parties seemed like such a Herculean task—especially during COVID-19 where people could not all be in the same room. Those co-mediators were: Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

15

003596

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas.  As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation.  And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim).  The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16.    **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**.  Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court.  Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons.  Originally, there were over a dozen objections filed to the Plan.  The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below.  The only objectors to the Plan left at the time of the Confirmation Hearing

DOCS_SF:104487.21 36027/002

003597

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned and/or controlled by him and that filed the following objections:

a.   *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b.   *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund) [Docket No. 1670];

c.   A *Joinder to the Objection filed at 1670 by: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d.   *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e.   *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676]. The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17.   **Questionability of Good Faith as to Outstanding Confirmation Objections.** Mr. Dondero and the Dondero Related Entities technically have standing to object to the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

003598

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections. In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors. Mr. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan. As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring. The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18.    **Remote Interest of Outstanding Confirmation Objectors.** To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately. First, Mr. Dondero has a pending objection to the Plan. Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture). Mr. Dondero owns no equity in the Debtor directly. Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor. Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good"). The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor. *See* Disclosure Statement at 7, n.3. The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero. Get Good

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which

the Debtor believes arise from Get Good's equity security interests and are subject to subordination

as set forth in its Confirmation Brief.  Dugaboy filed three claims against the Debtor: (a) an

administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat

Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to

pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation

Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor

asserts should be subordinated.  Another group of objectors that has joined together in one

objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See*

Docket No. 1863.  The Bankruptcy Court understands they assert disputed administrative expense

claims against the estate that were filed shortly before the Confirmation Hearing on January 23,

2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No.

1888].  At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and

Funds that the Funds have independent board members that run the Funds, but the Bankruptcy

Court was not convinced of their independence from Mr. Dondero because none of the so-called

independent board members have ever testified before the Bankruptcy Court and all have been

engaged with the Highland complex for many years.  Notably, the Court questions Mr. Post's

credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in

October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request,

and he is currently employed by Mr. Dondero.  Moreover, Dustin Norris, a witness in a prior

proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero owned and/or controlled these entities. Finally, various NexBank entities objected to the Plan. The Bankruptcy Court does not believe they have liquidated claims against the Debtor. Mr. Dondero appears to be in control of these entities as well.

19. **Background Regarding Dondero Objecting Parties.** To be clear, the Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Bankruptcy Court questions their good faith. Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero. In the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in specific ways that were supported by evidence. Around the time that this all came to light and the Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company phone, which he had been asked to turn in to Highland, mysteriously went missing. The Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to confirmation of the Plan.

20. **Other Confirmation Objections.** Other than the objections filed by Mr. Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

DOCS_SF:104487.21 36027/002

003601

Debtor release provisions. In juxtaposition, to these pending objections, the Bankruptcy Court

notes that the Debtor resolved the following objections to the Plan:

    a.    *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

    b.    *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

    c.    *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

    d.    *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679]. This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

    e.    *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

    f.    *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678]. This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

    21.    **Capitalized Terms.** Capitalized terms used herein, but not defined herein,

shall have the respective meanings attributed to such terms in the Plan and the Disclosure

Statement, as applicable.

DOCS_SF:104487.21 36027/002

003602

22.     **Jurisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.     **Chapter 11 Petition.**  On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the Committee on October 29, 2019.

24.     **Judicial Notice.**  The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

003603

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25. **Plan Supplement Documents.** Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements. The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26. **Retained Causes of Action Adequately Preserved.** The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27. **Plan Modifications Are Non-Material.** In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

23

003604

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's*

*Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital*

*Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the

"Plan Modifications").  Section 1127(a) of the Bankruptcy Code provides that a plan proponent

may modify its plan at any time before confirmation so long as such modified plan meets the

requirements of sections 1122 and 1123 of the Bankruptcy Code.  None of the modifications set

forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant

to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because,

among other things, they do not materially adversely change the treatment of the claims of any

creditors or interest holders who have not accepted, in writing, such supplements and

modifications.  Among other things, there were changes to the projections that the Debtor filed

shortly before the Confirmation Hearing (which included projected distributions to creditors and

a comparison of projected distributions under the Plan to potential distributions under a

hypothetical chapter 7 liquidation).  The Plan Supplements and Plan Modifications did not mislead

or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity

Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan.

Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021

[Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors

or interest holders but, rather, simply update the estimated distributions based on Claims that were

settled in the interim and provide updated financial data.  The filing and notice of the Plan

Supplements and Plan Modifications were appropriate and complied with the requirements of

003605

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required. The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code. The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28. **Notice of Transmittal, Mailing and Publication of Materials.** As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto. No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29. **Voting.** The Bankruptcy Court has reviewed and considered the Voting Certifications. The procedures by which the Ballots for acceptance or rejection of the Plan were

003606

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30.     **Bankruptcy Rule 3016(a).**  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31.     **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**  As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32.     **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).**  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33.     **Classification of Secured Claims.**  Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors.  Class 3 (Other

26

003607

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34.    **Classification of Priority Claims.**    Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims.    Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35.    **Classification of Unsecured Claims.**    Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8.    Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims).    The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor.    Class 8 Creditors

DOCS_SF:104487.21 36027/002

003608

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36. **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37. **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

DOCS_SF:104487.21 36027/002

003609

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38. **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

29

DOCS_SF:104487.21 36027/002

003610

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39.    **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).** Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan. Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40.    **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).** Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes. Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41.    **No Discrimination (11 U.S.C. § 1123(a)(4)).** The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest. The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan. Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

DOCS_SF:104487.21 36027/002

003611

42.    **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).**  Article IV of the Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the establishment of:  (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor; and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are included in the Plan Supplements.

a.    **The Claimant Trust.**  The Claimant Trust Agreement provides for the management of the Claimant Trust, as well as the Reorganized Debtor with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its general partner).  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.  Additionally, the Plan provides for the transfer to the Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and for the Claimant Trust Assets to automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement.  The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.

b.    **The Litigation Sub-Trust.**  The Plan and the Litigation Sub-Trust Agreement provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims (as transferred to the Claimant Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the Litigation Sub-Trust Agreement.  The Litigation Trustee is charged with investigating, pursuing, and otherwise resolving any Estate Claims (including those with respect to which the Committee has standing to pursue prior to the Effective Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, regardless of whether any litigation with respect to any Estate Claim was commenced by the Debtor or the Committee prior to the Effective Date.

31

003612

      c.    **The Reorganized Debtor**.  The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action. The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan. The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors. Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests). Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan. Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents. Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

      43.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).** The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

DOCS_SF:104487.21 36027/002

003613

44. **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).** Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee. The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board. The Claimant Trust Oversight Board will consist of: (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery; and (5) David Pauker. Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee. Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors. They are therefore intimately familiar with the Debtor, its business, and assets. The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties. The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

DOCS_SF:104487.21 36027/002

003614

45.    **Selection of Trustees.**  The Plan Supplements disclose that Mr. Seery will serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee.  As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive management and restructuring experience, as evidenced from his curriculum vitae which is part of the record.    The evidence shows that Mr. Seery is intimately familiar with the Debtor's organizational structure, business, and assets, as well as how Claims will be treated under the Plan.  Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment post-emergence as the Claimant Trustee.   Mr. Seery, upon consultation with the Committee, testified that he intends to employ approximately 10 of the Debtor's employees to enable him to manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets, instead of hiring a sub-servicer to accomplish those tasks.  Mr. Seery testified that he believes that the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by a sub-set of the Debtor's current employees, who will be managed internally.  Mr. Seery shall initially be paid $150,000 per month for services rendered after the Effective Date as Claimant Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight Board within forty-five (45) days after the Effective Date.  The Bankruptcy Court has also reviewed Mr. Kirschner's curriculum vitae.  Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particularly with respect to his prior experience as a litigation trustee for several litigation trusts, as set forth on the record of the

003615

Confirmation Hearing and in the Confirmation Brief. Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries. The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders. Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46. **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).** Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47. **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.** Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order. In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not entitled to vote on the Plan pursuant to the Disclosure Statement Order. The Disclosure Statement Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan. The Debtor and KCC each complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and Publication. The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class. The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan. The Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order. The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain Dondero Related Entities that the changes made to certain assumptions and projections from the Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the Plan. The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections. Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial Projections do not constitute materially adverse change to the treatment of Claims or Equity

003617

Interests.  Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data.   Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets.  The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48. **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).**  The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

a. The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

b.    The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.    Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.    While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.    On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation. As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.    On August 12, 2020, the Debtor filed its *Chapter 11 Plan of* Reorganization *of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero. The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.    The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020. The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.    Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.    Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful. This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

DOCS_SF:104487.21 36027/002

003619

49.     **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

Article II.B of the Plan provides that Professionals will file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such claims.  The procedures set forth in the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.

50.     **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**  Article IV.B of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee and the members thereto.  For the reasons more fully explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation of any insider to be employed or retained by the Reorganized Debtor, if applicable, and compensation for any such insider.  The appointment of such individuals is consistent with the interests of Claims and Equity Interests and with public policy.  Thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

51.     **No Rate Changes (11 U.S.C. § 1129(a)(6)).**  The Plan does not provide for any rate change that requires regulatory approval.  Section 1129(a)(6) of the Bankruptcy Code is thus not applicable.

DOCS_SF:104487.21 36027/002

003620

52.     **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).** The "best interests" test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. On October 15, 2020, the Debtor filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its advisors and which was attached as Exhibit C to the Disclosure Statement. On January 29, 2021, in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor provided an updated version of the Liquidation Analysis to the then-objectors of the Plan, including Mr. Dondero and the Dondero Related Entities. On February 1, 2021, the Debtor filed the Amended Liquidation Analysis/Financial Projections. The Amended Liquidation Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues, and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in market conditions and other factors; (3) expected revenues and expenses arising in connection with the Debtor's continued management of the CLOs pursuant to management agreements that the Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding two or three employees to assist in the management of the CLOs, the Debtor also increased modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and professional fees; and (5) an increase in projected recoveries on notes resulting from the

DOCS_SF:104487.21 36027/002

003621

acceleration of term notes owed to the Debtor by the following Dondero Related Entities: NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC).  Under the Plan, as of the Confirmation Date, (a) Class 7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b) Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on account of their Claims.  Under a hypothetical chapter 7 liquidation, all general unsecured creditors are projected to receive approximately 55% on account of their Claims.  The Bankruptcy Court finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation based on Mr. Seery's testimony, including the following credible reasons he posited, among others:

    a.    The nature of the Debtor's assets is complex.  Certain assets relate to complicated real estate structures and private equity investments in operating businesses.  Mr. Seery's extensive experience with the Debtor during the thirteen months since his appointment as an Independent Director and later Chief Executive Officer and Chief Restructuring Officer, provides him with a substantial learning curve in connection with the disposition of the Debtor's assets and are reasonably expected to result in him being able to realize tens of millions of dollars more value than would a chapter 7 trustee.

    b.    Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's business under chapter 7 of the Bankruptcy Code and hire the necessary personnel with the relevant knowledge and experience to assist him or her in selling the Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's assets in a forced sale liquidation which would generate substantially less value for the Debtor's creditors than the asset monetization plan contemplated by the Plan.

    c.    A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals to assist in its efforts to monetize assets, resulting in delays, increased expenses, and reduced asset yields for the chapter 7 estate.

003622

    d.       The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

    e.       The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

    53.    **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

    54.    **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

003623

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

55.     **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).**    Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider.  Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56.     **Feasibility (11 U.S.C. § 1129(a)(11)).**    Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor.  The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets.  The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan.  The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors.  Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note.  The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date.  Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

003624

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the Claimant Trust Agreement. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57. **Payment of Fees (11 U.S.C. § 1129(a)(12)).** All fees payable under 28 U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code. The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.

58. **Retiree Benefits.** The Plan provides for the assumption of the Pension Plan (to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the Bankruptcy Code). Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to the extent applicable.

59. **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).** Sections 1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii) is not a nonprofit corporation (section 1129(a)(16)).

60. **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. § 1129(b)).** The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11, which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

DOCS_SF:104487.21 36027/002

003625

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy

Code.

    a.    <u>Class 8</u>.  The Plan is fair and equitable with respect to Class 8 General Unsecured Claims.  While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement.  Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

    b.    <u>Class 10 and Class 11</u>.  There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement.  Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C).  The Plan does not discriminate unfairly as to Equity Interests.  As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly, and is fair and equitable with respect to each Class that has rejected the Plan.  Thus, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10, and 11.

DOCS_SF:104487.21 36027/002

003626

61.     **Only One Plan (11 U.S.C. § 1129(c)).**  The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62.     **Principal Purpose (11 U.S.C. § 1129(d)).**  Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds.  Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63.     **Satisfaction of Confirmation Requirements.**  Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64.     **Good Faith Solicitation (11 U.S.C. § 1125(e)).**  The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65.     **Discharge (11 U.S.C. § 1141(d)(3)).**  The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code.  Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

DOCS_SF:104487.21 36027/002

003627

in the same manner as the Debtor did prior to Plan confirmation, which includes the management

of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund.  Although the

Plan projects that it will take approximately two years to monetize the Debtor's assets for fair

value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be

monetizing their assets, there is no specified time frame by which this process must conclude.  Mr.

Seery's credible testimony demonstrates that the Debtor will continue to engage in business after

consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is

entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66.  **Retention of Jurisdiction.**  The Bankruptcy Court may properly retain

jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the

Bankruptcy Code to the maximum extent under applicable law.

67.  **Additional Plan Provisions (11 U.S.C. § 1123(b)).**  The Plan's provisions

are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68.  **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**

The Debtor has exercised reasonable business judgment with respect to the rejection of the

Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation

Order, and such rejections are justified and appropriate in this Chapter 11 Case.  The Debtor also

filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the

contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No.

1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

003628

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts"). With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8] Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69. **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).** All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

70. **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).** The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

003629

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71.    **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties.  Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.  Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties.  The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties.  The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases.  The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction. The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions"). Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date. The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring. The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

       72.    **Exculpation.**  Section IX.C of the Plan provides for the exculpation of

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision"). As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent. First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

003631

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order. The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor up until entry of the January 9 Order. The January 9 Order was not appealed. In addition to the appointment of the Independent Directors in an already contentious and litigious case, the January 9 Order set the standard of care for the Independent Directors and specifically exculpated them for negligence. Mr. Seery and Mr. Dubel each testified that they had input into the contents of the January 9 Order and would not have agreed to their appointment as Independent Directors if the January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order. Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent Directors or their agents and advisors must first seek approval from the Bankruptcy Court before doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case and exculpated the Independent Directors for acts other than willful misconduct or gross negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not expire by its terms.

73. **Existing Exculpation of Independent Directors.** The Bankruptcy Court also finds and concludes that  it has already exculpated Mr. Seery acting in the capacity as Chief Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order. The Bankruptcy Court concludes its previous approval of the exculpation of the Independent Directors, their agents, advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

DOCS_SF:104487.21 36027/002

003632

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the

law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046

(5th Cir.1987). The January 9 Order and July 16 Order cannot be collaterally attacked based on

the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors,

including any employees acting at their direction, as well as the Chief Executive Officer and Chief

Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order

and the July 16 Order.

74. **The Exculpation Provision Complies with Applicable Law.** Separate

and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy

Court also finds and concludes that the Exculpation Provision is consistent with applicable law,

including *In re Pacific Lumber Co*., 584 F.3d 229 (5th Cir. 2009), for several reasons:

a. First, the statutory basis for *Pacific Lumber's* denial of exculpation for certain parties other than a creditors' committee and its members is that section 524(e) of the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific Lumber*, 253 F.3d. at 253. However, *Pacific Lumber* does not prohibit all exculpations under the Bankruptcy Code and the court in such case specifically approved the exculpations of a creditors' committee and its members on the grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers, implies committee members have qualified immunity for actions within the scope of their duties…. [I]f members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al, Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008)). *Pacific Lumber's* rationale for permitted exculpation of creditors' committees and their members (which was clearly policy-based and based on a creditors' committee qualified immunity flowing from their duties under section 1103(c) of the Bankruptcy Code and their disinterestedness and importance in chapter 11 cases) does not preclude exculpation to other parties in a particular chapter 11 case that perform similar roles to a creditors' committee and its members. The Independent Directors, and by extension the Chief Executive Officer and Chief Restructuring Officer, were not

003633

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.    Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumber*, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

DOCS_SF:104487.21 36027/002

003634

75.    **Injunction.**  Section IX.D of the Plan provides for a Plan inunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision").  The Injunction Provision is necessary to implement the provisions in the Plan.  Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value.  In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities.  Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero,  it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors.  The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142.  The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release."  The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law.  The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76.    **Gatekeeper Provision**.  Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision").  The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties.  Thereafter, if the Bankruptcy Court determines that the action is

DOCS_SF:104487.21 36027/002

003635

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action. The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan. The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77. **Factual Support for Gatekeeper Provision.** The facts supporting the need for the Gatekeeper Provision are as follows. As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade. Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor. During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor. Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

55

003636

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the Dondero Related Entities be able to continue their litigation against the Debtor and its successors post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and (vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc. No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

78. **Findings Regarding Dondero Post-Petition Litigation.** The Bankruptcy Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down the place." The Bankruptcy Court concludes that without appropriate protections in place, in the form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more hospitable to his claims. The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79.     **Necessity of Gatekeeper Provision.**  The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles.  The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("<u>AON</u>"), regarding his efforts to obtain D&O insurance.  Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision.  Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide (In re Carroll)* 850 F.3d 811 (5th Cir. 2017).  Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.  Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

003638

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80.    **Statutory Authority to Approve Gatekeeper Provision.**    The Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a).  The Gatekeeper Provision is also within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126 (1881).  The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir. 2017).

81.    **Jurisdiction to Implement Gatekeeper Provision.**  The Bankruptcy Court finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under *United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260 (5th Cir. 2005).  Based upon the rationale of the Fifth Circuit in *Villegas v. Schmidt,* 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a gatekeeper does not violate *Stern v. Marshall.*  The Bankruptcy Court's determination of whether

DOCS_SF:104487.21 36027/002

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from

whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82. **Resolution of Objections of Scott Ellington and Isaac Leventon**. Each

of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior

Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the

following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees'*

*Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the

"Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated

Bonus Claims").

a.  Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of
$1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the
aggregate amount of $598,198.00. Mr. Ellington received two Ballots[10] – a Ballot
for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Ellington completed
and timely returned both of such Ballots, voted to reject the Plan, and elected to
have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject
to the objections and reservations of rights set forth in the Senior Employees'
Objection. If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated
Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be
$1,000,000.

b.  Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot
for Class 8 of the Plan. Mr. Leventon completed and timely returned both of such
Ballots and voted each such Ballots to rejected the Plan.

c.  The Senior Employees' Objection, among other things, objects to the Plan on the
grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class
7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to
receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims. The
Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect
to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests
entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

003640

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.  The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims. As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.  Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant. Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan. Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan. If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims). In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims. Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.  Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7). If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

003641

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.  The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date.  If the Debtor does not make an election, then Option A will apply.

h.  Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.  Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.  The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.  For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

A.  **Confirmation of the Plan.**  The Plan is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code.  The terms of the Plan, including the

003642

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

       **B.**      **Findings of Fact and Conclusions of Law**.  The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such.  To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

       **C.**      **Objections**.  Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference.  All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

       **D.**      **Plan Supplements and Plan Modifications.**  The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

DOCS_SF:104487.21 36027/002

003643

sufficient notice thereof.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and

Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional

disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126

of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded

an opportunity to change previously cast acceptances or rejections of the Plan.  The Plan

Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the

Bankruptcy Code.  Accordingly, the Plan, as modified, is properly before the Bankruptcy Court

and all votes cast with respect to the Plan prior to such modification shall be binding and shall

apply with respect to the Plan.

> **E.     Deemed Acceptance of Plan.**  In accordance with section 1127 of the

Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted

to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have

accepted the Plan as modified by the Plan Modifications.  No holder of a Claim shall be permitted

to change its vote as a consequence of the Plan Modifications.

> **F.     Vesting of Assets in the Reorganized Debtor.**  Except as otherwise

provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized

Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or

other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to

such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan

upon the Effective Date.  The Reorganized Debtor shall be the exclusive trustee of the Reorganized

Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

003644

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

       **G.**    **Effectiveness of All Actions.**  All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

       **H.**    **Restructuring Transactions.**  The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

003645

**I.**     **Preservation of Causes of Action.**  Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order).  In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**J.**     **Independent Board of Directors of Strand.**  The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors.  For avoidance of doubt, the Assumed Contracts

003646

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

K.      **Cancellation of Equity Interests and Issuance of New Partnership Interests.**   On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.  As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

DOCS_SF:104487.21 36027/002

003647

Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

L.     **Transfer of Assets to Claimant Trust.**  On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.  Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

M.     **Transfer of Estate Claims to Litigation Sub-Trust**.  On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses.  The Litigation Trustee will

003648

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor or Committee, as applicable, in any litigation commenced prior to the Effective Date in which Estate Claims are asserted.

      **N.**      **Compromise of Controversies.**  In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

      **O.**      **Objections to Claims**.  The Claims Objection Deadline shall be the date that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise provided under the Plan.

      **P.**      **Assumption of Contracts and Leases.**  Effective as of the date of this Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the Plan.  Each Assumed Contract shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to any of the

003649

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of the Assumed Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed Contracts.

Q. **Rejection of Contracts and Leases.** Unless previously assumed during the pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant to the terms of the Plan. To the extent that any party asserts any damages resulting from the rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty (30) days** following entry of this Confirmation Order, or such claim will be forever barred and disallowed against the Reorganized Debtor.

R. **Assumption of Issuer Executory Contracts.** On the Confirmation Date, the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

DOCS_SF:104487.21 36027/002

003650

Issuer Executory Contracts (collectively, the "<u>Portfolio Manager</u>") will pay to the Issuers[12] a

cumulative amount of $525,000 (the "<u>Cure Amount</u>") as follows:

a.  $200,000 in cash on the date that is five business days from the Effective Date, with
    such payment paid directly to Schulte Roth & Zabel LLP ("<u>SRZ</u>") in the amount of
    $85,714.29, Jones Walker LLP ("<u>JW</u>") in the amount of $72,380.95, and Maples
    Group ("<u>Maples</u>" and collectively with SRZ and JW, the "<u>Issuers' Counsel</u>") in the
    amount of $41,904.76 as reimbursement for the attorney's fees and other legal
    expenses incurred by the Issuers in connection with the Debtor's bankruptcy case;
    and

b.  $325,000 in four equal quarterly payments of $81,250.00 (each, a "<u>Payment</u>"),
    which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount
    of $29,404.76, and Maples in the amount of $17,023.81 as additional
    reimbursement for the attorney's fees and other legal expenses incurred by the
    Issuers in connection with the Debtor's bankruptcy case (i) from any management
    fees actually paid to the Portfolio Manager under the Issuer Executory Contracts
    (the "<u>Management Fees</u>"), and (ii) on the date(s) Management Fees are required to
    be paid under the Issuer Executory Contracts (the "<u>Payment Dates</u>"), and such
    obligation shall be considered an irrevocable direction from the Debtor and the
    Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the
    Payment to Issuers' Counsel, allocated in the proportion set forth in such
    agreement; *provided, however,* that (x) if the Management Fees are insufficient to
    make any Payment in full on a Payment Date, such shortfall, in addition to any
    other amounts due hereunder, shall be paid out of the Management Fees owed on
    the following Payment Date, and (y) nothing herein shall limit either Debtor's
    liability to pay the amounts set forth herein, nor the recourse of the Issuers or
    Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

**S.**    **Release of Issuer Claims.**  Effective as of the Confirmation Date, and to

the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and

former advisors, trustees, directors, officers, managers, members, partners, employees,

beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1,
Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding
LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd.,
Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd.,
Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

DOCS_SF:104487.21 36027/002

003651

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

**T.      Release of Debtor Claims against Issuer Released Parties.**  Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

003652

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "Issuer Released Parties"),] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts. Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

U.  **Authorization to Consummate.** The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan. The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

V.  **Professional Compensation.** All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

003653

must be filed no **later than sixty (60) days after the Effective Date**. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Court. The Debtor shall fund the Professional Fee Reserve as provided under the Plan. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy Court allows. The Debtor is authorized to pay the pre-Effective Date fees and expenses of all ordinary course professionals in the ordinary course of business without the need for further Bankruptcy Court order or approval. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any Professional or Entity employed in the ordinary course of the Debtor's business without any further notice to or action, order, or approval of the Bankruptcy Court.

**W.** **Release, Exculpation, Discharge, and Injunction Provisions. The following release, exculpation, discharge, and injunction provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.**

**X.** **Discharge of Claims and Termination of Interests.** To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

DOCS_SF:104487.21 36027/002

003654

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

Y.    **Exculpation.** Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

003655

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

**Z.    Releases by the Debtor.**  On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

DOCS_SF:104487.21 36027/002

003656

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance
Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual
fraud, or gross negligence of such applicable Released Party as determined by Final Order of the
Bankruptcy Court or any other court of competent jurisdiction.

**AA.  Injunction.  Upon entry of this Confirmation Order, all Enjoined
Parties are and shall be permanently enjoined, on and after the Effective Date, from taking
any actions to interfere with the implementation or consummation of the Plan.  Except as
expressly provided in the Plan, this Confirmation Order, or a separate order of the
Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after
the Effective Date, with respect to any Claims and Equity Interests, from directly or
indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or
other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative
or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing,
levying, attaching (including any prejudgment attachment), collecting, or otherwise
recovering, enforcing, or attempting to recover or enforce, by any manner or means, any
judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii)
creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or
encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any
right of setoff, directly or indirectly, against any obligation due to the Debtor or against
property or interests in property of the Debtor, except to the limited extent permitted under
Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

DOCS_SF:104487.21 36027/002

003657

in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property. Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in

DOCS_SF:104487.21 36027/002

003658

Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

      **BB.**    **Duration of Injunction and Stays.** Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.

      **CC.**    **Continuance of January 9 Order and July 16 Order.** Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 shall remain in full force and effect from the Confirmation Date and following the Effective Date.

      **DD.**    **No Governmental Releases.** Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

003659

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

EE. **Exemption from Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

DOCS_SF:104487.21 36027/002

003660

including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

FF.    **Cancellation of Notes, Certificates and Instruments.**    Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the

DOCS_SF:104487.21 36027/002

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

GG.     **Documents, Mortgages, and Instruments.**     Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

HH.     **Post-Confirmation Modifications.**     Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

II.     **Applicable Nonbankruptcy Law.**  The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

JJ.     **Governmental Approvals Not Required.**  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

003662

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

      **KK.**    **Notice of Effective Date.**  As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c).  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

      **LL.**    **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

      **MM.**    **Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

003663

NN. **References to and Omissions of Plan Provisions.** References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

OO. **Headings.** Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

PP. **Effect of Conflict.** This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order. If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control. If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

QQ. **Resolution of Objection of Texas Taxing Authorities.** Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes. The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

003664

applicable nonbankruptcy law. In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

a.      The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law. The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan. The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

b.      The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full. In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default. Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default. If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith. The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

003665

**RR.** **Resolution of Objections of Scott Ellington and Isaac Leventon.**
Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all respects. The Debtor may, only with the consent of the Committee, elect Option B for a Senior Employee Claimant by written notice to such Senior Employee Claimant on or before the occurrence of the Effective Date. If the Debtor does not elect Option B, then Option A will govern the treatment of the Liquidated Bonus Claims.

a. Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

b. The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

c. Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan. Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

d. The Senior Employees' Objection is deemed withdrawn.

**SS.** **No Release of Claims Against Senior Employee Claimants**. For the avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

003666

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released Party" under the Plan.

   **TT.**  **Resolution of Objection of Internal Revenue Service.** Notwithstanding any other provision or term of the Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("<u>IRS</u>") and all of its claims, including any administrative claim (the "<u>IRS Claim</u>"):

  (a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

   (1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

   (2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

   (3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

  (b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

003667

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c) The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

UU.    **IRS Proof of Claim.**    Notwithstanding anything in the Plan or in this

Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's

proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and

may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general

unsecured taxes, penalties and interest.

003668

**VV.    CLO Holdco, Ltd. Settlement**    Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25,2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

**WW.    Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX.    Payment of Statutory Fees; Filing of Quarterly Reports.**  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.   The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**YY.    Dissolution of the Committee**.  On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

003669

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

      **ZZ.**   **Miscellaneous.**  After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

DOCS_SF:104487.21 36027/002

003670

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post confirmation reporting requirements.

### ###END OF ORDER###

DOCS_SF:104487.21 36027/002

003671

**Exhibit A**

**Fifth Amended Plan (as Modified)**

003672

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

003673

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
        GOVERNING LAW AND DEFINED TERMS ............................................ 1

    A.    Rules of Interpretation, Computation of Time and Governing Law ................... 1

    B.    Defined Terms ................................................................................................ 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

    A.    Administrative Expense Claims .................................................................... 16

    B.    Professional Fee Claims ................................................................................ 17

    C.    Priority Tax Claims ...................................................................................... 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
        AND EQUITY INTERESTS ............................................................... 18

    A.    Summary ..................................................................................................... 18

    B.    Summary of Classification and Treatment of Classified Claims and
        Equity Interests ........................................................................................... 18

    C.    Elimination of Vacant Classes ...................................................................... 19

    D.    Impaired/Voting Classes ............................................................................... 19

    E.    Unimpaired/Non-Voting Classes ................................................................. 19

    F.    Impaired/Non-Voting Classes ...................................................................... 19

    G.    Cramdown ................................................................................................... 19

    H.    Classification and Treatment of Claims and Equity Interests .......................... 19

    I.    Special Provision Governing Unimpaired Claims .......................................... 24

    J.    Subordinated Claims .................................................................................... 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ................................ 24

    A.    Summary ..................................................................................................... 24

    B.    The Claimant Trust ...................................................................................... 25

        1.    Creation and Governance of the Claimant Trust and Litigation
                Sub-Trust ........................................................................................ 25

        2.    Claimant Trust Oversight Committee .................................................. 26

003674

3.      Purpose of the Claimant Trust. ................................................................27

4.      Purpose of the Litigation Sub-Trust. ......................................................27

5.      Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6.      Compensation and Duties of Trustees. ...................................................29

7.      Cooperation of Debtor and Reorganized Debtor. ...................................29

8.      United States Federal Income Tax Treatment of the Claimant
        Trust. .......................................................................................................29

9.      Tax Reporting. .........................................................................................30

10.     Claimant Trust Assets. ............................................................................30

11.     Claimant Trust Expenses. .......................................................................31

12.     Trust Distributions to Claimant Trust Beneficiaries. .............................31

13.     Cash Investments. ...................................................................................31

14.     Dissolution of the Claimant Trust and Litigation Sub-Trust. ................31

C.      The Reorganized Debtor ...................................................................................32

1.      Corporate Existence ................................................................................32

2.      Cancellation of Equity Interests and Release...........................................32

3.      Issuance of New Partnership Interests .....................................................32

4.      Management of the Reorganized Debtor ..................................................33

5.      Vesting of Assets in the Reorganized Debtor ..........................................33

6.      Purpose of the Reorganized Debtor .........................................................33

7.      Distribution of Proceeds from the Reorganized Debtor Assets;
        Transfer of Reorganized Debtor Assets ...................................................33

D.      Company Action ................................................................................................34

E.      Release of Liens, Claims and Equity Interests..................................................35

F.      Cancellation of Notes, Certificates and Instruments.........................................35

003675

**Page**

    G.      Cancellation of Existing Instruments Governing Security Interests ................. 35

    H.      Control Provisions ........................................................................... 35

    I.       Treatment of Vacant Classes ............................................................ 36

    J.       Plan Documents ............................................................................. 36

    K.      Highland Capital Management, L.P. Retirement Plan and Trust ...................... 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
          LEASES ...................................................................................... 37

    A.      Assumption, Assignment, or Rejection of Executory Contracts and
          Unexpired Leases ........................................................................... 37

    B.      Claims Based on Rejection of Executory Contracts or Unexpired
          Leases ....................................................................................... 38

    C.      Cure of Defaults for Assumed or Assigned Executory Contracts and
          Unexpired Leases ........................................................................... 38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 39

    A.      Dates of Distributions ..................................................................... 39

    B.      Distribution Agent .......................................................................... 39

    C.      Cash Distributions .......................................................................... 40

    D.      Disputed Claims Reserve .................................................................. 40

    E.      Distributions from the Disputed Claims Reserve .................................... 40

    F.      Rounding of Payments ..................................................................... 40

    G.      *De Minimis* Distribution .................................................................. 41

    H.      Distributions on Account of Allowed Claims .......................................... 41

    I.       General Distribution Procedures ........................................................ 41

    J.       Address for Delivery of Distributions ................................................... 41

    K.      Undeliverable Distributions and Unclaimed Property ............................... 41

    L.      Withholding Taxes .......................................................................... 42

003676

**Page**

M.     Setoffs .................................................................................................... 42

N.     Surrender of Cancelled Instruments or Securities ............................... 42

O.     Lost, Stolen, Mutilated or Destroyed Securities ................................. 43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
         UNLIQUIDATED AND DISPUTED CLAIMS .......................................... 43

A.     Filing of Proofs of Claim .................................................................... 43

B.     Disputed Claims ................................................................................... 43

C.     Procedures Regarding Disputed Claims or Disputed Equity Interests ............. 43

D.     Allowance of Claims and Equity Interests ........................................... 44

      1.     Allowance of Claims .............................................................. 44

      2.     Estimation ............................................................................... 44

      3.     Disallowance of Claims .......................................................... 44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ...................................... 45

A.     Conditions Precedent to the Effective Date ........................................ 45

B.     Waiver of Conditions .......................................................................... 46

C.     Dissolution of the Committee .............................................................. 46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................. 47

A.     General ................................................................................................. 47

B.     Discharge of Claims ............................................................................ 47

C.     Exculpation .......................................................................................... 47

D.     Releases by the Debtor ........................................................................ 48

E.     Preservation of Rights of Action ......................................................... 49

      1.     Maintenance of Causes of Action ........................................... 49

      2.     Preservation of All Causes of Action Not Expressly Settled or
           Released ................................................................................... 49

003677

**Page**

F.    Injunction ...................................................................................................... 50

G.    Duration of Injunctions and Stays ................................................................. 51

H.    Continuance of January 9 Order .................................................................... 51

ARTICLE X. BINDING NATURE OF PLAN ................................................................. 51

ARTICLE XI. RETENTION OF JURISDICTION ........................................................... 52

ARTICLE XII. MISCELLANEOUS PROVISIONS .......................................................... 54

A.    Payment of Statutory Fees and Filing of Reports ......................................... 54

B.    Modification of Plan ...................................................................................... 54

C.    Revocation of Plan ......................................................................................... 54

D.    Obligations Not Changed ............................................................................... 55

E.    Entire Agreement ........................................................................................... 55

F.    Closing of Chapter 11 Case ........................................................................... 55

G.    Successors and Assigns .................................................................................. 55

H.    Reservation of Rights ..................................................................................... 55

I.    Further Assurances ......................................................................................... 56

J.    Severability ..................................................................................................... 56

K.    Service of Documents .................................................................................... 56

L.    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code .................................................................................. 57

M.    Governing Law ............................................................................................... 58

N.    Tax Reporting and Compliance ...................................................................... 58

O.    Exhibits and Schedules .................................................................................. 58

P.    Controlling Document .................................................................................... 58

003678

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan.  The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein.  There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents.  All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B. **Defined Terms**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2. "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3. "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4. "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5. "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6. "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

003680

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.  "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.  "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.  "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

003681

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

003682

24.    "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25.    "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26.    "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27.    "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28.    "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29.    "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30.    "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

003683

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31.    "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32.    "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33.    "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34.    "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35.    "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36.    "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37.    "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38.    "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41.    "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

003684

42.     "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein.  Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43.     "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44.     "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved.  As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45.     "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46.     "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47.     "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48.     "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49.     "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50.     "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be:  (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

003685

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51.     "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52.     "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53.     "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54.     "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55.     "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56.     "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57.     "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58.     "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59.     "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60.     "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61.     "*Estate Claims*" has the meaning given to it in <u>Exhibit A</u> to the *Notice of Final Term Sheet* [D.I. 354].

003686

62.     "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.     "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.     "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.     "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.     "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68.     "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

003687

69. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

003688

81.     "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.     "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.     "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.     "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.     "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.     "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.     "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.     "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89.     "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.     "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.     "Petition *Date*" means October 16, 2019.

92.     "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

003689

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93.      "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94.      "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95.      "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96.      "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97.      "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98.      "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99.      "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100.      "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101.      "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

003690

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

003691

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110.    "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111.    "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113.    "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114.    "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115.    "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116.    "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

003692

117.    "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118.    "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120.    "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122.    "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123.    "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124.    "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125.    "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

003693

130.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.    "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A.    Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

003694

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.    Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

003695

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

### A.     Summary

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

### B.     Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

003696

## C.    <u>Elimination of Vacant Classes</u>

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

## D.    <u>Impaired/Voting Classes</u>

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

## E.    <u>Unimpaired/Non-Voting Classes</u>

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

## F.    <u>Impaired/Non-Voting Classes</u>

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

## G.    <u>Cramdown</u>

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## H.    <u>Classification and Treatment of Claims and Equity Interests</u>

1.    *<u>Class 1 – Jefferies Secured Claim</u>*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

003697

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.  *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.  *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

003698

4.    *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.    *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6

003699

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.  *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.  *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

003700

9.   *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

  *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.   *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.   *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

003701

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## J.     Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

## A.     Summary

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

003702

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.    The Claimant Trust**[2]

1.    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

003703

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2. *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

003704

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.    *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.    *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

003705

(i)      the payment of the Claimant Trust Expenses;

(ii)     the payment of other reasonable expenses of the Claimant Trust;

(iii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)     the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)      the orderly monetization of the Claimant Trust Assets;

(vi)     litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)    the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)   the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)     the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)      the payment of other reasonable expenses of the Litigation Sub-Trust;

003706

(ii)      the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)      the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee.  Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.      _Compensation and Duties of Trustees._

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate.  The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.      _Cooperation of Debtor and Reorganized Debtor._

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.      _United States Federal Income Tax Treatment of the Claimant Trust._

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer

003707

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trust makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.    *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.    *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

003708

11.     *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.     *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.     *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.     *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

003709

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.    The Reorganized Debtor

### 1.    *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2.    *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3.    *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date.  Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order.  Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

003710

4. *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5. *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6. *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7. *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

003711

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

### D.    **Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

003712

### E. Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### F. Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### G. Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### H. Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

003713

## I.    Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

## J.    Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

## K.    Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

003714

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**    **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

003715

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.**   **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order.  Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date.  Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.**   **Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

003716

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

**A.**     **Dates of Distributions**

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

**B.**     **Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

003717

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C.    **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D.    **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E.    **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests.  If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

## F.    **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

003718

### G. *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

### H. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

### I. General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

### J. Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

### K. Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

003719

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.   Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.   Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.   Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

003720

## O.    Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

<div align="center">

### ARTICLE VII.
### PROCEDURES FOR RESOLVING CONTINGENT,
### UNLIQUIDATED AND DISPUTED CLAIMS

</div>

## A.    Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

## B.    Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

## C.    Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

003721

### D.   Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1.   *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2.   *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3.   *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

003722

**ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

<div align="center">

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

</div>

**A.      Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

<div align="center">45</div>

<div align="right">003723</div>

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

## B.  <u>Waiver of Conditions</u>

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

## C.  <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

003724

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

<div align="center">

### ARTICLE IX.
### EXCULPATION, INJUNCTION AND RELATED PROVISIONS

</div>

**A.**    <u>**General**</u>

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

**B.**    <u>**Discharge of Claims**</u>

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**C.**    <u>**Exculpation**</u>

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however, the* foregoing

003725

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.**     **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

003726

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

## E.    **Preservation of Rights of Action**

### 1.    *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

### 2.    *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

003727

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.    Injunction**

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

003728

(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

**G.      Duration of Injunctions and Stays**

ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.

**H.      Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.


**ARTICLE X.
BINDING NATURE OF PLAN**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

003729

# ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

003730

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

003731

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

<div align="center">

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

</div>

**A.      Payment of Statutory Fees and Filing of Reports**

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**B.      Modification of Plan**

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

**C.      Revocation of Plan**

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

003732

### D.    Obligations Not Changed

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

### E.    Entire Agreement

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### F.    Closing of Chapter 11 Case

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

### G.    Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

### H.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

003733

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

## I.    **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## J.    **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## K.    **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

> **If to the Claimant Trust:**
>
> Highland Claimant Trust
> c/o Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700

003734

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
        Ira D. Kharasch, Esq.
        Gregory V. Demo, Esq.

## L.   Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

003735

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.**     <u>**Governing Law**</u>

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.**     <u>**Tax Reporting and Compliance**</u>

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.**     <u>**Exhibits and Schedules**</u>

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**     <u>**Controlling Document**</u>

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

003736

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

    James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
      ikharasch@pszjlaw.com
      gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
      ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

**Exhibit B**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1.  Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2.  Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3.  Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4.  Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5.  Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6.  Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7.  Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8.  Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9.  Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

003739

19. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

36. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46. A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47. A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48. Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49. Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50. Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

DOCS_NY:42355.1 36027/002

003741

51.  Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52.  Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53.  Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54.  Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55.  Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56.  Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57.  Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58.  Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59.  Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60.  Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

DOCS_NY:42355.1 36027/002

003742

# Exhibit

003743

*DRAFT*

# CLAIMANT TRUST AGREEMENT

This Claimant Trust Agreement, effective as of _____ , 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among Highland Capital Management, L.P. (as debtor and debtor-in-possession, the "Debtor"), as settlor, and James P. Seery, Jr., as trustee (the "Claimant Trustee"), and [_____] as Delaware trustee (the "Delaware Trustee," and together with the Debtor and the Claimant Trustee, the "Parties") for the benefit of the Claimant Trust Beneficiaries entitled to the Claimant Trust Assets.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on _____ , 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. •] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Claimant Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Claimant Trust Assets are to be transferred to the Claimant Trust (each as defined herein) created and evidenced by this Agreement so that (i) the Claimant Trust Assets can be held in a trust for the benefit of the Claimant Trust Beneficiaries entitled thereto in accordance with Treasury Regulation Section 301.7701-4(d) for the objectives and purposes set forth herein and in the Plan; (ii) the Claimant Trust Assets can be monetized; (iii) the Claimant Trust will transfer Estate Claims to the Litigation Sub-Trust to be prosecuted, settled, abandoned, or resolved as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement, for the benefit of the Claimant Trust; (iv) proceeds of the Claimant Trust Assets, including Estate Claims, may be distributed to the Claimant Trust Beneficiaries[2] in accordance with the Plan; (v) the Claimant Trustee can resolve Disputed Claims as set forth herein and in the Plan; and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.

003744

(vi) administrative services relating to the activities of the Claimant Trust and relating to the implementation of the Plan can be performed by the Claimant Trustee.

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor, the Claimant Trustee, and the Delaware Trustee have executed this Agreement for the benefit of the Claimant Trust Beneficiaries entitled to share in the Claimant Trust Assets and, at the direction of such Claimant Trust Beneficiaries as provided for in the Plan.

TO HAVE AND TO HOLD unto the Claimant Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust Beneficiaries, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Claimant Trust in accordance with Article IX hereof, this Claimant Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Claimant Trust Assets are to be strictly held and applied by the Claimant Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1   Certain Definitions.   Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan.   For all purposes of this Agreement, the following terms shall have the following meanings:

(a)   "Acis" means collectively, Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

(b)   "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(c)   "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, with respect to a Member, or to the extent applicable, the Claimant Trustee, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony (other than a felony that does not involve fraud, theft, embezzlement, or jail time) with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

003745

(d)      "Claimant Trust Agreement" means this Agreement.

(e)      "Claimant Trustee" means James P. Seery, Jr., as the initial "Claimant Trustee" hereunder and as defined in the Plan, and any successor Claimant Trustee that may be appointed pursuant to the terms of this Agreement.

(f)      "Claimant Trust" means the "Highland Claimant Trust" established in accordance with the Delaware Statutory Trust Act and Treasury Regulation Section 301.7701-4(d) pursuant to this Agreement.

(g)      "Claimant Trust Assets" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

(h)      "Claimant Trust Beneficiaries" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest at the federal judgment rate in accordance with the terms and conditions set forth herein, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

(i)      "Claimant Trust Expense Cash Reserve" means $[•] million in Cash to be funded pursuant to the Plan into a bank account of the Claimant Trust on or before the Effective Date for the purpose of paying Claimant Trust Expenses in accordance herewith.

(j)      "Claimant Trust Expenses" means the costs, expenses, liabilities and obligations incurred by the Claimant Trust and/or the Claimant Trustee in administering and conducting the affairs of the Claimant Trust, and otherwise carrying out the terms of the Claimant Trust and the Plan on behalf of the Claimant Trust, including without any limitation, any taxes owed by the Claimant Trust, and the fees and expenses of the Claimant Trustee and professional persons retained by the Claimant Trust or Claimant Trustee in accordance with this Agreement.

(k)      "Committee Member" means a Member who is/was also a member of the Creditors' Committee.

(l)      "Conflicted Member" has the meaning set forth in Section 4.6(c) hereof.

(m)      "Contingent Trust Interests" means the contingent interests in the Claimant Trust to be distributed to Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests in accordance with the Plan.

003746

(n)     "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Case, comprised of Acis, Meta-e Discovery, the Redeemer Committee and UBS.

(o)     "Delaware Statutory Trust Act" means the Delaware Statutory Trust Act 12 Del C. §3801, et seq. as amended from time to time.

(p)     "Delaware Trustee" has the meaning set forth in the introduction hereof.

(q)     "Disability" means as a result of the Claimant Trustee's or a Member's incapacity due to physical or mental illness as determined by an accredited physician or psychologist, as applicable, selected by the Claimant Trustee or the Member, as applicable, the Claimant Trustee or such Member has been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

(r)     "Disinterested Members" has the meaning set forth in Section 4.1 hereof.

(s)     "Disputed Claims Reserve" means the reserve account to be opened by the Claimant Trust on or after the Effective Date and funded in an initial amount determined by the Claimant Trustee [(in a manner consistent with the Plan and with the consent of a simple majority of the Oversight Board)] to be sufficient to pay Disputed Claims under the Plan.

(t)     "Employees" means the employees of the Debtor set forth in the Plan Supplement.

(u)     "Employee Claims" means any General Unsecured Claim held by an Employee other than the Claims of the Senior Employees subject to stipulations (provided such stipulations are executed by any such Senior Employee of the Debtor prior to the Effective Date).

(v)     "Estate Claims" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [Docket No. 354].

(w)     "Equity Trust Interests" has the meaning given to it in Section 5.1(c) hereof.

(x)     "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(y)     "General Unsecured Claim Trust Interests" means interests in the Claimant Trust to be distributed to Holders of Allowed Class 8 General Unsecured Claims (including Disputed General Unsecured Claims that are subsequently Allowed) in accordance with the Plan.

(z)     "GUC Beneficiaries" means the Claimant Trust Beneficiaries who hold General Unsecured Claim Trust Interests.

(aa)    "GUC Payment Certification" has the meaning given to it in Section 5.1(c) hereof.

003747

(bb) "HarbourVest" means, collectively, HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

(cc) "Investment Advisers Act" means the Investment Advisers Act of 1940, as amended.

(dd) "Investment Company Act" means the Investment Company Act of 1940, as amended.

(ee) "Litigation Sub-Trust" means the sub-trust created pursuant to the Litigation Sub-Trust Agreement, which shall hold the Claimant Trust Assets that are Estate Claims and investigate, litigate, and/or settle the Estate Claims for the benefit of the Claimant Trust.

(ff) "Litigation Sub-Trust Agreement" means the litigation sub-trust agreement to be entered into by and between the Claimant Trustee and Litigation Trustee establishing and setting forth the terms and conditions of the Litigation Sub-Trust and governing the rights and responsibilities of the Litigation Trustee.

(gg) "Litigation Trustee" means Marc S. Kirschner, and any successor Litigation Trustee that may be appointed pursuant to the terms of the Litigation Sub-Trust Agreement, who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

(hh) "Managed Funds" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to the Plan; *provided, however,* that the Highland Select Equity Fund, L.P. (and its direct and indirect subsidiaries) will not be considered a Managed Fund for purposes hereof.

(ii) "Material Claims" means the Claims asserted by UBS, Patrick Hagaman Daugherty, Integrated Financial Associates, Inc., and the Employees.

(jj) "Member" means a Person that is member of the Oversight Board.

(kk) "New GP LLC" means the general partner of the Reorganized Debtor.

(ll) "Oversight Board" means the board comprised of five (5) Members established pursuant to the Plan and Article III of this Agreement to oversee the Claimant Trustee's performance of his duties and otherwise serve the functions set forth in this Agreement and those of the "Claimant Trust Oversight Committee" described in the Plan. Subject to the terms of this Agreement, the initial Members of the Oversight Board shall be: (i) Eric Felton, as representative of the Redeemer Committee; (ii) Josh Terry, as representative of Acis; (iii) Elizabeth Kozlowski, as representative of UBS; (iv) Paul McVoy, as representative of Meta-e Discovery; and (v) David Pauker.

003748

(mm) "Plan" has the meaning set forth in the Recitals hereof.

(nn) "Privileges" means the Debtor's rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Estate Claims or Employee Claims, including, without limitation, to, attorney-client privilege and work-product privilege as defined in Rule 502(g) of the Federal Rules of Evidence; provided, however, that "Privileges" shall not include the work-product privilege of any non-Employee attorney or attorneys that has not been previously shared with the Debtor or any of its employees and the work-product privilege shall remain with the non-Employee attorney or attorneys who created such work product so long as it has not been previously shared with the Debtor or any of its employees, or otherwise waived.

(oo) "PSZJ" means Pachulski Stang Ziehl & Jones LLP.

(pp) "Redeemer Committee" means the Redeemer Committee of the Highland Crusader Fund.

(qq) "Registrar" has the meaning given to it in Section 5.3(a) hereof.

(rr) "Reorganized Debtor Assets" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

(ss) "Securities Act" means the Securities Act of 1933, as amended.

(tt) "Subordinated Beneficiaries" means the Claimant Trust Beneficiaries who hold Subordinated Claim Trust Interests.

(uu) "Subordinated Claim Trust Interests" means the subordinated interests in the Claimant Trust to be distributed to Holders of Allowed Class 9 Subordinated Claims in accordance with the Plan.

(vv) "TIA" means the Trust Indenture Act of 1939, as amended.

(ww) "Trust Interests" means collectively the General Unsecured Claim Trust Interests, Subordinated Claim Trust Interests, and Equity Trust Interests.

(xx) "Trust Register" has the meaning given to it in Section 5.3(b) hereof.

(yy) "Trustees" means collectively the Claimant Trustee and Delaware Trustee.

(zz) "UBS" means collectively UBS Securities LLC and UBS AG London Branch.

(aaa) "WilmerHale" Wilmer Cutler Pickering Hale & Dorr LLP.

003749

1.2     <u>General Construction</u>.  As used in this Agreement, the masculine, feminine and neuter genders, and the plural and singular numbers shall be deemed to include the others in all cases where they would apply.  "Includes" and "including" are not limiting and "or" is not exclusive.   References  to  "Articles,"  "Sections"  and  other  subdivisions,  unless  referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement, and the words "herein," "hereafter" and words of similar import refer to this Agreement  as  a  whole  and  not  to  any  particular  Article,  Section,  or  subdivision  of  this Agreement.  Amounts expressed in dollars or following the symbol "$" shall be deemed to be in United States dollars.  References to agreements or instruments shall be deemed to refer to such agreements or instruments as the same may be amended, supplemented, or otherwise modified in accordance with the terms thereof.

1.3     <u>Incorporation of the Plan</u>.  The Plan is hereby incorporated into this Agreement and made a part hereof by this reference.

## ARTICLE II.
## ESTABLISHMENT OF THE CLAIMANT TRUST

2.1     <u>Creation of Name of Trust</u>.

(a)     The Claimant Trust is hereby created as a statutory trust under the Delaware Statutory Trust Act and shall be called the "Highland Claimant Trust."  The Claimant Trustee  shall  be  empowered  to  conduct  all  business  and  hold  all  property  constituting  the Claimant Trust Assets in such name in accordance with the terms and conditions set forth herein.

(b)     The Trustees shall cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in their capacity as Trustees, such certificates as may from time to time be required under the Delaware Statutory Trust Act or any other Delaware law.

003750

2.2 <u>Objectives</u>.

(a)  The Claimant Trust is established for the purpose of satisfying Allowed General Unsecured Claims and Allowed Subordinated Claims (and only to the extent provided herein, Allowed Class A Limited Partnership Interests and Class B/C Limited Partnership Interests) under the Plan, by monetizing the Claimant Trust Assets transferred to it and making distributions to the Claimant Trust Beneficiaries.  The Claimant Trust shall not continue or engage in any trade or business except to the extent reasonably necessary to monetize and distribute the Claimant Trust Assets consistent with this Agreement and the Plan and act as sole member and manager of New GP LLC.  The Claimant Trust shall provide a mechanism for (i) the monetization of the Claimant Trust Assets and (ii) the distribution of the proceeds thereof, net of all claims, expenses, charges, liabilities, and obligations of the Claimant Trust, to the Claimant Trust Beneficiaries in accordance with the Plan.  In furtherance of this distribution objective, the Claimant Trust will, from time to time, prosecute and resolve objections to certain Claims and Interests as provided herein and in the Plan.

(b)  It is intended that the Claimant Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations.  In furtherance of this objective, the Claimant Trustee shall, in his business judgment, make continuing best efforts to (i) dispose of or monetize the Claimant Trust Assets and resolve Claims, (ii) make timely distributions, and (iii) not unduly prolong the duration of the Claimant Trust, in each case in accordance with this Agreement.

2.3 <u>Nature and Purposes of the Claimant Trust</u>.

(a)  The Claimant Trust is organized and established as a trust for the purpose of monetizing the Claimant Trust Assets and making distributions to Claimant Trust Beneficiaries in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d).  The Claimant Trust shall retain all rights to commence and pursue all Causes of Action of the Debtor other than (i) Estate Claims, which shall be assigned to and commenced and pursued by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement, and (ii) Causes of Action constituting Reorganized Debtor Assets, if any, which shall be commenced and pursued by the Reorganized Debtor at the direction of the Claimant Trust as sole member of New GP LLC pursuant to the terms of the Reorganized Limited Partnership Agreement.  The Claimant Trust and Claimant Trustee shall have and retain, and, as applicable, assign and transfer to the Litigation Sub-Trust and Litigation Trustee, any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Claim as of the Petition Date.  On and after the date hereof, in accordance with and subject to the Plan, the Claimant Trustee shall have the authority to (i) compromise, settle or otherwise resolve, or withdraw any objections to Claims against the Debtor, <u>provided</u>, <u>however</u>, the Claimant Trustee shall only have the authority to compromise or settle any Employee Claim with the unanimous consent of the Oversight Board and in the absence of unanimous consent, any such Employee Claim shall be transferred to the Litigation Sub-Trust and be litigated, comprised, settled, or otherwise resolved exclusively by the Litigation Trustee and (ii) compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, which authority may be shared with or transferred to the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement.  For the avoidance of doubt, the Claimant Trust,

003751

pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Claims other than Estate Claims, the Employee Claims, and those Claims constituting Reorganized Debtor Assets.

        (b)    The Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purposes:

        (i)    to manage and monetize the Claimant Trust Assets in an expeditious but orderly manner with a view towards maximizing value within a reasonable time period;

        (ii)    to litigate and settle Claims in Class 8 and Class 9 (other than the Employee Claims, which shall be litigated and/or settled by the Litigation Trustee if the Oversight Board does not unanimously approve of any proposed settlement of such Employee Claim by the Claimant Trustee) and any of the Causes of Action included in the Claimant Trust Assets (including any cross-claims and counter-claims); provided, however, that Estate Claims transferred to the Litigation Sub-Trust shall be litigated and settled by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement;

        (iii)    to distribute net proceeds of the Claimant Trust Assets to the Claimant Trust Beneficiaries;

        (iv)    to distribute funds from the Disputed Claims Reserve to Holders of Trust Interests or to the Reorganized Debtor for distribution to Holders of Disputed Claims in each case in accordance with the Plan from time to time as any such Holder's Disputed Claim becomes an Allowed Claim under the Plan;

        (v)    to distribute funds to the Litigation Sub-Trust at the direction the Oversight Board;

        (vi)    to serve as the limited partner of, and to hold the limited partnership interests in, the Reorganized Debtor;

        (vii)    to serve as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner;

        (viii)    to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds; and

        (ix)    to perform any other functions and take any other actions provided for or permitted by this Agreement and the Plan, and in any other agreement executed by the Claimant Trustee.

003752

2.4    <u>Transfer of Assets and Rights to the Claimant Trust; Litigation Sub-Trust</u>.

(a)    On the Effective Date, pursuant to the Plan, the Debtor shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Claimant Trust Assets and related Privileges held by the Debtor to the Claimant Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan and this Agreement.  To the extent certain assets comprising the Claimant Trust Assets, because of their nature or because such assets will accrue or become transferable subsequent to the Effective Date, and cannot be transferred to, vested in, and assumed by the Claimant Trust on such date, such assets shall be considered Reorganized Debtor Assets, which may be subsequently transferred to the Claimant Trust by the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement after such date.

(b)    On or as soon as practicable after the Effective Date, the Claimant Trust shall irrevocably transfer, assign, and deliver, and shall be deemed to have transferred, assigned, and delivered, all Estate Claims and related Privileges held by the Claimant Trust to the Litigation Sub-Trust Trust free and clear of all Claims, Interests, Liens, and other encumbrances, and liabilities, except as provided in the Plan, this Agreement, and the Litigation Sub-Trust Agreement.  Following the transfer of such Privileges, the Litigation Trustee shall have the power to waive the Privileges being so assigned and transferred.

(c)    On or before the Effective Date, and continuing thereafter, the Debtor or Reorganized Debtor, as applicable, shall provide (i) for the Claimant Trustee's and Litigation Trustee's reasonable access to all records and information in the Debtor's and Reorganized Debtor's possession, custody or control, (ii) that all Privileges related to the Claimant Trust Assets shall transfer to and vest exclusively in the Claimant Trust (except for those Privileges that will be transferred and assigned to the Litigation Sub-Trust in respect of the Estate Claims), and (iii) subject to Section 3.12(c), the Debtor and Reorganized Debtor shall preserve all records and documents (including all electronic records or documents), including, but not limited to, the Debtor's file server, email server, email archiving system, master journal, SharePoint, Oracle E-Business Suite, Advent Geneva, Siepe database, Bloomberg chat data, and any backups of the foregoing, until such time as the Claimant Trustee, with the consent of the Oversight Board and, if pertaining to any of the Estate Claims, the Litigation Trustee, directs the Reorganized Debtor, as sole member of its general partner, that such records are no longer required to be preserved. For the purposes of transfer of documents, the Claimant Trust or Litigation Sub-Trust, as applicable, is an assignee and successor to the Debtor in respect of the Claimant Trust Assets and Estate Claims, respectively, and shall be treated as such in any review of confidentiality restrictions in requested documents.

(d)    Until the Claimant Trust terminates pursuant to the terms hereof, legal title to the Claimant Trust Assets (other than Estate Claims) and all property contained therein shall be vested at all times in the Claimant Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Claimant Trust Assets to be vested in the Claimant Trustee, in which case title shall be deemed to be vested in the Claimant Trustee, solely in his capacity as Claimant Trustee.  For purposes of such jurisdictions, the term Claimant Trust, as used herein, shall be read to mean the Claimant Trustee.

003753

2.5 <u>Principal Office</u>. The principal office of the Claimant Trust shall be maintained by the Claimant Trustee at the following address:[_____].

2.6 <u>Acceptance</u>. The Claimant Trustee accepts the Claimant Trust imposed by this Agreement and agrees to observe and perform that Claimant Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.7 <u>Further Assurances</u>. The Debtor, Reorganized Debtor, and any successors thereof will, upon reasonable request of the Claimant Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Claimant Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Claimant Trustee the powers, instruments or funds in trust hereunder.

2.8 <u>Incidents of Ownership</u>. The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust and the Claimant Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

## <u>ARTICLE III.</u>
## <u>THE TRUSTEES</u>

3.1 <u>Role</u>. In furtherance of and consistent with the purpose of the Claimant Trust, the Plan, and this Agreement, the Claimant Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Claimant Trustee with respect to the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries and maintain, manage, and take action on behalf of the Claimant Trust.

3.2 <u>Authority</u>.

(a) In connection with the administration of the Claimant Trust, in addition to any and all of the powers enumerated elsewhere herein, the Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust. The Claimant Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Claimant Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law. The Claimant Trustee will monetize the Claimant Trust Assets with a view toward maximizing value in a reasonable time.

(b) The Claimant Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Claims and Causes of Action that are part of the Claimant Trust Assets, other than the Estate Claims transferred to the Litigation Sub-Trust, as the Claimant Trustee determines is in the best interests of the Claimant Trust; <u>provided</u>, <u>however</u>, that if the Claimant Trustee proposes a settlement of an Employee Claim and does not obtain unanimous consent of the Oversight Board of such settlement, such Employee Claim shall be transferred to the Litigation Sub-Trust for the Litigation Trustee to litigate. To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or

003754

otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)     Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)     solely as required by Section 2.4(c), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

(ii)     open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)     as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)     settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)     sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)     upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)     exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)     protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)     obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board solely in their capacities as such, in the form of fiduciary liability insurance, a directors and

003755

officers policy, an errors and omissions policy, or otherwise. The cost of any such insurance shall be a Claimant Trust Expense and paid by the Claimant Trustee from the Claimant Trust Assets;

(x)    without further order of the Bankruptcy Court, but subject to the terms of this Agreement, employ various consultants, third-party service providers, and other professionals, including counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors, as the Claimant Trustee deems necessary to aid him in fulfilling his obligations under this Agreement; such consultants, third-party service providers, and other professionals shall be retained pursuant to whatever fee arrangement the Claimant Trustee deems appropriate, including contingency fee arrangements and any fees and expenses incurred by such professionals engaged by the Claimant Trustee shall be Claimant Trust Expenses and paid by the Claimant Trustee from the Claimant Trust Assets;

(xi)    retain and approve compensation arrangements of an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Claimant Trust as may be required by this Agreement, the Plan, the Confirmation Order, and applicable laws and as may be reasonably and appropriate in Claimant Trustee's discretion. Subject to the foregoing, the Claimant Trustee may commit the Claimant Trust to, and shall pay, such independent public accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, and all such compensation and reimbursement shall be paid by the Claimant Trustee from Claimant Trust Assets;

(xii)    prepare and file (A) tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a), (B) an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity, or (C) any periodic or current reports that may be required under applicable law;

(xiii)    prepare and send annually to the Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Claimant Trust and its share of the Claimant Trust's income, gain, loss, deduction or credit, and to instruct all such Beneficiaries to report such items on their federal tax returns;

(xiv)    to the extent applicable, assert, enforce, release, or waive any attorney-client communication, attorney work product or other Privilege or defense on behalf of the Claimant Trust (including as to any Privilege that the Debtor held prior to the Effective Date), including to provide any information to insurance carriers that the Claimant Trustee deems necessary to utilize applicable insurance coverage for any Claim or Claims;

(xv)    subject to Section 3.4, invest the proceeds of the Claimant Trust Assets and all income earned by the Claimant Trust, pending any distributions in short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills;

003756

(xvi)   request any appropriate tax determination with respect to the Claimant Trust, including a determination pursuant to section 505 of the Bankruptcy Code;

(xvii)   take or refrain from taking any and all actions the Claimant Trustee reasonably deems necessary for the continuation, protection, and maximization of the value of the Claimant Trust Assets consistent with purposes hereof;

(xviii)   take all steps and execute all instruments and documents necessary to effectuate the purpose of the Claimant Trust and the activities contemplated herein and in the Confirmation Order and the Plan, and take all actions necessary to comply with the Confirmation Order, the Plan, and this Agreement and the obligations thereunder and hereunder;

(xix)   exercise such other powers and authority as may be vested in or assumed by the Claimant Trustee by any Final Order;

(xx)   evaluate and determine strategy with respect to the Claimant Trust Assets, and hold, pursue, prosecute, adjust, arbitrate, compromise, release, settle or abandon the Claimant Trust Assets on behalf of the Claimant Trust; and

(xxi)   with respect to the Claimant Trust Beneficiaries, perform all duties and functions of the Distribution Agent as set forth in the Plan, including distributing Cash from the Disputed Claims Reserve, solely on account of Disputed Class 1 through Class 7 Claims that were Disputed as of the Effective Date, but become Allowed, to the Reorganization Debtor such that the Reorganized Debtor can satisfy its duties and functions as Distribution Agent with respect to Claims in Class 1 through Class 7 (the foregoing subparagraphs (i)-(xxi) being collectively, the "Authorized Acts").

(d)   The Claimant Trustee and the Oversight Committee will enter into an agreement as soon as practicable after the Effective Date concerning the Claimant Trustee's authority with respect to certain other assets, including certain portfolio company assets (the "Other Assets").

(e)   The Claimant Trustee has the power and authority to act as trustee of the Claimant Trust and perform the Authorized Acts through the date such Claimant Trustee resigns, is removed, or is otherwise unable to serve for any reason.

3.3   Limitation of Authority.

(a)   Notwithstanding anything herein to the contrary, the Claimant Trust and the Claimant Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the management of the Claimant Trust Assets as are required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement, or (iv) cause New GP LLC to cause the Reorganized Debtor to take any action in contravention of the Plan, Plan Documents or the Confirmation Order.

(b)   Notwithstanding anything herein to the contrary, and in no way limiting the terms of the Plan, the Claimant Trustee must receive the consent by vote of a simple majority

003757

of the Oversight Board pursuant to the notice and quorum requirements set forth in Section 4.5 herein, in order to:

(i)    terminate or extend the term of the Claimant Trust;

(ii)    prosecute, litigate, settle or otherwise resolve any of the Material Claims;

(iii)    except otherwise set forth herein, sell or otherwise monetize any assets that are not Other Assets, including Reorganized Debtor Assets (other than with respect to the Managed Funds), that are valued greater than $3,000,000 (over a thirty-day period);

(iv)    except for cash distributions made in accordance with the terms of this Agreement, make any cash distributions to Claimant Trust Beneficiaries in accordance with Article IV of the Plan;

(v)    except for any distributions made in accordance with the terms of this Agreement, make any distributions from the Disputed Claims Reserve to Holders of Disputed Claims after such time that such Holder's Claim becomes an Allowed Claim under the Plan;

(vi)    reserve or retain any cash or cash equivalents in an amount reasonably necessary to meet claims and contingent liabilities (including Disputed Claims and any indemnification obligations that may arise under Section 8.2 of this Agreement), to maintain the value of the Claimant Trust Assets, or to fund ongoing operations and administration of the Litigation Sub-Trust;

(vii)    borrow as may be necessary to fund activities of the Claimant Trust;

(viii)    determine whether the conditions under Section 5.1(c) of this Agreement have been satisfied such that a certification should be filed with the Bankruptcy Court;

(ix)    invest the Claimant Trust Assets, proceeds thereof, or any income earned by the Claimant Trust (for the avoidance of doubt, this shall not apply to investment decisions made by the Reorganized Debtor or its subsidiaries solely with respect to Managed Funds);

(x)    change the compensation of the Claimant Trustee;

(xi)    subject to ARTICLE X, make structural changes to the Claimant Trust or take other actions to minimize any tax on the Claimant Trust Assets; and

(xii)    retain counsel, experts, advisors, or any other professionals; provided, however, the Claimant Trustee shall not be required to obtain the consent of the Oversight Board for the retention of (i) PSZJ, WilmerHale, or Development Specialists, Inc. and

003758

(ii) any other professional whose expected fees and expenses are estimated at less than or equal to $200,000.

        (c)     [Reserved.]

    3.4    <u>Investment of Cash</u>.  The right and power of the Claimant Trustee to invest the Claimant Trust Assets, the proceeds thereof, or any income earned by the Claimant Trust, with majority approval of the Oversight Board, shall be limited to the right and power to invest in such Claimant Trust Assets only in Cash and U.S. Government securities as defined in section 29(a)(16) of the Investment Company Act; <u>provided</u>, <u>however</u> that (a) the scope of any such permissible investments shall be further limited to include only those investments that a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the Internal Revenue Service ("<u>IRS</u>") guidelines, whether set forth in IRS rulings, other IRS pronouncements, or otherwise, (b) the Claimant Trustee may retain any Claimant Trust Assets received that are not Cash only for so long as may be required for the prompt and orderly monetization or other disposition of such assets, and (c) the Claimant Trustee may expend the assets of the Claimant Trust (i) as reasonably necessary to meet contingent liabilities (including indemnification and similar obligations) and maintain the value of the assets of the Claimant Trust during the pendency of this Claimant Trust, (ii) to pay Claimant Trust Expenses (including, but not limited to, any taxes imposed on the Claimant Trust and reasonable attorneys' fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Claimant Trust (or to which the assets are otherwise subject) in accordance with the Plan or this Agreement.

    3.5    <u>Binding Nature of Actions</u>.  All actions taken and determinations made by the Claimant Trustee in accordance with the provisions of this Agreement shall be final and binding upon any and all Beneficiaries.

    3.6    <u>Term of Service</u>.  The Claimant Trustee shall serve as the Claimant Trustee for the duration of the Claimant Trust, subject to death, resignation or removal.

    3.7    <u>Resignation</u>.  The Claimant Trustee may resign as Claimant Trustee of the Claimant Trust by an instrument in writing delivered to the Bankruptcy Court and Oversight Board at least thirty (30) days before the proposed effective date of resignation.  The Claimant Trustee shall continue to serve as Claimant Trustee after delivery of the Claimant Trustee's resignation until the proposed effective date of such resignation, unless the Claimant Trustee and a simple majority of the Oversight Board consent to an earlier effective date, which earlier effective date shall be no earlier than the date of appointment of a successor Claimant Trustee in accordance with Section 3.9 hereof becomes effective.

    3.8    <u>Removal</u>.

        (a)    The Claimant Trustee may be removed by a simple majority vote of the Oversight Board for Cause for Cause immediately upon notice thereof, or without Cause upon 60 days' prior written notice.  Upon the removal of the Claimant Trustee pursuant hereto, the Claimant Trustee will resign, or be deemed to have resigned, from any role or position he or she

003759

may have at New GP LLC or the Reorganized Debtor effective upon the expiration of the foregoing 60 day period unless the Claimant Trustee and a simple majority of the Oversight Board agree otherwise.

(b)     To the extent there is any dispute regarding the removal of a Claimant Trustee (including any dispute relating to any compensation or expense reimbursement due under this Agreement) the Bankruptcy Court shall retain jurisdiction to consider and adjudicate such dispute.  Notwithstanding the foregoing, the Claimant Trustee will continue to serve as the Claimant Trustee after his removal until the earlier of (i) the time when a successor Claimant Trustee will become effective in accordance with Section 3.9 of this Agreement or (ii) such date as the Bankruptcy Court otherwise orders.

3.9     <u>Appointment of Successor</u>.

(a)     <u>Appointment of Successor</u>.  In the event of a vacancy by reason of the death or Disability (in the case of a Claimant Trustee that is a natural person), dissolution (in the case of a Claimant Trustee that is not a natural person), or removal of the Claimant Trustee, or prospective vacancy by reason of resignation, a successor Claimant Trustee shall be selected by a simple majority vote of the Oversight Board.  If Members of the Oversight Board are unable to secure a majority vote, the Bankruptcy Court will determine the successor Claimant Trustee on motion of the Members.  If a final decree has been entered closing the Chapter 11 Case, the Claimant Trustee may seek to reopen the Chapter 11 Case for the limited purpose of determining the successor Claimant Trustee, and the costs for such motion and costs related to re-opening the Chapter 11 Case shall be paid by the Claimant Trust.  The successor Claimant Trustee shall be appointed as soon as practicable, but in any event no later than sixty (60) days after the occurrence of the vacancy or, in the case of resignation, on the effective date of the resignation of the then acting Claimant Trustee.

(b)     <u>Vesting or Rights in Successor Claimant Trustee</u>.  Every successor Claimant Trustee appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trust, the exiting Claimant Trustee, the Oversight Board, and file with the Bankruptcy Court, an instrument accepting such appointment subject to the terms and provisions hereof.  The successor Claimant Trustee, without any further act, deed, or conveyance shall become vested with all the rights, powers, trusts and duties of the exiting Claimant Trustee, except that the successor Claimant Trustee shall not be liable for the acts or omissions of the retiring Claimant Trustee.  In no event shall the retiring Claimant Trustee be liable for the acts or omissions of the successor Claimant Trustee.

(c)     <u>Interim Claimant Trustee</u>.  During any period in which there is a vacancy in the position of Claimant Trustee, the Oversight Board shall appoint one of its Members to serve as the interim Claimant Trustee (the "<u>Interim Trustee</u>") until a successor Claimant Trustee is appointed pursuant to Section 3.9(a).  The Interim Trustee shall be subject to all the terms and conditions applicable to a Claimant Trustee hereunder.  Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a Member of the Oversight Board merely by such Person's appointment as Interim Trustee.

003760

3.10   Continuance of Claimant Trust.   The death, resignation, or removal of the Claimant Trustee shall not operate to terminate the Claimant Trust created by this Agreement or to revoke any existing agency (other than any agency of the Claimant Trustee as the Claimant Trustee) created pursuant to the terms of this Agreement or invalidate any action taken by the Claimant Trustee.   In the event of the resignation or removal of the Claimant Trustee, the Claimant Trustee shall promptly (i) execute and deliver, by the effective date of resignation or removal, such documents, instruments, records, and other writings as may be reasonably requested by his successor to effect termination of the exiting Claimant Trustee's capacity under this Agreement and the conveyance of the Claimant Trust Assets then held by the exiting Claimant Trustee to the successor Claimant Trustee; (ii) deliver to the successor Claimant Trustee all non-privileged documents, instruments, records, and other writings relating to the Claimant Trust as may be in the possession or under the control of the exiting Claimant Trustee, provided, the exiting Claimant Trustee shall have the right to make and retain copies of such documents, instruments, records and other writings delivered to the successor Claimant Trustee and the cost of making such copies shall be a Claimant Trust Expense to be paid by the Claimant Trust; and (iii) otherwise assist and cooperate in effecting the assumption of the exiting Claimant Trustee's obligations and functions by his successor, provided the fees and expenses of such assistance and cooperation shall be paid to the exiting Claimant Trustee by the Claimant Trust. The exiting Claimant Trustee shall irrevocably appoint the successor Claimant Trustee as his attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such exiting Claimant Trustee is obligated to perform under this Section 3.10.

3.11   Claimant Trustee as "Estate Representative".   The Claimant Trustee will be the exclusive trustee of the Claimant Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code (the "Estate Representative") with respect to the Claimant Trust Assets, with all rights and powers attendant thereto, in addition to all rights and powers granted in the Plan and in this Agreement; provided that all rights and powers as representative of the Estate pursuant to section 1123(b)(3)(B) shall be transferred to the Litigation Trustee in respect of the Estate Claims and the Employee Claims.   The Claimant Trustee will be the successor-in-interest to the Debtor with respect to any action pertaining to the Claimant Trust Assets, which was or could have been commenced by the Debtor prior to the Effective Date, except as otherwise provided in the Plan or Confirmation Order.   All actions, claims, rights or interest constituting Claimant Trust Assets are preserved and retained and may be enforced, or assignable to the Litigation Sub-Trust, by the Claimant Trustee as an Estate Representative.

3.12   Books and Records.

(a)    The Claimant Trustee shall maintain in respect of the Claimant Trust and the Claimant Trust Beneficiaries books and records reflecting Claimant Trust Assets in its possession and the income of the Claimant Trust and payment of expenses, liabilities, and claims against or assumed by the Claimant Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof.   Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Claimant Trust and the requirements of Article VII herein.   Except as otherwise provided herein, nothing in this Agreement requires the Claimant Trustee to file any

003761

accounting or seek approval of any court with respect to the administration of the Claimant Trust, or as a condition for managing any payment or distribution out of the Claimant Trust Assets.

(b)    The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

(c)    The Claimant Trustee may dispose some or all of the books and records maintained by the Claimant Trustee at the later of (i) such time as the Claimant Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Claimant Trust, or (ii) upon the termination and winding up of the Claimant Trust under Article IX of this Agreement; provided, however, the Claimant Trustee shall not dispose of any books and records related to the Estate Claims or Employee Claims without the consent of the Litigation Trustee. Notwithstanding the foregoing, the Claimant Trustee shall cause the Reorganized Debtor and its subsidiaries to retain such books and records, and for such periods, as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

3.13    Compensation and Reimbursement; Engagement of Professionals.

(a)    Compensation and Expenses.

(i)    Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

(ii)    Expense Reimbursements.  All reasonable out-of-pocket expenses of the Claimant Trustee in the performance of his or her duties hereunder, shall be reimbursed as Claimant Trust Expenses paid by the Claimant Trust.

003762

     (b)    <u>Professionals</u>.

         (i)    <u>Engagement of Professionals</u>.  The Claimant Trustee shall engage professionals from time to time in conjunction with the services provided hereunder.  The Claimant Trustee's engagement of such professionals shall be approved by a majority of the Oversight Board as set forth in Section 3.3(b) hereof.

         (ii)    <u>Fees and Expenses of Professionals</u>.  The Claimant Trustee shall pay the reasonable fees and expenses of any retained professionals as Claimant Trust Expenses.

    3.14    <u>Reliance by Claimant Trustee</u>.  Except as otherwise provided herein, the Claimant Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Claimant Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles, to have been sent by the proper party or parties, and the Claimant Trustee may conclusively rely as to the truth of the statements and correctness of the opinions or direction expressed therein.  The Claimant Trustee may consult with counsel and other professionals, and any advice of such counsel or other professionals shall constitute full and complete authorization and protection in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trustee shall have the right at any time to seek instructions from the Bankruptcy Court, or any other court of competent jurisdiction concerning the Claimant Trust Assets, this Agreement, the Plan, or any other document executed in connection therewith, and any such instructions given shall be full and complete authorization in respect of any action taken or not taken by the Claimant Trustee in accordance therewith.  The Claimant Trust shall have the right to seek Orders from the Bankruptcy Court as set forth in Article IX of the Plan.

    3.15    <u>Commingling of Claimant Trust Assets</u>.  The Claimant Trustee shall not commingle any of the Claimant Trust Assets with his or her own property or the property of any other Person.

    3.16    <u>Delaware Trustee</u>.  The Delaware Trustee shall have the power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Claimant Trust in the State of Delaware; and (ii) execute any certificates that are required to be executed under the Statutory Trust Act and file such certificates in the office of the Secretary of State of the State of Delaware, and take such action or refrain from taking such action under this Agreement as may be directed in a writing delivered to the Delaware Trustee by the Claimant Trustee; <u>provided, however</u>, that the Delaware Trustee shall not be required to take or to refrain from taking any such action if the Delaware Trustee shall believe, or shall have been advised by counsel, that such performance is likely to involve the Delaware Trustee in personal liability or to result in personal liability to the Delaware Trustee, or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law.  The Parties agree not to instruct the Delaware Trustee to take any action or to refrain from taking any action that is contrary to the terms of this Agreement or of any document contemplated hereby to which the Claimant Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law.  Other than as

003763

expressly provided for in this Agreement, the Delaware Trustee shall have no duty or power to take any action for or on behalf of the Claimant Trust.

<div align="center">

**ARTICLE IV.**
**THE OVERSIGHT BOARD**

</div>

4.1    <u>Oversight Board Members</u>.  The Oversight Board will be comprised of five (5) Members appointed to serve as the board of managers of the Claimant Trust, at least two (2) of which shall be disinterested Members selected by the Creditors' Committee (such disinterested members, the "<u>Disinterested Members</u>").  The initial Members of the Oversight Board will be representatives of Acis, the Redeemer Committee, Meta-e Discovery, UBS, and David Pauker.  David Pauker and Paul McVoy, the representative of Meta-e Discovery, shall serve as the initial Disinterested Board Members;  <u>provided</u>,  <u>however</u>, that if the Plan is confirmed with the Convenience Class or any other convenience class supported by the Creditors' Committee, Meta-E Discovery and its representative will resign on the Effective Date or as soon as practicable thereafter and be replaced in accordance with Section 4.10 hereof..

4.2    <u>Authority and Responsibilities</u>.

(a)    The Oversight Board shall, as and when requested by either of the Claimant Trustee and Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or this Agreement, consult with and advise the Claimant Trustee and Litigation Trustee as to the administration and management of the Claimant Trust and the Litigation Sub-Trust, as applicable, in accordance with the Plan, the Confirmation Order, this Agreement, and Litigation Sub-Trust Agreement (as applicable) and shall have the other responsibilities and powers as set forth herein.  As set forth in the Plan, the Confirmation Order, and herein, the Oversight Board shall have the authority and responsibility to oversee, review, and govern the activities of the Claimant Trust, including the Litigation Sub-Trust, and the performance of the Claimant Trustee and Litigation Trustee, and shall have the authority to remove the Claimant Trustee in accordance with Section 3.7 hereof or the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement;  <u>provided</u>,  <u>however</u>, that the Oversight Board may not direct either Claimant Trustee and Litigation Trustee to act inconsistently with their respective duties under this Agreement (including without limitation as set in Section 4.2(e) below), the Litigation Sub-Trust Agreement, the Plan, the Confirmation Order, or applicable law.

(b)    The Oversight Board shall also (i) monitor and oversee the administration of the Claimant Trust and the Claimant Trustee's performance of his or her responsibilities under this Agreement, (ii) as more fully set forth in the Litigation Sub-Trust Agreement, approve funding to the Litigation Sub-Trust, monitor and oversee the administration of the Litigation Sub-Trust and the Litigation Trustee's performance of his responsibilities under the Litigation Sub-Trust Agreement, and (iii) perform such other tasks as are set forth herein, in the Litigation Sub-Trust Agreement, and in the Plan.

(c)    The Claimant Trustee shall consult with and provide information to the Oversight Board in accordance with and pursuant to the terms of the Plan, the Confirmation Order, and this Agreement to enable the Oversight Board to meet its obligations hereunder.

003764

(d)     Notwithstanding any provision of this Agreement to the contrary, the Claimant Trustee shall not be required to (i) obtain the approval of any action by the Oversight Board to the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is required to be taken by applicable law, the Plan, the Confirmation Order, or this Agreement or (ii) follow the directions of the Oversight Board to take any action the extent that the Claimant Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that such action is prohibited by applicable law the Plan, the Confirmation Order, or this Agreement.

(e)     Notwithstanding provision of this Agreement to the contrary, with respect to the activities of the Reorganized Debtor in its capacity as an investment adviser (and subsidiaries of the Reorganized Debtor that serve as general partner or in an equivalent capacity) to any Managed Funds, the Oversight Board shall not make investment decisions or otherwise participate in the investment decision making process relating to any such Managed Funds, nor shall the Oversight Board or any member thereof serve as a fiduciary to any such Managed Funds.  It is agreed and understood that investment decisions made by the Reorganized Debtor (or its subsidiary entities) with respect to Managed Funds shall be made by the Claimant Trustee in his capacity as an officer of the Reorganized Debtor and New GP LLC and/or such persons who serve as investment personnel of the Reorganized Debtor from time to time, and shall be subject to the fiduciary duties applicable to such entities and persons as investment adviser to such Managed Funds.

4.3     Fiduciary Duties.  The Oversight Board (and each Member in its capacity as such) shall have fiduciary duties to the Claimant Trust Beneficiaries consistent with the fiduciary duties that the members of the Creditors' Committee have to unsecured creditors and shall exercise its responsibilities accordingly; provided, however, that the Oversight Board shall not owe fiduciary obligations to any Holders of Class A Limited Partnership Interests or Class B/C Limited Partnership Interests until such Holders become Claimant Trust Beneficiaries in accordance with Section 5.1(c) hereof; provided, further, that the Oversight Board shall not owe fiduciary obligations to a Holder of an Equity Trust Interest if such Holder is named as a defendant in any of the Causes of Action, including Estate Claims, in their capacities as such, it being the intent that the Oversight Board's fiduciary duties are to maximize the value of the Claimant Trust Assets, including the Causes of Action.  In all circumstances, the Oversight Board shall act in the best interests of the Claimant Trust Beneficiaries and in furtherance of the purpose of the Claimant Trust.  Notwithstanding anything to the contrary contained in this Agreement, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

4.4     Meetings of the Oversight Board.  Meetings of the Oversight Board are to be held as necessary to ensure the operation of the Claimant Trust but in no event less often than quarterly.  Special meetings of the Oversight Board may be held whenever and wherever called for by the Claimant Trustee or any Member; provided, however, that notice of any such meeting shall be duly given in writing no less than 48 hours prior to such meeting (such notice requirement being subject to any waiver by the Members in the minutes, if any, or other transcript, if any, of proceedings of the Oversight Board).  Unless the Oversight Board decides otherwise (which decision shall rest in the reasonable discretion of the Oversight Board), the

003765

Claimant Trustee, and each of the Claimant Trustee's designated advisors may, but are not required to, attend meetings of the Oversight Board.

    4.5    <u>Unanimous Written Consent</u>.  Any action required or permitted to be taken by the Oversight Board in a meeting may be taken without a meeting if the action is taken by unanimous written consents describing the actions taken, signed by all Members and recorded. If any Member informs the Claimant Trustee (via e-mail or otherwise) that he or she objects to the decision, determination, action, or inaction proposed to be made by unanimous written consent, the Claimant Trustee must use reasonable good faith efforts to schedule a meeting on the issue to be set within 48 hours of the request or as soon thereafter as possible on which all members of the Oversight Board are available in person or by telephone.  Such decision, determination, action, or inaction must then be made pursuant to the meeting protocols set forth herein.

    4.6    <u>Manner of Acting</u>.

    (a)    A quorum for the transaction of business at any meeting of the Oversight Board shall consist of at least three Members (including no less than one (1) Disinterested Member); <u>provided</u> that if the transaction of business at a meeting would constitute a direct or indirect conflict of interest for the Redeemer Committee, Acis, and/or UBS, at least two Disinterested Members must be present for there to be a quorum.  Except as set forth in Sections 3.3(c), 4.9(a), 5.2, 5.4, 6.1, 9.1, and 10, herein, the majority vote of the Members present at a duly called meeting at which a quorum is present throughout shall be the act of the Oversight Board except as otherwise required by law or as provided in this Agreement.  Any or all of the Members may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone, video conference, or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition of the place) for the holding hereof.  Any Member participating in a meeting by this means is deemed to be present in person at the meeting.  Voting (including on negative notice) may be conducted by electronic mail or individual communications by the applicable Trustee and each Member.

    (b)    Any Member who is present and entitled to vote at a meeting of the Oversight Board when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Oversight Board, unless (i) such Member objects at the beginning of the meeting (or promptly upon his/her arrival) to holding or transacting business at the meeting; (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention to the Oversight Board before its adjournment.  The right of dissent or abstention is not available to any Member of the Oversight Board who votes in favor of the action taken.

    (c)    Prior to a vote on any matter or issue or the taking of any action with respect to any matter or issue, each Member shall report to the Oversight Board any conflict of interest such Member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including, without limitation, disclosing any and all financial or other pecuniary interests that such Member may have with respect to or

23

003766

in connection with such matter or issue, other than solely as a holder of Trust Interests). A Member who, with respect to a matter or issue, has or who may have a conflict of interest whereby such Member's interests are adverse to the interests of the Claimant Trust shall be deemed a "<u>Conflicted Member</u>" who shall not be entitled to vote or take part in any action with respect to such matter or issue. In the event of a Conflicted Member, the vote or action with respect to such matter or issue giving rise to such conflict shall be undertaken only by Members who are not Conflicted Members and, notwithstanding anything contained herein to the contrary, the affirmative vote of only a majority of the Members who are not Conflicted Members shall be required to approve of such matter or issue and the same shall be the act of the Oversight Board.

(d)    Each of Acis, the Redeemer Committee, and UBS shall be deemed "Conflicted Members" with respect to any matter or issue related to or otherwise affecting any of their respective Claim(s) (a "<u>Committee Member Claim Matter</u>"). A unanimous vote of the Disinterested Members shall be required to approve of or otherwise take action with respect to any Committee Member Claim Matter and, notwithstanding anything herein to the contrary, the same shall be the act of the Oversight Board.

4.7    <u>Tenure of the Members of the Oversight Board</u>. The authority of the Members of the Oversight Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Claimant Trust is terminated in accordance with Article X hereof. The Members of the Oversight Board will serve until such Member's successor is duly appointed or until such Member's earlier death or resignation pursuant to Section 4.7 below, or removal pursuant to Section 4.8 below.

4.8    <u>Resignation</u>. A Member of the Oversight Board may resign by giving not less than 90 days prior written notice thereof to the Claimant Trustee and other Members. Such resignation shall become effective on the earlier to occur of (i) the day specified in such notice and (ii) the appointment of a successor in accordance with Section 4.9 below.

4.9    <u>Removal</u>. A majority of the Oversight Board may remove any Member for Cause or Disability. If any Committee Member has its Claim disallowed in its entirety the representative of such entity will immediately be removed as a Member without the requirement for a vote and a successor will be appointed in the manner set forth herein. Notwithstanding the foregoing, upon the termination of the Claimant Trust, any or all of the Members shall be deemed to have resigned.

4.10   <u>Appointment of a Successor Member</u>.

(a)    In the event of a vacancy on the Oversight Board (whether by removal, death, or resignation), a new Member may be appointed to fill such position by the remaining Members acting unanimously; <u>provided</u>, <u>however,</u> that any vacancy resulting from the removal, resignation, or death of a Disinterested Member may only be filled by a disinterested Person unaffiliated with any Claimant or constituency in the Chapter 11 Case; <u>provided</u>, <u>further</u>, that if an individual serving as the representative of a Committee Member resigns from its role as representative, such resignation shall not be deemed resignation of the Committee Member itself and such Committee Member shall have the exclusive right to designate its replacement representative for the Oversight Board. The appointment of a successor Member will be further

003767

evidenced by the Claimant Trustee's filing with the Bankruptcy Court (to the extent a final decree has not been entered) and posting on the Claimant Trustee's website a notice of appointment, at the direction of the Oversight Board, which notice will include the name, address, and telephone number of the successor Member.

(b)    Immediately upon the appointment of any successor Member, the successor Member shall assume all rights, powers, duties, authority, and privileges of a Member hereunder and such rights and privileges will be vested in and undertaken by the successor Member without any further act. A successor Member will not be liable personally for any act or omission of a predecessor Member.

(c)    Every successor Member appointed hereunder shall execute, acknowledge, and deliver to the Claimant Trustee and other Members an instrument accepting the appointment under this Agreement and agreeing to be bound thereto, and thereupon the successor Member without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of a Member hereunder.

4.11    <u>Compensation and Reimbursement of Expenses</u>.    Unless determined by the Oversight Board, no Member shall be entitled to compensation in connection with his or her service to the Oversight Board; <u>provided</u>, <u>however</u>, that a Disinterested Member shall be compensated in a manner and amount initially set by the other Members and as thereafter amended from time to time by agreement between the Oversight Board and the Disinterested Member. Notwithstanding the foregoing, the Claimant Trustee will reimburse the Members for all reasonable and documented out-of-pocket expenses incurred by the Members in connection with the performance of their duties hereunder (which shall not include fees, costs, and expenses of legal counsel).

4.12    <u>Confidentiality</u>. Each Member shall, during the period that such Member serves as a Member under this Agreement and following the termination of this Agreement or following such Member's removal or resignation, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person to which any of the Claimant Trust Assets relates or of which such Member has become aware in the Member's capacity as a Member ("<u>Confidential Trust Information</u>"), except as otherwise required by law. For the avoidance of doubt, a Member's Affiliates, employer, and employer's Affiliates (and collectively with such Persons' directors, officers, partners, principals and employees, "<u>Member Affiliates</u>") shall not be deemed to have received Confidential Trust Information solely due to the fact that a Member has received Confidential Trust Information in his or her capacity as a Member of the Oversight Board and to the extent that (a) a Member does not disclose any Confidential Trust Information to a Member Affiliate, (b) the business activities of such Member Affiliates are conducted without reference to, and without use of, Confidential Trust Information, and (c) no Member Affiliate is otherwise directed to take, or takes on behalf of a Member or Member Affiliate, any actions that are contrary to the terms of this Section 4.11.

<div align="center">

**ARTICLE V.**
**TRUST INTERESTS**

</div>

5.1    <u>Claimant Trust Interests</u>.

003768

(a)  General Unsecured Claim Trust Interests.  On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue General Unsecured Claim Trust Interests to Holders of Allowed Class 8 General Unsecured Claims (the "GUC Beneficiaries").  The Claimant Trustee shall allocate to each Holder of an Allowed Class 8 General Unsecured Claim a General Unsecured Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 8 Claim bears to the total amount of the Allowed Class 8 Claims.  The General Unsecured Claim Trust Interests shall be entitled to distributions from the Claimant Trust Assets in accordance with the terms of the Plan and this Agreement.

(b)  Subordinated Claim Trust Interests.  On the date hereof, or on the date such Claim becomes Allowed under the Plan, the Claimant Trust shall issue Subordinated Claim Trust Interests to Holders of Class 9 Subordinated Claims (the "Subordinated Beneficiaries"). The Claimant Trustee shall allocate to each Holder of an Allowed Class 9 Subordinated Claim a Subordinated Claim Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 9 Claim bears to the total of amount of the Allowed Class 9.  The Subordinated Trust Interests shall be subordinated in right and priority to the General Unsecured Claim Trust Interests.  The Subordinated Beneficiaries shall only be entitled to distributions from the Claimant Trust Assets after each GUC Beneficiary has been repaid in full with applicable interest on account of such GUC Beneficiary's Allowed General Unsecured Claim, and all Disputed General Unsecured Claims have been resolved, in accordance with the terms of the Plan and this Agreement.

(c)  Contingent Trust Interests.  On the date hereof, or on the date such Interest becomes Allowed under the Plan, the Claimant Trust shall issue Contingent Interests to Holders of Allowed Class 10 Class B/C Limited Partnership Interests and Holders of Allowed Class 11 Class A Limited Partnership Interests (collectively, the "Equity Holders").  The Claimant Trustee shall allocate to each Holder of Allowed Class 10 Class B/C Limited Partnership Interests and each Holder of Allowed Class 11 Class A Limited Partnership Interests a Contingent Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 10 or Class 11 Interest bears to the total amount of the Allowed Class 10 or Class 11 Interests, as applicable, under the Plan.  Contingent Trust Interests shall not vest, and the Equity Holders shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the "GUC Payment Certification").  Equity Holders will only be deemed "Beneficiaries" under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court, at which time the Contingent Trust Interests will vest and be deemed "Equity Trust Interests."  The Equity Trust Interests shall be subordinated in right and priority to Subordinated Trust Interests, and distributions on account thereof shall only be made if and when Subordinated Beneficiaries have been repaid in full on account of such Subordinated Beneficiary's  Allowed Subordinated Claim, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement.  The Equity Trust Interests distributed to Allowed Holders of Class A Limited Partnership Interests shall be subordinated to the Equity Trust Interests distributed to Allowed Holders of Class B/C Limited Partnership Interests.

5.2  Interests Beneficial Only.  The ownership of the beneficial interests in the Claimant Trust shall not entitle the Claimant Trust Beneficiaries to any title in or to the Claimant

003769

Trust Assets (which title shall be vested in the Claimant Trust) or to any right to call for a partition or division of the Claimant Trust Assets or to require an accounting. No Claimant Trust Beneficiary shall have any governance right or other wright to direct Claimant Trust activities.

5.3     Transferability of Trust Interests. No transfer, assignment, pledge, hypothecation, or other disposition of a Trust Interest may be effected until (i) such action is unanimously approved by the Oversight Board, (ii) the Claimant Trustee and Oversight Board have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary to assure that any such disposition shall not cause the Claimant Trust to be subject to entity-level taxation for U.S. federal income tax purposes, and (iii) either (x) the Claimant Trustee and Oversight Board, acting unanimously, have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary or appropriate to assure that any such disposition shall not (a) require the Claimant Trust to comply with the registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act or (b) cause any adverse effect under the Investment Advisers Act, or (y) the Oversight Board, acting unanimously, has determined, in its sole and absolute discretion, to cause the Claimant Trust to become a public reporting company and/or make periodic reports under the Exchange Act (provided that it is not required to register under the Investment Company Act or register its securities under the Securities Act) to enable such disposition to be made. In the event that any such disposition is allowed, the Oversight Board and the Claimant Trustee may add such restrictions upon such disposition and other terms of this Agreement as are deemed necessary or appropriate by the Claimant Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws.

5.4     Registry of Trust Interests.

(a)     Registrar. The Claimant Trustee shall appoint a registrar, which may be the Claimant Trustee (the "Registrar"), for the purpose of recording ownership of the Trust Interests as provided herein. The Registrar, if other than the Claimant Trustee, shall be an institution or person acceptable to the Oversight Board. For its services hereunder, the Registrar, unless it is the Claimant Trustee, shall be entitled to receive reasonable compensation from the Claimant Trust as a Claimant Trust Expense.

(b)     Trust Register. The Claimant Trustee shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time, a registry of the Claimant Trust Beneficiaries and the Equity Holders (the "Trust Register"), which shall be maintained pursuant to such reasonable regulations as the Claimant Trustee and the Registrar may prescribe.

(c)     Access to Register by Beneficiaries. The Claimant Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Claimant Trustee, and in accordance with reasonable regulations prescribed by the Claimant Trustee, to inspect and, at the expense of the Claimant Trust Beneficiary make copies of the Trust Register, in each case for a purpose reasonable and related to such Claimant Trust Beneficiary's Trust Interest.

003770

5.5    Exemption from Registration.  The Parties hereto intend that the rights of the Claimant Trust Beneficiaries arising under this Claimant Trust shall not be "securities" under applicable laws, but none of the Parties represent or warrant that such rights shall not be securities or shall not be entitled to exemption from registration under the applicable securities laws.  The Oversight Board, acting unanimously, and Claimant Trustee may amend this Agreement in accordance with Article IX hereof to make such changes as are deemed necessary or appropriate with the advice of counsel, to ensure that the Claimant Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act.  The Trust Interests shall not have consent or voting rights or otherwise confer on the Claimant Trust Beneficiaries any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken, or decisions made or to be made, by the Oversight Board and/or the Claimant Trustee under this Agreement.

5.6    Absolute Owners.  The Claimant Trustee may deem and treat the Claimant Trust Beneficiary of record as determined pursuant to this Article 5 as the absolute owner of such Trust Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever.

5.7    Effect of Death, Incapacity, or Bankruptcy.  The death, incapacity, or bankruptcy of any Claimant Trust Beneficiary during the term of the Claimant Trust shall not (i) entitle the representatives or creditors of the deceased Beneficiary to any additional rights under this Agreement, or (ii) otherwise affect the rights and obligations of any of other Claimant Trust Beneficiary under this Agreement.

5.8    Change of Address.  Any Claimant Trust Beneficiary may, after the Effective Date, select an alternative distribution address by providing notice to the Claimant Trustee identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Claimant Trustee.  Absent actual receipt of such notice by the Claimant Trustee, the Claimant Trustee shall not recognize any such change of distribution address.

5.9    Standing.  No Claimant Trust Beneficiary shall have standing to direct the Claimant Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Claimant Trust Assets.  No Claimant Trust Beneficiary shall have any direct interest in or to any of the Claimant Trust Assets.

5.10    Limitations on Rights of Claimant Trust Beneficiaries.

(a)    The Claimant Trust Beneficiaries shall have no rights other than those set forth in this Agreement, the Confirmation Order, or the Plan (including any Plan Supplement documents incorporated therein).

(b)    In any action taken by a Claimant Trust Beneficiary against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, the prevailing party will be entitled to reimbursement of attorneys' fees and other costs; provided, however, that any fees and costs shall be borne by the Claimant Trust on behalf of any such Trustee or Member, as set forth herein.

003771

(c)     A Claimant Trust Beneficiary who brings any action against the Claimant Trust, a current or former Trustee, or a current or former Member, in their capacity as such, may be required by order of the Bankruptcy Court to post a bond ensuring that the full costs of a legal defense can be reimbursed.  A request for such bond can be made by the Claimant Trust or by Claimant Trust Beneficiaries constituting in the aggregate at least 50% of the most senior class of Claimant Trust Interests.

(d)     Any action brought by a Claimant Trust Beneficiary must be brought in the United States Bankruptcy Court for the Northern District of Texas.  Claimant Trust Beneficiaries are deemed to have waived any right to a trial by jury

(e)     The rights of Claimant Trust Beneficiaries to bring any action against the Claimant Trust, a current or former Trustee, or current or former Member, in their capacity as such, shall not survive the final distribution by the Claimant Trust.

## <u>ARTICLE VI.</u><br><u>DISTRIBUTIONS</u>

6.1     <u>Distributions</u>.

(a)     Notwithstanding anything to the contrary contained herein, the Claimant Trustee shall distribute to holders of Trust Interests at least annually the Cash on hand net of any amounts that (a) are reasonably necessary to maintain the value of the Claimant Trust Assets pending their monetization or other disposition during the term of the Claimant Trust, (b) are necessary to pay or reserve for reasonably incurred or anticipated Claimant Trust Expenses and any other expenses incurred by the Claimant Trust (including, but not limited to, any taxes imposed on or payable by the Claimant Trustee with respect to the Claimant Trust Assets), (c) are necessary to pay or reserve for the anticipated costs and expenses of the Litigation Sub-Trust, (d) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Claimant Trustee in accordance with the Plan and this Agreement (including, but not limited to, indemnification obligations and similar expenses in such amounts and for such period of time as the Claimant Trustee determines, in good faith, may be necessary and appropriate, which determination shall not be subject to consent of the Oversight Board, may not be modified without the express written consent of the Claimant Trustee, and shall survive termination of the Claimant Trustee), (e) are necessary to maintain the Disputed Claims Reserve, and (f) are necessary to pay Allowed Claims in Class 1 through Class 7.  Notwithstanding anything to the contrary contained in this paragraph, the Claimant Trustee shall exercise reasonable efforts to make initial distributions within six months of the Effective Date, and the Oversight Board may not prevent such initial distributions unless upon a unanimous vote of the Oversight Board.  The Claimant Trustee may otherwise distribute all Claimant Trust Assets on behalf of the Claimant Trust in accordance with this Agreement and the Plan at such time or times as the Claimant Trustee is directed by the Oversight Board.

(b)     At the request of the Reorganized Debtor, subject in all respects to the provisions of this Agreement, the Claimant Trustee shall distribute Cash to the Reorganized Debtor, as Distribution Agent with respect to Claims in Class 1 through 7, sufficient to satisfy Allowed Claims in Class 1 through Class 7.

003772

      (c)    All proceeds of Claimant Trust Assets shall be distributed in accordance with the Plan and this Agreement.

      6.2    <u>Manner of Payment or Distribution</u>.  All distributions made by the Claimant Trustee on behalf of the Claimant Trust to the Claimant Trust Beneficiaries shall be payable by the Claimant Trustee directly to the Claimant Trust Beneficiaries of record as of the twentieth (20th) day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such date or the distribution shall be the following Business Day, but such distribution shall be deemed to have been completed as of the required date.

      6.3    <u>Delivery of Distributions</u>.  All distributions under this Agreement to any Claimant Trust Beneficiary shall be made, as applicable, at the address of such Claimant Trust Beneficiary (a) as set forth on the Schedules filed with the Bankruptcy Court or (b) on the books and records of the Debtor or their agents, as applicable, unless the Claimant Trustee has been notified in writing of a change of address pursuant to Section 5.6 hereof.

      6.4    <u>Disputed Claims Reserves</u>.  There will be no distributions under this Agreement or the Plan on account of Disputed Claims pending Allowance.  The Claimant Trustee will maintain a Disputed Claims Reserve as set forth in the Plan and will make distributions from the Disputed Claims Reserve as set forth in the Plan.

      6.5    <u>Undeliverable Distributions and Unclaimed Property</u>.  All undeliverable distributions and unclaimed property shall be treated in the manner set forth in the Plan.

      6.6    <u>*De Minimis* Distributions</u>.  Distributions with a value of less than $100 will be treated in accordance with the Plan.

      6.7    <u>United States Claimant Trustee Fees and Reports</u>.  **After the Effective Date, the Claimant Trust shall pay as a Claimant Trust Expense, all fees incurred under 28 U.S.C. § 1930(a)(6) by reason of the Claimant Trust's disbursements until the Chapter 11 Case is closed.  After the Effective Date, the Claimant Trust shall prepare and serve on the Office of the United States Trustee such quarterly disbursement reports for the Claimant Trust as required by the Office of the United States Trustee Office for as long as the Chapter 11 Case remains open.**

<u>**ARTICLE VII.**</u>
<u>**TAX MATTERS**</u>

      7.1    <u>Tax Treatment and Tax Returns</u>.

      (a)    It is intended for the initial transfer of the Claimant Trust Assets to the Claimant Trust to be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes where applicable) as if the Debtor transferred the Claimant Trust Assets (other than the amounts set aside in the Disputed Claim Reserve, if the Claimant Trustee makes the election described below) to the Claimant Trust Beneficiaries and then, immediately thereafter, the Claimant Trust Beneficiaries transferred the Claimant Trust Assets to the Claimant Trust.  Consistent with such treatment, (i) it is intended that the Claimant Trust will be treated as a grantor trust for federal income tax purposes (and foreign, state, and local income tax purposes

003773

where applicable), (ii) it is intended that the Claimant Trust Beneficiaries will be treated as the grantors of the Claimant Trust and owners of their respective share of the Claimant Trust Assets for federal income tax purposes (and foreign, state, and local income tax purposes where applicable). The Claimant Trustee shall file all federal income tax returns (and foreign, state, and local income tax returns where applicable) for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

(b)    The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Beneficiaries of such valuation, and such valuation shall be used consistently by all parties for all federal income tax purposes.

(c)    The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity.

7.2    <u>Withholding</u>. The Claimant Trustee may withhold from any amount distributed from the Claimant Trust to any Claimant Trust Beneficiary such sum or sums as are required to be withheld under the income tax laws of the United States or of any state or political subdivision thereof. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable Beneficiary. As a condition to receiving any distribution from the Claimant Trust, the Claimant Trustee may require that the Beneficiary provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Claimant Trustee to comply with applicable tax reporting and withholding laws. If a Beneficiary fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution and treated in accordance with Section 6.5(b) of this Agreement.

<u>**ARTICLE VIII.**</u>
<u>**STANDARD OF CARE AND INDEMNIFICATION**</u>

8.1    <u>Standard of Care</u>. None of the Claimant Trustee, acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan, the Delaware Trustee, acting in its capacity as Delaware Trustee, the Oversight Board, or any current or any individual Member, solely in their capacity as Members of the Oversight Board, shall be personally liable to the Claimant Trust or to any Person (including any Claimant Trust Beneficiary) in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the acts or omissions of any such Claimant Trustee, Delaware Trustee, Oversight Board, or Member constituted fraud, willful misconduct, or gross negligence. The employees, agents and professionals retained by the Claimant Trust, the Claimant Trustee, Delaware Trustee, Oversight Board, or individual Member shall not be personally liable to the Claimant Trust or any other Person in connection with the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise

003774

jurisdiction over such action, such other court of competent jurisdiction that such acts or omissions by such employee, agent, or professional constituted willful fraud, willful misconduct or gross negligence. None of the Claimant Trustee, Delaware Trustee, Oversight Board, or any Member shall be personally liable to the Claimant Trust or to any Person for the acts or omissions of any employee, agent or professional of the Claimant Trust or Claimant Trustee taken or not taken in good faith reliance on the advice of professionals or, as applicable, with the approval of the Bankruptcy Court, unless it is ultimately determined by order of the Bankruptcy Court or, if the Bankruptcy Court either declines to exercise jurisdiction over such action, or cannot exercise jurisdiction over such action, such other court of competent jurisdiction that the Claimant Trustee, Delaware Trustee, Oversight Board, or Member acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent or professional of the Claimant Trust.

8.2    Indemnification.    The Claimant Trustee (including each former Claimant Trustee), Delaware Trustee, Oversight Board, and all past and present Members (collectively, in their capacities as such, the "Indemnified Parties") shall be indemnified by the Claimant Trust against and held harmless by the Claimant Trust from any losses, claims, damages, liabilities or expenses (including, without limitation, attorneys' fees, disbursements, and related expenses) to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against any of the Indemnified Parties in their capacity as Claimant Trustee, Delaware Trustee, Oversight Board, or Member, or in connection with any matter arising out of or related to the Plan, this Agreement, or the affairs of the Claimant Trust, unless it is ultimately determined by order of the Bankruptcy Court or other court of competent jurisdiction that the Indemnified Party's acts or omissions constituted willful fraud, willful misconduct, or gross negligence. If the Indemnified Party becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with the Plan, this Agreement or the affairs of the Claimant Trust for which an indemnification obligation could arise, the Indemnified Party shall promptly notify the Claimant Trustee and/or Oversight Board, as applicable; provided, however, that the failure of an Indemnified Party to promptly notify the Claimant Trustee and/or Oversight Board of an indemnification obligation will not excuse the Claimant Trust from indemnifying the Indemnified Party unless such delay has caused the Claimant Trust material harm. The Claimant Trust shall pay, advance or otherwise reimburse on demand of an Indemnified Party the Indemnified Party's reasonable legal and other defense expenses (including, without limitation, the cost of any investigation and preparation and attorney fees, disbursements, and other expenses related to any claim that has been brought or threatened to be brought) incurred in connection therewith or in connection with enforcing his or her rights under this Section 8.2 as a Claimant Trust Expense, and the Claimant Trust shall not refuse to make any payments to the Indemnified Party on the assertion that the Indemnified Party engaged in willful misconduct or acted in bad faith; provided that the Indemnified Party shall be required to repay promptly to the Claimant Trust the amount of any such advanced or reimbursed expenses paid to the Indemnified Party to the extent that it shall be ultimately determined by Final Order that the Indemnified Party engaged in willful fraud, misconduct, or negligence in connection with the affairs of the Claimant Trust with respect to which such expenses were paid; provided, further, that any such repayment obligation shall be unsecured and interest free. The Claimant Trust shall indemnify and hold harmless the employees, agents and professionals of the Claimant Trust and Indemnified Parties to the same extent as provided in this Section 8.2 for the Indemnified Parties.

003775

For the avoidance of doubt, the provisions of this Section 8.2 shall remain available to any former Claimant Trustee, Delaware Trustee, or Member or the estate of any decedent Claimant Trustee or Member, solely in their capacities as such. The indemnification provided hereby shall be a Claimant Trust Expense and shall not be deemed exclusive of any other rights to which the Indemnified Party may now or in the future be entitled to under the Plan or any applicable insurance policy. The failure of the Claimant Trust to pay or reimburse an Indemnified Party as required under this Section 8.2 shall constitute irreparable harm to the Indemnified Party and such Indemnified Party shall be entitled to specific performance of the obligations herein.

8.3     <u>No Personal Liability</u>.  Except as otherwise provided herein, neither of the Trustees nor Members of the Oversight Board shall be subject to any personal liability whatsoever, whether in tort, contract, or otherwise, to any Person in connection with the affairs of the Claimant Trust to the fullest extent provided under Section 3803 of the Delaware Statutory Trust Act, and all Persons asserting claims against the Claimant Trustee, Litigation Trustee, or any Members, or otherwise asserting claims of any nature in connection with the affairs of the Claimant Trust, shall look solely to the Claimant Trust Assets for satisfaction of any such claims.

8.4     <u>Other Protections</u>.  To the extent applicable and not otherwise addressed herein, the provisions and protections set forth in Article IX of the Plan will apply to the Claimant Trust, the Claimant Trustee, the Litigation Trustee, and the Members.

<div align="center">

**ARTICLE IX.**
**TERMINATION**
</div>

9.1     <u>Duration</u>.  The Trustees, the Claimant Trust, and the Oversight Board shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets.

9.2     <u>Distributions in Kind</u>.  Upon dissolution of the Claimant Trust, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

003776

9.3 <u>Continuance of the Claimant Trustee for Winding Up</u>. After dissolution of the Claimant Trust and for purpose of liquidating and winding up the affairs of the Claimant Trust, the Claimant Trustee shall continue to act as such until the Claimant Trustee's duties have been fully performed. Prior to the final distribution of all remaining Claimant Trust Assets, the Claimant Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Claimant Trustee's own costs and expenses, including a reserve to fund any potential indemnification or similar obligations of the Claimant Trust, until such time as the winding up of the Claimant Trust is completed. Upon the dissolution of the Claimant Trust and completion of the winding up of the assets, liabilities and affairs of the Claimant Trust pursuant to the Delaware Statutory Trust Act, the Claimant Trustee shall file a certificate of cancellation with the State of Delaware to terminate the Claimant Trust pursuant to Section 3810 of the Delaware Statutory Trust Act (such date upon which the certificate of cancellation is filed shall be referred to as the "<u>Termination Date</u>"). Upon the Termination date, the Claimant Trustee shall retain for a period of two (2) years, as a Claimant Trust Expense, the books, records, Claimant Trust Beneficiary lists, and certificated and other documents and files that have been delivered to or created by the Claimant Trustee. At the Claimant Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the Termination Date.

9.4 <u>Termination of Duties</u>. Except as otherwise specifically provided herein, upon the Termination Date of the Claimant Trust, the Claimant Trustee, the Oversight Board and its Members shall have no further duties or obligations hereunder.

9.5 <u>No Survival</u>. The rights of Claimant Trust Beneficiaries hereunder shall not survive the Termination Date, <u>provided</u> that such Claimant Trust Beneficiaries are provided with notice of such Termination Date.

<div align="center">

**ARTICLE X.**
**AMENDMENTS AND WAIVER**

</div>

The Claimant Trustee, with the consent of a simple majority of the Oversight Board, may amend this Agreement to correct or clarify any non-material provisions. This Agreement may not otherwise be amended, supplemented, otherwise modified, or waived in any respect except by an instrument in writing signed by the Claimant Trustee and with the unanimous approval of the Oversight Board, and the approval of the Bankruptcy Court, after notice and a hearing; <u>provided</u> that the Claimant Trustee must provide the Oversight Board with prior written notice of any non-material amendments, supplements, modifications, or waivers of this Agreement.

<div align="center">

**ARTICLE XI.**
**MISCELLANEOUS**

</div>

11.1 <u>Trust Irrevocable</u>. Except as set forth in this Agreement, establishment of the Claimant Trust by this Agreement shall be irrevocable and shall not be subject to revocation, cancellation or rescission by the Claimant Trust Beneficiaries.

11.2 <u>Bankruptcy of Claimant Trust Beneficiaries</u>. The dissolution, termination, bankruptcy, insolvency or other similar incapacity of any Claimant Trust Beneficiary shall not

003777

permit any creditor, trustee, or any other Claimant Trust Beneficiary to obtain possession of, or exercise legal or equitable remedies with respect to, the Claimant Trust Assets.

11.3    <u>Claimant Trust Beneficiaries have No Legal Title to Claimant Trust Assets</u>.  No Claimant Trust Beneficiary shall have legal title to any part of the Claimant Trust Assets.

11.4    <u>Agreement for Benefit of Parties Only</u>.  Nothing herein, whether expressed or implied, shall be construed to give any Person other than the Claimant Trustee, Oversight Board, and the Claimant Trust Beneficiaries any legal or equitable right, remedy or claim under or in respect of this Agreement.  The Claimant Trust Assets shall be held for the sole and exclusive benefit of the Claimant Trust Beneficiaries.

11.5    <u>Notices</u>.  All notices, directions, instructions, confirmations, consents and requests required or permitted by the terms hereof shall, unless otherwise specifically provided herein, be in writing and shall be sent by first class mail, facsimile, overnight mail or in the case of mailing to a non-United States address, air mail, postage prepaid, addressed to:

(a)    If to the Claimant Trustee:

Claimant Trustee
c/o **[insert contact info for Claimant Trustee]**

With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067
Attn:  Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
   Ira Kharasch (ikharasch@pszjlaw.com)
   Gregory Demo (gdemo@pszjlaw.com)

Notice mailed shall be effective on the date mailed or sent.  Any Person may change the address at which it is to receive notices under this Agreement by furnishing written notice pursuant to the provisions of this Section 11.5 to the entity to be charged with knowledge of such change.

11.6    <u>Severability</u>.  Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in another jurisdiction.

11.7    <u>Counterparts</u>.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

11.8    <u>Binding Effect, etc.</u>  All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Claimant Trust, the Claimant Trustee, and the

003778

Claimant Trust Beneficiaries, and their respective successors and assigns. Any notice, direction, consent, waiver or other instrument or action by any Claimant Trust Beneficiary shall bind its successors and assigns.

11.9 <u>Headings; References</u>. The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.10 <u>Governing Law</u>. This Agreement shall in all respects be governed by, and construed in accordance with the laws of the State of Delaware, including all matters of constructions, validity and performance.

11.11 <u>Consent to Jurisdiction</u>. Each of the parties hereto, each Member (solely in their capacity as Members of the Oversight Board), and each Claimant Trust Beneficiary consents and submits to the exclusive jurisdiction of the Bankruptcy Court for any action or proceeding instituted for the enforcement and construction of any right, remedy, obligation, or liability arising under or by reason of this Agreement, the Plan or any act or omission of the Claimant Trustee (acting in his capacity as the Claimant Trustee or in any other capacity contemplated by this Agreement or the Plan), Litigation Trustee (acting in his capacity as the Litigation Trustee or in any other capacity contemplated by this Agreement or the Plan), the Oversight Board. or any individual Member (solely in their capacity as Members of the Oversight Board); *provided, however*, that if the Bankruptcy Court either declines to exercise jurisdiction over such action or cannot exercise jurisdiction over such action, such action may be brought in the state or federal courts located in the Northern District of Texas.

11.12 <u>Transferee Liabilities</u>. The Claimant Trust shall have no liability for, and the Claimant Trust Assets shall not be subject to, any claim arising by, through or under the Debtor except as expressly set forth in the Plan or in this Agreement. In no event shall the Claimant Trustee or the Claimant Trust Beneficiaries have any personal liability for such claims. If any liability shall be asserted against the Claimant Trust or the Claimant Trustee as the transferee of the Claimant Trust Assets on account of any claimed liability of, through or under the Debtor or Reorganized Debtor, the Claimant Trustee may use such part of the Claimant Trust Assets as may be necessary to contest any such claimed liability and to pay, compromise, settle or discharge same on terms reasonably satisfactory to the Claimant Trustee as a Claimant Trust Expense.

[Remainder of Page Intentionally Blank]

003779

IN WITNESS HEREOF, the parties hereto have caused this Claimant Trust Agreement to be duly executed by their respective officers thereunto duly authorized on the day and year first written above.

Highland Capital Management, L.P.

By: _____
James P. Seery, Jr.
Chief Executive Officer and
Chief Restructuring Officer

Claimant Trustee

By: _____
James P. Seery, Jr., not individually but solely in his capacity as the Claimant Trustee

37

003780

Exhibit

003781

Jason S. Brookner (Texas Bar No. 24033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
Drake M. Rayshell (Texas Bar No. 24118507)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, TX 75201
Telephone: (214) 954-4135
Facsimile:  (214) 953-1332
Email:     jbrookner@grayreed.com
           dyork@grayreed.com
           jsmeltzer@grayreed.com
           drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | § § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Adversary No. 25-03055 |
| PATRICK HAGAMAN DAUGHERTY, | § § § | |
| Defendant. | § § § § | |

## PATRICK DAUGHERTY'S
## <u>MOTION TO DISMISS</u>

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Defendant Patrick Daugherty ("<u>Daugherty</u>") moves to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(6) (incorporated herein by Fed. R. Bankr. P. 7012(b)) for failure to state a claim upon which relief may be granted. Further, the Court should deny leave for further amendments of the Complaint, as no amendment can cure what is otherwise a fatal defect: that the IRS Audit Dispute remains pending and is not yet final.

## I.   SUMMARY

1.      Plaintiff filed its *Complaint for (1) Disallowance of Claim No. 205 in its Entirety, (2) Estimation of Claim no. 205 for Allowance Purposes, or (3) Subordination of Any Allowed Portion of Claim No. 205 of Patrick Hagaman Daugherty* [Docket No. 1] (the "<u>Complaint</u>") in the face of a Settlement Agreement approved by this Court on March 8, 2022,[2] that mandates a stay of any litigation by and between Plaintiff and Daugherty until the Internal Revenue Service ("<u>IRS</u>") makes a final determination regarding an IRS Audit Dispute material to Daugherty's Reserved Claim under the Settlement Agreement.[3]  As Plaintiff concedes in its briefing, that IRS Audit Dispute remains unresolved.[4]  Accordingly, Plaintiff's claim is premature, subject to the

---

[2] *See* Doc. No. 1 at ¶ 14 (citing Main Case Docket No. 3088, which itself incorporates and relies upon the "<u>Settlement Agreement</u>" at Main Case Docket No. 3089, Ex. 1). When reviewing a 12(b)(6) motion to dismiss, the Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011)(quoting *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).  In doing so, the Court may take judicial notice of its own records. *E.g., Biliouris as next friend of Biliouris v. Patman*, 751 Fed. App'x 603, 604 (5th Cir. 2019)("court may take judicial notice of the record in prior related proceedings"); *ITT Rayonier Inc. v. U.S.*, 651 F.2d 343, 345 n.2 (5th Cir. 1981)("court may… take judicial notice of its own records…").  Plaintiff incorporated the Settlement Agreement by reference in its Complaint.  Daugherty also respectfully requests the Court also take judicial notice of the Settlement Agreement at Main Case Docket No. 3089 as it considers this Motion to Dismiss.

[3] All capitalized terms used but not herein defined shall have the meanings ascribed to them in the Settlement Agreement at Main Case Docket No. 3089.

[4] Indeed, Plaintiff concedes as much stating "[o]n information and belief, the 2008 Audit has not been resolved and is heading to court with a resolution not expected until approximately 2029." Docket No. 1 at ¶ 23, n. 6.

Settlement Agreement's mandatory stay, and should be dismissed for failure to state a claim upon which relief may be granted.

## II.    BACKGROUND

2.     On March 8, 2022, Daugherty and Plaintiff entered a Settlement Agreement to resolve, in part, his claims against Highland Capital Management, L.P. ("<u>Debtor</u>" or "<u>Plaintiff</u>"). Main Case Docket No. 3088, 3089.

3.     Under that Settlement Agreement, Daugherty retained a Reserved Claim relating to an audit/dispute between the Debtor and the IRS concerning the Debtor's 2008 tax return.[5]  Main Case Docket No. 3089 at Ex. 1, § 9.  Critically, under the terms of the Settlement Agreement, "[a]ny litigation by and between the [Debtor] and Daugherty concerning the validity and amount of the Reserved Claim *shall be stayed* until the IRS makes a final determination with respect to the IRS Audit Dispute."  *Id.* (emphasis added).

4.     Despite the Settlement Agreement's mandatory stay language, Plaintiff filed its Complaint asserting three claims for relief: (1) disallowance under section 502(a) of the Bankruptcy Code; (2) estimation under section 502(c) of the Bankruptcy Code; and (3) subordination under section 510(b) of the Bankruptcy Code.  *See* Docket No. 1 at ¶¶ 28-45.  Each of those claims seek a determination from this Court on the "validity and amount" of Daugherty's Reserved Claim relating to the IRS Audit Dispute.  Yet, Plaintiff concedes that resolution of the

---

[5] Although Daugherty acknowledges that for purposes of ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) the Court must accept as true the allegations in the Complaint, Daugherty disputes Plaintiff's characterization of the Reserved Claim.  The Reserved Claim concerns a compensation and benefits contract, between Plaintiff and Daugherty relating to Daugherty's cash bonus, that was presented pursuant to a tax refund scheme developed by Plaintiff during the financial crisis in 2008 and 2009.  That tax refund scheme was later challenged by the IRS.  Indeed, despite Plaintiff's passing attempt to downplay the document's language as vague, the "validity and amount" issues that are the gravamen of Daugherty's Reserved Claim (which is subject to the mandatory stay) relate to whether Plaintiff's refund "deviat[ed] materially from [Debtor's] estimate" such that "other compensation [to Daugherty should have been] fairly adjusted" as promised.  Docket No. 1-1.  Moreover, Plaintiff's Fifth Amended Plan of Reorganization, which was confirmed by the Court, provided for "Disputed Claims" and required the Claimant Trustee under the Plan to maintain a reserve account for such claims.

4909-5194-8358

003784

IRS Audit Dispute is still pending, alleging that "Highland's 2008 tax return *is currently subject to an IRS audit.*" *Id.* at ¶ 3 (emphasis added). Plaintiff further concedes "the 2008 Audit has not been resolved" and "[i]t is unclear when, how, or if the 2008 Audit will be finally resolved." *Id.* at ¶¶ 4, 23 n. 6; *see also id.* at ¶ 38. Finally, Plaintiff acknowledges Daugherty's Reserved Claim is "contingent on the final outcome of the 2008 Audit." *Id.* at ¶ 35.

5.      As such, Plaintiff's claims are premature, run afoul of the Settlement Agreement's mandatory stay, and should be dismissed pursuant Fed. R. Civ. P. 12(b)(6).

### III.     LEGAL STANDARD

6.      To survive a motion to dismiss under Rule 12(b)(6), Plaintiff must assert a theory that could entitle it to relief. Fed. R. Civ. P. 12(b)(6). In support of that theory, a complaint must allege "sufficient factual matter" that, taken as true, "state[s] a claim for relief [that] is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff must establish more than a "sheer possibility that a defendant has acted unlawfully." *Id.* This Court need not accept as true legal conclusions or conclusory factual allegations. *Id.* "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 761 (S.D. Tex. 2010) (quoting *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007)) (cleaned up).

### IV.     ARGUMENT

7.      The final determination of the IRS Audit Dispute is a dispositive condition precedent to Plaintiff's right to commence and maintain any litigation concerning the amount or validity of Daugherty's Reserved Claim. The Complaint does not allege that a final determination has occurred, nor can it. In fact, the Complaint alleges the exact opposite: that the IRS Audit Dispute is *ongoing*. For this reason alone, the Complaint should be dismissed.

4909-5194-8358

003785

8.     To the extent Plaintiff makes any claim of finality—despite not alleging it in the Complaint—that claim is the result of a fundamental misunderstanding of the administrative procedure at the IRS for auditing, assessing, and collecting tax amounts that are allegedly due following a partnership audit.  There is no practical or economic effect of the IRS's *proposed* adjustment at the end of an audit beyond just that—*proposing* changes to partnership items subject to challenge by the partners, the courts, and subsequent limitations on assessment and collection.

9.     Partnership audit procedures, in this case, are governed by the standards established in the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA").  *See* 26 U.S.C. §§ 6221-6234, adopted by TEFRA, Pub. L. No. 97-248, § 402(a).  TEFRA governs partnership audits for partnership years beginning after September 3, 1982, and applies generally to partnership tax years from 1983 through 2017 and subsequent tax years are governed by different rules.[6]  Determinations at the partnership level are binding upon all direct and indirect partners of the partnership and, in the absence of a partnership-level proceeding, the IRS is bound by the partnership items as reported on the partnership return.  *Sente Inv. Club P'Ship of Utah v. Commissioner*, 95 T.C. 243, 247-250 (1990); *Roberts v. Commissioner,* 94 T.C. 853, 862 (1990).  The tax matters partner ("TMP"),[7] plays an important role in the audit and in any resulting administrative proceedings,[8] conducts judicial proceedings,[9] and is obligated to keep the partners informed.[10]  The IRS has a duty to issue

---

[6] The Bipartisan Budget Act of 2015 repealed the TEFRA procedures entirely for partnership tax years beginning after December 31, 2017.  Bipartisan Budget Act of 2015, Pub. L. No. 114-74§§ 1101(g)(1), 1101(g)(4).  All references to Internal Revenue Code (IRC) provisions are TEFRA versions of those IRC provisions enacted on September 3, 1982.

[7] 26 U.S.C. § 6231(a)(7); Treas. Reg. § 301.6231(a)(7)-1.

[8] 26 U.S.C. § 6224(c)(3); Treas. Reg. § 301.6224(c)-1.

[9] 26 U.S.C. § 6226.

[10] 26 U.S.C. § 6223(g); Treas. Reg. § 301.6223(g)-1.

4909-5194-8358

003786

certain notices,[11] and partners have a right to participate in the administrative proceedings unless they waive or fail to exercise their rights.[12]

10.     The IRS commences an audit by giving notice to all partners and all partners may participate in the audit, but the primary representative is the Tax Matters Partner ("TMP").  26 U.S.C. § 6223(a); 26 U.S.C. § 6231(a)(7); Treas. Reg. § 301.6231(a)(7)-1(b)(1).  A partnership audit is concluded by the IRS issuing a no-change finding or a Final Partnership Administrative Adjustment ("FPAA"). 26 U.S.C. § 6223(a)(2); Internal Revenue Manual § 8.19.12.3.  The IRS is required to mail an FPAA to the TMP, all notice partners, and representatives of notice groups.  The mailing of the FPAA to the TMP starts the clock on various procedures that are contingent on issuance of an FPAA.  *See e.g., Triangle Investors Ltd. Partners v. Comm'r*, 95 TC 610 (1990).  The mailing to the remaining partners must occur within 60 days after the mailing to the TMP.  *See Byrd Invs. v. CIR*, 89 TC 1 (1988)**,** aff'd, 853 F2d 928 (11th Cir. 1988) (procedures for mailing to partners other than TMP satisfy due process).

11.     The IRS cannot assess tax resulting from adjustments to partnership items until the notice of an FPAA has been mailed, at least 150 days have elapsed after the mailing *and* the FPAA has not been contested.  26 U.S.C. § 6225(a)(1).  If the IRS violates the assessment restriction, the assessment can be enjoined.  26 U.S.C. § 6225(b).  If a Tax Court petition is filed within 150 days after the FPAA notice, no deficiency attributable to a partnership item may be assessed until the court's decision on the matter becomes final.  26 U.S.C. § 6225(a)(1).  Partners who receive an FPAA are allowed to file a petition contesting the FPAA in the Tax Court, a federal district court, or the Court of Federal Claims.  26 U.S.C. § 6226; Internal Revenue Manual § 8.19.12.11.1.

---

[11] 26 U.S.C. § 6223(a)-(b); Treas. Reg. § 301.6223(b)-1, (e)-1, (e)-2.

[12] IRC § 6224(a), IRC § 6224(b); Treas. Reg. § 301.6224(a)-1, (b)-1.

4909-5194-8358

003787

12.     Based on information and belief, Defendant expects that a challenge is most likely to occur in the U.S. Tax Court.  In that instance, the Tax Court will employ the same reasoning applied in deficiency cases to a decision in a TEFRA proceeding.  *See Cinema '84 v. Commissioner*, 122 T.C. 264 (2004).  Any partner can appeal the decision, subject to the usual rules for appeals from the deciding court.  26 U.S.C. §§ 6226(g), 7485(b).  Under TEFRA, there is only one appeal to one circuit court.  *See* 26 U.S.C. § 7482(b)(1)(A); *Abatti v. Comm'r*, 86 T.C. 1319 (1986), *aff'd*, 859 F.2d 115 (9th Cir. 1988).  If no notice of appeal is filed within the applicable period, the decision of the trial court becomes final and unappealable at the end of the appeal period.  26 U.S.C. § 7481(a)(1); *see also Benenson v. United States*, 385 F.2d 26 (2d Cir. 1967); *Richland Knox Mutual Ins. Co. v. Kallen*, 376 F.2d 360 (6th Cir. 1967).

13.     If an appeal is filed, the decision becomes final after the appeal is resolved and the time to take any further appeal expires.  Once the decision becomes final, the decision cannot be challenged without moving to vacate the court decision.  *See* Tax Court Rule 162; *see also Tashjian v. Comm'r*, 320 Fed. App'x. 649 (9th Cir. 2009) (cannot contest partnership item decision in subsequent collection due process case for partner).  The finality date is critical for determination of the statute of limitations and the IRS generally has at least one year after the date the decision becomes final to assess the partnership item adjustments.  *See* 26 U.S.C. § 6229(d)(2).

14.     Here, each and every one of Plaintiff's allegations is premised on speculating what the final outcome of the 2008 Audit will be.  The FPAA, once one is issued, is subject to challenge and adjustment by the TMP and other partners and, if challenged, no assessment of any proposed adjustment can occur until a final decision is entered by the courts..  Even at the conclusion of all the court proceedings, which Plaintiff itself estimates will not occur until 2029,[13] the adjustments

---

[13] *Supra*, note 4.

003788

may still never occur if the IRS does not follow the requirements for assessment within the given statute of limitations. In short, the issuance of an FPAA at this stage—assuming one has actually been issued—is meaningless beyond providing a clear understanding of the IRS position on certain tax return items, and is subject to challenge and potential change by the partners or the courts.

15.     Therefore, Plaintiff has failed to allege any facts which give rise to plausible claims for relief against Daugherty. As a result, all claims against Daugherty should be dismissed without prejudice.

## V.     DISMISSAL SHOULD BE WITHOUT PREJUDICE, AND LEAVE TO AMEND SHOULD BE DENIED

16.     Leave to amend is not automatic, but "is within the sound discretion of the district court." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003) (internal citations omitted). Courts typically afford leave to amend at least once, however, a plaintiff should be denied leave to amend if the court determines that the proposed change is frivolous or advances a claim or defense that is legally insufficient on its face. *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 761 (S.D. Tex. 2010); *Ayers v. Johnson*, 247 Fed. Appx. 534, 535 (5th Cir. 2007).

17.     As set forth above, Plaintiff's claim is premature and as a result cannot be corrected by an amended pleading. Accordingly, should Plaintiff seek leave to amend, such request would be futile and should be categorically denied.

## VI.     CONCLUSION

18.     For the foregoing reasons, the Court should dismiss all claims against Daugherty because the Complaint does not satisfy the Rule 12(b)(6) pleading requirements as it fails to state a claim upon which relief may be granted. Additionally, the Court should deny leave to amend because any attempt to amend the Complaint at this time would be futile as the IRS Audit Dispute

003789

remains pending and unresolved.  Alternatively, the Court should stay this adversary proceeding until the Debtor's IRS Audit Dispute is fully and finally resolved.

Respectfully submitted this 4th day of June 2025.

**GRAY REED**

By: _/s/ Andrew K. York_ _____

Jason S. Brookner
Texas Bar No. 24033684
Andrew K. York
Texas Bar No. 24051554
Joshua D. Smeltzer
Texas Bar No. 24113859
Drake M. Rayshell
Texas Bar No. 24118507
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:    (469) 320-6050
Facsimile:    (469) 320-6886
Email:         jbrookner@grayreed.com
               dyork@grayreed.com
               jsmeltzer@grayreed.com
               draysehll@grayreed.com

*Counsel to Patrick Daugherty*

003790

## CERTIFICATE OF SERVICE

     I hereby certify that a true and accurate copy of the foregoing instrument was served on all Parties or counsel of record herein on this 4th day of June 2025, via the CM/ECF system and/or email.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz
CA Bar No. 143717
jpomerantz@pszjlaw.com
John A. Morris
NY Bar No. 2405397
jmorris@pszjlaw.com
Gregory V. Demo
NY Bar No. 5371992
gdemo@pszjlaw.com
Hayley R. Winograd
NY Bar No. 5612569
hwinograd@pszjlaw.com
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

**HAYWORD PLLC**
Melissa S. Hayward
TX Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
TX Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

By: /s/ *Andrew K. York*
     Andrew K. York

4909-5194-8358

003791

# Exhibit 7

| | |
|---|---|
| **From:** | Gregory V. Demo |
| **To:** | Drew K. York; John A. Morris |
| **Cc:** | Jeff Pomerantz; zannable@haywardfirm.com; Jason S. Brookner; Drake Rayshell |
| **Subject:** | [EXTERNAL] Highland - Eighth Distribution Notice |
| **Date:** | Tuesday, May 20, 2025 12:41:33 PM |
| **Attachments:** | Eighth Distribution Notice - Pat Daugherty .pdf |

Counsel,

Attached is the eighth distribution notice from the Highland Claimant Trust to Mr. Daugherty.
It is being delivered concurrently to Mr. Daugherty via U.S. mail.  Can you please forward him
the attached?

Best,
Greg

**Gregory V. Demo**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Cell: 312.662.3573 | Fax: 212.561.7777
GDemo@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | New York | Wilmington, DE | Houston | San Francisco

003793

CONFIDENTIAL

Highland Claimant Trust
100 Crescent Court, Suite 1850
Dallas, TX 75201

May 20, 2025

Patrick Daugherty
3621 Cornell Ave, Ste 830
Dallas, TX 75205

Dear Patrick Daugherty:

Highland Claimant Trust is making a distribution (the "**Eighth Distribution**") of cash proceeds to holders of Claimant Trust Interests in accordance with Article VI of the Claimant Trust Agreement.

Your share of the Eighth Distribution is $797,269.56, of which $781,707.29 represents the remaining portion of your previously allowed Class 9 claim and $15,562.27 represents all accrued interest with respect to such claim. No further distributions will be made on account of your allowed Class 9 claim after the Eighth Distribution, provided however that you still have an unresolved and pending claim that is separate from your allowed Class 9 claim, which has neither been allowed nor disallowed as of the date of this notice. The Eighth Distribution will be paid out to you on or about May 20, 2024.

The foregoing is not intended to provide, and should not be relied on for, tax, legal or accounting advice. You should consult your own tax, legal and accounting advisors regarding treatment of the Eighth Distribution. This notice contains confidential information and is intended only for the addressee named herein. If you are not named addressee, you should not disseminate, distribute, or copy this notice. If you have received this notice by mistake, please notify David Klos immediately by e-mail (dklos@highlandcapital.com) and delete it along with any copies in your possession. If you are not the intended recipient, you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.

Sincerely,

James P. Seery, Jr.
Claimant Trustee, Highland Claimant Trust

003794

# Exhibit

003795

**Department of the Treasury**
**Internal Revenue Service**
**Pass- Through Entity/LB&I**
1973 Rulon White Blvd
Ogden UT, 84404
M/S 4552

Date:
NOV 20 2024
Mail stop:
4552
Taxpayer ID number (last 4 digits):
7373
Tax periods:
2009-2010
Person to contact:
Name: Mrs. Berrett
ID number: 1003947641
Telephone: 385-426-0355
Fax: (855) 244-9679
Hours: 8:00-15:30 MT
Related partnership/S corporation information:
Name: HIGHLAND CAPITAL MAN
Taxpayer ID number: 6725
Tax period: 2008

PATRICK H & KIMBERLY A DAUGHERTY
3621 CORNELL AVE
DALLAS
TX 75205-2818

Dear Mrs or Mr Daugherty:

**Why you're receiving this letter**
We might have to adjust your tax return based on our examination of the
HIGHLAND CAPITAL MANAGMENT listed above. Although your investment in the related
HIGHLAND CAPITAL MANAGMENT may be direct or indirect, any tax adjustment from this examination
may result in the IRS adjusting your tax returns.

**What you need to know**
We're unable to obtain your original Forms 1040 for tax years 2009 - 2010. We need copies of your original tax
returns with their schedules, documents, statements, and any amended returns as applicable.

Please submit a copy of the tax return for the year listed above and also a copy of tax returns for years with
potential carryover issues created from the partnership audit based on the K1 items as they flow to your tax
return. Attach all forms, schedules and calculations for any carryovers and carryover limitations.

The normal statute of limitations (to adjust a tax return) is three years from the due date of the return or three
years from the date of the returns filing, whichever is later. However, to allow us enough time to complete
TEFRA partnership examinations, we may extend the statute of limitations at the partnership level. These
extensions apply to partner adjustments resulting from the partnership examination. This statute is open until the
partnership flow-through issues are resolved.

**What you need to do within 30 days from the date of this letter**
Supply the requested information:
- Mail to the address shown above, or
- Fax to the number shown above using either a fax machine or online fax service. Protect yourself when
  sending digital data by understanding the fax service's privacy and security policies.

Include your phone number, the hours we can reach you, and a copy of this letter with your response. If you
send tax return information, write "COPY DO NOT PROCESS" in red on the top of your return.

Thank you for your cooperation.

Letter 5639 (Rev. 7-2023)
Catalog Number 68243X

003796

If you have questions, you can call the contact person shown above.

Sincerely,

**Tracy J. Berrett** Digitally signed by Tracy J. Berrett
Date: 2024.11.15 14:42:57 -07'00'

Tracy Berrett
Tax Examining Tech

**Letter 5639 (Rev. 7-2023)**
Catalog Number 68243X

003797

# Exhibit 9

003798

Case 19-34054-sgj11 Doc 158 Filed 05/19/22 Entered 05/19/22 11:49:42 Page 1 of 8
Case 3:25-cv-01876-K    Document 35-119 Filed 09/12/25    Page 352 of 1195    PageID 10085
Docket #0158 Date Filed: 5/19/2022

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Alexandre J. Tschumi (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000

**SIDLEY AUSTIN LLP**
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation*
*Trustee of the Highland Litigation Sub-Trust*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>    Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST,<br><br>    Plaintiff,<br><br>       v.<br><br>JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA OKADA FAMILY TRUST – | Adv. Pro. No. 21-03076-sgj<br><br>AMENDED COMPLAINT AND OBJECTION TO CLAIMS |

---

[1]  The last four digits of the Reorganized Debtor's taxpayer identification number are (8357).  The Reorganized Debtor is a Delaware limited partnership.  The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.

1934054220520000000000002
003799

Case 21-34074-sgj11 Doc 158 Filed 05/19/22 Entered 05/19/22 06/25/25 11:49:42 of 146
Case 3:25-cv-01876-K    Document 35-19 Filed 06/13/25    Page 353 of 1195    PageID 10066
Exhibit 9    Page 3 of 547

EXEMPT TRUST #2 AND LAWRENCE
TONOMURA IN HIS CAPACITY AS TRUSTEE
OF MARK & PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2; CLO HOLDCO,
LTD.; CHARITABLE DAF HOLDCO, LTD.;
CHARITABLE DAF FUND, LP.; HIGHLAND
DALLAS FOUNDATION; RAND PE FUND I,
LP, SERIES 1; MASSAND CAPITAL, LLC;
MASSAND CAPITAL, INC.; AND SAS ASSET
RECOVERY, LTD.,

        Defendants.

## TABLE OF CONTENTS

<div align="right">Page</div>

I.    INTRODUCTION ......................................................................................................1

II.   PARTIES ....................................................................................................................4

III.  JURISDICTION, VENUE & STANDING ...........................................................12

IV.  FACTUAL ALLEGATIONS ..................................................................................14

    A.    Dondero Creates HCMLP.............................................................................14

    B.    HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages ..........15

    C.    In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business ...........................................................................18

          1.    NexPoint ...........................................................................................19

          2.    HCMFA ............................................................................................22

    D.    Dondero, Ellington, and Leventon Cause HCMLP To Engage In Misconduct That Exposes It To Additional Liability ...........................................25

          1.    Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry...........................................................26

          2.    Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest ......................29

          3.    Dondero And His Accomplices, Including Ellington and Leventon, Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS ...................................................................................30

          4.    Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty .............................................33

    E.    Dondero, Ellington, and Leventon Cause HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy ......................................................35

    F.    Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP ...................................................................................................38

          1.    HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct ...............................39

          2.    HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct ......................................................................41

          3.    HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct ......................42

<div align="center">i</div>

003801

G.     HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy ...................... 43

H.     At All Time Relevant To This Amended Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit ........................................................................................ 46

      1.     Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand ................................................................ 46

      2.     Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form ...................................................................... 47

I.     Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP ...................................................................................................... 55

      1.     Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities ................................... 55

           (a)     The Fraudulent CLO Holdco Transaction ...................... 55

           (b)     Fraudulent Distributions ................................................ 58

           (c)     Fraudulent Transfers To Massand ................................. 63

J.     Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds ...................................................................... 65

K.     Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction ...................................................................... 66

V.     CAUSES OF ACTION .................................................................................... 67

PRAYER FOR RELIEF ................................................................................................ 141

003802

Plaintiff Marc S. Kirschner (the "<u>Litigation Trustee</u>"), as Litigation Trustee of the Litigation Sub-Trust (the "<u>Trust</u>") established pursuant to the Fifth Amended Plan of Reorganization (the "<u>Plan</u>") of Highland Capital Management L.P. ("<u>HCMLP</u>" or the "<u>Reorganized Debtor</u>") (Docket No. 1472), through his undersigned counsel, brings this action and alleges as follows:

## I.   INTRODUCTION[2]

1.      The Litigation Trustee brings this action to recover hundreds of millions of dollars in damages that HCMLP suffered at the hands of its founder, James Dondero, acting in concert with other entities that he owned and/or controlled (collectively, the "<u>Dondero Entities</u>"), and with the aid of other HCMLP officers and attorneys who disregarded their fiduciary duties to HCMLP in favor of Dondero and their own self-interests.

2.      HCMLP was founded in 1993 as an investment advisor that also provided middle- and back-office services and engaged in proprietary trading.  Prior to its bankruptcy filing on October 16, 2019, HCMLP was one of more than 2,000 Dondero Entities.  The Dondero Entities were operated and controlled for Dondero's benefit, with Dondero utilizing complex corporate structures and transactions to transfer money and assets between the various Dondero Entities in the manner he viewed most advantageous to his own bottom line, including to avoid creditors, exploit personal tax benefits, and ensure that assets were preserved for his benefit and profits ultimately flowed to him.

3.      HCMLP was at the center of Dondero's web: it employed nearly all of the people who performed services for myriad Dondero Entities, and it was those employees who carried out the substantive work for the Dondero Entities.  Even when HCMLP's full role was hidden—

---

[2]   Capitalized terms not defined in this section are defined later in the Amended Complaint.

003803

either because it was not credited at all, or because it was identified only as a sub-advisor or service provider to Dondero's other management companies—it was HCMLP personnel executing Dondero's strategies for a wide array of Dondero Entities.

4.      In or about 2008, after years of successful operations, HCMLP was hit hard by the economic recession.  The recession gave rise to a multitude of lawsuits against HCMLP, and it became embroiled in litigations that threatened to impose crippling damages amounting to hundreds of millions of dollars.

5.      Faced with this looming threat, Dondero devised a plan to siphon business away from HCMLP through the creation of "lifeboats" that he owned and controlled, which he sought to insulate from the claims of HCMLP's litigation creditors once they crystalized.  The lifeboats were set up to provide the management services that HCMLP had been providing before the lifeboats' creation.  The lifeboats were really HCMLP in disguise, however, as they conducted their business through HCMLP's employees, operated out of HCMLP's office, and in several cases, simply took over HCMLP's contracts, diverting the resulting fees away from HCMLP while HCMLP continued to provide the underlying services.  The lifeboats collected the lion's share of the profits for HCMLP's work, while HCMLP bore the majority of expenses.

6.      In the years that followed, Dondero—acting with the aid of certain HCMLP officers and employees—operated HCMLP to further his own personal interests, to HCMLP's detriment.   Among other transgressions, Dondero, standing behind HCMLP's perceived corporate shield:

- Caused HCMLP to pay tens of millions of dollars to or for the benefit of Dondero and his affiliates in order to evade creditors, at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay;

003804

- Caused HCMLP to transfer assets to other Dondero Entities for less than reasonably equivalent value at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay, in order to deprive creditors of the value of the transferred assets;

- Exploited HCMLP to exact vendettas on employees he perceived as disloyal, going so far as to destroy value at HCMLP and other Dondero Entities solely to inflict losses on his perceived enemies;

- Used HCMLP as a vehicle to fraudulently induce an investment of approximately $75 million into another Dondero Entity, with the goal of moving funds to yet another Dondero Entity;

- Caused the fraudulent transfer of assets worth at least $100 million out of HCMLP-managed funds to evade pending litigation claims asserted by UBS;

- Disregarded HCMLP's contractual and fiduciary obligations to investors in certain of HCMLP liquidating funds; and

- Siphoned funds out of HCMLP for use by other Dondero Entities, in exchange for artificially low interest, long-term notes that Dondero later purported to extend (by 30 years) or retroactively forgive, all for no consideration to HCMLP.

7.    Dondero's conduct resulted in a second wave of litigation against HCMLP, exacerbating HCMLP's insolvency, inadequate capitalization, and inability to pay its debts. As was wholly foreseeable, Dondero's conduct hobbled HCMLP with hundreds of millions of dollars of additional contingent litigation liabilities that were all but certain to come due given Dondero's brazen wrongdoing.

8.    In October 2019, the dam broke, and the repercussions of Dondero's actions came crashing down on HCMLP. An arbitration award of approximately $190 million was issued against HCMLP based on Dondero's failure to abide by a negotiated plan of distribution for certain of its liquidating funds, forcing HCMLP to file for bankruptcy protection. Shortly thereafter, a judgment of more than $1 billion was rendered for UBS against two HCMLP-managed funds, leading UBS to file a proof of claim against HCMLP that sought to hold

003805

HCMLP responsible for its role in preventing the Fund Counterparties (defined below) from satisfying any of their debt to UBS.

9. In 2020, HCMLP, finally operating under the control of true and independent fiduciaries, negotiated a settlement with UBS for a total of $75 million in allowed claims. HCMLP was forced to reopen settlement discussions and increase that number to $125 million, however, when HCMLP discovered that in 2017, Dondero and his loyalists had surreptitiously transferred the two funds' remaining assets to a Dondero Entity. Other settlements followed, as HCMLP, burdened by Dondero's blatant wrongdoing, was forced to compromise claim after claim in order to avoid even greater dilution of creditor recoveries.

10. HCMLP now stands liable for more than $350 million in allowed creditor claims—in addition to tens of millions of dollars of costs occasioned by HCMLP's bankruptcy filing—that stem solely from, and would not exist but for, the knowing misconduct of Dondero and his loyalists. The Litigation Trustee thus brings this action to seek redress for the significant harm Dondero and his affiliates and accomplices inflicted on HCMLP, and to ensure that Dondero and those who aided him are not permitted to abscond with or divert value that rightfully belongs to HCMLP and its creditors.

## II. PARTIES

11. Plaintiff Marc S. Kirschner is the Litigation Trustee for the Trust established under HCMLP's Plan.

12. Defendant James D. Dondero is an individual who, upon information and belief, at all times relevant to this Amended Complaint was residing in Dallas, Texas. Dondero is the co-founder of HCMLP and, prior to his removal on January 9, 2020, was the Chief Executive Officer and President of HCMLP. From the time that HCMLP was founded through October

4

16, 2019, when it filed for bankruptcy (the "Petition Date"), Dondero controlled HCMLP

through his position at HCMLP, his ownership of HCMLP's general partner, and his ownership

of, or control over the owners of, HCMLP's limited partnership interests. As set forth below,

Dondero also owns and/or directly or indirectly controls hundreds of Dondero Entities within

the Highland web, including the dozens of Dondero Entities referenced herein.

13.    Defendant Mark A. Okada is an individual who, upon information and belief, at

all times relevant to this Amended Complaint was residing in Dallas, Texas. Okada is the co-

founder of HCMLP and was its Chief Investment Officer until he stepped down in 2019, after

which he assumed an advisory role through the end of that year. After Dondero, Okada was the

next-largest owner of HCMLP or a beneficiary of the distributions it made to its limited

partners. Like Dondero, Okada held his interest in HCMLP directly and through trusts.

14.    Defendant Strand Advisors, Inc. ("Strand") is a Delaware corporation that is

wholly-owned by Dondero. Since HCMLP's formation, Strand has been its general partner and

owned limited partnership interests in HCMLP. At all times relevant to this Amended

Complaint, Strand's principal place of business was 300 Crescent Court, Suite 700, Dallas,

Texas 75201.

15.    Defendant NexPoint Advisors, L.P. ("NexPoint") is a Delaware limited

partnership. NexPoint is 99.9% owned by the Dugaboy Investment Trust, its sole limited

partner. NexPoint's general partner, NexPoint Advisors GP, LLC ("NexPoint GP"), owns the

remaining 0.1%. NexPoint and NexPoint GP were both formed on March 20, 2012. NexPoint

concedes that it is controlled by Dondero, who owns 100% of NexPoint GP and is NexPoint

GP's sole member and president. At all times relevant to this Amended Complaint, NexPoint's

principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

<center>5</center>

<center>003807</center>

16.     Defendant Nancy Dondero is named in her capacity as Trustee of Defendant
Dugaboy Investment Trust ("Dugaboy").  Dugaboy is a grantor trust established under the laws
of the state of Delaware.  Dugaboy was formed pursuant to an October 2010 Trust Agreement
between Dana Scott Breault, as Settlor, and James D. Dondero and Commonwealth Trust
Company, as Trustees.  Dondero is Dugaboy's primary beneficiary.  Under the Dugaboy trust
agreement, Dondero has the power to remove trustees without cause, as well as the power to
appoint successive trustees.  Dugaboy's original Family Trustee was Dondero, and Defendant
Grant James Scott III ("Scott") was its Independent Trustee.  In 2015, Dondero appointed Scott
as the Family Trustee, and shortly thereafter replaced Scott with his sister Nancy.  Between
2016 through confirmation of the Plan, Dugaboy owned a 0.1866% economic interest and a
74.4426% voting interest in HCMLP's Class A partnership interests, and, as set forth above,
owns a 99.9% economic interest in NexPoint.  At all times relevant to this Amended Complaint,
Dugaboy's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

17.     Defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA") is a
Delaware limited partnership.[3]  HCMFA is owned by Strand Advisors XVI, Inc.[4] (which is
HCMFA's general partner and owns a 1% interest in HCMFA); Highland Capital Management
Services, Inc. ("HCMS") (which owns limited partnership interests in HCMFA equal to a
89.6667% ownership interest); and the Okada Family Revocable Trust (which owns limited
partnership interests in HCMFA equal to a 9.3333% ownership interest).   Dondero controls,

---

[3]   HCMFA was originally created by Dondero on February 9, 2009, as Highland Funds Asset
Management, L.P. ("HFAM").  On January 9, 2012, HFAM was renamed Pyxis Capital, L.P.
("Pyxis"), and on February 8, 2013, Pyxis was renamed HCMFA.

[4]   Strand Advisors XVI, Inc. purports to be managed by six individuals, all but one of whom were
previously on HCMLP's payroll.

003808

and is the sole stockholder and director of, Strand Advisors XVI, Inc. Additionally, Dondero and Okada own 75% and 25% of HCMS, respectively.[5] HCMFA has acknowledged that it is controlled by Dondero. At all times relevant to this Amended Complaint, HCMFA's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

      18.    Defendant Scott is an individual who currently resides in North Carolina. At all times relevant to this proceeding, Scott had various roles at numerous Dondero-controlled or affiliated entities: he was the trustee of Get Good Trust; a director of the Highland Dallas Foundation; the managing member of Charitable DAF GP, LLC; the sole director of Charitable DAF Holdco, Ltd.; the managing member of the Charitable DAF Fund; and the director of CLO Holdco, Ltd. Scott is Dondero's long-time friend, former college roommate, and was the best man at Dondero's wedding. Scott has testified under oath that Dondero is his "closest friend." Dondero personally selected Scott as his successor to run the Charitable DAF Fund. Dondero also caused Scott to serve on multiple boards on which Dondero also served, including the boards of the Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. Scott is also the executor of Dondero's will. Dondero, HCMLP, and/or entities controlled by Dondero transferred tens of thousands of dollars' worth of "business gifts" to Scott in the five years prior to the Petition Date. Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and HCMLP's directives without asking questions or requesting additional information.

---

[5]  Dondero is the Director and President of Highland Capital Management Services, Inc. Scott Ellington is its Secretary.

003809

19.     Defendant Scott Ellington ("Ellington") was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest.  At all times relevant to this Amended Complaint, Ellington was a Texas resident.

20.     Defendant Isaac Leventon ("Leventon") was Assistant General Counsel at HCMLP from March 2011 until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interests.  At all times relevant to this Amended Complaint, Leventon was a Texas resident.

21.     Defendant Charitable DAF Fund, LP (the "DAF") is an exempted company incorporated in the Cayman Islands.  Dondero was the initial managing member of the DAF's General Partner, Charitable DAF GP, LLC ("DAF GP"), but in January 2011 he transferred all membership interests to Scott, who held those interests until March 2021.  At all times relevant to this proceeding, Scott served as managing member of DAF GP and director of the DAF. HCMLP acted as the formal or informal non-discretionary investment manager for the DAF from its inception through 2020, and provided advisory and back-office services to the DAF and its subsidiaries, including CLO Holdco, Ltd., from 2012 until HCMLP terminated that relationship in February 2021.  According to the DAF, Dondero currently serves as its investment advisor (although without an advisory contract).

22.     Defendant Charitable DAF Holdco, Ltd. ("DAF Holdco") is an exempted company incorporated in the Cayman Islands.  At all times relevant to this proceeding, Scott served as DAF Holdco's managing member and sole director.  DAF Holdco is the limited partner of the DAF and owns 100% of the partnership interests in the DAF.

8

003810

23.     Defendant CLO Holdco, Ltd. ("CLO Holdco") is an exempted company incorporated in the Cayman Islands that was formed on December 13, 2010. CLO Holdco is a wholly-owned subsidiary of the DAF. CLO Holdco filed a proof of claim in HCMLP's bankruptcy case, which was subsequently amended to reduce the claim amount to zero.[6] In January 2022, CLO Holdco attempted to further amend the proof of claim to reassert a positive claim amount. CLO Holdco has no employees or officers. According to CLO Holdco, Dondero currently serves as an investment advisor to CLO Holdco (although without an advisory contract). Until Dondero's departure from HCMLP in January 2020, HCMLP (through Dondero) effectively made all investment decisions for the DAF which allocated the investments to CLO Holdco, which would then be rubber-stamped by Scott. At all times relevant to this Amended Complaint, CLO Holdco's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

24.     As of December 31, 2020, CLO Holdco and the DAF collectively controlled approximately $260 million in assets. Dondero has testified under oath that he was unaware of a single investment decision that HCMLP ever recommended to Scott regarding the DAF that Scott rejected. Likewise, Dondero was unaware of any investment Scott made on behalf of the DAF that did not originate with HCMLP.

25.     Defendant Highland Dallas Foundation ("Highland Dallas") is registered as a Delaware nonprofit, nonstock corporation. The directors of Highland Dallas at the time of the events relevant to this proceeding were Dondero, Scott, and Mary Jalonick. Dondero also acted

---

[6]  This proof of claim was signed by Grant Scott in his capacity as CLO Holdco's sole director. Grant Scott served in that capacity at all times relevant to this proceeding.

003811

as Highland Dallas's president, and Scott served as its treasurer. Highland Dallas's principal office address is 3963 Maple Avenue, Suite 390, Dallas, Texas, 75219.

26.     Defendant Scott, in addition to being named above in his individual capacity, is named in his capacity as Trustee of Get Good Trust, a trust established under the laws of the State of Delaware. According to Get Good's July 9, 2021, disclosure to this Court, Get Good consists of three related trusts: Get Good Trust, Get Good Non Exempt Trust No. 1, and Get Good Non Exempt Trust No. 2, all of which are included in the term "Get Good." Dondero is the settlor of Get Good, its beneficiaries are his "living descendants," and Scott was Get Good's trustee at all times relevant to this Amended Complaint.

27.     Defendant Hunter Mountain Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state of Delaware. Hunter Mountain was formed on December 17, 2015, shortly before it purchased limited partnership interests in HCMLP from HCMLP's then-existing limited partners (*i.e.*, Dondero, Okada, and entities that they controlled) and HCMLP. Through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, Dondero caused Hunter Mountain to become the owner-in-name of 99.5% of the economic interests of HCMLP. Meanwhile, Dondero caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, The Mark & Pamela Okada Family Trust – Exempt Trust #1, and The Mark & Pamela Okada Family Trust – Exempt Trust #2) continued to receive the economic benefit of limited partnership distributions made by HCMLP to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain. One such note was a $63 million secured promissory note Hunter Mountain entered into with HCMLP on December 21, 2015 (the "Hunter Mountain Note").

28.     Rand PE Fund I, LP, Series 1 ("Rand") is a Delaware series limited partnership. Rand is the indirect parent of Hunter Mountain and is a guarantor of the Hunter Mountain Note.

29.     Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #1 ("MAP #1"), a trust established under the laws of the state of Texas.  Okada controls MAP #1, which he created for the benefit of his children.

30.     Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #2 ("MAP #2"), a trust established under the laws of the state of Texas.  Okada controls MAP #2, which he created for the benefit of his siblings.

31.     Defendant Massand Capital, Inc. ("Massand Inc.") is a New York corporation that was created in 2002.  Defendant Massand Capital, LLC ("Massand LLC") is a Delaware limited liability company created in 2014, pursuant to a certificate of incorporation signed by Leventon.  Massand Inc. received payments from HCMLP between February 4, 2014 and January 7, 2015.  Massand LLC received payments from HCMLP between February 25, 2015, and August 1, 2019.  Massand Inc. and Massand LLC are referred to collectively herein as "Massand Capital".

32.     Defendant SAS Asset Recovery Ltd. ("SAS") is a Cayman Island entity created in 2012, whose principal place of business is Dallas, Texas.  Upon information and belief, SAS is a litigation funding and management business created by Dondero and Ellington in 2012 and operated out of HCMLP's headquarters.  SAS, along with its direct and indirect subsidiaries, is owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic

003813

interests in SAS, respectively. Upon information and belief, Ellington is the Chief Executive Officer of SAS.

### III.     JURISDICTION, VENUE & STANDING

33.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising under or relating to the bankruptcy petition filed by HCMLP under Chapter 11 of the United States Bankruptcy Code. *See In re Highland Capital Management, L.P.*, No. 19-34054-sgj11 (Bankr. N.D. Tex.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

34.     Venue is proper in this Court under 28 U.S.C. § 1409(a).

35.     This Court has personal jurisdiction over the defendants because each of the Defendants: (i) is a Texas resident; (ii) was formed under the laws of Texas; (iii) is the alter ego of a Texas resident or an entity that was formed under the laws of Texas; (iv) has a business presence in Texas; (v) filed a proof of claim in HCMLP's bankruptcy case; and/or (vi) had minimum contacts with the state of Texas by either invoking the benefits and protections of the state of Texas or otherwise purposefully directing conduct toward a Texas resident.

36.     The Plan created the Claimant Trust, which was vested with assets including substantially "all Causes of Action" and "any proceeds realized or received from such Assets." The Plan also created the Litigation Sub-Trust, as a "sub-trust established within the Claimant Trust or as a wholly-owned subsidiary of the Claimant Trust," for the purpose of "investigating, prosecuting, settling, or otherwise resolving the Estate Claims" transferred to it by the Claimant Trust pursuant to the Plan. The Plan defines Estate Claims to include "any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of [HCMLP], and each of the Related Entities, including any promissory notes held by any of the foregoing." Proceeds

003814

from the Litigation Trust's pursuit of claims "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries[.]"

37.     On October 8, 2021, the Claimant Trust confirmed the assignment of certain Causes of Action (as defined in the Plan) to the Trust, including all claims set forth in this Amended Complaint.  All of the claims asserted in this Amended Complaint belong to the Litigation Sub-Trust, not the Reorganized Debtor.

38.     Under the Plan, the Claimant Trust Beneficiaries are (i) the Holders of Allowed General Unsecured Claims and (ii) the Holders of Allowed Subordinated Claims, whose Claims are junior to those distributed to Holders of Allowed General Unsecured Claims.[7]  The Claimant Trust Beneficiaries' claims against the Reorganized Debtor's estate are substantial and exceed, in aggregate, $380 million.  To date, neither the Holders of Allowed General Unsecured Claims nor the Holders of Allowed Subordinated Claims have been paid at all.

39.     The Trustee has standing to avoid all transfers described herein pursuant to 11 U.S.C. § 544(b) and applicable law.  On the date of the Debtor's bankruptcy filing, at least one or more unsecured creditors who held an allowable claim, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis (all as defined herein), could have sought under state law to avoid each of the transfers made on or after October 16, 2015.  The Internal Revenue Service filed an amended Proof of Claim in the Debtor's bankruptcy case on October 6, 2021, which asserts unsecured claims including for the tax period of June 30, 2015.  Under applicable state and federal law, the IRS was entitled to seek to avoid all transfers at issue herein

---

[7]     Holders of certain Allowed Limited Partnership Interests may become Claimant Trust Beneficiaries but only if *all* Allowed General Unsecured Claims, Allowed Subordinated Claims, and costs and expenses are indefeasibly paid in full.

003815

as a present or future creditor, including transfers that occurred on or before October 16, 2015, because the IRS's claim arose within a reasonable time of those transfers.

## IV.   FACTUAL ALLEGATIONS

### A.   Dondero Creates HCMLP

40.    HCMLP was a global alternative investment manager and registered investment advisor that was founded in 1993 by Dondero and Okada.  The funds managed by HCMLP originally focused on the leveraged loan market, and subsequently expanded into other asset classes such as high-yield credit, public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific industries.

41.    By the mid-2000s, HCMLP employed over 100 employees, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel.  As of the Petition Date, HCMLP had three primary business lines:  (i) investment management; (ii) the provision of middle- and back-office services ("shared services") to other registered investment advisors; and (iii) proprietary trading.

42.    Dondero exercised complete control over HCMLP from its founding until January 9, 2020, when this Court entered an order implementing the settlement and term sheet entered into between HCMLP and the unsecured creditors' committee, pursuant to which three new independent directors (the "Independent Board") were appointed at Strand to oversee the management and reorganization of HCMLP.  HCMLP's employees have bluntly acknowledged that, prior to the appointment of the Independent Board, Dondero was HCMLP's solitary decision-maker on all matters concerning the company's operation and management.  Dondero

003816

served as HCMLP's Chief Executive Officer and President from the time that HCMLP was founded until he resigned from those roles on January 9, 2020.

43. As of December 31, 2006, HCMLP provided investment advisory services pursuant to management agreements for: (i) 22 CLOs, (ii) 1 SLT; (iii) 11 RICs, (iv) 7 warehouse transactions, (v) 4 SMAs; (vi) one trust; and (vii) 10 hedge fund structures.[8] At that time, the value of HCMLP's assets under management ("<u>AUM</u>") was approximately $33.1 billion.[9]

**B.    HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages**

44. Around 2008, HCMLP's business began to falter, as the financial crisis began to set in. The funds that HCMLP managed faced large losses, followed by substantial redemptions. In January 2008, HCMLP experienced its worst performance to date, with the value of many of its managed funds deteriorating significantly.

45. At the same time that HCMLP was facing significant losses that threatened its existence, the company also became ensnared in litigation posing the threat of hundreds of millions of dollars in damages. In March 2008, HCMLP and its managed funds Highland CDO

---

[8]  A collateralized loan obligation ("<u>CLO</u>") is a structure that acquires and manage a pool of debt or loans. The CLO issues multiple debt tranches as well as equity, and uses the proceeds of those issuances to obtain loans. A structured loan transaction ("<u>SLT</u>") is a transaction involving structured financial instruments such as collateralized loan obligations. A registered investment company ("<u>RIC</u>") is a corporation, partnership, or trust registered with the Securities and Exchange Commission under the Investment Company Act of 1940. A warehouse transaction is an intermediate transaction that involves purchasing loans or bonds that will undergo the warehousing period prior to serving as collateral for a CLO security. A separately-managed account ("<u>SMA</u>") is a managed investment vehicle that has only one investor. A trust is a fiduciary agreement in which one entity that holds property or assets as its owner for one or more beneficiaries. A hedge fund structure is an actively managed investment pool held by a limited partnership of investors that allows partners to "redeem" their investment, subject to certain limitations.

[9]  At its high-water mark, HCMLP's AUM exceeded $40 billion.

003817

Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding
Company ("SOHC" and together with CDO Fund, the "Fund Counterparties")[10] had entered
into a transaction with UBS to finance the purchase of various CLO tranches (*i.e.*, tranches of
debt issued by existing CLOs) and other assets, including credit default swaps ("CDS"). The
governing agreements required the Fund Counterparties to post collateral based on the mark-
to-market value of certain collateralized debt obligations. The value of these assets dropped by
more than $400 million in the fall of 2008, and in November 2008, the Fund Counterparties
failed to meet UBS's margin demand. In December 2008, UBS terminated the agreements, and
claimed that it was owed 100% of its losses—which UBS alleged was as much as $745
million—from HCMLP and the Fund Counterparties.

46.    On February 24, 2009, UBS commenced an action against HCMLP and the Fund
Counterparties in New York state court. As amended and consolidated, UBS asserted claims
against HCMLP for actual and constructive fraudulent transfer and breach of the implied
covenant of good faith and fair dealing. Among other things, UBS alleged that in March 2009,
HCMLP had orchestrated transfers of approximately $233 million of assets from SOHC's
parent entity HFP, which UBS alleged was the alter ego of SOHC or its subsidiaries (the "March
2009 Transfers"). UBS sought to disgorge those transfers, and also sought damages against

---

[10]   The CDO Fund is an indirectly-controlled subsidiary of HCMLP. At all times relevant to this
proceeding, the CDO Fund was controlled by HCMLP, either pursuant to an investment advisory
agreement and/or through HCMLP's indirect ownership of CDO Fund's general partner. SOHC
is a subsidiary of Highland Financial Partners, L.P. ("HFP"). At all times relevant to this
proceeding, HFP was managed and controlled by Dondero in his capacity as an officer of HFP and
its general partner and as a member of HFP's monitoring committee. HFP's general partner is a
wholly-owned indirect subsidiary of HCMLP. After 2010, Dondero was the sole member of
HFP's monitoring committee until his resignation in mid-2021. At all times relevant to this
Complaint, Dondero managed and controlled SOHC through his control of HFP.

003818

HCMLP, including punitive damages, attorneys' fees, and pre-judgment interest (calculated at 9% under New York law).

47.     Meanwhile, in December 2008, CDO Fund ceased meeting margin calls issued by Citibank N.A., Citigroup Global Markets Limited, Citigroup Financial Products Inc., and Citigroup Global Markets Inc. (together, "Citi") in connection with CDS entered into by CDO Fund and Citi.  Citi seized assets posted by CDO Fund to collateralize the CDS, and, by March 2009, conducted two auctions to sell the collateral.  The proceeds of the collateral sales, however, were not sufficient to satisfy CDO Fund's obligations to Citi.  On April 5, 2012, CDO Fund sued Citi, alleging various claims arising from the margin calls.  On May 3, 2013, Citi answered and countersued CDO Fund, HCMLP, and Highland CDO Opportunity Fund GP, L.P. ("CDO Fund GP") to:  (i) recover a deficit of more than $24 million, plus accrued interest, still owed under the agreements governing the CDS; (ii) recoup $3 million in liquidation proceeds mistakenly received from a third party; and (iii) seek indemnification for all losses and costs Citi incurred as a result of CDO Fund's breach.

48.     In addition, on April 2, 2009, Barclays Bank PLC ("Barclays PLC") and its wholly-owned subsidiary HYMF, Inc. ("HYMF" and, together with Barclays PLC, "Barclays") commenced an action against HCMLP and certain of its managed funds (the "Fund Defendants") and related entities for breach of contract, breach of fiduciary duty, and equitable accounting (the "Barclays Action").  The Barclays Action focused on hedge contracts that HYMF had entered into with various HCMLP-managed funds, which provided that HYMF would be able to remove its investments in a preferential fashion via a "redemption" right, usually as quickly as one day.  Barclays alleged that HYMF attempted to exercise that redemption right in mid-October 2008 but was rejected by HCMLP and its managed funds,

17

003819

notwithstanding the clear terms of the HYMF contracts. This breach of the HYMF contracts was accompanied by Dondero personally stating he would withhold over $100 million for over a year unless HYMF performed certain unrelated financial services for the Fund Defendants. Barclays alleged that it had invested more than $700 million into the Fund Defendants, that Dondero personally held at least $100 million of that "hostage," and that "hundreds of millions of dollars" were still owed to HYMF.

49.  Additionally, on June 3, 2011, HCMLP became aware that on November 1, 2010, the Securities and Exchange Commission (the "SEC") had commenced an investigation with respect to potential violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. While the SEC investigation was settled years later for a reduced amount, HCMLP's understanding in 2011 was that the SEC investigation could result in significant penalties, including substantial monetary penalties, for the company.

**C.    In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business**

50.  In 2012, Dondero explained HCMLP's precarious financial condition, testifying under oath that the 2008 financial crisis took HCMLP "to a state of insolvency and we've been juggling liquidity since that," and that "[t]he last three, four years have been negative to the tune of hundreds of millions of dollars[.]" Dondero testified further that the contingent liabilities resulting from the lawsuits filed against HCMLP were a primary driver of HCMLP's insolvency.

51.  It was against this backdrop that in or about 2011, Dondero determined to create a series of new entities—referred to internally by some at HCMLP as "lifeboats"—to take over HCMLP's business, with the aim of placing the resulting profits beyond the reach of HCMLP's

003820

creditors.  Ultimately, the most successful of the lifeboats were NexPoint and HCMFA, which are described in greater detail below.  However Dondero also created other lifeboats at or around this time, including:

- Tunstall Capital Management, LP—which was created to manage stressed and distressed investing in hedge funds, private equity funds, and retail funds;

- Falcon E&P Opportunities GP, LLC—which was created to manage oil and gas investments in private equity funds;

- Granite Bay Advisors, LP—which was created to manage long-short credit investing; and

- Highland Capital Healthcare Advisors, LP ("HCHA")—which was created to serve as a healthcare equity advisor.

### 1.    NexPoint

52.    NexPoint was effectively a shell entity that Dondero created in March 2012 to siphon profits from HCMLP in order to evade HCMLP's creditors.  Dondero's family trust Dugaboy, of which Dondero is the primary beneficiary, owns 99.9% of NexPoint.

53.    Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP.  To the contrary, NexPoint used HCMLP's employees to perform the same investment management and advisory services—including investment advisory, compliance, accounting, tax, human resources, and information technology services—that were performed by HCMLP.

54.    For over a year, HCMLP performed all services for NexPoint, without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees.  In mid-2013, Dondero attempted to retroactively infuse this scheme with a patina of legitimacy, by causing NexPoint to enter into a shared services agreement with HCMLP that required NexPoint to pay fees to HCMLP based on a formula that resulted in low

19

003821

fee payments.  NexPoint continued to reap the vast majority of the generated fees, however.

NexPoint's fees were based on a percentage of AUM, set at a level to yield fees far in excess of

those NexPoint was paying HCMLP.  The NexPoint scheme is illustrated in Figure 1, below.

**Figure 1.**



55.    Adding insult to injury, HCMLP funded NexPoint's operations whenever

needed, seeded large investments made by NexPoint, and funded a large portion of the

distributions NexPoint made to its owner, Dugaboy (the beneficiary of which was Dondero).

Indeed, in June 2012, at the time that Dondero was transferring HCMLP's advisory services

business to NexPoint, Okada complained to Dondero that he was "using Highland's cash flow"

to set up new entities controlled by Dondero and to "fund all their negative working capital."

56.    Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million,

and entered into a revolving line of credit to provide NexPoint with additional liquidity.

Initially, the loans were in the form of demand notes and were unsecured, frequently below-

003822

market, and had few to no covenants. NexPoint paid no principal or interest to HCMLP on the loans during the 2012-2017 period. At the same time, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were made to Dugaboy for Dondero's benefit.

57. Dondero caused HCMLP to enter into multiple forbearance agreements with respect to the NexPoint loans, pursuant to which HCMLP agreed not to collect on the NexPoint loans for a period of one year from the time of the agreement. According to NexPoint's financial statements, these agreements were entered into to provide NexPoint "with the necessary financial support to fund [NexPoint's] obligations as they come due[.]" By May 2017, NexPoint owed HCMLP more than $30 million. Although all of these obligations were payable on demand, HCMLP again agreed not to demand repayment—this time through May 31, 2018—and also agreed to provide support to fund NexPoint's obligations through the same period. Meanwhile, HCMLP recorded the NexPoint loans at face amount on HCMLP's books.

58. Upon information and belief, on May 31, 2017, following discussions with NexPoint's auditors, Dondero restructured the NexPoint loans into a consolidated $30,746,812.33 note (the "NexPoint Loan") with an unusually long 30-year term maturity, a low coupon rate, no covenants, and no security. HCMLP received no consideration in exchange for its agreement to extend the NexPoint loans' maturity date from on-demand to 30 years.

59. Subsequent to Dondero's resignation from HCMLP, on December 31, 2020, NexPoint defaulted on the NexPoint Loan and the full outstanding amount of the loan was accelerated. On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on the NexPoint Loan. *See Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Pro. 21-03005-sgj (Bankr. N.D. Tex. Jan. 22, 2021). NexPoint has raised

003823

a series of frivolous defenses to HCMLP's claims, including that HCMLP—acting through the owner of a majority of its Class A interests, Dugaboy (which was acting through Dondero's sister, as Dugaboy's Family Trustee)—orally agreed to forgive the NexPoint Loan as part of Dondero's compensation. More than $23 million remains outstanding on the NexPoint Loan, and interest and fees continue to accrue. HCMLP has moved for summary judgment on this matter.

60. From the time that it was created in 2012 through 2019, NexPoint—which used HCMLP's employees to perform the same management and advisory services that are performed by HCMLP—earned over $150 million in revenues (including over $120 million in advisory and administrative fees) and approximately $50 million in operating income. Between 2012 and 2015, NexPoint's AUM increased 34%, from $700 million to $936 million, and revenues increased from $4.1 million to $16.2 million. Between 2015 and 2019, NexPoint's AUM increased by approximately 408%—from $936 million to $4.8 billion, and revenue increased from $16.2 million to $46.8 million. By contrast, over the same 2015 to 2019 period, HCMLP's AUM decreased from $9.5 billion to $2.3 billion.

### 2.    HCMFA

61. Dondero utilized the same basic playbook for HCMFA, which is directly or indirectly owned by Dondero and Okada. HCMFA was created to replace HCMLP as the new investment manager for certain open-ended retail investment funds, but in a manner similarly designed to ensure that the profits generated by the business would not be available to HCMLP's litigation creditors in the event they achieved favorable judgments.

003824

62.     On December 15, 2011, Dondero caused HCMLP to transfer HCMLP's rights and obligations to provide investment advisory services for Highland Credit Strategies Fund,[11] Highland Floating Rate Opportunities Fund ("HFRO") (n/k/a Highland Income Fund), Highland Long/Short Equity Fund, Highland Long/Short Healthcare Fund, and Highland Special Situations Fund to HCMFA.  HCMLP received no consideration for the transfer.  Prior to the transfer, HCMLP received management and advisory fees under those agreements in return for the services it performed.  Following the transfer, it was HCMFA rather than HCMLP that received those fees, notwithstanding that HCMFA used HCMLP's employees to perform most services.  Thus, the effect of the transfer was to insert a new entity to reap the profits earned from the same HCMLP employees performing the same work that had been performed prior to the transfer.

63.     HCMFA collected management fees from its managed funds based on a percentage of their net asset value ("NAV").  Meanwhile, HCMLP—whose employees performed most services required by HCMFA—received a low fee that was only a small fraction of the fees earned by HCMFA.  And HCMLP received no fee with respect to the advisory services it provided to HCMFA, despite the fact that HCMLP's employees were named portfolio managers, and constituted entire teams of supporting investment analysts, for HCMFA-managed funds.  Indeed, HCMFA did not execute a sub-advisory agreement with HCMLP, and it was only in May 2018 that HCMFA executed a payroll reimbursement agreement to partially compensate HCMLP for the services of certain HCMLP employees.  If

---

[11]   On June 13, 2012, the management agreements for Highland Credit Strategies Fund were purportedly "novated" to the newly-created NexPoint.  Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as "NHF."  The result of this transfer was simply to shift management fees relating to NHF—which had previously been diverted from HCMLP—from one lifeboat (Pyxis/HCMFA) to another (NexPoint).

003825

HCMLP had managed the HCMFA-managed funds directly rather than doing so through an entity that was created to evade HCMLP's creditors, then HCMLP would have earned tens of millions of dollars (potentially over $100 million) in additional fees between 2012 and 2018. The HCMFA scheme is illustrated by Figure 2, below.

**Figure 2.**



64.     Following Dondero's "lifeboat" playbook, HCMLP also provided financial support to HCMFA so that HCMFA was well-positioned to earn profits that bypassed HCMLP's creditors and flowed directly to Dondero and his affiliated entities, primarily through HCMFA's largest limited partner, HCMS (of which Dondero and Okada owned 75% and 25%, respectively).  Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million.  Those HCMFA loans were evidenced by demand notes, for which Dondero caused HCMLP to enter into multiple forbearances, ultimately preventing HCMLP from demanding payment until May 31, 2021.  As of the Petition Date, $6.3 million was outstanding on the notes subject to the

003826

forbearance agreement. In May 2019, HCMFA borrowed an additional $7.4 million from HCMLP pursuant to two additional demand notes.

65. Subsequent to Dondero's resignation from HCMLP, HCMFA defaulted on its debt to HCMLP. On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on the debt. HCMFA has raised a series of frivolous defenses to HCMLP's claims, including that the notes were executed in error. As of December 11, 2020, approximately $7.7 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated May 2 and 3, 2019 and, as of June 4, 2021, approximately $3.1 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated February 26, 2014, and February 26, 2016, and interest and fees continue to accrue. HCMLP has moved for summary judgment on this matter.

### D. Dondero, Ellington, and Leventon Cause HCMLP To Engage In Misconduct That Exposes It To Additional Liability

66. As described more fully below, in addition to establishing the lifeboats to usurp HCMLP's business and evade its contingent creditors, Dondero, along with Scott Ellington, HCMLP's Chief Legal Officer and General Counsel, and Isaac Leventon, HCMLP's Assistant General Counsel, engaged in other actions that meaningfully harmed HCMLP. This included exposing HCMLP to significant liability by utilizing it to exact revenge on Dondero's perceived adversaries, and carrying out schemes that personally benefitted Dondero and, in certain instances, Ellington, but conferred no benefit on HCMLP. Ellington and Leventon were also financially rewarded by Dondero for faithfully serving Dondero's interest, rather than HCMLP's, even where doing was detrimental to HCMLP. As described below, these actions ultimately resulted in more than one billion dollars in litigation and arbitration claims against

003827

HCMLP and millions of dollars in legal fees, necessitated HCMLP's bankruptcy filing, and ultimately forced HCMLP to enter into settlements for hundreds of millions of dollars.

### 1. Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry

67.     In 2011, Dondero formed Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC ("Acis GP").  Dondero was President both of Acis and Acis GP, and controlled their overall financial strategies and decisions.  Upon information and belief, prior to its bankruptcy filing in 2018, Acis was indirectly owned by Dondero (through Dugaboy), Okada, and Joshua Terry ("Terry"), an HCMLP employee that Dondero tapped to manage Acis.  Like HCMLP, Acis was a registered investment advisor whose purpose was to raise money from third-party investors to launch or invest in CLOs.  HCMLP was the investment manager for Acis, and Acis performed almost all of its services through HCMLP employees.  Dondero created Acis to act as another lifeboat—*i.e.*, to divert income away from HCMLP when HCMLP was facing the risk that all of its assets would be absorbed by its creditors.  In 2013, HCMLP began what proved to be a short-lived turnaround, spurred by improving financial performance and settlement of the Barclays litigation.  At this point, Dondero became more troubled by the dilution of his share of Acis's income, caused by Terry's ownership in Acis, than he was about evading HCMLP's liabilities.  As a result, Dondero once again redirected the flow of money for his own benefit, this time by siphoning value from Acis back to HCMLP.

68.     By 2016, tensions between Dondero and Terry hit a boiling point.  Dondero sought to finance an acquisition by an HCMLP portfolio company through a loan from HCMLP-managed CLOs, and an extension of the maturity dates on the portfolio company's notes that were held by the CLOs.  Terry was the investment manager for the CLOs, and

003828

opposed the plan on the ground that agreeing to extend the notes' maturity dates would breach his fiduciary duties to the CLOs. Dondero responded to Terry's opposition by firing him from Acis and HCMLP, making up a pretextual claim of termination for "cause." Shortly thereafter, Dondero amended the Acis limited partnership agreement to terminate Terry's interests in Acis, and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded arbitration.

69.     On October 20, 2017, following a ten-day arbitration, the arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked HCMLP's false pretext of "for cause" in order to deny Terry his contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay HCMLP more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying HCMLP under their shared services and sub-advisory agreements, retroactive to January 1, 2016.

70.     Beginning on October 24, 2017—four days after Terry's arbitration judgment was issued—Dondero, acting through HCMLP, and with the aid of Ellington and Leventon, entered into numerous transactions designed to take control of Acis's assets and business, and strip Acis of assets so that it would be unable to pay Terry's arbitration award. Ellington and Leventon aided Dondero by implementing Dondero's directives and taking the steps necessary to consummate these transactions, notwithstanding their knowledge that the transactions

003829

benefitted only Dondero, and would ultimately harm HCMLP by exposing it to significant liability.

71.   Ultimately, Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United States Bankruptcy Code against Acis and Acis GP on January 30, 2018.  In response to the bankruptcy filings, Dondero caused HCMLP, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis CLOs, including by failing to purchase a single loan for the CLOs following the appointment of a chapter 11 trustee in the Acis bankruptcy case.  This abrogation of duties caused the chapter 11 trustee to replace HCMLP with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland").  Put another way, Dondero's use of HCMLP to cause damage to Acis actually harmed HCMLP itself, leading HCMLP to incur exorbitant legal fees attacking Acis, the loss of its investment management contracts and the income flowing from those contracts, and reputational harm that precluded HCMLP from launching any future CLOs and generating fee income therefrom.

72.   Dondero also caused HCMLP to commence litigation against the Acis chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through HCMLP) and to stop HCMLP from engaging in a course of conduct that was harmful to Acis and the Acis CLOs.  This led to the entry of a temporary restraining order against HCMLP, which Dondero caused HCMLP to violate.  Dondero also caused Highland CLO Funding, Ltd. ("HCLOF") to initiate an additional frivolous lawsuit against Terry in the Royal Court of Guernsey (the "Guernsey Suit"), which was ultimately dismissed, resulting in Terry arguing that HCMLP, as the owner of HCLOF's

003830

advisor Highland HCF Advisors, Ltd. ("HHCFA"), was liable for Terry's attorneys' fees and expenses under Guernsey's "loser pays" regime.[12]

### 2. Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest

73. Dondero and Ellington also exposed HCMLP to substantial liability to third-party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis CLOs away from Acis in order to evade Terry's arbitration award, he and Ellington were using HCMLP to induce the HarbourVest Entities to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million in HCLOF.[13] In soliciting this investment, Dondero and Ellington failed to disclose material facts

---

[12]    Dondero's litigation crusade against Terry and Acis continues to date. On May 14, 2021, NexPoint, acting under Dondero's direction, caused one of its managed retail funds, NSOF, to commence a lawsuit in the district court for the Southern District of New York against Acis, Terry, U.S. Bank, N.A., and Brigade, alleging that the Acis CLOs had been mismanaged. On May 20, 2021, NSOF then filed a motion in Acis's bankruptcy case, seeking a ruling that the complaint did not violate the injunction contained in Acis's plan of reorganization. On September 9, 2021, the bankruptcy court conducted a lengthy hearing, and on September 24, 2021, declined to issue the order requested by NSOF and held that NSOF must amend its complaint to comply with the plan injunction. On October 8, 2021, NSOF then filed a motion asking the Bankruptcy Court to reconsider its ruling, but withdrew the motion on December 1, 2021. NSOF filed an Amended Complaint in the SDNY action on November 23, 2021. Acis, U.S. Bank, N.A., Brigade, and HCLOF (as defendant intervenor) filed motions to dismiss, which were fully briefed in March 2022, and remain pending.

[13]    CLO Holdco acquired Acis CLO equity tranches when the CLOs were launched and then transferred them to HCLOF in exchange for a 100% ownership interest in HCLOF after it was formed.

003831

to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing HCMLP to substantial and unnecessary liability.[14]

74.  In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through HCMLP, made numerous misrepresentations and omissions, including:  (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

75.  Moreover, unbeknownst to HarbourVest, Dondero intended for CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero-owned entities, including entities managed by NexPoint and HCMFA.  Thus, the HarbourVest investment benefitted Dondero personally, but left HCMLP exposed to hundreds of millions of dollars in potential damages to HarbourVest.

**3.**   **Dondero And His Accomplices, Including Ellington and Leventon, Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS**

76.  In March 2017, the New York state court presiding over UBS's claims against HCMLP and the Fund Counterparties ruled that UBS's claims against the Fund Counterparties,

---

[14]  HCLOF has never paid a management fee to HHCFA, a wholly-owned subsidiary of HCMLP that is managed and controlled by HCMLP and operated using HCMLP employees.  Consequently, HCMLP has indirectly provided free investment management services to HCLOF since its inception.

003832

and its fraudulent transfer claims against HCMLP, could proceed to trial.[15]  Shortly thereafter, Dondero, Ellington, and Leventon, along with HCMLP employees Jean Paul Sevilla, Katie (Irving) Lucas, and Matthew DiOrio, took steps to transfer the Fund Counterparties' remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington,[16] in order to ensure that such assets would be out of UBS's reach in the event that a judgment was entered in its favor.[17]  In or around August 2017, Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio orchestrated the surreptitious transfer of substantially all of the Fund Counterparties' assets—with a face amount of $300 million and a fair market value of at least $100 million—to Sentinel.

77.     The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that purportedly insured the Fund Counterparties' first $100 million of liability to UBS.  The real goal of the transfer, however, was to drain the Fund Counterparties' assets and render the Fund Counterparties judgment-proof, while keeping the assets within Dondero's and Ellington's control.  There is no legitimate explanation as to why the Fund Counterparties transferred assets worth at least four times the premium payment to Sentinel.  And given that Dondero and Ellington indirectly own and control Sentinel, they personally and improperly benefitted from this overpayment.

---

[15]  UBS's claim against HCMLP for breach of the implied covenant of good faith and fair dealing was subsequently also permitted to proceed.

[16]  Sentinel was created in 2012 and is 70%-owned by Dondero and 30%-owned by Ellington through intermediate holding companies.  Sentinel has no employees or physical office space. HCMLP employees, including Leventon, performed work on behalf of Sentinel.

[17]  In December 2017, Ellington caused Dilip Massand and DiOrio to be appointed as directors of Sentinel.

003833

78.     Moreover, Ellington and Leventon (along with Sevilla, Lucas, and DiOrio) actively concealed the transfer of assets and the existence of the purported insurance policy from the Independent Board, apparently in order to prevent the Fund Counterparties from making a claim under the policy.  Indeed, Leventon, who was directly involved in the transfers to Sentinel, was tasked with educating the Independent Board about UBS's claim and the assets potentially available to satisfy it.  In response, Leventon delivered an extensive—but intentionally misleading—presentation to the Independent Board that said nothing about the August 2017 asset transfer and the purported Sentinel insurance policy, and lied to HCMLP regarding the Fund Counterparties' assets.  Additionally, around the same time that Ellington and Leventon were hiding this secret insurance policy from the Independent Board, (i) Ellington charged the policy for personal expenses in excess of $500,000 that bore no relation to the UBS litigation and provided no benefit whatsoever to the Fund Counterparties or HCMLP; and (ii) Ellington and Leventon, among others, entered into agreements whereby Sentinel agreed to pay attorneys' fees and expenses they incurred in connection with HCMLP's bankruptcy.

79.     As a direct result of Ellington's and Leventon's fraudulent concealment of the transfers to Sentinel, HCMLP inadvertently made factually inaccurate statements to the Bankruptcy Court and incurred millions of dollars in additional fees litigating (rather than settling) with UBS.  In March 2021, after the policy was uncovered through HCMLP's diligence (notwithstanding Ellington's and Leventon's cover-up), the CDO Fund made a claim on the policy.  To date, Sentinel has refused to make any payments.

80.     On February 10, 2020, the New York state court entered a judgment against the Fund Counterparties in connection with the phase one litigation, in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of

003834

$1,042,391,031.79. Trial on UBS's claims against HCMLP was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed *infra*).

### 4. Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty

81. HCMLP's poor performance during the 2008-09 financial crisis left it with insufficient available cash and assets to offer incentive-based compensation to key senior employees. After HCMLP defaulted on a credit facility with a group of unsecured banks, the lender group demanded a security interest in all HCMLP's assets, but permitted the creation of a retention program to stave off an exodus of employees. With the consent of the lenders, on June 23, 2009, HCMLP created Highland Employee Retention Assets LLC ("HERA"), an employee-owned (subject to a two-year vesting period) entity that served as a replacement for certain senior employees' deferred compensation, which had been previously-awarded but wiped out by the financial crisis. HCMLP contributed assets to HERA, which then distributed proceeds from time to time. Patrick Daugherty, a former senior HCMLP employee, was a director of HERA and its largest unitholder.

82. Dondero's relationship with Daugherty deteriorated, and Daugherty resigned from HCMLP in the fall of 2011. Instead of simply allowing HERA to pay Daugherty what he was owed, Dondero caused HCMLP to carry out his personal vendetta against Daugherty through years of spiteful, unnecessary litigation borne out of personal animosity. As a result of that litigation, HCMLP accrued (i) litigation expenses and pre- and post-judgment interest that exceeded the amounts that HERA owed Daugherty in the first place; and (ii) liability in connection with a jury verdict that HCMLP defamed Daugherty with malice and breached the implied covenant of good faith and fair dealing.

003835

83.    Moreover, Dondero, through HCMLP, engaged in an asset-stripping campaign designed to render HERA judgment-proof, further exposing HCMLP to liability and unnecessary legal costs.  In furtherance of that scheme, Dondero caused: (i) HCMLP to buy out all HERA unitholders except for Daugherty; (ii) HERA's board to transfer its powers to Highland ERA Management, a newly formed entity for which Dondero served as president and sole member; and (iii) HERA to distribute substantially all of HERA's assets to HCMLP, while claiming that HCMLP would place Daugherty's interests in HERA into escrow.

84.    When Daugherty demanded payment of his judgment from HERA, HERA claimed it had become insolvent, citing that it owed HCMLP more than $7.5 million for legal expenses—approximately $4.9 million of which HCMLP had written off because of "lack of collectability."

85.    Daugherty then sued HCMLP, HERA, Highland ERA Management, and Dondero in the Delaware Chancery Court.  A Vice Chancellor concluded that HCMLP, Dondero, and the other defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case.  The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement to make their way to Daugherty."

86.    In total, HCMLP suffered at least $10 million in harm as a result of Dondero's decision to launch a protracted and unnecessary war against Daugherty.

003836

**E.    Dondero, Ellington, and Leventon Cause HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy**

87.    Dondero, Ellington, and Leventon also engaged in misconduct relating to HCMLP managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds") that resulted in an arbitration award against HCMLP of approximately $190 million. HCMLP had placed the Crusader Funds into wind-down in October 2008.  Investors in the funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against HCMLP, based on allegations that Dondero had refused to make mandated distributions and honor redemption requests, and traded the funds' positions in a manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors.   Certain of these lawsuits were ultimately resolved in July 2011, when the parties entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement for its creditors (together, the "Joint Plan and Scheme").  As part of the Joint Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors.

88.    The peace would not last, however.  On July 5, 2016, the Redeemer Committee (i) terminated HCMLP as investment manager; (ii) filed a complaint in Delaware Chancery Court against HCMLP seeking a limited status quo order, a declaration that the Redeemer Committee had "cause" to terminate HCMLP as manager, and a declaration that HCMLP had forfeited any right to indemnification as a result of its failure to distribute proceeds to investors of various funds; and (iii) commenced an arbitration proceeding (the "Redeemer Arbitration")

003837

against HCMLP alleging that it had engaged in various forms of misconduct in its role as investment advisor. After two years of arbitration proceedings, the Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that included testimony from eleven fact witnesses and four expert witnesses. On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million. Ultimately, the panel awarded ten forms of damages: (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim ($22,922,608); (3) the Taking of Plan Claims ($3,277,991); (4) the CLO Trades Claim ($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850); (9) the Portfolio Company Award ($71,894,891); and (10) the Administrative Fees Award ($514, 164).

89. The claims that were asserted against HCMLP by the Redeemer Committee stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero, Ellington, and Leventon caused HCMLP to commit. For example, the "Barclays Claim"— which gave rise to over $30 million in liability for HCMLP—arose out of Dondero, Ellington, and Leventon causing HCMLP to transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, after the Redeemer Committee had already refused to approve that transfer. In so doing, Dondero, Ellington, and Leventon caused HCMLP to violate the Joint Plan and Scheme and its fiduciary duties. Because of Dondero, Ellington, and Leventon's wrongful conduct, HCMLP was ordered to pay: (1) over $30 million on account of disgorged partnership interests; (2) additional sums for disgorgement

003838

of distribution fees (that were included within the $22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

90.     In addition, from December 2013 through January 2016, Dondero, Ellington, and Leventon caused HCMLP to purchase 28 Plan Claims from Crusader investors in violation of the Redeemer Committee's right of first refusal ("ROFR").  During this time, Leventon told multiple investors interested in possible transfers of their interests that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. Leventon also made affirmative misrepresentations to the Redeemer Committee to disguise the fact that HCMLP had purchased the Plan Claims.  Pursuant to the arbitration award, HCMLP was required to transfer the 28 Plan Claims to the Redeemer Committee, and to disgorge to the Committee whatever financial benefits Highland obtained from the 28 transactions, plus interest at the rate of 9%, from the date of each purchase.

91.     Dondero's, Ellington's, and Leventon's conduct also resulted in HCMLP becoming liable to the Redeemer Committee for over $71 million (the "Portfolio Company Claim") in connection with claims arising from a portfolio company that was owned, directly and indirectly, by HCMLP (the "Portfolio Company").  Some of the Portfolio Company's stock was owned by the Crusader Funds.  Dondero, Ellington, and Leventon caused HCMLP to covertly purchase shares in the Portfolio Company from another fund that Dondero controlled at below-market prices, and failed to liquidate the Crusader Funds' shares in the Portfolio Company as their fiduciary duties required.  Pursuant to the arbitration award, HCMLP was required to purchase the Crusader Funds' shares in the Portfolio Company at a fixed price of $48,070,407, and to pay pre-judgment interest that brought the total claim to $71,894,891.

003839

92.     Additionally, the Joint Plan and Scheme required HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete.  Dondero, Ellington, and Leventon caused HCMLP to violate that provision of the Joint Plan and Scheme by causing HCMLP to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016.  The arbitration panel ruled that as a consequence of Dondero's, Ellington's, and Leventon's blatant breach of the payment requirements of the Joint Plan and Scheme, HCMLP forfeited its right to these fees entirely.

93.     The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019 to obtain entry of a judgment with respect to the award.  The hearing was subsequently continued to October 16, 2019.  HCMLP filed for bankruptcy on the day of oral arguments for the Redeemer Committee's motion to enforce the Award in Delaware Chancery Court.

**F.     Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP**

94.     As noted, Dondero's schemes ultimately resulted in hundreds of millions of dollars of liability for HCMLP.  As described below, the creditors that Dondero had sought to cheat and evade filed proofs of claim in HCMLP's bankruptcy proceeding, and HCMLP's management, burdened with Dondero's blatant misconduct (and that of Ellington, Leventon, and other of Dondero's loyalists), was forced to settle these claims for amounts that enabled HCMLP to escape the risk of even greater liability.

95.     Additionally, HCMLP has incurred in excess of $40 million in professional fees in connection with the bankruptcy filing, which was necessitated solely as a result of Dondero's misconduct.  HCMLP also incurred legal expenses for entities that HCMLP did not own, including several of the "lifeboats."

003840

1.      **HCMLP Incurs $125 Million In Liability To UBS As A Result Of
Dondero's, Leventon's, and Ellington's Misconduct**

96.     On June 26, 2020, UBS filed a proof of claim (the "<u>UBS Claim</u>") in HCMLP's
bankruptcy proceeding for the full $1,039,957,799.44 of its judgment against the Fund
Counterparties.[18]   The UBS claim sought "damages arising from HCMLP's breach of the
implied covenant of good faith and fair dealing, its specific role in directing the fraudulent
transfers of assets involving HFP," and interest, punitive damages, and attorneys' fees.

97.     In November 2020, the Court considered the value of the UBS Claim for
purposes of plan voting.  In connection therewith, the Court temporarily allowed the UBS Claim
in the amount of $94,761,076.  Of that amount, approximately $43 million related to transfers
HCMLP caused to be made to one of HCMLP's managed funds, based on the Court's estimation
that there was a 90% chance that UBS would prevail on that portion of its claim under either a
fraudulent conveyance or breach of implied covenant theory.

98.     Subsequently, HCMLP and UBS engaged in settlement discussions and
mediation.  Following mediation, the parties reached an initial settlement in principle, pursuant
to which UBS would receive a $75 million unsecured claim, consisting of a $50 million Class
8 General Unsecured Claim and a $25 million Class 9 Subordinated General Unsecured Claim.
That settlement was disclosed to the Court at the February 2, 2021 confirmation hearing.  This
settlement was in satisfaction of damages resulting from conduct that Dondero, Ellington, and
Leventon perpetrated on behalf of HCMLP.  But for that conduct, HCMLP would not have been
liable to, or required to enter into the settlement with, UBS.

---

[18]   The UBS Claim consists of two substantively identical claims: (i) Claim No. 190 filed by UBS
Securities LLC; and (ii) Claim No. 191 filed by UBS AG, London Branch.

003841

99.     While the preliminary settlement for the known misconduct of Dondero, Ellington, and Leventon was being finalized, the Independent Board learned that Dondero and Ellington had surreptitiously caused the Fund Counterparties to transfer their remaining assets to Sentinel, and had caused HCMLP to misrepresent to UBS that the Fund Counterparties had no assets prior to that transfer occurring.  Purportedly acting on behalf of HCMLP, Dondero, Ellington, and Leventon had concealed this transfer from the Independent Board, while advising the Independent Board that the Fund Counterparties lacked any material assets.  The Independent Board had communicated that information to UBS (and the Court) and negotiated with UBS on those bases.

100.     When the Independent Board discovered that Dondero, Ellington, and Leventon engaged in a conspiracy to cover up the fraudulent Sentinel transfer, it disclosed the transfer to UBS.  As a result, the parties reopened settlement discussions.  Ultimately, in order to limit HCMLP's potential liability to UBS as a result of Dondero's, Leventon's, and Ellington's bad acts, HCMLP entered into a revised settlement with UBS that granted UBS a claim totaling $125 million, consisting of a $65 million Class 8 General Unsecured Claim and a $60 million Class 9 Subordinated Unsecured Claim.  In addition to the increased settlement amount and litigation costs, HCMLP is required to expend up to $3 million (subject to reimbursement) pursuant to certain cooperation provisions contained in the settlement agreement with UBS as a result of the fraudulent Sentinel transfer.  The Bankruptcy Court approved the UBS settlement on May 27, 2021.

003842

      **2.**    **HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct**

101.    On April 3, 2020, the Redeemer Committee filed a general unsecured claim in the amount of its $190,824,557.00 arbitration award, plus "post-petition interest, attorneys' fees, costs and other expenses that continue to accrue." Likewise, on April 3, 2020, the Crusader Funds filed a claim for $23.5 million, consisting of $8.2 million in management fees and $15.3 million in distribution fees. Faced with this potential liability, HCMLP entered into a settlement whereby, among other things: (i) the Redeemer Committee was granted an allowed general unsecured claim of $136,696,610.00; (ii) the Crusader Funds were granted an allowed general unsecured claim of $50,000.00; (iii) HCMLP and Eames each consented to the cancellation of interests they and the Charitable DAF held in the Crusader Funds that the arbitration panel had determined were wrongfully-acquired; (iv) HCMLP and Eames each acknowledged that they would not receive any portion of distributions reserved by the Crusader Funds, and HCMLP further acknowledged that it will not receive any future payments from the Crusader Funds in respect of any Deferred Fees, Distribution Fees, or Management Fees; and (v) HCMLP and the Redeemer Committee agreed to a form of amendment to the Portfolio Company's shareholders' agreement and to a process whereby HCMLP would use commercially reasonable efforts to monetize all Portfolio Company shares held by HCMLP, funds managed by HCMLP, and the Crusader Funds.[19] The Bankruptcy Court approved HCMLP's settlement with the Redeemer Committee and Crusader Funds on October 23, 2020.

---

[19] Because HCMLP did not have the money to purchase the shares, the Redeemer Committee and HCMLP agreed to treat the Portfolio Company's shares differently than the process required under the arbitration award. Rather than having HCMLP purchase the Crusader Funds' shares in the Portfolio Company for approximately $48 million, they agreed that the Crusader Funds would

003843

### 3. HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct

102. Acis also filed proofs of claim against HCMLP, seeking, among other things, the amounts Dondero had caused HCMLP to overcharge Acis in order to diminish Terry's limited partner distributions from Acis, and damages arising from HCMLP's efforts to transfer assets out of Acis, in order to evade Terry's arbitration award and ensure that Dondero would benefit from the transferred assets. Terry and his wife also filed a proof of claim against HCMLP, alleging that HCMLP, acting through Dondero, had misappropriated assets in their retirement account. The Acis and Terry proofs of claim were settled in mediation after Dondero resigned from HCMLP. Pursuant to that settlement, Acis received a $23 million allowed claim against HCMLP, and HCMLP was required to pay (1) Terry and his wife $425,000 plus 10% interest to resolve the Terry's claim that HCMLP had misappropriated their retirement account;[20] (ii) Terry $355,000 in legal fees because of HCLOF's frivolous suit in Guernsey; and (iii) Acis an additional $97,000 for legal fees incurred defending another frivolous lawsuit initiated by Dondero.

103. On April 8, 2020, the HarbourVest entities filed proofs of claim against HCMLP (the "HarbourVest Proofs of Claim") alleging that HCMLP had fraudulently induced them into entering into the HCLOF Investment based on HCMLP's misrepresentations and omissions concerning certain material facts, including that HCMLP: (1) failed to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award; (2) failed to disclose that it orchestrated a series of fraudulent transfers to prevent Terry from collecting on his

---

retain their shares in the Portfolio Company and that the total damages award would be reduced by approximately $30.5 million to account for the perceived fair market value of those shares.

[20] Because of the interest component, HCMLP ultimately paid the Terrys approximately $1 million to compensate them for Dondero's theft of their retirement account.

003844

arbitration award, and misrepresented the reasons for changing the portfolio manager for HCLOF immediately prior to HarbourVest's HCLOF Investment; (3) indicated that the dispute with Terry would not impact HCLOF's investment activities; and (4) falsely expressed confidence in HCLOF's ability to reset or redeem the CLOs under its control.

104.    HarbourVest sought to rescind its HCLOF Investment and alleged damages in excess of $300 million.  Ultimately, following Dondero's departure from HCMLP, the parties reached a resolution whereby HarbourVest agreed to transfer its interests in HCLOF to a new entity designated by HCMLP in exchange for a $45 million general unsecured claim and a $35 million subordinated general unsecured allowed claim.  The value of the HCLOF interests that HarbourVest transferred to the HCMLP-designated entity was tens of millions of dollars less than the allowed amount of HarbourVest's claim against HCMLP.

### G.    HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy

105.    The Redeemer Committee's $190 million arbitration award left HCMLP with no choice but to file for bankruptcy.  But HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay well before the Redeemer Committee arbitration award was issued.  As Dondero himself has acknowledged under oath, as a result of the economic recession of 2008 HCMLP "almost went under and . . . moved to a state of insolvency" from which HCMLP was still struggling to emerge in 2012.[21]  Indeed, as shown below, a valuation of HCMLP's assets and liabilities shows that HCMLP was balance sheet insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay in

---

[21]  Mar. 28, 2012 H'rg Tr. 62:06-10 (J. Dondero), *In the Matter of the Marriage of I.C. and Q.C.*, Cause No. 11-16417-Z (Tex. Dist. [256th Dist.]).

2011 and 2012, when Dondero created lifeboats NexPoint and HCMFA, and transferred certain of HCMLP's management contracts to HCMFA for no value. Contemporaneous valuations performed by the company itself corroborate this conclusion.

106.     More specifically, these valuations show that when litigation liabilities resulting from claims by Barclays and UBS against HCMLP are taken into account, HCMLP was insolvent from no later than April 9, 2010 until no earlier than April 30, 2013.

|  | Apr. 9, 2010 | Dec. 31, 2010 | Dec. 31, 2011 | Dec. 31, 2012 | Apr. 30, 2013 |
|---|---|---|---|---|---|
| Total Assets Less Financial Liabilities[22] | ($32M) | ($22) | $60M | $101M | $145M |
| Litigation Liabilities[23] | $365M | $365M | $365M | $145M | $145M |
| Net Value | ($397M) | ($387M) | ($305M) | ($44M) | ($1M) |

107.     The creation of the lifeboats and subsequent transfer of management contracts (and business value) all but ensured HCMLP's demise. HCMLP's assets under management, operating income from its investment management business, and operating margins steadily declined, and almost no new third-party investor money came into the company. HCMLP continued to shoulder the burden of providing services to NexPoint and HCMFA without compensation. HCMLP's financial condition began to improve in late 2013, due largely to

---

[22]   HCMLP's "Total Assets Less Financial Liabilities" is exclusive of litigation liabilities and is estimated as the sum of the enterprise value of the investment fund management business, the fair market value of HCMLP's investment portfolio, and the value of related parties notes receivable, less HCMLP's non-contingent financial liabilities. HCMLP's valuation is corroborated by valuations prepared by CBIZ, Inc. on behalf of HCMLP's general partner. Figures are rounded to the nearest million.

[23]   Litigation liabilities are set at the values at which they were settled, or the values at which they were estimated by the Court in the course of the bankruptcy proceeding.

003846

successful proprietary trading and overall improving market conditions, but those gains began to dissipate in 2015 due to Dondero's reckless trading.

108. By December 2016, the company was again firmly insolvent, inadequately capitalized, and/or unable to pay its debts as they came due, in large part because its CLOs were generating diminishing returns, and the company was earning only minimal fees for servicing other Dondero Entities rather than generating new business of its own, while continuing to bear significant employee expenses. HCMLP's financial condition deteriorated further between 2017 and 2019, as additional litigation claims were levied against the company, and it was forced to answer for the misconduct perpetrated in its name by Dondero and his loyalists.

109. Specifically, as shown below, when litigation liabilities resulting from claims by UBS, the Redeemer Committee, and Acis against HCMLP are taken into account in valuations prepared on HCMLP's behalf, HCMLP was insolvent from no later than December 31, 2016, until the date it filed for bankruptcy.

| | Dec. 19, 2016 | Dec. 31, 2017 | Dec. 31, 2018 | Oct. 16, 2019 |
|---|---|---|---|---|
| Total Assets Less Financial Liabilities[24] | $183M | $260M | $184M | $101M |
| Litigation Liabilities[25] | $212M | $365M | $365M | $365M |
| Net Value | ($29M) | ($105M) | ($181M) | ($264M) |

---

[24] HCMLP's "Total Assets Less Financial Liabilities" is exclusive of litigation liabilities and is estimated as the sum of the enterprise value of the investment fund management business, the fair market value of HCMLP's investment portfolio, and the value of related parties notes receivable, less HCMLP's non-contingent financial liabilities. HCMLP's valuation is corroborated by valuations prepared by CBIZ, Inc. on behalf of HCMLP's general partner. Figures are rounded to the nearest million.

[25] Litigation liabilities are set at the values at which they were settled, or the values at which they were estimated by the Court in the course of the bankruptcy proceeding.

003847

### H. At All Time Relevant To This Amended Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit

110.   At all times relevant to this Amended Complaint, Dondero exploited HCMLP, Strand, and the various entities he controlled within the Highland empire for his own personal benefit, both directly and through other HCMLP fiduciaries whose loyalties ran to Dondero rather than HCMLP, and who aided Dondero in his various schemes. Dondero treated the elaborate corporate web he had created as a single integrated entity that existed solely to further his own self-enriching schemes, rather than as individual entities with their own respective stakeholders and corporate governance.

#### 1. Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand

111.   Dondero singularly dominated and controlled HCMLP and was its solitary decision-maker. Dondero made every material business, operational, management, and financial decision for HCMLP. Dondero exercised his complete control of HCMLP through HCMLP's general partner Strand, which Dondero similarly dominated and controlled. Dondero was Strand's 100% owner, sole director, and president between 1993 and 2020. For eight years he was also its secretary and only officer.

112.   Strand did not even attempt to maintain the pretenses of observing corporate formalities. As an initial matter, Strand did not hold regular board meetings. Indeed, the Litigation Trustee, having reviewed HCMLP's books and records, has been unable to identify a single instance in which a Strand board meeting was held prior to the Petition Date. This is consistent with Dondero's own testimony in 2020 in an unrelated proceeding that he cannot recall ever attending a board meeting for Strand or seeing Strand board meeting minutes.

003848

113.    Although Strand's bylaws require annual meetings of stockholders, over the 26 years that Dondero controlled Strand, only six annual stockholder meetings were ever held, and no such meetings took place after 2005. The Litigation Trustee was able to identify only twelve instances of documented corporate action taken by the Strand board over the course of approximately 26 years, eight of which related to the appointment or removal of officers.

114.    Dondero was the only officer of Strand between 1993 and 2001. Although Strand had certain elected officers between 2001 and 2019, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and standing with, Dondero. Indeed, when Dondero was asked under oath in 2020 about Strand's officers, he testified that he did not know if Strand even had officers, and stated that he was "not aware of [Strand] having any employees or active … governance." Moreover, he did not know whether Strand had a board of directors or if he was solely Strand's president.

### 2.    Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form

115.    As of the Petition Date, the Highland complex spanned more than 2,000 entities. For at least the last two decades, it has functioned largely as a single economic unit that was operated and controlled by Dondero, who abused his direct or indirect ownership stakes for his own personal benefit. Dondero directed the integrated enterprise himself, using friends, family members, and directors-for-hire that the Court has previously described as "nominal figureheads"[26] to carry out his will. As high-level HCMLP employees have testified under

---

[26]    *See In re Acis Cap. Mgmt., L.P.*, No. 18-30264-SGJ-11, 2019 WL 417149, at *17 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019), *appeal dismissed as moot sub nom. Matter of Acis Cap. Mgmt. G.P., L.L.C.*, 850 F. App'x 300 (5th Cir. 2021), and *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021).

003849

oath, Dondero was the "ultimate decision-maker" for "every [] entity in the firm and for the firm as a whole."

116.    Dondero managed the entities as a single integrated unit.  Internal business plans and projections were prepared in the aggregate across entities, including entities that were not owned by HCMLP, but were instead otherwise directly or indirectly owned by Dondero. Internal financial forecasts even projected AUM growth in non-HCMLP entities that was predicated upon HCMLP acting as support and service provider, even though HCMLP itself was effectively a melting ice-cube when those projections were made.  Indeed, as far back as 2011, company projections provided to the valuation advisor CBIZ Valuation Group projected negative operating income for HCMLP.

117.    Dondero used his domination of his web of entities, operated as a single unit, to facilitate his pillaging of HCMLP, moving HCMLP's assets and revenue out of reach of its creditors while preserving those funds and assets for his own use or for the benefit of other entities he created or controlled.  As described above, Dondero operated NexPoint and HCMFA for the purpose of siphoning off HCMLP's revenue and value; in addition, he used HCMLP as NexPoint's and HCMFA's direct piggy-bank, transferring not only HCMLP's business and agreements, but also its cash, which was used to seed new funds and investment vehicles, among other things.

118.    Dondero's control of the various entities within the Highland web was so pervasive that his own co-founder Okada remarked at one point in 2012, "I am not cool with you coming up with ideas, using Highland's cash flow to set them up, fund all their negative working capital and then somehow think the split shouldn't be 75 25 without some sort of negotiation and true up [(i.e., making new entities that Dondero owned entirely on his own)]."

48

003850

Indeed, a 2016 draft accounting memo concluded that HCMLP, HCMFA, and NexPoint (and all of their subsidiaries) "are considered to be under common control … James Dondero controls all 3 of the entities." This conclusion accords with statements NexPoint's and HCMFA's own funds have made in public filings,[27] as well as the Bankruptcy Court's finding that they are both "controlled by Dondero."[28]

119.    Dondero also funneled his own personal expenses through HCMLP, routinely seeking expense reimbursements from HCMLP in excess of $1 million per year. At Dondero's direction, HCMLP employed certain employees whose only responsibilities and obligations were to manage Dondero's and Okada's personal affairs and private business interests. For example, Melissa Schroth was employed by HCMLP, but her only duties were to serve as Dondero's and Okada's personal bookkeeper. Her duties involved no work for HCMLP, but rather concerned Dondero's and Okada's personal investments and entities, including but not limited to Dugaboy and Get Good. Dondero also used HCMLP and its employees for the benefit of other entities he dominated without adequate compensation to HCMLP—including for the benefit of NexPoint and HCMFA as described above, as well as for the benefit of his personal trusts. For example, Dondero used his domination of HCMLP to make its employee resources available to Dugaboy and Get Good at his sole discretion. HCMLP employees were involved

---

[27]  *See*, *e.g.*, NexPoint Real Estate Strategies Fund, Prospectus (Form 497) (as filed Apr. 29, 2022) ("NexPoint Advisors, L.P. … is controlled by James Dondero by virtue of his control of its general partner, Nexpoint Advisors GP, LLC."); Highland Income Fund, Prospectus Supplement (To Prospectus dated July 1, 2019) (Form 497) (July 29, 2019) ("HCMFA is owned by Highland Capital Management Services, Inc. ("HCM Services") and its general partner, Strand Advisors XVI, Inc., of which James Dondero is the sole stockholder. HCM Services is controlled by Mr. Dondero and Mr. Mark Okada by virtue of their respective share ownership.").

[28]  *See* Order Dismissing as Moot Debtor's Motion for a Mandatory Injunction, *Highland Capital Mgmt., L.P. v. Highland Capital Mgmt. Fund Advisors, L.P. (In re Highland Capital Mgmt., L.P.)*, Adv. Proc. No. 21-03010-sgj11 (Bankr. N.D. Tex. Feb. 24, 2021) (Docket No. 25).

003851

in creating, managing, and providing accounting services to Dugaboy, and certain of those employees, including Melissa Schroth, performed work on behalf of Get Good in connection with Dondero's estate planning and transactions between Get Good and other Dondero Entities. Moreover, both Dugaboy and Get Good have acknowledged in the course of HCMLP's bankruptcy that HCMLP hosted their documents on its server. However, neither Dugaboy nor Get Good compensated HCMLP for the use of its employees or its resources.

120.    This use of HCMLP's employees for Dondero's personal benefit continued even after the commencement of HCMLP's bankruptcy.  For example, after the bankruptcy commenced, Schroth instructed Nancy Dondero to send a letter in her capacity as a trustee of Dugaboy instructing the Swiss entity Highland Capital Management AG ("HCM AG"), which is majority-owned by Dugaboy (which is ultimately owned and controlled by Dondero), to write off a liability that it owed to HCMLP for payments that HCMLP had made on its behalf. Schroth even ghost-wrote a letter for Nancy Dondero to send to HCM AG authorizing this theft. Likewise, Dondero frequently instructed HCMLP's employees to perform services in connection with Dondero's personal and business interests, which conferred no value on HCMLP.

121.    Highland employees frequently did not know whether they or their colleagues were employees of HCMLP or another entity within the Dondero web.  Employees shared the same office space in HCMLP's headquarters.  Indeed, each of Strand, NexPoint, NexPoint GP, HCMFA, Dugaboy, CLO Holdco, the Highland Dallas Foundation, the Highland Santa Barbara Foundation, the Highland Kansas City Foundation, HFP, SAS, and Acis listed its business headquarters at this same address:  300 Crescent Court, Suite 700, Dallas, Texas 75201. Moreover, when employees of HCMLP performed services for other Dondero entities, they

50

003852

sometimes did so pursuant to agreements that Dondero signed for both HCMLP, on the one hand, and the counterparty, on the other hand.  In other instances, HCMLP's employees performed services for non-HCMLP entities without any formal agreements in place at all.  For example, Leventon testified that he performed work for SAS "on and off" for approximately seven years (*e.g.*, in connection with whether to invest in a new litigation funding case), notwithstanding that he was never an employee of SAS and HCMLP did not have a shared services agreement with SAS.[29]  Moreover, when shared services and advisory agreements were in place, HCMLP frequently charged Dondero's other entities below-market rates for use of HCMLP's employees and resources.

122.    Additionally, Dondero delegated authority to his loyalists irrespective of their titles or roles.  For example, Dondero delegated decision-making authority for Acis to Ellington, notwithstanding that he was not an officer, director, or employee of Acis.  And Leventon testified that although he was an HCMLP employee, HCMLP could request that he perform legal services for any of the 2,000 entities in the Highland web.

123.    Dondero would also use HCMLP as his own personal piggy-bank.  For example, between January and August of 2018, Dondero borrowed $16,725,000 on four demand notes.  Dondero remains obligated on three of the demand notes and maintains an outstanding principal

---

[29]    Similarly, several HCMLP employees, including Ellington, Leventon, Katie Irving, and JP Sevilla, had SAS email addresses, and there were frequent meetings among HCMLP's legal department—including Ellington, Leventon, and Sevilla—and Dilip Massand in connection with SAS.  SAS did not compensate any of these HCMLP employees for their work for SAS.  Moreover, in 2014, when a telephone call was placed to the number listed on SAS's website, the call was routed to HCMLP's office in Dallas with a message that stated:  "Thank you for calling SAS Asset Recovery.  For reception press 0.  For Scott [Ellington], press 1.  For Dilip [Massand], press 2.  For JP [Sevilla], press 3.  For Tabor [Pittman, former HCMLP Associate GC], press 4.  For Katie [Irving], press 5.  For Isaac [Leventon], press 6.  Thanks and have a good day."

003853

balance of approximately $9 million. HCMLP has demanded payment on all of the outstanding demand notes, but to date, Dondero has failed to make any repayments on that debt.[30]

124. Dondero also effectively paid himself and Okada distributions from HCMLP through other Dondero Entities, including HCMS. Between 2013 and 2017, HCMS issued dozens of demand notes to HCMLP in return for tens of millions of dollars in cash, and between May 2017 through 2020, HCMS issued four additional promissory demand notes with an aggregate face amount of $900,000. Frequently, these notes functioned as disguised distributions to Dondero and Okada, by virtue of a "loan" from HCMLP to HCMS followed by a "loan" from HCMS to Dondero and Okada. As with other intercompany notes between HCMLP and other Dondero Entities, these notes had minimal covenants. Moreover, Dondero caused HCMLP to issue these loans to HCMS with minimal interest.

125. To take yet another example, Dondero exploited HCMLP's employees and capital in order to launch HCRE Partners, LLC ("HCRE"), another entity designed to evade HCMLP's creditors.[31] HCRE pursued financial and real estate investments, failing to pay

---

[30] In January 2021, HCMLP filed adversary proceedings against Dondero and four of his affiliated entities (HCMFA, NexPoint, HCRE, and HCMS) in the Bankruptcy Court to collect on these notes. *See, e.g.*, *Highland Capital Management, L.P. v. James Dondero*, Adv. Pro. 21-03003-sgj (Bankr. N.D. Tex. Jan. 22, 2021). Dondero and his affiliated entities have raised a series of frivolous defenses to repayment of the notes, including that Dugaboy—acting through Dondero's sister—agreed to forgive the notes as part of Dondero's compensation. As of December 2021, the defendants owed an aggregate of over $50 million in past-due principal and interest on the notes. In November 2021, HCMLP filed a second adversary proceeding against HCMFA to collect on additional notes. *See Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, Adv. Pro. 21-03082-sgj. In this second notes litigation, HCMFA has raised a similarly frivolous defense.

[31] HCRE is 70% owned by Dugaboy, 25% owned by Highland Capital Management Real Estate Holdings I, LLC ("HCMRE I") (owned by a former HCMLP managing director) and 5% owned by Highland Capital Management Real Estate Holdings II, LLC ("HCMRE II") (owned by Ellington).

003854

HCMLP any consideration for advisory, administrative, and other services HCMLP provided. Moreover, Dondero (1) caused HCMLP to loan HCRE tens of millions of dollars on terms that were unfair to HCMLP; (2) used the proceeds of those loans to pay approximately $32 million in distributions (between 2016 and 2020) to Dugaboy, Ellington, and another former HCMLP employee; and (3) caused HCRE to default on its debt to HCMLP and assert frivolous defenses to HCMLP's right to repayment. As of January 8, 2021, approximately $6.1 million in principal and interest was due and owing to HCMLP on HCRE notes.

126. As explained above, Dondero also used HCMLP to support the growth of lifeboats like NexPoint and HCMFA. Additionally, in December 2010, certain preferred tranches of CLOs managed by HCMLP and held by Highland CDO Holding Company, a portion of which was indirectly owned by HCMLP, were sold to CLO Holdco, a Cayman Islands entity then owned and controlled by a Dondero trust. CLO Holdco purported to pay approximately $39 million in return, but $33 million of that amount consisted of a note that was never repaid. The value of these preferred securities predictably skyrocketed soon thereafter, and generated substantial income that was used to benefit Dondero's lifeboats. An analysis of CLO Holdco's cash flows over time demonstrates that income generated from these assets was used to seed a variety of NexPoint-managed funds and entities, HCMFA-managed funds and entities, and Acis-managed CLOs and other vehicles—all for Dondero's benefit—rather than accruing in favor of HCMLP or its subsidiaries.

127. Dondero used HCMLP's funds to support other entities in his web as well. In or around 2013, HCM AG entered into a joint venture with a Brazilian entity named Brasilinvest Investimentos e Participacoes Ltda ("Brasilinvest Investimentos") for a shared interest in a Brazilian entity named Highland Capital Brasilinvest Gestora de Recursos, Ltda (a.k.a Highland

003855

Capital Brasil Gestora de Recursos).  With Dondero's approval, HCM AG acquired Brasilinvest Investimentos's shares in this joint venture through a $230,000 cash payment in October 2016. However, at Dondero's direction, the $230,000 was paid by HCMLP rather than HCM AG or Dugaboy.

128.    Dondero did not bother to distinguish between himself and HCMLP.  After Dondero was removed as HCMLP's Chief Executive Officer and President in January 2020, he continued using his HCMLP email account and continued working out of HCMLP's headquarters until his forced resignation in October 2020 and removal from HCMLP's premises in December 2020.  When the Court entered an order restraining Dondero from communicating with HCMLP employees, Dondero flouted the order, including by communicating with Ellington and instructing Melissa Schroth (an HCMLP employee at the time) to resist Dugaboy-related document production requests, even though those documents were always kept on HCMLP's computer system.  Likewise, a temporary restraining order entered by this Court prohibited Dondero from participating in, or encouraging others to participate in, any action that undermined decisions made by HCMLP's Chief Restructuring Officer, James Seery ("Seery"), regarding the disposition of HCMLP assets.  Nevertheless, Dondero did so multiple times, including by contacting various employees and instructing them to act in a manner that was inconsistent with Seery's directions.

129.    Dondero evinced no respect for HCMLP as an entity separate and apart from himself.  Thus, he disposed of a cell phone that belonged to HCMLP that contained relevant data, likely resulting in the spoliation of valuable evidence that HCMLP could have used to pursue claims benefitting HCMLP.  In addition, Dondero interfered with document productions of HCMLP and trespassed on HCMLP's property.

54

003856

# I.    Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP

## 1.    Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities

130.    Dondero and his loyalists also engaged in other transactions that siphoned value from HCMLP to themselves.  As described in greater detail below, these included (i) transfers of liquid assets for illiquid notes that could not have been monetized for the same value as the assets for which they were exchanged, (ii) limited partner distributions, and (iii) payments for services provided to other Dondero Entities rather than HCMLP.

### (a)    The Fraudulent CLO Holdco Transaction

131.    On December 28, 2016, shortly after the Redeemer Committee commenced its Delaware state court action and arbitration against HCMLP, and while UBS's action against HCMLP was pending, Dondero, acting with substantial assistance from Scott, undertook a scheme whereby HCMLP transferred assets valued by the company at approximately $24 million through a series of related assignments (the "Transferred CLO Holdco Assets") to CLO Holdco, in exchange for an assignment from Get Good of an existing Dugaboy obligation (the "Dugaboy Note"), which was worth significantly less than the transferred assets (the "CLO Holdco Transaction").

132.    Upon information and belief, Dondero consummated the CLO Holdco Transaction in order to claim a charitable deduction on his tax returns, and to place value out of his ex-wife's reach.  Specifically, Dondero wanted to transfer assets out of Get Good so that they would not be available to his ex-wife, and to do so through a charitable donation so that he would get the added benefit of a tax deduction.  Get Good, however, did not own enough assets that qualified for a tax-deductible charitable donation.  Accordingly, Dondero caused Get Good

003857

to exchange the Dugaboy Note, which did not qualify for a tax-deductible donation, for HCMLP's Transferred CLO Holdco Assets, which did. Dondero, acting with Scott's assistance, then caused the Transferred CLO Holdco Assets to be immediately transferred from Get Good to Highland Dallas, to the Charitable DAF, to the DAF, and ultimately to CLO Holdco. The CLO Holdco Transaction thus furthered Dondero's personal interests, but harmed HCMLP and its creditors by replacing liquid and liquidating assets with an illiquid note of significantly less value.

133.   The Transferred CLO Holdco Assets consisted of: (1) $2,032,183.24 or potentially more in Series A Interests in Highland Capital Loan Fund, L.P., an HCMLP-managed hedge fund investing primarily in liquid loans; (2) a participation interest worth $8,710,000 or potentially more in call options of publicly-traded American Airlines Group, Inc. (the "AA Interests"); and (3) a participation interest in certain Highland Crusader Fund L.P. and Highland Crusader Fund II, Ltd. shares, as well as a tracking interest in certain participation shares of Highland Crusader Fund II, Ltd., which at the time of the transfer HCMLP valued at $12,625,395.44 (the "Crusader Interests"). The transfer of the Transferred CLO Holdco Assets was initiated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good. Pursuant to that agreement, the Transferred CLO Holdco Assets were received by Get Good.

134.   Dondero caused HCMLP to transfer the Transferred CLO Holdco Assets to Get Good in exchange for the Dugaboy Note. While the face amount of the Dugaboy Note was equal to the reported value of the Transferred CLO Holdco Assets, in actuality, the value of the Dugaboy Note did not come close to the value of the Transferred CLO Holdco Assets. The interest rate on the Dugaboy Note was a paltry 2.75%. There was no security interest provided

003858

in respect of the Dugaboy Note or other material covenants or lender protections other than rights to cost of collections.  No payments of principal or interest were required on the note until 2036.  And because Dugaboy was a completely private and opaque counterparty, there was no third-party market for the sale of the Dugaboy Note.  Lastly, from a counterparty risk perspective, Dondero's control over the repayment of a note clearly does not ensure timely repayment without litigation, as evidenced by the several entities controlled by Dondero that are currently seeking to evade their unambiguous payment obligations on other notes owed to HCMLP, on frivolous grounds such as mistake and subsequent alleged oral agreements between Dondero and his sister.  In the end, Dondero caused HCMLP to exchange valuable liquid or otherwise near-term liquidating assets for a paper-thin promise 20 years into the future.

135.    Following Get Good's receipt of the Transferred CLO Holdco Assets, Scott—at Dondero's direction—immediately caused Get Good to donate the assets to Highland Dallas Foundation in his capacity as trustee of Get Good.  Dondero and Scott caused the Highland Dallas Fund to immediately contribute the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick, each in their capacity as the directors of Highland Dallas Foundation.  Following that transfer, through an omnibus assignment agreement, Scott caused DAF Holdco to transfer the Transferred CLO Holdco Assets to the DAF, which itself immediately transferred them to CLO Holdco.  The DAF GP issued a written resolution, as general partner of the DAF and as 100% owner of CLO Holdco, contributing the Transferred CLO Holdco Assets to CLO Holdco.  Scott again executed this document as managing member of DAF GP.  As purported consideration for these transfers, the Highland Dallas Foundation, DAF Holdco, the DAF, and CLO Holdco all agreed to be fully bound by apparently unrelated "Multi Strat Governing Documents."  Scott executed the

003859

requisite consent documents on behalf of each entity, in his capacities as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco. Upon information and belief, Scott consented to each step of the CLO Holdco Transaction on behalf of Get Good, DAF Holdco, the DAF, DAF GP, and CLO Holdco solely at Dondero's request, and without performing any independent analysis.

136.    The structure of the CLO Holdco Transaction is set forth below in Figure 3.

**Figure 3.**



(b)    <u>Fraudulent Distributions</u>

137.    Notwithstanding HCMLP's limited liquidity and hundreds of millions of dollars in looming liabilities, Dondero caused HCMLP to make a series of equity distributions between 2010 and 2012, and 2015 and 2019, for Dondero's and Okada's ultimate benefit, and to the detriment of HCMLP's creditors. These distributions were made at a time when HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay, and

58

were intended to hinder, delay, and/or defraud creditors by siphoning value to limited partners that should have been preserved for creditors' benefit.

138.    Although Dondero and Okada placed certain of their limited partnership interests in trusts that they ultimately owned or controlled, Dondero frequently disregarded corporate formalities, including with respect to limited partnership distributions.  Until 2015, distributions were made to Dondero personally, notwithstanding that he owned HCMLP largely through certain trusts.  Beginning in 2015, it appears that distributions were made directly to Strand and Dugaboy, *i.e.*, the Dondero Entities that actually held HCMLP limited partnership interests.  As such, the distributions made to Dondero between April 9, 2010 and February 28, 2015 (identified below) were made for the benefit of Dondero, Dugaboy, and/or Strand.  The distributions made after February 28, 2015, were, upon information and belief, made directly to the limited partnership interest holders, for the benefit of Dondero and Okada.

139.    Likewise, until 2015, distributions were made to Okada individually, rather than HCMLP's limited partners MAP #1 and MAP #2.  As such, the distributions made to Okada between April 9, 2010, and February 28, 2015, (identified below) were made for the benefit of Okada, MAP #1, and/or MAP #2.  The distributions to Okada made after February 28, 2015, were broken out into three transfers in HCMLP's records, in amounts proportionate to the limited partnership interests of Okada, MAP #1, and MAP #2.

140.    On or around April 9, 2010, HCMLP made distributions to Dondero and Okada, in the amounts of $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) and

003861

$405,585.62 (two transfers of $375,000.00 and $30,585.62), respectively (the "April 9, 2010 Distributions").[32]

141.    On or around April 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $649,318.45 and $216,439.49, respectively (the "April 13, 2011 Distributions").

142.    On or around May 2, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $3,124,435.00 and $1,024,018.00, respectively (the "May 2, 2011 Distributions").

143.    On or around September 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,351,316.00 and $1,705,813.00, respectively (the "September 13, 2011 Distributions").

144.    On or around November 25, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,250,000.00 and $1,750,000.00, respectively (the "November 25, 2011 Distributions").

145.    On or around February 22, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $3,000,000.00 and $1,000,000.00, respectively (the "February 22, 2012 Distributions").

146.    On or around February 29, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $4,514,780.25 and $1,504,926.75, respectively (the "February 29, 2012 Distributions").

---

[32]  Plaintiff's original Complaint referred to the distributions as being made on or around the dates reflected on HCMLP's general ledger.  Plaintiffs have now located the bank transfer statements for each distribution, and use the bank transfer date instead.  The distributions being challenged, however, have not changed.

003862

147.    On or around April 10, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $6,221,364.15 and $2,073,788.05, respectively (the "April 10, 2012 Distributions").

148.    On or around April 9, 2013, HCMLP made distributions to Dondero and Okada, in the amounts of $25,375,083.16 and $8,440,148.31, respectively (the "April 9, 2013 Distributions").

149.    On or around December 19, 2016, HCMLP made distributions to Hunter Mountain,[33] Dugaboy, and Strand, in the amounts of $4,769,570, $8,945, and $12,017, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,334, $470, and $201, respectively (the "December 19, 2016 Distributions").

150.    On or around January 5, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $11,034,754, $20,694,  and $27,803, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2,[34] in the amounts of $5,401, $1,087, and $466, respectively (the "January 5, 2017 Distributions").

---

[33]    In December 2015, Dondero orchestrated two sequential transactions, whereby Hunter Mountain purchased virtually all of HCMLP's limited partnership interests in exchange for cash and notes (collectively, the "Hunter Mountain Transaction"). The effect of the Hunter Mountain Transaction was to consolidate over 99% of all existing limited partners' interests in HCMLP into a single entity, Hunter Mountain. Hunter Mountain is owned through a series of intermediate shell companies, and ultimately all economic interests are held in a series of tax-favored life insurance accounts at Crown Global Life Insurance Ltd. ("Crown Global"). On information and belief, these accounts were created by Dondero and Okada, who were the direct or indirect owners of nearly all of the Debtor's limited partner interests prior to the Hunter Mountain Transaction. Dondero orchestrated the Hunter Mountain Transaction in order to avail himself of personal tax benefits.

[34]    At the time of the December 19, 2016 distributions and thereafter, Okada and two trusts (MAP #1 and MAP #2) established for the benefit of Okada's children and siblings held economic interests in HCMLP.  HCMLP's accounting records indicate that distributions allocated to Okada, MAP #1, and MAP #2 were all made to a single account in Okada's name. Thus, with respect to this and subsequent, applicable distributions, Plaintiff pleads that they were made to or for the benefit of Okada, MAP #1, and MAP #2.

003863

151. On or around February 7, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $7,169,970.00, $13,446.40, and $18,065.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $3,509.32, $706.19, and $302.65, respectively (the "February 7, 2017 Distributions").

152. On or around June 15, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $79,600.00, $149.28, and $200.56, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $38.96, $7.84, and $3.36, respectively (the "June 15, 2017 Distributions").

153. On or around December 21, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $2,651,675.00, $4,972,89, and $6,681.16, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,297.86, $261.17, and $111.93, respectively (the "December 21, 2017 Distributions").

154. On or around March 9, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $84,575.00, $158.61, and $213.10, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $41.40, $8.33, and $3.57, respectively (the "March 9, 2018 Distributions").

155. On or around December 19, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $4,930,722.50, $9,246.96, and $12,423.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,413.33, $485.64, and $208.13, respectively (the "December 19, 2018 Distributions").

156. On or around March 28, 2019, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $3,711,456.47, $6,960.38, and $9,351.38, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,816.56, $365.55,

003864

and $156.66, respectively (the "March 28, 2019 Distributions," and together with the April 9,

2010 Distributions, April 13, 2011 Distributions, May 2, 2011 Distributions, September 13,

2011 Distributions, November 25, 2011 Distributions, February 22, 2012 Distributions,

February 29, 2021 Distributions, April 10, 2012 Distributions, April 9, 2013 Distributions,

December 19, 2016 Distributions, January 5, 2017 Distributions, February 7, 2017

Distributions, June 15, 2017 Distributions, December 21, 2017 Distributions, March 9, 2018

Distributions, December 19, 2018 Distributions, March 28, 2019 Distributions, the "HCMLP

Distributions").

157.    All of these distributions were made at a time when HCMLP was insolvent and

as part of a scheme to transfer HCMLP's value to Dondero and Okada and divert value away

from HCMLP's current and potential future creditors.  The March 28, 2019 Distributions, which

were made shortly after the arbitration panel awarded the Redeemer Committee over $190

million, were the final distributions made by HCMLP.  The distributions ceased at that time—

the end result of HCMLP's valuable businesses being usurped by the "lifeboats" and a years-

long effort to transfer HCMLP's remaining cash to its limited partners via distributions.

(c)    Fraudulent Transfers To Massand

158.    HCMLP also made payments of at least $519,000 per year to Massand Capital

from November 2014 through 2019.  On January 1, 2014, HCMLP entered into a one-year

consulting agreement with Massand Inc., pursuant to which HCMLP agreed to pay Massand

Inc. $25,000 per month in fees, $7,500 per month in "accommodations," $750 per month in cell

phone expenses, and other "reasonable" expenses.  Then, on January 5, 2015, HCMLP entered

into a consulting agreement (together, the "Massand Consulting Agreements") on the same

terms with Massand LLC, pursuant to which HCMLP agreed to pay Massand LLC $35,000 per

003865

month in fees, $7,500 per month in "accommodations," $750 per month in cell phone expenses, and other "reasonable" expenses. In exchange, the Massand Consulting Agreements provided that HCMLP's Chairman, Dondero, and its General Counsel, Ellington, would assign certain unspecified "tasks" to Massand Capital.

159.    Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP. Moreover, Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

160.    The Massand Consulting Agreements noted that Massand Capital would be responsible for advising HCMLP on its "Investment Recovery Strategies business in the Countries of the Gulf Cooperation Council"—specifically Bahrain, Saudi Arabia, the United Arab Emirates, Kuwait, Qatar, and Oman. Based upon a review of information to date, it appears that Massand Capital provided no actual services to HCMLP, and that HCMLP did not have any "business" that was related to "investment recovery strategies."

161.    Rather, Massand Capital appears to have provided services solely to SAS—a separate entity that was owned and controlled by Dondero and Ellington. The owner of Massand Capital, Dilip Massand, was assigned an SAS email address, was bestowed the title of "Managing Director" of SAS, and was involved in communications relating to SAS's claims purchase litigation financing business.[35] As set forth above, SAS was owned by Dondero and Ellington, not HCMLP.

---

[35]    In a speaker profile in 2014, Dilip Massand was described as overseeing "the operations of SAS Asset Recovery in the Middle East."

003866

162.     Thus, based on the documents and information that Plaintiff has reviewed to date, Dondero caused HCMLP to pay millions of dollars in consulting fees to Massand Capital in exchange for no value to HCMLP, all solely to benefit other Dondero-controlled entities. HCMLP received no value for the payments that Dondero and Ellington directed to Massand Capital.

**J.     Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds**

163.     HCMLP owned a 97.5% interest in HE Capital 232 Phase I, LLC ("HE Capital 232"). In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Phase I Property, LLC ("HE Capital 232 Property"), sold real property in Arizona. Net of costs and expenses in connection with the transaction, HE Capital 232 was due $8,687,245.15. These proceeds were placed in an escrow account maintained by HCMLP's counsel, Wick Phillips Gould & Martin LLP ("Wick Phillips"), "pending distribution of the proceeds to the direct and indirect owners of interests in [HE Capital 232 Property]."

164.     On March 2, 2018, Ellington directed Wick Phillips to disburse from the escrow account $4,510,000 to HCMLP and $1,200,000 to an HCMLP managed fund to pay down mezzanine debt. This left $2,977,245.15 in the escrow account that was due and owing to HCMLP. On information and belief, Dondero and Ellington directed Wick Phillips to keep these funds in the escrow account so that they could funnel the money to themselves. For three months, Wick Phillips requested disbursement instructions for the remaining funds from Ellington, but Ellington demurred while "waiting for answers from others so can tell you where to send." Upon information and belief, during this period, Ellington and Dondero were determining how to direct the funds to themselves.

003867

165.    On June 4, 2018, Ellington dropped HCMLP's Managing Director (Real Estate) from an email chain and directed Wick Phillips to disburse the remainder to an account in the name of MaplesFS—a fiduciary services company in the Cayman Islands acting as a payment agent—for further credit to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.  MaplesFS subsequently transferred the full amount to Grey Royale Ltd.  A Wick Phillips employee commented that the payment to Grey Royale Ltd. was "pretty suspicious."

166.    In September 2019, in connection with the preparation of HE Capital 232's tax return, HCMLP's Tax Director inquired about the missing funds owed to HCMLP as a result of the Arizona property sale.  Ellington responded that the "facts as I know them" were that the approximately $3 million in missing HCMLP funds were "additional cost[s] of sale, reducing the gain," and "used to pay various legal expenses and other closing costs."  Ellington did not disclose that he had directed that the funds be paid to a Cayman Islands shell company owned by Dondero and Ellington, which had no role in the real estate transaction and was not owed any legal expenses or closing costs.

167.    Neither Dondero, Ellington, nor Grey Royale Ltd. were parties to the escrow agreement or had any legal claim to the proceeds of the real estate sale held by the escrow agent.

### K.    Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction

168.    HCMLP employees other than Dondero also engaged in, and improperly benefited from, self-interested transactions and schemes involving HCMLP.

169.    In early 2020, only months after the Petition Date, Ellington and Leventon formed a group of entities that have received millions of dollars of payments from four Dondero Entities pursuant to a services agreement dated March 13, 2020, among Tall Pine, NexBank,

66

003868

DAF Holdco, NexPoint, and HCMFA (the "<u>Tall Pine Services Agreement</u>"). The Tall Pine scheme was an elaborate arrangement pursuant to which Dondero would be able to keep certain key employees, including Ellington and Leventon, loyal to Dondero during the bankruptcy. Through the Tall Pine scheme, Ellington and Leventon ensured that they would profit off their wrongdoing, and that Dondero would compensate them no matter what happened to HCMLP.

170.    Pursuant to the Tall Pine Services Agreement, HCMLP employees, including Ellington and Leventon, would receive approximately $17 million through pass-through entities that they created and owned over the course of two years. When Tall Pine would receive a payment from any of the counterparties to the Tall Pine Services Agreement, Tall Pine contemporaneously transferred funds to Leventon's pass-through entity, Clairmont Holdings, LLC ("<u>Clairmont</u>"). Ellington, who owned Tall Pine, profited from the amounts that remained in Tall Pine after it had distributed sums to Clairmont and other pass-through entities controlled by HCMLP employees.

171.    After the Petition Date, Dondero surreptitiously approved wire transfers from accounts held by NexPoint, NexBank, and the DAF to Tall Pine for the benefit of himself, Ellington, and Leventon. These payments were made to compensate Ellington and Leventon for the amounts that would have been paid to them in 2020 but for the Committee's objection. Ellington and Leventon did not disclose these payments to the Independent Board.

## V.    CAUSES OF ACTION

### COUNT I
**Avoidance and Recovery of HCMLP Distributions as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

172.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

003869

173.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

174.    As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 2, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 22, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 9, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| December 19, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |

003870

|  | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| January 5, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 7, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 15, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 21, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 9, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 19, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 28, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $54,703,053.88 | $34,432,322.97 | $64,573.52 | $18,142,416.67 | | | $86,755.08 |
| Grand Total | $107,429,122.12 | | | | | | |

175.    At the time of each HCMLP Distribution, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

176.    HCMLP received less than reasonably equivalent value in exchange for each of HCMLP Distributions set forth above.  Indeed, HCMLP received no value for HCMLP the Distributions, each of which was a gratuitous transfer from HCMLP, either to one of its limited partners or for the benefit of one of its limited partners and/or Dondero.

69

003871

177.    Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain did not receive HCMLP Distributions in good faith.  To the contrary, at the times that Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain received each of HCMLP Distributions, they knew that HCMLP was balance sheet insolvent (or would be rendered balance sheet insolvent), inadequately capitalized, and/or unable to pay its debts as they came due.  Each of these defendants was aware that Dondero had siphoned HCMLP's valuable assets and business opportunities after HCMLP had incurred substantial contingent liabilities.  Moreover, each of these defendants was aware that HCMLP Distributions were yet another effort to siphon value from HCMLP to Dondero, Okada, and their affiliated entities at a time when HCMLP was insolvent, inadequately capitalized, and unable to pay its debts as they came due.

178.    Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

179.    Each HCMLP Distribution is voidable as a constructively fraudulent transfer.  Accordingly, each HCMLP Distribution should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT II**
**Avoidance and Recovery of HCMLP Distributions as Intentional Fraudulent Transfers**
**Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

180.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

70

003872

181.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

182.    As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 2, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 22, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 9, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| December 19, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |

71

003873

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| January 5, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 7, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 15, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 21, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 9, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 19, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 28, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $54,703,053.88 | $34,432,322.97 | $64,573.52 | $18,142,416.67 | | | $86,755.08 |
| Grand Total | $107,429,122.12 | | | | | | |

183.    Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Okada was HCMLP's Co-Chief Investment Officer and Co-Founder. Together, Dondero and Okada directly or indirectly owned substantially all of the equity interests in HCMLP, or were the beneficiaries of all distributions HCMLP made to its limited partners. Dondero exercised complete control over HCMLP, and Okada acquiesced to and profited from schemes orchestrated by Dondero to enrich HCMLP's direct and indirect owners.

184.    To that end, Dondero caused HCMLP to make the HCMLP Distributions set forth above with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

003874

(a) Dondero and Okada were insiders of HCMLP;

(b) before HCMLP Distributions were made, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(d) HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the HCMLP Distributions;

(e) at the time of each HCMLP Distribution, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(f) The initial recipients of the HCMLP Distributions were Dondero, Dugaboy, Okada, Strand, and Hunter Mountain, each of which was owned and/or controlled by Dondero and Okada;

(g) Dondero and Okada personally received certain HCMLP Distributions instead of HCMLP's limited partners Dugaboy, Strand, MAP #1, and MAP #2; and

(h) Dondero made HCMLP Distributions during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming

73

contingent liabilities, and effected the transfers in order to siphon value so that such value would not be available to satisfy HCMLP's creditors.

185.    Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

186.    Each HCMLP Distribution is voidable as an intentionally fraudulent transfer. Accordingly, each of the HCMLP Distributions should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT III
**Illegal Distributions Under Delaware Revised Uniform Limited Partnership Act**
*(Against Dondero, Dugaboy, Strand, and Hunter Mountain)*

187.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

188.    The Delaware Revised Uniform Limited Partnership Act ("DRULPA") § 17-607(a) prohibits distributions "to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited partnership … exceed the fair value of the assets of the limited partnership[.]"

189.    Under 17-607(b), "[a] limited partner who receives a distribution in violation of subsection (a) … and  who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to the limited partnership for the amount of the distribution."

74

003876

190.    As set forth below, between December 31, 2016 and the Petition Date, HCMLP made the following distributions to Hunter Mountain, Dugaboy, and Strand (the "Illegal Distributions").

|  | Hunter Mountain | Dugaboy | Strand |
|---|---|---|---|
| December 31, 2016 Distributions | $4,769,570.00 | $8,945.00 | $12,017.00 |
| January 31, 2017 Distributions | $11,034,754.00 | $20,694.00 | $27,803.00 |
| February 28, 2017 Distributions | $7,169,970.00 | $13,446.40 | $18,065.44 |
| June 30, 2017 Distributions | $79,600.00 | $149.28 | $200.56 |
| December 31, 2017 Distributions | $2,651,675.00 | $4,972.89 | $6,681.16 |
| March 31, 2018 Distributions | $84,575.00 | $158.61 | $213.10 |
| December 31, 2018 Distributions | $4,930,722.50 | $9,246.96 | $12,423.44 |
| March 31, 2019 Distributions | $3,711,456.47 | $6,960.38 | $9,351.38 |
| Total | $34,432,322.97 | $64,573.52 | $86,755.08 |
| Grand Total |  | $34,583,651.57 | |

191.    Hunter Mountain, Dugaboy, and Strand knew that HCMLP made the Illegal Distributions at a time that its liabilities exceeded the fair value of its assets. As set forth herein and in the counts below, each of Hunter Mountain, Dugaboy, and Strand were the alter egos of Dondero. Even if Hunter Mountain, Dugaboy, or Strand were not the alter egos of Dondero, they would be imputed with Dondero's knowledge. Dondero was the sole owner of Strand. Likewise, Dondero created Hunter Mountain as a shell entity whose sole purpose was to purchase the majority of HCMLP's limited partnership interests from himself and his Dugaboy trust (among others). Through Hunter Mountain, Dondero continued to receive the economic

75

003877

benefit of HCMLP's limited partnership distributions through distributions on notes that would be triggered by those Illegal Distributions made to Hunter Mountain.

192.    Hunter Mountain, Dugaboy, and Strand are liable to HCMLP and its creditors for the full amount of the Illegal Distributions, plus interest.

<div align="center">

**COUNT IV**
**Breach of Fiduciary Duty Arising Out Of Dondero's Lifeboat Scheme**
*(Against Dondero and Strand)*

</div>

193.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

194.    During all periods relevant to the allegations set forth herein, Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner.  Likewise, during all periods relevant to the allegations set forth herein, Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP and as an officer of HCMLP.

195.    Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero or Strand set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020.  Moreover, given Strand's and Dondero's fiduciary obligations, neither the Estate nor the Litigation Trustee  was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal.   By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit. Dondero and Strand transferred HCMLP's valuable business to the lifeboat entities, including but not limited to NexPoint and HCMFA.  Pursuant to the scheme, the lifeboats utilized HCMLP's employees to

<div align="center">76</div>

003878

perform management and advisory services that HCMLP had provided directly, and should have continued to provide directly.  As a result of this scheme, HCMLP would perform the same services via the same employees, but would now either receive only a small fraction of the profits that were generated or, in some instances, provide these services at a loss because the service agreements between HCMLP and the lifeboats would not even cover HCMLP's costs of providing the services.  The majority of profits were paid to the lifeboats, which were owned by Dondero and/or entities that he controlled, placing those profits beyond the reach of HCMLP's creditors.

196.    Dondero and Strand willfully and wantonly orchestrated this scheme in bad faith in order to evade HCMLP's present and future creditors.

197.    Strand was dominated and controlled by its sole owner, Dondero.  Dondero also owned substantial economic interests in each of the lifeboats either directly or through entities that he owned and/or controlled.  As such, Dondero appeared on both sides of the agreements and transactions entered into between HCMLP, on one hand, and NexPoint, HCMFA, Acis, and the other lifeboats, on the other hand.

198.    The wrongful acts that Dondero and Strand committed in connection with the lifeboat scheme—including but not limited to funneling new business to the lifeboat entities and undercompensating HCMLP for the use of its employees—continued through the Petition Date.  Likewise, injury to HCMLP—in the form of lost profits and misappropriation of its employees and resources—continued through the Petition Date.

199.    HCMLP suffered tens or hundreds of millions of dollars of harm, as the result of Dondero's and Strand's breaches, in the form of lost management and advisory fee revenue that far exceeded the amounts that the lifeboats paid to HCMLP under their respective shared

003879

services and other agreements. Between the date of its formation and the Petition Date, NexPoint earned approximately $120 million in advisory and administrative fees and approximately $50 million in profits. Between the date of its formation and the Petition Date, HCMFA earned approximately $150 million in advisory and administrative fees.

200. Strand and Dondero profited from their breaches of fiduciary duties in connection with their lifeboat scheme in violation of Delaware law. Strand and Dondero are liable to HCMLP for their breaches of fiduciary duty in connection with the lifeboat scheme in an amount to be proven at trial.

### COUNT V
### Breach of Fiduciary Duty Arising Out Of Conduct That Resulted in HCMLP Liabilities To Third Parties
*(Against Dondero, Strand, Ellington, and Leventon)*

201. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

202. During all periods relevant to the allegations set forth herein: (1) Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP's Chief Legal Officer and General Counsel; and (4) Leventon owed fiduciary duties to HCMLP in his capacity as HCMLP's Assistant General Counsel.

203. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero, Strand, Ellington, or Leventon set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed by all these parties to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into

003880

the breaches set out herein prior to Dondero's removal. By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

204.    Dondero (and in turn, Strand), Ellington, and Leventon each breached their fiduciary duties to HCMLP by engaging in willful and wanton misconduct that foreseeably resulted in liability to HCMLP. In total, these breaches resulted in more than $350 million in allowed claims against HCMLP. But for their breaches of fiduciary duty, either HCMLP never would have incurred these claims, or HCMLP would have resolved these claims for substantially lower amounts. These breaches resulted in millions of dollars to Dondero, Ellington, and Leventon, either directly, through transfers from HCMLP to entities owned in whole or in part by Dondero and Ellington, or indirectly, through compensation paid to Ellington and Leventon in exchange for their loyalty to Dondero in perpetrating schemes that breached their duties to HCMLP.

205.    **Liabilities to UBS.** Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to UBS. Dondero exposed HCMLP and its subsidiaries to litigation against UBS that resulted in an adverse judgment that exceeded $1 billion. Among other things, acting through HCMLP, Dondero caused the Fund Counterparties to refuse to meet their obligations to UBS, and orchestrated transfers of more than $233 million of assets from HFP, exposing HCMLP to claims for fraudulent transfer, breach of the implied covenant of good faith and fair dealing, and extensive prejudgment interest and legal fees.

206.    Then, in 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial,

003881

Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio caused HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate the surreptitious transfer of assets worth at least $100 million to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington. Neither HCMLP nor the Fund Counterparties received legitimate value in exchange for this transfer.

207.    After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court. Ellington even went so far as to state in August 2020 that "[Leventon] and myself have spent in excess of 100 hours trying to piece together everything we can [about the Fund Counterparties' assets] to create a true and accurate document based record of what happened with these target entities['s assets]." Ellington made this statement knowing that the Fund Counterparties' assets had been transferred to an offshore entity he owned and controlled. When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

208.    **Liabilities to Acis.** Dondero willfully and wantonly caused HCMLP to incur over $23 million in liability to Acis and Terry. As with NexPoint and HCMFA, Acis was originally created to perform management and advisory services that were previously provided by HCMLP. When Dondero's relationship with Terry deteriorated, Dondero set in motion a series of contentious litigation with Terry, which resulted in Terry obtaining a $7.95 million arbitration award against Acis.

209.    Dondero then embarked on a crusade to ensure Terry would not collect from Acis. In connection therewith, Dondero acted through HCMLP to, among other things: (1) siphon assets from Acis, causing Terry to commence an involuntary bankruptcy against Acis

80

003882

and causing HCMLP to lose its advisory and shared services contracts with Acis; (2) enter into costly, frivolous litigation with Terry in Guernsey, a "loser pays" jurisdiction; (3) convert the retirement accounts owned by Terry and his wife, leading to additional legal fees incurred in litigation in Texas state court; (4) violate injunctive provisions set forth in Acis's plan of reorganization, exposing HCMLP to additional liability; (5) enter into costly litigation with Acis's chapter 11 trustee in connection with Acis's bankruptcy case; and (6) mismanage Acis CLOs, exposing HCMLP to substantial liability in its capacity as advisor and fiduciary to Acis. As a result of these actions and the reputational harm they caused, it became impossible for HCMLP to launch another CLO either directly or indirectly.

210.    In connection with his vendetta against Terry, Dondero willfully and wantonly subjected HCMLP to substantial liability to Acis and Terry, including by giving testimony at trial which, along with Leventon's testimony, was found "to be of questionable reliability" and structured "to convey plausible deniability." Ultimately, in order to avoid further liability to Terry and Acis, HCMLP settled those claims for more than $23 million pursuant to a settlement approved by this Court.

211.    Beginning on October 24, 2017, four days after Terry's arbitration judgment was issued, Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so it could not pay the arbitration award.  Ellington and Leventon implemented Dondero's directives and took the steps necessary to consummate the transactions.

212.    Leventon willfully and wantonly helped to transfer value away from Acis in an attempt to make it judgment-proof.  Among other things, Leventon assisted in the drafting and execution of the agreement that transferred Acis's interest in a note receivable from HCMLP,

003883

which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO Management Ltd. just ten days after Terry obtained his arbitration award. The agreement recites that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis, therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO Management Ltd. agrees to step in to the collateral manager role. Given the timing of the assignment—just days after Terry's arbitration award—Leventon knew that it was part of a scheme to strip Acis of its assets, which ultimately resulted in millions of dollars of damage to HCMLP.

213. **Liabilities to HarbourVest.** Dondero and Ellington also willfully and wantonly caused harm to HCMLP by exposing it to substantial liability to HarbourVest. Dondero and Ellington, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash, with a commitment for an additional $75 million in the future, while concealing that Dondero was actively engaged in a campaign against Terry that would significantly impair the value of HarbourVest's investment. In addition, Dondero did not intend to use the $75 million that CLO Holdco received from HarbourVest to satisfy capital calls at HCLOF, and instead intended for CLO Holdco to use those funds as part of a scheme to infuse other Dondero Entities (including entities that benefitted the NexPoint and HCMFA lifeboats) with additional cash. Ultimately, HCMLP was forced to settle with HarbourVest by providing it with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by HCMLP. But for Dondero's and Ellington's conduct, HCMLP would not have incurred the foregoing liabilities. As a result of their conduct, those interests in HCLOF were then worth tens of millions of dollars less than the $75 million HarbourVest paid to acquire them.

003884

214.    **Liabilities to Crusader Funds.**  Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to the Redeemer Committee due to their conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors.  Among other things, Dondero, Ellington, and Leventon caused HCMLP to:  (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) purchase 28 Plan Claims for the benefit of HCMLP without the approval of the Redeemer Committee, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (3) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (4) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely.  Both Ellington and Leventon provided false narratives and misrepresentations in furtherance of Dondero's harm to the Crusader Funds.  The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated."  As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith.

215.    Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from the breaches of fiduciary duty committed by Dondero, Ellington,

83

003885

Leventon and Strand.  For example, the $190 million Redeemer arbitration award—which was itself caused by Dondero's, Ellington's, Leventon's and Strand's breaches of their fiduciary duty to HCMLP—caused HCMLP to file for bankruptcy.  As of October 15, 2021, HCMLP had incurred in excess of $40 million in professional fees in connection with the bankruptcy.  But for Dondero's, Ellington's, Leventon's, and Strand's willful and wanton misconduct, HCMLP would not have been obligated to pay any of these fees.

216.    In light of the foregoing, Dondero, Strand, Ellington, and Leventon are liable for breaches of their fiduciary duties to HCMLP in an amount to be determined at trial.

<div align="center">

**COUNT VI**
**Declaratory Judgment That Strand Is Liable For HCMLP's Debts**
**In Its Capacity As HCMLP's General Partner**
*(Against Strand)*

</div>

217.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

218.    Under DRULPA § 17-403(b), "a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to persons other than the partnership and the other partners."  Moreover, "[e]xcept as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to the partnership and to the other partners."  *Id.*

219.    Under Delaware Uniform Partnership Law ("<u>DUPL</u>") § 15-306(a), partners of a partnership "are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."

003886

220.     During all periods relevant to the allegations set forth herein, Strand was the general partner of HCMLP.  Moreover, Strand has not been relieved of its obligation to satisfy HCMLP's obligations by agreement or law.

221.     Accordingly, under the operative partnership agreements and applicable law, Strand is liable to HCMLP and "to persons other than [HCMLP]" for the full amount of HCMLP's liabilities.

### COUNT VII
### Declaratory Judgment That Dondero Is Liable For Strand's Debts As Strand's Alter Ego
*(Against Dondero)*

222.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

223.     Between the formation of Strand and the Petition Date, Dondero, Strand's sole equity owner, dominated and controlled Strand such that Dondero and Strand operated as a single economic entity.  Although Strand was the general partner of HCMLP, Strand—as opposed to Dondero himself—rarely took any official corporate action.  Between its formation and the Petition Date, Strand documented only 12 instances in which it took corporate action, eight of which related to the appointment or removal of officers.

224.     Dondero was the only officer of Strand between 1993 and 2001.  Although Strand elected certain officers between 2001 and the Petition Date, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and their current relationship with, Dondero.  Dondero testified that he did not know whether Strand even had any officers, stating that he was "not aware of [Strand] ever having any employees or active … governance."  Likewise, Dondero did not know whether Strand had a board of directors and whether he sat on Strand's board.

85

003887

225. Strand did not observe corporate formalities. Based on a review of HCMLP's books and records, between the formation of Strand and the Petition Date, Strand never held a board meeting. Indeed, Dondero testified that he is not aware of attending a board meeting for Strand and does not recall ever seeing board minutes for Strand.

226. Strand did not comply with its own bylaws, which require annual meetings of stockholders.

227. Strand was a sham entity whose sole purpose was to serve as a vehicle through which Dondero could dominate and control HCMLP. Dondero used this abuse of the corporate form to facilitate his scheme to make HCMLP act contrary to its own interests and in favor of Dondero's interests by insulating assets from HCMLP's creditors, including those whose liabilities were the direct result of Dondero's own wrongdoing. As such, Dondero is Strand's alter ego, and the Court should pierce the corporate veil to hold Dondero liable for Strand's debts.

## COUNT VIII
### Declaratory Judgment That Dondero and Strand Are Liable For HCMLP's Debts
### In Their Capacities As HCMLP's Alter Ego
*(Against Dondero and Strand)*

228. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

229. Dondero, using his alter ego Strand, dominated and exercised total control over HCMLP through the Petition Date, such that Dondero, Strand, and HCMLP operated as a single economic entity. Dondero had total decision-making authority and governed HCMLP by decree—using the lack of an independent Strand to render HCMLP a mere instrumentality of Dondero. HCMLP had no independence and could not exercise any business discretion separate

003888

and apart from Dondero, in service of his personal interests and the interests of his integrated web of entities.

230.    Strand, like innumerable entities within Dondero's empire—including NexPoint GP, HCMFA, Dugaboy, CLO Holdco, Highland Dallas, Highland Santa Barbara, Highland Kansas City, HFP, and Acis—listed HCMLP's headquarters as its business address.

231.    Dondero failed to observe corporate formalities with regard to HCMLP.  Indeed, he did not distinguish between HCMLP and his personal interests and businesses.  Dondero used HCMLP employees to service his own interests that were unrelated to HCMLP.  For example, Dondero caused HCMLP to employ individuals to carry out roles serving Dondero personally.  Such employees included Dondero's accountant, security guard, and landscaper. Dondero also frequently instructed HCMLP's legal department to perform legal services in connection with his own personal and business interests, which conferred no value on HCMLP.

232.    Dondero used his domination and control over HCMLP to perpetrate numerous injustices, abuses, and frauds.

233.    Dondero siphoned value from HCMLP to other entities he owned and controlled by causing HCMLP's employees and resources to be used for his lifeboat businesses.  In connection with this fraudulent scheme to move assets out of the reach of HCMLP's creditors, Dondero exploited HCMLP by using its employees and resources for the benefit of other lifeboat entities, either at no cost to the lifeboats, at a loss to HCMLP, or at substantially below-market rates.  In fact, HCMLP should have received all of the profits generated from the services performed by the lifeboats, which in fact were performed by HCMLP's employees.  The purpose and effect of this scheme was to cause HCMLP to provide the employees and

003889

infrastructure that were needed by Dondero's profitable business ventures, while also ensuring that HCMLP would remain cash poor and lack the funds to satisfy its own obligations.

234. Dondero caused HCMLP to enter into agreements, including the Massand Consulting Agreement, the object and purpose of which were to cause HCMLP to incur obligations for services that conferred benefits on Dondero, through benefits conferred to entities he owned other than HCMLP.

235. Dondero used his abusive domination and control to cause HCMLP's assets to be commingled with those of his other businesses, without observing corporate formalities. By commingling entities and using HCMLP's employees and resources to further his own personal goals, Dondero exposed HCMLP to hundreds of millions of dollars in liability to numerous parties, including UBS, Acis, Terry, HarbourVest, the Redeemer Committee, and the Crusader Funds.

236. By virtue of his complete control over HCMLP, Dondero caused HCMLP to willfully and wantonly breach contractual obligations and take measures to render HCMLP "judgment-proof." Ultimately, this brazen disregard for HCMLP as an independent entity with its own obligations rendered HCMLP insolvent, including by resulting in multiple adverse awards such as the $190 million arbitration award that caused HCMLP to file for bankruptcy.

237. Dondero further abused the corporate form to siphon assets from HCMLP by orchestrating intercompany transfers that were designed to siphon assets from HCMLP. For example, Dondero orchestrated the CLO Holdco Transaction, through which he caused HCMLP to transfer assets valued by the company at approximately $24 million through a series of entities he controlled in exchange for consideration that was worth a small fraction of the value of the transferred assets.

003890

238.    Because Dondero operated Strand and HCMLP as a single economic entity and used that domination to defraud HCMLP's creditors, Dondero and Strand are the alter egos of HCMLP and should be held liable for the full amount of HCMLP's obligations.

### COUNT IX
**Declaratory Judgment That Dugaboy Is Liable For The Debts Of Dondero and HCMLP In Its Capacity As Dondero's Alter Ego**
*(Against Dugaboy)*

239.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

240.    Dondero operated Dugaboy—Dondero's personal trust—as an extension of himself and his alter ego HCMLP.  Dondero treated himself, Dugaboy, and HCMLP as a single economic entity.  Dondero dominated and controlled Dugaboy.  Under the terms of Dugaboy's trust agreement, Dondero has the power to remove trustees without cause—leverage that allowed him to control Dugaboy.  Dondero appointed Scott, his longtime personal friend, as the trustee of Dugaboy, for the purpose of serving as a rubber stamp of approval for all transactions that Dondero (or HCMLP employees acting at Dondero's direction) presented to Scott.

241.    Dondero treated Dugaboy as a vehicle for his own interests.  For example, Dondero caused Dugaboy to falsely assert in HCMLP's notes litigation that Dugaboy, acting through Dondero's sister, Nancy Dondero, allegedly caused HCMLP to enter into an agreement whereby the notes owed to HCMLP by various Dondero Entities would be forgiven as compensation to Dondero upon satisfaction of certain conditions subsequent.  Dondero also caused Dugaboy to help facilitate HCMLP's transfer of the Transferred CLO Holdco Assets to Get Good, by agreeing to provide the Dugaboy Note, purportedly but not actually equal to the value of the Transferred CLO Holdco Assets and with a paltry 2.75% interest rate and no security, covenants, lender protections provided to Dugaboy, or payments due until 2036.

89

242.     Dondero disregarded corporate formalities between Dugaboy and HCMLP. Dondero used HCMLP employees, on HCMLP's payroll, to transact business on behalf of Dugaboy, without any compensation to HCMLP. Dondero used HCMLP employees for Dondero's personal estate planning and caused HCMLP to comingle Dugaboy's electronically stored information with HCMLP's data. Dugaboy shared its principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.

243.     With Dondero as the primary beneficiary of Dugaboy, there are no other innocent shareholders whose expectations could be impaired by holding Dugaboy liable for Dondero or HCMLP's debts. There are no innocent third-party creditors of Dugaboy who would be harmed by holding Dugaboy liable for Dondero's or HCMLP's debts.

244.     Dugaboy is the alter ego of Dondero, and the Court should hold Dugaboy liable for Dondero's debts. Because Dondero is also HCMLP's alter ego, and because Dugaboy knowingly participated in Dondero's scheme to abuse the corporate form to defraud creditors, Dugaboy is also the alter ego of HCMLP and the Court should hold Dugaboy liable for the debts of HCMLP.

## COUNT X
### Declaratory Judgment That NexPoint Is Liable
### For The Debts Of Dondero and HCMLP As Their Alter Egos
*(Against NexPoint)*

245.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

246.     Dondero dominated and controlled NexPoint such that Dondero, NexPoint, and Dondero's alter ego HCMLP operated as a single economic entity. NexPoint is owned and controlled by Dondero through Dugaboy and NexPoint GP.

003892

247.     NexPoint knowingly participated in—and played a core role in accomplishing—Dondero's scheme to move HCMLP's assets out of reach of its creditors by operating NexPoint as a facade of HCMLP, in order to siphon profits away from HCMLP and to Dondero and other entities he controlled.  Dondero and NexPoint acted together to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

248.     Dondero disregarded the corporate formalities and the distinctions between himself, NexPoint, and HCMLP.  Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP.  NexPoint shared its principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.  NexPoint was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed.  Dondero caused internal business plans and projections to be prepared as if these entities were part of a single economic unit.

249.     For over one year, HCMLP performed all services for NexPoint without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees.  Even after Dondero attempted to infuse this scheme with a patina of legitimacy by causing NexPoint to enter into agreements with HCMLP, they were structured to ensure that NexPoint retained the vast majority of profits for the work performed by HCMLP and its employees.

250.     Dondero used NexPoint as a part of his scheme to extract value from HCMLP. Dondero caused HCMLP to fund NexPoint's operations, seed its investments, and provide a substantial amount of the capital that ultimately funded distributions NexPoint made to its

003893

owner, Dugaboy. Transferring funds from HCMLP to NexPoint funded distributions by NexPoint to Dondero's alter ego Dugaboy, draining HCMLP's value to Dondero with NexPoint's knowledge and participation. Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and during that same period, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were paid to Dugaboy. Distributions to Dugaboy were made at the direction of, and for the benefit of, Dondero.

251.    Dondero and NexPoint worked together to further extract value from HCMLP by causing HCMLP to lend to NexPoint on terms entirely determined by Dondero. Dondero further caused HCMLP to enter into multiple agreements with NexPoint providing for forbearance and other relief. As of the Petition Date, NexPoint owed HCMLP approximately $23 million, and HCMLP is currently embroiled in litigation with Dondero and NexPoint following a payment default that occurred January 2021.

252.    There are no other innocent shareholders whose expectations could be impaired by holding NexPoint liable for Dondero or HCMLP's debts. Similarly, there are no innocent third-party creditors of NexPoint who would be harmed by holding NexPoint liable for Dondero or HCMLP's debts.

253.    NexPoint is the alter ego of Dondero and the Court should hold NexPoint liable for the debts of its ultimate shareholder Dondero. Because Dondero is also HCMLP's alter ego, and because NexPoint knowingly participated in Dondero's scheme to abuse the corporate form to defraud creditors, NexPoint is also alter ego of HCMLP and the Court should hold NexPoint liable for the debts of HCMLP.

003894

## COUNT XI
### Declaratory Judgment That HCMFA Is Liable
### For The Debts Of Dondero and HCMLP As Their Alter Ego
*(Against HCMFA)*

254. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

255. Dondero dominated and controlled HCMFA such that Dondero, HCMFA, and Dondero's alter ego HCMLP operated as a single economic entity. HCMFA is controlled by Dondero through its general partner, Strand Advisors XVI, Inc., which owns a 1% interest in HCMFA and is wholly-owned by Dondero. Dondero and Okada are the ultimate owners of the remaining stakes in HCMFA: HCMS owns an 89.6667% ownership interest in HCMFA, and is itself owned 75% by Dondero and 25% by Okada; the Okada Family Revocable Trust owns the remaining 9.3333% ownership interest in HCMFA. Dondero caused internal business plans and projections to be prepared as if these entities were part of a single economic unit.

256. HCMFA knowingly participated in—and played a key role in accomplishing—Dondero's scheme to move HCMLP's assets out of reach of its creditors by operating HCMFA as a facade of HCMLP, in order to siphon profits away from HCMLP and to Dondero directly or indirectly through other entities he controlled. Dondero and HCMFA acted together to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

257. Dondero disregarded the corporate formalities and the distinctions between HCMFA and HCMLP. HCMFA was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed. Strand Advisors XVI, Inc., HCMFA's general partner, purports to be managed by six individuals, all but one of whom were previously on HCMLP's payroll. HCMFA shared its

93

003895

principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.

258.     HCMFA was effectively a shell entity created to replace HCMLP as the new investment manager for open-ended retail investment funds.  Agreements between HCMLP and HCMFA were structured to ensure that HCMFA retained the vast majority of profits for the work performed by HCMLP and its employees.  To the extent that sub-advisory and shared services agreements existed between HCMLP and HCMFA, they existed to lend credibility to Dondero's fraudulent scheme to divert HCMLP's profits to himself and Okada through HCMFA.

259.     Dondero used HCMFA as a part of his scheme to extract value from HCMLP. Dondero caused HCMLP to use its resources to support HCMFA.  Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million; Dondero caused HCMLP to enter into multiple forbearances on HCMFA's debts.  In May 2019, HCMLP loaned HCMFA an additional $7.4 million, and HCMFA again failed to repay.  Dondero exerted his control and dominance of these entities to direct both sides of those agreements, with the knowing participation of HCMFA, to accomplish his own ultimate goal of siphoning value from HCMLP to insulate it from creditors.

260.     There are no other innocent shareholders whose expectations could be impaired by holding HCMFA liable for Dondero or HCMLP's debts.  Similarly, there are no innocent third-party creditors of HCMFA who would be harmed by holding NexPoint liable for Dondero or HCMLP's debts.

261.     HCMFA is the alter ego of Dondero and the Court should hold HCMFA liable for Dondero's debts.  Because Dondero is also HCMLP's alter ego, and because HCMFA

003896

knowingly participated in Dondero's scheme to abuse of the corporate form to defraud creditors, HCMFA is also the alter ego of HCMLP and the Court should hold HCMFA liable for the debts of HCMLP.

<div align="center">

**COUNT XII**
**Avoidance of Transfer of Management Agreements As Constructive Fraudulent Transfers**
**Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against HCMFA and NexPoint)*

</div>

262.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

263.    On the date of the Debtor's bankruptcy filing, the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

264.    On December 15, 2011, HCMLP entered into a novation agreement, pursuant to which HCMFA became the investment advisor for Highland Credit Strategies Fund, Highland Floating Rate Opportunities Fund, the Highland Long/Short Equity Fund, the Highland Long/Short Healthcare Fund, and the Highland Special Situations Fund (collectively, the "Transferred Funds"). Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

265.    HCMLP received less than reasonably equivalent value in connection with the novation agreement. Prior to the transfer, HCMLP received management and advisory fees in return for the services that its employees performed for the Transferred Funds. After the transfer, HCMLP's employees provided the same services for the Transferred Funds, except that the vast majority of the profits were diverted to HCMFA following the extinguishment of HCMLP's credit facility.

<div align="center">95</div>

266.    At the time of the transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

267.    On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF.  The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

268.    The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds (the fair market value of which likely exceeded $25 million at the time of transfer) is voidable as constructively fraudulent against HCMFA and its subsequent transferee, NexPoint.  Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XIII
**Avoidance of Transfer of Management Agreements As Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against HCMFA and NexPoint)*

269.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

270.    On the date of the Debtor's bankruptcy filing, the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.  On December 15, 2011, HCMLP entered into

96

003898

a novation agreement, pursuant to which HCMFA became the investment advisor for the Transferred Funds. Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

271. Dondero caused HCMLP to make the transfer with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP and HCMFA;

(b) before the transfer, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to transfer its valuable management contracts and business opportunities to newly-created "lifeboat" entities;

(d) at the time of the transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) Dondero caused HCMLP to make the transfer during a period when he believed the value of HCMLP may ultimately be distributed to its creditors, as a result of its looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's present and future creditors; and

003899

(f)    HCMLP did not receive reasonably equivalent value in return for transferring its valuable management and advisory contracts with the Transferred Funds to HCMFA.

272.    On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF. The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

273.    The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds is voidable as intentionally fraudulent against HCMFA and its subsequent transferee, NexPoint. Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

## COUNT XIV
### Breach of Fiduciary Duty In Connection With Fraudulent Transfers And Schemes
*(Against Dondero, Strand, Ellington, and Okada)*

274.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

275.    During all periods relevant to the allegations set forth herein: (1) Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP'S Chief Legal Officer and General Counsel; and (4) Okada owed fiduciary duties to HCMLP in his capacity as Chief Investment Officer.

003900

276.    Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero, Strand, Ellington, or Okada set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed by all these parties to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal.  By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

277.    Dondero and Ellington caused HCMLP to enter into the Massand Consulting Agreements, with the intent to have Massand Capital perform services for SAS, an entity that they surreptitiously created and owned.  Likewise, Dondero and Ellington oversaw and approved the Massand Transfers.  The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP.  In addition, Dondero and Ellington caused HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP.

278.    Likewise, Dondero orchestrated the fraudulent CLO Holdco Transaction, pursuant to which he (acting through Strand) siphoned valuable assets from HCMLP in return for illusory consideration, in the form of a note from Dugaboy, an entity that he controlled. Dondero siphoned these assets from HCMLP in order to benefit other entities that he owned and controlled, including CLO Holdco, NexPoint, and HCMFA.

003901

279.     Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

280.     As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including, but not limited to, the distributions made to Okada, MAP #1, and MAP #2—were made at times that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

281.     By willfully and wantonly not returning the distributions made to Okada, MAP #1, and MAP #2 that were made at times that Okada knew that HCMLP was insolvent, and knowingly permitting unlawful distributions to Dondero and his controlled entities, Okada breached his fiduciary duties to HCMLP.

282.     Dondero and Okada further breached their fiduciary duties by using HCMLP employees for their own personal affairs and private business interests, on HCMLP's time and payroll.

283.     Dondero and Ellington breached their fiduciary duties by diverting approximately $3 million that was held in escrow for HCMLP to an entity that they owned in the Cayman Islands.

284.     By willfully and wantonly orchestrating these fraudulent transfers, Dondero, Strand, and Ellington breached their fiduciary duties to HCMLP.

003902

## COUNT XV
### Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law
*(Against NexPoint, HCMFA, SAS, Scott, CLO Holdco,*
*DAF Holdco, DAF, Get Good, Highland Dallas)*

285.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

286.    NexPoint and HCMFA aided and abetted the breaches of fiduciary duty committed by Dondero and Strand. NexPoint and HCMFA were each dominated and controlled by Dondero. As such, each of NexPoint and HCMFA knowingly participated in their breaches of their fiduciary duties to HCMLP. NexPoint and HCMFA knowingly participated in Dondero's scheme to divert HCMLP's valuable business into new "lifeboat" entities that he owned and controlled. The breaches of fiduciary duty that were aided and abetted by NexPoint and HCMFA caused tens of million (and potentially over one hundred million) of dollars in damage to HCMLP.

287.    SAS, which was owned and controlled by Dondero and Ellington, knowingly participated in Dondero's and Ellington's breaches of their fiduciary duties in connection with the Massand Consulting Agreement and Massand Transfers. SAS was aware of the fiduciary duties that Dondero and Ellington owed to HCMLP as high ranking officers. SAS received the benefit of the services performed by Massand Capital, which Dondero and Ellington surreptitiously charged to HCMLP. The breaches of fiduciary duty that were aided and abetted by SAS caused millions of dollars of damage to HCMLP.

288.    Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas aided and abetted Dondero's breach of fiduciary duties relating to the CLO Holdco Transaction. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas—

101

003903

knowingly participated in the scheme to transfer assets valued by the company at approximately $24 million to CLO Holdco in exchange for a note worth significantly less than the transferred assets. Scott either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the CLO Holdco Transaction, as evidenced by, among other things, the low interest rate on the Dugaboy Note; the lack of security, material covenants; or other protections; the unfair repayment terms; and the fact that Dondero stood on both sides of the transaction. Moreover, Scott dutifully executed the necessary documentation in order to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas.

289. Neither the Litigation Trustee nor the Estate could have discovered the conduct set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By its nature, the conduct alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

### COUNT XVI
### Civil Conspiracy to Breach Fiduciary Duties Under Texas Law
*(Against Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, Highland Dallas)*

290. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

102

003904

291.    Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas conspired with Dondero to breach his fiduciary duties to HCMLP by intentionally siphoning assets away from HCMLP to evade HCMLP's creditors.  To effectuate the conspiracy, Dondero, Ellington, and Leventon acted outside the scope of their HCMLP employments, as agents of the non-HCMLP entities they owned and controlled, and for their personal benefits.

292.    Neither the Litigation Trustee nor the Estate could have discovered the conduct set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020.  Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal.  By its nature, the conspiracy alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

293.    Dondero, Ellington, and Leventon orchestrated myriad transactions to divert funds from HCMLP to Dondero and the entities that he owned and controlled, as well as to Ellington, Leventon, and the entities they owned and controlled.  NexPoint and HCMFA took over valuable HCMLP management agreements and used HCMLP's employees to usurp HCMLP's business in return for little or no consideration to HCMLP.  SAS—which is owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic interests in SAS, respectively—received valuable services from Massand while HCMLP bore the expense. Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas participated in the

103

003905

fraudulent CLO Holdco Transaction that siphoned valuable assets from HCMLP in return for patently insufficient consideration.

294. Ellington and Leventon understood that their conduct was directed at enriching themselves and Dondero at the expense of HCMLP, and each of them were compensated in excess of their HCMLP salaries by Dondero (sometimes via minority ownership in an entity, like Ellington's stake in SAS, and sometimes via complex, circuitous schemes like the Tall Pine arrangement) for their participation. NexPoint, HCMFA, and SAS—each of which was controlled by Dondero—likewise understood that their role in the conspiracy was to obtain value for Dondero at HCMLP's expense. Scott, too, understood that he was appointed to be a rubber-stamp for Dondero's self-interested schemes to siphon value from HCMLP and distribute it throughout the vast web of Dondero Entities. Scott acted on the basis of his longstanding loyalty to his "closest friend" Dondero and was compensated with "business gifts" for his service in furtherance of the conspiracy.

295. In furtherance of the conspiracy, Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas undertook, *inter alia*, the following schemes and overt acts:

(a) Dondero, NexPoint, and HCMFA conspired to perpetrate the lifeboat scheme in order to place valuable assets outside the reach of HCMLP's creditors, in violation of Dondero's fiduciary duties. NexPoint and HCMFA were each dominated and controlled by Dondero and, as such, they each consciously acted in furtherance of the conspiracy, including by transferring existing business to NexPoint and HCMFA, generating new business through NexPoint and HCMFA, and failing to compensate

104

HCMLP for the use of its employees and resources. NexPoint and HCMFA were aware that the lifeboat scheme caused substantial damages to HCMLP.

(b)     Dondero, Ellington, and SAS caused HCMLP to enter into the fraudulent Massand Consulting Agreements, pursuant to which HCMLP paid Massand millions of dollars in return for services that were rendered for SAS, which Dondero and Ellington owned and controlled. Likewise, SAS acted in furtherance of the conspiracy by surreptitiously receiving the benefits from the Massand Consulting Agreements while HCMLP incurred the costs under those agreements. Each of Dondero, Ellington, and SAS were aware that causing HCMLP to pay SAS's expenses—for the benefit of SAS and its owners Dondero and Ellington—harmed HCMLP.

(c)     Dondero, Scott, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas conspired to cause HCMLP to transfer valuable assets to CLO Holdco for less than reasonably equivalent value. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas— consciously participated in the scheme to transfer assets valued by the company at approximately $24 million to CLO Holdco in exchange for a note worth significantly less than the transferred assets, including by executing the necessary documentation to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas. Each of Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas were aware that the CLO Holdco Transaction breached fiduciary duties to HCMLP, constituted a

105

fraudulent transfer, and harmed HCMLP by diverting valuable assets in exchange for the far less valuable Dugaboy Note.

(d)    Ellington and Dondero conspired to disburse to a Cayman Islands shell company they owned and controlled nearly $3 million of escrowed proceeds rightfully owing to HCMLP.

(e)    In furtherance of the conspiracy and to maintain loyalty to Dondero, Ellington and Leventon accepted benefits like minority ownership in entities (like Ellington's stake in SAS) and additional compensation via complex, circuitous schemes like the Tall Pine arrangement.

296.    Each of Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas understood that his or its conduct was causing damage to HCMLP and that Dondero was breaching his fiduciary duties to HCMLP by orchestrating and participating in these transactions.  The participants specifically intended to benefit themselves and Dondero at the expense of HCMLP, and agreed with Dondero to undertake acts in furtherance of the conspiracy notwithstanding the harm to HCMLP.

## COUNT XVII
### Tortious Interference with Prospective Business Relations
*(Against Dondero, NexPoint, and HCMFA)*

297.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

298.    Dondero siphoned business away from HCMLP and its creditors through the creation of "lifeboats" owned and controlled by Dondero.  The "lifeboats," which included

003908

NexPoint and HCMFA, were companies set up to provide management services that HCMLP had previously been providing.

299.    But for the actions of Dondero, NexPoint, and HCMFA, HCMLP would have continued to pursue the business opportunities that Dondero diverted to NexPoint and HCMFA. Indeed, NexPoint and HCMFA used HCMLP's employees, operated out of HCMLP's office, and performed the same advisory and administrative services for its managed funds that HCMLP had previously performed.

300.    By using NexPoint and HCMFA as part of his lifeboat scheme, Dondero breached his fiduciary duties to HCMLP. In addition, Dondero breached his fiduciary duties to HCMLP by causing HCMLP to fraudulently transfer certain of its existing management contracts to NexPoint and HCMFA. NexPoint and HCMFA conspired with, and aided and abetted, Dondero's breaches of his fiduciary duties and HCMLP's fraudulent transfers.

301.    Dondero, NexPoint, and HCMFA acted with a conscious desire to prevent HCMLP from continuing to directly manage the funds that were subsequently managed by NexPoint and HCMFA. Moreover, Dondero, NexPoint, and HCMFA knew that their interference in HCMLP's business relationships was certain to occur as a result of their conduct.

302.    HCMLP suffered, at minimum, tens of millions of dollars in damage from Dondero's, NexPoint's, and HCMFA's tortious interference with its prospective business relations.

003909

**COUNT XVIII**
**Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets**
**as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550**
**and Applicable State Law**
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good,*
*and Highland Dallas Foundation)*

303.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully

set forth herein.

304.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured

creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and

Acis, held an allowable claim other than one allowable under § 502(e), and could have sought

under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal

Revenue Service held an allowable unsecured claim other than one allowable under § 502(e)

and could have sought to avoid the transfers challenged in this Count.

305.    On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO

Holdco Assets, which were valued by the company at approximately $24 million.  The transfer

of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale

Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

306.    As purported consideration for the Transferred CLO Holdco Assets, HCMLP

received the Dugaboy Note, which was worth substantially less than the Transferred CLO

Holdco Assets.  The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an

illiquid, private loan on below market terms.

307.    Immediately after HCMLP transferred the Transferred CLO Holdco Assets to

Get Good, Dondero caused Get Good to transfer the Transferred CLO Holdco Assets to

Highland Dallas by an exercise of discretion executed by Scott in his capacity as trustee of Get

Good.

108

003910

308.    Immediately after the Transferred CLO Holdco Assets were transferred to Highland Dallas by Get Good, Dondero caused Highland Dallas to transfer the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick in their capacities as the sole directors of Highland Dallas.

309.    Immediately after the Transferred CLO Holdco Assets were transferred to DAF Holdco by Highland Dallas, Dondero caused DAF Holdco, DAF, and CLO Holdco to enter into an omnibus assignment agreement, pursuant to which DAF Holdco transferred the Transferred CLO Holdco Assets to DAF, and DAF transferred the Transferred CLO Holdco Assets to CLO Holdco.  Scott signed on behalf of each entity, as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco.  Scott also executed a written resolution by DAF GP, in his capacity as the managing member of the general partner of the DAF, effectuating the transfer of the Transferred CLO Holdco Assets to CLO Holdco (which was wholly-owned by the DAF).

310.    Dondero directly or indirectly controlled each entity in the chain of transfers that together constitute the CLO Holdco Transaction.  Dondero controlled each of Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco either along with or through Scott, who was Dondero's longtime friend, former roommate, loyalist, and fellow board member on multiple boards of directors.

311.    At the time of the CLO Holdco Transaction, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

003911

312.    None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

313.    At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that, pursuant to the CLO Holdco Transaction, HCMLP transferred its assets to CLO Holdco for less than reasonably equivalent value.

314.    The CLO Holdco Transaction is voidable as constructively fraudulent transfers. Accordingly, the CLO Holdco Transaction should be set aside and avoided and Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

## COUNT XIX
### Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas Foundation)*

315.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

316.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

110

003912

317.    On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which the company valued at approximately $24 million.  The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

318.    As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO Holdco Assets.  The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan that was worth significantly less than the value of the transferred assets.

319.    After HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused the assets to be transferred to Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco.  Dondero effected each transfer through his direct or indirect control of each of these entities.

320.    Dondero caused HCMLP to enter into the CLO Holdco Transaction with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)    Dondero was an insider of HCMLP;

(b)    Dondero controlled Get Good, the initial transferee, and each of the subsequent transferees, Highland Dallas, DAF Holdco, DAF, and CLO Holdco, through Scott;

(c)    before the CLO Holdco Transaction, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(d)    at the time of the CLO Holdco Transaction, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were

111

003913

unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e)    The CLO Holdco Transaction siphoned value away from HCMLP, so that such value would not be available to satisfy HCMLP's creditors; and

(f)    The purported consideration for the Transferred CLO Holdco Assets, the Dugaboy Note, was worth less than the reasonably equivalent value of the Transferred CLO Holdco Assets, and replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below-market terms, the repayment of which was subject to Dondero's control.

321.    None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

322.    At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that the CLO Holdco Transaction transferred HCMLP's assets to CLO Holdco for less than reasonably equivalent value.

323.    The CLO Holdco Transaction is voidable as an intentionally fraudulent transfer. Accordingly, the CLO Holdco Transaction should be set aside and avoided, and the Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XX
**Avoidance of Obligations Under Massand Consulting Agreement as Constructively Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand LLC)*

003914

324. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

325. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

326. On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.

327. HCMLP received less than reasonably equivalent value in exchange for the payment obligations that it incurred under the Massand Consulting Agreements (and in fact, received zero value). Dondero and Ellington caused HCMLP to hire Massand Capital in order for Massand Capital to provide services to SAS, which conferred no benefit to HCMLP.

328. At the time it entered into the Massand Consulting Agreements, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

329. HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as constructively fraudulent.

003915

## COUNT XXI
### Avoidance of Obligations Under Massand Consulting Agreement as Intentionally Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law
*(Against Massand Capital)*

330. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

331. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

332. On January 1, 2014, HCMLP entered into a consulting agreement with Massand Inc. On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay them tens of thousands of dollars per month.

333. Dondero caused HCMLP to enter into the Massand Consulting Agreements with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

    (a) Dondero was an insider of HCMLP;

    (b) Dondero was an insider of SAS;

    (c) Dondero benefitted from HCMLP's payments to Massand Capital because they conferred value on SAS, an entity that Dondero owned and controlled;

    (d) before HCMLP entered into the Massand Consulting Agreements, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

114

003916

(e)     HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved, among other things, causing HCMLP to incur obligations of other entities owned or controlled by Dondero, including SAS;

(f)     at the time HCMLP entered into the consulting agreement with Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due; and

(g)     Dondero caused HCMLP to enter into the Massand Consulting Agreements during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors.

334.     HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as intentionally fraudulent.

## COUNT XXII
**Avoidance and Recovery of Certain Massand Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital, SAS, Dondero, and Ellington)*

335.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

336.     On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and

003917

Acis, held an allowable claim other than one allowable under § 502(e), and could have sought

under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal

Revenue Service held an allowable unsecured claim other than one allowable under § 502(e)

and could have sought to avoid the transfers challenged in this Count.

337.    HCMLP entered into the fraudulent Massand Consulting Agreements, pursuant

to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.  The

transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| January 3, 2017 | $49,644 | May 1, 2018 | $55,852 |
| February 1, 2017 | $55,691 | June 1, 2018 | $55,093 |
| March 3, 2017 | $47,929 | July 2, 2018 | $64,516 |
| April 3, 2017 | $57,563 | August 1, 2018 | $56,539 |
| May 1, 2017 | $57,861 | September 4, 2018 | $53,749 |
| June 1, 2017 | $60,814 | October 1, 2018 | $52,537 |
| July 3, 2017 | $51,974 | November 1, 2018 | $53,278 |
| August 1, 2017 | $58,074 | December 3, 2018 | $52,219 |
| September 5, 2017 | $50,371 | January 2, 2019 | $47,812 |
| October 2, 2017 | $53,016 | February 1, 2019 | $51,437 |
| November 1, 2017 | $59,971 | March 1, 2019 | $51,156 |
| December 1, 2017 | $56,031 | April 2, 2019 | $54,063 |
| January 2, 2018 | $52,894 | May 1, 2019 | $55,359 |
| February 1, 2018 | $51,378 | June 3, 2019 | $56,470 |
| March 1, 2018 | $54,396 | July 1, 2019 | $54,878 |
| April 3, 2018 | $54,538 | August 1, 2019 | $54,979 |
|  |  | Total | $1,742,082 |

003918

338.  HCMLP did not receive any consideration in exchange for its payments to Massand Capital.  The consulting agreement between Massand Capital and HCMLP provided that Massand would be responsible for advising HCMLP on its "investment recovery strategies" business in certain countries where HCMLP did not have any business.

339.  Rather, upon information and belief, Massand Capital provided services to SAS, a separate entity owned and controlled by Dondero.  As such, HCMLP's transfers to Massand Capital were made for the benefit of SAS and Dondero.

340.  Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP, and Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

341.  At the time of each of the Massand Transfers, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

342.  The Massand Transfers are voidable as constructively fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XXIII
**Avoidance and Recovery of Massand Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital, SAS, Dondero, and Ellington)*

343.  Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

003919

344.    On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

345.    On January 5, 2015, HCMLP entered into a fraudulent consulting agreement, pursuant to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.  The transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| January 3, 2017 | $49,644 | May 1, 2018 | $55,852 |
| February 1, 2017 | $55,691 | June 1, 2018 | $55,093 |
| March 3, 2017 | $47,929 | July 2, 2018 | $64,516 |
| April 3, 2017 | $57,563 | August 1, 2018 | $56,539 |
| May 1, 2017 | $57,861 | September 4, 2018 | $53,749 |
| June 1, 2017 | $60,814 | October 1, 2018 | $52,537 |
| July 3, 2017 | $51,974 | November 1, 2018 | $53,278 |
| August 1, 2017 | $58,074 | December 3, 2018 | $52,219 |
| September 5, 2017 | $50,371 | January 2, 2019 | $47,812 |
| October 2, 2017 | $53,016 | February 1, 2019 | $51,437 |
| November 1, 2017 | $59,971 | March 1, 2019 | $51,156 |
| December 1, 2017 | $56,031 | April 2, 2019 | $54,063 |
| January 2, 2018 | $52,894 | May 1, 2019 | $55,359 |
| February 1, 2018 | $51,378 | June 3, 2019 | $56,470 |
| March 1, 2018 | $54,396 | July 1, 2019 | $54,878 |

003920

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| April 3, 2018 | $54,538 | August 1, 2019 | $54,979 |
| | | Total | $1,742,082 |

346.    Dondero caused HCMLP to make the Massand Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)    Dondero was an insider of HCMLP and Massand Capital;

(b)    before the Massand Transfers, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c)    HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to become an obligor on certain contracts, including the Massand Consulting Agreements, that did not confer value on HCMLP;

(d)    at the time of the transfers to Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e)    Dondero caused HCMLP to make the Massand Transfers during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors; and

119

003921

(f)    The Massand Transfers were made for no consideration to HCMLP, and the services provided by Massand were made for the benefit of SAS, an entity that was not owned by HCMLP.

347.    The Massand Transfers are voidable as intentionally fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

<div align="center">

**COUNT XXIV**
**Breach of Contract Arising Out of Hunter Mountain Note**
*(Against Hunter Mountain and Rand)*

</div>

348.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

349.    On December 21, 2015, HCMLP and Hunter Mountain entered into the Hunter Mountain Note, pursuant to which Hunter Mountain agreed to pay HCMLP $63 million at an interest rate of 2.61% per annum.

350.    Rand is a guarantor on the Hunter Mountain Note.

351.    Pursuant to the Hunter Mountain Note, accrued interest and principal is due and payable in accordance with an amortization schedule attached to the note.

352.    Hunter Mountain breached the Hunter Mountain Note by failing to make the payments due under the note on December 21, 2019 and December 21, 2020.

353.    On May 3, 2021, HCMLP sent a demand letter to Hunter Mountain stating that the Hunter Mountain Note was in default and therefore, pursuant to the "Remedies" section of the note, all principal, interest, and any other amounts due and owing on the Hunter Mountain

003922

Note are immediately due and payable. As of May 5, 2021, that amount was more than $72 million, with interest continuing to accrue.

354. The Hunter Mountain Note is currently in default. Pursuant to the Hunter Mountain Note, HCMLP is entitled to damages from Hunter Mountain and Rand in an amount equal to all unpaid principal and interest, in addition to HCMLP's cost of collection, including attorneys' fees.

## COUNT XXV
### Conversion
*(Against Dondero and Ellington)*

355. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

356. In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Property obtained the HE Capital 232 Proceeds and placed them in an escrow account maintained by HCMLP's counsel, Wick Phillips, "pending distribution of the proceeds to the direct and indirect interest owners in [HE Capital 232 Property]."

357. On March 2, 2018, Wick Phillips disbursed a portion of those funds from the escrow account. The Remaining HE Capital 232 Proceeds, worth approximately $2.98 million, were never disbursed to HCMLP.

358. HCMLP owned, had possession of (through its counsel Wick Phillips), or had entitlement to possession of the Remaining HE Capital 232 Proceeds.

359. The Remaining HE Capital 232 Proceeds had been held for safekeeping, were intended to be kept segregated, specific and identifiable money, in the form they were received, and not subject to a claim by anyone other than HCMLP.

003923

360.     Upon information and belief, Dondero and Ellington directed Wick Phillips to withhold the Remaining HE Capital 232 Proceeds in a scheme to funnel the money to themselves through shell companies that they owned in the Cayman Islands.  Indeed, on June 4, 2018, at Ellington's direction, Wick Phillips disbursed the remainder of the proceeds to MapleFS, a fiduciary services company in the Cayman Islands, which subsequently transferred the full amount to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.

361.     Dondero's and Ellington's acts manifest a clear repudiation of HCMLP's rights in the Remaining HE Capital 232 Proceeds.

### COUNT XXVI
### Unjust Enrichment or Money Had and Received
*(Against Dondero)*

362.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

363.     As set forth above, Dondero caused HCMLP to enter into numerous intercompany note transactions with other Dondero Entities in order to, among other things: (i) fund distributions to himself and his loyalists; (ii) inject funds into other entities he owns; and (iii) obtain personal tax benefits.  Now, Dondero is actively spearheading an expensive, frivolous litigation campaign against HCMLP, through these same Dondero Entities, in order to avoid or delay their repayment obligations.

364.     Dondero exploited HCMLP by using it to pursue goals that did not benefit HCMLP.  Dondero orchestrated countless transactions and schemes designed to benefit himself and other Dondero Entities at the expense of HCMLP, including but not limited to:  (i) the lifeboat scheme; (ii) distributions from HCMLP to himself and certain trusts he owned and

003924

controlled during periods when HCMLP was insolvent; and (iii) intercompany transactions involving various Dondero Entities that distributed cash throughout his vast web of entities. Dondero unjustly profited from these schemes, either by directly transferring value to himself (*e.g.*, through distributions) or by using HCMLP's money to seed business activities and investments that would inure to his own personal benefit. Dondero diverted millions or tens of millions of dollars to himself, at HCMLP's expense.

365. Likewise, Dondero was willing to harm HCMLP even when it would seem economically irrational for him to do so, such as when he caused HCMLP to incur more in legal fees pursuing a vendetta against Daugherty than the total funds Daugherty was owed.

366. Dondero, together with Ellington, caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP's cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

367. Dondero obtained personal services from individuals who were employed and paid by HCMLP, including with respect to private business ventures.

368. There was no valid express contract governing the subject matter of this dispute.

369. As a result of fraud, duress, or taking undue advantage of his own position of authority within HCMLP, Dondero holds or has held money that in equity and good conscience belongs to HCMLP, which unjustly enriched him and would be unconscionable to retain.

370. Plaintiff seeks restitution from Dondero and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by him as a result of the unjust conduct set forth above.

003925

## COUNT XXVII
### Unjust Enrichment or Money Had and Received
*(Against Ellington and Leventon)*

371.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

372.    Ellington and Leventon were employees of HCMLP who received millions of dollars in compensation.  However, each of them understood and performed their duties as functionaries for Dondero.  As such, both Ellington and Leventon subordinated the interests of HCMLP to the interests of Dondero, and actively participated in and implemented his schemes to divert value from HCMLP.  Portions of Ellington's and Leventon's compensation, paid for by HCMLP, was consideration for their willingness to elevate Dondero's interests over those of HCMLP.

373.    Together with Dondero, Ellington caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP's cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

374.    Ellington and Leventon engaged in willful and wanton misconduct that gave rise to more than $350 million in allowed claims against HCMLP.  Among other things, Ellington and Leventon participated in the scheme to evade UBS collection efforts by fraudulently transferring assets to Sentinel.

375.    There was no valid express contract governing the subject matter of this dispute.

376.    As a result of fraud, duress, or taking undue advantage of their own positions of authority within HCMLP, Ellington and Leventon hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

124

377. Plaintiff seeks restitution from Ellington and Leventon and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

## COUNT XXVIII
### Unjust Enrichment or Money Had and Received
*(Against NexPoint and HCMFA)*

378. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

379. The lifeboat scheme was perpetrated primarily through NexPoint and HCMFA. NexPoint and HCMFA utilized HCMLP's employees to perform management and advisory services that HCMLP had directly provided, and should have continued to provide directly. Neither NexPoint nor HCMFA fairly compensated HCMLP for the use of its employees or resources.

380. HCMLP provided substantial financial support for NexPoint and HCMFA, including in the form of below-market note agreements. Both NexPoint and HCMFA have defaulted on their debts to HCMLP and are currently pursuing expensive, frivolous litigation against HCMLP in an effort to evade their payment obligations.

381. NexPoint and HCMFA were effectively HCMLP in disguise, conducting HCMLP's business, with HCMLP's employees, operating out of HCMLP's office, beginning with HCMLP's contracts.

382. Through their exploitation of HCMLP, NexPoint and HCMFA received tens or hundreds of millions of dollars of profits.

383. There was no valid express contract governing the subject matter of this dispute.

003927

384.    As a result of fraud, duress, or taking undue advantage of HCMLP, NexPoint and HCMFA hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

385.    Plaintiff seeks restitution from NexPoint and HCMFA and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

### COUNT XXIX
### Unjust Enrichment or Money Had and Received
*(Against Massand Capital and SAS)*

386.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

387.    Massand Capital received millions of dollars in payments from HCMLP under the Massand Consulting Agreements.  Nevertheless, Massand Capital was aware that it would not and never intended to perform any services on behalf of HCMLP.  Rather, Massand Capital was performing services on behalf of SAS, with HCMLP footing the bill.  HCMLP received no benefit under the Massand Consulting Agreements.

388.    Further, the value of the services provided to SAS were far less than HCMLP's payments, resulting in Massand receiving unearned profits to the tune of millions of dollars.

389.    HCMLP employees performed work for SAS.  Indeed, at least four HCMLP employees even received SAS email addresses.  SAS did not compensate HCMLP for these services.

390.    SAS has profited from the services performed by Massand Capital and from the use of HCMLP's employees and resources.

391.    There was no valid express contract governing the subject matter of this dispute.

126

003928

392.    As a result of fraud, duress, or taking undue advantage of HCMLP, Massand and SAS hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

393.    Plaintiff seeks restitution from Massand Capital and SAS and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

### COUNT XXX
### Unjust Enrichment or Money Had and Received
*(Against CLO Holdco)*

394.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

395.    Dondero, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of HCLOF for approximately $75 million, with a commitment to fund an additional $75 million. CLO Holdco was the beneficiary of the funds invested by HarbourVest. HCMLP received no benefit from the HarbourVest investment.  Nevertheless, HarbourVest filed a proof of claim against HCMLP for fraudulently inducing the HarbourVest investment, and HCMLP was ultimately forced to settle with HarbourVest by providing them with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by HCMLP.  As a result of Dondero's conduct, however, the HCLOF interests were then worth significantly less than the face amount of HarbourVest's allowed claim. HCMLP bore the consequences for Dondero and CLO Holdco in a scheme that deposited $75 million into the coffers of CLO Holdco.

396.    CLO Holdco was aware that HarbourVest was fraudulently induced by Dondero to make the $75 million investment. Nonetheless, CLO Holdco said nothing to HarbourVest

127

003929

and received their money, all while leaving HCMLP on the hook when HarbourVest ultimately filed their proof of claim.

397.    There was no valid express contract governing the subject matter of this dispute.

398.    As a result of fraud, duress, or taking undue advantage of HCMLP, CLO Holdco holds or has held money that in equity and good conscience belongs to HCMLP, which unjustly enriched it and would be unconscionable to retain

399.    Plaintiff seeks restitution from CLO Holdco and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by it as a result of its unjust receipt and use of the proceeds of the HarbourVest investment.

## COUNT XXXI
### Avoidance and Recovery of the One-Year Transfers as Preferential Transfers under 11 U.S.C. §§ 547 and 550
*(Against Dondero and Ellington)*

400.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

401.    Dondero and Ellington are insiders of HCMLP.

402.    As set forth below, within one year of the Petition Date, HCMLP made payments to Dondero of $4,753,911 and payments to Ellington of $318,893 (the "Alleged Expense Transfers" and the "March 28, 2019 Repayment Transfer," as set forth below, and collectively the "One-Year Transfers"):

| March 28, 2019 Repayment Transfer | | |
|---|---|---|
| Date | Transferee | Amount |
| March 28, 2019 | Dondero | $3,750,000 |
| Alleged Expense Transfers | | |
| Date | Transferee | Amount |
| October 31, 2018 | Dondero | $8,986 |

128

003930

| November 15, 2018 | Dondero | $65,078 |
| December 14, 2018 | Dondero | $115,481 |
| January 15, 2019 | Dondero | $96,786 |
| January 31, 2019 | Dondero | $38,628 |
| February 15, 2019 | Dondero | $42,435 |
| February 28, 2019 | Dondero | $19,063 |
| March 15, 2019 | Dondero | $50,771 |
| March 29, 2019 | Dondero | $21,935 |
| April 15, 2019 | Dondero | $60,191 |
| April 30, 2019 | Dondero | $7,164 |
| May 15, 2019 | Dondero | $89,257 |
| May 31, 2019 | Dondero | $38,804 |
| June 14, 2019 | Dondero | $82,710 |
| June 28, 2019 | Dondero | $7,605 |
| July 15, 2019 | Dondero | $47,006 |
| August 15, 2019 | Dondero | $85,059 |
| August 30, 2019 | Dondero | $12,714 |
| August 30, 2019 | Ellington | $205,788 |
| September 13, 2019 | Dondero | $56,763 |
| September 30, 2019 | Dondero | $24,498 |
| October 15, 2019 | Dondero | $32,977 |
| October 15, 2019 | Ellington | $113,105 |
| Total | Dondero | $4,753,911 |
| Total | Ellington | $318,893 |
| Grant Total | | $5,072,804 |

403.    The One-Year Transfers were made on account of antecedent debt.

404.    HCMLP was insolvent when each One-Year Transfer was made.

405.    Each One-Year Transfer enabled Dondero and Ellington to receive more than they would have if (i) the One-Year Transfers had not been made; and (ii) Dondero and Ellington received payment on account of the debt paid by the One-Year Transfers to the extent provided by the Bankruptcy Code.

406.    Each One-Year Transfer constitutes an avoidable preference pursuant to Section 547(b) of the Bankruptcy Code.

003931

407.    Plaintiff is entitled to an order and judgment under 11 U.S.C. §§ 547 and 550 that each of the One-Year Transfers is avoided and recoverable.

## COUNT XXXII
### Avoidance and Recovery of the Alleged Expense Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law
*(Against Dondero and Ellington)*

408.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

409.    To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute constructive fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

410.    At the time of each Alleged Expense Transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

411.    HCMLP received less than reasonably equivalent value in exchange for each of the Alleged Expense Transfers.  Indeed, HCMLP received no value for the Alleged Expense Transfers, each of which was a gratuitous transfer from HCMLP to or for the benefit of Dondero and Ellington.

412.    Each Alleged Expense Transfer is voidable as a constructively fraudulent transfer.  Accordingly, each Alleged Expense Transfer should be set aside, avoided, and recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable,

003932

against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

### COUNT XXXIII
**Avoidance and Recovery of the Alleged Expense Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*(Against Dondero and Ellington)*

413.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

414.    To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute intentional fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

415.    Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Ellington was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest.    Dondero exercised complete control over HCMLP, and Ellington acquiesced to and profited from schemes orchestrated by Dondero to enrich Dondero, Ellington, and HCMLP's direct and indirect owners.

416.    To that end, Dondero and Ellington caused HCMLP to make the Alleged Expense Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a)     Dondero and Ellington were insiders of HCMLP;

(b)     although Dondero and Ellington assert that the Alleged Expense Transfers constitute reimbursement for valid expenses, on information and belief, there is no factual basis for that assertion;

131

003933

(c)     before the Alleged Expense Transfers were made, HCMLP had been sued and Dondero and Ellington believed HCMLP's legal exposure rendered it insolvent;

(d)     HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(e)     HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved siphoning HCMLP's value through the Alleged Expense Transfers (among other means);

(f)     HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the Alleged Expense Transfers;

(g)     at the time of each Alleged Expense Transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(h)     Dondero and Ellington made the Alleged Expense Transfers during a period when they believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to

003934

siphon value so that such value would not be available to satisfy HCMLP's creditors.

417. Each Alleged Expense Transfer is voidable as an intentionally fraudulent transfer. Accordingly, each of the Alleged Expense Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

## COUNT XXXIV
### Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law Out Of Conduct That Resulted in HCMLP Liabilities
*(Against Ellington and Leventon)*

418. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

419. Ellington and Leventon aided and abetted the breaches of fiduciary duty committed by Dondero and Strand that foreseeably resulted in liability to HCMLP. Ellington and Leventon knowingly participated in Dondero's schemes that foreseeably resulted in liability to HCMLP. In total, these breaches that were aided and abetted by Ellington and Leventon resulted in more than $350 million in allowed claims against HCMLP.

420. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Ellington and Leventon set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the conduct set out herein prior to Dondero's removal. By its nature, the conduct alleged herein was inherently undiscoverable because of

003935

the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

421.    **Liabilities to UBS.**  Ellington and Leventon aided and abetted Dondero in causing HCMLP to incur substantial liability to UBS.  In 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial, Ellington and Leventon aided Dondero in causing HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate a surreptitious transfer of more than $300 million in face amount of assets from the Fund Counterparties to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington, ostensibly to pay a premium on the Sentinel insurance policy that was only $25 million.  Ellington and Leventon knew or willfully blinded themselves to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the transfer to Sentinel

422.    After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court.  When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

423.    **Liabilities to Acis.**  After the Terry arbitration award issued, Ellington and Leventon aided and abetted Dondero in causing HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so it could not pay the arbitration award.  Ellington and Leventon implemented Dondero's directives and took necessary steps to

134

003936

consummate the transactions, knowingly or willfully blinding themselves to the fact that Dondero breached his fiduciary duties to HCMLP by stripping Acis of assets.

424. Leventon knowingly participated in the scheme to transfer value away from Acis in an attempt to make it judgment-proof. Among other things, Leventon assisted in the drafting and execution of the agreement, approved by Dondero in a breach of his fiduciary duty, that transferred Acis's interest in a note receivable from HCMLP, which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO Management Ltd. just ten days after Terry obtained his arbitration award. The agreement recites that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis, therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO Management Ltd. agrees to step in to the collateral manager role. Given the timing of the assignment—just days after Terry's arbitration award—Leventon knew that it was part of a scheme to strip Acis of its assets and a breach of Dondero's fiduciary duty, which ultimately resulted in millions of dollars of damage to HCMLP.

425. **Liabilities to HarbourVest.** Ellington also aided and abetted Dondero in causing harm to HCMLP by exposing it to substantial liability to HarbourVest. Ellington aided Dondero, acting through HCMLP, in fraudulently inducing HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash, with a commitment for an additional $75 million in the future, while concealing that Dondero was actively engaged in a campaign against Terry that would significantly impair the value of HarbourVest's investment. In addition, Dondero did not intend to use the $75 million that CLO Holdco received from HarbourVest to satisfy capital calls at HCLOF, and instead intended for CLO Holdco to use those funds as part of a scheme to infuse other Dondero Entities (including entities that

135

003937

benefitted the NexPoint and HCMFA lifeboats) with additional cash. Ultimately, HCMLP was forced to settle with HarbourVest by providing it with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to an affiliate of HCMLP. As a result of Dondero's and Ellington's conduct, those interests in HCLOF were then worth tens of millions of dollars less than the $75 million HarbourVest paid to acquire them. Ellington either knew or willfully blinded himself to the fact that Dondero breach his fiduciary duties to HCMLP by fraudulently inducing HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash.

426. **Liabilities to Crusader Funds.** Ellington and Leventon aided and abetted Dondero in causing HCMLP to incur substantial liability to the Redeemer Committee due to his conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors. Among other things, Dondero, Ellington, and Leventon caused HCMLP to: (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) purchase 28 Plan Claims for the benefit of HCMLP without the approval of the Redeemer Committee, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (3) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (4) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely. Additionally, both Ellington and Leventon were active participants in Dondero's scheme; they both provided false narratives or misrepresentations in furtherance

003938

of Dondero's harm to the Crusader Funds. The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated." As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith. Ellington and Leventon either knew or willfully blinded themselves to the fact that Dondero breached his duties to HCMLP through the foregoing acts.

427. Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from Ellington's and Leventon's aiding and abetting the breaches of fiduciary duty committed by Dondero and Strand. For example, the $190 million Redeemer arbitration award—which was itself caused by the Dondero's and Strand's breaches of their fiduciary duty to HCMLP and Ellington's and Leventon's aiding and abetting of those breaches—caused HCMLP to file for bankruptcy. As of October 15, 2021, HCMLP had incurred in excess of $40 million in professional fees in connection with the bankruptcy. Ellington and Leventon either knew or willfully blinded themselves to the fact that Dondero and Strand breached their fiduciary duties to HCMLP through their actions that led to the $190 million Redeemer arbitration award.

428. In light of the foregoing, Ellington and Leventon are liable for aiding and abetting Dondero's breaches of fiduciary duties to HCMLP in an amount to be determined at trial.

137

003939

**COUNT XXXV**
**Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law In Connection With Fraudulent Transfers And Schemes**
*(Against Ellington and Okada)*

429.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

430.    Neither the Litigation Trustee nor the Estate could have discovered the conduct by Ellington and Okada set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020.  Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the conduct set out herein prior to Dondero's removal.  By its nature, the conduct alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

431.    Ellington aided and abetted Dondero in causing HCMLP to enter into the Massand Consulting Agreements.  Likewise, Ellington aided and abetted Dondero in overseeing and approving the Massand Transfers.  The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP.  In addition, Ellington aided and abetted Dondero in causing HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP.  Ellington either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP through the foregoing actions.

138

003940

432.     Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

433.     As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including the distributions made to Okada, MAP #1, and MAP #2—were made at times that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors. Okada either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by approving hundreds of millions of dollars of distributions from HCMLP at a time HCMLP was insolvent.

### COUNT XXXVI
### Disallowance or Subordination of Claims Under
### Section 502 and 510 of the Bankruptcy Code
*(Against CLO Holdco)*

434.     Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

435.     On April 8, 2020, CLO Holdco filed Claim No. 133 seeking approximately $11 million (the "CLO Holdco Claim"). The basis of the CLO Holdco Claim was that CLO Holdco purchased a participation interest in certain interests that HCMLP held in the Crusader Fund.

436.     HCMLP acquired the interests in the Crusader Fund that are the subject of the CLO Holdco Claim in violation of the Joint Plan and Scheme. HCMLP released its claim on those interests in connection with HCMLP's settlement with the Redeemer Committee. Accordingly, CLO Holdco is not entitled to any value on account of the CLO Holdco Claim. In recognition of this fact, on October 21, 2020, CLO Holdco amended its claim to seek $0.

003941

437.    Additionally, CLO Holdco subsequently agreed to withdraw the CLO Holdco Claim.   Nevertheless, CLO Holdco has failed to date to actually withdraw the claim, notwithstanding the Reorganized Debtor's request.   Accordingly, out of an abundance of caution, and to the extent that CLO Holdco attempts to pursue the CLO Holdco Claim, the Litigation Trustee objects to the CLO Holdco Claim, and the CLO Holdco Claim should be disallowed in its entirety or subordinated.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

003942

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Defendants as follows:

A.      awarding Plaintiff damages against, and disgorgement and restitution from each Defendant in an amount to be determined at trial;

B.      setting aside, avoiding, and granting recovery of the HCMLP Distributions;

C.      setting aside, avoiding, and granting recovery of the CLO Holdco Transfer;

D.      setting aside and avoiding the payment obligations under the Massand Consulting Agreement;

E.      setting aside, avoiding, and granting recovery of the Massand Transfers;

F.      setting aside and avoiding the transfers of management and advisory agreements to HCMFA and NexPoint;

G.      setting aside, avoiding, and granting recovery of the One-Year Transfers;

H.      disallowing or subordinating, to the extent applicable, the CLO Holdco Claim;

I.      awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law;

J.      awarding Plaintiff his attorneys' fees, costs, and other expenses incurred in this action; and

K.      awarding Plaintiff such other and further relief as the Court deems just and proper.

003943

Dated: May 19, 2022
     Dallas, Texas

Respectfully submitted,

SIDLEY AUSTIN LLP
*/s/ Paige Holden Montgomery*
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Alexander J. Tschumi (admitted *pro hac vice*)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone:  (212) 849-7000

*Counsel for the Litigation Trustee*

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the above and foregoing document was sent

via electronic mail via the Court's ECF system to parties authorized to receive electronic notice in

this case on May 19, 2022.

                                              */s/ Paige Holden Montgomery*
                                              Paige Holden Montgomery

003944

# Exhibit 1

003945

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND EMPLOYEE RETENTION ASSETS LLC | § § § | |
| *Plaintiff,* | § § | Civil Action No. 3:24-cv-498 |
| v. | § § § | |
| JAMES DONDERO, MARK OKADA, MARK KATZ, MICHAEL HURST, SHON BROWN, SCOTT ELLINGTON, ISAAC LEVENTON, ERIC GIRARD, JOHN HONIS, TED DAMERIS, RAYMOND JOSEPH DOUGHERTY, AMIT WALIA, PATRICK BOYCE, LANE BRITAIN, FRANK WATERHOUSE, BRIAN COLLINS, HUNTON ANDREWS KURTH LLP, ABRAMS & BAYLISS LLP, DLA PIPER LLP, NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; JOHN HONIS, AS TRUSTEE OF HUNTER MOUNTAIN INVESTMENT TRUST; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2 | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| *Defendants.* | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Plaintiff Highland Employee Retention Assets LLC ("PLAINTIFF" or the "Highland Employee Vessel") complaining of James Dondero ("Dondero"), Mark Okada

("Okada"), Marc Katz ("Katz"),  Michael Hurst ("Hurst"), Shon Brown ("Brown"), Scott Ellington

("Ellington"), Isaac Leventon ("Leventon"), Eric Girard ("Girard"),  John Honis ("Honis"), Ted

Dameris ("Dameris"), Raymond Joseph Dougherty ("Dougherty"), Amit Walia ("Walia"), Patrick

Boyce ("Boyce"), Lane Britain ("Britain"), Frank Waterhouse ("Waterhouse"), Brian Collins

("Collins"), Hunton Andrews Kurth LLP ("Hunton Andrews Kurth"),  Abrams & Bayliss LLP,

("Abrams & Bayliss") DLA Piper, LLP ("DLA Piper") Nancy Dondero, As Trustee Of Dugaboy

Investment Trust "Dugaboy Trust"); Grant James Scott III, As Trustee Of Get Good Trust

("Get Good Trust");  John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter

Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust –

Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark &

Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") and referred to

collectively as Defendants and for cause of action would respectfully show the Court as follows:

## I.
## PARTIES

1.      Plaintiff Highland Employee Retention Assets, LLC ("Highland Employee

Vessel") is a Delaware limited liability company with its principal place of business in Dallas,

Texas.

2.      Defendant Dondero is an individual who resides in Dallas County Texas and may

be served with process either at his place of residence at 3807 Miramar Ave, Dallas, TX 75205

and/or where he regularly conducts business at 300 Crescent Court, Suite 700, Dallas, Texas

75201.

3.      Defendant Okada is an individual who resides in Dallas County Texas and may be

served with process either at his place of residence at 9008 Briarwood Lane, Dallas, Texas, 75209

and/or where he regularly conducts business at 2101 Cedar Springs Rd Suite 1250, Dallas, Texas

75201.

003947

4.      Defendant Katz is an individual who resides in Dallas County Texas and may be served with process either at his place of residence at 10244 Epping Lane, Dallas, Texas, 75229 and/or where he regularly conducts business at 1900 N Pearl St Suite 2200, Dallas, TX 75201.

5.      Defendant Hurst is an individual who resides in Dallas County Texas and may be served with process where he regularly conducts business at 2100 Ross Ave., Suite 2700, Dallas, Texas 75201.

6.      Defendant Brown is an individual who resides in Dallas County Texas and may be served with process either at where he resides in 5840 Colhurst St, 752305, Dallas Texas, and/or where he regularly conducts business at 2200 Ross Avenue, Suite 2200, Dallas, TX 75201

7.      Defendant Ellington is an individual who resides in Dallas County Texas and may be served with process either at where he resides at 3825 Potomac Ave, Dallas, Texas 75205 and/or where he regularly conducts business at 2101 Cedar Springs Road, Suite 1200, Dallas, Texas 75201.

8.      Defendant Leventon is an individual who resides in Dallas County Texas and may be served with process either at where he resides at 409 Pleasant Valley Ln, Richardson, Texas, 75080 and/or where he regularly conducts business at 2101 Cedar Springs Road Ste 1200 Dallas Texas 75201.

9.      Defendant Girard is an individual who resides in Tarrant County Texas and may be served with process either at where he resides at 312 Polo Trail, Colleyville, Texas76034 and/or where he regularly conducts business at 12222 Merit Dr, Dallas, Texas 75251.

10.      Defendant Honis is an in individual who resides in Florida and may be served with process either where he resides at 2250 Seaside St, Vero Beach, Florida 32963 and/or regularly conducts business at 42 Regatta View Dr, Saratoga Springs, New York 12866-8307, and/or at Trust 87 Railroad Place – Suite 403 Saratoga Springs, New York, 12866.

003948

11.      Defendant Dameris is an individual who resides in Dallas County Texas and may be served with process where he resides at 2215 Cedar Springs Road #1702, Dallas, Texas, 75201.

12.      Defendant Dougherty is an individual who resides in Dallas County Texas and may be served with process where he resides at 316 W. Parkway, Ada, Oklahoma, 74820.

13.      Defendant Walia is an individual who resides in Dallas County Texas and may be served with process where he resides at 6716 Woodland Drive, Dallas, Texas, 75225.

14.      Defendant Boyce is an individual who resides in Montgomery County Texas and may be served with process where he resides at 9651 Crestwater Circle, Montgomery, Texas, 77354.

15.      Defendant Britain is an individual who resides in Dallas County Texas and may be served with process where he resides at 5721 Farquhar Lane, Dallas, Texas, 75209.

16.      Defendant Waterhouse is an individual who resides in Collin County Texas and may be served with process either where he resides at 2604 Dublin Park Drive, Parker, Texas 75094 and/or where he regularly conducts business at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

17.      Defendant Collins is an individual who regularly conducts business at 8343 Douglas Ave #400, Dallas, TX 75225

18.      Defendant Hunton Andrews Kurth LLP may be served with process by serving Jarrett Hale and/or Alexander G. McGeoch at 1445 Ross Avenue, Suite 3700, Dallas, Texas 75202.

19.      Defendant Abrams & Bayliss LLP is a partnership established under the laws of Delaware and regularly conducts business at 20 Montchanin Road, Suite 200, Wilmington, Delaware 19807.

20.     Defendant DLA Piper LLP is a partnership established under the laws of Maryland and may be served with process by serving CSC-Lawyers Incorporating Service Company 7 St. Paul Street Ste 820 Baltimore MD 21202.

21.     Defendant Honis is named in his capacity as Trustee of Hunter Mountain Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state of Delaware and can be served at c/o E. P. Keiffer at Rochelle McCullough LLP, 325 N. Saint Paul St., Ste. 4500, Dallas, Texas 75201.

22.     Defendant Nancy Dondero as Trustee of Dugaboy Investment Trust ("Dugaboy Trust") is a statutory trust established under the laws of the state of Delaware and can be served at c/o E. P. Keiffer at Rochelle McCullough LLP, 325 N. Saint Paul St., Ste. 4500, Number Street, Dallas, Texas 75201 or where it regularly conducts its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

23.     Defendant Lawrence Tonomura as Trustee of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Trust #1") that was created under the laws of the state of Texas. Okada controls Okada Trust #1 and can be served with process at 2101 Cedar Springs Rd., Suite 1250, Dallas, Texas 75201.

24.     Defendant Lawrence Tonomura as Trustee of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Trust #2") that was created under the laws of the state of Texas. and can be served by process at 2101 Cedar Springs Rd., Suite 1250, Dallas, Texas 75201.

25.     Defendant Grant James Scott III as Trustee of the Get Good Trust that was created under the laws of the state of Texas. and can be served with process where it regularly conducts its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

## II.
## JURISDICTION

26.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because it

involves a federal question.

<div align="center">

### III.
### <u>VENUE</u>

</div>

27.     Venue for this action is predicated upon 28 U.S.C. §1391(a)(2) and 28 U.S.C. §1391(b)(1) and (2).

<div align="center">

### IV.
### <u>FACTUAL BACKGROUND</u>

</div>

**A. The Tortured History of Dondero, Okada, Ellington, and The Defendant Minions**

28.     This is yet another example of an all-too familiar pattern where Dondero, Okada and Ellington would strip the assets of entities they controlled to ensure that an aggrieved party could not collect on their hard-fought judgments or their rights of ownership. When challenged, they would execute their well-honed tactics to lie, deny, conceal, and postpone while attempting to exhaust their adversaries of funds as they ran out the clock. In this case, Highland Employee Vessel brings this action to recover tens of millions of dollars in damages that it suffered at the hands of Dondero, Okada, Ellington, and their enablers, acting in concert with other entities that they owned and/or controlled (collectively, the "Dondero/Okada/Ellington Entities"), and with the aid of its own officers, directors and attorneys who disregarded their duties to Highland Employee Vessel in favor of their own self-interests.

29.     Dondero and Okada co-founded Highland Capital Management, LP ("Highland Capital") in 1993 and with their trusts were its primary owners until it emerged from bankruptcy in August 2021. Highland Capital is an investment advisor registered with the SEC under the Investment Company Act 1940 that managed billions of dollars of assets through its structure of approximately 2,000 separate business entities including those of Highland Employee Vessel. Dondero was President, and Chief Executive Officer of Highland Capital until his removal in 2020. Okada was Chief Investment Officer and Executive Vice President until Highland Capital

filed for bankruptcy in late 2019. Ellington served in various roles as a partner and Highland Capital's Chief Legal Officer and General Counsel from 2010 until he was fired for cause in January 2021 for acting in a manner adverse to Highland Capital's interest. Leventon served as Assistant General Counsel at Highland from 2009 until he was fired for cause in January 2021 for acting in a manner adverse to Highland Capital's interest. Thomas Surgent ("Surgent") served as Chief Compliance Officer and Deputy General Counsel of Highland Capital from 2011 through the Highland Capital bankruptcy. Girard served as internal counsel at Highland Capital from 2011 until he was terminated in 2017. Hurst was a partner at his former firm Gruber Hurst Johansen Hail Shank LLP and served as outside counsel to Highland Employee Vessel. Brown was a partner at her former firm Gruber Hurst Johansen Hail Shank LLP and served as outside counsel to Highland Employee Vessel. Katz was a partner at his former firm Hunton Andrews Kurth and is now at DLA Piper where he served as outside counsel to Highland Employee Vessel and Highland Capital. Jeff Abrams ("Abrams"), Matt Miller ("Miller") and Stephen Hough ("Hough") were attorneys at Abrams & Bayliss and served as outside counsel to Highland Employee Vessel. Dameris was a board member of Highland Employee Vessel and served as a Managing Director at Highland Capital. Boyce was a board member of Highland Employee Vessel and was a Partner at Highland Capital. Lane Britain was a board member of Highland Employee Vessel and was a Partner at Highland Capital. Honis was a board member of Highland Employee Vessel, Partner of Highland Capital, and trustee to Hunter Mountain. Walia was a board member of Highland Employee Vessel and was a Partner at Highland Capital. Dougherty was a board member of Highland Employee Vessel and was a Partner at Highland Capital. Collins was the Head of Human Resources at Highland Capital and was the primary agent for Highland Employee Vessel's investor communications, document custody, governance solicitation, and Highland Capital's offer solicitation. Waterhouse was the Chief Financial Officer at Highland

Capital. Klos was the head accountant for Highland Employee Vessel. Dugaboy, Get Good, the
Okada Trusts and Hunter Mountain are trusts established by Dondero and Okada for themselves
and their family members that have owned or controlled Highland Capital through the relevant
period.

30.     Dondero and Okada, with Ellington, Leventon, Girard, Thomas Surgent
("Surgent"), Hurst and Katz at their side, for years-controlled Highland Capital and its byzantine
web of funds and other entities under its management with unilateral and unfettered discretion.
Dondero, Okada, Ellington and the individual Defendants ensured the companies they controlled
routinely failed to observe corporate formalities with respect to their personnel, governance,
internal systems, and considerable assets.

31.     In a dubious tax scheme, ownership of Highland Capital transferred to Hunter
Mountain on or around December 17, 2015, from its then-existing limited partners (i.e., Dondero,
Okada, Ellington, and entities that they controlled). Through a complex series of transactions
that occurred on December 21, 2015, and December 24, 2015, Dondero and Okada caused Hunter
Mountain to become the owner-in name of 99.5% of the economic interests of Highland Capital.
Meanwhile, Dondero and Okada caused Hunter Mountain to issue a series of notes and cash,
such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, Okada
Trust #1, and Okada Trust #2) continued to receive the economic benefit of limited partnership
distributions made by Highland Capital to Hunter Mountain even after they had purportedly
sold their limited partnership interests to Hunter Mountain.

32.     Highland Employee Vessel has never had employees and at all times depended on
its board of directors, counsel, manager, and its investment advisor to conduct its affairs.
Highland employees including Dondero, Okada, Ellington, Leventon, Girard, Collins, Jason
Goldsmith, Hellen Kim, Waterhouse, and David Klos performed investment management, legal

and accounting services to Highland Employee Vessel under shared services and "blanket" agreements.

33.    In September 2008, Highland Capital took a dramatic turn for the worse because of mismanagement and self-dealing by Dondero and Okada during the financial crisis. Highland Capital defaulted on its credit facility prompting its lenders to demand a forensic accounting review of missing cash and assets. During the audit, it was discovered that Dondero and Okada had siphoned tens of millions of dollars out of the Highland Capital accounts while leaving creditors and employees with insufficient resources to collect what was owed to them. A multitude of lawsuits were filed over a ten-year period against Dondero, Okada, Ellington, Leventon, and their affiliates as they became embroiled in litigation for fraud, breach of fiduciary duty, breach of good faith and fair dealing, willful misconduct, fraudulent transfers, money laundering, and wire fraud among others that resulted in over one billion of damage awards.

34.    The lenders initially demanded that the cash be returned immediately to which Dondero threatened, "Highland will fail before I fail"! Following months of difficult negotiations, the lenders agreed to an extension of the credit facility in exchange for strict repayment terms and a security interest in over $125 million of Highland Capital's remaining assets. In addition, the lenders agreed to allow for the creation of a vessel to set aside assets for the purpose of retaining and incentivizing employees (the "Highland Employee Vessel"). Importantly, the assets were transferred to the Highland Employee Vessel in exchange for deferred compensation assets that were terminated as a result of the security interests taken by the lenders. Dondero, Okada and their affiliates were intentionally forbidden from participating as preferred unit holders in the Highland Employee Vessel.

35.    Okada resented the cost of the Highland Employee Vessel and often demonstrated his contempt for employees in general. Indeed, when he wasn't lambasting employees: hispanics

as "spics" and "wetbacks"; Jews as "Jesus Killers", and Caucasians as "dumb white people that all look the same", he would flaunt his belief that he could "Do whatever I want because I'm in a protected class" while bragging about the Japanese surprise attack on Pearl Harbor, exposing himself in the nude at company events, groping women in the office through simulated intercourse, and physically assaulting employees as his alter ego "Thor".

36.    Patrick Daugherty ("Daugherty") was a partner, officer, director, Head of Private Equity, and Co-Head of Research for Highland Capital and certain of its affiliates from 1998 until 2011. Daugherty became a holder of Series A Preferred Units of Highland Employee Vessel on October 26, 2009. He was awarded 1,571.86 preferred units and was the largest holder of the lender approved Highland Employee Vessel. The number of his units and percentage ownership of Highland Employee Vessel increased to 1,909.69 and approximately 19.09% as other employees resigned from Highland Capital prior to their interests vesting in 2011. Daugherty and his affiliates now own and control 100% of Highland Employee Vessel pursuant to the terms of a bankruptcy court approved settlement on March 1, 2022.

37.    Daugherty resigned from Highland Capital on September 28, 2011, because he refused to participate in conduct at Highland Capital that would later result in over a billion dollars in damage awards to investors and creditors for breach of fiduciary duty, willful misconduct, and fraud among other causes. Indeed, Dondero, Okada, Ellington, Leventon, Katz, and Hurst would later pursue legal actions on behalf of Highland Capital against Daugherty to whitewash willful misconduct and breach of fiduciary duties against UBS, Josh Terry (a former employee), the Credit Strategies fund investors and the Crusader Fund investors (including Dallas Police and Fire, Baylor University, Army Airforce Exchange, Ontario Teachers, and many others).  At the time of his resignation, Daugherty was a director of Highland Employee Vessel. After his resignation, Defendants began a campaign to inflict economic pain on him by stripping

Highland Employee Vessel of its assets.

38.     On February 16, 2012, Highland Employee Vessel's board members, Boyce, Britain, Dameris, Dougherty (no relation to Daugherty), Honis, and Walia removed Daugherty as a director. Immediately thereafter, the newly composed board executed a Second Amended and Restated Agreement (the "2012 Amendment") prepared by Highland Capital's Chief Compliance Officer and Deputy General Counsel, Thomas Surgent (Surgent"). The 2012 Amendment purported to impose a punitive procedure to deplete the value of a holder who litigated any action "related to" Highland Employee Vessel, Highland Capital, and its officers and directors, escrow the holder's interest, and, in a type of reverse-indemnification, impose the litigation costs of Highland Employee Vessel and any deemed "diminution in value" cost to the litigant whether they lost or won the litigation (the "Lose – Lose Clause").

## B.  The Texas Litigation

39.     On April 11, 2012, Highland Capital at the direction of Dondero, Okada, Ellington and Leventon commenced a lawsuit against Daugherty in Texas captioned Highland Capital Management, L.P. v. Daugherty, 12-04005, District Court of Dallas County, Texas, 68th Judicial District (Dallas) (the "Texas Action") and Dondero subsequently threatened, "You will never get a dime" and "I'm going to take you [Daugherty] to zero". Daugherty responded with counterclaims against Highland Capital, Highland Employee Vessel, and others, alleging breach of contract and breach of the covenant of good faith and fair dealing against Highland Employee Vessel and Highland Capital. Katz and Hutton Andrews Kurth purported to represent Highland Capital and Hurst, Brown and Gruber Hurst purported to represent Highland Employee Vessel.

40.     It was not until new management of Highland Employee Vessel demanded review of its invoices and records in May 2022 that it was revealed Abrams & Bayless had been retained solely on behalf of Highland Employee Vessel on June 11, 2012, after discussions with Boyce,

Britain, Dameris, Honis, Dougherty, Hough, Abrams, Brown, Ellington, Kim, Collins, Surgent regarding the Highland employee Vessel litigation with Daugherty. It was also revealed that in an email dated November 28, 2012, Dameris was advised by Kevin Abrams ("Abrams") and Stephen Hough ("Hough"), "We caution that the board, which manages Highland Employee Vessel, owes fiduciary duties to both the LLC itself and to its members."

41.     On September 24, 2012, Daugherty made his first request to inspect Highland Employee Vessel's assets to verify its assets. Abrams acted to block the inspection by scheming with Surgent, Hurst, and Katz to demand that Daugherty pay for the costs of producing the materials and sign an onerous confidentiality agreement.

42.     A subsequent invoice discovered in October 2022 revealed that on December 22, 2012, Dondero communicated his buyout offer to Highland Employee Vessel's board.

43.     On December 26, 2012, Dameris, as Managing Director of Highland Capital, sent an email titled "Buyout" to Dondero detailing a scheme in which Dondero could gain control of Highland Employee Vessel at a substantial discount to value pending review by Delaware counsel and noted, "If you decide to offer everyone except 1 [Daugherty] a buyout…". The scheme was created at the same time that a large cash payoff was due to be paid to the Highland Employee Vessel from the Safety-kleen Systems, Inc sale proceeds.

44.     It was not until new management of Highland Employee Vessel demanded review of its invoices and records in May 2022 that it was revealed Hough (copying Abrams) had conspired with Demaris and its former board members on December 30, 2012 to provide a detailed scheme of "Buyout Steps" including how to  transfer control to Dondero and Okada while attempting to forgive the board members of their fiduciary duties to Highland Employee Vessel and simultaneously seeking to create expanded indemnification rights for themselves.

45.     It was also revealed in late 2022 that Surgent sent an email on January 15, 2013,

distributing all of Highland Employee Vessel's operative documents to implement the scheme to Paul Lackey ("Lackey"), Mike Aigen ("Aigen") [lawyers at Lackey Hershmen], Katz, Hough, Ellington, Boyce, Britain and Dameris for comment. Lackey, Aigen and Katz were not counsel to Highland Employee Vessel during his time but, nevertheless Highland Employee's confidential information was disclosed to them for unrelated matters concerning Highland Capital litigation with Daugherty and his law firm, Looper Reed, and McGraw. It would later be discovered that  their invoices were allocated by Dondero, Ellington, Leventon, Surgent, Klos and Waterhouse to Highland Employee Vessel.

46.    Highland Capital and Dondero then directed Collins and Surgent to offer all of Highland Employee Vessel preferred unit holders, except Daugherty, to purchase their preferred units for 100% of the value of their cash interests and 60% of the value of their non- cash interests on January 18 and 31, 2013. However, Highland Capital and its legal team often engaged in the practice of creating documents after the fact and back-dating or forward-dating them to appear as if they existed on the date listed. It was not until October of 2022 that it was revealed the actual offer for preferred unit holders that were employed by Highland Capital at the time occurred much sooner and were effectively offers to keep their employment if they signed. Indeed, all of the preferred unit holders that were employed by Highland Capital at the time purported to accept the offer on the same date the offer was made, January 18, 2013. When the offer was finally presented to former employees on January 31, 2013, Collins and Surgent warned those who questioned the fairness of the price that a majority had already agreed to the offer and that anyone who did not accept the offer would "have their rights stripped".

47.    It was also not until late 2022 that documents were finally produced to reveal that Highland Employee Vessel's board and counsel did nothing to protect the company from this lowball offer despite knowing it was a violation of their fiduciary duties, among others. It did not

seek a higher price from Highland Capital, Dondero, Okada or from Highland Capital's other partners at the time including Boyce, Britain, Ellington, Honis and Walia who stood to benefit from the transaction despite simultaneously serving on Highland Employee Vessel's board. They did not discuss a poison pill or a standstill or any other corporate defense mechanism available to protect from a creeping tender pursuant to their obligation under Delaware law. The board never even met to discuss the offer. Rather, they secretly attempted to ratify their own self-dealing actions, whitewash their dereliction of duty, and enlisted counsel from Abrams and Bayliss and Surgent to provide themselves broad releases of their fiduciary obligations and indemnifications while paving the way for Dondero, Okada, Ellington, and Highland Capital to strip Highland Employee Vessel of its assets. Tellingly, in one of the many amendments and actions by written consent that were never produced in the litigation with Daugherty, the board members purported to execute a Reserve for actual and potential expenses but did not bother to reserve anything for the claims being made by Daugherty.

48.     It was not until concealed documents with metadata were finally produced by Abrams & Bayliss and new management at Highland Capital in October 2022 that a review indicated numerous documents had been executed in violation of Section 5.1, 5.2(b)(ii) and 5.2(b)(iv) of the Second Amended and Restated Limited Liability Company Agreement. Specifically, document data revealed they had been falsely and intentionally misdated by Highland Employee Vessel counsel Surgent to appear as if the board members had authority when in fact they did not. Hough reported to Abrams in a "Buyout Update Highland Employee Vessel" email on January 18, 2013, "Thomas Surgent called and told me that the Highland Employee Vessel buyout documents were executed this morning, with close to 60% accepting. As we discussed, Highland [Capital] is going to wait two weeks to extend the offer to HERA's [Highland Employee Vessel's] non-employee members…. "Thomas [Surgent] will date the

outgoing board's resignations January 19 so that there is no doubt that their resignations occurred only after the transactions were effected." Indeed, Surgent noted in an email to Hough that they had not reached the 75% threshold until February 11, 2013, long after the board members had surrendered their ownership rights in the Highland Employee Vessel and their board positions had terminated. Notwithstanding, the board members disregarded the fact that Delaware entities such as Highland Employee Vessel are not permitted to waive liability for fraud, or breach of good faith and fair dealing.

49.     The purported new manager of Highland Employee Vessel, Highland ERA Management was formed on February 1, 2013, and wrongfully assumed management and control of Highland Employee Vessel. Although Defendants contended that Highland ERA Management was the manager of Highland Employee Vessel, metadata later revealed in October 2022 indicated there was no valid corporate action taken by the board and Series A Preferred unit holders to execute such an arrangement. Indeed, Daugherty and his affiliates were the only rightful owners of the Series A Preferred Units of Highland Employee Vessel at that time.

50.     Despite the absence of valid authority, Dondero, serving as the president of Highland ERA Management and with the assistance of his minions of Highland Capital legal counsel who simultaneously represented both Highland Capital and the Highland Employee Vessel through a "shared services agreement" and an "umbrella agreement", purported to execute a series of transactions to strip Highland Employee Vessel of its assets.

51.     On February 1, 2013, the day that Highland ERA Management was formed, Dondero purportedly executed the Third Amended and Restated Agreement on behalf of Highland Employee Vessel prepared by Surgent, Ellington, Katz, Hurst, Hough and Abrams, which (1) eliminated the purpose for which Highland Employee Vessel was created, (2) eliminated the requirement of Highland Employee Vessel to make cash distributions to preferred unit

holders to cover pass-through tax obligations attributable to Highland Employee Vessel, (3) eliminated members' rights to indemnification, (4) limited indemnification obligations to the discretion of the Manager (Highland ERA Management, LLC) or the Initial Member (Highland Capital Management , LP), and (5) provided for broad indemnification to the Manager [Highland ERA Management, LLC] and Dondero.

52.     Dondero purported to execute an Expense Allocation Agreement prepared by Surgent, Ellington, Leventon, Katz, Hurst, Hough, Abrams, Waterhouse and Klos also dated February 1, 2013, on behalf of both Highland Capital and Highland Employee Vessel under which the parties reallocated 93.4% of Highland Capital's purported legal expenses billed by their firms and others related to the Texas Action to Highland Employee Vessel for no consideration. According to the document, Highland Capital had incurred $1,142,284 in legal expenses in the Texas Action as of December 31, 2012, compared to just $154,029 incurred by Highland Employee Vessel over the same period.

53.     On February 6, 2013, Daugherty sent a letter seeking to review the books and records of Highland Employee Vessel to verify its assets and their value. Abrams rejected the request in a letter dated February 13, 2013 by declaring, "You seek, inter alia, "documents establishing the December 31, 2012 estimated value of the Interests as calculated by HERA [Highland Employee Vessel]"; "HERA's [Highland Employee Vessel's] balance sheets, income statements, lists of assets, general ledger, and the account records for any depository accounts of HERA [Highland Employee Vessel], as of December 31, 2012 and for the periods ending December 31, 2012, 2011, 2010 and 2009"; "HERA's [Highland Employee Vessel's] 2009, 2010 and 2011 federal, state, and local tax returns"; "information… regarding and identifying the current holders of the Series A Preferred Units, and to the extent the Common Unit Holder has already acquired any such units… from whom, in what amounts and for what consideration";

"documents… regarding member lists"; and "documents… regarding HERA's [Highland Employee Vessel] Board… and any amendments to HERA's [Highland Employee Vessel's] company agreement." Your Demand takes a shotgun approach to requesting books and records that is antithetical to the "rifled precision" required by Delaware law. E.g., Brehm v. Eisner, 746 A.2d 244, 266 (Del. 2000).

54.    On February 7, 2013, Surgent sent an email attaching Daugherty's request to inspect Highland Employee Vessel's assets to Hough, Hurst, Katz, Lackey, Ellington, and Zarin. Again, Katz and Lackey did not represent Highland Employee Vessel at the time but were adverse to Daugherty and his counsel at Looper Reed, and McGraw on behalf of Highland Capital. It was later discovered in September 2023 that Leventon, Ellington, Dondero, Klos, Waterhouse, and Katz, had fraudulently allocated over $14,000,000 in invoices from Hurst, Hunton Andrews Kurth, DLA Piper, Lackey Hershman, and other firms to Highland Employee Vessel.

55.    On April 30, 2013, Dondero purported to execute a backdated action by Written Consent that declared Highland Capital as the "sole economic interest holder in the [Highland Employee Vessel] following the consummation of the transactions pursuant to the Offers to Purchase dated on or about January 18, 2013, and January 31, 2013". The same document also declared that, "Daugherty's economic interest in the [Highland Employee Vessel] is now zero as a result of the application of Article XI of the [Highland Employee Vessel's Operating Agreement]. And it further resolved to transfer all of Highland Employee Vessel's assets to Highland Capital because Highland Capital and Highland Employee Vessel "have each determined that it is in their respective best interest" to transfer substantially all the assets of Plaintiff as "in-kind distribution[s]" to Highland Capital (then valued at approximately $9,700,000 on top of approximately $6 million in cash that Highland Capital also took) despite

providing no consideration to Highland Employee Vessel.

56.    Through this series of bogus transactions that were later revealed in October of
2022 to have been backdated from August 22, 2013, by Leventon and Jason Goldsmith to appear
legitimate, Highland Capital claimed to have taken all the assets of Highland Employee Vessel,
leaving it insolvent. Highland Employee Vessel only became insolvent in 2013 because its funds
and assets were purportedly used: (1) to pay for substantially all of Highland Capital's attorneys'
fees incurred in the Texas Action pursuant to the Expense Allocation Agreement dated February
1, 2013; (2) to pay for all of Highland Employee Vessel's attorneys' fees incurred in in trying to
wrongfully prevent Daugherty from receiving his share of the assets; and (3) transfer and register
substantially all of its assets to Highland Capital for nothing. It was also revealed that in an email
dated October 7, 2013, Katz, Hurst, Miller, Childers knew the Highland Employee Vessel board
had ignored their duties to properly review the Highland Capital Purchase Offer and had even
discussed the LAMPERS v Fertitta case by highlighting:

> Turning first to the board's failure to employ a poison pill to prevent
> Fertitta from obtaining control without paying a control premium, it is reasonable
> in the context of a motion to dismiss to infer fiduciary misconduct more serious
> than a breach of the duty of care. The failure to act in the face of an obvious threat
> to the corporation and the minority stockholders instead supports a reasonable
> inference that the board breached its duty of loyalty in choosing not to cross
> Fertitta.

57.    It was later revealed after legal invoices were finally produced under new
management in October 2022, that as Defendants prepared for the first trial in Texas, they
[Highland Capital, Hurst, Katz, Ellington, Brown, Leventon, Girard, Boyce, Britain and Hunton
Andrews Kurth] participated in a mock trial on December 4, 2013, that resulted in their mock

jury finding in favor of Daugherty. From December 6 to 12, 2013, Defendants Dondero, Hurst, Brown, Katz, Abrams, Miller, Boyce, Britain, Ellington, Girard, Leventon, and others schemed to "come up with trial strategy regarding witness testimony as to HERA [Highland Employee Vessel] sale and where are funds;" and conferenced with "Delaware counsel concerning escrowing of Daugherty's HERA [Highland Employee Vessel] interests and related issues there to."

58.    In May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, it was revealed that on December 12, 2013, Ellington, Leventon, and Surgent coordinated with Delaware law firm Abrams & Bayliss LLP ("Abrams & Bayliss") to serve as escrow agent of the Escrow. Highland Capital's assistant general counsel, Leventon, sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day by Ellington. Matthew Miller ("Miller"), Esquire, the Abrams & Bayliss attorney who primarily worked on the escrow matter and had just completed his first year as an attorney and simply used the terms proposed by Leventon.

59.    The deposited assets in the escrow were represented to be: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) 1088.42 shares of NexPoint Credit Strategies. This was the story Defendants "came up with" so they could sell to the jury that they had not simply stolen Highland Employee Vessel's assets. The notion that Defendants did nothing nefarious with Highland Employee Vessel's and Daugherty's assets and merely set them aside would become a theme of Defendants in the Texas Action.

60.    The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Action provided that if Daugherty prevailed in the Texas Action, escrowed assets in the amount of the judgment "shall" be transferred to Highland Employee Vessel. Also pursuant to the crime-fraud discovery in May 2019, it was revealed that 19 days after executing the Escrow

Agreement, Leventon and Girard changed the Escrow Agreement without Daugherty's knowledge because it wanted to "slip sheet the Schedule 1 assets" to change "the NexPoint shares from shares to the cash equivalent of shares because it is difficult to find a prime broker to open account for such a small pool of assets." Abrams & Bayliss simply swapped the pages. Abrams & Bayliss later explained, "if Daugherty digs deeply enough, he may discover that Schedule 1 was revised on December 16, 2013, with no re-execution of the Escrow Agreement by Highland and A&B. Highland's counsel merely re-sent the Escrow Agreement with an updated Schedule 1, and A&B sent an email confirmation of the change." According to Abrams & Bayliss, "[i]t is unlikely that Daugherty would learn of the revision." With the appearance of an escrow in place, Defendants were poised to present themselves in the Texas Action not as thieves, but rather protectors of Highland Employee Vessel's and Daugherty's interests. This was the state of affairs just a month before trial in the Texas Action.

61.    In furtherance of the sham, Hurst, Dondero, and Surgent made it a point to let the court and jury know during the trial that Highland Employee Vessel retained control of "all" of its assets. In January Dondero testified in response to questions by Hurst:

> Q. Okay. So – so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and [Highland Employee Vessel], what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?
> A. They go to him.
> Q. I'm sorry?
> A. They go to him via to HERA [Highland Employee Vessel] and then to him.
>
> Dondero further testified when Hurst asked him:
>
> Q. The escrow, did you just escrow this last month?
> A. No. We've had it segregated at Highland since April when we first put it in and then formalized the escrow. It takes a while to set up an escrow and transfer illiquid assets that have all sorts of transfer limitations.

62.    Highland Capital's Chief Compliance Officer and Deputy General Counsel,

Surgent swore under oath in regard to a question regarding the April 30, 2013, implementation of the asset sweep from Highland Employee Vessel, "Yes, but then it placed those funds in escrow". But when questioned further why the escrow appeared to be created 36 days prior to his testimony and more than eight months after the assets were swept from Highland Employee Vessel, Surgent answered to the court and jury, "The escrow was formalized in this agreement, but I believe it existed sooner." In fact, it did not, and Surgent knew it.

63.     In closing arguments, Highland Employee Vessel's counsel, Hurst lied to the court jury once again, "[I]f Pat Daugherty happens to prevail in his lawsuit against HERA [Highland Employee Vessel], you heard Jim Dondero testify, he gets his interest, which is currently escrowed in the third-party escrow account, all of it.'

64.     It was not until legal invoices were produced by the new management of Highland Capital in October 2022 that this was all exposed as a lie.

65.     After three-weeks of trial, the jury found that Highland Employee Vessel, at the direction of Defendants from Highland Capital, breached the implied covenant of good faith and fair dealing by adopting Section 12.1 of the 2012 Agreement (the "Lose-Lose" clause) and that Highland Capital and Dondero had defamed Daugherty with malice. The jury awarded Daugherty damages against Plaintiff in the amount of $2.6 million plus interest. The court also determined that Daugherty had retained ownership of his preferred units in Highland Employee Vessel. The problem was Dondero, Ellington, Surgent and their merry band of minions lied to the jury and never funded the Escrow while incurring millions in legal fees to drain Highland Capital Vessel's assets to perpetuate the lie.

66.     It was not until May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege that it was revealed Highland Capital contacted Abrams & Bayliss on February 14, 2014 "to discuss a memorandum we need drafted to address the Escrow

Agreement in context of the recent Daugherty Verdict." The memo reaffirmed that Abrams &
Bayliss had "received no cash or documents from Highland Capital or HERA (Highland
Employee Vessel) regarding the escrow of Daugherty's interests in Restoration Capital Partners,
LP. The memorandum then discussed the consequences if the escrow of Highland Employee
Vessel's assets was deemed a "sham". In a section of the memorandum titled "Daugherty May
Assert that the Escrow Agreement Is a Sham and that the Deposit Assets Stayed within the
Control of Highland," Abrams & Bayliss advised: "Daugherty could argue that, even if the
Deposit Assets are deemed to be in escrow, the Escrow Agreement left Highland [Highland
Capital] with actual control of the Deposit Assets because (1) A&B [Abrams & Bayliss] is
Highland's [Highland Capital] counsel, and (2) A&B [Abrams & Bayliss] may resign at any time
with the Deposit Assets returning to Highland [Highland Capital]. Daugherty might argue that,
despite the language of the Escrow Agreement, A&B [Abrams & Bayliss] will do whatever
Highland [Highland Capital] instructs it to do with the Deposit Assets, even if that means
disbursing the Deposit Assets in contrary to the Escrow Agreement's terms. Paragraph 5 of the
Escrow Agreement entitles A&B [Abrams & Bayliss] to resign at any time provided that it gives
ten days advance notice. After A&B [Abrams & Bayliss] resigns, it must deliver the Deposit
Assets either to the successor escrow agent or to Highland [Highland Capital]. Daugherty might
argue that, even if A&B [Abrams & Bayliss] would not disburse the Deposit Assets in
contradiction of the Escrow Agreement, A&B [Abrams & Bayliss] might be willing to resign as
Escrow Agent in order to return the Deposit Assets to Highland." Said another way, Highland
Employee Vessel's own lawyers were acting on behalf of Highland Capital at the expense of their
client while they stripped it of its assets and charged it for the privilege.

     67.    True to form, Highland Capital requested, and on March 25, 2014, Abrams &
Bayliss provided, an expanded memo addressing "tangentially related topics." In the expanded

memo, Abrams & Bayliss explained: "Although unlikely, it is conceivable that the court in the Texas Litigation could take issue with the assertion of Highland Employee Vessel's counsel that the full amount of the Deposit Assets was held by A&B, when arguably at least, only $1.2 million of the Deposit Assets were truly beyond Highland's control."

68.    The Defendants also attempted to conceal the true value of the assets that were supposed to be escrowed on behalf of Highland Employee Vessel. When Girard was asked to provide an update on value by Miller. Girard briefed Abrams that, "Girard would prefer not to update the estimated value of the Restoration Capital Funding interest. Highland received a windfall when the jury valued Daugherty's Highland Employee Vessel interest at only $2.6 million because Highland believes his former interest in HERA [Highland Employee Vessel] is worth more. Schedule 1 currently reflects a value of $3.03 million. If Highland updated Schedule 1 to reflect their current estimates, the Escrow Assets would be worth $3.3 million."

69.    Daugherty suspected that Defendants had lied about the existence of the Highland Employee vessel escrow and on August 24, 2014, served post-judgment discovery requests on Highland Employee Vessel and Highland Capital, seeking information concerning the location of Highland Employee Vessel's assets and liabilities and its post-litigation conveyances to Highland Capital.

70.    Twenty days later, Highland Employee Vessel, at the direction of Dondero, Ellington, Leventon and Hurst, filed a Notice of Cash Deposit in Lieu of Supersedeas Bond and Affidavit Establishing Net Worth. Highland Employee Vessel submitted the affidavit of Klos, which stated that Highland Employee Vessel had a negative net worth of ($2,447,709) after fraudulently applying approximately $7,500,000 of Highland Capital's legal expenses at the time to Highland Employee Vessel as of August 31, 2014. Highland Capital also purported to have loaned Highland Employee Vessel the cash necessary to repay its own legal expenses owed to

Highland Capital because Highland Employee Vessel did not have sufficient funds after transferring all of its assets to Highland Capital back on April 30, 2013. However, a footnote to the balance sheet exhibit to the affidavit noted, "Per Escrow Agreement dated December 13, 2013, between HCMLP [Highland Capital] and Abrams & Bayliss, LLP, if a final, non-appealable judgment against HERA [Highland Employee Vessel] is reached, Abrams & Bayliss, LLP as Escrow Agent, will transfer the HERA [Highland Employee Vessel] Deposit Assets to HERA [Highland Employee Vessel]." The affidavit included a copy of the Escrow Agreement with a schedule again falsely listing escrow assets of: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) cash equivalent of 1088.42 shares of NexPoint Credit Strategies.

71.    Also not revealed until May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, Miller emailed Abrams, "do we look bad for claiming to hold non-monetary assets in escrow when on a day-to-day basis we have no idea what the status of these assets are?" Miller was "not looking forward to being deposed."

72.    In order to conceal the fact that no such transfer ever actually occurred, Dondero, Hurst and the Highland Capital minions then directed Highland Employee Vessel to object to Daugherty's discovery requests on the basis that it was harassing and argued that its cash deposit limited post-judgment discovery to Highland Employee Vessel's net worth. Hurst, doubled down at a subsequent hearing on September 22, 2014, before the court and stated, "everything that's in the sworn financial statement has been provided to the other side and it's been provided to the Court, also came up during trial; that is the exact same assets."

73.    Again on July 10, 2015, Hurst thwarted discovery of Highland Employees' missing assets by filing Highland Employee Retention Assets LLC's Written Objections To Daugherty's Notice of Deposition Upon Written Questions and responding to every question

and request for production with the boiler plate response, "Given the procedural posture of the case, with a final judgment and appellant bond on file, the only discovery that may be sought by Daugherty is that directly relevant to the calculation of HERA's [Highland Employee Vessel's] net worth. The scope of this request goes well beyond that, seeking information that that [sic] has potential proprietary confidential interests and unduly burdening a third-party."

74.    On December 1, 2016, Hurst and Ellington boasted in the press about a settlement with Nautic Partners regarding a breach of fiduciary duty matter over an indirect investment owned by Highland Employee Vessel and other funds in Cornerstone Healthcare Group. It would not be discovered until December 2021 that Dondero, as Chairman of the Cornerstone board and Ellington as General Counsel to Highland Capital serving as the investment advisor to the funds that owned interests in Cornerstone, had schemed with Hurst, Katz and Hunton Andrews Kurth to revise their fee structure on the eve of settlement increasing them from an hourly fee that had already incurred $6 million in charges to a contingency fee that would pay the lawyers approximately $25 million in fees. Dondero and Ellington then received an $11 million facilitating fee that was wired to their affiliates secretly operating as the SAS Platform in the Cayman Islands.

75.    Also on December 1, 2016, Daugherty's judgment against Plaintiff, which had been affirmed on appeal, became final and non-appealable pursuant to the appellate Court's mandate. The appellate court also denied the request to declare that Daugherty's ownership in the preferred units of Highland Employee Vessel were extinguished as a result of his damage award paving the way for him to seek damages on behalf of Highland Employee Vessel. Dondero, Katz, Ellington, Leventon, Miller, and Abrams reviewed the mandate that day and started the process of shutting down the Escrow and assuring the remaining cash assets were swept from Highland Employee Vessel to Highland Capital. A summary of the reconciled emails sent or

received from different time zones follows:

76.     From discovery obtained in May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, a series of emails revealed that on December 1, 2016, at 7:51 p.m.: Hunton Andrews Kurth, outside counsel for Highland Capital and now concurrently outside counsel for Highland Employee Vessel, emailed Abrams, counsel for Highland Capital, counsel for Highland Employee Vessel, and trustee for Highland Employee Vessel's escrow: "Kevin, we need to have a call as early tomorrow as possible regarding the escrow arrangements. Can you let me know when you can be available? Also, can you please send us a copy of the escrow agreement?. Abrams responded to the email copying Miller and Hunton Andrews Kurth lawyers Katz, James Bookhout, and Isabel Crosby.

77.     December 2, 2016, at 10:03 a.m.: Miller informed Abrams, "The call with Highland's [Highland Capital's] attorneys in the HERA [Highland Employee Vessel] litigation was short. Simply put, Highland [Highland Capital] wants to get the funds back to HERA [Highland Employee Vessel] and/or Highland [Highland Capital] as quickly as possible in any way we feel comfortable with." Miller proposed several alternatives, including resignation: "Second, we could resign as escrow agent under Paragraph 5 …. This paragraph permits us to return assets directly to the Depositor, which is Highland [Highland Capital]. Highland's [Highland Capital's] attorneys think that a ten-day notice period will not interfere with their garnishment action plans."

Miller outlined for Abrams a step-by-step resignation plan:

1.     Resignation letter from us that states that all deposit assets will be released to Highland [Highland Capital] after the 10-day notice period.
2.     Letter from Highland [Highland Capital] waiving notice period and seeking our confirmation and signature (because paragraph 10 requires all amendments or waivers to be signed by both parties).
3.     Wiring of cash back to Highland [Highland Capital].

Highland [Highland Capital] encouraged Abrams & Bayliss to resign, "As an update to the

below, Highland [Highland Capital] would prefer that we resign but before we do to agree in writing that the 10-day notice period is waived". "Hunton Andrews Kurth and [Abrams & Bayliss] were on the same page about the resignation strategy."

78.     December 2, 2016, at 2:52 p.m.: Miller emailed Hunton Andrews Kurth: "As we discussed, attached is the resignation letter we contemplate as the first step of unwinding the escrow."

79.     December 2, 2016, at 4:37 p.m.: Miller emailed Hunton Andrews Kurth: "As an FYI, my banker tells me that 5:30 EST is the cut-off time for a domestic wire; the international transfer cut-off already is passed. I am not optimistic that I will receive the necessary authorizations during the next hour. However, would you mind passing along the Highland [Highland Capital] letter on an FYI basis so that I have the wiring instructions handy?"

80.     December 2, 2016, at 5:08 p.m.: Hunton Andrews Kurth emailed Miller: "Matt, please find attached Highland's [Highland Capital's] signed letter accepting the Escrow Agent's resignation." Miller subsequently informed Abrams, "The second step in the HERA [Highland Employee Vessel] strategy is for you to sign the attached letter from Highland [Highland Capital]."

81.     December 2, 2016, at 10:07 p.m.: Miller emailed Ellington: "Scott, please find the attached correspondence regarding the escrow agreement between Highland Capital Management, L.P. and Abrams & Bayliss LLP."

82.     December 2, 2016, at 10:18 p.m.: Katz emailed Miller: "Matt, attached is correspondence from Scott Ellington accepting the resignation and providing wiring instructions. If you need additional information, please let me know."

83.     December 2, 2016, at 10:19 p.m.: Miller emailed Katz: "Thanks, Mark. [sic] We will get a counter-signed copy back to you and arrange for wiring the funds."

84.    December 3, 2016, at 10:06 a.m.: Miller emailed Ellington and Katz: "Scott and Marc, attached please find a counter-signed copy of Scott Ellington's letter."

85.    December 3, 2016, at 2:45 p.m.: Internal Abrams & Bayliss email: "Wells Fargo was unable to initiate the transaction today [a Saturday]. The wire amount required multiple levels of upper management approval so I will go back on Monday morning."

86.    December 5, 2016, at 12:26 p.m.: Miller emailed the team: "Team, As reflected below, the funds A&B [Abrams & Bayliss] was holding in escrow on behalf of HERA [Highland Employee Vessel] have been transferred as instructed in Scott Ellington's December 2, 2016, letter."

87.    "Boom!" (emphasis added). That was the reaction of Girard when he learned the Escrow funds "have been received" by Highland [Highland Capital] on December 5, 2016.

### C.  Crime-fraud Evidence in Delaware

88.    On February 16, 2017, Abrams of Abrams & Bayliss unveiled Defendants' "Highland Employee Asset strategy" to Daugherty:

> I write on behalf of Abrams & Bayliss LLP ("Abrams & Bayliss") in response to your letter of February 14, 2017 (incorrectly dated February 14, 2016) regarding my firm's service as escrow agent under an escrow agreement with Highland Capital Management, L.P. ("Highland"), dated December 13, 2013 (the "Escrow Agreement"). Capitalized terms used but not defined herein have the meanings given in the Escrow Agreement.
>
> By letter dated December 2, 2016, Abrams & Bayliss notified Highland that it was resigning as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement. By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.
>
> On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately. On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016, instructions. Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.

89.     On July 6, 2017, Daugherty, having his disputed ownership in Highland Employee Vessel's assets recently confirmed by Texas Appellate Court, filed a complaint in Delaware Chancery Court seeking the return of all of Highland Employee Vessel's assets in addition to making claims for fraudulent transfer, breach of fiduciary duties on behalf of Highland Employee Vessel, aiding and abetting breach of fiduciary duties on behalf of Highland Employee Vessel, breach of implied covenant of good faith and fair dealing on behalf of Highland Employee Vessel, among other claims. Certain defendants moved to dismiss the complaint.

90.     On January 16, 2018, the Delaware Court of Chancery denied the motion to dismiss against Highland Capital and Plaintiff but granted dismissal against Dondero and Highland ERA management which was controlled by Dondero at the time on the grounds that evidence against them was "conclusory" at that time the court was not privy to the evidence that was later produced pursuant to the crime-fraud ruling in May 2019 and the document production by new management at Highland Capital in October 2022 and October 2023. Later, on June 29, 2018, the Delaware Court denied dismissal against Highland Capital but granted dismissal based on laches for the claims arising out of what was known about the 2013 amendments and contemporaneous actions of the Defendants at that time. It was not until October 2022 and October 2023 that Highland Capital, under new management, produced refuting documentation and invoices.

91.     On May 17, 2019, the Delaware Chancery Judge granted a motion to compel stating, "Daugherty has been dogged in his pursuit of these documents, and Highland [Capital] was just as resolute in refusing to produce them." She also stated, "Daugherty has made a prima facie showing that a reasonable basis exists to believe that a fraud has been perpetrated, and that Highland [Highland Capital] sought A&B [Abrams & Bayliss] to serve as escrow agent and to provide legal analysis in furtherance of that fraud; specifically, to protect the escrowed assets

from Daugherty while the Texas case was pending, and then to transfer them back to Highland [Highland Capital] after the Texas verdict was finalized. I conclude any privilege Highland [Highland Capital] claims over A&B's [Abram's & Bayliss] legal advice regarding the escrow arrangement and A&B's [Abram's & Bayliss] resignation has been stripped under the crime-fraud exception." She also concluded that, Highland Capital, Dondero, Ellington, Leventon, and the other defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case. The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement make their way to Daugherty." Additionally, a Special Master was appointed to oversee discovery compliance. It was later discovered after Highland Capital filed for bankruptcy that Leventon concealed the existence of company owned phones used by Dondero and Ellington as well as a secret server used by many of the defendants or their affiliates to transfer assets. In addition, despite a motion to compel to the contrary, the existence of numerous January 2013 Highland Employee Vessel amendments and actions by written consent were concealed by Dondero, Ellington, Leventon, and Surgent until they were finally produced in October 2022 after full ownership of Highland Employee Vessel was transferred to Daugherty.

92.     On the second day of a three-day trial, Dondero—for the first time—revealed that his misconduct as manager of Highland Employee Vessel was done at the direction and based on the advice of his outside and in-house counsel, i.e., the other defendants in this action. He testified, for example:

> Q. Did Highland [Capital] have outside counsel advising with respect to the purchase of the units?
> A. Yes. I believe the whole situation was the most lawyered thing we've ever done. I mean, there was counsel for each of the board members, there was counsel for Highland [Highland

Capital], there was counsel for HERA [Highland Employee Vessel], there was Delaware counsel. Everything was orchestrated, dictated by counsel.

Q. Did Highland [Highland Capital] have – did that counsel that Highland [Highland Capital] used also advise counsel on the documents, the transaction documents, relating to those purchases?

A. Yes. All the functional documents and major moves at various turning points were all at the request – or decided by counsel.

Q. Did you have any communication – are you familiar with Abrams & Bayliss, with what Abrams & Bayliss is?

A. I know they're a Delaware law firm. But beyond that, no.

Q. Did you ever have any communications with Abrams & Bayliss about them resigning as escrow agent?

A. No. Highland [Highland Capital] and myself, I know, were purposely kept separate from this whole thing. And it was driven by – it was driven by counsel.

Q. My question is a little bit more specific because it relates to the escrow assets and Mr. Daugherty. If you had been told by counsel that Mr. Daugherty was entitled to the escrow assets, you would have given him the escrow assets; right?

A. Yes. We would have done whatever counsel told us. We tried very hard to compartmentalize this mess. We have a business to run. And this is – a half dozen lawsuits, haranguing everybody in public, it was all intended to disrupt our business as much as possible. So we tried to delegate it and compartmentalize it to the lawyers as much as possible.

Q. Let's talk about which lawyers you're referring to. So I'll start with the in-house lawyers again. Which in-house lawyers of Highland [Highland Capital] are you relying on with respect to the transfer of the escrow assets?

A. It would have been the same three internal lawyers working with external counsel.

Q. Mr. Ellington, Mr. Leventon, and Mr. Surgent; is that right?

A. I believe so. I believe they were the ones at that time and place.

Q. Which outside counsel are you relying on?

A. I don't know if Andrews and Kurth had merged with Piper. I don't know who else was involved besides the Abrams guys. But it would have been, more likely than not, those two counsels with whatever other counsel was representing some of the people who were sued individually.

### D. Highland Capital Bankruptcy

93.    The following day, On October 16, 2019, Highland Capital at the direction of Dondero and Ellington filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware. On December 4, 2019, the Delaware Court entered an order transferring venue of the case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. As a result, the Delaware action was stayed.

94.    On January 9, 2020, the Highland Capital Creditors Committee demanded and

Court approved a change of control of Highland Capital, which involved the removal of Dondero as the sole director and the appointment of James P. Seery ("Seery"), John S. Dubel ("Dubel"), and retire Judge Russell F. Nelms ("Nelms") as independent directors (the "Independent Directors" and collectively, the "Independent Board") of Strand Advisors, Inc., Highland Capital's general partner (the "General Partner"). The Independent Directors were granted exclusive control over Highland Capital and its operations during the pending bankruptcy proceedings.

95.     On July 16, 2020, the Court approved Highland Capital's motion to appoint Independent Director Seery, as Highland's CEO and CRO.

96.     On October 9, 2020, Dondero was further instructed to resign or face removal as an employee of Highland Capital and as portfolio manager for all Highland Capital managed funds due to his detrimental conduct to the firm and its creditors.

97.     Highland Capital's bankruptcy was unique because all of the largest creditors' claims stemmed from litigation claims and judgments against the firm, not debt holders. Indeed, Dondero, Ellington and Leventon expected to use the bankruptcy process to once again thwart recoveries while keeping themselves in control. Dondero later complained to Seery, "I'm not getting the Chapter 11 experience." as if he were somehow supposed to benefit from the failure of the company he managed. To the contrary, bankruptcy revealed a litany of terrible acts through a pattern of recurring conduct ultimately resulting in well over one billion dollars in litigation and arbitration claims and over $50,000,000 million dollars in legal fees.

98.     In January 2021, it was discovered that Dondero had been secretly coordinating with Highland Capital's then counsel Ellington and Leventon to direct the affairs of Highland Capital despite his dismissal. When the Court entered an order restraining Dondero from communicating with Highland Capital employees, Dondero flouted the order, by communicating with Ellington and Leventon and instructing other employees to resist document production

requests, even though those documents were kept on Highland Capital's computer system.

99.    Ellington and Leventon we terminated for cause on January 5, 2021, for acting in manner adverse to Highland Capital's interests.

100.    Dondero, Ellington and Leventon evinced no respect for Highland Capital as an entity separate and apart from themselves. The bankruptcy also revealed discovery misconduct during the Delaware action with Daugherty including a secret server that Dondero, Ellington, Leventon and others routinely used, which was concealed during discovery in the Delaware action with Daugherty. Additionally, the bankruptcy court twice found Dondero in contempt for violating a TRO. During testimony at the first show cause hearing, it was revealed that Dondero and Ellington destroyed their cell phones that were provided by Highland Capital. Yet, in the Delaware action with Daugherty, Leventon testified at his custodian of records deposition that Highland Capital did not "have access to people's phones" and that Highland Capital did not own any cell phones for the custodians.

101.    On February 8, 2021, the Court agreed to confirm Highland Capital's bankruptcy plan, and the Court entered its plan Confirmation Order on February 22, 2021.

102.    On August 11, 2021, Highland Capital's bankruptcy plan, as amended to date, became effective, and as a result Highland Capital's ownership was restructured. Highland Capital became a wholly owned subsidiary of the Highland Claimant Trust, a newly formed liquidating trust owned by the creditors of Highland Capital. Specifically:

- The Highland Claimant Trust became the sole limited partner of Highland Capital.
- HCMLP GP LLC replaced Strand Advisors, Inc. as General Partner of
- Highland Capital. HCMLP GP LLC is also a wholly owned subsidiary of the Highland Claimant Trust.
- Seery serves as the Claimant Trustee of the Highland Claimant Trust and remains the CEO of Highland Capital today. Dondero and Okada are no longer involved in the management of Highland Capital or the Claimant Trust.

103.    In the Bankruptcy, Daugherty filed claims estimated in excess of $40,000.00. In

November 2021, Daugherty reached a settlement with Highland Capital for some of his claims and retained the right to pursue Defendants for various other claims.

104.    On March 1, 2022, during the settlement hearing, Highland Capital finally acknowledged, "Dondero, through Highland Capital, engaged in an asset-stripping campaign designed to render Highland Employee Vessel judgment-proof, further exposing Highland Capital to liability and unnecessary legal costs." Highland's new CEO, James Seery, testified:

> It actually looks like, frankly, the escrow was never really an escrow, and it was a —
> it was a fraud from the beginning. And that one's a pretty disturbing one.

105.    On April 1,2022, full ownership of Highland Employee Vessel and Highland ERA Management were transferred to Daugherty and his affiliates.

106.    On May 11, 2022, Highland Employee Vessel instructed Abrams & Bayliss, Hunton Andrews Kurth, DLA Piper, Marc Katz, and Michal Hurst to forward all of its casefiles, records and invoices allocated to Highland Employee Vessel.

107.    True to form, Hunton Andrews Kurth responded by letter on May 25, 2022, "Our records and research indicate that the Firm represented ERA and/or HERA [Highland Employee Vessel] in connection with only two matters. The first matter was opened on June 1, 2012, for which our records indicate we represented Highland Capital Management, LP ("Highland") and HERA [Highland Employee Vessel], and for which only 1.6 hours of attorney time was recorded. We have located no files for this matter other than an electronic record of the recorded time." They made this statement despite Katz representing before the court Highland Employee Vessel incurred millions of dollars in legal expenses, including those from his firm, making it insolvent.

108.    Hunton Andrews Kurth continued, "Additionally, given that Daugherty now wholly owns and controls HERA [Highland Employee Vessel] and ERA, we believe we are constrained in what we may transfer. Your HERA [Highland Employee Vessel] and ERA file

transfer request equates to Daugherty gaining access to his litigation adversaries' attorney's files. In this unique circumstance of a litigant seeking his adversary's attorney's file by acquiring control of one (or more) of his litigation adversary's attorney's former jointly represented clients, the case law we have reviewed favors protecting the co-client's justified expectation that its attorney's files will not be disclosed to its litigation adversary." Said another way, after invoicing millions of dollars in legal fees that were allocated to Highland Employee Vessel, Hunton Andrews Kurth continues to conceal their conduct by claiming some privilege based on jointly representing Highland Capital and Dondero. Tellingly, Hunton Andrews Kurth could produce no retention agreement that named Dondero as a client nor did Dondero pay a single $1 for any such legal expenses. However, Highland Employee Vessel was allocated over 93% of the fees invoiced to Highland Capital.

109.    DLA Piper delayed until July 22, 2022, to make the following similar response, "Second, as you know, DLA's representations of HERA and ERA in the Daugherty Case were joint representations in which DLA also represented HCMLP and Mr. Dondero. Mr. Daugherty is still adverse to Mr. Dondero in the Daugherty case and in Daugherty v. Dondero, No. 2019-0956 (Del. Ch.). That means that your request for the client file would result in DLA providing to one litigation party the privileged and work product-protected communications of its litigation adversary. Such a production "would be anathema to the principles underlying the policy of fostering unfettered attorney-client communication." Again, DLA piper made this response despite having millions of dollars of its fees allocated to Highland Employee Vessel and producing no retention agreement that listed Dondero as a client or that he ever paid anything for the alleged representation.

110.    Hurst never responded to Highland Employee Vessel's file and document request.

111.    It was not until October 2022 and October 2023, after Highland Employee Vessel

received documents from Highland Capital and Abrams & Bayliss pursuant to two books and records requests, that extensive billing fraud was revealed at the expense of Highland Employee Vessel at the hands of its lawyers Katz, Hurst, Hunton Andrews Kurth, DLA Piper, Abrams & Bayliss and others. Indeed, financial records and information from Highland Capital reveal that over $14,000,000 of expenses for other matters were allocated to the Highland Employee Vessel and their lawyers were aware of it.

112.    Shockingly, Highland Capital and its partners including Dondero, Okada, their trusts, Ellington, Boyce, Britain, Dougherty, and Surgent had taken the tax benefits of these expenses as though they were their own despite knowing that the obligations to pay were allocated to Highland Employee Vessel. Surgent explained to Abrams & Bayliss that they did not want Daugherty to get the tax benefit of the expense/loss pass-throughs so they made the legal expense allocations effective after they received their 2013 buy-out proceeds.

113.    Not surprisingly, when the details of the fraud were discovered, new management of Highland Capital realized a charge to the Highland Employee Vessel capital accounts in excess $10 million as an offset to write off over $10 million of falsely allocated debt resulting in a loss of capital account basis that could have been used by Highland Employee Vessel and its unit holders for tax purposes.

### E.  A Recurring Theme

114.    This avoidance of having to pay judgments for their terrible acts is a customary practice for the Defendants. Highland Employee Vessel was stripped of its assets as retaliation against Daugherty for assisting in recovery efforts of the following related matters:

#### 1.  Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry

115.    In 2010, Dondero and Okada formed Acis Capital Management, L.P. ("Acis") and

Acis Capital Management GP, LLC ("Acis GP") as a "lifeboat" to divert collateralized loan business fees from Highland Capital after its lenders placed security liens on its assets. Dondero was President both of Acis and Acis GP. Okada was Chief Investment Officer for all funds including those of Acis. Collectively, they controlled the investment and operating decisions of the Acis platform. Acis was initially indirectly owned by Dondero and Okada (through Highland Capital Management Services, Inc). Joshua Terry ("Terry"), a Highland Capital employee, later joined the platform in 2011 to manage Acis after its previous managers left Highland Capital. Like Highland Employee Vessel, Acis had no employees. Highland Capital was the investment manager for Acis, and Acis performed almost all of its services through Highland Capital employees. In 2013, Dondero modified Terry's ownership in Acis. As a result, Dondero and Okada, with the help of the Highland Capital legal team, once again engaged in a scheme to siphon value from Acis and transfer it back to Highland Capital.

116.    By 2016, Dondero and Terry came to an impasse. Dondero sought to improperly finance a latex company investment in South America by causing a separate portfolio company, Trussway Industries Inc ("Trussway"), to incur unnecessary debt and divert the loan proceeds to finance the purchase. Terry criticized the misconduct as a breach of their fiduciary duties to their investors. Dondero responded by firing him and making a pretextual claim of termination for "cause". Dondero also amended the partnership agreement to terminate Terry's interests in Acis and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded arbitration.

117.    On October 20, 2017, following a ten-day arbitration, the arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked Highland Capital's false pretext of "for cause" in order to deny Terry his

contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay Highland Capital more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying Highland Capital under their shared services and sub-advisory agreements, retroactive to January 1, 2016.

118.    Beginning on October 24, 2017—four days after Terry's arbitration judgment was issued—Dondero, acting through Highland Capital, and with the aid of Ellington, Leventon, and Surgent entered into numerous transactions designed to take control of Acis's assets and business, and strip Acis of assets so that it would be unable to pay Terry's arbitration award.

119.    Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United States Bankruptcy Code against Acis and Acis GP on January 30, 2018. In response to the bankruptcy filings, Dondero caused Highland Capital, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis funds following the appointment of a chapter 11 trustee in the Acis bankruptcy case. This abrogation of duties caused the chapter 11 trustee to replace Highland Capital with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland").

120.    Dondero also caused Highland Capital to commence litigation against the Acis chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through Highland Capital) and to stop Highland Capital from engaging in a course of conduct that was harmful to Acis and the Acis CLOs. This led to the entry of a temporary restraining order against Highland Capital, which

Dondero caused Highland Capital to violate.

121.    Daugherty communicated with Terry on several occasions regarding the extreme means utilized by Highland Capital against Daugherty including sending constables to his home to execute collection efforts under false pretenses, stripping the Highland Employee Vessel of its assets, and seeking to have Daugherty incarcerated. For the legal services provided by Hurst, Katz, Hunton Andrews Kurth, DLA Piper and Lackey Hershman for attacking Daugherty on behalf of Highland Capital, Highland Employee Vessel was allocated the bill.

### 2. Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest

122.    Dondero and Ellington fraudulently induce third party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis funds away from Acis in order to evade Terry's arbitration award, he and Ellington were using Highland Capital to induce the HarbourVest Entities to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million in HCLOF. In soliciting this investment, Dondero and Ellington failed to disclose material facts to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing Highland Capital to substantial and unnecessary liability.

123.    In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through Highland Capital, made numerous misrepresentations and omissions, including: (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding

company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior

to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem

the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration

award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

124.    Moreover, unbeknownst to HarbourVest, Dondero intended for CLO Holdco to

use the $75 million that it received from HarbourVest to make investments in other Dondero

controlled and owned entities, including entities managed by NexPoint and HCMFA. Thus, the

HarbourVest investment benefited Dondero personally, but left Highland Capital exposed to

hundreds of millions of dollars in potential damages to HarbourVest.

125.    At various times in the Highland Capital bankruptcy, Daugherty coordinated with

HarbourVest on an ad hoc steering committee basis to identify and seek the return of the assets

looted from Highland Capital estate, HarbourVest and Highland Employee Vessel.

### 3.    Willful Misconduct in the Transfer of Highland Capital Credit Strategies Fund's Assets to Dondero, Okada and Ellington Controlled Entities

126.    Another instance involved the Highland Capital Credit Strategies Fund judgment.

In that case Highland Capital was found to have engaged in distinct types of misconduct, where

Dondero also personally threatened the redeemer committee's personnel with retribution. The

most important aspect of the misconduct is that Highland Capital effectively moved the assets to

other Highland Capital-controlled entities for far less than their actual value. In fact, Highland

Capital paid even less for the interest ($24 million) than it had marked the value on its own books

($28 million) and far less than valuations done by third parties, even those hired by Highland

Capital (up to $37 million). Highland Capital did so in secret and the redeemer committee only

found out when a line item referring to the $24 million as "Cornerstone sale proceeds" showed

up in a regular cash report to the redeemer committee. An arbitration panel found that Highland

Capital not only breached its obligations under the Plan of liquidation but engaged in willful

misconduct in its sale of the Fund's Cornerstone equity. The panel found Highland Capital's explanations to excuse its conduct as "to put it mildly, far-fetched."

127.    Daugherty communicated several times with members of the Highland Capital Credit Strategies Fund regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital detailed numerous acts of fraud and breaches of fiduciary duty that caused damage to Highland Capital Credit Strategies Fund. Dondero, Ellington, Leventon, Hurst, Katz, Hunton Andrews Kurth, DLA Piper and Lackey Hershman embarked on a crusade to smear Daugherty and his law firm while filing numerous baseless show cause motions against him. In addition, the services of the Ashcroft Law Firm ("Ashcroft") were retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and not surprisingly, Ashcroft produced a report that absolved Highland Capital. The arbitration panel disagreed and found in favor of Highland Capital Credit Strategies Fund for over $30,000,000 in damages resulting from willful misconduct and breach of fiduciary duty. Once again, for these dubious legal services provided by Hurst, Katz, Hutton Andrews Kurth, DLA Piper, and Lackey Hershman on behalf of Highland Capital, Highland Employee Vessel was allocated the bill.

### 4.  Willful Misconduct in the Transfer of Highland Crusader Fund's Assets to Dondero, Okada and Ellington Controlled Entities

128.    Dondero, Ellington, and Leventon also engaged in misconduct relating to Highland Capital managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds"). Highland Capital had placed the Crusader Funds into wind-down in October 2008. Investors in the funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against Highland Capital, based on allegations that Dondero had refused to make

mandated distributions and honor redemption requests, and traded the funds' positions in a manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors. Certain of these lawsuits were ultimately resolved in July 2011, when the parties entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement for its creditors (together, the "Joint Plan and Scheme"). As part of the Joint Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee Highland Capital's wind-down of the Crusader Funds and distribution of proceeds to investors.

129.    On July 5, 2016, the Redeemer Committee (i) terminated Highland Capital as investment manager; (ii) filed a complaint in Delaware Chancery Court against Highland Capital seeking a limited status quo order, a declaration that the Redeemer Committee had "cause" to terminate Highland Capital as manager, and a declaration that Highland Capital had forfeited any right to indemnification as a result of its failure to distribute proceeds to investors of various funds; and (iii) commenced an arbitration proceeding (the "Redeemer Arbitration") against Highland Capital alleging that it had engaged in various forms of misconduct in its role as investment advisor. After two years of arbitration proceedings, the Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that included testimony from eleven fact witnesses and four expert witnesses. On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million. Ultimately, the panel awarded ten forms of damages: (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim ($22,922,608); (3) the Taking of Plan Claims ($3,277,991); (4) the CLO Trades Claim ($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850); (9) the Portfolio

Company Award (\$71,894,891); and (10) the Administrative Fees Award (\$514, 164).

130.    The claims that were asserted against Highland Capital by the Redeemer Committee stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero, Ellington, and Leventon caused Highland Capital to commit. For example, the "Barclays Claim"—which gave rise to over \$30 million in liability for Highland Capital—arose out of Dondero, Ellington, and Leventon causing Highland Capital to transfer Barclays' limited partnership interests in the Crusader Funds to Highland Capital's wholly-owned affiliate, Eames, after the Redeemer Committee had already refused to approve that transfer. In so doing, Dondero, Ellington, and Leventon caused Highland Capital to violate the Joint Plan and Scheme and its fiduciary duties. Because of Dondero, Ellington, and Leventon's wrongful conduct, Highland Capital was ordered to pay: (1) over \$30 million on account of disgorged partnership interests; (2) additional sums for disgorgement of distribution fees (that were included within the \$22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

131.    In addition, from December 2013 through January 2016, Dondero, Ellington, and Leventon caused Highland Capital to purchase 28 Plan Claims from Crusader investors in violation of the Redeemer Committee's right of first refusal ("ROFR"). During this time, Leventon told multiple investors interested in possible transfers of their interests that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. Leventon also made affirmative misrepresentations to the Redeemer Committee to disguise the fact that Highland Capital had purchased the Plan Claims. Pursuant to the arbitration award, Highland Capital was required to transfer the 28 Plan Claims to the Redeemer Committee, and to disgorge to the Committee whatever financial benefits Highland Capital obtained from the 28 transactions, plus interest at the rate of 9%, from the date of each purchase.

132.   Dondero's, Ellington's, and Leventon's conduct also resulted in Highland Capital becoming liable to the Redeemer Committee for over $71 million in connection with claims arising from the Cornerstone Healthcare Group Capital ("Cornerstone") that was owned, directly and indirectly, by Highland Capital. Some of Cornerstone's stock was owned by the Crusader Funds. Dondero, Ellington, and Leventon caused Highland Capital to covertly purchase shares in Cornerstone from another fund that Dondero controlled at below-market prices and failed to liquidate the Crusader Funds' shares in Cornerstone as their fiduciary duties required. Pursuant to the arbitration award, Highland Capital was required to purchase the Crusader Funds' shares in Conrerstone at a fixed price of $48,070,407, and to pay pre-judgment interest that brought the total claim to $71,894,891.

133.   Additionally, the Joint Plan and Scheme required Highland Capital to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete. Dondero, Ellington, and Leventon caused Highland Capital to violate that provision of the Joint Plan and Scheme by causing Highland Capital to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016. The arbitration panel ruled that as a consequence of Dondero's, Ellington's, and Leventon's blatant breach of the payment requirements of the Joint Plan and Scheme, Highland Capital forfeited its right to these fees entirely.

134.   The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019, to obtain entry of a judgment with respect to the award. The hearing was subsequently continued to October 16, 2019, before the same court presiding over the Daugherty causes involving Dondero, Highland Capital, Ellington, Leventon, Girard, Hurst, and Katz. That morning, Highland Capital filed for bankruptcy.

135.   Daugherty communicated several times with members of the Highland Crusader

Fund regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital detailed numerous acts of fraud and breaches of fiduciary duty that caused damage to Highland Crusader Fund. Dondero, Ellington, Leventon, Hurst, Katz, Hunton Andrews Kurth, and Lackey Hershman embarked on a crusade to smear Daugherty and his legal counsel while filing numerous baseless show cause motions against him. In addition, the services of the Ashcroft Law Firm ("Ashcroft") were retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and, not surprisingly, Ashcroft produced a report that absolved Highland Capital and its officers. The arbitration panel disagreed and found in favor of Crusader Funds for over $190,000,000 in damages resulting from willful misconduct and breach of fiduciary duty among other things. Once again, for these dubious legal services provided by Hurst, Katz, Hutton Andrews Kurth, DLA Piper, and Lackey Hershman in attempting to silence Daugherty on behalf of Highland Capital, Highland Employee Vessel was allocated the bill.

### 5. Dondero And His Accomplices, Including Ellington, and Leventon, Cause Highland Capital To Engage In Misconduct That Increases Its Liability To UBS

136. In March 2017, the New York state court presiding over UBS's claims against Highland Capital and other fund counterparties ruled its claims could proceed to trial. Shortly thereafter, Dondero, Ellington, and Leventon, along with Highland Capital employees Jean Paul Sevilla, Katie (Irving) Lucas, and Matthew DiOrio, took steps to transfer the fund counterparty's remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington, in order to ensure that such assets would be out of UBS's reach in the event that a judgment was entered in its favor.

137. In or around August 2017, Dondero, Ellington, Leventon, Sevilla, Lucas, and

DiOrio orchestrated the surreptitious transfer of all of the fund counterparty's assets—with a face amount of $300 million and a market value of at least $100 million —to Sentinel.

138.    The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that purportedly insured the fund counterparty's first $100 million of liability to UBS. The real goal of the transfer, however, was to drain the fund counterparty's assets and render them judgment-proof, while keeping the assets within Dondero's and Ellington's control. There is no legitimate explanation as to why the funds transferred assets worth at least four times the premium payment to Sentinel. And given that Dondero and Ellington indirectly own and control Sentinel, they personally and improperly benefitted from this overpayment.

139.    Moreover, Ellington and Leventon (along with Sevilla, Lucas, and DiOrio) actively concealed the transfer of assets and the existence of the insurance policy from the Independent Board, apparently in order to prevent the Fund Counterparties from making a claim under the policy. Indeed, Leventon, who was directly involved in the transfers to Sentinel, was tasked with educating the Independent Board about UBS's claim and the assets potentially available to satisfy it. In response, Leventon delivered an extensive—but intentionally misleading—presentation to the Independent Board that said nothing about the August 2017 asset transfer and the Sentinel insurance policy and lied to Highland Capital regarding the Fund Counterparties' assets. Additionally, around the same time that Ellington and Leventon were hiding this secret insurance policy from the Independent Board, (i) Ellington charged the policy for personal expenses in excess of $500,000 that bore no relation to the UBS litigation and provided no benefit whatsoever to the Fund Counterparties or Highland Capital; and (ii) Ellington and Leventon, among others, entered into agreements whereby Sentinel agreed to pay attorneys' fees and expenses they incurred in connection with Highland Capital's bankruptcy.

140.    As a direct result of Ellington's and Leventon's fraudulent concealment of the transfers to Sentinel, Highland Capital inadvertently made factually inaccurate statements to the Bankruptcy Court and incurred millions of dollars in additional fees litigating (rather than settling) with UBS. In March 2021, after the policy was uncovered through Highland Capital's diligence (notwithstanding Ellington's and Leventon's cover-up), the CDO Fund made a claim on the policy. To date, Sentinel has refused to make any payments.

141.    Daugherty communicated several times with members of the UBS team regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital detailed numerous acts of fraud and breaches of fiduciary duty that caused damage to UBS. Dondero, Ellington, Leventon, Hurst, Katz, Hunton Andrews Kurth embarked on a crusade to smear Daugherty and his counsel while filing numerous baseless show cause motions against him. In addition, the services of the Ashcroft Law Firm ("Ashcroft") were retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and not surprisingly, Ashcroft produced a report that absolved Highland Capital.

142.    On February 10, 2020, the New York state court disagreed with the Ashcroft report and issued a judgment against the Highland Counterparties in connection with the phase one litigation, in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of $1,042,391,031.79. Trial on UBS's claims against Highland Capital was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed infra).

143.    Once again, for these dubious legal services provided by Hurst, Katz, Hutton Andrews Kurth, DLA Piper, and Lackey Hershman in attempting to silence Daugherty on behalf of Highland Capital, Highland Employee Vessel was allocated the bill.

## V.
## CAUSES OF ACTION

**Count One: Violations of Federal Civil RICO—Conduct of a RICO Enterprise, 18 U.S.C. §**
**1962(c)**

144.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if
fully set forth herein.

145.    At all relevant times, Defendants Dondero, Okada, Dameris, Ellington, Katz, Hurst,
Brown Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce
and Britain are each "person[s]" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

146.    The Defendants each violated 18 U.S.C. § 1962(c) by the acts described in the
paragraphs above.

147.    The Defendants actions described in the previous paragraphs constitute an
Enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

148.    At all relevant times, the Defendants were engaged in, and/or its activities
constituting wire fraud within the meaning of 18 U.S.C. § 1962(c) and 1343. At all relevant times,
the Defendants participated in the operation, management, and directed the affairs of the
Enterprise.

149.    The Defendants, each of whom are persons associated with the concerted efforts
against Plaintiff did knowingly, willfully, and unlawfully conduct or participate, directly or
indirectly, in the conduct, management, or operation of the affairs of the Enterprise.

150.    The Defendants through a pattern of racketeering activity within the meaning of
18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), through multiple instances of Mail Fraud and Wire
Fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and Money Laundering, in violation of 18
U.S.C. § 1956(a)(1)(A)(i). Use of the Mails and Wires to Defraud, in violation of 18 U.S.C. §§
1341 and 1343. 94. The Defendants devised or intended to devise a scheme to defraud Plaintiffs

of money, property, and other benefits and assets

151.    For the purposes of executing their scheme, the Defendants delivered or caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers or received such therefrom. For the purposes of executing their scheme, the Defendants transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various writings, signs, and signals.

152.    In furtherance of their scheme, the Defendants used the wires and/or U.S. mails or private or commercial carriers to delivery documents and things to Plaintiff or the Enterprise for the purposes of defrauding Plaintiff, including, but not limited to the following: a. Emails b. Wirings and/or mailings between and among the Defendants concerning: the scheme to defraud Plaintiff of money and property as well as other benefits and assets. c. Funds transferred between Defendants with the intent that those funds be used to promote the carrying on of Defendants' scheme to defraud Plaintiff of money and property as well as other benefits and assets.

153.    The Defendants used wire and mail communications in furtherance of their scheme to defraud Plaintiff, in violation of 18 U.S.C. §§ 1341 and 1343, as described fully above.

154.    The Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to advance their scheme to deceive or defraud Plaintiff. The Defendants knowingly and intentionally prepared documents, including but not limited to, resolutions, court papers, letters, notices, and other documents, and then knowingly and with the intent to deceive Plaintiff, caused those documents to be sent to Plaintiff or entities that would further the Defendants' scheme to defraud.

155.    The Defendants have, on multiple occasions, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducted or attempt to conduct a financial transaction which in fact involves the proceeds of specified

unlawful activity with the intent to promote the carrying on of specified unlawful activity, including, but not limited to, violations of 18 U.S.C. §§ 1341 and 1343 and the Defendants have, therefore, violated 18 U.S.C § 1956(a)(1)(A)(i), money laundering.

156.    Each of the Defendants has engaged in multiple predicate acts, as described in the preceding paragraphs. The conduct of each of the Defendants described in the preceding paragraphs constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

157.    The Defendants violations of federal law as set forth herein, each of which directly and proximately injured Plaintiff, constitutes a continuous course of conduct, which was intended to defraud Plaintiff of money and property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of racketeering activity as defined by 18 U.S.C. §§ 1961(1) and (5).

158.    Plaintiff was injured in their money and property by reason of the Defendants' violation of 18 U.S.C. § 1962(c).

159.    The Defendants' injuries to Plaintiff were a direct, proximate, and reasonably foreseeable result of their violation of 18 U.S.C. § 1962. Plaintiff is the ultimate victims of the Defendants unlawful Enterprises and scheme. Plaintiff has been and will continue to be injured in their money and property in an amount to be determined at trial.

160.    Pursuant to 18 U.S.C. § 1962(c), Plaintiff is entitled to recover treble damages plus costs and attorneys' fees from the Defendants as well as any other relief authorized by statute.

**Count Two: PROMISSORY ESTOPPEL**

161.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

162.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce, and Britain made promises to Plaintiff regarding the establishment, funding, and management of the Escrow.

163.    Plaintiff reasonably and substantially relied on that promise to its detriment.

164.    Plaintiff's reliance on the promise was foreseeable to Defendants.

165.    Injustice to Plaintiff can only be avoided by enforcing Defendants promise.

166.    The Defendants actions or omission proximately caused Plaintiff injury.

167.    Plaintiff incurred actual damages.

## Count Three: MONEY HAD AND RECEIVED

168.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

169.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce, Britain, Honis as Trustee of Hunter Mountain Trust, Nancy Dondero as Trustee of Dugaboy Trust, Lawrence Tonomura as Trustee of the Okada Trust #1 and Okada Trust #2 and Grant James Scott III as Trustee of the Get Good Trust hold money.

170.    That money belongs to Plaintiff in equity and good conscious.

## Count Four: CONVERSION

171.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

172.    Plaintiff had the right to possession of assets which were personal.

173.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce, Britain, Honis as Trustee of Hunter Mountain Trust, Nancy Dondero as Trustee of Dugaboy Trust, Lawrence Tonomura

003996

as Trustee of the Okada Trust #1 and Okada Trust #2 and Grant James Scott III as Trustee of the Get Good Trust have wrongfully exercised dominion and control over Plaintiff's property.

174.    Plaintiff has suffered injury as a result of Defendants actions.

## Count Five: FRAUD

175.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

176.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain made representations to Plaintiff.

177.    The representations were material.

178.    The representations were false.

179.    At the time Defendants made the representations the Defendants knew they were false and made the representations recklessly, as a positive assertion and without knowledge of its truth.

180.    The Defendants made the representations with the intent that the Plaintiff act on them which in fact the Plaintiff did rely on them.

181.    The representations caused the Plaintiff injury.

## Count Six: FRAUD BY NONDISCLOSURE

182.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

183.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain and concealed from and/or failed to disclose certain facts to Plaintiff.

184.    Defendants had a duty to disclose these facts to the Plaintiff.

003997

185.     The facts were material.

186.     At the time Defendants made those representations the Defendants knew that Plaintiff was ignorant of the facts and that Plaintiff would not have an equal opportunity to discover the facts.

187.     The Defendants were deliberately silent when they had a duty to speak.

188.     By failing to disclose those facts the Defendants intended to induce Plaintiff to take some action or refrain from same.

189.     Plaintiff relied on the Defendants nondisclosure.

190.     Plaintiff was injured as a result of acting without the knowledge of the undisclosed facts.

## Count Seven: LEGAL MALPRACTICE

191.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

192.     Defendants Ellington, Katz, Hurst, Leventon, Girard, Demaris, Brown, Hunton Andrews Kurth LLP, Abrams & Bayliss, LLP, DLA Piper, LLP, and owed Plaintiff a duty.

193.     The Defendants negligent acts and/or commissions breached that duty.

194.     The breach proximately caused Plaintiff's injury.

195.     Plaintiff suffered damages as a result.

## Count Eight: TEXAS THEFT LIABILITY ACT

196.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

197.     Plaintiff had possessory right to assets.

198.     Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain appropriated

those assets by taking it without Plaintiff's effective consent by the theft of personal property under Texas Penal Code §31.03.

199.    The Defendants unlawful taking was made with the intent to deprive the Plaintiff of the property.

200.    The Plaintiff sustained damage as a result of the theft.

## Count Nine: BREACH OF FIDUCIARY DUTY

201.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

202.    Plaintiff had a fiduciary relationship with Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain .

203.    The Defendants breached that duty to the Plaintiff.

204.    The Defendants breach proximately caused injury to the Plaintiff and/or resulted in a benefit to the Defendants.

## Count Ten: ASSISTING AND PARTICIPATING

205.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

206.    Defendants Dondero, Okada and Ellington's acts and/or omissions accomplished a tortious result as to Plaintiff.

207.    Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain provided substantial assistance to Defendants Dondero, Okada and Ellington in accomplishing the tortious result.

208.    Defendants Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain own conduct, separate from Defendants

Donero, Okada and Ellington's were a breach of the duty to Plaintiff and their participation was a substantial factor in causing the tort against Plaintiff.

209.    These acts caused injury to the Plaintiff.

## Count Eleven: CONSPIRACY

210.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

211.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain were members of a combination of two or more people who object was to accomplish the unlawful acts and omissions against Plaintiff.

212.    The Defendants had a meeting of the minds on the object of that course of action.

213.    One of more of the Defendants committed an unlawful overt act to further course of actions.

214.    The Plaintiff suffered injury as a proximate result of the wrongful act.

## Count Twelve: TEXAS UNIFORM FRAUDULENT TRANSFER ACT (TUFTA)

215.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

216.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain fraudulently transferred the assets with the actual intent to hinder delay and/or defraud the Plaintiff.

217.    Defendants retained possession and control of the assets after the transfer.

218.    Defendants transfer of the assets was concealed.

219.    Defendants had been sued before the transfer was made.

220.    The transfer was of substantially all of the Defendants assets.

221.    Defendants became insolvent shortly after the transfer was made.

**Count Thirteen: IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**

222.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

223.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce and Britain owed Plaintiff an implied duty of good faith and fair dealing regarding the company operating agreement.

224.    The agreement required that Defendants act in a reasonable manner which Defendants failed to do by taking advantage of Plaintiff in a manner Plaintiff did not contemplate when entering the agreement.

225.    Defendants impaired and/or inhibited Plaintiffs right to receive the benefits of the agreement.

226.    Plaintiff suffered injury as a result of Defendants acts and/or omissions.

**Count Fourteen: UNJUST ENRICHMENT (In the alternative)**

227.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

228.    Defendants Dondero, Okada, Ellington, Katz, Hurst, Brown, Leventon, Girard, Collins, Waterhouse, Girard, Honis, Dameris, Dougherty, Walia, Boyce, Britain, Honis as Trustee of Hunter Mountain Trust, Nancy Dondero as Trustee of Dugaboy Trust, Lawrence Tonomura as Trustee of the Okada Trust #1 and Okada Trust #2 and Grant James Scott III as Trustee of the Get Good Trust were unjustly enriched by receiving the assets of the Plaintiff.

229.    Defendant's acquisition of the assets caused a detriment to the Plaintiff.

230.    There was no contract between the parties.

231.    Plaintiff expected to receive the assets from the Defendants.

232.    Defendants accepted, used, and enjoyed the benefit of the assets.

**Count Fifteen: PIERCING THE COPRORATE VEIL**

233.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

234.    The corporate forms of Plaintiff Highland Employee Retention Assets LLC, (during the time Dondero and Okada controlled it) and Highland ERA Management LLC (during the time Dondero and Okada controlled it) should be disregarded because the form was used to perpetuate a fraud, the corporation was organized and operated as a mere tool or business conduit of another and the form was used to protect against the discovery of a crime or to justify a wrong.

235.    As it relates to the operating agreements of the entities Defendants Dondero and Okada caused the corporations to be sued for the purpose of perpetrating an actual fraud and perpetrated an actual fraud on the Plaintiff primarily for Defendant Dondero and Okada's direct personal benefit.

## VI.
## CONDITIONS PRECEDENT

236.    All conditions precedent for the claims above have been performed or have occurred.

## VII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Highland Capital Employee Retention Assets LLC prays that Defendants be cited to appear and answer herein, and for the further relief set forth below:

(1)    Actual damages;

(2)    Exemplary damages;

(3)    Pre and post judgment interest;

(5)    For costs of suit; and

(6)     For such other and further relief to which Plaintiff Highland Capital Employee Retention Assets LLC may be justly entitled.

Dated: February 29, 2024.

                                  Respectfully submitted,

                                  LAW OFFICE OF MATTHEW BOBO, PLLC.


                                  /s/ Matthew W. Bobo
                                  **Matthew W. Bobo**
                                  State Bar No. 24006860

                                  4916 Camp Bowie Blvd.
                                  Fort Worth, Texas 76107
                                  Telephone: (817) 529-0774
                                  Facsimile: (817) 698-9401
                                  mbobo@mwblawyer.com

                                  **ATTORNEYS FOR PLAINTIFF**

Exhibit 11

004004

**Attachments:**

Daugherty -  riginal Answer  ounterclaim  5-22-12.pdf
 reditStrat  Arbitration Award  04  2   1  .pdf
 rusader  Partial and  inal Arbitration Award  03  0   1  and 05  0   1  .pdf
 BS   H  P  Verdict  11  14  1  .pdf

---

**From:**
**Sent:**
**To:**
**Cc:**
**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

**From:**
**Sent:**
**To:**
**Subject:**

Good morning Pat: I have still not received any  email with documents from  you.

If you have been continuing to try to send material, I will need to have my IT folks  get involved.

Please advise, thanks,


**Marc Kirschner**
Senior Managing Director

**Teneo**
**280 Park Avenue, 4th Floor**
**New York, NY 10017**
**O:** +1 (212) 593 2255
**M** +1 (917) 459 6964
**E:** marc.kirschner@teneo.com


**teneo.com**

**From:**
**Sent:**
**To:**
**Subject:**


**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

**From:**
**Sent:**
**To:**

004006

**Subject:**

Hi Pat: I hope this works.

Thanks, for reaching out.

Quinn will contact you in a couple of days.

Please resend your emails to me by reply to this email.

Regards, Marc

**Marc Kirschner**
Senior Managing Director

**Teneo**
**280 Park Avenue, 4th Floor**
**New York, NY 10017**
**O:** +1 (212) 593 2255
**M** +1 (917) 459 6964
**E:** marc.kirschner@teneo.com

  

**teneo.com**

---

This communication is confidential and may contain privileged information, or may otherwise be protected from disclosure. Any unauthorized disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is strictly prohibited. If you are not the intended recipient, please notify the sender that you have received this communication in error and delete and destroy all copies in your possession. Nothing contained in this disclaimer shall be construed in any way to grant permission to transmit confidential information via this firm's e-mail system or as a waiver of confidentiality or privilege. No responsibility or liability is accepted by Teneo for any loss or damage arising in any way from the use of this communication. No representation is being made that the information presented is accurate, current or complete, and such information is at all times subject to change without notice. E-mail messages are not guaranteed to be secure.

Teneo does not provide tax, accounting or legal advice. This e-mail and any attachments are not intended or written to be used, and cannot be used or relied upon, by any taxpayer for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. Each person should seek advice based on its particular circumstances from independent legal, accounting and tax advisors regarding the matters discussed in this communication.

This communication is for informational purposes only. Nothing herein should be construed as an attempt to effect any transaction in, or induce or attempt to induce the sale of, any security. Any such offer or solicitation may only be made by means of delivery of an offering memorandum and would be subject to applicable disclosure, documentation, registration and investor qualification requirements. Investment banking services are conducted by Teneo Capital LLC , including transactions by its subsidiary Teneo Securities LLC, a member of FINRA and SIPC. To view our privacy policy, click here.

---

This communication is confidential and may contain privileged information, or may otherwise be protected from disclosure. Any unauthorized disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is strictly prohibited. If you are not the intended recipient, please notify the sender that you have received this communication in error and delete and destroy all copies in your possession. Nothing contained in this disclaimer shall be construed in any way to grant permission to transmit confidential information via this firm's e-mail system or as a waiver of confidentiality or privilege. No responsibility or liability is accepted by Teneo for any loss or damage arising in any way from

the use of this communication. No representation is being made that the information presented is accurate, current or complete, and such information is at all times subject to change without notice. E-mail messages are not guaranteed to be secure.

Teneo does not provide tax, accounting or legal advice. This e-mail and any attachments are not intended or written to be used, and cannot be used or relied upon, by any taxpayer for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. Each person should seek advice based on its particular circumstances from independent legal, accounting and tax advisors regarding the matters discussed in this communication.

This communication is for informational purposes only. Nothing herein should be construed as an attempt to effect any transaction in, or induce or attempt to induce the sale of, any security. Any such offer or solicitation may only be made by means of delivery of an offering memorandum and would be subject to applicable disclosure, documentation, registration and investor qualification requirements. Investment banking services are conducted by Teneo Capital LLC , including transactions by its subsidiary Teneo Securities LLC, a member of FINRA and SIPC. To view our privacy policy, click here.

# Exhibit 12

004009

**Attachments:**   Ne Point Strategic  pportunities  und  ormerly Highland  redit Strategies  und Managed by Highland  apital SE  Report 0  30 21.pdf
Ne Point Strategic  pportunities  und NH  Dugaboy Dondero SE     RM 4 0  22 21.pdf
Ne Point Residential Trust NXRT Dugaboy SE     RM 4  05 11 21pdf.pdf
Ne Point Strategic  pportunities  und NH  James and Nancy Dondero Dugaboy Trust S  13DA 01 0  21.pdf
Ne Point  redit Strategies  und  Managed by Highland  apital prior to No ation  Dondero  omp SE     RM 4 0  24 21.pdf
Highland  apital Py is No ation to Ne Point from Highland  apital Ne point  redit Strategies  und2 0  0  12.pdf
Highland  apital Lifeboats E plains  alcon E P  Petro ap. 2011pdf.pdf
Tunstall  Dondero attempt to include in Daugherty  ompensation  2011.pdf
Ne point Ad isors  Ad   Dugaboy No ation 2012 03 31 21.pdf
Highland  apital Management  und Ad isors  Ad   Mo ed from Highland 2011 03 31 21.pdf
Tunstall  apital Management  Ad   Highland  apital Management Ser ices  Dondero  kada Surgent 12 01 14.pdf
Sentinel Ne point RE 0  11 1 .pdf
Ne Point Real Estate  und Jan Ne eril Maples S  13D A 0  25 1 .pdf
 alcon E P Ad   Highland  apital Management Ser ices  nc Petro ap Dondero  kada  Britain 03 30 21.pdf
 alcon E P ADV Petro ap Highland  apital Management Ser ices  nc 03 30 1 .pdf
Highland  apital Management Ser ices  nc SE  orm 4 Go ernance Re Thread 55 Dondero  kada 0  25 14.pdf
Go ernance Re Highland  apital Management Ser ices Dondero  kada  wnership  amily Tree.pdf
Go ernance Ltd 40    Go ernment of Bermuda.pdf

---

**From:**
**Sent:**
**To:**
**Cc:**
**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

---

**From:**
**Sent:**
**To:**
**Cc:**

**Subject:**

- 
- 

004010

- 

- 

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

---

**From:**
**Sent:**
**To:**
**Cc:**

**Subject:**

**From:**
**Sent:**
**To:**
**Cc:**

**Subject:**

004011

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

*******************************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

*******************************************************************************************

# Exhibit 13

004013

**Attachments:**    Safety-Kleen_S1_Go_ernance_re_Tunstall_Restoration__rusader__redit_Strat_0__2__12.pdf
Go_ernance_Re_Ltd_40__5_Go_ernment_of_Bermuda.pdf
Highland__apital_Bankruptcy_Le_enton_Deposition_R___GH_Gu_ray_[Go_ernance_Re]_02_15_21.pdf
Ne_Point__redit_Strategies__und_Dugaboy_n_estment_Trust_Go_ernance_Re_Thread_55_Highland__apital
Management_Ser_ices_nc_12_31_14.pdf
Go_ernance_Re_Highland__apital_Management_Ser_ices_Dondero__kada__wnership__amily_Tree.pdf

---

**From:**
**Sent:**
**To:**
**Cc:**
**Subject:**

- c e Co n

- r o

**From:**
**Sent:**
**To:**
**Cc:**

**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

004015

# Exhibit 14

004016

**Attachments:**     Ne point  redit Strategies  und   NXRT   Go ernance Re03_24_15.pdf

---

**From:**
**Sent:**
**To:**
**Cc:**
**Subject:**

e   oint -  overnance  e -  ighland  apital  anagement  ervices Inc -      wor ing in
tandem - pg     -

**From:**
**Sent:**
**To:**
**Cc:**

**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

004017

**From:**
**Sent:**
**To:**
**Cc:**

**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

004018

# Exhibit 15

004019

**From:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Sent:** Friday, August 20, 2021 5:01 PM
**To:** marc.kirschner@teneo.com <marc.kirschner@teneo.com>
**Cc:** James Seery <jpseeryjr@gmail.com>
**Subject:** Brad Ross - Anonymous threats from HCM sources (see bottom)

**From:** Brad Ross <j.bross@msn.com>
**Sent:** Tuesday, January 28, 2020 5:15 PM
**To:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Subject:** Re: Lunch

Anonymous..Pat, as you well know, that culture toxic..

Brad Ross
972-322-3654


> On Jan 28, 2020, at 5:00 PM, Patrick Daugherty
> <pdaugherty@glacierlakecap.com> wrote:
>
>
> Also, do you know who jacksonhole12 is or is that a laughable anonymous threat?
> Regardless, they are scared.
>
> **Patrick H Daugherty, Esq.**
> President and Chief Investment Officer
>
> **Glacier Lake Capital Advisors**
> 3710 Rawlins St., Suite 830, Dallas, TX 75219
> **(t)** +1 214.932.9140 **(m)** +1 972.679.7487
> **(e)** pdaugherty@glacierlakecap.com

**From:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Sent:** Tuesday, January 28, 2020 4:43 PM
**To:** Brad Ross <j.bross@msn.com>
**Subject:** Re: Lunch

Huh? I haven't even put you in the book yet. The only person I spoke to about getting your contact information was Mike Pleumer.

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
3710 Rawlins St., Suite 830, Dallas, TX 75219
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

---

**From:** Brad Ross <j.bross@msn.com>
**Sent:** Tuesday, January 28, 2020 4:34 PM
**To:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Subject:** Fwd: Lunch

I'm on a flight to Orlando.  I just received this?!???

Brad Ross
972-322-3654

Begin forwarded message:

> **From:** "jacksonhole12@protonmail.com"
> <jacksonhole12@protonmail.com>
> **Date:** January 28, 2020 at 4:21:19 PM CST
> **To:** "J.bross@msn.com" <J.bross@msn.com>
> **Subject: Fw:  Lunch**
> **Reply-To:** jacksonhole12@protonmail.com

> Sent with ProtonMail Secure Email.

> ------- Original Message -------
> On Tuesday, January 28, 2020 4:07 PM,

004021

\<jacksonhole12@protonmail.com\> wrote:

Brad, I would be very careful.  The tentacles of HCM are
still long and will sting.

Sent with ProtonMail Secure Email.

# Exhibit 16

004023

**Attachments:**        Highland  apital   haritable DA   How it works.pdf
                        The Super-Rich Are Stockpiling    ealth in Black-Bo    harities - Bloomberg.pdf
                        Acis Bankruptcy  Transcript-  ull_03_23_1 .pdf
                        Acis Bankruptcy  Transcript  ncludes Dondero   ross  nder Seal_03_23_1 .pdf
                        Dondero   haritable DA   GP LL   Delaware Registration_10_25_11.pdf
                        Dondero   haritable DA    ayman Registry.pdf
                        Highland   apital  Ellington-Le enton  -Dondero Depositions re control of DA  .pdf

---

**From:**
**Sent:**
**To:**
**Cc:**
**Subject:**


**From:**
**Sent:**
**To:**

**Cc:**

**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
3710 Rawlins St., Suite 830, Dallas, TX 75219
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

# Exhibit 17

004026

**Attachments:**  H_T_S-1_10_30_0_.pdf
       Highland_inancialPartners__orm S-1_04_30_0_.pdf
       Highland__haritable DA__H_L__NAV_alculation_Public_Acis_04_30_1__NAV.pdf
       Acis Bankruptcy_Dondero Testimony that Acis__ee Stream Sale was Sham and__nwind_03_23_1_.pdf
       Highland__apital Bankruptcy__haritable DA__Disclosures abridged E_hibits_0__0__21.pdf
       Highland__apital Bankruptcy_Transcript__alPERS and MGM Transaction_03_04_20_2_.pdf
       Highland__apital Bankruptcy__haritable DA___Highland re MGM_04_12_21.pdf

**From:**

**Sent:**

**To:**

**Cc:**

**Subject:**

004027

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

Exhibit 18

004029

**Attachments:**  Highland Bankruptcy   haritable DA   H  L    NAV   alculation  04  30  1  .pdf
NVR  Greenbriar    L     Ltd   201   10  22.pdf
PR  Liberty    L     Ltd  201   10  22.pdf
TR  Liberty    L     Ltd  201   0   30.pdf
NVR  Brentwood    L     Ltd   201   10  22.pdf
NVR  Grayson    L   201   10  22.pdf
NVR  Rockwall    L     Ltd   201   10  23.pdf
PR  Gleneagles    L    Ltd   201   10  22.pdf
TR  Gleneagles    L     Ltd   201   0   30.pdf

**From:**

**Sent:**

**To:**

**Cc:**

**Subject:**

**From:**

**Sent:**

**To:**

**Cc:**

**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
3710 Rawlins St., Suite 830, Dallas, TX 75219
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

# Exhibit 19

004032

| **Attachments:** | Highland _apital_E_ecuti_es_PR benefits from DA_4_12_01_1_.pdf |
|---|---|
| | Highland DA__haritable Gi_ing_Brag Sheet.pdf |
| | _haritable DA__H_L__reation_rganization_hart_Mark Patrick Spin.pdf |

---

**From:**
**Sent:**
**To:**
**Cc:**
**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**

004033

**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

**From:**
**Sent:**
**To:**

**Cc:**

**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
3710 Rawlins St., Suite 830, Dallas, TX 75219
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

# Exhibit 20

004035

**Attachments:**    Highland _apital Bankruptcy _laim Assignment to _P_M by _aterhouse_03_24_21.pdf.pdf
                    _P_M LL__formation Te_Sec of St_Ellington_Highgate__onsulting_02_1__21.PD_
                    Ellington-_P_M-Highgate-Sky_iew__amily Tree_2021.pdf

**From:**

**Sent:**

**To:**

**Cc:**

**Subject:**

CPC      C
6 0    . Park _lvd.  _te. 306 P    3 2
Plano      7_093
_mail_CPC___C__@gmail.com

3100 Independence Park _ay _te. 311
Plano    7_07

004036

- 

- 
- 
- 
- 
- 

- 

President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

004037

Exhibit 21

**Attachments:**      Ne_Point_Ne_point Real Estate Strategies__und_Sentinel 13D_0__11_1_.pdf
                       Ne_point Real Estate Strategies__und_Highland sale to Sentinel_13D_0__11_1_.pdf
                       Ne_Point_Ne_point Real Estate Strategies__und_Highland sale to Sentinel_13D_0__11_1_.pdf
                       Andrew Dean_Maples__ayman_slands.pdf
                       _hristopher__atler_Maples__ayman_slands.pdf

---

**From:**
**Sent:**
**To:**
**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

---

**From:**
**Sent:**
**To:**
**Subject:**

004039

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

# Exhibit 22

004041

**Attachments:**  Acis Bankruptcy_Transcript_Ellington and SAS_02_0__1_.pdf
Highland__apital Bankruptcy_Ellington_Deposition_02_1__21.pdf
SAS Asset Reco_ery Ltd__ayman_slands Registry_02_1__21.pdf
Summit Management Ltd__ullinane_Egglishaw_.pdf
Highland__apital_ADV_03_20_20.pdf

**From:**
**Sent:**
**To:**
**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
(t) +1 214.932.9140 (m) +1 972.679.7487
(e) pdaugherty@glacierlakecap.com

**From:**
**Sent:**
**To:**
**Subject:**

t  t eS S   t orm  n    o     oc te   t  t

- 
- 
- 
- 
- 

- 
- 

- 

- 
- 
- 
-

- 

- 

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

004044

# Exhibit 23

**Attachments:**    _reditStrat Arbtration Award_Ellington _orbusier_04_0 _1 .pdf
     _orbusier Ltd _ ayman_slands Registry_12_12_12 to 02_1 _21.pdf
     Pollack Ltd _ ayman_slands Registry_12_12_12 to 02_22_21.pdf
     SAS Holdings SPV _ LTD _ ayman_slands Registry_02_13_15 to 02_21_21.pdf
     SAS Loan Ser ices Ltd _ ayman_slands Registry_12_12_15 to 02_1 _21.pdf
     Patton Ltd _ ayman_slands Registry_12_05_21 to 04_1 _1 .pdf
     Nimitz Ltd _ ayman_slands Registry_12_05_12 to 04_1 _1 .pdf
     Mustang Asset Reco ery _ ullinane_Dondero_12_21_1 .pdf

---

**From:**

**Sent:**

**To:**

**Cc:**

**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

---

**From:**

**Sent:**

**To:**

**Cc:**

**Subject:**

t  t e   rc   tr n  ct on

---

- 

- 

-

- 

- 

_____

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

004048

# Exhibit 24

004049

**Attachments:**  Summit Management Ltd   ullinane  Egglishaw  .pdf
Ne  Point Real Estate   und  Jan Ne  eril  Maples  S   13DA  0    25  1  .pdf
Sentinel Ne  point RE  0    11  1  .pdf
   ade Kenny    alderwood    aymans  Sentinel Board  0    2    21.pdf

---

**From:**
**Sent:**
**To:**
**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

---

**From:**
**Sent:**
**To:**
**Subject:**

- 
- 

- 

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487

004050

**(e)** pdaugherty@glacierlakecap.com

# Exhibit 25

004052

**Attachments:**

Redcoat Enterprises LL    ormation  Diorio  Ellington  Te   Sec of St  12  01  14.pdf
JPS Partners LL    ormation  Ellington  T  Sec of St  05  14  14.PD
MMB  V LL    ormation  Ellington  T  Sec of St  05  14  14.PD
 rigate Enterprises LL    ormation  Ellington  T  Sec of St  05  13  14.PD
 hitesnake Management LL    ormation  Ellington  T  Sec of St  05  23  13.PD
 ebra Land    attle  ormation  Ellington  T  Sec of St  12  30  12.PD
Voiture Enterprises LL    ormation  Ellington  T  Sec of St  02  12  13.PD
 DR Solutions LL    ormation  Ellington  T  Sec of St  11  12  12.PD
 reekside Associates LL    ormation  Ellington  T  Sec of St  0   0    11.PD
 ebra Land    attle  Ta   Diorio-Ellington  EV  T  Sec of St  05  1    1  .PD
 reekside Associates LL  Ta   Diorio-Ellington  EV  T  Sec of St  05  1    1  .pdf
 DR Solutions LL    Amendment  Diorio  Greystone  Ellington  T  Sec of St  12  2    1  .PD
Voiture Enterprises LL  Ta   Diorio-Ellington  EV  T  Sec of St  05  1    1  .PD
 hitesnake Management LL  Ta   Diorio-Ellington  EV  T  Sec of St  05  1    1  .PD
 rigate Enterprises LL  Ta   Diorio-Ellington  EV  T  Sec of St  05  1    1  .PD
JPS Partners LL    Greystone Ad isors   EV  Ne ada  Te   Sec of St.  Ta es  Matt Diorio  05  1    1  .PD
MMB  V LL  Ta   Diorio-Ellington  EV  T  Sec of St  05  1    1  .PD
Redcoat Enterprises LL  Ta   Diorio-Ellington  EV  T  Sec of St  05  1    1  .PD
 ebra Land    attle  Amendment  Diorio  Greystone  Ellington  T  Sec of St  12  2    1  .PD
 reekside Associates LL    Amendment  Diorio  Greystone  Ellington  T  Sec of St  12  2    1  .PD
 DR Solutions LL    Amendment  Diorio  Greystone  Ellington  T  Sec of St  12  2    1  .PD
Voiture Enterprises LL    Amendment  Diorio  Greystone  Ellington  T  Sec of St  12  2    1  .PD
 hitesnake Management LL    Amendment  Diorio  Greystone  Ellington  T  Sec of St  12  2    1  .PD
 rigate Enterprises LL    Amendment  Diorio  Greystone  Ellington  T  Sec of St  12  2    1  .PD
JPS Partners LL    Greystone  Te   Sec of St.  Amend Ellington to Di  rio  12  2    1  .PD
MMB  V LL    Amendment  Diorio  Greystone  Ellington  T  Sec of St  12  2    1  .PD
Redcoat Enterprises LL    Amendment  Diorio  Greystone  Ellington  T  Sec of St  12  2    1  .PD
Greystone Ad isors LL    ormation   onstance Ellington  Te   Sec of St  01  04  1  .PD
Greystone Ad isors LL    Te   Sec of St.  Ta es   onnie Ellington  Di  rio  05  10  1  .PD
 EV Holdings LL    Di  rio   onni Ellington  Da id Kramer  Ne   Sec of St  As of 0   2   21.pdf
 onnie Ellington    bituary  11  10  20.pdf
Highland  apital  SAS  Dilip Massand  Dubai  05  1    1  .pdf
TT3 Partners    ormation  Di  rio   kolita  T  Sec of St  10  1    20.PD
TT3 Partners LL    Di  rio   kolita  Summary  TX Sec of St  As of  05  22  21.pdf
Highland  Law3  0   redit Suisse Decepti e Loan   ight  03  0    1  .pdf
BSN Ventures LL    ormation  Reid  Palmer  Ellington  T  Sec of State  0   04  20.PD
Ellington  Reid   ollins Tsai   lose Relationship  02  14  21.pdf
Millennium Risk Management LL    ormation  Ne   Sec of St  01  02  20.pdf
 aterfall  ealth LL    ormation  Sheri Ellington  Ne   Sec of St  11  21  1  .pdf
 aterfall  ealth  nc  Del Sec of St   ormation  0   14  1  .pdf
Sheri Ellington    inacial Planner  Estate  Ne ada  02  0    21.pdf
Marcia Ellington  Maslow  Linkedin  0   11  21.pdf

---

**From:**
**Sent:**
**To:**
**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

**From:**
**Sent:**
**To:**
**Subject:**

- ebr   n   C tt e   C

- Cree   e   oc te   C

-   So ut on   C

-  o ture  nter r e   C

-    te n  e   n   ement  C

- Fr  te  nter r e   C

- S   rtner   C

- rtner   C

- e co t  nter  r  e   C

- re  tone    or   C

- C   o  n   C

- S    enture    C

- ort    e t    enture    C

- enn um        n    ement    C

**ter    e   t   C**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

# Exhibit 26

004058

**Attachments:**   Ne_Point_Ne_point Real Estate Strategies _und_Sentinel 13D_0_ _11_1_.pdf
Ne_point Real Estate Strategies_ _und_Highland sale to Sentinel_13D_0_ _11_1_.pdf
Ne_Point_Ne_point Real Estate Strategies _und_Highland sale to Sentinel_13D_0_ _11_1_.pdf
Andrew Dean_Maples_ _ayman_slands.pdf
_hristopher_ _atler_Maples_ _ayman_slands.pdf

**From:**
**Sent:**
**To:**

**Cc:**
**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

**From:**
**Sent:**
**To:**
**Subject:**

004059

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

004060

# Exhibit 27

004061

**Attachments:**     Highland _apital Bankruptcy _Dondero Deposition _DA _and the the Dean _oods E_ecuit_e_0__01_21_Re_iewed
and__ommented on the__ompliant prior to filing _0__0__21.pdf
Highland _apital _Matt Di_rio _Analyst Linked_n_11_03_1_.pdf
Highland _apital _Matt Di_rio _Linked_n_01_01_20.pdf
Highland _apital _Matt Di_rio _Sky_iew _Managing Director _Linkedin05_04_21.pdf
Highland _apital _Matt Di_rio _Pri_ate E_uity _Linkedin_03_1__21.pdf
Sentinel Reinsurance Ltd __ayman _slands Registry _Directors Diorio_Ne_eril_Austin as of _02_1__21.pdf
Sentinel Reinsurance Ltd _Directors Diorio_Kenny_McDonald _0__25_21.pdf
Acis Bankruptcy _Transcript Ellington Declares__annot Re_eal _ayman _wnesrhip or Jail_02_0__1_.pdf
Mustang Asset Reco_ery __ullinane_Dondero_12_21_1_.pdf
Sentinel Re Holdings __ayman _slands Registry _Merged and Struck as of _0__1__1_.pdf
SAS Holdings SPV _LTD __ayman _slands Registry _Data As of _02_13_15 to 02_21_21.pdf
Highland _apital Bankruptcy _Le_enton _Deposition _R__GH_02_15_21.pdf
SAS __Groupo Me_ico _Ellington __r_ing listed as _nterested Party_05_0__14.pdf
Highland _apital Bankruptcy _Ellington Deposition _02_1__21.pdf
Nimitz Ltd __ayman _slands Registry _12_05_12 to 04_1__1_.pdf
Patton Ltd __ayman _slands Registry _12_05_21 to 04_1__1_.pdf
SAS __Grupo Me_ico _Memorandum including__ootnote on Ellington_12_1__14.pdf
Highland _apital _ADV_03_20_20.pdf
NS_1__ayman _slands Registry _Dissol_ed as of _03_15_1_.pdf
Sebastian __larke Ltd __ayman _slands Registry _Data as of _05_0__21.pdf
SX Management Ltd __ayman _slands Registry _Data as of _04_14_21_.pdf
SS Holdings Ltd __ayman _slands Registry _Data as of _04_1__21.pdf

**From:**
**Sent:**
**To:**
**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

**From:**
**Sent:**
**To:**
**Subject:**

**From:**

**Sent:**

**To:**

**Subject:**

```
18        Q.     And did he tell you who those
19   candidates were?
20            MR. TAYLOR:  Objection, hearsay.
21        A.     He did at the time.  I can't
22   remember who they were.  One was -- one was a
23   former Dean Foods executive, I believe; and the
24   other was an offshore sole practitioner.
```

  tt   r o

o n Cu  n  ne                            n  Summ t   n  ement

```
4       Q     Has -- have you had any communications
5   with the directors since your e-mail address was shut
6   off
7       A     I ve never communicated with the
8   directors at any point, ever.  I don t even know --
9   one of their names is  ohn, is all I know.
```

-

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

004064

# Exhibit 28

004065

**From:** Montgomery, Paige <pmontgomery@sidley.com>
**Sent:** Friday, December 1 , 2021 10:14 AM
**To:** Patrick Daugherty <pdaugherty@glacierlakecap.com>    ewman, Deborah (   T R  AL
@   I     MA    L.C  M ) <deborahnewman@ uinnemanuel.com>
**Cc:**  irschner, Marc (    -SIDL    @T       .C  M) <marc.kirschner@teneo.com> James Seery
<jpseeryjr@gmail.com>
**Subject:** R : CPCM - Highgate Consulting - Skyview -  llington

Thanks Pat.  Merry Christmas and Happy Holidays

> **From:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
> **Sent:** Friday, December 1 , 2021 10:01 AM
> **To:** Montgomery, Paige <pmontgomery@sidley.com>    ewman, Deborah (   T R  AL
> @   I     MA    L.C  M ) <deborahnewman@ uinnemanuel.com>
> **Cc:**  irschner, Marc (    -SIDL    @T       .C  M) <marc.kirschner@teneo.com> James
> Seery <jpseeryjr@gmail.com>
> **Subject:** Fw: CPCM - Highgate Consulting - Skyview -  llington
>
>  oing through files and could not remember if I had forwarded this data.
>
> **Patrick H Daugherty, Esq.**
> President and Chief Investment Officer
>
> **Glacier Lake Capital Advisors**
> **(t)** +1 214.932.9140 **(m)** +1 972.679.7487
> **(e)** pdaugherty@glacierlakecap.com
>
> **From:** Patrick Daugherty
> **Sent:**  ednesday, March 24, 2021 3:28 PM
> **To:** James Seery <jpseeryjr@gmail.com>
> **Subject:** CPCM - Highgate Consulting - Skyview -  llington
>
> - CPCM recently ac uired the claims of  llington, Leventon, Sevilla and

004066

aterhouse

- I believe this was done to circumvent the gatekeeper function of the plan which is limited to  Parties
- See relevant Te  as Secretary of State and Delaware Secretary of State filings attached
- Highgate Consulting lists the same address (a  PS mailbo  and shipping office) as several entities associated with  llington through his mother's name, Connie or Constance  llington. She is recently deceased but has engaged in several businesses with Matt Diorio (recently terminated by the Debtor) that were initially created by Scott  llington
- I visited 3100 Independence Parkway Suite 311 and learned that there are over 20 entities allocated to this  mailbo  . I believe you will find entities associated with SAS doing business through this mailbo .
- The Debtor should subpoena this  PS station to find all entities allocated to this  mailbo  . Importantly, a  PS station is not part of the  P Postal system.

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

004067

# Exhibit 29

004068

---

**From:** Montgomery, Paige <pmontgomery@sidley.com>
**Sent:** Friday,    ctober 1, 2021 8:3   AM
**To:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Subject:** R  : Highland background reading - additions for Crusader Redeemer Committee

Thanks Pat.

Sent with BlackBerry    ork
www.blackberry.com

---

**From:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Date:**    riday, Oct 01, 2021, 8:37 AM
**To:** Montgomery, Paige <pmontgomery@sidley.com>,    ewman, Deborah E  TER  A   @    I    EMA     E .COM <deborahnewman@  uinnemanuel.com>
**Cc:**    irschner, Marc    O  -SID  E   @TE  EO.COM <marc.kirschner@teneo.com>, Bhavaraju,    arthik    O  -SID  E
@TE  EO.COM <karthik.bhavaraju@teneo.com>, James Seery <jpseeryjr@gmail.com>
**Subject:**   w: Highland background reading - additions for Crusader Redeemer Committee

F  I - Background

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

---

**From:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Sent:** Thursday, January   , 2020 2:52 PM
**To:** andrew.clubok@lw.com <andrew.clubok@lw.com>
**Cc:** Thomas    ebler <tuebler@mdsulaw.com>
**Subject:** Fw: Highland background reading - additions for Crusader Redeemer Committee

F  I - last of the background.

I will send you additional analysis that I have prepared by accessing public information. It should be helpful in e plaining how assets traveled out of the estate and where they are now. The Creditors should be focused on fraudulent conveyance (dating back 10 years because of the IRS objection from 2008), Corporate    pportunity breach of fiduciary duties under Delaware and Te as law, alter ego, piercing the corporate veil, and conspiracy to commit fraud.

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
3710 Rawlins St., Suite 830, Dallas, TX 75219
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

---

004069

**From:** Patrick Daugherty
**Sent:**  ednesday,  ovember 13, 201   :35 AM
**To:** MCL M   T @SIDL  .C  M <MCL M   T @SIDL  .C  M> Tully, Conor <Conor.Tully@FTIConsulting.com>
**Cc:** daniel.h.o'brien@fticonsulting.com <daniel.h.o'brien@fticonsulting.com>  earnestiena.cheng@fticonsulting.com
<earnestiena.cheng@fticonsulting.com>
**Subject:** Highland background reading - additions for Crusader Redeemer Committee

Please see additional information regarding how the Crusader Redeemer committee became a creditor. Although the court
filings are substantially redacted, the Credit Strategies materials provide a parallel e  planation with many of the same
methods of misconduct regarding principal transactions (Cornerstone, etc). This should provide helpful information on
when the Crusader Claim actually arose.


**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
3710 Rawlins St., Suite 830, Dallas, TX 75219
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com


This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

Exhibit 30

004071

---

**From:** Montgomery, Paige <pmontgomery@sidley.com>
**Sent:** ednesday, September 2 , 2021 1:54 PM
**To:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Subject:** R : Dondero-Highland- e Bank: alter ego evidence and year-end ta scheming

Thanks. o word on the Rothstein depo yet.

---

**From:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Sent:** ednesday, September 2 , 2021 10:3 AM
**To:** Montgomery, Paige <pmontgomery@sidley.com> ewman, Deborah ( T R AL
@ I MA L.C M ) <deborahnewman@ uinnemanuel.com>
**Cc:** irschner, Marc ( -SIDL @T .C M ) <marc.kirschner@teneo.com> Bhavaraju,
arthik ( -SIDL @T .C M ) <karthik.bhavaraju@teneo.com> James Seery
<jpseeryjr@gmail.com>
**Subject:** Dondero-Highland- e Bank: alter ego evidence and year-end ta scheming

Paige,

Pursuant to your re uest regarding alter-ego matteres, please see attached email and
documents (written or directed by Dondero) that show how Dondero created Barrier
Advisors (now merged with e Bank ealth Advisors aka e Bank Capital Advisors
aka Barrier Advisors). Also, see an e ample of how fees from portfolio companies were
directed to e Bank. The abbreviations are for the following:

- HCM - Highland Capital Management, LP
- JH - John Honis
- B Advisory - Barrier Advisors ( e Bank ealth Advisors aka e Bank Securities
  Inc)
- B P - was part of Barrier Advisors and moved to Highland Capital
  Management LP as part of the private e uity operations group purusant to the
  marketing of Restoration Capital Funding (RCP) in late 200 2008

- Moll - Moll Industries (a portfolio company that later changed its name to
  e Pack at the direction of Dondero and Honis

-

I also included emails that show how e Bank worked at the direction of Highland Dondero to originate loans (also includes reference to HFC, owned by HFP). See sse reference.

Finally, I included a December email that shows Dondero directing asset transfers among varies entities controlled by Highland to reduce collective ta liabilites. This was an annual occurence in December (where kada was very much aware) and it is consistent with his testimony in the Acis bankruptcy where he testified *"What this transaction was and was meant to be and was never anything more was a tax strategy to reduce taxes",* Acis Bankruptcy Transcript, March 23, 2018 pg 134. Dondero as a matter of practice repeatedly invaded the alleged independence of the entities he controlled directly or indirectly to suit his purposes.

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

# Exhibit 31

**Attachments:**    Ne Point Strategic  pportunities  und  ormerly Highland  redit Strategies  und Managed by Highland  apital SE  Report 0  30 21.pdf
Ne Point Residential Trust  und NH  Dugaboy Dondero SE     RM 4 0  22 21.pdf
Ne Point Residential Trust NXRT Dugaboy SE     RM 4  05 11 21pdf.pdf
Ne Point Strategic  pportunities  und NH  James and Nancy Dondero Dugaboy Trust S  13DA 01 0  21.pdf
Ne Point  redit Strategies  und Managed by Highland  apital prior to No ation Dondero  omp SE     RM 4 0  24 21.pdf
Highland  apital Py is No ation to Ne Point from Highland  apital Ne point  redit Strategies  und2 0  0  12.pdf
Highland  apital Lifeboats E plains  alcon E P Petro ap  2011pdf.pdf
Tunstall  Dondero attempt to include in Daugherty  ompensation  2011.pdf
Ne point Ad isors Ad   Dugaboy No ation 2012 03 31 21.pdf
Highland  apital Management  und Ad isors Ad   Mo ed from Highland 2011 03 31 21.pdf
Tunstall  apital Management Ad   Highland  apital Management Ser ices Dondero   kada Surgent 12 01 14.pdf
Sentinel Ne point RE 0   11 1  .pdf
Ne Point Real Estate  und Jan Ne eril Maples S  13D A 0  25 1  .pdf
 alcon E P Ad   Highland  apital Maangement Ser ices nc Petro ap Dondero   kada Britain 03 30 21.pdf
 alcon E P ADV Petro ap Highland  apital Management Ser ices nc 03 30 1  .pdf
Highland  apital Management Ser ices nc SE   orm 4 Go ernance Re Thread 55 Dondero   kada 0  25 14.pdf
Go ernance Re Highland  apital Management Ser ices Dondero   kada  wnership  amily Tree.pdf
Go ernance Ltd 40     Go ernment of Bermuda.pdf

**From:**

**Sent:**

**To:**

**Cc:**

**Subject:**

- 
- 
- 

- 

004075

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

---

**From:**
**Sent:**
**To:**
**Cc:**

**Subject:**

**From:**
**Sent:**
**To:**
**Cc:**

**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

*************************************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

*************************************************************************************************

# Exhibit 32

004077

**Attachments:**    Highland   apital Bankruptcy  Dondero Deposition  DA   and the the Dean   oods E  ecuit  e  0   01 21 Re  iewed
and   ommented on the   ompliant prior to filing   0   0    21.pdf
Highland   apital  Matt Di  rio  Analyst Linked n  11  03  1  .pdf
Highland   apital  Matt Di  rio  Linked n  01  01  20.pdf
Highland   apital  Matt Di  rio  Sky  iew  Managing Director  Linkedin05  04  21.pdf
Highland   apital  Matt Di  rio  Pri  ate E  uity  Linkedin  03  1    21.pdf
Sentinel Reinsurance Ltd    ayman   slands Registry  Directors  Diorio  Ne  eril  Austin as of  02  1    21.pdf
Sentinel Reinsurance Ltd  Directors  Diorio  Kenny  McDonald  0    25  21.pdf
Acis Bankruptcy  Transcript  Ellington Declares   annot Re  eal   ayman   wnesrhip or Jail  02  0    1  .pdf
Mustang Asset Reco  ery    ullinane  Dondero  12  21  1  .pdf
Sentinel Re Holdings   ayman   slands Registry  Merged and Struck as of  0   1    1  .pdf
SAS Holdings SPV    LTD    ayman   slands Registry  Data As of  02  13  15 to 02  21  21.pdf
Highland   apital Bankruptcy  Le  enton  Deposition  R    GH  02  15  21.pdf
SAS    Groupo Me  ico  Ellington   r  ing listed as   nterested Party  05  0    14.pdf
Highland   apital Bankruptcy  Ellington Deposition  02  1    21.pdf
Nimitz Ltd    ayman   slands Registry  12  05  12 to 04  1    1  .pdf
Patton Ltd    ayman   slands Registry  12  05  21 to 04  1    1  .pdf
SAS    Grupo Me  ico  Memorandum including   ootnote on Ellington  12  1    14.pdf
Highland   apital  ADV  03  20  20.pdf
NS 1    ayman   slands Registry  Dissol  ed as of  03  15  1  .pdf
Sebastian   larke Ltd    ayman   slands Registry  Data as of  05  0    21.pdf
SX Management Ltd    ayman   slands Registry  Data as of  04  14  21  .pdf
SS Holdings Ltd    ayman   slands Registry  Data as of  04  1    21.pdf

---

**From:**

**Sent:**

**To:**

**Cc:**

**Subject:**

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

---

**From:**

**Sent:**
**To:**
**Cc:**

**Subject:**


**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

_____

**From:**
**Sent:**
**To:**
**Subject:**


```
18        Q.    And did he tell you who those
19   candidates were?
20              MR. TAYLOR:  Objection, hearsay.
21        A.    He did at the time.  I can't
22   remember who they were.  One was -- one was a
23   former Dean Foods executive, I believe; and the
24   other was an offshore sole practitioner.
```


   tt   r o

 o n Cu  n  ne                    n  Summ t    n  ement

4      Q    Has -- have you had any communications
5    with the directors since your e-mail address was shut
6    off
7        A    I ve never communicated with the
8    directors at any point, ever.  I don t even know --
9    one of their names is  ohn, is all I know.

-

004080

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

Exhibit 33

004082

**From:** Montgomery, Paige <pmontgomery@sidley.com>
**Sent:** Tuesday, September 21, 2021   :03 PM
**To:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Subject:** R  : Highland Capital Management LP Asset Holdings - as of May 200

arthik Bhavaraju s email is: karthik.bhavaraju@teneo.com

> **From:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
> **Sent:** Monday, September 20, 2021 8:18 PM
> **To:** Montgomery, Paige <pmontgomery@sidley.com>    ewman, Deborah (  T  R  AL
> @   I      MA     L.C  M ) <deborahnewman@  uinnemanuel.com>
> **Cc:** James Seery <jpseeryjr@gmail.com>    irschner, Marc (     -SIDL    @T       .C  M)
> <marc.kirschner@teneo.com>
> **Subject:** Highland Capital Management LP Asset Holdings - as of May 200
>
> Paige and Deborah,
>
> As we discussed, here is the list of assets owned by Highland at the time I was
> negotiating with Scotia and BofA regarding the amendment to the Highland credit
> facility in 200  . Recall that the banks were not secured at the time of the default in 3
> 2008. This list represents all assets owned by Highland that were subse  ently (i)
> pledged to the banks as collateral  (ii) allocated to the Highland   mployee Retention
> Asset fund (H  RA) to retain key employees (specifically to e  clude Dondero and
>   kada)through a 3 year cliff vest  or (iii) allocated to Dondero and    kada pursuant to
> the amendment negotiations. I recall that many of these assets were transferred to
>   e  Point Advisors, Highland Capital Management Fund Advisors, Highland Capital
> Management Services, Inc, etc after Highland sold its   uropean CL    business to
> Carlysle in early 2012 and used the proceeds to repay the banks thereby obtaining a
> release of the the pledges in the process. However, Dondero,   kada,   llington and
> others were fullly aware that the liability to Crusader Fund, Credit Strat Fund,   BS  HFP,
> and me were unresolved at the time.

004083

Many of these assets had their names changed or were merged into other entities that are not obvious on their face. Importantly,  risten Hendricks and several other people from the accounting team were used to transfer these assets and a search of their names with the assets should lead you to time and destination of the transfers (to pinpoint the harm to Highalnd). I have discovery production from my Te  as trial to provide emails to the e  ent they were subse  uently deleated or destroyed. In addition, my personal computer with Highland emails from 200  to 2011 are held by my counsel pursuant to cour ordered retention but I am not permitted to access the information pursuant to the injunction. I am willing to work with Highland to access this data for the purpose of assisting the estate to pursue its claims.

 ery importantly, do not be discouraged by the low values as these assets were marked in June of 200  when the  reat Financial Crisis was at its peek. Focus on the unit ownership that the Highland estate would be entitled to had these assets not been diverted to affiliates of Dondero,  kada and  llington pursuant to their plan to strip Highland of its assets.   ere it not for these transfers, the estate would have more value to compensate its creditors that have been pursuing their claims for over 10 years - instead of them being transfered pursuant to a delay strategy to Dondero,  kada and  llington affiliates.

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

004084

Case 3:25-cv-01876-K   Document 35-4   Filed 06/13/25   Page 638 of 1195   PageID 10351

# Exhibit 34

004085

**From:** Montgomery, Paige <pmontgomery@sidley.com>
**Sent:** Tuesday, September 21, 2021 3:4  PM
**To:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Subject:** F   :   ovation of the Highland Credit Strategies Fund management contract

F  I-you sent this one to counsel for the individual former employees (Dandenau) and not to Deborah
   ewman at   uinn.

I have been on back to back calls.  Can I call you between 4:30 and 5?

**From:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Sent:** Monday, September 20, 2021 8:4  PM
**To:** Montgomery, Paige <pmontgomery@sidley.com>  Debra A. Dandeneau
<debra.dandeneau@bakermcken ie.com>
**Cc:** James Seery <jpseeryjr@gmail.com>   irschner, Marc (      -SIDL   @T       .C  M)
<marc.kirschner@teneo.com>
**Subject:**    ovation of the Highland Credit Strategies Fund management contract

Recall that one of the   life-boats   or   brands   created after the   BS litigaiton commenced was
for Highland's retail management contractc. This entity received Highland retail management
contracts in December 2011 to divert Highland's retail management business and was intially
called Py  is - owned by Highland Capital Managements Services Inc (   5  , as I recall) and Joe
Dougherty (25  , as I recall). It then transferred those contracts to    e  Point Advisors via the
   ovation   transaction in June 2012. The Highland Credit Strategies Fund then e  ecuted a
name change to   e  Point Credit Strategies Fund (    HF  ).    ote that there was also a transfer
of the Highland Funds in late 2011 that would later be known as HFR    to Highland Capital
Management Services, Inc . As you know,    e  Point Advisors is owned by Dondero and the
Dugaboy trust and the    ovation purported to cut    kada out - much to his chagrine.
Accordingly, Dondero promised to   make it up   to   kada with other assets (as testified by
   reg Stuecheli, former Portfolio Manager of the Highland Credit Strategies Fund).    hen we
talk about    kada, it is important to note that despie him not being directy listed in emails, he

004086

was aware of this and many other transactions (like Acis) and did nothing as Highland's senior officer and Chief Investment   fficer to prevent the bad acts. To the contrary, he typically turned a blind eye so long as he was compensated for his share.

**Patrick H Daugherty, Esq.**
President and Chief Investment Officer

**Glacier Lake Capital Advisors**
**(t)** +1 214.932.9140 **(m)** +1 972.679.7487
**(e)** pdaugherty@glacierlakecap.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# Exhibit 35

004088

**From:** Montgomery, Paige <pmontgomery@sidley.com>
**Sent:** Friday, September 10, 2021 4:52 PM
**To:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
**Subject:** R  : Are you available to chat?

Can I call you in the ne t 10 minutes?

> **From:** Patrick Daugherty <pdaugherty@glacierlakecap.com>
> **Sent:** Friday, September 10, 2021 4:50 PM
> **To:** Montgomery, Paige <pmontgomery@sidley.com>
> **Subject:** Are you available to chat?
>
>  ou guys should follow up on the deposition of  ate Irving. She is an integral player in
> the Cayman entities.
>
> **Patrick H Daugherty, Esq.**
> President and Chief Investment Officer
>
> **Glacier Lake Capital Advisors**
> **(t)** +1 214.932.9140 **(m)** +1 972.679.7487
> **(e)** pdaugherty@glacierlakecap.com

This e-mail is sent by a law firm and may contain information that is privileged or
confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify
us
immediately.

004089

Case 3:25-cv-01876-K   Document 15-4   Filed 09/13/25   Page 2 of 643   PageID 10356

# Exhibit 36

004090

---

---

Montgomery, Paige <pmontgomery@sidley.com>
Tuesday, August 31, 2021  :13 AM
Patrick Daugherty <pdaugherty@glacierlakecap.com>
Clemente, Matthew A. <mclemente@sidley.com>  Rognes, Chandler <crognes@sidley.com>
R  : Highland Regroup call

Pat,

Just moving this up in the inbo  .   ould Thursday work for you?

Best,

Paige

Montgomery, Paige
Thursday, August 2  , 2021 2:22 PM
'pdaugherty@glacierlakecap.com' <pdaugherty@glacierlakecap.com>
Clemente, Matthew A. <mclemente@sidley.com>  Rognes, Chandler <crognes@sidley.com>
Highland Regroup call

Pat,

ould you be available to speak to me,  uinn, and some folks from Teneo (Marc  irschner s firm) ne  t week on   2?
Please let us know if you could do either  :30 CT or 12:30 CT that day, or if some other time would be better.

Best,

Paige

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.

Exhibit 37

004092

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris *(*admitted *pro hac vice)*
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

WILLKIE FARR & GALLAGHER LLP
Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

REED SMITH LLP
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
(469) 680-4292

*Counsel for Highland Capital Management, L.P., and the Highland Claimant Trust*

*Counsel for James P. Seery, Jr.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

## HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND CLAIMANT TRUST, AND JAMES P. SEERY, JR.'S JOINT OPPOSITION TO HUNTER MOUNTAIN INVESTMENT TRUST'S MOTION FOR LEAVE TO FILE <u>VERIFIED ADVERSARY PROCEEDING</u>

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.


1934054230511000000000014

004095

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

RELEVANT FACTUAL BACKGROUND ................................................................. 5

    A.    The Gatekeeper Provision Was Adopted To Prevent Baseless Litigation. ............ 5

    B.    Dondero, Patrick, And HMIT Unsuccessfully Search For Allegations To Manufacture A Complaint. ............................................................................. 6

    C.    The Premise Of HMIT's Proposed Complaint—An Alleged *Quid Pro Quo* Between Seery And The Claims Purchasers—Is Demonstrably False. ................ 8

    D.    The Allegations Concerning MGM and Insider Trading Have No Basis In Fact. .......................................................................................................... 9

    E.    HMIT's Allegations Concerning Seery's Alleged Relationships With The Claims Purchasers Are Unsupported And Provide No Foundation For The Purported Inferences. ................................................................................. 17

    F.    HMIT's "Insider Trading" Allegations Are Unsupported And Provide No Foundation For The Purported Inferences. ................................................... 19

    G.    A Rational Basis Exists For the Claims Purchases—Although Only the Claim Sellers Could Have Been Harmed in Any Event. .................................. 23

    H.    Seery's Compensation Structure Is Consistent With The Plan And The Trust Agreement, And Was The Product Of Arms'-Length Negotiations. ......... 25

RELEVANT PROCEDURAL HISTORY ................................................................. 29

LEGAL STANDARD ........................................................................................... 32

    A.    HMIT Misconstrues The "Colorability" Standard Established In The Gatekeeper Provision. ............................................................................. 32

    B.    Evidentiary Hearing ................................................................................. 36

    C.    Exculpation and Release .......................................................................... 38

ARGUMENT ...................................................................................................... 38

I.    HMIT LACKS STANDING TO BRING DERIVATIVE CLAIMS UNDER DELAWARE LAW. ...................................................................................... 38

    A.    HMIT Lacks Standing To Bring Derivative Claims On Behalf Of The Trust. ..................................................................................................... 39

    B.    HMIT Lacks Standing To Bring Derivative Claims On HCMLP's Behalf. ........ 40

    C.    HMIT Lacks Standing To Bring A "Double Derivative" Action. ...................... 42

II.    HMIT LACKS STANDING TO BRING DERIVATIVE CLAIMS UNDER FEDERAL BANKRUPTCY LAW. ................................................................... 42

    A.    Federal Law Does Not Confer Standing Prohibited By Delaware Law. ............. 43

|   | B. | HMIT Cannot Meet The *Louisiana World* Standard Governing Derivative Actions By Creditors In Bankruptcy.................................................. 44 |

|   | C. | HMIT Lacks Standing To Bring Derivative Claims Challenging Pre-Confirmation Conduct. ........................................................................... 47 |

III. HMIT DID NOT SATISFY THE PROCEDURAL REQUIREMENTS TO BRING A DERIVATIVE ACTION. ................................................................. 48

|   | A. | HMIT Failed To Include The Litigation Trust As A Party................................. 48 |

|   | B. | HMIT Failed To Make Any Demand To The Litigation Trustee And Fails To Plead Demand Futility With Particularity. ....................................... 49 |

|   | C. | HMIT Cannot "Fairly And Adequately" Represent The Interests of Claimant Trust Beneficiaries. ................................................................. 51 |

IV. HMIT HAS NO DIRECT CLAIMS AGAINST THE HIGHLAND PARTIES. ........... 52

V. HMIT'S PROPOSED COMPLAINT FAILS TO PLAUSIBLY ALLEGE ANY CLAIMS AGAINST THE PROPOSED DEFENDANTS. ........................................... 55

|   | A. | HMIT Does Not Adequately Allege Any Breach Of Fiduciary Duties (Count I)........................................................................................... 55 |

|   | B. | HMIT's Theories Of Secondary Liability Fail (Counts II and III). .................... 58 |

|   | C. | HMIT Seeks Remedies That Are Not Available As A Matter Of Law (Counts IV, V, and VI). ...................................................................... 60 |

CONCLUSION........................................................................................................ 62

004095

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abraham v. Exxon Corp.,*
    85 F.3d 1126 (5th Cir. 1996) ...................................................................................36

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC,*
    580 S.W.3d 136 (Tex. 2019)...................................................................................59

*Alexander v. Hedback,*
    718 F.3d 762 (8th Cir. 2013) ...................................................................................37

*Am. Med. Hospice Care, LLC v. Azar,*
    2020 WL 9814144 (W.D. Tex. Dec. 9, 2020) ..........................................................36

*Anderson v. United States,*
    520 F.2d 1027 (5th Cir. 1975) .................................................................................33

*Armstrong v. Capshaw, Goss & Bowers LLP,*
    404 F.3d 933 (5th Cir. 2005) ...................................................................................53

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).....................................................................................55, 56, 60

*Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.,*
    2020 WL 2521557 (Del. Super. May 18, 2020) .......................................................55

*Barton v. Barbour,*
    104 U.S. 126 (1881) ...............................................................................................3, 32

*BCC Merch. Sols., Inc. v. Jet Pay, LLC,*
    129 F. Supp. 3d 440 (N.D. Tex. 2015) .....................................................................48

*In re Beck Indus., Inc.,*
    725 F.2d 880 (2d Cir. 1984).....................................................................................37

*In re Bednar,*
    2021 WL 1625399 (B.A.P. 10th Cir. Apr. 27, 2021) ...............................................37

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).....................................................................................55, 56, 60

*Benjamin v. Diamond (In re Mobile Steel Co.),*
    563 F.2d 692 (5th Cir. 1977) ...............................................................................60, 61

004096

*BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.*,
    247 F. Supp. 3d 377 (S.D.N.Y. 2017) ........................................................................49

*Brooks v. United Dev. Funding III, L.P.*,
    2020 WL 6132230 (N.D. Tex. Apr. 15, 2020) ............................................................56

*Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*,
    539 B.R. 31 (S.D.N.Y. 2015) ......................................................................................61

*Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Grp.)* ,
    66 F.3d 1436 (6th Cir. 1995) ........................................................................35, 45, 46

*CFTC v. Hunter Wise Commodities, LLC*,
    2020 WL 13413703 (S.D. Fla. Mar. 5, 2020) ............................................................33

*CML V, LLC v. Bax*,
    28 A.3d 1037 (Del. 2011) .......................................................................................39, 41

*CML V, LLC v. Bax*,
    6 A.3d 238 (Del. Ch. 2010) ........................................................................................41

*Collins Cnty., Texas v. Homeowners Ass'n for Values Essential to Neighborhoods*,
    915 F.2d 167 (5th Cir. 1990) ......................................................................................61

*Davis v. Comed, Inc.*,
    619 F.2d 588 (6th Cir. 1980) ......................................................................................51

*El Paso Pipeline GP Co. v. Brinckerhoff*,
    152 A.3d 1248 (Del. 2016) ..............................................................................41, 53, 54

*Energytec, Inc. v. Proctor*,
    2008 WL 4131257 (N.D. Tex. Aug. 29, 2008) ......................................................51, 52

*English v. Narang*,
    2019 WL 1300855 (Del. Ch. Mar. 20, 2019) ............................................................59

*Family Rehab., Inc. v. Azar*,
    886 F.3d 496 (5th Cir. 2018) ......................................................................................36

*Fin. Indus. Assoc. v. SEC*,
    2013 WL 11327680 (M.D. Fla. July 24, 2013) ........................................................33

*Fortune Prod. Co. v. Conoco, Inc.*,
    52 S.W.3d 671 (Tex. 2000) ........................................................................................61

*Foster v. Aurzada (In re Foster)*,
    2023 WL 20872 (5th Cir. Jan. 3, 2023) ....................................................................36

004097

*Gatz v. Ponsoldt,*
    2004 WL 3029868 (Del. Ch. Nov. 5, 2004) ................................................................53

*Gerber v EPE Holdings, LLC,*
    2013 WL 209658 (Del. Ch. Jan. 18, 2013) ...............................................................54

*Gesoff v. IIC Indus., Inc.,*
    902 A.2d 1130 (Del. Ch. 2006) ................................................................................62

*Gilbert v El Paso Co.,*
    1988 WL 124325 (Del. Ch. Nov. 21, 1988) .............................................................56

*Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.,*
    207 F. Supp. 2d 570 (N.D. Tex. 2002) ....................................................................36

*Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie),*
    716 F.3d 404 (6th Cir. 2013) ...................................................................................37

*Green v. Wells Fargo Home Mtg.,*
    2016 WL 3746276 (S.D. Tex. June 7, 2016) ...........................................................61

*Hargrove v. WMC Mortg. Corp.,*
    2008 WL 4056292 (S.D. Tex. Aug. 29, 2008) ........................................................60

*Harry v. Colvin,*
    2013 WL 12174300 (W.D. Tex. Nov. 6, 2013) ........................................................36

*Hartsel v. Vanguard Grp., Inc.,*
    2011 WL 2421003 (Del. Ch. Jun. 15, 2011) ........................................................39, 40

*In re Highland Cap. Mgmt., L.P.,*
    2021 WL 2326350 (Bankr. N.D. Tex. June 7, 2021) ...............................................52

*Hill v. Keliher,*
    2022 WL 213978 (Tex. App. Jan. 25, 2022) ...........................................................59

*Howell v. Adler (In re Grodsky),*
    2019 WL 2006020 (Bankr. E.D. La. Apr. 11, 2019) ...............................................36

*In re Hunter Mt. Inv. Tr.,*
    No. 23-10376 (5th Cir. Apr. 12, 2023) ....................................................................62

*Joseph C. Bamford & Young Min Ban v. Penfold, L.P.,*
    2020 WL 967942 (Del. Ch. Feb. 28, 2020) ............................................................56

*Kamen v. Kemper Fin. Servs., Inc.,*
    500 U.S. 90 (1991) ...................................................................................................43

004098

*Kashani v. Fulton (In re Kashani)*,
   190 B.R. 875 (B.A.P. 9th Cir 1995).................................................................33, 36

*Klaassen v Allegro Dev. Corp.*,
   2013 WL 5967028 (Del. Ch. Nov. 7, 2013) ...............................................................56

*Klinek v. LuxeYard, Inc.*,
   596 S.W.3d 437 (Tex. App. – Houston [14th Dist.] 2020)......................................59

*La. World Expo. v. Fed. Ins. Co.*,
   858 F.2d 233 (5th Cir. 1988) ........................................................................ *passim*

*Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods. (In re Deepwater Horizon)*,
   732 F.3d 326 (5th Cir. 2013) ...................................................................................36

*Lambrecht v. O'Neal*,
   3 A.3d 277 (Del. 2010) ........................................................................................42, 49

*Larson v. Foster (In re Foster)*,
   516 B.R. 537 (B.A.P. 8th Cir. 2014)........................................................................35

*Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*,
   2000 WL 1761020 (N.D. Ill. Nov. 30, 2000) .........................................................34

*In re Lightsquared Inc.*,
   504 B.R. 321 (Bankr. S.D.N.Y. 2013)....................................................................60

*In re Linton*,
   136 F.3d 544 (7th Cir. 1998) ...................................................................................37

*In re Lupo*,
   2014 WL 4653064 (B.A.P. 1st Cir. Sept. 17, 2014) ...............................................37

*Marucci Sports, L.L.C. v. NCAA*,
   751 F.3d 368 (5th Cir. 2014) ...................................................................................62

*McMillan .v Intercargo Corp.*,
   768 A.2d 492 (Del. Ch. 2000)..................................................................................58

*Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*,
   912 F.3d 291 (5th Cir. 2019) .............................................................................53, 54

*In re Nat'l Coll. Student Loan Tr. Litig.*,
   251 A.3d 116 (Del. Ch. 2020)............................................................................39, 40

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*,
   48 F.4th 419 (5th Cir. 2022) ........................................................................ *passim*

004099

*Official Comm. v. Hudson United Bank (In re America's Hobby Ctr.)*,
    225 B.R. 275 (Bankr. S.D.N.Y. 1998) ............................................................35, 46

*In re On-Site Fuel Serv., Inc.*,
    2020 WL 3703004 (Bankr. S.D. Miss. May 8, 2020) ............................................45

*Panaras v. Liquid Carbonic Indus. Corp.*,
    74 F.3d 786 (7th Cir. 1996) ..................................................................................36

*Pfeffer v. Redstone*,
    965 A.2d 676 (Del. 2009) .....................................................................................58

*Pike v. Texas EMC Mgmt., LLC*,
    610 S.W.3d 763 (Tex. 2020) .................................................................................54

*PW Enters. v. N.D. Racing Comm'n (In re Racing Servs., Inc.)*,
    540 F.3d 892 (8th Cir. 2008) ...................................................................... *passim*

*Reed v. Cooper (In re Cooper)*,
    405 B.R. 801 (Bankr. N.D. Tex. 2009) ...........................................................43, 45

*Reed v. Linehan (In re Soporex, Inc.)*,
    463 B.R. 344 (Bankr. N.D. Tex. 2011) ................................................................57

*Reyes v. Vanmatre*,
    2021 WL 5905557 (S.D. Tex. Dec. 13, 2021) ......................................................36

*Richardson v. United States*,
    468 U.S. 317 (1984) ..............................................................................................36

*Sabhari v. Mukasey*,
    522 F.3d 842 (8th Cir. 2008) ................................................................................36

*Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*,
    34 A.3d 1074 (Del. 2011) ..........................................................................38, 42, 49

*Schmermerhorn v. CenturyTel, Inc. (In re SkyPort Global Commcn's, Inc.)*,
    2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011) ....................................41, 52, 53

*Schwab v. Oscar (In re SII Liquidation Co.)*,
    2012 WL 4327055 (Bankr. S.D. Ohio Sept. 20, 2012) .........................................49

*SEC v. Cuban*,
    2013 WL 791405 (N.D. Tex. Mar. 5, 2013) .........................................................57

*SEC v. Mayhew*,
    121 F.3d 44 (2d Cir. 1997) ...................................................................................57

004100

*SEC v. N. Am. Clearing, Inc.*,
    656 F. App'x 969 (11th Cir. 2016) ........................................................37

*SED Holdings, LLC v. 3 Star Props., LLC*,
    2019 WL 13192236 (S.D. Tex. Sept. 11, 2019) ...................................60

*Sherer v. Sherer*,
    393 S.W.3d 480 (Tex. App. 2013).........................................................61

*Silver v. City of San Antonio*,
    2020 WL 3803922 (W.D. Tex. July 7, 2020) .......................................34

*Silver v. Perez*,
    2020 WL 3790489 (W.D. Tex. July 7, 2020) .......................................34

*In re Six Flags Ent. Corp. Deriv. Litig.*,
    2021 WL 1662466 (N.D. Tex. Apr. 28, 2021) ......................................50

*Smith v. Ayres*,
    977 F.2d 946 (5th Cir. 1992) ................................................................51

*Stanley v. Gonzales*,
    476 F.3d 653 (9th Cir. 2007) ................................................................36

*In re STN Enterps.*,
    779 F.2d 901 (2d Cir. 1985)..................................................................46

*Taylor v. Trevino*,
    569 F. Supp. 3d 414 (N.D. Tex. 2021) .................................................61

*Tilton v. Marshall*,
    925 S.W.2d 672 (Tex. 1996).................................................................59

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ...................................................................53

*Tow v. Amegy Bank, N.A.*,
    976 F. Supp. 2d 889 (S.D. Tex. 2013) .............................................40, 41

*Trippodo v. SP Plus Corp.*,
    2021 WL 2446204 (S.D. Tex. June 15, 2021) ......................................36

*United Food & Comm. Workers Union v. Zuckerberg*,
    250 A.3d 862 (Del. Ch. 2020)...............................................................50

*In re VistaCare Grp., LLC*,
    678 F.3d 218 (3d Cir. 2012)............................................................. *passim*

004101

*Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring, Inc.)*,
   714 F.3d 860 (5th Cir. 2013) .........................................................47, 48

*In re World Mktg. Chi., LLC*,
   584 B.R. 737 (Bankr. N.D. Ill. 2018) ...................................................34

*In re WorldCom, Inc.*,
   351 B.R. 130 (Bankr. S.D.N.Y. 2006)...................................................41

*Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*,
   563 B.R. 614 (Bankr. W.D. Tex. 2016)..................................................59

*Yowell v. Granite Operating Co.*,
   630 S.W.3d 566 (Tex. App. 2021)........................................................61

**Statutes**

6 Del. C. § 17-211(h)...........................................................................41

6 Del. C. § 17-1002........................................................................40, 42

12 Del C. § 3803(b) ............................................................................55

12 Del C. § 3803(c).............................................................................55

12 Del C. § 3816(b) ............................................................................39

11 U.S.C. § 541(a)(1)...........................................................................53

28 U.S.C. § 2072(b) ............................................................................43

**Rules**

Fed. R. Bankr. P. 7012(b).....................................................................49

Fed. R. Bankr. P. 7019 ........................................................................49

Fed. R. Bankr. P. 7023.1..............................................................43, 50, 51

Fed. R. Civ. P. 12(b)(6)................................................................. *passim*

Fed. R. Civ. P. 12(b)(7).......................................................................49

Fed. R. Civ. P. 17(a)...........................................................................48

Fed. R. Civ. P. 19(a)(1)........................................................................49

Fed. R. Civ. P. 23.1....................................................................43, 50, 51

004102

Tex. R. Civ. P. 202................................................................................................... *passim*

**Other Authorities**

Aaron L. Hammer & Michael A. Brandess, *Claims Trading: The Wild West of Chapter 11s*,
    29 Am. Bankr. Inst. J. 61 (July/Aug. 2010)........................................................56

Michael H. Whitaker, *Regulating Claims Trading in Chapter 11 Bankruptcies: A Proposal for Mandatory Disclosure*,
    3 Cornell J.L. & Pub. Pol'y 303 (1994)................................................................56

004103

Highland Capital Management, L.P. ("HCMLP" or, as applicable, the "Debtor"), the reorganized debtor in the above-referenced bankruptcy case, the Highland Claimant Trust (the "Trust"; together with HCMLP, "Highland"), and James P. Seery, Jr., HCMLP's Chief Executive Officer and the Claimant Trustee of the Trust ("Seery"; together with Highland, the "Highland Parties"), by and through their undersigned counsel, hereby file this opposition (the "Opposition") to *Hunter Mountain Investment Trust's* ("HMIT") *Emergency Motion for Leave to File Verified Adversary Petition* ("Initial Motion" or "Mot."; Docket No. 3699) and *Hunter Mountain Investment Trust's Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* ("Supplemental Motion" or "Supp. Mot."; Docket No. 3760; collectively, the "Motion"). In support of their Opposition, the Highland Parties state as follows:

## PRELIMINARY STATEMENT[1]

1. This Motion is the latest attempt by James Dondero ("Dondero") to make good on his threat to "burn down the place." This iteration involves baseless and personal attacks against the Proposed Defendants,[2] harassing those individuals charged with maximizing value for creditors while (perversely) wasting Highland's resources. Dondero's demonstrated hostility to Highland's legitimate goals is precisely why this Court entered the Gatekeeper Provision at issue here, and the current Motion vividly illustrates the wisdom of installing that prophylaxis. HMIT's Motion should be denied.

---

[1] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

[2] "Proposed Defendants" refers to, collectively, Seery, Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"; collectively with Muck, Jessup, and Farallon, the "Claims Purchasers"), and John Doe Defendant Nos. 1–10.

2.      HMIT's proposed Complaint ("Compl."; Docket No. 3760-1) is long on rhetoric,

unsupported conspiracy theories, and conclusory statements, but short on actual factual

allegations. For all its bluster, the Complaint rests entirely on the following assertions:

- On December 17, 2021, Dondero sent an unsolicited email to Seery regarding a potential acquisition of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"). At the time, the Debtor owned MGM stock directly and managed an entity that owned, among numerous other assets, subordinated debt in other entities that owned MGM stock (Compl. ¶¶ 44–45);

- Seery purportedly communicated with principals at Farallon and Stonehill, entities with which Seery allegedly did "substantial business" more than a decade before he assumed his roles at Highland. (Id. ¶ 48.) The Complaint contains no allegations regarding *when* these communications supposedly occurred, but speculates that Seery provided "material non-public information" about MGM and vague "assurances of great profits" on Highland claims (id. ¶¶ 3, 13–14, 47, 50);

- In April 2021 (four months after Dondero's unsolicited email), Farallon and Stonehill purchased "approved unsecured claims" of Highland at a 65% discount to face value. Based on the "publicly projected" estimates in Debtor's November 30, 2020, Disclosure Statement—which the Complaint touts as the only public source of information regarding the claims' potential value—Farallon and Stonehill stood to earn at least an 18% return on those purchases (id. ¶¶ 3, 37, 42); and

- In August 2021 (eight months after Dondero's unsolicited email), Farallon and Stonehill became members of the Claimant Oversight Board ("COB"). Under the Court-approved Chapter 11 Plan, Seery earned a set base salary and a performance-based bonus. The Complaint speculates that negotiations over the latter component "were not arm's-length," but contains no allegations about the negotiation process or the terms of Seery's final compensation package (id. ¶¶ 4, 13, 54).

The remainder of the Complaint consists of rhetorical rehash of these basic contentions, *ad hominem* attacks, or a self-serving (and utterly unsupported) claim by Dondero that a Farallon principal confessed this purported scheme to Dondero.

3.      The Motion should be denied for three, independently sufficient reasons. *First*, as

a threshold legal matter, HMIT, as a holder of unvested, contingent interests, lacks standing to

bring derivative claims on behalf of the Trust or HCMLP under applicable state law and the

Claimant Trust Agreement ("Trust Agreement" or "Trust Agmt."). HMIT cannot escape this reality by alternatively asserting its claims as nonexistent direct claims.

4.    **Second**, HMIT's claims are not "colorable" as that term is used in the Court-approved Plan and the Gatekeeper Provision included in this Court's Confirmation Order. (Plan Art. IX.F; Confirmation Order ¶¶ 72, 76, 81.) As the Confirmation Order expressly stated, the Gatekeeper Provision requires Dondero to make a threshold showing consistent with the (i) "the Supreme Court's 'Barton Doctrine,' *Barton v. Barbour*, 104 U.S. 126 (1881))," and (ii) "the notion of a prefiling injunction to deter vexatious litigants, that has been approved by Fifth Circuit." (*Id.* ¶¶ 76–81.) The Fifth Circuit confirmed as much when it rejected (in relevant part) Dondero's confirmation appeal, holding that the Gatekeeper Provision "screen[s] and prevent[s] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness." *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt., L.P.*), 48 F.4th 419, 435 (5th Cir. 2022).

5.    It is well-settled that "colorability" in this context requires HMIT to demonstrate *more* than the bare-bones Fed. R. Civ. P. 12(b)(6) "plausibility" standard. HMIT must demonstrate the "foundation" for its "*prima facie* case." *In re VistaCare Grp., LLC*, 678 F.3d 218, 232 (3d Cir. 2012). Accordingly, and contrary to HMIT's contention, evidentiary hearings are routinely conducted in this setting—particularly where (as here) the movant has larded its complaint with unsupported, conclusory assertions that cannot withstand even passing scrutiny and has attached hundreds of pages of exhibits and two self-serving declarations in support of its motion. HMIT's proffered gatekeeping standard, by contrast, would impose no hurdle at all and would render the threshold entirely duplicative of the motion to dismiss standard that every litigant already faces. In addition to ignoring the stated purposes and intent of the Gatekeeper Provision (which are long

since beyond collateral attack) and the factual bases upon which it was adopted, HMIT offers no reason why litigants whose serial abuses earned the imposition of the Gatekeeper Provision should be subject to the same standard as everyone else. To state that absurd contention is to refute it, and would essentially nullify this Court's authority to police its own docket.

6.      ***Third***, even if the Rule 12(b)(6) standard applied, HMIT's bare-bones Complaint would fail. Even accepting the sparse factual allegations as true for purposes of this Motion, its central conclusions collapse under their own weight. For example, assuming that Dondero's unsolicited December 17, 2020 email, which violated this Court's TRO, included confidential information regarding MGM, the Complaint does not allege that such information remained nonpublic at the unidentified time Seery supposedly communicated with Farallon and Stonehill—and the Complaint acknowledges that neither entity purchased claims before April 2021. Likewise, although the Complaint's central thesis is that Farallon and Stonehill would not have purchased the Highland claims without knowing the supposedly secret MGM information, the Complaint acknowledges that the November 30, 2020 Disclosure Statement predicted a recovery ***significantly above*** what Farallon and Stonehill allegedly paid for the claims in April 2021.

7.      While such self-contradictory and sparse allegations ordinarily might counsel in favor of denying the Motion under the Rule 12(b)(6) standard (*i.e.*, obviating the need to decide whether the *Barton*/vexatious-litigant standard applies), the Highland Parties respectfully request that this Court conduct the Rule 12(b)(6) analysis only in the alternative. Given the litigiousness of Dondero and his affiliated entities, who inevitably will appeal any adverse decision, the Fifth Circuit will benefit from a full record. Applying the correct heightened standard will also serve important interests going forward. This Motion is unlikely to be the last to require application of

the Gatekeeper Provision, and significant interests of judicial economy will be served by definitively establishing the threshold standard and propriety of an evidentiary hearing.

<div align="center">

**RELEVANT FACTUAL BACKGROUND**

</div>

**A.**    **The Gatekeeper Provision Was Adopted To Prevent Baseless Litigation.**

8.    HMIT was required to file the Motion in accordance with a provision in Highland's confirmed Plan known as the "gatekeeper" (the "Gatekeeper Provision"). (Morris Dec. Ex. 1 at 51–52.)[3] The Gatekeeper Provision states, in pertinent part, that:

> [N]o Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case . . . ***without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim*** of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against such Protected Party.

(*Id*. (emphasis added).)[4]

9.    The Gatekeeper Provision is not a garden-variety plan provision. Rather, as this Court stated in its order confirming the Plan,[5] the Gatekeeper Provision was adopted as a direct result of Dondero's history of harassing, costly litigation. In describing the factual support for the Gatekeeper Provision, this Court observed that "prior to the commencement of the Debtor's

---

[3] References to the "Plan" are to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*. (Morris Dec. Ex. 1.) Citations to "Morris Dec. Ex. __" are to the exhibits attached to the *Declaration of John A. Morris In Support of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding* accompanying this Opposition.

[4] Under the Plan, HMIT is an "Enjoined Party," and HCMLP, the Trust, Seery (in various capacities), Farallon, and Stonehill (in their capacities as members of the COB approving Seery's compensation) are "Protected Parties." (Plan Arts. I.B.56, I.B.105.)

[5] (Morris Dec. Ex. 2 (the "Confirmation Order").)

bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation some of which had gone on for years and, in some cases, over a decade . . . . During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor." (Confirmation Order ¶ 77.)

10.    The Court further found that the "Dondero Post-Petition Litigation [as defined] was a result of Mr. Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would 'burn down the place.'" (*Id*. ¶ 78.)

11.    These findings of fact—all of which the Fifth Circuit left undisturbed while affirming, in relevant part, the Confirmation Order—were the foundation upon which the Gatekeeper Provision was adopted:

> Approval of **the Gatekeeper Provision will prevent baseless litigation** designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will **avoid abuse of the Court system and preempt the use of judicial time** that properly could be used to consider the meritorious claims of other litigants.

(*Id*. ¶ 79 (emphasis added).)

### B.    Dondero, Patrick, And HMIT Unsuccessfully Search For Allegations To Manufacture A Complaint.

12.    HMIT's proposed Complaint is premised on two primary allegations emanating from Dondero: (i) Seery supposedly shared with the Claims Purchasers "material, non-public inside information" that he had obtained from Dondero as part of a *quid pro quo* pursuant to which the Claims Purchasers would someday return the favor by joining the COB and "rubber-stamping" Seery's compensation package, and (ii) a representative of Farallon essentially confessed to the arrangement in one or more phone calls with Dondero in the late Spring of 2021. Despite knowing

of these alleged "facts," Dondero, Mark Patrick ("<u>Patrick</u>"),[6] HMIT's purported manager, and HMIT did not bring any claims but instead sought discovery—which two different Texas state courts denied.

        1.      <u>The First Rule 202 Petition</u>

      13.     On July 22, 2021, Dondero filed a petition in Texas state court seeking pre-suit discovery against Farallon and Alvarez & Marsal pursuant to Tex. R. Civ. P. 202 (the "<u>First Rule 202 Petition</u>"). (Morris Dec. Ex. 3.) The First Rule 202 Petition was based, in part, on Dondero's allegations that (i) Seery possessed "non-public, material information" that "[u]pon information and belief . . . was the basis for instructing Farallon to purchase the Claims," and that (ii) he had a telephone call with Michael Linn ("<u>Linn</u>"), a representative of Farallon, in which Linn allegedly told Dondero that "Farallon had purchased the claims sight unseen—relying entirely on Mr. Seery's advice solely because of their prior dealings." (*Id*. ¶¶ 21, 23.)[7]

      14.     After the targets of the First Rule 202 Petition removed it to the Bankruptcy Court, this Court held a hearing, after which it entered an Order remanding the proceeding back to Texas state court despite having "grave misgivings." (Morris Dec. Ex. 6 at 20.) In doing so, the Court noted that it was "familiar with the concept of claims-trading in bankruptcy (including the fact that, for decades now, since a rule change in the last century, no court approval and order is necessary unless the transferor objects)" and that it appeared that Dondero's motives were "highly suspect." (*Id*. at 21.)

---

[6] Patrick has worked closely with Dondero for over a decade. Patrick was hired by Highland in 2008 and now serves as manager of the "Charitable DAF," which is controlled by Dondero. On August 3, 2021, this Court held Patrick "in civil contempt of court" after "basically abdicating responsibility" for "executing the litigation strategy" to Dondero. (Aug. 3, 2021 Order at 20–21, 30, Docket No. 2660.)

[7] As described in more detail below, Dondero later amended the First Rule 202 Petition (Morris Dec. Ex. 4) to, among other things, modify his description of his conversation with Linn and, several weeks after doing so, offered his third sworn version of his purported communication(s) with Farallon (*id.* Ex. 5).

004110

15.     After remand, the Texas state court slammed the gate closed, denying the First Rule 202 Petition (as amended) and dismissing Dondero's case. (Morris Dec. Ex. 7.)

2.     The Second Rule 202 Petition

16.     Seven months later, in January 2023, HMIT filed another petition in a different Texas state court again seeking pre-suit discovery regarding, among other things, alleged wrongdoing in connection with the Claims Purchasers' acquisition of claims in the Debtor's bankruptcy case. (Morris Dec. Ex. 8 (the "Second Rule 202 Petition").) While the Second Rule 202 Petition was embellished and contained a few more speculative and conclusory assertions, it was based on many of the same allegations contained in the First Rule 202 Petition. Indeed, Dondero submitted yet another sworn statement, this one in support of the Second Rule 202 Petition, which included the fourth version of his purported communication(s) with Farallon. (Morris Dec. Ex. 9.)

17.     On March 8, 2023, the Texas state court again slammed the gate closed, denying the Second Rule 202 Petition and dismissing HMIT's case. (Morris Dec. Ex. 10.)

18.     Having been refused entry by two different Texas state courts, HMIT finally knocked on this Court's door on March 28, 2023 by filing the Motion, on an emergency basis, and contending that its 18-month detour in the Texas state court system left it at risk of blowing the statute of limitations on certain claims. The Motion is largely based on the same threadbare facts and speculative and conclusory statements that were insufficient to obtain discovery in both the First Rule 202 Petition and the Second Rule 202 Petition.

**C.     The Premise Of HMIT's Proposed Complaint—An Alleged *Quid Pro Quo* Between Seery And The Claims Purchasers—Is Demonstrably False.**

19.     HMIT asserts various legal theories resting on the assertion that Seery passed on material, non-public information concerning MGM to his purportedly "past business partners and close allies" Farallon and Stonehill, so that they could buy claims on the cheap and later reward

Seery by "rubber-stamp[ing]" an oversized compensation package. (Mot. ¶¶ 22, 24; *see also*
Compl. ¶¶ 3–4, 16, 47, 54, 71, 77.)

20.     HMIT primarily relies on: (i) an email Dondero sent to Seery on December 17,
2020, in which Dondero purportedly disclosed material, non-public inside information;
(ii) Dondero's prior sworn statements concerning, among other things, his supposed recollection
of one or more telephone calls he had with one or more representatives of Farallon in the late
Spring of 2021; and (iii) two letters summarizing "investigations" commissioned by Dondero, the
results of which were apparently delivered to the Executive Office of the United States Trustee
("EOUST"). (Mot. ¶ 1 ("This Motion is separately supported by . . . the declarations of James
Dondero, dated May 2022 (Ex. 2), James Dondero, dated February 2023 (Ex. 3), and Sawnie A.
McEntire with attached evidence (Ex. 4).").)

21.     Based on the facts set forth below, and as will further be demonstrated at the
upcoming hearing, HMIT cannot meet its burden of establishing that there is a good faith basis for
the allegations concerning the "*quid pro quo.*"

**D.      The Allegations Concerning MGM and Insider Trading Have No Basis
In Fact.**

22.     As a member of MGM's Board, Dondero was admittedly the source of the so-called
material, non-public inside information. (Compl. ¶ 45.) On December 17, 2020, Dondero—in
violation of an existing temporary restraining order—sent an email to Seery and others with the
subject line "Trading Restriction re MGM – material non public information" stating:

> Just got off a pre board call, board call at 3:00. Update is as follows:
> Amazon and Apple actively diligencing in Data Room. Both
> continue to express material interest. Probably first quarter event,
> will update as facts change. Note also any sales are subject to a
> shareholder agreement.

004112

(Morris Dec. Ex. 11 (the "MGM E-Mail").)[8]

         1.    Dondero Had An Axe To Grind When He Sent The MGM E-Mail.

23.     By December 17, 2020, Dondero viewed Seery as his enemy. The MGM E-Mail was initially just another clumsy and improper attempt to impede the Debtor's asset sales (*see infra* ¶ 25), but when that failed, Dondero shifted gears and began peddling the "inside information" angle, in multiple forums, hoping to make life difficult for Seery and anyone Dondero perceived to be supporting him.[9] But viewed in context, the MGM E-Mail and related allegations provide no basis for the assertion of "colorable" claims.

24.     After causing the Debtor to file for bankruptcy protection in October 2019, Dondero was forced to surrender his control positions at the Debtor—including his positions as President and Chief Executive Officer—in January 2020 as part of a broader corporate governance settlement entered into to avoid the appointment of a Chapter 11 trustee. (Morris Dec. Ex. 12.) He remained an unpaid employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he then held titles, subject to the authority of the newly-appointed independent board of directors (the "Independent Board").[10]

25.     By the Fall of 2020, however, the Independent Board demanded (and obtained) Dondero's resignation, and the Debtor had (1) reached proposed settlements with certain of its larger creditors, (2) proposed an asset-monetization plan, (3) obtained court approval of its

---

[8] Notably, the MGM E-Mail is internally inconsistent because it simultaneously purports to impose a "[t]rading [r]estriction" while also stating that "sales are subject to a shareholder agreement," which permits sales in certain circumstances.

[9] Neither Dondero nor HMIT ever explain how Dondero could have disclosed "material non-public inside information" that he purportedly obtained as a member of the MGM Board without violating his own fiduciary duties to MGM. The absence of any explanation is further indication that Dondero did not believe that the MGM E-Mail contained "material non-public inside information."

[10] In July 2020, Seery was appointed Chief Executive Officer and Chief Structuring Officer of the Debtor. (Morris Dec. Ex. 36.)

Disclosure Statement, and (4) begun to solicit votes in support of its proposed Plan. In response to these developments and others, Dondero began disrupting preparations for the implementation of the proposed Plan. The events in the weeks leading up to the MGM E-Mail are as follows:

- <u>October 9</u>: In accordance with the Independent Board's demand, made after threats and disruptions to the Debtor's operations, Dondero is forced to resign from all positions with the Debtor and its affiliates (Morris Dec. Ex. 13);

- <u>October 16</u>: Dondero's affiliates attempt to impede the Debtor's trading activities by demanding—with no legal basis—that Seery cease selling certain assets (*id.* Ex. 14; *id.* Ex. 15 at 13–15);

- <u>November 24</u>: This Court enters an Order approving the Debtor's Disclosure Statement, scheduling the confirmation hearing on the Debtor's Plan for January 13, 2021, and granting related relief (*id.* Ex. 16);

- <u>November 24–27</u>: Dondero personally interferes with certain securities trades ordered by Seery (*id.* Ex. 15 at 30–36);

- <u>November 30</u>: The Debtor provides written notice of termination of shared services agreements with Dondero's affiliates, NexPoint Advisors, L.P. ("<u>NexPoint</u>") and Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>"; together with NexPoint, the "<u>Advisors</u>") (*id.* Ex. 17);

- <u>December 3</u>: The Debtor makes written demands to Dondero and certain affiliates for payment of all amounts due under certain promissory notes that had an aggregate face amount of more than $60 million (*id.* Exs. 18–21);

- <u>December 3</u>: Dondero responds by threatening Seery in a text message: "***Be careful what you do -- last warning***" (*id.* Ex. 22 (emphasis added));

- <u>December 10</u>: Dondero's interference and threat cause the Debtor to seek and obtain a temporary restraining order ("<u>TRO</u>") against Dondero (*id.* Ex. 23);

- <u>December 16</u>: The Court denies as "frivolous" a motion filed by certain Dondero affiliates in which they sought "temporary restrictions" on certain asset sales (*id.* Ex. 24); and

- <u>December 17</u>: After exhausting other avenues to curtail the asset sales Debtor conducted in furtherance of the proposed Plan, Dondero sends the MGM E-Mail to Seery (*id.* Ex. 11).

004114

### 2. Dondero Had No Duty To Send The MGM E-Mail To Seery And He Violated An Existing TRO When He Did So.

26.     With his efforts to disrupt the proposed Plan stymied, Dondero sent the MGM E-Mail to Seery. While HMIT alleges that Dondero disclosed "material non-public information regarding Amazon and Apple's interest in acquiring MGM" to Seery on December 17, 2020 (Compl. ¶ 45), HMIT does not state or suggest why Dondero did so.

27.     That failure is unsurprising. As of December 17, 2020, Dondero owed no duty of any kind to the Debtor or any entity controlled by the Debtor because (i) in January 2020, he surrendered direct and indirect control of the Debtor to the Independent Board as part of the corporate governance settlement (*see* Docket Nos. 339, 354-1 (Term Sheet)), and (ii) in October 2020, he resigned from all roles at the Debtor and affiliates.

28.     Notably, Dondero admitted elsewhere that his goal in sending the MGM E-Mail was to impede the Debtor and Seery from engaging in any transactions involving MGM:

> On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. ***My purpose was to alert Mr. Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades***.

(Morris Dec. Ex. 9 ¶ 3 (emphasis added).)

29.     Dondero had no relationship of any kind with the Debtor when he sent the MGM E-Mail, and he directly violated the TRO by sending it to Seery without copying Debtor's counsel.[11] Particularly against the backdrop of Dondero's attempted interference with the Debtor's

---

[11] The TRO enjoined Dondero from, among other things, "communicating… with any Board member" (including Seery) without including Debtor's counsel. (Morris Dec. Ex. 23 ¶ 2(a).)

004115

trading activities just weeks before and just days after December 17, 2020,[12] the MGM E-Mail was another transparent attempt to impede asset sales and undermine Seery's efforts to bring the Debtor's bankruptcy to a close.

> 3. The MGM E-Mail Did Not Disclose Material, Non-Public Inside Information.

30.     HMIT's contention that the MGM E-Mail contained "material non-public inside information" is belied by press reports issued *before* December 17, 2020.

31.     For example, as early as January 2020, Apple and Amazon were identified as being among a new group of "Big 6" global media companies and MGM was identified as being a leading media acquisition target. Indeed, according to at least one media report, "MGM, in particular, seems like a logical candidate to sell this year" having already held "preliminary talks with Apple, Netflix and other larger media companies." (Morris Dec. Ex. 25.)

32.     In October 2020, the Wall Street Journal reported that MGM's largest shareholder, Anchorage Capital Group ("Anchorage"), was facing mounting pressure to sell the company. Anchorage was led by Kevin Ulrich, who also served as Chairman of MGM's Board. The article reported that "[i]n recent months, Mr. Ulrich has said he is working toward a deal," and he specifically named Amazon and Apple as being among four possible buyers. (*Id.* Ex. 26.)

33.     The forgoing is a small sample of publicly available information showing that MGM and Anchorage faced substantial pressure in 2020 and were contemplating a sale, and that Amazon and Apple were expected to be among interested bidders. No one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed "material interest" in acquiring MGM.

---

[12] (Morris Dec. Ex. 15 at 30–36.)

004116

34.    Even if the MGM E-Mail contained "material non-public information" when Dondero sent it on December 17, 2020 (which it did not), its substance was fully and publicly disclosed to the market in the days and weeks that followed.

35.    For example, on December 21, 2020, a Wall Street Journal article titled *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale* (the "Wall Street Journal Article"), reported that MGM had "tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process," and had "a market value of around $5.5 billion, based on privately traded shares and including debt." The Wall Street Journal Article reiterated that (i) Anchorage "has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks," and (ii) "Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers." (*Id.* Ex. 27.)

36.    The Wall Street Journal article thus contained more information than the MGM E-Mail, insofar as the former (i) disclosed that investment bankers had been retained; (ii) disclosed the identity of the investment bankers; (iii) reported that MGM had commenced a "formal sales process"; (iv) provided an indication of market value; and (v) reiterated that Anchorage, MGM's largest shareholder, was under pressure to sell its illiquid position and was actively "working toward a deal for the studio."

37.    The Wall Street Journal's reporting was picked up and expanded upon in other publications soon after. For example:

- On December 23, 2020, Business Matters published an article specifically identifying Amazon as a potential suitor for MGM. The article, titled *The World is net enough! Amazon Joins other Streaming services in £4bn Bidding war for Bond films as MGM Considers Selling Back Catalogue*, cited the Wall Street Journal Article and further reported that MGM "hopes to spark a battle that could interest streaming services such as Amazon Prime" (*id.* Ex. 28);

- On December 24, 2020, an article in iDropNews specifically identified Apple as entering the fray. In an article titled *Could Apple be Ready to Gobble Up MGM Studios Entirely?*, the author observed that "it's now become apparent that MGM is actually up on the auction block," noting that the Wall Street Journal was "reporting that the studio has begun a formal sale process" and that Apple—with a long history of exploratory interest in MGM—would be a likely bidder (*id.* Ex. 29); and

- On January 15, 2021, Bulwark published an article entitled *MGM is For Sale (Again)* that identified attributes of MGM likely to appeal to potential purchasers and handicapped the odds of seven likely buyers—with Apple and Amazon named as two of three potential buyers most likely to close on an acquisition (*id.* Ex. 30).

    4.    <u>Dondero's Conduct Confirms That He Did Not Believe He Disclosed Material, Non-Public Inside Information To Seery; The MGM E-Mail Played No Role In The HarbourVest Settlement.</u>

38.    Dondero's conduct further demonstrates that he did not believe he disclosed material, non-public information to Seery in December 2020.

39.    HMIT contends that, upon receipt of the MGM E-Mail, "Seery should have halted all transactions involving MGM stock, yet just six days later Seery filed a motion in the Bankruptcy Court seeking approval of the Debtor's settlement with HarbourVest – resulting in a transfer to the Debtor's Estate of HarbourVest's interest in a Debtor-advised fund, Highland CLO Funding, Ltd. ("<u>HCLOF</u>"), which held substantial MGM debt and equity." (Compl. ¶ 46.) These allegations do not withstand scrutiny for several reasons.

40.    ***First***, the Debtor and HarbourVest had already reached an agreement in principle—including the core question of consideration—to settle their disputes on December 10, 2020, ***a week before*** Dondero sent the MGM E-Mail to Seery. (*See* Morris Dec. Ex. 31.)[13] Thus, even assuming that the MGM E-Mail contained "material non-public inside information" (which it did

---

[13] In its motion for approval of the HarbourVest settlement, Highland valued the interest in HCLOF that it was receiving as part of the settlement of HarbourVest's claim at $22.5 million. Dondero and other affiliates ostensibly controlled by Patrick have previously alleged that the valuation was "stale." It was not; rather, it was based on the then most recent report made available to holders of interests in HCLOF, including Dondero. (Morris Dec. Ex. 31-a.) In any event, HCLOF did not directly own any "MGM debt and equity."

004118

not), the substance of that communication played no role in Seery's negotiations, which had concluded before he received the MGM E-Mail.

41.     **Second,** *neither Dondero nor any of his affiliates ever raised this issue with the Court when lodging objections to the HarbourVest settlement*, which were filed just weeks after Dondero sent the MGM E-Mail to Seery. In fact, Dondero contended that the Debtor was ***overpaying*** HarbourVest via the settlement to buy votes and that the settlement was neither reasonable nor in the best interests of the Debtor's estate. (Morris Dec. Ex. 32.)

42.     Dondero and HMIT cannot reconcile their current assertion that Seery misused allegedly "material, non-public inside information" with their failure to object to the HarbourVest settlement on that basis.

     5.    <u>The Texas State Securities Board Has Determined That No Action Is Warranted.</u>

43.     In its Motion, HMIT claimed that the Texas State Securities Board (the "<u>TSSB</u>") "opened an investigation into the subject matter of the insider trades at issue," and argued that the "continuing nature of this investigation underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely 'colorable.'" (Mot. ¶ 37.)

44.     HMIT's characterization is misleading because the TSSB never "opened an investigation"; rather, the TSSB reviewed a "complaint" (undoubtedly filed at Dondero's direction). That review is now complete. On May 9, 2023, the TSSB issued the following statement:

> The staff of the Texas State Securities Board (the "Staff") has completed its review of the complaint received by the Staff against Highland Capital Management, L.P. The issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time.

(Morris Dec. Ex. 33.)

45.     The TSSB's decision that no further action is warranted underscores the Highland
Parties' position that the claims described in the proposed Complaint are neither plausible nor
"colorable."

### E. HMIT's Allegations Concerning Seery's Alleged Relationships With The Claims Purchasers Are Unsupported And Provide No Foundation For The Purported Inferences.

46.     HMIT asserts that Seery and the Claims Purchasers had substantial pre-existing
relationships that provided the foundation for the alleged "*quid pro quo*." (*See*, *e.g.*, Compl. ¶¶ 14,
47–48.) These allegations appear to be based solely on a review of Seery's resume and some
internet searches conducted as part of the "investigation" commissioned by Dondero, the results
of which were presented to the EOUST in an unsuccessful effort to convince that agency to
investigate further. (*See* Mot. Ex. 2 ¶ 4 & Exs. A–B.) As HMIT's pleadings and the documents
presented to the EOUST show, and as will be further established at the hearing, these conclusory
allegations have no basis in fact.

#### 1.     HMIT's Allegations Concerning Stonehill

47.     HMIT's conclusory allegation that Seery and Stonehill had a "close business
relationship" is based on two alleged "facts."

48.     ***First***, HMIT contends that Seery "joined a hedge fund, River Birth Capital," that
"served on the creditors committee in other bankruptcy proceedings" with Stonehill. (Compl.
¶ 48.) But HMIT fails to (i) identify those proceedings or when they occurred; (ii) allege that Seery
was aware of, let alone participated in, any "bankruptcy proceedings" with Stonehill; or
(iii) suggest how the unidentified "bankruptcy proceedings" resulted in a relationship close enough
to support the wide-ranging conspiracy HMIT imagines.

49.     HMIT tries to bolster this supposed connection by pointing to a decade-old court filing showing that the law firm for which Seery worked (Sidley Austin LLP) represented a "Steering Group of Senior Secured Noteholders" in the Blockbuster bankruptcy, and that, at some point, Stonehill was one of five members of that group. (Mot. Ex. 2 at A-66.)[14] There is no evidence or non-conclusory allegation that Seery (or his then-firm) ever represented Stonehill individually or that any individual involved in the Blockbuster bankruptcy on Stonehill's behalf had any involvement in Stonehill's decision to purchase claims in the Highland bankruptcy.

50.     **Second**, HMIT alleges that (i) a global asset management firm called GCM Grovesnor held four seats on the Redeemer Committee; (ii) "upon information and belief" GCM Grovesnor "is a significant investor in Stonehill and Farallon"; (iii) Grovesnor "through Redeemer, played a large part in appointing Seery as a director of Strand Advisors"; and (iv) Seery was therefore "beholden to Grovesnor from the outset, and, by extension, Grovesnor's affiliates Stonehill and Farralon [*sic*]." (*Id.*)

51.     These allegations, however, are based on unsupported speculation and tortured inferences, and certain of them make no sense.[15]

2.      HMIT's Allegations Concerning Farallon

52.     Likewise, the speculative and unsupported allegations concerning Seery's alleged relationship with Farallon cannot withstand scrutiny.

---

[14] The Complaint incorrectly claims that "Seery represented Farallon as its legal counsel" (Compl. ¶ 48), but its Motion appends a court filing referring to Stonehill (Mot. Ex. 2 at A-66).

[15] For example, HMIT alleges that Grovesnor is a "significant investor" in Stonehill and Farallon and that Grovesnor is an "affiliate" of Stonehill and Farallon, while also effectively alleging that Stonehill and Farallon fleeced the Redeemer Committee by buying its claim while in possession of "material, non-public inside information." Notably, the Redeemer Committee—the actual party that would have been harmed if HMIT's allegations had any merit (which they do not)—has never sought to intervene in this matter even though Dondero first floated these allegations in 2021 as part of the First Rule 202 Petition (nor, for that matter, has Acis, UBS, or HarbourVest ever voiced any concerns about supposedly being victimized by the Claims Purchasers).

53.     HMIT alleges "upon information and belief" that Seery "conducted substantial business with Farallon" while he was the Global Head of Fixed Income Loans at Lehman Brothers. (Compl. ¶ 48.) But the only "fact" supposedly supporting this broad allegation is a single page taken from (what appears to be) a Lehman Brothers real estate group promotional document stating that Farallon participated in a secured real estate loan in 2007. (Mot. Ex. 2 at A-65.) HMIT does not allege that Seery knew of, let alone participated in, this transaction, nor does it identify any other business (let alone "substantial business") that Seery allegedly conducted with Farallon while at Lehman Brothers.

### F.     HMIT's "Insider Trading" Allegations Are Unsupported And Provide No Foundation For The Purported Inferences.

54.     One of HMIT's principal allegations is that, as part of the purported *quid pro quo*, Seery disclosed to the Claims Purchasers "material non-public inside" information concerning MGM that he obtained from Dondero to entice them to buy claims in Highland's bankruptcy case. (*See*, *e.g.*, Compl. ¶¶ 13, 47, 50, 83, 89.)

### 1.     Dondero's Description Of His Communication(s) With Farallon Have Changed Over Time.

55.     HMIT's Motion is based in substantial part on Dondero's description of communication(s) he purportedly had with one or two representatives of Farallon in the "late spring" of 2021 concerning Farallon's acquisition of certain claims in the Highland bankruptcy. (Mot. ¶ 1 & Ex. 3; Morris Dec. Ex. 9.)

56.     Because (i) Dondero's description of his communication(s) with Farallon has substantially changed over time, (ii) neither HMIT nor Dondero offer any rational reason why Farallon would voluntarily confess to improprieties to a third party with a well-earned reputation

004122

for using overly aggressive litigation tactics, and (iii) certain aspects of his various descriptions are contradicted by documentary evidence, they cannot be the basis for any claim.[16]

57. In the First Rule 202 Petition filed in July 2021, Dondero swore, among other things, that:

> [Seery] has an age-old connection to Farallon and, upon information and belief, advised Farallon to purchase the claims.
>
> On a telephone call between [Dondero] and a representative of Farallon, Michael Lin [*sic*], Mr. Lin [*sic*] informed [Dondero] that Farallon had purchased the claims sight unseen—relying entirely on Mr. Seery's advice solely because of their prior dealings.
>
> As Highland's current CEO, Mr. Seery had non-public, material information concerning Highland. Upon information and belief, such non-public, material information was the basis for instructing Farallon to purchase the Claims.

(Morris Dec. Ex. 3 ¶¶ 20–21, 23 ("Version 1").)

58. Version 1 is notable because it (i) did not state what Dondero said, if anything, (ii) referred to a single phone call, (iii) made no mention of MGM, (iv) made no mention of Raj Patel (who features later); and (v) stated only "upon information and belief" that Farallon purchased the Claims based on "non-public, material information."[17]

59. On May 2, 2022, Dondero amended the First Rule 202 Petition. In his new verified pleading, Dondero swore, among other things, that:

> [Seery] has an age-old connection to Farallon and, upon information and belief, advised Farallon to purchase the claims.

---

[16] Notably, there is no allegation that anyone ever communicated with Stonehill about its claims purchases (let alone obtained a "confession"); thus, HMIT's "conspiracy" theory against Stonehill rests on nothing but rank speculation based on unsupportable inferences.

[17] Later in 2021, Dondero "commissioned an investigation by counsel" who produced written reports to the EOUST. The first such report was prepared by Douglas Draper, counsel to Dondero's family trusts, and delivered to the EOUST on October 5, 2021. Draper provided several reasons to support his speculation that "Farallon and Stonehill may have been provided material, non-public information to induce their purchase of claims" and to justify his request for further investigation—but conspicuously failed to mention Dondero's telephone call(s) with Farallon. (Mot. Ex. 2-A at 7.)

004123

> On a telephone call between [Dondero] and Michael Lin [*sic*], a representative of Farallon, Mr. Lin [*sic*] informed [Dondero] that Farallon had purchased the claims sight unseen ***and with no due diligence—100% relying on Mr. Seery's say-so because they had made so much money in the past when Mr. Seery told them to purchase claims***.
>
> In other words, ***Mr. Seery had inside information on the price and value of the claims that he shared with no one but Farallon for their benefit***.

(*Id.* Ex. 4 ¶¶ 22–24 ("Version 2") (emphasis added).)

60.     Like Version 1, Version 2 also (i) did not state what Dondero said, if anything; (ii) referred to a single phone call; (iii) made no mention of MGM; and (iv) made no mention of Raj Patel. But in contrast to Version 1, Version 2 embellished Linn's alleged comments and—more importantly—now expressly asserted that Seery "shared" inside information with "no one but Farallon" rather that adopting Version 1's statement that "upon information and belief," Farallon purchased the Claims based on "non-public, material information."[18]

61.     About four weeks later, Dondero provided yet another version of his discussion with Linn. In a declaration sworn to on May 31, 2022, Dondero stated, among other things, that:

> Last year, I called Farallon's Michael Lin [*sic*] about purchasing their claims in the bankruptcy. ***I offered them 30% more than what they paid***. I was told by Michael Lin [*sic*] of Farallon that they purchased the interests ***without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid***.

(*Id.* Ex. 5 ¶ 2 ("Version 3") (emphasis added).)

62.     Version 3 introduces several new topics. For example, Dondero asserts for the first time that he called Linn because he was interested in purchasing Farallon's claims. Dondero also

---

[18]If, as Dondero contends, Seery "shared" inside information with "no one but Farallon," then he did not share the inside information with Stonehill.

asserts that he offered "30% more than what they paid."[19] Finally, and significantly, Dondero asserts for the first time that Linn reported Seery telling him that the "interests would be worth far more than what Farallon paid."

63. On February 15, 2023, Dondero filed yet another sworn statement concerning his 2021 discussion(s) with Farallon, this time in support of HMIT's Verified Rule 202 Petition. (*Id.* Ex. 9.) In this version, Dondero stated that:

> In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), **Raj Patel** and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the **Acis and HarbourVest claims**, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Mr. Seery because they had made significant profits when Mr. Seery told them to purchase other claims in the past. **They also stated that they were particularly optimistic because of the expected sale of MGM**.

(*id*. Ex. 9 ¶ 4 ("Version 4") (emphasis added).)

64. Version 4 introduces still more new topics. For example, Dondero asserted for the first time that (i) more than one telephone call occurred; (ii) Raj Patel also participated in these calls on Farallon's behalf; (iii) he was told that "Farallon had a deal in place to purchase the Acis and HarbourVest claims"; and (iv) he learned that Farallon was "**particularly optimistic because of the expected sale of MGM**."

65. Finally, in its Motion, HMIT attributes statements to Farallon that even Dondero never described. For example, HMIT contends that "Farallon bragged about the value of its investment referencing non-public information regarding Amazon, Inc.'s ('Amazon') interest in

---

[19] Ironically, Dondero appears to have offered to purchase Farallon's claims without conducting any due diligence because (i) he provides no indication that he knew at that time how much Farallon paid for its claims yet he blindly offered to pay "30% more than what" Farallon paid, and (ii) HMIT alleges that the Debtor was not transparent. (*See* Compl. ¶¶ 51–53.)

acquiring Metro-Goldwyn-Mayer Studios Inc." (Mot. ¶ 32.)[20] While HMIT cites Version 4 as support, neither that version nor any prior version is consistent with HMIT's description of Dondero's purported communication(s) with Farallon.[21]

> ### 2.   Dondero's Offer to Purchase Farallon's and Stonehill's Claims In 2022 Contradicts HMIT's Allegations.

66.     According to HMIT, Dondero offered to buy Farallon's claims in the Highland bankruptcy for 30% more than what Farallon was paid, but that Farallon insisted it would not sell at any price. (Morris Dec. Ex. 5 ¶ 2.)

67.     Yet, on October 14, 2022, before the Second Rule 202 Petition was filed, HCMFA (one of Dondero's advisory firms) made written offers to Stonehill and Farallon to purchase their claims at cost "plus a five percent (5%) return." (Morris Dec. Ex. 35.) Dondero's offer to purchase claims at 5% above cost is inconsistent with his purported knowledge that Farallon would not sell at any price.

### G.   A Rational Basis Exists For the Claims Purchases—Although Only the Claim Sellers Could Have Been Harmed in Any Event.

68.     HMIT insists that it "made no sense" for the Claims Purchasers to buy claims because "the publicly available information [] did not offer a sufficient potential profit to justify the publicly disclosed risk," and "their investment was projected to yield a small return with

---

[20] This purported statement that HMIT attributes to Farallon makes little sense because the MGM-Amazon deal was publicly announced on May 26, 2021 (Morris Dec. Ex. 34), before Dondero and Farallon ever spoke.

[21] Conspicuously absent from HMIT's pleadings is any evidence corroborating any of the five versions of Dondero's conversation(s) with Farallon. Given the importance of the Farallon's alleged confessional, one would have expected Dondero to contemporaneously (i) send a confirming e-mail to Farallon to make sure there was a written record of the discussion, (ii) send an e-mail to a colleague so that others were informed, (iii) make notes to himself; or (iv) tell someone what happened. Yet, no such corroborating evidence was presented or referred to in the First Rule 202 Petition, either of the EOUST Letters, the Second Rule 202 Petition, the Motion, the original proposed Complaint, the Supplement, or the amended proposed Complaint.

virtually no margin for error." (Compl. ¶ 3.) HMIT's arguments are belied by the publicly available

facts and its own allegations.

69.     In advance of Plan confirmation, the Debtor projected that Class 8 general

unsecured creditors would recover 71.32% on their allowed claims. (Docket No. 1875 Ex. A.) In

its proposed Complaint, HMIT sets forth the amounts the Claims Purchasers purportedly paid for

their claims. (Compl. ¶ 42.) Taking into account the face amount of the allowed claims, the Claims

Purchasers' projected profits (in millions of dollars) were as follows:

| Creditor | Class 8 | Class 9 | Ascribed Value[22] | Purchaser | Purchase Price | Projected Profit |
|---|---|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | $97.71 | Stonehill | $78.0 | $19.71 |
| Acis | $23.0 | $0.0 | $16.4 | Farallon | $8.0 | $8.40 |
| HarbourVest | $45.0 | $35.0 | $32.09 | Farallon | $27.0 | $5.09 |
| UBS | $65.0 | $60.0 | $46.39 | Stonehill & Farallon | $50.0 | ($3.61) |

70.     As HMIT acknowledges, by the time Dondero spoke with Farallon in the "late

spring" of 2021, the Claims Purchasers had acquired the allowed claims previously held by Acis,

Redeemer, and HarbourVest. (Compl. ¶ 41 n.12.)[23] Based on an aggregate purchase price of

$113 million, the Claims Purchasers would have expected to net over $33 million in profits, or

nearly 30% on their investment, had Highland met its projections. The Claims Purchasers would

make even more money if Highland beat its projections because they also purchased the Class 9

claims, and would therefore capture any upside. In this context, HMIT assertions in its proposed

Complaint lack any rational basis.

---

[22] "Ascribed Value" is derived by multiplying the Class 8 amount by the projected recovery of 71.32% for that class.

[23] The UBS claims were not acquired until August 2021, long after the alleged "*quid pro quo*" was supposedly agreed upon and the MGM-Amazon deal was announced. (Morris Dec. Ex. 34.)

71.    Notably, none of the selling claimholders—all of which are sophisticated parties that were represented by sophisticated counsel—have raised any objections or complaints. In fact, three of the four selling claimholders (Redeemer, Acis, and UBS) were members of the Official Committee of Unsecured Creditors.

72.    Finally, even if HMIT's allegations had any merit (they do not), only the selling claimholders would have cause to complain. The estate (and HMIT) would not have been harmed because it made (and may in the future make) the exact same distributions to claimholders regardless of what entity owns the claims.

**H.    Seery's Compensation Structure Is Consistent With The Plan And The Trust Agreement, And Was The Product Of Arms'-Length Negotiations.**

73.    According to HMIT, Seery provided "material non-public information" to the Claims Purchasers so that he could someday "plant friendly allies onto the [COB] to rubber stamp compensation demands." (Mot. ¶ 22; *see also id.* ¶¶ 3, 24, 48.) HMIT alleges in its revised Complaint:

> As part of the scheme, the Defendant Purchasers obtained a position to approve Seery's ongoing compensation – to Seery's benefit and also to the detriment of the Claimant Trust, the Reorganized Debtor, and HMIT. Initially, Seery's compensation package was composed of a flat monthly pay [sic]. Now, however, it is also performance based. This allows the Defendant Purchasers to satisfy the *quid pro quo* at the heart of the scheme. Seery would help the Defendant Purchasers make large profits and they would help enrich Seery with big pay days.

(Compl. ¶ 4.)

74.    Notably, these allegations (i) describe a compensation structure that is ***entirely consistent with*** the incentive compensation plan structure in the Court-confirmed Plan and set forth in the Trust Agreement; and (ii) are devoid of any actual facts (*e.g.*, the terms of Seery's compensation plan or how it was calculated or negotiated). In reality, Seery's compensation

004128

package was the product of arm's-length negotiations with the COB (including the active participation of the COB's independent member) over a four-month period, the result of which was an incentive compensation plan that aligned Seery's interests with those of the Claimant Trust Beneficiaries (*i.e.*, to maximize value and creditor recoveries).

75.     As a threshold matter, HMIT's allegation that "[i]nitially, Seery's compensation package was composed of a flat monthly pay [*sic*]" (Compl. ¶ 4]) is plainly wrong. Seery was appointed Highland's Chief Executive Officer (effective as of March 15, 2020) pursuant to a Bankruptcy Court order entered on July 16, 2020 without objection. (Morris Dec. Ex. 36 (the "July Order").) The July Order approved the terms of a separate employment agreement (a copy of which was included in the Debtor's motion (Docket No. 774 Ex. A-1) and attached to the July Order) (the "Original Employment Agreement").

76.     Under the Original Employment Agreement, Seery was to receive (i) Base Compensation in the amount of $150,000 per month, ***plus*** (ii) a Restructuring Fee, the amount of which would be determined by whether a Case Resolution Plan (*i.e.*, a plan with substantial creditor support) or a Monetization Vehicle Plan (*i.e.*, a plan lacking substantial creditor support) was achieved (as those terms are defined in the Original Employment Agreement).

77.     On November 24, 2020, after notice and a hearing, the Bankruptcy Court entered an Order (Docket No. 1476) approving the adequacy of *The Disclosure Statement of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (Morris Dec. Ex. 37 (the "Disclosure Statement").) The Disclosure Statement provided in pertinent part that:

> The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement . . . . The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(*Id*. Art. III.F.2(e); *see* Plan Art. IV.B.6 (incorporating identical language).)

004129

78. The Trust Agreement was part of a Plan Supplement (as amended) filed in advance
of the confirmation hearing (Morris Dec. Ex. 38), and provided in pertinent part:

> <u>Compensation</u>. As compensation for any services rendered by the
> Claimant Trustee in connection with this Agreement, the Claimant
> Trustee shall receive compensation of $150,000 per month (the
> "<u>Base Salary</u>"). Within the first forty-five days following the
> Confirmation Date, the Claimant Trustee on the one hand, and the
> Committee, if prior to the Effective Date, or the Oversight Board, if
> on or after the Effective Date, on the other, will negotiate go-forward
> compensation for the Claimant Trustee which will include (a) the
> Base Salary, (b) a success fee, and (c) severance.

(Trust Agmt. § 3.13(a)(i).)[24]

79. The Plan went effective on August 11, 2021, and, as a result, the COB was formed.
The COB ultimately had three members: a representative of Farallon (Michael Linn), a
representative of Stonehill (Christopher Provost), and an independent member (Richard Katz).

80. On August 26, 2021, the COB held a regularly scheduled meeting during which it
discussed the incentive compensation program ("<u>ICP</u>"). The minutes of this meeting reflect that:

> Mr. Seery also presented the Board with an overview of his
> Incentive Compensation Program proposal which would include not
> only Mr. Seery but the current HCMLP team. (The terms and
> structure of the proposal had been previewed with the Board in prior
> operating models presented by Mr. Seery.) Mr. [Seery] reviewed the
> proposal and stated his view that the proposal was market based and
> was designed to align incentives between himself and the HCMLP
> team on the one hand and the Claimant Trust [B]eneficiaries on the
> other. ***The Board asked questions regarding proposal and***
> ***determined that is [sic] would consider the proposal and revert to***
> ***Mr. Seery with a counter proposal***.

(Morris Dec. Ex. 39 (emphasis added).)

---

[24] Seery was designated as the "Claimant Trustee" under the Trust Agreement. (Trust Agmt. 38 §1.1(e).)

004130

81. Far from being a "rubber stamp," the minutes show that the COB did not simply accept Seery's initial proposed ICP but "asked questions" and indicated that it would provide a "counter proposal."

82. On August 30, 2021, the COB convened for "an off-cycle (non-regular) meeting." As reflected in the minutes of this meeting, the COB again discussed the ICP:

> Mr. Katz began the meeting by walking the Oversight Board and Mr. Seery through the Oversight Board's counter-proposal to the HCMLP incentive compensation proposal, including the review of a spreadsheet and summary of the counter-proposal. Discussion was joined by Mr. Linn and Mr. Stern. Mr. Seery asked numerous questions and received detailed responses from the Oversight Board. ***Mr. Seery and the Oversight Board agreed to continue the discussion and negotiations regarding the proposed incentive compensation plan for the Claimant Trustee and the HCMLP [employees]***.

(*Id.* Ex. 40 (emphasis added).)

83. Seery and the COB continued to exchange and discuss additional proposals and counter-proposals over the coming months.[25] Finally, on December 6, 2021, Seery and the COB executed a Memorandum of Agreement stating that:

> In accordance with the provisions of the Highland Claimant Trust Agreement and the Highland Capital Management, L.P. ("HCMLP") Plan of Reorganization, ***the Oversight Board of the Highland Claimant Trust and the Claimant Trustee/Chief Executive Officer of HCMLP engaged in robust, arm's length and good faith negotiations regarding the incentive compensation program for the Claimant Trust/CEO*** and the HCMLP post-effective date operating team ("HCMLP Team"). ***After considering various structures and incentives to motivate performance on behalf of the Claimant Trust***, the parties reached the binding

---

[25] In particular, (i) Seery delivered another proposal to the COB on October 9, 2021, which he further revised later in the month; (ii) Katz (the independent COB member) responded on behalf of the COB on October 26 and proposed that the parties agree upon the structure of the proposal before addressing the specific numbers; (iii) Seery responded on November 3; (iv) further discussions were held on November 9; (v) on November 17, Linn provided a "wholesome response" in which he "updated the term sheet" and raised certain issues that he did not believe would have "much a difference for this negotiation"; (vi) Seery wrote to the COB indicating that he wanted to "finalize the ICP" but had "a couple of asks and one question"; and (vii) still further negotiations took place thereafter.

agreement reflected in the attached HCMLP and Claimant Trust
Management Incentive Compensation Program.

(Morris Dec. Ex. 41 (emphasis added).)

84.    Notably, in November 2021, one of the "investigative reports" commissioned by
Dondero incorrectly speculated that "Mr. Seery's success fee presumably will be based on whether
the Plan outperforms what was disclosed in the Plan Analysis." (Mot. Ex. 2-B at 14.) In fact,
Seery's bonus is tied to creditor recoveries so that the interests of stakeholders are aligned.

85.    Dondero's commissioned report also incorrectly "estimate[d] that, based on the
estate's [alleged] $600 million value today, ***Mr. Seery's success fee could be approximate [sic]
$50 million***." (*Id.*) In reality, under the negotiated terms of the ICP (Morris Dec. Ex. 41), the
maximum bonus Seery can receive is approximately $8.8 million—which would require all
Class 8 and 9 claimholders to receive cash distributions for the full amount of their claims plus
interest—82.4% less than the baseless success fee presented to the EOUST on Dondero's behalf.

**RELEVANT PROCEDURAL HISTORY**

86.    To avoid the appointment of a Chapter 11 trustee, on January 9, 2020, this Court
approved a settlement (the "January Order"; Docket No. 339) removing Dondero from control of
Highland and appointing an Independent Board consisting of John Dubel, Russell Nelms, and
Seery (the "Independent Directors"). The January Order prohibited litigation against the
Independent Directors without this Court's prior authorization and limited claims to those arising
from willful misconduct or gross negligence.[26]

---

[26] (January Order ¶ 10 ("No entity may commence or pursue a claim or cause of action of any kind against any
Independent Director . . . relating in any way to the Independent Director's role as an independent director . . . without
the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful
misconduct or gross negligence against Independent Director . . . .").)

004132

87.     Highland later moved to have Seery appointed its Chief Executive Officer and Chief Restructuring Officer. This Court approved his appointment in the July Order (Morris Dec. Ex. 36), which like the January Order, prohibited litigation against Seery without this Court's prior authorization and limited claims to those arising from willful misconduct or gross negligence.[27]

88.     On February 22, 2021, this Court issued the Confirmation Order confirming the Plan. The confirmed Plan included the Gatekeeper Provision prohibiting Enjoined Parties, including HMIT, from bringing claims against Protected Parties, including Seery, unless, after notice and a hearing, this Court found the claims "colorable." (Plan Art. IX.F.) The Gatekeeper Provision was affirmed by the Fifth Circuit. *NexPoint*, 48 F.4th at 425–26, 435–39. The detail factual findings in the Confirmation Order supporting the Gatekeeper Provision were not challenged or disturbed on appeal.

89.     On August 11, 2021, the Plan became effective (Docket No. 2700), and pursuant to the Plan:

- All prepetition partnership interests in the Debtor, including HMIT's, were cancelled;

- HCMLP was reorganized as a Delaware limited liability partnership;

- The Trust, a Delaware statutory trust, was established pursuant to the Trust Agreement;

- HCMLP's limited partnership interests were issued to the Trust;

- HCMLP's general partnership interests were issued to HCMLP GP LLC, a newly-established Delaware limited liability company;

---

[27] (July Order ¶ 5 ("No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery . . . .").)

- The majority of HCMLP's assets, including its "Causes of Action,"[28] were transferred to the Trust;

- Seery was appointed reorganized HCMLP's Chief Executive Officer and trustee of the Trust (the "Claimant Trustee");

- "Estate Claims" (*i.e.*, Causes of Action against HCMLP's insiders)[29] were transferred to the newly-established Highland Litigation Sub-Trust (the "Litigation Trust"), a Delaware statutory trust and subsidiary of the Trust;

- An oversight board was appointed to oversee the management of the Trust, reorganized HCMLP, and the Litigation Trust;

- Holders of allowed general and subordinated unsecured claims (*i.e.*, Class 8 and 9) received interests in the Trust (collectively, the "Trust Interests") and became "Claimant Trust Beneficiaries" (as defined in the Plan); and

- Holders of the Debtor's prepetition partnership interests (*i.e.*, Class 10 and 11) were allocated unvested contingent interests (the "Contingent Interests") in the Trust that vest if, and only if, the Claimant Trustee certifies that all Claimant Trust Beneficiaries (*i.e.*, Class 8 and 9) have been paid in full, Class 8 have received post-petition interest, and all disputed claims in Class 8 and 9 have been resolved.

(*See* Plan Art. IV.)

90.    On October 8, 2021, the Trust irrevocably transferred and assigned to the Litigation

Trust "any and all Causes of Action not previously transferred or assigned by operation of the

Plan, the Litigation Sub-Trust Agreement, or otherwise" except for causes of action then being

---

[28] "Causes of Action" are defined in the Plan as: "any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law." (Plan Art. I.B.19.)

[29] "Estate Claims" are defined in the Plan as "estate claims and causes of action against Dondero, Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing" other than causes of action against any current employee of Highland other than Dondero. (Plan Art. I.B.61.)

004134

pursued by the Trust or which the Trust intended to pursue on behalf of entities managed by reorganized HCMLP. (*See* Morris Dec. Ex. 42.)[30]

91.　　On March 28, 2023, HMIT filed its Initial Motion with a proposed Verified Adversary Complaint totaling 387 pages with exhibits. This Court scheduled a conference for Monday, April 24, 2023. (Docket No. 3751.) On Friday, April 21, 2023, HMIT filed objections to any evidentiary hearing or briefing on its Initial Motion. ("Objs."; Docket No. 3758.) On Sunday, April 23, 2023, HMIT filed a Supplemental Motion with an amended proposed Verified Adversary Complaint, which added HCMLP and the Trust as nominal defendants and dropped a claim for "fraud by misrepresentation and material nondisclosure." (Docket No. 3760.) On April 24, 2023, this Court held a conference, set a briefing schedule on the Motion, and scheduled a hearing for June 8, 2023. (Docket Nos. 3763–64.)

## LEGAL STANDARD

92.　　HMIT concedes, as it must, that its proposed lawsuit is subject to this Court's "gatekeeping protocol," and "the injunction and exculpation provision in the Plan." (Mot. ¶¶ 1, 4, 14; Supp. Mot. ¶ 11.) But HMIT fundamentally misunderstands the threshold showing it must make to clear that hurdle.

### A.　HMIT Misconstrues The "Colorability" Standard Established In The Gatekeeper Provision.

93.　　This Court made extensive factual findings and approved the Gatekeeper Provision on two grounds: (i) "the Supreme Court's 'Barton Doctrine,' *Barton v. Barbour*, 104 U.S. 126 (1881))," and (ii) "the notion of a prefiling injunction to deter vexatious litigants[] that has been approved by Fifth Circuit." (Confirmation Order ¶¶ 76–81.) Those doctrines operate to "prevent

---

[30] The October 8, 2021 transfer was publicly disclosed by the Litigation Trust in its litigation with HMIT, among others. *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj, Docket No. 211 (Bankr. N.D. Tex. Sept. 9, 2022).

004135

baseless litigation designed merely to harass the post-confirmation entities," "avoid abuse of the court system," and "preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants." (*Id.* ¶ 79.) The Fifth Circuit confirmed that "the injunction and gatekeeping provisions are sound," explaining that "[c]ourts have long recognized bankruptcy courts can perform a gatekeeping function," including "[u]nder the '*Barton*' doctrine." *NexPoint*, 48 F.4th at 435, 438–39 (collecting cases). The Fifth Circuit further recognized that the Gatekeeper Provision here was necessary to prevent "bad-faith litigation" from consuming the resources of the reorganized debtor and those working to maximize claims of legitimate stakeholders. *Id.*

94. Under the *Barton* doctrine, "[a] party seeking leave of court to sue a trustee must make a prima facie case against the trustee, showing that its claim is not without foundation." *VistaCare*, 678 F.3d at 232 (cleaned up) (citing *Anderson v. United States*, 520 F.2d 1027, 1029 (5th Cir. 1975); *Kashani v. Fulton (In re Kashani)*, 190 B.R. 875, 885 (B.A.P. 9th Cir 1995)); *see also, e.g.*, *CFTC v. Hunter Wise Commodities, LLC*, 2020 WL 13413703, at *1 (S.D. Fla. Mar. 5, 2020) ("Under the *Barton* doctrine, . . . before leave to sue a receiver or trustee is granted, the plaintiff must demonstrate that he has a *prima facie* case against the trustee or receiver.") (citing *Anderson*, 520 F.2d at 1029; *Fin. Indus. Assoc. v. SEC*, 2013 WL 11327680, at *4 (M.D. Fla. July 24, 2013) (same). Contrary to HMIT's contention, this standard "involves a greater degree of flexibility" than a "Rule 12(b)(6) motion to dismiss," because "the bankruptcy court, which, ***given its familiarity with the underlying facts and the parties***, is uniquely situated to determine whether a claim against the trustee has merit," and "[t]he bankruptcy court is also uniquely situated to determine the potential effect of a judgment against the trustee on the debtor's estate." *VistaCare*, 678 F.3d at 233 (emphasis added).

95.     To satisfy the "*prima facie* case standard," "the movant must do more than meet the liberal notice-pleading requirements of Rule 8." *In re World Mktg. Chi., LLC*, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) (cleaned up; collecting cases). "[I]f the [bankruptcy] court relied on mere notice-pleading standards rather than evaluating the merits of the allegations, the leave requirement would become meaningless." *Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*, 2000 WL 1761020, at *2 (N.D. Ill. Nov. 30, 2000). "To apply a less stringent standard would eviscerate the protections" of the Gatekeeper Provision. *World*, 584 B.R. at 743 (quoting *Leighton*, 2000 WL 1761020, at *2).

96.     Similarly, courts in the vexatious litigant context require the movant to "show that the claims sought to be asserted have sufficient merit," including that "the proposed filing is both procedural and legally sound," and "that the claims are not brought for any improper purpose, such as harassment." *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex. July 7, 2020) (denying leave to file lawsuit); *see also Silver v. Perez*, 2020 WL 3790489, at *1 (W.D. Tex. July 7, 2020) (same). "[T]o protect courts and innocent parties from abusive and vexatious litigation[,] . . . courts may apply whatever standard deemed warranted when reviewing the proposed complaint." *Silver*, 2020 WL 3803922, at *6. "For a prefiling injunction to have the intended impact, it must not merely require a reviewing official to apply an already existing level of review," such as the "plausibility" standard for a Rule 12(b)(6) motion. *Id.* Rather, courts apply "an additional layer of review," and "may appropriately deny leave to file when even part of the pleading fails to satisfy the reviewer that it warrants a federal civil action" or that the "litigant's allegations are unlikely," especially "when prior cases have shown the litigant to be untrustworthy or not credible . . . ." *Id.*

97.     HMIT argues that "a claim is colorable if it is 'plausible' and could survive a motion to dismiss" under Rule 12(b)(6). (Mot. ¶¶ 38–42.) But HMIT's motion does not even mention the specific bases this Court invoked in the Confirmation Order—the *Barton* doctrine and vexatious-litigant provisions—as supporting the Gatekeeper Provision, much less has HMIT identified a single case in the *Barton* doctrine or vexatious litigant context that supports its interpretation. (*Id.*; *see also* Morris Dec. Ex. 43 at 15:25–16:4 (THE COURT: "[D]id you find any legal authority in the *Barton* doctrine context that you think sheds light? Because that seems to me the most analogous context, right?" MR. MCENTIRE: "Specifically to answer -- to respond to your question directly, the answer is no.").) HMIT relies instead on cases from inapposite contexts, such as whether a bankruptcy court should grant a creditor's committee derivative standing after a trustee or debtor-in-possession declined to pursue a claim.[31] None of those cases, of course, involves gatekeeping orders entered in response to a pattern of abusive conduct that specifically rely on *Barton* and vexatious-litigant authorities. Moreover, and as discussed below, even those cases recognize that a claim must not only be likely to survive a motion to dismiss, but also that the debtor has "unjustifiably" refused to pursue it. *La. World*, 858 F.2d at 247–48**.** That requirement demands that the proposed claims be subjected to a realistic cost-benefit analysis, which here would be fatal to HMIT's speculative, Hail Mary conspiracy theory.

98.     HMIT also relies on a series of cases that are even farther afield from the Gatekeeper Provision here. Those include benefits coverage disputes under ERISA, Medicare

---

[31] *See La. World Expo. v. Fed. Ins. Co.*, 858 F.2d 233, 247–48 (5th Cir. 1988); *PW Enters. v. N.D. Racing Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892, 900 (8th Cir. 2008); *Larson v. Foster (In re Foster)*, 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014); *Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Grp.)*, 66 F.3d 1436, 1446 (6th Cir. 1995); *Official Comm. v. Hudson United Bank (In re America's Hobby Ctr.)*, 225 B.R. 275, 282 (Bankr. S.D.N.Y. 1998).

004138

coverage disputes, and constitutional challenges.[32] None of those cases implicate the *Barton*

doctrine and vexatious-litigant concerns. (*See* Mot. ¶¶ 39–41; Objs. ¶¶ 9–13.)

### B. Evidentiary Hearing

99.     Courts in the *Barton* doctrine context regularly conduct an evidentiary hearing to

determine whether a proposed complaint meets the necessary threshold. "Whether to hold a

hearing is within the sound discretion of the bankruptcy court." *VistaCare*, at 232 n.12 "[T]he

decision whether to grant leave may involve a 'balancing of the interests of all parties involved,'"

which will ordinarily require an evidentiary hearing. *Id.* at 233 (quoting *Kashani*, 190 B.R. at 886–

87). In *VistaCare*, for example, the bankruptcy court "held a hearing on CGL's motion for leave"

in which "the sole owner of CGL, and the Trustee, testified." *Id.* at 223, 232. The Fifth Circuit has

affirmed a colorability analysis in the *Barton* context, which involved an evidentiary hearing,

without any concern that the inquiry was somehow improper. *See Foster v. Aurzada (In re Foster)*,

2023 WL 20872, at *1 (5th Cir. Jan. 3, 2023) (affirming dismissal of an action to sue a trustee

under *Barton* "[a]fter a hearing [by] the bankruptcy court"); *Howell v. Adler (In re Grodsky)*, 2019

WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019) (dismissing an action under *Barton* after "a

---

[32] *See Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002) (assessing whether an employee has "a colorable claim to vested benefits" such that the employee may be considered a "participant" under ERISA); *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1129 (5th Cir. 1996) (same); *Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 790 (7th Cir. 1996) (same); *Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods. (In re Deepwater Horizon)*, 732 F.3d 326, 340 (5th Cir. 2013) (holding that claims administrator incorrectly interpreted class settlement agreement by permitting "claimants [with] no colorable legal claim" to receive awards); *Richardson v. United States*, 468 U.S. 317, 326 n.6 (1984) (discussing whether criminal defendant's double jeopardy claim was "colorable" such that it could be appealed before final judgments); *Trippodo v. SP Plus Corp.*, 2021 WL 2446204, at *3 (S.D. Tex. June 15, 2021) (assessing whether plaintiff stated a "colorable claim" against proposed additional defendants in determining whether plaintiff could amend complaint); *Reyes v. Vanmatre*, 2021 WL 5905557, at *3 (S.D. Tex. Dec. 13, 2021) (same); *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 n.15 (5th Cir. 2018) (assessing whether plaintiff raised a "colorable claim" to warrant the district court's exercise of jurisdiction over a Medicare coverage dispute); *Am. Med. Hospice Care, LLC v. Azar*, 2020 WL 9814144, at *5 (W.D. Tex. Dec. 9, 2020) (same); *Harry v. Colvin*, 2013 WL 12174300, at *5 (W.D. Tex. Nov. 6, 2013) (considering whether plaintiff asserted a "colorable constitutional claim" such that the court could exercise jurisdiction); *Sabhari v. Mukasey*, 522 F.3d 842, 844 (8th Cir. 2008) (same); *Stanley v. Gonzales*, 476 F.3d 653, 657 (9th Cir. 2007) (same).

close examination" of the evidence revealed only that the trustee "acted within the scope of [his]

duties"), *aff'd* 799 F. App'x 271 (5th Cir. 2020).

100. Recognizing that the *Barton* doctrine requires more than a mere Rule 12(b)(6)

analysis, courts of appeals routinely review "a bankruptcy court's decision to grant a motion for

leave to sue a trustee under the deferential abuse of discretion standard." *VistaCare*, 678 F.3d at

224 (citing *In re Linton*, 136 F.3d 544, 546 (7th Cir. 1998); *In re Beck Indus., Inc.*, 725 F.2d 880,

889 (2d Cir. 1984)).[33] Application of the Rule 12(b)(6) standard, of course, is subject to *de novo*

review. Indeed, as this Court noted at the April 24, 2023 status conference, HMIT's "original

motion for leave attached something like 387 pages of not just Dondero affidavits, but other

evidentiary support," which is inconsistent with HMIT's position that this Court "just need[ed] to

look at the four corners and apply a 12(b)(6) standard." (Morris Dec. Ex. 43 at 43:16–18, 44:4–7.)

Although HMIT's belatedly counsel suggested it might seek to "withdraw the Dondero affidavits"

(*id.* at 22:17–18), HMIT has filed no such motion and "reserve[d] the opportunity to revisit the

issue of withdrawing Mr. Dondero's declarations" (*id.* at 55:1–5). As this Court noted, "parties are

always given the chance to cross-examine an affiant or a declarant." (*Id.* at 22:2–3.) This Court

should exercise its discretion to hold an evidentiary hearing to permit the parties to present

evidence, including through cross-examination of Dondero—even if HMIT now engages in

gamesmanship by seeking to withdraw the Dondero declarations before the hearing.

---

[33] Although the Fifth Circuit has not squarely addressed this issue, all nine Circuits that have considered this issue have also adopted an abuse-of-discretion standard. *See In re Bednar*, 2021 WL 1625399, at *3 (B.A.P. 10th Cir. Apr. 27, 2021) ("[T]he Bankruptcy Court's decision to decline leave to sue the Trustee under the *Barton* doctrine is reviewed for abuse of discretion . . . .") (citing *VistaCare*); *SEC v. N. Am. Clearing, Inc.*, 656 F. App'x 969, 973–74 (11th Cir. 2016) ("Although we have never determined the standard of review for a challenge to the denial of a *Barton* motion, other Circuits that have considered the issue review a lower court's ruling on a *Barton* motion for an abuse of discretion.") (citing *VistaCare*); *In re Lupo*, 2014 WL 4653064, at *3 (B.A.P. 1st Cir. Sept. 17, 2014) ("Appellate courts review a bankruptcy court's decision to deny a motion for leave to sue under the abuse of discretion standard.") (citing *VistaCare*); *Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*, 716 F.3d 404, 422 (6th Cir. 2013) (holding that abuse-of-discretion standard applies to *Barton* doctrine); *Alexander v. Hedback*, 718 F.3d 762 (8th Cir. 2013) (applying abuse-of-discretion standard to *Barton* doctrine).

### C.   Exculpation and Release

101.   This Court's January Order and July Order exculpated Seery from all claims except "those alleging willful misconduct and gross negligence." (January Order ¶ 10; July Order ¶ 5.) The Plan's exculpation provision also limited claims against Seery, in his role as an Independent Director, to those arising "from willful misconduct, criminal misconduct…or gross negligence." (Plan Art. IV.D; Confirmation Order ¶¶ 72–73.) The Trust Agreement similarly limits claims against Seery to "fraud, willful misconduct, or gross negligence." (Trust Agmt. § 8.1; *see also id.* §§ 8.3–8.4.) Thus, HMIT cannot assert claims other than those expressly permitted under these Orders and court-approved documents.

## ARGUMENT

102.   HMIT lacks standing to bring the derivative claims alleged in the Complaint (*see infra* Sections I–II), did not satisfy the procedural requirements to bring derivative claims (*see infra* Section III), and cannot bring derivative claims under the guise of direct claims (*see infra* Section IV). Even if HMIT could assert claims (which it cannot), they fail under any standard (*see infra* Section V).

## I.   HMIT Lacks Standing To Bring Derivative Claims Under Delaware Law.

103.   HMIT acknowledges that any "fiduciary duties and claims involving breaches of those duties" with respect to HCMLP and the Claimant Trust are "governed by Delaware law" under the "Internal Affairs Doctrine." (Motion ¶ 21 & n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity)); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). HMIT lacks standing to bring any such claims under Delaware law.

004141

A.    **HMIT Lacks Standing To Bring Derivative Claims On Behalf Of The Trust.**

104.    The Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29. (Compl. ¶ 26.) "[T]o proceed derivatively against a Delaware statutory trust, a plaintiff has the burden of satisfying the continuous ownership requirement" such that "the plaintiff must be a beneficial owner" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action." *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012); 12 Del C. § 3816(b). This requirement is "mandatory and exclusive" and only "a beneficial owner" "has standing to bring a derivative claim on behalf of the Trust." *In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011)).

105.    HMIT is not a "beneficial owner" of the Trust and therefore lacks standing to bring derivative claims on its behalf. The "beneficial owners" of the Trust are the "Claimant Trust Beneficiaries." (*See* Trust Agmt. § 2.8 ("The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust . . . .").) The Claimant Trust Beneficiaries are "the Holders of Allowed General Unsecured Claims" and "Holders of Allowed Subordinated Claims." (Plan Art. I.B.44; *see also* Trust Agmt. § 1.1(h).)[34] HMIT is neither. HMIT was an "equity holder in the

---

[34] (*See* Morris Dec. Ex. 1, Plan Art. I.B.44 ("'*Claimant Trust Beneficiaries*' means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests."); Trust Agmt. at 1 n.2 ("For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.").)

004142

Original Debtor" and now holds only an unvested "Contingent Trust Interest in the Claimant Trust." (Compl. ¶ 24.) HMIT argues, without justification, that it "should be treated as a vested Claimant Trust Beneficiary." (*Id.*) But, under the Trust Agreement, "Contingent Trust Interests" "shall not have any rights under this Agreement" and will not "be deemed 'Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and Trust Agreement. (Trust Agmt. § 5.1(c).) Because it is undisputed that the Contingent Trust Interests have not vested, HMIT is not a "beneficial owner" and lacks standing to bring derivative claims under Delaware law. *See Nat'l Coll.*, 251 A.3d at 190–92 (dismissing creditors' derivative claims because they were not "beneficial owners of the Trusts"); *Hartsel*, 2011 WL 2421003, at *19 n.123 (dismissing derivative claims by investors that "no longer own shares" because "those investors no longer have standing to pursue a derivative claim").[35]

### B. HMIT Lacks Standing To Bring Derivative Claims On HCMLP's Behalf.

106.    Reorganized HCMLP is a Delaware a limited liability partnership governed by the Delaware Limited Partnership Act, 6 Del. C. § 17-101, *et seq.* (Compl. ¶ 25.) To bring "a derivative action" on behalf of a limited partnership, "the plaintiff must be a partner or an assignee of a partnership interest" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action." 6 Del. C. § 17-1002; *see Tow v. Amegy Bank, N.A.*, 976 F. Supp. 2d 889, 904 (S.D. Tex. 2013) ("The [Delaware] partnership act facially bars any party other than a limited partner from suing derivatively. . . . Delaware courts historically have interpreted the provisions as giving the partners exclusive rights to sue for breach of another

---

[35] If HMIT were a Claimant Trust Beneficiary (which it is not), its claims must be brought in this Court and it has "waived any right to a trial jury." (Trust Agmt. § 5.10(d).) HMIT would also be required to reimburse the Claimant Trustee and any member of the COB if its suit fails (*id.* § 5.10(b)), and this Court could require HMIT "to post a bond ensuring that the full costs of a legal defense can be reimbursed" (*id.* § 5.10(c)). The Highland Parties reserve the right to seek reimbursement and posting of a bond commensurate with the enormous burdens this litigation would impose.

004143

party's fiduciary duties to them.") (quoting *CML V, LLC v. Bax*, 6 A.3d 238, 245 (Del. Ch. 2010),

*aff'd* 28 A.3d 1037 (Del. 2011)); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265

n.87 (Del. 2016) ("The statutory foundation for the continuous ownership requirement in the

corporate realm is echoed in the limited partnership context.") (citing 6 Del. C. § 17-211(h)).

107.    HMIT is not a partner of reorganized HCMLP and therefore lacks standing to bring

derivative claims on its behalf. "HMIT held a 99.5% limited partnership in Highland Capital

Management, L.P., the Original Debtor." (Compl. ¶ 6; *see id.* ¶¶ 12, 15, 24.) But that limited

partnership interest was extinguished by the Plan on August 11, 2021 (the Effective Date of the

Plan) and HMIT does not own any partnership interest in reorganized HCMLP. (Plan Art. IV.A.)

Because HMIT would not hold a partnership interest at "the time of bringing the action," it "lacks

derivative standing" to bring claims "on the partnership's behalf." *Tow*, 976 F. Supp. 2d at 904

(dismissing derivative claims by creditor on behalf of partnership for lack of standing).

108.    HMIT also cannot satisfy "the continuous ownership requirement." When HMIT's

partnership interest was extinguished on the Plan's Effective Date, HMIT "los[t] standing to

continue a derivative suit" on behalf of the Debtor.[36] *El Paso*, 152 A.3d at 1265 (cleaned up)

(dismissing derivative action for lack of standing where plaintiff's partnership interest was

extinguished by a merger transaction); *see also Schmermerhorn v. CenturyTel, Inc. (In re SkyPort*

*Global Commcn's, Inc.)*, 2011 WL 111427, at *25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding

that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law

because they "had their equity interests in the company extinguished pursuant to the merger under

the Plan"); *In re WorldCom, Inc.*, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) ("[T]he cancellation

---

[36] Even before its partnership interest was extinguished, HMIT would have been required to obtain the Debtor's consent or court approval before it could have brought a derivative suit on behalf of the estate.

of WorldCom shares under the Plan … prevents the required continuation of shareholder status through the litigation.") (cleaned up).

### C.    HMIT Lacks Standing To Bring A "Double Derivative" Action.

109.    "[A] double derivative suit is one brought by a shareholder of a parent corporation to enforce a claim belonging to a subsidiary that is either wholly owned or majority controlled." *Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010). Under "Delaware's 'double derivative' standing jurisprudence," "parent level standing is required to enforce a subsidiary's claim derivatively." *Sagarra*, 34 A.3d at 1079–81 (capitalization omitted) (citing *Lambrecht*, 3 A.3d at 282).

110.    To the extent HMIT seeks to bring a double derivative action on behalf of the Trust based on claims purportedly held by its wholly owned subsidiary, HCMLP, HMIT lacks standing. Because HMIT lacks derivative standing to bring claims on behalf of the parent Trust, it also lacks standing to bring a double derivative action. (*See supra* Section I.A.)

111.    The Trust also lacks standing to bring these claims on behalf of HCMLP. The Claimant Trust received limited partnership interests in Highland on August 11, 2021, the Effective Date of the Plan. (*See supra* ¶ 79.) HMIT challenges trades that occurred in April and August 2021 (Compl. ¶ 41 & n.12), which predate the Effective Date of the Plan. Because the Trust did not hold limited partnership interests "[a]t the time of the transaction of which the plaintiff complains," 6 Del. C. § 17-1002, it cannot bring a derivative action based on these trades, and HMIT lacks standing to bring a double derivative action.

## II.    HMIT Lacks Standing To Bring Derivative Claims Under Federal Bankruptcy Law.

112.    HMIT ignores its inability to proceed derivatively under Delaware law and instead insists it has derivative standing as a matter of federal bankruptcy law. (Mot. ¶¶ 9–14.) HMIT also

lacks derivative standing under federal bankruptcy law because (i) HMIT's lack of standing under Delaware law is dispositive regardless of forum, and (ii) HMIT, in any event, cannot meet the requirements for suing on behalf of a debtor under the federal bankruptcy case law it cites.

### A. Federal Law Does Not Confer Standing Prohibited By Delaware Law.

113.    HMIT's invocation of federal bankruptcy law cannot remedy HMIT's lack of derivative standing under Delaware law. HMIT cites Fed. R. Civ. P. 23.1, which "applies to this proceeding pursuant to" Fed. R. Bankr. P. 7023.1. (Mot. ¶ 10.) But Rule 23.1 "speaks only to the adequacy of the . . . pleadings," and "cannot be understood to 'abridge, enlarge, or modify any substantive right.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991) (quoting 28 U.S.C. § 2072(b)). Thus, the question of whether HMIT has a right to proceed derivatively is governed not by Rule 23.1, but by the "source and content of the substantive law" governing the requirements for derivative actions, which is Delaware law. *Id.* at 96–97.

114.    HMIT's own authority (*see* Mot. ¶¶ 12–13) further supports that Delaware law governs the standing analysis and precludes HMIT's suit. *Louisiana World Exposition v. Federal Insurance Co.*, 858 F.2d 233 (5th Cir. 1988), on which HMIT relies, "is the leading case from the Fifth Circuit . . . articulating when a creditors committee may be permitted standing to pursue estate causes of action." *Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 809 (Bankr. N.D. Tex. 2009). To the extent *Louisiana World* applies post-Effective Date,[37] it does not supersede state law requirements for derivative standing. Before addressing the requirements a creditors' committee must meet to sue derivatively as a matter of federal bankruptcy law (discussed below), the Fifth Circuit conducted a lengthy analysis to determine "as a threshold issue" whether the creditors'

---

[37] *Louisiana World*, in certain circumstances, allows creditors to "file suit on behalf of a debtor-in-possession or a [bankruptcy] trustee." *La. World*, 858 F.2d at 247. HCMLP is no longer a debtor-in-possession; it has been reorganized.

committee in that case could assert its claims under Louisiana law. 858 F.2d at 236–45. The court specifically addressed whether the creditors' committee could pursue a derivative action under Louisiana law and concluded that "there is no bar in Louisiana law to actions brought by or in the name of a corporation against the directors and officers of the corporation which benefit only the creditors of the corporation; indeed, Louisiana law specifically recognizes such actions." *Id.* at 243. The opposite is equally true: where state law imposes such a bar, a creditor cannot flout that prohibition because it is in bankruptcy court. *See In re Dura Automotive Sys., LLC*, No. 19-123728 (Bankr. D. Del. June 10, 2020), Docket No. 1115 at 46 ("To determine that the third party may bring the claim under the derivative basis and, thus, step into the shoes of the debtor to pursue them, the Court must look to the law of the debtors' state of incorporation or formation.") (denying creditors' committee standing to sue derivatively on behalf of a Delaware LLC because the committee lacked standing under the Delaware LLC Act).

115. Because HMIT lacks standing to bring derivative claims under Delaware law (*see supra* Section I), it cannot satisfy the "threshold issue" to proceed derivatively, whether in state or federal court.

### B. HMIT Cannot Meet The *Louisiana World* Standard Governing Derivative Actions By Creditors In Bankruptcy.

116. Even if Delaware law did not preclude HMIT from suing derivatively (it does), HMIT still would lack standing under federal bankruptcy law. Under Fifth Circuit precedent, a bankruptcy court may authorize a creditor to proceed derivatively only if: (i) the creditor's claims are "colorable"; (ii) the trustee or debtor-in-possession "refused unjustifiably to pursue the claim"; and (iii) the creditor "first receive[d] leave to sue from the bankruptcy court." *La. World*, 858 F.2d at 247; *see also, e.g.*, *PW Enters.*, 540 F.3d at 899 (same). "These requirements ensure that derivative standing does not risk interfering with the debtor or trustee and prevents creditors from

pursuing weak claims." *In re On-Site Fuel Serv., Inc.*, 2020 WL 3703004, at *9 (Bankr. S.D. Miss. May 8, 2020). HMIT does not and cannot satisfy these requirements.

117.    HMIT focuses solely on the first of these three requirements—asserting that its claims are "colorable." (*See* Mot. ¶¶ 12–14, 38–42; Objs. ¶¶ 3–4, 7–15; Supp. Mot. ¶ 13.) Even if HMIT could satisfy the "colorable claim" requirement under *Louisiana World*, which it cannot (*see infra* Section V), it does not even try to satisfy the second requirement—that Highland "refused unjustifiably to pursue the claim"—because it cannot.

118.    To assess whether a debtor's refusal was unjustified, courts "must look to whether the interests of creditors were left unprotected as a result" by conducting a "cost-benefit analysis" that takes into account whether the potential action is "valid and profitable." *La. World*, 858 F.2d at 253 n.20; *see also Reed*, 405 B.R. at 810 (same); *Canadian Pac.*, 66 F.3d at 1442 ("[I]f a creditor pleads facts to support the conclusion that it has a colorable claim . . . and if the bankruptcy court finds that the claim will likely benefit the estate based on a cost-benefit analysis, then the creditor has raised a rebuttable presumption that the debtor-in-possession's failure to bring that claim is unjustified."). This requirement is not easily met. Under HMIT's own authority (*see* Mot. ¶ 40) "the real challenge for the creditor will be to persuade the bankruptcy court that the trustee unjustifiably refuses to bring its claim." *PW Enters.*, 540 F.3d at 900. As the Eighth Circuit explained:

> To satisfy its burden, the creditor, at a minimum, must provide the bankruptcy court with *specific* reasons why it believes the trustee's refusal is unjustified. A creditor thus does not meet its burden with a naked assertion that 'the trustee's refusal is unjustified.' . . . The creditor, *not the bankruptcy court*, has the onus of establishing the trustee unjustifiably refuses to bring the creditor's claim.

*Id.* (emphasis in original).

119.     In conducting the "cost/benefit" analysis required to determine if a debtor's refusal to sue is unjustified, courts consider (i) the probability of success on the claims and the financial recovery to the estate, (ii) the proposed cost of the litigation, and (iii) the delay and expense of bringing the litigation. *PW Enters.*, 540 F.3d at 901; *see also Official Comm.*, 225 B.R. at 282 ("The mandated cost/benefit analysis involves the weighing of the probability of success and financial recovery, whether it is preferable to appoint a trustee to bring suit instead of the creditors' committee, and 'the terms relative to attorneys' fees on which suit might be brought.'") (quoting *In re STN Enterps.*, 779 F.2d 901, 905 (2d Cir. 1985)). A creditor seeking to proceed derivatively must establish "a sufficient likelihood of success" to "'justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.'" *Official Comm.*, 225 B.R. at 282 (quoting *STN*, 779 F.2d at 906. If the creditor carries its burden, it shifts to the debtor to refute by a preponderance of the evidence. *PW Enters.*, 540 F.3 at 900 n.9; *Canadian Pac.*, 66 F.3d at 1442; *see also La. World*, 858 F.2d at 248 n.15 (noting that an "evidentiary hearing was unnecessary under the circumstances," where the debtor-in-possession's officers and directors "neither refuted any of the Committee's claims nor objected to them").

120.     HMIT does not even attempt to meet its burden to establish that HCMLP or the Trust unjustifiably refused to pursue HMIT's claims, or to present facts to enable the Court to conduct a cost-benefit analysis and conclude that HMIT's proposed claims are "valid and profitable." *La. World*, 858 F.2d at 253 n.20. Under HMIT's own authority (*see* Mot. ¶¶ 39–41), courts permitted creditors to sue derivatively on behalf of debtors ***only*** after conducting such an evidentiary analysis. For example, in *Louisiana World*, the court found that "the Committee demonstrated"—and the debtor-in-possession did not "refute[]" or "rebut[]"—"the existence of a potential cause of action, a demand on the debtor-in-possession, a refusal or inability on the part

of the debtor-in-possession to bring suit, the possibility of a sizeable monetary recovery and, given the contingent nature of the attorney's fee schedule, a limited cost factor." 858 F.2d at 248 n.15.

121.    Here, as discussed at length above, the evidence shows that HMIT's "claims" are spurious, would be a waste of time, money, and effort, and have no purpose but to further Dondero's crusade to burn Highland down, and make good on his explicit thread against Seery. (*See supra* ¶¶ 8–85.)

122.    HMIT's vague assertion that the COB has "conflicts of interest" does not excuse HMIT from having to ask HCMLP and/or the Trust to pursue HMIT's alleged claims or from proving that any refusal to do so was "unjustified." (Mot. ¶¶ 12–14.) In *Louisiana World*, the court conducted the cost-benefit analysis even though the directors and officers of the debtor-in-possession were conflicted. *La. World*, 858 F.2d at 234.[38]

### C.    HMIT Lacks Standing To Bring Derivative Claims Challenging Pre-Confirmation Conduct.

123.    "When a Chapter 11 plan is confirmed," the debtor loses "its authority to pursue claims as through it were trustee," unless it makes a "specific and unequivocal" "reservation of claims." *Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring, Inc.)*, 714 F.3d 860, 864 (5th Cir. 2013) (cleaned up; collecting cases). "Without an effective reservation, the debtor has no standing to pursue a claim that the estate owned before it was dissolved." *Id.* (cleaned up).

124.    HCMLP did not reserve any claims against Seery or any other Proposed Defendant. (Docket No. 1875-3.) Therefore, neither HCMLP nor the Trust has standing to bring claims against Seery based on conduct occurring before August 11, 2021, the Effective Date of the Plan. *Wooley*, 714 F.3d at 864. Because HMIT seeks to bring derivative claims on behalf of both HCMLP and

---

[38] Moreover, HMIT did not ask the COB's independent member to pursue its proposed "claims," even though the independent member is empowered to make decisions on behalf of the COB if the other members are conflicted. (Trust Agmt. § 4.6(c).)

004150

the Trust, HMIT's "standing is contingent upon" HCMLP's and the Trust's standing." *Id.* ("[A]
creditor can derive standing to bring a debtor's claim only if the debtor itself could bring the
claim."). HMIT therefore lacks standing to challenge any pre-confirmation conduct. Other than
the "success fee" portion of Seery's compensation, every single allegation against Seery, including
the alleged breaches of fiduciary duties, is based on pre-effective date conduct.[39]

## III.  HMIT Did Not Satisfy The Procedural Requirements To Bring A Derivative Action.

### A.    HMIT Failed To Include The Litigation Trust As A Party.

125.    It is settled law that "[a]n action must be prosecuted in the name of the real party in
interest." Fed. R. Civ. P. 17(a); *see BCC Merch. Sols., Inc. v. Jet Pay, LLC*, 129 F. Supp. 3d 440,
450 (N.D. Tex. 2015) ("The Rule 17(a) requirement is in essence a codification of the prudential
standing requirement that a litigant cannot sue in federal court to enforce the rights of third
parties.") (cleaned up; collecting cases). "The real party in interest is the person with the right to
sue under substantive law, and the determination whether one is the real party in interest with
respect to a particular claim is based on the controlling state or federal substantive laws." *BCC*,
129 F. Supp. 3d at 453 (cleaned up; collecting cases).

126.    HMIT seeks to bring a "derivative action benefitting and on behalf of the
Reorganized Debtor [HCMLP] and the [] Claimant Trust." (Compl. ¶¶ 1, 11.) But the Claimant
Trustee transferred to the Litigation Trust "any and all Causes of Action," with limited exceptions
not relevant here. (*See supra* ¶ 89.) The Litigation Trust is therefore the "real party in interest,"

---

[39] The movant in *Wooley* also alleged that (i) the complained-of breaches of fiduciary duty were kept "secret," (ii) the movant did not discover the claims until after confirmation, and (iii) it would therefore be inequitable to preclude its lawsuits. 714 F.3d at 865–66. The Fifth Circuit denied standing, notwithstanding later discovered "facts," because "[a]llowing [movant] to assert these claims simply because some of the underlying facts were unknown at the time the Plan was confirmed would be inconsistent with the 'nature of a bankruptcy which is designed primarily to secure prompt, effective administration and settlement of all debtor's assets and liabilities within a limited time." *Id.* at 866. Here, HMIT had knowledge of at least some of the "facts," including Dondero's alleged disclosure of MGM's inside information to Seery, before confirmation and did not object.

004151

and HMIT lacks prudential standing to bring derivative claims on behalf of Highland. *See, e.g.*, *BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.*, 247 F. Supp. 3d 377, 414–15 (S.D.N.Y. 2017) (holding that plaintiff "lacks standing to bring a derivative claim against Defendant" because it "transferred all rights to such claim").

127. The Litigation Trust is likewise "an indispensable party to a [beneficiary's] derivative suit," so HMIT cannot bring a derivative action without including the Litigation Trust. *Schwab v. Oscar (In re SII Liquidation Co.)*, 2012 WL 4327055, at *8 (Bankr. S.D. Ohio Sept. 20, 2012) (cleaned up) (dismissing derivative action); *see also* Fed. R. Civ. P. 19(a)(1) (requiring joinder of indispensable party); Fed. R. Bankr. P. 7019; Fed. R. Civ. P. 12(b)(7) (permitting dismissal for "failure to join a party under Rule 19"); Fed. R. Bankr. P. 7012(b).

128. HMIT's footnoted assertion that it "seeks standing to bring this action as a derivative action on behalf of the Litigation Sub-Trust" (Compl. ¶ 1 n.1) fails because, as discussed above, HMIT lacks standing to bring such "double derivative" claims (*see supra* Section I.C). The Litigation Trust is wholly owned by the Trust and, as matter of Delaware law, HMIT must demonstrate "parent level standing" to bring a "double derivative" claim that belongs to the Litigation Trust. *Sagarra*, 34 A.3d at 1079–81; *Lambrecht*, 3 A.3d at 282. Because HMIT lacks standing to bring a derivative claim on behalf of the Trust (*see supra* Section I.A), it also lacks standing to bring a double derivative claim.

## B. HMIT Failed To Make Any Demand To The Litigation Trustee And Fails To Plead Demand Futility With Particularity.

129. HMIT's failure to include the Litigation Trust as a party was no accident. The Litigation Trust is a Delaware statutory trust and wholly-owned subsidiary of the Trust. (Litigation Sub-Trust Agmt. § 1.1(e).) Even if HMIT had standing under Delaware law to bring a derivative action on behalf of the Litigation Trust, which it does not (*see supra* ¶ 128), HMIT can proceed

004152

derivatively only "if (i) [HMIT] demanded that the [Trustee] pursue the corporate claim and [he] wrongfully refused to do so or (ii) demand is excused because the [Trustee is] incapable of making an impartial decision regarding the litigation." *United Food & Comm. Workers Union v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020) (collecting cases). Accordingly, to allege a derivative action under Rule 23.1, which HMIT claims governs (*see* Compl. ¶ 6), HMIT must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3); Fed. R. Bankr. P. 7023.1. HMIT failed to do so.

130.     This Court approved Marc Kirschner ("Kirschner") as Litigation Trustee. (Confirmation Order ¶ 45; *see also* Morris Dec. Ex. 44 (the "Litigation Sub-Trust Agreement") § 1.1(r).) HMIT admits that it did not make any effort to make a pre-filling demand to Kirschner regarding this action. (Compl. ¶ 1 n.1.) Instead, HMIT asserts that "[a]ny demand on the Litigation Sub-Trust would be [] futile" because "the Litigation Trustee serves at the direction of the Oversight Board." (*Id.* ¶ 1 n.1; Mot. ¶ 11 n.13.) This conclusory assertion does not allege a single fact casting "reasonable doubt" on Kirschner's objectivity or showing that he was "dominate[d]" by interested parties, let alone with particularity. *Zuckerberg*, 250 A.3d at 877–91 (surveying Delaware demand futility law); (Mot. ¶ 11).[40] Because HMIT has not satisfied either the demand requirement or demand futility, it cannot bring a derivative action. *See, e.g.*, *Zuckerberg*, 250 A.3d at 900–901 (granting "motion to dismiss under Rule 23.1"); *In re Six Flags Ent. Corp. Deriv. Litig.*, 2021 WL 1662466, at *8 (N.D. Tex. Apr. 28, 2021) (dismissing derivative action with

---

[40] As discussed *supra* note 38, HMIT also does not explain its failure to make any pre-filing demand to the independent member of the COB, who it does not allege is conflicted. (Compl. ¶ 10.)

prejudice for failure to plead demand futility under Delaware law "under Rule 23.1's heightened standard").

### C.     HMIT Cannot "Fairly And Adequately" Represent The Interests of Claimant Trust Beneficiaries.

131.     Rule 23.1 provides that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1(a); Fed. R. Bankr. P. 7023.1. To be an adequate representative, "a plaintiff in a [] derivative action must not have ulterior motives and must not be pursuing an external personal agenda." *Energytec, Inc. v. Proctor*, 2008 WL 4131257, at *6 (N.D. Tex. Aug. 29, 2008) (cleaned up) (quoting *Smith v. Ayres*, 977 F.2d 946, 949 (5th Cir. 1992)). To determine adequacy, courts evaluate, *inter alia*, "economic antagonisms between representative and class," "other litigation pending between the plaintiff and defendants," "plaintiff's vindictiveness towards the defendant," and "the degree of support plaintiff was receiving from the [beneficiaries] he purported to represent." *Id.* *6–7 (quoting *Davis v. Comed, Inc.*, 619 F.2d 588, 593–94 (6th Cir. 1980)).

132.     HMIT is an inadequate representative. HMIT is effectively controlled by Dondero, and the Plan recognizes HMIT as a Dondero Related Entity (Plan Art. I.B.110). This Court found that "Mr. Dondero and the Dondero Related Entities have harassed the Debtor," including with "substantial, costly, and time-consuming litigation." (Confirmation Order ¶ 77.) This Court also found that Dondero threatened to "burn down the place" if he did not get his way and that "Mr. Dondero and his related entities," including HMIT, "will likely commence litigation against the Protected Parties," including Seery. (*Id.* ¶ 78.) This Court has even referred to Dondero as an "antagonist" whose conduct has made this bankruptcy "contentious, protracted, and unpleasant," and akin to a "corporate divorce." *In re Highland Cap. Mgmt., L.P.*, 2021 WL 2326350, at *1, *25

(Bankr. N.D. Tex. June 7, 2021) (holding Dondero in "civil contempt of court"). The Fifth Circuit similarly recognized that Dondero and his related entities sought to "frustrate the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's management, threatening employees, and canceling trades between Highland Capital and its clients." *NexPoint*, 48 F.4th at 426; *see also id.* at 427–28. Dondero's own written threats confirm these findings: "Be careful what you do -- last warning." (*See supra* ¶ 25.) Dondero-controlled HMIT is pursuing this derivative action for "ulterior motives" of "antagonism" and "vindictiveness," cannot "fairly and adequately the interests" of the Claimant Trust Beneficiaries, and should be not be permitted to "bring a derivative suit on their behalf." *Energytec*, 2008 WL 4131257, at *6–7 (dismissing derivative action by former CEO on adequacy grounds because he sought to "revers[e] the events leading to his removal" and was in litigation with other shareholders).[41]

## IV.  HMIT Has No Direct Claims Against The Highland Parties.

133.    Throughout its Motion and Complaint, HMIT makes vague references to unspecified direct claims against the Proposed Defendants. (*See, e.g.*, Motion ¶ 10 ("HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time . . . ."); *id.* ¶ 67 (arguing that "HMIT has [d]irect [s]tanding"); Compl. ¶ 24 ("HMIT has constitutional standing and capacity to bring these claims both individually and derivatively.").) But "a claim is not 'direct' simply because it is pleaded that way." *Schmermerhorn*, 2011 WL 111427, at *26 (quoting *Gatz v. Ponsoldt*, 2004 WL 3029868 at *7 (Del. Ch. Nov. 5, 2004)). "Fifth

---

[41] HMIT and Dondero also have a "personal economic interest" and other claimants "do not share this interest." *Energytec*, 2008 WL 4131257, at *7. Specifically, HMIT has asserted in another proceeding that Highland has sufficient assets "to pay class 8 and class 9 creditors 100 cents on the dollar." (Docket No. 3662 ¶ 5.) If true, HMIT's proposed claims will benefit only HMIT and, potentially, The Dugaboy Investment Trust (controlled by Dondero) and Mark Okada (HCMLP's co-founder) as the holders of Class 11 interests. Proposed Defendants reserve the right to contest HMIT's assertion.

004155

Circuit precedent [] dictates that," to determine whether claims are direct or derivative, "this Court look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the Plaintiffs' characterization." *Id.* (citing *Armstrong v. Capshaw, Goss & Bowers LLP*, 404 F.3d 933, 936 (5th Cir. 2005)).

134.     Under Delaware law, "whether a claim is solely derivative or may continue as a dual-natured claim 'must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'" *El Paso*, 152 A.3d at 1260 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)) (emphasis in original). "In addition, to prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'" *Id.* (quoting *Tooley*, 845 A.2d at 1033); *see also Schmermerhorn*, 2011 WL 111427, at *24 (same).

135.     Similarly, in the bankruptcy context, "[i]f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate." *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. § 541(a)(1)). "In that situation, only the bankruptcy trustee has standing to pursue the claim for the estate . . . ." *Id.* "To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate." *Id.*

136.     Even if HMIT had viable claims (it does not), they would be derivative, not direct, under both Delaware law and federal bankruptcy law. HMIT argues that the Proposed Defendants' "alleged actions devalued HMIT's interest in the Debtor's Estate, including, without limitation, payment of excessive compensation to Seery." (Mot. ¶ 67.) Thus, by its own admission, any

alleged harm to HMIT "comes about only because of harm to the debtor," so the alleged "injury is derivative." *Meridian*, 912 F.3d at 293–94 ("The creditors' injury (reduced bankruptcy recovery) derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third parties."); *see also El Paso,* 152 A.3d at 1260–61 & n.60 (holding that claim "claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative") (collecting cases); *Gerber v EPE Holdings, LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) (holding that claims were derivative because plaintiff had "not identified any independent harm suffered by the limited partners"; "the partnership suffered all the harm at issue—it paid too much").

137. HMIT's reliance on *Pike v. Texas EMC Management, LLC*, 610 S.W.3d 763 (Tex. 2020), is misplaced. The fact that "a partner or other stakeholder in a business organization has **constitutional** standing to sue for an alleged loss in the value of its interest in the organization" (Mot. ¶ 67 (quoting *Pike*, 610 S.W.3d at 778) (emphasis added)) is irrelevant. As the Court explained, it is "the statutory provisions that define and limit a stakeholder's ability to recover certain measures of damages, which protect the organization's status as a separate and independent entity," and therefore considered the matter under Texas partnership law. *Pike*, 610 S.W.3d at 778–79. Here, HMIT admits that both the Trust and HCMLP are governed by Delaware law, which does not recognize any direct (or derivative) claims by HMIT.

138. Even assuming, *arguendo*, that HMIT could bring direct claims (it cannot), the Highland Parties cannot be held liable for them. "Under the Delaware Statutory Trust Act, 'a trustee, when acting in such capacity, shall not be personally liable to any person other than the statutory trust or a beneficial owner for any act, omission or obligation of the statutory trust or any trustee thereof' except 'to the extent otherwise provided' by the trust's governing document."

*Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2020 WL 2521557, at *8 (Del. Super. May 18, 2020) (quoting 12 Del C. §§ 3803(b)–(c)). The Trust Agreement likewise limits "personal liability" "to the fullest extent provided under Section 8303 of the Delaware Statutory Trust Act." (Trust Agmt. § 8.3.) Because, as discussed above, HMIT is not a "beneficial owner" of the Claimant Trust (*see supra* Section I.A), it cannot bring direct claims against Proposed Defendants under Delaware law.

## V.    HMIT's Proposed Complaint Fails To Plausibly Allege Any Claims Against The Proposed Defendants.

139.    Because HMIT lacks standing, this Court need not reach the merits of HMIT's proposed Adversary Complaint. As a matter of judicial economy, however, the Highland Parties respectfully request that this Court address the lack of merit as an alternative basis to deny the Motion. HMIT fails to adequately allege its claims under any standard. HMIT's claims are not colorable because they lack foundation, and HMIT's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," fail to "[]cross the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

### A.    HMIT Does Not Adequately Allege Any Breach Of Fiduciary Duties (Count I).

140.    HMIT alleges that Seery breached his fiduciary duties (i) "[b]y disclosing material non-public information to Stonehill and Farallon" before their purchase of certain Highland claims, and (ii) by receiving "compensation paid to him under the terms of the [Trust Agreement] since the Effective Date of the Plan in August 2021." (Compl. ¶¶ 64–67.) Under Delaware law, which HMIT admits governs (*see* Mot. ¶ 21 n.24), "[t]o bring a claim for breach of fiduciary duty, a plaintiff must allege '(1) that a fiduciary duty existed and (2) that the defendant breached that duty.'" *Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *30 (N.D. Tex. Apr. 15,

004158

2020) (quoting *Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*, 2020 WL 967942, at *8 (Del. Ch. Feb. 28, 2020)). HMIT fails to plausibly allege either element.

141.    ***First***, HMIT's "legal conclusion[]" that Seery "owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate" (Compl. ¶ 63) "do[es] not suffice" to plausibly allege the existence of any actionable fiduciary relationship. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Officers and directors generally owe fiduciary duties only to the entity and its stakeholders as a whole, not to individual shareholders. *See Gilbert v El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups.") *aff'd,* 575 A.2d 1131 (Del. 1990); *Klaassen v Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) (same). Because Seery did not owe any "duty" to HMIT directly and individually, the Complaint fails to state a claim for breach of fiduciary duty to HMIT.

142.    ***Second***, to the extent Seery owed any fiduciary duties to HMIT or the Debtor, he did not breach them by allegedly communicating with Farallon and Stonehill. (*See* Compl. ¶ 64.) As this Court recognized, "claims trading in bankruptcy is [] pretty unregulated—it's just kind of between the claims trader and the transferee." (Morris Dec. Ex. 43 at 53:6–7.) In fact, this Court recognized that "for decades now, since a rule change in the last century, no court approval and order is necessary unless the transferor objects." (Morris Dec. Ex. 6 at 20); *see also* Aaron L. Hammer & Michael A. Brandess, *Claims Trading: The Wild West of Chapter 11s*, 29 Am. Bankr. Inst. J. 61 (July/Aug. 2010) ("In 1991, Fed. R. Bankr. P. 3001(e) was amended to limit the court's oversight on claims trading" such that "only the transferor may object to a transfer.") (quoting Michael H. Whitaker, *Regulating Claims Trading in Chapter 11 Bankruptcies: A Proposal for Mandatory Disclosure*, 3 Cornell J.L. & Pub. Pol'y 303, 320 (1994)). Because none of the

transferors objected to the claims trades at issue, Seery's alleged actions in connection with them cannot constitute a breach of any fiduciary duties.

143. **Third**, HMIT's "conclusory allegations" and "legal conclusions" are "purely speculative, devoid of factual support," and therefore "stop[] short of the line between possibility and plausibility of entitlement to relief." *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 367, 386 (Bankr. N.D. Tex. 2011) (cleaned up). As to Seery's discussions with Farallon and Stonehill, HMIT asserts that Seery "disclose[d] material non-public information to Stonehill and Farallon," and they "acted on inside information and Seery's secret assurances of great profits." (Compl. ¶¶ 3, 64; *see also id.* ¶¶ 13–14, 40, 47, 50.) HMIT never alleges when any of these purported communications occurred, what material non-public information Seery provided, or what "assurances" he made. The few facts HMIT provides contradict its own allegations. The only purportedly "material non-public information" identified is the Complaint is the MGM E-Mail Dondero sent to Seery containing "information regarding Amazon and Apple's interest in acquiring MGM." (Compl. ¶ 45.) This information was widely reported in the financial press at the time (*see supra* ¶¶ 30–37), so it cannot constitute material non-public information as a matter of law. *See, e.g., SEC v. Cuban*, 2013 WL 791405, at *10–11 (N.D. Tex. Mar. 5, 2013) (holding that information is not "material, nonpublic information" and "'becomes public when disclosed to achieve a broad dissemination to the investing public'") (quoting *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997)). HMIT asserts that Farallon and Stonehill's purchases "made no sense" without access to "material non-public information." (Compl. ¶¶ 3, 50.) But HMIT admits that Farallon and Stonehill purchased Highland claims at discounts of 43% to 65% to their allowed amounts, so they would therefore receive at least an 18% return based on publicly available estimates in Highland's Court-approved Disclosure Statement. (*Id.* ¶¶ 3, 37, 42.)

004160

144.    As to Seery's compensation, HMIT asserts that it was "excessive," and speculates that compensation negotiations between Seery and the COB "were not arm's-length." (Compl. ¶¶ 4, 13, 54, 74.) But HMIT does not say one word about the process for negotiating and approving Seery's compensation. Nor does HMIT allege what Seery's compensation actually is, let alone compare it to others' compensation to show that it is "excessive." HMIT's assertion that Seery's compensation package was initially "composed of a flat monthly pay" but now "is also performance based" (*id.* ¶ 4) is wrong and contradicted by Court-approved documents. The structure of Seery's post-effective date compensation, which includes a "Base Salary," "success fee," and "severance," was fully disclosed in the Trust Agreement, which was publicly filed in advance of the Plan confirmation hearing and approved by this Court and the Fifth Circuit as part of the Plan (*see supra* ¶¶ 78–79).

145.    Thus, HMIT fails to allege facts that, even if true (and they are not), support a reasonable inference that Mr. Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty. *See Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (dismissing claim for breach of duty of loyalty against a director where "conclusory allegations" failed to give rise to inference that director failed to perform fiduciary duties); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing claim for breach of fiduciary duty where "[a]though the complaint makes the conclusory allegation that the defendants breached their duty of disclosure in a 'bad faith and knowing manner,' no facts pled in the complaint buttress that accusation.")

**B.    HMIT's Theories Of Secondary Liability Fail (Counts II and III).**

146.    HMIT seeks to hold Proposed Defendants secondarily liable for Seery's alleged breach of fiduciaries duties on an aid/abet theory (Compl. ¶¶ 69–74) and conspiracy theory of liability (*id.* ¶¶ 75–81). As a threshold matter, HMIT has not plausibly alleged any primary breach

of fiduciary duties, so it cannot pursue secondary liability for the same alleged wrongdoing. *See English v. Narang*, 2019 WL 1300855, at *14 (Del. Ch. Mar. 20, 2019) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.") (cleaned up; collecting cases); *Hill v. Keliher*, 2022 WL 213978, at *10 (Tex. App. Jan. 25, 2022) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.") (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).[42]

147.    Even if HMIT could pursue secondary liability, it has not plausibly alleged any civil conspiracy. Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort." *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019). "[T]he elements of civil conspiracy [are] "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Id.* at 141 (cleaned up).

148.    HMIT has not plausibly alleged any "meeting of the minds." HMIT asserts that "Defendants conspired with each other to unlawfully breach fiduciary duties" (Compl. ¶ 76), which is precisely the sort of "legal conclusion" the Supreme Court held is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 555 U.S. at 565–66). HMIT repeats four times that Seery provided information to Farallon and Stonehill as a "as a *quid pro quo*" for "additional compensation" (Compl. ¶ 77; *see also id* ¶¶ 4, 47, 74), but never provides

---

[42] Because HMIT breach of fiduciary duty claim is governed by Delaware law, its aid/abet theory of liability is also governed by Delaware law. *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas); By contrast, "conspiracy is not an internal affair" or a matter of corporate governance, so it is governed by Texas law under the Plan. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M).

"nonconclusory factual allegations" in support. *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 565–66). HMIT vaguely alleges "upon information and belief" that Seery "did business with Farallon" and "served on [a] creditors committee" with Stonehill. (Compl. ¶ 48.) HMIT also asserts "[u]pon information and belief" that Farallon "conducted no due diligence but relied on Seery's profit guarantees." (*Id.* ¶ 40.) These allegations "upon information belief" are "wholly speculative and conclusory," and therefore do "not satisfy the pleading requirements under Rule 8(a)." *Hargrove v. WMC Mortg. Corp.*, 2008 WL 4056292, at *3 (S.D. Tex. Aug. 29, 2008) (citing *Twombly*, 550 U.S. at 555).

### C. HMIT Seeks Remedies That Are Not Available As A Matter Of Law (Counts IV, V, and VI).

149.    HMIT seeks a grab bag of unavailable remedies, including (1) equitable disallowance (Compl. ¶¶ 82–87), (2) unjust enrichment (*id.* ¶¶ 88–94), (3) declaratory relief (*id.* ¶¶ 95–99), (4) punitive damages (*id.* ¶¶ 100–01), and (5) equitable tolling (*id.* ¶¶ 103–08), several of which are incorrectly pleaded as causes of action. None of these remedies are available under applicable law.

150.    *First*, Seery does not have any bankruptcy claims that can be subordinated or disallowed. (*Id.* ¶¶ 82–87.) In any event, the Fifth Circuit has expressly rejected equitable disallowance as remedy available under the Bankruptcy Code. *See SED Holdings, LLC v. 3 Star Props., LLC*, 2019 WL 13192236, at *2 (S.D. Tex. Sept. 11, 2019) ("[T]he claim may only be subordinated, but not disallowed.") (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699 (5th Cir. 1977)); *see also In re Lightsquared Inc.*, 504 B.R. 321, 339–40 (Bankr. S.D.N.Y. 2013) ("[T]he Bankruptcy Code, pursuant to section 510(c) or otherwise, does not permit equitable disallowance of claims that are otherwise allowable under section 502(b).") (citing *Mobile Steel*, 563 F.2d at 699 n.10).

151.    **Second**, under Texas law, "[u]njust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay." *Taylor v. Trevino*, 569 F. Supp. 3d 414, 435 (N.D. Tex. 2021) (cleaned up); *see also Yowell v. Granite Operating Co.*, 630 S.W.3d 566, 578 (Tex. App. 2021) (same).[43] Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory." *Taylor*, 569 F. Supp. 3d at 435 (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)). Here, Seery's compensation is governed by express agreements (*see supra* ¶¶ 78–79), so unjust enrichment is unavailable as a theory of recovery.

152.    **Third**, HMIT brings "claims for declaratory relief, but a request for declaratory relief is not an independent cause of action, [and] in the absence of any underlying viable claims such relief is unavailable." *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) (citing *Collins Cnty., Texas v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170–71 (5th Cir. 1990)).

153.    **Fourth**, HMIT has no basis to seek punitive damages. HMIT abandoned its fraud claim so its sole claim for primary liability is breach of fiduciary duty. As a matter of Delaware law, the "court cannot award punitive damages in [a] fiduciary duty action." *Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*, 539 B.R. 31, 52 (S.D.N.Y. 2015) (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006)), *aff'd* 682 F. App'x 24 (2d Cir. 2017).

---

[43] Under the Plan, Texas law governs HMIT's "claim" for unjust enrichment because it is not a "corporate governance matter." (Plan Art. XII.M.) It also governs HMIT's "claim" for constructive trust, which "is merely a remedy used to grant relief on the underlying cause of action." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013).

154.   **Finally**, HMIT cannot invoke "the discovery rule," "equitable tolling doctrine," "fraudulent concealment," or "any other applicable tolling doctrine" to toll the statute of limitations (Compl. ¶ 108), because this Court has held that that HMIT "has known about the conduct underlying the desired lawsuit for well over a year, based on activity that has occurred in the bankruptcy court" (Docket No. 3713 at 2–3); *see also* Order at 2–3, *In re Hunter Mt. Inv. Tr.*, No. 23-10376 (5th Cir. Apr. 12, 2023) (declining to disturb this Court's "appropriate" Order, because HMIT "approached the brink of the limitations period before seeking leave to assert its claim").

## CONCLUSION

155.   For the foregoing reasons, the Highland Parties respectfully request that this Court deny the Motion in its entirety and grant such other relief this Court deems just and proper.[44]

---

[44] Denial should be **with prejudice**. HMIT "has known about the conduct underlying the desired lawsuit for well over a year" (Docket No. 3713 at 2–3) and has already filed two proposed Complaints. It should not be permitted to file a third (or more), which "would be futile." *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 378 (5th Cir. 2014) (affirming denial of leave to amend as futile) (collecting cases).

004165

Dated: May 11, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email:    jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

/s/ *Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.,*
*and the Highland Claimant Trust*

**WILLKIE FARR & GALLAGHER LLP**

Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

-and-

**REED SMITH LLP**

/s/ *Omar J. Alaniz*
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
(469) 680-4292

*Counsel for James P. Seery, Jr.*

004166

# Exhibit 38

004167



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 25, 2023**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj-11** |
| Reorganized Debtor. | § | |

### MEMORANDUM OPINION AND ORDER PURSUANT TO PLAN "GATEKEEPER PROVISION" AND PRE-CONFIRMATION "GATEKEEPER ORDERS": DENYING HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERSARY PROCEEDING[1]
### [BANKR. DKT. NOS. 3699, 3760, 3815, and 3816]

## I.    INTRODUCTION

BEFORE THIS COURT is yet another post-confirmation dispute relating to the Chapter

11 bankruptcy case of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor").

---

[1] On August 2, 2023, this court signed an Order [Bankr. Dkt. No. 3897] that was agreed to among various parties, after the filing of a Motion to Stay and Compel Mediation [Bankr. Dkt. No. 3752] filed by James D. Dondero and related entities. Pursuant to paragraph 7 of that order, certain pending matters in the bankruptcy court are stayed pending mediation. The parties did not agree to stay the matter addressed in this Memorandum Opinion and Order.

It is now more than two and half years since the confirmation of Highland's Plan[2]—the Plan having been confirmed on February 22, 2021.[3] The Plan was never stayed; it went effective on August 11, 2021 ("Effective Date"), and it was affirmed almost in its entirety by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit"), in late summer 2022, including an approval of the so-called Gatekeeper Provision[4] therein. The Gatekeeper Provision—and how and whether it should now be exercised or interpreted to allow a certain lawsuit to be filed—is at the heart of the current *Emergency Motion for Leave to File Verified Adversary Proceeding* [Bankr. Dkt. Nos. 3699, 3760, 3815, 3816] (collectively, the "Motion for Leave") filed by a movant known as Hunter Mountain Investment Trust ("HMIT").

### A. Who is the Movant, HMIT?

Who is HMIT? It is undisputed that it is a former equity owner of Highland. It held 99.5% of Highland's Class B/C limited partnership interests and was classified in a Class 10 under the confirmed Plan, which class treatment provided it with a contingent interest in the Highland Claimant Trust ("Claimant Trust") created under the Plan, and as defined in the Claimant Trust Agreement. This means that HMIT could receive consideration under the Plan if all claims against Highland are ultimately paid in full, with interest. As later further discussed, it is undisputed that

---

[2] Capitalized terms not defined in this introduction shall have the meaning ascribed to them below.

[3] The court entered its *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Confirmation Order")[Bankr. Dkt. No. 1943].

[4] In an initial opinion dated August 19, 2022, the Fifth Circuit affirmed the Confirmation Order in large part, "revers[ing] only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties from the plan's exculpation, and affirm[ing] on all remaining grounds." *In re Highland Capital Management, L.P.*, No. 21-10449, 2022 WL 3571094, at *1 (5th Cir. Aug. 19, 2022). On September 7, 2022, following a petition for limited panel rehearing filed by certain appellants on September 2, 2022, "for the limited purpose of clarifying and confirming one part of its August 19, 2022 opinion," the Fifth Circuit withdrew its original opinion and replaced it with its opinion reported at *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 424 (5th Cir. 2022). The substituted opinion differed from the original opinion only by the replacement of one sentence from section "IV(E)(2) – *Injunction and Gatekeeper Provisions*" of the original opinion: "The injunction and gatekeeper provisions are, on the other hand, perfectly lawful." was replaced with "We now turn to the Plan's injunction and gatekeeper provisions." In all other respects, the Fifth Circuit panel's original ruling remained unchanged. Petitions for writs of certiorari regarding the Confirmation Order have been pending at the United States Supreme Court since January 2023.

004169

HMIT's only asset is its contingent interest in the Claimant Trust. It has no employees or revenue. HMIT's representative has testified that HMIT is liable on more than $62 million of indebtedness owed to The Dugaboy Investment Trust ("Dugaboy"), a family trust of which James Dondero ("Dondero"), the co-founder and former chief executive officer ("CEO") of Highland, and his family members are beneficiaries, and that Dugaboy also is paying HMIT's legal fees. HMIT vehemently disputes the suggestion that it is controlled by Dondero.

B.    *What Does the Movant HMIT Seek Leave to File?*

HMIT seeks leave to file an adversary proceeding ("Proposed Complaint")[5] in the bankruptcy court to bring claims on behalf of itself and, derivatively, on behalf of the Reorganized Debtor and the Claimant Trust for alleged breach of fiduciary duties by the Reorganized Debtor's CEO and Claimant Trustee, James P. Seery, Jr. ("Seery") and conspiracy against: (1) Seery; and (2) purchasers of $365 million face amount of ***allowed*** unsecured claims in this case, who purchased their claims post-confirmation but prior to the occurrence of the Effective Date of the Plan ("Claims Purchasers,"[6] and with Seery, the "Proposed Defendants"). To be clear (and as later further explained), the claims acquired by the Claims Purchasers were acquired by them after extensive litigation, mediation, and settlements were approved by the bankruptcy court and after the original claims-holders had voted on the Plan and after Plan confirmation. As later explained,

---

[5] In its original Motion for Leave filed at Bankruptcy Docket No. 3699 on March 28, 2023, HMIT sought leave to file the proposed complaint ("Initial Proposed Complaint") attached as Exhibit 1 to the Motion for Leave. Nearly a month later, on April 23, 2023, HMIT filed a *Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* ("Supplement") [Bankr. Dkt. No. 3760], a revised proposed complaint as Exhibit 1-A, and stating that "[t]he Supplement is not intended to supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action." Supplement, ¶ 1 and Exhibit 1-A. It is this revised proposed complaint to which this court will refer, when it uses the defined term "Proposed Complaint," even though HMIT filed redacted versions of its Motion for Leave on June 5, 2023 at Bankruptcy Docket Nos. 3815 and 3816 that attached the Initial Proposed Complaint as Exhibit 1.

[6] The Claims Purchasers identified in the Proposed Complaint are Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which is a special purpose entity created by Farallon to purchase allowed unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which is a special purpose entity created by Stonehill to purchase allowed unsecured claims against Highland.

the Claims Purchasers filed notices of their purchases as required by Bankruptcy Rule 3001(e)(2), and no objections were filed thereto. In any event, various damages or remedies are sought against the Proposed Defendants revolving around the Claims Purchasers' claims purchasing activities.

### C.    Why Does HMIT Need to Seek Leave?

As alluded to above, HMIT filed its Motion for Leave to comply with the provision in the Plan known as a "gatekeeper" provision ("Gatekeeper Provision") and with this court's prior gatekeeper orders entered in January and July 2020, which all require that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain (1) a finding from the bankruptcy court that its proposed claims ("Proposed Claims") are "colorable"; and (2) specific authorization by the bankruptcy court to pursue the Proposed Claims.[7] The Gatekeeper Provision was not included in the Plan *sans raison*. Indeed, as the Fifth Circuit recognized in affirming confirmation of the Plan, the Gatekeeper Provision (along with the other "protection provisions" in the Plan) had been included in the Plan to address the "continued litigiousness" of Mr. James Dondero ("Dondero"), Highland's co-founder and former chief executive officer ("CEO"), that began prepetition and escalated following the post-petition "nasty breakup" between Highland and Dondero, by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness."[8]

---

[7] To be clear, the Gatekeeper Provision in the Plan was not the first or even second injunction of its type issued in this bankruptcy case. The Gatekeeper Orders were entered by the bankruptcy court pre-confirmation: (a) in January 2020, just a few months into the case, as part of this court's order approving a corporate governance settlement between Highland and its unsecured creditors committee, in which Dondero, Highland's co-founder and former CEO, was removed from any management role at Highland and three independent directors ("Independent Directors") were appointed in lieu of a chapter 11 trustee being appointed ("January 2020 Order"); and (b) in July 2020, in this court's order authorizing the employment of Seery (one of the three Independent Directors) as the Debtor's new Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative ("July 2020 Order," together with the January 2020 Order, the "Gatekeeper Orders").

[8] *See Highland Capital*, 48 F.4th at 427, 435.

D.    *Some Further Context Regarding Post-Confirmation Litigation Generally.*

Since confirmation of the Plan, hundreds of millions of dollars have been paid out to creditors under the Plan, and there are numerous adversary proceedings and contested matters still pending, at various stages of litigation, in the bankruptcy court, the district court, and the Fifth Circuit, almost exclusively involving Dondero and entities that he owns or controls.   To be sure, the post-confirmation litigation in this case does not consist of the usual adversaries and contested matters one typically sees by and against a reorganized debtor and/or litigation trustee, such as preference or other avoidance actions and litigation over objections to claims that are still pending after confirmation of a plan.   Indeed, the claims of the largest creditors in this case (with claims asserted in the aggregate of more than one billion dollars) were successfully mediated and incorporated into the Plan—a plan which was ultimately accepted by the votes of an overwhelming majority of Highland's non-insider creditors.   Dondero and entities under his control were the only parties who appealed the Confirmation Order, and Dondero and entities under his control have been the appellants in virtually every appeal that has been filed regarding this bankruptcy case. Petitions for writs of mandamus (which have been denied) have been filed in the district court and in the Fifth Circuit by some of these same entities, including one by HMIT, when this court denied setting an ***emergency*** hearing on the instant Motion for Leave (HMIT had sought a setting on three-days' notice).

A recent list of active matters involving Dondero and/or entities and/or individuals affiliated or associated with him, filed in the bankruptcy case by Highland and the Claimant Trust, reveals that there were at least 30 pending and "Active Dondero-Related Litigation" matters as of July 14, 2023:  six (6) proceedings in this court; six (6) active appeals or actions are pending in the District Court for the Northern District of Texas; seven (7) appeals in the Fifth Circuit; two (2)

petitions for writs of certiorari in the United States Supreme Court; and nine (9) other proceedings

or actions with or affecting the Highland Parties ("Highland," the "Claimant Trust," and "Seery")

in various other state, federal, and foreign jurisdictions.[9]

The above-described context is included because the Proposed Defendants assert that the

Motion for Leave is just a continuation of Dondero's unrelenting barrage of meritless and

harassing litigation, making good on his oft-mentioned alleged threat to "burn down the place"

after not achieving the results he wanted in the Highland bankruptcy case. Indeed, the Motion for

Leave was filed after two years of unsuccessful attempts by, first, Dondero personally, and then

HMIT to obtain pre-suit discovery from the Proposed Defendants (i.e., the Claims Purchasers)

through two different Texas state court proceedings, pursuant to Tex. R. Civ. P. 202 ("Rule 202").

In each of these Rule 202 proceedings, Dondero and HMIT espoused the same Seery/Claims

---

[9] *See* Bankr. Dkt. No. 3880 (filed on July 14, 2023, providing a list of "Active Dondero-Related Litigation" and noting that the list is "a summary of active pending actions only and does not include actions that were resolved by final orders, including actions finally resolved after appeals to the U.S. District Court for the Northern District of Texas and/or the U.S. Court of Appeals for the Fifth Circuit."). Just since the filing by the Highland Parties of the list, *three* of the appeals pending in the Fifth Circuit have been decided against the Dondero-related appellants, two of which upheld the district court's dismissal of appeals by Dondero-related entities of bankruptcy court orders based on the lack of bankruptcy appellate standing on behalf of the appellant. On July 19, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by NexPoint Advisors, L.P. ("NexPoint") of bankruptcy court orders approving professional compensation on the basis that NexPoint did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the orders. *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, 74 F.4th 361 (5th Cir. 2023). On July 31, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy—the Dondero family trust that, like the movant here in this Motion for Leave, was the holder of a limited partnership interest in Highland, and, as such, now has a contingent interest in the Claimant Trust—which had appealed a bankruptcy court order approving a Rule 9019 settlement on the same basis: Dugaboy did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the settlement order. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10960, 2023 WL 4861770 (5th Cir. July 31, 2023). The July 31, 2023 ruling followed the Fifth Circuit's ruling on February 21, 2023, affirming the district court's dismissal of an appeal by Dugaboy of yet another bankruptcy court order for lack of bankruptcy appellate standing. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023). These rulings by the Fifth Circuit are discussed in greater detail below. The third ruling by the Fifth Circuit since July 14, 2023, was issued by the Fifth Circuit in a per curium opinion not designated for publication on July 26, 2023, this one affirming the district court's affirmance of yet another Rule 9019 settlement order of the bankruptcy court that was appealed by Dugaboy, agreeing with the district court that the bankruptcy court had jurisdiction to approve a settlement among the Debtor, an entity affiliated with the Debtor but not a debtor itself, and UBS (the Debtor's largest prepetition creditor and the seller of its claims to the Claims Purchasers, which is one of the claims trading transactions HMIT complains about in the Proposed Complaint). *See The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P.*, No. 22-10983, 2023 WL 4842320 (5th Cir. July 26, 2023).

Purchasers conspiracy theory espoused in the Motion for Leave—that Seery must have provided one or more of the Claims Purchasers with material nonpublic information to induce them to want to purchase large, allowed, unsecured claims at a discount; a *quid pro quo* is suggested, such that the Claims Purchasers were allegedly told they would make a hefty profit on the claims they purchased and, in return, they would gladly "rubber stamp" Seery's "excessive compensation" as the Claimant Trustee of the Claimant Trust. In sum, HMIT alleges this constituted wrongful "insider trading" of the bankruptcy claims. In addition, certain lawyers for Dondero and Dugaboy sent letters reporting this alleged conspiracy and "insider trading" to the Texas State Securities Board ("TSSB") and the Executive Office of the United States Trustee ("EOUST").

It is against this background and in this context that the court must analyze, in the exercise of its gatekeeping function under the confirmed Plan and its prior Gatekeeping Orders, whether HMIT should be allowed to pursue the Proposed Claims (i.e., whether the Proposed Claims are "colorable" claims as contemplated under the Gatekeeper Orders and the Gatekeeper Provision of the Plan). The court held an evidentiary hearing on the Motion for Leave on June 8, 2023 ("June 8 Hearing"), during which the court admitted exhibits and heard testimony from three witnesses both in support of and in opposition to the Motion for Leave. Having considered the Motion for Leave, the response of the Proposed Defendants thereto, HMIT's reply to the response, and the arguments and evidence presented at the hearing on the Motion for Leave, the court denies HMIT's request for leave to pursue its Proposed Claims. The court's reasoning is set forth below.

## II.    BACKGROUND

### A.    *Highland's Bankruptcy Case, Dondero's Removal as CEO, and the Plan*

Highland was co-founded in Dallas in 1993 by Dondero and Mark Okada ("Okada"). It operated as a global investment adviser that provided investment management and advisory services and managed billions of dollars of assets, both directly and indirectly through numerous

004174

affiliates. Highland's equity interest holders included HMIT (99.5%), Dugaboy (0.1866%), Okada, personally and through trusts (0.0627%), and Strand Advisors, Inc. ("Strand"), which was wholly owned by Dondero and was the only general partner of Highland (0.25%). On October 16, 2019 (the "Petition Date"), Highland, with Dondero in control[10] and acting as its CEO, president, and portfolio manager, and facing a myriad of massive, business litigation claims – many of which had finally become or were about to be liquidated (after a decade or more of contentious litigation in multiple fora all over the world—filed for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The bankruptcy case was transferred to the Northern District of Texas, Dallas Division in December 2019. The official committee of unsecured creditors (the "Committee") (and later, the United States Trustee) expressed a desire for the appointment of a chapter 11 trustee due to concerns over and distrust of Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

After many weeks under the specter of a possible appointment of a trustee, Highland and the Committee engaged in substantial and lengthy negotiations, resulting in a corporate governance settlement approved by this court on January 9, 2020.[11] As a result of this settlement, Dondero relinquished control of Highland and resigned his positions as officer or director of Highland and its general partner, Strand,[12] and three independent directors ("Independent Directors") were

---

[10] Mark Okada resigned from his role with Highland prior to the Petition Date.

[11] This order is hereinafter referred to as the "January 2020 Order" and was entered by the court on January 9, 2020 [Bankr. Dkt. No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Bankr. Dkt. No. 281].

[12] Dondero agreed to this settlement pursuant to a stipulation he executed and that was filed in connection with Highland's motion to approve the settlement. *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Bankr. Dkt. No. 338].

004175

chosen to lead Highland through its chapter 11 case: Seery, John S. Dubel, and retired bankruptcy judge Russell Nelms. Given the Debtor's perceived culture of constant litigation while Dondero was at the helm, it was purportedly not easy to get such highly qualified persons to serve as independent board members. At the hearing on the corporate governance settlement motion, the court heard credible testimony that none of the Independent Directors would have taken on the role without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation from mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the Independent Directors without the bankruptcy court's prior authority. The gatekeeper provision approved by the court in its January 9 Order states,[13]

> No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Dondero agreed to remain with Highland as an unpaid portfolio manager following his resignation and did so "subject at all times to the supervision, direction and authority of the Independent Directors" and to his agreement to "resign immediately" "[i]n the event the Independent Directors determine for any reason that the Debtor shall no longer retain Dondero as an employee"[14] and to "not cause any Related Entity to terminate any agreements with the Debtor."[15] The court later

---

[13] January 2020 Order, 3-4, ¶ 10.

[14] January 2020 Order, 3, ¶ 8.

[15] *Id.* at ¶ 9.

entered, on July 16, 2020, an order approving the appointment of Seery as Highland's Chief

Executive Officer, Chief Restructuring Officer, and Foreign Representative,[16] which included

essentially the same "gatekeeper" language with respect to the pursuit of claims against Seery

acting in these roles.  The gatekeeper provision in the July 2020 Order was essentially the same as

the gatekeeper provision in the January 2020 Order:

> No entity may commence or pursue a claim or cause of action of any kind against
> Seery relating in any way to his role as the chief executive officer and chief
> restructuring officer of the Debtor without the Bankruptcy Court (i) first
> determining after notice that such claim or cause of action represents a colorable
> claim of willful misconduct or gross negligence against Seery, and (ii) specifically
> authorizing such entity to bring such claim.  The Bankruptcy Court shall have sole
> jurisdiction to adjudicate any such claim for which approval of the Court to
> commence or pursue has been granted.

July 2020 Order, 3, ¶5.  Neither the January 2020 Order nor the July 2020 Order were appealed.

Throughout the summer of 2020, Dondero informally proposed several reorganization

plans, none of which were embraced by the Committee or the Independent Directors.  When

Dondero's plans failed to gain support, he and entities under his control engaged in substantial,

costly, and time-consuming litigation for Highland.[17]  As the Fifth Circuit described the situation,

after Dondero's plans failed "he and other creditors began to frustrate the proceedings by objecting

to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's

management, threatening employees, and canceling trades between Highland Capital and its

clients."[18] On October 9, 2020, Dondero resigned from all positions with the Debtor and its

---

[16] *See* the July 16, 2020 order approving the retention by Highland of Seery as Chief Executive Officer, Chief
Restructuring Officer, and Foreign Representative, *nunc pro tunc*, to March 15, 2020 ("July 2020 Order") [Bankr.
Dkt. No. 854].

[17] According to Seery's credible testimony during the hearing on confirmation of the Plan that had been negotiated
between the Committee and the Independent Directors, Dondero had threatened to "burn the place down" if his
proposed plan was not accepted. *See* Transcript of Confirmation Hearing dated February 3, 2021 at 105:10-20. Bankr.
Dkt. No. #1894.

[18] *Highland Capital*, 48 F.4th at 426 (citing *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Capital Mgmt.,
L.P.)*, Ch. 11 Case No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex.

004177

affiliates in response to a demand by the Independent Directors made after Dondero's purported threats and disruptions to the Debtor's operations.[19]

The Independent Directors and the Committee had negotiated their own plan of reorganization which culminated in the filing by Highland of its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* (the "Plan") [Bankr. Dkt. No. 1808] on January 22, 2021.[20] Highland had negotiated settlements with most of its major creditors following mediation and had amended its initially proposed plan to address the objections of most of its creditors, leaving only the objections of Dondero and entities under his control (the "Dondero Parties") at the time of the confirmation hearing,[21] which was held over two days in early February 2021. The Plan is essentially an "asset monetization" plan pursuant to which the Committee was dissolved, and four new entities were created: the Reorganized Debtor; a new general partner for the Reorganized Debtor called HCMLP GP, LLC; the Claimant Trust (administered by Seery, its trustee); and a Litigation Sub-Trust (administered by its trustee, Marc Kirschner). Highland's various servicing agreements were vested in the Reorganized Debtor, which continues to manage collateralized loan obligation vehicles ("CLOs") and various other investments postconfirmation. The Claimant Trust owns the limited partnership interests in the Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust and is charged with winding down the Reorganized Debtor over a three-year period by monetizing its assets and making

---

June 7, 2021) where this court "h[eld] Dondero in civil contempt, sanctioning him $100,000, and comparing this case to a 'nasty divorce.'").

[19] *See* Highland Ex. 13. The court shall refer to exhibits offered and admitted at the June 8 Hearing on the Motion for Leave by the Highland Parties as "Highland Ex. ___" and to exhibits offered and admitted by HMIT as "HMIT Ex. ___."

[20] The *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* was filed on November 24, 2020 ("Disclosure Statement") [Bankr. Dkt. No. 1473].

[21] The only other objection remaining was the objection of the United States Trustee to the Plan's exculpation, injunction, and release provisions.

distributions to Class 8 and Class 9 creditors as Claimant Trust Beneficiaries. The Claimant Trust

is overseen by a Claimant Trust Oversight Board ("CTOB"), and pursuant to the terms of the Plan

and the Claimant Trust Agreement ("CTA"),[22] the CTOB approved Seery's compensation package

as the CEO of the Reorganized Debtor and the Claimant Trustee. Following their acquisition of

their unsecured claims, representatives of Claims Purchasers Muck and Jessup became members

of the CTOB.[23] Seery's compensation included the same base salary that he was receiving as CEO

and CRO of Highland, plus an added incentive bonus tiered to recoveries and distributions to the

creditors under the Plan. The Plan provides for the cancellation of the limited partnership interests

in Highland held by HMIT, Dugaboy, and Okada and his family trusts in exchange for each

holder's pro rata share of a contingent interest in the Claimant Trust ("Contingent Claimant Trust

Interest"), as holders of allowed interests in Class 10 (holders of Class B/C limited partnership

interests) or Class 11 (holders of Class A limited partnership interests) under the Plan.

> **B. *Dondero Communicates Alleged Material Non-Public Information ("MNPI") to Seery, and Seery Allegedly Provides the MNPI to the Claims Purchasers in Furtherance of an Alleged Fraudulent Scheme to Have the Claims Purchasers "Rubber Stamp" His Compensation as Claimant Trustee Post-Confirmation***

> 1. The December 17, 2020 MGM Email

Between Dondero's forced resignation from Highland in October 2020 and the

confirmation hearing in February 2021, Dondero engaged in what appeared to be attempts to

thwart, impede, and otherwise interfere with the Plan being proposed by the Independent Directors

and the Committee. In the midst of this, on December 17, 2020, Dondero sent Seery[24] an email

---

[22] Highland Ex. 38

[23] The CTOB had three members: a representative of Muck (Michael Linn), a representative of Jessup (Christopher Provost), and an independent member (Richard Katz). *See* Joint Opposition ¶ 79.

[24] Dondero sent the email to others as well but did not copy counsel for the Independent Directors (including Seery) in violation of the terms of an existing temporary restraining order that enjoined Dondero from, among other things, "communicating . . . with any Board member" (including Seery) without including Debtor's counsel. Morris Dec. Ex. 23 ¶ 2(a). Citations to "Morris Dec. Ex. _" are to the exhibits attached to the *Declaration of John A. Morris in Support*

004179

(the "MGM Email") that featured prominently in HMIT's Motion for Leave. According to HMIT

and Dondero, the MGM Email contained material nonpublic information ("MNPI") regarding the

possibility of an imminent acquisition of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"), likely

by either Amazon or Apple.[25] At the time Dondero sent the MGM Email, Dondero sat on the board

of directors of MGM, and the Debtor owned MGM stock directly. The Debtor also managed and

partially owned a couple of other entities that owned MGM stock and managed various CLOs that

owned some MGM stock as well. HMIT alleges now that Seery later misused and wrongfully

disclosed to the Claims Purchasers this purported MNPI as part of a *quid pro quo* scheme, whereby

the Claims Purchasers agreed to approve excessive compensation for Seery in the future (in

exchange for him providing this allegedly "insider" information that inspired them to purchase

unsecured claims with an alleged expectation of future large profits).[26] A timeline of events (in

late 2020) in the weeks leading up to Dondero's MGM Email to Seery, following Dondero's

departure from Highland, helps to put the email in full context:

- October 16: Dondero and his affiliates attempt to impede the Debtor's trading activities by demanding—with no legal basis—that Seery cease selling certain assets;[27]

- November 24: Bankruptcy Court enters an Order approving the Debtor's Disclosure Statement, scheduling the confirmation hearing on the Debtor's Plan for January 13, 2021, and granting related relief;[28]

- November 24–27: Dondero personally interferes with the Debtor's

---

*of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding*, Bankr. Dkt. No. 3784.

[25] *See* Proposed Complaint ¶ 45.

[26] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the [Claims Purchasers], with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims."); ¶ 4 ("As part of the scheme, the [Claims Purchasers] obtained a position to approve Seery's ongoing compensation – to Seery's benefit and also to the detriment of the Claimant Trust, the Reorganized Debtor, and HMIT.").

[27] *See* Highland Ex. 14, Dondero-Related Entities' October 16, 2020 Letter; Highland Ex. 15, *Memorandum Opinion and Order Holding Dondero in Contempt for Violation of TRO*, 13-15.

[28] *See* Bankr. Dkt. No. 1476.

implementation of certain securities trades ordered by Seery;[29]

- <u>November 30</u>: The Debtor provides written notice of termination of certain shared services agreements it had with Dondero's two non-debtor affiliates, NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"; together with NexPoint, the "Advisors");[30]

- <u>December 3</u>: The Debtor makes written demands to Dondero and certain affiliates for payment of all amounts due under certain promissory notes they owed to the Debtor, that had an aggregate face amount of more than $60 million—this was part of creating liquidity for the Debtor's Plan;[31]

- <u>December 3</u>: Dondero responds with what appeared to be a threat of some sort to Seery in a text message: "***Be careful what you do -- last warning***;"[32]

- <u>December 10</u>: Dondero's interference and apparent threat cause the Debtor to seek and obtain a temporary restraining order ("TRO") against Dondero;[33]

- <u>December 16</u>: This court denies as "frivolous" a motion filed by certain affiliates of Dondero, in which they sought "temporary restrictions" on certain asset sales;[34] and

- <u>December 17</u>: Dondero sends the unsolicited MGM Email[35] to Seery, which violates the TRO entered just a week earlier.[36]

---

[29] *See* Highland Ex. 15, 30-36.

[30] Morris Decl. Ex. 17; *see also* Transcript of June 8, 2023 Hearing on HMIT's Motion for Leave ("June 8 Hearing Transcript"), 273:23-24.

[31] Morris Decl. Exs. 18-21; *see also* June 8 Hearing Transcript, 273:23-274:1.

[32] Morris Decl. Ex. 22 (emphasis added); *see also* June 8 Hearing Transcript, 273:1-12 (where Seery testified about receiving the threat from Dondero: "A: [T]his came after he threatened me. He threatened me in writing. I'd never been threatened in my career. I've never heard of anyone else in this business who's been threatened in their career. So anything I would get from him, I was going to be highly suspicious.").

[33] *See* Morris Decl. Ex. 23, *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* entered December 10, 2020 [Adv. Pro. No. 20-3190 Dkt. No. 10].

[34] *See* Morris Decl. Ex. 24, Transcript of December 16, 2020 Hearing, 63:5-64:15.

[35] Highland Ex. 11.

[36] Seery testified at the June 8 Hearing that Dondero knowingly violated the TRO when he sent the MGM Email:

[The MGM Email] . . . followed the imposition of a TRO for interfering with the business. He knew what was in the TRO and he knew what it applied to, and it restricted him from communicating with me or any of the other independent directors without Pachulski [Debtor's counsel] being on it. Furthermore, Pachulski had advised Dondero's counsel that not only could they not communicate with us, if they wanted to communicate they had to prescreen the topics. And how do we know that? Because Dondero filed a motion to modify the TRO. And that was all before this email.

June 8 Hearing Transcript, 273:13-22.

004181

The MGM Email had the subject line "Trading Restriction re MGM – material non public information" and stated:

> Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest. Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.[37]

Seery credibly testified at the June 8 Hearing that he was "highly suspicious" when he received the MGM Email.  This was because, among other reasons, Dondero sent it *after*: (i) unsuccessful efforts to impede the Debtor's trading activities (followed by the TRO); (ii) the "be careful what you do" text to Seery by Dondero: (iii) Highland's termination of its shared service arrangements with Dondero's various affiliated entities; (iv) the bankruptcy court's approval of the disclosure statement; and (v) Highland's demand to collect on the demand notes for which Dondero and his entities were liable.[38]  Highland's Chapter 11 case was fast approaching the finish line.  Moreover, MGM was already on the restricted list at Highland Capital, and had been for a long time, and Dondero would know this.[39]  Still further, as of December 17, 2020 (the date Dondero sent the unsolicited MGM Email to Seery), Dondero no longer owed a duty of any kind to the Debtor or any entity controlled by the Debtor, having surrendered in January 2020 direct and indirect control of the Debtor to the Independent Board as part of the corporate governance settlement[40] and having resigned from all roles at the Debtor and affiliates in October 2020.  Still further, Dondero—to the extent he was sharing with Seery MNPI that he obtained as a member of the board of directors of MGM—would have been violating his own fiduciary duties to MGM.

---

[37] Highland Ex. 11.

[38] June 8 Hearing Transcript, 273:1-274:4.

[39] June 8 Hearing, 215:21-216:9.

[40] *See* Bankr. Dkt. Nos. 339, 354-1 (Term Sheet)).

In any event, in a declaration filed by Dondero in support of HMIT's Rule 202 petition in Texas state court for pre-suit discovery,[41] he indicated that his goal in sending the MGM E-mail was to impede the Debtor and Seery from engaging in any transactions involving MGM:

> On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. ***My purpose was to alert Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades***.

It is noteworthy that ***Dondero's labeling of the MGM Email (in the subject line) as a communication containing "material non public information" did not make it so***.  In fact, it appears from the credible evidence presented at the June 8, 2023 hearing on HMIT's Motion for Leave that the MGM Email did not disclose information to Seery that was not already made available to the public at the time it was sent. Seery testified that he did not think the MGM Email contained MNPI and that he did not personally "take any steps . . . to make sure that MGM stock was placed on a restricted list at Highland Capital after [he] received [the MGM Email]" because—as earlier noted—"MGM was already on the restricted list at Highland Capital . . . before I got to Highland."[42]  Indeed, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months[43] and that was officially

---

[41] Highland Ex. 9 ¶ 3 (emphasis added).

[42] June 8 Hearing Transcript, 215:21-216:9.  Seery elaborated upon further questioning from HMIT's counsel that he did not think the indications in the MGM Email (that came from a member of the board of directors in MGM) that "it was probably a first-quarter event" and that "Amazon and Apple were actively diligencing – are diligencing in the data room, both continue to express material interest" were not MNPI. *Id.*, 217:23-218:10.  He testified that "it was clear [before he received the MGM Email] from the media reports and the actual quotes from Kevin Ulrich of Anchorage, who was the chairman at MGM, that a transaction would have to take place very quickly. And, in fact, the transaction did not take place in the first quarter." *Id.*, 219:3-7.

[43] *See* Highland Ex. 25 ("MGM has held preliminary talks with Apple, Netflix and other larger media companies . . . . MGM, in particular, seems like a logical candidate to sell this year. Its owners include Anchorage Capital, Highland Capital and Solus Alternative Asset Management, hedge funds that acquired the company out of bankruptcy in 2010.") (article dated 1/26/20); Highland Ex. 26 (describing prospects of an MGM sale, noting that, among its largest

004183

announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months *before* certain of their claims—the UBS claims—were purchased).[44]   For example, as early as January 2020, Apple and Amazon were identified as being among a new group of "Big 6" global media companies, and MGM was identified as being a leading media acquisition target. Indeed, according to at least one media report on January 26, 2020, "MGM, in particular, seems like a logical candidate to sell this year" having already held "preliminary talks with Apple, Netflix and other larger media companies."[45]   In October 2020, the Wall Street Journal reported that MGM's largest shareholder, Anchorage Capital Group ("Anchorage"), was facing mounting pressure to sell the company.  Anchorage was led by Kevin Ulrich, who also served as Chairman of MGM's Board.  The article reported that "[i]n recent months, Mr. Ulrich has said he is working toward a deal," and he specifically named Amazon and Apple as being among four possible buyers.[46]   Thus, no one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed "material interest" in acquiring MGM.  Dondero testified during the June 8 Hearing that, at the time he sent the MGM Email, he "knew with certainty from the board level that Amazon had hit our price, and it was going to close in the next couple of months,"[47] that "as of December 17th, Amazon had made an offer that was acceptable to MGM, [and that] that's what the board meeting was.  We were going into exclusive negotiations to culminate the merger with

---

shareholders, was "Highland Capital Management, LP") (article October 11, 2020).  *See also* Highland Exs. 27-30 & 34 (various other articles regarding possible sale/suitors of MGM, dated in years 2020 and 2021, and ultimately announcing sale to Amazon on May 26, 2021, for $8.4 billion).

[44] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.

[45] Highland Ex. 25.

[46] Highland Ex. 26.

[47] June 8 Hearing Transcript, 127:2-4.

004184

them."[48]  Notwithstanding this testimony, Dondero eventually admitted (after a lengthy and torturous cross examination) that he did not actually communicate this supposed "inside" information to Seery in the MGM Email.  He did not "say anything about Amazon hitting the price."  He did not say anything about the MGM board going into exclusive negotiations with Amazon "to culminate the merger with them."  Rather, he communicated information that Seery and any member of the public who cared to look could have gleaned from publicly available information as of December 17, 2020, regarding a much-written-about potential MGM transaction that involved interest from numerous companies, including, specifically, Amazon and Apple.  When questioned why "[he felt] the need to mention Apple [in the MGM Email] if Amazon had already hit the price," Dondero simply answered, "The only way you generally get something done at attractive levels in business is if two people are interested," suggesting that he specifically *did not* communicate the purported inside information he obtained as a MGM board member—that Amazon had met MGM's strike price and that the MGM board was moving forward with exclusive negotiations with Amazon—because he wanted it to appear that there was still a competitive process going on that included both Amazon and Apple.[49]

Even if the MGM Email contained MNPI on the day it was sent (four months prior to the first of the Claim Purchases that occurred in April 2021), the information was fully and publicly disclosed to the market in the days and weeks that followed.  For example, on December 21, 2020, just four days later, a Wall Street Journal article titled *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale*, reported that MGM had "tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process," and had "a market value of around $5.5 billion, based on privately traded shares and including debt."  The Wall Street Journal Article reiterated

---

[48] *Id.*, 161:10-14.
[49] June 8 Hearing Transcript, 162:2-6.

18

004185

that (i) Anchorage "has come under pressure in recent years from weak performance and defecting

clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it

shrinks," and (ii) "Mr. Ulrich has told clients in recent months he was working toward a deal for

the studio and has spoken of big technology companies as logical buyers."[50] (*Id.* Ex. 27.)  The

Wall Street Journal's reporting was picked up and expanded upon in other publications soon after.

For example:

- On December 23, 2020, Business Matters published an article specifically identifying Amazon as a potential suitor for MGM. The article, titled *The world is net enough! Amazon joins other streaming services in £4bn bidding war for Bond films as MGM considers selling back catalogue*, cited the Wall Street Journal article and further reported that MGM "hopes to spark a battle that could interest streaming services such as Amazon Prime";[51]

- On December 24, 2020, an article in iDropNews specifically identified Apple as entering the fray. In an article titled *Could Apple be Ready to Gobble Up MGM Studios Entirely?*, the author observed that "it's now become apparent that MGM is actually up on the auction block," noting that the Wall Street Journal was "reporting that the studio has begun a formal sale process" and that Apple—with a long history of exploratory interest in MGM—would be a likely bidder;[52] and

- On January 15, 2021, Bulwark published an article entitled *MGM is For Sale (Again)* that identified attributes of MGM likely to appeal to potential purchasers and handicapped the odds of seven likely buyers—with Apple and Amazon named as two of three potential buyers most likely to close on an acquisition.[53]

Finally, Highland and entities it controlled did not sell their MGM stock while the MGM-

Amazon deal was under discussion and/or not made public but, instead, they tendered their MGM

holdings in connection with, and as part of, the ultimate MGM-Amazon transaction after it closed

in March 2022.

---

[50] Highland Ex. 27.
[51] Highland Ex. 28.
[52] Highland Ex. 29.
[53] Highland Ex. 30.

2. <u>No Evidence to Support HMIT/Dondero's Assumptions that Seery Shared Alleged MNPI in the MGM Email with Claims Purchasers</u>

One of HMIT's allegations in the Proposed Complaint it seeks leave to file—which is central to HMIT's and Dondero's conspiracy theory—is that Seery shared the alleged MNPI from the MGM Email with the Claims Purchasers (or at least Farallon—the owner/affiliate of Muck, one of the Claims Purchasers) and that the Claims Purchasers only acquired the purchased claims ("Purchased Claims") based on, and because, of their receipt of the MNPI from Seery. HMIT essentially admits in the original version of its Motion for Leave that it has no direct evidence that Seery communicated the alleged MNPI to any of the Claims Purchasers. Rather, its allegation is based on inferences it wants the court to make based on "circumstantial" evidence and on the Dondero Declarations that were attached to the Motion for Leave, which described communications Dondero purportedly had with one or two representatives of Farallon in the "late spring" of 2021 concerning Farallon's recent acquisition of certain claims in the Highland bankruptcy case.[54] Based on these communications, HMIT and Dondero only assume Seery must have provided the MNPI about MGM to Farallon, which must have caused both Farallon and the other Claims Purchaser, Stonehill, to acquire the Purchased Claims.[55]

At the June 8 Hearing, HMIT offered Dondero's testimony that he had three telephone conversations with two representatives of Farallon, Mike Linn ("Linn") and Raj Patel ("Patel"),

---

[54] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 1 and Ex. 3; *see also* Highland Ex. 9, *Declaration of James Dondero* (with Exhibit 1) dated February 15, 2023.

[55] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 28. HMIT subsequently filed the final version of the Motion for Leave that was revised to withdraw the Dondero Declarations and delete all references therein to the Dondero Declarations (but, notably, leaving in the allegations that were based on the Dondero Declaration(s)). This was done after the court ruled that it would allow the Proposed Defendants to examine Dondero regarding his Declarations. HMIT contended at that point that the court should consider the Motion for Leave on a no-evidence Rule 12(b)(6) type basis (but could not explain why it had attached the Dondero Declarations as evidence that "supported" the Motion for Leave, if it believed no evidence should be considered). *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 28; *see also infra* pages 45 to 47 regarding the "sideshow" litigation that occurred prior to the June 8 Hearing over whether the hearing on the Motion for Leave would be an evidentiary hearing.

004187

who allegedly told him that they purchased the claims without conducting any due diligence and based solely on Seery's assurances that the claims were valuable. These conversations allegedly took place on May 28, 2021—two days after the MGM-Amazon deal was officially announced to the public (on May 26, 2021). Dondero also testified that a photocopy of handwritten notes ("Dondero Notes")[56] (which were partially cut off) were notes he took contemporaneously with these short telephone conversations he initiated (one with Patel and two follow-up conversations with Linn).[57] He testified that his purpose in taking these notes and in initiating the phone calls was that "[w]e'd been trying nonstop to settle the case for two-plus years. . . . [a]nd when we heard the claims traded, we realized there were new parties to potentially negotiate to resolve the case . . . [s]o I reached out [to] the Farallon guys,"[58] and further, on *voir dire* from the Proposed Defendants' counsel, that the purpose of taking the notes was so that he had "a written record of the important points that [he] discussed . . . so I know how to address it the next time."[59] The handwritten notes[60] stated:

| | |
|---|---|
| *Raj Patel bought it because of Seery* | *1* |
| *50-70¢ not compelling* | *2* |
| *Class 8* | *3* |
| *Asked what would be compelling* | *4* |
| *-- No Offer* | *5* |
| *Bought in Feb/March timeframe* | *6* |
| *Bought assets w/ Claims* | *7* |
| *Offered him 40-50% premium* | *8* |
| *130% of cost; "Not Compelling"* | *9* |
| *No Counter; Told Discovery coming* | *10* |

---

[56] HMIT Ex. 4. The handwritten notes were admitted into evidence after *voir dire*, not for the truth of anything Patel or Linn allegedly said to him during the three telephone conversations, but as Dondero's "present sense impression" of the telephone conversations.

[57] June 8 Hearing Transcript, 133:1-136:3.

[58] *See id.*, 133:13-23.

[59] *See id.* (on *voir dire*), 144:1838-145:4.

[60] HMIT Ex. 4. The court has placed in a table and numbered each line for ease of reference. The table does not include the separate apparent partial date from the top left corner that Dondero testified was the date that he made the initial call to Patel: May 28, 2021.

004188

On direct examination, Dondero testified that line 1 is what he wrote contemporaneously with the short call he initiated to Patel of Farallon in which Patel allegedly told Dondero "that he bought it because Seery told him to buy it and they had made money with Seery before"[61] and that Farallon "bought [the claim] because he was very optimistic regarding MGM"[62] before referring him to Linn, a portfolio manager at Farallon. Dondero testified that the rest of the handwritten notes (reflected in lines 2 through 10 of the table) were notes he took contemporaneously with two telephone conversations he had with Linn following his call to Patel, with lines 2-8 referring to Dondero's first call with Linn and lines 9 and 10 referring to his second call with Linn.[63]  Dondero testified that the "50-70¢" in line 2 referred to his offer to Linn to pay 70 cents on the dollar to buy Farallon's[64] claims because "[w]e knew that they had – that the claims had traded around 50 cents" and "[w]e wanted to prevent the $5 million-a-month burn" (referring to attorney's fees in the Highland case) and that "not compelling Class 8" in lines 2-3 referred to Linn's response to him that the offer was not compelling.[65]  Dondero testified that lines 4-5 referred to him asking Linn what amount would be compelling and to Linn's response that "he had no offer."[66]  Dondero testified that lines 6-8 referred to Linn telling Dondero that Farallon bought the claims in the February, March timeframe and that Dondero told Linn that, given that the estate was spending $5 million a month on legal fees, Farallon should want to sell its claims and Linn's alleged response that "Seery told him it was worth a lot more."[67]  Lastly, Dondero testified on direct examination

---

[61] June 8 Hearing Transcript, 134:7-10, 135:13-22.

[62] *Id.*, 139:3-11.

[63] *Id.*, 136:4-138:16.

[64] As noted above, Farallon did not acquire any of the Purchased Claims; rather, Farallon created a special purpose entity, Muck, to acquire the claims.

[65] June 8 Hearing Transcript, 136:4-16.

[66] *Id.*, 136:17-23.

[67] *Id.*, 137:6-138:7.

004189

that the last two lines referred to a second telephone conversation he had with Linn in which Dondero offered 130 percent of cost for the claims and that Linn told him that the offer was not compelling, and he would not give a price at which he would sell.[68]

On cross-examination, Dondero acknowledged that, though he had testified that the handwritten notes were intended to be a written record of the important points from the telephone conversations he had with Patel and Linn, there was no mention in the notes of: (1) MGM: (2) or that Farallon was very optimistic about MGM; (3) the sharing of MNPI; (4) a *quid pro quo;* or (5) Seery's compensation, and that his last note—"Told Discovery coming"—was a reference to Dondero telling Linn (not Linn telling Dondero) that discovery was coming in response to Dondero's own supposition that Farallon must have traded on MNPI.[69] Cross-examination also revealed that Farallon never told Dondero that Seery gave them MNPI, and that Dondero only **believed** Seery **must have** given Farallon MNPI, because Farallon (Patel and Linn) had told him that the only reason Farallon bought their claims was because of their prior dealings with Seery, which Dondero took to mean that they had conducted no due diligence on their own prior to acquiring the claims. Dondero also testified that he did not have any personal knowledge as to how Seery's compensation package, as CEO of the Reorganized Debtor and Claimant Trustee, was determined because he was "not involved" in the setting of Seery's compensation pursuant to the Claimant Trust[70] and that he never discussed Seery's compensation with Farallon.[71]

As noted earlier, Dondero attempted to obtain discovery from the Claims Purchasers in a Texas state court pursuant to Rule 202 of the Texas Rules of Civil Procedure. The Texas state

---

[68] *Id.*, 138:8-22.

[69] *Id.*, 190:14-191:25. Dondero testified that he told Linn that discovery "would be coming in the next few weeks" and noted that "this has been a couple years. . . . [w]e've been trying for two years to get . . . discovery in this."

[70] *Id.*, 200:13-201:1.

[71] *Id.*, 208:23-209:8.

court denied the First Rule 202 petition on June 1, 2022, after having considered the amended

petition, the responses, the record, applicable authorities and having conducted a hearing on the

petition on June 1, 2022.[72]

> 3.  <u>Dondero Unsuccessfully Seeks Discovery and to Have Various Agencies and Courts
>     Outside of the Bankruptcy Court Acknowledge His Insider Trading Theories</u>

Dondero acknowledged at the June 8 Hearing that the verified petition ("First Rule 202

Petition") he signed and filed on July 22, 2021, in the first Texas Rule 202 proceeding—just weeks

after his telephone calls with Linn and Patel—was true and accurate.  In it, he swore under oath as

to what Linn told him in the telephone call concerning Farallon's purchase of the claims, and the

only reason he gave for wanting discovery was that Linn told him Farallon bought the claims "sight

unseen—relying entirely on Seery's advice solely because of their prior dealings."[73] Dondero

acknowledged, as well, that his sworn statement that he filed in support of an amended verified

Rule 202 petition filed in the same Texas Rule 202 proceeding, but nearly ten months later (in May

2022), described the same telephone conversation he had with Linn, and it did not mention MGM

at all and did not say that Linn told him that Seery gave him MNPI; rather, the sworn statement

stated only that "On a telephone call between Petitioner and Michael Lin[n], a representative of

Farallon, Mr. Lin[n] informed Petitioner that Farallon had purchased the claims sight unseen and

with no due diligence—100% relying on Seery's say-so because they had made so much money

in the past when Seery told them to purchase claims" and that Linn did not tell him that Seery gave

them MNPI, but he concluded that Seery gave Farallon MNPI based on what Linn did tell him.[74]

---

[72] Highland Ex. 7.

[73] *Id.*, 193:8-194:16; Highland Ex. 3, *Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 21. The first Texas Rule 202 proceeding in which Dondero sought discovery regarding the Farallon acquisition of its claims was brought by Dondero, individually, in the 95th Judicial District, Dallas County, Texas.

[74] *Id.*, 195:11-197:17; Highland Ex. 4, *Amended Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 23.

004191

Nine days later, Dondero filed a declaration in the same proceeding, in which he described the same call with Linn as follows:[75]

> Last year, I called Farallon's Michael Lin[n] about purchasing their claims in the bankruptcy. I offered them 30% more than what they paid. I was told by Michael Lin[n] of Farallon that they purchased the interests without doing any due diligence other than what Mr. James Seery—the CEO of Highland—told them, and that he told them that the interests would be worth far more than what Farallon paid. Given the value of those claims that Seery had testified in court, it made no sense to me that Mr. Lin[n] would think that the claims were worth more than what Seery testified under oath was the value of the bankruptcy claims.

Dondero further stated in his declaration that "I have an interest in ensuring that the claims purchased by [Farallon] are not used as a means to deprive the equity holders of their share of the funds," and that "[i]t has become obvious that despite the fact that the bankruptcy estate has enough money to pay all claimants 100 cents on the dollar, there is plainly a movement afoot to drain the bankrupt estate and deprive equity of their rights. Accordingly, "I commissioned an investigation by counsel who have been in communication with the Office of the United States Trustee."[76] Dondero attached as Exhibit A to his declaration a letter from Douglas Draper ("Draper"), an attorney with the law firm of Heller, Draper & Horn, L.L.C. in New Orleans, to the office of the General Counsel, Executive Office for U.S. Trustees, dated October 5, 2021, in which Draper opens the letter by stating that "[t]he purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the [Creditors' Committee] in the bankruptcy of [Highland]," and later noted that he "became involved in Highland's bankruptcy through my representation of [Dugaboy], an irrevocable trust of which Dondero is the primary beneficiary."[77]  Mr. Draper laid out the same allegations of insider claims trading, breach of

---

[75] Highland Ex. 5, ¶ 2.
[76] *Id.*, ¶¶ 3-4.
[77] *Id.*, Ex. A, 1-2.

004192

fiduciary duties, and conspiracy that HMIT seeks to bring in the Proposed Complaint.[78]  The U.S. Trustee's office took no action.   Dondero made a second and third attempt to get the U.S. Trustee's office to conduct an investigation into the same allegations laid out in Draper's letter, this time in "follow-up" letters to the Office of the U.S. Trustee on November 3, 2021, and six months later, on May 11, 2022, through another lawyer, Davor Rukavina ("Rukavina"), in which Rukavina wrote "to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the [Highland] bankruptcy."[79] Again, the U.S. Trustee's office took no action.

On February 15, 2023, Dondero filed yet another sworn statement about his alleged conversation with Linn, this time in support of a Verified Rule 202 Petition **filed by HMIT** ("Second Rule 202 Petition"), filed in a different Texas state court (Texas District Court, 191st Judicial District, Dallas County, Texas), following Dondero's unsuccessful attempts throughout 2021 and 2022 to obtain discovery in the First Rule 202 proceeding and based on the same allegations of misconduct by Seery and Farallon.[80]   In this new sworn statement, Dondero describes for the first time the "call" he had with Linn as having been "phone calls" with Patel and Linn and **mentions MGM** and Farallon's alleged optimism about the **expected sale of MGM**:[81]

> In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the Acis and HarbourVest claims, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Seery because they had made significant profits when Seery told them to purchase other claims in the past. They also stated that they were particularly optimistic because of the expected sale of MGM.

---

[78] *Id.*, Ex. A, 6-11.

[79] HMIT Ex. 61.

[80] Highland Ex. 9.

[81] *Id.*, ¶ 4.

004193

The Second Rule 202 Petition was also denied by the second Texas state court on March 8, 2023.[82]

HMIT, in an apparent attempt to provide support for its argument that the Proposed Claims are "colorable," stated in its Motion for Leave that "[t]he Court also should be aware that the Texas States [sic] Securities Board ("TSSB") opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed. The continuing nature of this investigation underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely 'colorable.'"[83] But, two days before opposition briefing was due, on May 9, 2023, the TSSB issued a letter ("TSSB Letter") to Highland, informing it that "[t]he staff of the [TSSB] has completed its review of the complaint received by the Staff against [Highland]. The issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time."[84] HMIT's counsel (frankly, to the astonishment of the court) objected to the admission of the TSSB Letter at the June 8 Hearing "on the grounds of relevance, 403, hearsay, and authenticity . . . [a]nd I also . . . think it's important that the decision by a regulatory body has no bearing on this cause of action or the colorability of this claim, and the Texas State Securities Board will tell you that. This is completely and utterly irrelevant to your inquiry."[85] The court overruled HMIT's objection to the relevance of this exhibit—considering, among other things, that HMIT, in its Motion for Leave, specifically mentioned the allegedly open TSSB "investigation" as relevant evidence the court "should be aware" of in making its determination of whether the Proposed Claims were "colorable."[86]

---

[82] Highland Ex. 10.

[83] Motion for Leave, ¶ 37.

[84] *See* Highland Ex. 33.

[85] June 8 Hearing Transcript, 323:22-324:3.

[86] *Id.*, 324:4-328:2.

004194

### C. *Claims Purchasers Purchase Claims and File Notices of Transfers of Claims*

To be clear about the time line here, it was after confirmation of the Plan but prior to the Effective Date of the Plan, that the Claims Purchasers: (1) purchased several large unsecured claims that had been allowed following, and as part of, Rule 9019 settlements, each of which were approved by the bankruptcy court, after notice and hearing, prior to the confirmation hearing; and (2) filed notices of the transfers of those claims pursuant to Rule 3001(e)(2) of the Federal Rules of Bankruptcy Procedure. The noticing of the claims transfers began on April 16, 2021, with the notice of transfer of the claim held by Acis Capital Management to Muck, and ended on August 9, 2021, with the notices of transfers of the claims held by UBS Securities to Muck and Jessup:

| Claimant(s) | Date Filed/ Claim No. | Asserted Amount | Claim Settled/Allowed? If so, Amount | Date Filed/ Rule 3001 Notice Dkt. No. |
|---|---|---|---|---|
| Acis Capital Management LP and Acis Capital Management, GP LLC (together, "Acis") | 12/31/2019 Claim No. 23 | $23,000,000 | Yes[87]<br><br>$23,000,000 | 4/16/2021 Bankr. Dkt. No. 2215 (Muck) |
| Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee") | 4/3/2020 Claim No. 72 | $190,824,557 | Yes[88]<br><br>$137,696,610 | 4/30/2021 Bankr. Dkt. No. 2261 (Jessup) |
| HarbourVest 2017 Global Fund, LP, HarbourVest 2017 Global AIF, LP, HarbourVest Partners LP, HarbourVest Dover Street IX Investment LP, HV International VIII Secondary LP, HarbourVest Skew Base AIF LP (the "HarbourVest Parties") | 4/8/2020<br><br>Claim Nos. 143, 147, 149, 150, 153, 154 | Unliquidated | Yes[89]<br><br>$80,000,000 in aggregate ($45,000,000 General Unsecured Claim, and $35,000,000 subordinated claim) | 4/30/2021 Bankr. Dkt. No. 2263 (Muck) |

---

[87] Bankr. Dkt. No. 1302. The Debtor's settlement with Acis was approved over the objection of Dondero. Bankr. Dkt. No. 1121.

[88] Bankr. Dkt. No. 1273.

[89] Bankr. Dkt. No. 1788. The Debtor's settlement with the HarbourVest Parties was approved over the objections of Dondero, Bankr. Dkt. No. 1697, and Dugaboy and the Get Good Trust. Bankr. Dkt. No. 1706.

004195

| UBS Securities LLC, UBS AG, London Branch (the "UBS Parties") | 6/26/2020<br><br>Claim Nos. 190, 191 | $1,039,957,799.40 | Yes[90]<br><br>$125,000,000 in aggregate ($65,000,000 General | 8/9/2021<br>Bankr. Dkt. No. 2698 (Muck) and Bankr. Dkt. No. 2697 (Jessup) |
|---|---|---|---|---|

HMIT insists that it "made no sense" for the Claims Purchasers to buy the Purchased Claims because "the publicly available information [] did not offer a sufficient potential profit to justify the publicly disclosed risk," and "their investment was projected to yield a small return with virtually no margin for error."[91]   Dondero testified that it was *his* view that there was insufficient information in the public to justify the claims purchases.[92]   But, HMIT's arguments here are contradicted by the information that was publicly available to Farallon and Stonehill at the time of their purchases and by HMIT's own allegations.   In advance of Plan confirmation, Highland projected that Class 8 general unsecured creditors would recover 71.32% on their allowed claims.   In the Proposed Complaint, HMIT sets forth the amounts the Claims Purchasers purportedly paid for their claims.[93]   Taking into account the face amount of the allowed claims, the Claims Purchasers' projected profits (in millions of dollars) were as follows:

| Creditor | Class 8 | Class 9 | Ascribed Value[94] | Purchaser | Purchase Price | Projected Profit |
|---|---|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | $97.71 | Stonehill | $78.0 | $19.71 |
| Acis | $23.0 | $0.0 | $16.4 | Farallon | $8.0 | $8.40 |

---

[90] Bankr. Dkt. No. 2389.  The Debtor's settlement with the UBS Parties was approved over the objections of Dondero, Dkt. No. 2295, and Dugaboy and the Get Good Trust. Bankr. Dkt. Nos. 2268, 2293.

[91] Proposed Complaint, ¶ 3.

[92] June 8 Hearing Transcript, 187:3-7 ("Q: And it's your testimony that there wasn't sufficient information in the public for them to buy – this is your view – that there wasn't sufficient information in the public to justify their purchases.  Is that your view? A: Correct.).

[93] *Id.*, ¶ 42.

[94] "Ascribed Value" is derived by multiplying the Class 8 amount by the projected recovery of 71.32% for that class.

004196

| HarbourVest | $45.0 | $35.0 | $32.09 | Farallon | $27.0 | $5.09 |
| UBS | $65.0 | $60.0 | $46.39 | Stonehill & Farallon | $50.0 | ($3.61) |

As HMIT acknowledges, by the time Dondero spoke with Farallon in the "late spring" of 2021, the Claims Purchasers had acquired the allowed claims previously held by Acis, Redeemer, and HarbourVest.[95]  Based on an aggregate purchase price of $113 million for these three claims, the Claims Purchasers would have expected to net over $33 million in profits, or nearly 30% on their investment, had Highland met its projections. The Claims Purchasers would make even more money if Highland beat its projections, because they also purchased the Class 9 claims and would therefore capture any upside.  In this context, HMIT's and Dondero's assertions that it did not "make any sense" for the Claims Purchasers to purchase their claims when they did does not pass muster—given the publicly available information about potential recoveries under the Plan. Dondero even acknowledged, on cross-examination, that he was prepared to pay **30 percent more** than Farallon had paid, even though he did not think there was sufficient public information available to justify Farallon's purchase of the claims.[96]  Dondero essentially testified that he wanted to purchase Farallon's claims because he wanted to be in a position of control to force a settlement or resolution of the bankruptcy case, post-confirmation, under terms acceptable to him. He did not want to try to settle by negotiating with Farallon and Stonehill **as creditors**, but instead he wanted to purchase the claims because "if we owned all the claims, it would settle the case."[97]

---

[95] *See* Complaint, ¶ 41 n.12.  The UBS claims were not acquired until August 2021, long after the alleged "*quid pro quo*" was supposedly agreed upon and the MGM-Amazon deal was announced in the press in late May 2021. *See*, Highland Ex. 34, *Amazon's $8.45 Billion Deal for MGM is Historic But Feels Mundane* (dated May 26, 2021).

[96] June 8 Hearing Transcript, 187:8-11.

[97] *Id.*, 187:12-189:10.

D. *Fifth Circuit's Approval of the Gatekeeper Provision in Plan, Recognition of Res Judicata Effect of the Prior Gatekeeper Orders, and the Bankruptcy Court's Order Approving Highland's Motion to Conform Plan*

Harkening back to February 22, 2021, after a robust confirmation hearing, this court entered its order confirming the Plan, over the objections of Dondero and Dondero-Related Parties, specifically questioning the good faith of their objections. The court found, after noting "the remoteness of their economic interests" that "[it] has good reason to believe that [the Dondero Parties] are not objecting to protect economic interests they have in the Debtor but to be disruptors. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan."[94] The Plan became effective on August 11, 2021.

Of relevance to the Motion for Leave, the confirmed Plan included certain exculpations, releases, and injunctions designed to protect the Debtor and other bankruptcy participants from bad-faith litigation. These participants included: Highland's employees (with certain exceptions); Seery as Highland's CEO and CRO; Strand (after the appointment of the Independent Directors); the Independent Directors; the successor entities; the CTOB and its members; the Committee and its members; professionals retained in the case; and all "Related Persons." The injunction provisions contained a Gatekeeper Provision which is similar to the gatekeeper provisions in the prior Gatekeeper Orders in that it provided that the bankruptcy court will act as a "gatekeeper" to screen and prevent bad-faith litigation against the Protected Parties. The Gatekeeper Provision in the Plan states, in pertinent part:[98]

> No Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case . . . without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents *a colorable claim of any kind*, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically

---

[98] Plan, 50-51 (emphasis added).

004198

authorizing such Enjoined Party to bring such claim or cause of action against such Protected Party.

The Plan defines Protected Parties as,

> collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the [CTOB] (in their official capacities), (xiii) [HCMLP GP LLC], (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); [but excluding Dondero and Okada and various entities including HMIT and Dugaboy].

The court notes that the Gatekeeper Provision in the Plan provides protection to a broader number of persons than the persons protected under the January 2020 Order (addressing the Independent Directors and their agents and advisors) and the July 2020 Order (addressing Seery in his role as CEO and CRO of the Debtor). But, at the same time, it is less restrictive than the gatekeeping provisions under the Gatekeeper Orders, in that the gatekeeping provisions in the prior orders shield the protected parties from any claim that is not both "colorable" *and* a claim for "willful misconduct or gross negligence," effectively providing the protected parties under the prior orders with a limited immunity from claims of simple negligence or breach of contract that do not rise to the level of "willful misconduct or gross negligence," whereas the Gatekeeping Provision under the Plan does not act as a release or exculpation of the Protected Parties in any way because it does not prohibit any party from bringing *any kind of claim* against a Protected Party, provided the proposed claimant first obtains a finding in the bankruptcy court that its proposed claims are "colorable."[99]

---

[99] It should be noted that--as discussed further below--there are, separately in the Plan, exculpations as to a smaller universe of persons--*e.g.,* the Debtor, the Committee and its members, and the Independent Directors.

004199

Dondero and some of the entities under his control appealed[100] the Confirmation Order directly to the Fifth Circuit, arguing, among other issues, that the Plan's exculpation, release, and injunction provisions, including the Gatekeeper Provision (collectively, the "Protection Provisions") impermissibly provide certain non-debtor bankruptcy participants with a discharge, purportedly in contravention of the provisions of Bankruptcy Code § 524(e)'s statutory bar on non-debtor discharges. As noted above, the Fifth Circuit, "affirm[ed] the confirmation order in large part" and "reverse[d] *only insofar as the plan exculpates* certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties *from the plan's exculpation*, and affirm[ed] on all remaining grounds."[101] The Fifth Circuit specifically found the "injunction and gatekeeping provisions [to be] sound" and found that it was only "the *exculpation* of certain non-debtors" that "exceed[ed] the bankruptcy court's authority," agreeing with the bankruptcy court's conclusions that the Protection Provisions were legal, necessary under the circumstances, and in the best interest of all parties" in part, and only disagreeing to the extent that the *exculpation* provision improperly extended to certain bankruptcy participants other than Highland, the Committee and its members, and the Independent Directors and "revers[ing] and strik[ing] the few unlawful parts

---

[100] On appeal, the appellant funds ("Funds"), whom this court found to be "owned and/or controlled" by Dondero despite their purported independence, also asked the Fifth Circuit to vacate this court's factual finding "because it threatens the Funds' compliance with federal law and damages their reputations and values" and because "[a]ccording to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him." *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th at 434. Applying the "clear error" standard of review, the Fifth Circuit "le[ft] the bankruptcy court's factual finding undisturbed" because "nothing in this record leaves us with a firm and definite conviction that the bankruptcy court made a mistake in finding that the Funds are 'owned and/or controlled by [Dondero]." *Id.* at 434-35.

[101] *See supra* note 4. The Fifth Circuit replaced its initial opinion with its final opinion a few days after certain appellants had filed a short (four-and-one-half pages) motion for rehearing (the "Motion for Rehearing") on September 2, 2022. The movants had asked the Fifth Circuit to "narrowly amend the [initial] Opinion in order to confirm the Court's holding that the impermissibly exculpated parties are similarly struck from the protections of the injunction and gatekeeper provisions of the plan (in other words, that such parties cannot constitute 'Protected Parties')." In the final Fifth Circuit opinion, same as the initial Fifth Circuit opinion, the Fifth Circuit stated that, with regard to the Confirmation Order, the panel would "reverse only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those few parties from the plan's exculpation, and affirm on all remaining grounds." *Highland Capital*, 48 F.4th at 424. No findings, discussion, or rulings regarding the injunction and gatekeeper provisions that were in the initial Fifth Circuit opinion were disturbed.

of the Plan's **exculpation provision**."[102]  The Fifth Circuit then remanded to the Bankruptcy Court "for further proceedings in accordance with the opinion."[103]

In the course of analyzing the Protection Provisions under the Plan, the Fifth Circuit noted that the protection provisions in the January and July 2020 Orders appointing the Independent Directors and Seery as CEO and CRO of Highland were *res judicata* and that "*those* orders have the effect of exculpating the Independent Directors and Seery in his executive capacities" such that "[d]espite removal from the exculpation provision in the confirmation order, the Independent Directors' agents, advisors, and employees, as well as Seery in his official capacities are all exculpated to the extent provided in the January and July 2020 Orders."[104]

The Reorganized Debtor filed a motion in the bankruptcy court to conform the plan to the Fifth Circuit's mandate, proposing that only one change was needed to make the Plan compliant with the Fifth Circuit's ruling:  narrow the defined term for "Exculpated Parties" to read as follows:

> "Exculpated Parties" means, collectively, (i) the Debtor, (ii) the Independent Directors, (iii) the Committee, and (iv) members of the Committee (in their official capacities).

The Reorganized Debtor proposed that this one simple revision of this defined term removed the exculpations deemed by the Fifth Circuit to violate section 524(e) of the Bankruptcy Code, and that no other changes would be required to conform the Plan and Confirmation Order to the Fifth Circuit's mandate.  Some of the Dondero-related entities objected to the motion to conform, arguing that the Fifth Circuit's ruling required more surgery on the Plan than simply narrowing the defined term "Exculpated Parties."  On February 27, 2023, this court entered its order granting

---

[102] *Id.* at 435.

[103] *Id.* at 440. The Fifth Circuit's docket reflects that it issued its Judgment and mandate on September 12, 2022.

[104] *Highland Capital*, 48 F.4th at 438 n.15.  The Fifth Circuit stated, "To the extent Appellants seek to roll back the protections in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such a collateral attack is precluded." *Id.*

Highland's motion to conform the Plan, ordering that one change be made to the Plan – revising the definition of "Exculpated Parties" – and no more.[105]  The objecting parties' direct appeal of this order has been certified to the Fifth Circuit and is one of the numerous currently active appeals by Dondero-related parties pending in the Fifth Circuit.

### E.  HMIT's Motion for Leave

HMIT filed its emergency Motion for Leave on March 28, 2023, which, with attachments, as first filed, was 387 pages in length, including an initial proposed complaint ("Initial Proposed Complaint") and two sworn declarations of Dondero that were attached as "objective evidence" in "support[ ]" of the Motion for Leave,[106] and with it, an application for an emergency setting on the hearing on the Motion to Leave.  On April 23, 2023, HMIT filed a pleading entitled a "supplement" to its Motion to Leave ("Supplement"),[107] to which it attached a revised proposed verified complaint ("Proposed Complaint")[108] as Exhibit 1-A to the Motion for Leave and stated that "[t]he Supplement is not intended to amend or supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action."[109]  The HMIT Motion for Leave was later amended to eliminate the Dondero Declarations and references to the same (but not the underlying allegations that were supposedly supported by the Dondero Declarations).[110]

---

[105] Bankr. Dkt. No. 3672.

[106] Bankr. Dkt. No. 3699.

[107] Bankr. Dkt. No. 3760.

[108] *See supra* note 5.

[109] Supplement ¶ 1.

[110] Bankr. Dkt. Nos. 3815 and 3816.  Both of these filings had the Initial Proposed Complaint attached as Exhibit 1 to the Motion for Leave.

004202

As earlier noted, HMIT desires leave to sue the Proposed Defendants regarding **the post-confirmation, pre-Effective Date purchase of allowed unsecured claims**.   The Proposed Defendants would be:

> **Seery,** who was a stranger to Highland until approximately four months following the Petition Date when he was brought in as one of the three Independent Directors, and now serves as the CEO of the Reorganized Debtor and the Trustee of the Claimant Trust (and also was previously Highland's CRO during the case, then CEO, and, also, an Independent Board Member of Highland's general partner during the Highland case).  Seery is best understood as the man who took Dondero's place running Highland—per the request of the Committee.

> **Claims Purchasers,** who were strangers to Highland until the end of the bankruptcy case.   They are identified as Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which was a special purpose entity created by Farallon to purchase unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which was a special purpose entity created by Stonehill to purchase unsecured claims against Highland (collectively, the "Claims Purchasers").   The Claims Purchasers purchased $240 million face value of already-allowed unsecured claims post-confirmation and pre-Effective Date in the spring of 2021 and another $125 million face value of already-allowed unsecured claims in August 2021. Bankruptcy Rule 3001(e) notices—giving notice of same—were filed on the bankruptcy clerk's docket regarding these purchases.   The claims had previously been held by the creditors known as the Crusader Redeemer Committee, Acis Capital, HarbourVest, and UBS (three of these four creditors formerly served on the Committee during the Highland bankruptcy case).

> **John Doe Defendants Nos. 1-10**, which are described to be "currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue."

> **Highland,** as a nominal defendant.  HMIT added Highland as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

> **Claimant Trust**, as a nominal defendant.  HMIT added the Claimant Trust as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

The proposed plaintiffs would be:

> **HMIT,** which, again, was the largest equity holder in Highland and held a 99.5% limited partnership interest (specifically, Class B/C limited partnership interests).  HMIT is the holder of a Class 10 interest under the Plan, pursuant to which HMIT's limited partnership interest in Highland was extinguished as of the Effective Date in exchange for a pro rata share of a contingent interest in the Claimant Trust.

004203

**Highland,** as a nominal party. HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Reorganized Debtor.

**Claimant Trust**, as a nominal party. HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Claimant Trust.

In the Proposed Complaint, HMIT asserts the following six counts: Count I (against Seery) for breach of fiduciary duties; Count II (against the Claims Purchasers and John Doe Defendants) for knowing participation in breach of fiduciary duties; Count III (against all Proposed Defendants) for conspiracy; Count IV (against Muck and Jessup) for equitable disallowance of their claims; Count V (against all Proposed Defendants) for unjust enrichment and constructive trust; and Count VI (against all Proposed Defendants) for declaratory relief.[111] The gist of the Proposed Complaint is as follows. HMIT asserts that something seems amiss regarding the post-confirmation/pre-Effective Date purchase of claims by the Claims Purchasers. Actually, more bluntly, HMIT asserts that "wrongful conduct occurred" and "improper trades" were made.[112] HMIT believes the Claims Purchasers paid around $160 million for the $365 million face amount of claims they purchased. HMIT believes that this amount was too high for any rational claim purchaser (particularly hedge funds who expect high returns) to have paid for the claims—based on Highland's Disclosure Statement and Plan projections regarding the projected distributions under the Plan to holders of allowed unsecured claims. And, of course, Dondero purports to have concluded from the three phone conversations he had with representatives of one of the Claims Purchasers that they did no due diligence before purchasing the claims. Therefore, HMIT surmises, Seery must have given these Claims Purchasers MNPI regarding Highland that convinced them that it was to their economic advantage to purchase the claims. In particular, HMIT surmises Seery must have shared

---

[111] In the Initial Proposed Complaint, HMIT proposed to bring claims against the various Proposed Defendants in seven counts, including a count for fraud by misrepresentation and material nondisclosure against all Proposed Defendants. In the Proposed Complaint, HMIT abandons its claim for fraud by misrepresentation and material nondisclosure.

[112] Motion for Leave, 7.

004204

MNPI regarding the likely imminent sale of MGM, in which Highland had, directly and indirectly, substantial holdings. As noted earlier, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months and that was officially announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months *before* certain of their claims—the UBS claims—were purchased).[113] In summary, while the Proposed Complaint is lengthy and at times hard to follow, it boils down to allegations that: (a) Seery filed (or caused to be filed) deflated, pessimistic, misleading projections regarding the value of the Debtor's estate in connection with the Plan, (b) then induced very sophisticated unsecured creditors to discount and sell their claims to the likewise very sophisticated Claims Purchasers, (c) which Claims Purchasers are allegedly friendly with Seery, and are now happily approving Seery's allegedly excessive compensation demands post-Effective Date (resulting in less money in the pot to pay off the creditor body in full, and, thus, a diminished likelihood that HMIT will realize any recovery on its contingent Class 10 interest). HMIT argues that Seery should be required to disgorge his compensation. It appears that HMIT also seeks other damages in the form of equitable disallowance of the Claims Purchasers' claims and disgorgement of distributions on account of those claims, the imposition of a constructive trust over all disgorged funds, and declaratory relief.

HMIT claims that, in seeking to file the Proposed Complaint, it is seeking to protect the rights and interests of the Reorganized Debtor, the Claimant Trust, and "innocent stakeholders" who were allegedly injured by Seery's and the Claims Purchasers' alleged conspiratorial and

---

[113] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid. Credible testimony from Seery at the June 8 Hearing revealed that Highland and entities it controlled tendered their MGM holdings in connection with the Amazon transaction (they did not sell their holdings while the MGM-Amazon deal was under discussion and/or not made public).

004205

fraudulent scheme to line Seery's pockets with excessive compensation for his role as Claimant Trustee. In its Motion for Leave, HMIT states that "[t]he attached Adversary Proceeding alleges claims which are substantially more than 'colorable' based upon plausible allegations that the Proposed Defendants, acting in concert, perpetrated a fraud, including a fraud upon innocent stakeholders, as well as breaches of fiduciary duties and knowing participation in (or aiding or abetting) breaches of fiduciary duty."[114]

## F. Is HMIT Really Dondero by Another Name?

The Proposed Defendants argue that HMIT's Motion for Leave is nothing more than a continuation of the harassing and bad-faith litigation by Dondero and his related entities that the Gatekeeper Provisions were intended to prevent and, thus, this is one of multiple reasons that the Motion for Leave should be denied.

To be clear, HMIT asserts that it is controlled by Mark Patrick ("Patrick"), who has been HMIT's administrator since August 2022. Patrick asserts that he is not influenced or controlled by Dondero, in general, and specifically not in its efforts to pursue the Proposed Claims against Seery and the Claims Purchasers. However, the testimony elicited at the June 8 Hearing—the hearing at which HMIT had the burden of showing the court that its Proposed Claims were "colorable" such that it should be allowed to pursue them through the filing of the Proposed Complaint—paints a different picture. Somewhat tellingly, HMIT chose not to call Patrick— allegedly HMIT's only representative and control person—as a witness in support of its Motion for Leave. Rather, Dondero was HMIT's first witness called in support of its motion, and the first

---

[114] *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 3. HMIT notes, in a footnote 6, that "Neither this Motion nor the proposed Adversary Complaint seeks to challenge the Court's Orders or the Plan. In addition, neither this Motion nor the proposed Adversary Complaint seeks to redistribute the assets of the Claimant Trust in a manner that would adversely impact innocent creditors. Rather, the proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan, as well as the Claimant Trust Agreement."

004206

questions on direct from HMIT's counsel were aimed at establishing that Dondero was not behind the filing of the Motion for Leave and the pursuit of the Proposed Claims.[115]  Dondero testified that he did not (i) "have any current official position" with HMIT, (ii) "attempt to exercise [control] on the business affairs of [HMIT]," (iii) "have any official legal relationship with [HMIT] where [he] can attempt to exercise either direct or indirect control over [HMIT]," or (iv) "participate in the decision of whether or not to file the proceedings that are currently pending before Judge Jernigan."[116]  After HMIT rested, Highland and the Claimant Trust called Patrick as a witness, and he testified that he was the administrator of HMIT, that HMIT does not have any employees, operations, or revenues, and, when asked if HMIT owned any assets, Patrick testified, with not a great deal of certainty, that "it's my understanding it has a contingent beneficiary interest in the Claimants [sic] Trust" and that is the only asset HMIT has.[117]  Patrick testified that HMIT did not owe any money to Dondero personally, but acknowledged that in 2015, HMIT had issued a secured promissory note in favor of Dondero's family trust, Dugaboy, in the amount of approximately $62.6 million (the "Dugaboy Note") in exchange for Dugaboy transferring a portion of its limited partner interests in Highland to HMIT; the Dugaboy Note was secured in part by the Highland limited partnership interests purchased from Dugaboy.[118]  Patrick admitted that, if HMIT's Class 10 interest has no value, HMIT would have no ability to pay the Dugaboy Note.[119]  He further testified that neither he nor any representative of HMIT had ever spoken with any representative of Farallon or Stonehill, that he had no personal knowledge about any *quid pro quo*, the amount of due diligence Farallon or Stonehill conducted prior to buying their claims, or the terms of

---

[115] *See* June 8 Hearing Transcript, 113:10-25.

[116] *Id.*

[117] June 8 Hearing Transcript, 307:7-308:2.

[118] *Id.*, 303:11-305:1; Highland Ex. 51, HMIT's $62,657,647.27 *Secured Promissory Note* dated December 24, 2015, in favor of Dugaboy.

[119] *Id.*, 308:3-16.

004207

Seery's compensation package (until the terms were disclosed to them in opposition to the Motion

for Leave).[120]  Patrick admitted that Dugaboy was paying HMIT's attorneys' fees pursuant to a

settlement agreement between HMIT and Dugaboy.[121]

On cross-examination by HMIT's counsel, Patrick further testified that HMIT has not filed

any litigation, as plaintiff, other than its efforts to be a plaintiff in the Motion for Leave and its

action as a petitioner in the Texas Rule 202 proceeding filed earlier in 2023 in the Texas state

court.[122] HMIT's counsel argued that the point of this questioning was that "they're just trying to

draw Dondero into this and – this vexatious litigant argument, and we're just developing the fact

that obviously Hunter Mountain has only filed – attempting to file this action and a Rule 202

proceeding.[123]  But, Dondero and HMIT's counsel referred during the June 8 Hearing to the First

Rule 202 Petition (where Dondero was the petitioner) and the Second Rule 202 Petition (where

HMIT was the petitioner) as "our" Rule 202 petitions, and also to the numerous attempts at getting

the discovery (that Dondero had warned Linn was coming) in the collective.  For example, in

objecting to the admission of Highland's Exhibit 10 – the Texas state court order denying and

dismissing the Second Rule 202 Petition – on the basis of relevance, HMIT's counsel referred to

the order as "an order denying *our second"* Rule 202 Petition.[124]  And, Dondero testified that his

warning to Linn in May 2021 that "discovery was coming" was "my response to I knew they had

traded on material nonpublic information" and that "I thought it would be a lot easier to get

---

[120] *Id.*, 308:18-312:12. This testimony from Patrick came after HMIT's counsel objection to counsel's line of questioning regarding Patrick's personal knowledge of the facts supporting the allegations in the Proposed Complaint on the basis that he was invading the attorney work product privilege, which was overruled by this court; HMIT's counsel argued (311:4-19) that the line of questioning was an "invasion of attorney work product . . . [b]ecause they might – he would have knowledge from the efforts and investigation through attorneys in the case."

[121] *Id.*, 312:24-313:18.

[122] *Id.*, 315:3-9.

[123] *Id.*, 316:6-11.

[124] *Id.*, 58:11-13.  The court overruled HMIT's relevance objection and admitted Highland's Exhibit 10 into evidence. *Id.*, 58:14-15.

004208

discovery on a situation like this than it has been for the last two years" and that "*we've* been trying

for two years to get . . . discovery."[125]

Dondero's use of an entity over which he exerts influence and control to pursue his own

agenda in the bankruptcy case is not new. Rather, this has been part of Dondero's *modus operandi*

since the "nasty breakup" between Dondero and Highland that culminated with Dondero's ouster

in October 2020, whereby Dondero, after not getting his way in the bankruptcy court, continued

to lob objections and create obstacles to Highland's implementation of the Plan through entities

he owns or controls. As noted above, the Fifth Circuit specifically upheld this court's finding in

the Confirmation Order that Dondero owned or controlled the various entities that had objected to

confirmation of the Plan and appealed the Confirmation Order, where the Dondero-related

appellants made similar protestations that they are not owned or controlled by Dondero and asked

the Fifth Circuit to vacate this court's factual finding because, among other reasons, "[a]ccording

to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely

independent from him."[126] Based on the totality of the evidence in this proceeding, the court finds

that, contrary to the protestations of HMIT's counsel and Patrick otherwise, Dondero is the driving

force behind HMIT's Motion for Leave and the Proposed Complaint. The Motion for Leave is

just one more attempt by Dondero to press his conspiracy theory that he has pressed for over two

years now, unsuccessfully, in Texas state court through Rule 202 proceedings, with the Texas State

Securities Board, and with the United States Trustee's office.

---

[125] *Id.*, 191:5-25.
[126] *Highland Capital*, 48 F.4th at 434-435.

004209

### G. Opposition to Motion for Leave: Arguing No Standing and No "Colorable" Claims

Highland, the Claimant Trust, and Seery (together, the "Highland Parties") filed a joint opposition ("Joint Opposition") to HMIT's Motion for Leave on May 11, 2023.[127] The Claims Purchasers filed a separate objection ("Claims Purchasers' Objection") to the Motion for Leave on May 11, 2023, as well.[128] In the Joint Opposition, the Highland Parties urge the court to deny HMIT leave to pursue the Proposed Claims because, as a threshold matter, HMIT does not have standing to bring them, directly or derivatively against the Proposed Defendants. They argue, in the alternative, that the Motion for Leave should be denied even if HMIT had standing to pursue the Proposed Claims because none of the Proposed Claims are "colorable" claims as that term is used in the Gatekeeper Provision of the Plan (and Gatekeeper Orders).[129]

The Claims Purchasers likewise argue that HMIT lacks standing to complain about claims trading in the bankruptcy which occurred between sophisticated Claims Purchasers and sophisticated sellers ("Claims Sellers"), represented by skilled bankruptcy and transactional counsel. Moreover, they argue HMIT cannot show that it or the Reorganized Debtor or the Claimant Trust were injured by the claims trading at issue because the Purchased Claims had already been adjudicated as allowed claims in the bankruptcy case—thus, distributions under the Plan on account of the Purchased Claims remain the same, the only difference being who holds the claims. Moreover, even if HMIT could succeed in equitably subordinating the validly transferred **allowed** claims, HMIT would still be in the same position it is today: the holder of a

---

[127] Bankr. Dkt. Nos. 3783. Highland, the Claimant Trust, and Seery also filed on May 11 a *Declaration of John A. Morris in Support of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding* ("Morris Declaration") that attached 44 Exhibits in support of the Joint Opposition. Bankr. Dkt. No. 3784.

[128] Bankr. Dkt. No. 3780.

[129] *See* Joint Opposition ¶ 139 ("Because HMIT lacks standing, this Court need not reach the merits of HMIT's proposed Adversary Complaint. As a matter of judicial economy, however, the Highland Parties respectfully request that this Court address the lack of merit as an alternative basis to deny the Motion.").

004210

contingent, speculative Class 10 interest that would only be paid after payment, in full, with interest, of all creditors under the Plan. The Claims Purchasers argue in the alternative that the Proposed Claims are not "colorable."

Finally, the Proposed Defendants argue that the standard of review for assessing whether the Proposed Claims are "colorable" (as such term is used in the Gatekeeper Provision and Gatekeeping Orders) is a standard that is a higher than the "plausibility" standard applied to Rule 12(b)(6). They argue that HMIT should be required to meet a higher bar with respect to colorability that includes making a *prima facie* showing that the Proposed Claims have merit (and/or are not without foundation) which requires HMIT to do more than meet the liberal notice-pleading standards.

### H. HMIT's Reply to the Proposed Defendants' Opposition to the Motion for Leave

In its reply brief ("Reply"), filed by HMIT on May 18, 2023,[130] it argues that it has constitutional standing as an "aggrieved party" to bring the Proposed Claims on behalf of itself.[131] HMIT also argues that it has standing under Delaware Trust law to bring a derivative action on behalf of the Claimant Trust and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to bring the claims.[132] Finally, HMIT maintains that the standard of review that the bankruptcy court should apply in assessing the "colorability" of the Proposed Claims is no greater than the standard of review applied to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), which would require the bankruptcy court to look only to the "four corners" of the Proposed Complaint

---

[130] Bankr. Dkt. No. 3785.

[131] *See* Reply ¶ 7.

[132] See, Reply ¶ 23 n.5, where HMIT argues "The nature of this injury, in addition to Seery's influence over the Claimant Trust, and the lack of prior action by the Claimant Trust to pursue the claims HMIT seeks to pursue derivatively, among other things, demonstrate that HMIT is not only a proper party to assert its derivative claims – but the best party to do so."

004211

and "not weigh extraneous evidence,"[133] take all allegations as true, and view all allegations and inferences in a light most favorable to HMIT. As discussed in greater length below, HMIT argues that, under this standard, the bankruptcy court should not consider evidence in making its determination as to whether the Proposed Complaint presents "colorable" claims.

I. *Litigation within the Litigation: The Pre- June 8 Hearing Skirmishes*

Suffice it to say there was significant activity before the Motion for Leave actually was presented at the June 8 hearing. HMIT sought an emergency hearing on its Motion for Leave (wanting a hearing on three days' notice). When the bankruptcy court denied an emergency hearing, HMIT unsuccessfully pursued an interlocutory appeal of the denial of an emergency hearing to the district court. HMIT then petitioned for a writ of mandamus at the Fifth Circuit regarding the emergency hearing denial, which was denied by the Fifth Circuit on April 12, 2023.

Next, there were multiple pleadings and hearings regarding **what kind of hearing** the bankruptcy court should or should not hold on the Motion for Leave—particularly focusing on whether or not it would be an evidentiary hearing.[134] The resolution of this issue turned on what standard of review the court should apply in exercising its gatekeeping function and determining the colorability of the Proposed Claims. HMIT (although it had submitted two declarations of Dondero with its original Motion for Leave and approximately 350 pages of total evidentiary support) was adamant that there should be no evidence presented at the hearing on the Motion for Leave, arguing that the standard for review should be the plausibility standard under Rule 12(b)(6)

---

[133] *See* Reply ¶ 47.

[134] Highland, joined by Seery and the Claims Purchasers, had filed a motion asking the bankruptcy court to set a briefing schedule on the Motion for Leave and to schedule a status conference, indicating that Highland's proposed timetable for same was opposed by HMIT. HMIT subsequently filed a response unopposed to a briefing schedule and status conference, but, before the status conference, HMIT filed a brief, stating it was opposed to there being any evidence at the ultimate hearing on the HMIT Motion for Leave—arguing the bankruptcy court did not need evidence to exercise its gatekeeping function and determine if HMIT has a "colorable" claim. Rather, the court need only engage in a Rule 12(b)(6)-type plausibility analysis.

motions to dismiss such that "the threshold inquiry is very, very low. Evidence is not allowed. . . . [S]imilar to a 12(b)(6) inquiry, [the court] is limited to the four corners of the principal pleading – in this case, the complaint, or now the revised complaint."[135] Counsel for the Proposed Defendants argued that the standard of review for colorability here, in the specific context of the court exercising its gatekeeping function under the Plan, is more akin to the standards applied under the Supreme Court's *Barton Doctrine*[136] pursuant to which that the bankruptcy court must apply a higher standard than the 12(b)(6) standard, including the consideration of evidence at the hearing on the motion for leave; if the standard of review presents no greater hurdle to the movant than the 12(b)(6) standard applied to every plaintiff in every case, then the gatekeeping provisions mean nothing and do nothing to protect the parties from the harassing, bad-faith litigation they were put in place to prevent.[137] On May 22, 2023, after receipt of post-hearing briefing on the issue, the court entered an order stating that "the court has determined that there may be mixed questions of fact and law implicated by the Motion for Leave" and "[t]herefore, the parties will be permitted to present evidence (including witness testimony) at the June 8, 2023 hearing [on the Motion to Leave] if they so choose."

Two days later, HMIT filed an emergency motion for expedited discovery or alternatively for continuance of the June 8, 2023 hearing, seeking expedited depositions of corporate

---

[135] Transcript of April 24, 2023 Status Conference, Bankr. Dkt. No. 3765 ("April 24 Transcript"), 14:6-11.

[136] The *Barton Doctrine* was established in the 19th century Supreme Court case of *Barton v. Barbour*, 104 U.S. 126 (1881), and states that a party wishing to sue a court-appointed trustee or receiver must first obtain leave of the appointing court by making a *prima facie* case that the claim it wishes to bring is not without foundation.

[137] *See* April 24 Transcript, 36:24-37:4 ("[W]e're exactly today where the Court had predicted in entering [the Confirmation Order], that the costs and distraction of this litigation are substantial. And if all we're doing is replicating a 12(b)(6) hearing on a motion for leave, we're actually not doing anything to reduce, as the Court made clear, the burdens, distractions, of litigation."); 37:5-13 ("The Fifth Circuit likewise cited *Barton* in its order affirming the confirmation order. Specifically, it also explained that the provisions, these gatekeeper provisions requiring advance approval were meant to 'screen and prevent bad-faith litigation.' Well that – if that means only what the Plaintiff[ ] say[s] it does, then it really doesn't do anything at all to screen. There's no gatekeeping because their version of what that means is always policed under 12(b)(6) standards.").

representatives of the Claims Purchasers and of Seery and production of documents pursuant to deposition notices and subpoenas duces tecum that HMIT had attached to the motion. On May 26, 2023, this court held yet another status conference. Following the status conference, the court granted in part and denied in part HMIT's request for expedited discovery by ordering only Seery and Dondero to be made available for depositions prior to the June 8 Hearing. The court reached what seemed like appropriate middle ground by allowing the deposition of Seery and allowing the other parties to depose Dondero (for whom sworn declarations had been submitted), but the court was not going to allow any more discovery (i.e., of the Claims Purchasers) at so late an hour. The court was aware that HMIT and Dondero had been seeking discovery relating to the very claims trades that are the subject of the Revised Proposed Complaint from the Claims Purchasers in Texas state court "Rule 202" proceedings for approximately two years, where their attempts were rebuffed.

Approximately 60 hours before the June 8 Hearing, HMIT filed its Witness and Exhibit List disclosing for the first time two potential expert witnesses (along with biographical information and a disclosure regarding the subject matter of their likely testimony). Highland, the Claimant Trust, and Seery filed a joint motion to exclude the expert testimony and documents ("Motion to Exclude"), which the court ultimately granted in a separate order.

During the full-day June 8 Hearing on the Motion to Leave, the court admitted over 50 HMIT exhibits and over 30 Highland/Claimant Trust exhibits. The court heard testimony from HMIT's witnesses Dondero and Seery (as an adverse witness) and from the Highland Parties' witness Mark Patrick, the administrator of HMIT since August 2022 (as an adverse witness). The bankruptcy court allowed HMIT to make a running objection to all evidence—as it continued to argue that evidence was not appropriate.

## III.    LEGAL ANALYSIS

In determining whether HMIT should be granted leave, pursuant to the Gatekeeper Provision of the Plan and the court's prior Gatekeeper Orders, to pursue the Proposed Claims, the court must address the issue of whether HMIT would have ***standing*** to bring the Proposed Claims in the first instance.  If so, the next question is whether the Proposed Claims are "***colorable***."  But prior to getting into the weeds on ***standing*** and "***colorability,***" some general discussion regarding the topic of claims trading in the bankruptcy world seems appropriate, given that HMIT's Proposed Claims are based, in large part, on allegations of ***improper*** claims trading.

### A.    Claims Trading in the Context of Bankruptcy Cases—Can It Be Tortious or Otherwise Actionable?

As noted, at the crux of HMIT's desired lawsuit is what this court will refer to as "claims trading activity" that occurred shortly after the Plan was confirmed, but before the Plan went effective.  HMIT believes that the claims trading activity gave rise to various torts:  breach of fiduciary duty on the part of Seery; knowing participation in breach of fiduciary duty by the other Proposed Defendants; and conspiracy by all Defendants.  HMIT also believes that the following remedies should be imposed: equitable disallowance of the Purchased Claims; disgorgement of the alleged profits the Claims Purchasers made on their purchases; and disgorgement of all Seery's compensation received since the beginning of his "collusion" with the other Defendants.  Without a doubt, the Motion for Leave and Proposed Complaint revolve almost entirely around the claims trading activity.

This begs the question:  ***When (or under what circumstances) might claims trading activity during a bankruptcy case give rise to a cause of action that either the bankruptcy estate or an economic stakeholder in the case might have standing to bring?***  Here, the claims trading

004215

wasn't even "during a bankruptcy case" really—it was post-confirmation and pre-effective date, and it happened to be: (a) after mediation of the claims, (b) after Rule 9019 settlement motions, (c) after objections by Dondero and certain of his family trusts were lodged, (d) after evidentiary hearings, and (e) after orders were ultimately entered *allowing* the claims (and in most cases, such orders were appealed). The further crux of HMIT's desired lawsuit is that Seery allegedly "wrongfully facilitated and promoted the sale of large unsecured creditor claims to his close business allies and friends" by sharing *material non-public information* to them regarding the potential value of the claims (i.e., the potential value of the bankruptcy estate), and this is what made the claims trading activity particularly pernicious. The alleged sharing of MNPI allegedly caused the Claims Purchasers to purchase their claims without doing any due diligence and with knowledge that the claims would be worth much more than the Plan's "pessimistic" projections might have suggested, and also allowed Seery to plant friendly allies into the creditor constituency (and on the post-confirmation CTOB) that would "rubber stamp" his generous compensation. This is all referred to as "not arm's-length" and "collusive." Notably, the MNPI mostly pertained to a likely future acquisition of MGM by Amazon (which transaction, indeed, occurred in 2022, after being publicly announced in Spring of 2021); as noted earlier, Highland owned, directly and indirectly, common stock in MGM. Also notably, there had been rumors and media attention regarding a potential sale of MGM for many months.[138] In summary, to be clear, HMIT's desired lawsuit is laced with a theme of "insider trading"—although this isn't a situation of securities trading *per se* (i.e., the unsecured Purchased Claims were not securities), and, as noted earlier, the Texas State Securities Board has not seen fit to investigate the claims trading activity.

So, preliminarily, is claims trading in bankruptcy sinister *per se*? The answer is no.

---

[138] *E.g.,* Benjamin Mullin, *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale,* THE WALL STREET JOURNAL (Dec. 21, 2020, 6:38 p.m.).

004216

The activity of investing in distressed debt (which frequently occurs during a bankruptcy case—sometimes referred to as "claims trading") is ubiquitous and, indeed, has been so for a very long time. As noted by one scholar:

> The creation of a market in bankruptcy claims is the single most important development in the bankruptcy world since the Bankruptcy Code's enactment in 1978. [Citations omitted.] Claims trading has revolutionized bankruptcy by making it a much more market-driven process. [Citations omitted.] . . . The development of a robust market for all types of claims against debtors has changed the cast of characters involved in bankruptcies. In addition to long-standing relational creditors, like trade creditors or a single senior secured bank or bank group, bankruptcy cases now involve professional distressed debt investors, whose interests and behavior are often quite different than traditional relational counterparty creditors.

Adam J. Levitin, *Bankruptcy* Markets*: Making Sense of Claims Trading*, 4 BROOK. J. CORP. FIN. & COM. L. 64, 65 (2010) (hereinafter "*Bankruptcy Markets*").[139]

As a pure policy matter, some practitioners have bemoaned this claims trading phenomenon, suggesting that "distressed debt traders may sacrifice the long-term viability of a debtor for the ability to realize substantial and quick returns on their investments."[140]  Others suggest that claims trading in bankruptcy is beneficial, in that it allows creditors of a debtor an early exit from a potentially long bankruptcy case, enabling them to save expense and administrative hassles, realize immediate liquidity on their claims (albeit discounted), and may

---

[139] *See also* Aaron Hammer & Michael Brandess, *Claims Trading: The Wild West of Chapter 11s*, AM. BANKR. INST. JOURNAL 62 (Jul./Aug. 2010); Chaim Fortgang & Thomas Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11,* 12 CARDOZO L. REV. 1, 25 (1990) (noting that "the first recorded instance of American fiduciaries trading claims against insolvent debtors predates all federal bankruptcy laws and goes back to 1790" when the original 13 colonies were insolvent, owing tremendous amounts of debt to various parties in connection with the Revolutionary War; early American investors purchased these debts for approximately 25% of their par value, hoping the claims would be paid at face value by the American government).

[140] Harvey R. Miller, *Chapter 11 Reorganization Cases and the Delaware Myth*, 55 VAND. L. REV. 1987, 2016 (2002). *See also* Harvey R. Miller & Shai Y. Waisman, *Does Chapter 11 Reorganization Remain a Viable Option for Distressed Businesses for the Twenty-First Century?*, 78 AM. BANKR. L.J. 153 (2004); Harvey R. Miller & Shai Y. Waisman, *Is Chapter 11 Bankrupt?*, 47 B.C. L. REV. 129 (2005).

even permit them to take advantage of a tax loss on their own desired timetable.[141]  On the flipside, "[c]aims trading permits an entrance to the bankruptcy process for those investors who want to take the time and effort to monitor the debtor and contribute expertise to the reorganization process."[142]

So, what are the "rules of the road" here?  What does the Bankruptcy Code dictate regarding claims trading? The answer is nothing. The Bankruptcy Code itself has no provisions whatsoever regarding claims trading. The only thing resembling any regulation of claims trading during a bankruptcy case is found at Federal Rule of Bankruptcy Procedure 3001(e)—the current version of which went into effect in 1991—and it imposes extremely light regulation—if it could even be called that.  This rule requires, in pertinent part (at subsection (2)), that "[i]f a claim other than one based on a publicly traded note, bond, or debenture" is traded during the case after a proof of claim is filed, notice/evidence of that trade must be filed with the bankruptcy clerk by the transferee.  The transferor shall then be notified and given 21 days to object.  If there is an objection, the bankruptcy court will hold a hearing regarding whether a transfer, in fact, took place. If there is no objection, nothing further needs to happen, and the transferee will be considered substituted for the transferor.

There are several things noteworthy about Rule 3001(e)(2).  First, the only party given the opportunity to object is the **transferor** of the claim (presumably, in the situation of a dispute regarding whether there was truly an agreement regarding the transfer of the claim).  Second, there is no need for a bankruptcy court order approving the transfer (except in the event of an objection

---

[141]*See Bankruptcy Markets*, at 70.  *See also In re Kreisler,* 546 F.3d 863, 864 (7th Cir. 2008) ("Claims trading allows creditors to opt out of the bankruptcy system, trading an uncertain future payment for an immediate one, so long as they can find a purchaser.").

[142] *Bankruptcy Markets* at 70 (citing, among other authorities, Edith S. Hotchkiss & Robert M. Mooradian, *Vulture Investors and the Market for Control of Distressed Firms*, 43 J. FIN. ECON. 401, 401 (1997) (finding that "vulture investors add value by disciplining managers of distressed firms").

by the alleged transferor).  Third, the ***economic consideration paid need not be disclosed to the
court or anyone***.  Fourth, there is no requirement or definition of timeliness.  Finally, it explicitly
does not apply with regard to publicly traded debt.  This, alone, means that many claims trades are
not even reported in a bankruptcy case.  But it is not just publicly traded debt that will not be
reflected with a Rule 3001(e) filing.  For example, bank debt, in modern times, is often syndicated
(i.e., fragmented into many beneficial holders of portions of the debt) and only the administrative
agent for the syndicate (or the "lead bank") will file a proof of claim in the bankruptcy—thus, as
the syndicated interests (participations) change hands, and they frequently do, there typically will
not be a Rule 3001(e) notice filed.[143]  To be clear here, this syndication-of-bank-debt fact, along
with the fact that there are financial products whereby bank debt might be carved up into economic
interests separate and apart from legal title to the loan, means there are many situations in which
trading of claims during a bankruptcy case is not necessarily transparent or, for that matter, policed
by the bankruptcy court. This is the world of modern bankruptcy.  Most of the claims trading that
gets reported through a Rule 3001(e) notice is the trading of small vendor claims. And this is all
regarded as private sale transactions for the most part.[144]

Suffice it to say that there is not a wealth of case law dealing with claims trading in a
bankruptcy context.  Perhaps this is not surprising, since it is not prohibited and ***is mostly a matter
of private contract between buyer and seller***.  The case law that does exist seems to arise in
situations of perceived bad faith of a purchaser—for example, when there was an attempt to control
voting and/or ultimate control of the debtor through the plan process (not always problematic, but

---

[143] Anne Marrs Huber & Thomas H. Young, *The Trading of Bank Debt in and Out of Chapter 11*, 15 J. BANKR. L. & PRAC. 1, 1, 3 (2006).

[144] Note that Bankruptcy Rule 3001(e) was very different before 1991.  Between 1983-1991, the rule required that parties transferring claims inform the court that a transfer of claims was taking place and also disclose the consideration paid for the transferred claims. A hearing would take place prior to the execution of a trade.  Judicial involvement was required and resulted in judicial scrutiny of transactions—something that simply does not exist today.

there are outlier cases where this was found to cross a line and result in consequences such as disallowing votes on a plan or even equitable subordination of a claim).[145]  Another type of case that has generated case law is where the purchaser of claims occupied a fiduciary status with the debtor.[146]  Still another type of case that has generated case law is where there is an attempt to cleanse claims that might have risks because of a seller's malfeasance, by trading the claim to a new claim holder.[147]

The following is a potpourri of the more notable cases that have addressed claims trading in different contexts.  Most of them imposed no adverse consequences on claims traders:  *In re Kreisler*, 546 F.3d 863, 864 (7th Cir. 2008) (where a corporation named Garlin, that was owned by the individual chapter 7 debtors' sister and close friend, purchased a $900,000 bank claim for $16,500, and there was no disclosure of Garlin's connections to debtors and no Rule 3001(e)(2) notice was filed, the Seventh Circuit reversed the bankruptcy court's invocation of the doctrine of equitable subordination to the claim, stating:  "Equitable subordination is generally appropriate only if a creditor is guilty of misconduct that causes injury to the interests of other creditors;" the Seventh Circuit further stated that it could "put to one side whether the court's finding of inequitable conduct was correct" because even if there was misconduct, it did not harm the other creditors, who were in the same position whether the original creditor or Garlin happened to own the claim; the Seventh Circuit did note that Garlin's decision to purchase the original bank

---

[145] *In re Applegate Prop. Ltd.,* 133 B.R. 827, 836 (Bankr. W.D. Tex. 1991) (designating votes of an affiliate of the debtor that purchased a blocking position to thwart a creditor's plan because it was done in bad faith); *In re Allegheny Int'l, Inc.,* 118 B.R. 282, 289–90 (Bankr. W.D. Pa. 1990) (because of bad faith activities, the court designated votes of a claims purchaser who purchased to get a blocking position on a plan).  *But see In re First Humanics Corp.,* 124 B.R. 87, 92 (Bankr. W.D. Mo. 1991) (claims purchased by debtor's former management company to gain standing to file a plan to protect interest of the debtor was in good faith).

[146] *See In re Exec. Office Ctrs., Inc.,* 96 B.R. 642, 649-650 (Bankr. E.D. La. 1988) (and numerous old cites therein).

[147] *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 340 B.R. 180 (Bankr. S.D.N.Y. 2006), vacated, *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425 (S.D.N.Y 2007); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 333 B.R. 205, 211 (Bankr. S.D.N.Y. 2005).

creditor's claim might have disadvantaged the other creditors if it interfered with the trustee's own potential settlement with the original bank creditor (note that the trustee argued that she had been negotiating a deal with bank under which bank might have reduced its claims); however, the trustee presented no evidence that any deal with the bank was imminent or even likely; thus, whether such a deal could have been reached was speculation; equitable subordination was therefore improper."); *Viking Assocs., L.L.C. v. Drewes (In re Olson),* 120 F.3d 98, 102 (8th Cir. 1997) (case involved the actions of an entity known as Viking in purchasing all of the unsecured claims against the bankruptcy estate of two chapter 7 debtors, Hugo and Jeraldine Olson; Viking was a related entity, owned by the debtors' children, and purchased $525,000 of unsecured claims for $67,000; while the bankruptcy court had discounted the claims down to the purchase amount and subordinated Viking's discounted claims to the claims of the other unsecured creditors, relying on section 105 of the Bankruptcy Code, the Eighth Circuit held that the bankruptcy court lacked the authority to do this, and, thus, reversed and remanded; the Eighth Circuit noted that in 1991, Bankruptcy Rule 3001(e)(2) was amended "to restrict the bankruptcy court's power to inspect the terms of" claims transfers. *Id.* at 101 (citing *In re SPM Mfg. Corp.,* 984 F.2d 1305, 1314 n. 9 (1st Cir. 1993)); the text of the rule makes clear that the existence of a "dispute" depends upon an objection by the *transferor*; where there is no objection by the *transferor*, there is no longer any role for the court); *Citicorp. Venture Capital, Ltd. v. Official Committee of Unsecured Creditors (In re Papercraft Corp.),* 160 F.3d 982 (3d Cir. 1998) (large investor who held seat on board of directors of debtor and debtor's parent, and who also had nonpublic information regarding the debtor's value, anonymously purchased 40% of the unsecured claims at a steep discount during the chapter 11 case, and then, having obtained a blocking position for plan voting purposes, proposed a plan to acquire debtor; the claims purchaser's claims were equitably reduced to amount

paid for the claims since investor was a fiduciary who was deemed to have engaged in inequitable conduct); *Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter),* 118 F.3d 635 (9th Cir. 1997) (Ninth Circuit affirmed bankruptcy court's ruling that a secured creditor's purchase of 21 out of 34 unsecured claims in the case was in good faith and it would not be prohibited from voting such claims on the debtor's plan, pursuant to Bankruptcy Code section 1126(e)); *In re Lorraine Castle Apartments Bldg. Corp.,* 145 F.2d 55, 57 & 58 (7th Cir. 1945) (in a case under the old Bankruptcy Act, in which there were more restrictions on claims trading, a debtor and two of its stockholders argued that the claims of purchasers of bonds should be limited to the amounts they paid for them; bankruptcy court special master found, "that, though he did not approve generally the ethics reflected by speculation in such bonds," there was no cause for limitation of the amounts of their claims, pointing out that the persons who had dealt in the bonds were not officials, directors, or stockholders of the corporation and owed no fiduciary duty to the estate or its beneficiaries—rather they were investors or speculators who thought the bonds were selling too cheaply and that they might make a legitimate profit upon them; the district court agreed, as did the Seventh Circuit, noting that "[t]o reduce the participation to the amount paid for securities, in the absence of exceptional circumstances which are not present here, would reduce the value of such bonds to those who have them and want to sell them. This would result in unearned, undeserved profit for the debtor, destroy or impair the sales value of securities by abolishing the profit motive, which inspires purchasers."); *In re Washington Mutual, Inc.*, 461 B.R. 200 (Bankr. Del. 2011), *vacated in part*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (discussion of an equity committee's potential standing to pursue equitable subordination or equitable disallowance of the claims of certain noteholders who had allegedly traded their claims during the chapter 11

case while having material non-public information; while bankruptcy court originally indicating these were viable tools, court later vacated its ruling on this after a settlement was reached).

Suffice it to say that the courts have, more often than not, been unwilling to impose legal consequences, for an actor's involvement with claims trading. At most, in outlier-type situations during a case, courts have taken steps to disallow claims for voting purposes or to subordinate claims to other unsecured creditors for distribution purposes.[148] But the case at bar does not present facts that are typical of any of the situations in reported cases.

For one thing, unlike in the reported cases this court has located, there **seems to have been complete symmetry of sophistication among the claim sellers and claim purchasers here—and complete symmetry with HMIT for that matter**. All persons involved are highly sophisticated financial institutions, hedge funds, or private equity funds. No one was a "mom-and-pop" type business or vendor that might be vulnerable to chicanery. The claims ranged from being worth $10's of millions of dollars to $100's of millions of dollars in face value. And, of course, the sellers/transferors of the claims have never shown up, subsequent to the claims trading

---

[148] Note that, while some cases suggest that outright disallowance of an unsecured claim, in the case of "inequitable conduct" might be permitted (not merely equitable subordination to unsecured creditors)—usually citing to *Pepper v. Litton*, 308 U.S. 295 (1939)—the Fifth Circuit has suggested otherwise. *In re Mobile Steel Co., Inc.*, 563 F.2d 692, 699-700 (5th Cir. 1977) (cleaned up) (noting that "equitable considerations can justify only the subordination of claims, not their disallowance" and also noting that "three conditions must be satisfied before exercise of the power of equitable subordination is appropriate[:] (i) The claimant must have engaged in some type of inequitable conduct[;] (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant[; and] (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." In *Mobile Steel*, the Fifth Circuit held that the bankruptcy judge exceeded the bounds of his equitable jurisdiction by disallowing a group of claims and also reversed the subordination of certain claims, on the grounds that the bankruptcy court had made clearly erroneous findings regarding alleged inequitable conduct and other necessary facts. *Contrast In re Lothian Oil Inc.*, 650 F.3d 539 (5th Cir. 2011) (involving the question of whether a bankruptcy court may **recharacterize** a claim as equity rather than debt; the court held yes, but it has nothing to do with inequitable conduct *per se*; rather section 502(b)'s language that a claim should be allowed unless it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." is the relevant authority; unlike equitable subordination, recharacterization is about looking at the true substance of a transaction not the conduct of a party (if it looks like a duck and quacks like a duck, it's a duck—i.e., equity); the court indicated that section 105 is not a basis to recharacterize debt as equity; it's a matter of looking at state law to determine if there is any basis and looking at the nature of the underlying transaction—as either a lending arrangement or equity infusion.

transactions, to complain about anything.  Everyone involved here is, essentially, a behemoth and there is literally no sign of innocent creditors getting harmed.  Second, the case at bar is unique in that the claims traded here ***had all been allowed after objections, mediation, and Rule 9019 settlements during the bankruptcy case***.  Thus, the amounts that would be paid on them were "locked in," so to speak.  There was no risk to a hypothetical claims-purchaser of disallowance, offset, or any "claw-back" litigation (or—one might have reasonably assumed—any type of litigation). Third, the terms for distributions on unsecured claims had been established in a confirmed plan (although the claims were purchased before the effective date of the Plan).  Thus, there was a degree of certainty regarding return on investment for the Claims Purchasers here that was much higher than if the claims had been purchased early, during, or mid-way through the case.[149] ***This was post-confirmation, pre-effective date claims purchasing.***  Interestingly, all three of these facts might suggest that little due diligence would be undertaken by any hypothetical purchaser.  The rules of the road had been set.  The court makes this observation because HMIT has suggested there is something highly suspicious about the fact that Farallon allegedly told Dondero that it did no due diligence before purchasing its claims (leading him to conclude that the Claims Purchasers must have purchased their claims based on receiving MNPI from Seery).  Not only has there been no colorable evidence suggesting that insider information was shared, but the lack of due diligence in this context does not reasonably seem suspicious. The claims purchases

---

[149] *See discussion* in BANKRUPTCY MARKETS, at 91:

> Some claims purchasers buy before the bankruptcy petition is filed, some at the beginning of the case, and some towards the end. For example, there are investors who look to purchase at low prices either when a business is failing or early in the bankruptcy and ride through the case until payouts are fairly certain. [Citations omitted.]  These investors might be hoping to buy at 30 cents on the dollar and get a payout at 70 cents on the dollar. Perhaps if they waited another six months, the payout would be 74 cents on the dollar, but the additional 4 cents on the dollar for six months might not be a worthwhile return for the time value of the investment. Other investors might not want to assume the risk that exists in the early days of a case when the fate of the debtor is much less certain, but they would gladly purchase at 70 cents on the dollar at the end of the case to get a payout of 74 cents on the dollar six months later.

004224

were almost like passive investments, at this point—there was no risk of a claim objection and there was a confirmed plan, with a lengthy disclosure statement that described not only plan payment terms and projections, but essentially anything that any investor might want to know.

To reiterate, here, HMIT seeks leave to assert the following causes of action:

I.      Breach of Fiduciary Duties (Seery)

II.     Knowing Participation in Breach of Fiduciary Duties (Claims Purchasers)

III.    Conspiracy (all Proposed Defendants)

IV.     Equitable Disallowance (Claims Purchasers)

V.      Unjust Enrichment and Constructive Trust (all Proposed Defendants)

VI.     Declaratory Judgment (all Proposed Defendants)

***The court struggles to fathom how any of these proposed causes of action or remedies can be applied in the context of: (a) post-confirmation claims trading; (b) where the claims have all been litigated and allowed***.

In reflecting on the case law and various Bankruptcy Code provisions, the court can fathom the following hypotheticals in which claims trading during a bankruptcy case might be somehow actionable:

**Hypothetical #1**:  The most obvious situation would be if a purchaser of a claim files a Rule 3001(e) Notice, and the seller/transferor then files an objection thereto. There would then be a contested hearing between purchaser and seller regarding the validity of the transfer with the bankruptcy court issuing an appropriate order after the hearing on the objection. ***As noted, there was no objection to the Rule 3001(e) notices here***.

**Hypothetical #2:** Alternatively, there could be a breach of contract suit between purchaser and seller if one thinks the other breached the purchase-sale agreement somehow.  Perhaps torts might also be alleged in such litigation. ***As noted, there is no dispute between purchasers and sellers here.***

**Hypothetical #3:** If there is believed to be fraud in connection with a plan, a party in interest might, pursuant to section 1144 of the Bankruptcy Code, move for

004225

revocation of the plan "at any time before 180 days after the date of entry of the order for confirmation" and the court "may revoke such order if and only if such order was procured by fraud." *As noted, here HMIT has suggested that the "pessimistic" plan projections may have been fraudulent or misrepresentations somehow. The time elapsed long ago to seek revocation of the Plan.*

**Hypothetical #4:** As discussed above, in rare situations (bad faith), during a Chapter 11 case, before a plan is confirmed, a claims purchaser's claim might not be allowed for voting purposes. *See* Sections 1126(e) of the Bankruptcy Code ("the court may designate any entity whose acceptance or rejection of such plan was not in good faith"). *Obviously, in this case, this is not applicable—the claims were purchased post-confirmation.*

**Hypothetical #5:** As discussed above, in rare situations (inequitable conduct), a court might equitably subordinate *claims* to *other claims*. *See* Section 510(c) of the Bankruptcy Code. But here**,** HMIT is seeking either: (a) equitable subordination of the *claims* of the Claims Purchaser to HMIT's *Class 10 former equity interest* (in contravention of the explicit terms of section 510(c)) or, (b) *equitable disallowance* of the claims of the Claims Purchasers (in contravention of *Mobile Steel*).

**Hypothetical #6:** Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case may permit "recharacterization" of a claim from debt to equity in certain circumstances, but not in circumstances like the ones in this case. Here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders). The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . . according to the equities of the case."). The problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate *entered without a contest* is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added). Here there was most definitely "a contest" with regard to all of these purchased claims. *Thus, it would appear that any effort to have a court reconsider these claims pursuant to section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

**Hypothetical #7:** If a party believes "insider trading" occurred there are governmental agencies that investigate and police that. *Here, the purchased claims (which were not based on bonds or certificated equity interests) would not be securities so as to fall under the SEC's purview. Moreover, there was evidence that HMIT or Dondero-Related entities requested that the Texas State Securities Board investigate the claims trading and the board did not find a basis to pursue anyone for wrongdoing.*

**Hypothetical #8:** The United States Trustee can investigate wrongdoing by a debtor or unsecured creditors committee. While the United States Trustee would naturally have concerns about members of an unsecured creditors committee (or an officer of a debtor-in-possession) adhering to fiduciary duties and not putting their

004226

own interests above those of the estate, here, there are a couple of points that seem noteworthy. One, the claims trading activity was post-confirmation so—while certain of the claim-sellers may have still been on the unsecured creditors committee, as the effective date of the plan had not yet occurred—the circumstances are very different than if this had all happened during the early, contentious stages of the case. It seems inconceivable that there was somehow a disparity of information that might be troubling—the Plan had been confirmed and it was available for the world to see. The whole notion of "insider information" (just after confirmation here) feels a bit off-point. Bankruptcy practitioners and judges sometimes call bankruptcy a fishbowl or use the "open kimono" metaphor for good reason. It is generally a very open process. And information-sharing on the part of a debtor-in-possession or unsecured creditors committee is intended to be robust. *See, e.g.,* Bankruptcy Code sections 521 and 1102(b)(3). In a way, HMIT here seems to be complaining about this very situation that the Code and Rules have designed.

In summary, claims trading is a highly ***unregulated*** activity in the bankruptcy world.

***HMIT is attempting to pursue causes of action here that, to this court's knowledge, have never been allowed in a context like this*.**

### B. *Back to Standing—Would HMIT Have Standing to Bring the Proposed Claims?*

The Proposed Defendants argue that HMIT lacks standing to bring the Proposed Claims, either: (a) derivatively on behalf of the Reorganized Debtor and Claimant Trust, or (b) directly on behalf of itself. Thus, they argue that this is one reason that the Motion for Leave should be denied.

In making their specific standing arguments, the parties analyze things slightly differently:

The Claims Purchasers focus primarily on HMIT's lack of ***constitutional*** standing but also argue that HMIT does not have ***prudential*** standing under Delaware trust law to bring the Proposed Claims either individually or derivatively. Why do they mention Delaware trust law? Because the Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29.[150]

The Highland Parties' standing arguments focus almost entirely on HMIT's lack of ***prudential*** standing under Delaware trust law to bring the Proposed Claims.

HMIT argues that the Proposed Defendants "play fast and loose with standing arguments" and that HMIT has ***constitutional*** standing as a "party aggrieved"[151] to bring the Proposed Claims on behalf of itself. HMIT also argues that it has standing under Delaware trust law to bring a

---

[150] *See* Proposed Complaint, ¶ 26.

[151] Proposed Complaint, ¶7.

derivative action on behalf of the Claimant Trust, and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to do so.

1. The Different Types of Standing: Constitutional Versus Prudential

The parties are addressing two concepts of standing that can sometimes be confused and misapplied by both attorneys and judges: ***constitutional Article III standing***, which implicates federal court subject matter jurisdiction,[152] and the narrower standing concept of ***prudential standing***, which does not implicate subject matter jurisdiction but nevertheless might prevent a party from having capacity to sue, pursuant to limitations set by courts, statutes or other law.

Article III constitutional standing works as follows: a plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing three elements: (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[153] "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."[154] These elements ensure that a plaintiff has "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."[155]

---

[152] Article III, Section 2 of the U.S. Constitution gives federal courts jurisdiction over enumerated cases and controversies.

[153] *See Thole v. U.S. Bank, N.A.*, 140 S.Ct. 1615, 1618 (2020)(citing the Supreme Court's seminal case on the tripartite test for Article III constitutional standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), where the Supreme Court stated that "the irreducible constitutional minimum of standing contains [the] three elements"); *see also Spokeo*, 578 U.S. at 338; *Abraugh v. Altimus*, 26 F.4th 298, 302 (5th Cir. 2022) (citing *id.*).

[154] *Transunion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021)(cleaned up).

[155] *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

004228

Apart from this minimal constitutional mandate, courts and statutes have set other limits on the class of persons who may seek judicial remedies—and this is the concept of prudential standing. In its recent opinion in *Abraugh v. Altimus*,[156] the Fifth Circuit set forth a detailed analysis of the two types of "standing," noting that the term "standing" is often "misused" in our legal system, which has led to confusion for both attorneys and judges.[157] The constitutional standing that is necessary for a court to exercise subject matter jurisdiction is broader than prudential standing and is only the first hurdle a party must clear before pursuing a claim in federal court.

The Fifth Circuit explained that ***in addition to*** Article III constitutional standing, "courts have occasionally articulated other 'standing' requirements that plaintiffs must satisfy under certain conditions, ***beyond those imposed by Article III***,"[158] such as the "standing" requirement that might be imposed by a statute or by jurisprudence. The *Abraugh* case was a perfect example of the latter.

*Abraugh* involved the civil rights statutes that provide, among other things, that "a party must have standing under the state wrongful death or survival statutes to bring [a § 1983 cause of action]" and noted that these statutes impose additional "standing" requirements that are a matter of prudential standing, not constitutional standing.[159] In *Abraugh*, the Fifth Circuit reversed and remanded a district court's dismissal of a § 1983 civil rights cause of action—noting that the district court had stated that it was dismissing based on a "lack of subject matter jurisdiction" because the plaintiff in that action lacked standing.[160] The plaintiff was the mother of a prisoner

---

[156] 26 F.4th 298.

[157] *Id.* at 303.

[158] *Id.* at 302 (emphasis added).

[159] *Id.* at 302-303.

[160] *Id.* at 301.

004229

Case 19-34054-sgj11 Doc 4366-38 Filed 08/25/25 Entered 08/25/25 15:49:42 Desc
Case 3:25-cv-01876-K    Document 38 Filed 05/06/25 Page 783 of 1195    PageID 10496
Main Exhibit Exhibit 38 Page 40 of 65 Page 783 of 1195

who died by suicide while in custody who brought a § 1983 action against Louisiana correctional officers and officials. After finding that the plaintiff/mother lacked standing under Louisiana's wrongful death and survival statutes (because there had been a surviving child and wife of the prisoner who were the proper parties with capacity to sue), the district court held that it was dismissing for lack of subject matter jurisdiction. The Fifth Circuit pointed out that the plaintiff/mother may have lacked standing under Louisiana's wrongful death and survival statutes to bring the claim under § 1983, but that type of standing was matter of *prudential* standing, and the plaintiff/mother actually *did* have *Article III* constitutional standing ("a constitutionally cognizable interest in the life of her son").[161] Thus, the district court's error was *not* in finding that the plaintiff/mother lacked prudential standing but in improperly conflating the two standing concepts when it held that it had lacked *subject matter jurisdiction* to consider any of the plaintiff's/mother's amended complaints.[162] The Fifth Circuit noted specifically that[163]

> prudential standing does not present a jurisdictional question, but "a merits question: who, according to the governing substantive law, is entitled to enforce the right?" As the Federal Rules of Civil Procedure make clear, "an action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1). And a violation of this rule is a failure of "prudential" standing. "Not one of our precedents holds that the inquiry is jurisdictional." It goes only to the validity of the cause of action. And "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction."

Somewhat relevant to this prudential standing discussion is the fact that, in this bankruptcy case, there have been dozens of appeals of bankruptcy court orders by Dondero and Dondero-related entities. In connection therewith, both the district court and the Fifth Circuit, in evaluating the *appellate standing* of the appellants, have taken pains to distinguish between the concepts of:

---

[161] *Id.*

[162] *Id.* at 301, 303-304. The Fifth Circuit opined that "the district court did not err in describing [the mother's] inability to sue under Louisiana law as a defect of 'standing[, b]ut it is a defect of prudential standing, not Article III standing" thus technically not implicating the federal court's subject matter jurisdiction. *Id.* at 303.

[163] *Id.* at 304 (cleaned up).

(a) traditional, constitutional standing, and (b) a type of prudential standing known as the "person aggrieved" test, which is applied in the Fifth Circuit in determining whether a party has **standing to appeal a bankruptcy court order**—which it describes as a narrower and "more exacting" standard than constitutional standing. As explained in a Fifth Circuit opinion addressing the standing of a Dondero-related entity called NexPoint to appeal bankruptcy court orders allowing professional fees, the "person aggrieved" standard that is typically applied to ascertain bankruptcy **appellate** standing originated in a statute in the Bankruptcy Act. The Fifth Circuit continued to apply it after Congress removed the provision when it enacted the Bankruptcy Code in 1978.[164] Because it is narrower and "more exacting" than the test for Article III constitutional standing, it involves application of prudential standing considerations.[165] The Fifth Circuit describes the "person aggrieved" test for bankruptcy appellant standing as requiring that an appellant show that it was "*directly and adversely affected pecuniarily* by the order of the bankruptcy court," requiring "a higher causal nexus between act and injury than traditional standing . . . that best deals with the unique posture of bankruptcy actions."[166] In affirming the district court's dismissal of NexPoint's appeal of the bankruptcy court's fee orders, due to NexPoint's lack of prudential standing under the "person aggrieved" test, the court rejected NexPoint's argument that it had standing to appeal

---

[164] *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, No. 22-10575, 2023 WL 4621466, *2 (5th Cir. July 19, 2023)(citing *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004)(cleaned up)).

[165] *Id.* at *1, **4-6 (where the Fifth Circuit repeatedly throughout its opinion refers to the "person aggrieved" test for standing in bankruptcy actions as a test for "prudential standing."); *see also Dondero v. Highland Capital Mgt., L.P.*, Civ. Act. No. 3:20-cv-3390-X, 2002 WL 837208 (N.D. Tex. Mar. 18, 2022)(where the district court, in addressing Dondero's standing to appeal a bankruptcy court order approving a Rule 9019 settlement (between Highland and Acis Capital Management GP LLC), notes that "[i]t is substantially more difficult to have standing to appeal a bankruptcy court's order than it is to pursue a typical complaint under Article III of the U.S. Constitution" and that "the Fifth Circuit has long recognized that bankruptcy cases' wide-reaching scope calls for a more stringent standing test.").

[166] *See id.* at *3 (cleaned up). The court quotes its 2018 opinion in *Matter of Technicool Sys., Inc. (In re Technicool)*, 896 F.3d 382, 385 (5th Cir. 2018), which explains why the "person aggrieved" prudential standing standard is applied in bankruptcy actions: "Bankruptcy cases often involve numerous parties with conflicting and overlapping interests. Allowing each and every party to appeal each and every order would clog up the system and bog down the courts. Given the specter of such sclerotic litigation, standing to appeal a bankruptcy court order is, of necessity, *quite limited.*" *Id.* (cleaned up).

004231

because "it meets traditional Article III standing requirements [and that the more exacting] prudential standing considerations such as the 'person aggrieved' standard" did not survive the Supreme Court's 2014 *Lexmark*[167] opinion,[168] which addressed standing issues in the context of false advertising claims under the Lanham Act and reminded that courts may not "limit a cause of action that Congress has created merely because 'prudence' dictates."[169] The Fifth Circuit held that the Supreme Court's reminder in *Lexmark* did not nullify the "person aggrieved" test for prudential standing in bankruptcy appeals, citing its own decision in *Superior MRI Services Inc. v. Alliance Healthcare Services, Inc.*[170] (rendered a year after *Lexmark* was decided), in which it held that *Lexmark* applied only to the circumstances of that case, "rather than broadly modifying— or undermining—*all* prudential standing concerns, such as the one animating the 'person aggrieved' standard in bankruptcy appeals."[171]

Similarly, in yet another appeal in this bankruptcy case involving three Dondero-related entities as appellants (NexPoint, Dugaboy, and HCMFA)—this one an appeal of a bankruptcy court order authorizing the creation of an indemnity subtrust and entry into an indemnity trust agreement—the district court noted the parties' confusion about the standing issue, as exemplified in the parties' reference to constitutional standing when they were actually arguing that they had prudential standing under the "person aggrieved" test: "Although the parties frame this issue as one of constitutional standing . . . they cite case law and present arguments about the prudential

---

[167] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

[168] *Id.* at *2.

[169] *See id.* at *4 (cleaned up).

[170] 778 F.3d 502 (5th Cir. 2015).

[171] *NexPoint*, 2023 WL 4621466 at *4 (cleaned up).  The Fifth Circuit explicitly stated that "*Lexmark* does not expressly reach prudential concerns in bankruptcy appeals and brought no change relevant here." *Id.* at *5 (cleaned up).

004232

standing requirement embodied in the 'person aggrieved' test."[172]  The district court noted that it

had an "independent obligation to consider constitutional standing before reaching its prudential

aspects."[173]   The district court dismissed the appeal as to Dugaboy and HCMFA for lack of

standing but, upon concluding that NexPoint did have standing, dismissed the appeal as to it on

the merits.  The Fifth Circuit affirmed.[174] Interestingly, the court noted that, while the parties did

not contest the district court's determination that NexPoint had standing to pursue the appeal, it

"may consider prudential standing issues *sua sponte*."[175]  In doing so, the Fifth Circuit recognized

the distinction between constitutional standing and the prudential "person aggrieved" test applied

to bankruptcy appeals, which "is, of necessity, quite limited" and "an even more exacting standard

than traditional constitutional standing," as it requires an appellant to show that it is "directly,

adversely, and financially impacted by a bankruptcy order."[176]

In summary, in analyzing whether HMIT would have standing to bring the Proposed

Claims, this court must ***first*** determine whether HMIT would have constitutional standing under

Article III (which is a subject matter jurisdiction hurdle) and, assuming it does, then ***additionally***

address whether HMIT would also have prudential standing (i.e., capacity to sue) pursuant to any

applicable statutes (e.g., Delaware statutes), jurisprudence, or other substantive law that might

***limit*** who may sue.  Notwithstanding HMIT's argument that it has standing under the "person

---

[172] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2002 WL 270862, *1 (N.D. Tex. Jan. 18, 2022)(cleaned up).  The district court dismissed the appeals of two of the appellants, Dugaboy and HCMFA, finding that they lacked both constitutional standing and prudential standing under the "person aggrieved" test and affirmed the bankruptcy court's order after finding the third appellant, NexPoint, to have prudential standing under the "person aggrieved" test. *Id.* at **1-3 and *4.

[173] *Id.* at *1 n.2.

[174] *Highland Capital Mgt. Fund, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, 57 F.4th 494 (5th Cir. 2023).

[175] *Id.* at 501 (cleaned up).

[176] *Id.*

004233

aggrieved" test[177]—which, as discussed above, is a matter of prudential standing—this is applied

only in the context of bankruptcy **appellate** matters.[178]  As noted in its most recent opinion

discussing standing in an appeal from the Highland bankruptcy case, the Fifth Circuit reiterated

that the "person aggrieved" test is a test for bankruptcy **appellate** standing, which is narrower than

a party in interest's right to be heard in bankruptcy cases in general.[179]  The court rejected an

argument that Bankruptcy Code § 1109, which provides that "[a] party in interest . . . may raise

and may appear and be heard on any issue in a case under this chapter" confers **appellate** standing,

noting that "one's standing to appear and be heard before the bankruptcy court [is] a concept

distinct from standing to appeal the merits of a decision" and that the "person aggrieved" test for

bankruptcy appellate standing is narrower than the test for determining one's standing to appear

and be heard in a bankruptcy proceeding.[180]

Thus, the court will now analyze whether HMIT would, at a minimum, have constitutional

standing to bring the Proposed Claims.

2.  <u>HMIT Would Lack Article III Constitutional Standing to Bring the Proposed Claims</u>.

As noted above, the Supreme Court and the Fifth Circuit have made clear that constitutional

standing is necessary for a court to exercise subject matter jurisdiction.  It is only the first hurdle a

party must clear before pursuing a claim in federal court.  HMIT, as  plaintiff, would bear the

---

[177] HMIT insists that it has constitutional standing to bring claims on its individual behalf "as an aggrieved party." *See* Reply, ¶ 7.

[178] HMIT's argument in this matter that it has constitutional standing because it is a "party aggrieved" incorrectly conflates the prudential bankruptcy appellate "person aggrieved" test with the broader test that is applied to constitutional standing.  The court is not being critical of this mistake.  As noted at *supra* note 149, the Fifth Circuit in *Abraugh* pointed out that courts and attorneys alike have created confusion by misusing the term "standing" when they equate a lack of "standing," in all instances, with a lack of subject matter jurisdiction, even when the party is found to lack only prudential standing.  Thus, HMIT is not alone in its confusion over the two different concepts of standing.

[179] *See NexPoint*, 2023 WL 4621466 at *6.

[180] *Id.* at *6 (cleaned up)("Because Section 1109(b) expands the right to be heard [in a bankruptcy proceeding] to a wider class than those who qualify under the 'person aggrieved' standard, courts considering the issue have concluded that merely being a party in interest is insufficient to confer **appellate** standing.")(emphasis added).

004234

burden of establishing:   (1) that it suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[181]

<u>Concrete and Particularized; Actual or Imminent</u>.  As the Supreme Court made clear in the *Lujan* case, the injury in fact element requires a showing that the injury was "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[182]  The Supreme Court in the *Spokeo* case expounded on the "concrete and particularized" requirements of the "injury in fact" element.  Particularization requires a showing that the injury "must affect the plaintiff in a personal and individual way," but while particularization is necessary, it alone is "not sufficient," because an injury in fact must also be "concrete."[183]  And, concreteness is "quite different from particularization."[184]  A "concrete" injury must be "real," and "not abstract," though it does not mean that the injury must be "tangible," as the injury can be intangible and nevertheless be concrete.[185]  In addition to the concreteness and particularization requirements, an injury in fact must be "actual or imminent" such that "allegations of injury that is merely conjectural or hypothetical do not suffice to confer standing."[186]  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly*

---

[181] *See supra* note 153.
[182] *Lujan*, 504 U.S. at 560 (cleaned up).
[183] *Spokeo*, 578 U.S. at 339.
[184] *Id.* at 340.
[185] *Id.*
[186] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

004235

impending"; "allegations of *possible* future injury are not sufficient."[187]

  <u>Traceability - Causal Connection</u>.  As to the second element—that the injury was caused by the defendant—the Supreme Court in *Lujan* further described it as requiring a showing that "the injury has to be fairly traceable to the challenged action of the defendant."[188]  The "fairly traceable" test requires an examination of "the causal connection between the assertedly unlawful conduct and the alleged injury."[189]

  <u>Redressability</u>.  The third element—redressability—requires the court to examine the connection "between the alleged injury and the judicial relief requested."[190]  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."[191]  "[A] court must determine that there is an available remedy which will have a 'substantial probability' of redressing the plaintiff's injury."[192]

  The Claims Purchasers argue that HMIT lacks constitutional standing to pursue the claims asserted in the Proposed Complaint because: (i) neither HMIT nor the Bankruptcy Estate was injured by the Claim Purchasers' acquisition of the claims; and (ii) the Proposed Complaint lacks a theory of cognizable damages to the Reorganized Debtor, the Claimant Trust, and/or the beneficiaries of the Claimant Trust.[193]

---

[187] *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)(cleaned up); *see also Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023)("[Injury] cannot be speculative, conjectural, or hypothetical [and] [a]llegations of only a 'possible' future injury similarly will not suffice.")(cleaned up).

[188] *Lujan*, 504 U.S. at 560-61 (cleaned up).

[189] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

[190] *Id.* (noting "it is important to keep the ['fairly traceable' and 'redressability'] inquiries separate if the 'redressability' component is to focus on the requested relief.").

[191] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

[192] *City of Los Angeles v. Lyons*, 461 U.S. 95, 129 n.20 (1983)(Marshall, J., dissenting)(cleaned up); *see also Ondrusek v. U.S. Army Corps of Engineers*, Civ. Act. No. 3:22-cv-1874-N, 2023 WL 2169908, at *5 ("Plaintiffs have not demonstrated that any available remedy would be sufficiently likely to relieve their alleged economic losses. Without a showing of redressability, those harms also cannot support Plaintiff's Article III standing.").

[193] As noted earlier, certain of the Proposed Defendants—the Highland Parties—do not focus on HMIT's lack of constitutional standing to pursue the Proposed Claims against them, but on its lack of prudential standing under

The court agrees with the Claims Purchasers' argument here. What is HMIT's concrete and particularized injury—that is "real" and is not abstract? That is not conjectural or hypothetical? That is actual or imminent?

Recall that, under the Plan, HMIT holds a Class 10 contingent interest in the Claimant Trust that only realizes value if all creditors are paid in full with interest. HMIT alleges the following injury: it has suffered a devaluation of its unvested Contingent Claimant Trust Interest by virtue of the alleged over-compensation of Seery as the Claimant Trustee—Seery's alleged over-compensation depletes the assets in the Claimant Trust available for distribution to creditors under the Plan, such that there is less likely a chance that HMIT ultimately receives any distributions on account of its Class 10 Contingent Claimant Trust Interest.[194] Yet, HMIT testified, through both witnesses Dondero and Patrick, that it had no personal knowledge of what Seery's actual compensation is under the CTA at the time HMIT filed its Motion for Leave. It was clear that HMIT's allegations regarding Seery's "excessive" compensation were based entirely on Dondero's pure speculation. In reality, Seery's base salary is exactly what the bankruptcy court approved during the bankruptcy case by a court order (after negotiations between Seery and the Committee). The CTA now further governs his compensation. The CTA, which was publicly filed ***in advance of*** the Plan confirmation hearing and approved by this court as part of the Plan

---

applicable law. Because constitutional standing is a matter of subject matter jurisdiction, the court has an independent duty to determine whether HMIT would have constitutional standing to pursue the Proposed Claims in federal court. The issue cannot be forfeited or waived by a party. *See Abraugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived. Moreover, courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.")(cleaned up); *Abraugh*, 26 F.4th at 304 ("It is our constitutional duty, of course, to decline subject matter jurisdiction where it does not exist—and that is so whether the parties challenge Article III standing or not.")(cleaned up).

[194] At the June 8 Hearing, HMIT's counsel was unable to identify any other injury HMIT has alleged to have suffered. HMIT's counsel acknowledged that claims trades, in and of themselves, would not "involve injury to the Reorganized Debtor and to the Claimant Trust" and that claims trades are "normally outside the purview of the bankruptcy court" but that "[h]ere, we have alleged . . . . injury [that] takes the form of unearned excessive fees that Mr. Seery has garnered as a result of his relationship and arrangements, as we have alleged, with the Claims Purchasers." June 8 Hearing Transcript, 67:16-68:8. HMIT can only point to Seery's excess compensation as injury.

004237

(which has been affirmed by the Fifth Circuit), specifically provides that Seery's post-Effective Date compensation would include a "Base Salary" (again, same as during the bankruptcy case), a "success fee," and "severance."[195]   The CTA discussed the role of the Committee and then the CTOB in setting the success fee and severance and the like.  A fully executed copy of the CTA was admitted into evidence at the June 8 Hearing.  HMIT is essentially arguing that its injury (i.e., diminished likelihood of realizing value on its Contingent Claimant Trust Interest) stems from a court-sanctioned and creditor-approved process for approving compensation to Seery.  Moreover, HMIT has failed to plead facts sufficient to show that, even if Seery received excessive compensation and that compensation is ordered to be returned, HMIT's Contingent Claimant Trust Interest will ever vest.  The district court and the Fifth Circuit in various appeals by Dugaboy, another Dondero-related entity that, similar to HMIT, was a holder of a limited partnership interest in Highland whose interests were terminated as of the Effective Date of the Plan in exchange for a Contingent Claimant Trust Interest, have repeatedly rejected Dugaboy's claims to have standing based on the *speculative nature of its alleged injuries as a contingent beneficiary of the Claimant Trust under the Plan*.  For example, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy of the bankruptcy court's order authorizing the creation of an indemnity subtrust, wherein Judge Fitzwater found that, in addition to lacking prudential standing under the

---

[195]   The Disclosure Statement that was approved by this court, after notice and a hearing, on November 24, 2020, provided that "The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement . . . ."  The CTA was part of a Plan Supplement (as amended) that was filed in advance of the confirmation hearing and provided:

> Compensation. As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary"). Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

*See* Highland Ex. 38, at § 3.13(a)(i).

004238

"person aggrieved" test to appeal the bankruptcy court's order, Dugaboy lacked constitutional standing "because they have not identified any injury fairly traceable to the Order: **the injuries identified are speculative at best and nonexistent at worst**."[196]  HMIT's allegations of injury are, without a doubt, "merely conjectural or hypothetical" and are only speculative of possible future injury if its Contingent Claimant Trust Interest ever vests."[197]  The court finds that HMIT would not meet the "concrete and particularized" or the "actual or imminent" requirements for an "injury in fact," and, thus, would lack constitutional standing to pursue the Proposed Claims.

With regard to the second requirement of constitutional standing—whether HMIT could show "traceability" with respect to the Claims Purchasers and/or Seery (i.e., a "causal connection between the assertedly unlawful conduct and the alleged injury"[198]), as noted above, there is only a speculative injury.  Even if there is unlawful conduct asserted (i.e., sharing of MNPI to Claims Purchasers who then, as a *quid pro quo*, rubber stamped excessive compensation for Seery), there is nothing other than a hypothetical theory of an alleged injury (i.e., an allegedly less likelihood of a distribution on a Contingent Claimant Trust Interest).

With respect to the third requirement of constitutional standing—whether HMIT can show "redressability" (i.e., that it is likely, not speculative, that the injury can be redressed by a favorable

---

[196] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2022 WL 270862, *1 n.2 (N.D. Tex. Jan. 28, 2022), *aff'd* 57 F.4th 494 (5th Cir. 2023)(emphasis added); *see also* Judge Scholer's opinion in *Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-2268-S, 2022 WL 3701720, *3 (N.D. Tex. Aug. 8, 2022)(cleaned up), *aff'd per curium*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023) (where Dugaboy had argued that "**its pecuniary interest is** . . . **a potential recovery under the Plan as one of Debtor's former equity holders**" and that "it ha[d] standing as a 'contingent beneficiary' under the Plan, or a beneficiary who will be entitled to payment after all creditors are paid in full," and Judge Scholer stated, "This assertion is premised on the assumption that Dugaboy's 0.1866% pre-bankruptcy limited partnership interest in Debtor—which was extinguished under the Plan—makes it a contingent beneficiary of the creditor trust created under the Plan. . . . [S]uch a 'speculative prospect of harm is far from a direct, adverse, pecuniary hit' as required to confer standing."

[197] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

[198] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

004239

decision), there are multiple problems here.[199] The major remedy sought here is the equitable disallowance of the allowed Purchased Claims (and disgorgement and/or constructive trust of amounts paid or owed to the Claim Purchasers on account of their claims). There is no such remedy available here. As noted earlier, there is a similar concept of ***equitable subordination*** of a claim to another claim, or of an interest to another interest, pursuant to Bankruptcy Code section 510(c). But under the literal terms of section 510(c), ***claims cannot be subordinated to interests***. Moreover, the Fifth Circuit noted in the *Mobile Steel* case,[200] that ***equitable disallowance*** of a claim (as opposed to equitable subordination of a claims) is not an available remedy. Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case might permit "recharacterization" of a claim from debt to equity in certain circumstances—but not based on inequitable conduct but rather on the nature of a financial transaction. In any event, here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders). The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . . according to the equities of the case."). As noted earlier, the problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate ***entered without a contest*** is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added). As further noted earlier, here there was most definitely a "contest" with regard to all of these purchased claims. ***Thus, it would appear***

---

[199] *See supra* notes 182-184 and accompanying text. The court will note that, as discussed *supra* note 141 and pages 71-72, the remedy of equitable subordination (as to the Claims Purchasers) would not redress HMIT's alleged injury (because equitable subordination of claims to interests is not an available remedy in the Fifth Circuit and thus subordination of the Purchased Claims to other claims would not change HMIT's distributions from the Claimant Trust, if any), and because outright disallowance of all or part of the already allowed Purchased Claims is not an available remedy either, HMIT would not be able to meet the "redressability" requirement with respect to the Claims Purchasers.

[200] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).

*that any effort to have a court reconsider and potentially disallow these claims pursuant to section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

3. <u>HMIT Would Also Lack Prudential Standing to Bring the Proposed Claims</u>.

Even if HMIT would have constitutional standing to bring the Proposed Claims in an adversary proceeding filed in the bankruptcy court, the Proposed Claims would still be barred if HMIT would lack prudential standing to bring them under applicable state or federal law. HMIT argues that it does have prudential standing under both federal bankruptcy law and Delaware law to pursue the Proposed Claims derivatively and also to bring the Proposed Claims in its individual capacity.

With regard to "federal bankruptcy law," HMIT argues that it has standing pursuant to: (a) Rule 23.1 of the Federal Rules of Civil Procedure, pertaining to derivative actions, which "applies to this proceeding pursuant to" Rule 7023.1 of the Federal Rules of Bankruptcy Procedure, and (b) *Louisiana World Exposition v. Federal Insurance Co. ("LWE")*,[201] the Fifth Circuit's leading case addressing when a creditors committee may be granted standing to bring causes of action on behalf of a bankruptcy estate. But, federal bankruptcy law does not confer standing *where the plaintiff otherwise lacks standing under applicable state law*. In other words, whether HMIT would have prudential standing to sue under Delaware law is dispositive of the issue, regardless of the forum. Rule 23.1 "speaks only to the adequacy of the . . . pleadings," and "cannot be understood to 'abridge, enlarge, or modify any substantive right,'"[202] including a right (or lack thereof) to bring a derivative action under the substantive law of Delaware. Additionally, HMIT's reliance on *LWE* is misplaced: *LWE* permits creditors, in certain circumstances *during* a bankruptcy case, to "file

---

[201] 858 F.2d 233 (5th Cir. 1988).
[202] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)(quoting 28 U.S.C. § 2072(b)).

004241

suit on behalf of a debtor-in-possession or a trustee"[203] and does not apply to a party's right to sue, derivatively, on behalf of the Reorganized Debtor or any entity that is the assignee of the former bankruptcy estate's assets. Upon confirmation of the Plan, the bankruptcy estate of Highland ceased to exist;[204] Highland is no longer a debtor-in-possession but a reorganized debtor, and the Claimant Trust is a new entity created under the Plan and Claimant Trust Agreement. Even if *LWE* did apply in this ***post***-confirmation context, it supports the application of Delaware law to the issue of prudential standing and does not supersede state-law requirements for standing. In *LWE*, before addressing the requirements a creditors' committee must meet to sue derivatively on behalf of a bankruptcy estate as a matter of federal bankruptcy law, the Fifth Circuit conducted a lengthy analysis to determine "as a threshold issue" whether the creditors' committee in that case could assert its claims under Louisiana law.[205] The court specifically addressed whether the creditors' committee could pursue a derivative action under Louisiana law and concluded that "there is no bar in Louisiana law to actions brought by or in the name of a corporation against the directors and officers of the corporation which benefit only the creditors of the corporation; indeed, Louisiana law specifically recognizes such actions."[206] So, even under *LWE* (which the court does not think applies in this post-confirmation context), if HMIT would be barred from bringing a derivative action on behalf the Reorganized Debtor or Claimant Trust under state law, the analysis stops there.[207] Thus, the court looks to Delaware law to determine if HMIT would have prudential standing to pursue the derivative claims on behalf the Reorganized Debtor and the Claimant Trust.

---

[203] *LWE*, 858 F.2d at 247.

[204] *See In re Craig's Stores*, 266 F.3d 388, 390 (5th Cir. 2001).

[205] *LWE*, 858 F.2d at 236-45.

[206] *Id.* at 243.

[207] *See In re Dura Automotive Sys., LLC*, No. 19-123728 (Bankr. D. Del. June 10, 2020), Docket No. 1115 at 46 (where the Delaware bankruptcy court denied the creditors' committee standing to sue derivatively on behalf of a Delaware LLC because the committee lacked standing under the Delaware LLC Act, stating, "To determine that the third party

004242

HMIT acknowledges that both the Reorganized Debtor and the Claimant Trust are organized under Delaware law, and thus the cause of action against Seery alleging breach of fiduciary duties to the Reorganized Debtor and the Claimant Trust are governed by Delaware law under the "Internal Affairs Doctrine."[208]  In addition, because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting theory of liability as to the Claims Purchasers is also governed by Delaware law.[209]  For the reasons set forth below, the court finds that HMIT would lack prudential standing under Delaware law to bring the claims set forth in the Proposed Complaint, derivatively, on behalf of either the Claimant Trust or the Reorganized Debtor.

  a) First, HMIT Would Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Claimant Trust.

The Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29,[210] and "to proceed derivatively against a Delaware statutory trust, a plaintiff has the burden of satisfying the continuous ownership requirement" such that "the plaintiff must be a beneficial owner" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[211]  This requirement is "mandatory and exclusive" and only "a beneficial owner" "has standing to bring a derivative claim on behalf of the

---

may bring the claim under the derivative basis and, thus, step into the shoes of the debtor to pursue them, the Court must look to the law of the debtors' state of incorporation or formation.").

[208] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[209] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

[210] *See* Proposed Complaint, ¶ 26.

[211] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012); 12 Del C. § 3816(b).

004243

Trust."[212] The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, would lack standing to bring derivative claims on behalf of the Claimant Trust. HMIT argues to the contrary: that it *is* currently, and was at all relevant times, a "beneficial owner" of the Claimant Trust under Delaware trust law such that it would have standing to bring derivative claims on behalf of the Claimant Trust if it were allowed to proceed with the filing of the Proposed Complaint. The disagreement turns on the nature of HMIT's interest under the Plan and the Claimant Trust Agreement and whether HMIT, as a holder of such interest, would be considered a "beneficial owner" of the Claimant Trust under Delaware trust law.

As noted, pursuant to the Plan, HMIT's former limited partnership interest in Highland was cancelled as of the Effective Date in exchange for its pro rata share of a "Contingent Claimant Trust Interest," as defined under the Plan.[213] HMIT argues that its Contingent Claimant Trust Interest makes it a contingent beneficiary of the Claimant Trust, which makes it a present "beneficial owner" under Delaware trust law.

The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust; rather, the "beneficial owners" of the Claimant Trust are the "Claimant Trust Beneficiaries,"[214] which are defined in the Plan and the CTA as "the Holders of Allowed General Unsecured Claims" (which are in Class 8 under the Plan) and "Holders of Allowed Subordinated Claims" (which are in Class 9 under the Plan);[215] HMIT, a holder of a Class 10 interest under the Plan, is neither.

---

[212] *In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011)). HMIT acknowledges this requirement in its Reply: "Delaware statutory trust law provides that a plaintiff in a derivative action on behalf of a trust must be a beneficial owner at the time of the action and at the time of the transaction." Reply, ¶ 19 (citing 12 Del C. § 3816).

[213] *See* Plan Art. III.H.10 and Art. I.B.44.

[214] Section 2.8 of the CTA provides, "The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust . . . ." HMIT Ex. 26, § 2.8.

[215] *See* Plan Art. I.B.44 ("'*Claimant Trust Beneficiaries*' means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the

HMIT, as the holder of a "Contingent Claimant Trust Interest," has only an ***unvested*** contingent interest in the Claimant Trust and, as such, is not a "beneficial owner" of the Claimant Trust for standing purposes under Delaware trust law.  HMIT argues that it "should be treated as a vested Claimant Trust Beneficiary due to [the Proposed Defendants'] wrongful conduct and considering the current value of the Claimant Trust Assets before and after the relief requested herein."[216]  The court disagrees.

HMIT's status as a "beneficiary" of the Claimant Trust is defined by the CTA itself, pure and simple.  The CTA specifically provides that "Contingent Trust Interests" "shall not have any rights under this Agreement" and will not "be deemed 'Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and the CTA.  It is undisputed that HMIT's Contingent Trust Interest has not vested under the terms of the Plan and the CTA, and the court does not have the power to equitably deem HMIT's Contingent Trust Interest to be vested based on HMIT's unsupported allegation of wrongdoing on the part of Seery, the Claimant Trustee.  Thus, the court finds that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, lacks prudential standing under Delaware law to bring derivative claims on behalf of the Claimant Trust.[217]

---

Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests."); CTA § 1.1(h). *See also*, CTA, 1 at n.2 ("For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan."). HMIT Ex. 26.

[216] Proposed Complaint ¶ 24.

[217] *See Nat'l Coll.*, 251 A.3d at 190–92 (dismissing creditors' derivative claims because they were not "beneficial owners of the Trusts"); *Hartsel*, 2011 WL 2421003, at *19 n.123 (dismissing derivative claims by investors that "no longer own shares" because "those investors no longer have standing to pursue a derivative claim").

004245

      b) HMIT Would Likewise Lack Prudential Standing Under Delaware Law to Bring
         Derivative Actions on behalf of the Reorganized Debtor.

HMIT acknowledges that the Reorganized Debtor, Highland Capital Management, L.P., is

a Delaware limited liability partnership governed by the Delaware Limited Partnership Act, 6 Del.

C. § 17-101, *et seq.*[218]  To bring "a derivative action" on behalf of a limited partnership, "the

plaintiff must be a partner or an assignee of a partnership interest" continuously from "the time of

the transaction of which the plaintiff complains" through "the time of bringing the action."[219]

HMIT is not a partner, general or limited, of the Reorganized Debtor limited partnership.

HMIT *was* a limited partner in the original debtor (specifically, a holder of Class B/C Limited

Partnership interests in Highland), but that limited partnership interest was extinguished on August

11, 2021 (the Effective Date of the Plan) per the terms of the Plan, and HMIT does not own any

partnership interest in the newly created Reorganized Debtor limited partnership.[220]  Because

HMIT would not hold a partnership interest in the Reorganized Debtor at "the time of bringing the

action," it "lacks derivative standing" to bring claims "on the partnership's behalf."[221]  HMIT

likewise cannot satisfy "the continuous ownership requirement"; when HMIT's limited

partnership interest in the original Debtor was cancelled on the Plan's Effective Date, HMIT "los[t]

standing to continue a derivative suit" on behalf of the Debtor.[222]  Finally, to the extent HMIT

---

[218] Proposed Complaint ¶ 25.

[219] 6 Del. C. § 17-1002; *see Tow v. Amegy Bank, N.A.*, 976 F. Supp. 2d 889, 904 (S.D. Tex. 2013) ("The [Delaware] partnership act facially bars any party other than a limited partner from suing derivatively. . . . Delaware courts historically have interpreted the provisions as giving the partners exclusive rights to sue for breach of another party's fiduciary duties to them.") (quoting *CML V, LLC v. Bax*, 6 A.3d 238, 245 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011)); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265 n.87 (Del. 2016) ("The statutory foundation for the continuous ownership requirement in the corporate realm is echoed in the limited partnership context.") (citing 6 Del. C. § 17-211(h)).

[220] *See* Plan Art. IV.A.

[221] *Tow*, 976 F. Supp. 2d at 904 (dismissing derivative claims by creditor on behalf of partnership for lack of standing).

[222] *El Paso*, 152 A.3d at 1265 (cleaned up) (dismissing derivative action for lack of standing where plaintiff's partnership interest was extinguished by a merger transaction); *see also Schermerhorn v. CenturyTel, Inc. (In re*

004246

seeks to bring a "double derivative" action on behalf of the Claimant Trust based on claims

purportedly held by its wholly owned subsidiary, the Reorganized Debtor, HMIT lacks standing.

A "double derivative" action is a suit "brought by a shareholder of a parent corporation to enforce

a claim belonging to a subsidiary that is either wholly owned or majority controlled."[223] And, under

Delaware law, "parent level standing is required to enforce a subsidiary's claim derivatively."[224]

Because HMIT would lack derivative standing to bring claims on behalf of the parent Claimant

Trust,[225] it also would lack standing to bring a double derivative action.

> c)  Finally, HMIT Would Also Lack Prudential Standing under Applicable Law to Bring the Proposed Claims As **Direct** Claims.

HMIT argues that it has "direct" standing to pursue the Proposed Claims on behalf of itself,

individually.[226]  But just because HMIT asserts that some or even all of the Proposed Claims are

direct, not derivative claims, does not make it so:  "a claim is not 'direct' simply because it is

pleaded that way."[227]  Rather, in determining whether claims are direct or derivative, a court must

"look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the

Plaintiffs' characterization."[228]  And, under Delaware law, "whether a claim is solely derivative or

---

*SkyPort Global Commcn's, Inc.)*, 2011 WL 111427, at *25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law because they "had their equity interests in the company extinguished pursuant to the merger under the Plan"); *In re WorldCom, Inc.*, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) ("[T]he cancellation of WorldCom shares under the Plan … prevents the required continuation of shareholder status through the litigation.") (cleaned up).

[223] *Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010).

[224] *Sagarra*, 34 A.3d at 1079–81 (capitalization omitted) (citing *Lambrecht*, 3 A.3d at 282).

[225] *See supra* pp. 80-82.

[226] *See e.g.*, Motion for Leave ¶ 10 ("HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time . . . ."); *id.* ¶ 67 (arguing that "HMIT has [d]irect [s]tanding"); Proposed Complaint ¶ 24 ("HMIT has constitutional standing and capacity to bring these claims both individually and derivatively.").

[227] *Schermerhorn*, 2011 WL 111427, at *26 (quoting *Gatz v. Ponsoldt*, 2004 WL 3029868 at *7 (Del. Ch. Nov. 5, 2004)).

[228] *See id.* (citing *Armstrong v. Capshaw, Goss & Bowers LLP*, 404 F.3d 933, 936 (5th Cir. 2005)); *see also Moore v. Simon Enters., Inc.*, 919 F.Supp. 1007, 1009 (N.D. Tex. 1995)("The determination of whether a claim is a derivative claim or a direct claim is made by reference to the nature of the wrongs alleged in the complaint, and is not limited by a [party's] characterization or stated intention.")(cleaned up).

may continue as a dual-natured claim 'must turn ***solely*** on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'"[229] "In addition, to prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'"[230] Similarly, in the bankruptcy context, whether a creditor can assert a claim directly or whether the claim belongs to the estate turns on the nature of the injury for which relief is sought: "[i]f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate," such that "only the bankruptcy trustee has standing to pursue the claim for the estate . . . ."[231] "To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate."[232]

As a reminder, HMIT argues that the injury it has suffered is a devaluation of its interests in the Claimant Trust by virtue of alleged over-compensation of Seery as the Claimant Trustee. HMIT was unable, when pressed during closing arguments, to identify any other injury. It essentially admitted that the claims trades, in and of themselves, would not have harmed the Claimant Trust, the Reorganized Debtor, or individual stakeholders, including HMIT, ***since the Claims Purchasers acquired already allowed unsecured claims, such that the distributions on those claims pursuant to the Plan would be unchanged in the hands of new holders of the claims***.

---

[229] *El Paso*, 152 A.3d at 1260 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)) (emphasis in original).

[230] *Id.* (quoting *Tooley*, 845 A.2d at 1033); *see also Schmermerhorn*, 2011 WL 111427, at *24 (same).

[231] *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. § 541(a)(1)).

[232] *Id.*; *see also Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994)("If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate.")(citations omitted).

004248

Thus, by its own concessions, any alleged harm to HMIT (through devaluation of assets in the Claimant Trust) "comes about only because of harm to the debtor," so the alleged "injury is derivative."[233]  The court concludes that all of the claims set forth in the Proposed Complaint allege derivative claims only, and that none would be direct claims against the Proposed Defendants. Thus, HMIT would lack prudential standing to bring any of the Proposed Claims in the Proposed Complaint, so its Motion for Leave should be denied.

d)  Some Final Points Regarding Standing.

In this standing discussion, one should not lose sight of the fact that there are both procedural safeguards in place, as well as certain independent individuals in place with fiduciary duties that might act in the event of any shenanigans regarding Claimant Trust activities.  Under section 4.1 of the CTA (approved as part of the Plan process), the CTOB, which includes an independent disinterested member in addition to representatives of the Claims Purchasers,[234] oversees the Claimant Trustee's performance of his duties, approves his compensation, and may remove him for cause.  Moreover, there is a separate "Litigation Trustee" in this case who was brought in, post-confirmation, as an independent fiduciary to pursue claims and causes of action. These independent persons are checks and balances in the post-confirmation wind down of Highland.  This is what creditors voted on in connection with the Plan.  Seery and the Claims Purchasers are not in sole control of anything.  The CTA, as well as Delaware law, very clearly set forth who can bring an action in the event of some colorable claim.  This is the reality of prudential

---

[233] *Meridian*, 912 F.3d at 293–94 ("The creditors' injury (reduced bankruptcy recovery) derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third parties."); *see also El Paso*, 152 A.3d at 1260–61 & n.60 (holding that claim "claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative") (collecting cases); *Gerber v EPE Holdings, LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) (holding that claims were derivative because plaintiff had "not identified any independent harm suffered by the limited partners"; "the partnership suffered all the harm at issue—it paid too much").
[234] *See supra* note 23 and accompanying text.

standing.  Just as in the *Abraugh* case, where Louisiana law dictated that a mother could not bring a wrongful death case when the deceased prisoner had a surviving wife and child, Delaware law and the CTA dictate here that a contingent beneficiary cannot bring the Proposed Claims here. This is separate and apart from whether the claims are colorable.

### C.  Are the Proposed Claims "Colorable"?

1.  <u>What is the Proper Standard of Review for a "Colorability" Determination?</u>

Although the court has determined that HMIT would ***not*** have standing (constitutional or prudential) to bring the Proposed Claims, this court will nevertheless evaluate whether the claims—assuming HMIT somehow has standing—might be "colorable."  This, in turn, requires the court to assess what the legal standard is to determine if a claim is "colorable." As a reminder, the Plan's Gatekeeper Provision and this court's prior Gatekeeper Orders entered in January and July 2020 each required that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain a finding from the bankruptcy court that its proposed claims are "colorable." The Gatekeeper Provision and Gatekeeper Orders did not specifically define "colorable" or what type of legal standard should apply.

HMIT argues that the standard for review to be applied by this court is the same as a simple "plausibility" standard used in connection with a Rule 12(b)(6) motions to dismiss.  In other words, the court should simply assess whether the allegations of the Proposed Complaint, taken as true and with all inferences drawn in favor of the movant, state a ***plausible*** claim for relief (i.e., colorable equals plausible), and that this standard does not allow for the weighing of evidence by the court.[235] The Proposed Defendants, however, argue that the test for colorability should be more

---

[235] Reply, ¶ 5 ("[T]he determination of 'colorability' does not allow the 'weighing' of evidence. At most, a Rule 12(b)(6) 'plausibility' standard applies.").

004250

akin to the test applied under the *Barton* doctrine,[236] under which a plaintiff must make a *prima facie* case that a proposed claim against a bankruptcy trustee is "not without foundation." In this regard, they argue that the court can and should consider evidence outside of the four corners of the complaint—especially since HMIT attached to its Motion for Leave, as "evidence" to support it, two declarations of Dondero (as part of a 350-page attachment) and only attempted to withdraw those declarations after the Highland Parties urged that they be permitted to cross-examine Dondero on them.

This court ultimately determined that the "colorability" standard was somewhat of a mixed question of fact and law and, therefore, the parties could put on evidence at the June 8 Hearing if they so-chose. The court would not require it. It was up to the parties. But, in any event, the Proposed Defendants should have an opportunity to cross-examine Dondero on the statements made in his declarations since the declarations had been filed on the docket and the court had reviewed them at this point. HMIT attempted to withdraw the declarations and any reference to them in the Motion for Leave, by filing redacted versions of the Motion for Leave,[237] less than 72 hours before the June 8 Hearing; however, the redacted versions did not redact any allegations in the Motion for Leave that were purportedly supported by the Dondero declarations. Also, HMIT called Dondero as a direct witness, in addition to calling Seery as an adverse witness at the June 8 Hearing, albeit subject to its running objection to the evidentiary format of the hearing.[238] HMIT also filed a witness and exhibit list attaching 80 exhibits and over 2850 pages of evidence and

---

[236] *Barton v. Barbour,* 104 U.S. 126 (1881).
[237] Bankr. Dkt. Nos. 3815 and 3816.
[238] *See* June 8 Hearing Transcript, 7:20-24, 112:11-13.

Case 19-34054-sgj11 Doc 4306-38 Filed 08/23/25 Entered 08/23/25 15:59:42 Desc
Case 3:25-cv-01876-K    Document 38-1 Filed 06/05/25    Page 805 of 1195    PageID 10518
Main Exhibit 38 Filed Page 85 of 106 Page 805 of 1195    PageID 10518

moved for the admission of those exhibits at the June 8 Hearing (again, subject to its running objection to the evidentiary format of the hearing).[239]

In determining what appropriate legal standard applies here in the "colorability" analysis, the context in which the Gatekeeper Provision of the Plan was approved seems very relevant. In determining that the Gatekeeper Provision was legal, necessary, and in the best interest of all of the parties, this court set forth in the Confirmation Order a lengthy discussion of the factual support for it, and made specific findings relating to Dondero's post-petition litigation and the need for inclusion of the Gatekeeper Provision in the Plan.[240] This court observed that "prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade" and that "[d]uring the last several months, Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor."[241] This court further found that: (1) Dondero's post-petition litigation "was a result of Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Seery's credible testimony, that if Dondero's plan proposal was not accepted, he would 'burn down the place,'"[242] (2) without the Gatekeeper Provision in place, "Dondero and his related entities will likely commence litigation against the Protected Parties after the Effective Date" and that "the threat of continued litigation by Dondero and his related entities after the Effective Date will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result in lower distributions to creditors because of

---

[239] *See Hunter Mountain Investment Trust's Witness and Exhibit List in Connection with Its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement* ("HMIT W&E List")[Bankr. Dkt. No. 3818] and n.1 thereto; *see also* June 8 Hearing Transcript, 33:7-10.

[240] *See* Confirmation Order ¶¶ 76-79.

[241] *Id.* ¶ 77.

[242] *Id.* ¶ 78. *See supra* note 12.

004252

costs and distraction such litigation or the threats of such litigation would cause,"[243] and, (3)

"unless the [court] approves the Gatekeeper Provision, the Claimant Trustee and the Claimant

Trust Oversight Board will not be able to obtain D&O insurance,[244] the absence of which will

present unacceptable risks to parties currently willing to serve in such roles." Thus, as set forth in

the Confirmation Order, the Gatekeeper Provision (and the Gatekeeper Orders as well, which were

approved based on the same concerns regarding the threat of continued litigation by Dondero and

his related entities) required Dondero and related entities to make a threshold showing of

colorability, noting that the:

> Gatekeeper Provision is also within the spirit of the Supreme Court's "Barton
> Doctrine." *Barton v. Barbour*, 104 U.S. 126 (1881). The Gatekeeper Provision is
> also consistent with the notion of a prefiling injunction to deter vexatious litigants,
> that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon
> Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll*, 850 F.3d 811
> (5th Cir. 2017)."[245]

The Fifth Circuit, in approving the Gatekeeper Provision on appeal, noted that that the Plan

injunction and Gatekeeper Provision "screen and prevent bad-faith litigation against Highland

Capital, its successors, and other bankruptcy participants that could disrupt the Plan's

effectiveness."[246]

Again, the court believes it is appropriate to consider the context in which—and the

purpose for which—the Gatekeeper Orders and Gatekeeper Provision were entered in assessing

---

[243] *Id.*

[244] Asd noted at ¶ 79 of the Confirmation Order, the bankruptcy court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance for the post-confirmation parties implementing the Plan. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so *without an exclusion for claims asserted by Mr. Dondero and his affiliates* required that the Confirmation Order approve the Gatekeeper Provision.

[245] *Id.* ¶ 80.

[246] *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt., L.P.*), 48 F.4th 419, 435 (5th Cir. 2022).

004253

how "colorability" should work here. It seems that applying HMIT's proposed Rule 12(b)(6) "plausibility" standard would impose no hurdle at all to litigants and would render the threshold for bringing claims under the Gatekeeper Provision and Gatekeeper Orders entirely duplicative of the motion to dismiss standard that every litigant already faces.

The authorities cited by HMIT in support of its argument for applying a Rule 12(b)(6) standard are inapposite. HMIT has cited no authority that addresses the appropriate standard for assessing the "colorability" of claims in the context of a plan gatekeeper provision—specifically, one implemented in response to a demonstrated need to screen and prevent continued bad-faith, harassing litigation against a chapter 11 debtor that would impede the debtor's implementation of a plan, which is what we have here. HMIT relies on a bevy of cases that include benefits coverage disputes under ERISA, Medicare coverage disputes, and constitutional challenges[247]—none of which implicate the *Barton* doctrine and vexatious-litigant concerns that were referenced by the court in the Plan as justifications for the gatekeeping provisions at issue here.

In affirming the Plan's Gatekeeper Provision, the Fifth Circuit stated, "Courts have long recognized bankruptcy courts can perform a gatekeeping function" and noted, by way of example, that "[u]nder the '*Barton* doctrine,' the bankruptcy court may require a party to 'obtain leave of

---

[247] *See Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002) (assessing whether an employee has "a colorable claim to vested benefits" such that the employee may be considered a "participant" under ERISA); *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1129 (5th Cir. 1996) (same); *Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 790 (7th Cir. 1996) (same); *Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods. (In re Deepwater Horizon)*, 732 F.3d 326, 340 (5th Cir. 2013) (holding that claims administrator incorrectly interpreted class settlement agreement by permitting "claimants [with] no colorable legal claim" to receive awards); *Richardson v. United States*, 468 U.S. 317, 326 n.6 (1984) (discussing whether criminal defendant's double jeopardy claim was "colorable" such that it could be appealed before final judgments); *Trippodo v. SP Plus Corp.*, 2021 WL 2446204, at *3 (S.D. Tex. June 15, 2021) (assessing whether plaintiff stated a "colorable claim" against proposed additional defendants in determining whether plaintiff could amend complaint); *Reyes v. Vanmatre*, 2021 WL 5905557, at *3 (S.D. Tex. Dec. 13, 2021) (same); *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 n.15 (5th Cir. 2018) (assessing whether plaintiff raised a "colorable claim" to warrant the district court's exercise of jurisdiction over a Medicare coverage dispute); *Am. Med. Hospice Care, LLC v. Azar*, 2020 WL 9814144, at *5 (W.D. Tex. Dec. 9, 2020) (same); *Harry v. Colvin*, 2013 WL 12174300, at *5 (W.D. Tex. Nov. 6, 2013) (considering whether plaintiff asserted a "colorable constitutional claim" such that the court could exercise jurisdiction); *Sabhari v. Mukasey*, 522 F.3d 842, 844 (8th Cir. 2008) (same); *Stanley v. Gonzales*, 476 F.3d 653, 657 (9th Cir. 2007) (same).

004254

Case 19-34054-sgj11 Doc 4360-38 Filed 08/25/25 Entered 08/25/25 15:49:42 Desc
Case 3:25-cv-01876-K    Document 36-1 Filed 08/25/25 Page 808 of 1195    PageID 10521
Main Exhibit 38 Page 82 of 106 Page 808 of 1195

the bankruptcy court before initiating an action in district court when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity."[248] As noted above, the Fifth Circuit found that the Gatekeeper Provision, which "requires that, before any lawsuit is filed, the plaintiff must seek the bankruptcy court's approval of the claim as 'colorable'"—*i.e.*, to "screen and prevent bad-faith litigation,"—is "sound."[249]

On balance, the court views jurisprudence applying the *Barton* doctrine and vexatious litigant injunctions—while not specifically addressing the "colorability" standard under gatekeeping provisions in a plan[250]—as more informative on how to approach "colorability" than any of the other authorities presented by the parties. One example is *In re VistaCare Group, LLC*.[251]

In *VistaCare*, the Third Circuit noted that, under the *Barton* doctrine, "[a] party seeking leave of court to sue a trustee must make a prima facie case against the trustee, showing that its claim is not without foundation," and emphasized that the "not without foundation" standard, while similar to the standard courts apply in evaluating Rule 12(b)(6) motions to dismiss, "involves a greater degree of flexibility" than a Rule 12(b)(6) motion to dismiss because "the bankruptcy court, which given its familiarity with the underlying facts and the parties, is uniquely situated to determine whether a claim against the trustee has merit," and "is also uniquely situated to determine the potential effect of a judgment against the trustee on the debtor's estate."[252] To satisfy the "*prima facie* case standard," "the movant must do more than meet the liberal notice-pleading

---

[248] *Id.* at 438 (cleaned up).

[249] *Id.* at 435.

[250] The court acknowledges that the *Barton* doctrine itself would not be directly applicable here because HMIT is proposing to bring the Proposed Complaint in the bankruptcy court – the "appointing" court of Seery.

[251] 678 F.3d 218 (3d Cir. 2012).

[252] *Id.* at 232-233 (cleaned up).

004255

requirements of Rule 8."[253] "[I]f the [bankruptcy] court relied on mere notice-pleading standards rather than evaluating the merits of the allegations, the leave requirement would become meaningless."[254] This court agrees with the notion, that "[t]o apply a less stringent standard would eviscerate the protections" of the Gatekeeper Provision and Gatekeeper Orders.[255] The court notes, as well, that courts in the *Barton* doctrine context regularly hold evidentiary hearings on motions for leave to determine if the proposed complaint meets the necessary threshold for pursuing litigation.  The Third Circuit in *VistaCare* noted that "[w]hether to hold a hearing [on a motion for leave to bring suit against a trustee] is within the sound discretion of the bankruptcy court,"[256] and that "the decision whether to grant leave may involve a 'balancing of the interests of all parties involved,'" which will ordinarily require an evidentiary hearing.[257]  The Third Circuit applied "the deferential abuse of discretion standard" in considering whether the bankruptcy court's granting of leave should be affirmed on appeal.[258]

---

[253] *In re World Mktg. Chi., LLC*, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) (cleaned up; collecting cases).

[254] *Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*, 2000 WL 1761020, at *2 (N.D. Ill. Nov. 30, 2000).

[255] *World*, 584 B.R. at 743 (quoting *Leighton*, 2000 WL 1761020, at *2).

[256] *VistaCare*, 678 F.3d at 232 n.12.

[257] *Id.* at 233 (quoting *In re Kashani*, 190 B.R. 875, 886–87 (9th Cir. BAP 1995)).  The Third Circuit noted that the bankruptcy court's holding of an evidentiary hearing on the motion for leave was appropriate (though not required in every case)). *Id.* at 232 n.12.

[258] *Id.* at 224 ("We review a bankruptcy court's decision to grant a motion for leave to sue a trustee under the deferential abuse of discretion standard.") (citing *In re Linton*, 136 F.3d 544, 546 (7th Cir. 1998); *In re Beck Indus., Inc.*, 725 F.2d 880, 889 (2d Cir. 1984)).  Courts of appeal routinely apply the deferential abuse of discretion standard to a bankruptcy court's decision regarding whether leave should be granted to sue a trustee.  Although the Fifth Circuit has not squarely addressed this issue, all nine Circuits that have considered this issue have also adopted an abuse-of-discretion standard. *See In re Bednar*, 2021 WL 1625399, at *3 (B.A.P. 10th Cir. Apr. 27, 2021) ("[T]he Bankruptcy Court's decision to decline leave to sue the Trustee under the *Barton* doctrine is reviewed for abuse of discretion . . . .") (citing *VistaCare*); *SEC v. N. Am. Clearing, Inc.*, 656 F. App'x 969, 973–74 (11th Cir. 2016) ("Although we have never determined the standard of review for a challenge to the denial of a *Barton* motion, other Circuits that have considered the issue review a lower court's ruling on a *Barton* motion for an abuse of discretion.") (citing *VistaCare*); *In re Lupo*, 2014 WL 4653064, at *3 (B.A.P. 1st Cir. Sept. 17, 2014) ("Appellate courts review a bankruptcy court's decision to deny a motion for leave to sue under the abuse of discretion standard.") (citing *VistaCare*); *Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*, 716 F.3d 404, 422 (6th Cir. 2013) (holding that abuse-of-discretion standard applies to *Barton* doctrine); *Alexander v. Hedback*, 718 F.3d 762 (8th Cir. 2013) (applying abuse-of-discretion standard to *Barton* doctrine).

004256

The Fifth Circuit has affirmed a bankruptcy court's conducting of an evidentiary hearing, in the context of applying a *Barton* doctrine analysis as to a proposed lawsuit against a trustee, without any concern that the inquiry was somehow improper.[259]

Similarly, courts in the vexatious litigant context, where there was an injunction requiring a movant to seek leave to pursue claims, have required movants to "show that the claims sought to be asserted have sufficient merit," including that "the proposed filing is both procedural and legally sound," and "that the claims are not brought for any improper purpose, such as harassment."[260] "For a prefiling injunction to have the intended impact, it must not merely require a reviewing official to apply an already existing level of review," such as the "plausibility" standard for a Rule 12(b)(6) motion.[261] Rather, courts apply "an additional layer of review," and "may appropriately deny leave to file when even part of the pleading fails to satisfy the reviewer that it warrants a federal civil action" or that the "litigant's allegations are unlikely," especially "when prior cases have shown the litigant to be untrustworthy or not credible . . . ."[262]

In summary, the court rejects HMIT's positions: (a) that it need only show, at most, that the allegations in the Proposed Complaint are "plausible" under the Rule 12(b)(6) standard for motions to dismiss; and (b) that this court improperly conducted an evidentiary hearing on the Motion for Leave (i.e., that consideration of evidence in this context is impermissible). The court notes, again, that HMIT's argument that this court is not permitted to consider evidence in making its "colorability" determination is completely contradictory to HMIT's actions in filing the Motion

---

[259] *See Howell v. Adler (In re Grodsky)*, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019) (dismissing an action under *Barton* after "a close examination" by the bankruptcy court of the evidence regarding the trustee's actions and finding that "the plaintiffs' allegations are not based in fact"), *aff'd* 799 F. App'x 271 (5th Cir. 2020).

[260] *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex. July 7, 2020) (denying leave to file lawsuit); *see also Silver v. Perez*, 2020 WL 3790489, at *1 (W.D. Tex. July 7, 2020) (same).

[261] *Silver*, 2020 WL 3803922, at *6.

[262] *Id.*

004257

Case 19-34054-sgj11 Doc 4390-38 Filed 08/25/25 Entered 08/25/25 15:59:42 Desc
Case 3:25-cv-01876-K Document 38 Filed 08/25/25 Page 811 of 1195 PageID 10524
Main Exhibit Exhibit Page 92 of 106 Page 811 of 1195 PageID 10524

for Leave, where it attached two Dondero declarations as part of 350 pages of "objective evidence" that "supported" its motion.

The court concludes that the appropriate standard to be applied in making its "colorability" determination in *this* bankruptcy case, in the exercise of its gatekeeping function pursuant to the two Gatekeeper Orders and the Gatekeeper Provision in *this* Plan, is a broader standard than the "plausibility" standard applied to Rule 12(b)(6) motions to dismiss. It is, rather, a standard that involves *an additional level of review*—one that places on the proposed plaintiff a burden of making a prima facie case that its proposed claims are *not without foundation*, are *not without merit*, and are *not being pursued for any improper purpose such as harassment*. Additionally, this court may, and should, take into consideration its *knowledge* of the *bankruptcy proceedings* and *the parties* and any additional evidence presented at the hearing on the Motion for Leave. For ease of reference, the court will refer to this standard of "colorability" as the "Gatekeeper Colorability Test." The court considers this test as a sort of hybrid of what the *Barton* doctrine contemplates and what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place.

2. <u>HMIT's Proposed Complaint Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test or Even Under a Rule 12(b)(6) "Plausibility" Standard.</u>

The court finds, in the exercise of its gatekeeping function under the Gatekeeper Orders and the Gatekeeping Provision in the Plan, that the Motion for Leave should be denied as the claims set forth in the Proposed Complaint are not "colorable" claims. The court makes this determination after considering evidence admitted at the June 8 Hearing, including the testimony of Dondero, Patrick, and Seery, and the numerous exhibits offered by HMIT and the Highland Parties. HMIT's Proposed Claims lack foundation, are without merit, and appear to be motivated by the improper purposes of vexatiousness and harassment. But, even under the less stringent

"plausibility" standard under Rule 12(b)(6) motions to dismiss, where all allegations must be accepted as true, HMIT's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," fail to "[]cross the line from conceivable to plausible."[263]

HMIT makes unsubstantiated and conclusory allegations in its Motion for Leave and Proposed Complaint that the Claims Purchasers purchased the large allowed unsecured claims only because Seery, while he was CEO of Highland prior to the Effective Date of the Plan, provided them with MNPI and assurances that the Purchased Claims were very valuable. This was allegedly in exchange for their agreement to approve, in their future capacities as members of the CTOB, excessive compensation for Seery in his capacity as the Claimant Trustee after the Effective Date of the Plan. This was an alleged *quid pro quo* that HMIT claims establishes Seery's breach of fiduciary duties and the Claims Purchasers' conspiracy to participate in that breach. As discussed below, these allegations are unsubstantiated and conclusory allegations, and they do not support the inferences that HMIT needs the court to make when it analyzes whether the Proposed Claims are "colorable"—or even merely plausible.

> a) HMIT's Proposed Breach of Fiduciary Duties Claim Set Forth in Count I of the Proposed Complaint

Based on HMIT's Proposed Complaint and the evidence admitted at the June 8 Hearing, the court finds that HMIT has not pleaded facts that would support a "colorable" breach of fiduciary duties claim against Seery, under this court's Gatekeeper Colorability Test, nor a plausible claim pursuant to the Rule 12(b) standard. HMIT alleges that Seery breached his fiduciary duties (i) "[b]y disclosing material non-public information to Stonehill and Farallon"

---

[263] *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

004259

Case 19-34054-sgj11 Doc 4286-38 Filed 08/25/25 Entered 08/25/25 15:59:42 Desc
Case 3:25-cv-01876-K    Document 38 Filed 05/30/25 Page 813 of 1195    PageID 10526
Main Exhibit 38 Page 92 of 106 Page 813 of 1195    PageID 10526

before their purchase of certain Highland claims, and (ii) by receiving "compensation paid to him under the terms of the [CTA] since the Effective Date of the Plan in August 2021."[264]

As earlier noted, both the Reorganized Debtor and the Claimant Trust are organized under Delaware law and, thus, its proposed Count I against Seery for breach of fiduciary duties to these entities is governed by Delaware law under the "Internal Affairs Doctrine."[265]  Under Delaware law, "[t]o bring a claim for breach of fiduciary duty, a plaintiff must allege '(1) that a fiduciary duty existed and (2) that the defendant breached that duty.'"[266]  HMIT fails to plausibly or sufficiently allege either element such that its breach of fiduciary duty claims against Seery could survive.

Under Delaware law, officers and directors generally owe fiduciary duties only to the entity and its stakeholders as a whole, not to individual shareholders.[267] Because Seery did not owe any "duty" to HMIT directly and individually, the Proposed Complaint fails to state a claim for breach of fiduciary duties to HMIT.  HMIT's "legal conclusion[]" that Seery "owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate"[268] "do[es] not suffice" to plausibly allege the existence of any actionable fiduciary relationship.[269]  And as discussed earlier in the standing section, HMIT does not have standing to assert a breach of fiduciary claim derivatively on behalf

---

[264] Proposed Complaint ¶¶ 64–67.

[265] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[266] *Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *30 (N.D. Tex. Apr. 15, 2020) (quoting *Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*, 2020 WL 967942, at *8 (Del. Ch. Feb. 28, 2020)).

[267] *See Gilbert v El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups.") *aff'd*, 575 A.2d 1131 (Del. 1990); *Klaassen v Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) (same).

[268] Proposed Complaint ¶ 63.

[269] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

004260

of the Claimant Trust or Reorganized Debtor. But even if HMIT had sufficiently alleged the existence of a fiduciary duty by Seery to HMIT—or to the Reorganized Debtor or Claimant Trust that HMIT would have standing to assert—Seery's alleged communications with Farallon would not have breached those duties.

HMIT alleges that Seery ""disclose[d] material non-public information to Stonehill and Farallon," and they "acted on inside information and Seery's secret assurances of great profits."[270] But the Proposed Complaint does not make any factual allegations regarding HMIT's "conclusory allegations," and its "legal conclusions" are "purely speculative, devoid of factual support," and therefore "stop[] short of the line between possibility and plausibility of entitlement to relief"[271] (and certainly stop short of being "colorable"). HMIT never alleges when any of these purported communications occurred, what material non-public information Seery provided, and what "assurances of great profits" he made to Farallon or to Stonehill. At the June 8 Hearing, Dondero could only clarify that he believed the MGM Email to have been MNPI and that he **believed** that Seery **must have** communicated that MNPI to Farallon at some point between December 17, 2020 (the date the MGM Email was sent) and May 28, 2021 (the day that Dondero alleges to have had three telephone calls with representatives of Farallon, Messrs. Patel and Linn, regarding Farallon's purchase of the bankruptcy claims). Dondero alleges that, during these phone calls, Patel and Linn gave Dondero no reason for their purchase of the claims that "made [any] sense." Dondero and Patrick also both testified that neither of them had any personal knowledge: (a) of a *quid pro quo* arrangement between Seery and the Claims Purchasers, (b) of Seery having actually communicated any information from the MGM Email to Farallon, or (c) whether Seery's post-Effective Date compensation had or had not been negotiated in an arms' length transaction. Dondero only

---

[270] Proposed Complaint ¶¶ 3, 64; *see also id.* ¶¶ 13–14, 40, 47, 50.
[271] *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 367, 386 (Bankr. N.D. Tex. 2011) (cleaned up).

004261

speculates regarding these things, because it "made no sense" to him that the Claims Purchasers would have acquired the bankruptcy claims without having received the MNPI. But HMIT admits in the Proposed Complaint that Farallon and Stonehill purchased the Highland claims at discounts of 43% to 65% to their allowed amounts. Thus, they would receive at least an 18% return based on publicly available estimates in Highland's court-approved Disclosure Statement.[272] The evidence established that, if the acquisition of the UBS claims is excluded—recall that the UBS claims were not purchased until August 2021, which was after the May 28, 2021 phones calls that Dondero made to Farallon personnel—the Claims Purchasers would have expected to net over $33 million in profits, or nearly a 30% return on their investment, had Highland met its projections (this is based on the aggregate purchase price of $113 million for the non-UBS claims purchased in the Spring 2021).

To be clear, the only purported MNPI identified in HMIT's Proposed Complaint was the MGM Email Dondero sent to Seery containing "information regarding Amazon and Apple's interest in acquiring MGM." But, the evidence showed that this information was widely reported in the financial press at the time. Thus, it could not have constituted MNPI as a matter of law.[273] Moreover, the evidence showed that Dondero **did not** communicate in the MGM Email the actual inside information that he claimed to have obtained as a board member of MGM–which was that Amazon had met MGM's "strike price" and that the MGM board was going into exclusive negotiations with Amazon to culminate the merger with them (and, thus, Apple was no longer considered a potential purchaser). Dondero admitted that he included Apple in the MGM Email for the purpose of making it look like there was a competitive process still ongoing. In other

---

[272] Proposed Complaint ¶¶ 3, 37, 42.

[273] *See, e.g.*, *SEC v. Cuban*, 2013 WL 791405, at *10–11 (N.D. Tex. Mar. 5, 2013) (holding that information is not "material, nonpublic information" and "'becomes public when disclosed to achieve a broad dissemination to the investing public'") (quoting *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997)).

words, the MGM Email, at the very least, did not include MNPI and, at worst, was deceptive regarding the status of the negotiations between MGM and potential purchasers.

As to HMIT's allegations that Seery's post-Effective Date compensation is "excessive" and that the negotiations between Seery and the CTOB "were not arm's-length,"[274] the evidence at the June 8 Hearing reflected that the allegations are completely speculative, without any foundation whatsoever, and lack merit. And they are also simply not plausible. HMIT fails to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty.[275]

    b)   HMIT's Proposed Claims Set Forth in Counts II (Knowing Participation in Breach of Fiduciaries) and III (Conspiracy)

HMIT seeks to hold the Claims Purchasers secondarily liable for Seery's alleged breach of fiduciaries duties on an aiding and abetting theory in Count II of the Proposed Complaint[276] and, along with Seery, on a civil conspiracy theory of liability in Count III of the Proposed Complaint.[277] Because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting breach of fiduciary duties claim against the Claims Purchasers (Count II) is also governed by Delaware law.[278] HMIT's conspiracy cause of action against the Claims

---

[274] Proposed Complaint ¶¶ 4, 13, 54, 74.

[275] *See Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (dismissing claim for breach of duty of loyalty against a director where "conclusory allegations" failed to give rise to inference that director failed to perform fiduciary duties); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing claim for breach of fiduciary duty where "[a]though the complaint makes the conclusory allegation that the defendants breached their duty of disclosure in a 'bad faith and knowing manner,' no facts pled in the complaint buttress that accusation.").

[276] Proposed Complaint ¶¶ 69-74.

[277] Proposed Complaint ¶¶ 75-81.

[278] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

004263

Case 19-34054-sgj11 Doc 4306-38 Filed 08/25/25 Entered 08/25/25 15:49:42 Desc
Case 3:25-cv-01876-K    Document 36 Filed 09/02/25 Page 817 of 1195    PageID 10530
Main Exhibit 38 Page 92 of 106 Page 817 of 1195

Purchasers and Seery (Count III), on the other hand, does not involve a matter of "internal affairs" or of corporate governance, so it is governed by Texas law under the Plan.[279]

As an initial matter, because HMIT does not present either a "colorable"—or even plausible claim—that Seery breached his fiduciary duties, it cannot show that it has alleged a "colorable" or plausible claim for secondary liability for the same alleged wrongdoing.[280]  In addition, HMIT's civil conspiracy claim against the Claims Purchasers and Seery is based entirely on Dondero's speculation and unsupported inferences and, thus, HMIT has not "colorably" alleged, or even plausibly alleged, its conspiracy claim.  Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort."[281] "[T]he elements of civil conspiracy [are] "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."[282]   While HMIT alleges that "Defendants conspired with each other to unlawfully breach fiduciary duties,"[283] it is simply a "legal conclusion" and not the kind of allegation that the court must assume to be true even for purposes of determining plausibility under a motion to dismiss.[284]

---

[279] *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M)(which provides for the application of Texas law to "the rights and obligations arising under this Plan" except for "corporate governance matters.")

[280] *See English v. Narang*, 2019 WL 1300855, at *14 (Del. Ch. Mar. 20, 2019) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.") (cleaned up; collecting cases); *Hill v. Keliher*, 2022 WL 213978, at *10 (Tex. App. Jan. 25, 2022) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.") (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).  Because HMIT's breach of fiduciary duty claim is governed by Delaware law, its aiding and abetting theory of liability is also governed by Delaware law. *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas). By contrast, "conspiracy is not an internal affair" or a matter of corporate governance, so it is governed by Texas law under the Plan. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M).

[281] *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).

[282] *Id.* at 141 (cleaned up).

[283] Proposed Complaint ¶ 76.

[284] *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 555 U.S. at 565–66).

HMIT repeats four times that Seery provided MNPI to Farallon and Stonehill as a "as a *quid pro quo*" for "additional compensation,"[285] each time based upon conclusory allegations based "upon information and belief" and, frankly, pure speculation from Dondero that his imagined "scheme," "covert *quid pro quo*," and secret "conspiracy" between Seery, on the one hand, and Farallon and Stonehill, on the other,[286] **must have** occurred because "[i]t made no sense for the [Claims] Purchasers to invest millions of dollars for assets that – per the publicly available information – did not offer a sufficient potential profit to justify the publicly disclosed risk" (i.e., "[t]he counter-intuitive nature of the purchases at issue compels the conclusion that the [Claims] Purchasers acted on inside information and Seery's assurance of great profits.")[287]  Importantly, HMIT admits that the Claims Purchasers would have turned a profit based on the information available to them at the time of their acquisitions of the Purchased Claims.[288]  HMIT's allegations about the level of potential profits were contradicted by their own allegations and other evidence admitted at the June 8 Hearing. But Dondero's speculation about what level of projected return would be sufficient to justify the acquisition of the claims by the Claims Purchasers, or any other third-party investor, does not give rise to a plausible inference that they acted improperly.[289]  Thus, HMIT cannot meet

---

[285] Proposed Complaint ¶ 77; *see also id.* ¶¶ 4, 47, 74.

[286] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the other Defendants with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims.").

[287] *Id.*

[288] *See, e.g., id.* ¶ 3 (alleging that acquiring the claims "did not offer a **sufficient** potential profit to justify the publicly disclosed risk")(emphasis added); ¶ 43 ("Furthermore, although the publicly available projections suggested only a small margin of error on any profit potential for its significant investment . . . ."); ¶ 49 ("Yet, in this case, it would have been *impossible* for Stonehill and Farallon (in the absence of inside information) to forecast *any* **significant** profit at the time of their multi-million-dollar investments given the publicly available, negative financial information.") (third emphasis added).

[289] In fact, the court did not allow Mr. Dondero to testify regarding what kind of information a hypothetical investor in bankruptcy claims would require or what level of potential profits would justify the purchase of bankruptcy claims by investors in the bankruptcy claims trading market because he was testifying as a fact witness, not an expert.  Thus, the court only allowed Dondero to testify as to what data **he** (or entities he controls or controlled) would rely on, what **his** risk tolerance would have been, and what level of potential profits **he** would have required to purchase an allowed unsecured bankruptcy claim in a post-confirmation situation. June 8 Hearing Transcript, 129:6-130:4.

004265

its burden, under the Gatekeeper Colorability Test, of making a prima facie showing that its allegations do not lack foundation or merit. Nor can it meet a plausibility standard.

In addition, contrary to the Proposed Complaint's statement that it would have been "***impossible*** for Stonehill and Farallon (in the absence of insider information) to forecast ***any*** significant profit at the time of their multi-million-dollar investments," the evidence showed there were already reports in the financial press that MGM was engaging with Amazon, Apple, and others in selling its media portfolio, and thus the prospect of an MGM transaction increasing the value of, and return on, the Purchased Claims, "at the time of their multi-million-dollar investments" was publicly available information.[290] HMIT's suggestion that the Claims Purchasers were in possession of inside information not publicly available when they acquired the Purchased Claims is simply not plausible. Nor is HMIT's allegation that "[u]pon information and belief" Farallon "conducted no due diligence but relied on Seery's profit guarantees" plausible. The allegations regarding Farallon not conducting any due diligence are based, again, entirely on Dondero's speculation and inferences he made from what Patel and Linn (of Farallon) allegedly told him on May 28, 2021; Dondero did not testify that either Patel or Linn ever told him specifically that they had conducted no due diligence. HMIT's allegations in the Proposed Complaint that ***Farallon*** "conducted no due diligence," are based on Dondero's speculation, unsubstantiated, and contradicted by the testimony of Seery, who testified that emails to him from Linn in June 2020 and later in January 2021 indicated to him that Farallon, at least, had been conducting some level of due diligence in that they had been following and paying attention to the

---

[290] The court notes, as well, that the Claim Purchasers acquired the UBS claims in August 2021—approximately two and a half months *after* the announcement of the MGM-Amazon transaction (which was on May 26, 2021)—a fact that HMIT makes no attempt to harmonize with its conspiracy theory that the Claims Purchasers profited from the misuse of MNPI allegedly given to them by Seery.

Highland case.[291]  In addition, there are no allegations in the Proposed Complaint regarding whether Stonehill conducted due diligence or not, and Patrick testified that neither he nor HMIT had any personal knowledge of how much due diligence Farallon or Stonehill did prior to acquiring the Purchased Claims.[292]  The court finds and concludes that HMIT's allegations of aiding and abetting and conspiracy in Counts II and III of the Proposed Complaint are based on unsubstantiated inferences and speculation, lack internal consistency, and lack consistency with verifiable public facts.  Accordingly, HMIT has failed to show that these claims have a foundation and merit and has also failed to show that they are plausible.

     c)  HMIT's Proposed Claims Set Forth in Counts IV (Equitable Disallowance), V (Unjust Enrichment and Constructive Trust), and VI (Declaratory Relief) of the Proposed Complaint

     i.  Count IV (Equitable Disallowance).

In Count IV of its Proposed Complaint, HMIT seeks "equitable disallowance" of the claims acquired by Farallon's and Stonehill's special purpose entities Muck and Jessup, "to the extent over and above their initial investment," and, in the alternative, equitable subordination of their claims to all claims and interests, including HMIT's unvested Class 10 Contingent Claimant Trust Interest, "given [their] willful, inequitable, bad faith conduct" of allegedly "purchasing the Claims based on material non-public information" and being "unfairly advantaged" in "earning significant profits on their purchases."[293]  As noted above, these remedies are not available to HMIT.[294]

First, HMIT's request to equitably subordinate the Purchased Claims to all claims and interests is not permitted because Bankruptcy Code § 510(c), by its terms, permits equitable

---

[291] *See* June 8 Hearing Transcript, 239:6-21.

[292] *See id.*, 310:19-312:2.

[293] Proposed Complaint ¶¶ 83-87.

[294] *See infra* pages 74-75.

004267

subordination of a *claim to other claims* or an *interest to other interests* but does not permit equitable subordination of a *claim to interests*.

Second, "equitable" disallowance of claims is not an available remedy in the Fifth Circuit pursuant to the *Mobile Steel* case.[295]

Third, reconsideration of an already-allowed claim in a bankruptcy case can only be accomplished through Bankruptcy Code § 502(j), which, pursuant to Federal Rule of Bankruptcy Procedure 9024, allows reconsideration of allowance of a claim that was allowed following *a contest* (which is certainly the case with respect to the Purchased Claims) based on the "equities of the case." But this is only if the request for reconsideration is made within the one-year limitation prescribed in Rule 60(c) of the Federal Rules of Civil Procedure. HMIT's request for disallowance of Muck and Jessup's Purchased Claims (if it could somehow be construed as a request for reconsideration of their claims), is clearly untimely, as it is being made well beyond a year since their allowance by this court following contests and approval of Rule 9019 settlements. Thus, the court finds that HMIT has not alleged a colorable or even plausible claim in Count IV of the Proposed Complaint and, therefore, the Motion for Leave should be denied.

    ii.    Count V (Unjust Enrichment and Constructive Trust)

In Count V of the Proposed Complaint, HMIT alleges that, "by acquiring the Claims using [MNPI], Stonehill and Farallon were unjustly enriched and gained an undue advantage over other creditors and former equity" and that "[a]llowing [the Claims Purchasers] to retain their ill-gotten benefits would be unconscionable;" thus, HMIT alleges, the Claims Purchasers "should be forced to disgorge all distributions over and above their original investment in the Claims as restitution for their unjust enrichment" and "a constructive trust should be imposed on such proceeds . . . ."[296]

---

[295] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).
[296] Proposed Complaint ¶¶ 89-93.

004268

HMIT alleges further that "Seery was also unjustly enriched by his participation in this scheme and he should be required to disgorge or restitute all compensation he has received from the outset of his collusive activities" and "[a]lternatively he should be required to disgorge and restitute all compensation received since the Effective Date" over which a constructive trust should be imposed.[297]  HMIT has not alleged a colorable or even a plausible claim for unjust enrichment or constructive trust in Count V.

Under Texas law,[298] "[u]njust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay."[299]  Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory."[300]  Here, as noted above, HMIT's only alleged injury is a diminution of the value of its unvested Contingent Claimant Trust Interest by virtue of Seery's allegedly having wrongfully obtained excessive compensation, with the help of the Claims Purchasers.  *Yet Seery's compensation is governed by express agreements* (i.e., the Plan and the CTA).  Thus, HMIT's claim based on unjust enrichment is not an available theory of recovery.

   iii.   Count VI (Declaratory Relief)

HMIT seeks declaratory relief in Count VI of the Proposed Complaint, essentially, that Dondero's conspiracy theory is correct and that HMIT's would succeed on the merits with respect

---

[297] *Id.* ¶ 94.

[298] Under the Plan, Texas law governs HMIT's "claim" for unjust enrichment because it is not a "corporate governance matter." (Plan Art. XII.M.) It also governs HMIT's "claim" for constructive trust, which "is merely a remedy used to grant relief on the underlying cause of action." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013).

[299] *Taylor v. Trevino*, 569 F. Supp. 3d 414, 435 (N.D. Tex. 2021) (cleaned up); *see also Yowell v. Granite Operating Co.*, 630 S.W.3d 566, 578 (Tex. App. 2021) (same).

[300] *Taylor*, 569 F. Supp. 3d at 435 (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)).

004269

to the Proposed Claims if it were permitted leave to bring them in an adversary proceeding.[301]  But, a request for declaratory relief is not "an independent cause of action"[302] and "in the absence of any underlying viable claims such relief is unavailable."[303]  This court has already found and concluded that HMIT would not have constitutional or prudential standing to bring the underlying causes of action in the Proposed Complaint.  This court has also found and concluded that all of the Proposed Claims are without foundation or merit *2 and are not even plausible and are all; being brought for the improper purpose of continuing Dondero's vexatious, harassing, bad-faith litigation.  Thus, HMIT would not be entitled to pursue declaratory judgement relief as requested in Count VI of the Proposed Complaint.

### d)  HMIT Has No Basis to Seek Punitive Damages

HMIT separately alleges that the Claims Purchasers' and Seery's "misconduct was intentional, knowing, willful, in bad faith, fraudulent, and in total disregard of the rights of others," thus entitling HMIT to an award of punitive damages under applicable law.  But, HMIT abandoned its proposed fraud claim that was in its Original Proposed Complaint, so its sole claim for primary liability is Seery's alleged breach of his fiduciary duties.  And under Delaware law, the "court cannot award punitive damages in [a] fiduciary duty action."[304]

---

[301] Proposed Complaint ¶¶ 96-99.

[302] *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 932 (5th Cir. 2023).

[303] *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) (citing *Collin Cty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170–71 (5th Cir. 1990)); *see also Hopkins v. Cornerstone Am.*

[304] *Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*, 539 B.R. 31, 52 (S.D.N.Y. 2015) (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006)), *aff'd* 682 F. App'x 24 (2d Cir. 2017).

004270

3. **HMIT Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test Because It Seeks to Bring the Proposed Complaint for Improper Purposes of Harassment and Bad-Faith, Vexatiousness.**

Under this court's Gatekeeper Colorability Test, in addition to showing that its allegations and claims are not without foundation or merit, HMIT must also show that the Proposed Claims are not being brought for any improper purpose. Taking into consideration the court's knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, the court finds that HMIT is acting at the behest of, and under the control or influence of, Dondero in continuing to pursue harassing, bad faith, vexatious litigation to achieve his desired result in these bankruptcy proceedings. So, in addition to failing to show that its Proposed Claims have foundation and merit, HMIT cannot show that it is pursuing the Proposed Claims for a proper purpose and, thus, cannot meet the requirements under the Gatekeeper Colorability Test; HMIT's Motion for Leave should be denied.

## IV. CONCLUSION

The court concludes, having taken into consideration both its knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, that HMIT's Motion for Leave should be denied for three independent reasons: (1) HMIT would lack constitutional standing to bring the Proposed Claims (and, thus, the federal courts would lack subject matter jurisdiction over the Proposed Claims); (2) even if HMIT would have constitutional standing to pursue the Proposed Claims, it would lack prudential standing to bring the Proposed Claims; and (3) even if HMIT would have both constitutional standing and prudential standing to bring the Proposed Claims, it has not met its burden under the Gatekeeper Colorability Test of showing that its Proposed Claims are "colorable" claims—that the Proposed Claims are not without foundation, not without merit, and not being pursued for an improper purpose. Moreover,

004271

even if this court's Gatekeeper Colorability Test should be replaced with a Rule 12(b)(6) "plausibility" standard, the Proposed Claims are not plausible.

Accordingly,

**IT IS ORDERED** that HMIT's Motion for Leave be, and hereby is **DENIED**.

### ###End of Memorandum Opinion and Order###

# Exhibit 39

004273

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND EMPLOYEE RETENTION ASSETS LLC | § § § § | |
| *Plaintiff,* | § § | Civil Action No. |
| v. | § § | |
| JAMES DONDERO, MARK OKADA, MARK KATZ, MICHAEL HURST, SHONN BROWN, SCOTT ELLINGTON, ISAAC LEVENTON, ERIC GIRARD, JOHN HONIS, TED DAMERIS, RAYMOND JOSEPH DOUGHERTY, AMIT WALIA, PATRICK BOYCE, LANE BRITAIN, FRANK WATERHOUSE, BRIAN COLLINS, HUNTON ANDREWS KURTH LLP, ABRAMS & BAYLISS LLP, DLA PIPER LLP, NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; JOHN HONIS, AS TRUSTEE OF HUNTER MOUNTAIN INVESTMENT TRUST; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| *Defendants.* | § § | |

## PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Plaintiff Highland Employee Retention Assets LLC ("Plaintiff" or "Highland Employee Vessel") complaining of James Dondero ("Dondero"), Mark Okada ("Okada"), Marc Katz/HAK/DLAP ("Katz/HAK/DLAP"),  Michael Hurst ("Hurst"), Shonn

Brown ("Brown"), Scott Ellington ("Ellington"), Isaac Leventon ("Leventon"), Eric Girard ("Girard"),  John Honis ("Honis"), Ted Dameris ("Dameris"), Raymond Joseph Dougherty ("Dougherty"), Patrick Boyce ("Boyce"), Lane Britain ("Britain"), Frank Waterhouse ("Waterhouse"), Brian Collins ("Collins"), Hunton Andrews Kurth LLP ("Hunton Andrews Kurth"),  Abrams & Bayliss LLP, ("Abrams & Bayliss") DLA Piper, LLP ("DLA Piper") Nancy Dondero, As Trustee Of Dugaboy Investment Trust "Dugaboy Trust"); Grant James Scott III, As Trustee Of Get Good Trust ("Get Good Trust");  John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") referred to collectively as Defendants, and for cause of action would respectfully show the Court as follows:

## I.
## PARTIES

1.    Plaintiff Highland Employee Retention Assets, LLC ("Plaintiff" or "Highland Employee Vessel") is a Delaware limited liability company with its principal place of business in Dallas, Texas.

2.    Defendant Dondero is an individual who resides in Dallas County Texas and has made an appearance through counsel.

3.    Defendant Okada is an individual who resides in Dallas County Texas and has made an appearance through counsel.

4.    Defendant Katz is an individual who resides in Dallas County Texas and has made an appearance through counsel. [we need to break DLAP out separately].

5.    Defendant Hurst is an individual who resides in Dallas County Texas and has made an appearance through counsel.

6.    Defendant Brown is an individual who resides in Dallas County Texas and has

made an appearance through counsel.

7.    Defendant Ellington is an individual who resides in Dallas County Texas and has made an appearance through counsel.

8.    Defendant Leventon is an individual who resides in Dallas County Texas and has made an appearance through counsel.

9.    Defendant Girard is an individual who resides in Tarrant County Texas and has made an appearance through counsel.

10.    Defendant Honis is an individual who resides in Florida and has made an appearance through counsel.

11.    Defendant Dameris is an individual who resides in Dallas County Texas and has made an appearance through counsel.

12.    Defendant Dougherty is an individual who resides in Ada, Oklahoma and has made an appearance through counsel.

13.    Defendant Boyce is an who resides in Montgomery County Texas and may be served with process where he resides at 9651 Crestwater Circle, Montgomery, Texas, 77354.

14.    Defendant Britain is an individual who resides in Dallas County Texas and has made an appearance through counsel.

15.    Defendant Waterhouse is an individual who resides in Collin County Texas and has made an appearance through counsel.

16.    Defendant Collins is an individual who resides in Dallas County Texas and has made an appearance through counsel.

17.    Defendant Hunton Andrews Kurth LLP has made an appearance through counsel.

18.    Defendant Abrams & Bayliss LLP is a partnership established under the laws of Delaware and has made an appearance through counsel.

19.    Defendant DLA Piper LLP is a partnership established under the laws of

Maryland and has made an appearance through counsel.

20.     Defendant Honis is named in his capacity as Trustee of Hunter Mountain
Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state
of Delaware and has made an appearance through counsel.

21.     Defendant Nancy Dondero as Trustee of Dugaboy Investment Trust ("Dugaboy
Trust") is a statutory trust established under the laws of the state of Delaware and has made an
appearance through counsel.

22.     Defendant Lawrence Tonomura as Trustee of Mark & Pamela Okada Family
Trust – Exempt Trust #1 ("Okada Trust #1") that was created under the laws of the state of
Texas. Okada controls Okada Trust #1 and has made an appearance through counsel.

23.     Defendant Lawrence Tonomura as Trustee of Mark & Pamela Okada Family
Trust – Exempt Trust #2 ("Okada Trust #2") that was created under the laws of the state of
Texas and has made an appearance through counsel.

24.     Defendant Grant James Scott III as Trustee of the Get Good Trust that was
created under the laws of the state of Texas and has made an appearance through counsel.

## II.
## JURISDICTION

25.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because it
involves a federal question.

## III.
## VENUE

26.     Venue for this action is predicated upon 28 U.S.C. §1391(a)(2) and 28 U.S.C.
§1391(b)(1) and (2).

## IV.
## FACTUAL BACKGROUND

### A.  The Tortured History of Dondero, Okada, Ellington, and The Defendant Minions

27.     Dondero and Okada co-founded Highland Capital Management, LP ("Highland

Capital") in 1993 and, with the Defendant Trusts, were its primary owners until it emerged from bankruptcy in August 2021. Highland Capital is an investment advisor registered with the SEC under the Investment Company Act of 1940 that managed billions of dollars of assets through its structure of approximately 2,000 separate business entities. Plaintiff was one of those entities.

28.     Dondero was President and Chief Executive Officer of Highland Capital was a "Key Man" manager of Plaintiffs most valuable investment, Restoration Capital Partners, LP. until his removal in 2020.

29.     Okada was Chief Investment Officer and Executive Vice President until Highland Capital filed for bankruptcy in October 2019. He also was defined as a "Key Man" manager of Plaintiffs most valuable investment, Restoration Capital Partners, LP. He managed the investor relations department of Highland Capital where he orchestrated his stated strategy to manipulate "perception over reality."

30.     Ellington served in various roles as a partner and Highland Capital's Chief Legal Officer and General Counsel from 2010 until he was fired for cause in January 2021 for acting in a manner adverse to Highland Capital's interest.

31.     Leventon served as Assistant General Counsel at Highland from 2009 until he was fired for cause in January 2021 for acting in a manner adverse to Highland Capital's interest.

32.     Thomas Surgent ("Surgent") served as Chief Compliance Officer and Deputy General Counsel of Highland Capital from 2011 through the Highland Capital bankruptcy and has served as Highland Capital's General Counsel since it emerged from bankruptcy in August 2021.

33.     Girard served as internal counsel at Highland Capital from 2011 until he was terminated in 2017.

34.     Hurst was a partner at his former firm, Gruber Hurst Johansen Hail Shank LLP, and is currently a partner at Lynn Pinker Gruber & Schwegmann where he served as outside

counsel to Plaintiff until he was fired by Highland Capital's new management team in 2020 for insubordination and unprofessional misconduct.

35.     Brown was a partner at her former firms, Gruber Hurst Johansen Hail Shank LLP, and Lynn Pinker Gruber & Schwegmann where she served as outside counsel to Plaintiff.

36.     Katz was a partner at his former firm, Hunton Andrews Kurth, and is now at DLA Piper[1], where he served as outside counsel to Plaintiff and Highland Capital.

37.     Jeff Abrams ("Abrams"), Matt Miller ("Miller") and Stephen Hough ("Hough") were attorneys at Abrams & Bayliss and served as outside counsel to Plaintiff.

38.     Dameris was a board member of Plaintiff and served as a Managing Director at Highland Capital.

39.     Boyce was a board member of Plaintiff and was a Partner at Highland Capital. He also served as Head of Private Equity for Plaintiff's limited partnership interests including Plaintiffs most valuable investment, Restoration Capital Partners, LP. from late 2011 until his termination from Highland Capital in 2014.

40.     Britain was a board member of Plaintiff and was a Partner at Highland Capital.

41.     Honis was a board member of Plaintiff, Partner of Highland Capital, and trustee to Hunter Mountain. He also was a "Key Man" manager of Plaintiffs most valuable investment, Restoration Capital Partners, LP.

42.     Walia was a board member of Plaintiff and was a Partner at Highland Capital.

43.      Dougherty was a board member of Plaintiff and was a Partner at Highland Capital.

44.     Trey Parker ("Parker") was Co-Chief Investment Officer with Okada at Highland Capital and Head of Private Equity after Boyce for Plaintiff's limited partnership investments

---

[1] Throughout this petition Plaintiff will refer to Katz, Hunton Andrews Kurth and DLA Piper collectively as ("Katz/HAK/DLAP, except where DLAP is identified separately")

including Plaintiff's most valuable investment, Restoration Capital Partners, LP. He was also named Partner at Highland Capital in 2015.

45.    Waterhouse was the Chief Financial Officer at Highland Capital until he was terminated in 2021.

46.    Collins was the Head of Human Resources at Highland Capital until he was terminated in 2021 and was the primary agent to implement and execute actions on behalf of the board for Plaintiff as well as lead its investor communications, document custody, governance solicitation and Highland Capital's buyout offer solicitation.

47.    David Klos ("Klos") was a senior accountant at Highland Capital that was responsible for the management of Plaintiff's accounting records. He has been the Chief Financial Officer at Highland Capital since its emergence from bankruptcy in August 2021.

48.    Rick Swadley ("Swadley") was a senior tax director at Highland Capital that was responsible for the management of Plaintiff's tax records until he was terminated in 2021.

49.    Dugaboy, Get Good, the Okada Trusts and Hunter Mountain are trusts established by Dondero and Okada for the benefit of themselves and their family members.

50.    Dondero and Okada, with Boyce, Parker, Ellington, Leventon, Girard, Surgent, Hurst, Katz/HAK/DLAP, Waterhouse, Klos and Swadley at their side, controlled Highland Capital and its byzantine web of funds and other entities under its management with unilateral and unfettered discretion for years. They ensured that Highland Capital and its affiliates routinely failed to observe corporate formalities with respect to their personnel, corporate governance, internal systems, legal affairs, and considerable assets.

51.    In September 2008, Highland Capital took a dramatic turn for the worse because of Dondero and Okada's mismanagement and self-dealing during the financial crisis. Highland Capital defaulted on its credit facility, prompting its lenders to demand a forensic accounting review of missing cash and assets. The audit revealed that Dondero and Okada had siphoned tens

of millions of dollars out of Highland Capital's accounts, while leaving creditors and employees with insufficient resources to collect what was owed to them. A multitude of lawsuits were filed over a ten-year period against Dondero and his trusts, Okada and his trust, Ellington, Leventon, and their affiliates as they became embroiled in litigation on allegations of fraud, breach of fiduciary duty, breach of good faith and fair dealing, willful misconduct, fraudulent transfers, money laundering, and wire fraud that resulted in verdicts of over one billion dollars in damages against them or their affiliates.

52.   The lenders initially demanded that the cash be returned immediately to which Dondero threatened, "Highland will fail before I fail!" Following months of difficult negotiations, the lenders agreed to an extension of the credit facility in exchange for strict repayment terms and a security interest in over $125 million of Highland Capital's remaining assets. In addition, the lenders agreed to allow for the creation of a vessel to set aside assets for the purpose of retaining and incentivizing employees – this entity is Plaintiff. Importantly, the assets were transferred to Plaintiff in exchange for deferred compensation assets that were terminated as a result of the security interests taken by the lenders. Dondero, Okada and their affiliates were intentionally forbidden from participating as preferred unit holders in Plaintiff.

53.   Plaintiff has never had employees and at all times depended on its board of directors, legal counsel, managers, service providers, and its investment advisors to conduct its affairs. Highland employees, including Dondero, Okada, Parker, Ellington, Leventon, Girard, Surgent, Collins, Hellen Kim, Waterhouse, Swadley, and Klos performed investment management, legal, accounting, and tax services to Plaintiff under Shared Services and Blanket Agreements. Dondero and Okada resented the cost of Plaintiff.

54.   Okada often demonstrated his contempt for Highland Capital employees, routinely lambasting them and referring to Hispanics as "spics" and "wetbacks," Jews as "Jesus Killers," and Caucasians as "dumb white people that all look the same." He would flaunt his belief

that he could "do whatever I want because I'm in a protected class," while bragging about the Japanese surprise attack on Pearl Harbor. Okada also exposed himself in the nude at company events, groped women in the office through simulated intercourse, and physically assaulted employees as his self-proclaimed alter ego, "Thor."

## B. Daugherty Resigns from Highland Capital and is Removed as Director of Plaintiff

55.     Patrick Daugherty ("Daugherty") was a partner, officer, director, Head of Private Equity, and Co-Head of Research for Highland Capital and certain of its affiliates from 1998 until 2011. Daugherty resigned from Highland Capital on September 28, 2011, because he refused to participate in the conduct at Highland Capital that would later result in over a billion dollars in damage awards to investors and creditors for breach of fiduciary duty, willful misconduct, and fraud, among other causes of action. Indeed, Dondero, Okada, Ellington, Leventon, Katz/HAK/DLAP, Hurst and Brown would later pursue legal actions on behalf of Highland Capital against Daugherty to whitewash willful misconduct and breach of fiduciary duties against UBS, Josh Terry (a former employee), the Credit Strategies fund investors and the Crusader Fund investors (including Dallas Police and Fire, Baylor University, Army Airforce Exchange, Ontario Teachers, and many others).

56.     Prior to his resignation, Daugherty became a holder of Series A Preferred Units of Plaintiff on October 26, 2009. He was awarded 1,571.86 preferred units and was the largest holder of the lender-approved Plaintiff. Plaintiff was created based on a "last man standing" structure where remaining employees would receive reallocated shares of the units forfeited by departed employees. The number of Daugherty's units and percentage ownership of Plaintiff increased to 1,909.69 and approximately 19.09% as other employees resigned from Highland Capital prior to their interests vesting in 2011. At the time of his resignation, Daugherty was a director of Plaintiff. After his resignation, Defendants began a campaign to inflict economic pain on Daugherty by stripping Plaintiff of its assets.

004282

57.     On February 16, 2012, Plaintiff's board members, Boyce, Britain, Dameris, Dougherty (no relation to Daugherty), Honis, and Walia removed Daugherty as a director of Plaintiff. Immediately thereafter, the newly composed board executed a Second Amended and Restated Agreement (the "2012 Amendment") prepared by Highland Capital's Chief Compliance Officer and Deputy General Counsel, Surgent. The 2012 Amendment purported to impose a punitive procedure to deplete the value of a holder who litigated any action "related to" Plaintiff, Highland Capital, and its officers and directors, escrow the holder's interest, and, in a type of reverse-indemnification, impose the litigation costs of Plaintiff and any deemed "diminution in value" cost to the litigant, whether it lost or won the litigation – a proverbial lose-lose clause.

58.     After his removal as a director of Plaintiff, Daugherty had no access to or ability to know what the Defendants were doing regarding the Plaintiff.

59.     In a dubious tax scheme, ownership of Highland Capital transferred to Hunter Mountain on or around December 17, 2015, from its then-existing limited partners (i.e., Dondero, Okada, Ellington, Parker, and entities they controlled). Through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, Dondero and Okada caused Hunter Mountain to become the owner-in name of 99.5% of the economic interests of Highland Capital. Meanwhile, Dondero and Okada caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities they controlled (including Dugaboy, Okada Trust #1, and Okada Trust #2) continued to receive the economic benefit of limited partnership distributions made by Highland Capital to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain.

### C. Daugherty Obtains Control of Plaintiff and For the First Time Discovers Harm to Plaintiff Caused by Defendants' Deliberately Concealed Bad Acts and Omissions

60.     Daugherty and his affiliates now own and control 100% of Plaintiff pursuant to the terms of a bankruptcy court approved settlement on March 1, 2022. It is critically important to note that it was not until Daugherty and his affiliates obtained control of Plaintiff in March of

2022 that Defendants' wrongdoing complained of in this lawsuit, was fully discovered and that those wrongful acts and omissions had been deliberately concealed.

61.    After obtaining control of Plaintiff, Daugherty (on behalf of Plaintiff) began to request documents, legal invoices, emails, and metadata related to Plaintiff, but was met with obstruction at every turn. Despite this, through diligent efforts undertaken since March of 2022 Daugherty, for the first time, has been able to gather detailed information regarding Defendants' acts and omissions as they relate to harm caused to Plaintiff.

62.    The subsequent facts relay more background information interposed with what Plaintiff now knows happened with the information obtained since March of 2022.

**D.    In 2022, it is Discovered that Plaintiff's Board Members Stripped Plaintiff of all of its Assets Through a Series of Shady Backdoor Corporate Governance Maneuvers**

63.    Back on September 24, 2012, Daugherty, after he was removed as a director of Plaintiff, made his first request to inspect and verify Plaintiff's assets. Abrams & Bayliss acted to block the inspection by scheming with Surgent, Hurst, and Katz/HAK to demand that Daugherty pay for the costs of producing the materials and sign an onerous confidentiality agreement.

64.    It was not until Plaintiff's new management demanded review of its invoices and records in May 2022 that it was revealed that Abrams & Bayless had been retained solely on behalf of Plaintiff on June 11, 2012, after discussions with Boyce, Britain, Dameris, Honis, Dougherty, Hough, Abrams, Brown, Ellington, Kim, Collins, and Surgent regarding the Plaintiff's litigation with Daugherty. It was also revealed that in an email dated November 28, 2012, Dameris was advised by Jeff Abrams and Stephen Hough ("Hough"), "We caution that the board, which manages Plaintiff, owes fiduciary duties to both the LLC itself and to its members."

65.    Invoices and emails discovered in October 2022, revealed that December 22, 2012, Dondero communicated his buyout offer to members of Plaintiff's board after Dameris considered and Dondero rejected certain settlement scenarios regarding Daugherty's claims against Plaintiff

despite Abrams & Bayliss' warning to Dameris that Plaintiff's board had fiduciary duties to Plaintiff and the other unit holders. This provided previously unknown context to an email that was produced in the Texas litigation from Dameris, as Managing Director of Highland Capital, to Dondero on December 26, 2012 that presented as legitimate a "Buyout" scheme in which Dondero could gain control of Plaintiff at a substantial discount to value, pending review by Delaware counsel, noting "[i]f you decide to offer everyone except 1 [Daugherty] a buyout . . ..". It refuted certain testimony given by Dondero in the Texas trial that Dondero had no influence over Plaintiff prior to January 2013. It also revealed why Dameris collaborated with Abrams & Bayliss on December 30, 2013, to enhance indemnification rights of Plaintiff's directors. Importantly, this scheme was created at the same time that a large cash payoff was due to be paid to Plaintiff from the Safety-Kleen Systems, Inc. sale proceeds.

66.     It was not until Plaintiff's new management demanded review of its invoices and records in May 2022 that it was for the first time revealed that Hough (copying Abrams & Bayliss) had conspired with Plaintiff and its former board members on December 30, 2012 to provide a detailed scheme of "Buyout Steps," including how to  transfer control of Plaintiff to Dondero and Okada, while attempting to forgive the board members of their fiduciary duties to Plaintiff and simultaneously seeking to create expanded indemnification rights for themselves.

67.     It was also revealed for the first time in late 2022 that Surgent sent an email on January 9th and 15th, 2013, distributing all of Plaintiff's operative documents to implement the scheme to Katz/HAK, Paul Lackey ("Lackey"), Michael Aigen ("Aigen), Hough, Ellington, Boyce, Britain, Dameris for comment. Katz/HAK, Lackey, and Aigen were not counsel to Plaintiff during this time but, nevertheless, Plaintiff's confidential information was disclosed to them.

68.     Highland Capital and Dondero directed Collins and Surgent to offer all of Plaintiff preferred unit holders, except Daugherty, to purchase their preferred units for 100% of the value of their cash interests and 60% of the value of their non- cash interests on January 18, 2013.

However, Highland Capital and its legal team often engaged in the practice of creating documents after the fact and back-dating or forward-dating them to appear as if they existed on the date listed. It was not until October 2022 that it was revealed for the first time that the actual offer for preferred unit holders that were employed by Highland Capital at the time occurred much sooner and were effectively offers to keep their employment if they signed. Indeed, all of the preferred unit holders that were employed by Highland Capital at the time purported to accept the offer on the same date the offer was made, January 18, 2013. When the offer was finally presented to former employees on January 31, 2013, Collins and Surgent warned those who questioned the fairness of the price that a majority had already agreed to the offer and that anyone who did not accept the offer would "have their rights stripped."

69.    It was also not until late 2022 that documents were finally produced that revealed that Plaintiff's board of directors and legal counsel did nothing to protect Plaintiff from this lowball offer, despite knowing it was a violation of their fiduciary duties. It did not seek a higher price from Highland Capital, Dondero, Okada or from Highland Capital's other partners at the time, including Boyce, Britain, Ellington, and Honis, who stood to benefit from the transaction, despite simultaneously serving on Plaintiff's board. They did not discuss a poison pill, a standstill, or any other corporate defense mechanism available to protect from a creeping takeover pursuant to their obligations under Delaware law. The board never even met to discuss the offer. Rather, they secretly attempted to ratify their own self-dealing actions, whitewash their dereliction of duty, and enlisted counsel from Abrams & Bayliss and Surgent to provide themselves broad releases of their fiduciary obligations and indemnifications while paving the way for Dondero, Okada, Ellington, and Highland Capital to strip Plaintiff of its assets. Tellingly, in one of the many amendments and actions by written consent that were never produced in the litigation with Daugherty, the board members purported to execute a Reserve for actual and potential expenses but did not bother to reserve anything for the claims being made by Daugherty.

70.    It was not until concealed documents with metadata were finally produced by Abrams & Bayliss and new management at Highland Capital in October 2022 that a review indicated numerous documents had been executed in violation of Section 5.1, 5.2(b)(ii) and 5.2(b)(iv) of the Second Amended and Restated Limited Liability Company Agreement. Specifically, document data revealed they had been falsely and intentionally misdated by Plaintiff's counsel, Surgent, to appear as if the board members had authority when, in fact, they did not. Hough reported to Abrams in a "Buyout Update Plaintiff" email on January 18, 2013, "Thomas Surgent called and told me that the Plaintiff buyout documents were executed this morning, with close to 60% accepting. As we discussed, Highland [Capital] is going to wait two weeks to extend the offer to HERA's [Plaintiff's] non-employee members…. "Thomas [Surgent] will date the outgoing board's resignations January 19 so that there is no doubt that their resignations occurred only after the transactions were effected." Indeed, Surgent noted in an email to Hough that they had not reached the 75% threshold until February 11, 2013, long after the board members had surrendered their ownership rights in the Plaintiff and their board positions had terminated. Regardless of their failed attempt, the board members disregarded the fact that Delaware entities such as Plaintiff are not permitted to waive liability for fraud, or breach of good faith and fair dealing.

71.    It was not discovered until May 2024 that Walia was never included as a signatory to the January 17, 2013, governance amendments and corporate actions and that Honis did not submit his signatures on the proposed actions until after 4:30pm on January 18, 2013. By that time, Boyce, Britain, Dougherty, and Dameris had previously forfeited their positions as board members by waiving and releasing any and all rights they had to the Preferred Units pursuant to the terms of the Transfer Agreement. The then-existing governance of the Second Amended and Restated Limited Liability Company Agreement specifically required that 75% approval of board members be required for amendments to the agreement. Since there were only two board

members at the time Honis submitted his signatures for the proposed actions, approval was impossible without the signature of Walia. The attempted amendments failed, but Honis and Walia subsequently negotiated for and received their own transactions that required them to waive and release all claims to their Preferred Units pursuant to their Transfer Agreements. Accordingly, Daugherty became the only remaining owner of the Preferred Units in Plaintiff and only he and his affiliates could effect a change in governance pursuant to the terms of the last legitimate governance amendment on February 16, 2012.

72.     The new manager of Plaintiff, Highland ERA Management, LLC was formed on February 1, 2013, and, at the direction of Dondero, wrongfully assumed management and control of Plaintiff. Although Defendants contended that Highland ERA Management was the manager of Plaintiff, metadata later revealed in October 2022 indicated there was no valid corporate action taken by the board and Series A Preferred Unit holders to execute such an arrangement. Indeed, Daugherty was the only rightful and sole owner of the Series A Preferred Units of Plaintiff at that time.

73.     Despite the absence of valid authority, Dondero, serving as the president of Highland ERA Management, with the assistance of his minions at Highland Capital and their legal counsel who simultaneously represented both Highland Capital and the Plaintiff through a Shared Services Agreement and a Blanket Agreement, purported to execute a series of transactions to strip Plaintiff of its assets.

74.     On February 1, 2013, the day that Highland ERA Management was formed, Dondero purportedly executed the Third Amended and Restated Agreement on behalf of Plaintiff prepared by Surgent, Ellington, Katz/HAK, Hurst, Hough and Abrams, which (1) eliminated the purpose for which Plaintiff was created, (2) eliminated the requirement of Plaintiff to make cash distributions to preferred unit holders to cover pass-through tax obligations attributable to Plaintiff, (3) eliminated members' rights to indemnification, (4) limited indemnification

obligations to the discretion of the Manager (Highland ERA Management, LLC) or the Initial Member (Highland Capital Management, LP), and (5) provided for broad indemnification to the Manager (Highland ERA Management, LLC) and Dondero.

75.    Dondero purported to execute an Expense Allocation Agreement prepared by Surgent, Ellington, Leventon, Katz/HAK, Hurst, Hough, Abrams, Waterhouse and Klos also dated February 1, 2013, on behalf of both Highland Capital and Plaintiff under which the parties reallocated 93.4% of Highland Capital's purported legal expenses billed by their firms and others related to the Texas Litigation[2] to Plaintiff for no consideration. According to the document, Highland Capital had incurred $1,142,284 in legal expenses in the Texas Litigation as of December 31, 2012, compared to just $154,029 incurred by Plaintiff over the same period.

76.    On February 6, 2013, Daugherty sent a letter seeking to review Plaintiff's books and records to verify its assets and their value. Abrams & Bayliss rejected the request in a letter dated February 13, 2013 by declaring, "You seek, inter alia, 'documents establishing the December 31, 2012 estimated value of the Interests as calculated by HERA [Plaintiff];' 'HERA's [Plaintiff's] balance sheets, income statements, lists of assets, general ledger, and the account records for any depository accounts of HERA [Plaintiff], as of December 31, 2012 and for the periods ending December 31, 2012, 2011, 2010 and 2009;' 'HERA's [Plaintiff's] 2009, 2010 and 2011 federal, state, and local tax returns'; 'information… regarding and identifying the current holders of the Series A Preferred Units, and to the extent the Common Unit Holder has already acquired any such units… from whom, in what amounts and for what consideration;' 'documents… regarding member lists;' and 'documents… regarding HERA's [Plaintiff's] Board… and any amendments to HERA's [Plaintiff's] company agreement.' Your Demand takes a shotgun approach to requesting books and records that is antithetical to the 'rifled precision'

---

[2] On April 11, 2012, Highland Capital, at the direction of Dondero, Okada, Ellington, Leventon, Girard and Surgent, commenced a lawsuit against Daugherty in Texas captioned *Highland Capital Management, L.P. v. Daugherty*, Cause No. 12- 04005 in the 68th Judicial District Court of Dallas County, Texas (the "Texas Litigation") which will be described in detail in Section F below.,

required by Delaware law. e.g., Brehm v. Eisner, 746 A.2d 244, 266 (Del. 2000)."

77.     It was further discovered in 2022 that on February 7, 2013, Surgent sent an email attaching Daugherty's request to inspect Plaintiff's assets to Hough, Hurst, Katz/HAK, Lackey and Ellington. Again, Katz/HAK and Lackey did not represent Plaintiff at the time but were adverse to Daugherty and his counsel at Looper Reed, and McGraw on behalf of Highland Capital. It was later discovered in September 2023 that Leventon, Ellington, Surgent, Dondero, Klos, Swadley, Waterhouse, and Katz/HAK had fraudulently allocated over $14,000,000 in invoices from Hunton Andrews Kurth, Lackey Hershman and other firms to Plaintiff.

78.     It was discovered for the first time in October 2022 that an action by written consent purportedly executed by Dondero on April 30, 2013 was in fact backdated to declare Highland Capital as the "sole economic interest holder in the [Plaintiff] following the consummation of the transactions pursuant to the Offers to Purchase dated on or about January 18, 2013, and January 31, 2013." The same document also declared that, "Daugherty's economic interest in the [Plaintiff] is now zero as a result of the application of Article XI of [Plaintiff's Operating Agreement]." And it further resolved to transfer all of Plaintiff's assets to Highland Capital because Highland Capital and Plaintiff "have each determined that it is in their respective best interest" to transfer substantially all the assets of Plaintiff as "in-kind distribution[s]" to Highland Capital (then valued at approximately $9,700,000 on top of approximately $6 million in cash that Highland Capital also took), despite providing no consideration to Plaintiff.

79.     Through this series of bogus transactions that were only revealed for the first time in October 2022 to have been backdated and later circulated by Leventon and Goldsmith to appear legitimate, Highland Capital claimed to have taken all of Plaintiff's assets, leaving it insolvent. Plaintiff only became insolvent in 2013 because its funds and assets were purportedly used: (1) to pay for substantially all of Highland Capital's attorneys' fees incurred in the Texas Litigation pursuant to the Expense Allocation Agreement dated February 1, 2013; (2) to pay for

all of Plaintiff's attorneys' fees incurred in in trying to wrongfully prevent Daugherty from
receiving his share of the Plaintiff's assets; and (3) to transfer and register substantially all of its
assets to Highland Capital for nothing. It was also revealed that in an email dated October 7,
2013, Katz/HAK, Hurst, and Miller knew Plaintiff's board had ignored their duties to carefully
review the Highland Capital Purchase Offer and had even discussed the *Lampers v. Fertitta* case
by highlighting:

> Turning first to the board's failure to employ a poison pill to prevent Fertitta from
> obtaining control without paying a control premium, it is reasonable in the
> context of a motion to dismiss to infer fiduciary misconduct more serious than a
> breach of the duty of care. The failure to act in the face of an obvious threat to the
> corporation and the minority stockholders instead supports a reasonable inference
> that the board breached its duty of loyalty in choosing not to cross Fertitta.

### E. The Texas Litigaiton

80.    On April 11, 2012, Highland Capital, at the direction of Dondero, Okada,
Ellington, Leventon, Girard and Surgent, commenced a lawsuit against Daugherty in Texas
captioned *Highland Capital Management, L.P. v. Daugherty*, Cause No. 12- 04005 in the 68th Judicial
District Court of Dallas County, Texas (the "Texas Litigation"), and Dondero subsequently
threatened, "You will never get a dime" and "I'm going to take you [Daugherty] to zero."
Daugherty responded with counterclaims against Highland Capital, Plaintiff, and others,
alleging breach of contract and breach of the covenant of good faith and fair dealing against
Plaintiff and Highland Capital. Katz/HAK and Hutton Andrews Kurth purported to represent
Highland Capital while Hurst, Brown and Gruber Hurst purported to represent Plaintiff.

81.    It was later revealed after legal invoices were finally produced under new
management in October 2022, that as Defendants prepared for the first trial in Texas, they
[Highland Capital, Hurst, Katz/HAK, Ellington, Brown, Leventon, Surgent, Girard, Boyce,
Britain and Hunton Andrews Kurth] participated in a mock trial on December 4, 2013, that
resulted in their mock jury finding in favor of Daugherty. From December 6 to 12, 2013,
Defendants Dondero, Hurst, Brown, Katz/HAK, Abrams, Miller, Boyce, Britain, Ellington,

Girard, Leventon, and others schemed to "come up with trial strategy regarding witness testimony as to HERA [Plaintiff] sale and where are funds;" and conferenced with "Delaware counsel concerning escrowing of Daugherty's HERA [Plaintiff] interests and related issues there to."

82.    In June 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, it was for the first time revealed that on December 12, 2013, Ellington, Leventon, and Surgent coordinated with Abrams & Bayliss to serve as escrow agent of the Escrow. Highland Capital's assistant general counsel, Leventon, sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day by Ellington. Matthew Miller ("Miller"), an Abrams & Bayliss attorney who primarily worked on the escrow matter and had just completed his first year as an attorney and simply used the terms proposed by Leventon.

83.    The assets deposited in the escrow were represented to be: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) 1088.42 shares of NexPoint Credit Strategies. This was the story Defendants "came up with" so they could sell to the jury that they had not simply stolen Plaintiff's assets. The notion that Defendants did nothing nefarious with Plaintiff's and Daugherty's assets and merely set them aside would become a theme of Defendants in the Texas Litigation.

84.    The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Litigation provided that if Daugherty prevailed in the Texas Litigation, escrowed assets in the amount of the judgment "shall" be transferred to Plaintiff. Also pursuant to the crime-fraud discovery in May 2019, it was revealed that 19 days after executing the Escrow Agreement, Leventon and Girard changed the Escrow Agreement without Daugherty's knowledge because it wanted to "slip sheet the Schedule 1 assets" to change "the NexPoint shares from shares to the cash equivalent of shares because it is difficult to find a prime broker to open

account for such a small pool of assets." Abrams & Bayliss simply swapped the pages. Abrams & Bayliss later explained, "if Daugherty digs deeply enough, he may discover that Schedule 1 was revised on December 16, 2013, with no re-execution of the Escrow Agreement by Highland and Abrams & Bayliss. Highland's counsel merely re-sent the Escrow Agreement with an updated Schedule 1, and Abrams & Bayliss sent an email confirmation of the change." According to Abrams & Bayliss, "[i]t is unlikely that Daugherty would learn of the revision." With the appearance of an escrow in place, Defendants were poised to present themselves in the Texas Litigation not as thieves, but rather as protectors of Plaintiff's and Daugherty's interests. That is the story they spun at trial. This was a state of affairs just a month before trial in the Texas Litigation.

85.    On the first day of trial, January 16, 2014, Okada took the stand as Chief Investment officer and Head of Public Relations to assure the jury the following regarding their duties to clients and funds: "We have an advisory business where we're managing other people's money, teachers, firefighters, individuals, through their pension funds, or through their retirement accounts, or, you know, various pools of savings." "But our primary business at Highland Capital is to take their money, take the money that's entrusted to us and make good decisions with it."

86.    He further sanctimoniously lectured about his and Dondero's culture of trust, "Our culture is one of trust, of hard work, and transparency, and something that we like to call alignment of interest, and I will explain the last one. But when you're managing other people's money you have to make sure that they trust you. That they know what you're doing. That you're telling them what you're doing, how well you're doing well, whether you're doing well or not doing so well. You've got to be honest and straightforward. And you can't do this for 20 years without doing that. If you're not trustworthy and honest and your culture isn't one of those, you're just not going to be in this business. You don't survive in the money management business

without having a culture of trust……And then lastly, I would say that this idea of alignment of interest is where -- think of it this way, if something's good for you, it's good for me. If it's good for our clients, it should be good for us. If it's bad for our clients, it should be bad for us, that's alignment of interest. It means that whatever you're doing, whether you're paying an employee, or whether you're promoting an employee, or whether you're making an investment, you've got to think about the client. You're thinking about their interest and putting their interest first. And our culture is one of doing that." This testimony was a far cry from what insiders knew about Okada, Dondero and the culture at Highland Capital. Indeed, Okada was often observed to cover his ears and exclaim "I'm not hearing this! I'm not hearing this! I'm not hearing this!" when confronted with legal, fiduciary, and ethical misdeeds at Highland Capital. It was quite a contrast with reality when Highland Capital filed for bankruptcy on October 16, 2019, because its clients, including teachers, firefighters, veterans, pensioners, former employees, and other creditors, won over $1.4 billion in damage awards against it for willful misconduct, fraud, breach of fiduciary duties and other causes of action.

87.    In furtherance of the sham, Hurst, Dondero, and Surgent made it a point to let the court and jury know that Plaintiff retained control of "all" of its assets. Dondero also testified in January, responding to questions by Hurst as follows:

> Q. Okay. So – so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and [Plaintiff], what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?
> A. They go to him.
> Q. I'm sorry?
> A. They go to him via to HERA [Plaintiff] and then to him.

Dondero further testified when Hurst asked him:

> Q. The escrow, did you just escrow this last month?
> A. No. We've had it segregated at Highland since April when we first put it in and then formalized the escrow. It takes a while to set up an escrow and transfer illiquid assets that have all sorts of transfer limitations.

88.    Highland Capital's Chief Compliance Officer and Deputy General Counsel,

Surgent, swore under oath in regard to a question regarding the April 30, 2013, implementation of the asset sweep from Plaintiff, "Yes, but then it placed those funds in escrow." But when questioned further why the escrow appeared to be created 36 days prior to his testimony and more than eight months after the assets were swept from Plaintiff, Surgent answered to the court and jury, "The escrow was formalized in this agreement, but I believe it existed sooner." In fact, it did not, and Surgent knew that.

89.    In closing arguments, Plaintiff's counsel, Hurst, lied to the court and jury once again, "[I]f Pat Daugherty happens to prevail in his lawsuit against HERA [Plaintiff], you heard Jim Dondero testify, he gets his interest, which is currently escrowed in the third-party escrow account, all of it."

90.    It was not until some evidence from Abrams & Bayliss was produced pursuant to the crime-fraud ruling in Delaware on June 7, 2019, and substantial detailed legal invoices and emails were produced to the new management of Highland Capital in October 2022 that this web of lies was fully exposed.

91.    After three-weeks of trial, the jury found that Plaintiff, at the direction of Defendants from Highland Capital, breached the implied covenant of good faith and fair dealing by adopting Section 12.1 of the 2012 Agreement (the Lose-Lose clause) and that Highland Capital and Dondero had defamed Daugherty with malice. The jury awarded Daugherty damages against Plaintiff in the amount of $2.6 million, plus interest which remains unpaid and has currently accreted to approximately $5 million. The court also determined that Daugherty had retained ownership of his preferred units in Plaintiff. The problem was Dondero, Ellington, Surgent and their merry band of minions lied to the jury and never funded Escrow while incurring millions in legal fees to drain Plaintiff's assets to perpetuate the lie.

92.    It was not until May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, that it was revealed that Highland Capital contacted

Abrams & Bayliss on February 14, 2014 "to discuss a memorandum we need drafted to address the Escrow Agreement in context of the recent Daugherty Verdict." The memo reaffirmed that Abrams & Bayliss had "received no cash or documents from Highland Capital or HERA [Plaintiff] regarding the escrow of Daugherty's interests in Restoration Capital Partners, LP. The memorandum then discussed the consequences if the escrow of Plaintiff's assets was deemed a "sham." In a section of the memorandum titled "Daugherty May Assert that the Escrow Agreement Is a Sham and that the Deposit Assets Stayed within the Control of Highland," Abrams & Bayliss advised: "Daugherty could argue that, even if the Deposit Assets are deemed to be in escrow, the Escrow Agreement left Highland [Highland Capital] with actual control of the Deposit Assets because (1) A&B [Abrams & Bayliss] is Highland's [Highland Capital] counsel, and (2) A&B [Abrams & Bayliss] may resign at any time with the Deposit Assets returning to Highland [Highland Capital]. Daugherty might argue that, despite the language of the Escrow Agreement, A&B [Abrams & Bayliss] will do whatever Highland [Highland Capital] instructs it to do with the Deposit Assets, even if that means disbursing the Deposit Assets contrary to the Escrow Agreement's terms. Paragraph 5 of the Escrow Agreement entitles A&B [Abrams & Bayliss] to resign at any time provided that it gives ten days advance notice. After A&B [Abrams & Bayliss] resigns, it must deliver the Deposit Assets either to the successor escrow agent or to Highland [Highland Capital]. Daugherty might argue that, even if A&B [Abrams & Bayliss] would not disburse the Deposit Assets in contradiction of the Escrow Agreement, A&B [Abrams & Bayliss] might be willing to resign as Escrow Agent in order to return the Deposit Assets to Highland." Said another way, Plaintiff's own lawyers were acting on behalf of Highland Capital at the expense of their client while they stripped it of its assets and charged it for the privilege.

93.    True to form, Highland Capital requested, and on March 25, 2014, Abrams & Bayliss provided, an expanded memo addressing "tangentially related topics." In the expanded

memo, Abrams & Bayliss explained: "Although unlikely, it is conceivable that the court in the
Texas Litigation could take issue with the assertion of Plaintiff's counsel that the full amount of
the Deposit Assets was held by A&B, when arguably at least, only $1.2 million of the Deposit
Assets were truly beyond Highland's control."

94.    Defendants also attempted to conceal the true value of the assets that were
supposed to be escrowed on behalf of Plaintiff. When Girard was asked to provide an update on
value by Miller, Girard briefed Abrams that, "Girard would prefer not to update the estimated
value of the Restoration Capital Funding interest. Highland received a windfall when the jury
valued Daugherty's Plaintiff interest at only $2.6 million because Highland believes his former
interest in HERA [Plaintiff] is worth more. Schedule 1 currently reflects a value of $3.03 million.
If Highland updated Schedule 1 to reflect their current estimates, the Escrow Assets would be
worth $3.3 million."

95.    Daugherty suspected that Defendants had lied about the existence of the escrow
and on August 24, 2014, served post-judgment discovery requests on Plaintiff and Highland
Capital, seeking information concerning the location of Plaintiff's assets and liabilities and its
post-litigation conveyances to Highland Capital.

96.    Twenty days later, Plaintiff, at the direction of Dondero and Hurst, filed a Notice
of Cash Deposit in Lieu of Supersedeas Bond and Affidavit Establishing Net Worth. Plaintiff
submitted the affidavit of Klos, which stated that Plaintiff had a negative net worth of
($2,447,709) after fraudulently applying approximately $7,500,000 of Highland Capital's legal
expenses at the time to Plaintiff as of August 31, 2014. Highland Capital also purported to have
loaned Plaintiff the cash necessary to repay its own legal expenses owed to Highland Capital
because Plaintiff did not have sufficient funds after transferring all of its assets to Highland
Capital back on April 30, 2013. However, a footnote to the balance sheet exhibit to the affidavit
noted, "Per Escrow Agreement dated December 13, 2013, between HCMLP [Highland Capital]

and Abrams & Bayliss, LLP, if a final, non-appealable judgment against HERA [Plaintiff] is reached, Abrams & Bayliss, LLP as Escrow Agent, will transfer the HERA [Plaintiff] Deposit Assets to HERA [Plaintiff]." The affidavit included a copy of the Escrow Agreement with a schedule again falsely listing escrow assets of: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) cash equivalent of 1088.42 shares of NexPoint Credit Strategies.

97.    Also not revealed until May 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, Miller emailed Abrams, "do we look bad for claiming to hold non-monetary assets in escrow when on a day-to-day basis we have no idea what the status of these assets are?" Miller was "not looking forward to being deposed."

98.    In order to conceal the fact that no such transfer ever actually occurred, Dondero, Hurst and the Highland Capital minions then directed Plaintiff to object to Daugherty's discovery requests on the basis that it was harassing and argued that its cash deposit limited post-judgment discovery to Plaintiff's net worth. Hurst, doubled down at a subsequent hearing on September 22, 2014, before the court and stated, "everything that's in the sworn financial statement has been provided to the other side and it's been provided to the Court, also came up during trial; that is the exact same assets."

99.    Again on July 10, 2015, Hurst thwarted discovery of Plaintiff's missing assets by filing Highland Employee Retention Assets LLC's Written Objections To Daugherty's Notice of Deposition Upon Written Questions and responding to every question and request for production with the boiler plate response, "Given the procedural posture of the case, with a final judgment and appellant bond on file, the only discovery that may be sought by Daugherty is that directly relevant to the calculation of HERA's [Plaintiff's] net worth. The scope of this request goes well beyond that, seeking information that that [sic] has potential proprietary confidential interests and unduly burdening a third-party."

100.    On December 1, 2016, Hurst and Ellington boasted in the press about a settlement with Nautic Partners regarding breach of fiduciary duty over an indirect investment owned by Plaintiff and other funds in Cornerstone Healthcare Inc. It was not discovered until December 2021 that Dondero, as Chairman of the Cornerstone board, and Ellington, as General Counsel to Highland Capital serving as the investment advisor to the funds that owned interests in Cornerstone, had schemed with Hurst, Katz/HAK/DLAP and Hunton Andrews Kurth to revise their fee structure on the eve of settlement increasing them from an hourly fee that had already reached $6 million to a contingency fee that would pay the lawyers approximately $25 million in fees. Dondero and Ellington then received an $11 million facilitating fee that was wired to their affiliates secretly operating as the SAS platform in the Cayman Islands.

101.    Also on December 1, 2016, Daugherty's judgment against Plaintiff, which had been affirmed on appeal, became final and non-appealable pursuant to the appellate Court's mandate. The appellate court also denied the request to declare that Daugherty's ownership in the preferred units of Plaintiff were extinguished as a result of his damage award. Dondero, Katz/HAK, Ellington, Leventon, Miller, and Abrams reviewed the mandate that day and started the process of shutting down the Escrow and assuring the remaining cash assets were swept from Plaintiff to Highland Capital. A summary of the reconciled emails sent or received from different time zones follows:

102.    From discovery obtained in May 2019, after a Delaware court granted the crime-fraud exception to attorney-client privilege, a series of emails revealed that on December 1, 2016, at 7:51 p.m.: Hunton Andrews Kurth, outside counsel for Highland Capital and now concurrently outside counsel for Plaintiff, emailed Abrams, counsel for Highland Capital, counsel for Plaintiff, and trustee for Plaintiff's escrow: "Kevin , we need to have a call as early tomorrow as possible regarding the escrow arrangements. Can you let me know when you can be available? Also, can you please send us a copy of the escrow agreement?. Abrams responded to the email copying

Miller and Hunton Andrews Kurth lawyers Katz/HAK, James Bookhout, and Isabel Crosby.

103.   December 2, 2016, at 10:03 a.m.: Miller informed Abrams, "The call with Highland's [Highland Capital's] attorneys in the HERA [Plaintiff] litigation was short. Simply put, Highland [Highland Capital] wants to get the funds back to HERA [Plaintiff] and/or Highland [Highland Capital] as quickly as possible in any way we feel comfortable with." Miller proposed several alternatives, including resignation: "Second, we could resign as escrow agent under Paragraph 5 …. This paragraph permits us to return assets directly to the Depositor, which is Highland [Highland Capital]. Highland's [Highland Capital's] attorneys think that a ten-day notice period will not interfere with their garnishment action plans."

Miller outlined for Abrams a step-by-step resignation plan:

1.   Resignation letter from us that states that all deposit assets will be released to Highland [Highland Capital] after the 10-day notice period.
2.   Letter from Highland [Highland Capital] waiving notice period and seeking our confirmation and signature (because paragraph 10 requires all amendments or waivers to be signed by both parties).
3.   Wiring of cash back to Highland [Highland Capital].

Highland [Highland Capital] encouraged Abrams & Bayliss to resign, "As an update to the below, Highland [Highland Capital] would prefer that we resign but before we do to agree in writing that the 10-day notice period is waived." "Hunton Andrews Kurth and [Abrams & Bayliss] were on the same page about the resignation strategy."

104.   December 2, 2016, at 2:52 p.m.: Miller emailed Hunton Andrews Kurth: "As we discussed, attached is the resignation letter we contemplate as the first step of unwinding the escrow."

105.   December 2, 2016, at 4:37 p.m.: Miller emailed Hunton Andrews Kurth: "As an FYI, my banker tells me that 5:30 EST is the cut-off time for a domestic wire; the international transfer cut-off already is passed. I am not optimistic that I will receive the necessary authorizations during the next hour. However, would you mind passing along the Highland [Highland Capital] letter on an FYI basis so that I have the wiring instructions handy?"

106.    December 2, 2016, at 5:08 p.m.: Hunton Andrews Kurth emailed Miller: "Matt, please find attached Highland's [Highland Capital's] signed letter accepting the Escrow Agent's resignation." Miller subsequently informed Abrams, "The second step in the HERA [Plaintiff] strategy is for you to sign the attached letter from Highland [Highland Capital]."

107.    December 2, 2016, at 10:07 p.m.: Miller emailed Ellington: "Scott, please find the attached correspondence regarding the escrow agreement between Highland Capital Management, L.P. and Abrams & Bayliss LLP."

108.    December 2, 2016, at 10:18 p.m.: Katz/HAK emailed Miller: "Matt, attached is correspondence from Scott Ellington accepting the resignation and providing wiring instructions. If you need additional information, please let me know."

109.    December 2, 2016, at 10:19 p.m.: Miller emailed Katz/HAK: "Thanks, Mark. [sic] We will get a counter-signed copy back to you and arrange for wiring the funds."

110.    December 3, 2016, at 10:06 a.m.: Miller emailed Ellington and Katz/HAK: "Scott and Marc, attached please find a counter-signed copy of Scott Ellington's letter."

111.    December 3, 2016, at 2:45 p.m.: Internal Abrams & Bayliss email: "Wells Fargo was unable to initiate the transaction today [a Saturday]. The wire amount required multiple levels of upper management approval so I will go back on Monday morning."

112.    December 5, 2016, at 12:26 p.m.: Miller emailed the team: "Team, As reflected below, the funds A&B [Abrams & Bayliss] was holding in escrow on behalf of HERA [Plaintiff] have been transferred as instructed in Scott Ellington's December 2, 2016, letter."

113.    "Boom!" (emphasis added). That was the reaction of Girard when he learned the Escrow funds "have been received" by Highland [Highland Capital] on December 5, 2016.

### F.    Crime-Fraud Evidence in Delaware

114.    On February 16, 2017, Abrams of Abrams & Bayliss unveiled Defendants' "Highland Employee Asset strategy" to Daugherty:

I write on behalf of Abrams & Bayliss LLP ("Abrams & Bayliss") in response to your letter of February 14, 2017 (incorrectly dated February 14, 2016) regarding my firm's service as escrow agent under an escrow agreement with Highland Capital Management, L.P. ("Highland"), dated December 13, 2013 (the "Escrow Agreement"). Capitalized terms used but not defined herein have the meanings given in the Escrow Agreement.

By letter dated December 2, 2016, Abrams & Bayliss notified Highland that it was resigning as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement. By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.

On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately. On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016, instructions. Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.

115.    On July 6, 2017, Daugherty, having his disputed ownership in Plaintiff's assets recently confirmed by Texas Appellate Court, filed a complaint in Delaware Chancery Court seeking the return of all of Plaintiff's assets, in addition to making claims for fraudulent transfer, breach of fiduciary duties on behalf of Plaintiff, aiding and abetting breach of fiduciary duties on behalf of Plaintiff, and breach of implied covenant of good faith and fair dealing on behalf of Plaintiff, among other claims. Certain defendants moved to dismiss the complaint.

116.    On January 16, 2018, the Delaware Court of Chancery denied the motion to dismiss against Highland Capital and Plaintiff but granted dismissal against Dondero and Highland ERA management, which was controlled by Dondero at the time, on the grounds that evidence against them was "conclusory." At that time, the court was not privy to the evidence that was later produced pursuant to the crime-fraud ruling in May 2019 and the document production by new management at Highland Capital in October 2022 and October 2023. Later, on June 29, 2018, the Delaware Court denied dismissal against Highland Capital but granted dismissal based on laches for the claims arising out of what was known about the 2013 amendments and contemporaneous actions of the Defendants at that time, which was very little.

It was not until October 2022 and October 2023 that Highland Capital, under new management, produced refuting documentation and invoices.

117.    On May 17, 2019, the Delaware Chancery Judge granted a motion to compel stating, "Daugherty has been dogged in his pursuit of these documents, and Highland [Capital] was just as resolute in refusing to produce them." She also stated, "Daugherty has made a prima facie showing that a reasonable basis exists to believe that a fraud has been perpetrated, and that Highland [Highland Capital] sought A&B [Abrams & Bayliss] to serve as escrow agent and to provide legal analysis in furtherance of that fraud; specifically, to protect the escrowed assets from Daugherty while the Texas case was pending, and then to transfer them back to Highland [Highland Capital] after the Texas verdict was finalized. I conclude any privilege Highland [Highland Capital] claims over A&B's [Abram's & Bayliss] legal advice regarding the escrow arrangement and A&B's [Abram's & Bayliss] resignation has been stripped under the crime-fraud exception." She also concluded that Highland Capital, Dondero, Ellington, Leventon, and the other defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case. The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement make their way to Daugherty." Additionally, a Contractual Master was appointed to oversee discovery compliance. It was later discovered in 2021, after Highland Capital filed for bankruptcy, that Leventon concealed the existence of company owned phones used by Dondero and Ellington, as well as a secret server used by many of the defendants or their affiliates to transfer assets. In addition, despite a motion to compel to the contrary, the existence of numerous January 2013 Plaintiff amendments and actions by written consent were concealed by Dondero, Ellington, Leventon, and Surgent until they were finally produced in October 2022

after full ownership of Plaintiff was transferred to Daugherty.

118.     On the second day of a three-day trial, Dondero—for the first time—revealed that his misconduct as manager of Plaintiff was done at the direction and based on the advice of his outside and in-house counsel, i.e., the other defendants in this action. He testified, for example:

> Q. Did Highland [Capital] have outside counsel advising with respect to the purchase of the units?
> A. Yes. I believe the whole situation was the most lawyered thing we've ever done. I mean, there was counsel for each of the board members, there was counsel for Highland [Highland Capital], there was counsel for HERA [Plaintiff], there was Delaware counsel. Everything was orchestrated, dictated by counsel.
> Q. Did Highland [Highland Capital] have – did that counsel that Highland [Highland Capital] used also advise counsel on the documents, the transaction documents, relating to those purchases?
> A. Yes. All the functional documents and major moves at various turning points were all at the request – or decided by counsel.
> Q. Did you have any communication – are you familiar with Abrams & Bayliss, with what Abrams & Bayliss is?
> A. I know they're a Delaware law firm. But beyond that, no.
> Q. Did you ever have any communications with Abrams & Bayliss about them resigning as escrow agent?
> A. No. Highland [Highland Capital] and myself, I know, were purposely kept separate from this whole thing. And it was driven by – it was driven by counsel.
> Q. My question is a little bit more specific because it relates to the escrow assets and Mr. Daugherty. If you had been told by counsel that Mr. Daugherty was entitled to the escrow assets, you would have given him the escrow assets; right?
> A. Yes. We would have done whatever counsel told us. We tried very hard to compartmentalize this mess. We have a business to run. And this is – a half dozen lawsuits, haranguing everybody in public, it was all intended to disrupt our business as much as possible. So we tried to delegate it and compartmentalize it to the lawyers as much as possible.
> Q. Let's talk about which lawyers you're referring to. So I'll start with the in-house lawyers again. Which in-house lawyers of Highland [Highland Capital] are you relying on with respect to the transfer of the escrow assets?
> A. It would have been the same three internal lawyers working with external counsel.
> Q. Mr. Ellington, Mr. Leventon, and Mr. Surgent; is that right?
> A. I believe so. I believe they were the ones at that time and place.
> Q. Which outside counsel are you relying on?
> A. I don't know if Andrews and Kurth had merged with Piper. I don't know who else was involved besides the Abrams guys. But it would have been, more likely than not, those two counsels with whatever other counsel was representing some of the people who were sued individually.

## G. Highland Capital Bankruptcy

119.     The following day, on October 16, 2019, Highland Capital at the direction of

Dondero and Ellington, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware. On December 4, 2019, the Delaware Court entered an order transferring venue of the case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. As a result, the Delaware action was stayed.

120.    On January 9, 2020, the Highland Capital Creditors Committee demanded and the Court approved a change of control of Highland Capital, which involved the removal of Dondero as the sole director and the appointment of James P. Seery ("Seery"), John S. Dubel ("Dubel"), and retired Judge Russell F. Nelms ("Nelms") as independent directors (the "Independent Directors" and collectively, the "Independent Board") of Strand Advisors, Inc., Highland Capital's general partner (the "General Partner"). The Independent Directors were granted exclusive control over Highland Capital and its operations during the pending bankruptcy proceedings.

121.    On July 16, 2020, the Court approved Highland Capital's motion to appoint Independent Director Seery, as Highland's CEO and CRO.

122.    On October 9, 2020, Dondero was further instructed to resign or face removal as an employee of Highland Capital and as portfolio manager for all Highland Capital managed funds due to his detrimental conduct to the firm and its creditors.

123.    Highland Capital's bankruptcy was unique because all of the largest creditors' claims stemmed from litigation claims and judgments against the firm, not debt holders. Indeed, Dondero, Ellington and Leventon expected to use the bankruptcy process to once again thwart recoveries while keeping themselves in control. Dondero later complained to Seery, "I'm not getting the Chapter 11 experience," as if he were somehow supposed to benefit from the failure of the company he managed. To the contrary, bankruptcy revealed a litany of terrible acts through a pattern of recurring conduct resulting in well over $1.4 billion dollars in litigation and arbitration claims and over $50,000,000 in legal fees.

124.    In January 2021, it was discovered that Dondero had been secretly coordinating

with Highland Capital's then-counsel Ellington and Leventon to direct the affairs of Highland Capital, despite his dismissal. When the Court entered an order restraining Dondero from communicating with Highland Capital employees, Dondero flouted the order by communicating with Ellington and Leventon and instructing other employees to resist document production requests, even though those documents were kept on Highland Capital's computer system.

125.    Ellington and Leventon we terminated for cause on January 5, 2021, for acting in manner adverse to Highland Capital's interests.

126.    Dondero, Ellington and Leventon evinced no respect for Highland Capital as an entity separate and apart from themselves. The bankruptcy also revealed discovery misconduct during the Delaware action with Daugherty, including a secret server that Dondero, Ellington, Leventon and others routinely used, which was concealed during discovery in the Delaware action with Daugherty. Additionally, the bankruptcy court twice found Dondero in contempt for violating a temporary restraining order. During testimony at the first show cause hearing, it was revealed that Dondero and Ellington destroyed their cell phones that were provided by Highland Capital. Yet, in the Delaware action with Daugherty, Leventon testified at his custodian of records deposition that Highland Capital did not "have access to people's phones" and that Highland Capital did not own any cell phones for the custodians.

127.    On February 8, 2021, the Court agreed to confirm Highland Capital's bankruptcy plan, and the Court entered its plan Confirmation Order on February 22, 2021.

128.    On August 11, 2021, Highland Capital's bankruptcy plan, as amended to date, became effective, and as a result, Highland Capital's ownership was restructured. Highland Capital became a wholly owned subsidiary of the Highland Claimant Trust, a newly formed liquidating trust owned by the creditors of Highland Capital. Specifically:

- The Highland Claimant Trust became the sole limited partner of Highland Capital.

- HCMLP GP LLC replaced Strand Advisors, Inc. as General Partner of Highland Capital. HCMLP GP LLC is also a wholly owned subsidiary of the Highland

Claimant Trust.

- Seery serves as the Claimant Trustee of the Highland Claimant Trust and remains the CEO of Highland Capital today. Dondero and Okada are no longer involved in the management of Highland Capital or the Claimant Trust.

129.   In the Bankruptcy, Daugherty filed claims estimated in excess of $40,000.000.00. In November 2021, Daugherty reached a settlement with Highland Capital for some of his claims and specifically retained the right to pursue Defendants in future litigation, i.e., this current lawsuit for these claims.

130.   On March 1, 2022, during the settlement hearing, Highland Capital finally acknowledged, "Dondero, through Highland Capital, engaged in an asset-stripping campaign designed to render Plaintiff judgment-proof, further exposing Highland Capital to liability and unnecessary legal costs." Highland's new CEO, James Seery, testified:

> It actually looks like, frankly, the escrow was never really an escrow, and it was a -- it was a fraud from the beginning. And that one's a pretty disturbing one.

131.   On April 1,2022, full ownership of Plaintiff and Highland ERA Management was transferred to Daugherty and his affiliates.

132.   On May 11, 2022, Plaintiff instructed Abrams & Bayliss, Hunton Andrews Kurth, DLA Piper, Marc Katz/HAK/DLA, and Michal Hurst to forward all of its casefiles, records and invoices allocated to Plaintiff.

133.   True to form, Hunton Andrews Kurth responded by letter on May 25, 2022, "Our records and research indicate that the Firm represented ERA and/or HERA [Plaintiff] in connection with only two matters. The first matter was opened on June 1, 2012, for which our records indicate we represented Highland Capital Management, LP ("Highland") and HERA [Plaintiff], and for which only 1.6 hours of attorney time was recorded. We have located no files for this matter other than an electronic record of the recorded time." They made this statement despite Katz/HAK/DLAP representing before the Delaware court that Plaintiff incurred millions of dollars in legal expenses, including those from his firm, making it insolvent.

134.    Hunton Andrews Kurth continued, "Additionally, given that Daugherty now wholly owns and controls HERA [Plaintiff] and ERA, we believe we are constrained in what we may transfer. Your HERA [Plaintiff] and ERA file transfer request equates to Daugherty gaining access to his litigation adversaries' attorney's files. In this unique circumstance of a litigant seeking his adversary's attorney's file by acquiring control of one (or more) of his litigation adversary's attorney's former jointly represented clients, the case law we have reviewed favors protecting the co-client's justified expectation that its attorney's files will not be disclosed to its litigation adversary." Said another way, after invoicing millions of dollars in legal fees that were allocated to Plaintiff, Hunton Andrews Kurth continues to conceal their conduct by claiming some privilege based on jointly representing Highland Capital, Dondero and Plaintiff. Tellingly, Hunton Andrews Kurth could produce no retention agreement that named Dondero as a client nor did Dondero pay a single dollar for any such legal expenses. However, Plaintiff was allocated over 93% of the fees invoiced to Highland Capital.

135.    DLA Piper delayed until July 22, 2022, to make the following similar response, "Second, as you know, DLA's representations of HERA [Plaintiff] and ERA in the Daugherty Case were joint representations in which DLA also represented HCMLP [Highland Capital] and Mr. Dondero. Mr. Daugherty is still adverse to Mr. Dondero in the Daugherty case and in Daugherty v. Dondero, No. 2019-0956 (Del. Ch.). That means that your request for the client file would result in DLA providing to one litigation party the privileged and work product-protected communications of its litigation adversary. Such a production "would be anathema to the principles underlying the policy of fostering unfettered attorney-client communication." Again, DLA Piper made this response despite having millions of dollars of its fees allocated to Plaintiff, representing Plaintiff in Delaware court, and producing no retention agreement that listed Dondero as a client or that he ever paid anything for the alleged representation.

136.    Hurst never responded to Plaintiff's file and document request.

137.    It was not until October 2022 and October 2023, after Plaintiff received documents from Highland Capital and Abrams & Bayliss pursuant to two books and records requests, that extensive billing fraud was revealed at the expense of Plaintiff at the hands of its lawyers Katz/HAK/DLAP, Hurst, Hunton Andrews Kurth, Abrams & Bayliss and others. Indeed, financial records and information from Highland Capital reveal that over $14,000,000 of expenses for other matters were allocated to Plaintiff, and its lawyers were aware of it.

138.    Shockingly, Highland Capital and its partners, including Dondero, Okada, the Defendant trusts, Ellington, Boyce, Britain, Dougherty, Honis, Parker, had taken the tax benefits of these expenses with the assistance of Surgent, Leventon, Girard, Waterhouse, Swadley and Klos as though they were their own, despite knowing that the obligations to pay were allocated to Plaintiff. Surgent explained to Abrams & Bayliss that they did not want Daugherty to get the tax benefit of the expense/loss pass-throughs so they made the legal expense allocations effective after they received their 2013 buy-out proceeds.

139.    Not surprisingly, when the details of the fraud were discovered, new management of Highland Capital realized a charge to the Plaintiff capital accounts in excess $10 million as an offset to write off over $10 million of falsely allocated debt resulting in a loss of capital account basis that could have been used by Plaintiff and its unit holders for tax purposes.

## H.  A Recurring Theme

140.    This above-described acts are simply yet another example of an all-too familiar pattern where Dondero, Okada and Ellington strip the assets of entities they controlled to ensure that an aggrieved party could not collect on its hard-fought judgments or its rights of ownership. When challenged, they execute their well-honed tactics to lie, deny, conceal, and postpone, while attempting to exhaust their adversaries of funds as they ran out the clock. In this case, Plaintiff brings this action to recover tens of millions of dollars in damages that it suffered at the hands of Dondero, Okada, Ellington, and their enablers, acting in concert with other entities that they

owned and/or controlled and with the aid of Plaintiff's own officers, directors and attorneys at
the time who disregarded their duties to Plaintiff in favor of their own self-interests.

141.     Plaintiff was stripped of its assets as retaliation against Daugherty for his
assistance in recovery efforts of the following related matters:

### 1. Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry

142.     In 2010, Dondero and Okada formed Acis Capital Management, L.P. ("Acis") and
Acis Capital Management GP, LLC ("Acis GP") as a "lifeboat" to divert collateralized loan
business fees from Highland Capital after its lenders placed security liens on its assets. Dondero
was President both of Acis and Acis GP. Okada was Chief Investment Officer for all funds
including those of Acis. Collectively, they controlled the investment and operating decisions of
the Acis platform. Acis was initially indirectly owned by Dondero and Okada (through Highland
Capital Management Services, Inc). Joshua Terry ("Terry"), a Highland Capital employee, later
joined the platform in 2011 to manage Acis after its previous managers left Highland Capital.
Like Plaintiff, Acis had no employees. Highland Capital was the investment manager for Acis,
and Acis performed all of its services through Highland Capital employees. In 2013, Dondero
modified Terry's ownership in Acis. As a result, Dondero and Okada, with the help of the
Highland Capital legal team, once again engaged in a scheme to siphon value from Acis and
transfer it back to Highland Capital.

143.     By 2016, Dondero and Terry came to an impasse. Dondero sought to improperly
finance a latex company investment in South America by causing a separate portfolio company,
Trussway Industries Inc. ("Trussway"), to incur unnecessary debt and divert the loan proceeds
to finance the purchase. Terry criticized the misconduct as a breach of their fiduciary duties to
their investors. Dondero responded by firing him and making a pretextual claim of termination
for "cause." Dondero also amended the partnership agreement to terminate Terry's interests in
Acis and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded

arbitration.

144.    On October 20, 2017, following a ten-day arbitration, the arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked Highland Capital's false pretext of "for cause" in order to deny Terry his contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay Highland Capital more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying Highland Capital under their shared services and sub-advisory agreements, retroactive to January 1, 2016.

145.    Beginning on October 24, 2017—four days after Terry's arbitration judgment was issued—Dondero, acting through Highland Capital, and with the aid of Ellington, Leventon, and Surgent, entered into numerous transactions designed to take control of Acis's assets and business and strip Acis of assets so that it would be unable to pay Terry's arbitration award.

146.    Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United States Bankruptcy Code against Acis and Acis GP on January 30, 2018. In response to the bankruptcy filings, Dondero caused Highland Capital, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis funds following the appointment of a chapter 11 trustee in the Acis bankruptcy case. This abrogation of duties caused the chapter 11 trustee to replace Highland Capital with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland").

147.    Dondero also caused Highland Capital to commence litigation against the Acis

chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through Highland Capital) and to stop Highland Capital from engaging in a course of conduct that was harmful to Acis and the Acis CLOs. This led to the entry of a temporary restraining order against Highland Capital, which Dondero caused Highland Capital to violate.

148.    Daugherty communicated with Terry on several occasions regarding the extreme means utilized by Highland Capital against Daugherty, including sending constables to his home to execute collection efforts under false pretenses, stripping Plaintiff of its assets, and seeking to have Daugherty incarcerated. For the legal services provided by Hurst, Katz/HAK/DLAP for attacking Daugherty on behalf of Highland Capital, Plaintiff was allocated the bill.

### 2. Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest

149.    Dondero and Ellington fraudulently induced an investment from third party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis funds away from Acis in order to evade Terry's arbitration award, he and Ellington were using Highland Capital to induce the HarbourVest Entities to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million in HCLOF. In soliciting this investment, Dondero and Ellington failed to disclose material facts to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing Highland Capital to substantial and unnecessary liability.

150.    In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through Highland Capital, made numerous misrepresentations and omissions, including: (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million

arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

151.    Moreover, unbeknownst to HarbourVest, Dondero intended for CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero controlled and owned entities, including entities managed by NexPoint and HCMFA. Thus, the HarbourVest investment benefited Dondero personally, but left Highland Capital exposed to hundreds of millions of dollars in potential damages to HarbourVest.

152.    At various times in the Highland Capital bankruptcy, Daugherty coordinated with HarbourVest on an ad hoc steering committee basis to identify and seek the return of the assets looted from Highland Capital's estate, HarbourVest and Plaintiff.

### 3.  Willful Misconduct in the Transfer of Highland Capital Credit Strategies Fund's Assets to Dondero, Okada and Ellington Controlled Entities

153.    Another instance involved the Highland Capital Credit Strategies Fund judgment. In that case, Highland Capital was found to have engaged in distinct types of misconduct, where Dondero also personally threatened the redeemer committee's personnel with retribution. The most important aspect of the misconduct is that Highland Capital and Dondero effectively moved the assets to other Highland Capital-controlled entities for far less than their actual value. In fact, Highland Capital paid even less for the interest ($24 million) than it had marked the value on its own books ($28 million) and far less than valuations done by third parties, even those hired by Highland Capital (up to $37 million). Highland Capital did so in secret and the redeemer committee only found out when a line item referring to the $24 million as "Cornerstone sale proceeds" showed up in a regular cash report to the redeemer committee. An arbitration panel

found that Highland Capital not only breached its obligations under the Plan of liquidation but engaged in willful misconduct in its sale of the Fund's Cornerstone equity. The panel found Highland Capital's explanations to excuse its conduct "to put it mildly, far-fetched."

154.    Daugherty communicated several times with members of the Highland Capital Credit Strategies Fund regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital revealed numerous acts of fraud and breaches of fiduciary duty that caused damage to Highland Capital Credit Strategies Fund. Dondero, Ellington, Leventon, Hurst, and Katz/HAK/DLAP embarked on a crusade to smear Daugherty and his law firm while filing numerous baseless show cause motions against him. In addition, the services of the Ashcroft Law Firm ("Ashcroft") were retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and not surprisingly, Ashcroft produced a report that absolved Highland Capital. The arbitration panel disagreed and found in favor of Highland Capital Credit Strategies Fund for over $30,000,000.00 in damages resulting from willful misconduct and breach of fiduciary duty. Once again, for these dubious legal services provided by Hurst, Katz/HAK/DLAP and other firms on behalf of Highland Capital, Plaintiff was allocated the bill.

### 4.  Willful Misconduct in the Transfer of Highland Crusader Fund's Assets to Dondero, Okada and Ellington Controlled Entities

155.    Dondero, Ellington, and Leventon also engaged in misconduct relating to Highland Capital managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds"). Highland Capital had placed the Crusader Funds into wind-down in October 2008. Investors in the funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against Highland Capital, based on allegations that Dondero had refused to make mandated distributions and honor redemption requests, and traded the funds' positions in a

manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors. Certain of these lawsuits were resolved in July 2011, when the parties entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement for its creditors (together, the "Joint Plan and Scheme"). As part of the Joint Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee Highland Capital's wind-down of the Crusader Funds and distribution of proceeds to investors.

156.    On July 5, 2016, the Redeemer Committee (i) terminated Highland Capital as investment manager; (ii) filed a complaint in Delaware Chancery Court against Highland Capital seeking a limited status quo order, a declaration that the Redeemer Committee had "cause" to terminate Highland Capital as manager, and a declaration that Highland Capital had forfeited any right to indemnification as a result of its failure to distribute proceeds to investors of various funds; and (iii) commenced an arbitration proceeding (the "Redeemer Arbitration") against Highland Capital alleging that it had engaged in various forms of misconduct in its role as investment advisor. After two years of arbitration proceedings, the Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that included testimony from eleven fact witnesses and four expert witnesses. On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million. Ultimately, the panel awarded ten forms of damages: (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim ($22,922,608); (3) the Taking of Plan Claims ($3,277,991); (4) the CLO Trades Claim ($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850); (9) the Portfolio Company Award ($71,894,891); and (10) the Administrative Fees Award ($514,164).

157.    The claims that were asserted against Highland Capital by the Redeemer

Committee stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero, Ellington, and Leventon caused Highland Capital to commit. For example, the "Barclays Claim"—which gave rise to over $30 million in liability for Highland Capital—arose out of Dondero, Ellington, and Leventon causing Highland Capital to transfer Barclays' limited partnership interests in the Crusader Funds to Highland Capital's wholly-owned affiliate, Eames, after the Redeemer Committee had already refused to approve that transfer. In so doing, Dondero, Ellington, and Leventon caused Highland Capital to violate the Joint Plan and Scheme and its fiduciary duties. Because of Dondero, Ellington, and Leventon's wrongful conduct, Highland Capital was ordered to pay: (1) over $30 million on account of disgorged partnership interests; (2) additional sums for disgorgement of distribution fees (that were included within the $22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

158.     In addition, from December 2013 through January 2016, Dondero, Ellington, and Leventon caused Highland Capital to purchase 28 Plan Claims from Crusader investors in violation of the Redeemer Committee's right of first refusal ("ROFR"). During this time, Leventon told multiple investors interested in transfers of their interests that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. Leventon also made affirmative misrepresentations to the Redeemer Committee to disguise the fact that Highland Capital had purchased the Plan Claims. Pursuant to the arbitration award, Highland Capital was required to transfer the 28 Plan Claims to the Redeemer Committee, and to disgorge to the Committee whatever financial benefits Highland Capital obtained from the 28 transactions, plus interest at the rate of 9% from the date of each purchase.

159.     Dondero's, Ellington's, and Leventon's conduct also resulted in Highland Capital becoming liable to the Redeemer Committee for over $71 million in connection with claims arising from the Cornerstone Healthcare Group Capital ("Cornerstone") that was owned, directly

and indirectly, by Highland Capital. Some of Cornerstone's stock was owned by the Crusader Funds. Dondero, Ellington, and Leventon caused Highland Capital to covertly purchase shares in Cornerstone from another fund that Dondero controlled at below-market prices and failed to liquidate the Crusader Funds' shares in Cornerstone as their fiduciary duties required. Pursuant to the arbitration award, Highland Capital was required to purchase the Crusader Funds' shares in Cornerstone at a fixed price of $48,070,407, and to pay pre-judgment interest that brought the total claim to $71,894,891.

160.    Additionally, the Joint Plan and Scheme required Highland Capital to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete. Dondero, Ellington, and Leventon caused Highland Capital to violate that provision of the Joint Plan and Scheme by causing Highland Capital to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016. The arbitration panel ruled that as a consequence of Dondero's, Ellington's, and Leventon's blatant breach of the payment requirements of the Joint Plan and Scheme, Highland Capital forfeited its right to these fees entirely.

161.    The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019, to obtain entry of a judgment with respect to the award. The hearing was subsequently continued to October 16, 2019, before the same court presiding over the Daugherty causes involving Dondero, Highland Capital, Ellington, Leventon, Girard, Hurst, and Katz/HAK/DLAP. That morning, Highland Capital filed for bankruptcy.

162.    Daugherty communicated several times with members of the Highland Crusader Fund regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital revealed numerous acts of fraud and breaches of fiduciary duty that caused damage to Highland Crusader Fund. Dondero, Ellington, Leventon, Hurst, and Katz/HAK/DLAP

embarked on a crusade to smear Daugherty and his legal counsel while filing numerous baseless show cause motions against him. In addition, Ashcroft was retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and, not surprisingly, Ashcroft produced a report that absolved Highland Capital and its officers. The arbitration panel disagreed and found in favor of Crusader Funds for over $190,000,000 in damages resulting from willful misconduct and breach of fiduciary duty among other things. Once again, for these dubious legal services provided by Hurst, and Katz/HAK/DLAP in attempting to silence Daugherty on behalf of Highland Capital, Plaintiff was allocated the bill.

### 5.  Dondero And His Accomplices, Including Ellington, and Leventon, Cause Highland Capital To Engage In Misconduct That Increases Its Liability To UBS

163.    In March 2017, the New York state court presiding over UBS's claims against Highland Capital and other fund counterparties ruled its claims could proceed to trial after numerous filings and dismissals since 2009. Shortly thereafter, Dondero, Ellington, and Leventon, along with Highland Capital employees Jean Paul Sevilla ("Sevilla"), Katie (Irving) Lucas ("Irving"), and Matthew DiOrio ("DiOrio") took steps to transfer the fund counterparty's remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington, in order to ensure that such assets would be out of UBS's reach in the event that a judgment was entered in its favor.

164.    In or around August 2017, Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio orchestrated the surreptitious transfer of all of the fund counterparty's assets—with a face amount of $300 million and a market value of at least $100 million —to Sentinel.

165.    The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that insured the fund counterparty's first $100 million of liability to UBS. The real goal of the transfer, however, was to drain the fund counterparty's assets and render them judgment-proof, while keeping the assets

within Dondero's and Ellington's control. There is no legitimate explanation as to why the funds transferred assets worth at least four times the premium payment to Sentinel. And given that Dondero and Ellington indirectly own and control Sentinel, they personally and improperly benefitted from this overpayment.

166.    Moreover, Ellington and Leventon (along with Sevilla, Lucas, and DiOrio) actively concealed the transfer of assets and the existence of the insurance policy from the new Highland Capital management independent board ("Independent Board"), apparently in order to prevent the Fund Counterparties from making a claim under the policy. Indeed, Leventon, who was directly involved in the transfers to Sentinel, was tasked with educating the Independent Board about UBS's claim and the assets potentially available to satisfy it. In response, Leventon delivered an extensive—but intentionally misleading—presentation to the Independent Board that said nothing about the August 2017 asset transfer and the Sentinel insurance policy and lied to Highland Capital regarding the Fund Counterparties' assets. Additionally, around the same time that Ellington and Leventon were hiding this secret insurance policy from the Independent Board, (i) Ellington charged the policy for personal expenses in excess of $500,000 that bore no relation to the UBS litigation and provided no benefit whatsoever to the Fund Counterparties or Highland Capital; and (ii) Ellington and Leventon, among others, entered into agreements whereby Sentinel agreed to pay attorneys' fees and expenses they incurred in connection with Highland Capital's bankruptcy.

167.    As a direct result of Ellington's and Leventon's fraudulent concealment of the transfers to Sentinel, Highland Capital inadvertently made factually inaccurate statements to the Bankruptcy Court and incurred millions of dollars in additional fees litigating (rather than settling) with UBS. In March 2021, after the policy was uncovered through Highland Capital's diligence (notwithstanding Ellington's and Leventon's cover-up), the CDO Fund made a claim on the policy. To date, Sentinel has refused to make any payments.

168.     Daugherty communicated several times with members of the UBS team regarding his views of the value and location of their assets pursuant to his ongoing fiduciary duties under the 1940 Advisors Act. In addition, his countersuit against Highland Capital revealed numerous acts of fraud and breaches of fiduciary duty that caused damage to UBS. Dondero, Ellington, Leventon, Hurst, and Katz/HAK/DLAP embarked on a crusade to smear Daugherty and his counsel while filing numerous baseless show cause motions against him. In addition, Ashcroft was retained to conduct an independent "investigation" into the allegations made by Daugherty. Daugherty was never interviewed and not surprisingly, Ashcroft absolved Highland Capital in its report.

169.     On February 10, 2020, the New York state court disagreed with the Ashcroft report and issued a judgment against the Highland Counterparties in connection with the phase one litigation in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of $1,042,391,031.79. Trial on UBS's claims against Highland Capital was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed infra).

170.     Once again, for these dubious legal services provided by Hurst, Katz/HAK/DLAP, on behalf of Highland Capital, Plaintiff was allocated the bill.

**V.**
**CAUSES OF ACTION**

**COUNT ONE: BREACH OF FIDUCIARY DUTY #1 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – THE BOARD MEMBER GROUP DEFENDANTS**

171.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

172.     Boyce, Britain, Dameris, Dougherty, Ellington[3]  and Honis (collectively, the

---

[3] There is a dispute as to whether Ellington was ever properly a board member due to the timing of the "election"

"Board Member Group") had a fiduciary relationship with Plaintiff as they served on the board of directors of Plaintiff.

173.    The above described buy out and asset stripping scheme of 2013 was nothing more than a ruse to strip Plaintiff of its assets and its distributions for the benefit of Dondero, Okada, Boyce, Collins, Honis, Ellington, Leventon, Girard, and Waterhouse (collectively, "Highland Capital Officers and Employees Group").

174.    Plaintiff discovered in 2022 that Dameris began the scheme with Dondero in December 2012 to strip Plaintiff of its assets for no value by collaborating with Abrams & Bayliss to "…. offer everyone but the 1 a buyout…." Plaintiff but did not learn that Abrams & Bayliss was "Delaware Counsel" until 2022 invoices when some of the invoices were finally provided⌋

175.    Further, Plaintiff discovered in 2022 that in January 2013, Abrams and Bayliss, Boyce, Britain, Ellington, Dameris, Honis, Hurst, Katz and HAK,  discussed, coordinated, prepared and reviewed documents prepared for Plaintiff to execute the scheme to strip Plaintiff of its assets for no value and transfer those assets to Highland Capital for the benefit of Highland Capital and the Highland Capital Officers and Employees Group and the Defendant Trusts.

176.    They revealed their culpability by racing to create broad releases and indemnifications rights for themselves on January 17, 2013, as they attempted to facilitate the buyout.

177.    Plaintiff discovered in 2022 that after the buyout, Leventon and Goldsmith identified over $14 million in assets and distribution transfers to Highland Capital and then Leventon lied under oath in multiple courts that such transfers of "non-certificated" limited partnership interests were simply not possible.

178.    Further, Plaintiff discovered in 2022 that just prior to the Texas Litigation,

---

and thus whether his vote counts and if it did so when it counted; however, that notwithstanding he took actions as a board member and is thus included in this group.

Dondero, Ellington, Leventon, Hurst, Brown, Abrams & Bayliss, Katz/HAK colluded in December 2013 to manufacture false and misleading evidence that an escrow account was created to hold over $3 million to be paid to Plaintiff upon final resolution of the Texas Litigation.

179.    Plaintiff discovered in 2022 that Dameris concealed the value of Plaintiff's assets by saying to Highland Capital colleagues about one particular asset, "I hope he [Daugherty] does not find out about the parking garage deal value". During the Texas trial in 2014, Hurst, Brown and Dondero presented multiple lies about the timing and amount of the escrow to gain advantage for themselves by misleading the judge and jury. Dondero also lied when he testified at the Texas trial that the escrow assets "First go to HERA [Plaintiff]…." Dondero also lied when he testified that the delay caused in funding the escrow for Plaintiff was due to the illiquidity of the escrowed assets when no such assets were ever transferred to the escrow, and in fact the same assets were immediately transferred to Highland Capital purportedly in April 2013.

180.    Plaintiff further discovered in 2022 that Abrams & Bayliss knew that Hurst and Brown stated false facts to the jury in the Texas Litigation regarding the assets in the escrow account and that they were falsely representing the contents therein. They also knew that "Highland is happy for Daugherty to be distracted by another front of warfare in Delaware while he is also fighting the appeal in Texas…… Playing obstructionist in Delaware and then filing the Texas bond after-the-fact if Daugherty seems to be succeeding might be fun for Highland, but I think it harms our credibility."

181.    Plaintiff, discovered in 2022 that Miller of Abrams & Bayliss had the audacity to ask, "Do we look bad for claiming to hold non-monetary assets in escrow when on a day-to-day basis we have no idea what the status of these assets are? I personally am not looking forward to being deposed, even if I do know the questions ahead of time but will do it if I have to." Miller also acknowledged, "…although Highland doesn't seem to care what the Texas trial judge thinks

of it, does Highland lose credibility with the Texas court if the Texas court pierces the escrow account and finds HERA's previous representations that the funds being held in escrow were false?"

182.    Moreover Plaintiff discovered in 2022 that later in 2014, Girard colluded with Abrams & Bayliss further to conceal the true value of the escrow assets on behalf of Plaintiff that were previously presented to the Texas Litigaiton jury so that Highland Capital could collect a "windfall."

183.    During the Delaware litigation in 2019 Dondero testified at trial that he was relying on the advice of counsel, who are co-Defendants in this action, with respect to the buyout of all Plaintiff unit holders except Daugherty, the purported assignment of all assets from Plaintiff in 2013, and the taking of assets from Plaintiff in December 2016, all of which formed part of the fraud that was consummated in December 2016.

184.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by failing to evaluate the buyout offer for fairness.

185.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by failing to disclose all material facts about the buyout offer including that the board members were controlled by Highland Capital and that Boyce, Britain, and Honis were partners of Highland Capital.

186.    The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by

knowing that the buyout offer had been tendered and doing nothing to assure full disclosure of the buyout offer.

187.    The Board Member Group breached their fiduciary duties to Plaintiff. specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own by doing nothing to challenge, and in fact facilitating, the Dondero-led buyout by Highland Capital and allowing a "creeping takeover" unobstructed by a standstill agreement or poison pill.

188.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation, duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by failing to require abstention from conflicted board members who were simultaneously partners and employees of Highland Capital and stood to gain by acquiring the assets of Plaintiff at a substantial discount.

189.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by attempting to acquire broad releases and indemnifications rights for themselves to protect against liability caused by their breaching of fiduciary duties by allowing the buyout or creeping takeover to occur.

190.    The Board Member Group breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by

ignoring Plaintiff's existing governance at the time of the buyout, which prohibited a buyout or purchase by Highland Capital. The Board Member Group instead negotiated for their own individual buyout, abdicated their duties as board members, accepted the buyout, surrendered their rights in Preferred Units of Plaintiff pursuant to the terms of the Transfer Agreement, and automatically surrendered their positions as board members of Plaintiff leaving Plaintiff with no one except Abrams & Bayliss, Hurst, Brown, Katz, Andrews Kurth, Highland Capital Officers and Employees Group to conduct its affairs.

191. The Board Member Group breached their fiduciary duties to Plaintiff specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by participating in a scheme to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

192. The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

193. The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by causing Plaintiff to incur unnecessary legal expenses so that Dondero could use Plaintiff's

relationship with Daugherty to exact his vengeance on Daugherty.

194.    The Board Member Group breached its fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the directors own interest and the duty of the utmost good faith in the officers relations with the corporation by allocating legal expenses incurred by Highland Capital to Plaintiff.

195.    The Board Member Group's breaches proximately caused injury to Plaintiff in forcing it to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT TWO: BREACH OF FIDUCIARY DUTY #2 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – DONDERO ERA MANAGEMENT DEFENDANTS

196.    Dondero and his alter ego, Highland ERA Management, LLC ("ERA" and together, "Dondero ERA Management")[4] had a fiduciary relationship with Plaintiff in February 2013. ERA was a limited liability company created by Dondero, as President, in collaboration with Surgent, Dameris, Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, Boyce, Britain and Honis purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

197.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and managers relations with the corporation when they purported to implement an action by written consent in February 2013 that allocated 93% of Highland Capital's expenses related to the Highland Capital v.

---

[4] ERA Management is not a party to this lawsuit as it is also an entity that Daugherty obtained control of from the Delaware settlement.

Daugherty litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

198.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager relations with the corporation by failing to require abstention from conflicted Dondero ERA Management who were simultaneously President and managing partner at Highland Capital and President, Manager and general partner at Plaintiff in February 2013, when they implemented an action by consent that allocated 93% of Highland Capital's expenses related to the Highland Capital v. Daugherty litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

199.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and managers relations with the corporation by attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

200.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to require abstention from conflicted Dondero ERA Management who

were attempting to acquire broad releases and indemnifications rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

201.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

202.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to require abstention from conflicted Dondero ERA Management who were participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

203.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

204.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporation's interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by allocating legal expenses incurred by Highland Capital to Plaintiff.

205.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

206.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by approving or signing accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital.

207.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by falsely representing to be the President and manager of Plaintiff while secretly

concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

208.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation when they collaborated with Brown, Hurst, Katz/HAK, Abrams & Bayliss, Dondero, Ellington, and Leventon to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013.

209.    Dondero ERA Management's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT THREE: BREACH OF FIDUCIARY DUTY #3 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – HIGHLAND CAPITAL OFFICERS AND EMPLOYEES DEFENDANTS

210.    Plaintiff had fiduciary duty relationships with Dondero, Okada, Boyce, Collins, Honis, Ellington, Leventon, Girard, and Waterhouse (collectively, "Highland Capital Officers and Employees Group"). This fiduciary relationship arose out of the long relationship between the Highland Capital Officers and Employees Group and the Plaintiff whereby Plaintiff relied on the Highland Capital Officers and Employees Group to act in its best interest. Similarly, the fiduciary relationship arises as a result of the dominance on the part of the Highland Capital Officers and Employees Group compared to the weakness and dependence on the part of the Plaintiff.

211.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure, by failing to protect it from having its assets stripped and instead facilitating the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

212.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

213.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by allocating legal expenses incurred by Highland Capital to Plaintiff.

214.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

215.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by ostensibly providing legal services to Plaintiff that were in actuality for the benefit of Highland Capital to develop and execute a scheme to strip Plaintiff of its assets

and transfer them Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

216.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by secretly concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

217.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by serving in the capacity as advisors to Plaintiff in addition to that of its largest investment, Restoration Capital Partners, LP, along with investments in  Highland Capital Real Estate Fund, L.P., Sugar Land Project, LLC, HCREA Nolen Drive, L.P. HE MEZZ KR, LLC., HCREA Trimarchi of North Dallas, L.P., CHS Electronics, Inc., HE Capital KR, LLC. And HYSKY Communications, Inc. and allowing Plaintiff's assets to be transferred to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

218.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by allocating legal expenses incurred by Highland Capital to Plaintiff.

219.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain

from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by serving in the capacity as administrator, implementor and executor to effectuate Dondero's scheme to transfer ownership of Plaintiff in January 2013 and ultimately its assets to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

220.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by collaborating with Swadley, Klos and Surgent to prepare, allocate, approve and/or sign inaccurate accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital .

221.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by wrongfully participating in and coordinating the 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

222.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure when they collaborated with outside counsel to conceive and falsify misleading evidence with Brown, Hurst, Katz/HAK, and Abrams & Bayliss that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013.

223.     Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure when they collaborated with Brown, Hurst, and Surgent to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of April 2013.

224.     Highland Capital Officers and Employees Group breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT FOUR: BREACH OF FIDUCIARY DUTY #4 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – OUTSIDE LEGAL PROVIDERS GROUP #1 DEFENDANTS

225.     Abrams & Bayliss, Hurst and Katz/HAK (collectively, "Outside Legal Providers Group #1") had a fiduciary relationship with Plaintiff in that they acted as attorneys for and provided legal services to Plaintiff.

226.     Abrams & Bayliss stated in its engagement letter, "You are engaging us solely to provide civil litigation and related services in connection with the civil action pending in the District Court of Dallas County, Texas, styled Highland Capital Management, L.P. v. Daugherty, No. 12-04005. We refer to our advice with respect to this matter as the 'Representation.' Our engagement is limited to the Representation. We are not acting as your counsel generally or on other matters. We are engaged to represent you as your exclusive Delaware counsel in connection with the Representation. With respect to entities or persons generally affiliated or associated with you, including entities owned by or otherwise related to you, you agree that the Firm is not being asked to provide, and will not be providing, legal advice to, or establishing an attorney-client relationship with, any such affiliated entity or person in his, her, or its individual

capacity and will not be expected to do so unless the Firm has been asked and has specifically agreed to do so in writing. Additionally, although in the course of our Representation we may receive or provide information or advice from or to your affiliates, associates, agents, or employees, our engagement is to represent you and not any of your affiliates, associates, agents, or employees."

227.    Abrams & Bayliss further stated, "We understand that you have retained Gruber Hurst Johansen Hail Shank LLP ('Gruber Hurst') with respect to matters related to the Representation. We expect to consult with Gruber Hurst, and you have confirmed that we may rely on instructions given and information provided by Gruber Hurst as to all matters involving the Representation and that, absent written notice from you, we may take direction from Gruber Hurst as if provided directly by you." Hurst and Brown were the lead attorneys at Gruber Hurst that provided legal services to and invoiced Plaintiff.

228.    The civil litigation in Texas pertaining to Plaintiff was limited to the breach of its implied duty of good faith and fair dealing with regard to the damages to Daugherty's interest in Plaintiff caused by the implementation of Article XII Dispute Resolution of the Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets, LLC on February 16, 2012 where the jury determined such bad faith actions to have caused a diminution in Daugherty's interests[5]

229.    Importantly, the Texas Litigation against Plaintiff did not include actions against or on behalf of Highland Capital or Sierra Verde, nor did it include corporate actions based on asset transfers.

230.    Katz/HAK purported to represent Plaintiff in Delaware Court through 2017 up until the Highland Capital bankruptcy filing in 2019.

---

[5] . The Texas Litigation was limited to claims against Plaintiff board members Boyce and Britain for involvement in Second Amended and Restated Limited Liability Company Agreement of Highland Employee Assets, LLC.

231.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they developed, advised and assisted the implementation of the Dondero scheme to deprive Daugherty of his interests in Plaintiff's assets in 2013 by stripping Plaintiff of all its assets and transferring them to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

232.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they developed, advised and assisted the implementation of the Dondero scheme to deprive Daugherty of his interests in Plaintiff's assets in 2013 that transferred substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

233.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when it prepared, revised and distributed certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability. Those documents include but are not limited to:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a

resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board members;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated in.

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting to amend section 5.1 and 5.2. to allow assignment to Highland capital.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment for ARTICLE VIII modification to grant broad releases to the board that just ignored their fiduciary duties.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment Section 5.1 and 5.2 modification to alter board member service requirements and approve recommendation of assignment of preferred units to Highland Capital.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013, with recommendation for dispute reserve and fairness opinion that did not happen.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013with recommendation for dispute reserve and fairness opinion that did not happen.

- THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- EXPENSE ALLOCATION AGREEMENT – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- WRITTEN CONSENT OF MANAGER - Effective as of February 1, 2013 – regarding allocation of Highland Capital's legal expenses to Plaintiff.

234.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly

004338

honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they failed to inform all of Plaintiff's board members of their fiduciary duties to Plaintiff regarding the buyout and subsequent transfer of assets in 2013 to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

235.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by failing to protect Plaintiff from having its assets stripped in 2013 and instead facilitating the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

236.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

237.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they knew their legal expenses incurred on behalf of Highland Capital were allocated to Plaintiff.

238.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff,

specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by presenting evidence of invoices they attributed to legal costs regarding the Texas Litigation and then later presenting evidence while defending Plaintiff in the Daugherty v. Highland Employee Retention Asset, LLC trial in Delaware to justify the transfer of Plaintiff's assets to Highland pursuant to an expense allocation agreement that allocated those same invoices to Plaintiff despite knowing that Daugherty had already paid the invoices submitted in the Texas Litigation – double dipping their legal expenses and concealing that Daugherty had already reimbursed Highland Capital for the invoices presented at the Texas Litigation.

239.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by wrongfully participating in and coordinating the 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

240.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they collaborated to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of

December 2013.

241.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they caused Plaintiff to incur unnecessary legal expenses by invoicing and/or allocating to Plaintiff legal expenses that were actually for the benefit of Highland Capital, including but not limited to unrelated third-party employee harassment and separation agreement matters, defense matters concerning Sierra Verde, Dondero and Okada, issues concerning their interests in the Acis Capital Bankruptcy, litigation against the Wall Street Journal for unflattering articles, press spin communications, a multitude of discrete legal actions on behalf of Highland Capital against Daugherty, and to pursue Dondero's various vendettas against former employees Terry and Daugherty, including but not limited to Highland Capital's numerous failed attempts to have Daugherty held in contempt and incarcerated for fabricated violations of a since vacated injunction while almost $30,000 in donations were funneled to the presiding judge from Katz, Hurst, Ellington, Leventon, Sevilla, DiOrio and Crystal Jameson Woods (counsel at Hutton Andrews Kurth and DLA Piper on behalf of Plaintiff).

242.    Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when it knowingly double allocated invoices to both Plaintiff and Highland Capital while representing to the Delaware Court that they were allocated to Plaintiff.

243.     Outside Legal Providers Group #1 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by causing Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

244.     Outside Legal Providers Group #1's breaches proximately caused injury to the Plaintiff and/or resulted in a benefit to the Defendants.

## COUNT FIVE: BREACH OF FIDUCIARY DUTY #5 –TRANSFER OF ESCROW ASSETS 2016- DONDERO ERA MANAGEMENT DEFENDANTS

245.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

246.     Dondero and his alter ego, Highland ERA Management, LLC ("ERA" and together, "Dondero ERA Management") had a fiduciary relationship with Plaintiff in December 2016. ERA was a limited liability company created by Dondero, as President, in collaboration with Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, and Hutton Andrews Kurth purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

247.     Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable interest in Highland Restoration Partners fund, cash, and shares in NexPoint Credit strategies fund . These interests

Case 3:25-cv-01876-K049Bocumentxhibit39 Filed09/11/25127Page 896 of 1195 age 80f0 10609

were assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis.

248.     Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to require abstention from conflicted Dondero ERA Management, who were participating in a scheme that was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis.

249.     Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

250.     Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by allocating legal expenses incurred by Highland Capital to Plaintiff.

251.     Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's

own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

252.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by approving or signing false accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, falsely recognized loan obligations back to Highland Capital.

253.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by failing to evaluate the fairness of a transfer on behalf of all preferred unit holders of Plaintiff.

254.    Dondero ERA Management breached their fiduciary duties to Plaintiff, specifically the duty of due care, duty of loyalty, duty to use uncorrupted business judgment for the sole benefit of the corporation and duty to place the corporations interest above the manager's own interest and the duty of the utmost good faith in the officers and manager's relations with the corporation by ignoring Plaintiff's existing governance at the time of the transfers that prohibited substantial assets transfers without amendment.

255.    Dondero ERA Management's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff

in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT SIX: BREACH OF FIDUCIARY DUTY #6 –TRANSFER OF ESCROW ASSETS 2016- HIGLAND CAPITAL OFFICERS AND EMPLOYEES GROUP

256.    Plaintiff had fiduciary duty relationships with Highland Capital Officers and Employees Group. This fiduciary relationship arose out of the long relationship between the Highland Capital Officers and Employees Group and the Plaintiff whereby Plaintiff relied on the Highland Capital Officers and Employees Group to act in its best interest. Similarly, the fiduciary relationship arises as a result of the dominance on the part of the Highland Capital Officers and Employees Group and the weakness and dependence on the part of the Plaintiff.

257.    Dondero, Ellington, and Leventon testified that services were provided to Plaintiff under a Blanket Agreement. Highland Capital Officers and Employees Group provided management, administration, legal, accounting, tax, administration, and implementation services creating fiduciary relationship with Plaintiff.

258.    Okada, as Chief Investment Officer, testified about the importance of transparency, trust, alignment of interest and putting the client first. None of those virtues were practiced with regard to the transfer of assets from the escrow account in December 2016.

259.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by failing to protect it from having its remaining assets stripped from the escrow and instead facilitating the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

260.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by participating in the 2016 remaining asset stripping scheme that left

Plaintiff insolvent and unable to pay its expenses and debts.

261.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by allocating legal expenses incurred by Highland Capital to Plaintiff.

262.    Highland Capital Officers and Employees Group breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing and the duty of full disclosure by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

263.    Ellington, Leventon and Girard breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure, duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by ostensibly providing legal services to Plaintiff that were in actuality for the benefit of Highland Capital to develop and execute a scheme to strip Plaintiff of its remaining escrow assets and transfer them to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

264.    Dondero, Okada and Honis breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by serving in the capacity as advisors to Plaintiff in addition to that of its largest investment,

Restoration Capital Partners, and allowing Plaintiff's remaining escrow assets to be transferred to Highland Capital in December 2016 for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

265.    Collins breached his fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by serving in the capacity as administrator, implementor and executor to effectuate the stripping of the remaining assets from the escrow in December 2016 and the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

266.    Waterhouse and Leventon breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by preparing, allocating, approving and/or signing accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, wrongly failed to indicate payments made by Daugherty and falsely recognized loan obligations back to Highland Capital.

267.    Ellington, Leventon and Girard breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure by wrongfully participating in and coordinating the 2016 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

268.    Ellington, Leventon and Girard breached their fiduciary duties to Plaintiff, specifically the duty of loyalty and utmost good faith, duty of candor, duty to refrain from self-

dealing, duty to act with integrity of the strictest kind, duty of honest fair dealing, the duty of full disclosure when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

269.    Highland Capital Officers and Employees Group's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT SEVEN: BREACH OF FIDUCIARY DUTY #7 –TRANSFER OF ESCROW ASSETS 2016- OUTSIDE LEGAL PROVIDERS GROUP #2 DEFENDANTS

270.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

271.    Abrams & Bayliss, Hurst, Katz/HAK and Brown (collectively, "Outside Legal Providers Group #2") had a fiduciary relationship with Plaintiff in that they acted as attorneys for and provided legal.

272.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they developed, advised and assisted the implementation of the Dondero scheme that transferred Plaintiff's remaining assets from escrow in 2016 to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington, and Honis.

273.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation,

and the duty to timely inform Plaintiff of conflict of interest when they failed to inform Plaintiff's managers of their duties to Plaintiff regarding the escrow assets and subsequent transfer of assets to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis despite performing legal analysis of the previous board members' breach of fiduciary duty to Plaintiff and its unit holders on December 2016.

274.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they collaborated with Ellington, Leventon and Girard in December 2016 to transfer Plaintiff's remaining assets to Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

275.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by knowing their invoices were being double allocated to both Plaintiff and Highland Capital while representing to the Delaware Court that they were allocated to Plaintiff.

276.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they caused Plaintiff to incur

unnecessary legal expenses by invoicing and/or allocating to Plaintiff legal expenses that were for the benefit of Highland Capital for matters concerning Josh Terry, the Acis Capital Bankruptcy, Highland Capital claims against Daugherty including but not limited to numerous failed attempts to have Daugherty held in contempt and incarcerated for fabricated violations of the an injunction for the benefit of Highland Capital to prevent Daugherty from disclosing Highland Capital's confidential information (the injunction was subsequently vacated pursuant to Daugherty's bankruptcy court approved settlement with Highland Capital).

277.    Hurst and Brown breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest when they represented and invoiced Plaintiff in the Texas litigation with Daugherty for services provided on behalf of Highland Capital. In 2014, Daugherty won a judgment in the Texas litigation against Plaintiff that was defended by Hurst and Brown for breach of good faith and fair dealing with regards to the implementation of the Second Amended and Restated Limited Liability Operating Agreement of Highland Employee Retention Assets, LLC that resulted in an award of approximately $5 million in damages and interest against Plaintiff. However, Hurst and Brown invoiced Plaintiff for services rendered on behalf of Highland Capital before and after the Texas Litigation.

278.    Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by participating in the 2016 remaining asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and

debts.

279.     Outside Legal Providers Group #2 breached their fiduciary duties to Plaintiff, specifically the duty to represent the Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by knowing Daugherty had paid over $3.1 million in payment to Highland Capital for its legal invoices that were subsequently presented to the Delaware court as unpaid legal obligations on behalf of Plaintiff. Additionally, invoices were being double allocated to both Plaintiff and Highland Capital while they represented to the Delaware Court that they were allocated to Plaintiff.

280.     Outside Legal Providers Group #2's breaches proximately caused injury to Plaintiff and/or resulted in a benefit to the Defendants.

## COUNT EIGHT: BREACH OF CONTRACT #1 -- BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 -- BOARD MEMBER GROUP DEFENDANTS

281.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

282.     The Board Member Group had a valid, enforceable contract with Plaintiff. Plaintiff is the proper party to bring suit for breach of the contract. Plaintiff performed, tendered performance of, or was excused from performing its contractual obligations.

283.     Pursuant to Section 5.1 and 5.2 of the Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets, LLC (the "HERA Company Agreement"), The Board Member Group agreed to operate Plaintiff and its business Section 2.1 Purpose to hold and receive assets.

284.     The Board Member Group breached its contractual obligations under Section 2.1 to receive and hold assets and instead participated and/or acquiesced to a scheme that stripped Plaintiff of its assets for no value and sent those assets to Highland Capital for the benefit of

Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

285.    The Board Member Group breached its contractual obligations under Section 3.4 to maintain Capital Accounts pursuant to the terms of 3.4.(a)(i)–(iv) as they participated and/or acquiesced to a scheme to misallocate expenses, net income, and net losses to individual member Capital Accounts.

286.    The Board Member Group breached its contractual obligations under Section 3.5 to maintain allocate Net Income and Net Loss pro rata in accordance with each vested Series A Preferred Unit holders Capital Account balance as they participated and/or acquiesced to a scheme to misallocate expenses, net income, and net losses to individual member Capital Accounts.

287.    The Board Member Group breached its contractual obligations under Section 4.1 by participating or acquiescing to a scheme that allowed distributions to be made of all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

288.    The Board Member Group breached its contractual obligations under Section 5.2 (b)(iv) to Plaintiff by not obtaining prior affirmative vote or written consent of at least 75% of the members of the Board to make the purported amendments, alterations, changes and/or repeals to the purported in the January 17, 2013 and January 18, 2013 governance actions by amendment and/or written consent pursuant to the HERA Company Agreement. Such actions include but are not limited to the following:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC – Effective as of January 17, 2013 – Regarding expenses;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC – Effective as of January 17, 2013 –

Regarding transfer of Joseph Dougherty Preferred Units to Highland Capital;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board signed by Boyce, Britain, Dameris, Honis and Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting

to amend section 5.1 and 5.2.

- **SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC** – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated.

- **TRANSFER AGREEMENT** – for the buyout and release of claims against Plaintiff.

- **OFFER TO PURCHASE** – dated January 15, 2013with recommendation for dispute reserve and fairness opinion that did not happen.

- **THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC** – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- **EXPENSE ALLOCATION AGREEMENT** – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- **WRITTEN CONSENT OF MANAGER** - Effective as of February 1, 2013 – regarding allocation of Highland Capital's legal expenses to Plaintiff.

289.    The Board Member Group breached its contractual obligations under Section 5.6 to Plaintiff by causing it to prepare false tax returns that improperly reflected the preferred unit holders share of income, loss, credit, and deductions.

290.    The Board Member Group breached its contractual obligations under ARTICLE IX by allowing the preferred units to be assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trust, Boyce, Britain, and Honis.

291.    The Board Member Group breached its contractual obligations to Plaintiff under

Section 11.1 by ignoring its obligation of Separateness and Operations by:

- 11.1(a)(i) and (ii) not solely holding assets for distribution to former employees of Highland Capital, and not distributing the proceeds of Retention Assets pursuant to the terms of the Series A Preferred Units of the Plaintiff

- 11.1(b) allowing the Plaintiffs assets to be listed on the books of another entity, Highland Capital's for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

- 11.1(d) allowing its funds to be commingled with affiliates, Highland Capital's for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

- 11.1(e) allowing the Plaintiff to be obligated for Highland Capital's legal expenses and holding Plaintiff out as responsible to pay Highland Capital's legal expenses for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

- 11.1(f) failing to allocate expenses to Plaintiff in a fair and reasonable manner.

- 11.1(g) failing to hold regular board meetings.

- 11.1(h) limiting the Plaintiff to paying its own liabilities and expenses to the benefit of Highland Capital and Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

292.    The Board Member Group's breaches caused Plaintiff injury.

## COUNT NINE: IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING #1 — BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – BOARD MEMBER GROUP DEFENDANTS

293.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

294.    The Board Member Group owed Plaintiff an implied duty of good faith and fair

dealing due to their contractual relationship.

295.     The Board Member Group and Plaintiff did not consider at the time of contracting that the Board Member Group would allow Plaintiff's assets to be stripped and transferred to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis for no value. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing to Plaintiff by failing to protect it from having its assets stripped and instead facilitating the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis for no value.

296.     The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would allow Plaintiff's assets to be stripped leaving Plaintiff insolvent and unable to pay its expenses and debts. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, the Board Member Group breached their implied duty of good faith and fair dealing by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

297.     The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would allocate Highland Capital's legal expenses to Plaintiff (including those already repaid by Daugherty). The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing by allocating legal expenses incurred by Highland Capital to Plaintiff.

298.     The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would double allocate legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty. The Board Member Group and Plaintiff

would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

299.    The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would participate in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability by doing so. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing to Plaintiff when they participated in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability. Those documents include but are not limited to:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated in.

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting to amend section 5.1 and 5.2. to allow assignment to Highland capital.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment for ARTICLE VIII modification to grant broad releases to the board that just ignored their fiduciary duties at the advice of A&B and Hurst and Brown.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment Section 5.1 and 5.2 modification to alter board member service requirements and approve recommendation of assignment of preferred units to Highland Capital.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013with recommendation for dispute reserve and fairness opinion that did not happen.

004358

- THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- EXPENSE ALLOCATION AGREEMENT – Dated February 1, 2013, regarding allocation of Highland Capital's legal expenses to Plaintiff.

- WRITTEN CONSENT OF MANAGER - Effective as of February 1, 2013 – regarding allocation of Highland Capital's legal expenses to Plaintiff.

300.    The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would participate in preparing, allocating, approving, or signing false accounting statements and tax returns that purported to transfer all of Plaintiff's assets to Highland Capital, falsely allocate Highland Capital expenses to Plaintiff, and falsely allocate loan obligations back to Highland Capital. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing to Plaintiff by participating in preparing, allocating, approving, or signing false accounting statements and tax returns that purported to transfer all of Plaintiff's assets to Highland Capital, falsely allocate Highland Capital expenses to Plaintiff, and falsely allocate loan obligations back to Highland Capital.

301.    Ellington and Plaintiff did not consider at the time of contracting that Ellington would falsely represent himself to be a board member for a three-day period to legitimize and effectuate the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis. Ellington and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Ellington breached his implied duty of good faith and fair dealing to Plaintiff by falsely representing to be a board member for a three-day period to legitimize and effectuate the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada

and his trusts, Boyce, Britain and Honis.[This should probably get moved to the next section since he was not a board member].

302.    The Board Member Group and Plaintiff did not consider at the time of contracting that The Board Member Group would allow Dondero to use Plaintiff's relationship with Daugherty to further his vendetta against Daugherty causing Plaintiff to incur unnecessary legal expenses and loss. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Board Member Group breached their implied duty of good faith and fair dealing by causing Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

303.    The Board Member Group's breaches caused Plaintiff injury.

## COUNT TEN: IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING #2-- BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

304.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

305.    Dondero, Ellington, and Leventon testified that management, administration, legal, accounting, tax, and implementation services were provided to Plaintiff under a Blanket Agreement.

306.    Highland Capital Officers and Employees Group owed Plaintiff an implied duty of good faith and fair dealing due to their contractual relationship.

307.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would not protect Plaintiff from having its assets stripped and instead would facilitate the transfer of those assets to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The

Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to Plaintiff by allowing it to have its assets stripped and instead facilitated the transfer of those assets to Highland Capital in April 2013 for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

308.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would participate in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, the Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by participating in the 2013 asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

309.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would allocate Highland Capital's legal expenses to Plaintiff (including those already repaid by Daugherty). The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by allocating legal expenses incurred by Highland Capital to Plaintiff.

310.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would double allocate legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by

double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

311.   The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would participate in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability by doing so. The Board Member Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to Plaintiff when they participated in preparing, revising, and distributing certain documents designed to strip Plaintiff of all its assets and assist the board members in shielding their liability. Those documents include but are not limited to:

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 18, 2013 – Regarding approving a resolution to transfer of Series A Preferred units to Highland Capital in violation of Article IX, and accepting Highland Capitals offer to purchase in violation of Section 5.2(b)(ii).

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding approving amendment to Article VIII – Expanded indemnification for board;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removing of Joseph Dougherty as board member and replacing him with Scott Ellington;

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HIGHLAND EMPLOYEE RETENTION ASSETS LLC - Effective as of January 17, 2013 – Regarding removal of Walia as board member and approving Amendment;

- AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, to add Ellington to board, remove Walia from board and reduce board size to five members by Boyce, Britain, Dameris, Honis and Ellington;

- SECOND AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 17, 2013, purporting to amend ARTICLE VIII in its entirety and provide the self-dealing board members with broad indemnification for the bad conduct they just participated in.

- THIRD AMENDMENT TO SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF HIGHLAND EMPLOYEE RETENTION ASSET, LLC – Dated January 18, 2013, purporting to amend section 5.1 and 5.2. to allow assignment to Highland capital.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment for ARTICLE VIII modification to grant broad releases to the board that just ignored their fiduciary duties at the advice of A&B and Hurst and Brown.

- WRITTEN CONSENT OF BOARD OF DIRECTORS OF HOLDERS OF SERIES A PREFERRED - Effective as of January 18, 2013 – purporting to consent to the Amendment Section 5.1 and 5.2 modification to alter board member service requirements and approve recommendation of assignment of preferred units to Highland Capital.

- TRANSFER AGREEMENT – for the buyout and release of claims against Plaintiff.

- OFFER TO PURCHASE – dated January 15, 2013 with recommendation for dispute reserve and fairness opinion that did not happen.

   312.    The Highland Capital Officers and Employees Group and Plaintiff did not

consider at the time of contracting that The Highland Capital Officers and Employees Group would participate in preparing, allocating, approving, or signing false accounting statements and tax returns that purported to transfer all of Plaintiff's assets to Highland Capital, falsely allocate Highland Capital expenses to Plaintiff, and falsely allocate loan obligations back to Highland Capital. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to Plaintiff by participating in preparing, allocating, approving, or signing false accounting statements and tax returns that purported to transfer all of Plaintiff's assets to Highland Capital, falsely allocate Highland Capital expenses to Plaintiff, and falsely allocate loan obligations back to Highland Capital.

313.    Ellington did not consider at the time of contracting that Ellington would falsely represent himself to be a board member for a three-day period to legitimize and effectuate the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis. Ellington and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Ellington breached his implied duty of good faith and fair dealing to Plaintiff by falsely representing to be a board member for a three-day period to legitimize and effectuate the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

314.    The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would allow Dondero to use Plaintiff's relationship with Daugherty to further his vendetta against Daugherty causing Plaintiff to incur unnecessary legal expenses and loss. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the

parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by causing Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

315.  The Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that The Highland Capital Officers and Employees Group would collaborate with outside counsel to conceive and falsify misleading evidence with Brown, Hurst, Katz/HAK and Abrams & Bayliss that was presented in the Texas Litigation to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013. The Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing by when they collaborated with outside counsel to conceive and falsify misleading evidence with Surgent, Brown, Hurst, Katz/HAK and Abrams & Bayliss that was presented in the Texas Litigation to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013.

316.  Highland Capital Officers and Employees Group's breaches caused Plaintiff injury.

## COUNT ELEVEN: IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING #3 — BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – DONDERO ERA MANAGEMENT GROUP DEFENDANTS

317.  Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

318.  Dondero, Ellington, and Leventon testified that management, administration, legal, accounting, tax, and implementation services were provided to Plaintiff under a Blanket Agreement. [I'm not sure this is proper here].

319.    Dondero and his alter ego, Highland ERA Management, LLC ("ERA" and together, "Dondero ERA Management") owed Plaintiff implied duties of good faith and fair dealing in February 2013. ERA was a limited liability company created by Dondero, as President, in collaboration with Surgent, Dameris, Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, Boyce, Britain and Honis purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

320.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would attempt to implement an action by written consent in February 2013 that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, The Highland Capital Officers and Employees Group breached their implied duty of good faith and fair dealing to implement an action by written consent in February 2013 that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

321.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would not require abstention from conflicted Dondero ERA Management who were simultaneously President and managing partner at Highland and President, Manager and general partner at Plaintiff in February 2013, when they implemented an action by consent that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their implied duty of good faith and fair dealing to plaintiff when they

implemented an action by consent that allocated 93% of Highland Capital's expenses related to the Texas and Delaware litigation to Plaintiff that ultimately benefited Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

322. Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would attempt to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the 2013 asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account in December 2013. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

323. Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would not abstain from attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the 2013 asset transfer to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account in December 2013. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by not abstaining before attempting to acquire broad releases and indemnification rights for themselves in 2013 to protect against liability caused by their breaching of fiduciary duties in allowing the asset transfer

to occur, the expense allocation to occur, the unnecessary legal expenses to occur, and the costs associated with the fraudulent escrow account.

324.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would participate in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it  Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

325.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would not abstain from participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by not abstaining from participating in a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

326.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would participate in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA

Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts.

327.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would double allocate legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

328.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would approve and/or sign accounting statements and tax returns from 2013 to 2022 that purported to transfer substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by approving and/or signing accounting statements and tax returns from 2013 to 2022 that purported to transfer substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, and falsely recognized loan obligations back to Highland Capital.

329.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would falsely represent to be the President and manager of Plaintiff while secretly concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his

trusts, Boyce, Britain and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by falsely representing to be the President and manager of Plaintiff while secretly concealing the documentation and governance documents that proved they had no legitimate authority for the purpose of legitimizing and effectuating the Dondero scheme to transfer Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.

330.     Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff when they collaborated with Brown, Hurst, Katz/HAK, Abrams & Bayliss, Dondero, Ellington, Leventon and Surgent to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from Plaintiff in April 2013 were held in an escrow account as of December 2013.

331.     Dondero ERA Management's breaches proximately caused injury to Plaintiff in forcing Plaintiff to lose all of its assets and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

## COUNT TWELVE: BREACH OF IMPLIED GOOD FAITH AND FAIR DEALING #4 – TRANSFER OF ESCROW ASSETS 2016- DONDERO ERA MANAGEMENT DEFENDANTS

332.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

333.     Dondero ERA Management owed Plaintiff an implied duty of good faith and fair

dealing in 2016. ERA was a limited liability company created by Dondero, as President, in collaboration with Surgent, Dameris, Ellington, Leventon, Surgent, Abrams & Bayliss, Hurst, Katz/HAK, Boyce, and Britain purportedly to serve as the sole general partner and manager of Plaintiff after the Board Member Group vacated their director positions.

334.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would participate in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable purported interest in Highland Restoration Partners fund and substantial cash and transfer those interest to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable purported interest in Highland Restoration Partners fund and substantial cash. These interests were assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis.

335.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would fail to require themselves to abstain from conflicted positions regarding a scheme that was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by failing to require abstention from conflicted Dondero ERA Management who were participating in a scheme that

was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis.

336.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

337.    Dondero ERA Management and Plaintiff did not consider that Dondero ERA Management would fail to require themselves to abstain from conflicted positions by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly,, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by failing to require abstention from conflicted Dondero ERA Management who were participating in a scheme that was designed to strip Plaintiff of its remaining assets in escrow pursuant to the December 2016 assignment of substantially all of Plaintiff's remaining assets to Highland Capital Highland Capital for the benefit of Highland Capital, Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington, and Honis.

338.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would participate in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts. Dondero ERA

Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by participating in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts.

339.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would cause injury to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by causing injury to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

340.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would fail to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by failing to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff.

341.    Dondero ERA Management and Plaintiff did not consider at the time of contracting that Dondero ERA Management would ignore Plaintiff's existing governance at the time of the escrow transfers that prohibited substantial assets transfers without amendment. Dondero ERA Management and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by ignoring Plaintiff's existing governance at the time of the escrow

transfers that prohibited substantial assets transfers without amendment.

342.    Dondero ERA Management and Plaintiff did not consider at the time of
contracting that Dondero ERA Management would cause injury to Plaintiff in forcing Plaintiff
to lose all of its escrow assets and incur unnecessary legal expenses by involving Plaintiff in their
scheme to deprive Daugherty of his interests in Plaintiff. Dondero ERA Management and
Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly,
Dondero ERA Management breached their duty of good faith and fair dealing to Plaintiff by
causing injury to Plaintiff in forcing Plaintiff to lose all of its escrow assets and incur unnecessary
legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in
Plaintiff.

## COUNT THIRTEEN: BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING #5 –TRANSFER OF ESCROW ASSETS 2016- HIGLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

343.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as
if fully set forth below.

344.    Dondero, Ellington, and Leventon testified that management, administration,
legal, accounting, tax, and implementation services were provided to Plaintiff under a Blanket
Agreement.

345.    Highland Capital Officers and Employees Group owed Plaintiff an implied duty of
good faith and fair dealing in 2016.

346.    Highland Capital Officers and Employees Group and Plaintiff did not consider
that Highland Capital Officers and Employees Group would participate in a new December 2016
scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including
a valuable purported interest in Highland Restoration Partners fund and substantial cash and
transfer those interest to Highland Capital for the benefit of Dondero and his trusts, Okada and
his trusts, Hunter Mountain Trust, Ellington and Honis. Highland Capital Officers and

Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by participating in a new December 2016 scheme that was designed to strip Plaintiff of its remaining assets in an escrow account including a valuable purported interest in Highland Restoration Partners fund and substantial cash. These interests were assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis.

347.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would be participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by participating in the 2016 escrow stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

348.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would participate in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by participating in an asset stripping scheme that would leave Plaintiff insolvent and unable to pay its expenses and debts.

349.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would cause injury

to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by causing injury to Plaintiff in forcing Plaintiff to lose all of its assets in escrow and incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

350.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would fail to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by failing to evaluate the fairness of the escrow transfer on behalf of all preferred unit holders of Plaintiff.

351.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would ignore Plaintiff's existing governance at the time of the escrow transfers that prohibited substantial assets transfers without amendment. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by ignoring Plaintiff's existing governance at the time of the escrow transfers that prohibited substantial assets transfers without amendment.

352.    Highland Capital Officers and Employees Group and Plaintiff did not consider at the time of contracting that Highland Capital Officers and Employees Group would cause injury to Plaintiff by forcing Plaintiff to lose all of its escrow assets and incur unnecessary legal expenses

by allocating over $14 million in legal expenses, including cocktails and meals, incurred on behalf of Highland Capital and its affiliates to Plaintiff [including but not limited to Hutton Andrews Kurth, DLA Piper, Gruber Hurst, Abrams & Bayliss, Lynn Pinker Hurst Schwegman, Ashcroft Law Firm, Cole Schotz, Morgan Lewis, Stanton Law Firm, Bell Nunnally, Cooke Young & Keidan, Fish & Richardson, Gardner Haas, Greenberg Traurig, The Griffith Law Firm, Hutcherson Law, Littler Mendelson, Nutter, McLennen & Fish, Contractual Counsel, Robert Half, The Stanton Law Firm, Berkeley Research Group, Bloom Strategic Consulting, CBIZ valuation Group, Digital Works, Duff and Phelps, Elite Document Technology, Esquire Deposition Solutions, Folks & Associates, Point Multimedia, Phil Rochefort Audio Services, Gary Durham Consulting, JAMS Inc, Matthew Okolita, and Michael Colvin.] by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Highland Capital Officers and Employees Group breached their duty of good faith and fair dealing to Plaintiff by causing injury to Plaintiff by forcing Plaintiff to lose all of its escrow assets and incur unnecessary legal expenses by allocating over $14 million in legal expenses,

353.   Ellington, Leventon and Plaintiff did not consider at the time of contracting that Ellington and Leventon would breach their duty of good faith and fair dealing to Plaintiff when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining escrow assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis. Highland Capital Officers and Employees Group and Plaintiff would have prohibited such conduct if the parties had considered it. Accordingly, Ellington and Leventon breached their duty of good faith and fair dealing to Plaintiff when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining escrow assets to Highland Capital for

the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

354.     Highland Capital Officers and Employees Group's breaches caused Plaintiff injury.

## COUNT FOURTEEN: BREACH OF CONTRACT #2 –TRANSFER OF ESCROW ASSETS 2016- HIGLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

355.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

356.     Plaintiff had a valid, enforceable contractual relationship with Highland Capital Officers and Employees Group. Plaintiff is a property party to bring suit for breach of contract. Plaintiff performed, tendered performance of, or was excused from performing its contractual obligations.

357.     Dondero, Ellington, and Leventon testified that management, administration, legal, accounting, tax, administration, and implementation services were provided to Plaintiff under a Blanket Agreement.

358.     Highland Capital Officers and Employees Group breached the contract by failing to protect Plaintiff from having its remaining assets stripped from the escrow in December 2016 and instead facilitated the transfer of those assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

359.     Highland Capital Officers and Employees Group breached the contract by participating in the 2016 remaining asset stripping scheme that left Plaintiff insolvent and unable to pay its expenses and debts.

360.     Highland Capital Officers and Employees Group breached the contract by allocating over $14 million in legal expenses, including cocktails and meals, incurred on behalf of Highland Capital and its affiliates to Plaintiff, including but not limited to Hutton Andrews Kurth, DLA Piper, Gruber Hurst, Abrams & Bayliss, Lynn Pinker Hurst Schwegman, Ashcroft

Law Firm, Cole Schotz, Morgan Lewis, Stanton Law Firm, Bell Nunnally, Cooke Young & Keidan, Fish & Richardson, Gardner Haas, Greenberg Traurig, The Griffith Law Firm, Hutcherson Law,  Littler Mendelson, Nutter, McLennen & Fish, Contractual Counsel, Robert Half, The Stanton Law Firm, Berkeley Research Group, Bloom Strategic Consulting, CBIZ valuation Group, Digital Works, Duff and Phelps, Elite Document Technology, Esquire Deposition Solutions, Folks & Associates, Point Multimedia, Phil Rochefort Audio Services, Gary Durham Consulting, JAMS Inc, Matthew Okolita, and Michael Colvin.

361.    Highland Capital Officers and Employees Group breached the contract by double allocating legal expenses to Plaintiff that were incurred by Highland Capital and repaid by Daugherty.

362.    Highland Capital Officers and Employees Group breached the contract by serving in the capacity as advisor to Plaintiff in addition to that of its largest investment, Restoration Capital Partners, and allowing Plaintiff's remaining escrow assets to be transferred to Highland Capital in December 2016 for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

363.    Highland Capital Officers and Employees Group breached the contract by allocating legal expenses incurred by Highland Capital to Plaintiff.

364.    Highland Capital Officers and Employees Group breached the contract by preparing, allocating, approving, or signing accounting statements and tax returns from 2013 to 2022 that transferred substantially all of Plaintiff's assets to Highland Capital, falsely allocated Highland Capital expenses to Plaintiff, wrongly failed to indicate payments made by Daugherty and falsely indicated loan obligations back to Highland Capital.

365.    Highland Capital Officers and Employees Group breached the contract by wrongfully participating in and coordinating the 2016 assignment of all of Plaintiffs assets to Highland Capital for the benefit of Highland Capital for the benefit of Dondero and his trusts,

Okada and his trusts, Hunter Mountain, Ellington and Honis.

366.    Highland Capital Officers and Employees Group breached the contract when they collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer Plaintiff's remaining assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.

367.    Highland Capital Officers and Employees Group breached the contract when they caused Plaintiff to incur unnecessary legal expenses by involving Plaintiff in their scheme to deprive Daugherty of his interests in Plaintiff.

368.    Highland Capital Officers and Employees Group's breaches caused Plaintiff injury.

## COUNT FIFTEEN - BREACH OF CONTRACT #3 –CHARGING OF EXCESSIVE ATTORNEYS FEES- OUTSIDE LEGAL PROVIDERS GROUP #2 DEFENDANTS

369.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

370.    Outside Legal Providers Group #2 breached their contract with Plaintiff by charging excessive attorney's fees. *Pollard v. Hanschen*, 315 S.W.3d 636, 641 (Tex. App.—Dallas 2010, no pet.).

371.    Plaintiff had valid and enforceable contracts with the Outside Legal Providers Group #2. Plaintiff is a proper party to bring suit for breach of contract. Plaintiff performed, tendered performance of, or was excused from performing its contractual obligations.

372.    Outside Legal Providers Group #2 breached their contractual duties to Plaintiff when they caused Plaintiff to incur unnecessary legal expenses by invoicing and/or allocating to Plaintiff legal expenses that were actually for the benefit of Highland Capital, including but not limited to unrelated third-party employee harassment and separation agreement matters, defense matters concerning Sierra Verde, Dondero and Okada issues concerning their interests in the Acis Capital Bankruptcy, litigation against the Wall Street Journal for unflattering articles, press

spin communications, a multitude of discrete legal actions on behalf of Highland Capital against Daugherty including having Daugherty followed to London and recording his panel discussion at a conference, and to pursue Dondero's various vendettas against former employees Terry and Daugherty, including but not limited to Highland Capital's numerous failed attempts to have Daugherty held in contempt and incarcerated for fabricated violations of a since vacated injunction while approximately $29,000 in donations were funneled to the presiding judge.

373.    Outside Legal Providers Group #2 breached their contractual duties to Plaintiff by causing redacted invoices for reimbursement to be produced in the Texas Litigation between Highland Capital and Daugherty in 2014 for services performed on behalf of Highland Capital. And then, after Daugherty paid over $3.1 million in December 2016 pursuant to wiring instructions by Katz/HAK, they represented that the same invoices were unpaid obligations for work performed on behalf of Plaintiff in the Delaware litigation commencing in 2017. Additionally, invoices were being double allocated to both Plaintiff and Highland Capital while they represented to the Delaware Court that they were allocated to Plaintiff.

374.    Outside Legal Providers Group #2 breached their contractual duties with Plaintiff by representing to the Delaware court that certain legal expenses incurred on behalf of Plaintiff by Highland Capital were unpaid obligations of Plaintiff when in fact those same invoices were already paid by Daugherty pursuant to wiring instructions provided by Katz/HAK after Katz/HAK was already secretly aware that Highland had already swept over $1.2 million from Plaintiff's escrow account and after Katz/HAK had filed turnover and garnishment motions against Daugherty claiming that Highland Capital had not been paid. Said another way, Katz/HAK charged Plaintiff for expenses they knew had already been paid twice by sweeping Plaintiff's cash escrow assets and then by wire from Daugherty because they had been falsely presented the same invoices as Highland Capital expenses in the Texas trial.

375.    Outside Legal Providers Group #2 breached their contractual duties to Plaintiff

when it was discovered in 2022 that on February 7, 2013, Surgent sent an email attaching Daugherty's request to inspect Plaintiff's assets to Hough, Hurst, Katz/HAK, and Ellington. Again, Katz/HAK did not represent Plaintiff at the time but was adverse to Daugherty and his counsel at Looper Reed, and McGraw on behalf of Highland Capital.

376.     Outside Legal Providers Group #2 breached their contractual duties to Plaintiff when a detailed review of invoices discovered for the first time in 2022 revealed that Outside Legal Providers Group #2, with the assistance of Dondero, Leventon, Ellington, Dondero, Klos, Waterhouse, and Swadley, had fraudulently represented to various courts that over $14,000,000 in invoices for the benefit of Highland Capital was improperly allocated to Plaintiff from 2012 to 2019.

377.     Outside Legal Providers Group #2's breaches proximately caused injury to Plaintiff.

## COUNT SIXTEEN - CONSPIRACY TO COMMIT FRAUD #1 – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – BOARD MEMBER GROUP, DONDERO ERA MANAGEMENT, HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, OUTSIDE LEGAL PROVIDERS GROUPS #1 AND #2 DEFENDANTS

378.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

379.     The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 were a member of a combination of two or more persons whose object was to accomplish an unlawful purpose, to defraud Plaintiff of its assets and distributions pursuant to the buyout scheme of 2012/2013.

380.     The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 had a meeting of the minds on the object and course of action to cooperate in the 2012/2013 scheme to defraud

Plaintiff and all acted in accordance with the conspiracy to defraud Plaintiff.

381.    The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 made and caused to be made false representations in the Texas Litigation, Delaware actions, and Northern District of Texas bankruptcy court that were at various times designed to induce the Texas judge and jury, the Delaware judge, the Northern District of Texas Bankruptcy Judge, Daugherty and Plaintiff to rely on those false representations. The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 knew the representations to be false at the time made because at all times the Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 intended to take the assets that they represented were validly approved in the purported corporate governance actions of Plaintiff on January 17, 2013, January 18, 2013, February 2013, and April 30, 2013 and assign Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, Honis and Ellington.

382.    The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 withheld critical information and documents that disproved the legitimacy of the scheme that stripped Plaintiff of its assets and associated distributions in April of 2013.

383.    The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 made and caused to be made false representations in the Texas Litigation that were designed to induce the Texas judge and jury on those false representations. The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group #1 and the Outside Legal Provider Groups #1 and #2 knew the representations to be false at the time made because at all

times the The Board Member Group, Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Groups #1 and #2 intended to take the assets out of escrow that belonged to Plaintiff.

384. The Plaintiff suffered injury as a proximate result of these wrongful acts.

## COUNT SEVENTEEN - CONSPIRACY TO COMMIT FRAUD #2 – TRANSFER OF ESCROW ASSETS 2016 – DONDERO ERA MANAGEMENT, HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, OUTSIDE LEGAL PROVIDERS GROUP #2 AND BOYCE DEFENDANTS

385. Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth below.

386. Dondero ERA Management, Highland Capital Officers and Employees Group and the Outside Legal Provider Group #2 and Boyce were members of a combination of two or more person whose object was to accomplish an unlawful purpose, to defraud Plaintiff of the assets held on escrow in 2016.

387. Dondero ERA Management, Highland Capital Officers, and Employees Group, the Outside Legal Provider Group #2 and Boyce had a meeting of the minds on the object and course of action to cooperate in the 2016 scheme to defraud Plaintiff and all acted in accordance with the conspiracy to defraud Plaintiff.

388. Dondero ERA Management, Highland Capital Officers, and Employees Group, the Outside Legal Provider Group #2 and Boyce participated in the conspiracy to defraud Plaintiff of its assets and distributions therefrom pursuant to the escrow stripping scheme.

389. Dondero ERA Management, Highland Capital Officers and Employees Group, the Outside Legal Provider Group #2 and Boyce made and caused to be made false representations in the Delaware courts and the Northern District of Texas bankruptcy courts that were designed to induce the respective judges to rely on those false representations. Dondero ERA Management, Highland Capital Officers and Employees Group, the Outside Legal Provider Group #2 and Boyce knew the representations to be false at the time made because at all times

the Dondero ERA Management, Highland Capital Officers and Employees Group, Outside Legal Provider Group #2 and Boyce intended to legitimize the taking of the assets out of escrow that belonged to Plaintiff.

390.    The Plaintiff suffered injury as a proximate result of these wrongful acts.

## COUNT EIGHTEEN – UNJUST ENRICHMENT #1 BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – ALL DEFENDANTS

391.    Plaintiff restates each of the foregoing allegations as if fully set forth in this paragraph.

392.    Defendants exercised total control over Plaintiff and, due to their acts and omission, were unjustly enriched.

393.    Defendants participated in the conspiracy to defraud Plaintiff of its assets by enabling a scheme that was designed to strip Plaintiff of its assets pursuant to the April 2013 assignment of substantially all of Plaintiffs assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.

394.    Defendants wrongly acquired assets for their mutual benefit while simultaneously being unjustly enriched at the expense of Plaintiff. Defendants took these actions knowingly and as part of their conspiracy to unjustly enrich themselves at the expense of Plaintiff.

395.    Defendants were unjustly enriched by the taking of the assets in April 2013 that they had misrepresented as properly approved and then actively concealed the improper execution and legitimacy pursuant to the terms of the Second Amended and Restated Limited Liability Company Operating Agreement of Plaintiff.

396.    Defendants accepted, used, and enjoyed the benefit of these assets leaving Plaintiff stripped of its assets and allocated legal expenses that were incurred on behalf of Highland Capital, legal expenses that were already paid by Daugherty, and legal expenses to defend against Daugherty's claims to Plaintiff.

**COUNT NINETEEN – UNJUST ENRICHMENT #2 (IN THE ALTERNATIVE)–
TRANSFER OF ESCROW ASSETS 2016 – ALL DEFENDANTS**

397.    Plaintiff restates each of the foregoing allegations as if fully set forth in this paragraph.

398.    Defendants exercised total control over Plaintiff and treated its funds as their own.

399.    Defendants participated in the conspiracy to defraud Plaintiff of its interests in the escrow in December 2016 to unjustly enrich themselves.

400.    Defendants were unjustly enriched by the taking of the assets in escrow that they had misrepresented had been set aside for Plaintiff to pay its obligations. Defendants themselves benefited from this unjust enrichment through the acquisition of the assets and the payment of their legal fees and salaries.

401.    Defendants accepted, used, and enjoyed the benefit of these assets leaving Plaintiff stripped of its assets and allocated legal expenses that were incurred on behalf of Highland Capital, legal expenses that were already paid by Daugherty, and legal expenses to defend against Daugherty's claims to Plaintiff.

**COUNT TWENTY – VIOLATIONS OF FEDERAL CIVIL RICO—CONDUCT OF A
RICO ENTERPRISE, 18 U.S.C. § 1962(C) -- BOARD MEMBER GROUP AND
HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS**

402.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

403.    At all relevant times, the Board Member Group and Highland Capital Officers and Employees Group Defendants are each "person[s]" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

404.    The Board Member Group and Highland Capital Officers and Employees Group each violated 18 U.S.C. § 1962(c) by the acts described in the paragraphs above.

405.    The Board Member Group and Highland Capital Officers and Employees Group actions described in the previous paragraphs constitute an Enterprise within the meaning of 18

U.S.C. §§ 1961(4) and 1962(c).

406.    At all relevant times, The Board Member Group and Highland Capital Officers and Employees Group were engaged in, and/or its activities constituting wire fraud within the meaning of 18 U.S.C. § 1962(c) and 1343. At all relevant times, The Board Member Group and Highland Capital Officers and Employees Group participated in the operation, management, and directed the affairs of an enterprise intended to defraud Plaintiff of money, property, and other benefits and assets as set forth above (the "Enterprise").

407.    The Board Member Group and Highland Capital Officers and Employees Group, each of whom are persons associated with the concerted efforts against Plaintiff did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the conduct, management, or operation of the affairs of the Enterprise.

408.    The Board Member Group and Highland Capital Officers and Employees Group through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), through multiple instances of Mail Fraud and Wire Fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). The Board Member Group and Highland Capital Officers and Employees Group devised or intended to devise a scheme to defraud Plaintiff of money, property, and other benefits and assets.

409.    For the purposes of executing their scheme, The Board Member Group and Highland Capital Officers and Employees Group delivered or caused delivery of various documents and things by U.S. mail or by private or commercial interstate carriers or received such therefrom. For the purposes of executing their scheme, The Board Member Group and Highland Capital Officers and Employees Group transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various writings, signs, and signals.

410.    In furtherance of their scheme, The Board Member Group and Highland Capital

Officers and Employees Group used the wires and/or U.S. mails or private or commercial carriers to deliver documents and things to Plaintiff or the Enterprise for the purposes of defrauding Plaintiff, including, but not limited to the following: (a) emails; (b) wirings and/or mailings between and among The Board Member Group and Highland Capital Officers and Employees Group concerning the scheme to defraud Plaintiff of money and property as well as other benefits and assets; and (c) funds transferred between The Board Member Group and Highland Capital Officers and Employees Group with the intent that those funds be used to promote the carrying on of The Board Member Group and Highland Capital Officers and Employees Group's scheme to defraud Plaintiff of money and property as well as other benefits and assets.

411.    The Board Member Group and Highland Capital Officers and Employees Group used wire and mail communications in furtherance of their scheme to defraud Plaintiff, in violation of 18 U.S.C. §§ 1341 and 1343, as described fully above.

412.    The Board Member Group and Highland Capital Officers and Employees Group participated in the scheme or artifice knowingly, willfully, and with the specific intent to advance their scheme to deceive or defraud Plaintiff. The Board Member Group and Highland Capital Officers and Employees Group knowingly and intentionally prepared documents, including but not limited to, resolutions, court papers, letters, notices, and other documents, and then knowingly and with the intent to deceive Plaintiff, caused those documents to be sent to Plaintiff or other entities that would further The Board Member Group and Highland Capital Officers and Employees Groups' scheme to defraud.

413.    The Board Member Group and Highland Capital Officers and Employees Group have, on multiple occasions, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducted or attempt to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity, including, but not limited to,

violations of 18 U.S.C. §§ 1341 and 1343 and The Board Member Group and Highland Capital Officers and Employees Group have, therefore, violated 18 U.S.C § 1956(a)(1)(A)(i), money laundering.

414.      The Board Member Group and Highland Capital Officers and Employees Group have engaged in multiple predicate acts, as described in the preceding paragraphs. The conduct of each of The Board Member Group and Highland Capital Officers and Employees Group described in the preceding paragraphs constitutes a pattern of racketeering activity connected to the acquisition, establishment, conduct or control of the Enterprise within the meaning of 18 U.S.C. § 1961(5).

415.      The Board Member Group and Highland Capital Officers and Employees Groups' violations of federal law as set forth herein, each of which directly and proximately injured Plaintiff, constitutes a continuous course of conduct, which was intended to defraud Plaintiff of money and property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of racketeering activity as defined by 18 U.S.C. §§ 1961(1) and (5).

416.      Plaintiff was injured in its money and property by reason of The Board Member Group and Highland Capital Officers and Employees Groups' violation of 18 U.S.C. § 1962(c).

417.      The Board Member Group and Highland Capital Officers and Employees Groups' injuries to Plaintiff were a direct, proximate, and reasonably foreseeable result of their violation of 18 U.S.C. § 1962. Plaintiff is the ultimate victim of The Board Member Group and Highland Capital Officers and Employees Groups' unlawful Enterprises and scheme. Plaintiff has been and will continue to be injured in its money and property in an amount to be determined at trial.

418.      Pursuant to 18 U.S.C. § 1962(c), Plaintiff is entitled to recover treble damages plus costs and attorneys' fees from The Board Member Group and Highland Capital Officers and Employees Group as well as any other relief authorized by statute.

**COUNT TWENTY-ONE – PROMISSORY ESTOPPEL – TRANSFER OF ESCROW ASSETS 2016 – DONDERO ERA MANAGEMENT, BOARD MEMBER GROUP, HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, OUTSIDE LEGAL PROVIDERS GROUPS #1 AND #2 AND BOYCE DEFENDANTS**

419.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

420.    The Dondero ERA Management, Highland Capital Officers and Employees Group, the Outside Legal Provider Groups #1 and #2 and Boyce made promises to Plaintiff regarding the establishment, funding, and management of Escrow.

421.    Plaintiff reasonably and substantially relied on those promises to its detriment.

422.    Plaintiff's reliance on the promise was foreseeable to The Dondero ERA Management, Highland Capital Officers and Employees Group, the Outside Legal Provider Groups #1 and #2 and Boyce.

423.    Injustice to Plaintiff can only be avoided by enforcing The Dondero ERA Management, Highland Capital Officers and Employees Group, the Outside Legal Provider Groups #1 and #2 and Boyce.

424.    The Dondero ERA Management, Highland Capital Officers and Employees Group, the Outside Legal Provider Groups #1 and #2 and Boyce actions or omission proximately caused Plaintiff injury.

425.    Plaintiff incurred actual damages.

**COUNT TWENTY-TWO – MONEY HAD AND RECIEVED – TRANSFER OF ESCROW ASSETS 2016 AND BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 – ALL DEFENDANTS**

426.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

427.    Defendants Dondero, Okada, Katz/HAK/DLAP, Hurst, Brown, Ellington, Leventon, Girard, Honis, Collins, Dameris, Dougherty, Boyce, Britain, Waterhouse, Abrams & Bayliss, Nancy Dondero, As Trustee Of Dugaboy Investment Trust ("Dugaboy Trust"); Grant

James Scott III, As Trustee Of Get Good Trust ("Get Good Trust"); John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") hold money that came from assets or distributions from assets that belonged to Plaintiff..

428.   That money belongs to Plaintiff in equity and good conscience.

## COUNT TWENTY-THREE – CONVERSION – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 AND TRANSFER OF ESCROW ASSETS 2016– ALL DEFENDANTS

429.   Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

430.   Plaintiff owned, possessed, or had the right to possession of its property/assets, which were personal.

431.   Defendants Dondero, Okada, Katz/HAK/DLAP, Hurst, Brown, Ellington, Leventon, Girard, Honis, Collins, Dameris, Dougherty, Boyce, Britain, Waterhouse, Abrams & Bayliss, Nancy Dondero, As Trustee Of Dugaboy Investment Trust ("Dugaboy Trust"); Grant James Scott III, As Trustee Of Get Good Trust ("Get Good Trust"); John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") have wrongfully exercised dominion and control over Plaintiff's property.

432.   Plaintiff has suffered injury as a result of Defendants' actions.

**COUNT TWENTY-FOUR – TEXAS THEFT LIABLITY ACT – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 AND TRANSFER OF ESCROW ASSETS 2016 – ALL DEFENDANTS**

433. Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

434. Plaintiff had possessory right to its property/assets.

435. Defendants Dondero, Okada, Katz/HAK/DLAP, Hurst, Brown, Ellington, Leventon, Girard, Honis, Collins, Dameris, Dougherty, Boyce, Britain, Waterhouse, Abrams & Bayliss, Nancy Dondero, As Trustee Of Dugaboy Investment Trust ("Dugaboy Trust"); Grant James Scott III, As Trustee Of Get Good Trust ("Get Good Trust"); John Honis, As Trustee Of Hunter Mountain Investment Trust ("Hunter Mountain Trust"); Lawrence Tonomura As Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #1 ("Okada Exempt Trust #1"); Lawrence Tonomura as Trustee Of Mark & Pamela Okada Family Trust – Exempt Trust #2 ("Okada Exempt Trust #2") unlawfully appropriated those assets by taking them without Plaintiff's effective consent by the theft of personal property under Texas Penal Code §31.03.

436. The Defendants' unlawful taking was made with the intent to deprive the Plaintiff of the property.

437. The Plaintiff sustained damage as a result of the theft.

**COUNT TWENTY-FIVE – TEXAS UNIFORM FRAUDLENT TRANSFER ACT (TUFTA) – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013 AND TRANSFER OF ESCROW ASSETS 2016 – BOARD MEMBER GROUP, HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP, DONDERO ERA MANAGEMENT GROUP, OUTSIDE LEGAL PROVIER GROUP #1 AND #2 DEFENDANTS**

438. Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

439. Plaintiff is a creditor with a claim as a result of his verdict in the Texas Litigaiton and the Delaware Litigation.

440. The Board Member Group, The Dondero ERA Management, the Highland

Capital Officers, and Employees Group and the Outside Legal Provider Group #1 and #2 are debtors liable on those claims.

441.     As described in detail above, The Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group and the Outside Legal Provider Groups #1 and #2 fraudulently transferred Plaintiff's assets with the actual intent to hinder delay and/or defraud the Plaintiff.

442.     The Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group and the Outside Legal Provider Groups #1 and #2 retained possession and control of the assets after the transfer.

443.     The Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group and the Outside Legal Provider Group #1 and #2 transfer of the assets was concealed and made with the intent to hinder, delay, or defraud Plaintiff.

444.     The transfer was of all of Plaintiff's assets.

445.     The Plaintiff became insolvent shortly after the transfer was made.

## COUNT TWENTY-SIX – FRAUD – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013– THE BOARD MEMBER GROUP, THE DONDERO ERA MANAGEMENT, THE HIGHLAND CAPITAL OFFICERS, AND EMPLOYEES GROUP DEFENDANTS

446.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

447.     Plaintiff refers specifically to the above factual background section and the facts plead in the causes of action sections above as applied and incorporated to this cause of action for fraud.

448.     As set forth above, the Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group made multiple false and material representations to Plaintiff regarding the protection of its assets in 2012-2013.

449.     The Board Member Group, The Dondero ERA Management, the Highland

Capital Officers, and Employees Group made these representations, and they knew the representations were false.

450.     The Board Member Group, The Dondero ERA Management, the Highland Capital Officers and Employees Group these representations with the intent that the Plaintiff act on it.

451.     The Plaintiff did in fact rely on these representations thus causing injury to the Plaintiff.

## COUNT TWENTY-SEVEN – FRAUD – TRANSFER OF ESCROW ASSETS 2016– THE DONDERO ERA MANAGEMENT, THE HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

452.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

453.     Plaintiff refers specifically to the above factual background section and the facts plead in the causes of action sections above as applied and incorporated to this cause of action for fraud.

454.     As set forth above, The Dondero ERA Management, the Highland Capital Officers, and Employees Group, made multiple false and material representations to Plaintiff regarding the stripping of the escrow in 2016.

455.     The Dondero ERA Management, the Highland Capital Officers, and Employees Group, made these representations, and they knew the representations were false.

456.     The Dondero ERA Management, the Highland Capital Officers, and Employees Group, made these representations with the intent that the Plaintiff act on it.

457.     The Plaintiff did in fact rely on these representations thus causing injury to the Plaintiff.

## COUNT TWENTY-EIGHT – THIRD PARTY BENEFICAIRY BREACH OF CONTRACT – TRANSFER OF ESCROW ASSETS 2016– ABRAMS & BAYLISS DEFENDANT

458.     Plaintiff hereby incorporates the allegations set forth in the above paragraphs as

if fully set forth herein.

459.    On December 12, 2013, Ellington, Leventon, and Surgent coordinated with Abrams & Bayliss to serve as escrow agent. Highland Capital's assistant general counsel, Leventon, sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day by Ellington. Matthew Miller ("Miller"), an Abrams & Bayliss attorney who primarily worked on the escrow matter and had just completed his first year as an attorney and simply used the terms proposed by Leventon.

460.    The assets deposited in the escrow account were represented to be: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) 1088.42 shares of NexPoint Credit Strategies. This was the story Defendants "came up with" so they could sell to the jury in the Texas Litigaiton that they had not simply stolen Plaintiff's assets. The notion that Defendants did nothing nefarious with Plaintiff's assets and merely set them aside would become a theme of Defendants in the Texas Litigation.

461.    The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Litigation provided that if Daugherty prevailed in the Texas Litigation, escrowed assets in the amount of the judgment "shall" be transferred to Plaintiff. Also pursuant to the crime-fraud discovery in May 2019, it was revealed that 122 days after executing the Escrow Agreement, Leventon and Girard changed the Escrow Agreement without Daugherty's knowledge because it wanted to "slip sheet the Schedule 1 assets" to change "the NexPoint shares from shares to the cash equivalent of shares because it is difficult to find a prime broker to open account for such a small pool of assets." Abrams & Bayliss simply swapped the pages. Abrams & Bayliss later explained, "if Daugherty digs deeply enough, he may discover that Schedule 1 was revised on December 16, 2013, with no re-execution of the Escrow Agreement by Highland Capital and Abrams & Bayliss. Highland's counsel merely re-sent the Escrow Agreement with an updated Schedule 1, and Abrams & Bayliss sent an email confirmation of the change."

According to Abrams & Bayliss, "⸢i⸣t is unlikely that Daugherty would learn of the revision." With the appearance of an escrow in place, Defendants were poised to present themselves in the Texas Litigation not as thieves, but rather as protectors of Plaintiff's and Daugherty's interests. That is the story they spun at trial. This was a state of affairs just a month before trial in the Texas Litigation.

462.    It was not until previously concealed document and email production in 2022 and 2023 that Plaintiff learned the full story of how Abrams & Bayliss and Highland Capital had stripped the escrow account of all assets.

463.    The Escrow Agreement between Abrams & Bayliss and Highland Capital is a valid and enforceable contract whose intent was to secure a benefit, the deposited assets, for the benefit of the Plaintiff. Plaintiff is now entitled to enforce that contract as a third-party beneficiary because that benefit has been denied to Plaintiff, as Abrams & Bayliss and Highland Capital stripped the escrow account of the deposited assets.

### COUNT TWENTY-NINE – TORTIOUS INTEREFRENCE WITH A CONTRACT – TRANSFER OF ESCROW ASSETS 2016– ABRAMS & BAYLISS AND HIGHLAND CAPITAL OFFICERS AND EMPLOYEES GROUP DEFENDANTS

464.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

465.    Plaintiff was controlled by a limited liability company operating agreement, which was a valid and enforceable contract. The Highland Capital Officers and Employees Group and Abrams & Bayliss intentionally interfered with that contract when The Highland Capital Officers and Employees Group moved Plaintiff's assets into an escrow account held by Abrams & Bayliss. This interference proximately caused Plaintiff's injury through the loss of its assets, incurring actual damages.

**COUNT THIRTY – TORTIOUS INTEREFRENCE WITH A CONTRACT – BUYOUT AND SUBSEQUENT STRIPPING OF PLAINTIFF ASSETS 2013– DONDERO ERA MANAGEMENT, OFFICERS, AND EMPLOYEES GROUP DEFENDANTS**

466.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

467.    Plaintiff was controlled by a limited liability company operating agreement, which was a valid and enforceable contract. The Highland Capital Officers and Employees Group intentionally interfered with that contract when The Highland Capital Officers and Employees Group moved Plaintiff's assets to Highland Capital in 2013. This interference proximately caused damage to Plaintiff.

**COUNT THIRTY-ONE – TORTIOUS INTEREFRENCE WITH A CONTRACT – TRANSFER OF ESCROW ASSETS 2016– DONDERO ERA MANAGEMENT, HIGHLAND CAPITAL OFFICER AND EMPLOYEES GROUP DEFENDANTS**

468.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

469.    Plaintiff was controlled by a limited liability company operating agreement, which was a valid and enforceable contract. Dondero ERA Management and the Highland Capital Officer and Employees Group intentionally interfered with that contract when The Highland Capital Officers and Employees Group and the Dondero ERA Management Group moved Plaintiff's assets from an escrow account to Highland Capital in 2016. This interference proximately caused damages to Plaintiff.

**COUNT THIRTY-TWO – BREACH OF FIDUCAIRY DUTY– KATZ/DLAP DEFENDANT**

470.    Plaintiff hereby incorporates the allegations set forth in the above paragraphs as if fully set forth herein.

471.    Katz/DLAP breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements,

duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by presenting redacted invoices for reimbursement in the Texas Litigation between Highland Capital and Daugherty in 2014 that represented legal services were performed on behalf of Highland Capital. And then, after Daugherty paid over $3.1 million in December 2016 pursuant to wiring instructions by Katz, they represented that the same invoices were unpaid obligations for work performed on behalf of Plaintiff in the Delaware litigation commencing in 2017.

472.    Katz/DLAP breached their fiduciary duties to Plaintiff, specifically the duty to represent Plaintiff with undivided loyalty, duty to act with absolute perfect candor, openness and honesty without any concealment or deception, duty to be strictly honest about fee arrangements, duty to inform the Plaintiff of matters of material representation, and the duty to timely inform Plaintiff of conflict of interest by billing Plaintiff for legal services provided to Highland Capital in the Delaware Litigation.

473.    Katz/DLAP's breaches proximately caused injury to the Plaintiff and/or resulted in a benefit to the Defendants.

## VI.
## CONDITIONS PRECEDENT

474.    All conditions precedent for the claims above have been performed or have occurred.

## VII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Highland Capital Employee Retention Assets LLC prays that Defendants be cited to appear and answer herein, and for the further relief set forth below:

(1)    Actual damages;

(2)    Exemplary damages;

(3)    Pre- and post- judgment interest;

(4)    Attorneys' fees and costs of suit; and

(5)    Such other and further relief to which Plaintiff Highland Capital Employee Retention Assets LLC may be justly entitled.

Dated: July 15, 2024.

Respectfully submitted,

LAW OFFICE OF MATTHEW BOBO, PLLC.

*/s/ Matthew W. Bobo*
**Matthew W. Bobo**
State Bar No. 24006860

4916 Camp Bowie Blvd.
Fort Worth, Texas 76107
Telephone: (817) 529-0774
Facsimile: (817) 698-9401
mbobo@mwblawyer.com

**ATTORNEYS FOR PLAINTIFF**

# Exhibit 40

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND EMPLOYEE RETENTION ASSETS LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:24-cv-00498-K |
| JAMES DONDERO; MARK OKADA; MARK KATZ; MICHAEL HURST; SHONN BROWN; SCOTT ELLINGTON; ISAAC LEVENTON; ERIC GIRARD; JOHN HONIS; TED DAMERIS; RAYMOND JOSEPH DOUGHERTY; AMIT WALLA; PATRICK BOYCE; LANE BRITAIN; FRANK WATERHOUSE; BRIAN COLLINS, HUNTON ANDREWS KURTH LLP; ABRAMS & BAYLISS LLP; DLA PIPER LLP; NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; JOHN HONIS, AS TRUSTEE OF HUNTER MOUNTAIN INVESTMENT TRUST; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST - EXEMPT TRUST #1; LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST - EXEMPT TRUST #2, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

**PLAINTIFF HIGHLAND EMPLOYEE RETENTION ASSETS LLC'S OMNIBUS
RESPONSE TO THE HIGHLAND DEFENDANTS, OUTSIDE ATTORNEYS
DEFENDANTS AND TRUSTEE DEFENDANTS' MOTIONS TO DISMISS AND
MEMORANDUM IN SUPPORT**

004401

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ..................................................................................... v

TABLE OF EXHIBITS ........................................................................................... xix

GLOSSARY OF DEFINED TERMS ..................................................................... xxv

**Omnibus Response Split into Two Sperate Sections** .......................................... 1

**The Court May Consider Extrinsic Materials** ...................................................... 1

INTRODUCTION .................................................................................................... 3

*HIGHLAND DEFENDANTS AND OUTSIDE ATTORNEYS
DEFENDANTS SECTION* ..................................................................................... 3

I.      STATEMENT OF FACTS ................................................................. 3

      A.  Relevant Background Facts Important to the Present Lawsuit. ............. 3

           1.  The Fall of Highland. ................................................................ 3

           2.  Daugherty Resigns from Highland and is Removed as
Director of HERA .................................................................... 5

           3.  The Texas Lawsuit ................................................................... 6

           4.  Delaware I and Delaware II .................................................... 17

           5.  Highland Bankruptcy ............................................................. 21

      B.  March/April 2022 – Daugherty and His Affiliates Obtain Control of
HERA and For the First Time Discover Harm to HERA Caused
by Defendants' Deliberately Concealed Bad Acts and Omissions. ....... 24

      C.  The 2022 Documents Prove the Invalidity of the Corporate
Actions Taken on Behalf of HERA by the Defendants to Strip
HERA of Its Assets ................................................................................ 29

      D.  HERA's Assets Are Stripped ................................................................ 48

II.     STANDARD OF REVIEW ............................................................... 53

III.    ARGUMENT AND AUTHORITIES ................................................ 54

      A.  Statute of Limitations .......................................................................... 54

           1.  Adverse Domination Applies to Toll the Applicable Statutes of
Limitation. ............................................................................. 55

           2.  The Discovery Rule Applies to HERA's Claims ..................... 57

               i.  Knowledge Should Not Be Imputed ........................... 57

004402

ii.  The Prior Lawsuits Are Completely Different Than This Lawsuit ...........................................................59

3.  Daugherty Never Brought A Derivative Suit on Behalf of HERA ...........61

4.  The Fraudulent Concealment Doctrine Applies to the Applicable Statutes of Limitations .......................................................62

B.  Res Judicata and Claim Splitting ..........................................................63

1.  HERA's Claims Are Not Precluded by Res Judicata or Claim Splitting. ....................................................................63

C.  Judicial Estoppel - 2016 Escrow Transfer .............................................66

1.  Highland Defendants. ...............................................................66

2.  Outside Attorneys Defendants. ................................................68

D.  HERA's Claims Are Not Barred by the Judicial Proceedings Privilege ........70

E.  HERA's Claims Are Not Barred by Attorney Immunity ..................................72

1.  Claims Asserted Against Hunton and Katz. .....................................73

2.  Claims Asserted Against In-House Attorneys (Ellington, Leventon, and Girard) ............................................................................75

3.  HERA's Claims Based on Legal Services Provided to HERA Are Not Barred Because of Assignment ..............................................78

4.  HERA's Claims Against Attorneys Are Not Improperly Fractured ..........78

F.  HERA Properly Pleads Counts 3 and 6 ("BOFD") Alleging Improper Benefit Received by In-House Attorneys ....................................................89

1.  The FAC Satisfies the Requirements of FRCP 8 ...............................89

2.  The FAC Satisfies the Requirements of FRCP 9. ..............................92

G.  HERA Properly Pleads Claims for Breach of Fiduciary Duty ("BOFD") in Count 1 .........................................................................94

1.  Standing .................................................................................94

2.  The Second Amendment to Second Amended LLC Agreement is Invalid ...........................................................................96

3.  HERA Sufficiently Alleges a Legally Cognizable Duty ......................99

4.  Post-Resignation Conduct – The Nanny-Nanny-Boo-Boo Argument ....100

004403

5.  Defendants Are Not Protected by the Business Judgment Rule ............... 101

H.  HERA Properly Pleads Its Claims for BOFD in Counts 2, 3, 5 and 6 ......... 103

1.  Counts 2, 3, 5 and 6 Are Sufficiently Pled to Survive
    a 12(b)(6) Motion ................................................................................. 103

I.  The Second Amended LLC Agreement Does Not
    Exculpate HERA Board Members ......................................................... 105

J.  The Second Amended LLC Agreement Does Not
    Exculpate Employees .............................................................................. 106

K.  The Second Amended LLC Agreement Does Not
    Eliminate All Liability for Breach of Contract .................................... 108

1.  Count 8 – Breach of Contract Applies to HERA Board Members ........... 108

2.  The Second Amended LLC Agreement Does
    Not Exculpate Defendants' Liability ................................................... 109

L.  HERA Properly Pleads Its Claim for Breach of the Second Amended LLC
    Agreement ................................................................................................ 111

M.  HERA Properly Pleads Its Claim Against the Outside
    Attorneys for Breach of Contract in Count 15 .................................... 113

N.  HERA Properly Pleads Its Claims for Breach of the Implied Covenant
    of Good Faith and Fair Dealing .............................................................. 115

1.  Count 9 .................................................................................................... 115

2.  Counts 10, 11, 12, and 13 ....................................................................... 115

O.  HERA Properly Pleads Its Unjust Enrichment Claim ....................... 116

P.  HERA Properly Pleads Defendants' RICO Violations ....................... 118

1.  The FAC States a Claim that RICO Defendants Committed
    Predicate Offense of Wire and/or Mail Fraud .................................... 121

2.  The FAC Adequately Alleges a Pattern of Racketeering Activity .......... 123

i.  The FAC Adequately Alleges the Predicate Acts
    Were "Related" .................................................................................. 123

ii.  The FAC Adequately Alleges the Predicate Acts
    Were "Continuous" ........................................................................... 127

Q.  HERA Properly Pleads Its Money Had and Received Claim ......................... 129

R.  HERA Properly Pleads Its Conversion Claim .................................................. 130

S.  HERA Properly Pleads Its TTLA Claim .......................................................... 131

T.  HERA Properly Pleads Its TUFTA Claim ........................................................ 134

U.  HERA Properly Pleads Its Fraud Claims ......................................................... 136

V.  HERA Properly Pleads Its Conspiracy Claims ................................................. 137

W. HERA Properly Pleads Its Tortious Interference Claims ............................... 138


***TRUSTEE DEFENDANTS SECTION*** ...................................................... 139


I.    STATEMENT OF FACTS ...................................................................................... 139

II.   ARGUMENT AND AUTHORITIES ..................................................................... 141

A.  Legal Standard for Personal Jurisdiction .......................................................... 141

B.  The Trustee Defendants Have Sufficient Minimum Contacts With
Texas .................................................................................................................. 142

1.  The Nature and Character of the Trusts Sufficiently Tie
the Trustees to Texas .................................................................................. 145

i.    The Trusts' Business is Conducted from Dallas ........................... 145

ii.   The Trusts' Settlors and Beneficiaries Reside in Texas .............. 145

iii.  The Trusts Hold Assets in Texas ..................................................... 146

iv.  The Trusts Were Created Under Texas Law ................................. 147

2.  The Trustee Defendants' Conduct Directed at Texas Justifies
the Court's Exercise of Personal Jurisdiction ............................................. 147

C.  The Exercise of Personal Jurisdiction Over the Trustee Defendants
is Fair and Reasonable ....................................................................................... 151

D.  Alternatively, Plaintiff Moves for Limited Jurisdictional Discovery ............ 151

ALTERNATIVE REQUEST FOR LEAVE TO AMEND ......................................... 154

CONCLUSION ............................................................................................................. 154

004405

## TABLE OF AUTHORITIES

**CASES**                                                                                     **PAGE(s)**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk,*
    291 F.3d 336, 350 (5th Cir. 2002) ……………………………………………..…93, 136

*Abraham v. Singh,*
    480 F.3d 351, 355-56 (5th Cir. 2007) …………………………………………..……….128

*Ahrens v. Perot Systems Corp.,*
    205 F.3d 831, 833 (5th Cir. 2000) …………………………………………….…..69

*Allen v. Wilkerson,*
    396 S.w.2d 493, 500 (Tex. App.—Austin 1965, writ ref'd n.r.e.) …………………...…56

*Allied Capital Corp. v. GC-Sun Holdings, L.P.,*
    910 A.2d 1020, 1032-33 (Del. Ch. 2006) ………………………………………..……115

*Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.,*
    14 Del. Ch. 1, 120 A. 486, 491 (Del. Ch. 1923) ...................................................................105

*Allstate Ins. Co. v. Benhamou,*
    190 F. Supp. 3d 631, 662 (S.D. Tex. 2016) ……………………………...………123, 128

*Allstate Ins. Co. v. Plambeck,*
    802 F.3d 665, 675 (5th Cir. 2015) …………………………………………...……………126

*Am. Standard Credit, Inc. v. Nat'l Cement Co.,*
    643 F.2d 248, 271 (5th Cir. 1981) ……………………………………...……55, 56

*Armadillo Hotel Group v. Harris,*
    84 F.4th 623, 628 (5th Cir. 2023) …………………………………..……………64

*Ashcroft v. Iqbal,*
    556 U.S. 662, 663-63, 678, 681 (2009) …………………….…………………1, 53, 54, 90, 92

*Askanase v. Fatjo,*
    130 F.3d 657, 666 (5th Cir. 1997) ……………………………..…………..…….…...55, 56, 57

*Askanase v. Fatjo,*
    828 F. Supp. 465, 471 (S.D. Tex. 1993) …………………………………………58

*Austin v. McNamara,*
    No. 6:05-cv-247, 2007 WL 578498, (E.D. Tex. March 30, 2007) ……………........…68, 70

*Bascom v. Fiduciary Trust Co. Int'l,*
    No. 2:23-cv-7, 2023 WL 3305169, at *4 (E.D. Va. May 8, 2023) …………………143, 144

004406

*Bay Ctr. Apts. Owner, LLC v. Emery Bay PKI, LLC,*
    C.A. No. 3658-VCS, 2009 Del. Ch. LEXIS 54, at *21-22 (Apr. 20, 2009) ……..………116

*Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.,*
    284 S.W.3d 416, 436 (Tex. App.—Austin 2009, no pet.) …………………..……………79

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544, 555, 570 (2007) ……………………………………..…………1, 53, 89, 90, 92

*Benson v. Rosenthal,*
    116 F. Supp. 3d 702, 708-09, 710 (E.D. La. 2015) ……………………………………….143, 144

*Bird v. W.C.W.,*
    868 S.W.2d 767, 771-72 (Tex. 1994) …………………………………………..………………71

*Bishop v. Air Line Pilots Ass'n,*
    900 F.3d 388, 399 n.28 (7th Cir. 2018) ……………………………………………………1

*Bonton v. Archer Chrysler Plymouth, Inc.,*
    889 F. Supp. 995, 1002-03 (S.D. Tex. 1995) …………………………………………122

*Boyle v. U.S.,*
    556 U.S. 938, 947 (2009) …………………………………………………………………120

*BP Am. Prod. Co. v. Marshall,*
    342 S.W.3d 59, 67 (Tex. 2011) ……………………………………….....…........………62, 63

*Brookfield Asset Mgmt., Inc. v. Rosson,*
    261 A.3d 1251, 1277 (Del. 2021) …………………………………………………...66

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462, 477 (1985) ……………………………………………………..………142

*Burlington N.R.R. v. Sw. Elec. Power,*
    925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996),
    *aff'd,* 966 S.W.2d 467 (Tex. 1998) …………………………………………………117

*Burrow v. Arce,*
    997 S.W.2d 229, 237-47 (Tex. 1999) ……………………………………………………78

*Butnaru v. Ford Motor Co.,*
    84 S.W.3d 198, 207 (Tex. 2002) ………………………………………………......…138

*Calder v. Jones,*
    465 U.S. 783, 789-90 (1984) ……………………………………………………………144

*Camp v. RCW & Co.,*
    No. H-05-3580, 2007 U.S. Dist. LEXIS 32596, at *19
    (S.D. Tex. May 3, 2007) …………………………………………………………………78

004407

*Cantey Hanger, LLP v. Byrd,*
    467 S.W.3d 477, 481, 482, 484 (Tex. 2015) …………………...………...……….72, 74, 75, 77

*Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC,*
    27 A.3d 531, 535 (Del. 2011) ……………………………………………….……………99

*Clark v. Amoco Prod. Co.,*
    794 F.2d 967, 970 (5th Cir. 1986) …………………………………………...……..……55

*Clatterbuck v. City of Charlottesville,*
    708 F.3d 549, 557 (4th Cir. 2013) …………………………………………………………1

*Cochran v. Astrue,*
    2011 U.S. Dist. LEXIS 132730, 2011 WL 5604024, at *1
    (N.D. Tex. Nov. 17, 2011) …………………………………………...……….…..…55

*Cole v. Gen. Motors Corp.,*
    484 F.3d 717, 723 (5th Cir. 2007) …………………………………………….………95

*Commercial Metals Co. v. Chazanow,*
    No. CIV. A. 3:09-cv-818, 2009 WL 3853704, at *5 (N.D. Tex. Nov. 17, 2009) ……...…122

*Commercial Metals Co. v. Chazanow,*
    2009 WL 3853704, at *6, *7 (N.D. Tex. Nov. 17, 2009) ……..………………123, 124, 128

*Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen,*
    525 S.W.3d 671, 689 (Tex. 2017) ………………………………………………………138

*Corwin v. KKR Fin. Holdings LLC,*
    125 A.3d 304 (Del. 2015) ………………………………………………………………101

*County of El Paso, Tex. v. Jones,*
    2009 WL 4730303, at *22 (W.D. Tex. Dec. 4, 2009) …………………………...……120

*Crisp v. Southwest Bancshares Leasing Co.,*
    586 S.W.2d 610 (Tex.Civ.App.–Amarillo 1979, writ ref'd n.r.e.) …………….…………56

*Cypress/Spanish Ft. I, L.P. v. Prof. Serv. Indus., Inc.,*
    814 F. Supp. 2d 698, 711, 712 (N.D. Tex. 2011) ………………………………120, 121, 122

*Daugherty v. Highland Capital Management, L.P.*
    C.A. No. 2017-0488-MTZ at 489:17-531:1 …………………………………………...148

*Daugherty v. Dondero,*
    2023 WL 461112, at *2, *7(Del. Ch. Jan. 27, 2023) *aff'd,* 307 A.3d 977
    (Del. 2023) ...............................................................................................................63, 65

*Delhomme v. Caremark Rx, Inc.,*
    232 F.R.D. 573, 578 (N.D. Tex. 2005) …………………………….………………………1

004408

*Denning v. Bond Pharmacy, Inc.*,
 50 F.4th 445, 450 (5th Cir. 2022) ………………………………..………………………94

*Deuell v. Tex. Right to Life Comm., Inc.*,
 508 S.W.3d 679, 689 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) …….………71

*Deutsch v. Hoover, Bax & Slovacek, L.L.P.*,
 97 S.W.3d 179, 189 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ……………....78

*DG BF, LLC v. Ray*,
 2021 WL 776742 (Del. Ch. Mar. 1, 2021) ………………………...…………………109

*Doe v. Blake*,
 809 F. Supp. 1020, 1028 (D. Conn. 1992) ………………………………..…………71

*Doe v. Cruz*,
 683 S.W.3d 475, 493 (Tex. App.—San Antonio 2023, no pet.) ...........................................71

*Dorsey v. Portfolio Equities, Inc.*,
 540 F.3d 333, 339 (5th Cir. 2008) …………………………………………...93, 136

*Douglas v. Hirshon*,
 63 F.4th 49, 57 (1st Cir. 2023) ……………………………………………………1

*Downs v. Liberty Life Assurance Co. of Boston*,
 2005 U.S. Dist. LEXIS 22531, 2005 WL 2455193 *4 (N.D. Tex. 2005) …………...………1

*Dunlap v. State Farm Fire & Cas. Co.*,
 878 A.2d 434, 442 (Del. 2005) ……………………………………………………116

*Earle v. Ratliff*,
 998 S.W.2d 882, 888 (Tex. 1999) ……………………………………...…………63

*ED&F Man Biofuels, Ltd. v. MV Fase*,
 728 F.Supp.2d 862, 869-70 (S.D. Tex. 2010) ……………………………………117

*Efron v. UBS Fin. Servs. Inc. of P.R.*,
 96 F.4th 430, 439 (1st Cir. 2024) ……………………………………..…………...121

*Elledge v. Friberg-Cooper Water Supply Corp.*,
 240 S.W. 3d 869, 869-70 (Tex. 2007) …………………………………..…………117

*Ellenstein v. S&S Game Preserve, Inc.*,
 581 F.Supp. 81, 83 (S.D. Ind. 1983) ………………………………………..………144

*Ellman v. MDOffice LLC*,
 No. EP-21-CV-290-DB, 2022 U.S. Dist. LEXIS 59435, at *9, *10
 (W.D. Tex. Mar. 31, 2022) ………………………………………………...…………90, 91

004409

*Energium Health v. Gabali*,
  No. 3:21-cv-2951, 2022 WL 16842660, at *8 (N.D. Tex. Nov. 9, 2022) ..................121

*Ergo Science, Inc. v. Martin*,
  73 F.3d 595, 598 (5th Cir. 1996) ...............................................................................69

*Essex Crane Rental Corp. v. Carter*,
  371 S.W.3d 366, 371, 382 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) ......75, 77

*Estate of Degley v. Vega*,
  797 S.W.2d 299, 303-04 (Tex. App.—Corpus Christi 1990, no writ) ..................78, 79

*Evercrete Corp. v. H-Cap Ltd.*,
  429 F. Supp. 2d 612, 624 (S.D.N.Y. 2006) .................................................................122

*Exxon Mobil Corporation v. Healey*,
  215 F.Supp.3d 520, 522 (N.D. Tex. 2016) (Kinkeade, J.) ........................................152

*FDIC v. Dawson*,
  4 F.3d 1303, 1308, 1309-11 (5th Cir. 1993) ...........................................55, 56, 57

*FDIC v. Ernst & Young*,
  967 F.2d 166, 171 (5th Cir. 1992) ..........................................................................58

*FDIC v. Henderson*,
  61 F.3d 421, 426 (5th Cir. 1995)..........................................................55, 56, 57

*FDIC v. Nathan*,
  804 F. Supp. 888, 894–95 (S.D. Tex. 1992) .........................................................59

*FDIC v. Shrader & York*,
  991 F.2d at 223-24...................................................................................................57

*Feeley v. NHAOCG, LLC*,
  62 A.3d 649, 671 (Del. Ch. 2012) ..........................................................................105

*Finley Lines Joint Protective Board v. Norfolk S. Corp.*,
  109 F.3d 993, 996 (4th Cir. 1997) ............................................................................1

*Fortune Prod. Co. v. Conoco, Inc.*,
  52 S.W.3d 671, 683-85........................................................................................117

*Gatz v. Ponsoldt*,
  925 A.2d 1265, 1280 (Del. 2007) ......................................................................104, 107

*GE Capital Commercial Inc. v. Worthington Nat'l Bank*,
  754 F.3d 297, 302 (5th Cir. 2014) ........................................................................134

*Geinosky v. City of Chicago*,
  675 F.3d 743, 745 n.1 (7th Cir. 2012) .......................................................................1

004410

*Gibson v. Ellis,*
    126 S.W.3d 324, 330 (Tex. App.—Dallas 2004, no pet.) ……………………………..…79

*Goffney v. Rabson,*
    56 S.W.3d 186, 193 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ……………79

*Gonzalez v. Kay,*
    577 F.3d 600, 603 (5th Cir. 2009) …………………………………………....…53, 92

*Gordon v. Green,*
    602 F.2d 743, 746 (5th Cir. 1979) …………………………………………………...89

*H.J. Inc. v. Nw. Bell Tel., Co.,*
    492 U.S. 229, 240, 241, 242 (1989) ………………………….……..120, 127, 128

*Hall v. Civ. Air Patrol, Inc.,*
    193 F. App'x 298, 299 (5th Cir. 2006) ………………………………………...89

*Hall v. GE Plastic Pacific PTE Ltd.,*
    327 F.3d 391, 396, 399 (5th Cir. 2003) …………………………………69, 70

*Hanson v. Denckla,*
    357 U.S. 235, 251 (1958) …………………………………………………..142

*Harker Heights v. Sun Meadows Land, Ltd.,*
    830 S.W.2d 313, 319 (Tex. App.—Austin 1992, no writ) …………………………117

*Haynes & Boone, LLP v. NFTD, LLC,*
    631 S.W.3d 65, 76, 78 (Tex. 2021) …………………………………………...72, 73

*HECI Exploration Co. v. Neel,*
    982 S.W. 2d 881, 885 (Tex. 1998) …………………………………….....……117

*Heldenfels Bros., Inc. v. Corpus Christi,*
    832 S.W.2d 39, 41 (Tex. 1992) ………………………………………….…..……117

*Howard v. Matterhorn Energy, LLC,*
    628 S.W.3d 319, 333 (Tex. App.—Texarkana 2021, no pet.) ……………………71

*In re Alloy, Inc.,*
    No. 5626-VCP, 2011 Del. Ch. LEXIS 159, at *21 (Del. Ch. Oct. 13, 2011) …………...99

*In re Burzynski,*
    989 F.2d 733, 741-42, 743 (5th Cir. 1993) …………….……….......……119, 120, 122, 128

*In re Emerging Commc'ns, Inc. S'holders Litig.,*
    2004 Del. Ch. LEXIS 70, 2004 WL 1305745, at * 38-39
    (Del. Ch. May 3, 2004) ………………………………………………………….....105

004411

*In re GGP, Inc. Stockholder Litig.,*
  282 A.3d 37 (Del. 2022) ……………………………………………..……………..106

*In re Katrina Canal Breaches Litig.,*
  495 F.3d 191, 205 (5th Cir. 2007) ……………………………………………….53

*In re KKR Fin. Holdings LLC S'holder Litig.,*
  101 A.3d 980, 990 (Del. Ch. 2014) ……………………………….………..…...101

*In re McDonald's Corp. S'holder Derivative Litig.,*
  291 A.3d 652, 686 (Del. Ch. 2023) ……………………………………….......101

*In re Primedia Inc. Deriv. Litig.,*
  910 A.2d 248, 258 n.26 (Del. Ch. 2006)…………………………………………105

*In re Shorenstein Hays–Nederlander Theatres LLC Appeals,*
  213 A.3d 39, 56 (Del. 2019) ………………………………………………………110

*J.L. v. Barnes,*
  33 A.3d 902, 913 (Del. Super. Ct. 2011) ………………………………………65

*Jampole v. Matthews,*
  857 S.W.2d 57, 61-63 (Tex. App.—Houston [1st Dist.] 1993, writ denied) ………..78, 79

*Janvey v. Thompson & Knight LLP,*
  3:03-CV-158-M, 2003 U.S. Dist. LEXIS 29778, at *17 (July 8, 2003) ………………55, 56

*Jaser v. AT&T Servs.,*
  No. 3:18-CV-3429-B-BH, 2020 U.S. Dist. LEXIS 49341, at *14
  (N.D. Tex. Mar. 23, 2020) ……………………………………………………………91

*Jethroe v. Omnova Solutions, Inc.,*
  412 F.3d 598, 600 (5th Cir. 2005) ……………………………………………..70

*Kahn v. Lynch Commc'n Sys. Inc.,*
  638 A.2d 1110, 1114 (Del. 1994) ……………………………………………...105

*Kaplan v. Utilicorp United,*
  9 F.3d 405, 407 (5th Cir. 1993) ……………………………………………………56

*Katz v. Oak Industries, Inc.,*
  508 A.2d 873, 880 (Del. Ch. 1986) …………………………...…..…..…...........116

*Keenan v. Eshleman,*
  2 A.2d 904 (Del. 1938) …………………………………………………….........105

*Kulksdahl v. Loyola Univ. New Orleans,*
  No. 16-2990 Section "B" (3), 2016 U.S. Dist. LEXIS 106901, at *2
  (E.D. La. Aug. 12, 2006) ……………………………………………………………91

004412

*Kyle v. Strasburger,*
    No. 13-13-00609-CV, 2019 WL 1487357, at *9
    (Tex. App.—Corpus Christi Apr. 4, 2019, no pet.) ..................................71

*Landon v. GTE Communications Servs., Inc.,*
    696 F. Supp. 1213, 1217 (N.D. Ill. 1988) .........................................122

*Landry's, Inc. v. Animal Legal Defense Fund,*
    631 S.W.3d 40, 46, 52 (Tex. 2021) ............................................71, 72

*Lapiner v. Maimon,*
    429 S.W.3d 816, 823 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ...............62

*Latham v. Castillo,*
    972 S.W.2d 66, 69-70 (Tex. 1998) ............................................78, 79

*Leskinen v. Halsey,*
    No. 2:10-cv-03363 MCE KJN PS, 2011 WL 4056121, at *6 (E.D. Cal. 2011) ............144

*Lobato v. Herndon,*
    No. GJH-15-2978, 2017 WL 1185202, at *5 (D. Md. Mar. 29, 2017) ...................143

*Lovelace v. Software Spectrum,*
    78 F.3d 1015, 1017-18 (5th Cir. 1996) .........................................1, 2

*Maffei v. Palkon,*
    2025 WL 384054, at *23 (Del. Feb. 4, 2025) ....................................102

*Manichaen Cap., LLC v. Exela Techs, Inc.,*
    759 F. Supp. 2d 477, 504 (D. Del. Ch. 2021) ...................................104

*Marbury v. Madison,*
    5 U.S. 137, 163 (1803) ........................................................95

*Martin v. D.B. Martin Co.,*
    10 Del. Ch. 211, 88 A. 612, 615, 102 A. 373 (Del. Ch. 1913)....................105

*McZeal v. J.P. Morgan Chase Bank, NA,*
    2014 U.S. Dist. LEXIS 92529, at *20 (E.D. La. July 7, 2014) ...................91

*Megatel Homes, LLC v. Moayedi (Megatel I),*
    2021 WL 5360509, at *7 (N.D. Tex. Nov. 16, 2021) .........................123, 124

*Megatel Homes, LLC v. Moayedi (Megatel II),*
    2022 WL 2306949, at *5-6 (N.D. Tex. June 27, 2022) .......................121, 122

*Monroe Park v. Metro. Life Ins. Co.,*
    457 A.2d 734, 737 (Del. 1983) ...........................................104, 107

*Morgan v. Hubert,*
    335 F. App'x 466, 470 (5th Cir. 2009) .......................................54, 91

004413

*Mullins v. TestAmerica, Inc.,*
    564 F.3d 386, 400-01 (5th Cir. 2009) ……………………………………………...144

*Muniz v. Medtronic, Inc.,*
    2014 U.S. Dist. LEXIS 36552, at *7-8 (W.D. Tex. Mar. 20, 2014) ……….…………..91

*Murphy v. Gruber,*
    241 S.W.3d 689, 693 (Tex. App.—Dallas 2007, pet. denied) ……………………………79

*Nath v. Baylor Coll. Of Med.,*
    No. 01-20-00401-CV, 2022 WL 1038372, at *5
    (Tex. App.—Houston [1st Dist.] Apr. 7, 2022, pet. denied) …………….…………....71

*Neff v. Brady,*
    527 S.W.3d 511, 523 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ……….…….....62

*New Hampshire v. Maine,*
    532 U.S. 742, 749, 750-751 (2001) …………………………….…………………69, 70

*Nwokedi v. Unlimited Restoration Specialists, Inc.,*
    428 S.W.3d 191, 204-05 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) ……..…134

*Official Comm. of Unsecured Creditors of Integrated Health Servs. v. Elkins,*
    No. 20228-NC, 2004 Del. Ch. LEXIS 122, at *28 (Del. Ch. Aug. 24, 2004) ….……....100

*Paz v. Bush Engineered Materials, Inc.,*
    445 F.3d 809, 812 (5th Cir. 2006) …………….......……………………………141

*Phillips v. Wilks, Lukoff & Bracegirdle, LLC,*
    2014 WL 4930693, at *4 (Del. Oct. 1, 2014) …………………………….........……114

*Pierce v. Int'l Ins. Co.,*
    671 A.2d 1361, 1366 (Del. 1996) ………………………………………………115

*Prager v. LaFaver,*
    180 F.3d 1185, 1188-89 (10th Cir. 1999), *cert. denied,* 528 U.S. 967 (1999) ……...............2

*R.P. Small Corp. v. Land Dep't, Inc.,*
    505 F. Supp. 3d 681 (S.D. Tex. 2020) …………….........…………………94, 108, 137

*Ramco Asset Mgmt., LLC v. USA Rare Earth, LLC,*
    C.A. No. 2022-0665-SG, 2024 Del. Ch. LEXIS 127, at *25
    (Del. Ch. Apr. 22, 2024) …………………………………………………….....61

*Ray Malooly Trust v. Juhl,*
    186 S.W.3d 568, 570 (Tex. 2006) …………………….........…………………142

*Regnery v. Wallerich,*
    626 F. Supp. 2d 872, 873, 874, (N.D. Ill. 2009) ………….……………………143, 144

004414

*Reneker v. Offill,*
    2012 U.S. Dist. LEXIS 83017, 2012 WL 2158733, at *10
    (N.D. Tex. June 14, 2012) ..................................................................59

*Resolution Trust Corp. v. Acton,*
    866 F. Supp. 981, 985 (N.D. Tex. 1993) ...............................55, 56, 57

*Resolution Trust Corp. v. Bright,*
    872 F. Supp. 1551, 1561 (N.D. Tex. 1995) .................................55, 56

*Riverwalk Cy Hotel Partners Ltd. v. Akin Gump Strauss Hauer & Feld, LLP,*
    391 S.W.3d 229, 236 (Tex. App.—San Antonio 2012, no pet.) ..............................79

*Rose v. Walsh,*
    No. 05-22-00289-CV, 2022 WL 17750750, at *5
    (Tex. App.—Dallas Dec. 19, 2022, no pet.) .......................................71

*S. Leasing Partners, Ltd. v. McMullan*
    801 F.2d 783, 788 (5th Cir. 1986) ..................................................90

*S. Pac. Co. v. Bogert,*
    250 U.S. 483, 488, 39 S. Ct. 533, 63 L. Ed. 1099 (1919) ...........104, 107

*S.V. v. R.V.,*
    933 S.W.2d 1, 6 (Tex.1996) ...........................................................57

*Sangha v. Navig8 ShipManagement Priv. Ltd.,*
    882 F.3d 96, 101 (5th Cir. 2018) ..................................................141

*Schacht v. Brown,*
    711 F.2d 1343, 1347–48 (7th Cir. 1983) ..........................................58

*Schnell v. Chris-Craft Indus., Inc.,*
    285 A.2d 437, 439 (Del. 1971) ....................................................102

*Shandler v. DLJ Merch. Banking, Inc.,*
    2010 Del. Ch. LEXIS 154, 2010 WL 2929654, at *15 (Del. Ch. July 26, 2010) ...........105

*Shelby v. City of El Paso,*
    577 F. App'x 327, 332 (5th Cir. 2014) .............................................62

*Shell Oil Co. v. Ross,*
    356 S.W.3d 924, 927 (Tex. 2011) ...................................................62

*Sivertson v. Clinton,*
    2011 U.S. Dist. LEXIS 104097, 2011 WL 4100958, at *3
    (N.D. Tex. Sept. 14, 2011) ..........................................................55

*Smith v. 2005 Tower LLC,*
    No. 09-22-00350-CV, 2024 WL 3616470, at *9
    (Tex. App.—Beaumont Aug. 1, 2024, pet. denied) .............................71

004415

*Smith Int'l, Inc. v. Egle Grp., LLC,*
    490 F.3d 380, 387 (5th Cir. 2007) ……………………….......……………………..114

*State Farm Mut. Auto. Ins. Co. v. Giventer,*
    212 F. Supp. 2d 639, 650 (N.D. Tex. 2002) …………………………….……………119

*Steen Seijo v. Miller,*
    425 F. Supp. 2d 194, 200 (D.P.R. 2006) …………………………………….....143, 144

*Sterling v. Mayflower Hotel Corp.,*
    33 Del. Ch. 293, 93 A.2d 107, 109-10 (Del. 1952) ………………………………104, 105, 107

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders*
*In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber,*
    327 F.3d 173, 185 (2d Cir. 2003) …………………………….......………………………64

*Stuart v. Spademen,*
    772 F.2d 1185, 1192 (5th Cir. 1985) ………………………………………………143

*Southern Farm Bureau Casualty Ins. Co. v. Allen,*
    388 F.2d 126, 131 (5th Cir. 1967) …………………………………………………...56

*Spera v. Fleming, Hovenkamp & Grayson, P.C.,*
    25 S.W.3d 863, 872-73 (Tex. App.—Houston [14th Dist.] 2000, no pet.) …..…………78

*Sunbeck v. Sunbeck,*
    No. 1:10 CV23-A-D, 2011 U.S. Dist. LEXIS 121538, at *10
    (N.D. Miss. Oct. 20, 2011) …………………………………….......………………55, 57

*Taylor v. Rothstein Kass & Co., PLLC,*
    Civil Action No. 3:19-CV-1594-D, 2020 U.S. Dist. LEXIS 17435
    (N.D. Tex. 2020) …………………….......……………………………….…………58

*Taylor v. Scheef & Stone, LLC,*
    Civil Action No. 3:19-CV-2602-D, 2020 U.S. Dist. LEXIS 135756
    (N.D. Tex. 2020) ……………………………………………….......……………59

*Thomas v. Dhi Home Mortg. Co.,*
    No. 3:22-CV-1236-B-BK, 2023 U.S. Dist. LEXIS 36774, at *12
    (N.D. Tex. Feb. 8, 2023) ………………………………………....………………90

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.,*
    845 A.2d 1031, 1033 (Del. 2004) …………………………………………….....61

*Toth Enterprises II, P.A. v. Forage,*
    707 F. Supp. 3d 697, at *709-10 (W.D. Tex. 2023) …………………………..…………126

*Toys "R" Us, Inc. v. Step Two, S.A.,*
    318 F.3d 446, 456 (3d Cir. 2003) …………………….……………………………152

004416

*TransFirst Holdings, Inc. v. Phillips,*
2008 WL 11350043, at *3-4 (N.D. Tex. July 3, 2008) …………………....…………..126

*UFCW & Participating Food Indus. Empls Tri-State Pension Fund v. Zuckerberg,*
250 A.3d 862, 877, 876 (Del. Ch. 2020) …………………….......…......……………….61

*U.S. v. Dovalina,*
282 F.3d 472, 475 (5th Cir. 2001) …………………....…………………………………122

*Uzuegbunam v. Preczewski,*
141 S. Ct. 792, 796, 209 L. Ed. 2d 94 (2021) ...............................................................95

*United Healthcare Servs., Inc. v. Next Health, LLC,*
2021 WL 764035, at *5 (N.D. Tex. Feb. 26, 2021) ………………………………127

*United States v. Hoffman,*
901 F.3d 523, 546 (5th Cir. 2018) ………………………………………………121

*United States v. Hungerford,*
No. 21-30359, 2023 WL 8179273, at *4 (5th Cir. Nov. 27, 2023),
*cert denied,* 144 S. Ct. 1128 (2024) ……………………………………….......…………..121

*United States ex rel. Garst v. Lockheed–Martin Corp.,*
328 F.3d 374, 378 (7th Cir. 2003) ………………………………………………......89

*United States v. Spalding,*
894 F.3d 173, 171, 181 (5th Cir. 2018) …………………….......……………………121

*United States v. Stalnaker,*
571 F.3d 428, 436 (5th Cir. 2009) ……………………………………....…………126

*Valtech Sols., Inc. v. Davenport,*
No. 3:15-CV-3361-D, 2016 WL 2958927, at *2 (N.D. Tex. May 23, 2016) ……………152

*Vinson & Elkins v. Moran,*
946 S.W.2d 381, 400 (Tex. App.—Houston [14th Dist.] 1997,
writ dism'd by agr.) …………………………………………………...………………..78

*Virtus Capital L.P. v. Eastman Chem. Co.,*
2015 Del. Ch. LEXIS 34, 2015 WL 580553, at *18 (Del. Ch. Feb. 11, 2015) ……….......105

*Wagner & Brown, Ltd. v. Horwood,*
58 S.W.3d 732, 737 (Tex. 2001) …………………………………....……………………117

*Weaver v. Witt,*
561 S.W.2d 792, 793 (Tex. 1977) …………………………………….......………………63

*Webb v. Portland Mfg. Co.,*
29 F. Cas. 506, 509, F. Cas. No. 17322 (C.C.D. Me. 1838) …………………………95

004417

*White v. Panic,*
    783 A.2d 543, 554 n.36 (Del. 2001) ...................................... 103

*Wood v. Baum,*
    953 A.2d 136, 143 (Del. 2008) ........................................ 116

*Word of Faith World Outreach Center Church, Inc. v. Sawyer,*
    90 F.3d 118, 122 (5th Cir. 1996) .................................120, 129

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286, 297 (1980) ............................................143

*Yaquinto v. Krage & Janvey, L.L.P. (In re Tex. E&P Operating, Inc.),*
    Nos. 17-34386-sgj7, 19-03231-sgj, 2024 Bankr. LEXIS 1674,
    at *43 (Bankr. N.D. Tex. 2024) ...................................... 73

## Statutes

6 Del. C. § 18-1101(e) .......................................... 109, 110

8 Del. C. § 102(b)(7) ................................................ 106

18 U.S.C. § 1341 ................................................... 121

18 U.S.C. § 1343 ................................................... 121

18 U.S.C. § 1956(a)(1)(A)(i) ......................................... 122

18 U.S.C. § 1962(c) ............................................ 118, 119

Tex. Bus. & Com. Code § 24.002(3) .................................. 134

Tex. Bus. & Com. Code § 24.002(6) .................................. 134

Tex. Bus. & Com. Code § 24.005(a)(1) ............................... 134

Tex. Bus. & Com. Code § 24.009(b) .................................. 134

Tex. Bus. Orgs. Code § 21.562 (a) ................................... 62

Tex. Civ. Prac. & Rem. Code § 16.003 ............................... 117

## Other Authorities

Delaware Ct. Ch. R. 23.1(a)(1) ...................................... 61

Fed. R. Civ. P. 8 ................................................... 89

Fed. R. Civ. P. 8(a) ................................................ 89

Fed. R. Civ. P. 8(d) ................................................ 89

Fed. R. Civ. P. 8(c)(1) ............................................. 55

Fed. R. Civ. P. 9(b) ............................................. passim

Fed. R. Civ. P. 12(b) ............................................... 2

004418

Case 3:25-cv-01808-K   Document 35-18   Filed 07/10/25   Page 972 of 1195   PageID 30685

FED. R. CIV. P. 12(b)(6) ……………......……….............................................................……*passim*

FED. R. CIV. P. 12(c) ……………………………………….....…………………1, 2, 154

FED. R. CIV. P. 12(d) ……………………………………….....…………………2, 154

FED. R. CIV. P. 30(d) ……………………………………….....…………………153

004419

## TABLE OF EXHIBITS

| Ex. | Description | Date |
|---|---|---|
| 1 | Highland Capital Management, L.P.'s Schedule of Investments | |
| 2 | Agreed Motion to Partially Vacate the Final Judgment Dated July 14, 2014 | 03/17/2022 |
| 3 | Third-Party Defendant HERA's Notice of Cash Deposit in Lieu of Supersedes Bond and Affidavit Establishing Net Worth | 09/19/2014 |
| 4 | Letters Rogatory Motion Transcript from Texas Trial | 09/22/2014 |
| 5 | Plaintiff Highland Capital Management, L.P.'s Application for Writ of Garnishment Exhibit B Ellington Affidavit | 12/08/2016 |
| 6 | *Delaware I* Second Amended Complaint | 02/15/2019 |
| 7 | *Delaware II* Verified Amended Complaint | 05/15/2020 |
| 8 | Excerpts from Deposition of James Seery | 03/20/2024 |
| 9 | Daugherty Proof of Claim filed in Highland Bankruptcy | 10/23/2020 |
| 10 | Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith with Settlement Agreement attached | 03/08/2022 |
| 11 | Transfer Agreements | 04/01/2022 |
| 12 | HERA Letter from Thom Uebler Requesting Case Files, Records and Invoices | 05/11/2022 |
| 13 | Letter Response from HAK | 05/25/2022 |
| 14 | Letter Response from Williams & Connolly on behalf of DLA Piper | 07/22/2022 |
| 15 | Email from Steven Hough to Surgent/Abrams re: Books and Records 【HERA】【RE: Daugherty】 | 02/11/2013 |
| 16 | Letter from Drew York to John Morris requesting documents | 01/30/2024 |
| 17 | Email from John Morris to Drew York | 03/05/2024 |
| 18 | Email from Annette Tyler attaching Abrams & Bayliss and HAK invoices for February 2013 | 03/05/2013 |
| 19 | Email from Surgent to Highland Defendants and Outside Attorneys with revised HERA documents | 01/15/2013 |
| 20 | Leventon deposition testimony in Delaware I | 06/18/2019 |
| 21 | Leventon trial testimony in Delaware I | 10/14/2019 |
| 22 | Ellington deposition testimony in Delaware I | 08/12/2019 |
| 23 | Ellington trial testimony in Delaware I | 10/14/2019 |
| 24 | Dondero trial testimony in Delaware I | 10/14/2019 |
| 25 | Email from Hough to Demaris and Abrams | 11/28/2012 |
| 26 | Email from Annette Tyler to Surgent and attached invoice with 12-22-2012 entry regarding Dondero buyout issue. | 01/09/2013 |
| 27 | Email from Abrams to Dameris re: HERA memo | 12/30/2012 |

004420

Case 3:25-cv-01806-K DocumentExhibit 40 Filed 07/24/25184 Page 974 of 1195    PageID 10687

| 28 | Email from Hough to Dameris and Abrams re: Buyout Steps | 01/04/2013 |
| 29 | Email from Surgent to Lackey, Aigen, Britain, Boyce, Honis, Ellington, Abrams and Dameris, dated Jan. 9, 2013 (pg 2 of email string) re: DRAFT HERA DOCS | 01/09/2013 |
| 30 | Email from Abrams to Britain, Dameris and Surgent re: Retainer Request | 01/11/2013 |
| 31 | Email from Hough to Surgent, Dameris and Abrams re: HERA | 01/11/2013 |
| 32 | Email from Surgent to Lackey, Aigen, Britain, Boyce, Dameris, Ellington, Katz and Hough re: HERA docs for review | 01/15/2013 |
| 33 | Agreement between Highland and Joe Dougherty | 01/17/2013 |
| 34 | Email from Abrams to Surgent and Dameris re: HERA | 02/04/2013 |
| 35 | Email from Abrams to Surgent re: Daugherty Litigation | 03/05/2013 |
| 36 | Excerpts from William Lane Britain Deposition in Texas Lawsuit | 06/11/2013 |
| 37 | Excerpts from Boyce Deposition in Texas Lawsuit | 06/05/2013 |
| 38 | Britain trial testimony in Texas Lawsuit | 01/17/2014 |
| 39 | Britain trial testimony in Texas Lawsuit | 01/21/2014 |
| 40 | Surgent trial testimony in Texas Lawsuit | 01/16/2014 |
| 41 | Surgent trail testimony in Texas Lawsuit | 01/17/2014 |
| 42 | Email from Hough to Surgent, Dameris, and Abrams re: HERA | 01/14/2013 |
| 43 | Excerpts from Mark Okada deposition testimony in Texas Lawsuit | 10/15/2013 |
| 44 | Email from Surgent to various recipients re: HERA docs for review | 01/15/2013 |
| 45 | Email from Surgent to various recipients re: DRAFT HERA DOCS | 01/09/2013 |
| 46 | Excerpts from Carl Moore deposition in Texas Lawsuit | 09/24/2013 |
| 47 | Email from Hough to Abrams re: Buyout Update ⸢HERA⸥ | 01/18/2013 |
| 48 | Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets LLC | 02/16/2012 |
| 49 | Agreement between Highland and Amit Walia | 02/06/2013 |
| 50 | Honis 1-18-2013, 4:33p.m. CST fax signature pages from Hotel Palomar in San Fransisco | 01/18/2013 |
| 51 | Written Consent of Board of Directors of HERA purporting to (1) approve the amendment to Section 5.1 of the Second Amended LLC Agreement to change number of board members from 6 to 5, and (2) remove Walia effective January 17, 2013 | 01/17/2013 |
| 52 | Amendment to Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets LLC | 01/17/2013 |

004421

| 53 | Written Consent of Board of Directors (Expense Payments and Reserves) | 01/17/2013 |
| 54 | Written Consent of Board of Directors (Transfer of Dougherty Units to Highland) | 01/17/2013 |
| 55 | Written Consent of Board of Directors (Approval to Amend Article 5.1 to reduce number of board members to 5 and remove Walia as board member) | 01/17/2013 |
| 56 | Amendment to Second Amended LLC Agreement | 01/17/2013 |
| 57 | Written Consent of Board of Directors (Approval to amend Article VIII for Indemnification and Liability) | 01/17/2013 |
| 58 | Second Amendment to Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets LLC (Amend Article VIII for Indemnification and Liability) | 01/18/2013 |
| 59 | Written Consent of Board of Directors (Approval of Third Amendment to Article 5.1, 5.2(b)(iv) and Article IX for acceptance and offer of assignment of preferred unit to Highland) | 01/18/2013 |
| 60 | Third Amendment to Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets LLC | 01/18/2013 |
| 61 | Transfer Agreements of Britain, Dameris, Boyce and Ellington | 01/18/2013 |
| 62 | Email from Hough to Abrams re: Buyout Update 〔HERA〕 | 01/18/2013 |
| 63 | Third Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets LLC | 02/01/2013 |
| 64 | Expense Allocation Agreement | 02/01/2013 |
| 65 | Written Consent of Manager of HERA to Expense Allocation | 02/01/2013 |
| 66 | Managers Written Consent for Assignment Agreement and Assignment Agreement as Exhibit A attached thereto | 04/30/2013 |
| 67 | Corporate governance documents produced by Defendants in Texas Lawsuit regarding HERA buyout scheme | 12/18/2013 |
| 68 | Exhibits 70 & 71 from Deposition of Moore in Texas Lawsuit. | 09/24/2013 |
| 69 | Affidavit of William Lane Britain | 08/14/2013 |
| 70 | Email from Hough to Surgent and Abrams re: LLC Fiduciary Duties 〔HERA〕 〔RE; Privileged〕 | 08/15/2013 |
| 71 | Metadata for Limited Liability Company Agreement of Highland ERA Management, LLC | 02/07/2013 |
| 72 | Email from Hough to Surgent and Abrams attaching draft response to Daugherty's demand | 02/11/2013 |
| 73 | Highland Financial Statements and Excel Spreadsheets. | 10/15/2019 |

004422

| 74 | Email from Leventon to Hough and Goldsmith re: Daugherty - HERA Distribution, attaching Assignment Agreement | 08/22/2013 |
| 75 | David Klos trial testimony in Delaware I | 10/14/2019 |
| 76 | Daugherty Third Amended Complaint in the Texas Lawsuit | 05/07/2013 |
| 77 | Final Judgment in Texas Lawsuit | 07/11/2014 |
| 78 | HERA's Legitimate Third Amended and Restated Company Agreement | 02/28/2024 |
| 79 | Get Good Trust's Proof of Claim in the Highland Bankruptcy | 04/08/2020 |
| 80 | Dugaboy Investment Trust's ("Dugaboy") Proof of Claim in the Highland Capital Bankruptcy. | 04/08/2020 |
| 81 | Dugaboy's Witness and Exhibit List in the Highland Capital Bankruptcy. | 06/23/2021 |
| 82 | Litigation Trustee's Complaint against the Trustee Defendants in the Highland Capital Bankruptcy's Adversary Proceeding No. 21-03076-sgj | 05/19/2022 |
| 83 | Certificate of Amendment for 3820 Goar Park LLC filed with the Texas Secretary of State. | 06/06/2012 |
| 84 | NexBank Capital, Inc.'s Annual Report of Holding Companies—FR Y-6 filed with the Board of Governors Federal Reserve System | 08/09/2017 |
| 85 | Dugaboy's Amended Response to Order Requiring Disclosures in the Highland Capital Bankruptcy | 07/09/2021 |
| 86 | Judge Jernigan's Order Requiring Disclosures in the Highland Capital Bankruptcy | 06/18/2021 |
| 87 | Texas Franchise Tax Public Information Report for 4312 Belclaire, LLC | 11/08/2022 |
| 88 | Account History for 4312 Belclaire from the Dallas Central Appraisal District | 12/31/2024 |
| 89 | Texas Franchise Tax Public Information Report for 3409 Rosedale, LLC. | 05/04/2023 |
| 90 | Account History for 3409 Rosedale from the Dallas Central Appraisal District. | 01/31/2025 |
| 91 | Deposition of Isaac Daniel Leventon in the Acis Capital Management, LP Bankruptcy Proceeding, Cause No. 18-30264–SGJ7 in the United States Bankruptcy Court for the Northern District of Texas Dallas Division (the "Acis Bankruptcy") | 03/07/2018 |
| 92 | Dugaboy's Proof of Claim #177 in the Highland Capital Bankruptcy | 04/23/2020 |
| 93 | Get Good's Proof of Claim #120 in the Highland Capital Bankruptcy. | 04/08/2020 |
| 94 | Get Good's Proof of Claim #128 in the Highland Capital Bankruptcy | 04/08/2020 |
| 95 | Texas Franchise Tax Public Information Report for Goar Park LLC | 11/15/2013 |

| 96 | Texas Secretary State report for 3820 Goar Park LLC | |
| 97 | Hunter Mountain Investment Trust's ("Hunter Mountain") Rule 202 Petition in the 191st Judicial District in Dallas County, Texas. | 06/05/2023 |
| 98 | Get Good's Certificate of Interested Persons filed in the United States District Court for the Northern District of Texas Dallas Division, Cause No. 3:09-CV-02034-F | 03/16/2010 |
| 99 | Dugaboy's Proof of Claim #131 in the Highland Capital Bankruptcy | 04/08/2020 |
| 100 | Dugaboy's Proof of Claim #113 in the Highland Capital Bankruptcy | 04/08/2020 |
| 101 | Hunter Mountain's Proof of Claim #152 in the Highland Capital Bankruptcy | 04/08/2020 |
| 102 | Hunter Mountain's Proof of Claim #70 in the Highland Capital Bankruptcy | 04/02/2020 |
| 103 | Mark Okada's Proof of Claim #135 in the Highland Capital Bankruptcy | 04/08/2020 |
| 104 | High Capital's Form ADV Part 2A | 03/29/2019 |
| 105 | Email Correspondence transmitting a Letter from Nancy Dondero, filed in the Acis Bankruptcy | 03/20/2018 |
| 106 | NexBank Capital, Inc.'s Annual Report of Holding Companies—FR Y-6 filed with the Board of Governors Federal Reserve System. | 03/31/2014 |
| 107 | BrokerCheck Report on NexBank Securities Inc. | 06/19/2006 |
| 108 | Third Amended and Restated Shareholders Agreement for NexBank Capital, Inc. dated January 25, 2018 | 01/25/2018 |
| 109 | NexBank Capital, Inc.'s Notice of Action Taken by Stockholders, dated December 10, 2015 | 12/10/2015 |
| 110 | Dana Breault's Certificate of License History from the Texas Real Estate Commission ("TREC") | |
| 111 | Collin County Appraisal District's property search return for Dana Breault's homestead located in Dallas, TX | |
| 112 | Nancy Dondero's deposition transcript from Highland Capital Bankruptcy's Adversary Proceeding No. 21-03000-SGI, Doc. No. 135-2 | 12/18/2021 |
| 113 | Redacted Trial Transcript in *Daugherty v. Highland Capital Management, L.P.* C.A. No. 2017-0488-MTZ, in the Delaware Court of Chancery | 10/15/2019 |
| 114 | Get Good's Amended Response to Order Requiring Disclosures in the Highland Capital Bankruptcy | 07/09/2021 |
| 115 | Email from Hough to Surgent and Abrams re LLC Fiduciary Duties 〔HERA〕〔RE: Privileged〕 | 08/05/2013 |
| 116 | Daugherty's Motion for Leave to File Fourth Amended Counterclaim and Third-Party Petition | 11/13/2013 |
| 117 | Highland Defendants' Response to Motion for Leave to File Fourth Amended Counterclaim and Third-Party Petition of Patrick Daugherty | 12/06/2013 |
| 118 | Third-Party Defendants' Response to Daugherty's | 12/06/2013 |

|     | Motion for Leave to File Fourth Amended Counterclaim and Third-Party Petition |            |
| --- | --- | --- |
| 119 | Order Denying Daugherty's Motion for Leave to File Fourth Amended Counterclaim and Third-Party Petition | 12/09/2013 |
| 120 | Andrews Kurth Invoice No. 10735699 | 01/12/2017 |
| 121 | Post-Judgment Request Form | 12/09/2016 |
| 122 | Lynn Pinker Cox & Hurst Invoice No. 20170066 | 01/26/2017 |

004425

Case 3:25-cv-01806-K    Document Exhibit 40 Filed 07/24/25    Page 979 of 1195    PageID 30692

## GLOSSARY OF DEFINED TERMS AND NAMES[1]

1. **2013 Asset Transfer:**[2] The series of acts and transactions in 2012–2013 that transferred a majority of HERA's assets to Highland and or entities controlled by Defendants.

2. **2016 Escrow Transfer:** The series of alleged acts and transactions in 2016 through which the assets in Escrow were transferred to Highland.

3. **Abrams:** Jeff Abrams was an attorney at Abrams & Bayliss and served outside counsel for HERA.

4. **Bankruptcy:** *In re Highland Capital Management, L.P.*, Case No. 19-34054–sgj 11 in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (transferred from *In re Highland Capital Management, L.P.*, Case No. 19-12239 (CSS) in the United States Bankruptcy Court for the District of Delaware).

5. **Board Members:** Defendants Lane Britain, Ted Dameris, Joe Dougherty, Scott Ellington, and John Houis. Amit Walia was also a HERA board member during the applicable time periods.[3]

6. **Boyce:** Patrick Boyce was a board member of HERA and was a Partner at Highland. He also served as Head of Private Equity for HERA's limited partnership interests including HERAs most valuable investment, Restoration Capital Partners, LP. from late 2011 until his termination from Highland in 2014.

7. **Britain:** Lane Britain was a board member of HERA and was a partner at Highland

8. **Brown:** Shonn Brown was a partner at her former firms, Gruber Hurst Johansen Hail Shank LLP, and Lynn Pinker Gruber & Schwegmann where she served as outside counsel to HERA.

9. **Collins:** Brian Collins was the Head of Human Resources at Highland until he was terminated in 2021 and was the primary agent to implement and execute actions on behalf of the board for HERA as well as lead its investor communications, document custody, governance solicitation and Highland's buyout offer solicitation

10. **Complaint** (also **FAC**): Plaintiff's First Amended Original Complaint in this matter.

11. **Daugherty:**[4] Patrick Daugherty, HERA's sole member as of March 1, 2022, and the plaintiff in the Prior Lawsuits.

12. **Delaware I:** *Daugherty v. Highland Capital Management, L.P., et al.*, C.A. No. 2017-0488-SG in the Court of Chancery of Delaware.

---

[1] For ease of reference, HERA adopts the Glossary of Defined Terms filed with Defendants' Motions to Dismiss with some modifications and additions, noted via footnote.

[2] This definition more accurately reflects what transpired in 2012-2013.

[3] Added Amit Walia, non-party, who was on the HERA board during the applicable times.

[4] Clarifying that Daugherty did not become sole owner or have any control over HERA until March/April 2022.

004426

Case 3:25-cv-01876-K  Document 36-12 Filed 06/28/25  Page 980 of 1195   PageID 30693

13. **Delaware I Decision:** *Daugherty v. Highland Capital Mgmt., L.P.,* C.A. No. 2017-0488-SG, 2018 WL 3217738 (Del. Ch. June 29, 2018).

14. **Delaware II:** *Daugherty v. Dondero, et al.,* C.A. No. 2019-0956: MTZ in the Court of Chancery of the State of Delaware.

15. **Dameris:** Ted Demaris was a board member of HERA and served as a Managing Director at Highland

16. **DLAP:** The law firm of DLA Piper.

17. **Dondero:** James Dondero was President and Chief Executive Officer of Highland was a "Key Man" manager of HERAs most valuable investment, Restoration Capital Partners, LP. until his removal in 2020.

18. **Dougherty:** R. Joseph Dougherty was a board member of HERA and was a partner at Highland

19. **Ellington:** Scott Ellington served in various roles as a partner and Highland's Chief Legal Officer and General Counsel from 2010 until he was fired for cause in January 2021 for acting in a manner adverse to Highland's interest.

20. **Employees:** Defendants Jim Dondero, Mark Okada, Scott Ellington, Isaac Leventon, Eric Girard, Frank Waterhouse, Brian Collins, and John Honis.

21. **ERA Management:** Highland ERA Management, LLC, former manager of HERA.

22. **Escrow:** The agreement by which assets were placed into escrow, pursuant to the Escrow Agreement.

23. **Escrow Agreement:** The December 13, 2013, agreement between Highland as Depositor and Abrams & Bayliss, LLP as Escrow Agent for the escrow of assets related to the Texas Lawsuit.

24. **FAC** (also **Complaint**): HERA's First Amended Original Complaint in this matter.

25. **First Amendment:** The First Amendment to the Second Amended LLC Agreement, dated January 17, 2013.

26. **Girard:** Eric Girard served as internal counsel at Highland from 2011 until he was terminated in 2017.

27. **HAK:** The law firm of Hunton Andrews LLP fka Andrews Kurth, LLP

28. **HERA** (also **Plaintiff**): Plaintiff Highland Employee Retention Assets LLC.

29. **Highland** (also **Highland Capital**): Non-party Highland Capital Management, LP.

Case 3:25-cv-01878-K Document Exhibit 40 Filed 07/24/25 Page 981 of 1195   PageID 36694

30. **Highland Capital** (also **Highland**): Non-party Highland Capital Management, LP.

31. **Highland Settlement Agreement:** The settlement agreement between Daugherty and Highland, dated November 22, 2021.

32. **Honis:** John Honis was a board member of HERA, partner of Highland, and trustee to Hunter Mountain. He also was a "Key Man" manager of HERA's most valuable investment, Restoration Capital Partners, LP.

33. **Hough:** Steven Hough was an attorney at Abrams & Bayliss and served as outside counsel for HERA.

34. **Hurst:** Michael Hurst was a partner at his former firm, Gruber Hurst Johansen Hail Shank LLP, and is currently a partner at Lynn Pinker Gruber & Schwegmann where he served as outside counsel to HERA until he was fired by Highland's new management team in 2020 for insubordination and unprofessional misconduct.

35. **In-House Attorneys:** Defendants Ellington, Leventon, Surgent and Girard.[5]

36. **Katz:** Michael Katz was a partner at his former firm, HAK, and is now at DLAP[6], where he served as outside counsel to HERA and Highland

37. **Klos:** David Klos was a senior accountant at Highland that was responsible for the management of HERA's accounting records. He has been the Chief Financial Officer at Highland since its emergence from bankruptcy in August 2021.

38. **Leventon:** Isaac Leventon served as Assistant General Counsel at Highland from 2009 until he was fired for cause in January 2021 for acting in a manner adverse to Highland's interest.

39. **Miller:** Matt Miller was an attorney at Abrams & Bayliss and served as outside counsel for HERA.

40. **Moore:** Carl Moore was designated as HERA's corporate representative during the Texas Lawsuit.

41. **Okada:** Mark Okada was Chief Investment Officer and Executive Vice President until Highland filed for bankruptcy in October 2019. He also was defined as a "Key Man" manager of HERA's most valuable investment, Restoration Capital Partners, LP. He managed the investor relations department of Highland until his removal in 2020.

42. **Outside Attorneys:** Defendants Andrews Kurth, LLP, Marc Katz, Michael Hurst and Shonn Brown as well as non-party attorneys Miller, Hough, Abrams and Abrams & Bayliss LLP.

---

[5] Added Surgent.

[6] Throughout this response, HERA will refer to Katz, HAK and DLAP collectively as ("Katz/HAK/DLAP," except where DLAP is identified separately").

004428

43. **Parker:** Trey Parker was Co-Chief Investment Officer with Okada at Highland and Head of Private Equity after Boyce for HERA's limited partnership investments including HERA's most valuable investment, Restoration Capital Partners, LP. He was also named partner at Highland in 2015.

44. **Plaintiff** (also **HERA**): Plaintiff Highland Employee Retention Assets LLC.

45. **Prior Lawsuits:** Collectively, the Texas Lawsuit, *Delaware I*, and *Delaware II*.

46. **RICO:** The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

47. **Second Amended LLC Agreement:** The Second Amended and Restated Limited Liability Company Agreement of HERA, dated February 16, 2012.

48. **Second Amendment:** The Second Amendment to the Second Amended LLC Agreement, dated January 17, 2013.

49. **Surgent:** Thomas Surgent served as Chief Compliance Officer and Deputy General Counsel of Highland from 2011 through the Highland bankruptcy and has served as Highland's General Counsel since it emerged from bankruptcy in August 2021.

50. **Swadley:** Rick Swadley was a senior tax director at Highland that was responsible for the management of HERA's tax records until he was terminated in 2021.

51. **Texas Lawsuit:** *Highland Capital Mgmt., L.P. v. Daugherty*, 12-04005 in the 68th District Court for Dallas County, Texas.

52. **Third Amended LLC Agreement:** The Third Amended and Restated Limited Liability Company Agreement of HERA, dated February 1, 2013.

53. **Transfer Agreements:** Series of transactions in January of 2013 whereby HERA board members and Highland employees were given buy out agreements to the detriment of HERA by stripping its assets.

54. **Trustees:** Nancy Dondero as Trustee of The Dugaboy Investment Trust, Grant Scott as Trustee of the Get Good Trust, John Hanis as Trustee of the Hunter Mountain Investment Trust, and Lawrence Tonomura as Trustee of the Mark & Pamela Okada Family Trust – Exempt Trust #1 and Exempt Trust #2.

55. **TTLA:** The Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code, Ch. 134.

56. **TUFTA:** The Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code, Ch. 24.

57. **Walia:** Amit Walia was a board member of HERA and was a partner at Highland.

004429

TO THE HONORABLE JUDGE OF SAID COURT:

HIGHLAND EMPLOYEE RETENTION ASSETS LLC ("HERA" or "Plaintiff") files its Omnibus Response to the Highland Defendants, Outside Attorneys Defendants and Trustee Defendants' Motions to Dismiss and Memorandum in Support as follows:

**Omnibus Response Split into Two Separate Sections**

HERA has divided the memorandum into two separate sections: (1) addressing the Highland Defendants and Outside Attorneys Defendants' arguments; and (2) addressing the Trustee Defendants' arguments.

**The Court May Consider Extrinsic Materials**

HERA attaches to this Response documents that are referenced in the First Amended Complaint ("FAC"), consistent with the FAC, are actual pleadings or court orders themselves, such that they do not present matters outside the FAC. Although a party moving for dismissal ordinarily converts a Rule 12 motion into a Rule 56 motion for summary judgment by attaching extrinsic materials to its motion, a party opposing a Rule 12 motion "has much more flexibility," such that courts may consider the additional materials as long as they are "consistent with the pleadings."[1] In fact, under the more stringent pleading standards of *Ashcroft v. Iqbal* and *Bell Atlantic Corp. v. Twombly*, "a plaintiff who is opposing a Rule 12(b)(6) or Rule 12(c) motion and who can provide such illustration may find it prudent to do so."[2] The "submission of extraneous materials does not by itself convert a Rule 12(b)(6) motion into a motion for summary judgment."[3]

Here, the Court can consider the materials submitted without converting Defendants' motions to dismiss to motions for summary judgment,[4] because they are referenced in and

---

[1] *Bishop v. Air Line Pilots Ass'n*, 900 F.3d 388, 399 n.28 (7th Cir. 2018) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)).

[2] *Geinosky*, 675 F.3d at 745 n.1.

[3] *Delhomme v. Caremark Rx, Inc.*, 232 F.R.D. 573, 578 (N.D. Tex. 2005) (citing *Downs v. Liberty Life Assurance Co. of Boston*, 2005 U.S. Dist. LEXIS 22531, 2005 WL 2455193 *4 (N.D.Tex. 2005) (quoting *Finley Lines Joint Protective Board v. Norfolk S. Corp.*, 109 F.3d 993, 996 (4th Cir. 1997)).

[4] *See Douglas v. Hirshon*, 63 F.4th 49, 57 (1st Cir. 2023); *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1017-18 (5th Cir. 1996).

consistent with the allegations in the FAC, and include things such as exhibits, affidavits, matters of public record, matters that may be taken by judicial notice, and those that Plaintiff relied upon in bringing suit.[5]  Given the flexibility HERA  has in opposing the motions to illustrate the facts it expects to be able to prove, the Court may consider the materials without converting the motions.[6]  However, if the Court   determines that conversion is proper, HERA  respectfully requests, pursuant to FED. R. CIV. P. 12(d), a reasonable opportunity to conduct discovery so that it may present all material that is pertinent to the motions before the Court renders a ruling.[7]

---

[5] *See Lovelace*, 78 F.3d at 1017-18.
[6] FED. R. CIV. P. 12(b); *see also, Prager v. LaFaver*, 180 F.3d 1185, 1188-89 (10th Cir. 1999), *cert. denied*, 528 U.S. 967 (1999) (court has discretion to consider extrinsic materials submitted in conjunction with a Rule 12(b)(6) motion); *Lovelace*, 78 F.3d at 1017-18 (in securities-fraud claim, court could consider public disclosure documents filed with the SEC without converting motion under FRCP 12 (d)).
[7] "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. ***All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion***." (emphasis added).

004431

## INTRODUCTION

The claims brought by HERA in this lawsuit have never been alleged in the Prior Lawsuits, or in any other litigation. In fact, HERA was unaware of the claims brought forth in this lawsuit until after March/April 2022. The Court should focus on several key points when sifting through Defendants' "throw-it-against-the-barn-door" approach. First, HERA has never brought any claims of any kind against any party at any time in any jurisdiction. Second, Daugherty is not HERA. Daugherty's individual knowledge and actions cannot, as a matter of law, be imputed onto HERA, and Defendants do not and cannot cite any authority to the Court for this erroneous proposition. HERA retains its own separate corporate identity, and its own claims separate and apart from the individual Daugherty. Third, Daugherty and his affiliates did not obtain control of HERA, and thus actual knowledge of Defendants' bad acts giving rise to the claims made in this lawsuit, until granted control by the bankruptcy court in March/April 2022. Fourth, Defendants have a long history of not only calculated and deceitful concealment, but outright perfidious lying and misrepresentation to juries, judges and, of course, anyone they perceive as an enemy. HERA's claims are not barred, are sufficiently pleaded, and Defendants' Motions to Dismiss should be denied.

### *HIGHLAND DEFENDANTS AND OUTSIDE ATTORNEYS DEFENDANTS SECTION*

### I.    STATEMENT OF FACTS

#### A. Relevant Background Facts Important to the Present Lawsuit

##### 1.    The Fall of Highland

1.    Dondero and Okada, with Britain, Boyce, Dameris, Honis, Parker, Collins, Ellington, Leventon, Girard, Klos, Surgent, Hurst, Katz/HAK/DLAP, Waterhouse, Klos and Swadley at their side, controlled Highland and its byzantine web of funds and other entities under its management with unilateral and unfettered discretion for years.[8] They ensured that Highland

---

[8] FAC ¶ 27.

and its affiliates routinely failed to observe corporate formalities with respect to their personnel, corporate governance, internal systems, legal affairs, and considerable assets.[9]

2.     In September 2008, Highland took a dramatic turn for the worse because of Dondero and Okada's mismanagement and self-dealing during the financial crisis.[10] Highland defaulted on its credit facility, prompting its lenders to demand a forensic accounting review of missing cash and assets.[11] The audit revealed that Dondero and Okada had siphoned tens of millions of dollars out of Highland's accounts, while leaving creditors and employees with insufficient resources to collect what was owed to them.[12] A multitude of lawsuits were filed over a ten-year period against Dondero and his trusts, Okada and his trusts, Ellington, Leventon, and their affiliates as they became embroiled in litigation on allegations of fraud, breach of fiduciary duty, breach of good faith and fair dealing, willful misconduct, fraudulent transfers, money laundering, and wire fraud that resulted in verdicts of over one billion dollars in damages against them or their affiliates.[13]

3.     Following months of difficult negotiations, the lenders agreed to an extension of the credit facility in exchange for strict repayment terms and a security interest in over $125 million of Highland's remaining assets.[14]  In addition, the lenders agreed to allow for the creation of a vessel to set aside assets for the purpose of retaining and incentivizing employees – this entity is HERA.[15] Importantly, the assets were transferred to HERA in exchange for deferred compensation assets that were terminated as a result of the security interests taken by the lenders. Dondero, Okada and their affiliates were intentionally forbidden from participating as preferred unit holders in HERA.[16]

---

[9] FAC ¶ 50.
[10] FAC ¶ 51.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] FAC ¶ 52; Exh. 1-- Highland Schedule of Investments. (App. 1).
[15] FAC ¶ 52.).
[16] *Id.*

004433

4.      HERA has never had employees and at all times depended on its board of directors, legal counsel, managers, service providers, and its investment advisors to conduct its affairs.[17]  The Highland Defendants and the Outside Attorneys, along with Swadley and Klos, performed investment management, legal, accounting, and tax services to HERA pursuant agreements and/or arrangements, which, to this day, are still unknown to HERA.[18] Dondero and Okada resented the creation and cost of HERA.[19]

### 2.      Daugherty Resigns from Highland and is Removed as Director of HERA

5.      Daugherty was a partner, officer, director, Head of Private Equity, and Co-Head of Research for Highland and certain of its affiliates from 1998 until 2011.[20] Daugherty resigned from Highland on September 28, 2011, because he refused to participate in the conduct at Highland that would later result in awards of over a billion dollars in damages to investors and creditors for breach of fiduciary duty, willful misconduct, and fraud, among other causes of action.[21] Indeed, Dondero, Okada, Ellington, Leventon, Girard, Katz/HAK/DLAP, Hurst and Brown would later pursue legal actions on behalf of Highland against Daugherty to whitewash willful misconduct, breach of fiduciary duties and/or fraud against the Credit Strategies fund investors, Crusader Fund investors (including Dallas Police and Fire, Baylor University, Army Airforce Exchange, Ontario Teachers, and many others), UBS, and Josh Terry (a former employee).[22]

6.      Prior to his resignation, Daugherty became a holder of Series A Preferred Units of HERA on October 26, 2009.[23] He was awarded 1,571.86 preferred units and was the largest holder of the lender-approved HERA. HERA was created based on a "last man standing"

---

[17] FAC ¶ 53.
[18] *Id.*
[19] *Id.*
[20] FAC ¶ 55.
[21] *Id.*
[22] *Id.*
[23] FAC ¶ 56.

004434

structure where remaining employees would receive reallocated shares of the units forfeited by departed employees.[24] The number of Daugherty's units and percentage ownership of HERA increased to 1,909.69 and approximately 19.09% as other employees resigned from Highland prior to their interests vesting in 2011.[25] At the time of his resignation, Daugherty was the largest holder of HERA and a member of its board of directors.[26]

7.      On February 16, 2012, HERA's board members, Boyce, Britain, Dameris, Dougherty (no relation to Daugherty), Honis, and Walia removed Daugherty as a director of HERA.[27]

8.      After his removal as a director of HERA, Daugherty had no access to or ability to know what HERA and/or the Defendants were doing regarding HERA until after March 2022, when the Texas bankruptcy court granted Daugherty and his affiliates complete ownership and control of HERA.[28]

9.      Immediately after removing Daugherty from HERA's board, the newly composed board executed the Second Amended LLC Agreement, prepared by Surgent.[29] The Second Amended LLC Agreement purported to (i) impose a punitive procedure to deplete the value of a holder who litigated any action "related to" HERA, Highland, and its officers and directors; (ii) escrow the holder's interest; and (iii) in a type of reverse-indemnification, impose the litigation costs of HERA and any deemed "diminution in value" cost to the litigant, whether it lost or won the litigation – a proverbial lose-lose clause.[30]

### 3.    The Texas Lawsuit

10.      On April 11, 2012, Highland, at the direction of Dondero, Okada, Ellington,

---

[24] Id.
[25] Id.
[26] Id.
[27] FAC ¶ 57.
[28] FAC ¶ 60.
[29] FAC ¶ 57.
[30] Id.

004435

Leventon, Girard and Surgent, commenced a lawsuit against Daugherty in the 68th Judicial

District Court of Dallas County, Texas captioned *Highland Management, L.P. v. Daugherty*, Cause

No. 12-04005 (the "Texas Lawsuit").[31]    Daugherty responded with counterclaims against

Highland, HERA, and others, alleging breach of contract and breach of the covenant of good

faith and fair dealing against HERA and Highland.[32] Katz and Andrew Kurth purported to

represent Highland while Hurst, Brown and Gruber Hurst purported to represent HERA.[33]

11.    At trial, Hurst, Dondero, and Surgent made it a point to let the court and jury

know that HERA retained control of "all" of its assets. Dondero testified responding to questions

by Hurst as follows:

> Q. Okay. So – so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick
> Boyce and Lane Britain and [HERA], what happens to Mr. Daugherty's interest
> that's being escrowed right now with a third-party escrow agent?
> A. They go to him.
> Q. I'm sorry?
> A. They go to him via to HERA and then to him.[34]

Dondero further testified when Hurst asked him:

> Q. The escrow, did you just escrow this last month?
> A. No. We've had it segregated at Highland since April when we first put it in and
> then formalized the escrow. It takes a while to set up an escrow and transfer illiquid
> assets that have all sorts of transfer limitations.[35]

12.    Surgent, swore under oath on January 17, 2014 in regard to a question concerning

the April 30, 2013, implementation of the asset sweep from HERA, "Yes, but then it placed those

funds in escrow."[36] But when questioned further why the escrow appeared to be created 36 days

prior to his testimony and more than eight months after the assets were swept from HERA,

Surgent answered to the court and jury, "The escrow was formalized in this agreement, but I

---

[31] FAC ¶ 80.
[32] *Id.*
[33] *Id.*
[34] FAC ¶ 87.
[35] FAC ¶ 87.
[36] FAC ¶ 88.

004436

believe it existed sooner."[37] In fact, it did not, and Surgent knew that.[38]

13.    In closing arguments, HERA's counsel, Hurst, lied to the court and jury once
again stating that "if Pat Daugherty happens to prevail in his lawsuit against HERA, you heard
Jim Dondero testify, he gets his interest, which is currently escrowed in the third-party escrow
account, all of it."[39]

14.    After three weeks of trial, the jury found that HERA, at the direction of
Defendants from Highland, breached the implied covenant of good faith and fair dealing by
adopting Article 12.1 of the 2012 Agreement (the Lose-Lose clause) and that Highland and
Dondero had defamed Daugherty with malice.[40] The jury awarded Daugherty damages against
HERA in the amount of $2.6 million, plus interest which remains unpaid and has currently
accreted to approximately $5 million.[41] The court also determined that Daugherty had retained
ownership of his preferred units in HERA.[42] The problem was Dondero, Ellington, Surgent and
their merry band of minions lied to the jury and never funded the escrow while incurring millions
in legal fees to drain HERA's assets to perpetuate the lie.[43]

15.    Daugherty suspected that Defendants had lied about the existence of the escrow
and on August 24, 2014, served post-judgment discovery requests on HERA and Highland,
seeking information concerning the location of HERA's assets and liabilities and its post-
litigation conveyances to Highland so as to recover the judgment Daugherty had obtained.[44]

16.    Twenty days later, HERA, at the direction of Dondero and Hurst, filed a Notice

---

[37] *Id.*
[38] *Id.*
[39] FAC ¶89.
[40] FAC ¶91.
[41] *Id.*
[42] FAC ¶91.
[43] FAC ¶91. It should be noted that Defendants in their MTD mislead the Court by noting that the jury found against Daugherty for certain claims by Highland, while omitting the fact that those findings were vacated once the Defendants had been terminated (some for cause) and it was subsequently revealed that several Defendants lied on behalf of Highland in the Texas Lawsuit trial. *See* Exh. 2 -- Agreed Motion to Partially Vacate the Final Judgment Dated July 14, 2014, at 3, n 1. (App. 2-6)
[44] FAC ¶95.

004437

of Cash Deposit in Lieu of Supersedeas Bond and Affidavit Establishing Net Worth. HERA submitted the affidavit of Klos, which stated that HERA had a negative net worth of ($2,447,709) after fraudulently applying approximately $7,500,000 of Highland's legal expenses at the time to HERA as of August 31, 2014.[45] Highland also purported to have loaned HERA back its own cash necessary to repay HERA's legal expenses that were advanced by Highland because HERA did not have sufficient funds after transferring all of its assets to Highland back on April 30, 2013.[46] However, a footnote to the balance sheet exhibit to the affidavit noted, "Per the Escrow Agreement dated December 13, 2013, between HCMLP [Highland] and Abrams & Bayliss, LLP, if a final, non-appealable judgment against HERA is reached, Abrams & Bayliss, LLP as Escrow Agent, will transfer the HERA Deposit Assets to HERA."[47] The affidavit included a copy of the Escrow Agreement with a schedule, again falsely listing escrow assets of: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) cash equivalent of 1088.42 shares of NexPoint Credit Strategies.[48]

17.    In order to conceal the fact that no such transfer ever actually occurred, Dondero, Hurst and the Highland minions then directed HERA to object to Daugherty's discovery requests on the basis that it was harassing and argued that its cash deposit limited post-judgment discovery to HERA's net worth.[49] Hurst, doubled down at a subsequent hearing on September 22, 2014, before the court and stated, "everything that's in the sworn financial statement has been provided to the other side and it's been provided to the Court, also came up during trial; that is the exact same assets."[50]

---

[45] FAC ¶96. *See* Exh. 3 –Affidavit (of David Klos) Establishing Net Worth of HERA (Exhibit A to Third-Party Defendant HERA's Notice of Cash Deposit in Lieu of Supersedes Bond and Affidavit Establishing Net Worth)(App. 7-22).
[46] *Id.*
[47] *Id. See* Exh. 3 – Exhibit 1,n. 2 to Klos Affidavit Establishing Net Worth of HERA (Exhibit A to Third-Party Defendant HERA's Notice of Cash Deposit in Lieu of Supersedes Bond and Affidavit Establishing Net Worth)(App. 7-22).
[48] *Id.*
[49] FAC ¶98.
[50] *Id. See* Exh. 4 –Letters Rogatory Motion, pg11, line 21 to pg13, line15. (App. 23-26).

004438

18.    Again on July 10, 2015, Hurst thwarted discovery of HERA's missing assets by filing HERA's Written Objections To Daugherty's Notice of Deposition Upon Written Questions and responding to every question and request for production with the boiler plate response, "Given the procedural posture of the case, with a final judgment and appellant bond on file, the only discovery that may be sought by Daugherty is that directly relevant to the calculation of HERA's net worth.[51] The scope of this request goes well beyond that, seeking information that that [sic] has potential proprietary confidential interests and unduly burdening a third-party."[52]

19.    On December 1, 2016, Daugherty's judgment against HERA, which had been affirmed on appeal, became final and non-appealable pursuant to the appellate Court's mandate.[53] The appellate court also denied the request to declare that Daugherty's ownership in the preferred units of HERA was extinguished as a result of his damage award.[54] Incredibly, after the verdict against Daughtry on the attorney's fees portion in the Texas Lawsuit (which was ultimately vacated) the Highland Defendants and Outside Attorneys went on a vengeful post judgment collection witch hunt. The invoices from Gruber Hurst and HAK starting on December 2, 2016 demonstrate how involved S. Grant (Debevoise Law Firm), Leventon, Ellington, Girard, Hurst, Katz and HAK were in assisting Highland to execute a judgment against Daugherty by trying to seize all of his personal assets including his home in Dallas (filed an extraction of judgment) and his house in Montana (coordinated with Sheriff), his shares in NexBank and Trussway, as well as his individual interest in HERA.[55]  Then they had the audacity to allocate

---

[51] FAC ¶99.
[52] *Id.*
[53] FAC ¶101.
[54] *Id.*
[55] Exh. 120 – Andrews Kurth Invoice No. 10735699 Entries beginning December 2, 2016 (App. 2684-2697). Exh. 121 – Post-Judgment Request Form (App. 2698-2705). Defendants notably allocated legal invoices back to HERA where they were performing work regarding how to stop Daugherty from collecting his judgment against HERA, more proof *Delaware I* and *II* were nothing more than collection efforts by Daugherty, individually, to collect on his Texas judgment against HERA. Exh. 122 – Lynn Pinker Cox & Hurst Invoice No. 20170066 (App. 2706).

all of those legal costs to HERA. Dondero, Katz/HAK, Ellington, Leventon, Matthew Miller ("Miller"), and Abrams reviewed the mandate that day and started the process of shutting down the Escrow and assuring that the remaining cash assets were swept from HERA to Highland.[56] A summary of the reconciled emails sent or received from different time zones follows:[57]

20.    From discovery obtained in May 2019, after a Delaware court granted the crime-fraud exception to attorney-client privilege, a series of emails revealed that on December 1, 2016, at 7:51 p.m., HAK, outside counsel for Highland and concurrently outside counsel for HERA up through 2018 (later replaced after Katz had joined the DLAP firm through 2021), emailed Abrams, counsel for Highland, counsel for HERA, and trustee for HERA's escrow: "Kevin, we need to have a call as early tomorrow as possible regarding the escrow arrangements. Can you let me know when you will be available? Also, can you please send us a copy of the escrow agreement?" Abrams responded to the email copying Miller and Hunton Andrews Kurth lawyers Katz/HAK, James Bookhout, and Isabel Crosby.[58]

21.    On December 2, 2016, at 10:03 a.m., Miller informed Abrams, "The call with Highland's attorneys in the HERA litigation was short. Simply put, Highland wants to get the funds back to HERA and/or Highland as quickly as possible in any way we feel comfortable with." Miller proposed several alternatives, including resignation: "Second, we could resign as escrow agent under Paragraph 5 …. This paragraph permits us to return assets directly to the Depositor, which is Highland. Highland's attorneys think that a ten-day notice period will not interfere with their garnishment action plans."[59]

---

[56] FAC ¶ 101.
[57] Id.
[58] FAC ¶ 102.
[59] FAC ¶ 103. Abrams, Katz, Ellington, Leventon, Girard and counsel from Lynn, Pinker, Cox and Hurst were collaborating to strip HERA of its escrow assets while simultaneously seeking to garnish Daugherty's ownership in HERA to collect a judgment on behalf of Highland for approximately $3.1 million by declaring to the court that Daugherty had no other way to satisfy Highland's judgment against him. This was their attempt to beat Daugherty to the HERA escrow assets before it was discovered that the HERA escrow was never funded with the non-cash assets as listed in the Schedule attached to the Escrow that was presented to the judge and jury in the Texas Lawsuit.

Miller outlined for Abrams a step-by-step resignation plan:

1. Resignation letter from us that states that all deposit assets will be released to Highland after the 10-day notice period.
2. Letter from Highland waiving notice period and seeking our confirmation and signature (because paragraph 10 requires all amendments or waivers to be signed by both parties).
3. Wiring of cash back to Highland.[60]

Highland encouraged Abrams & Bayliss to resign, "As an update to the below, Highland would prefer that we resign but before we do to agree in writing that the 10-day notice period is waived." HAK and Abrams & Bayliss were on the same page about the resignation strategy.[61]

22.     On December 2, 2016, at 2:52 p.m., Miller emailed HAK: "As we discussed, attached is the resignation letter we contemplate as the first step of unwinding the escrow."[62]

23.     On December 2, 2016, at 4:37 p.m., Miller emailed HAK: "As an FYI, my banker tells me that 5:30 EST is the cut-off time for a domestic wire; the international transfer cut-off already is passed. I am not optimistic that I will receive the necessary authorizations during the next hour. However, would you mind passing along the Highland letter on an FYI basis so that I have the wiring instructions handy?"[63]

24.     On December 2, 2016, at 5:08 p.m., Hunton Andrews Kurth emailed Miller: "Matt, please find attached Highland's signed letter accepting the Escrow Agent's resignation." Miller subsequently informed Abrams, "The second step in the HERA strategy is for you to sign the attached letter from Highland."[64]

25.     On December 2, 2016, at 10:07 p.m., Miller emailed Ellington: "Scott, please find the attached correspondence regarding the escrow agreement between Highland Management, L.P. and Abrams & Bayliss LLP."[65]

---

[60] *Id.*
[61] *Id.*
[62] FAC ¶ 104.
[63] FAC ¶ 105.
[64] FAC ¶ 106.
[65] FAC ¶ 107.

26. On December 2, 2016, at 10:18 p.m., Katz/HAK emailed Miller: "Matt, attached is correspondence from Scott Ellington accepting the resignation and providing wiring instructions. If you need additional information, please let me know."[66]

27. On December 2, 2016, at 10:19 p.m., Miller emailed Katz/HAK: "Thanks, Mark. [sic] We will get a counter-signed copy back to you and arrange for wiring the funds."[67]

28. On December 3, 2016, at 10:06 a.m., Miller emailed Ellington and Katz/HAK: "Scott and Marc, attached please find a counter-signed copy of Scott Ellington's letter."[68]

29. On December 3, 2016, at 2:45 p.m., an internal Abrams & Bayliss email states: "Wells Fargo was unable to initiate the transaction today [a Saturday]. The wire amount required multiple levels of upper management approval so I will go back on Monday morning."[69]

30. On December 5, 2016, at 12:26 p.m., Miller emailed the team: "Team, As reflected below, the funds A&B [Abrams & Bayliss] was holding in escrow on behalf of HERA have been transferred as instructed in Scott Ellington's December 2, 2016, letter."[70]

31. "Boom!" (emphasis added). That was the reaction of Girard when he learned the Escrow funds "have been received" by Highland on December 5, 2016.[71]

32. On December 8, 2016, at 9:52 a.m., Katz filed an Application for Writ of Garnishment against Daugherty on behalf of Highland Capital and supported by an Affidavit of Scott Ellington dated November 23, 2016, swearing that:

> 4. In the Final Judgment, Highland Employee Retention Assets, LLC ("HERA") is itself a judgment debtor to Mr. Daugherty under the Final Judgment in the amount of $2,600,000.00 plus prejudgment and post-judgment interest. The Final Judgment is valid and subsisting.
>
> 5. Within Highland's knowledge, Defendant Patrick Daugherty does not possess property in Texas subject to execution sufficient to satisfy the Final Judgment.[72]

---

[66] FAC ¶ 108.
[67] FAC ¶ 109.
[68] FAC ¶ 110.
[69] FAC ¶ 111.
[70] FAC ¶ 112.
[71] FAC ¶ 113.
[72] Exh. 5 – Plaintiff Highland Capital Management, L.P.'s Application for Writ of Garnishment Exhibit B Ellington

004442

33.     More information came out about the Defendants fraudulently concealing information when in June 2019, after a Delaware court granted the crime-fraud exception to attorney client privilege, it was for the first time revealed that on December 12, 2013, Ellington, Leventon, and Surgent coordinated with Abrams & Bayliss to serve as escrow agent of the Escrow.[73] Highland's assistant general counsel, Leventon, sent a draft of the Escrow Agreement to Abrams & Bayliss on December 13, 2013, and the agreement was executed that day by Ellington. Miller, an Abrams & Bayliss attorney who primarily worked on the escrow matter and had just completed his first year as an attorney, simply used the terms proposed by Leventon.[74]

34.     The assets deposited in the escrow were represented to be: (1) $1,210,502.03 in cash; (2) a limited partner interest in Restoration Capital Partners Fund, LP and (3) 1088.42 shares of NexPoint Credit Strategies.[75] This was the story Defendants came up with so they could sell to the jury that they had not simply stolen HERA's assets.[76] The notion that Defendants did nothing nefarious with HERA's and Daugherty's assets and merely set them aside would become a theme of Defendants in the Texas Lawsuit.[77]

35.     The key provision of the Escrow Agreement that undergirded Defendants' story in the Texas Lawsuit provided that if Daugherty prevailed in the Texas Lawsuit, escrowed assets in the amount of the judgment "shall" be transferred to HERA.[78] Also pursuant to the crime-fraud discovery in May 2019, it was revealed that 14 days after executing the Escrow Agreement, Leventon and Girard changed the Escrow Agreement without Daugherty's knowledge because it wanted to "slip sheet the Schedule 1 assets" to change "the NexPoint shares from shares to the cash equivalent of shares because it is difficult to find a prime broker to open account for such a

---

Affidavit ¶¶ 4–5.(App. 27–40)
[73] FAC ¶ 82.
[74] Id.
[75] FAC ¶ 83.
[76] Id.
[77] Id.
[78] FAC ¶ 84.

004443

small pool of assets."[79] Abrams & Bayliss simply swapped the pages. Abrams & Bayliss later explained, "if Daugherty digs deeply enough, he may discover that Schedule 1 was revised on December 16, 2013, with no re-execution of the Escrow Agreement by Highland and Abrams & Bayliss.[80] Highland's counsel merely re-sent the Escrow Agreement with an updated Schedule 1, and Abrams & Bayliss sent an email confirmation of the change."[81] According to Abrams & Bayliss, "[i]t is unlikely that Daugherty would learn of the revision."[82] With the appearance of an escrow in place, Defendants were poised to present themselves in the Texas Lawsuit not as thieves, but rather as protectors of HERA's and Daugherty's interests.[83] That is the story they spun at trial.[84]

36.     It was further revealed that Highland contacted Abrams & Bayliss on February 14, 2014 "to discuss a memorandum we need drafted to address the Escrow Agreement in context of the recent Daugherty Verdict."[85] The memo reaffirmed that Abrams & Bayliss had "received no cash or documents from Highland or HERA regarding the escrow of Daugherty's interests in Restoration Capital Partners, LP."[86] The memorandum then discussed the consequences if the escrow of HERA's assets was deemed a "sham."[87] In an Article of the memorandum titled "Daugherty May Assert that the Escrow Agreement Is a Sham and that the Deposit Assets Stayed within the Control of Highland," Abrams & Bayliss advised: "Daugherty could argue that, even if the Deposit Assets are deemed to be in escrow, the Escrow Agreement left Highland with actual control of the Deposit Assets because (1) A&B [Abrams & Bayliss] is Highland's counsel, and (2) A&B may resign at any time with the Deposit Assets returning to Highland . Daugherty

---

[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] FAC ¶92.
[86] *Id.*
[87] *Id.*

Case 3:25-cv-01808-K   Document 8-40   Filed 04/25/84   Page 998 of 1195   PageID 40711

might argue that, despite the language of the Escrow Agreement, A&B will do whatever Highland instructs it to do with the Deposit Assets, even if that means disbursing the Deposit Assets contrary to the Escrow Agreement's terms. Paragraph 5 of the Escrow Agreement entitles A&B to resign at any time provided that it gives ten days' advance notice. After A&B resigns, it must deliver the Deposit Assets either to the successor escrow agent or to Highland. Daugherty might argue that, even if A&B would not disburse the Deposit Assets in contradiction of the Escrow Agreement, A&B might be willing to resign as Escrow Agent in order to return the Deposit Assets to Highland."[88] Said another way, HERA's own lawyers were acting on behalf of Highland at the expense of their own client while they stripped it of its assets and charged it for the privilege.[89]

37.     True to form, Highland requested, and on March 25, 2014, Abrams & Bayliss provided, an expanded memo addressing "tangentially related topics."[90] In the expanded memo, Abrams & Bayliss explained: "Although unlikely, it is conceivable that the court in the Texas Lawsuit could take issue with the assertion of HERA's counsel that the full amount of the Deposit Assets was held by A&B, when arguably at least, only $1.2 million of the Deposit Assets were truly beyond Highland's control."[91]

38.     Defendants also attempted to conceal the true value of the assets that were supposed to be escrowed on behalf of HERA.[92] When Girard was asked to provide an update on value by Miller, Girard briefed Abrams that, "Girard would prefer not to update the estimated value of the Restoration Capital Funding interest. Highland received a windfall when the jury valued Daugherty's HERA interest at only $2.6 million because Highland believes his former interest in HERA is worth more. Schedule 1 currently reflects a value of $3.03 million. If

---

[88] *Id.*
[89] *Id.*
[90] FAC ¶93.
[91] *Id.*
[92] FAC ¶94.

004445

Highland updated Schedule 1 to reflect their current estimates, the Escrow Assets would be worth $3.3 million."[93]

39.    It was further revealed that Miller emailed Abrams, "do we look bad for claiming to hold non-monetary assets in escrow when on a day-to-day basis we have no idea what the status of these assets are?" Miller was "not looking forward to being deposed."[94]

40.    Finally, after legal invoices were finally produced under new Highland management in October 2022, HERA discovered that as Defendants prepared for the first trial in Texas, they (Highland, Hurst, Katz/HAK, Ellington, Brown, Leventon, Surgent, Girard, Boyce, Britain and Hunton Andrews Kurth) participated in a mock trial on December 4, 2013, that resulted in their mock jury finding in favor of Daugherty.[95] From December 6 to 12, 2013, Defendants Dondero, Hurst, Brown, Katz/HAK, Abrams, Miller, Boyce, Britain, Ellington, Girard, Leventon, and others schemed to "come up with trial strategy regarding witness testimony as to HERA sale and where are funds;" and conferenced with "Delaware counsel concerning escrowing of Daugherty's HERA interests and related issues there to."[96]

### 4.    Delaware I and Delware II

41.    Defendants spend an inordinate amount of paper arguing that all of these claims have been litigated in *Delaware I* and *Delware II*.  However, that is simply not true.  *Delaware I* and *Delware II* focus soley on Daugherty'a individual claims trying to recover funds from Highland to satsify the judgment he obtained in the Texas Lawsuit.[97]  HERA never made a claim in the Prior Lawsuits.[98]  This is pivotal, because Defendants cannot direct this Court to a single legal proceeding or pleading wherein HERA makes a claim prior to this lawsuit.

---

[93] *Id.*
[94] FAC ¶97.
[95] FAC ¶81.
[96] *Id.*
[97] Exh. 6 -- *Delaware I* Second Amended Complaint (App. 41-84); Exh. 7 -- *Delaware II* Verified Amended Complaint (App. 85-133).
[98] *Id.*

004446

42.     Further, as discussed in the argument section in detail below, neither Daugherty nor any other party has ever made a derivative claim on behalf of HERA.  Being named as a nominal defendant in *Delaware I* and *Delware II* (simply because it was the entity for which Defendants lied about having funds in escrow to satifsy the judgment) does not equate to having or making claims.  This is a complete red herring.

43.     On February 16, 2017, Abrams, of Abrams & Bayliss, unveiled Defendants' "Highland Employee Asset strategy" to Daugherty:

> I write on behalf of Abrams & Bayliss LLP ("Abrams & Bayliss") in response to your letter of February 14, 2017 (incorrectly dated February 14, 2016) regarding my firm's service as escrow agent under an escrow agreement with Highland Management, L.P. ("Highland"), dated December 13, 2013 (the "Escrow Agreement"). Capitalized terms used but not defined herein have the meanings given in the Escrow Agreement.
> By letter dated December 2, 2016, Abrams & Bayliss notified Highland that it was resigning as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement. By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.
> On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately. On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016, instructions. Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.[99]

44.     On July 6, 2017, Daugherty, having his disputed ownership in HERA's escrow funds recently confirmed by Texas Appellate Court, filed Delaware I seeking to recover his judgment from the Texas Lawsuit. Certain defendants moved to dismiss the complaint.[100]

45.     On January 16, 2018, the Delaware Court of Chancery denied the motion to dismiss against Highland and HERA but granted dismissal against Dondero and Highland ERA management, which was controlled by Dondero at the time, on the grounds that evidence against

---

[99] FAC ¶ 114.
[100] FAC ¶ 115.

them was "conclusory."[101] Later, on June 29, 2018, the Delaware I Court denied dismissal against Highland but granted dismissal based on laches for the claims arising out of what was known about the 2013 amendments and contemporaneous actions of the Defendants at that time, which due to the concealment of critical documents, was very little.[102] It was not until October 2022 and October 2023 that Highland, under new management, produced refuting documentation and invoices.[103]

46.    On May 17, 2019, the Delaware I Judge granted a motion to compel stating, "Daugherty has been dogged in his pursuit of these documents, and Highland was just as resolute in refusing to produce them."[104] She also stated, "Daugherty has made a prima facie showing that a reasonable basis exists to believe that a fraud has been perpetrated, and that Highland sought A&B to serve as escrow agent and to provide legal analysis in furtherance of that fraud; specifically, to protect the escrowed assets from Daugherty while the Texas case was pending, and then to transfer them back to Highland after the Texas verdict was finalized. I conclude any privilege Highland claims over A&B's legal advice regarding the escrow arrangement and A&B's resignation has been stripped under the crime-fraud exception."[105] She also concluded that Highland, Dondero, Ellington, Leventon, and the other defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case.[106] The Judge concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement make their way to Daugherty."[107]

---

[101] FAC ¶ 116. At that time, the court was not privy to the evidence that was later produced pursuant to the crime-fraud ruling in May 2019 and the documents produced to HERA in and after October 2022.
[102] *Id.*
[103] *Id.*
[104] FAC ¶ 117.
[105] *Id.*
[106] *Id.*
[107] *Id.*

004448

Additionally, a Contractual Master was appointed to oversee discovery compliance.[108] It was later discovered in 2021, after Highland filed for bankruptcy, that Leventon concealed the existence of company owned phones used by Dondero and Ellington, as well as a secret server used by many of the defendants or their affiliates to transfer assets.[109] In addition, despite a motion to compel to the contrary, the existence of numerous January 2013 HERA actions and resolutions by written consent were concealed by Dondero, Boyce, Britain, Demaris, Ellington, Leventon, Surgent, Hurst, Katz, Abrams and Hough until they were finally produced in October 2022 after full ownership and control of HERA was transferred to Daugherty.[110]

47.    On the second day of a three-day trial, Dondero—for the first time—revealed that his vis-a-vis ERA's misconduct as manager of HERA was committed at the direction and based on the advice of his outside and in-house counsel, i.e., the In-house attorney defendants and Outside Attorneys in this action.[111] He testified, for example:

> Q. Did Highland have outside counsel advising with respect to the purchase of the units?
> A. Yes. I believe the whole situation was the most lawyered thing we've ever done. I mean, there was counsel for each of the board members, there was counsel for Highland, there was counsel for HERA, there was Delaware counsel. Everything was orchestrated, dictated by counsel.
> Q. Did Highland have – did that counsel that Highland used also advise counsel on the documents, the transaction documents, relating to those purchases?
> A. Yes. All the functional documents and major moves at various turning points were all at the request – or decided by counsel.
> Q. Did you have any communication – are you familiar with Abrams & Bayliss, with what Abrams & Bayliss is?
> A. I know they're a Delaware law firm. But beyond that, no.
> Q. Did you ever have any communications with Abrams & Bayliss about them resigning as escrow agent?
> A. No. Highland and myself, I know, were purposely kept separate from this whole thing. And it was driven by – it was driven by counsel.
> Q. My question is a little bit more specific because it relates to the escrow assets and Mr. Daugherty. If you had been told by counsel that Mr. Daugherty was entitled to the escrow assets, you would have given him the escrow assets; right?

---

[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] FAC ¶ 118.

004449

A. Yes. We would have done whatever counsel told us. We tried very hard to compartmentalize this mess. We have a business to run. And this is – a half dozen lawsuits, haranguing everybody in public, it was all intended to disrupt our business as much as possible. So we tried to delegate it and compartmentalize it to the lawyers as much as possible.

Q. Let's talk about which lawyers you're referring to. So I'll start with the in-house lawyers again. Which in-house lawyers of Highland are you relying on with respect to the transfer of the escrow assets?

A. It would have been the same three internal lawyers working with external counsel.

Q. Mr. Ellington, Mr. Leventon, and Mr. Surgent; is that right?

A. I believe so. I believe they were the ones at that time and place.

Q. Which outside counsel are you relying on?

A. I don't know if Andrews and Kurth had merged with Piper. I don't know who else was involved besides the Abrams guys. But it would have been, more likely than not, those two counsels with whatever other counsel was representing some of the people who were sued individually.[112]

### 5.    Highland Bankruptcy

48.    On the third day of the trial, October 16, 2019, Highland, at the direction of Dondero and Ellington, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[113] On December 4, 2019, the Delaware Court entered an order transferring venue of the case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.[114] As a result, the Delaware I action was stayed.[115]

49.    On January 9, 2020, the Highland Creditors Committee demanded and the Court approved a change of control of Highland, which involved the removal of Dondero as the sole director and the appointment of James P. Seery ("Seery"), John S. Dubel ("Dubel"), and retired Judge Russell F. Nelms ("Nelms") as independent directors (the "Independent Directors" and collectively, the "Independent Board") of Strand Advisors, Inc., Highland's general partner (the

---

[112] Id.
[113] FAC ¶ 119.
[114] Id.
[115] Id.

004450

"General Partner").[116] The Independent Directors were granted exclusive control over Highland and its operations during the pending bankruptcy proceedings.[117]

50.     On July 16, 2020, the Court approved Highland's motion to appoint Independent Director Seery to replace Dondero, as Highland's CEO and gave him the additional title of CRO.[118]

51.     On or around April 2020, Highland's new management discovered that Hurst had filed an unauthorized lawsuit on its behalf and ordered him to dismiss the lawsuit and subsequently terminated his services because of unprofessionalism.[119]

52.     On October 9, 2020, Dondero was instructed to resign or be fired as an employee of Highland and as portfolio manager for all Highland managed funds due to his detrimental conduct to the firm and its creditors.[120]

53.     Highland's bankruptcy was unique because all of the largest creditors' claims stemmed from litigation claims and judgments against the firm, not debt holders.[121] Indeed, Dondero, Ellington and Leventon expected to use the bankruptcy process to once again thwart recoveries while keeping themselves in control.[122] To the contrary, bankruptcy revealed a litany of terrible acts through a pattern of recurring conduct resulting in well over $1.4 billion dollars in litigation and arbitration claims and over $50,000,000 in legal fees.[123]

54.     In January 2021, it was discovered that Dondero had been secretly coordinating with Highland's then-counsel, Ellington and Leventon, to direct Highland's affairs, despite his dismissal.[124] When the Court entered an order restraining Dondero from communicating with

---

[116] FAC ¶120.
[117] *Id.*
[118] FAC ¶121.
[119] Exh. 8 -- Deposition of James Seery ("Seery Dep."), dated March 20, 2024, Pg 231 line 4 – Pg 232 line 25 (App. 134–144).
[120] FAC ¶122.
[121] FAC ¶123.
[122] *Id.*
[123] *Id.*
[124] FAC ¶124.

004451

Highland employees, Dondero flouted the order by communicating with Ellington and Leventon and instructing other employees to resist document production requests, even though those documents were kept on Highland's computer system.[125]

55.     Ellington and Leventon were fired for cause on January 5, 2021, for acting in a manner adverse to Highland's interests.[126]

56.     Dondero, Ellington and Leventon evinced no respect for Highland as an entity separate and apart from themselves.[127] The bankruptcy also revealed discovery misconduct during the Delaware I action with Daugherty, including a secret server that Dondero, Ellington, Leventon and others routinely used, which was concealed during discovery in the Delaware I action with Daugherty.[128] Additionally, the bankruptcy court twice found Dondero in contempt for violating a temporary restraining order.[129] During testimony at the first show cause hearing, it was revealed that Dondero and Ellington destroyed their cell phones that were provided by Highland.[130] Yet, in the Delaware I action with Daugherty, Leventon testified at his custodian of records deposition that Highland did not "have access to people's phones" and that Highland did not own any cell phones for the custodians.[131]

57.     On February 8, 2021, the Court agreed to confirm Highland's bankruptcy plan, and the Court entered its plan Confirmation Order on February 22, 2021.[132]

58.     On August 11, 2021, Highland's bankruptcy plan, as amended to date, became effective, and as a result, Highland's ownership was restructured.[133] Highland became a wholly

---

[125] *Id.*
[126] FAC ¶ 125.
[127] FAC ¶ 126.
[128] *Id.*
[129] *Id.*
[130] *Id.*
[131] *Id.*
[132] FAC ¶ 127.
[133] FAC ¶ 128.

004452

owned subsidiary of the Highland Claimant Trust, a newly formed liquidating trust owned by the creditors of Highland.[134] Specifically:

- The Highland Claimant Trust became the sole limited partner of Highland.

- HCMLP GP LLC replaced Strand Advisors, Inc. as General Partner of Highland. HCMLP GP LLC is also a wholly owned subsidiary of the Highland Claimant Trust.

- Seery serves as the Claimant Trustee of the Highland Claimant Trust and remains the CEO of Highland today. Dondero and Okada are no longer involved in the management of Highland or the Claimant Trust.[135]

59.      In the Bankruptcy, Daugherty filed a 3018 estimated claim for bankruptcy plan voting purposes at $40,000.000.00.[136] In November 2021, it is vital to note that Daugherty reached a settlement with Highland in the bankruptcy that excluded Defendants and specifically preserved claims on behalf of HERA in future litigation, i.e., this lawsuit and these claims.[137]

## B. March/April 2022 -- Daugherty and His Affiliates Obtain Control of HERA and For the First Time Discover Harm to HERA Caused by Defendants' Deliberately Concealed Bad Acts and Omissions

60.      Daugherty and his affiliates obtained ownership and control of HERA pursuant to the terms of a bankruptcy court approved settlement in March/April 2022.[138] It is critically important to note that it was not until Daugherty and his affiliates obtained control of HERA in March/April 2022, that Defendants' wrongdoing complained of in this lawsuit, was discovered and that those wrongful acts and omissions had been deliberately concealed. Indeed, Defendants strategically attempt to limit the discussion of their liability to matters only concerning the escrow fraud; however, documents discovered after March 1, 2022, reveal that the escrow scam was merely an extension of a much greater fraud and concealment – that the January/February

---

[134] *Id.*
[135] *Id.*
[136] FAC ¶ 129. *See* Exh. 9 -- Daugherty 3018 Proof of Claim (App. 145-150).
[137] FAC ¶ 129. *See* Exh. 10 – Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith with Settlement Agreement attached, ¶¶ 7-8 (of Settlement Agreement). Importantly, any dispute related to the settlement must be brought exclusively before the bankruptcy court. *See* Exh. 10, ¶ 7 (of the Order).(App. 151-183).
[138] FAC ¶¶ 60, 131.

004453

2013 buyout scheme and all actions pursuant to it were invalid.

61.     After control was removed from the Defendants, HERA began to request documents, legal invoices, emails, and metadata related to HERA, but was met with obstruction at every turn.[139] Despite this, through diligent efforts undertaken since March 2022, HERA, for the first time, has been able to gather and piece together information regarding Defendants' acts and omissions as they relate to harm caused to HERA.[140]

62.     Starting with March 1, 2022, during the bankruptcy settlement hearing, Highland finally acknowledged, "Dondero, through Highland, engaged in an asset-stripping campaign designed to render HERA judgment-proof, further exposing Highland to liability and unnecessary legal costs." Highland's new CEO, James Seery, testified:

> It actually looks like, frankly, the escrow was never really an escrow, and it was a -- it was a fraud from the beginning. And that one's a pretty disturbing one.[141]

63.     On April 1, 2022, actual full ownership and control of HERA and ERA was transferred to Daugherty and his affiliates.[142]

64.     On May 11, 2022, HERA instructed Abrams & Bayliss, HAK, DLAP, Marc Katz, and Michal Hurst via Lynn Pinker Hurst and Schwegman, to forward all of their respective casefiles, records and invoices allocated or related to HERA.[143]

65.     True to form, HAK responded by letter on May 25, 2022, "Our records and research indicate that the Firm represented ERA and/or HERA in connection with only two matters. The first matter was opened on June 1, 2012, for which our records indicate we represented Highland Management, LP ("Highland") and HERA, and for which only 1.6 hours of attorney time was recorded. We have located no files for this matter other than an electronic

---

[139] FAC ¶61.
[140] *Id.*
[141] FAC ¶130
[142] FAC ¶131; Exh. 11 - Transfer Agreements of HERA interests to Daugherty and affiliates.(App. 184–189).
[143] FAC ¶132; Exh. 12 – Letter from Thom Uebler requesting documents and records, dated May 11, 2022.(App. 190-197).

record of the recorded time." [144] They made this statement despite Katz/HAK/DLAP representing before the Delaware court that HERA was insolvent as it incurred millions of dollars in legal expenses, including those from his firm.[145]

66.    HAK continued, "Additionally, given that Daugherty now wholly owns and controls HERA and ERA, we believe we are constrained in what we may transfer. Your HERA and ERA file transfer request equates to Daugherty gaining access to his litigation adversaries' attorney's files. In this unique circumstance of a litigant seeking his adversary's attorney's file by acquiring control of one (or more) of his litigation adversary's attorney's former jointly represented clients, the case law we have reviewed favors protecting the co-client's justified expectation that its attorney's files will not be disclosed to its litigation adversary."[146] Tellingly, HAK could produce no retention agreement that named Dondero as a client nor did Dondero pay a single dollar for any such legal expenses.[147]   To summarize, after invoicing millions of dollars in legal fees that were knowingly allocated to HERA, HAK continued to conceal their conduct by claiming some contrived privilege based on jointly representing Highland, Dondero and HERA.[148] However, for strategic purposes while representing HERA against Daugherty in the prior collection efforts, Katz/HAK/DLAP left the Delaware court with precisely the opposite impression by making sure it knew 93% of the legal fees invoiced to Highland were for the benefit of HERA.[149]

67.    DLAP delayed until July 22, 2022, to make the following similar response:

Second, as you know, DLA's representations of HERA and ERA in the Daugherty Case were joint representations in which DLA also represented HCMLP [Highland] and Mr. Dondero. Mr. Daugherty is still adverse to Mr. Dondero in the Daugherty case and in Daugherty v. Dondero, No. 2019-0956 (Del. Ch.). That means that your request for the client file would result in DLA providing to one

---

[144] FAC ¶133; Exh. 13 –Letter Response from HAK, dated May 25, 2022.(App. 198-199).
[145] FAC ¶133.
[146] FAC ¶134; Exh. 13 –Letter Response from HAK, dated May 25, 2022. (App. 198-199).
[147] Id.
[148] FAC ¶134.
[149] *Id.*

004455

> litigation party the privileged and work product-protected communications of its
> litigation adversary. Such a production "would be anathema to the principles
> underlying the policy of fostering unfettered attorney-client communication.[150]

Again, DLAP made this response despite having millions of dollars of its fees allocated to HERA,

representing HERA in Delaware courts, and producing no retention agreement that listed

Dondero as a client or that he ever paid anything for the alleged representation.[151]

     68.    Hurst and Lynn Pinker Hurst and Schwegman never responded to HERA's file

and document request.[152]

     69.    For over 13 years, Defendants have fraudulently concealed documents and

resisted discovery efforts to obtain HERA documents. In 2013, Daugherty made a demand to

inspect the books and records of HERA, but the Highland Defendants and Outside Attorneys

denied the request.[153] Even after the bankruptcy court granted Daugherty and his affiliates 100%

ownership and control of HERA and ordered all HERA books and records turned over, the

Highland Defendants still refuse to comply. Even as late as January 2024, counsel for HERA was

still requesting documents from HERA's former attorneys and Highland, which requests have

still been refused.[154]

     70.    It was not until October 2022 and after that HERA received documents from

Highland's new management and Abrams & Bayliss pursuant to two books and records requests,

that extensive billing fraud, at the expense of HERA at the hands of its lawyers

Katz/HAK/DLAP, Hurst, HAK, Abrams & Bayliss and others, was revealed.[155]  The position

Outside Attorneys take that they did not perform legal services on behalf of HERA (thus, making

---

[150] FAC ¶135; Exh. 14 – Letter Response from Williams & Connolly on behalf of DLAP, dated July 22, 2022.(App. 200-202).
[151] FAC ¶135.
[152] FAC ¶136.
[153] Exh. 15 – Email from Steven Hough to Surgent/Abrams re: Books and Records [HERA] {RE: Daugherty], dated February 11, 2013.(App. 203-205).
[154] Exh. 16 – Letter from Drew York to John Morris, dated January 30, 2024.(App. 206-207); Exh. 17 –Email from John Morris, counsel for Defendants, to Drew York, dated March 5, 2022.(App. 208).
[155] FAC ¶137.

004456

Highland their client), is simply unbelievable.[156]

71.    HAK provided legal services to HERA along with the other Outside Attorneys

pursuant to a purported joint defense agreement, and all of their invoices for work on behalf of

Highland and HERA in the Texas Lawsuit were allocated to HERA.[157]   HAK's legal services

were expansive, and all the Outside Attorneys worked under a purported joint defense

agreement, although it has never been produced to HERA.[158]  Ellington testified in his deposition

in Delaware I that the Outside Attorneys performed legal services for HERA pursuant to a

shared services agreement or affiliated agreement.[159]   Ellington also testified at the Delaware I

trial that he and Surgent provided legal services to HERA through contractual and shared

services agreement.[160]    Dondero testified in Delaware I trial that he, along with the Outside

---

[156] Exh. 18 – Email from Annette Tyler attaching Abrams & Bayliss and HAK invoices for February 2013. (App. 209-263). The Abrams & Bayliss invoice identifies the buyout scheme and people they spoke with in January and February 2012, including, Surgent (misspelled Sargent), Dameris and the HERA board. The HAK invoice was not produced by HAK or Highland. However, it was found as an exhibit supporting Highland's fee award in the Texas Lawsuit. They actually had the audacity to redact this work that was done for the buyout scheme and present it to the Texas court as an expense incurred by Highland in the breach of contract action against Daugherty in Texas. One can see from the unredacted portions: 1-15-13 — Katz corresponded with Surgent and Lackey on the same day of an email produced by AB that was addressed to Paul Lackey, Michael Aegen, Marc Katz, Boyce, Britain, Dameris, Ellington and Hough. The email goes on to say "Paul/Michael: I will call you to discuss the form of release contained in the transfer agreement to determine what final tweaks are necessary to cover the issue previously discussed. Marc: I will call you to explain. (App. 223-224); 1-22-13 — Katz correspondence with counsel to HERA (misspelled HEAR), Boyce, Britain, and Surgent. (App. 227-228); (d) 1-23-13 -- Katz correspondence with counsel to HERA (misspelled HEAR) regarding case matters. (App. 228-230); (e) 1-24-13 — Katz correspondence with counsel to HERA (misspelled HEAR) regarding ???; and Surgent regarding ???. (App. 230-231); (f) 1-28-13 — Katz correspondence with HERA counsel to quash Boyce deposition. (App. 233-235); (g) 1-31-13 — Regas (of HAK) correspondence with Shonn Brown (counsel to HERA) to develop litigation strategy regarding Boyce deposition.(App.238-239). Surgent plays a central role in these communications, but he is also the current General Counsel at Highland and serves as its gatekeeper to stymie HERA's document requests. Not coincidentally, Highland failed to produce any invoices from this critical period (from any firm) or emails that implicated Surgent's role in the January/February 2013 buyout scheme. Importantly, the HAK invoice was used as part of the expenses that the jury ordered Daugherty to pay to Highland in the Texas Lawsuit (subsequently vacated) and he paid that amount around December 13, 2016. At the same time, Highland allocated these same invoices to HERA and forced HERA to recognize these expenses on its own tax and financial statements (double counting). Additionally, after Daugherty paid the expenses, Katz, as counsel to HERA, continued to represent to the Delaware court that these were legitimate expense of HERA's that had gone unpaid and that such amounts were owed to Highland pursuant to a loan (triple counting).

[157] Exh. 20 -- Leventon deposition testimony in Delaware I Pg 190 line 12- Pg 193, line 11.(App. 306-309).
[158] Exh. 21 -- Leventon trial testimony in Delaware I Pg. 203, line 22- Pg 205, line 12. (App. 310-315).
[159] Exh. 22 -- Ellington deposition testimony in Delaware I Pg 103, line 25- Pg 104, line 16. (App. 316-320)
[160] Exh. 23 -- Ellington trial testimony in Delaware I Pg 345 line 1- Pg 346, line 8, Pg 103, line 25- Pg 104, line 16; Pg 362, lines1-24. (App. 321-327).

Attorneys and Highland's in-house attorneys, decided to transfer the HERA assets to Highland.[161]   Indeed, financial records and information from Highland reveal that over $14,000,000.00 of expenses were allocated to HERA, and its lawyers were aware of it.[162]   The Outside Attorneys are now apparently admitting that these allocated expenses were illegitimate and fraudulent.

72.     Shockingly, Highland and its partners, including Dondero, Okada, the Defendant trusts, Ellington, Boyce, Britain, Dougherty, Honis and Parker, took the pass-through tax benefits of these expenses with the assistance of Surgent, Leventon, Girard, Waterhouse, Swadley and Klos as though they were their own, despite knowing that the obligations to pay were additionally recognized as loan write-off losses on Highland's books, creating another pass-through loss.[163] Surgent explained to Abrams & Bayliss that they did not want Daugherty to get the tax benefit of the expense/loss pass-throughs so they made the legal expense allocations effective after they received their 2013 buy-out proceeds.[164]

73.     Not surprisingly, when the details of the fraud were discovered, Highland's new management realized a charge to HERA's capital accounts in excess $10 million as an offset to write off over $10 million of falsely allocated debt, resulting in a loss of capital account basis that could have been used by HERA and its unit holders for tax purposes.[165]

74.     In addition, HERA, for the first time in 2022 and 2023, received thousands of pages of documents, emails and invoices from Highland, through its new management.

**C. The 2022 Documents Prove the Invalidity of the Corporate Actions Taken on Behalf of HERA by the Defendants to Strip HERA of Its Assets**

75.     It was not until HERA's new management demanded review of its own counsel's invoices and records in May of 2022 that it was revealed that Abrams & Bayliss had been retained

---

[161] Exh. 24 -- Dondero Delaware I trial testimony, Pg 307, line 8 - Pg312, line 13. (328-336).
[162] FAC ¶ 137.
[163] FAC ¶ 138.
[164] Id.
[165] FAC ¶ 139.

solely on behalf of HERA on June 11, 2012, after discussions with Boyce, Britain, Dameris, Honis, Dougherty, Hough, Abrams, Brown, Ellington, Kim, Collins, and Surgent regarding HERA's litigation with Daugherty.[166] It was also revealed that in an email dated November 28, 2012, Dameris was advised by Abrams and Hough, "We caution that the board, which manages HERA, owes fiduciary duties to both the LLC itself and to its members."[167]

76.    Invoices and emails discovered in October 2022, revealed that on December 22, 2012, Dondero communicated his buyout offer to members of HERA's board after Dameris considered and Dondero rejected certain settlement scenarios regarding Daugherty's claims against HERA, despite Abrams & Bayliss' warning to Dameris that HERA's board had fiduciary duties to HERA and the other unit holders.[168] This provided previously unknown context to an email that was produced in the Texas Lawsuit from Dameris, as Managing Director of Highland, to Dondero on December 26, 2012 that presented as legitimate a "Buyout" scheme in which Dondero could gain control of HERA at a substantial discount to value, pending review by Delaware counsel, "[i]f you decide to offer everyone except 1 [Daugherty] a buyout."[169]

77.    Therefore, the argument that the HERA board members did not know of the buyout offer and asset transfers from HERA to Highland because they occurred after they signed their Transfer Agreements is a gross misremembering of the actual facts.[170] In fact, it is quite

---

[166] FAC ¶64.

[167] *Id.* Exh. 25 – Email from Hough to Dameris, dated November 28, 2012. (App. 337-340).

[168] FAC¶65. *See* Exh. 26 – 1-9-2013 email from Annette Tyler to Surgent and attached invoice (App. 343) with 12-22-2012 entry regarding Dondero buyout issue. (App. 342). Exh. 25 -- Email from Hough to Dameris, dated November 28, 2012. (App. 347-340).

[169] FAC ¶65.

[170] *See* FAC¶¶ 66-67; Exh. 27 -- Email from Abrams to Dameris, dated December 30, 2012, re: HERA memo, discussing board matters of "Dondero Buyout," ¶ 5 (App. 344-346); Exh. 28 -- Email from Hough to Dameris and Abrams, dated January 4, 2013, re: Buyout Steps (App. 347-348); Exh. 29 -- Email from Surgent to Lackey, Aigen, Britain, Boyce, Honis, Ellington, Abrams and Dameris, dated January 9, 2013 (pg 2 of email string) (App. 350) re: DRAFT HERA DOCS including Offer to Purchase HERA interests and Amendment (post all transactions) (App. 349-366); Exh. 30 -- Email from Abrams to Britain, Dameris and Surgent, dated January 11, 2013, seeking a Retainer for buyout and transfer advice. (App. 367-368); Exh. 31 -- Email from Hough to Surgent, Dameris and Abrams, dated January 11, 2013, detailing buyout documents including Offer and Transfer document. (App. 369-371); Exh. 19 – January 15, 2013, Email from Surgent to Lackey, Aigen, Britain, Boyce, Dameris, Ellington, Katz and Hough, re: HERA docs for review, including all buyout documents (App. 264-305); Exh. 32 -- Email from Abrams to Hough, dated January 17, 2013, re: Buyout [HERA] discussing Surgent and Dondero's intention to delay the offer to non-employees to keep Daugherty from finding out about the transaction. (App. 372-373); Exh. 33 – January 17, 2013,

clear they were fully aware and complicit in the scheme, per emails from their lawyers with *draft* documents a week before they signed the Transfer Agreements.[171]

78.     This also refutes certain testimony given by Dondero in the Texas Lawsuit that Dondero had no influence over HERA prior to January 2013.[172] It also revealed why Dameris collaborated with Abrams & Bayliss on December 30, 2013, to enhance indemnification rights of HERA's directors.[173] Importantly, this buyout scheme was created at the same time that a large cash payoff was due to be paid to HERA's largest asset holding, Restoration Capital Partners, LP, pursuant to the sale proceeds of Safety-Kleen Systems, Inc.[174]

79.     Likewise, Okada was fully aware, or certainly should have been fully aware, of the buyout scheme. Yet, he testified in the Texas Lawsuit he knew next to nothing of the buyout scheme.[175]  This is incredible, since Okada was the Chief Investment Officer and Executive Vice President (as well as co-founder) of Highland.[176]   He was a Principal and controlled the

---

Dougherty Transfer Agreement to sell interests in preferred units in form similar to, but not the same as the other Transfer Agreements. (App. 374-380); Exh. 34— Email from Abrams to Surgent and Dameris, dated February 4, 2013, making follow up request for $100,000 retainer and attaching invoices detailing legal services and communications with the board to facilitate the Dondero buyout. (App. 381-385); Exh. 35 - Email from Abrams to Surgent, dated March 5, 2013, re: Daugherty Litigation, attaching mislabeled invoices for Daugherty Litigation that were actually for facilitating the buyout and transfer. (App. 386-390); Exh. 36 – Britain deposition in Texas Lawsuit dated June 11, 2013 Pg 259, line 18 – Pg 260 line 23; Pg 276 lines 1-14 (testifying the board had no responsibility to determine if the offer price was fair), at Pg 293, line 24 - Pg 294 line 10 (no knowledge of board involvement in analyzing, formulating or reviewing the offer)(App. 391-399); Exh. 37 –Boyce Deposition in Texas Lawsuit, dated June 5, 2013, Pg 280, line 1- Pg 297 line 15 (testifying about the buyout process)(App. 400-407); Exh. 38 – Britain trial testimony in Texas Lawsuit dated January 17, 2014, Pg 114, line 13 – Pg 115, line 23. (App. 408-417); Exh. 39 — Britain trial testimony in Texas Lawsuit dated January 21, 2014,  Pg 23, line 25- Pg 27, line 22 (Britain testimony re: no involvement in decision to make offer, even though he was included in drafting process), at Pg 72, line 3 – Pg 73, line 3 (denying that Dondero discussed the buyout with board members prior to the offer)(App. 418-431); Exh. 40 – Surgent trial testimony in Texas Lawsuit dated January 16, 2014, Pg104, line 22 - Pg105, line 12 (Surgent testifying that Boyce and Britain were not involved in the offer to purchase), Pg110 lines 1-3 (testifying that Dondero was not involved in the affairs of HERA), Pg 130, line 24 – Pg 131, line 8 (testifying that Britain and Boyce were not involved)(App. 432-444); Exh. 41 - Excerpts from Transcript of (Texas) Trial on the Mertis, dated January 17, 2014, Pg 76, line 24 – Pg 78, line 25 (Surgent testifying, again, that the board did not have any involvement in offers to purchase HERA units)(App. 445-466); Exh. 42 - Email from Hough to Surgent, Dameris, and Abrams, dated January 14, 2013, re: HERA documents for revisions including all buyout documents, except Offer.(App.467-512).
[171] *Id.*
[172] FAC ¶65.
[173] *Id.*
[174] *Id. See* Exh.36 - Britain Deposition dated June 11, 2013, at Pg 87, lines 18-25 and Pg 218, line 6 - Pg 222, line 18.(App. 391-399).
[175] Exh. 43 – Okada Deposition dated October 15, 2013, Pg 194, line 2- Pg 196, line 22.(App. 513-515).
[176] FAC ¶29.

004460

"Manager" of HERA's largest asset, Restoration Capital Partners, LP., along with Dondero.[177] It is impossible to believe that Okada knew nothing about the buyout scheme, given these positions and the fact that he and his trusts benefitted from the assets assigned to Highland from HERA.[178]

80.    It was not until HERA demanded review of its own invoices and records in May 2022 that it was for the first time revealed that Hough (copying Abrams & Bayliss) had conspired with HERA and its former board members on December 30, 2012 to provide a detailed scheme of "Buyout Steps," including how to transfer control of HERA to Dondero and Okada, while attempting to forgive the board members of their fiduciary duties to HERA and simultaneously seeking to create expanded indemnification rights for themselves.[179]

81.    It was also revealed for the first time in late 2022 that Surgent sent an email on January 9, 2013, and again on January 15, 2013, distributing all of HERA's operative documents to implement the buyout scheme to Katz/HAK, Paul Lackey ("Lackey"), Michael Aigen ("Aigen), Hough, Ellington, Boyce, Britain, Dameris for comment. Even though Katz/HAK, Lackey, and Aigen were purported not to be counsel for HERA during this time, they nevertheless received HERA's confidential information, and their legal invoices were allocated to HERA.[180]

82.    Additionally, records discovered in 2022 revealed that on January 11, 2013, in an email addressed to Britain, Dameris and Surgent, Abrams demanded an additional $100,000 retainer for the services rendered in regard to the buyout and transfer.[181] It was also revealed that invoices to HERA, with attention to Surgent, from January and February 2013 falsely labeled the subject matter of the buyout and transfer advice as "Daugherty Litigation."[182]

---

[177] *Id.*
[178] FAC ¶ 175.
[179] FAC ¶ 66.
[180] FAC ¶ 67. *See* Exh. 44 – Email from Surgent to various recipients, dated January. 15, 2013, re: HERA docs for review.(App. 516-527); Exh. 45 – Email from Surgent to various recipients, dated January 9, 2013, re: DRAFT HERA DOCS.(App. 528-530).
[181] Exh. 29. January 10, 2013, email from Helen Kim to Hough, Abrams and Surgent.(App. 349-366).
[182] Exh. 18. March 5, 2014, email from Anette Taylor to Surgent with December 2012, January and February 2013

83.     Highland and Dondero directed Collins and Surgent to offer holders of HERA preferred units that were current employees (plus Joe Dougherty) Transfer Agreements to purchase their preferred units for 100% of the value of their cash interests and 60% of the value of their non-cash interests on January 18, 2013.[183] When asked under oath why current employees were given the offer two weeks prior to non-employees, Carl Moore, as corporate representative for HERA, testified that it was just because of logistics in order to easily access current employees.[184] It was not until October 2022 that it was revealed for the first time that the actual offer for preferred unit holders that were employed by Highland (plus Joe Dougherty) at the time occurred much sooner, because Dondero had told Surgent that he did not want Daugherty to find out.[185] Dondero needed a majority and current Highland Capital employees were effectively given an offer they could not refuse weeks before their year-end bonuses were paid upon approval by Dondero on February 28, 2013. Joe Dougherty, in turn, received over $1 million, plus expanded indemnification from Highland. Indeed, all of the preferred unit holders that were employed by Highland at the time purported to accept the offer on the same date the offer was made -- January 18, 2013.[186] When the offer was finally presented to former employees, other than Joe Dougherty, on January 31, 2013, Collins and Surgent warned those who questioned the fairness of the price that a majority had already agreed to the offer and that anyone who did not accept the offer would "have their rights stripped."[187]

84.     It was also not until late 2022 that documents were finally produced that revealed that HERA's board of directors ignored the advice of legal counsel, despite testimony by Britain and Boyce to the contrary, and did nothing to protect HERA from this lowball buyout; despite

---

invoices.(App. 209-263) discussed in length at *supra* ¶ 70.

[183] FAC ¶ 68.

[184] Exh. 46 – Deposition of Carl Moore, Jr., dated September 24, 2013, Pg 67, lines 1-21.(App.531-537).

[185] FAC ¶ 68. *See* Exh. 33 -Email between Abrams and Hough, dated January 17, 2013, re: Buyout [HERA] discussing Surgent call regarding Dondero's instructions.(App. 374-380).

[186] Exh. 47 -- Email from Hough to Abrams, dated January 18, 2013, re: Buyout Update [HERA].(App. 538).

[187] FAC ¶ 68.

004462

knowing it was a violation of their fiduciary duties. It did not seek a higher price from Highland, Dondero, Okada or from Highland's other partners at the time, including Boyce, Britain, Ellington, and Honis, who stood to benefit from the transaction, despite simultaneously serving on HERA's board.[188] They did not discuss a poison pill, a standstill, or any other corporate defense mechanism available to protect from a creeping takeover pursuant to their obligations under Delaware law.[189] They did not even seek a fairness opinion on the financial fairness of the buy-out scheme event though they were advised by Abrams to do so.[190]

85.    Between January 17- April 30, 2013, the Defendants executed this buyout scheme though a series of corporate governance maneuvers designed to strip HERA of its assets. The timing of who actually was serving on the HERA board, and thus who had authority to make certain decisions, is critical to determining the illegitimacy of the corporate governance actions that purportedly occurred from January 17- April 30, 2013.

86.    It was not until March 2022 that HERA came into possession of documents that for the first time prove that the January 17-April 30, 2013, actions and subsequent documents were invalid.[191]    Similarly, the Defendants have constantly changed their story as to what happened January 17-19, 2013.

87.    Article 5 of the Second Amended LLC Agreement clearly governed HERA's management as of January 17, 2013,[192] which reads in relevant part:

> Section 5.1 General. The Company shall be managed by a Board of Directors (the "Board"), which shall at all times consist of six members, consisting of the following individuals:
> R. Joseph Dougherty
> Patrick Boyce
> John Honis
> William L. Britain
> Amit Walia

---

[188] FAC ¶ 69.
[189] Id.
[190] Id. See also Exh. 44. (January 15, 2013 email advising they should seek a fairness opinion. (App. 527.)
[191] See FAC ¶ ¶ 69-70.
[192] Exh. 48 -- Second Amended LLC Agreement.(App. 539-559).

Ted Dameris

The Board shall act by majority vote (either by meeting or written consent), unless a greater percentage is expressly required under this Agreement. Each member of the Board shall serve until such member shall cease to hold Series A Preferred Units or until such member's death, resignation or removal from by Board by the unanimous affirmative vote of the remaining Board members. Any vacancies on the Board shall be filled by holder(s) of Series A Preferred Units elected by a majority of the remaining members of the Board, or if no such majority decision can be reached, by the holder(s) of the greatest number of Series A Preferred Units who are not then currently a member of the Board and who are willing to serve on the Board, or if no Series A Preferred Units remain outstanding, as determined by a majority of the remaining members of the Board.

Section 5.2 Delegation of Powers of the Board (a) Subject to Article 5.2(b) and ARTICLE XI hereof, the Board shall have the exclusive and complete authority, acting without the consent or approval of, or notice to, the Member and in the Board's sole and absolute discretion, to operate the Company and its business and to make all determinations or elections or to consent to any matter otherwise described in this Agreement. Neither the Member nor any other unitholder shall have the authority to remove any member of the Board.

(b) Notwithstanding any other provision of this Agreement or any provision of law that otherwise so empowers the Company, from and after the date of this Agreement and until the date on which all assets of the Company have been distributed in full, the Company shall not, and shall not have power or authority and shall not be authorized to, and the Board shall not, and shall not have power or authority and shall not be authorized to cause the Company to, take any of the following actions without the prior affirmative vote or written consent of at least 75% of the members of the Board:

…

(ii)     be a party to any merger or consolidation or sell, transfer, assign, convey or lease any asset of the Company, or cause or consent to any merger or consolidation or sale, transfer, assignment, conveyance or lease of any assets of the Company;

…

(iv)     amend, alter, change or repeal any of the provisions of this Agreement;

(v)     incur or assume any indebtedness or obligations except for liabilities under Article 3.3, or cause the Company, to incur or assume any indebtedness or obligations except for liabilities under Section 3.3[.][193]

88.     Section 5.1 clearly states that "Each member of the Board shall serve until such

---

[193] *Id.*, §§ 5.1 & 5.2.

004464

member shall cease to hold Series A Preferred Units."[194]  Thus, once a board member executed their respective Transfer Agreements, they ceased to hold Series I Preferred Units and ceased to have the right to vote as a HERA board member.[195]  Proof of the Defendants' manipulation, forward dating and back dating the corporate documents, and the timeline of events of January 17 and 18, 2013 is critical.

89.    The Court must first look at the January 18, 2013, email from Hough to Abrams (not discovered until 2022) which illuminates the degree of Defendants' manipulation to effectuate the invalid corporate governance documents.[196]  First, Hough acknowledged that the HERA Transfer Agreements were signed the *morning of January 18* (ostensibly including Boyce, Britain and Dameris), thus removing them as HERA board members.[197] Second, the document purporting to remove Walia as a HERA Board member was "effective" January 17, 2013.[198] Third, Hough incredibly admits that the amendments "permitting *Dondero* to make further amendments, the various member consents, the offer to purchase, and the transfer agreements were dated January 18."[199]  Fourth, to cover their tracks, he admits Surgent would date the outgoing board members resignations January 19, 2013, so there is no doubt their resignation occurred only after the transactions were effected.[200]

90.    This is truly a remarkable fantasy, as it is clear that it does not matter when the HERA board members resigned, as their removal as HERA board members occurred upon the surrender of their units, *i.e.*, the Transfer Agreements.[201]  Thus, despite the Defendants' best efforts to manipulate and conceal these invalid actions, HERA now knows these actions were invalid. Sadly, even if the HERA board members had wanted to stop Dondero from stripping

---

[194] *Id.*, § 5.1
[195] *Id.*
[196] Exh. 47 – Email from Hough to Abrams, dated January 18, 2013, re: Buyout Update [HERA].(App. 538).
[197] *Id. See also* Exh. 48 – Second Amended LLC Agreement, § 5.1 (App. 539–559).
[198] Exh. 47 – Email from Hough to Abrams, dated January 18, 2013, re: Buyout Update [HERA].(App. 538).
[199] *Id.*
[200] *Id.*
[201] Exh. 48 – Second Amended LLC Agreement § 5.1. (App. 539–559).

004465

HERA's assets (which they clearly did not), they were apparently powerless to do so. Britain testified in his deposition in the Texas Lawsuit that, as a HERA Board Member, he had no power to stop the offers, even though he admits he had a fiduciary duty to do so.[202] So, he was either lying when he said he had no power to stop the offers, despite signing over 12 documents in an attempt to effectuate the offer, or he was lying when he testified that he could have told Dondero no.

91.     It is undisputed that R. Jospeh Dougherty signed his Transfer Agreement on January 17, 2013, and thus was automatically removed from the HERA board.[203]  It is undisputed that Walia did not execute his Transfer Agreement until February 5, 2013.[204] Honis did not submit his 12-page fax signatures for all of the documents below until January 18, 2013, at 4:33pm CST – after the other board members (except Walia) had already signed their Transfer Agreements and thus relinquished all claims and rights to their HERA interests and board positions.[205]

92.     As a result, the January 17, 2013 Written Consent of Board of Directors purporting to (1) approve the amendment to Section 5.1 of the Second Amended LLC Agreement to change number of board members from 6 to 5, and (2) remove Walia effective January 17, 2013, is clearly invalid, because at that time a unanimous vote was required to remove Walia (which had not occurred because Honis had not executed the documents) and a 75% vote was required to amend Section 5.1 (which had not occurred because Honis and Walia had not executed the documents).[206]

93.     This is also the case for the remainder of the corporate governance documents

---

[202] Exh. 36 –– Britain Deposition in Texas Lawsuit, Pg 273, line 25 – Pg 276, line 20. (App. 391–399).
[203] Exh. 33 –Dougherty Transfer Agreement. (App. 374–380); Exh. 48 – Second Amended LLC Agreement, § 5.1.(App. 539–559).
[204] Exh. 49 –– Walia Transfer Agreement.(App.560–563).
[205] Exh. 50 -  Honis January 18, 2013, 4:33p.m. CST fax signature pages from Hotel Palomar in San Francisco.(App. 565–597).
[206] Exh. 51 – Written Consent of Board of Directors, effective January 17, 2013(App. 598–603). Exh. 52 – January 17, 2013  - Amendment to Second Amended LLC Agreement.(App. 604–610).

Defendants used to make further amendments, all of which are invalid.

➤ Written Consent of Board of Directors (Expense Payments and Reserves) -- effective date January 17, 2013 – Honis execution untimely, Walia did not vote, and no majority vote approving same, as required by Second Amended LLC Agreement § 5.1. Thus this action and document are invalid.[207]

➤ Written Consent of Board of Directors (Transfer of Dougherty Units to Highland) -- effective date January 17, 2013 – Honis execution untimely, Walia did not vote, and no majority vote approving same, as required by Second Amended LLC Agreement § 5.1. Thus this action and document are invalid.[208]

➤ Written Consent of Board of Directors (Approval to amend § 5.1 to reduce number of board members to 5 and remove Walia as board member) -- effective date January 17, 2013 – Honis execution untimely, Walia did not vote, no majority vote approving same, as required by Second Amended LLC Agreement § 5.1, there was not 75% required to amend pursuant to § 5.2(b)(iv) and no unanimous vote to remove Walia pursuant to § 5.1. Thus this action and document are invalid.[209]

➤ Amendment to Second Amended LLC Agreement (Amending § 5.1 to reduce number of board members to 5) -- effective date January 17, 2013 – Honis execution untimely, Walia did not vote, and pursuant to Second Amended LLC Agreement § 5.1, there was not 75% required to amend pursuant to § 5.2(b)(iv). Thus this action and document are invalid.[210]

➤ Written Consent of Board of Directors (Approval to amend Article VIII for Indemnification and Liability) -- effective date January 17, 2013 – Honis execution

---

[207] Exh. 53 –Written Consent of Board of Directors (Expense Payments and Reserves), effective January 17, 2013.(App. 611-615).
[208] Exh. 54 –Written Consent of Board of Directors (Transfer of Dougherty Units to Highland), effective January 17, 2013.(App. 616-620).
[209] Exh. 55 – Written Consent of Board of Directors (Approval to Amend Article 5.1 to reduce number of board members to 5 and remove Walia as board member), effective January 17, 2013.(App. 621-626).
[210] Exh. 56 – Amendment to Second Amended LLC Agreement, effective January 17, 2013.(App. 627-633).

004467

untimely, Walia did not vote, and pursuant to Second Amended LLC Agreement § 5.1, there was not 75% required to amend pursuant to § 5.2(b)(iv). In addition, no majority of preferred unit holders consented (only 33.235% without Dougherty and Honis) to and ratified Article VIII amendment, as required. Thus this action and document are invalid.[211]

➢ Second Amendment to Second Amended LLC Agreement (Amending Article VIII for Indemnification and Liability) -- effective date January 18, 2013 – Honis execution untimely, Walia did not vote, and there was not 75% required to amend pursuant to § 5.2(b)(iv). In addition, no majority of preferred unit holders consented (only 33.235% without Dougherty and Honis) to and ratified Article VIII amendment as required. Thus this action and document are invalid.[212]

➢ Board Resolution of Written Consent (Approval to 3rd Amendment to §§ 5.1, 5.2(b)(iv) and Article IX for acceptance and offer of assignment of preferred unit to Highland) -- effective date January 18, 2013 – Honis execution untimely, Walia did not vote, and there was not 75% required to amend pursuant to § 5.2(b)(iv). In addition, no majority of preferred unit holders consented (only 33.235% without Dougherty and Honis) to and ratified Article VIII amendment as required. Thus this action and document are invalid.[213]

➢ Third Amendment to Second Amended LLC Agreement (Amending §§ 5.1, 5.2(b)(iv) and Article IX for acceptance and offer of assignment of preferred unit to Highland) -- effective date January 18, 2013 – Honis execution untimely, Walia did not vote, and there was not 75% required to amend pursuant to § 5.2(b)(iv). In addition, no majority of preferred unit holders consented (only 33.235% without Dougherty and Honis) to and

---

[211] Exh. 57 –Written Consent of Board of Directors (Approval to amend Article VIII for Indemnification and Liability), effective January 17, 2013.(App. 634–639).

[212] Exh. 58 – January 18, 2013 - Second Amendment to Second Amended LLC Agreement (amending Article VIII for Indemnification and Liability)(App. 640-645)

[213] Exh. 59 – January 18, 2013 - Written Consent of Board of Directors  (Approval to 3rd Amendment to Article 5.1, 5.2(b)(iv) and Article IX for acceptance and offer of assignment of preferred unit to Highland)(App. 646-652).

004468

ratified the proposed Article 5.1, 5.2(b)(iv) and Article IX amendment as required. Thus this action and document are invalid.[214]

➢ Transfer Agreements – as of the morning of January 18, 2013, Surgent informs Abrams & Bayliss via Steven Hough in email, "Thomas Surgent called and told me that the HERA buyout documents were executed this morning, with close to 60% accepting. As we discussed, Highland is going to wait two weeks to extend the offer to HERA's non-employee members."[215]  Therefore, as of noon January 18, 2013, Ellington, Boyce, Britain and Dameris had vacated their board positions and, pursuant to § 5.1, had no power or authority to act on behalf of HERA.[216]  As of 4:33pm CST, Honis had vacated his board position and, pursuant to § 5.1, had no power or authority to act on behalf of HERA.[217]  Thus, HERA was left with an incomplete board -- only Walia and what should have been Daugherty, had it not been concealed from him, to fill the remaining board positions.

➢ On February 1, 2013, Highland ERA Management, LLC ("ERA") was created in Delaware via an LLC Agreement with Highland as limited partner, Strand Advisors as the general partner, and Dondero as president.[218]

➢ Third Amended LLC Agreement (Replaces the Second Amended LLC Agreement and names ERA as manager of HERA) – effective February 1, 2013 – At this time Walia is the only sitting board member, and there was not 75% required to amend pursuant to § 5.2(b)(iv). Further, ERA has no authority to act as manager of HERA. Thus this action and document are invalid.[219]

➢ Expense Allocation Agreement (Highland expenses are allocated to HERA) – effective

---

[214] Exh. 60 – Third Amendment to Second Amended LLC Agreement, effective January 18, 2013.(App. 653-660).
[215] Exh. 61 – Transfer Agreements of Britain, Dameris, Boyce and Ellington, each dated January 18, 2013.(App. 661-684); Exh. 62 – Email from Hough to Abrams re: Buyout Update [HERA], dated January 18, 2013.(App. 685).
[216] Id.; Exh. 48 – Second Amended LLC Agreement, § 5.1.(App. 539-559).
[217] Exh. 50 - Honis January 18, 2013, 4:33p.m. CST fax signature pages from Hotel Palomar in San Francisco.(App.565-597).
[218] See FAC ¶¶ 72-73.
[219] Exh. 63 –Third Amended LLC Agreement, effective February 1, 2013.(App.686-696).

February 1, 2013 – At this time Walia is only sitting board member and there was not 75% required to amend pursuant to § 5.2(b)(iv). Further, ERA has no authority to act as manager of HERA. Thus this action and document are invalid.[220]

➢ Written Consent of Manager – effective February 1, 2013 – (Expense Allocation to HERA) -- At this time Walia is the only sitting board member, and there was not 75% required to allow transfer, assignment of conveyance of HERA assets pursuant to § 5.2(b)(ii). Further, ERA had no authority to act as manager of HERA. Thus this action and document are invalid.[221]

➢ Assignment Agreement (HERA assets assigned to Highland as sole interest holder) – effective April 30, 2013 – At this time Walia had signed his Transfer Agreement (February 5, 2013), resulting in no board and no 75% required to allow transfer, assignment of conveyance of HERA assets pursuant to § 5.2(b)(ii). Further, ERA had no authority to act as manager of HERA. Thus this action and document are invalid. [222]

➢ Manager's Written Consent (Making Daugherty's economic interest in HERA zero per Article XI and approving assignment of HERA assets to Highland as sole interest holder) – effective April 30, 2013 – At this time Walia had signed his Transfer Agreement (February 5, 2013), resulting in no board, no 75% required to allow transfer, assignment of conveyance of HERA assets pursuant to § 5.2(b)(ii), and no 75% required to amend the agreement pursuant to § 5.2(b)(iv). Further, ERA had no authority to act as manager of HERA. Thus this action and document are invalid.[223]

94.    Through these actions, Defendants secretly attempted to ratify their own self-dealing actions, whitewash their dereliction of duty, and enlisted counsel from Abrams & Bayliss,

---

[220] Exh. 64 -- Expense Allocation Agreement, effective February 1, 2013.(App.697-699).
[221] Exh. 65 – Written Consent of Manager of HERA to Expense Allocation, effective February 1, 2013.(App. 700-702)
[222] Exh. 66 – Managers Written Consent for Assignment Agreement and Assignment Agreement Exhibit A attached thereto, effective April 30, 2013.(App. 703-711).
[223] *Id.*

Andrews Kurth, Gruber Hurst, Surgent, Ellington, Girard and Leventon to provide themselves broad releases of their fiduciary obligations and indemnifications while paving the way for Dondero, Okada, Ellington, and Highland to strip HERA of its assets.[224]

95.    Tellingly, these critical corporate governance documents were never produced in the Prior Lawsuits because Defendants deliberately concealed the true events of January 17, 2013, to April 30, 2013. During the Texas Lawsuit, they only produced documents to "legitimize" their actions.[225]  Furthermore, the HERA board members purported to execute a reserve for actual and potential expenses but did not bother to reserve anything for the claims being made in the Prior Lawsuits. Regardless of their failed attempt, the board members disregarded the fact that Delaware entities, such as HERA, are not permitted to waive liability for fraud or breach of good faith and fair dealing.

96.    There are significant takeaways from the above documents and timeline demonstrating the invalidity of these documents and actions: (1) It was not discovered until May 2024 that Walia never resigned or was properly removed, such that he was a required signatory to the January 17-18, 2013, governance amendments and corporate actions;[226] (2) Taken in concert with Honis not submitting his signatures on the proposed actions until after 4:30pm on January 18, 2013, the actions by Boyce, Britain, Dougherty, and Dameris, who had already forfeited their positions as HERA board members by waiving and releasing any and all rights they had pursuant to the terms of the Transfer Agreement, were void;[227] (3) Since there were only two board members at the time Honis submitted his signatures for the proposed actions, approval was impossible without Walia's signature.

97.    More recently, on October 31, 2024, Britain, Dougherty and Dameris filed

---

[224] FAC ¶69. *See supra* n. 170; Exh. 18– Abrams & Bayliss and HAK invoices.(App. 209-263).
[225] Exh. 67 – Corporate governance documents Defendants produced in the Texas Lawsuit regarding the HERA buyout scheme.(App.712-753).
[226] FAC ¶71.
[227] *Id.*

documents in this Court claiming they resigned as board members as of January 17, 2013.[228] Accordingly, Britain and Dameris wrongfully purported to be acting as board members of HERA for all purported governance actions on January 18, 2013.

98.     Therefore all of the attempted amendments failed, but Honis and Walia subsequently negotiated for and received their own transactions that required them to waive and release all claims pursuant to their Transfer Agreements.[229] Accordingly, Daugherty became the only remaining owner of the preferred units in HERA as of February 22, 2013, and only he and his affiliates could effect a change in governance pursuant to the terms of the last legitimate governance amendment on February 16, 2012,[230] a fact Daugherty and HERA did not discover until May of 2024 when Walia confirmed same.

99.     Defendants knew their actions were invalid, as they fabricated Honis's signature at least once (of which Plaintiff only became aware of in late 2022).[231] Exhibit 58 (Second Amendment to the Second Amended LLC Agreement and Exhibit 68 the deposition of Carl Moore, the corporate representative of HERA during the Texas Lawsuit, and Exhibit 71 to that deposition purports to be the executed signature pages of Honis and Boyce (with no fax information in the header).[232] As has been established, Honis faxed his signature pages to all documents from a hotel in San Francisco on January 18, 2013, at 4:33pm CST, as evidence by the fax line at the top of the page where he signed all the documents, a review of which contains no signature of Honis on a Second Amendment to the Second LLC Agreement, it does not exist.[233]. Honis was not with Boyce on January 18, 2013, as Honis was in San Francisco and all his

---

[228] *See* Highland Defendants Joint Motion to Dismiss (Doc. 111) at page 5 n. 23.
[229] FAC ¶ 71.
[230] *Id.*
[231] Exh. 58 and Exh. 68 – Deposition of Carl Moore, Jr. in Texas Lawsuit (App.754-770) see Exhibit 71 to his deposition (App. 765-767).
[232] *Id.*
[233] Exh. 50 -- Honis January 18, 2013, 4:33p.m. CST fax signature pages from Hotel Palomar in San Francisco.(App.565-597).

004472

signature pages have fax information in the header.[234] So either Honis never signed the Second Amendment to the Second Amended LLC Agreement (thus again making it invalid), or his signature was fabricated by the Defendants.[235]

100.    Further, the significance of the timing of execution is confirmed by Britain in an affidavit he provided in the Texas Lawsuit wherein he swears under oath that "By operation of Section 5.1 of the Second Amended and Restated HERA LLC Agreement, I was automatically removed as a director upon sale of my Series A preferred Units" – the sale, of course, being the Transfer Agreement. Therefore, the timing of the execution of the Transfer Agreements is critical to the analysis above regarding validity.[236]

101.    Moreover, these actions, specifically the transfer of assets through the: (1) Board Resolution by Written Consent transferring Dougherty units to Highland; (2) Board Resolution by Written Consent acceptance of Offer and Assignment of Preferred Units to Highland; (3) Third Amendment to Second Amended LLC Agreement acceptance of Offer and Assignment of Preferred Units to Highland; (4) Preferred Unit Resolution by Written Consent acceptance of Offer and Assignment of Preferred Units to Highland; (5) Assignment Agreement where HERA assets are assigned to Highland; and (6) Manager Resolution by Written Consent approving assignment of HERA assets to Highland, all violated Section 2.1 of the Second Amended LLC Agreement which states:

> Section 2.1 <u>Purposes</u>. The purpose of the Company shall be to **receive and hold assets** to be contributed by the Initial Member and to distribute the proceeds of such assets from time to time to certain employees of the Initial Member (or of affiliates of the Initial Member, as applicable) as the Board may from time to time determine in order to create a retention initiative for such employees and to engage in such other lawful purposes and activities in connection with the foregoing.[237]

---

[234] Exh. 50.  Exh. 68 -- Deposition of Carl Moore, Jr. in Texas Lawsuit.(App. 754–770). See also Exhibit 71 to the Moore deposition (App. 765-767).
[235] *Id.*
[236] *See* Exh. 69 –Affidavit of William Lane Britain dated August 14, 2013, ¶¶ 10-11.(App. 771-774).
[237] Exh. 48 -- Second Amended LLC Agreement, § 2.1.(App. 539-559).

004473

102.    Moreover, Defendants' actions of January–April 2013 violated Article IX of the

Second Amended LLC Agreement, which IX states:

> No interest in the Company, whether Common Units, Preferred Units or otherwise, may be assigned without the prior written consent of the Board, provided, however, that vested Series A Preferred Units may be assigned as set forth on <u>Exhibit A</u>.[238]

103.    Thus, the transfer of Preferred Units is null and void.

104.    Defendants' actions of January–April 2013 also violated Article XI of the Second

Amended LLC Agreement, which states:

> Section 11.1 <u>Separateness: Operating Procedures</u>. Until the date on which no Series A Preferred Units remain outstanding, the Company represents warrants and covenants as follows:
>
> (a) The purpose for which the Company is organized shall be and remain limited solely to (i) directly owning and holding assets to be contributed by the Member and to distribute the proceeds of such assets from time to time to certain employees of the Member in order to create a retention initiative for such employees (the "Retention Assets"), (ii) distribute the proceeds of the Retention Assets in accordance with the terms of the Series A Preferred Units of the Company, and (iii) transacting any and all lawful business for which a limited liability company may be organized under Delaware law that is incident, necessary and appropriate to accomplish the foregoing.
>
> (b) The Company will maintain all of its books, records, and bank accounts separate from those of any affiliate. The Company's assets will not be listed as assets on the financial statement of any other entity. The Company's assets will not be listed as assets on the financial statement of any other entity; provided, however, that its assets may be included in a consolidated financial statement of its parent if inclusion on such consolidated financial statements shall contain a footnote to the effect that the Company's assets are owned by it and that they are being included on the financial statement of its parent solely to comply with the requirements of GAAP. The Company will file its own tax returns and will not file a consolidated federal income tax return with any other entity unless required to do so by applicable law or regulation.
>
> (c) The Company will be, and at all times, will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any of its

---

[238] Exh. 48 -- Second Amended LLC Agreement, Article IX.(App. 539-559).

004474

affiliates), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, and shall maintain and utilize separate stationery, invoices and checks.

(d) The Company shall maintain its bank accounts separate from any other person or entity other than a successor in interest and will not commingle its funds and other assets with those of any of its affiliates, other than any successor in interest, or any other person, and will not participate in a cash management system with any such party.

(e) The Company will not guarantee or become obligated for the debts of any other entity or person or pledge its assets for the benefit of any such entity or person and does not and will not hold itself out as being responsible for the debts or obligations of any other person or hold out its credit as available to satisfy the obligations of any other person or entity.

(f) The Company shall allocate fairly and reasonably any overhead expenses that are shared with an affiliate, including paying for office space and services performed by any employee of an affiliate.

. . .

(h) The Company shall pay its own liabilities and expenses out of its own funds drawn on its own, or any successor-in-interest's, bank account.[239]

105.    These are not mere semantics; this is *Corporate Governance and Authority 101*. The aforementioned HERA governance, resolutions, agreements, and assignments that were purportedly executed in January 2013 and after are <u>invalid</u>.

106.    The Highland Defendants and Outside Attorneys knew the buyout scheme was a sham, even commenting prior to the January 17-18, 2013 execution of documents that the HERA Board Members would be in breach of their fiduciary duties.[240]  Highland's in-house lawyers and the Outside Attorneys all agree that the HERA board members owed fiduciary duties to HERA.[241]

107.    The Highland Defendants deliberately withheld critical documents from  January

---

[239] Exh. 48 -- Second Amended LLC Agreement, Article XI. (App. 539-559).
[240] Exh. 25 – November 28, 2012, email from Abrams and Hough to Dameris.(App. 337-341).
[241] Exh. 70 – Email from Hough to Surgent and Abrams, dated August 5, 2013, re: LLC Fiduciary Duties 〚HERA〛.(App.775-776).

004475

17-18, 2013, and the immediate aftermath, that "allowed" them to strip HERA of its assets. The only documents that were produced in the Prior Lawsuits were those that purported to legitimize the acting authority and its actions, such as: Second Amended and Restated LLC Agreement dated 2-16-12, Amendment to the Second Amended and Restated LLC Agreement dated 1-17-13, Second Amendment to the Second Amended and Restated LLC Agreement dated 1-17-13, Third Amendment to the Second Amended and Restated LLC Agreement dated 1-18-13, Third Amended and Restated LLC Agreement – dated 2-1-13, Expense Allocation Agreement – dated 2-1-13, Written Consent for Expense Allocation – dated 2-1-13, Assignment Agreement – dated 4-30-13, Managers Written consent re Asset Transfer – dated 4-30-13, Board resignations of Boyce and Britain – dated January 19, 2013, and Escrow Agreement – dated 12-13-13.

108.    The damning documents were fraudulently and deliberately concealed from HERA until 2022 and later. As a result, HERA did not have knowledge of these claims until that time, specifically the manner and timing to which the actions occurred, making them invalid.

109.    Indeed, Defendants followed up their scheme to conceal critical documents by providing false and misleading testimony in depositions through 2013 and at the Texas Trial in 2014. Surgent, Boyce, Britain all testified in the Texas Lawsuit, upon direction by Hurst and Brown, that the HERA Board was not involved in the buy-out scheme offer to purchase HERA preferred units by Highland.[242] Thus, during the Prior Lawsuits, Daugherty and the court were told that Highland owned 100% of the HERA preferred units.  However, once HERA obtained documents in 2022, it realized that the HERA Board was in fact not only involved in the buy-out

---

[242] Exh. 38 - Excerpts from Transcript of (Texas) Trial on the Merits – Afternoon Proceedings, dated January 17, 2014,  Pg 114, line 13 – Pg 115, line 23 (Britain testimony re no involvement in offer)(App. 408-417); Exh. 39 – Excerpts from Transcript of (Texas) Trial on the Merits, dated January 21, 2014,  Pg 23, line 25- Pg 27, line 22 (Britain testimony re  no involvement in decision to make offer, even though he was included in drafting process), at Pg 72, line 3 – Pg 73, line 3 (denying that Dondero discussed the buyout with board members prior to the offer)(App. 418-431); Exh. 40 – Excerpts from Transcript of (Texas) Trial on the Mertis – Afternoon Proceedings, dated January 16, 2014, Pg104, line 22 - Pg105, line 12 (Surgent testifying that Boyce and Britain were not involved in the offer to purchase), Pg 130, line 24 – Pg 131, line 8 (testifying that Britain and Boyce were not involved)(App. 432-444); Exh. 41 - Excerpts from Transcript of (Texas) Trial on the Mertis, dated January 17, 2014, Pg 76, line 24 – Pg 78, line 25 (Surgent testifying, again, that the board did not have any involvement in offers to purchase HERA units)(App. 445-466).

scheme, but they also knew about it beforehand and actively attempted to facilitate it.[243]

110.    This testimony was proven to be a lie, when Abrams and Bayliss produced a series of documents in 2022 that revealed Surgent and Defendants' current counsel, Michael Aigen, were actively involved in reviewing and implementing the governance documents to effect the offer and subsequent transfer of assets to Highland Capital for the benefit of Defendants.[244] These documents specifically included a resolution to address Article IX, a "Privileged Offer to Purchase", and all other documents to affect the buyout scheme despite Surgent's testimony to the contrary that there was no need for Article IX to effect transfer.[245]

### D.  HERA's Assets Are Stripped

111.    Although Defendants contended that ERA was the manager of HERA, metadata later revealed in October 2022 indicated there was no valid corporate action taken by the board.[246] Despite the absence of valid authority, Dondero, acting as the president of ERA, with the assistance of his minions at Highland and their legal counsel who simultaneously represented both Highland and HERA through what they claim were Shared Services Agreement and a Blanket Agreement, purported to execute a series of transactions to strip HERA of its assets.[247]

112.    On February 1, 2013, the day that ERA was formed, Dondero purportedly executed the Third Amended LLC Agreement on behalf of HERA prepared by Surgent, Ellington, Katz/HAK, Hurst, Hough and Abrams, which (1) eliminated the purpose for which HERA was created, (2) eliminated the requirement of HERA to make cash distributions to preferred unit holders to cover pass-through tax obligations attributable to HERA, (3) eliminated members' rights to indemnification, (4) limited indemnification obligations to the discretion of

---

[243] Exh. 44 – January 15, 2013, Email from Surgent to various recipients re: HERA docs for review. (App. 516-527); Exh. 45 – January 9, 2013, Email from Surgent to various recipients re: DRAFT HERA DOCS.(App. 528-530).
[244] Id.
[245] Id. See also Exh. 41 – Surgent trial testimony in Texas Lawsuit. (App. 463-464).
[246] FAC ¶ 72. See Exh. 71 – Metadata shows that the ERA operating agreement was modified, if not created, on February 7, 2013, six days after its supposed formation and approval.(App.777-778).
[247] FAC¶ 73.

004477

the Manager (Highland ERA Management, LLC) or the Initial Member (Highland Management, LP), and (5) provided for broad indemnification to the Manager (Highland ERA Management, LLC) and Dondero.[248]

113.   That same day, Dondero also purported to execute an Expense Allocation Agreement prepared by Surgent, Ellington, Leventon, Katz/HAK, Hurst, Hough, Abrams, Waterhouse and Klos, on behalf of both Highland and HERA under which the parties reallocated 93.4% of Highland's purported legal expenses billed by their firms and others related to the Texas Lawsuit to HERA for no consideration.[249] According to the document, Highland had incurred $1,142,284 in legal expenses in the Texas Lawsuit as of December 31, 2012, compared to just $154,029 incurred by HERA over the same period.[250]

114.   On February 6, 2013, Daugherty sent a letter seeking to review HERA's books and records to verify its assets and their value.[251] Defendants rejected this request and their reasoning was laid out in an email dated February 13, 2013 by declaring, "You seek, inter alia, 'documents establishing the December 31, 2012 estimated value of the Interests as calculated by HERA;' 'HERA's  balance sheets, income statements, lists of assets, general ledger, and the account records for any depository accounts of HERA, as of December 31, 2012 and for the periods ending December 31, 2012, 2011, 2010 and 2009;' 'HERA's 2009, 2010 and 2011 federal, state, and local tax returns'; 'information… regarding and identifying the current holders of the Series A Preferred Units, and to the extent the Common Unit Holder has already acquired any such units… from whom, in what amounts and for what consideration;' 'documents… regarding member lists;' and 'documents… regarding HERA's Board… and any amendments to HERA's company agreement.' Your Demand takes a shotgun approach to requesting books and records that is antithetical to the 'rifled precision' required by Delaware law. e.g., Brehm v. Eisner, 746

---

[248] FAC ¶74; Exh. 63 - Third Amended LLC Agreement.(App. 686-696).
[249] FAC ¶75; Exh. 64 - Expense Allocation Agreement.(App. 697-699).
[250] *Id.*
[251] FAC ¶76.

A.2d 244, 266 (Del. 2000)."[252]

115.    However, it was discovered in 2022 that on February 7, 2013, Surgent sent an email attaching Daugherty's request to inspect HERA's assets to Abrams, Hough, Hurst, Katz/HAK, Lackey and Ellington.[253] Again, Katz/HAK and Lackey did not represent HERA at the time but were adverse to Daugherty and his counsel at Looper Reed, and McGraw on behalf of Highland.[254]

116.    It was not discovered until October of 2022 the manner of how all of HERA's assets had been stripped and litigation expenses allocated to it. Exhibit 73, obtained from Highland in October of 2022, contains Highland financial statements and an excel spreadsheet summary that proves this.[255] It also proves that Leventon, Ellington, Surgent, Dondero, Klos, Swadley, Waterhouse, and Katz/HAK had fraudulently allocated all of the legal invoices from the Outside Attorneys and other firms to HERA.[256]

117.    It was further discovered for the first time in October 2022 that an action by written consent purportedly executed by Dondero on April 30, 2013, to declare Highland as the "sole economic interest holder in [HERA] following the consummation of the transactions pursuant to the Offers to Purchase dated on or about January 18, 2013, and January 31, 2013" was invalid.[257] The same document also declared that, "Daugherty's economic interest in [HERA] is now zero as a result of the application of Article XI of [HERA's] Operating Agreement."[258] And it further resolved to transfer all of HERA's assets to Highland because Highland and HERA "have each determined that it is in their respective best interest" to transfer

---

[252] *Id.*; Exh. 72 – February 11, 2013, email from Hough to Surgent and Abrams.(App.779-791).
[253] FAC ¶77. Exh. 72 – February 11, 2013, email string February 7, 2013, email from Surgent to Outside Attorneys.(App. 779-791).
[254] FAC ¶ 77.
[255] Exh. 73 – Highland Financial Statements and Excel Spreadsheets.(792-869).
[256] *Id.*
[257] FAC ¶78. Exh. 66 –Managers Written Consent for Assignment Agreement and Assignment Agreement as Exhibit A attached thereto.(App. 686-696).
[258] *Id.*

004479

substantially all the assets of HERA as "in-kind distribution[s]" to Highland (then valued at approximately $9,700,000 on top of approximately $6 million in cash that Highland also took), despite providing no consideration to HERA.[259]

118.     Through this series of these invalid transactions that were only revealed for the first time in October 2022 to have been invalid and/or otherwise backdated and later circulated by Leventon and Goldsmith to appear legitimate, Highland claimed to have taken all of HERA's assets, leaving it insolvent.[260] HERA only became insolvent in 2013 because its funds and assets were purportedly used: (1) to pay for substantially all of Highland's attorneys' fees incurred in the Texas Lawsuit pursuant to the Expense Allocation Agreement dated February 1, 2013; (2) to pay for all of HERA's attorneys' fees incurred in in trying to wrongfully prevent Daugherty from receiving his share of the HERA's assets; and (3) to transfer and register substantially all of its assets to Highland for nothing.[261]

119.     It was also revealed in 2022 that in an email dated October 7, 2013, Katz/HAK, Hurst, and Miller knew HERA's board had ignored their duties to carefully review the Highland Purchase Offer and had even discussed the *Lampers v. Fertitta* case by highlighting:

> Turning first to the board's failure to employ a poison pill to prevent Fertitta from obtaining control without paying a control premium, it is reasonable in the context of a motion to dismiss to infer fiduciary misconduct more serious than a breach of the duty of care. The failure to act in the face of an obvious threat to the corporation and the minority stockholders instead supports a reasonable inference that the board breached its duty of loyalty in choosing not to cross Fertitta.[262]

120.     Further, the excel spreadsheets prepared by Highland personnel for 2013 to 2019 (and concealed from HERA until October 2022) show details of law firms, individuals, and

---

[259] *Id.* Exh. 66 -- Managers Written Consent for Assignment Agreement and Assignment Agreement as Exhibit A attached thereto.(App. 686-696); Exh. 73 – Highland Financial Statements and Excel Spreadsheets.(App. 792-869).
[260] FAC ¶79. *See* Exh. 74 – Email from Leventon to Hough and Goldsmith, dated August. 22, 2013, re: Daugherty - HERA Distribution, attaching Assignment Agreement.(App. 870-877); Exh. 73 – Highland Financial Statements and Excel Spreadsheets. (App. 792-869).
[261] FAC ¶79.
[262] *Id.*

004480

Highland (listed as GP) that received cash/assets of HERA.[263] Importantly, HERA owned assets composed of cash and non-cash assets. The cash assets generated interest, and the non-cash assets generated cash upon their monetization and then subsequently generated interest once converted to cash and distributed.[264] The financial statements and spread sheets show that these cashflows were itemized until the assets were transferred to Highland circa April 30, 2013.[265] The distributions continued, but going forward, they came from the assets taken from HERA and assigned to Highland books.[266] Dondero, Okada and their trusts (and ay various times Britain, Boyce, Ellington, Honis and Parker) owned Highland from 2013 to 2020 and received comingled distributions in cash from the Highland distributions. Accordingly, they directed HERA assets to Highland and then directed the cash distributions from those assets to themselves and their trusts.[267]

121.    At the time of the Highland bankruptcy filing, any cash not already distributed to Dondero, Okada and their trusts, and the non-cash assets on the books of Highland were trapped pursuant to the automatic stay and were subsequently held in the Claimant Trust for the benefit of creditors. Thus, some of the remaining wrongly transferred assets from HERA were not distributed to Dondero, Okada, and their Trusts and remained on the books of Highland to pay creditors.

122.    These facts and attached exhibits show: (1) HERA has never alleged a single claim against any party in any previous court, including the Prior Lawsuits; (2) HERA's assets were stripped and litigation expenses allocated through a series of invalid corporate actions; (3) HERA could not (due to being controlled by Defendants doing the bad acts) or did not know to (since most of the information forming the basis of this lawsuit was discovered after March of 2022 or

---

[263] Exh. 73 – Highland Financial Statements and Excel Spreadsheets.(App. 792-869).
[264] Id.
[265] Id.
[266] Exh. 73 – Highland Financial Statements and Excel Spreadsheets. (App. 792-869). Highland commingled the cash that was used to repay the Hunter Mountain note to Dondero, Okada and their trusts.
[267] Exh. 73 – Highland Financial Statements and Excel Spreadsheets. (App. 792-869).

004481

later) bring these claims until this lawsuit.

## II.  STANDARD OF REVIEW

123.  Rule 12(b)(6) permits dismissal if a party fails "to state a claim upon which relief can be granted."[268]  When deciding a Rule 12(b)(6) motion, the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the non-movant.[269]  A well-pleaded complaint must allege facts upon which the claims are based and not be a conclusory recitation of the elements of a cause of action.[270]  A complaint must state sufficient facts such that the "claim has facial plausibility" and is not merely "possible."[271]  A plaintiff pleads a claim with facial plausibility when the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable."[272]  The complaint must allege sufficient facts to "give the defendant fair notice" of plaintiff's claims against it.[273]  The alleged facts must be facially plausible such that the facts nudge the plaintiff's claims "across the line from conceivable to plausible."[274]  The court must view all facts in the light most favorable to the plaintiff.[275]

124.  Courts have set out a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion.[276]  First, the Court identifies conclusory allegations and disregards them, for they are "not entitled to the assumption of truth."[277]  Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief."[278]  "This standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or

---

[268] FED. R. CIV. P. 12(b)(6).
[269] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).
[270] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).
[271] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[272] *Id.*
[273] *Twombly*, 550 U.S. at 555.
[274] *Id.* at 570.
[275] *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).
[276] *Iqbal*, 556 U.S. at 681.
[277] *Id.*
[278] *Id.*

elements."[279]  This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[280] When conducting a Rule 12(b)(6) analysis while sitting in diversity, a court applies Texas state substantive law to the question of whether a party's factual allegations "plausibly suggest an entitlement to relief."[281]

### III.    ARGUMENT AND AUTHORITIES

#### A.  Statute of Limitations

125.    HERA did not have a chance to bring a claim until March/April 2022, when Daugherty and his affiliates gained ownership and control over HERA through a settlement agreement in Highland's Bankruptcy.[282] HERA is the Plaintiff here, not Daugherty, a fact Defendants refuse to acknowledge because doing so would render their basis for dismissal on limitations moot. At no time has HERA ever brought any claim against any party for the stripping of its assets and allocation of expenses, much less the fundamental revision of HERA's business purpose. A cursory review of the pleadings in all of the Prior Lawsuits abundantly bears this truth out. In fact, the opposite is quite true: HERA has always been a party being sued by Daugherty in his individual capacity. HERA's claims in this lawsuit are not Daugherty's claims, nor could they be.

126.    Furthermore, Defendants, try as they might, cannot impute Daugherty's claims or knowledge to HERA for limitations purposes in this lawsuit. Not until March/April 2022, when Daugherty and his affiliates gained ownership and control of HERA, did HERA for the very first time have the ability to bring claims on behalf of itself, because at all times prior, it was controlled by the Defendants who were perpetrating the bad acts against HERA. The Defendants argue profusely and erroneously that because Daugherty, individually, was the plaintiff in the

---

[279] *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009).
[280] *Iqbal*, 556 U.S. at 663-64.
[281] *Iqbal*, 556 U.S. at 681; FED. R. CIV. P. 12(b)(6).
[282] FAC ¶¶ 60, 131; Exh. 10 – Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith.(App. 151-183).

004483

Prior Lawsuits, HERA somehow had knowledge of its own claims and could have brought those claims.

127.    Limitations is an affirmative defense.[283]  To obtain a Rule 12(b)(6) dismissal based on an affirmative defense, the successful affirmative defense must appear clearly on the face of the pleadings.[284]  In other words, Defendants are not entitled to dismissal under Rule 12(b)(6) unless HERA has pleaded itself out of court by admitting to all of the elements of the defense.[285]

### 1.    Adverse Domination Applies to Toll the Applicable Statutes of Limitation

128.    The adverse domination rule applies to toll the limitations on causes of action against members of the board of an entity while it is dominated by wrongdoers.[286]  The logic behind adverse domination is that it is unreasonable to expect the wrongdoers to bring an action against themselves.[287]  Another rationale for the doctrine is that a wrongdoing corporate officer or director will seek to hide his or her wrongful conduct from the entity.[288]  Similarly, another rationale for the doctrine is that where the agents of the corporation who know of the injury are themselves the wrongdoers, their knowledge should not be imputed to the corporation.[289]  Thus, if the plaintiff can show that the officer/director was acting adversely to the entity and entirely for his own or another's purpose, then the limitations will be tolled, because imputation would not apply,[290] a rule well established in the Fifth Circuit.[291]  In order for limitations to run against

---

[283] FED. R. CIV. P. 8(c)(1).
[284] *Cochran v. Astrue*, 2011 U.S. Dist. LEXIS 132730, 2011 WL 5604024, at *1 (N.D. Tex. Nov. 17, 2011) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)).
[285] *Id.* (quoting *Sivertson v. Clinton*, 2011 U.S. Dist. LEXIS 104097, 2011 WL 4100958, at *3 (N.D. Tex. Sept. 14, 2011).
[286] *FDIC v. Henderson*, 61 F.3d 421, 426 (5th Cir. 1995); *FDIC v. Dawson*, 4 F.3d 1303, 1308 (5th Cir. 1993); *Resolution Trust Corp. v. Bright*, 872 F. Supp. 1551, 1561 (N.D. Tex. 1995); *Resolution Trust Corp. v. Acton*, 866 F. Supp. 981, 985 (N.D. Tex. 1993).
[287] *Acton*, 866 F. Supp. at 985; *Henderson*, 61 F.3d at 426 ("[A]lthough the law usually presumes that directors will exercise their fiduciary duties and sue on behalf of the corporation when it is wronged, that presumption is reversed when a majority of the board is culpably involved in the alleged wrongdoing.") (citing *Dawson*, 4 F.3d at 1309-11).
[288] *Henderson*, 61 F.3d at 426.
[289] *Sunbeck v. Sunbeck*, No. 1:10 CV23-A-D, 2011 U.S. Dist. LEXIS 121538, at *10 (N.D. Miss. Oct. 20, 2011).
[290] *Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir. 1997); *Janvey v. Thompson & Knight LLP*, 3:03-CV-158-M, 2003 U.S. Dist. LEXIS 29778, at *17 (July 8, 2003).
[291] *Am. Standard Credit, Inc. v. Nat'l Cement Co.*, 643 F.2d 248, 271 (5th Cir. 1981) ("[A] a well-established rule of imputed knowledge holds that where an officer is dealing with the corporation in his own behalf, or is, for any other reason, interested in a transaction adversely  to the corporation, knowledge possessed by him in the transaction is

a corporation's right of action against one of its own directors, two things must concur: (1) notice (2) to a disinterested majority of its board members.[292]

129.    Here, HERA was dominated by the wrongdoers, through a combination at different times of the Board Member Group and Dondero/ERA until March/April 2022, when Daugherty and his affiliates were granted control and ownership over HERA.[293] As set forth in the FAC, HERA alleges that each and every member of the Board Member Group and Dondero/ERA, along with the Outside Attorneys, committed fraud and were members of a conspiracy to commit fraud,[294] acting in their own self-interests and not for the benefit of HERA, such that their knowledge is not imputed to HERA.[295]  Once Daugherty and his affiliates received documents in October of 2022, the limitations clock began to run. HERA filed this suit on February 29, 2024,[296] less than two years later, such that HERA's causes of action are not barred by limitations.

130.    Specifically applicable to adverse domination, the following acts pleaded in the FAC show that Defendants had complete control over HERA while simultaneously conducting the bad acts. The January 17-18, 2013, corporate governance actions taken by Defendants, which are invalid as discussed at length above, changed the entire business purpose of HERA from being a vessel to set aside assets to retain and incentivize Highland employees[297] to being an

---

not imputable to the corporation, even though the officer obtaining the knowledge was, at the time, the managing agent of the corporation, or even though the officer possessing the knowledge or having the notice attended the meeting at which the matter in question was considered[.]"); *Kaplan v. Utilicorp United*, 9 F.3d 405, 407 (5th Cir. 1993) ("[T] the knowledge and actions of employees acting adversely to the corporate employer cannot be imputed to the corporation.") (citing *Southern Farm Bureau Casualty Ins. Co. v. Allen*, 388 F.2d 126, 131 (5th Cir.1967); *Crisp v. Southwest Bancshares Leasing Co.*, 586 S.W.2d 610 (Tex.Civ.App.--Amarillo 1979, writ ref'd n.r.e.)).

[292] *Allen v. Wilkerson*, 396 S.w.2d 493, 500 (Tex. App.—Austin 1965, writ ref'd n.r.e.); *Dawson*, 4 F.3d at 1310; *Henderson*, 61 F.3d at 426 ("The statute of limitations is thereby tolled until a majority of the directors is disinterested and informed of the wrongdoing."); *Bright*, 872 F. Supp. at 1561. *See also, Acton*, 866 F. Supp. at 985 ("[O]nly when a new entity takes control . . . , be it a receiver or a new board of directors, can suit against the wrongdoers be brought as a practical matter.").

[293] FAC ¶¶ 60, 131.

[294] FAC ¶¶ 379-384, 386-390, 447-451, 453-457.

[295] *Askanase*, 130 F.3d at 666; *Janvey*, 2003 U.S. Dist. LEXIS 29778, at *17; *Am. Standard Credit*, 643 F.2d at 271; *Kaplan*, 9 F.3d at 407.

[296] *See* Plaintiff's Original Complaint (Doc. 1), filed February 29, 2024.

[297] FAC ¶¶ 64-71. *See* ¶¶ 75-107, *supra*.

entity owned and controlled by Dondero and ERA to transfer those assets to Highland.[298]
Second, Defendants stripped HERA of its assets and allocated to it millions in legal expenses.
These actions are precisely why the adverse domination doctrine exists.

131.    It is not reasonable to think that Defendants would bring an action against
themselves and, in fact, they did not.[299]  Defendants actively hid their wrongful acts in not
disclosing the full extent of the corporate governance transactions and effects until after 2022
and only then when forced to turn over the records.[300]  Likewise, Defendants, as agents of HERA,
knew of the injury, but their knowledge cannot be imputed to HERA.[301]  As the Fifth Circuit
requires, HERA has sufficiently pleaded that Defendants were acting adversely to HERA for
entirely their own interests, or the interests of those under their control and direction, including
the Outside Attorneys.  Thus, limitations were tolled while HERA was adversely dominated,
until March/April 2022.

## 2.    The Discovery Rule Applies to HERA's Claims

### i.    Knowledge Should Not Be Imputed

132.    The discovery rule, which applies to both the act and the injury, requires that a
claim be (a) inherently undiscoverable and (b) objectively verifiable.[302]  If the plaintiff can show
that the officer/director was acting adversely to the corporation and entirely for his own or
another's purpose, then limitations will be tolled.[303]  The officer/director, though, must act so
that his endeavors are so incompatible that it destroys the agency.[304]  Courts in this district have

---

[298] FAC ¶¶ 72, 75, 78, 79.
[299] *Acton*, 866 F. Supp. at 985; *Henderson*, 61 F.3d at 426 ("[A]lthough the law usually presumes that directors will exercise their fiduciary duties and sue on behalf of the corporation when it is wronged, that presumption is reversed when a majority of the board is culpably involved in the alleged wrongdoing.") (citing *Dawson*, 4 F.3d at 1309-11).
[300] *Henderson*, 61 F.3d at 426.
[301] *Sunbeck v. Sunbeck*, No. 1:10 CV23-A-D, 2011 U.S. Dist. LEXIS 121538, at *10 (N.D. Miss. Oct. 20, 2011)
[302] *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex.1996). *See also Askanase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997).
[303] *Id. See also FDIC v. Shrader & York*, 991 F.2d at 223-24.
[304] *Id.*

004486

held that that where it is not clear from the face of the pleadings that a defendant's knowledge can be imputed to the entity, dismissal under 12(b)(6) is improper.[305]

133.    The general rule is that courts are to impute an officer/director's knowledge to the corporation so long as the officer/director is acting on the corporation's behalf.[306]  Where a plaintiff can show that the officer/director was acting adversely to the corporation and entirely for his own or another's purpose, however, limitations will be tolled.[307]  Courts have refused to impute the knowledge of the principals to controlled entities where the officers "allegedly filled their own pockets while fraudulently extending the life of the institution they continued to milk" and where they "systematically looted [the company] of its most profitable and least risky businesses as well as millions of dollars in income."[308]  This is exactly what happened here. Defendants, through their individual acts for their own benefit, drove HERA to insolvency, such that their knowledge cannot be imputed to HERA for limitations purposes.

134.    The *Taylor* Court's analysis applies in this case. In *Taylor*, the plaintiffs explicitly alleged that "Faulkner caused the Breitling Entities to fraudulently sell tens of millions of dollars' worth of securities to investors" and that he "diverted and distributed substantial sums to himself for his own personal benefit and in support of his lavish lifestyle."[309]  The Court held that the plaintiffs had pleaded a factual scenario that may give rise to an exception to imputation and that "dismissal at this juncture would be improper, as it cannot be said that Plaintiffs could prove no set of facts entitling them to relief."[310]  The Court further held that because it "is a factual issue" whether defendant acted on behalf of, or against, the entities such that his knowledge should be

---

[305] *Taylor v. Rothstein Kass & Co., PLLC*, Civil Action No. 3:19-CV-1594-D, 2020 U.S. Dist. LEXIS 17435 (N.D. Tex. 2020).
[306] *Id. See also Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir. 1997) (citing *FDIC v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992)).
[307] *Id.*
[308] *Askanase v. Fatjo*, 828 F. Supp. 465, 471 (S.D. Tex. 1993) (citing *Schacht v. Brown*, 711 F.2d 1343, 1347–48 (7th Cir. 1983)) (denying motion to dismiss where plaintiffs pleaded that principal looted company to the point of insolvency).
[309] *Taylor v. Rothstein Kass & Co., PLLC*, Civil Action No. 3:19-CV-1594-D, 2020 U.S. Dist. LEXIS 17435 (N.D. Tex. 2020).
[310] *Id. See also Askanase*, 828 F. Supp. at 471.

004487

imputed to them, that question was better decided in the context of a summary judgment motion.[311]

135.    HERA has not pleaded itself out of court. It has pleaded a factual scenario that may give rise to an exception to imputation rendering dismissal at this stage inappropriate. It is clear in this case that Defendants' actions stripped HERA of its assets and, importantly, those actions were adverse to HERA and inured entirely to the benefit of Defendants or those in league with them, such that limitations should be tolled.

### ii.    The Prior Lawsuits Are Completely Different Than This Lawsuit

136.    Defendants want this Court to believe that this case has been litigated three times and thus HERA has knowledge.[312] Imputation of knowledge has been addressed above, and this case is entirely different than the Prior Lawsuits, despite Defendants' best efforts to confuse the Court.[313] Defendants argue profusely and erroneously that because Daugherty was a Plaintiff in the Prior Lawsuits, HERA somehow had knowledge of its own claims.

137.    In the Texas Lawsuit, Daugherty filed counterclaims against HERA for loss of his ownership interest and/or the diminution in value of his individual units in HERA.[314] Daugherty's contention was that the Second Amended LLC Agreement, whereby he was removed as a director of HERA, diminished the value of his individual HERA interests and made it punitive for anyone to sue HERA going forward.[315]   Daugherty's individual interests and the value of his individual units in HERA have no bearing on the claims brought by HERA against the Defendants in this lawsuit.

---

[311] *Id. See also FDIC v. Nathan,* 804 F. Supp. 888, 894–95 (S.D. Tex. 1992) (noting that question whether principal was "acting for or against the [company] [was] a factual issue," and suggesting such questions are properly resolved "on summary judgment."); *see also Reneker v. Offill,* 2012 U.S. Dist. LEXIS 83017, 2012 WL 2158733, at *10 (N.D. Tex. June 14, 2012) (Fitzwater, C.J.) (deciding matter of imputation in legal malpractice action at summary judgment stage); *Taylor v. Scheef & Stone, LLC,* Civil Action No. 3:19-CV-2602-D, 2020 U.S. Dist. LEXIS 135756 (N.D. Tex. 2020).
[312] *See* ¶¶ 132-135, *supra.*
[313] *Supra* ¶¶ 132-135.
[314] FAC ¶¶ 158-177. *See also* Exh. 76- Daugherty 3rd Amended Complaint in Texas Lawsuit (App. 881-936).
[315] *Id.*

138.    In *Delaware I*, Daugherty is obviously suing HERA and others to collect on his judgment in the Texas Lawsuit,[316] which has nothing to do with the claims HERA has and asserts in this lawsuit. Specifically, Daugherty seeks to collect on his Texas judgment and seeks the return of assets fraudulently transferred from HERA (the Escrow account) to satisfy his Texas judgment.[317] The *Delaware I* complaint is replete with examples where the harm complained of is to Daugherty, individually, a few examples of which include: (1) all acts of ERA disadvantaged Daugherty;[318] (2) transfer of HERA assets' funds reserved for Daugherty in the Escrow;[319] (3) failed to satisfy Daugherty's judgment.[320]

139.    In *Delaware II*, Daugherty again sued HERA and others to collect on his judgment in the Texas Lawsuit, which, again, has nothing to do with claims HERA has and asserts in this lawsuit. Specifically, Daugherty sought to collect on his Texas judgment and sought the return of assets fraudulently transferred from HERA (the Escrow account) to satisfy his Texas judgment.[321] The *Delaware II* complaint is also replete with examples where the harm complained of is to Daugherty, individually, a few examples of which include: (1) cost allocation damages Daugherty;[322] (2) defendants' actions deprived Daugherty of his HERA interest;[323] and (3) defendants' actions solely to harm Daugherty.[324] In fact, anywhere damages are complained of, they are damages to Daugherty, only.[325]

140.    Simply because there are some similar facts in the Prior Lawsuits does not somehow equate to a limitations defense as urged by Defendants. Instead, a thorough examination of the actual claims made by whom and against whom in the Prior Lawsuits

---

[316] Exh. 6 – *Delaware I* Second Amended Complaint – Introduction and ¶¶5, 6 (App. 41-84).
[317] *Id.*
[318] *Id.* at ¶ 77.
[319] *Id.* at ¶ 79.
[320] *Id.* at ¶ 121.
[321] *Id.*
[322] Exh. 7 – *Delaware II* Verified Amended Complaint ¶90.(App. 85-133).
[323] *Id.* at ¶73.
[324] *Id.* at ¶92.
[325] *Id.* at ¶¶ 50-65, 52, 107, 113, 117, 121.

004489

juxtaposed against the exception arguments above can only lead the Court to deny the motion to dismiss on limitations grounds.

### 3.   Daugherty Never Brought A Derivative Suit on Behalf of HERA

141.   Defendants argue that HERA's claims are barred because they allege Daugherty previously brought derivative claims on behalf of HERA in *Delaware I* and *Delaware II*.  This argument is completely without merit. To determine whether a claim is direct or derivative under Delaware law, courts consider "who suffered the alleged harm" and "who would receive the benefit of any recovery or other remedy[.]"[326] If a claim is derivative, "the plaintiff must plead that (1) a demand was made on the entity or (2) reasons why making such demand on the entity would be futile."[327] Further a derivative claim must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[328]

142.   *Delaware I* and *Delaware II* were brought by Daugherty in his individual capacity for damages he suffered, individually.[329] Thus, Daugherty "suffered the alleged harm," and Daugherty "would receive the benefit of any recovery or other remedy"[330] in those matters. Nowhere in either of the *Delaware I* or *Delaware II* complaints is there any allegation that Daugherty made demand on HERA nor any allegation of the futility in doing so, as required by Delaware law to bring a derivative claim.[331] Nor are there any allegations of efforts by Daugherty to obtain the action he desired from the then-directors of HERA or the reasons for failure to do

---

[326] *Ramco Asset Mgmt., LLC v. USA Rare Earth, LLC*, C.A. No. 2022-0665-SG, 2024 Del. Ch. LEXIS 127, at *25 (Del. Ch. Apr. 22, 2024) (quoting *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)).
[327] *Id.* (citing DELAWARE CT. CH. R. 23.1(a)(1); *UFCW & Participating Food Indus. Empls Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 877 (Del. Ch. 2020)).
[328] DELAWARE CT. CH. R. 23.1(a)(1); *Zuckerberg*, 250 A.3d at 876.
[329] Exh. 6 - Delaware I Second Amended Complaint. (App. 41-84); Exh. 7 - Delaware II Verified Amended Complaint.(App. 85-133).
[330] *Ramco Asset Mgmt.*, 2024 Del. Ch. LEXIS 127, at *25.
[331] Exh. 6 - Delaware I Second Amended Complaint. (App. 41-84); see also Exh. 7 - Delaware II Verified Amended Complaint.(App. 85-133).

004490

so.[332]   Those complaints are devoid of any allegations necessary to state a derivative claim,

because, simply put, it was Daugherty who brought the claims, and it was Daugherty that

suffered the injury.

143.    In a derivative action brought in Texas on behalf of a Delaware entity, Delaware

law applies to substantive issues, such that the foregoing analysis applies to Daugherty's claims

in the Texas Lawsuit.[333] As set forth above, Daugherty brought claims only in his individual

capacity, because his personal ownership interest in HERA had diminished in value. There are

no allegations necessary to state a derivate claim.[334]   Daugherty, individually, obtained a

judgment against Defendants, including HERA.[335]   Defendants' argument that Daugherty has

brought derivative claims on behalf of HERA is absurd.

144.    As set forth above, HERA did not have actual or constructive knowledge of the

claims it brings in this lawsuit, such that discovery rule applies, and HERA's claims are not

barred by limitations.

### 4.    The Fraudulent Concealment Doctrine Applies to the Applicable Statutes of Limitations

145.    Fraudulent concealment is an equitable doctrine that tolls limitations "because a

person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing

until limitations has run."[336] Fraudulent concealment tolls the statute of limitations until "the

fraud is discovered or could have been discovered with reasonable diligence."[337] A party asserting

fraudulent concealment must establish an underlying wrong, and that "the defendant actually

---

[332] *Id.*

[333] *Lapiner v. Maimon*, 429 S.W.3d 816, 823 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see* TEX. BUS. ORGS. CODE § 21.562 (a) ("In a derivative proceeding brought in the right of a foreign corporation, the matters covered by this subchapter are governed by the laws of the jurisdiction of formation of the foreign corporation[.]"); *Neff v. Brady*, 527 S.W.3d 511, 523 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("'[T]he 'internal affairs doctrine' provides that, with respect to foreign entities, the laws of the entity's jurisdiction of formation govern its internal affairs.").

[334] Exh. 76 -- Daugherty's 3rd Amended Complaint in the Texas Lawsuit.(App. 881-936).

[335] Exh. 77 – Texas Lawsuit Final Judgment.(App. 937-973).

[336] *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 927 (Tex. 2011); *Shelby v. City of El Paso*, 577 F. App'x 327, 332 (5th Cir. 2014).

[337] *Id.* (quoting *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011)).

004491

knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff."[338] Here, HERA alleges an underlying wrong -- that Defendants knew they were stripping HERA's assets and wrongfully allocating expenses, leaving HERA insolvent.[339] HERA also alleges that Defendants concealed their wrongful acts to deceive HERA, i.e. they hid the wrongful corporate governance acts and asset stripping from HERA. As set forth throughout the FAC, Daugherty and then HERA (once Daugherty obtained ownership and control) exercised reasonable diligence and continuously requested documents from Defendants for years to no avail.[340] Due to Defendants' fraudulent concealment, HERA still did not discover the wrongful conduct until after March/April 2022, when Daugherty was granted control and ownership of HERA.

## B.   Res Judicata And Claim Splitting

### 1.   HERA's Claims Are Not Precluded by Res Judicata or Claim Splitting

146.   Defendants cannot rely on res judicata or claim splitting to avoid HERA's claims, which neither HERA nor its privies have prosecuted or are prosecuting against Defendants.

147.   *Delaware I* is stayed pending the conclusion of Highland's bankruptcy proceedings:

> On the morning of October 16, 2019—the third day of trial—the defendants informed the Court that Highland Capital filed for bankruptcy. All proceedings against Highland Capital were automatically stayed, and the parties agreed that the rest of the First Delaware Action should also be stayed. Those proceedings remained stayed, and the trial record remains open.[341]

148.   Defendants' assertion that the "*Delaware I* Lawsuit further adjudicated claims arising from the 2016 Escrow Transfer, including those based on the formation and dissolution of the Escrow"—citing a *pre-trial* brief[342]—is nonsensical. The trial record is open. There is no

---

[338] *BP Am.*, 342 S.W.3d at 67 (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 888 (Tex. 1999); *Weaver v. Witt*, 561 S.W.2d 792, 793 (Tex. 1977)).
[339] *See* ¶¶ 111-122, *supra.*
[340] FAC ¶¶ 61, 63-64, 66, 71, 76, 95, 99, 132-136. *See also* ¶¶ 17-18, 64-69, 95, *supra.*
[341] *Daugherty v. Dondero*, 2023 WL 461112, at *2 (Del. Ch. Jan. 27, 2023) (footnotes omitted), *aff'd*, 307 A.3d 977 (Del. 2023).
[342] Highland Defendants' Motion to Dismiss at 46 (Doc. 112).

final judgment and thus it remains open and appealable. The absence of claims against any of Defendants in the stayed *Delaware I* case disposes of the claim splitting argument, which Defendants acknowledge can prevent a party "from *simultaneously* prosecuting multiple suits involving the same subject matter against the same defendants."[343] And the absence of a final judgment should dispose of res judicata.

149.    There is also a lack of privity. When Daugherty brought his claims, he was adverse to HERA, which was controlled by Highland, Dondero and the other Defendants and which had been found liable to Daugherty in the Texas Lawsuit. This is not a case where a stockholder sued a defendant and then the same stockholder caused his own company, which he was always in privity with, to file a subsequent suit, as Defendants claim.[344] HERA's claims here are based on information obtained by HERA after Dondero and his lackies were ousted and bear little resemblance to the claims Daugherty pursued before. Daugherty and HERA were not in privity at any time his claims were pending in *Delaware I.* The Second Circuit, for example, has "found privity where a party to a previous suit *was, at the time of the litigation,* acting as either a fiduciary or organizational agent of the person against whom preclusion is asserted."[345] The Court should follow that reasoning here and reject the argument that the current ownership and control of HERA by Daugherty and his affiliates means they were in privity in 2017. HERA has never had a fair chance to pursue its own claims, on its own behalf, against its former faithless fiduciaries. The *Delaware I* case provides no basis to bar HERA's claims.

150.    As for *Delaware II*, it is not pending against Defendants and thus not relevant to claim splitting. In support of their argument that *Delaware II* bars this case under res judicata, Defendants argue that there was a final judgment on the merits.[346] The case was dismissed under

---

[343] *Id.* at 41 (citing *Armadillo Hotel Group v. Harris*, 84 F.4th 623, 628 (5th Cir. 2023)) (emphasis added).
[344] *Id.* at 43 (Doc. 112).
[345] *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 185 (2d Cir. 2003) (emphasis added).
[346] Highland Defendants Motion to Dismiss at 47–48 (Doc. 112).

004493

Court of Chancery Rule 12(b)(6) and, say Defendants, "operates as an adjudication on the merits."[347] But the cases Defendants cite in support of their argument involved dismissals of prior cases "with prejudice."[348] *Delaware II*, however, was dismissed "without prejudice."[349] Defendants overlooked this disconnect between their authorities and the facts. "A dismissal without prejudice, while final, does not operate as *res judicata* with respect to a subsequent lawsuit on the same cause of action."[350] *Delaware II* provides no basis to bar HERA's claims.

151.    Finally, the Texas Lawsuit was not based on the 2013 Buyout or the 2016 Escrow Transfer,[351] as Defendants claim, and Daugherty and HERA were not then in privity (Daugherty won a judgment against HERA). Daugherty tried to bring claims about the faithless governance of HERA, but the defendants successfully precluded Daugherty from doing so. After the deadline to amend the pleadings, the Defendants produced over one million pages of documents and on November 13, 2013, Daugherty tried to amend his claims to challenge some of the 2013 transactions.[352] The Defendants responded that they "would be prejudicially forced into the untenable position of having to defend against new facts, claims, and theories with virtually no meaningful time before trial to develop their defenses through discovery or legally."[353] The judge denied Daugherty's motion to amend. It is unclear on what basis Defendants could possibly be asserting that the "Texas Lawsuit adjudicated claims arising from the 2013 Buyout, including those based on alleged facts regarding the buyout offer, the Third Amended LLC Agreement, the asset transfers to Highland, and the Assignment Agreement."[354] The trial record debunks

---

[347] *Id.* at 48 (Doc. 112).

[348] *Id.* at 48 n.261 (citing and quoting cases dismissed with prejudice) (Doc. 112).

[349] *Daugherty v. Dondero*, 2023 WL 461112, at *7 (Del. Ch. Jan. 27, 2023), *aff'd*, 307 A.3d 977 (Del. 2023) ("The dismissal of the Amended Complaint is without prejudice.").

[350] *J.L. v. Barnes*, 33 A.3d 902, 913 (Del. Super. Ct. 2011).

[351] Highland Defendants' Motion to Dismiss at 40 (Doc. 112).

[352] Exh. 116 – Daugherty's Motion for Leave to file Fourth Amended Complaint in the Texas Lawsuit (App. 2298-2541).

[353] Exh. 117 – Highland Defendants' Response to Daugherty's Motion for Leave to file Fourth Amended Complaint in the Texas Lawsuit at 18 (App. 2542-2626); Exh. 118 - Third-Party Defendants' Response to Daugherty's Motion for Leave to file Fourth Amended Complaint in the Texas Lawsuit (App.2627-2681).

[354] Highland Defendants' Motion to Dismiss at 45–46 (Doc. 112).

Defendants' argument.[355] Nor can Defendants seriously contend the escrow-transfer claims were adjudicated in the Texas Lawsuit—they arose from Defendants' misconduct *after* the Texas Lawsuit. The Texas Lawsuit provides no basis to bar HERA's claims.

### C.  Judicial Estoppel – 2016 Escrow Transfer

#### 1.    Highland Defendants

152.    Here again, Defendants mischaracterize the facts, testimony, and law to try and divert this Court's attention from the truth. Again, *Delaware I* and *II* were lawsuits brought by Daugherty to collect on his judgment in the Texas Lawsuit. This lawsuit is a claim by HERA for all of HERA's assets wrongfully transferred away by the Defendants.

153.    Defendants' argument fails for several reasons. First, the double recovery rule cited by Defendants is inapplicable and misconstrued in this case. The *Brookfield* case does state the double recovery rule in Delaware that "prohibits a plaintiff from recovering twice for the same injury from the same tortfeasor."[356]  However, Defendants misconstrue its application to this case. The *Brookfield* case does not say "in other words HERA and its sole member Daugherty cannot both be allowed to recover for the same claim." The *Brookfield* case was a derivative shareholder case, which is not the case here. Similarly, the same plaintiff recovering twice from the same tortfeasor does not exist in this case. In *Delaware I*, the plaintiff was Daugherty, individually, and the defendants were Highland, HERA, ERA and Dondero.[357] In *Delaware II*, the plaintiff was Daugherty, individually, and the defendants were Dondero, ERA, HERA, HAK/, Katz, Hurst, Ellington, Surgent and Leventon.[358] In the Bankruptcy, the debtor was Highland

---

[355] *See* Exh 76 – Daugherty's Third Amended Complaint in the Texas Lawsuit (App.881-936); Exh. 116 – Daugherty's Motion for Leave to file Fourth Amended Complaint in the Texas Lawsuit (App. 2298-2541); Exh. 117 – Highland Defendants' Response to Daugherty's Motion for Leave to file Fourth Amended Complaint in the Texas Lawsuit at 18 (App. 2542-2566); Exh. 118 - Third-Party Defendants' Response to Daugherty's Motion for Leave to file Fourth Amended Complaint in the Texas Lawsuit (App. 2627-2681); Exh. 119 -- Order Denying Daugherty's Motion for Leave to file Fourth Amended Counterclaim in Texas Lawsuit (App. 2682-2683); Exh. 77 - Texas Lawsuit Final Judgment (App. 937-973).
[356] *See Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1277 (Del. 2021).
[357] Exh. 6 - *Delaware I* Second Amended Complaint (App. 41-84)
[358] Exh.7 - *Delaware II* Verified Amended Complaint (App. 85-133).

and the creditor was Daugherty, individually.[359] In the present case, the Plaintiff is HERA, a limited liability company whose members are Daugherty and his affiliate Angry Horse Land, LLC. The Plaintiff here is not Daugherty, as incorrectly alleged by Defendants to be the sole member of HERA. The Defendants are obviously the named Defendants. None of the Prior Lawsuits have the same plaintiff trying to recover twice from the same tortfeasor. The injury in the Prior Lawsuits was for recovery of the Daugherty judgment entered in the Texas Lawsuit and further the Texas Lawsuit judgment was for breach of good faith and fair dealing regarding the implementation of the "lose-lose" clause in the Second LLC Agreement as opposed to this lawsuit which claims the corporate governance actions were invalid (notably HERA does not contest the legitimacy of the Second Amended LLC Agreement in this lawsuit). The injury in this case is for all the assets stolen from and expenses allocated to HERA by the Defendants. The tortfeasors, while there is some crossover, are not identical such that the double recovery rule does not apply.

154.    Second, HERA makes no claim to the monies that were supposed to be placed in escrow for Daugherty to satisfy the judgment he obtained in the Texas Lawsuit. Further, Daugherty has never made any claim to HERA assets other than those promised to be placed in escrow to satisfy <u>his</u> judgment in the Texas Lawsuit.

155.    Third, it was not until March 2022 and after that Daugherty and/or HERA even knew where the other HERA assets were that Defendants had transferred to Highland.[360] As such, there is no possible way for Daugherty to have made a previous claim to those assets in the Prior Lawsuits.

156.    Fourth, a review of the pleadings in the Prior Lawsuits shows Daugherty never made a claim for assets of HERA, other than those he was promised had been placed in escrow

---

[359] Exh. 10 -- Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith (App. 151-183).
[360] FAC ¶¶ 61, 63-64, 66, 71, 76, 95, 99, 132-136. *See* ¶¶ 17-18, 64-69, 95, *supra*.

to satisfy <u>his</u> judgment in the Texas Lawsuit.[361]  In fact, the pleadings reveal quite the opposite, as all relate to assets to satisfy collection of the judgment Daugherty obtained in the Texas Lawsuit.[362]  Defendants' cites to the record prove this fact explicitly when Daugherty testified in Delaware I "⌈t⌉hat if I won, I got the escrow assets. I would get what was set aside, up to what was set aside in the account."  This refers explicitly and solely to the funds in escrow the Defendants lied about setting up to satisfy the Daugherty judgment in the Texas Lawsuit. Daugherty made no claim to any other HERA assets other than what Defendants had promised had been set aside for him in the event he won the Texas Lawsuit, which he did, and which Defendants lied about setting aside.

157.    Fifth and finally, a settlement in the Highland Bankruptcy has no bearing on the Defendants in the present case, and Defendants provide no case law or evidence to the contrary.

158.    Since Daugherty has only ever made claims for the HERA assets that were supposed to be placed in escrow to satisfy <u>his</u> judgment in the Texas Lawsuit and since HERA has never made a claim as to those assets, Defendants' judicial estoppel argument fails as a matter of law.

### 2. Outside Attorneys Defendants

159.    HERA incorporates the previous arguments in the immediately preceding section, here. Additionally, the Outside Attorneys argue that HERA is judicially estopped because Daugherty's claims in the Prior Lawsuits are imputed to HERA citing the *Austin v. McNamara* case, which is inapplicable to this case. In *Austin v. MacNamara*, there was one individual who was the sole shareholder of an entity (and had complete control of the entity) who filed bankruptcy, did not disclose the debt in the bankruptcy, and tried to sue on that same debt later.[363]

---

[361] *See* Exh. 6 - *Delaware I* Second Amended Complaint (App. 41-84); Exh. 7 - *Delaware II* Verified Amended Complaint (App. 85-133); Exh. 10 -- Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith (App. 151-183).
[362] *Id.*
[363] *Austin v. McNamara*, No. 6:05-cv-247, 2007 WL 578498, (E.D. Tex. Mar. 30, 2007).

The Court held that because the plaintiff asserted a position contrary to that asserted in the instant suit, the judicial estoppel doctrine applied.

160.    In this case, Daugherty was not the sole shareholder when these causes of action arose but was a minority shareholder, at best. According to Defendants, he was not a shareholder during any of the Prior Lawsuits (even though Daugherty owned 19.1%), and, as has been clearly established, never had any type of ownership and control over HERA until March/April 2022.[364] Judicial estoppel "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding."[365]  The purpose of the doctrine is to protect the integrity of the judicial process.[366]  Two elements must be established before a party is estopped under this doctrine: first, it must be shown that the position of the party to be estopped is clearly inconsistent with its previous one; and second, that party must have convinced the court to accept that previous position.[367]   Some factors that "typically inform" a court's decision as to the applicability of the doctrine include: whether a party's position is "clearly inconsistent" with its earlier position; whether the party succeeded in persuading a court to accept the earlier position; or whether the party seeking to assert an inconsistent position "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."[368]  "Judicial estoppel is particularly appropriate where . . . a party fails to disclose an asset to a bankruptcy court, but then pursues a claim in a separate tribunal based on that undisclosed asset."[369]

161.    Defendants cannot establish the two necessary elements for judicial estoppel. First, Defendants cannot show that HERA has made any claim in any previous proceeding

---

[364] FAC ¶¶ 60, 131; Exh. 10 – Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith (App. 151-183).

[365] *Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (quoting *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996)).

[366] *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

[367] *Hall*, 327 F.3d at 396 (citing *Ahrens v. Perot Systems Corp.*, 205 F.3d 831, 833 (5th Cir. 2000)).

[368] *New Hampshire*, 532 U.S. at 750-51 (citations omitted); *see Hall*, 327 F.3d at 399.

[369] *Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 600 (5th Cir. 2005).

(because it has not). As such, the claims HERA makes in this lawsuit cannot be inconsistent as they are being made for the first time by HERA. Further, even if Defendants could (and they cannot) impute Daugherty's Prior Lawsuits to HERA, the claims made by HERA in this lawsuit against these Defendants were never made in the Prior Lawsuits.

162.    Second, Defendants cannot show that HERA convinced any previous court to accept its position. Again, HERA never took a position in the Prior Lawsuits. Further, Defendants cannot show how HERA "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."[370]

163.    Two additional facts should be considered in this analysis. First, Defendants continue to wrongfully insist Daugherty is the sole member of HERA.[371]  As has been shown, that is not the case. Even if HERA is currently owned controlled by Daugherty and his affiliate, that control did not begin until March/April 2022.[372] Second, unlike in *McNamara*, HERA did not fail to disclose anything in the Prior Lawsuits — a primary basis for the *McNamara* courts' finding of judicial estoppel.

164.    Defendants cannot satisfy the requirements for judicial estoppel, and their motion to dismiss must be denied.

**D.  HERA's Claims Are Not Barred by the Judicial Proceedings Privilege**

165.    The Highland Defendants next argue HERA's claims that are premised, in part, on "the content of communications made in the course of judicial proceedings" are barred by the judicial proceedings privilege.[373]  According to the Highland Defendants, the privilege applies to "all intentional torts," regardless of the circumstances surrounding the claim.[374]  The Highland Defendants read the doctrine too broadly.

---

[370] *New Hampshire*, 532 U.S. at 750–51 (citations omitted); *see Hall*, 327 F.3d at 399.
[371] Exh. 78 – HERA's Legitimate Third Amended and Restated Company Agreement (App. 974–984).
[372] FAC ¶¶ 60, 131; Exh. 10 -- Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith (App. 151-183).
[373] Highland Defendants' Motion to Dismiss at 53–56 (Doc. 112).
[374] *Id.* at 54. (Doc. 112).

70

166.    The judicial proceedings privilege commonly applies to claims of libel and slander.[375]  The privilege "bars claims based on communications related to a judicial proceeding when the claimant seeks defamation-type damages."[376]  In other words, the privilege applies where the plaintiff is seeking damages based on ***reputational harm*** caused by a statement in a judicial proceeding.[377]

167.    Although Texas courts have expanded the doctrine to non-defamation causes of action, the purpose for extending is clear – to prevent a plaintiff from circumventing the policy behind the privilege by asserting the same claim "'under a different label.'"[378]  When claims are predicated on statements made in judicial proceedings, the doctrine does not apply when the plaintiff is not seeking relief akin to reputational or mental anguish damages.  The limitations of the doctrine was summed up in *Kyle v. Strasburger*:

> Fidelity is correct that the judicial privilege doctrine may, under certain circumstances, apply in non-defamation cases. But those circumstances are limited to cases in which a plaintiff, though asserting a non-defamation claim, seeks "defamation damages"—i.e., damages for loss of reputation and mental anguish. . . . To the extent Kyle's statutory claims are based on statements made in judicial proceedings, they do not seek relief akin to reputational or mental anguish damages—instead, they seek damages arising from Kyle's agreement to transfer her interest in the homestead to Mark.[379]

168.    The Highland Defendants do not point to any of HERA's claims that seek damages for reputational harm – because the FAC does not seek those damages. Consequently, the privilege does not apply to bar any of HERA's claims.

---

[375] *Landry's, Inc. v. Animal Legal Defense Fund*, 631 S.W.3d 40, 46 (Tex. 2021) (finding privilege "commonly applied in defamation cases").

[376] *Smith v. 2005 Tower LLC*, No. 09-22-00350-CV, 2024 WL 3616470, at *9 (Tex. App.—Beaumont Aug. 1, 2024, pet. denied).

[377] *Doe v. Cruz*, 683 S.W.3d 475, 493 (Tex. App.—San Antonio 2023, no pet.); *Rose v. Walsh*, No. 05-22-00289-CV, 2022 WL 17750750, at *5 (Tex. App.—Dallas Dec. 19, 2022, no pet.); *Nath v. Baylor Coll. Of Med.*, No. 01-20-00401-CV, 2022 WL 1038372, at *5 (Tex. App.—Houston [1st Dist.] Apr. 7, 2022, pet. denied); *Howard v. Matterhorn Energy, LLC*, 628 S.W.3d 319, 333 (Tex. App.—Texarkana 2021, no pet.); *Deuell v. Tex. Right to Life Comm., Inc.*, 508 S.W.3d 679, 689 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("The judicial privilege applies to bar claims that are based on communications related to a judicial proceeding that seek defamation-type damages in name or in substance, i.e., damages for reputational harm.").

[378] *Bird v. W.C.W.*, 868 S.W.2d 767, 771-72 (Tex. 1994) (quoting *Doe v. Blake*, 809 F. Supp. 1020, 1028 (D. Conn. 1992)).

[379] No. 13-13-00609-CV, 2019 WL 1487357, at *9 (Tex. App.—Corpus Christi Apr. 4, 2019, no pet.).

### E.  HERA's Claims Are Not Barred by Attorney Immunity

169.    Attorney immunity is a more comprehensive affirmative defense that protects an attorney from civil liability than the traditional common law rule that a lawyer owes no duty of care to a third party by shielding lawyers for actions taken in connection to representing a client.[380] The policy behind this rule is that attorneys are to zealously fight for their client's interest and fear of liability in connection with representing a client would undercut this.[381] Furthermore, there are other mechanisms to punish lawyers who engage in improper conduct such as sanctions, disbarment, or other disciplinary proceedings.[382] The key inquiry for attorney immunity is whether the action was of "the kind of conduct in which an attorney engages when discharging [their] duties to [their] client" or if the actions are "entirely foreign to the duties of an attorney."[383] Courts again emphasize that the alleged wrongfulness of the conduct is not important as the inquiry for attorney immunity is the kind of conduct alleged.[384] Fraud on behalf of a client is protected but independently fraudulent conduct schemed with a client is outside the limits of attorney immunity.[385] Furthermore, even conduct taken on behalf of a client may not be protected if it is not an action involving the "uniquely lawyerly capacity of one who possesses the office, professional training, skill and authority of an attorney."[386] Following this long list of examples and various fact patterns outlining the contours of attorney immunity, the Texas Supreme Court summarized the limits of the doctrine as follows:

> [A]ttorney immunity protects an attorney against a non-client's claim when the claim is based on conduct that (1) constitutes the provision of "legal" services involving the unique office, professional skill, training, and authority of an attorney and (2) the attorney engages in to fulfill the attorney's duties in representing the client within an adversarial context in which the client and the

---

[380] *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015) (citations omitted).
[381] *Id.*
[382] *Id.* at 482.
[383] *Id.*
[384] *Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 76 (Tex. 2021).
[385] *Id.* at 77.
[386] *Id. See Landry's, Inc. v. Animal Legal Defense Fund*, 631 S.W.3d 40, 52 (Tex. 2021) (holding that a lawyer who repeated defamatory statements to the media was not protected from liability because the act of talking to the media and sharing those statements was not action unique to the lawyerly role).

004501

non-client do not share the same interests and therefore the non-client's reliance on the attorney's conduct is not justifiable.[387]

### 1.    Claims Asserted Against Hunton and Katz

170.    Hunton and Katz correctly assert that attorneys are absolutely immune from suit and liability to non-clients for any conduct within the scope of the representation of a client. However, attorney immunity does not apply to clients, including former clients, who may bring direct claims against their attorneys,[388] which is precisely the case here. As alleged in the FAC, Katz was a partner at Hunton, where he served as outside counsel to HERA.[389] Additionally, HERA alleges that Hunton and Katz prepared the Third Amended LLC Agreement **on behalf of HERA** on or about February 1, 2013, which (1) eliminated the purpose for which HERA was created, (2) eliminated the requirement of HERA to make cash distributions to preferred unit holders to cover pass-through tax obligations attributable to HERA, (3) eliminated members' rights to indemnification, (4) limited indemnification obligations to the discretion of the Manager (ERA) or the Initial Member (Highland Capital Management, LP), and (5) provided for broad indemnification to the Manager (ERA) and Dondero.[390] HERA further alleges that Hunton and Katz prepared an expense allocation on behalf of HERA, pursuant to which 93.4% of Highland's purported legal expenses related to the Texas Lawsuit to HERA.[391]  In fact, Katz represented in *Delaware I* that he and Hunton did represent HERA when he informed the court that HERA had incurred millions of dollars in legal expenses, including those from his firm.[392]  Hunton and Katz, themselves, purported to represent HERA in all of the Prior Lawsuits.[393]

---

[387] *Haynes & Boone, LLP*, 631 S.W.3d at 78 (emphasis in original).

[388] *Yaquinto v. Krage & Janvey, L.L.P. (In re Tex. E&P Operating, Inc.)*, Nos. 17-34386-sgj7, 19-03231-sgj, 2024 Bankr. LEXIS 1674, at *43 (Bankr. N.D. Tex. 2024) (citing *Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 78 (Tex. 2021)).

[389] FAC ¶ 36 (alleging Katz served as outside counsel to HERA while partner at Hunton Andrews Kurth).

[390] FAC ¶ 74; Exh. 63 – HERA Third Amended and Restated Company Agreement (App. 686-696).

[391] FAC ¶¶ 75, 77, 148, 154, 162, 170.

[392] FAC ¶ 133.

[393] FAC ¶ 230.

004502

171.    Hunton and Katz also represented HERA when they took actions in furtherance of the 2013 Asset Transfer. In 2022, HERA discovered that in January 2013, Hunton and Katz, among others, discussed, coordinated, prepared and reviewed documents prepared for HERA to execute the scheme to strip HERA of its assets for no value and transfer those assets to Highland for the benefit of Highland and the Highland Officers and Employees Group and the Defendant Trusts.[394] Also in 2022, HERA discovered that just prior to the Texas Lawsuit, Hunton and Katz colluded with other Defendants in December 2013 to manufacture false and misleading evidence that an escrow account was created to hold over $3 million to be paid to HERA upon final resolution of the Texas Lawsuit.[395] They also represented HERA when they participated in the 2016 Escrow Transfer. As HERA alleges, Hunton and Katz acted as outside counsel to HERA when they collaborated with others in December 2016 to transfer HERA's remaining assets to Highland for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.[396] And, they represented HERA when they double counted fees Daugherty had already paid to justify the taking of the Escrow Assets in December 2016.  Specifically, HERA alleges that Hunton and Katz caused redacted invoices for reimbursement to be produced in the Texas Lawsuit between Highland and Daugherty in 2014 for services performed on behalf of Highland. And then, after Daugherty paid over $3.1 million in December 2016 pursuant to wiring instructions by Katz/HAK, they represented that the same invoices were unpaid obligations for work performed on behalf of HERA in *Delaware II* commencing in 2017.[397]

172.    Even though these actions related to depositing funds into an escrow account, something attorneys do for clients, the act of pulling money out of the account after a verdict came down against their client is not part of the normal work an attorney does. In fact, the Texas Supreme Court cited approvingly in *Cantey Hanger, LLP*, the case of *Essex Crane Rental Corp. v.*

---

[394] FAC ¶ 175.
[395] FAC ¶¶ 178, 208, 315, 330.
[396] FAC ¶¶ 268, 353, 366.
[397] FAC ¶¶ 373, 374.

004503

*Carter*,[398] a case that very closely matches the facts of this case. In *Essex*, the plaintiff sued a defendant's attorneys for conspiracy in helping a judgment debtor avoid payment.[399] The trial court rendered summary judgment for the attorneys based upon their attorney immunity defense.[400] However, the en banc Court of Appeals in Houston reversed, holding that attorney immunity did not apply when the actions alleged were drafting fraudulent documents to help a client evade payment of a judgment.[401]

173.    Because Hunton and Katz represented HERA at all times during which they are alleged to have taken actions against HERA, the attorney immunity doctrine does not apply to bar HERA's claims. However, even if Hunton and Katz did not represent HERA during the time that the foregoing fraudulent conduct took place, attorney-immunity still does not apply to protect them. The attorney-immunity defense does not apply when an attorney personally participates in a fraudulent business scheme with his client,  because such acts are entirely foreign to the duties of an attorney.[402]  Thus, fraudulent conduct outside the scope of an attorney's legal representation of his client is also not protected.[403]  All of the foregoing acts taken by Hunton and Katz are fraudulent and fall outside the scope of their representation of their client. Accordingly, the attorney-immunity defense does not apply to bar HERA's claims against Hunton and Katz.

**2.    Claims Asserted Against In-House Attorneys (Ellington, Leventon, and Girard)**

174.    The In-House Attorneys are likewise not immune from suit.  The In-House Attorneys provided legal services to HERA allegedly pursuant to a Shared Services Agreement

---

[398] 371 S.W.3d 366 (Tex. App.—Houston [1st Dist.] 2012, no pet.).
[399] *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 371 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).
[400] *Id.* at 375.
[401] *Id.* at 382 (a lawyer "cannot shield his own willful and premeditated fraudulent actions from liability simply on the ground that he is an agent of his client.").
[402] *NFTD, LLC*, 631 S.W.3d at 77; *see also Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 482 (Tex. 2015) *Essex Crane Rental Corp.*, 371 S.W.3d at 382 (holding that attorneys were not immune from claims that they knowingly helped their clients evade a judgment through a fraudulent transfer).
[403] *Byrd*, 467 S.W.3d at 484.

75

or Blanket Agreement or Joint Defendant Agreement,[404] thus HERA was a client of the In-House Attorneys. The In-House Attorneys are alleged to have participated the following fraudulent acts in furtherance of a fraudulent business scheme with Highland, while simultaneously representing HERA (although Ellington, Leventon, Girard and Surgent invoked the privilege to avoid answering questions from Daugherty's counsel in the Prior Lawsuits):

1. Preparing the Third Amended LLC Agreement on behalf of HERA, which (1) eliminated the purpose for which HERA was created, (2) eliminated the requirement of HERA to make cash distributions to preferred unit holders to cover pass-through tax obligations attributable to HERA, (3) eliminated members' rights to indemnification, (4) limited indemnification obligations to the discretion of the Manager (ERA) or the Initial Member (Highland Capital Management, LP), and (5) provided for broad indemnification to the Manager (ERA) and Dondero.[405]

2. Preparing an Expense Allocation Agreement on behalf of Highland and HERA that reallocated 93.4% of Highland Capital's purported legal expenses related to the Texas Lawsuit to HERA for no consideration.[406]

3. Double allocating Highland's legal expenses to HERA.[407]

4. Purporting to provide legal services to HERA that were in actuality for the benefit of Highland to develop and execute a scheme to strip HERA of its assets and transfer them Highland for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.[408]

---

[404] FAC ¶¶ 53, 257, 305, 344, 357.
[405] FAC ¶ 74; Exh. 63 – Third Amended and Restated LLC Agreement (App. 697-699).
[406] FAC ¶¶ 75, 77, 213, 376; Exh. 64 –- Expense Allocation Agreement (App. 697-699).
[407] FAC ¶ 214.
[408] FAC ¶ 215.

004505

5. Participating in the creation of the Escrow Agreement and fraudulently switching out assets therein, to falsely represent in the Texas Lawsuit that HERA's assets were being safely held in escrow.[409]

6. Participating in the 2013 stripping of HERA's assets.[410]

7. Manufacturing false and misleading evidence that an escrow account was created to hold over $3 million to be paid to HERA upon final resolution of the Texas Lawsuit.[411]

8. Colluding with others to conceal the true value of the assets held in escrow.[412]

9. Participating in the 2016 assignment of substantially all of HERA's assets to Highland for the benefit of Highland, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.[413]

175. Because the In-House Attorneys committed the foregoing acts while representing HERA, attorney-immunity does not bar HERA's claims against them. However, even if the In-House Attorneys did not represent HERA during the time of that the foregoing fraudulent conduct took place, attorney-immunity still does not protect them.  The attorney-immunity defense does not apply when an attorney personally participates in a fraudulent business scheme with his client, because such acts are entirely foreign to the duties of an attorney.[414]  Thus, fraudulent conduct outside the scope of an attorney's legal representation of his client is also not protected.[415]  The foregoing acts are fraudulent and fall outside the scope of the In-House Attorneys' representation of their client.  Accordingly, the attorney-immunity defense does not apply to bar HERA's claims against the In-House Attorneys.

---

[409] Exh. 64 – Expense Allocation Agreement (App. 697–699).
[410] FAC ¶¶ 82–84. 173, 175, 211–212, 221, 263.
[411] FAC ¶¶ 178, 208, 222–223, 330.
[412] FAC ¶ 182.
[413] FAC ¶¶ 259–260, 267–269, 353; Exh. 66 –– Managers Written Consent for Assignment Agreement and Assignment Agreement as Exhibit A attached thereto (App. 703–711).
[414] *NFTD, LLC*, 631 S.W.3d at 77; *see also Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 482 (Tex. 2015) *Essex Crane Rental Corp.*, 371 S.W.3d at 382 (holding that attorneys were not immune from claims that they knowingly helped their clients evade a judgment through a fraudulent transfer).
[415] *Byrd*, 467 S.W.3d at 484.

004506

### 3.    HERA's Claims Based on Legal Services Provided to HERA are Not Barred Because of Assignment

176.    The Highland Defendants argue that HERA's claims based on legal services provided to it are barred because they were legal malpractice claims unlawfully assigned to Daugherty.

177.    First of all, the claims belonged to and were owned by HERA. Those claims are still owned by HERA. What was assigned was any interest Highland held in HERA, the entity, to Daugherty. Ownership of the claims was not assigned. They were owned by HERA before the Bankruptcy Settlement Agreement, and they are still owned by HERA today.

178.    While Texas law holds assignments of legal malpractice claims void as contrary to public policy, it also holds that if such an assignment is void, the right to bring the action reverts to the assignor.[416]  Here, the right belonged to HERA and still belongs to HERA.

179.    HERA's claims based on legal services were not improperly assigned to Daugherty, and they are not barred.

### 4.    HERA's Claims Against Attorneys are Not Improperly Fractured

180.    Defendants further argue that HERA's claims against the attorneys are barred by the anti-fracturing rule. The anti-fracturing rule prevents legal-malpractice plaintiffs from opportunistically transforming a claim that sounds *only* in negligence into other claims.[417] While it is true that when the gist of the complaint is that the attorney failed to exercise the degree of

---

[416] *Camp v. RCW & Co.*, No. H-05-3580, 2007 U.S. Dist. LEXIS 32596, at *19 (S.D. Tex. May 3, 2007) (citing *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 400 (Tex. App.—Houston [14th Dist.] 1997, writ dism'd by agr.) (voiding an assignment of a malpractice action, but holding an assignor who participated in the appeal could prosecute his claims against the attorneys on remand)); *see also* 7 WILLISTON ON CONTRACTS § 15:5 (4th ed. 1999) ("If the assignment or conveyance is champertous, it does not destroy the assignor's right; the assignor may still prosecute the claim in his own name.").

[417] *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 189 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *Burrow v. Arce*, 997 S.W.2d 229, 237–47 (Tex. 1999) (holding that, although a negligence claim fails if client suffers no damages, clients still may obtain fee forfeiture as remedy under their breach-of-fiduciary-duty claim, even in absence of damages); *Latham v. Castillo*, 972 S.W.2d 66, 69–70 (Tex. 1998); *Spera v. Fleming, Hovenkamp & Grayson, P.C.*, 25 S.W.3d 863, 872–73 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (holding that fact issue precluded summary judgment as to breach-of-fiduciary-duty claim, even though negligence claim failed); *Jampole v. Matthews*, 857 S.W.2d 57, 61-63 (Tex. App.—Houston [1st Dist.] 1993, writ denied); *Estate of Degley v. Vega*, 797 S.W.2d 299, 303-04 (Tex. App.—Corpus Christi 1990, no writ).

care, skill and diligence that attorneys of ordinary skill and knowledge commonly possess and exercise, the claims may not be "fractured" into separate claims, the rule against fracturing does not preclude a party from asserting causes of action other than negligence against an attorney if the other claims are supported by the facts.[418]

181.    For example, if a claim focuses on the attorney obtaining an improper benefit, as opposed to him failing to adequately represent the client, then the claim may appropriately be classified as a breach of fiduciary duty claim.[419]  Or, where a plaintiff alleges an attorney made affirmative misrepresentations, it can assert a DTPA claim against that attorney, separate and apart from a negligence claim.[420] Furthermore, courts have also held that plaintiffs may assert fraud and breach of contract claims against their attorneys.[421]

182.    HERA's factual allegations support its claims against the Defendant attorneys, include, but are not limited to:

- Highland's legal counsel simultaneously purported to represent both Highland and HERA through a Shared Services Agreement, or Blanket Agreement or Joint Defense Agreement[422] and purported to execute a series of transactions to strip HERA of its assets.[423]

---

[418] *Riverwalk Cy Hotel Partners Ltd. v. Akin Gump Strauss Hauer & Feld, LLP*, 391 S.W.3d 229, 236 (Tex. App.—San Antonio 2012, no pet.).
[419] *Id.* (citing *Murphy v. Gruber*, 241 S.W.3d 689, 693 (Tex. App.—Dallas 2007, pet. denied); *Gibson v. Ellis*, 126 S.W.3d 324, 330 (Tex. App.—Dallas 2004, no pet.) (An attorney breaches his fiduciary duty when he "benefits improperly from the attorney-client relationship by, among other things, subordinating his client's interest to his own, retaining the client's funds, engaging in self-dealing, improperly using client confidences, failing to disclose conflicts of interest, or making misrepresentations to achieve these ends." (citing *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)); *Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*, 284 S.W.3d 416, 436 (Tex. App.—Austin 2009, no pet.).
[420] *Latham*, 972 S.W.2d at 69-70.
[421] *Jampole*, 857 S.W.2d at 61-63; *Estate of Degley*, 797 S.W.2d at 303-04 (holding that clients may assert common-law fraud claims against their attorneys separate from their negligence claims).
[422] Does not exist or has not been produced to HERA.
[423] FAC ¶ 73.

004508

- Ellington, Katz/HAK, and Hurst prepared an Expense Allocation[424] wherein 93.4% of Highland's purported legal expenses billed by their firms and others related to the Texas Lawsuit to HERA for no consideration.[425]

- Leventon, Ellington, and Katz/HAK fraudulently allocated over $14,000,000 in invoices from Hunton Andrews Kurth, Lackey Hershman and other firms to HERA.[426]

- Leventon backdated and circulated a series of bogus transactions to make them appear legitimate, through which Highland claims to have taken all of HERA's assets, leaving it insolvent.[427]

- Ellington and Leventon coordinated with Abrams & Bayliss to create the fake escrow of HERA's assets, when in reality, they were stolen.[428]

- Twenty days after executing the Escrow Agreement, Leventon and Girard changed the Escrow Agreement without Daugherty's knowledge.[429]

- Hurst lied in open court that HERA's assets were currently escrowed in the third-party escrow account.[430]

- HERA's own lawyers acted on behalf of Highland at HERA's expense while they stripped it of its assets and charged it for doing so.[431]

- Hurst directed HERA to file a Notice of Cash Deposit in Lieu of Supersedeas Bond and Affidavit Establishing Net Worth, stating that HERA had a negative net

---

[424] Exh. 64 – Expense Allocation Agreement (App. 697-699).
[425] FAC ¶ 75.
[426] FAC ¶ 77.
[427] FAC ¶ 79.
[428] FAC ¶¶ 82-83.
[429] FAC ¶ 84.
[430] *Id.*
[431] FAC ¶ 89.

worth of ($2,447,709) after fraudulently applying approximately $7,500,000 of
Highland's legal expenses to HERA.[432]

- In order to conceal the fact that the assets were never escrowed, Hurst directed
  HERA to object to Daugherty's discovery requests on the basis that it was
  harassing and argued that its cash deposit limited post-judgment discovery to
  HERA's net worth.[433]

- After Daugherty's judgment against HERA became final and non-appealable,
  Katz/HAK, Ellington, and Leventon began shutting down the escrow and
  assuring the remaining cash assets were swept from HERA to Highland.[434]

- Leventon concealed the existence of company-owned phones used by Dondero and
  Ellington, as well as a secret server used by many of the Defendants.[435]

- Ellington and Leventon concealed the existence of numerous January 2013 HERA
  actions by written consent.[436]

- Dondero testified that his managerial misconduct was orchestrated and dictated
  by counsel.[437]

- Ellington and Leventon concealed a secret server during discovery in the
  Delaware action.[438]

- In response to HERA's request for all of its casefiles, records and invoices, HAK
  responded that it represented HERA in connection with only two matters, "The
  first matter was opened on June 1, 2012, for which our records indicate we

---

[432] FAC ¶ 96; Exh. 3 — Third-Party Defendant HERA's Notice of Cash Deposit in Lieu of Supersedes Bond and
Affidavit Establishing Net Worth (App. 7-22).
[433] FAC ¶ 98.
[434] FAC ¶¶ 101-113.
[435] FAC ¶ 117.
[436] FAC ¶ 117.
[437] FAC ¶ 118.
[438] FAC ¶ 126.

represented Highland Management, LP ("Highland") and HERA [HERA], and for which only 1.6 hours of attorney time was recorded. We have located no files for this matter other than an electronic record of the recorded time." They made this statement despite Katz/HAK/DLAP representing before the Delaware court that HERA incurred millions of dollars in legal expenses, including those from his firm, making it insolvent. Said another way, after invoicing millions of dollars in legal fees that were allocated to HERA, HAK continues to conceal their conduct by claiming some privilege based on jointly representing Highland, Dondero and HERA.[439]

- Said another way, after invoicing millions of dollars in legal fees that were allocated to HERA, HAK continues to conceal their conduct by claiming some privilege based on jointly representing Highland, Dondero and HERA.[440]

- Ellington inserted himself as a board member for a three-day period to legitimize and effectuate the Dondero scheme to transfer HERA's assets to Highland for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.[441]

- Outside Legal Providers Group #1 (defined to include Hurst, Katz and HAK):

  o Assisted in developing, advised and assisted the implementation of the Dondero scheme to deprive Daugherty of his interests in HERA's assets in 2013 by stripping HERA of all its assets and transferring them to Highland for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.[442]

---

[439] FAC ¶¶ 133-34; Exh. 13 — Letter Response from HAK 5-25-2022 (App. 198-199).
[440] FAC ¶¶ 137-38.
[441] FAC ¶ 301.
[442] FAC ¶ 231.

o   Developed, advised and assisted in the implementation of the Dondero scheme to deprive Daugherty of his interests in HERA's assets in 2013 that transferred substantially all of HERA's assets to Highland for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.[443]

o   Prepared, revised and distributed certain documents designed to strip HERA of all its assets and assist the board members in shielding their liability.[444]

o   Failed to inform all of HERA's board members of their fiduciary duties to HERA regarding the buyout and subsequent transfer of assets in 2013 to Highland for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.[445]

o   Failed to protect HERA from having its assets stripped in 2013 and instead facilitating the transfer of those assets to Highland for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.[446]

o   Participated in the 2013 asset stripping scheme that left HERA insolvent and unable to pay its expenses and debts.[447]

o   Concealed the fact that their legal expenses incurred on behalf of Highland were allocated to HERA.[448]

---

[443] FAC ¶ 232; Exh. 29 -- Email from Surgent to Lackey, Aigen, Britain, Boyce, Honis, Ellington, Abrams and Dameris, dated January 9, 2013 (p. 2 of email string) re: DRAFT HERA DOCS (App. 349-366); Exh. 26 - Email from Annette Tyler to Surgent and attached invoice with 12-22-2012 entry regarding Dondero buyout issue (App. 341-343).

[444] *Id.* FAC ¶ 233.

[445] *Id.* FAC ¶ 234.

[446] *Id.* FAC ¶ 235.

[447] *Id.* FAC ¶¶ 236, 239.

[448] FAC ¶ 237; Exh. 64 – Expense Allocation Agreement (App. 697-699).

004512

- o Presented evidence of invoices they attributed to legal costs regarding the Texas Lawsuit and then later presented evidence while defending HERA in Delaware I to justify the transfer of HERA's assets to Highland pursuant to an expense allocation agreement[449] that allocated those same invoices to HERA despite knowing that Daugherty had already paid the invoices submitted in the Texas Lawsuit – double dipping their legal expenses and concealing that Daugherty had already reimbursed Highland for the invoices presented at the Texas Lawsuit.[450]

- o Collaborated to conceive and falsify misleading evidence that was presented to a judge and Texas jury to represent that certain assets transferred from HERA in April 2013 were held in an escrow account as of December 2013.[451]

- o Invoiced and/or allocated to HERA legal expenses that were actually for the benefit of Highland, including but not limited to unrelated third-party employee harassment and separation agreement matters, defense matters concerning Sierra Verde, Dondero and Okada, issues concerning their interests in the Acis Capital Bankruptcy, Lawsuit against the Wall Street Journal for unflattering articles, press spin communications, a multitude of discrete legal actions on behalf of Highland against Daugherty, and to pursue Dondero's various vendettas against former employees Terry and Daugherty, including but not limited to Highland's numerous failed attempts to have Daugherty held in contempt and incarcerated for fabricated violations of a since vacated injunction while almost $30,000 in

---

[449] *Id.*; FAC ¶ 238.
[450] FAC ¶ 238.
[451] FAC ¶ 240.

004513

donations were funneled to the presiding judge from Katz, Hurst, Ellington, Leventon, Sevilla, DiOrio and Crystal Jameson Woods (counsel at HAK and DLAP on behalf of HERA).[452]

- o Double allocated invoices to both HERA and Highland while representing in Delaware I and II that they were allocated to HERA.[453]

- Ellington, Leventon and Girard:

  - o Ostensibly providing legal services to HERA that were in actuality for the benefit of Highland to develop and execute a scheme to strip HERA of its remaining escrow assets and transfer them to Highland for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.[454]

  - o Wrongfully participated in and coordinated the 2016 assignment of substantially all of HERA's assets to Highland for the benefit of Highland, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.[455]

  - o Collaborated with outside counsel Katz/HAK, and Abrams & Bayliss in December 2016 to transfer HERA's remaining assets to Highland for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.[456]

- Hurst, Katz, HAK, and Brown:

---

[452] FAC ¶ 241.
[453] FAC ¶ 242.
[454] FAC ¶ 263; Exh. 29 -- Email from Surgent to Lackey, Aigen, Britain, Boyce, Honis, Ellington, Abrams and Dameris, dated January 9, 2013 (p. 2 of email string) re: DRAFT HERA DOCS (App. 349-366); Exh. 26 - Email from Annette Tyler to Surgent and attached invoice with 12-22-2012 entry regarding Dondero buyout issue (App. 341-343).
[455] *Id.* FAC ¶ 267.
[456] *Id.* FAC ¶ 268.

004514

o   Developed, advised and assisted the implementation of the Dondero scheme that transferred HERA's remaining assets from escrow in 2016 to Highland for the benefit of Highland, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington, and Honis.[457]

o   Failed to inform HERA's managers of their duties to HERA regarding the escrow assets and subsequent transfer of assets to Highland for the benefit of Highland, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis despite performing legal analysis of the previous board members' breach of fiduciary duty to HERA and its unit holders on December 2016.[458]

o   Collaborated with Ellington, Leventon and Girard in December 2016 to transfer HERA's remaining assets to Highland for the benefit of Highland, Dondero and his trusts, Okada and his trusts, Hunter Mountain, Ellington and Honis.[459]

o   Falsely represented to the Delaware Court that their invoices were allocated to HERA when they were being double allocated to both HERA and Highland.[460]

o   Caused HERA to incur unnecessary legal expenses by invoicing and/or allocating to HERA legal expenses that were for the benefit of Highland for matters concerning Josh Terry, the Acis Capital Bankruptcy, Highland claims against Daugherty including but not limited to numerous failed attempts to have Daugherty held in contempt and incarcerated for

---

[457] *Id.* FAC ¶ 272.
[458] *Id.* FAC ¶ 273.
[459] *Id.* FAC ¶ 274.
[460] FAC ¶ 275.

004515

fabricated violations of the an injunction for the benefit of Highland to prevent Daugherty from disclosing Highland's confidential information (the injunction was subsequently vacated pursuant to Daugherty's bankruptcy court approved settlement with Highland).[461]

o   Represented and invoiced HERA in the Texas Lawsuit with Daugherty for services provided on behalf of Highland. In 2014, Daugherty won a judgment in the Texas Lawsuit against HERA that was defended by Hurst and Brown for breach of good faith and fair dealing with regards to the implementation of the Second Amended LLC Agreement that resulted in an award of approximately $5 million in damages and interest against HERA. However, Hurst and Brown invoiced HERA for services rendered on behalf of Highland before and after the Texas Lawsuit.[462]

o   Participated in the 2016 remaining asset stripping scheme that left HERA insolvent and unable to pay its expenses and debts.[463]

o   Knew Daugherty had paid over $3.1 million in payment to Highland for its legal invoices that were subsequently presented in Delaware I as unpaid legal obligations on behalf of HERA. Additionally, invoices were being double allocated to both HERA and Highland while they represented to the Delaware Court that they were allocated to HERA.[464]

o   Charged excessive attorney's fees[465] and caused HERA to incur unnecessary legal expenses by invoicing and/or allocating to HERA legal expenses that were actually for the benefit of Highland, including but not

---

[461] FAC ¶ 276.
[462] FAC ¶ 277.
[463] FAC ¶ 278.
[464] FAC ¶ 279.
[465] FAC ¶ 370.

limited to unrelated third-party employee harassment and separation agreement matters, defense matters concerning Sierra Verde, Dondero and Okada issues concerning their interests in the Acis Capital Bankruptcy, Lawsuit against the Wall Street Journal for unflattering articles, press spin communications, a multitude of discrete legal actions on behalf of Highland against Daugherty including having Daugherty followed to London and recording his panel discussion at a conference, and to pursue Dondero's various vendettas against former employees Terry and Daugherty, including but not limited to Highland's numerous failed attempts to have Daugherty held in contempt and incarcerated for fabricated violations of a since vacated injunction while approximately $29,000 in donations were funneled to the presiding judge.[466]

o    Caused redacted invoices for reimbursement to be produced in the Texas Lawsuit between Highland and Daugherty in 2014 for services performed on behalf of Highland. And then, after Daugherty paid over $3.1 million in December 2016 pursuant to wiring instructions by Katz/HAK, they represented that the same invoices were unpaid obligations for work performed on behalf of HERA in Delaware II commencing in 2017. Additionally, invoices were being double allocated to both HERA and Highland while they represented in Delaware I and II that they were allocated to HERA.[467]

183.    These allegations clearly go far beyond allegations that the Defendant attorneys merely failed to exercise the degree of care, skill and diligence that attorneys of ordinary skill

---

[466] FAC ¶ 372.
[467] FAC ¶ 373.

and knowledge commonly possess and exercise. Thus, HERA's claims do not sound solely of

negligence. Accordingly, HERA's claims against them are not barred by the anti-fracturing rule.

### F. HERA Properly Pleads Counts 3 And 6 ("BOFD") Alleging Improper Benefit Received By In-House Attorneys

#### 1.    The FAC Satisfies the Requirements of FRCP 8

184.    A plaintiff fails to state a claim for relief under Rule 12(b)(6) when the complaint

does not contain "enough facts to state a claim to relief that is plausible on its face."[468] The

analysis begins with the court's consideration of whether a party has complied with Federal Rule

of Civil Procedure 8.[469]   Specifically, Rule 8 requires that a complaint (1) set forth a "short and

plain statement of the claim showing that the pleader is entitled to relief" and (2) be "simple,

concise and direct."[470] This serves two purposes. First, Rule 8 "eliminate[s] prolixity in

pleading and . . . achieve[s] brevity, simplicity, and clarity."[471] Second, the rule ensures "that

judges and adverse parties need not try to fish a gold coin from a bucket of mud."[472] As aptly

noted in *Garst*, "[f]ederal judges have better things to do, and the substantial subsidy of litigation

. . . should be targeted on those litigants who take the preliminary steps to assemble a

comprehensible claim."[473]

185.    The FAC contains 43 pages of factual background clearly and concisely outlining

the lengthy historical, factual and legal history that led to this action.[474] This is not a simple car

wreck or breach of contract case between two parties. This lawsuit is complex and involves

multiple parties over multiple years. Simply because the facts are lengthy does not make them

"repetitive, rambling, and references immaterial sources such as banking workbooks, Wikipedia

---

[468] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[469] *Id.* at 557 (noting that the Rule 12(b)(6)'s plausibility element derives from "Rule 8(a)(2)'s threshold requirement of that the 'plain statement' possess enough heft to [show] that the pleader is entitled to relief") (quoted cases omitted).

[470] FED. R. CIV. P. 8(a), (d).

[471] *Gordon v. Green*, 602 F.2d 743, 746 (5th Cir. 1979) (citation omitted).

[472] *Hall v. Civ. Air Patrol, Inc.*, 193 F. App'x 298, 299 (5th Cir. 2006) (quoting *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003)).

[473] *Lockheed-Martin Corp.*, 328 F.3d at 378.

[474] FAC ¶¶ 27-170.

searches, tax manuals, and irrelevant and non-binding authorities."[475] In fact, it is the exact opposite. The factual background is not repetitive. It clearly explains the tortured history leading to this action in as concise a manner as possible for the complexity and history of this case.

186.    Likewise, each of the 32 distinct causes of action contains allegations of specific acts attributed to specific defendants.[476] The FAC goes to great lengths to clearly identify which defendants are being sued for which acts.[477] The pleadings also satisfy the federal pleading standard that a complaint must be "plausible on its face" to survive a Rule 12(b)(6) motion.[478] Further, the FAC pleads "factual content that allows the court to draw the reasonable inference that the [other side] is liable for the misconduct alleged."[479]

187.    The Fifth Circuit defines shotgun pleadings (group pleadings) as those wherein the pleader "heedlessly throws a little bit of everything into his complaint in the hopes that something will stick."[480]  The *Ellman* court analysis is appropriate in this case. There, the plaintiff made several allegations against groups of defendants. The Court found that where plaintiffs have explained the basis for grouping the Defendants together when discussing their conduct with respect to the agreements, there was no group pleading.[481] Further, where plaintiffs explained the connection between defendants and the actions, there was no group pleading.[482]

188.    Moreover, as the Court is aware, Defendants, to this very day, have not provided HERA all of its records and documents[483] and as many courts have found, "[A]t this stage of litigation, before any discovery has been conducted, Plaintiffs cannot be expected to know the exact nature of the connections between the Defendants, and they do not need to know it in order

---

[475] *Thomas v. Dhi Home Mortg. Co.*, No. 3:22-CV-1236-B-BK, 2023 U.S. Dist. LEXIS 36774, at *12 (N.D. Tex. Feb. 8, 2023).
[476] FAC ¶¶ 171–473.
[477] *Id.*
[478] *Twombly*, 550 U.S. at 555.
[479] FAC ¶¶ 171–473; *Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009).
[480]  *S. Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986).
[481] *Ellman v. MDOffice LLC*, No. EP-21-CV-290-DB, 2022 U.S. Dist. LEXIS 59435, at *9 (W.D. Tex. Mar. 31, 2022).
[482] *Id.*
[483] FAC ¶¶ 58, 61, 63, 69, 76, 132-136.

Case 19-34054-sgj11   Doc 4266-40   Filed 06/23/25   Entered 06/23/25 11:49:42   Desc
Case 3:25-cv-01800-K   Document Ex 40   Filed 09/12/25   Page 1073 of 1195   PageID 40786
Case 3:23-cv-01084-K   Document 35-18   Filed 07/14/25   Page 1073 of 1195   PageID 40786

to meet the pleading standard."[484]  The Fifth Circuit has held that the federal pleading standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements."[485]  Here, HERA does not make conclusory or nonspecific claims against a group of unrelated defendants; it makes specific claims against a group of linked defendants.[486] Given the limited knowledge that HERA has at this point, the FAC contains as much specificity as possible and contains "enough fact to raise a reasonable expectation that discovery will reveal evidence" of the claimed breaches.[487]

189.    There is no doubt this Court can conclude what Plaintiff is alleging against the different Defendants. The FAC is nothing like complaints Courts have dismissed pursuant to FRCP 8, including for example, an employment discrimination and wrongful termination complaint wherein the allegations devolve into a litany of conspiracy-and fraud-related accusations that rely on the "haphazard combination[] of legal terms" and that are vague as to *who* is implicated in each specific action,[488] a complaint that named individuals in conspiracy who were not named as defendants, implicating unspecified "defendant" in intentional infliction of emotional distress claim for "all the above acts" and alleging general negligence against named and unnamed Defendants,[489]  and a complaint containing rambling, scattered arguments and factual allegations.[490] Unlike the foregoing, the FAC in this action satisfies the federal pleading standards of FRCP 8, such that Defendants' motions to dismiss must be denied.

---

[484] *Ellman*, 2022 U.S. Dist. LEXIS 59435, at *10.
[485] *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (internal quotations omitted).
[486] *See Ellman*, 2022 U.S. Dist. LEXIS 59435, at *10.
[487] *Morgan*, 335 F. App'x at 470.
[488] *See McZeal v. J.P. Morgan Chase Bank, NA*, 2014 U.S. Dist. LEXIS 92529, at *20 (E.D. La. July 7, 2014).
[489] *Jaser v. AT&T Servs.*, No. 3:18-CV-3429-B-BH, 2020 U.S. Dist. LEXIS 49341, at *14 (N.D. Tex. Mar. 23, 2020).
[490] *See Kulksdahl v. Loyola Univ. New Orleans*, No. 16-2990 Section "B"(3), 2016 U.S. Dist. LEXIS 106901, at *2 (E.D. La. Aug. 12, 2006); *see also Muniz v. Medtronic, Inc.*, 2014 U.S. Dist. LEXIS 36552, at *7-8 (W.D. Tex. Mar. 20, 2014).

004520

### 2.    The FAC Satisfies the Requirements of FRCP 9

190.    The FAC satisfies the particularity requirement of FRCP 9(b). Every cause of action specifically identifies which defendants are being sued for that particular claim, related to a specific action, *i.e.*, the 2013 stripping of Plaintiff's assets, and in that section provides the Court and Defendants with sufficient specificity, going so far as to directly quote from emails or documents.

191.    In considering a Rule 12(b)(6) motion, a court must determine whether the plaintiff has sufficiently stated a claim upon which relief may be granted.[491]  A well-pleaded complaint must allege facts upon which the claims are based and not be a conclusory recitation of the elements of a cause of action.[492]  A complaint must state sufficient facts such that the "claim has facial plausibility" and is not merely "possible."[493]  A plaintiff pleads a claim with facial plausibility when the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable."[494]  The complaint must allege sufficient facts to "give the defendant fair notice" of plaintiff's claims against the defendant.[495]  The alleged facts must be facially plausible such that the facts nudge the plaintiff's claims "across the line from conceivable to plausible."[496]  The court must view all facts in the light most favorable to the plaintiff.[497]

192.    When a complaint alleges fraud as part of its action, the plaintiff "must state with particularity the circumstances constituting fraud or mistake."[498] Courts interpret this rule strictly; a plaintiff that pleads fraud must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the

---

[491] FED. R. CIV. P. 12(b)(6).
[492] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).
[493] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[494] *Id.*
[495] *Twombly*, 550 U.S. at 555.
[496] *Id.* at 570.
[497] *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).
[498] FED. R. CIV. P. 9(b).

004521

statements were fraudulent."[499] "Rule 9(b) requires the complaint to set forth 'the who, what, when, where, and how' of the events at issue."[500]

193.    FRCP 9(b) does not, however, require the plaintiff at the pleading stage to put every single piece of evidence it has or might obtain during the discovery process in a pleading. This is not a summary judgment. Plaintiff is only required to meet the federal pleading standards, which the FAC does.

194.    Take Count Four as an example.[501] The FAC establishes the fiduciary duty against particular set of identified Defendants.[502] It provides specific examples of actions that constitute a breach of fiduciary duty in every paragraph.[503] Defendants cannot possibly argue that they do not know who Plaintiff is suing for breach of fiduciary duty or what Plaintiff claims those breaches are.

195.    This same analysis applies to Counts 7, 32, 16, 17, 18, 19 and 25.[504] Counts 21, 22, 23 and 24[505] are not fraud claims, but even as Defendants try to bootstrap them in under FRCP 9(b), they satisfy the pleading requirements.

196.    Simply put, this is not a trial nor a summary judgment motion. It is a specificity of pleading argument, and the FAC satisfies the federal pleading standards of FRCP 12(b)(6) and 9(b). Accordingly, Defendants' motions to dismiss must be denied.

197.    The Court must also consider the fact that Defendants have actively prevented the discovery of, and are currently in possession of, information and documents that would allow Plaintiff to plead more precisely. The FAC details Defendants' efforts to avoid turning over pertinent documents and information.[506]  To date, none of the Defendants, most importantly the

---

[499] *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008).
[500] *Id.* (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).
[501] FAC ¶¶ 225-244.
[502] *Id.*
[503] *Id.*
[504] FAC ¶¶ 270-280, 378-384, 385-390, 391-401, 438-445, 470-473.
[505] FAC ¶¶ 419-425, 426-428, 429-432, 433-437.
[506] FAC ¶¶ 61, 132-136.

Highland Defendants, with the exception of Abrams and Bayliss, have produced any documents relevant to this lawsuit.

198.    The Plaintiff cannot plead what it does not know. Courts have held that where there are facts solely within the possession of the defendants, it is premature to dismiss the claims under FRCP 9(b).[507]  Clearly, the Defendants, most notably the Highland Defendants, have more information that would assist the Court in its analysis making dismissal pursuant to FRCP 9(b) improper.

### G. HERA Properly Pleads Claims for Breach of Fiduciary Duty ("BOFD") in Count 1

#### 1.    Standing

199.    Article III of the Constitution extends the judicial power of the United States only to "Cases" and "Controversies."[508]  Standing to sue is part of the common understanding of what it takes to make a justiciable case.[509]  To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[510]

200.    To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[511]  Central to assessing concreteness is whether the asserted harm has a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts.[512]  To show traceability, a plaintiff must allege that his injury is connected with the conduct about which he complains.[513]  Meanwhile, to establish redressability,

---

[507] *R.P. Small Corp. v. Land Dep't, Inc.*, 505 F. Supp. 3d 681 (S.D. Tex. 2020).
[508] *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 450 (5th Cir. 2022).
[509] *Id.*
[510] *Id.*
[511] *Id.* at 451.
[512] *Id.*
[513] *Id.*

004523

a plaintiff must show a "substantial likelihood" that the requested relief will remedy the alleged injury in fact.[514]

201.    The Supreme Court has long recognized "that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded."[515]  More recently, the Supreme Court reemphasized in *Uzuegbunam*, that "every violation ⎡of a right⎤ imports damage."[516]  Likewise, the Fifth Circuit has held that "it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered."[517]

202.    HERA has suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" – the stripping of its assets by Defendants' acts and omissions.[518]  The FAC clearly alleges throughout that its injury, the stripping of its assets, is connected with the conduct about which it complains.[519]  Finally, the FAC shows a "substantial likelihood" that the requested relief – recovery of its assets or their value – will remedy the alleged injury.

203.    The irrefutable facts are that in 2012 HERA owned assets, by 2016 HERA did not own assets, and those assets were stripped away by Defendants' collective acts and omissions.  The FAC methodically establishes this stripping of assets.[520]  The FAC specifically identifies Defendants' acts and omissions (that it is aware of as of now).[521]  The loss of HERA's assets is clearly an injury in fact, and HERA has standing to bring claims related thereto.

---

[514] *Id.*
[515] *Marbury v. Madison*, 5 U.S. 137, 163 (1803) (quoting 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 23 (1765)).
[516] *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796, 209 L. Ed. 2d 94 (2021) (alteration in original) (quoting *Webb v. Portland Mfg. Co.*, 29 F. Cas. 506, 509, F. Cas. No. 17322 (C.C.D. Me. 1838)).
[517] *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007).
[518] FAC ¶¶ 66-79.
[519] FAC ¶¶ 66-79, 172-194, 196-208, 210-223, 246-268, 282-291, 294-302, 305-315, 318-330, 333-342, 344-353, 356-367, 379-383, 386-389, 392-401, 427, 430-436, 439-444, 447-450, 453-456, 465, 467, 469.
[520] *Id.*
[521] *Id.*

004524

### 2.     The Second Amendment to Second Amended LLC Agreement is Invalid

204.     The Highland Defendants' entire argument rests on the applicability of the invalid

Second Amendment to the Second Amended LLC Agreement. Article 5 of the Second Amended

LLC Agreement[522] clearly governed management of HERA on January 17, 2013,[523] which reads:

> Section 5.1 <u>General</u>. The Company shall be managed by a Board of
> Directors (the "***Board***"), which shall at all times consist of six members, consisting
> of the following individuals:
>
> R. Joseph Dougherty
> Patrick Boyce
> John Honis
> William L. Britain
> Amit Walia
> Ted Dameris
>
> . . . The Board shall act by majority vote (either by meeting or written consent),
> unless a greater percentage is expressly required under this Agreement. Each
> member of the Board shall serve until such member shall cease to hold Series A
> Preferred Units or until such member's death, resignation or removal from by
> [sic] Board by the unanimous affirmative vote of the remaining Board members.
> Any vacancies on the Board shall be filled by holder(s) of Series A Preferred Units
> elected by a majority of the remaining members of the Board, or if no such majority
> decision can be reached, by the holder(s) of the greatest number of Series A
> Preferred Units who are not then currently a member of the Board and who are
> willing to serve on the Board, or if no Series A Preferred Units remain
> outstanding, as determined by a majority of the remaining members of the Board.
>
> Section 5.2 <u>Delegation of Powers of the Board</u>. (a) Subject to Section 5.2(b)
> and ARTICLE XI hereof, the Board shall have the exclusive and complete
> authority, acting without the consent or approval of, or notice to, the Member and
> in the Board's sole and absolute discretion, to operate the Company and its
> business and to make all determinations or elections or to consent to any matter
> otherwise described in this Agreement. Neither the Member nor any other
> unitholder shall have the authority to remove any member of the Board.
>
>                (b) Notwithstanding any other provision of this Agreement or any
> provision of law that otherwise so empowers the Company, from and after the date
> of this Agreement and until the date on which all assets of the Company have been
> distributed in full, the Company shall not, and shall not have power or authority
> and shall not be authorized to, and the Board shall not, and shall not have power
> or authority and shall not be authorized to cause the Company to, take any of the

---

[522] Exh. 48 -- Second Amended and Restated Limited Liability Company Agreement of Highland Employee
Retention Assets LLC (App. 539-559).
[523] *See* ¶¶ 75-107, *supra*; FAC ¶¶ 66-79.

004525

following actions without the prior affirmative vote or written consent of at least 75% of the members of the Board:

. . .

(ii) be a party to any merger or consolidation or sell, transfer, assign, convey or lease any asset of the Company, or cause or consent to any merger or consolidation or sale, transfer, assignment, conveyance or lease of any assets of the Company;

. . .

(iv)    amend, alter, change or repeal any of the provisions of this Agreement;

(v)    incur or assume any indebtedness or obligations except for liabilities under Section 3.3, or cause the Company, to incur or assume any indebtedness or obligations except for liabilities under Section 3.3[.]

205.    Section 5.1 clearly states that a person cannot serve as a Board member once they no longer hold rights to their preferred units.[524] As previously established, the timeline of events of January 17-18, 2013, are critical to the fact that the Board actions taken on those dates are invalid. Honis did not submit his 12-page fax signatures for all of the documents below until January 18, 2013, at 4:33pm CST – after the other board members (except for Walia) had already signed their Transfer Agreements and relinquished all claims and rights to their HERA interests and Board positions.[525] The Board Resolution by Written Consent (Expense Payments and Reserves) -- effective date January 17, 2013 – Honis and Walia did not vote on this and, pursuant to Section 5.1, there was no majority vote approving same.[526] The Board Resolution by Written Consent (Transfer of Dougherty Units to Highland) -- effective date January 17, 2013 – Honis and Walia did not vote on this and, pursuant to Section 5.1, there was no majority vote approving same.[527] Board Resolution by Written Consent (Approval to Amend Article 5.1 to change # of

---

[524] *Id.*

[525] FAC ¶ 71; Exh. 50 - Honis 1-18-2013, 4:33p.m. CST fax signature pages from Hotel Palomar in San Francisco (App. 565-597).

[526] FAC ¶ 288; Exh. 53 - Written Consent of Board of Directors (Expense Payments and Reserves) (App. 611-615)

[527] FAC ¶ 288; Exh. 54 - Written Consent of Board of Directors (Transfer of Dougherty units to Highland) (App.

004526

board members to 5 and remove Walia as board member) -- effective date January 17, 2013 –
Honis and Walia did not vote on this and, pursuant to Section 5.1, there was not 75% required
to amend pursuant to Section 5.2(b)(iv) and no unanimous vote to remove Walia pursuant to
Section 5.1.[528]   Amendment to Second Amended LLC Agreement (Approval to Amend Article
5.1 to change # of board members to 5) -- effective date January 17, 2013 – Honis and Walia did
not vote on this and, pursuant to Section 5.1, there was not 75% required to amend pursuant to
Section 5.2(b)(iv).[529] Board Resolution by Written Consent (Approval to 2nd Amend Article VIII
for Indemnification and Liability) -- effective date January 17, 2013 – Honis and Walia did not
vote on this and, pursuant to Section 5.1, there was not 75% required to amend pursuant to
Section 5.2(b)(iv). In addition, no majority of preferred unit holders consented (only 33.235%
without Dougherty and Honis) to and ratified Article VIII amendment as required.[530]  Preferred
Unit Resolution by Written Consent (Approval to 2nd Amend Article VIII for Indemnification
and Liability) -- effective date January 18, 2013 – Only 33.235% of the preferred unit holders
voted on the morning of January 18, 2013 and thus no majority of preferred unit holders
consented (only 33.325% without Dougherty and Honis) to and ratified the Article VIII
amendment as required.[531] Second Amendment to Second Amended LLC Agreement (Amend
Article VIII for Indemnification and Liability) -- effective date January 18, 2013 – Honis (not
timely) and Walia did not vote on this there was not 75% required to amend pursuant to Section
5.2(b)(iv). In addition, no majority of preferred unit holders consented (only 33.235% without
Dougherty and Honis) to and ratified Article VIII amendment as required.[532]

---

616–620).
[528] FAC ¶ 288; Exh. 55 - Written Consent of Board of Directors (Approval to Amend Article 5.1 to reduce number
of board members to 5 and remove Walia as board member) (App. 621–626).
[529] FAC ¶ 288; Exh. 56 - Amendment to Second Amended LLC Agreement (App.627–633).
[530] FAC ¶ 288; Exh. 57 - Written Consent of Board of Directors (Approval to amend Article VIII for Indemnification
and Liability) (App.634–639).
[531] Id.
[532] FAC ¶288; Exh. 58 - Second Amendment to Second Amended and Restated Limited Liability Company
Agreement of Highland Employee Retention Assets LLC (Amend Article VIII for Indemnification and Liability)
(App. 640–645).

004527

206.    Without the requisite majority vote required by Section 5.1, all of these actions are invalid.

### 3.    HERA Sufficiently Alleges a Legally Cognizable Duty

207.    The FAC pleads significant and specific facts it discovered in 2022 that allow this Court to draw the reasonable inference that the Highland Defendants breached their fiduciary duty.  The Delaware standard to survive a motion to dismiss is "reasonable conceivability."[533] That is, when considering the motion, the Court must accept all well-pleaded factual allegations in the FAC as true, accepting even vague allegations in the FAC as well-pleaded if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and only deny the motion where the plaintiff could not "recover under any reasonably conceivable set of circumstances susceptible of proof."[534]

208.    The FAC clearly meets this pleading standard. While the Highland Defendants get caught up on the lowball offer issue, they completely ignore the well-pleaded factual allegations of the bigger issue – that in accepting the lowball offer, they were fully aware that they were stripping HERA of its assets. Specifically, the FAC alleges, among other acts:

- over $14 million in assets and distribution transfers to Highland (the value of which has since doubled at least);[535]
- missing assets from the original 2009 assignment that have not been accounted for[536];
- that the buyout scheme was a plan to strip HERA of its assets, transferring them to Highland and consequently the Highland Defendants;[537]
- hiding the parking garage deal value;[538]
- having absolutely no evaluation of the buyout and its effect on HERA;[539]
- even the Highland Defendants attorneys, upon whom they testified they were relying for advice regarding the buyout, admitted being scared of being deposed about the assets;[540]

---

[533] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).
[534] *In re Alloy, Inc.*, No. 5626-VCP, 2011 Del. Ch. LEXIS 159, at *21 (Del. Ch. Oct. 13, 2011).
[535] FAC ¶ 177.
[536] FAC ¶ 217.
[537] FAC ¶ 175.
[538] FAC ¶ 179.
[539] FAC ¶ 184.
[540] FAC ¶ 181.

004528

209.     These, along with the multitude of specific factual allegations in the FAC, clearly
establish that it is reasonably conceivable that the Highland Defendants breached their fiduciary
duties.

### 4.     Post-Resignation Conduct – The Nanny-Nanny-Boo-Boo Argument

210.     Delaware law is clear that once a director has resigned, that director may no
longer be held liable for the subsequent actions of the company's board.[541]    However, the
Highland Defendants misconstrue this argument. The actions of the Highland Defendants in
executing the January 17-18, 2013, documents constitute the breach of fiduciary duty itself in
that their actions not only purported to transfer control of HERA to Highland, but allowed the
future procedural machinations, a few months later, for the stripping of HERA's assets – a plan
they were fully aware of at the time of their actions.[542]

211.     As has been established, the actions of the board members immediately prior to
and on January 17-18, 2013, illustrate the buyout scheme to transfer control of HERA to
Highland and Dondero, who then immediately transferred all of HERA's assets to Highland.[543]
The Highland Defendants cannot participate in the buyout scheme to transfer control of HERA
to Highland (putting into place the exact plan that stripped HERA of its assets), then allow
Dondero to transfer the assets to Highland (assets the Highland Defendants all benefited from
financially) then argue, "Nanny-nanny-boo-boo, Dondero did that after we were gone, we have
no liability."

212.     In other words, the Highland Defendants had full knowledge of the buyout
scheme, such that their actions immediately prior to and on January 17-18, 2013, constitute a
breach of their fiduciary duties, because they knew those actions would give Highland control
over HERA and allow Dondero to strip HERA of its assets. They also knew they would benefit

---

[541] *Official Comm. of Unsecured Creditors of Integrated Health Servs. v. Elkins*, No. 20228-NC, 2004 Del. CH. LEXIS 122,
at *28 (Del. Ch. Aug. 24, 2004).
[542] FAC ¶¶ 66-69. *See* ¶¶ 75-107, *supra.*
[543] *Id.*

from those exact assets as partners and employees of Highland. HERA was damaged by all of these actions. The Highland Defendants cannot now hide and claim exoneration because Dondero transferred HERA's assets a mere 90 days after their actions allowed him to do so.

### 5.    Defendants Are Not Protected by the Business Judgment Rule

213.    Despite Defendants' thorough recitation of the doctrine,[544] the business judgment rule is not a basis to dismiss Count 1 for breach of fiduciary duties. "At the pleading stage, to change the standard of review from the business judgment rule to entire fairness, the complaint must allege facts supporting a reasonable inference that there were not enough sufficiently informed, disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority."[545]

214.    HERA's Complaint provides numerous examples of the Board Member Group failing to act on an informed, disinterested basis and in good faith. To start, Dondero's fingerprints are all over the acts of the Board Member Group. That, alone, rebuts the business judgment rule. A plaintiff rebuts the business judgment rule by showing "that: (1) a controlling stockholder stands on both sides of a transaction or (2) at least half of the directors who approved the transaction were not disinterested or independent."[546] The allegations of the Complaint establish that Dondero personally benefited from the wrongdoing of the Board Member Group, which he controlled.[547] The Board Member Group depended on Dondero for their livelihood and he was the sole decision maker of their annual bonuses which were always announced in February. . They did as he pleased, including stripping all of HERA's assets for his benefit.[548]

---

[544] Highland Defendants' Motion to Dismiss at 80-84 (Doc. 112).

[545] *In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 686 (Del. Ch. 2023).

[546] *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 990 (Del. Ch. 2014) (footnote omitted), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015).

[547] FAC ¶¶ 66, 69, 138, 173, 175, 191, 284, 287, 290-91, 295, 301, 381, 393.

[548] FAC ¶ 173; *see also, e.g., Id.* ¶ 174 (Dameris schemed with Dondero to strip HERA's assets for Dondero's benefit), ¶ 185 (Board Member Group controlled by Highland), ¶ 187 (Board Member Group "doing nothing to challenge, and in fact facilitating, the Dondero-led buyout by Highland Capital").

004530

215.    But apart from Dondero's control and interest, the Board Group Members themselves were conflicted because it was in their interest to empty HERA of its assets in favor of Highland, from which they derived their wealth and livelihood. Defendants are wrong that "nothing in Count 1 identifies any material conflict of interest that might have precluded any Board Member from fulfilling his duties to act in the best interest of the company." The Board Member Group pilfered HERA to benefit themselves, Dondero, and Highland.[549] That self-interested conduct is subject to entire-fairness scrutiny.

216.    Defendants' argument that their adoption of broad releases and indemnification to shield their past conduct[550] "cannot" amount to a breach of fiduciary duty because it was permitted by statute,[551] is incorrect. Defendants are confusing statutory compliance with fiduciary duties. "[I]nequitable action does not become permissible simply because it is legally possible."[552] Indeed, "Delaware courts have applied entire fairness review when directors or controllers have adopted exculpatory provisions to shield themselves from claims based on *past* conduct."[553] That is what the Board Group Members did here: attempt to shield themselves from their past misdeeds in any way potentially possible under the Delaware Code. They now have the burden of proving the entire fairness of their self-serving actions.

217.    Finally, if Dondero's control and the Board Group Members' own conflicts of interest were not enough to rebut the business judgment rule at the pleading stage (they are, by far), the irrationality and waste of their decisions to strip HERA of all its value supports an inference of bad faith. "To prevail on a waste claim or a bad faith claim, the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so

---

[549] FAC ¶ 188 (Board Member Group failed "to require abstention from conflicted board members who were simultaneously partners and employees of Highland Capital and stood to gain by acquiring the assets of Plaintiff at a substantial discount").

[550] *See, e.g.*, FAC ¶ 189.

[551] Highland Defendants' Motion to Dismiss at 82 (Doc. 112).

[552] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971).

[553] *Maffei v. Palkon*, 2025 WL 384054, at *23 (Del. Feb. 4, 2025).

egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests."[554] HERA has done so here.

### H. HERA Properly Pleads Its Claims for BOFD in Counts 2, 3, 5 and 6

#### 1. Counts 2, 3, 5 & 6 Are Sufficiently Pleaded to Survive a 12(b)(6) Motion

218.    Plaintiff refers the Court to its argument on standing above that applies here.[555] In addition, HERA alleges the requisite elements for breach of fiduciary duty claims against Dondero, individually, and the Employees. On January 17-18, 2013, the Defendants purported to execute corporate governance documents transferring control of HERA to Highland and Dondero. This is, in fact, exactly what happened.

219.    Regarding Counts 2 and 5, on February 1, 2013, Dondero created ERA to be the manager of HERA, still ignoring the fact that HERA only had, at that time, two legitimate board members, Walia and Daugherty by accession (although Daugherty was kept from knowing this at that time).[556]   Highland was the sole member of ERA and Dondero was presented as the President of both HERA and ERA at that time.[557]   That same day, Dondero acting as President and on behalf of Highland, without board approval and without authority for ERA to act as manager, executed the Third Amended LLC Agreement.[558]   Dondero, as President and on behalf of Highland, also executed the Expense Allocation Agreement, without board approval and without authority for ERA to act as manager, allocating 95% of Highlands legal expenses to HERA.[559]   Then, 60 days later, Dondero, as President and on behalf of Highland, executed the Assignment Agreement and Manager Resolution by Written Consent, without board approval and without authority for ERA to act as manager, assigning all of HERA's assets to Highland.[560]

---

[554] *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001).
[555] *See* ¶¶ 199-203, *supra*.
[556] FAC ¶74; Exh.71 - Metadata for Limited Liability Company Agreement of Highland ERA Management, LLC (App. 777-778).
[557] *Id.*
[558] *Id.*
[559] FAC ¶75; Exh. 64 - Expense Allocation Agreement (App. 697-699).
[560] FAC ¶78; Exh. 66 - Managers Written Consent for Assignment Agreement and Assignment Agreement as

220.    This series of transactions is laid out in pain-staking detail in the FAC and clearly satisfies the factors for the Court to determine at the motion to dismiss stage, that Dondero was acting through ERA. First, as has been discussed at length, the corporate formalities were not observed and, in fact, are invalid.[561]  Second, the dominant shareholder, Dondero through ERA and Highland, after the January 17-18, 2013, transactions, siphoned all of HERA's assets to Highland.[562]  Third, HERA was not acting independently and functioned as a façade for Dondero to do as he pleased with HERA's assets.[563]

221.    Moreover, courts look to actual control for corporate actions. An ultimate human controller who engages directly or indirectly in an interested transaction with a corporation is potentially liable for breach of duty, even if other corporate actors made the formal decision on behalf of the corporation, and even if the controller participated in the transaction through intervening entities.[564]  Breach of fiduciary duty is an equitable claim, and it is a maxim of equity that "equity regards substance rather than form."[565]  Liability for breach of fiduciary duty therefore extends to outsiders who effectively controlled the corporation.[566]  And because the application of equitable principles depends on the substance of control rather than the form, it does not matter whether the control is exercised directly or indirectly. The United States Supreme Court's explanation of how a controller exercised control in the *Southern Pacific* is pertinent where it held "[I]t is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation."[567]

---

Exhibit A attached thereto (App. 703-711).
[561] FAC ¶¶ 63-79. *See also Manichaen Cap., LLC v. Exela Techs, Inc.,* 759 F. Supp. 2d 477, 504 (D. Del. Ch. 2021).
[562] FAC ¶¶ 74, 75, 78. *See also Manichaen Cap., LLC,* 759 F. Supp. 2d at 504.
[563] *Id.*
[564] *Monroe Park v. Metro. Life Ins. Co.,* 457 A.2d 734, 737 (Del. 1983); *accord Gatz v. Ponsoldt,* 925 A.2d 1265, 1280 (Del. 2007) ("It is the very nature of equity to look beyond form to the substance of an arrangement.").
[565] *Id.*
[566] *See, e.g., S. Pac. Co. v. Bogert,* 250 U.S. 483, 488, 39 S. Ct. 533, 63 L. Ed. 1099 (1919); *Sterling v. Mayflower Hotel Corp.,* 33 Del. Ch. 293, 93 A.2d 107, 109-10 (Del. 1952).
[567] *S. Pac. Co. v. Bogert,* 250 U.S. 483, 39 S. Ct. 533 (1919).

222.    Likewise, Delaware courts have held individual defendants liable and the fact that another corporate entity was the formal corporate vehicle behind the transactions did not matter.[568] Delaware corporate decisions consistently look to who wields control in substance and impose the risk of fiduciary liability on that person.[569]

223.    The facts pleaded in the FAC, along with the referenced documents, make clear that Dondero and the Highland Defendants exercised complete control over HERA. The Highland Defendants' position that these transactions and Dondero's actions do not establish, at this stage in the proceedings, sufficient facts to survive dismissal, is simply a misstatement of the pleadings and the law.

I.    **The Second Amended LLC Agreement Does Not Exculpate HERA Board Members**

224.    Defendants make the argument that language in the Second Amended LLC Agreement exculpates all liability for breach of fiduciary duty is simply incorrect in fact and in law. First, Delaware law prohibits such blanket protection from liability. Where claims for breach

---

[568] *Keenan v. Eshleman*, 2 A.2d 904 (Del. 1938).

[569] *Kahn v. Lynch Commc'n Sys. Inc.*, 638 A.2d 1110, 1114 (Del. 1994) (holding that 43% stockholder that exercised actual control over subsidiary could be liable for breach of fiduciary duty); *Sterling*, 93 A.2d at 109-10 (citing "the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, in relation to the minority, a fiduciary position in dealing with Mayflower's property"); *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 Del. Ch. LEXIS 34, 2015 WL 580553, at *18 (Del. Ch. Feb. 11, 2015) (holding that individual who controlled a complex family of funds that acquired control of corporation could be personally liable to corporation's minority stockholders for breach of fiduciary duty); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 671 (Del. Ch. 2012) (applying corporate principles and holding that managing member of an LLC that was the managing member of a second LLC could be held personally liable for first LLC's breach of fiduciary duty); *Shandler v. DLJ Merch. Banking, Inc.*, 2010 Del. Ch. LEXIS 154, 2010 WL 2929654, at *15 (Del. Ch. July 26, 2010) (Strine, V.C.) ("Fairly read, the complaint alleges that DLJ, Inc. presided over a family of entities that it dominated and controlled, including the entities that together owned 74% of Insilco's equity. Using their unified power in a concerted way, DLJ controlled Insilco and directed its business strategy, including causing it to employ the DLJ Advisors. . . . I believe that Shandler has pled sufficient facts from which it can be inferred that the DLJ Funds were instrumentalities operated for the benefit of DLJ, Inc. and DLJMB."); *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 258 n.26 (Del. Ch. 2006) (holding that private equity firm could owe fiduciary duties to non-controlling stockholders when firm controlled corporation through intervening entities); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 Del. Ch. LEXIS 70, 2004 WL 1305745, at * 38-39 (Del. Ch. May 3, 2004) (holding that human controller of family of entities that executed an unfair squeeze-out merger was liable for breach of fiduciary duty in his capacity as majority stockholder); *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 14 Del. Ch. 1, 120 A. 486, 491 (Del. Ch. 1923) (Wolcott, C.) ("When, in the conduct of the corporate business, a majority of the voting power . . . join hands in imposing its policy upon all, it is beyond all reason . . . to take any view other than that they are to be regarded as having placed upon themselves the same sort of fiduciary character which the law impresses upon the directors in their relation to all the stockholders."); *Martin v. D.B. Martin Co.*, 10 Del. Ch. 211, 88 A. 612, 615, 102 A. 373 (Del. Ch. 1913) ("For the protection of the rights of stockholders of the dominant, or parent company, and for righting of wrongs done them by means of the control of the dominant, or parent, company . . . the latter are to be treated as agents of the former, or even as identical with each other.").

of fiduciary duty are alleged, certain violations fall within the coverage of exculpatory charter provisions authorized by 8 Del. C. § 102(b)(7).[570] Section 102(b)(7) allows for an entity to eliminate or limit "the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as director[.]".[571] Critically, Section 102(b)(7) provisions may not exculpate directors for their breaches of the duty of loyalty or "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law[.]"[572]

225.    Courts have held that where a complaint alleges or pleads facts sufficient to support the inference that actions were made in bad faith, knowingly or intentionally, the alleged violation implicates the duty of loyalty and may not be exculpated.[573] This statutory provision and the court's interpretation of the same bear directly in this case. The Highland Defendants, including Dondero, cannot rely on a company agreement as a shield to hide their intentional wrongful acts. As the Delaware Supreme Court noted in a case at the motion to dismiss stage "we do not affirm a dismissal unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[574] Similarly, HERA's claims should not be dismissed.

### J.    The Second Amended LLC Agreement Does Not Exculpate Employees

226.    Regarding Counts 3 and 6, the FAC pleads sufficient facts regarding the acts and omissions of the Employees[575] to establish breach of fiduciary duty claims. The same analysis applies to the Employees. This series of transactions is laid out in pain-staking detail in the FAC, outlining which Employees' acts and omissions as to which actions were committed to exert

---

[570] 8 Del. C. § 102(b)(7).
[571] In re GGP, Inc. Stockholder Litig., 282 A.3d 37 (Del. 2022).
[572] Id.
[573] Id.
[574] Id.
[575] Dondero, Okada, Collins, Leventon, Girard, Waterhouse, Boyce, Honis and Ellington.

004535

control over HERA.[576]  As set forth above, the ultimate human controller who engages directly

or indirectly in an interested transaction with a corporation is potentially liable for breach of

duty, even if other corporate actors made the formal decision on behalf of the corporation, and

even if the controller participated in the transaction through intervening entities.[577]  Breach of

fiduciary duty is an equitable claim, and it is a maxim of equity that "equity regards substance

rather than form."[578]  Liability for breach of fiduciary duty therefore extends to outsiders who

effectively controlled the corporation.[579]  And because the application of equitable principles

depends on the substance of control rather than the form, it does not matter whether the control

is exercised directly or indirectly. The United States Supreme Court's explanation of how a

controller exercised control in the *Southern Pacific* is pertinent where it held "[I]t is the fact of

control of the common property held and exercised, not the particular means by which or manner

in which the control is exercised, that creates the fiduciary obligation.[580]

227.    As noted previously, the Court must also consider the fact that the Defendants

have actively prevented the discovery of, and are currently in possession of, information and

documents that would allow Plaintiff to plead more precisely. The FAC details Defendants'

efforts to avoid turning over pertinent documents and information.[581]  To date, none of the

Defendants, most importantly none of the Highland Defendants and Employees, with the

exception of Abrams and Bayliss, have produced any documents relevant to this lawsuit.

228.    HERA cannot plead what it does not know. Courts have held that where there are

facts solely within the possession of the defendants it is premature to dismiss the claims under

---

[576] FAC ¶¶ 63-79.
[577] *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983); *accord Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007) ("It is the very nature of equity to look beyond form to the substance of an arrangement.").
[578] *Id.*
[579] *See, e.g.*, *S. Pac. Co. v. Bogert*, 250 U.S. 483, 488, 39 S. Ct. 533, 63 L. Ed. 1099 (1919); *Sterling v. Mayflower Hotel Corp.*, 33 Del. Ch. 293, 93 A.2d 107, 109-10 (Del. 1952).
[580] *S. Pac. Co. v. Bogert*, 250 U.S. 483, 39 S. Ct. 533 (1919).
[581] FAC ¶¶ 61, 132-136.

004536

FRCP 9(b).[582] Clearly, the Defendants, most notably the Highland Defendants and Employees, have more information that would assist the Court in its analysis making dismissal improper due to a failure to plead with more particularity.

### K. The Second Amended LLC Agreement Does Not Eliminate All Liability For Breach of Contract

#### 1.      Count 8 -- Breach of Contract Applies to HERA Board Members

229.      The Highland Defendants' argument that the HERA Board Members are not subject to a breach of contract claim is mystifying and contrary to the law. First, it is irrefutable that company agreements are enforceable contracts. Second, the HERA Board members are signatories to the Second Amended LLC Agreement.[583]   Third, the Second Amended LLC Agreement clearly lays out the HERA Board Members' contractual duties. Section 5.1 of the Second Amended LLC Agreement gives the Board and, by extension, each individual Board Member) the "sole right, power and authority to manage, direct and control all business and affairs of the Company."[584]   Thus, any action by the Company is an action by the Board and individual Board Members.

230.      The FAC pleads facts establishing which actions by the individual Board Members were in breach of their contractual duty.[585]   Notwithstanding the specifics laid out in the FAC, the Court need look no further than Section 2.1 of the Second Amended LLC Agreement where the Board and, by extension Board Members, had the following contractual duty: "The purpose of the Company is to receive and hold assets….to distribute…to certain employees…as the Board may from time to time determine in in order to create a retention initiative for such employees."[586]

---

[582] *R.P. Small Corp. v. Land Dep't, Inc.*, 505 F. Supp. 3d 681 (S.D. Tex. 2020).
[583] Exh. 48 - Second Amended and Restated Limited Liability Company Agreement of Highland Employee Retention Assets LLC.(App. 539-559).
[584] *Id.*, § 5.1.
[585] FAC ¶¶ 282-292.
[586] *Id* at § 2.1.

004537

This duty transposed against the irrefutable transfer of HERA's assets gives rise to a claim for breach of contract and, as a matter of law, survives a motion to dismiss.

> **2.      The Second Amended LLC Agreement Does Not Exculpate Defendants' Liability**

231.      In Count 8, HERA alleges that the Board Member Group breached the HERA Company Agreement in a number of ways, including by stripping HERA of its assets for no value and misallocating expenses and losses to benefit themselves and their controllers.[587]

232.      Defendants argue that Section 8.1 of the Second Amended LLC Agreement insulates them from liability for their bad-faith contractual breaches.[588] But Section 8.1 is not, as Defendants contend, an "exculpatory clause covering all Board Members that precludes liability for breach of contract."[589] Although an operating agreement may limit or eliminate liabilities of a member or manager "for breach of contract and breach of duties (including fiduciary duties),"[590] Section 8.1 of the Second Amended LLC Agreement contains no such language. It does not refer to the limitation of liability for breach of contract or even use the words "breach" or "contract."[591] A case cited by Defendants provides the specificity required, i.e., exculpation "for monetary damages for breach of any duty set forth in the Act."[592]

233.      As with other terms in the limited liability company agreement, provisions modifying liabilities must be drafted carefully to achieve desired results.[593] Defendants knew how to carefully craft language, they just chose not to in the Second Amended LLC Agreement. The

---

[587] FAC ¶¶ 281-92. HERA alleges that the Board Member Group breached §§ 2.1, 3.4, 3.5, 4.1, 5.1, 5.2, 5.6, & 11.1.
[588] Highland Defendants Motion to Dismiss at 91 (Doc. 112).
[589] *Id*..
[590] 6 Del. C. § 18-1101(e). The statute does not, however, insulate defendants from equitable remedies.
[591] Exh. 48 Second Amended LLC Agreement § 8.1(a). (App. 539-559).
[592] Highland Defendants Motion to Dismiss at 91.(Doc. 112)(citing *DG BF, LLC v. Ray*, 2021 WL 776742 (Del. Ch. Mar. 1, 2021). Also in *Ray*, the exculpatory provision referred to exculpation "to the maximum extent permitted under the Act," *Id*., at 10, but Section 8 of the Second Amended LLC Agreement does not refer to the Delaware LLC Act at all. It only refers vaguely to "applicable law" despite the fact that the drafters knew how to refer to the Delaware LLC Act because it is a defined term under the agreement, defined as the "Act.." Exh. 48 – Second Amended LLC Agreement at 10.(App. 539-559).
[593] Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 9.08[B][4].

004538

inadequacy of Section 8.1 as an all-encompassing safe harbor is highlighted by the triage Defendants later attempted in Section 8.1 of the Second Amendment to the Second Amended LLC Agreement (in violation of their fiduciary duties), where they expressly included exculpation "for breach of fiduciary duty."[594] The amount of time and effort Defendants went to examining this issue and trying to find a way around the law to exculpate themselves is astonishing, especially in ultimately failing to do so.[595]

234.    Defendants' brief does not address either the applicable statutory language or the absence of an express limitation of contractual liability in Section 8.1. Defendants' cherry-picked words "any act" cannot mean that the Board Member Group is insulated from any and all liability for any and all acts. If that were the case, the specific limitation of liability for "mistakes of judgment" would be superfluous because "mistakes of judgment" necessarily include some act or inaction. Courts do not interpret contracts to render terms meaningless.[596]

235.    Further, even if Section 8.1 were interpreted to limit liability beyond "mistakes of judgment," which it should not be, under Delaware law an exculpatory provision "may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."[597] It is exactly those types of bad-faith, non-exculpated breaches that HERA alleges here (e.g., stripping all of a company's assets for personal gain), so Section 8.1 could not provide the Board Group Members with the safe harbor they seek, even if it purported to limit all contractual liability for any act whatsoever, which it does not.

---

[594] Exh. 58 – Second Amendment to Second Amended LLC Agreement. § 8.1.(App. 640-645).

[595] FAC ¶¶ 64-67, 233; Exh. 115 – 08-05-2013 Email from Hough to Abrams and Surgent re: LLC fiduciary duties (App. 2296-2297); Exh. 25 – 11-28-2012 Email from Hough to Demaris and Abrams (App. 337-340); Exh. 27 – 12-30-2012 Email from Abrams to Dameris re: HERA memo (App. 344-346); Exh. 28 – 01-04-2013 email from Hough to Dameris and Abrams re: Buyout Steps (App. 347-348); Exh. 32 – 01-15-2013 Email from Surgent to Lackey, Aigen, Britain, Boyce, Dameris, Ellington, Katz and Hough re: HERA docs for review (App. 372-373); Exh. 29 – 01-09-2013 Email from Surgent to Lackey, Aigen, Britain, Boyce, Honis, Ellington, Abrams and Dameris, dated January 9, 2013 (pg 2 of email string) re: DRAFT HERA DOCS (App. 349-366); Exh. 42 01-14-2013 Email from Hough to Surgent, Dameris, and Abrams re: HERA (App. 467-512); Exh. 31 – 01-11-2013 Email from Hough to Surgent, Dameris and Abrams re: HERA (App. 369-372).

[596] *See In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019).

[597] 6 Del. C. § 18-1101(e).

### L. HERA Properly Pleads Its Claim for Breach of the Second Amended LLC Agreement

236.    As discussed above, Count 8 alleges that the Board Member Group breached the HERA Company Agreement in a number of ways.[598] Defendants contend, even under the plaintiff-friendly notice-pleading standard on a motion to dismiss, that HERA failed to state a claim for breach of Sections 3.4, 3.5, and 11.1.[599] Defendants do not challenge the adequacy of HERA's claim insofar as it relies on Sections 2.1, 4.1, 5.1, 5.2, or 5.6.[600]

237.    HERA stated a claim for breach of Section 3.4. According to Defendants, Section 3.4 "required HERA to establish and maintain capital accounts for each member" and "the Complaint pleads no facts to establish that HERA failed to establish and maintain those capital accounts."[601] To the contrary, HERA pleads that Section 3.4 was breached because the Board Member Group "participated and/or acquiesced to a scheme to misallocate expenses, net income, and net losses to individual member Capital Accounts."[602] Those are factual, non-conclusory allegations of conduct—i.e., the misallocation of expenses, income, and losses and related failure to maintain proper capital accounts—that are more than sufficient to meet the notice-pleading standard.[603]

238.    HERA stated a claim for breach of Section 3.5. Defendants contend that "the Complaint pleads no facts alleging … HERA failed to correctly allocate net income and loss among accounts."[604] But, as with Section 3.4, HERA pleaded those facts: the Board Group Members "participated and/or acquiesced to a scheme to misallocate expenses, net income, and net losses to individual member Capital Accounts."[605] Because the Board Member Group engaged

[598] FAC ¶¶ 281-92. HERA alleges that the Board Member Group breached Sections 2.1, 3.4, 3.5, 4.1, 5.1, 5.2, 5.6, and 11.1.
[599] Highland Defendants Motion to Dismiss at 93-95. (Doc. 112).
[600] Id.
[601] Id. at 93.
[602] FAC ¶ 285.
[603] Exh. 73 – Highland Financial Statements and Excel Spreadsheets.
[604] Highland Defendants Motion to Dismiss at 94. (Doc. 112).
[605] FAC ¶ 286.

111

004540

in that conduct, they failed to allocate Net Income and Net Loss pro rata in accordance with each

vested Series A Preferred Unit holder's Capital Account balance and therefore breached Section

3.5. This is not a conclusory allegation. To the contrary, it is an allegation of specific conduct

that resulted in the violation of an enforceable contract provision. Nothing more is required at

the pleading stage.

239.    HERA stated a claim for breach of Sections 11.1(a), (b), (d), (e), (f), (g), and (h).

Defendants argue that HERA failed to plead facts sufficient to state a claim for breach of Sections

11.1(b), (d), (g), and (h) (without challenging the sufficiency of the claim as to Sections 11.1(a),

(e), or (f)).[606] As for Section 11.1(b), Defendants argue that the claim is deficient because HERA

"does not plead that its assets were listed on Highland's books."[607] That is exactly what HERA

alleges: the Board Group Members "allow[ed] the Plaintiff['']s assets to be listed on the books

of another entity, Highland Capital's for the benefit of Dondero and his trusts, Okada and his

trusts, Boyce, Britain, and Honis."[608] The allegation relied on by Defendants (¶78) supports

HERA's allegation; it is not a basis for a defendant-friendly inference on a motion to dismiss.

Similarly, as to Section 11.1(d), Defendants argue that "HERA does not allege that Defendants

commingled company funds or assets."[609] But, again, HERA alleges that the Board Member

Group allowed HERA's "funds to be commingled with affiliates, Highland Capital's for the

benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis."[610] Defendants

next argue that, for Section 11.1(g), "HERA alleges no facts about the frequency of board

meetings."[611] HERA need not plead the frequency of board meetings with specificity to allege

that the Board Member Group "fail[ed] to hold regular board meetings."[612] That allegation is

---

[606] Highland Defendants Motion to Dismiss at 94. (Doc. 112).
[607] *Id.*
[608] FAC ¶ 291.
[609] Highland Defendants Motion to Dismiss at 94. (Doc. 112).
[610] FAC ¶ 291.
[611] Highland Defendants Motion to Dismiss at 94–95. (Doc. 112).
[612] FAC ¶ 291.

004541

sufficient to state a claim of breach of the obligation to "hold regular board meetings."[613] Finally, Defendants' argument that "HERA alleges no facts to suggest the company paid its liabilities and expenses with any funds other than its own," in violation of Section 11.1(h), should be rejected. HERA pleaded that the Board Member Group failed to limit HERA "to paying its own liabilities and expenses."[614] HERA also pleaded that its funds and assets were "purportedly used: (1) to pay for substantially all of Highland Capital's attorneys' fees incurred in the Texas Litigation pursuant to the Expense Allocation Agreement dated February 1, 2013; (2) to pay for all of Plaintiff's attorneys' fees incurred in in trying to wrongfully prevent Daugherty from receiving his share of the Plaintiff's assets; and (3) to transfer and register substantially all of its assets to Highland Capital for nothing."[615] Furthermore, HERA pleaded that Highland Capital purported to have loaned Plaintiff the cash necessary to repay its own legal expenses owed to Highland Capital because Plaintiff did not have sufficient funds after transferring all of its assets to Highland Capital back on April 30, 2013.[616] Having sufficient facts alleged, the entirety of Count 8 should proceed.

### M. HERA Properly Pleads Its Claim Against the Outside Attorneys for Breach of Contract in Count 15

240.    In Count 15, HERA alleged that Outside Attorneys breach their contract with HERA by (1) charging excessive attorneys' fees, (2) causing HERA to incur unnecessary legal expenses, (3) producing improper invoices in the Texas action, (4) making misrepresentations about those invoices, (5) sharing confidential information with other attorneys who did not represent HERA, and (6) misrepresenting to courts that over $14 million of invoices were properly allocated to HERA when they were in fact for the benefit of Highland.[617]

---

[613] Exh. 48 – Second Amended LLC Agreement, § 11.1(g).(App. 539-559).
[614] FAC ¶ 291.
[615] FAC ¶ 79.
[616] FAC ¶ 96.
[617] FAC ¶¶ 369-77.

241.    In support of their motion to dismiss Count 15, the Outside Attorneys argue that Count 15 is deficient because HERA did not identify the contract(s), identify breached provisions of the contract(s), the circumstances under which the contract(s) were formed, the parties to the alleged contract(s), or how the alleged acts constitute a breach of contract.[618]

242.    As an initial matter, the circumstances under which a contract is formed is not an element of a contract claim,[619] so that argument should be rejected. As for the other elements, the FAC satisfies the pleading standard. The contract, plainly, is the engagement letter between HERA and the various attorneys. Such a contract can be express or implied-in-fact.[620] In this case it was both. At the pleading stage, HERA is not required to plead its evidence. HERA has provided notice of its claim that its contractual counterparties, through their alleged acts, breached their contractual obligations to perform legal services for the benefit of HERA.

243.    Defendants' secondary argument that the claim should be dismissed because "HERA does not allege that any of these [individual attorneys] contracted directly with HERA" should also be rejected. At the pleading stage it is premature to determine all the terms of an implied-in-fact contract between HERA, its law firms, and its individual attorneys, but it is reasonable to infer that the financial harm imposed on HERA and the improper sharing of HERA's confidential information breached the attorneys' express and implied duties to represent the client in a loyal, professional, and competent manner. Defendants' authority that an individual attorney cannot collect fees from a client[621] does not mean that individual attorneys are immunized for their own acts in violation of an express or implied contract created between them and their client.

---

[618] Outside Attorneys' Motion to Dismiss at 47 (Doc. 107).
[619] *Id.* (quoting *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007)).
[620] *See Phillips v. Wilks, Lukoff & Bracegirdle, LLC*, 2014 WL 4930693, at *4 (Del. Oct. 1, 2014) ("This argument is also unpersuasive because an implied-in-fact, contract existed between the parties. The engagement letter was signed by Phillips, who owns and operates Wicks' End. Wicks' End was a third-party defendant in the Court of Chancery litigation at issue and was clearly represented by Bracegirdle.").
[621] Outside Attorneys' Motion to Dismiss at 47 n.241 (Doc. 107).

### N. HERA Properly Pleads Its Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing

#### 1.    Count 9

244.    The Highland Defendants argue that Count 9 of the FAC (breach of the implied covenant of good faith and fair dealing against the Board Member Group Defendants) should be dismissed because the allegations in Count 9 mirror those in Count 8 (breach of *contract* against the Board Member Group Defendants). Plaintiff concedes that to the extent the allegations in Count 9 overlap those in Count 8 which are governed by the contract, those allegations do not survive.[622]  However, the allegations in FAC paragraphs 301 and 302 of Count 9 regarding Ellington acting as a HERA board member[623] and the Board Member Group allowing Dondero to use Plaintiff's relationship with Daugherty to further his vendetta against Daugherty causing Plaintiff to incur unnecessary legal expenses and loss,[624] are not governed by the contract such that the implied covenant of good faith and fair dealing is invoked to "protect the spirit of the agreement."[625]  These acts are so "fundamental" that the parties did not feel a need to negotiate them.[626]

#### 2.    Counts 10, 11, 12, and 13

245.    Plaintiff withdraws Counts 10 and 13 (breaches of implied covenant of good faith and fair dealing) against the Highland Capital Officers and Employees group. However, Counts 11 and 12 allege breach of the implied covenant of good faith and fair dealing against Dondero/ERA. Dondero formed ERA in February 2013 as a Delaware limited liability company to act as the manager of HERA, also a Delaware limited liability company. Accordingly, their relationship is governed by Delaware law.

---

[622] Plaintiff withdraws the allegations contained in paragraphs 295-300 of the FAC.
[623] FAC ¶ 301.
[624] FAC ¶ 302.
[625] *Pierce v. Int'l Ins. Co.*, 671 A.2d 1361, 1366 (Del. 1996).
[626] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032-33 (Del. Ch. 2006).

246.     Dondero/ERA purported to act as the manager of Plaintiff under the Third Amended LLC agreement, which purported to give Dondero/ERA the authority to act in its sole discretion.[627] Delaware courts have recognized the necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled."[628] Regarding corporate entities, the implied covenant functions to protect stockholders' expectations that the company and its board will properly perform the contractual obligations they have under the operative organizational agreements.[629] Part of a manager's proper performance of its contractual obligations is to use the discretion granted to it the company's organizational documents ***in good faith***.[630] Thus, a manager may be liable for breaching the covenant when its conduct frustrates the "overarching purpose" of the contract by taking advantage of its position to control implementation of the agreement's terms.[631]

247.     Here, Plaintiff alleges that Dondero/ERA's conduct in stripping and transferring Plaintiff's assets thwarted the overall purpose of Plaintiff, which was to hold and receive assets.[632] In fact, the conduct was diametrically opposed to Plaintiff's overall purpose. It is clear from the agreement that had the parties thought that Dondero/ERA would strip Plaintiff of its assets, they would have agreed to prohibit such acts. Accordingly, Plaintiff is entitled to invoke the covenant of good faith and fair dealing against Dondero/ERA.[633]

### O.  HERA Properly Pleads Its Unjust Enrichment Claims

248.     Unjust enrichment allows a plaintiff to recover money or property given to a defendant when the defendant has obtained a benefit from the plaintiff by fraud, duress, or taking undue advantage, or to recover when a contemplated agreement is unenforceable, impossible, not

---

[627] Exh. 63 Third Amended LLC Agreement, Section 5.2.(App. 686-696).
[628] *See Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).
[629] *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008).
[630] *Bay Ctr. Apts. Owner, LLC v. Emery Bay PKI, LLC*, C.A. No. 3658-VCS, 2009 Del. Ch. LEXIS 54, at *21-22 (Apr. 20, 2009).
[631] *Dunlap*, 878 A.2d at 442.
[632] FAC ¶ 283.
[633] *Katz v. Oak Industries, Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986).

fully performed, thwarted by mutual mistake, or void for other legal reasons.[634]   Outside Attorneys argue unjust enrichment is not a stand-alone cause of action, but rather a theory of recovery.  However, the Texas Supreme Court has stated otherwise.[635]

249.    The Highland Defendants disingenuously argue that the FAC contains no allegation that one party has obtained benefit from another party by fraud, duress, or the taking of an undue advantage. The FAC alleges at least **50 times** that the various Defendants benefitted from their fraudulent acts, including, but certainly not limited to:

> Highland Capital and its partners, including Dondero, Okada, the Defendant trusts, Ellington, Boyce, Britain, Dougherty, Honis, Parker, had taken the tax benefits of these expenses with the assistance of Surgent, Leventon, Girard, Waterhouse, Swadley and Klos as though they were their own, despite knowing that the obligations to pay were allocated to Plaintiff.[636]

> The above described buy out and asset stripping scheme of 2013 was nothing more than a ruse to strip Plaintiff of its assets and its distributions for the benefit of Dondero, Okada, Boyce, Collins, Honis, Ellington, Leventon, Girard, and Waterhouse[.].[637]

> Plaintiff discovered in 2022 that in January 2013, Abrams and Bayliss, Boyce, Britain, Ellington, Dameris, Honis, Hurst, Katz and HAK, discussed, coordinated, prepared and reviewed documents prepared for Plaintiff to execute the scheme to strip Plaintiff of its assets for no value and transfer those assets to Highland Capital for the benefit of Highland Capital and the Highland Capital Officers and Employees Group and the Defendant Trusts.[638]

> The April 2013 assignment of substantially all of Plaintiff's assets to Highland Capital . . . benefit[ted] of Dondero and his trusts, Okada and his trusts, Boyce, Britain, and Honis.[639]

---

[634] *Burlington N.R.R. v. Sw. Elec. Power*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd*, 966 S.W.2d 467 (Tex. 1998); *Heldenfels Bros., Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992); *Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 513, 319 (Tex. App.—Austin 1992, no writ).

[635] *ED&F Man Biofuels, Ltd. v. MV Fase*, 728 F.Supp.2d 862, 869-70 (S.D. Tex. 2010); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683-85; *HECI Exploration Co. v. Neel*, 982 S.W. 2d 881, 885 (Tex. 1998) (holding that the two-year statute of limitations under TEX. CIV. PRAC. & REM. CODE § 16.003 applies to unjust enrichment claims); *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W. 3d 869, 869-70 (Tex. 2007) (reaffirming that unjust enrichment claims are governed by a two-year statute of limitations); *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 737 (Tex. 2001) (discussing limitations period for unjust enrichment claims).

[636] FAC ¶ 138.

[637] FAC ¶ 173.

[638] FAC ¶ 175.

[639] FAC ¶ 191.

Defendants wrongly acquired assets for their mutual benefit while simultaneously being unjustly enriched at the expense of Plaintiff. Defendants took these actions knowingly and as part of their conspiracy to unjustly enrich themselves at the expense of Plaintiff.[640]

Defendants themselves benefited from this unjust enrichment through the acquisition of the assets and the payment of their legal fees and salaries.[641]

Defendants accepted, used, and enjoyed the benefit of these assets[642]

250.    HERA's unjust enrichment claims survive.

## P. HERA Properly Pleads Defendants' RICO Violations

251.    HERA asserts a claim for violation of the federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against the Highland Capital Officers and Employees Group and the Board Member Group (together, the "RICO Defendants").[643] While the numerous events giving rise to this RICO claim are complex, the premise of the racketeering activity is simple: the RICO Defendants owed duties to HERA but instead of facilitating their duties, they looted the company for their own benefits and to punish its largest shareholder, Daugherty, then made numerous actionable misrepresentations and wire transfers to cover it up.

---

[640] FAC ¶ 394.

[641] FAC ¶ 400.

[642] FAC ¶¶ 396, 401; *see also e.g.*, FAC ¶¶ 197-98, 201-02, 207, 211, 215-17, 219, 221, 231-32, 234-35, 239, 241, 244, 247-48, 259, 263-65, 267-68, 272-74, 276, 280, 284, 287, 290-91, 295, 301, 307, 313, 320-21, 324-25, 329, 393, 473, etc.

[643] The Highland Capital Officers and Employees Group was employed by Highland, and most had been designated with a "Key Man," "Principal" and "Manager" role for Restoration Capital, HERA's largest investment. The Highland Capital Officers and Employees Group Defendants is comprised of **Dondero** (President and CEO of Highland; "Key Man", "Principal" and "Manager" of Restoration Capital (FAC ¶ 28)), **Okada** (CIO and EVP of Highland; "Key Man", "Principal" and "Manager" of Restoration Capital (FAC ¶ 29)), **Boyce**, **Collins** (head of HR at Highland until 2021, and tasked with acting on behalf of HERA's board (FAC ¶ 46)), **Honis**, **Ellington**, **Leventon** (ACG for Highland 2009-2020 (FAC ¶ 31)), **Girard** (counsel at Highland from 2011-2017 (FAC ¶ 33)), and **Waterhouse** (CFO at Highland until his termination in 2021 (FAC ¶ 45)). Each of the Board Member Group defendants held board of director and/or general counsel roles for Highland. Additionally, many held management roles with Highland's affiliates and subsidiaries. The Board Member Group is made up of **Boyce** (board member of HERA, partner at Highland and Head of Private Equity for HERA's interest in Restoration Capital (FAC ¶ 39)), **Britain** (board member of HERA and partner at Highland (FAC ¶ 40)), **Dameris** (board member of HERA and managing director of Highland (FAC ¶ 38)), **Dougherty** (board member of HERA and partner at Highland (FAC ¶ 43), **Ellington** (general counsel and other roles from 2010 until fired for cause in January 2021 (FAC ¶ 30)), and **Honis** (board member of HERA , Partner of Highland, "Key Man" of Restoration Capital (FAC ¶ 41)).

004547

252.     HERA was, at all relevant times, a wholly owned subsidiary of Highland Capital, created to retain and incentivize Highland Capital's employees.[644] Highland Capital's business investments soured during the 2008 financial crisis, and it began making risky business decisions to compensate.[645]

253.     In approximately 2012, the RICO Defendants began a series of maneuvers designed to strip HERA of its valuable assets and to transfer expenses of Highland Capital and its affiliates to HERA, without exchange for consideration.[646] This was done to benefit Dondero, the Board Members, and the Officers and Employees through financial buy-outs and purported indemnification in exchange for dereliction of their fiduciary duties.[647] The fraudulent scheme states a RICO claim, because the RICO Defendants used mail and wire fraud to deprive HERA of money, property, and other benefits and assets.[648]

254.     To assert a RICO claim, the FAC must allege sufficient facts to support an inference that "(1) a person [engaged] in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise."[649] The RICO Defendants do not dispute that the FAC satisfies elements (1) and (3) of a RICO claim, identifying them as "persons" who are "connected to the acquisition, establishment, conduct, or control of an enterprise."[650] Instead, the Motion focuses only on the two components of the second element, whether the FAC adequately alleges a pattern of racketeering activity. It does.[651]

---

[644] FAC ¶ 52

[645] FAC ¶ 51.

[646] FAC ¶¶ 65–69 (accepting low offers without exercising business judgment), ¶74 (indemnification), ¶¶75–77 (allocating unrelated expenses without consideration), ¶79 (transferring HERA's assets to Highland), ¶¶114–118, 140, 138.

[647] FAC ¶¶ 69–72, 75 114–118, 130.

[648] FAC ¶ 408. The actions taken in furtherance of the scheme are detailed above. *See* ¶¶ 75–107, *supra.* FAC ¶¶ 403–425. The RICO Defendants never address money laundering in their challenge to the FAC. For this reason alone, the Court can deny this portion of Defendants' Motions to Dismiss.

[649] *In re Burzynski*, 989 F.2d 733, 741–42 (5th Cir. 1993).

[650] *See generally* Defendant Motion to Dismiss (Doc. 111) at 102–05

[651] The RICO Defendants further argue that HERA fails to plead the existence of the required RICO enterprise under 28 U.S.C. § 1962(C). This is incorrect. To establish an association-in-fact enterprise, the relationship of the enterprise may be formal or informal, where the parties operate as a "continuing unit." *State Farm Mut. Auto. Ins. Co. v. Giventer*, 212 F. Supp. 2d 639, 650 (N.D. Tex. 2002). The enterprise (1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a

255.    A "pattern of racketeering activity" has two components: (1) predicate acts—the requisite racketeering activity, and (2) a pattern of such acts.[652] The first component — "racketeering activity" — consists of two or more predicate offenses, defined by the statute to include acts violating federal wire or mail fraud statutes.[653] To meet the second component these racketeering activities must form a "pattern" by being both "related to" and posing a threat of "continued criminal activity."[654] These acts cannot be "isolated events," but must be undertaken for "the same or similar purposes."[655]    "Relatedness" requires that the acts have the "same or similar purposes, results, participants, victims, or methods of commission."[656] "Continuity" requires showing "a closed period of repeated conduct or an open-ended period of conduct that 'by its nature projects into the future with a threat of repetition.'"[657] "A closed period of conduct may be demonstrated 'by proving a series of related predicates extending over a substantial period of time.'"[658] The FAC satisfies each component's requirement.

256.    "Though [the RICO pleading] burden requires specificity, a 'complainant need not, however, state all facts pertinent to a case to satisfy the requirements of Rule 9(b)."[659] As

---

continuing unit as shown by a hierarchical or consensual decision-making structure. *Id.*; *see also Boyle v. U.S.*, 556 U.S. 938, 947 (2009) (addressing the first element and holding that "if the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect. We recognized in *Turkette* that the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'"). Here, the enterprise is clear: each of the RICO Defendants was an acting representative of Highland Capital, one of its affiliates, or its investments. In those capacities, the RICO Defendants were hierarchically organized and held duties outside their intentional acts in furtherance of the RICO scheme. *County of El Paso, Tex. v. Jones*, 2009 WL 4730303, at *22 (W.D. Tex. Dec. 4, 2009) (association-in-fact sufficiently alleged where defendants' main objective was to secure contracts and agreements and did so through commission of predicate acts). Like *Jones*, the RICO Defendants' primary purpose was in their roles as officers, directors, managers, and "key men" of the affiliated businesses they represented. However, the allegations also demonstrate that—as permitted under *BP Am*—their concerted efforts across multiple layers of corporate structure to further the scheme demonstrate the existence of an "enterprise."
[652] *In re Burzynski*, 989 F.2d at 742.
[653] *Word of Faith World Outreach Center Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996).
[654] *Id.* (citations and quotes omitted).
[655] *Burzynski*, 989 F.2d at 742 (citations omitted).
[656] *H.J. Inc. v. Nw. Bell Tel., Co.*, 492 U.S. 229, 240 (1989).
[657] *Word of Faith*, 90 F.3d at 122 (quoting *H.J. Inc.*, 492 U.S. at 242).
[658] *Id.*
[659] *Cypress/Spanish Ft. I, L.P. v. Prof. Serv. Indus., Inc.*, 814 F. Supp. 2d 698, 711 (N.D. Tex. 2011) (citations omitted).

detailed below, the FAC sets out a detailed explanation of the RICO Defendants' scheme to defraud and adequately alleges a claim for RICO.

1. **The FAC States a Claim That RICO Defendants Committed Predicate Offense of Wire and/or Mail Fraud**

257.    The predicate act of wire fraud under 18 U.S.C. § 1343 requires: (1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud."[660] The elements of mail fraud under 18 U.S.C. § 1341 are the same but with "use of the mails."[661] An email, telephone call, or other message may satisfy the "wire communications" element.[662] The "scheme to defraud" element requires proof that the defendant "made some kind of false or fraudulent material misrepresentation."[663] Wire communications "that conceal or delay detection of an ended scheme can be considered essential to the scheme."[664] "It is not necessary that a wire transmission contain a falsehood for purposes of establishing wire fraud; rather, it must only promote the scheme in some manner."[665] "Even an interstate email that says 'Meet me at the bowling alley tonight' can serve as the necessary wire if the parties planned the fraud while bowling a few frames that evening."[666]

258.    "In alleging a RICO scheme involving mail or wire fraud, it is not necessary to assert that each defendant personally made fraudulent mailings or wires[.]"[667]

259.    The RICO Defendants principally rely on out-of-circuit precedent to argue that the mail and wire fraud allegations in the FAC are insufficient and raise the pleading standards.[668] *Efron* has not been adopted or cited in the Fifth Circuit. Instead, courts in this Circuit have ruled

---

[660] *United States v. Spalding*, 894 F.3d 173, 171 (5th Cir. 2018).
[661] *Id.*
[662] *See United States v. Hungerford*, No. 21-30359, 2023 WL 8179273, at *4 (5th Cir. Nov. 27, 2023), *cert denied*, 144 S. Ct. 1128 (2024) (emails); *Energium Health v. Gabali*, No. 3:21-cv-2951, 2022 WL 16842660, at *8 (N.D. Tex. Nov. 9, 2022) (phone calls, text messages, and emails).
[663] *Spalding*, 894 F.3d at 181.
[664] *Hungerford*, 2023 WL 8179273, at *4 (quotation omitted).
[665] *Megatel Homes, LLC v. Moayedi* (*Megatel II*), 2022 WL 2306949, at *5 (N.D. Tex. June 27, 2022) (quoting *United States v. Hoffman*, 901 F.3d 523, 546 (5th Cir. 2018)).
[666] *Id.*
[667] *Cypress/Spanish Ft. I*, 814 F. Supp. at 711.
[668] *See* Docket 112 at 103 (citing *Efron v. UBS Fin. Servs. Inc. of P.R.*, 96 F.4th 430, 439 (1st Cir. 2024)).

that where the wire transfer itself is not the fraudulent or false act, but is in furtherance of the scheme, plaintiffs are not required to plead the time and contents of each and every wire made.[669] The FAC satisfies this standard because the wire transfers and mailings were in furtherance of a larger scheme to defraud.

260. The FAC details allegations that the RICO Defendants committed false use of mail or wires including improperly transferring money via wire-transfer to hide assets, filing false tax returns,[670] making, approving, or authorizing false filings in multiple courts throughout the country, removing money from the accounts where it was held in escrow, sending false statements via the mail (including resolutions, court papers, letters, notices, and other documents), and using email to hide changes to an Escrow Agreement that had not been authorized or consented to.[671] In addition, the RICO Defendants regularly communicated about the scheme via email.[672] And they used email to hide evidence of their scheme.[673] This activity occurred across state lines, throughout Texas, Delaware, and as far as the Cayman Islands.[674] As a result, the FAC adequately alleges predicate acts.[675]

---

[669] *Cypress/Spanish Ft. I, L.P. v. Profess. Serv. Indus., Inc.*, 814 F. Supp. 2d 698, 711-12 (N.D. Tex. 2011); *Megatel II*, 2022 WL 2306949, at *5-6; *Commercial Metals Co. v. Chazanow*, No. CIV. A. 3:09-cv-818, 2009 WL 3853704, at *5 (N.D. Tex. Nov. 17, 2009); *see also Evercrete Corp. v. H-Cap Ltd.*, 429 F.Supp. 2d 612, 624 (S.D.N.Y. 2006).The RICO Defendants also rely on *Bonton v. Archer Chrysler Plymouth, Inc.*, 889 F. Supp. 995, 1002-03 (S.D. Tex. 1995) for the proposition that every specific act of mail fraud must be plead, including who mailed what and when. *See* MTD at 103-04. *Bonton* is not binding and relied on out-of-Circuit law from the Northern District of Illinois. *See Id.* at 1002 (citing *Landon v. GTE Communications Servs., Inc.*, 696 F. Supp. 1213, 1217 (N.D. Ill. 1988)). While *Bonton* has been cited for general RICO propositions in the Northern District of Texas, more recent case law from this District does not require pleadings that each defendant personally made fraudulent mailings or wires or the date, time, or contents of each fraudulent wire or mailing. *Cypress/Spanish Ft.*, 814 F. Supp. 2d at 711-12; *Megatel II*, 2022 WL 2306949, at *5-6.

[670] FAC ¶¶ 100, 289, 99, 381-383, 102-113, 183, 412, 461-463. While it is not presently clear whether the tax returns were submitted by wire or mail, the filing of the false tax returns state a claim for wire or mail fraud in the alternative.

[671] These allegations also satisfy the pleading standards for the predicate act of money laundering. Under 18 U.S.C. § 1956(a)(1)(A)(i), to state a claim for money laundering the FAC must plead the RICO Defendants: (1) knowingly conducting a financial transaction; (2) which involved the proceeds of an unlawful activity; and (3) with the intent to promote or further unlawful activity. *U.S. v. Dovalina*, 282 F.3d 472, 475 (5th Cir. 2001). The repeated intentional misrepresentations, fraud, transfers, and mishandling of the Escrow Transaction alone states a predicate offense for money laundering. *See* FAC ¶¶ 84-89.

[672] FAC ¶¶ 64, 67, 70, 77, 79, 102-113.

[673] FAC ¶¶ 84, 97.

[674] FAC ¶ 65(emails from Delaware to Texas), ¶ 84 (describing violation of Escrow Agreement in Texas Litigation), ¶¶ 88-89 (misrepresentations made in Texas Litigation), ¶ 100 (wire transfer to Cayman Islands account).

[675] *See Burzynski*, 898 F.2d at 742.

## 2.    The FAC Adequately Alleges a Pattern of Racketeering Activity

261.    The FAC adequately alleges that the RICO Defendants participated in a "pattern of racketeering activity" because the conduct alleged was "related" and "continuous." The RICO Defendants' fraudulent scheme to deprive HERA of valuable assets was undertaken for a common purpose over the course of several years.

### i.    The FAC Adequately Alleges the Predicate Acts Were "Related"

262.    "The relatedness inquiry focuses on the interrelationship of charged RICO predicates in order to ensure that a person is not 'subjected to sanctions for committing two widely separated and isolated criminal offenses.'"[676]  Here, the RICO Defendants' fraudulent conduct was part of a long-running scheme and attempted cover up, not a series of isolated incidents, thereby satisfying the relatedness element.

263.    To adequately plead a RICO conspiracy, the FAC need not assert "direct evidence" of the parties' agreement to participate. Instead, "proof of such an agreement may rest upon inferences drawn from relevant and competent circumstantial evidence, ordinarily the acts and conduct of the alleged conspirators themselves."[677] In *Megatel I*, the Court found that RICO allegations had been sufficiently alleged because the defendants had financial incentives to carry out the alleged scheme to defraud, participated in weekly meetings, were in constant contact about the pattern of racketeering, and agreed to participate in the scheme to the benefit of one Defendant and harm to the company.[678] Additionally, the pattern of racketeering activity was adequately plead by describing the ongoing scheme to defraud, over the course of several years.[679] Such is the case here.[680]

---

[676] *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 662 (S.D. Tex. 2016) (citations omitted).
[677] *Megatel Homes, LLC v. Moayedi* (*Megatel I*), 2021 WL 5360509, at *7 (N.D. Tex. Nov. 16, 2021).
[678] *Id.*
[679] *Id.* at * 6.
[680] *See also Commercial Metals Co. v. Chazanow*, 2009 WL 3853704, at *6 (N.D. Tex. Nov. 17, 2009) (finding complaint stated RICO claim that identified the misrepresentations, responsibility for misrepresentations, and what was obtained through misrepresentations, and sufficiently apprised each defendant of his role in the alleged scheme).

004552

264.   As with *Megatel I* and *Chazanow*, the FAC adequately alleges the contents of the misrepresentations, the role of each of the RICO Defendants in furthering the fraudulent scheme, and the harm that resulted.

265.   The RICO Defendants worked together and with their outside counsel to perpetuate their fraud on HERA over the course of approximately 10 years—from 2012 to 2012. They intended to defraud HERA of money and property as well as other benefits and assets.[681] Each of the actions taken over the course of the more than ten years was "related" because it was all part of the larger scheme to defraud HERA, not unrelated incidents targeting unrelated victims. Each of the actions described in the FAC is part of the long-running scheme to benefit the RICO Defendants at the expense of HERA:

- Imposition of the lose-lose clause in the 2012 Amendment, designed to punish both the company and any litigants who bring suits "related to" HERA;[682]

- The Board Members conspired to reject viable settlement options to HERA in favor of low ball offers by Dondero, and rejection of their fiduciary duties to consider the fairness of his offers for the purpose of impairing Daugherty's membership rights. They further attempted to forgive the board members' breaches of duties owed to HERA before they were discovered;[683]

- The RICO Defendants ignored their fiduciary duties by accepting low ball purchase offers to HERA and abdicating their duties to seek other, higher offers, discussing poison pills, standstills, or other corporate defense mechanisms to prevent takeovers, or even met to discuss the offer.[684] (Votes had not even been received by the time board positions had terminated.);

- Under the auspices of the Shared Services Agreement and a Blanket Agreement, Dondero — along with the other Highland Capital Officers and Employees — executed a series of transactions to strip HERA of its assets:

  o Eliminating HERA's corporate purpose while indemnifying Highland Capital and Dondero;[685]

---

[681] FAC ¶ 410.
[682] FAC ¶ 57.
[683] FAC ¶¶ 65–68.
[684] FAC ¶¶ 69–70.
[685] FAC ¶ 74.

004553

 o Allocating Highland Capital's legal expenses to HERA for no consideration and ultimately allocating over $14,000,000 in expenses to HERA for work performed on behalf of other entities;[686]

 o The Board Member Defendants rendered HERA insolvent by transferring all of its assets to Highland Capital;[687]

 o The RICO Defendants sanctioned, participated in, and authorized the Texas Litigation, brought by Highland Capital against Daugherty, which included strategies to manipulate documents and hide evidence and assets related to the HERA buyout, the escrow and the location of its funds ((detailing events, testimony, witness statements, and malfeasance by RICO Defendants), [688] (detailing scheme to terminate escrow and hide assets); [689] ("Dondero, through Highland Capital, engaged in an asset-stripping campaign designed to render [HERA] judgment-proof[.]"));[690]

 o The RICO Defendants further authorized and directed the transfer of assets from other Highland Capital Affiliates (including Highland Crusader Fund and Sentinel to Dondero, Okada, and Ellington controlled entities, and the allocation of the related litigation fees to HERA (despite HERA not being a party to said litigation) (describing Highland Crusader Litigation[691]; discussing transfers orchestrated by Dondero, Ellington, Leventon, Lucas, and others).[692]

- Highland Capital, for whom the RICO Defendants were agents, was found to have forfeited its attorney-client privilege because the acts of its counsel were found to be in furtherance of fraud. The RICO Defendants also concealed the existence of critical contracts and amendments, assets, and discoverable cell phones during litigation;[693] further, several of the RICO Defendants, in addition to Dondero, Ellington, Leventon, and Surgent, specifically authorized and directed these actions.[694]

- Engaging in breaches of fiduciary duties in their roles managing and operating HERA and its indirect assets resulting in financial windfalls where Dondero and Ellington received "facilitating fees" of $11 million and Katz, Hurst and their firms received contrived contingent fees;[695]

- Dondero continued to direct Highland Capital after his dismissal, with the knowledge and participation of Ellington, Leventon, and the other Highland Capital Officers and Employees;[696]

---

[686] FAC ¶¶ 75–77.
[687] FAC ¶ 79.
[688] FAC ¶¶ 81–99.
[689] FAC ¶¶ 101–113.
[690] FAC ¶ 130.
[691] FAC ¶¶ 155–162.
[692] FAC ¶¶ 162–170.
[693] FAC ¶¶ 114–118, 130.
[694] FAC ¶ 118.
[695] FAC ¶ 100.
[696] FAC ¶¶ 124–126.

004554

- Highland Capital and its partners, including RICO Defendants Dondero, Okada, Ellington, Boyce, Britain, Dougherty, Honis, and Parker, had received tax benefits as a result of the scheme, with the express intention to avoid passing any tax benefits to HERA holders other than Highland under the direction and assistance of Surgent, Leventon, Girard, and Waterhouse.[697]

266.    This scheme to defraud was undertaken with the intended purpose of benefitting the RICO Defendants, including negotiating their own individual buyouts rather than resolve key pending governance issues,[698] benefitting certain Defendants individually (*e.g.* board members negotiated their own buy-outs and manipulated timing of documents in their favor),[699] hiding malfeasance to avoid further consequences[700] and harming the remaining shareholders[701] (eliminating indemnification and distributions for pass-through taxes to all unit holders). Each of the RICO Defendants participated in the scheme to defraud through their intentional misconduct or through the breach of their fiduciary duties and abdication of any attempts at diligence.[702]

267.    The RICO Defendants argue that HERA fails to plead how any of the communications contributed to the stripping of HERA's assets, arguing without citation that this is "problematic."[703] Not only is this statement factually false, but it is also legally untrue. "Once membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme."[704] Each defendant is not required to engage in every aspect of the scheme to be held liable for the fraud.[705] And "a defendant may be liable for fraud without making any

---

[697] FAC ¶ 138.
[698] FAC ¶ 190.
[699] FAC ¶¶ 69–72.
[700] FAC ¶¶ 114–118, 130.
[701] FAC ¶ 75.
[702] *See, e.g., Toth Enterprises II, P.A. v. Forage*, 707 F. Supp. 3d 697, at *709-10 (W.D. Tex. 2023) (complaint sufficiently alleged RICO claims where it pled officers and directors regularly skimmed money, distributed false financial reports, sent checks and tax forms to members containing falsehoods). *See also TransFirst Holdings, Inc. v. Phillips*, 2008 WL 11350043, at *3-4 (N.D. Tex. July 3, 2008) (employee's honest-services fraud and breaches of fiduciary duty satisfied "scheme to defraud" element of wire fraud claim).
[703] Defendants' Motion to Dismiss at 104–105 (Doc. 112).
[704] *See United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009).
[705] *See Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 675 (5th Cir. 2015) (finding that although different defendants held

126

004555

fraudulent representations where he 'allegedly participated in the fraudulent transactions and reaped the benefits,' even by silent acquiescence."[706] Here, arguing whether any specific communication stripped HERA of value is missing the forest for a single leaf: it disregards the allegations that each of the communications the RICO Defendants identified[707] (as well as those that they did not identify) were part of a concerted effort to move, hide, destroy, or spend HERA's assets causing significant harm.

268.    As was the case in *Next Health*, the detailed pleadings about the repeated fraudulent acts connect each RICO Defendant to the fraudulent claims and raise an inference of their knowing participation in the scheme and each personally benefited from the scheme.[708] The FAC details the roles and responsibilities each RICO Defendant had and the detailed allegations of their wrongdoing.[709] The FAC further details exactly what each RICO Defendants' role meant, and how each participated in the larger scheme—from fraudulently altering legal documents[710] to breach of fiduciary duties[711] to allocation of expenses to HERA without consideration.[712] And the FAC lays out how each RICO Defendant benefited from the scheme.[713]

### ii.    The FAC Adequately Alleges the Predicate Acts Were "Continuous"

269.    In enacting RICO, Congress was concerned with long-term criminal conduct.[714] Pleading "continuity" of conduct is not subject to stringent pleading requirements but can be

---

different roles, each was part of a "cohesive unit" that engaged in fraud).

[706] *See United Healthcare Servs., Inc. v. Next Health, LLC*, 2021 WL 764035, at *5 (N.D. Tex. Feb. 26, 2021).

[707] *See* Defendants' Motion to Dismiss at 105 (Doc. 112).

[708] *See* 2021 WL 764035, at *6.

[709] *See* ¶ *251*, *supra*, and footnote cited therein (summarizing the roles and responsibilities each RICO Defendant held).

[710] FAC ¶ 84, whereby attorneys Leventon and Girard changed the Escrow Agreement without Daugherty's knowledge).

[711] FAC ¶¶ 171-195 detailing the breaches of fiduciary duties owed by the Board Member Group.

[712] FAC ¶¶ 75-78.

[713] *See, for example,* FAC ¶ 100 (Dondero and Ellington received $11M facilitating fee. This was from an investment ultimately controlled by Highland and Dondero and Ellington – HERA owned an interest in Restoration Capital Partners that owned an interest in Cornerstone Healthcare that reached a settlement for approximately $77 million against Nautic Partners with Katz and Hurst serving as counsel, ¶138 (Dondero, Okada, Ellington, Boyce, Britain, Dougherty, Honis and Parker accepted tax benefits and buy-out proceeds as part of the scheme), ¶166 (received attorney's fees), 173 (received distributions).

[714] *See H.J. Inc.*, 492 U.S. at 242.

done in a variety of ways.[715] The FAC satisfies the continuity requirement. "Continuity" under RICO is both a closed- and open-ended concept, referring either to a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition.[716] While there is no hard and fast rule regarding the number of months that a fraudulent scheme must occur to satisfy the "substantial period of time" requirement, courts have found it satisfied when the acts continued for thirty-two months.[717] The RICO Defendants' fraudulent scheme satisfies the "continuity" requirement because it lasted for several *years*, throughout multiple trials (including finding sanctionable conduct in multiple courts), and was not confined to a specific act, event, transfer, or litigation.[718]

270.    The RICO Defendants' scheme lasted more than a decade.[719] The long-standing practice of hiding assets, causing HERA to incur indemnification obligations for which it received no benefit, and allocating unrelated expenses to HERA occurred in multiple forums, several cases, and as a pattern and practice of general operations at Highland Capital under the leadership of Dondero, Okada and Ellington.[720]

271.    Indeed, unlike *Burzynski*, the fraudulent activity in this case was not limited to bad acts in relation to a single lawsuit or a single business transaction, but occurred across several court cases involving numerous parties, throughout business operations, shareholder communications, and a pattern and practice of transferring all value out of HERA without consideration and allocating all expenses to HERA, regardless of whether HERA, Highland

---

[715] *See Abraham v. Singh*, 480 F.3d 351, 355-56 (5th Cir. 2007).

[716] *See H.J. Inc.*, 492 U.S. at 241.

[717] *See Chazanow*, 2009 WL 35853704, at *7.

[718] *See Benhamou*, 190 F. Supp. 3d at 662 (complaint adequately alleged continuity where it occurred over the course of years, encompassed at least 51 individual victims with separate occurrences); *compare Burzynski*, 989 F.3d at 743 (finding no continuity where the activity was limited to the time period of the defense of a specific lawsuit which had concluded because it did not constitute or threaten long-term criminal activity).

[719] *See, e.g.*, FAC ¶ 448 (material false misrepresentations began in 2012-2013), ¶462 (in 2022 and 2023 full explanation for stripping the escrow account finally uncovered).

[720] *See, e.g.*, FAC ¶ 381 (summarizing all litigation where the RICO Defendants made or caused to be made false statements).

Capital, or another Highland Capital affiliate in fact incurred them. Thus, this case asserts the type of long-term criminal activity contemplated under RICO.[721]

### Q. HERA Properly Pleads Its Money Had and Received Claim

272.    The FAC sufficiently pleads facts and allegations showing that HERA's assets, both cash and non-cash, were stripped away to Highland. In the limited documentation HERA received post-2022, it has found financial statements that show distributions from Highland to specific named defendants. Importantly, HERA owned assets composed of cash and non-cash assets. The cash assets generated interest, and the non-cash assets generated cash upon their monetization and generated interest once converted to cash and then distributed. The attached spread sheets show these cashflow were itemized until HERA's assets were transferred to Highland circa April 30, 2013.[722] The distributions continued but going forward they came from the assets taken from HERA and assigned to Highland books. Dondero, Okada, and their trusts owned Highland from 2013 to 2020 and received comingled distributions in cash from the Highland distribution of HERA assets. In short, the Defendants moved HERA assets to Highland then to themselves, therefore holding money that in equity and good conscious belongs to HERA.

273.    Moreover, at the time of the Highland bankruptcy filing, any cash not already distributed to Dondero, Okada and their trusts and the non-cash assets on the books of Highland were trapped pursuant to the automatic stay and were subsequently held in the Claimant Trust for the benefit of creditors. Thus, some of the wrongfully transferred assets that were held up until the time of the bankruptcy stay qualify as money had and received but are now unavailable.

---

[721] *See Word of Faith*, 90 F.3d at 122.
[722] Exh. 73 – Highland Financial Statements and Excel Spreadsheets (App. 792-869).

004558

274.   The money had and received claim is properly pleaded and the documents (at least the ones HERA has access to) identify assets that are held wrongfully and who received those assets, thus making dismissal inappropriate.

**R.  HERA Properly Pleads Its Conversion Claim**

275.   Reliance on the Written Consent and other actions taken by the Highland Defendants prior to and on January 17-18, 2013, to claim the asset transfer was in HERA's best interest is disingenuous. The asset transfer was not in HERA's best interest, instead it was in the Highland Defendants' best interest because once the HERA assets were stripped away, they went to the benefit of the Highland Defendants.

276.   The FAC clearly pleads facts and allegations showing that HERA's assets, both cash and non-cash, were stripped away to Highland.[723]   In the limited documentation HERA received post 2022 it has found financial statements that show HERA owned assets composed of cash and non-cash assets. The cash assets generated interest, and the non-cash assets generated cash upon their monetization and then subsequently generated interest once converted to cash and then distributed. The attached spread sheets show these cashflow were itemized until HERA's assets were transferred to Highland circa April 30, 2013.[724] The distributions continued, but going forward they came from the assets taken from HERA and assigned to the Highland books. Dondero, Okada, and their trusts owned Highland from 2013 to 2020 and received comingled distributions in cash from the Highland distribution of HERA assets. In short, the Defendants moved HERA assets to Highland then to themselves, thus converting HERA's assets.

277.   Moreover, at the time of the Highland bankruptcy filing, any cash not already distributed to Dondero, Okada and their trusts and the non-cash assets on the books of Highland

---

[723] FAC ¶¶ 63, 65-79, 137-139, 288-291; Exh. 73 - Highland Financial Statements and Excel Spreadsheets (App. 792-869). *See* ¶¶ 75-107, *supra.*
[724] Exh. 73 – Highland Financial Statements and Excel Spreadsheets (App. 792-869).

were trapped pursuant to the automatic stay and were subsequently held in the Claimant Trust for the benefit of creditors. Thus, some of the wrongfully transferred assets that were held up until the time of the bankruptcy stay qualify as assets converted but are now unavailable.

278.    Simply put, the FAC sufficiently pleads the following:

- HERA had legal possession of its own assets

- The Highland Defendants through their invalid corporate documents and buy out scheme unlawfully and without proper authorization assumed and exercised control over the HERA assets;[725]

- HERA has demanded its assets back and Defendants refuse to return them.

279.    The conversion claim is properly pleaded and the documents (at least the ones HERA has access to), identify assets that are held wrongfully and by whom, making dismissal inappropriate.

**S.    HERA Properly Pleads Its TTLA Claim**

280.    Plaintiff sufficiently pleads a claim under the TTLA. First, it is undisputed that HERA had the possessory right to its cash and non-cash assets prior to 2013. Second, the Highland Defendants unlawfully transferred those assets to Highland for their benefit. Third, the loss of HERA's assets is the damage sustained as a result of the unlawful transfers. Highland Defendants argue that HERA's assets were used to pay for attorney's fees pursuant to an agreement between HERA and Highland and were thus transferred to Highland pursuant to the April 30, 2013, Managers Written Consent for Assignment Agreement and Assignment Agreement as Exhibit A attached thereto (signed by Dondero).[726]  First, as has been established, the April 30, 2013, Managers Written Consent for Assignment Agreement and Assignment

---

[725] FAC ¶¶ 63, 65-79, 137-139, 288-291. *See* ¶¶ 75-107, *supra*.

[726] Highland Defendant's Motion to Dismiss at 141 (Doc. 112); *see also* Exh. 66 - Managers Written Consent for Assignment Agreement and Assignment Agreement as Exhibit A attached thereto (App. 703-711).

004560

Agreement as Exhibit A attached thereto is invalid.[727]  Second, this "agreement," referred to by the Highland Defendants as a Blanket Agreement, Shared Services Agreement, Blanket Shared Services Agreement, Joint Defense Agreement or Affiliated Agreement, does not exist or, at the very least, has never been produced.

281.   Isaac Leventon testified in his deposition in Delaware I that Andrews Kurth provided legal services (and presumably the legal expenses associated therewith) to HERA through a Joint Defense Agreement.[728]  Leventon then testified that all expenses incurred by HERA from the Texas Lawsuit were covered by the Expense Allocation Agreement.[729]

282.   Ellington, who was Chief Legal Officer, General Counsel and Partner of Highland at the time of his deposition in Delaware I testified that he hired Gruber Hurst to represent HERA pursuant to an existing "shared services agreement or affiliated agreement."[730]  Ellington also testified that HERA agreed to pay Highland pursuant to the Expense Allocation Agreement.[731]

283.   Ellington also testified in the *Delaware I* trial that he provided legal services to HERA in his capacity as Chief Legal Officer and General Counsel of Highland pursuant to a shared services agreement.[732]  Ellington also refers to a blanket shared services agreement but cannot specifically identify same.[733]

---

[727] Exh. 66 – Managers Written Consent for Assignment Agreement and Assignment Agreement as Exhibit A attached thereto (App. 703-711). *See* ¶¶ 75-107, *supra*.

[728] Exh. 20 – Leventon deposition testimony in *Delaware I* Pg 190 line 12– Pg 193, line 11 (App. 308-308a).

[729] *Id. See also* Exh. 64 - Expense Allocation Agreement (App. 697-699).

[730] FAC ¶¶ 64–67, 70, 75-77, 79-82, 84-85, 117, 133, 135, 137; Exh. 22 - Ellington deposition testimony in *Delaware II* Pg 103, line 25– Pg 104, line 16 (App. 318).

[731] FAC ¶¶ 64–67, 70, 75-77, 79-82, 84-85, 117, 133, 135, 137; Exh. 22 - Ellington *Delaware II* deposition testimony Pg 102 line 9-18 (App. 318). *See also* Exh. 64 - Expense Allocation Agreement (App. 697-699).

[732] FAC ¶¶ 64–67, 70, 75-77, 79-82, 84-85, 117, 133, 135, 137; Exh. 23 - Ellington trial testimony *Delaware I* Pg 345 line 1- Pg 346 line 1 (App. 325-326).

[733] FAC ¶¶ 64–67, 70, 75-77, 79-82, 84-85, 117, 133, 135, 137; Exh. 23 - Ellington trial testimony *Delaware I*  Pg 362 lines 1-24 (App. 327).

284.    Dondero testified in the *Delaware I* trial that he relied on the Outside Attorneys for advice on the documents and strategy that HERA owed $9,500,000 to Highland for services.[734]

285.    Leventon testified in the *Delaware I* trial that he provided legal services to HERA through a shared services agreement.[735]  Leventon also testified that Katz, HUK, Hurst and Abrams & Bayliss all provided legal services to HERA through a joint defense agreement.[736]

286.    Notwithstanding multiple examples of sworn testimony regarding the existence of this "agreement," which provides the basis for the Highland Defendants argument that HERA owed Highland money (thus justifying the asset transfer from HERA to Highland), it apparently does not, in fact, exist. Klos, the controller for Highland testified in the *Delaware II* trial that he oversaw the accounting related to assets and liabilities of HERA and was unaware of any shared services agreement.[737]  Moreover, in March 2024, Highland's counsel, John Morris, in response to a request for HERA documents, informed counsel for HERA that neither HERA nor ERA ever had a shared services agreement with Highland.[738]

287.    The FAC lays out with specificity how HERA's assets were unlawfully transferred to Highland for the benefit of the Highland Defendants.[739] Furthermore, the Highland Defendants argument against the TTLA claims relies solely on "agreements" that simply do not exist or have not been produced. HERA's TTLA claim should not be dismissed.

---

[734] FAC ¶¶ 64–67, 70, 75–77, 79–82, 84–85, 117, 133, 135, 137; Exh. 24 - Dondero *Delaware I* trial testimony Pg 310 line 18- Pg 313  line 12 (App. 333–336).

[735] FAC ¶¶ 64–67, 70, 75–77, 79–82, 84–85, 117, 133, 135, 137; Exh. 21 - Leventon *Delaware I* trial testimony Pg 184 line 17-23 (App. 312).

[736] FAC ¶¶ 64–67, 70, 75–77, 79–82, 84–85, 117, 133, 135, 137; Exh. 21 - Leventon *Delaware I* trial testimony Pg 203 line 22 – Pg 205 line 12 (App. 313–315).

[737] FAC ¶¶ 64–67, 70, 75–77, 79–82, 84–85, 117, 133, 135, 137; Exh. 75 - Klos *Delaware I* trial testimony Pg 454 line 7 – Pg 455 line 8 (App. 879–880).

[738] Exh. 17- Email from John Morris to Drew York 03/05/2024 (App. 208).

[739] FAC ¶¶ 63, 65, 79, 137-139, 288-291. *See* ¶¶ 75-107, *supra*.

### T. HERA Properly Pleads Its TUFTA claim.

288.    TUFTA "aims to prevent debtors from fraudulently placing assets beyond the reach of creditors[,]"[740] which is precisely what HERA has alleged here. TUFTA allows a creditor to bring a claim not only against the debtor, but also against the first transferee of the assets, any subsequent transferees who did not take in good faith, and persons for whose benefit the transfer was made.[741]

289.    Here, HERA has properly alleged the elements of a TUFTA claim, which are: (1) plaintiff is a creditor with a claim against a debtor; (2) the debtor transferred assets after, or a short time before, plaintiff's claim arose; and (3) the debtor made the transfer with the intent to hinder, delay, or defraud the plaintiff.[742] TUFTA defines a creditor as someone who has a claim— that is, "a right to payment or property, *whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured*[.]"[743] HERA alleges it is a creditor by way of the verdicts in the Texas and Delaware litigation,[744] the details of which are set forth in excruciating detail in Sections IV (E)-(G) of the FAC.

290.    TUFTA defines a debtor as "a person who is liable on a claim."[745] HERA alleges that Defendants are debtors liable on those claims[746] (the verdicts in the Prior Lawsuits) by way of their participation in the stripping of HERA's assets, as alleged throughout the FAC. And finally, HERA alleges that Defendants transferred the assets with the actual intent to hinder, delay and/or defraud HERA, that they retained possession and control of the assets after the

---

[740] *GE Capital Commercial Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 302 (5th Cir. 2014).
[741] TEX. BUS. & COM. CODE § 24.009(b).
[742] *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 204-05 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (citing TEX. BUS. & COM. CODE § 24.005(a)(1)).
[743] TEX. BUS. & COM. CODE § 24.002(3) (emphasis added).
[744] FAC ¶ 439.
[745] *Id.* at § 24.002(6).
[746] FAC ¶ 440.

transfer, and they concealed such acts to do so.[747]  Defendants are each alleged to have been either

a subsequent transferee, a recipient of distributions therefrom, or a party for whose benefit the

transfers were made.  Those allegations include, but are not limited to:

- Ownership of Highland Capital, to whom Plaintiff's assets were transferred, transferred to Hunter Mountain on or around December 17, 2015, from its then-existing limited partners (i.e., Dondero, Okada, Ellington, Parker, and entities they controlled). Through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, Dondero and Okada caused Hunter Mountain to become the owner-in name of 99.5% of the economic interests of Highland Capital. Meanwhile, Dondero and Okada caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities they controlled (including Dugaboy, Okada Trust #1, and Okada Trust #2) continued to receive the economic benefit of limited partnership distributions made by Highland Capital to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain.[748]
- These interests were assigned to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Hunter Mountain Trust, Ellington and Honis.[749]
- All Defendants hold money that came from assets or distributions from assets that belonged to Plaintiff.[750]
- Distributions were made of all of Plaintiff's assets to Highland Capital for the benefit of Dondero and his trusts, Okada and his trusts, Boyce, Britain and Honis.[751]
- Assets and distributions were for the benefit of Dondero, Okada, Boyce, Collins, Honis, Ellington, Leventon, Girard, and Waterhouse (collectively, "Highland Capital Officers and Employees Group")[752]

291.    Moreover, in the limited documentation HERA received post-2022, it has found

financial statements that show distributions from Highland to numerous Defendants.[753] In short,

and as set forth throughout the FAC, Defendants transferred and/or received the benefit of the

transfer of HERA's assets. Because HERA adequately pleads the elements of a TUFTA claim,

dismissal is improper.

---

[747] FAC ¶¶ 441-43.
[748] FAC ¶ 59.
[749] FAC ¶ 247.
[750] FAC ¶ 427.
[751] FAC ¶ 287.
[752] FAC ¶ 173.
[753] *See* Exh. 73 – Highland Financial Statements and Excel Spreadsheets (App. 792-869).

004564

## U. HERA Properly Pleads Its Fraud Claims

292.   Highland Defendants argue that Plaintiff's fraud claims are not sufficiently pleaded with particularity. This argument is disingenuous, at best. FRCP 9(b) requires the complaint to set forth "the who, what, when, where, and how" of the events at issue.[754] Rule 9(b) does not, however, require the plaintiff at the pleading stage to put every single piece of evidence it has or might obtain during the discovery process in a pleading. This case is not yet at the summary judgment phase. Plaintiff is only required to meet the federal pleading standards, which it does.

293.   Plaintiff properly alleges facts upon which the fraud claims are based. Given the limited knowledge Plaintiff has due to Defendants' years-long stonewalling[755] and Daugherty's removal from Plaintiff's board,[756] Plaintiff cannot possibly be expected to know every single detail of Defendants' fraudulent acts, such that it cannot plead what it does not yet know. The FAC does, however, contain enough facts and circumstances constituting fraud. For example, Plaintiff alleges the "who" as the defined defendants "the Board Member Group, The Dondero ERA Management, the Highland Capital Officers, and Employees Group."[757]  The facts establishing the "what" include, but are not limited to, these defendants' representations that "$1,210,502.03 in cash, a limited partner interest in Restoration Capital Partners Fund, LP and 1088.42 shares of NexPoint Credit Strategies had been deposited in an escrow account for Plaintiff,"[758] that those assets had been set aside for Plaintiff to pay its obligations, [759] and that the taking of the assets from Plaintiff was validly approved in the purported corporate governance actions of Plaintiff on January 17, 2013, January 18, 2013, February 2013, and April 30, 2013.[760]  These allegations also

---

[754] *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).
[755] FAC ¶¶ 58, 61, 63, 69, 76, 132-136.
[756] FAC ¶ 58.
[757] FAC ¶¶ 448, 454.
[758] FAC ¶¶ 83, 460.
[759] FAC ¶ 400.
[760] FAC ¶¶ 381, 395.

sets forth "when" and "where" of Defendants' fraudulent scheme, further details of which are also set forth throughout the FAC.[761]   The FAC also sets forth "how" Defendants' specific representations were later discovered to be fraudulent, *i.e.*, all the assets purported to be held in escrow for Plaintiff, were in fact, not, and what assets remained were swept from Plaintiff.[762]

294.   The FAC establishes its fraud claims against the Highland Defendants with requisite specificity. It identifies the "who, what, when, where and how" with specific names and descriptions of various false representations, including exact dates and overt acts taken that constitute a fraud claim. Plaintiff simply cannot plead what it does not know, and since there are facts solely within the possession of Defendants, it is premature to dismiss those claims.[763]  Thus, dismissal of Plaintiff's fraud claims is unwarranted.

## V.   HERA Properly Pleads Its Conspiracy Claims

295.   Plaintiff brings claims for conspiracy to commit fraud against the Highland Defendants and the Outside Attorneys with regard to the buyout and 2013 stripping of Plaintiff's assets (Count 16) and the 2016 transfer of escrow assets (Count 17). As set forth in the preceding section, Plaintiff has alleged with requisite particularity the "who, what, when, where and how" of the underlying fraud claims.[764] With regard to the conspiracy, Plaintiff has also alleged a meeting of the minds, describing in great detail the purported corporate actions taken by the Highland Defendants with the assistance and cooperation of the Outside Attorneys, and quoting correspondence among them describing their "meeting of the minds" and the overt acts taken in furtherance of the buyout and 2013 asset stripping[765] and the 2016 transfer of escrow assets.[766]

---

[761] FAC ¶¶ 82–84, 87–90, 98, 279, 389, 459–60.

[762] FAC ¶¶ 66–79, 91–94, 96–97, 101–114, 139. While Boyce, Britain, Demaris, Dougherty and Okada were not involved in the Escrow set up or sweep they were certainly aware of same and part of the planning that led to the initial transfer in April of 2013.

[763] *R.P. Small Corp. v. Land Dep't, Inc.*, 505 F. Supp. 3d 681 (S.D. Tex. 2020).

[764] *See* ¶¶ 75–107, *supra*.

[765] FAC ¶¶ 66–79 (describing communications and acts taken in furtherance of the buyout and 2013 stripping of Plaintiff's assets).

[766] FAC ¶¶ 101–113 (describing communications and acts taken in furtherance of the 2016 transfer of assets).

137

296.    The Highland Defendants further argue that the individually named defendants were acting in the course and scope of their employment or agency relationship, such that they could not conspire with each other through their employer/principal. However, Plaintiff alleges a conspiracy among (1) the individual employees/officers of Highland, (2) the Board Member Group, (3) Dondero/ERA Management and (4) the Outside Attorneys to defraud Plaintiff. Highland Defendants' argument is simply misplaced.

297.    Because Plaintiff properly alleges its underlying fraud claims, and because Plaintiff describes in no less than 25 paragraphs the particulars of Defendants' meeting of the minds and the overt acts taken in furtherance of the conspiracy, Plaintiff's claims for conspiracy to commit fraud must not be dismissed.

### W. HERA Properly Pleads Its Tortious Interference Claims

298.    HERA has adequately alleged the elements of tortious interference in each of Counts 29, 30, and 31. The elements of tortious interference are the existence of a valid contract subject to interference, defendant's willful and intentional interference therewith, causation, and damage/loss as a result.[767] As set forth throughout this response, the FAC describes in painstaking detail the willful and intentional acts Defendants took that interfered with the Second Amended LLC Agreement to strip Plaintiff of its assets.

299.    As to the first element, HERA alleges the existence of a contract subject to interference, specifically its "limited liability company operating agreement," which agreement is referenced and quoted throughout the FAC.[768] Later, HERA alleges that Defendants willfully and intentionally interfered with same by moving Plaintiff's assets into an escrow account held by Abrams & Bayliss,[769] by moving Plaintiff's assets to Highland Capital in 2013,[770] and by

---

[767] *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017) (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002)).
[768] FAC ¶¶ 465, 467, and 469.
[769] FAC ¶ 465.
[770] FAC ¶ 467.

004567

moving Plaintiff's assets from an escrow account to Highland Capital again in 2016,[771] the details of which are contained in Sections IV(B)-(G) of the FAC.  And finally, Plaintiff pleads the third and fourth elements (causation and damage) by stating in each count that the interference referenced therein "proximately caused" Plaintiff's injury/damages[772] through the loss of its assets.[773] Because HERA has adequately pleaded the elements of tortious interference, dismissal is improper.[774]

### ***TRUSTEE DEFENDANTS SECTION***

### I.    STATEMENT OF FACTS

300.    Highland Capital created HERA as an employee-retention tool for Highland Capital's key employees.[775] Highland Capital's business investments soured during the 2008 financial crisis, and it began making risky business decisions to compensate.[776] Those decisions ultimately led to Defendants, through their various connections, ties, or roles within Highland Capital, illegally pillaging HERA of all of its assets, for which HERA now brings suit. Based on their inextricable roles in those activities, HERA brings claims for money had and received, conversion, and violations of the Texas Theft Liability Act against the Trustee Defendants.[777]

301.    While the events giving rise to all of HERA's claims are complex (by Defendants' design), the premise of the fraudulent activity is simple: the Board Member Group and Highland Capital Officers and Employees Group[778] (together, the "Non–Trustee Defendants") spurned their

---

[771] FAC ¶ 469.

[772] FAC ¶¶ 465, 467, and 469.

[773] FAC ¶ 465.

[774] Plaintiff has nonsuited its claims against Abrams & Bayliss. Plaintiff hereby concedes that Defendants Boyce and Honis are parties to the Second Amended LLC Agreement and withdraws its tortious interference claims against them.

[775] FAC ¶ 27.

[776] FAC ¶ 51.

[777] "Trustee Defendants" means Nancy Dondero ("Nancy") as trustee of the Dugaboy Investment Trust ("Dugaboy"), Grant James Scott as trustee of the Get Good Trust ("Get Good"), John Honis as Trustee of the Hunter Mountain Investment Trust ("Hunter Mountain"), and Lawrence Tonomura as trustee of both The Mark & Pamela Okada Family Trust - Exemplary Trust # 1 ("Okada #1") and the Mark and Pamela Okada Family Trust Exempt Trust #2 ("Okada #2") (collectively the "Okada Trusts") in their capacities as trustees.

[778] Each of the Board Member Group defendants held board of director and/or general counsel roles for HERA or Highland. Additionally, many held management roles with Highland's affiliates and subsidiaries. The Board Member Group is made up of **Boyce** (board member of HERA, partner at Highland, and Head of Private Equity for HERA's

004568

legal duties to HERA and looted the company for their benefit. Worse, in an attempt to disguise their illicit activities, they concocted a scheme to layer their fraud under a vast quilt of smoke and mirrors.

302.    In approximately 2011, the Non-Trustee Defendants began a series of maneuvers designed to strip HERA of its valuable assets and to transfer expenses of Highland Capital and its affiliates to HERA, without exchange for consideration.[779] This was done to benefit Dondero, Okada, the Trustees Defendants, the Board Members, and the Officers and Employees through financial buyouts and indemnification in exchange for dereliction of their fiduciary duties.[780]

303.    Each Trustee Defendant executed or permitted transactions to transfer or receive funds that ultimately originated or were sourced from (and rightfully belonged to) HERA, and those funds were then funneled through various Highland Capital entities and trusts.[781] Dondero and Okada perpetuated their fraud, with the assistance of the Trustee Defendants, by utilizing their trusts as vehicles to effectuate a multitude of fraudulent transfers to harm HERA.

304.    The Trustee Defendants' illicit actions were executed within, effectuated within, and/or directed at the State of Texas. Therefore, the Court should deny the Trustee Defendants' Motion and find each of them subject to the Court's personal jurisdiction.

---

interest in Restoration Capital, FAC ¶ 39), **Britain** (board member of HERA and partner at Highland, FAC ¶ 40), **Dameris** (board member of HERA and managing director of Highland, FAC ¶ 38), **Dougherty** (board member of HERA and partner at Highland, FAC ¶ 43), **Ellington** (board member of HERA, General Counsel and other legal roles for Highland from 2010 until fired for cause in January 2021, FAC ¶ 30), and **Honis** (board member of HERA, Partner of Highland, "Key Man" of Restoration Capital, FAC ¶ 41). The Highland Capital Officers and Employees Group was employed by Highland Capital, and most had been designated with a "Key Man" role for Restoration Capital, HERA's largest investment. The Highland Capital Officers and Employees Group Defendants are comprised of **Dondero** (President and CEO of Highland; "Key Man", "Principal" and "Manager"  of Restoration Capital, FAC ¶ 28), **Okada** (CIO and EVP of Highland; "Key Man", "Manager" and/or "Principal of Restoration Capital, FAC ¶ 29), **Boyce**, **Collins** (head of HR at Highland until 2021, and tasked with acting on behalf of HERA's board, FAC ¶ 46), **Honis**, **Ellington**, **Leventon** (ACG for Highland 2009-2020, FAC at ¶ 31), **Girard** (counsel at Highland from 2011-2017. FAC ¶ 33), and **Waterhouse** (CFO at Highland until his termination in 2021, FAC ¶ 45).

[779] *See* FAC at ¶¶ 65-58 (accepting low offers without exercising business judgment), ¶ 74 (indemnification), ¶¶ 75-77 (allocating unrelated expenses without consideration), ¶ 79 (transferring HERA's assets to Highland), ¶¶ 114–118, 138, 140.

[780] FAC at ¶¶ 69-72, 75 114–118, 130.

[781] *See, e.g.*, FAC ¶¶ 175, 191, 217, 287, 427, 431.

004569

## II.    ARGUMENT AND AUTHORITIES

### A.  Legal Standard for Personal Jurisdiction

305.    A plaintiff bears the burden of establishing personal jurisdiction but need only establish a prima facie case.[782] Importantly, "[i]n determining whether a prima facie case for personal jurisdiction exists on a motion to dismiss, uncontroverted allegations in the plaintiff's complaint must be taken as true."[783] Additionally, to support a finding of personal jurisdiction, the court may consult both the plaintiff's assertions in the complaint and evidence offered in response to a motion to dismiss.[784] The Trustee Defendants have failed to controvert any of the substantive factual allegations supporting this Court's exercise of personal jurisdiction over them.

306.    A federal court may exercise personal jurisdiction over a non-resident defendant "if the state's long-arm statute extends to the defendant and the exercise of such jurisdiction is consistent with due process."[785] Texas's long-arm statute permits jurisdiction to the full extent allowed by the Constitution, and therefore, "the two-step inquiry collapses into one federal due process analysis."[786] Due process requires: (A) minimum contacts with the forum state; and (B) that "exercising jurisdiction is consistent with traditional notions of fair play and substantial justice."[787]

307.    A defendant has minimum contacts if that "defendant has purposely availed himself of the privilege of conducting activities within the forum state."[788] Minimum contacts may "give rise to either specific jurisdiction or general jurisdiction."[789]

---

[782] *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018) (citation omitted).
[783] *Paz v. Bush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006) (citation omitted).
[784] *Id.* ("the district court may consider the contents of the record at the time of the motion, including affidavits").
[785] *Sangha*, 882 F.3d at 101 (citation omitted).
[786] *Id.* (internal quotes omitted).
[787] *Id.* (internal quotes omitted).
[788] *Id.* (citation omitted).
[789] *Id.* (citation omitted).

004570

308.   A court may exercise specific jurisdiction "if the cause of action asserted arises out of or is related to those contacts" even where contacts are "singular or sporadic."[790] "In other words, such jurisdiction exists when a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities."[791]

309.   "Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable."[792] In determining whether exercising jurisdiction is fair and reasonable, "the court must balance: (1) the burden on the nonresident defendant of having to defend itself in the forum, (2) the interests of the forum state in the case, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interests of the states in furthering fundamental social policies."[793]

## B. The Trustee Defendants Have Sufficient Minimum Contacts With Texas

310.   All the Trustee Defendants have committed acts sufficient to satisfy minimum contacts with Texas. Indeed, the very nature and character of each of the trusts in the Trustee Defendants' care provide sufficient justification for the Court to exercise personal jurisdiction, whether considered together with its respective trustees' conduct or not.

311.   HERA agrees that a trust may only be sued through its trustee.[794] However, a non-resident trustee can establish minimum contacts sufficient for specific jurisdiction with a forum state through his actions directed at the forum state taken as trustee or due to the nature and character of the trust itself which is sufficiently associated with the forum state.[795] A variety

---

[790] *Id.* (citation omitted).
[791] *Id.* (internal quotes omitted).
[792] *Id.* (citation omitted).
[793] *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).
[794] *Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 570 (Tex. 2006).
[795] *See Hanson v. Denckla*, 357 U.S. 235, 251 (1958) (finding courts may exercise personal jurisdiction over a trustee

of circumstances surrounding the trust and trustee support a court's exercise of specific personal jurisdiction when the facts demonstrate their activities are directed at the forum state. Indeed, purposeful availment is satisfied through a "totality-of-the-circumstances test" where "no single factor . . . is determinative."[796]

312.     The key is whether the circumstances surrounding the trust indicate that the trustee-defendant, through his availment, "should reasonably anticipate being hailed into court in the forum state."[797] Courts found the following non-exhaustive circumstances gave rise to jurisdiction over a trustee:

- Settlor resided in the forum state at the time the trust was executed.[798]

- Beneficiaries resided in the forum state at the time the trust was executed or when the trustee accepted the role as trustee.[799]

- Trust holds property, businesses, or any other assets located in the forum state.[800]

- Trustee resided in forum state as of the time they accepted their position as trustee.[801]

- Trustee executed trust-related activities in the forum state.[802]

- Trustee entered into and/or performed contracts on behalf of the trust in the forum state.[803]

- Trustee communicated with the plaintiff, beneficiaries, or others who live in the forum state.[804]

---

either because of the trustee's actions or the trust itself).

[796] *Stuart v. Spademen*, 772 F.2d 1185, 1192 (5th Cir. 1985).

[797] *See Benson v. Rosenthal*, 116 F. Supp. 3d 702, 708 (E.D. La. 2015) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

[798] *Bascom v. Fiduciary Trust Co. Int'l*, No. 2:23-cv-7, 2023 WL 3305169, at *4 (E.D. Va. May 8, 2023) (settlors spent six months of each year in forum state when trust was executed); *Steen Seijo v. Miller*, 425 F. Supp. 2d 194, 200 (D.P.R. 2006); *Lobato v. Herndon*, No. GJH-15-2978, 2017 WL 1185202, at *5 (D. Md. Mar. 29, 2017).

[799] *Bascom*, 2023 WL 3305169, at *4; *Steen Seijo*, 425 F. Supp. 2d at 200; *Lobato*, 2017 WL 1185202, at *5; *Regnery v. Wallerich*, 626 F. Supp. 2d 872, 874 (N.D. Ill. 2009).

[800] *Benson*, 116 F. Supp. 3d at 708-09 (E.D. La. 2015); *Regnery*, 626 F. Supp. 2d at 873-74.

[801] *Lobato*, 2017 WL 1185202, at *5.

[802] *Bascom*, 2023 WL 3305169, at *4 (trustee appraised home located in forum state upon the death of settlor and retained broker to sell the home).

[803] *Benson*, 116 F. Supp. 3d at 709-10.

[804] *Bascom*, 2023 WL 3305169, at *4; *Lobato*, 2017 WL 1185202, at *5.

- Forum state's law governs trust.[805]

- Trustee attended meetings located in the forum state on behalf of the trust.[806]

- Trustee made distributions to those located in the forum state.[807]

- Trust executed in the forum state.[808]

- Corporate trustee was registered to do business in the forum state.[809]

- Corporate trustee had a registered agent for service of process in the forum state.[810]

313.    In addition to these factors (the "Trustee Jurisdictional Factors"), courts also find that the receipt of illicit funds is a positive factor for finding personal jurisdiction when there are other factors present supporting personal jurisdiction so long as the defendant is not a mere "passive transferee."[811]

314.    The Trustee Defendants satisfy more than enough of the above Trustee Jurisdictional Factors, including the *Mullins* positive-factor, receipt of funds in Texas, for the Court to exercise jurisdiction on that basis alone. Equally, the Court could exercise jurisdiction based on actions taken in their capacities as trustees directed at Texas and central to this litigation.

---

[805] *Bascom*, 2023 WL 3305169, at *4; *Regnery*, 626 F. Supp. 2d at 874.

[806] *Benson*, 116 F. Supp. 3d at 710.

[807] *Bascom*, 2023 WL 3305169, at *4; *Steen Seijo*, 425 F. Supp. 2d at 200.

[808] *Regnery*, 626 F. Supp. 2d at 874.

[809] *Bascom*, 2023 WL 3305169, at *4.

[810] *Id.*

[811] *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 400-01 (5th Cir. 2009) (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)); *see also Leskinen v. Halsey*, No. 2:10-cv-03363 MCE KJN PS, 2011 WL 4056121, at *6 (E.D. Cal. 2011) (finding personal jurisdiction was initially proper in New York because "defendants are alleged to have transacted business in New York; namely, the alleged execution of the contract for sale of the New York property, the alleged receipt of funds from that transaction, and the alleged execution of related documents such as powers of attorney"); *Ellenstein v. S&S Game Preserve, Inc.*, 581 F.Supp. 81, 83 (S.D. Ind. 1983) (finding the defendants had minimum contacts with Indiana because "delivery of the certificate and receipt of funds in Indiana, the distribution of brochures in Indiana, and advertising on a broadcasting station located in Indiana").

1. **The Nature and Character of the Trusts Sufficiently Tie the Trustees to Texas**

315.     Each Trustee Defendant is subject to specific personal jurisdiction in their capacity as trustee based on the nature and character of the trusts. As detailed below, all were created by Texas residents, for Texas residents, and hold significant assets in Texas. Thus, the Trustee Defendants availed themselves of jurisdiction in Texas and all should have reasonably anticipated being hailed into court in Texas by accepting the role of trustee for a trust so closely tied to Texas.

i.     **The Trusts' Business is Conducted From Dallas**

316.     All the trusts list their principal place of business and address for service of process in Dallas, Texas.[812] Not only do they all operate out of Dallas, but four of the trusts—Dugaboy, Get Good, and the two Okada Trusts—utilize the same address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.[813]

ii.     **The Trusts' Settlors and Beneficiaries Reside in Texas**

317.     Four of the trusts were created by Texas residents for beneficiaries who are Texas residents.[814] Dana Breault, a Texas resident and girlfriend of Dondero, is the settlor of Dugaboy.[815] Breault created Dugaboy at the direction of James Dondero in 2010, naming Nancy Dondero as trustee and Dondero as the primary beneficiary.[816] Dondero is the settlor of Get

---

[812] Exh. 79 – Get Good Trust Proof of Claim (App. 988); Exh. 80 – Dugaboy Investment Trust Proof of Claim (App. 993); Exh. 81 – Dugaboy's Witness and Exhibit List (App. 1008, 1020); Exh. 82 – Litigation Trustee's Amended Complaint and Objection, ¶ 16 (Dugaboy) (App. 1033); Exh. 83 – Certificate of Amendment for 3820 Goar Park LLC (Get Good) (App. 1171); Exh. 84 – NexBank Capital, Inc.'s Annual Report of Holding Companies—FR Y-6 (Both Okada Trusts) (App. 1174); Exh. 101 – Hunter Mountain's Proof of Claim #152 (Hunter Mountain) (App. 1655).

[813] *See Id.*

[814] While HERA does not possess information concerning the settlor and beneficiary of Hunter Mountain, HERA strongly suspects Texas residents fill these roles given Hunter Mountain was created to hold 99.5% of Highland Capital's shares for the benefit of Dondero, Okada, and their families. *See* Exh. 82 – Litigation Trustee's Amended Complaint, ¶ 27 (App. 1037); Exh. 86 – Order Requiring Disclosures (App. 1245-1257). Jurisdictional discovery, if necessary, would be likely to reveal this information.

[815] Exh. 82 – Litigation Trustee's Amended Complaint, ¶ 16 (App. 1032); Exh. 85 – Dugaboy's Amended Response to Order Requiring Disclosures, ¶ 5 (App. 1238); Exh. 110 - Dana Breault's Certificate of License History from the Texas Real Estate Commission (App. 1903-1907); Exh. 111 - Collin County Appraisal District's property search return for Dana Breault's homestead located in Dallas, TX (App. 1908).

[816] Exh. 82 - Litigation Trustee's Amended Complaint ¶ 16 (App. 1033); *see also* Exh. 85 - Dugaboy's Amended

Good, and its beneficiaries are his living descendants.[817] At the time Get Good was created,

Dondero was a Texas resident; Dondero and his family still reside in Texas.[818] Defendant Mark

Okada, a Texas resident, is the settlor of the Okada Trusts.[819] The beneficiaries of Okada #1 are

Okada's children, who were/are Texas residents from 2012 to the present, and the beneficiaries

of Okada #2 are Okada's siblings.[820]

### iii.    The Trusts Hold Assets in Texas

318.    All the trusts also hold significant assets located in Texas, for example:

| Dugaboy | <ul><li>Wholly owned Texas limited liability companies that owned real property located in Texas: 4312 Belclaire, LLC, owning real property at the same address in Dallas, TX[821] and 3409 Rosedale, LLC, owning real property at the same address in Dallas, TX.[822]</li><li>Partnership interest in Highland Capital, a Texas partnership, including a 0.1866% economic interest and 74.4426% voting interest in Highland's Class A partnership interest.[823]</li><li>A 99.9% interest in NexPoint Advisors, L.P., a Dallas-based company that also happens to have its principal place of business at 300 Crescent Court, Suite 700.[824]</li><li>Ownership in Acis Capital Management GP and Acis Capital Management LP, Dallas-based entities.[825]</li><li>Investments managed by Highland Capital, including the Highland Multi-Strategy Credit Fund, L.P. and Highland Multi-Strategy Credit Fund, Ltd.[826]</li></ul> |

---

Response to Order Requiring Disclosures (App. 1236-1244).

[817] Exh. 82 – Litigation Trustee's Amended Complaint ¶ 26 (App. 1037); *see also* Exh. 114 – Get Good's Amended Response to Order Requiring Disclosures (App. 2289-2295).

[818] *See* Exh. 114 – Get Good's Amended Response to Order Requiring Disclosures (App. 2289-2295).

[819] Exh. 82 – Litigation Trustee's Amended Complaint ¶¶ 29-30 (App. 1038).

[820] *Id.*

[821] Exh. 87 – Texas Franchise Tax Public Information Report for 4312 Belclaire, LLC (App. 1258); Exh. 88 – Account History for 4312 Belclaire from the Dallas Central Appraisal District (App. 1259-1267).

[822] Exh. 89 – Texas Franchise Tax Public Information Report for 3409 Rosedale, LLC (App. 1268); Exh. 90 – Account History for 3409 Rosedale from the Dallas Central Appraisal District (App. 1269-1270).

[823] Exh. 82 – Litigation Trustee's Amended Complaint ¶ 16 (App. 1033).

[824] Exh. 82 – Litigation Trustee's Amended Complaint ¶ 15 (App. 1032). Dugaboy was also its sole Limited Partner. *Id.*

[825] Exh. 91 – Deposition of Isaac Daniel Leventon in Acis Bankruptcy at 94:3-95:10 (App. 1295).

[826] Exh. 92 – Dugaboy's Proof of Claim #177 (App. 1401); Exh. 91 – Deposition of Isaac Daniel Leventon in Acis Bankruptcy at 99:24-100:1 (App. 1296).

| Get Good | • Limited partnership interest in Highland Capital.[827] |
| | • Wholly owned Texas limited liability companies that owned real property located in Texas: 3820 Goar Park LLC, owning real property at the same address in Texas.[828] |
| Hunter Mountain | • 99.5% of the economic interest in Highland Capital.[829] |
| Okada #1 and Okada #2 | • Collectively, both trusts held a 9% interest in NexBank Capital, Inc., a Dallas-based company.[830] |
| | • Held interest in Highland in similar manner to Dugaboy and Get Good. |

### iv.    The Trusts Were Created Under Texas Law

319.    Conspicuously, the two Okada Trusts were even created under the laws of Texas – facts that the Trustee Defendants do not deny.[831]

320.    In sum, the trusts themselves have a close connection with Texas as they are clothed with multiple of the Trustee Jurisdictional Factors outlined above. Four of them (Dugaboy, Get Good, and the two Okada Trusts) satisfy a minimum of five of the Trustee Jurisdictional Factors. There is no question the Trustee Defendants should have reasonably anticipated being hailed into court in Texas after accepting the role of trustee for trusts so closely tied to Texas.

### 2.    The Trustee Defendants' Conduct Directed at Texas Justifies the Court's Exercise of Personal Jurisdiction

321.    Each Trustee Defendant engaged in activities directed at Texas and central to this litigation. Moreover, each of their conduct within Texas surpasses that of a mere passive transferee as they were active participants in the overall scheme to defraud HERA. Two broad

---

[827] Exh. 79 - Get Good Trust Proof of Claim (App. 989); Exh. 93 - Get Good's Proof of Claim #120 (App. 1406); Exh. 94 - Get Good's Proof of Claim #128 (App. 1411).
[828] Exh. 83 - Certificate of Amendment for 3820 Goar Park LLC (App. 1170-1172); Exh. 95 - Texas Franchise Tax Public Information Report for Goar Park LLC (App. 1412); Exh. 96 - Texas Secretary of State report for 3820 Goar Park LLC (App. 1413).
[829] Exh. 82 - Litigation Trustee's Amended Complaint ¶ 27 (App. 1037); Exh. 86 - Order Requiring Disclosures (App. 1251).
[830] Exh. 84 - NexBank Capital, Inc.'s Annual Report of Holding Companies—FR Y-6 (App. 1175).
[831] FAC ¶¶ 22-24; Exh. 82 - Litigation Trustee's Amended Complaint ¶¶ 29-30 (Okada Trusts) (App. 1038).

categories of activities sufficiently establish minimum contacts for each of the Trustee Defendants with Texas.

322. First, the Trustee Defendants each participated in, and executed a series of transfers and notes designed to fraudulently transfer assets, including those previously transferred from HERA to Highland, away from Highland and into the pockets of Dondero, Okada, their families, and the other defendants. The first of these is a Partnership Interest Purchase Agreement.[832] In this transaction, Dugaboy and the two Okada Trusts, through their trustees, sold their interests in Highland Capital to Hunter Mountain, granting Hunter Mountain a 99.5% stake in Highland Capital.[833] In exchange, Honis, on Hunter Mountain's behalf, executed a note worth $63M.[834] The agreement's forum selection clause names Texas as the venue for all disputes.[835] Critically, Nancy Dondero (Dugaboy), Lawrence Tonomura (Okada #1 and #2), and John Honis (Hunter Mountain) executed this agreement on behalf of their trusts.[836] As a result of this arrangement, Dondero, Okada, and their trusts received numerous distributions from Highland Capital through Hunter Mountain.[837] This transaction, among others, involved assets that rightfully belong to HERA.[838] It demonstrates how the Trustee Defendants collaborated with Dondero and Okada to fraudulently strip HERA of its assets. Whether Trustee Defendants were present in Texas or not for this agreement is of little consequence because the Trustee Defendants cannot argue that they were merely passive transferees when their signatures are plainly visible on the agreement.

323. The Trustee Defendants and Dondero also created various notes to conceal assets Dondero wrongfully stripped from HERA and Highland Capital. Scott (Get Good) and Nancy

---

[832] Exh. 97 - Hunter Mountain's Rule 202 Petition (App. 1490–1519).
[833] Id.
[834] Id.
[835] Id.
[836] Id.
[837] Exh. 82 - Litigation Trustee's Amended Complaint ¶¶ 149–57, 174–79 (App. 1088–1090, 1095–1097).
[838] See generally Exh. 113 - Redacted Trial Transcript in Daugherty v. Highland Capital Management, L.P. C.A. No. 2017-0488-MTZ at 489:17–531:1 (App. 2224–2266).

(Dugaboy) exchanged a note with Highland Capital which severely undervalued assets used as collateral.[839] The exchange involved Series A interest in the Highland Capital Loan fund, interest in various Highland Crusader funds, and millions of dollars of American Airlines call options.[840] Nancy further executed a note to Trussway Holdings, a subsidiary of Highland Capital and a Houston-based company.[841] The Trussway note was executed under the laws of Texas and has a forum selection clause naming Texas as the venue.[842] At Dondero's request, Nancy executed similar loan forgiveness schemes in Texas on multiple other occasions.[843]

324.    Second, the Trustee Defendants voluntarily submitted to jurisdiction in Texas through the Highland Bankruptcy.[844] All the Trustee Defendants participated in the Highland Bankruptcy (which remains pending in the United States Bankruptcy Court for the Northern District of Texas) through filing proofs of claims and various adversary proceedings. All the trusts, necessarily through their respective trustee, filed proofs of claims in the bankruptcy.[845] Further, the bankruptcy trustee named all the Trustee Defendants as defendants in an adversary proceeding, which alleged the Trustee Defendants also participated in a scheme to fraudulently siphon assets away from Highland.[846] Though purposefully obscured through thoughtful and complex deception, the assets subject to those proofs of claims and the fraudulent transfers, in part, involve many of those that rightfully belong to HERA.

---

[839] Exh. 82 – Litigation Trustee's Amended Complaint ¶¶ 132–36 (App. 1082–1085).

[840] *Id.*

[841] Exh. 81 – Dugaboy's Witness and Exhibit List (App. 1012).

[842] Exh. 81 – Dugaboy's Witness and Exhibit List (App. 1009).

[843] *See, e.g.,* Exh. 82 – Litigation Trustee's Amended Complaint ¶ 20 (App. 1035); Exh. 112 – Nancy Dondero's October 18, 2021, deposition transcript from Highland Capital Bankruptcy's Adversary Proceeding No. 21-03000-SGI, Doc. No. 135-2 at 162:22-163:8 (App. 1966).

[844] *See generally* Exh. 85 – Dugaboy's Amended Response to Order Requiring Disclosures (App. 1236-1244); Exh. 86 – Order Requiring Disclosures (App. 1245-1257); Exh. 98 – Get Good's Certificate of Interested Persons (App. 1642-1644); Exh. 82 - Litigation Trustee's Amended Complaint (App. 1024-1169); Exh. 99 – Dugaboy's Proof of Claim #131 (App. 1645-1649).

[845] *See* Exh. 80 Dugaboy Investment Trust Proof of Claim (App. 0990); Exh. 100 – Dugaboy's Proof of Claim #113 (App. 1650); *see also* Exh. 85 - Dugaboy's Amended Response to Order Requiring Disclosures (App. 1236); Exh. 92 (Dugaboy) (App. 1397); Exh. 79 (App. 985); Exh. 93 (App. 1402); Exh. 94 (Get Good) (App. 1407); Exh. 101 – Hunter Mountain's Proof of Claim #152 (App. 1655); Exh. 102 – Hunter Mountain's Proof of Claim #70 (Hunter Mountain) (App. 1664); Exh. 103 - Mark Okada's Proof of Claim #135 (both Okada Trusts) (App. 1676).

[846] Exh. 82 - Litigation Trustee's Amended Complaint ¶¶ 132–36 (App. 1082–1085).

325.    Third, the Trustee Defendants frequently focus their attention, efforts, and business/legal dealings at Texas. Honis, once a board member of HERA and a former partner at Highland Capital[847] filed a lawsuit on Hunter Mountain's behalf in Texas state court related to the Acis Bankruptcy.[848] Nancy, for her part, sent official trust communications to counsel in Texas related to the Highland Bankruptcy.[849] And, on Dondero's behalf, Scott routinely performs actions directed at Texas in his role as trustee of Get Good and as trustee for other trusts or roles at various Highland entities.[850] For example, Dondero devised a scheme to claim charitable donations on his tax returns and place assets out of the reach of his ex-wife by relying on Scott as Trustee of Get Good to execute a series of transactions where assets were transferred from Highland through Get Good and into other Highland affiliated entities.[851]

326.    Stated plainly, Dondero and Okada should not be permitted to hide assets that rightfully belong to HERA by naming foreign trustees when those trustees are more than mere passive transferees. Indeed, not only were the Trustee Defendants active participants in the scheme to defraud HERA, but the trusts they administered were critical vehicles used to perpetuate that fraud. The Trustee Defendants' involvement in this lawsuit should not surprise anyone, and the Trustee Defendants knew one day they would be hailed into court in Texas for their lengthy history of enabling and sharing Dondero and Okada's bad acts. That they filed this

---

[847] Exh. 104 – Highland Capital's Form ADV Part 2A (App. 1691).
[848] Exh. 97 – Hunter Mountain Investment Trust's ("Hunter Mountain") Rule 202 Petition (App. 1415).
[849] Exh. 105 – Email Correspondence transmitting a Letter from Nancy Dondero (App. 1743-1745).
[850] *See* Exh. 82 – Litigation Trustee's Amended Complaint ¶¶ 16, 18 (App. 1048-1049); Exh. 84 – NexBank Capital, Inc.'s Annual Report of Holding Companies—FR Y-6 (App. 1177); Exh. 106 – NexBank Capital, Inc.'s Annual Report of Holding Companies—FR Y-6 (App. 1747, 1749, 1751); Exh. 107 – BrokerCheck Report on NexBank Securities Inc. (App. 1808); Exh. 108 – Third Amended and Restated Shareholders Agreement for NexBank Capital, Inc. (App. 1893); Exh. 109 – NexBank Capital, Inc.'s Notice of Action Taken by Stockholders (App. 1898). Additionally, as further evidence of Scott's frequent involvement with Dondero, he is also the trustee of The SLHC Trust—a Dondero-affiliated trust also maintaining an address at 300 Crescent in Dallas and which has ownership and primary voting rights in NexBank Capital, Inc., a Dallas-based company. *See id.*; *see also* Exh. 82 – Litigation Trustee's Amended Complaint ¶¶ 18, 21-26, (describing Scott's various roles) (App. 1034-1037). Similarly, Scott was Director of the Highland Dallas Foundation. Exh. 82 – Litigation Trustee's Amended Complaint ¶ 18 (App. 1034).
[851] Exh. 82 – Litigation Trustee's Amended Complaint ¶¶ 131-36 (App. 1082-1085).

Motion when they are so intricately woven into this fraudulent scheme is simply evidence of their catch-me-if-you-can ploy.

### C. The Exercise of Personal Jurisdiction Over the Trustee Defendants is Fair and Reasonable

327.    The burden on the Trustee Defendants of litigating in Texas is low. As detailed above, Trustee Defendants regularly conduct business in Texas, both in their capacities as trustees and in their other relationships with Dondero and Okada. Each of the trusts lists Dallas as its official address and have voluntarily been involved in litigation in Texas, including the Highland Bankruptcy.[852] Further, as discussed above, the trusts have settlors, beneficiaries, and assets in Texas that the Trustee Defendants knew or ought to have known would require their participation in trust activities in Texas—including litigation within Texas—that they accepted by agreeing to be trustees.

328.    Likewise, Texas has a strong interest in litigating this case. HERA is a Texas-based entity. The harm perpetrated by all the defendants was felt in Texas, and Texas has a strong interest in protecting the rights of one of its citizens and making clear that it will not tolerate unscrupulous actors that seek to exploit its business-friendly atmosphere. Further, much of this dispute centers around activities that took place in Dallas related to Highland Capital, which had its principal place of business in Dallas. Accordingly, much of the evidence and witnesses, including the other defendants, are located in Texas. It follows, therefore, that for the same reasons, HERA also has a strong interest in litigating this case in Texas.

### D. Alternatively, Plaintiff Moves for Limited Jurisdictional Discovery

329.    While HERA maintains the above sufficiently demonstrates that all of the Trustee Defendants are subject to the Court's personal jurisdiction, should the Court find HERA's arguments unavailing as to any or all of the Trustee Defendants, HERA respectfully requests

---

[852] *See* ¶¶ 305–314, *supra.*

the Court authorize it to conduct limited jurisdictional discovery against each of the Trustee Defendants regarding the existence, strength, and number of their minimum contacts with Texas before ruling on the Trustee Defendants' Motion.

330.    District courts have broad discretion to grant jurisdictional discovery.[853] Jurisdictional discovery is warranted where the movant's motion to dismiss raises an issue of fact as to the court's exercise of personal jurisdiction over the movant.[854] Indeed, the Fifth Circuit has cited with approval the Third Circuit's standard that "if a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts... the plaintiff's right to conduct jurisdictional discovery should be sustained."[855] Accordingly, the court may grant jurisdictional discovery upon a plaintiff's prima facie showing of personal jurisdiction over a defendant.[856] The plaintiff seeking discovery must "identify the discovery needed, the facts expected to be obtained thereby, and how such information would support personal jurisdiction."[857]

331.    As discussed above, the Trustee Defendants established minimum contacts with Texas through either their acts as trustees directed at Texas or the nature and character of the trusts themselves, which are closely associated with Texas. The FAC's allegations, taken as true, and the evidence attached to this Response show at least a "possible existence" of personal jurisdiction. Accordingly, at a minimum, HERA has established a prima facie basis for exercising personal jurisdiction over each of the Trustee Defendants. Still, to the extent that HERA's currently available evidence leaves doubt as to the sufficiency of minimum contacts, limited jurisdictional discovery directed to each individual Trustee Defendant in their respective

---

[853] *Exxon Mobil Corporation v. Healey*, 215 F.Supp.3d 520, 522 (N.D. Tex. 2016) (Kinkeade, J.).
[854] *Valtech Sols., Inc. v. Davenport*, No. 3:15-CV-3361-D, 2016 WL 2958927, at *2 (N.D. Tex. May 23, 2016) (citations omitted).
[855] *Id.* (quoting *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)) (citations omitted).
[856] *Id.*
[857] *Id.*

capacities as trustee over the named trusts in this litigation would provide the remaining information necessary to prove this Court's personal jurisdiction over the Trustee Defendants.

332.    HERA requests the depositions of Dondero, Okada, and each of the Trustee Defendants. Deposition topics would include the background of the trusts, transfers made to and from the trusts executed within, effectuated within, or otherwise involving Texan agents or Texan assets, the amount of control Dondero, Okada, or any other Defendant exercises over any or all of the Trustee Defendants, any communications regarding official trust activities in Texas, and any other assets and/or actions taken on behalf of the trust by each Trustee or their agents in Texas. Such topics would confirm the Trustee Defendants and their respective trusts have sufficient contacts with Texas and have purposefully availed themselves of Texas's laws and benefits through, *inter alia*, the activities described in the FAC at ¶¶ 52, 59, 66, 71, 78, 79, 96, 98, 105, 112, 115, 142, 147, 149, 157, 160, 163, 164, 165, 166, 167, 175, 177, 179.  Hence, confirming that this Court's exercise of personal jurisdiction would be proper. Moreover, given the scope and complexity of Defendants' illicit enterprise, and because concealment has been the Defendants' game since day one, HERA requests these depositions separate and apart from the time allotted under Fed. R. Civ. Proc. 30(d).

333.    Additionally, for each Trustee Defendant and respective trust, HERA requests the production of the trust agreements, trust accountings back to 2010, including the names of individuals involved in record keeping and tax filings, trust voting histories for Highland Capital and any affiliates, Trustee Defendants' travel history to Texas, and documentation regarding any transfers of assets between the trusts and Highland Capital or its affiliates. Such documents would further assist HERA in proving the fraudulent transfers' relationship to Texas and the trustees' involvement in those transfers. These documents would further establish facts that tie the trusts and Trustee Defendants to Texas—thus confirming this Court may properly exercise personal jurisdiction over each of them.

004582

## ALTERNATIVE REQUEST FOR LEAVE TO AMEND

334.    In the unlikely event that the Court concludes that the FAC fails to sufficiently

allege claims against the Defendants, Plaintiff respectfully requests leave to amend the FAC.

## CONCLUSION[858]

335.    Based on the above Plaintiffs respectfully ask this Court to deny Defendants

Motions to Dismiss.

Dated: February 14, 2025

<div style="margin-left:40%">

Respectfully submitted,

LAW OFFICE OF MATTHEW BOBO, PLLC.

*/s/ Matthew W. Bobo*
**Matthew W. Bobo**
State Bar No. 24006860

4916 Camp Bowie Blvd.
Fort Worth, Texas 76107
Telephone: (817) 529-0774
Facsimile: (817) 698-9401
mbobo@mwblawyer.com

**ATTORNEY FOR PLAINTIFF**

</div>

## CERTIFICATE OF SERVICE

I certify that on February 14, 2025, a true and correct copy of the foregoing document was served on all counsel of record via the Court's electronic filing system.

<div style="margin-left:40%">

*/s/ Matthew W. Bobo*
Matthew W. Bobo

</div>

---

[858] Plaintiff abandons its claims regarding Counts 14 and 22 in the FAC.

004583

# Exhibit 41

# EXHIBIT 6

004585

**DAF/CLO Holdco Structure Chart**



004586

GScott000007

# Exhibit 42

004587



NO. 12-04005

| | | |
|---|---|---|
| **HIGHLAND CAPITAL** | § | **IN THE DISTRICT COURT OF** |
| **MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff and Counter-Defendant,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **PATRICK DAUGHERTY,** | § | |
| | § | |
| **Defendant and Counter-Plaintiff,** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **v.** | § | |
| | § | |
| **SIERRA VERDE, LLC, HIGHLAND** | § | |
| **EMPLOYEE RETENTION ASSETS LLC,** | § | |
| **JAMES DONDERO, PATRICK BOYCE,** | § | |
| **AND WILLIAM L. BRITAIN,** | § | |
| | § | |
| **Third-Party Defendants.** | § | **68th JUDICIAL DISTRICT** |

## DEFENDANT'S ORIGINAL ANSWER, COUNTERCLAIM AND THIRD-PARTY PETITION

COMES NOW, Patrick Daugherty ("Daugherty") and files this his Original Answer, Counterclaim and Third-Party Petition and would respectfully show the Court as follows:

### I.

### GENERAL DENIAL

1.     Daugherty generally denies each and every allegation contained in Highland Capital Management, L.P.'s ("HCM or "Defendant") Original Petition and demands strict proof thereof.

004588

## II.

## COUNTERCLAIM AND THIRD-PARTY PETITION

### PARTIES

2.     Patrick Daugherty is an individual who resides in Dallas County, Texas.

3.     Counterclaim Defendant Highland Capital Management, L.P. has already entered an appearance in this cause.  Therefore, no further service of process is required at this time.

4.     Third-Party Defendant Sierra Verde, LLC ("Sierra Verde") is a Delaware limited liability company that maintains its principal office in Dallas, Texas and may be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

5.     Third-Party Defendant Highland Employee Retention Assets LLC ("HERA") is a Delaware limited liability company that maintains its principal office in Dallas, Texas and may be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

6.     Third-Party Defendant James Dondero ("Dondero") is a Texas resident and may be served with process at 3807 Miramar, Dallas, Texas 75205, or 300 Crescent Court, Suite 700, Dallas, Texas 75201, or wherever he may be found.

7.     Third-Party Defendant Patrick Boyce ("Boyce") is a Texas resident and may be served with process at 6617 Muirfield Circle, Plano, Texas 75093, or 300 Crescent Court, Suite 700, Dallas, Texas 75201, or wherever he may be found.

004589

8.      Third-Party Defendant William L. Britain ("Britain") is a Texas resident and may be served with process at 5603 Caruth Blvd., Dallas, Texas 75209, or 300 Crescent Court, Suite 700, Dallas, Texas 75201, or wherever he may be found.

### III.

### VENUE AND JURISDICTION

9.      This Court has jurisdiction over this matter under the laws and Constitution of the State of Texas.  The amount in controversy, exclusive of interest and costs, is within the jurisdictional limits of this Court.

10.      Venue is proper in Dallas County, Texas pursuant to Tex. Civ. Prac. & Rem. Code §§ 15.002(a)(1) and (a)(2), because all or a substantial part of the events or omissions giving rise to the claims in this action occurred in Dallas County, Texas, and all of the Defendants either reside or had their principal place of business in Dallas County, Texas at the time the causes of action accrued.

### IV.

### DISCOVERY PLAN

11.      Discovery is to be conducted pursuant to a Level III Discovery Control Plan Scheduling Order in accordance with Texas Rules of Civil Procedure 190.4.

### V.

### FACTUAL BACKGROUND

12.      In April 1998, Daugherty was hired by HCM as a Portfolio Analyst.  He reported to Dondero and his duties initially consisted of underwriting and performing credit analysis for a portfolio of corporate loans held by investment vehicles known as collateralized loan obligations

("CLOs"). Daugherty prepared annual self-reviews through 2008, where his yearly performance was evaluated and benchmarked against other employees within the firm. These evaluations reflected his strong performance, and he was promoted several times to more senior positions as his responsibilities and compensation grew. After 2008, Daugherty was no longer required to prepare self-reviews.

13.    Through his tenure at HCM, Daugherty was promoted from Portfolio Analyst to Senior Analyst to Portfolio Manager to Senior Portfolio Manager to Team Leader to Head of Distressed to Head of Distressed and Special Situations to Head of Distressed, Special Situations and Private Equity. Daugherty founded HCM's profitable stressed, distressed and private equity lines of business. He also served twice as General Counsel of HCM during his successful career there.

14.    During Daugherty's employment, he entered into various agreements with HCM, including an Amended Employment Agreement, effective December 31, 2004, which purports to contain a non-competition provision and various other restrictive covenants (the "Employment Agreement").

15.    During Daugherty's annual compensation review, he received a Compensation and Benefits Statement that detailed various forms of earnings and awards granted to Daugherty as a result of his performance at HCM over the previous year. These awards included cash and incentive-based compensation in the form of equity or equity-like options that served to track the performance of reference investments which Dondero and HCM deemed important. The equity and equity-like options were issued under various tax based structures and were generally

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,
COUNTERCLAIM AND THIRD-PARTY PETITION – Page 4**
1056534.9

004591

referred to as the STIP program, the Option-it program and the Vessel program (also known as the LTIP/Vessel program). The LTIP/Vessel programs included HERA and Sierra Verde.

16.     The STIP consisted of reference positions in the Highland Crusader Fund, L.P., Highland Real Estate Fund 2002-A, L.P., Highland CDO and Structured Products Fund and the Highland Credit Strategies Fund, L.P.

17.     The Option-it program consisted of reference positions in the Highland Crusader Fund, L.P., Highland Real Estate Fund 2002-A, L.P., Highland CDO and Structured Product Fund, Highland Equity Focus Fund, L.P. and the Highland Credit Strategies Fund-HCF.

18.     The LTIP/Vessel programs included at least two valuable, vested awards for Daugherty: 1) the HERA program (the Amended and Restated Limited Liability Company Agreement between HERA and HCM), which included most HCM employees; and 2) the Sierra Verde program, which included Daugherty's private equity team.

19.     The HERA program consisted of limited partnership grants in the Restoration Capital Partners, L.P. ("Restoration"), HE Sugarland Project, LLC., and the Highland CLO Value Fund, L.P.

20.     The Sierra Verde vessel, an entity formed in December 2010 to hold and distribute assets, was a program conceived to retain, reward and incentivize Daugherty and his private equity team, which received equity and options in Cornerstone Healthcare Group Holdings, Inc. ("Cornerstone") and Trussway Holdings, Inc.

21.     For high ranking employees ("Partners"), HCM also awarded LTIP interests that tracked the performance of the Highland Partnership. This program was separate from the LTIP/Vessel program. The LTIP program (the 2005 HCMLP Long-Term Incentive Plan) is an

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION – Page 5**
1056534.9

incentive plan created for non-voting partners in HCM, a partnership controlled by Strand

Advisors which is controlled by affiliates of Dondero.  Daugherty also had an interest in the

Defined Benefit Pension Plan.

22.    Contrary  to  HCM's  assertions,  which  characterize  Daugherty  as  some

"unmanageable,  erratic  and  insubordinate"  or  brain-damaged[1]  employee,  Daugherty  was

dedicated, hard-working, healthy and consistently ranked and paid as the top performer through

the 2011 bonus year.  In fact, Daugherty was held out by Dondero as the model manager which

others should aspire to emulate.  Dondero regularly praised Daugherty's "warrior" mentality and

effective restructuring skills.  However, beginning in 2006, Daugherty, in his role of Portfolio

Manager, began to disagree with the firm's shift in strategy and risk.  He was concerned that the

Highland Crusader Fund, L.P. ("Crusader"), started in 2000 by Daugherty and Dondero, had

drifted too far from its original mandate and had become an unfocused and levered mix of non-

---

[1] HCM falsely alleges that Daugherty "recently" admitted to having "two strokes," that left him with "dead spots in his brain." Such statement is a complete fabrication. In January of 2000, Daugherty suffered a Transient Ischemic Attack while working at HCM.  The symptoms abated within less than 60 seconds without Daugherty ever losing consciousness.  EMS was called to the scene and Daugherty was taken to the hospital for evaluation.  Daugherty received a battery of tests that came back inconclusive.  After not feeling well a few days later, Daugherty returned to the hospital and underwent a series of tests including numerous blood tests, electrocardiograms, MRIs, CatScans, Carotid Ultrasounds, and a Transesophageal Echocardiogram. It was determined that Daugherty had a Atrial Septal heart defect consisting of a "hole" in his heart about the size of a quarter.  The remedy was routine open-heart surgery to patch/repair the hole between the two upper chambers of Daugherty's heart.  Daugherty had successful surgery to make the repair in early April of 2000.

HCM was fully aware that Daugherty reported back to work within 10 days of having the surgery and actively participated in leading the Genesis/Multicare bankruptcy and restructuring negotiations.  At no time did Daugherty suffer damage to his brain as a result of the 2000 TIA.  Daugherty has had no recurrence of TIA.  Daugherty has had no adverse neurological or cardiovascular occurrences or tests since 2000.  HCM was fully aware that Daugherty received a full release from his cardiologist and neurologist within months of the surgery in 2000.  HCM was fully aware of Daugherty's medical releases as he qualified for HCM's Life Insurance and Healthcare coverage programs within a year of the surgery.

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 6
1056534.9

core strategies.  He was particularly troubled by the fact that Dondero had begun to more actively and unilaterally change the focus and risk profile of Crusader, allocating the vast majority of the fund's assets to Dondero's other "seed" initiatives that were beyond the expertise of HCM and its employees' skill sets.  Daugherty voiced these concerns to Dondero on numerous occasions beginning in 2006.

23.    From 2006 thru 2008, Daugherty objected to speculative bets being placed on heavily concentrated and leveraged public equities, residential mortgage backed securities ("RMBS"), commercial mortgage backed securities ("CMBS"), treasuries, foreign exchange, life settlement investments, undeveloped residential real estate, timber, and oil and gas investments—all utilizing the assets of Crusader.  Daugherty was quite vocal in expressing his growing disapproval of the increased leverage being used in Crusader.

24.    In late October 2007, Daugherty pleaded with Dondero to reduce the leverage in Crusader's equity portfolio on the basis that it left no room for error.  Despite having positive year-to-date returns, Dondero was not satisfied with the performance, and said that if Crusader could not achieve certain unrealistic return goals by the end of the year, then he would take the firm's capital out of Crusader and invest it elsewhere where he could achieve those returns. Daugherty thought this was wrong and continued to lobby to reduce the leverage in Crusader. Even so, Dondero rejected Daugherty's advice and assigned Dave Semic to reallocate vast portions of Crusader's capital, and increase its overall leverage by shorting treasuries and buying RMBS and CMBS securities on virtually limitless margins.

25.    During 2007, HCM also decided to pursue a new distressed for control private equity fund named Restoration.  This fund was created based on Daugherty's successful

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 7
1056534.9

distressed for control track record within Crusader.   However, HCM's senior management decided that Daugherty would not be part of the Restoration management team.   When Daugherty objected, Mark Okada ("Okada"), HCM's co-founder, explained to him (with Dondero and Jack Yang ("Yang") on the phone) that while they appreciated his contributions to the track record, they had decided to reduce their exposure to Daugherty and feature another manager within HCM, John Honis ("Honis"), despite the fact that Honis had much less involvement with the referenced track record.   Daugherty was disappointed with their decision, but agreed to assist in the development of the target strategy and preparation of the marketing materials.

26.    Soon after the launch of Restoration, it was apparent that the marketing process was failing miserably.   Initially Yang and Okada blamed Honis for having poor marketing skills as cause for the failure.   Honis was even directed to enroll in a public speaking course.   Yang then briefly took control of the marketing effort for Restoration, but he, too, failed due to his lack of knowledge of the details behind the track record.

27.    Ultimately, it was determined that Daugherty needed to be included in the Restoration marketing effort, because he was best suited to handle the in-depth questions that arose from detailed investor due diligence.   Daugherty hesitantly accepted the new role as a key man in the revised Restoration platform and spent the second half of 2007 leading Restoration's capital-raising efforts.

28.    By the end of 2007, Honis had been functionally removed from Restoration and was replaced with Brett Pope ("Pope"), who was named co-manager with Daugherty.   Dondero announced that Daugherty would be in charge of sourcing and restructuring of distressed

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 8
1056534.9

investments, while Pope would be placed in charge of post-restructured operations and traditional private equity. Neither Pope nor Daugherty favored this arrangement, since the responsibilities were ambiguous and the available capital for each initiative came from the same source.

29.    In January 2008, Daugherty informed Dondero of his intent to leave the firm on his anniversary date in April 2008. He offered a 6-month transition period. Also in January, HCM experienced the worst performance of its existence with many funds deteriorating significantly. By March 2008, Pope resigned from HCM. The problems at HCM and the funds it managed had continued to escalate and Dondero asked Daugherty to stay and help him manage through the crisis. Daugherty agreed to stay and assist HCM, even though he would experience significant deterioration in his personal wealth by not having sold out of the various incentive compensation awards he could have liquidated had he resigned as planned. Daugherty worked with Britt Brown and Brian Lording from the accounting team at HCM and began to raise cash for various HCM funds by selling investments, as the firm and its funds entered a severe liquidity crisis. He was also appointed to sole head of the Private Equity Team and Senior Manager of the Restoration Fund.

30.    By July 2008, Daugherty was troubled to hear that available cash was flowing out of HCM to support struggling initiatives and affiliates of HCM that were experiencing liquidity crises of their own. He was equally concerned to hear that Dondero refused to de-lever (reducing debt by selling more assets) in anticipation of further deterioration because Dondero had declared to Daugherty, Okada and Kurt Plumer that he was going to "robo trade our way out of this."

004596

31.     Daugherty's concerns were validated when later in July/August, Dondero refused to satisfy a prime brokerage capital call with its bank counter party, triggering a breach in the financing line for several of its funds.   This led to a daily liquidity crisis, since margin arrangements could be modified by the bank at its sole discretion.   Instead of meeting the mandated margin call, Dondero chose not to liquidate the necessary assets and only authorized a partial payment.   However, the margin call required 100% satisfaction, and this partial payment resulted in a breach of the loan (total return swap arrangement).   On the Friday that the breach occurred, Dondero was happily passing out $100 bills and dinner vouchers to accountants and analysts in attendance, thinking he had done "enough" to comply with the requirement.   HCM found out the following Monday that the breach had caused an immediate acceleration in the credit line and that Crusader was now at the mercy of its creditors.

32.     In August 2008, Daugherty continued to raise cash in Crusader and other funds for margin calls, as well as for investor redemptions that were due to be paid in early October. Daugherty attempted to reject several purchases into Crusader (e.g., life settlement and real estate investments), but Dondero overruled him, instructing him that he was to make purchases if Crusader had cash to make the trade on that day, regardless of what the future impact on cash would be post looming redemptions.   In fact, Dondero instructed Daugherty to respond only with "ok" in response to Dondero's trades if Crusader had cash.

33.     Dondero's actions had led to a substantial write down/write-off in the value of Daugherty's and the other employees' previously awarded incentive compensation.   By September 10, 2008, Daugherty was out of patience with Dondero's reckless and self-serving actions.   He formally submitted his resignation in writing, although he gave 30 days' notice in

order to effect an orderly transition. By the last week in September, Daugherty had raised enough cash to meet margin calls as well as make a partial cash payment to prior redeemers in Crusader. By this time, it was apparent that Crusader and the Highland Credit Strategy Fund ("Strat") would have to liquidate by October with a "payment in-kind" distribution of securities and assets to investors, because there simply wasn't enough cash to pay redeemers in full.

34. During the last week in September, Michael Colvin ("Colvin") and Okada came to Daugherty's office to seek his help in preventing Dondero from orchestrating a series of trades that would sell the most liquid investments in Crusader and Strat to the CLOs and then have Crusader take that cash and funnel it into Highland Financial Partners ("HFP"). HFP was another HCM fund which was experiencing a major liquidity crisis, even though Dondero had previously transferred over $100 million in cash to keep it afloat, in return for illiquid notes to be held by Crusader and Strat. Colvin and Okada explained their concerns and objections with the appropriateness of the transactions and Daugherty agreed.

35. Daugherty phoned Dondero, told him of his conversation with Colvin and Okada, and informed him that the trades in question should not be completed. At first, Dondero calmly explained that his intention was to make Crusader, Strat and HFP as illiquid as possible to punish Barclays for raising the margin requirements on HCM's pledge of limited partnership interests to another loan. Dondero then instructed Daugherty to authorize the trades. Daugherty resisted and told Dondero that he would not allow the trades. Dondero grew angry and ordered Daugherty to make the trades, claiming that it was his decision, and telling Daugherty to stay out of the trade approval process. Daugherty then angrily shouted to Dondero that he was not going to approve the trades nor was he going to let Dondero make the trades. Dondero was furious. He told

Daugherty that he was not to "waste any more of his time" and was to immediately "go home until further notice." Daugherty was further instructed by Dondero to inform Boyce, the Chief Administrative Officer, Chief Operating Officer and Chief Financial Officer of HCM at the time, of his absence and was not to discuss the matter with anyone at HCM until further notice.

36.    Daugherty followed Dondero's instruction and stayed at home for the remainder of the last week of September 2008. While Daugherty was at home on the mandated leave, the trades were completed. Britain took control of Daugherty's team during this time and directed Daugherty's team at the time the trades were executed. Boyce, as CFO and head of the Pricing Committee, also presided over the execution and settlement of the trades. Daugherty received an email from a Haynes and Boone attorney attempting to formalize closing of the trades and asking Daugherty whether "Crusader approves of these trades." Since Daugherty was on orders from Dondero to keep his views to himself, he simply responded: "I don't think Crusader has a say." The Haynes and Boone representative pressed more directly and asked Daugherty, as Portfolio Manager of Crusader, if he "approves of the trades on behalf of the Crusader investors." To which Daugherty replied: "Jim Dondero is approving these trades on behalf of the Crusader investors."

37.    In September 2008, Lehman Brothers failed, causing it to file for bankruptcy. HCM was directly and indirectly impacted by the Lehman collapse because Dondero had invested HCM's and many of its fund's last remaining cash on a desperate bet for Lehman's survival. Additionally, with the fall of Lehman, HCM and the funds it managed lost almost all of their hedges because Lehman was its counter-party and had failed in its obligations when it filed for bankruptcy. As the crisis worsened, asset prices reached new lows, and financial firms were

liquidating performing loans at pennies on the dollar. HCM was forced to "put up the gates" to stem withdrawals at Crusader and Strat. Shockingly, Dondero determined that he would not make "payment in kind" distributions to the Crusader and Strat investors. In fact, he declared that he had traded the positions of the funds in such a manner as to render them completely illiquid in order to punish those investors who had redeemed or might attempt to redeem in the future. He used this approach to take advantage of investors who needed immediate liquidity by offering to buy their partnership interests at huge discounts to value. He and Okada purchased these interests into Highland Capital Services, L.P. ("Highland Services"), an entity wholly owned and operated by Dondero, Okada and their affiliates. He further schemed to manufacture a dispute between the "prior redeemers" and the "compulsory redeemers" of the two funds so that he could delay unwinding the fund until the "dispute" was eventually resolved.

38. Many of the Crusader and Strat investors brought suits or threatened to bring suits against HCM for its self-serving actions. The investors were disgusted with HCM's blatant disregard for its fiduciary duties towards them, but were being held hostage with their own money, since Dondero refused to liquidate the portfolio until he received full releases from the investors. These suits were ultimately resolved through settlement negotiations that were finalized in July 2011. Dondero declared the outcome a success and ordered news releases posted to the HCM website so that the investment community and the SEC would see the news.

39. By "putting up the gates," HCM effectively committed to a liquidation of Crusader and Strat, and lost its ability to charge most of its management and incentive fees to those funds. This would play a critical role later in 2012, as HCM attempted to purchase the

assets being liquidated from these funds at deep discounts into other HCM-managed funds or into portfolio companies owned by other HCM-managed funds that were paying full fees.

40.    Late in 2008, HCM was widely viewed as a firm certain to default.  Dondero assigned Yang with the task of negotiating a restructure of HCM's credit facility.  The banks were furious to discover that Dondero and Okada had been siphoning tens of millions of dollars out of HCM into their closely-held affiliated account at Highland Services under the guise of repaying their loan to HCM.

41.    The banks demanded that the cash be returned immediately or they would put HCM into an involuntary bankruptcy.  During a telephonic bank meeting, Dondero refused to return the cash and defiantly proclaimed: "Highland will fail before I fail."  To make matters worse, Yang was repeatedly caught lying to the bank group about the status of HCM and its funds (namely Crusader, Strat and HFP) and their redemption activity.  The situation deteriorated so badly that the banks would no longer speak with Yang.  In January 2009, Boyce asked Daugherty to intervene.

42.    Boyce and Daugherty agreed that the payments to Highland Services needed to stop immediately.  Daugherty then assumed an active role in negotiations with the bank group. During the process of negotiating with the banks, Dondero and Okada refused to provide collateral pledges to the banks until they were allowed to withdraw tens of millions of additional non-cash assets from HCM.  Dondero brought the negotiations to the brink of a midnight bankruptcy filing in June 2009 until he got what he wanted.  Dondero ultimately took the incremental amount he demanded from the employee compensation reserve, which had been set aside by the banks in order to retain employees during the crisis.  Neither Dondero nor Okada

returned the tens of millions of cash they siphoned from HCM during this horrible crisis in late 2008, despite ordering lay-offs of more than 50% of HCM's employees.

43.     By the Compensation Review period for February 27, 2009, moral was at an all-time low at HCM.  Employees were resigning and being fired en mass.  HCM had very little cash and available assets for incentive compensation grants.  In fact, Dondero, Okada and Boyce announced that managers were to consider the tax-loss refund checks for prior year's compensation awards that had been written off in 2008 as their "bonus" for 2009.  Dondero and Boyce determined arbitrary values for the "2008 Tax Refund" and distributed them to employees in their Compensation and Benefits Statement for 2009.  These "awards" were notorious for being inconsistent with what the employees actually received from the Internal Revenue Service.

44.     During late 2009, members of Daugherty's private equity team (Lawler, Carl Moore ("Moore"), Callan, and Smith) expressed to Daugherty their concerns regarding the stability of HCM.  They were especially concerned about the tens of millions of dollars that Dondero and Okada had siphoned from HCM and what that said about their commitment to HCM.  Accordingly, the members of the team presented a proposal that would incentivize them to stay with HCM, while aligning their interests with those of the investors.  The plan included options and equity that tracked the performance of certain HCM-managed portfolio companies targeted for the plan.  Options were chosen in addition to equity grants, since it was generally HCM's policy to grant option-like compensation programs to reward performance when the stock price of the underlying Company could have sufficient value that would lead to high cash taxes in the year of the grant.  Importantly, these options would not create a taxable event for the recipient until they were exercised.

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 15
1056534.9

45.     The intent of the plan was to provide equity-based incentives to the private equity team that would be realized upon the successful sale of certain portfolio companies managed by the team. Daugherty, together with Moore and Lawler, presented the plan to Dondero for approval. Daugherty explained to Dondero that the plan would act as an incentive to retain the employees on the private equity platform, since much of the value of their existing HCM retention-based incentive compensation had been destroyed as a result of right-offs and the liquidations caused by HCM's numerous margin defaults in late 2008.

46.     After a series of discussions between Dondero, Moore, Thomas Surgent ("Surgent") (HCM's in-house attorney and Chief Compliance Officer) and Daugherty, including one where Dondero inserted himself into the program as the largest recipient under the retention plan, Dondero approved moving forward on the plan. He then instructed Daugherty to work with Surgent and Moore to implement the plan. In addition, Dondero gave strict instructions that the plan was not to be mentioned to Boyce, since he believed Boyce would also demand to be included, and he did not want to include Boyce in this particular incentive plan.

47.     Surgent then gave instructions to Daugherty and Moore on what processes were required in order to make the plan align with HCM's Compliance Policy. He instructed Daugherty and Moore that any rewards under the plan would be subject to the Turnover Grid (a chart listing what percentage of compensation must be repaid or turned over to certain funds and what percentage of compensation could be retained by HCM employees in compliance with the various fund indenture agreements) applied to HCM employees who received compensation as portfolio company board members.

48.     Surgent also instructed Daugherty that independent counsel would need to be retained on behalf of the portfolio companies involved and that the independent board members of the companies involved would have to approve of the plans.  In January 2010, Moore retained Matt Lyons ("Lyons") of Andrews Kurth LLP to review the plan and negotiate on behalf of the portfolio companies and the board of directors (the board generally consisted of the Chief Executive Officer, Highland Private Equity personnel and independent board members). Numerous discussions took place between Lyons, Daugherty, Moore, senior executive management and the independent board members.  Lyons advised all of the board members, including Daugherty, that all options awarded to executive management, independent board members and HCM employees should have the same strike prices.

49.     Over the next several months, Lyons negotiated the various other points and concerns with Moore and Daugherty, who interceded on behalf of Dondero.  These negotiations caused numerous delays on finalizing the incentive compensation to the executive teams and the independent board members, but by July 2010, the plans were submitted to the independent board members for final approval.

50.     During the board meetings and prior to seeking approval of the independent board members, Lyons detailed the purpose, merits, market standards and fairness for each one of the option incentive grants.  Lyons hosted question and answer sessions (with and without HCM representatives present) where all board members had the opportunity to discuss any matters regarding the option plans.  Daugherty and the other board members relied heavily on Lyon's advice during these sessions. Finally, a vote for final approval was made with all HCM affiliated board members abstaining from the vote.  By the end of July 2010, each portfolio company

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 17
1056534.9

received final approval to grant the options to the executive management teams, independent board members and the private equity team.

51.     In accordance with Dondero's instruction, the HCM employee grants were amalgamated and held in a separate holding entity called Sierra Verde. This was an entity named by Moore and created by Lyons to resemble the HERA vessel which was created to hold equity-based compensation for other HCM employees. Final ownership of Sierra Verde was allocated among the private equity team on December 16, 2010, with Dondero receiving the largest share at 24%. As far as Daugherty was concerned, Sierra Verde was finalized and was just another component of his and the private equity team's deferred compensation package from HCM.

52.     HCM began to stabilize in the second half of 2009, although it remained significantly leveraged and had become the target of many large lawsuits. In late 2009, Dondero informed the senior managers at HCM that he intended to position future fund initiatives outside of HCM to avoid having to contribute such interests to the bank group's collateral pool. He sketched a schematic for Daugherty where new "brands" would be created for HCM's future initiatives, with Dondero, Okada and their affiliates retaining 75% via Highland Services. The proposed brands eventually included:

> Tunstall – for stressed and distressed investing in hedge fund, private equity fund and 40act sub-advisory (retail funds) – led by Daugherty;
>
> ACIS – for structured product and CLOs – led by Mahmoud, later Terry;
>
> Falcon – for oil and gas investments in private equity funds – led by Britain;
>
> Canopy – for timber investments in private equity funds – led by Britain;

Highland Funds (now Pyxis) – for various comingled, sub-advisored and equity based 40act funds (retail) – led by Joe Dougherty (no relation to Patrick Daugherty);

Granite Bay – for long-short credit investing – led by Okada and Kaufman with Dondero taking a minority interest;

Brazillian Fund-unnamed at Daugherty's departure to pursue debt investing with Brazilian partners – led by Latimer, later Bramer; and

Swiss Fund – unnamed at Daugherty's departure to pursue healthcare venture capital investing based on Gregory and Daugherty's track record in healthcare – led by Gregory.

53.     Dondero offered to partner with Daugherty on the Tunstall fund initiative, giving Daugherty 25% of Tunstall Capital Management, LP ("Tunstall Capital").  He also offered Daugherty 5-10% of all of the other management companies (or branded initiatives).  The rest of the initiatives were doled out by Dondero to the managers he believed were most critical to their success.

54.     In December 2009, Daugherty spoke to Dondero about the desire of several independent board members within the private equity portfolio platform to get better returns on the accumulated cash on their balance sheets.  Daugherty suggested a non-leveraged, lower risk fund primarily with senior debt, bonds and highly liquid public equities that would carry no fees. Dondero agreed with the concept but wanted to incorporate a fee structure consistent with the hedge fund standard of 2% management fee and 20% incentive fee.  Daugherty was opposed to charging a fee for managing these funds, since the cash balances were owned by companies that were owned by pre-existing funds managed by HCM and so were already being charged such fees or had their fees intentionally terminated (as was the case with Crusader and Strat).

55.     Further, because Dondero intended to structure the fund like a hedge fund with monthly marking, both the management fee and the incentive fee would be paid monthly without disclosure to the various fund investors.  This contrasted with the Sierra Verde equity/options, which would not be paid until a realization event occurred (e.g. when the companies were actually sold), at which time all distributions would be transparent to fund investors, and any turnover or netbacks against HCM's incentive fees would be made.  Dondero agreed to make the incentive fee subject to realization events (actual sales of the investments), but Daugherty was not satisfied because there was no pass-through distribution to fund investors, unlike Sierra Verde.  Daugherty thought the new fund idea had died until early January 2010, when Dondero inquired about the progress and instructed Daugherty and Surgent to "get it done."

56.     Daugherty enlisted the help of Moore and once again retained Lyons at Andrew Kurth to advise them on the best way to achieve Dondero's demand.  On January 26, 2010, Daugherty received an email from Surgent, copying Dondero, Boyce, Clint Gilchrist ("Gilchrist") and Honis, with attachments for documents related to Tunstall Distressed Opportunities Fund, which was later renamed Tunstall Special Opportunities Fund ("Tunstall").  In the email, Surgent instructed Daugherty that Dondero directed that the documents were to be distributed to the board of directors by the end of the day.  This was just one of many emails from Surgent to Daugherty pushing to get Tunstall launched.  Daugherty continued to resist signing the Tunstall Capital Management, LP ("Tunstall Capital") documents because he was not comfortable with numerous elements of the documents, including the fee structure to be paid to Tunstall Capital to manage Tunstall.

57.     Daugherty made his views opposing the structure of Tunstall Capital and the fees paid by Tunstall clear to Dondero during several meetings in Dondero's office.  On September 1, 2010, Daugherty learned that all committee members for the portfolio companies had approved the formation of Tunstall and the fees structure.

58.     On January 22, 2011, Dondero sent Daugherty another email stating that 75% of Tunstall Capital fees had already been distributed (to Dondero and Okada and their affiliates via Highland Services), and that the remainder must be distributed by February 15, 2011 to Daugherty, and he needed to sign the documents.  Daugherty again refused to sign.  On March 13, 2011, Daugherty was informed that Tunstall Capital was a part of his compensation for 2010. He received several other emails from Dondero, declaring that he needed to sign the Tunstall Capital documents.  Daugherty again refused to sign.

59.     Having his past incentive compensation awards virtually wiped out from late 2008 to early 2009, but avoiding a bankruptcy filing for HCM, Daugherty focused on managing his HCM private equity portfolio back to health, and again began to experience significant successes by the end of 2009 and into 2010.  HCM stabilized, primarily as a result of hundreds of millions of dollars of gains due to Daugherty's investments and restructuring contributions. Dondero proposed that Daugherty launch a new follow-on fund to Restoration, which had been tremendously successful under his leadership.  Daugherty began the marketing process for Tunstall RCP II in early 2011.

60.     Daugherty received his Compensation and Benefits letter for 2010 on the last day of February 2011.  He was disappointed to see that he was awarded less compensation than the year before, reduced by 50% of the board fees he was allowed to keep pursuant to HCP's Board

Compensation Turnover Plan, with a payout over two years instead of one. He was also told that Dondero would not grant him the promised 5-10% ownership interests in any of the new branding initiatives agreed to earlier. Finally, he was again told to sign the Tunstall Capital documents so that he could receive his 25% share and fees earned at that entity. Daugherty expressed his disappointment to Dondero. Dondero explained that Daugherty had to trust him and that he based his decision on Highland 2.0 (a "back to future" attempt at resetting HCM's culture to the earlier days of HCM when Dondero made decisions and awarded or changed compensation purely at his discretion). Daugherty told Dondero that Highland 2.0 would not work for him because he wanted an agreement in writing that clearly defined how he and his team would be compensated. He told Dondero that he would negotiate in good faith thru the end of the summer of 2011, explaining that if they did not have a deal by that time, he would resign from HCM at the end of the summer.

61.    In the spring of 2011, Dondero asked Daugherty and David Smith ("Smith") what they thought the ultimate value and recovery would be for Cornerstone equity and bank debt, respectively, and whether Daugherty would be interested in buying some cheap for the Restoration Fund. Daugherty and Smith gave Dondero their views regarding the value of the Cornerstone debt and equity consistent with their presentations that had been prepared on a quarterly and semi-annual basis for investors. Daugherty and Smith presented Dondero with a series of analyses demonstrating what the value of the Company could be once the reimbursement environment had stabilized. Dondero then directed HCM trading personnel to offer to purchase Cornerstone's equity and debt at a significant discount from the valuation offered by Daugherty and Smith.

004609

62.     After a couple of weeks had passed, Dondero informed Daugherty and Smith that the seller was actually the committee representative for the Strat Fund, and that they were willing to pursue a sale of their Cornerstone interests for liquidity reasons, so long as the buying party was not affiliated with HCM because they did not trust Dondero's or HCM's pricing motives. More time passed, leading Daugherty and Smith to assume that the trade had died.

63.     As summer began, Dondero began to show enhanced interest in how Cornerstone was valued.  Daugherty found this strange, since the value used for Cornerstone was basically meaningless because the funds that held the investment did not pay fees based on estimated values; they only paid incentive fees based on realized values (e.g. when the asset was actually sold).  Daugherty and Smith had appropriately and conservatively marked the position for many months and had discounted the negative factors that could impact the stock price over the foreseeable future.

64.     As Dondero continued to pursue a transaction with the Highland Credit Strat Committee, he directed that a third-party valuation of Cornerstone should be performed.  By early August, the new valuation of Cornerstone had been completed, and Smith presented it to Dondero.  However, Dondero was not pleased with the new valuation of Cornerstone because it was "not low enough."  Smith explained that Cornerstone was already conservatively marked and that he and the third-party valuation expert had already valued Cornerstone at a steep discount compared to its publicly-traded peers.  Boyce was put in charge of getting a "better" third-party valuation.

65.     While Daugherty was out of the office, Dondero and Boyce directed Smith to present additional and more onerous discounts to the third-party valuation expert.  Additionally,

Dondero, after being fully appraised of the value of real estate owned by Cornerstone as well as settlement negotiations in Cornerstone's pending litigation, instructed Smith to ignore and to omit any other value from the third-party firm's data package.  Dondero and Boyce instructed Smith to make additional value reduction assumptions, including more draconian future reimbursement assumptions and management team discounts that would further reduce the third-party valuation.  Finally, Dondero and Boyce received the lower valuation they had sought and presented it to the Highland Credit Strat Committee as proof for the legitimacy of their low bid price.

66.    About this same time, Dondero instructed Daugherty and Smith to begin the process of granting another series of options for the Sierra Verde vehicle in order to true-up the dilutive effect of the rights offering promulgated by the Restoration investment into Cornerstone in December 2010, which effectively diluted/reduced the ownership of preexisting holders by approximately 30%.  The purpose of the original rights offering was to infuse additional capital into Cornerstone so that it could make strategic acquisitions and acquire hospital real estate assets.

67.    By the end of August 2011, Smith reported to Daugherty that Lyons was not comfortable with the mechanics of the second round of equity/option grants and that the request had "numerous problems."  Daugherty instructed Moore, who had been the point man on the original Sierra Verde transaction, to take over the discussions with Andrews Kurth, and to advise Daugherty about any problems he discovered.  By mid-September, Moore indicated that a second round of equity/option grants was not advisable at the past levels due to the company's material improvement since the last grants.  Daugherty agreed with Moore's assessment and

informed Dondero accordingly. Dondero disagreed with the assessment and instructed Daugherty to "find a way to get it done." Daugherty said he would try to find a way to complete the transaction, but that it was unlikely.

68. Also during the summer of 2011, Dondero broached the subject of having Daugherty serve as CEO of Cornerstone, while Dondero assumed the role of Chairman of the Board. Dondero told Daugherty that they could each collect the equivalent of a CEO's salary via this arrangement. Daugherty disagreed and explained to Dondero that there could only be the equivalent of one CEO's salary paid, regardless of the split between the CEO and Chairman responsibilities. Dondero then proposed a co-CEO arrangement: Daugherty would manage "operations" and work at Cornerstone three days a week while Dondero would handle "marketing" and work at Cornerstone two days a week. Dondero also informed Daugherty that Dondero would receive 60% of the CEO compensation while Daugherty would receive 40%. Dondero suggested that they would not have to follow the firm's Turnover guidelines as used for board fees. Daugherty disagreed. Dondero gave Daugherty a highlighted copy of the Restoration indenture and told him that HCM's legal/compliance group recommended that they would have to turnover certain compensation mandated by the indentures consistent with the process for board fees earned by HCM employees, but that Dondero thought it was a "grey area" and would let Daugherty decide. Daugherty showed the highlighted document to Moore and told him he did not think there was any way to keep all of the compensation as Dondero suggested. Moore agreed, and Daugherty informed Dondero that he concurred with HCM's legal/compliance department's conclusions that Dondero's approach was not permitted. Dondero and Daugherty were elected as co-CEO's of Cornerstone during the last week of

August 2011. Daugherty resigned by the end of September and never collected any compensation for his services as co-CEO of Cornerstone.

69.   In early September 2011, Dondero informed Daugherty of his intent to issue a second rights offering for NexBank Capital, Inc. ("NexBank Capital"). NexBank Capital is a holding Company controlled by Dondero, Okada and their affiliates, and is the sole shareholder of NexBank Capital, SSB). Daugherty and other senior HCM and affiliate employees had been granted shares in NexBank Capital pursuant to their Compensation and Benefits award for 2004. After Todd Travers and Davis Deadman left HCM and its affiliates in 2010, Dondero ordered the first rights offering to raise capital for NexBank Capital. Dondero disputed with Travers and Deadman regarding the "fair value" and lack of arms length process for the rights offering. Dondero guided the valuation experts' price lower so that he could cheaply dilute existing holders who were unwilling to participate under Dondero's leadership. Existing holders that were HCM employees were expected to be "loyal" and participate or suffer reprisals in their 2011 bonuses. Travers and Deadman were removed from the board and subsequently diluted. Daugherty reluctantly participated and was named to the NexBank Capital board of directors in early 2011. When Dondero informed Daugherty of his intent to launch a second rights offering in September 2011, Daugherty protested. This time, Dondero launched an even lower value for the rights offering and did not even bother to retain a third-party valuation expert. Dondero assured Daugherty that he would benefit because his purpose was to increase the ownership of current HCM employees like Daugherty and decrease the ownership of those former employees perceived as "disloyal" to the firm. He specifically identified Travers and Deadman as being his targets for dilution. Daugherty and other senior ranking HCP employees declined to participate.

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 26
1056534.9

Daugherty later learned that Amit Wahlia, who did not participate, was subsequently demoted and reassigned to report to a more junior HCM employee, Trey Parker, in early 2012.

70.    Daugherty worked from Montana during the Summer of 2011, and spent most of his weeks on the road attempting to raise funds for Tunstall RCP II, a second distressed for control private equity fund. From March 2011 to September 2011, Daugherty was also in the process of negotiating his future compensation package with Dondero that would keep him at HCM through the investment period of Tunstall RCP II, which was about 5 years. Daugherty made it clear to Dondero in March 2011 that he intended to leave HCM if a new arrangement could not be worked out. He also told Dondero that he would not remain at HCM through the first close on Tunstall RCP II without an agreement that committed him to the firm for the investment period of the Tunstall RCP II Fund. Dondero assured Daugherty that he would provide him and his team with more autonomy and a market-based deal by the end of the summer.

71.    Dondero offered Daugherty a Compensation and Benefits Statement that was delivered to Daugherty by Brian Collins on September 26, 2011. The statement included a series of inducements that included cash and bonuses, 25% of the management fees in Tunstall RCP II, the 40% share of the CEO compensation from Cornerstone, full retention of portfolio board fees as allowed by HCM compliance, 15% of a future REIT (assuming it was launched) and 25% of the before-mentioned Tunstall Capital management fees.

72.    Daugherty had concerns about some of the components of the compensation offer, namely the co-CEO role at Cornerstone and the Tunstall Capital fees. However, before he could address these issues, Dondero retracted the REIT award and inexplicably rescinded the entire

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 27
1056534.9

004614

offer on September 27, 2011.  When Daugherty called Dondero to protest, he was told "Fuck you! Quit!"  When he later tried to discuss the matter by email, Dondero sent him a response (with a copy to Boyce) telling him: "[You] will get no agreement in writing" and "[You] will trust or you will leave."

73.     By this point, Daugherty was already very frustrated by the proposition of having Dondero as a co-CEO of Cornerstone, since he regularly missed entire board meetings and corporate dinners for Cornerstone and other portfolio companies in which he served as board member.  He was also tired of having his job made more complicated by constantly having to find solutions to Dondero's self-dealing and conflicts of interest.  Further, he was generally disgusted by Donderos's attempts to manipulate mark-downs so that he could take advantage of his own investors.   Daugherty was unwilling to tolerate Dondero's latest attempt to re-trade his commitment to Daugherty's compensation and bonus terms and was totally fed up with the entire HCM culture, which pitted senior managers against one another in order to incite negative comments and backstabbing to justify paying each less. Daugherty submitted his letter of resignation on September 28, 2011.

74.     The day following his resignation and pursuant to his 30-day notice, Daugherty reported to work and attended a meeting in Boyce's conference room to present his thoughts and recommendations on each investment within his portfolio and each member of his team.  Boyce and Britain were in attendance.  Daugherty again brought up the problems with issuing a second round of equity/option grants for Cornerstone to the Sierra Verde entity.  He also told all in attendance that the lawyers at Andrews Kurth, as counsel to Cornerstone and the board, were

unlikely to approve of the supplemental issuance demanded by Dondero and that the idea should not be pursued. He continued to give his views on other portfolio positions and personnel.

75.    After the meeting, Boyce and Britain conspired to deprive Daugherty of his earned compensation by converting and modifying contracts and vessels which Daugherty had vested ownership in. They both disliked Daugherty and each stood to gain by acquiring power and prestige with his departure. Throughout 2011, Boyce inserted himself into the affairs of Daugherty's team and created problems and tensions in order to undermine Daugherty. Boyce and Britain also led the implementation of Highland 2.0, which was used to reduce Daugherty's influence at the firm and over his team.

76.    On September 30, 2012, Boyce and Britain began interrogating many of the members of Daugherty's private equity team regarding the initial Sierra Verde grants and the formation of that vessel. Boyce was livid to learn that he had not been included in the Sierra Verde transaction and that its value was now substantial. In fact, Boyce and Britain focused much of their attention in the days following Daugherty's departure on investigating and confronting private equity team members with the fact that their equity/option grants could now be worth more than what Boyce and Britain had received in total compensation for 2010.

77.    Their accusations were self-serving and wholly ignored the fact that the Sierra Verde grant process began in 2009, when all security levels were much lower because of the global financial crisis against a context where HCM itself had defaulted on its bank loans and had contemplated filing for bankruptcy. Their investigation ignored the fact that these grants were approved by the independent board members on behalf of each company following a process that was dictated by outside counsel at Andrews Kurth and by HCM counsel, Surgent, on

behalf of the HCM-managed funds. In fact, Britain boasted that he intended to never speak to Daugherty again upon hearing of his resignation. This obviously made it difficult for Britain to determine the reason for Sierra Verde's creation and the purpose and process behind it.

78.    Several of the private equity team members, including Moore, Lawler, Smith and Callan, reported to Daugherty that Boyce and Britain were determined to unwind the Sierra Verde vessel and presented it as a rogue transaction promulgated by Daugherty. Never once did Britain or Boyce seek Daugherty's explanation for the genesis, scope and intent of the plan. They later discovered that Dondero had mandated the plan in 2009 and that Surgent had given the Legal Department's approval for the plan -- with Lyon's blessing.

79.    On October 2, 2011, Dondero reached out to Daugherty to have drinks at Nicola's Restaurant telling Daugherty:  "Life is too short for it to be anything but a pleasant exchange between two battle-hardened warriors."  They met at Nicolas's on October 6, 2011.  In that meeting, Dondero discussed, in great detail, how he recently discovered his wife's infidelity. He suggested that other wives of HCM employees had not been faithful to their husbands as well, while assuring Daugherty that his wife had remained faithful.

80.    Dondero then offered, as evidence of his wife's unfaithfulness to their marriage, about 20 pages of emails and text messages between his wife and her alleged lover.  He explained to Daugherty that he had spent about three sleepless days reading almost 20,000 emails and texts raided from various tracking sources he had through his connections with certain branches of the intelligence community.  Dondero explained that the emails and texts covered every communication his wife had over their five-year marriage.  He also mentioned

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,
COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 30
1056534.9

that he had used sources that were illegal in order to obtain the information and had committed about 20,000 misdemeanors in the process.

81.     In the meeting, Dondero went on to explain that at the time of Daugherty's resignation, he was in the process of reviewing these communications and that initially, a cell phone number he identified as belonging to Daugherty kept recurring, causing him to think Daugherty may have been having an affair with his wife as well.  Dondero admitted that it was not until the following week when he was able to match up phone numbers with messages that he had been able to determine that his wife was communicating with Daugherty's wife, primarily regarding children's activities.

82.     Dondero then attempted to entice Daugherty to come back to HCM by re-offering him the options of Cornerstone that had previously been held in the Sierra Verde vessel, which had been illegally dissolved after Daugherty's departure.  He also offered Daugherty the full CEO position at Cornerstone, conditioned upon Daugherty's agreement that Dondero could alter his compensation as he felt appropriate and that his private equity team members could be reassigned as Dondero determined to be necessary.  Dondero also told Daugherty that he would continue to lead the marketing effort for the Tunstall RCP II Fund.  He dangled other incentives before Daugherty in order to attempt to entice him to return, including his right to maintain his board positions at MGM Studios and Safety-Kleen Systems, Inc.

83.     Daugherty was understandably unnerved by this entirely bizarre conversation.  He thanked Dondero for the offer, but respectfully declined.  As Daugherty prepared to leave, Dondero asked that Daugherty think it over and get back to him with a final answer later.  The following morning, Daugherty reported to work and was soon greeted by Boyce who remarked

that he had heard the meeting with Dondero "went well" and that Daugherty would be staying at HCM under the revised offer proposed by Dondero. Daugherty informed Boyce that while the meeting was civil, he had no intention of remaining at HCM under the new terms or under any other terms. Boyce left Daugherty's office with a surprised look on his face.

84.     On October 12, 2011, Boyce informed Daugherty that Dondero had originally instructed him to find a way to get out of paying Daugherty under Sierra Verde the day after Daugherty resigned. Boyce, in an attempt to play "good cop," then assured Daugherty that he would try and get him the value of his Sierra Verde holdings. Boyce's efforts were hollow, since he did not like Daugherty. Boyce considered Daugherty a threat and envied Daugherty's senior position within the firm. Boyce desperately wanted to lead the private equity group managed by Daugherty. When Daugherty informed Boyce that he was unwilling to accept Dondero's revised offer, Boyce aggressively lobbied to have Daugherty removed from the office immediately.

85.     When Daugherty returned to the office on October 17, 2011, Boyce had Brian Collins, Head of Human Resources, present Daugherty with three documents relating to HCM's separation offer: (1) Sierra Verde Consent – a document to be signed by the Board of Directors of Sierra Verde agreeing to have the vessel dissolved; (2) Cornerstone Separation Agreement - a document dictating that Daugherty was no longer co-CEO and Chairman of Cornerstone, and that he would be paid $600,000.00 over the following 18 months in exchange for his continuing duty to consult and cooperate relating to Cornerstone matters; and (3) HCM Separation Agreement – with new and more restrictive terms and release provisions from Daugherty's 2004 Employment Agreement. At this meeting, Daugherty stated that he wanted his compensation

awards and that he was exercising any rights to be paid such awards. Daugherty received a compensation spreadsheet explaining his remaining payouts.

86.     Daugherty was also informed by various HCM employees that Dondero had hastily called a brief meeting with Restoration investors the previous Friday and had informed them that Daugherty had resigned from the firm because he had "flaked out" and "wanted to go to Montana because he didn't know what he wanted to do with his life." Dondero also told Julie Silcock at Houlihan Lokey that Daugherty had "taken a one year leave of absence."

87.     Within days of being asked to vacate HCM's offices, Daugherty received immediate pressure from Surgent, Collins and Dondero to sign the new separation documents, which he refused to do. He also noted that the documents he was given instructed him to seek the advice of legal counsel, which he had not had a chance to do. On October 20, 2011, Daugherty asked Collins if the offer was an all or nothing deal and whether he had to execute all three documents in order for any one of them to be effective. Collins replied that he did.

88.     Daugherty also inquired of Surgent why Sierra Verde was being unwound and dissolved. Surgent told him it was an "improper transaction" and was not permitted under the relevant indenture documents. When Daugherty asked how it was that this was just being discovered now, especially since Surgent was involved in the Sierra Verde approval and formation process dating back to 2009, Surgent did not respond. Daugherty said he was willing to entertain substitute consideration if there was a legitimate mistake, but that he was confused as to how it was now determined that the indenture did not permit Daugherty and the private equity team to receive options on the performance of Cornerstone and Trussway – especially since a payment could only be realized upon a successful sale of the company, with full disclosure to the

funds' investors. Further, if the Sierra Verde vessel was improper, Daugherty could not understand how it was permissible for him to receive monthly payments by Cornerstone equaling $600,000.00 under the proposed Cornerstone Separation Agreement, when there was no connection to Cornerstone's performance and the payments would not be visible to the fund's investors. Surgent again did not respond.

89.    Daugherty further inquired about how the rest of his private equity team was being compensated. Surgent refused to answer Daugherty's question, other than to say that his former private equity team had been taken care of. Finally, Daugherty asked Surgent how it was deemed that the performance-driven option program under Sierra Verde was considered impermissible but the Tunstall fees were considered permissible. Surgent did not respond.

90.    Daugherty later discovered that the Cornerstone independent board members had not been informed of the Sierra Verde unwind and were completely unaware that there was a compensation dispute with Daugherty. Dondero left voice messages with Daugherty telling him he needed to sign the documents and offering to update him on "what it's like to be married to a tramp wife."

91.    On October 27, 2011, Dondero sent Daugherty an email notifying him that HCM had changed the documents and that all of the new documents would have to be signed. Surgent, Collins and Dondero attempted to schedule another meeting to discuss the new documents on October 28, 2011. Daugherty declined to discuss the matter further with HCM and referred the matter to his attorneys.

92.    In January 2012, Daugherty was informed that Dondero, Boyce, Britain and Honis were schedule to host an investor committee update for the Crusader Fund. Daugherty

was listed in the presentation materials as having left HCM for "lifestyle" reasons. Dondero explained to those in attendance that Daugherty left HCM due to "lifestyle" reasons, that he was "burned out," that he was only willing to "work 30 hour weeks," and that he had effectively spent the summer of 2011 on vacation in Montana. Dondero, Boyce, Britain and Honis knew these remarks were wholly untrue, misleading and defamatory in nature. To the contrary, Daugherty was actively managing the various funds and investments and people that reported to him, and was aggressively marketing the new Tunstall RCP II Fund. Dondero was fully aware of, and indeed specifically approved of, Daugherty's request to work from a base in Montana during the summer of 2011 since so much of his time was spent on the road attending board meetings and marketing Tunstall RCP II in places like Dallas, Chicago, Boston and New York. In fact, Daugherty maintained an approximate 57 hour per week average approved by Dondero through the day of his resignation.

93.     The Crusader investors did not trust Dondero because of the misrepresentations, broken promises and activities that took place with the management of their fund since 2008. Many of them knew Daugherty to be blunt, honest and hard working, and found it suspicious that he would leave HCM for "lifestyle" reasons. They insisted on having access to Daugherty to conduct an exit interview. Dondero and HCM complied with this demand and included Daugherty's email and contact information in the same presentation materials that listed Daugherty as having left for "lifestyle" reasons.

94.     In late January 2012, Daugherty participated in exit interviews with certain fund committee members and detailed his views on the prospects and liquidity for the various fund investments and his reasons for leaving HCM. Daugherty presented his views in the same

manner and thoroughness that he had done while conducting quarterly and semi-annual updates consistent with his responsibilities at HCM.

95.     Apparently, Daugherty's views were materially inconsistent with information and advice provided by Dondero, Boyce and Britain regarding the companies in the Fund. Daugherty gave a very strong review of one of the fund's largest investments, noting that discussions were taking place at the board level to sell one of the Fund's companies to a private equity firm or take it public in an IPO (Initial Public Offering) in the third quarter of 2012, which would likely more than double the price of the stock.  Britain and Dondero had presented a completely different scenario to these investors, telling them there were no plans for a liquidity event.

96.     Britain and Dondero had recommended that these investors sell their shares into a HCM-endorsed tender that the portfolio company was pursuing at the direction of Dondero and Britain at half of the expected IPO/sale price.  The investors were told this was their only foreseeable option for liquidity, while Dondero and Britain were simultaneously campaigning to block the company from pursuing the IPO or outright sale.  Dondero and Britain knew this would transfer more value to themselves and to HCM, since other HCM-managed funds were paying full management fees and incentive fees to HCM and this would increase one fund's percentage ownership of the company at the expense of another fund's investors.  The net effect of their scheme allowed higher fee paying funds to increase their ownership and take part in the higher price liquidity event later, while funds that had suspended fees to HCM would sell out at depressed levels.  Additionally, Dondero and Britain were actively trying to acquire shares in the

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,
COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 36
1056534.9

company from an investment bank for their personal accounts, while instructing the fund's investors to tender (sell) their shares.

97.     Daugherty was asked by the committee to give his views on value and future prospects of another portfolio company.  Daugherty told the group that the bank debt was easily worth 100% on the dollar, and that the equity would likely be worth two and maybe three times its current market price.  Daugherty mentioned that EBITDA had significantly improved and there was a significant potential value from a proposed settlement.

98.     In contrast, Daugherty learned that Dondero and Boyce had presented a far lower and bleaker value picture.  In addition, among other things, they omitted any reference to the EBITDA improvement.  Instead, they focused their analysis on the trailing reported quarterly EBITDA numbers and contraction by trading multiples of industry peers.  Daugherty later learned that Dondero and Boyce were attempting to buy the debt and equity in this company from other Highland fund investors at deep discounts.

99.     This pattern of abuse and self-dealing continues through the acts of Dondero, Okada, Britain, Boyce and Surgent. Recently, these same principals threatened investors to agree to being bought out at .75 cents on the dollar on their entire holdings in a fund, or run the risk of having their covenants stripped and being made silent partners if HCM was able to raise enough cash to buy over 50% of the partnership.  Simply put, HCM is attempting to raise cash from new investors in order to steal the assets of its old investors by claiming that they are "distressed."

100.     In response to a request from Dondero on Christmas Eve 2011, Daugherty agreed to meet Dondero for drinks on February 2, 2012.  Daugherty had been subpoenaed by Rebecca Dondero to testify in the Dondero's divorce that morning, but the hearing had been postponed.

Dondero again chose Nicola's Restaurant to meet. During the meeting, which lasted about an hour and a half, Dondero explained to Daugherty how evil his wife was and why he was determined to pay her nothing in the divorce. Daugherty advised Dondero to pay his wife the $5 million stipulated in their prenuptial agreement because she would always be the mother of his children and would always have primary custody of them. Daugherty also advised Dondero that it wasn't good for the kids to see their father disparaging their mother in public as a "whore." Dondero said he was leery about the cost of litigation, but was following his lawyer's advice that "if his wife got all of the money up front, it would be too easy to just leave the kids with a nanny and go party in Aspen." Dondero further commented that he could also trade custody for more cash compensation at a later date.

101.    Dondero then briefly mentioned Daugherty's unresolved compensation issues and acknowledged that Daugherty was treated poorly during his exit from HCM. Daugherty expressed his opinions about the real value of Sierra Verde and its underlying investments. Dondero mentioned his appreciation for Daugherty's most recent investments/restructurings and the positive impact they had on the firm's performance (MGM, Safety-Kleen, Rotech and Graceway Pharmaceuticals just to name a few). Dondero further stated that he would try to get Daugherty's compensation issues resolved quickly.

102.    Daugherty awoke the next morning to a phone message requesting that he call Dondero back. The message had been left around 9:00 p.m. the previous night. Daugherty called Dondero around 7:30 a.m., and Dondero proceeded to interrogate Daugherty as to why Rebecca Dondero was seeking his testimony. Daugherty explained that he did not know, but that he was subpoenaed and was required to produce any emails between him and Dondero in 2011,

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION – Page 38**
1056534.9

any financial information of HCM, any partnership documents, and to surrender his cell phone. Dondero then attempted to help Daugherty remember how he should testify regarding his wife, suggesting that it was Daugherty's idea that he pay his wife nothing and that Daugherty had referred to Dondero's wife as a whore. Daugherty denied Dondero's manipulated version of the facts and reminded Dondero that he had encouraged him to seek marriage counseling in September 2011. Dondero became annoyed and hung up on Daugherty.

103. On February 9, 2012, Dondero phoned Daugherty and left him a message, again offering to pay him $600,000.00 from Cornerstone with a "consulting contract" in exchange for seizing his Sierra Verde shares. He also offered to purchase Daugherty's shares in Nexbank Holdings for $40 per share, compared to a recent rights offering price of $30 per share, as long as Daugherty would cease communications with former investors and executives of companies affiliated with HCM's funds.

104. Daugherty reminded Dondero that he was very familiar with the appropriate value for Cornerstone, since he had presided over the investment in various capacities as Chairman, Executive Chairman and CEO since 2008. Daugherty refused to accept Dondero and Boyce's valuation. Dondero raged at Daugherty, claiming it was his mark that was used for valuation purposes, but Daugherty reminded Dondero that it was his and Boyce's valuation, since they were the ones who ordered Smith to have the company revalued by a third-party firm while Daugherty was working from Montana.

105. Dondero then angrily proclaimed that he had spoken to someone at Concorde who told him they were not pursuing the Strat sale because Daugherty had given them HCM's confidential information and had told them not to do so. This was not true. Concorde

004626

representative served on both the Crusader committee and the Strat committee, and were thus informed of Daugherty's views of Cornerstone during the exit interview granted by HCM. Concorde independently determined not to sell to Dondero or his affiliates, despite numerous attempts by Dondero to induce a sale through the summer of 2011.

106.   In the last week of February 2012, Dondero instructed certain HCM employees, as board members of the HERA program, to amend the governing documents. The amendments would allow the entity to terminate the payments and ownership interests if the board, in its sole discretion, determined that a former employee violated the terms of the confidentiality provisions in HCM's employment agreement. Dondero also instructed the board members to amend the governing documents to cause any former employee to forfeit his interest if he or she ever brought suit against HCM. This effectively made it impossible for anyone to enforce collection under the rewards program. These actions took place even though Daugherty was fully vested in the program and received a 2011 W2 from HCM claiming it as income for Daugherty and an expense for HCM.

107.   In the first week of March 2012, Dondero, Okada, Boyce and Britain called a mandatory meeting among HCM professionals to inform them that there would soon be litigation with Daugherty, and that anyone caught communicating with Daugherty for any reason would be fired on the spot. They were also told that anyone who helped HCM provide damaging testimony or dirt on Daugherty would be well-regarded by management, and any misdeeds or failings of the past would be forgiven.

108.   On March 19, 2012, Daugherty received a letter from counsel for HCM alleging broad, ambiguous and unsupported violations of various agreements, and claiming that

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,**
**COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 40
1056534.9

Daugherty had therefore forfeited "compensation and other payments and distributions" that he was entitled to under "any policy, plan, or agreement with Highland or any of its affiliates." Such conduct constitutes an anticipatory repudiation of the parties' agreements.

109.   On April 4, 2012, Daugherty testified, pursuant to a subpoena issued by Rebecca Dondero, in Dondero's divorce proceedings, currently pending in a Family District Court in Dallas County. At the hearing, Daugherty testified that he believed Highland was stable and solvent. He also testified that while he was having drinks with Dondero, Dondero told Daugherty that he was going to get his net worth down to as little as possible in order to avoid paying his wife the $5 million that she was entitled to pursuant to the couple's prenuptial agreement. During the hearing and after Daugherty had testified, Dondero stated, off the record, that he would "destroy" Daugherty. Two weeks later, Plaintiff filed its Original Petition.

## V.

## <u>GENERAL CAUSES OF ACTION</u>

110.   For each cause of action herein, Daugherty re-alleges and incorporates by reference each and every allegation and statement contained in the foregoing paragraphs as if fully set forth herein.

### A.    REQUEST FOR DECLARATORY JUDGMENT AS TO THE EMPLOYMENT AGREEMENT

111.   Pursuant to Section 37.001 of the Texas Civil Practice & Remedies Code, *et seq.*, Plaintiff requests that the Court determine the rights of the parties with regard to the Restrictive Covenants contained in Section 5.3 of the Employment Agreement. Plaintiff seeks a declaratory judgment that the non-solicitation and non-competition covenants are overly-broad and unenforceable and not reasonably tailored to protect the business interests and good will of HCM

004628

and are accordingly, unenforceable under Section 15.50 of the Texas Business & Commerce Code.

**B.     BREACH OF THE EMPLOYMENT AGREEMENT AGAINST HCM**

112.    Pursuant to the Employment Agreement, Daugherty was entitled to participate in any bonus, option or similar incentive compensation plan, including the LTIP, the HERA Plan, Sierra Verde and HCM's Defined Benefit Pension Plan.   Daughtery's termination under the Employment Agreement was a "Voluntary Termination—Non-Competing Business," as dictated by Section 4.5 of the Employment Agreement, which requires HCM to honor any amounts or rights to which the employee would be entitled to under any other written agreements with HCM.

113.    Section 4.5 of the Employment Agreement further required HCM to pay Daugherty severance pay dependent upon his execution of a separation agreement and release "substantially in the form" as Exhibit "A" to the Employment Agreement.  In further breach of the Employment Agreement, HCM presented Daugherty with a General Release and Separation Agreement on October 27, 2011 which did not resemble, in any respect, Exhibit "A" to the Employment Agreement.

114.    By reason of the foregoing acts and conduct of HCM, and breach of numerous agreements, including the Employment Agreement, Daugherty has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

004629

C.    **DEFAMATION AGAINST HCM AND DONDERO**

115.    In connection with Daugherty leaving his employment with HCM, HCM and Dondero published false statements of fact regarding Daugherty stating, among other things, that Daugherty was "burned out" and had left for "lifestyle" reasons. HCM and Dondero made such statements knowing them to be false, and published them to third parties intentionally with actual malice or reckless disregard for the truth and/or created an unreasonable risk that the defamatory statements would be communicated to third parties.

116.    HCM and Dondero's actions constitute defamation *per se,* because the nature of the defamatory statements related to Daugherty's professional character, reputation or standing. HCM and Dondero's defamation of Daugherty proximately caused damage to Daugherty in excess of the minimum jurisdictional limits of this Court.

## VI.

## <u>SIERRA VERDE CAUSES OF ACTION</u>

117.    For each cause of action herein, Daugherty re-alleges and incorporates by reference each and every allegation and statement contained in the foregoing paragraphs as if fully set forth herein.

A.    **BREACH OF CONTRACT AGAINST SIERRA VERDE AND DONDERO**

118.    On December 16, 2010, a Limited Liability Company Agreement ("Agreement") was entered into by Sierra Verde and certain Members, including Daugherty, who were holders of units. Pursuant to the Agreement, Dondero was named the Manager of Sierra Verde and given "sole right, power and authority to manage, direct and control all of the business and affairs" of Sierra Verde.

<u>PATRICK DAUGHERTY'S ORIGINAL ANSWER,
COUNTERCLAIM AND THIRD-PARTY PETITION</u> – Page 43
1056534.9

004630

119.    After Daughterly left his employment at HCM, and in an illegal and unilateral breach of the Agreement intended to cause harm to Daugherty and to deprive him of his valuable ownership interests in Sierra Verde, Sierra Verde and Dondero took steps to purportedly unwind and dissolve Sierra Verde.

120.    Sierra Verde and Dondero further breached the Agreement by failing to give Daugherty, as a holder of units, his entitled vote, as required by Section 3.3 of the Agreement.

121.    Sierra Verde and Dondero failed to deliver to Daugherty, as a holder of units, the quarterly reports required by Section 3.5 of the Agreement, again in breach of the Agreement.

122.    Sierra Verde and Dondero engaged in other acts amounting to blatant, illegal breaches of the Sierra Verde Agreement, including but not limited to, the improper delegation of power and authority to Dondero as Manager and the failure to properly distribute cash and assets of Sierra Verde to Daughtery, as a holder of units, upon the dissolution of Sierra Verde.

123.    By reason of the foregoing acts and conduct of Sierra Verde and Dondero, Daugherty has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

**B.    OPPRESSION OF A MINORITY SHAREHOLDER AGAINST SIERRA VERDE AND DONDERO**

124.    At all relevant times, Daugherty was a minority holder of units in Sierra Verde. Sierra Verde and Dondero, as Manager, have engaged in conduct that constitutes oppression of Daugherty, a minority shareholder, including but not limited to the following: (i) unwinding and dissolving Sierra Verde; (ii) failing to provide Daugherty with required quarterly reports; (iii) committing multiple breaches of the Sierra Verde Agreement; (iv) failing to provide Daugherty

with his voting rights under the Agreement; and (v) failing to distribute any property or other assets to Daughterty in accordance with his ownership interests.

125.    The actions of Sierra Verde and Dondero served to substantially defeat the expectations of Daugherty, as a member of Sierra Verde with a minority ownership. Daugherty's expectations were both reasonable under the circumstances and central to his decision to continue in the employ of HCM. Further, the actions of Sierra Verde and Dondero were burdensome, harsh, and wrongful conduct amounting to a lack of probity and fair dealing in the affairs of Sierra Verde to the prejudice of Daugherty. Sierra Verde and Dondero visibly departed from the standards of fair dealing on which Daugherty was entitle to rely.

126.    By reason of the foregoing acts and conduct, Daugherty has suffered damages in an amount in excess of the minimum jurisdictional limits of this Court.

**C.    BREACH OF FIDUCIARY DUTY ON BEHALF OF SIERRA VERDE**

127.    At all relevant times, Daugherty was a holder of units in Sierra Verde, and may thus pursue a derivative action if Sierra Verde refuses to pursue action against Dondero.

128.    As a majority shareholder and an officer of Sierra Verde, Dondero owed fiduciary duties of due care and loyalty to Sierra Verde.

129.    Dondero engaged in unfair business transactions with respect to Sierra Verede, including: (i) unwinding and dissolving Sierra Verde; (ii) fraudulently inducing holders of units in Sierra Verde to agree to unwind Sierra Verde based upon false statements of fact; (iii) attempting to coerce Daugherty to agree to unwind Sierra Verde; (iv) failing to provide Daugherty with required quarterly reports; (v) committing multiple breaches of the Sierra Verde Agreement; (vi) failing to provide Daugherty with his voting rights under the Agreement; and

004632

(vii) failing to distribute any property or other assets to Daughtery in accordance with his ownership interests.

130.    Specifically, Dondero breached his duties of (i) candor; (ii) loyalty and utmost good faith; (iii) refraining from self-dealing; (iv) integrity of the strictest kind; and (v) full disclosure.

131.    The transactions decreased the value of Sierra Verde's shares and caused damages to Sierra Verde and its unit holders.

**D.     IMPROPER WITHHOLDING OF CORPORATE BOOKS AND RECORDS**

132.    Defendant is a minority holder of units and has demanded to inspect Sierra Verde's books and records. Defendant's purpose for inspecting the company books and records is reasonably related to his ownership of a minority holder of units. Dondero refused to allow Daugherty access to the books and records; thus, they violated Tex. Bus. Corp. Act, Art. 2.44(B) and damaged Sierra Verde and its unit holders. Daugherty hereby requests that the Court compel Dondero to open the books and records of Sierra Verde to Daugherty for inspection and to award Daugherty his reasonable attorneys' fees pursuant to Tex. Bus. Corp. Act, Art. 2.44(B).

**E.     CONVERSION AGAINST SIERRA VERDE AND DONDERO**

133.    Daugherty, as a holder of units in Sierra Verde, owned, possessed, or had the right to immediate possession of his property.

134.    Sierra Verde and Dondero, in engaging in the above described intentional conduct, wrongfully exercised dominion and control over Daugherty's personal property in a manner inconsistent with Daugherty's exclusive rights to the property. This conversion of Daugherty's property was willful, malicious and in conscious disregard of Daugherty's rights.

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,
COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 46
1056534.9

135.    Consequently, Daugherty suffered damages in an amount in excess of the minimum jurisdictional limits of this Court.  Further, Daugherty is entitled to an award of exemplary damages sufficient to punish Sierra Verde and Dondero and to serve as a deterrent to such conduct in the future.

**F.    UNJUST ENRICHMENT AGAINST SIERRA VERDE AND DONDERO**

136.    Sierra Verde and Dondero illegally received and retained benefits from Daugherty when they wrongfully dissolved and maintained the property and assets of Sierra Verde.  The benefits obtained by Sierra Verde and Dondero were not gratuitous, and Sierra Verde and Dondero will be unjustly enriched if allowed to retain the benefits.

137.    As a direct and proximate result of unjust enrichment, Daugherty has sustained damages in an amount in excess of the minimum jurisdictional limits of this Court.

**G.    BREACH OF FIDUCIARY DUTY AGAINST DONDERO**

138.    As Manager of Sierra Verde, Dondero controlled Sierra Verde.  In engaging in the wrongful conduct described above, Dondero breached fiduciary duties owed to Daugherty as a minority holder of units in Sierra Verde.  A special relationship of trust and confidence exists between Daugherty and Dondero.  Specifically, Dondero breached his duties of (i) candor; (ii) loyalty and utmost good faith; (iii) refraining from self-dealing; (iv) integrity of the strictest kind; and (v) full disclosure.  Dondero's breaches of these duties has materially harmed Daugherty and unlawfully benefited Dondero and Sierra Verde.

139.    Daugherty is entitled to recover damages sustained by him as a result of Dondero's breach of fiduciary duty.  In addition to actual damages, Daugherty is also entitled to

recover exemplary damages because Dondero intentionally and maliciously violated the fiduciary duties he owed Daugherty.

## VII.

## HERA CAUSES OF ACTION

140.   For each cause of action herein, Daugherty re-alleges and incorporates by reference each and every allegation and statement contained in the foregoing paragraphs as if fully set forth herein.

### A.   BREACH OF CONTRACT AGAINST HCM AND HERA

141.   On October 26, 2009, a Limited Liability Company Agreement ("Agreement") was entered into by HERA and HCM and other members of the board of HERA, including Daugherty. The purpose of the HERA Plan was to receive and hold assets contributed by HCM and to distribute proceeds of those assets from time to time to create a retention initiative. Daugherty was granted units of ownership in the HERA Plan. The unilateral decision of HCM and HERA to amend the Agreement to divest Daugherty of his valuable ownership interest constitutes a material breach of the Agreement.

142.   As a result of this breach of contract, Daugherty has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

### B.   SHAREHOLDER OPPRESSION AGAINST DONDERO, BOYCE AND BRITAIN

143.   Dondero, as well as, Boyce and Britain, who were members of HERA's board of directors, which is effectively controlled by Dondero, engaged in oppressive conduct by unilaterally amending the Agreement to suspend distributions for any holder of units who commenced litigation, initiated a dispute or made a claim related to HERA or its management or

PATRICK DAUGHERTY'S ORIGINAL ANSWER,
COUNTERCLAIM AND THIRD-PARTY PETITION – Page 48
1056534.9

004635

members. This conduct substantially defeated the expectations of Daugherty, as a member of the HERA Plan with a minority ownership. Daugherty's expectations were both reasonable under the circumstances and central to his decision to join HCM. Further, these defendants engaged in burdensome, harsh, and/or wrongful conduct and a lack of probity and fair dealing in the company's affairs to the prejudice of Daugherty. Defendants visibly departed from the standards of fair dealing on which Daugherty was entitled to rely.

144.    As a direct and proximate result, Daugherty has suffered damages in an amount in excess of the minimum jurisdictional limits of this Court.

**C.    DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY**

145.    At all relevant times, Daugherty was a member of HERA with a minority ownership.

146.    As members of HERA's Board of Directors, Dondero, Boyce, and Britain owed fiduciary duties of due care and loyalty to Sierra Verde.

147.    Dondero, Boyce, and Britain engaged in unfair business transactions with respect to HERA by unilaterally amending the Agreement to suspend distributions for any holder of units who commenced litigation, initiated a dispute or made a claim related to HERA or its management or members, making it impossible for anyone to enforce collections through the rewards program.

148.    By engaging in the aforementioned conduct, Dondero, Boyce, and Britain breached their duties of (i) candor; (ii) loyalty and utmost good faith; (iii) refraining from self-dealing; (iv) integrity of the strictest kind; and (v) full disclosure.

149. The transactions decreased the value of ownership in HERA and caused damages to HERA and its members.

**D.  CONVERSION AGAINST HERA, HCM, DONDERO, BOYCE AND BRITAIN**

150. Daugherty owned, possessed, or had the right to immediate possession of his property, including his interests in HERA.

151. These Defendants wrongfully exercised dominion and control over Daugherty's personal property in a manner inconsistent with Daugherty's exclusive rights to the property. Daugherty suffered injury in an amount in excess of the minimum jurisdictional limits of this Court. Defendants' conversion of Daugherty's property was willful, malicious and in conscious disregard of Daugherty's rights. Consequently, Daugherty is entitled to an award of exemplary damages sufficient to punish HERA, HCM, Dondero, Boyce and Britain and to serve as a deterrent to such conduct in the future.

## VIII.

## LTIP CAUSES OF ACTION

152. For each cause of action herein, Daugherty re-alleges and incorporates by reference each and every allegation and statement contained in the foregoing paragraphs as if fully set forth herein.

**A.  BREACH OF CONTRACT AGAINST HCM**

153. Effective January 1, 2005, HCM established a long-term incentive program for selected key employees, including Daugherty. The LTIP was established to create positive morale and teamwork, to attract and retain key talent and to encourage achievement of common goals. Daugherty was granted long-term incentive units in the LTIP. HCM's unilateral decision

004637

to divest Daugherty of his valuable ownership interest in units held by him constitutes a material breach of the parties' agreement.

154.    As a result of this breach of contract, Daugherty has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

**B.    CONVERSION AGAINST HCM**

155.    Daugherty owned, possessed, or had the right to immediate possession of his property, including his interests in the LTIP.

156.    HCM wrongfully exercised dominion and control over Daugherty's personal property in a manner inconsistent with Daugherty's exclusive rights to the property.    Daugherty suffered injury in an amount in excess of the minimum jurisdictional limits of this Court. HCM's conversion of Daugherty's property was willful, malicious and in conscious disregard of Daugherty's rights.    Consequently, Daugherty is entitled to an award of exemplary damages sufficient to punish HCM and to serve as a deterrent to such conduct in the future.

## IX.

### ATTORNEYS' FEES AGAINST HCM, DONDERO, SIERRA VERDE AND HERA

157.    Daugherty seeks recovery of the costs and reasonable and necessary attorneys' fees incurred in connection with this action pursuant to Sections 37.009 and 38.001 of the Texas Civil Practice and Remedies Code.

## X.

### REQUEST FOR DISCLOSURE

158.    Pursuant to Rule 194 of the Texas Rules of Civil Procedure, HCM, HERA, Sierra Verde, Dondero, Boyce and Britain are hereby requested to disclose the information or material

described in Rule 194.2. This is a continuing duty and requires supplementation in accordance with the Texas Rules of Civil Procedure.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Daugherty respectfully requests that this Honorable Court grant the following relief:

Upon trial of this cause, that the Court make an award in favor of Daugherty and against HCM, HERA, Sierra Verde, Dondero, Boyce and Britain for the following:

a.    Actual damages and exemplary damages;

b.    A declaratory judgment that the covenants not to compete are unenforceable under Section 15.50 of the Texas Business & Commerce Code;

c.    Reasonable and necessary attorneys' fees and costs incurred; prejudgment and post judgment interest as allowed by law; and,

d.    Any and all further relief the Court deems just and equitable.

Respectfully submitted,

By: _____
James W. Ribman
State Bar No. 00797762
Ruth Ann Daniels
State Bar No. 15109200
Looper Reed & McGraw P.C.
1601 Elm Street, Suite 4600
Dallas, Texas 75201
(214) 954-4135
(214) 953-1332 (Fax)

**ATTORNEYS FOR PATRICK DAUGHERTY**

004639

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been transmitted by certified mail – return receipt requested to counsel for Defendant, Marc D. Katz and Aaron J. Epstein, Andrews Kurth LLP, 1717 Main St., Suite 3700, Dallas, Texas 75201, on this 22nd day of May, 2012.

James W. Ribman

**PATRICK DAUGHERTY'S ORIGINAL ANSWER,
COUNTERCLAIM AND THIRD-PARTY PETITION** – Page 53
1056534.9

004640



**LOOPER REED**

LOOPER REED & MCGRAW P.C.

Dallas | Houston | Boulder

James W. Ribman
jribman@lrmlaw.com

May 22, 2012

*__Via Hand-Delivery__*
Mr. Gary Fitzsimmons
Dallas County District Clerk
George L. Allen, Sr. Court's Bldg.
600 Commerce Street
Dallas, Texas 75202

Re:    Cause No. 12-04005; *Highland Capital Management, L.P. v. Patrick Daugherty
v. Sierra Verde, LLC, Highland Employee Retention Assets LLC, James Dondero,
Patrick Boyce, and William L. Britain*

Dear Mr. Fitzsimmons:

Enclosed please find the original and seven copies of Defendant's Original Answer,
Counterclaim and Third-Party Petition for filing with the Court along with our firm's check in
the amount of $100.00 to serve as payment for the filing and issuance fees. Please prepare
citations for the five Third-Party Defendants and contact my assistant, Stel Benavides when they
are ready for pick-up so that we have them served by private process.

In addition, enclosed you will find the original and one copy of Patrick Daugherty's
Verified Motion to Disqualify Marc D. Katz, Aaron J. Epstein and Andrews Kurth LLP, and
Patrick Daugherty's Motion for Sanctions Against Plaintiff and Plaintiff's Counsel for filing with
the Court.

Please return a file-stamped copy of all documents to our office, via our courier.

Thank you for your assistance in this matter. Should you have any questions, please do
not hesitate to contact me.

Sincerely,

*James W. Ribman* /eib
James W. Ribman

JWR/eib
Enclosures

004641

Mr. Gary Fitzsimmons
May 22, 2012
Page 2

cc:    Marc D. Katz
       Aaron J. Epstein
       (w/enclosures – via CM-RRR 7011 2000 0001 4619 4938)

       Ruth Ann Daniels (*of the firm*)

