**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P

|  |  |  |
|---|---|---|
|  | § |  |
|  | § | Case No. **19-34054-sgj11** |
| **Patrick Daugherty - Appellant** |  |  |
|  | § | **3:25-CV-01901-S** |
|  |  | CONSOLIDATED UNDER: |
| vs. | § | **3:25-CV-01876-K** |
| **Highland Capital Management, L.P; et al** - Appellee |  |  |
|  | § |  |
|  | § |  |

**[4297] Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document # 4216) Entered on 6/30/2025**

# Volume 15

# APPELLANT RECORD

Jason S. Brookner (Texas Bar No. 240033684)
Andrew K. York (Texas Bar No. 24051554)
Joshua D. Smeltzer (Texas Bar No. 24113859)
Drake M. Rayshell (Texas Bar No. 24118507)
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email:     jbrookner@grayreed.com
           dyork@grayreed.com
           jsmeltzer@grayreed.com
           drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | § § § | |

*INDEX*

## APPELLANT'S AMENDED DESIGNATION OF ITEMS
## TO BE INCLUDED IN THE RECORD ON APPEAL
## AND STATEMENT OF THE ISSUES PRESENTED

Pursuant to Fed. R. Bankr. P. 8009(a) and Docket No. 4366, Appellant Patrick Daugherty

("Daugherty") hereby submits his amended designation of items to be included in the record on

appeal and statement of issues to be presented in connection with his appeal from the *Order*

*Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the*

*Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

No. 4297] (the "HMIT Settlement Order").[2] *See Notice of Appeal* [Docket No. 4310, as amended at Docket No. 4327].

## Statement of Issues on Appeal

1. Whether the Bankruptcy Court erred in its approval of the HMIT Settlement Order [Docket No. 4297], which permits payment to Class 10 creditors before all Class 8 and Class 9 claims have been paid in full when the plain language of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. 1808], the Court's Confirmation Order [Dkt. 1943] and the Claimant Trust Agreement [Dkt. 3817-4] require full payment plus applicable interest to all Class 8 and Class 9 creditors before any Class 10 or Class 11 claims can vest.

2. Whether the Bankruptcy Court abused its discretion by approving the HMIT Settlement Order [Docket No. 4297] when the settlement is not fair, reasonable, or in the best interests of the estate as the Debtor, through its principals, is forgoing the recovery of millions in material value to the estate in exchange for, inter alia, self-serving releases of its principals.

## Designation of Record

Daugherty respectfully designates the following items to be included in the appellate record pursuant to Bankruptcy Rule 8009(a):

*000001* 1. Amended Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Dkt. 4327].

*000011* 2. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Dkt. 4310].

*000022* 3. The Judgment Order or Decree appealed from: *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4297].

*000026* 4. Docket Sheet for Bankruptcy Case No. 19-34054-sgj1 kept by the Bankruptcy Clerk.

5. Documents listed below for Bankruptcy Case No. 19-34054-sgj11:

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the HMIT Settlement Order.

4905-5299-6446

Vol. 2

| Date | Docket | Description |
|---|---|---|
| 11/18/2020 | 1426 | *Transcript regarding Hearing Held 11/17/2020 (90 pages)* RE: Motion for Temporary Allowance of Claim (#1281). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 02/16/2021. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 1422 Hearing held on 11/17/2020. (RE: related document(s) 1281 Motion for leave - Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 filed by Creditor Patrick Daugherty) (Appearances: T. Uebler, J. Christensen, and J. Kathman for P. Daugherty; J. Morris and J. Pomeranz for Debtor; M. Clemente for UCC. Evidentiary hearing. Claim estimated for voting purposes at $9,134,019 for reasons stated on the record. Counsel to upload order.)). Transcript to be made available to the public on 02/16/2021. (Rehling, Kathy) |
| 05/19/2025 | 4216 | *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (Attachments: # 1 Exhibit A--Proposed Order) |
| 05/19/2025 | 4217 | *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 05/20/2025 | 4218 | *Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust* (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |

000637

000727

000745

000773

4905-5299-6446

Vol. 2

| Date | Docket | Description |
|---|---|---|
| 05/22/2025 | 4221 | *Amended Notice of hearing filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust* (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Attachments: # 1 Exhibit A # 2 Exhibit B), 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: # 1 Exhibit A--Proposed Order)). Hearing to be held on 6/25/2025 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 4213 and for 4216, (Annable, Zachery) |
| 06/09/2025 | 4229 | *Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) (filed by Creditor Patrick Daugherty. (Attachments: # 1 Proposed Order) (York, Andrew)* |

000779

000785

4

4905-5299-6446

*[Handwritten left margin: "Vol. 3 Starts w/ 000801"]*

*[Handwritten left margin: "Thru End of Vol. 13"]*

| Date | Docket | Description |
|------|--------|-------------|
| 06/20/2025 | 4255 | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53 # 54 Exhibit 54 # 55 Exhibit 55 # 56 Exhibit 56 # 57 Exhibit 57 # 58 Exhibit 58 # 59 Exhibit 59 # 60 Exhibit 60 # 61 Exhibit 61 # 62 Exhibit 62 # 63 Exhibit 63 # 64 Exhibit 64 # 65 Exhibit 65 # 66 Exhibit 66 # 67 Exhibit 67 # 68 Exhibit 68 # 69 Exhibit 69 # 70 Exhibit 70 # 71 Exhibit 71 # 72 Exhibit 72 # 73 Exhibit 73 # 74 Exhibit 74 # 75 Exhibit 75 # 76 Exhibit 76 # 77 Exhibit 77 # 78 Exhibit 78 # 79 Exhibit 79 # 80 Exhibit 80 # 81 Exhibit 81 # 82 Exhibit 82 # 83 Exhibit 83 # 84 Exhibit 84 # 85 Exhibit 85 # 86 Exhibit 86 # 87 Exhibit 87 # 88 Exhibit 88 # 89 Exhibit 89 # 90 Exhibit 90 # 91 Exhibit 91 # 92 Exhibit 92 # 93 Exhibit 93 # 94 Exhibit 94 # 95 Exhibit 95 # 96 Exhibit 96 # 97 Exhibit 97 # 98 Exhibit 98 # 99 Exhibit 99 # 100 Exhibit 100 # 101 Exhibit 101 # 102 Exhibit 102 # 103 Exhibit 103 # 104 Exhibit 104 # 105 Exhibit 105 # 106 Exhibit 106 # 107 Exhibit 107 # 108 Exhibit 108 # 109 Exhibit 109 # 110 Exhibit 110 # 111 Exhibit 111 # 112 Exhibit 112 # 113 Exhibit 113 # 114 Exhibit 114 # 115 Exhibit 115 # 116 Exhibit 116 # 117 Exhibit 117 # 118 Exhibit 118 # 119 Exhibit 119 # 120 Exhibit 120 # 121 Exhibit 121 # 122 Exhibit 122 # 123 Exhibit 123) (Annable, Zachery) |
| 06/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |

*[Handwritten left margin: "Vol 14 003458"]*

4905-5299-6446

*Vol. 14*

*0003461*

*Vol. 15*

*0004643*

*0004654*

*0004656*

*Vol. 16*

*0004873*

*0004898*

| Date | Docket | Description |
|---|---|---|
| 06/23/2025 | 4266 | *Witness and Exhibit List of Patrick Daugherty filed by Creditor Patrick Daugherty* (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 List of 20 Largest Creditors 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 List of 20 Largest Creditors 34 # 35 Exhibit 35 # 36 List of 20 Largest Creditors 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42) (York, Andrew) |
| 06/23/2025 | 4275 | *Omnibus Reply to (related document(s): 4229 Objection filed by Creditor Patrick Daugherty, 4230 Objection filed by Partner Dugaboy Investment Trust, 4231 Objection filed by Interested Party The Dallas Foundation, Interested Party Crown Global Life Insurance, Ltd) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust. (Annable, Zachery)* |
| 06/23/2025 | 4276 | *Joinder by to Reply in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4275 Reply). (Phillips, Louis)* |
| 06/24/2025 | 4277 | *Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 124 # 2 Exhibit 125) (Annable, Zachery)* |
| 06/24/2025 | 4280 | *Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 126) (Annable, Zachery)* |
| 06/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York; Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). |

| Date | Docket | Description |
|---|---|---|
| 06/30/2025 | 4296 | *Transcript regarding Hearing Held 06/25/2025 before Judge Stacy G.C. Jernigan (266 pages) RE: Motion for an Order Further Extending Duration of Trusts (4213); Motion for Entry of an Order Approving Settlement with HMIT Entities (4216).* THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 09/29/2025. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 4294 Hearing held on 6/25/2025. (RE: related document(s) 4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s) 4144 Order on motion to extend/shorten time) Filed by Interested Party Highland Litigation Sub-Trust, Other Professional Highland Claimant Trust (Appearances: J. Morris and Pachulski team for Reorganized Debtor; R. Loigman for Post-Confirmation Trusts; D. Deitsch-Perez for Dugaboy; L. Young for UST. Evidentiary hearing. Motion granted. Counsel to upload order.), 4295 Hearing held on 6/25/2025. (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Appearances: J. Morris and Pachulski team for Reorganized Debtor; R. Loigman for Post-Confirmation Trusts; L. Phillips for HMIT Entities; M. Lang for Dugaboy; D. Curry for Dallas Foundation; L. Young for UST. Evidentiary hearing. Motion granted. Counsel to upload order.)). Transcript to be made available to the public on 09/29/2025. (Rehling, Kathy) |
| 07/16/2025 | 4317 | *Clerk's correspondence requesting to amend notice of appeal from creditor*. (RE: related document(s) 4297 Order approving settlement between the Highland Entities and the HMIT Entities and authorizing actions consistent therewith (related document 4216) Entered on 6/30/2025. (Okafor, M.)) Responses due by 7/18/2025. (Whitaker, Sheniqua) |
| 07/22/2025 | 4336 | *Certificate of mailing regarding appeal* (RE: related document(s) 4327 Amended notice of appeal filed by Creditor Patrick Daugherty Related document(s) 4310 Notice of appeal filed by Creditor Patrick Daugherty. MODIFIED linkage on 7/17/2025 (suw).) (Attachments: # 1 Service List) (Whitaker, Sheniqua) |
| 07/22/2025 | 4337 | *Notice regarding the record for a bankruptcy appeal to the U.S. District Court.* (RE: related document(s) 4327 Amended Notice of appeal . Fee Amount $298 filed by Creditor Patrick Daugherty (RE: related document(s) 4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Attachments: # 1 Exhibit A)) (Whitaker, Sheniqua) |
| 07/22/2025 | 4343 | *Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01901-S.* (RE: related document(s) 4327 Amended notice of appeal filed by Creditor Patrick Daugherty Related document(s) 4310 Notice of appeal filed by Creditor Patrick Daugherty. (RE: related document(s)4297 Order on motion to compromise controversy).) (Almaraz, Jeanette) |

7

**Reservation of Rights**

     Daugherty expressly reserves the right to amend or supplement this Designation and/or to object, or otherwise supplement or move to strike or modify, some or all of any designations filed by any other party to this appeal.  This filing is made expressly subject to, and without waiver, of any and all rights, remedies, challenges and objections.

8

Respectfully submitted this 14th day of August 2025.

**GRAY REED**

By: */s/ Andrew K. York*
    Jason S. Brookner
    Texas Bar No. 240033684
    Andrew K. York
    Texas Bar No. 24051554
    Joshua D. Smeltzer
    Texas Bar No. 24113859
    Drake M. Rayshell
    Texas Bar No. 24118507

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:      jbrookner@grayreed.com
          dyork@grayreed.com
          jsmeltzer@grayreed.com
          drayshell@grayreed.com

*Counsel to Patrick Daugherty*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing instrument was served on all Parties or counsel of record herein on this 14th day of August 2025, via the CM/ECF system and/or email.

*/s/ Andrew K. York*
Andrew K. York

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

QUINN EMANUEL URQUHART & SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Highland Capital Management, L.P. and
the Highland Claimant Trust*

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee
of The Highland Litigation Sub-Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | **Re: Docket Nos. 4216, 4217, 4229, 4230, 4231** |
| | ) | |

## OMNIBUS REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

The Movants hereby submit this reply (the "Reply") in support of their *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

"Motion")[2] and in opposition to (i) *Patrick Daugherty's Objection to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4229] (the "Daugherty Obj.") filed by Patrick Daugherty ("Daugherty"); (ii) *Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities* [Docket No. 4230] (the "Dugaboy Obj.") filed by The Dugaboy Investment Trust ("Dugaboy"); and (iii) *Objection of the Dallas Foundation and Crown Global Life Insurance Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231] (the "Crown Obj." and together with the Daugherty Objection and the Dugaboy Objection, the "Objections") filed by The Dallas Foundation (on behalf of Empower Dallas Foundation and The Okada Family Foundation), and Crown Global Life Insurance, Ltd. (collectively, the "Purported Beneficiaries," and together with Daugherty and Dugaboy, the "Objectors"). In further support of the Motion, the Movants state as follows:

## I.    PRELIMINARY STATEMENT

1.     The Objectors' lack of any meaningful economic interest in the outcome of the Motion or substantive connection to, or interests in, the Movants calls into question their motives. Dugaboy, James Dondero's family trust, has no allowed Claims or Interests, is subordinated to HMIT, and would be hopelessly out-of-the money even if its unvested Class 11 Interest were ever allowed. Daugherty's allowed Class 8 and Class 9 Claims have been paid in full, and his disputed Class 8 Claim has been fully reserved at an agreed-upon amount for years. And the Purported Beneficiaries are complete strangers to this case, cannot be heard, and are

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

004644

being bankrolled by Dondero—both here and in their litigation in the Cayman Islands. Nor does any Objector articulate how the Settlement Agreement adversely affects *its* alleged Claims or Interests in the Highland estate. Rather, the Objectors point to perceived inconsistencies with the Plan and the Claimant Trust Agreement to argue how Class 9 Claim holders—all of whom have either been paid or consented to the Settlement Agreement—are somehow negatively affected.

2.     None of the Objectors has a cognizable pecuniary interest in the estate; none of the Objections has merit.

3.     To the contrary, the Settlement Agreement is in the best interests of Highland's estate—and particularly holders of Class 9 Claims. It will (i) stop costly and time-consuming litigation; (ii) dispose of certain illiquid Estate assets; (iii) dispose of the Estate Claims and certain Causes of Action; (iv) resolve all disputes concerning HMIT's Class 10 Interests; and (v) protect against and prevent future value-destructive litigation. As a result, if approved, the Settlement Agreement will bring the Movants substantially closer to fully consummating the Plan. The Objections—transparent efforts to keep the litigation machine running—are frustrating, familiar, and tired.

4.     The Court should overrule the Objections, approve the Motion, and allow the estate to move towards completion of the Plan and dissolution of the Trusts.

## II.   REPLY

### A.     The Objections Are Meritless

5.     As discussed in the Motion, under applicable Fifth Circuit precedent, a bankruptcy court may approve a compromise or settlement as long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See, e.g.*, *In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). In making this determination, courts review the following factors: (i) probability of success in the litigation, with due consideration for the uncertainty of law and fact;

004645

(ii) complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and (iii) all other factors bearing on the wisdom of the compromise, including (a) "the paramount interest of creditors with proper deference to their reasonable views" and (b) whether the settlement is the product of arm's length bargaining and not of fraud or collusion. *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted); *see also Age Ref. Inc.*, 801 F.3d at 540; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995). Settlements, like the Settlement Agreement which contemplates the transfer and release of estate assets or claims, are further authorized under section 363(b) if "'supported by an articulated business justification, good business judgment, or sound business reasons.'" *Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*, 922 F.3d 323, 327 (5th Cir. 2019) (quoting *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010)).

6.      Each element is satisfied here, and the Objections should be overruled.

**B.      Dugaboy Objection**

7.      Dugaboy asserts (i) the Settlement Agreement violates the Plan and Claimant Trust Agreement because it allows payments on HMIT's Class 10 Interest notwithstanding that HMIT's Class 10 Interest has not vested and will not vest under the terms of the Settlement Agreement; (ii) there is insufficient evidence to support the relief requested in the Motion; and (iii) the mutual releases in the Settlement Agreement are overly broad and could (somehow) release claims that Dugaboy or its affiliates have against the Highland Entities or the HMIT Entities. The Dugaboy Objection should be overruled.

**1.      The Settlement Agreement Does Not Violate the Plan or Claimant Trust Agreement**

8.      Dugaboy argues HMIT cannot receive anything on account of its Class 10 Interest

**004646**

until the Claimant Trustee files a "GUC Payment Certification" pursuant to Section 5.1(c) of the Claimant Trust Agreement. Dugaboy Obj. ¶ 10. Dugaboy is wrong. Upon the filing of a GUC Payment Certification, Contingent Trust Interests vest, and allowed interests in Class 10 and Class 11 gain rights under the Claimant Trust Agreement. That is all. Section 5.1(c) does not prohibit (or even address) the allowance of a Class 10 Interest—which is entirely separate from vesting—nor does it prohibit settlements agreed to by all affected parties that further the intent of the Plan and Claimant Trust, *i.e.*, monetizing assets and making distributions.

9.      The Claimant Trust Agreement (CTA §§ 2.2(a)-(b), 3.2(a)-(b), 3.2(c)(iv)) and the Litigation Sub-Trust Agreement (LTA §§ 2.2, 3.2(a)-(b), 3.2(c)(v)) expressly authorize the Claimant Trustee and Litigation Trustee to resolve and settle Claims and to implement those settlements. The Plan also permits Claimants and Equity Interest holders (including those in Class 9 and Class 10) to accept "other less favorable" treatment. Plan, Art. III.H.9, 10. Here, the documentary evidence proves that the holders of the remaining Class 9 claims consented to the proposed payments being made to HMIT *before* payment in full on their Class 9 Interests to bring this case closer to completion. Docket No. 4255, Ex. 59. For its part, HMIT has agreed that its Class 10 Interest will not vest; it will not have rights under the Claimant Trust Agreement; and it will voluntarily provide broad Litigation Protections in exchange for the consideration being provided to it under the proposed Settlement Agreement. Parties' willing waiver of their rights and acceptance of reduced rights otherwise provided for by a plan as part of a settlement agreement is neither atypical nor frowned upon. It is encouraged.

10.     More specifically, holders of Class 9 Claims—the only parties with a pecuniary interest in the payments to HMIT—signed consents agreeing that (i) Daugherty's Class 9 Claim could be paid in full (which payment occurred on or about May 20, 2025) and (ii) HMIT could

004647

receive certain payments under the Settlement Agreement before their Class 9 Claims are paid in full.[3]

11.    In sum, all parties economically affected by the Settlement Agreement have knowingly and voluntarily waived rights in order to settle with HMIT because the settlement resolves existing litigation, limits future litigation, and creates a scenario where those parties may receive their final distributions.

### 2.    Sufficient Evidence Supports Approval of the Motion

12.    Dugaboy contends the Movants failed to offer evidence sufficient to support their Motion and has requested significant discovery. In response, the Movants expeditiously produced more than 4,000 pages of documents to Dugaboy (and others) and made four witnesses available for deposition. As will be shown at the hearing, the evidence overwhelmingly supports approval of the Motion.

### 3.    The Release Is Neither Vague nor Overbroad

13.    Finally, Dugaboy alleges the releases in the Settlement Agreement are vague and overbroad and could limit Dondero's ability or the ability of the legion of entities controlled by him to sue the estate. Dugaboy cites no language to support its assertions and is wrong. The release is a broad, mutual release, but it is a standard provision necessary to effectuate the intent of the settlement and which does not release any purported claims of Dugaboy against any party.

### C.    Daugherty Objection

14.    Like Dugaboy, Daugherty alleges the Settlement Agreement violates the Plan and Claimant Trust Agreement as well as the absolute priority rule. Daugherty also alleges the

---

[3] All Class 8 Claims—other than Daugherty's disputed Claim—have been fully resolved and paid in full. Daugherty's disputed Class 8 Claim has been fully reserved for in accordance with the Plan and in an amount ($2,650,353) plus interest Daugherty agreed to years ago. Finally, all Claims junior to Class 8 have been fully resolved and paid.

**004648**

Settlement Agreement is contrary to the estate's interests because it settles litigation rather than propagates it. Daugherty is wrong on both counts.

### 1. The Settlement Agreement Does Not Violate the Claimant Trust Agreement, the Plan, or the Bankruptcy Code

15.     First, as set forth above, the Settlement Agreement does not violate the Plan or Claimant Trust Agreement. It effectuates a settlement among the affected parties; Daugherty is not an affected party. His allowed Class 8 and Class 9 Claims have been paid in full, and his disputed Class 8 Claim has been fully reserved in an amount he agreed to and in accordance with the Disputed Claims Reserve requirements in the Plan (Plan, Art. I.B.49, I.B.50, VI.E; Docket No. 4255, Exhibits. 58, 60-63).[4] Nevertheless, Daugherty asserts no settlement with HMIT can be reached until his disputed Class 8 Claim has been resolved to Daugherty's satisfaction. Given the status of Daugherty's claims, that assertion is wholly without basis.

16.     Second, the Settlement Agreement does not implicate the absolute priority rule because that is a requirement for plan confirmation; it does not apply to a settlement occurring nearly four years after the Plan Effective Date.

17.     Ultimately, Daugherty's objection is a transparent attempt to create leverage in the negotiation of his Class 8 Claim.[5]

### 2. The Settlement Agreement Is in the Estate's Best Interests

18.     Daugherty also argues the Settlement Agreement is not in the best interests of the

---

[4] Daugherty cannot unilaterally increase the amount reserved for his Class 8 Claim. Under the Plan, the "Disputed Claims Reserve Amount" can be increased, in pertinent part, (i) with Highland's agreement or (ii) by an order of this Court disallowing, in whole or in part, or estimating Daugherty's Class 8 Claim. Plan, Art. I.B.50. Highland will not agree to increase Daugherty's Disputed Claim Reserve Amount. In fact, Highland filed a complaint to disallow, subordinate, or estimate Daugherty's Class 8 Claim. Adv. Pro. No. 25-03055. In response, Daugherty moved to dismiss, seeking to delay adjudication of that Complaint indefinitely. Daugherty is bound by his actions and cannot refuse to adjudicate his Claim while simultaneously demanding that his Disputed Claims Reserve Amount be increased.

[5] The evidence will show Daugherty recently threatened to sue Highland's employees and object to the Motion if Highland did not pay him $20 million.

**004649**

estate because Highland should sue HMIT to recover "hundreds of millions of dollars." *See, e.g.*, Daugherty Obj. ¶ 26. Daugherty misconstrues the economics of the estate and the terms of the Claimant Trust Agreement and Plan. In the absence of a settlement, the Litigation Trustee's claims against HMIT were a potential source of cash that might have been needed to pay senior claims and obligations, including indemnification obligations. With the settlement of HMIT's Class 10 Interest—which represents 99.5% of Highland's prepetition equity—and resulting limitation of future litigation, the need for litigation funding is reduced, making further distributions possible. In any event, Daugherty fails to explain why he cares about the settlement or how it affects him. Rather, the facts are undisputed: Daugherty's disputed Class 8 Claim is fully reserved, and the reserve is fully funded. Any amounts recovered from HMIT through litigation would never have flowed to Daugherty. They would have been used to pay senior obligations, whatever remained of Class 9, and then returned to HMIT as payment on its Class 10 Interest.

## D.   <u>Crown Objection</u>

19.   As an initial matter, the Purported Beneficiaries are not parties in interest under 11 U.S.C. § 1109 and have no right to appear or be heard with respect to the Motion. As the Purported Beneficiaries admitted during their depositions:

- They have (i) never appeared in Highland's bankruptcy case; (ii) never filed a claim against Highland in its bankruptcy case; (iii) no claims or interests in Highland or the Claimant Trust; and (iv) have never had an interest—direct or otherwise—in Highland.

- Neither Highland nor the Claimant Trust owes any Purported Beneficiary any duty—contractual, fiduciary, or otherwise.

- They had no direct interest in HMIT before the reorganization discussed in the Crown Objection.

- They had no interest—direct or indirect—in HMIT after the reorganization.

004650

- If the Settlement Agreement is consummated, the Purported Beneficiaries would have no claims against Highland or any Movant related to the Settlement Agreement or otherwise.

- Their concern is not the Settlement Agreement before the Court but whether they will share in the cash and assets HMIT will recover if the Court grants the Motion.

Based on their deposition testimony and other evidence, the Purported Beneficiaries are strangers to these proceedings with no interest in the Motion or Settlement Agreement.

20.     Even under the most capacious interpretation of what constitutes a "party in interest" under Bankruptcy Code § 1109, and even assuming 11 U.S.C. § 1109 applies four years post-confirmation, the Purported Beneficiaries do not have a sufficient interest in the relief requested in the Motion—either before or after the reorganization described in the Crown Objection—to object to the Motion. According to the Supreme Court, the ability to be heard under Section 1109 requires an entity to have a "direct financial stake in the outcome." *Truck Ins. Exch. v. Kaiser Gypsum Co.,* 602 U.S. 268, 277–78 (2024) (quoting 7 COLLIER ON BANKRUPTCY ¶ 1109.01 (16th ed. 2023)). A "direct financial interest" requires "an actual interest in the controversy, as distinguished from a nominal party"—*i.e.*, a "pecuniary interest … directly affected by the bankruptcy proceeding." *Id.* at 278, n.3. "Where a proposed plan 'allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard and to have their legitimate objections addressed.'" *Id.* at 282 (quoting *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 204 (3d Cir. 2011)). The Movants have no interest in the Purported Beneficiaries' pockets. The Purported Beneficiaries are interlopers falling well outside the

Supreme Court's definition of "party in interest" under Section 1109.[6] They epitomize the "truly peripheral parties" lacking any "direct interest" to whom the Supreme Court denies the ability to be heard. *Id.*, 602 U.S. at 284. Because the Purported Beneficiaries do not have sufficient interest in the relief requested in the Motion or in the bankruptcy case under Section 1109, the Court should strike the Crown Objection and decline to hear their arguments pertaining to the Motion.[7]

21.     Substantively, the Crown Objection is meritless. The Purported Beneficiaries argue the Motion must be denied or stayed because Mark Patrick allegedly violated his fiduciary obligations to the Purported Beneficiaries. On this basis, the Purported Beneficiaries conclude that the Settlement Agreement could be jeopardized by protracted costly litigation.[8] In so arguing, the Purported Beneficiaries conflate whether Patrick's *corporate restructuring* was a breach of his fiduciary duty with whether Patrick had the *authority* to execute the Settlement Agreement. Whether the Purported Beneficiaries or the Cayman liquidators (who, tellingly, are not before this Court) have claims against Patrick is not a question of corporate authority and is irrelevant to whether Highland can meet its burden under Bankruptcy Rule 9019 and 11 U.S.C. § 363. Regardless, the evidence will demonstrate that Patrick is authorized to enter into the Settlement Agreement and that he required no one's consent to do so.

---

[6] This would be true even if the restructuring outlined in the Crown Objection were reversed and the Purported Beneficiaries retained their remote interest in HMIT. *Truck Insurance* left undisturbed a long line of cases holding that "a shareholder of a party in interest is not, by virtue of its equity holding, itself a party in interest." *In re AIO US, Inc.*, 2025 Bankr. LEXIS 1369, at *29 (Bankr. D. Del. June 6, 2025); *see also, e.g.*, *In re Refco*, 505 F.3d 109, 117 (2d Cir. 2007); *In re Vantage Drilling Int'l*, 603 B.R. 538, 545 (D. Del. 2019).

[7] Ignoring the Movants' written request (Docket No. 4255, Ex. 120), the Purported Beneficiaries also failed to file a disclosure statement as required by Federal Rule of Bankruptcy Procedure 2019, which is independent grounds to refuse to permit the Purported Beneficiaries to be heard and to assess sanctions against them. FED. R. BANKR. PROC. 2019(e)(2)(A)-(C).

[8] The Purported Beneficiaries also conceded during their depositions that (i) Dondero is funding their pursuit of the Crown Objection and (ii) they had not even read the Settlement Agreement. The Purported Beneficiaries also testified, among other things, that (i) HMIT had the corporate authority to enter into the Settlement Agreement and (ii) they had no reason to believe the Settlement Agreement was not the product of good faith and arm's length negotiations or that the terms of the Settlement Agreement were unfair to either side.

004652

WHEREFORE, for the reasons set forth above and in the Motion, the Movants respectfully request that the Court overrule the Objections and grant the Motion.

DATED: June 23, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email:      jpomerantz@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P., and
the Highland Claimant Trust*

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

*/s/ Robert S. Loigman*
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

-and-

**SIDLEY AUSTIN LLP**
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation
Trustee of the Highland Litigation Sub-Trust*

004653

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

COUNSEL FOR THE HMIT ENTITIES

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | **Re: Docket Nos. 4216, 4217, 4229, 4230, 4231** |
| | ) | |

## JOINDER TO REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

Hunter Mountain Investment Trust ("HMIT"), Beacon Mountain LLC ("Beacon

Mountain"), Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund I, LP ("Rand PE Fund"),

Rand PE Fund Management, LLC ("Rand GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP,

LLC ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund,

---

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

004654

Rand GP, and Atlas IDF, the "HMIT Entities") hereby submit this *Joinder* (the "Joinder") to the

*Reply* (the "Reply") [Dkt. No. 4275] filed in support of their *Motion for Entry of an Order Pursuant*

*to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and*

*Authorizing Actions Consistent Therewith* [Dkt. No. 4216] (the "9019 Motion") by the Movants.

The HMIT Entities adopt the briefing in the Reply for all purposes and respectfully request for the

reasons set forth in the 9019 Motion and the Reply that the Court grant the 9019 Motion and

approve the Settlement (as defined in the 9019 Motion) with the HMIT Entities.

Respectfully Submitted:


**KELLY HART PITRE**

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com
***Counsel for the HMIT Entities***


### CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties
receiving notice in this chapter 11 case through this Court's CM/ECF System on this June 23,
2025.


*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)

004655

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

QUINN EMANUEL URQUHART &
SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Highland Capital Management,*
*L.P. and the Highland Claimant Trust*

*Co-Counsel for Marc S. Kirschner, as*
*Litigation Trustee of The Highland*
*Litigation Sub-Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | | |

## HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND CLAIMANT TRUST, AND LITIGATION SUB-TRUST AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT TO HEARING TO BE HELD ON JUNE 25, 2025

Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland,"

as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 1 OF 15**

004656

Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"), by and through their undersigned counsel, submit the following amended witness and exhibit list with respect to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216], which the Court has set for hearing at 9:30 a.m. (Central Time) on June 25, 2025 (the "Hearing") in the Bankruptcy Case.

A.  **Witnesses**:

    1.  James P. Seery, Jr.;

    2.  James Dondero;

    3.  Deborah Deitsch-Perez, Esq;

    4.  Julie Diaz (by deposition transcript);

    5.  Any witness identified by or called by any other party; and

    6.  Any witness necessary for rebuttal.

B.  **Amended Exhibits:**[2]

| Number | Exhibit | Offered | Admitted |
|:---:|---|---|---|
| **A.** | **Settlement Agreement** | | |
| 1. | *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to a Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Agreement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4217] [HCMLPHMIT00002688-HCMLPHMIT00002715] | | |
| **B.** | **Negotiation Documents** | | |

---

[2] The amendments to the original exhibit list, filed at Docket No. 4255, include the additions of two exhibits: Exhibit Nos. 124 & 125, in bold font below.

AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025 PAGE 2 OF 15
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004657

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 2. | Email from L. Phillips to J. Morris dated March 5, 2025 [HCMLPHMIT00000015-HCMLPHMIT00000017] | | |
| 3. | Email from L. Phillips to J. Morris dated March 13, 2025 [HCMLPHMIT00000022-00000026] | | |
| 4. | Email from L. Phillips to J. Morris dated March 18, 2025 [HCMLPHMIT00000028-HCMLPHMIT00000029] | | |
| 5. | Email from L. Phillips to J. Morris dated March 19, 2025 [HCMLPHMIT00000030-HCMLPHMIT00000031] | | |
| 6. | Confidentiality Agreement-M Patrick and Related Entities [HCMLPHMIT00000032-HCMLPHMIT00000045] | | |
| 7. | Email from L. Phillips to J. Morris and A. Hurt dated March 22, 2025 [HCMLPHMIT00000046-HCMLPHMIT00000048] | | |
| 8. | Email from L. Phillips to J. Morris dated March 24, 2025 [HCMLPHMIT00000052-HCMLPHMIT00000054] | | |
| 9. | Email from L. Phillips to J. Morris dated March 24, 2025 [HCMLPHMIT00000055-HCMLPHMIT00000056] | | |
| 10. | Email from L. Phillips to J. Morris dated March 28, 2025 [HCMLPHMIT00000057] | | |
| 11. | Email from L. Phillips to J. Morris dated March 30, 2025 [HCMLPHMIT00000058] | | |
| 12. | Email from L. Phillips to J. Morris dated March 31, 2025 [HCMLPHMIT00000059] | | |
| 13. | HCLOM Intercreditor and Participation Agreement [HCMLPHMIT00000060-HCMLPHMIT00000063] | | |
| 14. | Email from L. Phillips to J. Morris dated April 2, 2025 [HCMLPHMIT00000075-HCMLPHMIT00000078] | | |
| 15. | Email from L. Phillips to J. Morris dated April 2, 2025 [HCMLPHMIT00000079-HCMLPHMIT00000080] | | |
| 16. | Email from L. Phillips to J. Morris dated April 3, 2025 with attachment - Paul Murphy Joinder to Confidentiality Agreement [HCMLPHMIT00000081-HCMLPHMIT00000083] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 3 OF 15**

004658

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 17. | Email from L. Phillips to J. Morris dated April 4, 2025 [HCMLPHMIT00000089] | | |
| 18. | Email from L. Phillips to J. Morris dated April 7, 2025 [HCMLPHMIT00000090-HCMLPHMIT00000092] | | |
| 19. | Email from L. Phillips to J. Morris dated April 7, 2025 with attachment – Shawn Raver Joinder to Confidentiality Agreement [HCMLPHMIT00000093-HCMLPHMIT00000096] | | |
| 20. | Email from L. Phillips to J. Morris dated April 7, 2025 [HCMLPHMIT00000099-HCMLPHMIT00000102] | | |
| 21. | Email from L. Phillips to J. Morris dated April 7, 2025 with attachments- Phillips Joinder to Confidentiality Agreement (signed by Phillips) and A. Hurt Joinder to Confidentiality Agreement (signed by Hurt) [HCMLPHMIT00000103-HCMLPHMIT00000107] | | |
| 22. | Email from L. Phillips to J. Morris dated April 8, 2025 with fully executed HCLOM Remittance Agreement [HCMLPHMIT00000108-HCMLPHMIT00000112] | | |
| 23. | Email from L. Phillips to J. Morris dated April 10, 2025 with HMIT 2022 Settlement Agreement [HCMLPHMIT00000118-HCMLPHMIT00000130] | | |
| 24. | Email from L. Phillips to J. Morris dated April 17, 2025 with attachment James Shields Joinder to Confidentiality Agreement [HCMLPHMIT00000135-HCMLPHMIT00000150] | | |
| 25. | Email from L. Phillips to J. Morris dated May 9, 2025 [HCMLPHMIT00000157-HCMLPHMIT00000158] | | |
| 26. | Email from L. Phillips to J. Morris dated May 9, 2025 [HCMLPHMIT00000159-HCMLPHMIT00000161] | | |
| 27. | Email from L. Phillips to J. Morris dated May 13, 2025 [HCMLPHMIT00000162-HCMLPHMIT00000163] | | |
| 28. | Email from L. Phillips to J. Morris dated May 14, 2025 [HCMLPHMIT00000164-HCMLPHMIT00000166] | | |
| 29. | Email from L. Phillips to J. Morris dated May 14, 2025 with Redlines of Settlement Agreement [HCMLPHMIT00000167-HCMLPHMIT00000218] | | |

AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025            PAGE 4 OF 15
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004659

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 30. | Email from L. Phillips to J. Morris dated May 15, 2025 [HCMLPHMIT00000226-HCMLPHMIT00000234] | | |
| 31. | Email from L. Phillips to J. Morris dated May 16, 2025 with Clean and Redline of Rand Settlement Agreement [HCMLPHMIT00000235-HCMLPHMIT00000283] | | |
| 32. | Email from L. Phillips to T. Cournoyer dated May 16, 2025 [HCMLPHMIT00000287-HCMLPHMIT00000289] | | |
| 33. | Email from L. Phillips to J. Seery, M. Patrick, S. Raver, J. Shields, A. Hurt dated May 17, 2025 [HCMLPHMIT00000290] | | |
| 34. | Email from L. Phillips to J. Morris dated May 17, 2025 [HCMLPHMIT00000291-HCMLPHMIT00000292] | | |
| 35. | Email from L. Phillips to J. Morris, J. Pomerantz dated May 19, 2025 with attachment HMIT Redlined Pages only to Settlement Agreement [HCMLPHMIT00000295-HCMLPHMIT00000297] | | |
| 36. | Email from L. Phillips to G. Demo, A. Hurt, J. Shields dated May 19, 2025 [HCMLPHMIT00000342-HCMLPHMIT00000344] | | |
| 37. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 with attachment - M. Patrick signature of HMIT Rand Settlement Agreement [HCMLPHMIT00000345; HCMLPHMIT00000347-HCHMLPHMIT00000370] | | |
| 38. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz date May 19, 2025 [HCMLPHMIT00000371-HCMLPHMIT00000372] | | |
| 39. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 [HCMLPHMIT00000373-HCMLPHMIT00000374] | | |
| 40. | Email from L. Phillips to G. Demo, J. Morris, J. Pomerantz dated May 19, 2025 [HCMLPHMIT00000423-HCMLPHMIT00000428] | | |
| 41. | Email from J. Morris to L. Phillips dated March 22, 2025 [HCMLPHMIT00000562-HCMLPHMIT00000563] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 5 OF 15**

004660

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 42. | Email from J. Morris to L. Phillips, A. Hurt dated March 22, 2025 with attachment – fully executed Confidentiality Agreement<br>[HCMLPHMIT00000564-HCMLPHMIT00000580] | | |
| 43. | Email from J. Morris to L. Phillips dated April 4, 2025 with attachment Litigation Protections M. Patrick<br>[HCMLPHMIT00000621-HCMLPHMIT00000631] | | |
| 44. | Email from J. Morris to L. Phillips dated April 7, 2025<br>[HCMLPHMIT00000642-HCMLPHMIT00000644] | | |
| 45. | Email from J. Morris to L. Phillips dated April 8, 2025 with attachment – current snapshot of remaining assets<br>[HCMLPHMIT00000656--HCMLPHMIT00000661] | | |
| 46. | Email from J. Morris to L. Phillips dated April 16, 2025 with attachment – Second Amended and Restated Indemnity Trust Agreement<br>[HCMLPHMIT00000672-HCMLPHMIT00000727] | | |
| 47. | April 15, 2025 Draft Illustrative Highland Indemnity Trust Payout Schedule<br>[HCMLPHMIT00000724-HCMLPHMIT00000727] | | |
| 48. | Email from J. Morris to L. Phillips dated May 15, 2025 with attachment – Draft Rand Settlement Agreement and Redline<br>[HCMLPHMIT00000766-HCMLPHMIT00000820] | | |
| 49. | Email from J. Morris to L. Phillips dated May 15, 2025 with Clean and Redline Settlement Agreement<br>[HCMLPHMIT00000829-HCMLPHMIT00000877] | | |
| 50. | Email from L. Phillips to D. Klos dated April 17, 2025<br>[HCMLPHMIT00000947] | | |
| 51. | Email re: Microsoft Teams call from D. Klos to J. Seery, T. Cournoyer, K. Hendrix, J. Morris, G. Demo, M. Patrick, S. Raver, Paul, L. Phillips, A. Hurt dated April 7, 2025<br>[HCMLPHMIT00000949] | | |
| 52. | Microsoft Teams Appointment for J. Seery, T. Cournoyer, K. Hendrix, J. Morris, G. Demo, M. Patrick, S. Raver, Paul, L. Phillips, A. Hurt scheduled for April 8, 2025<br>[HCMLPHMIT00000950] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 6 OF 15**

004661

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 53. | Email from D. Klos to J. Shields dated April 22, 2025 with attachment – Potential Settlement Structure with DAF and HMIT [HCMLPHMIT00000987-HCMLPHMIT00001000] | | |
| 54. | Email from J. Seery to M. Patrick, S. Raver, L. Phillips, A. Hurt, J. Shields dated April 28, 2025 with attachment – Draft Rand Settlement Agreement [HCMLPHMIT00001001-HCMLPHMIT00001025] | | |
| 55. | Email Microsoft Teams appointment from D. Klos to J. Seery, K. Hendrix, M. Patrick, S. Raver, Paul dated April 3, 2025 [HCMLPHMIT00001037] | | |
| 56. | Email from D. Klos to M. Patrick dated April 2, 2025 [HCMLPHMIT00001042] | | |
| 57. | Email from J. Seery to J. Morris, T. Cournoyer, D. Klos, M. Gray dated June 11, 2025 with attachment – Class 9 Consent to Rand Settlement and Release [HCMLPHMIT00001220-HCMLPHMIT00001245] | | |
| **C.** | **Class 9 Documents** | | |
| 58. | Letter to P. Daugherty from J. Seery re: Eighth Distribution re: Highland Claimant Trust dated May 20, 2025 [HCMLPHMIT00002329] | | |
| 59. | Written Consent of Holders of Class 9 Subordinated Claim Trust Interests in the Highland Claimant Trust dated May 16, 2025 [HCMLPHMIT00002677-HCMLPHMIT00002682] | | |
| 60. | Tolling Agreement Extending Claim Objection Deadline dated July 27, 2022 | | |
| 61. | Amendment No. 1 to Tolling Agreement Extending the Claim Objection Deadline dated December 21, 2022 | | |
| 62. | Amendment No. 2 to Tolling Agreement Extending Claim Objection Deadline dated November 6, 2023 | | |
| 63. | Amendment No. 3 to Tolling Agreement Extending Claim Objection Deadline dated November 20, 2024 | | |
| **D.** | **HCLOM/HMIT** | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 7 OF 15**

004662

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 64. | Email from L. Phillips to J. Morris dated January 6, 2025 [HCMLPHMIT00000008-HCMLPHMIT00000009] | | |
| 65. | Email from L. Phillips to J. Morris, A. Hurt dated January 11, 2025 [HCMLPHMIT00000010-HCMLPHMIT00000012] | | |
| 66. | *Highland Capital Management, L.P.'s Motion for (A) a Bad Faith Finding and (B) and Award of Attorney's Fees Against Highland CLO Management, Ltd. and James Dondero in Connection with HCLOM Claims 3.65 and 3.66* [Docket No. 4176] [HCMLPHMIT00000441-HCMLPHMIT00000500] | | |
| 67. | Hearing Transcript dated December 18, 2024 [Docket No. 4197] [HCMLPHMIT00003829-HCMLPHMIT00003859] | | |
| 68. | *Stipulated and Agreed Order Resolving (A) HCLOM, Ltd.'s Scheduled Claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a Bad Faith Finding and an Award for Attorney's Fees Against HCLOM, Ltd. and James Dondero in Connection Therewith [Docket Nos. 3657, 4716]* [Docket No. 4199] [HCMLPHMIT00003860-HCMLPHMIT00003866] | | |
| 69. | Intercreditor and Participation Agreement with HCLOM dated January 10, 2025 [HCMLPHMIT00003868-HCMLPHMIT00003871] | | |
| **E.** | **Patrick Authority** | | |
| 70. | Trust Agreement of Hunter Mountain dated December 17, 2015 [HCMLPHMIT00004103-HCMLPHMIT00004114] | | |
| 71. | Show Cause Hearing Transcript June 8, 2021 [HCMLPHMIT00002716-HCMLPHMIT00003013] | | |
| 72. | HMIT Hearing Transcript June 8, 2023 [HCMLPHMIT00003014-HCMLPHMIT00003402] | | |
| 73. | Limited Liability Company Agreement of Atlas IDF GP, LLC dated October 29, 2015 [HCMLPHMIT00003511-HCMLPHMIT00003517] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**                    **PAGE 8 OF 15**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004663

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 74. | HOLDCO Responses and Disclosures Related to the Court's Order Requiring Disclosures [Docket No. 2547] HCMLPHMIT00003523-HCMLPHMIT00003828] | | |
| 75. | HMIT Appointment of Successor Administrator dated 8/12/2022 [HCMLPHMIT00003872] | | |
| 76. | Limited Liability Company Agreement of Rand PE Fund Management, LLC dated October 29, 2015 [HCMLPHMIT00003873-HCMLPHMIT00003879] | | |
| 77. | Limited Liability Company Agreement of Rand Advisors, LLC dated August 28, 2013 [HCMLPHMIT00003880-HCMLPHMIT00003886] | | |
| 78. | Agreement of Limited Partnership of Rand PE Fund I, L.P. dated October 29, 2015 [HCMLPHMIT00003887-HCMLPHMIT00003893] | | |
| 79. | Amended and Restated Limited Partnership Agreement of Atlas IDF, LP dated November 30, 2015 [HCMLPHMIT00003894-HCMLPHMIT00003928] | | |
| 80. | Atlas IDF, LP Offering of Series 1 Limited Partnership Interests dated November 30, 2015 [HCMLPHMIT00003929-HCMLPHMIT00004023] | | |
| 81. | Rand PE Fund I, LP Offering Series 1 Limited Partnership Interests dated November 30, 2015 [HCMLPHMIT00004024-HCMLPHMIT00004095] | | |
| 82. | Member and Manager Consent of Atlas IDF GP, LLC dated October 13, 2022 [HCMLPHMIT00004124-HCMLPHMIT00004126] | | |
| 83. | Amended and Restated Company Agreement of Atlas IDF GP, LLC dated August 8, 2022 [HCMLPHMIT00004127-HCMLPHMIT00004151] | | |
| 84. | Amended and Restated Company Agreement of Rand Advisors, LLC dated August 1, 2022 [HCMLPHMIT00004152-HCMLPHMIT00004176] | | |
| 85. | Amended and Restated Company Agreement of Rand PE Fund Management, LLC dated August 1, 2022 [HCMLPHMIT00004177-HCMLPHMIT00004201] | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 9 OF 15**

004664

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 86. | Membership Interest Purchase Agreement Rand Advisors dated August 1, 2022<br>[HCMLPHMIT00004202-HCMLPHMIT00004215] | | |
| 87. | Member and Manager Consent of Rand Advisors, LLC dated October 13, 2022<br>[HCMLPHMIT00004216-HCMLPHMIT00004218] | | |
| 88. | Member and Manager Consent of Rand PE Fund Management, LLC dated October 13, 2022<br>[HCMLPHMIT00004219-HCMLPHMIT00004221] | | |
| 89. | 3/17/2025 Rand Advisors Form ADV<br>[HCMLPHMIT00003465-HCMLPHMIT00003493] | | |
| 90. | Atlas IDF, LP Subscription 12/21/2015 (signature pages only) | | |
| 91. | Atlas IDF, LP Subscription 12/23/2015 (signature page only) | | |
| 92. | Atlas IDF LP SEC Form D dated February 24, 2025<br>[HCMLPHMIT00003518-HCMLPHMIT00003522] | | |
| 93. | Rand PE Fund I, L.P. SEC Form D dated February 24, 2025<br>[HCMLPHMIT00004096-HCMLPHMIT00004100] | | |
| 94. | Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated September 24, 2015<br>[HCMLPHMIT00004115-HCMLPHMIT00004123] | | |
| 95. | Second Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated February 12, 2025 | | |
| 96. | Bylaws of The Okada Family Foundation, Inc. (final version) | | |
| 97. | Bylaws of Empower Dallas Foundation, Inc. | | |
| 98. | Crown Global DVA Policy 30218 (signed) | | |
| 99. | Crown Global DVA Termsheet 30218 | | |
| 100. | Crown Global DVA Policy 30219 (signed) | | |

**Amended Witness and Exhibit List for Hearing on June 25, 2025**  **Page 10 of 15**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004665

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 101. | Crown Global DVA Termsheet 30219 | | |
| 102. | Crown Global Rand Participation Agreement (Executed) | | |
| 103. | S&G HMIT Opinion Rep Letter dated January 29, 2016 | | |
| 104. | S&G HMIT Opinion dated January 29, 2016 | | |
| **F.** | **Dugaboy Note** | | |
| 105. | Promissory Note $24,268,621.69 dated May 31, 2017 [HCMLPHMIT00001327-HCMLPHMIT00001328] | | |
| 106. | The Dugaboy Investment Trust Offering of $1817M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002323-HCMLPHMIT00002327] | | |
| 107. | Participation Agreement for Par/Near Par Trades dated July 18, 2024 [HCMLPHMIT00002594-HCMLPHMIT00002600] | | |
| 108. | $18.5mm Dugaboy Note Attempted Sale – Process Update [HCMLPHMIT00002601] | | |
| 109. | The Dugaboy Investment Trust $18.17M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002602-HCMLPHMIT00002607] | | |
| 110. | The Dugaboy Investment Trust $18.17M Promissory Note Owed to HCMLP February 2024 [HCMLPHMIT00002608-HCMLPHMIT00002630] | | |
| 111. | Highland Claimant Trust Recommended Dugaboy Note Contribution dated June 7, 2024 [HCMLPHMIT00002631-HCMLPHMIT00002636] | | |
| 112. | Email from D. Klos to DC Sauter dated May 23, 2024 [HCMLPHMIT00002637-HCMLPHMIT00002639] | | |
| **G.** | **Capital Account Amounts** | | |

AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025    PAGE 11 OF 15
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004666

| Number | Exhibit | Offered | Admitted |
|---|---|---|---|
| 113. | Highland Capital Management, L.P. Consolidated Financial Statement and Supplemental Information dated December 31, 2018<br>[HCMLPHMIT00002548-HCMLPHMIT00002593] | | |
| 114. | Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 24, 2015<br>[HCMLPHMIT00002641-HCMLPHMIT00002676] | | |
| 115. | 2018 Tax Return for Highland Capital Management, LP (sig page, p. 1 of return, p. 1 of each partners' Schedule K-1 (Strand, Okada, MAP 1, MAP 2, Dugaboy, HMIT)<br>[HCMLPHMIT00001332; HCMLPHMIT00001336; HCMLPHMIT00001414; HCMLPHMIT00001419; HCMLPHMIT00001424; HCMLPHMIT00001429; HCMLPHMIT00001434; HCMLPHMIT00001439] | | |
| 116. | 2019 Tax Return for Highland Capital Management, LP (sig page, p. 1 of return, p. 1 of each partners' Schedule K-1 (Strand, Okada, MAP 1, MAP 2, Dugaboy, HMIT)<br>[HCMLPHMIT00001762; HCMLPHMIT00001766; HCMLPHMIT00001865; HCMLPHMIT00001870; HCMLPHMIT00001875; HCMLPHMIT00001880; HCMLPHMIT00001885; HCMLPHMIT00001890] | | |
| 117. | Monthly Operating Report – FINAL November 2019<br>[HCMLPHMIT00001329] | | |
| 118. | Hunter Mountain Note Receivable October 15, 2019<br>[HCMLPHMIT00001330] | | |
| H. | **Dallas Foundation Issues** | | |
| 119. | Affidavit of James Dondero in the Grand Court of Cayman Islands FSD2025-0099 dated April 16, 2025<br>[HCMLPHMIT00003429-HCMLPHMIT00003438] | | |
| 120. | Email from J. Pomerantz to D. Curry, M. Okin dated June 19, 2025 | | |
| I. | **Plan, CTA, and Litigation Trust Agreement** | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**    PAGE 12 OF 15
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004667

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 121. | *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Pages 26-29, (entire document can be found at Docket No. 1808)<br>Excerpts:<br>Article IV. B.1-5 (pages 26-28)<br>Article IV. B.5 (pages 28-29)<br>Article IV. B.7 (page 30)<br>Article IV. B.10 (page 31)<br>Article IV. D. (pages 34-35)<br>Article VII. D.1-2 (pages 44-45)<br>Article XI (pages 53-55) | | |
| 122. | *Claimant Trust Agreement*, (entire document can be found at Docket No. 1811-2, as modified by Docket No. 1875-4)<br>Excerpts:<br>Fourth "Whereas" clause (page 1)<br>Section 2.2(a)-(b) (page 8)<br>Section 3.2(a)-(b) (pages 11-12)<br>Section 3.2(c)(iv) (page 12)<br>Section 2.3(b)(ix) (page 9) | | |
| 123. | *Litigation Sub-Trust Agreement*, (entire document can be found at Docket No. 1811-4)<br>Excerpts:<br>Fourth "Whereas" clause (page 1)<br>Section 2.2 (page 5)<br>Section 3.2(a) (page 7)<br>Section 3.2(b) (page 7)<br>Section 3.2(c)(v) (page 7)<br>Section 3.3 (b)(iii) (page 9) | | |
| **J.** | **Deposition Transcripts** | | |
| 124. | **Deposition Transcript of Julie Diaz dated June 22, 2025** | | |
| 125. | **Deposition Transcript of Torrey Littleton dated June 22, 2025** | | |
| 126. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**                    **PAGE 13 OF 15**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

004668

| Number | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 127. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 128. | All exhibits identified by or offered by any other party at the Hearing | | |

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 14 OF 15**

004669

Dated:  June 24, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com


 - and -

**HAYWARD PLLC**

*/s/  Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.
and the Highland Claimant Trust*

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**

Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

-and-

**SIDLEY AUSTIN LLP**

Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as
Litigation Trustee of the Highland Litigation
Sub-Trust*

**AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE 25, 2025**
SF 4929-2074-0176.1 36027.002 DOCS_NY:42648.1 36027/002

**PAGE 15 OF 15**

004670

# EXHIBIT 124

004671

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 36-5   Filed 09/22/25   Page 40 of 240   PageID 10948
Deposition of Julie Diaz   Exhibit 5124   Page 1 of 2502   In re Highland Capital Management, L.P.

```
 1              UNITED STATES BANKRUPTCY COURT

 2           FOR THE NORTHERN DISTRICT OF TEXAS

 3                    DALLAS DIVISION

 4       --------------------------

 5  In Re:                      Case No. 19-34054-sgj11

 6  HIGHLAND CAPITAL MANAGEMENT,

 7  L.P.,

 8       Debtor.                Chapter 11

 9  -------------------------X.

10

11

12

13       REMOTE VIDEO-RECORDED DEPOSITION of

14                    JULIE DIAZ

15              Sunday, June 22, 2025

16             1:37 p.m. Central Time

17

18

19

20  Reported Stenographically by:

21  Gail L. Inghram,

22  BA, RDR, CRR, RSA, CA-CSR No. 8635

23

24

25
```

```
 1

 2

 3

 4

 5

 6

 7

 8              WHEREUPON, the remote video-recorded

 9    deposition of JULIE DIAZ was held via

10    video-conferencing on Sunday, June 22, 2025,

11    beginning at approximately 1:37 p.m. Central

12    Time, the proceedings being recorded

13    stenographically by Gail Inghram, Registered

14    Diplomate Reporter, Certified Realtime Reporter,

15    Certified Shorthand Reporter, and transcribed

16    under her direction, there being present:

17

18

19

20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2   [All parties appeared via remote videoconferencing.]

 3

 4   On behalf of Highland Capital Management, and the Highland

 5   Claimant Trust:

 6       JOHN MORRIS, ESQ.

 7       jmorris@pszjlaw.com

 8       GREGORY V. DEMO, ESQ.

 9       gdemo@pszjlaw.com

10       JEFFREY POMERANTZ, ESQ.

11       jpomerantz@pszjlaw.com

12       HAYLEY WINOGRAD, ESQ.

13       hwinograd@pszjlaw.com

14          PACHULSKI STANG ZIEHL & JONES

15          780 Third Avenue, 34th Floor

16          New York, New York 10017-2024

17          310.277.6910

18

19   On behalf of Highland Litigation Trustee:

20       ROBERT S. LOIGMAN, ESQ.

21       robertloigman@quinnemanuel.com

22          QUINN EMANUEL URQUHART & SULLIVAN, LLP

23          51 Madison Avenue 22nd Floor

24          New York, New York 10010

25          212.849.7615
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 35-1   Filed 09/12/25   Page 43 of 240   PageID 1095
Deposition of Exhibit 124 Page 4 of 25   Highland Capital Management, L.P.

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   On behalf of Defendant Dallas Foundation and Crown Global

 4   Life Insurance:

 5      MATTTHEW OKIN, ESQ.

 6      mokin@okinadams.com

 7      DAVID CURRY, ESQ.

 8      dcurry@okinadams.com

 9         OKIN ADAMS BARTLETT CURRY LLP

10         1113 Vine Street, Suite 240

11         Houston, Texas 77002

12         713.228.4100

13

14   On behalf of Defendant Dugaboy Investment Trust:

15      MICHAEL LANG, ESQ.

16      mlang@cwl.law.com

17         CRAWFORD WISHNEW & LANG PLLC

18         1700 Pacific Avenue, Suite 2390

19         Dallas, Texas 75201

20         214.817.4500

21

22

23

24

25
```

```
 1    A P P E A R A N C E S (Cont'd):

 2

 3    On Behalf of Hunter Mountain Investment Trust:

 4        LOUIS M. PHILLIPS, ESQ.

 5        lphillips@kellyhart.com

 6        AMELIA L. HURT, ESQ.

 7        ahurt@kellyhart.com

 8            KELLY HART & HALLMAN LLP

 9            301 Main Street, Suite 1600

10            Baton Rouge, Louisiana 70801

11            225.381.9643

12

13    VIDEOGRAPHER:

14        PAUL D'AMBRA

15

16

17    ALSO PRESENT:

18        NATHAN HALL, Pachulski Stang Ziehl & Jones

19        JAMES SEERY

20        TORREY LITTLETON

21        SHAWN RAVER

22

23

24

25
```

```
  1                        - - -

  2                      I N D E X

  3                        - - -

  4   EXAMINATION OF:                          PAGE

  5   JULIE DIAZ

  6          By Attorney Morris ...............8

  7

  8

  9

 10

 11

 12                    E X H I B I T S
      HIGHLAND:                               PAGE

 13

 14   Highland 1     Objection of the Dallas ..........63

 15                  Foundation and Crown Global to

 16                  Motion for Entry of An Order

 17                  Approving Settlement

 18                  (15 pages)

 19

 20

 21

 22

 23

 24

 25
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 35-124   Filed 09/8/2502   Page 46 of 240   PageID 10954
Exhibit 124 Page 8 of 22   Deposition of Highland Capital Management, L.P.

```
 1                 DEPOSITION SUPPORT INDEX

 2

 3   QUESTIONS INSTRUCTED NOT TO ANSWER:

 4   PAGE  LINE

 5   (None)

 6

 7   REQUEST FOR PRODUCTION OF DOCUMENTS

 8   PAGE  LINE

 9   (None)

10

11

12   STIPULATIONS

13   PAGE  LINE

14   (None)

15

16   QUESTIONS MARKED

17   PAGE  LINE

18   (None)

19

20

21              REPORTER'S NOTE:

22   QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT NECESSARILY

23   REFLECT A DIRECT QUOTE.

24

25
```

```
 1                    -   -   -

 2                 P R O C E E D I N G S

 3                    -   -   -

 4    WHEREUPON,

 5                      JULIE DIAZ,

 6    being first duly sworn or affirmed to testify to the

 7    truth, the whole truth, and nothing but the truth,

 8    was examined and testified as follows:

 9

10                     EXAMINATION

11     BY ATTORNEY MORRIS:

12         Q.    Good afternoon, Ms. Diaz.  Can you

13    hear me okay?

14         A.    I can.

15         Q.    My name is John Morris.  I'm an

16    attorney for Highland Capital Management, and

17    we're here to take your deposition today in

18    connection with the Dallas Foundation's objection

19    to a certain settlement.

20             Are you aware of that?

21         A.    Yes, I am.

22         Q.    Have you ever been deposed before?

23         A.    Yes, I have.

24         Q.    Okay.  So just some quick ground rules

25    so we're on the same page.
```

```
 1              I'm going to ask a series of
 2     questions, and it's very important that you allow
 3     me to finish my question before you begin the
 4     answer.
 5              Is that fair?
 6        A.    Yes.
 7        Q.    I will try to allow you to finish your
 8     answer before I begin a question; but if I fail
 9     to do so, will you let me know that?
10        A.    Yes, I will.
11        Q.    If I ask a question that you don't
12     understand, will you let me know that?
13        A.    I will.
14        Q.    If you need a break at any time, I'm
15     happy to accommodate you; but I just ask that you
16     not seek a break while a question is pending
17     unless you need to consult with your lawyer about
18     privilege questions.
19              Is that fair?
20        A.    Yes.
21        Q.    Are you affiliated with the Dallas
22     Foundation?
23        A.    Yes.  I am the president and CEO.
24        Q.    When did you become the president and
25     CEO of the Dallas Foundation?
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Deposition 3:25-cv-01876-K   Document 35-1 524   Filed 09/16/25   Page 49 of 240   Page Capital Management, L.P.
Exhibit Page 11 of 102   Page 49 of 240   PageID 1095

```
 1          A.     Formally, April 1st, 2024.  Prior to

 2    that, I was interim CEO; and have been with the

 3    foundation for six years.

 4          Q.     Are you familiar with the company

 5    called Highland Capital Management, LP?

 6          A.     Yes, I am.

 7          Q.     Are you aware that Highland Capital

 8    Management, LP, filed for bankruptcy back in

 9    2019?

10          A.     Yes, I am.

11          Q.     Are you aware that the Dallas

12    Foundation recently filed in the bankruptcy court

13    an objection to a proposed settlement between

14    certain Highland affiliates and certain

15    affiliates of Hunter Mountain Investment Trust?

16          A.     Yes, I am.

17          Q.     Are you aware of the parties to the

18    settlement agreement that the Dallas Foundation

19    has objected to?

20          A.     Can you clarify that question.

21          Q.     Can you identify the parties on the

22    Highland side that are -- that executed the

23    settlement agreement that the Dallas Foundation

24    objected to?

25          A.     No.
```

```
 1        Q.    Can you identify the parties --

 2   withdrawn.

 3            Are you aware that there are

 4   parties -- are you aware that Hunter Mountain

 5   Investment Trust is a party to the settlement

 6   agreement?

 7        A.    Yes, I am.

 8        Q.    Are you aware that a gentleman named

 9   Mark Patrick signed the agreement on behalf of

10   the Hunter Mountain Investment Trust?

11        A.    I'm aware of his involvement.

12        Q.    But you're not aware as you sit here

13   right now that Mr. Patrick signed on behalf of

14   Hunter Mountain Investment Trust?

15        A.    No.

16        Q.    Can I refer to Hunter Mountain

17   Investment Trust as "HMIT" for purposes of the

18   deposition?

19        A.    Yes, you may.

20        Q.    Are you aware that there are other

21   entities that are affiliated with HMIT that are

22   also party to the settlement agreement?

23        A.    Yes, I am.

24        Q.    Can we generally refer to all of the

25   affiliates of HMIT and HMIT itself as "the HMIT
```

```
 1    entities" for purposes of today's deposition?

 2         A.    Yes.

 3         Q.    Did you review the Dallas Foundation's

 4    objection before it was filed?

 5         A.    Yes, I did.

 6         Q.    Were you responsible for authorizing

 7    its filing?

 8         A.    Yes.

 9         Q.    Are you aware that the objection was

10    filed on behalf of an entity called Empower

11    Dallas Foundation?

12         A.    Yes.

13         Q.    Are you familiar with that entity?

14         A.    Yes, I am.

15         Q.    What is the Empower Dallas Foundation?

16         A.    Empower Dallas Foundation is a

17    supporting organization that is sponsored by the

18    Dallas Foundation.  It's a grant-making

19    organization that's been in existence for at

20    least 10 years.

21         Q.    Do you know who formed Empower Dallas

22    Foundation?

23         A.    Yes.  I'm aware that it came from Jim

24    Dondero.

25         Q.    What do you mean that it came from Jim
```

 1   Dondero?

 2        A.    Well, that the donation was made from

 3   Mr. Dondero.

 4        Q.    Did Mr. Dondero make a donation to

 5   Empower Dallas Foundation?

 6        A.    Yes.

 7        Q.    And does Empower Dallas Foundation

 8   fund the Dallas Foundation?

 9        A.    Technically, it is a -- we are a -- it

10   is a supporting organization of the Dallas

11   Foundation, which is an IRS entity for which it

12   makes grant recommendations that then flow to a

13   donor-advised fund that then the Dallas

14   Foundation effectuates, basically, the grant.

15        Q.    Do you know if the Dallas -- did I

16   step on your words?

17        A.    No.

18        Q.    Do you know if the Dallas --

19   withdrawn.

20             Do you know if Empower Dallas

21   Foundation had any contractual obligation to make

22   donations to the Dallas Foundation?

23        A.    I believe that through its charitable

24   status, it is required to make contributions on a

25   regular basis.  And we also have governance that

1    oversees activity within all of our charitable

2    funds.

3         Q.    Is there an agreement of any kind

4    between the Dallas Foundation and Empower Dallas

5    Foundation?

6         A.    Yes.  We have a fund agreement.

7         Q.    And under that fund agreement, is the

8    Dallas Foundation entitled to receive

9    contributions from Empower Dallas?

10        A.    Yes.  I don't know the technical

11   language offhand.

12        Q.    Do you know if Mr. Dondero plays any

13   role in the management of Empower Dallas

14   Foundation?

15        A.    What do you mean by "management"?

16        Q.    Does he have any involvement in --

17        A.    Yes.  As any fundholder, he would have

18   involvement in making recommendations for grants

19   he would like to put into the community, as all

20   of our fundholders do.

21        Q.    Does he play any other role, to the

22   best of your knowledge, with respect to the

23   Empower Dallas Foundation?

24        A.    No.

25        Q.    Are you familiar with --

```
 1          A.    Oh, sorry.  May I correct myself?

 2                The Empower Dallas Foundation does

 3     have its own governance, of which he is president

 4     of the foundation.  I'm the vice president.  And

 5     we have a treasurer.  As with all of our

 6     supporting orgs, the Dallas Foundation has

 7     majority oversight.

 8          Q.    The Dallas Foundation has majority

 9     oversight of Empower Dallas Foundation?

10          A.    Yes.

11          Q.    And how does it exercise that

12     oversight?

13          A.    In voting.

14          Q.    And who gets to vote?

15          A.    The officers:  the president, the vice

16     president, and the treasurer.

17          Q.    Of which entity?

18          A.    Of the supporting organization, the

19     Empower Dallas Foundation.

20          Q.    Can you identify who those people are.

21          A.    Jim Dondero is the president; I'm the

22     vice president; and our CFO, Torrey Littleton, is

23     the treasurer.

24          Q.    How about the Okada Family Foundation?

25     Are you familiar with that?
```

Case 19-34054-sgj11 Doc 4277-1 Filed 06/24/25 Entered 06/24/25 10:20:25 Desc
Case 3:25-cv-01876-K Document 55-1 Filed 07/02/25 Page 55 of 240 PageID 10963
Deposition of Dugaboy Investment Trust, Exhibit 524 Page 17 of 102, Highland Capital Mgmt. L.P.

```
 1            A.    Oh, excuse me -- sorry.

 2                  I'm -- I need to correct myself.  That

 3       is for Empower Dallas, because we have two funds

 4       I'm confusing.  Empower Dallas Foundation, I am

 5       the president; Torrey is the treasurer; and we

 6       have a secretary.

 7                  For consent agendas, Jim Dondero plays

 8       an individual member role.

 9            Q.    Ma'am, what are you reading right now?

10            A.    I'm looking at the structure of our

11       supporting organizations.

12            Q.    Can you just hold that up for me so I

13       can see what you're looking at.

14            A.    It literally lists that for all of

15       them.

16            Q.    Do you have any other documents with

17       you today?

18            A.    Just my notes.

19            Q.    Can I ask you to put those away for

20       now.

21            A.    Oh, sure.

22            Q.    How about the Okada Family Foundation;

23       is that another supporting organization?

24            A.    Yes, it is.

25            Q.    And do you know if Mr. Dondero has any
```

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-01876-K    Document 15-1    Filed 09/26/25    Page 56 of 240    PageID 10964

Deposition of [...] Capital Management, L.P.
Exhibit 24    Page 91826.02    Page 56 of 240    PageID 10964

 1    involvement with that entity?

 2         A.    It does not have any involvement with

 3    that entity.

 4         Q.    Okay.  Do you know if Mr. Dondero

 5    played any role in the Dallas Foundation's

 6    decision to object to the proposed settlement

 7    between the Highland entities and the HMIT

 8    entities?

 9         A.    Did not have any role.

10         Q.    Did you ever speak to him about the

11    objection?

12         A.    I have spoken to him in the last six

13    months.

14         Q.    Did you ever speak with him about the

15    objection?

16         A.    No.

17         Q.    Did you speak with him about any of

18    the facts that are set forth in the objection?

19         A.    No.

20         Q.    Was Mr. Dondero a source for some of

21    the facts that are set forth in the Dallas

22    Foundation's objection?

23         A.    No.

24         Q.    Did Mr. Dondero or anyone acting on

25    his behalf provide any information to the Dallas

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Deposition of 26-cv-01876-K    Document 55-1.524    Filed 05/20/25    Page 57 of 240    Highland Capital Management, L.P.
Exhibit 1.524    Page 91 of 102    Page 57 of 240    PageID 10965

1    Foundation that the Dallas Foundation used in its

2    objection?

3        A.     Repeat the question.

4        Q.     Did Mr. Dondero or anybody you believe

5    was acting on his behalf provide any information

6    that the Dallas Foundation used in its objection?

7        A.     I'll abstain from answering that.

8        Q.     Excuse me?

9        A.     I'd rather not answer that question.

10       Q.     I appreciate that, but you have to.

11       A.     Well, there's a lot of context around

12    the formation of where we are today.  So I have

13    been engaged with our counterpart over the last

14    six years, so I have a lot of information from

15    working through our grant-making and the

16    management of the assets over the past six years.

17        So in that same vein, I've learned a

18    lot from many interested parties.

19       Q.     Okay.  So I ask you to listen

20    carefully to my question, because it's rather

21    precise.

22        Do you know if Mr. Dondero or anybody

23    you believed was acting on his behalf provided

24    the Dallas Foundation with any information that

25    is -- that was used to prepare the objection?

```
 1            A.    No.

 2            Q.    Are you familiar with the objection?

 3            A.    I am familiar.  I authorized it and

 4      read it.

 5            Q.    And it's your testimony that Jim

 6      Dondero wasn't the source of any information

 7      that's in that objection.  Is that fair?

 8            A.    That is fair.

 9            Q.    Do you know where the idea of filing

10      the objection originated?

11            A.    I don't.

12            Q.    Do you know whose idea, who came up

13      with the idea to object to this -- withdrawn.

14            Do you know whose idea it was to

15      object to the Highland/HMIT settlement?

16            ATTORNEY OKIN:  Okay.  Actually,

17      Ms. Diaz, before you answer, just want to caution

18      you that as long as it's not conveying advice of

19      counsel, you can answer the question.

20            A.    You'll have to repeat that.  I don't

21      understand that.

22      BY ATTORNEY MORRIS:

23            Q.    Do you know who came up with the idea

24      of objecting to the proposed Highland/HMIT

25      settlement?
```

```
 1        A.    I believe it came out of discussions

 2   in another settlement.

 3        Q.    What settlement are you referring to?

 4        A.    In the Cayman Islands.

 5        Q.    What settlement is that?

 6        A.    Well, it has to do with the three

 7   large supporting orgs and an entity called

 8   DAF Holdco.

 9        Q.    Which three large supporting orgs are

10   you referring to?

11        A.    Kansas City Foundation; Santa Barbara

12   Foundation; Highland Dallas Foundation; and

13   really in a small way, North Texas Community

14   Foundation.  All --

15        Q.    And I apologize.  What did you just

16   refer to those entities as?  Supporting

17   organizations?

18        A.    Yes.

19        Q.    The Kansas -- and you called it the

20   Kansas City --

21        A.    Foundation.

22        Q.    -- Foundation, the Santa Barbara

23   Foundation and the Dallas Foundation?  And those

24   are three additional supporting organizations of

25   the Dallas Foundation?
```

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-01876-K    Document 5-1.24    Filed 09/22/25    Page 60 of 240    PageID 10968
Deposition of James Dondero    Exhibit 24    Page 22 of 102    Highland Capital Management, L.P.

```
 1        A.    Sorry.  We have three -- four

 2   community foundations; right?  Dallas Foundation,

 3   Santa Barbara Foundation, Kansas City Foundation,

 4   and North Texas Community Foundations.

 5             The three -- Kansas City, Dallas and

 6   Highland -- I'm sorry -- Dallas, Kansas City, and

 7   Santa Barbara all have supporting organizations

 8   that were the result of contributions from

 9   Highland Capital in 2011.

10        Q.    Do you know if Mr. Dondero has any

11   relationship to the Dallas, Kansas City, or

12   Santa Barbara Foundations that you just

13   identified?

14        A.    My understanding is they have -- he

15   has the same structure of supporting org with

16   Kansas City, Santa Barbara, and Dallas.

17        Q.    Is he the president of each, to the

18   best of your knowledge?

19        A.    Yes.

20        Q.    And are those the entities that

21   commenced the Cayman Islands proceedings, to the

22   best of your understanding?

23        A.    Yes.

24        Q.    Is it your understanding that

25   Mr. Dondero directed those entities to do so?
```

```
 1            A.    No.

 2            Q.    Who directed those entities to do so,

 3      to the best of your knowledge?

 4            A.    CEOs of the organizations.

 5            Q.    And who are they?

 6            A.    Debbie Wilkerson is the CEO of

 7      Kansas City.  Jackie Carrera is the CEO of

 8      Santa Barbara.  Rose Bradshaw is the CEO of North

 9      Texas Community Foundation, although she did not

10      enter in, in the formal filing.  They have a very

11      de minimis role in the asset.

12            Q.    Are you aware that Mr. Dondero filed a

13      declaration or an affidavit in the Cayman Islands

14      in support of the Community Foundation's

15      litigation that they commenced?

16            A.    I did see that.

17            Q.    Did you read it?

18            A.    Yeah.

19            Q.    Did you see any familiarity between

20      that declaration and the Dallas Foundation's

21      objection?

22            A.    I think there were some similarities

23      because of the nature of the activities that have

24      been happening.

25            Q.    Did you learn, when you read
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 35-1524   Filed 06/24/25   Page 62 of 240   PageID 10970
Deposition of James Dondero - Exhibit 1524 - Filed 06/24/25 - Page 62 of 240 - Capital Depositions, L.P.

1   Mr. Dondero's declaration in the Cayman Islands,

2   that he's actually funding that litigation on

3   behalf of the supporting organizations?

4       A.    No, that's not when I learned that.

5       Q.    That's not when you learned it or --

6   withdrawn.

7             Are you aware that he's funding that

8   litigation?

9       A.    Yes.

10      Q.    When did you learn that he was funding

11  that litigation?

12      A.    Before we got into litigation.

13      Q.    Is he funding this litigation on

14  behalf of the Dallas Foundation?

15      A.    Yes, he is.

16      Q.    And how much money did he provide for

17  the funding of this litigation?

18      A.    We have not agreed on an amount.  As

19  with any of our fundholders', legal expenses will

20  get paid through by the fund.  So that's a very

21  common business practice.  And it would go until

22  the legal issues ceased.

23      Q.    But he's made a commitment to fund --

24  to personally fund the expenses of the Dallas

25  Foundation in connection with this litigation; is

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Deposition 3:25-cv-01876-K   Document 551-1524   Filed 06/25/02   Page 63 of 240   PageID 10971 L.P.
Exhibit 524   Page 925 of 102   Page 63 of 240   Capital Management, L.P.

```
 1    that right?
 2         A.    Yes.
 3         Q.    Are you aware of any particular reason
 4    that that's not disclosed in the Dallas
 5    Foundation's objection?
 6         A.    I'm not aware.
 7         Q.    Why did the Dallas Foundation file the
 8    objection on behalf of Empower Dallas Foundation?
 9         A.    Well, we filed the objection on behalf
10    of both Empower and Okada Family Foundation, in
11    essence, because the person who has been
12    overseeing the activity ceased to communicate
13    with us as of last fall.  And there were enough
14    irregularities in our communication and
15    accounting leading up to then some pretty
16    dramatic changes in valuations that raised a red
17    flag for us.
18         Q.    Who is the person that you're
19    referring to?
20         A.    Mark Patrick.
21         Q.    And did the Empower Dallas Foundation
22    ask the Dallas Foundation to file this objection
23    on its behalf?
24         A.    As fiduciaries of all of our
25    charitable assets, we oversee the activity; and
```

| | |
|---|---|
| 1 | when there is any irregular activity, we |
| 2 | investigate. |
| 3 | Q.   I appreciate that.  I'm just asking |
| 4 | you if the Empower Dallas Foundation asked the |
| 5 | Dallas Foundation to file the objection on its |
| 6 | behalf. |
| 7 | A.   Well, since I am representative of the |
| 8 | Empower Dallas Foundation, I don't have to ask |
| 9 | anybody except ourselves to do that. |
| 10 | Q.   And did you confer with Mr. Dondero |
| 11 | about that decision? |
| 12 | A.   I think we informed him. |
| 13 | Q.   Did he review a copy of the objection |
| 14 | before it was filed? |
| 15 | A.   Not to my knowledge, no. |
| 16 | Q.   Are you aware that the Dallas |
| 17 | Foundation also filed the objection on behalf of |
| 18 | certain segregated accounts held at Crown Global |
| 19 | Life Insurance Limited? |
| 20 | A.   Yes. |
| 21 | Q.   Can I refer to Crown Global Life |
| 22 | Insurance Limited as just "Crown Global"? |
| 23 | A.   Yes. |
| 24 | Q.   And can I refer to the segregated |
| 25 | accounts that are identified in the Dallas |

```
 1    Foundation's objection as "the segregated
 2    accounts"?
 3         A.    Yes.
 4         Q.    And are you familiar with those
 5    segregated accounts?
 6         A.    At a high level.
 7         Q.    What's your understanding at a high
 8    level of what those segregated accounts are?
 9         A.    That the Crown Global assets are
10    really insurance annuities that pay out to the
11    fund; and that's the source of income for
12    charitable purposes.
13         Q.    Where does the income from the annuity
14    flow to?
15         A.    Flows to the supporting organizations.
16         Q.    And then the supporting organizations
17    have the proceeds from the annuity available for
18    the foundations; is that fair?
19         A.    Yes.
20         Q.    And do you know who took out these
21    insurance policies or these annuities?  Which of
22    the -- withdrawn.
23               Can you identify the supporting
24    organization that funded the purchase of the
25    annuities?
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Deposition 3:25-cv-01876-K   Document 55-1.524   Filed 06/23/25   Page 66 of 240   PageID 1974 L.P.
Exhibit 524   Page 27 of 102   Page 66 of 240

```
 1          A.     Empower Dallas Foundation and Okada
 2    Family Foundation.
 3          Q.     And is the cash that is thrown off
 4    from the annuities -- withdrawn.
 5                 To the best of your understanding, is
 6    the cash that's thrown off from the annuities the
 7    sole source of income for Empower Dallas
 8    Foundation and the Okada Foundation?
 9          A.     That's my understanding.
10          Q.     Is it your understanding that the
11    Dallas Foundation has not received anything of
12    value from Empower Dallas Foundation or the Okada
13    Family Foundation other than proceeds from the
14    annuities?
15          A.     That's my understanding.
16          Q.     Do you know why the Dallas Foundation
17    filed the objection on behalf of the segregated
18    accounts at Crown Global?
19          A.     Yes.
20          Q.     Why did the Dallas Foundation file its
21    objection on behalf of the segregated accounts?
22          A.     As I said earlier, because there had
23    been activity and essentially a write-down of
24    40 percent of value, we were concerned that there
25    were activities within Crown Global for the
```

1   organizations that support that that we did not

2   have any, you know, access to, vision or

3   communication around.

4       Q.    Does the Dallas Foundation have any

5   relationship with Crown Global?

6       A.    Yes.

7       Q.    As it pertains to -- what relationship

8   does the Dallas Foundation have with

9   Crown Global?

10       A.    Well, I don't understand on a

11   transactional, but we get quarterly reports from

12   them.  They obviously send the proceeds to us.  I

13   mean, they are a fiduciary to us in the same way

14   we are to others.

15       Q.    Crown Global is?

16       A.    Yeah.

17       Q.    With respect to the disbursement of

18   proceeds from the annuity?

19       A.    Yes.

20       Q.    Okay.  So the proceeds from the

21   annuity don't go to Empower Dallas or the Okada

22   Family Foundation; they get remitted directly to

23   the Dallas Foundation.

24            Do I have that right?

25       A.    No.  They go -- they go to the

 1    supporting organizations.  But in our governance

 2    that -- I refer to both as -- it flows into our

 3    finance office, and then they get allocated to

 4    the foundations.

 5        Q.    You mentioned that there was a

 6    40 percent write-down in value.  Is that with

 7    respect to the annuities?

 8        A.    I don't know all of the transactions

 9    that led up to that.  But what we understood,

10    there were a few -- sorry.

11            There are a few requests for us to

12    approve that we didn't understand and sent them

13    to our counsel, and then got the first-quarter

14    report for March 30th, and it was significantly

15    lower and we didn't know why.

16            So in asking for that, we found out

17    there was a decline.

18        Q.    And is that -- is it your

19    understanding that it's the decline in value --

20    withdrawn.

21            Is it your understanding that it's the

22    unexplained decline in value that caused the

23    Dallas Foundation to file the objection on behalf

24    of the segregated accounts?

25        A.    Yes.

```
 1          Q.    Did anybody ask the Dallas Foundation

 2    to file the objection on behalf of the segregated

 3    accounts?

 4          A.    No.

 5          Q.    Can you identify the owner of the

 6    segregated accounts on behalf of -- on whose

 7    behalf the Dallas Foundation filed the objection?

 8                Withdrawn.  Too many words.

 9                Do you know who owns the segregated

10    accounts?

11          A.    No.  I won't guess.

12          Q.    Are you aware that the owner of the

13    segregated accounts is Crown Global?

14          A.    Oh, yes.

15          Q.    And so is that your understanding,

16    that Crown Global --

17          A.    Yes.

18          Q.    -- owns the segregated accounts?

19          A.    Yes.

20          Q.    Did anybody from the Dallas Foundation

21    seek Crown Global's consent and approval before

22    filing the objection on behalf of the segregated

23    accounts?

24          A.    Yes.

25          Q.    Yes?
```

```
 1            And who at Crown Global gave the

 2      authorization, if you know?

 3         A.    Mr. -- the CEO and their chief legal,

 4      Hernandez -- Paul --

 5            ATTORNEY OKIN:  Let me interrupt here

 6      too, John.  You're acting as though the objection

 7      was filed solely by the Dallas Foundation.  We

 8      represent two clients here.  We represent the

 9      Dallas Foundation and Crown Global.

10            And you're putting Ms. Diaz in a

11      position where I think she thinks she has to

12      justify having -- Crown Global's actions when

13      they -- we represent them as well.

14            ATTORNEY MORRIS:  Well, as I read the

15      pleading that you filed, it said the Dallas

16      Foundation -- I won't --

17            ATTORNEY OKIN:  I think that's a --

18            ATTORNEY MORRIS:  I'll ask the

19      questions, and we'll --

20            ATTORNEY OKIN:  Take a look at our

21      signature block.  It says clearly that we're

22      doing it on behalf of the Dallas Foundation and

23      Crown Global.

24      BY ATTORNEY MORRIS:

25         Q.    Ms. Diaz, do you know if the Dallas
```

 1    Foundation ever appeared in the Highland

 2    bankruptcy case before it filed this objection?

 3         A.    I do not believe so.

 4         Q.    To the best of your knowledge, the

 5    Dallas Foundation never filed a claim against

 6    Highland in the Highland bankruptcy case;

 7    correct?

 8         A.    No.

 9         Q.    To the best of your knowledge --

10    withdrawn.

11              Have you ever heard of the Highland

12    Claimant Trust?

13         A.    No.

14         Q.    So is it fair to say that you have no

15    reason to believe that the Dallas Foundation has

16    any interest in the Highland Claimant Trust?

17         A.    No.  That is not -- that's not fair to

18    claim.

19         Q.    So is it your testimony that you

20    believe the Dallas Foundation has a direct or

21    indirect interest in the Highland Claimant Trust?

22         A.    What you asked me was had we ever

23    participated and did we then have any result

24    from it.

25              I don't know the answer to that

```
 1   question.
 2        Q.    I apologize if my questioning wasn't
 3   clear to you.  Let me try again.
 4             To the best of your knowledge, the
 5   Dallas Foundation has never appeared in the
 6   Highland bankruptcy case until it filed the
 7   objection that we're talking about today;
 8   correct?
 9        A.    I don't know the answer to that.
10        Q.    But to the -- you have no knowledge
11   that they ever did; is that fair?
12        A.    I have no knowledge.
13        Q.    Okay.  And you have no knowledge that
14   the Dallas Foundation ever filed a claim against
15   Highland in the Highland bankruptcy case;
16   correct?
17        A.    I have no knowledge of that.
18        Q.    And you have no knowledge that the
19   Dallas Foundation has any interest of any kind in
20   the Highland Claimant Trust; correct?
21        A.    I do not agree with that statement.
22        Q.    What knowledge do you have that the
23   Dallas Foundation has an interest in the Highland
24   Claimant Trust?
25        A.    Because of the relationship between
```

```
 1    Hunter Mountain and how it feeds up to

 2    Crown Global and, therefore, the supporting

 3    organizations.

 4         Q.    It might be my fault that I'm not

 5    being clear, but I'm really just focused on

 6    Highland right now.  Has nothing to do with

 7    Crown Global --

 8         A.    Okay.

 9         Q.    -- or Hunter Mountain; it's just

10    Highland.

11         A.    Okay.

12         Q.    Are you aware that as a result of the

13    bankruptcy, an entity Called the Highland

14    Claimant Trust was formed?

15         A.    I was not, no.

16         Q.    Okay.  So if you weren't aware that an

17    entity called the Highland Claimant Trust was

18    formed, is it also fair to say you have no

19    knowledge that the Dallas Foundation has an

20    interest in the Highland Claimant Trust?

21         A.    Okay.

22         Q.    Okay.  And does the Dallas Foundation

23    have any contractual relationship with Highland

24    Capital Management, LP?

25         A.    No.
```

1       Q.    Has the Dallas Foundation ever had a

2  contractual relationship with Highland Capital

3  Management, LP, to the best of your knowledge?

4       A.    No.

5       Q.    Does the Dallas Foundation have any

6  contractual relationship with an entity called

7  the Highland Claimant Trust, to the best of your

8  knowledge?

9       A.    No.

10       Q.    And to the best of your knowledge, has

11  the Dallas Foundation ever had a contractual

12  relationship with an entity called the Highland

13  Claimant Trust?

14       A.    No.

15       Q.    Do you have any reason to believe, as

16  you sit here today, that Highland Capital

17  Management, LP, owes any duties or obligations to

18  the Dallas Foundation?

19       ATTORNEY OKIN:  Object to form.

20  BY ATTORNEY MORRIS:

21       Q.    You can answer.

22       A.    Can you ask the question again.

23       Q.    Sure.

24       As you sit here today, do you have any

25  reason to believe that Highland Capital

```
 1    Management, LP, owes any duties or obligations to

 2    the Dallas Foundation?

 3              ATTORNEY OKIN:  Object to form.

 4       A.    No.

 5    BY ATTORNEY MORRIS:

 6       Q.    As you sit here today, do you have any

 7    reason to believe that Highland Capital

 8    Management, LP, ever had any duties or

 9    obligations that it owed to the Dallas

10    Foundation?

11              ATTORNEY OKIN:  Object to form.

12       A.    No.

13    BY ATTORNEY MORRIS:

14       Q.    Are you aware that if the settlement

15    agreement between the Highland entities and the

16    HMIT entities is approved, the HMIT entities will

17    receive cash and other assets pursuant to the

18    terms of the settlement agreement?

19       A.    I'm assuming that there is assets

20    within the agreement.

21       Q.    Have you reviewed the settlement

22    agreement yourself, Ms. Diaz?

23       A.    No.

24       Q.    Are you generally familiar with the

25    terms of the settlement agreement?
```

```
 1            A.    At a high level.

 2            Q.    What's your understanding at a high

 3    level?

 4            A.    That once the settlement is complete,

 5    that Hunter Mountain will receive assets of some

 6    size that will flow up to Crown Global.

 7            Q.    Do you know if the requirement that

 8    the assets flow up to Crown Global is part of the

 9    settlement agreement that's before the Court and

10    that the Dallas Foundation is objecting to?

11            A.    That was our understanding.

12            Q.    From the agreement itself?

13            A.    I have not seen the settlement

14    agreement.

15            Q.    So you authorized an objection to a

16    settlement agreement that you haven't seen; is

17    that fair?

18            A.    That's fair.

19            Q.    Do you have any reason to believe that

20    the Dallas Foundation has a right to recover any

21    of the assets you just described that HMIT will

22    receive if the settlement is approved by the

23    Court?

24                 ATTORNEY OKIN:   Object to form.

25            A.    Can you repeat the question.
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K    Document 55-1 Filed 06/20/25   Page 77 of 240   PageID 10985
Deposition of James R. Dondero, Exhibit 524   Page 77 of 240 Capital Depositions, L.P.

```
 1    BY ATTORNEY MORRIS:

 2         Q.    Do you have any reason to believe that

 3    the Dallas Foundation has a right to recover any

 4    portion of the assets that HMIT will receive if

 5    the settlement agreement is approved by the

 6    bankruptcy court?

 7              ATTORNEY OKIN:  Object to form.

 8         A.    My job is to protect the charitable

 9    assets under our organization's fiduciary

10    compliance role; and so if there is any

11    opportunity for assets to either be diminished or

12    not move forward, it's my job to ensure that I've

13    done everything I can to recover them.

14    BY ATTORNEY MORRIS:

15         Q.    But do you have an understanding as to

16    whether or not -- withdrawn.

17              I think you just testified that it's

18    your understanding at a high level that HMIT will

19    receive certain assets if the settlement

20    agreement is approved.

21              Do I have that right?

22         A.    Yes.

23         Q.    Do you have an understanding that the

24    Dallas Foundation is entitled to receive all or

25    any portion of the assets that HMIT would receive
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 55-15   Filed 06/26/25   Page 78 of 240   PageID 10986
Deposition of Suzanne Diaz    Exhibit 24    Page 92 of 502    Highland Capital Management, L.P.

 1   under the settlement agreement?

 2                ATTORNEY OKIN:  Object to form.

 3        A.    I don't know that.

 4   BY ATTORNEY MORRIS:

 5        Q.    You don't know that?

 6        A.    (Shakes head.)

 7        Q.    Have you asked anybody whether the

 8   Dallas Foundation has a right to recover any

 9   portion of the assets that HMIT will receive

10   under the settlement agreement?

11                ATTORNEY OKIN:  Before you answer

12   that, Ms. Diaz, I'll just remind you:  Other than

13   disclosing any of your conversations with counsel

14   for you or for the foundation.

15   BY ATTORNEY MORRIS:

16        Q.    But you can answer the question.

17        A.    You'll have to ask the question again.

18        Q.    No problem.  I appreciate that.

19                Did you ever ask anybody whether the

20   Dallas Foundation had a right to receive any of

21   the assets that HMIT will receive under the

22   settlement agreement?

23        A.    Like somebody-who in your question?

24        Q.    Anybody.  Did you ever ask the

25   question of anybody?  Let's just start with "yes"

```
 1    or "no."

 2         A.    Yes.

 3         Q.    And who did you ask?

 4         A.    I'll strike that, because it would

 5    be -- I couldn't tell you definitively I did

 6    that.

 7         Q.    Did Mr. Dondero tell you that the

 8    Dallas Foundation had a right to the assets that

 9    HMIT was going to receive under the settlement

10    agreement?

11         A.    No.

12         Q.    And you don't recall asking that

13    question of anybody; is that fair?

14         A.    The only person I talked to this --

15    about these assets to is Mark Patrick.

16         Q.    And did Mr. Patrick tell you that the

17    Dallas Foundation had a right to recover any of

18    the proceeds under the HMIT/Highland settlement

19    agreement?

20         A.    I don't know.

21         Q.    Have you ever received any documents

22    that lead you to believe that the Dallas

23    Foundation has an ownership interest in any of

24    the assets that HMIT will receive under the

25    settlement agreement?
```

 1              ATTORNEY OKIN:  Object to form.

 2       A.     My understanding is that through the

 3  Hunter Mountain settlement, that those assets

 4  flow into the Atlas fund that I know Mark Patrick

 5  was managing.  So indirectly.

 6  BY ATTORNEY MORRIS:

 7       Q.     Is there a document that you reviewed

 8  that leads you to believe that the assets HMIT

 9  receives will go to the Atlas fund?

10       A.     No.

11       Q.     Can you identify with any specificity

12  which Atlas entity you have in mind that's

13  expected to receive the proceeds from the

14  HMIT/Highland settlement?

15       A.     No.

16       Q.     Do you know if the Atlas entity that

17  you just identified, does that have any

18  obligation to disburse any of the assets it may

19  receive from HMIT?

20       A.     I don't know.

21       Q.     Okay.  Let's -- do you have any reason

22  to believe that the Dallas Foundation will be

23  impacted in any way if the settlement between

24  Highland and the HMIT entities is approved?

25       A.     As I said, because the Crown Global is

```
 1    to disburse money that it receives from Atlas,

 2    then there would be an impact.  That's why we

 3    filed the objection.

 4         Q.    Is it fair to say that the Dallas

 5    Foundation's concern is what happens to the

 6    assets that HMIT receives after the settlement is

 7    approved and it's not with the agreement itself?

 8         A.    I can't answer that.

 9         Q.    If Mark Patrick hadn't done anything

10    to change any of the structure that's described

11    in the Dallas Foundation's objection such that

12    the Dallas Foundation's expectations as set forth

13    in its objection were met, would the Dallas

14    Foundation have any reason to object to this

15    settlement?

16              ATTORNEY OKIN:  Objection; form.

17         A.    I don't know.

18    BY ATTORNEY MORRIS:

19         Q.    Isn't the problem here that you're

20    concerned about what happens to the money after

21    it's received by HMIT?

22         A.    I'm concerned that the case that's

23    pending in the Cayman Islands shows that

24    $300 million of charitable assets have vanished

25    and that the same type of behavior is happening
```

 1    in Crown Global and impacts those funds to the

 2    tune of $25 million.

 3         Q.    But that has nothing to do with

 4    Highland.

 5               Fair enough?

 6         A.    I don't know.

 7         Q.    Do you have any basis to say that

 8    Highland has any involvement in anything you just

 9    described?

10         A.    Well, I'm not a lawyer and,

11    technically, I don't know how to answer that.

12    But Highland has been involved from day one.

13         Q.    Involved in what?

14         A.    The original contribution to set up

15    the supporting orgs with those shares; like I

16    said, I -- all the different legal entities --

17    GPs, LPs, et cetera -- I leave you all to track.

18         Q.    If the Court approved the settlement

19    and Mark Patrick decided to give all of the

20    proceeds to the Dallas Foundation, would the

21    Dallas Foundation have any reason to object to

22    the settlement?

23               ATTORNEY OKIN:  Object to form.

24         A.    I think we'd want to know more.

25    ///

```
 1   BY ATTORNEY MORRIS:
 2        Q.    What would you want to know?
 3        A.    What are the assets that we would be
 4   receiving?  What would the structure be?
 5        Q.    Well, the assets are set forth in the
 6   settlement agreement; right?  So there's no
 7   mystery about the assets.
 8              Fair enough?
 9        A.    I don't know that.  I don't know --
10   are they -- is it cash?  Is it securities?  What
11   are the nature of the -- I would want to know a
12   lot more before accepting all things like that.
13        Q.    Do you know if Crown Global ever
14   appeared in the Highland bankruptcy?
15        A.    I don't know.
16        Q.    Do you know if the segregated accounts
17   ever filed a notice of appearance in the Highland
18   bankruptcy?
19        A.    I don't know.
20        Q.    Do you know if Crown Global ever filed
21   a claim against Highland in the Highland
22   bankruptcy?
23        A.    I don't know.
24        Q.    Do you know if the segregated accounts
25   ever filed a claim against Highland in the
```

```
 1    Highland bankruptcy?

 2         A.    I don't know.

 3         Q.    Do you know if Crown Global has an

 4    interest in the Highland Claimant Trust?

 5         A.    No.  No, I don't know.

 6         Q.    Do you know if the segregated accounts

 7    have an interest in the Highland Claimant Trust?

 8         A.    I don't know.

 9         Q.    Do you know if Crown Global has any

10    contractual relationship with Highland?

11         A.    I don't know.

12         Q.    Do you know if Crown Global has any

13    contractual relationship with the Highland

14    Claimant Trust?

15         A.    No.

16         Q.    I'm going to take Mr. -- I think it's

17    Mr. Littleton's deposition next.

18         A.    Yep.

19         Q.    Do you know if he is affiliated with

20    Crown Global in any way?

21         A.    No.  He's an employee of the Dallas

22    Foundation.

23         Q.    Thank you.

24               Do you know if Crown Global has any

25    right to recover any of the assets that HMIT and
```

```
 1    the HMIT entities may receive under the

 2    settlement agreement?

 3              ATTORNEY OKIN:  Object to form.

 4         A.    I don't know.

 5    BY ATTORNEY MORRIS:

 6         Q.    Have you asked that question of

 7    anybody?

 8              ATTORNEY OKIN:  Other than your

 9    lawyers, you can answer that, Ms. Diaz.

10              ATTORNEY MORRIS:  Please --

11    BY ATTORNEY MORRIS:

12         Q.    Was the answer "no," Ms. Diaz?

13         A.    Ask the question again, please.

14         Q.    Have you ever asked anybody whether

15    Crown Global had the right to receive any of the

16    assets that Highland will convey to HMIT under

17    the settlement agreement?

18         A.    No.

19         Q.    We're using the phrase "HMIT entities"

20    to mean the entities on whose behalf Mark Patrick

21    signed the settlement agreement; right?  Are we

22    on the same page?

23         A.    That's what you're telling me.

24         Q.    Okay.  Are you familiar with any of

25    those entities?
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 35-1 Filed 04/29/25   Page 86 of 240   PageID 10094
Deposition 3:25-cv-01876-K   Exhibit 24 Filed 04/20/25   Page 86 of 240   Capitol Deposition L.P.

```
 1           A.    Tell me what they are.

 2           Q.    Are you familiar with any of the Rand

 3      entities?

 4           A.    I'm familiar with Rand.

 5           Q.    And what's your familiarity with Rand?

 6           A.    Certainly it was another vehicle that

 7      flowed through to Atlas.  And when Mr. Patrick

 8      came to see me last October, told me that there

 9      might be some issues with Rand and that structure

10      might be changing.  That's vague.

11           Q.    Let's stick with the Hunter Mountain

12      Investment Trust.

13                 Are you aware of any assets that the

14      Hunter Mountain Investment Trust owns today?

15           A.    No.

16           Q.    Was it your understanding that

17      Mr. Patrick controlled Rand?

18           A.    Yes.

19           Q.    And is it your understanding that he

20      controls Rand today?

21           A.    Yes.

22           Q.    And going back to Hunter Mountain

23      Investment Trust, you're not aware of any assets

24      that that entity holds today; correct?

25           A.    No.
```

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-01876-K    Document 55-15    Filed 04/26/25    Page 87 of 240    PageID 10095
Deposition of Patricia Diaz    Exhibit 524    Page 949 of 1102    Highland Capital Management, L.P.

1          Q.      Were you --

2          A.      I'm assuming Rand is one of the

3    assets, I guess.

4          Q.      Were you ever -- did you ever know --

5    were you ever aware of any asset that HMIT owned?

6          A.      Well, Atlas.

7          Q.      It's your understanding --

8          A.      Yeah, I feel like I'm being quizzed on

9    Hunter Mountain Trust.

10               ATTORNEY OKIN:  Let me interrupt here.

11    John, two things.

12               One, if you want to show her an org

13    chart so she can actually see these entities in a

14    way that actually would help her remember them.

15    Nobody can possibly keep them in their mind cold.

16               And, second, Ms. Diaz is not going to

17    be our witness on this Hunter Mountain structure

18    and the Rand structure.  You can keep asking her

19    questions about it and testing her memory on it,

20    but I don't think you're going to find that the

21    answers are going to be any different.

22               Mr. Littleton will talk to these

23    issues, yes.  I can't promise you he'll be able

24    to answer every one of your questions.  But to

25    the extent you want somebody with the Dallas

1    Foundation's knowledge of the workings of that

2    structure, he's the one to ask about that.

3            ATTORNEY MORRIS:  I'll continue to ask

4    the questions, but I appreciate that.

5    BY ATTORNEY MORRIS:

6        Q.    Do you know if the Dallas Foundation

7    ever received anything of value from any of the

8    HMIT entities?

9        A.    Crown Global.

10       Q.    Crown Global is not an HMIT entity.

11   So I'm asking you to just focus on the entities

12   that Mark Patrick controlled, the Rand entities,

13   the Atlas entities and Hunter Mountain.

14           Did any of those entities ever give

15   anything of value to the Dallas Foundation?

16       A.    Not directly that I'm aware of, no.

17       Q.    Did any of those entities ever have

18   any business dealings with the Dallas Foundation?

19       A.    Only in the relationship with

20   Crown Global.

21       Q.    Do you have any understanding as to

22   whether any of the HMIT entities owes any duties

23   or obligations to the Dallas Foundation today?

24           ATTORNEY OKIN:  Objection to form.

25       A.    I don't know.

1    BY ATTORNEY MORRIS:

2         Q.    I understand there was some corporate

3    reorganization earlier this year.  I think that's

4    described in the Dallas Foundation's objection.

5         Is that just generally fair?

6         A.    As it relates to Mr. Patrick?

7         Q.    Yes.

8         A.    (Nods head.)

9         Q.    Okay.  Do you have any reason to

10   believe that before Mr. Patrick effectuated those

11   changes, that any of the HMIT entities owed any

12   duty or obligation to the Dallas Foundation?

13        ATTORNEY OKIN:  Objection to form.

14        A.    I don't know.

15   BY ATTORNEY MORRIS:

16        Q.    Are you aware that HMIT filed a couple

17   of years ago a motion in the bankruptcy court for

18   permission to bring certain claims against

19   Highland Capital Management and a gentleman named

20   James Seery?

21        A.    No.

22        Q.    Nobody ever told you that; is that

23   fair?

24        A.    Fair.

25        Q.    Are you aware that Highland contends

```
 1    that the settlement agreement that it has entered

 2    into with the HMIT entities is the product of

 3    good-faith, arm's-length negotiations?

 4         A.    Am I aware?  No.

 5         Q.    Do you have any knowledge of the

 6    nature of any negotiations between the Highland

 7    entities and the HMIT entities?

 8         A.    I'm aware that it's been going on for

 9    four years.

10         Q.    I'm just talking about the settlement

11    agreement now.

12         A.    Okay.

13         Q.    Do you have any knowledge of any facts

14    concerning the negotiation of that particular

15    settlement agreement?

16         A.    No.

17         Q.    Do you have any knowledge of any facts

18    that might suggest that the settlement agreement

19    was not the product of good-faith, arm's-length

20    negotiations?

21         A.    No.

22         Q.    Do you have any reason to believe that

23    the proposed settlement is unfair to Highland

24    Capital Management, LP?

25              ATTORNEY OKIN:  Object to form.
```

```
 1   BY ATTORNEY MORRIS:

 2        Q.    You can answer, ma'am.

 3        A.    I don't know.

 4        Q.    Do you know whether the proposed

 5   settlement is unfair to the Highland Claimant

 6   Trust?

 7        A.    I don't know.

 8              ATTORNEY OKIN:  Object to form.

 9   BY ATTORNEY MORRIS:

10        Q.    You don't have a view on that; is that

11   fair?

12        A.    Yes.

13        Q.    And is it fair that in connection with

14   the preparation and the filing of the

15   objection -- withdrawn.

16              The Dallas Foundation, in its

17   objection, does not contend that the settlement

18   is unfair to Highland Capital Management; is that

19   correct?

20        A.    I don't know.

21        Q.    You reviewed and authorized the filing

22   of the objection; isn't that right, ma'am?

23        A.    Right.

24        Q.    And you're familiar with the document

25   that you authorized to be filed; fair?
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Deposition 3:25-cv-01876-K   Document 55-1 Filed 05/12/25 Page 92 of 240 Page 93 of 240 Capital Management, L.P.
Exhibit 524   Page 95 of 102   Page 92 of 240   PageID 1000

 1      A.      Yes.

 2      Q.      And based on your recollection, do you

 3   recall the Dallas Foundation making any assertion

 4   or claim that the settlement agreement was unfair

 5   to Highland Capital Management, LP, or any of its

 6   affiliates?

 7      A.      The claim was that it was unfair to

 8   the supporting organizations.

 9      Q.      And how is the settlement agreement

10   unfair to the supporting organizations?

11      A.      Because we would -- well, what we

12   claimed is that because of our lack of

13   transparency of the flow of those funds and the

14   changes in the fund recently, that the supporting

15   organizations were losing their assets and any

16   potential future assets.

17      Q.      Is there any other basis that you're

18   aware of by which the Dallas Foundation contends

19   that the settlement agreement is unfair to it?

20      A.      No.

21      Q.      Does the Dallas Foundation contend

22   that the settlement agreement is unfair to Hunter

23   Mountain Investment Trust?

24      A.      I don't know.

25      Q.      As the person who authorized the

 1   filing of the objection on behalf of the Dallas

 2   Foundation, do you have any reason to believe

 3   that the terms of the settlement are unfair to

 4   the Hunter Mountain Investment Trust?

 5       A.    I do not.

 6       Q.    Are you aware that under the

 7   settlement agreement, the HMIT entities and the

 8   Highland entities are releasing each other from

 9   all liabilities except for the liabilities

10   arising under the settlement agreement?

11       A.    I'm assuming that's what the

12   settlement is intended to do.

13       Q.    And the Dallas Foundation doesn't have

14   any concern about the scope of the mutual

15   releases; is that fair?

16           ATTORNEY OKIN:  Objection to form.

17       A.    I don't know.

18   BY ATTORNEY MORRIS:

19       Q.    As the person who authorized the

20   filing of the objection on behalf of the Dallas

21   Foundation, do you recall there being any

22   statement in the objection where the Dallas

23   Foundation expressed any concern at all about the

24   scope of the mutual releases that are in the

25   settlement agreement?

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Deposition of 25-cv-01876-K   Document 55-1 524   Filed 05/26/25 02 102   Page 94 of 240   Capital Management, L.P.
Exhibit 524   Page 55 of 102   Page 94 of 240   PageID 1002

```
 1              ATTORNEY OKIN:  Object to form.  The
 2    document speaks for itself.  I mean, if you want
 3    to show it to her and ask her to find it, that's
 4    fine.
 5    BY ATTORNEY MORRIS:
 6         Q.   You can answer, ma'am.
 7         A.   I don't --
 8         Q.   I'm sorry?
 9         A.   I don't recall that.
10         Q.   Okay.  Thank you.
11              Are you aware of any facts that could
12    give rise to a claim by the Dallas Foundation
13    against any Highland entity?
14              ATTORNEY OKIN:  Object to form.
15         A.   Repeat the question.
16    BY ATTORNEY MORRIS:
17         Q.   Are you aware of any facts that would
18    support a claim by the Dallas Foundation against
19    Highland Capital Management, LP, or the Highland
20    Claimant Trust?
21              ATTORNEY OKIN:  Object to form.
22         A.   No.
23    BY ATTORNEY MORRIS:
24         Q.   Do you understand the basis for the
25    Dallas Foundation's objection?
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 55-524   Filed 09/26/25   Page 95 of 240   PageID 11003
Deposition of Dugan Marcie as Corp. Rep. of Charitable DAF Fund, L.P.

```
 1          A.    Yes.

 2          Q.    Can you articulate that for me.

 3    What's your understanding of the basis of the

 4    Dallas Foundation's objection?

 5                ATTORNEY OKIN:  Object to form.

 6          A.    Our objection --

 7    BY ATTORNEY MORRIS:

 8          Q.    Pardon me?  What's that, ma'am?

 9                ATTORNEY OKIN:  I said I object to the

10    form of the question.

11                Go ahead.  You can answer.

12          A.    Our objection is based on -- and I've

13    said this before -- the fact that there's been

14    irregular significant erosion of the assets to

15    date by the party who seems to control a lot of

16    the liquidity flows and oversight of the assets.

17                And so with the backdrop of all of the

18    work we're doing in the Cayman Islands to recover

19    300-plus million dollars, this seemed not

20    insignificant to protect the $25 million for

21    these two supporting organizations.

22                So as this happens on Wednesday, what

23    we've learned is that every opportunity we can to

24    slow down decisions that are made give us time to

25    understand where -- what is happening with these
```

 1   charitable assets and where they are.

 2   BY ATTORNEY MORRIS:

 3        Q.    Do you have any reason to believe that

 4   Mark Patrick does not have the authority to enter

 5   into the settlement agreement on behalf of each

 6   of the HMIT entities?

 7             ATTORNEY OKIN:  Object to the form of

 8   the question.

 9        A.    I don't know what authority he has to

10   enter into that.

11   BY ATTORNEY MORRIS:

12        Q.    Do you have any facts that you can

13   share with me that suggest that Mr. Patrick does

14   not have the legal authority to enter into the

15   settlement agreement on behalf of any of the HMIT

16   entities?

17             ATTORNEY OKIN:  Object to the form of

18   the question.

19        A.    I don't.

20   BY ATTORNEY MORRIS:

21        Q.    Is it your understanding that

22   Mr. Patrick was required to obtain the Dallas

23   Foundation or Crown Global's consent before

24   entering into this settlement agreement?

25        A.    I think what we would have appreciated

 1    and what had been our business as usual was

 2    information prior to and during anything that

 3    involved the assets under our aegis.

 4         Q.    Do you know if any of the HMIT

 5    entities had an obligation or duty to provide

 6    information to the Dallas Foundation or

 7    Crown Global before entering into the settlement

 8    agreement?

 9              ATTORNEY OKIN:  Object to the form of

10    the question.

11         A.    I don't --

12    BY ATTORNEY MORRIS:

13         Q.    I'm sorry.  Ms. Diaz, you don't know?

14         A.    I don't contractually know that.  But

15    whether it's authority that he was given or

16    assumed, he should have communicated with us.

17         Q.    Should he have communicated with you

18    before filing a lawsuit against the Highland --

19    withdrawn.

20              Do you believe that Mr. Patrick should

21    have communicated with the Dallas Foundation

22    before filing a lawsuit on behalf of Hunter

23    Mountain Investment Trust against Highland,

24    Mr. Seery, and others?

25         A.    I don't know.

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Deposition of 3:25-cv-01876-K   Document 55-1 24   Filed 06/20/25 102   Page 98 of 240   Capital Management, L.P.
Exhibit 524   Page 96 of 102   Page 98 of 240   PageID 1006

1        Q.    You don't have a view on that; is that

2    fair?

3        A.    Fair.

4        Q.    I apologize if I asked this, but do

5    you have any reason to believe that Mr. Patrick

6    was required to obtain either the Dallas

7    Foundation's or Crown Global's consent before

8    entering into the settlement on behalf of the

9    HMIT entities?

10              ATTORNEY OKIN:  Object to form of the

11   question.

12       A.    I don't know.

13   BY ATTORNEY MORRIS:

14       Q.    Do you have any reason to believe that

15   the Dallas Foundation or Crown Global has --

16   withdrawn.

17              Do you know if the Dallas Foundation

18   has a direct ownership interest in any of the

19   HMIT entities that are party to the settlement

20   agreement?

21       A.    I don't believe so.

22       Q.    Do you know if Crown Global has a

23   direct ownership interest in any of the HMIT

24   entities that are party to the settlement

25   agreement?

```
 1            A.    I don't know.

 2            Q.    Do you know if the Dallas Foundation

 3      has an indirect ownership interest in any of the

 4      HMIT entities that are party to the settlement

 5      agreement?

 6            A.     Indirect ownership?

 7                  ATTORNEY OKIN:  Object to the form of

 8      the question.

 9            A.    I don't know.

10      BY ATTORNEY MORRIS:

11            Q.    Did you ever ask anybody?

12            A.    No.

13            Q.    No?

14            A.    No.

15            Q.    Do you know if Crown Global has an

16      indirect ownership interest in any of the HMIT

17      entities that are party to the settlement

18      agreement?

19                  ATTORNEY OKIN:  Object to the form of

20      the question.

21            A.    I don't know.

22      BY ATTORNEY MORRIS:

23            Q.    Do you know if the Dallas Foundation

24      has any right to control any of the HMIT

25      entities?
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 15-4   Filed 06/02/25   Page 100 of 240   PageID 1008
Exhibit 1 24   Page 99 of 102   Declaration of Capital Depiction

```
 1              A.     No.
 2              Q.     No, you don't know; or, no, they don't
 3     have that right?
 4              A.     No, we don't have that right.
 5              Q.     Do you know if Crown Global has the
 6     right to control any of the HMIT entities?
 7              A.     I don't know.
 8              Q.     Do you know if the Dallas Foundation
 9     has the right to approve transactions that are
10     entered into by any of the HMIT entities?
11              A.     I don't know.
12              Q.     Do you know if Crown Global has the
13     right to approve any transaction that's entered
14     into by any of the HMIT entities?
15              A.     I don't know.
16              Q.     Do you know if Crown Global or the
17     segregated accounts has any right to control any
18     of the HMIT entities?
19              A.     I don't know.
20              Q.     Do you know if Crown Global or the
21     segregated accounts has any right to approve
22     transactions that any of the HMIT entities might
23     enter into?
24              A.     I don't know.
25              Q.     Do you know if any of the HMIT
```

| | |
|---|---|
| 1 | entities were required to obtain the segregated |
| 2 | accounts' consent before entering into the |
| 3 | settlement agreement? |
| 4 |         ATTORNEY OKIN:  Object to the form of |
| 5 | the question. |
| 6 |     A.   I don't know. |
| 7 |         ATTORNEY MORRIS:  Okay.  We're going |
| 8 | to put up on the screen -- Nathan, can you please |
| 9 | put up on the screen the Dallas Foundation's |
| 10 | objection. |
| 11 | BY ATTORNEY MORRIS: |
| 12 |     Q.   And while we wait, Ms. Diaz, I will |
| 13 | tell you that, you know, the good news with |
| 14 | COVID -- or at least one piece of the good |
| 15 | news -- is that we learned to do these remote |
| 16 | depositions so people don't have to travel and |
| 17 | it's much less expensive for clients. |
| 18 |     The bad news is that I'm not in the |
| 19 | room with you and we have to put documents on the |
| 20 | screen, and sometimes that can be a little bit |
| 21 | cumbersome. |
| 22 |     The Dallas Foundation's objection is |
| 23 | fairly lengthy.  This is not a test at all.  I am |
| 24 | going to point to certain parts of the objection. |
| 25 | But if you believe that you need to see any other |

```
 1    portion of the document, will you let me know
 2    that so that I give you a chance to be fully
 3    informed?
 4         A.    Yes.
 5              ATTORNEY MORRIS:  Okay.  I think it's
 6    towards the end, Nathan, paragraph 32.
 7              This will be -- let's just call it
 8    Highland 1.
 9              (Whereupon, Exhibit Highland 1
10              was marked for identification and
11              is attached hereto.)
12    BY ATTORNEY MORRIS:
13         Q.    So we've got up on the screen
14    paragraph 32 of the objection.  And the third
15    sentence states, "Unfortunately, it does not
16    appear, however, that joint official liquidators
17    are parties to or have authorized the
18    settlement."
19              Do you see that?
20         A.    I see it.
21         Q.    Okay.  Are you aware that joint
22    official liquidators were appointed by a Cayman
23    court?
24         A.    Yes.
25         Q.    Do you know the entity over which the
```

1    joint official liquidators were appointed?

2        A.    I've met with them.

3             Entity?

4             ATTORNEY OKIN:  Ms. Diaz, maybe you

5    need the question repeated.  You seem to be

6    confused by the wrong part of it.

7             THE WITNESS:  Okay.

8             ATTORNEY MORRIS:  Thank you, Matt.

9    That's fine.  That's fine.  I'll ask the question

10   again.

11   BY ATTORNEY MORRIS:

12       Q.    Can you identify the entity that's the

13   subject of the Cayman Islands liquidation

14   proceeding?

15       A.    Yes; the DAF Holdco.

16       Q.    Are you aware that all of the HMIT

17   entities are Delaware corporations?  Withdrawn.

18             Are you aware that all of the HMIT

19   entities were formed under the laws of the State

20   of Delaware?

21       A.    Sounds familiar.

22       Q.    And have you ever communicated with

23   the joint official liquidators?

24       A.    Yes.

25       Q.    When did you do that?

1      A.    Two weeks ago.

2      Q.    Did you make them aware of Highland's

3 motion to have the settlement between the

4 Highland entities and the HMIT entities approved?

5      A.    I'd have to look at my calendar.

6      Q.    Do you need your calendar to refresh

7 your recollection as to whether or not you

8 informed them of the Highland settlement motion?

9      A.    I would want to make sure that the day

10 I met with them is clear in my mind as to this

11 versus when we've talked to them.

12      Q.    Fair enough.

13      A.    As you can imagine, there's been a lot

14 of detail around all of these cases.

15      Q.    Sure.  And I don't mean to be

16 disrespectful at all, ma'am.  I apologize if you

17 took it that way.

18           Do you recall ever making the joint

19 official liquidators aware of the Dallas

20 Foundation's objection to the settlement motion?

21      A.    As I said, I don't know if we've made

22 them aware of the objection, except as it relates

23 to ancillary activity that we're concerned about

24 regarding Mark Patrick.

25           So this was filed on June 9th, and I

```
 1    would want to make sure that I spoke with them

 2    before or after that; and I don't have that.

 3         Q.   Do you know if anybody provided a copy

 4    of the Dallas Foundation's objection to the joint

 5    official liquidators?

 6         A.   I don't know that.

 7         Q.   Did you ever consider doing that?

 8         A.   I will after today.

 9         Q.   Do you know if anybody asked the joint

10    official liquidators to make an appearance in

11    this case?

12         A.   I don't know that.

13         Q.   Did you ever ask the joint official

14    liquidators to appear in this case?

15         A.   We've already precluded that we don't

16    know whether I've actually talked to them about

17    this case, so that's moot; right?

18         Q.   Okay.  Do you believe that Mr. Patrick

19    was required to obtain the joint official

20    liquidators' authorization before entering into

21    the settlement agreement?

22         A.   I don't know that.

23              ATTORNEY OKIN:  Object to the form of

24    the question.

25    ///
```

```
 1    BY ATTORNEY MORRIS:

 2          Q.    I'm sorry, ma'am.  What did you say?

 3          A.    I don't know that.

 4          Q.    Did you have any reason to believe

 5    that Mr. Patrick was required to obtain the joint

 6    official liquidators' consent before entering

 7    into this settlement agreement?

 8          A.    I don't know.

 9          Q.    Do you have any reason to believe that

10    the joint official liquidators have any authority

11    to reject the proposed settlement?

12                ATTORNEY OKIN:   Object to the form.

13          A.    I don't know.

14    BY ATTORNEY MORRIS:

15          Q.    A little bit further down, towards the

16    bottom of this paragraph, there's a reference, it

17    says that the Court-appointed fiduciary, quote,

18    may -- withdrawn.

19                It says:

20                "Indeed, many of Mr. Patrick's

21          actions, including the insertion of

22          newly created entities into the fund's

23          structure for the apparent purpose of

24          diverting charitable assets, will now be

25          subject to the scrutiny of an
```

Case 19-34054-sgj11   Doc 4277-1   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 35-15   Exhibit 15   Filed 09/02/25   Page 107 of 240   Capital Deci5.P.
Declaration3-15-cv-01876-K   Document 35-15   Filed 09/02/25   Page 107 of 240   PageID 1015

```
 1              independent, Court-appointed fiduciary
 2              and may be subject to clawback or other
 3              avoidance actions in the Cayman
 4              liquidation or such other tribunal as
 5              has jurisdiction."
 6                   Do you see that?
 7         A.    No.  You need to scroll down on the --
 8         Q.    It's just at the end of paragraph 32
 9    here.  It's the last sentence of 32.
10         A.    And so what's your question?
11         Q.    I just want to make sure that you and
12    I are on the same page, because I'm going to ask
13    some questions about this sentence.
14         A.    Yeah.
15         Q.    You're not an expert in Cayman Islands
16    law; fair?
17         A.    Fair.
18         Q.    You're not a lawyer, are you?
19         A.    Nope.
20         Q.    You're not an expert on clawback or
21    other avoidance actions, as that phrase is used
22    in the Dallas Foundation's objection in
23    paragraph 32; fair?
24         A.    Fair.
25         Q.    Do you have any understanding as to
```

```
 1   what facts must be established to succeed in a

 2   clawback or other avoidance action?

 3        A.   Repeat the question.

 4        Q.   Do you have any understanding as to

 5   what facts somebody needs to prove in order to

 6   succeed on a clawback or other avoidance action?

 7        A.   Not in a corporate setting.

 8        Q.   Is there any other type of setting

 9   that would pertain to the Dallas Foundation's

10   claims against Mr. Patrick?

11        A.   No.

12        Q.   Okay.  Do you have a view as to the

13   likelihood that the Dallas Foundation might

14   succeed in clawing back or asserting another

15   avoidance action to set aside the settlement

16   agreement if it's approved by the bankruptcy

17   court?

18             ATTORNEY OKIN:  Object to form.

19        A.   I don't know.

20   BY ATTORNEY MORRIS:

21        Q.   And you don't have a view; is that

22   fair?

23        A.   No, I just really don't know --

24        Q.   If we could --

25        A.   -- whether we will.
```

1    Q.    Okay.  You would have to speculate; is

2    that fair?

3    A.    Yes.

4           ATTORNEY MORRIS:  Can we scroll down

5    to paragraph 33, please.

6           ATTORNEY OKIN:  John, how much longer

7    do you anticipate going?  We talked about these

8    being an hour and a half.

9           ATTORNEY MORRIS:  Correct.  And we

10   started at exactly 2:37 New York time.  I expect

11   to finish at 4:07 New York time.

12           ATTORNEY OKIN:  Are we doing

13   additional questions from anybody else?

14           ATTORNEY MORRIS:  Mr. Phillips, do you

15   have any questions?

16           You're on mute, sir.

17           We'll be done in the 90 minutes.

18           ATTORNEY PHILLIPS:  Not at this time.

19           ATTORNEY MORRIS:  Okay.  Thank you.

20   BY ATTORNEY MORRIS:

21    Q.    So in paragraph 33, it says at the

22   end, quote:  "Even if approved by this Court,

23   consummation of the settlement is not likely to

24   buy the peace the debtor now seeks."

25           Do you see that?

```
 1          A.     Yes.

 2          Q.     Are you aware of anything in the

 3    Dallas Foundation's objection that suggests the

 4    Highland parties have done anything wrong here?

 5          A.     Repeat that question.

 6          Q.     Is there anything in the Dallas

 7    Foundation objection that you read and authorized

 8    to be filed that suggests that any of the

 9    Highland parties have done anything wrong?

10              ATTORNEY PHILLIPS:  I'm going to

11    object to that question because you said that she

12    read and authorized it to be filed.

13              ATTORNEY MORRIS:  I apologize.  I

14    apologize.  Thank you.

15    BY ATTORNEY MORRIS:

16          Q.     Let me start again, Ms. Diaz.

17              Do you recall whether there's anything

18    in the Dallas Foundation objection that asserts

19    that any of the Highland parties have done

20    anything wrong in connection with the entry into

21    the settlement agreement?

22          A.     I don't recall.

23          Q.     Are you aware of any facts that cause

24    you to believe that any of the Highland entities

25    did anything wrong in negotiating and entering
```

```
 1   into the settlement agreement?

 2        A.    I don't know.

 3        Q.    If you're not aware of any facts

 4   suggesting that Highland has engaged in

 5   wrongdoing, do you know why the Dallas Foundation

 6   has informed the Court that consummation of the

 7   settlement is not likely to buy the peace the

 8   debtor now seeks?

 9             ATTORNEY OKIN:  Object to form.

10        A.    I'll abstain from answering that.

11   BY ATTORNEY MORRIS:

12        Q.    That's not a thing, respectfully.

13             ATTORNEY MORRIS:  If -- Matt, if you

14   want to just help your witness out.

15             ATTORNEY OKIN:  You want me to give

16   her the answer?

17   BY ATTORNEY MORRIS:

18        Q.    Well, there's no abstention, so you

19   have to answer the question, ma'am.

20             ATTORNEY OKIN:  As best you can answer

21   it, Ms. Diaz, answer it.  If you can't answer it,

22   tell him you can't answer it.

23        A.    And I'll just say, when you say

24   "Highland," you want to be more specific?

25   ///
```

```
 1    BY ATTORNEY MORRIS:

 2         Q.    Sure.  Highland Capital Management,

 3    LP, the Highland Claimant Trust or the Highland

 4    Litigation Subtrust.

 5         A.    And so repeat the question.

 6         Q.    Okay.  If you don't have any facts

 7    suggesting that they've done anything wrong, why

 8    did the Dallas Foundation inform the Court, at

 9    the end of paragraph 33, that consummation of the

10    settlement is not likely to buy the peace the

11    debtor now seeks?

12              ATTORNEY OKIN:  Object to form.

13    BY ATTORNEY MORRIS:

14         Q.    You can answer.

15              ATTORNEY OKIN:  If you can answer it.

16         A.    Again, I'll just repeat that the peace

17    that the debtor seeks will be tainted because of

18    the harm that will come to the Dallas Foundation.

19    BY ATTORNEY MORRIS:

20         Q.    Anything else?

21         A.    No.

22         Q.    Is the Dallas Foundation considering

23    bringing any claims against Highland, the

24    Highland Claimant Trust or any of its

25    fiduciaries?
```

```
 1              A.      (No audible response.)

 2              Q.      I'm sorry, ma'am.  Did you answer?

 3              A.      I did.  I said, "No."

 4              Q.      Thank you.

 5                      In paragraph 34 --

 6                      ATTORNEY MORRIS:  Yeah, right there.

 7    Thank you Nathan --

 8    BY ATTORNEY MORRIS:

 9              Q.      -- it says, quote:  "There is ample

10    evidence that Mr. Patrick has acted and is acting

11    well outside the scope of his authority and

12    fiduciary obligations."

13                      Have I read that correctly?

14              A.      Yes.

15              Q.      Focusing solely on the settlement

16    agreement, do you have any reason to believe that

17    Mr. Patrick is acting outside of the scope of his

18    authority in entering into the settlement

19    agreement on behalf of each of the HMIT entities?

20                      ATTORNEY OKIN:  Object to form.

21              A.      And I don't know.

22    BY ATTORNEY MORRIS:

23              Q.      Okay.  Focusing solely on the

24    settlement agreement, do you have any reason to

25    believe that Mr. Patrick is breaching his
```

```
 1    fiduciary obligations by entering into the

 2    settlement agreement on behalf of each of the

 3    HMIT entities?

 4         A.    I don't know.

 5              ATTORNEY MORRIS:  Can we scroll up to

 6    paragraph 16, please.

 7              Do you see paragraph 16 concerns

 8    material nonpublic inside information?

 9         A.    Yes.

10         Q.    And was Mr. Dondero the source of the

11    information in this particular paragraph?

12         A.    No.

13         Q.    Who was?

14         A.    My attorneys.

15         Q.    That's how you learned about it; is

16    that fair?

17         A.    Yes.

18         Q.    Do you see there's a reference to a

19    put option in the last line of this paragraph?

20         A.    Yes.

21         Q.    Are you generally familiar with that

22    put option?

23         A.    Yes.

24         Q.    And do you know who the counterparty

25    is for that put option?
```

```
 1        A.    No, I don't.

 2        Q.    You don't know?

 3        A.    No.

 4        Q.    Did you ever ask?

 5        A.    I'm sure when we --

 6              ATTORNEY OKIN:  Louis, you're not on

 7    mute, by the way.

 8    BY ATTORNEY MORRIS:

 9        Q.    Go ahead, Ms. Diaz.  I'm sorry.

10        A.    I'm sure when we received the

11    contribution, we asked.  And you can ask our CFO

12    that question.

13              My understanding from the original

14    call in Labor Day weekend to our attorney was

15    that we should call the put.  That was a 10-year,

16    I believe, and this would have been at year 7;

17    and we didn't understand why he would be calling

18    to ask that.  And ...

19        Q.    Has the Dallas Foundation exercised

20    the put as of today?

21        A.    Absolutely not.

22        Q.    Why not?

23        A.    We stopped all activity because this,

24    again, was the beginning of, why is somebody

25    doing that, not giving us the information, not
```

```
 1    talking to us directly; and that -- and at advice
 2    of counsel, we -- we have been very careful with
 3    any of our activities to date.
 4         Q.    And do you know what material
 5    nonpublic inside information Mr. Patrick
 6    supposedly misused?
 7         A.    I'll just tell you the quote he gave
 8    us, which was Jim Dondero's spiraling out of
 9    control and you need to do this because nothing
10    appears to be what it is.
11         Q.    He didn't tell you who -- withdrawn.
12              Is that your basis for alleging that
13    he had material nonpublic inside information --
14         A.    I'll -- well, I guess, I can't
15    abstain.  I don't know.
16         Q.    Do you have any other --
17         A.    If my --
18         Q.    I'm sorry.
19         A.    Well, if my attorney says, "Don't do
20    that," we don't do it.
21         Q.    I appreciate that.  I don't quarrel
22    with you.  I'm just trying to learn facts here.
23              Can you identify any information that
24    you believe Mr. Patrick had that constitutes
25    material nonpublic inside information, as that
```

Deposition of... Capital Management, L.P.

```
 1    phrase is used in the Dallas Foundation's

 2    objections?

 3         A.    Right.

 4              ATTORNEY OKIN:  Hold on, John.  I

 5    assume you're not -- I assume we're talking about

 6    information that's no longer nonpublic?

 7              ATTORNEY MORRIS:  If -- if you all

 8    want to mark this -- I don't know what it is,

 9    Matt, so I can't say.  And it's not my

10    information either.  So I'm happy to mark it

11    confidential if you really prefer.

12              ATTORNEY OKIN:  I -- I don't even know

13    if she knows the answer to the question.

14         A.    I don't know the answer to that.  But

15    I will tell you that we quickly got a call from

16    Skyview saying that Mark Patrick was no longer

17    employed there and that that was confidential,

18    yeah, insider information.

19    BY ATTORNEY MORRIS:

20         Q.    Oh, so somebody at Skyview told you

21    that; is that fair?

22         A.    That's fair.

23         Q.    And who was that at Skyview?

24         A.    Well, it was an attorney for Skyview.

25         Q.    Was it D.C. Sauder?
```

```
 1          A.    No.  A woman.

 2          Q.    Okay.  So a female attorney at Skyview

 3    told you that Mark Patrick had been terminated

 4    and that he had material nonpublic inside

 5    information.

 6                Do I have that right?

 7          A.    That they were investigating him and

 8    understood that we had called the -- he had

 9    called -- told us to call the put option.

10          Q.    Okay.  But as you sit here today,

11    you're not able to tell me what material

12    nonpublic inside information Mr. Patrick

13    supposedly had; fair?

14          A.    Fair.

15                ATTORNEY MORRIS:  Ma'am, thank you so

16    much.  I appreciate your time.

17                Matt, thank you for a professional

18    deposition.

19                We'll see you all, I guess, in a

20    little bit for the next deposition.

21                Thanks, folks.

22                THE COURT REPORTER:  Do you want a

23    copy of the transcript?

24                ATTORNEY OKIN:  Yes, rushed, please.

25    Whenever John gets it.
```

```
 1              ATTORNEY PHILLIPS:  Yes, expedited,

 2     like everybody else.

 3              THE COURT REPORTER:  Mr. Lang, do you

 4     want a copy of the transcript?

 5              ATTORNEY LANG:  Yes, please.

 6              (Whereupon, at 3:08 p.m. Central

 7              Time, the proceedings concluded.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INSTRUCTIONS TO DEPONENT

 2                    After reading this volume of your

 3      deposition, indicate any corrections or changes

 4      to your testimony and the reasons therefor on the

 5      Errata Sheet supplied to you and sign it.  DO NOT

 6      make marks or notations on the transcript volume

 7      itself.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    E R R A T A

 2

 3              I wish to make the following changes,

 4         for the following reasons:

 5    Page   Line

 6    _____  _____   CHANGE: _____

 7    REASON: _____

 8    _____  _____   CHANGE: _____

 9    REASON: _____

10    _____  _____   CHANGE: _____

11    REASON: _____

12    _____  _____   CHANGE: _____

13    REASON: _____

14    _____  _____   CHANGE: _____

15    REASON: _____

16    _____  _____   CHANGE: _____

17    REASON: _____

18    _____  _____   CHANGE: _____

19    REASON: _____

20    _____  _____   CHANGE: _____

21    REASON: _____

22    _____  _____   CHANGE: _____

23    REASON: _____

24

25
```

```
 1

 2

 3              C E R T I F I C A T I O N

 4

 5

 6              I hereby certify that I have read the

 7    foregoing transcript of my deposition testimony,

 8    and that my answers to the questions propounded,

 9    with the attached corrections or changes, if any,

10    are true and correct.

11

12    ------------------------------------
      JULIE DIAZ
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 19-34054-sgj11    Doc 4277-1    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc

Case 3:25-cv-01876-K    Document 36-15    Exhibit 124    Filed 05/05/25    Page 123 of 240 Capital Decision L.P.    PageID 1031.

```
 1

 2                 CERTIFICATE OF SHORTHAND REPORTER

 3

 4

 5              I, Gail Inghram, Registered Diplomate

 6      Reporter, Certified Realtime Reporter, Realtime

 7      Systems Administrator, CA-Certified Shorthand

 8      Reporter No. 8635, and Notary Public, the officer

 9      before whom the foregoing proceedings were taken,

10      do hereby certify that the foregoing transcript

11      is a true and correct record of the proceedings;

12      that said proceedings were taken by me

13      stenographically and thereafter reduced to

14      typewriting under my supervision; and that I am

15      neither counsel for, related to, nor employed by

16      any of the parties to this case and have no

17      interest, financial or otherwise, in its outcome.

18

19

20    

21     _____
       Gail Inghram,
22     BA, RDR, CRR, RSA, CA-CSR No. 8635

23

24

25
```

## WORD INDEX

**< $ >**
**$25**  43:*2*  56:*20*
**$300**  42:*24*

**< 1 >**
**1**  6:*14*  63:*8, 9*
**1:37**  1:*16*  2:*11*
**10**  12:*20*
**10010**  3:*24*
**10017-2024**  3:*16*
**10-year**  76:*15*
**11**  1:*8*
**1113**  4:*10*
**15**  6:*18*
**16**  75:6, *7*
**1600**  5:*9*
**1700**  4:*18*
**19-34054-sgj11**  1:*5*
**1st**  10:*1*

**< 2 >**
**2:37**  70:*10*
**2011**  21:*9*
**2019**  10:*9*
**2024**  10:*1*
**2025**  1:*15*  2:*10*
**212.849.7615**  3:*25*
**214.817.4500**  4:*20*
**22**  1:*15*  2:*10*
**225.381.9643**  5:*11*
**22nd**  3:*23*
**2390**  4:*18*
**240**  4:*10*

**< 3 >**
**3:08**  80:*6*
**300-plus**  56:*19*
**301**  5:*9*
**30th**  29:*14*
**310.277.6910**  3:*17*
**32**  63:6, *14*  68:8, *9,
23*
**33**  70:5, *21*  73:*9*
**34**  74:*5*
**34th**  3:*15*

**< 4 >**

**4:07**  70:*11*
**40**  27:*24*  29:*6*

**< 5 >**
**51**  3:*23*

**< 6 >**
**63**  6:*14*

**< 7 >**
**7**  76:*16*
**70801**  5:*10*
**713.228.4100**  4:*12*
**75201**  4:*19*
**77002**  4:*11*
**780**  3:*15*

**< 8 >**
**8**  6:*6*
**8635**  1:*22*  84:8, *21*

**< 9 >**
**90**  70:*17*
**9th**  65:*25*

**< A >**
**able**  48:*23*  79:*11*
**Absolutely**  76:*21*
**abstain**  18:7  72:*10*
*77:15*
**abstention**  72:*18*
**accepting**  44:*12*
**access**  28:*2*
**accommodate**  9:*15*
**accounting**  24:*15*
**accounts**  25:*18, 25*
*26:2, 5, 8*  27:*18, 21
29:24*  30:*3, 6, 10, 13,
18, 23*  44:*16, 24*  45:*6
61:17, 21*  62:*2*
**acted**  74:*10*
**acting**  17:*24*  18:*5,
23*  31:*6*  74:*10, 17*
**action**  69:*2, 6, 15*
**actions**  31:*12*  67:*21
68:3, 21*
**activities**  22:*23
27:25*  77:*3*

**activity**  14:*1*  24:*12,
25*  25:*1*  27:*23*  65:*23
76:23*
**ADAMS**  4:*9*
**additional**  20:*24
70:13*
**Administrator**  84:*7*
**advice**  19:*18*  77:*1*
**aegis**  58:*3*
**affidavit**  22:*13*
**affiliated**  9:*21*  11:*21
45:19*
**affiliates**  10:*14, 15
11:25*  53:*6*
**affirmed**  8:*6*
**afternoon**  8:*12*
**agendas**  16:*7*
**ago**  50:*17*  65:*1*
**agree**  33:*21*
**agreed**  23:*18*
**agreement**  10:*18, 23
11:6, 9, 22*  14:*3, 6, 7
36:15, 18, 20, 22, 25
37:9, 12, 14, 16*  38:*5,
20*  39:*1, 10, 22*  40:*10,
19, 25*  42:*7*  44:*6
46:2, 17, 21*  51:*1, 11,
15, 18*  53:*4, 9, 19, 22
54:7, 10, 25*  57:*5, 15,
24*  58:*8*  59:*20, 25
60:5, 18*  62:*3*  66:*21
67:7*  69:*16*  71:*21
72:1*  74:*16, 19, 24
75:2*
**ahead**  56:*11*  76:*9*
**ahurt@kellyhart.com**
*5:7*
**alleging**  77:*12*
**allocated**  29:*3*
**allow**  9:2, *7*
**AMELIA**  5:*6*
**amount**  23:*18*
**ample**  74:*9*
**ancillary**  65:*23*
**annuities**  26:*10, 21,
25*  27:*4, 6, 14*  29:*7*
**annuity**  26:*13, 17
28:18, 21*
**ANSWER**  7:*3*  9:*4, 8
18:9*  19:*17, 19*  32:*25*

*33:9*  35:*21*  39:*11, 16
42:8*  43:*11*  46:*9, 12
48:24*  52:*2*  55:*6
56:11*  72:*16, 19, 20,
21, 22*  73:*14, 15*  74:*2
78:13, 14*
**answering**  18:*7
72:10*
**answers**  48:*21*  83:*8*
**anticipate**  70:*7*
**anybody**  18:*4, 22
25:9*  30:*1, 20*  39:*7,
19, 24, 25*  40:*13*  46:*7,
14*  60:*11*  66:*3, 9
70:13*
**apologize**  20:*15*  33:*2
59:4*  65:*16*  71:*13, 14*
**apparent**  67:*23*
**appear**  63:*16*  66:*14*
**appearance**  44:*17
66:10*
**appeared**  3:*2*  32:*1
33:5*  44:*14*
**appears**  77:*10*
**appointed**  63:*22*  64:*1*
**appreciate**  18:*10
25:3*  39:*18*  49:*4
77:21*  79:*16*
**appreciated**  57:*25*
**approval**  30:*21*
**approve**  29:*12*  61:*9,
13, 21*
**approved**  36:*16
37:22*  38:*5, 20*  41:*24
42:7*  43:*18*  65:*4
69:16*  70:*22*
**Approving**  6:*17*
**approximately**  2:*11*
**April**  10:*1*
**arising**  54:*10*
**arm's-length**  51:*3, 19*
**articulate**  56:*2*
**aside**  69:*15*
**asked**  25:*4*  32:*22
39:7*  46:*6, 14*  59:*4
66:9*  76:*11*
**asking**  25:*3*  29:*16
40:12*  48:*18*  49:*11*
**asserting**  69:*14*

assertion 53:*3*
asserts 71:*18*
asset 22:*11* 48:*5*
assets 18:*16* 24:*25*
26:*9* 36:*17*, *19* 37:*5*,
*8*, *21* 38:*4*, *9*, *11*, *19*,
*25* 39:*9*, *21* 40:*8*, *15*,
*24* 41:*3*, *8*, *18* 42:*6*,
*24* 44:*3*, *5*, *7* 45:*25*
46:*16* 47:*13*, *23* 48:*3*
53:*15*, *16* 56:*14*, *16*
57:*1* 58:*3* 67:*24*
assume 78:*5*
assumed 58:*16*
assuming 36:*19* 48:*2*
54:*11*
Atlas 41:*4*, *9*, *12*, *16*
42:*1* 47:*7* 48:*6*
49:*13*
attached 63:*11* 83:*9*
Attorney 6:*6* 8:*11*,
*16* 19:*16*, *22* 31:*5*, *14*,
*17*, *18*, *20*, *24* 35:*19*,
*20* 36:*3*, *5*, *11*, *13*
37:*24* 38:*1*, *7*, *14*
39:*2*, *4*, *11*, *15* 41:*1*, *6*
42:*16*, *18* 43:*23* 44:*1*
46:*3*, *5*, *8*, *10*, *11*
48:*10* 49:*3*, *5*, *24*
50:*1*, *13*, *15* 51:*25*
52:*1*, *8*, *9* 54:*16*, *18*
55:*1*, *5*, *14*, *16*, *21*, *23*
56:*5*, *7*, *9* 57:*2*, *7*, *11*,
*17*, *20* 58:*9*, *12* 59:*10*,
*13* 60:*7*, *10*, *19*, *22*
62:*4*, *7*, *11* 63:*5*, *12*
64:*4*, *8*, *11* 66:*23*
67:*1*, *12*, *14* 69:*18*, *20*
70:*4*, *6*, *9*, *12*, *14*, *18*,
*19*, *20* 71:*10*, *13*, *15*
72:*9*, *11*, *13*, *15*, *17*, *20*
73:*1*, *12*, *13*, *15*, *19*
74:*6*, *8*, *20*, *22* 75:*5*
76:*6*, *8*, *14* 77:*19*
78:*4*, *7*, *12*, *19*, *24*
79:*2*, *15*, *24* 80:*1*, *5*
attorneys 75:*14*
audible 74:*1*

**< B >**
authority 57:*4*, *9*, *14*
58:*15* 67:*10* 74:*11*,
*18*
authorization 31:*2*
66:*20*
authorized 19:*3*
37:*15* 52:*21*, *25*
53:*25* 54:*19* 63:*17*
71:*7*, *12*
authorizing 12:*6*
available 26:*17*
Avenue 3:*15*, *23* 4:*18*
avoidance 68:*3*, *21*
69:*2*, *6*, *15*
aware 8:*20* 10:*7*, *11*,
*17* 11:*3*, *4*, *8*, *11*, *12*,
*20* 12:*9*, *23* 22:*12*
23:*7* 24:*3*, *6* 25:*16*
30:*12* 34:*12*, *16*
36:*14* 47:*13*, *23* 48:*5*
49:*16* 50:*16*, *25* 51:*4*,
*8* 53:*18* 54:*6* 55:*11*,
*17* 63:*21* 64:*16*, *18*
65:*2*, *19*, *22* 71:*2*, *23*
72:*3*

**< B >**
BA 1:*22* 84:*21*
back 10:*8* 47:*22*
69:*14*
backdrop 56:*17*
bad 62:*18*
BANKRUPTCY 1:*1*
10:*8*, *12* 32:*2*, *6* 33:*6*,
*15* 34:*13* 38:*6* 44:*14*,
*18*, *22* 45:*1* 50:*17*
69:*16*
Barbara 20:*11*, *22*
21:*3*, *7*, *12*, *16* 22:*8*
BARTLETT 4:*9*
based 53:*2* 56:*12*
basically 13:*14*
basis 13:*25* 43:*7*
53:*17* 55:*24* 56:*3*
77:*12*
Baton 5:*10*
beginning 2:*11* 76:*24*
behalf 3:*4*, *19* 4:*3*,
*14* 5:*3* 11:*9*, *13*
12:*10* 17:*25* 18:*5*, *23*

23:*3*, *14* 24:*8*, *9*, *23*
25:*6*, *17* 27:*17*, *21*
29:*23* 30:*2*, *6*, *7*, *22*
31:*22* 46:*20* 54:*1*, *20*
57:*5*, *15* 58:*22* 59:*8*
74:*19* 75:*2*
behavior 42:*25*
believe 13:*23* 18:*4*
20:*1* 32:*3*, *15*, *20*
35:*15*, *25* 36:*7* 37:*19*
38:*2* 40:*22* 41:*8*, *22*
50:*10* 51:*22* 54:*2*
57:*3* 58:*20* 59:*5*, *14*,
*21* 62:*25* 66:*18* 67:*4*,
*9* 71:*24* 74:*16*, *25*
76:*16* 77:*24*
believed 18:*23*
best 14:*22* 21:*18*, *22*
22:*3* 27:*5* 32:*4*, *9*
33:*4* 35:*3*, *7*, *10*
72:*20*
bit 62:*20* 67:*15*
79:*20*
block 31:*21*
bottom 67:*16*
Bradshaw 22:*8*
breaching 74:*25*
break 9:*14*, *16*
bring 50:*18*
bringing 73:*23*
business 23:*21* 49:*18*
58:*1*
buy 70:*24* 72:*7*
73:*10*

**< C >**
CA-Certified 84:*7*
CA-CSR 1:*22* 84:*21*
calendar 65:*5*, *6*
call 63:*7* 76:*14*, *15*
78:*15* 79:*9*
called 10:*5* 12:*10*
20:*7*, *19* 34:*13*, *17*
35:*6*, *12* 79:*8*, *9*
calling 76:*17*
CAPITAL 1:*6* 3:*4*
8:*16* 10:*5*, *7* 21:*9*
34:*24* 35:*2*, *16*, *25*
36:*7* 50:*19* 51:*24*

52:*18* 53:*5* 55:*19*
73:*2*
careful 77:*2*
carefully 18:*20*
Carrera 22:*7*
Case 1:*5* 32:*2*, *6*
33:*6*, *15* 42:*22* 66:*11*,
*14*, *17* 84:*16*
cases 65:*14*
cash 27:*3*, *6* 36:*17*
44:*10*
cause 71:*23*
caused 29:*22*
caution 19:*17*
Cayman 20:*4* 21:*21*
22:*13* 23:*1* 42:*23*
56:*18* 63:*22* 64:*13*
68:*3*, *15*
ceased 23:*22* 24:*12*
Central 1:*16* 2:*11*
80:*6*
CEO 9:*23*, *25* 10:*2*
22:*6*, *7*, *8* 31:*3*
CEOs 22:*4*
certain 8:*19* 10:*14*
25:*18* 38:*19* 50:*18*
62:*24*
Certainly 47:*6*
CERTIFICATE 84:*2*
Certified 2:*14*, *15*
84:*6*
certify 83:*6* 84:*10*
cetera 43:*17*
CFO 15:*22* 76:*11*
chance 63:*2*
change 42:*10* 82:*6*, *8*,
*10*, *12*, *14*, *16*, *18*, *20*,
*22*
changes 24:*16* 50:*11*
53:*14* 81:*3* 82:*3*
83:*9*
changing 47:*10*
Chapter 1:*8*
charitable 13:*23*
14:*1* 24:*25* 26:*12*
38:*8* 42:*24* 57:*1*
67:*24*
chart 48:*13*
chief 31:*3*

**City**  20:*11*, *20*  21:*3,
*5, 6, 11, 16*  22:*7*
**claim**  32:*5*, *18*  33:*14*
44:*21*, *25*  53:*4, 7*
55:*12*, *18*
**Claimant**  3:*5*  32:*12,
16, 21*  33:*20, 24*
34:*14, 17, 20*  35:*7, 13*
45:*4, 7, 14*  52:*5*
55:*20*  73:*3, 24*
**claimed**  53:*12*
**claims**  50:*18*  69:*10*
73:*23*
**clarify**  10:*20*
**CLARITY**  7:*22*
**clawback**  68:*2, 20*
69:*2, 6*
**clawing**  69:*14*
**clear**  33:*3*  34:*5*
65:*10*
**clearly**  31:*21*
**clients**  31:*8*  62:*17*
**cold**  48:*15*
**come**  73:*18*
**commenced**  21:*21*
22:*15*
**commitment**  23:*23*
**common**  23:*21*
**communicate**  24:*12*
**communicated**  58:*16,
17, 21*  64:*22*
**communication**  24:*14*
28:*3*
**community**  14:*19*
20:*13*  21:*2, 4*  22:*9,
14*
**company**  10:*4*
**complete**  37:*4*
**compliance**  38:*10*
**concern**  42:*5*  54:*14,
23*
**concerned**  27:*24*
42:*20, 22*  65:*23*
**concerning**  51:*14*
**concerns**  75:*7*
**concluded**  80:*7*
**confer**  25:*10*
**confidential**  78:*11, 17*
**confused**  64:*6*
**confusing**  16:*4*

**connection**  8:*18*
23:*25*  52:*13*  71:*20*
**consent**  16:*7*  30:*21*
57:*23*  59:*7*  62:*2*
67:*6*
**consider**  66:*7*
**considering**  73:*22*
**constitutes**  77:*24*
**consult**  9:*17*
**consummation**  70:*23*
72:*6*  73:*9*
**Cont'd**  4:*1*  5:*1*
**contend**  52:*17*  53:*21*
**contends**  50:*25*  53:*18*
**context**  18:*11*
**continue**  49:*3*
**contractual**  13:*21*
34:*23*  35:*2, 6, 11*
45:*10, 13*
**contractually**  58:*14*
**contribution**  43:*14*
76:*11*
**contributions**  13:*24*
14:*9*  21:*8*
**control**  56:*15*  60:*24*
61:*6, 17*  77:*9*
**controlled**  47:*17*
49:*12*
**controls**  47:*20*
**conversations**  39:*13*
**convey**  46:*16*
**conveying**  19:*18*
**copy**  25:*13*  66:*3*
79:*23*  80:*4*
**corporate**  50:*2*  69:*7*
**corporations**  64:*17*
**correct**  15:*1*  16:*2*
32:*7*  33:*8, 16, 20*
47:*24*  52:*19*  70:*9*
83:*10*  84:*11*
**corrections**  81:*3*  83:*9*
**correctly**  74:*13*
**counsel**  19:*19*  29:*13*
39:*13*  77:*2*  84:*15*
**counterpart**  18:*13*
**counterparty**  75:*24*
**couple**  50:*16*
**COURT**  1:*1*  10:*12*
37:*9, 23*  38:*6*  43:*18*
50:*17*  63:*23*  69:*17*

70:*22*  72:*6*  73:*8*
79:*22*  80:*3*
**Court-appointed**
67:*17*  68:*1*
**COVID**  62:*14*
**CRAWFORD**  4:*17*
**created**  67:*22*
**Crown**  4:*3*  6:*15*
25:*18, 21, 22*  26:*9*
27:*18, 25*  28:*5, 9, 15*
30:*13, 16, 21*  31:*1, 9,
12, 23*  34:*2, 7*  37:*6, 8*
41:*25*  43:*1*  44:*13, 20*
45:*3, 9, 12, 20, 24*
46:*15*  49:*9, 10, 20*
57:*23*  58:*7*  59:*7, 15,
22*  60:*15*  61:*5, 12, 16,
20*
**CRR**  1:*22*  84:*21*
**cumbersome**  62:*21*
**CURRY**  4:*7, 9*

**< D >**
**D.C**  78:*25*
**DAF**  20:*8*  64:*15*
**DALLAS**  1:*3*  4:*3, 19*
6:*14*  8:*18*  9:*21, 25*
10:*11, 18, 23*  12:*3, 11,
15, 16, 18, 21*  13:*5, 7,
8, 10, 13, 15, 18, 20, 22*
14:*4, 8, 9, 13, 23*  15:*2,
6, 8, 9, 19*  16:*3, 4*
17:*5, 21, 25*  18:*1, 6,
24*  20:*12, 23, 25*  21:*2,
5, 6, 11, 16*  22:*20*
23:*14, 24*  24:*4, 7, 8,
21, 22*  25:*4, 5, 8, 16,
25*  27:*1, 7, 11, 12, 16,
20*  28:*4, 8, 21, 23*
29:*23*  30:*1, 7, 20*
31:*7, 9, 15, 22, 25*
32:*5, 15, 20*  33:*5, 14,
19, 23*  34:*19, 22*  35:*1,
5, 11, 18*  36:*2, 9*
37:*10, 20*  38:*3, 24*
39:*8, 20*  40:*8, 17, 22*
41:*22*  42:*4, 11, 12, 13*
43:*20, 21*  45:*21*
48:*25*  49:*6, 15, 18, 23*
50:*4, 12*  52:*16*  53:*3,

18, 21*  54:*1, 13, 20, 22*
55:*12, 18, 25*  56:*4*
57:*22*  58:*6, 21*  59:*6,
15, 17*  60:*2, 23*  61:*8*
62:*9, 22*  65:*19*  66:*4*
68:*22*  69:*9, 13*  71:*3,
6, 18*  72:*5*  73:*8, 18,
22*  76:*19*  78:*1*
**D'AMBRA**  5:*14*
**date**  56:*15*  77:*3*
**DAVID**  4:*7*
**day**  43:*12*  65:*9*
76:*14*
**dcurry@okinadams.co
m**  4:*8*
**de**  22:*11*
**dealings**  49:*18*
**Debbie**  22:*6*
**Debtor**  1:*8*  70:*24*
72:*8*  73:*11, 17*
**decided**  43:*19*
**decision**  17:*6*  25:*11*
**decisions**  56:*24*
**declaration**  22:*13, 20*
23:*1*
**decline**  29:*17, 19, 22*
**Defendant**  4:*3, 14*
**definitively**  40:*5*
**Delaware**  64:*17, 20*
**DEMO**  3:*8*
**DEPONENT**  81:*1*
**deposed**  8:*22*
**DEPOSITION**  1:*13*
2:*9*  7:*1*  8:*17*  11:*18*
12:*1*  45:*17*  79:*18, 20*
81:*3*  83:*7*
**depositions**  62:*16*
**described**  37:*21*
42:*10*  43:*9*  50:*4*
**detail**  65:*14*
**DIAZ**  1:*14*  2:*9*  6:*5*
8:*5, 12*  19:*17*  31:*10,
25*  36:*22*  39:*12*  46:*9,
12*  48:*16*  58:*13*
62:*12*  64:*4*  71:*16*
72:*21*  76:*9*  83:*12*
**different**  43:*16*  48:*21*
**diminished**  38:*11*
**Diplomate**  2:*14*  84:*5*

**DIRECT** 7:*23* 32:*20*
59:*18, 23*
**directed** 21:*25* 22:*2*
**direction** 2:*16*
**directly** 28:*22* 49:*16*
77:*1*
**disburse** 41:*18* 42:*1*
**disbursement** 28:*17*
**disclosed** 24:*4*
**disclosing** 39:*13*
**discussions** 20:*1*
**disrespectful** 65:*16*
**DISTRICT** 1:*2*
**diverting** 67:*24*
**DIVISION** 1:*3*
**document** 41:*7*
52:*24* 55:*2* 63:*1*
**DOCUMENTS** 7:*7*
16:*16* 40:*21* 62:*19*
**doing** 31:*22* 56:*18*
66:*7* 70:*12* 76:*25*
**dollars** 56:*19*
**donation** 13:*2, 4*
**donations** 13:*22*
**Dondero** 12:*24* 13:*1,
3, 4* 14:*12* 15:*21*
16:*7, 25* 17:*4, 20, 24*
18:*4, 22* 19:*6* 21:*10,
25* 22:*12* 25:*10* 40:*7*
75:*10*
**Dondero's** 23:*1* 77:*8*
**donor-advised** 13:*13*
**dramatic** 24:*16*
**Dugaboy** 4:*14*
**duly** 8:*6*
**duties** 35:*17* 36:*1, 8*
49:*22*
**duty** 50:*12* 58:*5*

**< E >**
**earlier** 27:*22* 50:*3*
**effectuated** 50:*10*
**effectuates** 13:*14*
**either** 38:*11* 59:*6*
78:*10*
**EMANUEL** 3:*22*
**employed** 78:*17*
84:*15*
**employee** 45:*21*

**Empower** 12:*10, 15,
16, 21* 13:*5, 7, 20*
14:*4, 9, 13, 23* 15:*2, 9,
19* 16:*3, 4* 24:*8, 10,
21* 25:*4, 8* 27:*1, 7, 12*
28:*21*
**engaged** 18:*13* 72:*4*
**ensure** 38:*12*
**enter** 22:*10* 57:*4, 10,
14* 61:*23*
**entered** 51:*1* 61:*10,
13*
**entering** 57:*24* 58:*7*
59:*8* 62:*2* 66:*20*
67:*6* 71:*25* 74:*18*
75:*1*
**entities** 11:*21* 12:*1*
17:*7, 8* 20:*16* 21:*20,
25* 22:*2* 36:*15, 16*
41:*24* 43:*16* 46:*1, 19,
20, 25* 47:*3* 48:*13*
49:*8, 11, 12, 13, 14, 17,
22* 50:*11* 51:*2, 7*
54:*7, 8* 57:*6, 16* 58:*5*
59:*9, 19, 24* 60:*4, 17,
25* 61:*6, 10, 14, 18, 22*
62:*1* 64:*17, 19* 65:*4*
67:*22* 71:*24* 74:*19*
75:*3*
**entitled** 14:*8* 38:*24*
**entity** 12:*10, 13*
13:*11* 15:*17* 17:*1, 3*
20:*7* 34:*13, 17* 35:*6,
12* 41:*12, 16* 47:*24*
49:*10* 55:*13* 63:*25*
64:*3, 12*
**Entry** 6:*16* 71:*20*
**erosion** 56:*14*
**Errata** 81:*5*
**ESQ** 3:*6, 8, 10, 12, 20*
4:*5, 7, 15* 5:*4, 6*
**essence** 24:*11*
**essentially** 27:*23*
**established** 69:*1*
**et** 43:*17*
**everybody** 80:*2*
**evidence** 74:*10*
**exactly** 70:*10*
**EXAMINATION** 6:*4*

8:*10*
**examined** 8:*8*
**excuse** 16:*1* 18:*8*
**executed** 10:*22*
**exercise** 15:*11*
**exercised** 76:*19*
**Exhibit** 63:*9*
**existence** 12:*19*
**expect** 70:*10*
**expectations** 42:*12*
**expected** 41:*13*
**expedited** 80:*1*
**expenses** 23:*19, 24*
**expensive** 62:*17*
**expert** 68:*15, 20*
**expressed** 54:*23*
**extent** 48:*25*

**< F >**
**fact** 56:*13*
**facts** 17:*18, 21* 51:*13,
17* 55:*11, 17* 57:*12*
69:*1, 5* 71:*23* 72:*3*
73:*6* 77:*22*
**fail** 9:*8*
**fair** 9:*5, 19* 19:*7, 8*
26:*18* 32:*14, 17*
33:*11* 34:*18* 37:*17,
18* 40:*13* 42:*4* 43:*5*
44:*8* 50:*5, 23, 24*
52:*11, 13, 25* 54:*15*
59:*2, 3* 65:*12* 68:*16,
17, 23, 24* 69:*22* 70:*2*
75:*16* 78:*21, 22*
79:*13, 14*
**fairly** 62:*23*
**fall** 24:*13*
**familiar** 10:*4* 12:*13*
14:*25* 15:*25* 19:*2, 3*
26:*4* 36:*24* 46:*24*
47:*2, 4* 52:*24* 64:*21*
75:*21*
**familiarity** 22:*19*
47:*5*
**Family** 15:*24* 16:*22*
24:*10* 27:*2, 13* 28:*22*
**fault** 34:*4*
**feeds** 34:*1*
**feel** 48:*8*
**female** 79:*2*

**fiduciaries** 24:*24*
73:*25*
**fiduciary** 28:*13* 38:*9*
67:*17* 68:*1* 74:*12*
75:*1*
**file** 24:*7, 22* 25:*5*
27:*20* 29:*23* 30:*2*
**filed** 10:*8, 12* 12:*4,
10* 22:*12* 24:*9* 25:*14,
17* 27:*17* 30:*7* 31:*7,
15* 32:*2, 5* 33:*6, 14*
42:*3* 44:*17, 20, 25*
50:*16* 52:*25* 65:*25*
71:*8, 12*
**filing** 12:*7* 19:*9*
22:*10* 30:*22* 52:*14,
21* 54:*1, 20* 58:*18, 22*
**finance** 29:*3*
**financial** 84:*17*
**find** 48:*20* 55:*3*
**fine** 55:*4* 64:*9*
**finish** 9:*3, 7* 70:*11*
**first** 8:*6*
**first-quarter** 29:*13*
**flag** 24:*17*
**Floor** 3:*15, 23*
**flow** 13:*12* 26:*14*
37:*6, 8* 41:*4* 53:*13*
**flowed** 47:*7*
**Flows** 26:*15* 29:*2*
56:*16*
**focus** 49:*11*
**focused** 34:*5*
**Focusing** 74:*15, 23*
**folks** 79:*21*
**following** 82:*3, 4*
**follows** 8:*8*
**foregoing** 83:*7* 84:*9,
10*
**form** 35:*19* 36:*3, 11*
37:*24* 38:*7* 39:*2*
41:*1* 42:*16* 43:*23*
46:*3* 49:*24* 50:*13*
51:*25* 52:*8* 54:*16*
55:*1, 14, 21* 56:*5, 10*
57:*7, 17* 58:*9* 59:*10*
60:*7, 19* 62:*4* 66:*23*
67:*12* 69:*18* 72:*9*
73:*12* 74:*20*

formal 22:*10*
Formally 10:*1*
formation 18:*12*
formed 12:*21* 34:*14*,
*18* 64:*19*
forth 17:*18*, *21*
42:*12* 44:*5*
forward 38:*12*
found 29:*16*
Foundation 4:*3* 6:*15*
9:*22*, *25* 10:*3*, *12*, *18*,
*23* 12:*11*, *15*, *16*, *18*,
*22* 13:*5*, *7*, *8*, *11*, *14*,
*21*, *22* 14:*4*, *5*, *8*, *14*,
*23* 15:*2*, *4*, *6*, *8*, *9*, *19*,
*24* 16:*4*, *22* 18:*1*, *6*,
*24* 20:*11*, *12*, *14*, *21*,
*22*, *23*, *25* 21:*2*, *3*
*22*:*9* 23:*14*, *25* 24:*7*,
*8*, *10*, *21*, *22* 25:*4*, *5*, *8*,
*17* 27:*1*, *2*, *8*, *11*, *12*,
*13*, *16*, *20* 28:*4*, *8*, *22*,
*23* 29:*23* 30:*1*, *7*, *20*
31:*7*, *9*, *16*, *22* 32:*1*, *5*,
*15*, *20* 33:*5*, *14*, *19*, *23*
34:*19*, *22* 35:*1*, *5*, *11*,
*18* 36:*2*, *10* 37:*10*, *20*
38:*3*, *24* 39:*8*, *14*, *20*
40:*8*, *17*, *23* 41:*22*
42:*14* 43:*20*, *21*
45:*22* 49:*6*, *15*, *18*, *23*
50:*12* 52:*16* 53:*3*, *18*,
*21* 54:*2*, *13*, *21*, *23*
55:*12*, *18* 57:*23* 58:*6*,
*21* 59:*15*, *17* 60:*2*, *23*
61:*8* 69:*13* 71:*7*, *18*
72:*5* 73:*8*, *18*, *22*
76:*19*
foundations 21:*2*, *4*,
*12* 26:*18* 29:*4*
Foundation's 8:*18*
12:*3* 17:*5*, *22* 22:*14*,
*20* 24:*5* 26:*1* 42:*5*,
*11*, *12* 49:*1* 50:*4*
55:*25* 56:*4* 59:*7*
62:*9*, *22* 65:*20* 66:*4*
68:*22* 69:*9* 71:*3*
78:*1*
four 21:*1* 51:*9*
fully 63:*2*

fund 13:*8*, *13* 14:*6*, *7*
23:*20*, *23*, *24* 26:*11*
41:*4*, *9* 53:*14*
funded 26:*24*
fundholder 14:*17*
fundholders 14:*20*
23:*19*
funding 23:*2*, *7*, *10*,
*13*, *17*
funds 14:*2* 16:*3*
43:*1* 53:*13*
fund's 67:*22*
further 67:*15*
future 53:*16*

< G >
Gail 1:*21* 2:*13* 84:*5*,
*21*
gdemo@pszjlaw.com
3:*9*
generally 11:*24*
36:*24* 50:*5* 75:*21*
gentleman 11:*8*
50:*19*
give 43:*19* 49:*14*
55:*12* 56:*24* 63:*2*
72:*15*
given 58:*15*
giving 76:*25*
Global 4:*3* 6:*15*
25:*18*, *21*, *22* 26:*9*
27:*18*, *25* 28:*5*, *9*, *15*
30:*13*, *16* 31:*1*, *9*, *23*
34:*2*, *7* 37:*6*, *8* 41:*25*
43:*1* 44:*13*, *20* 45:*3*,
*9*, *12*, *20*, *24* 46:*15*
49:*9*, *10*, *20* 58:*7*
59:*15*, *22* 60:*15* 61:*5*,
*12*, *16*, *20*
Global's 30:*21* 31:*12*
57:*23* 59:*7*
go 23:*21* 28:*21*, *25*
41:*9* 56:*11* 76:*9*
going 9:*1* 40:*9*
45:*16* 47:*22* 48:*16*,
*20*, *21* 51:*8* 62:*7*, *24*
68:*12* 70:*7* 71:*10*
Good 8:*12* 62:*13*, *14*
good-faith 51:*3*, *19*

governance 13:*25*
15:*3* 29:*1*
GPs 43:*17*
grant 13:*12*, *14*
grant-making 12:*18*
18:*15*
grants 14:*18*
GREGORY 3:*8*
ground 8:*24*
guess 30:*11* 48:*3*
77:*14* 79:*19*

< H >
half 70:*8*
HALL 5:*18*
HALLMAN 5:*8*
happening 22:*24*
42:*25* 56:*25*
happens 42:*5*, *20*
56:*22*
happy 9:*15* 78:*10*
harm 73:*18*
HART 5:*8*
HAYLEY 3:*12*
head 39:*6* 50:*8*
hear 8:*13*
heard 32:*11*
held 2:*9* 25:*18*
he'll 48:*23*
help 48:*14* 72:*14*
hereto 63:*11*
Hernandez 31:*4*
high 26:*6*, *7* 37:*1*, *2*
38:*18*
HIGHLAND 1:*6* 3:*4*,
*19* 6:*12*, *14* 8:*16*
10:*5*, *7*, *14*, *22* 17:*7*
20:*12* 21:*6*, *9* 32:*1*, *6*,
*11*, *16*, *21* 33:*6*, *15*, *20*,
*23* 34:*6*, *10*, *13*, *17*, *20*,
*23* 35:*2*, *7*, *12*, *16*, *25*
36:*7*, *15* 41:*24* 43:*4*,
*8*, *12* 44:*14*, *17*, *21*, *25*
45:*1*, *4*, *7*, *10*, *13*
46:*16* 50:*19*, *25* 51:*6*,
*23* 52:*5*, *18* 53:*5*
54:*8* 55:*13*, *19* 58:*18*,
*23* 63:*8*, *9* 65:*4*, *8*
71:*4*, *9*, *19*, *24* 72:*4*,
*24* 73:*2*, *3*, *23*, *24*

Highland/HMIT
19:*15*, *24*
Highland's 65:*2*
HMIT 11:*17*, *21*, *25*
17:*7* 36:*16* 37:*21*
38:*4*, *18*, *25* 39:*9*, *21*
40:*9*, *24* 41:*8*, *19*, *24*
42:*6*, *21* 45:*25* 46:*1*,
*16*, *19* 48:*5* 49:*8*, *10*,
*22* 50:*11*, *16* 51:*2*, *7*
54:*7* 57:*6*, *15* 58:*4*
59:*9*, *19*, *23* 60:*4*, *16*,
*24* 61:*6*, *10*, *14*, *18*, *22*,
*25* 64:*16*, *18* 65:*4*
74:*19* 75:*3*
HMIT/Highland
40:*18* 41:*14*
hold 16:*12* 78:*4*
Holdco 20:*8* 64:*15*
holds 47:*24*
hour 70:*8*
Houston 4:*11*
Hunter 5:*3* 10:*15*
11:*4*, *10*, *14*, *16* 34:*1*,
*9* 37:*5* 41:*3* 47:*11*,
*14*, *22* 48:*9*, *17* 49:*13*
53:*22* 54:*4* 58:*22*
HURT 5:*6*
hwinograd@pszjlaw.c
om 3:*13*

< I >
idea 19:*9*, *12*, *13*, *14*,
*23*
identification 63:*10*
identified 21:*13*
25:*25* 41:*17*
identify 10:*21* 11:*1*
15:*20* 26:*23* 30:*5*
41:*11* 64:*12* 77:*23*
imagine 65:*13*
impact 42:*2*
impacted 41:*23*
impacts 43:*1*
important 9:*2*
including 67:*21*
income 26:*11*, *13*
27:*7*
independent 68:*1*

**INDEX** 7:*1*

**indicate** 81:*3*
**indirect** 32:*21* 60:*3,
6, 16*
**indirectly** 41:*5*
**individual** 16:*8*
**inform** 73:*8*
**information** 17:*25*
18:*5, 14, 24* 19:*6*
58:*2, 6* 75:*8, 11*
76:*25* 77:*5, 13, 23, 25*
78:*6, 10, 18* 79:*5, 12*
**informed** 25:*12* 63:*3*
65:*8* 72:*6*
**Inghram** 1:*21* 2:*13*
84:*5, 21*
**insertion** 67:*21*
**inside** 75:*8* 77:*5, 13,
25* 79:*4, 12*
**insider** 78:*18*
**insignificant** 56:*20*
**INSTRUCTED** 7:*3*
**INSTRUCTIONS**
81:*1*
**Insurance** 4:*4* 25:*19,
22* 26:*10, 21*
**intended** 54:*12*
**interest** 32:*16, 21*
33:*19, 23* 34:*20*
40:*23* 45:*4, 7* 59:*18,
23* 60:*3, 16* 84:*17*
**interested** 18:*18*
**interim** 10:*2*
**interrupt** 31:*5* 48:*10*
**investigate** 25:*2*
**investigating** 79:*7*
**Investment** 4:*14* 5:*3*
10:*15* 11:*5, 10, 14, 17*
47:*12, 14, 23* 53:*23*
54:*4* 58:*23*
**involved** 43:*12, 13*
58:*3*
**involvement** 11:*11*
14:*16, 18* 17:*1, 2*
43:*8*
**irregular** 25:*1* 56:*14*
**irregularities** 24:*14*
**IRS** 13:*11*

**Islands** 20:*4* 21:*21*
22:*13* 23:*1* 42:*23*
56:*18* 64:*13* 68:*15*
**issues** 23:*22* 47:*9*
48:*23*
**its** 12:*7* 13:*23* 15:*3*
18:*1, 6* 24:*23* 25:*5*
27:*20* 42:*13* 52:*16*
53:*5* 73:*24* 84:*17*

**< J >**
**Jackie** 22:*7*
**JAMES** 5:*19* 50:*20*
**JEFFREY** 3:*10*
**Jim** 12:*23*, 25 15:*21*
16:*7* 19:*5* 77:*8*
**jmorris@pszjlaw.com**
3:*7*
**job** 38:*8, 12*
**JOHN** 3:*6* 8:*15*
31:*6* 48:*11* 70:*6*
78:*4* 79:*25*
**joint** 63:*16, 21* 64:*1,
23* 65:*18* 66:*4, 9, 13,
19* 67:*5, 10*
**JONES** 3:*14* 5:*18*
**jpomerantz@pszjlaw.c
om** 3:*11*
**JULIE** 1:*14* 2:*9* 6:*5*
8:*5* 83:*12*
**June** 1:*15* 2:*10*
65:*25*
**jurisdiction** 68:*5*
**justify** 31:*12*

**< K >**
**Kansas** 20:*11, 19, 20*
21:*3, 5, 6, 11, 16* 22:*7*
**keep** 48:*15, 18*
**KELLY** 5:*8*
**kind** 14:*3* 33:*19*
**know** 9:*9, 12* 12:*21*
13:*15, 18, 20* 14:*10,
12* 16:*25* 17:*4* 18:*22*
19:*9, 12, 14, 23* 21:*10*
26:*20* 27:*16* 28:*2*
29:*8, 15* 30:*9* 31:*2,
25* 32:*25* 33:*9* 37:*7*
39:*3, 5* 40:*20* 41:*4,
16, 20* 42:*17* 43:*6, 11,*

24 44:*2, 9, 11, 13, 15,
16, 19, 20, 23, 24* 45:*2,
3, 5, 6, 8, 9, 11, 12, 19,
24* 46:*4* 48:*4* 49:*6,
25* 50:*14* 52:*3, 4, 7,
20* 53:*24* 54:*17* 57:*9*
58:*4, 13, 14, 25* 59:*12,
17, 22* 60:*1, 2, 9, 15,
21, 23* 61:*2, 5, 7, 8, 11,
12, 15, 16, 19, 20, 24,
25* 62:*6, 13* 63:*1, 25*
65:*21* 66:*3, 6, 9, 12,
16, 22* 67:*3, 8, 13*
69:*19, 23* 72:*2, 5*
74:*21* 75:*4, 24* 76:*2*
77:*4, 15* 78:*8, 12, 14*
**knowledge** 14:*22*
21:*18* 22:*3* 25:*15*
32:*4, 9* 33:*4, 10, 12,
13, 17, 18, 22* 34:*19*
35:*3, 8, 10* 49:*1* 51:*5,
13, 17*
**knows** 78:*13*

**< L >**
**L.P** 1:*7*
**Labor** 76:*14*
**lack** 53:*12*
**LANG** 4:*15, 17* 80:*3,
5*
**language** 14:*11*
**large** 20:*7, 9*
**law** 68:*16*
**laws** 64:*19*
**lawsuit** 58:*18, 22*
**lawyer** 9:*17* 43:*10*
68:*18*
**lawyers** 46:*9*
**lead** 40:*22*
**leading** 24:*15*
**leads** 41:*8*
**learn** 22:*25* 23:*10*
77:*22*
**learned** 18:*17* 23:*4,
5* 56:*23* 62:*15* 75:*15*
**leave** 43:*17*
**led** 29:*9*
**legal** 23:*19, 22* 31:*3*
43:*16* 57:*14*
**lengthy** 62:*23*

**level** 26:*6, 8* 37:*1, 3*
38:*18*
**liabilities** 54:*9*
**Life** 4:*4* 25:*19, 21*
**likelihood** 69:*13*
**Limited** 25:*19, 22*
**LINE** 7:*4, 8, 13, 17*
75:*19* 82:*5*
**liquidation** 64:*13*
68:*4*
**liquidators** 63:*16, 22*
64:*1, 23* 65:*19* 66:*5,
10, 14, 20* 67:*6, 10*
**liquidity** 56:*16*
**listen** 18:*19*
**lists** 16:*14*
**literally** 16:*14*
**Litigation** 3:*19*
22:*15* 23:*2, 8, 11, 12,
13, 17, 25* 73:*4*
**little** 62:*20* 67:*15*
79:*20*
**LITTLETON** 5:*20*
15:*22* 48:*22*
**Littleton's** 45:*17*
**LLP** 3:*22* 4:*9* 5:*8*
**LOIGMAN** 3:*20*
**long** 19:*18*
**longer** 70:*6* 78:*6, 16*
**look** 31:*20* 65:*5*
**looking** 16:*10, 13*
**losing** 53:*15*
**lot** 18:*11, 14, 18*
44:*12* 56:*15* 65:*13*
**LOUIS** 5:*4* 76:*6*
**Louisiana** 5:*10*
**lower** 29:*15*
**LP** 10:*5, 8* 34:*24*
35:*3, 17* 36:*1, 8*
51:*24* 53:*5* 55:*19*
73:*3*
**lphillips@kellyhart.co
m** 5:*5*
**LPs** 43:*17*

**< M >**
**Ma'am** 16:*9* 52:*2, 22*
55:*6* 56:*8* 65:*16*
67:*2* 72:*19* 74:*2*

79:*15*
**Madison** 3:*23*
**Main** 5:*9*
**majority** 15:*7, 8*
**making** 14:*18* 53:*3*
65:*18*
**MANAGEMENT** 1:*6*
3:*4* 8:*16* 10:*5, 8*
14:*13, 15* 18:*16*
34:*24* 35:*3, 17* 36:*1,*
*8* 50:*19* 51:*24* 52:*18*
53:*5* 55:*19* 73:*2*
**managing** 41:*5*
**March** 29:*14*
**Mark** 11:*9* 24:*20*
40:*15* 41:*4* 42:*9*
43:*19* 46:*20* 49:*12*
57:*4* 65:*24* 78:*8, 10,*
*16* 79:*3*
**MARKED** 7:*16*
63:*10*
**MARKS** 7:*22* 81:*6*
**material** 75:*8* 77:*4,*
*13, 25* 79:*4, 11*
**Matt** 64:*8* 72:*13*
78:*9* 79:*17*
**MATTTHEW** 4:*5*
**mean** 12:*25* 14:*15*
28:*13* 46:*20* 55:*2*
65:*15*
**member** 16:*8*
**memory** 48:*19*
**mentioned** 29:*5*
**met** 42:*13* 64:*2*
65:*10*
**MICHAEL** 4:*15*
**million** 42:*24* 43:*2*
56:*19, 20*
**mind** 41:*12* 48:*15*
65:*10*
**minimis** 22:*11*
**minutes** 70:*17*
**misused** 77:*6*
**mlang@cwl.law.com**
4:*16*
**mokin@okinadams.co**
**m** 4:*6*
**money** 23:*16* 42:*1, 20*
**months** 17:*13*
**moot** 66:*17*

**MORRIS** 3:*6* 6:*6*
8:*11, 15* 19:*22* 31:*14,*
*18, 24* 35:*20* 36:*5, 13*
38:*1, 14* 39:*4, 15*
41:*6* 42:*18* 44:*1*
46:*5, 10, 11* 49:*3, 5*
50:*1, 15* 52:*1, 9*
54:*18* 55:*5, 16, 23*
56:*7* 57:*2, 11, 20*
58:*12* 59:*13* 60:*10,*
*22* 62:*7, 11* 63:*5, 12*
64:*8, 11* 67:*1, 14*
69:*20* 70:*4, 9, 14, 19,*
*20* 71:*13, 15* 72:*11,*
*13, 17* 73:*1, 13, 19*
74:*6, 8, 22* 75:*5* 76:*8*
78:*7, 19* 79:*15*
**Motion** 6:*16* 50:*17*
65:*3, 8, 20*
**Mountain** 5:*3* 10:*15*
11:*4, 10, 14, 16* 34:*1,*
*9* 37:*5* 41:*3* 47:*11,*
*14, 22* 48:*9, 17* 49:*13*
53:*23* 54:*4* 58:*23*
**move** 38:*12*
**mute** 70:*16* 76:*7*
**mutual** 54:*14, 24*
**mystery** 44:*7*

**< N >**
**name** 8:*15*
**named** 11:*8* 50:*19*
**NATHAN** 5:*18* 62:*8*
63:*6* 74:*7*
**nature** 22:*23* 44:*11*
51:*6*
**NECESSARILY** 7:*22*
**need** 9:*14, 17* 16:*2*
62:*25* 64:*5* 65:*6*
68:*7* 77:*9*
**needs** 69:*5*
**negotiating** 71:*25*
**negotiation** 51:*14*
**negotiations** 51:*3, 6,*
*20*
**neither** 84:*15*
**never** 32:*5* 33:*5*
**New** 3:*16, 24* 70:*10,*
*11*

**newly** 67:*22*
**news** 62:*13, 15, 18*
**Nods** 50:*8*
**nonpublic** 75:*8* 77:*5,*
*13, 25* 78:*6* 79:*4, 12*
**Nope** 68:*19*
**North** 20:*13* 21:*4*
22:*8*
**NORTHERN** 1:*2*
**Notary** 84:*8*
**notations** 81:*6*
**NOTE** 7:*21*
**notes** 16:*18*
**notice** 44:*17*

**< O >**
**object** 17:*6* 19:*13, 15*
35:*19* 36:*3, 11* 37:*24*
38:*7* 39:*2* 41:*1*
42:*14* 43:*21, 23* 46:*3*
51:*25* 52:*8* 55:*1, 14,*
*21* 56:*5, 9* 57:*7, 17*
58:*9* 59:*10* 60:*7, 19*
62:*4* 66:*23* 67:*12*
69:*18* 71:*11* 72:*9*
73:*12* 74:*20*
**objected** 10:*19, 24*
**objecting** 19:*24*
37:*10*
**Objection** 6:*14* 8:*18*
10:*13* 12:*4, 9* 17:*11,*
*15, 18, 22* 18:*2, 6, 25*
19:*2, 7, 10* 22:*21*
24:*5, 8, 9, 22* 25:*5, 13,*
*17* 26:*1* 27:*17, 21*
29:*23* 30:*2, 7, 22*
31:*6* 32:*2* 33:*7*
37:*15* 42:*3, 11, 13, 16*
49:*24* 50:*4, 13* 52:*15,*
*17, 22* 54:*1, 16, 20, 22*
55:*25* 56:*4, 6, 12*
62:*10, 22, 24* 63:*14*
65:*20, 22* 66:*4* 68:*22*
71:*3, 7, 18*
**objections** 78:*2*
**obligation** 13:*21*
41:*18* 50:*12* 58:*5*
**obligations** 35:*17*
36:*1, 9* 49:*23* 74:*12*
75:*1*

**obtain** 57:*22* 59:*6*
62:*1* 66:*19* 67:*5*
**obviously** 28:*12*
**October** 47:*8*
**offhand** 14:*11*
**office** 29:*3*
**officer** 84:*8*
**officers** 15:*15*
**official** 63:*16, 22*
64:*1, 23* 65:*19* 66:*5,*
*10, 13, 19* 67:*6, 10*
**Oh** 15:*1* 16:*1, 21*
30:*14* 78:*20*
**Okada** 15:*24* 16:*22*
24:*10* 27:*1, 8, 12*
28:*21*
**okay** 8:*13, 24* 17:*4*
18:*19* 19:*16* 28:*20*
33:*13* 34:*8, 11, 16, 21,*
*22* 41:*21* 46:*24* 50:*9*
51:*12* 55:*10* 62:*7*
63:*5, 21* 64:*7* 66:*18*
69:*12* 70:*1, 19* 73:*6*
74:*23* 79:*2, 10*
**OKIN** 4:*5, 9* 19:*16*
31:*5, 17, 20* 35:*19*
36:*3, 11* 37:*24* 38:*7*
39:*2, 11* 41:*1* 42:*16*
43:*23* 46:*3, 8* 48:*10*
49:*24* 50:*13* 51:*25*
52:*8* 54:*16* 55:*1, 14,*
*21* 56:*5, 9* 57:*7, 17*
58:*9* 59:*10* 60:*7, 19*
62:*4* 64:*4* 66:*23*
67:*12* 69:*18* 70:*6, 12*
72:*9, 15, 20* 73:*12, 15*
74:*20* 76:*6* 78:*4, 12*
79:*24*
**once** 37:*4*
**opportunity** 38:*11*
56:*23*
**option** 75:*19, 22, 25*
79:*9*
**Order** 6:*16* 69:*5*
**org** 21:*15* 48:*12*
**organization** 12:*17,*
*19* 13:*10* 15:*18*
16:*23* 26:*24*
**organizations** 16:*11*
20:*17, 24* 21:*7* 22:*4*

23:3  26:15, 16  28:1
29:1  34:3  53:8, 10,
15  56:21
**organization's** 38:9
**orgs** 15:6  20:7, 9
43:15
**original** 43:14  76:13
**originated** 19:10
**outcome** 84:17
**outside** 74:11, 17
**oversee** 24:25
**overseeing** 24:12
**oversees** 14:1
**oversight** 15:7, 9, 12
56:16
**owed** 36:9  50:11
**owes** 35:17  36:1
49:22
**owned** 48:5
**owner** 30:5, 12
**ownership** 40:23
59:18, 23  60:3, 6, 16
**owns** 30:9, 18  47:14

< P >
**p.m** 1:16  2:11  80:6
**PACHULSKI** 3:14
5:18
**Pacific** 4:18
**PAGE** 6:4, 12  7:4, 8,
13, 17  8:25  46:22
68:12  82:5
**pages** 6:18
**paid** 23:20
**paragraph** 63:6, 14
67:16  68:8, 23  70:5,
21  73:9  74:5  75:6, 7,
11, 19
**Pardon** 56:8
**part** 37:8  64:6
**participated** 32:23
**particular** 24:3
51:14  75:11
**parties** 3:2  10:17, 21
11:1, 4  18:18  63:17
71:4, 9, 19  84:16
**parts** 62:24
**party** 11:5, 22  56:15
59:19, 24  60:4, 17

**Patrick** 11:9, 13
24:20  40:15, 16  41:4
42:9  43:19  46:20
47:7, 17  49:12  50:6,
10  57:4, 13, 22  58:20
59:5  65:24  66:18
67:5  69:10  74:10, 17,
25  77:5, 24  78:16
79:3, 12
**Patrick's** 67:20
**PAUL** 5:14  31:4
**pay** 26:10
**peace** 70:24  72:7
73:10, 16
**pending** 9:16  42:23
**people** 15:20  62:16
**percent** 27:24  29:6
**permission** 50:18
**person** 24:11, 18
40:14  53:25  54:19
**personally** 23:24
**pertain** 69:9
**pertains** 28:7
**PHILLIPS** 5:4
70:14, 18  71:10  80:1
**phrase** 46:19  68:21
78:1
**piece** 62:14
**play** 14:21
**played** 17:5
**plays** 14:12  16:7
**pleading** 31:15
**Please** 46:10, 13
62:8  70:5  75:6
79:24  80:5
**PLLC** 4:17
**point** 62:24
**policies** 26:21
**POMERANTZ** 3:10
**portion** 38:4, 25
39:9  63:1
**position** 31:11
**possibly** 48:15
**potential** 53:16
**practice** 23:21
**precise** 18:21
**precluded** 66:15
**prefer** 78:11
**preparation** 52:14

**prepare** 18:25
**present** 2:16  5:17
**president** 9:23, 24
15:3, 4, 15, 16, 21, 22
16:5  21:17
**pretty** 24:15
**Prior** 10:1  58:2
**privilege** 9:18
**problem** 39:18  42:19
**proceeding** 64:14
**proceedings** 2:12
21:21  80:7  84:9, 11,
12
**proceeds** 26:17
27:13  28:12, 18, 20
40:18  41:13  43:20
**product** 51:2, 19
**PRODUCTION** 7:7
**professional** 79:17
**promise** 48:23
**proposed** 10:13  17:6
19:24  51:23  52:4
67:11
**propounded** 83:8
**protect** 38:8  56:20
**prove** 69:5
**provide** 17:25  18:5
23:16  58:5
**provided** 18:23  66:3
**Public** 84:8
**purchase** 26:24
**purpose** 67:23
**purposes** 11:17  12:1
26:12
**pursuant** 36:17
**put** 14:19  16:19
62:8, 9, 19  75:19, 22,
25  76:15, 20  79:9
**putting** 31:10

< Q >
**quarrel** 77:21
**quarterly** 28:11
**question** 9:3, 8, 11, 16
10:20  18:3, 9, 20
19:19  33:1  35:22
37:25  39:16, 17, 23,
25  40:13  46:6, 13
55:15  56:10  57:8, 18
58:10  59:11  60:8, 20

62:5  64:5, 9  66:24
68:10  69:3  71:5, 11
72:19  73:5  76:12
78:13
**questioning** 33:2
**QUESTIONS** 7:3, 16
9:2, 18  31:19  48:19,
24  49:4  68:13  70:13,
15  83:8
**quick** 8:24
**quickly** 78:15
**QUINN** 3:22
**quizzed** 48:8
**QUOTATION** 7:22
**QUOTE** 7:23  67:17
70:22  74:9  77:7

< R >
**raised** 24:16
**Rand** 47:2, 4, 5, 9, 17,
20  48:2, 18  49:12
**RAVER** 5:21
**RDR** 1:22  84:21
**read** 19:4  22:17, 25
31:14  71:7, 12  74:13
83:6
**reading** 16:9  81:2
**really** 20:13  26:10
34:5  69:23  78:11
**Realtime** 2:14  84:6
**reason** 24:3  32:15
35:15, 25  36:7  37:19
38:2  41:21  42:14
43:21  50:9  51:22
54:2  57:3  59:5, 14
67:4, 9  74:16, 24
82:7, 9, 11, 13, 15, 17,
19, 21, 23
**reasons** 81:4  82:4
**recall** 40:12  53:3
54:21  55:9  65:18
71:17, 22
**receive** 14:8  36:17
37:5, 22  38:4, 19, 24,
25  39:9, 20, 21  40:9,
24  41:13, 19  46:1, 15
**received** 27:11  40:21
42:21  49:7  76:10
**receives** 41:9  42:1, 6
**receiving** 44:4

recollection 53:2
65:7
recommendations
13:12  14:18
record 84:11
recorded 2:12
recover 37:20  38:3,
13  39:8  40:17  45:25
56:18
red 24:16
reduced 84:13
refer 11:16, 24  20:16
25:21, 24  29:2
reference 67:16
75:18
referring 20:3, 10
24:19
REFLECT 7:23
refresh 65:6
regarding 65:24
Registered 2:13  84:5
regular 13:25
reject 67:11
related 84:15
relates 50:6  65:22
relationship 21:11
28:5, 7  33:25  34:23
35:2, 6, 12  45:10, 13
49:19
releases 54:15, 24
releasing 54:8
remember 48:14
remind 39:12
remitted 28:22
REMOTE 1:13  2:8
3:2  62:15
reorganization 50:3
Repeat 18:3  19:20
37:25  55:15  69:3
71:5  73:5, 16
repeated 64:5
report 29:14
Reported 1:20
Reporter 2:14, 15
79:22  80:3  84:2, 6, 8
REPORTER'S 7:21
reports 28:11
represent 31:8, 13
representative 25:7

REQUEST 7:7
requests 29:11
required 13:24
57:22  59:6  62:1
66:19  67:5
requirement 37:7
respect 14:22  28:17
29:7
respectfully 72:12
response 74:1
responsible 12:6
result 21:8  32:23
34:12
review 12:3  25:13
reviewed 36:21  41:7
52:21
right 11:13  16:9
21:2  24:1  28:24
34:6  37:20  38:3, 21
39:8, 20  40:8, 17
44:6  45:25  46:15, 21
52:22, 23  60:24  61:3,
4, 6, 9, 13, 17, 21
66:17  74:6  78:3
79:6
rise 55:12
ROBERT 3:20
robertloigman@quinn
emanuel.com 3:21
role 14:13, 21  16:8
17:5, 9  22:11  38:10
room 62:19
Rose 22:8
Rouge 5:10
RSA 1:22  84:21
rules 8:24
rushed 79:24

< S >
Santa 20:11, 22  21:3,
7, 12, 16  22:8
Sauder 78:25
saying 78:16
says 31:21  67:17, 19
70:21  74:9  77:19
scope 54:14, 24
74:11, 17
screen 62:8, 9, 20
63:13

scroll 68:7  70:4
75:5
scrutiny 67:25
second 48:16
secretary 16:6
securities 44:10
see 16:13  22:16, 19
47:8  48:13  62:25
63:19, 20  68:6  70:25
75:7, 18  79:19
seek 9:16  30:21
seeks 70:24  72:8
73:11, 17
seen 37:13, 16
SEERY 5:19  50:20
58:24
segregated 25:18, 24
26:1, 5, 8  27:17, 21
29:24  30:2, 6, 9, 13,
18, 22  44:16, 24  45:6
61:17, 21  62:1
send 28:12
sent 29:12
sentence 63:15  68:9,
13
series 9:1
set 17:18, 21  42:12
43:14  44:5  69:15
setting 69:7, 8
Settlement 6:17  8:19
10:13, 18, 23  11:5, 22
17:6  19:15, 25  20:2,
3, 5  36:14, 18, 21, 25
37:4, 9, 13, 16, 22
38:5, 19  39:1, 10, 22
40:9, 18, 25  41:3, 14,
23  42:6, 15  43:18, 22
44:6  46:2, 17, 21
51:1, 10, 15, 18, 23
52:5, 17  53:4, 9, 19,
22  54:3, 7, 10, 12, 25
57:5, 15, 24  58:7
59:8, 19, 24  60:4, 17
62:3  63:18  65:3, 8,
20  66:21  67:7, 11
69:15  70:23  71:21
72:1, 7  73:10  74:15,
18, 24  75:2
Shakes 39:6

share 57:13
shares 43:15
SHAWN 5:21
Sheet 81:5
Shorthand 2:15  84:2,
7
show 48:12  55:3
shows 42:23
side 10:22
sign 81:5
signature 31:21
signed 11:9, 13  46:21
significant 56:14
significantly 29:14
similarities 22:22
sir 70:16
sit 11:12  35:16, 24
36:6  79:10
six 10:3  17:12
18:14, 16
size 37:6
Skyview 78:16, 20, 23,
24  79:2
slow 56:24
small 20:13
sole 27:7
solely 31:7  74:15, 23
somebody 48:25
69:5  76:24  78:20
somebody-who 39:23
sorry 15:1  16:1
21:1, 6  29:10  55:8
58:13  67:2  74:2
76:9  77:18
Sounds 64:21
source 17:20  19:6
26:11  27:7  75:10
speak 17:10, 14, 17
speaks 55:2
specific 72:24
specificity 41:11
speculate 70:1
spiraling 77:8
spoke 66:1
spoken 17:12
sponsored 12:17
STANG 3:14  5:18
start 39:25  71:16
started 70:10
State 64:19

Case 19-34054-sgj11 Doc 4277-1 Filed 06/24/25 Entered 06/24/25 10:20:25 Desc

Case 3:25-cv-01876-K Document 15-124 Filed 09/25/02 Page 133 of 240 PageID 11041

Exhibit 124 Page 93 of 102 Hunter Mountain Trust v. Dondero et al., Capital P.P.

statement 33:21
54:22
STATES 1:1 63:15
status 13:24
Stenographically
1:20 2:13 84:13
step 13:16
stick 47:11
STIPULATIONS
7:12
stopped 76:23
Street 4:10 5:9
strike 40:4
structure 16:10
21:15 42:10 44:4
47:9 48:17, 18 49:2
67:23
subject 64:13 67:25
68:2
Subtrust 73:4
succeed 69:1, 6, 14
suggest 51:18 57:13
suggesting 72:4 73:7
suggests 71:3, 8
Suite 4:10, 18 5:9
SULLIVAN 3:22
Sunday 1:15 2:10
supervision 84:14
supplied 81:5
SUPPORT 7:1
22:14 28:1 55:18
supporting 12:17
13:10 15:6, 18 16:11,
23 20:7, 9, 16, 24
21:7, 15 23:3 26:15,
16, 23 29:1 34:2
43:15 53:8, 10, 14
56:21
supposedly 77:6
79:13
sure 16:21 35:23
65:9, 15 66:1 68:11
73:2 76:5, 10
sworn 8:6
Systems 84:7

< T >
tainted 73:17
take 8:17 31:20

45:16
taken 84:9, 12
talk 48:22
talked 40:14 65:11
66:16 70:7
talking 33:7 51:10
77:1 78:5
technical 14:10
Technically 13:9
43:11
tell 40:5, 7, 16 47:1
62:13 72:22 77:7, 11
78:15 79:11
telling 46:23
terminated 79:3
terms 36:18, 25 54:3
test 62:23
testified 8:8 38:17
testify 8:6
testimony 19:5
32:19 81:4 83:7
testing 48:19
TEXAS 1:2 4:11, 19
20:13 21:4 22:9
Thank 45:23 55:10
64:8 70:19 71:14
74:4, 7 79:15, 17
Thanks 79:21
therefor 81:4
thing 72:12
things 44:12 48:11
think 22:22 25:12
31:11, 17 38:17
43:24 45:16 48:20
50:3 57:25 63:5
thinks 31:11
Third 3:15 63:14
three 20:6, 9, 24
21:1, 5
thrown 27:3, 6
Time 1:16 2:12
9:14 56:24 70:10, 11,
18 79:16 80:7
today 8:17 16:17
18:12 33:7 35:16, 24
36:6 47:14, 20, 24
49:23 66:8 76:20
79:10
today's 12:1

told 47:8 50:22
78:20 79:3, 9
TORREY 5:20
15:22 16:5
track 43:17
transaction 61:13
transactional 28:11
transactions 29:8
61:9, 22
transcribed 2:15
transcript 79:23
80:4 81:6 83:7
84:10
transparency 53:13
travel 62:16
treasurer 15:5, 16, 23
16:5
tribunal 68:4
true 83:10 84:11
Trust 3:5 4:14 5:3
10:15 11:5, 10, 14, 17
32:12, 16, 21 33:20,
24 34:14, 17, 20 35:7,
13 45:4, 7, 14 47:12,
14, 23 48:9 52:6
53:23 54:4 55:20
58:23 73:3, 24
Trustee 3:19
truth 8:7
try 9:7 33:3
trying 77:22
tune 43:2
two 16:3 31:8 48:11
56:21 65:1
type 42:25 69:8
typewriting 84:14

< U >
understand 9:12
19:21 28:10 29:12
50:2 55:24 56:25
76:17
understanding 21:14,
22, 24 26:7 27:5, 9,
10, 15 29:19, 21
30:15 37:2, 11 38:15,
18, 23 41:2 47:16, 19
48:7 49:21 56:3
57:21 68:25 69:4

76:13
understood 29:9 79:8
unexplained 29:22
unfair 51:23 52:5,
18 53:4, 7, 10, 19, 22
54:3
Unfortunately 63:15
UNITED 1:1
URQUHART 3:22
usual 58:1

< V >
vague 47:10
valuations 24:16
value 27:12, 24 29:6,
19, 22 49:7, 15
vanished 42:24
vehicle 47:6
vein 18:17
versus 65:11
vice 15:4, 15, 22
videoconferencing 3:2
video-conferencing
2:10
VIDEOGRAPHER
5:13
VIDEO-RECORDED
1:13 2:8
view 52:10 59:1
69:12, 21
Vine 4:10
vision 28:2
volume 81:2, 6
vote 15:14
voting 15:13

< W >
wait 62:12
want 19:17 43:24
44:2, 11 48:12, 25
55:2 65:9 66:1
68:11 72:14, 15, 24
78:8 79:22 80:4
way 20:13 28:13
41:23 45:20 48:14
65:17 76:7
Wednesday 56:22
weekend 76:14
weeks 65:1

**Well**  13:*2*  18:*11*
20:*6*  24:*9*  25:*7*
28:*10*  31:*13, 14*
43:*10*  44:*5*  48:*6*
53:*11*  72:*18*  74:*11*
77:*14, 19*  78:*24*
**we're**  8:*17, 25*  31:*21*
33:*7*  46:*19*  56:*18*
62:*7*  65:*23*  78:*5*
**we've**  56:*23*  63:*13*
65:*11, 21*  66:*15*
**Wilkerson**  22:*6*
**WINOGRAD**  3:*12*
**wish**  82:*3*
**WISHNEW**  4:*17*
**withdrawn**  11:*2*
13:*19*  19:*13*  23:*6*
26:*22*  27:*4*  29:*20*
30:*8*  32:*10*  38:*16*
52:*15*  58:*19*  59:*16*
64:*17*  67:*18*  77:*11*
**witness**  48:*17*  64:*7*
72:*14*
**woman**  79:*1*
**words**  13:*16*  30:*8*
**work**  56:*18*
**working**  18:*15*
**workings**  49:*1*
**write-down**  27:*23*
29:*6*
**wrong**  64:*6*  71:*4, 9,*
*20, 25*  73:*7*
**wrongdoing**  72:*5*

**< Y >**
**Yeah**  22:*18*  28:*16*
48:*8*  68:*14*  74:*6*
78:*18*
**year**  50:*3*  76:*16*
**years**  10:*3*  12:*20*
18:*14, 16*  50:*17*  51:*9*
**Yep**  45:*18*
**York**  3:*16, 24*  70:*10,*
*11*

**< Z >**
**ZIEHL**  3:*14*  5:*18*

## WORD LIST

< $ >
$25  (2)
$300  (1)

< 1 >
1  (3)
1:37  (2)
10  (1)
10010  (1)
10017-2024  (1)
10-year  (1)
11  (1)
1113  (1)
15  (1)
16  (2)
1600  (1)
1700  (1)
19-34054-sgj11  (1)
1st  (1)

< 2 >
2:37  (1)
2011  (1)
2019  (1)
2024  (1)
2025  (2)
212.849.7615  (1)
214.817.4500  (1)
22  (2)
225.381.9643  (1)
22nd  (1)
2390  (1)
240  (1)

< 3 >
3:08  (1)
300-plus  (1)
301  (1)
30th  (1)
310.277.6910  (1)
32  (5)
33  (3)
34  (1)
34th  (1)

< 4 >
4:07  (1)

40  (2)

< 5 >
51  (1)

< 6 >
63  (1)

< 7 >
7  (1)
70801  (1)
713.228.4100  (1)
75201  (1)
77002  (1)
780  (1)

< 8 >
8  (1)
8635  (3)

< 9 >
90  (1)
9th  (1)

< A >
able  (2)
Absolutely  (1)
abstain  (3)
abstention  (1)
accepting  (1)
access  (1)
accommodate  (1)
accounting  (1)
accounts  (20)
acted  (1)
acting  (6)
action  (3)
actions  (4)
activities  (3)
activity  (7)
ADAMS  (1)
additional  (2)
Administrator  (1)
advice  (2)
aegis  (1)
affidavit  (1)
affiliated  (3)
affiliates  (4)
affirmed  (1)

afternoon  (1)
agendas  (1)
ago  (2)
agree  (1)
agreed  (1)
agreement  (59)
ahead  (2)
ahurt@kellyhart.com  (1)
alleging  (1)
allocated  (1)
allow  (2)
AMELIA  (1)
amount  (1)
ample  (1)
ancillary  (1)
annuities  (7)
annuity  (4)
ANSWER  (30)
answering  (2)
answers  (2)
anticipate  (1)
anybody  (16)
apologize  (6)
apparent  (1)
appear  (2)
appearance  (2)
appeared  (4)
appears  (1)
appointed  (2)
appreciate  (6)
appreciated  (1)
approval  (1)
approve  (4)
approved  (10)
Approving  (1)
approximately  (1)
April  (1)
arising  (1)
arm's-length  (2)
articulate  (1)
aside  (1)
asked  (8)
asking  (5)
asserting  (1)
assertion  (1)
asserts  (1)
asset  (2)
assets  (38)

assume  (2)
assumed  (1)
assuming  (3)
Atlas  (8)
attached  (2)
Attorney  (126)
attorneys  (1)
audible  (1)
authority  (7)
authorization  (2)
authorized  (9)
authorizing  (1)
available  (1)
Avenue  (3)
avoidance  (5)
aware  (42)

< B >
BA  (2)
back  (3)
backdrop  (1)
bad  (1)
BANKRUPTCY  (15)
Barbara  (7)
BARTLETT  (1)
based  (2)
basically  (1)
basis  (6)
Baton  (1)
beginning  (2)
behalf  (35)
behavior  (1)
believe  (31)
believed  (1)
best  (12)
bit  (3)
block  (1)
bottom  (1)
Bradshaw  (1)
breaching  (1)
break  (1)
bring  (1)
bringing  (1)
business  (3)
buy  (3)

< C >
CA-Certified  (1)
CA-CSR  (2)

calendar (2)
call (5)
called (10)
calling (1)
CAPITAL (17)
careful (1)
carefully (1)
Carrera (1)
Case (10)
cases (1)
cash (4)
cause (1)
caused (1)
caution (1)
Cayman (10)
ceased (2)
Central (3)
CEO (7)
CEOs (1)
certain (7)
Certainly (1)
CERTIFICATE (1)
Certified (3)
certify (2)
cetera (1)
CFO (2)
chance (1)
change (10)
changes (6)
changing (1)
Chapter (1)
charitable (8)
chart (1)
chief (1)
City (8)
claim (9)
Claimant (18)
claimed (1)
claims (3)
clarify (1)
CLARITY (1)
clawback (4)
clawing (1)
clear (3)
clearly (1)
clients (2)
cold (1)
come (1)
commenced (2)

commitment (1)
common (1)
communicate (1)
communicated (4)
communication (2)
community (6)
company (1)
complete (1)
compliance (1)
concern (3)
concerned (4)
concerning (1)
concerns (1)
concluded (1)
confer (1)
confidential (2)
confused (1)
confusing (1)
connection (4)
consent (6)
consider (1)
considering (1)
constitutes (1)
consult (1)
consummation (3)
Cont'd (2)
contend (1)
contends (2)
context (1)
continue (1)
contractual (7)
contractually (1)
contribution (2)
contributions (3)
control (5)
controlled (2)
controls (1)
conversations (1)
convey (1)
conveying (1)
copy (4)
corporate (2)
corporations (1)
correct (11)
corrections (2)
correctly (1)
counsel (5)
counterpart (1)
counterparty (1)

couple (1)
COURT (14)
Court-appointed (2)
COVID (1)
CRAWFORD (1)
created (1)
Crown (45)
CRR (2)
cumbersome (1)
CURRY (2)

< D >
D.C (1)
DAF (2)
DALLAS (160)
D'AMBRA (1)
date (2)
DAVID (1)
day (3)
dcurry@okinadams.com (1)
de (1)
dealings (1)
Debbie (1)
Debtor (5)
decided (1)
decision (2)
decisions (1)
declaration (3)
decline (3)
Defendant (2)
definitively (1)
Delaware (2)
DEMO (1)
DEPONENT (1)
deposed (1)
DEPOSITION (11)
depositions (1)
described (4)
detail (1)
DIAZ (20)
different (2)
diminished (1)
Diplomate (2)
DIRECT (4)
directed (2)
direction (1)
directly (3)
disburse (2)

disbursement (1)
disclosed (1)
disclosing (1)
discussions (1)
disrespectful (1)
DISTRICT (1)
diverting (1)
DIVISION (1)
document (4)
DOCUMENTS (4)
doing (5)
dollars (1)
donation (2)
donations (1)
Dondero (20)
Dondero's (2)
donor-advised (1)
dramatic (1)
Dugaboy (1)
duly (1)
duties (4)
duty (2)

< E >
earlier (2)
effectuated (1)
effectuates (1)
either (3)
EMANUEL (1)
employed (2)
employee (1)
Empower (25)
engaged (2)
ensure (1)
enter (5)
entered (3)
entering (9)
entities (55)
entitled (2)
entity (19)
Entry (2)
erosion (1)
Errata (1)
ESQ (10)
essence (1)
essentially (1)
established (1)
et (1)
everybody (1)

evidence  (1)
exactly  (1)
EXAMINATION  (2)
examined  (1)
excuse  (2)
executed  (1)
exercise  (1)
exercised  (1)
Exhibit  (1)
existence  (1)
expect  (1)
expectations  (1)
expected  (1)
expedited  (1)
expenses  (2)
expensive  (1)
expert  (2)
expressed  (1)
extent  (1)

< F >
fact  (1)
facts  (13)
fail  (1)
fair  (36)
fairly  (1)
fall  (1)
familiar  (14)
familiarity  (2)
Family  (6)
fault  (1)
feeds  (1)
feel  (1)
female  (1)
fiduciaries  (2)
fiduciary  (6)
file  (6)
filed  (25)
filing  (10)
finance  (1)
financial  (1)
find  (2)
fine  (3)
finish  (3)
first  (1)
first-quarter  (1)
flag  (1)
Floor  (2)
flow  (6)

flowed  (1)
Flows  (3)
focus  (1)
focused  (1)
Focusing  (2)
folks  (1)
following  (2)
follows  (1)
foregoing  (3)
form  (33)
formal  (1)
Formally  (1)
formation  (1)
formed  (4)
forth  (4)
forward  (1)
found  (1)
Foundation  (145)
foundations  (5)
Foundation's  (24)
four  (2)
fully  (1)
fund  (11)
funded  (1)
fundholder  (1)
fundholders  (2)
funding  (5)
funds  (4)
fund's  (1)
further  (1)
future  (1)

< G >
Gail  (4)
gdemo@pszjlaw.com  (1)
generally  (4)
gentleman  (2)
give  (6)
given  (1)
giving  (1)
Global  (41)
Global's  (4)
go  (7)
going  (13)
Good  (3)
good-faith  (2)
governance  (3)
GPs  (1)

grant  (2)
grant-making  (2)
grants  (1)
GREGORY  (1)
ground  (1)
guess  (4)

< H >
half  (1)
HALL  (1)
HALLMAN  (1)
happening  (3)
happens  (3)
happy  (2)
harm  (1)
HART  (1)
HAYLEY  (1)
head  (2)
hear  (1)
heard  (1)
held  (2)
he'll  (1)
help  (2)
hereto  (1)
Hernandez  (1)
high  (5)
HIGHLAND  (82)
Highland/HMIT  (2)
Highland's  (1)
HMIT  (54)
HMIT/Highland  (2)
hold  (2)
Holdco  (2)
holds  (1)
hour  (1)
Houston  (1)
Hunter  (19)
HURT  (1)
hwinograd@pszjlaw.com  (1)

< I >
idea  (5)
identification  (1)
identified  (3)
identify  (8)
imagine  (1)
impact  (1)
impacted  (1)

impacts  (1)
important  (1)
including  (1)
income  (3)
independent  (1)
INDEX  (1)
indicate  (1)
indirect  (4)
indirectly  (1)
individual  (1)
inform  (1)
information  (19)
informed  (4)
Inghram  (4)
insertion  (1)
inside  (6)
insider  (1)
insignificant  (1)
INSTRUCTED  (1)
INSTRUCTIONS  (1)
Insurance  (5)
intended  (1)
interest  (13)
interested  (1)
interim  (1)
interrupt  (2)
investigate  (1)
investigating  (1)
Investment  (13)
involved  (3)
involvement  (6)
irregular  (2)
irregularities  (1)
IRS  (1)
Islands  (8)
issues  (3)
its  (13)

< J >
Jackie  (1)
JAMES  (2)
JEFFREY  (1)
Jim  (6)
jmorris@pszjlaw.com  (1)
job  (2)
JOHN  (7)
joint  (11)
JONES  (2)

jpomerantz@pszjlaw.com *(1)*
JULIE *(5)*
June *(3)*
jurisdiction *(1)*
justify *(1)*

< K >
Kansas *(9)*
keep *(2)*
KELLY *(1)*
kind *(2)*
know *(122)*
knowledge *(21)*
knows *(1)*

< L >
L.P *(1)*
Labor *(1)*
lack *(1)*
LANG *(4)*
language *(1)*
large *(2)*
law *(1)*
laws *(1)*
lawsuit *(2)*
lawyer *(3)*
lawyers *(1)*
lead *(1)*
leading *(1)*
leads *(1)*
learn *(3)*
learned *(6)*
leave *(1)*
led *(1)*
legal *(5)*
lengthy *(1)*
level *(5)*
liabilities *(2)*
Life *(3)*
likelihood *(1)*
Limited *(2)*
LINE *(6)*
liquidation *(2)*
liquidators *(11)*
liquidity *(1)*
listen *(1)*
lists *(1)*
literally *(1)*

Litigation *(10)*
little *(3)*
LITTLETON *(3)*
Littleton's *(1)*
LLP *(3)*
LOIGMAN *(1)*
long *(1)*
longer *(3)*
look *(2)*
looking *(2)*
losing *(1)*
lot *(6)*
LOUIS *(2)*
Louisiana *(1)*
lower *(1)*
LP *(11)*
lphillips@kellyhart.com *(1)*
LPs *(1)*

< M >
Ma'am *(10)*
Madison *(1)*
Main *(1)*
majority *(2)*
making *(3)*
MANAGEMENT *(19)*
managing *(1)*
March *(1)*
Mark *(14)*
MARKED *(2)*
MARKS *(2)*
material *(6)*
Matt *(4)*
MATTHEW *(1)*
mean *(6)*
member *(1)*
memory *(1)*
mentioned *(1)*
met *(3)*
MICHAEL *(1)*
million *(4)*
mind *(3)*
minimis *(1)*
minutes *(1)*
misused *(1)*
mlang@cwl.law.com *(1)*

mokin@okinadams.com *(1)*
money *(3)*
months *(1)*
moot *(1)*
MORRIS *(69)*
Motion *(5)*
Mountain *(19)*
move *(1)*
mute *(2)*
mutual *(2)*
mystery *(1)*

< N >
name *(1)*
named *(2)*
NATHAN *(4)*
nature *(3)*
NECESSARILY *(1)*
need *(8)*
needs *(1)*
negotiating *(1)*
negotiation *(1)*
negotiations *(3)*
neither *(1)*
never *(2)*
New *(6)*
newly *(1)*
news *(3)*
Nods *(1)*
nonpublic *(7)*
Nope *(1)*
North *(3)*
NORTHERN *(1)*
Notary *(1)*
notations *(1)*
NOTE *(1)*
notes *(1)*
notice *(1)*

< O >
object *(35)*
objected *(2)*
objecting *(2)*
Objection *(63)*
objections *(1)*
obligation *(4)*
obligations *(6)*
obtain *(5)*

obviously *(1)*
October *(1)*
offhand *(1)*
office *(1)*
officer *(1)*
officers *(1)*
official *(11)*
Oh *(5)*
Okada *(7)*
okay *(29)*
OKIN *(52)*
once *(1)*
opportunity *(2)*
option *(4)*
Order *(1)*
org *(2)*
organization *(6)*
organizations *(15)*
organization's *(1)*
orgs *(4)*
original *(2)*
originated *(1)*
outcome *(1)*
outside *(2)*
oversee *(1)*
overseeing *(1)*
oversees *(1)*
oversight *(4)*
owed *(2)*
owes *(3)*
owned *(1)*
owner *(2)*
ownership *(6)*
owns *(3)*

< P >
p.m *(3)*
PACHULSKI *(2)*
Pacific *(1)*
PAGE *(10)*
pages *(1)*
paid *(1)*
paragraph *(13)*
Pardon *(1)*
part *(2)*
participated *(1)*
particular *(3)*
parties *(11)*
parts *(1)*

party *(7)*
Patrick *(31)*
Patrick's *(1)*
PAUL *(2)*
pay *(1)*
peace *(4)*
pending *(2)*
people *(2)*
percent *(2)*
permission *(1)*
person *(5)*
personally *(1)*
pertain *(1)*
pertains *(1)*
PHILLIPS *(5)*
phrase *(3)*
piece *(1)*
play *(1)*
played *(1)*
plays *(2)*
pleading *(1)*
Please *(7)*
PLLC *(1)*
point *(1)*
policies *(1)*
POMERANTZ *(1)*
portion *(4)*
position *(1)*
possibly *(1)*
potential *(1)*
practice *(1)*
precise *(1)*
precluded *(1)*
prefer *(1)*
preparation *(1)*
prepare *(1)*
present *(2)*
president *(10)*
pretty *(1)*
Prior *(2)*
privilege *(1)*
problem *(2)*
proceeding *(1)*
proceedings *(6)*
proceeds *(8)*
product *(2)*
PRODUCTION *(1)*
professional *(1)*
promise *(1)*

proposed *(6)*
propounded *(1)*
protect *(2)*
prove *(1)*
provide *(4)*
provided *(1)*
Public *(1)*
purchase *(1)*
purpose *(1)*
purposes *(3)*
pursuant *(1)*
put *(11)*
putting *(1)*

< Q >
quarrel *(1)*
quarterly *(1)*
question *(39)*
questioning *(1)*
QUESTIONS *(12)*
quick *(1)*
quickly *(1)*
QUINN *(1)*
quizzed *(1)*
QUOTATION *(1)*
QUOTE *(5)*

< R >
raised *(1)*
Rand *(9)*
RAVER *(1)*
RDR *(2)*
read *(8)*
reading *(2)*
really *(5)*
Realtime *(3)*
reason *(29)*
reasons *(2)*
recall *(7)*
receive *(17)*
received *(5)*
receives *(3)*
receiving *(1)*
recollection *(2)*
recommendations *(2)*
record *(1)*
recorded *(1)*
recover *(7)*
red *(1)*

reduced *(1)*
refer *(6)*
reference *(2)*
referring *(3)*
REFLECT *(1)*
refresh *(1)*
regarding *(1)*
Registered *(2)*
regular *(1)*
reject *(1)*
related *(1)*
relates *(2)*
relationship *(11)*
releases *(2)*
releasing *(1)*
remember *(1)*
remind *(1)*
remitted *(1)*
REMOTE *(4)*
reorganization *(1)*
Repeat *(8)*
repeated *(1)*
report *(1)*
Reported *(1)*
Reporter *(9)*
REPORTER'S *(1)*
reports *(1)*
represent *(3)*
representative *(1)*
REQUEST *(1)*
requests *(1)*
required *(6)*
requirement *(1)*
respect *(3)*
respectfully *(1)*
response *(1)*
responsible *(1)*
result *(3)*
review *(2)*
reviewed *(1)*
right *(31)*
rise *(1)*
ROBERT *(1)*
robertloigman@quinn
emanuel.com *(1)*
role *(7)*
room *(1)*
Rose *(1)*
Rouge *(1)*

RSA *(2)*
rules *(1)*
rushed *(1)*

< S >
Santa *(7)*
Sauder *(1)*
saying *(1)*
says *(6)*
scope *(4)*
screen *(4)*
scroll *(3)*
scrutiny *(1)*
second *(1)*
secretary *(1)*
securities *(1)*
see *(13)*
seek *(2)*
seeks *(4)*
seen *(2)*
SEERY *(3)*
segregated *(20)*
send *(1)*
sent *(1)*
sentence *(3)*
series *(1)*
set *(6)*
setting *(2)*
Settlement *(84)*
Shakes *(1)*
share *(1)*
shares *(1)*
SHAWN *(1)*
Sheet *(1)*
Shorthand *(3)*
show *(2)*
shows *(1)*
side *(1)*
sign *(1)*
signature *(1)*
signed *(3)*
significant *(1)*
significantly *(1)*
similarities *(1)*
sir *(1)*
sit *(5)*
six *(4)*
size *(1)*
Skyview *(5)*

slow  *(1)*
small  *(1)*
sole  *(1)*
solely  *(3)*
somebody  *(4)*
somebody-who  *(1)*
sorry  *(11)*
Sounds  *(1)*
source  *(5)*
speak  *(3)*
speaks  *(1)*
specific  *(1)*
specificity  *(1)*
speculate  *(1)*
spiraling  *(1)*
spoke  *(1)*
spoken  *(1)*
sponsored  *(1)*
STANG  *(2)*
start  *(2)*
started  *(1)*
State  *(1)*
statement  *(2)*
STATES  *(2)*
status  *(1)*
Stenographically  *(3)*
step  *(1)*
stick  *(1)*
STIPULATIONS  *(1)*
stopped  *(1)*
Street  *(2)*
strike  *(1)*
structure  *(9)*
subject  *(3)*
Subtrust  *(1)*
succeed  *(3)*
suggest  *(2)*
suggesting  *(2)*
suggests  *(2)*
Suite  *(3)*
SULLIVAN  *(1)*
Sunday  *(2)*
supervision  *(1)*
supplied  *(1)*
SUPPORT  *(4)*
supporting  *(23)*
supposedly  *(2)*
sure  *(9)*
sworn  *(1)*

Systems  *(1)*

**< T >**
tainted  *(1)*
take  *(3)*
taken  *(2)*
talk  *(1)*
talked  *(4)*
talking  *(4)*
technical  *(1)*
Technically  *(2)*
tell  *(10)*
telling  *(1)*
terminated  *(1)*
terms  *(3)*
test  *(1)*
testified  *(2)*
testify  *(1)*
testimony  *(4)*
testing  *(1)*
TEXAS  *(6)*
Thank  *(9)*
Thanks  *(1)*
therefor  *(1)*
thing  *(1)*
things  *(2)*
think  *(11)*
thinks  *(1)*
Third  *(2)*
three  *(5)*
thrown  *(2)*
Time  *(9)*
today  *(14)*
today's  *(1)*
told  *(5)*
TORREY  *(3)*
track  *(1)*
transaction  *(1)*
transactional  *(1)*
transactions  *(3)*
transcribed  *(1)*
transcript  *(5)*
transparency  *(1)*
travel  *(1)*
treasurer  *(4)*
tribunal  *(1)*
true  *(2)*
Trust  *(32)*
Trustee  *(1)*

truth  *(3)*
try  *(2)*
trying  *(1)*
tune  *(1)*
two  *(5)*
type  *(2)*
typewriting  *(1)*

**< U >**
understand  *(8)*
understanding  *(26)*
understood  *(2)*
unexplained  *(1)*
unfair  *(9)*
Unfortunately  *(1)*
UNITED  *(1)*
URQUHART  *(1)*
usual  *(1)*

**< V >**
vague  *(1)*
valuations  *(1)*
value  *(7)*
vanished  *(1)*
vehicle  *(1)*
vein  *(1)*
versus  *(1)*
vice  *(3)*
videoconferencing  *(1)*
video-conferencing  *(1)*
VIDEOGRAPHER  *(1)*
VIDEO-RECORDED  *(2)*
view  *(4)*
Vine  *(1)*
vision  *(1)*
volume  *(2)*
vote  *(1)*
voting  *(1)*

**< W >**
wait  *(3)*
want  *(16)*
way  *(7)*
Wednesday  *(1)*
weekend  *(1)*
weeks  *(1)*

Well  *(17)*
we're  *(9)*
we've  *(5)*
Wilkerson  *(1)*
WINOGRAD  *(1)*
wish  *(1)*
WISHNEW  *(1)*
withdrawn  *(16)*
witness  *(3)*
woman  *(1)*
words  *(2)*
work  *(1)*
working  *(1)*
workings  *(1)*
write-down  *(2)*
wrong  *(6)*
wrongdoing  *(1)*

**< Y >**
Yeah  *(6)*
year  *(2)*
years  *(6)*
Yep  *(1)*
York  *(6)*

**< Z >**
ZIEHL  *(2)*

**EXHIBIT 125**

```
 1            UNITED STATES BANKRUPTCY COURT

 2         FOR THE NORTHERN DISTRICT OF TEXAS

 3                   DALLAS DIVISION

 4      --------------------------

 5      In Re:                     Case No. 19-34054-sgj11

 6      HIGHLAND CAPITAL MANAGEMENT,

 7      L.P.,

 8          Debtor.               Chapter 11

 9      -------------------------X.

10

11

12         REMOTE VIDEO-RECORDED DEPOSITION of

13                  TORREY LITTLETON

14               Sunday, June 22, 2025

15               3:30 p.m. Central time

16

17

18

19

20    Reported Stenographically by:

21    Gail L. Inghram,

22    BA, RDR, CRR, RSA, CA-CSR No. 8635

23

24

25
```

1

2

3

4

5

6

7

8          WHEREUPON, the remote video-recorded

9    deposition of TORREY LITTLETON was held via

10   video-conferencing on Sunday, June 22, 2025,

11   beginning at approximately 3:30 p.m. Central

12   Time, the proceedings being recorded

13   stenographically by Gail Inghram, Registered

14   Diplomate Reporter, Certified Realtime Reporter,

15   Certified Shorthand Reporter, and transcribed

16   under her direction, there being present:

17

18

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:

 2   [All parties appeared via remote videoconferencing.]

 3

 4   On behalf of Highland Capital Management, and the Highland

 5   Claimant Trust:

 6       JOHN MORRIS, ESQ.

 7       jmorris@pszjlaw.com

 8       GREGORY V. DEMO, ESQ.

 9       gdemo@pszjlaw.com

10       JEFFREY POMERANTZ, ESQ.

11       jpomerantz@pszjlaw.com

12       HAYLEY WINOGRAD, ESQ.

13       hwinograd@pszjlaw.com

14          PACHULSKI STANG ZIEHL & JONES

15          780 Third Avenue, 34th Floor

16          New York, New York 10017-2024

17          310.277.6910

18

19   On behalf of Highland Litigation Trustee:

20       ROBERT S. LOIGMAN, ESQ.

21       robertloigman@quinnemanuel.com

22          QUINN EMANUEL URQUHART & SULLIVAN, LLP

23          51 Madison Avenue 22nd Floor

24          New York, New York 10010

25          212.849.7615
```

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   On behalf of Defendant Dallas Foundation and Crown Global

 4   Life Insurance:

 5       MATTTHEW OKIN, ESQ.

 6       mokin@okinadams.com

 7       DAVID CURRY, ESQ.

 8       dcurry@okinadams.com

 9           OKIN ADAMS BARTLETT CURRY LLP

10           1113 Vine Street, Suite 240

11           Houston, Texas 77002

12           713.228.4100

13

14   On behalf of Defendant Dugaboy Investment Trust:

15       MICHAEL LANG, ESQ.

16       mlang@cwl.law.com

17           CRAWFORD WISHNEW & LANG PLLC

18           1700 Pacific Avenue, Suite 2390

19           Dallas, Texas 75201

20           214.817.4500

21

22

23

24

25
```

```
 1    A P P E A R A N C E S (Cont'd):

 2

 3    On Behalf of Hunter Mountain Investment Trust:

 4        LOUIS M. PHILLIPS, ESQ.

 5        lphillips@kellyhart.com

 6        AMELIA L. HURT, ESQ.

 7        ahurt@kellyhart.com

 8          KELLY HART & HALLMAN LLP

 9          301 Main Street, Suite 1600

10          Baton Rouge, Louisiana 70801

11          225.381.9643

12

13    VIDEOGRAPHER:

14        PAUL D'AMBRA

15

16

17    ALSO PRESENT:

18        NATHAN HALL, Pachulski Stang Ziehl & Jones

19        JAMES SEERY

20        SHAWN RAVER

21        JULIE DIAZ

22

23

24

25
```

```
1                      - - -

2                  I N D E X

3                      - - -

4

5    EXAMINATION OF:                        PAGE

6    TORREY LITTLETON

7          Attorney Morris ..................8

8

9

10

11   PREVIOUSLY MARKED EXHIBITS REFERENCED:

12   NUMBER                    PAGE

13   Exhibit Highland 1 ..........58

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                DEPOSITION SUPPORT INDEX

 2    INSTRUCTION NOT TO ANSWER:

 3    PAGE   LINE

 4     67      21

 5

 6

 7    REQUEST FOR PRODUCTION OF DOCUMENTS

 8    PAGE   LINE

 9    (None)

10

11

12    STIPULATIONS

13    PAGE   LINE

14    (None)

15

16    QUESTIONS MARKED

17    PAGE   LINE

18    (None)

19

20

21                  REPORTER'S NOTE:

22    QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT NECESSARILY

23    REFLECT A DIRECT QUOTE.

24

25
```

```
 1                      -   -   -

 2              P R O C E E D I N G S

 3                      -   -   -

 4   WHEREUPON,

 5                    TORREY LITTLETON,

 6   being first duly sworn or affirmed to testify to the

 7   truth, the whole truth, and nothing but the truth,

 8   was examined and testified as follows:

 9

10                    EXAMINATION

11   BY ATTORNEY MORRIS:

12       Q.    Actually, I just want to start by

13   apologizing to the witness that I did not tell

14   him that Sunday depositions were casual.  Thanks

15   for dressing up.

16       A.    I appreciate it.  No worries.

17       Q.    And for some of us, Mr. Littleton,

18   every day is Sunday unless we're going to court.

19            It's nice to meet you, sir.

20       A.    Same here.

21       Q.    Can you hear me okay, sir?

22       A.    Yes, I can hear you.

23       Q.    Okay.  Good afternoon.  My name is

24   John Morris.  I'm an attorney at a law firm who

25   represents Highland Capital Management, LP, and
```

| | |
|---|---|
| 1 | the Highland Claimant Trust.  And we're here |
| 2 | today for your deposition in connection with the |
| 3 | Dallas Foundation's objection to a certain |
| 4 | proposed settlement agreement between Highland |
| 5 | and some affiliates and some entities that are |
| 6 | controlled by Mark Patrick. |
| 7 | Do you understand that? |
| 8 | A.    Yes. |
| 9 | Q.    Have you ever been deposed before, |
| 10 | sir? |
| 11 | A.    No.  This is my first time. |
| 12 | Q.    Okay.  It's not -- just relax.  It's |
| 13 | a -- it's a formal process, but it's not a |
| 14 | complicated process.  I'm going to ask you a |
| 15 | series of questions, and it's very important that |
| 16 | you let me finish my question before you begin |
| 17 | your answer.  Okay? |
| 18 | A.    Yes, sir. |
| 19 | Q.    It's important that I allow you to |
| 20 | finish your answer before I begin my next |
| 21 | question; and if I fail to do that, will you let |
| 22 | me know? |
| 23 | A.    Yes, sir, I will. |
| 24 | Q.    Do you understand that your testimony |
| 25 | today is being transcribed by Gail, the court |

```
 1    reporter?

 2         A.    Yes.

 3         Q.    So everything you and I say is going

 4    to be written down verbatim, or that's the goal

 5    anyway.

 6               Do you understand that?

 7         A.    Yes, I do.

 8         Q.    Okay.  If there's a question that I

 9    ask that you don't understand, will you let me

10    know and I'll try to rephrase it?

11         A.    Yes.

12         Q.    From time to time your lawyer might

13    object to some of my questions.  It will give --

14    it's formal, legal stuff, lawyer stuff.  It gives

15    me a chance to think about whether there's a

16    legal infirmity in my question, and it gives me

17    an opportunity to rephrase it if I want.

18               But unless he directs you not to

19    answer, I'm going to ask you to answer the

20    question anyway.  Okay?

21         A.    Okay.

22         Q.    Just so you're not surprised by the

23    process.

24               If you need a break for any reason at

25    any time, let me know, and I'll try to
```

```
 1    accommodate you as long as a question is not

 2    pending.  Okay?

 3        A.    Yes.

 4        Q.    Are you affiliated with the Dallas

 5    Foundation, sir?

 6        A.    Yes, I am.

 7        Q.    In what capacity?

 8        A.    I am the CFO here at the Dallas

 9    Foundation.

10        Q.    How long have you been the CFO of the

11    Dallas Foundation?

12        A.    I've been the CFO here since

13    January 1st of 2022, but I've been with the

14    organization for 13 years.

15        Q.    And what are your duties and

16    responsibilities as the CFO?

17        A.    As the CFO, my main duty is to ensure

18    the proper oversight and fiduciary stewardship of

19    our charitable assets.  That means having

20    fiduciary oversight of our investments, our

21    financial reporting, any legal aspects that may

22    impact the foundation in any capacity.

23            I also serve as a board director as

24    relates to some of our supporting organizations,

25    part of our conversation here today with Empower
```

Case 19-34054-sgj11    Doc 4277-2    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-01876-K    Document 35-15    Filed 06/13/25    Page 153 of 240    PageID 1061

Deposition of Bryson Capital    Exhibit 25    Page 09/13/25 00    Highland Capital Management, L.P.

 1   Foundation and the Okada Family Foundation.

 2          Q.    Are you a lawyer?

 3          A.    No, sir.

 4          Q.    Are you familiar with a company called

 5   Highland Capital Management, LP?

 6          A.    Yes, sir.

 7          Q.    Are you aware that that entity filed

 8   for bankruptcy a number of years ago?

 9          A.    Yes, sir.

10          Q.    Are you aware that that entity used to

11   be controlled by a gentleman named Jim Dondero?

12          A.    Yes, sir.

13          Q.    Okay.  Are you aware that the Dallas

14   Foundation recently filed an objection in the

15   bankruptcy court overseeing Highland's bankruptcy

16   and the objection pertaining to a proposed

17   settlement agreement between Highland and certain

18   affiliates and certain entities that are

19   controlled by Mr. Patrick?

20          A.    Yes, sir.

21          Q.    Did you review that objection before

22   it was filed?

23          A.    Yeah, I read through the objections.

24   But for the most part, I rely on our legal team

25   to give us a summary and kind of walk us through

Case 19-34054-sgj11    Doc 4277-2    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-01876-K    Document 36-15    Filed 09/12/25    Page 154 of 240    PageID 1062
Exhibit 25 Page 99 of 100    Deposition of Hunter Mountain Capital Investment, L.P.

```
 1    some of the pertinent details.

 2         Q.    Are you familiar with the entities

 3    that Mr. Patrick signed that agreement on behalf

 4    of?

 5         A.    Yeah; I believe it's the Hunter

 6    Mountain Investment Trust.

 7         Q.    Right.  And you're aware that in

 8    addition to the Hunter Mountain -- can we refer

 9    to Hunter Mountain Investment Trust as "HMIT"

10    today?

11         A.    Yes.

12         Q.    And are you aware that certain

13    affiliates of HMIT are also party to the

14    settlement agreement that is the subject of this

15    proceeding?

16         A.    I am.

17         Q.    And can we refer to HMIT and those

18    affiliates that are party to the agreement as

19    "the HMIT entities"?

20         A.    Yes.

21         Q.    Okay.  It's going to make our day a

22    little bit quicker and a little bit easier.

23         A.    Sure.

24         Q.    Do you know who approved the filing of

25    the objection on behalf of the Dallas Foundation?
```

 1          A.     Yeah, so it was approved by President

 2    Julie Diaz.

 3          Q.     Anybody else?

 4          A.     Then our legal team helped us kind of

 5    put together the objection.

 6          Q.     Do you know, have you ever met

 7    Jim Dondero?

 8          A.     I have never met him personally, no.

 9          Q.     Have you ever spoken with him?

10          A.     I think I was on one conference call

11    with him one time that I can recall.

12          Q.     Okay.  Do you know if he had any role

13    in the preparation of the Dallas Foundation's

14    objection?

15          A.     I didn't have any exposure with

16    Mr. Dondero.  So, no, I do not know.

17          Q.     Do you know where the idea of filing

18    the objection originated?  Like, whose idea was

19    it?

20          A.     Yes -- yes.

21          Q.     Whose idea was it to file the

22    objection?

23          A.     Well, it's a combination of the

24    Empower and Okada Foundation boards.  Just

25    looking at some of the investment activity that

```
 1    transpired through the first quarter, we had some

 2    concerns about the activity.  And a portion of

 3    that activity was the sale of Hunter Mountain

 4    interests through the Rand PE Fund I that

 5    ultimately rolled up to the Atlas, LP Fund, which

 6    impacted the economic value of the portfolio

 7    that's held by Crown Global.

 8        Q.    That's why the -- let's unpack that a

 9    little bit.  I asked where did the -- who came up

10    with the idea of objecting?  Let's take that

11    first.

12        A.    Sure, sure.  Yeah, I think it was the

13    board of the foundations, so primarily Julie Diaz

14    and myself just kind of thinking through the

15    activity that we became aware of.

16        Q.    And Mr. Dondero is a member of the

17    board; right?

18        A.    That's correct.

19        Q.    And it's just the three of you;

20    correct?

21        A.    That's correct.

22            ATTORNEY OKIN:  Object to form.

23    BY ATTORNEY MORRIS:

24        Q.    The Dallas Foundation's objection

25    refers to certain litigation pending in the
```

```
1    Cayman Islands.

2              Are you aware of that?

3         A.    Yes.

4         Q.    Are you aware that Mr. Dondero is

5    funding that litigation on behalf of the

6    supporting organizations that commenced it?

7         A.    Yes, sir.

8         Q.    And you're aware that he's funding

9    this litigation on behalf of the Dallas

10   Foundation; correct?

11        A.    That's correct.

12        Q.    Do you know why Empower Dallas

13   Foundation and the Okada Family Foundation didn't

14   just file the objection in their own name rather

15   than having the Dallas Foundation do it for them?

16             ATTORNEY OKIN:  Object to form.

17        A.    I think we looked it as the Dallas

18   Foundation is the supporting organization of the

19   two entities.  And we felt that the Dallas

20   Foundation and our president, Julie Diaz, we just

21   decided to file it under the foundation based on

22   a recommendation from our legal counsel.

23   BY ATTORNEY MORRIS:

24        Q.    Are you aware that the objection is

25   also filed on behalf of Crown Global Life
```

```
 1    Insurance, Limited?

 2         A.    Yes, sir.

 3         Q.    Okay.  And what is Crown Global Life

 4    Insurance, Limited?

 5         A.    The Crown Global Life Insurance,

 6    Limited, is an issuer of insurance annuities.

 7         Q.    What -- what role does it play with

 8    respect to the Dallas Foundation?

 9         A.    Yeah, so it plays a role more so with

10    the Empower Dallas and Okada Family Foundation.

11    They each hold policies with Crown Global through

12    the insurance annuities.  So the legal contract

13    is between Empower Dallas and Okada Family

14    Foundation with Crown Global.

15         Q.    And -- and is the withdrawn.

16               Does the annuity pay dividends or make

17    other distributions?

18         A.    Yeah, it makes distributions to the

19    fund as fixed payments through the contract, yes,

20    sir.

21         Q.    And do those fixed payments go

22    directly from Crown Global to Empower Dallas and

23    the Okada Family Foundation respectively?

24         A.    That's correct.

25         Q.    And do you know what the annuities are
```

```
 1    invested in?

 2         A.    I don't know the actual underlying

 3    investments.  I know the annuities have within

 4    them the Atlas IDF, LP Fund, and that they --

 5    what ultimately rolls up is the Rand Fund I, the

 6    Beacon Mountain and the Hunter Mountain, HMIT,

 7    ultimately rolls up.

 8         Q.    And is -- are the annuities the sole

 9    source of Empower Dallas and the Okada Family

10    Foundation's income, to the best of your

11    knowledge?

12         A.    That's correct, yes, sir.

13         Q.    And does a portion of that income then

14    flow up to the Dallas Foundation?

15         A.    Well, the income doesn't flow to the

16    Dallas Foundation.  What does happen is, as

17    Empower and the Okada Family Foundations make

18    recommendations, those recommendations flow to

19    the Dallas Foundation, to the corresponding

20    donor-advised fund; and then ultimately those

21    donor-advised funds make the grants out to the

22    community.

23              We typically don't get any of the

24    income through the Crown Global vehicle -- the

25    Dallas Foundation doesn't get any income through
```

```
 1    the Crown Global vehicle.
 2          Q.     Is there anybody in the room with you
 3    right now?
 4          A.     No, sir.
 5          Q.     Do you have any device on other than
 6    the computer that we're sharing right now?
 7          A.     No.  I have a fan on.  Is it causing
 8    feedback?
 9          Q.     No, but I have a fan on too.  Maybe
10    it's --
11          A.     Okay.  Sorry.  Yeah.  Sorry about
12    that.
13          Q.     Do you have any notes or anything that
14    you're reading from or that you're looking at?
15          A.     No, sir, no.
16          Q.     Okay.  So there are these annuities.
17    How did those annuities get funded?  Do you know?
18          A.     Yes.  So back in 2015, I believe, in
19    November of 2015, we funded the annuities with
20    about $29 million.  So contributions from -- I
21    think it was about $22 million from the --
22    Mr. Dondero, and then I believe another $7
23    million from Mr. Okada, which ultimately were
24    sent over to Crown Global to invest in the
25    annuities.
```

1        Q.      And under the annuities, they pay

2    fixed amounts to both supporting organizations?

3        A.      Yes, sir, that's correct.

4        Q.      And is there any market risk that the

5    supporting organizations have, or is this a -- is

6    it your understanding that it's a contractual

7    obligation of Crown Global to pay that fixed

8    amount for some duration?

9        A.      Yeah, I believe Crown Global takes the

10   risk.  They have to pay a fixed amount through

11   the obligation.  I believe they take an M&E

12   expense, which compensates for the risk.

13       Q.      What's that last piece?  I missed --

14       A.      The M&E expenses, it's part of

15   their -- we receive their statements quarterly.

16   They have an administrative fee that they take,

17   and then they have what they call an M&E expense,

18   which it was explained a while back that's a

19   percentage that they take to compensate for the

20   risk associated with insurance annuities.

21       Q.      And is the annuity tied to a -- is it

22   a fixed period of time, or is it tied to a

23   particular event?

24       A.      That, I cannot answer.

25       Q.      Okay.  But is it fair to say that the

| | |
|---|---|
| 1 | supporting organizations paid money to Crown |
| 2 | Royal -- Crown Global -- it's getting late. |
| 3 | Sorry. |
| 4 | ATTORNEY OKIN:  Sounds good. |
| 5 | THE WITNESS:  No.  Sounds good, yeah. |
| 6 | BY ATTORNEY MORRIS: |
| 7 | Q.   Let me restate the question. |
| 8 | Is it your understanding that the |
| 9 | supporting organizations paid money to |
| 10 | Crown Global; and in exchange, they got annuities |
| 11 | which produced a fixed stream of income for a |
| 12 | period of time in the future?  Is that right? |
| 13 | A.   That's correct. |
| 14 | Q.   Okay.  And that the assets -- the |
| 15 | segregated accounts themselves are owned by |
| 16 | Crown Global; correct? |
| 17 | A.   I believe the Atlas IDF Fund, I |
| 18 | believe Crown Global has partnership interests in |
| 19 | that particular fund.  I don't think they have |
| 20 | any ownership of the other underlying segregated |
| 21 | accounts.  Not that I'm aware of. |
| 22 | Q.   Do the segregated accounts hold |
| 23 | anything other than the annuities?  Withdrawn. |
| 24 | Do the segregated accounts hold the |
| 25 | annuities? |

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Deposition 3:25-cv-01876-K   Document 86-15   Filed 07/23/25   Page 163 of 240 Capital Management, L.P.
Exhibit 15 Page 23 of 100   Page 163 of 240 PageID 1071

```
 1          A.    The segregated accounts, not to my
 2    knowledge do they hold the annuities.  What I
 3    believe hold the annuities is the Atlas IDF, LP
 4    Fund holds the annuities.
 5          Q.    But Crown Global is the one who takes
 6    the risk with respect to the investments in the
 7    annuities; correct?
 8          A.    That's correct.
 9          Q.    And do they take the risk as well with
10    respect to the value of Atlas, for example?
11          A.    Yes, they do take the risk with the
12    value of Atlas.
13          Q.    So whether Atlas is worth a dollar or
14    a billion dollars, Crown Global has the same
15    obligation to the supporting organizations to pay
16    the fixed stream of income that it agreed to when
17    it sold the annuity to them; correct?
18          A.    That's my understanding.
19          Q.    Okay.  So that regardless of the value
20    of the segregated accounts, the supporting
21    organizations are guaranteed to receive the exact
22    same amount of money over time as long as
23    Crown Global complies with its obligations in the
24    annuity contract; correct?
25          A.    Yes, sir.
```

```
 1        Q.    Okay.  Do you know if the Dallas
 2   Foundation ever appeared in the Highland
 3   bankruptcy before it filed this objection?
 4        A.    No, sir, I don't believe we did.
 5        Q.    And as the CFO, is it fair to say that
 6   you know that the Dallas Foundation never filed a
 7   claim in the Highland bankruptcy?
 8        A.    Yes, sir.
 9        Q.    And do you also know that the Dallas
10   Foundation does not have an interest in the
11   Highland Claimant Trust that was formed as part
12   of the plan of reorganization?
13              ATTORNEY OKIN:  Object to form.
14   BY ATTORNEY MORRIS:
15        Q.    Withdrawn.  Let me lay a little bit of
16   foundation.
17              Are you familiar with an entity called
18   the Highland Claimant Trust?
19        A.    Yes.
20        Q.    Okay.  Does the Dallas Foundation
21   have, directly or indirectly, any interest in the
22   Highland Claimant Trust?
23              ATTORNEY OKIN:  Object to form.
24        A.    What I could say is that it depends on
25   the settlement with relationship with Hunter
```

```
 1    Mountain and indirectly with the roll-up that the
 2    beneficial interest to Empower and Okada
 3    Foundation and how that settlement impacts the
 4    economic interest there.  I think that's where
 5    the Dallas Foundation could indirectly have some
 6    interest.  While we're not the sole ownership of
 7    the Crown Global policy, we do have a
 8    relationship with Empower Dallas and the Okada
 9    supporting organizations.
10    BY ATTORNEY MORRIS:
11         Q.   Well, you don't have an interest in
12    what, did you say?  The annuities?
13         A.   We do have an interest in the annuity
14    contracts.
15         Q.   The Dallas Foundation didn't fund the
16    annuity contracts; correct?
17         A.   No, we did not fund them.  But --
18         Q.   And the Dallas Foundation doesn't own
19    the annuity contracts; correct?
20         A.   No, we don't own the annuity
21    contracts.  But what we do is we do have a
22    fiduciary responsibility for any relationship
23    that they financially to protect, preserve and to
24    grow these charitable assets.  And, ultimately,
25    the supporting organizations, they roll up into
```

```
 1    our financial statements.

 2         Q.    Is it your understanding that

 3    Crown Global has a duty to distribute --

 4    withdrawn.

 5              Is it your understanding that

 6    Crown Global has a duty to make distributions to

 7    the Dallas Foundation?

 8         A.    No, sir.  They make distributions to

 9    Empower and Okada supporting organizations.

10         Q.    Do you have any reason to believe that

11    Crown Global owes any duty at all to the Dallas

12    Foundation with respect to the annuities?

13              ATTORNEY OKIN:  Object to form.

14         A.    There's no direct responsibility from

15    Crown Global to the Dallas Foundation.  But

16    because of our relationship with Okada and

17    Empower, there is an indirect relationship there,

18    that we have an interest.

19    BY ATTORNEY MORRIS:

20         Q.    And let's go beyond the annuities.

21              Do you know whether Crown Global has

22    any direct duty to the Dallas Foundation for any

23    reason?

24              ATTORNEY OKIN:  Object to form.

25         A.    I'm going to say not directly.
```

```
 1    BY ATTORNEY MORRIS:

 2         Q.    Okay.   Thank you.

 3               Does the Dallas Foundation carry on

 4    its balance sheet any interest in the Highland

 5    Claimant Trust?

 6         A.    No, sir.

 7         Q.    Do you know if the Dallas Foundation

 8    has any contractual relationship with Highland

 9    Capital Management or the Highland Claimant

10    Trust?

11         A.    No, sir, we don't.

12         Q.    Do you have any reason to believe

13    today that Highland Capital Management or the

14    Highland Claimant Trust owes any duties or

15    obligations to the Dallas Foundation?

16               ATTORNEY OKIN:   Object to form.

17         A.    I wouldn't say there was any duties or

18    obligations to the Dallas Foundation.   But I do

19    think we have, again, some interest in the

20    settlements and how the funds originally were

21    supposed to flow up to Empower and Okada.

22               Empower and Okada, they roll up to the

23    Dallas Foundation's financial statements.   So I

24    think there is some indirect interest in Highland

25    Capital Claimant Trust and the decisions that are
```

```
 1    being made as it relates to the settlement.

 2    BY ATTORNEY MORRIS:

 3         Q.    I'm going to respectfully move to

 4    strike and ask you to listen carefully to my

 5    question --

 6         A.    Yes, sir.

 7         Q.    -- and this will go very smoothly.

 8               Do you have any reason to believe that

 9    Highland Capital Management or the Highland

10    Claimant Trust owes any duties or obligations to

11    the Dallas Foundation?

12               ATTORNEY OKIN:  Objection; form.

13               THE WITNESS:  My apologies.

14               ATTORNEY OKIN:  Go ahead.

15         A.    No, sir.

16    BY ATTORNEY MORRIS:

17         Q.    Are you aware that if the settlement

18    between the Highland entities and the HMIT

19    entities is approved, that the HMIT entities will

20    receive cash and other assets as set forth in the

21    agreement?

22         A.    Yes.

23         Q.    Do you have any reason to believe that

24    the Dallas Foundation has a right to receive any

25    of the cash or other assets that would be
```

1    delivered to HMIT if the settlement is approved?

2              ATTORNEY OKIN:  Object to form.

3         A.    Like I say based on the facts is that

4    the interest in HMIT were sold for a million

5    dollars.  So I believe the current structure as

6    of now, the two supporting organizations would

7    not receive any settlements.  They would not have

8    any economic benefit of the settlement payout.

9              Based on the historical structure,

10   yes, I would have said yes.  We had interest in

11   that settlement that would ultimately impact the

12   fair market values for Empower and Okada.

13   BY ATTORNEY MORRIS:

14        Q.    Are you familiar with the fair market

15   value of Empower and Okada?

16        A.    So the fair market value is through

17   the insurance annuity.  So based on the --

18        Q.    I'm sorry.  Through the insurance

19   what?

20        A.    It's the insurance through

21   Crown Global, so they produce a fund statement on

22   a quarterly basis.  We use that to state the fair

23   market value.

24        Q.    And is the fair market value based on

25   anything other than the projected future income

1    stream that you described earlier?

2         A.    I believe there is impact related to

3    some of the sub accounts.  One thing we do know

4    is in February of 2025, we saw the fair market

5    value increased by 918,000 due to the sale of

6    Rand's interest in Hunter Mountain.  So we do

7    believe there are other assets that impact the

8    fair market value.

9         Q.    But that's the fair market value of

10   the annuities; is that right?

11        A.    The sale of the Rand -- the interest

12   in the Hunter Mountain, the Rand?

13        Q.    Yeah, yeah.  Is what you're describing

14   the fair market value of the annuities that flows

15   up to the supporting organizations?

16        A.    I believe we have a couple of

17   investments that are within the Crown Global

18   structure.  I think you have insurance annuities,

19   and then you have other assets that are also

20   within that structure through the Atlas platform.

21   The way I understand it, the Atlas platform

22   allows for other alternative investments to be

23   wrapped within the insurance annuities.

24        Q.    Did the supporting organizations have

25   an ownership interest in Crown Global?

1    A.    Yeah.  They hold the policy, right?

2    The supporting organizations hold the policy

3    through Crown Global, so absolutely.

4    Q.    And the policy that you're referring

5    to are the annuity policies?

6    A.    The annuity policies, that's correct.

7    Q.    And, again, just for clarity, it does

8    not matter to the supporting organization what

9    the value of the assets that are held by

10    Crown Global is; what matters is the agreed-upon

11    future flow of distributions; fair?

12    A.    That's fair, yes, sir.  Yes.

13    Q.    Are you familiar at all with the

14    structure of the Highland Claimant Trust?

15    A.    Not with the Highland Claimant Trust,

16    no.  I'm familiar with the structure of the --

17    the Rand structure here as relates to the Empower

18    Dallas, and then I'm familiar with the DAF Holdco

19    structure.

20    Q.    Are you familiar with the HMIT

21    structure?

22    A.    I'm familiar -- I know how the

23    structure flows up to the Atlas IDF Fund.

24    Q.    Have you reviewed any of the governing

25    documents for HMIT or any of the Rand funds or

1   any of the Atlas funds?  Have you ever reviewed

2   the governing documents?

3       A.    At a high level, I took a glance at

4   the governing documents to get an understanding

5   of the flow.  I've seen organizational flow

6   charts to kind of give me an idea of who owns

7   what and how does it roll up ultimately to

8   Crown Global.

9       Q.    Do you have any knowledge as to what,

10  if any, role Crown Global played in the Highland

11  bankruptcy?

12      A.    No, sir.

13      Q.    So we've talked about the Rand and the

14  Atlas entities and Hunter Mountain, and we've

15  referred to those that signed on to the agreement

16  as "the HMIT entities"; right?

17      A.    Yes.

18      Q.    Do you know why each of the HMIT

19  entities was created?  Do you know what purpose

20  they served?

21      A.    You know, I know that they create some

22  vehicles that allow some different types of

23  investments.  I would imagine -- I don't know why

24  the structures were created the way they were.

25  We don't have that kind of insight.  That's just

```
 1    an assumption.
 2         Q.     Can you identify any assets that HMIT
 3    owns today?
 4         A.     No, sir.
 5         Q.     Were you ever able to identify any
 6    assets that HMIT owned?
 7         A.     No.
 8         Q.     In your duties as the CFO for the
 9    Dallas Foundation, did you ever make an inquiry
10    as to what assets HMIT owned?
11         A.     We made an inquiry to the Atlas
12    structure unsuccessfully over the years because
13    they were able to get to the underlying assets to
14    have a clear understanding of the holdings; so,
15    no, I couldn't tell you that I was successful in
16    understanding the underlying assets.
17         Q.     So you've been the CFO for three years
18    now --
19         A.     Yes, sir.
20         Q.     -- and a half?
21                But you were with the organization for
22    about six; right?
23         A.     For 13, 13 total.
24         Q.     Thank you.
25                So you've been with the organization
```

```
 1    long before Mark Patrick ever had any role with

 2    respect to the HMIT entities; right?

 3         A.    Yes, sir.

 4         Q.    Okay.  At any time that you've been

 5    with the Dallas Foundation, were you ever

 6    informed as to the assets that were held by HMIT?

 7         A.    No, sir.

 8         Q.    No; right?

 9         A.    That's correct -- no.

10         Q.    Do you know today what assets are held

11    by any of the HMIT entities?

12         A.    No, sir.

13         Q.    At any time during your tenure at the

14    Dallas Foundation, were you ever informed as to

15    what the assets were that any of the HMIT

16    entities owned?

17         A.    No, sir.

18         Q.    Okay.  And did you ever think that, as

19    part of your duties and responsibilities working

20    for the Dallas Foundation, that you needed to

21    know that information?

22         A.    Absolutely.  Yeah, we inquired on

23    multiple occasions to get our auditors

24    comfortable with the investment vehicle.

25         Q.    And you were never able to get that
```

```
 1    information, is that right?
 2         A.    That's right.
 3         Q.    And that was true for the entire time
 4    of your tenure at the Dallas Foundation?
 5         A.    Yes, sir.
 6         Q.    Okay.  In the course of your duties,
 7    did you ever communicate with anybody who was
 8    acting on behalf of HMIT?
 9         A.    I had some communications with
10    Mark Patrick, but I don't think he was over HMIT
11    at the time.  I don't know.  So it's kind of hard
12    to understand the transfer of a trustee or
13    ownership or oversight those accounts had.
14              So at a high level, he was probably
15    the person I tried to communicate with if we had
16    any questions around the valuations.
17         Q.    But it wasn't necessarily because he
18    was wearing the HMIT hat; it was because he wore
19    a lot of hats.  Is that fair?
20         A.    That's fair, yes.
21         Q.    During the course of your tenure at
22    the Dallas Foundation, did you ever once say to
23    yourself, I need to speak to the guy who's the
24    head of HMIT?
25         A.    No, we've never said that.
```

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K     Document 5-1   Exhibit 15   Filed 06/30/25   Page 176 of 240   Capital Markets, L.P.   PageID 1084
Exhibit 15   Page 36 of 100   Page 176 of 240

```
 1              Q.    Okay.  Did you ever say to yourself at

 2       any time during your tenure at the Dallas

 3       Foundation, I need to speak to the head of any of

 4       the HMIT entities?

 5              A.    No, sir.

 6              Q.    Do you know if the Dallas Foundation

 7       ever received anything of value from HMIT

 8       directly?

 9              A.    I can't say directly, no.  I just

10       assumed it had rolled up.  It was -- we had some

11       value through the structure, I would imagine.

12              Q.    Do you know if the Dallas Foundation

13       ever received anything of value directly from any

14       of the HMIT entities?

15              A.    No, sir.

16              Q.    Do you know if any of the --

17       withdrawn.

18              Do you have any reason to believe that

19       any of the HMIT entities owes a duty or

20       obligation to the Dallas Foundation today?

21              ATTORNEY OKIN:  Object to the form.

22              A.    I believe that there's going to be

23       impact to our economic interest in Crown Global.

24       I do believe there's a fiduciary obligation to

25       the Dallas Foundation to have communication if
```

1    there are investment decisions that are being

2    made that's going to impact that economic

3    interest, positive or negatively.

4    BY ATTORNEY MORRIS:

5         Q.    Sorry.  I may not have heard it

6    clearly.

7              But do you believe that Highland

8    Capital Management or the Highland Claimant Trust

9    owes a fiduciary duty to the Dallas Foundation?

10        A.    Sorry.  No.  No.  No.  I thought you

11   said HMIT.  Sorry.

12        Q.    You know what?  I probably did.  Let's

13   do that.

14        A.    Yeah.

15        Q.    Did you believe -- do you believe that

16   any of the HMIT entities owes a fiduciary duty to

17   the Dallas Foundation?

18             ATTORNEY OKIN:  Object to form.

19        A.    Again, I'll just restate what I said.

20             If it's starting to impact the

21   economic interest for the value of the

22   Crown Global policies, I do think there's a

23   fiduciary obligation to have a conversation to

24   inform of any investment decisions that are being

25   made that could have significant impact to that

1    value.

2    BY ATTORNEY MORRIS:

3        Q.    Okay.  Are you aware that HMIT filed a

4    motion in the bankruptcy court a couple of years

5    ago seeking permission to file a lawsuit against

6    Highland Capital Management and others?

7        A.    Yes, sir, I am aware of that.

8        Q.    You are.

9              Did HMIT seek the Dallas Foundation's

10   approval before filing that motion?

11       A.    No, sir, not that I'm aware of.

12       Q.    Do you believe that HMIT was required

13   to seek the Dallas Foundation's approval before

14   filing that lawsuit?

15       A.    Again, I think it -- I don't know if

16   "seek approval" is the right language I would

17   use.  But I do think informing the Dallas

18   Foundation, that this could impact the economic

19   interests of Empower and Okada Foundation.

20       Q.    And nobody ever told you that; is that

21   right?

22       A.    That's correct.

23       Q.    How did you learn about the lawsuit

24   that HMIT commenced against Highland and others a

25   couple of years ago?

```
 1        A.    Well, as we kind of got -- one, it was
 2   kind of some news that was -- that came about
 3   through some other research.  Currently, as of
 4   today, we have our legal team working, pulling
 5   together facts so they kind of reiterated some of
 6   the facts that could impact the overall case.  So
 7   I will just lean on our legal team to kind of
 8   bring us up to speed on this fact-finding.
 9        Q.    Do you know who authorized the filing
10   of that motion?
11        A.    From HMIT?
12             ATTORNEY OKIN:  Object to form.  Which
13   motion do you mean, John?
14             ATTORNEY MORRIS:  The same one we're
15   talking about, the motion for permission from the
16   bankruptcy court to sue Highland and other
17   parties.
18             ATTORNEY OKIN:  The one he told you he
19   didn't even know about what was filed.
20             ATTORNEY MORRIS:  Hey, Matt, he did
21   tell me.  He actually did tell me --
22             ATTORNEY OKIN:  He told you he heard
23   about it after, but go ahead.
24   BY ATTORNEY MORRIS:
25        Q.    So...
```

 1          A.    Yes, sir, I believe it was

 2     Mr. Mark Patrick that filed them.

 3          Q.    That authorized the filing of that

 4     lawsuit?

 5          A.    Yes, sir.

 6          Q.    Do you think he did anything wrong in

 7     doing that?

 8               ATTORNEY OKIN:  Object to form.

 9          A.    What I can say is that it has

10     impact -- it can potentially have some impact on

11     the -- it's convoluted.  I can't say he did

12     anything wrong with filing that motion.  But if

13     it's going to impact the Empower and Okada

14     Foundation, which is why I'm here today, is to

15     represent those supporting orgs, you know, I

16     think we have interest in the decisions that he's

17     making, right?

18     BY ATTORNEY MORRIS:

19          Q.    Okay.  But we can agree that he never

20     sought nor obtained the Dallas Foundation's

21     approval to file that motion; correct?

22          A.    Yes, sir, we can agree.

23          Q.    And can we also agree that you only

24     heard about that lawsuit after it was commenced

25     or after the motion was filed?

```
 1        A.    Yes, sir.

 2        Q.    Okay.  Have you read the settlement

 3   agreement that is the subject of the Dallas

 4   Foundation's objection?

 5        A.    Yeah, I've got some high-level facts

 6   related to the settlement agreement.  We had a

 7   legal team kind of -- again, we leaned on them to

 8   kind of pull out some of the important facts that

 9   could impact the Empower and Okada Foundation.

10        Q.    Do you know generally what HMIT is

11   proposing to give and receive under the

12   settlement agreement?

13        A.    Yes, sir, generally, I do know.  I

14   believe they're trying to release liability on

15   some of the claims.  I think that's part of the

16   settlement agreement.  I'm also aware that there

17   are future payouts that will be made to Hunter

18   Mountain.

19        Q.    And are you aware of other assets that

20   Hunter Mountain might receive if the settlement

21   agreement is pursued?

22        A.    Yes.

23        Q.    And what other assets are you aware

24   of?

25        A.    I know there's a large sum of assets,
```

```
 1    you know, in the -- 300 million, I think that's

 2    the amount of it that I don't recall.  But I

 3    couldn't go verbatim.

 4         Q.    It's not your understanding that

 5    there's $300 million worth of anything that's

 6    related to that agreement --

 7         A.    Oh, yeah, yeah, yeah.  But, yeah, it's

 8    not -- it's not there -- I was thinking about

 9    there was some data around -- I apologize if I'm

10    getting my facts confused.

11         Q.    That's okay.

12         A.    Yeah, actually, there's a -- as it

13    relates to the Empower and Okada, I believe there

14    was an impact of roughly 23-plus million dollars,

15    potentially.

16         Q.    But that has nothing to do with

17    Highland; correct?

18         A.    That's correct.

19         Q.    And it has nothing to do with this

20    settlement agreement; correct?

21              ATTORNEY OKIN:  Object to form.

22         A.    Well, I think if it has impact,

23    ultimately, again, to Empower and Okada, again,

24    we sold our interest in Highland Capital

25    Management -- or Hunter Mountain for a million
```

Case 19-34054-sgj11    Doc 4277-2    Filed 06/24/25    Entered 06/24/25 10:20:25    Desc
Case 3:25-cv-01876-K    Document 66-15    Filed 04/13/25    Page 183 of 240    PageID 1091
Deposition of Grant J. Scott    Exhibit 15    Page 43 of 100    In re Highland Capital Management, L.P.

1  dollars.  So based on what we know is if there is

2  a payout of $23 million, Empower and Okada, we

3  won't benefit from it.

4  BY ATTORNEY MORRIS:

5     Q.    So is it fair to say that the Dallas

6  Foundation's concern is not with the terms of the

7  settlement agreement itself but with the

8  disposition of the assets that Hunter Mountain

9  will receive if the settlement agreement is

10  approved?

11         ATTORNEY OKIN:  Object to form.

12     A.    Well, the only thing I would say about

13  that is we have individuals making some

14  questionable decisions and, you know, with

15  charitable assets.  I believe Highland Dallas has

16  entered into a settlement agreement with this

17  individual.  I think that's -- that's what I

18  could say is somewhat problematic.

19  BY ATTORNEY MORRIS:

20     Q.    What's problematic?

21     A.    Oh, we have an individual that's

22  shifting around charitable assets out of the

23  responsibility of Empower and Okada; right?  And,

24  you know, Highland Capital has entered into an

25  agreement with this individual.  I think we all

1    understand the facts that are at play.

2         Q.    Do you have any reason to believe that

3    the settlement agreement was not the product of

4    an arm's-length, good-faith negotiation between

5    adverse parties?

6              ATTORNEY OKIN:  Object to form.

7         A.    I can't say anything.  Yeah, I wasn't

8    a part of those conversations, so I can't opine.

9    BY ATTORNEY MORRIS:

10        Q.    And you don't have any facts that

11   would suggest that the settlement agreement is

12   anything other than the product of good-faith,

13   arm's-length negotiations; correct?

14             ATTORNEY OKIN:  Object to the form.

15        A.    I wasn't part of the conversation, so

16   I can't opine.  But what I can state is that I

17   believe there's significant impact to the Okada

18   and Empower Dallas Foundation.

19   BY ATTORNEY MORRIS:

20        Q.    And that's as -- not as a result of

21   the settlement agreement, but as a result of what

22   the Dallas Foundation contends was the

23   restructuring that Mr. Patrick engaged in earlier

24   this year; fair?

25             ATTORNEY OKIN:  Object to form.

 1          A.     For the most part, I'd say that's

 2     fair.

 3     BY ATTORNEY MORRIS:

 4          Q.     Okay.  Do you have any concerns that

 5     the settlement agreement is not the product of

 6     arm's-length, good-faith negotiations?

 7          A.     I'd have to restate that, again, we

 8     have an individual who's moving around charitable

 9     assets.  And, again, I think we understand the

10     facts of restructuring, and the agreement was

11     made to settle with this individual.  So from our

12     standpoint, again, it impacts the two supporting

13     organizations that we are here representing.

14            So I think there's two things at play.

15     The negotiations that you had with this

16     individual, I can't opine whether or not that it

17     wasn't done in good faith; but the impact of that

18     settlement agreement does impact Okada and

19     Empower Dallas.

20          Q.     And that's because as a result of

21     Mr. Patrick's restructuring, the Dallas

22     Foundation is concerned that it may not have --

23     it may not receive as much as it would have

24     indirectly had the restructuring not taken place;

25     fair?

```
 1            A.    That's fair.
 2                  ATTORNEY OKIN:  Object to form.
 3       BY ATTORNEY MORRIS:
 4            Q.    Okay.  Do you have any reason to
 5       believe that the proposed settlement is unfair to
 6       Highland Capital Management, LP?
 7            A.    Yeah, I don't have any reason to
 8       opine, no.
 9            Q.    Okay.  Do you have any reason to opine
10       as to whether or not the proposed settlement
11       agreement is unfair to the Highland Claimant
12       Trust?
13            A.    No, sir.
14            Q.    Do you have any reason to opine that
15       the proposed settlement agreement is unfair to
16       the Highland Litigation Subtrust?
17            A.    No, sir.
18            Q.    Do you have any reason to opine that
19       the settlement agreement is unfair to Hunter
20       Mountain Investment Trust?
21            A.    No, sir.  We can make good-faith
22       settlements, given that there are facts that
23       certain organizations or entities could be
24       impacted, given what we've already talked about,
25       what Mark Patrick has done with the
```

 1    restructuring.

 2          Q.     So two things can be true, at the same

 3    time --

 4          A.     Two things can be true.

 5          Q.     Two things can be true at the same

 6    time; right, sir?  The settlement agreement can

 7    be a fair and reasonable settlement that's the

 8    product of arm's-length and good-faith

 9    negotiations; while at the same time, the Dallas

10    Foundation can still have concerns over the

11    disposition of the assets that Hunter Mountain

12    receives as a result of this restructuring; fair?

13          A.     I think for the most part, that's

14    fair.  The only caveat I would add to that is if

15    I'm negotiating with an individual that we know

16    is causing harm to other organizations, I just

17    say maybe we don't care about that.  But from our

18    standpoint, we do.

19          Q.     Do you have any reason to believe that

20    the proposed settlement is unfair to any of the

21    HMIT entities?

22          A.     No, sir.

23          Q.     Are you aware that under the

24    settlement agreement, the HMIT entities are

25    releasing the Highland parties from any liability

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 6-15   Filed 09/12/25   Page 188 of 240 Capital Debenture P.
Exhibit 15   Page 42 of 100   Page 188 of 240

```
 1    other than that which arises out of the

 2    settlement agreement itself?

 3         A.    Yeah.  I believe that was a part of

 4    the settlement.  That's why we have the

 5    settlement.  Yeah.

 6         Q.    Do you have any concern about the

 7    scope of the releases that the HMIT entities are

 8    providing?

 9              ATTORNEY OKIN:  Object to form.

10    BY ATTORNEY MORRIS:

11         Q.    You can answer, sir.

12         A.    No, sir; only as it impacts, how does

13    it impact or potentially can impact lost income

14    for Okada and Empower.

15         Q.    Do you have any reason to believe that

16    the granting of the releases in the proposed

17    settlement agreement by the HMIT entities will

18    have any impact at all on the supporting

19    organizations?

20              ATTORNEY OKIN:  Object to form.

21         A.    Again, I think there's an economic

22    interest in what does the settlement -- the loss

23    of income streams to Empower and Okada, which we

24    believe is true.

25    ///
```

```
 1    BY ATTORNEY MORRIS:

 2         Q.    I'm just focused on the releases now.

 3         A.    Sure.

 4         Q.    Do you have any reason to believe that

 5    the releases that the HMIT parties are granting

 6    under the proposed settlement will have any

 7    economic impact on the supporting organizations?

 8               ATTORNEY OKIN:  Object to form.

 9         A.    No, sir.

10    BY ATTORNEY MORRIS:

11         Q.    Okay.  Are you aware of any facts that

12    could give rise to a claim by the Dallas

13    Foundation against Highland?

14               ATTORNEY OKIN:  Object to form.

15         A.    Can you elaborate on that a little bit

16    for me.

17    BY ATTORNEY MORRIS:

18         Q.    Sure.

19               So I'm just -- I'm wondering if you

20    know of any facts that might give rise to a claim

21    or a cause of action by the Dallas Foundation

22    against Highland Capital Management.

23               ATTORNEY OKIN:  Object to form.

24         A.    Not directly, no, sir.

25    ///
```

1   BY ATTORNEY MORRIS:

2        Q.     Okay.   Are you aware of any facts that

3   might give rise to a claim or cause of action

4   that the Dallas Foundation could assert against

5   the Highland Claimant Trust?

6              ATTORNEY OKIN:   Object to form.

7        A.     No, sir, not directly, no.

8   BY ATTORNEY MORRIS:

9        Q.     Do you understand the basis for the

10  Dallas Foundation's objection to the proposed

11  settlement?

12       A.     Absolutely, yes, I do.

13       Q.     Can you describe for me in your own

14  words what your understanding is of the basis of

15  the objection.

16       A.     Yeah.   We are aware that we sold Rand

17  PE Fund, which rolls up to the Atlas IDF Fund,

18  sold its interest in the Hunter Mountain for a

19  million dollars; and we believe that we have

20  significant future economic payments that would

21  be paid out to Hunter Mountain that Empower and

22  Okada would no longer benefit from.

23       Q.     Is it fair to say that the Dallas

24  Foundation is concerned, not with the terms of

25  the settlement agreement itself, but with the

1    possibility that it may not get its fair share of

2    the consideration that the HMIT entities are to

3    receive under the settlement agreement?

4              ATTORNEY OKIN:  Object to form.

5         A.    Yeah, for the most part, that's the

6    key -- that's our concern.

7    BY ATTORNEY MORRIS:

8         Q.    Okay.  Do you understand that Mark

9    Patrick has entered into the settlement agreement

10   with the Highland entities on behalf of each of

11   the HMIT entities?

12        A.    That's my understanding.

13        Q.    Do you have any reason to believe that

14   the governing documents for the HMIT entities did

15   not authorize Mr. Patrick to enter into the

16   settlement agreement on behalf of each of the

17   HMIT entities?

18              ATTORNEY OKIN:  Object to form.

19        A.    You know, what I would say to that is,

20   you know, regardless of the governing documents,

21   I do believe there's a fiduciary obligation that

22   Mr. Patrick had to the supporting organizations,

23   to inform us of any significant investment

24   decisions that could impact the economic interest

25   in the Crown Global vehicle.

1          So I just believe that, you know, just

2     like any trustee investment advisor/control

3     person, those are just normal conversations that

4     we expect to have; and we not did not have that

5     in this situation.

6     BY ATTORNEY MORRIS:

7          Q.    Okay.  Anything else?

8          A.    No, sir.

9          Q.    Okay.  You don't believe that

10    Mr. Patrick was required to obtain the Dallas

11    Foundation's consent before entering into the

12    settlement agreement; fair?

13         A.    That's fair.

14         Q.    And you don't have any reason to

15    believe that the Dallas Foundation has any right

16    or ability to prevent Mr. Patrick from entering

17    into the settlement agreement on behalf of the

18    HMIT entities; fair?

19              ATTORNEY OKIN:  Object to form.

20         A.    You know, I think there's two things

21    can be true again.  I think there's documentation

22    which I haven't seen, but, again, there's a

23    fiduciary obligation to the interested parties, I

24    believe, just as any relationship with an

25    investment advisor or control person.

 1  BY ATTORNEY MORRIS:

 2      Q.    And in your view, does the fiduciary

 3  duty that you believe Mr. Patrick had as the

 4  representative of the HMIT entities, does that

 5  extend anywhere beyond the duty to inform?

 6          ATTORNEY OKIN:  Object to form.

 7      A.    Well, I'm just trying to think

 8  about -- you know, we advised $650 million of

 9  assets under management.  We have advisors all

10  the time, before they make any decisions on the

11  sale of investments, we're informed about it.

12  They kind of let us know if it's going to have

13  impact to our portfolios.  And that's just an

14  expectation that we have of any investment

15  advisor or control person.

16  BY ATTORNEY MORRIS:

17      Q.    I appreciate that you have that

18  expectation.  Do you have an expectation that the

19  HMIT entities needed to obtain the Dallas

20  Foundation's consent before entering into the

21  settlement agreement?

22      A.    I'm not a legal person.  But I would

23  imagine if you have the documentation legally, I

24  don't know if you had to get our consent.  It's

25  more so just a fiduciary obligation.

 1       Q.    And, legally, do you have any reason

 2   to believe that the Dallas Foundation has a legal

 3   right over transactions that Mark Patrick, in his

 4   capacity as the representative of any of the HMIT

 5   entities, wanted to enter into?

 6             ATTORNEY OKIN:  Object to form.

 7       A.    As an interested party, I think we

 8   have an ability to have conversations to see if

 9   this decision was made that negatively impacted

10   the supporting organizations.  I think we do have

11   a right there to really understand why this

12   decision was made.  Why are we selling the

13   interest for a million dollars?  Why now?  Why is

14   the timing that happened now?  Because if nothing

15   happened, what we know is we would have benefited

16   from the settlement payouts.

17   BY ATTORNEY MORRIS:

18       Q.    Does the Dallas Foundation have a

19   direct ownership interest in any of the HMIT

20   entities?

21       A.    Not a direct ownership, no, sir.

22       Q.    Does the Dallas Foundation have any

23   indirect ownership interest in any of the HMIT

24   entities?

25             ATTORNEY OKIN:  Object to form.

```
 1        A.    Not directly.  The Dallas Foundation

 2   does not.

 3   BY ATTORNEY MORRIS:

 4        Q.    So no direct interest -- withdrawn.

 5              No direct ownership interest and no

 6   indirect ownership interest; fair?

 7              ATTORNEY OKIN:  Object to form.

 8        A.    We do have an interest in -- because

 9   the assets roll up to our balance sheet overall,

10   they would present an audited financial

11   statement.  So we do have to understand the

12   fluctuations in market value to explain not just

13   to our board but to our auditors what's happened.

14   So we do have indirect interest.

15   BY ATTORNEY MORRIS:

16        Q.    And none of the HMIT entities appear

17   as an asset on the Dallas Foundation's balance

18   sheet; correct?

19        A.    Not directly.  But if they roll up and

20   they feed into the Atlas IDF Fund, right, and

21   then the Atlas IDF Fund, which is a part of the

22   Crown Global annuities, feeds into our balance

23   sheet, there is an indirect interest in HMIT.

24              Fair to say?

25        Q.    Does any Atlas entity appear on the
```

```
 1    Dallas Foundation balance sheet?

 2         A.    Yeah, through the Crown Global

 3    annuity.  So if you look at the Crown Global

 4    statement, it lists an Atlas LP as the investment

 5    vehicle.

 6         Q.    Do you know if the Dallas Foundation

 7    has any right to control any of the HMIT

 8    entities?

 9               ATTORNEY OKIN:  Object to form.

10         A.    No, we can't directly control the HMIT

11    entities.

12    BY ATTORNEY MORRIS:

13         Q.    Do you know if the Dallas Foundation

14    has any right to approve or disapprove of any

15    potential transaction that an HMIT entity was

16    contemplating entering into?

17         A.    Yeah, so with the Atlas IDF Fund, what

18    I can say is the Empower and Okada, they do have

19    the opportunity to consent.

20               We had some notes that were -- there

21    were some notes that Mark Patrick wanted to sell

22    in February.  We had to get the consent of

23    Crown Global in order to sell these notes; and we

24    had -- we opined with Crown Global to withdraw

25    consent, right?
```

```
 1              So he did reach out to Crown Global

 2     for consent in which the Empower and Okada had an

 3     opportunity to provide our recommendation.

 4        Q.    Let's focus on the settlement

 5     agreement.

 6              Do you have any reason to believe that

 7     Mr. Patrick was required to obtain the consent of

 8     the Dallas Foundation before he signed it on

 9     behalf of the HMIT entities?

10              ATTORNEY OKIN:  Object to form.

11        A.    No.

12     BY ATTORNEY MORRIS:

13        Q.    Do you have any reason to believe that

14     Mr. Patrick was required to obtain the consent of

15     the supporting organizations before entering into

16     the settlement agreement on behalf of the HMIT

17     entities?

18              ATTORNEY OKIN:  Object to form.

19        A.    No, sir.

20     BY ATTORNEY MORRIS:

21        Q.    Do you have any reason to believe that

22     Mr. Patrick was required to obtain the consent of

23     Crown Global before entering into the proposed

24     settlement agreement on behalf of each of the

25     HMIT entities?
```

```
 1                   ATTORNEY OKIN:  Object to form.

 2          A.    No, sir.

 3   BY ATTORNEY MORRIS:

 4          Q.    Do you have any reason to believe that

 5   Crown Global has any right to control any of the

 6   HMIT entities?

 7                   ATTORNEY OKIN:  Object to form.

 8          A.    Not that I'm aware of, no.

 9   BY ATTORNEY MORRIS:

10          Q.    Do you have any reason to believe

11   that -- we're going to move on.

12                   So we're going to put up on the screen

13   the Dallas Foundation's objection.

14          A.    Yes, sir.

15          Q.    It will just take a moment for my

16   colleague to do that.

17                   While he's doing that, let me just

18   tell you that this can be a little bit of a

19   cumbersome process.  I'm doing this by Zoom.  If

20   there's any aspect of the document that you

21   recall that you think you need to review to

22   refresh your recollection or to put it in

23   context, will you just let me know that so that I

24   give you a full and fair opportunity to answer

25   the questions?
```

```
 1            A.    Yes, sir.

 2            ATTORNEY MORRIS:  Okay.  Can we go to

 3    paragraph 32, please.

 4            (Previously marked Highland Exhibit

 5            1 introduced by counsel.)

 6    BY ATTORNEY MORRIS:

 7            Q.    So I've put up on the screen,

 8    Mr. Littleton, the portion of the Dallas

 9    Foundation's objection that was filed in this

10    case.

11            And you're familiar with that

12    document; is that right?

13            A.    Yeah.  I couldn't repeat it back to

14    you verbatim, but I understand some of the

15    high-level facts in this objection.

16            Q.    You give me comfort when you say that.

17    You should not be able to repeat verbatim what

18    this document is.  So --

19            ATTORNEY OKIN:  And, Mr. Littleton,

20    although he didn't say it this time, he did say

21    it in the prior one:  If you need to see any more

22    of this in order to be able to answer his

23    questions, be sure to point that out.

24            THE WITNESS:  Absolutely.

25            ATTORNEY MORRIS:  I actually did say
```

 1    that.  That's okay.

 2              ATTORNEY OKIN:  Did you say that this

 3    time?  I know you said it last time.

 4              ATTORNEY MORRIS:  Sorry, I must be

 5    putting you to sleep.

 6              ATTORNEY OKIN:  That's a possibility.

 7    BY ATTORNEY MORRIS:

 8        Q.    Looking at the third line, I'm just

 9    going to read this quote:  "Unfortunately, it

10    does not appear, however, that joint official

11    liquidators are parties to or have authorized the

12    settlement."

13              Do you see that sentence?

14        A.    Yes, sir.

15        Q.    Do you know the entity over which the

16    joint official liquidators were appointed?

17        A.    Yes, sir.  It's the DAF Foundation

18    Holdco.

19        Q.    And that's in the Cayman Islands; is

20    that right?

21        A.    Yes, sir; that's correct.

22        Q.    Are you aware that all of the HMIT

23    entities are Delaware organizations?

24        A.    Yes, sir; that's correct.

25        Q.    Have you ever communicated with the

```
 1   joint official liquidators?

 2         A.    No, not officially.  We do have a

 3   planned communication this week.

 4         Q.    Do you know if anybody acting on

 5   behalf of the Dallas Foundation has ever informed

 6   the joint official liquidators of Highland's

 7   motion to have the settlement agreement approved?

 8         A.    No, sir.

 9         Q.    Do you know if anybody acting on

10   behalf of the Dallas Foundation has provided a

11   copy of the objection that's on the screen to the

12   joint official liquidators?

13         A.    Not that I'm aware of, sir.

14         Q.    Do you have any reason to believe, as

15   you sit here today, that the joint official

16   liquidators have any knowledge of the settlement

17   agreement that is going to be before the Court on

18   Wednesday?

19               ATTORNEY OKIN:  Object to form.

20         A.    I can't directly say.

21   BY ATTORNEY MORRIS:

22         Q.    Okay.  You haven't had any

23   communications with anybody in the world at any

24   time that led you to believe that the joint

25   official liquidators were informed of the
```

 1    proposed settlement agreement or the Dallas

 2    Foundation's objection; fair?

 3         A.    That's fair, sir.

 4         Q.    Okay.  Do you have any reason to

 5    believe that Mr. Patrick was required to obtain

 6    the authorization of the joint official

 7    liquidators before entering into this settlement

 8    agreement on behalf of the HMIT entities?

 9              ATTORNEY OKIN:  Object to form.

10         A.    No, sir, I can't.  I can't speak to

11    that.

12    BY ATTORNEY MORRIS:

13         Q.    Can you speak to whether or not the

14    joint official liquidators have any right to veto

15    or prevent the HMIT entities from entering into

16    the settlement agreement?

17         A.    Again, I'm not a legal person, so I

18    can't really opine on the official capacity of

19    the joint liquidators and what they're capable of

20    doing and not doing.  So I'm going to have to

21    say, no, I can't answer that question.

22         Q.    Further down in the paragraph it

23    states that:

24              "Indeed, many of Mr. Patrick's

25         actions, including the insertion of

```
 1              newly created entities into the fund's

 2              structure for the apparent purpose of

 3              diverting charitable assets will now be

 4              subject to the scrutiny of an

 5              independent, Court-appointed fiduciary

 6              and may be subject to clawback or other

 7              avoidance actions in the Cayman

 8              liquidation or such other tribunal as

 9              has jurisdiction."

10                   Have I read that correctly, sir?

11         A.    Yes, sir, you have.

12         Q.    Okay.  You're not an expert in Cayman

13    Islands law; correct?

14         A.    No, sir.

15         Q.    I think you said earlier you're not a

16    lawyer.  Right?

17         A.    That's correct.

18         Q.    Do you have any understanding as to

19    what facts must be established in order to

20    succeed in a clawback or avoidance action?

21         A.    It would just be assumption of mine

22    that I would have, whether it's a breach of

23    contract, discovery of various actions

24    decision-making.  But, no, I can't give you a

25    legal opinion.
```

 1    Q.    Do you have any view at all as to

 2    likelihood that the supporting organizations or

 3    the Dallas Foundation might succeed in clawing

 4    back or succeeding in other avoidance actions to

 5    set aside the settlement agreement if it's

 6    approved by the Court?

 7              ATTORNEY OKIN:  Object to form.

 8              And I'll also just remind you,

 9    Mr. Littleton, to the extent it's implicated,

10    don't go into attorney-client privileged

11    information that you may have received.

12    A.    Yeah, I can't -- I can't answer your

13    question, Mr. Morris, on that one.

14    BY ATTORNEY MORRIS:

15    Q.    Is it fair to say you'd have to

16    speculate as to whether or not -- let me just

17    finish the question.

18              Is it fair to say that you would have

19    to speculate as to whether or not the Dallas

20    Foundation or anybody else might succeed in

21    clawing back or avoiding the settlement agreement

22    if it's approved by the Court?

23              ATTORNEY OKIN:  Object to form.

24    A.    It would be my opinion.  It would be

25    speculation of how I feel, given the facts that

```
 1    I've seen and just some of the impact that we've

 2    seen on our supporting organizations; and I would

 3    just leave it there.

 4              ATTORNEY MORRIS:  Okay.  If we could

 5    scroll up to paragraph 33, please.

 6    BY ATTORNEY MORRIS:

 7         Q.    Okay.  The last sentence of

 8    paragraph 33 says:  "Thus, even if approved by

 9    this Court, consummation of the settlement is not

10    likely to buy the peace the debtor now seeks."

11              Do you see that?

12         A.    Yes, sir.

13         Q.    Do you have any reason to believe that

14    the Highland parties have done anything wrong in

15    entering into this proposed settlement agreement?

16              ATTORNEY OKIN:  Object to form.

17         A.    You know, what I would say is we have

18    an individual, in Mr. Patrick, that's moving

19    around charitable assets; and we -- Highland

20    Capital or the Highland entities have settled --

21    have made a settlement agreement with this

22    individual, knowing some of the facts of how the

23    charities are being negatively impacted.

24    That's -- that would be my comment there.

25    ///
```

BY ATTORNEY MORRIS:

    Q.   I'm not asking about the impact on the charitable foundations, and I'm not asking about Mr. Patrick.  I'm just asking if you have any facts that lead you to believe that Highland has engaged in any wrongdoing with respect to negotiation and entry into the proposed settlement agreement.

        ATTORNEY OKIN:  Object to form.  He answered your question.

BY ATTORNEY MORRIS:

    Q.   You can answer, sir.

    A.   No, sir.  I'll just leave it as I stated.  That was my answer.

    Q.   All right.  So I didn't hear any facts, so you don't have any facts.  Is that fair?

        ATTORNEY OKIN:  Object to form; argumentative.  Come on, John.

        ATTORNEY MORRIS:  Matt, I'm being --

        ATTORNEY OKIN:  You asked him if they did anything wrong.  He told you they did something wrong by --

        (Indiscernible cross-talk.)

        THE COURT REPORTER:  I'm sorry.  I

 1   can't understand you both when you are talking at

 2   the same time.

 3   BY ATTORNEY MORRIS:

 4        Q.    Mr. Littleton, are you aware of any

 5   facts that cause you to believe that the Highland

 6   parties have done anything wrong in entering into

 7   this agreement?

 8             ATTORNEY OKIN:  Object to form.

 9        A.    Again, I would just state that we have

10   an individual who is moving around charitable

11   assets, and I think we all are aware of the facts

12   of what has taken place.  Now, whether we want to

13   consider that as anything wrong, in quotations,

14   that's up for opinion.

15             In terms of "facts" facts, I can't --

16   no, I'm going to say, no, I don't have facts that

17   I can with share you, Mr. Morris.

18   BY ATTORNEY MORRIS:

19        Q.    And you don't even have any facts that

20   suggest Highland had any role in moving the

21   assets around that you just described; fair?

22        A.    Yeah, I don't understand that Highland

23   has moved around the assets.  But I think when

24   you're making a deal knowing that the individual

25   that I'm settling with has done some things that

 1    are questionable, you know, I think that

 2    discussion can be up for debate, whether -- you

 3    know, charities are being impacted; significant

 4    dollars are not going to be going out to the

 5    community; there's a lot of uncertainty with

 6    these assets.

 7              And we all know the facts.  The facts

 8    are clearly outlined.

 9        Q.    Do you know why the Dallas Foundation

10    contends that:  "Even if approved by the Court,

11    consummation of the settlement is not likely to

12    buy the peace that the debtor now seeks"?

13              What's the basis for that, if you have

14    any understanding at all?

15        A.    That one there, sir, I'm not going to

16    be able to answer that one for you.

17        Q.    Are you aware of any potential claims

18    that the Dallas Foundation is considering

19    bringing against Highland Capital Management or

20    the Highland Claimant Trust?

21              ATTORNEY OKIN:  I'm going to instruct

22    him not to answer that.  To the extent that he

23    would be aware of those, that would be --

24              ATTORNEY MORRIS:  Why don't we just do

25    "yes" or "no," Matt.  Okay?

```
 1              ATTORNEY OKIN:  No.  I think -- I
 2    think whether or not there are any claims and
 3    whether we're considering any claims is
 4    attorney-client privilege.  It's not a "yes" or
 5    "no" or detail; it's a not answer.
 6              ATTORNEY MORRIS:  I'll ask him on
 7    Wednesday.
 8              ATTORNEY OKIN:  Okay.
 9    BY ATTORNEY MORRIS:
10        Q.    Let's go to -- yeah, paragraph 34 says
11    that "there is ample evidence that Mr. Patrick
12    has acted and is acting well outside the scope of
13    his authority and fiduciary obligations."
14              Do you see that?
15        A.    Yes, sir, I do.
16        Q.    Okay.  I want to focus solely on the
17    negotiation and execution of the settlement
18    agreement.
19              Focusing --
20        A.    Yes, sir.
21        Q.    Focusing solely on the settlement
22    agreement, do you believe that Mr. Patrick acted
23    outside of the scope of his authority to
24    negotiate and enter into the settlement agreement
25    on behalf of each of the HMIT entities?
```

 1           ATTORNEY OKIN:  Object to form of the

 2     question.

 3        A.    Again, I think it's something that

 4     I've stated a few times now.  Two things can be

 5     true.  I think we've already agreed on that.

 6     BY ATTORNEY MORRIS:

 7        Q.    Which two things can be true here?

 8        A.    The good-faith conversation with the

 9     settlement; but at the same time, it could have a

10     consequential impact on the Okada and Empower

11     Dallas supporting organizations.

12        Q.    Okay.  Do you believe -- do you have

13     any reason to believe that Mr. Patrick acted

14     outside of his fiduciary obligations with respect

15     to his negotiation and execution of the

16     settlement agreement on behalf of the HMIT

17     entities?

18           ATTORNEY OKIN:  Object to form.  Are

19     you asking him personally or the organization

20     that filed this?

21           ATTORNEY MORRIS:  It's not a 30(b)(6)

22     witness.  I know the difference.

23           ATTORNEY OKIN:  Just so we're clear.

24        A.    Yeah, I do think there was a fiduciary

25     obligation to inform and have a conversation with

```
 1    the interested parties.

 2    BY ATTORNEY MORRIS:

 3         Q.    Okay.  So, again, it's a duty to

 4    inform but nothing more; is that fair?

 5              ATTORNEY OKIN:  Object to form.

 6         A.    Yeah, yeah, again, I think it's, you

 7    know, something that we all expect to have,

 8    again, with our investment advisors, control

 9    persons, trustees.

10    BY ATTORNEY MORRIS:

11         Q.    Okay.  Can we go to paragraph 16,

12    please.

13              Do you see paragraph 16 refers to

14    material nonpublic information?

15         A.    Yes, sir.  I see it.

16         Q.    Do you know what material nonpublic

17    information is being referred to there?

18         A.    No, sir.

19         Q.    Did you ever ask anybody?

20         A.    No.  I didn't want to get involved in

21    that conversation, no, sir.  I did not ask

22    anybody.

23         Q.    Do you know where -- withdrawn.

24              Do you know the Dallas Foundation's

25    source of information that enabled it to state,
```

 1    upon information and belief, that the information

 2    provided was obtained by Mr. Patrick through his

 3    employment at Skyview and constituted MNPI?

 4              ATTORNEY OKIN:   Object to form.

 5         A.    No, sir, I was not -- no.

 6    BY ATTORNEY MORRIS:

 7         Q.    You don't know where that information

 8    came from?

 9         A.    No, sir.

10         Q.    The next sentence refers to a put

11    option.

12              Do you see that?

13         A.    Yes, sir.

14         Q.    Did the foundation have a put option?

15         A.    Yeah, the Highland Dallas Foundation

16    had a put option agreement with the Dugaboy

17    Investment Trust.  I think we had 1.5 million

18    shares of NexPoint Hospitality Trust.  I think it

19    was a contribution that was given in 2019 with

20    the 7-year put option.

21         Q.    And is that option now expired?

22         A.    I believe it converted into a

23    different investment vehicle now.

24         Q.    So the Dallas Foundation never

25    exercised that option; correct?

```
 1              A.    Correct.

 2              Q.    Why not?

 3              A.    We didn't have a -- we didn't feel we

 4      had any reason to exercise the put option.

 5              Q.    Did you ever do any analysis to try to

 6      determine what the economic impact would be on

 7      the Dallas Foundation if they actually exercised

 8      that put option?

 9              A.    We had some conversations with our

10      internal investment advisor, and at the time his

11      recommendation was not to make any changes or

12      call the put option.

13              Q.    Who was that advisor?

14              A.    Madden & Associates at the time --

15      excuse me.  Madden Asset Management.

16              Q.    Do you have the shares to exercise the

17      put today?

18              A.    To be honest, Mr. Morris, there's a

19      little bit of discovery we have to understand now

20      that the shares have converted.  I believe they

21      converted to a different vehicle in April of this

22      year.

23              Q.    Are you aware that the Dallas

24      Foundation lost $9 million by not exercising the

25      put option before it converted?
```

```
 1                ATTORNEY OKIN:  Object to form.

 2         A.    I think we -- so we do have some

 3    information that we just need to understand

 4    thoroughly about what's happened now that the

 5    assets transferred into a different vehicle.

 6    BY ATTORNEY MORRIS:

 7         Q.    Well, you're the CFO; right?  And I

 8    think you said that your duty is to be

 9    responsible for the foundation's assets; right?

10         A.    That's fair; yes, sir.

11         Q.    Were you aware that the put was going

12    to convert before it actually converted?

13         A.    I was not aware of that.  I was not

14    informed of that.

15         Q.    Were you ever told what the value

16    would be to the Dallas Foundation if the Dallas

17    Foundation exercised the put?

18         A.    Yeah, I believe you're correct, it was

19    in the ballpark range of $9 million.

20         Q.    So is it fair to say that had the

21    Dallas Foundation exercised the put, then it

22    would have recovered $9 million?

23         A.    Yeah, I think that's fair, yeah.

24         Q.    What's the value of the shares that it

25    received upon conversion?  Do you know that?
```

```
 1        A.     No, I don't know that.  We were just

 2    notified recently that the shares had converted.

 3        Q.     Is one of the reasons that you didn't

 4    exercise the put option is because Dugaboy,

 5    Mr. Dondero's family trust, was the counterparty?

 6               ATTORNEY OKIN:  Object to the form.

 7        A.     No, sir, that wouldn't be the reason.

 8    BY ATTORNEY MORRIS:

 9        Q.     Do you think Mark Patrick breached his

10    fiduciary duty by telling the Dallas Foundation

11    that it should consider exercising a put that was

12    worth $9 million?

13               ATTORNEY OKIN:  Object to form.

14        A.     You know, I think there was

15    information that was not privy to individuals, so

16    I don't know if we could rely on that information

17    to make a decision.

18    BY ATTORNEY MORRIS:

19        Q.     This was a put that was owned by the

20    Dallas Foundation; do I have that right?

21        A.     The Highland Dallas Foundation,

22    supporting organization.

23        Q.     And what's the relationship between

24    the Dallas Foundation and the Highland Dallas

25    Foundation?
```

```
1        A.    Very similar to the relationship

2    between Empower Dallas and Okada Dallas.  The

3    Highland Dallas Foundation is the supporting org

4    that we have indirect oversight of.

5        Q.    And if the Highland Dallas Foundation

6    had exercised the put, would that have inured to

7    the benefit of the Dallas Foundation?

8             ATTORNEY OKIN:  Object to form.

9        A.    It ultimately would have.  What it

10   would have benefited was the supporting

11   organization to allow for more impactful

12   grant-making.  So you would have had $9 million

13   of liquidity that could be pushed out into the

14   community.

15            ATTORNEY MORRIS:  Okay.  How much time

16   do I have left, Matt?  I know you're watching.

17            ATTORNEY OKIN:  I lost track, I was so

18   enraptured by your questions.

19            18 minutes.

20            ATTORNEY MORRIS:  You wouldn't be the

21   first one.

22            Why don't we take a short break here.

23   I've got 18 minutes left.  If we could just take

24   a five-minute break.

25   ///
```

```
 1                  (Recess taken from 4:42 p.m. to
 2             4:49 p.m.)
 3    BY ATTORNEY MORRIS:
 4         Q.    Mr. Littleton, I think you answered
 5    this.  If I did, I apologize.
 6                  Can you confirm for me that you've
 7    never communicated with the joint official
 8    liquidators?
 9         A.    Yes, sir.  That is correct, other than
10    emails to set up a conversation.
11         Q.    Conversations that you did not
12    participate in; is that right?
13         A.    Yeah, just for -- yeah, just for some
14    questions they wanted to ask of the Dallas
15    Foundation's finance team.
16         Q.    But did you participate -- so you
17    spoke with the joint official liquidators'
18    finance team?
19         A.    No.  They wanted to set up a call.
20    That's the only time -- the only communication
21    I've had.
22         Q.    And you haven't had that call yet; is
23    that right?
24         A.    That's correct.
25         Q.    And that call is going to be scheduled
```

```
 1    for sometime in the future; fair?

 2         A.    Yes, sir.

 3              ATTORNEY MORRIS:  I have no further

 4    questions.

 5              ATTORNEY PHILLIPS:  No questions.

 6              ATTORNEY OKIN:  All right.

 7              ATTORNEY MORRIS:  Mr. Littleton, thank

 8    you very, very much for your time and patience.

 9              Matt, thank you for arranging this on

10    short notice.

11              Gail, do you need anything else from

12    anybody?

13              THE COURT REPORTER:  Okay.  I have

14    copies for Mr. Morris, Mr. Lang, Mr. Okin,

15    and Mr. Phillips.

16              Anybody else?

17              ATTORNEY OKIN:  Gail, we do want to

18    read and sign both transcripts.

19                   (Whereupon, at 4:50 p.m. Central

20                   Time the proceedings concluded.)

21

22

23

24

25
```

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 35-5 Filed 07/22/25   Page 219 of 240   PageID 1127
Exhibit 5   Page 79 of 100   Debtors v. Highland Capital Mgmt., L.P.

```
 1              INSTRUCTIONS TO DEPONENT

 2              After reading this volume of your

 3   deposition, indicate any corrections or changes

 4   to your testimony and the reasons therefor on the

 5   Errata Sheet supplied to you and sign it.  DO NOT

 6   make marks or notations on the transcript volume

 7   itself.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 E R R A T A

 2

 3           I wish to make the following changes,

 4     for the following reasons:

 5    Page   Line

 6    _____  _____   CHANGE: _____

 7    REASON: _____

 8    _____  _____   CHANGE: _____

 9    REASON: _____

10    _____  _____   CHANGE: _____

11    REASON: _____

12    _____  _____   CHANGE: _____

13    REASON: _____

14    _____  _____   CHANGE: _____

15    REASON: _____

16    _____  _____   CHANGE: _____

17    REASON: _____

18    _____  _____   CHANGE: _____

19    REASON: _____

20    _____  _____   CHANGE: _____

21    REASON: _____

22    _____  _____   CHANGE: _____

23    REASON: _____

24

25
```

```
 1
 2
 3                    C E R T I F I C A T I O N
 4
 5
 6               I hereby certify that I have read the
 7    foregoing transcript of my deposition testimony,
 8    and that my answers to the questions propounded,
 9    with the attached corrections or changes, if any,
10    are true and correct.
11
12    ------------------------------------
      TORREY LITTLETON
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CERTIFICATE OF SHORTHAND REPORTER

           I, Gail Inghram, Registered Diplomate

Reporter, Certified Realtime Reporter, Realtime

Systems Administrator, CA-Certified Shorthand

Reporter No. 8635, and Notary Public, the officer

before whom the foregoing proceedings were taken,

do hereby certify that the foregoing transcript

is a true and correct record of the proceedings;

that said proceedings were taken by me

stenographically and thereafter reduced to

typewriting under my supervision; and that I am

neither counsel for, related to, nor employed by

any of the parties to this case and have no

interest, financial or otherwise, in its outcome.

_____

Gail Inghram,
BA, RDR, CRR, RSA, CA-CSR No. 8635

## WORD INDEX

**< $ >**
**$22**  19:21
**$23**  42:2
**$29**  19:20
**$300**  41:5
**$650**  52:8
**$7**  19:22
**$9**  72:24  73:19, 22
74:12  75:12

**< 1 >**
**1**  6:13  58:5
**1.5**  71:17
**10010**  3:24
**10017-2024**  3:16
**11**  1:8
**1113**  4:10
**13**  11:14  32:23
**16**  70:11, 13
**1600**  5:9
**1700**  4:18
**18**  75:19, 23
**19-34054-sgj11**  1:5
**1st**  11:13

**< 2 >**
**2015**  19:18, 19
**2019**  71:19
**2022**  11:13
**2025**  1:14  2:10  29:4
**21**  7:4
**212.849.7615**  3:25
**214.817.4500**  4:20
**22**  1:14  2:10
**225.381.9643**  5:11
**22nd**  3:23
**2390**  4:18
**23-plus**  41:14
**240**  4:10

**< 3 >**
**3:30**  1:15  2:11
**30(b)(6**  69:21
**300**  41:1
**301**  5:9
**310.277.6910**  3:17
**32**  58:3

**33**  64:5, 8
**34**  68:10
**34th**  3:15

**< 4 >**
**4:42**  76:1
**4:49**  76:2
**4:50**  77:19

**< 5 >**
**51**  3:23
**58**  6:13

**< 6 >**
**67**  7:4

**< 7 >**
**70801**  5:10
**713.228.4100**  4:12
**75201**  4:19
**77002**  4:11
**780**  3:15
**7-year**  71:20

**< 8 >**
**8**  6:7
**8635**  1:22  81:8, 21

**< 9 >**
**918,000**  29:5

**< A >**
**ability**  51:16  53:8
**able**  32:5, 13  33:25
58:17, 22  67:16
**absolutely**  30:3
33:22  49:12  58:24
**accommodate**  11:1
**accounts**  21:15, 21,
22, 24  22:1, 20  29:3
34:13
**acted**  68:12, 22  69:13
**acting**  34:8  60:4, 9
68:12
**action**  48:21  49:3
62:20
**actions**  61:25  62:7,
23  63:4
**activity**  14:25  15:2,

3, 15
**actual**  18:2
**ADAMS**  4:9
**add**  46:14
**addition**  13:8
**administrative**  20:16
**Administrator**  81:7
**adverse**  43:5
**advised**  52:8
**advisor**  51:25  52:15
72:10, 13
**advisor/control**  51:2
**advisors**  52:9  70:8
**affiliated**  11:4
**affiliates**  9:5  12:18
13:13, 18
**affirmed**  8:6
**afternoon**  8:23
**ago**  12:8  37:5, 25
**agree**  39:19, 22, 23
**agreed**  22:16  69:5
**agreed-upon**  30:10
**agreement**  9:4  12:17
13:3, 14, 18  27:21
31:15  40:3, 6, 12, 16,
21  41:6, 20  42:7, 9,
16, 25  43:3, 11, 21
44:5, 10, 18  45:11, 15,
19  46:6, 24  47:2, 17
49:25  50:3, 9, 16
51:12, 17  52:21  56:5,
16, 24  60:7, 17  61:1,
8, 16  63:5, 21  64:15,
21  65:8  66:7  68:18,
22, 24  69:16  71:16
**ahead**  27:14  38:23
**ahurt@kellyhart.com**
5:7
**allow**  9:19  31:22
75:11
**allows**  29:22
**alternative**  29:22
**AMELIA**  5:6
**amount**  20:8, 10
22:22  41:2
**amounts**  20:2
**ample**  68:11
**analysis**  72:5
**annuities**  17:6, 12, 25
18:3, 8  19:16, 17, 19,

25  20:1, 20  21:10, 23,
25  22:2, 3, 4, 7  24:12
25:12, 20  29:10, 14,
18, 23  54:22
**annuity**  17:16  20:21
22:17, 24  24:13, 16,
19, 20  28:17  30:5, 6
55:3
**ANSWER**  7:2  9:17,
20  10:19  20:24
47:11  57:24  58:22
61:21  63:12  65:12,
14  67:16, 22  68:5
**answered**  65:10  76:4
**answers**  80:8
**Anybody**  14:3  19:2
34:7  60:4, 9, 23
63:20  70:19, 22
77:12, 16
**anyway**  10:5, 20
**apologies**  27:13
**apologize**  41:9  76:5
**apologizing**  8:13
**apparent**  62:2
**appear**  54:16, 25
59:10
**appeared**  3:2  23:2
**appointed**  59:16
**appreciate**  8:16
52:17
**approval**  37:10, 13,
16  39:21
**approve**  55:14
**approved**  13:24  14:1
27:19  28:1  42:10
60:7  63:6, 22  64:8
67:10
**approximately**  2:11
**April**  72:21
**argumentative**  65:19
**arises**  47:1
**arm's-length**  43:4, 13
44:6  46:8
**arranging**  77:9
**aside**  63:5
**asked**  15:9  65:21
**asking**  65:2, 3, 4
69:19
**aspect**  57:20

**aspects** 11:*21*
**assert** 49:*4*
**asset** 54:*17* 72:*15*
**assets** 11:*19* 21:*14*
24:*24* 27:*20, 25* 29:*7,*
*19* 30:*9* 32:*2, 6, 10,*
*13, 16* 33:*6, 10, 15*
40:*19, 23, 25* 42:*8, 15,*
*22* 44:*9* 46:*11* 52:*9*
54:*9* 62:*3* 64:*19*
66:*11, 21, 23* 67:*6*
73:*5, 9*
**associated** 20:*20*
**Associates** 72:*14*
**assumed** 35:*10*
**assumption** 32:*1*
62:*21*
**Atlas** 15:*5* 18:*4*
21:*17* 22:*3, 10, 12, 13*
29:*20, 21* 30:*23* 31:*1,*
*14* 32:*11* 49:*17*
54:*20, 21, 25* 55:*4, 17*
**attached** 80:*9*
**Attorney** 6:*7* 8:*11,*
*24* 15:*22, 23* 16:*16,*
*23* 21:*4, 6* 23:*13, 14,*
*23* 24:*10* 25:*13, 19,*
*24* 26:*1, 16* 27:*2, 12,*
*14, 16* 28:*2, 13* 35:*21*
36:*4, 18* 37:*2* 38:*12,*
*14, 18, 20, 22, 24* 39:*8,*
*18* 41:*21* 42:*4, 11, 19*
43:*6, 9, 14, 19, 25*
44:*3* 45:*2, 3* 47:*9, 10,*
*20* 48:*1, 8, 10, 14, 17,*
*23* 49:*1, 6, 8* 50:*4, 7,*
*18* 51:*6, 19* 52:*1, 6,*
*16* 53:*6, 17, 25* 54:*3,*
*7, 15* 55:*9, 12* 56:*10,*
*12, 18, 20* 57:*1, 3, 7, 9*
58:*2, 6, 19, 25* 59:*2, 4,*
*6, 7* 60:*19, 21* 61:*9,*
*12* 63:*7, 14, 23* 64:*4,*
*6, 16* 65:*1, 9, 11, 18,*
*20, 21* 66:*3, 8, 18*
67:*21, 24* 68:*1, 6, 8, 9*
69:*1, 6, 18, 21, 23*
70:*2, 5, 10* 71:*4, 6*
73:*1, 6* 74:*6, 8, 13, 18*

**audited** 54:*10*
**auditors** 33:*23* 54:*13*
**authority** 68:*13, 23*
**authorization** 61:*6*
**authorize** 50:*15*
**authorized** 38:*9*
39:*3* 59:*11*
**Avenue** 3:*15, 23* 4:*18*
**avoidance** 62:*7, 20*
63:*4*
**avoiding** 63:*21*
**aware** 12:*7, 10, 13*
13:*7, 12* 15:*15* 16:*2,*
*4, 8, 24* 21:*21* 27:*17*
37:*3, 7, 11* 40:*16, 19,*
*23* 46:*23* 48:*11* 49:*2,*
*16* 57:*8* 59:*22* 60:*13*
66:*4, 11* 67:*17, 23*
72:*23* 73:*11, 13*

**< B >**
**BA** 1:*22* 81:*21*
**back** 19:*18* 20:*18*
58:*13* 63:*4, 21*
**balance** 26:*4* 54:*9,*
*17, 22* 55:*1*
**ballpark** 73:*19*
**BANKRUPTCY** 1:*1*
12:*8, 15* 23:*3, 7*
31:*11* 37:*4* 38:*16*
**BARTLETT** 4:*9*
**based** 16:*21* 28:*3, 9,*
*17, 24* 42:*1*
**basis** 28:*22* 49:*9, 14*
67:*13*
**Baton** 5:*10*
**Beacon** 18:*6*
**beginning** 2:*11*
**behalf** 3:*4, 19* 4:*3,*
*14* 5:*3* 13:*3, 25* 16:*5,*
*9, 25* 34:*8* 50:*10, 16*
51:*17* 56:*9, 16, 24*
60:*5, 10* 61:*8* 68:*25*
69:*16*
**belief** 71:*1*

**believe** 13:*5* 19:*18,*
*22* 20:*9, 11* 21:*17, 18*
22:*3* 23:*4* 25:*10*
26:*12* 27:*8, 23* 28:*5*
29:*2, 7, 16* 35:*18, 22,*
*24* 36:*7, 15* 37:*12*
39:*1* 40:*14* 41:*13*
42:*15* 43:*2, 17* 45:*5*
46:*19* 47:*3, 15, 24*
48:*4* 49:*19* 50:*13, 21*
51:*1, 9, 15, 24* 52:*3*
53:*2* 56:*6, 13, 21*
57:*4, 10* 60:*14, 24*
61:*5* 64:*13* 65:*5*
66:*5* 68:*22* 69:*12, 13*
71:*22* 72:*20* 73:*18*
**beneficial** 24:*2*
**benefit** 28:*8* 42:*3*
49:*22* 75:*7*
**benefited** 53:*15*
75:*10*
**best** 18:*10*
**beyond** 25:*20* 52:*5*
**billion** 22:*14*
**bit** 13:*22* 15:*9*
23:*15* 48:*15* 57:*18*
72:*19*
**board** 11:*23* 15:*13,*
*17* 54:*13*
**boards** 14:*24*
**breach** 62:*22*
**breached** 74:*9*
**break** 10:*24* 75:*22,*
*24*
**bring** 38:*8*
**bringing** 67:*19*
**buy** 64:*10* 67:*12*

**< C >**
**CA-Certified** 81:*7*
**CA-CSR** 1:*22* 81:*21*
**call** 14:*10* 20:*17*
72:*12* 76:*19, 22, 25*
**called** 12:*4* 23:*17*
**capable** 61:*19*
**capacity** 11:*7, 22*
53:*4* 61:*18*
**CAPITAL** 1:*6* 3:*4*
8:*25* 12:*5* 26:*9, 13,*
*25* 27:*9* 36:*8* 37:*6*

**believe** 41:*24* 42:*24* 45:*6*
48:*22* 64:*20* 67:*19*
**care** 46:*17*
**carefully** 27:*4*
**carry** 26:*3*
**Case** 1:*5* 38:*6* 58:*10*
81:*16*
**cash** 27:*20, 25*
**casual** 8:*14*
**cause** 48:*21* 49:*3*
66:*5*
**causing** 19:*7* 46:*16*
**caveat** 46:*14*
**Cayman** 16:*1* 59:*19*
62:*7, 12*
**Central** 1:*15* 2:*11*
77:*19*
**certain** 9:*3* 12:*17, 18*
13:*12* 15:*25* 45:*23*
**CERTIFICATE** 81:*2*
**Certified** 2:*14, 15*
81:*6*
**certify** 80:*6* 81:*10*
**CFO** 11:*8, 10, 12, 16,*
*17* 23:*5* 32:*8, 17*
73:*7*
**chance** 10:*15*
**CHANGE** 79:*6, 8, 10,*
*12, 14, 16, 18, 20, 22*
**changes** 72:*11* 78:*3*
79:*3* 80:*9*
**Chapter** 1:*8*
**charitable** 11:*19*
24:*24* 42:*15, 22* 44:*8*
62:*3* 64:*19* 65:*3*
66:*10*
**charities** 64:*23* 67:*3*
**charts** 31:*6*
**claim** 23:*7* 48:*12, 20*
49:*3*
**Claimant** 3:*5* 9:*1*
23:*11, 18, 22* 26:*5, 9,*
*14, 25* 27:*10* 30:*14,*
*15* 36:*8* 45:*11* 49:*5*
67:*20*
**claims** 40:*15* 67:*17*
68:*2, 3*
**CLARITY** 7:*22* 30:*7*
**clawback** 62:*6, 20*

**clawing**  63:*3*, *21*
**clear**  32:*14*  69:*23*
**clearly**  36:*6*  67:*8*
**colleague**  57:*16*
**combination**  14:*23*
**Come**  65:*19*
**comfort**  58:*16*
**comfortable**  33:*24*
**commenced**  16:*6*
  37:*24*  39:*24*
**comment**  64:*24*
**communicate**  34:*7*, *15*
**communicated**  59:*25*
  76:*7*
**communication**  35:*25*
  60:*3*  76:*20*
**communications**  34:*9*
  60:*23*
**community**  18:*22*
  67:*5*  75:*14*
**company**  12:*4*
**compensate**  20:*19*
**compensates**  20:*12*
**complicated**  9:*14*
**complies**  22:*23*
**computer**  19:*6*
**concern**  42:*6*  47:*6*
  50:*6*
**concerned**  44:*22*
  49:*24*
**concerns**  15:*2*  44:*4*
  46:*10*
**concluded**  77:*20*
**conference**  14:*10*
**confirm**  76:*6*
**confused**  41:*10*
**connection**  9:*2*
**consent**  51:*11*  52:*20*,
  *24*  55:*19*, *22*, *25*  56:*2*,
  *7*, *14*, *22*
**consequential**  69:*10*
**consider**  66:*13*  74:*11*
**consideration**  50:*2*
**considering**  67:*18*
  68:*3*
**constituted**  71:*3*
**consummation**  64:*9*
  67:*11*
**Cont'd**  4:*1*  5:*1*

**contemplating**  55:*16*
**contends**  43:*22*  67:*10*
**context**  57:*23*
**contract**  17:*12*, *19*
  22:*24*  62:*23*
**contracts**  24:*14*, *16*,
  *19*, *21*
**contractual**  20:*6*
  26:*8*
**contribution**  71:*19*
**contributions**  19:*20*
**control**  51:*25*  52:*15*
  55:*7*, *10*  57:*5*  70:*8*
**controlled**  9:*6*  12:*11*,
  *19*
**conversation**  11:*25*
  36:*23*  43:*15*  69:*8*, *25*
  70:*21*  76:*10*
**conversations**  43:*8*
  51:*3*  53:*8*  72:*9*
  76:*11*
**conversion**  73:*25*
**convert**  73:*12*
**converted**  71:*22*
  72:*20*, *21*, *25*  73:*12*
  74:*2*
**convoluted**  39:*11*
**copies**  77:*14*
**copy**  60:*11*
**correct**  15:*18*, *20*, *21*
  16:*10*, *11*  17:*24*
  18:*12*  20:*3*  21:*13*, *16*
  22:*7*, *8*, *17*, *24*  24:*16*,
  *19*  30:*6*  33:*9*  37:*22*
  39:*21*  41:*17*, *18*, *20*
  43:*13*  54:*18*  59:*21*,
  *24*  62:*13*, *17*  71:*25*
  72:*1*  73:*18*  76:*9*, *24*
  80:*10*  81:*11*
**corrections**  78:*3*  80:*9*
**correctly**  62:*10*
**corresponding**  18:*19*
**counsel**  16:*22*  58:*5*
  81:*15*
**counterparty**  74:*5*
**couple**  29:*16*  37:*4*, *25*
**course**  34:*6*, *21*
**COURT**  1:*1*  8:*18*
  9:*25*  12:*15*  37:*4*
  38:*16*  60:*17*  63:*6*, *22*

64:*9*  65:*25*  67:*10*
  77:*13*
**Court-appointed**  62:*5*
**CRAWFORD**  4:*17*
**create**  31:*21*
**created**  31:*19*, *24*
  62:*1*
**cross-talk**  65:*24*
**Crown**  4:*3*  15:*7*
  16:*25*  17:*3*, *5*, *11*, *14*,
  *22*  18:*24*  19:*1*, *24*
  20:*7*, *9*  21:*1*, *2*, *10*, *16*,
  *18*  22:*5*, *14*, *23*  24:*7*
  25:*3*, *6*, *11*, *15*, *21*
  28:*21*  29:*17*, *25*  30:*3*,
  *10*  31:*8*, *10*  35:*23*
  36:*22*  50:*25*  54:*22*
  55:*2*, *3*, *23*, *24*  56:*1*,
  *23*  57:*5*
**CRR**  1:*22*  81:*21*
**cumbersome**  57:*19*
**current**  28:*5*
**Currently**  38:*3*
**CURRY**  4:*7*, *9*

**< D >**
**DAF**  30:*18*  59:*17*
**DALLAS**  1:*3*  4:*3*, *19*
  9:*3*  11:*4*, *8*, *11*  12:*13*
  13:*25*  14:*13*  15:*24*
  17:*19*  18:*9*
  14, *16*, *19*, *25*  23:*1*, *6*,
  *9*, *20*  24:*5*, *8*, *15*, *18*
  25:*7*, *11*, *15*, *22*  26:*3*,
  *7*, *15*, *18*, *23*  27:*11*, *24*
  30:*18*  32:*9*  33:*5*, *14*,
  *20*  34:*4*, *22*  35:*2*, *6*,
  *12*, *20*, *25*  36:*9*, *17*
  37:*9*, *13*, *17*  39:*20*
  40:*3*  42:*5*, *15*  43:*18*,
  *22*  44:*19*, *21*  46:*9*
  48:*12*, *21*  49:*4*, *10*, *23*
  51:*10*, *15*  52:*19*  53:*2*,
  *18*, *22*  54:*1*, *17*  55:*1*,
  *6*, *13*  56:*8*  57:*13*
  58:*8*  60:*5*, *10*  61:*1*
  63:*3*, *19*  67:*9*, *18*
  69:*11*  70:*24*  71:*15*,
  *24*  72:*7*, *23*  73:*16*, *21*

74:*10*, *20*, *21*, *24*  75:*2*,
  *3*, *5*, *7*  76:*14*
**D'AMBRA**  5:*14*
**data**  41:*9*
**DAVID**  4:*7*
**day**  8:*18*  13:*21*
**dcurry@okinadams.co
  m**  4:*8*
**deal**  66:*24*
**debate**  67:*2*
**Debtor**  1:*8*  64:*10*
  67:*12*
**decided**  16:*21*
**decision**  53:*9*, *12*
  74:*17*
**decision-making**
  62:*24*
**decisions**  26:*25*  36:*1*,
  *24*  39:*16*  42:*14*
  50:*24*  52:*10*
**Defendant**  4:*3*, *14*
**Delaware**  59:*23*
**delivered**  28:*1*
**DEMO**  3:*8*
**depends**  23:*24*
**DEPONENT**  78:*1*
**deposed**  9:*9*
**DEPOSITION**  1:*12*
  2:*9*  7:*1*  9:*2*  78:*3*
  80:*7*
**depositions**  8:*14*
**describe**  49:*13*
**described**  29:*1*  66:*21*
**describing**  29:*13*
**detail**  68:*5*
**details**  13:*1*
**determine**  72:*6*
**device**  19:*5*
**DIAZ**  5:*21*  14:*2*
  15:*13*  16:*20*
**difference**  69:*22*
**different**  31:*22*
  71:*23*  72:*21*  73:*5*
**Diplomate**  2:*14*  81:*5*
**DIRECT**  7:*23*  25:*14*,
  *22*  53:*19*, *21*  54:*4*, *5*
**direction**  2:*16*
**directly**  17:*22*  23:*21*
  25:*25*  35:*8*, *9*, *13*

48:24  49:7  54:1, 19
55:10  60:20
**director**  11:23
**directs**  10:18
**disapprove**  55:14
**discovery**  62:23
72:19
**discussion**  67:2
**disposition**  42:8
46:11
**distribute**  25:3
**distributions**  17:17,
18  25:6, 8  30:11
**DISTRICT**  1:2
**diverting**  62:3
**dividends**  17:16
**DIVISION**  1:3
**document**  57:20
58:12, 18
**documentation**  51:21
52:23
**DOCUMENTS**  7:7
30:25  31:2, 4  50:14,
20
**doing**  39:7  57:17, 19
61:20
**dollar**  22:13
**dollars**  22:14  28:5
41:14  42:1  49:19
53:13  67:4
**Dondero**  12:11  14:7,
16  15:16  16:4  19:22
**Dondero's**  74:5
**donor-advised**  18:20,
21
**dressing**  8:15
**due**  29:5
**Dugaboy**  4:14  71:16
74:4
**duly**  8:6
**duration**  20:8
**duties**  11:15  26:14,
17  27:10  32:8  33:19
34:6
**duty**  11:17  25:3, 6,
11, 22  35:19  36:9, 16
52:3, 5  70:3  73:8
74:10

**< E >**

**earlier**  29:1  43:23
62:15
**easier**  13:22
**economic**  15:6  24:4
28:8  35:23  36:2, 21
37:18  47:21  48:7
49:20  50:24  72:6
**elaborate**  48:15
**emails**  76:10
**EMANUEL**  3:22
**employed**  81:15
**employment**  71:3
**Empower**  11:25
14:24  16:12  17:10,
13, 22  18:9, 17  24:2,
8  25:9, 17  26:21, 22
28:12, 15  30:17
37:19  39:13  40:9
41:13, 23  42:2, 23
43:18  44:19  47:14,
23  49:21  55:18  56:2
69:10  75:2
**enabled**  70:25
**engaged**  43:23  65:6
**enraptured**  75:18
**ensure**  11:17
**enter**  50:15  53:5
68:24
**entered**  42:16, 24
50:9
**entering**  51:11, 16
52:20  55:16  56:15,
23  61:7, 15  64:15
66:6
**entire**  34:3
**entities**  9:5  12:18
13:2, 19  16:19  27:18,
19  31:14, 16, 19  33:2,
11, 16  35:4, 14, 19
36:16  45:23  46:21,
24  47:7, 17  50:2, 10,
11, 14, 17  51:18  52:4,
19  53:5, 20, 24  54:16
55:8, 11  56:9, 17, 25
57:6  59:23  61:8, 15
62:1  64:20  68:25
69:17
**entity**  12:7, 10  23:17
54:25  55:15  59:15

**entry**  65:7
**Errata**  78:5
**ESQ**  3:6, 8, 10, 12, 20
4:5, 7, 15  5:4, 6
**established**  62:19
**event**  20:23
**evidence**  68:11
**exact**  22:21
**EXAMINATION**  6:5
8:10
**examined**  8:8
**example**  22:10
**exchange**  21:10
**excuse**  72:15
**execution**  68:17
69:15
**exercise**  72:4, 16
74:4
**exercised**  71:25  72:7
73:17, 21  75:6
**exercising**  72:24
74:11
**Exhibit**  6:13  58:4
**EXHIBITS**  6:11
**expect**  51:4  70:7
**expectation**  52:14, 18
**expense**  20:12, 17
**expenses**  20:14
**expert**  62:12
**expired**  71:21
**explain**  54:12
**explained**  20:18
**exposure**  14:15
**extend**  52:5
**extent**  63:9  67:22

**< F >**

**fact-finding**  38:8
**facts**  28:3  38:5, 6
40:5, 8  41:10  43:1,
10  44:10  45:22
48:11, 20  49:2  58:15
62:19  63:25  64:22
65:5, 16  66:5, 11, 15,
16, 19  67:7
**fail**  9:21
**fair**  20:25  23:5
28:12, 14, 16, 22, 24
29:4, 8, 9, 14  30:11,
12  34:19, 20  42:5

43:24  44:2, 25  45:1
46:7, 12, 14  49:23
50:1  51:12, 13, 18
54:6, 24  57:24  61:2,
3  63:15, 18  65:17
66:21  70:4  73:10, 20,
23  77:1
**faith**  44:17
**familiar**  12:4  13:2
23:17  28:14  30:13,
16, 18, 20, 22  58:11
**Family**  12:1  16:13
17:10, 13, 23  18:9, 17
74:5
**fan**  19:7, 9
**February**  29:4  55:22
**fee**  20:16
**feed**  54:20
**feedback**  19:8
**feeds**  54:22
**feel**  63:25  72:3
**felt**  16:19
**fiduciary**  11:18, 20
24:22  35:24  36:9, 16,
23  50:21  51:23  52:2,
25  62:5  68:13  69:14,
24  74:10
**file**  14:21  16:14, 21
37:5  39:21
**filed**  12:7, 14, 22
16:25  23:3, 6  37:3
38:19  39:2, 25  58:9
69:20
**filing**  13:24  14:17
37:10, 14  38:9  39:3,
12
**finance**  76:15, 18
**financial**  11:21  25:1
26:23  54:10  81:17
**financially**  24:23
**finish**  9:16, 20  63:17
**firm**  8:24
**first**  8:6  9:11  15:1,
11  75:21
**five-minute**  75:24
**fixed**  17:19, 21  20:2,
7, 10, 22  21:11  22:16
**Floor**  3:15, 23
**flow**  18:14, 15, 18

26:21  30:11  31:5
**flows**  29:14  30:23
**fluctuations**  54:12
**focus**  56:4  68:16
**focused**  48:2
**Focusing**  68:19, 21
**following**  79:3, 4
**follows**  8:8
**foregoing**  80:7  81:9,
10
**form**  15:22  16:16
23:13, 23  25:13, 24
26:16  27:12  28:2
35:21  36:18  38:12
39:8  41:21  42:11
43:6, 14, 25  45:2
47:9, 20  48:8, 14, 23
49:6  50:4, 18  51:19
52:6  53:6, 25  54:7
55:9  56:10, 18  57:1,
7  60:19  61:9  63:7,
23  64:16  65:9, 18
66:8  69:1, 18  70:5
71:4  73:1  74:6, 13
75:8
**formal**  9:13  10:14
**formed**  23:11
**forth**  27:20
**Foundation**  4:3  11:5,
9, 11, 22  12:1, 14
13:25  14:24  16:10,
13, 15, 18, 20, 21  17:8,
10, 14, 23  18:14, 16,
19, 25  23:2, 6, 10, 16,
20  24:3, 5, 15, 18
25:7, 12, 15, 22  26:3,
7, 15, 18  27:11, 24
32:9  33:5, 14, 20
34:4, 22  35:3, 6, 12,
20, 25  36:9, 17  37:18,
19  39:14  40:9  43:18,
22  44:22  46:10
48:13, 21  49:4, 24
51:15  53:2, 18, 22
54:1  55:1, 6, 13  56:8
59:17  60:5, 10  63:3,
20  67:9, 18  71:14, 15,
24  72:7, 24  73:16, 17,
21  74:10, 20, 21, 24,
25  75:3, 5, 7

**foundations**  15:13
18:17  65:3
**Foundation's**  9:3
14:13  15:24  18:10
26:23  37:9, 13  39:20
40:4  42:6  49:10
51:11  52:20  54:17
57:13  58:9  61:2
70:24  73:9  76:15
**full**  57:24
**Fund**  15:4, 5  17:19
18:4, 5, 20  21:17, 19
22:4  24:15, 17  28:21
30:23  49:17  54:20,
21  55:17
**funded**  19:17, 19
**funding**  16:5, 8
**funds**  18:21  26:20
30:25  31:1
**fund's**  62:1
**Further**  61:22  77:3
**future**  21:12  28:25
30:11  40:17  49:20
77:1

**< G >**
**Gail**  1:21  2:13  9:25
77:11, 17  81:5, 21
gdemo@pszjlaw.com
3:9
**generally**  40:10, 13
**gentleman**  12:11
**getting**  21:2  41:10
**give**  10:13  12:25
31:6  40:11  48:12, 20
49:3  57:24  58:16
62:24
**given**  45:22, 24
63:25  71:19
**gives**  10:14, 16
**glance**  31:3
**Global**  4:3  15:7
16:25  17:3, 5, 11, 14,
22  18:24  19:1, 24
20:7, 9  21:2, 10, 16,
18  22:5, 14, 23  24:7
25:3, 6, 11, 15, 21
28:21  29:17, 25  30:3,
10  31:8, 10  35:23
36:22  50:25  54:22

55:2, 3, 23, 24  56:1,
23  57:5
**go**  17:21  25:20  27:7,
14  38:23  41:3  58:2
63:10  68:10  70:11
**goal**  10:4
**going**  8:18  9:14
10:3, 19  13:21  25:25
27:3  35:22  36:2
39:13  52:12  57:11,
12  59:9  60:17  61:20
66:16  67:4, 15, 21
73:11  76:25
**Good**  8:23  21:4, 5
44:17
**good-faith**  43:4, 12
44:6  45:21  46:8
69:8
**governing**  30:24
31:2, 4  50:14, 20
**granting**  47:16  48:5
**grant-making**  75:12
**grants**  18:21
**GREGORY**  3:8
**grow**  24:24
**guaranteed**  22:21
**guy**  34:23

**< H >**
**half**  32:20
**HALL**  5:18
**HALLMAN**  5:8
**happen**  18:16
**happened**  53:14, 15
54:13  73:4
**hard**  34:11
**harm**  46:16
**HART**  5:8
**hat**  34:18
**hats**  34:19
**HAYLEY**  3:12
**head**  34:24  35:3
**hear**  8:21, 22  65:15
**heard**  36:5  38:22
39:24
**held**  2:9  15:7  30:9
33:6, 10
**helped**  14:4
**Hey**  38:20
**high**  31:3  34:14

**HIGHLAND**  1:6  3:4,
19  6:13  8:25  9:1, 4
12:5, 17  23:2, 7, 11,
18, 22  26:4, 8, 9, 13,
14, 24  27:9, 18  30:14,
15  31:10  36:7, 8
37:6, 24  38:16  41:17,
24  42:15, 24  45:6, 11,
16  46:25  48:13, 22
49:5  50:10  58:4
64:14, 19, 20  65:5
66:5, 20, 22  67:19, 20
71:15  74:21, 24  75:3,
5
**Highland's**  12:15
60:6
**high-level**  40:5  58:15
**historical**  28:9
**HMIT**  13:9, 13, 17,
19  18:6  27:18, 19
28:1, 4  30:20, 25
31:16, 18  32:2, 6, 10
33:2, 6, 11, 15  34:8,
10, 18, 24  35:4, 7, 14,
19  36:11, 16  37:3, 9,
12, 24  38:11  40:10
46:21, 24  47:7, 17
48:5  50:2, 11, 14, 17
51:18  52:4, 19  53:4,
19, 23  54:16, 23  55:7,
10, 15  56:9, 16, 25
57:6  59:22  61:8, 15
68:25  69:16
**hold**  17:11  21:22, 24
22:2, 3  30:1, 2
**Holdco**  30:18  59:18
**holdings**  32:14
**holds**  22:4
**honest**  72:18
**Hospitality**  71:18
**Houston**  4:11
**Hunter**  5:3  13:5, 8,
9  15:3  18:6  23:25
29:6, 12  31:14  40:17,
20  41:25  42:8  45:19
46:11  49:18, 21
**HURT**  5:6
hwinograd@pszjlaw.c
om  3:13

< I >
**idea** 14:*17, 18, 21*
*15:10* 31:6
**identify** 32:*2, 5*
**IDF** 18:*4* 21:*17*
22:*3* 30:23 49:*17*
54:*20, 21* 55:*17*
**imagine** 31:*23* 35:*11*
52:*23*
**impact** 11:*22* 28:*11*
29:*2, 7* 35:*23* 36:*2,
20, 25* 37:*18* 38:6
39:*10, 13* 40:*9* 41:*14,
22* 43:*17* 44:*17, 18*
47:*13, 18* 48:*7* 50:*24*
52:*13* 64:*1* 65:*2*
69:*10* 72:*6*
**impacted** 15:*6* 45:*24*
53:*9* 64:*23* 67:*3*
**impactful** 75:*11*
**impacts** 24:*3* 44:*12*
47:*12*
**implicated** 63:*9*
**important** 9:*15, 19*
40:*8*
**including** 61:*25*
**income** 18:*10, 13, 15,
24, 25* 21:*11* 22:*16*
28:*25* 47:*13, 23*
**increased** 29:*5*
**independent** 62:*5*
**INDEX** 7:*1*
**indicate** 78:*3*
**indirect** 25:*17* 26:*24*
53:*23* 54:6, *14, 23*
75:*4*
**indirectly** 23:*21*
24:*1, 5* 44:*24*
**Indiscernible** 65:*24*
**individual** 42:*17, 21,
25* 44:*8, 11, 16* 46:*15*
64:*18, 22* 66:*10, 24*
**individuals** 42:*13*
74:*15*
**infirmity** 10:*16*
**inform** 36:*24* 50:*23*
52:*5* 69:*25* 70:*4*
**information** 33:*21*
34:*1* 63:*11* 70:*14, 17,*

*25* 71:*1, 7* 73:*3*
74:*15, 16*
**informed** 33:*6, 14*
52:*11* 60:*5, 25* 73:*14*
**informing** 37:*17*
**Inghram** 1:*21* 2:*13*
81:*5, 21*
**inquired** 33:*22*
**inquiry** 32:*9, 11*
**insertion** 61:*25*
**insight** 31:*25*
**instruct** 67:*21*
**INSTRUCTION** 7:*2*
**INSTRUCTIONS**
78:*1*
**Insurance** 4:*4* 17:*1,
4, 5, 6, 12* 20:*20*
28:*17, 18, 20* 29:*18,
23*
**interest** 23:*10, 21*
24:*2, 4, 6, 11, 13*
25:*18* 26:*4, 19, 24*
28:*4, 10* 29:*6, 11, 25*
35:*23* 36:*3, 21* 39:*16*
41:*24* 47:*22* 49:*18*
50:*24* 53:*13, 19, 23*
54:*4, 5, 6, 8, 14, 23*
81:*17*
**interested** 51:*23*
53:*7* 70:*1*
**interests** 15:*4* 21:*18*
37:*19*
**internal** 72:*10*
**introduced** 58:*5*
**inured** 75:*6*
**invest** 19:*24*
**invested** 18:*1*
**Investment** 4:*14* 5:*3*
13:*6, 9* 14:*25* 33:*24*
36:*1, 24* 45:*20* 50:*23*
51:*2, 25* 52:*14* 55:*4*
70:*8* 71:*17, 23* 72:*10*
**investments** 11:*20*
18:*3* 22:*6* 29:*17, 22*
31:*23* 52:*11*
**involved** 70:*20*
**Islands** 16:*1* 59:*19*
62:*13*
**issuer** 17:*6*

**its** 22:*23* 26:*4* 49:*18*
50:*1* 81:*17*

< J >
**JAMES** 5:*19*
**January** 11:*13*
**JEFFREY** 3:*10*
**Jim** 12:*11* 14:*7*
**jmorris@pszjlaw.com**
3:*7*
**JOHN** 3:*6* 8:*24*
38:*13* 65:*19*
**joint** 59:*10, 16* 60:*1,
6, 12, 15, 24* 61:6, *14,
19* 76:*7, 17*
**JONES** 3:*14* 5:*18*
**jpomerantz@pszjlaw.c
om** 3:*11*
**JULIE** 5:*21* 14:*2*
15:*13* 16:*20*
**June** 1:*14* 2:*10*
**jurisdiction** 62:*9*

< K >
**KELLY** 5:*8*
**key** 50:*6*
**kind** 12:*25* 14:*4*
15:*14* 31:*6, 25* 34:*11*
38:*1, 2, 5, 7* 40:*7, 8*
52:*12*
**know** 9:*22* 10:*10, 25*
13:*24* 14:*6, 12, 16, 17*
16:*12* 17:*25* 18:*2, 3*
19:*17* 23:*1, 6, 9*
25:*21* 26:*7* 29:*3*
30:*22* 31:*18, 19, 21,
23* 33:*10, 21* 34:*11*
35:*6, 12, 16* 36:*12*
37:*15* 38:*9, 19* 39:*15*
40:*10, 13, 25* 41:*1*
42:*1, 14, 24* 46:*15*
48:*20* 50:*19, 20* 51:*1,
20* 52:*8, 12, 24* 53:*15*
55:*6, 13* 57:*23* 59:*3,
15* 60:*4, 9* 64:*17*
67:*1, 3, 7, 9* 69:*22*
70:*7, 16, 23, 24* 71:*7*
73:*25* 74:*1, 14, 16*
75:*16*
**knowing** 64:*22* 66:*24*

**knowledge** 18:*11*
22:*2* 31:*9* 60:*16*

< L >
**L.P** 1:*7*
**LANG** 4:*15, 17*
77:*14*
**language** 37:*16*
**large** 40:*25*
**late** 21:*2*
**law** 8:*24* 62:*13*
**lawsuit** 37:*5, 14, 23*
39:*4, 24*
**lawyer** 10:*12, 14*
12:*2* 62:*16*
**lay** 23:*15*
**lead** 65:*5*
**lean** 38:*7*
**leaned** 40:*7*
**learn** 37:*23*
**leave** 64:*3* 65:*13*
**led** 60:*24*
**left** 75:*16, 23*
**legal** 10:*14, 16* 11:*21*
12:*24* 14:*4* 16:*22*
17:*12* 38:*4, 7* 40:*7*
52:*22* 53:*2* 61:*17*
62:*25*
**legally** 52:*23* 53:*1*
**level** 31:*3* 34:*14*
**liability** 40:*14* 46:*25*
**Life** 4:*4* 16:*25* 17:*3,
5*
**likelihood** 63:*2*
**Limited** 17:*1, 4, 6*
**LINE** 7:*3, 8, 13, 17*
59:*8* 79:*5*
**liquidation** 62:*8*
**liquidators** 59:*11, 16*
60:*1, 6, 12, 16, 25*
61:*7, 14, 19* 76:*8, 17*
**liquidity** 75:*13*
**listen** 27:*4*
**lists** 55:*4*
**Litigation** 3:*19*
15:*25* 16:*5, 9* 45:*16*
**little** 13:*22* 15:*9*
23:*15* 48:*15* 57:*18*
72:*19*

**LITTLETON** 1:*13*
2:*9* 6:*6* 8:*5*, *17* 58:*8*,
*19* 63:*9* 66:*4* 76:*4*
77:*7* 80:*12*
**LLP** 3:*22* 4:*9* 5:*8*
**LOIGMAN** 3:*20*
**long** 11:*1*, *10* 22:*22*
33:*1*
**longer** 49:*22*
**look** 55:*3*
**looked** 16:*17*
**looking** 14:*25* 19:*14*
59:*8*
**loss** 47:*22*
**lost** 47:*13* 72:*24*
75:*17*
**lot** 34:*19* 67:*5*
**LOUIS** 5:*4*
**Louisiana** 5:*10*
**LP** 8:*25* 12:*5* 15:*5*
18:*4* 22:*3* 45:*6* 55:*4*
**lphillips@kellyhart.co**
**m** 5:*5*

**< M >**
**M&E** 20:*11*, *14*, *17*
**Madden** 72:*14*, *15*
**Madison** 3:*23*
**Main** 5:*9* 11:*17*
**making** 39:*17* 42:*13*
66:*24*
**MANAGEMENT** 1:*6*
3:*4* 8:*25* 12:*5* 26:*9*,
*13* 27:*9* 36:*8* 37:*6*
41:*25* 45:*6* 48:*22*
52:*9* 67:*19* 72:*15*
**Mark** 9:*6* 33:*1*
34:*10* 39:*2* 45:*25*
50:*8* 53:*3* 55:*21*
74:*9*
**MARKED** 6:*11* 7:*16*
58:*4*
**market** 20:*4* 28:*12*,
*14*, *16*, *23*, *24* 29:*4*, *8*,
*9*, *14* 54:*12*
**MARKS** 7:*22* 78:*6*
**material** 70:*14*, *16*
**Matt** 38:*20* 65:*20*
67:*25* 75:*16* 77:*9*

**matter** 30:*8*
**matters** 30:*10*
**MATTTHEW** 4:*5*
**mean** 38:*13*
**means** 11:*19*
**meet** 8:*19*
**member** 15:*16*
**met** 14:*6*, *8*
**MICHAEL** 4:*15*
**million** 19:*20*, *21*, *23*
28:*4* 41:*1*, *5*, *14*, *25*
42:*2* 49:*19* 52:*8*
53:*13* 71:*17* 72:*24*
73:*19*, *22* 74:*12*
75:*12*
**mine** 62:*21*
**minutes** 75:*19*, *23*
**missed** 20:*13*
**mlang@cwl.law.com**
4:*16*
**MNPI** 71:*3*
**mokin@okinadams.co**
**m** 4:*6*
**moment** 57:*15*
**money** 21:*1*, *9* 22:*22*
**MORRIS** 3:*6* 6:*7*
8:*11*, *24* 15:*23* 16:*23*
21:*6* 23:*14* 24:*10*
25:*19* 26:*1* 27:*2*, *16*
28:*13* 36:*4* 37:*2*
38:*14*, *20*, *24* 39:*18*
42:*4*, *19* 43:*9*, *19*
44:*3* 45:*3* 47:*10*
48:*1*, *10*, *17* 49:*1*, *8*
50:*7* 51:*6* 52:*1*, *16*
53:*17* 54:*3*, *15* 55:*12*
56:*12*, *20* 57:*3*, *9*
58:*2*, *6*, *25* 59:*4*, *7*
60:*21* 61:*12* 63:*13*,
*14* 64:*4*, *6* 65:*1*, *11*,
*20* 66:*3*, *17*, *18* 67:*24*
68:*6*, *9* 69:*6*, *21* 70:*2*,
*10* 71:*6* 72:*18* 73:*6*
74:*8*, *18* 75:*15*, *20*
76:*3* 77:*3*, *7*, *14*
**motion** 37:*4*, *10*
38:*10*, *13*, *15* 39:*12*,
*21*, *25* 60:*7*
**Mountain** 5:*3* 13:*6*,
*8*, *9* 15:*3* 18:*6* 24:*1*

29:*6*, *12* 31:*14* 40:*18*,
*20* 41:*25* 42:*8* 45:*20*
46:*11* 49:*18*, *21*
**move** 27:*3* 57:*11*
**moved** 66:*23*
**moving** 44:*8* 64:*18*
66:*10*, *20*
**multiple** 33:*23*

**< N >**
**name** 8:*23* 16:*14*
**named** 12:*11*
**NATHAN** 5:*18*
**NECESSARILY** 7:*22*
34:*17*
**need** 10:*24* 34:*23*
35:*3* 57:*21* 58:*21*
73:*3* 77:*11*
**needed** 33:*20* 52:*19*
**negatively** 36:*3* 53:*9*
64:*23*
**negotiate** 68:*24*
**negotiating** 46:*15*
**negotiation** 43:*4*
65:*7* 68:*17* 69:*15*
**negotiations** 43:*13*
44:*6*, *15* 46:*9*
**neither** 81:*15*
**never** 14:*8* 23:*6*
33:*25* 34:*25* 39:*19*
71:*24* 76:*7*
**New** 3:*16*, *24*
**newly** 62:*1*
**news** 38:*2*
**NexPoint** 71:*18*
**nice** 8:*19*
**nonpublic** 70:*14*, *16*
**normal** 51:*3*
**NORTHERN** 1:*2*
**Notary** 81:*8*
**notations** 78:*6*
**NOTE** 7:*21*
**notes** 19:*13* 55:*20*,
*21*, *23*
**notice** 77:*10*
**notified** 74:*2*
**November** 19:*19*
**NUMBER** 6:*12* 12:*8*

**< O >**

**object** 10:*13* 15:*22*
16:*16* 23:*13*, *23*
25:*13*, *24* 26:*16* 28:*2*
35:*21* 36:*18* 38:*12*
39:*8* 41:*21* 42:*11*
43:*6*, *14*, *25* 45:*2*
47:*9*, *20* 48:*8*, *14*, *23*
49:*6* 50:*4*, *18* 51:*19*
52:*6* 53:*6*, *25* 54:*7*
55:*9* 56:*10*, *18* 57:*1*,
*7* 60:*19* 61:*9* 63:*7*,
*23* 64:*16* 65:*9*, *18*
66:*8* 69:*1*, *18* 70:*5*
71:*4* 73:*1* 74:*6*, *13*
75:*8*
**objecting** 15:*10*
**objection** 9:*3* 12:*14*,
*16*, *21* 13:*25* 14:*5*, *14*,
*18*, *22* 15:*24* 16:*14*,
*24* 23:*3* 27:*12* 40:*4*
49:*10*, *15* 57:*13* 58:*9*,
*15* 60:*11* 61:*2*
**objections** 12:*23*
**obligation** 20:*7*, *11*
22:*15* 35:*20*, *24*
36:*23* 50:*21* 51:*23*
52:*25* 69:*25*
**obligations** 22:*23*
26:*15*, *18* 27:*10*
68:*13* 69:*14*
**obtain** 51:*10* 52:*19*
56:*7*, *14*, *22* 61:*5*
**obtained** 39:*20* 71:*2*
**occasions** 33:*23*
**officer** 81:*8*
**official** 59:*10*, *16*
60:*1*, *6*, *12*, *15*, *25*
61:*6*, *14*, *18* 76:*7*, *17*
**officially** 60:*2*
**Oh** 41:*7* 42:*21*
**Okada** 12:*1* 14:*24*
16:*13* 17:*10*, *13*, *23*
18:*9*, *17* 19:*23* 24:*2*,
*8* 25:*9*, *16* 26:*21*, *22*
28:*12*, *15* 37:*19*
39:*13* 40:*9* 41:*13*, *23*
42:*2*, *23* 43:*17* 44:*18*
47:*14*, *23* 49:*22*
55:*18* 56:*2* 69:*10*
75:*2*

**okay**  8:*21, 23*  9:*12,
*17*  10:*8, 20, 21*  11:*2*
12:*13*  13:*21*  14:*12*
17:*3*  19:*11, 16*  20:*25*
21:*14*  22:*19*  23:*1, 20*
26:*2*  33:*4, 18*  34:*6*
35:*1*  37:*3*  39:*19*
40:*2*  41:*11*  44:*4*
45:*4, 9*  48:*11*  49:*2*
50:*8*  51:*7, 9*  58:*2*
59:*1*  60:*22*  61:*4*
62:*12*  64:*4, 7*  67:*25*
68:*8, 16*  69:*12*  70:*3,
*11*  75:*15*  77:*13*
**OKIN**  4:*5, 9*  15:*22*
16:*16*  21:*4*  23:*13, 23*
25:*13, 24*  26:*16*
27:*12, 14*  28:*2*  35:*21*
36:*18*  38:*12, 18, 22*
39:*8*  41:*21*  42:*11*
43:*6, 14, 25*  45:*2*
47:*9, 20*  48:*8, 14, 23*
49:*6*  50:*4, 18*  51:*19*
52:*6*  53:*6, 25*  54:*7*
55:*9*  56:*10, 18*  57:*1,
*7*  58:*19*  59:*2, 6*
60:*19*  61:*9*  63:*7, 23*
64:*16*  65:*9, 18, 21*
66:*8*  67:*21*  68:*1, 8*
69:*1, 18, 23*  70:*5*
71:*4*  73:*1*  74:*6, 13*
75:*8, 17*  77:*6, 14, 17*
**once**  34:*22*
**opine**  43:*8, 16*  44:*16*
45:*8, 9, 14, 18*  61:*18*
**opined**  55:*24*
**opinion**  62:*25*  63:*24*
66:*14*
**opportunity**  10:*17*
55:*19*  56:*3*  57:*24*
**option**  71:*11, 14, 16,
*20, 21, 25*  72:*4, 8, 12,
*25*  74:*4*
**order**  55:*23*  58:*22*
62:*19*
**org**  75:*3*
**organization**  11:*14*
16:*18*  30:*8*  32:*21, 25*
69:*19*  74:*22*  75:*11*
**organizational**  31:*5*

**organizations**  11:*24*
16:*6*  20:*2, 5*  21:*1, 9*
22:*15, 21*  24:*9, 25*
25:*9*  28:*6*  29:*15, 24*
30:*2*  44:*13*  45:*23*
46:*16*  47:*19*  48:*7*
50:*22*  53:*10*  56:*15*
59:*23*  63:*2*  64:*2*
69:*11*
**orgs**  39:*15*
**originally**  26:*20*
**originated**  14:*18*
**outcome**  81:*17*
**outlined**  67:*8*
**outside**  68:*12, 23*
69:*14*
**overall**  38:*6*  54:*9*
**overseeing**  12:*15*
**oversight**  11:*18, 20*
34:*13*  75:*4*
**owes**  25:*11*  26:*14*
27:*10*  35:*19*  36:*9, 16*
**owned**  21:*15*  32:*6,
*10*  33:*16*  74:*19*
**ownership**  21:*20*
24:*6*  29:*25*  34:*13*
53:*19, 21, 23*  54:*5, 6*
**owns**  31:*6*  32:*3*

**< P >**

**p.m**  1:*15*  2:*11*  76:*1,
*2*  77:*19*
**PACHULSKI**  3:*14*
5:*18*
**Pacific**  4:*18*
**PAGE**  6:*5, 12*  7:*3, 8,
*13, 17*  79:*5*
**paid**  21:*1, 9*  49:*21*
**paragraph**  58:*3*
61:*22*  64:*5, 8*  68:*10*
70:*11, 13*
**part**  11:*25*  12:*24*
20:*14*  23:*11*  33:*19*
40:*15*  43:*8, 15*  44:*1*
46:*13*  47:*3*  50:*5*
54:*21*
**participate**  76:*12, 16*
**particular**  20:*23*
21:*19*

**parties**  3:*2*  38:*17*
43:*5*  46:*25*  48:*5*
51:*23*  59:*11*  64:*14*
66:*6*  70:*1*  81:*16*
**partnership**  21:*18*
**party**  13:*13, 18*  53:*7*
**patience**  77:*8*
**Patrick**  9:*6*  12:*19*
13:*3*  33:*1*  34:*10*
39:*2*  43:*23*  45:*25*
50:*9, 15, 22*  51:*10, 16*
52:*3*  53:*3*  55:*21*
56:*7, 14, 22*  61:*5*
64:*18*  65:*4*  68:*11, 22*
69:*13*  71:*2*  74:*9*
**Patrick's**  44:*21*  61:*24*
**PAUL**  5:*14*
**pay**  17:*16*  20:*1, 7, 10*
22:*15*
**payments**  17:*19, 21*
49:*20*
**payout**  28:*8*  42:*2*
**payouts**  40:*17*  53:*16*
**PE**  15:*4*  49:*17*
**peace**  64:*10*  67:*12*
**pending**  11:*2*  15:*25*
**percentage**  20:*19*
**period**  20:*22*  21:*12*
**permission**  37:*5*
38:*15*
**person**  34:*15*  51:*3,
*25*  52:*15, 22*  61:*17*
**personally**  14:*8*
69:*19*
**persons**  70:*9*
**pertaining**  12:*16*
**pertinent**  13:*1*
**PHILLIPS**  5:*4*  77:*5,
*15*
**piece**  20:*13*
**place**  44:*24*  66:*12*
**plan**  23:*12*
**planned**  60:*3*
**platform**  29:*20, 21*
**play**  17:*7*  43:*1*
44:*14*
**played**  31:*10*
**plays**  17:*9*
**please**  58:*3*  64:*5*

70:*12*
**PLLC**  4:*17*
**point**  58:*23*
**policies**  17:*11*  30:*5,
*6*  36:*22*
**policy**  24:*7*  30:*1, 2, 4*
**POMERANTZ**  3:*10*
**portfolio**  15:*6*
**portfolios**  52:*13*
**portion**  15:*2*  18:*13*
58:*8*
**positive**  36:*3*
**possibility**  50:*1*  59:*6*
**potential**  55:*15*  67:*17*
**potentially**  39:*10*
41:*15*  47:*13*
**preparation**  14:*13*
**present**  2:*16*  5:*17*
54:*10*
**preserve**  24:*23*
**President**  14:*1*  16:*20*
**prevent**  51:*16*  61:*15*
**PREVIOUSLY**  6:*11*
58:*4*
**primarily**  15:*13*
**prior**  58:*21*
**privilege**  68:*4*
**privileged**  63:*10*
**privy**  74:*15*
**probably**  34:*14*
36:*12*
**problematic**  42:*18, 20*
**proceeding**  13:*15*
**proceedings**  2:*12*
77:*20*  81:*9, 11, 12*
**process**  9:*13, 14*
10:*23*  57:*19*
**produce**  28:*21*
**produced**  21:*11*
**product**  43:*3, 12*
44:*5*  46:*8*
**PRODUCTION**  7:*7*
**projected**  28:*25*
**proper**  11:*18*
**proposed**  9:*4*  12:*16*
45:*5, 10, 15*  46:*20*
47:*16*  48:*6*  49:*10*
56:*23*  61:*1*  64:*15*
65:*7*

proposing 40:*11*
propounded 80:*8*
protect 24:*23*
provide 56:*3*
provided 60:*10*  71:*2*
providing 47:*8*
Public 81:*8*
pull 40:*8*
pulling 38:*4*
purpose 31:*19*  62:*2*
pursued 40:*21*
pushed 75:*13*
put 14:*5*  57:*12, 22*
58:*7*  71:*10, 14, 16, 20*
72:*4, 8, 12, 17, 25*
73:*11, 17, 21*  74:*4, 11,*
*19*  75:*6*
putting 59:*5*

< Q >
quarter 15:*1*
quarterly 20:*15*
28:*22*
question 9:*16, 21*
10:*8, 16, 20*  11:*1*
21:*7*  27:*5*  61:*21*
63:*13, 17*  65:*10*  69:*2*
questionable 42:*14*
67:*1*
QUESTIONS 7:*16*
9:*15*  10:*13*  34:*16*
57:*25*  58:*23*  75:*18*
76:*14*  77:*4, 5*  80:*8*
quicker 13:*22*
QUINN 3:*22*
QUOTATION 7:*22*
quotations 66:*13*
QUOTE 7:*23*  59:*9*

< R >
Rand 15:*4*  18:*5*
29:*11, 12*  30:*17, 25*
31:*13*  49:*16*
Rand's 29:*6*
range 73:*19*
RAVER 5:*20*
RDR 1:*22*  81:*21*
reach 56:*1*

read 12:*23*  40:*2*
59:*9*  62:*10*  77:*18*
80:*6*
reading 19:*14*  78:*2*
really 53:*11*  61:*18*
Realtime 2:*14*  81:*6*
reason 10:*24*  25:*10,*
*23*  26:*12*  27:*8, 23*
35:*18*  43:*2*  45:*4, 7, 9,*
*14, 18*  46:*19*  47:*15*
48:*4*  50:*13*  51:*14*
53:*1*  56:*6, 13, 21*
57:*4, 10*  60:*14*  61:*4*
64:*13*  69:*13*  72:*4*
74:*7*  79:*7, 9, 11, 13,*
*15, 17, 19, 21, 23*
reasonable 46:*7*
reasons 74:*3*  78:*4*
79:*4*
recall 14:*11*  41:*2*
57:*21*
receive 20:*15*  22:*21*
27:*20, 24*  28:*7*  40:*11,*
*20*  42:*9*  44:*23*  50:*3*
received 35:*7, 13*
63:*11*  73:*25*
receives 46:*12*
Recess 76:*1*
recollection 57:*22*
recommendation
16:*22*  56:*3*  72:*11*
recommendations
18:*18*
record 81:*11*
recorded 2:*12*
recovered 73:*22*
reduced 81:*13*
refer 13:*8, 17*
REFERENCED 6:*11*
referred 31:*15*  70:*17*
referring 30:*4*
refers 15:*25*  70:*13*
71:*10*
REFLECT 7:*23*
refresh 57:*22*
regardless 22:*19*
50:*20*
Registered 2:*13*  81:*5*
reiterated 38:*5*

related 29:*2*  40:*6*
41:*6*  81:*15*
relates 11:*24*  27:*1*
30:*17*  41:*13*
relationship 23:*25*
24:*8, 22*  25:*16, 17*
26:*8*  51:*24*  74:*23*
75:*1*
relax 9:*12*
release 40:*14*
releases 47:*7, 16*
48:*2, 5*
releasing 46:*25*
rely 12:*24*  74:*16*
remind 63:*8*
REMOTE 1:*12*  2:*8*
3:*2*
reorganization 23:*12*
repeat 58:*13, 17*
rephrase 10:*10, 17*
Reported 1:*20*
Reporter 2:*14, 15*
10:*1*  65:*25*  77:*13*
81:*2, 6, 8*
REPORTER'S 7:*21*
reporting 11:*21*
represent 39:*15*
representative 52:*4*
53:*4*
representing 44:*13*
represents 8:*25*
REQUEST 7:*7*
required 37:*12*
51:*10*  56:*7, 14, 22*
61:*5*
research 38:*3*
respect 17:*8*  22:*6, 10*
25:*12*  33:*2*  65:*6*
69:*14*
respectfully 27:*3*
respectively 17:*23*
responsibilities 11:*16*
33:*19*
responsibility 24:*22*
25:*14*  42:*23*
responsible 73:*9*
restate 21:*7*  36:*19*
44:*7*
restructuring 43:*23*
44:*10, 21, 24*  46:*1, 12*

result 43:*20, 21*
44:*20*  46:*12*
review 12:*21*  57:*21*
reviewed 30:*24*  31:*1*
Right 13:*7*  15:*17*
19:*3, 6*  21:*12*  27:*24*
29:*10*  30:*1*  31:*16*
32:*22*  33:*2, 8*  34:*1, 2*
37:*16, 21*  39:*17*
42:*23*  46:*6*  51:*15*
53:*3, 11*  54:*20*  55:*7,*
*14, 25*  57:*5*  58:*12*
59:*20*  61:*14*  62:*16*
65:*15*  73:*7, 9*  74:*20*
76:*12, 23*  77:*6*
rise 48:*12, 20*  49:*3*
risk 20:*4, 10, 12, 20*
22:*6, 9, 11*
ROBERT 3:*20*
robertloigman@quinn
emanuel.com 3:*21*
role 14:*12*  17:*7, 9*
31:*10*  33:*1*  66:*20*
roll 24:*25*  26:*22*
31:*7*  54:*9, 19*
rolled 15:*5*  35:*10*
rolls 18:*5, 7*  49:*17*
roll-up 24:*1*
room 19:*2*
Rouge 5:*10*
roughly 41:*14*
Royal 21:*2*
RSA 1:*22*  81:*21*

< S >
sale 15:*3*  29:*5, 11*
52:*11*
saw 29:*4*
says 64:*8*  68:*10*
scheduled 76:*25*
scope 47:*7*  68:*12, 23*
screen 57:*12*  58:*7*
60:*11*
scroll 64:*5*
scrutiny 62:*4*
see 53:*8*  58:*21*
59:*13*  64:*11*  68:*14*
70:*13, 15*  71:*12*
seek 37:*9, 13, 16*

seeking 37:5
seeks 64:10 67:12
seen 31:5 51:22
64:1, 2
SEERY 5:19
segregated 21:15, 20,
22, 24 22:1, 20
sell 55:21, 23
selling 53:12
sent 19:24
sentence 59:13 64:7
71:10
series 9:15
serve 11:23
served 31:20
set 27:20 63:5
76:10, 19
settle 44:11
settled 64:20
settlement 9:4 12:17
13:14 23:25 24:3
27:1, 17 28:1, 8, 11
40:2, 6, 12, 16, 20
41:20 42:7, 9, 16
43:3, 11, 21 44:5, 18
45:5, 10, 15, 19 46:6,
7, 20, 24 47:2, 4, 5, 17,
22 48:6 49:11, 25
50:3, 9, 16 51:12, 17
52:21 53:16 56:4, 16,
24 59:12 60:7, 16
61:1, 7, 16 63:5, 21
64:9, 15, 21 65:8
67:11 68:17, 21, 24
69:9, 16
settlements 26:20
28:7 45:22
settling 66:25
share 50:1 66:17
shares 71:18 72:16,
20 73:24 74:2
sharing 19:6
SHAWN 5:20
sheet 26:4 54:9, 18,
23 55:1 78:5
shifting 42:22
short 75:22 77:10
Shorthand 2:15 81:2,
7
sign 77:18 78:5

signed 13:3 31:15
56:8
significant 36:25
43:17 49:20 50:23
67:3
similar 75:1
sir 8:19, 21 9:10, 18,
23 11:5 12:3, 6, 9, 12,
20 16:7 17:2, 20
18:12 19:4, 15 20:3
22:25 23:4, 8 25:8
26:6, 11 27:6, 15
30:12 31:12 32:4, 19
33:3, 7, 12, 17 34:5
35:5, 15 37:7, 11
39:1, 5, 22 40:1, 13
45:13, 17, 21 46:6, 22
47:11, 12 48:9, 24
49:7 51:8 53:21
56:19 57:2, 14 58:1
59:14, 17, 21, 24 60:8,
13 61:3, 10 62:10, 11,
14 64:12 65:12, 13
67:15 68:15, 20
70:15, 18, 21 71:5, 9,
13 73:10 74:7 76:9
77:2
sit 60:15
situation 51:5
six 32:22
Skyview 71:3
sleep 59:5
smoothly 27:7
sold 22:17 28:4
41:24 49:16, 18
sole 18:8 24:6
solely 68:16, 21
somewhat 42:18
Sorry 19:11 21:3
28:18 36:5, 10, 11
59:4 65:25
sought 39:20
Sounds 21:4, 5
source 18:9 70:25
speak 34:23 35:3
61:10, 13
speculate 63:16, 19
speculation 63:25
speed 38:8

spoke 76:17
spoken 14:9
standpoint 44:12
46:18
STANG 3:14 5:18
start 8:12
starting 36:20
state 28:22 43:16
66:9 70:25
stated 65:14 69:4
statement 28:21
54:11 55:4
statements 20:15
25:1 26:23
STATES 1:1 61:23
Stenographically
1:20 2:13 81:13
stewardship 11:18
STIPULATIONS
7:12
stream 21:11 22:16
29:1
streams 47:23
Street 4:10 5:9
strike 27:4
structure 28:5, 9
29:18, 20 30:14, 16,
17, 19, 21, 23 32:12
35:11 62:2
structures 31:24
stuff 10:14
sub 29:3
subject 13:14 40:3
62:4, 6
Subtrust 45:16
succeed 62:20 63:3,
20
succeeding 63:4
successful 32:15
sue 38:16
suggest 43:11 66:20
Suite 4:10, 18 5:9
SULLIVAN 3:22
sum 40:25
summary 12:25
Sunday 1:14 2:10
8:14, 18
supervision 81:14
supplied 78:5
SUPPORT 7:1

supporting 11:24
16:6, 18 20:2, 5 21:1,
9 22:15, 20 24:9, 25
25:9 28:6 29:15, 24
30:2, 8 39:15 44:12
47:18 48:7 50:22
53:10 56:15 63:2
64:2 69:11 74:22
75:3, 10
supposed 26:21
Sure 13:23 15:12
48:3, 18 58:23
surprised 10:22
sworn 8:6
Systems 81:7

< T >
take 15:10 20:11, 16,
19 22:9, 11 57:15
75:22, 23
taken 44:24 66:12
76:1 81:9, 12
takes 20:9 22:5
talked 31:13 45:24
talking 38:15 66:1
team 12:24 14:4
38:4, 7 40:7 76:15,
18
tell 8:13 32:15
38:21 57:18
telling 74:10
tenure 33:13 34:4,
21 35:2
terms 42:6 49:24
66:15
testified 8:8
testify 8:6
testimony 9:24 78:4
80:7
TEXAS 1:2 4:11, 19
Thank 26:2 32:24
77:7, 9
Thanks 8:14
therefor 78:4
thing 29:3 42:12
things 44:14 46:2, 4,
5 51:20 66:25 69:4,
7
think 10:15 14:10
15:12 16:17 19:21

21:*19*  24:*4*  26:*19, 24*
29:*18*  33:*18*  34:*10*
36:*22*  37:*15, 17*  39:*6,
16*  40:*15*  41:*1, 22*
42:*17, 25*  44:*9, 14*
46:*13*  47:*21*  51:*20,
21*  52:*7*  53:*7, 10*
57:*21*  62:*15*  66:*11,
23*  67:*1*  68:*1, 2*  69:*3,
5, 24*  70:*6*  71:*17, 18*
73:*2, 8, 23*  74:*9, 14*
76:*4*
**thinking**  15:*14*  41:*8*
**Third**  3:*15*  59:*8*
**thoroughly**  73:*4*
**thought**  36:*10*
**three**  15:*19*  32:*17*
**tied**  20:*21, 22*
**time**  1:*15*  2:*12*  9:*11*
10:*12, 25*  14:*11*
20:*22*  21:*12*  22:*22*
33:*4, 13*  34:*3, 11*
35:*2*  46:*3, 6, 9*  52:*10*
58:*20*  59:*3*  60:*24*
66:*2*  69:*9*  72:*10, 14*
75:*15*  76:*20*  77:*8, 20*
**times**  69:*4*
**timing**  53:*14*
**today**  9:*2, 25*  11:*25*
13:*10*  26:*13*  32:*3*
33:*10*  35:*20*  38:*4*
39:*14*  60:*15*  72:*17*
**told**  37:*20*  38:*18, 22*
65:*22*  73:*15*
**TORREY**  1:*13*  2:*9*
6:*6*  8:*5*  80:*12*
**total**  32:*23*
**track**  75:*17*
**transaction**  55:*15*
**transactions**  53:*3*
**transcribed**  2:*15*
9:*25*
**transcript**  78:*6*  80:*7*
81:*10*
**transcripts**  77:*18*
**transfer**  34:*12*
**transferred**  73:*5*
**transpired**  15:*1*
**tribunal**  62:*8*
**tried**  34:*15*

**true**  34:*3*  46:*2, 4, 5*
47:*24*  51:*21*  69:*5, 7*
80:*10*  81:*11*
**Trust**  3:*5*  4:*14*  5:*3*
9:*1*  13:*6, 9*  23:*11, 18,
22*  26:*5, 10, 14, 25*
27:*10*  30:*14, 15*  36:*8*
45:*12, 20*  49:*5*  67:*20*
71:*17, 18*  74:*5*
**Trustee**  3:*19*  34:*12*
51:*2*
**trustees**  70:*9*
**truth**  8:*7*
**try**  10:*10, 25*  72:*5*
**trying**  40:*14*  52:*7*
**two**  16:*19*  28:*6*
44:*12, 14*  46:*2, 4, 5*
51:*20*  69:*4, 7*
**types**  31:*22*
**typewriting**  81:*14*
**typically**  18:*23*

< U >
**ultimately**  15:*5*  18:*5,
7, 20*  19:*23*  24:*24*
28:*11*  31:*7*  41:*23*
75:*9*
**uncertainty**  67:*5*
**underlying**  18:*2*
21:*20*  32:*13, 16*
**understand**  9:*7, 24*
10:*6, 9*  29:*21*  34:*12*
43:*1*  44:*9*  49:*9*  50:*8*
53:*11*  54:*11*  58:*14*
66:*1, 22*  72:*19*  73:*3*
**understanding**  20:*6*
21:*8*  22:*18*  25:*2, 5*
31:*4*  32:*14, 16*  41:*4*
49:*14*  50:*12*  62:*18*
67:*14*
**unfair**  45:*5, 11, 15,
19*  46:*20*
**Unfortunately**  59:*9*
**UNITED**  1:*1*
**unpack**  15:*8*
**unsuccessfully**  32:*12*
**URQUHART**  3:*22*
**use**  28:*22*  37:*17*

< V >
**valuations**  34:*16*
**value**  15:*6*  22:*10, 12,
19*  28:*15, 16, 23, 24*
29:*5, 8, 9, 14*  30:*9*
35:*7, 11, 13*  36:*21*
37:*1*  54:*12*  73:*15, 24*
**values**  28:*12*
**various**  62:*23*
**vehicle**  18:*24*  19:*1*
33:*24*  50:*25*  55:*5*
71:*23*  72:*21*  73:*5*
**vehicles**  31:*22*
**verbatim**  10:*4*  41:*3*
58:*14, 17*
**veto**  61:*14*
**videoconferencing**  3:*2*
**video-conferencing**
2:*10*
**VIDEOGRAPHER**
5:*13*
**VIDEO-RECORDED**
1:*12*  2:*8*
**view**  52:*2*  63:*1*
**Vine**  4:*10*
**volume**  78:*2, 6*

< W >
**walk**  12:*25*
**want**  8:*12*  10:*17*
66:*12*  68:*16*  70:*20*
77:*17*
**wanted**  53:*5*  55:*21*
76:*14, 19*
**watching**  75:*16*
**way**  29:*21*  31:*24*
**wearing**  34:*18*
**Wednesday**  60:*18*
68:*7*
**week**  60:*3*
**Well**  14:*23*  18:*15*
22:*9*  24:*11*  38:*1*
41:*22*  42:*12*  52:*7*
68:*12*  73:*7*
**we're**  8:*18*  9:*1*  19:*6*
24:*6*  38:*14*  52:*11*
57:*11, 12*  68:*3*  69:*23*
**we've**  31:*13, 14*
34:*25*  45:*24*  64:*1*

69:*5*
**WINOGRAD**  3:*12*
**wish**  79:*3*
**WISHNEW**  4:*17*
**withdraw**  55:*24*
**withdrawn**  17:*15*
21:*23*  23:*15*  25:*4*
35:*17*  54:*4*  70:*23*
**witness**  8:*13*  21:*5*
27:*13*  58:*24*  69:*22*
**wondering**  48:*19*
**words**  49:*14*
**wore**  34:*18*
**working**  33:*19*  38:*4*
**world**  60:*23*
**worries**  8:*16*
**worth**  22:*13*  41:*5*
74:*12*
**wrapped**  29:*23*
**written**  10:*4*
**wrong**  39:*6, 12*
64:*14*  65:*22, 23*  66:*6,
13*
**wrongdoing**  65:*6*

< Y >
**Yeah**  12:*23*  13:*5*
14:*1*  15:*12*  17:*9, 18*
19:*11*  20:*9*  21:*5*
29:*13*  30:*1*  33:*22*
36:*14*  40:*5*  41:*7, 12*
43:*7*  45:*7*  47:*3, 5*
49:*16*  50:*5*  55:*2, 17*
58:*13*  63:*12*  66:*22*
68:*10*  69:*24*  70:*6*
71:*15*  73:*18, 23*
76:*13*
**year**  43:*24*  72:*22*
**years**  11:*14*  12:*8*
32:*12, 17*  37:*4, 25*
**York**  3:*16, 24*

< Z >
**ZIEHL**  3:*14*  5:*18*
**Zoom**  57:*19*

Case 19-34054-sgj11   Doc 4277-2   Filed 06/24/25   Entered 06/24/25 10:20:25   Desc
Case 3:25-cv-01876-K   Document 6-1   Filed 09/12/25   Page 234 of 240   PageID 1142
Deposition of Amelia 125 Exhibit Page 92 of 100   Capital Advisors, L.P.

## WORD LIST

**< $ >**
**$22**  (*1*)
**$23**  (*1*)
**$29**  (*1*)
**$300**  (*1*)
**$650**  (*1*)
**$7**  (*1*)
**$9**  (*5*)

**< 1 >**
**1**  (*2*)
**1.5**  (*1*)
**10010**  (*1*)
**10017-2024**  (*1*)
**11**  (*1*)
**1113**  (*1*)
**13**  (*3*)
**16**  (*2*)
**1600**  (*1*)
**1700**  (*1*)
**18**  (*2*)
**19-34054-sgj11**  (*1*)
**1st**  (*1*)

**< 2 >**
**2015**  (*2*)
**2019**  (*1*)
**2022**  (*1*)
**2025**  (*3*)
**21**  (*1*)
**212.849.7615**  (*1*)
**214.817.4500**  (*1*)
**22**  (*2*)
**225.381.9643**  (*1*)
**22nd**  (*1*)
**2390**  (*1*)
**23-plus**  (*1*)
**240**  (*1*)

**< 3 >**
**3:30**  (*2*)
**30(b)(6**  (*1*)
**300**  (*1*)
**301**  (*1*)
**310.277.6910**  (*1*)
**32**  (*1*)
**33**  (*2*)

**34**  (*1*)
**34th**  (*1*)

**< 4 >**
**4:42**  (*1*)
**4:49**  (*1*)
**4:50**  (*1*)

**< 5 >**
**51**  (*1*)
**58**  (*1*)

**< 6 >**
**67**  (*1*)

**< 7 >**
**70801**  (*1*)
**713.228.4100**  (*1*)
**75201**  (*1*)
**77002**  (*1*)
**780**  (*1*)
**7-year**  (*1*)

**< 8 >**
**8**  (*1*)
**8635**  (*3*)

**< 9 >**
**918,000**  (*1*)

**< A >**
**ability**  (*2*)
**able**  (*6*)
**absolutely**  (*4*)
**accommodate**  (*1*)
**accounts**  (*8*)
**acted**  (*3*)
**acting**  (*4*)
**action**  (*3*)
**actions**  (*4*)
**activity**  (*4*)
**actual**  (*1*)
**ADAMS**  (*1*)
**add**  (*1*)
**addition**  (*1*)
**administrative**  (*1*)
**Administrator**  (*1*)
**adverse**  (*1*)
**advised**  (*1*)

**advisor**  (*4*)
**advisor/control**  (*1*)
**advisors**  (*2*)
**affiliated**  (*1*)
**affiliates**  (*4*)
**affirmed**  (*1*)
**afternoon**  (*1*)
**ago**  (*3*)
**agree**  (*3*)
**agreed**  (*2*)
**agreed-upon**  (*1*)
**agreement**  (*57*)
**ahead**  (*2*)
**ahurt@kellyhart.com**
  (*1*)
**allow**  (*3*)
**allows**  (*1*)
**alternative**  (*1*)
**AMELIA**  (*1*)
**amount**  (*4*)
**amounts**  (*1*)
**ample**  (*1*)
**analysis**  (*1*)
**annuities**  (*26*)
**annuity**  (*12*)
**ANSWER**  (*16*)
**answered**  (*2*)
**answers**  (*1*)
**Anybody**  (*11*)
**anyway**  (*2*)
**apologies**  (*1*)
**apologize**  (*2*)
**apologizing**  (*1*)
**apparent**  (*1*)
**appear**  (*3*)
**appeared**  (*2*)
**appointed**  (*1*)
**appreciate**  (*2*)
**approval**  (*4*)
**approve**  (*1*)
**approved**  (*10*)
**approximately**  (*1*)
**April**  (*1*)
**argumentative**  (*1*)
**arises**  (*1*)
**arm's-length**  (*4*)
**arranging**  (*1*)
**aside**  (*1*)
**asked**  (*2*)

**asking**  (*4*)
**aspect**  (*1*)
**aspects**  (*1*)
**assert**  (*1*)
**asset**  (*2*)
**assets**  (*34*)
**associated**  (*1*)
**Associates**  (*1*)
**assumed**  (*1*)
**assumption**  (*2*)
**Atlas**  (*19*)
**attached**  (*1*)
**Attorney**  (*143*)
**attorney-client**  (*2*)
**audited**  (*1*)
**auditors**  (*2*)
**authority**  (*2*)
**authorization**  (*1*)
**authorize**  (*1*)
**authorized**  (*3*)
**Avenue**  (*3*)
**avoidance**  (*3*)
**avoiding**  (*1*)
**aware**  (*32*)

**< B >**
**BA**  (*2*)
**back**  (*5*)
**balance**  (*5*)
**ballpark**  (*1*)
**BANKRUPTCY**  (*9*)
**BARTLETT**  (*1*)
**based**  (*6*)
**basis**  (*4*)
**Baton**  (*1*)
**Beacon**  (*1*)
**beginning**  (*1*)
**behalf**  (*22*)
**belief**  (*1*)
**believe**  (*62*)
**beneficial**  (*1*)
**benefit**  (*4*)
**benefited**  (*2*)
**best**  (*1*)
**beyond**  (*2*)
**billion**  (*1*)
**bit**  (*7*)
**board**  (*4*)
**boards**  (*1*)

breach  (1)
breached  (1)
break  (3)
bring  (1)
bringing  (1)
buy  (2)

< C >
CA-Certified  (1)
CA-CSR  (2)
call  (6)
called  (2)
capable  (1)
capacity  (4)
CAPITAL  (16)
care  (1)
carefully  (1)
carry  (1)
Case  (4)
cash  (2)
casual  (1)
cause  (3)
causing  (2)
caveat  (1)
Cayman  (4)
Central  (3)
certain  (6)
CERTIFICATE  (1)
Certified  (3)
certify  (2)
CFO  (9)
chance  (1)
CHANGE  (9)
changes  (4)
Chapter  (1)
charitable  (9)
charities  (2)
charts  (1)
claim  (4)
Claimant  (16)
claims  (4)
CLARITY  (2)
clawback  (2)
clawing  (2)
clear  (1)
clearly  (2)
colleague  (1)
combination  (1)
Come  (1)

comfort  (1)
comfortable  (1)
commenced  (3)
comment  (1)
communicate  (2)
communicated  (2)
communication  (3)
communications  (2)
community  (3)
company  (3)
compensate  (1)
compensates  (1)
complicated  (1)
complies  (1)
computer  (1)
concern  (3)
concerned  (2)
concerns  (3)
concluded  (1)
conference  (1)
confirm  (1)
confused  (1)
connection  (1)
consent  (10)
consequential  (1)
consider  (2)
consideration  (1)
considering  (2)
constituted  (1)
consummation  (2)
Cont'd  (2)
contemplating  (1)
contends  (2)
context  (1)
contract  (4)
contracts  (4)
contractual  (2)
contribution  (1)
contributions  (1)
control  (6)
controlled  (3)
conversation  (7)
conversations  (5)
conversion  (1)
convert  (1)
converted  (6)
convoluted  (1)
copies  (1)
copy  (1)

correct  (36)
corrections  (2)
correctly  (1)
corresponding  (1)
counsel  (3)
counterparty  (1)
couple  (3)
course  (2)
COURT  (13)
Court-appointed  (1)
CRAWFORD  (1)
create  (1)
created  (3)
cross-talk  (1)
Crown  (45)
CRR  (2)
cumbersome  (1)
current  (1)
Currently  (1)
CURRY  (1)

< D >
DAF  (2)
DALLAS  (116)
D'AMBRA  (1)
data  (1)
DAVID  (1)
day  (2)
dcurry@okinadams.co
m  (1)
deal  (1)
debate  (1)
Debtor  (3)
decided  (1)
decision  (3)
decision-making  (1)
decisions  (7)
Defendant  (2)
Delaware  (1)
delivered  (1)
DEMO  (1)
depends  (1)
DEPONENT  (1)
deposed  (1)
DEPOSITION  (6)
depositions  (1)
describe  (1)
described  (2)
describing  (1)

detail  (1)
details  (1)
determine  (1)
device  (1)
DIAZ  (4)
difference  (1)
different  (4)
Diplomate  (2)
DIRECT  (7)
direction  (1)
directly  (12)
director  (2)
directs  (1)
disapprove  (1)
discovery  (2)
discussion  (1)
disposition  (2)
distribute  (1)
distributions  (5)
DISTRICT  (1)
diverting  (1)
dividends  (1)
DIVISION  (1)
document  (3)
documentation  (2)
DOCUMENTS  (6)
doing  (5)
dollar  (1)
dollars  (7)
Dondero  (6)
Dondero's  (1)
donor-advised  (2)
dressing  (1)
due  (1)
Dugaboy  (3)
duly  (1)
duration  (1)
duties  (7)
duty  (13)

< E >
earlier  (3)
easier  (1)
economic  (12)
elaborate  (1)
emails  (1)
EMANUEL  (1)
employed  (1)
employment  (1)

Empower *(33)*
enabled *(1)*
engaged *(2)*
enraptured *(1)*
ensure *(1)*
enter *(3)*
entered *(3)*
entering *(10)*
entire *(1)*
entities *(48)*
entity *(6)*
entry *(1)*
Errata *(1)*
ESQ *(10)*
established *(1)*
event *(1)*
evidence *(1)*
exact *(1)*
EXAMINATION *(2)*
examined *(1)*
example *(1)*
exchange *(1)*
excuse *(1)*
execution *(2)*
exercise *(3)*
exercised *(5)*
exercising *(2)*
Exhibit *(2)*
EXHIBITS *(1)*
expect *(2)*
expectation *(3)*
expense *(2)*
expenses *(1)*
expert *(1)*
expired *(1)*
explain *(1)*
explained *(1)*
exposure *(1)*
extend *(1)*
extent *(2)*

< F >
fact-finding *(1)*
facts *(28)*
fail *(1)*
fair *(42)*
faith *(1)*
familiar *(10)*
Family *(8)*

fan *(2)*
February *(2)*
fee *(1)*
feed *(1)*
feedback *(1)*
feeds *(1)*
feel *(2)*
felt *(1)*
fiduciary *(16)*
file *(5)*
filed *(12)*
filing *(7)*
finance *(2)*
financial *(5)*
financially *(1)*
finish *(3)*
firm *(1)*
first *(5)*
five-minute *(1)*
fixed *(8)*
Floor *(2)*
flow *(7)*
flows *(2)*
fluctuations *(1)*
focus *(2)*
focused *(1)*
Focusing *(2)*
following *(2)*
follows *(1)*
foregoing *(3)*
form *(53)*
formal *(2)*
formed *(1)*
forth *(1)*
Foundation *(101)*
foundations *(3)*
Foundation's *(20)*
full *(1)*
Fund *(18)*
funded *(2)*
funding *(2)*
funds *(4)*
fund's *(1)*
Further *(2)*
future *(6)*

< G >
Gail *(7)*
gdemo@pszjlaw.com

*(1)*
generally *(2)*
gentleman *(1)*
getting *(2)*
give *(10)*
given *(4)*
gives *(2)*
glance *(1)*
Global *(44)*
go *(10)*
goal *(1)*
going *(23)*
Good *(4)*
good-faith *(6)*
governing *(5)*
granting *(2)*
grant-making *(1)*
grants *(1)*
GREGORY *(1)*
grow *(1)*
guaranteed *(1)*
guy *(1)*

< H >
half *(1)*
HALL *(1)*
HALLMAN *(1)*
happen *(1)*
happened *(4)*
hard *(1)*
harm *(1)*
HART *(1)*
hat *(1)*
hats *(1)*
HAYLEY *(1)*
head *(2)*
hear *(3)*
heard *(3)*
held *(5)*
helped *(1)*
Hey *(1)*
high *(2)*
HIGHLAND *(59)*
Highland's *(2)*
high-level *(2)*
historical *(1)*
HMIT *(65)*
hold *(7)*
Holdco *(2)*

holdings *(1)*
holds *(1)*
honest *(1)*
Hospitality *(1)*
Houston *(1)*
Hunter *(18)*
HURT *(1)*
hwinograd@pszjlaw.c
om *(1)*

< I >
idea *(5)*
identify *(2)*
IDF *(8)*
imagine *(3)*
impact *(29)*
impacted *(5)*
impactful *(1)*
impacts *(3)*
implicated *(1)*
important *(3)*
including *(1)*
income *(10)*
increased *(1)*
independent *(1)*
INDEX *(1)*
indicate *(1)*
indirect *(7)*
indirectly *(4)*
Indiscernible *(1)*
individual *(11)*
individuals *(1)*
infirmity *(1)*
inform *(5)*
information *(12)*
informed *(6)*
informing *(1)*
Inghram *(4)*
inquired *(1)*
inquiry *(2)*
insertion *(1)*
insight *(1)*
instruct *(1)*
INSTRUCTION *(1)*
INSTRUCTIONS *(1)*
Insurance *(12)*
interest *(34)*
interested *(3)*
interests *(3)*

internal  *(1)*
introduced  *(1)*
inured  *(1)*
invest  *(1)*
invested  *(1)*
Investment  *(18)*
investments  *(7)*
involved  *(1)*
Islands  *(3)*
issuer  *(1)*
its  *(5)*

**< J >**
JAMES  *(1)*
January  *(1)*
JEFFREY  *(1)*
Jim  *(2)*
jmorris@pszjlaw.com  *(1)*
JOHN  *(4)*
joint  *(12)*
JONES  *(2)*
jpomerantz@pszjlaw.com  *(1)*
JULIE  *(4)*
June  *(2)*
jurisdiction  *(1)*

**< K >**
KELLY  *(1)*
key  *(1)*
kind  *(13)*
know  *(76)*
knowing  *(2)*
knowledge  *(4)*

**< L >**
L.P  *(1)*
LANG  *(3)*
language  *(1)*
large  *(1)*
late  *(1)*
law  *(2)*
lawsuit  *(5)*
lawyer  *(4)*
lay  *(1)*
lead  *(1)*
lean  *(1)*
leaned  *(1)*

learn  *(1)*
leave  *(2)*
led  *(1)*
left  *(2)*
legal  *(14)*
legally  *(2)*
level  *(2)*
liability  *(2)*
Life  *(4)*
likelihood  *(1)*
Limited  *(3)*
LINE  *(6)*
liquidation  *(1)*
liquidators  *(12)*
liquidity  *(1)*
listen  *(1)*
lists  *(1)*
Litigation  *(5)*
little  *(7)*
LITTLETON  *(12)*
LLP  *(3)*
LOIGMAN  *(1)*
long  *(4)*
longer  *(1)*
look  *(1)*
looked  *(1)*
looking  *(3)*
loss  *(1)*
lost  *(3)*
lot  *(2)*
LOUIS  *(1)*
Louisiana  *(1)*
LP  *(7)*
lphillips@kellyhart.com  *(1)*

**< M >**
M&E  *(3)*
Madden  *(2)*
Madison  *(1)*
Main  *(2)*
making  *(3)*
MANAGEMENT  *(15)*
Mark  *(9)*
MARKED  *(3)*
market  *(11)*
MARKS  *(2)*
material  *(2)*

Matt  *(5)*
matter  *(1)*
matters  *(1)*
MATTTHEW  *(1)*
mean  *(1)*
means  *(1)*
meet  *(1)*
member  *(1)*
met  *(2)*
MICHAEL  *(1)*
million  *(18)*
mine  *(1)*
minutes  *(2)*
missed  *(1)*
mlang@cwl.law.com  *(1)*
MNPI  *(1)*
mokin@okinadams.com  *(1)*
moment  *(1)*
money  *(3)*
MORRIS  *(79)*
motion  *(9)*
Mountain  *(19)*
move  *(2)*
moved  *(1)*
moving  *(4)*
multiple  *(1)*

**< N >**
name  *(2)*
named  *(1)*
NATHAN  *(1)*
NECESSARILY  *(2)*
need  *(7)*
needed  *(2)*
negatively  *(3)*
negotiate  *(1)*
negotiating  *(1)*
negotiation  *(4)*
negotiations  *(4)*
neither  *(1)*
never  *(7)*
New  *(4)*
newly  *(1)*
news  *(1)*
NexPoint  *(1)*
nice  *(1)*
nonpublic  *(2)*

normal  *(1)*
NORTHERN  *(1)*
Notary  *(1)*
notations  *(1)*
NOTE  *(1)*
notes  *(4)*
notice  *(1)*
notified  *(1)*
November  *(1)*
NUMBER  *(2)*

**< O >**
object  *(53)*
objecting  *(1)*
objection  *(22)*
objections  *(1)*
obligation  *(10)*
obligations  *(6)*
obtain  *(6)*
obtained  *(2)*
occasions  *(1)*
officer  *(1)*
official  *(12)*
officially  *(1)*
Oh  *(2)*
Okada  *(33)*
okay  *(51)*
OKIN  *(71)*
once  *(1)*
opine  *(8)*
opined  *(1)*
opinion  *(3)*
opportunity  *(4)*
option  *(11)*
order  *(3)*
org  *(1)*
organization  *(8)*
organizational  *(1)*
organizations  *(27)*
orgs  *(1)*
originally  *(1)*
originated  *(1)*
outcome  *(1)*
outlined  *(1)*
outside  *(3)*
overall  *(2)*
overseeing  *(1)*
oversight  *(4)*
owes  *(6)*

owned  (5)
ownership  (9)
owns  (2)

< P >
p.m  (5)
PACHULSKI  (2)
Pacific  (1)
PAGE  (7)
paid  (3)
paragraph  (7)
part  (13)
participate  (2)
particular  (2)
parties  (11)
partnership  (1)
party  (3)
patience  (1)
Patrick  (27)
Patrick's  (2)
PAUL  (1)
pay  (5)
payments  (3)
payout  (2)
payouts  (2)
PE  (2)
peace  (2)
pending  (2)
percentage  (1)
period  (2)
permission  (2)
person  (6)
personally  (2)
persons  (1)
pertaining  (2)
pertinent  (1)
PHILLIPS  (3)
piece  (1)
place  (2)
plan  (1)
planned  (1)
platform  (2)
play  (3)
played  (1)
plays  (1)
please  (3)
PLLC  (1)
point  (1)
policies  (4)

policy  (4)
POMERANTZ  (1)
portfolio  (1)
portfolios  (1)
portion  (3)
positive  (1)
possibility  (2)
potential  (2)
potentially  (3)
preparation  (1)
present  (3)
preserve  (1)
President  (2)
prevent  (2)
PREVIOUSLY  (2)
primarily  (1)
prior  (1)
privilege  (1)
privileged  (1)
privy  (1)
probably  (2)
problematic  (2)
proceeding  (2)
proceedings  (5)
process  (4)
produce  (1)
produced  (1)
product  (4)
PRODUCTION  (1)
projected  (1)
proper  (1)
proposed  (13)
proposing  (1)
propounded  (1)
protect  (1)
provide  (1)
provided  (2)
providing  (1)
Public  (1)
pull  (1)
pulling  (1)
purpose  (2)
pursued  (1)
pushed  (1)
put  (20)
putting  (1)

< Q >
quarter  (1)

quarterly  (2)
question  (13)
questionable  (2)
QUESTIONS  (11)
quicker  (1)
QUINN  (1)
QUOTATION  (1)
quotations  (1)
QUOTE  (2)

< R >
Rand  (8)
Rand's  (1)
range  (1)
RAVER  (1)
RDR  (2)
reach  (1)
read  (6)
reading  (2)
really  (2)
Realtime  (3)
reason  (39)
reasonable  (1)
reasons  (3)
recall  (3)
receive  (10)
received  (4)
receives  (1)
Recess  (1)
recollection  (1)
recommendation  (3)
recommendations  (2)
record  (1)
recorded  (1)
recovered  (1)
reduced  (1)
refer  (2)
REFERENCED  (1)
referred  (2)
referring  (1)
refers  (3)
REFLECT  (1)
refresh  (1)
regardless  (2)
Registered  (2)
reiterated  (1)
related  (4)
relates  (4)
relationship  (9)

relax  (1)
release  (1)
releases  (4)
releasing  (1)
rely  (2)
remind  (1)
REMOTE  (3)
reorganization  (1)
repeat  (2)
rephrase  (2)
Reported  (1)
Reporter  (10)
REPORTER'S  (1)
reporting  (1)
represent  (1)
representative  (2)
representing  (1)
represents  (1)
REQUEST  (1)
required  (6)
research  (1)
respect  (7)
respectfully  (1)
respectively  (1)
responsibilities  (2)
responsibility  (3)
responsible  (1)
restate  (3)
restructuring  (6)
result  (4)
review  (2)
reviewed  (2)
Right  (38)
rise  (3)
risk  (7)
ROBERT  (1)
robertloigman@quinn
emanuel.com  (1)
role  (6)
roll  (5)
rolled  (1)
rolls  (3)
roll-up  (1)
room  (1)
Rouge  (1)
roughly  (1)
Royal  (1)
RSA  (2)

< S >
sale *(4)*
saw *(1)*
says *(2)*
scheduled *(1)*
scope *(3)*
screen *(3)*
scroll *(1)*
scrutiny *(1)*
see *(8)*
seek *(3)*
seeking *(1)*
seeks *(2)*
seen *(4)*
SEERY *(1)*
segregated *(6)*
sell *(2)*
selling *(1)*
sent *(1)*
sentence *(3)*
series *(1)*
serve *(1)*
served *(1)*
set *(4)*
settle *(1)*
settled *(1)*
settlement *(68)*
settlements *(3)*
settling *(1)*
share *(2)*
shares *(5)*
sharing *(1)*
SHAWN *(1)*
sheet *(6)*
shifting *(1)*
short *(2)*
Shorthand *(3)*
sign *(2)*
signed *(3)*
significant *(5)*
similar *(1)*
sir *(87)*
sit *(1)*
situation *(1)*
six *(1)*
Skyview *(1)*
sleep *(1)*
smoothly *(1)*
sold *(5)*

sole *(2)*
solely *(2)*
somewhat *(1)*
Sorry *(9)*
sought *(1)*
Sounds *(2)*
source *(2)*
speak *(4)*
speculate *(2)*
speculation *(2)*
speed *(1)*
spoke *(1)*
spoken *(1)*
standpoint *(2)*
STANG *(2)*
start *(1)*
starting *(1)*
state *(4)*
stated *(2)*
statement *(3)*
statements *(3)*
STATES *(2)*
Stenographically *(3)*
stewardship *(1)*
STIPULATIONS *(1)*
stream *(3)*
streams *(1)*
Street *(2)*
strike *(1)*
structure *(13)*
structures *(1)*
stuff *(2)*
sub *(1)*
subject *(4)*
Subtrust *(1)*
succeed *(3)*
succeeding *(1)*
successful *(1)*
sue *(1)*
suggest *(2)*
Suite *(3)*
SULLIVAN *(1)*
sum *(1)*
summary *(1)*
Sunday *(4)*
supervision *(1)*
supplied *(1)*
SUPPORT *(1)*
supporting *(30)*

supposed *(1)*
Sure *(6)*
surprised *(1)*
sworn *(1)*
Systems *(1)*

< T >
take *(9)*
taken *(5)*
takes *(2)*
talked *(2)*
talking *(2)*
team *(7)*
tell *(5)*
telling *(1)*
tenure *(4)*
terms *(3)*
testified *(1)*
testify *(1)*
testimony *(3)*
TEXAS *(3)*
Thank *(4)*
Thanks *(1)*
therefor *(1)*
thing *(2)*
things *(8)*
think *(50)*
thinking *(2)*
Third *(2)*
thoroughly *(1)*
thought *(1)*
three *(2)*
tied *(2)*
time *(31)*
times *(1)*
timing *(1)*
today *(12)*
told *(5)*
TORREY *(5)*
total *(1)*
track *(1)*
transaction *(1)*
transactions *(1)*
transcribed *(2)*
transcript *(3)*
transcripts *(1)*
transfer *(1)*
transferred *(1)*
transpired *(1)*

tribunal *(1)*
tried *(1)*
true *(10)*
Trust *(24)*
Trustee *(3)*
trustees *(1)*
truth *(3)*
try *(3)*
trying *(2)*
two *(10)*
types *(1)*
typewriting *(1)*
typically *(1)*

< U >
ultimately *(10)*
uncertainty *(1)*
underlying *(4)*
understand *(17)*
understanding *(13)*
unfair *(5)*
Unfortunately *(1)*
UNITED *(1)*
unpack *(1)*
unsuccessfully *(1)*
URQUHART *(1)*
use *(2)*

< V >
valuations *(1)*
value *(21)*
values *(1)*
various *(1)*
vehicle *(8)*
vehicles *(1)*
verbatim *(4)*
veto *(1)*
videoconferencing *(1)*
video-conferencing
*(1)*
VIDEOGRAPHER
*(1)*
VIDEO-RECORDED
*(2)*
view *(2)*
Vine *(1)*
volume *(2)*

< W >

walk  *(1)*
want  *(6)*
wanted  *(4)*
watching  *(1)*
way  *(2)*
wearing  *(1)*
Wednesday  *(2)*
week  *(1)*
Well  *(10)*
we're  *(10)*
we've  *(6)*
WINOGRAD  *(1)*
wish  *(1)*
WISHNEW  *(1)*
withdraw  *(1)*
withdrawn  *(7)*
witness  *(5)*
wondering  *(1)*
words  *(1)*
wore  *(1)*
working  *(2)*
world  *(1)*
worries  *(1)*
worth  *(3)*
wrapped  *(1)*
written  *(1)*
wrong  *(7)*
wrongdoing  *(1)*

**< Y >**
Yeah  *(41)*
year  *(2)*
years  *(6)*
York  *(4)*

**< Z >**
ZIEHL  *(2)*
Zoom  *(1)*