Case No. 3:25-cv-01876-K

---

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

---

## IN RE HIGHLAND CAPITAL MANAGEMENT, L.P.,
*Debtor*

---

## THE DUGABOY INVESTMENT TRUST

*Appellant*

v.

## HIGHLAND CAPITAL MANAGEMENT, L.P. and HIGHLAND CLAIMANT TRUST,

*Appellees*

---

On Appeal from the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj11
The Honorable Chief Judge Stacey G. C. Jernigan, Presiding

---

## APPENDIX IN SUPPORT OF DUGABOY INVESTMENT TRUST'S OPENING BRIEF

---

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
**WINSTON & STRAWN LLP**
2121 N. Pearl Street, Suitee 900
(214) 453-6500
(214) 453-6400 (fax)

| | Record Reference | Exhibit Description | Doc Date(s) | Page Range |
|---|---|---|---|---|
| 1. | Excerpts from Claimant Trust Agreement | Dkt. No. 1656-2 | 1/4/2021 | R. 003508–00518; 004845 |
| 2. | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief | Dkt. No. 1943 | 2/22/2021 | R. 000625–000714 |
| 3. | Fifth Amended Plan of Reorganization of Highland Capital Management L.P. (As Modified) | Dkt. No. 1943 | 2/22/2021 | R. 000716–000780; 004263–004274 |
| 4. | Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management L.P. | Dkt. No. 2700 | 8/11/2021 | R. 000402 |
| 5. | Proposed Order Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith | Dkt. No. 4216-1 | 5/19/2025 | R. 000801–000803 |
| 6. | Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith | Dkt. No. 4216 | 5/19/2025 | R. 000786–000798 |
| 7. | Settlement Agreement & General Release | Dkt. No. 4217-1 | 5/19/2025 | R. 000808–000831 |
| 8. | Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving | Dkt. No. 4230 | 6/9/2025 | R. 000849–000856 |

1

|  | Settlement with the HMIT Entities |  |  |  |
|---|---|---|---|---|
| 9. | Email Re: Draft of Settlement Structure | Dkt. No. 4255-45 | 6/20/2025 | R. 001259 |
| 10. | HCLOM/HMIT Intercreditor and Participation Agreement | Dkt. No. 4255-69 | 6/20/2025 | R. 001649–001651 |
| 11. | U.S. Return of Partnership Income | Dkt. No. 4255-116 | 6/20/2025 | R. 003452–003459 |
| 12. | Transcript regarding Hearing Held 6/25/2025 before Judge Stacy G. C. Jernigan (266 pages) RE: Motion for an Order Further Extending Duration of Trusts (4213); Motion for Entry of an Order Approving Settlement with HMIT entities (4216) | Dkt. No. 4296 | 6/25/2025 | [Pages 4–263] Supp. R. 000001–000263 |
| 13. | Order approving settlement between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent therewith | Dkt. No. 4297 | 6/30/2025 | R. 000006–000013; 004549–004556 |
| 14. | Memorandum Opinion and Order Regarding Stay Requests | Dkt. No. 4333 | 7/21/2025 | R. 004684–004699 |
| 15. | Statement of Claim in the Grand Court of the Cayman Islands | Dkt. No. 4326 | 7/17/2025 | R. 004331–004404 |

Dated:  November 25, 2025

Respectfully submitted,
**WINSTON & STRAWN LLP**
*/s/ Geoffrey S. Harper*
Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suitee 900
(214) 453-6500
(214) 453-6400 (fax)

***Attorneys for Appellant The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 25, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

*DRAFT*

# CLAIMANT TRUST AGREEMENT

This Claimant Trust Agreement, effective as of _____ , 2021 (as may be amended, supplemented, or otherwise modified in accordance with the terms hereof, this "Agreement"), by and among Highland Capital Management, L.P. (as debtor and debtor-in-possession, the "Debtor"), as settlor, and James P. Seery, Jr., as trustee (the "Claimant Trustee"), and [____] as Delaware trustee (the "Delaware Trustee," and together with the Debtor and the Claimant Trustee, the "Parties") for the benefit of the Claimant Trust Beneficiaries entitled to the Claimant Trust Assets.

## RECITALS

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. filed with the United States Bankruptcy Court for the District of Delaware, a voluntary petition for relief under chapter 11 of the Bankruptcy Code, which case was subsequently transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") and captioned *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (the "Chapter 11 Case");

WHEREAS, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[1] which was confirmed by the Bankruptcy Court on _____ , 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. •] (the "Confirmation Order");

WHEREAS, this Agreement, including all exhibits hereto, is the "Claimant Trust Agreement" described in the Plan and shall be executed on or before the Effective Date in order to facilitate implementation of the Plan; and

WHEREAS, pursuant to the Plan and Confirmation Order, the Claimant Trust Assets are to be transferred to the Claimant Trust (each as defined herein) created and evidenced by this Agreement so that (i) the Claimant Trust Assets can be held in a trust for the benefit of the Claimant Trust Beneficiaries entitled thereto with Treasury Regulation Section 301.7701-4(d) for the objectives and purposes set forth herein and in the Plan; (ii) the Claimant Trust Assets can be monetized; (iii) the Claimant Trust will transfer Estate Claims to the Litigation Sub-Trust to be prosecuted, settled, abandoned, or resolved as may be determined by the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement, for the benefit of the Claimant Trust; (iv) proceeds of the Claimant Trust Assets, including Estate Claims, may be distributed to the Claimant Trust Beneficiaries[2] in accordance with the Plan; (v) the Claimant Trustee can resolve Disputed Claims as set forth herein and in the Plan; and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan.

(vi) administrative services relating to the activities of the Claimant Trust and relating to the implementation of the Plan can be performed by the Claimant Trustee.

## DECLARATION OF TRUST

NOW, THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the premises and mutual agreements herein contained, the confirmation of the Plan and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor, the Claimant Trustee, and the Delaware Trustee have executed this Agreement for the benefit of the Claimant Trust Beneficiaries entitled to share in the Claimant Trust Assets and, at the direction of such Claimant Trust Beneficiaries as provided for in the Plan.

TO HAVE AND TO HOLD unto the Claimant Trustee and his successors or assigns in trust, under and subject to the terms and conditions set forth herein and for the benefit of the Claimant Trust Beneficiaries, and for the performance of and compliance with the terms hereof and of the Plan; provided, however, that upon termination of the Claimant Trust in accordance with Article IX hereof, this Claimant Trust Agreement shall cease, terminate, and be of no further force and effect, unless otherwise specifically provided for herein.

IT IS FURTHER COVENANTED AND DECLARED that the Claimant Trust Assets are to be strictly held and applied by the Claimant Trustee subject to the specific terms set forth below.

## ARTICLE I.
## DEFINITION AND TERMS

1.1   Certain Definitions.   Unless the context shall otherwise require and except as contained in this Section 1.1 or as otherwise defined herein, the capitalized terms used herein shall have the respective meanings assigned thereto in the "Definitions," Section 1.1 of the Plan or if not defined therein, shall have the meanings assigned thereto in the applicable Section of the Plan.   For all purposes of this Agreement, the following terms shall have the following meanings:

(a)      "Acis" means collectively, Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

(b)      "Bankruptcy Court" has the meaning set forth in the Recitals hereof.

(c)      "Cause" means (i) a Person's willful failure to perform his material duties hereunder (which material duties shall include, without limitation, with respect to a Member, or to the extent applicable, the Claimant Trustee, regular attendance at regularly scheduled meetings of the Oversight Board), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft, or embezzlement during the performance of his or her duties hereunder; (iii) a Person's conviction of a felony (other than a felony that does not involve fraud, theft, embezzlement, or jail time) with all appeals having been exhausted or appeal periods lapsed; or (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his or her duties hereunder.

2

003509

Section 2.2(a)-(b)

003510

2.2 <u>Objectives</u>.

(a)    The Claimant Trust is established for the purpose of satisfying Allowed General Unsecured Claims and Allowed Subordinated Claims (and only to the extent provided herein, Allowed Class A Limited Partnership Interests and Class B/C Limited Partnership Interests) under the Plan, by monetizing the Claimant Trust Assets transferred to it and making distributions to the Claimant Trust Beneficiaries.  The Claimant Trust shall not continue or engage in any trade or business except to the extent reasonably necessary to monetize and distribute the Claimant Trust Assets consistent with this Agreement and the Plan and act as sole member and manager of New GP LLC.  The Claimant Trust shall provide a mechanism for (i) the monetization of the Claimant Trust Assets and (ii) the distribution of the proceeds thereof, net of all claims, expenses, charges, liabilities, and obligations of the Claimant Trust, to the Claimant Trust Beneficiaries in accordance with the Plan.  In furtherance of this distribution objective, the Claimant Trust will, from time to time, prosecute and resolve objections to certain Claims and Interests as provided herein and in the Plan.

(b)    It is intended that the Claimant Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations.  In furtherance of this objective, the Claimant Trustee shall, in his business judgment, make continuing best efforts to (i) dispose of or monetize the Claimant Trust Assets and resolve Claims, (ii) make timely distributions, and (iii) not unduly prolong the duration of the Claimant Trust, in each case in accordance with this Agreement.

2.3 <u>Nature and Purposes of the Claimant Trust</u>.

(a)    The Claimant Trust is organized and established as a trust for the purpose of monetizing the Claimant Trust Assets and making distributions to Claimant Trust Beneficiaries in a manner consistent with "liquidating trust" status under Treasury Regulation Section 301.7701-4(d).  The Claimant Trust shall retain all rights to commence and pursue all Causes of Action of the Debtor other than (i) Estate Claims, which shall be assigned to and commenced and pursued by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement, and (ii) Causes of Action constituting Reorganized Debtor Assets, if any, which shall be commenced and pursued by the Reorganized Debtor at the direction of the Claimant Trust as sole member of New GP LLC pursuant to the terms of the Reorganized Limited Partnership Agreement.  The Claimant Trust and Claimant Trustee shall have and retain, and, as applicable, assign and transfer to the Litigation Sub-Trust and Litigation Trustee, any and all rights, defenses, cross-claims and counter-claims held by the Debtor with respect to any Claim as of the Petition Date.  On and after the date hereof, in accordance with and subject to the Plan, the Claimant Trustee shall have the authority to (i) compromise, settle or otherwise resolve, or withdraw any objections to Claims against the Debtor, <u>provided</u>, <u>however</u>, the Claimant Trustee shall only have the authority to compromise or settle any Employee Claim with the unanimous consent of the Oversight Board and in the absence of unanimous consent, any such Employee Claim shall be transferred to the Litigation Sub-Trust and be litigated, comprised, settled, or otherwise resolved exclusively by the Litigation Trustee and (ii) compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, which authority may be shared with or transferred to the Litigation Trustee in accordance with the terms of the Litigation Sub-Trust Agreement.  For the avoidance of doubt, the Claimant Trust,

003511

Case 25-cv-01876-K   Document 538   Filed 06/20/25   Page 9 of 614   PageID 12557

Section 3.2(a)-(b)

2.5  <u>Principal Office</u>.  The principal office of the Claimant Trust shall be maintained by the Claimant Trustee at the following address:[_____].

2.6  <u>Acceptance</u>.  The Claimant Trustee accepts the Claimant Trust imposed by this Agreement and agrees to observe and perform that Claimant Trust, on and subject to the terms and conditions set forth herein and in the Plan.

2.7  <u>Further Assurances</u>.  The Debtor, Reorganized Debtor, and any successors thereof will, upon reasonable request of the Claimant Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Claimant Trustee any portion of the Claimant Trust Assets intended to be conveyed hereby and in the Plan in the form and manner provided for hereby and in the Plan and to vest in the Claimant Trustee the powers, instruments or funds in trust hereunder.

2.8  <u>Incidents of Ownership</u>.  The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust and the Claimant Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein.

### ARTICLE III.
### THE TRUSTEES

3.1  <u>Role</u>.  In furtherance of and consistent with the purpose of the Claimant Trust, the Plan, and this Agreement, the Claimant Trustee, subject to the terms and conditions contained herein, in the Plan, and in the Confirmation Order, shall serve as Claimant Trustee with respect to the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries and maintain, manage, and take action on behalf of the Claimant Trust.

3.2  <u>Authority</u>.

(a)  In connection with the administration of the Claimant Trust, in addition to any and all of the powers enumerated elsewhere herein, the Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust.  The Claimant Trustee shall have the power and authority and is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Claimant Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law.  The Claimant Trustee will monetize the Claimant Trust Assets with a view toward maximizing value in a reasonable time.

(b)  The Claimant Trustee, subject to the limitations set forth in Section 3.3 of this Agreement shall have the right to prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle any and all Claims and Causes of Action that are part of the Claimant Trust Assets, other than the Estate Claims transferred to the Litigation Sub-Trust, as the Claimant Trustee determines is in the best interests of the Claimant Trust; <u>provided</u>, <u>however</u>, that if the Claimant Trustee proposes a settlement of an Employee Claim and does not obtain unanimous consent of the Oversight Board of such settlement, such Employee Claim shall be transferred to the Litigation Sub-Trust for the Litigation Trustee to litigate.  To the extent that any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or

11

003513

otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)     Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)     solely as required by Section 2.4(c), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

(ii)     open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)     as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)     settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)     sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)     upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)     exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)     protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)     obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board solely in their capacities as such, in the form of fiduciary liability insurance, a directors and

003514

Section 3.2(c)(iv)

003515

otherwise deal with and settle any such Claims and Causes of Action prior to the Effective Date, on the Effective Date the Claimant Trustee shall be substituted for the Debtor in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable by Rule 7025 of the Federal Rules of Bankruptcy Procedure, and the caption with respect to such pending action shall be changed to the following "[Claimant Trustee], not individually but solely as Claimant Trustee for the Claimant Trust, et al. v. [Defendant]".

(c)    Subject in all cases to any limitations contained herein, in the Confirmation Order, or in the Plan, the Claimant Trustee shall have the power and authority to:

(i)    solely as required by Section 2.4(c), hold legal title to any and all rights of the Claimant Trust and Beneficiaries in or arising from the Claimant Trust Assets, including collecting and receiving any and all money and other property belonging to the Claimant Trust and the right to vote or exercise any other right with respect to any claim or interest relating to the Claimant Trust Assets in any case under the Bankruptcy Code and receive any distribution with respect thereto;

(ii)    open accounts for the Claimant Trust and make distributions of Claimant Trust Assets in accordance herewith;

(iii)    as set forth in Section 3.11, exercise and perform the rights, powers, and duties held by the Debtor with respect to the Claimant Trust Assets (other than Estate Claims), including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting as a representative of the Debtor's Estate with respect to the Claimant Trust Assets, including with respect to the sale, transfer, or other disposition of the Claimant Trust Assets;

(iv)    settle or resolve any Claims in Class 8 and Class 9 other than the Material Claims and any Equity Interests;

(v)    sell or otherwise monetize any publicly-traded asset for which there is a marketplace and any other assets (other than the Other Assets (as defined below)) valued less than or equal to $3,000,000 (over a thirty-day period);

(vi)    upon the direction of the Oversight Board, fund the Litigation Sub-Trust on the Effective Date and as necessary thereafter;

(vii)    exercise and perform the rights, powers, and duties arising from the Claimant Trust's role as sole member of New GP LLC, and the role of New GP LLC, as general partner of the Reorganized Debtor, including the management of the Managed Funds;

(viii)    protect and enforce the rights to the Claimant Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(ix)    obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees, Litigation Trustee, and the Members of the Oversight Board solely in their capacities as such, in the form of fiduciary liability insurance, a directors and

003516

Section 2.3(b)(ix)

003517

pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable state trust law, is appointed as the successor-in-interest to, and representative of, the Debtor and its Estate for the retention, enforcement, settlement, and adjustment of all Claims other than Estate Claims, the Employee Claims, and those Claims constituting Reorganized Debtor Assets.

(b)     The Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purposes:

(i)     to manage and monetize the Claimant Trust Assets in an expeditious but orderly manner with a view towards maximizing value within a reasonable time period;

(ii)     to litigate and settle Claims in Class 8 and Class 9 (other than the Employee Claims, which shall be litigated and/or settled by the Litigation Trustee if the Oversight Board does not unanimously approve of any proposed settlement of such Employee Claim by the Claimant Trustee) and any of the Causes of Action included in the Claimant Trust Assets (including any cross-claims and counter-claims); provided, however, that Estate Claims transferred to the Litigation Sub-Trust shall be litigated and settled by the Litigation Trustee pursuant to the terms of the Litigation Sub-Trust Agreement;

(iii)     to distribute net proceeds of the Claimant Trust Assets to the Claimant Trust Beneficiaries;

(iv)     to distribute funds from the Disputed Claims Reserve to Holders of Trust Interests or to the Reorganized Debtor for distribution to Holders of Disputed Claims in each case in accordance with the Plan from time to time as any such Holder's Disputed Claim becomes an Allowed Claim under the Plan;

(v)     to distribute funds to the Litigation Sub-Trust at the direction the Oversight Board;

(vi)     to serve as the limited partner of, and to hold the limited partnership interests in, the Reorganized Debtor;

(vii)     to serve as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner;

(viii)     to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds; and

(ix)     to perform any other functions and take any other actions provided for or permitted by this Agreement and the Plan, and in any other agreement executed by the Claimant Trustee.

003518

## INITIAL OBJECTIONS

**A.    The Settlement Agreement Violates the Terms of the Plan and the Claimant Trust Agreement**

9.    The Claimant Trust Agreement has explicit requirements that must be met prior to the distribution of funds or assets to any Equity Trust Certificate holders.  Sec. 5.1(c) of the Claimant Trust Agreement provides:

> (c) <u>Contingent Trust Interests.</u> On the date hereof, or on the date such Interest becomes Allowed under the Plan, the Claimant Trust shall issue Contingent Interests to Holders of  Allowed Class 10 Class B/C Limited Partnership Interests and Holders of Allowed Class 11 Class A Limited Partnership Interests (collectively, the "Equity Holders"). The Claimant Trustee shall allocate to each Holder of Allowed Class 10 Class B/C Limited Partnership Interests and each Holder of Allowed Class 11 Class A Limited Partnership Interests a Contingent Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 10 or Class 11 Interest bears to the total amount of the Allowed Class 10 or Class 11 Interests, as applicable, under the Plan. Contingent Trust Interests shall not vest, and the Equity Holders shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the "GUC Payment Certification"). Equity Holders will only be deemed "Beneficiaries" under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court, at which time the Contingent Trust Interests will vest and be deemed "Equity Trust Interests." The Equity Trust Interests shall be subordinated in right and priority to Subordinated Trust Interests, and distributions on account thereof shall only be made if and when Subordinated Beneficiaries have been repaid in full on account of such Subordinated Beneficiary's Allowed Subordinated Claim, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Equity Trust Interests distributed to Allowed Holders of Class A Limited Partnership Interests shall be subordinated to the Equity Trust Interests distributed to Allowed Holders of Class B/C Limited Partnership Interests.

10.    Before the Holders of Class 10 or Class 11 Interests are entitled to receive any distribution of property, the Claimant Trustee is required to file with the Court the "GUC Payment Certification" (as defined in Section 5.1(c) of the Claimant Trust Agreement).  As of the filing of the Settlement Motion, the GUC Payment Certification had not been filed.  So, based on the





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 22, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) |

### ORDER (I) CONFIRMING THE FIFTH AMENDED
### PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
### MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

The Bankruptcy Court[2] having:

a.   entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below).  The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "<u>Disclosure Statement</u>") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.  set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "<u>Objection Deadline</u>"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "<u>Plan</u>");

c.  set January 5, 2021, at 5:00 p.m. prevailing Central Time,  as the deadline for voting on the Plan (the "<u>Voting Deadline</u>") in accordance with the Disclosure Statement Order;

d.  initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.  reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "<u>Confirmation Hearing Notice</u>"), the form of which is attached as <u>Exhibit 1-B</u> to the Disclosure Statement Order;

f.  reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "<u>Plan Supplements</u>");

g.  reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.  reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i.  reviewed: (i) *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

3

000627

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "<u>Affidavits of Service and Publication</u>");

j.      reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k.      conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "<u>Confirmation Hearing</u>);

l.      heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m.     considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("<u>Strand</u>"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "<u>Witnesses</u>"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor,

the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of

law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.      **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case.  Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P*., filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021.  The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board.  The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders.  The Claimant Trustee is responsible

000629

for this process, among other duties specified in the Plan's Claimant Trust Agreement.  There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3.      **Confirmation Requirements Satisfied.**  The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7.  Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code.  The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4.      **Not Your Garden Variety Debtor**.  The Debtor's case is not a garden variety chapter 11 case.  The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940.  It was founded in 1993 by James Dondero and Mark Okada.  Mark Okada resigned from his role with Highland prior to the

DOCS_SF:104487.21 36027/002

bankruptcy case being filed on October 16, 2019 (the "Petition Date").  Mr. Dondero controlled

the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020,

pursuant to an agreement reached with the Committee, as described below.  Although Mr. Dondero

remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his

employment with the Debtor terminated on October 9, 2020.  Mr. Dondero continues to work for

and/or control numerous non-debtor entities in the complex Highland enterprise.

5.     **The Debtor**.  The Debtor is headquartered in Dallas, Texas.  As of the

Petition Date, the Debtor employed approximately 76 employees.  The Debtor is privately-owned:

(a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment

Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark

Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general

partner.

6.     **The Highland Enterprise.**  Pursuant to various contractual arrangements,

the Debtor provides money management and advisory services for billions of dollars of assets,

including collateralized loan obligation vehicles ("CLOs"), and other investments.  Some of these

assets are managed by the Debtor pursuant to shared services agreements with certain affiliated

entities, including other affiliated registered investment advisors. In fact, there are approximately

2,000 entities in the byzantine complex of entities under the Highland umbrella.  None of these

affiliated entities filed for chapter 11 protection.  Most, but not all, of these entities are not

subsidiaries (direct or indirect) of the Debtor.  Many of the Debtor's affiliated companies are

000631

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

7.    **Debtor's Operational History.**  The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.  For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business.  The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits."  The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

8.    **Not Your Garden Variety Creditor's Committee**.  The Debtor and this chapter 11 case are not garden variety for so many reasons.  One of the most obvious standouts in this case is the creditor constituency.  The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11.  For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank.  The Debtor also did not have problems with its trade vendors or landlords.

000632

The Debtor also did not suffer any type of catastrophic business calamity. In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic. Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator." The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a.   **The Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee")**. This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda). This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b.   **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("Acis")**. Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date. This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016. Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis. Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case. Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals.  There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York.  The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c.    **UBS Securities LLC and UBS AG London Branch ("UBS").**  UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case.  The UBS Claim was based on a judgment that UBS received from a New York state court in 2020.  The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex.  The UBS litigation related to activities that occurred in 2008 and 2009.  The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history).  The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d.    **Meta-E Discovery ("Meta-E").**  Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years.  It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel.  They fought hard before and during this Chapter 11 Case.  The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them.  They have represented their constituency in this case as fiduciaries extremely well.

9.    **Other Key Creditor Constituents.**  In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts.  Mr. Daugherty filed an amended

DOCS_SF:104487.21 36027/002

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor.  The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose).  Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations.  HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10.    **Other Claims Asserted.**  Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11.    **Not Your Garden Variety Post-Petition Corporate Governance Structure**.  Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure.  Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best.  First, the Committee moved for a change of venue from

000635

Delaware to Dallas.  Second, the Committee (and later, the United States Trustee) expressed its then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr. Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

12.     **Post-Petition Corporate Governance Settlement with Committee.**  After spending many weeks under the threat of the potential appointment of a trustee, the Debtor and Committee engaged in substantial and lengthy negotiations resulting in a corporate governance settlement approved by the Bankruptcy Court on January 9, 2020.[5]  As a result of this settlement, among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as an officer or director of the Debtor and its general partner, Strand.  As noted above, Mr. Dondero agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor. The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the commencement of any litigation against the three independent board members appointed to oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the exculpation of those board members by limiting claims subject to the "gatekeeper" provision to those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "Stipulation").

DOCS_SF:104487.21 36027/002

000636

13.    **Appointment of Independent Directors.**    As part of the Bankruptcy

Court-approved settlement, three eminently qualified independent directors were chosen to lead

Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen

by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are

each technically independent directors of Strand (Mr. Dondero had previously been the sole

director of Strand and, thus, the sole person in ultimate control of the Debtor).    The three

independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr.

Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and

Foreign Representative.    Suffice it to say that this settlement and the appointment of the

independent directors changed the entire trajectory of the case and saved the Debtor from the

appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent

directors.  They were the right solution at the right time.  Because of the unique character of the

Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent

directors was a far better outcome for creditors than the appointment of a conventional chapter 11

trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in

particular, knew and had vast experience at prominent firms with high-yield and distressed

investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring

large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not

only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver

through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis,

the former affiliate of Highland that the Bankruptcy Court presided over and which company was

DOCS_SF:104487.21 36027/002

000637

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience. While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland complex shortly after he was appointed (which the Bankruptcy Court had to address).  The Acis trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14.     **Conditions Required by Independent Directors.**  Given the experiences in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer, as it would be in an ordinary chapter 11 case.  The independent board members were stepping into a morass of problems. Naturally, they were worried about getting sued no matter how defensible their efforts—given the litigation culture that enveloped Highland historically.  Based on the record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything always ended in litigation at Highland.  The Bankruptcy Court heard credible testimony that none of the independent directors would have taken on the role of independent director without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent directors without the Bankruptcy Court's prior authority.  This gatekeeper provision was also

14

000638

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's

Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on

July 16, 2020.[7]  The gatekeeper provisions in both the January 9 Order and July 16 Order are

precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine"

(first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)).

The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16

Order, and no one appealed either of those orders.  As noted above, Mr. Dondero signed the

Stipulation that led to the settlement that was approved by the January 9 Order.  The Bankruptcy

Court finds that, like the Committee, the independent board members have been resilient and

unwavering in their efforts to get the enormous problems in this case solved.  They seem to have

at all times negotiated hard and in good faith, which culminated in the proposal of the Plan

currently before the Bankruptcy Court.  As noted previously, they completely changed the

trajectory of this case.

        15.    **Not Your Garden Variety Mediators.**  And still another reason why this

was not your garden variety case was the mediation effort.  In the summer of 2020, roughly nine

months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis,

UBS, the Redeemer Committee, and Mr. Dondero.  The Bankruptcy Court selected co-mediators

because mediation among these parties seemed like such a Herculean task—especially during

COVID-19 where people could not all be in the same room.  Those co-mediators were:  Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

000639

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas.  As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation.  And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim).  The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16.   **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**.  Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court.  Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons.  Originally, there were over a dozen objections filed to the Plan.  The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below.  The only objectors to the Plan left at the time of the Confirmation Hearing

DOCS_SF:104487.21 36027/002

000640

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

a.   *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b.   *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

c.   A *Joinder to the Objection filed at 1670 by:  NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d.   *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e.   *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676].  The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17.   **Questionability of Good Faith as to Outstanding Confirmation Objections.**  Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

000641

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections. In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors. Mr. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan. As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring. The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18.    **Remote Interest of Outstanding Confirmation Objectors.** To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately. First, Mr. Dondero has a pending objection to the Plan. Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture). Mr. Dondero owns no equity in the Debtor directly. Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor. Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good"). The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor. *See* Disclosure Statement at 7, n.3. The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero. Get Good

DOCS_SF:104487.21 36027/002

000642

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which

the Debtor believes arise from Get Good's equity security interests and are subject to subordination

as set forth in its Confirmation Brief.  Dugaboy filed three claims against the Debtor: (a) an

administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat

Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to

pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation

Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor

asserts should be subordinated.  Another group of objectors that has joined together in one

objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See*

Docket No. 1863.  The Bankruptcy Court understands they assert disputed administrative expense

claims against the estate that were filed shortly before the Confirmation Hearing on January 23,

2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No.

1888].  At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and

Funds that the Funds have independent board members that run the Funds, but the Bankruptcy

Court was not convinced of their independence from Mr. Dondero because none of the so-called

independent board members have ever testified before the Bankruptcy Court and all have been

engaged with the Highland complex for many years.  Notably, the Court questions Mr. Post's

credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in

October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request,

and he is currently employed by Mr. Dondero.  Moreover, Dustin Norris, a witness in a prior

proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

DOCS_SF:104487.21 36027/002

000643

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero

owned and/or controlled these entities.  Finally, various NexBank entities objected to the Plan.

The Bankruptcy Court does not believe they have liquidated claims against the Debtor.  Mr.

Dondero appears to be in control of these entities as well.

          19.     **Background Regarding Dondero Objecting Parties.**  To be clear, the

Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in

opposition to confirmation, even though their economic interests in the Debtor appear to be

extremely remote and the Bankruptcy Court questions their good faith.  Specifically, the

Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero.  In

the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary

injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in

specific ways that were supported by evidence.  Around the time that this all came to light and the

Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company

phone, which he had been asked to turn in to Highland, mysteriously went missing.  The

Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy

Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to

confirmation of the Plan.

          20.     **Other Confirmation Objections.**  Other than the objections filed by Mr.

Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the

*United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of*

*Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

000644

Debtor release provisions.  In juxtaposition, to these pending objections, the Bankruptcy Court

notes that the Debtor resolved the following objections to the Plan:

  a.   *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

  b.   *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

  c.   *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

  d.   *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679].  This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

  e.   *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

  f.   *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].  This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

  21.   **Capitalized Terms.**  Capitalized terms used herein, but not defined herein,

shall have the respective meanings attributed to such terms in the Plan and the Disclosure

Statement, as applicable.

000645

22.    **Jurisdiction and Venue.**  The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.    **Chapter 11 Petition.**  On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.  The Office of the United States Trustee appointed the Committee on October 29, 2019.

24.    **Judicial Notice.**  The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

DOCS_SF:104487.21 36027/002

000646

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25.    **Plan Supplement Documents.**   Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements.   The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26.    **Retained Causes of Action Adequately Preserved.**   The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27.    **Plan Modifications Are Non-Material.**   In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

000647

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's
Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital
Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the
"Plan Modifications").  Section 1127(a) of the Bankruptcy Code provides that a plan proponent
may modify its plan at any time before confirmation so long as such modified plan meets the
requirements of sections 1122 and 1123 of the Bankruptcy Code.  None of the modifications set
forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant
to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because,
among other things, they do not materially adversely change the treatment of the claims of any
creditors or interest holders who have not accepted, in writing, such supplements and
modifications.  Among other things, there were changes to the projections that the Debtor filed
shortly before the Confirmation Hearing (which included projected distributions to creditors and
a comparison of projected distributions under the Plan to potential distributions under a
hypothetical chapter 7 liquidation).  The Plan Supplements and Plan Modifications did not mislead
or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity
Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan.
Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021
[Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors
or interest holders but, rather, simply update the estimated distributions based on Claims that were
settled in the interim and provide updated financial data.  The filing and notice of the Plan
Supplements and Plan Modifications were appropriate and complied with the requirements of

DOCS_SF:104487.21 36027/002

000648

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required. The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code. The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28. **Notice of Transmittal, Mailing and Publication of Materials.** As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto. No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29. **Voting.** The Bankruptcy Court has reviewed and considered the Voting Certifications. The procedures by which the Ballots for acceptance or rejection of the Plan were

000649

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30. **Bankruptcy Rule 3016(a).** In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31. **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).** As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32. **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class. The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33. **Classification of Secured Claims.** Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors. Class 3 (Other

000650

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

   34. **Classification of Priority Claims.** Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims.  Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

   35. **Classification of Unsecured Claims.** Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8.  Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims).  The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor.  Class 8 Creditors

000651

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36. **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37. **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38. **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

000653

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests.  The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39.     **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).**  Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan.  Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40.     **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).**  Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes.  Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41.     **No Discrimination (11 U.S.C. § 1123(a)(4)).**  The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest.  The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan.  Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

000654

42.    **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).**  Article IV of the
Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the
establishment of:  (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor;
and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are
included in the Plan Supplements.

a.    **The Claimant Trust.**    The Claimant Trust Agreement provides for the
management of the Claimant Trust, as well as the Reorganized Debtor with the
Claimant Trust serving as the managing member of New GP LLC (a wholly-owned
subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its
general partner).  The Claimant Trust, the Claimant Trustee, the management and
monetization of the Claimant Trust Assets, and the management of the Reorganized
Debtor (through the Claimant Trust's role as managing member of New GP LLC)
and the Litigation Sub-Trust will all be managed and overseen by the Claimant
Trust Oversight Committee.  Additionally, the Plan provides for the transfer to the
Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the
Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and
for the Claimant Trust Assets to automatically vest in the Claimant Trust free and
clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant
Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant
Trust Agreement.  The Claimant Trust will administer the Claimant Trust Assets as
provided under the Plan and the Claimant Trust Agreement contained in the Plan
Supplements.

b.    **The Litigation Sub-Trust.**  The Plan and the Litigation Sub-Trust Agreement
provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights,
title, and interest in and to all of the Estate Claims (as transferred to the Claimant
Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and
for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear
of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-
Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the
Litigation Sub-Trust Agreement.    The Litigation Trustee is charged with
investigating, pursuing, and otherwise resolving any Estate Claims (including those
with respect to which the Committee has standing to pursue prior to the Effective
Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-
Trust Agreement and the Plan, regardless of whether any litigation with respect to
any Estate Claim was commenced by the Debtor or the Committee prior to the
Effective Date.

000655

Case 3:25-cv-01876-K    Document 53-2    Filed 12/26/25    Page 48 of 614    PageID 12595

    c.    **The Reorganized Debtor**.   The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action.  The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan.  The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors.  Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests).  Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan.  Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents.  Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

    43.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).**  The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code.  Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

000656

44.    **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).**  Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee.  The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board.  The Claimant Trust Oversight Board will consist of:  (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery; and (5) David Pauker.  Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee.  Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors.  They are therefore intimately familiar with the Debtor, its business, and assets.  The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties.  The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

DOCS_SF:104487.21 36027/002

000657

45.     **Selection of Trustees.**  The Plan Supplements disclose that Mr. Seery will

serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee.  As noted

above, Mr. Seery has served as an Independent Board member since January 2020, and as the

Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive

management and restructuring experience, as evidenced from his curriculum vitae which is part of

the record.   The evidence shows that Mr. Seery is intimately familiar with the Debtor's

organizational structure, business, and assets, as well as how Claims will be treated under the Plan.

Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment

post-emergence as the Claimant Trustee.  Mr. Seery, upon consultation with the Committee,

testified that he intends to employ approximately 10 of the Debtor's employees to enable him to

manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets,

instead of hiring a sub-servicer to accomplish those tasks.  Mr. Seery testified that he believes that

the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by

a sub-set of the Debtor's current employees, who will be managed internally.  Mr. Seery shall

initially be paid $150,000 per month for services rendered after the Effective Date as Claimant

Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses

and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight

Board within forty-five (45) days after the Effective Date.  The Bankruptcy Court has also

reviewed Mr. Kirschner's curriculum vitae.  Mr. Kirschner has been practicing law since 1967 and

has substantial experience in bankruptcy litigation matters, particularly with respect to his prior

experience as a litigation trustee for several litigation trusts, as set forth on the record of the

Confirmation Hearing and in the Confirmation Brief.  Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries.  The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders.  Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46.      **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).** Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47.      **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.**  Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order.  In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

DOCS_SF:104487.21 36027/002

000659

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not

entitled to vote on the Plan pursuant to the Disclosure Statement Order.  The Disclosure Statement

Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity

Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan,

and the deadlines for voting on and objecting to the Plan.  The Debtor and KCC each complied

with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying

sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and

Publication.  The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides

that the same disclosure statement must be transmitted to each holder of a claim or interest in a

particular class.  The Debtor caused the same Disclosure Statement to be transmitted to all holders

of Claims and Equity Interests entitled to vote on the Plan.  The Debtor has complied in all respects

with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure

Statement Order.  The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain

Dondero Related Entities that the changes made to certain assumptions and projections from the

Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation

Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the

Plan.  The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to

the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections.

Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the

changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial

Projections do not constitute materially adverse change to the treatment of Claims or Equity

000660

Interests. Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data. Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets. The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48. **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).** The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

    a.    The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

Case 3:25-cv-01876-K   Document 53-2   Filed 10/26/23   Page 54 of 614   PageID 12597

b.   The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.   Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.   While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.   On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation. As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.   On August 12, 2020, the Debtor filed its *Chapter 11 Plan of* Reorganization *of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero. The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.   The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020. The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.   Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.   Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful. This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

000662

49.      **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

Article II.B of the Plan provides that Professionals will file all final requests for payment of

Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an

adequate period of time for interested parties to review such claims.  The procedures set forth in

the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in

connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter

11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy

Code.

50.      **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**  Article IV.B

of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the

Claimant Trust Oversight Committee and the members thereto.  For the reasons more fully

explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of

section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation

of any insider to be employed or retained by the Reorganized Debtor, if applicable, and

compensation for any such insider.  The appointment of such individuals is consistent with the

interests of Claims and Equity Interests and with public policy.  Thus, the Plan satisfies section

1129(a)(5) of the Bankruptcy Code.

51.      **No Rate Changes (11 U.S.C. § 1129(a)(6)).**  The Plan does not provide for

any rate change that requires regulatory approval.  Section 1129(a)(6) of the Bankruptcy Code is

thus not applicable.

DOCS_SF:104487.21 36027/002

000663

52.     **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).**  The "best interests"

test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity

Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date

of the Plan, that is not less than the amount that such Holder would so receive or retain if the

Debtor were liquidated under chapter 7 of the Bankruptcy Code.  On October 15, 2020, the Debtor

filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its

advisors and which was attached as Exhibit C to the Disclosure Statement.  On January 29, 2021,

in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor

provided an updated version of the Liquidation Analysis to the then-objectors of the Plan,

including Mr. Dondero and the Dondero Related Entities.  On February 1, 2021, the Debtor filed

the Amended Liquidation Analysis/Financial Projections.    The Amended Liquidation

Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues,

and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the

Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued

at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in

market conditions and other factors; (3) expected revenues and expenses arising in connection with

the Debtor's continued management of the CLOs pursuant to management agreements that the

Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding

two or three employees to assist in the management of the CLOs, the Debtor also increased

modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and

professional fees; and (5) an increase in projected recoveries on notes resulting from the

DOCS_SF:104487.21 36027/002

Case 3:25-cv-01876-K Document 53-2 Filed 11/26/25 Page 57 of 248 PageID 12704

acceleration of term notes owed to the Debtor by the following Dondero Related Entities:

NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC

(n/k/a NexPoint Real Estate Partners, LLC). Under the Plan, as of the Confirmation Date, (a) Class

7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b)

Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on

account of their Claims. Under a hypothetical chapter 7 liquidation, all general unsecured creditors

are projected to receive approximately 55% on account of their Claims. The Bankruptcy Court

finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive

under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation

based on Mr. Seery's testimony, including the following credible reasons he posited, among

others:

    a.    The nature of the Debtor's assets is complex. Certain assets relate to complicated real estate structures and private equity investments in operating businesses. Mr. Seery's extensive experience with the Debtor during the thirteen months since his appointment as an Independent Director and later Chief Executive Officer and Chief Restructuring Officer, provides him with a substantial learning curve in connection with the disposition of the Debtor's assets and are reasonably expected to result in him being able to realize tens of millions of dollars more value than would a chapter 7 trustee.

    b.    Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's business under chapter 7 of the Bankruptcy Code and hire the necessary personnel with the relevant knowledge and experience to assist him or her in selling the Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's assets in a forced sale liquidation which would generate substantially less value for the Debtor's creditors than the asset monetization plan contemplated by the Plan.

    c.    A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals to assist in its efforts to monetize assets, resulting in delays, increased expenses, and reduced asset yields for the chapter 7 estate.

000665

      d.      The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

      e.      The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53.      **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54.      **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

Case 3:25-cv-01876-K   Document 53-2   Filed 12/26/25   Page 59 of 248   PageID 12653

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

55.   **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).**   Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider.  Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56.   **Feasibility (11 U.S.C. § 1129(a)(11)).**   Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor.  The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets.  The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan.  The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors.  Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note.  The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date.  Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

DOCS_SF:104487.21 36027/002

000667

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the

Claimant Trust Agreement.  Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57.    **Payment of Fees (11 U.S.C. § 1129(a)(12)).**  All fees payable under 28

U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article

XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code.

The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-

Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United

States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor

or the dismissal or conversion of the Chapter 11 Case.

58.    **Retiree Benefits.**  The Plan provides for the assumption of the Pension Plan

(to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the

Bankruptcy Code).  Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to

the extent applicable.

59.    **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).**  Sections

1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic

support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii)

is not a nonprofit corporation (section 1129(a)(16)).

60.    **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. §**

**1129(b)).**  The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11,

which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

000668

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy

Code.

      a.     <u>Class 8</u>.  The Plan is fair and equitable with respect to Class 8 General Unsecured Claims.  While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement.  Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

      b.     <u>Class 10 and Class 11</u>.  There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement.  Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C).  The Plan does not discriminate unfairly as to Equity Interests.  As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly,

and is fair and equitable with respect to each Class that has rejected the Plan.  Thus, the Plan

satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10,

and 11.

000669

61.     **Only One Plan (11 U.S.C. § 1129(c)).**  The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62.     **Principal Purpose (11 U.S.C. § 1129(d)).**  Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds.  Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63.     **Satisfaction of Confirmation Requirements.**  Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64.     **Good Faith Solicitation (11 U.S.C. § 1125(e)).**  The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65.     **Discharge (11 U.S.C. § 1141(d)(3)).**  The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code.  Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

DOCS_SF:104487.21 36027/002

000670

in the same manner as the Debtor did prior to Plan confirmation, which includes the management

of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund.  Although the

Plan projects that it will take approximately two years to monetize the Debtor's assets for fair

value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be

monetizing their assets, there is no specified time frame by which this process must conclude.  Mr.

Seery's credible testimony demonstrates that the Debtor will continue to engage in business after

consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is

entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66.    **Retention of Jurisdiction.**  The Bankruptcy Court may properly retain

jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the

Bankruptcy Code to the maximum extent under applicable law.

67.    **Additional Plan Provisions (11 U.S.C. § 1123(b)).**  The Plan's provisions

are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68.    **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**

The Debtor has exercised reasonable business judgment with respect to the rejection of the

Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation

Order, and such rejections are justified and appropriate in this Chapter 11 Case.  The Debtor also

filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the

contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No.

1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

DOCS_SF:104487.21 36027/002

000671

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts").  With respect

to the Assumed Contracts, only one party objected to the assumption of any of the Assumed

Contracts, but that objection was withdrawn.[8]  Any modifications, amendments, supplements, and

restatements to the Assumed Contracts that may have been executed by the Debtor during the

Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or

the validity, priority, or amount of any Claims that may arise in connection therewith.  Assumption

of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant

to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether

monetary or nonmonetary, including defaults of provisions restricting the change in control or

ownership interest composition or other bankruptcy-related defaults, arising under any assumed

Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69.     **Compromises and Settlements Under and in Connection with the Plan
(11 U.S.C. § 1123(b)(3)).**  All of the settlements and compromises pursuant to and in connection

with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and

Bankruptcy Rule 9019.

70.     **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).**  The

Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the

jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the

transactions incorporated into the Plan, and inextricably bound with the other provisions of the

Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

000672

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71.     **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties.  Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.  Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties.  The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties.  The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases.  The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.  The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions").  Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date.  The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring.   The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

      72.    **Exculpation.**  Section IX.C of the Plan provides for the exculpation of

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision").   As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent.  First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

50

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these

parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order.

The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor

up until entry of the January 9 Order.  The January 9 Order was not appealed.  In addition to the

appointment of the Independent Directors in an already contentious and litigious case, the January

9 Order set the standard of care for the Independent Directors and specifically exculpated them for

negligence.  Mr. Seery and Mr. Dubel each testified that they had input into the contents of the

January 9 Order and would not have agreed to their appointment as Independent Directors if the

January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order.

Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent

Directors or their agents and advisors must first seek approval from the Bankruptcy Court before

doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case

and exculpated the Independent Directors for acts other than willful misconduct or gross

negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims

of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not

expire by its terms.

73.     **Existing Exculpation of Independent Directors.**  The Bankruptcy Court

also finds and concludes that  it has already exculpated Mr. Seery acting in the capacity as Chief

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order.  The Bankruptcy

Court concludes its previous approval of the exculpation of the Independent Directors, their agents,

advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

000675

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the

law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046

(5th Cir.1987).  The January 9 Order and July 16 Order cannot be collaterally attacked based on

the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors,

including any employees acting at their direction, as well as the Chief Executive Officer and Chief

Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order

and the July 16 Order.

      74.     **The Exculpation Provision Complies with Applicable Law.**  Separate

and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy

Court also finds and concludes that the Exculpation Provision is consistent with applicable law,

including *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), for several reasons:

    a.    First, the statutory basis for *Pacific Lumber's* denial of exculpation for certain
parties other than a creditors' committee and its members is that section 524(e) of
the Bankruptcy Code "only releases the debtor, not co-liable third parties."  *Pacific
Lumber*, 253 F.3d. at 253.  However, *Pacific Lumber* does not prohibit all
exculpations under the Bankruptcy Code and the court in such case specifically
approved the exculpations of a creditors' committee and its members on the
grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers,
implies committee members have qualified immunity for actions within the scope
of their duties…. [I]f members of the committee can be sued by persons unhappy
with the committee's performance during the case or unhappy with the outcome of
the case, it will be extremely difficult to find members to serve on an official
committee."  *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al,
Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008]).  *Pacific Lumber's*
rationale for permitted exculpation of creditors' committees and their members
(which was clearly policy-based and based on a creditors' committee qualified
immunity flowing from their duties under section 1103(c) of the Bankruptcy Code
and their disinterestedness and importance in chapter 11 cases) does not preclude
exculpation to other parties in a particular chapter 11 case that perform similar roles
to a creditors' committee and its members.  The Independent Directors, and by
extension the Chief Executive Officer and Chief Restructuring Officer, were not

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.    Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumber*, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

75. **Injunction.** Section IX.D of the Plan provides for a Plan inunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision"). The Injunction Provision is necessary to implement the provisions in the Plan. Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value. In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities. Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero, it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors. The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142. The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release." The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law. The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76. **Gatekeeper Provision.** Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision"). The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties. Thereafter, if the Bankruptcy Court determines that the action is

DOCS_SF:104487.21 36027/002

000678

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action.  The Bankruptcy

Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient

administration, implementation, and consummation of the Plan.  The Bankruptcy Court also

concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the

Gatekeeper Provision.

77.    **Factual Support for Gatekeeper Provision.**  The facts supporting the need

for the Gatekeeper Provision are as follows.  As discussed earlier in this Confirmation Order, prior

to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr.

Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for

years and, in some cases, over a decade.  Substantially all of the creditors in this case are either

parties who were engaged in litigation with the Debtor, parties who represented the Debtor in

connection with such litigation and had not been paid, or trade creditors who provided litigation-

related services to the Debtor.  During the last several months, Mr. Dondero and the Dondero

Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and

time-consuming litigation for the Debtor.  Such litigation includes: (i) entry of a temporary

restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190

Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees

and interference with the Debtor's business operations; (ii) a contempt motion against Mr.

Dondero for violation of the temporary restraining order, which motion is still pending before the

Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's

controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

000679

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by

the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the

Dondero Related Entities be able to continue their litigation against the Debtor and its successors

post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to

the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the

Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and

(vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them

from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc.

No. 21-03000 Docket No 1] (collectively, the "<u>Dondero Post-Petition Litigation</u>").

      78.   **Findings Regarding Dondero Post-Petition Litigation.**  The Bankruptcy

Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain

creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's

credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down

the place."  The Bankruptcy Court concludes that without appropriate protections in place, in the

form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence

litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than

the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more

hospitable to his claims.  The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that

the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date

will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

in lower distributions to creditors because of costs and distraction such litigation or the threats of

such litigation would cause.

79.    **Necessity of Gatekeeper Provision.**  The Bankruptcy Court further finds

that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the

Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which

will present unacceptable risks to parties currently willing to serve in such roles.  The Bankruptcy

Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the

Debtor's insurance broker ("<u>AON</u>"), regarding his efforts to obtain D&O insurance.  Mr. Tauber

credibly testified that of all the insurance carriers that AON approached to provide D&O insurance

coverage after the Effective Date, the only one willing to do so without an exclusion for claims

asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the

Gatekeeper Provision.  Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper

Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr.

Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient

administration, implementation and consummation of the Plan and is appropriate pursuant to

*Carroll v. Abide (In re Carroll)* 850 F.3d 811 (5th Cir. 2017).  Approval of the Gatekeeper

Provision will prevent baseless litigation designed merely to harass the post-confirmation entities

charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid

abuse of the court system and preempt the use of judicial time that properly could be used to

consider the meritorious claims of other litigants.  Any suit against a Protected Party would

effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

DOCS_SF:104487.21 36027/002

000681

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective

Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between

Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such

agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80.     **Statutory Authority to Approve Gatekeeper Provision.**     The

Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under

sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a).  The Gatekeeper Provision is also

within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126

(1881).  The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to

deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue

Moon Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir.

2017).

81.     **Jurisdiction to Implement Gatekeeper Provision.**  The Bankruptcy Court

finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision

as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under

*United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d

296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge

Techs., Inc.)*, 430 F.3d 260 (5th Cir. 2005).  Based upon the rationale of the Fifth Circuit in *Villegas

v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a

gatekeeper does not violate *Stern v. Marshall.*  The Bankruptcy Court's determination of whether

000682

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from

whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82.    **Resolution of Objections of Scott Ellington and Isaac Leventon**.    Each

of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior

Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the

following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees'*

*Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the

"Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated

Bonus Claims").

a.    Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of
$1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the
aggregate amount of $598,198.00.  Mr. Ellington received two Ballots[10] – a Ballot
for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Ellington completed
and timely returned both of such Ballots, voted to reject the Plan, and elected to
have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject
to the objections and reservations of rights set forth in the Senior Employees'
Objection.  If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated
Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be
$1,000,000.

b.    Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot
for Class 8 of the Plan.  Mr. Leventon completed and timely returned both of such
Ballots and voted each such Ballots to rejected the Plan.

c.    The Senior Employees' Objection, among other things, objects to the Plan on the
grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class
7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to
receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims.  The
Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect
to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests
entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

000683

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.     The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims.  As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.     Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant.  Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan.  Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan.  If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims).  In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims.  Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.     Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7).  If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

000684

Case 3:25-cv-01876-K Document 53-2 Filed 12/26/25 of Page 77 of 248 PageID 12674

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.     The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date. If the Debtor does not make an election, then Option A will apply.

h.     Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.      Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.      The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.     For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court

at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

A.     **Confirmation of the Plan.** The Plan is approved in its entirety and

**CONFIRMED** under section 1129 of the Bankruptcy Code. The terms of the Plan, including the

000685

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

> **B.     Findings of Fact and Conclusions of Law**.  The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

> **C.     Objections**.  Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference.  All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

> **D.     Plan Supplements and Plan Modifications.**   The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

000686

sufficient notice thereof.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and

Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional

disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126

of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded

an opportunity to change previously cast acceptances or rejections of the Plan.  The Plan

Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the

Bankruptcy Code.  Accordingly, the Plan, as modified, is properly before the Bankruptcy Court

and all votes cast with respect to the Plan prior to such modification shall be binding and shall

apply with respect to the Plan.

       E.       **Deemed Acceptance of Plan.**  In accordance with section 1127 of the

Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted

to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have

accepted the Plan as modified by the Plan Modifications.  No holder of a Claim shall be permitted

to change its vote as a consequence of the Plan Modifications.

       F.       **Vesting of Assets in the Reorganized Debtor.**  Except as otherwise

provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized

Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or

other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to

such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan

upon the Effective Date.  The Reorganized Debtor shall be the exclusive trustee of the Reorganized

Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

000687

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

G. **Effectiveness of All Actions.** All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

H. **Restructuring Transactions.** The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

DOCS_SF:104487.21 36027/002

I.     **Preservation of Causes of Action.** Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order). In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

J.     **Independent Board of Directors of Strand.** The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors. For avoidance of doubt, the Assumed Contracts

65

000689

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

   **K.**  **Cancellation of Equity Interests and Issuance of New Partnership Interests.** On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.  As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

000690

Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

  **L. Transfer of Assets to Claimant Trust.**  On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.  Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

  **M. Transfer of Estate Claims to Litigation Sub-Trust**.  On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses.  The Litigation Trustee will

DOCS_SF:104487.21 36027/002

000691

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms

of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor

or Committee, as applicable, in any litigation commenced prior to the Effective Date in which

Estate Claims are asserted.

      **N.**    **Compromise of Controversies.**  In consideration for the distributions and

other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a

good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved

under the Plan and the entry of this Confirmation Order constitutes approval of such compromise

and settlement under Bankruptcy Rule 9019.

      **O.**    **Objections to Claims**.  The Claims Objection Deadline shall be the date

that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline

may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise

provided under the Plan.

      **P.**    **Assumption of Contracts and Leases.**  Effective as of the date of this

Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the

need for any further notice to or action, order, or approval of the Bankruptcy Court, under section

365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the

Plan.  Each Assumed Contract shall include all modifications, amendments, supplements,

restatements, or other agreements related thereto, and all rights related thereto, if any, including

all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and

any other interests.  Modifications, amendments, supplements, and restatements to any of the

000692

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not

be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or

amount of any Claims that may arise in connection therewith.  Assumption of the Assumed

Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to

the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether

monetary or nonmonetary, including defaults of provisions restricting the change in control or

ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed

Contracts.

       **Q.**     **Rejection of Contracts and Leases.**  Unless previously assumed during the

pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and

Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant

to the terms of the Plan.  To the extent that any party asserts any damages resulting from the

rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty

(30) days** following entry of this Confirmation Order, or such claim will be forever barred and

disallowed against the Reorganized Debtor.

       **R.**     **Assumption of Issuer Executory Contracts.**  On the Confirmation Date,

the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer

Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.

In full and complete satisfaction of its obligation to cure outstanding defaults under section

365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

000693

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a

cumulative amount of $525,000 (the "Cure Amount") as follows:

    a.    $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

    b.    $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

    **S.**    **Release of Issuer Claims.**  Effective as of the Confirmation Date, and to

the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and

former advisors, trustees, directors, officers, managers, members, partners, employees,

beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

000694

Case 3:25-cv-01876-K   Document 53-2   Filed 12/26/25   Page 87 of 248   PageID 12684

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

  **T. Release of Debtor Claims against Issuer Released Parties.**  Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton  (collectively,

the "Issuer Released Parties")],] for and from any and all claims, debts, liabilities, demands,

obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without

limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action

of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or

unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or

otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether

known or unknown, which were or could have been asserted in, in connection with, or with respect

to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that

notwithstanding anything herein to the contrary, the release contained herein will apply to the

Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released

Claims arising from or relating to the Issuer Executory Contracts.  Notwithstanding anything in

this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with

respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

     **U.**    **Authorization to Consummate.**  The Debtor is authorized to consummate

the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the

conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan.  The

Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the

Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

     **V.**    **Professional Compensation.**  All requests for payment of Professional Fee

Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

000696

must be filed no **later than sixty (60) days after the Effective Date**. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Court. The Debtor shall fund the Professional Fee Reserve as provided under the Plan. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy Court allows. The Debtor is authorized to pay the pre-Effective Date fees and expenses of all ordinary course professionals in the ordinary course of business without the need for further Bankruptcy Court order or approval. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any Professional or Entity employed in the ordinary course of the Debtor's business without any further notice to or action, order, or approval of the Bankruptcy Court.

**W.      Release, Exculpation, Discharge, and Injunction Provisions.  The following release, exculpation, discharge, and injunction provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.**

**X.      Discharge of Claims and Termination of Interests.**  To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

DOCS_SF:104487.21 36027/002

000697

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against

the Debtor or any of its Assets or properties, and regardless of whether any property will have been

distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except

as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date,

the Debtor and its Estate will be deemed discharged and released under and to the fullest extent

provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code

from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not

limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the

kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

Y.     **Exculpation.**  Subject in all respects to Article XII.D of the Plan, to the

maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each

Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage,

demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after

the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter

11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation

of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including

the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation

of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be

issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan

Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any

negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

DOCS_SF:104487.21 36027/002

000698

Case 3:25-cv-01876-K    Document 53-2    Filed 12/26/25    Page 93 of 248    PageID 12684

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

**Z.    Releases by the Debtor.**  On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

DOCS_SF:104487.21 36027/002
000699

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance

Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.

**AA.    Injunction.  Upon entry of this Confirmation Order, all Enjoined
Parties are and shall be permanently enjoined, on and after the Effective Date, from taking
any actions to interfere with the implementation or consummation of the Plan.  Except as
expressly provided in the Plan, this Confirmation Order, or a separate order of the
Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after
the Effective Date, with respect to any Claims and Equity Interests, from directly or
indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or
other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative
or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing,
levying, attaching (including any prejudgment attachment), collecting, or otherwise
recovering, enforcing, or attempting to recover or enforce, by any manner or means, any
judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii)
creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or
encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any
right of setoff, directly or indirectly, against any obligation due to the Debtor or against
property or interests in property of the Debtor, except to the limited extent permitted under
Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

000700

in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.  Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in

DOCS_SF:104487.21 36027/002

000701

Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

BB.     **Duration of Injunction and Stays.  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.**

CC.     **Continuance of January 9 Order and July 16 Order.**  Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020  shall remain in full force and effect from the Confirmation Date and following the Effective Date.

DD.     **No Governmental Releases.**  Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

**EE.    Exemption from Transfer Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

DOCS_SF:104487.21 36027/002

000703

including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

FF.     **Cancellation of Notes, Certificates and Instruments.**  Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the

000704

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

**GG. Documents, Mortgages, and Instruments.** Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

**HH. Post-Confirmation Modifications.** Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

**II. Applicable Nonbankruptcy Law.** The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

**JJ. Governmental Approvals Not Required.** This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

DOCS_SF:104487.21 36027/002

000705

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

      **KK.**   **Notice of Effective Date.**  As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c). Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

      **LL.**   **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

      **MM.**   **Waiver of Stay.**  For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

DOCS_SF:104487.21 36027/002

000706

NN.     **References to and Omissions of Plan Provisions.**  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.  The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

OO.     **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

PP.     **Effect of Conflict.**  This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.  If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

QQ.     **Resolution of Objection of Texas Taxing Authorities.**  Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes.  The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

DOCS_SF:104487.21 36027/002

000707

applicable nonbankruptcy law.  In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

a. The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law.  The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan.  The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

b. The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full.  In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default.  Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default.  If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith.  The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

RR.     **Resolution of Objections of Scott Ellington and Isaac Leventon.**

Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all

respects.  The Debtor may, only with the consent of the Committee, elect Option B for a Senior

Employee Claimant by written notice to such Senior Employee Claimant on or before the

occurrence of the Effective Date.  If the Debtor does not elect Option B, then Option A will govern

the treatment of the Liquidated Bonus Claims.

a.  Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

b.  The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

c.  Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan.  Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

d.  The Senior Employees' Objection is deemed withdrawn.

SS.     **No Release of Claims Against Senior Employee Claimants**.  For the

avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not

be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

DOCS_SF:104487.21 36027/002

000709

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released Party" under the Plan.

**TT.** **Resolution of Objection of Internal Revenue Service.** Notwithstanding any other provision or term of the Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the "IRS Claim"):

(a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

(1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

(2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

(3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

86

000710

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c) The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

   **UU.** **IRS Proof of Claim.** Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

DOCS_SF:104487.21 36027/002

000711

**VV.    CLO Holdco, Ltd. Settlement**    Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25,2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

**WW.    Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX.    Payment of Statutory Fees; Filing of Quarterly Reports.**  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.  The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**YY.    Dissolution of the Committee**.  On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

000712

any role arising from or relating to the Chapter 11 Case, except in connection with final fee

applications of Professionals for services rendered prior to the Effective Date (including the right

to object thereto). Notwithstanding the foregoing, any Committee member or Professional may

serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation

Sub-Trust.  The Professionals retained by the Committee and the members thereof will not be

entitled to assert any fee claims for any services rendered to the Committee or expenses incurred

in the service of the Committee after the Effective Date, except for reasonable fees for services

rendered, and actual and necessary costs incurred, in connection with any applications for

allowance of Professional Fees pending on the Effective Date or filed and served after the Effective

Date pursuant to the Plan.  Nothing in the Plan shall prohibit or limit the ability of the Debtor's or

Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed

per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such

representation.

       **ZZ.**    **Miscellaneous.**  After the Effective Date, the Debtor or Reorganized

Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any

parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under

the Bankruptcy Code or a court order, including monthly operating reports (even for those periods

for which a monthly operating report was not filed before the Effective Date), ordinary course

professional reports, reports to any parties otherwise required under the "first" and "second" day

orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in

this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

000713

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post

confirmation reporting requirements.

### ###END OF ORDER###

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
           GOVERNING LAW AND DEFINED TERMS ............................................... 1

    A.     Rules of Interpretation, Computation of Time and Governing Law ..................... 1

    B.     Defined Terms ......................................................................................... 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 16

    A.     Administrative Expense Claims .......................................................... 16

    B.     Professional Fee Claims ..................................................................... 17

    C.     Priority Tax Claims ............................................................................ 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
           AND EQUITY INTERESTS .......................................................... 18

    A.     Summary ............................................................................................ 18

    B.     Summary of Classification and Treatment of Classified Claims and
           Equity Interests ............................................................................. 18

    C.     Elimination of Vacant Classes ........................................................... 19

    D.     Impaired/Voting Classes .................................................................... 19

    E.     Unimpaired/Non-Voting Classes ....................................................... 19

    F.     Impaired/Non-Voting Classes ........................................................... 19

    G.     Cramdown .......................................................................................... 19

    H.     Classification and Treatment of Claims and Equity Interests ............ 19

    I.     Special Provision Governing Unimpaired Claims .............................. 24

    J.     Subordinated Claims .......................................................................... 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ................................... 24

    A.     Summary ............................................................................................ 24

    B.     The Claimant Trust ............................................................................ 25

         1.     Creation and Governance of the Claimant Trust and Litigation
             Sub-Trust ................................................................................. 25

         2.     Claimant Trust Oversight Committee ..................................... 26

000717

Case 19-34054-sgj11    Doc 1943    Filed 02/22/21    Entered 02/22/21 16:48:16    Desc
Case 3:25-cv-01876-K    Document 56-2    Filed 11/25/24    Page 109 of 614    PageID 12657

**Page**

| | 3. | Purpose of the Claimant Trust. | 27 |
| | 4. | Purpose of the Litigation Sub-Trust. | 27 |
| | 5. | Claimant Trust Agreement and Litigation Sub-Trust Agreement. | 27 |
| | 6. | Compensation and Duties of Trustees. | 29 |
| | 7. | Cooperation of Debtor and Reorganized Debtor. | 29 |
| | 8. | United States Federal Income Tax Treatment of the Claimant Trust. | 29 |
| | 9. | Tax Reporting. | 30 |
| | 10. | Claimant Trust Assets. | 30 |
| | 11. | Claimant Trust Expenses. | 31 |
| | 12. | Trust Distributions to Claimant Trust Beneficiaries. | 31 |
| | 13. | Cash Investments. | 31 |
| | 14. | Dissolution of the Claimant Trust and Litigation Sub-Trust. | 31 |
| C. | | The Reorganized Debtor | 32 |
| | 1. | Corporate Existence | 32 |
| | 2. | Cancellation of Equity Interests and Release | 32 |
| | 3. | Issuance of New Partnership Interests | 32 |
| | 4. | Management of the Reorganized Debtor | 33 |
| | 5. | Vesting of Assets in the Reorganized Debtor | 33 |
| | 6. | Purpose of the Reorganized Debtor | 33 |
| | 7. | Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets | 33 |
| D. | | Company Action | 34 |
| E. | | Release of Liens, Claims and Equity Interests | 35 |
| F. | | Cancellation of Notes, Certificates and Instruments | 35 |

000718

**Page**

  G. Cancellation of Existing Instruments Governing Security Interests ..................35

  H. Control Provisions ............................................................................35

  I. Treatment of Vacant Classes ...........................................................36

  J. Plan Documents ..............................................................................36

  K. Highland Capital Management, L.P. Retirement Plan and Trust ......................36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
   LEASES ......................................................................................37

  A. Assumption, Assignment, or Rejection of Executory Contracts and
   Unexpired Leases ............................................................................37

  B. Claims Based on Rejection of Executory Contracts or Unexpired
   Leases ..........................................................................................38

  C. Cure of Defaults for Assumed or Assigned Executory Contracts and
   Unexpired Leases ............................................................................38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................39

  A. Dates of Distributions ......................................................................39

  B. Distribution Agent ...........................................................................39

  C. Cash Distributions ...........................................................................40

  D. Disputed Claims Reserve ..................................................................40

  E. Distributions from the Disputed Claims Reserve ....................................40

  F. Rounding of Payments ......................................................................40

  G. *De Minimis* Distribution ..................................................................41

  H. Distributions on Account of Allowed Claims .........................................41

  I. General Distribution Procedures .........................................................41

  J. Address for Delivery of Distributions ..................................................41

  K. Undeliverable Distributions and Unclaimed Property ...............................41

  L. Withholding Taxes ...........................................................................42

000719

|  |  |  | **Page** |
|---|---|---|---|
| M. | Setoffs | | 42 |
| N. | Surrender of Cancelled Instruments or Securities | | 42 |
| O. | Lost, Stolen, Mutilated or Destroyed Securities | | 43 |
| ARTICLE VII. | PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS | | 43 |
| A. | Filing of Proofs of Claim | | 43 |
| B. | Disputed Claims | | 43 |
| C. | Procedures Regarding Disputed Claims or Disputed Equity Interests | | 43 |
| D. | Allowance of Claims and Equity Interests | | 44 |
|  | 1. | Allowance of Claims | 44 |
|  | 2. | Estimation | 44 |
|  | 3. | Disallowance of Claims | 44 |
| ARTICLE VIII. | EFFECTIVENESS OF THIS PLAN | | 45 |
| A. | Conditions Precedent to the Effective Date | | 45 |
| B. | Waiver of Conditions | | 46 |
| C. | Dissolution of the Committee | | 46 |
| ARTICLE IX. | EXCULPATION, INJUNCTION AND RELATED PROVISIONS | | 47 |
| A. | General | | 47 |
| B. | Discharge of Claims | | 47 |
| C. | Exculpation | | 47 |
| D. | Releases by the Debtor | | 48 |
| E. | Preservation of Rights of Action | | 49 |
|  | 1. | Maintenance of Causes of Action | 49 |
|  | 2. | Preservation of All Causes of Action Not Expressly Settled or Released | 49 |

000720

**Page**

F.      Injunction ................................................................................................50

G.      Duration of Injunctions and Stays..........................................................51

H.      Continuance of January 9 Order .............................................................51

ARTICLE X. BINDING NATURE OF PLAN ................................................................51

ARTICLE XI. RETENTION OF JURISDICTION..........................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS .......................................................54

A.      Payment of Statutory Fees and Filing of Reports ..................................54

B.      Modification of Plan ...............................................................................54

C.      Revocation of Plan ..................................................................................54

D.      Obligations Not Changed.........................................................................55

E.      Entire Agreement ....................................................................................55

F.      Closing of Chapter 11 Case ....................................................................55

G.      Successors and Assigns...........................................................................55

H.      Reservation of Rights..............................................................................55

I.      Further Assurances..................................................................................56

J.      Severability..............................................................................................56

K.      Service of Documents.............................................................................56

L.      Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
        the Bankruptcy Code................................................................................57

M.      Governing Law ........................................................................................58

N.      Tax Reporting and Compliance ..............................................................58

O.      Exhibits and Schedules ...........................................................................58

P.      Controlling Document .............................................................................58

000721

---

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

---

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "<u>Debtor</u>"), proposes the following chapter 11 plan of reorganization (the "<u>Plan</u>") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

**A.**      <u>Rules of Interpretation, Computation of Time and Governing Law</u>

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    <u>Defined Terms</u>

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.    "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.    "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.    "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.    "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.    "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

000723

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.     "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.     "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.     "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.     "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

000724

15.     "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16.     "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17.     "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19.     "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims.  The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20.     "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21.     "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22.     "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23.     "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

000725

24.     "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25.     "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26.     "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC.  For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27.     "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28.     "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.  The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29.     "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30.     "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

000726

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

000727

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

000728

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

000729

62.    "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64.    "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65.    "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66.    "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67.    "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68.    "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

000730

69.    "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70.    "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71.    "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.    "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73.    "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74.    "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.    "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76.    "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77.    "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78.    "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79.    "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80.    "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

000731

81.     "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82.     "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83.     "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84.     "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85.     "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86.     "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87.     "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88.     "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89.     "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90.     "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91.     "Petition *Date*" means October 16, 2019.

92.     "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

000732

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

000733

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

000734

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109.    "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110.    "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111.    "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113.    "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114.    "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115.    "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116.    "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

000735

117. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121. "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122. "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123. "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125. "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127. "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128. "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129. "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

000736

130.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.    "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### A.    Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

000737

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C.    Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

000738

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.**    **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**    **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

000739

#### C.    <u>Elimination of Vacant Classes</u>

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

#### D.    <u>Impaired/Voting Classes</u>

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

#### E.    <u>Unimpaired/Non-Voting Classes</u>

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

#### F.    <u>Impaired/Non-Voting Classes</u>

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

#### G.    <u>Cramdown</u>

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

#### H.    <u>Classification and Treatment of Claims and Equity Interests</u>

1.    *Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

000740

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.  *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.  *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

000741

4.      *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.      *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.      *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6

000742

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.   *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.   *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

000743

9.      *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

  *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.     *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.     *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

000744

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and shall retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

**I.**   **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.**   **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.**   **Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited

000745

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.  The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement.  Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.**     **The Claimant Trust**[2]

1.     _Creation and Governance of the Claimant Trust and Litigation Sub-Trust._

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries.  Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

000746

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.   *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

000747

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.    *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.    *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

000748

(i)      the payment of the Claimant Trust Expenses;

(ii)     the payment of other reasonable expenses of the Claimant Trust;

(iii)    the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)    the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)     the orderly monetization of the Claimant Trust Assets;

(vi)    litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)   the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)  the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)    the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)      the payment of other reasonable expenses of the Litigation Sub-Trust;

000749

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.     _Compensation and Duties of Trustees._

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.     _Cooperation of Debtor and Reorganized Debtor._

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.     _United States Federal Income Tax Treatment of the Claimant Trust._

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer

000750

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

      9.     *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trust will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

      10.     *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

000751

11.     *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.     *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.     *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.     *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

**C.**    **The Reorganized Debtor**

1.    *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

2.    *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

3.    *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

000753

4.    _Management of the Reorganized Debtor_

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.    _Vesting of Assets in the Reorganized Debtor_

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.    _Purpose of the Reorganized Debtor_

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.    _Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of_
    _Reorganized Debtor Assets_

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

000754

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.    Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

000755

### E.  Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### F.  Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

### G.  Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### H.  Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

000756

I.      **Treatment of Vacant Classes**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

J.      **Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement.  To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

K.      **Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**    **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

000758

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.**     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order.  Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.**     **Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

000759

Case 3:25-cv-01876-K    Document 59-1    Filed 12/26/25    Page 151 of 614    PageID 12694

### ARTICLE VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

**A.**     **Dates of Distributions**

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan. Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

**B.**     **Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

000760

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C.    **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

## D.    **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

## E.    **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount.  To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.  For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests.  If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

## F.    **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

000761

## G.   *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

## H.   Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

## I.   General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

## J.   Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

## K.   Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

000762

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.     Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.     Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.     Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

000763

O.      **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

A.      **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

B.      **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

C.      **Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

000764

**D.**   **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1.   *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2.   *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3.   *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

000765

**ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

**A.    Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

000766

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

### B.    <u>Waiver of Conditions</u>

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

### C.    <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

000767

the Effective Date or filed and served after the Effective Date pursuant to the Plan.  Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

**A.**      **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

**B.**      **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**C.**      **Exculpation**

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however,* the foregoing

000768

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.**     **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

000769

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

## E.    **Preservation of Rights of Action**

1.    *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

2.    *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

000770

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.    Injunction**

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

000771

(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

G. **Duration of Injunctions and Stays**

**ARTICLE II.** Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.

H. **Continuance of January 9 Order**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.


**ARTICLE X.**
**BINDING NATURE OF PLAN**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

000772

# ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

000773

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

000774

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.    Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C.    Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

000775

### D.    Obligations Not Changed

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

### E.    Entire Agreement

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### F.    Closing of Chapter 11 Case

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

### G.    Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

### H.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

000776

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

I.   **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order. On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

J.   **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

K.   **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

**If to the Claimant Trust:**

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700

000777

Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attn:   Jeffrey N. Pomerantz, Esq.
         Ira D. Kharasch, Esq.
         Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
         Ira D. Kharasch, Esq.
         Gregory V. Demo, Esq.

**L.**   **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

57

000778

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.**     **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.**     **Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.**     **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**     **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

000779

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

000780

Case 19-34054-sgj11 Doc 1808 Filed 01/22/21 Entered 01/22/21 15:36:25 Page 1 of 86
Case 3:25-cv-01876-K Document 68-12 Filed 11/25/25 Page 172 of 614 PageID 12515
Docket #1808 Date Filed: 01/22/2021

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

---

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

---

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210122000000000013
0O4263

Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

**C.**     **Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.**     **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

004264

B.    **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

C.    **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

D.    **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

E.    **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

F.    **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

G.    **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the

19

004265

Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## H.    Classification and Treatment of Claims and Equity Interests

1.    *Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.    *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

004266

3.  _Class 3 – Other Secured Claims_

- _Classification_:  Class 3 consists of the Other Secured Claims.

- _Allowance and Treatment_:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- _Impairment and Voting_:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4.  _Class 4 – Priority Non-Tax Claims_

- _Classification_:  Class 4 consists of the Priority Non-Tax Claims.

- _Allowance and Treatment_:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- _Impairment and Voting_:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.  _Class 5 – Retained Employee Claims_

- _Classification_:  Class 5 consists of the Retained Employee Claims.

- _Allowance and Treatment_:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

004267

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.  *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.  *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.  *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

004268

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9. <u>Class 9 – Subordinated Claims</u>

- *Classification*:  Class 9 consists of the Subordinated Claims.

  *Treatment*:  On the Effective Date, Holders of Subordinated Claims  shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10. <u>Class 10 – Class B/C Limited Partnership Interests</u>

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

004269

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11. *Class 11 – Class A Limited Partnership Interests*

- *Classification*: Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

**I.** **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

24

### J.    Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

### ARTICLE IV.
### MEANS FOR IMPLEMENTATION OF THIS PLAN

### A.    Summary

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be

004271

| IN RE: Highland Capital Management, L.P. | Motion for Approval of Settlement with the HMIT Entities Rule 9019 doc. #4216 | Case # 19−34054−sgj11 |

**DEBTOR**

### TYPE OF HEARING

| Highland Capital Management, L.P. | *VS* | James Dondero/Patrick Daugherty |

**PLAINTIFF / MOVANT** | | **DEFENDANT / RESPONDENT**

| John Morris/Louis M. Phillips | | Michael Justin Lang/Andrew K. York |

**ATTORNEY** | | **ATTORNEY**

### EXHIBITS

SEE EXHIBIT & WITNES LIST AT DOC. #4253, #4255, & #4271

Court Admitted Exhibits #1 through #9; #11 through #56; #58 through #123 & #126

SEE EXHIBIT & WITNESS LIST AT DOC. #4266

Court Admitted All Exhibits; #1 through #42

Dugaboy Exhibit #3 Letter dated June 24 2025: Admitted by Michael Lang

| Michael Edmond | June 25, 2025 | Stacey G Jernigan |

**REPORTED BY** | **HEARING DATE** | **JUDGE PRESIDING**

004287

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | **STIPULATION WITHDRAWING THE DUGABOY INVESTMENT TRUST'S OBJECTION TO MOTION FOR ORDER EXTENDING DURATION OF TRUSTS** |

## <u>STIPULATION WITHDRAWING THE DUGABOY INVESTMENT TRUST'S OBJECTION TO MOTION FOR ORDER EXTENDING DURATION OF TRUSTS</u>

This stipulation (the "Stipulation") is made and entered into in the above-captioned

bankruptcy case by and between The Highland Claimant Trust and the Highland Litigation Sub-

Trust (together, the "Trusts"), on the one hand, and The Dugaboy Investment Trust ("Dugaboy"),

on the other hand, by and through their respective undersigned counsel.

## RECITALS

WHEREAS, on May 8, 2025, Trusts filed a Motion for an Order Further Extending Duration of Trusts [Dkt. No. 4213] (the "Motion"), requesting the Bankruptcy Court to enter an order further extending the duration of the Trusts through and including August 11, 2026;

WHEREAS, on May 29, 2025, Dugaboy filed its Objection of The Dugaboy Investment Trust to Motion for an Order Further Extending Duration of Trusts [Dkt. No. 4223] (the "Objection");

WHEREAS, the Trusts and Dugaboy hereby enter into this Stipulation in order to resolve the Motion and the Objection;

NOW, WHEREFORE, IT IS HEREBY JOINTLY STIPULATED AND AGREED, as follows:

1. Dugaboy agrees to withdraw its Objection to the Motion with prejudice;

2. The Trusts expect to dissolve by August 11, 2026 so that no further extension of the duration of the Trusts will be necessary;

3. Dugaboy hereby preserves and does not waive its right, if any, to object to any further attempts to extend the date by which the Trusts must dissolve or to extend the duration of the Trusts;

4. This Stipulation may be executed in counterparts. A facsimile, electronic, or photocopy of this Stipulation and the signatures hereto shall have the same effect and may be accepted with the same authority as if it were an original; and

5.      The Trusts and Dugaboy agree that the Bankruptcy Court shall retain jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Stipulation and any order related to same.


[*Remainder of Page Intentionally Blank*]

| | |
|---|---|
| 08/09/2021 | 🖰 2697 (4 pgs) Assignment/Transfer of Claim. Fee Amount $52. Transfer Agreement 3001 (e) 2 Transferors: UBS Securities LLC and UBS AG London Branch (Claim No. 190, Amount $32,175,000.00); UBS Securities LLC and UBS AG London Branch (Claim No. 191, Amount $18,000,000.00) To Jessup Holdings LLC. Filed by Creditor Jessup Holdings LLC. (Leen, Edward) |
| 08/09/2021 | 🖰 2698 (4 pgs) Assignment/Transfer of Claim. Fee Amount $52. Transfer Agreement 3001 (e) 2 Transferors: UBS Securities LLC and UBS AG London Branch (Claim No. 190, Amount $32,175,000.00); UBS Securities LLC and UBS AG London Branch (Claim No. 191, Amount $18,000,000.00) To Muck Holdings LLC. Filed by Creditor Muck Holdings LLC. (Leen, Edward) |
| 08/09/2021 | Receipt of filing fee for Assignment/Transfer of claim (Claims Agent)(19-34054-sgj11) [claims,trclmagt] ( 52.00). Receipt number 28905213, amount $ 52.00 (re: Doc# 2697). (U.S. Treasury) |
| 08/09/2021 | Receipt of filing fee for Assignment/Transfer of claim (Claims Agent)(19-34054-sgj11) [claims,trclmagt] ( 52.00). Receipt number 28905213, amount $ 52.00 (re: Doc# 2698). (U.S. Treasury) |
| 08/10/2021 | 🖰 2699 (17 pgs) Order granting motion of the Debtor for entry of an order (i) Authorizing the sale and/or forfeiture of certain limited partnership interests and other rights and (ii) Granting related relief (related document # 2537) Entered on 8/10/2021. (Rielly, Bill) |
| 08/11/2021 | 🖰 2700 (4 pgs) Notice *(Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1943 Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.)). (Annable, Zachery) |
| 08/11/2021 | 🖰 2701 (4 pgs) Certificate of No Objection filed by Other Professional Teneo Capital, LLC (RE: related document(s)2586 Application for compensation *of Teneo Capital, LLC as Litigation Advisor* for Official Committee of Unsecured Creditors, Other Professional, Period: 4/15/2021 to 6/30/2021, Fee: $80,000.00, Expenses: $118.89.). (Hoffman, Juliana) |
| 08/11/2021 | 🖰 2702 (16 pgs) Certificate of service re: *Documents Served on August 6, 2021* Filed by Claims Agent Kurtzman Carson Consultants LLC (related document(s)2678 Order approving stipulation (A) amending schedule and (B) consolidating and resolving certain matters (RE: related document(s)2607 Stipulation filed by Debtor Highland Capital Management, L.P.). Trial in the Adversary Proceeding (including on the Advisors Admin Claim) is set for December 7 and 8, 2021 at 9:30 a.m. (Central Time), Entered on 8/6/2021 (Okafor, M., 2686 Second Agreed Supplemental Order authorizing the retention and employment of Hunt Andrews Kurth LLP as special counsel nunc pro tunc to the petition date (RE: related document(s)1169 Agreed Supplemental Order authorizing the retention and employment of Hunton Andrews Kurth LLP as Special Counsel Nunc Pro Tunc to the petition date (RE: related document(s)763 Order on application to employ). Entered on 8/6/2021 (Okafor, M.), 2687 Order approving Debtors Motion for Entry of an Order (i)Authorizing the Sale of Certain Property and (ii) Granting Related Relief (related document 2535) Entered on 8/6/2021. (Okafor, M.), 2688 Order granting the Committee's Emergency Motion to Set Briefing Schedule for Motion of the Official Committee of Unsecured Creditors and the Litigation Advisor for Entry of an Order Authorizing the Examination of Rule 2004 Parties Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (Re: related document(s) 2652 Motion to shorten time to Response Deadline to Rule 2004 Motion (RE: related document(s)2620 Motion for examination)) Entered on 8/6/2021. (Okafor, M.)). (Kass, Albert) |
| 08/12/2021 | 🖰 2703 (3 pgs) Certificate of No Objection filed by Other Professional Hayward PLLC (RE: related document(s)2595 Application for compensation *(Fourteenth Monthly Application for Compensation and Reimbursement of Expenses of Hayward PLLC as Local Counsel to the Debtor for the Period from February 1, 2021 through February 28, 2021)* for Hayward PLLC, Deb). (Annable, Zachery) |

000402

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

**ORDER APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND
AUTHORIZING ACTIONS CONSISTENT THEREWITH**

This matter having come before the Court on the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. []] (the "Motion")[2] filed by the Movants; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 as well as the retention of jurisdiction provisions of the Plan; and the Court having found that this is a

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for the Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue in this District being proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered the Motion, the

materials submitted in support of the Motion, all responses to the Motion, and the arguments

presented by counsel at the hearing on the Motion; and the Court having found that the relief

requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other

parties-in-interest, and is supported by sound business reasons and justifications; and the Court

having determined that the legal and factual bases set forth in the Motion establish sufficient

cause for the relief granted herein; and adequate notice of the Motion having been given; and

after due deliberation and good cause appearing therefor,

**THE COURT FINDS THAT:**

1.      The Settlement Agreement was negotiated and entered into by the HMIT Entities

without collusion or fraud, in good faith, and was the product of arm's-length negotiations.

2.      The HMIT Entities are not "insiders" or "affiliates" of Highland as those terms

are defined in Bankruptcy Code sections 101(3) and 101(2).

3.      The HMIT Entities entered into the Settlement Agreement and are acquiring the

Transferred Claims and Dugaboy Note in good faith and have proceeded with all aspects of the

Settlement Agreement in good faith.

4.      The Highland Entities have demonstrated a sufficient basis and compelling

circumstances to enter into the Settlement Agreement, and entry into the Settlement Agreement

is an appropriate exercise of the Highland Entities' business judgment and in the best interests of

Highland, its estate, and its creditors.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

5.      The Motion is **GRANTED**.

000802

6.      The Settlement Agreement attached as **Exhibit 1** to the Demo Declaration is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363(b) of the Bankruptcy Code.

7.      The HMIT Entities, as good faith purchasers of Estate assets in the Settlement, are entitled to the protections contained in section 363(m) of the Bankruptcy Code.

8.      The Highland Entities and their agents are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement without further notice or further Court approval.

9.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

### ### END OF ORDER ###

000803

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

QUINN EMANUEL URQUHART &
SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Counsel for Highland Capital Management,
L.P. and the Highland Claimant Trust*

*Co-Counsel for Marc S. Kirschner, as
Litigation Trustee of The Highland
Litigation Sub-Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § | |

## MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

Highland Capital Management, L.P., the reorganized debtor (the "<u>Debtor</u>" or "<u>Highland</u>," as applicable) in the above-captioned chapter 11 case (the "<u>Bankruptcy Case</u>"), the Highland Claimant Trust (the "<u>Claimant Trust</u>"), and the Highland Litigation Sub-Trust (the "<u>Litigation</u>

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Sub-Trust" and together with Highland and the Claimant Trust, the "<u>Movants</u>") file this Motion

(the "<u>Motion</u>") for entry of an order pursuant to sections 105(a) and 363 of title 11 of the United

States Code (the "<u>Bankruptcy Code</u>") and Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>"), substantially in the form attached hereto as **Exhibit A**,

approving a settlement agreement (the "<u>Settlement Agreement</u>")[2] between Highland, the

Claimant Trust, the Litigation Sub-Trust, and the Highland Indemnity Trust (the "<u>Indemnity</u>

<u>Trust</u>", and together with Highland, the Claimant Trust, and the Litigation Sub-Trust, the

"<u>Highland Entities</u>"), on the one hand, and Hunter Mountain Investment Trust ("<u>HMIT</u>"),

Beacon Mountain LLC ("<u>Beacon Mountain</u>"), Rand Advisors, LLC ("<u>Rand Advisors</u>"), Rand PE

Fund I, LP ("<u>Rand PE Fund</u>"), Rand PE Fund Management, LLC ("<u>Rand GP</u>"), Atlas IDF, LP

("<u>Atlas IDF</u>"), and Atlas IDF GP, LLC ("<u>Atlas GP</u>" and together with HMIT, Beacon Mountain,

Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "<u>HMIT Entities</u>"), on the other

hand. A copy of the Settlement Agreement is attached as **Exhibit 1** to the *Declaration of*

*Gregory V. Demo in Support of the Motion for Entry of an Order Pursuant to Bankruptcy Rule*

*9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions*

*Consistent Therewith* (the "<u>Demo Declaration</u>"), filed concurrently herewith. In support of this

Motion, the Movants respectfully state as follows:

<u>**INTRODUCTION**</u>

1.        Following extensive, arm's-length, good faith negotiations, the Highland Entities

and the HMIT Entities, acting through their duly authorized representatives, executed the

Settlement Agreement that will result in, among other things: (a) the dismissal with prejudice of

all pending litigation between and among them; (b) the disposition of Estate Claims asserted

against certain of the HMIT Entities by the Litigation Trustee of the Litigation Sub-Trust and the

---

[2] Capitalized terms used herein, but not defined, have the meanings ascribed to them in the Settlement Agreement or elsewhere in this Motion, as applicable.

assignment of the balance of the remaining Estate Claims (as defined in the Plan) to the HMIT

Entities; (c) the allowance of the HMIT Class 10 Interest in the Claimant Trust in a fixed

amount; (d) distributions to HMIT on account of its Class 10 interest, including the assignment

of the Dugaboy Note, a long-term note with no ready market, at times and in amounts, and

subject to the conditions, set forth in the Settlement Agreement; and (e) the exchange of mutual

general and broad releases and other protections consistent with the parties' intent to end all

current, and avoid all future litigation, between and among them (except for any alleged breach

of the Settlement Agreement).

2.      The parties' entry into the Settlement Agreement is one of the most significant

developments in the long-running Highland Bankruptcy Case. As this Court is aware, until now,

HMIT has used its position as a holder of an unallowed, unvested, contingent interest in Class 10

of the Claimant Trust to commence litigation demanding books and records, seeking judicial

declarations as to its claimed status as a beneficiary of the Claimant Trust, and asserting various

other claims against the Highland Entities and their Court-appointed fiduciaries. The HMIT

Entities have been made subject to a motion filed by Highland in the District Court seeking an

adjudication that they or some of them are vexatious litigants. While that motion was denied by

the District Court, Highland could bring the same type of motion before this Court. Also certain

of the HMIT Entities have been named as defendants by the Liquidation Sub-Trust in the

Amended Kirschner Complaint.

3.      No more. The parties' willingness to resolve all disputes and settle all claims

among them will finally end that portion of the protracted and value-destructive litigation that

has impeded the Highland Entities' ability to distribute their assets to their constituents and fully

implement the Plan. The Settlement Agreement will also remove substantial hurdles to the

eventual windup of the Highland Entities.[3] Indeed, among the many benefits that will accrue to the Highland Entities from the Settlement Agreement are: (a) the cessation of costly, time-consuming, and disruptive litigation; (b) the disposition of two significant Estate assets—the Estate Claims and another illiquid asset, the Dugaboy Note—via distribution, assignment, and sale in furtherance of the ultimate winding up of the Claimant Trust's affairs; (c) the resolution of all disputes in connection with the HMIT Class 10 interest in the Claimant Trust, which was not previously allowed; and (d) the protection against future value-destructive litigation.

4.      The proposed Settlement Agreement is clearly in the best interests of the Highland Entities and their stakeholders and results from a sound exercise of their business judgment. The Motion should be granted.

## RELEVANT BACKGROUND

### I.      HMIT's Partnership Interest in Highland

5.      In December 2015, HMIT acquired 100% of Highland's Class B and Class C limited partnership interests (the "Class B/C Interests") from James Dondero, Mark Okada, and certain entities affiliated with them. Mr. Dondero—through the Dugaboy Investment Trust ("Dugaboy") and Strand Advisors, Inc. ("Strand")—and Mr. Okada, directly and indirectly, retained Highland's Class A limited partnership interests (the "Class A Interests").

6.      The Class B/C Interests represented 99.50% of the Debtor's prepetition total equity. The Class A Interests, in aggregate, represented the remaining 0.50%.

7.      Concurrently with its acquisition of the Class B/C Interests, HMIT executed that certain *Secured Promissory Note* dated December 21, 2015, in the original face amount of

---

[3] Assuming the Settlement Agreement is approved, the only unresolved Claims or Equity Interests will be Patrick Daugherty's claim (Adv. Proc. No. 25-03055-sgj, Docket No. 1 (Bankr. N.D. Tex. May 2, 2025) (the "Daugherty Claim")), and the disputed, out-of-the-money, *de minimis* Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand.

$63,000,000 in favor of Highland (the "<u>HMIT Note</u>"), which, as of the Petition Date, had an outstanding principal balance of $57,690,640.95 (the "<u>HMIT Note Balance</u>").

8.      On December 24, 2015, the Debtor and its limited partners, including HMIT, entered into that certain *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as subsequently amended, the "<u>LPA</u>"). Pursuant to the LPA, each limited partner had a capital account at the Debtor on account of its limited partnership interests.

9.      As of the Petition Date, HMIT's capital account balance on account of its Class B/C Interests was $394,630,871.53 (the "<u>HMIT Capital Account Balance</u>"), and the capital account for all Class A Interests in aggregate was $1,983,069.70.[4]

## II.     <u>The Bankruptcy Case</u>

10.     The Debtor commenced the Bankruptcy Case in the District of Delaware on October 16, 2019, by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Bankruptcy Case was subsequently transferred to this Court.

11.     On February 22, 2021, the Bankruptcy Court entered the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* [Docket No. 1943], which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1943-1] (the "<u>Plan</u>"). The Plan went effective on August 11, 2021 [Docket No. 2700] (the "<u>Effective Date</u>").

12.     On the Effective Date, in accordance with the Plan: (a) the Claimant Trust and Litigation Sub-Trust were created; (b) the Class B/C Interests and the Class A Interests were extinguished; (c) holders of allowed Class 10 interests, consisting of Class B/C Interests, would receive contingent and unvested Class 10 Interests if and when their claims or interests were

---

[4] As of the Petition Date, Dugaboy's capital account was $740,081.61; Strand's capital account was $994,707.76; and Mr. Okada's and his affiliates entities' capital accounts, in aggregate, was $248,280.33.

allowed in amounts determined under the Plan; (d) holders of allowed Class 11 interests,

consisting of the Class A Interests, would receive contingent and unvested Class 11 Interests if

and when their claims or interests were allowed in amounts under the Plan; (e) James P. Seery,

Jr., was appointed the Claimant Trustee of the Claimant Trust; and (f) Marc Kirschner was

appointed the Litigation Trustee of the Litigation Sub-Trust.

13.     Presently, neither the HMIT Class 10 Interest nor any of the Class 11 Interests

have been Allowed (as such term is defined in the Plan).

### III.   The Kirschner Litigation

14.     On October 15, 2021, the Litigation Trustee filed his *Complaint and Objection to

Claims* (Adv. Proc. No. 21-03076-sgj, Docket No. 1 (Bankr. N.D. Tex. Oct. 15, 2021)) (the

"Kirschner Complaint") which asserted, among other things, various claims against (a) Rand PE

Fund and (b) HMIT, including a cause of action to collect amounts owed to Highland by HMIT

pursuant to the HMIT Note.

15.     On May 19, 2022, the Litigation Trustee amended the Kirschner Complaint (Adv.

Proc. No. 21-03076-sgj, Docket No. 158 (Bankr. N.D. Tex. May 19, 2022)) (the "Amended

Kirschner Complaint"). The Amended Kirschner Complaint asserted substantially similar claims

against HMIT and Rand PE Fund, including claims to collect the amounts owed under the HMIT

Note.

16.     On April 4, 2023, upon the motion of the Litigation Trustee, this Court stayed

prosecution of the Amended Kirschner Complaint, among other proceedings. Adv. Proc. No. 21-

03076-sgj, Docket No. 338 (Bankr. N.D. Tex. April 4, 2023). As of the issuance of the stay, none

of the HMIT Entities named a defendant had filed answers and therefore had not been required to

file any counterclaims.

## IV.   The Pending HMIT Litigation

17.     On March 28, 2023, HMIT filed *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket Nos. 3699, 3760, 3815, 3816] (as amended and supplemented, the "First Motion for Leave") in which HMIT asserted, *inter alia*, claims for breach of fiduciary duty, conspiracy, and unjust enrichment against Highland, the Claimant Trust, and Mr. Seery, among others. On August 25, 2023, this Court denied the First Motion for Leave. *In re Highland Cap. Mgmt., L.P.*, 2023 Bankr. LEXIS 2104 (Bankr. S.D. Tex Aug. 25, 2023). HMIT appealed to the District Court for the Northern District of Texas (the "District Court"), and, on March 21, 2025, the District Court remanded to this Court for further proceedings. *Hunter Mountain Inv. Tr. v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E, Docket No. 44 (N.D. Tex. Mar. 21, 2025).

18.     On May 10, 2023, Dugaboy Investment Trust ("Dugaboy") and HMIT filed that certain *Complaint to (i) Compel Disclosures About the Assets of Highland Claimant Trust and (ii) Determine (a) Relative Value of Those Assets, and (b) Nature of Plaintiffs' Interests in the Claimant Trust*, Adv. Proc. No. 23-03038-sgj, Docket No. 1 (the "Valuation Complaint"), seeking an order (a) compelling the Claimant Trust to provide information about its assets, (b) valuing those assets, and (c) deeming Dugaboy and HMIT "Claimant Trust Beneficiaries." On May 24, 2024, this Court dismissed the Valuation Complaint with prejudice [Docket No. 27]. Dugaboy and HMIT appealed to the District Court (Case No. 3:24-cv-01531-X (N.D. Tex.)), and the appeal is fully briefed and *sub judice*.

19.     On January 1, 2024, HMIT filed its *Motion for Leave to File a Delaware Complaint* [Docket. No. 4000] (the "Second Motion for Leave," and together with the First Motion for Leave and the Valuation Complaint, the "Pending HMIT Litigation"). On January 16, 2024, Highland and the Claimant Trust moved to stay the Second Motion for Leave pending

000792

appellate review of the dismissal of the Valuation Complaint [Docket No. 4013] (the "Stay

Motion"). On June 22, 2024, this Court granted the Stay Motion [Docket No. 4104]. HMIT

subsequently appealed to the District Court (Case No. 3:24-cv-01786-L (N.D. Tex.)), and the

appeal is fully briefed and *sub judice*.

**V.**     **Summary of the Salient Terms of the Settlement Agreement**

20.     To resolve the disputes between the Highland Entities and the HMIT Entities,

including the Pending HMIT Litigation, the parties and their counsel engaged in extensive arm's-

length, good faith negotiations over the last several months. These negotiations resulted in the

Settlement Agreement, which provides for, *inter alia*, the sale and transfer of certain Estate

Claims and other Estate assets to the HMIT Entities, the dismissal of the Pending HMIT

Litigation, and the exchange of broad mutual releases.

21.     Subject to the terms of the Settlement Agreement, the principal terms of the

Settlement Agreement are set forth below:[5]

- Within five (5) business days after the Court issues an order approving the allowance of HMIT Class 10 Interest (the "Bankruptcy Court Approval Date"), the HMIT Entities will dismiss the Pending HMIT Litigation with prejudice;[6]

- Within five (5) business days after the Bankruptcy Court Approval Date, the Litigation Trustee will dismiss HMIT and Rand PE Fund from Counts I, II, III, and XXIV (which relates to the HMIT Note) of the Amended Kirschner Complaint with prejudice;

- Within five (5) business days after the Bankruptcy Court Approval Date, Highland will pay $500,000 to HMIT;

- Subject to the Court's approval and the terms and conditions set forth in the Settlement Agreement, the HMIT's Class 10 Interests will be allowed in the amount of

---

[5] In the event of any inconsistency between this Motion and the Settlement Agreement, the terms of the Settlement Agreement shall control.

[6] The Valuation Complaint will only be dismissed as to HMIT; Dugaboy's claims in the Valuation Complaint will not be impaired.

$336,940,230.58, which represents the HMIT Capital Account Balance, less the HMIT Note Balance;[7]

- Within five (5) business days after the Bankruptcy Court Approval Date, (a) the Indemnity Trust will distribute $10 million Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests and (b)(i) the Highland Entities will cause the portion of that certain *Promissory Note*, dated May 31, 2017, in the original face amount of $24,268,621.69, from Dugaboy, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee (the "Dugaboy Note") held by the Highland Entities to be distributed in-kind to HMIT and (ii) the Indemnity Trust will distribute to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the date of the Settlement Agreement to the date of such assignment of the Dugaboy Note;[8]

- Subject to certain conditions precedent, the Indemnity Trust will make subsequent distributions Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests with a final distribution date estimated to be on or about April 1, 2029;

- Within five (5) business days after the Bankruptcy Court Approval Date, the Litigation Trustee will, solely to the extent permitted by the Plan, the Litigation Sub-Trust Agreement, and applicable law, transfer, sell and assign to the HMIT Entities all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee in the Amended Kirschner Complaint (the "Transferred Claims"); and

- On the Bankruptcy Court Approval Date, the HMIT Releasors will provide broad, general releases to the Highland Released Parties and the Highland Releasors will provide broad, general releases to the HMIT Released Parties.

If the Settlement Agreement is approved, the only unresolved Claims or Equity Interests will be the Daugherty Claim and the Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand—that have no value but, if they did, their aggregate maximum value, if allowed, would not exceed approximately $1.7 million.

---

[7] Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in the Settlement Agreement.

[8] Pursuant to the Settlement Agreement, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than 50% of the current balance owed under the Dugaboy Note. Contemporaneously with the assignment of the Dugaboy Note, the Indemnity Trust will make a *pro rata* cash distribution to any other Holder of an Allowed Class 10 Claim or Equity Interest based on such valuation.

### RELIEF REQUESTED

22.　　Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 363(b), the Movants request entry of an order substantially in the form attached hereto as **Exhibit A**, granting the Motion, approving the Settlement Agreement, and authorizing the Highland Entities and their agents to take all actions necessary or desirable to implement the Settlement Agreement without the need for further notice or approval by the Court.

### BASIS FOR RELIEF REQUESTED

23.　　Bankruptcy Rule 9019 provides that "[o]n motion … and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). Settlements are favored in the bankruptcy context to "minimize litigation and expedite the administration of a bankruptcy estate." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). The approval of a settlement is within the "sound discretion" of the Court. *In re Jackson Brewing Co.*, 624 F.2d 599, 603 (5th Cir. 1980).

24.　　Pursuant to Bankruptcy Rule 9019(a), the Court may approve a settlement if it is fair, reasonable, and in the best interests of the estate. *See, e.g., Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015). A settlement should be approved unless it falls below the lowest point in the range of reasonableness, based on a comparison between the terms of the settlement and the costs and benefits of further litigation. *See, e.g., Jackson Brewing Co.*, 624 F.2d at 602 (court must compare the "terms of the compromise with the likely rewards of litigation"); *Cook v. Waldron*, 2006 U.S. Dist. LEXIS 31411, at *10 (S.D. Tex. April 18, 2006) (court should "canvass the issues" to decide if settlement falls "below the lowest point in the range of reasonableness").

25.　　In evaluating a proposed settlement, courts consider (i) the "probability of success in the litigation, with due consideration for the uncertainty in fact and law," (ii) the "complexity

and likely duration of the litigation and any attendant expense, inconvenience and delay," and (iii) "[a]ll other factors bearing on the wisdom of the compromise." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (quoting *Jackson Brewing Co.*, 624 F.2d at 602). Assessing the first factor—success on the merits—does not require a "mini-trial" on the merits. *Cajun Elec. Power Coop.*, 119 F.3d at 356. The "other factors" include "the best interests of the creditors, 'with proper deference to their reasonable views,'" as well as "'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.'" *Id.* (quoting *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917-18 (5th Cir. 1995)).

26.     A trustee also "is permitted to settle lawsuits pursuant to section 363(b)" of the Bankruptcy Code. *Id.* at 354. Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. 363(b)(1). A settlement involving a transaction outside the ordinary course of business "'must be supported by an articulated business justification, good business judgment, or sound business reasons.'" *Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*, 922 F.3d 323, 327 (5th Cir. 2019) (quoting *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010)).

27.     As discussed in detail below, the factors to be considered pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 363(b) weigh in favor of approving the Settlement Agreement in this case.

28.     First, although the Highland Entities believe they have strong and meritorious defenses to all of the Pending HMIT Litigation, history has shown that defending the Pending HMIT Litigation, including the appeals that could result therefrom, will be costly, time-consuming and value-destructive to the estate and creditor recoveries. Further, there is no guarantee that the

Highland Entities would continue to be successful in defending the Pending HMIT Litigation—or that the HMIT Entities will not file additional litigation against the Highland Entities and their indemnified parties.

29.    The second factor—complexity, duration, and costs of litigation—also weighs heavily in favor of approval of the Settlement Agreement. As this Court is aware, the cost of defending against the litigation in this case, including the Pending HMIT Litigation, has been significant. The litigation and its attendant costs have also significantly delayed and reduced distributions to the Debtor's constituents. The Pending HMIT Litigation began in 2023 and, although HMIT has lost in this Court, the Pending HMIT Litigation is subject to at least two pending appeals and has no signs of resolving absent this settlement. If the Settlement Agreement is not approved, the Highland Entities will be faced with significant appellate litigation and potentially additional litigation in this Court and other courts to resolve the Pending HMIT Litigation as well as any other litigation that may be brought by the HMIT Entities if the Settlement Agreement—and the Litigation Protections, including the releases—are not approved.

30.    Third, approval of the Settlement Agreement is justified by the paramount interest of Highland's creditors and constituents. The Settlement Agreement resolves the Pending HMIT Litigation, resolves all disputes in connection with the HMIT Class 10 claim; sells, transfers, and assigns the Estate Claims asserted in the Amended Kirschner Complaint—which has been pending since 2021 at significant cost to the estate—to the HMIT Entities; and provides for broad mutual releases and a cessation of the litigation and acrimony that has delayed consummation of the Plan. In exchange the Highland Entities are paying $500,000 and the Indemnity Trust is agreeing to scheduled distributions from the Indemnity Trust to the Holders of Allowed Class 10 Claims and Equity Interests. The Settlement Agreement is clearly a rational exercise of the Highland Entities' business judgment.

31. Finally, the Settlement Agreement was unquestionably negotiated in good faith and at arm's length. The Highland Entities' and HMIT Entities' relationship to date has been defined by hostility. Notwithstanding that history, the Highland Entities and HMIT Entities, with their advisors, negotiated the Settlement Agreement over the last several months, which, although not perfect for any party, finally resolves the years of active litigation and acrimony between the Highland Entities and HMIT Entities.

32. While this Motion is the motion of the Highland Entities, undersigned counsel for the HMIT Entities appears below to evidence the approval by the HMIT Entities of the form and content of this Motion.

## **NO PRIOR REQUEST**

33. No previous request for the relief sought herein has been made to this Court or any other court.

## **PRAYER**

**WHEREFORE**, the Movants respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the Motion and the relief requested herein, and granting them such other and further relief as the Court deems just and proper.

[remainder of page intentionally blank]

Case 19-34054-sgj11    Doc 4217-1    Filed 05/19/25    Entered 05/19/25 16:59:49    Desc
Case 3:25-cv-01876-K    Document 58-1    Filed 06/23/25    Page 202 of 614    PageID 1745

EXECUTION VERSION

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 19, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand.  The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with <u>Section 18</u>.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant

000810

Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xii) any Person indemnified by any Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO, Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming

4

through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity

000812

trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in Sections 1 – 2 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"**Operating Expenses**" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

000813

"**Original Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court's docket.

"**Oversight Board**" means the oversight board of the Highland Claimant Trust.

"**Pending Litigation**" means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X (N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

"**Permitted Investments**" has the meaning set forth in the Indemnity Trust Agreement.

"**Person**" means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

"**Plan**" means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit's rulings.

"**Plan Documents**" has the meaning given to it in the Plan.

"**Plan Protections**" means, collectively, the provisions of the Plan contained in Article IX thereof.

"**Pro Rata**" means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

"**Threats**" means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threatened restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

"**Threats Notice**" means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

## RECITALS

7

000814

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

**WHEREAS**, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1.     <u>Stay and Dismissal of Pending Litigation With Prejudice</u>.

(a)     Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

(b)     Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2.     <u>Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint</u>.

(a)     The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3.     <u>Cash Payment to HMIT</u>.  Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

> Hunter Mountain Investment Trust
> C/o CLO Holdco, LLC
> Hancock Whitney
> Account # - 071173413
> Routing # - 113000968
> (469) 604-0955

4.     <u>HMIT Class 10 Interest</u>.

(a)     Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, <u>less</u> the HMIT Note Balance.

(b)     Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable,

000816

statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement. Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c) Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

(d) For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5. Initial Interim Distributions on the Allowed Class 10 Interests.

(a) Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**"), by means of wire transfer with the Pro Rata portion in respect of the HMIT Class 10 Interest sent to the wire instructions contained in Section 3 ("**Wire Transfer**").

(b) Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date. Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6. Subsequent Distribution(s) on the Allowed Class 10 Interests.

(a) On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the

Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00), by Wire Transfer.

(b)     On December 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00) by Wire Transfer.

(c)     Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7.     Final Distribution on the Allowed Class 10 Interests.

(a)     On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; provided, however, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b)     The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c)     Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8.     Transfer Kirschner Claims; Dismissal of HMIT Note Claims.

(a)     Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in Section 2, the Litigation Sub-Trust shall execute a short-

form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including Section 8(b) below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of Section 8(c) below.

(b)    THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT.  The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement.  Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c)    As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint.  The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d)    Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9.    General Release By The HMIT Entities. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants,

000819

administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10. <u>General Release By The Highland Entities</u>. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11. <u>Further Provisions Concerning The General Releases</u>.

(a) **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

13

000820

(b)     To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c)     Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES, ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d)     As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in <u>Sections 9 and 10</u>, should:

000821

(i)     any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii)     any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12.     <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a)     Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b)     Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c)     For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13.     <u>Representations and Warranties</u>.

(a)     Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b)     The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the

000822

other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c)     Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d)     Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms.  Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14.     <u>No Continuing Rights, Duties or Obligations</u>.  Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15.     <u>Gatekeeper Standard</u>.

(a)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be  "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**Gatekeeper Court**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

000823

(b)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c)     The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

16.    <u>Indemnification</u>.

(a)     Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in <u>Section 13</u> or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted  or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims.  Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches <u>Section 12</u> shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action.  Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b)     Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in <u>Section 13</u> or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted  or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims.  Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches <u>Section 12</u> shall be liable to the HMIT

000824

Released Party against whom the applicable Action has been brought or prosecuted in violation of <u>Section 12</u> for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action.  Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17.    <u>Execution</u>.  This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel.  All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18.    <u>Bankruptcy Court Order</u>.  The allowance of the allowed HMIT Class 10 Interest pursuant to <u>Section 4</u> is subject to the entry of the Bankruptcy Court Order.  To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date.  Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby.  If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no effect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in <u>Section 4</u> to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19.    <u>Fees and Expenses</u>.  Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to <u>Section 18</u>.  Notwithstanding the foregoing, if any Party hereto, any Highland Released Party, or any HMIT Released Party brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Person in that Action shall be entitled to have and recover from the non-prevailing Person all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Person may suffer or incur in the pursuit or defense of such action or proceeding.

000825

20. <u>Entire Agreement; No Other Representations</u>. **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT. THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "<u>REPRESENTATIONS</u>"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21. <u>Agreement and Release Knowing and Voluntary</u>. The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement. The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22. <u>Cooperation</u>. The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard. For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23. <u>Governing Law</u>. This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24. <u>Jurisdiction/Venue</u>. The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or

000826

subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25. <u>No Admissions</u>. All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26. <u>Other Provisions</u>.

(a) No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b) The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c) The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d) The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27. <u>Notices</u>. All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

000827

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28.     Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

29.     Interpretive Provisions. Unless the express context otherwise requires: (a) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words "Dollars" and "$" mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words ",without limitation,"; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; (i) the word "or" shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

*[Signature page follows]*

000828

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By     _____/s/ Mark Patrick_____
        Name:      Mark Patrick
        Title:       Administrator
        Date:       May 19, 2025

**BEACON MOUNTAIN LLC**

By     _____/s/ Mark Patrick_____
        Name:      Mark Patrick
        Title:       President
        Date:       May 19, 2025

**RAND ADVISORS, LLC**

By     _____/s/ Mark Patrick_____
        Name:      Mark Patrick
        Title:       President
        Date:       May 19, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By     _____/s/ Mark Patrick_____
        Name:      Mark Patrick
        Title:       President
        Date:       May 19, 2025

**RAND PE FUND MANAGEMENT, LLC**

By     _____/s/ Mark Patrick_____
        Name:      Mark Patrick
        Title:       President
        Date:       May 19, 2025

000829

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner


By      /s/ Mark Patrick
         Name:     Mark Patrick
         Title:      President
         Date:      May 19, 2025

**ATLAS IDF GP, LLC**


By      /s/ Mark Patrick
         Name:     Mark Patrick
         Title:      President
         Date:      May 19, 2025


**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By      /s/ James P. Seery, Jr.
         Name:     James. P. Seery, Jr.
         Title:      Chief Executive Officer
         Date:      May 19, 2025


**HIGHLAND CLAIMANT TRUST**


By      /s/ James P. Seery, Jr.
         Name:     James P. Seery, Jr.
         Title:      Claimant Trustee
         Date:      May 19, 2025

**HIGHLAND LITIGATION SUB-TRUST**


By      /s/ Marc S. Kirschner
         Name:     Marc S. Kirschner
         Title:      Litigation Trustee
         Date:      May 19, 2025

000830

**HIGHLAND INDEMNITY TRUST**


By     ___/s/ James P. Seery, Jr._____
         Name:      James P. Seery, Jr.
         Title:       Indemnity Trust Administrator
         Date:      May 19, 2025

000831

Gregory G. Hesse, Esq.
State Bar No. 09549419
HUNTON ANDREWS KURTH, LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
Telephone:  (214) 979-3000
Telecopy:   (214) 880-0011

**ATTORNEYS FOR DUGABOY INVESTMENT TRUST**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Case No. 19-34054-sgj-11 |
|  | § |  |
| Reorganized Debtor. | § |  |
|  | § |  |

**PRELIMINARY OBJECTION OF THE DUGABOY INVESTMENT TRUST TO THE
MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019
AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES**

**COMES NOW**, the Dugaboy Investment Trust ("Dugaboy") and submits this Preliminary

Objection (the "Objection") to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019*

*and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions*

*Consistent Therewith* [Dkt. No. 4216] (the "Settlement Motion"), and in support thereof,

respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The Settlement Motion seeks approval of a settlement agreement between Highland

Capital Management, L.P. ("Highland"), the Highland Claimant Trust, the Highland Litigation

Sub-Trust, and the Highland Indemnity Trust (collectively, the "Highland Entities"), on the one

hand, and Hunter Mountain Investment Trust ("HMIT") and related entities (the "HMIT Entities")

000849

on the other (the "Settlement Agreement").  On June 6, 2025, Dugaboy retained the undersigned

counsel to represent it with respect to the Settlement Motion.  The undersigned promptly requested

a brief two-week extension of the Settlement Motion's objection deadline.  Counsel for the

Highland Entities declined any extension.  As such, Dugaboy files this Objection to preserve its

rights, and expressly reserves the right to supplement this Objection after conducting discovery of

the issues relevant to the Settlement Motion.

2.      If the Court grants the Settlement Motion, it will approve a wide-ranging

compromise that would significantly alter the confirmed Plan (as defined below). Specifically, the

Settlement Motion attempts to elevate distributions to certain equity interests (Class 10) above the

remaining creditors and provides for accelerated distributions *ahead* of those creditor[s].[1]  Such a

distribution is a clear violation of the terms of the Plan and its implementation documents,

including the Claimant Trust Agreement.  For this reason alone, the Court should deny the

Settlement Motion.

3.      Additionally, the Settlement Motion is devoid of information sufficient to allow the

Court or other parties in interest to determine whether the proposed Settlement Agreement meets

the standards for approval, including evidence to support the distribution of any assets to the

holders of any equity interests, including the HMIT Entities, and evidence to support the allowance

of HMIT's Class 10 interest in the amount of $336,940,230.58.  As a result, Dugaboy intends to

serve discovery upon the Highland Entities to obtain the evidence relating to these and other issues

set forth in the Settlement Motion.

---

[1]      It is not clear from the Settlement Motion the total number of remaining, unpaid claimants.  In footnote
3 of the Settlement Motion, the Highland Entities represent that if the Settlement Motion is granted, the only
"unresolved claim" is the claim of Patrick Daugherty.  Since the Settlement Motion proposes making distributions to
only the holder of a Class 10 Equity Interest, it implies that the only "unresolved claim" (maybe the only unpaid claim)
is held by Mr. Daugherty.

000850

4.     Finally, the Settlement Agreement's currently drafted mutual release provisions are vague and overly broad.  Out of an abundance of caution, Dugaboy objects to any language that explicitly or implicitly attempts to impose a release of any of its claims or the claims of any affiliates, including James Dondero ("Dondero"), against any Highland Entity (as that term is defined in the Settlement Agreement) or any HMIT Entity (as that term is defined in the Settlement Agreement).  For these reasons, as further detailed below, the Settlement Motion should be denied.

## PROCEDURAL HISTORY

5.     The Debtor commenced the above-captioned case (the "Bankruptcy Case") in the District of Delaware on October 16, 2019.  The Bankruptcy Case was subsequently transferred to this Court.  On February 22, 2021, this Court entered the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* [Docket No. 1943], which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1943-1] (the "Plan").  The Plan went effective on August 11, 2021 [Docket No. 2700] (the "Effective Date").

6.     On the Effective Date, in accordance with the Plan: (a) Highland established the Claimant Trust for the benefit of the Claimant Trust Beneficiaries; (b) Highland established Litigation Sub-Trust for the benefit of the Claimant Trust as the "Litigation Sub-Trust Beneficiary"; (c) the Class B/C Interests and the Class A Interests in Highland were extinguished; (d) holders of allowed Class 10 interests, consisting of Class B/C Interests, would receive contingent and unvested Class 10 Interests if and when their claims or interests were allowed in amounts determined under the Plan; (e) holders of allowed Class 11 interests, consisting of the Class A Interests, would receive contingent and unvested Class 11 Interests if and when their claims or interests were allowed in amounts under the Plan; (f) James P. Seery, Jr., was appointed

the Claimant Trustee of the Claimant Trust; and (g) Marc Kirschner was appointed the Litigation

Trustee of the Litigation Sub-Trust.

7.      Subsequently, on or about August 16, 2021, the Claimant Trust, as grantor through

the Claimant Trustee (Mr. Seery), established the Indemnity Trust for the benefit of the "Trust

Indemnified Parties."[2]  In general terms the "Trust Indemnified Parties" and "Beneficiaries" of the

Indemnity Trust are (a) the "Indemnified Parties" identified in Sec. 8.2 of the Claimant Trust

Agreement, (b) the "Indemnified Parties" identified in Sec. 8.2 of the Litigation Sub-Trust and (c)

the "Covered Persons" under Sec. 10 of the Reorganized Limited Partnership Agreement of

Highland.  Mr. Seery appointed himself the Indemnity Trust Administrator for the Indemnity Trust

and is generally responsible for managing the Indemnity Trust.[3]

8.      Prior to the filing of the Settlement Motion, neither the Class 10 Interests held by

HMIT nor any of the Class 11 Interests, including those held by Dugaboy, have been Allowed (as

defined in the Plan).  The Settlement Motion, however, proposes to alter this state of affairs with

an agreement to allow HMIT's Class 10 Interests and to authorize distribution of funds and assets

to HMIT by the Claimant Trust or by other entities for the benefit of the Claimant Trust.  The

proposed distributions being made by the Claimant Trust, or for the benefit of the Claimant Trust,

are being effectuated, apparently, prior to payment in full of all holders of claims.

---

[2]     According to the Settlement Agreement, the Indemnity Trust Agreement has been amended at least two
times, most recently "effective as of [April 28], 2025."  See, Settlement Agreement, p.5 (definition of "Indemnity
Trust Agreement").  Upon information and belief, the Second Amendments to the Indemnity Trust Agreement have
not been provided to Dugaboy.
[3]     The Settlement Agreement was signed for the Highland Entities by Mr. Kirschner as the Litigation
Trustee for the Litigation Sub-Trust and Mr. Seery as (a) the Chief Executive Officer of Highland, (b) the Claimant
Trustee for the Claimant Trust and (c) the Indemnity Trust Administrator for the Indemnity Trust.

## INITIAL OBJECTIONS

**A.    The Settlement Agreement Violates the Terms of the Plan and the Claimant Trust Agreement**

9.    The Claimant Trust Agreement has explicit requirements that must be met prior to the distribution of funds or assets to any Equity Trust Certificate holders.  Sec. 5.1(c) of the Claimant Trust Agreement provides:

> (c) <u>Contingent Trust Interests.</u> On the date hereof, or on the date such Interest becomes Allowed under the Plan, the Claimant Trust shall issue Contingent Interests to Holders of  Allowed Class 10 Class B/C Limited Partnership Interests and Holders of Allowed Class 11 Class A Limited Partnership Interests (collectively, the "Equity Holders"). The Claimant Trustee shall allocate to each Holder of Allowed Class 10 Class B/C Limited Partnership Interests and each Holder of Allowed Class 11 Class A Limited Partnership Interests a Contingent Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 10 or Class 11 Interest bears to the total amount of the Allowed Class 10 or Class 11 Interests, as applicable, under the Plan. Contingent Trust Interests shall not vest, and the Equity Holders shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the "GUC Payment Certification"). Equity Holders will only be deemed "Beneficiaries" under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court, at which time the Contingent Trust Interests will vest and be deemed "Equity Trust Interests." The Equity Trust Interests shall be subordinated in right and priority to Subordinated Trust Interests, and distributions on account thereof shall only be made if and when Subordinated Beneficiaries have been repaid in full on account of such Subordinated Beneficiary's Allowed Subordinated Claim, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Equity Trust Interests distributed to Allowed Holders of Class A Limited Partnership Interests shall be subordinated to the Equity Trust Interests distributed to Allowed Holders of Class B/C Limited Partnership Interests.

10.    Before the Holders of Class 10 or Class 11 Interests are entitled to receive any distribution of property, the Claimant Trustee is required to file with the Court the "GUC Payment Certification" (as defined in Section 5.1(c) of the Claimant Trust Agreement).  As of the filing of the Settlement Motion, the GUC Payment Certification had not been filed.  So, based on the

express terms of the Claimant Trust Agreement, no distribution can be made to the HMIT Entities

based on its Class 10 Interests.

11.      The Settlement Agreement, however, includes an agreement between the Highland

Entities and the HMIT Entities as to the allowed amount of HMIT's Class 10 Interest:

$336,940,230.58.  And Section 4(b) of the Settlement Agreement provides that, notwithstanding

the allowance of HMIT's Class 10 Interest, it shall not be a "Claimant Trust Beneficiary" or a

"Beneficiary" under the Claimant Trust Agreement.

12.      In an apparent attempt to subvert the prohibition against making distributions to the

HMIT Entities, the Settlement Agreement proposes to have distributions made by entities under

the control of the Claimant Trust or the Claimant Trustee to the HMIT Entities.  For example:

- Highland, which is wholly owned, directly and indirectly, by the Claimant Trust, is making a $500,000 payment to the HMIT Entities;[4]

- the Indemnity Trust, which was created by the Claimant Trust for the benefit of the Indemnified Parties identified in the Claimant Trust, the Litigation Trust and the Highland limited partnership agreement is making a series of payments in an amount not less than $23 million (and could be more if any funds remain in the Indemnity Trust on April 1, 2029) to be applied to HMIT's allowed Class 10 Equity Interest;

- the Litigation Trust, the sole beneficiary of which is the Claimant Trust, is transferring to the HMIT Entities the "Kirschner Claims";[5] and

- "The Highland Entities" (the specific Highland Entity is not disclosed in the Settlement Motion or Settlement Agreement) is transferring to HMIT the Dugaboy Note.  After the Dugaboy Note is valued, the value is to be applied to HMIT's Class 10 Interest.

13.      All, or substantially all, of the payments and transfers of property are being made

by *or for the benefit of* the Claimant Trust to reduce the HMIT Entities' Class 10 Equity Interests

---

[4]      The Settlement Agreement is silent as to how this payment is to be applied by HMIT.  Will it be applied to HMIT's Class 10 Interest?
[5]      The Settlement Agreement is silent as to the value of the "Kirschner Claims" or how such value it to be applied by HMIT.  Once again, will the value attributed to the "Kirschner Claims" be applied to HMIT's Class 10 Interest?

in violation of the express terms of the Claimant Trust Agreement and Plan. As such, the Settlement Motion should be denied.

**B.       There is Insufficient Evidence to Support Approval of the Settlement Agreement**

14.       The Highland Entities are proposing a settlement with the HMIT Entities that violates the Plan, the Claimant Trust Agreement and the Confirmation Order. As a result, Dugaboy requires discovery relating to a number of relevant issues, including but not limited to:

- Has the Claimant Trust paid all the creditors, including the Class 9 subordinated creditors, in full?

- Is the Debtor solvent and capable of paying all the creditors, including the Class 9 subordinated creditors, in full?

- If the Debtor has not paid all creditors in full, does it have adequate funds and resources to pay all creditors in full?

- What is the basis of the Claimant Trustee's agreement to allow the Class 10 Equity Interest of HMIT in the amount of $336,940,230.58?

- What is the basis of the Claimant Trustee's assertion in Footnote 3 as to the amount of the Class 11 Equity Interests?

- What value is being attributed to the Kirschner Claims, and will such value be applied to HMIT's Class 10 Equity Interest?

15.       The forgoing factual issues are not exhaustive but illustrate a sampling of the types of open factual issues left unaddressed by the Settlement Motion. Dugaboy intends to serve discovery on the Highland Entities with regard to the Settlement Motion. Because the Highland Entities have failed to provide sufficient evidence to support approval of the Settlement Agreement, the Court should deny the Settlement Motion.

**C.       The Releases Contained in the Settlement Agreement are Vague and Overly Broad**

16.       Finally, the Settlement Motion contains vague and overly broad mutual release provisions. Out of an abundance of caution, Dugaboy objects to any language that explicitly or implicitly attempts to impose a release of any of its claims or the claims of any affiliate, including

Mr. Dondero, of any Highland Entity (as that term is defined in the Settlement Agreement) or any

HMIT Entity (as that term is defined in the Settlement Agreement).

### RESERVATION OF RIGHTS

17.     In the event the Court grants Dugaboy's motion to extend the response deadline to

the Settlement Motion, Dugaboy reserves its rights to supplement this Objection.   Further,

Dugaboy reserves its rights to supplement this Objection as a result of evidence that will be

obtained in discovery.

**WHEREFORE, PREMISES CONSIDERED**, Dugaboy prays that the Court enter an

order (a) denying the Settlement Motion,  and (b) granting Dugaboy such other and further relief

to which it is entitled.

Respectfully submitted,

**HUNTON ANDREWS KURTH LLP**

By:     /s/  *Gregory G. Hesse*
Gregory G. Hesse (Texas Bar No.09549419)
1445 Ross Avenue, Suite 3700
Dallas, Texas  75202-2799
Telephone:  (214) 979-3000
Telecopy:    (214) 880-0011
GHesse@hunton.com

**ATTORNEYS FOR DUGABOY INVESTMENT
TRUST**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 9th day of June, 2025, a true and correct copy
of the foregoing was served on ECF participants, electronically through the Court's ECF System.

/s/  *Gregory G. Hesse*
Gregory G. Hesse

| **From:** | "John A. Morris" <jmorris@pszjlaw.com> |
| **To:** | "Louis Phillips" <Louis.Phillips@kellyhart.com> |
| **Cc:** | "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "amelia.hurt@kellyhart.com" <Amelia.Hurt@kellyhart.com> |
| **Subject:** | Highland: Privileged and confidential settlement communication and materials |
| **Date:** | Tue, 8 Apr 2025 20:22:22 +0000 |
| **Importance:** | Normal |
| **Attachments:** | Privileged_and_confidential_-_DRAFT_4.8.25_discussion_materials.pdf; PRIVILEGED_AND_CONFIDENTIAL_DRAFT_SETTLEMENT_STRUCTURE_4.8.25.pdf; HFP_-_Entity_Chart_-_2011.pdf |
| **Inline-Images:** | image001.jpg |

---

E-MAIL AND ATTACHMENTS DELIVERED PURSUANT TO FED. R. EVID. 408
AND APPLICABLE CONFIDENTIALITY AGREEMENT

Louis,

Thank you and your team for your time today.

As a follow up, attached are the following:

1. Discussion materials from today (draft numbers)
2. Discussion materials from today (draft structure)
3. HFP entity chart from 2011

On your end, please send us the following at your earliest convenience:

1. Copy of settlement agreement circa 2022 between HMIT and Dugaboy/Okada entities
2. Copy of operative document relating to the [redemption] of the Dolomiti/Hakusan entities limited partnership interest in Rand PE Fund I
3. Copy of operative document providing for the [extinguishment] of participating shares of the supporting organizations of Charitable DAF Holdco, Ltd.

Let's confer as soon as you've had a chance to consider these matters with your team.

Please let us know if you have any questions in the interim.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

## INTERCREDITOR AND PARTICIPATION AGREEMENT

This Intercreditor and Participation Agreement (the "Agreement") is entered into as of January 10, 2025 (the "Effective Date") by and between Highland CLO Management, Ltd. (together with its successors and assigns in such capacities, "HCLOM Ltd.") and Hunter Mountain Investment Trust (together with its successors and assigns in such capacities, "HMIT"). HCLOM Ltd. and HMIT are each referred to herein individually as a "Party" and jointly as the "Parties."

## RECITALS

WHEREAS, on September 22, 2020, Highland Capital Management, L.P. filed a Notice of Filing of Debtor's Amended Schedules in its pending Chapter 11 Case No. 19-34054-sgj11 (the "Bankruptcy Case") in which it, among other things, scheduled a creditor's claim by HCLOM Ltd. (the "HCLOM Claim"); and

WHEREAS, on December 27, 2024, the Bankruptcy Court entered a Stipulated and Agreed Order Resolving (A) HCLOM, Ltd.'s Scheduled Claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a Bad Faith Finding and an Award of Attorneys' Fees Against HCLOM, Ltd. and James Dondero in Connection Therewith [Docket Nos. 3657, 4176] in the Bankruptcy Case (the "Stipulation and Agreed Order"); and

WHEREAS, the Stipulation and Agreed Order converted the HCLOM Claim to a Class 10 interest/claim (as such is defined in Article III.H. ¶ 10 of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) in the Bankruptcy Case) (the "Plan") in the amount of $10,140,633.26; and

WHEREAS, the Parties have agreed to certain rights and priorities solely as between themselves regarding HCLOM Ltd.'s participation in the payment of Class 10 interests/claims;

THEREFORE, for and in consideration of the promises, covenants, conditions, stipulations, benefits, and obligations described and provided herein, the sufficiency and adequacy of which is expressly hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.     **HMIT Payment Obligation to HCLOM Ltd.** Upon HMIT's receipt of distributions on account of its Class 10 interest/claim (the "Distributions"), HMIT will pay to HCLOM Ltd. an amount equal to five percent (5%) of the funds received by HMIT within two (2) business days after receipt of indefeasible funds by HMIT (the "HMIT Payment Obligation"). HMIT shall be entitled to deduct from the Distributions the fees and expenses billed by Kelly Hart Hallman, LLP which directly relate to the Stipulation and Agreed Order or this Agreement (the "HMIT Expenses") until all HMIT Expenses are paid in full.

2.     **No Additional Duties to HCLOM Ltd.** HMIT shall retain and have the sole discretion to act with respect to its Class 10 interest/claim, and shall owe no additional duties to HCLOM Ltd. or any other person or entity, including without limitation, with respect to (i) the amount of Distributions or recovery by HMIT on account of its Class 10 interests/claims,

1

001649

HCMLPHMIT00003868

(ii) the amount of Distributions that could be received by any holder of Class 10 interests/claims, (iii) the rights of any holder of Class 10 interests/claims, or (iv) any pleading or document that could or should be filed in any way related to the Bankruptcy Case, the Plan, or the HMIT Class 10 interests/claims.

3. **No Liens or Encumbrances**. HMIT will not take any action that could reasonably be expected to encumber HMIT's Class 10 interests/claims, limit or affect HMIT's right or ability to fulfil and perform the HMIT Payment Obligation, or limit or affect HCLOM Ltd.'s right to receive the Distributions.

4. **This Agreement Supersedes the Effects of the Stipulated and Agreed Order Among the Parties**. HCLOM acknowledges and agrees that, notwithstanding the Stipulated and Agreed Order, the terms of this Agreement amends and supersedes the effect of the Stipulation and Agreed Order as between the Parties and HCLOM's rights to payment under the Plan are limited solely to the HMIT Payment Obligation.

5. **Non-Interference; No Cause of Action**. Notwithstanding Paragraph 3, HCLOM will not have any rights to object to or otherwise interfere with the rights of HMIT as a holder of Class 10 interest to reach a settlement with Highland Capital Management, LP ("Highland"). HCLOM acknowledges that it shall have no right to notice or approval of such a settlement nor will it have any cause of action against HMIT arising out of any such settlement.

6. **Remittance Agreement**. The Parties acknowledge that contemporaneously herewith NREA SB II Holdings, LLC (together with its successors and assigns in such capacities, "NexPoint Small Bay."), Charitable DAF Holdings Corp. (together with its successors and assigns in such capacities, "Charitable DAF"), and Liberty CLO Holdco, Ltd. (together with its successors and assigns in such capacities, "Liberty CLO") have entered into that certain Remittance Agreement effective January 10, 2025 (the "Remittance Agreement"). HCLOM agrees that if NexPoint Small Bay fails to make the DAF Bridge Equity Payment (as defined in the Remittance Agreement) pursuant to the terms of the Remittance Agreement, HMIT will have no obligations to make the HMIT Payment Obligation, and HMIT shall not receive any distribution from HMIT or any other party related to any Class 10 interest/claim. Notwithstanding any failure of NexPoint Small Bay to adhere to the terms of the Remittance Agreement, HCLOM acknowledges that by executing this Agreement, it shall have no other recourse or rights to payment under the Plan other than the terms of this Agreement.

7. **Choice of Law; Jurisdiction; Venue**. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflict of law provisions. Each Party to hereby consents and agrees that the courts located in Texas shall have sole and exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens*.

8. **Amendments; Waivers**. No amendment, modification, or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the Party making such waiver or the obligations of the other Party in any other respect or at any other time.

2

001650

HCMLPHMIT00003869

9. **Binding Effect**. Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors, assigns, executors, representatives, and administrators.

10. **Entire Agreement**. The Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into this Agreement.

11. **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Signature by facsimile or other similar electronic transmission shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Intercreditor and Participation Agreement as of the Effective Date set forth above and in the capacities set forth below.

001651

HCMLPHMIT00003870

# Form **1065**

Department of the Treasury
Internal Revenue Service

## U.S. Return of Partnership Income

For calendar year 2019, or tax year beginning _____, 2019, ending _____, 20 _____.
► Go to www.irs.gov/Form1065 for instructions and the latest information.

OMB No. 1545-0123

**2019**

| A Principal business activity | Name of partnership | | D Employer identification number |
|---|---|---|---|
| INVESTMENT MANAGEMENT | HIGHLAND CAPITAL MANAGEMENT, LP | | 75-2716725 |
| B Principal product or service | Type or Print | Number, street, and room or suite no. If a P.O. box, see instructions. | E Date business started |
| INVESTMENT SERVICES | | 300 CRESCENT COURT, SUITE 700 | 07/07/1997 |
| C Business code number | | City or town, state or province, country, and ZIP or foreign postal code | F Total assets (see instructions) |
| 523900 | | DALLAS, TX 75201 | $ 1,015,968,222. |

G Check applicable boxes: (1) ☐ Initial return (2) ☐ Final return (3) ☐ Name change (4) ☐ Address change (5) ☐ Amended return

H Check accounting method: (1) ☐ Cash (2) ☒ Accrual (3) ☐ Other (specify) ►

I Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ► 6

J Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► ☒

K Check if Partnership: (1) ☐ Aggregated activities for section 465 at-risk purposes (2) ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include only trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

### Income

| | | | |
|---|---|---|---|
| 1a | Gross receipts or sales . . . . . . . . . . . . . . . . . . . | 1a | 32,009,311. |
| b | Returns and allowances . . . . . . . . . . . . . . . . . . . | 1b | |
| c | Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . . . . . . . | 1c | 32,009,311. |
| 2 | Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . . . . . . . . . . | 2 | |
| 3 | Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . . . . . . . | 3 | 32,009,311. |
| 4 | Ordinary income (loss) from other partnerships, estates, and trusts (attach statement)STMT. 1 | 4 | -3,799,517. |
| 5 | Net farm profit (loss) (attach Schedule F (Form 1040 or 1040-SR)) . . . . . . . . . . . | 5 | |
| 6 | Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . . . . | 6 | |
| 7 | Other income (loss) (attach statement) . . . . . . . . . . SEE. STATEMENT. 1. . | 7 | -2,886,805. |
| 8 | Total income (loss). Combine lines 3 through 7 . . . . . . . . . . . . . . . . . . . | 8 | 25,322,989. |

### Deductions (see instructions for limitations)

| | | | |
|---|---|---|---|
| 9 | Salaries and wages (other than to partners) (less employment credits) . . . . . . . . . . . | 9 | 28,941,198. |
| 10 | Guaranteed payments to partners . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | |
| 11 | Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | 18,389. |
| 12 | Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12 | 5,139,915. |
| 13 | Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | 1,377,540. |
| 14 | Taxes and licenses . . . . . . . . . . . . . . . . . . SEE. STATEMENT. 1. . | 14 | 1,761,610. |
| 15 | Interest (see instructions) . . . . . . . . . . . . . . . . SEE. STATEMENT. 1. . | 15 | 1,910,445. |
| 16a | Depreciation (if required, attach Form 4562) . . . . . . . . | 16a | 423,258. |
| b | Less depreciation reported on Form 1125-A and elsewhere on return | 16b | |
| 16c | | 16c | 423,258. |
| 17 | Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . . . . . . . . . . . | 17 | |
| 18 | Retirement plans, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 | |
| 19 | Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 | 1,808,577. |
| 20 | Other deductions (attach statement) . . . . . . . . . . . . SEE. STATEMENT. 1. . | 20 | 15,611,953. |
| 21 | Total deductions. Add the amounts shown in the far right column for lines 9 through 20 . . . | 21 | 56,992,885. |
| 22 | Ordinary business income (loss). Subtract line 21 from line 8 . . . . . . . . . . . . | 22 | -31,669,896. |

### Tax and Payment

| | | | |
|---|---|---|---|
| 23 | Interest due under the look-back method – completed long-term contracts (attach Form 8697) . | 23 | |
| 24 | Interest due under the look-back method – income forecast method (attach Form 8866) . . . . | 24 | |
| 25 | BBA AAR imputed underpayment (see instructions) . . . . . . . . . . . . . . . . . | 25 | |
| 26 | Other taxes (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . | 26 | |
| 27 | Total balance due. Add lines 23 through 26 . . . . . . . . . . . . . . . . . . . . | 27 | |
| 28 | Payment (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . | 28 | |
| 29 | Amount owed. If line 28 is smaller than line 27, enter amount owed. . . . . . . . . . . | 29 | |
| 30 | Overpayment. If line 28 is larger than line 27, enter overpayment . . . . . . . . . . . | 30 | |

### Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

► _(signature)_    ► 9/10/20

Signature of partner or limited liability company member    Date

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

### Paid Preparer Use Only

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| TODD CRAWFORD | T W Crawford | 9/6/2020 | | P00848788 |
| Firm's name ► DELOITTE TAX LLP | | | Firm's EIN ► 86-1065772 | |
| Firm's address ► 1111 BAGBY STREET, SUITE 4500 HOUSTON, TX 77002-2591 | | | Phone no. 713-982-2000 | |

For Paperwork Reduction Act Notice, see separate instructions.

JSA 9P1010 1.000    1128CM    1216    V19-6.4F

Form **1065** (2019)

003452

HCMLPHMIT00001762

| Form **1065** | U.S. Return of Partnership Income | | **2019** |
|---|---|---|---|
| Department of the Treasury Internal Revenue Service | For calendar year 2019, or tax year beginning _____, 2019, ending _____, 20 _____. ▶ Go to *www.irs.gov/Form1065* for instructions and the latest information. | | |

| A Principal business activity | Name of partnership | D Employer identification number |
|---|---|---|
| INVESTMENT MANAGEMENT | HIGHLAND CAPITAL MANAGEMENT, LP | 75-2716725 |
| B Principal product or service | Type or Print — Number, street, and room or suite no. If a P.O. box, see instructions. | E Date business started |
| INVESTMENT SERVICES | 300 CRESCENT COURT, SUITE 700 | 07/07/1997 |
| C Business code number | City or town, state or province, country, and ZIP or foreign postal code | F Total assets (see instructions) |
| 523900 | DALLAS, TX 75201 | $ 1,015,968,222. |

G Check applicable boxes:  (1) ☐ Initial return  (2) ☒ Final return  (3) ☐ Name change  (4) ☐ Address change  (5) ☐ Amended return

H Check accounting method:  (1) ☐ Cash  (2) ☒ Accrual  (3) ☐ Other (specify) ▶

I Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 6

J Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

K Check if Partnership:  (1) ☐ Aggregated activities for section 465 at-risk purposes  (2) ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See instructions for more information.

**Income**

| | | | |
|---|---|---|---|
| 1a Gross receipts or sales . . . . . . . . . . . . . . . . . | 1a | 32,009,311. | |
| b Returns and allowances . . . . . . . . . . . . . . . . | 1b | | |
| c Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . . . . . . . | | | 1c | 32,009,311. |
| 2 Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . . . . . | | | 2 | |
| 3 Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . . | | | 3 | 32,009,311. |
| 4 Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) STMT. 1 | | | 4 | -3,799,517. |
| 5 Net farm profit (loss) (attach Schedule F (Form 1040 or 1040-SR)) . . . . . . . | | | 5 | |
| 6 Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) . . . . . . . | | | 6 | |
| 7 Other income (loss) (attach statement) . . . . . . . . . . SEE. STATEMENT. 1 . . | | | 7 | -2,886,805. |
| 8 **Total income (loss).** Combine lines 3 through 7 . . . . . . . . . . . . . . . . | | | 8 | 25,322,989. |

**Deductions** *(see instructions for limitations)*

| | | | |
|---|---|---|---|
| 9 Salaries and wages (other than to partners) (less employment credits) . . . . . . | | | 9 | 28,941,198. |
| 10 Guaranteed payments to partners . . . . . . . . . . . . . . . . . . . . . | | | 10 | |
| 11 Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . | | | 11 | 18,389. |
| 12 Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 12 | 5,139,915. |
| 13 Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 13 | 1,377,540. |
| 14 Taxes and licenses . . . . . . . . . . . . . . . SEE. STATEMENT. 1 . . | | | 14 | 1,761,610. |
| 15 Interest (see instructions) . . . . . . . . . . . . . SEE. STATEMENT. 1 . . | | | 15 | 1,910,445. |
| 16a Depreciation (if required, attach Form 4562) . . . . . . . . | 16a | 423,258. | |
| b Less depreciation reported on Form 1125-A and elsewhere on return | 16b | | 16c | 423,258. |
| 17 Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . . . . . . . | | | 17 | |
| 18 Retirement plans, etc. . . . . . . . . . . . . . . . . . . . . . . . . | | | 18 | |
| 19 Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . | | | 19 | 1,808,577. |
| 20 Other deductions (attach statement) . . . . . . . . . SEE. STATEMENT. 1 . . | | | 20 | 15,611,953. |
| 21 **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | | | 21 | 56,992,885. |
| 22 **Ordinary business income (loss).** Subtract line 21 from line 8 . . . . . . . | | | 22 | -31,669,896. |

**Tax and Payment**

| | | | |
|---|---|---|---|
| 23 Interest due under the look-back method - completed long-term contracts (attach Form 8697) . | | | 23 | |
| 24 Interest due under the look-back method - income forecast method (attach Form 8866) . . . | | | 24 | |
| 25 BBA AAR imputed underpayment (see instructions) . . . . . . . . . . . . | | | 25 | |
| 26 Other taxes (see instructions) . . . . . . . . . . . . . . . . . . . . . | | | 26 | |
| 27 **Total balance due.** Add lines 23 through 26 . . . . . . . . . . . . . . | | | 27 | |
| 28 Payment (see instructions) . . . . . . . . . . . . . . . . . . . . . . | | | 28 | |
| 29 **Amount owed.** If line 28 is smaller than line 27, enter amount owed . . . . . . | | | 29 | |
| 30 **Overpayment.** If line 28 is larger than line 27, enter overpayment . . . . . . | | | 30 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

|  |  | May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No |
|---|---|---|
| ▶ Signature of partner or limited liability company member | ▶ Date | |

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| TODD CRAWFORD | *Todd Crawford* | 9/6/2020 | | P00848788 |
| Firm's name ▶ DELOITTE TAX LLP | | | | Firm's EIN ▶ 86-1065772 |
| Firm's address ▶ 1111 BAGBY STREET, SUITE 4500 HOUSTON, TX 77002-2591 | | | | Phone no. 713-982-2000 |

For Paperwork Reduction Act Notice, see separate instructions.
JSA  9P1010 1.000

Form **1065** (2019)

1128CM   1216                                    V19-6.4F

003453

HCMLPHMIT00001766

## Schedule K-1
### (Form 1065)

Department of the Treasury
Internal Revenue Service

**20**19

For calendar year 2019, or tax year

beginning ____ / ____ / 2019   ending ____ / ____ / ____

### Partner's Share of Income, Deductions, Credits, etc.

▶ **See back of form and separate instructions.**

| | Final K-1 | ☐ Amended K-1 | OMB No. 1545-0123 |
|---|---|---|---|

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) | | 15 | Credits |
| | (79,427) | | | |
| 2 | Net rental real estate income (loss) | | 16 | Foreign transactions |
| | 59,057 | | A | VARIOUS |
| 3 | Other net rental income (loss) | | B | 271,740 |
| 4a | Guaranteed payments for services | | C | 275,214 |
| 4b | Guaranteed payments for capital | | G | (3,473) |
| 4c | Total guaranteed payments | | I | 19,783 |
| 5 | Interest income | | J | 167,808 |
| | 24,413 | | * | SEE STMT |
| 6a | Ordinary dividends | | | |
| | 6,149 | | 17 | Alternative minimum tax (AMT) items |
| 6b | Qualified dividends | | A | (8) |
| | 332 | | D | 5,336 |
| 6c | Dividend equivalents | | * | SEE STMT |
| 7 | Royalties | | 18 | Tax-exempt income and nondeductible expenses |
| | 2,891 | | C | 14,285 |
| 8 | Net short-term capital gain (loss) | | | |
| | (22,160) | | | |
| 9a | Net long-term capital gain (loss) | | | |
| | 53,724 | | 19 | Distributions |
| 9b | Collectibles (28%) gain (loss) | | A | 9,351 |
| 9c | Unrecaptured section 1250 gain | | | |
| | 7 | | | |
| 10 | Net section 1231 gain (loss) | | 20 | Other information |
| | (3,439) | | A | 38,729 |
| 11 | Other income (loss) | | B | 623 |
| A | 38 | | T | 717 |
| * | SEE STMT | | * | SEE STMT |
| 12 | Section 179 deduction | | | |
| 13 | Other deductions | | | |
| A | 11 | | | |
| H | 14,992 | | | |
| * | SEE STMT | | | |
| 14 | Self-employment earnings (loss) | | | |

### Part I   Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II   Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
95-4440863

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
STRAND ADVISORS, INC
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**G** ☒ General partner or LLC member-manager   ☐ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____   Name _____

**I1** What type of entity is this partner?   S CORPORATION

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.250795 % | 0.250795 % |
| Loss | NONE % | NONE % |
| Capital | 0.250795 % | 0.250795 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 310,721 | $ 294,988 |
| Qualified nonrecourse financing | $ 102,634 | $ 352,799 |
| Recourse | $ 136,641,607 | $ 211,263,413 |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**   Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account | $ 932,867 |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ (46,485) |
| Other increase (decrease) (attach explanation) | $ 95 |
| Withdrawals & distributions | $ ( 9,351 ) |
| Ending capital account | $ 877,126 |

| 21 | ☐ More than one activity for at-risk purposes* |
|---|---|
| 22 | ☐ More than one activity for passive activity purposes* |

*See attached statement for additional information.

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N**   Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning _____ $ _____
Ending _____ $ _____

*For IRS Use Only*

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2019

P14409B330613 08/26/2020 18:00

Partner # 1

003454

HCMLPHMIT00001865

OMB No. 1545-0123

| Final K-1 | Amended K-1 |

**Schedule K-1**
**(Form 1065)**

Department of the Treasury
Internal Revenue Service

**20**19

For calendar year 2019, or tax year

beginning ___ / ___ / 2019   ending ___ / ___ /

**Partner's Share of Income, Deductions,
Credits, etc.** ▶ **See back of form and separate instructions.**

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
| --- | --- |

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) | (15,418) | 15 | Credits |
| 2 | Net rental real estate income (loss) | 11,464 | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions |
| 4a | Guaranteed payments for services | | A | VARIOUS |
| 4b | Guaranteed payments for capital | | B | 52,750 |
| 4c | Total guaranteed payments | | C | 53,424 |
| | | | G | (674) |
| 5 | Interest income | 4,739 | I | 3,840 |
| 6a | Ordinary dividends | 1,194 | J | 32,575 |
| 6b | Qualified dividends | 64 | * | SEE STMT |
| 6c | Dividend equivalents | | 17 | Alternative minimum tax (AMT) items |
| 7 | Royalties | 561 | A | (2) |
| | | | D | 1,036 |
| 8 | Net short-term capital gain (loss) | (4,302) | * | SEE STMT |
| 9a | Net long-term capital gain (loss) | 10,429 | 18 | Tax-exempt income and nondeductible expenses |
| 9b | Collectibles (28%) gain (loss) | | C | 2,773 |
| 9c | Unrecaptured section 1250 gain | 1 | | |
| 10 | Net section 1231 gain (loss) | (668) | 19 | Distributions |
| 11 | Other income (loss) | | A | 17,945 |
| A | | 7 | | |
| * | SEE STMT | | 20 | Other information |
| 12 | Section 179 deduction | | A | 7,518 |
| 13 | Other deductions | | B | 121 |
| A | | 2 | T | 139 |
| H | | 2,910 | * | SEE STMT |
| * | SEE STMT | | | |
| 14 | Self-employment earnings (loss) | | | |

**Part I** Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

**Part II** Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
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

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
MARK OKADA
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____   Name _____

**I1** What type of entity is this partner?   INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.048684 % | 0.048684 % |
| Loss | NONE % | NONE % |
| Capital | 0.048684 % | 0.048684 % |

Check if decrease is due to sale or exchange of partnership interest . . ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse . . . $ | 60,316 | $ 57,262 |
| Qualified nonrecourse financing . . . $ | 19,923 | $ 68,484 |
| Recourse . . . $ | 12,000,000 | $ 12,000,000 |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L** Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account . . . $ | 181,086 |
| Capital contributed during the year . . $ | |
| Current year net income (loss) . . $ | (9,024) |
| Other increase (decrease) (attach explanation) $ | 16,149 |
| Withdrawals & distributions . . $ ( | 17,945 ) |
| Ending capital account . . . $ | 170,265 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . . . $ _____
Ending . . . . . . . $ _____

**21** ☐ More than one activity for at-risk purposes*

**22** ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   **Schedule K-1 (Form 1065) 2019**

P14409B330613 08/26/2020 18:00

Partner # 2

003455

HCMLPHMIT00001870

# Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

For calendar year 2019, or tax year

beginning ___/___/ 2019   ending ___/___/___

**2019**

| Final K-1 | Amended K-1 | OMB No. 1545-0123 |

**Part III   Partner's Share of Current Year Income, Deductions, Credits, and Other Items**

## Partner's Share of Income, Deductions, Credits, etc.

▶ **See back of form and separate instructions.**

### Part I   Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II   Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
74-6494106

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
THE MARK AND PAMELA OKADA
FAMLY TRUST, EXEMPT TRUST #1
3800 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN ___   Name ___

**I1** What type of entity is this partner?   TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.009777 % | 0.009777 % |
| Loss | NONE % | NONE % |
| Capital | 0.009777 % | 0.009777 % |

Check if decrease is due to sale or exchange of partnership interest   ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 12,113 | $ 11,499 |
| Qualified nonrecourse financing | $ 4,001 | $ 13,753 |
| Recourse | $ NONE | $ NONE |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**   **Partner's Capital Account Analysis**

| | |
|---|---|
| Beginning capital account | $ 36,365 |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ (1,812) |
| Other increase (decrease) (attach explanation) | $ 5 |
| Withdrawals & distributions | $ ( 366 ) |
| Ending capital account | $ 34,192 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning ___ $ ___
Ending ___ $ ___

| # | Description | Amount |
|---|---|---|
| 1 | Ordinary business income (loss) | (3,096) |
| 2 | Net rental real estate income (loss) | 2,302 |
| 3 | Other net rental income (loss) | |
| 4a | Guaranteed payments for services | |
| 4b | Guaranteed payments for capital | |
| 4c | Total guaranteed payments | |
| 5 | Interest income | 952 |
| 6a | Ordinary dividends | 240 |
| 6b | Qualified dividends | 13 |
| 6c | Dividend equivalents | |
| 7 | Royalties | 113 |
| 8 | Net short-term capital gain (loss) | (864) |
| 9a | Net long-term capital gain (loss) | 2,094 |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | NONE |
| 10 | Net section 1231 gain (loss) | (134) |
| 11 | Other income (loss) | |
| A | | 1 |
| * | SEE STMT | |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| A | | NONE |
| H | | 584 |
| * | SEE STMT | |
| 14 | Self-employment earnings (loss) | |

| # | Description | Amount |
|---|---|---|
| 15 | Credits | |
| 16 | Foreign transactions | |
| A | | VARIOUS |
| B | | 10,594 |
| C | | 10,729 |
| G | | (135) |
| I | | 771 |
| J | | 6,542 |
| * | SEE STMT | |
| 17 | Alternative minimum tax (AMT) items | |
| A | | NONE |
| D | | 208 |
| * | SEE STMT | |
| 18 | Tax-exempt income and nondeductible expenses | |
| C | | 557 |
| 19 | Distributions | |
| A | | 366 |
| 20 | Other information | |
| A | | 1,510 |
| B | | 24 |
| T | | 28 |
| * | SEE STMT | |

**21** ☐ More than one activity for at-risk purposes*
**22** ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.*

*For IRS Use Only*

P14409B330613 08/26/2020 18:00

Partner # 3

003456

HCMLPHMIT00001875

Case 19-34054-sgj11 Doc 4255-116 Filed 06/20/25 Entered 06/20/25 21:39:29
Case 3:25-cv-01876-K Document 36 Exhibit 110 Page 243 of 614 Page ID 2786
Case 3:25-cv-01876-K Document 36-11 Filed 07/25/25 Page 243 of 470 PageID 12786

OMB No. 1545-0123

☐ Final K-1   ☐ Amended K-1

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

2019

For calendar year 2019, or tax year

beginning __/__/2019   ending __/__/__

**Partner's Share of Income, Deductions,
Credits, etc.**
▶ See back of form and separate instructions.

## Part III — Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| **1** Ordinary business income (loss) | (1,327) | **15** Credits | |
| **2** Net rental real estate income (loss) | K47 | | |
| **3** Other net rental income (loss) | | **16** Foreign transactions | |
| | | A | VARIOUS |
| **4a** Guaranteed payments for services | | B | 9,590 |
| **4b** Guaranteed payments for capital | | C | 9,5K4 |
| **4c** Total guaranteed payments | | G | (54) |
| **5** Interest income | 904 | I | 331 |
| **6a** Ordinary dividends | 103 | J | 2,409 |
| **6b** Qualified dividends | 6 | * | SEE STMT |
| **6c** Dividend equivalents | | **17** Alternative minimum tax (AMT) items | |
| | | A | NONE |
| **7** Royalties | 94 | D | 4K |
| **8** Net short-term capital gain (loss) | (370) | * | SEE STMT |
| **9a** Net long-term capital gain (loss) | 4K4 | **18** Tax-exempt income and nondeductible expenses | |
| **9b** Collectibles (28%) gain (loss) | | C | 23K |
| **9c** Unrecaptured section 1250 gain | NONE | | |
| **10** Net section 1231 gain (loss) | (57) | **19** Distributions | |
| **11** Other income (loss) | | A | 157 |
| A | 1 | | |
| * | SEE STMT | **20** Other information | |
| **12** Section 179 deduction | | A | 697 |
| **13** Other deductions | | B | 10 |
| A | NONE | T | 12 |
| H | 250 | | |
| * | SEE STMT | * | SEE STMT |
| **14** Self-employment earnings (loss) | | | |

### Part I — Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II — Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
64-62039K9

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
THE MARF AND PAMELA OFADA
YAML# TRUST, EXEMPT TRUST 82
3400 WENTWOOD DRIVE
DALLAS, TX 75225

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner?   TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 0.0091K0 % | 0.0091K0 % |
| Loss | NONE % | NONE % |
| Capital | 0.0091K0 % | 0.0091K0 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse $ | 5,1K1 | $ 9,K24 |
| Qualified nonrecourse financing $ | 1,715 | $ 5,4K9 |
| Recourse $ | NONE | $ NONE |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L** Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account $ | 15,545 |
| Capital contributed during the year $ | |
| Current year net income (loss) $ | (777) |
| Other increase (decrease) (attach explanation) $ | 3 |
| Withdrawals & distributions $ ( | 157) |
| Ending capital account $ | 19,659 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning _____ $ _____
Ending _____ $ _____

**21** ☐ More than one activity for at-risk purposes*
**22** ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   **Schedule K-1 (Form 1065) 2019**

Partner 8.9

003457

HCMLPHMIT00001880

| Schedule K-1 | | |
|---|---|---|
| **(Form 1065)** | | |

**20**19

| | Final K-1 | Amended K-1 | OMB No. 1545-0123 |

Department of the Treasury
Internal Revenue Service

For calendar year 2019, or tax year

beginning ___ / ___ / 2019   ending ___ / ___ / ___

## Partner's Share of Income, Deductions, Credits, etc.

► **See back of form and separate instructions.**

| **Part III** | **Partner's Share of Current Year Income, Deductions, Credits, and Other Items** |

| # | Item | # | Item |
|---|---|---|---|
| 1 | Ordinary business income (loss) 5( ,0V1E | 15 | Credits |
| 2 | Net rental real estate income (loss) . 3.( 2( | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| | | A | 4 ARIOUS |
| 4a | Guaranteed payments for services / | | 202,13. |
| 4b | Guaranteed payments for capital | C | 20. ,71V |
| 4c | Total guaranteed payments | G | )2,5V. E |
| 5 | Interest income 1V,160 | I | 1. ,716 |
| 6a | Ordinary dividends . ,57. | 9 | 12. ,V2. |
| 6b | Qualified dividends 2. 7 | I | SEE STMT |
| 6c | Dividend equivalents | 17 | Alternative minimum tax (AMT) items |
| | | A | )6E |
| 7 | Royalties 2,151 | D | 3,( 6( |
| 8 | Net short-term capital gain (loss) )16,. V. E | I | SEE STMT |
| 9a | Net long-term capital gain (loss) 3( ,( 63 | 18 | Tax-exempt income and nondeductible expenses |
| 9b | Collectibles (28%) gain (loss) | C | 10,626 |
| 9c | Unrecaptured section 1250 gain 5 | | |
| 10 | Net section 1231 gain (loss) )2,55VE | 19 | Distributions |
| 11 | Other income (loss) | A | 151,7V5 |
| A | 2V | | |
| I | SEE STMT | 20 | Other information |
| 12 | Section 179 deduction | A | 2V,V0( |
| 13 | Other deductions | / | . 63 |
| A | V | T | 53. |
| H | 11,152 | I | SEE STMT |
| 14 | Self-employment earnings (loss) | I | SEE STMT |

## Part I   Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ► OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II   Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
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

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
9AMES DONDERO
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☒ If the partner is a disregarded entity (DE), enter the partner's:
TIN NONE   Name THE DUGABOY INVESTMENT TRUST

**I1** What type of entity is this partner?   INDI4 IDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 08 V655. % | 08 V655. % |
| Loss | NONE % | NONE % |
| Capital | 08 V655. % | 08 V655. % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse $ | 231,130 | $ 21( ,. 27 |
| Qualified nonrecourse financing $ | 76,3. . | $ 262,. 30 |
| Recourse $ | 35,000,000 | $ 35,000,000 |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**   Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account . . $ | 6( 3,( 1. |
| Capital contributed during the year . $ | |
| Current year net income (loss) . $ | )3. ,57VE |
| Other increase (decrease) (attach explanation) $ | 1. . .( 00 |
| Withdrawals & distributions . $ | ( 151,7V5) |
| Ending capital account . . $ | 652,. 51 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N**   Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . . . . $
Ending . . . . . . . . $

| 21 | ☐ More than one activity for at-risk purposes* |
| 22 | ☐ More than one activity for passive activity purposes* |

*See attached statement for additional information.

*For IRS Use Only*

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   Schedule K-1 (Form 1065) 2019

P1. . 0( / 330613 0V:26:2020 1V:00

Pr tne#t 5

003458

HCMLPHMIT00001885

# Schedule K-1
## (Form 1065)

Department of the Treasury
Internal Revenue Service

**20**19

☐ Final K-1   ☐ Amended K-1     OMB No. 1545-0123

For calendar year 2019, or tax year

beginning ___ / ___ / 2019   ending ___ / ___ / ___

### Partner's Share of Income, Deductions, Credits, etc.
▶ **See back of form and separate instructions.**

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| # | Item | Amount | # | Item | Amount |
|---|---|---|---|---|---|
| 1 | Ordinary business income (loss) | (31,511,547) | 15 | Credits | |
| 2 | Net rental real estate income (loss) | 23,429,983 | | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions | |
| 4a | Guaranteed payments for services | | A | | VARIOUS |
| 4b | Guaranteed payments for capital | | B | | 107,809,792 |
| 4c | Total guaranteed payments | | C | | 109,187,851 |
| 5 | Interest income | 9,685,521 | G | | (1,378,061) |
| | | | I | | 7,848,766 |
| 6a | Ordinary dividends | 2,439,576 | J | | 66,575,961 |
| 6b | Qualified dividends | 131,590 | * | | SEE STMT |
| 6c | Dividend equivalents | | 17 | Alternative minimum tax (AMT) items | |
| | | | A | | (3,101) |
| 7 | Royalties | 1,147,036 | D | | 2,116,810 |
| 8 | Net short-term capital gain (loss) | (8,791,920) | * | | SEE STMT |
| 9a | Net long-term capital gain (loss) | 21,314,362 | 18 | Tax-exempt income and nondeductible expenses | |
| 9b | Collectibles (28%) gain (loss) | | C | | 5,667,593 |
| 9c | Unrecaptured section 1250 gain | 2,880 | | | |
| 10 | Net section 1231 gain (loss) | (1,364,433) | 19 | Distributions | |
| 11 | Other income (loss) | | A | | 3,711,456 |
| A | | 14,893 | | | |
| * | | SEE STMT | 20 | Other information | |
| 12 | Section 179 deduction | | A | | 15,365,420 |
| 13 | Other deductions | | B | | 247,031 |
| A | | 4,238 | | | |
| H | | 5,947,873 | T | | 284,597 |
| * | | SEE STMT | * | | SEE STMT |
| 14 | Self-employment earnings (loss) | | | | |

## Part I   Information About the Partnership

**A** Partnership's employer identification number
75-2716725

**B** Partnership's name, address, city, state, and ZIP code
HIGHLAND CAPITAL MANAGEMENT, LP
300 CRESCENT COURT, SUITE 700
DALLAS, TX 75201

**C** IRS Center where partnership filed return ▶ OGDEN

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II   Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
47-5261938

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
RAND PE FUND I, LP
87 RAILROAD PLACE, SUITE 403
SARATOGA SPRINGS, NY 12866

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☒ If the partner is a disregarded entity (DE), enter the partner's:
TIN  47-5145562   Name  HNTR MNTN INV TRST FBO BCN MN

**I1** What type of entity is this partner?   PARTNERSHIP

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 99.500000 % | 99.500000 % |
| Loss | NONE % | NONE % |
| Capital | 99.500000 % | 99.500000 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 123,274,967 | $ 117,033,004 |
| Qualified nonrecourse financing | $ 40,718,835 | $ 139,968,727 |
| Recourse | $ NONE | $ NONE |

☒ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**   **Partner's Capital Account Analysis**

| | |
|---|---|
| Beginning capital account | $ 370,103,735 |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ (18,442,312) |
| Other increase (decrease) (attach explanation) | $ 39,227 |
| Withdrawals & distributions | $ ( 3,711,456 ) |
| Ending capital account | $ 347,989,195 |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . $
Ending . . . . . $

21 ☐ More than one activity for at-risk purposes*
22 ☐ More than one activity for passive activity purposes*

*See attached statement for additional information.

*For IRS Use Only*

For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Cat. No. 11394R   **Schedule K-1 (Form 1065) 2019**

HCMLPHMIT00001890

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | June 25, 2025 |
|  | ) | 9:30 a.m. Docket |
| Reorganized Debtor. | ) |  |
|  | ) | - MOTION TO EXTEND DURATION OF |
|  | ) |   TRUSTS (4213) |
|  | ) | - MOTION TO APPROVE SETTLEMENT |
|  | ) |   (4216) |
| _____ | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Highland Capital Management Claimant Trust: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY  10017-2024<br>(212) 561-7760 |
| For the Highland Capital Management Claimant Trust: | Hayley R. Winograd<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>1700 Broadway, 36th Floor<br>New York, NY  10019<br>(212) 561-7732 |
| For the Highland Capital Management Claimant Trust: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd.,<br> 13th Floor<br>Los Angeles, CA  90067<br>(310) 277-6910 |
| For Marc S. Kirschner, Litigation Trustee: | Robert Scott Loigman<br>QUINN EMANUEL URQUHART & SULLIVAN,<br> LLP<br>295 5th Avenue<br>New York, NY  10016<br>(212) 849-7000 |

000001

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 50   Filed 11/26/25   Page 247 of 614   PageID 12796

2

```
 1   APPEARANCES, cont'd.:

 2   For the Hunter Mountain        Louis M. Phillips
     Entities:                     Amelia L. Hurt
 3                                 KELLY HART & PITRE
                                   301 Main Street, Suite 1600
 4                                 Baton Rouge, LA  70801
                                   (225) 381-9643
 5
     For the Dugaboy               Deborah Rose Deitsch-Perez
 6   Investment Trust:             STINSON, LLP
                                   2200 Ross Avenue, Suite 2900
 7                                 Dallas, TX  75201
                                   (214) 560-2201
 8
     For the Dugaboy               Michael Justin Lang
 9   Investment Trust:             CRAWFORD WISHNEW & LANG, PLLC
                                   1700 Pacific Avenue, Suite 2390
10                                 Dallas, TX  75201
                                   (214) 817-4500
11
     For Crown Global Life         David L. Curry, Jr.
12   Insurance, Ltd. and          OKIN ADAMS, LLP
     The Dallas Foundation:        1113 Vine Street, Suite 240
13                                 Houston, TX  77002
                                   (713) 228-4100
14
     For Patrick Daugherty:        Andrew K. York
15                                 Drake Rayshell
                                   Joshua Smeltzer
16                                 GRAY REED & MCGRAW, LLP
                                   1601 Elm Street, Suite 4600
17                                 Dallas, TX  75201
                                   (214) 954-4135
18
     For the U.S. Trustee:         Erin Marie Schmidt
19                                 OFFICE OF THE UNITED STATES
                                        TRUSTEE
20                                 1100 Commerce Street, Room 976
                                   Dallas, TX  75242-1496
21                                 (214) 767-1075

22   Recorded by:                  Michael F. Edmond, Sr.
                                   UNITED STATES BANKRUPTCY COURT
23                                 1100 Commerce Street, 12th Floor
                                   Dallas, TX  75242
24                                 (214) 753-2062

25
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 50   Filed 11/26/25   Page 248 of 614   PageID 12791

3

1   Transcribed by:       Kathy Rehling

2                  311 Paradise Cove
                    Shady Shores, TX   76208

3                  (972) 786-3063

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 53   Filed 11/26/25   Page 249 of 674   PageID 12792

4

1          <u>DALLAS, TEXAS - JUNE 25, 2025 - 9:38 A.M.</u>

2        THE CLERK:  All rise.  The United States Bankruptcy

3 Court for the Northern District of Texas, Dallas Division, is

4 now in session, the Honorable Stacey Jernigan presiding.

5        THE COURT:  Good morning.  Please be seated.

6        MR. LANG:  Good morning, Judge.

7        THE COURT:  All right.  We have Highland settings

8 this morning, Case No. 19-34054.  We have two motions:  a

9 motion to extend the duration of the Plan Trust, and then a

10 motion under Rule 9019 to approve a settlement between the

11 estate entities and Hunter Mountain entities.

12     All right.  So, lots to get to.  Let's quickly get

13 appearances from the participating parties in interest this

14 morning.

15        MR. MORRIS:  Good morning, Your Honor.  John Morris;

16 Pachulski Stang Ziehl & Jones.  I'm joined by my colleagues

17 Jeffery Pomerantz, Gregory Demo, and Hayley Winograd.  And we

18 represent the Highland Capital Management Claimant Trust and

19 Highland Capital Management, LP.

20        THE COURT:  Okay.  Good morning.  Other appearances?

21        MR. LOIGMAN:  Good morning, Your Honor.  Robert

22 Loigman from Quinn Emanuel.  We represent the Highland

23 Litigation Trustee, Marc Kirschner.

24        THE COURT:  Good morning.

25        MS. DEITSCH-PEREZ:  Good morning, Your Honor.  This

1  is Deborah Deitsch-Perez from Stinson representing the Dugaboy

2  Trust on the motion to extend the duration of the Trust.

3            THE COURT:  Good morning.

4            MS. DEITSCH-PEREZ:  Good morning.

5            MR. LANG:  Michael Lang for Dugaboy Investment Trust

6  on the 9019 motion.

7            THE COURT:  Good morning.

8            MR. LANG:  Good morning.

9            MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

10  Phillips and Amelia L. Hurt; Kelly Hart Hallman -- Kelly Hart

11  Pitre, Louisiana trade name, I don't know why -- appearing on

12  behalf of Hunter Mountain Investment Trust and the Hunter

13  Mountain entities in connection with the 9019 motion.

14            THE COURT:  Good morning.

15            MR. YORK:  Good morning, Your Honor.  Drew York along

16  with Joshua Smeltzer and Drake Rayshell from Gray Reed on

17  behalf of Patrick Daugherty with regard to the 9019 motion.

18            THE COURT:  Good morning.  Ms. Schmidt?

19            MS. SCHMIDT:  Erin Schmidt on behalf of the U.S.

20  Trustee.

21            THE COURT:  Good morning.

22            MR. CURRY:  Good morning, Your Honor.  David Curry

23  from Okin Adams on behalf of The Dallas Foundation and Crown

24  Global Life Insurance, Ltd.

25            THE COURT:  Good morning.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 53   Filed 11/26/25   Page 251 of 614   PageID 12794

6

1      All right.  Well, let me ask.  I'll start with Mr. Morris,

2   given these are your motions.  Do you have any agreements

3   about how you're going to proceed?  I'm wondering, first off,

4   are we going to have joint presentations, joint evidence on

5   both motions, or are we going to take one at the time?

6          MR. MORRIS:  Good morning, Your Honor.  Thank you

7   very much for hearing us yesterday.  It's kind of a big day in

8   the case.  We have a milestone that we hope will greatly

9   advance the prosecution of this case, and, frankly, what

10   remains to be done to complete the wind-up of Highland.

11      There are two motions before the Court.  The first is the

12   motion to extend the Trusts.  That was filed at Docket No.

13   4213.  We're going to address that one first, Your Honor,

14   because we have a resolution and a stipulation.  There's only

15   one objecting party.  That was the Dugaboy Investment Trust.

16   And early this morning we reached an agreement whereby Dugaboy

17   is going to withdraw its objection, with prejudice, subject to

18   a stipulation that we will file with the Court but that

19   contains the following terms.

20          THE COURT:  Okay.

21          MR. MORRIS:  Number one, Dugaboy agrees to withdraw

22   its objection to the motion, with prejudice.

23      Number two, the Trusts expect to dissolve by August 11th,

24   2026, so that no further extension of the duration of the

25   Trusts will be necessary.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 50   Filed 11/26/25   Page 252 of 614   PageID 12795

7

1          THE COURT:  Okay.

2          MR. MORRIS:  And number three, Dugaboy hereby

3  preserves and does not waive its right, if any, to object to

4  any further attempts to extend the date by which the Trusts

5  must be dissolved or to extend the duration of the Trusts.

6          THE COURT:  Wait.  I don't understand that third one.

7  Could you repeat it?

8          MR. MORRIS:  It's a reservation of rights.

9          THE COURT:  Okay.

10          MR. MORRIS:  And so Dugaboy preserves and does not

11  waive its right, if any, to object --

12          THE COURT:  Well, okay.  I'm sorry.  Maybe I zoned

13  out or heard something different.

14          MR. MORRIS:  Uh-huh.

15          THE COURT:  I thought number two of the agreement was

16  August 11th, 2026 would be it; there would be no further

17  extensions.

18          MR. MORRIS:  It's a statement of expectation.  It's

19  not a representation.  It's not a warranty.  We do not believe

20  today, based on the facts and circumstances that we know of,

21  that a further extension will be necessary, but we're not

22  waiving the right to seek it if circumstances change or

23  something unforeseen happens.  And all Dugaboy is saying is

24  that, okay, we reserve the right, if any, to object.

25          THE COURT:  Okay.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 53   Filed 11/26/25   Page 253 of 614   PageID 12796

8

1           MR. MORRIS:  It's that simple.

2           THE COURT:  Okay.  It's sort of confusing, right?

3           MR. MORRIS:  Yeah.

4           THE COURT:  Okay.

5           MR. MORRIS:  Perhaps.  If you have any questions, let

6    me try and clarify.

7           THE COURT:  Well, I guess I'll just start with Ms.

8    Deitsch-Perez.  Would you come to the podium?  We've got I

9    don't know who on the camera, but we want to make sure

10   everyone hears.

11          MS. DEITSCH-PEREZ:  Okay.  I'll take a stab at --

12          THE COURT:  Do you confirm what you heard and do you

13   have any clarification of Points 2 and 3?

14          MS. DEITSCH-PEREZ:  Maybe I can make it clear.  I

15   confirm that is the stipulation that we agreed upon, and I

16   think all that was intended is the Trusts and the Debtor are

17   saying they expect to be done by August 11, 2026, so that they

18   will not need to make this motion again, but they could not

19   and would not promise that they will be done by then.  So

20   Dugaboy is withdrawing the objection to this particular

21   extension but is not waiving the right to object to a further

22   request for an extension.  And that's the sum of it.  Does

23   that make sense to Your Honor?

24          THE COURT:  It does.

25          MS. DEITSCH-PEREZ:  Okay.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 53   Filed 11/26/25   Page 254 of 614   PageID 12797

9

1          THE COURT:  I'm hoping it'll be over by August 11th,

2     2026, and we'll see where we are at that time.

3        Well, one of my reasons for a slight bit of confusion is,

4     in reading the 9019 settlement that is before the Court, I saw

5     that there were some future installments payments, if you

6     will, to HMIT, I think up through 2029, maybe.

7          MR. MORRIS:  Sure.

8          THE COURT:  So I was --

9          MR. MORRIS:  So let me clarify.

10          THE COURT:  Okay.

11          MR. MORRIS:  The only thing that we said that we

12     expect to happen as of, you know, by August 11th, 2026 is that

13     the Trusts will be dissolved.  But that is not the end of

14     their life.  It is a process.  Once you file for dissolution,

15     then you have to complete the wind-down.  And completing the

16     wind-down will require the completion of all litigation.  It

17     will -- right?

18        All we're talking about is dissolving the Highland

19     Claimant Trust and the Highland Litigation Subtrust so that

20     what remains after that is the Indemnity Trust.  And the

21     Indemnity Trust will be fully funded and will be prepared to

22     go forward.  And if we ever get to a point when there's no

23     further litigation, the corpus of that will be distributed to

24     whatever stakeholders are entitled to it at that time.

25        But when we talk about being done by next year, it doesn't

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 56    Filed 11/19/25    Page 255 of 614    PageID 12793

10

 1   mean the case will be over.  It simply means that the Claimant

 2   Trust and the Highland Litigation Subtrust will be dissolved.

 3   But they still have to complete the wind-up.

 4            THE COURT:  Okay.  Gotcha.

 5            MS. DEITSCH-PEREZ:  And Dugaboy is reserving its

 6   rights to object to -- if something is happening that seems

 7   improper or untoward or they're seeking additional relief,

 8   obviously, we're not waiving the unknown now.

 9            THE COURT:  Okay.  Gotcha.  All right.  Well, I

10   appreciate the resolution of these issues.  I assume no other

11   party in interest is going to weigh in since we only had a

12   Dugaboy objection.

13            MR. MORRIS:  That was the only objection we had.  I'm

14   prepared to, if Your Honor thinks it's necessary or

15   appropriate, or both, to make a very short proffer.  A

16   proffer.

17            THE COURT:  Okay.  I'll accept that proffer at this

18   time.

19            MR. MORRIS:  Okay.  So, Your Honor, we filed on the

20   docket at No. 4253 Exhibits 1 through 65, and we supplemented

21   our exhibit list at Docket No. 4271 with two additional

22   documents, which are Exhibits 66 and 67.  We don't believe

23   there's any objection to any of those documents, and we would

24   respectfully move for their admission into evidence.

25            THE COURT:  All right.  Could you repeat the numbers

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 56-1 Filed 1/25/25 of Page 256 of 614    PageID 12799

Seery - Proffer                            11

 1    once again?

 2              MR. MORRIS:  Yes, Your Honor.  So, for the motion for

 3    an order further extending the duration of the Trusts, we have

 4    two docket entries that contain Highland's exhibits.  The

 5    first is Docket No. 4253, and that has Exhibits 1 through 65.

 6              THE COURT:  Okay.

 7              MR. MORRIS:  And then we supplemented at 4271 with

 8    Docket -- with Exhibit Numbers 66 and 67.

 9              THE COURT:  All right.  I presume there's no

10    objection to these exhibits.

11         All right.  They are admitted.

12         (Claimant Trust's Exhibits 1 through 67 are admitted into

13    evidence.)

14              JAMES P. SEERY, JR., PROFFER OF TESTIMONY

15              MR. MORRIS:  Okay.  So, Your Honor, if called to

16    testify, James P. Seery, Jr., the Claimant Trustee of the

17    Highland Claimant Trust, would testify as follows.

18         At Exhibits 63 and 64, Highland filed excerpts of the

19    Litigation Trust and the Litigation Subtrust -- the Claimant

20    Trust and the Litigation Subtrust, and each of those excerpts

21    contain Section 9.1, respectively.  That's the section of the

22    Trusts that deal with the extensions that may be necessary

23    from to the original three-year term.  And Mr. Seery would

24    testify that he's familiar with those provisions and that he

25    understands the requirements of those provisions include,

Seery - Proffer                                    12

1    among other things, the requirement that all objections to

2    claims and equity interests have been resolved and that all

3    assets that the Trustee believes might yield sufficient value

4    to the estate have been sold.

5        Mr. Seery would also testify that the Highland estate has

6    a number of assets in its possession today, certain of which

7    will be conveyed to Hunter Mountain if the 9019 motion is

8    approved.

9        Among those assets, Mr. Seery would testify that, in

10   accordance with the proposed settlement agreement, which is at

11   Exhibit 17, in Paragraph 5(b), the Court will see reference to

12   what's known as the Dugaboy Note.  The Dugaboy Note is an

13   asset of the estate that will go to Hunter Mountain if the

14   9019 motion is approved.  If it's not approved, then Mr. Seery

15   would testify that he's got to find another way to dispose of

16   it.  But it is an asset with a face amount today of about $17

17   million, so it has substantial value.

18       There is a note from Hunter Mountain.  That also will be

19   disposed of as set forth in Paragraph 4(a) of the proposed

20   settlement agreement.  That note is going to be used to reduce

21   the allowed amount of Hunter Mountain's Class 10 claim if the

22   settlement is approved.  But that note is also an asset of the

23   estate.  It's worth over $60 million.  I believe it actually

24   might be in the fifties.  But somewhere in the $50 to $60

25   million range.  And that's an asset that needs to be disposed

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 36-1   Filed 11/25/25   Page 258 of 614   PageID 12301

Seery - Proffer                           13

1    of.

2         The estate has a contingent right to receive certain funds

3    under its settlement with Mr. Okada, and it has the Kirschner

4    Litigation.  All of these assets will be disposed of.  They're

5    very illiquid assets, I'd call them, and it would be very

6    helpful to the estate in moving this case forward if the 9019

7    motion is approved.

8         There are other assets that the estate has that will not

9    be monetized by August 11th and which therefore require the

10   extension of the Trusts.  Mr. Seery would testify, if called

11   to the stand, that the pursuit of the sale of these assets

12   will yield proceeds that justified the continued pursuit of

13   their monetization.  They include interests in Highland CLO

14   Funding, Ltd.  Documents pertaining to that can be found at

15   Exhibits 21 and 25.

16        The Claimant Trust also owns shares in Highland Capital

17   Management Korea, Ltd.  Documents relating to that asset can

18   be found at Exhibits 18 through 20.  That's an asset that, if

19   Mr. Seery were to testify, he would say that he has been

20   actively engaged in trying to liquidate that asset, but it's

21   not going to be completed by August 11th.

22        There's also a note that is due from Highland Capital

23   Management Korea, Ltd.  That can be found at Exhibit 67.

24   That's another asset that Mr. Seery has concluded and would

25   testify to that he thinks is valuable for the estate but will

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 259 of 614   PageID 12302

Seery - Proffer                                    14

1    not be monetized by the end of this extension period.

2         And then there's the bad faith award that the estate

3    obtained against HCRE, which remains on appeal.  The appeal of

4    that order can be found at Exhibit 15.  And there's no further

5    cost, really, to waiting for the Court's decision, but that is

6    an asset of the estate that remains to be monetized.

7         So there's two buckets of assets, one of which, hopefully,

8    if the 9019 motion is approved, will go to HMIT and that will

9    be helpful.  But there's another bucket of assets that are not

10   implicated by the HMIT settlement that will not be monetized

11   before August 11th that Mr. Seery would testify we need a

12   little bit more time and that's why we're going to extend the

13   Trusts.

14        Mr. Seery would also testify, finally, that there are

15   claims and equity interests that remain unresolved.  They

16   include Mr. Daugherty's Class 8 claim.  As Your Honor is

17   probably aware at this point, Highland has objected to that

18   claim.  It seeks to disallow, subordinate, that particular

19   claim.  Otherwise, have it monetized for purposes of winding

20   up the estate.

21        Mr. Daugherty has moved to dismiss that complaint.  That's

22   his right.  But our scheduling order already takes us past

23   August 11th.

24        And then, finally, we've got Dugaboy's Class 11 interest,

25   which has not yet been allowed.  If the 9019 motion is

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 260 of 614   PageID 12303

Seery - Proffer                              15

1   approved today, we do expect to move quickly to get to that

2   point so that we can finish that up.  But we don't foresee

3   that being completed before August 11th, either.

4        So, in sum, Mr. Seery would testify that, from his

5   perspective, the estate still has assets that are valuable to

6   the estate that will not be monetized by August 11th, and

7   there are still one claim and one equity interest that need to

8   be resolved in order to satisfy the test, you know, to get to

9   the dissolution.

10       So that would be the sum total of his testimony.  That's

11  the completion of the proffer.  And unless Your Honor has any

12  objections, we're prepared to move to the next motion.

13            THE COURT:  I have a couple of questions.

14            MR. MORRIS:  Sure.

15            THE COURT:  But first I'm going to go ahead and swear

16  in Mr. Seery --

17            MR. MORRIS:  Great.

18            THE COURT:  -- to affirm this, as well as swear him

19  in for what I'm sure will be future testimony today.

20            MR. MORRIS:  Sure.

21            MR. SEERY:  Would you like me to come --

22            THE COURT:  Well, you can just stand in place.  Just

23  make sure we hear you.

24       (The witness is sworn as to both his proffer and future

25  testimony.)

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 261 of 614   PageID 12304

16

1          THE COURT:  Okay.  Thank you.

2       All right.  My question is probably for you.

3          THE WITNESS:  Uh-huh.

4          THE COURT:  Just confirm my understanding.  We have

5    one claim and one --

6          MR. MORRIS:  Equity interest.

7          THE COURT:  -- equity interest to resolve?  Mr.

8    Daugherty's Class 8 claim and the Dugaboy what would be Class

9    11 interest?

10          MR. MORRIS:  That is correct.

11          THE COURT:  Did I hear that correctly, Mr. Seery?

12          THE WITNESS:  That's correct, Your Honor.

13          THE COURT:  Okay.  Thank you.

14       And then my other question is, once again, a

15    clarification.  I pulled out of your attachments to your

16    motion to extend the Exhibit B, Unresolved Pending Litigation.

17          MR. MORRIS:  Uh-huh.

18          THE COURT:  And at the time this was filed, May 8th,

19    2025, it showed nine pending matters at all court levels.  And

20    I think two of them now are finished.  I'm sorry.  This is a

21    long question.  But maybe I'm wrong.  The first two matters,

22    the recusal matter that was at the Fifth Circuit, as well as

23    the gatekeeper appeal, which I know a motion to stay the

24    mandate was at the Supreme Court, both of those are finished

25    now?  Done?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 262 of 614   PageID 12305

17

1              MR. MORRIS:  Yes, Your Honor.

2              THE COURT:  Okay.  So the nine pending matters is now

3    down to seven.  And if the Court were to approve the 9019

4    today, I understand that, well, it looks like, at a minimum,

5    two more would go away?

6              MR. MORRIS:  Precisely.

7              THE COURT:  We have an appeal at the District Court,

8    what we call the Claims Trading Appeal, where Highland had

9    sued -- I'm sorry, Hunter Mountain had sued Highland and

10   others regarding the claims trading issue, I'll call it.  So

11   that would go away?

12             MR. MORRIS:  Yes, Your Honor.

13             THE COURT:  And then let me see what else.  I've

14   marked all over my chart.

15             MR. MORRIS:  And then I believe Hunter Mountain's

16   motion for leave to file a complaint in the Delaware Chancery

17   Court --

18             THE COURT:  Ah.

19             MR. MORRIS:  -- to remove Mr. Seery will also be

20   dismissed with prejudice --

21             THE COURT:  Okay.

22             MR. MORRIS:  -- if the 9019 motion is approved.

23             THE COURT:  Okay.  So, that, yes, Hunter Mountain v.

24   Seery, the Court issued a stay on that being able to go

25   forward in Delaware.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 263 of 614   PageID 12306

18

1          MR. MORRIS:  Precisely.

2          THE COURT:  So that would go away.

3      So, of the nine matters listed, we're down to five.  But

4  I'll hear, I guess, about this later with Mr. Seery, the big

5  what I would call Kirschner adversary against lots of

6  defendants which has been abated for a long, long time now.

7  Hunter Mountain would basically receive that lawsuit with

8  those claims?  The claims against it go away?  And I don't

9  know what we'll hear, I don't know what Hunter Mountain will

10  do with that big adversary, but maybe it doesn't know yet.  I

11  don't know.

12          MR. MORRIS:  Yeah.

13          THE COURT:  So, --

14          MR. MORRIS:  Not a question we've concerned ourselves

15  with, Your Honor.

16          THE COURT:  Okay.  So that, again, I'm kind of

17  recapping everything.

18      (Counsel confer.)

19          MR. MORRIS:  Go ahead, Your Honor.

20          THE COURT:  So, again, I'm looking at the chart.  If

21  anyone wants to know what I'm looking at, it's at Docket No.

22  4213-2, filed May 8th.  We're down to the HCRE --

23          MR. MORRIS:  Appeal.

24          THE COURT:  -- appeal.

25          MR. MORRIS:  Uh-huh.  Which is fully briefed and

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/95/25   Page 264 of 614   PageID 12347

19

1    we're just waiting for a decision.

2          THE COURT:  Okay.  So that bad faith decision may or

3    may not stick, but it's hanging there on appeal.

4          MR. MORRIS:  Uh-huh.

5          THE COURT:  We're down to a Dugaboy -- what we called

6    the Imaging Motion.  Or no?

7          MR. MORRIS:  Correct.  I guess that's been stayed,

8    but that's out there.

9          THE COURT:  We have the valuation motion of Dugaboy,

10   but I don't know, is it going to be moot after today?  I don't

11   know what I'm going to hear today as far as the evidence.

12         MR. MORRIS:  So, that has -- great question -- two

13   plaintiffs in that lawsuit, HMIT and Dugaboy.

14         THE COURT:  Oh, that's right.  So --

15         MR. MORRIS:  HMIT is going to dismiss it with

16   prejudice.  Dugaboy will still have an active complaint.

17         THE COURT:  Appeal.

18         MR. MORRIS:  My hope is that --

19         THE COURT:  It's an appeal of --

20         MR. MORRIS:  Yes.

21         THE COURT:  Okay.

22         MR. MORRIS:  My hope is that, because we produced so

23   much valuation information to HMIT, which we then had to make

24   available to Dugaboy because that's the way discovery works,

25   that they'll withdraw that complaint.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 265 of 614   PageID 12308

20

1              THE COURT:  Okay.

2              MR. MORRIS:  I'm going to make that plea right on the

3    record here, because they've now gotten everything they've

4    asked for.  But that's their decision to make, and it's out

5    there.  But HMIT is withdrawing itself as a party to that

6    lawsuit, but it does remain in Dugaboy's lap.

7              THE COURT:  Okay.  So those potentially three things?

8              MR. MORRIS:  Yeah.

9              THE COURT:  Plus the Daugherty matter?

10             MR. MORRIS:  Yeah.

11             THE COURT:  Okay.  Mr. Seery, did I miss something?

12             THE WITNESS:  One clarification, Your Honor.  My

13   apologies.  One clarification.  In the Class 11 subordinated

14   interests, there's a Dugaboy capital account of $740,000.

15   There's also the Strand capital account -- both of these are

16   controlled by Mr. Dondero -- of $994,000.  And then Mr. Okada

17   and his affiliates have a combined capital account of

18   $248,000.  So we'll -- I said just Dugaboy, but it's actually

19   Dugaboy, Strand, and then Okada and two family trusts of his.

20             THE COURT:  Okay.

21             MR. MORRIS:  And if the 9019 motion is granted, --

22             THE WITNESS:  It's in the footnote.  It's in the

23   footnote in the motion.

24             THE COURT:  Yes.  I actually had that in my notes.

25             MR. MORRIS:  Yeah.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 07/25/25   Page 266 of 614   PageID 12309

21

1        THE COURT: So I glossed over Class 11 just being

2  Dugaboy. There are Strand and Okada.

3    All right. So I appreciate that clarification. We're

4  down hopefully to very little litigation. But we have no

5  control over higher courts, when they have time to look at it.

6        MR. MORRIS: Or future litigation, now that the

7  gatekeeper has been curtailed.

8        THE COURT: Okay. All right.

9    Anyone wish to say anything about this motion to extend?

10    All right. Well, based on the pleadings, the argument,

11  the evidence, I do think it is necessary and appropriate and

12  reasonable to extend the duration of the Highland Trusts

13  through August 11th, 2026. The relief is something that is

14  contemplated as a possibility under the trust documents.

15  Moreover, I think the Court has some authority under

16  Bankruptcy Rule 9006(b) and Bankruptcy Code Section 105 to

17  grant this relief.

18    The evidence shows there are unliquidated assets and some

19  unfinished litigation that must be resolved before the Trust

20  is in a position to wind down. So, again, I think it's

21  necessary, prudent, and in the best interest. The motion is

22  granted, and the Court duly acknowledges the comments with

23  regard to the stipulation of Dugaboy and the estate. All

24  right.

25        MR. MORRIS: Thank you very much. So, may I move to

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 1/85/227 of 286 267 of 674   PageID 12316

22

1    the 9019 motion?

2              THE COURT:  You may.

3              MR. MORRIS:  Okay.  With respect to the 9019 motion,

4    there were originally three Objecting Parties:  the Dugaboy

5    Investment Trust, Patrick Daugherty, and The Dallas Foundation

6    and an entity called Crown Global.

7        I'm pleased to report, and I think Your Honor may already

8    be aware, that a settlement has been reached to dispose of The

9    Dallas Foundation and the Crown Global objection.  There is a

10   written agreement to that effect that effectuates that.  And

11   I'd like to just turn the podium over to Mr. Phillips.  Louis

12   Phillips represents the HMIT Entities.  I know Mr. Curry is

13   here on behalf of the objecting parties, The Dallas

14   Foundation, but I think -- I think I'll let Mr. Phillips

15   address, you know, the specific terms of the resolution of

16   that objection.

17             THE COURT:  All right.  Thank you.  And I will say

18   that my staff reached out yesterday to -- I don't know if it

19   was Mr. Curry or someone in your office -- wanting to know

20   have you delivered exhibit notebooks.  And it was at that

21   point my staff heard, well, we've resolved.

22             MR. CURRY:  We had just finished.

23             THE COURT:  Okay.  All right.  So I'm happy to hear

24   what the resolution is.

25             MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/35/23   Page 268 of 614   PageID 12341

23

1   Phillips on behalf of the Hunter Mountain Investment Trust and

2   the named parties therein.

3       We had a written stipulation that has been signed by my

4   firm, by Mr. Curry's firm, by the Pachulski firm, and by the

5   Quinn Emanuel firm that is to be submitted to the -- is to be

6   filed on the record.  It also contains a reference to a

7   settlement agreement that will be attached.  But we will read

8   the stipulation into the record, if Your Honor would allow me

9   to.

10          THE COURT:  All right.  You may.

11          MR. PHILLIPS:  And Mr. Curry is here, and he can tell

12  me whether or not I have read correctly, but I think I have

13  it.

14          THE COURT:  Okay.  All right.

15          MR. PHILLIPS:  (reading)  Now, wherefore, it is

16  jointly -- hereby jointly stipulated and agreed as follows.

17  The Foundation Parties -- Mr. Curry's clients -- withdraw The

18  Foundation Objection, which is a defined term in the

19  stipulation, with prejudice, in accordance with the terms of

20  the term sheet annexed hereto as Attachment 1.  And Attachment

21  1 will be attached to the stipulation.

22      Paragraph 2.  The Foundation Parties, the HMIT Entities --

23  that's Hunter Mountain Entities and the Movants; that is, Mr.

24  Morris' client and Quinn Emanuel on behalf of the Litigation

25  Subtrust -- agree that the following language shall be

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/24   Page 269 of 614   PageID 12312

24

1  contained in the proposed order on the 9019 motion.  And

2  that's clearly the proposed order.  This is not dependent upon

3  the motion being granted.  Notwithstanding anything in the

4  settlement agreement or the 9019 order to the contrary, none

5  of The Dallas Foundation, EDF, Okada Family, or Crown (The

6  Foundation Parties) are or will be included in the definition

7  of HMIT Releasors or Highland Releasors.  For the avoidance of

8  doubt, however, any attempt by The Foundation Parties to

9  assert a claim against an HMIT released party by, through, or

10  under, including derivatively a Highland entity, or against a

11  Highland released party by, through, or under, including

12  derivatively an HMIT entity, is barred by this order and the

13  settlement agreement.

14      That is the sum and substance of the stipulation.  The

15  settlement agreement we don't think needs to be read to the

16  Court because it's a signed settlement agreement that will be

17  attached as Attachment 1 to the stipulation.  And I believe I

18  read it correctly.

19          THE COURT:  Mr. Curry, did he read it correctly?

20          MR. CURRY:  Mr. Phillips did read it correctly, Your

21  Honor.  And thank you.

22      And we want to thank Trustee's counsel and Mr. Phillips

23  for working with us to address some very real concerns.  And

24  through the stipulation, we still have some work to do, but we

25  have the time to do it, and maybe move it to where we can

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 270 of 614   PageID 12313

25

1   actually get it resolved.

2           THE COURT:  Okay.  Well, there are some things I am

3   concerned -- well, I should say, all I really feel the need to

4   go into is you're releasing your objection, your clients are,

5   and all of the parties here, parties to the proposed

6   settlement and the estates, the Debtors, Hunter Mountain, are

7   agreeing that your clients are not releasors under the 9019

8   settlement if the Court approves it.

9           MR. CURRY:  Correct, Your Honor.  Unless and except

10  our clients were to attempt to assert a released claim against

11  a released party, and that's what the "provided, however" was

12  to clarify.

13          MR. PHILLIPS:  And this doesn't affect the estate at

14  all.  It basically affects the HMI -- the Hunter Mountain

15  entities.  But the language that we have read in the

16  stipulation has been agreed to and is contained within the

17  order that will be proposed.

18          THE COURT:  Okay.  You said it better than I said it.

19  The estate is releasing claims --

20          MR. PHILLIPS:  I can't believe that, Your Honor, but

21  thank you.

22          THE COURT:  Well, the estate is releasing claims that

23  it has --

24          MR. PHILLIPS:  Correct.

25          THE COURT:  -- or in Trusts have -- I shouldn't have

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56-1   Filed 11/05/25   Page 273 of 614   PageID 12354

26

 1   said the estate.  It's the Trust entities and what's left of

 2   the Reorganized Debtors are releasing any claims they have

 3   against Hunter Mountain in the proposed settlement --

 4           MR. PHILIPS:  Yes.

 5           THE COURT:  -- if it's approved.  But any direct

 6   claims of your clients are not --

 7           MR. CURRY:  Well, direct claims that our client has

 8   or derivative claims, for example, against Hunter Mountain

 9   that are derivative through Hunter Mountain.

10           THE COURT:  Okay.  All right.

11           MR. PHILLIPS:  Yeah.

12           MR. CURRY:  Yeah.  That was the -- what we were

13   trying to make sure.

14           THE COURT:  Yes.  All right.  Well, and when I said

15   this is all I care about, what I mean is I don't even know who

16   the heck Crown Insurance is.

17           MR. PHILLIPS:  Correct.

18           THE COURT:  There was a very interesting party in

19   interest objection asserted by the Debtor.  And I've learned a

20   lot about a lot of entities during all these years, but that

21   was a new one on me.  I understood that it's somewhere in the

22   framework of the --

23           MR. PHILLIPS:  Yes, Your Honor.

24           THE COURT:  -- Charitable DAF.

25           MR. PHILLIPS:  Let's say it's somewhere in the

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 56    Filed 11/85/227 of Page 272 of 614    PageID 12815

27

 1    universe, Your Honor.

 2          THE COURT:  The universe?  Okay.

 3          MR. PHILLIPS:  The universe.  Not necessarily the

 4    Charitable DAF or Hunter Mountain.

 5          THE COURT:  Okay.

 6          MR. PHILLIPS:  But in the universe.

 7          THE COURT:  Well, but the point is, we've announced

 8    anything relevant to --

 9          MR. PHILLIPS:  Correct.

10          THE COURT:  -- the Reorganized Debtor, --

11          MR. PHILLIPS:  Correct.

12          THE COURT:  -- Claimant Trust, Subtrust.

13          MR. PHILLIPS:  And the motion -- and the objections

14    of all these entities are withdrawn with prejudice.

15          THE COURT:  All right.

16          MR. CURRY:  And Your Honor, the one thing that I will

17    note, part of our agreement, and it's in the signed term sheet

18    that you'll see, is that we've agreed that if there's a

19    dispute over the settlement to withdraw our objection, this

20    Court will have at least concurrent jurisdiction to resolve

21    that dispute, because it is a settlement to resolve an

22    objection to a core proceeding.

23          THE COURT:  Okay.  Thank you.

24          MR. PHILLIPS:  And we have agreed and we do agree

25    that the Court has jurisdiction.  It has jurisdiction.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56-1   Filed 11/35/225   Page 273 of 614   PageID 12316

28

```
1              THE COURT:  Okay.  For what that is worth.

2              MR. PHILLIPS:  Well, that's what we can agree to.

3              THE COURT:  All right.  I appreciate that.

4         Anyone wish to say anything about what's been announced?

5         All right.  Well, I accept this resolution and withdrawal

6    of --

7              MR. PHILLIPS:  Okay.  We will be filing --

8              THE COURT:  -- the objection.

9              MR. PHILLIPS:  We will be filing, at the close of

10   this hearing, this stipulation, and we will be clicking

11   whatever ECF box request that the Court so ordered on the

12   stipulation.

13             THE COURT:  Okay.  We will be on the lookout for

14   that.

15        All right.  Well, Mr. Lang, you stood up on behalf of

16   Dugaboy.

17             MR. LANG:  I just want to make the Court aware of a

18   letter that was sent last night that involves this from the

19   Caymans, from Grant Thornton.

20             MR. PHILLIPS:  We object.

21             MR. LANG:  I just want to make the Court -- they were

22   asking for a 45-day that the Joint Liquidators --

23             MR. PHILLIPS:  We object to this, Your Honor.  That's

24   not a part of the record.  This is a person from outer space.

25   Not outer space, but the Cayman Islands.  And it's a letter
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56-1 Filed 11/25/25 of Page 274 of 614   PageID 12857

29

1    that we --

2         THE COURT:  Coming from someone --

3         MR. PHILLIPS:  It looks like a letter --

4         THE COURT:  -- who is called Yosemite Sam, I

5    understand, outside of court.

6         MR. PHILLIPS:  Yeah.  Yeah.  I didn't want to bring

7    that up, but Mr. Morris --

8         THE COURT:  Okay.  Well, it's stuck in my brain

9    forever now.

10        MR. PHILLIPS:  -- says it's his favorite cartoon

11   character, so it must be okay.

12        THE COURT:  Okay.  Well, okay, I don't want to make

13   light.  I think this goes back to what I was saying about

14   there are certain things I care about and certain things I

15   don't care about.  And I read from the pleadings, I haven't

16   heard evidence but I've read from the pleadings that there is

17   a lot going on in the Cayman Islands with regard to what I

18   call the Charitable DAF structure or Hunter Mountain.

19        MR. LANG:  Yes.

20        THE COURT:  Parties in that universe.  And I don't

21   plan to exercise any control or jurisdiction over that, so I'm

22   hesitant to hear what it is you want to present.  I don't

23   know, maybe on cross-examination of Mark Patrick today it may

24   or may not be relevant.  But what is it --

25        MR. LANG:  All they ask for is a 45-day basically

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 275 of 614   PageID 12319

30

1    abeyance or continuance of the decision on the 9019, to allow

2    them to investigate and weigh in on it.

3              MR. PHILLIPS:  Your Honor?

4              MR. LANG:  They're Joint Liquidators.  That's -- I'm

5    just making the Court aware of the request.

6              THE COURT:  Okay.  Well, they're not here to

7    articulate that.  So I respect your wanting to be transparent

8    and whatnot, but I'm not going to let it stop me from going

9    forward today.  Okay.

10             MR. LANG:  Thank you.

11             THE COURT:  Thank you.

12             MR. PHILLIPS:  Your Honor, if I may be excused,

13   that's our position with respect to the withdrawal.  We

14   appreciate Your Honor's attention.  Thank you.

15             THE COURT:  Okay.  Thank you.

16             MR. CURRY:  Thank you, Your Honor.

17             THE COURT:  Anyone else wish to weigh in?

18        All right.  Well, I do, as I was saying, accept the

19   withdrawal of The Dallas Foundation and related entities'

20   objection to the 9019 settlement.

21        So does that leave only the Daugherty objection to the

22   settlement?  Well, and the Dugaboy.

23             MR. MORRIS:  And the Dugaboy, yes.

24             THE COURT:  And Dugaboy, of course.

25             MR. MORRIS:  That's right.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 276 of 614   PageID 12315

31

1          THE COURT:  Okay.

2          MR. MORRIS:  So, --

3          THE COURT:  So how did you want to proceed?

4          MR. MORRIS:  So, the way I propose to proceed, Your

5    Honor, I have an opening statement to make --

6          THE COURT:  Okay.

7          MR. MORRIS:  -- with a PowerPoint presentation to

8    present.  I would propose that, as the Movant, I go first.

9    Then we can hear from Dugaboy, we can hear from Mr. Daugherty,

10   and then we can put Mr. Seery on the stand.

11       Assuming that there is no challenge to Mark Patrick's

12   authority to enter into the settlement agreement on behalf of

13   all of the HMIT entities, I would not plan on calling either

14   Mr. Dondero or Ms. Deitsch-Perez, who are under subpoena here,

15   because the challenge to authority was really coming from The

16   Dallas Foundation.  Their objection has now been withdrawn.

17   So as long as Mr. Daugherty -- well, really, as long as

18   Dugaboy doesn't challenge Mr. Patrick's authority to enter

19   into the settlement agreement on behalf of the HMIT entities,

20   I think we'll just put on the one witness and be done.

21         THE COURT:  All right.  Just so we know what lies

22   ahead, --

23         MR. MORRIS:  Uh-huh.

24         THE COURT:  -- I don't think that Dugaboy objected to

25   Mr. Patrick's authority.  I do recall it was just The

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 17/15/25   Page 277 of 614   PageID 12826

32

 1   Foundation.

 2           MR. LANG:  There was no objection on the -- there was

 3   no objection.

 4           THE COURT:  Okay.  And same with Mr. Daugherty?  No

 5   objection about the authority of Mark Patrick to enter into

 6   the settlement?

 7           MR. YORK:  There was no objection.

 8           THE COURT:  All right.

 9           MR. MORRIS:  All right.  May I proceed?

10           THE COURT:  You may proceed.

11           MR. MORRIS:  Okay.  So, may I approach, Your Honor?

12   I've got a --

13           THE COURT:  You may.  Is this a PowerPoint?  And

14   everyone else has it, correct?

15       (Pause.)

16           THE COURT:  You may proceed.

17           MR. MORRIS:  Thank you, Your Honor.  John Morris;

18   Pachulski Stang Ziehl & Jones; for Highland Capital

19   Management, LP and the Highland Claimant Trust.

20       Before I begin, Your Honor, I'd like to move my exhibits

21   into evidence because I will be referring to them in my

22   opening.

23           THE COURT:  All right.  So I think I said on Monday

24   the first thing I was going to ask, and I've already blown

25   that, was did you all have good faith discussions regarding

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 278 of 614   PageID 12331

33

1    admission of each other's exhibits?  And I did see Mr. Lang

2    filed a day or two ago his list of objections.  It looked like

3    you were like you were down to about nine or eleven exhibits

4    you were objecting to.

5        (Counsel confer.)

6            THE COURT:  Out of 123 designations, which I think

7    probably grew overnight to --

8            MR. MORRIS:  Oh, okay.  Well, --

9            MR. LANG:  I just have to make clear for the record.

10           MR. MORRIS:  You go ahead and do that.

11           MR. LANG:  Your Honor, I've been told that Dugaboy

12   does challenge the authority.  It is not in our objection.

13           MR. PHILLIPS:  It's not in his --

14           THE COURT:  Well, can I ask why it was not in your

15   objection?

16           MR. LANG:  I do not know.  I was not counsel of

17   record when the objection was filed.  I do not know what was

18   known or not known at that time.

19           THE COURT:  So, --

20           MR. LANG:  So I guess we just seek leave to --

21           THE COURT:  -- if you did not have him on -- was Mark

22   Patrick on your exhibit list?  I don't think he was, right?

23           MR. LANG:  He was not.

24           THE COURT:  Okay.  So how would you address that?

25   Again, we've had, I know, some back and forth over who was

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 1/85/254 of Page 279 of 614   PageID 12322

34

1  going to represent Dugaboy on this matter.

2          MR. LANG:  Yes.

3          THE COURT:  I remember the substitutions and whatnot.

4  But --

5          MR. LANG:  We found out late last night that The

6  Foundation was resolving their issue, and that kind of left us

7  in a position.

8          THE COURT:  So what are you saying?  You all were

9  relying on --

10          MR. LANG:  Well, the issue had --

11          THE COURT:  -- The Foundation to carry the flag on

12  this one?

13          MR. LANG:  They had raised the issue.  They were

14  pursuing the issue.  We went through discovery and they were

15  pursuing it.  It was already in front of the Court.

16          THE COURT:  All right.  What would you like to say,

17  Mr. Morris?

18          MR. MORRIS:  Your Honor, this is more than

19  disappointing.  The fact of the matter is Mr. Dondero is

20  funding both the Cayman Islands litigation as well as The

21  Dallas Foundation's prosecution of the objection.  The fact

22  that The Dallas Foundation settled doesn't open the door to

23  Mr. Dondero to assert objections that he's never asserted

24  before.

25      I will tell you what will happen.  If Your Honor allows

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 280 of 614   PageID 12333

35

1   this, I will have to call Mr. Dondero and Ms. Deitsch-Perez to

2   the stand to offer evidence under subpoena that they

3   personally acknowledge and understand, because Mr. Dondero's

4   signature is on documents that were signed in the year 2025,

5   that Mr. Patrick is authorized to represent HMIT.  I really

6   didn't want to do that.  But if they want to pursue it, I'll

7   have to do my job.

8           THE COURT:  All right.

9           MR. LANG:  And I want to clarify one thing.

10          THE COURT:  Uh-huh.

11          MR. LANG:  And it goes back to something we already

12   discussed, which is the authority issue is derived from the

13   Cayman Island Joint Liquidators' appointment on May 6th, 2020.

14   And so how that changes the authority, it's -- I think the

15   issue is does he have authority, like Mr. Morris --

16          THE COURT:  All right.  Well, before I comment, Mr.

17   Phillips, it's your client representative that we're talking

18   about here.  What do you say?

19          MR. PHILLIPS:  Very disappointing, but -- and further

20   revealing the limits of my imagination.  There is no objection

21   to authority.  There's no evidence of record of objection to

22   authority.  There's no evidence even in The Dallas

23   Foundation's papers about authority.  Dugaboy did not raise

24   objections to authority.  Daugherty did not raise objections

25   to authority.  And Mr. Morris was willing to release Ms.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/85/25   Page 283 of 614   PageID 12324

36

1    Deitsch-Perez and Mr. Dondero from subpoena in connection with

2    an order that this Court entered that Hunter Mountain objected

3    to.  And outside the Court, the evidence will establish, the

4    evidence submitted by Mr. Morris will establish that Hunter

5    Mountain, through authority of Mr. Patrick, objected to Ms.

6    Deitsch-Perez signing on behalf of Hunter Mountain because she

7    did not seek approval and did not have authorization to sign a

8    stipulation before this Court.

9         Subsequently, after signing the stipulation and entry of

10   the order, we suggested that we would not deal with Ms.

11   Deitsch-Perez, we would only deal with unconflicted counsel,

12   and we dealt with unconflicted counsel to make an agreement

13   with HCLOM and another of Mr. Dondero's entities to avoid

14   filing a motion for reconsideration before this Court based on

15   the fact that, as we have suggested in the motion that we

16   didn't file, Hunter Mountain's approval was not real.

17        So Mr. Morris has these people under subpoena because we

18   signed an agreement that Mr. Dondero signed to avoid the

19   filing of a motion for reconsideration before this Court,

20   recognizing that Mr. Patrick had authority for Hunter Mountain

21   to sign the agreement.  And so that's the purpose of his

22   subpoena.

23        But our position is there's no suggestion in pleadings by

24   Dugaboy or Daugherty that challenge the authority of Mr.

25   Patrick to execute on behalf of any of the Hunter Mountain

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 282 of 614   PageID 12875

37

1    entities.  And the one party who, without suggesting an

2    evidentiary basis, but that's fine, they say maybe they did

3    have an evidentiary -- we -- and they withdrew their

4    objection.

5              THE COURT:  Okay.  Let me --

6              MR. MORRIS:  Okay.  I'm sorry.  Just really --

7              THE COURT:  Thirty second.

8              MR. MORRIS:  Really quickly.

9              THE COURT:  Uh-huh.

10             MR. MORRIS:  The letter that Mr. Lang just referred

11   to from the Joint Official Liquidators, addressed to us,

12   asking for an extension of time, doesn't even challenge Mr.

13   Patrick's authority to act today on behalf of the HMIT

14   entities to enter into the settlement agreement.  The Joint

15   Official Liquidators wrote to us last night, and they don't

16   say what Mr. Lang is now saying.

17             MR. PHILLIPS:  And the only thing I would say is we

18   got a letter by email from somebody who says, I am who I am.

19   It came through email PDF.  We don't challenge the authority.

20   But we would respectfully request -- we're not there.  We've

21   made no appearance.  We don't challenge the authority.  But

22   please wait -- ask the Court to wait the 45 minutes -- 45 days

23   for us.  We got a letter.  PDF.  We don't know who sent it.

24             THE COURT:  Okay.

25             MR. PHILLIPS:  It wouldn't be admissible even if

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56-1   Filed 11/05/25   Page 283 of 614   PageID 12876

38

1    someone tried to introduce it as evidence.

2            THE COURT:  Okay.  Let me just say a few things here.

3    This has felt like a very strange sideshow, I'm going to say.

4    When I read The Foundation's objection, I was, again,

5    scratching my head, who in the heck is Crown Insurance?  I

6    know who Dallas Foundation is because there have been charts

7    submitted to me in the past, and I know it's part of the I'm

8    going to say Mr. Phillips' client set over the months, the

9    Charitable Foundation structure.  But I'm like, how in the

10   heck do these people have standing?  Okay?  I have to always

11   consider standing.  That's every trial judge's first

12   obligation, does this party have standing?  Not a creditor.

13   Not an equity holder.  But somehow I guess they're going to

14   explain through evidence how they're a person aggrieved by the

15   proposed settlement.

16       So that's why I kind of -- hopefully, it doesn't sound

17   flippant -- thought this sounded like a sideshow, because this

18   is a stranger, really, to weigh in.

19       Okay.  So now I'm hearing that a party in interest, which

20   Dugaboy is -- I guess some might argue that, but I think

21   they're affected by the settlement, so that makes them a party

22   in interest -- you're making the same argument.  And it's

23   because of a rotation of counsel you didn't make it sooner.

24       Okay.  So I'm just trying to be transparent here, tell you

25   what the Court is thinking.  I guess what the Court is

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 17/25/25   Page 284 of 614   PageID 12357

39

1    thinking is Mark Patrick is the client representative, so I'm

2    told by the Movants on the 9019, and you, Mr. Phillips, he's

3    the party representative for Hunter Mountain.

4          MR. PHILLIPS:  Yes, Your Honor.

5          THE COURT:  I don't, I guess, know what harm there

6    is, except a longer hearing, in, okay, put him on the stand to

7    testify about the bona fides of the settlement.  It's more

8    evidence.  But if you all want to call Mr. Dondero, I'm going

9    to require that.

10         MR. MORRIS:  Your Honor?

11         THE COURT:  I mean, as a counterbalance, since it's

12   appearing from the pleadings to be --

13         MR. MORRIS:  Your Honor, respectfully, Mr. Patrick is

14   not on their witness list.  He's not on our witness list.

15         THE COURT:  Wasn't he on somebody's witness list?

16         MR. MORRIS:  He was on The Dallas Foundation's

17   witness list.

18         THE COURT:  Oh.

19         MR. MORRIS:  He's not on their witness list.  He's

20   not on our witness list.  He should not testify today because

21   they're raising an issue that they didn't raise ever before.

22   This is improper.  They should just be shut down here.

23         THE COURT:  I think probably you should be shut down.

24   But I kind of go back and forth, what's the harm in having the

25   representative, the person I'm told is the representative of

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 56    Filed 11/35/25 of Page 285 of 674    PageID 12329

40

1    Highland?

2              MR. PHILLIPS:  Your Honor?

3              THE COURT:  I could limit it to one hour.  And the

4    flip side is that Dondero himself, as I guess the

5    representative of Dugaboy, would have to also take the stand,

6    limited to one hour.

7              MR. PHILLIPS:  I'd like to make one note, Your Honor,

8    about the documents that Mr. Morris has introduced.  That

9    document list -- and I don't have the numbers in front of me

10   -- but part of the presentation and the reason Mr. Patrick is

11   not on the Movants' motion -- witness and exhibit list, the

12   documents that have been introduced are all of -- include all

13   of the documents evidencing Mr. Patrick's authority as the

14   control person of the entire Hunter Mountain group.

15             THE COURT:  Which they've stipulated.

16             MR. PHILLIPS:  Which they've stipulated to.

17             THE COURT:  Uh-huh.

18             MR. MORRIS:  And to be clear, Your Honor, they can be

19   found at Exhibits 70 through 104.  We've got 34 documents in

20   evidence that establish that Mr. Patrick is authorized to act

21   on behalf of each of the HMIT entities.  All that's going to

22   happen is we're now going to spend time dealing with an issue

23   that you already described as a sideshow, and we're going to

24   do it for a party who didn't put Mr. Patrick on a witness

25   list, who hasn't objected on this basis, and we've got a

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 56    Filed 17/15/25    Page 286 of 614    PageID 12329

41

 1   mountain of evidence that shows that he's completely

 2   authorized to do this.  I just --

 3          MR. PHILLIPS:  To which there's no objection.

 4          MR. MORRIS:  And you can also look, Your Honor, at

 5   Exhibit 69.  That's the agreement that Mr. Dondero signed with

 6   Mr. Patrick after he got outed for authorizing Ms. Deitsch-

 7   Perez to sign a document on behalf of HMIT without Mark

 8   Patrick's knowledge or approval.  He signed that.  Six months

 9   ago.  And we're going to have a trial here over whether Mark

10   Patrick is authorized to act on behalf of HMIT?

11          A VOICE:  That was long ago.

12          MR. MORRIS:  This is not -- this is not --

13          THE COURT:  We're not going to have a trial.  And I

14   fully acknowledge that I am possibly abusing discretion by

15   allowing this.  We have our rules, and our rules were not

16   complied with, and it does feel a little bit like ambush.

17   Okay?

18       But on the flip side of it, it doesn't seem entirely

19   unreasonable to have the representative, the purported

20   representative of Hunter Mountain, who is the counterparty, if

21   you will, to this very major settlement, take the stand.  And

22   I'll limit it.  And, again, I condition it on Mr. Dondero, the

23   ultimate beneficiary of the Dugaboy Trust, as it's been

24   represented to me in prior filings, --

25          MR. MORRIS:  Correct.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 07/25/25   Page 287 of 614   PageID 12836

42

1        THE COURT:  -- he'll have to stay an equal amount of

2   time on the stand.  Okay?

3        MR. MORRIS:  Okay.

4        THE COURT:  Okay.  Hang on.  I've got my smarter

5   staff member handing me a note.  Okay.

6     (Pause.)

7        THE COURT:  Okay.  Well, so that's how we're going to

8   stand.

9     Now, I am going to address Mr. Daugherty here.  We're not

10  going to let Mr. Daugherty cross-examine Patrick.  Clearly,

11  his objection has been around, and he never said anything

12  about --

13        MR. YORK:  Certainly not as to authority.  However,

14  we should be able to examine him as it relates to the portion

15  of the objection that goes to whether the settlement is in the

16  best interest, given the claims that are being -- the

17  Kirschner claims that are being transferred by Highland to the

18  HMIT entities.

19        THE COURT:  All right.  Well, you all are going to

20  have to share your 30 minutes.

21        MR. YORK:  That's fine.

22        THE COURT:  Okay?  We're giving 30 minutes to Debtor

23  entities, Highland entities, and Hunter Mountain entities

24  collectively, and 30 minutes to Dugaboy and Daugherty

25  collectively.  Okay?  So, I'm going to have my law clerk

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 1/85/253 of Page 288 of 614   PageID 12361

43

1 ‖ timing you like you're on the clock.

2 ‖          MR. MORRIS:  Okay.

3 ‖          THE COURT:  Okay?

4 ‖          MR. MORRIS:  May I proceed?

5 ‖          THE COURT:  You may proceed.

6 ‖          MR. MORRIS:  Thank you, Your Honor.  So, appearing at

7 ‖ Docket 4255 is the Movants' exhibit list, with Exhibits 1

8 ‖ through 123.  At Docket 4277 are Exhibits 124 and 125.  And at

9 ‖ Docket 4280, we've got Exhibit 126.

10 ‖     The Movants respectfully move into evidence all of those

11 ‖ documents, with the exception of Exhibits 124 and 125 on

12 ‖ Docket No. 4277.  Those are the transcripts of The Dallas

13 ‖ Foundation representatives, and since we have reached an

14 ‖ agreement and The Dallas Foundation has withdrawn their

15 ‖ objection, we are not going to offer those two transcripts

16 ‖ into evidence as part of the record in this matter.

17 ‖     But Exhibits 1 through 123, and Exhibit 126, we move into

18 ‖ evidence.

19 ‖          THE COURT:  All right.  And as I thought we were

20 ‖ going to start talking about a moment ago, Mr. Lang objected

21 ‖ to 11 of these 123 designations.  Do those still remain?  If

22 ‖ they do, we're just going to see if they want to be I think

23 ‖ offered --

24 ‖          MR. LANG:  No, I think we've --

25 ‖          THE COURT:  -- the old-fashioned way, but I think

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 56    Filed 11/05/25    Page 289 of 614    PageID 12332

44

1    that might be more efficient.  I have, in your objection,

2    which is at Docket 4273, you objected to Numbers 10, 12, 13,

3    57 and 59, and then 64 through 69.  Eleven items.

4            MR. LANG:  Mr. Morris clarified that 12 and 13 are

5    one document.  But I still, I think that, again, for purposes

6    of the authority issue, Exhibit 13 we don't think is relevant.

7            MR. MORRIS:  Exhibit 13, Your Honor.  We'll just take

8    them one at a time.

9            THE COURT:  Yes, go ahead and address it.

10           MR. MORRIS:  Is relevant because it's simply a

11   document that was provided to Highland by Hunter Mountain as

12   part of the negotiations.  And we've been asked to produce all

13   of the documents related to the negotiations.  This is one of

14   the documents that we received.

15           THE COURT:  Okay.  And do I understand 12 and 13 are

16   actually the same thing, or --

17           MR. MORRIS:  Yeah.  Well, 12 is the email, 13 is the

18   attachment.

19           THE COURT:  Okay.  I overrule the relevance

20   objection.  Those will be admitted.

21      (Claimant Trust's Exhibits 12 and 13 are admitted into

22   evidence.)

23           MR. LANG:  57.

24           MR. MORRIS:  57 is also a part of the settlement

25   documents.  It's, I think, an email exchange between Mr. Seery

000044

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 290 of 614   PageID 12363

45

1    and UBS, which was one of the Class 9 claimants, and we had to

2    obtain their consent and that's part of the process of getting

3    to the settlement agreement.

4            MR. LANG:  I think the objection is it doesn't

5    include the attachment.

6            MR. MORRIS:  It's got all -- it's got numerous

7    attachments on it.

8            MR. LANG:  To 57?

9            MR. MORRIS:  Yeah.

10           MR. LANG:  Mine did not.

11           MR. MORRIS:  Your Honor, we'll withdraw the exhibit.

12           THE COURT:  Okay.

13           MR. MORRIS:  Okay.

14           THE COURT:  59.  Well, you didn't address #10.

15           MR. LANG:  Oh, sorry.

16           THE COURT:  That was the first one.

17           MR. LANG:  Yeah.

18           MR. MORRIS:  We'll withdraw #10.

19           THE COURT:  All right.

20           MR. MORRIS:  Okay.

21           THE COURT:  So, 59?

22           MR. MORRIS:  59?  Your Honor, I'm not surprised they

23    object, because it's at the core of the Court's ability to

24    authorize this settlement.

25           MR. LANG:  We withdrew that.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 291 of 614   PageID 12834

46

1              MR. MORRIS:  Oh, you withdrew that?

2              MR. LANG:  Withdrew.

3              MR. MORRIS:  Oh, okay.  They withdrew that.

4              THE COURT:  Okay.  So, 59 will be admitted.

5         (Claimant Trust's Exhibit 59 is admitted into evidence.)

6              MR. MORRIS:  And then I think the last is 64 to 69.

7              THE COURT:  Uh-huh.

8              MR. MORRIS:  We were actually prepared to withdraw

9    those exhibits because we didn't think there was a challenge

10   to authority.  Now that there's a challenge to authority,

11   we're going to offer all of those in because they're highly

12   relevant to the acknowledge of Mr. Patrick's authority.

13             THE COURT:  All right.  And your objection was solely

14   to relevance?

15             MR. LANG:  The objection was relevance because they

16   predate the May 6th issue in the Caymans, which is what caused

17   the entire structure to -- the authority from the top down to

18   be questioned.

19             THE COURT:  All right.  Well, you can cross-examine

20   if you want on those items.

21             MR. LANG:  Okay.

22             THE COURT:  But I find they're relevant so they will

23   be admitted, 64 through 69.

24        (Claimant Trust's Exhibits 64 through 69 are admitted into

25   evidence.)

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 292 of 614   PageID 12835

47

 1      *[Court Edit:  Claimant Trust's Exhibits 1 through 9, 11*

 2  *through 56, 58 through 123, and 126 are admitted into*

 3  *evidence.]*

 4          THE COURT:  All right.  And as far as the exhibits of

 5  Dugaboy, I think it was just the plan and settlement agreement

 6  were all that had been designated.  Correct?

 7          MR. LANG:  Yes.

 8          MR. MORRIS:  No objection.

 9          THE COURT:  So, no objection.  Those will be

10  admitted.

11      (Dugaboy Investment Trust's exhibits are admitted into

12  evidence.)

13          THE COURT:  And Daugherty's exhibits?

14          MR. YORK:  Yes, Your Honor.  So, Mr. Morris and I

15  conferred yesterday about both sides' exhibits.  And my

16  understanding is we've reached an agreement that both sides'

17  exhibits are not objected to.  And so therefore we'd move to

18  admit Daugherty's as well.

19          THE COURT:  All right.

20          MR. YORK:  1 through 42, I believe, it is.

21          THE COURT:  All right.  So you confirm?

22          MR. MORRIS:  Yes, Your Honor.

23          THE COURT:  All right.  The Court will admit all of

24  Daugherty's 1 through 42, and they appear at Docket Entry

25  4266.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 293 of 614   PageID 12836

48

1        (Patrick Daugherty's Exhibits 1 through 42 are admitted

2   into evidence.)

3            THE COURT:  All right.  Opening statements.

4        OPENING STATEMENT ON BEHALF OF THE CLAIMANT TRUST

5            MR. MORRIS:  All right.  Good morning, Your Honor.

6   John Morris; Pachulski Stang Ziehl & Jones; for Highland

7   Capital Management, LP and the Highland Claimant Trust.

8        If we can go to the first slide, Your Honor.  This is a

9   9019 motion.  It's not a terribly high bar.  What the Movant

10  has to show here is that the settlement agreement was the

11  product of arm's-length, good-faith negotiations, and

12  effectively that it's in the best interests of its

13  stakeholders.

14           THE COURT:  Did you want this put on the screen, or

15  does everyone have a hard copy?

16           MR. MORRIS:  Counsel have a hard copy.

17           THE COURT:  Oh, okay.

18           MR. MORRIS:  Yeah.  The evidence is going to show,

19  and there really is no dispute, that the settlement agreement

20  is the product of arm's-length, good-faith negotiations.  Mr.

21  Seery is going to testify that the negotiations began in late

22  March and they concluded on May 19th.  Exhibits 2 through 57,

23  with the exception of the one or two I just withdrew, reflect

24  the parties' negotiations.  Mr. Seery is going to testify that

25  the negotiations were conducted by Zoom, by phone call, there

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56-1 Filed 11/25/25   Page 294 of 614   PageID 12837

49

1    was one in-person meeting, there was many, many email

2    exchanges that are reflected in the exhibits.

3        Mr. Seery is going to testify about the substance of the

4    negotiations at a high level.  Originally, we had sought to

5    have one agreement with Hunter Mountain and the DAF entities.

6    Mr. Patrick was not comfortable with that.  He wanted to run

7    them separately.  And there was a DAF agreement that was

8    ultimately entered into but that nobody believed required

9    court approval.

10        So, once that got completed and one of the Fifth Circuit

11   appeals got dismissed as a result, we moved to the Hunter

12   Mountain discussions.  Those discussions were robust.  There

13   were issues about the timing of the effectiveness of certain

14   of the benefits under the proposed agreement.  Highland wanted

15   the releases, for example, to be effective upon signing.  Mr.

16   Patrick was unwilling to agree to anything without this

17   Court's approval.

18        So there were changes that were made over time in terms of

19   the timing of the transfer of the consideration.  There were

20   discussions and negotiations and bids and asks about the

21   amounts that would be paid, when they would be paid, the

22   circumstances under -- that they would be paid.  There was an

23   enormous amount of information that was exchanged pursuant to

24   a confidentiality agreement that now became public because

25   it's relevant to the Debtors' burden or the Claimant Trust's

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 295 of 614   PageID 12338

50

1   burden to carry the day here.

2       That information included claims information, the trust

3   agreement itself, budgets, asset/liability valuation

4   information, forecasted expenses, because HMIT rightly

5   wondered, you know, what's going to happen to the money?  Is

6   it going to be gone before it got its agreed-upon share?  So,

7   you know, there will be, I think, indisputable evidence at the

8   end of the day that the settlement is the product of arm's-

9   length, good-faith negotiations.

10      If we move to the next slide, the evidence will also show

11  that the proposed settlement is indisputably in the best

12  interest of the Highland entities and their stakeholders.

13  Upon court approval, all of the pending litigation that Your

14  Honor identified earlier will be dismissed with prejudice,

15  thereby greatly reducing litigation risk and attendant costs.

16      The stakeholders will also benefit from the allowance of

17  the HMIT claim at a fixed amount of $337 million.  And we will

18  explain -- Mr. Seery will explain to the Court how that number

19  was arrived at.

20      The estates and their stakeholders will also benefit

21  because, under the proposed settlement, as I indicated

22  earlier, Highland will be able to monetize or otherwise

23  dispose of a number of illiquid assets, including the Dugaboy

24  Note and the estate claims in the Kirschner Litigation.  And

25  perhaps most importantly to the estate, we are getting very,

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 296 of 614   PageID 12275

51

1   very broad what we refer to as litigation protections from all

2   of the Hunter Mountain entities.  It includes not only a

3   release but a covenant not to sue as well as, you know, we

4   could go through it, but -- but we believe that even if Mr.

5   Dondero or somebody else obtains control of Hunter Mountain,

6   unless somebody sets aside this agreement, those protections

7   are going to inure to the benefit of the Trusts, the Indemnity

8   Trust and all of its stakeholders until the end of time, and

9   nobody is ever going to be able to set this agreement aside

10  because it was negotiated in good faith, it was the product of

11  arm's-length negotiations, and it's fair and reasonable to

12  both sides.

13      So those litigation protections are paramount and they

14  provide another indicator of the benefits that the Claimant

15  Trust is going to receive.

16      The next slide, Your Honor, is a demonstrative exhibit,

17  although, as always, we have citations to the very specific

18  documents that are now in the record.  Mr. Seery will describe

19  for you at a high level how the allowed claim of HMIT was

20  calculated, and it's really just based on the limited

21  partners' capital accounts as of the petition date.  And I'll

22  just leave it at that for the moment.  There's no magic to it.

23  It's objectively reasonable.  It's mathematics.  There's

24  really no subjectivity that I'm aware of that goes into this.

25  It's just, hey, let's look at the tax returns, let's look at

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 56    Filed 11/05/25    Page 297 of 614    PageID 12346

52

1    the financial statements, and let's look at the partnership

2    agreement, and let's see how the capital account was

3    structured as of the petition date.  And that's how you get

4    to, really, $396 million less the amount of the Dugaboy Note.

5    I mean, the HMIT note.

6        The next slide.  With the settlement, the transfer of the

7    Kirschner Litigation is in the best interests of the Movants.

8    I think Mr. Daugherty somehow suggests that really the best

9    thing to do would be to prosecute that litigation.  We

10   respectfully disagree.  In the Debtors' business -- in the

11   Claimant Trust's business judgment, that would be exactly the

12   wrong thing to do when you are settling with HMIT.

13       And why is that?  When we commenced the Kirschner

14   Litigation a number of years ago, the Kirschner Litigation

15   represented a potential source of funding for indemnification

16   expenses, and at that time, for the payment in full to

17   creditors.

18       By 2023, 2024, with the success of the Highland team's

19   monetization of assets, the need to pursue and monetize the

20   Kirschner claims became less clear, so we put it on ice.  And

21   we voluntarily stayed the litigation to conserve resources.

22       The settlement with HMIT changes everything.  The claims

23   are as valid today as they were yesterday, as they were before

24   we signed the agreement, as they were when we commenced the

25   action.  But they have very different value to Highland when

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 298 of 614   PageID 12347

53

1   you're settling with HMIT.  And that's why we're prepared to

2   transfer the claims today.

3       Why?  Because at this point, unlike when we commenced the

4   action, Class 8 has been paid in full except for Mr.

5   Daugherty's fully-reserved claim, right, in an amount that he

6   agreed to for years and that he ratified and reaffirmed three

7   different times in three different stipulations.  That's the

8   only thing that remains in Class 8.

9           THE COURT:  And remind me of the dollar amounts on

10  reserve.

11          MR. MORRIS:  It's approximately $2.5 million.  I can

12  --

13          THE COURT:  Okay.

14          MR. MORRIS:  It's -- the dollar amount is

15  specifically set forth --

16      (Pause.)

17          MR. MORRIS:  It would be, I believe, in Exhibit 60,

18  --

19          THE COURT:  Okay.

20          MR. MORRIS:  -- is the original tolling agreement.

21  And in Paragraph 1 it has the very specific dollar amount.

22  And then in Exhibits 62, 63 -- 61, 62, and 63, those are

23  amendments to the tolling agreement that fully incorporated

24  the original tolling agreement, including the reserve amount.

25  So that amount has been there for years.  Nobody has ever said

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 299 of 614   PageID 12342

54

1   anything about it.  Nobody has ever tried to adjust it.

2   Nobody has ever identified a change in circumstances that

3   would suggest a change was appropriate.  But here we are.

4       So, why is it different and why does the Kirschner

5   Litigation not have so much value to us when we're settling

6   with Class 11?  Because Class 8 has been paid in full.  Class

7   9 has been paid 80 percent.  If the HMIT settlement is

8   approved, it will receive another 10 percent.  So that all

9   that remains is 10 percent of the Class 9s.

10      And most importantly, Your Honor, with the settlement with

11  HMIT and the Claimant Trust's receipt of the litigation

12  protections, the need for indemnification expenses is going to

13  be greatly reduced.  We can give the money where it belongs

14  because all we'll have left is Mr. Dondero and Dugaboy.  It

15  really will literally be the only thing.  And we need a lot to

16  deal with that, but not as much as we needed when we had to

17  deal with them and HMIT.

18      And at the end of the day, once you're settling with HMIT,

19  prosecution of the claims would only benefit HMIT, so why

20  should we undertake the expense of doing that?

21      Is that clear to Your Honor?

22          THE COURT:  It is.

23          MR. MORRIS:  It is?  So, it's -- this has nothing to

24  do -- and you're going to hear questions of Mr. Seery, did you

25  value the Kirschner claims?  Are you giving them away for

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 1/750/255 of Page 300 of 614   PageID 12343

55

1   free?  No, we didn't value them, because once you're settling

2   with HMIT it doesn't really matter.  Once you have the

3   litigation protections, once you know that HMIT is never going

4   to be an adversary of yours, the monetization of the Kirschner

5   claims would insure to their benefit because they will have an

6   allowed claim of $330 million.  So even if we sued and even if

7   we got a hundred million dollars, that's going to go to them.

8   Why would we pick up the tab today?  A very different scenario

9   than when we prosecuted the case, when the case was commenced.

10      So, really, really, in the estate's best interest to get

11   value for those claims.  The value is reflected in the

12   totality of the agreement.  The Court really should look at

13   the body of the consideration that's being received, including

14   the litigation protections.

15      If we can go to the next slide, Your Honor.  As long as

16   we're on the topic of Mr. Patrick's authority, Mr. Seery is

17   going to testify to the work that he did to satisfy himself

18   that Mr. Patrick was duly authorized to act on behalf of each

19   of the HMIT entities in this case.

20      The next slide here shows an excerpt from the Hunter

21   Mountain Trust Agreement.  It's Paragraph 7.  And it says,

22   among other things, the Administrator -- who is Mark Patrick

23   -- shall be duly authorized, from time to time, in his sole

24   discretion, to manage the business and affairs of the Trust.

25      It continues by saying that the Administrator, Mr.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 56    Filed 1/85/255 of 2563 363 of 614    PageID 12344

56

1    Patrick, shall also have the power to settle, compromise,

2    submit to arbitration, or to submit to any court having

3    jurisdiction in any matter, any matters that are in dispute.

4        So, you know, this is just one document.  It's the Hunter

5    Mountain document.  We focus on the Hunter Mountain document

6    because that's the only one of the HMIT entities that has a

7    stake in the Claimant Trust.  But, again, Your Honor, if you

8    just -- Mr. Seery will, at a high level, confirm that Exhibits

9    70 through 104 are documents that definitively establish that

10   Mr. Patrick has the authority to enter into each of these

11   agreements on behalf of the HMIT entities.

12       Not only that, but he will describe, if asked by you or

13   anybody cross-examining him, why nobody has the ability to

14   interfere with the effectuation of his authority.  He doesn't

15   have to get anybody's consent.  He doesn't have to -- right?

16   This is all just crystal clear.  And whatever entity far up

17   the chain may exist, Your Honor should just think of as a

18   shareholder.  And if Coca-Cola came in here and they wanted to

19   do a 9019 motion, a shareholder can't come in and stop Coca-

20   Cola from doing that.  If they don't like what Coca-Cola is

21   doing, go file a derivative suit.  Go sue Coca-Cola in another

22   court at another time.  Not that I'm inviting litigation

23   against Mr. Patrick, but by analogy, this is what we're

24   talking about.

25       There is no restriction on Mr. Patrick's authority.  The

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 36   Filed 11/25/25   Page 302 of 614   PageID 12345

57

1    settlement is fair and reasonable.  He has authority under the

2    governing documents to do what he has done here, and that is

3    act in the best interests of the HMIT entities.  And so this

4    is just one page.  Mr. Seery will explain, you know, just the

5    work that he's done to satisfy himself.

6         The next slide, Your Honor, there's objections about how

7    somehow the settlement agreement violates the plan or the

8    absolute priority rule, all of that.  It's not accurate.  I'll

9    just leave it at that in terms of how I characterize it.

10        The next slide is excerpts of -- I think it's the plan of

11   reorganization, Your Honor.  And I think we admitted the plan

12   last night.  That's Exhibit 126.  And they're -- these

13   excerpts are really important because what they show is that

14   Classes 9 and 10 have the indisputable right to accept less

15   favorable treatment.  And that's what they've done.  Okay?

16   And I think it's Article III, Section H, Subparts 9 and 10.

17   Holders of Class 9 and 10 interests have the right to accept

18   less favorable treatment.

19        And if we can go to the next slide, I'll just briefly

20   describe the less favorable treatment that these stakeholders

21   have in fact accepted.  As permitted by the plan, holders of

22   Class 9 claims consented to the payment in full of Mr.

23   Daugherty's Class 9 claim and the Class 10 distributions, in

24   accordance with the settlement agreement, before their Class 9

25   claim is paid in full.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56-1   Filed 11/25/25   Page 303 of 614   PageID 12346

58

1      And that's Exhibit 59.  It may be among the most important

2   documents that have been admitted this morning.  Exhibit 59 is

3   the consent of the Class 9 holders other than Mr. Daugherty to

4   accept lesser treatment.

5      So there's no violation of the plan at all.  HMIT is also

6   accepting less favorable treatment than it might otherwise be

7   entitled to if it ever successfully prosecuted its claim.  It

8   has less favorable treatment because it's agreeing that it's

9   not a Claimant Trust beneficiary, that its rights are limited

10  to the rights that are given to it under the settlement

11  agreement and nowhere else.  It's accepting less favorable

12  treatment because it's agreeing that the Highland entities owe

13  no duty of any kind to any HMIT entity except as provided for

14  in the settlement agreement.  It's accepting restrictions on

15  its ability to transfer its Class 10 interests -- more less-

16  favorable treatment -- as a condition to the first and second

17  distributions.  They have agreed that they are subject to Mr.

18  Seery's determination that the Highland entities are not at

19  that time under any Threat.  "Threat" is a defined term, and

20  it has to do with litigation.

21      And so if Mr. Seery, in his sole discretion, believes that

22  he needs to conserve resources because he remains years in the

23  future under threat of litigation, he's not going to make the

24  payments to HMIT, and HMIT is okay with that because they

25  understand.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/85/25 5 Page 304 of 614   PageID 12247

59

1       And, of course, in the end, they're accepting less

2   favorable treatment because they're granting to the Claimant

3   Trust the litigation protections.

4       All stakeholders have been paid in full except for the 10

5   percent of Class 9 and Mr. Daugherty's Class 8 claim.  That

6   claim is the subject of an objection, and as I just walked

7   Your Honor through, it has been fully reserved in an agreed-

8   upon amount for years.

9       There was some questioning during Mr. Seery's -- one of

10  Mr. Seery's I think three depositions in the last week --

11  about why he didn't offer Mr. Daugherty the same treatment

12  that he offered to the other Class 9 holders because Mr.

13  Daugherty had about an $800,000 Class 9 claim.  Your Honor

14  will see in Exhibit 58 that that claim was paid in full, and

15  Mr. Seery will explain that he found negotiating with Mr.

16  Patrick to be difficult, number one.  And number two, it was

17  an amount of money that the estate could afford.  And so the

18  other Class 9 claims are substantially bigger, so rather than

19  going through the process of attempting to negotiate with Mr.

20  Daugherty, he just paid it in full.  The Claimant Trust had

21  every right to do that.  And Mr. Daugherty should not be heard

22  to complain that he actually got everything that he could have

23  ever been entitled to.

24          THE COURT:  And --

25          MR. MORRIS:  Uh-huh?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56-1   Filed 11/25/25   Page 305 of 614   PageID 12249

60

1          THE COURT:  I don't mean to get you off-track.

2          MR. MORRIS:  That's all right.

3          THE COURT:  But Class 9 claimants, I'm trying to

4    remember who else was in that class.  Was it a UBS --

5          MR. MORRIS:  UBS.

6          THE COURT:  -- claim?

7          MR. MORRIS:  Exactly right.

8          THE COURT:  Okay.

9          MR. MORRIS:  And then affiliates of Stonehill and

10   Farallon.

11         THE COURT:  Okay.

12         MR. MORRIS:  Because they had purchased --

13         THE COURT:  They had Class 9 --

14         MR. MORRIS:  They had purchased originally I think it

15   was Josh Terry, and the Redeemer Committee may have had a

16   piece.  No, no.  No, no, no.  HarbourVest.  HarbourVest had a

17   piece.  Right?  So, HarbourVest sold their claim, including

18   the Class 9 claim.  Josh Terry sold his claim, including his

19   Class 9 claim.  Then there's UBS, who still holds a piece of

20   their claim, and Mr. Daugherty.  So, UBS, if you look at

21   Exhibit 59, you'll see the signatures of UBS and the

22   affiliates of Stonehill and Farallon, who all agreed to accept

23   lesser treatment.

24         THE COURT:  Okay.

25         MR. MORRIS:  So, at the end of the day, Your Honor,

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/21   Page 306 of 614   PageID 12345

61

1  the last slide is a slide that I didn't intend to present,

2  frankly, because I didn't ever believe that there was going to

3  be a challenge to authority by anybody other than The Dallas

4  Foundation.  But as long as we have it attached, we might as

5  well see it.

6      As you can see, Your Honor, in the lower right-hand

7  corner, you can see Hunter Mountain is owned by Beacon

8  Mountain, which is owned by CLO Holdco.  Like, there is no --

9  and Mr. Patrick controls it.  And it's really on the other

10  side of the ledger, in the DAF house, so to speak, that any of

11  The Dallas Foundation got interested.

12      Dugaboy is not even on here, by the way.  Like, Dugaboy is

13  nobody.  The people in here who are now going to challenge the

14  authority of Mr. Patrick, no, not on here.  And they're going

15  to do it, they're going to do it without ever having given us

16  notice.

17      I know Your Honor made your ruling and we'll deal with it,

18  but I don't know if Your Honor was aware of this:  They're not

19  on here.

20      Your Honor, at the end of the day, this is a really,

21  really easy call to make from our perspective.  We have been

22  waiting for this moment for years.  Finally, a responsible

23  person understands that the way to preserve value is to put

24  the sword down.

25      Mr. Patrick, I don't know what happened between him and

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 307 of 614   PageID 12356

62

1    Mr. Dondero.  I don't care.  I have no knowledge of that.  But

2    clearly he is exercising independence.  And that's why we're

3    here, because we finally have somebody who says, you know

4    what, give me everything I can possibly get and I will stop

5    fighting.  I wish other people would say that, because then

6    this case would be over.  Then the case would really be over.

7         But getting to a settlement with the Class 10 interest

8    holder who is going to have an allowed claim of $337 million,

9    such that any value in the future is going to go to HMIT, I

10   hope that that -- you know, this is an easy call to make, Your

11   Honor.

12        I have nothing further at this time, but I look forward to

13   putting Mr. Seery on the stand and making sure that Your Honor

14   has, you know, an adequate, sufficient, overwhelming basis,

15   frankly, to approve this motion.

16             THE COURT:  Okay.  I don't mean to stifle you, but --

17             MR. MORRIS:  Yeah.

18             THE COURT:  -- anything more for an opening

19   statement?  Mr. Phillips, I'm doing friendlies and then

20   friendlies.

21     OPENING STATEMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

22             MR. PHILLIPS:  Your Honor, just briefly.  Louis M.

23   Phillips on behalf of the Hunter Mountain entities.

24        We fully embrace and concur with everything that Mr.

25   Morris has told the Court.  From our perspective, and the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 36   Filed 11/35/253 of Page 308 of 614   PageID 12331

63

 1   reason that -- and you'll see, the documents include all of

 2   the back and forth -- we required the Court approval before

 3   the effectiveness of any releases, litigation protections, et

 4   cetera, for exactly the reason that we needed the Class 9 to

 5   agree.  And we obtained -- the Highland entities obtained the

 6   approval of the Class 9 creditors to our treatment, and I

 7   think that the bona fides of this settlement and the value of

 8   the settlement and our -- what we are giving in the settlement

 9   is, I think, established beyond even the slightest bit of

10   question by the fact that the Class 9 creditors and the

11   Oversight Board of the Claimant Trust all agreed that it was

12   important enough to the estate to get this settlement with

13   Hunter Mountain Investment Trust that they agreed to allow

14   Hunter Mountain Investment Trust to receive the money set

15   forth in the settlement upon the approval.  And we have agreed

16   that, notwithstanding appeal rights of some people who really

17   don't have the right to be here, but that's going to be

18   determined by Your Honor, we're not worried about that.  We

19   are giving our releases.  And the releases are effective upon

20   approval by this Court.  We are not requiring any type of

21   final unappealable order that doesn't -- that waits for years

22   before the releases are effective.

23        Very importantly, it seems to me, from Your Honor's

24   perspective, and I'm reluctant to suggest that I know about

25   that, but our releases are given upon the approval by this

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/35/254 of 206 Page 309 of 614   PageID 12352

64

 1    Court of the settlement.  They're not -- if the settlement is
 2    reversed on appeal, our releases stay.
 3         So the Class 9s that are above the Class 10 have voted,
 4    and they have approved, and Mr. Seery is going to testify
 5    about that.  And we think that in and of itself is a
 6    monumental accomplishment.  And we appreciate everything Mr.
 7    Morris has said.  We agree with everything Mr. Morris has
 8    said.  We agree with everything Mr. Morris has said about the
 9    absence of true objection.  We agree with everything Mr.
10    Morris has said about the fallacy of suggesting that Mr. Seery
11    had to value the Hunter Mountain -- the Kirschner Litigation
12    proceeds, of which would come to us.
13         The idea that we need to worry about how much Mr. Dondero
14    entities can pay in connection with the Kirschner Litigation
15    so that we could value the Kirschner Litigation based on what
16    Mr. Dondero can pay, so that to suffice with an objection by
17    Dugaboy maybe that there was no value given.  I mean, that's
18    all backwards.  Value was given as described by Mr. Morris and
19    will be established by the evidence submitted by Mr. Seery's
20    testimony and the documents that are already in evidence.
21         And that is it from our standpoint, Your Honor.  Thank
22    you.
23              THE COURT:  Thank you.  All right.  I'll hear from
24    the Objectors.  Daugherty's counsel, are you going to go
25    first?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 26   Filed 11/25/25   Page 310 of 614   PageID 12353

65

1        OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

2            MR. YORK:  Thank you, Your Honor.  If I may approach.

3            THE COURT:  You may.

4            MR. YORK:  Good morning, Your Honor.  Drew York on

5    behalf of Mr. Daugherty.

6        We're here today regarding the 9019 and Mr. Daugherty's

7    objection.  The 9019 motion should be denied.  If you turn to

8    the third slide in there, we say that Highland -- Highland,

9    I'm referring to Highland collectively for the Movants --

10   attempts to put the cart before the horse.  So really what's

11   going on here, Your Honor, is we're just asking the Court to

12   follow the rules of the road that it set forth in the plan,

13   the confirmation order, and, frankly, even Highland to follow

14   the terms of the settlement agreement it entered into with Mr.

15   Daugherty.

16       None of that is happening here as a result of this

17   proposed settlement that's being presented to you today for

18   consideration.

19       The first problem with the motion and the proposed

20   settlement is that it violates the absolute priority rule, it

21   violates the express terms of the Court's plan, the

22   confirmation order, as well as the Claimant Trust Agreement,

23   because it attempts to fund the contingent Class 10 claims

24   without first resolving, let alone satisfying, Mr. Daugherty's

25   remaining Class 8 claim.

Case 19-34054-sgj11 Doc 4296 Filed 06/30/25 Entered 06/30/25 11:25:22 Desc
Case 3:25-cv-01876-K Document 56 Filed 11/25/25 Page 313 of 614 PageID 12354

66

1     And then, secondly, the settlement agreement does not

2  satisfy the *Jackson Brewing* factors because it prioritizes the

3  HMIT insiders over the estate creditors, including Mr.

4  Daugherty, and it forfeits potential recovery that would go to

5  the benefit of those to creditors to appease litigation

6  pressure.

7     So, first, I'm going to talk about why the settlement

8  violates the plan, the confirmation order, and the Trust

9  Agreement.

10    As everyone is aware, the HMIT entities are asserting a

11  Class 10 claim.

12    If you turn to the next page, as Mr. Morris has

13  acknowledged and admitted here today, Mr. Daugherty has a

14  remaining Class 8 claim. And, importantly, Your Honor,

15  because Mr. Morris and Highland continue to argue that that

16  claim is fully reserved, I would point out that in the

17  settlement agreement between Mr. Daugherty and Highland the

18  parties characterized that claim as a contingent unliquidated

19  claim. A contingent unliquidated claim. And in fact, they

20  went so far, Highland did, in its adversary complaint on the

21  next slide, Your Honor, to again refer to it as an

22  unliquidated and contingent claim that is dependent on the

23  final outcome of the 2008 audit, including the magnitude of

24  any adjustments.

25    And so Highland cannot come into this courtroom and on the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 312 of 614   PageID 12355

67

1    one hand argue that that claim is fully reserved, and at the

2    same time admit that it is a contingent unliquidated claim

3    that is subject to a myriad of adjustments depending upon the

4    outcome of that audit.

5        And in reality, when you look at the tolling agreement,

6    there is nothing that the parties said that that was a fully

7    reserved claim at all.  That's simply not what they agreed to.

8    They just simply put a number in there, which was put into the

9    reserve account at the time.  But it did not constitute a

10   fully reserved claim at all.

11       Nor has Highland pointed to anything -- in the plan, the

12   confirmation order, or the Claimant Trust Agreement -- that

13   allows Highland to come in and violate those documents by

14   simply saying that we fully reserved for Mr. Daugherty's

15   claim.

16            THE COURT:  Okay.  Well, we're going to hear the

17   evidence, but as I understood it, it was an agreed reserved

18   amount.  And I asked earlier, was it $2.5 million or -- I feel

19   like it was an agreed amount plus even some interest,

20   acknowledging there might be time.  I don't remember every

21   detail from this case, but I'm just telling you that's what my

22   memory is.  Am I correct?

23            MR. YORK:  The --

24            THE COURT:  Mr. Daugherty agreed, here's what we'll

25   agree is enough to set aside for our ultimately potentially

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 313 of 614   PageID 12356

68

1   allowed claim, *x* amount plus interest?  Can you confirm?

2           MR. YORK:  What the tolling agreement provides is

3   that Mr. Daugherty agreed to provide the tolling of the

4   objection deadline.  Okay.  And Highland then agreed to put

5   $2.56 million into the reserve.

6       And what the footnote says in the tolling agreement,

7   Exhibit 60, is that the estimated amount of that claim as of

8   -- and let's be clear about this -- as of October 23rd of

9   2020, was $2.56 million and change.  And that's it.  And I'm

10  happy to have my colleague, Mr. Smeltzer, who is a tax

11  attorney and deals with these issues all the time, can come up

12  and explain why, at the end of the day, this is still a

13  contingent unliquidated claim and it's subject to a myriad of

14  factors that make it that that amount that Highland has set

15  aside is not necessarily going to be a fully-reserved amount.

16      That is why the parties have -- had called it both in the

17  settlement agreement and the tolling agreement, and Highland

18  has continued to call it -- characterize it in its adversary

19  complaint as a contingent unliquidated claim.  So --

20          THE COURT:  Okay.  It's hard to wrap my brain around

21  it.  It's a claim that I understood really couldn't be

22  liquidated with certainty until this potential audit of 2008

23  is final, and there was some discussion of how close to it

24  being final was it.  But I guess -- well, I don't know where

25  I'm going here except to say this could be a contingent

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 314 of 614   PageID 12357

69

1    unliquidated claim for a -- you know, it's already, what, 17

2    years?

3             MR. YORK:  Based -- from when the tax return was

4    filed?  I think that's correct, Your Honor.

5             THE COURT:  Okay.  Well, this is what the adversary

6    is about, right?  I guess they're finally saying it should be

7    estimated, liquidated, pursuant to the Bankruptcy Code and

8    we'll be done.

9             MR. YORK:  Correct.  In violation of the terms of the

10   settlement agreement between Mr. Daugherty and Highland.  Yes,

11   that's --

12            THE COURT:  Wait.  Wait.  What?

13            MR. YORK:  So, the settlement agreement between

14   Daugherty and Mr. Highland provides --

15            THE COURT:  Mr. Highland?

16            MR. YORK:  I'm sorry.  I apologize.  Between Mr.

17   Daugherty and Highland --

18            THE COURT:  Uh-huh.

19            MR. YORK:  -- provides that the -- as long as the IRS

20   audit has not had a final -- there's not a final

21   determination, --

22            THE COURT:  Uh-huh.

23            MR. YORK:  -- then any litigation concerning the

24   validity or the amount of Mr. Daugherty's claim is stayed and

25   cannot be brought before the Court.  And that's exactly what

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 56    Filed 11/05/25    Page 315 of 614    PageID 12359

70

 1  their adversary complaint did, which is -- because they admit

 2  in their adversary complaint --

 3      THE COURT:  Well, okay.  I won't pursue this anymore.

 4  But what's an estate to do?  They're getting criticized for

 5  the Trust going on too long.  Not by your client, but -- and

 6  meanwhile you want, I mean, 2032, are we still going to be

 7  waiting on the IRS?

 8      MR. YORK:  I don't know because we don't have any

 9  insight into what the IRS audit is.

10      THE COURT:  Well, it's been 17 years.

11      MR. YORK:  I understand, Your Honor.

12      THE COURT:  So, --

13      MR. YORK:  But the bottom line is this.  The plan --

14  that Highland entered into the terms of that settlement

15  agreement.

16      THE COURT:  I'm going to say it right now.  I'm not

17  keeping this estate open until 2032.  I just, I was --

18      MR. YORK:  I presume that --

19      THE COURT:  -- kind of flippantly throwing that out

20  there.

21      MR. YORK:  And --

22      THE COURT:  But this happens in bankruptcy cases a

23  lot, where you've got a contingent unliquidated claim, and

24  there are provisions in the Bankruptcy Code to say what can be

25  done in that scenario.  The Court can estimate or liquidate.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 36   Filed 11/25/21   Page 316 of 614   PageID 12355

71

1          MR. YORK:  Understood.  Your point to me was --

2     before was that's why Highland brought the adversary

3     complaint, and I was simply pointing out that, pursuant to the

4     express terms of the agreement that Highland reached with Mr.

5     Daugherty, Highland was -- is not allowed to bring the

6     adversary complaint to challenge the validity or amount of Mr.

7     Daugherty's claim so long as the IRS audit has not been -- had

8     a final determination.  That's exactly what's going on here

9     with the adversary complaint that they have filed.

10          THE COURT:  Okay.

11          MR. YORK:  Okay.  So I think Your Honor is familiar

12     with the terms of the plan, the Fifth Amended Plan and the

13     subordination.  But specifically we have two issues.  One

14     begins with the Claimant Trust Agreement in Section 5.1(c),

15     which provides that the equity holders shall not have any

16     rights under the agreement unless and until the Claimant

17     Trustee files with the Bankruptcy Court a certification that

18     all of general unsecured creditor beneficiaries have been paid

19     indefeasibly, in full, including, to the extent applicable,

20     all accrued and unpaid postpetition interest, consistent with

21     the plan, and all disputed claims have been resolved.

22          That has not happened here and it cannot happen because,

23     for one, Mr. Daugherty's unresolved Class 8 claim, and also

24     the remaining Class 9 claims, as I think you'll hear from Mr.

25     Seery.  And so there are no rights that can be given to the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 317 of 614   PageID 12360

72

1    HMIT entities pursuant to -- as a Class 10 holder, an allowed

2    Class 10 holder, pursuant to the Claimant Trust Agreement.  So

3    the proposed settlement violates the Claimant Trust

4    Agreement's express terms.

5        It also violates the Court's confirmation order that was

6    entered at -- specifically on Page 45 of the order, in

7    Subparagraph (a):  The holders of the equity interests --

8    which would be the Class 10 and Class 11 equity interests --

9    that are junior to the claims in Class 8 and Class 9 will not

10   receive or retain under the plan, on account of such junior

11   claim interest, any property, unless and until the claims --

12   the claims, not the allowed claims, but the claims -- in Class

13   8 and Class 9 are paid in full, plus applicable interest.

14       That's exactly what the settlement that is proposed here

15   is designed to do.

16       And if you turn two pages in, you'll see that in addition

17   to the assignment of the Kirschner claims, what we're also

18   having under this proposed settlement are interim cash

19   distributions that would be made to the HMIT entities, interim

20   cash distributions that theoretically could be made before the

21   resolution of Mr. Daugherty's Class 8 claim, which would be in

22   violation of the plan, the Claimant Trust Agreement, and the

23   confirmation order.

24       And that is, as best as they put in their agreement,

25   that's approximately $23 million in cash that would be paid

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 318 of 614   PageID 12361

73

1    out theoretically in those interim distributions.

2        One of the things that Mr. Morris said in his opening was

3    that they did not -- Mr. Seery did not negotiate with Mr.

4    Daugherty because he was difficult to deal with.  Well, that's

5    surprising, Your Honor, considering, on the other hand, Mr.

6    Morris says to the Court that there were repeated tolling

7    agreements or amendments to the tolling agreement that were

8    entered into by Mr. Daugherty willingly and voluntarily to

9    benefit Highland.

10       And what really happened when Mr. Morris says that there

11   were good-faith arm's-length negotiations, well, there may

12   have been good-faith, arm's-length negotiations between the

13   HMIT entities and Highland, but what happened here was that

14   Highland actually sought to ice out Mr. Daugherty from all of

15   this completely.

16       And how did that happen?  Well, the evidence is going to

17   show that Highland reached out to the other Class 9 creditors

18   over a month in advance of the motion being filed, sought

19   their consent to the proposed settlement, told them that Mr.

20   Daugherty was not going to be a part of it, told them that Mr.

21   Daugherty's Class 8 claim was going to have an adversary

22   complaint filed against it, told them that once that adversary

23   complaint was granted and the claim was disallowed, then those

24   funds would waterfall down to Class 9, so the Class 9

25   creditors would get that -- those funds that theoretically are

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 319 of 614   PageID 12362

74

1  part of Mr. Daugherty's Class 8 claim.

2      So at no point in time prior to the filing of the

3  adversary proceeding, or even prior to the filing of the

4  motion for approval of this proposed settlement, did Highland

5  ever contact Mr. Daugherty to attempt to discuss any of this,

6  because they simply wanted to ice him out.

7          THE COURT:  Okay.  I'm going to hear evidence.  I

8  don't mean to cut you off, but --

9          MR. YORK:  Sure.

10         THE COURT:  -- I was told that Mr. Daugherty was paid

11  $800,000 --

12         MR. YORK:  With respect to his --

13         THE COURT:  -- on his Class 9 claim.

14         MR. YORK:  Correct.

15         THE COURT:  Is that not true?

16         MR. YORK:  So, the day --

17         THE COURT:  Is that true?

18         MR. YORK:  It is true.  The day after the motion for

19  entry of the proposed settlement was filed, Mr. Demo sent a

20  letter to my office that was a payoff --

21         THE COURT:  I just wanted to -- I don't need to know

22  every detail.

23         MR. YORK:  Yes.  Sure.

24         THE COURT:  Has he been paid?

25         MR. YORK:  His Class 9 claim was paid in full the day

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 320 of 614   PageID 12365

75

1    after the proposed settlement was filed.

2              THE COURT:  Okay.  So what is the asserted amount of

3    his Class 8 claim?

4              MR. YORK:  We -- again, both sides do not know

5    because they do not have --

6              THE COURT:  What was the asserted amount in the proof

7    of claim that's been reserved for, the Class 8 proof of claim?

8    What was the asserted amount?

9              MR. YORK:  It was listed as contingent unliquidated.

10   And as I understood it, and Your Honor --

11             MR. MORRIS:  No.  I think it's approximately $1.7

12   million, Your Honor.

13             MR. DAUGHERTY:  That's not true.

14             THE COURT:  $1.7 million?

15             MR. DAUGHERTY:  No.

16             THE COURT:  I would look it up, but I don't know if

17   we --

18             MR. DAUGHERTY:  Your Honor, I'll tell you.  It was

19   like $1.45 million, and then the interest to October, which

20   was like another $1.3 million.  I'm estimating it.  But the

21   total is around $2.6 million, $2.7 million at October/November

22   2020.  Up to that point.

23             THE COURT:  Okay.  Well, that's kind of a weird

24   process here for an opening statement.  But I'm asking

25   because, you know, I always try to stray people into let's be

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 321 of 614   PageID 12364

76

1   pragmatic whenever I can.  And a pragmatic approach here might

2   have been, if your client didn't think the reserve was big

3   enough, you all could have a discussion about, oh, instead of

4   $2.56 million, it now should, I don't know, $3 million,

5   whatever you say the number is.  And there could have been a

6   give and take, instead of all these people showing up in the

7   court and having an all-day hearing.

8       So I'm just trying to understand that.  And you're saying,

9   okay, violation of the absolute priority, when your client

10  took a full payment on his Class 9 claim without Class 8 being

11  quite paid in full.  I'm just trying to be pragmatic here.

12  What would it take to make Mr. Daugherty happy?  Again, that's

13  just the bankruptcy judge speaking on Chapter 11 world that's

14  trying to get to a pragmatic result.

15           MR. YORK:  We're happy to have that discussion with

16  the other side.  We were -- we --

17           THE COURT:  Well, what --

18           MR. YORK:  Yes.

19           THE COURT:  You can't tell me right now?  You're here

20  ready to go to battle over this settlement, and I'm trying to

21  figure out what might happen here that would make you all

22  withdraw your objection.  And that's what we do in Chapter 11.

23  If there's a way we can pragmatically resolve things, we do.

24           MR. YORK:  Sure.

25           THE COURT:  And it just, I'm picking on you because

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 322 of 614   PageID 12365

77

1    we're talking about a $2.5 or so million claim in a situation

2    where people are wanting the estate wrapped up and it's

3    holding hundreds of millions of dollars, I guess.

4              MR. MORRIS:  Not that much, Your Honor.

5              THE COURT:  Not that much anymore.  Not that much

6    anymore.  A lot has been paid out.  But a lot more than $2.56

7    million, shall we say.

8              MR. YORK:  Understood, Your Honor.  And I'm happy to

9    have a conversation with Mr. Morris and see if we can reach a

10   number that's agreeable to accept as, you know, the reserve.

11             THE COURT:  How hard could that be?  I don't mean to

12   be --

13             MR. YORK:  Happy to do so.  Sure.

14             THE COURT:  How hard could that be, when we're

15   talking about he's been paid $800,000 on his Class 9 ahead of

16   his Class 8, which, to understand your argument, would be an

17   absolute priority rule problem.  But, you know, --

18             MR. YORK:  Correct.  We indicated that --

19             THE COURT:  -- no picking and choosing what is

20   problematic here.  And we're talking about $2.56 million is

21   set aside, and we're talking about the prospect of liquidating

22   it and paying whatever is appropriate way before the IRS is

23   finished.  Maybe.  I don't know.  So how hard could it be to

24   figure out --

25             MR. YORK:  I'm sure we can -- we can have a

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 07/25/25   Page 323 of 614   PageID 12366

78

1    conversation real quick and try to see if we can --

2            THE COURT:  Okay.  Well, it'll have to be during a

3    break, --

4            MR. YORK:  Sure.  Happy to.

5            THE COURT:  -- because we're plowing ahead.  Okay.

6    Anything else on your opening statement?

7            MR. YORK:  The only other thing I would point out

8    with respect to the best interests of the estate is that the

9    -- as part of the settlement, the Class 9 holders and the

10   Class 10 holders are actually getting more favorable treatment

11   than Mr. Daugherty's Class 8 claim because of the mutual

12   releases that they're getting pursuant to the terms of the

13   proposed settlement, including the fact that the Class 9

14   written consent holders who are all -- all have served on the

15   board here are getting those releases as well under the

16   proposed settlement.

17           THE COURT:  It's not a release by your client.

18           MR. YORK:  No, I understand that.  I understand that.

19   But they're getting mutual releases from each other on

20   litigation that Highland has -- the Claimant Trust, excuse me,

21   has -- Trustee has, you know, consistently said that they had

22   all of those parties, all of those defendants, dead to rights

23   on.

24       So, that's all I have.

25           THE COURT:  Okay.  I really, I'm trying to focus on

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/85/25   Page 324 of 614   PageID 12367

79

1  people's standing.  Your client has standing.  He has a proof

2  of claim that's unresolved.  But I'm just trying to understand

3  the economic impact, I guess, on your client.  And all I'm

4  hearing is, I don't know, that maybe he thinks more than $2.56

5  million ought to be reserved.  I mean, I'm --

6          MR. YORK:  Given the passage of time, and also given

7  the fact that it's still undetermined as to what's going to

8  happen with that audit and what the penalties might be,

9  considering that the amount that was --

10         THE COURT:  But, again, this is bankruptcy-land.  We

11  can't wait around 20 years, 30 years.  The Bankruptcy Code

12  contemplates we can at some point estimate --

13         MR. YORK:  Sure.

14         THE COURT:  -- a contingent unliquidated claim.

15         MR. YORK:  I understand.

16         THE COURT:  So I -- all right.  Thank you.

17         MR. YORK:  Thank you.

18         THE COURT:  And Mr. Lang?

19   OPENING STATEMENT ON BEHALF OF THE DUGABOY INVESTMENT TRUST

20         MR. LANG:  We're down to three issues, one of which

21  is the scope of the release, which I think we can work out

22  with Mr. Morris, just to make sure people are carved out,

23  being Dugaboy.

24     The second issue is the use of the dollar value from the

25  capital account as the basis for the Class 10 claim versus

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 325 of 614   PageID 12369

80

1   using the -- well, they're using it on the petition date

2   versus using it -- the current capital account balance or the

3   percentage interest of 99.5 percent, because that prevents the

4   class, as structured, class level (inaudible).  And so we have

5   an issue with why they're using the capital account as the

6   basis for the allowed claim, when the plan is silent on how

7   that equity interest is to be valued.

8       Does that make sense?

9           THE COURT:  Okay.  You have a problem with the

10  valuation methodology used here, which was taking the capital

11  account balances from --

12          MR. LANG:  On the petition date.

13          THE COURT:  -- on the petition date?

14          MR. LANG:  Versus using the ownership percentage of

15  the equity on, as repeatedly stated, 99.5 percent of Highland

16  is owned by HMIT, .5 is owned by the Class 11.

17          THE COURT:  Okay.  Well, I'm not sure what -- I guess

18  you'll cross-examine Mr. Seery on different possible

19  methodologies.

20          MR. LANG:  Yes.

21          THE COURT:  Okay.

22          MR. LANG:  And so then the third one is the authority

23  issue on Mr. Patrick's authority to enter into the settlement

24  agreement and the transfer of the Dugaboy Note to Mr.

25  Patrick's entity, HMIT.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 326 of 614   PageID 12365

81

1          THE COURT:  All right.  And, again, I'll just clarify

2     my understanding.  Dugaboy -- this came up earlier -- itself

3     has a .1866 percent Class A limited partnership interest?

4          MR. LANG:  I think that's approximately right.  Not

5     exact.  Is that Mr. Morris' sheet?

6          THE COURT:  It was in several pleadings.

7          MR. LANG:  Okay.  Yeah.

8          THE COURT:  Okay.  So the question will be, should

9     that be valued at $740,000 or something different?

10          MR. LANG:  More -- there's $65 to $70 million in

11     assets in the estate.  There's $20 million in Class 9 debt, is

12     what Mr. Seery -- unpaid Class 9, is what Mr. Seery testified

13     to.

14          THE COURT:  Uh-huh.

15          MR. LANG:  So it's $45 to $50 million would be left

16     after payment of the Class 9.  And if they use the ownership

17     percentages, Class 11 gets some money.  If they use a $333

18     million capital account, Class 11 gets nothing.

19          THE COURT:  Okay.  I presume that's a material

20     difference, and I'm going to hear about that.

21          MR. LANG:  Yes.

22          THE COURT:  Okay.  And then I guess my other thoughts

23     on his interest -- I say his; it's Dugaboy.  We tend to equate

24     Dugaboy with Mr. Dondero since we've heard he and his family

25     are the hundred percent beneficiaries.  There I guess is a

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 327 of 614   PageID 12376

82

1  note that is addressed in the settlement.

2          MR. LANG:  Yes.

3          THE COURT:  I called it the $24.2 million note in my

4  --

5          MR. LANG:  That was --

6          THE COURT:  -- preparation, but it's down to --

7          MR. LANG:  Seventeen-ish.

8          THE COURT:  -- $17 million or whatever.  So, right

9  now, Highland is a payee on that note, as well as Get Good

10 Trust, and Hunter Mountain under the proposed settlement gets

11 to substitute in as a co-payee.

12    So I guess I'm just trying to, in my brain, figure out all

13 the, just like I was doing with Mr. Daugherty, the economic

14 impact of this settlement on your client.  And have I just

15 addressed the two things in your view?

16         MR. LANG:  Yes.

17         THE COURT:  Okay.

18         MR. LANG:  I believe so.

19         THE COURT:  Okay.  Thank you.

20    All right.  Can we start with evidence?  At some point,

21 we'll break for lunch, but we'll figure out as we go.  I don't

22 want to be inconvenient to people if people have ordered lunch

23 or something.

24         MR. MORRIS:  We are going to be finished with Mr.

25 Seery on direct well before lunch.

 1          THE COURT:  Okay.

 2          MR. MORRIS:  Or by lunch, for sure.

 3          THE COURT:  It's 11:30.

 4          MR. MORRIS:  Yeah.

 5          THE COURT:  So, all right.

 6          MR. MORRIS:  I do -- I would be remiss if I didn't

 7  point out that Mr. Lang just raised yet another issue, the

 8  calculation of the allowed amount of HMIT's Class 10 claim.

 9  Nowhere in his pleading.  Again, hearing about this for the

10  first time as I'm standing here.  He raised three issues, only

11  one of which is in their pleading, only one of which I ever

12  heard about from Dugaboy, and that is the scope of the

13  release.

14          THE COURT:  Okay.  I don't know if it makes a

15  material difference or not.  I am not a mathematician.  But --

16          MR. MORRIS:  So Highland -- the Movants call Mr.

17  Seery.

18          THE COURT:  All right.  Mr. Seery, if you could

19  approach the witness box.  I swore you in earlier for purposes

20  of all testimony today, so you are under oath.

21          MR. SEERY:  Thank you, Your Honor.

22     JAMES SEERY, CLAIMANT TRUST'S WITNESS, PREVIOUSLY SWORN

23                       DIRECT EXAMINATION

24  BY MR. MORRIS:

25  Q   Good morning, Mr. Seery.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56-1   Filed 11/25/24   Page 329 of 614   PageID 12372

Seery - Direct                              84

 1  A    Good morning.

 2  Q    Do you have three binders in front of you?

 3  A    I have four binders in front of me.

 4  Q    Okay.  I just want to make sure you have ours.

 5  A    I think -- yes, sir.

 6  Q    The fourth has the last few exhibits that we filed on the

 7  docket.

 8       Should we wait for Mr. Edmond?

 9           THE WITNESS:  That would be good.

10           THE COURT:  Yes.  I just noticed.  Okay.  The

11  recording is always going, so never fear.

12       (Pause.)

13           THE COURT:  All right.

14           THE WITNESS:  Apologies, Your Honor.

15           THE COURT:  Oh, I didn't see what happened.  Was

16  there a spill episode?

17       And please, if people need breaks, let me know.  I

18  sometimes go long without appropriate breaks, so let me know,

19  anybody, if we need to break for bathroom.

20           MR. MORRIS:  May I proceed, Your Honor?

21           THE COURT:  You may.

22           MR. MORRIS:  All right.

23  BY MR. MORRIS:

24  Q    Are you comfortable, Mr. Seery?

25  A    Yes.

Seery - Direct                                85

1   Q   I want to actually start a little unscripted with the

2   argument that was just made on behalf of Mr. Daugherty.  Did

3   you listen to that?

4   A   I did, Your Honor.  Yes, I did.  I'll speak to Your Honor.

5   Yes, I did, Your Honor.

6   Q   Did Mr. Daugherty have a Class 9 claim?

7   A   He did have a Class 9 claim.

8   Q   And what was the value of the Class 9 interest that he

9   held?

10  A   It was approximately $3.7 million.

11  Q   And who are the other Class 9 claim holders?

12  A   There are three -- I'm sorry, there are four other Class 9

13  holders.  There is Muck Holdings, LLC.  There is Jessup

14  Holdings, LLC.  There is UBS AG.  And there's UBS Securities,

15  LLC.

16  Q   Okay.  And if you can turn to Exhibit 58, which is in

17  Volume 1.

18          A VOICE:  Mr. Morris, what was the exhibit number?

19          MR. MORRIS:  It's 58.

20          A VOICE:  Thank you.

21          MR. MORRIS:  You're welcome.

22  BY MR. MORRIS:

23  Q   Do you have that in front of you, sir?

24  A   Yes.

25  Q   What is that?

000085

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 56   Filed 11/25/25   Page 331 of 614   PageID 12374

Seery - Direct                                    86

1   A    That is a distribution notice to Mr. Daugherty from the

2   Highland Claimant Trust with the eighth distribution.  And I

3   believe this would be related to his Class 9 claim.  It may be

4   some 8 -- some Class 8 as well.  But March 25 is -- I'm sorry,

5   May 25, my eyes are not that great for close up, this is just

6   related to the payoff of his Class 9 claim.  So he'd had a

7   $3.7 million.  This was the last -- final payment, so he's

8   been paid in full on his Class 9 claim.

9   Q    So do I have this right, that before you sent this

10  $800,000-plus to him, he had already received $2.9 million on

11  account of his Class 9 claim?

12  A    That's approximately correct, yes.

13  Q    And how many different distributions were made to Mr.

14  Daugherty on account of his Class 9 claim before this last

15  one?

16  A    Two -- two or three.  I believe the way we had phrased and

17  put 8 is our total distributions including 8 and 9.  So he had

18  a larger Class 8 claim as well.  I think it was approximately

19  $8.25 million.  That's been paid in full.  His Class 9 claim

20  was getting paid in full by this one.

21  Q    Okay.  And did Mr. Daugherty receive these prior

22  distributions -- withdrawn.  Did the other holders of Class 9

23  claims also receive pro rata their Class 9 distributions at

24  the same time as Mr. Daugherty?

25  A    Yes.  The distributions were pro rata.

1   Q    Okay.  Did Mr. Daugherty ever return any of the Class 9

2   checks that he received and say, oh my goodness, it violates

3   the plan and the absolute priority rule and everything else

4   because his Class 8 claim hasn't been paid in full?

5   A    No, he did not.

6   Q    Did he -- did he suggest that UBS or Muck or Jessup should

7   return their checks that they received on account of their

8   Class 9 claims because his Class 8 claim had remained

9   unresolved?

10  A    No, he did not.

11  Q    Okay.  Let's go to the reason that we're really here

12  today, the agreement itself.  Did you negotiate the settlement

13  on behalf of the Highland entities?

14  A    Yes, I did.

15  Q    Can you describe for the Court how that came about?

16  A    In December, we had a hearing on -- this is a little bit

17  convoluted, I apologize -- but in December we had a hearing on

18  the HCLOM claim in court, and we settled that claim as a $10

19  million Class 10 interest.

20       We moved into the new year and we heard some -- at some

21  point that HMIT disagreed with that settlement, even though

22  HMIT had signed that settlement as acceptable to it in form

23  and substance.  And the reason was because HMIT had been the

24  only Class 10 -- not allowed, but the only Class 10 interest

25  in -- under the plan, and defined that way, and we had agreed

1   pursuant to the plan to put HCLOM in there.

2        And although HMIT had signed in form and substance

3   acceptable by its attorney, we learned that Mark Patrick had

4   not been consulted and that attorney had simply -- because we

5   were in the room -- had gone in and gotten permission from Mr.

6   Dondero to approve that settlement in form and substance.  We

7   didn't know it at the time.

8        That went away pretty quickly, and we understood that

9   somehow it got resolved.

10       Shortly after that, sometime I believe in January or early

11  February, there was contact between HMIT counsel and our

12  counsel about a potential settlement.  And we had two issues,

13  really, with Mr. Patrick, who controlled two separate

14  entities.  There's the DAF entities he controlled and there's

15  the HMIT entities.  And we wanted to make sure -- and we had

16  disputes with both of them.  We had a Fifth Circuit appeal

17  coming up in DAF and HMIT.  And so we were contacted and said,

18  okay, we're willing to settle this if we can get to a place

19  that makes sense to us.  And so that was the commencement of

20  those negotiations.

21  Q    And can you describe -- how long did the negotiations

22  last?

23  A    Well, there was negotiation around the NDA, which took

24  some time, and I think we probably got that finalized at

25  around the middle to end of March.  And then we began

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 561   Filed 11/25/25   Page 334 of 614   PageID 12877

Seery - Direct                                    89

1    negotiations in earnest during April.  And we took pretty much

2    the full month to get these negotiations done, maybe a month

3    and a half.

4    Q    Can you describe for the Court just how the negotiations

5    were conducted?

6    A    Well, initially, we ensured that the ground rules would be

7    set.  We didn't want to waste our time and expense if we

8    weren't going to reach agreement around particularly

9    litigation protections, because that's essential to us, and

10   having any settlement required that.

11        Secondly, we then -- from their side, they wanted

12   information.  So, pursuant to that NDA, which was rather

13   robust, we provided substantial information.

14        We then had a -- I believe one or two Zoom calls, and then

15   a face-to-face meeting, and then subsequently a number of Zoom

16   calls with our counsel -- usually, these were always with

17   counsel -- so, our counsel, their counsel, principals, my

18   team, Mr. Patrick and his team, to go through each of the

19   items that we exchanged.  And then we worked through a

20   framework to -- back and forth on that to a term sheet, to a

21   negotiated structured settlement along the lines of the one

22   you see.

23   Q    And did the parties exchange information as part of the

24   process?

25   A    Yeah.  As I explained, we, under our NDA, we gave a lot of

Case 19-34054-sgj11  Doc 4296  Filed 06/30/25  Entered 06/30/25 11:25:22  Desc
Case 3:25-cv-01876-K  Document 53  Filed 11/25/25  Page 335 of 614  PageID 12784

Seery - Direct                                    90

1  information.  We got information back from Mr. Patrick, Mr.

2  Phillips, their teams, about the structure of their entities,

3  how we could interact with them, who was responsible for each

4  entity.  And that caused us to, frankly, move from just HMIT

5  to a couple other entities to make sure we had full

6  protection.

7  Q    Did you provide information concerning assets, budgets,

8  expenses, and the like?

9  A    Yeah.  The detailed information we provided, it was pretty

10  extensive.  So we gave a high-level view of our budget,

11  assuming that we had a settlement with them.  We have an asset

12  list that we keep and where each asset was located.  So,

13  dollars amounts, what kind of form it was in, whether it was

14  cash, whether it was U.S. Treasuries, whether it was, you

15  know, equity interests.  Some couple other assets, as Mr.

16  Morris explained in the opening, had not yet been disposed of.

17  And the valuations we put on those assets.

18  Q    Can you turn, I guess, to any volume, and let's just look

19  at the exhibit list.  Are you generally familiar with the

20  documentation concerning the negotiations?

21  A    Yes.

22  Q    Can you confirm that Exhibits 2 through 57 are the emails

23  and information that were disclosed between the Highland side

24  and the HMIT side during the negotiations?

25  A    Yes.  And I -- I could look through 2 through 57 now, but

1   --

2   Q    Yeah.

3   A    -- I have looked through them before, and this is the

4   information back and forth.  We generally exchanged, other

5   than at the face-to-face meeting, we exchanged information on

6   Zoom calls as well, but when we get documents we gave them

7   counsel-to-counsel.

8   Q    Okay.  And did you instruct me to produce all of the

9   communications with the HMIT side in connection with the

10  discovery requests that were served in this case?

11  A    Yes.  We had discovery requests that we went through in

12  detail and reviewed them, and we produced in accordance with

13  those requests.

14  Q    Are you aware of any document that we didn't produce that

15  reflects the parties' negotiations of this agreement?

16  A    No, not at all.

17  Q    Can you describe for the Court the general deal points

18  that were negotiated?  Withdrawn.  Who was your counterparty

19  to these negotiations?

20  A    The principal on the HMIT side is Mr. Mark Patrick.  He

21  had his team.  And I was responsible on our side with my team.

22  Q    And can you just describe for the Court what the primary

23  negotiating points were between the two teams?

24  A    Yeah.  Number one for us was dismissal of outstanding

25  litigations.  So we needed, with prejudice, dismissal of those

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 561   Filed 11/25/22   Page 337 of 614   PageID 12806

Seery - Direct                                    92

 1   litigations.  Otherwise, why are we bothering?

 2       Number two, we wanted to make sure that we had litigation

 3   protections.  These have been around since -- we came up with

 4   them during our mediation.  They're really important to us.

 5   They set up a structure where we can actually count on the

 6   estate and the principals of the estate and the indemnified

 7   parties of the estate not being attacked.  So that was

 8   essential to us.

 9       In exchange, we had to fix their claim and allow it in an

10   amount pursuant to the plan, which requires us to fix an

11   amount.  And that's the Class 10 interest that they have,

12   which is senior to the Class 11 interests under the plan and

13   the Claimant Trust Agreement.

14       And then the way the Trust is set up in the plan, it's a

15   waterfall.  They -- we advocated for getting everything for us

16   upfront and putting everything for them at the back.  They,

17   understandably, didn't like that as much and wanted

18   distributions upfront.  So we negotiated around those terms.

19   And I think those are the biggest terms.

20       We had some assets that we were -- we were -- difficult to

21   monetize that we also were happy to dispose of in this way,

22   with a credit, you know, towards their claim amount.

23   Q   Did you -- and I may have missed this; I apologize if I

24   did -- but did you also negotiate the amounts and the timing

25   of the distributions that would be made to the HMIT entities?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 51   Filed 11/25/25   Page 338 of 614   PageID 12817

Seery - Direct                                    93

1   A    Yeah.  That's what I alluded to, where we -- we had hoped

2   to get everything for us upfront, give them everything later.

3   I think it's the *Wimpy* 'For a hamburger you give me today,

4   I'll gladly pay you Tuesday' structure.  That didn't like that

5   as much, so we did work on timing.  And that did bring into

6   consideration the other Class 9 holders and timing with

7   respect to payments to the Class 9.

8   Q    Was the topic of the allowed amount of HMIT's Class 10

9   interest the subject of negotiation?

10  A    The topic of the allowed --

11  Q    Did you discuss how the amount of its allowed interest

12  would be calculated?

13  A    Oh, yeah, that was a, you know, a critical part of the --

14  or, you know, essential part of the structure.  What's the

15  allowed amount they're going to get?  The plan requires an

16  amount fixed for that class.  We had already had a $10 million

17  HCLOM amount allowed into that class.  So we needed to fix

18  that amount.

19  Q    So let's transition to that particular topic, the

20  calculation of HMIT's Class 10 interest.  Are you familiar

21  with the methodology that was used to arrive at the Class 10

22  amount?

23  A    Yes.

24  Q    Can you tell me the process, before we get to the

25  methodology itself?  Like, what work was done to figure that

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 51   Filed 11/25/24   Page 339 of 614   PageID 12828

Seery - Direct                                   94

1    out?

2    A    Well, the structure of limited partnership is that the

3    equity account is treated as what's called a capital account.

4    Each limited partner in a limited partnership has a capital

5    account that tracks their equity interest.  As a default rule,

6    it's the amount that a limited partner can expect to get on a

7    sale of the partnership or a liquidation of the partnership.

8    So we used the capital account that had been maintained

9    continuously by Highland to set their capital account amount.

10       I think the partnership agreement talks about 99-1/2

11   percent for HMIT.  It doesn't talk about dollars because

12   that's kept in the accounting for the partnership.  And that

13   amount was consistently kept by Highland up to the petition

14   date.  And even after the petition date in the monthly

15   operating reports.

16   Q    If you take a look back at the exhibit list, I would

17   direct your attention to Page 12 of 15.  Actually, it starts

18   at the Page 11.  At the bottom, it's got the heading, Capital

19   Account Amounts.  Are you familiar with Exhibits 113 through

20   118?  And if you need to look at the exhibits, take your time.

21   A    Oh, I'm sorry.  I thought you told me 15.

22   Q    No.  One -- I did.  I mentioned Page 15.  But we're just

23   looking at Exhibits 113 to 118.

24              THE COURT:  113 to what?

25              MR. MORRIS:  18.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 561   Filed 11/25/25   Page 340 of 614   PageID 12889

Seery - Direct                                          95

1          THE COURT:  Okay.

2          THE WITNESS:  Um, --

3          MR. MORRIS:  If you look at the index, Your Honor, at

4  the bottom of Page 15 -- 11, you'll see a heading, Capital

5  Accounts --

6          THE COURT:  Right.

7          MR. MORRIS:  -- Amounts.  And then that captures

8  Exhibits 113 to 118.

9          THE WITNESS:  Yes.

10  BY MR. MORRIS:

11  Q   Are those the documents that you and your team relied upon

12  in order to calculate the amount of the allowed Class 10

13  interest for HMIT?

14  A   These are some of them.  I don't know if you have the tax

15  returns in here and the K-1s.  Oh, here they are.  115.

16  Q   Yeah.  That's 115?

17  A   Yeah.  You've got the K-1s for 2018, which fix an amount.

18  Those are signed by Mr. Dondero, and they give the amounts to

19  each partner.  And then you've got the adjustments, because

20  those are done in -- they're 2018 year-end.  They were done in

21  September of 2019, about a month before the filing.

22  Q   And is that Exhibit 116?

23  A   It's 115 and 116.  I believe that's -- 116 is 2019, I

24  believe, and that would have been signed postpetition by -- I

25  believe that was signed by Waterhouse.

000095

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 53   Filed 11/25/26 of Page 341 of 6178   PageID 12840

Seery - Direct                                    96

1   Q    Okay.

2   A    So it sets out the K-1.  The numbers that we have are

3   slightly different because they're in the -- they're not

4   middle of the year, but they're for the petition date of

5   10/16/19.  And there are -- there's economic activity that

6   happens during the year, that you take the year-end from '18

7   and you have economic activity that would affect, pursuant to

8   the partnership, the capital account of each partner during

9   that year,  fixed it on the petition date, and then it's been

10  forward since.

11  Q    Did you apply any of your own subjective views or beliefs

12  in the calculation of the amount of the Class 10 interest held

13  by HMIT?

14  A    No.  This was math.

15  Q    And did you hear Dugaboy's counsel suggest in the opening

16  that there was a different methodology that perhaps you could

17  have used, a pro rata methodology, instead of the methodology

18  you used?

19  A    I heard what he said, but it doesn't make any sense.  You

20  can't fix an amount that way.

21  Q    And do you understand that Dugaboy, under the partnership

22  agreement, is subordinated to HMIT?

23  A    Dugaboy is subordinated under the partnership agreement

24  for certain distributions.  But importantly for our purposes,

25  they're subordinated under the plan.  So the Class 11

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 51   Filed 11/25/25   Page 342 of 614   PageID 12351

Seery - Direct                                    97

1   interests are explicitly subordinated to the Class 10

2   interests, in both the plan and the Claimant Trust Agreement.

3   Q    Did the Debtor consider putting Dugaboy and HMIT in the

4   same class?  Back when the plan was being formulated?

5   A    I -- I don't recall.

6   Q    Do you recall why they're in separate classes?

7   A    They -- they're in separate classes because HMIT had a

8   senior -- a right to senior distributions under the

9   partnership agreement.  We set it up that way.  Nobody

10   objected to it.  That was part of the confirmed plan and the

11   confirmed order.

12   Q    Thank you very much.  Let's talk for just a moment about

13   Mr. Patrick's authority.  Before entering into the settlement

14   agreement, did you do anything to satisfy yourself that Mr.

15   Patrick had the authority to enter into the settlement

16   agreement on behalf of each of the HMIT entities?

17   A    Yes.

18   Q    What did you do to satisfy yourself?

19   A    Well, as a default rule, I always look at the agreements

20   that I'm going to enter into and the organizational docs.  And

21   we did do that.  We looked at each of the organizational docs

22   to --

23   Q    Let me stop you there for a second.  Are those the

24   documents that are in the exhibit list from 70 through 104?

25   A    I'd have to check the actual numbers, but --

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 55    Filed 11/26/25    Page 343 of 614    PageID 12886

Seery - Direct                                    98

1   Q    If you just look at the exhibit list.

2   A    Oh.

3   Q    It's at the front.  You'll see on Page 8 of 15 of the

4   exhibit list there's a heading, --

5   A    Yes.

6   Q    -- E, Patrick Authority, and then I'm asking you if you

7   are aware of what Exhibits 70 through 104 are?

8   A    Yes.  So, these, these are -- there's a number of

9   organizational documents that we looked and made sure that Mr.

10  Patrick had authority.

11       We also knew from our own files that Mr. Patrick, you

12  know, previously had different interests assigned to him, and

13  we know from Mr. Patrick and documents he's given us that John

14  Honis, who was a former controller of some of -- controlled

15  some of these entities and a friend of Dondero's who

16  previously worked at Highland, is on some retail boards, in

17  2022 transferred those interests to an entity controlled by

18  Mr. Patrick.

19       Moreover, Mr. Patrick was here in court as the HMIT

20  Administrator, trying to sue the Highland estate.  He

21  testified on behalf of HMIT as the Administrator.  And the

22  documents are very clear that the Administrator has full

23  control of these entities.

24  Q    We've heard some argument about a Cayman Islands

25  proceeding.  Are you generally aware of what's happening in

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 53   Filed 11/25/25   Page 344 of 614   PageID 12887

Seery - Direct                                        99

 1   the Cayman Islands?

 2   A     I hesitate to say generally aware.  I'm aware that there's

 3   a proceeding in the Cayman Islands about involving a blocker

 4   corp.  And there's disclosure in this Court about what that

 5   entity is.  It's a blocker corp. in the Caymans that prevents

 6   the ultimate charitable entities -- and I put that in quotes

 7   -- to -- from receiving UBTI, which is Unrelated Business

 8   Income.  And in that case, they would have to pay tax on it,

 9   and the idea is that they don't want to pay taxes and they

10   don't pay taxes.  So that corp. apparently is in some sort of

11   proceeding.  That's on the DAF side.  That is not on the HMIT

12   side.

13   Q     Okay.  So, based on the work that you did and the

14   documents that you reviewed, did you form a view as to whether

15   or not Mr. Patrick is authorized to enter into the settlement

16   agreement on behalf of each of the HMIT entities?

17   A     Yes.

18   Q     And what view did you reach?

19   A     He has complete authority over each of these entities.

20   They run up to entities that he controls or he owns.  And he's

21   had that, and it's the structure that was set up a long time

22   ago, and any changes to that structure are just consistent

23   with the documents that let him do these things.  And the

24   proceeding in Cayman, whatever that is, has no impact on Mr.

25   Patrick's authority over these entities or any of the entities

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/25/25   Page 345 of 614   PageID 12884

Seery - Direct                                          100

1   in this chain.

2   Q    Did you see anything in the diligence that you conducted

3   that required Mr. Patrick to seek anybody's authority,

4   consent, or approval before entering into the settlement

5   agreement on behalf of the HMIT entities?

6   A    No.  And we could go through each document.  He has

7   complete authority on each of these entities.  And even the

8   objections that were filed that were withdrawn from The Dallas

9   Foundation, they have no -- it's absolutely clear that they

10  have no rights to deal with at all the management of each of

11  these entities.  They don't have an ownership interest in it.

12  Crown issued an annuity policy that's a variable policy.  They

13  have no rights.

14  Q    All right.  Let's turn to the agreement itself.  Can you

15  tell the Court why you believe that the settlement agreement

16  is in the Claimant Trust's best interests?

17  A    Number one, this case has been going on for a full five

18  years.  We have spent tens of millions of dollars dealing with

19  vexatious and frivolous litigation and attacks.  The

20  opportunity to settle with a Class 10 holder and allow their

21  claim under the terms of the settlement is extremely valuable

22  because it moves us much, much closer to a potential

23  resolution of this case, which we would all love to resolve.

24       Number two, it's fair value for the estate.  We are making

25  sure, while we're paying some money out in front, we have

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/26/25   Page 346 of 614   PageID 12889

Seery - Direct                                        101

1    triggers on the backend payments to ensure that the Indemnity

2    Trust has enough assets to protect parties if there are

3    unforeseen litigations.  And I can almost bet there'll be at

4    least one or two of those.  So it's really, really valuable in

5    that respect.

6         Three, it cuts down tremendously on what future expenses

7    could be.  Because we have gotten these litigation

8    protections, we've basically walled off a potential avenue to

9    be attacked.  And I think the structure of this deal is

10   valuable, not only to the fiduciaries and folks who have been

11   responsible for managing this process and who are indemnified

12   by the Claimant Trust or HCMLP, it also enables us to, down

13   the road, pay off the Class 9s and ultimately make

14   distributions to the Class 10s.

15   Q    Is one of the other benefits to this agreement is that it

16   enables the Claimant Trust to dispose of certain illiquid

17   assets?

18   A    Well, that's a -- that is a benefit, because we do have to

19   resolve these claims and dispose of these assets, and we're

20   not in a position to hang around until 2030 or more to do

21   that.

22        So we've got the Kirschner claims, which would go to HMIT.

23   Again, the way that the waterfall is set up, to the extent

24   that they have value, they are very expensive to pursue.

25   We've spent a ton of money setting them up.  We've produced

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 16-1   Filed 11/05/25   Page 347 of 614   PageID 12390

Seery - Direct                                                    102

1    seven million documents, pages, and received zero in return.

2    We stayed them because we didn't think we needed them for the

3    Class 8 and 9 and it was prudent to do so, and the question

4    was would we need them for indemnification.  So disposing of

5    those claims now at this time as part of this settlement,

6    where that value would go to Class 10 anyway, is very

7    valuable.

8    Q    Had you made any efforts prior to entering into this

9    agreement to monetize or otherwise sell the Dugaboy Note?

10   A    Yes.

11   Q    Can you describe for the Court what your efforts were in

12   that regard?

13   A    So, we set out to try to monetize the Dugaboy Note.  I

14   contacted -- we put together what we call a teaser, laying out

15   what we knew about Dugaboy, at least up until the time that

16   Dugaboy was no longer part of our computer system.  Laid out

17   what we thought the assets were.  There's not a lot of public

18   information.  Laid out the amortizing of the note.  It's a 3.2

19   percent-ish, 3.26 percent note, I believe, goes to 2047, '46

20   on the amortization, 2047.   And then presented that to I

21   think it's five different investors in distressed funds.  Had

22   no interest whatsoever.  One investor laughed at me, which I

23   understood that he was aware of the parties and the principals

24   and the collection efforts that would be difficult on that

25   note.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/26/25   Page 348 of 614   PageID 12897

Seery - Direct                                103

 1      The note is performing, because if it hadn't performed I

 2  would have accelerated on the first second and we would have

 3  collected the whole thing.  But we've seen that show in the

 4  other Notes Litigation.  And so we didn't -- we didn't get any

 5  reception.

 6      We also reached out to Mr. Dondero, in writing, through

 7  D.C. Sauder, and made them an offer and tried to get them to

 8  respond, and they indicated they had no interest in the note.

 9  Q    Turning back to the exhibit list, if you can turn your

10  attention to Page 11 of 15 of the exhibit list, is Section F,

11  Exhibits 105 through 112, the documents that reflect the note

12  and your efforts to dispose of the note?

13  A    Yes.

14  Q    And let's take a look at Exhibit 112 quickly, since that

15  involves Mr. Dondero.  Can you just tell the Court what this

16  exhibit is?

17  A    Yes.  This is an exchange between D.C. Sauder, Matt

18  McGraner, both of whom work for Dondero, and Dave Klos, our

19  CFO.  I'd authorized Dave to make an offer to them to see if

20  we could get cash for the Dugaboy Note.  And as you see right

21  below the reply from Mr. Klos, which is -- this is friendly,

22  but Mr. Sauder's indication that they have no interest.

23  Q    Okay.  So Highland offered to sell the Dugaboy Note to Mr.

24  Dondero or entities controlled by him, and that offer was

25  rejected without a counteroffer.  Do I have that right?

Seery - Direct                                    104

1    A    That's correct.

2    Q    Okay.  Let's finish up here.  Are you familiar with the

3    objections of Dugaboy and Mr. Daugherty that the settlement

4    somehow violates the plan because it's making distributions to

5    Class 10 before junior classes are paid in full?

6    A    Yes.  I'm familiar with those.

7    Q    Do you believe the settlement violates the plan?

8    A    Not at all.

9    Q    And why is that?

10   A    The plan specifically contemplates that -- I don't think

11   it's -- we showed the 9 and 10s, but I think it's any claimant

12   could take less than is being offered by the plan.  What we

13   did very specifically is go to the Class 9 claimants and

14   discuss with them this opportunity to settle with HMIT and

15   what it would take, which included some, as I described

16   earlier, payments upfront.

17        After being fully informed -- they asked a lot of

18   questions, they pushed back quite a bit, as you can expect

19   that they would -- and we reached agreement with those Class 9

20   claimants in writing to approve the structure of the deal and

21   the settlement and the concurrent payments, as well as the

22   final small payment to Mr. Daugherty on behalf of his Class 9

23   claim.

24   Q    Could I trouble you to turn to Exhibit 59, please, Mr.

25   Seery?

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 1591    Filed 11/25/25    Page 350 of 614    PageID 12939

Seery - Direct                          105

1    A    I've got it.

2    Q    Are you familiar with that document?

3    A    I am, yes.

4    Q    Can you explain to the Court what that document is?

5    A    This document is the written consent that we entered into

6    with the Class 9 claimants, approving the settlement agreement

7    as well as the payment to Mr. Daugherty.

8    Q    Okay.

9    A    And -- and -- so these -- the payment to Mr. Daugherty

10   would have been non-pro rata, so they agreed to that.  And the

11   concurrent payments under the settlement agreement to Class 10

12   were agreed to by the Class 9 claim holders.

13   Q    So looking at Page 2 at the top, do I have this right,

14   that Mr. Daugherty's original Class 9 subordinated claim was

15   in the amount of $3.75 million, and that with the payment

16   described in this document his claim was paid in full?

17   A    That's correct, yes.

18   Q    And did he complain that he was getting paid in full but

19   the other Class 9 holders were not?

20   A    No.  That had never been his complaint.

21   Q    Did he complain that he was getting paid in full on his

22   Class 9 claim but his Class 8 claim remained unresolved?

23   A    No.  I think that, as indicated before in my testimony and

24   indicated here, this was the last payment, the 781.  Before

25   that, he'd received almost $3 million on account of his Class

Seery - Direct                              106

1   9 claim.  And pro rata with the other Class 9 claimants.

2   Q    I think you mentioned that your understanding is that,

3   under the plan, creditors can elect to receive less favorable

4   treatment than the plan otherwise provides.  Is that right?

5   A    That's correct.  And I think that's a pretty standard

6   provision in virtually every plan that I see.

7   Q    Can we just grab that for a second?  It's the last

8   exhibit, 126, which is probably in the skinny binder, if you

9   have one.

10  A    Yes.  Do you want me to go to the section?

11  Q    Yeah.  Just one minute.  I want to make sure the judge is

12  with us.  Give her a second.

13          MR. MORRIS:  Are you with us, Your Honor?

14          THE COURT:  Yes.

15          MR. MORRIS:  Okay.

16  BY MR. MORRIS:

17  Q    So if you can turn to Page 23 of Exhibit 126.  Does

18  Section 9, under Treatment, Romanette (ii), is that the

19  provision that you were just describing that gives Class 9

20  holders the ability to receive such other less-favorable

21  treatment as to which such holder and the Claimant Trust may

22  agree upon in writing?

23  A    That's correct.

24  Q    And the same is true with respect to the Class 10 claims,

25  at the top of Page 24?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1631   Filed 11/26/25   Page 352 of 614   PageID 12395

Seery - Direct                          107

1  A    That's also correct, yes.

2  Q    All right.  And so was the consent that was executed by

3  the Class 9 holders that's Exhibit 59 done in satisfaction of

4  these plan provisions?

5  A    I'd say it's consistent with these.  They could elect to

6  receive it or not, but this was, you know, did it under this

7  provision and they were entitled to elect to take lesser

8  treatment, if that's what they agree to.

9  Q    Okay.  Can you describe for the Court why you believe that

10  the Class 9 claim holders are receiving less-favorable

11  treatment under -- as a result of this settlement agreement

12  than they would otherwise be entitled to under the plan?

13  A    Well, they would be entitled to receive payments in front

14  of any payments that would be made to Class 10.  In addition,

15  they would have been entitled to receive a pro rata

16  distribution of the $800,000 that was paid to Mr. Daugherty,

17  and they agreed to waive those provisions.

18  Q    Okay.  Is it your understanding that HMIT is also

19  accepting less favorable treatment than it might otherwise

20  receive if it pursued and succeeded in the prosecution of its

21  claim?

22  A    I suppose, ultimately, if everything was resolved, that

23  they could have gotten a Class 10 interest that wasn't

24  structured along the lines of the settlement agreement.  So

25  the settlement agreement takes some of that structure and what

Seery - Direct                              108

1   arguably would be value away from them, and this is the amount
2   that they've agreed to have as their allowed claim, as
3   structured by the settlement agreement.
4   Q   And is it your understanding that under the settlement
5   agreement HMIT has disavowed any rights under the Claimant
6   Trust Agreement?
7   A   Under the Claimant Trust Agreement, yes.  They have rights
8   under the settlement agreement to receive distributions, and
9   those will ultimately come from the Indemnity Trust as we wind
10  down the Claimant Trust.
11  Q   And did HMIT also agree that it would not be a Claimant
12  Trust beneficiary under the Claimant Trust?
13  A   Yes.  And that's very important to us because we have seen
14  lots of litigation, lots of emails, trying to use these types
15  of structures just to create claims, even when there's
16  literally no basis for it.  I should -- well, I'll control
17  myself.
18  Q   Yeah.  We can stop there.
19          MR. MORRIS:  Your Honor, I have no further questions
20  at this time.
21          THE COURT:  All right.  We're going to figure out,
22  are we taking a bathroom break or a short lunch break.  I'll
23  poll the audience and then I'll decide.  Do people want to
24  take maybe a 30 to 45-minute lunch break, or just a bathroom
25  break and keep going?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/25/25   Page 354 of 614   PageID 12973

Seery - Direct                                109

1            THE WITNESS:  Thirty minutes.

2            THE COURT:  I'll say -- are you going to have any

3    further examination?

4            MR. PHILLIPS:  I'm going to maybe ask one question,

5    just to bring it up.  It's already been -- but one question.

6            THE COURT:  Okay.  And then what about Dugaboy and

7    Daugherty?  Guesstimate how much examination you'll have.

8            MR. YORK:  Fifteen minutes, maybe.

9            MR. LANG:  Twenty minutes or so.

10           THE COURT:  Why don't we take a five-minute bathroom

11   break, --

12           MR. PHILLIPS:  Sure.

13           THE COURT:  -- and then we'll at least finish this

14   witness.

15           MR. PHILLIPS:  Perfect.

16           THE COURT:  All right?

17           MR. PHILLIPS:  Thank you, Your Honor.

18           THE WITNESS:  Thank you.

19           THE CLERK:  All rise.

20      (A recess ensued from 12:07 p.m. until 12:15 p.m.)

21           THE CLERK:  All rise.

22           THE COURT:  Please be seated.

23      (Pause.)

24           THE COURT:  All right.  Can I get some help rounding

25   people up?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 355 of 614   PageID 12398

Seery - Cross                                    110

1        (Pause.)

2            THE COURT:  All right.  We're missing -- okay.  We're

3   going back on the record in Highland Capital.  We still have

4   Mr. Seery on the witness stand.  Mr. Phillips, you had

5   examination.  You said one question.

6            MR. PHILLIPS:  I did, Your Honor.  And I meant it.

7            THE COURT:  Okay.

8                          CROSS-EXAMINATION

9   BY MR. PHILLIPS:

10  Q    Could you look at Exhibit 118, please?

11  A    You said 118?

12  Q    Yes, sir.

13  A    Certainly.

14  Q    Did the calculation of the Class 10 claim amount of

15  $336,940,230.58, is that the result of applying the full value

16  to the Highland or Highland Claimant Trust of the HMIT note

17  receivable?

18  A    Apologies, because I can't read this because it's too

19  small, but I can answer the question.

20           THE COURT:  Would you like this?

21           THE WITNESS:  I think I can answer the question

22  without it.

23           THE COURT:  Okay.

24           THE WITNESS:  The -- what we used was the petition

25  date capital account.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/26/25   Page 356 of 614   PageID 12399

Seery - Cross                          111

1    BY MR. PHILLIPS:

2    Q    Correct.

3    A    And just like every other claim in bankruptcy, fixed at

4    the petition date.  And what we subtracted from that petition

5    date was the petition date amount principal and interest of

6    that HMIT note which was owed to Highland Capital.

7    Q    Thank you.

8         THE COURT:  All right.  That was one question.

9    All right.  Counsel?

10        MR. YORK:  Thank you, Your Honor.  Get it organized

11   here.

12                      CROSS-EXAMINATION

13   BY MR. YORK:

14   Q    Good afternoon, Mr. Seery.

15   A    Good afternoon.

16   Q    Would you take a look at Exhibit 1 in Daugherty's witness

17   and exhibit binder?  It's the settlement agreement between

18   Highland and Mr. Daugherty, I believe.

19   A    Yes, I have it.

20   Q    All right.  And can you confirm that is the settlement

21   agreement that Highland and Mr. Daugherty entered into in

22   connection with the claims Mr. Daugherty asserted in the

23   bankruptcy?

24   A    It appears to be, yes.

25   Q    Would you turn to Section 9, then, which is on Page #11,

Seery - Cross                         112

1   starts on Page #11?

2   A    Yes.

3   Q    And that relates to a reserved claim that Mr. Daugherty

4   had as part of his proof of claim against Highland in the

5   bankruptcy, correct?

6   A    That's correct.

7   Q    And would you agree with me that the second line of

8   Section 9 there of the settlement agreement describes that

9   claim as a contingent unliquidated claim against the Debtor?

10  A    I would not agree with you on that, no.

11  Q    Why not?

12  A    Because it says, Daugherty contends --

13  Q    Ah.  Daugherty contends.

14  A    -- he has a contingent unliquidated claim against the

15  Debtor.

16  Q    Okay.  Well, why don't you then turn with me to Daugherty

17  Exhibit #2, which is the -- which is the -- Highland's

18  adversary complaint that was filed against Mr. Daugherty on I

19  believe May 2nd of 2025.  Correct?

20  A    I don't recall the specific date and it's blurred at the

21  top.  So if you say so, I'll accept that.

22  Q    All right.  And if you look at Paragraph 1, the third

23  line, there's a sentence there that says, All of Mr.

24  Daugherty's claims were settled except his unliquidated

25  contingent claim that the Debtor has a continuing and

Seery - Cross                                                    113

1    indefinite obligation to make him whole if a tax refund he

2    apparently received for tax year 2008 on account of his

3    partnership interest is ever successfully challenged by the

4    IRS.

5        Did I read that correctly?

6    A    You did read that correctly, yes.

7    Q    All right.  This reserved claim under the settlement

8    agreement is a Class 8 unsecured claim, correct?

9    A    It is the claim that he asserted and that we initially

10   classed under Class 8 in a fixed amount for a tax refund which

11   is on his statement that he got that he claims he's entitled

12   to more, which would be unsecured as of the petition date.  I

13   believe the amount on his payment statement from 2009 is

14   $1.475 million.

15   Q    All right.

16           THE COURT:  Could you pull the microphone closer to

17   you?

18           THE WITNESS:  I'm sorry, Your Honor.

19           THE COURT:  Okay.  Good.

20           MR. YORK:  All right.

21   BY MR. YORK:

22   Q    And, again, my question is pretty simple.  And it's a

23   Class 8 unsecured claim, right?

24   A    It's not a Class 8.  It was in Class 8.  It's been

25   objected to.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 359 of 614   PageID 129028

Seery - Cross                                    114

1    Q    Right.

2    A    So it is not in a class now at all.  We seek to disallow

3    it in its entirety, or, at worst, subordinate it to all

4    creditor claims.

5    Q    Understood.  But it has been asserted as a Class 8 general

6    unsecured claim, right?

7    A    He asserted it as that, yes.

8    Q    Okay.  And is it fair to say that in the adversary

9    complaint, if you go to Page -- I'm sorry, Paragraph 4 --

10   Highland alleges that:  However, even if Mr. Daugherty's claim

11   is not disallowed in its entire -- I think that should be

12   entirety.  Right?

13   A    It should be, yes.

14   Q    It remains contingent on the outcome of the 2008 audit.

15   Correct?  Did I read that correctly?

16   A    You did read that correctly, yes.

17   Q    And the next sentence says, It is unclear when, how, or if

18   the 2008 audit will finally be resolved.  Correct?

19   A    Correct.

20   Q    And in fact, if you go to, then, Page #7 of the complaint

21   and you look at Footnote 6, at the very end of that footnote

22   it indicates that Highland has an understanding that the

23   resolution may not be expected until approximately 2029.  Is

24   that correct?

25   A    The litig... I can't read it because it's small, but the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 360 of 614   PageID 12303

Seery - Cross                                              115

 1   litigation may not be resolved.  The IRS has already issued a

 2   final determination on the audit.

 3   Q    How do you know that?

 4   A    I was advised that by another partner.

 5   Q    Who?

 6   A    Kurt Plumer.

 7   Q    Have you seen the FPAA that was issued by the IRS?

 8   A    No, I have not.

 9   Q    Have you asked for it?

10   A    Yes.

11   Q    You did, personally?

12   A    My lawyers did.

13   Q    Your lawyers did?

14   A    Yes.

15   Q    Okay.  But you -- but you did not, right?  Just to be

16   clear.

17   A    No, I did not.  My lawyers, acting at my direction, did.

18   Q    Asked the tax matters partner for Highland for that

19   information?

20   A    Asked Mr. Daugherty.

21   Q    Asked Mr. --

22   A    I think asked you, I'm sorry.

23   Q    Oh, asked me for that information?

24   A    Yes.

25   Q    Well, so tell me, why is Mr. Daugherty -- first off, do

1   you know if Mr. Daugherty has received the FPAA?

2   A    I don't know.

3   Q    Okay.  Do you know if anybody else has received an FPAA?

4   A    I was told there was a final determination.  I don't know

5   if they've actually received an FPAA.  But I do know that Mr.

6   Daugherty has produced a document where the IRS has requested

7   additional information for him.  Since they hadn't done that

8   for 17 years, I suspect that they've reached a final

9   determination of the audit.

10  Q    All right.  So you don't know whether an FPAA has actually

11  been issued?

12  A    I --

13  Q    True?

14  A    I don't know.  And for the Court's benefit, that's a Final

15  Partnership something Determination.

16  Q    Okay.  What -- where --

17          THE COURT:  F-A --

18          THE WITNESS:  F-P-P -- I think it's --

19          MR. YORK:  F-P-A-A.

20          THE WITNESS:  -- F-P-A-A.

21          THE COURT:  Okay.  The court reporter will no doubt

22  ask, so good.

23  BY MR. YORK:

24  Q    Tell me, where in the universe is it that -- is it Mr.

25  Daugherty's obligation to provide Highland with the FPAA?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/06/25   Page 362 of 614   PageID 12305

Seery - Cross                          117

1    A    I don't -- I don't think there's any such obligation that

2    I've seen.

3    Q    And in fact, the IRS audit is handled by the tax matters

4    partner for Highland Capital, correct?

5    A    The IRS audit for Highland Capital's -- from Highland

6    Capital's position is handled by that.  The IRS handles their

7    side.

8    Q    Right.  From Highland's side.  Okay.  And that tax matters

9    partner is doing that on behalf of Highland Capital, right?

10   A    I think at this point it's doing it on behalf of the old

11   Highland Capital, not Reorg Highland Capital.  We don't have

12   any liability with respect to it, nor do we have any

13   visibility as to what's going on in the tax audit.

14   Q    So even though, under the partnership agreement, that's

15   the tax matters partner that's referred to, Highland Capital

16   cannot compel that tax matters partner to provide that

17   information to them, if an FPAA actually exists?

18   A    I don't think so.  That partnership agreement is the pre-

19   effective date partnership agreement.

20   Q    All right.

21   A    The new Highland Reorg Debtor doesn't have these partners

22   and is not a tax matter partner for those -- those audits.

23   Q    So let's go back, then, to Paragraph 4 of the adversary

24   complaint that was filed.  And I want to look at the next

25   sentence that Highland wrote there.  It says:  Moreover, if

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/26/25   Page 363 of 614   PageID 12306

Seery - Cross                                       118

1    the claim is not disallowed, it will need to be estimated,

2    after taking into account the likely outcome of the 2008

3    audit, including adjustments that result therefrom.

4        Did I read that correctly?

5    A    You read that correctly.

6    Q    Have -- has anyone at Highland conducted any analysis as

7    of today to determine what Mr. Daugherty's potential liability

8    would be from that IRS audit if that audit was completed today

9    and all interest and penalties were assessed as of today?

10   A    Yes.

11   Q    How much?

12   A    It would be $1.475 million, the amount of his prepetition

13   claim in his proof of claim.  Since it's unsecured, whatever

14   happens with the IRS is not a concern of Highland.  His claim

15   is that he didn't get that amount as a refund.  Either he got

16   that amount or he got some -- some lower amount.  It would be

17   a petition -- prepetition-date amount.  And under Texas law,

18   he would be entitled to prejudgment interest from 2009 to the

19   petition date at a rate of five percent.

20   Q    Which would be how much?

21   A    It would be approximately $2.2 million in aggregate.

22   Q    Okay.  And there would be -- you're saying there would be

23   no penalties or any other -- any other interests or

24   assessments that would -- Mr. Daugherty would be liable for

25   that Highland would also then be liable for under that claim?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/26/25   Page 364 of 614   PageID 122973

Seery - Cross                                119

1   A    No.  There would not.  It would not impact his claim

2   against Highland.  His claim against Highland is simply:  I

3   did not get this refund.

4        He got the refund.  He's now claiming it might be

5   adjusted.  If the IRS otherwise has penalties, interest

6   against him for his tax attributes somewhere between 2009 and

7   2019, that wouldn't be subject to his proof of claim and it

8   wouldn't be the responsibility of Highland.

9   Q    Even if Highland had promised at the time that that refund

10  was made that it would -- it would make him whole with respect

11  to any IRS audit whatsoever?

12  A    It simply --

13            MR. MORRIS:  Objection to the form of the question.

14            THE WITNESS:  It simply didn't do that.

15            MR. MORRIS:  Yeah.

16            THE COURT:  Okay.  Overruled.

17            THE WITNESS:  We can -- you could litigate the claim,

18  but that's just not what it says.

19  BY MR. YORK:

20  Q    So you talked earlier about the Class 9 consent that was

21  obtained, and no one from Highland reached out to Mr.

22  Daugherty to try to seek his consent.  Right?

23  A    That's correct.

24  Q    Why not?

25  A    Because I didn't want to.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 1691    Filed 11/26/25    Page 365 of 614    PageID 12984

Seery - Cross                                      120

1   Q    Why?

2   A    Because Mr. Daugherty is an extremely difficult person to

3   deal with.  The last time I dealt with Mr. Daugherty on the

4   phone with respect to anything, I had extreme difficulty and

5   got sucked into a stalking lawsuit that I had to testify to

6   that is a complete mess that I want nothing to do with.  So

7   originally my counsel said, have no communication with him.

8   But with respect to this, we were objecting to his claim.  We

9   knew he would try to hold this up.  You have tried to do that

10  and demanded $20 million.  So that's why we didn't reach out

11  to you.  We just paid the 9 and we have a fully-reserved

12  amount on the 8.

13  Q    You thought that the stalking case that you were pulled

14  into was completely fabricated, didn't you?

15  A    I thought that at the time.  I'm not as sure anymore.

16  Q    Oh, really?

17  A    Yeah.

18  Q    Okay.  And you actually also told Mr. Daugherty that Mr.

19  Ellington, who brought that case, was a complete liar and POS,

20  right?

21  A    I don't know if I used POS, but I do not think Mr.

22  Ellington is an honest person.

23          MR. MORRIS:  Your Honor, at some point I'm going to

24  on relevance grounds.  I think we've got a settlement

25  agreement before the Court that we're trying to get approved

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 1691    Filed 11/05/21    Page 366 of 614    PageID 12395

Seery - Cross                                    121

1    today, not to take discovery on any other matters.

2              THE COURT:  Okay.  I'm going to overrule to the

3    extent there was an objection, but I think it's appropriate to

4    worry that we're straying down a road that is not relevant.

5    So, --

6              MR. YORK:  Understood.

7              THE COURT:  -- reign it in.

8              MR. YORK:  All right.

9    BY MR. YORK:

10   Q    You'd agree that the -- under the terms of the proposed

11   settlement, there will be some interim distributions will be

12   made to the HMIT entities in cash totaling approximately $23

13   million.  Correct?

14   A    Not necessarily, no.

15   Q    Why not?

16   A    Because there's an initial distribution.  I believe it's

17   $10 million.

18   Q    Yes.

19   A    And then subsequent distributions are predicated on

20   whether there are threats, either outstanding litigation or

21   threats as defined in the agreement.

22   Q    And so long as those threats don't occur, then those

23   interim -- those additional interim distributions will be

24   made, right?

25   A    Yes.  The Indemnity Trust would make those distributions

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 367 of 614   PageID 12314

Seery - Cross                                        122

1   at those times, and then I have to make -- it's a double

2   trigger, because it has to be no threats and I have to

3   determine that the Indemnity Trust had sufficient assets to

4   meet its obligations for both actual and contingent

5   indemnification obligations.

6   Q    But at a minimum, the HMIT entities will receive at least

7   $10 million?

8   A    Yes.

9   Q    On an interim basis?

10   A    Yes.

11   Q    All right.  And you'd agree with me that, under the terms

12   of the plan, the plan provides that the classes get paid in

13   order of priority, correct?

14   A    That's correct.

15   Q    All right.  And if you turn to Daugherty Exhibit 4, which

16   is the confirmation order, at Page 45.  And Subsection A there

17   in the middle of that has a sentence that says:  Accordingly,

18   as the holders of the equity -- excuse me.  Strike that.  Let

19   me start over.  Are you there yet, Mr. --

20   A    Now I am.

21   Q    All right.  Accordingly, as the holders of equity

22   interests that are junior to the claims in Class 8 and Class 9

23   will not receive or retain under the plan on account of such

24   junior claim interest in any property unless and until the

25   claims in Class 8 and Class 9 are paid in full, plus

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/25/25   Page 368 of 614   PageID 12947

Seery - Cross                                      123

1    applicable interest, --

2        Did I read all that correctly?

3    A    Yes.

4    Q    Okay.  And the term "Claim" there is a capitalized term,

5    right?

6    A    Yes.

7    Q    It's not -- it doesn't say allowed claims.  It just says

8    claims.  Right?

9    A    That's correct.

10   Q    All right.  All right.  Now, if you'd turn with me to the

11   Claimant Trust Agreement, which is Daugherty Exhibit 5, and go

12   to Section 5(c).  Excuse me.  5.1(c).  I apologize.

13   A    Yes.

14   Q    And this is -- this is -- relates to the contingent trust

15   interests associated with the Class 10 and Class 11 limited

16   partnership interests in Highland, correct?

17   A    Generally, yes.

18   Q    All right.  And you'd agree with me that, in the -- about

19   four lines down, it says:  The Claimant Trustee shall allocate

20   to each holder of allowed Class 10-B and C limited partnership

21   interests and each holder of allowed Class 11 Class A limited

22   partnership interests a contingent trust interest equal to the

23   ratio that the amount of each holder's allowed Class 10 or

24   Class 11 interest bears to the total amount of the Class 11 or

25   -- Class 10 or Class 11 interest, excuse me, as applicable

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 369 of 614   PageID 12918

Seery - Cross                           124

 1   under the plan.

 2       Did I read all of that correctly?

 3   A   I believe you did, yes.

 4   Q   All right.  And under the terms of the proposed

 5   settlement, the HMIT entities are getting an allowed Class 10

 6   interest, correct?

 7   A   That's correct, yes.

 8   Q   All right.  And then the next sentence goes on to say:

 9   The contingent trust interest shall not vest and the equity

10   holder shall not have any rights under this agreement unless

11   and until the Claimant Trustee files with the Bankruptcy Court

12   a certification that all GUC beneficiaries have been paid

13   indefeasibly in full, including, to the extent applicable, all

14   accrued and unpaid postpetition interest consistent with the

15   plan and all disputed claims have been resolved.  The GUC

16   Payment Certification.

17       Did I read that correctly?

18   A   You did, except you used the article "The" before

19   "contingent trust interest" at the start of the sentence.

20   Q   Fair enough.  And the GUC beneficiaries there would be the

21   general unsecured creditor beneficiaries, correct?

22   A   That's correct.

23   Q   And this certification has not been issued yet by the

24   Claimant Trustee in this bankruptcy, correct?

25   A   That's correct.

 1   Q   In part because of Mr. Daugherty's remaining unresolved

 2   Class 8 claim, correct?

 3   A   In part, yes.

 4   Q   And also in part because of the remaining Class 9 claimant

 5   holders who still have money owed to them on their Class 9

 6   claims?

 7   A   In part, yes.

 8   Q   Okay.  Does the term of the proposed settlement agreement

 9   provide those Class 9 consent holders with releases from the

10   HMIT entities?

11   A   No.

12   Q   It does not?

13   A   No.

14   Q   At all?

15   A   No.

16   Q   Even if they were in their capacity serving as board

17   members for Highland Capital?

18   A   Certain of the Class 9 holders are also on the Oversight

19   Board.  In their capacity as Oversight Board members, yes,

20   they get -- they get broad releases.  UBS, for example, is

21   not.  There are no releases in there for the two UBS entities.

22   Q   Would you now -- you can set that binder aside.  And if

23   you'd turn with me to Exhibit 60 in the -- Highland's exhibit

24   list.

25   A   Six zero?

1   Q    Yes, sir.

2   A    Yes.

3   Q    This is a copy of the tolling agreement extending

4   objection deadline between -- that's on -- dated July 27th of

5   2022 between Mr. Daugherty and Highland Capital Management, LP

6   and Highland Claimant Trust.  Correct?

7   A    Yes.  That's what it appears to be, yes.

8   Q    All right.  If you would, go with me to Page 2 at the

9   bottom.  There is a Footnote #3.  Do you see that?

10  A    Yes.

11  Q    And that footnote relates to, up above, a defined term

12  called a "Reserved Claim," the Reserved Claim being what was

13  discussed earlier in Mr. Daugherty's settlement agreement with

14  Highland, right?

15  A    That's correct, yes.

16  Q    And it states in here that that Reserved Claim means "the

17  contingent and unliquidated claim as referenced in Proof of

18  Claim #205."

19       Did I read that portion of the footnote correctly?

20  A    Yes.

21  Q    All right.  And it goes further to say that the amount

22  listed there of 2.65 million three hundred -- two point six --

23  let me start ever.  $2,650,353 is the amount estimated as of

24  October 23, 2020.  Correct?

25  A    That's correct.

Seery - Cross                                127

1   Q   All right.  It doesn't say it's -- anywhere in there that

2   it's a fully -- it fully reserves that unliquidated contingent

3   claim.  Correct?

4   A   In what you just read, no.

5   Q   All right.  And if you go to Page 1 -- or, I'm sorry, to

6   Page 3, Paragraph 1, the covenant to reserve where Highland

7   agrees to reserve $2,650,353 on account of the reserved claim,

8   does it say anywhere in there that that is -- fully reserves

9   that contingent unliquidated claim anywhere?

10  A   It says exactly what it says.  And you read it.

11  Q   That's not my question.  Does it say --

12  A   I don't -- well, it says, Further agree to reserve $2.650

13  [million] on account of the reserved claim in disputed claim

14  reserve.

15  Q   All right.  Does it say anywhere in there that that is the

16  fully-reserved amount of that claim?

17  A   Not in that sentence, no.

18  Q   Thank you.  All right.

19          MR. YORK:  Your Honor, give me one second.  Let me

20  confer.

21          THE COURT:  Okay.

22      (Pause.)

23  BY MR. YORK:

24  Q   Mr. Seery, UBS is one of the consent holders, Class 9

25  consent holders related to the HMIT settlement.  Correct?

Seery - Cross                                              128

1    A    There are two UBS entities, UBS AG 66 and UBS Securities,

2    LLC.

3    Q    All right.  Did either of those entities sit on the

4    Unsecured Creditors' Committee in this bankruptcy?

5    A    A UBS entity did.  I'm not sure which of those did, or

6    whether it was both with one counsel.  I don't -- there's a

7    UBS entity on that Creditors' Committee.

8    Q    Is the -- are the members of the Unsecured Creditors'

9    Committee within the definition of the Highland released

10   parties under the proposed HMIT settlement?  Do you know?

11   A    I don't know.  The members of the Creditors' Committee, I

12   believe, have exculpation anyway, so I don't -- I don't -- I

13   don't know if it captures the old members of the Creditors'

14   Committee.  I don't -- for example -- I don't think so.  I

15   don't -- I don't know.

16          MR. YORK:  Pass the witness.

17          THE COURT:  All right.  Mr. Lang?

18          THE WITNESS:  Do you have a separate binder?

19          MR. LANG:  No.

20          THE WITNESS:  Okay.  Will you be using Mr.

21   Daugherty's binder?

22          MR. LANG:  No.

23                   CROSS-EXAMINATION

24   BY MR. LANG:

25   Q    All right, Mr. Seery.  Just to be clear, the Class B and C

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/25/25   Page 374 of 614   PageID 12953

Seery - Cross                           129

 1   -- or the Class A interests and the -- of Highland under the

 2   plan, they have 99.5 percent of the -- Highland Capital

 3   Management.  Correct?

 4   A    Could --

 5   Q    Sorry.  The Class B and C --

 6   A    Limited partnership interest.

 7   Q    -- shareholder -- limited partnership interests were 99

 8   point -- or, were .5 percent of Highland Capital Management?

 9   A    I -- I'm not trying to be difficult.

10   Q    No, it's fine.  It's a terrible -- terrible --

11   A    I don't -- I just don't -- I don't understand your

12   question.  I apologize.

13   Q    Okay.  So, at the time of the petition, --

14   A    Yes.

15   Q    -- Hunter Mountain Investment Trust owned 99.5 percent of

16   Highland Capital Management?

17   A    It owned 99-1/2 percent of the limited partnership

18   interest in Highland Capital Management.

19   Q    And the remainder -- and HMIT has the Class 10 claims.

20   Correct?

21   A    You said something, the remainder?  The --

22   Q    Oh, sorry.  The remaining interests are owned by the Class

23   11 claims under the plan.

24   A    The remaining partnership interests are among those

25   entities I testified earlier to, which are Dugaboy, Strand, --

Seery - Cross                        130

1   Q    And Okada?

2   A    -- Mark Okada individually, and two Mark Okada and Pamela

3   Okada trusts.

4   Q    Okay.  And the total assets in the estate right currently

5   you testified are between $65 to $70 million?

6   A    I -- off the top of my head, I don't recall, but it --

7   rough range, it could be in that general vicinity.  That does

8   not include the payments that have to be made to the 9s and

9   expenses.  So I believe there's documents in here that we

10  could go through, if you like.

11  Q    And I believe you testified that the remaining unpaid 9s

12  are owed approximately $20 million?

13  A    Approximately $20 million, yes.

14  Q    Okay.  And the plan does not say that the equity claims

15  for Class 10 and 11 are to be determined by the capital

16  account values of the limited partnership interests in the

17  Debtor LP?

18  A    That's correct.  It says to set an amount.  It doesn't

19  tell you how to do the amount.

20  Q    Okay.  And under the settlement agreement, Class 10

21  interests will be allowed in the amount of $336,940,230.58?

22  A    Approximately $336 million, yes.

23  Q    $336 million.  Fair.  And this is the capital account

24  balance as of -- HMIT's capital account balance as of the

25  petition date, less, I believe, the HMIT note?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/03/25   Page 376 of 614   PageID 12395

Seery - Cross                                    131

1   A      That's correct.  So that amount is the net amount.

2   Q      The net?  And do you know how the capital account balances

3   were calculated --

4   A      Yes.

5   Q      -- on the petition date?

6   A      Yes.

7   Q      And how were they calculated?

8   A      So, you take the 2018 year-end capital account amount, and

9   then there's activity in the company that gets passed through

10  through the partnership.  The partnership agreement -- in this

11  instance, the prepetition Debtor partnership agreement passed

12  through profits and losses on a pro rata basis.  There was

13  activity in the first half of the year that affected that

14  capital account.  You can see that reflected in the year-end

15  auditeds as well as the K-1 statement that -- for 2018 that

16  was given to HMIT.  That would be their 2018 year-end.  That

17  then, from an accounting perspective, was used and brought

18  down to the petition date.  And between the petition date and

19  year-end 2019, there was additional capital activity, the

20  biggest one of which was the reserve -- full reserve for the

21  $50-plus million for the HMIT note.  And so then you'll see

22  the 2009 auditeds that are signed off by Mr. Waterhouse.  And

23  in those interim months, then you also see the gross amount of

24  the partner capital each month in the monthly operating

25  reports.

Seery - Cross                              132

1   Q    And correct me if I'm wrong, but I believe you testified

2   that the capital account balances continued to go down after

3   2019.  So you have the petition date, you have the next year,

4   and did they continue to --

5   A    I don't think I testified to that.  What I testified to is

6   that there was economic activity in 2019 that affected the

7   year-end '18 to the petition date.  And then from the petition

8   date there was year-end activity -- there was activity from

9   the petition date to year-end '19 that would affect the

10  capital account as reflected in the 2018 auditeds -- they

11  weren't auditeds -- 2018 tax returns signed off by Waterhouse.

12  The biggest part of that activity was the application or the

13  reserve for the Hunter Mountain Note.

14  Q    And was there any activity after the 2019 tax return?

15  A    There was postpetition activity in the partnership,

16  certainly.

17  Q    And did it reduce the capital accounts during those years?

18  A    I assume it would have reduced all of the capital accounts

19  pro rata.

20  Q    Okay.  And why'd you use the petition date as the date to

21  determine the value of the capital accounts?

22  A    Because this is bankruptcy and that's the date on which

23  you fix all your claims and interests.

24  Q    If you used -- have you ever used equity ownership

25  percentages to determine the payment to the equity versus

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 1691    Filed 11/12/25    Page 378 of 614    PageID 12925

Seery - Cross                                    133

```
 1   their capital account balances?

 2   A    In this case, or elsewhere?

 3   Q    Elsewhere.

 4   A    I think that's standard.  I can't cite you a specific

 5   thing, but typically when a partnership liquidates or a

 6   partnership is sold, amounts get distributed pursuant to the

 7   capital accounts and -- and -- in up to amounts in the capital

 8   accounts.

 9   Q    You would agree, if you use the percentage of ownership,

10   being 99.5 percent for Class 10 and the .5 percent for Class

11   11, would potentially leave money for the Class 11 creditors

12   to recover?

13   A    I don't think so.  No, I don't agree with that.

14   Q    Why do you say that?

15   A    Because Class 11 is subordinated to Class 10.

16   Q    Okay.  So explain how, if $60 million exists and you pay

17   $20 million to the Class 9, --

18   A    Roughly.  Yeah.

19   Q    Rough.  Just rough math.

20   A    Okay.

21   Q    That leaves $40 million.

22   A    Okay.

23   Q    Correct?  And if the ownership interests or the allowed

24   claim for HMIT was 99.5 percent, wouldn't that leave .5

25   percent of $40 million for the remaining creditors?
```

Seery - Cross                    134

1   A    That doesn't make any sense, because 99-1/2 percent of a

2   senior thing means you get everything.  So that Class 10 has

3   to be paid in full before the 11.

4        In addition, there's already an agreed-upon amount on

5   HCLOM for $10 million.  So how do I give HCLOM $10 million and

6   99-1/2 percent to somebody else?  There has to be numbers.

7   Q    But to be clear, the plan does not say that the equity

8   claims are determined on capital accounts.  Correct?

9   A    That's correct.

10  Q    All right.

11            MR. LANG:  No further questions.

12            THE COURT:  All right.  Any redirect?

13            MR. MORRIS:  Just one moment, Your Honor.

14       (Pause.)

15            MR. MORRIS:  We have no questions, Your Honor.

16            THE COURT:  All right.  Any redirect from --

17            MR. PHILLIPS:  No, Your Honor.  Thank you.

18            THE COURT:  -- the one question?

19       Okay.  Thank you, Mr. Seery.  You are excused from the

20  witness box.

21            THE WITNESS:  Thank you, Your Honor.

22       (The witness steps down.)

23            THE COURT:  Okay.  I'm going to again take proposals.

24  I can live with a 30-minute lunch break.  I and my staff can.

25  But it's easier for us than all of you.  So do you all want to

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691 mented 1 Page 2535 of Page 3807 of 6178   PageID 122359

135

```
 1   negotiate for more?

 2           MR. MORRIS:  I just wanted to let the Court know

 3   that, with that, the Movants rest.  We're not -- we're not

 4   going to call anybody else.

 5           THE COURT:  Okay.

 6           MR. MORRIS:  We reserve the right to cross-examine.

 7   We reserve the right to call rebuttal witnesses, including Ms.

 8   Deitsch-Perez and Mr. Dondero, depending on what testimony is

 9   elicited.  So we reserve the right to call rebuttal witnesses.

10   But we're not calling anybody further on our direct case, and

11   we rest.

12           THE COURT:  Okay.  So let me --

13           MR. MORRIS:  I'll let them --

14           THE COURT:  -- follow up on that point.

15           MR. MORRIS:  Uh-huh.

16           THE COURT:  There had been a discussion of Mr.

17   Patrick.

18           MR. MORRIS:  Uh-huh.

19           THE COURT:  Limited to one total hour.  Thirty

20   minutes collectively, Debtor and HMIT.  Thirty minutes

21   collectively, Dugaboy and Daugherty.

22           MR. MORRIS:  You know what, Your Honor.

23           THE COURT:  You're -- you're not asking --

24           MR. MORRIS:  No, maybe I -- I forgot that you had

25   told us we could do it, too.  So let's take the lunch break,
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 691   Filed 11/05/25   Page 381 of 614   PageID 122240

136

```
 1    let us figure it out, we'll let you know when we come back.

 2              THE COURT:  Well, I'm clarifying because I'm deciding

 3    --

 4              MR. MORRIS:  Yeah.

 5              THE COURT:  -- who gets to go first.

 6              MR. MORRIS:  Understood.

 7              THE COURT:  Each witness.

 8              MR. MORRIS:  Understood.

 9              THE COURT:  And I presume --

10              MR. MORRIS:  Understood.

11              THE COURT:  -- the Debtor/HMIT would go first.

12              MR. MORRIS:  Yeah.

13              THE COURT:  And then with regard to Dondero, --

14              MR. MORRIS:  Yeah.

15              THE COURT:  -- you all would go first.

16              MR. MORRIS:  So I withdraw what I said.  Let us

17    confer during the lunch break and we'll figure out who's going

18    first, whether we do rest or whether we put Mr. Patrick on for

19    a short direct.

20              THE COURT:  Okay.  Which leads me to our lunch break.

21    Do people want to negotiate for more than 30 minutes?  I don't

22    want to make someone collapse if --

23              MR. MORRIS:  Thirty minutes, or 1:30?

24              MR. PHILLIPS:  1:30.

25              MR. MORRIS:  1:30, Your Honor.  It's nice and round.
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 382 of 614   PageID 12925

137

```
 1              MR. PHILLIPS:  One clarification, Your Honor.

 2    Because I don't -- I don't -- if one side doesn't take the

 3    half hour, does that go over to the other side, or --

 4              THE COURT:  No.

 5              MR. PHILLIPS:  No?

 6              THE COURT:  I don't think -- I'm just giving --

 7              MR. PHILLIPS:  Great.  Thank you.

 8              THE COURT:  And my law clerk said maybe I was

 9    confusing about that earlier today.

10              MR. MORRIS:  Yeah.

11              THE COURT:  One hour total, but 30 minutes each.  And

12    if one collective team doesn't use the whole 30 minutes, we're

13    not --

14              MR. MORRIS:  Yeah.

15              THE COURT:  -- giving it to the other side.  Okay?

16              MR. PHILLIPS:  That was my question.

17              MR. MORRIS:  Understood, Your Honor.

18              THE COURT:  And while I'll let you all discuss

19    whatever you want, what I envisioned is you all would go first

20    with Mr. Patrick, --

21              MR. MORRIS:  Uh-huh.

22              THE COURT:  -- and then Dugaboy and Daugherty would

23    go first on Mr. Dondero.  But if you all collectively think it

24    makes sense to do something different, I'll hear.

25              MR. MORRIS:  No.  That makes sense, Your Honor.
```

```
1              MR. PHILLIPS:  Thank you, Your Honor.

2              THE COURT:  All right.  So we'll come back at 1:30 --

3              MR. YORK:  Yes.

4              THE COURT:  -- and resume.

5              MR. YORK:  Thank you so much.

6              THE COURT:  Okay.  Thank you.

7              THE CLERK:  All rise.

8      (A luncheon recess ensued from 12:51 p.m. until 1:33 p.m.)

9              THE CLERK:  All rise.

10             THE COURT:  Please be seated.  All right.  We're back

11   on the record in the Highland Capital matter, the Rule 9019

12   motion for approval of a settlement.  When we broke, we were

13   waiting to talk about Mr. Patrick and Mr. Dondero as

14   witnesses.  Are they going -- is Patrick going to be your

15   witness?

16             MR. MORRIS:  No, Your Honor.  We're going to reserve

17   our 30 minutes for rebuttal.

18             THE COURT:  Okay.  Thank you.

19        All right.  I'll hear from the Objectors now.

20        (Pause.)

21             MR. YORK:  Sorry, Your Honor.  I didn't realize they

22   were going to observe.  So, --

23             THE COURT:  Well, yes.  If you understood what I was

24   saying before the break, I presumed they might want to go

25   first with Mr. Patrick, but it was -- you're the one who
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 691-1   Filed 11/26/25   Page 384 of 614   PageID 12963

139

1  wanted him, so if they want to go second, they can go second.

2          MR. YORK:  Well, --

3          THE COURT:  Well, I say "you're."  I'm sorry.

4          MR. LANG:  No, it's okay.

5          THE COURT:  Mr. Lang wanted to go --

6          MR. YORK:  Yeah.  So are we definitely doing Mark

7  Patrick now?

8          MR. PHILLIPS:  No.

9          MR. YORK:  Oh, okay.

10          MR. PHILLIPS:  We just rested.

11          THE COURT:  Okay.

12          MR. MORRIS:  They can call whoever they want.

13          THE COURT:  They have rested.  If you don't want to

14  go forward with any witnesses, you don't have to.

15          MR. YORK:  Oh, we --

16          THE COURT:  But you had wanted to go forward -- you

17  wanted to question Patrick and I said, if he's going to be a

18  witness, then Dondero should also be a witness.  Okay?  And at

19  most an hour collectively for each witness.  If you don't want

20  to call either one of them, you don't have to call either one

21  of them.

22          MR. LANG:  We're going to.  I think that they were

23  just going to call Daugherty first.  I didn't know if you had

24  an order that you wanted to do this in.

25          THE COURT:  Well, no.  I don't care.  I guess I don't

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 6-1   Filed 11/05/25   Page 385 of 614   PageID 12928

140

1    care.  Was Daugherty listed?  I mean, --

2            MR. YORK:  Yes.

3            THE COURT:  I'm sorry.  Did you say Daugherty or

4    Dondero?

5            MR. LANG:  Daugherty.

6            THE COURT:  Okay.  I'm sorry.  So you want to call

7    Daugherty?

8            MR. YORK:  Yes.

9            THE COURT:  And you listed him as a witness?

10           MR. YORK:  Yes.

11           THE COURT:  So you may call Daugherty.

12           MR. YORK:  All right.

13           MR. MORRIS:  Yes.  I --

14           MR. YORK:  We'll call Patrick Daugherty, then.

15           THE COURT:  Okay.

16           MR. MORRIS:  I don't believe Dugaboy did, but --

17           MR. YORK:  Right.

18           MR. MORRIS:  -- if they -- if they want to call him,

19    by all means.

20           THE COURT:  Okay.

21           MR. MORRIS:  Yep.

22           THE COURT:  All right.  Mr. Daugherty, if you could

23    approach the witness box, I will swear you in.  Please raise

24    your right hand.

25      PATRICK DAUGHERTY, PATRICK DAUGHERTY'S WITNESS, SWORN

1          THE COURT:  All right.  Please be seated.

2          THE WITNESS:  Oh, wow.  A lot of water up here.

3          THE COURT:  Plenty of water for everyone.

4                    DIRECT EXAMINATION

5    BY MR. YORK:

6    Q    Good afternoon, Mr. Daugherty.  Could you state your name

7    for the record, please?

8    A    Patrick H. Daugherty.

9    Q    Mr. Daugherty, are you a creditor in the Highland Capital

10   bankruptcy?

11   A    Yes, I am.

12   Q    All right.  And would you turn to, in the Daugherty

13   exhibit binder, turn to Exhibit 1, please?

14   A    Yes.

15   Q    And this is a settlement agreement between you and

16   Highland Capital Management relating to claims -- your proof

17   of claim that you made in this bankruptcy, correct?

18   A    Yes.

19   Q    And we looked earlier.  You were in the courtroom for Mr.

20   Seery's testimony, correct?

21   A    I was.

22   Q    All right.  And we talked in Section 9 about the defined

23   Reserved Claim in there.  Do you remember that?

24   A    I did.

25   Q    All right.  Can you describe what --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/24   Page 387 of 614   PageID 12306

Daugherty - Direct                                    142

1   A    I consider it the Compensation Claim, but yes.

2   Q    Can you describe what the Reserved Claim is?

3   A    Yeah.  Basically, it, background, it dates back to the

4   financial crisis of 2008, 2009.  Highland was on the brink of

5   filing for bankruptcy.  We had a creditor bank led by Bank of

6   America and Scotia, and we were in default.  And so the banks

7   came in, declared default, and basically put a limit or

8   terminated our ability to pay cash bonuses.  And that -- right

9   after Lehman Brothers failed, so call it September 2008 and

10  going into 2009.

11       And the problem with that is we were losing people right

12  and left.  We had about 22 senior-level guys.  We were down --

13  and I say guys.  I think there were some women, too.  But we

14  were down to about 12 people.  And they were trying to stem

15  the tide of people running out of the doors in order to save

16  the value of Highland.  We started the year at about $40

17  billion under management, and by that time, we were -- I think

18  we were as low as $19 or $20 billion under management.

19       Hedge funds were rolling up.  CLOs did fine.  Private

20  equity did fine.  Retail funds were having problems.  And

21  separate accounts were okay.  But we were definitely a firm in

22  crisis and trying to hold on to people.

23       So the nature of this compensation claim, you know, every

24  year, everybody except Dondero and Okada would get what's

25  called a compensations and award letter.  Because Dondero and

000142

Case 19-34054-sgj11 Doc 4296 Filed 06/30/25 Entered 06/30/25 11:25:22 Desc
Case 3:25-cv-01876-K Document 1591 Filed 11/05/24 Page 388 of 614 PageID 12397

Daugherty - Direct                                              143

1    Okada were really the only partners. I think you can kind of

2    see that, given your experience. They were called the

3    founding partners. They were the only ones that got true

4    distributions from the firm annually. Guys like us, you know,

5    the other 12 or so, we got cash bonuses and incentive comp and

6    deferred comp. And, you know, obviously, cash compensation

7    was a big part of our compensation, and they were prohibited

8    from the banks from paying it.

9        So Dondero, with the help of Rick Swadley and some of the

10   other tax people, I don't know if we used out outside firms or

11   not, they came up with this scheme, if you will, where

12   Highland was going to go and use whatever they came up with

13   with the partnerships and whatnot and then generate a tax

14   refund to the senior-level guys. As or in lieu of the cash

15   bonuses that couldn't be paid, they were going to go make

16   these elections and then we were going to get this money.

17       And if you look at our awards agreement, it says you're

18   going to get $x$ amount of money. And it's in the line that

19   historically is the cash bonus.

20       Also, when we got like our email or whatever that year

21   from Patrick Boyce, our CFO, he was like, Congratulations,

22   your bonus this year was $x$. And it was whatever that amount

23   was on your compensation and award letter.

24       Well, several of us had the same accountant, John Garvey,

25   at Bland Garvey. Me, Joe Daugherty, and Davis Deadman. And

1  we took this concept to our accountant and he's like, man,

2  that's really precedent.  And so you guys are going to have to

3  basically protect yourselves from -- sorry, go ahead.  Make

4  your objection.  I'm sure I'm --

5          MR. MORRIS:  I just, I just don't remember what the

6  question was at this point and he's testifying to --

7          THE WITNESS:  Why I got this thing.

8          THE COURT:  It was --

9          THE WITNESS:  My apologies.

10         MR. MORRIS:  -- to conversations and hearsay.

11         THE COURT:  What is the --

12         MR. YORK:  Let me ask a question and I'm going to try

13  to --

14         THE COURT:  -- proof of claim about, was the essence

15  of the question.

16         MR. YORK:  Yeah.  Right.

17         THE COURT:  So I sustain.  We're getting a little

18  narrative, shall we say.

19         THE WITNESS:  My apologies.

20         MR. YORK:  So, --

21         THE WITNESS:  I'll tighten it up.

22  BY MR. YORK:

23  Q   All right.  So, Mr. Daugherty, what you were getting under

24  this scheme, as you describe it, was a cash bonus that was

25  masked as a refund, correct?

Daugherty - Direct                    145

1   A    Look, Highland paid for it however they're going to pay

2   for it.  They're the one who created whatever that they did.

3   But for us, it was a cash bonus.

4   Q    Okay.

5   A    But given that I was -- what I was just alluding to, there

6   were concerns about the tax impacts if the IRS didn't agree

7   with Highland.  And so what we did is we negotiated for and

8   got from Dondero -- really, I mean, Jim ultimately made the

9   decisions at Highland.  He said, look, if you don't -- if this

10  doesn't work, if it doesn't go through, we'll make you whole.

11  And so we got that provision in the compensation and award

12  letter that says if the actual refund deviates materially from

13  the refund, then you'll get substitute compensation.  And that

14  was enough for us, --

15  Q    And --

16  A    -- and that's what led to this claim.

17  Q    And was it your understanding that, in terms of making you

18  whole, that was not just whatever you had to pay back for the

19  refund, but also interest and penalties?

20  A    Yeah.

21            MR. MORRIS:  Objection.  Leading.

22            THE COURT:  Sustained.

23            THE WITNESS:  That's fair enough.

24  BY MR. YORK:

25  Q    What was your understanding as to what that 'make you

000145

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:23-cv-01876-K   Document 1591   Filed 11/26/24   Page 391 of 614   PageID 129340

Daugherty - Direct                           146

1    whole' constituted?

2    A    It was basically to put me and the others back in the

3    position of getting to that number that was listed in the

4    document.  So if there were any interest, penalties, pullbacks

5    from the IRS, then we would be made whole at that -- we'd get

6    back the net of that number.  However, if the IRS was fine

7    with it, we wouldn't get anything.

8    Q    So there's a chance, depending on how the IRS audit turns

9    out, if the IRS says what Highland did was fine, then you

10   don't owe the IRS anything, right?

11   A    Yeah.  That's been a critical thing, that I may not owe

12   the IRS anything, and certainly I wouldn't expect Highland to

13   give me anything.

14   Q    And at that point, what's been reserved as your reserved

15   claim would effectively at that point, from the IRS

16   perspective, the IRS audit perspective, would be a zero dollar

17   amount, right?

18   A    Yeah.  I mean, more so.  I mean, Jim Seery offered to buy

19   me out with an amount of the reserved claim.  And I said,

20   listen, I'm not looking for a windfall here.  What I'm looking

21   for is to be made whole, --

22   Q    Right.

23   A    -- it's my insurance policy on what I earned back in 2008,

24   because the alternative is I will have ended up working for

25   free in 2008, plus have to pay penalties and interest going

Daugherty - Direct                    147

1  forward that could wipe out my net worth.

2  Q    All right.

3  A    So I wanted the insurance policy aspect of it.

4  Q    So you heard Mr. Seery's testimony earlier where he said

5  the total amount you would owe was somewhere in the range of

6  $1.4 to $1.5 million if there was --

7  A    He's wrong about that, if that's what he said.

8  Q    Why?

9  A    At the time -- I think the number he was referencing was

10 in our claim number that I filed back in, I want to say,

11 October 2020.  And the $1.45 million, what was in the

12 compensation -- was the number in the compensation and awards

13 letter.

14     The other number that I spoke about from the gallery out

15 there was one point -- I don't know, whatever the interest --

16 whatever I guessed the interest might be.  And then I didn't

17 have anything for penalties.  So, at that particular time,

18 took those numbers and said, okay, if the IRS says no way on

19 all this, this is what I'd have to pay, not including

20 penalties.

21 Q    All right.  So you've seen today and you listened to the

22 testimony about the footnote in Highland's adversary complaint

23 against you in which they say that the resolution may not be

24 until 2029 of this IRS audit?

25 A    That's correct.  I've heard that.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 393 of 614   PageID 12362

Daugherty - Direct                           148

1    Q    All right.

2    A    I've seen it and heard it.

3    Q    All right.  As you've sat here today, have you done any

4    calculation back of the napkin to try to estimate what your

5    potential exposure would be to the IRS in terms of interest

6    and penalties as a result of that audit dispute if it wasn't

7    resolved until 2029?

8    A    Yeah.  I listened to the judge.  I went and ran '33

9    because that was a number that was just thrown out.  At '33,

10   if it's 2033, it's $7.4 million, and if it's 2029 it's $5.7

11   million.

12   Q    What sort of financial impact would that have on you?

13   A    The latter would pretty much wipe me out.  I'm sorry.  The

14   former would -- the $5.7 million would wipe me out.  The

15   latter would cause me to file for bankruptcy.

16   Q    Okay.  Mr. Seery also discussed his -- that he had heard

17   through the grapevine that the IRS audit had been resolved.

18   Has anyone from Highland ever told you that the IRS audit is

19   resolved?

20   A    No one's told me that from anywhere, anyhow, anyway.

21   Q    Have you had a conver... have you had -- so nobody at all,

22   right?

23   A    No one at all.

24   Q    Have you -- did you have a conversation recently with Kurt

25   Plumer over it?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 394 of 614   PageID 12373

Daugherty - Direct                        149

 1    A    I did.  I had lunch with him at Hillstone.

 2    Q    Did he mention it at all?

 3    A    No.

 4    Q    All right.  Could you turn with me to, in your exhibit

 5    binder, Exhibit 8, please?

 6    A    Yeah.

 7    Q    All right.  Can you just identify for us what this

 8    document is?

 9    A    This is a letter I got from the IRS dated November 20th,

10    2024, basically telling me that the case is open and I may owe

11    money.

12    Q    And specifically, if we look at the first paragraph, it

13    says, "Why You're Receiving This Letter," in bold, right?

14    A    It does.

15    Q    And then below that it says:  We might have to adjust your

16    tax return based on our examination of the Highland Capital

17    Management listed above.

18         Did I read that part correctly?

19    A    Yes.

20    Q    And so is it your understanding that your -- that this is

21    related to the IRS audit of Highland?

22    A    That is my understanding.

23    Q    And that your tax return, your personal tax return may be

24    adjusted as a result of that?

25    A    Mine and my wife's.

Daugherty - Direct                                    150

```
 1    Q    Which would mean you're subject to interests and penalties
 2    as well?
 3    A    As is she.
 4    Q    Okay.  And is this the only letter you've ever received
 5    from the IRS?
 6    A    No.
 7    Q    Related to the Highland Capital Management audit?
 8    A    No.
 9    Q    All right.  Do you receive these periodically?
10    A    Yes.  The initial one came I want to say about five months
11    after we filed the returns in two thousand -- it was for the
12    calendar year 2008, so it was April 15th, 2009, I want to say.
13    Maybe it was -- I think the first one came around October,
14    late October 2009.
15    Q    And --
16    A    Like this.  I can't -- I don't remember it verbatim.
17    Q    Is this the last communication you have received from the
18    IRS relating to Highland's IRS audit?
19    A    This was it.  Yeah.
20    Q    Okay.  Has anyone from the IRS ever told you that an FPAA
21    has been issued --
22    A    No.
23    Q    -- with respect to the Highland's audit?
24    A    No.  I don't even know what that -- I didn't even know
25    what that was.
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 396 of 614   PageID 12335

Daugherty - Direct                              151

 1  Q   And you've never received an FPAA from the IRS, right?

 2  A   I have not.

 3  Q   And you've never -- nobody else has ever sent you an FPAA

 4  related to the Highland audit, right?

 5  A   No.

 6          MR. MORRIS:  I'm being kind, but this is just --

 7          THE COURT:  It's leading.

 8          MR. MORRIS:  -- testifying from the podium.

 9          THE COURT:  Sustained.

10          THE WITNESS:  Yeah.

11  BY MR. YORK:

12  Q   All right.  Mr. Daugherty, would you turn -- we'll switch

13  topics real quick to the tolling agreement.  Would you turn in

14  Volume 1 of the Highland exhibits to Exhibit 60, please?

15  A   Volume 1, and then which one, I'm sorry?

16  Q   Exhibit 60.

17  A   Yeah.  Yes, I'm there.

18  Q   Why did you enter into -- well, back up.  Strike that.

19  Start over.  This is the tolling agreement extending a claim

20  objection deadline between you and Highland Capital and the

21  Highland Claimant Trust as of July 27th, 2022, correct?

22  A   That is correct.

23  Q   And is it your signature on Page 6 or 7 of the document on

24  the left-hand side?

25  A   It appears to be, yes.

Daugherty - Direct                          152

1    Q    All right.  Why did you enter in this tolling agreement?

2    Why did you enter into --

3    A    I'm sorry, what was your question?

4    Q    Why did you enter into this tolling agreement?

5    A    Jim Seery had reached out to me in 2022 and said that they

6    had a problem with -- the Court had an objection deadline that

7    was running and that was somewhat inconsistent with the

8    settlement agreement that we had just gotten approved in early

9    March of 2022 that said they couldn't object, they being

10   Highland, object to the legitimacy or amount of my

11   compensation claim.

12        So he said, look, you know, we're in a little bit of a

13   predicament here.  We can go to the Court or we can try and

14   work this out.  And I'm like, hey, I'm fine to work it out.  I

15   don't want the estate to be burdened or any way.  So we went

16   back and forth on the document, and ultimately I felt that it

17   was the right thing to do.  The spirit of our settlement was,

18   you know, I -- they couldn't -- they couldn't challenge this

19   part of my claim, but the *quid pro quo* was I'm not going to be

20   able to beat them out on a technicality by running in here,

21   saying, ah, the objection deadline, you know, expired.

22        So his solution seemed to be a reasonable one.  And we

23   worked with their counsel, I think Demo and to some degree

24   Morris, to work that out for them.

25   Q    How did the estimate come about in Footnote 3?

Daugherty - Direct                           153

 1  A    I don't know.  Nobody ever asked me about it.  There was

 2  no -- Mr. Morris is right, there was no negotiation about it.

 3  Because, frankly, I didn't see that as my problem.  They had

 4  something to fulfill pursuant to the plan.  And there was no

 5  back and forth on that reserve amount with Seery whatsoever.

 6  He just said, This is what we're doing and, you know, we're

 7  going to put this -- and my perception is I didn't have any

 8  right to challenge it other than what was in my settlement

 9  agreement.  And I looked at that as a one-time right to go and

10  seek an estimate, and I didn't want to do it that early in the

11  process.

12  Q    Would you take a look with me at the last recital that's

13  on Page 3 of the document?  All right.  It says, --

14  A    Oh.  You're going to make me read.  All right.

15  Q    It says:  Whereas, solely to avoid the expense,

16  inconvenience, and uncertainty associated with litigation, and

17  without any party admitting liability, fault, or wrongdoing,

18  or releasing or waiving any rights or defenses with respect to

19  the reserved claim, the parties desire to enter into this

20  agreement to extend the claim objection deadline solely with

21  respect to the reserved claim to January 11th, 2023 at 5:00

22  p.m. Central Time, defined as the Objection Deadline.

23       Did I read that part correctly?

24  A    You did.

25  Q    What was your understanding of this recital provision

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/03/25   Page 399 of 614   PageID 129428

Daugherty - Direct                        154

1  being put in here?

2  A    Well, I think I just kind of summarized it.  There was a

3  problem that the parties didn't, you know, fully recognize

4  could occur that would give me a windfall, and so this was to

5  kind of solve that on an interim basis until we got to a final

6  resolution on this tax refund thing.

7       I mean, the honest truth, God -- Judge.  Not God, Judge.

8  But the honest-to-God's truth is Seery and I had a very good

9  relationship, and we were going back and forth, and his view

10 was that this thing could get resolved in 2022.

11 Q    Did you have an understanding as to whether or not you

12 were reserving all rights with respect to your reserved claim

13 under the terms of the tolling agreement?

14 A    Absolutely I did.  Both in emails and in the document.

15 Q    All right.

16           MR. YORK:  Pass the witness.

17           THE COURT:  All right.  Any cross?  I'm assuming

18 Dugaboy did not have questions.  And, Mr. Daugherty, I should

19 have --

20           MR. LANG:  No, we do not.

21           THE COURT:  Okay.  Thank you.  Cross?

22                     CROSS-EXAMINATION

23 BY MR. MORRIS:

24 Q    Good afternoon, Mr. Daugherty.  Take your time.

25 A    How are you, Mr. Morris?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/25/25   Page 400 of 614   PageID 12943

Daugherty - Cross                                    155

1   Q    Good.  I just have a few questions.  You have been paid in

2   full on your Class 9 claim, correct?

3   A    Evidently, yes.

4   Q    And that Class 9 claim was for $3.7 million, correct?

5   A    I believe it was $3.75 million.

6   Q    Thank you for the clarification.  Do you recall how many

7   payments you received that resulted in your receipt of $3.75

8   million?

9   A    I don't.

10  Q    When you received those payments, did you tell Mr. Seery

11  -- did you send it back to Mr. Seery out of any concern that

12  your Class 8 claim has not been resolved?

13  A    No.

14  Q    When you received those payments, did you object to Mr.

15  Seery or to anybody else that it was improper for the other

16  Class 9 holders to receive the payments when your Class 8

17  claim had not been resolved?

18  A    I had no idea what they were receiving.

19  Q    Did you have any reason to believe that you were receiving

20  a benefit that the other Class 9 claim holders were not

21  receiving?

22  A    Again, I had no idea what they were receiving, so I can't

23  compare the two.

24  Q    Okay.  But it is true that you accepted without protest

25  your Class 9 payments, even though your Class 8 claim had not

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 401 of 614   PageID 12944

Daugherty - Cross                                156

 1  been resolved, correct?

 2  A    I think that's accurate.

 3  Q    Okay.  I think you mentioned in your proof of claim it had

 4  $1.4 million; is that right?

 5  A    Again, I'm cuffing it.  If you could grab it, I'll -- I

 6  want to say it was -- the proof of claim had two components,

 7  as I mentioned.  There was a, as I mentioned, there was the

 8  compensation award amount from my compensation letter of like

 9  $1.475 million.

10  Q    Uh-huh.

11  A    Don't quote me on that, but close enough.

12  Q    Approximate.

13  A    And then an interest component that would take me up to

14  that particular time if the IRS reversed it.

15  Q    Okay.

16  A    But no penalties were included.

17  Q    And that approximately $1.45 million, that's money that

18  you received back in 2009?

19  A    I didn't get that full amount in 2009.  That was -- I

20  don't want to broaden this up too much, but many times what

21  was promised was not what was delivered.  So I got a lesser

22  amount from the IRS.

23  Q    How much less did you receive?

24  A    I want to say, on a net basis, it was just under $1.2

25  million.

Daugherty - Cross                     157

```
 1   Q    Okay.  And so it's true that you've had the benefit of the
 2   $1.2 million for 15 years now?
 3   A    When you say the benefit, what do you mean?
 4   Q    It went into your pocket 15 years ago.
 5   A    Yeah, but it's a contingent liability I have back to the
 6   IRS, so I can't say that it's, you know, not without
 7   reservations.
 8   Q    But you've had possession of that million and a half
 9   dollars now for 15 years, correct?
10   A    Right.  And with it comes an obligation --
11   Q    Okay.
12   A    -- contingent back to the IRS.
13   Q    Your claim is a prepetition claim; is that right?
14   A    What do you mean by my claim?  Are you talking about the
15   compensation one?
16   Q    Yes.
17   A    Yeah.  I mean, that -- that contractual obligation
18   originated in, well, yeah, February 2009.
19   Q    It's not an administrative claim, right?
20   A    I don't believe so, no.
21   Q    It's just -- it's just a claim that existed prior to the
22   petition date.  Fair?
23   A    That is fair.
24   Q    Okay.  With respect to the reserve, you did agree to that
25   amount of the reserve, fair?
```

000157

Daugherty - Cross                                158

<table>
<tr><td>1</td><td>A   I did not.  I mean, I -- I signed the document, but I did</td></tr>
<tr><td>2</td><td>not agree to that amount.</td></tr>
<tr><td>3</td><td>Q   Well, --</td></tr>
<tr><td>4</td><td>A   I did not negotiate for it or anything like that.</td></tr>
<tr><td>5</td><td>Q   Well, but if you turn to Exhibit 60 that you just looked</td></tr>
<tr><td>6</td><td>at, --</td></tr>
<tr><td>7</td><td>A   sure.</td></tr>
<tr><td>8</td><td>Q   -- and you go towards the end of the document, that is</td></tr>
<tr><td>9</td><td>your signature on the first Page 7, right?</td></tr>
<tr><td>10</td><td>A   Yeah.  I've already admitted that.</td></tr>
<tr><td>11</td><td>Q   And Paragraph 1 of the agreement that you signed</td></tr>
<tr><td>12</td><td>specifically set the reserve at the amount set forth in</td></tr>
<tr><td>13</td><td>Paragraph 1, correct?</td></tr>
<tr><td>14</td><td>A   That much is true.</td></tr>
<tr><td>15</td><td>Q   Okay.  And you --</td></tr>
<tr><td>16</td><td>A   You just said, did I agree to it, and I'm like, it was in</td></tr>
<tr><td>17</td><td>the document.</td></tr>
<tr><td>18</td><td>Q   It's in the agreement that you signed, correct?</td></tr>
<tr><td>19</td><td>A   For sure.</td></tr>
<tr><td>20</td><td>Q   Okay.  And you've never asked for that amount to be</td></tr>
<tr><td>21</td><td>adjusted, correct?</td></tr>
<tr><td>22</td><td>A   I've spoken many times to Mr. Seery and told him that it</td></tr>
<tr><td>23</td><td>will need to be adjusted upward as years go by.  We've had</td></tr>
<tr><td>24</td><td>quite a dialogue along those lines.</td></tr>
<tr><td>25</td><td>Q   Okay.  But he's never agreed to do that, correct?</td></tr>
</table>

Daugherty - Cross                           159

 1   A    He said when the time comes, we'll figure out -- listen,

 2   we had a very collaborative relationship up until like the

 3   last year.  And so it was like, hey, I'm not going to press

 4   you.  You don't -- he's fighting off Dondero right and left.

 5   You know, and I'm like, I don't want to get in the middle of

 6   all this.  You go do what you've got to do.  We'll both sit

 7   tight.  In fact, there was dialogue to that very effect.

 8   Q    Uh-huh.

 9   A    And so this was just all part of sitting tight, thinking

10   that the right thing would be done when we got final analysis

11   to this.

12   Q    Okay.  So would you just agree with me that, since signing

13   this agreement, you haven't come to court to seek an

14   adjustment --

15   A    No.

16   Q    -- of the reserve?

17   A    I did not want to be a burden.

18   Q    Okay.  And since signing this agreement back in 2022, you

19   and Mr. Seery have not come to an agreement on any adjustment

20   to the reserve, correct?

21   A    We have not.

22   Q    Okay.  Do you believe that you have claims against

23   Highland's employees?

24        MR. YORK:  I'm going to object on relevance grounds.

25   Also, outside the scope.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/25/26   Page 405 of 614   PageID 12948

Daugherty - Cross                          160

1          THE COURT:  What is the relevance?

2          MR. MORRIS:  We're going to get to the $20 million

3    demand in a moment.  I'm laying the foundation.  But we have

4    anybody on anybody --

5          THE COURT:  But what's the $20 million demand?

6          MR. MORRIS:  I'll get to it in a moment.

7          THE WITNESS:  There's --

8          THE COURT:  I can't figure out if --

9          MR. MORRIS:  I can make a proffer if you'd like.

10         THE COURT:  -- that's relevant.

11         MR. MORRIS:  I can make a proffer, Your Honor.  I'll

12    tell you.  I'll tell you right now.

13       On June 5th, Mr. York called me and said that Mr.

14    Daugherty asserts that he has claims against the Highland

15    employees, and if Highland didn't pay him $20 million he was

16    going to sue them, and he was going to file this objection

17    together with a petition in the Supreme Court opposing

18    Highland's request to stay the issuance of a mandate in the

19    Fifth Circuit.

20         MR. YORK:  First off, if Mr. Morris is going to

21    become a witness, we've got a problem here.  Secondly, any

22    sort of communications between us would be 408.  And third,

23    it's not relevant to the issue we're here on today.

24         THE COURT:  Okay.

25         MR. MORRIS:  My response to that, Your Honor?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-591   Filed 11/05/25   Page 406 of 614   PageID 12949

Daugherty - Cross                    161

 1              THE COURT:  All right.  I'm going to allow a little

 2    latitude, --

 3              MR. MORRIS:  Yeah.

 4              THE COURT:  -- but I'm still unclear --

 5              MR. MORRIS:  It's about -- it's about three

 6    questions.

 7              THE COURT:  Okay.

 8              MR. MORRIS:  It's about three questions.

 9              THE COURT:  You may proceed.

10    BY MR. MORRIS:

11    Q    Do you believe you have claims against Highland's

12    employees?

13    A    Me personally, no.

14    Q    Okay.  Do you -- did you authorize your lawyer to call me

15    and to demand $20 million in exchange for a release and your

16    standing down from filing any objection to this motion?

17    A    I'm not aware that that ever happened.  Nobody demanded

18    anything of you.

19    Q    Really?

20    A    Yeah.

21    Q    Do you know that your lawyer used the number $20 million

22    to me?

23    A    Oh, I've read the emails back and forth between you.

24    Q    So why don't you explain to Judge Jernigan what your

25    understanding is as to what your lawyer meant when used $20

Daugherty - Cross                              162

1    million to me.

2    A    I can't say for sure what he meant, but I can tell you

3    from my perspective what I understood.

4    Q    What did you understand?

5    A    I have another entity that I picked up in the settlement

6    with Highland called the Highland Employee Retention Asset

7    Fund.  And again, pursuant to the settlement agreement, I mean

8    -- I guess supposedly, I guess, when I think about it, I do

9    have claims individually, because it's with me, that

10   agreement.

11        But it said that Highland had to turn over all the books

12   and records of the HERA fund.  And Mr. Morris was on many of

13   those emails.  And they had turned over some of the books and

14   records, but they didn't turn over any of the books and

15   records that implicated Thomas Surgent and David Klos in

16   defrauding HERA in allocating Highland's expenses when they

17   were litigating me, against me, back to HERA.

18        So I do have a settlement agreement with Highland and

19   these employees, but Highland Employee Retention Assets needs

20   their books and records.  And we've made it very clear to you

21   on numerous emails where you, you know, kind of muscled up on

22   us and said this is all you're going to get and tough if you

23   don't like it or whatever.

24        And so the deeper we get into this, we did get discovery

25   from others, we found that Highland's been withholding

Daugherty - Cross                         163

1    material information.

2          So as it relates to -- I mean, you're doing that little

3    squeaky thing, and I think he's a fantastic lawyer, but the

4    reality is you guys have created some damages to HERA that you

5    may be accountable for.  Your clients, not you.

6    Q   Okay.  In the four years since we signed the settlement

7    agreement, you've never asserted a breach of contract claim,

8    have you?

9    A   Well, because we thought you were complying with it.  So

10   if you want to go into the details there, in 2022, we were --

11   asked for more information.  2023, we asked for more

12   information.  2024, we asked for more information.  And so

13   those are continuing breaches.

14         Again, I -- I don't want to go to war with Highland.

15   You're too damn good of an attorney, you're scaring me a

16   little bit.  But --

17   Q   I don't want to.

18   A   You know, listen.  You know I think well of you.

19   Q   I appreciate that.

20   A   But, you know, I mean, I just wanted the information.  I'm

21   not looking to go to war with you guys.  I got enough battles

22   that I've got to fight.  And so, you know, I guess a number

23   was thrown out or whatever.  I don't know the full context of

24   it.  But it wasn't -- it wasn't for this IRS compensation

25   issue.

Daugherty - Cross                    164

1   Q    But what was the -- my last question.  What was the $20

2   million demand for?

3   A    Again, it's just a number.  Y'all were having settlement

4   negotiations.  So, I mean, you work off of it.

5   Q    All right.

6            MR. MORRIS:  I have no further questions, Your Honor.

7            THE WITNESS:  Yeah.

8            THE COURT:  All right.  Any redirect?

9            MR. PHILLIPS:  I have no questions, Your Honor.

10           THE COURT:  All right.  Okay.

11           MR. YORK:  Apologies.  I wanted to make sure.

12           THE COURT:  Yes.

13           MR. YORK:  No redirect, Your Honor.

14                   EXAMINATION BY THE COURT

15           THE COURT:  Okay.  If you've watched Highland

16   hearings, you know the judge sometimes has questions.  I am

17   still trying to understand the 1.4, the 1.2, the 1.475.  I

18   understand broadly that, in essence, a cash bonus was

19   negotiated back in early 2009, I think you said.

20           THE WITNESS:  Yes.

21           THE COURT:  After 2008.  And so that's, in essence,

22   what was contractually negotiated.  But I understand there was

23   a hook, if you will, we're calling it a contingency, whatever

24   word you want to use, where if one day there was an IRS audit

25   and I guess Highland had extra liability for 2008, that this

 1   -- I don't know if I understood it or not.

 2          THE WITNESS:  Do you want me to try and guess what

 3   you're asking, or --

 4          THE COURT:  Try to guess what I'm asking.  Again, I'm

 5   --

 6          THE WITNESS:  The liability -- so, Highland chose to

 7   use this tax scheme as a currency to pay us a cash bonus.

 8   From our perspective, we weren't stupid.  We're like, well,

 9   okay, that's great, but if the IRS says --

10          THE COURT:  Okay, I just want to know what -- you say

11   you were contractually entitled to $1.4 million.

12          THE WITNESS:  That's what I was supposed to get for

13   that bonus year.

14          THE COURT:  Okay.  But there was a tax contingency,

15   if you will, where -- that's where I want you to jump in.

16          THE WITNESS:  So, Highland had a tax problem.  They

17   came up with this mechanism to use whatever they were doing

18   with the IRS to create the cash to pay us a bonus.  We looked

19   at it and said, well, this looks fishy -- by the way, every

20   year before that and after that, I've just gotten a cash

21   bonus.  But for this one year, when the banks are saying, no,

22   no, no, we get this.  And so we looked at this and said, look,

23   this sounds fishy, but if you can't pull it off, we need to be

24   made whole.  I can't be in a situation where here I am in 2025

25   and I may have to pay $5, $6 million to the IRS for the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/26/25   Page 411 of 614   PageID 12540

Daugherty - Examination by the Court                166

1   pleasure of working at Highland.

2          THE COURT:  Okay.  See, that's where my disconnect

3   is.

4          THE WITNESS:  Uh-huh.

5          THE COURT:  Because I thought this all turned on a

6   Highland tax return.

7          THE WITNESS:  Oh, no, no.  So, Highland did the

8   planning and the creation of the scheme, and I guess

9   ultimately it was Highland's tax return, but it flowed through

10  to us as pass-throughs.  K-1s, what have you.

11         THE COURT:  Right.

12         THE WITNESS:  So I guess it's both.

13         THE COURT:  Okay.  You were a partner.

14         THE WITNESS:  Well, that's debatable, too.  That's

15  debatable, too, because I had a --

16         THE COURT:  Okay.  I thought you weren't, but --

17         THE WITNESS:  Well, I wasn't --

18         THE COURT:  But you got -- okay.  Let me just skip

19  to, --

20         THE WITNESS:  Yeah.

21         THE COURT:  -- I guess, the important part.  You did,

22  you got paid?  You said $1.2 million?

23         THE WITNESS:  Yeah.  I got a refund back from the IRS

24  for around that amount.  Slightly under $1.2 million.

25         THE COURT:  So the contingency you are worried about

Daugherty - Examination by the Court                    167

 1   that you think gives you a contingent claim against Highland

 2   is, what, the IRS comes back and says --

 3          THE WITNESS:  And they say, Give us that money back

 4   plus interest plus penalties or we're taking your house.  And

 5   it's a very real threat, because this has gone on, as you've

 6   noted, forever.  And I went from having a one-point-whatever

 7   bonus to possibly having to pay six, seven, eight, I don't

 8   know how long this lasts, million dollars back to the IRS for

 9   an election that was made by them.  As a substitute for paying

10   me a cash bonus the regular way, they did it this way.  And

11   that's why we put and negotiated for that term in the

12   compensation agreement that said, if for whatever reason the

13   actual refund is different, we get made whole.

14          THE COURT:  Okay.  I may be overthinking this, I do

15   do that sometimes, but I'm still, I'm trying to understand why

16   your claim would escalate up to, you know, you said maybe $5.7

17   million if, in 2029, this all plays out with the IRS.

18          THE WITNESS:  That --

19          THE COURT:  Because you've gotten the benefit of that

20   money and --

21          THE WITNESS:  Well, no, because if the IRS says --

22          THE COURT:  -- return on that.

23          THE WITNESS:  Sorry.  I didn't mean to interrupt.

24          THE COURT:  You know what I'm saying?  So I'm trying

25   to figure out why it would grow in the way that you're

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-691   Filed 11/05/25   Page 413 of 614   PageID 12562
Daugherty - Examination by the Court          168

1  suggesting.

2          THE WITNESS:  Can I respond?

3          THE COURT:  Yes.

4          THE WITNESS:  So I've gotten money that the IRS says

5  is not mine.  Right?  And the IRS says --

6          THE COURT:  And you've had the use of it.

7          THE WITNESS:  Oh, yes.

8          THE COURT:  You've presumably invested it and --

9          THE WITNESS:  Well, no, I mean, you can't --

10          THE COURT:  Well, you've had the ability to.  Uh-huh.

11          THE WITNESS:  But you don't want to take risk with

12  something that's not yours, so you're kind of limited, right?

13  But I have, I have that amount of money.  Here's the problem,

14  Your Honor, with that.  If the IRS says, Give us back our

15  money, here's the interest, here's the principal.  Oh, by the

16  way, if it's $7, $8 million, I can't -- I don't have that.

17  I've got to file for bankruptcy in order to give the IRS back

18  money that I'm having to pay them for the pleasure that I had

19  of working for Highland in 2008 when I helped save the company

20  and create a lot of the assets that paid all these people in

21  the room.  MGM Studios, Trussway.

22          THE COURT:  Okay.

23          THE WITNESS:  Okay.

24          THE COURT:  Yeah.  We are going beyond this.

25          THE WITNESS:  Fair enough.

000168

Case 19-34054-sgj11 Doc 4296 Filed 06/30/25 Entered 06/30/25 11:25:22 Desc
Case 3:25-cv-01876-K Document 1591 Filed 11/26/25 Page 414 of 614 PageID 12953

Daugherty - Examination by the Court 169

1     THE COURT: I was just, I'm zeroing in on this

2    because I'm trying to figure out, I mean, it matters to me if

3    that reserve is likely fair enough, the reserve I'm told you

4    agreed to is fair enough. And I'm having trouble figuring

5    out, I mean, if you've had the use of this money for 17 years

6    or whatever that is, why you would get this extra interest

7    add-on that you're -- $5.7 million or whatever it would be.

8    You know, $3 million more.

9     THE WITNESS: Can I answer that question?

10     THE COURT: Uh-huh.

11     THE WITNESS: Because the IRS didn't look at it as my

12    money. They looked at it as their money. And so if you look

13    at the plain language of the compensation award letter, if the

14    actual amount deviates from the amount that was granted, then

15    Highland was going to give me substitute compensation to make

16    me whole. Making me whole includes the penalties and the

17    interest that I would owe the IRS. Because if you look at it

18    any other way, I had to pay money to work at Highland.

19     THE COURT: Do I have that letter in my evidence?

20     THE WITNESS: You should. Drew?

21     THE COURT: Do I? Maybe I'll just cut this off and

22    look at the letter.

23     MR. YORK: It's at Daugherty 2, and it's at the back

24    of --

25     THE WITNESS: There's multiple letters, but this is

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 415 of 614   PageID 12584

Daugherty - Examination by the Court                170

1    one of them.

2              THE COURT:  The letter that you say this claim stems

3    from.

4              THE WITNESS:  Sure.

5              THE COURT:  I'll just cut it off and look at that.

6              THE WITNESS:  Yeah, you can tell her where it is.

7              MR. YORK:  So I think it's at the back of the

8    statement on PD-2.  It's at the last page, Your Honor.

9              THE COURT:  Which one?

10             MR. YORK:  P -- Daugherty 2.

11             THE COURT:  Oh, 2?  I've got emails.

12             THE WITNESS:  P-2?  I don't think so.

13             THE COURT:  Okay.  We can move on.

14             MR. YORK:  That's fine.  We'll work this out.

15             THE COURT:  Before we're done here today, I want to

16   look at the letter to better understand how the claim could

17   grow substantially to --

18             MR. YORK:  Yeah.

19             THE COURT:  -- $5.7 million by 2029.  Okay.  Thank

20   you.

21             THE WITNESS:  Thank you, Your Honor.

22             THE COURT:  You're excused.

23             THE WITNESS:  Oh, I found -- I just found it and then

24   I closed it.

25             THE COURT:  Okay.  Well, you can --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/26/25   Page 416 of 614   PageID 22595

Patrick - Direct                               171

1              THE WITNESS:  My bad.

2              THE COURT:  -- call my attention to it when you find

3     it.

4              THE WITNESS:  All right.

5          (The witness steps down.)

6              THE COURT:  All right.  Your next witness?

7              MR. YORK:  I believe we're calling Mark Patrick.

8              THE COURT:  All right, Mr. Patrick.  All right.

9     Please raise your right hand.

10       MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

11             THE COURT:  All right.  Please be seated.

12         And, Courtney, you're going to start the clock going.  I

13    show 2:12.  I don't know if my clock's right.

14         You may proceed.

15             MR. LANG:  And, Your Honor, may I hand the witness --

16    this is from Mr. Morris' opening.  May I use this as Exhibit

17    3?

18             THE COURT:  Oh, okay.  You're talking about the back

19    page of his PowerPoint?

20             MR. LANG:  Yes.  Org chart.

21             THE COURT:  Yes.  I've got it in front of me.  And

22    for the record, I'm going to put this PowerPoint, even though

23    it's not an exhibit *per se*, as a demonstrative aid in the file

24    for this matter.  And so it's the last item of the Highland

25    PowerPoint.  All right.

Patrick - Direct                    172

1          MR. LANG:  Yes.

2                    DIRECT EXAMINATION

3     BY MR. LANG:

4     Q    Mr. Patrick, does this Hunter Mountain Investment Trust

5     org chart that I just handed you accurately reflect the

6     structure of the Hunter Mountain Investment Trust ownership

7     today?

8     A    Just give me a few moments to review.

9     Q    Sure.

10         MR. LEWIS:  Your Honor, I had mentioned early on that

11    we object to this whole line of questioning because it's

12    outside the scope of the objection of Dugaboy.  And I don't

13    want to interrupt, but I want to make sure that my objection

14    is continuing, because this has nothing to do with the

15    objection presented by Dugaboy.

16         THE COURT:  All right.

17         MR. PHILLIPS:  So we object to the question.

18         THE COURT:  Okay.  So the record will reflect

19    basically a running objection from Hunter Mountain?

20         MR. PHILLIPS:  We would appreciate that, Your Honor.

21         THE COURT:  Okay.  In light of the failure of Dugaboy

22    to disclose Mark Patrick as a witness, as well as the failure

23    to challenge in a written objection his authority.  Okay.  So

24    I recognized that this was quite a persuasive objection, but

25    given the magnitude, I would say, of what is going on here,

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/06/25   Page 418 of 614   PageID 12961

Patrick - Direct                                    173

1    potentially a settlement that could come very close to ending

2    this long-running plan implementation process, I'm erring, if

3    it's an error, I'm erring on the side of allowing this.  All

4    right.  But you have a running objection that the record will

5    reflect if one day there is an appeal.

6              MR. MORRIS:  And, Your Honor, the Highland Claimant

7    Trust and the Highland Litigation Subtrust and Highland

8    Capital Management, LP join Mr. Phillips' objection.

9              THE COURT:  Okay.  Understood.

10             MR. PHILLIPS:  Thank you very much, Your Honor.

11             THE COURT:  All right.

12   BY MR. LANG:

13   Q    Mr. Patrick, have you had time to study this Hunter

14   Mountain Investment Trust org chart?

15   A    Yes, I have.

16   Q    And does this accurately show the ownership structure for

17   Hunter Mountain Investment Trust today?

18   A    I'm not sure, without reviewing the underlying corporate

19   documents on some of these entities that you have listed here.

20   Q    Did you help prepare this chart?

21   A    No.

22   Q    No?  Okay.  So Hunter Mountain Investment Trust is owned

23   by Beacon Mountain, LLC, correct?

24   A    Yes.

25   Q    And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 419 of 614   PageID 129628

Patrick - Direct                                174

1  correct?

2  A    Correct.

3  Q    And CLO Holdco, LLC is owned by CLO Holdco, Limited?

4  A    That's correct.

5  Q    And CLO Holdco, Limited is owned by Charitable DAF Fund,

6  LP?

7  A    Correct.

8  Q    And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?

9  A    The ultimate beneficial owner is DFW Charitable

10  Foundation.  To my -- to the best of my recollection, I would

11  say that appears accurate.  I'm just not a hundred percent.

12  Q    Okay.  And --

13  A    But I am a hundred percent that DFW Charitable Foundation

14  is the ultimate beneficial owner.  And I'm a hundred percent

15  that Dugaboy Investment Trust has no interest in it.  And I'm

16  also a hundred percent that The Dallas Foundation or any --

17          MR. LANG:  Judge, I haven't asked --

18          THE WITNESS:  -- or any other nonprofit has any --

19          MR. LANG:  -- any of these questions.

20          THE COURT:  Okay.  There's an objection,

21  nonresponsive.  I sustain.

22  BY MR. LANG:

23  Q    Mr. Patrick, before December of 2024, Charitable DAF Fund,

24  LP was owned by Charitable DAF Holdco, correct?

25  A    (Pause.)  I'm just waiting for a relevancy.  I don't

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 1691    Filed 11/05/25    Page 420 of 614    PageID 12639

Patrick - Direct                          175

 1  │ understand how that's relevant to my authority --

 2  │        THE COURT:  Okay.  You're not allowed to make a

 3  │ relevancy objection.  Okay.

 4  │        MR. PHILLIPS:  Your Honor, I think the problem is

 5  │ that, if I could, we have made an objection.  And our

 6  │ objection, our running objection is founded on relevancy and

 7  │ founded on improper process.  So I would like to just tell the

 8  │ Court, and so my client representative can hear it, that the

 9  │ fact that I'm not standing up every time there's a problematic

10  │ question, --

11  │        THE COURT:  Okay.

12  │        MR. PHILLIPS:  -- because every question is

13  │ problematic, my objection is being maintained to every

14  │ question that's being asked.

15  │        THE COURT:  Okay.  You understand that, right?

16  │        THE WITNESS:  I --

17  │        THE COURT:  There's a running relevancy objection.

18  │ You're the witness.  You can't make the objection.  But it's

19  │ on the record for whatever use it might have down the road.

20  │        MR. PHILLIPS:  I have objected to every question

21  │ that's coming in connection with this line of questioning on

22  │ the basis of relevance.

23  │        THE COURT:  I got it.  I think we all have it.

24  │        MR. PHILLIPS:  I'm just --

25  │        MR. LANG:  Understood.

Patrick - Direct                    176

 1              THE COURT:  Yes.  And you're thinking he's eating

 2      into your 30 minutes?

 3              MR. LANG:  Yes.

 4              THE COURT:  Okay.  We've got it.

 5              THE CLERK:  I stopped the time.

 6              MR. LANG:  So -- thank you.

 7              THE COURT:  Did you stop the time for a minute?

 8              THE CLERK:  Yes, I did.

 9              MR. LANG:  Thank you.

10              THE COURT:  Okay.

11      BY MR. LANG:

12      Q    So, to my question, before December of 2024, Charitable

13      DAF Fund, LP was owned by Charitable DAF Holdco, correct?

14      Charitable DAF Holdco, Limited?

15      A    And where is that on the chart?

16      Q    I'm asking, before December of 2024, Charitable DAF Fund,

17      LP was owned by Charitable DAF Holdco, Limited.

18      A    Can you show me a corporate document so I know the precise

19      corporation you're referring to?

20      Q    You're the -- you are the manager of -- or the control

21      person of CDHGP Limited, correct?

22      A    Again, I'd have to refresh my recollection, but I am the

23      control person over CDMC.

24      Q    Okay.  And CDMC --

25      A    As well as Charitable DAF Fund.  I'll represent that to

 1   you.

 2   Q   Okay.  Was there a transaction in December of 2024 where

 3   Charitable DAF Holdco, Limited sold its interest or

 4   transferred its interest in Charitable DAF Fund, LP to CDMC

 5   FAD, LLC?

 6   A   I know you're trying to help other litigation and --

 7           MR. PHILLIPS:  Mark.

 8           THE COURT:  Okay.  Nonresponsive.

 9           THE WITNESS:  Your Honor, he's using your time to

10   fish for other litigation to support that --

11           THE COURT:  Okay.  Okay.  We have a running objection

12   to relevance.  I'm going to say that one more time.  Okay.

13   Just answer the question as best you can.

14           THE WITNESS:  I'd have to review the corporate

15   documents to refresh my recollection for that time period.

16   BY MR. LANG:

17   Q   Up until December of 2024, Charitable DAF Fund, LP was

18   owned 100 percent by Charitable DAF Holdco, Limited, wasn't

19   it?

20   A   I don't know what entity you're referring to without a

21   refreshment of corporate documents of that entity.  There

22   could be a lot of entities called that.

23   Q   You're aware that there is a proceeding in the Caymans

24   investigating the December 2024 transaction that sold -- where

25   Charitable DAF Holdco, Limited sold its interest in -- and or

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591 Filed 11/05/25  Page 423 of 614   PageID 129662

Patrick - Direct                          178

 1  transferred its interest in Charitable DAF Fund, LP to CDMC

 2  FAD, LLC?

 3  A    There are several parts to that question.  So the answer

 4  is no.

 5  Q    Are you aware of a proceeding pending in the Caymans

 6  involving Charitable DAF Holdco, Limited?

 7  A    Again, I don't know what entity you're referring to.  Show

 8  me a -- show me a corporate document.

 9            MR. LANG:  Your Honor, this was on the Foundation's

10  exhibit list.  We cross-designated any document designated as

11  an exhibit by any other party in this case.  And I'd like to

12  hand this to the witness.

13            MR. MORRIS:  Which exhibit is it?

14            THE COURT:  Which is -- yes.

15            MR. LANG:  It was on the -- it was on the DAF -- or,

16  the Foundation's exhibit list.

17            MR. MORRIS:  They haven't been admitted into evidence

18  and they've withdrawn their objection.  We object, Your Honor.

19            THE COURT:  Yes, they've not been admitted.

20            MR. LANG:  Okay.  Well, can I --

21            MR. PHILLIPS:  We object to that, Your Honor.  We

22  object to any witness --

23            MR. LANG:  We cross-designated every --

24            THE COURT:  I already discussed at the beginning what

25  we were admitting and that was not disclosed.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 15-1   Filed 11/05/25   Page 424 of 614   PageID 12967

Patrick - Direct                                179

 1            MR. LANG:  Okay.

 2            THE COURT:  As I recall, I said you've only

 3  designated the plan and settlement agreement, and the answer

 4  was yes.

 5            MR. LANG:  Okay.

 6  BY MR. LANG:

 7  Q    And we're aware that the Joint Official -- are you aware

 8  that there is a Joint Official Liquidator appointed over a

 9  Charitable DAF entity in the Cayman Islands?

10            MR. PHILLIPS:  Objection to form.

11            THE WITNESS:  Again, without more specific --

12            THE COURT:  Overruled.  Yes.

13            THE WITNESS:  -- specificity, there could be a

14  thousand different actions that you're referring to, in my

15  mind.

16  BY MR. LANG:

17  Q    Are you aware that the Joint Official Liquidators in the

18  Caymans are investigating transactions involving Charitable

19  DAF Fund, LP and Charitable DAF Holdco, Limited?

20  A    Again, again, I don't specifically know what you're

21  referring to.

22            MR. PHILLIPS:  Your Honor, may I -- excuse me.  I

23  don't know that my running objection includes an objection to

24  form for each of the questions.  This objection is to form of

25  the questions about, quote, --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-591   Filed 11/25/2530 of 2Page 425 of 61478   PageID 129684

Patrick - Direct                    180

1           THE COURT:  What's wrong with the form?

2           MR. PHILLIPS:  -- investigation.

3           THE COURT:  What is wrong with the form of that

4    question?  I'm not clear.

5           MR. PHILLIPS:  My objection to form is that the

6    question is an open-ended question with an undefined term,

7    investigation.

8           THE COURT:  Overruled.  I don't think that's a vague

9    term.  So you may answer.

10          THE WITNESS:  If you show me some document, some

11   complaint or something, I'll be very happy to verify whatever

12   questions related to that.  But just giving me verbal words of

13   entities and names and actions, I don't know precisely what

14   you are talking about.

15   BY MR. LANG:

16   Q    Mr. Patrick, who set up the entities in the Hunter

17   Mountain Investment Trust org chart that is sitting in front

18   of you?

19   A    I'm sorry.  Repeat the question?

20   Q    Who set up the various entities that are in the org chart

21   that is on your -- on the stand?

22          MR. PHILLIPS:  Objection to form.  Set up.  What does

23   that mean?

24          THE WITNESS:  It -- yeah, it's very --

25          THE COURT:  I think we know what it means.  Creating,

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-1   Filed 11/05/25   Page 426 of 614   PageID 12965

Patrick - Direct                                  181

1    perhaps.

2    BY MR. LANG:

3    Q    Created?

4    A    Who?  Are you asking if I created it?

5    Q    Did you participate in creating them?

6    A    Did I participate?  In which ones?

7    Q    CDMC FAD, LLC.

8    A    What do you mean by participate?

9    Q    Were you involved in creating -- did you initiate the

10   creation of CDMC FAD, LLC?

11   A    Lawyers were.

12   Q    Did you engage in any capacity on behalf of any entity?

13   Were you involved in engaging the lawyers to set up CDMC FAD,

14   LLC?

15   A    Yes, I engaged lawyers to set up entities.

16            MR. LANG:  Objection.  Nonresponsive.

17            THE COURT:  Sustained.

18            MR. LANG:  Did you --

19            THE COURT:  He asked about this one particular

20   entity, I think.

21   BY MR. LANG:

22   Q    Did you --

23   A    Which entity, again, did you ask?

24   Q    CDMC FAD, LLC.

25   A    Yes, I believe I hired a lawyer.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 427 of 614   PageID 12970

Patrick - Direct                           182

1   Q   And when did CDMC FAD, LLC become a hundred percent owner

2   of Charitable DAF Fund, LP?

3   A   Around the end of March of 2025.  I believe.

4   Q   And were you involved in the transaction between -- in

5   which CDMC FAD, LLC obtained a hundred percent interest in

6   Charitable DAF Fund, LP?

7   A   What do you mean by involved?  How?

8           THE COURT:  Okay.  I can see what's happening here or

9   I have an impression of what's happening here.  I feel like

10  you're slowing down this process where I've given 30 minutes

11  to this lawyer.  Okay?  And I feel like you're feigning

12  confusion.  I don't mean to be insulting, but that's how it

13  comes across.  Okay?  So I need you to speed up your answers

14  and not be confused about things you shouldn't be confused

15  about.  Okay?

16          THE WITNESS:  Okay.

17          THE COURT:  I feel like it's late 1980s *Dondi*.  Does

18  anyone know what I mean by that?  Okay.  We've been there,

19  done that, in the federal courts, and we don't like the

20  looking at -- you're not looking up at the ceiling.  That's

21  what they did in *Dondi*.  Confusion.  Delay.  Okay?

22      So I don't mean to chastise you.  I'm just telling you

23  that you're going to make us be here a lot longer, and nobody

24  wants that, because I will give him extra time for this.

25  Okay?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/25/25   Page 428 of 614   PageID 12970

Patrick - Direct                                    183

1        THE WITNESS:  Understood.

2        THE COURT:  Thank you.

3   BY MR. LANG:

4   Q    Okay.  So you were involved in the transaction in which

5   CDMC FAD, LLC acquired 100 percent ownership interest in

6   Charitable DAF Fund, LP in or around March of 2025, correct?

7   A    Correct.

8   Q    Who did CDMC FAD, LLC obtain its interests in Charitable

9   DAF Fund, LP from in March of 2025?

10  A    From an -- from an entity called Charitable DAF Holdco,

11  Ltd.

12  Q    Charitable DAF Holdco, Ltd., the entity that I asked about

13  earlier, correct?

14  A    Of the same name.

15  Q    Yes.  And Charitable DAF Holdco, Ltd. has had Joint

16  Liquidated -- Liquidators, Joint Official Liquidators

17  appointed over it in the Cayman Islands, correct?

18  A    Yes.

19  Q    And those Joint Official Liquidators were appointed over

20  Charitable DAF Holdco, Limited in or around May 6th, 2025?

21  A    In May is what I recall.

22       MR. LANG:  Your Honor, we'll pass the witness.

23       THE COURT:  All right.  Do we have any questions?

24       MR. YORK:  No questions, Your Honor.

25       THE COURT:  Okay.  Any cross?

1        MR. MORRIS:  Just briefly, Your Honor.

2                    CROSS-EXAMINATION

3   BY MR. MORRIS:

4   Q    Mr. Patrick, do you know who initiated the proceedings to

5   get the appointment of the Joint Official Liquidators in the

6   Cayman Islands?

7   A    The director and myself, we initially filed for a

8   voluntary joint liquidation in May.

9   Q    And did there come a time when the Cayman court appointed

10  the Joint Official Liquidators?

11  A    Yes.

12  Q    Do you know who asked the court to appoint the Joint

13  Official Liquidators?

14  A    We did, as well as other -- it was an agreement with the

15  participation holders of that entity.

16  Q    And who are the participation holders of that entity?

17  A    It was the DFW Charitable Foundation as a 51 percent

18  holder as well as the Highland Dallas Foundation, Highland

19  Santa Barbara Foundation, and the Highland Kansas City

20  Foundation.

21  Q    And those three foundations that you just mentioned, do

22  you know who controls them?

23  A    Jim Dondero.

24  Q    Is it your understanding that Mr. Dondero was funding the

25  litigation in the Cayman Islands?

Patrick - Cross                                           185

1   A     Yes.

2   Q     The Joint Official Liquidators, are you aware of any

3   statement that they've ever made that you are not authorized

4   to act on behalf of any of the HMIT entities?

5   A     Yeah, they've never made a statement that I'm not

6   authorized to act under any of those entities.

7   Q     Okay.  Did you receive a letter last night that was

8   purportedly authored by the Joint Official Liquidators?

9   A     Yes.

10  Q     Did you review that letter?

11  A     Yes.

12  Q     Did that letter refer to today's hearing?

13  A     Yes.

14  Q     Are you aware of the Joint Official Liquidators making any

15  appearance in this proceeding?

16  A     No, I'm not aware they made any appearance in this

17  proceeding.

18  Q     Based on your recollection of the contents of that letter,

19  did the Joint Official Liquidators challenge your authority to

20  enter into the settlement agreement on behalf of the HMIT

21  entities?

22  A     No, they did not, because there's no ownership interest.

23  Q     Okay.  And what do you mean by that?

24  A     The entity in liquidation owns nothing.  And the DFW

25  Charitable Foundation is the ultimate beneficial owner.

Patrick - Cross                                     186

```
 1   Q    Are you aware that The Dallas Foundation filed an
 2   objection to the settlement agreement on behalf of Empower
 3   Dallas Foundation, the Okada Family Foundation, and Crown
 4   Global?
 5   A    Yes.
 6   Q    Are you aware that that objection was withdrawn?
 7   A    Yes.
 8   Q    Was the withdrawal of that objection the product of
 9   negotiations that your counsel had with lawyers for The Dallas
10   Foundation and Crown Global?
11   A    Yes, it was.
12   Q    Did The Dallas Foundation or Crown Global require you to
13   surrender your control position of the HMIT entities as a
14   condition to the withdrawal of their objection?
15   A    To give up my control?  No.
16   Q    They didn't ask you to do that, did they?
17   A    No.  No.
18   Q    You are the control person for each of the HMIT entities
19   that are party to the settlement agreement, correct?
20   A    That is correct.
21   Q    Are you aware of any requirement in any of the governance
22   documents --
23        MR. CURRY:  Your Honor, I'm not questioning, but I'm
24   going to object to the line of questioning here about what was
25   asked and what was not received into negotiations, because,
```

000186

1   frankly, you're getting an imperfect picture there.  And I

2   don't think it should be misrepresented.  The communications

3   didn't happen with Mr. Patrick.

4           THE COURT:  Okay.  I don't know if that objection was

5   a confidential settlement communications.

6           MR. CURRY:  It's a combination of foundation and that

7   he's going into confidential settlement discussions.

8           MR. MORRIS:  Your Honor, it's a very simple question.

9   I'll ask it again.

10          THE COURT:  Okay.  We'll let --

11  BY MR. MORRIS:

12  Q    To the best of best of your knowledge, Mr. Patrick, did

13  The Dallas Foundation or any of the entities on whose behalf

14  it filed its objection require you to surrender your position

15  as the control person of the HMIT entities in exchange for the

16  withdrawal of their objection?

17  A    No, they did not.

18  Q    Thank you.  Are you aware -- are you familiar with the

19  governance documents for the HMIT entities?

20  A    Yes, I am.

21  Q    Are you aware of any restriction on your ability to act on

22  behalf of those HMIT entities with respect to -- withdrawn.

23  Are you required to obtain the consent of anyone in order to

24  enter into the settlement agreement on behalf of the HMIT

25  entities?

Patrick - Cross                    188

1    A    No, I am not.  I'm the sole authority and control person

2    for that entity.

3    Q    And do you believe that you're entering into the

4    settlement agreement on behalf of the HMIT entities in good

5    faith?

6    A    Yes, I do.

7    Q    Have you received legal counsel before entering into the

8    agreement?

9    A    Yes, I have.

10   Q    Do you believe that you've negotiated the best terms that

11   you could get on behalf of the HMIT entities?

12   A    Yes, I do.

13   Q    Do you believe that you received the information that you

14   believed you required in order to make an informed decision

15   before you entered into the settlement agreement on behalf of

16   the HMIT entities?

17   A    Yes, I did.

18          MR. MORRIS:  I have no further questions, Your Honor.

19          THE COURT:  All right.  Mr. Phillips, anything from

20   you?

21          MR. PHILLIPS:  No questions.

22          THE COURT:  Okay.  Any redirect?

23          MR. LANG:  Briefly.

24          THE COURT:  Uh-huh.

25          MR. LANG:  Your Honor, because they mentioned the

000188

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-31   Filed 11/25/25   Page 434 of 614   PageID 12977

Patrick - Redirect                    189

1   letter of last night from Grant Thornton, the Liquidators, I'm

2   going to offer that into evidence as the letter that we talked

3   about this morning.  But Mr. Morris directly asked him if he

4   reviewed it and asked him questions about it.

5            THE COURT:  Response?

6            MR. MORRIS:  No objection, Your Honor.  Go right

7   ahead.

8            THE COURT:  I'll admit it.

9            MR. LANG:  This is --

10           THE COURT:  Do I have it in my notebook?

11           MR. LANG:  -- Dugaboy --

12           THE COURT:  Okay.

13                    REDIRECT EXAMINATION

14  BY MR. LANG:

15  Q   Mr. Patrick, I've handed you --

16           THE COURT:  We're going to call this Dugaboy 3?

17           MR. LANG:  Dugaboy 3.

18           THE COURT:  Okay.

19      (Dugaboy Investment Trust's Exhibit 3 is admitted into

20  evidence.)

21  BY MR. LANG:

22  Q   Mr. Patrick, I've handed you a letter.  It's from Grant

23  Thornton dated June 24th, 2025.  Do you see that?

24  A   Yes.

25  Q   And is this a true and correct copy of the letter that you

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/28/25   Page 435 of 614   PageID 12978

Patrick - Redirect                                    190

1    received or that you reviewed from the Joint Liquidators that

2    you referred to in your answers to Mr. Morris' questions?

3    A    Well, it's a PDF.  I mean, I'm assuming it's from the

4    Official Liquidators.

5    Q    But this is the letter you were referring to in your

6    testimony a few minutes ago?

7    A    Yes.

8    Q    And do you see on the second paragraph it says that, on

9    May 6th, 2025, the Grand Court of Cayman Islands Financial

10   Services Division appointed Margot MacInnis and Sandipan

11   Bhowmik, each of Grant Thornton Special Services (Cayman)

12   Limited, as the Joint Official Liquidators of the company.  Do

13   you see that?

14   A    Yes.

15   Q    And do you see on the second page, it says:  Since our

16   appointment, we have been diligently investigating these

17   transactions, including a corporate transaction that occurred

18   in or around December 2024 where the company transferred a

19   hundred percent of its interest in the Fund to CDMC FAD, LLC,

20   which resulted in the company being the sole member of CDM and

21   subsequent redemptions of the company's interests in CDM.

22        Do you see that?

23   A    Yes.

24   Q    Is that your understanding of what is happening in the

25   Caymans right now, is investigating these transactions?

Patrick - Recross                          191

1    A     Correct.

2          MR. LANG:  Pass the witness.

3          MR. MORRIS:  May I just have that letter, please?

4          THE COURT:  Any recross?

5          MR. MORRIS:  Yeah, just real brief.

6                      RECROSS-EXAMINATION

7    BY MR. MORRIS:

8    Q     None of the transactions that you were just asked about

9    has anything to do with any of the HMIT entities, correct?

10   A     That's absolutely correct.

11   Q     Okay.  And now that we have the letter in the record, if

12   you could look at the third paragraph.  Do you see --

13   A     Yeah.

14   Q     Do you see it refers to the Highland Dallas Foundation,

15   Highland Santa Barbara Foundation, and Highland Kansas City

16   Foundation?

17   A     Yes.

18   Q     Are those the three entities that you referred to earlier

19   that are, to the best of your understanding, controlled by Mr.

20   Dondero?

21   A     Yes.

22   Q     Okay.  And this is the letter that you said you reviewed

23   and concluded that the Joint Official Liquidators weren't

24   challenging your authority to enter into the agreement on

25   behalf of the HMIT entities; do I have that right?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 437 of 614   PageID 12940

Patrick - Examination by the Court                    192

```
 1   A    Yes.  Yes, you do.

 2              MR. MORRIS:  I have no further questions, Your Honor.

 3              THE COURT:  Okay.  I have a question or two.

 4                      EXAMINATION BY THE COURT

 5              THE COURT:  And again, I apologize if I sounded harsh

 6   earlier.  I recognize different people present different ways

 7   when they testify.  It just appeared to me that maybe we were

 8   slowing things down unnecessarily.  All right?

 9              THE WITNESS:  I apologize, too.  I'm just a little

10   emotionally upset they're using this proceeding for a benefit

11   someplace else.

12              THE COURT:  Okay.  My question, very general

13   question:  Do you think this settlement is fair and equitable

14   as far as HMIT is concerned?

15              THE WITNESS:  Absolutely.

16              THE COURT:  And could you tell me why?

17              THE WITNESS:  Yeah.  There was no obvious pathway for

18   HMIT to, in my mind, to receive the residual interest of the

19   bankruptcy estate without a settlement with the Debtor.

20   Otherwise, it just seemed to me that it would go on forever.

21   And then I balanced that against the existing litigation and

22   the probability of the outcome weighted against the costs, and

23   determined that it made sense from HMIT's perspective to enter

24   into the settlement agreement.

25              THE COURT:  Okay.  And you understand that, as part
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/25/25   Page 438 of 614   PageID 12917

Patrick - Examination by the Court                    193

 1   of this, you're giving up some litigation claims that have

 2   been waged now for a couple of years or more?

 3          THE WITNESS:  That is correct, but I'm also receiving

 4   the Kirschner Litigation, which I did negotiate to receive.

 5          THE COURT:  Okay.  And there was a note that the

 6   estate -- I've heard it called at some point the $57 million

 7   note that HMIT owed Highland, a December 2015 note -- that

 8   basically gets credited against the capital account.  You

 9   understand that?

10          THE WITNESS:  Yes, I do.

11          THE COURT:  Okay.  And then you understand that if I

12   approve this deal, I'm not sure why there's going to be

13   $500,000 to HMIT and then also another $10 million to HMIT,

14   but subsequent payments could get held up if there are

15   litigation threats to the Highland Claimant Trust.  You

16   understand that, correct?

17          THE WITNESS:  Yes, I do.

18          THE COURT:  Okay.  I just, I have to ask.  I'm

19   confused about what's going on here.  I thought that -- well,

20   let me just ask this:  Would you consider yourself crossways

21   with Mr. Dondero now?

22          THE WITNESS:  No, but I'll answer the question.  Upon

23   advice of counsel, I quit Skyview Group.  And upon advice of

24   counsel, I terminated the back office services that Skyview

25   Group was providing to the DAF.

1      THE COURT: Okay. Well, you said you're getting

2 maybe a little emotional because of other litigation. I'm

3 just trying -- I don't understand what all that other --

4      THE WITNESS: Unrelated -- well, unrelated to that.

5 They're clearly trying to use this forum to benefit their

6 Cayman actions. They hired U.S. counsel called Reed Smith,

7 and they've been begging for an organization chart to issue a

8 variety of frivolous lawsuits against the operating DAF

9 entities. So I do apologize, but that's a little upsetting to

10 me because I know we're going to -- that I've just fed them a

11 list of targets in another unrelated matter.

12      THE COURT: Okay. Reed Smith. Here we go again with

13 -- they've made an appearance for Mr. Seery in this

14 litigation.

15      MR. MORRIS: Exactly. And we have raised that issue.

16      THE COURT: Okay.

17      MR. MORRIS: And I'm surprised to hear that they

18 think they still have the ability to do this. But we will

19 pursue that later.

20      THE COURT: Okay. All right. I had nothing further.

21 Thank you, Mr. Patrick.

22    (The witness steps down.)

23      THE COURT: All right. So where are we now? I said

24 that, again, just trying to balance the playing field, if

25 Dugaboy was given the ability to question Mr. Patrick, then I

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 440 of 614   PageID 12983

Dondero - Direct                              195

 1  would allow I guess you want to call it rebuttal in the form

 2  of the Debtor, Reorganized Debtor/Claimant to call Mr.

 3  Dondero.  Do you choose to call him?

 4          MR. MORRIS:  I'm not.

 5          THE COURT:  Oh, and I guess I'll allow you, --

 6          MR. MORRIS:  Yeah.

 7          THE COURT:  -- if you want to put on your client

 8  representative, Mr. Lang.

 9          MR. LANG:  We call Jim Dondero.

10          THE COURT:  All right.  Yes, we are timing.

11      Please raise your right hand, sir, Mr. Dondero.

12  JAMES "JIM" DONDERO, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

13          THE COURT:  All right.  Thank you.  The time is

14  running.

15          THE WITNESS:  Thank you for the time.

16                      DIRECT EXAMINATION

17  BY MR. LANG:

18  Q   Mr. Dondero, do you claim that Mr. Patrick lost authority

19  to enter into the 9019 settlement -- or, the settlement

20  agreement that's the subject of the 9019 motion today?

21  A   Yes.

22  Q   And when do you claim Mr. Patrick lost authority to enter

23  into that settlement agreement?

24  A   I think it's best if I give a timeline.  He left Sky --

25  can I give a --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-1   Filed 11/05/25   Page 441 of 614   PageID 12984

Dondero - Direct                    196

1          MR. PHILLIPS:  Objection, Your Honor.  Nonresponsive.

2          THE COURT:  Overruled.  He can give a timeline.

3          THE WITNESS:  He left Skyview in October, November,

4    walked out the door, never talked to anybody again, never

5    talked to the charities again except through counsel.  Never

6    collected severance, anything else.  Just walked out the door.

7       As part of Skyview's review of what he'd been working on

8    and what was the nature and what might have been happening,

9    they discovered numerous abnormalities.  They discovered--

10          THE COURT:  Do we have an objection?

11          MR. MORRIS:  We do.  We're not going to use this

12   opportunity to smear Mr. Patrick.  If the notion is that the

13   breach of the ability to act with authority occurred in May,

14   he should start his timeline in May.

15          THE COURT:  Well, I assumed he was just giving

16   background to explain.

17          THE WITNESS:  Yes.

18          THE COURT:  So I'll overrule.

19          THE WITNESS:  Thank you.  I'm going to just give you

20   a little bit of background.  Everything that I'm stating is in

21   the public record.  I won't do anything to besmirch Mark

22   Patrick.  It's all in the public record.  It's all in the

23   Cayman pleadings.  But there was affidavits regarding

24   embezzlements by vendors where he would request overbilling

25   and the money sent to his house.

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 1591    Filed 11/25/25    Page 442 of 614    PageID 129851

Dondero - Direct                                    197

1          MR. PHILLIPS:  Your Honor, we're talking about

2    documents outside the scope, not identified, not listed.

3    Objection.

4          THE WITNESS:  It's all --

5          MR. PHILLIPS:  This is not a timeline.

6          THE COURT:  This --

7          THE WITNESS:  It's --

8          THE COURT:  Sustained.  We don't have anything in the

9    record.  This is --

10          THE WITNESS:  Okay.  It's all in the public arena.

11    And so is the insider trading.

12          MR. PHILLIPS:  Objection, Your Honor.

13          THE WITNESS:  So, --

14          THE COURT:  Okay.  I sustain.

15          THE WITNESS:  Okay.  All right.

16       And then, yeah, and then there was monies missing.  There

17    were large amounts of monies missing from the estate.  There

18    was unexplained $16 million of expenses in '23.

19          MR. PHILLIPS:  Objection, Your Honor.  They're --

20          THE COURT:  Okay.  Explain the relevance, Mr. Lang.

21          MR. LANG:  I thought he was just giving a background.

22          THE COURT:  It's getting rather --

23          THE WITNESS:  Okay, Your Honor.  Well, --

24          THE COURT:  -- colorful, shall we say.  All right?

25          THE WITNESS:  Okay.  Without giving specifics

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/25/25   Page 443 of 614   PageID 122962

Dondero - Direct                                198

 1   regarding the embezzlement or --

 2           MR. PHILLIPS:  Your Honor?

 3           MR. MORRIS:  We move to strike, Your Honor.

 4           MR. PHILLIPS:  We move to strike all of this.

 5           MR. MORRIS:  We move to strike all of this.

 6           THE COURT:  Okay.  I grant.  We don't have any

 7   evidence of embezzlement.

 8           THE WITNESS:  Okay.  All right.  Without detailing

 9   any of the bad acts that we -- that it looked like happened

10   from the investigation, we took all the bad acts and all the

11   investigations and we gave them to the three underlying

12   charities.  Let's remember the DAF is a legacy charity I set

13   up 15 years ago, or actually, Mark Patrick did the

14   documentation back when he was a loyal employee.  And it was

15   three -- around $300 million and about $600 million of

16   liability, I mean, legal claims and other things that were

17   meant to be a family legacy, where the donations would help

18   the community.  We've given out more than $50 million over the

19   years.  And the recognition would help our various companies

20   or our families.  That's what it was.  Okay?

21       Went to the three underlying charities who were the

22   beneficiaries of the DAF as it existed:  Santa Barbara, Dallas

23   Foundation, Kansas City.  These are large charities that have

24   been around for a hundred years.  I don't control them by any

25   form or fashion.  As a matter of fact, the Hunts are $4

Dondero - Direct                           199

1  billion out of the $6 billion in Kansas City.  I think I'm a

2  hundred million or whatever.  The DAF was a hundred million.

3  I think the Hunts would be disturbed to hear that I control

4  it.

5      Anyway, so all those charities were beneficiaries.  And so

6  we went to them with all the investigative results.  And at

7  first, they tried to verify, they tried to have an audience

8  with Mark Patrick.  They wanted details.  They wanted what --

9  financials.  They wanted to know what was happening.  And

10 nothing was forthcoming from Mark Patrick.  He didn't think he

11 owed them any fiduciary responsibilities.

12          MR. PHILLIPS:  Objection.  Hearsay.

13          THE WITNESS:  No, that's --

14          THE COURT:  What is the out-of-court statement?  I'm

15 not sure.

16          MR. MORRIS:  Mark Patrick thinks that he doesn't owe

17 any fiduciary duties.

18          MR. PHILLIPS:  They did an investigation.  They tried

19 to do x.  They tried to do y.

20          THE COURT:  Oh, okay.  Technically not hearsay, but I

21 think we're getting --

22          THE WITNESS:  Okay.

23          THE COURT:  -- a little far beyond the subject

24 matter.  So if we could reign it in, please.

25          THE WITNESS:  Okay.  In February, they were noted,

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 691   Filed 11/05/25   Page 445 of 614   PageID 12984

Dondero - Direct                                      200

```
 1    they were notified, or, in particular, Dallas Foundation was

 2    notified that their Empower subsidiary, which owned a hundred

 3    percent of the HMIT interests that we were talking about, was

 4    transferred to an undisclosed company for a million dollars.

 5    Without any transparency, without any understanding of who the

 6    new owner was, they filed for receivership in Cayman.  To the

 7    best of the charity's knowledge and based on all the

 8    documentation --

 9              MR. PHILLIPS:  Your Honor, objection.

10              THE COURT:  Okay.  Let me try to understand the

11    relevance.  Do you think I opened this up by asking if there

12    was a falling out essentially between you and Patrick?  Is

13    that why you're going into this?  Or --

14              THE WITNESS:  No, no, no.  No.  The falling-out is

15    much bigger than this.  But I'm just saying the day

16    receivership was filed was the day Mark Patrick lost

17    authority.  And I think anybody would look at it that way.  It

18    was for liquidation in the Cayman --

19              THE COURT:  Okay.  That's his view and we'll either

20    see the --

21              THE WITNESS:  Okay.

22              THE COURT:  -- documents that support that or not.

23              THE WITNESS:  All right.  So, your -- yes.  Because

24    the question was when do I think he lost authority.  I -- you

25    could make the argument he lost it a lot sooner, because for
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 446 of 614   PageID 12489

Dondero - Direct                    201

 1   months beforehand the charities had written him letters saying

 2   they wanted their assets distributed in kind, they lost faith

 3   in --

 4            THE COURT:  Okay.

 5            THE WITNESS:  Yeah.

 6            MR. PHILLIPS:  Again, Your Honor, objection.

 7            THE COURT:  This is hearsay.  Okay.  I sustain.

 8            THE WITNESS:  Okay.  Well, they did.

 9       So, eventually, and it takes a lot to get four little old

10   ladies at different charities to get together and agree to

11   file a charity in liquidation, but they did in the Caymans.

12   Okay?  And then lo and behold, the response from Mark Patrick

13   was, ha-ha, there are no assets there anymore, I moved them

14   all to my living room --

15            MR. PHILLIPS:  Move to strike, Your Honor.

16            THE WITNESS:  -- at DFW.

17            MR. PHILLIPS:  There's no evidence in the record of

18   this.  There was no evidence of any statement.  Move to

19   strike.

20            THE COURT:  There's not, right?

21            THE WITNESS:  Well, no, there is, because what Mark

22   Patrick --

23            THE COURT:  Sustained.  I don't have it.

24            MR. PHILLIPS:  Your Honor, there is no evidence of

25   any of this.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 447 of 614   PageID 122906

Dondero - Direct                    202

1          THE WITNESS:  Well, Mark Patrick's testimony, he said

2     -- he said that our receivership was right after his

3     receivership.  He had liquidated and taken all the assets out

4     from Dallas, Santa Barbara, and whatever, and moved it all to

5     his charity.  So when we tried -- when the poor charities in

6     Texas in the U.S. tried to file for liquidation, his response

7     was ha-ha.  And there were no assets there, you know, because

8     he had already filed --

9          MR. PHILLIPS:  Objection.

10          THE WITNESS:  He -- he --

11          THE COURT:  Okay, I've sustained the objection to the

12     ha-ha.  Okay.

13          THE WITNESS:  Okay.  But he had, he had filed --

14          MR. PHILLIPS:  Your Honor, please, move to strike.

15          THE COURT:  Okay.  Let's strike everything after that

16     last question.  Ask your next question.

17          MR. LANG:  I don't remember what the first question

18     was.

19     BY MR. LANG:

20     Q    What happened -- or, what's your understanding of the

21     proceedings in the Caymans?

22          MR. PHILLIPS:  Your Honor, objection.  Form.

23     Understanding of the proceedings in the Caymans?

24          MR. LANG:  His understanding is, I mean, his

25     understanding.  What's his endgame?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25 of 2800   Page 448 of 614   PageID 122917

Dondero - Direct                           203

```
 1              THE COURT:  All right.  I sustain.

 2              MR. LANG:  Okay.

 3              THE WITNESS:  The Cayman Islands --

 4              MR. PHILLIPS:  Your Honor?

 5              MR. LANG:  Hold --

 6              THE COURT:  I sustained, so --

 7              THE WITNESS:  Oh, sustained.  Sorry.  Okay.

 8    BY MR. LANG:

 9    Q    What is your endgame with respect to your objection over

10    the authority of Mr. Patrick to enter into the settlement

11    agreement that is subject of the 9019?

12    A    The three charities in the U.S. are affected materially.

13    Dallas Foundation can't make payroll as of October.  Dallas

14    Foundation --

15              MR. PHILLIPS:  Your Honor, I'll object to this

16    testimony.  The Dallas Foundation has withdrawn its objection

17    on behalf of -- Dallas Foundation appearing on behalf of

18    Empower, the Okada Family Foundation, and Crown Global.  The

19    Dallas Foundation is no longer a party here and did not even

20    object in its -- an individual capacity.  Object.

21              THE COURT:  I sustain the objection.  They had an

22    objection.  They withdrew it.

23         Moreover, as I announced early on today, I was really

24    questioning their standing to weigh in.

25         So in light of all of that, I'm not going to allow
```

1   testimony regarding the impact there has been on Dallas

2   Foundation as a result of something Mark Patrick may have

3   done.  Okay?

4          THE WITNESS:  Okay.  I can answer it differently.

5          THE COURT:  Well, wait for your question.  Okay.

6   BY MR. LANG:

7   Q   Well, what -- what is the --

8   A   What is my goal?

9   Q   Well, yes, what is your goal?

10         THE COURT:  Okay.  Yes.  Why are you objecting?  Why

11  is Dugaboy objecting?  How about that?

12         MR. LANG:  Safely.

13         THE WITNESS:  Safely.  Without stating where the

14  assets are or might be, they are not with the three charities

15  they were with a year ago.  They have zero.  And I would like

16  to get those assets back.

17    (Pause.)

18         THE COURT:  Okay.  Go ahead.  I have a couple of

19  questions, but maybe you'll hit on them.

20         MR. LANG:  Oh.

21  BY MR. LANG:

22  Q   Mr. Dondero, are you asking the Court to -- are you

23  objecting to the settlement agreement that is the subject of

24  the 9019, asking the Court to allow the Joint Liquidators in

25  the Caymans to weigh in on the settlement agreement?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/25/25   Page 450 of 614   PageID 12939

Dondero - Direct                    205

1   A   Yes.  Or described a little differently, there's no

2   irreparable harm --

3           MR. PHILLIPS:  Objection.  Nonresponsive.

4   BY MR. LANG:

5   Q   Well, let me ask you this:  Are you asking --

6           THE COURT:  Let him answer.

7           MR. LANG:  Yes.

8           THE COURT:  Go ahead and answer.

9   BY MR. LANG:

10  Q   Go ahead.

11  A   There's no irreparable harm for a bit of delay to get to

12  the bottom of where the assets are and what bad deeds have

13  occurred.

14  Q   Is that the reason why you're objecting, is to delay this

15  for 45 days or so?

16  A   Well, I believe the HMIT million-dollar transaction in

17  February was a steal.  I believe it was a stolen asset that he

18  -- Mark Patrick's trying to monetize.  And I don't believe

19  it's monetized at nearly its fair value.  And so I believe

20  that it needs to be reviewed.

21  Q   Are you asking the Court to -- are you objecting simply to

22  allow the Liquidators in the Caymans time to review this

23  transaction and the settlement agreement?

24  A   Yes.  There needs to be more time.

25  Q   Okay.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/25/25   Page 451 of 614   PageID 122940

Dondero - Cross                    206

     1          MR. LANG:  I'll pass the witness.

     2          THE COURT:  All right.  Cross?

     3                    CROSS-EXAMINATION

     4   BY MR. MORRIS:

     5   Q    Good afternoon, Mr. Dondero.

     6   A    How's it going?

     7   Q    Okay.  You referred to the three underlying charities as

     8   being The Dallas Foundation, The Highland Santa Barbara

     9   Foundation, and The Highland Kansas City Foundation.  Do I

    10   have that right?

    11   A    The three are The Dallas Foundation, Santa Barbara, Kansas

    12   City.  There's a holding company or there's an entity below

    13   it, below each one that I'm on the board of, but it's separate

    14   and distinct from the overall charity.

    15   Q    Okay.  But the ones that are separate and distinct that

    16   have the Highland name, --

    17   A    Yes.

    18   Q    -- those are the ones that you control, correct?

    19   A    No.  I'm on the board.  There's three or four people on

    20   the board.

    21   Q    Okay.  But --

    22   A    But we don't control.  Otherwise, you know, we would have

    23   not recommended the settlement.

    24   Q    Does the Hunt family make their contributions to The

    25   Dallas Foundation, The Santa Barbara Foundation, and The

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 169-1   Filed 11/25/25   Page 452 of 614   PageID 12951

Dondero - Cross                    207

1   Kansas City Foundation, or do they make them to The Highland

2   Dallas Foundation, The Highland Santa Barbara Foundation, and

3   The Highland Kansas City Foundation?

4   A    Most families do it through DAF, so they probably have

5   their own -- they're just involved with Kansas City, as far as

6   I know.  I don't know if they're involved in any of these

7   others.  But they probably have a Hunt Kansas City.

8   Q    But the ones with the Highland name are the ones who

9   initiated the proceeding in the Cayman Islands to get the

10  Joint Official Liquidators appointed over this entity down

11  there, right?

12  A    Yes, I believe so.

13  Q    And you personally funded that litigation, correct?

14  A    The charities can't make payroll.

15  Q    And the charities, did you tell the charities what's

16  happening here?

17  A    Yes.  They're aware.

18  Q    When did you tell the charities what's happening here?

19  A    They've known it for weeks.

20  Q    And they haven't filed any objection in this court,

21  correct?

22  A    They thought it was best for Dallas to file it.

23  Q    And Dallas settled; isn't that right?

24  A    To the surprise of all the other charities.

25  Q    Okay.  So today, there's actually no charity who is

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 453 of 614   PageID 12962

Dondero - Cross                              208

```
 1   objecting to the settlement agreement, correct?

 2   A    Because it was -- she got bludgeoned in depositions over

 3   the weekend and it happened last night and nobody was aware of

 4   it.

 5   Q    I didn't bludgeon anybody.

 6   A    Well, --

 7   Q    I don't bludgeon people.

 8   A    She switched course after a Sunday full-day deposition or

 9   half-day deposition.

10   Q    Okay.  So the charities that you speak of aren't

11   objecting, correct?

12   A    Well, if we had more time.  We only had six hours' notice

13   that Dallas fell away.  I think they probably would object.

14   Q    And you say -- you began to have concerns about Mark

15   Patrick going all the way back to 2023, right?

16   A    2023?  A little bit, yeah.

17   Q    And then you had real concerns in 2024, right?

18   A    Yeah.  I mean, he's an odd duck, but he was really odd

19   towards the end.

20   Q    Did you file a declara... is one of those public documents

21   you mentioned in the Cayman Islands, that's your affidavit,

22   right?

23   A    I believe so.

24   Q    Do you want to grab Binder 3 of 3?

25   A    Sure.
```

Dondero - Cross                    209

1   Q   And turn to Exhibit 119?

2   A   Yes.

3   Q   Okay.  And this is the declara... this is the affidavit

4   that you filed in the Cayman Islands?

5   A   Yes.

6   Q   And if you turn to Page 4, in Paragraph 25 you begin to

7   recite events concerning Mark Patrick that concerned you,

8   correct?

9   A   Yes.  I'm glad you're bringing this into evidence.

10  Q   Yes.  And in the two years since you started having

11  concerns, has anybody sued Mark Patrick for breach of

12  fiduciary duty?

13  A   No.

14  Q   Have you recommended to any of these charities:  Mark

15  Patrick is doing wrong, let's go sue him?

16  A   We were unaware on 90 percent of it until he left.

17  Q   You were aware of everything that's in your declaration.

18  It says in 2023, you have notice of these emails.  Right?  And

19  you did an investigation in 2024, correct?

20  A   Yes.  But it took a while to get the affidavits from third

21  parties.

22  Q   You had the whole investigation done in 2024 and nobody

23  sued Mark Patrick, right?

24  A   We didn't sue him.  Correct.

25  Q   You're just mad that you lost control.  Isn't that right?

1   A    No.

2   Q    Turn to Paragraph 33, please.  You accuse Mr. Patrick of

3   misusing material nonpublic inside information.  Is that

4   right?

5   A    Yes.

6   Q    What material nonpublic inside information did he abuse?

7   A    I wasn't involved in the specifics.  My understanding is

8   that he had an awareness of a tender or some financial

9   transaction and then was providing inside information to

10  attorneys and then had them do something.  But I don't -- I

11  don't know the specifics.

12  Q    Sir, under oath, in this affidavit that you submitted to

13  the Cayman Islands, you accuse Mark Patrick of obtaining and

14  abusing material nonpublic inside information.  Can you just

15  tell Judge Jernigan what you had in mind?

16  A    Whatever it says I have in mind.  I'm just saying I didn't

17  remember the specifics.  I can read it, though, if you'd like

18  me to read it.

19  Q    Well, was it something about a put option?

20  A    Yes.

21  Q    Did he tell The Dallas Foundation that it had a put

22  option?  Does that refresh your recollection?

23  A    I don't remember the details.

24  Q    Do you remember who the counterparty was to the put

25  option?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/06/25   Page 456 of 614   PageID 12995

Dondero - Cross                    211

 1   A    Counterparty.  One of the mutual funds.

 2   Q    Does it refresh your recollection that it was the Dugaboy?

 3   A    No.

 4   Q    Do you remember, sir?

 5   A    I don't remember.

 6   Q    I'm going to try.  I'm going to try and refresh your

 7   recollection.  Do you remember that Mark Patrick suggested to

 8   The Dallas Foundation that it could recover millions of

 9   dollars if it simply exercised the put option with Dugaboy?

10   A    My recollection is it was a mutual fund, and it wasn't

11   millions of dollars, but it would disrupt the transaction that

12   was already in place.  That's my recollection.

13   Q    Okay.

14   A    And I don't see Dugaboy anywhere in here, by the way.

15   Q    I know.  I was wondering if you could just -- I asked you,

16   but it doesn't sound like you know specifically what the

17   material nonpublic --

18   A    Well, --

19   Q    -- inside information is that you accused Mr. Patrick of

20   abusing at that time.

21   A    I know it's been reported.  We can get you the details.

22   Q    Okay.  You, in fact, acted on behalf of HMIT, didn't you?

23   A    Who is HMIT?

24   Q    Apologies.  You personally -- there's no question in your

25   mind that Mark Patrick is the Administrator at HMIT, correct?

Dondero - Cross                                  212

1   A    I'm sorry, I'm drawing a blank on HMIT.  What is HMIT?

2   Q    I apologize.  Hunter Mountain Investment Trust.

3   A    Oh.  Okay.

4   Q    I'm calling it HMIT.

5   A    Okay.  All right.  Sorry.

6   Q    I probably not saying it clearly.  I apologize.  H-M-I-T.

7   HMIT, that's what I call it.  Is there something better that

8   you prefer?

9   A    No, that's fine.  Yeah.

10  Q    Okay.  So HMIT.  Mark Patrick is the Administrator at

11  HMIT, right?

12  A    I believe his status, his dirty hands, I believe he's

13  trying to monetize a stolen asset.

14          MR. PHILLIPS:  Objection, Your Honor.  Nonresponsive.

15          THE COURT:  Sustained.

16          THE WITNESS:  No, I -- I saw it.  I don't agree --

17          MR. PHILLIPS:  Objection, Your Honor.

18          THE COURT:  Sustained.

19          MR. PHILLIPS:  Move to strike.

20          THE COURT:  Granted.

21          THE WITNESS:  I do not agree.

22  BY MR. MORRIS:

23  Q    Okay.  Has he -- he was at one time the Administrator.

24  You would agree with that, right?

25  A    Yes.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 458 of 614   PageID 18017

Dondero - Cross                          213

| | |
|---|---|
| 1 | Q    And did he stop becoming the Administrator in your mind |
| 2 | when the Joint Official Liquidators were appointed? |
| 3 | A    Yes.  I believe. |
| 4 | Q    Okay.  So, in your mind, that's when it happened? |
| 5 | Can you describe for the Court the relationship between |
| 6 | the entity in the Cayman Islands and HMIT? |
| 7 | A    The entity in the Cayman Island, as far as we knew, was |
| 8 | the org structure that all the assets were either in or |
| 9 | controlled by in the organizational structure before all the |
| 10 | HGEQ things that you went over earlier with Mark Patrick. |
| 11 | Q    Okay.  I'm not asking -- it's my fault.  Do you believe |
| 12 | the entity in the Cayman Islands controls HMIT? |
| 13 | A    HMIT was one of the assets that were owned by the |
| 14 | charities until it was moved for a million dollar to who know |
| 15 | who. |
| 16 | Q    And do you know how many layers there are between the |
| 17 | Cayman Islands entity and HMIT? |
| 18 | A    I do not. |
| 19 | Q    Is it fair to -- in your view, do you believe that the |
| 20 | Cayman Islands entity had a direct -- withdrawn.  Do you |
| 21 | believe that the Cayman Islands entity had an indirect |
| 22 | ownership interest in HMIT? |
| 23 | A    We believed it was direct. |
| 24 | Q    Direct.  So it was the owner? |
| 25 | A    Well, it was -- it was the direct before it got moved in |

1   February.

2   Q    Hasn't Beacon always been the owner of -- the beneficial

3   owner of HMIT?

4   A    Then it was Beacon that was moved.  There was -- charities

5   were notified in February that, for $1 million, the HMIT was

6   sold to an undisclosed, unknown person.

7   Q    Do you believe that the entity in the Cayman Islands ever

8   had the ability to control Hunter Mountain Investment Trust?

9   A    Yeah.  It was an asset in the portfolio.

10  Q    And do you believe that that gives it the right to control

11  HMIT?

12  A    Yes.  I think the Liquidators will prove that.  I think

13  they can go back in time on bad acts and bad behavior and they

14  can regroup assets to their rightful owners.

15  Q    So your concern here is not with corporate authority, it's

16  with the bad acts.  Is that fair?

17  A    Well, no.  I think you lose your corporate authority when

18  you're fiducially irresponsible or commit corporate crimes.

19  Q    Okay.  But you've never -- you've never brought a lawsuit

20  accusing him of that.  Fair?

21  A    I think you'll see a litany of stuff come out of the

22  Cayman Islands.

23           MR. PHILLIPS:  Objection.  Nonresponsive.

24           MR. MORRIS:  I'm sure we might someday.

25           THE COURT:  Sustained.

Dondero - Cross                                                      215

1              THE WITNESS:  Yeah.  But, no.  But I have not, no.

2      BY MR. MORRIS:

3      Q    Yeah.  But you personally, have you ever been the

4      Administrator of Hunter Mountain Investment Trust?

5      A    Not that I'm aware of.

6      Q    Have you ever had any role whatsoever with respect to the

7      Hunter Mountain Investment Trust?

8      A    Not that I -- not that I recall.

9      Q    Okay.  Do you recall last December we were here on some

10     litigation concerning HCLOM's scheduled claim?

11     A    You have to give me more of a clue.

12     Q    Remember HCLOM had that $10 million scheduled claim and

13     Highland had filed a bad faith motion and we were all here in

14     court and we wound up settling that matter and HCLOM got a

15     Class 10 interest for $10 million?

16     A    Yes, I vaguely remember that.

17     Q    Okay.  And you were here and you were representing HCLOM,

18     right?

19     A    Okay.  I don't remember specifics, but, yes, go ahead.

20     Q    Okay.  And do you recall that Highland required Hunter

21     Mountain Investment Trust's consent as part of the

22     transaction?

23     A    Vaguely.

24     Q    And you personally authorized that consent back in

25     December, didn't you?

1    A    No.

2    Q    Who did?

3    A    Whoever would have spoke for HMIT at the time.

4    Q    Okay.  Let's take a look at Exhibit 68, please.

5    A    So, Binder 2?

6    Q    Yes, please.

7    A    Sorry, this says Pat Daugherty.  This is 1 of 3.  This

8    one.  Okay.  Did you say 68?

9    Q    Yes.

10   A    It's not in here, either.  68.

11   Q    So you see that's an order of the Court?

12   A    Yes.

13   Q    And this resolves HCLOM's claim?  Take your time.

14   A    I'll leave it in case someone else needs it.  Okay.

15   Q    And do you see on the last page of the document there's an

16   electronic signature by Deborah Deitsch-Perez at the Stinson

17   firm as counsel for Hunter Mountain Investment Trust and

18   Dugaboy Investment Trust?  Do you see that?

19   A    I'm sorry.  I went to the very last page with Mark and I.

20   Is there another page?  Oh, okay.  Yes.  Okay.

21   Q    So you see Stinson has signed both on behalf of you

22   personally and HCLOM, and at the bottom, Stinson and Ms.

23   Deitsch-Perez has also signed on behalf of Hunter Mountain

24   Investment Trust and the Dugaboy Investment Trust?  Do you see

25   that?

Dondero - Cross                        217

1    A    Yes.  But then it's separate on 69, right?

2    Q    Yeah.  We're just looking at 68.

3    A    Okay.

4    Q    Do you know who authorized Ms. Deitsch-Perez to sign her

5    name and tell the Court that the Dugaboy Investment Trust had

6    approved this form of order both as to form and substance?

7    Who acted on behalf of Dugaboy?

8    A    I have no idea.  I hope she keeps it straight when she's

9    signing stuff.

10   Q    Well, on whose behalf are you here today?

11   A    Dugaboy's.

12   Q    And are you a representative of Dugaboy?

13   A    Representative?  I'm primary beneficiary until I pass.

14   Q    And who's the trustee of Dugaboy?

15   A    I believe it's my sister at the moment.

16   Q    Does she know you're here today testifying on behalf of

17   Dugaboy?

18   A    She knows I'm in court.  I didn't -- I wasn't specific.

19   Q    Did you talk to her about the Dugaboy -- does she -- does

20   she even know about the Dugaboy objection?

21   A    I don't know.

22   Q    Okay.  So how about Hunter Mountain Investment Trust?  Do

23   you know who authorized Ms. Deitsch-Perez to sign this

24   document on behalf of Hunter Mountain Investment Trust?

25   A    When was this?  In December or January?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/26/25   Page 463 of 614   PageID 13042

Dondero - Cross                                    218

1   Q    Yeah.

2   A    I'm assuming -- I'm assuming Mark Patrick.

3   Q    Late December.

4   A    I'm assuming Mark Patrick.  But I don't know.

5   Q    Did you hear about a week later that Mr. Phillips called

6   your lawyer and accused her of signing this document without

7   authority from Hunter Mountain Investment Trust's authorized

8   representative, Mr. Patrick?

9   A    In hindsight, he's been in on it for a while, so --

10  Q    What do you mean, he's been in on it for a while?

11  A    I think he knows the plan Mark Patrick's been putting in

12  place for quite a while.

13  Q    But this document was signed without his knowledge or

14  consent; isn't that right?

15  A    I don't know.

16  Q    And you had to sign a new agreement with Mark Patrick as

17  the authorized representative of HMIT.  Didn't you do that,

18  sir?

19  A    I don't know.

20  Q    Okay.  Let's take a look at guess I guess probably Exhibit

21  69.  So this is an intercreditor and participation agreement.

22  Do you see that?

23  A    Yes.

24  Q    And it's dated January 10th, 2025, correct?

25  A    Yes.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-691   Filed 11/05/25   Page 464 of 614   PageID 13073

Dondero - Cross                    219

1   Q    And even though you -- even though Skyview had completed

2   this investigation in which it was alleged that Mr. Patrick

3   misused material nonpublic inside information and he had

4   terminated his relationship with Skyview, you still entered

5   into this agreement with him as the authorized representative

6   of HMIT, correct?

7   A    Those were different work streams, you know, so they were

8   -- but yes.

9            MR. PHILLIPS:  Objection.  Nonresponsive.

10            THE COURT:  Sustained.

11  BY MR. MORRIS:

12  Q    That is -- that is your signature on the last page,

13  correct?

14  A    Yeah.  I mean, --

15  Q    It's a simple question.  That's your signature, right?

16  A    Yes.

17  Q    And you understood that you were signing an agreement with

18  Mark Patrick, correct?

19  A    Yes.

20  Q    And you signed this agreement in order to avoid Mr.

21  Phillips filing a motion in this court for reconsideration of

22  an order that she signed not knowing that Hunter Mountain had

23  given its consent without authority.  Isn't that right?

24  A    No, I had no -- none of that --

25  Q    So what's your memory?  Why do you think you entered into

Dondero - Cross                          220

1   this agreement?

2   A    Because the lawyers put it in front of me as a finished

3   product from what had been going on recently.

4   Q    And you had no understanding of what it was?

5   A    Not with the innuendo and agenda that you were describing.

6   No.  I mean, I just -- I knew what it generally involved.

7   That's it.

8   Q    But you would agree with me that you entered into an

9   agreement knowing that Mark Patrick was signing on behalf of

10  Hunter Mountain, correct?

11  A    Yes.

12  Q    I mean, it's right below your name, right?

13  A    Yes.

14  Q    You couldn't have missed it.

15  A    Yes.  That part, I'll agree with.

16  Q    Okay.  And you signed the agreement with Mark acting as

17  the authorized agent and representative of Hunter Mountain,

18  notwithstanding all of the bad acts that you supposedly were

19  aware of at the time.  Correct?

20  A    Object to aware of at the time.  They were all coming

21  together in parallel work paths.

22          THE COURT:  Okay.

23          MR. PHILLIPS:  Object.  Nonresponsive.

24          THE COURT:  Sustained.  Like I told Mr. Patrick, the

25  witness does not get to object.

000220

1              THE WITNESS:  Okay.

2    BY MR. MORRIS:

3    Q    And just to close the loop, Mr. Dondero, you fully funded

4    The Dallas Foundation's objection, correct?

5    A    And I made additional donations so that they could pursue

6    bad actors and get their money back.

7    Q    You funded the litigation so that The Dallas Foundation

8    could pursue their objection, correct?

9    A    I made additional donations so that they could get some

10   assets back so that they could be a charity again and make

11   donations.

12   Q    Do you get a tax deduction for that donation?

13   A    Yes.

14   Q    Okay.  That's nice.

15        Let's just finish up with the Joint Official Liquidators.

16   Have you spoken to them?

17   A    I do not believe so.

18   Q    Has anybody acting on your behalf spoken with the Joint

19   Official Liquidators?

20   A    I don't know.  I think the Joint Official Liquidators are

21   an accounting firm.  I think they're Grant Thornton.  I think

22   people have spoken to the attorneys down there, but I don't

23   know -- I haven't spoken to Grant Thornton and I don't know if

24   anybody else has.

25   Q    Okay.  Did you see the letter that your counsel marked as

Dondero - Cross                              222

1  the exhibit, the one that was sent last night?

2  A    I've not heard it -- I've not read it, but I've heard you

3  guys read it today.

4  Q    Yeah.  Are you aware of the Joint Official Liquidators

5  saying at any time that they didn't believe Mark Patrick had

6  the authority to enter into the settlement agreement on behalf

7  of the HMIT entities?

8  A    I have not.

9  Q    Okay.

10            MR. MORRIS:  No further questions, Your Honor.

11            THE COURT:  All right.  Mr. Phillips?

12            MR. PHILLIPS:  Yeah.

13            THE COURT:  Wait.  What are we at timewise?

14            THE CLERK:  So their 30 minutes is over.  If you

15  intended to give them 30 minutes for Patrick and --

16            THE COURT:  Yes.  Yes.  They collectively got 30

17  minutes.

18            THE CLERK:  For both of those --

19            THE COURT:  Yes.

20            THE CLERK:  -- witnesses.  Okay.  Yes, they're out.

21            THE COURT:  How much did Mr. Morris use?

22            THE CLERK:  Well, I don't know.  I just was --

23            THE COURT:  No, no, no, no.  30 minutes for each side

24  for each Patrick and Dondero.

25            MR. MORRIS:  About eight minutes.

 1              THE CLERK:  Yes.  Mr. Morris -- I think Mr. Phillips

 2    may have asked one question, but Mr. Morris mostly -- 30

 3    minutes.

 4              THE COURT:  No.  On this witness, Phillips hadn't

 5    gone.

 6              THE CLERK:  No, not this witness.

 7              THE COURT:  Okay.  That's all I care about, this

 8    witness.

 9              THE CLERK:  I don't know this witness.

10              THE COURT:  Okay.  Do you have a question, Mr.

11    Phillips?

12              THE CLERK:  I was doing 30 minutes for the total.

13              THE COURT:  No, no, no, no, no.

14              MR. PHILLIPS:  Your Honor, I can resolve this.  I can

15    resolve this.  We have no questions.

16              THE COURT:  Okay.  Thank you.  Where are we?  Mr.

17    Lang, any redirect?

18              MR. LANG:  I'm not sure.

19              THE COURT:  Okay.

20              THE WITNESS:  The last one.

21              MR. PHILLIPS:  Your Honor, the witness is telling the

22    lawyer what question to ask.

23              THE COURT:  Okay.

24              MR. LANG:  I believe I've already asked, which is the

25    endgame.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/25/24   Page 469 of 614   PageID 18042

Dondero - Redirect                    224

1          THE COURT:  Okay.  Just let's move on.  Anything

2     else?  What was the question?

3                         REDIRECT EXAMINATION

4     BY MR. LANG:

5     Q    Mr. Dondero, what are you looking to accomplish through

6     this objection?

7               MR. PHILLIPS:  Asked and answered.

8               THE COURT:  Sustained.  Sustained.  He did.  He was

9     asked and answered.

10    BY MR. LANG:

11    Q    The endgame in general.

12              MR. PHILLIPS:  Asked and answered.

13              THE COURT:  Answered and answered.  Move on.

14              THE WITNESS:  No, no.  No, I haven't.  No, I --

15              MR. PHILLIPS:  Asked and answered.  Move to strike.

16              THE COURT:  You asked him this on your direct

17    earlier.

18              MR. LANG:  I did.

19              THE WITNESS:  But, in general, regarding the --

20              MR. PHILLIPS:  Your Honor?

21              THE WITNESS:  Not just this.

22              THE COURT:  Sustained.  Ask another question.

23              MR. LANG:  I don't have any more questions.

24              THE COURT:  Okay.  I have a question.

25                         EXAMINATION BY THE COURT

Dondero - Examination by the Court                    225

1          THE COURT:  Here is something that I want to

2     understand.  What I have before me is whether a settlement

3     with Hunter Mountain, a settlement between the Highland

4     entities, the Claimant Trust, the Subtrusts, and the Hunter

5     Mountain entities, seven of them, is fair and equitable, is in

6     the best interest of the estate.  If you were the director,

7     the manager, the representative of Hunter Mountain estate,

8     what would your answer be?

9          THE WITNESS:  It's not in the ZIP Code.

10          THE COURT:  It's not in the ZIP Code?

11          THE WITNESS:  Of fair.  Yes.

12          THE COURT:  Okay.  Why do you think it's not in the

13     ZIP Code of fair?

14          THE WITNESS:  Okay.  We filed in Delaware on a $100

15     million judgment.  Pachulski was our counsel.  They told us --

16          THE COURT:  I know all this.

17          THE WITNESS:  It just --

18          THE COURT:  I'm talking about the settlement in front

19     of me right now.

20          THE WITNESS:  -- we'd be in and out in three months,

21     right?  We got liquidated instead.  We got liquidated for over

22     $850 million, which not enough people talk about.  Okay?  It

23     would've been $950 million if Seery had done a good job, but

24     it was $850 million we got liquidated for.  Okay?  The POCs

25     were pumped up.  People who supposedly had no claim, all of a

Case 19-34054-sgj11  Doc 4296  Filed 06/30/25  Entered 06/30/25 11:25:22  Desc
Case 3:25-cv-01876-K  Document 1-591  Filed 11/05/25  Page 473 of 614  PageID 18044
Dondero - Examination by the Court                    226

 1  sudden, $300 million.

 2      There's $700 million missing or misallocated from the

 3  estate.  Okay?  There was -- all the original creditors, all

 4  the original creditors sold 99 percent of their interest for

 5  $160 million.  The Farallon and Stonehill went to the beach.

 6  There was enough money on the balance sheet.  Seery could have

 7  given them the $160 million and tossed us the keys.  Instead,

 8  he had relations, deep relations, undisclosed business

 9  relationships with Farallon and Stonehill, --

10          THE COURT:  Okay.  I do want you to know --

11          THE WITNESS:  No, but --

12          THE COURT:  -- I've read all this many times.

13          THE WITNESS:  Okay.  But so -- so these --

14          THE COURT:  I promise I read every piece of paper

15  submitted.

16          THE WITNESS:  Okay.  So, so he sold the POCs to them,

17  and it's been -- they've tripled their money in two and a half

18  years.  The professional fees have been $300-odd million.

19  There's interrelationships between all the professionals --

20  Farallon, Stonehill, Grosvenor, the Hellman & Friedman guys,

21  the Millennium guys who took whatever.  All this stuff has to

22  come out.

23      We're on the edge of a giant RICO case eventually.  We're

24  -- that's -- we're on the edge of a giant RICO case.  And they

25  should not be giving up their rights for $10, $20 million.

000226

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 16-1   Filed 11/05/25   Page 472 of 614   PageID 13045

Dondero - Examination by the Court                227

 1 | It's crazy for them to give up their rights at Dallas
 2 | Foundation for 10 or 20 million bucks.
 3 |     There's $700 million missing.  All the original creditors
 4 | sold for $160 million.  The estate was sold for over $850
 5 | million.  Where'd all the money go?  Where'd all the money go
 6 | and why?  You know.
 7 |     We get updates quarterly, once in a while, well, this much
 8 | went out to this law firm, this much went out to this,
 9 | whatever, but no one looks at the gross amount and where'd all
10 | the money go?  And why?  Why did it have to -- why did it have
11 | to go down like that?  Why do we have to fire --
12 |           THE COURT:  Okay.  I know you have an objection.
13 |           THE WITNESS:  -- all the employees?
14 |           THE COURT:  This is narrative.
15 |           MR. MORRIS:  Yeah.  And --
16 |           THE COURT:  I understand all --
17 |           MR. MORRIS:  -- I'm not going to cross-examine him,
18 | but this is -- this is not accurate.
19 |           THE COURT:  I understand all of these arguments.  You
20 | know, I --
21 |           THE WITNESS:  But I'm just --
22 |           THE COURT:  Your lawyers at least know, if you don't
23 | know, that we wrote a 100-plus-page opinion on the motion of
24 | Hunter Mountain to sue for all of this.  Okay?  So I promise
25 | I've heard this and looked at it.  But right now, Hunter

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/26/25   Page 473 of 614   PageID 18042

Dondero - Examination by the Court                    228

1    Mountain, through Mark Patrick, you question his authority,

2    but they are ready to lay down their swords and not pursue

3    that motion for leave to sue based on the claims trading, and

4    --

5            THE WITNESS:  Have you seen all the insider trading,

6    Farallon, Stonehill?  Have you seen the trading and claims on

7    insider information?  Have you seen all that stuff?

8            THE COURT:  I've seen the allegations but I --

9            THE WITNESS:  Well, why would you release all those

10   people right now before the RICO?

11           THE COURT:  So I -- Dugaboy -- you've been asked what

12   is your goal?  Dugaboy a .18 limited partnership interest --

13           THE WITNESS:  Correct.

14           THE COURT:  -- that is subordinated to Hunter

15   Mountain.  I'm just trying to understand the scenario where it

16   makes sense to keep fighting for years to come.

17           THE WITNESS:  Well, RICO transcends this, right?  I

18   mean, RICO brings everybody in.  Until we get --

19           THE COURT:  Okay.  You think it's -- and my question,

20   why is this not fair and equitable and in the best interest of

21   the estate, you think it's better to litigate several more

22   years and maybe have a chance, you know, --

23           THE WITNESS:  At $600 mill.  At $600 million.

24           THE COURT:  -- Hunter Mountain would have a chance to

25   --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 474 of 614   PageID 18043

Dondero - Examination by the Court                    229

1          THE WITNESS:  $600 million.  Yes.

2          THE COURT:  Okay.

3          THE WITNESS:  Versus $20 million now.  But you have

4    to remember, it's all part of -- you have to pay attention to

5    this Mark Patrick stuff.

6          MR. PHILLIPS:  Your Honor?

7          THE COURT:  Okay.  Yes.  I asked my question.  I'm

8    trying to understand why Dugaboy, why its position is this is

9    not fair and equitable and in the best interest and in the

10   range of reasonableness.  Those are the buzz words that a

11   judge has to focus on.

12         THE WITNESS:  It's not fair to the charities.  I

13   still think no one's ever seen --

14         THE COURT:  The charities aren't parties here.

15         THE WITNESS:  Not yet.  Give them a little time.

16   They just heard about the settlement yesterday.

17         THE COURT:  Well, isn't that what the Cayman Islands

18   is all about?  What I do doesn't necessarily affect what's

19   happening there.

20         THE WITNESS:  Well, no, but you're saying they're not

21   here today.  If you delayed this three weeks, they'd be here.

22   It's just a couple --

23         THE COURT:  They were here and they chose to

24   withdraw.

25         THE WITNESS:  One.  One.  Just one charity.  But the

000229

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/26/25   Page 475 of 614   PageID 18054

Dondero - Examination by the Court                    230

1  others, if you give them some time, they'll be here.

2          THE COURT:  Okay.  Okay.  I think you've answered my

3  question, your theory of how this should play out and how you

4  want it to play out.  Okay.  All right.

5          THE WITNESS:  Thank you.

6          THE COURT:  That's all.  Thank you.

7          THE WITNESS:  Thank you for the time.

8          THE COURT:  Uh-huh.

9      (The witness steps down.)

10         THE COURT:  All right.  I think that concludes our

11  evidence, correct?

12         MR. YORK:  Yes, Your Honor.  At least from

13  Daugherty and --

14         THE COURT:  Okay.  The Objectors rest.  Any rebuttal?

15         MR. PHILLIPS:  No, Your Honor.

16         THE COURT:  Okay.

17         MR. YORK:  Your Honor, would it be okay if we took a

18  five-minute comfort break?

19         THE COURT:  Yes.  We may as well turn it into a 10-

20  minute break because that's what's going to happen.  All

21  right.  We'll be back at 3:40.

22         THE CLERK:  All rise.

23     (A recess ensued from 3:30 p.m. until 3:44 p.m.)

24         THE CLERK:  All rise.

25         THE COURT:  Please be seated.  We're back on the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/26/25   Page 476 of 614   PageID 18045

231

1    record in Highland Capital.  I will hear closing arguments.

2    And I dangled something out there before lunch and I've never

3    heard any follow-up.  I guess no agreement with Daugherty

4    could be reached on the reserve?

5         MR. YORK:  Haven't had that conversation, Your Honor.

6         THE COURT:  You didn't have that conversation?  Oh,

7    well.  Why didn't you have that conversation?

8         MR. YORK:  We were, during the lunch break, working

9    busily to prepare the rebuttal to Mr. Seery's testimony, --

10        MR. MORRIS:  Yeah.

11        MR. YORK:  -- Your Honor.  And so --

12        THE COURT:  Okay.  You told me you'd talk about it.

13        MR. MORRIS:  May I proceed, Your Honor?

14        THE COURT:  I guess I don't matter.  Do I not matter

15   when I suggest something like that?

16      Okay.  Go ahead.

17        CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

18        MR. MORRIS:  Good afternoon, Your Honor.  John

19   Morris; Pachulski, Stang, Ziehl & Jones; for Highland Capital

20   Management, LP and the Highland Claimant Trust and on behalf

21   of the Highland Litigation Subtrust.

22      I know that we've got Bob Loigman in the courtroom, but I

23   know that -- at least I hope he joins me in this closing

24   argument.  I suspect he does.

25      I don't want to be too long here, Your Honor.  We don't

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 691   Filed 11/05/25   Page 477 of 614   PageID 18256

232

 1   have a high burden.  This is a 9019 motion, for goodness'

 2   sakes.  I've never been involved in such a contentious 9019

 3   motion in my life.  We had three depositions on Friday.  We

 4   had two on Sunday.  I think we had two on Monday.  For a 9019,

 5   I've had one witness sit multiple times.

 6       It's been an extraordinary experience.  But at the end of

 7   the day, nobody's really challenging the settlement agreement.

 8   You've got people challenging, you know, the Cayman Islands.

 9   You've got people challenging, is it -- you know, can you jam

10   it in under the plan?  We're not jamming anything under the

11   plan.  We're following the plan provisions.

12       Nobody's challenging the bona fides of the motion.  Nobody

13   is challenging whether it's the product of good-faith, arm's-

14   length negotiations.

15       You heard Mr. Seery testify at length about the process.

16   You've got 55 different documents in the record proving that

17   this agreement is the product of arm's-length, good-faith

18   negotiations between parties represented by sophisticated

19   counsel that resulted from an exchange of information, an

20   exchange of proposals, back and forth, and here we are.

21       It's also in the best interests of the estate.  Really not

22   challenged by anybody.  Nobody is contending that Highland is

23   getting a raw deal here.  Nobody.  And the proof that Highland

24   is getting fair consideration and that this settlement is in

25   the best interest of the Claimant Trust and its stakeholders,

1    it's obvious we are terminating costly, wasteful, and I dare

2    say frivolous litigation.  We are disposing of several

3    illiquid assets.  We are getting litigation protections that

4    will inure to the benefit of the released parties, the

5    Highland release parties and it will, we believe, provide the

6    protection that we deserve.

7        It's not just releases.  It's covenants not to sue.  It's

8    all kinds of bells and whistles in there.  Substantial

9    benefits to the estate.  And so nobody's really objecting to

10   that.

11       Nobody's really objecting to the fairness of the

12   settlement to the HMIT parties except for Mr. Dondero, and

13   he's just mad that peace is breaking out.  He's just mad

14   because he's not going to be able to litigate anymore.  It's

15   not relevant to a 9019 motion.  But even if it was, it's

16   ridiculous.  It's just ridiculous.

17       The settlement is fair and reasonable and in the best

18   interest of the creditors.  It's the product of good-faith,

19   arm's-length negotiations.  And on that alone, it should be

20   approved.

21       We've had a lot of testimony today about Mark Patrick's

22   authority.  The only actual evidence that concerns Mark

23   Patrick's authority are the exhibits in the binder and Jim

24   Seery's testimony about the diligence that he did.  And the

25   exhibits in the binder all prove that Mark Patrick has the

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691-1   Filed 11/05/25   Page 479 of 614   PageID 13023

234

1   authority to act and bind the HMIT entities to the settlement

2   agreement.  It's Paragraph 7 of the HMIT trust agreement

3   itself.

4        Did the objecting parties point you to one single document

5   to support their speculative argument, because it's not

6   anything more than that, that somehow Mark Patrick isn't

7   authorized to do this?  There is not a scintilla of evidence

8   that Mark Patrick is not authorized to do this.

9        And if Your Honor had any concerns about Mr. Patrick, I

10  think he answered them at the end.  That he understood exactly

11  what the terms of the agreement are.  That he had a reasonable

12  opportunity to consult with counsel and to negotiate.  That he

13  knows exactly what he's doing on behalf of these entities.

14  That he believes the best path forward from the HMIT entities

15  is to grab the value today instead of letting it waste.

16       We welcome Mr. Patrick to the table.  It makes a lot of

17  sense.  We've been trying to get to this point forever.

18       Mr. Daugherty.  You know, I have no gripes with Mr.

19  Daugherty.  I don't know quite what's motivating him these

20  days, but he admitted and the evidence is clear that when he

21  was a Class 9 claim holder, I forget if it's two or three or

22  four occasions, he accepted $3.7 million in multiple payments,

23  without any concern at all as to whether or not it violated

24  the plan, even though his Class 8 claim had remained

25  unresolved.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-51   Filed 12/25/25   Page 480 of 614   PageID 18039

235

1    He didn't send the money back.  He didn't say, Mr. Seery,

2    you can't do this because it violates the plan.  He knowingly

3    and willingly accepted the benefits of being a Class 9 claim

4    holder.  And now he comes and objects on the basis that

5    somehow it's not fair to him as a Class 8 holder?  This is

6    what we call estoppel.  Right?

7       I wasn't in a position to really make the argument because

8    I didn't quite understand it until today.  Like, how does he

9    come in today and say you can't do this, Your Honor?  You

10   can't allow Class 9 and 10 to get a nickel until he's done,

11   when he himself has accepted millions of dollars before his

12   claim is resolved?  That doesn't sound right to me.  And I

13   don't think the Court should accept that argument.

14      Just quickly, because I don't want to give it any weight,

15   frankly, but this whole business of the Cayman Islands and the

16   JOLs, the only facts Your Honor has to take into account are

17   that they were appointed before this motion was filed.

18   They've never appeared here.  They've never objected.  And

19   there is no evidence in the record to suggest, let alone to

20   prove, that the JOLs contend that Mark Patrick does not have

21   the authority to enter into the settlement on behalf of the

22   HMIT entities.  There's no evidence of any kind.

23      What you need to know and need to remember, though, is

24   that whole proceeding in the Cayman Islands is being brought

25   on behalf of not The Kansas City Foundation or The Dallas

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/26/25   Page 481 of 614   PageID 13040

236

1  Foundation, but The Highland Kansas City Foundation, The

2  Highland Dallas.  It's Mr. Dondero, and he's funding it, and

3  it says it in Paragraph I think 47 or 48 of his declaration.

4  He's funding all of that.  And he funded The Dallas

5  Foundation's objection here.

6      And that's why he's upset, because they settled last night

7  without telling him because they didn't want any part of this,

8  Your Honor.  That's the truth.  That's why they're not here.

9  And they, right, they're the people who suggested that maybe

10  something untoward happened and maybe someday -- because this

11  is the way their objection is characterized.  Complete

12  speculation.

13      If you go back and look at the objection, it's someday,

14  somebody might do something and might someday set it aside.

15  That wasn't a proper basis at the time, but we know that Mark

16  Patrick remains in control of the HMIT entities today because

17  nobody has told the Court otherwise.  And we know that The

18  Dallas Foundation has withdrawn its objection.  As I asked Mr.

19  Patrick, have you been, you know, removed or clipped or

20  terminated or in any way restricted in your capacity as the

21  Administrator and control person of the HMIT entities as a

22  result of the settlement, and the answer was no.

23      There's nothing to see here, Your Honor, except the

24  opportunity for the Highland Claimant Trust and its affiliated

25  entities in moving this case forward in an enormously positive

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 482 of 614   PageID 18051

237

1 | and constructive direction.

2 | We have the opportunity today to put to rest a lot of

3 | pending litigation.  We have the opportunity today to put to

4 | rest a lot of future potential litigation that undoubtedly

5 | would have come to pass had these entities remained under the

6 | indirect control of Mr. Dondero, because we know that that was

7 | the case.

8 | If you remember, Your Honor, we sat here two years ago,

9 | June 8th, 2023, on the evidentiary hearing on Hunter

10 | Mountain's motion for leave to bring the claims trading case.

11 | And if Your Honor will remember, Mr. Patrick at that time was

12 | forced to admit that the entirety of that case came in from

13 | Mr. Dondero, that he had no knowledge of any facts that

14 | related to anything.

15 | I would ask Your Honor to go and compare The Dallas

16 | Foundation's objection with Mr. Dondero's declaration that he

17 | filed in the Cayman Islands.  I'm not going to say they're

18 | verbatim, but they are largely, largely the same.  This is

19 | just Jim Dondero being Jim Dondero, and that is not a basis to

20 | overrule or deny the motion under Rule 9019.

21 | It's a product of good faith negotiations, it is clearly

22 | in the best interests of the estate, and we respectfully

23 | request that as soon as possible Your Honor grant motion.

24 | THE COURT:  Okay.

25 | MR. MORRIS:  Thank you, Your Honor.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-91   Filed 11/26/25   Page 483 of 614   PageID 18042

238

```
 1              THE COURT:  Any closing from the Movant, Co-Movant?

 2              MR. PHILLIPS:  Your Honor, thank you very much.

 3   Louis M. Phillips on behalf of the --

 4              THE COURT:  I don't know if you're the Co-Movant.

 5   You're a party to the proposed settlement.

 6              MR. PHILLIPS:  I'm not a Co-Movant.

 7              THE COURT:  Okay.

 8              MR. PHILLIPS:  I'm a party to the settlement.

 9              THE COURT:  Uh-huh.

10              MR. PHILLIPS:  I didn't quite make it to that status

11   to be a Co-Movant.

12     CLOSING ARGUMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

13              MR. PHILLIPS:  But anyway, we appreciate the Court's

14   time.  We appreciate the Court's attention.  This was, as the

15   evidence established, we provided and were provided an immense

16   amount of information.

17      Much of the information, certainly the information about

18   Mr. Patrick's control of the HMIT entities, was provided by

19   us.  It was reviewed by Mr. Seery.  And Mr. Seery made a very

20   strong case for the amount of diligence he did on our side of

21   the equation.  It's not nearly as relevant to Your Honor's

22   decision about whether to approve the settlement whether we

23   got a good deal or not, but the deal we got, we think, is very

24   fair.

25      The deal we got was negotiated with counsel, with
```

Case 3:25-cv-01876-K   Document 1-591   Filed 11/05/25   Page 484 of 614   PageID 18273

1   businesspeople who are very sophisticated.  We have agreed on

2   the methodology and of the calculation of our Class 10 claim.

3   The Debtor and the Debtor estate or the Claimant Trust or

4   whoever held the HMIT note got full value for the HMIT note.

5   Any additional value from the HMIT note would come back to

6   HMIT.  The Kirschner Litigation would be for the benefit of

7   HMIT.  The Dugaboy Note would be for the benefit of HMIT.

8        All of that is being put into a package and is being

9   resolved, affiliated, administered in a very effective and

10  efficient manner.  We are getting some money.  We appreciate.

11  We tried to get more.  We couldn't.  They tried to pay less.

12  We made a deal.

13       So, Your Honor, I echo and thank Mr. Morris for all of his

14  comments.  I appreciate counsel being involved here today.  We

15  think this is a fair and equitable settlement.  There is no

16  question under 9019 that this settlement should be approved.

17  And the suggestion that this Court should allow itself to just

18  be a vehicle for continued litigation, when we have analyzed

19  it, perhaps from a different perspective, and made the

20  decision that it is time to make our deal now, it is time to

21  take HMIT out of the litigation picture and into the fold of a

22  party in interest of a fixed claim with fixed treatment that's

23  different from the plan, authorized by the plan.  And we

24  appreciate it.

25       Thank you, Your Honor.

240

1    THE COURT:  Thank you.  All right.  Mr. Loigman, we

2  didn't mean to ignore you.

3    CLOSING ARGUMENT ON BEHALF OF MARC S. KIRSCHNER, LITIGATION

4                          TRUSTEE

5    MR. LOIGMAN:  Thank you, Your Honor.  Robert Loigman,

6  Quinn Emanuel.  You didn't ignore me.  Louis was just quicker

7  to jump up than I was.

8    And I step up solely because you asked whether the Co-

9  Movant had anything to add.  And we have nothing further to

10  add to what Mr. Morris said.  We agree with it wholly.  We

11  think this is a fair and complete settlement, and we would ask

12  that the Court approve the settlement under the 9019 motion.

13    THE COURT:  Thank you.

14    MR. LOIGMAN:  Thank You, Your Honor.

15    THE COURT:  All right.  The Objectors?

16    MR. MORRIS:  Your Honor?

17    THE COURT:  Oh.

18    MR. MORRIS:  Just to clarify, the motion was made

19  under 9019 and Section 363.  I just don't want that to get

20  lost.  That's all.

21    THE COURT:  Okay.  363, use of property.  Okay.

22    The Objectors?

23    CLOSING ARGUMENT ON BEHALF OF PATRICK DAUGHERTY

24    MR. YORK:  Thank you, Your Honor.  I'll be very

25  brief.

1    I certainly appreciate that the Court desires to have this

2    bankruptcy wrapped up, given how long it's gone on now, for

3    six -- approximately six years in this court.  The fact of the

4    matter is that the settlement agreement that Highland proposes

5    to enter into with Hunter Mountain Investment Trust entities

6    violates the express terms of the plan, the confirmation

7    order, and the Claimant Trust Agreement.

8        And they have not pointed to any language in there or to

9    argue otherwise.  Their only argument has been that they've

10   set a reserve aside.  And there's no provision in any of those

11   documents that provides that that's an excuse for them to

12   violate the express terms of the confirmation order, the plan,

13   or the Claimant Trust Agreement, including specifically the

14   language that Class 10 claims are not to receive or retain

15   anything under the plan on account of their interest unless

16   and until the Class 8 and Class 9 claims are paid in full plus

17   applicable interest.  And --

18           THE COURT:  I really want to understand that

19   argument.  Mr. Seery correctly testified that, pretty much in

20   every Chapter 11 plan we see, there's a disputed claim

21   reserve.  Well, I guess unless we have really unsophisticated

22   creditors who don't insist on that.  But we had sophisticated

23   creditors.  So why doesn't that mechanism, which I would call

24   tried and true, we see it in most cases, why doesn't that

25   resolve this issue you're raising?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 487 of 614   PageID 18406

242

1          MR. YORK:  Well, --

2          THE COURT:  And I focused in more than maybe I needed

3    to about the nature of Mr. Daugherty's remaining claim, his

4    Class 8 claim.  What was the scope?  What's the maximum amount

5    it could be?  When might it be resolved?  Because I think we

6    have a tried-and-true mechanism that addresses his concerns.

7    Tell me why it doesn't.

8          MR. YORK:  Well, --

9          THE COURT:  Really, I want to understand what you

10   think I'm missing.

11         MR. YORK:  Well, so I think twofold, Your Honor.  The

12   first is that the dispute reserve that exists normally would

13   be for whatever the amount of the disputed claim is.  And here

14   we're dealing with, as both sides have acknowledged, a claim

15   that they at best could estimate, but they don't know for

16   certain, given all of the machinations that could come out of

17   the IRS audit.

18       And secondly, specifically with respect to the

19   confirmation order, if it had said that the net 10 and 11

20   claims could be paid as long as the allowed 8 and 9 claims

21   were paid, then the dispute reserve would provide that

22   protection.  But that's not what the language in the

23   confirmation order says.  It says claims, not allowed claims.

24   And therefore it's referring to all claims, including disputed

25   claims.  And --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 488 of 614   PageID 18047

243

1          THE COURT:  But we have a disputed claim reserve.

2     Okay.  We have a disputed claim reserve.

3          MR. YORK:  There is, yes, there is a reserve.

4          THE COURT:  So is it your argument that I can't

5     approve a settlement like this until Mr. Daugherty's claim has

6     been resolved with certainty, which might be in 2033 or

7     whatever?  I can't keep a bankruptcy estate open, allowing

8     administrative expenses to continue to accrue, because of one

9     contingent unliquidated claim that may never even develop.

10         MR. YORK:  Your Honor, I appreciate the Court's

11    frustration with that, but that's the way that the documents

12    are written in terms of the confirmation order.  And so it's

13    an --

14         THE COURT:  So the disputed claim reserve is

15    meaningless?

16         MR. YORK:  No, it is not -- a disputed claim reserve

17    exists, but it does not, under the terms of the confirmation

18    order, in terms of allowing the payment of Class 10 and Class

19    11 claims, those can't be done until the Class 8 claims are

20    resolved.

21         THE COURT:  You would have -- just a moment -- you

22    would have me keep this estate open for as long as it takes,

23    2033, whatever, without allowing Class 10 and Class 11

24    theoretically to get anything?

25         MR. YORK:  At least under --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 16-21   Filed 11/05/24   Page 489 of 614   PageID 18043

244

 1          THE COURT:  Let's just let the -- with all respect to

 2   Mr. Seery, he's charging a handsome amount.  It was agreed to

 3   or approved by the Court.  Let's just let him continue

 4   accruing until 2033 because of Mr. Daugherty's prospect of the

 5   IRS saying you owe $1.4 million plus interest and penalties,

 6   when he's gotten the use of that all?  Help me.  This doesn't

 7   make sense to me.

 8          MR. YORK:  Sure.  One way this could be solved is

 9   that the payments to -- the cash payments, for example, that

10   are to be made to the HMIT entities, under the proposed

11   settlement could be held in abeyance until the resolution of

12   the Class 8 claim.  The Court could modify the proposed

13   settlement based on that.  That's one way to deal with the

14   issue, for example.

15          THE COURT:  Do what?  Hold it in abeyance?

16          MR. YORK:  Yes.  For -- the payments to be made to

17   the Hunter Mountain Investment Trust under the proposed

18   settlement could be -- could be done in accordance with the

19   terms of the confirmation order.  We'll just hold those

20   payments until such time.

21          THE COURT:  We who?  Put it in the Court Registry?

22          MR. YORK:  Or --

23          THE COURT:  Where it will earn 0.18 percent?

24          MR. YORK:  No.  No.  It can remain within the

25   Claimant Trust until the time at which the Class 8 claim is

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 490 of 614   PageID 18369

245

 1    finally and fully resolved.

 2            THE COURT:  Okay.  Meanwhile, I've approved the

 3    extension of the Trusts for one year, with Dugaboy saying, we

 4    don't think this should happen again and again and again.  We

 5    reserve our rights.  That's not a good solution.

 6            MR. YORK:  Your Honor, I understand the Court's

 7    frustration, but this is the terms of the plan and the

 8    confirmation order that were entered.  Highland needs to

 9    follow it.

10            THE COURT:  Okay.  What about the estoppel argument

11    that I heard Mr. Morris make?

12            MR. YORK:  Well, sure.  So, the first time they raise

13    it is here today.  And the one thing that -- the difference is

14    that allowing this settlement to go forward is an effective

15    liquidation of the estate versus where things are now, in

16    which any payments that were made is not an effective

17    liquidation.  It doesn't expose anyone that would have

18    priority to Class 10 with respect to anything that happens in

19    the future from, you know, not having sufficient funds to deal

20    with it.  That's all.

21            THE COURT:  Okay.

22            MR. YORK:  Thank you, Your Honor.

23            THE COURT:  Thank you.  All right.  Mr. Lang?

24        CLOSING ARGUMENT ON BEHALF OF DUGABOY INVESTMENT TRUST

25            MR. LANG:  I'll be brief.  Your Honor, there are

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-691   Filed 11/05/25   Page 491 of 614   PageID 18040

246

1    three issues that we've raised.  One is the capital account

2    balance being used for the claim for the Class 10 holders.

3    The plan does not specify that the capital account balance is

4    to be used.  Allowing the $336 million claim to Class 10

5    ensures that Class 11 will not ever receive a dime.  That's

6    guaranteed.

7         Alternatively, upon the satisfaction of the Class 9, the

8    $20 million approximately owed to Class 9, the holders of HMIT

9    should receive 99.5 percent of the total residual.  We think

10   that would be a more fair outcome to the Class 11 claimants.

11             THE COURT:  Wait, say again?

12             MR. LANG:  That, so, of total assets, $70 million

13   approximately, $20 million is owed to Class 9.

14             THE COURT:  Uh-huh.

15             MR. LANG:  Of the remainder from that, HMIT should

16   receive 99.5 percent of those assets, whatever they are, the

17   value, rather than a $336 million claim.  That was the

18   objection.

19             THE COURT:  But I didn't get any evidence of a

20   separate way of competing -- of doing that.  I heard credible

21   testimony from Mr. Seery about why he used the math he used

22   and I didn't hear any countervailing evidence of, wait, this

23   is a more fair, realistic way of computing it.  And what I did

24   hear is the .5 percent limited partnership interest of Dugaboy

25   is subordinated in its payment rights under the limited

Case 19-34054-sgj11 Doc 4296 Filed 06/30/25 Entered 06/30/25 11:25:22 Desc
Case 3:25-cv-01876-K Document 31 Filed 11/05/25 Page 492 of 614 PageID 13045

247

 1 | partnership agreement of Highland.

 2 |      MR. LANG:  It's subordinated under the plan, but yes,

 3 | the plan does not say to use --

 4 |      THE COURT:  Under the partnership agreement is the

 5 | reason the plan did it, is what I've been presented.

 6 |      MR. LANG:  I believe Mr. Seery -- and I could be

 7 | wrong -- I think I heard him say that he has used the other

 8 | method, but I could have misheard him in the testimony.

 9 |      THE COURT:  Well, that's not what I heard.  I heard

10 | him emphasizing the fact that the Class 8 interests, including

11 | that of Dugaboy, are subordinated with regard to payment

12 | rights under the Highland partnership agreement.  And so

13 | that's why he didn't think it made sense to just apply

14 | percentages.

15 |      MR. LANG:  That's what he testified to.

16 |      THE COURT:  So I'm just -- anyway, I'm just trying to

17 | figure out what the countervailing evidence is here to suggest

18 | his methodology is wrong.

19 |      MR. LANG:  I believe the partner -- or, the plan says

20 | that the Class 10, when the GUC certification is a Class 10,

21 | and the Class 11 received pro rata, it doesn't specify the

22 | account balance is to be used as the number to determine what

23 | they receive.

24 |      THE COURT:  Okay.  You want to point out what you are

25 | focused on?

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/25/23   Page 493 of 614   PageID 130362

248

```
 1              MR. LANG:  I believe it's under Treatment.

 2              THE COURT:  Okay.

 3              MR. LANG:  Section --

 4              THE COURT:  I don't want to hunt.  I want you to tell

 5    me what the language is that you think is supportive of that.

 6              MR. LANG:  And the second -- I guess the secondary

 7    issue that we probably should just get to is the release.  We

 8    think it's broad, and just Dugaboy and Dondero are carved out.

 9    And Mr. Morris did send me a proposal last -- yesterday

10    evening that I haven't gotten to.  But that is an objection

11    that we have, is just to make sure that the -- that nobody can

12    argue that the release covers any claim Dugaboy might have, if

13    any.

14              THE COURT:  Okay.  I think many hours ago I remember

15    this being mentioned.  I guess it was a little bit more broad

16    than just -- I think it was Highland employees.  I don't know.

17        What is the agreement, Mr. Morris, if you're awake there,

18    on --

19              MR. MORRIS:  I am awake, Your Honor.  Apologies.

20              THE COURT:  Okay.  I didn't mean to be flippant.

21              MR. MORRIS:  Yeah.

22              THE COURT:  I get punchy and --

23              MR. MORRIS:  That's okay.  With respect to the

24    release?

25              THE COURT:  Right.
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1601   Filed 12/22/49   Page 494 of 614   PageID 18073

249

1          MR. MORRIS:  We don't have an agreement.  We have an

2    agreement -- well, I sent a proposal last night, but it didn't

3    get responded to.  If they want to accept that proposal,

4    that's terrific.

5          THE COURT:  Okay.  I don't know what the agreement

6    says.  Are you saying you want to accept what they proposed

7    last night?

8          MR. LANG:  No, I have edits to it.  I just couldn't

9    --  I was tied up on another filing last night.  I have not

10   been able to get to it today.

11         THE COURT:  Okay.  I'm going to make a ruling today.

12   Okay?  If it means y'all sit here in the courtroom a while,

13   fine.  But just like all of you, I have a mountain of other

14   stuff waiting for me, so I really want to rule today.  So, --

15         MR. LANG:  Understood.

16         THE COURT:  Yeah.

17         MR. LANG:  Maybe we can work on it as soon as I'm

18   done and I can get back to 'em --

19         THE COURT:  Okay.

20         MR. LANG:  -- and get back to you.

21      Your Honor, the -- it's on Page 23 of the plan.  It talks

22   about the Class 10 and Class 11, where the partnership

23   interests, that their treatment, they shall receive as pro

24   rata share of the contingent Claimant Trust interests.  And

25   all we're asking is that be used or applied as a 99.5/.5

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-691   Filed 11/25/25   Page 495 of 614   PageID 13084

250

```
 1    distribution.

 2         (Pause.)

 3              THE COURT:  I'm sorry.  Go ahead.

 4              MR. LANG:  Oh, sorry.  I thought you were looking for

 5    it.

 6         And the last issue is authority.  The only point of the

 7    authority argument, Your Honor, is that the Joint

 8    Administrators were appointed down in the Caymans to

 9    investigate the transaction that moved basically the entire

10    ownership, because it's owned a hundred percent down to HMIT,

11    out.  They're investigating the transactions.  They have not

12    stipulated to authority.  They're looking at everything.

13    They've requested a 45-day delay on this motion.  And that's

14    all that -- not even asking to deny the 9019.  They were just

15    asking time to basically bless this transaction so that nobody

16    could come back and make an issue of it.  But I understand

17    your desire to rule today.

18              THE COURT:  Okay.  Any rebuttal?

19              MR. MORRIS:  Yeah, briefly, Your Honor.

20       REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

21              MR. MORRIS:  I just want to point the Court to two

22    provisions of the operative documents that I think --

23              THE COURT:  Okay.

24              MR. MORRIS:  -- will resolve even further the issues

25    that we've presented today.
```

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 496 of 614   PageID 18045

251

1      The Claimant Trust Agreement -- and I apologize, I don't

2  know if the whole document is in evidence, but I will

3  respectfully suggest to the Court that the Claimant Trust

4  Agreement provides in Article 5, Section 5.1(c), --

5          THE COURT:  Okay.  Let me catch up.

6          MR. MORRIS:  Yes.

7      (Counsel confer.)

8          THE COURT:  It's not Debtor's Exhibit 5.

9          MR. MORRIS:  Yeah.

10         THE COURT:  Daugherty's Exhibit 5?

11         MR. MORRIS:  It's Daugherty Exhibit 5?

12         MR. YORK:  Yes.

13         THE COURT:  Okay.

14         MR. YORK:  So we have a full copy at Daugherty --

15         THE COURT:  I've got it.  Daugherty's Exhibit 5.

16         MR. MORRIS:  Okay.  So if you could just go to Page

17  27, Your Honor.  And this is in response to Mr. Lang's

18  argument about the calculation of the allowed claim.  You'll

19  see it deals with contingent trust interests.  And the very

20  last sentence says the equity trust --

21         THE COURT:  Wait.  What page again?

22         MR. MORRIS:  27.

23         THE COURT:  Okay.

24         MR. MORRIS:  Do you see Section C in the middle is

25  Contingent Trust Interests?

Case 19-34054-sgj11    Doc 4296    Filed 06/30/25    Entered 06/30/25 11:25:22    Desc
Case 3:25-cv-01876-K    Document 1-1    Filed 11/05/25    Page 497 of 614    PageID 1804 06

252

1          THE COURT:  No.

2          THE CLERK:  It's 26 of the Claimant Trust Agreement,

3    27 of the --

4          THE COURT:  Ah, it's 26.  Yes.  On the bottom, it's

5    26; on the top, it's 27 of 38.

6          MR. MORRIS:  Okay.

7          THE COURT:  Okay.

8          MR. MORRIS:  And at the end of Section C, it says

9    explicitly:  The equity trust interests distributed to allowed

10   holders of Class A limited partnership interests -- that's

11   Dugaboy --

12         THE COURT:  Uh-huh.

13         MR. MORRIS:  -- shall be subordinated to the equity

14   interests distributed to the allowed holders of Class B and C.

15   That's Hunter Mountain.  Okay?

16      So the trust agreement provides for exactly what we're

17   doing here.  Dugaboy is in fact subordinated to HMIT.  It

18   doesn't get paid until HMIT gets paid in full.  And Mr. Seery

19   I think compellingly testified as to the reasonable

20   calculation that he did based on very objective numbers to

21   determine each respective limited partner's capital account.

22      With respect to Mr. Daugherty, the plan, which is on the

23   docket at 1943, has a definition of Disputed Claim Reserve.

24   And it states, among other things, that the amount of the

25   disputed claim upon which the disputed claim --

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/26/25   Page 498 of 614   PageID 13047

253

1          THE COURT:  Give me the page number.

2          MR. MORRIS:  I apologize, Your Honor.

3          THE COURT:  I've got it right in front of me.

4          MR. MORRIS:  It's Page 7 of the plan.

5          THE COURT:  Okay.  All right.  I'm there.  The

6    Defined Term.

7          MR. MORRIS:  So the Defined Term "Disputed Claim,

8    Claims Reserve Amount" in the middle says:  The amount of the

9    disputed claim upon which the disputed claims reserve is

10   calculated shall be -- they've got an A and then a B -- the

11   amount agreed to by the holder of the disputed claim and the

12   Claimant Trustee or Reorganized Debtor, as applicable.  And

13   then it says D:  Or is otherwise ordered by the Bankruptcy

14   Court, including an estimated -- an order estimating the

15   disputed claim.

16       And that last provision is vital, Your Honor, because that

17   is the hook upon which you can always hang your hat when you

18   decide that we are not going to wait until 2023 [sic] when the

19   IRS audit may be resolved, because you have the ability, as

20   ordered by the Bankruptcy Court, including estimating the

21   amount of the disputed claim.  Which is one of the causes of

22   action that we've asserted in the complaint.  It's either to

23   subordinate -- actually, it's to disallow, to subordinate, or

24   to estimate.  Because this case does have to end, Your Honor.

25   We actually think he should be bound by the definition in B.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 499 of 614   PageID 18042

254

1   It is an agreed-upon amount.

2       I've heard the testimony from Mr. Daugherty that there was

3   no negotiation, but he didn't deny that he signed a document

4   that is called an agreement that sets forth the disputed claim

5   amount.  And that is an agreement, and I think that satisfies

6   that definition.  And even if it didn't, at some point this

7   case has to end.

8       Thank you, Your Honor.

9           THE COURT:  Okay.  Thank you.

10      All right.  Well, it's been a long day and even a longer

11  case.  I think a lot of people were on the receiving end of a

12  little bit of my grumpiness at times today, and I apologize

13  for that.

14      I always feel compelled to say to the lawyers and parties

15  when I rule from the bench that I can assure you it's not

16  knee-jerk.  I can assure you my law clerk and I have read

17  every piece of paper submitted.  And we come in here I think

18  well-prepared and we just want to listen to the evidence to

19  see if it supports -- who it supports.  So I am going to rule

20  from the bench.

21      I first want to make clear that with regard to the motion

22  before the Court, the motion which was filed May 19th at

23  Docket Entry 4216, pursuant to Bankruptcy Rule 9019 and

24  Bankruptcy Code Section 363, the Court is being asked to

25  approve a very broad settlement that is between what are

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 500 of 614   PageID 18043

255

1  defined as the HMIT entities, seven entities in all; Hunter

2  Mountain Investment Trust; as well as Beacon Mountain, LLC;

3  Rand Advisors, LLC; Rand PE Fund 1, LP; Rand PE Fund

4  Management, LLC; Atlas IDF, LP; and Atlas IDF GP, PLLC.  So

5  this proposed compromise and settlement is between all of

6  those Hunter Mountain entities as well as the Reorganized

7  Debtor, the Highland Claimant Trust, the Highland Litigation

8  Subtrust, and the Highland Indemnity Trust.

9       I first will note that notice has been fulsome, reasonable

10  under the circumstances, to provide due process to anyone

11  affected by the proposed compromise.

12       The Court would note that the legal standard is a very

13  well-known and established legal standard here.  Among other

14  things, the Court is to look at whether the settlement is

15  fair, reasonable, and in the best interest of the estate;

16  whether it would appear reasonable business judgment has been

17  exercised; is the compromise and settlement within the range

18  of reasonableness?

19       And this involves looking at, among other things, the

20  probability of success in the litigation -- that would be all

21  the various litigation involving HMIT, if it were to go

22  forward; the complexity and likely duration of further

23  litigation and attendant expense, inconvenience, and delay;

24  and all other factors bearing on the wisdom of the compromise.

25  We know that's *Cajun Electric*, *Jackson Brewing*, *Foster*

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-691   Filed 11/25/25   Page 501 of 614   PageID 13040

256

1   *Mortgage*, among other cases.  I probably left out *AWECO*.

2       Anyway, applying all of those legal standards here, I do

3   think the evidence was very thorough in showing that the

4   compromise is a product of good faith and arm's-length

5   negotiations.  Indeed, it was almost shocking to this Court

6   when I saw the motion, having the history I have with all of

7   the contested issues, adversary proceedings that have

8   transpired over the past few years between Hunter Mountain and

9   the Debtor.

10      I do think the evidence is that it's fair and equitable

11  and in the best interest of the estate and within the range of

12  reasonableness, given due regard for all of the expense,

13  delay, and likelihood of success.

14      I'll just briefly recount that, as noted early today,

15  there was an Exhibit B attached to the 9019 motion that listed

16  nine unresolved pending pieces of litigation that the Highland

17  entities are embroiled in.  Two of those are now gone.  This

18  was filed May 8th, and as of January 25th, they're gone.  So

19  seven pieces of litigation, of which two will go entirely away

20  if I approve this settlement.  The Kirschner adversary claims

21  against Hunter Mountain will go away.

22      We have very little, very little, relatively speaking,

23  left in this bankruptcy case to resolve if I approve this

24  settlement.  That alone is very, very significant.  Again, we

25  have large shall I say issues with Hunter Mountain.  Highland

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 6-1   Filed 11/05/25   Page 502 of 614   PageID 13045

257

1    says Hunter Mountain owes the Highland entities something like

2    $57.69 million on a note that Hunter Mountain is payor on

3    dated December 21st, 2015.

4        The flip side of that is that Hunter Mountain was sued by

5    Kirschner in the Kirschner action on various claims, including

6    this $57 million note.  We have had Hunter Mountain file

7    multiple motions for leave to sue Highland, the Claimant

8    Trust, Mr. Seery.  And those have been denied, but are in

9    appeal status or remand status or some further litigation

10   status.

11       And again, we have numerous issues.  Hunter Mountain

12   having sought valuation.  The Court denied that.  It's on

13   appeal.

14       So, so much goes away, so much further litigation goes

15   away and we make a monumental step in ending this long-running

16   case if I approve this settlement.

17       Now, on the flip side of this, I know that Dugaboy,

18   through the voice of Mr. Dondero today, expressed that Hunter

19   Mountain is, I forget the words he used, but not -- this isn't

20   close to being fair and equitable as far as he was concerned

21   for Hunter Mountain.  That Hunter Mountain, in addition to

22   being through with litigation in this bankruptcy-land, would

23   be paid $500,000 within five days.  They would also be paid

24   separately $10 million as an initial distribution, with the

25   hope of two more $6.5 million distributions in '27 and '28.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/06/25   Page 503 of 614   PageID 18042

258

1   And it would get a note, which I think has $24 million -- I

2   think it was less than that, $17 or $18 million left on it,

3   perhaps, on which Dugaboy is a maker.  The debtor is one of

4   the two payees.  The Debtor gives up its rights in that note.

5        It looks like Hunter Mountain is getting a lot.  And

6   again, the way this estate has been liquidated, there is money

7   that can flow to it as a Class 10 equity here, as the evidence

8   has shown.

9        So I am approving the settlement.  I am specifically

10  overruling the remaining objections of both Dugaboy and Mr.

11  Daugherty.

12       As far as Mr. Daugherty's argument that the settlement

13  violates the absolute priority rule or violates the terms of

14  the plan or the confirmation order or the trust agreement by,

15  putting words in his mouth, skipping over the full payment of

16  whatever his Class 8 claim is going to be and allowing a

17  subordinate class, Class 10, to get paid, I have flipped and

18  studied the wording of the plan and the confirmation order and

19  the defined term for Disputed Reserve.  And I referred to a

20  disputed reserve as a tried-and-true provision in Chapter 11

21  plans.  I think it does what needs to happen for precisely

22  this kind of situation, that as long as an appropriate amount

23  is being held in reserve, and the Court can decide what is an

24  appropriate amount, we don't have to hold up a bankruptcy

25  estate for years and years.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-591   Filed 11/05/25   Page 504 of 614   PageID 13047

259

1    So the disputed claim reserve is what allows me to find

2    this is fair and equitable and this isn't some sort of

3    violation of the absolute priority rule.  I think this is

4    precisely the reason the disputed claim reserve mechanism is

5    in place, so that we can get on with the business of getting

6    more people paid sooner.

7    And based on the evidence I've heard, it is an appropriate

8    amount, I think.  We're doing a lot of crystal-balling, what

9    may or may not ever happen when, but I think, based on all the

10   persuasive evidence I've heard, the Daugherty objection should

11   be overruled.

12   As far as Dugaboy, I, as noted, am overruling that

13   objection.  I didn't have any persuasive evidence, solid

14   evidence to show me that Mark Patrick doesn't have appropriate

15   corporate governance authority to enter into this settlement

16   agreement.

17   I realize there's a lot swirling around in the Cayman

18   Islands, and that's going to play out however it plays out.

19   But as of today, I don't have any evidence that he doesn't

20   have authority currently to enter into the settlement.  And it

21   speaks volumes that The Foundation backed down.  It would seem

22   that they have been convinced that the lack-of-authority

23   argument was not one they wanted to press today.  So that is

24   overruled.

25   I feel like we have all seen this movie many times before.

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1691   Filed 11/05/25   Page 505 of 614   PageID 13048

260

1    I wanted to understand, perhaps I went deeper than I needed

2    to, I know Mr. Phillips thinks I went deeper than I needed in

3    hearing some of the testimony from Mr. Patrick and Mr.

4    Dondero, but I'm just trying to understand what's happening

5    here.  Why people who were so lockstep and friendly for years

6    of this case suddenly, when we're right on the brink of maybe

7    the case being put to bed -- I'm optimistic; it's not quite

8    that close -- all of a sudden they're at loggerheads.

9         And so how many times have I seen this over the years,

10   whether it's a breakdown in business and personal

11   relationships, Mr. Daugherty, Mr. Terry, Grant Scott, now Mark

12   Patrick?  I'm probably leaving out someone.  I don't know.  I

13   feel like I'm watching the same movie.  Okay, now these two

14   have parted ways.  Now these two have parted ways.

15        And then, as I recall, when Grant Scott withdrew his

16   objection to the HarbourVest settlement all these years ago,

17   2020, 2021, which he had been lodging for Charitable DAF, I

18   think it was, --

19             MR. MORRIS:  Yes, Your Honor.

20             THE COURT:  -- then what happens?  Well, I think Mark

21   Patrick came in to work or replace Grant Scott, and then a

22   bunch of people ended up getting sued in a different court

23   regarding the settlement I approved, the HarbourVest

24   settlement I approved.

25        So why am I saying this?  I just, I'm trying to understand

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1-21   Filed 11/05/25   Page 507 of 614   PageID 18049

261

1   things I'll never understand.  I wanted to maybe hear

2   something that would make me better understand what's happened

3   now between Hunter Mountain, Mark Patrick, and Dondero and

4   Dugaboy, because it sure seems like they were on the same team

5   for many years.  But it was very likely irrelevant, as Mr.

6   Phillips kept getting up and down and saying.  I just was

7   seeing if it would lead to something relevant that would bear

8   on the wisdom of this compromise, since that's one of my other

9   legal standards.  I'm supposed to consider all factors that

10  might bear on the wisdom of the compromise.  And so I guess

11  that's where I was going in allowing all of that to come in.

12      All right.  Well, while everyone is not thrilled with this

13  compromise and settlement, I heartily congratulate the human

14  beings that made it happen, and they know who they are.  Maybe

15  I do, maybe I don't.  But I think it's rather amazing.  And I

16  hope that we are not coming to court for hearings in 2032.  I

17  don't know who among us will be alive.  I'm not going to be

18  alive by then.  Certain people might cheer if that's the case.

19  But I congratulate the human beings who made this happen.  And

20  you know who you are.  Maybe I do, maybe I don't, but I

21  congratulate you.

22      All right.  So I reserve the right to supplement or amend

23  this oral bench ruling in a more fulsome written order.  I am

24  asking Mr. Morris and his team to be the scriveners on that

25  order.  And obviously, you're going to run it by the other

Case 19-34054-sgj11 Doc 4296 Filed 06/30/25 Entered 06/30/25 11:25:22 Desc
Case 3:25-cv-01876-K Document 1591 Filed 11/05/25 Page 507 of 614 PageID 18056

262

1    lawyers here who participated today.

2        Is there anything else before we wrap it up?

3            MR. MORRIS:  Just one other thing, Your Honor.  And I

4    greatly appreciate your comments.

5        When we draft the order, are we authorized to say that

6    this settlement is approved not only pursuant to 9019 but to

7    363?  Because there are asset sales that are part of this.  We

8    moved under that provision, and I didn't hear Your Honor

9    reference that, --

10            THE COURT:  Okay.

11            MR. MORRIS:  -- but we would like to include that in

12   the order.

13            THE COURT:  You may.  And that is precisely why I

14   said I reserve the right to supplement or amend, because many

15   times I get out of here and look at this transcript and, ooh,

16   I forgot to say whatever.

17            MR. MORRIS:  Yeah.

18            THE COURT:  So I meant to say that and I didn't, so

19   you may add that.

20            MR. MORRIS:  And I assume all Your Honor wants is a

21   fairly simple form of order that incorporates --

22            THE COURT:  I do not want a 40-page order.

23            MR. MORRIS:  Right.

24            THE COURT:  Okay?

25            MR. MORRIS:  Just an order that incorporates your

Case 19-34054-sgj11   Doc 4296   Filed 06/30/25   Entered 06/30/25 11:25:22   Desc
Case 3:25-cv-01876-K   Document 1591   Filed 11/05/25   Page 508 of 614   PageID 18517

263

1   comments on the record, and to the extent that Your Honor

2   wants to amend that, you'll do so at your leisure?

3           THE COURT:  Yes.

4           MR. MORRIS:  Perfect.

5           THE COURT:  All right.

6           MR. MORRIS:  Thank you.

7           THE COURT:  Thank you all.  We're adjourned.

8           MR. PHILLIPS:  Thank you, Your Honor.

9           THE CLERK:  All rise.

10      (Proceedings concluded at 4:38 p.m.)

11                      --oOo--

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23    **/s/ Kathy Rehling**                    **06/27/2024**

24  _____     _____

25  Kathy Rehling, CETD-444                        Date
    Certified Electronic Court Transcriber





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 30, 2025**

United States Bankruptcy Judge

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|   |   |   |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
|  | § |  |
| Reorganized Debtor. | § |  |

**ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363
APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE
HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

This matter having come before the Court on the *Motion for Entry of an Order Pursuant
to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and
Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "Motion")[2] filed by Highland
Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland") in the above-
captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and
service address for the Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion or the
Settlement Agreement, as applicable.

Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"); and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 as well as the retention of jurisdiction provisions of the Plan; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered (a) the Motion, (b) *Patrick Daugherty's Objection to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4229] (the "Daugherty Objection") filed by Patrick Daugherty, (c) the *Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities* [Docket No. 4230] (the "Dugaboy Objection," and together with the Daugherty Objection, the "Objections"), filed by The Dugaboy Investment Trust, (d) the *Objection of the Dallas Foundation and Crown Global Life Insurance Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231] (the "Charitable Foundation Objection"), filed by The Dallas Foundation (the "Dallas Foundation") (on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation ("Okada Family"), and Crown Global Life Insurance, Ltd., not individually, but solely in respect of Segregated Accounts 30218 and 30219 ("Crown"), (e) the evidence admitted into the record during the hearing on the Motion on June 25, 2025 (the "Hearing") in support of, and in opposition to, the Motion, including the Court's assessment of the witnesses' credibility, and (f) all arguments heard at the Hearing in connection therewith; and the Court having found that the legal and factual bases set forth in the Motion establish sufficient

cause for the relief granted herein; and adequate notice of the Motion having been given; and after due deliberation and good cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

1.      The Court's findings of fact and conclusions of law set forth on the record at the conclusion of the Hearing are incorporated by reference except as supplemented in this Order, and as may be further supplemented by the Court.

2.      Entry into the Settlement Agreement is an appropriate exercise of the Movants' business judgment.

3.      The Settlement Agreement is fair, reasonable, and in the best interests of each of the Highland Entities and their creditors and constituents.

4.      The Settlement Agreement was negotiated and entered into by the Highland Entities and the HMIT Entities without collusion or fraud, in good faith, and was the product of arm's- length negotiations.

5.      The HMIT Entities are not "insiders" or "affiliates" of Highland as those terms are defined in Bankruptcy Code sections 101(31) and 101(2).

6.      The HMIT Entities entered into the Settlement Agreement, are acquiring the Transferred Claims and Dugaboy Note in good faith, and have proceeded with all aspects of the Settlement Agreement in good faith, and have received fair value in consideration of their entry into the Settlement Agreement.

7.      The Transferred Claims and Dugaboy Note are property of the estate, and the Highland Entities' sale of those assets free and clear of all liens and encumbrances but otherwise subject to the Settlement Agreement is a proper exercise of their business judgment.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

8.      The Motion is **GRANTED**.

9.      As stated on the record during the Hearing, The Charitable Foundation Objection is withdrawn with prejudice.

10.      All other Objections to the Motion are overruled.

11.      The Settlement Agreement attached as **Exhibit 1** to the Demo Declaration is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363(b) of the Bankruptcy Code.

12.      HMIT's Class 10 Interest is Allowed in the amount of $336,940,230.58.

13.      The HMIT Entities, as good faith purchasers of Estate assets in the Settlement, are entitled to the protections contained in section 363(m) of the Bankruptcy Code.

14.      The Highland Entities and their agents are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement without further notice or further Court approval.

15.      Notwithstanding anything in the Settlement Agreement to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (collectively, the "Foundation Parties") are or will be included in the definitions of "HMIT Releasors" or "Highland Releasors."  For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

16.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

### ### END OF ORDER ###





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 30, 2025**

United States Bankruptcy Judge

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

**ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363
APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE
HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

This matter having come before the Court on the *Motion for Entry of an Order Pursuant
to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and
Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "Motion")[2] filed by Highland
Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland") in the above-
captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and
service address for the Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion or the
Settlement Agreement, as applicable.

Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"); and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 as well as the retention of jurisdiction provisions of the Plan; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered (a) the Motion, (b) *Patrick Daugherty's Objection to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4229] (the "Daugherty Objection") filed by Patrick Daugherty, (c) the *Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities* [Docket No. 4230] (the "Dugaboy Objection," and together with the Daugherty Objection, the "Objections"), filed by The Dugaboy Investment Trust, (d) the *Objection of the Dallas Foundation and Crown Global Life Insurance Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231] (the "Charitable Foundation Objection"), filed by The Dallas Foundation (the "Dallas Foundation") (on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation ("Okada Family"), and Crown Global Life Insurance, Ltd., not individually, but solely in respect of Segregated Accounts 30218 and 30219 ("Crown"), (e) the evidence admitted into the record during the hearing on the Motion on June 25, 2025 (the "Hearing") in support of, and in opposition to, the Motion, including the Court's assessment of the witnesses' credibility, and (f) all arguments heard at the Hearing in connection therewith; and the Court having found that the legal and factual bases set forth in the Motion establish sufficient

cause for the relief granted herein; and adequate notice of the Motion having been given; and after due deliberation and good cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

1.      The Court's findings of fact and conclusions of law set forth on the record at the conclusion of the Hearing are incorporated by reference except as supplemented in this Order, and as may be further supplemented by the Court.

2.      Entry into the Settlement Agreement is an appropriate exercise of the Movants' business judgment.

3.      The Settlement Agreement is fair, reasonable, and in the best interests of each of the Highland Entities and their creditors and constituents.

4.      The Settlement Agreement was negotiated and entered into by the Highland Entities and the HMIT Entities without collusion or fraud, in good faith, and was the product of arm's- length negotiations.

5.      The HMIT Entities are not "insiders" or "affiliates" of Highland as those terms are defined in Bankruptcy Code sections 101(31) and 101(2).

6.      The HMIT Entities entered into the Settlement Agreement, are acquiring the Transferred Claims and Dugaboy Note in good faith, and have proceeded with all aspects of the Settlement Agreement in good faith, and have received fair value in consideration of their entry into the Settlement Agreement.

7.      The Transferred Claims and Dugaboy Note are property of the estate, and the Highland Entities' sale of those assets free and clear of all liens and encumbrances but otherwise subject to the Settlement Agreement is a proper exercise of their business judgment.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

8.      The Motion is **GRANTED**.

9.      As stated on the record during the Hearing, The Charitable Foundation Objection is withdrawn with prejudice.

10.     All other Objections to the Motion are overruled.

11.     The Settlement Agreement attached as **Exhibit 1** to the Demo Declaration is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363(b) of the Bankruptcy Code.

12.     HMIT's Class 10 Interest is Allowed in the amount of $336,940,230.58.

13.     The HMIT Entities, as good faith purchasers of Estate assets in the Settlement, are entitled to the protections contained in section 363(m) of the Bankruptcy Code.

14.     The Highland Entities and their agents are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement without further notice or further Court approval.

15.     Notwithstanding anything in the Settlement Agreement to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (collectively, the "Foundation Parties") are or will be included in the definitions of "HMIT Releasors" or "Highland Releasors."  For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

16.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

### ### END OF ORDER ###

000013





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 30, 2025**

_____
United States Bankruptcy Judge

_____

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

### ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "Motion")[2] filed by Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for the Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion or the Settlement Agreement, as applicable.

Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"); and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 as well as the retention of jurisdiction provisions of the Plan; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered (a) the Motion, (b) *Patrick Daugherty's Objection to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4229] (the "Daugherty Objection") filed by Patrick Daugherty, (c) the *Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities* [Docket No. 4230] (the "Dugaboy Objection," and together with the Daugherty Objection, the "Objections"), filed by The Dugaboy Investment Trust, (d) the *Objection of the Dallas Foundation and Crown Global Life Insurance Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231] (the "Charitable Foundation Objection"), filed by The Dallas Foundation (the "Dallas Foundation") (on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation ("Okada Family")), and Crown Global Life Insurance, Ltd., not individually, but solely in respect of Segregated Accounts 30218 and 30219 ("Crown"), (e) the evidence admitted into the record during the hearing on the Motion on June 25, 2025 (the "Hearing") in support of, and in opposition to, the Motion, including the Court's assessment of the witnesses' credibility, and (f) all arguments heard at the Hearing in connection therewith; and the Court having found that the legal and factual bases set forth in the Motion establish sufficient

cause for the relief granted herein; and adequate notice of the Motion having been given; and after due deliberation and good cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

1.     The Court's findings of fact and conclusions of law set forth on the record at the conclusion of the Hearing are incorporated by reference except as supplemented in this Order, and as may be further supplemented by the Court.

2.     Entry into the Settlement Agreement is an appropriate exercise of the Movants' business judgment.

3.     The Settlement Agreement is fair, reasonable, and in the best interests of each of the Highland Entities and their creditors and constituents.

4.     The Settlement Agreement was negotiated and entered into by the Highland Entities and the HMIT Entities without collusion or fraud, in good faith, and was the product of arm's- length negotiations.

5.     The HMIT Entities are not "insiders" or "affiliates" of Highland as those terms are defined in Bankruptcy Code sections 101(31) and 101(2).

6.     The HMIT Entities entered into the Settlement Agreement, are acquiring the Transferred Claims and Dugaboy Note in good faith, and have proceeded with all aspects of the Settlement Agreement in good faith, and have received fair value in consideration of their entry into the Settlement Agreement.

7.     The Transferred Claims and Dugaboy Note are property of the estate, and the Highland Entities' sale of those assets free and clear of all liens and encumbrances but otherwise subject to the Settlement Agreement is a proper exercise of their business judgment.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

8.     The Motion is **GRANTED**.

9.      As stated on the record during the Hearing, The Charitable Foundation Objection is withdrawn with prejudice.

10.     All other Objections to the Motion are overruled.

11.     The Settlement Agreement attached as **Exhibit 1** to the Demo Declaration is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363(b) of the Bankruptcy Code.

12.     HMIT's Class 10 Interest is Allowed in the amount of $336,940,230.58.

13.     The HMIT Entities, as good faith purchasers of Estate assets in the Settlement, are entitled to the protections contained in section 363(m) of the Bankruptcy Code.

14.     The Highland Entities and their agents are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement without further notice or further Court approval.

15.     Notwithstanding anything in the Settlement Agreement to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (collectively, the "Foundation Parties") are or will be included in the definitions of "HMIT Releasors" or "Highland Releasors."  For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

16.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

### ### END OF ORDER ###





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 30, 2025**

United States Bankruptcy Judge

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

**ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363
APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE
HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

This matter having come before the Court on the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "Motion")[2] filed by Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for the Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion or the Settlement Agreement, as applicable.

Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with
Highland and the Claimant Trust, the "Movants"); and the Court having jurisdiction over this
matter pursuant to 28 U.S.C. §§ 157 and 1334 as well as the retention of jurisdiction provisions
of the Plan; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. §
157(b)(2); and venue in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and
the Court having considered (a) the Motion, (b) *Patrick Daugherty's Objection to Motion for
Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement
with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4229] (the
"Daugherty Objection") filed by Patrick Daugherty, (c) the *Preliminary Objection of the
Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule
9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities* [Docket No. 4230] (the
"Dugaboy Objection," and together with the Daugherty Objection, the "Objections"), filed by
The Dugaboy Investment Trust, (d) the *Objection of the Dallas Foundation and Crown Global
Life Insurance Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11
U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent
Therewith* [Docket No. 4231] (the "Charitable Foundation Objection"), filed by The Dallas
Foundation (the "Dallas Foundation") (on behalf of Empower Dallas Foundation ("EDF") and
The Okada Family Foundation ("Okada Family"), and Crown Global Life Insurance, Ltd., not
individually, but solely in respect of Segregated Accounts 30218 and 30219 ("Crown"), (e) the
evidence admitted into the record during the hearing on the Motion on June 25, 2025 (the
"Hearing") in support of, and in opposition to, the Motion, including the Court's assessment of
the witnesses' credibility, and (f) all arguments heard at the Hearing in connection therewith; and
the Court having found that the legal and factual bases set forth in the Motion establish sufficient

cause for the relief granted herein; and adequate notice of the Motion having been given; and after due deliberation and good cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

1.      The Court's findings of fact and conclusions of law set forth on the record at the conclusion of the Hearing are incorporated by reference except as supplemented in this Order, and as may be further supplemented by the Court.

2.      Entry into the Settlement Agreement is an appropriate exercise of the Movants' business judgment.

3.      The Settlement Agreement is fair, reasonable, and in the best interests of each of the Highland Entities and their creditors and constituents.

4.      The Settlement Agreement was negotiated and entered into by the Highland Entities and the HMIT Entities without collusion or fraud, in good faith, and was the product of arm's- length negotiations.

5.      The HMIT Entities are not "insiders" or "affiliates" of Highland as those terms are defined in Bankruptcy Code sections 101(31) and 101(2).

6.      The HMIT Entities entered into the Settlement Agreement, are acquiring the Transferred Claims and Dugaboy Note in good faith, and have proceeded with all aspects of the Settlement Agreement in good faith, and have received fair value in consideration of their entry into the Settlement Agreement.

7.      The Transferred Claims and Dugaboy Note are property of the estate, and the Highland Entities' sale of those assets free and clear of all liens and encumbrances but otherwise subject to the Settlement Agreement is a proper exercise of their business judgment.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

8.      The Motion is **GRANTED**.

004555

9.      As stated on the record during the Hearing, The Charitable Foundation Objection is withdrawn with prejudice.

10.     All other Objections to the Motion are overruled.

11.     The Settlement Agreement attached as **Exhibit 1** to the Demo Declaration is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363(b) of the Bankruptcy Code.

12.     HMIT's Class 10 Interest is Allowed in the amount of $336,940,230.58.

13.     The HMIT Entities, as good faith purchasers of Estate assets in the Settlement, are entitled to the protections contained in section 363(m) of the Bankruptcy Code.

14.     The Highland Entities and their agents are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement without further notice or further Court approval.

15.     Notwithstanding anything in the Settlement Agreement to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (collectively, the "Foundation Parties") are or will be included in the definitions of "HMIT Releasors" or "Highland Releasors."  For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

16.     The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

### ### END OF ORDER ###



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 21, 2025**

United States Bankruptcy Judge

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |

## MEMORANDUM OPINION AND ORDER REGARDING STAY REQUESTS
## [ADDRESSING DE ## 4326 & 4308]

### I.       INTRODUCTION

This Order addresses the "Motion to Stay 9019 Order" filed July 17, 2025, by the Dugaboy

Investment Trust (the "Dugaboy Stay Motion").  DE # 4326.  This Order also addresses a letter

sent to this court by Texas Attorney General Ken Paxton, which letter was dated July 9, 2025, and

was docketed on July 10, 2025, at DE # 4308 (the "Texas AG Letter"). This court will sometimes

refer to the Dugaboy Stay Motion and the Texas AG Letter jointly as the "Stay Requests."

1

004684

The Dugaboy Stay Motion. The Dugaboy Stay Motion was filed by the Dugaboy Investment Trust ("Dugaboy"). Dugaboy is a trust whose beneficiaries are James Dondero and his children/descendants. Mr. Dondero is a co-founder and former CEO of the above-referenced Reorganized Debtor ("Highland" or "Reorganized Debtor"). As later discussed, Dugaboy was a former owner of a *de minimis* equity interest in Highland (less than .5%). The Dugaboy Stay Motion asks the bankruptcy court to stay **for 90 days** the court's June 30, 2025 "Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith" (the "Rule 9019 Settlement Order"). DE # 4297. The Rule 9019 Settlement Order approved a settlement ("Settlement Agreement") between the Reorganized Debtor (and certain post-confirmation plan trusts), on the one hand, and Hunter Mountain Investment Trust ("HMIT" or "Hunter Mountain") and certain of its affiliates, on the other. **Hunter Mountain was the 99.5% equity owner of Highland**. Dugaboy desires a 90-day stay of the Rule 9019 Settlement Order so that Dugaboy and other parties can investigate what it asserts was a fraud committed by an individual named Mark Patrick in connection with a Cayman Islands charitable foundation structure ("Cayman Islands Charitable Foundation Structure") that Mark Patrick manages. There are currently liquidation proceedings ongoing in the Cayman Islands, involving this Cayman Islands Charitable Foundation Structure, where these fraud allegations have been raised and presumably will be litigated. *See* Exh. A to the Dugaboy Stay Motion (which is an 83-page Writ of Summons and Statement of Claim filed on or about July 15, 2025, in the Grand Court of the Cayman Islands (the "Cayman Islands Action").

**What on earth does this litigation in the Cayman Islands have to do with the Rule 9019 Settlement Order (and the underlying Settlement Agreement approved therein)?** Well, as it turns out, this same Mark Patrick that is being accused of fraud in the Cayman Islands Action signed the

Settlement Agreement (on behalf of the Hunter Mountain entities). ***To be sure, the Hunter Mountain entities are not themselves charitable organizations***. Mark Patrick just happens to be a representative of both Hunter Mountain and the Cayman Islands charitable entities that are the subject of the Cayman Islands Action. Note that Dugaboy appealed this bankruptcy court's Rule 9019 Settlement Order on July 14, 2025. The Dugaboy Stay Motion is not a standard request for a stay pending appeal, pursuant to Fed. R. Bankr. Proc. 8007. Rather, a stay is sought, pursuant to Bankruptcy Code section 105, "to provide all stakeholders with time to investigate a motion under Rule 60 to vacate the [Rule] 9019 [Settlement] Order."[1]

<u>The Texas AG Letter</u>. The Texas AG Letter is not a properly filed motion. *See* Fed. R. Bankr. Proc. 5005. In any event, the court has considered it. It has a similar theme, only it asks for ***a stay of the entire bankruptcy proceedings*** (which are now more than four years post-confirmation). The Texas AG notes in his letter that, as the representative of the public's interest in charity, he is charged under Texas law with the power and duty to protect and enforce the public interest in nonprofit organizations, foundations, and charitable trusts.[2] The Texas AG Letter states that the Texas AG Office is investigating "persons and entities, some of whom are involved in this bankruptcy proceeding, in response to complaints"[3] and that "[o]ne of the complaints under investigation involves conduct allegedly taken by persons or entities during this bankruptcy proceeding."[4] The timing and statements in the Texas AG Letter suggest that the person being investigated is the same Mark Patrick addressed in the Dugaboy Stay Motion.

---

[1] Dugaboy Stay Motion, ¶ 3.
[2] Texas AG Letter, 1 (citing Tex. Prop. Code § 123.002 (authorizing the Attorney General to intervene in a "proceeding involving a charitable trust.") and *Tex. v. Veterans Support Org.*, 166 F. Supp. 3d 816, 820-21 (W.D. Tex. 2015)).
[3] Texas AG Letter, 1 (citing Tex. Bus. & Com. Code § 17.61).
[4] Texas AG Letter, 1.

004686

<u>Summary of Ruling.</u>  For the reasons set forth below, this bankruptcy court will not grant a stay. ***Whatever the misdeeds may or may not be of Mark Patrick, they are not sufficiently intertwined with the Highland bankruptcy estate (or the Settlement Agreement) to justify a stay***. Neither this bankruptcy case, nor the contested matter involving the Settlement Agreement, is a "proceeding involving a charitable trust."  As further described herein, there happens to be a "proceeding involving a charitable trust" ongoing in the Cayman Islands. Mark Patrick is apparently accused of misdeeds therein. But, in the bankruptcy case, Mark Patrick is merely a signatory for a counter-party to a settlement agreement with the bankruptcy estate (that counter-party being the former 99.5% equity owner of Highland, namely Hunter Mountain). This court evaluated the Settlement Agreement in the manner that jurisprudence requires[5] (and weighed the evidence presented, including witness testimony from four witnesses). As noted, this court's Rule 9019 Settlement Order is now subject to appeal. This court determined that the Settlement Agreement was fair and equitable, within the range of reasonableness, and in the best interest of the Highland bankruptcy estate being administered under a confirmed plan with disinterested fiduciaries. The Stay Requests do not articulate a bona fide reason to stay the Rule 9019 Settlement Order or, for that matter, a bankruptcy case that is now more than four years past confirmation. Importantly, it would appear that the parties have other avenues to address any malfeasance of Mark Patrick *vis-à-vis* the liquidation proceedings involving the Cayman Islands Charitable Foundation Structure.

---

[5] *In re Jackson Brewing Co.,* 624 F.2d 599, 603 (5th Cir. 1980); *Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.),* 801 F.3d 530, 540 (5th Cir. 2015); *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.),* 119 F.3d 349, 356 (5th Cir. 1997); *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.),* 68 F.3d 914, 917-18 (5th Cir. 1995); *Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.),* 922 F.3d 323, 327 (5th Cir. 2019) (quoting *Cadle Co. v. Mims (In re Moore),* 608 F.3d 253, 263 (5th Cir. 2010)).

004687

## II.      THE RULE 9019 SETTLEMENT MOTION

On May 19, 2025, a Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and

11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent

Therewith [DE # 4216] (the "Rule 9019 Motion") was filed by the Reorganized Debtor, the

Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the

"Litigation Sub-Trust") (collectively, the "Highland Entities").[6]

The Rule 9019 Motion proposed a broad settlement (the aforementioned Settlement

Agreement) that would resolve most of the remaining issues outstanding in the long-running

Highland bankruptcy case. The other parties to the Settlement Agreement, besides the Highland

Entities, were the so-called "HMIT Entities"—defined in the Settlement Agreement as Hunter

Mountain Investment Trust, Beacon Mountain LLC, Rand Advisors, LLC, Rand PE Fund I, LP,

Rand PE Fund Management, LLC, Atlas IDF, LP, and Atlas IDF GP, LLC. These HMIT Entities,

other than Hunter Mountain itself, are affiliates of Hunter Mountain. As earlier noted, ***Hunter

Mountain was the majority equity owner of Highland, prepetition.*** Hunter Mountain owned

100% of Highland's Class B & C limited partnership interests. This represented 99.5% of the

overall equity of Highland. Hunter Mountain acquired all of Highland's Class B and Class C

limited partnership interests (the "Class B/C Interests") in December 2015, from James Dondero

(the aforementioned co-founder and former CEO of Highland—whose family trust Dugaboy is

now wanting a stay); Mark Okada (another co-founder of Highland); and certain entities affiliated

with them.  These Class B/C Interests—again, held entirely by Hunter Mountain at this point—

were categorized in Class 10 of Highland's confirmed Chapter 11 plan.

---

[6] The Claimant Trust and Litigation Sub-Trust are entities created pursuant to the confirmed Highland Chapter 11 plan, to handle various post-confirmation matters.

004688

Among other things, the Settlement Agreement contemplated, in pertinent part: (a) the dismissal with prejudice of all pending litigation between and among the Highland Entities and the HMIT Entities (by way of example, Hunter Mountain had asserted claims for breach of fiduciary duty, conspiracy, and unjust enrichment against Highland and its new CEO, James P. Seery); (b) the disposition of bankruptcy estate claims asserted against certain of the HMIT Entities by the Claimant Trust and/or the Litigation Sub-Trust, and the assignment of the balance of the remaining estate claims to the HMIT Entities (by way of example, Highland had argued that Hunter Mountain owed Highland more than $57 million on a note payable to Highland); (c) the allowance of the Hunter Mountain Class 10 Interest in a fixed amount; (d) cash distributions to Hunter Mountain on account of its Class 10 Interest of about $10.5 Million, plus the assignment of an approximately $24 million note receivable owed to Highland known as the "Dugaboy Note," subject to certain conditions, set forth in the Settlement Agreement; and (e) the exchange of mutual general and broad releases and other protections consistent with the parties' intent to end all current, and avoid all future, litigation between and among them.

As previously mentioned, the current representative of Hunter Mountain is an individual named Mark Patrick. Mark Patrick assumed this role in March 2021, replacing an individual named Grant Scott. Mark Patrick was a long-time Highland employee. Mark Patrick had been employed by Highland as tax counsel since 2008. Mark Patrick had also provided personal tax advice to Mr. Dondero. In February 2021, as part of the Highland bankruptcy case, the employment contracts of many of Highland's employees, including Mark Patrick, were terminated. Mark Patrick, along with many other former back-office employees of Highland, thereafter became employees of a newly formed company called Skyview Group ("Skyview"), that provides middle and back-office services to various clients.

004689

Apparently, Mark Patrick and Mr. Dondero (and/or perhaps others at Skyview) got into disagreements of some sort in mid-2024, and Mark Patrick is no longer employed at Skyview.

### III.     THE OBJECTIONS TO THE RULE 9019 SETTLEMENT AGREEMENT

There were three objections to the Rule 9019 Settlement Motion/Settlement Agreement filed. Accordingly, the court presided over a contested evidentiary hearing on June 25, 2025 (the "Rule 9019 Settlement Hearing"). The court heard testimony from four witnesses: James Seery, Mark Patrick, James Dondero, and Patrick Daugherty. The court admitted documentary evidence as well.

<u>The Patrick Daugherty Objection.</u> One objection was filed by Patrick Daugherty (a former general counsel of Highland that has been in litigation for more than 15 years in several courts with Highland, Dondero, and others related to Highland) [DE # 4229]. Daugherty has already been paid on a large claim he was allowed in the Highland bankruptcy case but still has an unresolved, contingent, unsecured claim that is categorized in Class 8 of the confirmed Highland plan. Mr. Daugherty argued that the absolute priority rule and the Chapter 11 plan terms were being violated by the Settlement Agreement, since an equity interest (Hunter Mountain's Class 10 Interest) was receiving a distribution before Daugherty's Class 8 general unsecured claim. The court disagreed with these arguments, since Mr. Daugherty's unpaid, contingent Class 8 claim is highly speculative and has been fully reserved for, pending an ultimate hearing on the allowance of this claim. This Objection was overruled at the Rule 9019 Settlement Hearing.

<u>The Dugaboy Objection.</u> Another objection was filed by Dugaboy [DE # 4230]. As earlier noted, Dugaboy owned a very small amount of the equity in Highland—specifically, a .1866% share of the Class A limited partnership interests—and these Class A limited partnership interests, in turn, represented a merely .5% of the overall equity of Highland. Thus, Dugaboy owned well-

7

004690

under 1% of the equity of Highland. These Class A interests were categorized in Class 11 of the confirmed Highland plan. Note that two other parties besides Dugaboy owned Class A equity interests in Highland: Strand Advisors, Inc. ("Strand") and Mark Okada directly and indirectly (the other co-founder of Highland). The Dugaboy objection essentially argued that the Settlement Agreement violated the confirmed Plan, the Claimant Trust Agreement and the Confirmation Order, without much more detail than this. The Dugaboy objection was surprising to this court, because Hunter Mountain and Dugaboy have seemed to be at all times friendly—seemingly in lockstep—throughout the Highland bankruptcy case.  They have shared the same legal positions and the same legal counsel at times. On the day of the Rule 9019 Settlement Hearing, Dugaboy orally made additional arguments, beyond those made in its written objection. Specifically, Dugaboy argued that the existence of the Cayman Islands Action should cause the bankruptcy court to continue the Rule 9019 Settlement Hearing (which Cayman Islands Action is further discussed below). The court declined to continue the Rule 9019 Settlement Hearing, and Dugaboy's Objection was overruled at the hearing.

The Dallas Foundation Objection.  Another objection ("Dallas Foundation Objection") to the Settlement was filed by The Dallas Foundation [DE # 4231] (the "Dallas Foundation"), on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation (the "Okada Foundation"), and Crown Global Life Insurance, Ltd. ("Crown,"), not individually, but solely in respect of Segregated Accounts 30218 & 30219 (collectively, for ease of reference, the "Dallas Foundation"). The Dallas Foundation argued that "the Settlement is potentially tainted by the actions of Mark Patrick, the apparent sole manager and director of the HMIT Entities."[7]  It further stated that "upon information and belief, Mr. Patrick illicitly restructured *the ownership* of the

---

[7] Dallas Foundation Objection, ¶ 2.

HMIT Entities in a manner that seemed to facilitate the diversion of millions of dollars in assets from ***the charitable entities that are the beneficial owners of the HMIT Entities***."[8]

What did this mean? How exactly does the Dallas Foundation factor into all of this? How was the Dallas Foundation a party-in-interest with standing to object to a settlement in the Highland bankruptcy case at this juncture? ***It did not purport to be a creditor or equity interest holder***. Rather, the Dallas Foundation was referring to itself as ***"a Beneficial Owner of the HMIT Entities."***[9] Since HMIT owns 99.5% of Highland, does the Dallas Foundation also consider itself an indirect beneficial owner of Highland? Suddenly this is mind-numbing.

Not to worry. The Dallas Foundation Objection further explained how it is a "Beneficial Owner" of Hunter Mountain. The explanation involves a complex charitable entity structure that is organized in the Cayman Islands. One has to carefully follow the bouncing ball to make the connection.

## IV.     **THE CAYMAN ISLANDS CHARITABLE FOUNDATION STRUCTURE**[10]

<u>DAF Holdco (a "corporate blocker")</u>. First, there is an entity called Charitable DAF HoldCo, Ltd. (the "DAF Holdco"), that is a Cayman Islands exempted company, incorporated on October 27, 2011, having its registered office at HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman KY1-1207, that happens to currently be in liquidation proceedings in the Cayman Islands Action. The shares of DAF Holdco are divided into Participating Shares and Management Shares. DAF Holdco is apparently what's known as a "corporate blocker" in the Cayman Islands Charitable Foundation Structure. Mark Patrick has been the manager of it since March 2021.

---

[8] Dallas Foundation Objection, ¶ 2 (emphasis added).
[9] Dallas Foundation Objection, 4 (emphasis added).
[10] The following is gleaned from an Exhibit A attachment to the Dugaboy Stay Motion.

004692

<u>The DAF Fund</u>. Second, DAF Holdco has historically been the sole limited partner of another entity called Charitable DAF Fund, LP (the "DAF Fund"). The DAF Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets ***for the ultimate benefit of three or four registered charitable organizations in the U.S., including the Dallas Foundation*** (the "Charitable Entities").[11] The DAF Fund has sometimes been represented in filings (organizational charts) presented to the bankruptcy court as a Cayman Islands hedge fund. The general partner of the DAF Fund was historically Charitable DAF GP, LLC (the "DAF GP"), a Delaware limited liability company registered as a foreign company in the Cayman Islands. Mark Patrick has been the manager of DAF GP since March 2021.

<u>CLO Holdco (another "corporate blocker")</u>. Third, the sole asset of the DAF Fund is its 100% equity ownership in yet another entity called CLO HoldCo, Ltd. ("CLO HoldCo"), which is yet another Cayman Islands exempted company incorporated with limited liability, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands. CLO HoldCo is another "corporate blocker" entity in the Cayman Islands Charitable Foundation Structure. ***Interestingly, CLO HoldCo owns Hunter Mountain, and, as previously stated, Hunter Mountain was the 99.5% owner of Highland.***

It seems rather interesting that Highland—an alternative investment advisor (sometimes referred to as a hedge fund) that was managing billions of assets—was owned ultimately by an offshore structure designed for charitable purposes. However, this court has no expertise as to

---

[11] The Charitable Entities of which this court is aware are: The Dallas Foundation, The Greater Kansas City Foundation, The Santa Barbara Foundation, and the Community Foundation of North Texas (the "Charitable Entities" or sometimes the "Participating Shareholders"). The court has every reason to believe that these are respectable organizations dedicated to supporting charitable causes in their communities. The court has never heard anything to the contrary. Nothing herein should be construed as disparaging them in any way.

whether this is an unusual structure or one that is common to facilitate/enhance tax-exempt ownership and charitable giving. The court is simply presenting the information available to it that it thinks explains why a stay is not appropriate here: namely, *since other litigation exists involving Mark Patrick and the Charitable Entities*.

In any event, structurally, the three or four Charitable Entities (including the Dallas Foundation) are the ultimate beneficial owners of Participating Shares in DAF Holdco (one of the "corporate blockers"). This essentially means that the Charitable Entities are at the top of the whole structure.

The documentation supporting this whole structure apparently requires that the Participating Shareholders (i.e., the Charitable Entities such as the Dallas Foundation) must at all times qualify as a tax-exempt organizations, pursuant to section 501(c)(3) of the United States Internal Revenue Code of 1986 ("IRC"). The Participating Shares do not have voting rights but have the right to participate in the profits or assets of the DAF Holdco. Meanwhile, the Management Shares (which have been held by Mark Patrick) have voting rights but do not have the right to participate in the profits or assets of the DAF Holdco. In other words, the Participating Shareholders have the entirety of the economic interest in DAF Holdco, whereas the sole Management Shareholder has the control rights.

Bottom line, the Dallas Foundation argued that they had reason to believe that Mark Patrick engaged in some illicit actions recently that changed up some of the structure set forth above (i.e., including the insertion of newly created entities into the DAF Fund's structure). *As a result, the Dallas Foundation feared that a significant portion of the economic interests derived by the HMIT Entities from the Settlement Agreement would flow to Mark Patrick rather than to the Charitable Entities for whose benefit the DAF Fund was established*. The Dallas Foundation

004694

questioned Mark Patrick's requisite corporate authority to cause the HMIT Entities to enter into the Settlement Agreement. The Dallas Foundation asserted that many of Mark Patrick's alleged actions, including the apparent insertion of newly created entities into the DAF Fund's structure, would be subject to claw back or other avoidance actions in the Cayman Islands Action or such other tribunal as has jurisdiction. The Dallas Foundation wanted the bankruptcy court to defer to that process.

Significantly, the Dallas Foundation withdrew its objection the morning of the June 25, 2025 Rule 9019 Settlement Hearing. It made its announcement through counsel on the record at the hearing.

## V.     THE RULE 9019 SETTLEMENT HEARING

After hearing evidence and argument on June 25, 2025, the court approved the Settlement Agreement. Bankruptcy Rule 9019 provides that "[o]n motion … and after notice and a hearing, the court may approve a compromise or settlement."[12] Settlements are favored in the bankruptcy context to "minimize litigation and expedite the administration of a bankruptcy estate."[13] The approval of a settlement is within the "sound discretion" of the trial court.[14] Pursuant to Bankruptcy Rule 9019(a), the court may approve a settlement if it is fair, reasonable, and in the best interests of the estate.[15] A settlement should be approved unless it falls below the lowest point in the range of reasonableness, based on a comparison between the terms of the settlement and the costs and benefits of further litigation.[16]

---

[12] Fed. R. Bankr. Proc. 9019(a).

[13] *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

[14] *In re Jackson Brewing Co.*, 624 F.2d 599, 603 (5th Cir. 1980).

[15] *See, e.g., Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015).

[16] *See, e.g., Jackson Brewing Co.*, 624 F.2d at 602 (court must compare the "terms of the compromise with the likely rewards of litigation"); *Cook v. Waldron*, 2006 U.S. Dist. LEXIS 31411, at *10 (S.D. Tex. April 18, 2006) (court should "canvass the issues" to decide if settlement falls "below the lowest point in the range of reasonableness").

004695

In evaluating a proposed settlement, courts consider (i) the "probability of success in the litigation, with due consideration for the uncertainty in fact and law," (ii) the "complexity and likely duration of the litigation and any attendant expense, inconvenience and delay," and (iii) "[a]ll other factors bearing on the wisdom of the compromise."[17] Assessing the first factor—success on the merits—does not require a "mini-trial" on the merits.[18] The "other factors" include "the best interests of the creditors, 'with proper deference to their reasonable views,'" as well as "'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.'"[19]

A trustee or other estate representative also "is permitted to settle lawsuits pursuant to section 363(b)" of the Bankruptcy Code.[20] Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."[21] A sale involving a transaction outside the ordinary course of business "'must be supported by an articulated business justification, good business judgment, or sound business reasons.'"[22]

The court determined, based on this jurisprudence, that the factors to be considered pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 363(b) weighed in favor of approving the Settlement Agreement in this case. The Highland Entities believed they had strong and meritorious defenses to all of the then-pending HMIT litigation, and history has shown that defending the then-pending HMIT litigation, including the appeals that could result therefrom,

---

[17] *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (quoting *Jackson Brewing Co.*, 624 F.2d at 602).

[18] *Cajun Elec. Power Coop.*, 119 F.3d at 356.

[19] *Id.* (quoting *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917-18 (5th Cir. 1995)).

[20] *Id.* at 354.

[21] 11 U.S.C. § 363(b)(1).

[22] *Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*, 922 F.3d 323, 327 (5th Cir. 2019) (quoting *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010)).

004696

would be costly, time-consuming and value-destructive to the estate and creditor recoveries. Further, there was no guarantee that the Highland Entities would continue to be successful in defending the then-pending HMIT litigation—or that the HMIT Entities would not file additional litigation against the Highland Entities and their indemnified parties.

The second factor—complexity, duration, and costs of litigation—also weighed heavily in favor of approval of the Settlement Agreement. The cost of defending against the litigation in this case, including the then-pending HMIT litigation, had been significant. The litigation and its attendant costs have also significantly delayed and reduced distributions to the Reorganized Debtor's constituents. The HMIT litigation began in 2023 and is subject to at least two pending appeals which showed no signs of resolving absent this Settlement Agreement. If the Settlement Agreement was not approved, the Highland Entities would be faced with significant appellate litigation and potentially additional litigation in this court and other courts.

Third, approval of the Settlement Agreement was justified by the paramount interests of Highland's creditors and constituents. The Settlement Agreement resolved the pending HMIT litigation, resolved all disputes in connection with the HMIT Class 10 Interest; would sell, transfer, and assign the Estate Claims asserted in the so-called Kirschner Adversary Proceeding—which has been pending since 2021 (until it was stayed in 2023, at significant cost to the estate)—to the HMIT Entities; and would provide for broad mutual releases and a cessation of the litigation and acrimony that, in significant part, has delayed completion of the Plan and the overall bankruptcy case.

The preponderance of the evidence suggested that the Settlement Agreement was a rational exercise of the Highland Entities' business judgment and was negotiated in good faith and at arm's length.

004697

The court signed the Rule 9019 Settlement Order on June 30, 2025 [DE # 4297].

Then, on July 17, 2025, Dugaboy filed the Dugaboy Stay Motion. This was preceded by the filing of the Texas AG Letter on July 10, 2025. As earlier noted, both of these Stay Requests urge that this court should halt things while they or others investigate matters that should be hashed out in the Cayman Islands Action. The Dugaboy Stay Motion says this

> is necessary to provide all stakeholders with time to investigate a motion under Rule 60 to vacate the 9019 Order (and all resulting orders, such as the dismissals effected as a result of the 9019 Order) in light of evidence suggesting that the settlement approved by this Court was a key element of [Mark Patrick's] alleged fraudulent scheme. Transfers of assets to companies controlled by Mr. Patrick must be halted, lest those assets are moved to companies "hard to find or track."[23]

## VI.    DENIAL OF STAY REQUESTS

As noted earlier, the Dugaboy Stay Motion and the Texas AG Letter are not motions for stay pending appeal pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedure. Dugaboy requests some sort of discretionary stay, for 90 days, while proceedings in the Cayman Islands Action go forward and, perhaps, reach a conclusion that improprieties by Mark Patrick occurred with regard to the Cayman Islands Charitable Foundation Structure. To be clear, the request is made by Dugaboy, whose party-in-interest status in the Highland estate is quite *de minimis*. The Texas AG apparently is of the impression (as a result of whomever filed a complaint with him) that this bankruptcy case, or the contested matter involving the Settlement Agreement, is a "proceeding involving a charitable trust." But that simply is not the case. While the assets of Hunter Mountain—remember, the former 99.5% equity owner of Highland—may ultimately be part of a *res* that indirectly benefits (or was intended to benefit) the Charitable Entities such as Dallas Foundation (as a result of the manner in which the Cayman Islands Charitable Foundation

---

[23] Dugaboy Stay Motion, ¶ 3.

Structure was designed), this does not mean that the Highland bankruptcy case is a proceeding involving a charitable trust. This court believes it applied the correct analysis required for a bankruptcy settlement.  Nothing about the bankruptcy court's ruling impacts the Cayman Islands Action or the Texas AG actions it might seek to take on behalf of the Charitable Entities such as the Dallas Foundation. Accordingly,

**IT IS ORDERED** that the Stay Requests by Dugaboy and the Texas attorney general be, and hereby are, **DENIED.**

#### #### END OF MEMORANDUM OPINION AND ORDER ####

004699

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

**CAUSE NO: FSD 201 OF 2025 (  )**

BETWEEN:

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

<u>Plaintiff</u>

AND

|     |     |
|-----|-----|
| **(1)** | **MARK ERIC PATRICK** |
| **(2)** | **PAUL MURPHY** |
| **(3)** | **CDMCFAD, LLC** |
| **(4)** | **DFW CHARITABLE FOUNDATION** |
| **(5)** | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** |
| **(6)** | **CLO HOLDCO, LTD.** |

<u>Defendants</u>

---

**STATEMENT OF CLAIM**

---

## INTRODUCTION

1    The Plaintiff, Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**"), is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Cayman KY1-1207. The authorised and issued share capital of the Company is divided into Participating Shares and Management Shares.

2    The Company was placed into court supervised liquidation and Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited were appointed as joint official liquidators (the "**JOLs**") pursuant to an order of this Honourable Court dated 6 May 2025.

3    The Company was, between November 2011 and 18 December 2024, the sole limited partner of Charitable DAF Fund, LP (the "**Fund**").  At all relevant times, the net asset value of the Fund's assets was c. US$270million.

4    The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the U.S. namely The Dallas Foundation; the Greater Kansas City Community Foundation; the Santa Barbara Foundation and The Community Foundation of North Texas (the "**Charities**"). These charities are the owners or the ultimate beneficial owners of Participating Shares in the Company.

5    In March 2021, Mark Patrick (the "**First Defendant**") was appointed the sole director and registered as the sole Management Shareholder of the Company.  In April 2021, Paul Murphy (the "**Second Defendant**") was appointed by the First Defendant as a second director of Holdco.

6    By virtue of a series of transactions or purported transactions between March 2024 and March 2025, unbeknownst to the holders of the Participating Shares (the "**Participating Shareholders**")  of the Company, Mr Patrick caused:

6.1    the Company, with the agreement and concurrence of Mr Murphy, to assign its interest in the Fund to the Third Defendant, a Delaware limited liability company, formed in

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

2

December 2024 and controlled by Mr Patrick, in exchange for a membership interest
in that entity;

6.2   the Company, with the agreement and concurrence of Mr Murphy, to issue and allot
further Participating Shares (representing a majority of the issued participating share
capital) to the Fourth Defendant, a Delaware company, incorporated in December 2024
and controlled by Mr Patrick;

6.3   the Third Defendant to redeem the Company's membership interest in the Third
Defendant for a consideration of c. US$1.6 million, representing approximately 0.59%
of the total net asset value of the assets held by the Fund; and

6.4   the Company, with the agreement and concurrence of Mr Murphy, to be placed into
voluntary liquidation after having made a final distribution to all Original Participating
Shareholders (defined below) in the Company of the proceeds of redemption,

collectively the "**Impugned Transactions**".

7   The First and Second Defendants effected the Impugned Transactions in breach of their
fiduciary and other duties to the Company in order to bring ownership of the Fund and its
assets, with a net value of c. US$270 million (as assessed at 30 September 2024), under Mr
Patrick's effective control to the exclusion of the interests of the Charities. The Charities, as the
original, and rightful, ultimate beneficiaries of the Fund, have been left with nothing.

8   Further, during the period March 2021 to June 2024, the First and Second Defendants, in
breach of fiduciary duty, caused the Company to pay excessive fees and expenses to Mr
Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

3

**THE PARTIES**

<u>The Company</u>

9     The Company is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Limited, Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman, KY1-1207, Cayman Islands.

10    The directors of the Company are Mr Patrick (appointed on 25 March 2021) and Mr Murphy (appointed by Mr Patrick on 22 April 2021).

11    The Company has been governed by the following memorandum and articles of association from time to time:

    11.1    The memorandum and articles of association dated 27 October 2011; and

    11.2    The amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.

    The Company remains governed by the memorandum and articles of association as amended and restated on 20 February 2025 (the "**Articles**") save that the Company reserves the right to challenge the validity of the Articles.

12    Save as set out above, the Company will rely on the Articles and all previous iterations for their applicable full terms and effect.

13    Pursuant to the Articles and at all relevant times, the authorised share capital of the Company was US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

4

14       The Articles (with reference to the defined term of 'Restricted Person') require that the Participating Shareholders must at all times qualify as a tax-exempt organisation pursuant to section 501(c)(3) of the United States Internal Revenue Code of 1986 ("**IRC**").

15       The Participating Shares do not have voting rights but confer the right to participate in the profits or assets of the Company including by way of the receipt of dividends (Article 12).

16       The Management Shares have voting rights but confer no other right to participate in the profits or assets of the Company (Article 11).

17       The Participating Shareholders therefore have the entirety of the economic interest in the Company, whereas the Management Shareholders have the control rights.

18       On 7 November 2011, the Company issued:

18.1     300 Participating Shares to The Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"); and

18.2     100 Management Shares to Grant Scott.

19       On 30 November 2011, Trust #2 transferred its 300 Participating Shares equally amongst:

19.1     Highland Kansas City Foundation, Inc.;

19.2     Highland Dallas Foundation, Inc.[1]; and

19.3     Highland Santa Barbara Foundation, Inc.,

collectively, the "**Supporting Organisations**".

---

[1]Since June 2024, Highland Dallas Foundation, Inc. has also done business as 'NexPoint Philanthropies Dallas, Inc.', per an Assumed Name Certificate filed with the Secretary of State of Texas.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

5

Case 19-34054-sgj11   Doc 4326   Filed 07/17/25   Entered 07/17/25 10:54:33   Desc
Case 3:25-cv-01876-K   Document 33-1   Filed 11/26/25   Page 546 of 614   PageID 3593

FSD2025-0201                         **Page 9 of 83**                         **2025-07-15**

20   On 12 August 2015, the Company issued 5 Participating Shares to the Community Foundation of North Texas, ("**CFNT**", and together with the Supporting Organisations the "**Original Participating Shareholders**") for Highland Capital Management, L.P. Charitable Fund at CFNT.

21   On 25 March 2021, the Management Shares were transferred to Mr Patrick and he continues to hold these shares.

22   The Participating Shares held by the Original Participating Shareholders represented the entire issued Participating Share capital of the Company until 7 February 2025. On that date, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to issue 318 Participating Shares to the Fourth Defendant, DFW Charitable Foundation ("**DFW**"), significantly diluting the shareholdings of the Original Participating Shareholders and the indirect economic interest of the Charities.

23   Until 18 December 2024, the sole asset of the Company was its limited partnership interest in the Fund (the "**Partnership Interest**").

24   As a result of the Impugned Transactions, the Company now has no material assets.

DFW

25   DFW (the Fourth Defendant) is a non-profit non-stock corporation incorporated in Delaware on 9 December 2024, which is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes.

26   DFW is the majority Participating Shareholder of the Company by virtue of the purported share issuance on 7 February 2025, and Mr Patrick is its registered director, president and sole member.


FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

6

Case 19-34054-sgj11    Doc 4326    Filed 07/17/25    Entered 07/17/25 10:54:33    Desc
Case 3:25-cv-01876-K    Document 13-31    Filed 11/26/25    Page 547 of 614    PageID 13594

FSD2025-0201                         **Page 10 of 83**                         2025-07-15

The Fund

27    The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011
      (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor
      4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

28    The Fund is governed by the Second Amended and Restated Exempted Limited Partnership
      Agreement dated 11 March 2024 (the "**LPA**"). The initial exempted limited partnership
      agreement of the Fund was dated 25 October 2011, was amended and restated on 7
      November 2011 and further amended on 26 July 2022 (with effect from 24 March 2021). The
      Company will rely on the LPA for its applicable full terms and effect.

29    Mr Patrick was instrumental in the establishment of the Company, the Fund and the Fund
      structure.

30    Until 18 December 2024, the Company was the sole limited partner of the Fund.

31    On 18 December 2024, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused
      the Company to transfer its limited partnership interest to CDMCFAD, LLC ("**CDM**") (the Third
      Defendant) in exchange for a membership interest in CDM.

32    The original general partner of the Fund was Charitable DAF GP, LLC (the "**Original GP**"), a
      Delaware limited liability company registered as a foreign company in the Cayman Islands.
      The Original GP was the general partner from the Fund's formation until 7 March 2024.

33    On 7 March 2024, the Original GP was replaced by CDH GP, Ltd. (the "**New GP**") (the Fifth
      Defendant).

34    The sole asset of the Fund is its 100% shareholding in CLO HoldCo, Ltd. ("**CLO HoldCo**") (the
      Sixth Defendant), a Cayman Islands exempted company incorporated with limited liability,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

7

Case 19-34054-sgj11   Doc 4326   Filed 07/17/25   Entered 07/17/25 10:54:33   Desc
Case 3:25-cv-01876-K    Document 30 filed 11/26/25   Page 548 of 614   PageID 30595

FSD2025-0201                        **Page 11 of 83**                        2025-07-15

having its registered office address located at Campbells Corporate Services Limited, Floor 4,
Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

35    The assets of the Fund were valued at c. $270 million in September 2024.

<u>The New GP</u>

36    The New GP (the Fifth Defendant) is a Cayman Islands exempted company incorporated on
27 February 2024, having its registered office located at Campbells Corporate Services
Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

37    Mr Patrick is the New GP's sole director and sole shareholder.

38    The New GP is a defendant to these proceedings in two capacities: (i) in its capacity as General
Partner; and (ii) for and on behalf of the Fund in order to join the Fund as a defendant to these
proceedings.

<u>CDM</u>

39    CDM (the Third Defendant) is a limited liability company incorporated in Delaware on 12
December 2024, having its registered address c/o The Corporation Trust Company, 1209
Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

40    CDM is governed by the terms of a Limited Liability Company Agreement dated 18 December
2024.

41    Since 18 December 2024, the primary asset of CDM has been the limited partnership interest
in the Fund.

42    The sole manager of CDM is Mark Patrick.

43    From 18 December 2024 to 27 March 2025, the sole member of CDM was the Company.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

8

44      On 27 March 2025, Mr Patrick caused CDM to redeem the Company and admit DFW as the sole participating member.

<u>CLO HoldCo</u>

45      CLO HoldCo (the Sixth Defendant) is a Cayman Islands exempted company incorporated on 13 December 2010, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands, and which is the Fund's main subsidiary.

46      The directors of CLO Holdco are Messrs Patrick and Murphy.

47      The sole shareholder of CLO Holdco is the Fund.

<u>The Directors</u>

*Mark Patrick*

48      Mr Patrick (the First Defendant) is a U.S. resident who is:

   48.1     a director, holds the offices of (i) President, (ii) General Counsel, and (iii) Chief Investment Officer and is the current Management Shareholder of the Company;

   48.2     the Manager of CDM (the Third Defendant);

   48.3     the sole director and the sole member of DFW (the Fourth Defendant);

   48.4     the sole director and sole shareholder of the New GP (the Fifth Defendant); and

   48.5     a director of CLO HoldCo (the Sixth Defendant).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

9

Case 19-34054-sgj11   Doc 4326   Filed 07/17/25   Entered 07/17/25 10:54:33   Desc
Case 3:25-cv-01876-K   Document 33 on File 11/28/2525 or Page 550 of 614   PageID 35097

FSD2025-0201                        **Page 13 of 83**                        2025-07-15

49    Mr Patrick was employed as tax counsel by Highland Capital Management, L.P. ("**Highland**")
      from 2008 to 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a Skyview Group
      from March 2021 to October 2024.

*Paul Murphy*

50    Mr Murphy (the Second Defendant) is a Cayman Islands resident who is:

      50.1    a director of the Company;

      50.2    a director of CLO HoldCo (the Fifth Defendant); and

      50.3    a director of various other entities in the Charitable DAF structure.[2]

51    Mr Patrick and Mr Murphy are referred to herein as the "**Directors**".

**THE CHARITABLE PURPOSE OF THE FUND**

52    The Fund was formed on 28 October 2011 at the instigation of Mr James Dondero, a U.S.
      resident and the founder of Highland to enable certain assets, held through the shares in CLO
      Holdco, to be donated to a charitable foundation.

53    Upon the formation of the Fund, the Company was admitted as a limited partner and, by way
      of capital contribution, contributed all of the outstanding equity interests in CLO HoldCo to the
      Fund.

54    The purpose of the Fund was to make investments for the ultimate benefit of the Original
      Participating Shareholders and the Charities:

---

[2]Mr Murphy was appointed to the board of directors of the following entities on 22 April 2021; Liberty CLO Holdco, Ltd., Liberty Sub, Ltd.,
HCT Holdco 2, Ltd. and MGM Studios Holdco, Ltd. at the same time as Charitable DAF HoldCo, Ltd and CLO HoldCo, Ltd.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

10

54.1   The recitals to the LPA of the Fund provide that the purpose of the Fund was to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of the Limited Partner and its Indirect Charitable Owners…*".

54.2   Clause 1.3 of the LPA provides that "*… the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*".

54.3   Clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*".

54.4   "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" i.e., the Company's Participating Shareholders or the Charities.

54.5   Clause 4.2(a) of the LPA provides that "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses…*".

54.6   The LPA does not modify the statutory duty of the General Partner to act in good faith and in the interests of the Fund.

55   The Charities are the following four US charitable or non-profit foundations:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

11

55.1 *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

55.2 *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

55.3 *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

55.4 *North Texas Community Foundation*: which manages assets totalling $513 million and donated $38.9 million to local non-profits in 2023.

56   The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (the "**Supported Organisations**") hold their interests in the Company through their respective Supporting Organisation namely Highland Dallas Foundation, Inc. as the Supporting Organisation for The Dallas Foundation; Highland Kansas City Foundation, Inc. as the Supporting Organisation for the Greater Kansas City Community Foundation; Highland Santa Barbara Foundation, Inc as the Supporting Organisation for the Santa Barbara Foundation.

57   CFNT holds its Participating Shares in the Company directly.

**THE TAX STRUCTURE**

58   As a matter of U.S. tax law, in order for the Supported Organisations to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore corporate blocker entity, namely the Company:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

12

58.1   S501(c)(3) of the IRC provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that it receives income classified as unrelated business taxable income ("**UBTI**"); and

58.2   the Supported Organisations and their Supporting Organisations meet the criteria of s501(c)(3). They are therefore generally exempt from U.S. state and federal taxes, with a few exceptions, including to the extent that they receive UBTI.

59   As a matter of U.S. tax law, at least a portion of income received directly from the Fund by the Supported Organisations would likely be considered UBTI.

60   In order to insulate the Supported Organisations from UBTI, instead of holding their interest in the Fund directly, they held through an offshore corporate blocker structure, namely the Company.

**THE SUPPORTED ORGANISATIONS CONTROL THE SUPPORTING ORGANISATIONS**

61   The Supporting Organisations were incorporated in Delaware by Mr Dondero on or about 22 November 2011 for the purpose of making charitable donations to their respective charity from the proceeds of dividends received by the Supporting Organisations from the Company.

62   Supporting organisations under the IRC are tax exempt charitable organisations that provide financial or operational support to one or more public charitable organisations (called "supported organisations"). Because of the link with the supported public charities, supporting organisations are classified as public charities themselves, as opposed to private foundations, despite the fact that a supporting organisation's sources of funding may be limited to a single individual, which would otherwise cause the entity to be classified as a private foundation.

63   Contributions to supporting organisations, as public charities, qualify for the highest tax deductibility thresholds under the IRC (up to 50% of the taxpayer's adjusted gross income, or

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

13

60%, in the case of cash gifts) instead of the substantially lower threshold for contributions to private foundations (30% of adjusted gross income, regardless of the character of the contribution).

64      The Supporting Organisations are "Type I" tax exempt organisations under the IRC which means they must be organised and operated exclusively to support and benefit their relevant charity and controlled by that charity:

    64.1    S509(a)(3) of the IRC contains the qualifications for a "supporting organisation". Under that section, a supporting organisation is a tax-exempt entity that must be organised and then operate exclusively for either (i) the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of one or more supported organisations.  The supported organisations must also be s501(c)(3) entities;

    64.2    There are three types of supporting organisations, known as "Type I", "Type II" and "Type III". S509(a)(3)(B)(i), (ii) and (iii) sets out the requirements for each "Type", respectively;

    64.3    S509(a)(3)(B)(i) provides that a Type I supporting organisation must be operated, supervised or controlled by the supported organisation; and

    64.4    S509(a)(3)(C) provides that the supporting organisation may not be controlled by a disqualified person, other than the foundation managers and the supported organisation.

65      The Supporting Organisations are so controlled by the respective Supported Organisations.

66      The Supporting Organisations are governed by the terms of their respective Certificate of Incorporation and by-laws (the "**Bylaws**").

67      The Certificates of Incorporation provide (amongst other things) that:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

14

67.1    the Supporting Organisation:

(a)    is organised and shall be operated exclusively for charitable, educational and scientific purposes;

(b)    is organised and operated exclusively to support and benefit the particular charity that controls it; and

(c)    is a non-profit non-stock corporation and cannot issue any capital stock;

67.2    no part of the net earnings of the Supporting Organisation shall be distributable to the directors and officers of the Supporting Organisation or other private persons save that the Supporting Organisation can pay reasonable compensation for services rendered; and

67.3    net earnings can be used to make grants, loans and similar payments for charitable, educational and scientific purposes to benefit the relevant Supported Organisation.

68    The Bylaws provide that (amongst other things):

68.1    There are two classes of members of the Supporting Organisations with one member in each such class:

(a)    the institutional member (the "**Institutional Member**") which shall be the Supported Organisation; and

(b)    the individual member (the "**Individual Member**") which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

68.2    In terms of voting on a matter submitted to a vote of the members (except as otherwise provided in the Bylaws):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

15

004345

(a)   the Institutional Member is entitled to two votes; and

(b)   the Individual Member is entitled to one vote.

68.3   Institutional membership is not transferable or assignable.

68.4   Individual membership is transferable or assignable only upon approval of the Institutional Member.

68.5   Both the Institutional Member and the Individual Member must be present in person or by represented proxy to constitute a quorum at all meetings of members.

68.6   There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member.

69   The relationship between the Supporting Organisations and their respective Supported Organisation are governed by separate operating/legal relationship agreements (collectively "**Operating Agreements**"). These agreements provide, among other things, that:

69.1   the Supported Organisation will provide certain services to the Supporting Organisation;

69.2   the Supported Organisation will appoint two of the three directors of the Supporting Organisation as required by Bylaws; and

69.3   in consideration for the services provided by the Supported Organisation to the Supporting Organisation, the Supporting Organisation shall pay a fee to the Supported Organisation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

16

70      Mr Dondero sits on the board of each of the Supporting Organisations with two other directors
        from each of the Supported Organisations respectively.

71      The relationships, rights and obligations created by and between the Supported Organisations
        and the Supporting Organisations pursuant to the agreements entered into between them were
        at all material times in summary that:

        71.1    the Supported Organisations control the Supporting Organisations through their
                majority voting interest and their ability to elect a majority of the directors of the
                Supporting Organisations;

        71.2    the Supporting Organisations support the Supported Organisations by way of making
                grants to them from time to time from their assets, including any dividends received
                from the Company;

        71.3    the Supporting Organisations have no ability to pay dividends to any private person or
                make payments to their directors (save reasonable reimbursement for reasonable out-
                of-pocket expenses) and can only make grants to the relevant Charity in furtherance of
                their charitable purposes; and

        71.4    while Mr Dondero sits on the board of the Supporting Organisations, he does not control
                them, as a supermajority of the votes are always held by the respective Charity.

72      The Company will rely on the Certificates of Incorporation, Bylaws, Operating Agreements and
        terms of the IRC for their applicable full terms and effect.

**THE CONTROL POSITION OF MR PATRICK OVER THE COMPANY AND THE FUND**

73      The terms of the LPA grant sole control over the management and distribution of the Fund's
        assets to the General Partner. The terms of the Articles grant sole control over the
        management and distribution of the Company's assets to the Management Shareholder.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

17

Case 19-34054-sgj11   Doc 4326   Filed 07/17/25   Entered 07/17/25 10:54:33   Desc
Case 3:25-cv-01876-K   Document 33-1 on Filed 11/26/25   Page 558 of 614   PageID 11015

FSD2025-0201                    **Page 21 of 83**                    2025-07-15

The LPA

73.1   Clause 1.12

(i)   The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

73.2   Clause 1.6

(i)   *Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

(ii)   *Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

18

Case 19-34054-sgj11 Doc 4326 Filed 07/17/25 Entered 07/17/25 10:54:33 Desc
Case 3:25-cv-01876-K Document 33 filed 11/26/25 of Page 559 of 614 PageID 3102

FSD2025-0201 Page 22 of 83 2025-07-15

*hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.*

<u>The Articles</u>

73.3 Article 11

*The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.*

73.4 Article 12

*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.*

73.5 Article 13

*…the rights attached to any such Class may… only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting.*

73.6 Article 84 (d)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

19

*The office of Director shall be vacated if the Director…is removed from office by Ordinary Resolution.*

*The definition of Ordinary Resolution is a vote of the Management Shares.*

73.7   Article 99

*Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.*

73.8   Article 104

*Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.*

74   The Management Shares in the Company and the General Partner in the Fund have at all material times been held and/or controlled by a single individual who, as a result, has sole control of the Fund structure (the "**Control Position**"):

74.1   In or around November 2011:

(a)   Grant Scott was appointed as the sole director and allotted the 100 Management Shares of the Company; and

(b)   Grant Scott became the holder of the membership interest in the Original GP and was appointed the Manager thereof,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

20

004350

thereby assuming the Control Position from that date.

74.2   In or around 24 March 2021, Mr Scott:

    (a)   assigned 100% of the membership interest in the Original GP to Mr Patrick pursuant to an Assignment and Assumption of Membership Interests Agreement, which membership interest gave Mr Patrick the sole right to manage the Original GP;

    (b)   transferred to Mr Patrick the 100 Management Shares in the Company; and

    (c)   resigned as a director of the Company and resolved to appoint Mr Patrick as the sole director in his place.

74.3   On 25 March 2021, Mr Patrick was entered into the Company's Register of Members as the holder of the Management Shares.

74.4   Mr Patrick therefore assumed the Control Position from that date.

74.5   On 22 April 2021, Mr Patrick resolved to appoint Mr Murphy as a second director of the Company.

74.6   On 7 March 2024, by way of a Deed of Assignment and Assumption, Mr Patrick, as managing member of the Original GP, caused the Original GP to transfer its general partnership interest in the Fund to the New GP.

74.7   Mr Patrick is the sole shareholder and director of the New GP.

74.8   Mr Patrick therefore remains in the Control Position and was in such position at all relevant times since 25 March 2021.


FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

21

75      Further, the sole asset of the Fund is its shares in CLO Holdco (the Sixth Defendant).  Mr Patrick and Mr Murphy are the directors of CLO Holdco and were appointed on 2 April 2021 and 22 April 2021 respectively.

76      The Control Position was not and is not a term of art but was nevertheless a legal and factual position:

76.1    where a single individual was the sole Management, and therefore voting, Shareholder of the Company;

76.2    where the same individual was a director of the Company;

76.3    where the same individual was the sole shareholder or controller of the General Partner;

76.4    where the same individual was a director of the General Partner;

76.5    where the same individual was in complete and effective control of at least the Company, of the General Partner, of the Fund and of CLO Holdco;

76.6    where the same individual was in effective sole control of all assets of the Fund;

76.7    where the same individual had no economic, residual, beneficial or winding up interest in assets of the Company;

76.8    where the same individual had no economic, residual, beneficial or winding up interest in assets of the General Partner;

76.9    where the same individual had no economic, residual, beneficial or winding up interest in assets of the Fund;


FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

22

76.10   where the same individual was, irrespective of his or her formal positions, functions or duties, including as a director, acting as a trustee, fiduciary or in a trustee-like or fiduciary-like position with respect to the assets held by the Fund;

76.11   where the same individual was at all times acting solely for the benefit or the ultimate benefit of the Original Participating Shareholders and/or through them the Supported Organisations and/or through them the Charities; and

76.12   in the alternative to the plea directly above, where the duties otherwise owed by the same individual as a matter of law, including as a director, were affected and/or altered by the existence of the structure as pleaded above, including the facts and matters relating to the Control Position and including the fact that the structure as pleaded above was designed and intended to be solely for the benefit or the ultimate benefit of the Original Participating Shareholders, and/or through them the Charities.

**EVENTS RESULTING IN THE COMPANY HAVING NO MATERIAL ASSETS AND THE DILUTION OF THE SUPPORTING ORGANISATIONS' INTERESTS**

<u>Plan to defeat the interests of the Original Participating Shareholders</u>

77   On 9 November 2023, Shields Legal Group ("**Shields Legal**") (the U.S. attorneys for the Company) sent to Campbells LLP ("**Campbells**") (then Cayman Islands attorneys for the Company) a work plan (the "**Work Plan**") relevant to the Company, the Fund and CLO HoldCo.

78   It can be inferred, and is averred, that the purpose of the Work Plan and the subsequent advice and steps taken as detailed below was to seek to entrench Mr Patrick's Control Position and defeat the interests of the Original Participating Shareholders.

79   The Work Plan stated that (amongst other things):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

23

79.1    the advice required related to "…*potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc...*"; and

79.2    "…*we may need to rely on opinions and memoranda in potential future disputes...*"

80    The Work Plan set out the issues on which the Directors sought advice, including among other things the following questions:

80.1    'Can the controlling person dilute shares, e.g., the Participation Shares?'

80.2    'Can the controlling person redeem shares, e.g., the Participation Shares?'

80.3    'Is there any Cayman law requirement that the Company distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?'

80.4    'Could the Company liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?'

80.5    'What can be done at this point to make [the share transfers in the Company from Mr Scott to Mr Patrick] bullet proof?'

81    The Directors were advised that any steps taken in relation to the proposed issuance of new Participating Shares and withholding dividends must be in compliance with their fiduciary duties and taken in the best interest of the Company:

81.1    On 8 January 2024, Walkers (Cayman) LLP ("**Walkers**") (also then Cayman Islands counsel for the Company) provided advice on issues set out in the Work Plan to the effect that (amongst other things)*:*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

24

(a)     the Directors have power under the Articles to issue new Participating Shares
that dilute the current Participating Shareholders, but must consider their
fiduciary duties (including the duty to act in the best interests of the Company)
when issuing such shares;

(b)     the Participating Shares are non-redeemable;

(c)     while payment of a dividend or other distribution is at the discretion of the
Directors, if the Company were to have distributable reserves available, there
may be a question of whether the Directors would be acting in its best interests
to not pay some dividend or distribution; and

(d)     the Directors have fiduciary duties to the Company which are paramount when
considering (i) making a distribution and (ii) the distributable reserves available
from which to make payments; they must have regard to what is in the
Company's best interests, its future cash requirements, and its present and
future solvency.

82     In February 2024, without telling the Supporting Organisations or the Charities, Mr Patrick
sought to form a new entity to replace the Original GP. On 5 February 2024, Walkers emailed
Mr Patrick to ask whether that entity should be a Cayman LLC or an exempted company, to
which he responded later that day: "*Doesn't matter to me. Whatever from a strategic point of
view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation
protection.*"

83     On 27 February 2024, without telling the Supporting Organisations or the Charities, the New
GP (the Fifth Defendant) was incorporated in the Cayman Islands.

84     On 7 March 2024, Mr Patrick, in his capacity as Managing Member of the Original GP, and
without telling the Supporting Organisations or the Charities, executed a written consent for the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

25

transfer of the GP Interest to the New GP, thereby replacing the Fund's General Partner. The Supporting Organisations subsequently discovered this change only by chance in February 2025.

85    In or around August 2024, the Supporting Organisations were provided with a financial analysis (prepared by NexPoint Advisors LP) of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as follows (and without prejudice to any further relevant facts and matters relating to Directors' fees or expenses):

85.1    directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased further to around US$2.25 million in the first half of 2024; and

85.2    expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

86    On 13 September 2024, without telling the Supporting Organisations or the Charities, the Directors resolved (amongst other things) with respect to Mr Patrick's compensation:

86.1    to increase Mr Patrick's salary to US$850,000 per annum;

86.2    include a long-term incentive ("**LTI**") tied to the Fund's returns, being 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return); and

86.3    the Company should assess legal expenses attributable to investment which impacted the LTI compensation and then determine whether the LTI compensation should be increased.

87    On 1 October 2024, without telling the Supporting Organisations or the Charities:

87.1    the Directors resolved (amongst other things) that Mr Patrick would receive:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

26

(a)     an LTI payment of US$975,000; and

(b)     an 'annual discretionary bonus' for 2023 at an amount of 2.5 times his base salary.

87.2     Previously, in or around October 2021, Mr Patrick had signed an 'employment agreement' for his position at the Company, for the period commencing 24 March 2021, which provides that Mr Patrick:

(a)     shall receive a base salary of US$850,000;

(b)     shall receive an LTI payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and

(c)     is eligible for both annual and discretionary bonuses as determined at the 'sole and absolute discretion of the Directors'.

88     Comparatively, Mr Scott's salary during his tenure in the Control Position was approximately US$60,000 per annum. Notwithstanding the above, the Supporting Organisations were not informed of these increases to the Directors' fees, remuneration and/or benefits.

89     In late October 2024, as a result of concerns arising from this additional expenditure, the Supporting Organisations requested that Mr Patrick provide relevant financial information for the Company and the Fund.  Mr Patrick did not do so.

90     On 11 November 2024, Holland and Knight ("**H&K**"), U.S. attorneys for the Supporting Organisations, issued a letter to Mr Murphy advising that the Supporting Organisations no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations (the "**No Confidence Letter**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

27

91    On 26 November 2024, Mr Patrick sought advice from Walkers as to whether the Company
      could issue further Participating Shares to a new non-profit organisation to dilute the
      Supporting Organisations so as to weaken any winding-up petition brought by the Supporting
      Organisations on just and equitable grounds. Mr Murphy wrote that:

> "*Issuance of new participation shares, where the existing foundations represent a
> smaller % of the issued and outstanding shares, would weaken any petition based on
> just and equitable grounds but we must be careful they don't point to this as ground to
> wind up i.e. the existing foundations say we're artificially trying to weaken their position
> by diluting them therefore the company should be wound up or an order made for
> change of management /revocation of the share issuances. It's a very difficult situation
> to get right without gifting them a potential ground…*"

92    On 27 November 2024, Walkers responded to the Directors confirming that, if other
      shareholders were to oppose an equitable winding up, such opposition will be taken into
      consideration and would likely help.

93    On 9 December 2024, DFW was incorporated as a non-profit non-stock company in Delaware,
      by or with the assistance of Mr Douglas Mancino, partner of U.S. firm, Seyfarth Shaw LLP
      ("**Seyfarth**"), who, worked alongside Mr Patrick in the establishment of the Company and the
      Fund structure. The sole member of DFW was and is Mr Patrick.

94    On 7 February 2025, 318 Participating Shares were issued to DFW.

95    On 20 February 2025, Mr Patrick as the Management Shareholder of the Company resolved
      to adopt the Amended and Restated Memorandum and Articles of Association dated 20
      February 2025 which, among other things:

95.1    Amended the Memorandum at paragraph 3 to give the Company charitable objects;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

28

95.2  Amended article 70 to introduce the concept of a Management Director (being a director holding the Management Share) and to weight the voting such that on all matters the Management Director had 10 votes and any other directors had 1 vote;

95.3  Deleted the previous articles 70 and 71 giving the right to appoint alternate directors and proxies. By email dated 27 February 2025, Walkers confirmed that the purpose of this deletion was to "*avoid the risk of 'outsiders' being brought into the fold*".

96  The Company reserves its position in respect of the validity of these amendments.

The purported restructuring: Mr Patrick causes the assignment of the Partnership Interest to CDM

97  On 12 December 2024, CDM was incorporated as a limited liability company in Delaware.

98  On 18 December 2024, without telling the Supporting Organisations or the Charities, the Directors of the Company resolved (the "**Transfer Resolutions**") to approve the transfer of the entirety of the Company's limited partnership interest in the Fund to CDM, in consideration for the contribution by the sole member of CDM of 100% of the membership interest in CDM. The Transfer Resolutions provide (amongst other things) that, based apparently on U.S. tax advice, the transfer of the limited partnership interest to CDM:

98.1  "*…would help insulate the DAF from exposure to [Dondero] and his entities who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations which could imperil the assets of the Company*";

98.2  "*The IRS would look favorably upon any and all attempts for DAF to maintain its influence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement*";

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

29

Case 19-34054-sgj11   Doc 4326   Filed 07/17/25   Entered 07/17/25 10:54:33   Desc
Case 3:25-cv-01876-K   Document 33-10   Filed 11/26/2305 of 30   Page 670 of 614   PageID 3637

FSD2025-0201                    **Page 33 of 83**                    2025-07-15

98.3    As a Delaware limited liability company (CDM): "…*as permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee*".

99      On 18 December 2024, without telling the Supporting Organisations or the Charities, the Company, CDM and the New GP entered into a Deed of Assignment and Assumption (the "**Deed**") which was executed by Mr Patrick on behalf of each of (i) the Company in his capacity as Director; (ii) CDM in his capacity as Manager; and (iii) the New GP in his capacity as Director. Pursuant to the terms of the Deed:

99.1    The Company assigned its entire limited partnership interest in the Fund to CDM (the "**CDM Assignment**").

99.2    The New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with clause 1.11(a) of the LPA.

99.3    CDM agreed to exercise its reasonable best endeavours to ensure that 100% of the membership interest in CDM held by Mr Patrick would be transferred to the Company (the "**CDM Membership Interest**").

100     On 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "**LLC Agreement**").

101     The LLC Agreement, materially provides (amongst other things) that:

"*Fair Market Value shall have the meaning set forth in Section 6.9(b).*

…

*The initial Manager shall be Mark Patrick.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

30

*…*

*6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*

*…*

*6.9 Valuation of Company Assets.*

*(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*

*(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*

*…*

*7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

31

> *Member shall either be made in cash or pursuant to a promissory note. Such*
> *promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the*
> *imputation of additional interest under the Code; and (ii) have a stated principal amount*
> *of the Fair Market Value of such Member's Interest being redeemed, as determined by*
> *the Manager in its sole discretion."*

102    The Company will rely on the terms of the LLC Agreement for their applicable full terms and
       effect.

103    The effect of these transactions was that:

103.1    CDM was inserted into the corporate structure below and as a subsidiary of the
         Company and would hold the entirety of the limited partnership interest in the Fund
         previously held by the Company; and

103.2    The Company would hold the entire membership interest in CDM, with the result that
         the Company's sole asset, having previously been its limited partnership interest in the
         Fund, was exchanged for the CDM Membership Interest

         (the "**Restructuring**")

104    The Restructuring was at an undervalue and not in the interests of the Company (in that the
       CDM Membership Interest was less valuable than the limited partnership interest that the
       Company assigned to CDM) because (amongst other things)*:*

104.1    The General Partner owed fiduciary duties to the Company in the Fund, but the
         Manager (Mr Patrick) did not owe any fiduciary duties to CDM; and

104.2    The CDM Membership Interests were susceptible to being redeemed by Mr Patrick (as
         Manager) in his sole discretion and for any reason, for "fair market value" as defined by
         Article 6.9, i.e. a "good faith determination of the value".

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

32

105    On 3 April 2025, the Company obtained retrospective advice from Leading Counsel on the
       steps taken by the Company in December 2024 to effect the Restructuring and whether the
       transfer is "*open to challenge by the Participating Shareholders*", which advice:

105.1  refers to the justifications for the decisions taken as set out in the Restructuring
       Resolutions, and considers that, if called upon to justify the purpose of those decisions,
       the Directors would need to explain:

       (a)    how the penalisation or loss of tax-exempt status any of the current Participating
              Shareholders could have "*imperil[ed]*" the *"assets"* of the Company;

       (b)    the detrimental issues the Company was facing that the Directors believed
              would be mitigated by the interposition of CDM into the Fund structure; and

       (c)    how and/or why the Restructuring would (i) benefit the Company and (ii) reduce
              the influence of Mr Dondero; and

105.2  considers that a shareholder reviewing the reasons listed in the Restructuring
       Resolutions "*might suggest that the contents of the resolution are self-serving and do
       not tell the full story, but rather seek to obscure the true motivations of the board*".

Persistent and continual lack of information for the Supporting Organisations

106    On 23 January 2025, having received no response from Mr Murphy to the No-Confidence
       Letter, Julie Diaz, the CEO of The Dallas Foundation, sent Mr Patrick an email advising that
       the Supporting Organisations needed to better understand the Company's/Fund's asset
       position, and requesting certain information be provided by 10 February 2025.

107    Having received no response, on 28 January 2025, Ms Diaz sent a further email to the Directors
       expressing serious concern (i) that the Supporting Organisations' requests for information

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

33

continued to be disregarded, and (ii) about the ongoing lack of transparency on the part of the Directors.

108    On 30 January 2025, Mr Murphy replied to Ms Diaz stating that the Directors:

    108.1    had not received the 23 January email – but understood the next step was for the Directors to "*present directly*" to the Supporting Organisations to address the No-Confidence Letter; and

    108.2    are cooperating with the Supporting Organisations to provide additional information – but "*have no legal obligation to do so*" and such cooperation "*should not be construed as an implicit acknowledgement of any duty to continue providing information to you*".

109    On 31 January 2025, Mr Michael Stockham of H&K responded to Mr Murphy noting that he and Mr Patrick were fiduciaries, managing US$270 million in assets for the benefit of charities that support the most vulnerable (i.e. the Charities) and: "*[w]hatever your side's obvious antagonism to Mr Dondero, the fact remains that the underlying assets are ultimately for these charitable missions.*"

110    On 4 February 2025, Mr Murphy responded that while open to resolving the concerns, they (i.e. the Directors) were struggling to understand the Supporting Organisations' change in position.

111    On 7 February 2025, H&K responded that the Directors were fiduciaries in control of US$270 million for the benefit of charities: "*these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees*".

112    On 14 February 2025, H&K received a letter from Mr Mancino which rejected the accuracy of the reported increases in expenditure. On 27 February 2025, H&K responded that his clients

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

34

were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr Murphy to make the promised presentation to the Supporting Organisations. H&K responded the next day with three potential dates/times for the proposed call between 26 March and 3 April 2025. Mr Mancino did not respond.

113     On 20 March 2025, Mr Mancino sent a letter purportedly on behalf of the Company to the IRS about alleged undue influence and control exercised over the Supporting Organisations by Mr Dondero. The letter makes serious and unsubstantiated allegations about the Supporting Organisations, absent evidential support, including that they each (i.e. all of them): "*operates for Mr Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets…*".

114     On 3 April 2025, Mr Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the apparent source of confusion.

115     Mr Mancino, and Mr Patrick and Mr Murphy (each in part through Mr Mancino as an instructed attorney) acted in bad faith by maintaining a pretence of actual or potential cooperation with the Supporting Organisations when this was not the case, and by sending or causing to be sent the email of 20 March 2025 in secret:

115.1   four (4) months after the Directors and/or the Company transferred away the Company's interest in the Fund without telling the Supporting Organisations or the Charities;

115.2   two (2) months after the Directors and/or the Company diluted the existing Participating Shareholders without telling the Supporting Organisations or the Charities (see below);

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

35

115.3  one (1) week after the Directors and/or the Company redeemed the Company's interest in CDM without telling the Supporting Organisations or the Charities (see below);

115.4  one (1) day after the Directors placed the Company in voluntary liquidation, without telling the Supporting Organisations or the Charities.

<u>Purported Share Issuance and allotment to DFW</u>

116  In November 2024, without telling the Supporting Organisations or the Charities, the Directors began seeking advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders - "*in light of a possible just and equitable winding up petition*" being filed by one of the Supporting Organisations.

117  On 7 February 2025, Walkers advised that, while there must be a corporate benefit to the exercise of the power, the Articles grant the Directors power to issue new shares that dilute the Participating Shareholders, and recommended the shares be issued sooner than later, and before any winding up petition was presented, since any alteration to the Company's membership made after the presentation of the petition would be void.

118  On 7 February 2025, without telling the Supporting Organisations or the Charities, the Directors resolved to issue 318 Participating Shares to DFW (the "**Share Issue Resolutions**"), resulting in DFW owning 51.04% of the Participating Shareholding and the dilution of the Supporting Organisations from an aggregate shareholding of 100% to 48.96% (the "**Share Issuance**"). The Share Issue Resolutions provided that:

118.1  Participating Shareholders had requested information and made false and misleading claims about the Company and its finances which the Directors believe were directed by Mr Dondero.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

36

118.2   Based apparently on U.S. tax advice:

(a)   There was a heightened risk the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company.

(b)   Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero.

(c)   The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

118.3   The Directors believed the Share Issuance to DFW would protect the Company and the Participating Shareholders and resolved that the Share Issuance to DFW be approved.

119   On 5 March 2025, Leading Counsel (Mr Tony Beswetherick KC) issued draft retrospective (but final) advice to the Company on the Share Issuance in which he opined (amongst other things) as follows:

119.1   where Articles confer a power on directors to issues shares, that power is a fiduciary one and must only be exercised for proper purposes; an issue of shares "…*deliberately aimed at altering the balance of power between*" is problematic; the power should not be exercised with a view to altering an existing balance of power, irrespective of whether the directors consider that doing so is in the interests of the company;

119.2   the effect of the Share Issuance was that, if there were to be a company meeting or proposal to approve a modification that affects the Participating Shareholders' rights,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

37

the ability of the prior Participating Shareholders to vote down such a change was negatively affected (DFW now having over 50% of the total Participating Shares);

119.3   it is not immediately clear from the Share Issue Resolutions whether the justifications stated were actually relevant to the Directors' decision. If they were relevant, it is not explained why the issue of shares to DFW would prevent false claims being made by Mr Dondero; it may be that those matters are part of the context, rather than part of the reason for the decision; and

119.4   the Participating Shareholders might suggest the Share Issue Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board.

<u>Plan to redeem the Original Participating Shareholders</u>

120   In January and February 2025, the Directors, in connection with a plan to try to redeem the Participating Shareholders and/or the CDM Membership Interest held by the Company, and without telling the Supporting Organisations or the Charities, sought to obtain an analysis of the fair market value of the Participation Shares, and the discount that should be applied to such valuation, given the limited rights conferred upon Participating Share under the Articles.

*Historic ValueScope Valuations*

121   At the request of the Company, ValueScope, Inc. ("**ValueScope**") conducted a series of valuation analyses of 100 Participation Shares on a net asset value ("**NAV**") basis between December 2020 and September 2024 to determine their fair market value ("**FMV**"). These valuations were apparently prepared for internal reporting purposes and apparently applied consistent methodologies throughout the period. The results of these valuations are summarised below:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

38

| Valuation date | NAV | NAV Per Share | Combined Discounts | FMV Per Share | FMV (100 shares) |
|---|---|---|---|---|---|
| 31 December 2020 | $176.96M | $580,193 | 17.0% | $481,468 | $48,146,754 |
| 31 December 2021 | $243.19M | $797,343 | 11.6% | $705,210 | $70,521,019 |
| 31 December 2022 | $276.24M | $905,711 | 15.4% | $766,549 | $76,654,941 |
| 31 December 2023 | $277.57M | $910,076 | 14.0% | $782,847 | $78,284,712 |
| 30 September 2024 | $269.05M | $882,140 | 13.9% | $759,614 | $75,961,370 |

122   The final NAV-based valuation prepared by ValueScope prior to the Restructuring was dated
      7 January 2025, and gave a valuation of 100 Participating Shares as at 30 September 2024
      (the "**September 2024 Valuation**").

*PwC and FTI*

123   On 14 January 2025, Walkers inquired with PwC about a valuation of "*the shares of Charitable
      DAF Holdco*". In that email, Walkers, presumably on instructions from the Directors, listed the
      Supporting Organisations as "*potential adverse parties*".

124   On 7 February 2025, Walkers informed PwC that CDM had been inserted into the structure
      and requested that a second valuation be prepared of all the CDM Membership Interest, which
      valuation Walkers said was also to rely on the NAV as previously advised (rather than leaving

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

39

PwC to determine their own valuation methodology). PwC responded that their initial view is "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders*" - but that voting power/control remains with Mr Patrick (or with entities he controls). PwC asked for further information about what Mr Patrick was trying to achieve by the Restructuring to help them understand the valuation implications.

125 On 10 February 2025, PwC suggested a call with Walkers to discuss the second valuation, which call took place on 11 February 2025, and was also attended by Mr Patrick's '*onshore and Delaware counsel*'. Following that call, PwC declined to take on the instructions:

> "*... our view is that the new Delaware entity (CDMCFAD) effectively has full economic interest and control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity. As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd., we don't think we can reliably estimate the value/discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another). On that basis, I don't think there is a fee / scope that can work for us currently.*"

*The FTI Memo*

126 On 13 February 2025, without telling the Supporting Organisations or the Charities, the Company engaged FTI Consulting in London ("**FTI**") to advise on (i) the discount applicable (if any) to a valuation considering how the rights attached to Participation Shares differed from those typically associated with ordinary shares, and (ii) the impact of the existence of an additional share class (being the Management Shares held by Mr Patrick). FTI's engagement

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

40

Case 19-34054-sgj11   Doc 4326   Filed 07/17/25   Entered 07/17/25 10:54:33   Desc
Case 3:25-cv-01876-K   Document 3-1 Filed 11/26/25   Page 581 of 614   PageID 33248

FSD2025-0201                           **Page 44 of 83**                           2025-07-15

letter also stated that "*The Memo will also include a valuation of the ordinary shares of CDMCFAD, LLC, the immediate subsidiary of Charitable DAF HoldCo*".

127    On 2 March 2025, FTI provided a draft memorandum to Walkers/the Company.

128    On 27 March 2025, FTI issued its final memorandum (the "**FTI Memo**"), which stated (amongst other things) that the rights of Participating Shares were extremely limited, and the potential distribution of cash was highly dependent on a member's alignment with the Fund's mission. The FTI Memo concluded that a "limited discount" for lack of control and marketability should be applied where a member is aligned with the Fund's mission (said to be close to the range concluded by ValueScope in its 7 January ValueScope Report, i.e. a discount of 13.9%), and a "high discount" of 95% where a member is not.

*Legal advice sought*

129    On 25 February 2025, without telling the Supporting Organisations or the Charities, the Directors sought advice from Walkers and Shields Legal on any powers under the Articles to enable the removal of the Supporting Organisations, including by (i) redemption of the Participating Shares (Art 14 and 28), (ii) a forced transfer of Participating Shares held by a Restricted Person (Art 21) (iii) or an alternative course whereby DFW repurchased the shares, which could then be cancelled, and new shares issued which are redeemable by the Company. Walkers advised that both redemption and forced transfers were not permitted but agreed with the alternative course involving DFW.

130    On 5 March 2025, as stated above, Leading Counsel provided retrospective advice to the Company regarding the Share Issuance, which also considered whether the Directors had power under the Articles to redeem the Participating Shares. Leading Counsel opined that they did not, on the basis that the Participating Shares were not issued as redeemable shares, and could not be redeemed unless there were a prior variation of the rights ascribed to them. That said, any proposal to vary the rights attached to the shares to make them redeemable would

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

41

Case 19-34054-sgj11   Doc 4326   Filed 07/17/25   Entered 07/17/25 10:54:33   Desc
Case 3:25-cv-01876-K   Document 33-1   Filed 11/26/25   Page 582 of 614   PageID 3259

FSD2025-0201                          **Page 45 of 83**                          2025-07-15

support an argument "*that the [DFW Share Issue] was itself procured with a view, ultimately, to disenfranchising the pre-existing Participating Shareholders*".

131   On 17 March 2025, Mr Patrick wrote to Walkers in the following terms:

> "*Agree we need to finalise the [FTI valuation] reports …We should request any limits on use removed.*
>
> *We are seeking U.S. tax counsel to send emails to Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of its interests.  After that, an alternative approach is to give them what they want – liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero. US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled.  That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions …*
>
> *We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is.*
>
> *Note US LLC would make DFW its sole owner.*"

132   The email of 19 March 2025 makes plain that the Directors, or at least Mr Patrick, intended to liquidate the Company without notice to the Supporting Organisations and to otherwise obstruct

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

42

the Supporting Organisations' ability to exercise any right to petition to wind up the Company on just and equitable grounds.

133    On 20 March 2025, Walkers provided comments on the FTI draft valuation, and FTI responded. These comments include, amongst other things*:*

> "Walkers: *It is stated at [3.2(2)] that "there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission". However, as a matter of Cayman law, directors owe duties to the company, and must act in its best interests [which are] generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in its best interests.*
>
> FTI: *Can you explain how it was in the interests of the company to materially dilute the existing shareholders*?
>
> …
>
> Walkers: *It is stated at [3.10] that "the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company". However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles).*
>
> FTI: *Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states "Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed*".
>
> …

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

43

Walkers: *As per our comments, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege.*

FTI: *Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction?*

…

Walkers: *Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDM, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDM, and in turn HoldCo.*

FTI: *This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets."*

134   On 21 to 24 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"FTI: *If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing? Given they haven't received dividends since 2019, why haven't the participating shareholders triggered a wind down? If they can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

44

Case 3:25-cv-01876-K   Document 30-1   Filed 11/26/25   Page 585 of 614   PageID 3528

Walkers: *if HoldCo was wound up, the Participating Shareholders would receive distributions which would be made pari passu, and Mark (if he was the liquidator) would not be able to ensure the existing Participating Shareholders get nothing. Whilst the Participating Shareholders have the right to seek to wind up under the Companies Act, they need a proper basis to do so… We can only assume [they] have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so …*

…

FTI: *Would an absence of distributions be sufficient grounds to make an application to wind the company up? If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?*

Walkers: *A Participating Shareholder may consider an absence of distributions sufficient grounds for a winding up order on the just and equitable basis… But it is difficult for us to say whether that petition would be successful. If (a) a Participating Shareholder presented a petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and not impact the amounts the Participating Shareholders would receive.*"

135    On 26 and 27 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"Walkers: *We have discussed with our client and onshore counsel and set out some amendments in the attached. In addition, we note (1) we have not received any material addressing reliance on the memo by CDM; and (2) the "Limitations and restrictions" section still provides that the memo "should not be used to support a transaction". For*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

45

*the memo to be useful in the circumstances, CDM [and HoldCo] need to be able to rely on it or a separate memo would need to be addressed to CDM on which it may rely. Further, both entities need to be able to rely on the memo(s) to support the proposed transaction.*

FTI: *What is the intention of adding that directors should act in the interests of future members? I am struggling to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders.*

*The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation. We are open to doing a fairness opinion on the transaction. But this will require approval from our risk committee and more information on the transaction and situation. We are happy for CDM to have our memo on a non-reliance basis. But this memo should not be used to support a transaction.*"

*March 2025 ValueScope Valuation*

136     Following the Restructuring, ValueScope was requested by Shields Legal, without telling the Supporting Organisations or the Charities, to prepare two valuation analyses:

136.1   100% Membership Interest in CDM; and

136.2   Certain Participating Shares of the Company as at 25 March 2025 (the "**March 2025 Valuation**").

137     The March 2025 Valuation had the same instructions, definition of value and scope of work as the September 2024 Valuation. Like the September 2024 Valuation, the March 2025 Valuation also referenced a 30 September 2024 balance sheet (and did not refer to any later analysis of

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

46

assets and liabilities). As shown below, the September 2024 Valuation and March 2025 Valuation produced very different results.

138    A comparative summary of the September 2024 and March 2025 Valuations is set out below:

| Valuation Date | DLOC* | DLOM** | Valuation Basis | FMV (100 Shares) |
|---|---|---|---|---|
| 30 September 2024 | 8.1% | 6.3% | NAV | $75,961,370 |
| 25 March 2025 | 99.2% | 20.00% | DCF*** | $536,784 |
| **Difference** | **+91.1%** | **+13.7%** | | **-$75,424,586** |

\*DLOC – Discounted for Lack of Control

\*\*DLOM – Discounted for Lack of Marketability

\*\*\*DCF – Discounted Cash Flow

139    The March 2025 Valuation stated: "*for the valuation of non-controlling assets in holding companies such as DAF, the asset-based approach is most commonly used [as Valuescope had always done previously].  When applied to such companies, the approach consists of measuring the underlying net asset value of an entity (the fair market value of the entity's assets less the fair market value of its liabilities).  The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.  However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.*"

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

47

140    ValueScope does not appear to have considered whether winding up was a possibility, and therefore, whether value could have been realised that way and by reference to NAV.

141    For reasons which are unclear to the Company, the March 2025 Valuation expressly rejected the asset-based (NAV) approach on the basis that the economic benefits of the Participating Shares in the Company were contingent on discretionary distributions by its manager. The report states.

> *'Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality'.*

142    Accordingly, the methodology applied in the March 2025 Valuation was markedly different from the methodology applied in the September 2024 Valuation. Instead of relying on discounted net assets, the March 2025 Valuation:

142.1    applied a discounted cash flow ("**DCF**") methodology to estimate the present value of expected future distributions, rather than an asset-based approach, as had been applied in at least the past five annual valuations by ValueScope;

142.2    determined the FMV of 100 Participating Shares to be US$536,784;

142.3    applied a discount of 99.2% for DLOC; and

142.4    applied a discount of 20.00% for DLOM.

143    The DCF model is based on the present value of future distributions to the Company. ValueScope's report shows that these were estimated based on historic distributions themselves controlled by Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

48

Case 19-34054-sgj11   Doc 4326   Filed 07/17/25   Entered 07/17/25 10:54:33   Desc
Case 3:25-cv-01876-K   Document 33-1   Filed 11/26/25   Page 589 of 614   PageID 31526

FSD2025-0201                    **Page 52 of 83**                    2025-07-15

144    Based on the valuations above, between 30 September 2024 and 25 March 2025, the FMV of 100 Participating Shares in the Company apparently declined from US$75,961,370 to US$536,784, representing a reduction in value of 99.29% in less than a six month period, in which the Restructuring occurred, attributable to a change in valuation basis (amongst other things) from NAV to DCF.

145    Furthermore, ValueScope does not appear to have sense-tested their valuation. Although they identified "total equity" of c. US$270 million and concluded that all of the Participation Shares had a value of only c. US$1.6 million, they did not address themselves to who benefitted from the residual value of c. US$268 million.

<u>Admission and Redemption</u>

146    On 27 March 2025, Mr Patrick, as manager of CDM, executed a written consent (the "**Manager Consent**") to (a) cause CDM to admit DFW as an additional member of CDM pursuant to the terms of an Admission and Amendment No.1 Agreement (the "**Admission Agreement**") and (b) redeem the CDM Membership Interest held by the Company pursuant to the terms of a Redemption and Amendment No. 2 Agreement (the "**Redemption Agreement**" and together with the Admission Agreement, the "**Restructure Agreements**"):

146.1    The recitals to the Manager Consent stated that the redemption of the Company's membership interest was justified by reason of alleged attempts by the Supporting Organisations to exert control, and the potential loss of their (i.e. the Supporting Organisations') non-profit and tax-exempt status:

> *"… the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

49

*over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii)"*

146.2   The Manager Consent further stated:

"*WHEREAS, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests of the Company from ValueScope and FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests*"

146.3   Exhibits C and D to the Manager Consent are documents purportedly containing information regarding various alleged U.S. tax issues relating to the Company.

146.4   Exhibit C is the letter from Mr Mancino to the IRS dated 20 March 2025, in which Mr Mancino (amongst other things) stated:

(a)     there has been "deterioration" of the Company's relationship with Highland Dallas Foundation, Inc. ("**HDF**") due to the undue influence and control exercised over HDF by Mr Dondero.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

50

    (b)    the information in the letter will demonstrate clearly that Mr Dondero's influence and control is an inappropriate donor relationship with representatives of the HDF who serve on the Board of Directors of and as officers of HDF.

    (c)    such undue influence and control potentially jeopardises the tax-exempt status of HDF as an organisation described in s.501(c)(3) and, at a minimum, causes it to fail to remain a supporting organisation described in s. 509(a)(3).

146.5    Exhibit D is an advice produced by Carrington Coleman (U.S. law firm) dated 25 March 2025 (the "**Carrington Advice**") which amongst other things:

    (a)    asserts that Mr Dondero has been attempting "*through his control of the Highland SOs, to exert dominion and control over the cash and property he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit.*"

    (b)    suggests that Mr Dondero was using the Company as his personal "*piggy bank*", and that it may be perceived by the IRS that the Fund has been or is his financial alter ego.

    (c)    concludes that "*the IRS will look favourably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and inurement.*"

146.6    Exhibit E contained two valuation reports:

    (a)    The first was a ValueScope valuation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

51

(b)     The second is the FTI Memo referred to above, in which FTI expressly stated that the analysis in the FTI Memo should not be used in support of a transaction, but which Mr Patrick, in any event:

(i)      expressly relied upon in the Manager Consent to determine the fair market value of the CDM Membership Interest and the basis for the redemption of the Company's interests; and

(ii)     permitted Carrington Coleman to refer to and rely on in the FTI Memo (indeed, having provided the 27 March 2025 copy which was a draft copy only).

146.7    On 27 March 2025, without telling the Supporting Organisations or the Charities, Mr Patrick executed the:

(a)      Admission Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(b)      Redemption Agreement under which CDM redeemed the Company's membership interest in CDM for the same sum of US$1,637,192 (the "**Redemption Sum**").

147    On 27 March 2025, without telling the Supporting Organisations or the Charities, the Company entered into a letter agreement with CDM (the "**Letter Agreement**"), pursuant to which the Company assigned to CDM various contracts and agreements to which the Company was a party, listed in Schedule A to the Letter Agreement and CDM agreed to assume the liabilities and obligations in respect of those contracts.

148    On 2 April 2025, the Directors of the Company, by way of written resolution:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

52

148.1   Noted the redemption of the Company's membership interest in CDM for the Redemption Sum (the "**Redemption**").

148.2   Resolved to pay a dividend to the Original Participating Shareholders of US$1,612,192.01 in the amount of (i) US$528,587.54 with respect to each of HDF, Highland Kansas City Foundation, Inc. and Highland Santa Barbara Foundation, Inc.; and (ii) US$26,429.39 with respect to CFNT.

149   The substantive financial effect of the Redemption, under which DFW did or was committed to make a capital contribution equivalent to the Redemption Sum to CDM, and the CDM Membership Interest held by the Company were redeemed for the Redemption Sum, was that the Company's membership interest in CDM was purchased by or otherwise transferred to DFW for the Redemption Sum.

150   The substantive effect of the overall transaction or series of transactions pleaded above, including the Impugned Transactions already pleaded, was that:

150.1   The Company realised its interest in the Fund, which had a NAV of c. US$270 million, for c. US$1.6 million.

150.2   The Company made a distribution to the Original Participating Shareholders (c. US$1.6 million).

150.3   The Supporting Organisations and the Charities were actually or effectively divested of their indirect interest in the Fund, and the assets underlying the Fund; and

150.4   The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

53

Voluntary Liquidation and Supervision Order

151    On 2 April 2025, the Directors resolved, without telling the Supporting Organisations or the
       Charities, to place the Company into voluntary liquidation and appoint Mitchell Mansfield and
       William Clarke (the JVLs) of Kroll (Cayman) Ltd as voluntary liquidators.

152    However, unaware of the voluntary liquidation, on 10 April 2025, the Supporting Organisations
       presented a petition seeking the winding up of the Company on a just and equitable basis,
       under section 92(e) of the Companies Act (2025 Revision) (the "**J&E Petition**").

153    On 25 April 2025, Walkers and Shields Legal held a call to discuss the J&E Petition.  Following
       that call, Mr Patrick wrote in an email that the "*message ideas*" "*for Monday*" were to "*poison
       the well*", by which he meant to create a negative impression of Mr Dondero in the eyes of the
       Court.

154    On 6 May 2025, Justice Jalil Asif KC made a supervision order, under which voluntary
       liquidation of the Company was to be continued under the supervision of the Court pursuant to
       s.131 of the Companies Act (As Revised), and the JOLs were appointed.

**OBLIGATIONS OWED BY THE DIRECTORS**

155    At all material times, the Directors, as directors, owed the following duties individually to the
       Company:

       155.1    A fiduciary duty to act *bona fide* in what he considers to be the best interests of the
                Company (the "**Best Interests Duty**").

       155.2    A fiduciary duty to exercise his powers for a proper purpose, and for the purposes for
                which they were conferred (the "**Proper Purpose Rule**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO   Box   309,   Ugland   House,   Grand   Cayman,   KY1-1104,   Cayman   Islands.   (Ref:
CJM/JRN/TQR/858403.000001/83559387)

54

155.3   A fiduciary duty not to place himself in a position where his personal interest actually or potentially conflicted with his duty of loyalty to the Company (the "**First No-Conflicts Duty**").

155.4   A fiduciary duty not to place himself in a position where his duty to another actually or potentially conflicted with his duty of loyalty to the Company (the "**Second No-Conflicts Duty**").

155.5   A fiduciary duty to not make an unauthorised profit from or by reason of his fiduciary position (the "**No Profit Duty**").

155.6   A fiduciary duty not to accrue or take a benefit or commercial opportunity from the Company without the full and informed consent of the Company (the "**No Self-Dealing Rule**").

155.7   A duty to exercise reasonable skill, care, and diligence in the performance of his role and function as director (the "**Reasonable Care Duty**").

156   With respect at least to Mr Patrick, his duties above and the standard to which he was obliged to comply with such duties are affected by being in the Control Position and the trustee or trustee-like position he occupied. Paragraph 76 above is also relied upon.

157   The Company reserves its position as to whether Mr Patrick, by reason of being in the Control Position and the trustee or trustee-like position he occupied, was an express or other trustee of the assets of the Fund for the Original Participating Shareholders and, through or in addition to them, the Charities.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

55

004385

**ATTRIBUTION OF KNOWLEDGE AND INTENTION**

158    As a matter of Cayman Islands law, Mr Patrick's intention and knowledge of facts and matters for all such purposes relevant to this claim is to be attributed to each of DFW, CDM, and the New GP on the basis of at least the following facts:

158.1    As regards DFW, Mr Patrick is listed under DFW's certificate of incorporation, dated 9 December 2024, as "the member of the corporation", and the Admission Agreement showed he served as its "President". Mr Patrick is also the registered director of DFW. Mr Patrick the agent of DFW, in which capacity Mr Patrick executed the Admission Agreement.

158.2    As regards CDM, Mr Patrick is described under the LLC Agreement as the "Manager" of CDM, in which role Mr Patrick was CDM's agent, and in which capacity he (i) executed the Deed of Assignment and Assumption on behalf of CDM, and (ii) executed a written 'Manager Consent' (the "**Manager Consent**") approving the Redemption and Admission Agreements; and executed the Redemption and Admission Agreements.

158.3    As regards the New GP, Mr Patrick was and remains its director, and therefore its agent (in which capacity, Mr Patrick executed the Deed of Assignment and Assumption on the New GP's behalf). Further, Mr Patrick is the sole shareholder of the New GP.

159    Further, if applicable, as a matter of the laws of the State of Delaware, Mr Patrick's knowledge and intention is to be attributed to DFW, CDM, and the New GP on a like basis.

**CLAIMS AGAINST THE DEFENDANTS**

Breaches of fiduciary and other duty

160    The First and Second Defendants, and each of them, in their capacity as a Director of the Company, acted in breach of their fiduciary and other duties to the Company as follows.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

56

<u>Restructuring, including the CDM Assignment</u>

161   The Directors (and each of them), in procuring, directing or effecting the Restructuring as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty.  Additionally, Mr Patrick, in procuring, directing or effecting the Restructuring as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

161.1   The Plaintiff relies on paragraphs 77 to 105 above.

161.2   With the assistance of Mr Mancino, Mr Patrick took steps to form CDM and appoint himself as Manager of CDM.

161.3   Mr Patrick designed and/or negotiated and/or directed and/or effected the Restructuring in his capacity as Director of the Company, Director of the New GP, and Manager of CDM, being each of the parties to the Deed, and signed the Deed on behalf of each party.

161.4   The Directors (and each of them) approved the transfer of the Company's entire limited partnership interest in the Fund (having net assets worth c. US$270 million) to CDM, a Delaware entity whose LLC Agreement excluded any fiduciary obligations owed by its Manager (i.e. Mr Patrick) to CDM itself or to its members; in exchange for membership interest in CDM, which interest was capable of being extinguished, by redemption, and for a "fair value", determined at the discretion of the Manager (i.e. Mr Patrick).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

57

161.5   The Restructuring was of no benefit to the Company and not in its best interests, and Mr Patrick was subject to conflicts of interest (First and Second No-Conflicts Duties) and committed acts of self-dealing.

161.6   The Directors (and each of them) acted when each of them:

(a)     knew or ought to have known that the Company was proposing to exchange the Partnership Interest for a membership interest in CDM that was subject to redemption entirely at Mr Patrick's discretion, and for a "*fair value*" determined, in good faith, in his discretion.

(b)     knew or ought to have known that the Company was therefore proposing to trade its Partnership Interest, which was not in practical terms defeasible, for an interest that could be extinguished: (i) at a time over which it had no control, (ii) for a price over which it had very limited control and (iii) for a potential valuation basis which excluded a net asset valuation of the assets held in the Fund.

(c)     knew or ought to have known that the CDM Membership Interest was to be in a Delaware-incorporated company whose LLC Agreement excluded any fiduciary obligations owed by its Manager either to CDM itself or to its members and was therefore less valuable than the Partnership Interest.

(d)     knew or ought to have known that the CDM Assignment was therefore a transaction at an undervalue.

161.7   It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from CDM without the full authorisation or full and informed consent of the Company.

161.8   Further, and in any event, the Directors (and each of them) acted when each of them:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

58

(a)    knew or ought to have known that the CDM Assignment was the first step in a series of connected future transactions, including those pursuant to the CDM Assignment, the Share Issuance, the Admission Agreement, the Redemption Agreement and the Redemption, under which the Directors were able to and ultimately did procure the redemption of the Company's CDM Membership Interest, thus extinguishing the Company's interest in the Fund, for an undervalue.

(b)    knew or ought to have known that:

    (i)    the full terms and effect of the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

    (ii)    the full terms and effect the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk to the Company, which was not itself a Donor Advised Fund and/or did not enjoy or require tax-exempt status under s.501(c)(3) of the U.S. Internal Revenue Code.

    (iii)    other approaches to address concerns with respect to the tax-exempt status of the HDF short of undertaking the Restructuring (and entering into the CDM Assignment) included notifying the HDF of the conflict and/or concerns and requesting it to remedy it or them.

    (iv)    even if the facts and matters alleged in relation to the HDF were correct, there was more than a possibility, after an extended passage of time and at least two levels of appeal, that a U.S. tax audit would result in an adverse determination with respect to the tax-exempt status of the HDF.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

59

(v)   the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(c)   knew or ought to have known that they were keeping the Restructuring, the CDM Assignment, CDM itself and all the surrounding circumstances secret from the Participating Shareholders.

162   By reason of the foregoing breaches of duty or any of them:

162.1  The CDM Assignment is void, alternatively voidable and hereby avoided.

162.2  CDM holds the Partnership Interest on trust or constructive trust for the Company.

162.3  CDM is required to re-transfer the Partnership Interest to the Company and account for any profits on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

<u>Share Issuance</u>

163   The Directors (and each of them), in procuring, directing or effecting the Share Issuance as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty.  Additionally, Mr Patrick, in procuring, directing or effecting the Share Issuance as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

163.1  The Plaintiff relies on paragraphs 77 to 84, 91 to 96 and 106 to 119 above.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

60

163.2  The Directors (and each of them) designed and/or engineered the Share Issuance, having sought legal advice in relation to the powers conferred on them as Directors of the Company, for the improper purpose of:

(a)  diluting without any proper reason or corporate purpose the existing Participating Shareholders and/or depriving the ability of the Supporting Organisations to continue to comprise a majority of the Participating Shareholders.

(b)  inserting DFW as a new Participating Shareholder, an entity under the sole control of Mr Patrick, to obstruct and/or prejudice and/or adversely affect the exercise of a Participating Shareholders' right to petition for the just and equitable winding-up of the Company.

163.3  The Directors (and each of them) acted when each of them:

(a)  knew or ought to have known the issue and allotment of shares at par to DFW was of no benefit to the Company.

(b)  knew or ought to have known that the exercise of the power to issue shares and allot them to DFW was for the improper purpose of diluting the interest of the Original Participating Shareholders.

(c)  knew or ought to have known that the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was a response to the prospect that the Supporting Organisations might present a petition for the winding-up of the Company on a just and equitable basis, as indeed they did on 10 April 2025 in ignorance of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

61

(d)     knew or ought to have known that the sole or primary purpose of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was to insert a new majority Participating Shareholder (under their or at least Mr Patrick's control) into the Company's share capital structure to (if they or at least Mr Patrick deemed fit) to oppose the actions of the Supporting Organisations and/or the Original Participating Shareholders, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

163.4   Mr Patrick designed and/or directed and/or effected the Share Issuance in his capacity as Director of the Company, even though he was 'President' of DFW and the sole member and the sole director of DFW.

163.5   It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from DFW (if not also from CDM) without the full authorisation or full and informed consent of the Company.

164     By reason of the foregoing breaches of duty or any of them:

164.1   the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW is void, alternatively voidable and hereby avoided.

164.2   DFW holds its shares on trust or constructive trust for the Company.

164.3   DFW is required to concur in the rescission of the allotment and to re-transfer its shares to the Company on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

62

164.4   The Company's register of shareholders shall be rectified accordingly.

<u>Admission and Redemption</u>

165   The Directors (and each of them), in procuring or entering into the Admission Agreement and the Redemption Agreement, and/or in procuring, directing or effecting the Redemption acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty.  Additionally, Mr Patrick, in procuring or entering into the Admission Agreement and the Redemption Agreement, or in procuring, directing or effecting the Redemption as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

165.1   The Plaintiff relies on paragraphs 120 to 150 above.

165.2   The Directors (and each of them) acted when each of them:

    (a)   knew or ought to have known that:

        (i)   proceeding on the basis of the Seyfarth/Mancino letter to the IRS dated 20 March 2025 was flawed or unreasonable.

        (ii)   proceeding was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

        (iii)   the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

        (iv)   proceeding on the basis of the March 2025 Valuation and the FTI Report was flawed in that: (i) the 99.2% discount in value proposed by the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

63

ValueScope Report was a manifestly excessive discount, and resulted in the Company parting with its indirect ownership of 99% of the economic interest in the Fund (which had net assets worth c. US$270 million) for a mere US$1,637,192; and (ii) as pleaded above, the FTI Report expressly stated that *"this memo should not be used to support a transaction."*

(v)   the Admission Agreement and the Redemption Agreement were steps in a series of connected transactions, including those pursuant to the CDM Assignment, the Share Issuance, under which the Directors were able to and ultimately did procure the extinguishment of the Company's interest in the Fund, through the redemption of the Company's membership interest in CDM, for an undervalue.

(b)   knew or ought to have known that the sole or primary purpose of the Admission Agreement, the Redemption Agreement and the Redemption was to ensure that the Company was fully and finally deprived of an asset (its interest in the Fund) at an undervalue; and to enable a third party, DFW, controlled by Mr Patrick, to procure ownership of an interest in the Fund in complete replacement of the Company.

165.3   Mr Patrick designed and/or negotiated and/or directed and/or effected the Admission Agreement, the Redemption Agreement and the Redemption as Director of the Company, even though he was Manager of CDM and 'President' of DFW, sole member of CDM and sole member and sole director of DFW.

166   By reason of the foregoing breaches of duty or any of them:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

64

166.1  DFW holds the CDM Membership Interest on trust or constructive trust for the Company.

166.2  DFW is required to concur in the transfer of the CDM Membership Interest to the Company or as the Company directs on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

<u>Further claims against Mr Murphy</u>

167  In respect of any breach of duty as set out above for which Mr Patrick alone is liable:

167.1  At all material times, Mr Murphy worked in close concert with Mr Patrick, including at his direction.

167.2  Mr Murphy knew or ought to have known all the facts and matters pleaded above as known or ought to have been known by Mr Patrick.

167.3  Mr Murphy knew or ought to have known of all the facts and matters pertaining to such breach or breaches by Mr Patrick.

167.4  Mr Murphy took no steps to stop Mr Patrick or to prevent or report the breach or breaches of duty by Mr Patrick.

167.5  Mr Murphy accepted and acquiesced in all steps and actions suggested, promoted or effected by Mr Patrick.

167.6  Mr Murphy accepted and acquiesced in the breach or breaches of duty by Mr Patrick.

167.7  As a consequence, Mr Murphy has acted in breach of his duties to the Company, including the Best Interests Duty and the Reasonable Care Duty.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

65

<u>Directors' Fees, Remuneration and Expenses</u>

168    The Company is still unclear as to what precise fees or remuneration or emoluments or benefits were afforded to the Directors and from what source, and as to the proper expenses of the Company, in the period after March 2021 and thus reserves its position.

169    As is pleaded above in paragraphs 85 to 89, the Directors approved large increases for Mr Patrick's remuneration, benefits or emoluments: by around 1 October 2024, Mr Patrick's remuneration comprised a base salary of US$850,000, a bonus of 2.5 times that base salary, an LTI incentive payment of US$975,000; for the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000; and eligibility for discretionary and annual bonuses in addition, to be determined at the sole and absolute discretion of the Directors. By contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000.

170    Insofar as the Directors (or each of them) approved of or procured any payment or benefit to or for Mr Patrick or Mr Murphy more than the sum of US$60,000 per annum each in respect of fees or remuneration or emoluments or benefits, such sum was excessive and conferred in breach of duty to the Company, including the Best Interests Duty, the Proper Purpose Rule, the first No-Conflicts Duty, the No Self-Dealing Rule and the Reasonable Care Duty.

171    Further, as is pleaded above, the Directors (or each of them) approved or caused the payment of considerable sums by way of expenses, amounting for example to US$18.3 million for the first half of 2024, and US$18.6 million spent over 2023.  Such expenses may include the expenses incurred in effecting the transactions which are the subject matter of these proceedings.  The reasonableness or *bona fides* of these expenses is not accepted by the Company.

172    The Company claims:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

66

172.1  Full information, documents and discovery as to the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

172.2  Full information, documents and discovery as to expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

172.3  Repayment to the Company of all fees or remuneration or emoluments or benefits paid or claimed by Mr Patrick or Mr Murphy and each of them in excess of US$60,000 per annum; together with all improperly paid expenses caused or procured by Mr Patrick or Mr Murphy (or damages or equitable compensation in relation thereto).

Unlawful Means Conspiracy

173  The facts and matters pleaded above amount to an unlawful means conspiracy as follows:

173.1  It is unclear when the conspiracy began but it appears to have started by around the start of 2024.

173.2  The original conspirators were Mr Patrick and Mr Murphy. The Company is unaware of the circumstances in which Mr Patrick and Mr Murphy agreed or combined and is unable to plead further pending further information or discovery.

173.3  As they were incorporated and participated in the facts and matters pleaded above, the New GP, CDM and DFW joined the conspiracy but remain liable in damages for all losses, including prior to joining the conspiracy.

173.4  The conspiracy was a conspiracy to injure the Company.

173.5  The overt acts of the conspiracy were all the facts and matters pleaded above, including as breaches by Mr Patrick or Mr Murphy.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

67

173.6    The unlawful means of the conspiracy were all the facts and matters pleaded above as breaches of duty by Mr Patrick or Mr Murphy.

173.7    Each of the conspirators intended to injure the Company.  This averment is an inference from all the facts and matters pleaded above.

173.8    As a consequence, the Company has suffered loss and damage, as a result of the Restructuring, the CDM Assignment, and the Admission and Redemption, and the combined effect thereof, as set out above.

Proprietary claim and/or unconscionable receipt

174    The facts and matters pleaded above give rise to claims by the Company for unconscionable receipt as follows:

174.1    CDM received the Company's Partnership Interest in the Fund under the CDM Assignment.

174.2    The knowledge of CDM was and is that of Mr Patrick.

174.3    The breaches of duty in relation to the CDM Assignment above are relied upon.

174.4    CDM knew that the CDM Assignment was at an undervalue and that causing or procuring the Company to enter into the CDM Assignment was a breach of fiduciary duty by Mr Patrick and/or Mr Murphy.

174.5    By reason of the foregoing, it is unconscionable for CDM to retain the Partnership Interest in the Fund and CDM is liable to account to the Company in equity, by restoring Partnership Interest in the Fund to the Company and/or accounting for any profits or otherwise accounting to the Company in equity.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

68

Case 19-34054-sgj11   Doc 4326   Filed 07/17/25   Entered 07/17/25 10:54:33   Desc
Case 3:25-cv-01876-K   Document 33-1   Filed 11/26/25   Page 609 of 614   PageID 31526

FSD2025-0201                          **Page 72 of 83**                          2025-07-15

Unjust Enrichment

175    In receiving the Company's Partnership Interest in the Fund, CDM was unjustly enriched at the
       Company's expense and is liable to the Company in restitution:

       175.1   The Partnership Interest was transferred on the basis that there was a valid assignment
               agreement effecting that transfer.

       175.2   That basis has totally failed, the CDM Assignment being either void, or avoided hereby.

Alter Ego and Lifting the Corporate Veil

176    In order to obtain the return to it of the Partnership Interest in the Fund, together with an
       Account of Profits, the Company does not need as a matter of law to make any allegation of
       "alter ego" or to lift the corporate veil in relation to CDM or DFW.

177    If, contrary to the paragraph above, the Company does so need, it makes the following
       allegations for the purposes of all relevant claims or causes of action set out above.

       177.1   CDM is the "alter ego" of Mr Patrick.

       177.2   DFW is the "alter ego" of Mr Patrick.

       177.3   In relation to the receipt of any property by CDM directly or indirectly from the Company
               or the accrual of any profits or benefits by reason of such receipt, the corporate veil
               should be lifted, with the consequence that such receipt and such profits or benefits
               should be treated as those of Mr Patrick personally.

       177.4   In relation to the receipt of any property by DFW directly or indirectly from the Company
               or the accrual of any profits or benefits by reason of such receipt, the corporate veil
               should be lifted, with the consequence that such receipt and such profits or benefits
               should be treated as those of Mr Patrick personally.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is
PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref:
CJM/JRN/TQR/858403.000001/83559387)

69

Case 19-34054-sgj11   Doc 4326   Filed 07/17/25   Entered 07/17/25 10:54:33   Desc
Case 3:25-cv-01876-K   Document 33 in Main Filed 11/26/25 of 25   Page 610 of 614   PageID 3557

FSD2025-0201                              Page 73 of 83                              2025-07-15

PARTICULARS

(a)  In relation to CDM:

    (i)  Mr Patrick was and is the Manager. There are no other officers or managers.

    (ii)  Mr Patrick was and is the managing member.

    (iii)  CDM was incorporated at Mr Patrick's instigation in order to enter into the CDM Assignment or a transaction of like nature.

    (iv)  CDM's sole or primary purpose was to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company.

    (v)  CDM exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

(b)  In relation to DFW:

    (i)  Mr Patrick was and is the 'President'. There are no other officers or managers.

    (ii)  Mr Patrick was and is the sole member.

    (iii)  Mr Patrick was and is the sole registered director.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

70

(iv)     DFW was incorporated at Mr Patrick's instigation in order to enter into a transaction whereby it would in effect take over the Company's interest in CDM pursuant to the CDM Assignment.

(v)     DFW's sole or primary purpose was (i) to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company, (ii) to be the ultimate vehicle by which Mr Patrick would so control of the Company's Partnership Interest in the Fund and (iii) to be a newly-inserted majority Participating Shareholder (under at least Mr Patrick's control) in the Company's share capital structure to oppose the actions of the Supporting Organisations, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

(vi)     DFW exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

Loss and Damage

178    As a consequence of the above, the Company has suffered loss and damage, including but not limited to:

178.1   Its Partnership Interest in the Fund.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

71

178.2    The costs and expenses incurred in relation to the CDM Assignment, the Share Issuance, the Letter Agreement and the Redemption (including all legal or other advice taken in relation thereto).

178.3    Excessive Directors' fees or remuneration or emoluments or benefits.

178.4    Improper expenses (if any).

178.5    The lost opportunity cost of the Fund and its subsidiaries deploying such funds (as set out in (1), (2) and (3) above) elsewhere, and the consequent fall in value of the Company's interest in the Fund.

178.6    The legal and liquidation costs of investigating the conspiracy, and the costs of these proceedings.

**RESERVATION OF POSITION**

179    The Company and the JOLs (who direct the Company in bringing these proceedings) fully reserve their position to apply to amend this claim in any way or to bring fresh or further proceedings against any of the Defendants (whether in the Cayman Islands or elsewhere) in the name of the Company or in the name of the JOLs.

**OTHER**

180    CLO Holdco is joined as a party to these proceedings in order that, as the main subsidiary of the Fund, it may abide by any Order that the Court may make.

**INTEREST**

181    The Company claims interest pursuant to section 34 of the *Judicature Act (2021 Revision)* and the *Judgment Debts (Rates of Interest) Rules (2021 Revision)*, alternatively pursuant to the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

72

Court's equitable jurisdiction, compounded in equity at quarterly rests, alternately at common law, for such period and at such rate as the Court thinks just.

## PRAYER FOR RELIEF

In the premises, the Company claims:

(1)     Damages or equitable compensation.

(2)     Orders for restitution or disgorgement.

(3)     Orders for the restoration of property to the Company.

(4)     Interlocutory or final injunctions as may be necessary or appropriate.

(5)     Orders for the appointment of a Receiver or Receivers, as may be necessary or appropriate.

(6)     Orders for the provision of documents or information at an early interlocutory stage.

(7)     Orders for the cancellation of the Share Issuance, as appropriate.

(8)     Rectification of the register of the Company, as appropriate.

(9)     Orders pursuant to s.99 of the Companies Act (as revised), as appropriate.

(10)    An Account of the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

(11)    An Account of all expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

73

004403

(12)   All other Accounts, including an Account of Profits, or Inquiries as may be necessary or appropriate; and further Orders to give effect to the outcome of such Accounts or Inquiries, including Orders for payment of sums to the Company.

(13)   All such declarations as may be necessary or appropriate, including to give effect to the continuing interest of the Company in the Fund on the basis of a proprietary interest, trust, constructive trust or otherwise.

(14)   All such other relief relating to the Impugned Transactions as may be necessary or appropriate.

(15)   Interest as above.

(16)   Further or other relief.

(17)   Costs.

DATED  this 15th day of July 2025

_Maples and Calder (Cayman) LLP_

_____

**Maples and Calder (Cayman) LLP**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

74