Case No. 3:25-cv-1876-K

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re: Highland Capital Management, L.P.,

Reorganized Debtor.

The Dugaboy Investment Trust and Patrick Daugherty,

Appellants,

v.

Highland Capital Management, L.P. and Highland Claimant Trust,

Appellees.

Appeal from the United States Bankruptcy Court for the
Northern District of Texas, Dallas Division
Case No. 19-34054-sgj11
Hon. Stacey G. C. Jernigan

# APPELLEES' BRIEF

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Jordan A. Kroop (AZ Bar No. 018825)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

HAYWARD PLLC
Melissa S. Hayward
(Texas Bar No. 24044908)
Zachery Z. Annable
(Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

*Counsel for Highland Capital Management, L.P., and the Highland Claimant Trust*

## CORPORATE DISCLOSURE STATEMENT

Appellee Highland Capital Management, L.P. is a Delaware limited partnership, the general partner of which is HCMLP GP LLC, a privately held Delaware limited liability company. Appellee Highland Claimant Trust is a Delaware statutory trust. No publicly held corporation owns 10% or more of the interests in any of these entities.

# TABLE OF CONTENTS

**Page**

ISSUE PRESENTED ...................................................................... 1

STATEMENT OF THE CASE ...................................................... 2

    The Settlement was Negotiated in Good Faith .............................. 3

    The Settlement Is In the Estate's Best Interests ........................... 5

    HMIT's Class 10 Interest was Calculated Objectively .................. 6

    Patrick Was Authorized To Enter Into the Settlement
        Agreement On the HMIT Entities' Behalf ............................ 8

    The Cayman Proceedings Are Irrelevant ..................................... 10

SUMMARY OF ARGUMENT ..................................................... 13

ARGUMENT .............................................................................. 15

    There Is No Serious Argument that Patrick Lacked
        Authority to Bind HMIT ...................................................... 16

    The Settlement Met the Bankruptcy Rule 9019 Standard ........... 18

    Calculation Methodology was Sound ........................................... 26

    Settlement Agreement Does Not Implicate, Much Less
        Violate, the Absolute Priority Rule ..................................... 31

    Settlement Agreement Does Not Modify the Plan ...................... 35

CONCLUSION .......................................................................... 38

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bank of America Nat. Trust and Sav. Assn. v. 203 N. LaSalle St. P'ship.*, 526 U.S. 434 (1999) ................................................................. 31

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914 (5th Cir. 1995) ............................................. 19

*Dugaboy Inv. Trust v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 2023 U.S. App. LEXIS 19671 (5th Cir. July 31, 2023) ............. 18

*Dugaboy Inv. Trust v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 2023 U.S. App. LEXIS 4839 (5th Cir. Feb. 28, 2023) ............... 18

*Highland Capital Mgmt. Fund Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 57 F.4th 494 (5th Cir. 2023) ....... 18

*In re Age Ref. Inc.*, 801 F.3d 530 (5th Cir. 2015) ....................................... 19

*Nexpoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419 (5th Cir. 2022) ......................................... 30

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop, Inc. (In re Cajun Elec. Power Coop, Inc.)*, 119 F.3d 349 (5th Cir. 1997) ............. 19, 33, 34

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) ...................................................... 31

*United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293 (5th Cir. 1984) ............................................................... 32, 33

## STATUTES

Bankruptcy Code § 1129(b) ................................................. 14, 29, 31, 34

Bankruptcy Code § 363 ............................................................ 13, 17

Bankruptcy Code § 363(m) ............................................................ 1, 16

## RULES

Bankruptcy Rule 8014(b) ................................................................. 2

Bankruptcy Rule 9019 ......................................................... 13, 16, 18, 19

iii

# ISSUE PRESENTED[1]

Appellees Highland Capital Management, L.P. and the Highland Claimant Trust (together, "**Highland**")[2] agree with Appellants that this appeal involves only the review of the Bankruptcy Court's approval of the Settlement and that review should be conducted under an abuse of discretion standard. Stripped of argument, the four issues presented are appropriately stated thus:

(1) Did the Bankruptcy Court abuse its discretion by approving the Settlement, which paid a partial distribution to a former equity holder with the agreement of holders of all unpaid allowed unsecured claims before those claims had been actually paid in full?

(2) Did the Bankruptcy Court abuse its discretion by approving the Settlement as being fair, equitable, and in the best interest of the estate?

(3) Did the Bankruptcy Court abuse its discretion by approving the Settlement without allowing additional time for the Cayman Islands Joint

---

[1] On August 12, 2025, Highland moved to dismiss this appeal as statutorily moot under Bankruptcy Code § 363(m) [Doc. 21]. The Court has not yet ruled on that motion. Highland submits this brief without waiving the relief sought in that motion or any of the arguments Highland made in support of that relief.

[2] Unless otherwise obvious from the context, all references in this brief to "Rule" refer to the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") and "section" or "§" refers to the United States Bankruptcy Code, Title 11 of the United States Code ("**Bankruptcy Code**"). Capitalized terms used but not defined in this brief retain the definitions given to them in Daugherty's opening brief [Doc. 47] ("**Daugherty Brief**") or Dugaboy's opening brief [Doc. 52] ("**Dugaboy Brief**").

1

Official Liquidators, who are not parties in the Bankruptcy Case, to complete their purported investigation into Mark Patrick's conduct?

(4) Did the Bankruptcy Court commit clear error by approving the Settlement Agreement's claim calculation methodology?[3]

## STATEMENT OF THE CASE

Highland generally agrees with the pertinent parts of the "Statement of Facts" contained in the Daugherty Brief, which adequately provides an overview of the background underlying this appeal. That statement does, however, contain a number of false and misleading—but largely irrelevant—statements with which Highland does not agree.[4]

The "Statement of the Case" contained in the Dugaboy Brief is rife with irrelevant, spurious, and unsubstantiated allegations (including gratuitous broadsides and rank innuendo regarding Mark Patrick), mischaracterizations of the record, and misrepresentations of reality. Insofar as Dugaboy's Statement of the Case contains anything beyond the

---

[3] Subject to the foregoing, Highland is generally satisfied with the Appellants' jurisdictional statement and applicable standard of appellate review. Accordingly, under Bankruptcy Rule 8014(b), Highland declines to include those elements in this brief.

[4] Among others: (a) the first paragraph attributes an incorrect ownership percentage to HMIT (95.5%, instead of the correct 99.5%); and (b) the Statement of Facts contains other mischaracterizations in Sections I, II, III, V, V [*sic,* misnumbered] ("The Settlement Agreement"), and VI [*sic,* misnumbered] ("The Bankruptcy Court's Approval of the Settlement Agreement"). Because these misstatements are either irrelevant or immaterial to this appeal, Highland focuses this brief on the merits and reserves its rights with respect to those misstatements.

background in Daugherty's Statement of Facts, Highland categorically rejects it.

Neither opening brief includes more than a passing mention of the extensive evidence adduced at the Bankruptcy Court's hearing held on June 25, 2025 (the "**Hearing**"), including live testimony from multiple witnesses and considerable documentary evidence.[5] Highland summarizes here the salient portions of the extensive evidentiary foundation for the Bankruptcy Court's findings of fact and conclusions of law.

### The Settlement Was Negotiated in Good Faith

At the Hearing, James P. Seery, Jr., Highland's CEO and Claimant Trustee, testified[6] at length concerning the good-faith, arm's-length negotiations leading to the Settlement, including:

- After litigating against each other for years, the parties began by negotiating a Non-Disclosure Agreement after which they exchanged considerable information concerning HMIT's corporate structure and control, and Highland's current assets, liabilities, and expenses;[7]

---

[5] Nowhere in its Statement of the Case does Dugaboy deign to mention that the Hearing was an all-day evidentiary trial where Dugaboy was given the opportunity to cross-examine witnesses and present its own evidence.

[6] *See* Transcript of Proceedings dated June 25, 2025 [Doc. 50-1] Supp.ROA.1–263 ("**Tr.**") 87:11–108:17; 110:10–111:6; 130:22–134:9.

[7] Tr. 88:10–90:17.

- The parties were represented by independent, sophisticated counsel and negotiated through an in-person meeting, Zoom calls, and extensive email communications;[8]

- The parties' negotiations were reflected in written communications, including the extensive information exchanged, all of which was produced to the Appellants in discovery and admitted into evidence as Exhibits 2–57;[9]

- Among the significant deal points were terminating all pending litigation, granting extensive "litigation protections" to Highland and its representatives for the purpose of preventing future litigation regardless of who controls the HMIT Entities, fixing and allowing HMIT's Class 10 interest, selling and transferring certain assets to HMIT, and establishing the timing and conditions of distributions to HMIT.[10]

---

[8] Tr. 89:14–22.

[9] Tr. 90:18–91:16.

[10] Tr. 91:22–93:18.

## The Settlement Is in the Estate's Best Interests

Seery's unrebutted testimony also established that the Settlement served the best interests of the Highland bankruptcy estate and its stakeholders by providing the following material and indisputable benefits:[11]

- By settling with the holder of virtually all the Class 10 interests, and fixing and allowing HMIT's Class 10 interest, Highland moved its bankruptcy case much closer to final resolution because—subject to the Claimant Trust's satisfaction of its indemnity obligations—HMIT's Class 10 interest effectively serves as the fulcrum security;[12]

- All Pending Litigation (as defined in the Settlement Agreement) was dismissed with prejudice, ending ongoing, expensive litigation;[13]

- Highland obtained extensive litigation protections intended to prevent future litigation, protect Highland's fiduciaries, and mitigate the Claimant Trust's potential indemnity obligations;[14]

- The Settlement allowed Highland to monetize certain illiquid assets, including the Dugaboy Note (an asset Highland could not sell on the

---

[11] Tr. 100:14–104:1.

[12] ROA.890–913 (the "**Settlement Agreement**") § 4.

[13] Settlement Agreement § 1(b).

[14] Settlement Agreement §§ 9, 11–16.

5

open market despite considerable effort)[15] and the Kirschner Litigation;[16] and

- Distributions other than the Initial Distribution were expressly conditioned on there being no "Threats" of litigation and sufficient resources to satisfy indemnity obligations, thus providing additional protection to Highland.[17]

### HMIT's Class 10 Interest Was Calculated Objectively

The Plan and the Claimant Trust Agreement requires that all allowed Class 10 and Class 11 interests be determined in a fixed amount.[18] The Settlement Agreement achieved that objective with respect to HMIT's Class 10 interest.[19]

Seery testified at length how Highland's calculation of HMIT's Class 10 interest using Highland's consistently maintained partnership capital accounts was objective and based on filed tax returns signed by Dondero (Dugaboy's sole current beneficiary and the person with de facto control

---

[15] Tr. 102:8–104:1.

[16] Settlement Agreement §§ 5(b), 8(a); *see also* Exhibits 105-122 (documentary evidence showing Highland's unsuccessful efforts to sell the Dugaboy Note).

[17] Settlement Agreement §§ 6(c), 7(a).

[18] Claimant Trust Agreement [ROA.3501–02] Art. V. 5.1(c); Plan, Art. III, ¶¶ 10–11.

[19] Only one holder of a Class 10 interest exists besides HMIT, Highland CLO Management, Ltd. ("**HCLOM**"), an entity controlled by Dondero. As required, HCLOM's Class 10 interest was fixed by a court-approved stipulation among Highland, HCLOM, and Dondero. Bankr. Doc. 4200.

over Dugaboy) and financial statements prepared when Dondero controlled Highland:

- HMIT owned 99.5% of the limited partnership interests in Highland as of the Petition Date;

- Under the Limited Partnership Agreement, HMIT's prepetition partnership interests were senior to the holders of the remaining 0.5% partnership interests, including Dugaboy's 0.1866% interest;

- Under the Plan, HMIT's pre-petition partnership interests were converted to senior Class 10 interests in the Claimant Trust with the remaining limited partnership interests placed in a subordinated Class 11;

- Highland calculated the value of HMIT's Class 10 interest by (a) taking the value of HMIT's capital account as of December 31, 2018, (b) bringing that value forward to the Petition Date using Highland's financial statements, and (c) reducing that value by the amount of HMIT's obligations to Highland under the HMIT Note;[20]

- The calculation was based on (a) Highland's filed tax returns (executed by Dondero under penalty of perjury), (b) Schedule K-1s based on those tax returns and issued to the limited partners as of December 31, 2018, (c) Highland's financial statements prepared under the

---

[20] Tr. 93:19–96:20; 110:10–111:6; 130:20–134:9.

direction of its CFO, Frank Waterhouse, and (d) the terms of the Dugaboy Note;[21]

- The methodology was simple arithmetic and not at all subjective;[22]

- The contrived "pro rata" method Dugaboy briefly suggested[23] was untenable because it improperly treated the Class 10 and Class 11 interests equally—in plain violation of the Plan and Claimant Trust Agreement, which created separate classes for HMIT (senior Class 10) and the other LP holders (subordinated Class 11), and maintained the priority distribution rights fixed under Highland's pre-petition limited partnership agreement.[24]

### Patrick Was Authorized to Enter into the Settlement Agreement on the HMIT Entities' Behalf

The evidence clearly established that Patrick was authorized to enter into the Settlement Agreement on HMIT's behalf:

- Seery provided substantive testimony concerning Patrick's authority to bind HMIT;[25]

---

[21] ROA.3358–3472; Exhibits 113–118. This calculation was consistent with the post-petition capital account calculation on Highland's 2019 filed tax return executed by Frank Waterhouse under penalty of perjury.

[22] Tr. 96:11–14.

[23] Before the Hearing, Dugaboy did not object to Highland's calculation of HMIT's Class 10 interest, including the methodology employed. *See generally* Bankr. Doc. 4230. And at the Hearing, Dugaboy offered no evidence on the issue.

[24] Tr. 96:15–97:11. The Claimant Trust Agreement, including the provisions subordinating Class 11 interests to Class 10 interests, were adopted without objection as part of Highland's Plan.

[25] Tr. 97:12–100:13

- Before entering into the Settlement Agreement, Highland took steps to satisfy itself that Patrick was authorized to enter into the Settlement Agreement on HMIT's behalf, including reviewing organizational documents, none of which either Appellant challenged;[26]

- Specifically, and dispositively, under paragraph 7 of HMIT's Trust Agreement, Patrick (in his capacity as HMIT's Administrator) had the "power and authority … in his sole discretion to manage the business and affairs of [HMIT] … including the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute;"[27]

- Seery testified that, based on his reading of the organizational documents, Patrick was not required to seek or obtain anyone's authority, consent, or approval before acting on HMIT's behalf, testimony that has never been challenged;[28]

- Highland's interpretation of the corporate documents was validated by other indisputable facts, including that Patrick had previously sued Highland in his capacity as HMIT's Administrator,[29] testified on

---

[26] Exhibits 70–104; Tr. 97:12–98:23.

[27] Exhibit 70 ¶7.

[28] Tr. 100:1–13.

[29] *See, e.g.*, Settlement Agreement at 7 (definition of "Pending Litigation," including actions commenced by HMIT individually and jointly with appellant, Dugaboy).

HMIT's behalf against Highland,[30] and entered into an agreement on HMIT's behalf with Dugaboy just six months earlier.[31]

### The Cayman Proceedings Are Irrelevant

Despite spinning a sordid tale involving Patrick's alleged "fraudulent misconduct" (which, even if it actually happened, is irrelevant to Patrick's authority as HMIT's control person) and a purported "investigation" by liquidators in the Cayman Islands, Dugaboy offered and adduced no evidence at the Hearing that anything happening in the Cayman Islands has any bearing on Highland, the Plan, Patrick's unchallenged authority to control and act for HMIT,[32] or the Settlement Agreement:

- The Cayman Proceeding involves the liquidation of an entity called "Charitable DAF Holdco. Ltd." ("**DAF Cayman**");

- Dugaboy has no interest in DAF Cayman;

- Although Dugaboy alleges that Patrick engaged in wrongdoing with respect to DAF Cayman, that entity is not a party to the Settlement Agreement and has no authority to control HMIT or any of the other

---

[30] *See, e.g.*, transcript of June 8, 2023 hearing [Bankr. Doc. 3843] at 302:14-315:18 (including Patrick's admission that Dugaboy paid HMIT's legal fees to prosecute that particular action (312:24-313:18).

[31] Exhibit 69.

[32] Dugaboy flatly admits that Patrick had authority to act for HMIT: "As Mark Patrick admitted at the hearing, he **controls HMIT** through several intermediate entities." Dugaboy Brief at 9 n.7 (emphasis added). Authority is authority irrespective of whether Dugaboy believes that authority to be unwarranted or even illegitimate. Of course, Dugaboy offered no evidence at the Hearing that Patrick's authority was illegitimate.

entities party to the Settlement Agreement; in fact, the Cayman Joint Official Liquidators ("**JOLs**") have never contended otherwise or alleged that Patrick engaged in wrongdoing with respect to HMIT—and even Dugaboy failed at the Hearing and in its brief to establish any relationship between DAF Cayman and HMIT;[33]

- HMIT was never even *mentioned* in *any* pleading filed in the Cayman Islands and, despite knowing of the Settlement Motion and Hearing, the JOLs never appeared in the bankruptcy case, let alone objected to the Settlement;

- Contrary to Dugaboy's disingenuous implication, the JOLs never asked the Bankruptcy Court for a stay; rather, the night before the Hearing, they sent a letter to Seery (not to the Bankruptcy Court) asking for an adjournment, without ever asserting that Patrick was unauthorized to act on HMIT's behalf or that HMIT was even a subject of their investigation;[34]

- Before the Hearing, the only entities who even questioned Patrick's authority to enter into the Settlement were the Dallas Foundation and Crown Global,[35] who alleged that they were the indirect "beneficial

---

[33] The Dugaboy Brief deceptively presents its allegations in such a way that one could easily be misled into thinking that the JOLs have implicated HMIT in anything they are investigating. They have not.

[34] Tr. 185:7–22; 191:8–192:1; 222:4–8. Dugaboy did not designate this letter as part of the appellate record.

[35] Bankr. Doc. 4231.

owners" of entities related to the HMIT Entities and claimed the settlement "will have a direct, pecuniary impact" on them;

- The allegations supporting the Dallas Foundation's objection were all derived from Dondero's declaration filed in the Cayman Islands to try to seek relief there;[36]

- Yet, on the eve of the Hearing, the Dallas Foundation and Crown Global withdrew their joint objection—including their objection based on Patrick's alleged lack of authority—with prejudice.[37]

Despite basing the majority of its argument on purported goings-on in the Cayman Islands that have nothing to do with the Settlement, Patrick's authority to act on HMIT's behalf, or Dugaboy itself, Dugaboy purposely omits these facts, which are critical to understanding the deep and broad evidentiary record the Bankruptcy Court relied on to approve the Settlement. Dugaboy simply cannot prevail in this appeal in the face of those incontrovertible facts.

For his part, Daugherty's sole appellate argument does not challenge the extensive record supporting the Settlement or the Bankruptcy Court's factual findings. Highland responds to Daugherty's legal arguments below.

---

[36] Dondero admitted that he personally funded (with a tax deductible "donation") the initiation of the Cayman Proceedings and the filing of the objection to the settlement motion by the Dallas Foundation and Crown Global. Tr. 221:7–14.

[37] Bankr. Doc. 4291.

## SUMMARY OF ARGUMENT

The Bankruptcy Court conducted an all-day evidentiary trial during which several witnesses testified on direct, cross, and re-direct and well over 100 documentary exhibits were admitted into evidence. Based on the vast evidentiary record created at the Hearing, and considering the manifest weight of the evidence (most of which was never even challenged by either Appellant) the Bankruptcy Court made all the findings required under Bankruptcy Rule 9019, Bankruptcy Code § 363, and Fifth Circuit precedent to approve the Settlement and related sales. The Bankruptcy Court had ample, uncontroverted evidence to find that Patrick possessed full authority to bind HMIT to the Settlement and not one whit of evidence to the contrary. The Bankruptcy Court had ample, uncontroverted evidence to find that the Settlement was fair and equitable and served the best interests of the Highland estate and its creditors and stakeholders. The Bankruptcy Court had ample, uncontroverted evidence to find that the Settlement was the result of extensive, good faith, arm's length negotiations, something neither Appellant directly challenges. In all, the Bankruptcy Court's findings of fact—reversible only for clear error—met all the criteria for approval of the Settlement and sale under applicable statutory and judicial standards.

13

The absolute priority rule contained in Bankruptcy Code § 1129(b)(2) does not apply to settlement agreements entered into years after plan confirmation. But even if it did, this Settlement does not violate the absolute priority rule because, among other things, Dugaboy's Class 11 interest is already subordinated to HMIT's Class 10 interest and Highland has maintained and continues to maintain a cash reserve to pay Daugherty's still-disputed (*i.e.,* unallowed) Class 8 claim dollar-for-dollar in an amount Daugherty agreed to years ago. Nor does the Settlement Agreement modify the Plan or the Claimant Trust Agreement, again because the Plan always contemplated that disputed claims would be protected with cash reserves while those claims awaited resolution and that Class 9 creditors could agree to less favorable treatment sometime in the future, as they have here.

None of Daugherty's or Dugaboy's arguments should persuade this Court that the Bankruptcy Court erred in approving the Settlement and related sales. The Court should affirm the Settlement Order in all respects.

14

## ARGUMENT

Because settlements in bankruptcy cases are so heavily favored and encouraged, bankruptcy court orders approving settlements are rarely reversed on appeal. And because Highland met its burden of establishing that the Settlement was in the best interests of the estate and its stakeholders—former creditors with allowed claims and current Claimant Trust Beneficiaries—this appeal should be no different. The Settlement Order should be affirmed.

It is difficult to overstate how positively transformative the Settlement is for Highland and its stakeholders or how important a step it represents in concluding one of the most contentious and long-lived Chapter 11 cases this district has ever seen. The Settlement monetized most of Highland's remaining but illiquid assets through a court-approved sale. The Settlement resolved years of litigation with HMIT, one of Highland's most vociferous adversaries. And the Settlement finally established that Dugaboy's Class 11 interest—the most attenuated interest in Highland's entire capital structure and the lowest-level interest under the Plan—is hundreds of millions of dollars out of the money and will never recover

anything under the Plan.[38] Recognizing the monumental achievement the Settlement embodies in the life of the Chapter 11 case, and reflecting on the deluge of litigation that has typified the Chapter 11 case for going on seven years, the Bankruptcy Court was understandably enthusiastic about approving the highly-negotiated Settlement Agreement once Highland had amply met its burden under Bankruptcy Rule 9019 and Bankruptcy Code § 363(m).

### There Is No Serious Argument that Patrick Lacked Authority to Bind HMIT

No one can seriously argue that Patrick lacked authority to act on HMIT's behalf and enter into the Settlement. As described above, Seery testified extensively regarding Patrick's authority to bind HMIT, how Highland satisfied itself that Patrick was so authorized, and how Seery's review of HMIT's organizational documents (including paragraph 7 of HMIT's Trust Agreement) indicated that Patrick was not required to seek or obtain anyone else's authority, consent, or approval before binding HMIT. This was all corroborated by Patrick's testimony as well as his

---

[38] This Court should be concerned about Dugaboy's true motive in appealing the Settlement Order. Because Dugaboy cannot hope to recover anything on account of its Class 11 interest—it is not now and never was a creditor—it lacks any pecuniary interest in the Highland estate or the outcome of this appeal. Dugaboy and other Dondero affiliates continue to beset Highland and federal judges at all levels with never-ending appeals, including this one. The total exceeds a mind-boggling **60 appeals** and petitions for mandamus in this Court, the Fifth Circuit Court of Appeals, and the Supreme Court. What the Bankruptcy Court, this Court, and the Fifth Circuit Court of Appeals have all found to be motivating Dondero and its affiliates—a splenetic, wrathful thirst for retribution against his perceived enemies—continues.

having previously testified in the Bankruptcy Court on HMIT's behalf and having entered into an agreement on HMIT's behalf with Dugaboy just six months earlier. And, also as discussed above, nothing in the Cayman Islands proceeding concerns HMIT or Patrick's authority to act on HMIT's behalf.

All this evidence—two witnesses' testimony and dozens of exhibits admitted at the Hearing—stands in stark contrast to the utter absence of evidence Dugaboy offered at the Hearing to undermine Highland's conclusion that Patrick was authorized to act for HMIT as its Administrator. The Bankruptcy Court summed it up thus: "I don't have **any evidence** that he doesn't have authority currently to enter into the settlement."[39]

Dugaboy's challenge to Patrick's authority fails for want of any evidence. The Bankruptcy Court cannot have erred in making the only finding of fact permitted by 100% of the evidence before it.

---

[39] Tr. 259:13–24 (emphasis added). The Dugaboy Brief (at 24–26) perfunctorily repeats an argument more relevant to Highland's motion to dismiss this appeal as statutorily moot under Bankruptcy Code § 363, asserting that the Bankruptcy Court should not have found HMIT to be a "good faith" purchaser of assets. This issue has been briefed by all parties to this appeal, so Highland will not reiterate its arguments here. Suffice it to say that, far from inserting "boilerplate" into the Settlement Order, the Bankruptcy Court based its good faith finding on a rich body of evidence that remains uncontroverted by Dugaboy to this day.

## The Settlement Met the Bankruptcy Rule 9019 Standard

Dugaboy challenges the Bankruptcy Court's ruling that the Settlement was "fair, equitable, and in the best interest of the estate and its creditors."[40] Dugaboy's accurate expression of the appropriate standard for approving a settlement under Bankruptcy Rule 9019 points ineluctably to why this is a peculiar argument for Dugaboy to make. Dugaboy is not now, nor has it ever been, a creditor of the Highland estate. Dugaboy has **no cognizable interest** in the Highland estate.[41] Yet Dugaboy is the *only* entity now opposing the fairness of the Settlement or whether the Settlement serves the best interests of the Highland estate and its genuine stakeholders—even Daugherty has not raised that issue in this appeal.

---

[40] Dugaboy Brief at 19.

[41] In fact, the only conceivable interest Dugaboy may have in the Claimant Trust is an unvested, subordinated, contingent interest in Class 11 that is both capped in dollar amount ($740,081.61 in respect of Dugaboy's 0.1866% prepetition limited partnership interest in Highland) and mathematically certain never to vest or otherwise mature. Dugaboy's counsel at the Hearing acknowledged that Class 11 (which contains Dugaboy's only interest in the Highland estate) "will not ever receive a dime. That's guaranteed." Tr. 246:4–6. Because Highland already has one motion to dismiss this appeal pending, Highland has declined to further complicate this appeal with what would be a meritorious motion to dismiss Dugaboy's appeal for lack of standing. With no pecuniary interest in the outcome of this appeal, Dugaboy lacks prudential standing in the same way and for the same reasons the Fifth Circuit has dismissed Dugaboy in other appeals in the Highland case. *See, e.g., Dugaboy Inv. Tr. v. Highland Capital Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2023 U.S. App. LEXIS 4839 (5th Cir. Feb. 28, 2023); *Dugaboy Inv. Tr. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2023 U.S. App. LEXIS 19671 (5th Cir. July 31, 2023); *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 57 F.4th 494 (5th Cir. 2023). Dugaboy lacks Article III standing, as well. Because this Court, respectfully, has an independent duty to evaluate its own jurisdiction and because Dugaboy lacks even Article III standing, the Court can and should dismiss Dugaboy's appeal entirely on that basis. Highland reserves its right to raise Dugaboy's standing later in this appeal or in any subsequent appeal.

18

Dugaboy is but an interloper on this issue and the Court should affirm on that basis alone.

Nonetheless, Highland agrees with Dugaboy in respect of the proper standard for approval of a settlement under Bankruptcy Rule 9019: a bankruptcy court approves a settlement that is fair, reasonable, and in the best interests of the estate and its creditors.[42] In assessing a proposed settlement's satisfaction of this standard, courts consider: (a) the probability of success in the litigation, with due consideration for the uncertainty of law and fact; (b) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and (c) all other facts bearing on the wisdom of the compromise, including "the paramount interest of **creditors** with proper deference to their reasonable views" and whether the settlement is the product of arm's length bargaining and not of fraud or collusion.[43]

Highland offered extensive testimony and documentary evidence at the Hearing—which Dugaboy did not refute—satisfying Highland's burden on all these factors. Among other uncontroverted evidence, Seery testified that:

---

[42] *See, e.g., Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin. Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015).

[43] *Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (emphasis added, citations omitted); *see also Age Refin.*, 801 F.3d at 540, and *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995).

- He learned that HMIT opposed a prior settlement between Highland and HCLOM that gave HCLOM a limited Class 10 interest in the fixed amount of $10,140,633.26 that diluted HMIT's own potential Class 10 interest.[44]

- Patrick controlled HMIT and the other entities party to the Settlement Agreement, which had pending a Fifth Circuit appeal and other disputes against Highland.[45]

- It was critical to Highland to dismiss all the "outstanding litigations" with the HMIT entities, which had persisted for a long time, requiring Highland to spend substantial sums "dealing with vexatious and frivolous litigation and attacks" such that the "opportunity to settle with a Class 10 holder and allow their claim under the terms of the settlement is extremely valuable because it moves [Highland] much, much closer to a potential resolution of this case …."[46]

- Highland needed a way to stem the tide of relentless litigious attacks on the estate and its principals, some of which had been brought by the HMIT entities and were ongoing, such that the Settlement "cuts down tremendously on what future expenses could be … it also enables us to, down the road, pay off the Class 9s and ultimately make distributions to

---

[44] Tr. 87:16–88:7.
[45] Tr. 88:12–17.
[46] Tr. 91:24–25; 100:18–23.

the Class 10s" according a significant benefit to the Highland estate and its creditors.[47]

- HMIT's Class 10 interest remained unresolved and subject to litigation and needed to be allowed in a fixed amount as required under the Plan.[48]

- Highland had two significant "assets that were difficult to monetize that we also were happy to dispose of in this way, with a credit towards [HMIT's] claim amount."[49] First, Seery testified regarding what the Settlement Motion referred to as the Kirscher Litigation, an action asserting claims against HMIT and others including a defaulted promissory note payable to Highland in the original principal amount of $63,000,000:

> we've got the Kirschner claims … they are very expensive to pursue. We've spent a ton of money setting them up. We've produced seven million documents, pages, and received zero in return. … So disposing of those claims now at this time as part of this settlement … is very valuable.[50]

Second was the Dugaboy Note, a promissory note maturing in 2047 in the original amount of $24,268,621.69 payable to Highland, which Seery testified was essentially impossible to monetize:

---

[47] Tr. 92:2–8; 101:6–14.

[48] Tr. 92:9–11.

[49] Tr. 92:20–22 (cleaned up).

[50] Tr. 101:22–102:7.

We set out to try to monetize the Dugaboy Note. I contacted—
we put together what we call a teaser, laying out what we knew
about Dugaboy … Laid out what we thought the assets were. …
And then present that to … five different investors in distressed
funds. Had no interest whatsoever. One investor laughed at
me, which I understood that he was aware of the parties and
the principals and the collection efforts that would be difficult
on that note…. And so we didn't—we didn't get any reception.
We also reached out to Mr. Dondero, in writing, through D.C.
Sau[t]er, and made them an offer and tried to get them to
respond, and they indicated they had no interest in the note.[51]

Seery was not the only witness to testify at the Hearing. Patrick

testified as well. Most significantly, in response to the Bankruptcy Court's

own questioning, Patrick testified regarding his own assessment of the

fairness and equity of the Settlement:

There was no obvious pathway for HMIT to … receive the
residual interest of the bankruptcy estate without a settlement
with the Debtor. Otherwise, it just seemed to me that it would
go on forever. And then I balanced that against the existing
litigation and the probability of the outcome weighted against
the costs, and determined that it made sense from HMIT's
perspective to enter into the settlement agreement.[52]

Ultimately, the fairness of a proposed settlement is a factual

determination that deserves and receives considerable deference on appeal

as long as the bankruptcy court bases its findings on the weight of the

---

[51] Tr. 102:13–103:8.

[52] Tr. 192:17–24. The Dugaboy Brief supposes (at 22) that "it was error for the
Bankruptcy Court to premise its findings of good faith on [Patrick's] single self-serving
statement." Dugaboy conveniently omits more than an hour of testimony from Seery and
scores of documents regarding the Settlement parties' good faith. Dugaboy also declines
to inform the Court that it provided the Bankruptcy Court with exactly no evidence to
support Dondero's defamatory imaginings about Patrick.

evidence adduced at trial. Here, the Bankruptcy Court found the Settlement to be fair and equitable and in the estate's best interests based on hours of live witness testimony and scores of documentary exhibits more than amply substantiating the fairness of the Settlement. Dugaboy never rebutted or impeached any of this evidence at the Hearing and relies on nakedly conclusory statements in its brief in a futile attempt to persuade this Court that the Bankruptcy Court somehow committed "clear error."

First, Dugaboy perplexingly argues that the Bankruptcy Court "abused its discretion" because it failed to "weigh" the "veracity" of Highland's assertions. But that's exactly what the Bankruptcy Court did. It heard hours of witness testimony, including Dugaboy's cross examination and, based on that testimony and the voluminous documentary record, made factual findings regarding good faith, best interests of the estate, and Patrick's authority to enter HMIT into the Settlement. Dugaboy called no affirmative witnesses of its own on the topic of the Settlement's fairness. And the testimony of its only witness, Dondero, consisted entirely of defaming Patrick[53] and leveling unsubstantiated allegations about what may or may not be going on in the Cayman Islands. His testimony was an unseemly jumble of irrelevant facts, hearsay, and speculation, which drew

---

[53] Such as accusing Patrick of embezzlement without evidence. *See, e.g.*, Tr. 197:16–198:7. There were many other instances during Dondero's testimony where he baselessly accused Patrick of theft.

objections the Bankruptcy Court sustained and none of which undermined the Bankruptcy Court's factual findings in any way.[54]

Second, Dugaboy's claim that the Bankruptcy Court "deliberately ignor[ed] numerous warnings about the proceedings pending in the Cayman Islands" conveniently ignores Dugaboy's inability to connect the proceedings in the Cayman Islands with its argument about Patrick's alleged lack of authority. The Bankruptcy Court said:

> I didn't have **any persuasive evidence, solid evidence** to show me that Mark Patrick doesn't have appropriate corporate governance authority to enter into this settlement agreement. I realize there's a lot swirling around in the Cayman Islands, and that's going to play out however it plays out. But as of today, I don't have **any evidence** that he doesn't have authority currently to enter into the settlement.[55]

The Bankruptcy Court listened to testimony from several witnesses, including Dondero, for several hours at the Hearing and was forced to conclude that it heard **no evidence** regarding how the goings-on involving a different entity in the Cayman Islands had any bearing on the Settlement or Patrick's authority to bind HMIT to the Settlement. And not a single document regarding the Cayman Islands proceedings Dugaboy offered into evidence so much as mentions HMIT. **No evidence.** No one can ignore something that doesn't exist.

---

[54] The irrelevance of the Cayman Island proceeding and Dondero's testimony about it is further addressed below.
[55] Tr. 259:13–24 (emphasis added).

24

Ultimately, all this is window-dressing for Dugaboy's true motivation in opposing the Settlement—and it isn't that the Settlement is somehow unfair or inequitable:

> Q    [by Dugaboy's counsel to Dondero]: … are you objecting **simply** to allow the Liquidators in the Caymans time to review this transaction and the settlement agreement?
>
> A    Yes. There needs to be more time.[56]

Like so much of their meddling over the last several years, all Dugaboy and Dondero (neither of whom have an interest[57] in the Highland estate) care about is creating future litigation and causing delay that costs Highland and its real stakeholders real money.

In addition to admitting—on direct examination, no less—that the only reason for his objection to the Settlement was to delay proceedings[58] that could not possibly affect him economically, Dondero responded to the Bankruptcy Court's question regarding whether he thought the Settlement was fair by launching into a diatribe about Highland's "liquidation," Seery's performance as Creditor Trustee, the amount of claims allowed against

---

[56] Tr. 205:21–24 (emphasis added).

[57] Other than Dugaboy's unvested contingent interest that is hundreds of millions of dollars out of the money.

[58] The Dugaboy Brief (at 23) attempts to characterize the desire for delay as a request to allow the JOLs additional time to "investigate" Patrick and asserts that the Bankruptcy Court "chose to disregard the request" of the JOLs "for a 45-day stay …." This is a dishonest statement. The JOLs made no such request of Seery or of the Bankruptcy Court, as clearly established during counsel argument on the record of the Hearing. Tr. 30:6–7. The JOLs did not appear at the Hearing and have never appeared in, nor filed anything with, the Bankruptcy Court.

Highland, the amount of professional fees amassed in the six-year Chapter 11 case, and Patrick's alleged wrongdoing, topping it all off by saying "we're on the edge of a giant RICO case." Again, not a word about *this* Settlement's fairness or the Highland estate's best interests.[59] Dondero and Dugaboy care nothing about this Settlement and certainly cannot substantiate a coherent argument that the Bankruptcy Court erred in applying the standard for approving *this Settlement* under Bankruptcy Rule 9019. The Dugaboy Brief's entire argument on this point—cynical and insincere— should be disregarded.

### Calculation Methodology Was Sound

Dugaboy's argument that the Bankruptcy Court erred by not using Dugaboy's preferred "pro rata" method for calculating HMIT's Class 10 interest under the Settlement can be—and should be—understood for what it is: Dugaboy's vain attempt to obtain a distribution on its Class 11 interest that even Dugaboy admitted at the Hearing it will never receive. The Bankruptcy Court faced two issues: (1) whether a rational basis existed to calculate HMIT's Class 10 interest the way Highland did; and (2) whether, however that interest was calculated, distributions between Class 10 and

---

[59] When the Bankruptcy Court asked (for the third or fourth time) why Dugaboy's position is that the Settlement was "not fair and equitable and in the best interest [of the estate] and in the range of reasonableness," Dondero said only, "It's not fair to the charities." The Bankruptcy Court then reminded Dondero that "the charities" had withdrawn their objection. Then, remarkably, Dondero admitted that what the Bankruptcy Court did at the Hearing "doesn't necessarily affect what's happening" in the Cayman Islands. Tr. 229:7–21.

Class 11 should be pro rata despite Class 11's express subordination to Class 10 under the Plan and the Claimant Trust Agreement.

Highland solicited extensive testimony from Seery explaining the completely objective method he used to calculate HMIT's Class 10 interest, which had the added benefit of using Dondero's own figures from filed tax returns. Seery explained in exacting detail the source of the amounts of HMIT's and other limited partners' capital account balances, identifying (among other documents) Highland's own internal capital account ledgers, pre-bankruptcy tax returns, and K-1s prepared by Highland's accountants when Dondero controlled Highland; the tax returns and K-1s were signed by Dondero and Dondero's CFO, Frank Waterhouse.[60]

To dispel any concern that Seery had interjected his own choices into calculating HMIT's Class 10 interest as part of the Settlement Agreement, Highland's counsel asked, "Did you apply any of your own subjective views or beliefs in the calculation of the amount of the Class 10 interest held by HMIT?" and Seery answered, "No. This was math."[61] It was math done within the confines of Dondero's own capital account records, tax returns, and K-1s and, critically, within the confines of the Plan.

---

[60] Tr. 95:7–96:10; Exhibits 113–118. ROA.3358–3472.
[61] Tr. 96:11–14.

And that is why Dugaboy's contrived "pro rata" method made no sense to Seery[62] and is inconsistent with the Plan, which expressly subordinates Class 11 to Class 10. When the Dugaboy Brief characterizes the "pro rata" method as "correct" and "better suited to the facts" (without identifying what those "facts" are) while simultaneously acknowledging, as it must, that "Class 11 is subordinated to Class 10,"[63] Dugaboy contradicts itself, lumping HMIT's Class 10 interest together with Dugaboy's Class 11 interest because both were some form of "equity interest[s] in Highland."[64] That is not what the Plan says. The Plan does *not* treat all equity interests the same. HMIT's equity interest (already entitled to priority distribution rights under Highland's prepetition limited partnership agreement) was placed in a superior Class 10 while Dugaboy's equity interest was placed in

---

[62] Tr. 96:15–25:

> Q     And did you hear Dugaboy's counsel suggest … that perhaps you could have used a pro rata methodology instead of the methodology you used?
> A     I heard what he said, but it doesn't make any sense. You can't fix an amount that way.
> Q     And do you understand that Dugaboy, under the [Highland] partnership agreement, is subordinated to HMIT?
> A     Dugaboy is subordinated under the partnership agreement for certain distributions. But importantly for our purposes, they're subordinated under the plan.

Although it does not matter now, years later, Dugaboy's subordinated distribution rights in respect of its 0.1866% limited partnership interest under Highland's partnership agreement is precisely why Dugaboy's equity interest was subordinated to HMIT's equity interest under the Plan—the Plan legally respected the priority distribution arrangement Highland's former limited partners had negotiated for themselves.

[63] Dugaboy Brief at 37.

[64] Dugaboy Brief at 39.

a subordinated Class 11. And although Dondero or his controlled entities relentlessly objected to the Plan and appealed the Bankruptcy Court's order confirming the Plan, *nobody* objected to the subordination of Class 11 to Class 10 in the Plan.

The Dugaboy Brief badly misrepresents the absolute priority rule contained in Bankruptcy Code § 1129(b)(2)(C) (more on that below, including that the absolute priority does not even apply here), but what the absolute priority rule *would* say (if it applied) is that all holders of allowed Class 10 interests must be paid in full before the holders of allowed Class 11 interests receive anything—and even Dugaboy does not dispute that Class 10 interests will never be paid in full. That means, with epistemological certainty, that Dugaboy cannot now and will never recover anything under the Plan. Dugaboy may not like it, but that is Dugaboy's unavoidable reality.

At bottom, Dugaboy's argument devolves to a simple but illogical proposition—that "Highland's fixed-dollar methodology violates the absolute priority rule because it inaccurately values creditors' claims."[65] The Dugaboy Brief cites no case authority and no statutory authority for the notion that the absolute priority rule *ever* depends on the amount of a creditor's claim. No such authority exists because the absolute priority rule

---

[65] Dugaboy Brief at 38.

has nothing to do with the amount of a creditor's claim.[66] All the rule says is that junior creditors may not receive a distribution unless and until all senior creditors are paid in full—*whatever* the aggregate amount of those senior claims is. That is why Dugaboy's argument is not—and cannot be—about the absolute priority rule at all.[67] It is simply about Dugaboy's pique that it will never recover on its de minimis Class 11 interest unless it can convince some court somewhere to disregard the subordination of Class 11 contained in and mandated by the Plan confirmed and affirmed years ago. Citing the absolute priority rule is nothing more than Dugaboy's misguided attempt to brand the Settlement as "illegal"—and, therefore, not fair and equitable—not because it violates the Bankruptcy Code or the Plan but, rather, because it contains provisions that make it mathematically certain that Dugaboy's Class 11 interest is and will always be out of the money.

---

[66] If calculating a particular creditor's disputed claim post-confirmation could violate the absolute priority rule, as Dugaboy argues, then every Chapter 11 plan that provides for disputed claims to be resolved after plan confirmation would offend the absolute priority rule and could not be confirmed. But virtually all Chapter 11 plans contain provisions for post-confirmation claims resolution—Highland's Plan does as well—and no court, as far as Highland can tell, has ever countenanced the absurd principle Dugaboy urges here.

[67] At page 40 of its brief, Dugaboy shamelessly attacks the Plan's classification scheme itself as if the Plan had not been confirmed four years ago and survived an appeal by several Dondero entities to the Fifth Circuit. Despite that the Fifth Circuit characterized the Dondero entities' approach as a "bankruptcy-law blunderbuss," Dugaboy never appealed the subordination of Class 11 to Class 10. *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.),* 48 F.4th 419, 432 (5th Cir. 2022). The Fifth Circuit affirmed the Bankruptcy Court's order confirming the Plan on all bases but one not relevant here. It is disappointing but unsurprising that Dugaboy attempts to relitigate Plan confirmation once again.

### Settlement Agreement Does Not Implicate, Much Less Violate, the Absolute Priority Rule

Daugherty also advances an argument about the absolute priority rule, but for an entirely different reason. No matter the reason, the absolute priority rule simply does not apply to the Settlement Agreement.

The absolute priority rule applies solely when a bankruptcy court is asked to confirm a Chapter 11 plan of reorganization under circumstances where not every class of claims or interests has accepted the plan—frequently referred to as "cramdown."[68] There is no case—certainly no case cited by Daugherty—that applies the absolute priority rule to a settlement of post-confirmation litigation or a compromise of a disputed claim and where each creditor holding an allowed claim in the affected class consents to the settlement, all of which the Settlement here involves.

The Daugherty Brief relies heavily on *TMT Trailer Ferry* for the proposition that a settlement's fairness and equity can only be assessed with reference to the absolute priority rule. But *TMT Trailer Ferry*, as Daugherty admits, involved a settlement integrated into a plan of reorganization proposed for confirmation under the now-repealed Bankruptcy Act of 1898.[69] That case does not support an argument that the

---

[68] *See* Bankruptcy Code § 1129(b); *e.g., Bank of Am. Nat. Tr. and Sav. Assn. v. 203 N. LaSalle St. P'ship.*, 526 U.S. 434, 441 (1999).

[69] *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).

absolute priority rule somehow applies to the Settlement at issue here, entered into some four years after the Plan was confirmed.

Neither can *AWECO*. Daugherty himself indicates why *AWECO* is inapposite: "the Fifth Circuit held that the bankruptcy court had erred because it did not determine whether, after the payment of the settlement amount, enough money would remain in the estate to pay in full all creditors whose claims had priority over the junior creditor."[70] That case differs fundamentally from this case, where the Bankruptcy Court *did* determine that, after paying HMIT's Class 10 interest, sufficient funds remained in the estate to pay Daugherty's disputed Tax-Refund Claim in Class 8. Highland continues to maintain a full-value cash reserve for Daugherty's disputed Class 8 claim *in an amount Daugherty expressly agreed to.* In fact, not only did the Bankruptcy Court expressly determine that the disputed claim reserve—a provision contained "pretty much in every Chapter 11 plan we see"[71]—was "a tried-and-true mechanism that addresses [Daugherty's] concerns,"[72] but the Bankruptcy Court also gave Daugherty's counsel ample opportunity at the Hearing to explain *why* the cash reserve set aside specifically for Daugherty's disputed Class 8 claim

---

[70] Daugherty Brief at 24 (citing *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 299 (5th Cir. 1984)).

[71] Tr. 241:19–20.

[72] Tr. 242:6.

was somehow insufficient. He couldn't. He did, however, acknowledge the existence of the cash reserve *and* that the amount of the reserve was set by Daugherty's written agreement.[73] Ultimately, Daugherty's counsel made it clear that he was actually advocating for the Highland bankruptcy case to remain open indefinitely to see if a challenge to the IRS 2008 tax year audit of Highland might affect Daugherty's remaining unallowed but fully reserved-for Class 8 claim. In other words, Daugherty argues that the Settlement offends the absolute priority rule because HMIT's Class 10 interest would receive a payment before Daugherty receives a *payment* on account of his disputed and unallowed Class 8 claim. *AWECO* did not involve any cash held in reserve for the senior objecting creditor's claim. Such a reserve there would have changed the outcome. Here, there is no affected creditor in any senior class who has objected; Daugherty, by virtue of the fully funded disputed claim reserve, remains unaffected—if his claim is ultimately allowed in part or in full, the allowed amount will be paid from the reserve.

Neither does *Cajun Electric*[74] provide meaningful guidance to the issues in this appeal. Daugherty argues at page 26 of his brief that *Cajun Electric* held that the absolute priority rule applies to the Settlement.

---

[73] *See* Tr. 242:11–245:9.
[74] *Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop, Inc. (In re Cajun Elec. Power Coop, Inc.)*, 119 F.3d 349 (5th Cir. 1997).

Daugherty mischaracterizes *Cajun Electric*. The phrase "absolute priority" never appears in that case. No citation to Bankruptcy Code § 1129 (the provision containing the requirements for plan confirmation) appears in that case. The Fifth Circuit's opinion in that case never equates the phrase "fair and equitable" used in evaluating proposed settlements with the similar phrase in Bankruptcy Code § 1129(b).[75] And the Fifth Circuit *affirmed* the approval of the proposed settlement in that case both because the settlement was fair and equitable and because the settlement did not constitute a *sub rosa* plan (which was the legal issue the Fifth Circuit was asked to consider in that appeal). In short, *Cajun Electric* says nothing Daugherty suggests it says about a settlement having to satisfy the entirely inapplicable absolute priority rule.

The Daugherty Brief also asserts (at pages 26–27) that the Bankruptcy Court could not have determined that sufficient funds remained to pay Daugherty's disputed Class 8 claim in full because the Bankruptcy Court did not calculate either the "net value of property that the Claimant Trust will hold after the Settlement Agreement is fully performed" or "the amount of Daugherty's Class 8 claim." Daugherty is certainly correct that the Bankruptcy Court did not make those

---

[75] Regarding the cramdown of unsecured creditors, "fair and equitable" refers to the requirement in Bankruptcy Code § 1129(b)(2)(B) that a plan must provide each holder of a claim in a dissenting class with property "equal to the allowed amount of such claim."

calculations. It didn't have to. The "net value of property" is irrelevant because the Highland estate maintains a cash reserve of approximately $2,650,000 specifically held aside to pay Daugherty's disputed Class 8 claim if it is ultimately allowed.[76] The amount of Daugherty's claim is likewise irrelevant because Daugherty himself agreed to a stipulated claim amount for purposes of establishing the amount of the disputed claim reserve set aside for (and only for) his Class 8 claim.[77] In this way, Daugherty's entire position in this appeal relies on simply ignoring the presence of the disputed claim reserve specifically for Daugherty's disputed claim *and* that Daugherty himself set the amount of that reserve.

### Settlement Agreement Does Not Modify the Plan

Daugherty's very own cash reserve is also why the Settlement Agreement does not modify the Plan. Daugherty argues that the Settlement Agreement—insofar as it permits a payment of HMIT's distribution on account of its Class 10 interest before Daugherty's disputed but fully reserved-for Class 8 claim is paid in full—somehow modifies the Plan and the Claimant Trust Agreement. Daugherty is mistaken, and not simply because his argument is a non sequitur.

---

[76] *See* Tr. 118:6–119:8; 126:11–127:17 (discussing the hypothetical liability Highland could have on Daugherty's disputed Class 8 Claim versus the reserve of $2.65 million).

[77] As further evidence of the sufficiency of the reserve beyond Daugherty's agreed amount, the stipulated amount of the reserve is exactly the same amount as in Daugherty's proof of claim with respect to the Tax-Refund Claim.

Daugherty is correct that, because Daugherty's Tax-Refund Claim has not been resolved, Seery cannot certify under the Plan and the Claimant Trust Agreement that all Disputed Claims in Class 8 have been resolved. But that uncontroversial proposition does not logically take Daugherty where he would like to be. The lack of that certification does not prohibit the agreed-on distribution on account of HMIT's Class 10 interest because: (a) all Class 8 claims have been resolved and paid in full other than Daugherty's Tax-Refund Claim; (b) the Tax-Refund Claim has been fully reserved for, in cash, in full and in an amount Daugherty agreed to, for years; and (c) all Class 9 interest holders[78] consented to the Settlement in writing and the payment of HMIT's Class 10 interest ahead of their own distributions.

There is nothing in the Plan or the Claimant Trust Agreement that precludes Highland from making a distribution to HMIT under a Bankruptcy Court-approved Settlement Agreement even if one disputed Class 8 claim has not yet been finally resolved. The Claimant Trust Agreement expressly authorizes Seery as Claimant Trustee to resolve and settle Claims and to implement those settlements.[79] The Plan permits holders of claims (including those in Class 9) to accept "other less favorable"

---

[78] Except Daugherty, who received full payment, plus interest, of his entire Class 9 interest with the written consent of all other Class 9 interest holders, thus fully satisfying Daugherty's Class 9 interest.

[79] *See* Claimant Trust Agreement §§ 2.2(a)–(b), 3.2(a), (b), and (c)(iv).

treatment.[80] Here, Highland proved through uncontroverted documentary and testimonial evidence[81] that all holders of remaining Class 9 claims consented in writing to HMIT receiving payment on account of its Class 10 interest *before* they received payment in full.[82] It hardly bears noting that allowing HMIT to "jump the line" ahead of them for the limited purpose of implementing the Settlement is "less favorable" treatment that the Class 9 claim holders may accept under the Plan. They have. In this way, the Settlement Agreement is not a modification of the Plan but, rather, an act in furtherance of the Plan—both because Class 9 creditors can accept (and have accepted) different treatment under the Plan and also because the ultimate goal of the Plan is to wind up Highland's affairs, something the Bankruptcy Court noted repeatedly the Settlement would facilitate. And neither Appellant argues otherwise.

---

[80] Plan, Art. III.H.9 and 10.

[81] ROA.1512–39; Tr. 104:2–107:17.

[82] They also consented to Daugherty's Class 9 interest being paid in full, which occurred in May 2025. ROA.1515-18. To be sure, Daugherty willingly received $3,765,562.27 in distributions from the Highland Claimant Trust in respect of his Class 9 interest without objection, despite that his disputed Class 8 claim remained unresolved and the Class 9 interest was expressly subordinated to Class 8 under the Plan. Tr. 105:13–106:1.

## CONCLUSION

For the foregoing reasons (unless the Court first dismisses this appeal as statutorily moot), the Court should affirm the Bankruptcy Court's approval of the Settlement.

January 9, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Jordan A. Kroop (AZ Bar No. 018825)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          jkroop@pszjlaw.com

-and-

**HAYWARD PLLC**
*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:  MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.
and the Highland Claimant Trust*

## CERTIFICATE OF COMPLIANCE WITH RULE 8015

1.    This document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B)(i) because, according to Microsoft Word, it contains 8,747 words, excluding the portions of the brief exempted by Fed. R. Bankr. P. 8015(g).

2.    This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface (Century Schoolbook) in 14-point type (12-point type for footnotes).

By: */s/ Zachery Z. Annable*
Zachery Z. Annable

## CERTIFICATE OF SERVICE

I certify that, on January 9, 2026, a copy of this document was served electronically via the Court's CM/ECF system on all parties registered to receive electronic notice in this case.

By: */s/ Zachery Z. Annable*
Zachery Z. Annable